PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Intervenor Highland Capital Management, L.P.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al*., | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | |
| | § | Case No. 3:21-cv-00879-K |
| HON. STACEY G. C. JERNIGAN., | § | |
| | § | |
| Appellee. | § | |
| | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210521000000000022

**REPLY DECLARATION IN SUPPORT OF MOTION FOR LEAVE TO**
<u>**INTERVENE IN APPEAL OF RECUSAL ORDER**</u>

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1.      I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to the above-referenced Debtor, and I submit this Reply Declaration in support of the *Debtor's Motion for Leave to Intervene in Appeal of Recusal Order* [Docket No. 2] (the "<u>Motion</u>").  I submit this Reply Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached as <u>**Exhibit 1**</u> is a true and correct copy of an e-mail string between Appellants' counsel and Debtor's counsel, dated April 29, 2021 and April 30, 2021.

3.      Attached as <u>**Exhibit 2**</u> is a true and correct copy of the transcript from the hearing held on March 19, 2021.

Dated: May 21, 2021

<u>/s/ John A. Morris</u>
John A. Morris

2

DOCS_NY:42997.9 36027/002
DOCS_NY:43216.2 36027/002
DOCS_NY:43222.2 36027/002

# EXHIBIT 1

| | |
|---|---|
| **From:** | Michael Lang <mlang@cwl.law> |
| **Sent:** | Friday, April 30, 2021 9:35 AM |
| **To:** | John A. Morris |
| **Cc:** | Jeff Pomerantz; Gregory V. Demo; Hayley R. Winograd |
| **Subject:** | Re: Highland: Debtor's Intervention on Appeal of Order Denying Recusal Motion |

I know who you represent and I don't have an issue. You can put me down as unopposed.



**Michael Lang**
Crawford, Wishnew & Lang PLLC

D: +1(214)-817-4503 | M: 214-235-3986 | mlang@cwl.law
www.cwl.law
1700 Pacific Ave., Suite 2390 Dallas, Texas 75201



On Apr 29, 2021, at 4:53 PM, John A. Morris wrote:

Michael,
We represent the Debtor. The Debtor probably should have been identified as the Appellee, but regardless, we strongly believe we have the right to intervene.
Our request is standalone and unconditional.
Please let us know if the Appellants will agree to allow the Debtor to intervene without regard to what other parties may or may not want. If we can't reach an agreement by tomorrow, we'll simply file our motion.
Regards,
John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Michael Lang [mailto:mlang@cwl.law]
**Sent:** Thursday, April 29, 2021 5:31 PM
**To:** John A. Morris
**Cc:** Jeff Pomerantz; Gregory V. Demo; Hayley R. Winograd
**Subject:** [SUSPICIOUS MESSAGE] RE: Highland: Debtor's Intervention on Appeal of Order Denying Recusal Motion

1

APP.3643

John – Assuming that you would not oppose other parties who might also want to intervene, we would agree to Debtor intervening.



**Michael Lang**
Crawford, Wishnew & Lang PLLC

D: +1(214)-817-4503 | M: 214-235-3986 | mlang@cwl.law
www.cwl.law
1700 Pacific Ave., Suite 2390 Dallas, Texas 75201

 

---

**From:** John A. Morris
**Sent:** Thursday, April 29, 2021 6:01 AM
**To:** Michael Lang
**Cc:** Jeff Pomerantz ; Gregory V. Demo ; Hayley R. Winograd
**Subject:** Highland: Debtor's Intervention on Appeal of Order Denying Recusal Motion

Mr. Lang:

As you are likely aware, we are bankruptcy counsel to Highland Capital Management, L.P. (the "Debtor").

Please let us at your earliest convenience whether the Appellants who are appealing the Bankruptcy Court's order (Docket No. 2083) denying the Appellants' recusal motion (Docket No. 2062) will agree to the Debtor's intervention in the appeal. If so, we can quickly prepare a short stipulation for your consideration.

If not, the Debtor intends to promptly move to intervene in the appeal under applicable rules and laws.

Your prompt attention is appreciated.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

---

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a

APP.3644

contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

---

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

APP.3645

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
| | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) Friday, March 19, 2021 |
| | ) 9:30 a.m. Docket |
| Debtor. | ) |
| | ) MOTIONS TO STAY |
| | ) PENDING APPEAL |
| _____ | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:               Jeffrey Nathan Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
                                13th Floor
                              Los Angeles, CA  90067-4003
                              (310) 277-6910

For the Debtor:               John A. Morris
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
                              (212) 561-7700

For the Official Committee    Matthew A. Clemente
of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                              One South Dearborn Street
                              Chicago, IL  60603
                              (312) 853-7539

For James Dondero:            Clay M. Taylor
                              BONDS ELLIS EPPICH SCHAFER
                                JONES, LLP
                              420 Throckmorton Street,
                                Suite 1000
                              Fort Worth, TX  76102
                              (817) 405-6900

APP.3647

```
 1   APPEARANCES, cont'd.:

 2   For Get Good Trust and          Douglas S. Draper
     Dugaboy Investment Trust:       HELLER, DRAPER & HORN, LLC
 3                                    650 Poydras Street, Suite 2500
                                      New Orleans, LA  70130
 4                                    (504) 299-3300

 5   For Certain Funds and           Davor Rukavina
     Advisors:                       MUNSCH, HARDT, KOPF & HARR
 6                                    500 N. Akard Street, Suite 3800
                                      Dallas, TX  75201-6659
 7                                    (214) 855-7587

 8   For Certain Funds and           A. Lee Hogewood, III
     Advisors:                       K&L GATES, LLP
 9                                    4350 Lassiter at North Hills
                                        Avenue, Suite 300
10                                    Raleigh, NC  27609
                                      (919) 743-7306
11
     Recorded by:                    Michael F. Edmond, Sr.
12                                    UNITED STATES BANKRUPTCY COURT
                                      1100 Commerce Street, 12th Floor
13                                    Dallas, TX  75242
                                      (214) 753-2062
14
     Transcribed by:                 Kathy Rehling
15                                    311 Paradise Cove
                                      Shady Shores, TX  76208
16                                    (972) 786-3063

17

18

19

20

21

22

23

24          Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
25
```

1          DALLAS, TEXAS - MARCH 19, 2021 - 9:39 A.M.

2          THE COURT:  We have a Highland setting on various

3    motions for stay pending appeal of the confirmation order.

4    This is Case No. 19-34054.  We have four Movants, or two

5    Movants and two Joinders.  Let's get appearances first from

6    those Movants.  First, for the Advisors, do we have Mr.

7    Rukavina or someone from his team?

8          MR. RUKAVINA:  Your Honor, good morning.  Davor

9    Rukavina.  I apologize, my camera is not working.  IT is

10   running here to fix it.  I represent NexPoint Advisors, LP and

11   Highland Capital Management Advisors, LP.

12         THE COURT:  All right.  Now for the -- what we call

13   the Funds, who do we have appearing?  Someone from K&L Gates,

14   Mr. Hogewood, by chance?

15         MR. HOGEWOOD:  Good morning, Your Honor.  This is Lee

16   Hogewood representing the Funds.  From K&L Gates, as you said.

17   Thank you.

18         THE COURT:  Okay.  Thank you.  All right.  For the

19   joinder parties, who is representing Mr. Dondero this morning?

20         MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

21   appearing on behalf of Mr. Jim Dondero.

22         THE COURT:  Okay.  And now for the Get Good Trust and

23   the Dugaboy Trust, who do we have appearing?  Do we have Mr.

24   Draper or someone?

25         MR. DRAPER:  Good morning.  Good morning, Your Honor.

1    Unfortunately, I was on mute.  This is Douglas Draper

2    appearing for the Get Good and Dugaboy Trusts.

3              THE COURT:  All right.  Thank you.

4         Now for the Debtor team, who do we have appearing from the

5    Debtor team?

6              MR. POMERANTZ:  Good morning, Your Honor.  Jeff

7    Pomerantz; Pachulski, Stang, Ziehl & Jones; on behalf of the

8    Debtor.  Several of my colleagues are on the phone, but I will

9    be handling the matter today.

10             THE COURT:  Okay.  Good morning.

11        For the Unsecured Creditors' Committee, who joined in the

12   Debtor's objection, who do we have appearing?

13             MR. CLEMENTE:  Good morning, Your Honor.  Matthew

14   Clemente, Sidley Austin, on behalf of the Official Committee

15   of Unsecured Creditors.

16             THE COURT:  All right.  Well, that was all of the

17   parties who filed pleadings.  I know we have a lot of

18   observers this morning.

19        First, let me ask, can you hear me okay?  I heard that

20   there was a little bit of sound issue with my mic.  Can

21   everyone hear me okay?  All right.

22             MR. CLEMENTE:  Your Honor, when you first started, it

23   was fuzzy, but when you were speaking just now, it sounded

24   great.

25             THE COURT:  Okay.  Good.

APP.3650

5

1    All right.  Well, let's talk about time estimates.  I will

2  tell you, I have a hard stop today at 12:15.  In a normal

3  case, we would be definitely finished, I think, in probably an

4  hour-ish.  I shouldn't say normal.  I should say in an average

5  case.  But this case doesn't tend to be very average.  So I

6  would think an hour per side, okay -- hour for the Movant and

7  Joinders and then an hour for the Debtor and Committee, so a

8  two-hour time limit -- would be reasonable.  Does anyone want

9  to disagree with that?

10    All right.  Well, then that's where I will limit you.

11    And let me just ask, so I kind of know going in, is it

12  going to be that the Movants have a witness or evidence to put

13  in?  I saw last night the Debtors filed a witness and exhibit

14  list, but I didn't scan it this morning to see -- oh, I do see

15  that you filed, on the 17th, at least the Advisors filed a

16  witness and exhibit list.

17    So, anyway, I'll start with Mr. Rukavina.  Are you all --

18  is your team going to put on evidence?

19    MR. RUKAVINA:  Your Honor, our only evidence is going

20  to consist of my Docket 2043, those exhibits you referenced.

21  We reserve the right to cross-examine Mr. Seery if the Debtor

22  puts him on.  But I think we envision mainly oral argument

23  today.

24    And just so Your Honor knows, my exhibits are pretty much

25  just a record of the confirmation hearing plus a few claim

1  transfer forms.

2           THE COURT:  All right.  Well, are there any

3  housekeeping matters before I go ahead and let the Movants

4  make their opening statement?

5      All right.  Well, you may proceed.  Mr. Rukavina, are you

6  going first?

7           MR. RUKAVINA:  No, Your Honor.  Mr. Hogewood will.

8  So I'll yield to the podium to him, with your permission.

9           THE COURT:  All right.  Mr. Hogewood, you may

10  proceed.

11      OPENING STATEMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12           MR. HOGEWOOD:  Thank you, Your Honor.  Again, Lee

13  Hogewood with K&L Gates on behalf of the Funds.

14      As Your Honor knows, this confirmation hearing started on

15  February 2nd and continued on to February 3rd.  The Debtors

16  cleverly in their objection made reference to the movie

17  *Groundhog Day*, and it seems appropriate for this case and for

18  the day when the confirmation started.  We're here about six

19  weeks later asking for a stay pending appeal.  Our papers have

20  gone over many of the same arguments that the Court has

21  rejected before, so in that regard it is indeed somewhat like

22  the movie *Groundhog Day*.

23      We also know that stays pending appeal are rare,

24  especially stays granted by the court that rendered the

25  decision that is to be appealed.  But the Rules require us to

1   come to this first -- this Court first to request a stay in
2   the first instance.

3        The issues, I think, have been briefed, and there's no
4   point in belaboring *Groundhog Day*-type arguments any more than
5   is necessary.  So I'm going to try to be relatively brief, and
6   I think the group will beat the hour that has been assigned to
7   us.  We appreciate it.

8        Like injunctions, stays are the exception, not the rule,
9   and the standards are similar.  Balance of harms, likelihood
10  of success, and the public interest.  In 30 years of practice,
11  I have obtained three stays pending appeal.  In two of those,
12  the bankruptcy judge granted the stay *sua sponte*.  Judge
13  Marvin Wooten, the Western District of North Carolina, stayed
14  two decisions in the early '90s because he was confident he
15  was right, he knew he had pushed the envelope on existing
16  Fourth Circuit authority, and he knew that the appeal would be
17  moot without a stay.  He turned out to be right, the Fourth
18  Circuit affirmed his decisions, and the law advanced in the
19  manner that Judge Wooten thought that it should.  In the
20  other, the bankruptcy judge denied the stay and the district
21  court subsequently granted it.

22       For many reasons, most of them already identified by Your
23  Honor in earlier rulings, this is the type of case in which a
24  stay should be granted.  In Your Honor's ruling on February
25  8th and in the written order, the Court made abundantly clear

1   that this Court viewed this case to be exceptional for a long

2   list of reasons detailed orally and in writing.  A view of the

3   case being exceptional was part of the justification for

4   pushing the envelope on Fifth Circuit law on issues upon which

5   the Funds have based their appeal.

6       And I want to be clear:  The Funds' appeal is only on the

7   issues of exculpation, injunction, and gatekeeper, in light of

8   *Pacific Lumber*.  The Debtors challenged standing, and we all

9   agree that the question is are we, the Funds, a person

10  aggrieved?  The Funds are aggrieved in several ways.

11      First, the Court made findings regarding a lack of

12  independence or being controlled by the so-called Dondero

13  complex.  The Funds, Your Honor, receive advice from the

14  Advisors, and the Funds' boards make decisions based upon that

15  advice, after making an independent determination of whether

16  the advice is in the best interests of the Funds.  The Funds

17  then expect the Advisors to implement that advice that they

18  have given, or, indeed, if the Funds disagree with the advice,

19  to implement the decision that the Funds have made.

20      It is, therefore, customary for the Advisors to take the

21  lead, including the lead in litigation matters on behalf of

22  the Funds, and the Court's conclusions of Dondero's control

23  and a lack of independence of the Funds based upon a lack of

24  participation by the Funds is not fair.  The finding converts

25  customary conduct into a conspiracy of control.

1    The analogy that works for me on this, Your Honor, is a

2    lawyer analogy.  If the Pachulski law firm advises the Debtor

3    to file an adversary proceeding and the Debtor's independent

4    board considers and accepts the advice and directs Pachulski

5    to do so, Pachulski files the complaints, proceeds to take

6    depositions, and moves the litigation forward.  No one would

7    conclude from that conduct that Pachulski controlled the

8    Debtor or that the Debtor lacked independence from its law

9    firm.

10    The same conclusion should be reached regarding the Funds.

11    As was testified to at several hearings in this case, the

12    Funds' independent board meets regularly, and during the

13    pendency of this case, and particularly over the last several

14    months, almost weekly, if not more, to address and consider

15    advice from the Advisors and its independent counsel, a

16    partner at a law firm, not at K&L Gates.

17    These matters were testified to by Mr. Post, who is an

18    officer of the Funds, and he is also an employee of the

19    Advisors, but that does not make Mr. Post in control of the

20    Funds.

21    While the factual finding of the Court on this topic of

22    control is already on the record and some harm may have

23    already been done, a stay pending appeal of the confirmation

24    order mitigates the harm until the issue can be considered by

25    a higher court.

1    The Funds also have a different view of the investment

2    horizon for their assets, not the Debtors' assets, than is

3    possible under the Debtor's so-called asset maximization plan.

4    As part of that plan, the Debtor will be liquidating assets

5    owned by the Funds, not the Debtor, more rapidly than the

6    Funds' boards believe is in the best interests of their

7    investors.  The confirmed plan creates an irreconcilable

8    conflict between the Debtor and its plan obligations and the

9    Funds and their investors.

10    Interplay between the exculpation injunction and

11    gatekeeper directly limits the Funds' contractual rights and

12    may impair their ability to take action in the best interest

13    of their holders, thousands of outside investors.  The Funds

14    and their owners are aggrieved by these provisions.

15    These issues have been presented repeatedly, and the Court

16    clearly does not agree with the positions that I am stating on

17    behalf of the Funds.  That said, the Court has made clear that

18    this is an exceptional case.  And there is a good faith

19    argument that we are making that the plan's provisions

20    approved by the Court go well beyond what is permissible under

21    existing Fifth Circuit law.

22    Indeed, the exceptional nature of the case, at least in

23    part, the Court's -- was, at least in part, underlying the

24    Court's willingness to enter these sweeping provisions.  A

25    stay pending appeal (audio gap) exceptional relief should be

1    granted in an exceptional case so that plan provisions can be

2    collectively tested.

3         In the meantime, there is little harm to the Debtor in

4    continuing to operate in Chapter 11 while the appeal proceeds,

5    particularly if the Fifth Circuit accepts the certification of

6    direct appeal from this Court.

7         These are important issues that merit a review without the

8    threat of having the appeal dismissed as moot, and this Court

9    enjoys the discretion to grant a stay pending appeal.

10        We respectfully request that you exercise that discretion

11   in light of the previously-expressed view of the exceptional

12   nature of this case.  Thank you very much.

13             THE COURT:  All right.  Thank you.

14        Are there any other opening statements for the Movants or

15   Joining Parties?

16             MR. RUKAVINA:  Your Honor, Davor Rukavina, if I may.

17             THE COURT:  Okay.  Go ahead.

18    OPENING STATEMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

19             MR. RUKAVINA:  Your Honor, I'll echo what Mr.

20   Hogewood said, and I hope that the Court has some sympathy for

21   us.  It's a difficult position we're in, telling a court that

22   rendered an opinion, after careful thought and protracted

23   deliberation, that she's wrong, and we do respectfully and we

24   do so humbly.  But like Mr. Hogewood said, we are required by

25   the Rules to come to this Court first.

1    Your Honor, on my clients' standing, we are directly

2    subject to the plan's injunctions.  And I have presented Your

3    Honor case law, including the Fifth Circuit *Zale* opinion, that

4    confirms that, in and of itself, that grants us standing.  And

5    that's only logical.  A person subject to contempt for

6    violating an injunction has the ability to test that

7    injunction on appeal.

8    As far as the economics of the plan, my exhibits, Your

9    Honor, include four claim transfer forms that were filed two

10   days ago.  I think there's one more in the works.  We have

11   acquired, as part hiring various former Debtor employees, by

12   agreement, we have acquired their Class 8 claims.  The Debtor

13   did object to those claims last evening, but as of now those

14   claims still exist and have not been disallowed.

15   And if Your Honor wants to talk about the law, I have a

16   case that confirms that a claim purchase, even after the entry

17   of an underlying order, grants the party, so long as they

18   acted timely, standing on the underlying order.

19   So my clients, Your Honor, now have standing not only to

20   contest the plan's injunction provisions but also the

21   underlying plan itself.  And by that, I'm referring to the

22   absolute priority rule.

23   Your Honor, I have briefed that.  Your Honor has rejected

24   my arguments.  Your Honor has relied on a Western District

25   opinion.  Those issues are what they are.  I would simply

1   humbly submit that I have made a substantial case on the

2   merits on an important issue, which is, I think, what Judge

3   Jones ruled is the standard for likelihood of success on the

4   merits.

5       And it really is very simple, Your Honor.  The Debtor

6   argues and this Court accepted the argument that as long as

7   equity doesn't get a penny until creditors are paid in full,

8   then the absolute priority rule is preserved as opposed to

9   being violated.  And I would argue that that's not the case

10  because the Code clearly provides for the preservation or

11  grant of any property interest, any property interest at all,

12  no matter if it's worthless or highly contingent.

13      On the exculpation and injunction provision, Your Honor.

14  On exculpation, as I argued at the confirmation hearing, I

15  think that the Fifth Circuit will revisit its *Pacific Lumber*

16  opinion to allow the Court to exculpate case professionals for

17  case administration during the pendency of the case.  And I

18  think Your Honor will be affirmed on that.  I know some of my

19  co-counsel will disagree.

20      But the fact of the matter is that *Pacific Lumber* exists

21  today.  It has yet to be overturned.  So, Your Honor, we

22  believe that we have a probability of success on that issue.

23      But more importantly, the exculpation that this Court

24  approved does something that I don't think any court has

25  approved before.  It exculpates prospective future post-

1   reorganization liabilities.  That Your Honor I don't think can

2   do under any scenario.

3        On the injunction issue, as I argued before, if the Court

4   will have no jurisdiction to entertain the purely post-

5   confirmation action, I accept and I respect and I agree that

6   the Court has vast powers with respect to pre-confirmation

7   claims, but on the post-confirmation claims that are enjoined,

8   if the Court will have no jurisdiction to try those claims,

9   then the Court will have no jurisdiction to issue a finding

10  that the claim is colorable or not.  Because if the Court

11  finds that the claim is not colorable, I'm done.  There's no

12  other court I can go to.  There's no mechanism that I can at

13  that point in time trigger to protect my clients' rights.

14       And Your Honor, with respect to the Debtor's arguments

15  about prior orders entered in the case, it's black letter law

16  that the Court cannot create jurisdiction and the parties

17  cannot stipulate to jurisdiction.  So whatever prior orders

18  were entered in the case, and we can talk about whether they

19  were intended to apply post-confirmation or not, those prior

20  orders cannot be read as creating jurisdiction where none

21  would exist, *i.e.*, post-confirmation.

22       Your Honor, on the Rule 2015.3 issue, it's not worth even

23  talking about today.  It's a minor issue.  I made it to

24  preserve the record on it.

25       I echo what Mr. Hogewood said about the Debtor not being

1    harmed.  Mr. Seery has terminated or the Debtor has terminated

2    the shared services agreements.  The Debtor has terminated

3    employees.  The Debtor will have very little cost going

4    forward as far as administering its assets.  That cost will be

5    incurred regardless of whether the plan goes effective or not.

6        The Debtor has only some six assets left to administer.

7    The Debtor, as I understand it, is in the process of already

8    trying to sell those assets.  The Debtor can do that in

9    Chapter 11 or post-confirmation.

10        So, as I asked Mr. Seery at the confirmation hearing, as I

11    have briefed and as we have in the transcripts, the plan gives

12    Mr. Seery nothing that he lacks today in order to finish

13    administering this estate.  By that, I mean to liquidate its

14    assets and to adjudicate its liabilities.

15        The Debtor's response to my motion did accurately raise an

16    issue that I had not fully developed, which is that, yes, the

17    Debtor will have an increased cost if it's in a Chapter 11

18    that's open because of a stay pending appeal.  And the Debtor

19    -- the bond -- if the Court grants a stay pending appeal, a

20    bond should take into account that increased cost.  So that's

21    the final point I have to make, Your Honor, which is that if

22    we talk about the bond, whether now or later, what I had

23    proposed initially was that okay, the creditors that would be

24    paid soon should be compensated for the time value of money.

25    That's a proposition that the Debtor appears to agree with.

1    And we know what the appropriate interest rate is.  And then

2    we should include in the bond an amount for the Debtor's

3    additional burn rate for being in Chapter 11, meaning filing

4    MORs, perhaps filing 9019 motions.  But it's not $2.2 or $2.3

5    million per month, as the Debtor suggests.  It's a far lower

6    amount.  And again, we can argue about that later, depending

7    on whether the Debtor has evidence on that or not.

8         So we believe that a bond in the neighborhood of $3 or $4

9    million is appropriate, and that in the future, if we lose the

10   appeal, then the Court will decide what portion of that bond

11   should be forfeited, not as liquidated damages, not as the

12   price of playing poker, but as compensation for the actual

13   increased cost the estate incurred as a result of not having

14   the plan go effective.

15        Thank you, Your Honor.

16             THE COURT:  All right.  Thank you.

17        Do any of the Joining Parties have opening statements?

18             MR. TAYLOR:  Yes, Your Honor.  Clay Taylor on behalf

19   of Mr. Jim Dondero.

20             THE COURT:  Okay.

21             OPENING STATEMENT ON BEHALF OF JAMES DONDERO

22             MR. TAYLOR:  Your Honor, I'm not going to reiterate

23   what Mr. Hogewood and Mr. Rukavina said, but I did want to

24   address one thing that the Court has brought up before and I

25   thought it was important to address that point.  And that is,

1   what is Mr. Dondero's standing and how is -- and when we're

2   talking about a stay pending appeal, how in the balancing of

3   the harms to the respective parties, how is Mr. Dondero being

4   harmed?

5        Well, Mr. Dondero has said from the beginning of this

6   case, when Mr. Seery started selling off assets with little to

7   no notice, that he wasn't getting enough value for those.

8   Okay?  And the question has been raised, well, if equity was

9   never going to be reached anyway, how is Mr. Dondero harmed?

10  Well, as Your Honor has seen, and the papers have certainly

11  said, and as suits have started to be brought, alter ego

12  claims are being brought against Mr. Dondero.  To the extent

13  the value, the full value of those assets are not realized,

14  which Mr. Dondero says should be higher and could be higher if

15  proper notice was given and a full auction-like process was

16  instituted, then Mr. Dondero and the Unsecured Creditors'

17  Committee or the Trust, as the case may be, if this plan goes

18  effective, is going to bring those claims for the difference

19  between what was actually recovered and what the full value of

20  the debt is.  And that could run into the tens or hundreds of

21  millions of dollars.

22       So that is true irreparable harm that my client is going

23  to face if there's no stay pending appeal.  And we think that

24  is a very important one.  And as Mr. Rukavina just stated,

25  there's no real difference to the Debtor and Highland if it

1  runs its wind-down plan through a Chapter 11 or,

2  alternatively, under its wind-down or liquidation plan.  And

3  so, therefore, that is something we wanted the Court to

4  consider.

5         THE COURT:  Thank you.  All right.

6    Any other openings from the Objectors?  Or, I'm sorry, the

7  Movants and Joinders?  Mr. Draper, anything from you?

8         MR. DRAPER:  Yes, Your Honor.  I have just a few

9  comments to make.

10  OPENING STATEMENT ON BEHALF OF THE GET GOOD TRUST AND DUGABOY

11                 INVESTMENT TRUST

12         MR. DRAPER:  The Court has looked very carefully at

13  *Pacific Lumber* and has spent an inordinate amount of time.  In

14  our joinder paper, we gave the Court the citation to *Stanford*

15  *-- S.E.C. versus Stanford*, and I'd ask the Court, when you

16  look at success on the merits, to take *Pacific Lumber*, take

17  *S.E.C. v. Stanford*, and Judge Jones' decision ten years later,

18  and juxtapose that to the *Blixseth* decision that was cited by

19  Mr. Pomerantz.  And you could see the Fifth Circuit view on

20  both exculpation and releases.

21    And the interesting note is *Pacific Lumber* was written by

22  Judge Jones in 2009, *S.E.C. v. Stanford* is 2019.  And *S.E.C.*

23  *v. Stanford*, though it's a receivership case, looks directly

24  at the jurisdiction of a district court to grant the relief

25  that's been requested here.  And I'd ask the Court to take a

 1   look at that.  We think success on the merits is apparent from

 2   just looking at those three cases.

 3           THE COURT:  All right.  Thank you.

 4       All right.  Mr. Pomerantz, opening statement?

 5           MR. POMERANTZ:  Yes, Your Honor.  I have a fairly

 6   lengthy opening statement that I was going to go through each

 7   of the issues and elements in a lot more detail.  I'm happy to

 8   do that, Your Honor.  I have a lengthy argument on standing

 9   and harm and whatnot, if Your Honor believes that that would

10   +be helpful.  I don't want to waste the Court's time if Your

11   Honor does not believe that would be helpful.

12           THE COURT:  All right.  Go ahead.  I think it would

13   all be helpful.

14           MR. POMERANTZ:  Okay.

15            OPENING STATEMENT ON BEHALF OF THE DEBTOR

16           MR. POMERANTZ:  Your Honor, we're here yet again --

17   first of all, I'd like to admit my exhibits into evidence.

18   Again, as similar to Mr. Rukavina's exhibits, they are

19   essentially documents that are part of the court record.  I

20   don't think there's any controversy regarding them.

21       Also, we do not intend to present any witnesses at the

22   hearing today.

23           THE COURT:  All right.  Well, shall we --

24           MR. RUKAVINA:  Your Honor, if --

25           THE COURT:  Yes.  Shall we both just stipulate to the

1    admissibility of all of these exhibits?  Are you both in a

2    position to do that?

3              MR. RUKAVINA:  I am prepared to stipulate, Your

4    Honor.

5              MR. POMERANTZ:  Yes, I am, Your Honor.

6              THE COURT:  All right.  So, --

7              MR. POMERANTZ:  Thank you, Your Honor.

8              THE COURT:  So, let me just be clear.  The Movants'

9    collective exhibits are found at Docket Entry 2043, and it

10   looks like we have -- is it Exhibits A through M, Mr.

11   Rukavina?

12             MR. RUKAVINA:  Yes, Your Honor.  Exhibits A through M

13   as in Mary.

14             THE COURT:  Okay.

15             MR. RUKAVINA:  One of those, just so Your Honor

16   knows, has a wrong exhibit label on it, so we'll file an

17   amended that just cleans it up, but otherwise it's all in

18   there and correct.

19             THE COURT:  All right.  So those are admitted.

20       (Movants' Exhibits' A through M are received into

21   evidence.)

22             THE COURT:  And then Debtor's exhibits are at Docket

23   Entry 2058.  They are Numbers 1 through 33, correct, Mr.

24   Pomerantz?

25             MR. POMERANTZ:  Your Honor, I believe it's 1 through

1    36.

2              MR. MORRIS:  Substantively, it's 1 through 33, Your

3    Honor.

4              THE COURT:  Okay.

5              MR. POMERANTZ:  Okay.

6              THE COURT:  All right.  So those are admitted.

7              MR. POMERANTZ:  Oh, you're right.  That is correct.

8              THE COURT:  Okay.  Those will be admitted as well.

9         (Debtor's Exhibits 1 through 33 are received into

10   evidence.)

11             THE COURT:  All right.  Go ahead.

12             MR. POMERANTZ:  Thank you, Your Honor.  Your Honor,

13   we're here yet again to respond to a series of motions filed

14   by the Dondero entities, now in their capacity as Appellants,

15   seeking to put another roadblock in the way of the plan and

16   distributions to creditors.

17        These motions, like the various litigation involving the

18   Dondero entities that preceded them, border on the frivolous

19   and are not presented in good faith.  They are being

20   prosecuted to harass the Debtor and its creditors, get them to

21   spend more money, in the hope that at some point the Debtor

22   and the creditors will accept Mr. Dondero's plan.

23        While yes, this case is exceptional, it's not exceptional

24   because of any legal issues involved.  It's exceptional as to

25   the level at which a former CEO and person in control of the

1  Debtor has taken to interfere with the Debtor, its operations,

2  and a court-appointed independent board.

3  Mr. Dondero has had every opportunity throughout this case

4  to make a proposal acceptable to the Debtor and creditors to

5  buy his company back.  The Court has implored him to do so on

6  many occasions, as have the Debtor and the creditors.  But to

7  this point, he's refused to provide an acceptable proposal.

8  He should just acknowledge defeat and go on with the

9  remaining business ventures he has, but as we know, Your

10  Honor, that's not the Dondero way.  And we are here yet again

11  spending estate resources which should really be put in

12  creditors' pockets.

13  The Court should deny the motion for several reasons.

14  First, as I will go into in some detail, the Appellants lack

15  standing to appeal the confirmation order as they cannot

16  demonstrate that they're persons aggrieved.

17  However, even if the Court determines that the Appellants

18  do have standing to appeal, they cannot satisfy the standard

19  for a stay, which, as everyone admits, is an extraordinary

20  remedy that requires the Appellants to establish each of four

21  elements.  They can't demonstrate likelihood of success on the

22  merits of any of the legal issues.  They haven't established

23  harm, let alone irreparable harm, from a stay.  And

24  conversely, the Debtor has presented a compelling case of why

25  it and its creditors, who have been waiting for years to be

1  paid, will be harmed if the confirmation order is stayed.  And

2  lastly, Your Honor, the public interest is not stayed -- is

3  not served by allowing the Dondero entities' parochial agenda

4  to get in the way of a prompt conclusion in this case.

5      Before addressing each of these issues in detail, Your

6  Honor, I did want to address an overarching issue that cuts

7  across several of the Appellants' arguments specifically as

8  they relate to the injunction and exculpation provisions.

9  Appellants argued at confirmation and they repeat the

10 arguments here in the papers and comments today that by

11 extending the exculpation and injunction provisions to matters

12 relating to implementation and consummation of the plan, the

13 Appellants are prevented from exercising their rights on the

14 post-effective-date commercial relationships that they will

15 have with the Reorganized Debtors and for pursuing claims

16 against protected parties relating to the same.

17     The argument, however, Your Honor, reflects a serious

18 misunderstanding of this language, implementation and

19 consummation.  At confirmation, I informed the Court and all

20 objecting parties that the words implementation and

21 consummation did not go as far as the Appellants feared.

22 Specifically, I reminded everyone that implementation was a

23 term of art that was specifically referenced in 1123(a)(5) of

24 the Code and which provides that a plan can provide for its

25 implementation.  And I described the primary means of

1   implementation under the plan that the exculpation and the

2   injunction related to, which matters are set forth in Article

3   5 of the plan and include a cancellation of equity interests,

4   the creation of new general partners and limited partner of

5   the Reorganized Debtor, a restatement of the limited

6   partnership agreement, and the establishment of the Claimant

7   Trust and the Litigation Trust.

8       The injunction prohibits efforts to interfere, among other

9   things, with those steps, and the exculpation prohibits

10   parties from asserting claims against the exculpated parties

11   relating to those activities that relate to implementation.

12       Implementation in the context of the injunction provision

13   does not mean performance under post-effective date

14   contractual relationships that the Debtor will operate after

15   the effective date.  Accordingly, the argument that the

16   injunction prevents them from exercising rights under the CLO

17   agreements is just not true.

18       Similarly, Your Honor, the term consummation is not vague

19   either and does not mean what the Appellants contend.

20   Consummation is a commonly-used term and has been defined by

21   the Fifth Circuit and the Code.  Section 1101(2) defines

22   substantial consummation as the transfer of assets to be

23   transferred under the plan, the assumption by the Debtor of

24   the management of all assets and property dealt with by the

25   plan, and the commencement of distributions under the plan.

1    While consummation of the plan may be broader than

2    substantial consummation, again, it does not mean preventing

3    parties from exercising their rights under post-effective date

4    commercial contracts.

5    So, again, an injunction that prohibits acts to interfere

6    with consummation of the plan and an exculpation that protects

7    exculpated parties from being sued for negligent -- for

8    actions taken in connection with consummation of the plan do

9    not have the far-reaching effects the Appellants claim in

10    their motion.

11    Your Honor, I would now like to turn to standing of the

12    Appellants to prosecute the appeals.  As we all agree, under

13    Fifth Circuit law, bankruptcy appellate standing requires

14    appellants to demonstrate they are persons aggrieved.  The

15    Appellants have the burden to demonstrate that they are

16    directly and adversely or pecuniarily affected by the order

17    and that their alleged injuries are not conjectural or

18    hypothetical.

19    With the clarification of the meaning of implementation

20    and consummation that I just discussed, the Appellants cannot

21    meet their burden.

22    One more overarching comment that applies to the standing

23    of all Appellants.  They each argue, and Mr. Rukavina stressed

24    it today, that, because they are subject to a plan injunction,

25    that, by definition, they have appellate standing under *Zale*.

1   But Appellants misread *Zale*.  In that case, the debtor

2   obtained an injunction, the stated purpose of which was to

3   prevent appellants from bringing claims against an insurer

4   relating to a global settlement in which the appellants were

5   left out.  The Fifth Circuit rightfully held that where an

6   injunction specifically barred those parties from pursuing

7   their rights, they had standing to appeal.  That is a far cry

8   from the standing to appeal an injunction in a plan which is

9   not party-specific but applies to the world to prevent anyone

10  from interfering with the plan.

11       If Appellants are right, then in every case where there's

12  a confirmed plan that contains an injunction, and they all do,

13  that any party in the world would have standing to appeal

14  because their rights are theoretically affected by the

15  injunction.  That just isn't the law.  Something more, some

16  tangible injury is required to confer standing on the

17  Appellants.

18       In addressing the standing, lack of standing, I want to

19  put the Appellants into three buckets.  The first bucket are

20  Dugaboy, Get Good, and Dondero, who filed joinders to the

21  motion.  None of these parties have legitimate claims in the

22  case, and the Court found at confirmation that their interests

23  were extremely remote and their objections not filed in good

24  faith.

25       None of these parties have colorable Class 8 claims or are

1 harmed by the purported violation of the absolute priority

2 rule.

3     None of these parties were harmed by the failure of the

4 Debtor to file the 2015.3 reports.

5     None of these parties have attempted to assert claims

6 against any of the exculpated parties that their concern will

7 be lost if the exculpation provision is affirmed on the

8 appeal.

9     And none of these parties have any ongoing business

10 relationships or dealings with the protected parties such that

11 the gatekeeper provision will actually have more than a

12 theoretical effect on them.  Why is there the gatekeeper

13 provision in the plan?  It prevents them from harassing the

14 protected parties.

15     Mr. Dondero's counsel makes a new argument today in his

16 comments, that because he is a defendant and because he will

17 be pursued, he has a vested interest in making sure the assets

18 are sold for as much as they can be sold for.  If that's the

19 case, Your Honor, every defendant in every bankruptcy matter

20 would have the same argument.  He hasn't presented any law,

21 and I suspect he can't, to demonstrate standing.

22     Based upon the foregoing, Your Honor, Dugaboy, the Get

23 Good Trust, and Mr. Dondero are not persons aggrieved by the

24 confirmation order, as any effect on them is only conjectural

25 or hypothetical.

1    Next, Your Honor, the Advisors.  The Advisors argue,

2 without authority, that because they are purportedly harmed by

3 the plan, they can raise any infirmity with the plan, even if

4 it does not affect them.  They don't cite any authority for

5 that proposition, and it doesn't make sense.  In fact, the

6 2009 Southern District case of *Cypress Wood* is to the

7 contrary, where the court stated that courts across the nation

8 have determined that parties in interest may only object to

9 plan provisions that directly implicate its own rights and

10 interests.

11    If the appellate court reverses on the absolute priority

12 rule or the 1129(a)(2) issues, which it won't, the Advisors'

13 rights will not be affected at all.

14    Recognizing that the standing to appeal on the basis of a

15 perceived violation of the absolute priority rule was tenuous,

16 the Advisors attempted to manufacture standing by acquiring

17 the claims of four employees who were terminated by the Debtor

18 and now presumably work for the Advisor as one of the -- at

19 one of the Dondero companies.

20    In fact, the Debtor could, if it wanted to, object to the

21 transfers of the claims on a lack of good faith, that there is

22 case law that says you can't acquire a case -- claims for the

23 purpose of standing if it demonstrates good faith.

24    Notably, they acquired those claims on Wednesday, after --

25 long after the filing of their stay motion and after the

1  Debtor filed its opposition.

2      Putting aside acquiring -- whether -- putting aside the

3  issue of whether acquiring these claims at this juncture, when

4  none of those creditors appealed the order, none of those

5  creditors objected to confirmation of the plan, could

6  magically confer standing on the Advisors, which we say they

7  can't, the fact is these claims are not valid.  The Court

8  heard testimony at various hearings, including with respect to

9  the KERP motion and plan confirmation, that the Debtor

10  intended to terminate the vast majority of its employees at or

11  soon after confirmation, and that the termination of the

12  employees prior to the vesting of their bonuses would

13  eliminate those claims for bonuses.  No one ever challenged

14  that position.

15      Accordingly, since the four employees whose claims the

16  Advisors purportedly acquired were terminated, those claim

17  don't exist, and, in any event, would not be more than

18  $40,000.

19      But Your Honor, there is more to the story, and it is

20  reflected in the objection to these and other claims which the

21  Debtor filed yesterday.  It's not before Your Honor, but I

22  think it's perspective Your Honor needs to be aware of in

23  considering whether the Advisors have standing relating to

24  these claims.

25      As the Court will recall, the Debtor obtained approval of

1  a KERP program that would have entitled a number of employees

2  who were not expected to be with the Debtor long-term after

3  confirmation to a cash payment if they signed a separation

4  agreement.  The employees whose claims were purportedly

5  purchased by the Advisors are four of those 54 employees.

6  None of them signed the separation agreement.  As set forth in

7  our objection, we are informed and believe that Mr. Dondero

8  told them he would not hire them if they signed the agreement.

9  Rather, we're informed and believe that Mr. Dondero required

10  these employees to transfer the claims to one of his entities

11  as a condition of their continued employment.

12      But there is more.  As reflected in our claims objection,

13  we have recently learned that the Debtor -- that certain of

14  the Debtor's employees, acting on their own and without any

15  approval from Mr. Seery or the independent board, changed the

16  vesting requirements for the award letters that were given to

17  employees in connection with the 2019 contingent award granted

18  in August 2020 for services rendered in 2019.

19      What did that change do?  It purportedly provided that the

20  Debtor would remain on the hook for the 2019 contingent bonus

21  award even after the Debtor terminated their employment,

22  provided the employees continued to work for an affiliate.

23  And what were the specific affiliates that were identified in

24  the amendment, Your Honor?  Highland Capital Management Fund

25  Advisors, NexPoint Advisors, and NexPoint Securities.

1     These changes are not enforceable against the Debtor for a

2 variety of reasons.  The Debtor is continuing its

3 investigation, and wouldn't be surprised to learn that these

4 changes were orchestrated by Mr. Dondero in an attempt to

5 stick the Debtor with a continuing liability where none were

6 expected to exist.

7     Again, Your Honor, I don't raise these issues to litigate

8 them now.  I realize I was testifying from the podium.  They

9 will be litigated in connection with our claim objection.  But

10 I raise them in the context of the standing that the

11 Appellants -- the Advisors have attempted to manufacture.

12     The Advisors also argue that they have standing to appeal

13 the injunction because it prohibits the Advisors from advising

14 or causing their clients to exercise their contractual rights

15 against the Reorganized Debtor pursuant to the CLO management

16 agreements.

17     Nothing, Your Honor, prevents the Advisors from advising

18 their clients to do anything.  It's not the Advisors that have

19 commercial relationships with the Debtor under the CLO.  It's

20 the Funds.  And those relationships with the Funds are they

21 are investors in a fund that the Debtor manages.  The Advisors

22 are simply free to provide the Funds with any advice they want

23 to.

24     Moreover, with the clarification I provided earlier, there

25 is just no merit to the argument that the injunction in the

1    plan will affect the Advisors' advice to the Funds regarding

2    the CLO agreements.

3         Advisors also say that the gatekeeper infringes on their

4    ability to assert claims post-confirmation.  As it relates to

5    the CLO agreements, it's not the Advisors who have those

6    claims, theoretically, but it's the Funds.  And if the

7    Advisors, as I think was indicated in a footnote in Mr.

8    Rukavina's pleadings, are concerned that the gatekeeper

9    provision impacts their ability to assert claims under the

10   remaining commercial relationships they have with the Debtor

11   with respect to shared services, that's incorrect as well.

12   The February 24th order, Your Honor, and the subsequent

13   agreement between the Advisors and the Debtor both provide

14   that the bankruptcy court has exclusive jurisdiction to

15   resolve any disputes between the parties.

16        Accordingly, it's not the gatekeeper provision that will

17   require the Advisors to litigate in bankruptcy court, but

18   rather that order and the agreement.

19        Lastly, Your Honor, are the Funds.  They argue that the

20   injunction provision prevents them from seeking to terminate

21   the CLO agreements and exercising their rights thereunder, and

22   for the reasons I discussed, they're wrong.  It is the January

23   9th order that prevents the termination of the Debtor as the

24   manager of the CLO agreements, and that issue is being

25   litigated in connection with a preliminary injunction hearing

1   that Your Honor will hear next week.  If the Debtor wins, then

2   the Funds cannot seek to terminate the CLO management

3   agreements.  If the Debtor loses, nothing in the plan will

4   prevent the Funds from exercising whatever rights they have to

5   terminate the CLO agreements, subject to all applicable

6   defenses.

7       What is impacted by the plan is the assertion of

8   affirmative claims they may have, which would have to be

9   presented to the Court under the gatekeeper provision.

10      And while it is not before the Court today, Your Honor, I

11  do want to respond to the comments in the Funds' reply and

12  also the comments made by Mr. Hogewood earlier that they are

13  not related entities under the January 9th order.  As hard as

14  the Funds try, they cannot disentangle themselves from Mr.

15  Dondero.  Mr. Hogewood testified at the podium.  We believe

16  the testimony he gave is not consistent with the prior

17  testimony that has been given by Mr. Dondero, Mr. Post, and

18  Mr. Norris.  The Funds' continuing assertions that they are

19  managed by an independent board of directors has not convinced

20  the Court that they're truly independent.

21      Your Honor has heard the testimony.  Your Honor has

22  assessed credibility.  And most importantly, Your Honor has

23  seen what's happened in the last few months of litigation with

24  them.  None of these so-called directors have ever testified

25  to the Court, and up until these motions, the Funds and

1    Advisors have been in lockstep, asserting the same issues by

2    the same counsel with the same witnesses for Advisors.  You

3    heard at the last hearing that the Funds wouldn't agree --

4    wouldn't force Mr. Dondero to do the shared service agreement

5    because they didn't -- because Mr. Dondero needed to be in the

6    -- in the facility.

7         There is no evidence that there is independence, and Mr.

8    Hogewood's comments are just not well taken.

9         And the Court found in the confirmation order that the

10   Funds are marching to the order thereon controlled by him.

11   Those findings will be entitled to great deference, and it

12   will be hard for them to be overturned on appeal.  And the

13   findings are sufficient in and of themselves to cause the

14   Funds to come within the definition of related parties.  But,

15   again, that's not before Your Honor today.

16        In any event, for purposes of this motion, it's clear that

17   neither the exculpation provision or the injunction provisions

18   will affect the Funds' rights after the effective date, and

19   they cannot establish standing to appeal with respect to those

20   provisions.

21        The Debtors do acknowledge that, solely with respect to

22   the gatekeeper provision, the Funds have standing to appeal

23   that issue because of the requirement that they first come to

24   the bankruptcy court before asserting claims under the CLO

25   management agreements.

1      I would now like to turn to the merits of the motions and

2 explain why the extraordinary remedy of a stay is not

3 appropriate.  The Appellants cannot demonstrate that they are

4 likely to prevail on the merits of any of the issues they

5 contend the Court erroneously decided, nor do they raise

6 issues that are in serious dispute.

7      Let's first take the absolute priority rule.  The Advisors

8 repeat the arguments they made at confirmation that the plan

9 violates the absolute priority rule because Class 10 and Class

10 11 interest holders can receive property after all Class 8 --

11 or that they can receive a contingent interest that is

12 property but that will only receive a distribution until after

13 all Class 8 and Class 9 creditors are paid in full with

14 interest.

15      As I mentioned previously, Your Honor, the Advisors have

16 no business making this argument because it doesn't affect

17 them, and we challenge their standing on the claims they

18 purchased.  That claims acquisition was a last-minute gimmick,

19 and a poor one, for the reasons that I just went over a few

20 minutes ago.

21      On a more substantive level, though, Your Honor, the

22 argument fails now for the same reasons it did at

23 confirmation, and it hardly rises to an issue that they're

24 likely to prevail on appeal.

25      The Advisors don't cite any new case law, make any new

1    arguments.  They just claim that the Court got it wrong.

2         Importantly, the Advisors have not cited any case that

3    concerned a fact pattern even remotely like the fact pattern

4    in this case, of course, other than the *Introgen* case that

5    just rejects their argument on strikingly similar facts.

6         Advisors continue to misconstrue the meaning and the

7    purpose of the absolute priority rule.  The rule is meant to

8    prevent equity holders from receiving properties that senior

9    creditors are entitled to until the -- unless the senior

10   creditors consent or are paid in full.

11        The corollary to the rule which the Advisors brush aside

12   is that no creditor can receive more than a full recovery

13   based upon value determined at confirmation.  The plan is

14   faithful to both those concepts.

15        First, the Debtor does not dispute that the contingent

16   interest is a property right, but that's not the end of the

17   story.  The language that the Advisors conveniently omitted

18   from their brief from the Supreme Court *Ahlers* decision says

19   that a retained equity interest which would violate the

20   property -- the absolute priority rule is a property interest

21   to which the creditors are entitled before shareholders can

22   retain it for any purpose.  Under the plan, the property

23   interest that the Class 10 and Class 11 creditors are

24   receiving is a springing contingent interest payable only

25   after Class 8 and Class 9 holders are paid in full.

1    That interest, the right to receive payment after

2    creditors are paid in full, is not an interest to which the

3    creditors are entitled.  It is, by definition, an interest

4    that equity is entitled to after creditors are not entitled to

5    receive anything more.  Class 10 and Class 11 creditors are

6    not entitled to receive anything until that time.  They're not

7    the beneficiaries of the Trust.  They have no right to control

8    the Claimant Trust.  They can't transfer their interests.

9    As the *Introgen* court reasoned, the right is imaginary and

10   nonexistent until creditors are paid in full, plus interest,

11   as provided under the plan.

12   So, accordingly, the contingent interests held by the

13   holders of the Class 10 and Class 11 claims are not property

14   that creditors should receive under a straightforward

15   application of the absolute priority rule.

16   Moreover, the plan provided for this contingent recovery

17   to Class 10 and 11 creditors to avoid a valuation fight over

18   the value of the Debtor's litigation claims at confirmation.

19   As Your Honor is aware, the Debtor's assets consist of cash,

20   publicly-traded stocks, interests in private equity, and

21   causes of action.  The Debtor had a good idea of the value of

22   the non-litigation claims as of confirmation, and those values

23   form the basis of the plan projections, which reflected that

24   Class 8 general unsecured creditors were to receive

25   approximately 70 cents on the dollar.

1      However, the Debtor did not provide at confirmation a

2    value of the litigation assets as they existed at

3    confirmation.  Pursuit of those litigation assets which

4    existed at the time of confirmation at some value could result

5    in Class 8 and Class 9 creditors receiving more than a hundred

6    percent on their claims.  So what?  To avoid a confirmation

7    fight -- a valuation fight at confirmation where the Dondero

8    parties would have undoubtedly argued that the value at

9    confirmation of the Debtor's assets could result in payment in

10   full or more to Class 8 and Class 9 claims, thus violating the

11   absolute priority rule, the Debtor provided that any excess

12   proceeds would be paid to the Class 10 and 11 interest

13   holders.

14      Advisors brush this argument aside, claiming that debt-

15   for-equity plans that are routinely approved provide that

16   creditors may receive more than a hundred percent on their

17   claims, and they say that the Supreme Court precedent gives

18   this future upside to the creditors, not the equity holders.

19   But the Advisors, Your Honor, miss the point.  The debt-for-

20   equity plans that Advisors point to give the creditors upside

21   based upon future appreciation of value.  The upside that the

22   Debtor gives the Class 10 and the Class 11 interest holders is

23   the contingent upside based upon value that existed as of

24   confirmation.

25      Case law is clear that creditors cannot receive more than

1  a hundred percent of their claim based upon value at

2  confirmation, and the plan is faithful to that proposition.

3      Turning to 1129(a)(2), Your Honor, all Appellants except

4  for the Funds argue that the Court erred in confirming the

5  plan because the Debtor did not file reports required by

6  2015.3 and thus could not satisfy 1129(a)(2) of the Code

7  because the Debtor as the proponent of the plan has not

8  complied with the applicable provisions of this title.

9  Essentially, they argue that 1129(a)(2) is a strict liability

10  statute and if the Debtor has violated one provision of the

11  Code or Rules, no matter what, no matter what the context, and

12  no matter who it affects, the Court cannot confirm the plan.

13  Not raising this issue in their confirmation objections and

14  waiting until the confirmation hearing was the quintessential

15  "gotcha" moment.  Had it really been a good faith objection,

16  Your Honor, they would have raised it long ago.  In any event,

17  the argument fails for four reasons.

18      First, as reflected in the case law we cite in our

19  opposition, courts in this jurisdiction have held that Section

20  1129(a)(2) is geared at making sure that the debtor as plan

21  proponent complies with its disclosure obligations under

22  Section 1125 and not requiring adherence to every code section

23  and every rule.

24      Second, even if Section 1129(a)(2) is applicable, as the

25  Southern District of Texas held in the *Cyprus Wood* case, this

section is not a silver bullet that allows creditors to defeat

confirmation based upon any infraction committed by the

debtor.  *Cypress Wood* is not an outlier, as courts around the

country have reached the same conclusion.

Third, failure to file the reports in this case, Your

Honor, was harmless error.  As the Court knows, the Debtor

operates under court-approved protocols and has been

transparent with the Committee from the commencement of the

case.  The Committee has substantial rights to oversee the

Debtor's operations, and there was just no evidence presented

at confirmation that the Committee hasn't received all

relevant information regarding the Debtor's operations, asset

sales, and transfers, and the value of its holdings.

Fourth, the cases cited by the Appellants are

distinguishable.  None of them involved failure of a

confirmation because of a violation of a bankruptcy rule.  In

each of the cases, the debtor committed multiple material

violations that went to the debtor's credibility, its

transparency with creditors, and the indifference of their

obligations as a debtor-in-possession.  None of these cases

were remotely similar to the case that we have here and

support the denial of confirmation.

Next, Your Honor, I want to turn to the exculpation

provision.  The Appellants all argue that the Court exceeded

its authority in approving the exculpation provision, which

1  they describe as unprecedented, far-reaching, and it tramples

2  their rights.

3      As I discussed previously, Your Honor, the concern that

4  the exculpation provision applies post-effective date to

5  business decisions is just plainly wrong.  It only applies

6  post-effective date to narrow substantive issues relating to

7  implementation and consummation of the plan and do not impact

8  the ability to assert post-effective-date claims or enforce

9  post-effective-date rights under assumed contracts.

10     I know, Your Honor, that both the exculpation provisions

11 in *Pacific Lumber* and *Thru* applied to matters relating to

12 implementation and consummation of the plan.  We acknowledge,

13 of course, that those exculpations were struck down for

14 reasons distinguishable for this case. However, the Court

15 found those provisions unacceptable because they applied to

16 non-debtors, not because they applied to events occurring

17 after the effective date relating to implementation or

18 consummation of the plan.

19     Putting that issue aside, Your Honor, the principal

20 argument Appellants rely -- raise is that the Court's ruling

21 is directly contrary to the Fifth Circuit's opinion in *Pacific*

22 *Lumber*.  However, the Court was very careful in its ruling not

23 to run afoul of *Pacific Lumber*, and, in fact, its ruling is

24 consistent with *Pacific Lumber* and will not require any change

25 in Fifth Circuit law.

1    First, the Court relying on *Pacific Lumber's* citation to

2    the Fifth Circuit's prior decision in *Republic v. Shoaf*, the

3    Court held that the Court has already exculpated the

4    independent board, the CEO, the CRO, and their respective

5    agents, pursuant to the January 9th and July 16th orders.  As

6    those orders were final, not appealed by the Court [sic], they

7    are the law of the case and conclusively establish the

8    exculpation of those parties independent of the exculpation

9    provision of the plan.

10    The Advisors argue in their reply that these orders do not

11    exculpate the parties for negligence and are only gatekeeper

12    provisions.  This argument, which they make in their reply for

13    the first time, lacks any evidentiary support.  Rather, the

14    uncontroverted evidence at confirmation was to the contrary.

15    Mr. Seery and Mr. Dubel, two of the three independent board

16    members, testified at confirmation that they both understood

17    that the January 9th order, and as it related to Mr. Seery the

18    July 16th order, provided exculpation for negligence in the

19    performance of their duties.  They both testified that they

20    would not have undertaken their role as independent director

21    or CEO if they were not assured of exculpation.

22    Accordingly, the Advisors' argument that these orders did

23    not provide for exculpation because they didn't use the word

24    exculpation is just flat-out wrong.

25    The Advisors next argue that these orders were case

1   administration orders and were not intended to apply post-

2   confirmation.  So the Advisors would have the Court believe

3   that the independent directors, who were concerned about

4   exposure to frivolous litigation in this highly-contentious

5   case, expected they would be protected from negligence and

6   have the benefit of a gatekeeper provision during the case but

7   they would be open game to be sued for anything anywhere after

8   the case was concluded.

9       That argument is preposterous and certainly doesn't find

10   any evidentiary support in the record.

11       With all due respect to Mr. Rukavina, who is a late

12   entrant into this case, he is in no position to tell the Court

13   what was or was not intended in connection with those orders.

14       Similarly, the argument that the orders must expire on

15   confirmation because the Court lacks jurisdiction thereafter

16   is illusory.  The Court certainly has and retains jurisdiction

17   post-confirmation to enforce orders that it's entered during

18   the case.

19       Now, the Debtors do agree with the Appellants that the

20   January 9th and the July 16th orders do not exculpate all of

21   the exculpated parties under the plan.  This is where the

22   exculpation provision comes in.  The Court found that the

23   exculpation provision of the plan was consistent with *Pacific*

24   *Lumber* for two reasons.

25       Initially, since the Fifth Circuit did approve exculpation

1    for Committee members, it is clear in the Fifth Circuit that

2    there is no categorical prohibition on non-debtor

3    exculpations.  The Court rightfully found that the Fifth

4    Circuit's rationale for exculpating Committees and their

5    members was equally applicable to exculpating Strand,

6    independent directors, the CEO, the CRO, and their respective

7    agents.  The Court found that these parties were analogous to

8    Committee members rather than to incumbent directors and

9    officers.  They came into this highly-litigious case post-

10   petition and would not have been willing to serve without

11   exculpation for negligence.

12       The Court has also found that without the protection for

13   exculpation for negligence suits from parties unhappy with

14   their performance in the case and the outcome of the case,

15   independent directors in general would be unwilling to serve

16   in highly-contentious cases in the Fifth Circuit, which would

17   be a setback for modern-day complex restructurings.

18       The Court also read *Pacific Lumber's* limited rejection of

19   exculpation provisions as resting on a key factual finding

20   that distinguished that case from this case.  The Court

21   rightfully determined that exculpation is appropriate if there

22   is a showing that the costs that released parties might incur

23   defending against such suits, such as negligence, are likely

24   to swamp either the exculpated parties or the reorganization.

25   Given the substantial costs that the Debtor has had to face

1    during this case litigating with the Dondero entities, the

2    Court had no trouble finding that in this case the potential

3    for litigation and the exculpated parties could swamp the

4    reorganization, and for this reason determined that *Pacific*

5    *Lumber* supported the Court's ruling.

6         Accordingly, Your Honor, this Court's ruling on

7    exculpation provisions is entirely consistent with *Pacific*

8    *Lumber* and the Appellants are not likely to succeed on appeal.

9         Your Honor, the Appellants are also not likely to succeed

10   on appeal with respect to the appeal of the injunction

11   provision.  The Appellants often conflate the injunction

12   provision with the gatekeeper provision.  I will first address

13   the injunction provision, which is really the first three

14   paragraphs of Article 9(f) of the plan.  The Funds argue that

15   the injunction provision prohibits actions against non-debtors

16   and is an impermissible third-party release.  It is not.  The

17   injunction provision applies to the Debtor and its successors,

18   the Reorganized Debtor, the Claimant Trust, and the Litigation

19   Sub-Trust.

20        The Funds argue that it enjoins claims against protected

21   parties.  That's incorrect.  Protected parties does not appear

22   in the first three paragraphs of Article 9(f).

23        The Advisors' main argument is that the injunction

24   provision is too broad because it prevents actions to

25   interfere with the implementation and consummation of the

1  plan, and as I said earlier, my comments should alleviate the

2  Advisors' concerns.  We're not seeking to enjoin enforcement

3  of contractual rights by use of the term implementation and

4  consummation.

5      Appellants' argument that this injunction -- the

6  injunction provision here in this case is broader than the

7  injunction rejected by the district court in *Thru* is

8  misleading.  The only issue in *Thru* was whether it

9  impermissibly applied to non-debtor third parties.  That is

10 not the issue here, as the injunction provision only applies

11 to the Debtor and successors.  *Thru* did not address whether or

12 not -- an injunction extending to matters relating to

13 implementation and consummation of the plan, as is the case we

14 have here.

15     Lastly, Your Honor, the Appellants cannot demonstrate a

16 likelihood of success with respect to the gatekeeper

17 provision.  The Court's determination to approve the

18 gatekeeper provision was a mixed question of fact and law.

19 Based upon the uncontroverted evidence at confirmation, the

20 Court found that the Dondero entities' history of litigation,

21 both prior to this case and during the case, justified the

22 Court's approval of the gatekeeper provision.

23     The Court also heard uncontroverted testimony from Mr.

24 Seery that the continued threat of harassing litigation from

25 the Dondero entities would threaten success under the plan.

1      So, based upon the foregoing, the Court concluded that

2   there was an evidentiary showing as to the need for a

3   gatekeeper provision, a finding that is unlikely to get

4   overturned on appeal.

5      The Appellants raise two arguments on why the gatekeeper

6   provision is unlawful and is likely to get overturned on

7   appeal.  First they argue that the Court did not have

8   authority to approve the gatekeeper provision.  Second, they

9   argue that the Court will not have jurisdiction to perform the

10  gatekeeper function.  Neither argument has any merit.

11     The Court relied on several provisions of the Bankruptcy

12  Code providing for a gatekeeper provision in aid of

13  implementation of the plan, including Section 105 and

14  1123(b)(6) of the Code.  The Court also relied on the Fifth

15  Circuit cases of *Carroll* from 2017 and *Baum* from 2008 for the

16  authority of a court to deal with serial litigants by imposing

17  a gatekeeper provision.  And as we briefed, gatekeepers are

18  not some new intervention, but have been approved by courts in

19  this district, including Judge Lynn in the *Pilgrim's Pride*

20  case and Judge Houser in *CHC Group*.

21     Similarly, Your Honor, the argument that the Court lacks

22  jurisdiction to act as the gatekeeper fails.  Excuse me, Your

23  Honor.  The Debtor agrees that the Court's jurisdiction is

24  more limited post-confirmation.  And that may ultimately mean

25  that a court may not have authority to adjudicate each and

1   every claim relating to the post-confirmation period that

2   comes before it, but it doesn't mean that the Court cannot act

3   as a gatekeeper to determine if colorable claims exist.

4   Appellants continue to ignore the Fifth Circuit's opinion in

5   *Villegas*, where the Fifth Circuit said that a bankruptcy court

6   may act as a gatekeeper under *Barton* to determine if a claim

7   exists, even if the court will not have authority under *Stern*

8   to adjudicate that claim.  That's exactly what's going on

9   here.

10      Accordingly, Appellants are not likely to prevail on

11  appeal on this issue of the propriety of the gatekeeper

12  function.

13      Next, with respect to harm, Your Honor, the Appellants

14  must demonstrate that they will suffer irreparable harm if the

15  stay is not granted.  This they cannot do.

16      First, Appellants argue that, because their appeals may be

17  rendered moot without a stay, that constitutes irreparable

18  harm.  This argument proves too much, Your Honor.  If

19  Appellants are correct, then any party objecting to

20  confirmation of a plan that might be rendered moot without a

21  stay would be entitled to a stay, and that's not the law.

22      Your Honor presided over a case last year called *SR*

23  *Construction v. Palm Springs*, where Your Honor refused to

24  grant a stay pending appeal of an order approving a credit

25  bid.  You were affirmed by the district court, which rejected

1   mootness as constituting irreparable harm, reasoning that:

2   The Court agrees with the majority of courts in the circuit,

3   finding that the risk of mooting a bankruptcy appeal standing

4   alone does not constitute irreparable harm warranting a stay.

5       Appellants' remaining arguments suffer from the same

6   misinterpretation of the language implementation of plan and

7   consummation of the plan that I have previously discussed in

8   the context of standing.  Appellants are concerned that the

9   injunction will prevent them from seeking to terminate the CLO

10  agreements or exercising rights thereunder and the concern

11  that the exculpation will prohibit them from asserting post-

12  effective-date claims.

13      Preliminarily, these arguments only apply to the Funds, if

14  at all.  Neither Dondero, Get Good, Dugaboy have any -- or the

15  Advisors have any post-confirmation contractual relationship

16  with the Debtor other than the ones with the Advisors which I

17  mentioned previously.

18      And as I said, while the Debtor and the Advisors were

19  parties to shared service agreements, those agreements were

20  terminated and the Court reserved exclusive jurisdiction over

21  any remaining disputes, as well as in connection with the

22  shared resource agreement that the parties have entered.

23      Nothing in the plan impacts the Advisors' ability to

24  pursue whatever rights they have under the February 24th order

25  relating to shared services or the shared resources agreement.

1    And the Funds are wrong that either the injunction

2    provision or the exculpation provision affects their right

3    under the CLO management agreements.  The Funds', as I said,

4    right to terminate the CLO management agreements will be

5    determined by the existing adversary proceeding which is

6    scheduled for hearing next week.

7    Thus, the plan does not insulate the Debtor and other

8    parties from liability, which, under the applicable CLO

9    agreements, in any event, limits such claims to negligence,

10   willful misconduct, or fraud.  Nor does the plan prevent the

11   Funds from exercising their contractual remedies.  It just

12   prevents enjoined parties from filing an action before getting

13   court approval and allowing that action to go through the

14   gate.

15   Your Honor, turning to the harm that the Debtor and the

16   creditors will suffer, they will suffer substantial harm,

17   which basically the Appellants gloss over.  They continue to

18   argue that there's no harm, there's no exit financing, the

19   Debtor can just do what it's doing, and that liquidating its

20   assets, really, no harm, no foul.  However, they're wrong, and

21   the Debtor will be harmed in three significant ways.

22   First, as Mr. Seery provided uncontroverted testimony at

23   the confirmation hearing, that the value of the Debtor's

24   assets would be enhanced by eliminating the burdensome

25   restrictions the Debtor operates under in Chapter 11.

1    Second, remaining in Chapter 11 will substantially

2  increase professional fees compared to what they would be at

3  confirmation.  The Committee will still exist, with their

4  complement of professionals, and the Dondero entities will

5  likely continue to object to virtually every motion, requiring

6  needless evidentiary hearings and likely more appeals.

7    Third, the creditors' rights to receive recoveries will be

8  delayed.  The argument that the delay can be compensated by a

9  bond for interest at the federal judgment rate, which is less

10  than 10 basis points, is farcical.  These creditors have

11  waited years, and in some cases more than a decade, to receive

12  payment.  Paltry interest is hardly sufficient compensation.

13    Accordingly, the Appellants cannot come close to

14  demonstrating that the Debtor and its creditors will not be

15  harmed.

16    And lastly, Your Honor, with respect to public interest,

17  the Appellants argue that public interest is served because

18  it's necessary to respect the contractual rights of various

19  parties, protect the interests of thousands of investors,

20  prevent the Debtor from violating the securities laws, and

21  respecting and upholding precedent.  Your Honor, while these

22  words sound good, they really don't apply in this case.  The

23  Dondero entities are the only parties who have tried to get in

24  the way of confirmation of the plan.  It is the Dondero

25  entities who are pursuing their agenda and their intent and

1 │ attempt to invoke the interests of innocent public retail

2 │ investors, none of whom have ever appeared in this case, have

3 │ any claims against the Debtor, or have any contractual

4 │ relationship with the Debtor, should ring hollow to the Court.

5 │     As the *Yucaipa* court that we cite in our materials noted,

6 │ in talking about the public interest, courts recognize the

7 │ strong need for -- public need for finality of decisions,

8 │ especially in bankruptcy proceedings.  The public interest

9 │ requires bankruptcy courts to consider the good of the case as

10 │ a whole and not individual investment concerns.  The public

11 │ interest cannot tolerate any scenario under which private

12 │ agendas can thwart the maximization of value.

13 │     Your Honor, the Court should not let the Dondero entities'

14 │ agenda get in the way of the case any more than it has already

15 │ done.

16 │     And lastly, Your Honor, with respect to the bond, if the

17 │ Court is inclined to grant the motions, Appellants are

18 │ required to post a bond to protect the Debtor from any harm

19 │ resulting from the imposition of the stay and the delayed

20 │ effective date.  Appellants now agree that their initial

21 │ proposal of a million dollars was insufficient to cover the

22 │ additional costs of the case remaining in Chapter 11.  Their

23 │ new proposal in their reply, that the amount of the bond

24 │ should be $3 million -- and I think Mr. Rukavina even upped

25 │ that to $4 million -- is based on the faulty premise that

1    keeping the case in Chapter 11 will only result in an increase

2    of professional fees per month of $125,000 compared to what it

3    would be outside.  Appellants don't seem to have been paying

4    attention to the significant expenses the estate has been

5    forced to incur because of Appellants' actions in the Chapter

6    11 case.

7        If the Debtor remains in Chapter 11, we'll have to seek

8    approval of a variety of actions required by the Bankruptcy

9    Code, including the monetization of assets, resolution of

10   claims, retention and compensation of professionals.  And if

11   past is prologue, Your Honor, the Debtor can expect the

12   Appellants in one form or another to object to many of these

13   actions, objections which will involve discovery, an

14   evidentiary hearing, and likely appeal, expenses that will not

15   be necessary if the plan goes effective.

16       Accordingly, the argument the keeping the Chapter 11 cases

17   going at an additional monthly cost of $125,000 while the

18   appellate process plays out is fantasy.  While no one has a

19   crystal ball, Your Honor, to determine what the actual amount

20   of the costs will be, the Debtor's proposed analysis,

21   comparing average fees during the course of this case to those

22   projected post-effective date, is as good a proxy as any.

23   Therefore, Your Honor, the Debtor asks that if the Court is

24   inclined to grant the stay that the Court condition the stay

25   on the posting of a $17.4 million bond.

1          Thank you, Your Honor.

2          THE COURT:  Okay.  Thank you.  All right.  I'll hear

3  rebuttal from the Movants.

4          MR. CLEMENTE:  Your Honor, if I may?  Your Honor, if

5  I may?

6          THE COURT:  Oh, I'm sorry.

7          MR. CLEMENTE:  Matt Clemente, Committee --

8          THE COURT:  I'm sorry.

9          MR. CLEMENTE:  No, no.  No need to apologize.

10  Absolutely not, Your Honor.

11          THE COURT:  Okay.

12          MR. CLEMENTE:  I only have a minute or two, --

13          THE COURT:  Okay.

14          MR. CLEMENTE:  -- if Your Honor will indulge me,

15  quickly.

16          THE COURT:  Go ahead.

17     OPENING STATEMENT ON BEHALF OF THE CREDITORS' COMMITTEE

18          MR. CLEMENTE:  Thank you, Your Honor.  Again, Matt

19  Clemente on behalf of the Committee, for the record.

20      Your Honor, you carefully considered a full record that

21  was before you at the confirmation hearing, and you rendered a

22  very thoughtful and detailed ruling and decision based on the

23  voluminous record that was before you in this case, not just

24  at the confirmation hearing but throughout the duration of

25  this case since, I believe, late 2019, when it first came in

1    front of you.

2         Nothing in the Movants' arguments, Your Honor, raises any

3    new issues that were not carefully considered by the Court in

4    a thoughtful manner.

5         So, in short, Your Honor, Mr. Pomerantz effectively

6    addressed and laid out the issues with respect to the Movants'

7    request to stay, but they have failed to meet their incredibly

8    high burden of the extraordinary remedy of giving a stay of a

9    confirmation order.

10        Your Honor, additionally, from the Creditors' perspective,

11   and Mr. Pomerantz touched very briefly on this, as Your Honor

12   knows, many of the creditors here have been waiting, sometimes

13   as long as a decade, and any delay occasioned by the stay will

14   cause further harm to those creditors, Your Honor.

15        As Your Honor knows, the plan that Your Honor confirmed

16   was heavily negotiated with the Committee, and the Committee

17   believes it will serve, among other things, to reduce costs,

18   allow for the efficient and timely distribution to creditors,

19   provide a mechanism to vindicate claims against Dondero and

20   his tentacles, and provide a detailed and carefully-

21   constructed process and procedure to allow for the

22   maximization of the assets through the monetization and the

23   pursuit of claims.

24        Your Honor, the Committee believes that going effective is

25   the way -- is in the best interest of the creditor

1   constituency, after carefully and thoughtfully considering the

2   alternatives, including languishing in bankruptcy as suggested

3   by the Movants.

4        Your Honor, I refer you to the rest of our arguments in

5   our objection and joinder that we filed, but we believe that

6   the Movants' motion for a stay should be overruled and that

7   there should be no stay granted.

8        Your Honor, that's all I had for you.  If you have any

9   questions for me, I'd be happy to address them.

10            THE COURT:  All right.  No questions.  All right.

11            MR. CLEMENTE:  Thank you, Your Honor.

12            THE COURT:  I'll hear anything further now from the

13  Appellants collectively.  I guess I'll start with Mr.

14  Hogewood, since you went first before.  Anything at this point

15  to add?

16            MR. HOGEWOOD:  Yes, Your Honor.  Just very briefly.

17  I believe that I heard Mr. Pomerantz acknowledge that the

18  Funds had standing on a narrow point, and standing is

19  standing, so I'll take that.

20       I don't think I testified from the podium.  Rather, I

21  summarized testimony that Mr. Post and others provided during

22  the course of the confirmation hearing.

23       The gatekeeper provision goes well beyond what the Fifth

24  Circuit has previously permitted, and that is of grave concern

25  to our client, as well as the finding related to control.  And

1    for those reasons, we are seeking a stay.

2          And then there was a reference to these --

3                THE COURT:  Can I ask you a question?  You say you

4    perceive that the gatekeeping provision goes well beyond

5    anything that the circuit has allowed.  But what about my

6    colleagues in the Northern District of Texas?  Do you think

7    this is broader than what retired Judge Lynn permitted in

8    *Pilgrim's Pride* or our former Chief Judge Houser allowed in

9    *CHC*?

10               MR. HOGEWOOD:  Well, Your Honor, in this context, my

11   clients' contracts and the CLO contracts have been assumed,

12   and in order to exercise rights under those contracts we're

13   obligated to seek permission.  And we should be able to

14   proceed under the terms of those contracts, and I don't think

15   that we can do that under the current gatekeeper provision.

16         To the extent that that is similar to gatekeeper

17   provisions decided by other bankruptcy judges, I -- it may be

18   the same, but it is -- I don't -- but it is not yet the law of

19   the Fifth Circuit, and I think that's a reason to grant a stay

20   pending appeal, to determine whether the provisions in this

21   plan are permissible within the Fifth Circuit.

22               THE COURT:  Okay.  Thank you.

23               MR. HOGEWOOD:  The last thing I wanted to just

24   briefly touch upon is I think there was a mention that we

25   contest that we're related parties under what the January 2020

 1    order.  We weren't parties to that order.  We did not consent
 2    to it on behalf of the Funds.
 3        Even if we are related parties, that prohibition relates
 4    to Mr. Dondero.  Mr. Dondero is prohibited from directing
 5    related parties to take specific action.  And I understand
 6    that the Debtor disagrees that the Funds function
 7    independently.  The Court has made findings on that subject,
 8    that they do not function independently.  But that is one of
 9    the main reasons for which we are seeking both a stay and are
10    pursuing this appeal, to ask the appellate court to correct
11    those conclusions.
12        So, with that, Your Honor, we ask you to stay the
13    confirmation order pending appeal, and I have nothing further.
14    Thank you.
15            THE COURT:  All right.  Thank you.  Mr. Rukavina?
16            MR. RUKAVINA:  Your Honor, thank you.  And I'll be
17    brief.
18        On this employee claim transfer issue, Your Honor, when
19    those issues come up before you, you'll see that the employees
20    transferred their claims in late February or early March.
21    They did so because my clients basically gave them the years
22    of credit for seniority that they had at the Debtor with
23    respect to our bonus plans.  In other words, we're trying to
24    make good what they lost with the Debtor.  And in exchange,
25    they assigned their claims to us.

1    The reason why I didn't file the 3001 notices until

2    yesterday is because it wasn't until Friday night that the

3    Debtor challenged my standing, even though the Court found I

4    had standing at the confirmation.  So I got the employees as

5    fast as I could.

6    In other words, nothing to do with that had anything to do

7    with engineering standing, and I question why Mr. Pomerantz

8    would have a good faith basis for saying that.

9    As far as what I heard for the first time today, that some

10   employees tampered with the books and records of the Debtor, I

11   have no idea what the Debtor is talking about.  I'm sure it'll

12   come out in due course.  But I hope that there's a good faith

13   evidentiary basis for having made those statements.

14   Your Honor, if we look at -- and Your Honor doesn't have

15   to pull it up; I'm not suggesting that you do -- but it's in

16   the record.  On Page 198 of the first day's confirmation

17   trial, I asked Mr. Seery about the injunctions and I asked,

18   and I'm quoting now, "Do I understand correctly that this

19   provision we've just read means that, upon the assumption of

20   these CLO management agreements, if the counterparties to

21   those agreements want to take any action against the

22   Reorganized Debtor, they first have to go through this

23   channeling injunction?"  Mr. Seery answers, "I believe that's

24   what it says, yes."

25   And now, to paraphrase, I continue asking him, and I say,

1    "Because the wind-down of the business of the Reorganized
2    Debtor will include the management of these assets?"  And he
3    says yes.

4        And also, very briefly, on Page 206 of that same
5    transcript, and I'm paraphrasing now, I asked Mr. Seery to
6    tell me what the interference with the implementation or
7    consummation of the plan means, and he answers, now I'm
8    quoting, "That it means in some way taking any actions to
9    upset, disrupt, stop, or otherwise prohibit or hurt the estate
10   from implementing or consummating the plan."  Then I ask, "Is
11   this intended to be very broad?"  And he says yes.  Then I ask
12   him to be more specific, Your Honor.  Mr. Morris objects based
13   on form, and the Court sustains that objection before I may
14   respond to it.

15       So I hope the Court will forgive us for being very
16   concerned about these injunctions, especially when, in the
17   last two months, we had a mandatory injunction hearing before
18   Your Honor where the Debtor alleged massive, massive
19   irreparable injury, just to concede that its request was moot,
20   and based on tortious interference we had a hearing in January
21   where the Debtor admitted that it closed its sales, there was
22   no interference, and all that happened was that our employees,
23   our employees, refused to do something that Mr. Seery
24   requested.

25       So when I hear Mr. Pomerantz say, whoa, whoa, whoa, these

1   are actually very narrow provisions, Mr. Rukavina is not smart

2   enough to understand what I'm saying, then I would suggest,

3   Your Honor, that the Debtor do a plan modification and moot a

4   lot of our objections.  If Mr. Pomerantz's view of these

5   injunctions as being narrow is true, notwithstanding what Mr.

6   Seery testified to, then that's the proper remedy.  Let's

7   amend the plan by agreement, and if they want to moot ninety

8   percent of our arguments, we'd be happy to do that.

9        We don't want to appeal.  We don't want a stay pending

10  appeal.  We just don't want contempt in front of Your Honor

11  four months from now because something that we do in good

12  faith is brought before Your Honor as something nefarious

13  because apparently we're all Dondero tentacles.

14       Your Honor, as far as the Debtor collaterally attacking

15  its own confirmation order, now saying that, well, creditors

16  might receive a hundred percent, on Page 41 the Court finds

17  it's 71 percent, so I think that argument carries no weight.

18       And finally, Your Honor, I just want to leave you with one

19  parting thought, because I think -- I think it is important.

20  The Debtor has argued that we are all disrupters, that we are

21  trying to help Mr. Dondero burn down the house.  The Court, to

22  one degree or another, seems to have accepted that view.  What

23  we have tried to tell Your Honor, at least the Advisors and

24  the Funds, what we have tried to tell Your Honor is that there

25  is a business dispute underlying all of this, a good faith

1   business dispute.  The Debtor is liquidating assets worth more

2   than a billion dollars in a manner that we'd rather the Debtor

3   not do.

4       Now, the Court can decide whether the Debtor has the power

5   to do so. It's a legitimate business dispute.  I can see both

6   sides of it.  But it is that businesses dispute that is

7   driving this appeal and this stay pending appeal.

8       I heard Mr. Pomerantz say that if the Chapter 11 case

9   remains open, the Debtor will have to go to the Court to

10  approve sales, et cetera.  That's what we've been asking for

11  for months now.  We would love it if the Debtor did that, to

12  -- in open, with transparency, with bid procedures, to sell

13  these remaining assets.  Because, well, not my clients

14  directly, but Mr. Hogewood's clients, and my clients

15  indirectly, own those interests in those assets.  But the

16  Debtor has never taken that position before.  The Debtor has

17  said that it gets to liquidate these assets without authority

18  of the Court.

19      So if the price of a stay pending appeal is to have the

20  Debtor have to come to the Court with approved sale processes

21  and bid procedures, how can anyone complain about that?  We

22  will fund that stay pending appeal bond, as long as it's

23  reasonable, any day of the week, because that's all that we've

24  been asking for, that the Debtor not liquidate quickly and for

25  less than appropriate value the assets that it has remaining

 1  because it fundamentally conflicts with the rights of the

 2  underlying interest holders.

 3      Thank you, Your Honor.

 4          THE COURT:  All right.  Anyone else?  Mr. Taylor?

 5          MR. TAYLOR:  Yes, Your Honor.

 6          THE COURT:  Uh-huh.

 7          MR. TAYLOR:  Yes, Your Honor.  Clay Taylor on behalf

 8  of Mr. Dondero.

 9          THE COURT:  Okay.

10          MR. TAYLOR:  To echo a little bit of what Mr.

11  Rukavina said, and I head Mr. Pomerantz say they will have

12  significant expenses getting court approval inside a Chapter

13  11, including getting permission for asset sales.  One, I'm

14  very encouraged to hear that they have now admitted the errors

15  of their way and that they should have gotten permission for

16  asset sales.  It didn't happen before.  But if we could just

17  get adequate notice, either inside or outside of Chapter 11,

18  that's what Mr. Dondero wants.

19      He wants the opportunity to bid in an open market for

20  these assets or bring other bidders to the table.  He wants to

21  increase value.  He fundamentally disagrees with Mr. Seery.

22  And, you know, it's okay to have a disagreement on a business

23  issue as to whether this is the best way to liquidate these

24  assets.  He wants to see if value could ever get in a

25  waterfall down to Mr. Dondero.  He wants to limit his

1  liability or any of those entities in which he owns or are a

2  part of liability to the investors that they're holding their

3  money.  He wants to limit his potential liability for which

4  these alleged alter ego claims are being brought and they say

5  he is going to be liable for the difference in value.  He also

6  wants to make sure he preserves his reputation in the

7  marketplace as having been a savvy investor.

8      So these are exactly the fundamental things that we're

9  asking for that weren't done before.  That's why we're asking

10  for a stay pending appeal, so they actually either, one, have

11  to provide the proper notice as required under the Code and

12  Procedures, or alternatively, if they don't, that they can be

13  held liable for their actions, without the exculpation and

14  release and that we go through a gatekeeper process.

15      That is fundamentally the difference that we have and why

16  we're asking for a stay pending appeal and why I try to state

17  that succinctly and let Your Honor consider that.  Thank you,

18  Your Honor.

19          THE COURT:  All right.  Thank you.  Mr. Draper,

20  anything further from you?

21          MR. DRAPER:  I have a small comment.  Your Honor,

22  look, you and I completely disagree on *Pacific Lumber* and its

23  impact.  You spent a great deal of time looking at it and, you

24  know, you have your opinion and the Fifth Circuit will have

25  its opinion, since we're going through a direct appeal.

1    The one point I would like to make is that I've never seen

2 a *de minimis* limitation on somebody being a party in interest.

3 I think that does not exist in the Bankruptcy Code.  I

4 disagree that I have a *de minimis* interest, but I don't think

5 that takes somebody away from being a party in interest or

6 being affected by an order, and there's no case that stands

7 for that proposition.

8    So, with that, I have nothing further to say, Your Honor.

9         THE COURT:  All right.  Thank you.

10         MR. POMERANTZ:  Your Honor, may I briefly respond?

11 This is Jeff Pomerantz.

12         THE COURT:  Well, no, we -- I usually let the movants

13 have the last word, so I think we're done.

14         MR. POMERANTZ:  Okay.

15         THE COURT:  All right.

16         MR. POMERANTZ:  Thank you, Your Honor.

17         THE COURT:  My clock shows 11:06.  I am going to take

18 a break to collect my thoughts and look at these exhibits.

19 And I'll tell you what.  We'll come back in 30 minutes, at

20 11:36, and I'll give you my ruling.

21    We also have a few housekeeping matters, a couple of

22 housekeeping matters that I want to address when we come back.

23 You know, we have this hearing Monday on the contempt motion

24 as to Mr. Dondero, and I just want to see where things are

25 with the Fifth Circuit *mandamus* effort that Mr. Dondero is

 1    pursuing.  I don't know if you all will have any updates when

 2    I get back.

 3        And then I hear that a motion for my recusal has been

 4    filed by Dondero through new counsel.  When was that, Nate?

 5    Was that last night?  Okay.  Anyway.

 6              THE CLERK:  It was last night.

 7              THE COURT:  It was last night.  So I'll just comment

 8    on that when I come back as well.  So, I'll see you in 30

 9    minutes.

10              THE CLERK:  All rise.

11        (A recess ensued from 11:07 a.m. to 11:54 a.m.)

12              THE CLERK:  All rise.

13              THE COURT:  All right.  Please be seated.  All right.

14    We are going back on the record in the Highland motion for

15    stay pending appeal.  The Court deliberated a little longer

16    than I told you I would, but the Court is ready to make a

17    record.  Is everyone out there?  Hopefully, we have everyone

18    out there that we need.

19        All right.  Mike, can you tell, everyone is still logged

20    in?

21              THE CLERK:  Yes, ma'am, they are.

22              THE COURT:  Okay.  All right.  The Court has decided

23    to deny the motions for stay pending appeal of the

24    confirmation order.

25        First, as we all know very well, courts in this circuit

1    have held that a discretionary stay pending appeal of a

2    bankruptcy court order should only be granted if a movant

3    demonstrates the traditional four prongs: (1) a likelihood of

4    success on the merits; (2) some irreparable injury if the stay

5    is not granted; (3) the granting of the stay would not

6    substantially harm other parties; and (4) the granting of the

7    stay would serve the public interest. Many Fifth Circuit

8    cases have articulated these standards, including *In re First*

9    *South Savings Association*, 820 F.2d 700 (5th Cir. 1987) and

10    *Ruiz v. Estelle*, 666 F.2d 854.

11      The Fifth Circuit has also made very clear the party

12    seeking a stay pending appeal bears the burden of proof on

13    each of these elements. The Court has said that while each of

14    these four factors must be met, the movant need not always

15    show a probability of success on the merits when a serious

16    legal question is involved. The Court, the Fifth Circuit, has

17    hastened to add that this is not a *coup de grâce* for movants;

18    still there are the other three prongs that have to be met.

19      So, I also want to add a reference to Judge Marvin Isgur.

20    My Southern District of Texas colleague wrote at length on

21    this issue in a *TNT Procurement* decision in denying a request

22    for a stay pending appeal as to three different orders he had

23    entered during that Chapter 11 case. In that case, he held

24    that although the movant had met its burden of proof on the

25    first factor, likelihood of success on the merits as to some

 1   of the legal issues in the challenged orders, that with regard
 2   to the second factor, irreparable injury, the presence of
 3   irreparable injury is a fact issue, and the movant requesting
 4   a stay pending appeal must prove such fact by a preponderance
 5   of the evidence.  And Judge Isgur held that because the movant
 6   failed to present any evidence on this prong at the hearing,
 7   there could be no proof of irreparable injury.  So he denied a
 8   stay pending appeal.

 9       So, turning to the facts and arguments here, first, before
10   addressing the four prongs, the four traditional factors for
11   evaluating a request for a stay pending appeal, I'm going to
12   address the standing challenge that the Debtor has made as to
13   the four Appellants.  I determine there is standing, just as I
14   did at the confirmation hearing, although I really want to
15   reiterate we have a very close call on this standing argument.
16   Clearly, we do not have traditional creditors here appealing a
17   plan.  In fact, notably, we have an Official Unsecured
18   Creditors' Committee with large strong creditors as members
19   who have fought long and hard with this Debtor, both before
20   the case in many years of litigation and during the case, and
21   they've embraced the plan.

22       The four Objectors, the Court continues to believe, are
23   following the marching orders of Mr. Dondero, the company's
24   former CEO, and are *de facto* controlled by him, based on prior
25   evidence this Court has heard.

1    In any event, the Court determines that these four

2  Appellants, these four categories of Appellants, do have some

3  plausible argument of being persons aggrieved or affected by

4  the confirmation order, remote as that interest is by

5  traditional Chapter 11 standards.  And so, thus, I find they

6  have standing.

7    Again, for the benefit of courts hearing an appeal on this

8  or further considering a motion for stay pending appeal, I

9  stress that this bankruptcy judge has a very hard view on

10  this.  It's an extremely close call.  Again, these Appellants

11  are not conventional creditors affected by plan class

12  treatment, or direct interest holders, for that matter.  So

13  it's a hard call.

14    But, having found technical standing, the Court turns to

15  the evidence here with regard to the four-factor test for a

16  stay pending appeal.  And we had no witnesses.  We had merely

17  documentary evidence and argument.  The Court finds and

18  concludes that this documentary evidence and argument did not

19  meet the burden of proof necessary to justify a discretionary

20  stay pending appeal.

21    On the first factor, likelihood of success on the merits,

22  there was at least a serious legal question raised.  There

23  were, of course, three primary legal issues raised as errors

24  by this Court in the confirmation order.  The first two

25  arguments were not pressed too much in legal argument today,

1    although they were stressed in the briefing.  One, the

2    absolute priority rule violation argument; and then, two, the

3    Bankruptcy Rule 2015.3/Bankruptcy Code Section 1129(a)(2)

4    violation argument.

5         The Court considered these arguments to wholly lack merit,

6    and are borderline frivolous, frankly.  They do not raise a

7    serious legal question.

8         The question of the propriety of the exculpations, the

9    plan injunctions, and the gatekeeping provisions are a harder

10   call.  While this Court strived mightily to understand the

11   parameters, the dictates, the exceptions of *Pacific Lumber* as

12   to the exculpations, the Court acknowledges others may

13   reasonably disagree that I interpreted *Pacific Lumber*

14   correctly as to when the Fifth Circuit might extend its policy

15   rationales for exculpations or whether it might extend the

16   holding of *Pacific Lumber* or elaborate on the holding of

17   *Pacific Lumber* when there's a situation like this one where we

18   have an independent CEO and board members who are more like

19   Official Unsecured Creditors' Committee members than typical

20   incumbent officers and directors, and also, in an exceptional

21   situation like this case, where there's a real risk, a real

22   risk of burdensome and vexatious litigation going forward if

23   we don't have in place the exculpations, the injunctions, and

24   the gatekeeping provisions.

25        I think there are also *res judicata* issues that cannot be

1    ignored with regard to the prior January and July 2020 orders

2    that contained similar provisions to the exculpation

3    provisions and gatekeeping provisions.

4        In any event, I'm going to spot the Appellants on this

5    one, to use a slang term, the spot being that they have raised

6    a serious legal question as to the exculpations, gatekeeping

7    provisions, and plan injunctions, although I stress that I

8    think pushing the envelope, to use that phraseology, is a bit

9    of hyperbole certainly in connection with plan injunctions,

10   which are very common in Chapter 11 plans, and even the

11   gatekeeping provisions, which retired Judge Lynn and retired

12   Chief Judge Houser have approved in very significant large

13   Chapter 11 cases.

14       But turning now to the other three prongs, the Appellants

15   have not met their burden of proof.  They simply have not

16   shown they will suffer irreparable harm, certainly not because

17   of a mere mootness risk, and that's really the only harm that

18   I truly think has been plausibly presented or argued here by

19   Appellants.

20       They cannot show there will not be substantial harm to the

21   overall bankruptcy estate, when it undeniably will endure more

22   administrative costs and burdens if the Debtor continues on as

23   a debtor-in-possession in an already very lengthy case, by

24   today's measure.  A 15-month case in today's world is a long

25   Chapter 11 case.

1    And the Court believes there will be a substantial harm to

2   the legitimate creditors here, the creditors who have faced

3   nothing but delay in pursuing their claims for years and

4   years, some for decades now.

5    And as far as the public interest factor, I do agree with

6   one comment made today that this is more about Mr. Dondero's

7   private agenda to get his company back, the company that he

8   decided to file Chapter 11 back in October 2019, more than

9   about protection of the public interest or the interests of

10  retail investors that he or the Advisors or Funds purport to

11  be acting to protect.

12    So the discretionary stay is denied.

13    As to the possibility of a stay pursuant to a bond being

14  posted, we used to have a local district court rule that I

15  believe was repealed a few years ago.  But even if it's still

16  around, it's not terribly apropos for a confirmation order.

17  It was Local District Rule 62.1, dealing with a supersedeas

18  bond.  It provided, unless otherwise ordered by a presiding

19  judge, a supersedeas bond staying execution of a money

20  judgment shall be in the amount of judgment plus twenty

21  percent of that amount to cover interest and any award of

22  damages for delay, plus $250 to cover costs.  Certainly, that

23  would be a very large number here.  And I don't entirely agree

24  with retired Judge Richard Schmidt, who, in the *ASARCO* case,

25  said the entire amount of the indebtedness under a plan is the

1  appropriate amount for a bond.

2      So, what I will do here is I will accept the Debtor's

3  suggestion of $17.4 million as an appropriate amount of the

4  bond based on the argument made in its pleadings and today.  I

5  will tell you I frankly think it's a little on the low side,

6  but I will accept it as reasonable since the Debtor has, I

7  guess, looked into this deeply and decided that would be

8  reasonable.

9      So, if the Appellants are willing to post a $17.4 million

10  bond, the Court will grant the stay pending appeal.

11      All right.  Well, as I said, I have a hard stop at 12:15,

12  so I'm going to ask --

13          MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

14  I just had one comment on your last comment.

15          THE COURT:  Okay.

16          MR. POMERANTZ:  My presentation to the Court was not

17  to say that are they should get a stay if they posted the

18  bond.  My comment to the Court and argument to the Court is

19  they have not met the standard, but even if they had met the

20  standard, they still need to post a bond.  So it was only in

21  the event that you found that they had satisfied their

22  standard.  So the Debtor's view is that there should not be

23  any stay, regardless of whether they post a bond or not.

24      As I indicated in my argument and we indicate in our

25  pleadings, one of our arguments that we did not quantify, and

1   I suspect we would have quantified if there would have been an

2   evidentiary hearing on the bond, is the effect on the asset

3   sale based upon Mr. Seery's testimony at confirmation.

4        So we don't think that the Appellants should have a right

5   to a bond.  They don't have a right to a bond.  And I just

6   wanted to make sure that Your Honor didn't misconstrue my

7   comments differently.

8            THE COURT:  All right.  Well, I think I did

9   misconstrue your argument.  I mean, my understanding of the

10  case law is the courts of appeal view this as there's a

11  discretionary stay where the Court has the discretion to grant

12  a stay pending appeal.  And, you know, it's kind of

13  unfortunate they use that term "discretionary," because there

14  is a strict four-prong test that has to be met.  But if the

15  Appellants are willing to put up an appropriate dollar amount

16  as far as a bond, then I don't have discretion.  You know, I

17  don't even go through the four-prong analysis.

18       So, you're telling me you think I got the case law wrong

19  on that?

20           MR. POMERANTZ:  Your Honor, I didn't read the

21  briefing by the Appellants to suggest that.  I certainly

22  didn't read -- you know, present that to the Court in our

23  arguments.  I don't know if that's the law.

24       Your Honor, I fully expected that since -- look, a lot of

25  what was presented on the amount of the bond was not evidence,

1  right?  We presented exhibits.  The Appellants presented

2  exhibits.

3      If Your Honor is inclined to view it that way, I guess (a)

4  I would like the opportunity to brief it; and (b) present

5  evidence to Your Honor that the damage is in excess based upon

6  the argument we made on the potential adverse impact to the

7  sale of assets, as Mr. Seery testified on an uncontroverted

8  basis at the confirmation hearing.

9          MR. RUKAVINA:  Well, Your Honor, may I briefly

10 interject?

11         THE COURT:  Briefly.

12         MR. RUKAVINA:  Your Honor, this was our evidentiary

13 hearing, and just like the Court ruled against us based on the

14 evidence on the discretionary stay, Mr. Pomerantz had his

15 chance, the Court has adopted a $17.4 million number, we're

16 going to try our best to get that bond in place ASAP.

17     If the Court is inclined to consider post-hearing matters,

18 I would ask for a short administrative stay of the effective

19 date of the plan so that we're not prejudiced by that, because

20 otherwise we're kind of in limbo.

21         MR. CLEMENTE:  And Your Honor, if I may, it's Matt

22 Clemente on behalf of the Committee.

23         THE COURT:  Uh-huh.

24         MR. CLEMENTE:  I agree with Mr. Pomerantz's comments.

25 I don't believe -- at least, I didn't appreciate that today

 1  would be an evidentiary hearing over the size of the bond.  I

 2  understood the pleadings to read that there was a stay that

 3  was being requested by the Court [sic], and if the Court

 4  should otherwise determine that, based on the law, the stay

 5  was required -- which I believe, based on Your Honor's ruling,

 6  you did not believe it met the standard -- then there would be

 7  a discussion of a bond.

 8      So the Committee would like to offer evidence in

 9  connection with the Debtor, if appropriate, to the extent that

10  Your Honor is suggesting that the size of a bond would then

11  result in a stay as a matter of right on behalf of the

12  Appellants, or the potential Appellants.

13      Thank you, Your Honor.

14          THE COURT:  All right.  Well, it was your burden,

15  your -- Appellants -- burden to show -- and, again, I think

16  I'm inclined to allow a little -- well, again, my

17  understanding of the law is I have to grant a stay pending

18  appeal if a sufficient bond is put up.  You know, forget about

19  the four prongs if a sufficient bond is put up.

20      I did not find the $1 million that increased to $3 or $4

21  million, whatever the number was, was sufficient.

22      It occurs to me that we really didn't tee up -- we really

23  didn't tee up what was the size of the appropriate amount of

24  bond, now that I think about it.  It was all about the

25  discretionary stay, with that just kind of thrown in.

1    So here is what I will do.  I'll deny the motion before

2  me, but it is certainly with leave for us to have a follow-up

3  hearing on a bond amount.  Okay?  I mean, Mr. Rukavina makes a

4  fair point that he ought to get a small stay, small, a stay

5  between the time we come back -- between today and the time we

6  come back for him to argue about the appropriate bond amount.

7  So -- I'm running into my hard stop -- we'll talk about that

8  hearing date in a moment, but let's talk about what we have

9  set next week.  We have the motion to hold Mr. Dondero in

10 contempt related to the alleged violations of the preliminary

11 injunction and TRO.  Is there any update from the Fifth

12 Circuit on the *mandamus* request?

13         MR. TAYLOR:  Your Honor, this is Clay Taylor on

14 behalf of Mr. Dondero.

15    My understanding of that is that briefing was requested by

16 the Fifth Circuit of --

17         THE COURT:  It was due the 16th.

18         MR. TAYLOR:  -- the Debtor -- by the Debtor.

19         THE COURT:  Yes.  It was due the 16th.

20         MR. TAYLOR:  You're correct.  And that was filed.

21 And it is under consideration by the Fifth Circuit.  And

22 beyond that, I mean, of course, I wish I could tell you when

23 they're going to rule, but I can't.  So I don't think anybody

24 has any other update other than that.

25         THE COURT:  All right.  So we'll go forward Monday at

1   9:30 unless someone notifies my courtroom deputy over the

2   weekend that the Fifth Circuit has said stop, you can't.

3       All right.  Okay.  And then there's -- I don't know if the

4   apparently new counsel who has filed a motion of recusal is on

5   the line, but I'll just tell people I will let you all know by

6   the end of today if I think I need a hearing on that or I

7   think I need to give other parties in interest the opportunity

8   to weigh in on that.  But I don't think it's going to stop me

9   from going forward, just based on the very quick summary I got

10  from one of my law clerks this morning.  But I'll let you know

11  by the end of the day today if I think I need to set that for

12  hearing or need responsive pleadings.

13      All right.  The last thing before I'm late for my

14  engagement is, Mr. Pomerantz, at some point -- no, this is the

15  next-to-last thing.  At some point, you said we have a hearing

16  next week on a preliminary injunction adversary as to the

17  Funds.  Is that next week?

18          MR. POMERANTZ:  Your Honor, I may have misspoke.  I

19  think it's the 29th.

20          THE COURT:  Okay.

21          MR. POMERANTZ:  I could be corrected if I'm wrong.

22  So, --

23          THE COURT:  Okay.  So, with that, I'm going to offer

24  you this.  Traci, correct me if I'm wrong:  I don't think we

25  have anything set right now on Wednesday of next week,

1  correct?

2          THE CLERK:  That is correct.

3          THE COURT:  Okay.  I will offer you Wednesday to come

4  back on the bond issue.  And then, if that's the case, --

5          THE CLERK:  That's --

6          THE COURT:  -- then I'll give a temporary stay

7  through 11:59 next Wednesday on implementing the plan to give

8  the Appellants the opportunity to put on their argument and

9  evidence and for the other parties to put on their argument

10  and evidence about what is an appropriate bond amount.  Does

11  that work?

12          MR. RUKAVINA:  Your Honor, very quickly, our

13  agreement in principle with the Debtor was that we'd have a

14  week after a hearing on a temporary stay.  I would urge Your

15  Honor to give us that after next Wednesday.  Otherwise, we're

16  going to have to go to district court immediately.  I don't

17  know if Mr. Pomerantz is agreeable to that.

18          MR. POMERANTZ:  Yes, Your Honor.  We're prepared to

19  give a week from the hearing, as our prior agreement was with

20  Mr. Rukavina.

21          THE COURT:  Okay.

22          MR. POMERANTZ:  I would also suggest that, with

23  respect to the hearing next Wednesday, number one, that by the

24  end of the day today -- and it could be late evening -- that

25  parties at least file their witness lists for who would be a

1  witness at that hearing and that Your Honor set a joint

2  deadline for any briefs, which would primarily be on the legal

3  issue, for 3:00 p.m. Central time on Tuesday, so that Your

4  Honor will have time to review them before the hearing and

5  that we can at least see each other's legal position on

6  whether a stay is appropriate even without meeting the

7  standard in -- if there's a bond posted.

8          THE COURT:  All right.  Well, sounds reasonable to

9  me, since we're talking about such a specific narrow issue.

10  Is everyone good with those deadlines?

11          MR. RUKAVINA:  Your Honor, yes, and I know Your Honor

12  has to run.  I will not be available for Wednesday, so please

13  excuse me.  I'll have someone else handle it.

14      And I would just ask that in the order denying the

15  discretionary stay, or some order, that the effective date of

16  the plan be pushed out by said week so we have it on paper and

17  clarity.  Thank you, Your Honor.

18          THE COURT:  All right.  That sounds reasonable, Mr.

19  Pomerantz.  Okay.

20          MR. POMERANTZ:  Thank you, Your Honor.  I guess the

21  only addition to my -- what I -- on Tuesday, when people file

22  their briefs, they should also file whatever exhibits they

23  would be relying on Wednesday.  Today, with the witness, I

24  realize it's a little probably early for people to get all

25  their exhibits, but they should be able to get their witnesses

1   by today and then their exhibits by 3:00 p.m. Central Tuesday,

2   along with any briefs.

3        THE COURT:  Okay.  So that sounds reasonable.  By the

4   end of today, the witness and exhibit list, or did we just

5   want to say witness --

6        MR. POMERANTZ:  The witness list by the end of today.

7        THE COURT:  Just the witness list.

8        MR. POMERANTZ:  Just the witness list.

9        THE COURT:  3:00 p.m. Central time Tuesday for the

10   exhibit list, with exhibits filed, and any briefing.  Anyone

11   have any contrary views?

12     Okay.  That will be the ruling, then.  And I'll see you

13   Monday, I guess.  We're adjourned.

14        THE CLERK:  All rise.

15        MR. POMERANTZ:  Thank you, Your Honor.

16        MR. RUKAVINA:  Thank you.

17     (Proceedings concluded at 12:20 p.m.)

18                       --oOo--

19

20                   CERTIFICATE

21     I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the

22   above-entitled matter.

23   **/s/ Kathy Rehling**                   **03/19/2021**

24   _____     _____

    Kathy Rehling, CETD-444             Date
25   Certified Electronic Court Transcriber

82

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

- By Mr. Hogewood                                             6
- By Mr. Rukavina                                           11
- By Mr. Taylor                                             16
- By Mr. Draper                                            18
- By Mr. Pomerantz                                         19
- By Mr. Clemente                                          54

WITNESSES

-none-

EXHIBITS

Movants' Exhibits' A through M                    Received 20
Debtor's Exhibits 1 through 33                    Received 21

RULINGS                                                      66

    Motion to Stay Pending Appeal filed by Interested
    Party Highland Capital Management Fund Advisors, LP,
    Interested Party NexPoint Advisors, LP (1955) - *Denied*

    Motion to Stay Pending Appeal filed by Interested Party
    Highland Global Allocation Fund, Interested Party
    Highland Income Fund, Interested Party NexPoint Capital,
    Inc., Interested Party NexPoint Strategic Opportunities
    Fund (1967) - *Denied*

    Joinder by James Dondero to Highland Capital Management
    Fund Advisors, LP and NexPoint Advisors, LP's Motion for
    Stay Pending Appeal (1973) - *Denied*

    Joinder by Creditor Get Good Trust, Creditor The Dugaboy
    Investment Trust to Motions for Stay Pending Appeal of
    the Court's Order Confirming the Debtor's Fifth
    Amended Plan (1971) - *Denied*

END OF PROCEEDINGS                                           81

INDEX                                                        82

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25