# EXHIBIT 27

**EXHIBIT 2**

## Holdings of Preference Shares[1] in CLOs

| CLO | HIF | NSOF | NC | Total |
|---|---|---|---|---|
| Aberdeen | 0% | 30.21% | 0% | **30.21%** |
| Brentwood | 0% | 40.06% | 0% | **40.06%** |
| Eastland | 31.16% | 10.53% | 0% | **41.69%** |
| Gleneagles | 9.74% | 8.52% | 0% | **18.26%** |
| Grayson | 49.10% | 10.75% | 0.63% | **60.48%** |
| Greenbriar | 0% | 53.44% | 0% | **53.44%** |
| Jasper | 0% | 17.86% | 0% | **17.86%** |
| Liberty | 0% | 10.64% | 0% | **10.64%** |
| Red River | 0% | 10.49% | 0% | **10.49%** |
| Rockwall | 6.14% | 19.57% | 0% | **25.71%** |
| Rockwall II | 14.56% | 5.65% | 0% | **20.21%** |
| Southfork | 0% | 7.30% | 0% | **7.30%** |
| Stratford | 0% | 69.05% | 0% | **69.05%** |
| Loan Funding VII (aka Valhalla) | 0% | 1.83% | 0% | **1.83%** |
| Westchester | 0% | 44.38% | 0% | **44.38%** |

---

[1] Class E Certificates for Liberty CLO, Ltd.

308354413 v10

## Applications and Motions[1] filed in *In re: Highland Capital Management, L.P.*, Case No.19-bk-34054

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/09/20 20 | 340 | Application to employ Hayward & Associates PLLC as Attorney | No Response | Granted by Dkt. 435 |
| | 281 | Motion to compromise controversy with Official Committee of Unsecured Creditors, filed by Debtor Highland Capital Management, L.P.) | No Response | Granted by Dkt. 339 |
| 01/13/20 20 | 351 | Motion to extend time to (Debtor's Motion for Entry of an Order Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure) | No Response | Granted by Dkt. 459 |
| 01/15/20 20 | 359 | Agreed Motion to continue hearing on (related documents 218 Motion for relief from stay) | No Response | Granted by Dkt. 361 |
| 01/17/20 20 | 370 | *Joint Motion for Continuance of Hearing on (i) Debtor's Application for an Order Authorizing the Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date, and (ii) Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date) Filed by Debtor Highland Capital Management, L.P.* | No Response | Granted by Dkt. 371 |
| 01/23/20 20 | 389 | First and Final Application for Compensation and Reimbursement of Expenses on behalf of Young Conaway Stargatt & Taylor, LLP as Co-Counsel for Official Committee of Unsecured Creditors, Creditor Comm. | No Response | Granted by Dkt. 458 |
| 01/24/20 20 | 395 | -Motion to extend or limit the exclusivity period Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 460 |
| | 396 | -Motion for expedited hearing on Exclusivity Motion | No Response | Granted by Dkt. 410 |
| | 397 | -Motion to enforce (*Motion of the Debtor for the Entry of an Order Concerning the "Sealing Motion" and for a Conference Concerning the Substance, Scope and Intent of Certain Recent Rulings*) (related document(s): | No Response | |

---

[1] Motions for *Pro Hac Vice* admission and motions to seal have been excluded. Effort was made to include all other substantive motions and applications.

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2704 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/31/20 20 | 419 | - Agreed Motion to Extend by One Hundred Twenty Days the Deadline to Assume or Reject Unexpired Nonresidential Real Property Lease) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 429 |
|  | 421 | - *Debtor's Motion for an Order (i) Establishing Bar Dates for Filing Claims, Including 503(b)(9) Claims; and (ii) Approving the Form and Manner of Notice Thereof)* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 488 |
|  | 422 | -Motion for expedited hearing | No Response | Granted by Dkt. 427 |
| 02/14/20 20 | 451 | Motion for relief from stay Filed by Jennifer G. Terry, Joshua Terry | No Response | Granted by Dkt. 519 |
| 02/24/20 20 | 474 | - *Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities")* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 477 |
|  | 475 | -Motion for expedited hearing |  |  |
| 02/27/20 20 | 483 | Application to employ Deloitte Tax LLP as Other Professional Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 551 |
| 03/23/20 20 | 545 | -Motion to extend time to file objection (Agreed Motion) (RE: related document(s)453 Application to employ) Filed by Creditor Committee Official Committee of Unsecured Creditors | No Response | Granted by Dkt. 548 |
| 03/31/20 20 | 557 | Motion to extend time to (Debtor's Emergency Motion for an Order Extending Bar Date Deadline for Employees to File Claims) (RE: related document(s)488 Order on motion for leave) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 560 |
| 04/07/20 20 | 569 | -Application for compensation *Sidley Austin LLP's First Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 10/29/2019 to 2/29/2020* | No Response | Granted by Dkt. 661 (Amended) Granted by Dkt. 666 |
|  | 570 | -Application for compensation *First Interim Application for Compensation and Reimbursement of Expenses for FTI* | No Response | Granted by Dkt. 662 (Amended) Granted by Dkt. 665 |

Page 2 of 13

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2705 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | Consulting, Inc., Financial Advisor, Period: 10/29/2019 to 2/29/2020 | | |
| 04/13/2020 | 582 | Motion for relief from stay - agreed Filed by Interested Party Hunton Andrews Kurth LLP | No Response | Granted by Dkt. 623 |
| 04/15/2020 | 590 | Motion to reclaim funds from the registry [Motion for Remittance of Funds Held in Registry of Court] Filed by Creditor CLO Holdco, Ltd. | No Response | Denied by Dkt. 825 |
| 04/17/2020 | 593 | Motion for relief from stay Filed by Acis Capital Management GP, LLC, Acis Capital Management, L.P. Objections due by 5/1/2020. | 617 Response unopposed to motion filed by Interested Party James Dondero. (05/01/2020) | Granted by Dkt. 764 |
| 04/28/2020 | 602 | - First Interim Application for Compensation of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from October 16, 2019 through March 31, 2020 for Foley Gardere, Foley & Lardner LLP, Special Counsel, | No Response | Granted by Dkt. 670 |
| | 604 | -Application to employ Hunton Andrews Kurth LLP as Special Counsel | No Response | Granted by Dkt. 763 |
| | 605 | -Application to employ Wilmer Cutler Pickering Hale and Dorr LLP as Special Counsel ( | No Response | Granted by Dkt. 669 |
| | 606 | -Motion to extend or limit the exclusivity period (RE: related document(s)460 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. Objections due by 5/22/2020. | No Response | Granted by Dkt. 668 |
| | 607 | - First Interim Application for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP, as Counsel for the Debtor and Debtor in Possession, for the Period From October 16, 2019 Through March 31, 2020 | No Response | Granted by Dkt. 663 |
| | 608 | - First Interim Application for Compensation and Reimbursement of Expenses of Mercer (US) Inc., as Compensation Consultant to the Debtor for the Period From November 15, 2019 Through February 29, 2020 for Mercer (US) Inc., Consultant, | No Response | Granted by Dkt. 664 |
| | 609 | -Application for compensation (Hayward & Associates PLLC's First Interim Application for Compensation and Reimbursement of | No Response | Granted by Dkt. 667 |

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2706 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Expenses for the Period from December 10, 2019 through March 31, 2020)* for Hayward & Associates PLLC, Debtor's Attorney, Period: 12/10/2019 to 3/31/2020 | | |
| 04/29/20 20 | 615 | Motion to extend time to Assume or Reject Unexpired Nonresidential Real Property Lease (RE: related document(s)429 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 616** |
| 05/20/20 20 | 644 | Motion for relief from stay *(UBS's Motion for Relief From the Automatic Stay to Proceed With State Court Action)* Fee amount $181, Filed by Interested Parties UBS AG London Branch, UBS Securities LLC Objections due by 6/3/2020. | **No Response** | **Denied by Dkt. 765** |
| 06/11/20 20 | 733 | -Motion for leave to File an Omnibus Reply to Objections to UBS's Motion for Relief from the Automatic Stay to Proceed With State Court Filed by Interested Parties UBS AG London Branch, UBS Securities LLC Objections due by 7/2/2020. | **No Response** | **Granted by Dkt. 910** |
| 06/12/20 20 | 737 | Motion to extend or limit the exclusivity period Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 820** |
| 06/15/20 20 | 747 | Motion to extend time to (Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure) (RE: related document(s)459 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 816** |
| 06/23/20 20 | 774 | -Application to employ James P. Seery, Jr. as Other Professional Debtors Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020 Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 854** |
| | 775 | -Application to employ Development Specialists, Inc. as Other Professional Amended Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc to March 15, 2020 Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 853** |

Page 4 of 13

**APP. 2703**
**Appx. 02750**

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 07/08/20 20 | 808 | Motion to compel Production by the Debtor. Filed by Creditor Committee Official Committee of Unsecured Creditors Objections due by 7/29/2020. | -832 Response opposed to (related document(s): 808 Moti on to compel Production by the Debtor. filed by Creditor Committee Official Committee of Unsecured Creditors) filed by Interested Party James Dondero. (07/14/2020) | **Dkt. 942**<br><br>The Discovery Motions are GRANTED to the extent specifically set forth herein and are otherwise DENIED. Except to the extent specifically set forth herein, the Objections are OVERRULED |
| 07/09/20 20 | 810 | -Motion for protective order (Debtor's Motion for Entry of (i) a Protective Order, or, in the Alternative, (ii) an Order Directing the Debtor to Comply with Certain Discovery Demands Tendered by the Official Committee of Unsecured Creditors Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034) Filed by Debtor Highland Capital Management, L.P. | No Response | **Dkt. 942**<br><br>The Discovery Motions are GRANTED to the extent specifically set forth herein and are otherwise DENIED. Except to the extent specifically set forth herein, the Objections are OVERRULED |
|  | 814 | -Motion for expedited hearing (related documents 808 Motion to compel) Filed by Creditor Committee Official Committee of Unsecured Creditors |  |  |
| 07/13/20 20 |  | Proof of Claim 23 filed by Acis Capital Management, LP and Acis Capital Management GP, LLC | 827-Objection to Acis Claim Filed by Interested Party James Dondero. | N/A |
| 07/14/20 20 | 831 | -Application for compensation Sidley Austin LLP's Second Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 3/1/2020 to 5/31/2020 | No Response | Granted by Dkt. 1048 |
| 07/21/20 20 | 883 | Application for compensation Second Interim Application for Compensation and Reimbursement of Expenses for FTI Consulting, Inc., Financial Advisor, Period: 3/1/2020 to 5/31/2020 | No Response | Granted by Dkt. 1051 |
| 07/22/20 20 | 886 | -Motion to extend time to assume or reject unexpired nonresidential real property lease Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 909 |

APP. 2704
Appx. 02751

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2709
Case 3:23-cv-00726-S Document 8-22 of 2072 12/29/23 Page 8 of 1828 PageID 9501
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2708 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 08/03/20 20 | 914 | -Motion for leave [CLO Holdco, Ltd.'s Motion for Clarification of Ruling] Filed by Creditor CLO Holdco, Ltd. | No Response | Resolved by Dkt. 935 |
| 08/06/20 20 | 924 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from April, 2020 through July 31, 2020 | No Response | Granted by Dkt. 1045 |
| 08/12/20 20 | 944 | Chapter 11 plan filed by Debtor Highland Capital Management, L.P. | No Response | |
| | 945 | -Disclosure statement filed by Debtor Highland Capital Management, L.P. | | |
| 08/13/20 20 | 947 | - Joint Motion to continue hearing on (related documents 771 Objection to claim) (Joint Motion to Continue Status Conference) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) | No Response | Granted by Dkt. 951 |
| | 949 | - Motion to extend or limit the exclusivity period (RE: related document(s)920 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Exhibit A--Proposed Order) (Annable, Zachery) | No Response | Granted by Dkt. 1092 |
| 08/18/20 20 | 964 | Hayward & Associates PLLC's Second Interim Application for Compensation and Reimbursement of Expenses for the Period from April 1, 2020 through June 30, 2020 | No Response | Granted by Dkt. 1047 |
| 08/19/20 20 | 971 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession for the Period from April 1, 2020 through July 31, 2020 | No Response | Granted by Dkt. 1043 |
| | 972 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Mercer (US) Inc. as Compensation Consultant for the Debtor for the Period from March 1, 2020 through May 31, 2020 for Mercer (US) Inc., Consultant | No Response | Granted by Dkt. 1046 |
| | 975 | - Consolidated Monthly and First Interim Application of Wilmer Cutler Pickering Hale and Dorr LLP for Allowance of Compensation for Services Rendered and Reimbursement of | No Response | Granted by Dkt. 1044 |

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Expenses as Regulatory and Compliance Counsel for the Period November 1, 2019 through June 30, 2020* | | |
| 09/04/20 | 1025 | Motion to compromise controversy with Carey International, Inc. Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1123 |
| 09/16/20 | 1214 | Motion for partial summary judgment on proof of claim(s) 190 and 191 of UBS Securities LLC and UBS AG, London Branch filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1526 |
| 09/23/20 | 1087 | -Motion to compromise controversy with (A) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (C) Acis Capital Management, L.P. (Claim No. 159). Filed by Debtor Highland Capital Management, L.P. | -1121 Response opposed to Acis 9019 Motion filed by Interested Party James Dondero. (10/05/2020) | Granted by Dkt. 1302 |
| | 1089 | -Motion to compromise controversy with (a) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (b) the Highland Crusader Funds (Claim No. 81). Filed by Debtor Highland Capital Management, L.P. Objections due by 10/19/2020. | No Response | Granted by Dkt. 1273 |
| 09/24/20 | 1099 | Motion for relief from stay - *Daugherty's Motion to Confirm Status of Automatic Stay, or alternatively to Modify Automatic Stay* Fee amount $181, Filed by Creditor Patrick Daugherty Objections due by 10/8/2020. | No Response | Granted by Dkt. 1327 |
| 09/28/20 | 1108 | Motion to Approve Disclosure Statement Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1476 |
| 10/02/20 | 1118 | - Motion to extend time to Assume or Reject Unexpired Nonresidential Real Property Lease Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1122 |
| | 1119 | -Motion to extend time to Deadline To File An Adversary Proceeding Against CLO Holdco, Ltd. (EMERGENCY) Filed by Creditor Committee Official Committee of Unsecured Creditors | No Response | Granted by Dkt. 1168 |
| | 1120 | | No Response | |

APP. 2706
Appx. 02753

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2710 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | -Motion for expedited hearing (related documents 1119 Motion to extend/shorten time) Filed by Creditor Committee Official Committee of Unsecured Creditors | | |
| 10/09/20 20 | 1154 | -Motion for leave to Amend Certain Proofs of Claim Filed by Creditor The Dugaboy Investment Trust Objections due by 10/30/2020. | No Response | N/A |
| 10/16/20 20 | 1179 | Omnibus Objection to claim(s) of Creditor(s) Crescent Research; Hedgeye Risk Management, LLC; James D. Dondero; NexVest, LLC; James D. Dondero.. Filed by Debtor Highland Capital Management, L.P. Responses due by 11/18/2020. | 1502 Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)1179 Objection to claim). (12/03/2020) | Dkt. 1537 |
| 10/18/20 20 | 1207 | Motion to allow claims of HarbourVest Pursuant to Rule 3018(A) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan Filed by Creditor HarbourVest et al Objections due by 11/9/2020. | No Response | |
| 10/16/20 20 | 1215 | -Redeemer Committee of the Highland Crusader Fund and the Crusader Funds' Motion for partial summary judgment on proof of claim(s) 190 and 191 of UBS AG, London Branch and UBS Securities LLC filed by Interested Party Redeemer Committee of the Highland Crusader Fun and the Crusader's Funds' | No Response | Resolved by Dkt. 1526 |
| 10/20/20 20 | 1244 | - Third Interim Application for Compensation and Reimbursement of Expenses for FTI Consulting, Inc., Financial Advisor, Period: 6/1/2020 to 8/31/2020. | No Response | Granted by Dkt. 1685 |
| 10/21/20 20 | 1263 | Emergency Motion to continue hearing on (related documents 1080 Disclosure statement) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1266 |
| 10/23/20 20 | 1281 | -Motion for leave - Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Filed by Creditor Patrick Daugherty | No Response | Granted by Dkt. 1474 |

APP. 2707
Appx. 02754

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2711 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 10/25/20 20 | 1289 | Amended disclosure statement filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1945 Disclosure statement, 1080 Disclosure statement). | No Response | N/A |
| 10/27/20 20 | 1296 | Application for compensation *Sidley Austin LLP's Third Interim Application for Compensation and Reimbursement of Expenses* for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 6/1/2020 to 8/31/2020. | No Response | Granted by Dkt. 1684 |
| 11/06/20 20 | 1338 | *Motion for Temporary Allowance of Claims for voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018)* Filed by Interested Parties UBS AG London Branch, UBS Securities LLC | No Response | Granted by Dkt. 1518 |
| 11/09/20 20 | 1348 | Motion to continue hearing on (related documents 1207 Motion to allow claims) Filed by Creditor HarbourVest et al | No Response | Granted by Dkt. 1352 |
| 11/13/20 20 | 1384 | Amended disclosure statement filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1945 Disclosure statement, 1080 Disclosure statement, 1289 Disclosure statement). | No Response | N/A |
| 11/18/20 20 | 1424 | - Motion for leave *(Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements)* Filed by Debtor Highland Capital Management, L.P.<br><br>- Motion for expedited hearing (related documents 1424 Motion for leave) *(Debtor's Motion for an Expedited Hearing on the Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreement)* Filed by Debtor Highland Capital Management, L.P. | 1447 WITHDRAWN per # 1460 Response opposed to (related document(s): 1424 Mo tion for leave *(Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements)* filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (11/20/2020) | Granted by Dkt. 1436 & 1475 |
| | 1425 | | | Granted by Dkt. 1436 |
| 11/19/20 20 | 1439 | - WITHDRAWN per docket # 1622 Motion for leave *(James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the* | N/A | Withdrawn by Dondero by Dkt. 1622 |

APP. 2708
Appx. 02755

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Ordinary Course of Business)* Filed by Interested Party James Dondero | | **Denied by Bankruptcy Court on the Record during hearing on November 23, 2020** |
| | 1443 | - Motion for expedited hearing/related documents 1439 Motion for leave) *(Request for Emergency Hearing on James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business)* Filed by Interested Party James Dondero | | |
| 11/25/20 20 | 1483 | *Third and Final Application for Compensation and Reimbursement of Expenses of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from October 16, 2019 through October 31, 2020* | No Response | Granted by Dkt. 1691 |
| 11/30/20 20 | 1491 | Motion for relief from stay Filed by Creditor Patrick Daugherty | No Response | Denied by Dkt. 1612 |
| 12/08/20 20 | 1528 | Motion for order imposing temporary restrictions on Debtor's ability, as portfolio manager, to initiate sales by non-debtor CLO Vehicles. Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund. | No Response | Denied by Dkt. 1605 |
| 12/09/20 20 | 1530 | Motion to extend time to Time to File An Adversary Proceeding Against CLO Holdco, Ltd. (Agreed) (RE: related document(s)1168 Order (generic)) Filed by Creditor Committee Official Committee of Unsecured Creditors Objections due by 12/30/2020. | No Response | Granted by Dkt. 1534 |
| 12/11/20 20 | 1544 | -Application for compensation *(First Interim Application)* for Hunton Andrews Kurth LLP, Special Counsel | No Response | Granted by Dkt. 1686 |
| | 1545 | - *(Hayward & Associates PLLC's Third Interim Application for Compensation and Reimbursement of Expenses for the Period from July 1, 2020 through September 30, 2020)* for Hayward & Associates PLLC, Debtor's Attorney | No Response | Granted by Dkt. 1728 |
| | 1547 | - *Third Interim Application for Compensation and for Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession for the Period from August 1, 2020 through November 30, 2020* | No Response | Granted by Dkt. 1687 |
| | | - *Consolidated Monthly and Second Interim Application of Wilmer Cutler Pickering Hale and Dorr LLP for Allowance of* | No Response | Granted by Dkt. 1715 |

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2713 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | 1552 | *Compensation for Services Rendered and Reimbursement of Expenses as Regulatory and Compliance Counsel for the Period from July 1, 2020 through November 30, 2020)* | | |
| 12/14/20 20 | 1564 | -Motion to quash *(Debtor's Emergency Motion to Quash Subpoena and for Entry of a Protective Order or, in the Alternative, for an Adjournment)* Filed by Debtor Highland Capital Management, L.P. | 1571 Objection to Motion to Quash filed by Interested Party James Dondero, . (12/14/2020) | Resolved by Dkt. 1603 |
| | 1565 | - Motion for protective order *(Debtor's Emergency Motion to Quash Subpoena and for Entry of a Protective Order or, in the Alternative, for an Adjournment)* Filed by Debtor Highland Capital Management, L.P. | | Resolved by Dkt. 1603 |
| 12/16/20 20 | 1583 | -Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s)1816 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1725 |
| 12/17/20 20 | 1590 | Motion to pay *(Debtor's Motion Pursuant to the Protocols for Authority for Highland Multi Strategy Credit Fund, L.P. to Prepay Loan)* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1746 |
| 12/23/20 20 | 1623 | -- Motion to extend time to assume unexpired nonresidential real property lease Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1636 |
| | 1625 | -Motion to compromise controversy with HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. Filed by Debtor Highland Capital Management, L.P. | -1697 Objection to HarbourVest 9019 Motion filed by Interested Party James Dondero (01/06/2021) | Granted by Dkt. 1788 |
| 12/31/20 20 | 1649 | Joint Motion to continue hearing on (related documents 1207 Motion to allow claims) Filed by Creditor HarbourVest et al | No Response | Granted by Dkt. 1652 |

Page 11 of 13

APP. 2710
Appx. 02757

APP.9449

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2714 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/04/2021 | 1655 | Application for compensation *Fourth Interim Application for Compensation and Reimbursement of Expenses for FTI Consulting, Inc.,* Financial Advisor, Period: 9/1/2020 to 11/30/2020, Fee: $710,280.45, Expenses: $1,479.47. Filed by Attorney Juliana Hoffman Objections due by 1/25/2021. | No Response | N/A |
| 01/11/2021 | 1719 | Notice *(Second Notice of (I) Executory Contracts and Unexpired Leases to Be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, If Any, and (III) Related Procedures in Connection Therewith)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1606 Support/supplemental document (*Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1472 Chapter 11 plan). | 1784 WITHDRAWN PER # 1876. Objection to (related document(s): 1719 No tice (generic) filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. **(01/20/2021)** | N/A |
| 01/14/2021 | 1745 | *Motion to appoint trustee Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* Filed by Get Good Trust, The Dugaboy Investment Trust | 1756 Joinder by filed by Interested Party James Dondero **(01/15/2021)** | Denied by Dkt. 1960 |
| 01/19/2021 | 1777 | *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief)* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1849 |
| 01/27/2021 | 1853 | *Sidley Austin LLP's Fourth Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors,* Creditor Comm. Atty, Period: 9/1/2020 to 11/30/2020. | No Response | N/A |
| 02/01/2021 | 1878 | Motion to compel an Order Requiring James D. Dondero to Preserve Documents and to Identify Measures Taken to Ensure Document Preservation. Filed by Creditor Committee Official Committee of Unsecured Creditors | 1969 Objection to UCC's Preservation Motion filed by Interested Party James Dondero. **(03/03/2021)** | N/A |
| 02/08/2021 | 1914 | Motion for leave *(Motion for Status Conference)* Filed by Interested Party James Dondero | N/A | Denied by Dkt. 1929 |

APP. 2711
Appx. 02758

APP.9450

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2715 of
2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 02/28/2021 | 1955 | Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan) Filed by Interested Parties Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. | No Response | N/A |
| 03/01/2021 | 1958 | Motion for expedited hearing (related documents 1955 Motion to stay pending appeal) Filed by Interested Parties Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. | No Response | N/A |
| 03/03/2021 | 1967 | Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan) Filed by Interested Parties Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund (Hogewood, A.) | No Response | N/A |
| 03/04/2021 | 11973 | -Joinder by filed by Interested Party James Dondero (RE: related document(s)1955 Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan)) | N/A | N/A |

Page 13 of 13

**EXHIBIT 29**

## Highland Capital Management, L.P. v. Dondero 20-03190-sgj

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 12/07/2020 | 2 | - Motion for preliminary injunction [Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero] filed by Plaintiff Highland Capital Management, L.P. | 52 Response opposed to (related document(s): 2 Motion for preliminary injunction [Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero] filed by Plaintiff Highland Capital Management, L.P.) filed by Defendant James D. Dondero. (01/07/2021) | Granted by Dkt. 59 |
| | 5 | - Motion for expedited hearing/related documents 2 Motion for preliminary injunction) [Plaintiff Highland Capital Management, L.P.'s Motion for Expedited Hearing on Its Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero] filed by Plaintiff Highland Capital Management, L.P. (Annable, Zachery). Related document(s) 6 Motion for protective order filed by Plaintiff Highland Capital Management, L.P. | | Granted by Dkt. 9 |
| | 6 | - Motion for temporary restraining order filed by Plaintiff Highland Capital Management, L.P. | No Response | Granted by Dkt. 10 |
| 12/16/2020 | 24 | WITHDRAWN per # 29 Motion for leave [James Dondero's Emergency Motion to Modify Temporary Restraining Order] (related document(s) 10 Order on motion for protective order) filed by Defendant James D. Dondero | 29 Withdrawal filed by Defendant James D. Dondero (RE: related document(s):24 Motion for leave [James Dondero's Emergency Motion to Modify Temporary Restraining Order] (related document(s) 10 Order on motion for protective order)). | |
| 12/28/2020 | 32 | Motion for protective order [James Dondero's Emergency Motion for Entry of a Protective Order] filed by Defendant James D. Dondero | 34 Objection to (related document(s): 32 Motion for protective order [James Dondero's Emergency Motion for Entry of a Protective Order] filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. (12/28/2020) | Denied by Dkt. 38 |
| | 33 | - Motion for expedited hearing/related documents 32 Motion to [Request for Emergency Hearing] filed by Defendant James D. Dondero | | |
| 01/07/2021 | 48 | Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order [Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO] filed by Plaintiff Highland Capital Management, L.P. | 110 Objection to (related document(s): 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order [Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO] filed by Plaintiff Highland Capital Management, L.P.)[James Dondero's Objection and Response to Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause and Brief in Support] filed by Defendant James D. Dondero. (02/21/2021) | N/A |
| | 49 | - Brief in support filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s)48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order [Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO] | 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order [Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO] filed by Plaintiff Highland Capital Management, L.P. | N/A |
| | 51 | - Motion for expedited hearing/related documents 48 Motion for Contempt] filed by Plaintiff Highland Capital Management, L.P. | | N/A |
| 01/13/2021 | 64 | Motion for leave to appeal (related document(s) 59 Order on motion for preliminary injunction, 60 Notice of appeal filed by Defendant James D. Dondero) filed by Defendant James D. | 60 Notice of appeal filed by Defendant James D. | Denied by Dkt. 111 |
| 01/27/2021 | 75 | Emergency Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero | 77 Objection to (related document(s): 75 Emergency Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. (01/28/2021) | N/A |
| 02/10/2021 | 95 | Motion to continue hearing on (related documents 48 Motion for Contempt, 49 Brief) filed by Defendant James D. Dondero | No Response | Granted by Dkt. 97 |
| 02/17/2021 | 102 | Motion to continue hearing on (related documents 48 Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | No Response | Granted by Dkt. 104 |
| 02/20/2021 | 107 | Motion to strike (related document(s): 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order [Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO]) filed by Plaintiff Highland Capital Management, L.P.) [James Dondero's Emergency Motion in Limine and to Exclude Evidence and Argument] filed by Defendant James D. Dondero. | 115 Objection to (related document(s): 107 Motion to strike (related document(s): 48 Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order [Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO]) filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. (02/24/2021) | N/A |
| | 108 | - Motion for expedited hearing/related documents 107 Motion to strike document] filed by Defendant James D. Dondero | | N/A |
| 03/02/2021 | 119 | Motion to continue hearing on (related documents 48 Motion for Contempt] filed by Plaintiff Highland Capital Management, L.P. | No Response | Granted by Dkt. 120 |

| 03/10/2021 | 126 | Motion to continue hearing on (related document(s): **48** Motion for Contempt, **49** Brief, **125** Certificate of service)(Motion for Continuance of Contempt Hearing) filed by Defendant James D. Dondero (Attachments: # 1 Ex. A - Mandamus # 2 Ex. B - Letter # 3 Proposed Order) | **No Response** | N/A |

APP. 2714
Appx. 02761

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2719
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 18 of 1828 PageID 9511
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2718 of 2722

# EXHIBIT 30

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF MICHAEL J. LANG IN SUPPORT OF MOVANTS' MOTION
FOR RECUSAL PURSUANT TO 28 U.S.C. § 455**

I, Michael J. Lang, declare under penalty of perjury as follows:

1.      I am more than 21 years of age and am competent to make this Declaration. I have personal knowledge of the facts set forth herein, and they are true and correct.

2.      I am a partner at the law firm of Crawford, Wishnew & Lang PLLC and represent Movants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants") in the above-captioned action. I am authorized to make this Declaration in Support of Movants' Motion for Recusal Pursuant to 28 U.S.C. § 455 (the "Motion").

3.      **Exhibit 1** referenced and incorporated into the Brief in Support of the Motion ("the Brief") and contained in the Appendix in Support of the Motion (the "Appendix") (at APP. 0001-APP.

---

**DECLARATION OF MICHAEL J. LANG**                                                                **PAGE 1**

0137) is a true and correct copy of a court record [ECF Dkt. 181] from the bankruptcy proceeding styled *In the Matter of: Highland Capital Management, L.P.*; Case No. 19-12239 (CSS) in the United States Bankruptcy Court for the District of Delaware.

4.    The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from this above-captioned bankruptcy proceeding styled *In Re: Highland Capital Management, L.P.*; Case No. 19-34054-sgj-11, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 2 | January 9, 2020 Debtor's Motion to Compromise Controversy with Official Committee of Unsecured Creditors Transcript | APP. 0138-APP. 0228 |
| 3 | February 19, 2020 Transcript | APP. 0229-APP. 0416 |
| 4 | December 8, 2020 Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [ECF Dkt. 1522] | APP. 0417-APP. 0442 |
| 5 | December 16, 2020 Transcript - Motion for Order Imposing Temporary Restrictions | APP. 0443-APP. 0508 |
| 9 | February 8, 2021 Transcript - Bench Ruling on Confirmation Hearing and Agreed Motion to Assume | APP. 0990-APP. 1040 |
| 10 | July 8, 2020 Transcript - Motion to Extend Exclusivity Period and Motion to Extend Time to Remove Actions | APP. 1041-APP. 1098 |
| 12 | June 30, 2020 Transcript - Motion for Remittance of Funds Held in Registry of Court filed by CLO Holdco, Ltd. [ECF Dkt. 802] | APP. 1152-APP. 1251 |
| 13 | July 21, 2020 Official Committee of Unsecured Creditors Emergency Motion to Compel Production by the Debtor Transcript | APP. 1252-APP. 1376 |
| 14 | Applications to Employ James P. Seery and Development Specialists, Inc. Transcript [ECF Dkt. 864] | APP. 1377-APP. 1510 |
| 15 | March 4, 2020 Transcript - Hearing on Motion of The Debtor for Entry of an Order Authorizing, but not Directing, the Debtor to Cause Distributions to Certain "Related Entities" | APP. 1511-APP. 1631 |
| 16 | June 15, 2020 Transcript - UBS's Motion for Relief from the Automatic Stay to Proceed with State Court Action | APP. 1632-APP. 1758 |
| 22 | January 14, 2021 Motion to Appoint Examiner [ECF Dkt. 1752] | APP. 2057-APP. 2070 |
| 23 | February 2, 2021 Transcript of Proceedings | APP. 2071-APP. 2365 |
| 24 | Servicing Agreement – Exhibit N to the February 2, 2021 Transcript of Proceedings | APP. 2366-APP. 2401 |

**DECLARATION OF MICHAEL J. LANG**                                      **PAGE 2**

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2721
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 20 of 1828 PageID 9513
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2720 of 2722

| 25 | Servicing Agreement – Exhibit J to the February 2, 2021 Transcript of Proceedings | APP. 2402-APP. 2440 |
| 26 | February 3, 2021 Transcript of Proceedings | APP. 2441-APP. 2697 |
| 27 | Chart of Holdings of Preference Shares in CLOs – Exhibit 2 from February 3, 2021 Hearing | APP. 2698-APP. 2699 |

5.     **Exhibit 11** referenced and incorporated into the Brief and contained in the Appendix (at APP. 1099-1151) is a true and correct copy of a court record [ECF Dkt. 1186] from the proceeding styled *In the Acis Capital Management, L.P. and Acis Capital Management GP, LLC*; Case No. 18-30264-SGJ-11 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

6.     The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from the adversary proceeding styled *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*, Adversary Proceeding No. 21-03000-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 6 | January 6, 2021 Plaintiff Highland Capital Management, L.P.'S Verified Original Complaint for Declaratory and Injunctive Relief [ECF Dkt. 1] | APP. 0509-APP. 0527 |
| 7 | January 26, 2021 Transcript - Motion for Entry of Order Authorizing Debtor to Implement Key Employee Plan | APP. 0528-APP. 0784 |
| 17 | January 6, 2021 Debtor's Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero [ECF Dkt. 6] | APP. 1759-APP. 1776 |

7.     The following exhibit referenced and incorporated into the Brief and contained in the Appendix is a true and correct copy of a court record from the adversary proceeding styled *Highland Capital Management, L.P. v. James D. Dondero*, Adversary Proceeding No. 20-3190-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

**DECLARATION OF MICHAEL J. LANG**                                                              **PAGE 3**

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 8 | January 8, 2021 Transcript - Preliminary Injunction Hearing | APP. 0785-APP. 0989 |

8.      The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from the adversary proceeding styled *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*, Adversary Proceeding No. 21-03010-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 19 | February 17, 2021 Debtor's Memorandum of Law in Support of its Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021 [ECF Dkt. 3] | APP. 1792-APP. 1812 |
| 20 | February 24, 2021 Order on Mandatory Injunction [ECF Dkt. 25] | APP. 1813-APP. 1817 |
| 21 | February 23, 2021 Transcript - Mandatory Injunction Hearing | APP. 1818-APP. 2056 |

9.      **Exhibit 18** referenced and incorporated into the Brief and contained in the Appendix (at APP. 1777-1791) contains true and correct courtesy copies of the K&L Gates Letters (as defined in the Brief), which are attached to the Declaration of James Seery [ECF 4] in the Adversary Proceeding styled *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al*. Adversary No. 21-03000-sgj.

10.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED ON the 18th of March, 2021 in Dallas, Dallas County, Texas.

Michael J. Lang
Declarant

---

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1 of 11
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 23 of 1828   PageID 9516
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21   Entered 03/23/21 12:05:38   Page 1 of 11



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 22, 2021**

_____
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | CASE NO. 19-34054-SGJ-11 |
| L.P., | § | (Chapter 11) |
| DEBTOR. | § | |

### ORDER DENYING MOTION TO RECUSE,
### PURSUANT TO 28 U.S.C. § 455

CAME ON FOR CONSIDERATION before this court the Motion of James Dondero,

Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy

Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE

Partners, LLC, a Delaware limited liability company (collectively, the "Movants") to Recuse,

Pursuant to 28 U.S.C. § 455, filed March 18, 2021, along with a supporting Brief and an

Appendix that is 2,722 pages in length [DE ## 2060, 2061, & 2062] (hereinafter, the "Motion to

Recuse").

1



Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 11
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 24 of 1828 PageID 9517
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21 Entered 03/23/21 12:05:38 Page 2 of 11

The Movants, through newly appearing counsel, Michael J. Lang of Crawford, Wishnew & Lang PLLC, argue that the assigned bankruptcy judge (the "Presiding Judge") should, after 15 months, recuse herself from presiding in the above-referenced case of Highland Capital Management, L.P. (the "Debtor" or "Highland"), whose Chapter 11 plan was recently confirmed. The Movants state that they perceive the Presiding Judge has developed animus towards James Dondero ("Mr. Dondero") and parties connected with him or deemed under his control (the "Affected Entities"). Mr. Dondero and the Affected Entities argue that the Presiding Judge's impartiality can be reasonably questioned. Specifically, they express concerns that the Presiding Judge formed negative opinions of Mr. Dondero in a prior bankruptcy case over which the Presiding Judge presided (*In re Acis Capital Management, L.P.,* Case No. 18-30264)[1]; that those opinions have carried over to the current case; the Presiding Judge has been unable to extricate those opinions from her mind; and this has resulted in an actual bias against Mr. Dondero that is prejudicing him and the Affected Entities.

Accordingly, the Movants ask that the Presiding Judge recuse herself from any future contested matters and adversary proceedings arising in the Highland case.

By way of further background, the Highland case has been pending since October 16, 2019. It was filed in the Bankruptcy Court for the District of Delaware. Venue was transferred to the Bankruptcy Court for the Northern District of Texas, Dallas Division, on motion of the Official Unsecured Creditors Committee ("Committee") on December 4, 2019. On January 9, 2020, a significant corporate governance settlement between Highland and the Committee was reached and approved by this court. The settlement involved the removal of Mr. Dondero as CEO and from all decision making at Highland, at the insistence of the

---

[1] Acis Capital Management, L.P. ("Acis") was formerly a company in the Highland corporate organizational structure.

Committee, and an entirely new corporate governance structure was imposed on the Debtor, with extensive

oversight by the Committee. This new corporate governance structure was negotiated by the Debtor under

pressure from both the Committee and the United States Trustee—both of whom expressed positions that a

Chapter 11 Trustee should be appointed in this case, due to alleged conflicts of interest and mismanagement,

among other things, attributed to Mr. Dondero. Mr. Dondero signed off on the corporate governance

settlement and this court approved it. A new three-member board has controlled the Debtor since then,

consisting of a retired bankruptcy judge (Russell Nelms); a second individual with extensive experience

serving as an independent board member of companies undergoing bankruptcy or restructuring (John

Dubel); and a third individual (later appointed CEO) with broad experience managing distressed debt

investments and other products similar to what Highland manages (James P. Seery).

After more than a year, under direction of the new board, the Debtor obtained confirmation of a

Chapter 11 Plan on February 22, 2021. The Plan was proposed after many months of contentiousness with

several large creditors and the Committee. In fact, in August 2020, the court required the key parties to

engage in mediation before two respected co-mediators (Retired Bankruptcy Judge Allan Gropper, S.D.N.Y.

and Attorney/Mediator Sylvia Mayer, Houston). The Debtor (either during or after mediation) reached key

settlements with the largest creditors in this case (including Acis, which asserted more than a $70 million

disputed claim; the Redeemer Committee for the Crusader Fund which asserted more than a $250 million

claim and had been in litigation in multiple fora with Highland and affiliates for approximately a decade; and

UBS Securities, which asserted more than a $1 billion claim and had also been in litigation with Highland

and certain affiliates for more than a decade). Mr. Dondero participated in the mediation, but settlements were

not reached with him. The Plan that this court confirmed in February 2021 was supported by the Committee

and overwhelmingly by non-insider creditors. Other large, non-insider creditors that supported the Plan,

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 11
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 26 of 1828    PageID 9519
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21    Entered 03/23/21 12:05:38    Page 4 of 11

besides those mentioned above, were Patrick Daugherty (a former executive of Highland who has been in litigation with Highland and Mr. Dondero for more than a decade) and HarborVest—each of whom asserted multi-million dollar claims in this case. In any event, the Movants have appealed the confirmation order.

The Motion to Recuse comes 17 months after the Chapter 11 case was filed (although just 15 months after it was transferred to the Presiding Judge). As mentioned, it comes after confirmation of a plan. The Motion to Recuse was filed just two business days before this court is scheduled to hear a motion of the Debtor to hold Mr. Dondero in contempt of a TRO. This hearing on the motion to hold Mr. Dondero in contempt has been continued various times at his request. The underlying TRO has also been the subject of unsuccessful attempts at interlocutory appeals and is currently the subject of a petition for writ of mandamus before the Fifth Circuit.

## I.      LEGAL STANDARD APPLICABLE TO THE MOTION TO RECUSE.

Before addressing the substance of the Motion to Recuse, the court will address the governing legal authority: 28 U.S.C. § 455, Fed. R. Bankr. Pro. 5004(a), and certain case law interpreting same.

The relevant portions of 28 U.S.C. § 455 provide that:

(a)      Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b)      He shall also disqualify himself in the following circumstances:

(1)      Where he has a personal bias or prejudice concerning a party, a personal knowledge of disputed evidentiary facts concerning the proceeding;

28 U.S.C. § 455(a) & (b)(1).

APP. 02762

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of 11
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 27 of 1828   PageID 9520
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21   Entered 03/23/21 12:05:38   Page 5 of 11

Bankruptcy Rule 5004(a) further provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case."

The court first notes that the applicable statute and rule do not expressly address timeliness.  However, one Circuit Court has stated that recusal motions must be made in a timely fashion.  *Davies v. C.I.R*, 68 F.3d 1129, 1130-31 (9th Cir. 1995) (one year after a ruling was considered untimely).

The court next notes that the applicable statute and rule do not expressly state whether the presiding judge or some other judge should decide a motion to recuse/disqualify. Case authority has interpreted the provisions set forth above to give the targeted judge authority (at least initially) to decide a motion to disqualify. *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999) (a motion to recuse is committed to the discretion of the targeted judge, and the denial of such motion will only be reversed upon the showing of an abuse of discretion); *Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn)*, 401 B.R. 848, 851 (Bankr. S.D.Tex. 2009) (citing *United States v. Mizell*, 88 F.3d 288, 299 (5th Cir. 1996)(the targeted judge has broad discretion in determining whether disqualification is appropriate)).

Additionally, the court notes that the applicable statute and rule do not expressly state what type of hearing a movant is entitled to, if any. Case authority has interpreted that a motion for disqualification does not necessarily confer upon a movant a right to make a record in open court, nor does it confer upon them a right to an evidentiary hearing. *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D. Tex. 1990).   *See generally* 13A C. Wright, A. Miller & E.

APP. 0273

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of 11
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 28 of 1828   PageID 9521
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21   Entered 03/23/21 12:05:38   Page 6 of 11

Cooper, *Federal Practice and Procedure* § 3550, at 629 (a section 455 motion can be supported by an affidavit, a verified memorandum, or a statement of facts in some form). The procedure for a targeted judge to follow, as set forth in *Levitt v. University of Texas*, 847 F.2d 221, 226 (5th Cir. 1988), and as more specifically articulated in *Lieb v. Tillman*, 112 B.R. at 836, is: (a) first, the targeted judge should decide whether the "claim asserted" by the movants "rises to the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality; (b) if not, then the judge should not recuse himself; and (c) if so, another judge should "decide what the facts are," *i.e.,* hold an evidentiary hearing, and presumably then this other judge would decide whether disqualification is appropriate.

Next, with regard to evaluating a motion to recuse, the Fifth Circuit has recognized that section 455(a) claims are fact-driven, and as a result, the analysis of a particular section 455(a) claim must be guided, not by a comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue. *United States v. Jordan,* 49 F.3d 152, 157 (5th Cir. 1995).   As a matter of law, clashes between the court and counsel for a party is an insufficient basis for disqualification, and Circuit Courts have refused to base disqualification under Section 455 upon apparent animosity towards counsel. *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975) (holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel.")); *See also Focus Media, Inc. v. NBC (In re Focus Media),* 378 F.3d 916, 929-31 (9th Cir. 2004) (adverse rulings and negative remarks ordinarily do not support a bias challenge). Disqualification is appropriate if a reasonable person,

6

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of 11
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 29 of 1828   PageID 9522
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21   Entered 03/23/21 12:05:38   Page 7 of 11

knowing all of the relevant circumstances, would harbor doubts about a judge's impartiality.

*Chitmacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1165 (5th Cir. 1982).

Finally, if a movant appeals a decision not to disqualify and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record. Such procedure is consistent with *Levitt. See Lieb v.Tillman*, 112 B.R. at 836.

## II.     THE UNIQUE FACTS AND CIRCUMSTANCES APPLICABLE HERE.

First, the court determines that the Motion to Recuse is not timely.  Again, it was filed more than 15 months after the Presiding Judge was transferred the Highland case.  It comes after many dozens of orders have been issued by the court, including a confirmation order that the Movants have now appealed.  It comes on the eve of a contempt hearing. The timing does not seem to pass muster—if, indeed, timeliness is a factor, as the Ninth Circuit has suggested.

But, since the Motion to Recuse raises serious issues, the court will nevertheless analyze it as though it is timely. The court will address whether the overall circumstances might cause a reasonable observer to question or harbor doubts about the court's impartiality. Would the claims asserted in the Motion to Recuse rise to the threshold standard of raising a doubt in the mind of a reasonable observer as to the court's impartiality?

### A.  The Acis Case.

At the heart of the Motion to Recuse seems to be an assertion that the Presiding Judge gained extrajudicial knowledge and developed opinions of Mr. Dondero and the Affected Entities during the Acis case and that this has created animus or bias towards them in the Highland case and related adversary proceedings. Evaluating this contention requires some

examination of just what the court heard and adjudicated in the Acis case.

Acis Capital Management, L.P. ("Acis LP"), a Delaware limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware limited liability company—were two entities within the approximately 2,000-entity organizational structure of Highland that were forced into an involuntary bankruptcy case in January 2018 (for convenience, the court will collectively refer to them as "Acis"). The Presiding Judge presided over the Acis case. Mr. Dondero was the president of the two Acis Debtors, as well as the CEO of Highland at the time. The Presiding Judge's recollection is that Mr. Dondero testified *only once* during the lengthy Acis proceedings (during the trial on the involuntary petitions in the Spring of 2018) and, at all other times, various inhouse counsel at Highland served as the witnesses for Acis and Highland.

As far as "extrajudicial knowledge," what the Presiding Judge learned from the Acis case was largely regarding the "CLO Industry." The court learned that Highland was a pioneer, among registered investment advisors, in the securitization investment product known as a "CLO" (collateralized loan obligations) and Acis, for many years, was the vehicle through which Highland's CLO business was managed. The court learned about the typical structure of these CLOs (the various tranches of debt and the rights they enjoyed), the typical governing documents for and life span of a CLO, the typical portfolio management agreements, the shared services agreements, and the sub-advisory agreements that undergirded the whole operation. The court learned about Highland's role in these and the role of Acis, historically, and the role of an entity known as Highland CLO Funding "("HCLOF"). HCLOF is not a movant on the Motion to Recuse. If the Presiding Judge made any specific rulings with regard to Mr. Dondero or the Affected Entities during the Acis case, she cannot recall. The court certainly does recall

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of 11
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 31 of 1828   PageID 9524
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21   Entered 03/23/21 12:05:38   Page 9 of 11

accusations made by Acis against **Highland** and **HCLOF** with regard to alleged fraudulent transfers and alleged denuding of Acis assets to thwart judgment creditor Josh Terry.  The court has never ruled on the actual fraudulent transfer claims and, the Presiding Judge believes that the claims at least among Acis and Highland have been settled.

In summary, the extrajudicial knowledge—if it should be considered that—the Presiding Judge gained from the Acis case, that is now suggested to have created bias or animus, was knowledge about the highly complex CLO products industry, knowledge about the forms of agreement that typically set forth parties' rights and obligations, and some knowledge about the Highland business structure and the shared services and sub-advisory services model it typically used. The Presiding Judge at all times has been aware that Mr. Dondero was a founder of Highland, and was the President of Acis and CEO of Highland at relevant times. To be clear, a Chapter 11 Trustee was appointed in the Acis case soon after an order for relief was entered, and the Presiding Judge only recalls Mr. Dondero testifying once in court during the Acis case. The Presiding Judge has a vague recollection that deposition testimony may have been presented at another time. The court cannot recall any of the other Affected Entities ever being parties appearing in the Acis case or providing testimony.

The court notes, anecdotally, that 28 U.S.C. § 1408(2) contemplates that venue is proper over a case "in which there is a pending case under title 11 concerning such person's affiliate, general partner or partnership." Thus, it is not *per se* improper (in fact, is generally proper) for a presiding judge to preside over cases of affiliated business entities of a party. It happens all the time.

Case 19-34054-sgj11 Doc 3445-4 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 32 of 1828 PageID 9525
Case 19-34054-sgj11 Doc 2083 Filed 03/23/21 Entered 03/23/21 12:05:38 Page 10 of 11

### B. Bias or Animus, More Generally?

More generally, the court does not believe that the provisions of 28 U.S.C. § 455 are implicated here. The Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants.

As earlier mentioned, case law has held that clashes between a court and counsel for a party is an insufficient basis for disqualification, and Circuit Courts have refused to base disqualification under Section 455 upon apparent animosity towards counsel. *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975) (holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel.")). Not only does this court have the utmost respect for Mr. Dondero's and each of the Affected Entities' counsel, but the court has no disrespect or animus toward Mr. Dondero on a personal level or any of the Movants.

This court has merely addressed motions, objections, and other pleadings as they have been presented. It has issued and enforced orders where requested and warranted. This court and all courts sometimes use strong words as part of managing a complex and contentious case. None of this should be interpreted as "bias" or "prejudice." It is simply about rule enforcement and managing a docket consistent with this court's duty to the public. The court does not believe the assertions of the Movants rise to "the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality.

WHEREFORE, it is hereby

ORDERED that the Motion to Recuse is denied. The court reserves the right to

10

supplement or amend this ruling.

It is so ORDERED.

###END OF ORDER###

# EXHIBIT 5

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 2 of 16
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 35 of 1828  PageID 9528
Case 3:21-cv-00879-K  Document 5  Filed 05/17/21  Page 1 of 16  PageID 108
Docket #0005  Date Filed: 5/17/2021

**IN THE UNITED STATES DISTICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al*., | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

**APPELLANTS' RESPONSE TO DEBTOR'S MOTION FOR LEAVE TO INTERVENE
IN APPEAL OF RECUSAL ORDER**

James Dondero ("<u>Mr. Dondero</u>"), Highland Capital Management Fund Advisors, L.P.,

NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real

Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company

(collectively, "<u>Appellants</u>") file this *Response* (the "*<u>Response</u>*") to Highland Capital Management,

L.P.'s ( "<u>Debtor</u>") *Motion for Leave to Intervene in Appeal of Recusal Order* (the "*<u>Motion to</u>*

*<u>Intervene</u>*").[1] Appellants respectfully state as follows:

## I.  <u>BACKGROUND</u>

### A.  Procedural Background

1.      On October 16, 2019, Debtor filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

---

[1] Dkt 2.

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 16
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 36 of 1828   PageID 9529
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 2 of 10   PageID 109

"Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

2.      On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee"). The Committee then moved to transfer the Highland Bankruptcy Case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

3.      At the hearing on the Committee's Motion to Transfer, the Pachulski firm, counsel for Debtor, expressly acknowledged that the Committee's motive in seeking transfer of the Highland Bankruptcy Case to the Bankruptcy Court was to take advantage of the Bankruptcy Court's preexisting negative views of Debtor's management, including, notably, Mr. Dondero:

> However -- Your Honor pointed to this at the beginning, in mentioning comments about forum-shopping -- the committee and Acis are really being disingenuous, and they have not told you the real reason that they want the case before Judge Jernigan.[7] … And it's not because she's familiar with this debtor's business, this debtor's assets, or this debtor's liabilities, because she generally is not. ***It is because she formed negative views regarding certain members of the debtor's management that the committee and Acis hope will carry over to this case***.[2]
>
> ****
> The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, ***without the baggage of what happened in a previous case***, which contrary to what Acis and the committee says [*sic*], has very little to do with this debtor.[3]

4.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to the Bankruptcy Court.[4]

## B.   The *Motion to Recuse*

5.      As the Bankruptcy Court has essentially acknowledged, the Bankruptcy Court carried

---

[2] *See* B.R. Dkt. 2062, the *Appendix to the Motion to Recuse* at Exhibit 1 at 77:18-78:8 [App. 0077-0078] (emphasis added).

[3] *Id.* at 79:14-20 [App. 0079] (emphasis added).

[4] *See* B.R. Dkt. 186.

---

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 16
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 37 of 1828 PageID 9530
Case 3:21-cv-00879-K Document 5 Filed 05/17/21 Page 3 of 10 PageID 110

negative opinions of Mr. Dondero into the Highland Bankruptcy Case that it cannot extricate from its mind.

6.      Moreover, the record in the Highland Bankruptcy Case reflects that these negative opinions have resulted in, if not actual bias against Mr. Dondero (as well as any entity the Bankruptcy Court deems connected to him or under his control (collectively, the "Affected Entities")):[5] (a) the undeniable **perception** of bias against Mr. Dondero and the Affected Entities; and (b) distinct and regular favoritism toward Debtor and other parties (or, at a minimum, the undeniable **perception** of such favoritism).

7.      Specifically, among other things, the record in the Highland Bankruptcy Case reflects that the Bankruptcy Court's bias began to manifest itself in late 2020 and early 2021 as the Bankruptcy Court:

(a)     Repeatedly made statements demonstrating its unfavorable opinions about Mr. Dondero;

(b)     Declared that Mr. Dondero (and, by implication, the Affected Entities and each of their licensed attorneys) are vexatious litigants based on Mr. Dondero and the Affected Entities actions in: (i) defending lawsuits and motions filed against them; (ii) asserting valid legal positions; and/or (iii) preserving legal rights, including on appeal;

(c)     Reasonably appears to have prejudged an issue of fact in the Adversary Proceedings (defined below) by concluding that any entity connected to Mr. Dondero (*i.e.*, the Affected Entities) is essentially Mr. Dondero himself, without evidence being introduced that support disregarding the corporate status of these entities;

(d)     Summarily and/or preemptively disregarded the testimony of any witness who would testify in favor of Appellants, without evidentiary support, as "under [Mr. Dondero's] control" and, if the witness has any connection to Mr. Dondero, *per se* not credible; and

(e)     Entered findings of fact and granted remedies against Appellants that the

---

[5] The term "Affected Entities" should be understood to include Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc.

---

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 5 of 16
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 38 of 1828  PageID 9531
Case 3:21-cv-00879-K  Document 5  Filed 05/17/21  Page 4 of 10  PageID 111

opposing party did not seek, thus depriving Appellants of due process rights.

8.  This bias (or equally problematic perception of bias) has and will continue to impair the ability of Appellants to adequately preserve and protect their legal rights and interests.

9.  Consequently, on March 18, 2021, Appellants moved to recuse Presiding Judge Jernigan (the "*Motion to Recuse*")[6] from the below adversary proceedings (the "Adversary Proceedings"):

| Adversary Proceeding | File Date |
|---|---|
| *UCC v. CLO Holdco Ltd., et al.; Adversary No. 20-03195* | 12/17/2020 |
| *HCMLP v. NexPoint Advisors, L.P., et al.; Adversary No. 21-03000* | 1/6/2021 |
| *HCMLP v. Dondero; Adversary No. 21-03003* | 1/22/2021 |
| *HCMLP v. HCMFA; Adversary No. 21-03004* | 1/22/2021 |
| *HCMLP v. NexPoint Advisors, L.P.; Adversary No. 21-03005* | 1/22/2021 |
| *HCMLP v. HCM; Adversary No. 21-03006* | 1/22/2021 |
| *HCMLP v. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC; Adversary No. 21-03007* | 1/22/2021 |
| *HCMLP v. HCMFA; Adversary No. 21-03010* | 2/17/2021 |
| *HCMLP v. Dondero; Adversary No. 20-03190* | 12/7/2020 |

10.  Notably, while the Bankruptcy Court had presided over many issues in the Highland Bankruptcy Case at the time of the *Motion to Recuse*, Appellants' *Motion to Recuse* sought relief related to recently filed and future, stand-alone Adversary Proceedings, *i.e.*, **proceedings in which institutional knowledge is not required**. Indeed, as shown above, before the Bankruptcy Court's "institutional knowledge" became advantageous for Debtor, Debtor aptly referred to it as "baggage."

11.  Moreover, the Bankruptcy Court has not made any substantive rulings in those Adversary Proceedings, and the defendants therein have moved to withdraw the reference in most, if not all,

---

[6] *See* B.R. Dkt. 2060-2062.

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of 16
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 39 of 1828   PageID 9532
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 5 of 10   PageID 112

of those cases on the grounds that most of the claims are based on state law.

**C. The *Recusal Order* and Debtor's Intentional Inaction**

12.     On March 19, 2021, the morning after Appellants filed the *Motion to Recuse*, the Bankruptcy Court acknowledged receiving the *Motion to Recuse* in a hearing on a separate issue and stated to all present (which included Debtor) that it would review the *Motion to Recuse* and let the parties know whether responsive pleadings would be necessary.[7]

13.     The Bankruptcy Court's statements that morning clearly indicated that it would likely deny the *Motion to Recuse sua sponte*. Nonetheless, no party, including Debtor, sought to oppose the *Motion to Recuse*; or request time to file a response; or indicate that they, in any way, objected to the foreshadowed ruling without the opportunity to advocate for their interest and create a record. This silence continued in the days following the hearing.

14.     On March 23, 2021, the Bankruptcy Court, as it indicated it would, *sue sponte* denied Appellants' *Motion to Recuse* on three grounds (the "*Recusal Order*"): (a) the *Motion to Recuse* was untimely;[8] (b) the Bankruptcy Court's subjective belief that it was not biased ("[t]he Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants");[9] and (c) criticism of counsel (which was not a ground that Appellants asserted in the *Motion to Recuse*) did not justify recusal.[10]

15.     Appellants timely filed a *Notice of Appeal* of the *Recusal Order* and, since no other party

---

[7] *See* an excerpted copy of the Transcript from March 19, 2021 hearing at 78:3-12 ("All right. Okay. And then there's -- I don't know if the apparently new counsel who has filed a motion of recusal is on the line, but I'll just tell people I will let you all know by the end of today if I think I need a hearing on that or I think I need to give other parties in interest the opportunity to weigh in on that. But I don't think it's going to stop me from going forward, just based on the very quick summary I got from one of my law clerks this morning. But I'll let you know by the end of the day today if I think I need to set that for hearing or need responsive pleadings."), a true and correct copy of which is attached hereto as **Exhibit 1 to this *Response*** and incorporated herein by reference.
[8] B.R. Dkt. 2883 at p. 7.
[9] B.R. Dkt. 2883 at p. 10.
[10] *Id.*

---

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 16
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 40 of 1828    PageID 9533
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 6 of 10    PageID 113

had filed any response to the *Motion to Recuse* (or indicated any position in favor or opposing the *Motion to Recuse*), Appellants listed the Bankruptcy Court as the interested party to the appeal and Debtor (and others) as "Notice Parties."[11] Then, after discussions with the Clerk for the Bankruptcy Court, who had filed correspondence in the Bankruptcy Case requesting Appellants amend their *Notice of Appeal* to add an Appellee, Appellants named the Bankruptcy Court as "Appellee" in an *Amended Notice of Appeal*.[12]

## II.    RESPONSE TO DEBTOR'S *MOTION TO INTERVENE*

16.    In a footnote (fn. 2) to the *Motion to Intervene*, Debtor overstates that Appellants are unopposed to its *Motion to Intervene*.

17.    When counsel for Debtor conferred with counsel for Appellants, counsel for Appellants indicated Appellants would not be opposed to Debtor **seeking intervention** in this appeal of the *Recusal Order*. Specifically, what counsel for Appellants did not oppose was Debtor's request to intervene and defend the *Recusal Oder* against appeal **on the grounds stated by the Bankruptcy Court in the Recusal Order**.

18.    Counsel for Appellants did not indicate that Appellants were unopposed to Debtor using intervention as a back-door attempt to make arguments that Debtor knowingly and intentionally refused to make in response to the *Motion to Recuse* in the Bankruptcy Court.

19.    Regardless, Debtor, as shown herein, has failed to show that intervention is necessary, and Debtor should not be allowed to, through intervention, raise new arguments that it did not previously present to the Bankruptcy Court (or offer new grounds for denying the *Motion to Recuse* that were not raised by the Bankruptcy Court in its own *Recusal Order*).

20.    **First**, Debtor asserts that it "would face substantial adverse consequences if the Recusal

---

[11] B.R. Dkt. 2149.
[12] *See* B.R. Dkt. 2169; Dkt. 1-1.

---

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 16
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 41 of 1828    PageID 9534
Case 3:21-cv-00879-K   Document 5   Filed 05/17/21   Page 7 of 10   PageID 114

Order is overturned on appeal and Judge Jernigan is removed from the Bankruptcy Case."[13] In support of this statement, Debtor asserts that the Bankruptcy Court has issued 2,500 opinions and orders in the Highland Bankruptcy Case (and its various contested matters) and makes the conclusory statement that recusing Judge Jernigan from the Adversary Proceedings would somehow jeopardize the "successful implementation" of Debtor's reorganization plan. However, none of the Bankruptcy Court's institutional knowledge affects the trial of the pending and future Adversary Proceedings referenced above, which can and should stand alone and be determined on a case-by-new-case basis.

21.    More importantly, the core issues on appeal here are: (a) whether "a reasonable man, cognizant of the relevant circumstances surrounding [the Bankruptcy Court's] failure to recuse, would harbor legitimate doubts about that judge's impartiality;"[14] and (b) whether the Bankruptcy Court should be recused from sitting as the judge and jury in the various Adversary Proceedings listed above. Respectfully, Appellants, like every litigant, are entitled to a full and fair opportunity to make their case in a fair and impartial forum.[15]

22.    Under § 455(a), this Court must objectively address the requirements of § 455(a) and, if after such an objective analysis, this Court determines that a reasonable person would question the Bankruptcy Court's impartiality, then recusal is mandatory. Indeed, Debtor's insistence that the Bankruptcy Court's "institutional knowledge" (the same knowledge Debtor previously admitted was biased "baggage") is ***required*** for the Adversary Proceedings only further supports the positions taken by Appellants in the *Motion to Recuse*.

23.    ***Second***, while Debtor contends that its interest will not be adequately protected if it is not

---

[13] Dkt. 2 at ¶ 18.
[14] *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir.1999).
[15] *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir. 2021).

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of 16
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 42 of 1828 PageID 9535
Case 3:21-cv-00879-K Document 5 Filed 05/17/21 Page 8 of 10 PageID 115

permitted to intervene, ***Debtor, as shown above, made no attempt to oppose the Motion to Recuse or to represent Debtor's interests in the Bankruptcy Court***—including when the Bankruptcy Court specifically raised the *Motion to Recuse* at a hearing involving Debtor and indicated the likely reality that the Bankruptcy Court would reject the motion without hearing or responsive pleadings.

24.     Moreover, Debtor's claim that this appeal will go unopposed absent its intervention as an "appellant"[16] also lacks merit. Appellants have the burden irrespective of any intervention. As stated above, if a reasonable person would question the Bankruptcy Court's impartiality, then recusal is mandatory.

25.     ***Third***, in the *Motion to Intervene*, Debtor provides only conclusory statements as to why participating in this appeal as an *amicus curiae* would be inadequate. Debtor does not explain how filing an amicus brief enabling this Court to view the matter from Debtor's perspective would be insufficient. On the contrary, numerous cases support the proposition that allowing a proposed intervenor to file an amicus brief is an adequate alternative to permissive intervention.[17]

26.     Instead, Debtor states that "although intervention was not sought in the Bankruptcy Court, the Debtor seeks intervention in this Appeal in order to bring relevant issues and facts from the record to the District Court's attention."[18] Notably, as stated above, Debtor never requested that the Bankruptcy Court permit Debtor to respond to the *Motion to Recuse* before ruling, despite the Court's clear indication that it was going to rule on the *Motion to Recuse*. Moreover, Debtor never filed a notice of appeal, and it did not file or intervene to designate the record. In short, Debtor has

---

[16] Dkt. 2 at ¶ 23 ("Based on the foregoing, the Debtor respectfully requests that this Court grant leave for the Debtor to intervene in the instate Appeal, that it be given reasonable opportunity to supplement the record, and that it otherwise ***be treated as an "Appellant" for all purposes,*** as if originally named as such in the Notice of Appeal.").

[17] *See McHenry v. Comm'r*, 677 F.3d 214, 227 (4th Cir. 2012); *Ruthardt v. United States*, 303 F.3d 375, 386 (1st Cir.2002); *Mumford Cove Ass'n v. Town of Groton*, 786 F.2d 530, 535 (2d Cir.1986); *Bush v. Viterna*, 740 F.2d 350, 359 (5th Cir.1984); *Brewer v. Republic Steel Corp.*, 513 F.2d 1222, 1225 (6th Cir.1975).

[18] Dkt. 2 at ¶21.

---

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 43 of 1828    PageID 9536
Case 3:21-cv-00879-K    Document 5    Filed 05/17/21    Page 9 of 10    PageID 116

provided no justification for the arguments contained or the relief requested in the *Motion to Intervene*.

27.     Nonetheless, weeks after making no effort to "advocate for its own interests" in the Bankruptcy Court, it now appears that Debtor is seeking intervention in order to create new arguments it declined to make to the Bankruptcy Court. Debtor cannot use the intervention process this way. To the extent Debtor intervenes, it is stepping into the shoes of the Bankruptcy Court, and it is bound by the Bankruptcy Court's analysis, the Bankruptcy Court's basis, and the Bankruptcy Court's reasoning as stated in the *Recusal Order* denying the *Motion to Recuse*.

28.     As a result, Debtor has failed to satisfy the requirements for intervention.

29.     Moreover, while Appellants do not oppose Debtor filing a brief as an amicus to give this Court Debtor's perspective, Debtor should not be allowed to assert, for the first time on appeal, new arguments that Debtor did not present to the Bankruptcy Court and that the Bankruptcy Court did not raise in its *Recusal Order*. This Court cannot consider such additional grounds to determine whether the Bankruptcy Court abused its discretion in denying Appellants' *Motion to Recuse*.

### III.    <u>CONCLUSION</u>

FOR THE FOREGOING REASONS, Appellants respectfully request the Court deny the relief requested in the *Motion to Intervene* or, alternatively, limit Debtor's intervention to defending the Bankruptcy Court's *Recusal Order* on the grounds stated and the basis set forth in that order.

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 44 of 1828 PageID 9537
Case 3:21-cv-00879-K Document 5 Filed 05/17/21 Page 10 of 10 PageID 117

Dated: May 17, 2021                           Respectfully submitted,


                                              By: */s/ Michael J. Lang*
                                              Michael J. Lang
                                              Texas State Bar No. 24036944
                                              mlang@cwl.law
                                              CRAWFORD, WISHNEW & LANG PLLC
                                              1700 Pacific Ave, Suite 2390
                                              Dallas, Texas 75201
                                              Telephone: (214) 817-4500
                                              *Counsel for Appellants*


## CERTIFICATE OF SERVICE


The undersigned certifies that, on May 17, 2021, a true and correct copy of the above and foregoing document was served on all parties and counsel of record via the Court's e-filing system.


                                              */s/ Michael J. Lang*
                                              Michael J. Lang

# EXHIBIT 1

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                  )    Case No. 19-34054-sgj-11
In Re:                            )    Chapter 11
                                  )
HIGHLAND CAPITAL                  )    Dallas, Texas
MANAGEMENT, L.P.,                 )    Friday, March 19, 2021
                                  )    9:30 a.m. Docket
         Debtor.                  )
                                  )    MOTIONS TO STAY
                                  )    PENDING APPEAL
                                  )

                         TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:              Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor:              John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539

For James Dondero:           Clay M. Taylor
                             BONDS ELLIS EPPICH SCHAFER
                              JONES, LLP
                             420 Throckmorton Street,
                              Suite 1000
                             Fort Worth, TX  76102
                             (817) 405-6900
```

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 46 of 1828 PageID 9539

Case 3:21-cv-00879-K Document 5-1 Filed 05/17/21 Page 2 of 5 PageID 119

2

```
1    APPEARANCES, cont'd.:

2    For Get Good Trust and          Douglas S. Draper
     Dugaboy Investment Trust:       HELLER, DRAPER & HORN, LLC
3                                     650 Poydras Street, Suite 2500
                                      New Orleans, LA  70130
4                                     (504) 299-3300

5    For Certain Funds and           Davor Rukavina
     Advisors:                       MUNSCH, HARDT, KOPF & HARR
6                                     500 N. Akard Street, Suite 3800
                                      Dallas, TX  75201-6659
7                                     (214) 855-7587

8    For Certain Funds and           A. Lee Hogewood, III
     Advisors:                       K&L GATES, LLP
9                                     4350 Lassiter at North Hills
                                       Avenue, Suite 300
10                                    Raleigh, NC  27609
                                      (919) 743-7306
11
     Recorded by:                    Michael F. Edmond, Sr.
12                                    UNITED STATES BANKRUPTCY COURT
                                      1100 Commerce Street, 12th Floor
13                                    Dallas, TX  75242
                                      (214) 753-2062
14
     Transcribed by:                 Kathy Rehling
15                                    311 Paradise Cove
                                      Shady Shores, TX  76208
16                                    (972) 786-3063

17

18

19

20

21

22

23

24         Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25
```

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 47 of 1828   PageID 9540

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 3 of 5   PageID 120

78

1   9:30 unless someone notifies my courtroom deputy over the

2   weekend that the Fifth Circuit has said stop, you can't.

3       All right.  Okay.  And then there's -- I don't know if the

4   apparently new counsel who has filed a motion of recusal is on

5   the line, but I'll just tell people I will let you all know by

6   the end of today if I think I need a hearing on that or I

7   think I need to give other parties in interest the opportunity

8   to weigh in on that.  But I don't think it's going to stop me

9   from going forward, just based on the very quick summary I got

10  from one of my law clerks this morning.  But I'll let you know

11  by the end of the day today if I think I need to set that for

12  hearing or need responsive pleadings.

13      All right.  The last thing before I'm late for my

14  engagement is, Mr. Pomerantz, at some point -- no, this is the

15  next-to-last thing.  At some point, you said we have a hearing

16  next week on a preliminary injunction adversary as to the

17  Funds.  Is that next week?

18          MR. POMERANTZ:  Your Honor, I may have misspoke.  I

19  think it's the 29th.

20          THE COURT:  Okay.

21          MR. POMERANTZ:  I could be corrected if I'm wrong.

22  So, --

23          THE COURT:  Okay.  So, with that, I'm going to offer

24  you this.  Traci, correct me if I'm wrong:  I don't think we

25  have anything set right now on Wednesday of next week,

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 48 of 1828   PageID 9541

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 4 of 5   PageID 121
81

1  by today and then their exhibits by 3:00 p.m. Central Tuesday,

2  along with any briefs.

3          THE COURT:  Okay.  So that sounds reasonable.  By the

4  end of today, the witness and exhibit list, or did we just

5  want to say witness --

6          MR. POMERANTZ:  The witness list by the end of today.

7          THE COURT:  Just the witness list.

8          MR. POMERANTZ:  Just the witness list.

9          THE COURT:  3:00 p.m. Central time Tuesday for the

10  exhibit list, with exhibits filed, and any briefing.  Anyone

11  have any contrary views?

12      Okay.  That will be the ruling, then.  And I'll see you

13  Monday, I guess.  We're adjourned.

14          THE CLERK:  All rise.

15          MR. POMERANTZ:  Thank you, Your Honor.

16          MR. RUKAVINA:  Thank you.

17      (Proceedings concluded at 12:20 p.m.)

18                          --oOo--

19

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   /s/ Kathy Rehling                        03/19/2021

24  _____     _____
    Kathy Rehling, CETD-444                       Date
25  Certified Electronic Court Transcriber

Case 19-34054-sgj11 Doc 3445-5 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 16 of
16
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 49 of 1828   PageID 9542

Case 3:21-cv-00879-K   Document 5-1   Filed 05/17/21   Page 5 of 5   PageID 122

82

<div align="center">INDEX</div>

PROCEEDINGS                                                        3

OPENING STATEMENTS

- By Mr. Hogewood                                                  6
- By Mr. Rukavina                                                 11
- By Mr. Taylor                                                   16
- By Mr. Draper                                                   18
- By Mr. Pomerantz                                               19
- By Mr. Clemente                                                54

WITNESSES

-none-

EXHIBITS

Movants' Exhibits' A through M                      Received 20
Debtor's Exhibits 1 through 33                      Received 21

RULINGS                                                           66

     Motion to Stay Pending Appeal filed by Interested
     Party Highland Capital Management Fund Advisors, LP,
     Interested Party NexPoint Advisors, LP (1955) - *Denied*

     Motion to Stay Pending Appeal filed by Interested Party
     Highland Global Allocation Fund, Interested Party
     Highland Income Fund, Interested Party NexPoint Capital,
     Inc., Interested Party NexPoint Strategic Opportunities
     Fund (1967) - *Denied*

     Joinder by James Dondero to Highland Capital Management
     Fund Advisors, LP and NexPoint Advisors, LP's Motion for
     Stay Pending Appeal (1973) - *Denied*

     Joinder by Creditor Get Good Trust, Creditor The Dugaboy
     Investment Trust to Motions for Stay Pending Appeal of
     the Court's Order Confirming the Debtor's Fifth
     Amended Plan (1971) - *Denied*

END OF PROCEEDINGS                                                81

INDEX                                                             82

The line numbers 1 through 25 appear in the left margin.

# EXHIBIT 6

Case 19-34054-sgj11 Doc 3445-6 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 4
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 51 of 1828   PageID 9544
Case 3:21-cv-00879-K   Document 10   Filed 06/10/21   Page 1 of 3   PageID 9524
Docket #0010  Date Filed: 6/10/2021

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:                                                §
                                                        §
HIGHLAND CAPITAL                                        §
MANAGEMENT, L.P.                                        §
                                                        §

In re:                                                §
                                                        §
JAMES DONDERO, *et al.*,                               §
                                                        §
           Appellants,                                  §
                                                        §
v.                                                      §        Civil Action No. 3:21-CV-0879-K
                                                        §
HON. STACEY G. C. JERNIGAN,                            §
                                                        §
           Appellee.                                    §

## <u>ORDER</u>

Before the Court is Debtor Highland Capital Management, L.P.'s Motion for
Leave to Intervene in Appeal of Recusal Order ("Motion") (Doc. No. 2).  The Court
has considered the Motion, the Response, the Reply, the supporting documentation,
and the applicable law.  The Court **GRANTS** Debtor Highland Capital Management,
L.P.'s Motion.

On March 18, 2021, Appellants James Dondero, Highland Capital Management
Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get

ORDER – PAGE 1



Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC (collectively, "Appellants") filed a Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Motion to Recuse"). R. on Appeal, Volume 10 (Doc. No. 9-10) at 2338. On March 22, 2021, United States Bankruptcy Judge Stacey G. C. Jernigan issued an order denying the Motion to Recuse ("Order"). *Id.*, Volume 1 (Doc. No. 9-1) at 31. Appellants filed their Notice of Appeal as to Judge Jernigan's Order on April 1, 2021, and their Amended Notice of Appeal on April 6, 2021. *Id.* at 1, 16. In their Notices of Appeal, Appellants named Judge Jernigan as the Appellee. *See id.* Debtor filed the instant Motion for Leave to Intervene seeking leave to intervene and to be treated as "Appellee" and also that Debtor be allowed to supplement the appellate record. Appellants filed a Response (Doc. No. 5), opposing Debtor's request to intervene and, alternatively, asking the Court to limit any permitted intervention to defending those reasons stated in the Order. Debtor then filed a Reply (Doc. No. 6).

Federal Rule of Bankruptcy Procedure 8013 addresses, in relevant part, intervening in a bankruptcy appeal. FED. R. BANKR. P. 8013. Rule 8013(g) provides:

> Unless a statute provides otherwise, an entity that seeks to intervene in an appeal pending in the district court or BAP must move for leave to intervene and serve a copy of the motion on the parties to the appeal. The motion or other notice of intervention authorized by statute must be filed within 30 days after the appeal is docketed. It must concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the

ORDER – PAGE 2

Case 19-34054-sgj11 Doc 3445-6 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 4
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 53 of 1828   PageID 9546
Case 3:21-cv-00879-K   Document 10   Filed 06/10/21   Page 3 of 3   PageID 9526

proceeding, and why participating in an amicus curiae would not be adequate.

Fed. R. Bankr. P. 8013(g).  Section 1109 of the Bankruptcy Code permits a "party of interest, including the debtor," to raise and appear and "be heard on any issue in a case under this chapter."  11 U.S.C. § 1109.

The Court finds that Debtor has established the requirements for intervening in this bankruptcy appeal.  *See* Fed. R. Bankr. P. 8013(g).  Therefore, the Court **grants** Debtor leave to intervene.  Intervenor-Debtor may file a responsive brief, as accorded to an Appellee under the Bankruptcy Rules, in response to any appellate brief on the merits that Appellants may file.  *See* Fed. R. Bank. P. 8018.  Intervenor-Debtor may also designate additional items to be included in the appellate record.  Intervenor-Debtor **must supplement the record within 14 days from the date of this Order**.

The Court **denies** all other relief.

**SO ORDERED.**

Signed June 10th, 2021.

*Ed Kinkeade*

ED KINKEADE
UNITED STATES DISTRICT JUDGE

APP. 02797

# EXHIBIT 7

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 61
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 55 of 1828   PageID 9548
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 1 of 60   PageID 10087

Docket #0020  Date Filed: 7/28/2021

Case No. 3:21-cv-00879-K

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

**JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, AND NEXPOINT REAL ESTATE PARTNERS, LLC,**

<u>Appellants,</u>

v.

**HON. STACEY G. C. JERNIGAN AND HIGHLAND CAPITAL MANAGEMENT, L.P.**

<u>Appellees.</u>

---

**On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court**

**In re:  Highland Capital Management, L.P.
Case No. 19-34054 (Jointly Administered)**

---

## ANSWERING BRIEF OF APPELLEE
## HIGHLAND CAPITAL MANAGEMENT, L.P.

---



APP. 0799

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 61
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 56 of 1828   PageID 9549
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 2 of 60   PageID 10688

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        jelkin@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 61
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 57 of 1828 PageID 9550
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 3 of 60 PageID 10689

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................1

I.      STATEMENT OF ISSUES AND STANDARD OF REVIEW ........................2

II.     SUMMARY OF THE RESPONSE ..............................................................3

III.    STATEMENT OF FACTS ..........................................................................6

    A.   The Bankruptcy Court Presides Over the Acis Bankruptcy Case,
and the Delaware Court Transfers this Case to the Bankruptcy Court
for that Very Reason ..................................................................................6

    B.   Appellants File the Recusal Motion .......................................................11

       1.   The December 2019 Transfer Motion...............................................12

       2.   The January 2020 Settlement Hearing .............................................12

       3.   The February 19, 2020 Application to Employ Hearing ...................13

       4.   The December 2020 Restriction Motion...........................................16

       5.   The January 2021 Hearing on the Debtor's Motion for
Injunctive Relief...............................................................................20

       6.   The February 2021 Confirmation Hearing........................................22

       7.   Article Referencing PPP Loans........................................................28

       8.   Mandatory Injunction .......................................................................29

    C.   The Bankruptcy Court Denies the Recusal Motion.................................31

    D.   Appellants Appeal the Bankruptcy Court's Recusal Order .....................32

IV.     SUMMARY OF THE ARGUMENT ..........................................................33

V.      ARGUMENT ...........................................................................................35

    A.   The Bankruptcy Court Properly Exercised Its Discretion in
Finding the Recusal Motion Was Untimely ...........................................35

    B.   The Bankruptcy Court Properly Exercised Its Discretion in
Denying the Recusal Motion on the Merits.............................................43

       1.   There Is No Extrajudicial Bias Present Here ....................................45

       2.   The Bankruptcy Court Does Not Harbor Deep-Seated
Antagonism Toward Appellants ......................................................49

CONCLUSION...............................................................................................52

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of 61
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 58 of 1828   PageID 9551
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 4 of 60   PageID 10690

# TABLE OF AUTHORITIES

**CASES**

*Andrade v. Chojnacki,*
   338 F.3d 448 (5th Cir. 2003) ........................................................ passim
*Apple v. Jewish Hosp. & Med. Ctr.,*
   829 F.2d 326 (2d Cir. 1987) ...................................................................39
*Bossart v. Havis,*
   389 B.R. 511 (S.D. Tex.), aff'd sub nom. *In re Bossart*, 296 F. App'x 398
   (5th Cir. 2008) ....................................................................................3
*Brown v. Oil States Skagit Smatco,*
   664 F.3d 71 (5th Cir. 2011) ...................................................................46
*Caperton v. A.T. Massey Coal Co.,*
   556 U.S. 868 (2009) ..............................................................................49
*Conkling v. Turner,*
   138 F.3d 577 (5th Cir. 1998) ........................................................... 45, 46
*Da Silva Moore v. Publicis Groupe,*
   868 F. Supp. 2d 137 (S.D.N.Y. 2012) ............................................. 38, 40
*Davis v. Board of School Comm'rs,*
   517 F.2d 1044 (5th Cir. 1975) ...............................................................32
*Delesdernier v. Porterie,*
   666 F.2d 116 (5th Cir. 1982) .................................................................36
*Garcia v. Woman's Hosp. of Texas,*
   143 F.3d 227 (5th Cir. 1998) .................................................................51
*Grambling University Nat. Alumni Ass'n v. Board of Sup'rs for La. System,*
   286 Fed.Appx. 864 (5th Cir. 2008) ........................................................35
*Henderson v. Department of Public Safety and Corrections,*
   901 F.2d 1288 (5th Cir. 1990) ......................................................... 48, 51
*Hill v. Breazeale,*
   197 Fed.Appx. 331 (5th Cir. 2006) ................................................. 37, 43
*Hill v. Schilling,*
   495 Fed. Appx. 480 (5th Cir. 2012) ...................................... 2, 3, 35, 42
*Hill v. Schilling*,
   No. 3:07–CV–2020–L, 2014 WL 1516193, (N.D. Tex. Apr. 17, 2014)..............38
*Hirczy v. Hamilton,*
   190 Fed. Appx. 357 (5th Cir. 2006) ................................................. 39, 43
*In re Chevron U.S.A., Inc.,*
   121 F.3d 163 (5th Cir. 1997) .................................................................49

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 61
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 59 of 1828 PageID 9552
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 5 of 60 PageID 10691

*In re Ramba, Inc.*,
  416 F.3d 394 (5th Cir. 2005) ...................................................................3

*Johnson v. Mississippi*,
  403 U.S. 212 (1971) ..............................................................................49

*Lieb v. Tillman (In re Lieb)*,
  112 B.R. 830 (Bankr. W.D.Tex 1990) .................................................32

*Liteky v. U.S.*,
  510 U.S. 540 (1994) ...................................................................... passim

*Love v. Tyson Foods, Inc.*,
  677 F.3d 258 (5th Cir. 2012) ...................................................................3

*Marshall v. Jerrico*,
  446 U.S. 238 (1980) ..............................................................................48

*Martin v. Monumental Life Ins. Co.*,
  240 F.3d 223 (3d Cir. 2001) .................................................................42

*Miller v. Sam Houston State University*,
  986 F.3d 880 (5th Cir. 2021) ................................................................48

*Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*,
  485 F.3d 793 (5th Cir. 2007) ...................................................................3

*Travelers Ins. Co. v. Liljeberg Enters., Inc.*,
  38 F.3d 1404 (5th Cir. 1994) ................................................................35

*U.S. v. Jordan*,
  49 F.3d 152 (5th Cir. 1995) ..................................................................44

*U.S. v. Olis*,
  571 F.Supp.2d 777 (5th Cir. 2008) .......................................................41

*U.S. v. Sanford*,
  157 F.3d 987 (5th Cir. 1998) ..................................................... 35, 36, 38

*U.S. v. Williams*,
  127 Fed. Appx. 736 (5th Cir. 2005) .....................................................51

*U.S. v. York*,
  888 F.2d 1050 (5th Cir. 1989) ..............................................................42

*United States v. Bremers*,
  195 F.3d 221 (5th Cir. 1999) ................................................................43

*United States v. Landerman*,
  109 F.3d 1053 (5th Cir. 1997) ..............................................................51

*Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*,
  948 F.2d 1436 (5th Cir. 1991) ..............................................................44

*Weisshaus v. Fagan*,
  456 Fed.Appx. 23 (2d Cir. 2012) .................................................... 40, 42

DOCS_NY:43746.7 36027/002

APP. 02893

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of 61
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 60 of 1828   PageID 9553
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 6 of 60   PageID 10692

**STATUTES**

11 U.S.C. § 330.......................................................................................................14
28 U.S.C. § 455............................................................................................... passim

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 61
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 61 of 1828    PageID 9554
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 7 of 60    PageID 10693

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellee Highland Capital Management, L.P. is a limited partnership, the general partner of which is Strand Advisors, Inc., a privately held corporation. No publicly held corporation owns 10% or more of the interest in either entity.

DOCS_NY:43746.8 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of 61
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 62 of 1828   PageID 9555
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 8 of 60   PageID 10694

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy case (the "Bankruptcy Case"),  hereby submits its Answering Brief to the Opening Brief of appellants James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Advisors"), The Dugaboy Investment Trust ("Dugaboy"), The Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts"), and NexPoint Real Estate Partners, LLC (collectively, "Appellants") in respect of their appeal from the *Order Denying Motion to Recuse, Pursuant to 28 U.S.C. § 455,* (*see* R. 31)[1] (the "Recuse Order"), entered by the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on March 18, 2021.

## I.    STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issue on appeal is whether the Bankruptcy Court properly exercised its discretion in denying Appellants' *Motion to Recuse, Pursuant to 28 U.S.C. § 455*, (*see* R. 2338) (the "Recuse Motion").  The standard of review for a denial of a motion to recuse is abuse of discretion. *See Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003); *Hill v. Schilling*, 495 Fed. Appx. 480, 483 (5th Cir. 2012). "[D]eference ... is the hallmark of abuse-of-discretion review." *Love v. Tyson Foods,*

---

[1] Refers to Appellants' Record on Appeal [Docket No. 9].  Any reference to "Supp. R." refers to Appellants' Supplemental Record [Docket No. 19].

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 63 of 1828 PageID 9556
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 9 of 60 PageID 10695

*Inc.*, 677 F.3d 258, 262 (5th Cir. 2012). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Hill*, 495 Fed. Appx. at 483 (internal quotations omitted). "A finding of fact is clearly erroneous only when although there may be evidence to support it, the reviewing court on the entire [record] is left with the definite and firm conviction that a mistake has been committed." *Preston v. Tenet Healthsystem Memorial Med. Ctr., Inc.*, 485 F.3d 793, 796–97 (5th Cir. 2007) (internal quotations omitted). "Stated differently, a 'factual finding is not clearly erroneous if it is plausible in the light of the record read as a whole.'" *Bossart v. Havis*, 389 B.R. 511, 515 (S.D. Tex.), *aff'd sub nom. In re Bossart*, 296 Fed. App'x 398 (5th Cir. 2008) (quoting *In re Ramba, Inc.*, 416 F.3d 394, 402 (5th Cir. 2005)). For the reasons below, the Bankruptcy Court properly exercised its discretion in denying the Recusal Motion.

## II. SUMMARY OF THE RESPONSE

Under Mr. Dondero's direction, the Debtor was forced to file for bankruptcy in October 2019 to protect itself from an avalanche of adverse rulings entered against Highland and Dondero-controlled affiliates. For nearly a decade, courts and arbitration panels in Texas, Delaware, New York, and in foreign jurisdictions such as the Cayman Islands, Bermuda, and Guernsey, issued a series of rulings against Mr. Dondero and his enterprise, some with stinging rebukes.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 64 of 1828    PageID 9557
Case 3:21-cv-00879-K    Document 20    Filed 07/28/21    Page 10 of 60    PageID 10696

Now, over a year after the Debtor's bankruptcy proceeding was transferred to the Bankruptcy Court,[2] Appellants complain that the Bankruptcy Court is biased against Mr. Dondero, as if no other judge or fact-finder had previously ruled against him and the entities he controls. Appellants base their appeal on snippets of out-of-context quotes and on eight specific rulings out of the dozens entered by the Bankruptcy Court, while ignoring the mountain of evidence justifying that Court's rulings.

While Appellants' egregious omissions of evidence and other portions of the record are addressed below, it is noteworthy that Appellants have appealed only one of the eight orders and judgments they complain of. If the Bankruptcy Court's bias and prejudice was as open and notorious as Appellants now contend, Appellants would have appealed all of them, and their failure to do so is telling.

Rather than seeking disqualification "at the earliest possible moment," as litigants are required under applicable Fifth Circuit precedent, Appellants sat on their hands for almost a year and a half after supposedly first concluding that the Bankruptcy Court was biased. According to Appellants, the Debtor first expressed these concerns in the fall of 2019 when—then under Mr. Dondero's control—it opposed a motion to transfer venue to the Bankruptcy Court on the express basis that

---

[2] "Bankruptcy Court" refers to the United States Bankruptcy Court for the Northern District of Texas, The Hon. Stacey G. C. Jernigan presiding.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 65 of 1828 PageID 9558
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 11 of 60 PageID 10697

it was not objective. App. Brief ¶¶ 1-2. Appellants contend that the Bankruptcy

Court's bias was on full display during hearings held on (i) January 9, 2020, (ii)

February 19, 2020, (iii) June 30, 2020, (iv) July 8, 2020, and (v) September 2020.

*Id.* ¶¶ 3-6, 24-26. Rather than seek recusal at any time during 2020, Appellants

waited until mid-March 2021 (after at least three additional adverse rulings were

entered against them),[3] days before the Bankruptcy Court was to conduct an

evidentiary hearing on the Debtor's motion to hold Mr. Dondero in contempt of

court.[4] Based on Appellants' collective failure to promptly seek disqualification, the

Bankruptcy Court properly denied the Recusal Motion as "untimely."

Appellants have not—and cannot—meet their heavy burden of proving that

the Bankruptcy Court abused its discretion in denying the Recusal Motion on the

---

[3] Appellants contend that the Bankruptcy Court's rulings and comments in (a)
December 2020, (b) January 2021, and (c) and early February 2021, all conveyed
bias and prejudice. App. Brief ¶¶ 7-22.

[4] Notably, Appellants *do not* contend that the Bankruptcy Court exhibited any bias
or prejudice against Mr. Dondero with respect to its (a) *Order Granting Debtor's
Motion for Temporary Restraining Order Against James Dondero*, entered on
December 10, 2020 (R. 7233) ("Mr. Dondero's TRO"), or its (b) *Order Granting
Debtor's Motion for Preliminary Injunction Against James Dondero*, entered on
January 12, 2021 (R. 7382). The Bankruptcy Court held an evidentiary hearing on
the Debtor's contempt motion promptly after denying the Recusal Motion and on
June 7, 2021, issued a 55-page *Memorandum Opinion and Order Granting in Part
Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged
Violation of TRO* (*see* Supp. R. 474) (the "Contempt Order"). The Contempt Order
included an exhaustive recitation of facts and over 170 detailed footnotes as well as
(ironically) express findings in Mr. Dondero's favor that mitigated the consequences
of the Contempt Order.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 66 of 1828 PageID 9559
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 12 of 60 PageID 10698

merits. Seen in context, the record demonstrates that (a) numerous courts and tribunals have consistently ruled against Mr. Dondero and his enterprise, thereby demonstrating that the Bankruptcy Court does not stand alone, (b) the Bankruptcy Court's rulings and orders are unassailable (as evidenced by, among other things, Appellants' decision to appeal only one of those complained of), (c) there is ***no*** evidence presented of extrajudicial bias or prejudice, and (d) no objective person would find that Mr. Dondero and his enterprise are the victims of improper judicial conduct rising to the extraordinary remedy of recusal.

### III.  <u>STATEMENT OF FACTS</u>

**A.**  <u>The Bankruptcy Court Presides Over the Acis Bankruptcy Case, and the Delaware Court Transfers this Case to the Bankruptcy Court for that Very Reason</u>

Between 2008 and October 16, 2019, courts and arbitration panels in multiple domestic and foreign jurisdictions handed down a plethora of judgments and orders against Mr. Dondero, the Debtor, and other entities then under Mr. Dondero's control.[5]

For example, in March 2019, a blue-ribbon arbitration panel issued a 56-page decision in which it (a) rejected nearly every argument advanced by the Debtor and

---

[5] An overview of some of the prepetition litigation involving the Debtor and other Dondero-related parties is set forth in the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1473 (Bankr. N.D. Tex. Nov. 24, 2020) at 20-24 (Appx. 1:31-35).

DOCS_NY:43746.7 36027/002

APP. 0302

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 67 of 1828 PageID 9560
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 13 of 60 PageID 10699

made highly critical assessments of the credibility of Highland's witnesses, (b) found

that the Debtor had breached its fiduciary duties to its investors, breached certain

agreements, and engaged in other wrongful conduct, and (c) rendered an award

against the Debtor in excess of $150 million.[6] Just two months later, in an unrelated

case, the Chancery Court in the state of Delaware (i) found that the Dondero-related

defendants improperly withheld dozens of documents in discovery on privilege

grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has

been perpetrated" such that the Chancery Court applied the "crime-fraud exception"

to the attorney-client privilege in any event.[7]

The adverse rulings against Mr. Dondero and his controlled entities are

legion—and have resulted in the imposition of judgments and awards totaling more

than $1 billion (inclusive of interest).  The Bankruptcy Court had no involvement in

any of these cases.

---

[6] *See Partial Final Award* rendered in the arbitration captioned *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Case No. 01-16-0002-6927.  (Appx. 2:181-242).  The Partial Final Award was incorporated into the arbitration panel's final award (Appx. 3:244-266), and a hearing in the Delaware Chancery Court to have the award confirmed was about to begin when Mr. Dondero caused the Debtor to file for bankruptcy protection for the purpose of gaining the protection of the automatic stay.

[7] *Daugherty v. Highland Capital Management, L.P.*, C.A. No. 2018-0488-MTZ, May 17, 2019 transcript (bench ruling on motion to compel production of documents) at 10-15.  (Appx. 4:277-282).  The Dondero-related defendants made three desperate but unsuccessful attempts to overturn or stay the Chancery Court's rulings.  *See Order Denying Application to Certify Interlocutory Appeal*, entered in C.A. No. 2018-0488-MTZ on July 8, 2019 ¶ K-L.  (Appx. 5:366-378).

APP. 0503

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 68 of 1828 PageID 9561
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 14 of 60 PageID 10700

The Bankruptcy Court's experience with Mr. Dondero and the Debtor began in January 2018, when it was assigned a case captioned *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) (the "Acis Bankruptcy"). The Acis Bankruptcy was involuntarily commenced by Joshua Terry, a former Highland executive who had obtained an arbitration award against the Acis entities then under Mr. Dondero's control, but who could not collect on the judgment because Mr. Dondero allegedly orchestrated a fraudulent transfer of assets that left the Acis debtors judgment proof. Mr. Dondero and Mr. Terry were the chief antagonists in the highly contested Acis Bankruptcy, and the Bankruptcy Court made numerous credibility findings against Mr. Dondero and his associates before confirming a plan of reorganization that effectively transferred control of a valuable business from Mr. Dondero and Highland to Mr. Terry.[8]

With various judgment creditors bearing down, on October 16, 2019, the Debtor filed this case in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") expecting it to be a more hospitable forum. Less

---

[8] *See*, *e.g.*, (a) *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) (Appx. 7:540-543); and (b) *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified,* Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) (Appx. 8:545-773).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 69 of 1828 PageID 9562
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 15 of 60 PageID 10701

than two weeks later, on November 1, 2019, the Official Committee of Unsecured

Creditors (the "UCC") filed their *Motion for an Order Transferring Venue of this

Case to the United States Bankruptcy Court for the Northern District of Texas,* Case

No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) (Appx. 6:380-

538)[9] (the "Transfer Motion"). The UCC laid out its intentions in filing the Transfer

Motion:

> [T]he Dallas Bankruptcy Court is already intimately familiar with the
> Debtor's principals and complex organizational structure [because the
> Acis Bankruptcy is pending in that Court]. Specifically, the Dallas
> Bankruptcy Court has (a) heard multiple days' worth of material
> testimony from the Debtor's principal owner (James Dondero), the
> Debtor's minority owner (Mark Okada), the Debtor's general counsel,
> at least two assistant general counsels, and numerous other employees
> of the Debtor and other witnesses; and (b) issued at least six published
> opinions . . . [The Bankruptcy Court is] intimately familiar with the
> Debtor's business, principal owner, and key executives. For these
> reasons, the Dallas Bankruptcy Court is uniquely positioned to
> oversee this chapter 11 case.

(*Id.* ¶ 2).

The Delaware Court agreed. During a December 2, 2019 hearing, the

Delaware Court stated that it would grant the Transfer Motion, reasoning:

> This is a unique case … [T]his case is very focused on responding to
> existing [Acis] litigation. And that existing litigation of a former
> affiliate, as of a few months ago, and a pending appeal that could make
> it a current affiliate, is located in the Northern District of Texas. The
> [Bankruptcy Court] has done a tremendous amount of work and has

---

[9] Refers to the Debtor's appendix filed with this brief.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 70 of 1828 PageID 9563
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 16 of 60 PageID 10702

… issued a number of opinions, had a number of trials. That work creates a familiarity with the facts, issues, and players in a case …

(R. 2488:23-35-2499:1-11).

Mr. Dondero and Appellants knew **on December 2, 2019** that they were being sent back to the very Bankruptcy Court that took a justifiably stern view of Mr. Dondero and his associates.[10] Indeed, that is exactly why the Debtor (then under Mr. Dondero's control) opposed the Transfer Motion.[11]

Fully cognizant that he would soon face a Bankruptcy Court with substantial knowledge of (some of) his business practices, Mr. Dondero never caused the Debtor to (a) appeal the Delaware Court's order granting the Transfer Motion, or (b) seek the Bankruptcy Court's recusal on the basis of bias or prejudice (at least not until March 2021).

---

[10] Mr. Dondero and entities controlled by him appealed the Acis confirmation order, but the appeals were denied by the United States District Court for the Northern District of Texas and the United States Court of Appeals for the Fifth Circuit. *See* (a) *Opinion* affirming Confirmation Order Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) (Appx. 9:775-858); (b) *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) (Appx. 10:860-863).

[11] *See Objection of the Debtor to Motion of Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 118 (Bankr. D. Del. Nov. 12, 2019) (Appx. 11:865-891).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 71 of 1828 PageID 9564
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 17 of 60 PageID 10703

B.      **Appellants File the Recusal Motion**

On March 18, 2021, Appellants filed their Recusal Motion requesting that the

Bankruptcy Court recuse itself from any adversary proceedings and future contested

matters involving Appellants or any entity connected to Mr. Dondero.   In their

Recusal Motion, Appellants argue that the Bankruptcy Court is "predisposed against

Mr. Dondero" because it: (i) had "negative opinions about Mr. Dondero formed

during the Acis case;" (ii) "made repeated reference to proceedings in the Acis case

to justify findings made in this case" and made "repeated negative statements about

Mr. Dondero;" (iii) "threatened sanctions on" Appellants and "questioned the good-

faith basis" of certain of their positions; (iv) declared Appellants "vexatious"

litigants; (v) concluded that an entity "connected to or controlled by Mr. Dondero"

is "no more than a tool of Mr. Dondero;" and (vi) purportedly disregarded "the

testimony of any witness with a connection to Mr. Dondero as *per se* less credible."

Recusal Motion ¶ 67.   In support of their Recusal Motion, Appellants cite to a

number of proceedings that occurred between December 2019 and February 2021 in

an attempt to show that the Bankruptcy Court's comments and rulings demonstrate

a "deep-seeded antagonism" toward Appellants resulting from "extrajudicial" bias

emanating from the Acis Bankruptcy. *See id.* ¶ 68.   Appellants mischaracterize the

facts of these hearings by cherry-picking quotes out of context and by ignoring the

considerable evidence underlying each of the orders at issue.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 72 of 1828 PageID 9565
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 18 of 60 PageID 10704

## 1. <u>The December 2019 Transfer Motion</u>

Appellants argue that "the risk of prejudice to Mr. Dondero in this [Bankruptcy] Court has been apparent since this Bankruptcy's inception in Delaware," citing to comments made during the hearing on the Transfer Motion where Debtor's counsel "expressly acknowledged that the UCC's actual motive in seeking transfer to [the Bankruptcy Court] was [that] Court's pre-existing negative views" of Mr. Dondero from the Acis Bankruptcy. Recusal Motion ¶¶ 4-5. As noted *supra*, Mr. Dondero controlled the Debtor and directed its counsel to oppose the Transfer Motion on this basis during the December 2, 2019 hearing. The Delaware Court rejected this argument, and in fact relied on the Bankruptcy Court's extensive familiarity with the parties as one of the bases for transferring venue of the Highland Bankruptcy Case to the Bankruptcy Court. (*See* R. 2488).

## 2. <u>The January 2020 Settlement Hearing</u>

Appellants cite to the Bankruptcy Court's comments made during a January 9, 2020 hearing as evidence of the Bankruptcy Court's alleged bias toward Mr. Dondero resulting from the Acis Bankruptcy. Recusal Motion ¶¶9-13. On January 9, 2020, the Bankruptcy Court held an evidentiary hearing, (R. 2519), on the *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*), Case No. 19-34054-sgj11, Docket No. 281 (Bankr. N.D. Tex.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 73 of 1828 PageID 9566
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 19 of 60 PageID 10705

Dec. 27, 2019) (Appx. 12:893-992) (the "Settlement Motion"). The settlement set forth in the Settlement Motion was prompted by (a) concerns expressed by the UCC about the integrity of the Debtor's management (under Mr. Dondero's stewardship) due to its history of self-dealing, creditor avoidance asset transfers, and other breaches of fiduciary duty, and (b) the possibility that the UCC might seek the appointment of a trustee.

The Bankruptcy Court entered an order granting the Settlement Motion (R. 7291) (the "Settlement Order"). Pursuant to the Settlement Order, Mr. Dondero, the Debtor's founder and former CEO, voluntarily surrendered control of the Debtor to an independent board of three directors, Russell Nelms, John Dubel, and James P. Seery, Jr. (the "Board"). The Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor." (R. 7293). In finding that this "language is very important" to protect the Debtor, the Bankruptcy Court noted that in the Acis Bankruptcy, "Mr. Dondero was surreptitiously liquidating funds," and "doing things behind the scenes that were impacting the value of the Debtor in a bad way." (R. 2597). Mr. Dondero did not object to this language and signed off on the Settlement Order.

### 3. The February 19, 2020 Application to Employ Hearing

Appellants cite to the February 19, 2020, hearing on the Debtor's *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley &*

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 74 of 1828 PageID 9567
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 20 of 60 PageID 10706

*Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Foley Application") (R. 415) as another example of the Bankruptcy Court's "predisposition against Mr. Dondero." Recusal Motion ¶¶ 14-15. Appellants argue that the Bankruptcy Court discounted "the testimony of demonstrably independent witnesses who testified" in support of the Foley Application on a "pre-determined basis that any person sharing an opinion with Mr. Dondero … was somehow being unduly influenced by him." Recusal Motion ¶¶ 14-16. Appellants mischaracterize the facts of this hearing.

Through the Foley Application, the Debtor sought to retain Foley on behalf of both the Debtor *and* a non-Debtor entity, Neutra Ltd. ("Neutra"), in the appeal of the Acis confirmation order and related matters (the "Acis Appeal"). In support of the Foley Application, the Debtor disclosed that: (i) Neutra was wholly owned by Mr. Dondero and his partner, Mark Okada, and (ii) the Debtor intended to pay for Foley's representation of Neutra in the Acis Appeal.[12] The UCC and Acis objected

---

[12] The Debtor justified its payment of Neutra's fees under 11 U.S.C. § 330 (which does not allow the payment of non-debtor legal fees) by arguing, *inter alia*, that if Neutra were successful in its appeal of the involuntary petition entered in the Acis Bankruptcy (a) the Acis Bankruptcy would be unwound, (b) the equity in Acis would return to the Debtor, (c) the Debtor would regain the benefit of certain management fees that were otherwise being paid to Acis for the benefit of its new owner, Mr. Terry, and (d) the Debtor would have negotiating leverage with respect to Acis' $75 million claim against the Debtor's estate. *See* R. 2761:10-25-R. 2762:1-16. *See* (i) *Debtor's Omnibus Reply in Support of (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date,* Case No. 19-12239 (CSS),

14

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 75 of 1828 PageID 9568
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 21 of 60 PageID 10707

to the Foley Application on the ground that the Debtor should not be permitted to use estate assets to support Neutra, a Dondero-controlled entity.[13]

Russell Nelms testified in support of the Application. Mr. Nelms was subject to a lengthy cross-examination which undermined the Debtor's arguments. (R. 2666-2723). The Bankruptcy Court approved the Debtor's retention of Foley, but determined that the evidence was insufficient to justify expending estate assets to pay the legal fees of Neutra, a non-Debtor entity in which the Debtor held no interest. (R. 2785-2790). The Bankruptcy Court's ruling on the Foley Application was not, as Appellants contend, premised on any "pre-determined" bias toward Mr. Dondero to "contest positions that could benefit Mr. Dondero." (App. Brief ¶ 16). It was

---

Docket No. 159 (Bankr. D. Del. Nov. 21, 2019) (Appx. 13:994-1258), *and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 70 (Bankr. D. Del. Oct. 29, 2019) (Appx. 14:1260-1296).

[13] *See* (i) *Limited Objection to the Debtor's: (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 116 (Bankr. D. Del. Nov. 12, 2019) (Appx. 15:1298-1391); *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Piker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 120 (Bankr. D. Del. Nov. 12, 2019) (Appx. 16:1393-1398).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 76 of 1828   PageID 9569
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 22 of 60   PageID 10708

based on its determination that the Debtor failed to prove that the estate would benefit by paying a non-Debtor's legal fees, as required by applicable law.

Neither Mr. Dondero nor Neutra appealed the Bankruptcy Court's evidence-based order on the Foley Application.

### 4.     The December 2020 Restriction Motion

Appellants cite to certain of Judge Jernigan's comments and rulings made at the conclusion of an evidentiary hearing held on December 16, 2020 (the "December Hearing") [14] as evidence of bias.   Appellants argue that the Bankruptcy Court improperly denied their Restriction Motion as "frivolous," despite being filed in "good faith." (Recusal Motion ¶¶ 18-26).

In their Restriction Motion, the movants (*i.e.*, the Advisors and certain investment funds managed by the Advisors (the "Retail Funds," and with the Advisors, the "Movants")) asked the Bankruptcy Court to "impose a temporary restriction on the Debtor's ability, as portfolio manager, to cause CLOs to sell assets." (Restriction Motion ¶ 17).  The Movants called as their only witness Dustin Norris, the Executive Vice President of each of the Movants ("Mr. Norris").  During the December Hearing, Mr. Norris made the following admissions:

_____

[14] The December Hearing was held in connection with that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles*, (R. 2798), brought by the Advisors and the Retail Funds (the "Restriction Motion").

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 77 of 1828 PageID 9570
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 23 of 60 PageID 10709

## The Debtor Had the Exclusive Contractual Right to Buy and Sell CLO Assets

- The Debtor is the portfolio manager for each of the CLOs in which the Advisors caused the Retail Funds to invest (December 2020 Transcript at 41:18-24) (R. 6265);
- The Debtor's management of the CLOs is governed by written agreements (*id.* at 41:25-42:3) (R. 6265-6266);
- None of the Movants are parties to the Debtor's CLO management agreements (*id.* at 42:4-11) (R. 6266);
- The Debtor, as the CLO Portfolio Manager, has the responsibility to buy and sell assets on behalf of the CLOs (*id.* at 42:12-24) (R. 6266);
- Nobody other than the Debtor has any right or authority to buy and sell assets in the CLOs in which the Retails Funds invested (*id.* at 42:25-43:3) (R. 6266-6267); and
- Holders of preferred CLO shares, such as the Retail Funds, "do not make investment decisions on behalf of the CLOs" and the Advisors knew that when they caused the Retail Funds to make their investments (*id.* at 43:4-17) (R. 6267).

## The Movants Did Not Accuse the Debtor of Any Wrongdoing

- The Movants did not allege or contend that the Debtor (a) engaged in fraudulent conduct; (b) breached any agreement by effectuating any transactions; or (c) violated any CLO management agreement (*id.* at 49:5-50:10) (R. 6273-6274); and
- The Movants did not question the Debtor's business judgment nor could they since they did not know why the Debtor executed the transactions and never even asked (*id.* at 50:11-51:15) (R. 6274-6275).

## Mr. Dondero Controls the Movants and Caused the Restriction Motion to Be Filed

- Mr. Dondero owns and controls the Advisors (*id.* at 28:20-22) (R. 6252); (35:14-36:15) (R. 6259-6260);
- The Advisors manage the Retail Funds; Mr. Dondero serves as the Portfolio Manager of each of the Retail Funds and caused the Retail Funds to invest in the CLOs managed by the Debtor (*id.* at 28:23-29:4) (R. 6252-6253), 36:16-22 (R. 6260);

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 78 of 1828 PageID 9571
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 24 of 60 PageID 10710

- The "whole idea" for the Restriction Motion initiated with Mr. Dondero (*id.* at 29:19-22 (R. 6253), 41:6-10 (R. 6265)); and
- The Retail Funds' Boards did not authorize the filing of the Restriction Motion (*id.* at 37:23-38:6 (R. 6261-6262).

## Mr. Norris Was Not a Competent Witness and Had No Credibility

- Mr. Norris admitted that he does not make investment decisions, is not an investment manager, and has never worked for a CLO (*id.* at 39:7-16) (R. 6263);
- Mr. Norris (a) did not write his Declaration filed in support of the Restriction Motion, (b) did not provide any substantive comments to his Declaration, and (c) relied on the Advisors' "management" (including Mr. Dondero) for all "key information" in his Declaration (*id.* at 40:11-24) (R. 6264); and
- Mr. Norris did not bother to review the very CLO management agreements the Movants were seeking to interfere with (*id.* at 42:12-16) (R. 6266).

## The Movants Did Not Notify Any Other CLO Investors of the Restriction Motion

- The Movants hold (a) less than 50% of the preferred interests in 12 of the 15 CLOs at issue, and (b) less than 70% of the preferred interests in the other three CLOs at issue (*id.* at 44:22-45:7) (R. 6268-6269);
- Yet, the Restriction Motion was pursued solely on behalf of the Movants (*id.* at 46:22-25) (R. 6270);
- The Movants did not notify any other holder of CLO interests of the Restriction Motion and made no attempt to do so (*id.* at 47:1-12) (R. 6271);
- The Movants made no attempt to obtain the consent of all of the holders of the preferred shares to seek the relief sought in the Restriction Motion (*id.* at 47:13-16 (R. 6271));
- Mr. Norris did not know whether any other holder of CLO preferred shares wanted the relief sought in the Restriction Motion (*id.* at 47:17-21) (R. 6271);
- Mr. Norris did not know whether the Debtor's counterparties in the CLO management agreements (*i.e.*, the CLOs) wanted the relief sought in the Restriction Motion (*id.* at 47:22-48:1) (R. 6271-6272); and

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 79 of 1828 PageID 9572
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 25 of 60 PageID 10711

- Mr. Norris had no personal knowledge of the two transactions described in his Declaration; he testified that he was "very remote" and he didn't have "much knowledge." (*id.* at 53:22-55:13) (R. 6277-6279).

Based, in large part, on Mr. Norris's testimony, the Bankruptcy Court (a) found that there was no factual or legal basis for the Restriction Motion, and (b) declared the Restriction Motion "frivolous," and (c) granted the Debtor's motion for a directed verdict. (December Hearing Transcript at 64:1-7) (R. 6287). While Appellants contend that the "Bankruptcy Court inscrutably blamed Mr. Dondero" for the Restriction Motion, (App. Brief ¶ 11), Mr. Norris provided all the evidence the Court needed to reach its conclusion:

Q: The whole idea for this motion initiated with Mr. Dondero; isn't that right?

A: The concern, yes, the concern originated, and his concern was voiced to our legal and compliance team.

(*Id.* at 41:6-9) (R. 6265).[15]

The Restriction Motion was a misguided effort by Mr. Dondero and his associates to exert control over the Debtor. The Motion was frivolous.

---

[15] *See also id.* at 29:21-22 ("the initial cause for concern was raised by Mr. Dondero himself") (R. 6253); 28:20-22 (Mr. Dondero has a control relationship with the Advisors) (R. 6252); 26:11-17 (responsibility for the Retail Funds' portfolio management and investment decisions are delegated to the Advisors) (R. 6250); 35:14-36:15 (Mr. Dondero owns and controls the Advisors); (R. 6259-6260); 37:23-38:6 (the Retail Funds' Boards did not authorize the filing of the Restriction Motion) (R. 6261-6262).

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 80 of 1828 PageID 9573
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 26 of 60 PageID 10712

### 5. **The January 2021 Hearing on the Debtor's Motion for Injunctive Relief**

Unchastened by the debacle of the December Hearing, Mr. Dondero caused the Advisors and Retails Funds to continue to interfere with and unjustifiably threaten the Debtor. Consequently, on January 6, 2021, the Debtor filed its *Verified Original Complaint for Declaratory and Injunctive Relief* against the Advisors and Retail Funds (R. 1962) seeking injunctive relief after they interfered with the Debtor's trading activities and sent the Debtor a flurry of written correspondence (the "K&L Gates Letters") (R. 4158-4160, 4161-4163) threatening to terminate the Debtor's CLO management agreements and asserting specious claims. (R. 8069). The Bankruptcy Court held an exhaustive evidentiary hearing on the TRO Motion on January 26, 2021 (the "TRO Hearing"), during which it admitted voluminous documentary evidence and assessed the credibility of multiple witnesses, including that of Mr. Dondero. (*See* TRO Hearing Transcript) (R. 6291). At the conclusion of the TRO Hearing, the Bankruptcy Court determined that the TRO was necessary to protect the Debtor's interests pending a hearing on the preliminary injunction. (*See id.)*

Appellants cite to certain aspects of the TRO Hearing as evidence of the Bankruptcy Court's bias against Mr. Dondero while minimizing their conduct and

20

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 81 of 1828 PageID 9574
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 27 of 60 PageID 10713

noting that the Debtor did not prove specific damages. (App. Brief ¶¶ 12-17.)[16] But, consistent with the balance of the Recusal Motion, Appellants fail to disclose keys facts that caused the Bankruptcy Court to focus on Mr. Dondero: (a) the evidence established that he controlled the Advisors and Retails Funds and was involved in all of the acts complained of, and (b) their conduct implicated two court orders.

*First*, the Settlement Order expressly prohibited Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." (Settlement Order ¶ 9). The evidence established that the Advisors were "Related Entities" for purposes of the Settlement Order,[17] yet the K&L Gates Letters expressly and improperly threatened to seek to terminate the Debtor's CLO management agreements.

*Second*, Mr. Dondero's TRO enjoined him from, among other things, "causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly"

---

[16] Notably, the Debtor never attempted to prove damages during the TRO Hearing as it would have undermined its claim for equitable relief.

[17] This fact was (a) first established during the December Hearing (*see supra* at 12), (b) was confirmed at the TRO Hearing, and (c) was subsequently admitted to by the Advisors as part of the resolution of the adversary proceeding. *See Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11, Docket No. 2590 (Bankr. N.D. Tex. July 20, 2021) Ex. A ¶ 2(c) (*see* Appx. 17:1408) (settlement agreement in which each of the Advisors represents and warrants that it (i) is controlled by Mr. Dondero and (ii) is a "Related Party" for purposes of paragraph 9 of the Settlement Order).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 82 of 1828    PageID 9575
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21    Page 28 of 60    PageID 10714

making express or implied threats against the Debtor or interfering with the Debtor's

business.  (*See* R. 7235).   Yet, that is precisely what the evidence showed Mr.

Dondero did. (*TRO Hearing Transcript* at 42:9-107:10) (R. 6332-6397).

Given the evidence and the clear and unambiguous orders in effect, it would

have been shocking if the Bankruptcy Court ignored Mr. Dondero and instead

treated the Advisors and Retail Funds as if they were independent third-party actors.

Mr. Dondero controlled the Advisors and the Retail Funds.  He clearly "caused" or

"encouraged" or "conspired" with them to engage in wrongful conduct.  The Court's

focus on Mr. Dondero was entirely justified—particularly when seen in the context

of the applicable Bankruptcy Court orders that the Appellants pretend did not exist.

### 6. <u>The February 2021 Confirmation Hearing</u>

Appellants cite to the February 2021 confirmation hearing on the Debtor's

Plan[18] (the "<u>February 2021 Confirmation Hearing</u>") in support of their argument that

the Bankruptcy Court was biased against Appellants. *See* Recusal Motion ¶¶ 38-50.

Appellants principally contend that during the February 2021 Confirmation Hearing,

the Bankruptcy Court: (i) "summarily rejected ***<u>all</u>*** of the objections" to the Plan when

such objections were no different than those raised by the U.S. Trustee whose good

faith was "not questioned;" (ii) found the objections were not asserted in good faith,

---

[18] Refers to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (as amended, the "<u>Plan</u>").

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 83 of 1828 PageID 9576
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 29 of 60 PageID 10715

(iii) concluded, "without basis," that the entity Appellants were "controlled by Mr. Dondero"; (iv) disregarded witness testimony of Mr. Jason Post on the ground that the witness had left the Debtor's employ to work for one of the Advisors; and (v) wrongfully accused of Appellants of being "vexatious litigants." *See id.*

First, Appellants' confirmation objections were far more extensive than those filed by the U.S. Trustee, and included objections to (i) plan provisions that had no impact on them as they held no claims in the subject classes (the absolute priority rule), (ii) the assumption of certain executory contracts to which they were not party (the actual contract counterparties had consented to assumption of the contracts by the Debtor), and (iii) common plan provisions like debtor releases, plan supplements and a plan injunction.[19]

Moreover, the Bankruptcy Court included Appellants in the process by considering their objections. (R. 2085 ¶¶ 18-19); (R. 2102-2104). Appellants'

---

[19] Appellants did not include their objections to confirmation in the record on appeal. They can be found at Bankruptcy Docket Nos. 1661 (Dondero) (Appx. 18:1423-1430), 1667 (Trusts) (Appx. 19:1432-1465), 1670 (Funds and Advisors) (Appx. 20:1467-1516), and 1673 (NexPoint Real Estate Partners) (Appx. 21:1518-1524). The *Limited Objection of the U.S. Trustee* is at Docket No. 1671(Appx. 22:1526-1531). All Appellants' objections to confirmation were addressed at length in the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (Appx. 23:1533-1600) and *Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management* [Docket No. 1807] (Appx. 24:1602-1726) and by the Bankruptcy Court in its February 8, 2021 oral ruling on confirmation (R. 3371) and in the Confirmation Order (R. 2085).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 84 of 1828 PageID 9577
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 30 of 60 PageID 10716

objections were not overruled "summarily." Rather, the Bankruptcy Court conducted a two-day evidentiary hearing, at the conclusion of which it made detailed findings of fact and conclusions of law supporting the overruling of all the objections, including those of Appellants. Appellants were not treated any differently than any other objector at the February 2021 Confirmation Hearing.

The Bankruptcy Court also did not "disregard" the testimony of Mr. Post "solely" because Mr. Post had left the employ of the Debtor to work for the Advisors. This only was one of many factors the Bankruptcy Court considered in determining that Mr. Post's testimony was not credible. For instance:

1. Mr. Post testified at the confirmation hearing on behalf of both the Advisors and the Funds. (February 2021 Confirmation Hearing Transcript at 51:12 (R. 4872)). For twelve years, Mr. Post served as the Assistant Chief Compliance Officer ("CCO") for the Debtor, the Advisors and the Retail Funds, but left to become the CCO for the Advisors and the Retail Funds contemporaneously with Mr. Dondero leaving the Debtor. (*Id.* at 56:14-57:1). Mr. Post had no knowledge about the relationship between the board members for each of the Retail Funds and either the Debtor (during the years it was controlled by Mr. Dondero) or Mr. Dondero, and no board member (who presumably had knowledge and who Appellants contend are independent

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 32 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 85 of 1828   PageID 9578
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 31 of 60   PageID 10717

actors) ever testified at any hearing or proceeding.  (*Id.* at 57-61) (R. 4878-4882).

2.      Mr. Post testified that the Advisors manage and provide investment advice to the Retail Funds, and that the Advisors have been owned and controlled by Mr. Dondero for the entire period of time he served in the capacity of assistant CCO for the various entities. (*Id.* at 61:12-62:6) (R. 4882-4883).

3.      Mr. Post testified that he left the Debtor because of "conflicts that were created by being an employee of the Debtor and by also serving as the assistant CCO to the named Funds and the Advisors, and it coincided with Jim [Dondero] toggling over from HCMLP [the Debtor] to NexPoint [one of the Advisors].  It just made sense more functionally and from a silo perspective for me to be the named CCO for that entity since he [Mr. Dondero] was no longer an employee of HCMLP [the Debtor]." (*Id.* at 62:16-63:8) (R. 4883-4884). On cross-examination, Mr. Post acknowledged that the conflicts he mentioned had existed as of the Petition Date but claimed they had become "more evident as time progressed."  (*Id.* at 63:15-23) (R. 4884).

Based on this testimony, the Bankruptcy Court concluded that Mr. Post had left the employ of the Debtor to follow Mr. Dondero, that the alleged conflicts only became an issue when Mr. Dondero started his feud with the Debtor, and that his

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 86 of 1828 PageID 9579
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 32 of 60 PageID 10718

testimony about the alleged independence of the Retail Funds' boards was not within

the scope of his knowledge and was contradicted by the prior testimony of Mr.

Norris, as discussed below.

In finding Mr. Post's testimony not to be credible, the Bankruptcy Court also

considered the testimony of Mr. Dustin Norris.[20]  Mr. Post acknowledged that he

had never reviewed Mr. Norris's testimony and was unaware of the nature or extent

of his testimony.  (February 3, 2021 Confirmation Hearing Transcript at 59:12-19)

(R. 4880).  Mr. Norris testified that Mr. Dondero had a control relationship with the

Advisors, and that he is a portfolio manager for each of the Retail Funds, but that

relationship is subject to the annual review by the Funds' boards.  (*Id*. at 28:20-29:4)

(R. 6252-6253).

Mr. Norris acknowledged that the Advisors were owned and controlled by Mr.

Dondero.  (February 3, 2021 Confirmation Hearing Transcript at 35:14-36:15) (R.

6259-6260).  Mr. Norris further acknowledged that the Retail Funds are managed by

the Advisors, the Advisors control the Retail Funds' investment decisions, and Mr.

Dondero is either the (or one of the) portfolio managers of each of the Retail Funds.

(*Id*. at 36:19-37:13) (R. 6260-6261).  Mr. Norris further testified that the Funds'

boards make no investment decisions, (*id*. at 37:14-22) (R. 6261), and did not

participate in or approve the filing of the motion then at issue because it wasn't part

---

[20] (*See id.* at 63) (R. 6287).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 87 of 1828 PageID 9580
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 33 of 60 PageID 10719

of their duties. (*Id.* at 37:23-38:6) (R. 6261-6262). Mr. Norris testified that the directors were nearly identical for the dozen or so funds managed by the Advisors (who were controlled by Mr. Dondero), including the Retail Funds, and that many of the board members had, at various times, worked for Mr. Dondero at the Debtor or otherwise had long-standing relationships with him. (*Id.* at 55:19-58:6) (R. 6279-6282). Based on this evidence, the Bankruptcy Court determined that the Advisors and the Retail Funds were controlled by Mr. Dondero. The Bankruptcy Court's conclusion in this regard was thus not based, as Appellants represent, on the Bankruptcy Court's "disregard" of Mr. Post's testimony, but rather the entirety of the evidence presented and credibility of all witnesses.

Appellants' allegation that the Bankruptcy Court unfairly determined them to be "vexatious litigants" is equally unfounded. The Bankruptcy Court did not actually find Appellants to be "vexatious litigants." Rather, as part of the Court's analysis of the legal basis for approving the Plan's Gatekeeper Provision, the Bankruptcy Court determined that a court may approve a gatekeeper provision when the evidence shows a party may be subject to extensive and frivolous litigation. (Confirmation Order ¶¶ 80-81) (R. 2142-2143); (R. 6548 at 45:12-47:17 R. 6592-6594). The Debtor presented such evidence, and, accordingly, the Bankruptcy Court took judicial notice of all the actions that had been filed by Appellants through objections, appeals or adversary proceedings, as well as all the litigation the Debtor

DOCS_NY:43746.7 36027/002

APP. 0533
APP. 0321

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 88 of 1828 PageID 9581
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 34 of 60 PageID 10720

was forced to participate in due to the actions of Mr. Dondero and his related entities.[21] For the convenience of the Court, the Debtor has summarized all this litigation in a chart that was filed as an exhibit to *Debtor's Reply in Support of the Debtor's Motion to Enforce the Order of Reference*, Case No. 21-842 [Docket No. 43] and is included herein. (*See* Appx. 29:1786-1797).[22] The chart was created from the public record in this Bankruptcy Case which is part of the confirmation record. Based on this evidence, the Bankruptcy Court determined that the Gatekeeper Provision was necessary and appropriate to protect the Debtor from litigation of the type and magnitude that had been filed during the case. The vexatious litigant analogy was only one part of the legal basis for the Bankruptcy Court's approval of the Plan Gatekeeper Provision. (R. 6548 at 45:12-47:17 R. 6592-6594).

### 7. Article Referencing PPP Loans

Appellants contend that the Bankruptcy Court's inquiries into COVID-related "PPP loans" was evidence of bias against Mr. Dondero. Recusal Motion ¶ 52. As fully disclosed by the Bankruptcy Court, the inquiries were prompted by an extrajudicial source (a newspaper article) that purportedly noted that "Mr. Dondero

---

[21] The exhibits entered into the record at the confirmation hearing included the dockets from certain specified litigation as well as all documents and exhibits on the docket of the bankruptcy case and all exhibits necessary for impeachment. *See Debtor's Witness and Exhibit Lists for Confirmation Hearing* (as amended) (Docket Nos. 1822, 1866, 1877 and 1895) (Appx. 25:1728-1740; Appx. 26:1742-1754; Appx. 27:1756-1769; and Appx. 28:1771-1784).

[22] This chart reflects the status of Dondero-related litigation as of July 13, 2021.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 89 of 1828 PageID 9582
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 35 of 60 PageID 10721

or affiliates" received PPP loans. Because of the vagueness of the article, the Bankruptcy Court sought information about the Debtor and ordered it to disclose any PPP loans it had received. The Debtor responded to the court at a subsequent hearing that the Debtor had not obtained any PPP loans. Neither Mr. Dondero nor any of his affiliated entities were asked to provide any information, no action was taken against them and the issue was never raised in court again. Appellants' reliance on this event is emblematic of the lack of merit – and candor -- in the Recusal Motion and this appeal.

### 8. <u>Mandatory Injunction</u>

Appellants cite to the February 23, 2021 hearing on the Debtor's motion for a mandatory injunction (the "<u>Mandatory Injunction</u>"). (Recusal Motion ¶ 27). The Mandatory Injunction related to Appellants' failure to provide for a transition of the services previously provided by the Debtor under certain shared service agreements (the "<u>SSAs</u>"). Historically, the Debtor had provided back and middle office support to certain of the Appellants under the SSAs, including the Advisors. The Debtor publicly disclosed that it would be materially reducing its work force and would no longer provide services under the SSAs. Consistent therewith, the Debtor exercised its contractual rights to terminate the SSAs in November 2020 with the termination of the Advisors' SSAs becoming effective January 31, 2021. (R. 4178). The Advisors, which manage a series of retail funds, failed to adopt or implement a

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 90 of 1828 PageID 9583
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 36 of 60 PageID 10722

transition plan that would replace the services provided under the SSAs and allow them to manage their funds without risk of default following termination of the SSAs. (*See id.*) Because the Advisors manage retail, (*i.e.*, "mom and pop,") money, the Debtor was rightfully concerned that there would be significant legal and regulatory exposure both to the Advisors and the Debtor if the Advisors' funds could not operate and, to prevent a catastrophic result, the Debtor agreed to a series of extensions of the SSAs. This position was untenable. To avert the potential liability and to extricate itself from its unwanted contractual relationship with the Advisors, the Debtor sought, on an emergency basis, an order requiring the Advisors to implement a transition plan by the end of February before the Debtor would be forced to reduce its workforce and be unable to provide services under the SSAs. (*Id.*) Thus, this Mandatory Injunction was not "frivolous," as Appellants imply, (*see* Recusal Motion ¶ 50), but wholly necessary to protect the Debtor's estate from significant loss or risk of litigation. During the hearing, the Advisors (for the first time) stated unequivocally that they had adopted an operating plan to obtain or provide all services previously provided by the Debtor under the SSAs and could manage their funds without the Debtor's assistance. (*See* R. 4199-4437). Having credited the Advisors' testimony, the Bankruptcy Court issued its order finding the Debtor's motion for a Mandatory Injunction "moot." (R. 4194-98).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 91 of 1828 PageID 9584
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 37 of 60 PageID 10723

**C.**     <u>**The Bankruptcy Court Denies the Recusal Motion**</u>

On March 23, 2021, the Bankruptcy Court issued its Recusal Order denying the Recusal Motion on the grounds that it was (i) not "timely," and (ii) without merit. Regarding timeliness, the Bankruptcy Court found that "the timing does not seem to pass muster," reasoning that the Recusal Motion (i) "was filed more than 15 months after" the Case was transferred to the Bankruptcy Court; (ii) "comes after many dozens of orders have been issued by the [Bankruptcy] Court," and (iii) "comes on the eve of a contempt hearing." (Recusal Order at 7). The Bankruptcy Court further found that, even if the Recusal Motion had been timely, recusal was not warranted on the merits.

The Bankruptcy Court noted that Appellants' allegations of "extrajudicial" bias resulting from the Acis Bankruptcy were "at the heart of the" Recusal Motion. (Recusal Order at 7). The Bankruptcy Court explained that it did not form any animus or bias toward Appellants during the Acis Bankruptcy and concluded that any knowledge learned from the Acis Bankruptcy did not constitute "extrajudicial" knowledge warranting recusal. (*Id.*)

The Bankruptcy Court also found that "more generally," it does not harbor, and has not shown, any "personal bias or prejudice" against Appellants. (Recusal Order at 10). The Bankruptcy Court explained that it "has merely addressed motions, objections and other pleadings as they have been presented," and "has

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 92 of 1828    PageID 9585
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21    Page 38 of 60    PageID 10724

issued and enforced orders where requested and warranted." *Id.*  The Bankruptcy

Court noted that: "This court and all courts sometimes use strong words as part of

managing a complex and contentious case. None of this should be interpreted as

'bias' or 'prejudice." *Id.*  The Bankruptcy Court reasoned that "clashes between a

court and counsel for a party [are] an insufficient basis for disqualification under

Section 455. (Citing *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D.

Tex 1990) (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th

Cir. 1975) (holding that disqualification should be determined "on the basis of

conduct which shows a bias or prejudice or lack of impartiality by focusing on a

party rather than counsel."))  To that end, the Bankruptcy Court explained, it has

"the utmost respect for [Appellants]" and it has "no disrespect for Mr. Dondero on

a personal level or any of the [Appellants]."  (*Id.*)

Accordingly, the Bankruptcy Court determined, in an exercise of its

discretion, that Appellants' assertions did not "rise to the threshold standard of

raising a doubt in the mind of a reasonable observer as to" the Bankruptcy Court's

impartiality.  (Recusal Order at 10).

## D.    Appellants Appeal the Bankruptcy Court's Recusal Order

On April 1, 2021, Appellants appealed the Bankruptcy Court's Recusal Order

on the grounds that (i) the Recusal Motion was "timely" and (ii) the Bankruptcy

Court "erred in denying the Recusal Motion on the merits." (App. Brief at 19-20).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 93 of 1828 PageID 9586
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 39 of 60 PageID 10725

In support of their appeal, Appellants argue that the Bankruptcy Court abused its discretion in finding that the Recusal Motion was untimely because, in pertinent part: (i) "timeliness is not an express condition of a recusal motion under § 455," and (ii) the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021." (*Id.* at 19). Appellants further argue that: (i) the Bankruptcy Court exhibits "deep-seated antagonism toward" Appellants "that went well beyond 'normal' admonishment," (*id.* at 20), and (ii) even if there is a "lack of extrajudicial knowledge, it is not fatal" to the Recusal Motion because "Appellants are entitled a full and fair opportunity to make their case in an impartial forum." (*Id.* at 19-20). For the reasons that follow, the Bankruptcy Court properly exercised its discretion in denying the Recusal Motion.

## IV.    <u>SUMMARY OF THE ARGUMENT</u>

The Bankruptcy Court properly exercised its discretion in denying the Recusal Motion pursuant to 28 U.S.C. § 455 ("<u>Section 455</u>") on the grounds that it was (i) untimely and, independently, (ii) without merit. First, the Bankruptcy Court properly applied the "timeliness" requirement to Section 455, as mandated by the statute and applicable case law. In order to be timely, a party must move for recusal at the "earliest moment" after learning the facts forming the basis for recusal. The Bankruptcy Court properly determined that the Recusal Motion was untimely because Appellants waited 15 months to bring the Recusal Motion, after dozens of

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 94 of 1828 PageID 9587
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 40 of 60 PageID 10726

orders had been issued by the Bankruptcy Court, and on the eve of a hearing on a pending contempt motion against Mr. Dondero.

The Bankruptcy Court also properly exercised its discretion in finding that, had the Recusal Motion been timely, it was without merit on the grounds that: (i) there was no "extrajudicial" bias present, and (ii) the facts of this case do not rise to the extreme circumstance of showing a "deep seated antagonism" toward Appellants warranting recusal. The law is clear that recusal is not warranted where comments or opinions formed by the court result from events that transpire during current or prior proceedings, *i.e.*, intrajudicial bias, unless the movant can demonstrate such comments rise to the rare level of a "deep-seated antagonism" or "favoritism." Here, there was no "extrajudicial" source forming the Bankruptcy Court's alleged "bias." Rather, all events cited by Appellants relate to either judicial rulings or judicial comments, or "intrajudicial" sources. These types of events are nearly exempt from recusal. There is also no evidence of the Bankruptcy Court's "deep seated antagonism" toward Appellants such that a reasonable person would question its impartiality in this Case. Based on the entirety of the proceedings, the exceptional and rare remedy of recusal is not warranted.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 95 of 1828 PageID 9588
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 41 of 60 PageID 10727

# V. **ARGUMENT**

## A. **The Bankruptcy Court Properly Exercised Its Discretion in Finding the Recusal Motion Was Untimely**

The Bankruptcy Court properly exercised its discretion in denying the Motion to Recuse on the basis that it was untimely. Appellants argue that the Bankruptcy Court abused its discretion in finding that the Recusal Motion was untimely principally on the grounds that: (i) "timeliness is not an express condition of a recusal motion under § 455," (ii) the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021," and (iii) that the Debtor's motion for contempt against Mr. Dondero was "pending" when Appellants filed the Recusal Motion is "irrelevant." (*See* App. Brief. ¶¶ 36-44). Appellants' arguments are without merit.

As the Bankruptcy Court correctly stated, recusal motions brought under Section 455(a) must be "timely." *Hill*, 495 Fed. App'x at 483; *see also Grambling Univ. Nat'l Alumni Ass'n v. Board of Supervisors for La. System*, 286 Fed. App'x 864, 867 (5th Cir. 2008) (noting that while "[s]ection 455 does not contain an explicit timeliness requirement … this Court has consistently inferred such a requirement") (citing *U.S. v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998)). "The timeliness rule requires that 'one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification.'" *Sanford*, 157 F.3d at 988–89 (quoting *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 96 of 1828 PageID 9589
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 42 of 60 PageID 10728

"The most egregious delay—the closest thing to *per se* untimeliness—occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal." *Sanford*, 157 F.3d at 988–89. Courts have "rejected recusal challenges on appeal when the challenger waited to see if he liked an outcome before springing the recusal issue," and "rejected other challenges on appeal as simply too late under the facts to be timely." *Id.* at 989; *see also Delesdernier v. Porterie*, 666 F.2d 116, 122 (5th Cir. 1982) ("Congress did not enact § 455(a) to allow counsel to make a game of the federal judiciary's ethical obligations; we should seek to preserve the integrity of the statute by discouraging bad faith manipulation of its rules for litigious advantage.") The Bankruptcy Court, therefore, correctly applied the "timeliness" requirement in analyzing the Recusal Motion.

The Bankruptcy Court also properly exercised its discretion in determining that the Motion to Recuse was "untimely" because it was filed: (i) "more than 15 months after the case was transferred to the Bankruptcy Court," (b) "after many dozens of orders" were issued by the Bankruptcy Court, and (iii) "on the eve of a contempt hearing." (Recusal Order at 7).

As the Bankruptcy Court found, Appellants learned about the facts purportedly showing an "appearance of impropriety" fifteen (15) months before

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 97 of 1828 PageID 9590
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 43 of 60 PageID 10729

filing their Motion to Recuse. *See, e.g.*, Recusal Motion ¶ 1 (discussing Appellants'
awareness of Bankruptcy Court's alleged "pre-existing, negative views of" Mr.
Dondero during December 2, 2019 Motion to Transfer hearing); *id.* at 3 (alleging
that the "prejudice to Mr. Dondero has been apparent since the inception of this
Case").[23]  Appellants learned about the Bankruptcy Court's purported "bias" in open
court around this same time. *See id.* ¶ 3 (citing Bankruptcy Court's language from
January 9, 2020 hearing as evidence of bias).  Appellants cite to adverse decisions
rendered by the Bankruptcy Court from as early as February 2020, which they
contend show its "predisposition against Mr. Dondero." *See id.* ¶¶ 5-6.

Despite learning the requisite facts giving rise to their Recusal Motion as early
as December 2019, and throughout the following 15 months, Appellants did not
move to recuse until March 2021.  During these 15 months, the Bankruptcy Court
expended significant judicial resources overseeing the Bankruptcy Case and
Appellants' litigation.  Appellants fail to offer any credible explanation for their
delay in bringing the Recusal Motion at any point after the first moments of learning
of the Bankruptcy Court's purported "bias" over one year ago.  This, alone,
constitutes "*per se* untimeless." *See Hill v. Breazeale*, 197 Fed. App'x 331, 335 (5th
Cir. 2006) (holding district court did not abuse its discretion in denying motion to
recuse as untimely where party "waited, for no given reason, to raise the issue until

---

[23] *See also supra* at 5-7.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 98 of 1828 PageID 9591
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 44 of 60 PageID 10730

after the district court ruled against him"); *Sanford*, 157 F.3d at 989 (affirming district court's denial of recusal motion as untimely where party "knew of the facts purportedly causing an appearance of impropriety," but waited until after an adverse decision to raise the recusal issue); *Grambling*, 286 Fed. App'x at 867-88 (affirming denial of recusal motion as "*per se*" untimely where "despite having knowledge of the facts underlying its recusal argument," party "did not immediately move to have this case assigned to a judge from another division or district and instead allowed the case to linger … for nearly ten months. When the [party] finally acted, it did so only after [the judge] had dismissed its claims"); *Hill v. Schilling*, No. 3:07–CV–2020–L, 2014 WL 1516193, at *3 (N.D. Tex. Apr. 17, 2014) (affirming judge's finding that motion to recuse was untimely where it was brought "some eleven months after [plaintiff] and his counsel first became aware of the" facts giving rise to alleged perception of bias); *Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137, 155 (S.D.N.Y. 2012) ("Plaintiffs here had the requisite knowledge no later than January 4, 2012, but the recusal request did not come until nearly three months later," noting "I have made no efforts to hide my views, relationships or affiliations. If plaintiffs truly believed that any of these issues, individually or collectively, created a bias or the appearance of partiality, they should have promptly moved for my recusal.")

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 99 of 1828 PageID 9592
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 45 of 60 PageID 10731

Based on their own pleading and allegations, Appellants' contention that the Bankruptcy Court's bias "did not manifest itself until late 2020 and early 2021" is without merit. (App. Brief ¶¶ 38-42). Such an assertion also contradicts Appellants' own argument that the Bankruptcy Court's "bias" against Mr. Dondero was "apparent" from this Case's inception. (*See* Recusal Motion ¶ 3). Even assuming it was not until "late 2020" that such a "manifestation" of bias presented itself, the Recusal Motion would still be untimely because Appellants waited several months to bring the Recusal Motion, during which time the Bankruptcy Court held evidentiary hearings for injunctive relief in *three* separate adversary proceedings as well as a two-day contested confirmation hearing—all of which involved some or all of the Appellants. As discussed *supra*, this is precisely the type of delay that courts routinely find "untimely." *See Hirczy v. Hamilton*, 190 Fed. App'x 357, 360 (5th Cir. 2006) (affirming district court's denial of motion to recuse as "untimely" where party "learned directly" from the judge in open court of potential bias, yet "he waited over two months until and after the adverse decision to file his motion to recuse" further noting that because motion was untimely, "a substantive review for abuse of discretion is unnecessary"); *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 334 (2d Cir. 1987) (motion untimely where party waited two months after events giving rise to charge of bias or prejudice before making its recusal motion);

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 100 of 1828 PageID 9593
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 46 of 60 PageID 10732

*Da Silva*, 868 F. Supp. 2d at 155. Appellants otherwise offer no credible legal or factual basis in support of their "manifestation" argument. [24]

The Bankruptcy Court also appropriately considered the fact that the Recusal Motion came on the "eve of the contempt hearing." (Recusal Order at 7); *see Weisshaus v. Fagan,* 456 Fed. App'x 23, 34 (2d Cir. 2012) (noting that "[a]lthough there was no dispositive ruling as to [defendant] at the time [plaintiff] brought her recusal motion, the district court aptly noted that the motion came on the heels of its direction that [plaintiff] submit to a deposition, thus strongly suggesting that the motion was a mere fall-back position in response to an adverse ruling."); *Da Silva*, 868 F. Supp. 2d at 154 (denying recusal motion where "[i]t appears that plaintiffs are improperly using the recusal motion as a 'fall-back position' to an unfavorable ruling.")

Appellants' remaining contentions regarding "timeliness" are equally frivolous. Nevertheless, they warrant a response. Appellants' attempt to distinguish the Bankruptcy Court's cite to *Davies* is in vain. Appellants assert that *Davies* "does not support the Order" because there, a party moved to recuse "almost a year after an adverse ruling." (App. Brief ¶¶ 36-37 (quoting *Davies,* 68 F.3d at 1130-31)). But that is exactly what happened here. *See supra* at 27-29. As alleged by Appellants,

---

[24] The only case Appellants cite in support of this contention is *Davies*—the same case they try to distinguish from the present facts, (*see* App. Brief ¶ 37), and a case which does not even support that statement.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 101 of 1828 PageID 9594
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 47 of 60 PageID 10733

the Recusal Motion was filed more than one year after (a) an adverse ruling was granted (*i.e.*, the Transfer Motion) in December 2019 (App. Brief ¶¶1-2); (b) the Bankruptcy Court improperly relied on its opinions of Mr. Dondero to include certain provisions in the Settlement Order on January 9, 2020 (*id.* at ¶¶3-4); and (c) the Bankruptcy Court's bias allegedly caused it reached conclusions without evidence and render an adverse ruling in connection with the February 2020 hearing on the Foley Application (*id.* ¶¶ 5-6).

Finally, Appellants' cite to the Delaware Bankruptcy Court's statements regarding the "presumption" that the Bankruptcy Court would follow the "rules of evidence" early in the Case, (App. Brief. ¶ 9), is entirely irrelevant for purposes of this Appeal, and should be disregarded by the Court.[25] Indeed, Appellants' failure to appeal any of the orders complain of (other than the Confirmation Order) demonstrates that Appellants themselves generally find no fault in the actual conclusions reached and orders entered by the Bankruptcy Court.

In light of the expansive nature of this Case and the Bankruptcy Court's extensive knowledge of the proceedings that it has overseen throughout the last 21 months, interests of judicial economy also support the Bankruptcy Court's denial of the Recusal Motion. *See U.S. v. Olis*, 571 F. Supp. 2d 777 (5th Cir. 2008) (affirming

---

[25] Nothing in the Recusal Motion alleges the Bankruptcy Court has failed to follow the Federal Rules of Evidence.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 102 of 1828 PageID 9595
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 48 of 60 PageID 10734

denial of recusal motion as untimely where party was aware of facts stated in recusal

motion "well before he filed" the motion, noting that party "had duty to file [ ]

motion for recusal before the court's judicial resources were spent on resolution of

motions" and party "neither argues nor explains why his delay" was reasonable);

*Hill*, 495 Fed. App'x at 484 ("Particularly in light of the expansive nature of these

proceedings, considerations of judicial economy likewise countenance our

conclusion that the district court did not abuse its discretion"); *United States v. York*,

888 F.2d 1050, 1055 (5th Cir. 1989) ("The motivation behind a timeliness

requirement [for Section 455] is [] to a large extent one of judicial economy");

*Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001) ("After a

massive proceeding such as this, when the court has invested substantial judicial

resources and there is indisputably no evidence of prejudice, a motion for recusal of

a trial judge should be supported by substantial justification, not fanciful illusion");

*Weisshaus*, 456 Fed. App'x at 34 (affirming district court's denial of recusal motion

as untimely where party "waited almost nineteen months" to file the recusal motion,

at which point the district court had already expended substantial judicial resources

overseeing and adjudicating" the parties' claims).

Accordingly, the Bankruptcy Court was well within its discretion in finding

Appellants' Recusal Motion untimely. For this reason alone, the Recusal Motion

was properly denied. *See Hill*, 495 Fed. App'x at 482 (affirming denial of recusal

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 103 of 1828 PageID 9596
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 49 of 60 PageID 10735

motion solely because it was "untimely," noting "[b]ecause we affirm on the basis of untimeliness, we do not reach the merits of the recusal issue"); *Hirczy*, 190 Fed. App'x at 360 (noting that because recusal motion was untimely, "a substantive review for abuse of discretion is unnecessary."); *Andrade*, 338 F.3d at 459 ("[U]ntimely motions to recuse are ordinarily rejected.")

**B.** **The Bankruptcy Court Properly Exercised Its Discretion in Denying the Recusal Motion on the Merits**

Even if the Recusal Motion had been timely, the Bankruptcy Court did not abuse its discretion in denying Appellants' Motion to Recuse on the merits. A motion for recusal is committed to the sound discretion of the district court. *Hill*, 197 Fed. Appx'x at 335. "The judge abuses [their] discretion in denying recusal where a reasonable [person], cognizant of the relevant circumstances surrounding [the] judge's failure to recuse, would harbor legitimate doubts about that judge's impartiality." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999).

Pursuant to Section 455:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned.

(b) [They] shall also disqualify [themselves] in the following circumstances:

(1) Where [they] has a personal bias or prejudice concerning a party, a personal knowledge of disputed evidentiary facts concerning the proceeding.

28 U.S.C. § 455(a) and (b)(1).

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 104 of 1828 PageID 9597
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 50 of 60 PageID 10736

"The standard for bias is not 'subjective,' as it once was, but, rather, 'objective.'" *Andrade*, 338 F.3d at 454-55 (citing *Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*, 948 F.2d 1436, 1448 (5th Cir. 1991)). In other words, it "is with reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person' that the objective standard is currently established." *Id.* (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)). "Another maxim is that review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents." *Id.* at 455. Finally, the common-law doctrine called the "extrajudicial source rule" under Section 455 "divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal." *Id.* Ultimately, to succeed in an appeal of a denial of a recusal motion, the appellant must: (1) demonstrate that the alleged comment, action, or circumstance was of "extrajudicial" origin, (2) place the offending event into the context of the entire trial, and (3) do so by an "objective" observer's standard. They must also demonstrate that the "district court's refusal to recuse was not merely erroneous, but, rather, an abuse of discretion." *Id.* at 456-62.

As the Bankruptcy Court properly determined, none of the circumstances requiring disqualification under Section 455 are present here.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 105 of 1828 PageID 9598
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 51 of 60 PageID 10737

**1.      There Is No Extrajudicial Bias Present Here**

The Bankruptcy Court correctly found that any knowledge learned from the Acis Bankruptcy is insufficient to constitute "extrajudicial" knowledge warranting recusal. (*See* Recusal Order at 9).  The core of Appellants' argument on appeal is that the Bankruptcy Court's "extrajudicial" bias toward Appellants stemmed from opinions formed during the Acis Bankruptcy. (*See* App. Brief. ¶¶ 3-4).  Appellants' argument is frivolous.

As articulated by the most prominent Supreme Court case on recusal, "[o]pinions formed by the judge on the basis of facts of prior proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998) ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).  Rather, opinions or beliefs formed from events on the record or from prior proceedings, or "intrajudicial" opinions, are subject to a "deferential" review, and are the "type of opinions/expressions that *Liteky* holds nearly exempt from causing recusal." *Andrade*, 338 F.3d at 460-62.

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 106 of 1828 PageID 9599
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 52 of 60 PageID 10738

Any opinion allegedly formed by the Bankruptcy Court from the Acis Bankruptcy, a prior proceeding, is thus not contemplated by the "extrajudicial" source rule and is precisely the type of opinion that is exempt from warranting recusal. *See Litkey*, 510 U.S. at 555; *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 81 (5th Cir. 2011) (affirming denial of motion for recusal where "the only facts the [judge] learned about [party's] conduct were learned from judicial proceedings in the instant case and in previous cases"); *Conkling*, 138 F.3d at 592 ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).[26]

For these same reasons, Appellants' reliance on the Bankruptcy Court's rulings as evidence of "antagonism" is equally deficient. (*See, e.g.*, App. Brief ¶¶ 55-56). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion … and can only in the rarest circumstances evidence the degree of favoritism or antagonism required … when no extrajudicial source is involved." *Liteky*, 510 U.S. at 555. Here, Appellants rely on various rulings issued by the

---

[26] Appellants rely on only one allegedly "extrajudicial" source relating to the Bankruptcy Court's inquiries into COVID-related "PPP loans." (App. Brief. ¶ 24). However, as noted *supra*, the Bankruptcy Court took no action against Mr. Dondero or any of the Appellants and did not even ask them to respond.

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 54 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 107 of 1828   PageID 9600
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21   Page 53 of 60   PageID 10739

Bankruptcy Court to demonstrate "bias." *See* App. Brief. ¶¶ 7-11 (citing to Bankruptcy Court's grant in part and denial in part on Foley Application; *id.* ¶¶ 12-17 (citing to Bankruptcy Court's denial of Appellants' Restriction Motion), *id.* ¶¶ 27-28 (citing to Bankruptcy Court's grant of Debtor's TRO Motion against Advisors and Funds); *id.* ¶ 57 (citing to Bankruptcy Court's holding that Debtor's motion for Mandatory Injunction against Advisors and Funds was "moot"); *id.* ¶ 57 (citing to Bankruptcy Court's denial of Dugaboy's motion to compel the Debtor to file "unduly burdensome" financial reports); *id.* ¶ 58 (citing June 17 Order requiring Appellants to disclose inter alia, whether they are "creditors" of the Debtor and Mr. Dondero's ownership interest in entities "with ties to Mr. Dondero").  These rulings, none of which involve an extrajudicial source, simply do not rise to the rare circumstance of evidencing the degree of antagonism warranted for recusal.  *See Liteky*, 510 U.S. at 555 ("Almost invariably, judicial rulings are proper grounds for appeal, not for recusal"); *Andrade*, 338 F.3d at 456 (denying recusal based on judicial rulings where events cited "are embodied in judicial actions that Appellants could have, but did not, appeal").  Appellants fail to even address the established law set forth under *Liteky*, which plainly forecloses their remedy of recusal, and instead merely cite to *Liteky* in a few footnotes while twisting its holdings. (*See* App. Brief ¶¶ 54-55 fn. 114, 115, 117).  Simply put, Appellants offer no credible legal or factual basis for recusal. *See Henderson v. Dep't of Pub. Safety and Corrs.*, 901 F.2d 1288,

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 108 of 1828 PageID 9601
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 54 of 60 PageID 10740

1296 (5th Cir. 1990) ("[E]ven the most superficial research would have put [the party] on notice that the factual circumstances he alleged were not grounds for recusal" under *Liteky*, noting "there is absolutely no case authority cited by [party] to the contrary.")

Appellants' "due process" argument that "even a lack of extrajudicial knowledge is not fatal because Appellants are entitled to make their case in an impartial forum," App Brief. ¶¶50, 54, is frivolous and should be summarily rejected by the Court. Appellants fail to support any notion of a "due process" violation. Nor could they. The record of this Case shows the great extent to which the Bankruptcy Court has respected the due process rights of Appellants, notwithstanding their limited, if any, skin in the game. The cases cited by Appellants in support of their contention are entirely inapplicable. *Miller v. Sam Houston State Univ.,* 986 F.3d 880, 893 (5th Cir. 2021) does not address the standard for "recusal" under Section 455 or the "extrajudicial" source rule. Rather, *Miller* deals with whether a case should be reassigned to a different district court judge on remand after the original judge did not give plaintiff the opportunity for discovery and *sua sponte* dismissed a plaintiff's claim of sex discrimination and retaliation under the Fair Labor Standers Act. *Marshall v. Jerrico*, 446 U.S. 238 (1980) also does not address recusal motions, but deals with whether the "reimbursement provision of the [Fair Labor Standards] Act violate the Due Process Clause." *Id.* at 243. Appellants' remaining case cites on

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 109 of 1828 PageID 9602
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 55 of 60 PageID 10741

this point are equally irrelevant.[27] The types of exceptional circumstances warranting recusal in those cases are not present here. Appellants otherwise offer no legal basis in support of their argument. Accordingly, the Bankruptcy Court properly exercised its discretion in finding that there was no "extrajudicial" source warranting recusal.

### 2. The Bankruptcy Court Does Not Harbor Deep-Seated Antagonism Toward Appellants

The Bankruptcy Court also properly exercised its discretion in finding that it did not harbor any "deep-seated antagonism" toward Appellants such that it would raise "doubt in the mind of a reasonable observer" as to the Bankruptcy Court's impartiality. (Recusal Order at 10). Appellants contend that the Bankruptcy Court's "repeated negative statements about Mr. Dondero" and "reference to proceedings in the Acis Bankruptcy to justify findings made in the Highland" case justify recusal. (App. Brief ¶¶ 51-58). Appellants' arguments are without merit.

---

[27] For example, the Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), reversed a denial of a recusal motion as a "matter of due process" where, following entry of a $50 million judgment against a corporation in favor of the CEO, that CEO contributed $3 million to help elect the same judge who the CEO knew would preside over corporation's appeal. The Court in *Johnson v. Mississippi*, 403 U.S. 212 (1971), found recusal of a judge was necessary where that judge "was a defendant in one of petitioner's civil rights suits and a losing party at that." *Id.* at 215. The Court in *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 167 (5th Cir. 1997), denied a petition for writ of mandamus challenging denial of recusal premised on racist remarks, where, although a "reasonable person might indeed harbor doubts about the trial judge's impartiality" in a "racially-charged case such as the instant one," the judge had already presided over the case for so long such that recusal at that stage "would be unprecedented."

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 57 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 110 of 1828 PageID 9603
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 56 of 60 PageID 10742

"Judicial remarks that are critical or disapproving of, or even hostile to, counsel for the parties or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. In support of their argument that the Bankruptcy Court harbored "bias" toward Appellants, Appellants refer to a number of the Bankruptcy Court's remarks regarding, *inter alia*: (i) the "importance" of the language in Settlement Order and Mr. Dondero abiding by its terms, (App. Brief ¶¶ 3-4), (ii) its "concern" regarding Mr. Dondero's appeal of Acis, (*id.* ¶ 6), (iii) the Restriction Motion as "frivolous," (*id.* ¶ 11); and (iv) its reminder to Mr. Dondero that the Settlement Order prohibits him from terminating the Debtor's agreements after evidence established that he was likely behind the K&L Gates Letters, (*id.* ¶ 17).

In relying on such statements, Appellants again disregard the law on recusal. *See Andrade*, 338 F.3d at 459 (affirming denial of recusal motion premised on judge's negative comments made on the record – including describing a witness as "crazy, murdering son-of-a-bitch" and referring to parties' attempt to introduce certain evidence as "bullcrap," – noting that appellants "brief omits citing the most prominent Supreme Court statement on point (citing *Liteky*, 510, U.S. at 555)). As the Bankruptcy Court properly found, Appellants' cited remarks are, at best, "clashes between a court and counsel," and such remarks are "simply insufficient" for recusal. (Recusal Order at 10). *See United States v. Landerman*, 109 F.3d 1053, 1066 (5th

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 111 of 1828 PageID 9604
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 57 of 60 PageID 10743

Cir. 1997) (affirming denial of motion to recuse where district judge allowed "the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning"); *Garcia v. Woman's Hosp. of Texas*, 143 F.3d 227, 230 (5th Cir. 1998) (affirming denial of motion to recuse where district judge had made unflattering comments about plaintiff's ability to prove her case).

Based on the entirety of the proceedings before the Bankruptcy Court, in which all events raised by Appellants relate to either the Bankruptcy Court's knowledge of prior proceedings or the Bankruptcy Court's remarks during these proceedings, the exceptional remedy of recusal is not warranted. *See United States v. Williams*, 127 Fed. App'x 736, 737-38 (5th Cir. 2005) ("As our review of the entire context of the judicial proceedings in which the events challenged in this case arose reveals no disqualifying judicial bias, we conclude that there was no abuse of discretion in the district court's denial of [the] recusal motion"); *Henderson*, 901 F.2d at 1296 (affirming court's denial of recusal motion, where "none of the circumstances requiring disqualification under § 455 are present here" and "the trial judge was well within his discretion in finding that the motion for recusal was not well founded, either in fact or in law.") The Bankruptcy Court, therefore, properly exercised its discretion in finding that Appellants' assertions do not "rise to the

DOCS_NY:43746.7 36027/002

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 112 of 1828 PageID 9605
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 58 of 60 PageID 10744

threshold standard of raising doubt in the mind of a reasonable observer' as to the judge's impartiality." (Recusal Order at 10).

Accordingly, the Bankruptcy Court was well within its discretion in denying the Recusal Motion on the merits.

## **CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that this Court affirm the Recusal Order.

DOCS_NY:43746.7 36027/002

APP. 0356

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 113 of 1828 PageID 9606
Case 3:21-cv-00879-K Document 20 Filed 07/28/21 Page 59 of 60 PageID 10745

Dated:  July 28, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
    rfeinstein@pszjlaw.com
    jmorris@pszjlaw.com
    gdemo@pszjlaw.com
    jelkin@pszjlaw.com
    hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
_____
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11 Doc 3445-7 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 61 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 114 of 1828   PageID 9607
Case 3:21-cv-00879-K   Document 20   Filed 07/28/21    Page 60 of 60   PageID 10746

## CERTIFICATE OF COMPLIANCE WITH RULE 8015

This document complies with the type-volume limit of Fed. R. Bankr. P.

8015(a)(7)(B)(i) because, according to Microsoft Word, it contains 12,803 words,

excluding the portions of the document exempted by Fed. R. Bankr. P. 8015(g).


By: */s/ Zachery Z. Annable*
Zachery Z. Annable

DOCS_NY:43746.7 36027/002

# EXHIBIT 8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 116 of 1828   PageID 9609
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1 of 1803   PageID 10747

Docket #0021  Date Filed: 7/28/2021

Case No. 3:21-cv-00879-K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY
INVESTMENT TRUST, THE GET GOOD TRUST, AND NEXPOINT REAL
ESTATE PARTNERS, LLC,

Appellants,

v.

HON. STACEY G. C. JERNIGAN AND HIGHLAND CAPITAL
MANAGEMENT, L.P.

Appellees.

On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court

In re:  Highland Capital Management, L.P.
Case No. 19-34054 (Jointly Administered)

APPENDIX IN SUPPORT OF ANSWERING BRIEF OF
APPELLEE HIGHLAND CAPITAL MANAGEMENT, L.P.

1934054210728000000000007

APP. 0562

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 117 of 1828 PageID 9610
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 2 of 1803 PageID 10748

Appellee Highland Capital Management, L.P. ("Highland" or the "Debtor"),

the debtor and debtor-in-possession in the above-captioned chapter 11 bankruptcy

case (the "Bankruptcy Case"), hereby files this appendix in support of the Answering

Brief of Appellee Highland Capital Management, L.P. (the "Brief").

### TABLE OF CONTENTS

| Appx. | Description |
|-------|-------------|
| 1. | *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1473 (Bankr. N.D. Tex. Nov. 24, 2020) |
| 2. | *Partial Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (March 6, 2019) |
| 3. | *Final Award*, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., Case No. 01-16-0002-6927 (April 29, 2019) |
| 4. | *May 17, 2019 Transcript,* Daugherty v. Highland Capital Management, L.P., C.A. No. 2018-0488-MTZ (Del. Ch. May 17, 2019) |
| 5. | *Order Denying Application to Certify Interlocutory Appeal,* C.A. No. 2018-0488-MTZ (Del. Ch. July 8, 2019) |
| 6. | *Motion for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 86 (Bankr. D. Del. Nov. 11, 2019) |
| 7. | *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) |
| 8. | *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*, Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 118 of 1828 PageID 9611
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 3 of 1803 PageID 10749

| 9. | *Opinion* affirming Confirmation Order, Case No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18, 2019) |
| 10. | *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17, 2021) |
| 11. | *Objection of the Debtor to Motion of Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas*, Case No. 19-12239 (CSS), Docket No. 118 (Bankr. D. Del. Nov. 12, 2019) |
| 12. | *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, Case No. 19-34054-sgj11, Docket No. 281 (Bankr. N.D. Tex. Dec. 27, 2019) |
| 13. | *Debtor's Omnibus Reply in Support of (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 159 (Bankr. D. Del. Nov. 21, 2019) |
| 14. | *Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 70 (Bankr. D. Del. Oct. 29, 2019) |
| 15. | *Limited Objection to the Debtor's: (i) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date; and (ii) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 116 (Bankr. D. Del. Nov. 12, 2019) |
| 16. | *Limited Objection of the Official Committee of Unsecured Creditors to the Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP and Lynn Piker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, Case No. 19-12239 (CSS), Docket No. 120 (Bankr. D. Del. Nov. 12, 2019) |

DOCS_NY:43760.2 36027/002

| | |
|---|---|
| 17. | *Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11, Docket No. 2590 (Bankr. N.D. Tex. July 20, 2021) |
| 18. | *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1661 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 19. | *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* filed by Get Good Trust, The Dugaboy Investment Trust, Case No. 19-34054-sgj11, Docket No. 1667 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 20. | *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund, Case No. 19-34054-sgj11, Docket No. 1670 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 21. | *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)*, Case No. 19-34054-sgj11, Docket No. 1673 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 22. | *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization*, Case No. 19-34054-sgj11, Docket No. 1671 (Bankr. N.D. Tex. Jan. 5, 2021) |
| 23. | *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Docket No. 1814 (Bankr. N.D. Tex. Jan. 22, 2021) |
| 24. | *Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management,* |

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 120 of 1828 PageID 9613
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 5 of 1803 PageID 10751

|  | Case No. 19-34054-sgj11, Docket No. 1807 (Bankr. N.D. Tex. Jan. 22, 2021) |
|---|---|
| 25. | *Debtor's Witness and Exhibit List with Respect to Confirmation Hearing to be Held on January 26, 2021*, Case No. 19-34054-sgj11, Docket No. 1822 (Bankr. N.D. Tex. Jan. 22, 2021) |
| 26. | *Debtor's Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 2, 2021*, Case No. 19-34054-sgj11, Docket No. 1866 (Bankr. N.D. Tex. Jan. 29, 2021) |
| 27. | *Debtor's Second Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 2, 2021*, Case No. 19-34054-sgj11, Docket No. 1877 (Bankr. N.D. Tex. Feb. 1, 2021) |
| 28. | *Debtor's Third Amended Witness and Exhibit List with Respect to Confirmation Hearing to be Held on February 3, 2021*, Case No. 19-34054-sgj11, Docket No. 1895 (Bankr. N.D. Tex. Feb. 4, 2021) |
| 29. | *Summary of Dondero Entity Litigation*, Case No. 3:19-cv-00842-B, Docket No. 43 at 546-557 (N.D. Tex. July 13, 2021) |

DOCS_NY:43760.2 36027/002

APP. 0366

Respectfully submitted,

Dated: July 28, 2021      **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
rfeinstein@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 8 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 122 of 1828   PageID 9615
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 7 of 1803   PageID 10753

# APPENDIX 1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 123 of 1828   PageID 9616
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 8 of 1803   PageID 10754
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 1 of 178

Docket #1473  Date Filed: 11/24/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. |  |

**DISCLOSURE STATEMENT FOR THE FIFTH AMENDED PLAN OF**
**REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054201124000000000002

Appellee Appx. 00002

APP. 0909

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 124 of 1828 PageID 9617
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 9 of 1803 PageID 10755
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 2 of 178

**ARTICLE I. EXECUTIVE SUMMARY** .................................................................6

    **A.**    **Summary of the Plan** ........................................................6

    **B.**    **An Overview of the Chapter 11 Process** ...........................8

    **C.**    **Purpose and Effect of the Plan** ......................................8

        1.    The Plan of Reorganization ...............................8

        2.    Plan Overview .....................................................9

        3.    Voting on the Plan ...........................................10

        4.    Confirmation of the Plan ..................................11

        5.    Confirming and Effectuating the Plan ...............12

        6.    Rules of Interpretation .....................................12

        7.    Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests.....................12

        8.    Instructions and Procedures for Voting ...........14

        9.    The Confirmation Hearing ...............................15

        10.    The Deadline for Objecting to Confirmation of the Plan .........16

        11.    Notice Parties ...................................................16

        12.    Effect of Confirmation of the Plan ...................16

    **D.**    **Effectiveness of the Plan** .............................................17

    **E.**    **RISK FACTORS** .......................................................17

**ARTICLE II. BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE** .................17

    **A.**    **Description and History of the Debtor's Business** ........17

    **B.**    **The Debtor's Corporate Structure** ..............................17

    **C.**    **Business Overview** ......................................................18

    **D.**    **Prepetition Capital Structure** ...................................18

        1.    Jefferies Margin Borrowings (Secured)............18

        2.    The Frontier Bank Loan (Secured) ..................19

        3.    Other Unsecured Obligations ...........................19

- i -

4.    Equity Interests ...................................................................20

E.    **SEC Filings** ...................................................................................20

F.    **Events Leading Up to the Debtor's Bankruptcy Filings** .................20

G.    **Additional Prepetition Litigation** ..................................................21

H.    **The Debtor's Bankruptcy Proceeding** ............................................24

I.    **First Day Relief** ...........................................................................24

J.    **Other Procedural and Administrative Motions** ...............................25

K.    **United States Trustee** ...................................................................25

L.    **Appointment of Committee** ..........................................................26

M.    **Meeting of Creditors** ....................................................................26

N.    **Schedules, Statements of Financial Affairs, and Claims Bar Date** .................26

O.    **Governance Settlement with the Committee** ..................................27

P.    **Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer** ................................................27

Q.    **Mediation** ...................................................................................28

R.    **Postpetition Settlements** .............................................................28

   1.    Settlement with Acis and the Terry Parties .............................28

   2.    Settlement with the Redeemer Committee ..............................29

S.    **Certain Outstanding Material Claims** ...........................................30

T.    **Treatment of Shared Service and Sub-Advisory Agreements** .........31

U.    **Portfolio Managements with Issuer Entities** ..................................32

V.    **Resignation of James Dondero** .....................................................33

W.    **Exclusive Periods for Filing a Plan and Soliciting Votes** ...............33

X.    **Negotiations with Constituents** ....................................................34

Y.    **Highland Capital Management, L.P. Retirement Plan and Trust** .................34

**ARTICLE III. SUMMARY OF THE PLAN** ...............................................35

A.    **Administrative and Priority Tax Claims** ........................................35

   1.    Administrative Expense Claims ..............................................35

   2.    Professional Fee Claims ........................................................36

   3.    Priority Tax Claims ..............................................................37

B.    **Classification and Treatment of Classified Claims and Equity Interests** ..................................................................................37

- ii -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 126 of 1828 PageID 9619
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 11 of 1803 PageID 10757
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 4 of 178

1. Summary ................................................................................................37

2. Elimination of Vacant Classes ............................................................38

3. Impaired/Voting Classes .....................................................................38

4. Unimpaired/Non-Voting Classes ........................................................38

5. Impaired/Non-Voting Classes .............................................................38

6. Cramdown.............................................................................................39

C. Classification and Treatment of Claims and Equity Interests .....................39

1. *Class 1 – Jefferies Secured Claim* ....................................................39

2. *Class 2 – Frontier Secured Claim* .....................................................39

3. *Class 3 – Other Secured Claims* ........................................................40

4. *Class 4 – Priority Non-Tax Claims* ....................................................40

5. *Class 5 – Retained Employee Claims* .................................................41

6. *Class 6 – PTO Claims* ........................................................................41

7. *Class 7 – Convenience Claims* ...........................................................41

8. *Class 8 – General Unsecured Claims* .................................................42

9. *Class 9 – Subordinated Claims* ..........................................................43

10. *Class 10 – Class B/C Limited Partnership Interests* ..........................44

11. *Class 11 – Class A Limited Partnership Interests* ..............................44

D. Special Provision Governing Unimpaired Claims ..........................................45

E. Subordinated Claims ........................................................................................45

F. Means for Implementation of the Plan ............................................................45

1. Summary ................................................................................................45

2. The Claimant Trust ...............................................................................46

(a) *Creation and Governance of the Claimant Trust and
Litigation Sub-Trust.* ...........................................................46

(a) *Claimant Trust Oversight Committee* ................................47

(b) *Purpose of the Claimant Trust.* .........................................48

- iii -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 127 of 1828   PageID 9620
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 12 of 1803   PageID 10758
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 5 of 178

(c)     *Purpose of the Litigation Sub-Trust.* ...........................................................48

(d)     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* ................................................................................48

(e)     *Compensation and Duties of Trustees.* ........................................50

(f)     *Cooperation of Debtor and Reorganized Debtor.* ....................50

(g)     *United States Federal Income Tax Treatment of the Claimant Trust.* ..................................................................................50

(h)     *Tax Reporting.* ..................................................................50

(i)     *Claimant Trust Assets.* ......................................................51

(j)     *Claimant Trust Expenses.* ..................................................51

(k)     *Trust Distributions to Claimant Trust Beneficiaries.* .............51

(l)     *Cash Investments.* ............................................................51

(m)     *Dissolution of the Claimant Trust and Litigation Sub-Trust.* ...................52

3.      The Reorganized Debtor ..........................................................52

(a)     *Corporate Existence* .........................................................52

(b)     *Cancellation of Equity Interests and Release* ..........................53

(c)     *Issuance of New Partnership Interests* ...................................53

(d)     *Management of the Reorganized Debtor* ..................................53

(e)     *Vesting of Assets in the Reorganized Debtor* ...........................53

(f)     *Purpose of the Reorganized Debtor* .......................................54

(g)     *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* ...................................54

4.      Company Action ........................................................................54

5.      Release of Liens, Claims and Equity Interests .............................55

6.      Cancellation of Notes, Certificates and Instruments ...................55

7.      Cancellation of Existing Instruments Governing Security Interests ........................................................................56

- iv -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 128 of 1828 PageID 9621
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 13 of 1803 PageID 10759
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 6 of 178

8. Control Provisions ....................................................................56

9. Treatment of Vacant Classes ..........................................................56

10. Plan Documents ....................................................................56

11. Highland Capital Management, L.P. Retirement Plan and
Trust ..............................................................................56

A. **Treatment of Executory Contracts and Unexpired Leases**...........................57

1. Assumption, Assignment, or Rejection of Executory Contracts
and Unexpired Leases ................................................................57

2. Claims Based on Rejection of Executory Contracts or
Unexpired Leases ...................................................................58

3. Cure of Defaults for Assumed or Assigned Executory
Contracts and Unexpired Leases ......................................................58

B. **Provisions Governing Distributions** ................................................59

1. Dates of Distributions .............................................................59

2. Distribution Agent ................................................................60

3. Cash Distributions ................................................................60

4. Disputed Claims Reserve ...........................................................60

5. Distributions from the Disputed Claims Reserve .......................................61

6. Rounding of Payments .............................................................61

7. *De Minimis* Distribution ............................................................61

8. Distributions on Account of Allowed Claims ...........................................62

9. General Distribution Procedures .....................................................62

10. Address for Delivery of Distributions .................................................62

11. Undeliverable Distributions and Unclaimed Property.....................................62

12. Withholding Taxes.................................................................63

13. Setoffs ...........................................................................63

14. Surrender of Cancelled Instruments or Securities ......................................63

15. Lost, Stolen, Mutilated or Destroyed Securities .......................................63

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 129 of 1828   PageID 9622
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 14 of 1803   PageID 10760
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 7 of 178

**C.**   **Procedures for Resolving Contingent, Unliquidated and Disputed Claims** ..........................................................................................64

    1.   Filing of Proofs of Claim ...........................................................64

    2.   Disputed Claims.........................................................................64

    3.   Procedures Regarding Disputed Claims or Disputed Equity Interests.....................................................................................64

    4.   Allowance of Claims and Equity Interests ................................64

*Allowance of Claims* .........................................................................64

*Estimation* .........................................................................................65

*Disallowance of Claims* ....................................................................65

**D.**   **Effectiveness of the Plan**.........................................................66

    1.   Conditions Precedent to the Effective Date................................66

    2.   Waiver of Conditions.................................................................67

    3.   Effect of Non-Occurrence of Conditions to Effectiveness ........67

    4.   Dissolution of the Committee ....................................................67

**E.**   **Exculpation, Injunction, and Related Provisions** ................68

    1.   General .......................................................................................68

    3.   Exculpation ................................................................................69

    4.   Releases by the Debtor ..............................................................70

    5.   Preservation of Rights of Action ..............................................71

*Maintenance of Causes of Action* .....................................................71

*Preservation of All Causes of Action Not Expressly Settled or Released*.........................72

    6.   Injunction ..................................................................................72

    7.   Term of Injunctions or Stays ....................................................73

    8.   Continuance of January 9 Order ...............................................73

**F.**   **Article XII.D of the Plan** ........................................................74

**G.**   **Binding Nature of Plan**............................................................74

**H.**   **Statutory Requirements for Confirmation of the Plan** .......74

    1.   Best Interests of Creditors Test.................................................75

- vi -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 130 of 1828 PageID 9623
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 15 of 1803 PageID 10761
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 8 of 178

2. Liquidation Analysis .......................................................................... 75

3. Feasibility ......................................................................................... 76

4. Valuation .......................................................................................... 77

5. Acceptance by Impaired Classes .................................................... 77

6. Confirmation Without Acceptance by Impaired Classes ................. 78

7. No Unfair Discrimination .................................................................. 78

8. Fair and Equitable Test ................................................................... 78

**ARTICLE IV. RISK FACTORS** ................................................................... 79

A. **Certain Bankruptcy Law and Other Considerations** ..................... 79

1. Parties in Interest May Object to the Debtor's Classification of
Claims and Equity Interests, or Designation as Unimpaired. ......... 79

2. The Debtor May Not Be Able to Secure Confirmation of the
Plan. ............................................................................................... 79

3. The Conditions Precedent to the Effective Date of the Plan
May Not Occur. ............................................................................... 80

4. Continued Risk Following Effectiveness. ........................................ 80

5. The Effective Date May Not Occur. ................................................ 80

6. The Chapter 11 Case May Be Converted to Cases Under
Chapter 7 of the Bankruptcy Code ................................................. 81

7. Claims Estimation ........................................................................... 81

8. The Financial Information Contained Herein is Based on the
Debtor's Books and Records and, Unless Otherwise Stated,
No Audit was Performed. ................................................................ 81

B. **Risks Related to Recoveries under the Plan** .................................. 81

1. The Reorganized Debtor and/or Claimant Trust May Not Be
Able to Achieve the Debtor's Projected Financial Results .............. 81

2. Claim Contingencies Could Affect Creditor Recoveries ................. 82

3. If Approved, the Debtor Release Could Release Claims
Against Potential Defendants of Estate Causes of Action With
Respect to Which the Claimant Trust Would Otherwise Have
Recourse ........................................................................................ 82

- vii -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 131 of 1828   PageID 9624
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 16 of 1803   PageID 10762
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 9 of 178

C.    **Investment Risk Disclaimer** ............................................................................82

    1.    Investment Risks in General. ........................................................................82

    2.    General Economic and Market Conditions and Issuer Risk. ......................82

D.    **Disclosure Statement Disclaimer** ....................................................................83

    1.    The Information Contained Herein is for Disclosure Purposes
Only. ...............................................................................................................83

    2.    This Disclosure Statement was Not Approved by the SEC. ......................83

    3.    This Disclosure Statement Contains Forward-Looking
Statements. ....................................................................................................83

    4.    No Legal or Tax Advice is Provided to You by This
Disclosure Statement. ...................................................................................83

    5.    No Admissions Are Made by This Disclosure Statement. .........................84

    6.    No Reliance Should Be Placed on Any Failure to Identify
Litigation Claims or Projected Objections. .................................................84

    7.    Nothing Herein Constitutes a Waiver of Any Right to Object
to Claims or Equity Interests or Recover Transfers and Assets. ...............84

    8.    The Information Used Herein was Provided by the Debtor and
was Relied Upon by the Debtor's Advisors. ...............................................84

    9.    The Disclosure Statement May Contain Inaccuracies. ..............................84

    10.   No Representations Made Outside the Disclosure Statement
Are Authorized. .............................................................................................85

**ARTICLE V. ALTERNATIVES TO CONFIRMATION AND
EFFECTIVENESS OF THE PLAN**...........................................................................85

**ARTICLE VI. U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN** ...........................................................................................................................85

A.    **Consequences to the Debtor** ..............................................................................86

    1.    Cancellation of Debt ......................................................................................86

    2.    Transfer of Assets ..........................................................................................87

B.    **U.S. Federal Income Tax Treatment of the Claimant Trust** ........................87

C.    **Consequences to Holders of Allowed Claims** .................................................88

    1.    Recognized Gain or Loss...............................................................................88

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 132 of 1828 PageID 9625
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 17 of 1803 PageID 10763
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 10 of 178

       2.    <u>Distribution in Discharge of Accrued Unpaid Interest</u> .............................89

       3.    <u>Information Reporting and Withholding</u> ....................................................89

    **D.**    **Treatment of the Disputed Claims Reserve** ......................................................89

**ARTICLE VII. RECOMMENDATION** ......................................................................90

Appellee Appx. 00011
APP. 09566

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 133 of 1828    PageID 9626
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 18 of 1803    PageID 10764
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 11 of 178

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned cases (the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor or interest holder in connection with the *Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management, L.P.*, dated November 24, 2020, as the same may be amended from time to time (the "Plan").[2] The Debtor has filed a voluntary petition under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

This Disclosure Statement has not yet been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code. The Debtor intends to seek an order or orders of the Bankruptcy Court (a) approving this Disclosure Statement as containing adequate information and (b) confirming the Plan.

A copy of the Plan is attached hereto as **Exhibit A**.

The Debtor believes that the Plan is fair and equitable, will maximize the value of the Debtor's Estate, and is in the best interests of the Debtor and its constituents. Notably, the Plan provides for the transfer of the majority of the Debtor's Assets to a Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor. The Reorganized Debtor will be managed by New GP LLC – a wholly-owned subsidiary of the Claimant Trust. This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets.

The Claimant Trust, the Litigation Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant Trust Agreement, or the Reorganized Limited Partnership Agreement.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT FOR YOU TO READ**

---

**The Debtor is providing the information in this Disclosure Statement to Holders of Claims and Equity Interests in connection with the Debtor's Plan. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any purpose other than with respect to confirmation of the Plan. The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.**

**This Disclosure Statement has not been filed for approval with the Securities and Exchange Commission ("SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon**

---

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 134 of 1828 PageID 9627
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 19 of 1803 PageID 10765
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 12 of 178

the merits of the Plan. Any representation to the contrary is a criminal offense. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The Debtor considers all statements regarding anticipated or future matters to be forward-looking statements. Forward-looking statements may include statements about:

- the effects of insolvency proceedings on the Debtor's business and relationships with its creditors;

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- financial strategy, budget, projections, and operating results;

- variation from projected operating and financial data;

- substantial capital requirements;

- availability and terms of capital;

- plans, objectives, and expectations;

- the adequacy of the Debtor's capital resources and liquidity; and

- the Claimant Trust's or the Reorganized Debtor's ability to satisfy future cash obligations.

Statements concerning these and other matters are not guarantees of the Claimant Trust's or Reorganized Debtor's future performance. There are risks, uncertainties, and other important factors that could cause the Claimant Trust's or Reorganized Debtor's actual performance or achievements to be different from those that may be projected. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and is not necessarily in accordance with federal or state securities laws or other similar laws.

Appellee Appx. 00013
APP. 0570

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 135 of 1828 PageID 9628
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 20 of 1803 PageID 10766
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 13 of 178

No legal or tax advice is provided to you by this Disclosure Statement. The Debtor urges each Holder of a Claim or an Equity Interest to consult with its own advisers with respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein.

Pachulski Stang Ziehl & Jones LLP ("PSZ&J") is general insolvency counsel to the Debtor. Development Specialists, Inc. ("DSI") is the Debtor's financial advisor. PSZ&J, DSI, and the Independent Board (as defined below) have relied upon information provided by the Debtor in connection with preparation of this Disclosure Statement. PSZ&J has not independently verified the information contained herein.

This Disclosure Statement contains, among other things, summaries of the Plan, the management of the Reorganized Debtor, the Claimant Trust, certain statutory provisions, certain events in the Debtor's Chapter 11 Case, and certain documents related to the Plan that are attached hereto and incorporated herein by reference or that may be filed later with the Plan Supplement. Although the Debtor believes that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any conflict, inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern and control for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtor's management. The Debtor does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtor relied on financial data derived from the Debtor's books and records and on various assumptions regarding the Debtor's business. The Debtor's management has reviewed the financial information provided in this Disclosure Statement. Although the Debtor has used its reasonable business judgment to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited (unless otherwise expressly provided herein) and no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business and its, the Reorganized Debtor's, and the Claimant Trust's future results. The Debtor expressly cautions readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. Rather, this Disclosure Statement shall constitute a statement made in settlement negotiations related to potential contested matters, potential adversary proceedings and other pending or threatened litigation or actions.

Appellee Appx. 00014
APP. 0379

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 136 of 1828   PageID 9629
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 21 of 1803   PageID 10767
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 14 of 178

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in the Disclosure Statement.  Except as provided under the Plan, the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, may seek to investigate, file and prosecute Claims and Causes of Action and may object to Claims or Equity Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies any such Claims or Equity Interests or objections to Claims or Equity Interests on the terms specified in the Plan.

The Debtor is generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted.  Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so.  Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the Disclosure Statement was sent.  Information contained herein is subject to completion, modification, or amendment.  The Debtor reserves the right to file an amended or modified Plan and related Disclosure Statement from time to time.

The Debtor has not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.  The Debtor has not authorized any representations concerning the Debtor or the value of its property other than as set forth in this Disclosure Statement.

Holders of Claims or Equity Interests must rely on their own evaluation of the Debtor and their own analyses of the terms of the Plan in considering the Plan.  Importantly, each Holder of a Claim should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto, including the risk factors described in greater detail in ARTICLE IV herein, "Risk Factors."

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Equity Interests in, the Debtor will be bound by the terms of the Plan and the transactions contemplated thereby.

The effectiveness of the Plan is subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to become effective will be satisfied (or waived).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 23 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 137 of 1828   PageID 9630
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 22 of 1803   PageID 10768
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 15 of 178

## EXHIBITS

**EXHIBIT A** – Plan of Reorganization

**EXHIBIT B** – Organizational Chart of the Debtor

**EXHIBIT C** – Liquidation Analysis/Financial Projections

THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH
FULLY SET FORTH HEREIN.

Appellee Appx. 00016
APP. 09573

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 138 of 1828    PageID 9631
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 23 of 1803    PageID 10769
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 16 of 178

# ARTICLE I.
## EXECUTIVE SUMMARY

**This Disclosure Statement is provided for informational purposes only.**

**In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distributions to the Debtor's creditors and interest holders.  The Debtor believes that any delay in confirmation of the Plan would result in significant administrative expenses resulting in less value available to the Debtor's constituents.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan.  Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.**

This Executive Summary is being provided to Holders of Allowed Claims and Equity Interests as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (including all exhibits attached hereto and to the Plan and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization or liquidation.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.  This Disclosure Statement includes, without limitation, information about:

- the Debtor's operating and financial history;

- the significant events that have occurred to date;

- the Confirmation process; and

- the terms and provisions of the Plan, including key aspects of the Claimant Trust and the Reorganized Debtor, certain effects of Confirmation of the Plan, certain risk factors relating to the Plan, and the manner in which distributions will be made under the Plan.

The Debtor believes that any alternative to Confirmation of the Plan would result in significant delays, litigation, and additional costs, and ultimately would diminish the Debtor's value.  **Accordingly, the Debtor strongly supports confirmation of the Plan.**

A.    **Summary of the Plan**

The Plan represents a significant achievement for the Debtor.  As discussed herein, the Plan provides that the Claimant Trust will receive the majority of the Debtor's assets, including Causes of Action.  The assets being transferred to the Claimant Trust are referred to, collectively, as the Claimant Trust Assets.  The Claimant Trust will – for the benefit of the Claimant Trust

- 6 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 139 of 1828   PageID 9632
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 24 of 1803   PageID 10770
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 17 of 178

Beneficiaries – monetize the Claimant Trust Assets, pursue the Causes of Action, and work to conclude the various lawsuits and litigation claims pending against the Estate.

The Plan also provides for the reorganization of the Debtor. This will be accomplished by the cancellation of the Debtor's current Equity Interests, which consist of partnership interests held by: The Dugaboy Investment Trust;[3] the Hunter Mountain Investment Trust ("Hunter Mountain"); Mark Okada, personally and through family trusts; and Strand, the Debtor's general partner. On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. The Reorganized Debtor will be managed by the Claimant Trust, as the managing member of New GP LLC.

The Reorganized Debtor will oversee the monetization of the Reorganized Debtor Assets, which consist of, among other Assets, the management of the Managed Funds. The net proceeds from the Reorganized Debtor Assets will ultimately be distributed to the Claimant Trust and available for distribution to the Claimant Trust Beneficiaries.

The following is an overview of certain other material terms of the Plan:

- Allowed Priority Non-Tax Claims will be paid in full;

- Allowed Retained Employee Claims will be Reinstated;

- Allowed Convenience Claims will receive the lesser of (i) 85% of their Allowed Claim or (ii) such Holder's Pro Rata share of the Convenience Claims Cash Pool (*i.e.*, $13,150,000). Holders of Convenience Claims can elect the treatment provided to General Unsecured Claims by making the GUC Election on their Ballots;

- Allowed General Unsecured Claims and Allowed Subordinated Claims will receive their Pro Rata share of Claimant Trust Interests. The Claimant Trust Interests distributed to Allowed General Unsecured Claims will be senior to those distributed to Allowed Subordinated Claims as set forth in the Claimant Trust Agreement. Holders of General Unsecured Claims that are liquidated as of the Confirmation Date can elect the treatment provided to Convenience Class Election by reducing their Claims to $1,000,000 and making the Convenience Class Election on their Ballots; and

- Allowed Class B/C Limited Partnership Interests and Allowed Class A Limited Partnership Interests will receive their Pro Rata share of the Contingent Claimant Trust Interests.

---

[3] The Dugaboy Investment Trust is a Delaware trust created to manage the assets of James Dondero and his family.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 140 of 1828   PageID 9633
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 25 of 1803   PageID 10771
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 18 of 178

**B.      An Overview of the Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors, and other parties in interest.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The commencement of a Chapter 11 case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession," unless the bankruptcy court orders the appointment of a trustee.  The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the consummation of a plan of reorganization or liquidation, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.  Please see ARTICLE II for a discussion of the U.S. Trustee and the statutory committees.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders generally have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan is the principal objective of a chapter 11 case. The plan sets forth the means of satisfying the claims against and equity interests in the debtor.

**C.      Purpose and Effect of the Plan**

1.      The Plan of Reorganization

The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code.  As a result, the Confirmation of the Plan means that the Debtor's business will continue to operate following confirmation of the Plan through the Claimant Trust and the Reorganized Debtor to monetize assets for distribution to Holders of Allowed Claims.  The Claimant Trust will hold the Claimant Trust Assets and manage the efficient monetization of, the Claimant Trust Assets.  The Claimant Trust will also manage the Reorganized Debtor through the Claimant Trust's ownership of the Reorganized Debtor's general partner, New GP LLC.  The Claimant Trust will also be the sole limited partner in the Reorganized Debtor.  The Reorganized Debtor will manage the wind down

Appellee Appx. 00019
APP. 0574

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 27 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 141 of 1828   PageID 9634
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 26 of 1803   PageID 10772
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 19 of 178

of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. The Claimant Trust will also establish a Litigation Sub-Trust in accordance with the Plan, which will also be for the benefit of the Claimant Trust Beneficiaries. The Litigation Sub-Trust will receive the Estate Claims. The Litigation Trustee shall be the exclusive trustee of the Estate Claims included in the Claimant Trust Assets subject to oversight by the Claimant Trust Oversight Committee

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

2.  Plan Overview

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtor. For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[4] Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for eight Classes of Claims against and/or Equity Interests in the Debtor.

**The projected recoveries set forth in the table below are estimates only and therefore are subject to change. For a complete description of the Debtor's classification and treatment of Claims or Equity Interests, reference should be made to the entire Plan and the risk factors described in ARTICLE IV below. For certain classes of Claims, the actual amount of Allowed Claims could be materially different than the estimated amounts shown in the table below.**

---

[4] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

Appellee Appx. 00020
APP. 02573

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 142 of 1828 PageID 9635
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 27 of 1803 PageID 10773
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 20 of 178

| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount [1] | Impaired | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Jefferies Secured Claim | $0.00 | No | No | 100% |
| 2 | Frontier Secured Claim[2] | $5,209,964 | Yes | Yes | 100% |
| 3 | Other Secured Claims | $551,116 | No | No | 100% |
| 4 | Priority Non-Tax Claim | $16,489 | No | No | 100% |
| 5 | Retained Employee Claim | $0 | No | No | 100% |
| 6 | PTO Claims [3] | $1,181,886 | No | No | 100% |
| 7 | Convenience Claims[4] | $12,064,333 | Yes | Yes | 85.00% |
| 8 | General Unsecured Claims[5] | $180,442,199 | Yes | Yes | 85.31% |
| 9 | Subordinated Claims | Undetermined | Yes | Yes | Undetermined |
| 10 | Class B/C Limited Partnership Interests | N/A | Yes | Yes | Undetermined |
| 11 | Class A Limited Partnership Interests | N/A | Yes | Yes | Undetermined |

[1] Excludes Priority Tax Claims and certain other unclassified amounts totaling approximately $1.1 million owed to Joshua and Jennifer Terry and Acis under a settlement agreement.

[2] Excludes interest accrued postpetition estimated at $318,000, which will be paid on the Effective Date. The Liquidation Analysis/Financial Projections provide for the payment of postpetition interest.

[3] Represents outstanding PTO Claims as of September 30, 2020. PTO Claims are subject to adjustment depending on the amount of actual prepetition PTO Claims outstanding as of the Effective Date. PTO claims are accounted for in the Liquidation Analysis/Financial Projections as an administrative claim and will be paid out in ordinary courses pursuant to applicable state law.

[4] Represents the estimated gross prepetition amount of Convenience Claims with a total payout amount estimated at 85% of $12.06 million, or $10.25 million. This number includes approximately $1.113 million of potential Rejection Claims and assumes that Holders of Allowed General Unsecured Claims that are each less than $2.50 million opt into the Convenience Class.

[5] Assumes no recovery for UBS, the HarbourVest Entities, IFA, Hunter Mountain, and an Allowed Claim of only $3,722,019 for Mr. Daugherty (each as discussed further below). Assumes $1.440 million of potential rejection damage claims. The Liquidation Analysis/Financial Projections assume Highland RCP, LP and Highland RCP Offshore, LP offset their Claim of $4.4 million against amounts owed to the Debtor.

    3.    <u>Voting on the Plan</u>

        Under the Bankruptcy Code, acceptance of a plan by a Class of Claims or Equity Interests is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims or Equity Interests voting on the Plan. Acceptance by a Class of Claims requires more than one-half of the number of total Allowed Claims in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. Acceptance by a Class of Equity Interests requires at least two-thirds in amount of the total Allowed Equity Interests in the Class to vote in favor of the Plan.

- 10 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 143 of 1828   PageID 9636
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 28 of 1803   PageID 10774
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 21 of 178

Under the Bankruptcy Code, only Classes of Claims or Equity Interests that are "Impaired" and that are not deemed as a matter of law to have rejected a plan under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan.  Any Class that is "Unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted the Plan.  As set forth in Section 1124 of the Bankruptcy Code, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered.

Pursuant to the Plan, Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims and Equity Interests in those Classes are entitled to vote to accept or reject the Plan.  Whether a Holder of a Claim or Equity Interest in Class 2 and Class 7 through Class 11 may vote to accept or reject the Plan will also depend on whether the Holder held such Claim or Equity Interest as of November 23, 2020 (the "Voting Record Date").  The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

Pursuant to the Plan, Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, there are no Classes that will not receive or retain any property and no Classes are deemed to reject the Plan.

4.    Confirmation of the Plan

(a)    Confirmation Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan by the Bankruptcy Court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

(b)    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Debtor will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned from time to time without further notice except for an

- 11 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 144 of 1828 PageID 9637
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 29 of 1803 PageID 10775
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 22 of 178

announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

5. <u>Confirming and Effectuating the Plan</u>

It is a condition to the Effective Date of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtor and the Official Committee of Unsecured Creditors (the "<u>Committee</u>"). Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

6. <u>Rules of Interpretation</u>

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

7. <u>Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests</u>

As set forth above, Holders of Claims in Class 1 and Class 3 through Class 6 are not entitled to vote on the Plan. As a result, such parties will not receive solicitation packages or ballots but, instead, will receive this a notice of non-voting status, a notice of the Confirmation Hearing, and instructions on how to receive a copy of the Plan and Disclosure Statement.

The Debtor, with the approval of the Bankruptcy Court, has engaged Kurtzman Carson Consultants LLC (the "<u>Voting Agent</u>") to serve as the voting agent to process and tabulate Ballots for each Class entitled to vote on the Plan and to generally oversee the voting process. The following materials shall constitute the solicitation package (the "<u>Solicitation Package</u>"):

- This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

- 12 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 145 of 1828   PageID 9638
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 30 of 1803   PageID 10776
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 23 of 178

- • The Bankruptcy Court order approving this Disclosure Statement (the "<u>Disclosure Statement Order</u>") (excluding exhibits);

- • The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>");

- • A single Ballot, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "<u>Voting Instructions</u>");

- • A pre-addressed, postage pre-paid return envelope; and

- • Such other materials as the Bankruptcy Court may direct or approve.

The Debtor, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order.  The Solicitation Package is also available at the Debtor's restructuring website at www.kccllc.net/hcmlp.

On November 13, 2020, the Debtor filed the Plan Supplement [D.I. 1389] that included, among other things, the form of Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Reorganized Limited Partnership Agreement, New GP LLC Documents, the New Frontier Note, the Senior Employee Stipulation, and the identity of the initial members of the Claimant Trust Oversight Committee.  The Plan Supplement also includes a schedule of the Causes of Action that will be retained after the Effective Date.  The Plan Supplement may be supplemented or amended through and including December 18, 2020.  If the Plan Supplement is supplemented, such supplemented documents will be made available on the Debtor's restructuring website at www.kccllc.net/hcmlp.

If you are the Holder of a Claim or Equity Interest and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Kurtzman Carson Consultants LLC, via email at HighlandInfo@kccllc.com and reference "Highland Capital Management, L.P." in the subject line or by telephone at toll free: (877) 573-3984, or international: (310) 751-1829.  If your Claim or Equity Interest is subject to a pending claim objection and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim or Equity Interest for voting purposes or you will not be entitled to vote to accept or reject the Plan. Any such motion must be filed so that it is heard in sufficient time prior to the Voting Deadline to allow for your vote to be tabulated.

**THE DEBTOR, THE REORGANIZED DEBTOR, AND THE CLAIMANT TRUSTEE, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM OR EQUITY INTEREST FOR DISTRIBUTION PURPOSES.**

- 13 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 32 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 146 of 1828    PageID 9639
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 31 of 1803    PageID 10777
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 24 of 178

8.       Instructions and Procedures for Voting

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtor or the Voting Agent.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed November 23, 2020, as the Voting Record Date for the determination of the Holders of Claims and Equity Interests who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.  The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is January 5, 2021 at 5:00 p.m. (prevailing Central Time) (the "Voting Deadline")**.  In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and received no later than the Voting Deadline at the following address, as applicable:

**If by first class mail, personal delivery, or overnight mail to:**

<div align="center">

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

</div>

**If by electronic voting:**

**You may submit your Ballot via the Balloting Agent's online portal.  Please visit http://www.kcclc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot.  IMPORTANT NOTE: You will need the Unique Electronic Ballot ID Number and the Unique Electronic Ballot PIN Number set forth on your customized ballot in order to vote via the Balloting Agent's online portal.  Each Electronic Ballot ID Number is to be used solely for voting on those Claims or Interests on your electronic ballot.  You must complete and submit an electronic ballot for each Electronic Ballot ID Number you receive, as applicable.  Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

Only the Holders of Claims and Equity Interests in Class 2 and Class 7 through Class 11 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline.  Each Holder of a Claim and Equity Interest must vote its entire Claim or Equity Interest, as applicable, within a particular Class either to accept or reject the Plan and may not split such votes.  If multiple Ballots are received from the same Holder with respect to the same Claim or Equity Interest prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 33 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 147 of 1828   PageID 9640
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 32 of 1803   PageID 10778
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 25 of 178

reflect that voter's intent and will supersede and revoke any prior Ballot.  The Ballots will clearly indicate the appropriate return address.  It is important to follow the specific instructions provided on each Ballot.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS.  IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR EQUITY INTEREST IN THE CLASSES ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the Solicitation Package that you have received, or (c) the amount of your Claim or Equity Interest, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Voting Agent at the address specified above.  Copies of the Plan, Disclosure Statement and other documents filed in these Chapter 11 Case may be obtained free of charge on the Voting Agent's website at www.kccllc.net/hcmlp or by calling toll free at: (877) 573-3984, or international at: (310) 751-1829.  You may also obtain copies of pleadings filed in the Debtor's case for a fee via PACER at pacer.uscourts.gov.  Subject to any rules or procedures that have or may be implemented by the Court as a result of the COVID 19 Pandemic, documents filed in this case may be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Central Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, Earle Cabell Federal Building, 1100 Commerce Street, Room 1254, Dallas, Texas 75242-1496.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") by January 11, 2021.  The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTOR URGES HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

9.    The Confirmation Hearing

**The Bankruptcy Court has scheduled Confirmation Hearing Dates on January 13, 2021, and January 14, 2021, at 9:30 a.m. prevailing Central time.**  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

- 15 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 148 of 1828 PageID 9641
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 33 of 1803 PageID 10779
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 26 of 178

10.     The Deadline for Objecting to Confirmation of the Plan

**The Bankruptcy Court has set a deadline of January 5, 2021, at 5:00 p.m. prevailing Central time, for the filing of objections to confirmation of the Plan (the "Confirmation Objection Deadline")**. Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim of such Entity or the amount of Equity Interests held by such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

**CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE. INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING APPROVED BY THE BANKRUPTCY COURT.**

11.     Notice Parties

- Debtor: Highland Capital Management, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (Attn: James P. Seery, Jr.);

- Counsel to the Debtor: Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067-4003 (Attn: Jeffrey Pomerantz, Esq.; Ira Kharasch, Esq., and Gregory Demo, Esq.);

- Counsel to the Committee: Sidley Austin, LLP, One South Dearborn, Chicago, Illinois 60603 (Attn: Matthew Clemente, Esq., and Alyssa Russell, Esq.); and

- Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242 (Attn: Lisa Lambert, Esq.).

12.     Effect of Confirmation of the Plan

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests; (b) exculpation of certain parties; and (c) the release of claims against certain parties by the Debtor.

**The Plan shall bind all Holders of Claims against and Equity Interests in the Debtor to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder (i) will receive or retain any property or interest in property under the Plan, (ii) has filed a proof of claim in the Chapter 11 Case, or (iii) did not vote to accept or reject the Plan.**

Appellee Appx. 00027
APP 0534

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 149 of 1828   PageID 9642
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 34 of 1803   PageID 10780
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 27 of 178

D.    **Effectiveness of the Plan**

It will be a condition to the Effective Date of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will go into effect on the Effective Date.

E.    **RISK FACTORS**

**Each Holder of a Claim or an Equity Interest is urged to consider carefully all of the information in this Disclosure Statement, including the risk factors described in ARTICLE IV herein titled, "Risk Factors."**

**ARTICLE II.**
**BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE**

A.    **Description and History of the Debtor's Business**

Prior to the Petition Date, the Debtor was a multibillion-dollar global alternative investment manager founded in 1993 by James Dondero and Mark Okada.  A pioneer in the leveraged loan market, the firm evolved over twenty-five years, building on its credit expertise and value-based approach to expand into other asset classes.

As of the Petition Date, the Debtor operated a diverse investment platform, serving both institutional and retail investors worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams.  Additionally, the Debtor provided shared services to its affiliated registered investment advisers.

B.    **The Debtor's Corporate Structure**

The Debtor is headquartered in Dallas, Texas.  The Debtor itself is a Delaware limited partnership and one of the principal operating arms of the Debtor's business.  As of the Petition Date, the Debtor employed approximately 76 people, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.

Pursuant to various contractual arrangements, the Debtor, as of the Petition Date, provided money management and advisory services for approximately $2.5 billion of assets under management shared services for approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  None of these affiliates filed for Chapter 11 protection.  As of September 30, 2020, the Debtor provided money management and advisory services for approximately $1.641 billion of assets under management and shared services for approximately $7.136 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  Further, on the Petition Date, the value of the Debtor's Assets was approximately

- 17 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 36 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 150 of 1828   PageID 9643
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 35 of 1803   PageID 10781
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 28 of 178

$566.5 million. As of September 30, 2020, the total value of Debtor's Assets totaled approximately $328.3 million.

The drop in the value of the Debtor's Assets and assets under management was caused, in part, by the COVID-19 global pandemic. Specifically, the decline was the result of, among other things, the drop in value of the Debtor's assets generally, the loss of value in the Prime Accounts discussed below, the professional and other costs associated with the Chapter 11 Case, and the reserve of approximately $59 million against a loan receivable listed as an asset.

| Asset | | 10/16/2019 | 9/30/2020 |
|---|---|---|---|
| Investments (FV)[1] | | $232,620,000 | $109,479,000 |
| Investments (Equity) | | $161,819,000 | $101,213,000 |
| Cash/Cash Equivalents | | $2,529,000 | $5,888,000 |
| Management/Incentive Fees Receivable | | $2,579,000 | $3,350,000 |
| Fixed Assets, net | | $3,754,000 | $2,823,000 |
| Loan Receivables | | $151,901,000 | $93,445,000[2] |
| Other Assets | | $11,311,000 | $12,105,000 |
| | Totals | $566,513,000 | $328,302,000 |

[1] Includes decrease in value of assets, costs of Chapter 11 Cases, and assets sold to satisfy liabilities.

[2] Net of reserve of $59 million.

The Debtor's organizational chart is attached hereto as <u>Exhibit B</u>. The organizational chart is not all inclusive and certain entities have been excluded for the sake of brevity.

**C.     Business Overview**

The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course held through its prime brokerage account at Jefferies, LLC ("<u>Jefferies</u>"), as described in additional detail below. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and distribute those proceeds to the Debtor in the ordinary course of business. During calendar year 2018, the Debtor's stand-alone annual revenue totaled approximately $50 million. During calendar year 2019, the Debtor's stand-alone revenue totaled approximately $36.1 million.

**D.     Prepetition Capital Structure**

1.      <u>Jefferies Margin Borrowings (Secured)</u>

The Debtor is party to that certain *Prime Brokerage Customer Agreement* with Jefferies dated May 24, 2013 (the "<u>Brokerage Agreement</u>"). Pursuant to the terms of the Brokerage Agreement and related documents, the Debtor maintains a prime brokerage account with

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 37 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 151 of 1828   PageID 9644
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 36 of 1803   PageID 10782
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 29 of 178

Jefferies (the "Prime Account").  A prime brokerage account is a unique type of brokerage account that allows sophisticated investors to, among other things, borrow both money on margin to purchase securities and common stock to facilitate short positions.  A prime brokerage account also serves as a custodial account and holds client securities in the prime broker's street name.

As of the Petition Date, the Debtor held approximately $57 million of equity in liquid and illiquid securities (the "Securities") in the Prime Account.  Pursuant to the Brokerage Agreement, the Debtor granted a lien in favor of Jefferies in the Securities and all of the proceeds thereof.

However, because of the economic distress caused by the COVID-19 global pandemic, the value of the Securities held in the Prime Account dropped since the Petition Date, and Jefferies has exerted significant pressure on the Debtor to liquidate the Securities to satisfy margin calls.  As of September 30, 2020, the equity value of the Securities in the Prime Account was approximately $23.3 million, and the Debtor owed no amounts to Jefferies.  The Debtor has been actively selling Securities to cover operating expenses and professional fees.

2. The Frontier Bank Loan (Secured)

The Debtor and Frontier State Bank ("Frontier Bank") are parties to that certain *Loan Agreement* dated as of August 17, 2015 (the "Original Frontier Loan Agreement"), pursuant to which Frontier Bank loaned to the Debtor the aggregate principal amount of $9.5 million.  On March 29, 2018, the Debtor and Frontier Bank entered into that certain First Amended and Restated Loan Agreement (the "Amended Frontier Loan Agreement"), amending and superseding the Original Frontier Loan Agreement.  Pursuant to the Amended Frontier Loan Agreement, Frontier Bank made an additional $1 million loan to the Debtor (together with the borrowings under the Original Frontier Loan Agreement, the "Frontier Loan").  The Frontier Loan matures on August 17, 2021.

Pursuant to that certain Security and Pledge Agreement dated August 17, 2015, between Frontier Bank and the Debtor, as amended by the Amended Frontier Loan Agreement, the Debtor's obligations under the Frontier Loan are secured by 171,724 shares of voting common stock of MGM Holdings, Inc. (collectively, the "Frontier Collateral").

The aggregate principal balance of the Frontier Loan was approximately $5.2 million.  As of September 30, 2020, the value of the Frontier Collateral was approximately $13.1 million, and approximately $318,000 in postpetition interest had accrued.

3. Other Unsecured Obligations

As discussed below, the Plan provides for four Classes of unsecured claims:  (i) PTO Claims, (ii) the Convenience Claims, (iii) the General Unsecured Claims, and (iv) the Subordinated Claims.

The Debtor has various substantial litigation claims asserted against it, which have been classified as General Unsecured Claims.  In addition, as of the Petition Date, the Debtor had ordinary course trade debt, unaccrued employee bonus obligations and loan repayment, and

- 19 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 152 of 1828 PageID 9645
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 37 of 1803 PageID 10783
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 30 of 178

contractual commitments to various affiliated and unaffiliated non-Debtor entities for capital calls, contributions, and other potential reimbursement or funding obligations that were potentially in the tens of millions of dollars. The Debtor is still assessing these claims and its liability for such amounts. These Claims have been classified as Convenience Claims and Subordinated Claims.

4.    Equity Interests

The Debtor is a Delaware limited partnership. As of the Petition Date, the Debtor had three classes of limited partnership interest (Class A, Class B, and Class C). The Class A interests were held by The Dugaboy Investment Trust, Mark Okada, personally and through family trusts, and Strand, the Debtor's general partner. The Class B and C interests were held by Hunter Mountain.

In the aggregate, the Debtor's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by The Dugaboy Investment Trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand.

**E.    SEC Filings**

The Debtor is an investment adviser registered with the SEC as required by the Investment Advisers Act of 1940. As a registered investment adviser, the Debtor is required to file (at least annually) a Form ADV. The Debtor's current Form ADV is available at https://adviserinfo.sec.gov/.

Following the Effective Date, it is anticipated that the Reorganized Debtor will maintain its registration with the SEC as a registered investment adviser.

**F.    Events Leading Up to the Debtor's Bankruptcy Filings**

The Chapter 11 Case was precipitated by the rendering of an Arbitration Award (as that term is defined below) against the Debtor on May 9, 2019, by a panel of the American Arbitration Association (the "Panel"), in favor of the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee").

The Debtor was formerly the investment manager for the Highland Crusader Funds (the "Crusader Funds") that were formed between 2000 and 2002. In September and October 2008, as the financial markets in the United States began to fail, the Debtor was flooded with redemption requests from Crusader Funds' investors, as the Crusader Funds' assets lost significant value.

On October 15, 2008, the Debtor placed the Crusader Funds in wind-down, thereby compulsorily redeeming the Crusader Funds' limited partnership interests. The Debtor also declared that it would liquidate the Crusader Funds' remaining assets and distribute the proceeds to investors.

However, disputes concerning the distribution of the assets arose among certain investors. After several years of negotiations, a Joint Plan of Distribution of the Crusader Funds

- 20 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 153 of 1828 PageID 9646
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 38 of 1803 PageID 10784
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 31 of 178

(the "Crusader Plan"), and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors (the "Crusader Scheme"), were adopted in Bermuda and became effective in August 2011. As part of the Crusader Plan and the Crusader Scheme, the Redeemer Committee was elected from among the Crusader Funds' investors to oversee the Debtor's management of the Crusader Funds.

Between October 2011 and January 2013, in accordance with the Crusader Plan and the Crusader Scheme, the Debtor distributed in excess of $1.2 billion to the Crusader Funds' investors. The Debtor distributed a further $315.3 million through June 2016.

However, disputes subsequently arose between the Redeemer Committee and the Debtor. On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor (the "Arbitration"), and (c) commenced litigation in Delaware Chancery Court, to, among other things, obtain a status quo order in aid of the arbitration, which order was subsequently entered.

Following an evidentiary hearing, the Panel issued (a) a *Partial Final Award,* dated March 6, 2019 (the "March Award"), (b) a *Disposition of Application for Modification of Award,* dated March 14, 2019 (the "Modification Award"), and (c) a *Final Award,* dated May 9, 2019 (the "Final Award" and together with the March Award and the Modification Award, the "Arbitration Award"). Pursuant to the Arbitration Award, the Redeemer Committee was awarded gross damages against the Debtor in the aggregate amount of $136,808,302; as of the Petition Date, the total value of the Arbitration Award was $190,824,557, inclusive of interest

Prior to the Petition Date, the Redeemer Committee moved in the Chancery Court to confirm the Arbitration Award. For its part, the Debtor moved to vacate parts of the Final Award contending that certain aspects were procedurally improper. The Redeemer Committee's motion to confirm the Arbitration Award and the Debtor's motion to vacate were fully briefed and were scheduled to be heard by the Chancery Court on the day the Debtor filed for bankruptcy

On the Petition Date, the Debtor believed that the aggregate value of its assets exceeded the amount of its liabilities; however, the Debtor filed the Chapter 11 Case because it did not have sufficient liquidity to immediately satisfy the Award or post a supersedeas bond necessary to pursue an appeal.

## G. Additional Prepetition Litigation

In addition to the litigation with the Redeemer Committee described above, the Debtor, both directly and through certain subsidiaries, affiliates, and related entities, was party to substantial prepetition litigation. Although the Debtor disputes the allegations raised in this litigation and believes it has substantial defenses, this litigation has resulted in substantial Claims against the Debtor's Estate, each of which has been classified as a General Unsecured Claim. To the extent that these litigation Claims cannot be resolved consensually, they will be litigated by the Claimant Trustee or Reorganized Debtor, as applicable. The Debtor's major prepetition litigation is as follows:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 154 of 1828    PageID 9647
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 39 of 1803    PageID 10785
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 32 of 178

- **Redeemer Committee:**  The dispute with the Redeemer Committee is described in ARTICLE II.F above.  As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves the Redeemer Committee's claims against the Estate; however, that order is currently subject to appeal.

- **Acis Capital Management, L.P., & Acis Capital Management GP, LLC:**  On January 30, 2018, Joshua Terry filed involuntary bankruptcy petitions against both Acis Capital Management, L.P. ("Acis LP") and its general partner, Acis Capital Management GP, LLC ("Acis GP," and collectively with Acis LP, "Acis") in the Bankruptcy Court for the Northern District of Texas, Dallas Division, the Honorable Judge Jernigan presiding (the same judge presiding over the Chapter 11 Case), Case No. 18-30264-SGJ (the "Acis Case").  Mr. Terry had been an employee of the Debtor and a limited partner of Acis LP.  Mr. Terry was terminated in June 2016, and obtained a multi-million dollar arbitration award against Acis.  Overruling various objections, the Bankruptcy Court entered the orders for relief for the Acis debtors in April 2018, and a chapter 11 trustee was appointed.  The Debtor filed a proof of claim against Acis and an administrative claim.  Acis disputes the Debtor's claim, and the Debtor has not received any distributions on its claim to date.  On January 31, 2019, Acis's chapter 11 plan was confirmed, and Mr. Terry become the sole owner of reorganized Acis.  Several appeals remain pending, including an appeal of the entry of the Acis orders for relief and the Acis confirmation order.

  The Acis trustee commenced a lawsuit against the Debtor, among others, alleging fraudulent conveyance and other causes of action in relation to the Debtor's alleged prepetition effort to control and transfer away Acis's assets to avoid paying Mr. Terry's claim.  After the confirmation of the Acis plan, reorganized Acis allegedly supplanted the Acis Trustee as plaintiff and filed an amended complaint against the Debtor and other defendants, which claims comprise Acis's pending proof of claim against the Debtor.

  As discussed in ARTICLE II.R, the Bankruptcy Court entered an order approving a settlement that resolves  Acis's claims against the Estate; however, that order is currently subject to appeal.

- **UBS Securities LLC and UBS AG London Branch:**  UBS Securities LLC ("UBS Securities") filed a proof of claim in the amount of $1,039,957,799.40 [Claim No. 190] (the "UBS Securities Claim"), and UBS AG, London Branch ("UBS London," and together with UBS Securities, "UBS") filed a substantively identical proof of claim in the amount of $1,039,957,799.40 [Claim No. 191] (the "UBS London Claim" and together with the UBS Securities Claim, the "UBS Claim").  The UBS Claim was based on the amount of a judgment UBS received on a breach of contract claim against funds related to the Debtor that were unable to honor margin calls in 2008.  Although the Debtor had no obligation under UBS's contracts with the funds, UBS alleges the Debtor is liable for the judgment because it (i) breached an alleged duty to ensure that the funds could pay UBS, (ii) caused or permitted $233 million in alleged fraudulent transfers to be made by

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 41 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 155 of 1828    PageID 9648
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 40 of 1803    PageID 10786
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 33 of 178

Highland Financial Partners, L.P. ("HFP") in March 2009, and (iii) is an alter ego of the funds. The Debtor believes there are meritorious defenses to most, if not all, of the UBS Claim for numerous reasons, including: (i) decisions by the New York Appellate Division that limited UBS's claims to the March 2009 transfers that it alleges were fraudulent; (ii) those decisions should also apply to any alter ego claim (which at this time has not been formally asserted against the Debtor); (iii) UBS settled claims relating to $172 million of the $233 million in alleged fraudulent transfers and the Debtor is covered by the release; and (iv) the March 2009 transfers were in any event part of a wholly legitimate transaction that did not target UBS and for which HFP received fair consideration. Those and several additional defenses are described in the *Debtor's Objection to Proofs of Claim 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 928].

On October 19, 2020, both the Debtor and the Redeemer Committee filed motions seeking partial summary judgment of the UBS Claim, which, if granted, will significantly decrease the UBS Claim.[5] UBS responded to these motions on November 6, 2020 [D.I. 1341]. On November 20, 2020, the Bankruptcy Court granted partial summary judgment in favor of the Debtor and the Redeemer Committee. It is anticipated that the Bankruptcy Court will enter a formal order within the next couple of weeks.

- Patrick Daugherty: Patrick Daugherty has Filed a Proof of Claim for "at least $37,483,876.62" [Claim Nos. 67; 77] (the "Daugherty Claim").[6] Mr. Daugherty is a former limited partner and employee of the Debtor. The Daugherty Claim has three components, and Mr. Daugherty asserts claims: (1) for indemnification for any taxes Mr. Daugherty is required to pay as a result of the IRS audit of the Debtor's 2008-2009 tax return; (2) for defamation arising from a 2017 press release posted by the Debtor; and (3) arising from a pending Delaware lawsuit against the Debtor, which seeks to recover a judgment of $2.6 million in respect of Highland Employee Retention Assets ("HERA"), plus interest, from assets Mr. Daugherty claims were fraudulently transferred to the Debtor. The Daugherty Claim also seeks (a) the value of Mr. Daugherty's asserted interest in HERA, which he values at approximately $26 million; and (b) indemnification for fees incurred in the Delaware action and in previous litigation in Texas State Court. The Debtor believes that the Daugherty Claim should be allowed in the amount of

---

[5] See *Debtor's Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1180]; *Debtor's Opening Brief in Support of Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1181]; *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1183]; and *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Brief in Support of Motion for Partial Summary Judgment and Joinder in the Debtor's Motion for Partial Summary Judgment on Proof of Claim No. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1186].

[6] On October 23, 2020, Mr. Daugherty filed *Patrick Hagaman Daugherty's Motion for Leave to Amend Proof of Claim No. 77* [D.I. 1280] pursuant to which Mr. Daugherty has asked leave to amend the Daugherty Claim to assert damages of $40,710,819.42. On November 17, 2020, the Bankruptcy Court approved Mr. Daugherty's request to amend the Daugherty Claim from the bench.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 156 of 1828    PageID 9649
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 41 of 1803    PageID 10787
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 34 of 178

$3,722,019; however, the Debtor believes, for various reasons, that the balance of the Daugherty Claim lacks merit.  The Debtor's defenses to the Daugherty Claim are described in the *Debtor's (i) Objection to Claim No. 77 of Patrick Hagaman Daugherty and (ii) Complaint to Subordinate Claim of Patrick Hagaman Daugherty* [D.I. 1008].

**H.    The Debtor's Bankruptcy Proceeding**

On October 16, 2019, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").  On December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Chapter 11 Case to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").[7]  The Debtor continues to operate its business and manage its properties as debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

An immediate effect of commencement of the Chapter 11 Case was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor during the pendency of the Chapter 11 Case.  The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the later of the Effective Date and the date indicated in any order providing for the implementation of such stay or injunction.

**I.    First Day Relief**

On or about the Petition Date, the Debtor filed certain "first day" motions and applications (the "First Day Motions") with the Delaware Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of this Chapter 11 Case and to facilitate the Debtor's transition to debtor-in-possession status.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Frank Waterhouse in Support of First Day Motions* [D.I. 11] (the "First Day Declaration").  At a hearing on October 19, 2019, the Delaware Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions [D.I. 39, 40, 42-44].

The Delaware Bankruptcy Court subsequently entered an order authorizing the Debtor to pay critical vendor claims on a final basis [D.I. 168].  Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Bankruptcy Court entered an order authorizing the Debtor to continue its cash management system on a final basis [D.I. 379]

The First Day Motions, the First Day Declaration, and all orders for relief granted in this case can be viewed free of charge at https://www.kccllc.net/hcmlp.

---

[7] All docket reference numbers refer to the docket maintained by the Bankruptcy Court.

- 24 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 157 of 1828   PageID 9650
Case 3:21-cv-00879-K    Document 21   Filed 07/28/21    Page 42 of 1803   PageID 10788
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 35 of 178

**J.** **Other Procedural and Administrative Motions**

On and after the Petition Date, the Debtor also filed a number of motions and applications to retain professionals and to streamline the administration of the Chapter 11 Case, including:

- Interim Compensation Motion. On October 29, 2019, the Debtor filed the *Debtor's Motion Pursuant o Sections 105(a), 330 and 331 of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 72] (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to section 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to section 330 and 331 of the Bankruptcy Code. On November 14, 2019, the Delaware Bankruptcy Court entered an order granting the Interim Compensation Motion [D.I. 141].

- Ordinary Course Professionals. On October 29, 2019, the Debtor filed the Motion of the Debtor for an Order Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course of Business [D.I. 75] (the "OCP Motion"). The OCP Motion sought authority for the Debtor to retain and compensate certain professionals in the ordinary course of its business. On November 26, 2019, the Delaware Bankruptcy Court entered an order granting the OCP Motion [D.I. 176].

- Retention Applications. During the course of the chapter 11 case, the Delaware Bankruptcy Court or Bankruptcy Court, as applicable, have approved a number of applications by the Debtor seeking to retain certain professionals pursuant to sections 327, 328 and/or 363 of the Bankruptcy Code, including Pachulski Stang Ziehl & Jones LLP as legal counsel [D.I. 183], Development Specialists, Inc. as chief restructuring officer and financial advisor [D.I. 342], Kurtzman Carson Consultants LLC as administrative advisor [D.I. 74], Mercer (US) Inc. as compensation consultant [D.I. 381], Hayward & Associates PLLC as local counsel [D.I. 435], Foley Gardere, Foley & Lardner LLP as special Texas counsel [D.I. 513], Deloitte Tax LLP as tax services provider [D.I. 551], Wilmer Cutler Pickering Hale and Dorr LLP as regulatory and compliance counsel [D.I. 669], and Hunton Andrews Kurth LLP as special tax counsel [D.I. 763].

**K.** **United States Trustee**

While the Chapter 11 Case was pending in the Delaware Bankruptcy Court, the U.S. Trustee for Region 3 appointed Jane Leamy as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "Delaware U.S. Trustee"). Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Delaware U.S. Trustee no longer represented the U.S. Trustee, and the U.S. Trustee for Region 6 appointed Lisa Lambert as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "Texas U.S. Trustee," and together with the

- 25 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 158 of 1828   PageID 9651
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 43 of 1803   PageID 10789
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 36 of 178

Delaware U.S. Trustee, the "U.S. Trustee"). The Debtor has worked cooperatively to address concerns and comments from the U.S. Trustee's office during this Chapter 11 Case.

**L.    Appointment of Committee**

On October 29, 2019, the Delaware U.S. Trustee appointed the Committee in this Chapter 11 Case [D.I. 65]. The members of the Committee are (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP, LLP. Meta-E Discovery is a vendor to the Debtor. The other members of the Committee are litigants in prepetition litigation with the Debtor as described in ARTICLE II.G. The Bankruptcy Court approved the retention of Sidley Austin LLP as counsel to the Committee [D.I. 334], Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel to the Committee [D.I. 337], and FTI Consulting, Inc. as financial advisor to the Committee [D.I. 336].

**M.    Meeting of Creditors**

The meeting of creditors under section 341(a) of the Bankruptcy Code was initially scheduled for November 20, 2019, at 9:30 a.m. (prevailing Eastern Time) at the J. Caleb Boggs Federal Building, 844 N. King Street, Room 3209, Wilmington, Delaware 19801, and was rescheduled to December 3, 2019, at 10:30 a.m. (prevailing Eastern Time). At the meeting of creditors, the Delaware U.S. Trustee and creditors asked questions of a representative of the Debtor.

Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Texas U.S. Trustee scheduled an additional meeting of creditors under section 341(a) for January 9, 2020, at 11:00 a.m. (prevailing Central Time) at the Office of the U.S. Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242, at the conclusion of that meeting, the Texas U.S. Trustee continued the meeting to January 22, 2020. The Texas U.S. Trustee and creditors asked questions of a representative of the Debtor at the January 9 and January 22, 2020 meetings.

**N.    Schedules, Statements of Financial Affairs, and Claims Bar Date**

The Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") on December 19, 2019 [D.I. 247-248]. A creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated or disputed may have elected to file a proof of claim against the Debtor.

The Bankruptcy Court established (i) April 8, 2020 as the deadline for Creditors (other than governmental units) to file proofs of claim against the Debtor; (ii) April 13, 2020, as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code), (iii) April 23, 2020, and as the deadline for any investors in any fund managed by the Debtor to file proofs of claim against the Debtor; and (iv) May 26, 2020 as the deadline for the Debtor's employees to file proofs of claim against the Debtor pursuant to and accordance with Court's order entered on April 3, 2020 [D.I. 560].[8]  Consequently, the bar date for filing proofs

---

[8] During the course of its Chapter 11 Case, the Debtor entered into stipulations to extend the Bar Date for certain other claimants or potential claimants.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 45 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 159 of 1828    PageID 9652
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 44 of 1803    PageID 10790
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 37 of 178

of claims has passed and any claims filed after the applicable bar date will be considered late filed.

**O.    Governance Settlement with the Committee**

On January 9, 2020, the Bankruptcy Court entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] (the "Settlement Order").

Among other things, the Settlement Order approved a term sheet (the "Term Sheet") agreed to by the Debtor and the Committee pursuant to which the Debtor agreed to abide by certain protocols governing the production of documents and certain protocols governing the operation of the Debtor's business (the "Operating Protocols"). Under the Operating Protocols, the Debtor agreed to seek consent from the Committee prior to entering into certain "Transactions" (as defined in the Operating Protocols. The Operating Protocols were amended on February 21, 2020, with the consent of the Committee [D.I. 466].

Pursuant to the Term Sheet, the Debtor also granted the Committee standing to pursue certain estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and the Related Entities (as defined in the Operating Protocols) (collectively, the "Estate Claims"). To the extent permitted, the Estate Claims and the ability to pursue the Estate Claims are being transferred to either the Claimant Trust or Litigation Sub-Trust pursuant to the Plan.

In connection with the Settlement Order, an independent board of directors was also appointed at Strand, the Debtor's general partner (the "Independent Board"). The members of the Independent Board are John S. Dubel, James P. Seery, Jr., and Russell Nelms. The Independent Board was tasked with managing the Debtor's operations during the Chapter 11 Case and facilitating a reorganization or orderly liquidation of the Debtor's Estate.

**P.    Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer**

Following their appointment in January 2020, the Independent Board determined that it would be more efficient for the Debtor to have a traditional corporate management structure, i.e. a fully engaged chief executive officer supervised by the Independent Board. The Independent Board ultimately determined that Mr. Seery – a member of the Independent Board – had the requisite experience and expertise to lead the Debtor. On June 23, 2020, the Debtor filed *Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 774] (the "Seery Retention Motion") to retain Mr. Seery as chief executive officer, chief restructuring officer, and foreign representative).

The Bankruptcy Court entered an order approving the Seery Retention Motion on July 16, 2020 [D.I. 854]. Mr. Seery was retained as the Debtor's chief executive officer and the duties of Bradley Sharp of DSI as the Debtor's chief restructuring officer and foreign representative were transferred to Mr. Seery.

- 27 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 46 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 160 of 1828   PageID 9653
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 45 of 1803   PageID 10791
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 38 of 178

**Q.   Mediation**

On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [D.I. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation and appointed Sylvia Mayer and Allan Gropper as the mediators (the "Mediators").  The mediation began on August 27, 2020, and is still open as of the date of this Disclosure Statement

**R.   Postpetition Settlements**

1.   Settlement with Acis and the Terry Parties

With the assistance of the Mediators, on September 9, 2020, (i) the Debtor, (ii) Acis LP, (iii) Acis GP, and (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (together, the "Terry Parties") executed that certain Settlement Agreement and General Release.  On September 23, 2020, the Debtor filed the *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] (the "Acis Settlement Motion").

The Settlement Agreement and General Release contain the following material terms, among others:

- The proof of claim filed by Acis [Claim No. 23] will be Allowed in the amount of $23,000,000 as a General Unsecured Claim.

- On the Effective Date of the Plan (or any other plan of reorganization confirmed by the Bankruptcy Court), the Debtor will pay in cash to:

    o   Mr. and Mrs. Terry in the amount of $425,000 plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed by the Terry Parties [Claim No. 156];

    o   Acis LP in the amount of $97,000, which amount represents the legal fees incurred by Acis LP with respect to the N*WCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP [Claim No. 159]; and

    o   Mr. Terry in the amount of $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

- 28 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 161 of 1828   PageID 9654
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 46 of 1803   PageID 10792
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 39 of 178

The Settlement Agreement also provides that within five days of the Bankruptcy Court's approval of the Settlement Agreement and the General Release, the Debtor will move to withdraw, with prejudice, the proofs of claim that the Debtor filed in the Acis bankruptcy cases and the motion filed by the Debtor in the Acis bankruptcy cases seeking an administrative claim for postpetition services provided to Acis.

On October 5, 2020, James Dondero filed an objection to the Acis Settlement Motion [D.I. 1121] (the "Dondero Objection"). On October 28, 2020, the Bankruptcy Court entered an order approving the Acis Settlement Motion and overruling the Dondero Objection in its entirety [DI.I. 1347]. On November 9, 2020, Mr. Dondero filed a notice of his intent to appeal the order approving the Acis Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Acis Settlement Motion and related documents for additional information on the Settlement Agreement and General Release.

2.    Settlement with the Redeemer Committee

The Debtor, Eames, Ltd., the Redeemer Committee, and the Crusader Funds (collectively, the "Settling Parties") executed a settlement (the "Redeemer Stipulation"). The Redeemer Stipulation was also executed, solely with respect to paragraphs 10 through 15 thereof, by Hockney, Ltd., Strand,  Highland CDO Opportunity Master Fund, L.P., Highland Credit Strategies Master Fund, L.P., Highland Credit Opportunities CDO, L.P., House Hanover, LLC, and Alvarez & Marsal CRF Management, LLC (collectively, the "Additional Release Parties"). On September 23, 2020, the Debtor filed *Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee of the Highland Crusader Funds (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [D.I. 1089] seeking approval of the Redeemer Stipulation (the "Redeemer Settlement Motion").

The Redeemer Stipulation contains the following material terms, among others:

- The proof of claim filed by the Redeemer Committee [Claim No. 72] will be Allowed in the amount of $137,696,610 as a General Unsecured Claim;

- The proof of claim filed by the Crusader Funds [Claim No. 81] will be Allowed in the amount of $50,000 as a General Unsecured Claim;

- The Debtor and Eames, Ltd., each (a) consented to the cancellation of certain interests in the Crusader Funds held by them, and (b) agreed that they will not object to the cancellation of certain interests in the Crusader Funds held by the Charitable Donor Advised Fund;4

- The Debtor and Eames each acknowledged that they will not receive any portion of certain reserved distributions, and the Debtor further acknowledged that it will not receive any payments from the Crusader Funds in respect of any deferred fees, distribution fees, or management fees;

- 29 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 48 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23    Page 162 of 1828  PageID 9655
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 47 of 1803   PageID 10793
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 40 of 178

- • The Debtor and the Redeemer Committee agreed to a form of amendment to the shareholders' agreement for Cornerstone Healthcare Group and to a process to monetize Cornerstone Healthcare Group;

- • Upon the effective date of the Redeemer Stipulation, the Settling Parties and the Additional Release Parties shall exchange releases as set forth in the Redeemer Stipulation; and

- • All litigation between the Debtor, Eames, Ltd., and the Additional Highland Release Parties (as defined in the Redeemer Stipulation) on the one hand, and the Redeemer Committee and the Crusader Funds, on the other hand, will cease.

On October 16, 2020, UBS filed an objection to the Redeemer Settlement Motion [D.I. 1190] (the "UBS Objection"). On October 22, 2020, the Bankruptcy Court entered an order approving the Redeemer Settlement Motion and overruling the UBS Objection in its entirety [DI.I. 1273]. On November 6, 2020, UBS filed a notice of its intent to appeal the order approving the Redeemer Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Redeemer Settlement Motion and related documents for additional information on the Redeemer Stipulation.

**S.     Certain Outstanding Material Claims**

As discussed above, April 8, 2020, was the general bar date for filing proofs of claim. The Debtor has begun the process of resolving those Claims. Although each Claim represents a potential liability of the Estate, the Debtor believes that, in addition to UBS's Claim, the Claims filed by Integrated Financial Associates, Inc. ("IFA"), the HarbourVest Entities,[9] and Hunter Mountain represent the largest unresolved Claims against the Estate.

- • IFA Proof of Claim. IFA filed a proof of claim [Claim No. 93] (the "IFA Claim") seeking damages in the amount of $241,002,696.73 arising from the purported joint control of the Debtor and NexBank, SSB, and the Debtor's management of various lenders to IFA. The Debtor believes that IFA's claim should be disallowed in its entirety. IFA's claim and the Debtor's defenses thereto are described in greater detail in the *Objection to Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 868]. On October 4, 2020, the Bankruptcy Court entered the *Order Approving Stipulation Regarding Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 1126], which capped the IFA Claim, for all purposes, at $8,000,000.

- • HarbourVest Entities Proofs of Claim. The HarbourVest Entities are investors in Highland CLO Funding, Ltd. ("HCLOF") and filed proofs of claim against the

---

[9] "HarbourVest Entities" means HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

- 30 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 163 of 1828 PageID 9656
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 48 of 1803 PageID 10794
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 41 of 178

Debtor's Estate [Claim No. 143, 147, 149, 150, 153, 154] (the "HarbourVest Claims"). The Debtor included an assertion of "no liability" in respect of the HarbourVest Claims in its Debtor's *First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No-Liability Claims; and (f) Insufficient Documentation Claims* [D.I. 906]. HarbourVest provided a response in its *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [D.I. 1057]. The HarbourVest Entities' response argued that the Debtor's objection should be overruled, and set forth allegations in support of claims under federal and state law and Guernsey law, including claims for fraud, violations of securities laws, breaches of fiduciary duties, and RICO violations. The Debtor intends to vigorously defend the HarbourVest Claims on various grounds, including, among others, the failure to state a claim upon which relief can be granted, the lack of reasonable reliance, the lack of misrepresentations, the lack of reasonable reliance, the failure to mitigate damages, the parties' agreements bar or otherwise limit the Debtor's liability, and waiver and estoppel. The HarbourVest Entities invested approximately $80 million in HCLOF but seek an allowed claim in excess of $300 million dollars (after giving effect to treble damages for the alleged RICO violations).

- <u>Hunter Mountain Proof of Claim</u>. Hunter Mountain is one of the Debtor's limited partners. Hunter Mountain filed a proof of claim [Claim No. 152] seeking a $60,298,739 indemnification claim against the Debtor because of the Debtor's alleged failures to make priority distributions to Hunter Mountain under the Debtor's Partnership Agreement. The Debtor believes that it has meritorious defenses to Hunter Mountain's claim. Hunter Mountain's claim and the Debtor's defenses to such claim are described in greater detail in the *Debtor's (i) Objection to Claim No. 152 of Hunter Mountain Investment Trust and (ii) Complaint to Subordinate Claim of Hunter Mountain Investment Trust and for Declaratory Relief* [D.I. 995]. The Debtor believes that Hunter Mountain's proof of claim should either be disallowed in its entirety or subordinated in its entirety.

In addition to the foregoing, the UBS Claim (in the amount of $1,039,957,799.40) and the Daugherty Claim (in the amount of $40,710,819.42) remain outstanding. As set forth above, partial summary judgment on the UBS Claim was granted in favor of the Debtor and the Redeemer Committee on November 20, 2020, and a formal order is expected to be entered within the next couple of weeks.

The Daugherty Claim has been allowed for voting purposes only in the amount of $9,134,019 [D.I. 1422]. In a bench ruling on November 20, 2020, the Bankruptcy Court allowed UBS Claims for voting purposes only in the amount of $94,761,076 [D.I. 1646].

## T. Treatment of Shared Service and Sub-Advisory Agreements

As discussed in the Plan, the Reorganized Debtor will manage the wind down of the Managed Funds. However, it is not anticipated that either the Reorganized Debtor or the

- 31 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 50 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 164 of 1828    PageID 9657
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 49 of 1803    PageID 10795
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 42 of 178

Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.

Currently, the Debtor receives approximately $2.2 million per month in revenue from such contracts. However, in order to service those contracts, the Debtor must maintain a full staff and the cost of providing services under such contracts, among other factors, has historically resulted in a net loss to the Debtor. As such, the Debtor does not believe that assuming these contracts would benefit the Estate.

Further, the contracts generally contain anti-assignment provisions which the Debtor believes may be enforceable under 11 U.S.C. § 365(c). These provisions, therefore, would arguably prevent the assignment of such contracts without the consent of the Debtor's contract counterparty. However, even if 11 U.S.C. § 365(c) would not prevent assignment, the contracts are generally terminable at will by either party. As such, assuming and assigning such contracts without the consent of the contract counterparty would be of nominal or no benefit to the Estate. It is doubtful that any assignee would provide consideration to the Debtor for the assignment of such contract as the contract counterparty could simply terminate the contract immediately following assignment. As such, the Debtor does not believe that there is any benefit to the Estate in attempting to assign these contracts.

Notwithstanding the foregoing disclosure, the Debtor is currently assessing whether it is both possible and in the best interests of the Estate to assume and assign such shared services and sub-advisory agreements to a Related Entity.

During the course of this Chapter 11 Case, Mr. Daugherty stated that he would be willing to assume the Debtor's obligations under the shared service and sub-advisory contracts. The Independent Directors reviewed Mr. Daugherty's proposal and for the foregoing reasons, among others, determined that it was not workable and would provide no benefit to the Estate.

**U.      Portfolio Managements with Issuer Entities**

The Debtor is party to certain portfolio management agreements (including any ancillary agreements relating thereto collectively being the "Portfolio Management Agreements" and each a "Portfolio Management Agreement") with ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd. (each an "Issuer" and collectively the "Issuers") wherein the Debtor agreed to generally provide certain services to each Issuer in the Debtor's capacity as a portfolio manager in exchange for certain fees as described in the applicable Portfolio Management Agreement.

---

[10] For the avoidance of doubt, the Debtor does not consider any of the Issuers (as defined herein) to be a Related Entity.

Appellee Appx. 00043
APP. 09506

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 51 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 165 of 1828   PageID 9658
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 50 of 1803   PageID 10796
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 43 of 178

The Issuers filed proofs of claim [Claim No. 165, 168, and 169] asserting claims against the Debtor for damages arising from, relating to or otherwise concerning (i) such Issuer's Portfolio Management Agreement(s) with the Debtor, including, without limitation, failure to perform or other breach of the Portfolio Management Agreement(s), rejection of the Portfolio Management Agreement(s), any cure amount as a result of assumption of the Portfolio Management Agreement(s), any adequate assurance of future performance as a result of assumption of the Portfolio Management Agreement(s), and any failure to provide and pay for indemnification or other obligations under the Portfolio Management Agreement(s); and (ii) the action or inaction of the Debtor to the detriment of such Issuer (collectively, the "Issuer Claims"). The Debtor believes that it has satisfied its obligations to the Issuers; that the Issuer Claims lack merit; and that the Debtor will have no liability with respect to the Issuer Claims. However, such proofs of claim remain outstanding.

The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

**V.      Resignation of James Dondero**

On October 9, 2020, Mr. Dondero resigned as an employee and portfolio manager of the Debtor.

**W.      Exclusive Periods for Filing a Plan and Soliciting Votes**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtor filed motions to extend the exclusive period, and the Bankruptcy Court entered the following orders granting such applications:

- Order Granting Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 460];

- Agreed Order Extending Exclusive Periods by Thirty Days [D.I. 668];

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 52 of
Case 3:23-cv-00726-S   Document 8-22    Filed 12/29/23    Page 166 of 1828    PageID 9659
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 51 of 1803    PageID 10797
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 44 of 178

- Order Granting Debtor's Third Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Further Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 820]; and

- Order Further Extending the Debtor's Exclusive Period for Solicitation of Acceptance of a Chapter 11 Plan [D.I. 1092].

Pursuant to the foregoing orders, the Bankruptcy Court extended the exclusivity period through June 12, 2020, for the filing of a plan, which was subsequently extended through July 13, 2020, and again through August 12, 2020. The Bankruptcy Court also extended the exclusivity period for the solicitation of votes to accept such plan through August 11, 2020, which was subsequently extended through September 10, 2020, and again through October 13, 2020, and December 4, 2020.

## X.    Negotiations with Constituents

The Debtor, Mr. Dondero, and certain of the creditors have been negotiating a consensual reorganization plan for the Debtor that contemplates the Debtor continuing its business largely in its current form. Those negotiations have yet to reach conclusion but are continuing, and the negotiations were part of the previously discussed mediation. There is no certainty that those negotiations will reach a consensual resolution of the Debtor's bankruptcy case.

## Y.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461.

The Debtor is the contributing sponsor of the Pension Plan. As such, the PBGC asserts that Debtor is liable to contribute to the Pension Plan the amounts necessary to satisfy the minimum funding standards in ERISA and the Internal Revenue Code of 1986, as amended ("IRC"). See 29 U.S.C. §§ 1082, 1083; 26 U.S.C. §§ 412, 430. As the sponsor of the Pension Plan, the PBGC asserts Debtor is also liable for insurance premiums owed to PBGC. See 29 U.S.C. §§ 1306, 1307. The PBGC asserts that any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are also jointly and severally liable with the Debtor for such obligations relating to the Pension Plan.

The Pension Benefit Guaranty Corporation ("PBGC"), the federal agency that administers the pension insurance program under Title IV of ERISA, filed contingent proofs of claims against the Debtors for (1) the Pension Plan's potential underfunded benefit liabilities; (2) the potential  unliquidated unpaid minimum funding contributions owed to the Pension Plan; and (3) the potential unliquidated insurance premiums owed to PBGC. The PBGC acknowledges that, as of the date of this Disclosure Statement, there is nothing currently owed by the Debtor to the PBGC.

The Debtor reserves the right to contest any claims filed by the PBGC for any reason.

Appellee Appx. 00045
APP 0912

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 53 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 167 of 1828   PageID 9660
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 52 of 1803   PageID 10798
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 45 of 178

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

No provision contained in the Disclosure Statement, the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof), shall be construed as discharging, releasing, exculpating, or relieving any person or entity, including the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, government policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions for satisfaction, release, injunction, exculpation, and discharge of claims in the Plan, Confirmation Order, or the Bankruptcy Code.

### ARTICLE III.
### SUMMARY OF THE PLAN

**THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

**A.    Administrative and Priority Tax Claims**

1.    Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions

- 35 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 54 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 168 of 1828   PageID 9661
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 53 of 1803   PageID 10799
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 46 of 178

relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

2.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline.  Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date.  Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

Appellee Appx. 00047
APP. 0904

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 55 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 169 of 1828   PageID 9662
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 54 of 1803   PageID 10800
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 47 of 178

3.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**B.    Classification and Treatment of Classified Claims and Equity Interests**

1.    Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

Appellee Appx. 00048
APP. 09013

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 56 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 170 of 1828    PageID 9663
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 55 of 1803    PageID 10801
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 48 of 178

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

> 2.     Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

> 3.     Impaired/Voting Classes

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

Please refer to "Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests" and "Instructions and Procedures for Voting" in ARTICLE I.C.7 and ARTICLE I.C.8 for a discussion of how the how votes on the Plan will be solicited and tabulated.

> 4.     Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

> 5.     Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 57 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 171 of 1828   PageID 9664
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 56 of 1803   PageID 10802
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 49 of 178

6.     <u>Cramdown</u>

If any Class of Claims or Equity Interests is deemed to reject the Plan or does not vote to accept the Plan, the Debtor may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms of the Plan and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**C.     Classification and Treatment of Claims and Equity Interests**

1.     *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

2.     *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

Appellee Appx. 00050
APPX. 09917

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 172 of 1828    PageID 9665
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 57 of 1803    PageID 10803
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 50 of 178

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

  The New Frontier Note will include the following terms:  (i) an extension of the maturity date to December 31, 2022; (ii) quarterly interest only payments; (iii) a payment on the New Frontier Note equal to fifty percent of the outstanding principal on December 31, 2021, if the New Frontier Note is not paid in full on or prior to such date; (iv) mandatory prepayments from the proceeds of the sale of any collateral securing the New Frontier Note; and (v) the payment of fees and expenses incurred in negotiating the terms of the New Frontier Note.

3.    <u>*Class 3 – Other Secured Claims*</u>

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

4.    <u>*Class 4 – Priority Non-Tax Claims*</u>

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

Appellee Appx. 00051
APP. 09018

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 59 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 173 of 1828    PageID 9666
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 58 of 1803    PageID 10804
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 51 of 178

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

   "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is

Appellee Appx. 00052
APP. 09309

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 60 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 174 of 1828    PageID 9667
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 59 of 1803    PageID 10805
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 52 of 178

Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

  *"Convenience Claim"* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

  *"Convenience Claim Pool"* means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein.  Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

  By making the GUC Election on their Ballots, each Holder of a Convenience Claim can elect the treatment provided to General Unsecured Claims.

8.  <u>*Class 8 – General Unsecured Claims*</u>

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes the Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and

- 42 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 61 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 175 of 1828   PageID 9668
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 60 of 1803   PageID 10806
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 53 of 178

will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

  "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

  "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

9.    *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

  "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a

- 43 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 62 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 176 of 1828 PageID 9669
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 61 of 1803 PageID 10807
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 54 of 178

Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

10. _Class 10 – Class B/C Limited Partnership Interests_

- _Classification_: Class 10 consists of the Class B/C Limited Partnership Interests.

- _Treatment_: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- _Impairment and Voting_: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject the Plan.

11. _Class 11 – Class A Limited Partnership Interests_

- _Classification_: Class 11 consists of the Class A Limited Partnership Interests.

- _Treatment_: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

Appellee Appx. 00055
APP. 03912

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 63 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 177 of 1828 PageID 9670
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 62 of 1803 PageID 10808
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 55 of 178

- • *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject the Plan.

**D.     Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**E.     Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**F.     Means for Implementation of the Plan**

1.     <u>Summary</u>

The Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

- 45 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 64 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 178 of 1828 PageID 9671
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 63 of 1803 PageID 10809
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 56 of 178

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in the Plan and the Claimant Trust Agreement.

    2.    <u>The Claimant Trust</u>[11]

    (a)    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant

---

[11] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appellee Appx. 00057
APP. 0974

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:23-cv-00726-S   Document 8-22    Filed 12/29/23    Page 179 of 1828    PageID 9672
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 64 of 1803    PageID 10810
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 57 of 178

Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

(a)    *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

Appellee Appx. 00058
APP 09373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 66 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 180 of 1828   PageID 9673
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 65 of 1803   PageID 10811
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 58 of 178

(b)    *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in the Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in Article IV.C of the Plan.

(c)    *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims.  Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

(d)    *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

- the payment of the Claimant Trust Expenses;

- the payment of other reasonable expenses of the Claimant Trust;

- the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

- the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

- the orderly monetization of the Claimant Trust Assets;

- litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- 48 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 67 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 181 of 1828    PageID 9674
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 66 of 1803    PageID 10812
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 59 of 178

• the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

• the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

The Litigation Sub-Trust Agreement generally will provide for, among other things:

• the payment of other reasonable expenses of the Litigation Sub-Trust;

• the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

• the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

- 49 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 182 of 1828 PageID 9675
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 67 of 1803 PageID 10813
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 60 of 178

(e)    *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(f)    *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

(g)    *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(h)    *Tax Reporting.*

The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

Appellee Appx. 00061
APPX. 09378

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 69 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 183 of 1828   PageID 9676
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 68 of 1803   PageID 10814
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 61 of 178

The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

    (i)    *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in the Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

    (j)    *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

    (k)    *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

    (l)    *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

- 51 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 184 of 1828   PageID 9677
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 69 of 1803   PageID 10815
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 62 of 178

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

(m)  *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

3.  <u>The Reorganized Debtor</u>

(a)  *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

- 52 -

Appellee Appx. 00063
APP. 0920

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 71 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 185 of 1828 PageID 9678
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 70 of 1803 PageID 10816
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 63 of 178

(b) *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

(c) *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

(d) *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

(e) *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

- 53 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 72 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 186 of 1828 PageID 9679
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 71 of 1803 PageID 10817
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 64 of 178

(f)     *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court

(g)     *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in Article IV.B.1 of the Plan, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

4.     <u>Company Action</u>

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 73 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 187 of 1828    PageID 9680
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 72 of 1803    PageID 10818
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 65 of 178

of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

5.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable.  For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

6.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the

Appellee Appx. 00066
APPX. 09723

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 74 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 188 of 1828    PageID 9681
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 73 of 1803    PageID 10819
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 66 of 178

cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

7.    Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

8.    Control Provisions

To the extent that there is any inconsistency between the Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, the Plan shall control.

9.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under Article III.C of the Plan shall receive no Plan Distributions.

10.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I of the Plan) and fully enforceable as if stated in full herein.

11.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal

- 56 -

Appellee Appx. 00067
APP. 0924

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 189 of 1828 PageID 9682
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 74 of 1803 PageID 10820
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 67 of 178

Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

A.    **Treatment of Executory Contracts and Unexpired Leases**

1.    Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts

Appellee Appx. 00068
APP. 0923

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 76 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 190 of 1828 PageID 9683
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 75 of 1803 PageID 10821
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 68 of 178

and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [D.I. 1122].

2.   Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to the Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

3.   Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any).

Appellee Appx. 00069
APPX. 09326

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 77 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 191 of 1828 PageID 9684
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 76 of 1803 PageID 10822
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 69 of 178

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## B. **Provisions Governing Distributions**

### 1. Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in the Plan. Except as otherwise provided in the Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to the Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

Appellee Appx. 00070
APPX. 0923

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 192 of 1828 PageID 9685
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 77 of 1803 PageID 10823
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 70 of 178

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

2.      Distribution Agent

Except as provided herein, all distributions under the Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

3.      Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

4.      Disputed Claims Reserve

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

As used above, "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant

- 60 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 79 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 193 of 1828 PageID 9686
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 78 of 1803 PageID 10824
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 71 of 178

Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

"*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

HarbourVest and Mr. Daugherty have objected to the mechanisms for calculating the amount of the Disputed Claims Reserve with respect to the HarbourVest Claim and the Daugherty Claim, respectively, and intend to press their objections at the hearing for confirmation of the Plan.

     5.    <u>Distributions from the Disputed Claims Reserve</u>

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

     6.    <u>Rounding of Payments</u>

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under the Plan.

     7.    <u>*De Minimis* Distribution</u>

Except as to any Allowed Claim that is Unimpaired under the Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article VI.I of the Plan within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall

Appellee Appx. 00072
APPX. 09329

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 80 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 194 of 1828   PageID 9687
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 79 of 1803   PageID 10825
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 72 of 178

revert to the Claimant Trust.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

8.    Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

9.    General Distribution Procedures

The Distribution Agent shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.  All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under the Plan shall not be subject to any claim by any Person.

10.    Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

11.    Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under the Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes.  Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

- 62 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 81 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 195 of 1828   PageID 9688
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 80 of 1803   PageID 10826
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 73 of 178

12.    Withholding Taxes

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  As a condition to receiving any distribution under the Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws.  If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

13.    Setoffs

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or the Claimant Trustee possesses against such Holder.  Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

14.    Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to Article IV of the Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

15.    Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any

- 63 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 82 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 196 of 1828    PageID 9689
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 81 of 1803    PageID 10827
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 74 of 178

damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with Article VI.O of the Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**C.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims**

  1.      <u>Filing of Proofs of Claim</u>

  Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

  2.      <u>Disputed Claims</u>

  Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of the Plan.

  3.      <u>Procedures Regarding Disputed Claims or Disputed Equity Interests</u>

  No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

  4.      <u>Allowance of Claims and Equity Interests</u>

  Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

    *Allowance of Claims*

  After the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 83 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 197 of 1828    PageID 9690
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 82 of 1803    PageID 10828
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 75 of 178

defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

*Estimation*

Subject to the other provisions of the Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with the Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

*Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 84 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 198 of 1828   PageID 9691
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 83 of 1803   PageID 10829
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 76 of 178

**D.**   **Effectiveness of the Plan**

1.   <u>Conditions Precedent to the Effective Date</u>

The Effective Date of the Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of Article VIII.B of the Plan of the following:

- the Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to the Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate the Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in the Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under the Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (iii) the implementation of the Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

- All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- 66 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 199 of 1828 PageID 9692
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 84 of 1803 PageID 10830
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 77 of 178

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement the Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to the Plan in an amount determined by the Debtor in good faith.

2.  <u>Waiver of Conditions</u>

The conditions to effectiveness of the Plan set forth in Article VIII of the Plan (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate the Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

3.  <u>Effect of Non-Occurrence of Conditions to Effectiveness</u>

Unless waived as set forth in Article VIII.B of the Plan, if the Effective Date of the Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw the Plan and, if withdrawn, the Plan shall be of no further force or effect.

4.  <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

Appellee Appx. 00078
APP. 0933

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 86 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 200 of 1828   PageID 9693
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 85 of 1803   PageID 10831
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 78 of 178

**E.**     **Exculpation, Injunction, and Related Provisions**

1.     General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

For purposes of the following provisions:

- "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

- "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

- "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO

- 68 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 87 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 201 of 1828   PageID 9694
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 86 of 1803   PageID 10832
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 79 of 178

Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

2.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

3.    Exculpation

Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation  in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

- 69 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 88 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 202 of 1828   PageID 9695
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 87 of 1803   PageID 10833
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 80 of 178

    4.      <u>Releases by the Debtor</u>

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to Article IX.D of the Plan (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "<u>Reduced Employee Claim</u>"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "<u>Independent Members</u>"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with

Appellee Appx. 00081
APPX. 09368

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 89 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 203 of 1828   PageID 9696
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 88 of 1803   PageID 10834
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 81 of 178

respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to Article IX.D of the Plan will vest and the Employee will be indefeasibly released pursuant to Article IX.D of the Plan if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

In addition to the obligations set forth in Article IX.D of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor.  As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million.   That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

As of the date of this Disclosure Statement, the Debtor has not identified any Causes of Action against any Released Parties.  However, as set forth above, during the Chapter 11 Case, the Committee was granted sole standing to investigate and pursue the Estate Claims, which may include Causes of Action against certain of the Released Parties.  As of the date of this Disclosure Statement, the Committee has not identified any Estate Claims against any Released Parties.  The Debtor currently believes that there are no material Estate Claims or other Causes of Action against any Released Party.

5.     Preservation of Rights of Action

*Maintenance of Causes of Action*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as

- 71 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 90 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23    Page 204 of 1828  PageID 9697
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 89 of 1803  PageID 10835
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 82 of 178

appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

    6.   <u>Injunction</u>

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 91 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 205 of 1828 PageID 9698
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 90 of 1803 PageID 10836
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 83 of 178

judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to Article XII. D of the Plan, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. As set forth in Article XI of the Plan, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

7.     Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

8.     Continuance of January 9 Order

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on

- 73 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 92 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 206 of 1828    PageID 9699
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 91 of 1803    PageID 10837
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 84 of 178

January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

**F.    Article XII.D of the Plan**

Article XII.D of the Plan provides that, notwithstanding anything in the Plan to the contrary, nothing in the Plan will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**G.    Binding Nature of Plan**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in Article IX of the Plan, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan.  All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a)

**H.    Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Debtor's bankruptcy case, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the

- 74 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 93 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 207 of 1828   PageID 9700
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 92 of 1803   PageID 10838
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 85 of 178

approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

• Each Class of Claims or Equity Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

• Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

• Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor thereto under the Plan;

• The Debtor has paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

• The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, if applicable.

1.   Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.   To make these findings, the Bankruptcy Court must:  (a) estimate the net Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (b) determine the distribution (the "Liquidation Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

2.   Liquidation Analysis

Any liquidation analysis, including the estimation of Liquidation Proceeds and Liquidation Distributions, with respect to the Debtor (the "Liquidation Analysis") is subject to numerous assumptions and there can be no guarantee that the Liquidation Analysis will be accurate.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims and Equity Interests  at the projected amounts of Allowed Claims

Appellee Appx. 00086
APP. 0953

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 94 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 208 of 1828   PageID 9701
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 93 of 1803   PageID 10839
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 86 of 178

and Equity Interests set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims and Equity Interests that represents its best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims and Equity Interests. The estimate of the amount of Allowed Claims and Equity Interests set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Plan Distribution to be made on account of Allowed Claims and Equity Interests under the Plan and Disclosure Statement.

The full Liquidation Analysis is attached hereto as **Exhibit C**.

Furthermore, any chapter 7 trustee appointed in a chapter 7 liquidation would have to confront all of the issues described in this Disclosure Statement, including the prepetition litigation claims. This process would be significantly time-consuming and costly, and reduce any recoveries available to the Debtor's Estate. The Debtor believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of executory contracts in connection with the cessation of the Debtor's operations, and (iii) the failure to realize greater value from all of the Debtor's assets.

Therefore, the Debtor believes that confirmation of the Plan will provide each Holder of a Claim with a greater recovery than such Holder would receive pursuant to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor, unless the plan contemplates such liquidation or reorganization. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Claimant Trust and the Reorganized Debtor to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business. A copy of the financial projections prepared by the Debtor is attached hereto as **Exhibit C**.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtor believes that its available Cash and any additional proceeds from the Debtor's Assets will be sufficient to allow the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, to make all payments required to be made under the Plan. Accordingly, the Debtor believes that the Plan is feasible.

- 76 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 95 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 209 of 1828   PageID 9702
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 94 of 1803   PageID 10840
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 87 of 178

4.    <u>Valuation</u>

In order to provide information and full disclosure to parties in interest regarding the Debtor's assets, the Debtor estimates that its value and the total value of its Assets, as of September 30, 2020, was approximately $328.3 million.

5.    <u>Acceptance by Impaired Classes</u>

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accepts the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (a) cures any such default that occurred before or after the commencement of the Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (d) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders.  Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by holders of at least two-thirds in amount of the allowed interests of such class.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims or Equity Interests in any voting class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 96 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 210 of 1828   PageID 9703
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 95 of 1803   PageID 10841
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 88 of 178

6.      Confirmation Without Acceptance by Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtor's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

7.      No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

8.      Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that:  (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 97 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 211 of 1828 PageID 9704
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 96 of 1803 PageID 10842
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 89 of 178

amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests rejects the Plan, the Debtor reserves the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

<div align="center">

**ARTICLE IV.
RISK FACTORS**

</div>

> **ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

**A. Certain Bankruptcy Law and Other Considerations**

1. <u>Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests, or Designation as Unimpaired.</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Holders of Claims or Equity Interests or the Bankruptcy Court will reach the same conclusion.

There is also a risk that the Holders of Claims or Equity Interests could object to the Debtor's designation of Claims or Equity Interests as Unimpaired, and the Bankruptcy Court could reach the same conclusion.

2. <u>The Debtor May Not Be Able to Secure Confirmation of the Plan.</u>

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a

<div align="center">- 79 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 98 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 212 of 1828 PageID 9705
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 97 of 1803 PageID 10843
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 90 of 178

need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

3.      <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur.</u>

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

4.      <u>Continued Risk Following Effectiveness.</u>

Even if the Effective Date of the Plan occurs, the Debtor, the Reorganized Debtor, and Claimant Trust will continue to face a number of risks, including certain risks that are beyond its control, such as changes in assets, asset values, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of liquidation reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing its petition. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

5.      <u>The Effective Date May Not Occur.</u>

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 99 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 213 of 1828    PageID 9706
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 98 of 1803    PageID 10844
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 91 of 178

6.     <u>The Chapter 11 Case May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code</u>

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets in an orderly and controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

7.     <u>Claims Estimation</u>

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

8.     <u>The Financial Information Contained Herein is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit was Performed.</u>

**The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtor relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtor has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtor believes that such financial information fairly reflects its financial condition, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**B.     Risks Related to Recoveries under the Plan**

1.     <u>The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the Debtor's Projected Financial Results</u>

The Reorganized Debtor or Claimant Trust, as applicable, may not be able to achieve their projected financial results. The Financial Projections represent the best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor or Claimant Trust, as well as the United States and world economies in general, and the investment industry in which the Debtor operates. The Debtor's Financial Projections include key assumptions on (i) target asset monetization values, (ii) timing of asset monetization, and (iii) costs to effectuate the Plan. In terms of achieving target asset monetization values, the Debtor faces issues including investment assets with cross-ownership across related entities and challenges associated with

- 81 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 100 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 214 of 1828    PageID 9707
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 99 of 1803    PageID 10845
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 92 of 178

collecting notes due from affiliates. The Debtor's Financial Projections anticipate that all investment assets will be sold by 2022, which may be at risk due to the semi-liquid or illiquid nature of the Debtor's assets, as well as general market conditions, including the sustained impact of COVID-19.  Costs are based on estimates and may increase with delays or any other unforeseen factor.  If the Reorganized Debtor or Claimant Trust do not achieve their projected financial results, the recovery for Claimant Trust Beneficiaries may be negatively affected and the Claimant Trust may lack sufficient liquidity after the Effective Date.

<div style="text-align:center">

2.    <u>Claim Contingencies Could Affect Creditor Recoveries</u>

</div>

The estimated Claims and projected creditor recoveries set forth in this Disclosure Statement are based on various assumptions the actual amount of Allowed Claims may differ from the estimates.  Should one or more of the underlying assumptions ultimately prove incorrect, the actual Allowed amounts of Claims may vary materially from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

<div style="text-align:center">

3.    <u>If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse</u>

</div>

The Claimant Trust Assets will include, among other things, Causes of Action, including Estate Claims that will be assigned to the Litigation Sub-Trust.  The Committee's investigation of potential Estate Claims is still ongoing.  Because the Committee has not concluded its investigation as of the date hereof, and such investigation will be transferred to the Litigation Trustee, there is no certainty of whether there are viable Estate Claims against any of the Released Parties.  In the event there are viable Estate Claims against any of the Released Parties, such claims cannot be pursued for the ultimate benefit of Claimant Trust Beneficiaries if the Debtor Release is approved.

**C.    Investment Risk Disclaimer**

<div style="text-align:center">

1.    <u>Investment Risks in General.</u>

</div>

The Reorganized Debtor is and will remain a registered investment adviser under the Investment Advisers Act of 1940, and the Reorganized Debtor will continue advising the Managed Funds.  No guarantee or representation is made that the Reorganized Debtor's or the Managed Funds' investment strategy will be successful, and investment results may vary substantially over time.

<div style="text-align:center">

2.    <u>General Economic and Market Conditions and Issuer Risk.</u>

</div>

Any investment in securities carries certain market risks.  Investments by the Reorganized Debtor, the Managed Funds, or the Claimant Trust may decline in value for any number of reasons over which none of the Managed Funds, the Reorganized Debtor, the Claimant Trust, or the Claimant Trustee may have control, including changes in the overall

<div style="text-align:center">- 82 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 101 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 215 of 1828  PageID 9708
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 100 of 1803  PageID 10846
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20  Entered 11/24/20 10:24:41  Page 93 of 178

market and other general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws, currency exchange rates and controls and national, international political circumstances (including wars and security operations), and acts of God (including pandemics like COVID-19).  The value of the Managed Funds or the assets held by the Reorganized Debtor or Claimant Trust may also decline as a result of factors pertaining to particular securities held by the Managed Funds, Reorganized Debtor, or Claimant Trust, as applicable, such as perception or changes in the issuer's management, the market for the issuer's products or services, sources of supply, technological changes within the issuer's industry, the availability of additional capital and labor, general economic conditions, political conditions, acts of God, and other similar conditions.  All of these factors may affect the level and volatility of security prices and the liquidity and the value of the securities held by the Managed Fund, Reorganized Debtor, or Claimant Trust.  Unexpected volatility or illiquidity could impair the Managed Funds', Reorganized Debtor's, or Claimant Trust's profitability or result in it suffering losses.

**D.    Disclosure Statement Disclaimer**

      1.    <u>The Information Contained Herein is for Disclosure Purposes Only.</u>

The information contained in this Disclosure Statement is for purposes of disclosure in connection with the Plan and may not be relied upon for any other purposes.

      2.    <u>This Disclosure Statement was Not Approved by the SEC.</u>

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

      3.    <u>This Disclosure Statement Contains Forward-Looking Statements.</u>

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.

      4.    <u>No Legal or Tax Advice is Provided to You by This Disclosure Statement.</u>

**This Disclosure Statement is not legal or tax advice to you**.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

**Appellee Appx. 00094**
**APPX. 09959**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 102 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 216 of 1828   PageID 9709
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 101 of 1803   PageID 10847
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 94 of 178

5.      <u>No Admissions Are Made by This Disclosure Statement.</u>

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, the Claimant Trust, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

6.      <u>No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.</u>

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor or Claimant Trustee, as applicable, may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

7.      <u>Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.</u>

The Debtor, the Reorganized Debtor, the Claimant Trustee, or any party in interest, as the case may be, reserve any and all rights to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

8.      <u>The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors.</u>

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.      <u>The Disclosure Statement May Contain Inaccuracies.</u>

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, the information contained in this Disclosure Statement is as of the date of the Disclosure Statement and does not address events that may occur after such date. The Debtor may update this Disclosure Statement but is not required to do so.

- 84 -

10.    <u>No Representations Made Outside the Disclosure Statement Are Authorized.</u>

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## ARTICLE V.
## ALTERNATIVES TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets.  If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan.  In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

## ARTICLE VI.
## U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Implementation of the Plan will have federal, state, local or foreign tax consequences to the Debtor and Holders of Equity Interests as well as Holders of Claims.  No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan, and the following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to Holders of Claims.  This discussion assumes that each Holder of Claims is for United States federal income tax purposes:

- An individual who is a citizen or resident of the United States for federal income tax purposes;

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- any other person that is subject to U.S. federal income taxation on a net income basis.

- an estate the income of which is subject to United States federal income tax without regard to its source; or

- a trust (1) that is subject to the primary supervision of a United States court and the control of one or more United States persons or (2) that has a valid election in effect under applicable treasury regulations to be treated as a United States person.

- 85 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 104 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 218 of 1828   PageID 9711
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 103 of 1803   PageID 10849
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 96 of 178

This discussion also assumes that each Holder holds the Claims as capital assets under Section 1221 of the Internal Revenue Code.

The summary provides general information only and does not purport to address all of the federal income tax consequences that may be applicable to the Debtor or to any particular Holder of Claims in light of such Holder's own individual circumstances.  In particular, the summary does not address the federal income tax consequences of the Plan to Holders of Claims that may be subject to special rules, such as non-U.S. persons, insurance companies, financial institutions, regulated investment companies, broker-dealers, persons who acquired Claims as part of a straddle, hedge, conversion transaction or other integrated transaction, or persons who acquired Claims  in connection with the performance of services; persons who hold Claims through a partnership or other pass-through entity and tax-exempt organizations.  The summary does not address foreign, state, local, estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences to Holders of Equity Interests.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the final, temporary and proposed Treasury regulations promulgated thereunder, judicial decisions and administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, judicial decision or administrative action. Moreover, due to a lack of definitive authority, substantial uncertainties exist with respect to various tax consequences of the Plan.

**THE TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS OR EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

A.      **Consequences to the Debtor**

It is anticipated that the consummation of the Plan will not result in any federal income tax liability to the Debtor.  The Debtor is a partnership for federal income tax purposes. Therefore, the income and loss of the Debtor is passed-through to the Holders of its Equity Interests, and the Debtor does not pay federal income tax.

1.      Cancellation of Debt

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income that must be included in the debtor's income.  Due to the nature of the Impaired Claims, it is anticipated that

Appellee Appx. 00097
APP. 0964

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 105 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 219 of 1828 PageID 9712
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 104 of 1803 PageID 10850
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 97 of 178

the Debtor will not recognize any material amount of COD income. If any such COD income is recognized, it will be passed-through to the Holders of its Equity Interests, and the Holders of such Equity Interest generally will be required to include such amounts in income, unless a Holder is entitled to exclude such amounts from income under Section 108 of the Internal Revenue Code, based on the Holder's individual circumstances.

    2.    <u>Transfer of Assets</u>

Pursuant to the Plan, the Debtor's assets (including the Claimant Trust Assets and Reorganized Debtor Assets) will be transferred directly or indirectly to the Claimant Trust. For federal income tax purposes, any such assets transferred to the Claimant Trust will be deemed to have been transferred to the Claimant Trust Beneficiaries followed by the transfer by such Holders to the Claimant Trust of such assets in exchange for the respective Holders' beneficial interests in the Claimant Trust. The Claimant Trust thereafter will be treated as a grantor trust for federal income tax purposes. See U.S. Federal Income Tax Treatment of the Claimant Trust, below.

The Debtor's transfer of its assets pursuant to the Plan will constitute a taxable disposition of such assets. As discussed above, the Debtor is a partnership for federal income tax purposes. Any gain or loss recognized as a result of the taxable disposition of such assets will be passed through to the Holders of Equity Interests in the Debtor. The Debtor will not be required to pay any tax as a result of such disposition.

**B.    U.S. Federal Income Tax Treatment of the Claimant Trust**

It is intended that the Claimant Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Revenue Procedure 94-45, the Claimant Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Debtor's assets to the Claimant Trust as (i) a transfer of such assets to the Claimant Trust Beneficiaries (to the extent of the value of their respective interests in the applicable Claimant Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Claimant Trust (to the extent of the value of their respective interests in the applicable Claimant Trust Assets), with the beneficiaries being treated as the grantors and owners of the Claimant Trust.

The Plan and the Claimant Trust Agreement generally provide that the Claimant Trust Beneficiaries must value the assets of the Claimant Trust consistently with the values determined by the Claimant Trustee for all U.S. federal income tax purposes. As soon as possible after the Effective Date, the Claimant Trustee, based upon his good faith determination after consultation with his counsel and other advisors, shall inform the beneficiaries in writing as to his estimate of the value of the assets transferred to the Claimant Trust and the value of such assets allocable to each Class of beneficiaries.

Consistent with the treatment of the Claimant Trust as a grantor trust, the Claimant Trust Agreement will require each beneficiary to report on its U.S. federal income tax return its allocable share of the Claimant Trust's income, gain, loss or deduction that reflects the

Appellee Appx. 00098
APP. 0963
APP. 0963

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 106 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23    Page 220 of 1828    PageID 9713
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 105 of 1803  PageID 10851
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 98 of 178

beneficiary's interest in the interim and final distributions to be made by the Claimant Trust. Furthermore, certain of the assets of the Claimant Trust will be interests in the Reorganized Debtor, which will be a partnership for U.S. federal income tax purposes. The income, gain, loss or deduction of the Reorganized Debtor will also flow through the Claimant Trust to the beneficiaries of the Claimant Trust. Therefore, a beneficiary may incur a federal income tax liability with respect to its allocable share of the income of the Claimant Trust (including the income of the Reorganized Debtor) whether or not the Claimant Trust has made any distributions to such beneficiary. The character of items of income, gain, deduction, and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses will depend on the particular situation of such beneficiary. The interests of the beneficiaries may shift from time to time as the result of the allowance or disallowance of claims that have not been allowed at the Effective Date, which could give rise to tax consequences both to the Holders of claims that have, and have not been, allowed at the Effective Date. The Claimant Trustee will file with the IRS tax returns for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Trust income, gain, loss, deduction, or credit. Each beneficiary will be required to report such items on its U.S. federal income tax return. Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of distributions from the Claimant Trust.

The discussion above assumes that the Claimant Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Claimant Trust and the beneficiaries could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Claimant Trust).

**C.    Consequences to Holders of Allowed Claims**

1.    <u>Recognized Gain or Loss</u>

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). In general, the "amount realized" by a Holder will equal the sum of any cash and the aggregate fair market value of any property received by such Holder pursuant to the Plan (for example, such Holder's undivided beneficial interest in the assets of the Claimant Trust). A Holder that receives or is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its receipt or deemed receipt. See U.S. Federal Income Tax Treatment of the Claimant Trust, above for more information regarding the tax treatment of the Claimant Trust Interests.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at

Appellee Appx. 00099
APP. 09566

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 107 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 221 of 1828    PageID 9714
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 106 of 1803    PageID 10852
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 99 of 178

a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction.

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled to a deduction for U.S. federal income tax purposes. The rules governing the character, timing and amount of such a deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

2.    Distribution in Discharge of Accrued Unpaid Interest

Pursuant to the Plan, a distribution received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. In general, to the extent that an amount received (whether cash or other property) by a Holder of a claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income. Conversely, a Holder generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income. Holders of Claims are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

3.    Information Reporting and Withholding

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements. Under federal income tax law, interest, dividends, and other reportable payments, may, under certain circumstances, be subject to "backup withholding" (currently at a rate of up to 24%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**D.    Treatment of the Disputed Claims Reserve**

Pursuant to the Plan, the Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity. Such taxes will be paid out of the Disputed Claims Reserve and therefore may reduce amounts paid to Holders of Allowed Claims from the Claimant Trust. If the Claimant Trustee does not make such an election to treat the Disputed Claims Reserve as a separate taxable entity, the net income, if any, earned in the Disputed Claims Reserve will be taxable to the Holders of Allowed Claims in accordance with

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 108 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 222 of 1828   PageID 9715
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 107 of 1803   PageID 10853
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 100 of
178

the principles discussed above under the heading "U.S. Federal Income Tax Treatment of the Claimant Trust", possibly in advance of any distributions to the Holders.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

### ARTICLE VII.
### RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distribution to the Debtor's creditors and interest holders. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 109 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 223 of 1828   PageID 9716
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 108 of 1803   PageID 10854
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 101 of
178

Dated:  November 24, 2020

Respectfully submitted,

HIGHLAND CAPITAL MANAGEMENT, L.P.

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.Com:

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 110 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 224 of 1828    PageID 9717
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 109 of 1803    PageID 10855
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 102 of
178

**EXHIBIT A**

**PLAN OF REORGANIZATION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
|  | ) |
| Debtor. | ) |
|  | ) |

**FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND**
**CAPITAL MANAGEMENT, L.P.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

- 1 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 112 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 226 of 1828    PageID 9719
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 111 of 1803    PageID 10857
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 104 of
178

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS ...............................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law....................1

    B.    Defined Terms ................................................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS................ 16

    A.    Administrative Expense Claims........................................................ 16

    B.    Professional Fee Claims................................................................... 17

    C.    Priority Tax Claims ......................................................................... 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ........................................................... 18

    A.    Summary.......................................................................................... 18

    B.    Summary of Classification and Treatment of Classified Claims and
Equity Interests .............................................................................. 18

    C.    Elimination of Vacant Classes ........................................................ 18

    D.    Impaired/Voting Classes .................................................................. 19

    E.    Unimpaired/Non-Voting Classes ..................................................... 19

    F.    Impaired/Non-Voting Classes .......................................................... 19

    G.    Cramdown........................................................................................ 19

    H.    Classification and Treatment of Claims and Equity Interests............................ 19

    I.    Special Provision Governing Unimpaired Claims ............................... 24

    J.    Subordinated Claims ........................................................................ 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ............................ 24

    A.    Summary.......................................................................................... 24

    B.    The Claimant Trust ......................................................................... 25

    *1.*    *Creation and Governance of the Claimant Trust and Litigation Sub-*
*Trust.* .............................................................................................. 25

    *2.*    *Claimant Trust Oversight Committee* ................................................ 26

- ii -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 113 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 227 of 1828   PageID 9720
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 112 of 1803   PageID 10858
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 105 of
178

**Page**

3.   *Purpose of the Claimant Trust.* ............................................................27

4.   *Purpose of the Litigation Sub-Trust.* .................................................27

5.   *Claimant Trust Agreement and Litigation Sub-Trust Agreement.* .....................28

6.   *Compensation and Duties of Trustees.* ............................................29

7.   *Cooperation of Debtor and Reorganized Debtor.* ..............................29

8.   *United States Federal Income Tax Treatment of the Claimant Trust.* ...............30

9.   *Tax Reporting.* ..............................................................................30

10.  *Claimant Trust Assets.* .................................................................30

11.  *Claimant Trust Expenses.* .............................................................31

12.  *Trust Distributions to Claimant Trust Beneficiaries.* ...........................31

13.  *Cash Investments.* .......................................................................31

14.  *Dissolution of the Claimant Trust and Litigation Sub-Trust.* ...........................31

C.   The Reorganized Debtor .................................................................32

1.   *Corporate Existence* ....................................................................32

2.   *Cancellation of Equity Interests and Release* .....................................32

3.   *Issuance of New Partnership Interests* ..............................................32

4.   *Management of the Reorganized Debtor* .............................................32

5.   *Vesting of Assets in the Reorganized Debtor* ......................................33

6.   *Purpose of the Reorganized Debtor* ..................................................33

7.   *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer
     of Reorganized Debtor Assets* .........................................................33

D.   Company Action .............................................................................34

E.   Release of Liens, Claims and Equity Interests....................................34

F.   Cancellation of Notes, Certificates and Instruments...........................35

G.   Cancellation of Existing Instruments Governing Security Interests.................35

- iii -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 114 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 228 of 1828   PageID 9721
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 113 of 1803   PageID 10859
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 106 of
178

**Page**

H.   Control Provisions ..........................................................................................35

I.   Treatment of Vacant Classes ...........................................................................36

J.   Plan Documents ...............................................................................................36

K.   Highland Capital Management, L.P. Retirement Plan and Trust ....................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES .........................................................................................................37

A.   Assumption, Assignment, or Rejection of Executory Contracts and
      Unexpired Leases ............................................................................................37

B.   Claims Based on Rejection of Executory Contracts or Unexpired
      Leases ..............................................................................................................38

C.   Cure of Defaults for Assumed or Assigned Executory Contracts and
      Unexpired Leases ............................................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................39

A.   Dates of Distributions .....................................................................................39

B.   Distribution Agent ...........................................................................................40

C.   Cash Distributions ...........................................................................................40

D.   Disputed Claims Reserve ................................................................................40

E.   Distributions from the Disputed Claims Reserve ...........................................40

F.   Rounding of Payments .....................................................................................41

G.   *De Minimis* Distribution ...............................................................................41

H.   Distributions on Account of Allowed Claims .................................................41

I.   General Distribution Procedures .....................................................................41

J.   Address for Delivery of Distributions .............................................................41

K.   Undeliverable Distributions and Unclaimed Property ....................................42

L.   Withholding Taxes ...........................................................................................42

M.   Setoffs .............................................................................................................42

- iv -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 115 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 229 of 1828    PageID 9722
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 114 of 1803    PageID 10860
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 107 of
178

**Page**

N.   Surrender of Cancelled Instruments or Securities ................................................43

O.   Lost, Stolen, Mutilated or Destroyed Securities ..................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
         UNLIQUIDATED AND DISPUTED CLAIMS.............................................43

A.   Filing of Proofs of Claim ....................................................................................43

B.   Disputed Claims...................................................................................................43

C.   Procedures Regarding Disputed Claims or Disputed Equity Interests ...............44

D.   Allowance of Claims and Equity Interests...........................................................44

1.   *Allowance of Claims* ............................................................................................44

2.   *Estimation* ...........................................................................................................44

3.   *Disallowance of Claims* ......................................................................................45

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ..................................................45

A.   Conditions Precedent to the Effective Date ........................................................45

B.   Waiver of Conditions............................................................................................46

C.   Effect of Non-Occurrence of Conditions to Effectiveness ..................................47

D.   Dissolution of the Committee ..............................................................................47

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................47

A.   General..................................................................................................................47

B.   Discharge of Claims.............................................................................................47

C.   Exculpation ..........................................................................................................48

D.   Releases by the Debtor.........................................................................................48

E.   Preservation of Rights of Action.........................................................................50

1.   *Maintenance of Causes of Action* .......................................................................50

2.   *Preservation of All Causes of Action Not Expressly Settled or Released* ...........50

F.   Injunction .............................................................................................................50

- v -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 116 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 230 of 1828   PageID 9723
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 115 of 1803   PageID 10861
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 108 of
178

**Page**

G.   Term of Injunctions or Stays.................................................................51

H.   Continuance of January 9 Order .........................................................52

ARTICLE X. BINDING NATURE OF PLAN ...................................................52

ARTICLE XI. RETENTION OF JURISDICTION..............................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................54

A.   Payment of Statutory Fees and Filing of Reports .............................54

B.   Modification of Plan ...........................................................................55

C.   Revocation of Plan ..............................................................................55

D.   Obligations Not Changed....................................................................55

E.   Entire Agreement ................................................................................55

F.   Closing of Chapter 11 Case ................................................................55

G.   Successors and Assigns .......................................................................56

H.   Reservation of Rights ..........................................................................56

I.   Further Assurances ..............................................................................56

J.   Severability ..........................................................................................57

K.   Service of Documents .........................................................................57

L.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
the Bankruptcy Code............................................................................58

M.   Governing Law ....................................................................................58

N.   Tax Reporting and Compliance ..........................................................58

O.   Exhibits and Schedules .......................................................................59

P.   Controlling Document .........................................................................59

Appellee Appx. 00109
APP. 0976

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 117 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 231 of 1828  PageID 9724
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 116 of 1803  PageID 10862
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 109 of
178

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 118 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 232 of 1828   PageID 9725
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 117 of 1803   PageID 10863
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 110 of
178

(h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.   The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.**    <u>**Defined Terms**</u>

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.   "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2.   "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3.   "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4.   "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5.   "*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code and also includes any other Entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such affiliate.  For the purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6.   "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 119 of
180
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 233 of 1828    PageID 9726
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 118 of 1803    PageID 10864
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 111 of
178

unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7.   "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8.   "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9.   "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10.  "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11.  "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12.  "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13.  "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14.  "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15.  "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 120 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 234 of 1828 PageID 9727
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 119 of 1803 PageID 10865
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 112 of
178

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 121 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 235 of 1828    PageID 9728
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 120 of 1803    PageID 10866
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 113 of
178

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 122 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 236 of 1828 PageID 9729
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 121 of 1803 PageID 10867
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 114 of
178

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all

Appellee Appx. 00115
APP. 0572

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 123 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 237 of 1828  PageID 9730
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 122 of 1803  PageID 10868
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20  Entered 11/24/20 10:24:41  Page 115 of
178

distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

**Appellee Appx. 00116**
**APP. 0973**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 124 of 180
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 238 of 1828    PageID 9731
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 123 of 1803    PageID 10869
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 116 of 178

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

57. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

58. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

59. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

60. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

61. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the

Appellee Appx. 00117
APP. 00934

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 125 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 239 of 1828   PageID 9732
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 124 of 1803   PageID 10870
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 117 of
178

Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

62. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

63. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

64. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

65. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

66. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

67. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

68. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

69. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

70. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

71. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

Appellee Appx. 00118
APP. 00973

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 126 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 240 of 1828   PageID 9733
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 125 of 1803   PageID 10871
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 118 of
178

72. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

73. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

75. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

76. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

77. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

78. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

79. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

80. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement.  As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

81. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

82. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

Appellee Appx. 00119
APP. 09576

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 127 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 241 of 1828    PageID 9734
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 126 of 1803    PageID 10872
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 119 of
178

83. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

84. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

85. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

86. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

87. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

88. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

89. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

90. "*Petition Date*" means October 16, 2019.

91. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

92. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

93. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

94. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of

Appellee Appx. 00120
APPX. 09733

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 128 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 242 of 1828   PageID 9735
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 127 of 1803   PageID 10873
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 120 of
178

Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

95. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

96. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

97. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

98. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

99. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

100. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

101. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

102. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

103. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

Appellee Appx. 00121
APP. 00976

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 129 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 243 of 1828 PageID 9736
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 128 of 1803 PageID 10874
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 121 of
178

104.    "*Protected Parties*" means, collectively, (i) the Debtor and its successors
and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the
Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the
Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant
Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the
members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP
LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case,
(xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through
(xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada,
NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor
Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed
entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed
entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund
Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain
Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any
trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

105.    "*PTO Claims*" means any Claim for paid time off in favor of any Debtor
employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section
507(a)(4) of the Bankruptcy Code.

106.    "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

107.    "*Reinstated*" means, with respect to any Claim or Equity Interest, (a)
leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder
of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b)
notwithstanding any contractual provision or applicable law that entitles the Holder of such
Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity
Interest after the occurrence of a default: (i) curing any such default that occurred before or after
the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy
Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be
cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed
before such default; (iii) compensating the Holder of such Claim or Equity Interest for any
damages incurred as a result of any reasonable reliance by such Holder on such contractual
provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to
perform a nonmonetary obligation, other than a default arising from failure to operate a non-
residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code,
compensating the Holder of such Claim or Equity Interest (other than any Debtor or an insider of
any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and
(v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles
the Holder of such Claim.

108.    "*Rejection Claim*" means any Claim for monetary damages as a result of
the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

109.    "*Related Entity*" means, without duplication, (a) James Dondero, (b) Mark
Okada, (c) Grant Scott, (d) Hunter Covitz, (e) any entity or person that was an insider of the

Appellee Appx. 00122
APPX. 09739

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 130 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 244 of 1828   PageID 9737
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 129 of 1803   PageID 10875
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 122 of
178

Debtor on the Petition Date under Section 101(31) of the Bankruptcy Code, including any non-statutory insider, (f) any entity that, after the Effective Date, is controlled directly or indirectly by James Dondero, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, and (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries.

110.  "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present and former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case solely in their capacity as such.

111.  "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

112.  "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

113.  "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust.  For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

114.  "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

115.  "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

116.  "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

117.  "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

118.  "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 131 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 245 of 1828   PageID 9738
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 130 of 1803   PageID 10876
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 123 of
178

creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

119. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

120. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

121. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

122. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

123. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

124. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

125. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

126. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

127. "*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

128. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

129. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

130. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

<div align="center">15</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 132 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 246 of 1828    PageID 9739
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 131 of 1803    PageID 10877
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 124 of
178

131. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

132. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

134. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

135. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A.    Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 133 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 247 of 1828 PageID 9740
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 132 of 1803 PageID 10878
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 125 of
178

### B. Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

### C. Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

Appellee Appx. 00126
APP. 0983

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 134 of 180
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 248 of 1828 PageID 9741
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 133 of 1803 PageID 10879
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 126 of 178

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.**     **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**     **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C.**     **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 135 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 249 of 1828   PageID 9742
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 134 of 1803   PageID 10880
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 127 of
178

voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.      Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.      Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.      Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.      Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.      Classification and Treatment of Claims and Equity Interests**

    *1.      Class 1 – Jefferies Secured Claim*

- *Classification*:  Class 1 consists of the Jefferies Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.  Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan

<div align="center">19</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 136 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 250 of 1828  PageID 9743
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 135 of 1803  PageID 10881
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20  Entered 11/24/20 10:24:41  Page 128 of
178

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2. *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3. *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

Appellee Appx. 00129
APP. 0996

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 137 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 251 of 1828   PageID 9744
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 136 of 1803   PageID 10882
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 129 of
178

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.  *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.  *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

Appellee Appx. 00130
APP. 09307

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 138 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 252 of 1828 PageID 9745
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 137 of 1803 PageID 10883
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 130 of
178

7. _Class 7 – Convenience Claims_

- _Classification_: Class 7 consists of the Convenience Claims.

- _Allowance and Treatment_: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- _Impairment and Voting_: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. _Class 8 – General Unsecured Claims_

- _Classification_: Class 8 consists of the General Unsecured Claims.

- _Treatment_: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- _Impairment and Voting_: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9. _Class 9 – Subordinated Claims_

- _Classification_: Class 9 consists of the Subordinated Claims.

Appellee Appx. 00131
APP. 0936

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 139 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 253 of 1828  PageID 9746
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 138 of 1803  PageID 10884
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20  Entered 11/24/20 10:24:41  Page 131 of
178

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.    *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*:  Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

23

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 140 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 254 of 1828    PageID 9747
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 139 of 1803    PageID 10885
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 132 of
178

11.    *Class 11 – Class A Limited Partnership Interests*

- *Classification*:  Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.    Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.    Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

24

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 141 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 255 of 1828   PageID 9748
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 140 of 1803   PageID 10886
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 133 of
178

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement.  Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC.  The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement.  Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.**    **The Claimant Trust**[2]

    *1.*        *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries.  Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

**Appellee Appx. 00134**
**APP. 0399**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 142 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 256 of 1828   PageID 9749
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 141 of 1803   PageID 10887
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 134 of
178

rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.    *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be

**Appellee Appx. 00135**
**APPX. 09092**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 143 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 257 of 1828   PageID 9750
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 142 of 1803   PageID 10888
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 135 of
178

overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members.  Four of the five members will be representatives of the members of the Committee:  (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery.  The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor.  The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement.  The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement.  Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.         *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.         *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims.  Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

27

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 144 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23   Page 258 of 1828   PageID 9751
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21   Page 143 of 1803   PageID 10889
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 136 of
178

5.          *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i)      the payment of the Claimant Trust Expenses;

(ii)     the payment of other reasonable expenses of the Claimant Trust;

(iii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)     the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)      the orderly monetization of the Claimant Trust Assets;

(vi)     litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)    the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)   the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)     the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

28

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 145 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 259 of 1828   PageID 9752
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 144 of 1803   PageID 10890
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 137 of
178

The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)      the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)    the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

    6.        *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate.  The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

    7.        *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

Appellee Appx. 00138
APP. 08993

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 146 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 260 of 1828    PageID 9753
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 145 of 1803    PageID 10891
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 138 of
178

8.          *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests.  Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9.          *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10.          *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 147 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 261 of 1828   PageID 9754
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 146 of 1803   PageID 10892
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 139 of
178

Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11.    _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.    _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.    _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.    _Dissolution of the Claimant Trust and Litigation Sub-Trust._

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as:  (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the

Appellee Appx. 00140
APPX. 09097

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 148 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 262 of 1828   PageID 9755
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 147 of 1803   PageID 10893
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 140 of
178

Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

**C.**     **The Reorganized Debtor**

*1.*          *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

*2.*          *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

*3.*          *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

*4.*          *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 149 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 263 of 1828   PageID 9756
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 148 of 1803   PageID 10894
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 141 of
178

Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5. *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6. *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7. *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor.  Any assets distributed to the Claimant Trust

33

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 150 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 264 of 1828    PageID 9757
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 149 of 1803    PageID 10895
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 142 of
178

will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D.     Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

**E.     Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the

Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

F. **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

G. **Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

H. **Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

Appellee Appx. 00144

APP. 03709

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 152 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 266 of 1828    PageID 9759
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 151 of 1803    PageID 10897
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 144 of
178

### I.    Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

### J.    Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement.  To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

### K.    Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC.  In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code.  The Debtor reserves the right to contest any such liability or responsibility.

Appellee Appx. 00145
APP. 08012

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 153 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 267 of 1828    PageID 9760
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 152 of 1803    PageID 10898
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 145 of
178

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**    **Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases**

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assignments and assignments.  Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 154 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 268 of 1828 PageID 9761
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 153 of 1803 PageID 10899
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 146 of
178

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.** **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.** **Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts

38

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 155 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 269 of 1828 PageID 9762
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 154 of 1803 PageID 10900
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 147 of
178

or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A. Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan. Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

Appellee Appx. 00148
APPX. 08013

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 156 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 270 of 1828 PageID 9763
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 155 of 1803 PageID 10901
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 148 of
178

**B.** **Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C.** **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D.** **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E.** **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

Appellee Appx. 00149
APP. 08016

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 157 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 271 of 1828   PageID 9764
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 156 of 1803   PageID 10902
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 149 of
178

**F.    Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.  To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

**G.    *De Minimis* Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim.  *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust.  Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H.    Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order.  Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I.    General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise.  All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J.    Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

**Appellee Appx. 00150**

**APP. 03013**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 158 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 272 of 1828 PageID 9765
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 157 of 1803 PageID 10903
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 150 of
178

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K.**     **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.**     **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.**     **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to

42

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 159 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 273 of 1828   PageID 9766
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 158 of 1803   PageID 10904
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 151 of
178

such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.**     **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O.**     **Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest.  Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.**     **Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.**     **Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 160 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 274 of 1828 PageID 9767
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 159 of 1803 PageID 10905
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 152 of
178

Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

### C.   Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

### D.   Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

### 1.   *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### 2.   *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 161 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 275 of 1828   PageID 9768
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 160 of 1803   PageID 10906
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 153 of
178

3.    *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

**ARTICLE VIII.**
**EFFECTIVENESS OF THIS PLAN**

**A.    Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering

45

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 162 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 276 of 1828    PageID 9769
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 161 of 1803    PageID 10907
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 154 of
178

into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect.  All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.**    **Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan.  The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized

46

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 163 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 277 of 1828   PageID 9770
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 162 of 1803   PageID 10908
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 155 of
178

Debtor, or the Claimant Trust, as applicable.

**C.**     **Effect of Non-Occurrence of Conditions to Effectiveness**

Unless waived as set forth in ARTICLE VIII.B, if the Effective Date of this Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw this Plan and, if withdrawn, the Plan shall be of no further force or effect.

**D.**     **Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto).   The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

**ARTICLE IX.**
**EXCULPATION, INJUNCTION AND RELATED PROVISIONS**

**A.**     **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

**B.**     **Discharge of Claims**

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose

47

before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## D.    Releases by the Debtor

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal

Appellee Appx. 00157

APPX. 08072

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 165 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 279 of 1828   PageID 9772
Case 3:21-cv-00879-K   Filed 07/28/21   Page 164 of 1803   PageID 10910
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 157 of
178

misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 166 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 280 of 1828   PageID 9773
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 165 of 1803   PageID 10911
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 158 of
178

brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.      Preservation of Rights of Action**

    *1.      Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

    *2.      Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.      Injunction**

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest,

**Appellee Appx. 00159**

**APP. 0307**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 167 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 281 of 1828   PageID 9774
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 166 of 1803   PageID 10912
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41    Page 159 of
178

along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**Subject in all respects to ARTICLE XII.D, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; *provided, however,* the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  As set forth in ARTICLE XI, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

G.    <u>Term of Injunctions or Stays</u>

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 168 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 282 of 1828   PageID 9775
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 167 of 1803   PageID 10913
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 160 of
178

**H.**     <u>Continuance of January 9 Order</u>

Unless otherwise provided in this Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

<div align="center">

**ARTICLE X.**
**BINDING NATURE OF PLAN**

</div>

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

<div align="center">

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

</div>

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan as legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

<div align="center">52</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 169 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 283 of 1828 PageID 9776
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 168 of 1803 PageID 10914
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 161 of
178

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

Appellee Appx. 00162
APP. 08023

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 170 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 284 of 1828   PageID 9777
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 169 of 1803   PageID 10915
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 162 of
178

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

**A.**   **Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date.  All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed.  The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

Appellee Appx. 00163
APP. 08028

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 171 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 285 of 1828 PageID 9778
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 170 of 1803 PageID 10916
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 163 of
178

**B.      Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan:  (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**C.      Revocation of Plan**

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee.  If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then:  (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**D.      Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.      Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.      Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 172 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 286 of 1828   PageID 9779
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 171 of 1803   PageID 10917
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 164 of
178

**G.**     **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H.**     **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**I.**     **Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**Appellee Appx. 00165**
**APP. 03022**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 173 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 287 of 1828   PageID 9780
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 172 of 1803   PageID 10918
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 165 of
178

**J.**     **Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.**     **Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

       **If to the Claimant Trust:**

       Highland Claimant Trust
       c/o Highland Capital Management, L.P.
       300 Crescent Court, Suite 700
       Dallas, Texas 75201
       Attention:  James P. Seery, Jr.

       **If to the Debtor:**

       Highland Capital Management, L.P.
       300 Crescent Court, Suite 700
       Dallas, Texas 75201
       Attention:  James P. Seery, Jr.

       **with copies to:**

       Pachulski Stang Ziehl & Jones LLP
       10100 Santa Monica Blvd., 13th Floor
       Los Angeles, CA 90067
       Telephone: (310) 277-6910
       Facsimile:  (310) 201-0760
       Attn:   Jeffrey N. Pomerantz, Esq.
              Ira D. Kharasch, Esq.
              Gregory V. Demo, Esq.

**Appellee Appx. 00166**
**APP. 08023**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 174 of
Case 3:23-cv-00726-S   Document 8-22   Fil&d412/29/23   Page 288 of 1828   PageID 9781
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 173 of 1803   PageID 10919
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 166 of
178

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:   James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:   Jeffrey N. Pomerantz, Esq.
            Ira D. Kharasch, Esq.
            Gregory V. Demo, Esq.

**L.   Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.   Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M.   Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N.   Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 175 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 289 of 1828    PageID 9782
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 174 of 1803    PageID 10920
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 167 of
178

**O.**    **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**    **Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Appellee Appx. 00168
APP. 03023

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 176 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 290 of 1828   PageID 9783
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 175 of 1803   PageID 10921
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 168 of
178

Dated:  November 24, 2020

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

James P. Seery, Jr.
Chief Executive Officer and Chief
Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 177 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 291 of 1828   PageID 9784
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 176 of 1803   PageID 10922
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 169 of
178

**EXHIBIT B**

**ORGANIZATIONAL CHART OF THE DEBTOR**

155183.2
DOCS_NY:40478.29 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 178 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 292 of 1828    PageID 9785
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 177 of 1803    PageID 10923



Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 179 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 293 of 1828   PageID 9786
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 178 of 1803   PageID 10924
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 171 of
178

## EXHIBIT C

**LIQUIDATION ANALYSIS/FINANCIAL PROJECTIONS**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 180 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 294 of 1828    PageID 9787
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 179 of 1803    PageID 10925
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 172 of
178

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

  This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

  This Memorandum includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

  These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

  Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

  These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

11/13/2020

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 181 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 295 of 1828 PageID 9788
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 180 of 1803 PageID 10926
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 173 of
178

*Highland Capital Management, L.P.*
*Statement of Assumptions*

A. Plan effective date is January 31 ,2021.

B. All investment assets are sold by December 31, 2022.

C. All demand notes are collected in the year 2021.

D. All notes receivable with maturity dates beyond 12/31/2022 are sold in Q4 2022; in the
   interim interest income and principal payments are collected as they become due.

E. Fixed assets used in daily business operations are sold in February 2021.

F. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G. All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H. Post-effective date, the reorganized Debtor would retain three HCMLP employees as contractors to help monetize the remaining assets.

I. Litigation Trustee budget is $6,500,000.

J. Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K. Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100%
   of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or
   interest of junior priority.

L. Plan assumes zero allowed claims for UBS, IFA, the HarbourVest entities (collectively "HV") and Hunter Mountain Investment Trust ("HM").

M. Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for UBS, IFA, HM and HV.
   Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N. With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O. Class 7 payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $9.96 million.

P. See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date:

   o By September 30, 2021 - $50,000,000

   o By March 31, 2022 – additional $50,000,000

   o By June 30, 2022 – additional $25,000,000

   o All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

**Appellee Appx. 00174**
**APP 08739**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 182 of
184
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 296 of 1828    PageID 9789
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 181 of 1803    PageID 10927
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20    Entered 11/24/20 10:24:41    Page 174 of
178

*Highland Capital Management, L.P.*
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---:|---:|
| Estimated cash on hand at 1/31/2020 | $ 25,076 | $ 25,076 |
| Estimated proceeds from monetization of assets [1][2] | 190,445 | 149,197 |
| Estimated expenses through final distribution[1][3] | (33,642) | (36,232) |
| Total estimated $ available for distribution | 181,879 | 138,042 |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,078) | (1,078) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,463) | (5,463) |
| Class 3 - Other Secured Claims | (551) | (551) |
| Class 4 – Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims | - | - |
| Class 7 – Convenience Claims [7][8][9] | (10,255) | - |
| Subtotal | (27,937) | (17,682) |
| | | |
| Estimated amount remaining for distribution to general unsecured claims | 153,942 | 120,359 |
| | | |
| Class 8 – General Unsecured Claims [8][10] | 176,049 | 192,258 |
| Subtotal | 176,049 | 192,258 |
| | | |
| % Distribution to general unsecured claims | 87.44% | 62.60% |
| | | |
| Estimated amount remaining for distribution | - | |
| | | |
| Class 9 – Subordinated Claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C Limited Partnership Interests | *no distribution* | *no distribution* |
| Class 11 – Class A Limited Partnership Interest | *no distribution* | *no distribution* |

<u>Footnotes:</u>
*[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee*
  *Assumes Chapter 7 Trustee engages new professionals to help liquidate assets*
*[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable*
*[3] Estimated expenses through final distribution exclude non-cash expenses:*
  *Depreciation of $462 thousand in 2021*
*[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court*
*[5] Represents $4.7 million in unpaid professional fees and $4.5 million in timing of payments to vendors*
*[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold*
*[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million*
*[8] Class 7 includes $1.1 million estimate for aggregate contract rejections damage and Class 8 includes $1.4 million for contract rejection damages*
*[9] Assumes 3 claimants with allowed claims less than $2.5 million opt into Class 7 along with claims of Senior Employees*
*[10] Class estimates $0 allowed claim for the following creditors: IFA, HV, HM and UBS; assumes RCP claims offset against HCMLP interest in RCP fund*

<u>Notes:</u>
*All claim amounts are estimated as of November 20, 2020 and subject to change*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 183 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 297 of 1828 PageID 9790
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 182 of 1803 PageID 10928
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20 Entered 11/24/20 10:24:41 Page 175 of
178

*Highland Capital Management, L.P.*
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |
| Other Current Assets | 13,182 | 13,651 | 10,559 | 9,629 | 7,746 | 7,329 | 5,396 | 6,054 | 6,723 | 7,406 | - |
| Investment Assets | 320,912 | 305,961 | 261,333 | 258,042 | 133,026 | 81,793 | 54,159 | 54,159 | 54,159 | 54,159 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 26,226 | $ 19,138 | $ 19,280 | $ 2,891 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 126,365 | 126,343 | 121,950 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 – Frontier Secured Claim | - | - | - | 5,210 | - | - | - | - | - | - | - |
| Class 3 – Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 – PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 176,049 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| Class 9 – Subordinated Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 126,365 | 126,343 | 121,950 | 181,259 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| **TOTAL LIABILITIES** | $ 152,591 | 145,481 | 141,230 | 184,150 | 176,049 | 126,049 | 126,049 | 76,049 | 51,049 | 51,049 | 22,107 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 161,596 | 89,802 | 61,635 | 53,501 | 40,309 | 36,486 | 33,473 | 31,860 | (22,107) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 302,826 | $ 273,952 | $ 237,684 | $ 179,550 | $ 166,358 | $ 112,535 | $ 84,523 | $ 82,910 | $ - |

Appellee Appx. 00176
APP 03703

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 184 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 298 of 1828   PageID 9791
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 183 of 1803   PageID 10929
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 176 of
178

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Actual<br>Jan 2020 to June<br>2020 Total | Actual<br>3 month ended<br>Sept 2020 | Forecast --->
3 month ended<br>Dec 2020 | Total 2020 | 3 month ended<br>Mar 2021 | 3 month ended<br>Jun 2021 | 3 month ended<br>Sept 2021 | 3 month ended<br>Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,651 | $ 11,173 | $ 779 | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,263 | - | - | - | 1,263 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 113 | - | - | - | 113 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,779 | $ 30,401 | $ 2,154 | $ - | $ - | $ - | $ 2,154 |
| | | | | | | | | | |
| Operating Expenses [1] | 13,328 | 9,171 | 9,079 | 31,579 | 8,428 | 1,646 | 1,807 | 2,655 | 14,536 |
| | | | | | | | | | |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,301) | $ (1,177) | $ (6,274) | $ (1,646) | $ (1,807) | $ (2,655) | $ (12,381) |
| | | | | | | | | | |
| Professional Fees | 17,522 | 7,707 | 7,741 | 32,971 | 5,450 | 5,058 | 2,048 | 1,605 | 14,160 |
| | | | | | | | | | |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,057 | 4,878 | (59,016) | 573 | 423 | 423 | (57,598) |
| | | | | | | | | | |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (8,985) | $ (29,270) | $ (70,741) | $ (6,130) | $ (3,432) | $ (3,837) | $ (84,139) |
| | | | | | | | | | |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (763) | 522 | - | - | (241) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (12,167) | (39,036) | (290) | 19 | (4,702) | (8,006) | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | - | (37,380) | - | - | - | - | - |
| Net Realized Gain (Loss) from Equity Method Investees | - | - | (94) | (94) | - | (22,578) | - | (1,349) | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (12,262) | $ (158,992) | $ (1,053) | $ (22,037) | $ (4,702) | $ (9,355) | $ (37,147) |
| | | | | | | | | | |
| Net Income | $ (150,307) | $ (16,708) | $ (21,247) | $ (188,262) | $ (71,794) | $ (28,167) | $ (8,134) | $ (13,192) | $ (121,287) |

*Footnotes:*
*[1] Operating expenses include an adjustment in January 2021 to account*
*  for expenses that have not been accrued or paid prior to effective date.*
*[2] Other income and expenses of $61.2 million in January 2021 includes:*
*  [a] $77.7 million was expensed to record for the increase of*
*    allowed claims.*
*  [b] Income of $15.8 million for the accrued, but unpaid payroll liability related to*
*    the Debtor's deferred bonus programs amount written-off.*

Appellee Appx. 00177
APP 03704

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 185 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 299 of 1828   PageID 9792
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 184 of 1803   PageID 10930
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 177 of
178

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
|---|---|---|---|---|---|---|
| | Forecast ---> | | | | | |
| **Revenue** | | | | | | |
| Management Fees | $ - | $ - | $ - | $ - | $ - | $ 779 |
| Shared Service Fees | - | - | - | - | - | 1,263 |
| Other Income | - | - | - | - | - | 113 |
| Total revenue | $ - | $ - | $ - | $ - | $ - | $ 2,154 |
| Operating Expenses | 1,443 | 643 | 758 | 1,088 | 3,932 | 18,468 |
| Income/(loss) From Operations | $ (1,443) | $ (643) | $ (758) | $ (1,088) | $ (3,932) | $ (16,314) |
| Professional Fees | 2,788 | 2,788 | 1,288 | 1,288 | 8,153 | 22,313 |
| Other Income/(Expenses) | 408 | 419 | 434 | 184 | 1,444 | (56,154) |
| Operating Gain/(Loss) | $ (3,823) | $ (3,013) | $ (1,613) | $ (2,193) | $ (10,641) | $ (94,780) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | (51,775) | (51,775) | (52,016) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (12,979) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (23,927) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (51,775) | $ (51,775) | $ (88,922) |
| Net Income | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) | $ (62,415) | $ (183,702) |

Appellee Appx. 00178
APP 15745

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 186 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 300 of 1828   PageID 9793
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 185 of 1803   PageID 10931
Case 19-34054-sgj11 Doc 1473 Filed 11/24/20   Entered 11/24/20 10:24:41   Page 178 of
178

**Highland Capital Management, L.P.**
**Cash Flow Indirect**
**(US $000's)**

| | | | Forecast ----> | | | | | | | |
| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net (Loss) Income | $ (16,708) | $ (21,247) | $ (71,794) | $ (28,167) | $ (8,134) | (13,192) | $ (3,823) | $ (3,013) | $ (1,613) | $ (53,967) |
| Cash Flow from Operating Activity | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | - | - | 763 | (522) | - | - | - | - | - | 51,775 |
| Investment realized (gain)/ loss | (1,549) | 12,262 | 290 | 22,559 | 4,702 | 9,355 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | - | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | 3,092 | 930 | 1,884 | 417 | 1,933 | (658) | (669) | (684) | 2,010 |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (54,172) | (2,891) | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (9,913) | (123,752) | (6,907) | (3,015) | (1,904) | (4,481) | (3,681) | (2,297) | (182) |
| Cash Flow From Investing Activities | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | 250 | 1,639 | - | - | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 32,366 | 3,002 | 102,457 | 46,531 | 18,278 | - | - | - | 7,780 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 32,366 | 3,252 | 104,096 | 46,531 | 18,278 | - | - | - | 7,780 |
| Cash Flow from Financing Activities | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | - | - | - | - | - | - |
| Claim reclasses/(paid) | - | - | 181,259 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| Maple Avenue Holdings | - | - | (4,975) | - | - | - | - | - | - | - |
| Frontier Note | - | - | (5,195) | - | - | - | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 97,092 | (5,210) | (50,000) | - | (50,000) | (25,000) | - | (28,942) |
| Net Change in Cash | $ (9,107) | $ 22,454 | $ (23,408) | $ 91,979 | $ (6,484) | 16,374 | $ (54,481) | $ (28,681) | $ (2,297) | (21,344) |
| Beginning Cash | 14,994 | 5,888 | 28,342 | 4,934 | 96,913 | 90,428 | 106,803 | 52,322 | 23,641 | 21,344 |
| Ending Cash | $ 5,887 | $ 28,342 | $ 4,934 | $ 96,913 | $ 90,428 | $ 106,803 | $ 52,322 | $ 23,641 | $ 21,344 | $ - |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 187 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 301 of 1828   PageID 9794
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 186 of 1803   PageID 10932

# APPENDIX 2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 188 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 302 of 1828   PageID 9795
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 187 of 1803   PageID 10933

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

          Claimant,

v.                              Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

          Respondent.

## PARTIAL FINAL AWARD

    WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

I.      Introduction
      A.    The Parties
          1.    Claimant is a Committee of Redeemers in the Highland Crusader Fund (the "Committee"). Pursuant to the Joint Plan of Distribution of the Crusader Funds ("the Plan") and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors ("the Scheme")[1], HC300, the Committee was elected from among the investors in the Crusader Fund to oversee the management of the Crusader Fund by Highland Capital Management, L.P. (Highland Capital). The Plan and the Scheme are the governing documents which contain the arbitration agreements giving rise to this arbitration. The Committee is represented by Terri Mascherin, Andrew Vail, and Shaun Van Horn of Jenner & Block LLP.

          2.    Respondent, or Highland, is an investment manager and, until July 2016, served as such for the Highland Crusader Funds ("Crusader Funds" or the "Funds") that were formed between 2000 and 2002. The Funds consisted of one "Onshore Fund" and two "Offshore Funds," and the capital that was raised through these entities was pooled into a "Master

---

[1] The Plan was implemented with respect to Highland Crusader Offshore Funds by a "Scheme of Arrangement" ("Scheme") sanctioned by the Supreme Court of Bermuda. The Scheme incorporates the Plan and, unless otherwise noted, the Plan and Scheme contain effectively identical provisions. Unless the context requires otherwise, we will refer primarily to the Plan.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 189 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 303 of 1828   PageID 9796
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 188 of 1803   PageID 10934

Fund." The capital was invested primarily in "undervalued senior secured loans and other securities of financially troubled firms" among other asset types. HC-17, at HC-117.0010[2]. Highland is represented by Gary Cruciani, Travis DeArmand, Michael Fritz of McKool Smith, LLP.

B.   The Arbitrators

1.   The three arbitrators, whose appointment was formalized by the International Center for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), were David M. Brodsky, Chair, John S. Martin, Jr., and Michael D. Young.

II.   Background of the Dispute

A.   The 2008 Financial Crisis

1.   From 2000 until 2007, the Crusader Funds had double-digit annual returns, but in September and October 2008, as the financial markets in the United States began to fail, Highland Capital was flooded with redemption requests from Crusader Fund investors, as the Crusader Funds' assets lost significant value.

2.   On October 15, 2008, Highland Capital placed the Crusader Funds in wind-down, "compulsorily redeeming" Crusader Fund's limited partnership interests. Highland Capital also declared that it would liquidate the remaining assets and distribute the proceeds to investors. However, disputes over the appropriate distribution of the assets arose between those investors who had voluntarily redeemed their interests earlier in 2008 but had not yet been paid their redemption amount ("Prior Redeemers") and those who were compulsorily redeemed in October 2008 ("Compulsory Redeemers") (collectively, the "Redeemers").

B.   The Plan and Scheme

1.   At about the same time, an investor raised allegations of misconduct by Highland Capital and filed a wind-up petition in the Supreme Court of Bermuda. In 2011, after several years of negotiations among the Prior Redeemers, Compulsory Redeemers, and Highland, the Plan and Scheme were adopted and became effective in August 2011. The adoption of the Scheme and Plan was to "enable the orderly management, sale, and distribution of the assets" by Highland and the right of the Redeemers Committee to oversee Highland's services. HC-300 at 300.017.

---

[2] There are three sets of exhibits that will be referred to herein, Joint Exhibits (referred to as JX- —), Redeemer Committee Exhibits (RC- —), and Highland Capital Exhibits (HC- __).

Appellee Appx. 00182
APP. 03049

2.      Central to the Scheme and Plan was the role of the Redeemer Committee, which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund; that increased "level of influence" was particularly manifest in the Committee's ability to approve or disapprove of actions that Highland was contemplating taking, right of first refusal on other activities Highland wished to engage in, and the Committee's ability to terminate the services of Highland on 30 days' notice "with or without Cause."  HC-300 at 300.016. Thus, the relationship between the Redeemer Committee and Highland, although grounded in contract, was designed to become one of mutual cooperation and confidence.

3.      Pursuant to §2.04 of the Plan, a ten-person committee of Crusader Fund investors, composed of five representatives of the Prior Redeemers and five representatives of the Compulsory Redeemers, was created. HC-300, § 2.04. As part of the Plan and Scheme, Highland Capital continued to serve as the investment manager for the Crusader Funds. As part of its duties as investment manager, Highland Capital was to liquidate fund assets and distribute the proceeds to the Crusader Fund investors pursuant to an agreed 43-month distribution schedule. In addition, as an incentive to Highland in its liquidation of assets, the Scheme and Plan provided that the Deferred Fees would be paid to Highland if it completed the full liquidation.

4.      It is not disputed that, between October 2011 and January 2013, Highland Capital distributed in excess of $1.2 billion to the Crusader Fund investors. It is also not disputed that the Crusader Funds were not completely liquidated when Highland paid itself the Deferred Fees in January and April 2016 and the Funds remain unliquidated as of the time of these hearings.

C.      The Arbitration Agreement

1.      Sections 2.09 and 9.03 set forth the terms and conditions by which these disputes are to be resolved in arbitration. Section 2.09 provides, in relevant part, that "in the event of a dispute between the Crusader Funds or the Redeemer Committee and HCMLP, ... the applicable representatives shall confer in god faith in an attempt to resolve the dispute...If the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with Section 9.03."

2.      Section 9.03 provides, in relevant part, that "Any dispute referred to in Section 2.09...shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law. Arbitration shall be conducted in New York, New York."

D.      Termination of Highland Capital and Ensuing Litigation

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 191 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 305 of 1828   PageID 9798
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 190 of 1803   PageID 10936

1.      For reasons set forth below, disputes began to arise between the Redeemer Committee and Highland Capital, culminating in the termination of Highland Capital as investment manager by letter and notice dated July 5, 2016, for cause and without cause, with termination being effective on August 4, 2016, RC-318. Highland Capital was replaced as investment manager by Alvarez & Marsal CRT Management, LLC ("A&M"). JX-31.

2.      On July 5, 2016, the Committee filed a Notice of Claim before the AAA, commencing an arbitration against Highland, RC-319, and also commenced litigation in Delaware Chancery Court, inter alia, to obtain a status quo order in aid of the arbitration. On July 8, 2016, a Vice Chancellor entered an oral status quo order in aid of this arbitration, pending the adjudication of the Committee's request for interim relief by an AAA arbitrator on an emergency basis pursuant to AAA Rule 38. On August 2, 2016, an Emergency Interim Order was entered by an Emergency Arbitrator appointed by the ICDR, which order replicated the oral status quo order entered in Delaware Chancery Court.

3.      On July 21, 2016, Highland filed its Answering Statement, denying the claims and asserting affirmative defenses.

E.      The Arbitration

1.      This Tribunal was established as of October 31, 2016. The parties consented to the appointment of the Tribunal.

2.      On October 14, 2016, Claimant filed an Amended Notice of Claim, seeking specific performance, injunctive relief, declaratory relief, money damages, and disgorgement arising out of the allegedly willful misconduct and violations of fiduciary and contractual duties by Highland Capital as investment manager of the Highland Crusader Fund. Claimant sought four species of relief: (a) an award requiring Highland Capital to provide to the Committee all information about the Fund and its assets as required by Section 2.05 of the Plan and Section 4.6 of the Scheme; (b) an award of money damages, including disgorgement, for Highland Capital's allegedly willful misconduct and breaches of its fiduciary and contractual duties, and for any unjust enrichment; (c) an injunction requiring Highland to return the so-called Deferred Fees and Distribution Fees to the Crusader Fund; and (d) declarations that the Consenting Compulsory Redeemers are entitled to payment of the Deferred Fee Account, and that Highland is not entitled to advancement of expenses and legal fees.

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 192 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 306 of 1828   PageID 9799
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 191 of 1803   PageID 10937

3.      On December 14, 2016, Respondent filed a motion for partial summary adjudication, seeking dismissal of those claims seeking monetary damages, seeking relief as both breaches of contract and of fiduciary duties, and seeking relief barred by the applicable Statute of Limitations; by Order of March 1, 2017, we denied such motions without prejudice to their being renewed upon the development of a fuller record.

4.      On February 16, 2017, Claimant filed a motion for partial summary adjudication, seeking an order compelling Highland to comply with its alleged contractual obligation under the Plan and Scheme to provide the Committee with the Crusader Fund's books, records and other information from 2011 to 2016. By Order, dated April 21, 2017, we entered a Partial Final Award, granting the relief sought by Claimant, and ordering Highland, inter alia, to produce non-privileged documents, as described in the Order.

5.      On April 11, 2017, Respondent moved for Summary Adjudication of its counterclaim for advancement to defend against the claims brought by the Claimant in the Arbitration and in the parallel Delaware action, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., C.A. No. 12533-VCG (Del. Ch.) (the "Delaware Action").  Respondent sought a mandatory injunction requiring the Fund to escrow and segregate Crusader Fund assets to cover its indemnification and advancement rights.  By Order and Partial Final Award in favor of Claimant, dated July 20, 2017, we denied Highland's motions for advancement in this Arbitration and in the parallel Delaware Action and for the mandatory injunction, on the ground that the "inter-party indemnification exception" applies.

6.      On December 8, 2017, Highland moved to amend its Counterclaims against the Redeemer Committee of the Highland Crusader Fund and for leave to file a third party demand for arbitration against Alvarez & Marsal CRF Management, LLC ("A&M CRF"), Alvarez & Marsal North America, LLC ("A&M NA"), and House Hanover, LLC ("House Hanover").  On January 11, 2018, following a pre-hearing conference call, Respondent filed a revised proposed amended Counterclaim against the Committee alone, raising counterclaims of breach of the covenant of good faith and fair dealing in the its performance and enforcement of the Plan, breach of its fiduciary duty, and aiding and abetting the breach of fiduciary duty by A&M CRF, A&M NA and House Hanover.

5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 193 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 307 of 1828   PageID 9800
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 192 of 1803   PageID 10938

7.      By Order dated January 25, 2018, we granted the motion to amend Highland's counterclaims that raised direct claims of breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of the so-called Deferred Fees allegedly owed to Highland, and denied the balance of Highland's request for leave to file Counterclaims and Third Party Claims.

8.      On February 1, 2018, Respondent filed an Amended Answer and Counterclaims, seeking an order that the Committee account to Highland as an investor therein for all payments, gains, profits, and advantages obtained as a result of the Committee's alleged wrongful actions; that the Committee pay money damages, disgorge, and make restitution to Highland for damages arising from the Committee's alleged breaches of contract, breaches of the covenant of good faith and fair dealing, and breaches of fiduciary duty, including by awarding Highland the Deferred Fees allegedly improperly withheld, as well as an award of Highland's fees and expenses, including reasonable attorneys' fees incurred in this action; and such other relief as the Panel deems fair and equitable.

9.      On February 15, 2018, Claimant moved to strike portions of the Counterclaims on the grounds that certain of the new pleadings went beyond the limitations set by the Panel in the January 25 Order by including allegations that relate directly to claims the Panel had ordered not be included in the revised Counterclaim.  By Order dated April 1, 2018, we granted the motion of the Claimant to strike portions of the Counterclaim and directed Respondent to submit a revised Counterclaim to Claimant and the Panel.

10.     By Order dated March 19, 2018, we directed that "any party wishing to make a motion shall write a letter to the Panel, with copy to opposing counsel, seeking permission to make such motion..."

11.     By letter dated March 28, 2018, Highland requested permission to file a motion for partial summary adjudication with respect to the Committee's breach of fiduciary duty claims that accrued before July 5, 2013, which Highland contends are barred by the statute of limitations.  By Order dated April 5, 2018, relying upon AAA Commercial Arbitration Rule 33, we denied Highland's application to make a motion for partial summary adjudication, without prejudice to their doing so at the close of the Committee's main case at the hearing, if such factual and legal issues were briefed in the Pre-Hearing Briefs.

12.     On April 5, 2018, Respondent filed its revised Amended Counterclaims, seeking relief, as earlier, for alleged breaches of contract, of fiduciary duty, and of the covenant of good faith and fair dealing.

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 194 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 308 of 1828    PageID 9801
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 193 of 1803    PageID 10939

13.    On July 12, 2018, Highland moved to strike what it characterized as a new claim by the Committee.  The Committee opposed the motion. By Order dated July 22, 2018, the motion to strike was denied.

14.    On August 19, 2018, after a series of discovery motions were decided, the Parties entered into a Joint Proposed Pre-Hearing Consent Order, which was So Ordered by the Panel.

F.    Hearing Dates and Witnesses

1.    An evidentiary hearing was held in New York, N. Y. on September 12-14, 17-18, 20-21, and 24-25, 2018.

2.    Claimant presented the oral testimony of Eric Felton, Burke Montgomery, David Morehead, and Brian Zambie, all Members of the Redeemer Committee; Steven Varner, Alvarez & Marsal ("A&M"); Robert Collins, PriceWaterhouseCoopers; and two experts, Scott Meadow, Analysis Group; and Basil Imburgia, FTI Consulting.

3.    Respondent presented the oral testimony of Isaac Leventon, Esq., Highland internal counsel; Brant Behr, Redeemer Committee Member; Matt Jameson, formerly employed by Highland Capital; Scott Ellington, General Counsel, Highland Capital; the deposition testimony of Thomas Sargent, the Compliance Officer of Highland; and two experts, James Finkel, Duff and Phelps, and Karl Snow, Bates and White.

G.    Post-Hearing

1.    On October 24, 2018, Claimant filed its Post-Hearing Memorandum on its Claims and Respondent filed its Post-Hearing Memorandum on its Counterclaim.

2.    On November 17, 2018, Claimant filed its Reply to Respondent's Post-Hearing Memorandum and Respondent filed its Reply to Claimant's Post-Hearing Memorandum.

3.    On November 30, 2018, the Panel heard closing arguments from counsel to the Parties.

4.    On December 10, 2018, the Parties filed Supplemental Post-Trial Memoranda, dealing with questions asked by the Panel during closing arguments.

5.    On December 12, 2018, the record was declared closed.

7

6.    On January 5, 2019, at the request of the Panel, the Parties consented to the adjournment of the timing of the award from January 11, 2019 to February 28, 2019. On February 25, at the request of the Panel, the Parties consented to the extension of the deadline to March 7, 2019.

H.    Issues to be Determined

1.    Claimant has pleaded four claims of breaches of fiduciary duty and of breaches of contract, arising out of similar fact patterns, as follows:

a)    The taking of the Deferred Fees;

b)    The payment of Distribution Fees;

c)    The purchase of Plan claims without Redeemer Committee approval; and

d)    The transfer of Barclays' Fund interests without Redeemer Committee approval.

2.    Separately, Claimant has pleaded claims of breach of fiduciary duty, as follows:

a)    Engaging in related party transactions without Redeemer Committee approval

b)    Refusing to settle claims brought by Credit Suisse;

c)    Refusing to resolve the claims brought by UBS, which included a Temporary Restraining Order ("TRO"); and

d)    Failing to make a good faith effort to sell the Cornerstone asset.

3.    In addition, Claimant seeks a declaratory judgment that there should be an immediate distribution of the Deferred Fee Account to the Consenting Compulsory Redeemers.

4.    Respondent has pleaded one counterclaim against the Redeemer Committee, alleging that the Committee breached its contractual and fiduciary duties by delaying liquidation of the Fund's assets after July 2016, and depriving Respondent of its right to receive the remaining funds in the Deferred Fees account payable upon complete liquidation of the Fund.

8

5.      Both Claimant and Respondent have also made claims for the recovery of their attorneys' fees and costs.

I.      Applicable Law

1.      At the outset, we address which law applies to which claims.  It is not in dispute that Claimant's breach of contract claims are governed by the law of New York State.  However, Claimant contends that the law of New York State also applies to the breach of fiduciary duty claims, as the breaches are claimed to arise from Highland's relationship with the Fund and its investors under the Plan, which provides for New York law. Respondent argues that any fiduciary duties owed by Highland arise under its services as investment manager of the Crusader Fund, and, thus, are governed by the law governing the Fund's Governing Documents, the state of Delaware.

2.      Although there are few, if any, significant differences between New York and Delaware regarding fiduciary duties of entities in the position of Highland vis-a-vis its investors and the Committee, we find that the governing law on the breach of fiduciary duty claims is most appropriately that of New York, the state whose law governs regarding the Plan and rights of the parties under the Plan.

III.    Discussion of The Issues

A.      We recognize and appreciate the exemplary efforts by counsel for each Party. The results set forth herein are not a reflection of any difference in the quality of those presentations, but of our review of the evidentiary record and of the relevant law.

B.      Taking of Deferred Fees

1.      When the Plan and Scheme were adopted, a prominent feature was the creation of a Deferred Fee Account which was designed to provide an incentive to Highland to liquidate expeditiously the Crusader Fund of its assets. Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a "complete liquidation" of the Crusader Funds' assets," Scheme §1.5.2, Plan §2.02, HC-300.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 197 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 311 of 1828   PageID 9804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 196 of 1803   PageID 10942

2.      The evidence is uncontested that, as of the close of the hearing record in this matter,
the Crusader Funds have not been completely liquidated. It is also uncontested that, on
January 21 and April 6, 2016, Highland distributed to itself a total of $32,313,000 in Deferred
Fees. JX-25 at 14; JX-26 at 13.  Highland's stated rationale, or "position," for making the
payment without there first having been complete liquidation was set forth in the financial
statements of the Funds for the year-end 2015, issued on April 22, 2016: the UBS TRO
"prevented the full liquidation" and that Highland "would have received the Deferred
Fees...but-for the impact of the restraining order still in place." Thus, Highland "believe[d] its
right to receive the [Deferred Fees] crystalized as of the date the [TRO] was lifted," or
January 21, 2016, JX-025.0010.

3.      The core of Highland's position was that, in January 2016, it sought, received, and
relied on the advice of its outside counsel Akin Gump that the UBS TRO created an
impossibility for it to have earned the Deferred Fees, thus allowing the self-payment.
However, based upon the evidence heard, we do not find that Highland relied upon any such
advice in executing its plan to take the Deferred Fees.

4.      We find that in January 2016, Highland's CEO James Dondero raised the possibility of
taking the Deferred Fees before complete liquidation with Thomas Surgent, a Deputy
General Counsel and Chief Compliance Officer at Highland, who then discussed the idea
with Highland's General Counsel, Scott Ellington. Surgent Dep. 133:4-19.  Mr. Ellington
testified that, in January 2016, he and others spoke on several occasions with lawyers from
Akin Gump regarding the premature taking of the Deferred Fees, and that he received the
advice that "the deferred fees could be taken under the circumstances," that it was a
"calculated risk," and that, if successfully challenged, Highland would owe only "nominal
interest." Tr. 10 167:14-168:25; 167:14-168:25.

5.      However, Mr. Ellington's testimony is not supported by the hourly billing records of
Akin Gump, which do not show any time being billed in January 2016 for anything having
to do with this or any other Highland-related issue. RC-523; Tr. 11 136:9-14. Furthermore,
Highland's Assistant General Counsel, Isaac Leventon, testified that neither he, nor, he was
certain, anyone else at Highland, consulted with outside counsel in January 2016 regarding
taking the Deferred Fees.  Tr. 7 236:11-24.   When Highland executed on its "position" by
paying itself the Deferred Fees in January and again in early April, Highland did not disclose
the self-payment to its independent auditor or the Redeemer Committee.

10

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 198 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 312 of 1828   PageID 9805
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 197 of 1803   PageID 10943

6.      It was not until April 11, 2016, almost a week after it took the second tranche of Deferred Fees that Highland belatedly informed its independent auditor, PriceWaterhouse Coopers (PwC), of what it had done by sending it draft financial statements for the year ending December 31, 2015, in which Highland disclosed, without explanation, a "change ... related to how [they were] ... treating the deferred fee distribution." RC-288. On April 12, a meeting was held between Highland and PwC, at which PwC sought an explanation from Highland for the change in position and asked for a memorandum from Highland's counsel and a "copy of the letter that was sent [to the Redeemers Committee] notifying them of the position," JX-28.

7.      On April 12, Highland proceeded to have, apparently for the first time in 2016, discussions with Akin Gump about a justification for its taking the Deferred Fees prior to "complete liquidation." According to Akin Gump's billable time records, on April 12, there was a telephone "call with Thomas Surgent regarding interpretation of distribution plan and charging of fees during period of TRO." Following that call, on April 19, there was another call with Mr. Surgent and Mr. Leventon "regarding audit disclosures with respect to legal doctrine applicable to fee dispute…," following which an Akin Gump attorney started to draft a memo on the "impossibility" issue. After further calls and discussions regarding the drafting of the disclosure to the auditor, a memorandum was finalized and sent to PwC on April 22, 2016, the day that the financials were issued. See RC-523; Tr. 11 136:9-14.)

8.      Although Mr. Ellington testified the Akin Gump memo was "entirely generated by Akin Gump," without any participation by anyone from Highland, Tr. 10 189:14-21, there is contrary and indisputable evidence that, in fact, someone at Highland drafted footnotes to the financials that were then provided to Akin Gump and appear in the Akin Gump memo, see Tr. 7 283:19-284:9; compare RC-289 with HC-277.  Further, Mr. Leventon exchanged with Akin Gump and commented upon at least four separate drafts of the Akin Gump memo before it was finalized. RC-291; RC-295; -RC300; RC-302; JX-29; Tr. 7 291:4-295:19.

9.      We find that Highland made a deliberate and calculated decision to make no disclosure to the Committee of the actual taking of the Deferred Fees until the issuance of the 2015 financial statements on April 22, 2016, but that, in the course of communicating with PwC about its "position," Highland allowed PwC to conclude that it had informed the Redeemer Committee of its position regarding the payment of the Deferred Fees, and did not correct the misimpression. RC-441. It did so to induce PwC to provide the opinion Highland needed to have clean financials.

11

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 199 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 313 of 1828   PageID 9806
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 198 of 1803   PageID 10944

10.     This was not the first time that Highland had sought to use the so-called "impossibility defense" as a basis for suspending its obligations under the Plan. In 2013, Highland had proposed to use the doctrine in an attempt to avoid making distributions pursuant to the Realization Schedule, attached to the Plan and Scheme. Highland's then-outside counsel, Christopher Panos, now a federal bankruptcy judge, was asked to provide an opinion to allow such action but he expressed strong reservations about the use of that doctrine in an affirmative context, RC-153.

11.     Thereafter, Highland tried to secure another opinion that would be more supportive of its position and received a PowerPoint presentation from Akin Gump in November 2014, HC-356, that provided some additional arguments but, ultimately, focused on the doctrine being able to be used only as a defense, see, e.g., HC-356 at 16.

12.     Finally, when in early 2015, Highland asserted to Committee counsel that, by reason of the UBS TRO, "all applicable distribution dates, distribution thresholds and fees payable" were tolled, by reason of the UBS TRO, JX-22, Committee counsel had strongly rejected such use of the TRO to attempt to justify Highland's failure to meet "either the Realisation Schedule or the distribution threshold for the Deferred Fee Account." RC-219.

13.     Notwithstanding two prior and unsuccessful attempts to use the doctrine to evade its obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of its inside counsel, but not on the advice of Akin Gump, planned for and then executed on the strategy to take the Deferred Fees.

14.     Under New York law, the doctrine of impossibility does not create an affirmative right to engage in any conduct; rather, under certain circumstances, it acts as a defense to claims of breach of contract. When an unforeseeable event, such as an injunction, occurs, and the actions of the non-performing contract party have not contributed to the occurrence, and the occurrence renders the performance of a contractual obligation objectively impossible, a party's contractual obligation can be excused. Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987) ("While such defenses [as impossibility] have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances"); JJ. Cassone Bakery, Inc. v. Consolidated Edison Co. of New York, Inc., 168 Misc.2d 272, 278, 638 N.Y.S.2d 898 (N.Y. Sup. 1996), rev'd in part on other grounds, 240 A.D.2d 634, 659 N.Y.S.2d 293 (2d Dept. 1997).  Absent such factors, the doctrine of impossibility is not available to excuse a party's performance and cannot be used to justify affirmative conduct.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 200 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 314 of 1828   PageID 9807
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 199 of 1803   PageID 10945

15.     Highland attempts to squeeze itself into the four conditions, but its effort fails.  First, Highland argues that it is defending itself against accusations of breach of contract by invoking, defensively, the impossibility defense.  But it is Highland's illegitimate use of the impossibility defense to justify an affirmative act — the taking of the Deferred Fees — that is under attack, not its citation of the impossibility defense in 2018 as a defense to its breach of contract in 2016.

16.     Highland also argues that the TRO "rendered the complete liquidation of the Fund under the Plan's Realization Schedule objectively impossible." Closing Brief at 61. But Highland confuses the Realization Schedule which deals with timely distributions with the Deferred Fees which come into play only upon complete liquidation of the Fund with no deadline. Plan §2.02; Scheme §1.5.2.  In any case, when the UBS TRO was dissolved on January 21, 2016, there was nothing that prevented Highland from completing the liquidation.

13

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 201 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 315 of 1828 PageID 9808
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 200 of 1803 PageID 10946

17.    None of the factors allowing the doctrine of impossibility apply to the taking of the Deferred Fees. Indeed, we find that Highland — and its inside counsel —knew none of the factors were applicable when Highland asserted the defense. First, the UBS TRO was not unforeseeable; in fact, as Mr. Panos had advised his client in 2013, "UBS had already filed suit and was threatening to get an injunction at the time of the approval of the Scheme." Second, Highland's own acts gave rise to the UBS TRO, as it was UBS's accusation of Highland's fraudulent transfer of assets that gave rise to the TRO, as Mr. Panos again had advised Highland. Third, as Mr. Leventon himself testified at the hearings, "the TRO did not do away with Highland's obligation to complete liquidation of the fund." Tr. 7 262:6-10. Finally, the doctrine of impossibility gives rise to no affirmative rights to take action in violation of a contract. Once again, Mr. Panos had given this critical advice to Highland in 2013.

18.    We have considered the other elements of Highland's defense to this claim and find them similarly wanting. We find that Highland's paying itself the Deferred Fees in 2016 constituted a breach of both the Scheme and Plan. Given that finding, we need not reach the issue of whether the self-payment also constituted a breach of fiduciary duty by Highland to the Committee.

19.    As to remedy, under New York law, damages may be awarded for a breach of contract based upon the damages suffered by the claimant. Here, the damage suffered is the full amount of the Deferred Fees prematurely taken, plus prejudgment interest from the date of the taking. "Prejudgment interest is generally granted 'in order to compensate the injured party for the loss, over a period of time, of the use of the property to which it was entitled.'" Panix Prods., Ltd v. Lewis, 2003 WL 21659370, at *2 (S.D.N.Y. 2003)(citing Lewis v. S.L. & E., Inc. 831 F.2d 37, 40 (2d Cir.1987)). Although Respondent has raised good arguments as to why the interest rate should be nominal at best, we exercise our discretion to award statutory pre-judgment interest at 9% from the date of the taking, so as to measure as accurately as possible the totality of the damage that we perceive the Fund suffered by reason of the Deferred Fees being taken prematurely.

20.    Respondent also argues that the Tribunal lacks the authority to order a return of the moneys taken. But measuring the damages suffered by the Fund by referencing the full amount of the Deferred Fees taken is not the same as literally ordering a return of the moneys. It is an appropriate measure of the damages because the Fees were to have stayed within the Fund until they were appropriately earned, and while in the Fund, they were to serve as a protection and cushion against creditors. In addition, very importantly, keeping the Deferred Fees was to have acted as an incentive to Highland to complete liquidation of the portfolio, an event that had not occurred when Highland was terminated and still has not occurred. Taking the Deferred Fees deprived the investors of all of those benefits. The Deferred Fees in the amount of $33,313,000 should be returned in full, and with full statutory interest of 9% from the dates of taking in January and April 2016 through the date of this Partial Final Award.

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 202 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 316 of 1828   PageID 9809
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 201 of 1803   PageID 10947

C.    Distribution Fees

1.    Under the Plan, Highland was to receive fees in the amount of 125 basis points based on "all amounts actually Distributed to Redeemers during each quarter following the
        Effective Date . . . provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over.)" (Emphasis added) (Plan §2.01; Scheme §4.4.)

2.    Claimant alleges that Highland breached the provisions of the Plan by paying itself distribution fees totaling $14.5 million despite not having "actually" distributed to the Redeemers each quarter the minimum required to have been paid by the Realisation Schedule (Plan Appx. A).  The Committee alleges that Highland paid itself distribution fees eight times, but that the only time Highland met or exceeded the goals set by the Realization Schedule was in the quarters ending January 31, 2013, and April 30, 2013. Other than those two quarters, Claimant contends that Highland missed the target in every other time period.  Claimant also charged Highland with a breach of fiduciary duty, arising out of similar facts.

3.    The Committee alleges that six of the distribution fee payments were improper because Highland improperly calculated the amount paid to the Redeemers in one or more of the following ways: (1) in treating Deferred Fees as Distributions; (2) in withholding tax obligations from payments to Redeemers, but counted them for purposes of qualifying for its fee; (3) in improperly including amounts that it reserved to pay Barclays, amounts used to pay the Barclays settlement, and amounts paid to its affiliate Eames in its calculation of Distributions; and (4) in borrowing on margin and improperly treating such borrowings as "excess cash" under the Plan and, therefore, as Distributions.

4.    In addition, Claimant argues that if Highland missed any quarterly hurdle set in the Realisation Schedule, its deficiency would carry over to the next quarter, giving Highland an accordingly higher hurdle, or watermark, to meet in that next quarter.  In other words, Claimant urges that the Realisation Schedule was intended to be cumulative.

5.    Cumulative Quarterly Hurdles

        a)    Starting with the last issue first, the language in the Plan in question is as follows: "HCMLP will receive fees in cash ... (b) provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over)." HC-300 at 74 (emphasis added). Plan §2.01.

15

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 203 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 317 of 1828  PageID 9810
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 202 of 1803  PageID 10948

b)      Claimant argues that, although the foregoing language is not explicit regarding both the positive and negative cumulative nature of the Realisation Schedule, there is evidence sufficient to establish that requirement from the text itself and from the testimony of those who negotiated the clause in the Plan, citing the testimony of Mr. Montgomery ("The Realisation Schedule was a cumulative concept. 100 million during one period, 100 million to the next, 200 million during the next. . . . it was designed to be cumulative. It was a stack.") Tr. 3 307:5-19.  The Committee also points out that Highland kept internal accounting schedules that treated the Schedule as cumulative, including RC-364 at pp. 10, 23, 36, 49, 62, 75, 88, 101, 114, 127, 140; see also Tr. 4 196:17-197:19; Tr. 9 256:14-259.

c)      Finally, the Committee urges that there would be "perverse incentives" if Highland were allowed to treat the Schedule as cumulative if it got ahead of the distribution schedule but not if it fell behind, because if Highland knew it could not make a quarterly target, it would have the incentive to skip that quarter and wait until the next quarter where it would meet the Realisation Schedule for only that quarter. This would have the undesirable effect of delaying liquidation but not adversely affecting Highland's receipt of incentive fees.

d)      Highland strongly urges that the clause in question is unambiguous in requiring only a positive carry-forward, with no hint that a failure to meet a quarterly hurdle imposed an obligation to reach a high water mark that would meet both the prior hurdle and the present quarterly hurdle. In addition, Highland argues that, as Mr. Montgomery conceded on cross-examination, the Plan could have contained a cumulative shortfall provision, but that the inclusion of such language was never discussed with Highland, Tr. 3 at 308:7-13, and such could have been incorporated into the Plan had that been the Parties' intent.

e)      Highland also criticizes the Committee's "perverse incentive" argument, arguing, first, that Highland was highly incentivized to liquidate as quickly as possible so it could receive Distribution Fees during the pendency of the 36-month Realisation Schedule (§2.02) and obtain the $10 million Deferred Fee by distributing $1.7 billion within 43 months of the Plan's Effective Date (§6.02); and, secondly, "if Highland fell too far behind," it would lose its incentive to continue expeditious liquidation of the Fund's assets. Respondent's Post-Hearing Brief at 57. See Tr. Day 12 at 169:3-18 (Snow).

f)      In interpreting the section of the Plan, it is significant that the language regarding a positive carry-forward appears in a parenthetical phrase, not in the main operative text. Without considering the parenthetical, we read the main operative text as setting a test that Highland has to meet — each quarter, assets "equal to or in excess of the amount scheduled in the Realisation Schedule" must be distributed to Redeemers, or else Highland will not "receive fees in cash" that quarter.  Thus, each separate quarter, Highland has to make a required distribution or will not be paid fees.  But if each quarter there is a test that Highland has to meet, it would defeat the purpose of the quarterly test for Highland to be able to garner fees by just meeting the goal for one particular quarter without regard to how it had performed the prior quarter. Without a reward or a penalty each quarter dependent upon whether it met (or exceeded) the goal, Highland could undermine the objective of the clause. The supplemental parenthetical phrase simply makes explicit one benefit to Highland of overachieving such quarterly goal. We conclude that §2.01 requires both a positive and negative cumulative process.

g)      To read it otherwise would create a perverse incentive of encouraging Highland to skip quarters. The contrary is not true: by having both a positive and negative cumulative obligation, Highland loses no incentive to continue to liquidate, perhaps at a faster pace than it in fact adopted, if it were to fall behind.

h)      Though we reach our conclusion without need to rely on extrinsic evidence, we note that our interpretation is supported by Mr. Montgomery's testimony regarding Highland's request to include a parenthetical to make clear that it would not lose the benefit of an over-distribution and could carry it forward. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

D.    Deferred Fees as Distributions

1.      With respect to Highland's treating Deferred Fees as Distributions, the Committee urges that Deferred Fees being reserved in an account for possible later distribution were not amounts "actually Distributed" or the kind of Distributions made to Redeemers as part of the return to them of their investment.

2.      Highland defends on the basis that the Committee's position that Deferred Fees should not be included in calculating Distribution Fees is inconsistent with the parties' course of performance. From the outset, Highland argues that it included Deferred Fees in its calculation of Distribution Fees and gave written notice of its inclusion to the Committee on at least four occasions. HC-552; HC-591; HC-592; HC-593. However, Highland is not making the argument that the Plan was amended by what it says was its known conduct.

17

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 205 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 319 of 1828   PageID 9812
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 204 of 1803   PageID 10950

3.      Highland also argues that its successor, A&M, also included Deferred Fees in its calculation of Distribution Fees based upon the substantively identical language in the A&M investment management agreement, HC-56 at 6, and received a Distribution Fee based on that calculation in October 2016.

4.      We find that whether Highland's conduct was disclosed to the Committee or whatever A&M may have done are both irrelevant to the issue in this case, because, as we analyze the evidence adduced, the only relevant issue is whether including Deferred Fees in the calculation of Distribution Fees is authorized by the language of the Plan, and we find that it is not.

5.      The Plan sets forth a program of fees capable of being paid to Highland: if Highland met certain quarterly goals of distributions made to Redeemers, as set forth in the Realisation Schedule, it was entitled to receipt of certain Distribution Fees; if it distributed at least $1.7 billion to the Redeemers prior to the 43d month following the Effective Date, it was entitled to receive payment of the fees in the Deferred Fee Account in accordance with Section 2.02 of the Plan.

6.      The Plan distinguished what Highland had to do to qualify to receive each category of Fees. With respect to Deferred Fees, the Plan provides that "Highland shall not be deemed to be a Redeemer in respect of the deferred fees." We read that sentence as making clear that Highland's setting aside of Deferred Fees into a account that it might eventually be able to draw upon should not be construed as a form of distribution such that, if it were a Redeemer, it could be construed as an "actual" distribution.  Because Highland is not "deemed to be a Redeemer," its payment to a fund is not equivalent to a Distribution to an investor.

7.      We find that this language is not ambiguous and does not allow for the practice used by Highland to beef up the amount of Distribution Fees it received.

Appellee Appx. 00198
APP. 03063

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 206 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 320 of 1828   PageID 9813
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 205 of 1803   PageID 10951

E.    Withholding Taxes as Distributions

1.    The evidence at the hearing was that, as required in the Plan, HC-300 at 80, Highland took into account the amount of taxes that should be withheld and paid those amounts to the appropriate taxing authorities; however, Highland also included those withheld amounts in the calculation of amounts "actually" distributed to Redeemers.  The Committee contends that such withheld amounts were not "actually Distributed to Redeemers," and points out that, in fact, only a subset of Redeemers — the Offshore Fund investors — were subject to tax withholding, RC-62; Tr. 9 275:5-23, while some investors were nonprofits that did not pay taxes at all,  Tr. 12 167:5-24.  The Committee also points out that, when first informed in 2012 that Highland had counted tax withholdings toward the May 1, 2012 Distribution, the Committee objected, demanding successfully that Highland make up that shortfall. RC-68; Tr. 3 301:6-12; Tr. 9 278:4-279:16.

2.    Highland makes two points in its defense: first, tax withholdings made on behalf of an employee are considered "compensation," so tax withholdings for Crusader investors should also be treated in a "common-sense manner" as "distributions" to those investors; and second, Highland disclosed its methodology in at least one monthly report in November 2013, HC-591 at 14 (Nov. 2013 Summary Report), to which the Committee never objected.

3.    We need not consider either of these defenses because we find the language of the Plan supports the treatment by Highland of these amounts. As stated above, "Distributions" is defined as "Amounts to be paid to Redeemers under the Plan, including amounts to be paid to Redeemers under the Scheme..." §1.01. The operative language regarding withholding for taxes is as follows: "In connection with ... all Distributions to be made hereunder, the Crusader Funds shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any ... taxing authority, and all Distributions hereunder shall be subject to any such withholding ... requirements. The Crusader Funds are hereby authorized to take any and all actions that may be necessary or appropriate to comply with any such requirements."

4.    Read together, we find that "the amounts paid to Redeemers" were "subject to ... withholding requirements" and thus, were appropriately included within the calculation of amounts distributed to Redeemers, even if, in fact, it was an indirect payment. We find for Highland on this branch of the Committee's claim.

19

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 207 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23    Page 321 of 1828   PageID 9814
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 206 of 1803   PageID 10952

F.      Payments to Barclays and Eames as Distributions

1.      In 2006 and 2007, Barclays and a Highland affiliate entered into two securities transactions — a prepaid forward transaction and an accreting strike option transaction.  In connection with those two transactions, Barclays became an investor in the Highland Funds.  JX-5. In late 2008, Barclays submitted redemptions for its full interests in the Highland Funds, which Highland did not honor. Litigation between Barclays and Highland entities ensued. When the Plan and Scheme were adopted, Barclays did not consent and became what it is referred to as a Non-Consenting Redeemer. HC-300, at HC-300.0075.

2.      Thereafter, when Fund assets were disposed of and amounts distributed to Redeemers, no amounts were actually paid to Barclays; instead, amounts equivalent to those that Barclays would have received if it was a Consenting Redeemer were paid into the Redeemer Trust Account. That Account was set up for the purpose of segregating the deposited funds so they could be "used to pay all costs of HCM-Related Parties and the Redeemer Committee to defend, respond to, settle and satisfy any Claims by Crusader Fund Redeemers excluding Plan Claims ("Redeemer Claims") and ... to defend, respond to, settle and satisfy any such Redeemer Claims in advance of any amounts otherwise properly available for such purposes out of the assets of the Crusader Funds."  Plan 6.01.

3.      Notwithstanding such amounts remained in a designated account at a major financial institution, Highland treated such reserves as "actual" Distributions and paid itself fees based on the amounts reserved. The Committee argues that amounts reserved in the Redeemer Trust Account were not "actually Distributed" and that fees taken by Highland for such deposits were taken in breach of the Plan.

4.      We find that Highland's treatment of the reserves as Distributions violated the terms of the Plan.

5.      In July 2012, Highland, Barclays, and other entities entered into a settlement agreement, resolving all of the claims between and among them. JX-5. As part of the settlement, Barclays received both the cash reserved since August 2011 and several additional cash distributions expected between July and December 2012, essentially the exact distribution amounts that it was entitled to as a Consenting Redeemer. Tr. Day 9 at 146:12-19 (Palmer); HC-275; HC Demo 10 at 4.  Pursuant to the settlement, Barclays became a Consenting Redeemer, see JX-5 at 12 (§ 11.3). Highland treated such portion of the settlement payments as "Distributions" and paid itself the fees associated with that amount of Distributions. The Committee contends that any payments to Barclays were in settlement of various claims, in exchange for which there was a "relinquishment and/or abandonment" of all of Barclays' rights and interests in the Highland Funds, JX-5 at 3, and, thus, such payments were not Distributions.

20

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 208 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 322 of 1828   PageID 9815
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 207 of 1803   PageID 10953

6.      Finally, as part of the settlement, the two limited partner interests that Barclays had in the Funds were transferred to a newly-formed and wholly-owned affiliate of Highland, Eames; amounts equivalent to what Barclays would have received as an investor after the settlement were paid to Eames, totaling $35.1 million, and Highland treated such amounts as Distributions and paid itself the appropriate fees.  The Committee urges that the transfer of LP interests was in violation of Section 2.05(f) which gives that the Committee "the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims," HC-300, and that the transfer was explicitly disapproved, RC-79 ("The Crusader Redeemer Committee does not believe that Highland has the right to take assignment of Barclays' interest in the Crusader Fund. The Committee believes its approval is required for any such assignment under the Plan/Scheme, and the Committee is not willing to approve that assignment."). Furthermore, the Barclays Settlement Agreement provided that the settlement was subject to Highland's receiving all necessary approvals under the Crusader Plan of Liquidation, which the Committee contends Highland did not receive. HC-330, §12.3.2, at HC-330.0014.

7.      Highland argues, first, that the Committee's right to approve or disapprove of the transfer of interests under Section 2.05(f) is not applicable because under Section 2.05(g)[3], the Barclays settlement did not give Barclays more than it would have received as a Consenting Compulsory Redeemer; that, in any case, 2.05(f) is subject to the "reasonableness" test under Section 2.07[4]; and, finally, that it was entitled to keep the LP interests because the LP interests were in the Redeemer Trust account, citing to HC-275. We find that Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer. Its rejection was reasonable in that it was acting in the best interests of the other investors to have a smaller investment base that would have a greater portion of the asset distributions. The accounting ledger maintained by Highland, which created much confusion at the hearing, was not evidence that the LP interests were in the Redeemer Trust account; we agree with the Committee that the spreadsheet was an accounting convenience for Highland.

8.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

---

[3] "The Redeemer Committee will have, subject to the execution and delivery of customary and reasonable confidentiality agreements:... (g) the authority to approve or disapprove any settlement by the Crusader Funds with Barclays that would be in excess of what Barclays would receive as a Consenting Compulsory Redeemer..."

[4] "The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld."

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 209 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 323 of 1828    PageID 9816
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 208 of 1803    PageID 10954

9.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

10.     Finally, we find that when Barclays received the amounts, as part of the Settlement Agreement, that had been set aside in 2012 as if Barclays was then a Consenting Redeemer, it did not receive such amounts as Distributions "actually" paid to a Redeemer but rather as part of the Settlement amount. Although Barclays was "deemed" to have become a "Consenting Redeemer," it had that status only for the moment in time sufficient to transfer its LP interests to Eames. As the Settlement Agreement noted, "certain payments will be made by the Highland Entities to Barclays … in consideration of the settlement of the Claims hereunder and the assignment, relinquishment and/or abandonment by Barclays of all rights and interests it had in the Fund Interests…" HC-330 at HC-330.0003. Highland breached the Plan by treating the amounts paid to Barclays as if they had been received as a Consenting Compulsory Redeemer as Distributions.

11.     We conclude that it was improper for Highland to include in the calculation of the amounts distributed to the Redeemers:

a)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

b)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims; and

c)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames.

22

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 210 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 324 of 1828   PageID 9817
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 209 of 1803   PageID 10955

G.    Margin Borrowings as Distributions

1.      In January and April 2012, Highland caused the Fund to borrow $60 million from its Jefferies brokerage account to distribute to Redeemers. The Committee contends that it did so because Highland had not liquidated enough assets to meet the Realisation Schedule. After learning about the loans in September 2012, the Committee protested and directed Mr. Dondero at the September 2012 meeting to take no further margin loans without its consent. Tr. 2 353:2-22; RC-85; JX-8. The Committee contends that Highland's taking such margin loans to reach the Realisation Schedule and then paying itself Distribution Fees based on having reached the quarterly goal with the assistance of the margin borrowing breached the Plan because the margin borrowing did not constitute Excess Cash resulting from the liquidation of assets from which Distributions must come. Plan §§1.01, 3.01; Scheme §§2.4.1, 2.4.2.

2.      Highland maintains that, as it was authorized under the Plan, to engage in margin borrowing, and that amounts were actually distributed to the Redeemers, such payments to the Redeemers were appropriately treated as Distributions qualifying it to receive Distribution Fees.

3.      We find that such margin borrowings, which were authorized under the Plan, did not qualify as the type of Distribution that would entitle Highland to receive a Distribution Fee. The plain language of the Plan requires that any Distribution Fee be paid to Highland only upon the appropriate amount of Excess Cash having been accumulated from the sale of "assets equal to or in excess of the amount scheduled in the Realisation Schedule…" The "assets" referred to are the "assets, respectively, of the Onshore Fund, Offshore Fund I and Offshore Fund II…" §2.01. No such assets were sold and therefore no Excess Cash was accumulated to be distributed to the Redeemers.

23

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 211 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 325 of 1828 PageID 9818
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 210 of 1803 PageID 10956

4.      The Committees expert, Mr. Imburgia, determined that the result of Highland's including the above improper items in the calculation of Distributions to Redeemers in calculating its entitlement to Distribution Fees, resulted in Highland paying itself Distribution Fees to which it was not entitled by an overpayment of $14,452,275 in Distribution Fees. The Committee is entitled to judgment in that amount plus interest at the rate of 9% from the date of each improper fee. RX 408, Schedule 2.1

H.      Purchase of Plan Claims[5]

1.      From December 2013 through January 2016, Highland purchased twenty-seven Plan Claims from Crusader investors for itself, without the approval of the Committee [ Tr. 5 50:5-8.] The Committee contends that such purchases breached the Plan, because if it had known that the Plan Claims were available for sale, it would have exercised its ROFR. Tr. 3 163:11-24; Tr. 4 389:3-390:23. The Committee urges that the UBS TRO, said by Highland to block any purchases by the Fund during its pendency, does not in fact bar such purchases; in any event, the Committee points out that it is conceded that the Fund had assets other than the allegedly restrained assets with which to make purchases outside of the restrained assets. The Committee seeks damages equivalent to the value of the Claims at the time they were sold, any profits or benefits realized by Highland, and pre-judgment interest at 9%, for a total of $8,897,899 plus interest.

2.      Highland raises a number of defenses. First, it argues that, during the period that the TRO was in effect, the Committee agreed with the advice given by the Fund's (and Highland's) counsel in the UBS case, Lackey Hershman, that the TRO, at minimum, prevented the Fund from spending cash to buy-out other investors before UBS's claims were resolved. See Tr. Day 7 at 319:17-332:3. Thus, Highland contends that the Committee cannot prove it would have purchased the Claims had they been offered to it.

---

[5] Plan §1.01: "Plan Claim. The claim of a Redeemer to payment of, or based upon, the Redemption Amount relating to the redemption of its shares or withdrawal of its capital account balance, as the case may be, in the Crusader Funds as detailed in Section 4.01."

Appellee Appx. 00204
APP. 03069

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 212 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 326 of 1828 PageID 9819
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 211 of 1803 PageID 10957

3. But the record doesn't support that interpretation. First, refuting the idea that the Committee agreed with the advice being relayed to them is the exchange of correspondence between counsel for the Committee counsel and Highland set forth in RC-360, in which Committee counsel rejected the advice said to have been received from outside counsel, and stated how the Plan Claims should be dealt with if Highland were to persist in asserting that the TRO so blocked the Committee's exercise of its ROFR: "the Committee does not agree with Highland's interpretation of the UBS TRO because the expenditure of money to redeem interests is not a "Distribution" and, in any event, if Highland feels strongly that it cannot use the Funds' assets in this way, any acquisition of the interests by Highland or an affiliate is subject to the Committee's exercising its rights under Section 5.04 when the TRO is lifted or when the interests can, in Highland's opinion, be acquired by the Fund consistent with the UBS TRO. Otherwise, the Committee did not approve of the transfer of the Scheme Claims." RC-360 at 87-88.

4. Furthermore, before the TRO, when presented with the opportunity to purchase Plan Claims, the Committee exercised its right of first refusal (ROFR) on five occasions, see RC-358. During the pendency of the TRO, the Committee was informed about only five of twenty-eight Plan Claims purchases and disapproved each of the purchases by Highland, but the disapprovals were ignored. The Committee informed Highland that it disagreed about the scope of the TRO but that if Highland, as Fund Manager believed the TRO prevented the Fund from purchasing the Plan Claims, then it would be consistent with the Committee's ROFR for the right to be exercised when the TRO was lifted. HC-580.

5. We find that the Committee would have exercised its ROFR if it had been given full information and had not Highland been preventing the exercise of the ROFR by invoking the TRO and misrepresenting to buyers that it had the ROFR.

Appellee Appx. 00205
APP. 03072

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 213 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 327 of 1828   PageID 9820
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 212 of 1803   PageID 10958

6.      As a second defense, Highland contends that during the period that the UBS TRO was in effect, it relied on advice of counsel that the TRO prevented the Crusader Fund from acquiring any Plan Claims, thus opening the door for Highland to purchase the Plan Claims that would otherwise have been subject to the Committee's ROFR under §§2.05(f)[6] and 5.04[7] of the Plan.

7.      Mr. Leventon testified that the TRO was obtained by UBS in response to UBS's allegation that Crusader Funds had participated in a fraudulent transfer of assets from a UBS debtor; the TRO restricted transfer of assets but because those assets had been acquired about four years previously and disposed of in the ordinary course of business, "the UBS TRO was essentially designed to 'collateralize' UBS against the March 25, 2009 asset transfer. And if they couldn't be collateralized with those exact assets and the exact actual cash ... or cash equivalent, then it had to be collateralized with something else. And that something else was the assets of the fund." Day 7 at 328:12-20.  That testimony would suggest that from the moment that the TRO went into effect, the Fund was under constraints not to purchase any Plan Claims or other assets.

8.      But this explanation is not convincing.  Regarding the advice received from Lackey Hershman, Mr. Leventon testified that the majority of the advice received was orally and over time, and that the advice was "an evolving interpretation" that "crystallized...in the first quarter of 2014." Id. at 330:9-17.  The advice consisted of "a bunch of verbal conversations, but a lot of that advice is embodied in that memo [HC259] that Lackey wrote to the Crusader Fund. Because we wanted the Committee to understand our quandary."  Day 7 at 319:17-332:3 (Emphasis added).

---

[6] Plan §2.07(f): "The Redeemer Committee shall have ... the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims; provided that such proposed assignment or transfer shall be deemed to be rejected if not affirmatively approved in writing within 30 days of submission to the Redeemer Committee..."

[7] Plan § 5.04: "No assignment or transfer of a Plan Claim after the Effective Date may be purchased by [Highland] or its affiliates without such Plan Claim first being offered to, and rejected by, the Crusader Funds."

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 214 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 328 of 1828   PageID 9821
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 213 of 1803   PageID 10959

9.      The Lackey Hershman memo, dated July 23, 2014, HC-259, deals only with the practical consequences of seeking an amendment to the UBS TRO while an appeal was pending, and does not provide any advice regarding the scope or interpretation of the UBS TRO.[8]  Notably, there is no other document from Lackey Hershman presented at the hearing, even including emails, that supports Mr. Leventon's explanation.

10.      Perhaps in recognition of the thin basis for its claim that it relied on the advice of counsel, Highland requests that the Panel draw no inferences from the "relatively few written communications on this issue," because there was, Highland contends, "unrebutted testimony" of the "contemporaneous advice of counsel." Highland points to a letter from an internal counsel at Highland to the Committee that cites advice from outside counsel regarding the effect of the TRO on the Committee's ability to purchase Plan Claims, RC-360 ("outside counsel to HCMLP has advised that the temporary restraining order which has been imposed by the Court in UBS Securities LLC et al. v. Highland Capital Management, L.P. prohibits the Crusader Funds from purchasing the Scheme Claims using assets of the Crusader Funds").

11.      The statement by internal counsel is the type of hearsay that was received in evidence only because this was an arbitration but to which, under the circumstances, we accord little substantive weight. We find more persuasive the absence of any writing, even an e-mail, directly from the law firm regarding the scope of the TRO and restrictions against the Fund using its assets to purchase Plan Claims or similar items.

12.      Further, we find that, even before the TRO went into effect, and thus well before any advice from counsel would have been received, Highland was laying the groundwork for purchasing the Plan Claims for itself and bypassing the Committee's ROFR.

---

[8] On questioning by members of the Panel, Mr. Leventon referred to the Lackey Hershman memo in broad terms:

"As set forth in the Lackey memorandum, which we all have, Lackey reported that UBS said that, Crusader and Highland Credit Strategies could neither distribute cash to anybody, nor sell assets, nor make any payments outside of the normal course of business...ARBITRATOR BRODSKY: Is the Lackey Hershman memo you're referring to the one that is HC-259, dated July 23, 2014? THE WITNESS: I believe that's correct. ARBITRATOR BRODSKY: I don't see any reference to conversations relayed to you by counsel about what UBS said. I see a sentence on page RC-3208 at the top, it says, "UBS counsel stated that they're not willing to enter into such a stipulation unless Crusader provided detailed discovery of its cash and asset holdings," et cetera, et cetera. Is that what you were referring to? THE WITNESS: Yes. They were not willing to modify the TRO in order to permit the sale of assets unless Credit Strategies, Crusader and other defendants handed over detailed financial information that they would not otherwise be entitled to in discovery. And we were advised that that was a prohibitive risk."

Day 8 170:10-17, 173:4-174:7.

13.     On May 29, 2013, Highland caused the Board of the Master Fund, which it controlled, to adopt a resolution, as follows:  "Whereas, ... (2) certain investors from time-to-time desire to sell their interests as redeemed, unpaid shareholders, in the Company ... (any such shares, 'Offered Shares'); (3) one or more principal accounts (the "Related Accounts') in which James Dondero ... and/or Highland ... have material, direct and indirect, financial and ownership interests, have enters a bid to purchase certain of Offered Shares; (4) the bid of the Related Account(s) is equal to or greater than the highest bid; ...Now Therefore Resolved That (1) the undersigned Directors hereby consent to the Proposed Transaction and any future transfers of Offered Shares to the Related Account(s)..." RC-276 at 5; Tr. 7 63:25-68:14.

14.     This pre-approval of transfers of interests in the Fund to Mr. Dondero, Highland, or its affiliates does not reference the Committee's ROFR, but it enabled Highland, falsely, to claim that it had a ROFR.  Using that Resolution, Mr. Leventon informed multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. RC276[9]; RC280; RC434. This conduct alone constituted a breach of the Plan, because it deprived the Committee from having any insight into the transactions as to which the Plan gave them rights to purchase the underlying interests.

15.     Furthermore, by the time Highland received the Lackey Hershman memo in July 23, 2014, Highland had purchased fourteen Plan Claims, nine of which were not disclosed to the Committee. Thereafter, Highland purchased another thirteen Plan Claims without any disclosure to the Committee. Mr. Leventon testified that the only reason for Highland not to consult the Committee about the 27 purchases in 2013, 2014, and 2015 was its interpretation of the TRO. Day 7, 172:2-10.

16.     Additional actions by Highland further demonstrate that the reliance on the TRO was a facade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge. In May 2014 and again in January 2016, Highland hired a broker to solicit all Fund investors, except those who were on the Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set. RC417; Tr. 7 95:8-20, 96:8-23; RC425.

---

[9]  "By way of Written Resolution, the Board of Directors of [the Fund] determined that if the Investment Manager or an affiliate offers to purchase the shares in the Fund, then that bid shall be accepted if it is the highest bid. See Written Resolution of the Directors of the Fund dated May 29, 2013. The Board may, in its absolute discretion, approve transfers. ... Accordingly, the Investment Manager, as authorized by the applicable documents, hereby bids 60.25 cents of NAV for purchase of 100% of Crown Alpha's capital balance as of the November 2015 NAV date"

17.    The broker, Wake2O, used talking points drafted by Highland that misrepresented on whose behalf Wake2O was acting, represented, without apparent foundation, that the offering price of 50% or 55% of NAV was "[t]he current best market bid" and that price would go down in the future, and, finally, that the TRO prevented the Fund from making distributions and that the Fund held many illiquid assets. RC420; Tr. 7 101:4-11 ("Q: And so one of the things that Highland wanted Wake to convey to investors was, hey, you might want to sell your interest in Crusader because right now there's this TRO and you're not going to be able to get any distributions, right?  A.· · That's probably a fair paraphrasing.").

18.    Throughout Wake2O's engagements, it was under pressure from Highland's CEO to pursue investors so that Highland could obtain a greater share of the Fund. See, e.g., RC-250 ("[K]eep pushing as much and many as quickly as possible....")(August 2015); and RC-426 ("Our CEO is keen on starting the process as soon as possible. Please let us know if we can start Monday.") (January 2016); Tr. 7 135:6-137:18.

19.    It was also in this period that Highland undertook a renewed effort to keep the Redeemers Committee in the dark about their purchasing activities. Mr. Leventon was significantly involved in providing direction, as well as drafting talking points, to Wake2O to "reach out to all non-committee members,"  (emphasis added); Tr. 7 146:16-149:7.  Highland offered Wake2O an incentive fee to acquire interests representing $200 million of NAV, but made clear to Wake2O that they should try to achieve that goal without contacting members of the Redeemer Committee. Tr. 7 157:13-161:2. The amount of $200 million was not an accidental target; it was just $4 million of NAV more than what the Redeemer Committee held, Tr. 7 155:15-23.  Wake2O's efforts resulted in the acquisition by Highland of a significant number of Plan Claims, amounting to just shy of $200 million, RC418; RC360; RC419; RC422; RC423; RC424.

20.     Finally, Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the Committee was the entity actually possessing that right.  Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated, Tr. 55:19-25 ("Q.·Mr. Leventon, have you ever sent an e-mail to an investor telling the investor that Highland Capital has a right of first refusal in the event the investor wants to sell its interest in the fund? A. With respect to the Crusader Fund, I don't recall having done so."); but see RC-276; RC-280; RC434; Tr. 7 74:22-76:23.)[10]

21.     Based upon the testimony at the hearing, we have serious doubts about the scope of the advice given, if any.  In addition, as now conceded, there were adequate untainted funds under the control of the Crusader Funds to have enabled the Committee to exercise its ROFR as to the Plain Claims, had they been informed in a timely way, as mandated by the Plan. 10/24/18 Highland Ltr. to Panel at 2; RC-408 at 37.

22.     Further, from our examination of the language[11] in the TRO, we conclude that the restrained assets were narrowly circumscribed, and the broad position taken by Highland was not well-grounded. The TRO restrained the Crusader Fund only from transferring or disposing of property received, or its cash equivalent, in March 2009 "from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009." JX13; RC134. The TRO did not preclude the Fund's sale of unrestricted assets or use of a significant amount of cash in the Fund. JX13.

23.     We also find that Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee. We find that Highland breached the Plan and Scheme by its actions and injured the Committee by its breach. We also found that Highland breached its fiduciary duty to the Committee by so acting.

---

[10] It appears that Mr. Leventon was also involved in a misrepresentation to the Committee about the purchase of a Plan Claim after the TRO had expired. In June 2016, he requested the Committee's approval for the purchase of a Plan Claim by an entity he described as a third party that was not affiliated with Highland. But in the course of soliciting the sale of the Plan Claim, Mr. Leventon represented that Highland was exercising a ROFR on behalf of itself or its affiliates. Tr. 7 87:6-89:11; RC-434. In fact, we find that the third party, Charitable DAF Fund, L.P. ("DAF"), was an affiliate of Highland. RC-435; Tr. 7 82:1384:21.  Based on what Mr. Leventon stated, the Committee approved the transfer. RC-316.

[11] "ORDERED, that pending the hearing on this motion, Defendants Highland Crusader Offshore Partners, L.P., and Highland Credit Strategies Master Fund, L.P., are temporarily restrained from transferring or otherwise disposing of property received (or if property has already been transferred or disposed to, the cash equivalent) in March 2009 from Highland Financial Partner,s L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009."

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 218 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 332 of 1828   PageID 9825
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 217 of 1803   PageID 10963

24.     In the calculation of damages owed to the Redeemer Committee by Highland, we have assumed that any Plan or Scheme Claims purchased by Highland would have been purchased at the same discounted price as Highland did. However, the damages methodology used by the Committee's expert witness on damages makes the assumption that the fair market value of each of the Plan Claims was the NAV that Highland had established in each of the relevant months. We do not adopt this methodology because of the uncertainty as to whether a discount should be applied to the NAV in calculating the appropriate fair market value.

25.     Rather, we adopt the alternative approach suggested by the Committee, which is rescission.  We order Highland to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase. We will leave the hearing open until the parties have worked out the exact financial details to comply with this order.

I.      Related Party Transactions

1.      The Committee contends that Highland breached its fiduciary duties by engaging in multiple related-party transactions without seeking or gaining the approval of the Committee  The Plan provision in questions requires the Committee's approval of "all transactions between the Crusader Funds and any other HCM-Related Party, while it serves as investment manager of the Crusader Funds, including any 'cross trade' between the Crusader Funds and any other account managed or advised by HCMLP," Plan §2.06; Scheme §4.7.1 (emphasis added).

2.      First, we must resolve the interpretation question left open by the Order of March 1, 2017, denying Respondent's motion for partial summary adjudication regarding these claims. We found that the language cited above was ambiguous because while Respondent argued that "Crusader Funds" is defined as meaning only four entities, the Master Fund, Onshore Fund, Offshore Fund I and Offshore Fund II, Id., § 1.01, and does not include Crusader Fund "portfolio companies" and other affiliated "entities," Claimant argued that if Crusader Fund meant only those four entities, there would be no meaning to the "including 'cross trades' language of §2.06, because none of the four entities directly owns assets and thus could not engage in cross trades with each other or with any other account managed by Highland. Thus, the language 'including "cross trades" must refer to entities broader than just the defined entities within Crusader Funds, or else that portion of §2.06(a) prohibiting cross trades would be read out of the Plan. Accordingly, we denied without prejudice the motion to dismiss the breach of contract and fiduciary duty claims based on the so-called affiliate transactions until after the record has been more fully developed.

31

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 219 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 333 of 1828    PageID 9826
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 218 of 1803    PageID 10964

3.      At the hearing, testimony was taken from two Redeemer Committee members, Messrs. Montgomery and Behr, regarding the drafting of the section in question. Mr. Montgomery testified that he negotiated the terms of the Plan with Michael Colvin, who was then Highland's General Counsel, telling him that the Committee "needed a related-party transaction prohibition, and he agreed to that. And the understanding was that it included everything on the Highland side and everything on the Crusader side… we thought there was agreement that it was including everything on the Highland side and everything on the Crusader side…" Tr. 2, 234:2-6, 235:2-5. Although in response to a question from a member of the Panel, Mr. Montgomery could not recall the specific language he and Mr. Colvin used to convey this understanding, and on cross-examination, he could not provide a reason for how the specific clause was drafted on this point, we credit Mr. Montgomery's testimony on this point.

4.      Although of limited evidentiary significance, Mr. Behr's testimony that before the adoption of the Plan and Scheme he had had discussions with someone at Highland, whom he recalled was Mr. Colvin, about concerns regarding Highland expensing board fees paid to its portfolio companies, Tr. 9 76:17-25, 77:2, supported Mr. Montgomery's testimony, cited above, that the subject of prohibiting certain related party transactions was part of the negotiations over the Plan. His recollection was supported in part by his contemporaneous notes of having raised that subject in the negotiations. HC508 at 142.

Appellee Appx. 00212
APP. 03079

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 220 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 334 of 1828   PageID 9827
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 219 of 1803   PageID 10965

5.     In addition, the Committee makes the point that the occasional course of conduct between the parties before the relationship between the parties became a matter of some dispute reflected the belief that the Plan and Scheme required that Highland seek the Committee's approval before engaging in transactions that involved entities other than the four specific Crusader Fund entities in the definition. See, e.g., Tr. 4 213:6-9.[12] Under the established law relating to contract interpretation, "How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed." Gulf Ins. Co. v. Transatlantic Reinsurance Co., 886 N.Y.S.2d 133, 143 (First Dept. 2009);  "[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.' … 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (First Dept. 1999).

6.     Based on the foregoing evidence, we resolve the ambiguity in favor of a broad definition of the term "Crusader Funds" to include not only the four specific entities named in §2.06 but also the Crusader Fund "portfolio companies" and other affiliated "entities. The Committee contends that Highland engaged in two types of transactions that required but did not receive its consent: (1) transactions between Highland affiliates and Fund portfolio companies, and (2) transactions directly between Highland affiliates and the Fund entities.

J.     Related Party Transactions with Portfolio Companies.

1.     The Committee contends that Highland breached §2.06 by causing Fund portfolio companies to pay board fees, advisory fees and D&O insurance premiums.

2.     Highland responds that transactions between Highland affiliates and Fund portfolio companies were expressly disclosed to the Fund's investors, see HC-230 at 34-36, and that the investors specifically agreed such transactions were permissible, see HC-118 at 7. Accordingly, Highland urges that there can be no fiduciary duty breaches.

3.     Furthermore, Highland urges that the claims arose in 2011 or 2012, and in any case were disclosed to Highland counsel by April 6, 2013, JX-12, and, thus, would be barred by the three-year statute of limitations. Highland characterizes the proof regarding such claims as failing to establish more than the occurrence of "isolated or sporadic acts."

---

[12] We note that one of Highland's outside counsel also occasionally used the term "Crusader Funds" or "Crusader" when describing transactions between portfolio companies and Highland affiliates, RC83 at 2-3; see JX12; JX10.

Appellee Appx. 00213
APPX. 03770

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 221 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 335 of 1828   PageID 9828
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 220 of 1803   PageID 10966

4.    The Committee claims that the statute of limitations should be tolled under the "continuing violation doctrine," which applies where "separate violations of the same type, or character, are repeated over time," and not where the claims are "based on a single decision that results in lasting negative effects." Moses v. Revlon, 2016 U.S. Dist. LEXIS 106431, *18 (S.D.N.Y. 2016).  Under prevailing New York law, "The continuing violations doctrine 'will toll the limitations period to the date of the commission of the last wrongful act where there is a series of continuing wrongs.' Shelton v. Elite Model Mgt., 11 Misc.3d 345, 361 (Sup Ct, New York County 2005); 78/79 York Assoc. v. Rand, 175 Misc.2d 960, 966 (Civ Ct, New York County 1998) … However, 'it will only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.' Selkirk v. State of New York, 249 A.D.2d 818, 819 (3d Dept 1998)." Pankin v. Perlongo, 2012 WL 7868667, at *2 (Sup. Ct. N.Y. Cnty. 2012).

5.    The evidence brought forth by the Committee failed to show that the payments made by Highland for insurance premiums or for advisory fees were parts of a series of continuing wrongs. Rather, there appear to have been a series of discrete payments made in no regular or consistent pattern and in no similar amounts.[13] Under the circumstances, we find in favor of Highland on these claims. We do not reach the issue of whether disclosure to investors would bar a claim for breach of fiduciary duty.

K.    Related Party Transactions with Highland Affiliates

1.    The Committee contends that in 2013 and 2014, without seeking its permission as required under §2.06, Highland sold shares in four CLO assets held by the Master Fund, known as Eastland CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO, Ltd. (the "CLOs"), in what it characterizes as "pre-approved" transactions to Highland affiliates, without seeking the Committee's approval, as required by §2.06(a), which, as noted above, prohibits "any 'cross-trades' between the Crusader Funds and any other account managed or advised by HCMLP."

2.    The proof at the hearing showed that, with no disclosure to the Committee, Highland sold CLOs to brokers it used for other securities transactions who, within a very short time of purchasing the CLOs, sold some or all of the CLOs to Highland affiliates.[14] The Committee urges that such sales were breaches of fiduciary duty as well as breaches of the Plan.

---

[13] Insurance premiums were paid on behalf of four entities (American Home Patient, Inc., Cornerstone Healthcare, Nex-Tech Aerospace, and Trussway Holdings) in 2011 and 2012; no payment to any of the entities was the same as to any other entity. RC355, Schedule 6.1. As to the portfolio company advisory fees, various fees were paid over varying years between 2011 and 2016 by six different portfolio entities to Barrier or NexBank as advisors; with the exception of two years for one of the entities, each payment of an advisory fee was of a different amount.

[14] As set forth in the Expert Report of Basil Imburgia, RC408, Highland engaged in the following transactions:
- It sold 32,500 shares of Grayson CLO at a settlement amounts of $560 and $570 per share, of which $25,500 were sold to NexPoint, with a reported value of $570 per share, Table 19;
- It sold 32,250 shares of Eastland CLO at settlement amounts of $611.40 and $613.90, of which 25,250 were sold to NexPoint, with a reported value of $730 and $670, Table 20;

34

3.      Highland contends that the sales in question were not cross trades but were rather "market-bearing transactions" between Highland and an independent financial institution, which then sold to a Highland affiliate. But this contention is belied by the fact that the transactions bore all of the hallmarks of pre-arranged trades, designed to avoid obtaining the consent of the Committee. See JX-30 at 3 ("Trading assets between two affiliated accounts through a broker may be considered a Cross Trade…"). Indeed, Mr. Dondero, the Chief Executive Officer, is heard on a tape made by then-Chief Portfolio Manager Joshua Terry, suggesting "run[ning a CLO trade] through some broker," RC-263A. By using a middleman between itself and its affiliate, Highland sought to avoid the description of a "cross trade," but the reality is that the transactions were effectively cross trades and we will treat them as such.

4.      That said, however, the substance of the transaction, arguably, benefitted the Committee, because assets of the Fund were liquidated, which was a principal goal of the Plan and Scheme.  Yet the problem with these transactions is that Highland had a perfectly clear path to effectuate these trades without any question being raised as to their bona fides – it could have sought the consent of the Committee under §2.06, which consent could not be unreasonably withheld under §2.07, HC-300. We find that Highland's failure to do so constitutes a breach of the Plan.

5.      We are left with the question of whether Highland's roundabout trading method caused any damage to the Fund.  It appears Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman, and the damage to the Fund is the difference in the two values. While the Committee's expert Basil Imburgia did not use that methodology to calculate the damages associated with these trades, the information on the price paid to the funds and the price paid to the broker is set forth in the expert report of Highland's expert, Mr. Snow, HC-526 at 41.  The Committee contends that the difference is approximately $450,000. The Committee is entitled to judgment for the amount of the difference with interest from the date of the sale from the funds, Since none of the experts did the appropriate calculation, as with other items, we leave it for the parties to confer and agree upon the total amount of damages including 9% interest and we will leave the record open to resolve that amount.

---

- It sold 31,000 shares of Greenbriar at settlement amounts of $713.60 and $665.00, of which all of the shares were sold to NexPoint at reported values of $730.00 and $670.00, Table 21; and
- It sold 31,500 shares of Stratford at settlement amounts of $661.70 and $660.00, of which 25,500 were sold to NexPoint at reported values of $724.49 and $665.00, Schedule 22.

35

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 223 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 337 of 1828 PageID 9830
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 222 of 1803 PageID 10968

    L.      Failure to Settle Credit Suisse Trades/Litigation

    1.      The Committee contends that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, both by failing to settle two trades Highland made on behalf of the Fund in September 2008 with Credit Suisse (relating to the purchase from Credit Suisse of syndicated loans in the amount of $23.5/9 for properties known as Goldfield and Westgate) and by failing to settle the litigation initiated by Credit Suisse in July 2013 regarding the same trades. The Committee asserts that, despite clear legal authority requiring that Highland settle the trades and the subsequent litigation, Highland refused to do so because it sought to use its refusal to settle the trades and litigation as leverage against Credit Suisse with respect to other claims not involving the Fund that Highland had against Credit Suisse. Thus, the Committee contends Highland put its own interests ahead of the interests of the Fund. Consequently, the Committee further alleges, that by its delaying the settlement of the trades and then of the litigation, Highland caused the Fund to incur seven-plus years of statutory interest that could have been avoided but which the Fund had to pay in January 2016 when the trades and the litigation were ultimately settled.

    2.      Highland poses multiple defenses to the Committee contentions. First, Highland argues that the Committee's claim first accrued in 2008 when it allegedly failed to settle the trades and therefore was released by Section 7.01 of the Plan,[15] releasing Highland from all claims, known or unknown, "from the beginning of the world to the Effective Date" of the Plan in August 2011. Second, Highland contends that even if this claim was resurrected after the effective date of the Plan and Scheme, said claim would have arisen in 2011 and was thus barred by the three years statute of limitations for breach of fiduciary duty claims. Third, Highland argues that it did not breach its fiduciary duty as it was only exercising its legitimate business judgment in not settling the trades or the litigation and that the Committee has otherwise failed to show that Highland committed willful misconduct in this regard. Finally, Highland asserts that if the Tribunal finds that it breached its fiduciary duty, any damages that might be owing should be at a reduced amount from what the Committee claims.

---

[15] Section 7.01 provides, as follows: "Section7.01. Upon the Effective Date, each of the Consenting Redeemers, for themselves and on behalf of any of their respective officers, directors, shareholders, partners, members, employees, affiliates, investors, agents and representatives and any other person or entity entitled to assert a Claim (defined below) by, through, under, or on behalf of any Consenting Redeemer, hereby releases each of the HCM-Related Parties and each of the other Consenting Redeemers, from any and all accounts, actions, agreements, causes of action, claims, contracts, covenants, controversies, damages, debts, demands, executions, expenses, judgments, liabilities, obligations, omissions, promises, representations, and fights to payment, and all other liabilities of every kind, nature and description whatsoever, liquidated and unliquidated, fixed and contingent, matured and unmatured, disputed and undisputed, legal and equitable, state and federal, secured and unsecured, accrued and unaccmed, known and unknown, choate and inchoate (each, a "Claim"), which each Consenting Redeemer has, may have or ever had against any or all of the HCM-Related Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to each of the Crusader



Funds, including without limitation its administration and wind-down; provided, however, that such release shall not operate to release any claims arising from this Plan or based on larceny within the meaning of Section 155.05 of the New York Penal Code ("Larceny Claims"), provided that such exception shall not apply to Larceny Claims within the scope of knowledge of the releasing party as of the Effective Date. The benefit of the release in this Section 7.01, as it related to the HCM-Related Parties, is held in trust by the Crusader Funds for the HCM-Related Parties, and the Crusader Funds hereby assign the benefit of the release in this Section 7.01 in their favor."

37

3.      With respect to the issue of the release, the Tribunal concludes that Section 7.01 releases any claims that the Committee might have with respect to the failure by Highland to settle the Credit Suisse trades through the Effective Date of the Plan, but the Committee has not released any claims that arose after the Effective Date of the Plan. The Tribunal need not decide whether the continuous post-August 2011 failure to settle the trades automatically gives rise to new post-Effective Date claims; once Credit Suisse commenced litigation in July 2013 and the Committee renewed its demand that Highland settle the trades  and the litigation, and once Highland again failed to do so, a new claim arose, at least as of that point in time. This new claim would not be released under Section 7.01 since it arose after the Effective Date of the Plan. Accordingly, Tribunal views Highland's continuous failure to settle the trades and litigation after July 2013 (until January 2016, and subject to the temporary withdrawal by the Committee of its demand that Highland settle the trades and litigation in September of 2013, as discussed below) as the potentially actionable conduct that the Tribunal will analyze below.

4.      As to the statute of limitations issue, the Tribunal agrees with Highland that a three years statute of limitations applies to breach of fiduciary duty claims and therefore any conduct outside the three years limitations period is not actionable.  The Committee filed in this Arbitration its breach of fiduciary claim with respect to the unsettled Credit Suisse trades and litigation on July 5, 2016. Consequently, given the application of the statute of limitations, any claim for relief for any period prior to July 5, 2013 is barred by the statute of limitations and the Tribunal will not consider conduct prior to this date to be actionable nor will it consider any claim for damages for the period prior to July 5, 2013.

5.      The Tribunal finds that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, by failing to settle the two subject trades with Credit Suisse. The Tribunal finds that, whatever strategy Highland intended or whatever judgment calls it made, or purported to make, with respect to the settlement of these trades, it was under a clear legal obligation to settle the trades but failed to do so.

Appellee Appx. 00218

APPX. 03073

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 226 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 340 of 1828 PageID 9833
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 225 of 1803 PageID 10971

6.      Highland's then General Counsel admitted to at least a general awareness of the legal obligation under the LSTA regime to settle trades promptly (and to litigate later if there is a dispute regarding same). Tr. 10 288:2-12, 290:13-22, 291:15-20; and there is other evidence to the same effect. See, e.g., JX-12 at RC00100770-771. Despite this clear legal obligation, and despite Committee requests that it do so, Highland refused to settle the trades in order to provide itself with leverage vis-a-vis Credit Suisse on another dispute. Even if, as argued by Highland, its prevailing on this other dispute would advantage the Fund, once the Committee demanded that Highland settle the trades, as it first did during the limitations period on August 7, 2013, Highland should have done so given both the acknowledged weakness in its defenses and that its purported goal in not doing so at least primarily advantaged itself and not the Fund (even if the Fund might have gained some marginal potential advantage if Highland prevailed in the other dispute). In light of the preceding, Highland's refusal to settle the trades constitutes willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors.

7.      The Tribunal finds that the actionable willful misconduct by Highland for which damages will be due occurred during the period September 8, 2014 through January 14, 2016. The reason for the end date is clear and undisputed: on that date, Highland caused the Fund to pay for the trades and the interest due. As for the start date, the earliest possible start date, in light of the above analysis, is August 7, 2013 which is when the Committee first demanded during the limitations period that the trades be settled. But, in September 2013, counsel for the parties interacted and the Committee withdrew its demand that Highland settle the trades. HC-476a. The Committee argues that it was not apprised by Highland of relevant information at the time, and therefore the Fund should not be bound by its agent's withdrawal of the demand, but the Tribunal concludes that, notwithstanding Highland's failure to provide this information, the Committee's counsel independently analyzed the relevant issues and the Committee is responsible for the decisions flowing from that analysis. On or around September 8, 2014, after the trial court entered summary judgment in favor of Credit Suisse in the litigation, the Committee reinstated its demand that Highland settle the trades; since Highland did not do so until January 14, 2016, it is, under our analysis above, responsible for damages accruing during the period from September 8, 2014 through January 14, 2016.

8.      The Tribunal adopts the damages theory advanced by the Committee: the pre-judgment interest that the Fund had to pay during September 8, 2014 through January 14, 2016, minus the gain it achieved during the same period by virtue of having the use of the subject $23.5 million. However, neither party presented a damages analysis consistent with the preceding parameter. Accordingly, the Tribunal directs that the Parties jointly confer to calculate an amount of damages that takes into account the following parameters: (i) the damages period is between September 8, 2014 and January 14 , 2016; (ii) the 9% statutory interest (ordered by the New York State Supreme Court in September 2014) is to be applied on a simple basis to the total principal amount due ($23.5 million); (iii) the amount of the "off-set" is to be calculated using the factor utilized by Claimant's expert – the Treasury Yield Rates for the damages periods specified in (i); and (iv) 9% statutory, pre-judgment interest is to be applied on a simple basis to the result of the calculations in (i) – (iii) from January 14, 2016 to the date of this Partial Final Award.

M.      The Delay in Settling the UBS Litigation

1.      As noted above, Highland, Crusader and Credit Strategies were parties to an action commenced by UBS which alleged that certain securities had been fraudulently transferred by Highland to the funds. As a result, the funds were enjoined from transferring the subject assets during the course of the litigation.

2.      In May 2015, UBS, Highland, Crusader and Credit Strategies reached an agreement in principle to settle the litigation. Under the terms of that agreement Crusader was to pay UBS $25 million and Highland was to pay $35.75 million. A separate agreement between the Committee and Highland provided that, no sooner than December 30, 2016, Highland could recapture $33.75 million through incentive fees that could be generated through the liquidation of Crusader assets. RC-227.

3.      The settlement agreement was to be finalized on May 30, 2015, but Highland refused to go through with the settlement because Credit Strategies would not release claims against Highland. Tr. 3 21:10-22:3; Tr. 3 24:16-25:6; Tr. 10 316:20-317:23. Ultimately the Committee negotiated a its own settlement, pursuant to which Crusader paid UBS $25 million on July 1, 2015, and an additional amount of $30 million on December 29, 2015.

4.      The Committee argues that, had Highland not blown up the original settlement, it would not have had to pay the $30 million to UBS on December 29, 2015, and it would have retained those funds at least until December 30, 2016, when that amount might have been transferred to Highland if it had earned that amount in incentive fees. The Committee, therefore, seeks as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

40

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 228 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 342 of 1828   PageID 9835
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 227 of 1803   PageID 10973

5.      Highland denies that it has any liability and asserts that is protected by the business judgment rule. It also argues that 9% interest is not appropriate. Further, Highland urges that the Committee's expert did not otherwise account for the fact that Highland might have earned $33.75 million in incentive compensation and, therefore, there was a net benefit to the fund.

6.      There is no basis for Highland's claim that its conduct is protected by the business judgment rule. In deciding whether or not to settle the UBS litigation, Highland was acting as a fiduciary with respect to Crusader and had a fiduciary duty not to place its own interests above that of Crusader. As the New York Court of Appeals stated in Birnbaum v. Birnbaum, 73 N.Y. 461, 466 (1989):"It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect . . . . This is a sensitive and ' inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a  fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (Citations omitted.)"

7.      Thus, Highland was not free to place its own interests above that of Crusader and had an obligation to settle UBS's claims against Crusader regardless of its concerns about possible claims against it by Credit Strategies.

8.      There can be no question that Highland's action in refusing to settle with UBS resulted in Crusader being deprived the use of $30 million in cash between July 1, 2015 and December 30, 2016, the first day on which Highland would have been entitled to receive any of the incentive fees. Here, as with the Deferred Fees, it is appropriate to award interest on that amount at the rate of 9% to compensate Crusader for that loss.

Appellee Appx. 00221
APP. 03036

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 229 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 343 of 1828    PageID 9836
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 228 of 1803    PageID 10974

9.      The problem with Highland's claim that it might have earned an incentive fees of $33.75 million is that Highland offered no evidence that would suggest that its incentives fees would ever have reached even the $30 million amount that the Committee is willing to concede might have been reached. Since the original settlement agreement was negotiated at a time when there was no plan in place to terminate Highland as the fund manager, the incentive fee structure was based on events that would ultimately occur in periods after the Committee terminated Highland. Since neither party made any effort at the hearing to calculate incentive fees, it seems apparent that such a calculation was not possible. In these circumstances, the Committee's assumption that Highland would have earned $30 million in incentive fees by December 29, 2016 is generous and there is no basis for a finding that Highland would have earned more than that in incentive fees.

10.     We award Claimant as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

N.      Cornerstone

1.      Highland Cornerstone Healthcare Group ("Cornerstone") is a company that owns Long Term Acute Care (LTAC) hospitals in which the Fund owns a minority equity interest. At the time of the adoption of the Plan and Scheme, Highland owned or controlled 100% of the shares of Cornerstone. Two groups of funds, Crusader Funds and Highland Credit Strategies Fund ("Credit Strat"), owned more than 50% of the shares of Cornerstone. Between 2011 and 2013, Highland was secretly engaged in the process of valuing and, eventually, selling the interest held by Credit Strat in Cornerstone. In September 2013, after a process in which the Credit Strat Redeemer Committee was kept completely in the dark as to the sales process that was underway, and which was later found to be unfair to the investors in Credit Strat, see RC-306, Highland arranged for the purchase of Credit Strat's interest by Cornerstone itself at the price of $2,956.03 per share, see JX-16. This price was below the most recent mark set by Highland, and below the value of between $3,424 and $4,434 per share that Highland's investment bankers, Houlihan Lokey, found to be fair for the purchase of the minority interest, see HC-431.

42

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 230 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 344 of 1828   PageID 9837
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 229 of 1803   PageID 10975

2.      Following the purchase of the Credit Strat interest, the Crusader Funds owned 41.8% of Cornerstone, see RC-138 at 7. The Crusader Funds learned of the sale and made known their interest to Highland in having their interest in Cornerstone sold.  But when Highland offered to buy their interest for the same price of $2,956.03 per share as the Credit Strat interest, the Committee engaged Ernst & Young ("E&Y") as its advisor to analyze the offer and prepare a response. E&Y prepared two analyses of the value of the Cornerstone asset. The first, HC-577, found that, as of the fall of 2013, "Cornerstone's offer to purchase Crusader's share for $43.8 mm is below Crusader's current carrying value and at the low end of the range of values developed in this Report" and that "based on information provided and reviewed to date it would appear that the lower end of the range is more reasonable to expect that (sic) the higher end of the range," Id. at 5.

3.      The Committee then requested that E&Y prepare a supplemental report, and, in January 2014, E&Y rendered a second report, finding that Cornerstone underperformed expectations for 2013 and that the changes occurring in the healthcare field were creating uncertainty in the industry in which Cornerstone operated.  HC-577 at 19. E&Y reduced its range to $44 million to $63 million, by imposing a discount from its prior range as of year-end 2013 by 10% to 25%. In discussions with counsel to the Committee, E&Y suggested countering with a purchase price in the range of $50 million to $54 million "for negotiation purposes." Id.

4.      Thereafter, on March 28, 2014, after the Committee had considered its options, it made a counter-offer within the range suggested by E&Y at $52,342,188, or $3,529 per share, plus a 50% recapture provision in the event of a sale within three years. JX-18.  The counter-offer was at the 2013 year-end market value, as calculated by Highland. Id. Highland never responded to this counter-offer despite repeated overtures to Highland by the Committee, and despite the desire of the Claimant Redeemer Committee and the mandate of the Scheme and Plan to liquidate all of the assets of the Crusader Fund, the interest in Cornerstone held by the Crusader Funds has not been sold.

5.      Claimant contends that the failure of Highland, during the period it was the investment manager of the Funds, to make any good faith effort to sell the Funds' shares in Cornerstone, constituted a breach of fiduciary duty.

6.      As part of its claim of breach of fiduciary duty, the Committee urges that Highland is collaterally estopped from denying the findings of the arbitration tribunal in the arbitration brought by the Redeemer Committee of Credit Strat arbitration tribunal regarding, inter alia, the Cornerstone transaction. RC-306 (4/6/16 Credit Strategies Fund Final Award).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 231 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 345 of 1828   PageID 9838
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 230 of 1803   PageID 10976

7.      In particular, as it bears on this dispute, the Committee contends that Highland is
estopped from denying the following findings: (1) Highland controlled Cornerstone; (2) the
per share price at which Highland sold Credit Strat's interest was unfair; and (3) a price of
$3,929 per share was a fair price, based upon the Houlihan Lokey valuation.

8.      Highland contends that the Credit Strat Tribunal's findings do not bind Highland in
this proceeding, because the two arbitration proceedings deal with "fundamentally different"
issues, such that collateral estoppel does not apply.

9.      First, Highland urges that the Credit Strat Tribunal was dealing with the ramifications
of a consummated sale, where it found that Highland controlled both Cornerstone's offer and
Credit Strat's acceptance. HC-220 at 8, 30, whereas in this proceeding, the evidence is that
Cornerstone made an offer to the Committee, but Highland had no role in the Crusader
Fund's evaluation of or counter to that offer and no sale occurred.

10.     Secondly, Highland points out that in Credit Strat, the retention of Houlihan Lokey
and the entire process that Houlihan Lokey engaged in was a secret that the Credit Strat
Committee was unaware of, whereas, in this proceeding, the Houlihan report as well as other
financial information was made available to the Crusader Committee, HC-577 at 577.0002,
Tr. Day 5 at 114:12-117:18 (Zambie).

11.     The doctrine of collateral estoppel requires that an issue being litigated in the second
case be the same as was fully litigated by the same party in the first action. Fuchsberg &
Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002) ("[C]ollateral estoppel prevents a party
from relitigating an issue decided against that party in a prior adjudication. It may be
invoked to preclude a party from raising an issue (1) identical to an issue already decided (2)
in a previous proceeding in which that party had a full and fair opportunity to litigate.")
(internal quotations and citations omitted).

12.     Although there are differences in the way in which the sale process took place, we do
not find that such differences obscure the fact that some issues are substantially identical in
both proceedings.

44

Appellee Appx. 00224
APP. 08789

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 232 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 346 of 1828 PageID 9839
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 231 of 1803 PageID 10977

13.     The principal finding that we think is binding on Highland in this proceeding is that the price of $3,929 per share, based upon Houlihan Lokey's valuation, was a fair price. Claimant also argues that Respondent is bound by the finding that the offering price Highland made for the Credit Strat position, which was the same price as offered to the Redeemers Committee here, was unfair. But we think that finding would fly in the face of Claimant's own adviser, E&Y, who found that such a price was at the low end of a fair range. Accordingly, we do not think it appropriate to adopt such a finding as binding in this proceeding.

14.     Highland also contends that, with respect to the possible sale of the Cornerstone interest, it was not in a fiduciary relationship with the Committee, which was relying on EY for negotiating assistance, not on Highland, as Highland was sitting opposite to the Committee in the negotiation.  Tr. Day 5 at 116:10-117:18 (Zambie).

15.     While the Committee was not relying on Highland for financial advice or guidance with respect to Cornerstone in the period between the Fall of 2013, when an offer of $2,956.03 per share was made, and the early Spring of 2014, when the counter-proposal were made, the Committee did rely on Highland, in its role as investment manager, both before and after those dates, to liquidate the Fund as rapidly as possible.

16.     But by Highland's choosing to have the Crusader Funds, along with several other entities controlled by Highland, invest in Cornerstone, Highland voluntarily placed itself in a conflict position: it owed fiduciary obligations to the Crusader Funds to maximize the liquidation process, while being the control person of Cornerstone whose own interests were to have any purchase price be as low as possible. As investment manager, Highland was obligated to be fully responsible to the Committee, but could not do so as long as it also continued to play an active role as controlling party of Cornerstone with respect to the Committee's desire to sell.

17.     The hearing record is that, other than making the offer in September 2013, Highland took no steps to market or sell the Fund's interest in Cornerstone. Tr. 1 347:16-349:2; 364:12-22.  At meetings held with representatives of the Committee, the Committee asked about plans to sell assets and Highland never discussed, or appeared to have a plan by which it proposed to sell the Cornerstone asset. Tr. 1 349:4-22; 365:13-17; Tr. 4 55:14-20; RC-317 at 2("Mr. Jameson noted that for the remainder of the portfolio, formal strategies for disposition are not in place.").  When Committee representatives met periodically with Jim Dondero, the CEO, he made it clear that he ran the sales operation completely and did not wish to be questioned or have the portfolio managers questioned as to the timing of any particular sale.

45

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 233 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 347 of 1828 PageID 9840
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 232 of 1803 PageID 10978

18.     We find that Highland had a fiduciary duty not to place its own interests above that of Crusader, Birnbaum v. Birnbaum, 73 N.Y. at 466 (1989), but rather to subordinate its own economic interests behind its fiduciary obligation to the Crusader Funds. Guth v. Loft, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983) ("There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."); see also Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. 2013). Highland's failure to subordinate its own interests to those of the Committee led directly to its failure to engage in a fair negotiating process with the Committee. By failing to do so, Highland breached its fiduciary duty to the Fund.  Caruso v. Metex Corp., 1992 WL 237299, at *16 (E.D.N.Y. July 30, 1992), People ex rel. Spitzer v. Grasso, 50 A.D.3d 535, 546 (1st Dep't 2008). That breach of fiduciary duty was a continuing offense through the period of time that Highland was the investment manager of the Crusader Fund, as Highland never itself took, or authorized Cornerstone to take, any action in response to the counter-offer that was made in February 2014.

19.     Highland argues that the Committee must overcome the business judgment rule that "the defendant [fiduciaries] have acted on an informed basis and in the honest belief they acted in the best interest of the [client]," citing CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd., No. 03 CIV. 7936 (DAB), 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007), in turn citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)("While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply.").

20.     But here, we find that Highland's decisions regarding the purchase of the Cornerstone shares from the Crusader Funds — from the offer to purchase, the ignoring of the counteroffer, and the failure to engage in or authorize a negotiation process — were made with the willful intent to benefit itself and not the Crusader Funds investors. See JX-19; Tr. 1 379:17-380:8. The Business Judgment Rule does not protect Highland or its officers from scrutiny for alleged breaches of fiduciary duty under these circumstances.

46

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 234 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 348 of 1828    PageID 9841
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 233 of 1803    PageID 10979

21.    The question then is what is the appropriate price at which the sale should take place.  "[I]n determining whether a fiduciary has acted prudently, a court may examine a fiduciary's conduct throughout the entire period during which the investment at issue was held. The court may then determine, within that period, the 'reasonable time' within which divesture of the imprudently held investment should have occurred. What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary. The test remains 'the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs' (id., at 511 [citations omitted])." Matter of Estate of Janes, 90 N.Y.2d 4, 54 (1997); Public Service Co. of Colorado v. Chase Manhattan Bank, N.A., 577 F.Supp. 92, 107 (S.D.N.Y.1983) (Lumbard, CJ, sitting by designation)("where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time," (quoting Scott on Trusts)).

22.    To satisfy its obligation under the Plan to liquidate the Fund's assets as rapidly and as fairly as possible, Highland did not have "to cause Cornerstone to purchase the Fund's Cornerstone shares for a specific price and at the specific time demanded by the Committee…," Highland Post-Hearing Brief at 11, but it did have a duty to place the Funds' interest above its own and to obtain the best price possible for the Funds' Cornerstone interest. Thus, when it decided it wished to make an offer to purchase the Funds' Cornerstone shares, it was obligated to do so at the fair market value and not to attempt to take advantage of the fact that it had placed the funds in a position where it was the only available buyer.

23.    Highland argues that it makes no sense to assess damages based upon a hypothetical sale of the Cornerstone asset, because, first, since the shares have never been sold, there is no realized loss; and, second, "other than Cornerstone's $43.8 million offer, there is no evidence of any other willing buyer for Cornerstone's assets at any price."

24.    We reject the first argument because it ignores what we have found to be the breach of fiduciary duty —the obligation to pursue and consummate a sale at a fair and reasonable price. The Fund was damaged by reason of Highland's failure to fulfill that obligation.

47

**Appellee Appx. 00227**
**APP. 03094**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 235 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 349 of 1828   PageID 9842
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 234 of 1803   PageID 10980

25.     As to the second argument, Highland defeats its own argument by pointing out that, in the real world, there is only Cornerstone available as a buyer.  But, because of Highland's own financial objectives, there has been no indication since April 2014 when it failed to authorize a counteroffer that Highland was interested in directing Cornerstone, which it controlled, to make an offer to purchase the shares at anything other than a bargain basement and unfair price.

26.     Using our equitable powers, we believe that a fair price can be derived by using the fair market value of the shares of $3,929 per share, based upon Houlihan's valuation prepared on July 15, 2013, adjusted downward by 10-25% by the year-end discount caused by several factors cited by E&Y. The average of that discount results in a fair market valuation of $3,241.43, which amount is what we find should have been offered to pay for the Cornerstone shares.

27.     We order that Highland pay to the Committee $3,241.43 per share, or $48,070,407, and order that the Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland.

28.     With respect to an award of pre-judgment interest, "[a]lthough an action for breach of fiduciary duty is generally considered of an equitable nature, '[e]ven on [such] a claim with equitable underpinnings ... prejudgment interest [is] mandatory where the only relief sought was compensatory damages.' Lewis v. S.L. & E., Inc. 831 F.2d 37, 39 (2d Cir.1987) (citing Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir.1973))(emphasis added).

29.     Regarding the rate of pre-judgment interest to be applied, Claimant argues for the application of New York's statutory rate of interest of 9% as most appropriate. Under CPLR §5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." See  212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125(A), at *9 (Sup. Ct. N.Y. Cnty. 2007); Panix Prods., Ltd v. Lewis, id; Summa Corp. v. Trans World Airlines, 540 A.2d 403, 409 (Del. 1988).

30.     Under CPLR §5004, New York applies pre-judgment interest at 9%, simple annual interest. Under the circumstances here, where the breach of fiduciary duty deprived the investors of the Crusader Funds of a significant distribution and partial return of their equity, we exercise our "broad discretion, subject to principles of fairness, in fixing the rate to be applied," Summa Corp. v. Trans World Airlines, Inc., id., and we award interest at the statutory rate of 9%, simple annual interest, pursuant to New York law, from April 15, 2014, through the date of this Partial Final Award. We pick this date as it is the date by which we believe Highland and/or Cornerstone (as controlled by Highland) should have responded to the Committee offer.

IV.    The Return of the Deferred Fees

48

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 236 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 350 of 1828 PageID 9843
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 235 of 1803 PageID 10981

A.     Under §§2.02 and 6.02 of the Plan, if Highland distributed $1.7 billion within 43 months of the Plan's Effective Date, Highland could obtain $10 million in Deferred Fees that had been placed in the special account at the outset to incentivize Highland's rapid liquidation. There is no question that Highland did not meet that goal by the 43rd month and, thus, in Count Three of its Amended Demand, the Committee seeks the immediate return to the Fund of those proceeds by a declaration that the Fund should distribute the right to receive payment in respect of the funds in the Deferred Fee Account to the Consenting Compulsory Redeemers.

B.     Highland objects on the ground that the UBS TRO eliminated the 47-month schedule applicable to the Deferred Fee Account, invoking the Impossibility Doctrine, discussed in detail above, and argues that, upon the eventual complete liquidation of the Fund, it will be entitled to the $10 million in the Deferred Fee Account.

C.     For reasons set forth earlier, we reject the argument that, under the Impossibility Doctrine, Highland was relieved of the requirement that it achieve complete liquidation of the Fund within 43 months, and, thus, is entitled to the $10 million in Deferred Fees upon complete liquidation. Highland had the opportunity to achieve the complete liquidation despite the duration of the UBS TRO, but chose, for its own reasons, not to do so. The Impossibility Doctrine does not provide a basis for granting Highland affirmative relief.

D.     We order the return to the Crusader Fund the $10 million in the Deferred Fee Account.

V.     Counterclaims

A.     Respondent has brought two principal counterclaims: first, it seeks to recover the remainder of Deferred Fees to which it says it is entitled now because Claimant should have completed the complete liquidation of the Fund's assets by December 31, 2017, at the latest; and, second, it seeks damages against the Committee for breach of the Plan and of its fiduciary duties to Highland by failing to oversee A&M's liquidation of Fund assets and for approving, without adequate, if any, scrutiny, A&M's fees, said to be exorbitant.

B.     As to the breach of fiduciary duty claim, the fiduciary duty relation is said to arise from Highland's status as an investor in the Crusader Funds. Highland's Post-Hearing Brief at at 3-5. However, we have previously stricken those portions of Highland's Amended Counterclaim that alleged it was suing as an investor. Panel Order, April 1, 2018, at 4. Furthermore, even assuming that, as an investor, Highland had standing to bring a claim for breach of fiduciary duty, as stated below, we find that no breach of duty has been proved with respect to any of the allegations in Respondent's Amended Counterclaim.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 237 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 351 of 1828    PageID 9844
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 236 of 1803    PageID 10982

C.      Specifically, we have examined the record thoroughly and, aside from the testimony of
Highland's expert, James Finkel, and its former portfolio manager, Mr. Jameson, there is insufficient
evidence of a purposeful and wrongful delay in liquidation or a failure by the Committee to oversee
and scrutinize A&M's performance, nor any activity of A&M that the Committee aided and abetted
that was proved wrongful.

D.      Mr. Finkel had a distinguished thirty-plus year career in capital markets, investment
banking, and investment advisory work, including as a liquidator of the assets of alternative
investment funds. But his opinion that Highland or any reasonable manager or liquidator would
have completed liquidation by the end of 2017, at the latest, was not based on anything more than
his unverified judgment, and not on a close examination of the facts in this record. For example, he
conceded that, in reaching his opinions, he didn't consider the amount of information A&M
provided to investors, didn't review A&M's time records or evaluate the quality of the work
performed by A&M, and didn't consider the consequences of the lack of cooperation of Highland
with A&M, among other critical deficiencies. Tr.10 367:10-372:3. Similarly, his opinion that,
because of what he regarded as a flawed compensation structure, A&M's primary focus was on the
time it spent on projects, rather than on results achieved, was based on one assumption that time-
based work is, inevitably, less likely to be focused, an assumption that we reject as a sound basis of
criticism of A&M's contribution. We find that Mr. Finkel's opinions were not soundly based and
we reject them.

Appellee Appx. 00230
APP. 03093

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 238 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 352 of 1828 PageID 9845
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 237 of 1803 PageID 10983

E.      Mr. Jameson worked for Highland for almost seven years as co-head of Private Equity, responsible for sourcing and executing private equity investments and monetizing existing portfolio companies. He testified that he was aware of the UBS TRO and had been advised that he could not sell assets during its pendency. He was aware that Cornerstone did not comply with requests by A&M for information but did not think he had the power to direct Cornerstone to do so Tr 10 28:18-30:3. He also testified that, had Highland remained as its investment manager, it would have sold the Cornerstone asset by December 31, 2017, and that Highland Capital's purchase of Cornerstone from the Crusader Fund at a negotiated price around the mark set by Highland would have been logical. Tr. 10 30:4-35:23. He also testified, in response to questioning by the Tribunal, that little, if anything, would have changed in Highland's ability to negotiate a sale with the Committee when it was replaced by A&M as its investment manager, Tr. 10 119:8-121:23.  On balance, despite Mr. Jameson's on-the-ground role as portfolio manager, his testimony did not support the allegations of Highland in its counterclaims; if anything, his intimate understanding of the Cornerstone asset and how Highland controlled the process by which Cornerstone was or wasn't being marketed supported the Committee's contentions that Highland could have negotiated a fair disposition of the Cornerstone asset had it chosen to do so.

F.      As to an alleged delay in the liquidation of the Fund's assets, the weight of the credible evidence is that Highland, not A&M, was responsible for any delay in liquidating the balance of the assets in the Crusader Fund after Highland was discharged and A&M was retained.

1.      We note that we have previously found that Highland, after refusing to respond to numerous requests by the Committee for books and records, should make a thorough search of its books and records and produce all non-privileged documents in its possession, custody, or control on certain relevant topics. Thus, we rejected several arguments put up by Highland to prevent the Committee and A&M from gaining access to critical books and records. Order and Partial Award, April 21, 2017.

51

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 239 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 353 of 1828    PageID 9846
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 238 of 1803    PageID 10984

2.      But, even when ordered to do so, Highland again refused to produce documents on at least two other occasions, requiring additional motions addressed to this Tribunal, Order, June 20, 2017; Order, October 21, 2017.

3.      In addition, there was unrebutted testimony that Highland produced "hundreds of thousands" of documents in single-page PDF format, requiring the better part of three or more months of A&M's time to correlate and organize. Tr. 6 25:4-19.

4.      By contrast, other than Mr. Finkel's testimony, there was little or no evidence of A&M's procrastinating or proceeding with deliberate slowness or that the Committee failed in its oversight of A&M.

5.      We have considered all of the other factual and legal arguments made by Highland in support of its counterclaims and conclude that Highland is not entitled to recover the remaining Deferred Fees being held in the Fund's cash account and that the Committee did not breach Sections 2.02 of the Plan and 1.5.2 of the Scheme, the covenant of good faith and fair dealing, or its fiduciary duties to Highland and other investors. We dismiss Highland's counterclaims in their entirety.

VI.     Attorneys' Fees and Other Costs

A.      Both parties have requested attorneys' fees relating to all claims asserted in the Amended Demand, Highland's Answer, Highland's Amended Counterclaims, and Claimant's Answer to the Counterclaims. Am. Dem. at 53-54; Highland Answer, October 16, 2016, at 21-22; Highland Am. Counterclaim, April 15, 2018; Committee Answer to Counterclaims. Under AAA Commercial Arbitration Rules, Rule 47(d)(ii), those mutual demands for attorneys' fees submitted the issue to arbitration and gave this Panel the authority to award attorneys' fees, in its discretion. AAA Rule 47(d)(ii). "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." R.F. Lafferty & Co., Inc. v. Winter, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted).

B.      The Committee urges that an award of attorneys' fees to it is justified by Highland's having "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," InterChem 59 Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (citation omitted), and that the record shows numerous examples of Highland acting in bad faith.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 240 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 354 of 1828 PageID 9847
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 239 of 1803 PageID 10985

C.    Highland acknowledges the Tribunal's discretion to order an award of attorneys' fees but
opposes an imposition of attorneys' fees here. First, Highland argues that denying the Committee's
request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that
"each of the Crusader Funds retains obligations it has to pay . . . legal fees." HC-300 at 86. But this
section of the Plan does not deal with the issue of fee-shifting being ordered by an arbitral tribunal.
Nor, given Rule 47(d)(ii), would an order of this Tribunal shifting the responsibility of fees from one
party to another be contrary to the so-called American rule, as both parties have sought this relief
which is authorized under the prevailing rules of this Tribunal.

D.    Second, Highland urges that the only basis upon which the Committee is seeking an award is
that Highland allegedly engaged in bad faith and vexatious conduct, citing only InterChem Asia
2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005). Highland points
out that the Court in InterChem Asia justified an arbitrator's imposition of an award of attorneys'
fees because of one party's "bad faith" conduct during the arbitration, principally concerning
discovery issues. Here, the Committee cites seven examples of alleged bad faith, but only one dealt
with such conduct during the arbitration, "failing to provide the Committee with the books and
records of the Fund, resulting in an extensive discovery process, producing records as single-paged
TIFs, and resulting in a Panel ruling against them," citing the Tribunal's Panel Opinion and Final
Partial Award, dated April 17, 2017.

E.    We are exercising our discretion to grant Claimant's request for attorneys' fees and costs and
to deny Respondent's request for the same relief. We do not base our award on any concern of bad
faith or oppressive conduct by Highland's able trial counsel, who acted professionally throughout
these proceedings. However, with respect to each of the claims on which we have determined that
the Committee is entitled to prevail, we have noted above the many occasions where, during the
time it was investment manager and thereafter, Highland engaged in conduct that breached the
Plan, breached fiduciary duties, involved secrecy, misrepresentations, and false statements by the
most senior executives, and constituted willful misconduct. Furthermore, large portions of the
defense set forth by Highland's witnesses were unworthy of belief and reflect the fact that Highland
knew that it had no legitimate defense to many of the Committee's claims. Accordingly, in our
discretion, based on the foregoing, we award Claimant its legal fees and costs for the litigation of
this arbitration.

VII.    CONCLUSION AND AWARD

A.    With respect to the claims below for which we find liability and direct the payment of
damages and interest, if the Parties are not able to agree on the amount of damages or interest, we
direct them to submit simultaneous briefs to the Panel on the issues within thirty (30) days of the
date of this Partial Final Award; there will be no reply briefs unless otherwise directed.

B.    We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach
of contract claims as follows:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 241 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 355 of 1828 PageID 9848
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 240 of 1803 PageID 10986

1.      The taking of the Deferred Fees: We order that, within twenty (20) days of the date of
this Partial Final Award, Respondent, Highland Capital Management, pay to the Claimant
the Deferred Fees in the amount of $33,313,000, with statutory interest of 9%, calculated on
a simple basis, from the dates of taking in January and April 2016 through the date of this
Partial Final Award.

2.      The payment of Distribution Fees: As found above, with respect to each of the
following categories, we find that the Respondent is liable for damages in the amount set
forth in the Expert Report of Claimant's damages expert, Basil Imburgia, $14,452,275, plus
9% interest, calculated on a simple basis, from the respective dates such Fees were taken:

a)      The Distribution Fees attributable to the payment of Deferred Fees;

b)      The Distribution Fee attributable to the amounts reserved in the Redeemer
Trust Account;

c)      The Distribution Fee attributable to the amounts paid in settlement of the
Barclays claims;

d)      The Distribution Fee attributable to the value of the LP interests and amounts
transferred to Eames;

e)      The Distribution Fees attributable to the amount of margin borrowings; and

f)      The Distribution Fees attributable to the cumulative nature of the calculation,
as discussed above.

Appellee Appx. 00234
APP. 0309

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 242 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 356 of 1828   PageID 9849
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 241 of 1803   PageID 10987

C.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of fiduciary duty claims as follows:

1.      Engaging in related party transactions without Redeemer Committee approval:

2.      Purchase of Plan claims without Redeemer Committee approval: Within twenty (20) days of the date of this Partial Final Award, we order Respondent, Highland Capital Management, to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase, calculated on a simple basis;

3.      Sale of CLO interests - The Committee is entitled to judgment for the amount of the difference between the sale and repurchase prices with interest from the date of the sale from the funds. We direct the Parties promptly to confer and agree upon the total amount of damages including 9% interest, calculated on a simple basis; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

4.      Failure to settle Credit Suisse claims: We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on this claim and direct the Parties promptly to confer to calculate an amount of damages that takes into account the parameters set forth in the body of this Award; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

5.      The UBS litigation: We find in favor of Claimant, Redeemers Committee of the Highland Crusader Fund, and award damages in the amount of 9% simple interest on $30 million from December 29, 2015 to December 30, 2016, which shall be paid to the Redeemer Committee by Highland Capital Management within twenty (20) days of the date of this Partial Final Award; and

6.      The Cornerstone Asset: We find in favor of Claimant and direct Highland Capital Management, within twenty (20) days of the date of this Partial Final Award, to pay the Redeemer Committee the amount of $48,070,407, plus interest at 9%, on simple basis, in return for which the Fund will transfer title to the shares to Highland.

D.      We grant Claimant's request for a declaratory judgment, seeking the immediate distribution of the Deferred Fee Account, and order the payment of the $10 million in the Account to the Committee for disbursal to the Consenting Compulsory Redeemers within twenty (20) days of the date of this Partial Final Award.

55

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 243 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 357 of 1828    PageID 9850
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 242 of 1803    PageID 10988

E.      We find against Respondent on its counterclaim and dismiss the counterclaim with prejudice.

F.      We grant Claimant's request for reasonable attorneys' fees and costs and deny Respondent's request for an award of attorneys' fees and costs. With respect to the amount of fees and expenses that Claimant seeks, the parties should promptly confer to determine whether they can agree on an amount. If the parties can not agree, Claimant shall file an affidavit or petition setting out its claim with appropriate documentation within fifteen (15) days of the date of this Award, unless counsel agree otherwise. Respondent shall respond within fifteen (15) days thereafter, unless counsel agree otherwise. There will be no reply opportunity absent leave of the Tribunal.

G.      We will leave the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal.

Appellee Appx. 00236
APP. 08793

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 244 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 358 of 1828    PageID 9851
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 243 of 1803    PageID 10989

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

David M. Brodsky, Chair

John S. Martin, Jr.

Michael D. Young

54

Appellee Appx. 00237

APP. 03794

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 245 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 359 of 1828 PageID 9852
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 244 of 1803 PageID 10990

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019


_____
David M. Brodsky, Chair


_____
John S. Martin, Jr.


_____
Michael D. Young

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 246 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 360 of 1828 PageID 9853
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 245 of 1803 PageID 10991

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____

David M. Brodsky, Chair

_____

John S. Martin, Jr.

_Michael Young_
_____

Michael D. Young

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 247 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 361 of 1828   PageID 9854
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 246 of 1803   PageID 10992

State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in
and who executed this instrument, which is our Partial Final Award.


___3/6/19___                         _____
Date                                     David M. Brodsky, Chairperson



State of NEW YORK                    )

                                     )    SS:

County of NEW YORK                   )

On this __6__ day of MARCH, 2019, before me personally came and appeared David M. Brodsky, to
me known and known to me to be the individual described in and who executed the foregoing
instrument and he acknowledged to me that he executed the same.


_____
Notary Public

        MEENA M. GULATI
Notary Public, State of New York
        No. 01GU5015872
Qualified in New York County
Commission Expires August 2, 20 21

55

Appellee Appx. 00240
APP. 08793

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 248 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 362 of 1828   PageID 9855
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 247 of 1803   PageID 10993

State of FLORIDA                )

                                )   SS:

County of LEE                   )

I, JOHN S. MARTIN, JR.,, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

Date  March 5, 2019                                    John S. Martin, Jr.

State of Florida                )

                                )   SS:

County of Lee                   )

On this 5th day of MARCH, 2019, before me personally came and appeared John S. Martin, Jr.,, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 249 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 363 of 1828   PageID 9856
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 248 of 1803   PageID 10994

State of NEW YORK                )

                                 )   SS:

County of NEW YORK               )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and
who executed this instrument, which is our Partial Final Award.

3 -5- 19                                    _Michael Young_
_____                            _____
Date                                        Michael D. Young

State of NEW YORK                )

                                 )   SS:

County of NEW YORK               )

On this  5  day of MARCH, 2019, before me personally came and appeared Michael D. Young, to me
known and known to me to be the individual described in and who executed the foregoing instrument and
he acknowledged to me that he executed the same.

_Vickie L. Johnston_
_____
Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 250 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 364 of 1828   PageID 9857
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 249 of 1803   PageID 10995

# APPENDIX 3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 251 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 365 of 1828   PageID 9858
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 250 of 1803   PageID 10996

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

Claimant,

v.                                                 Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Respondent.

---

**FINAL AWARD**

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with
Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into
between the above-named parties and adopted in July 2011, and having been duly sworn, and
having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

    A. On March 6, 2019, we issued a Partial Final Award, finding Respondent Highland
Capital Management, L.P. ("Respondent") liable in a number of respects and awarding
damages, interest, attorneys' fees, and costs to Claimant Redeemer Committee of the
Highland Crusader Fund ("Claimant"), as described, in relevant part, below. We "le[ft]
the hearing open until all issues set forth ... have been agreed upon by the Parties or
decided by the Tribunal."

    B. In response to an email from Claimant, dated March 7, 2019, seeking clarification on an
apparent omission from the Partial Final Award, we issued a Disposition of Application
for Modification of Award dated March 14, 2019 ("Modification of Award").[1]

    C. This Final Award incorporates the Partial Final Award and the Modification of Award
(together, the "Partial Award"). We re-adopt all prior findings and conclusions of the
Partial Award, except as specifically modified hereinafter.

    D. We have before us the following:

---

[1] The Modification of Award referred to Rule R-46 of the AAA Commercial Arbitration Rules, instead of
Rule R-50, as the basis for the modification of a clerical error, relying upon the predecessor version of
Rule R-50. The substantive text of old Rule R-46 and present Rule R-50 are the same.

Appellee Appx. 00244
APP. 08109

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 252 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 366 of 1828   PageID 9859
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 251 of 1803   PageID 10997

a. Respondent's Memorandum, dated March 17, 2019, requesting that (1) the Panel withdraw its Modification of Award entered on March 16, 2019; (2) cease any further attempts to award additional damages, attorneys' fees, or costs that are not expressly set forth in the Partial Award; and (3) reconfirm that the hearing and all evidence is closed and the Panel is not empowered to take any further action beyond the issuance of its Partial Award ("Respondent's March 17 Memorandum").

b. Claimant's Submission Regarding Fees and Costs, dated March 21, 2019, made pursuant to Rules R-28, R-47, R-53, R-54, and R-55, AAA Commercial Arbitration Rules, seeking an award of $11,865,181.28 in attorneys' fees and costs, including Claimant's attorneys' fees, AAA administrative fees, arbitration expenses, fees incurred by A&M, expert fees, and Panel compensation paid by the Respondent Highland on behalf of the Committee in this arbitration ("Claimant's Fee Submission").

c. Claimant's Application, dated March 25, 2019, made pursuant to Rule 50, AAA Commercial Arbitration Rules, to modify the Partial Award, issued by this Panel on March 6, 2019 (Claimant's March 25 Application").

d. Claimant's and Respondent's Joint Submission on Damages dated April 5, 2019, in which the Parties agreed on the mathematical calculation of the amount of damages and interest contained in the Partial Award and Modification of Award, subject to Highland's objections to the inclusion of any damages awards that were not specified in the Partial Award and subject to objections on two specific issues: (1) whether the Eames residual LP interests would be extinguished; and (2) whether prejudgment interest awarded by the Panel will continue to run after March 6, 2019 until the earlier of the date the amount awarded is paid to the Committee for the benefit of the Fund, or the date on which a Final Judgment is issued on the Award ("Joint Submission").

e. Respondent's Memorandum dated April 5, 2019 opposing the motion to modify the Partial Award; and opposing any award for damages, attorneys' fees, or costs ("Respondent's April 5 Memorandum").

f. Claimant's Memorandum dated April 5, 2019 arguing that (1) the Panel should award further damages in connection with the Barclays claim measured by the Fund's loss of the residual value of the Eames LP interests, either by extinguishing the former Barclays LP interests, or alternatively, by awarding an appropriate amount of damages to compensate the Fund for loss of the value of those interests, which the Committee puts at $11,589,474; and (2) the Panel should award prejudgment interest through the date the Award is paid or final judgment is entered ("Claimant's April 5 Memorandum").

g. On April 10, 2019, Respondent sought leave, which we granted on consent, to file an additional Memorandum on two issues raised by Claimant in its April 5

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 253 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 367 of 1828 PageID 9860
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 252 of 1803 PageID 10998

Memorandum, namely, that Claimant adds a new and improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019; and that Claimant has provided a new and improper damages calculation relating to the extinguishment of the Eames LP interests.

h. Having reopened the record on March 6, 2019, for additional submissions, as described above, we deem the record closed as of April 10, 2019.

E. Issues

    a. Fees and costs

        1. In the Partial Award, we evaluated the competing claims made by Claimant and Respondent regarding an award of fees, which both sides had sought in their pleadings. As we noted in the Partial Award, ¶VI.A, 52, AAA Commercial Arbitration Rule R-47 (d)(ii) authorizes the Arbitrator to award attorneys' fees if, as here, "all parties have requested such an award . . . " "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." *R.F. Lafferty & Co., Inc. v. Winter*, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted); *In re U.S. Offshore, Inc. and Seabulk Offshore Ltd.*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) ("If both parties sought attorney's fees, . . . then both parties agreed *pro tanto* to submit that issue to arbitration, and the arbitrators had jurisdiction to consider that issue and to award them.")."

        2. During closing oral arguments, Respondent did not mention its own request for an award of fees, but "*acknowledge[d] the Tribunal's discretion* to order an award of attorneys' fees…" Indeed, Respondent made oral and written closing arguments that conceded that it was "*not disputing the discretion that the Panel has* [to award fees]." Tr. 13 444:2-3 (emphasis added). In its closing slides, Respondent also urged that "The Panel *should exercise its discretion in applying the American Rule*." Respondent Closing Slides at 261 (emphasis added).

        3. Respondent also argued that denying the Claimant's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." Second, Respondent urged that the only basis upon which Claimant is seeking an award is that Respondent allegedly engaged in bad faith and vexatious conduct.

<center>3</center>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 254 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 368 of 1828   PageID 9861
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 253 of 1803   PageID 10999

4. Respondent now chooses to oppose the grant of fees on grounds distinctly different from those set forth above. It belatedly argues an alleged lack of proof and the Panel's being *functus officio* to award fees.

    1. Respondent argues that the Panel "found that the evidence in the record was insufficient to determine many of the Committee's claims for damages, as well as its claims for costs and fees." Resp. April 5 Mem. 14.

    2. But that is incorrect; we did not find any insufficiency; instead, with no objection, we adopted a well-recognized method of dealing with attorneys' fees and costs by deciding entitlement before amount. See *Franco v. Dweck*, 87 N.Y.3d 5 (2018) ("Contrary to respondents' contention, the final award did not run afoul of the doctrine of *functus officio*, which precludes an arbitrator from altering in substance a prior award (see *Matter of Wolff & Munier [Diesel Constr. Co.]*, 41 A.D.2d 618, 340 N.Y.S.2d 455 [1st Dept. 1973] ). As the partial final award *expressly reserved* the issue of attorneys' fees, it cannot bar a *subsequent* award of those fees (see *Shimon v. Silberman*, 26 Misc.3d 910, 914–915, 891 N.Y.S.2d 891 [Sup. Ct., Kings County 2009] )."

5. Accordingly, we reject Respondent's new positions. From at least the time the pre-hearing briefs, witness lists, and list of exhibits were mutually filed, it was clear that whichever side that was going to seek attorneys' fees if it prevailed was reserving on the specific rates and amounts of legal fees, as well as costs and expenses, many of which had not yet been incurred. To do otherwise would be a waste of resources. Not once did Respondent ever raise the question of proof regarding attorneys' fees and costs; by its silence and conduct, Respondent consented to the process regarding proof of attorneys' fees that the Panel was following, see CCA Guide to Best Practices in Commercial Arbitration (3d edition), 246.

6. Second, we explicitly denominated the award of March 6 as a "Partial Final Award," making clear to the Parties that the arbitral proceeding was still ongoing. We also explicitly left the hearing open so that the Parties could meet and confer or make submissions, including providing additional evidence, "until *all issues* set forth ... have been agreed upon by the Parties or decided by the Tribunal." Under these circumstances, the doctrine of *functus officio* does not apply. *Kennecott Utah Copper Corp. V. Becker*, 186 F.3d 1261, 1270-71 & n.4 (10th Cir. 1999) (*Functus*

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 255 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 369 of 1828   PageID 9862
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 254 of 1803   PageID 11000

*officio* provides that, "once an arbitrator has issued a *final* award and thus discharged his or her office, that arbitrator lacks any continuing power to revise the award or issue a new one.")(emphasis added).

i. Accordingly, we turn to an examination of the application for attorneys' fees and costs, sought by Claimant:

    a. Claimant seeks the following in fees and costs:

        i. Jenner & Block Fees - $9,278,248.99

            1. In support of its fee application, Claimant has provided detailed time records, billing records, and a declaration of Andrew Vail, a partner of Jenner & Block, that establishes that records were maintained on a contemporaneous basis, that time billed on duplicative, inefficient, or extraneous to the arbitral proceeding was excluded from the application, and that hourly rates, and a fixed-fee discount, where applicable, were discounted by 15%. Vail Declaration ¶¶13-18. The hourly rates are shown to be comparable to rates charged by other similar firms and consistent with prevailing market rates for attorneys of similar high levels of expertise and experience. We note that Respondent does not object to the amount sought, except on the bases previously discussed. We find the request for legal fees to be reasonable, especially given the complex factual and legal setting, and grant Claimant's application.

        ii. FTI Expert Fees - $1,274,853.26; and A&M Arbitration Fees - $655,160.00

            1. In support of the FTI fees, Claimant submitted a declaration, with supporting exhibits, of Mr. Vail, who affirmed that the fees reflected "services that were necessary for the Committee to prosecute its claims against [Respondent] and to defend against [Respondent's] counterclaims, and … the amounts charged for such services were reasonable given the necessity of those services." Vail Declaration ¶26.

5

2. In support of the A&M Arbitration Fees, Claimant has provided the declaration of Steven Varner, a Managing Director of A&M, who affirms that A&M maintained billing records on a contemporaneous basis for its services throughout the course of this arbitration, but did not keep detailed descriptions of its billed time for specific matters within that engagement. He further affirmed that he and another managing director compiled a "conservative estimate of the time that A&M personnel spent on matters that were specifically required in connection with HCMLP's failure to timely provide A&M with books and records relating to the Fund." That work totaled approximately $655,160.00, after discounts were applied to their normal billing rates. Varner Declaration ¶¶6, 7, and 10.

3. Claimant is not seeking recovery for over $140,000 in attorneys' fees and costs for A&M's counsel to pursue information from Cornerstone pursuant to Del. Code Ann. tit. 8 § 220. Varner Declaration ¶8.

4. Respondent principally opposes the fees of FTI and A&M on the grounds that "while the AAA Rules permit the award of certain expenses (e.g. administrative costs and Panel compensation), they are much more restrictive when it comes to witness costs for the parties. In fact, Rule 54 expressly divides expenses into two categories: (i) witness expenses—which are to be borne by the party presenting the witness; and (ii) '[a]ll other expenses'—which may be apportioned by the arbitrator(s)."

5. While acknowledging some dispute among the courts as to whether Rule R-54 permits a prevailing party to recover its expert witness fees, Claimant urges that the weight of authority provides that both consulting and testifying witness fees are recoverable under the AAA's rules, citing *Dealer Comp.*

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 257 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 371 of 1828 PageID 9864
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 256 of 1803 PageID 11002

*Servs., Inc. v. Hammonasset Ford Lincoln-Mercury, Inc.*, 2008 WL 5378065, at *2, *4 (S.D. Tex. Dec. 22, 2008) (confirming final arbitration award that included expert witness fees); *In re Pos'tive Produc, Inc. v Thermal C/M Services, Inc.*, 2011 WL 13220365, at *4 (N.Y. Sup. Ct. Nov. 18, 2011) (confirming award that included "expert fees and costs"); and *Cardno Int'l Pty, Ltd. v. Merino*, 2017 WL 6034172 (S.D. Fla. Oct. 30, 2017).

6. Rule 47(a) gives the Tribunal the power to "grant any remedy or relief that the arbitrator deems *just and equitable* and within the scope of the agreement of the parties…", while Rule 47(c) provides that "In the final award, the arbitrator *shall* assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator *may apportion* such fees, expenses, and compensation among the parties in such amounts *as the arbitrator determines is appropriate*." (Emphasis added.) Parsing these sections in conjunction with R-54 leads us to conclude that we have the power to award the expenses of the arbitration, including expert fees, as we deem just, equitable, and appropriate. *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, No. 3:07-CV-752-J-25JRK, 2010 WL 11507082, at *4 (M.D. Fla. Sept. 13, 2010) (confirming award where tribunal awarded prevailing party its expert fees), *aff'd*, 660 F.3d 1277 (11th Cir. 2011).

7. Under the complex circumstances presented here, we find that the experts were essential to the prosecution of the Claimant's case and that their services, and consequent fees, were a necessary obligation the Claimant was bound to its members to undertake in its pursuit of the claims against Respondent.

7

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 258 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 372 of 1828   PageID 9865
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 257 of 1803   PageID 11003

8. We note, specifically with respect to the A&M fees, that a large portion of the fees appear to relate to "time spent organizing the tens of thousands of individual page PDF files that HCMLP provided as books and records instead of complete documents." Varner Declaration ¶7.

9. From our observations at the hearing and our review of the reported rates and fees of FTI and A&M, we conclude that such fees were fair and reasonable and we find that it would be "just and equitable" and "appropriate" relief to award Claimant all of the expert fees it seeks, and we do so.

   iii. Respondent does not object to the following categories of fees sought by Claimant:

1. AAA Administrative Costs - $64,750.00;
2. Court Reporter Hr'g Costs - $114,697.77;
3. Court Reporter Dep. Costs - $28,890.04; and
4. AAA Panel Compensation - $448,581.22 (to date).

  b. Accordingly, in our discretion, we award Claimant the total sought in fees, costs, and expenses, as detailed and updated in section F. below.

b. Claimant's Motion for Modification of the Partial Final Award
   i. On March 25, 2019, Claimant moved, pursuant to AAA Rule 50, to modify the Partial Final Award in several respects.

1. First, with respect to the Partial Final Award regarding the finding of liability of Respondent with respect to the Barclays LP interests, Claimant moved to correct a clerical error that resulted in the omission of a Barclays damages paragraph from the Partial Final Award by modifying that Award to include the paragraph set forth in the Panel's March 14, 2019 Modification of Award.

2. Second, also pursuant to Rule 50, Claimant moved that the Panel modify the award to address other clerical, typographical, and computational errors in the Partial Final Award.

3. AAA Rule 50 provides in relevant part, as follows: "R-50. Modification of Award. Within 20 calendar days after the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 259 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 373 of 1828 PageID 9866
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 258 of 1803 PageID 11004

transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto."

4. With respect to the Barclays issues, Respondent contends both that Rule 50 does not apply and that the doctrine of *functus officio* divests the Panel of the power to modify the Partial Final Award, as the Panel would be adding an "additional award" that "represents an entirely new award of $34 million in damages not included in the [Partial Final Award] ... constitut[ing] a material revision of the award."(Respondent's April 5 Memorandum at 5).

5. First, we are not adding an "additional award," as it is clear from the structure of the Partial Final Award that a paragraph was missing from the damages portion; all other findings of liability were accompanied by a section delineating the applicable damages except for the finding of a breach of the Plan and Scheme by reason of the transfer of LP interests to Eames. In other words, we found liability in two respects but omitted a paragraph regarding the remedy for Respondent's breach of the Plan and Scheme that we had found with respect to the transfer, without the required Committee approval, of Barclays' fund interests to itself through entities it controlled as part of the settlement. That omission is a classic example of a clerical error.

6. Second, although the effect of the Modification was to add additional damages to the award against the Respondent, the Panel did not "materially revise" the Partial Final Award since liability had already been found.

7. In addition, as previously discussed, the doctrine of *functus officio* "provides that, *while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued...*" *Int'l Broth. Of Elec. Workers, Local Union 824 v. Verizon Florida, LLC*, 803 F.3d 1241, 1250 (11th Cir. 2015). However, we did not issue a final award; it was explicitly labeled a Partial Final Award and was explicitly subject to being supplemented by subsequent presentations of damages analyses by both Parties.

9

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 260 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 374 of 1828  PageID 9867
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 259 of 1803  PageID 11005

8. Finally, there is ample case law for the proposition that the Panel is not divested of power, even when issuing a final award, from correcting clerical, typographical, or computational errors. See *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-73 (5th Cir. 2012); *E. Seaboard Const. Co., Inc. v. Gray Const., Inc.*, 553 F.3d 1, 5-6 (1st Cir. 2008).

9. Respondent also argues that the Panel is barred from correcting the Partial Final Award by AAA Rule 45, which provides that "The award shall be made ... no later than 30 calendar days from the date of closing the hearing..." Respondent urges that "the parties agreed that the final award would be made on or before March 7, 2019. Accordingly, any award made after that date is untimely and beyond the scope of the Panel's authority." (Resp. April 5 Mem. at 7). But, once again, this argument ignores the explicit nature of the March 6 Partial Final Award, which "le[ft] the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal."

10. Respondent also argues that we are "reopening" the record in violation of AAA Rule 40. That rule provides, in relevant part, as follows: "The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award..."

11. We acknowledge that a communication from the AAA, dated December 12, 2018, stated that the "no additional evidence is to be submitted and that the hearings are declared closed as of December 12, 2018," but this statement was subsequently withdrawn by the previously-quoted language of the Partial Final Award where we explicitly left the record open "until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

12. That language is equivalent to the language that "we will reopen the hearing." *Int'l Bhd. of Teamsters Local 959 v. Horizon Lines of Alaska, LLC*, 22 F. Supp. 3d 1005, 1007–08 (D. Alaska 2014) ("Where an arbitrator specifically retains jurisdiction to resolve disputes regarding damages, that indicates that the arbitrator did not intend the award to be Final. Put simply, an arbitration award that postpones the determination of a remedy should not constitute

a final and binding award"); *Golden v. Lim*, 2016 WL 520302, at *3, *9 (E.D. Mich. Feb. 10, 2016)(holding that the arbitrator had the authority under the AAA Rules to reopen the hearing to accept further submissions on attorneys' fees).

13. Second, even if the relief sought required a reopening of the record, Rule 40 authorizes the Panel to do so "upon the application of a party," so long as doing so did not violate "the specific time agreed to by the parties in the arbitration agreement" for the making of the award. No such time period is set forth in the arbitration agreement. Finally, we interpret Rule 40 to be speaking to the instance of reopening the hearing after the final award is made, which is, again, not the situation we are in.

ii. We grant Claimant's application under AAA Rule 50[2] and formally correct the clerical error by re-adopting the additional paragraph, previously included in the Panel's March 16 Modification of Award, as follows:

1. "Insert the following paragraph at page 54, immediately after VII.B.2.f: "3. The transfer of Barclays Fund interests: By transferring, without the required Committee approval, Barclays' fund interests to itself through entities it controlled as part of the settlement, Highland breached the Plan and Scheme. We award the Committee damages measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value. In Table 11, Version 2, Claimant's damages expert, Basil Imburgia, calculated that such an amount totaled $34,661,749. RC-522. As with other amounts awarded, the Parties are to confer to determine the actual amount of damages including the 9% interest to date."

iii. Claimant also moves under Rule 50 to correct four other clerical errors, set forth below, as to which Respondent does not object. The motion is granted; the clerical errors are set forth below and corrected as noted:

1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

---

[2] We acknowledge Respondent's interesting linguistic analysis of the differences between ICDR Article 33 and AAA Rule 50, see Respondent April 5 Memorandum at 5-6, but we deny the underlying premise that what we are being asked to do is to make an "additional award as to claims, counterclaims, or setoffs presented but omitted from the award." We had found liability as to two claims involving the Barclays LP interests but omitted the damages component of one of the two liability findings. That does not constitute an award as to a claim argued by Claimant but omitted from the partial final award.

11

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 262 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 376 of 1828   PageID 9869
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 261 of 1803   PageID 11007

2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

iv. Eames

1. In the March 6 Partial Final Award, as modified herein, we found Respondent liable for having transferred the Barclays LP interests to an entity which it wholly controlled, Eames [LLC].[3] We awarded damages "measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value." We estimated — but did not find — that amount by referring to a damages calculation by Claimant's damages expert, Basil Imburgia, who "calculated that such an amount totaled $34,661,749. RC-522." "As with other amounts awarded," we directed "the Parties ... to confer to determine the actual amount of damages including the 9% interest to date."

2. The Parties have conferred and disagree as to the appropriate amount of damages for Respondent's breach of the Plan and Scheme. Claimant asserts that the appropriate amount of damages is $29,609,015, which is lower than the amount estimated by its expert and cited in the Partial Final Award, because "the value of the Barclays interests which [Respondent] now controls through Eames is expressly excluded, as it would be extinguished and that value would be spread amongst the remaining Fund investors." Claimant April 5 Memorandum, 5.

3. Thus, Claimant urges that "the Panel should either (1) award $29,609,015 and order the extinguishment of the Barclays LP interests owned and controlled by Highland, or (2) award $29,609,015 plus the current value of those LP interests, which its

---

[3] We found, and it is not disputed, that Highland controls Eames through an entity, Hockney, Ltd., that Highland wholly owns, and which, along with Eames, was created solely for the purpose of holding the Barclays LP interests for Highland's financial benefit. JX24; Tr. Day 8 83:21-86:13; Tr. Day 9 144:21-25, 220:18-25.)

Appellee Appx. 00255
APP. 0812

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 263 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 377 of 1828   PageID 9870
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 262 of 1803   PageID 11008

damages expert estimates to be $11,589,474. Claimant April 5 Mem. at 10; Imburgia April 5 Declaration, ¶15.

4. Respondent urges that the "March 16 Modification contains specific language awarding the Committee a specific amount of monetary damages." However, as discussed above, that is not what the Panel did. We directed the Parties to confer on the exact amount to be awarded and to come to the Panel if they could not agree.

5. Respondent further argues that nowhere in the March 6 Partial Final Award or the March 16 Modification did the Panel award Claimant equitable relief concerning the Barclays Claim, and that had the Panel wanted to do so, it knew how to do so.

6. Respondent goes on to argue that Eames is not a party to this arbitration, and, therefore, the Panel lacks the authority to issue an award determining Eames' legal rights and obligations." Even if the Panel determines that the remaining equity interest should have been extinguished at the time of the 2012 settlement, "the fact remains that the equity interest was transferred to—and is still held by—Eames." Respondent April 5 Memorandum, 21-22.

7. Finally, in its April 10 submission, Respondent objects to the Claimant's calculation of interest on any award regarding Barclays or the other claims, to wit, Claimant's April 5 Request adds an improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019.

8. We disagree with Respondent's arguments except as relating to the compounding of interest sought by Claimant, which we discuss more fully below. First, when we found that "Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer," we sought a remedy to deprive Respondent of the benefits that it had received illegitimately, or, in other words, to void the Eames transaction and put the parties back into the position they should have been in. Respondent may not benefit in the future by its breach of the Plan and Scheme, and the illegitimate transaction it engaged in, by forfeiting some, but receiving future, benefits through its absolute control of the entity it created, Eames.

13

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 264 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 378 of 1828    PageID 9871
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 263 of 1803    PageID 11009

9.  Second, although Eames is not a party in this proceeding, that is
    irrelevant to the relief we grant. The operating party throughout all
    of the machinations that resulted in the transfer of Barclays' LP
    interests to an entity it created solely for the purpose of holding
    such interests was, and remains, Respondent. It is completely
    within its power to unwind the transfer and re-transfer those
    interests back to the Fund for the benefit of its investors, as we
    now order.

10. Regarding the appropriate amount upon which to award interest,
    for reasons set forth below, we reject Claimant's argument that
    $29,609,015 is the appropriate amount upon which to award
    interest, as to do so would be to violated well-settled law in New
    York regarding pre-judgment interest, CPLR §§5003-5004.

11. We award Claimant monetary damages against Respondent in the
    amount of $21,768,743, plus 9% simple prejudgment interest from
    the date of the breach until the earlier of either (1) the date the
    amount awarded is paid to Claimant for the benefit of the Fund, or
    (2) the date on which a court of competent jurisdiction enters a
    final judgment upon this Award.

12. We further order that Respondent take all necessary steps to cause
    the improperly taken Fund LP interests currently owned and
    controlled by Respondent through Eames, Ltd to be returned to
    Claimant within sixty (60) days from the date of transmittal of this
    Final Award to the Parties.

v.  Interest

1.  In the March 6 Partial Final Award, we awarded damages and
    interest through the date of that award, but then, as already referred
    to, directed the Parties to confer regarding all damages and interest
    issues.  Claimant now urges that we award 9% prejudgment
    interest on the damage amounts awarded until the earlier of: (1) the
    date on which the amounts due are paid to the Committee for the
    benefit of the Fund; or (2) the date on which a court of competent
    jurisdiction enters a final judgment on the Final Award.

2.  However, as Respondent points out, Claimant is, in effect, arguing
    for a compounding of interest upon interest.  We agree. The effect
    of Claimant's interest calculations would violate New York law, as
    an award of 9% interest post-March 6 on an amount that already
    includes 9% interest from the breach through March 6, would
    amount to compound interest after March 6, 2019. "[T]he statutory

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 265 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 379 of 1828 PageID 9872
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 264 of 1803 PageID 11010

scheme [in New York] for awarding ..., where applicable, prejudgment interest, does not provide for compound interest." *520 East 81st Street Associates* v. *State of New York*, 19 AD3d 24 (2005).

3. Respondent also contends that the March 6 Partial Final Award contained specific language awarding interest "through the date of this Partial Final Award"— i.e., March 6, 2019, and that awarding interest through any other date would constitute an untimely modification of the Partial Final Award.

4. We disagree with Respondent that changing the termination date of prejudgment interest would constitute an untimely modification. Although the Partial Final Award did use the date of March 6 as a reference point for calculation of interest, that fact is not determinative of this issue. We also explicitly left open calculations of damages and interest until the Parties had fully conferred on the extremely complex financial calculations that had to be made. Among the calculations was a further calculation of interest. It is not an unlawful modification of the Partial Final Award to make, as we do here, a final award on all damages and interest issues based upon a final record.

5. Furthermore, failing to continue the running of interest through payment or entry of a final judgment could well, under the circumstances presented here, result in Fund investors with no compensation for their documented losses during that time, as well as provide an incentive to Respondent to prolong the confirmation process. We have already had occasion to comment on Respondent's tactics of putting forth witnesses who were "unworthy of belief" and an "[il]legitimate defense to many of the Committee's claims." Partial Award ¶VI(E). We will not adopt a result that would allow Respondent to impose more hardships on the Fund Investors.

6. We award Claimant 9% prejudgment simple interest on all sums awarded from the dates of each breach through the earlier of the date paid or the entry of a final judgment.

F. FINAL AWARD

a. We reaffirm the findings of fact, conclusions of law, and findings of liability as set forth in the March 6 Partial Award, and make the following awards with respect to such findings and conclusions:

15

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 266 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 380 of 1828 PageID 9873
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 265 of 1803 PageID 11011

i. Claimant's Application to modify the Partial Final Award is granted pursuant to the Disposition of Application for Modification dated March 14, 2019.

ii. Claimant's Motion to Correct Errors is granted, on consent; the clerical errors are set forth below and corrected as noted:

    1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

    2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

    3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

    4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

    5. In all other respects, the Partial Final Award dated March 6, 2019 and the Disposition of Application for Modification dated March 14, 2019 are reaffirmed and incorporated by reference.

iii. For the Deferred Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the Deferred Fees in the amount of $32,313,000 as directed in the Partial Final Award, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

iv. For the Distribution Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $14,457,275, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

v. For the Taking of Plan Claims, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21,

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 267 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 381 of 1828 PageID 9874
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 266 of 1803 PageID 11012

2019, the amount of $3,106,414. The Panel further orders that LP interests identified in RC411 be transferred to Claimant for the benefit of the Crusader Fund or that Claimant cause the Fund to extinguish those claims. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to $3,106,414 beginning on March 7, 2019 and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vi. For the CLO Trades Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $449,375.00. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple, from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vii. For the Credit Suisse Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,735,411. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple on that sum, from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

viii. For the UBS Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,041,664. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of breach until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

ix. For the Cornerstone Claim, the Panel awards the following relief: the Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $48,070,407 for the sale of the Crusader Fund's shares in Cornerstone. The Panel also awards pre-prejudgment interest at the New York statutory rate of 9% simple on that sum from the date of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award. When the amount awarded for the Cornerstone claim is paid by Respondent, Claimant shall cause the Crusader Fund to tender its Cornerstone shares to Respondent.

Appellee Appx. 00260
APP. 08173

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 268 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 382 of 1828   PageID 9875
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 267 of 1803   PageID 11013

x.  For the Barclays Claim, the Panel awards the following relief:

   1. The Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $21,768,743. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

   2. Further to the Barclays Claim, the Panel orders that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant for the benefit of the Crusader Fund within sixty (60) days from the date of transmittal of this Final Award to the Parties, or, alternatively, that Claimant cause the Fund to extinguish those interests.

xi.  For Claimant's Application for Legal Fees, Costs, and Expenses, we award Claimant $11,351,850.06 in fees, costs, and expenses as per the following:

   1. Jenner & Block Fees - $9,278,248.99;
   2. FTI Expert Fees - $1,274,853.26;
   3. A&M Arbitration Fees - $655,160.00;
   4. Court Reporter Hr'g Costs - $114,697.77;
   5. Court Reporter Dep. Costs - $28,890.04

xii.  The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$94,693.88 and the compensation and expenses of the Tribunal totaling US$887,427.89 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the additional sum of US$514,163.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

G.  We have carefully considered, although not discussed in their entirety herein, all arguments made by Claimant and Respondent. Any other claims or requests for relief, made by either Party, are denied.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 269 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 383 of 1828   PageID 9876
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 268 of 1803   PageID 11014

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_David M. Brodsky, Chair_

_John S. Martin, Jr._

_Michael D. Young_

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 270 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 384 of 1828 PageID 9877
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 269 of 1803 PageID 11015

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
    David M. Brodsky, Chair


_____
    John S. Martin, Jr.

_____
    Michael D. Young

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 271 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 385 of 1828 PageID 9878
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 270 of 1803 PageID 11016

State of New York    )
                         )   SS:
County of New York  )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award.

_____5/9/19_____                            _____
Date                                David M. Brodsky, Chairperson

State of New York    )
                         )   SS:
County of New York  )

On this __9__ day of May, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ISAIAS MATEO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6274151
Qualified in New York County
My Commission Expires 12-31-2020

20

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 272 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 386 of 1828 PageID 9879
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 271 of 1803 PageID 11017

State of Florida )
                 ) SS:
County of Lee    )

I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our          Final Award.

_Date April 29,2019                    _____
                                       John S. Martin, Jr., Arbitrator

State of Florida )
                 ) SS:
County of Lee    )

On this 29th day of April, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

21

Appellee Appx. 00265
APP. 08132

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 273 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 387 of 1828   PageID 9880
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 272 of 1803   PageID 11018

State of New York          )
                           )  SS:
County of New York         )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument, which is our          Final Award.

_____4/29/19_____

Date

_____Michael Young_____

Michael D. Young, Arbitrator

State of New York          )
                           )  SS:
County of New York         )

On this 29 day of April, 2019, before me personally came and appeared Michael D. Young,
to me known and known to me to be the individual described in and who executed the foregoing
instrument and he acknowledged to me that he executed the same.

_____Vickie L. Johnston_____

Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 2U

22

Appellee Appx. 00266
APP. 08823

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 274 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 388 of 1828   PageID 9881
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 273 of 1803   PageID 11019

# APPENDIX 4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 275 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 389 of 1828   PageID 9882
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 274 of 1803   PageID 11020

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PATRICK DAUGHERTY,                       :
                                         :
              Plaintiff,                 :
                                         :
       v                                 :   C. A. No.
                                         :   2017-0488-MTZ
HIGHLAND CAPITAL MANAGEMENT, L.P.,       :
HIGHLAND EMPLOYEE RETENTION ASSETS       :
LLC, HIGHLAND ERA MANAGEMENT LLC, and    :
JAMES DONDERO,                           :
                                         :
              Defendants,                :
                                         :
       and                               :
                                         :
HIGHLAND EMPLOYEE RETENTION ASSETS       :
LLC,                                     :
                                         :
              Nominal Defendant.         :

                        - - -

                 Chancery Courtroom No. 12D
                 Leonard L. Williams Justice Center
                 500 North King Street
                 Wilmington, Delaware
                 Friday, May 17, 2019
                 1:30 p.m.

                        - - -

BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor

                        - - -

RULINGS OF THE COURT ON PLAINTIFF'S MOTION TO COMPEL
          AND MOTIONS FOR COMMISSIONS
ORAL ARGUMENT AND RULINGS OF THE COURT ON PLAINTIFF'S
MOTION FOR STATUS QUO ORDER AND DEFENDANTS' MOTION TO
DISMISS COUNT IX OF SECOND AMENDED VERIFIED COMPLAINT
---------------------------------------------------------
           CHANCERY COURT REPORTERS
       Leonard L. Williams Justice Center
       500 North King Street - Suite 11400
           Wilmington, Delaware 19801
                (302) 255-0533

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 276 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 390 of 1828  PageID 9883
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 275 of 1803  PageID 11021

```
                                                                    2

  1   APPEARANCES:

  2         THOMAS A. UEBLER, ESQ.
            JOSEPH L. CHRISTENSEN, ESQ.
  3         McCollom D'Emilio Smith Uebler LLC
              for Plaintiff
  4

  5         JOHN L. REED, ESQ.
            DLA Piper LLP (US)
  6              -and-
            MARC D. KATZ, ESQ.
  7         of the Texas Bar
            DLA Piper LLP (US)
  8           for Defendants

  9

 10                            - - -

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 277 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 391 of 1828   PageID 9884
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 276 of 1803   PageID 11022

3

1                    THE COURT:  Good afternoon.  Please be
2      seated.
3                    First I wanted to acknowledge, we have
4      an honored guest with us today.  We have the Honorable
5      Essam Yahyaoui, who is a judge from Tunisia.  He
6      presides over the commercial chamber of Tunisia's
7      First Instance Court.  So he's here to observe with
8      his colleagues.
9                    Welcome, sir.
10                   All right.  I'm going to start with
11     the motion to compel, and then we'll move on to the
12     motion for commission.  And then there may be
13     questions, and maybe take a break and regroup and we
14     can move on with the other motions.
15                   I'm going to grant Daugherty's motion
16     to compel in part.  For simplicity, I'm going to refer
17     to Abrams & Bayliss as A&B.  And I see four categories
18     of documents at issue here.  The first is regarding
19     the initiation, negotiation, and establishment of A&B
20     as Highland's escrow agent.  The second is regarding
21     A&B's legal work during the pendency of the Texas
22     action to determine whether and how Daugherty might
23     access the escrowed assets.  The third is A&B's work
24     responding to the Texas subpoena.  And the fourth is

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 278 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 392 of 1828   PageID 9885
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 277 of 1803   PageID 11023

4

1   documents regarding A&B's resignation as Highland's

2   escrow agent.

3               I grant the motion to compel as to

4   Categories 1, 2, and 4 for one of two reasons.

5               The first reason is unfortunately my

6   *in camera* review confirmed Daugherty's fear that

7   Highland is improperly withholding documents in

8   Categories 1 and 4 illustrating A&B's service and

9   resignation as escrow agent, which are nonprivileged

10  materials.

11              In a hearing on September 18, 2018,

12  concerning an earlier subpoena, Vice Chancellor

13  Glasscock stated that "... information regarding the

14  actions of Abrams & Bayliss in connection with its

15  operation of the escrow as agents of Highland, HERA,

16  those documents, that information is relevant, and it

17  doesn't appear to me to be generally privileged."

18  That's a quote from the transcript.

19              Highland has been adamant that it was

20  only withholding documents that implicated its role as

21  legal counsel, and not in its role as escrow agent.

22  For example, on page 28 of the transcript from the

23  April 12th argument, Highland's counsel stated that,

24  "We do not assert any privilege based solely on Abrams

Appellee Appx. 00271
APPX. 08326

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 279 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 393 of 1828   PageID 9886
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 278 of 1803   PageID 11024

5

1   & Bayliss's roles as escrow agents.  It's purely

2   because they have the dual roles both as escrow agents

3   and also legal counsel, that when they were in the

4   capacity of legal counsel, those communications were

5   privileged."

6              At that argument, I requested the

7   documents and stated I would review them *in camera*.  I

8   expressed my frustration that I had already given

9   Highland multiple chances, and invited it to redo its

10  privilege log for a final time.

11             In reviewing the documents, I

12  concluded that more than 70 documents that were

13  withheld based on claims of privilege or work product

14  protection were improperly withheld.  Those documents

15  were Privilege Log No. 1 through 25, 27 through 29,

16  35, 36, 41, 54, 56, 62, 85 through 87, and 336 through

17  372.

18             This represents nearly 20 percent of

19  the 372 documents in the log.  But even that doesn't

20  tell the full story, because more than 200 of the

21  listed documents were simply attachments to e-mails

22  collecting documents in response to the Texas

23  subpoena.  Excluding those, more than 50 percent of

24  the documents listed were improperly withheld as

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 280 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 394 of 1828 PageID 9887
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 279 of 1803 PageID 11025

6

1  privileged.

2               Documents regarding A&B's nonlegal

3  work and resignation as escrow agent are not

4  privileged or work product because when A&B agreed to

5  be an escrow agent, it stepped into a nonlegal role

6  despite its status as a law firm.

7               The cases are clear on that point.

8  *Northeast Credit Union v. CUMIS*: "It is well

9  understood ... that the services of an escrow agent,

10  even when that escrow agent is an attorney, are not

11  legal services." *CCS Associates v. Altman*: "[C]ourts

12  have specifically held that an attorney in the role of

13  escrow agent does not transform communications

14  pertaining to the administration of the escrow account

15  into privileged documents."  The first case is from

16  the District of New Hampshire, and the second one is

17  from the Eastern District of Pennsylvania.

18               These non-Delaware decisions more

19  specifically enunciate a principle common in our own

20  law.  Including an attorney, or having an attorney

21  perform nonlegal work, does not attach the privilege

22  to the communications or the work.  That is because

23  "... the attorney-client privilege protects legal

24  advice only, [and] not business or personal advice."

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 281 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 395 of 1828 PageID 9888
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 280 of 1803 PageID 11026

7

1   That's a quote from *MPEG v. Dell* from this court in

2   2013.

3                    And as Vice Chancellor Laster said in

4   the *Facebook Class C Reclassification* litigation,

5   "Making the lawyer the point person creates a pretext

6   for invoking the attorney-client privilege, but it is

7   only a pretext."  That's from his December 12th, 2016

8   order in Case No. 12286-VCL.

9                    Categories 1 and 4 reflect

10  communications between A&B and Highland concerning the

11  start of the escrow relationship, or A&B resigning as

12  escrow agent.  To be sure, there were legal

13  ramifications and issues regarding the work A&B was

14  doing in setting up and then ending the escrow

15  relationship.  But any legal component of A&B's

16  escrow-related work was secondary to the role as

17  escrow agent.  A&B was a contractual counterparty with

18  Highland under the escrow agreement, and each had

19  obligations under that agreement.

20                   A&B did perform legal work on the

21  escrow issue.  For example, A&B attorneys analyzed

22  what document 351 on the log calls the "HERA

23  Strategy."  But that legal advice was not for the

24  benefit of Highland, who was A&B's contractual

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 282 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 396 of 1828   PageID 9889
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 281 of 1803   PageID 11027

8

1    counterparty.  A&B could potentially claim that its

2    attorneys were providing legal services to A&B as

3    escrow agent.  But that is not what is before me; A&B

4    has claimed no privilege.  The only issue is whether

5    Highland can claim a privilege and withhold the

6    communications containing A&B's legal analysis

7    regarding its service as escrow agent.

8                    I think an example here might be

9    helpful.  If Highland had retained a bank or other

10   repository to act as escrow agent rather than a law

11   firm, the result would be more clear.  If the

12   employees of that non-law firm escrow agent

13   communicated internally about the relationship or the

14   contract, it would not be privileged.

15                   If those employees received legal

16   advice from attorneys about how to structure the

17   escrow, what the terms of the escrow agreement meant,

18   or how it could fulfill Highland's request to unwind

19   the escrow and transfer the assets back, Highland

20   could not claim that the in-house or outside counsel

21   retained by the escrow agent was providing legal

22   advice for Highland's benefit.  It would be much

23   clearer that the attorneys were providing legal advice

24   to, and for the benefit of, the escrow agent, not its

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 283 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 397 of 1828 PageID 9890
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 282 of 1803 PageID 11028

9

1 contractual counterparty, Highland.

2           The facts here are more muddied

3 because there are only lawyers involved because

4 Highland selected a law firm, that otherwise

5 represented Highland, to act as escrow agent. But the

6 result should be the same. A&B's privilege over its

7 in-house advice regarding its conduct under the escrow

8 agreement does not belong to Highland just because A&B

9 is itself Highland's attorney.

10           The next question is one of remedy for

11 improperly withholding so many of the documents as

12 privileged. Waiver "... has been characterized as a

13 'harsh result' typically only justified 'in cases of

14 the most egregious conduct by the party claiming the

15 privilege.'" That's from *TCV v. TradingScreen*.

16           "If a party falls substantially short

17 of the well-established requirements, then waiver is

18 an appropriate consequence that helps dissuade parties

19 from engaging in dilatory tactics." That's from

20 *Mechel Bluestone v. James C. Justice Companies*.

21           Daugherty has been dogged in his

22 pursuit of these documents, and Highland was just as

23 resolute in refusing to produce them. Vice Chancellor

24 Glasscock said last September these types of documents

Appellee Appx. 00276
APP. 0833

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 284 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 398 of 1828 PageID 9891
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 283 of 1803 PageID 11029

10

1   are not privileged.  I gave Highland multiple

2   opportunities to address this.  Because Highland stuck

3   by its position and continued to assert such a large

4   percentage of improper privilege assertions while

5   claiming it was producing documents concerning A&B's

6   role as escrow agent, any privilege related to that

7   topic is waived, and a full waiver of Highland's

8   privilege could be an appropriate consequence.

9               But I am reluctant to go that far

10  because Categories 2 and 3 were properly withheld and

11  logged adequately.  Category 2 relates to a memorandum

12  A&B prepared analyzing avenues available for Daugherty

13  to pursue the escrowed assets.  This work started in

14  February 2014.  Category 3 relates to efforts to

15  collect documents in response to the subpoena for the

16  Texas case.  I conclude Highland's unjustified

17  withholding of other documents related to the escrow

18  was not so egregious as to waive any privilege over

19  these two sets of documents.

20              This brings me to the crime-fraud

21  exception.  If Categories 1 and 4 were privileged, I

22  would conclude that the crime-fraud exception applies

23  and so A&B should produce those documents regardless.

24  I reach the same conclusion for Category 2, the subset

Appellee Appx. 00277
APP. 0834

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 285 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 399 of 1828 PageID 9892
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 284 of 1803 PageID 11030

11

1    of documents related to A&B's 2014 memorandum that

2    were privileged and properly logged.

3              Rule of Evidence 502(d)(1) says that

4    "There is no privilege ... If the services of the

5    lawyer were sought or obtained to enable or aid anyone

6    to commit or plan to commit what the client knew or

7    reasonably should have known to be a crime or fraud."

8              To fall within this exception, "... a

9    mere allegation of fraud is not sufficient; there must

10   be a prima facie showing that a reasonable basis

11   exists to believe a fraud has been perpetrated or

12   attempted."  That's from *Princeton Insurance Company*

13   *v. Vergano.*  That case also explains that "... when a

14   client seeks out an attorney for the purpose of

15   obtaining advice that will aid the client in carrying

16   out a crime or a fraudulent scheme, the client has

17   abused the attorney-client relationship and stripped

18   that relationship of its confidential status."

19             The client must intend the

20   communications to be used as a bases for the fraud.

21   "The advice must advance, or the client must intend

22   the advice to advance the client's ... fraudulent

23   purpose."  That's from *Buttonwood Tree Partners v.*

24   *R.L. Polk.*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 286 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 400 of 1828 PageID 9893
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 285 of 1803 PageID 11031

12

1            As Chief Justice Strine wrote while

2   Vice Chancellor in *Princeton Insurance v. Vergano*,

3   "The quintessential circumstance [when this exception

4   applies] is when the client obtains the advice of the

5   lawyer in order to help shape a future course of

6   criminal or fraudulent activity.  This is the classic

7   situation when the privilege gives way, as the

8   societal purpose of the confidential relationship has

9   been entirely subverted, with the client seeking the

10  expertise of someone learned in the law not so as to

11  comply with the law or mitigate legitimately the

12  consequences of his prior behavior, but to craft a

13  course of future unlawful behavior in the most

14  insidiously effective manner."

15           Here, there is a reasonable basis to

16  believe a fraud has been perpetrated.  Daugherty's

17  claim for fraudulent conveyance survived a motion to

18  dismiss, and I will refer the parties to Vice

19  Chancellor Glasscock's January 16, 2018 opinion on

20  that point.

21           The question is whether Highland

22  sought the services of attorneys to enable or aid it

23  in furtherance of that fraud.  I believe there is a

24  reasonable basis to believe that as well.  Highland's

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 287 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 401 of 1828   PageID 9894
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 286 of 1803   PageID 11032

13

1   attorney at Andrews Kurth contacted A&B almost

2   immediately after the Texas judgment became final and

3   nonappealable.  That's at Exhibit K.

4                Highland claims A&B then provided it

5   legal advice interpreting the escrow agreement, and

6   A&B resigned as escrow agent intending to cause, and

7   in fact causing, the assets to return to

8   Highland/HERA.  That is the transfer that Daugherty

9   claims was fraudulent.

10                This was not the first legal work A&B

11   performed in pursuit of keeping the escrowed assets

12   from Daugherty.  Starting in February 2014, it

13   analyzed Daugherty's ability to get at the assets

14   while the appeal was pending.  Because that appears to

15   be the beginning of the efforts that culminated in the

16   allegedly fraudulent acts, the crime-fraud exception

17   strips the privilege from these documents.

18                Daugherty has made a *prima facie*

19   showing that a reasonable basis exists to believe that

20   a fraud has been perpetrated, and that Highland sought

21   A&B to serve as escrow agent and to provide legal

22   analysis in furtherance of that fraud; specifically,

23   to protect the escrowed assets from Daugherty while

24   the Texas case was pending, and then to transfer them

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 288 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 402 of 1828 PageID 9895
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 287 of 1803 PageID 11033

14

```
 1  back to Highland after the Texas verdict was
 2  finalized.  I conclude any privilege Highland claims
 3  over A&B's legal advice regarding the escrow
 4  arrangement and A&B's resignation has been stripped
 5  under the crime-fraud exception.
 6                  I want to be clear on what I am not
 7  saying.  I am not saying that a fraud claim merely
 8  surviving a motion to dismiss permits the supposed
 9  victim to invade the defendant's privilege for any
10  legal advice the defendant received in regards to the
11  underlying transaction or act.  This is a unique case
12  in which it presently appears that the law firm that
13  provided the legal advice, one, was a contractual
14  counterparty to the defendant in the very contract
15  under which the fraudulent transfer was allegedly
16  made; two, provided legal advice interpreting that
17  agreement and charting the course for the transfer;
18  and, three, implemented its own advice to effectuate
19  the transfer.
20                  On these allegations, which are
21  supported by the documents I have reviewed, it appears
22  the defendant sought the firm's legal advice to
23  further the alleged fraud based on the terms of the
24  contract to which the defendant and the firm were
```

15

1   parties.  Based on these uncommon facts, the

2   crime-fraud exception applies here.

3             Accordingly, the privilege is either

4   nonexistent or waived as I just described for

5   Categories 1, 2, 4; in other words, all documents

6   regarding A&B's service as escrow agent.  The

7   crime-fraud exception also applies to documents in

8   these categories designated as work product, under

9   *Playtex v. Columbia* out of the Superior Court.

10           I find that Category 3, regarding the

11   Texas subpoena, was properly logged as privileged, and

12   that the crime-fraud exception does not reach those

13   documents.  Daugherty has not alleged that the

14   subpoena response was in furtherance of the fraud.

15   Category 3 comprises the families associated with

16   lines 91 through 327, which are the parent e-mails

17   attaching documents collected in response to a

18   subpoena.

19           Mr. Katz, is any of that unclear?

20           MR. KATZ:  No, Your Honor.  It's

21   clear.

22           THE COURT:  Mr. Uebler, any questions?

23           MR. UEBLER:  No questions, Your Honor.

24   Thank you.

16

1              THE COURT:  Thank you.

2              We'll turn to the motion for

3    commissions.

4              Daugherty seeks commissions to take

5    the depositions of James C. Bookhout and Marc D. Katz,

6    both of DLA Piper.  I will refer to Mr. Bookhout and

7    Mr. Katz collectively as "the requested deponents."

8    Both requested deponents represented Highland in its

9    dispute with Daugherty in Texas, beginning in 2012,

10   and Mr. Katz and his colleagues at DLA represent

11   Highland in this action as well.  Daugherty seeks fact

12   testimony from the requested deponents on five topics,

13   all pertaining to the events surrounding the escrow as

14   alleged in Daugherty's operative complaint.

15             The discovery Daugherty seeks is

16   clearly within the bounds of Court of Chancery

17   Rule 26.  And, based on the privilege log Highland

18   produced for the escrow-related documents, the

19   requested deponents have personal knowledge of at

20   least some of the escrow events.

21             The parties disagree on the threshold

22   standard for evaluating whether counsel can be

23   deposed.  Highland contends this court has adopted the

24   *Shelton* test, while Daugherty points to a series of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 291 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 405 of 1828   PageID 9898
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 290 of 1803   PageID 11036

17

1   standards from *Rainbow Navigation, Sealy Mattress,*

2   *Kaplan & Wyatt*, and *Dart*.

3               I note that in a transcript ruling

4   from 2018 in *LendUS, LLC v. Goede*, Vice Chancellor

5   Glasscock considered in the first instance whether it

6   was necessary to gather the evidence sought from

7   counsel, given the risk of disqualification.  I agree

8   this is a threshold consideration present in all the

9   cases the parties have cited.  And I conclude, like

10  Vice Chancellor Glasscock did in *LendUS*, that

11  Daugherty has not made a sufficient showing that he

12  needs to depose Mr. Bookhout and Mr. Katz at this

13  juncture.

14              As I just explained in my ruling on

15  Daugherty's motion to compel, Daugherty will receive

16  A&B's documents regarding the escrow.  Daugherty can

17  also depose the escrow agents.  He can depose the

18  Highland principals who were involved.  And I do not

19  see that any of this has happened yet.  He should

20  pursue those avenues before pursuing one that

21  jeopardizes Highland's choice of counsel.  His motions

22  for commission for the proposed deponents are denied

23  without prejudice.

24              I am mindful that trial is scheduled

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 292 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 406 of 1828   PageID 9899
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 291 of 1803   PageID 11037

18

1   for September, and that -- if Daugherty renews his

2   motions after taking the rest of the fact discovery --

3   the risk of disqualification carries more prejudice to

4   Highland the closer we get to trial.  I also note that

5   the discovery cutoff in this case is June 28, 2019.  I

6   am, therefore, interspersing an intermediate discovery

7   cutoff.

8                    Escrow discovery, including

9   depositions of fact witnesses other than the requested

10  deponents, must be complete by June 14th, 2019, and

11  Daugherty must make any renewed motion for commission

12  by June 17, 2019, with briefing on that motion to be

13  expedited.

14                    The burden this timeframe places on

15  both parties I think is appropriate in light of the

16  requested deponents' apparent knowledge of significant

17  aspects of Daugherty's allegations, and in light of

18  the desire to protect Highland's choice of counsel.

19  Any renewed motion by Daugherty must demonstrate what

20  gaps in the record he needs to fill, and why he

21  believes the requested deponents can fill those gaps.

22                    Mr. Uebler, is any of that unclear?

23                    MR. UEBLER:  Your Honor, nothing is

24  unclear about that ruling, but I do have a question

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 293 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 407 of 1828   PageID 9900
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 292 of 1803   PageID 11038

19

1    about the escrow agent depositions.  Can the parties

2    assume that the ruling that the Court has made with

3    respect to the documents will also apply to deposition

4    testimony? in other words, categories that may be

5    subject to privilege such as the subpoena response,

6    but all other escrow-related categories would

7    presumably be fair game and not subject to privilege

8    in a deposition?

9                    THE COURT:  That's correct, at least

10   as to A&B.  I note that we haven't really tested the

11   boundaries of where my ruling might go with regard to

12   DLA.  And I think that's probably another conversation

13   we would need to have.

14                    MR. UEBLER:  Understood.  Thank you.

15                    THE COURT:  Thank you.

16                    Mr. Katz, is any of that unclear?

17                    MR. KATZ:  No, Your Honor.  That's

18   clear.

19                    THE COURT:  I'll give you-all maybe

20   ten minutes to kind of regroup a little bit, and then

21   I'll hear the motion for status quo order first.

22                    We're in recess.

23        (Recess taken from 1:53 p.m. until 2:00 p.m.)

24                    THE COURT:  Mr. Uebler?

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 294 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 408 of 1828 PageID 9901
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 293 of 1803 PageID 11039

20

1                    MR. UEBLER:  Your Honor, my colleague,

2    Mr. Christensen, is going to argue the status quo

3    motion.  But I'd just like to point out, we had an

4    issue with our File & Serve converting Word documents

5    to pdf, and it would drop the occasional citation in

6    footnotes.  I don't know if it's our system or theirs.

7    But, in any event, we've brought revised copies of our

8    papers with all the citations for the Court.

9                    THE COURT:  Thank you.

10                   MR. UEBLER:  You're welcome.

11                   MR. CHRISTENSEN:  Good afternoon, Your

12   Honor.  Joseph Christensen from McCollom D'Emilio for

13   the plaintiff, Pat Daugherty.

14                   I just want to start very briefly with

15   how we got here.  Your Honor is familiar with the

16   facts, so I won't go over that in too much detail.

17   But I do want to highlight some of the additional

18   points that we included in our briefing related to

19   what Highland was saying about these assets during the

20   Texas action.

21                   So Thomas Surgent, during the Texas

22   action, he was the chief compliance officer of

23   Highland.  During the Texas action, he testified that

24   the assets listed in the escrow agreement were being

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 295 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 409 of 1828 PageID 9902
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 294 of 1803 PageID 11040

21

1 held for Pat's benefit for his interest in HERA.

2 These are all from Exhibit V. That one is at page 15

3 of 53.

4 Jim Dondero, the head of Highland,

5 testified that Pat's share of all the assets,

6 including the cash, is in escrow. He also testified

7 that Pat's *pro rata* share of all the assets, including

8 the cash, are all sitting in escrow. There's been

9 nothing deducted or removed from Pat's account. And

10 he also said that the escrow agreement was to protect

11 Pat Daugherty.

12 The point of all these statements was

13 to convince everybody who would listen that these

14 assets were being held for Pat Daugherty, and that if

15 he prevailed in the Texas action, he would obtain

16 those assets. And we haven't done anything with them.

17 We haven't offset any legal expenses, which is also

18 noted in our reply brief.

19 Coupled with the statements that Pat

20 continued to hold the HERA units, this was a clear

21 expression that Highland was trying to convince people

22 that they intended to hold onto these assets but give

23 them to Pat if he prevailed in the Texas action.

24 In HERA's closing argument its counsel

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 296 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 410 of 1828 PageID 9903
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 295 of 1803 PageID 11041

22

1  said, "If Pat Daugherty happens to prevail in his

2  lawsuit against Lane, Patrick and HERA you heard Jim

3  Dondero testify he gets his interest, which is

4  currently escrowed in the third-party escrow account,

5  all of it."

6                    And the jury clearly believed that the

7  escrow meant to preserve Daugherty's interest.  One of

8  the questions the jury sent back to the judge in the

9  Texas action referred to his -- that is Pat's -- HERA

10 units currently in escrow.  That's the third to the

11 last page in Exhibit U.

12                    The defendants now say, "Well, sure,

13 Pat continued to be an owner of HERA, but there was

14 never anything in HERA, at least during the Texas

15 action and before the Texas action."  Which reminds me

16 of a scene from my life at a movie theater with my two

17 sons, where the younger one was complaining that his

18 brother wouldn't give him the box of candy.  He asked

19 me to intervene, and I told him to give him the box of

20 candy, at which point the older brother emptied the

21 candy into his popcorn and gave him the empty box.

22                    That's exactly what happened here.

23 When they told everyone they were holding assets for

24 Pat's benefit, they would now have you believe that

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 297 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 411 of 1828 PageID 9904
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 296 of 1803 PageID 11042

23

1   what they really meant was that he was just entitled

2   to an empty box, and they had no intention -- and Pat

3   should have known that they never had any intention of

4   ever letting him have them.

5                   There are two possibilities to explain

6   the contrast between what they said during the Texas

7   action and what they're saying now. One is that they

8   knew at the time that they were never going to give

9   them back. The other is that they believed at the

10  time and were sincere in saying that they would give

11  them back, but they later changed their mind.

12                  Under either of those circumstances,

13  Daugherty prevails on at least one of his claims. If

14  they changed their mind but initially intended it, his

15  promissory estoppel claim is very strong. If they

16  never intended from the beginning to give them to him,

17  then his fraud and unjust enrichment claims are

18  equally strong. The status quo order should be

19  entered to make sure that they can't do either of

20  those things this time.

21                  I think that's all the background we

22  need, except for a clarification on what Daugherty is

23  seeking. He is seeking those assets. His relief --

24  Your Honor will note that we did not include in our

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 298 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 412 of 1828 PageID 9905
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 297 of 1803 PageID 11043

24

1  briefing any discussion of our claims for

2  indemnification.  Our indemnification claim is

3  effectively a monetary relief sort of claim.  But we

4  did discuss promissory estoppel, unjust enrichment,

5  and fraudulent transfer.  Each one of those theories

6  includes potential relief divesting those assets from

7  whoever holds them, which brings me to the next point,

8  which is that we do not know where these assets are.

9           We have asked the defendants where

10  these assets are; were they ever transferred after

11  December 2016.  They told us they would not provide

12  any information on those requests.  And that's at our

13  Exhibit L, Request No. 8 and 11, and Exhibit W, our

14  Request No. 34 and 37.

15           THE COURT:  I'm certainly not inviting

16  more or different motions.  But isn't the remedy for

17  that a motion to compel instead of a motion for a

18  status quo order?

19           MR. CHRISTENSEN:  It would be.  And we

20  are not seeking through this status quo order

21  effectively a back door to answering these requests

22  for documents and interrogatories.  But the fact that

23  they will not tell us where these assets are is

24  consistent with the prior behavior in the Texas action

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 299 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 413 of 1828   PageID 9906
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 298 of 1803   PageID 11044

25

1   and gives us a lot of pause about waiting until the

2   end of this trial.

3                   So we started out this case with -- I

4   guess I should first turn to the defendants' argument

5   that the Court doesn't have power to enter this status

6   quo order.  Clearly it does.  The kind of relief that

7   we're seeking is in aid of the ultimate relief that we

8   are seeking.  Because we are trying to obtain or move

9   particular assets, we are seeking the status quo order

10  to make sure those assets are still available for the

11  court to issue an effective ruling at the end of this

12  case.

13                  THE COURT:  And how do you get around

14  the *Hillsboro* and *HEM* cases that discourage

15  intermediate injunctive relief for the purpose of

16  preserving assets?

17                  MR. CHRISTENSEN:  Well, I think

18  generally the cases are referring to when you're

19  seeking monetary relief.  And that's not what we're

20  doing in this case.  And I think the history is

21  probably the most important point in this situation.

22                  One simply cannot ignore that the very

23  assets and the very parties in this litigation -- the

24  reason we're here is because we were chasing after

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 300 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 414 of 1828   PageID 9907
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 299 of 1803   PageID 11045

26

 1  these assets that we believe we obtained the right to

 2  in the previous action.  So it's a unique situation.

 3  None of the cases involve the same parties and the

 4  same assets.

 5            And the cases -- even the cases that

 6  have history as a basis for granting the status quo

 7  order, none of them have this kind of sort of clear

 8  evidence that there was a fraud and moving of assets

 9  to defeat a judgment in an earlier iteration of the

10  dispute between the parties.

11            THE COURT:  And how does that sort of

12  long history or long series of allegations of fraud

13  and hiding assets, how does that square up with the

14  requirement that the harm to be prevented by the

15  status quo order be imminent?

16            MR. CHRISTENSEN:  The imminence, Your

17  Honor, to be frank, is probably the most difficult

18  aspect of our situation to square with the law.

19  Because -- in part because they haven't told us

20  whether things have been transferred, where things

21  are, we cannot give Your Honor very many facts about

22  some imminent action that is going to take place.

23            But at the same time, we -- again, we

24  started as a frog in a pot at a very high temperature

Appellee Appx. 00293
APP. 08950

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 301 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 415 of 1828 PageID 9908
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 300 of 1803 PageID 11046

27

1  having come out of the experience in Texas.  Then

2  adding to that was the fact that they will not tell us

3  where these assets are.  They will not tell us whether

4  they are currently in a solvent entity or not.  They

5  will not really just come out and say whether those

6  assets are still in Highland or not.  There's a

7  suggestion in their brief that can be read as a

8  representation that they are in the Highland and never

9  have left, but they also make the argument in their

10 brief that the assets never went over to Abrams &

11 Bayliss; that during the whole time that Abrams &

12 Bayliss was holding the assets, that really Highland

13 held the assets, retained legal title, and Abrams &

14 Bayliss was simply holding onto them in trust.  We

15 don't know if something like that is happening in this

16 case either.

17              On top of that, we had -- and what

18 spurred us to action was the affidavit of Highland

19 saying that they did not have current assets to

20 satisfy the judgment in the *Crusader Redeemer* action.

21 So that's on the front end of that judgment.  We, at

22 this point, don't know what Highland is going to look

23 like from a solvency standpoint on the back end of

24 that after those assets have gone out the door, and so

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 302 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 416 of 1828    PageID 9909
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 301 of 1803    PageID 11047

28

1   at some point we have to act.  We need to act before

2   the end of this case.

3                    We didn't believe that we had enough

4   imminence at the beginning of this case that we would

5   get a status quo order or a preliminary injunction.

6   But when they filed that affidavit saying that in a

7   cash flow basis they were insolvent for purposes of

8   satisfying a judgment, against the backdrop of all the

9   history, it starts to look like we're doing a replay

10  of what happened in Texas.

11                   Your Honor referred to, I think, a

12  memo from Abrams & Bayliss talking about the HERA

13  strategy.  And what we're afraid of is that there is a

14  HERA Strategy Version 2 that we do not know about

15  right now and they just won't tell us.  So at some

16  point, in order to avoid them doing the same thing

17  again, we have to act.  We can't, unfortunately,

18  identify when they're going to do that in the same

19  clean kind of way that one often can in a status quo

20  or preliminary injunction case.  But the danger, I

21  would submit, is just as high as in those cases.

22                   I've talked some about the history.

23  And the defendants do talk about three of the cases

24  that we talked about regarding the history.  They

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 303 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 417 of 1828   PageID 9910
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 302 of 1803   PageID 11048

29

1    address the *Crusader Redeemer* action that Your Honor

2    is familiar with, the *UBS* litigation, and the *Acis*.

3    The ones that they don't mention are *Trussway*, for

4    example.

5                    *Trussway*, in this court under Vice

6    Chancellor Glasscock, he actually already found that

7    the kind of history that one would have to establish

8    to obtain a status quo order was found with respect to

9    these principals.  He said he took into account the

10   "... prior history of the controllers of the entities

11   in examining equitable matters that come before us."

12   And true to the way he is, he said, "... I would just

13   as soon not list all the reasons I have that make me

14   suspicious that a remedy will not be available here

15   ...."  "But I think it suffices to say that I have

16   experience with other cases involving the principals

17   here."  And he went on.  That's from page 40 of

18   Exhibit S, which is the transcript in the *Trussway*

19   action.

20                   On the next page he said that, "...

21   given ... some of the factors that I've mentioned,

22   including the Acis bankruptcy and my other experiences

23   with the principals here ... there is a reasonable

24   probability that without some action, any victory will

CHANCERY COURT REPORTERS

30

1    be a Pyrrhic victory."

2              THE COURT:  It sounds like what you're

3    suggesting is that given the track record of Highland

4    in this action and in other actions, that you're

5    suggesting that the imminence requirements be

6    dispensed with because of what's going on here.

7              MR. CHRISTENSEN:  I don't think I

8    would say that, Your Honor.  I would say that given

9    the caginess on discovery, we are not able to identify

10   the moment of imminence.  But we are, through the

11   history, able to establish the same point as

12   imminence.

13             Imminence is this -- the point of

14   addressing imminence is that if you don't address

15   this, it is going to happen, and it's going to happen

16   very soon.  We can't tell you that it's going to

17   happen very soon, but we can tell you that there's

18   every reason to believe that it will happen before the

19   end of this trial.

20             THE COURT:  But what about the -- I

21   think many times when one is considering imminence,

22   there's sort of a *laches*-esque element that comes into

23   it.  And this case was filed in 2017.  So this "it"

24   that we're discussing very well may have already

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 305 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 419 of 1828   PageID 9912
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 304 of 1803   PageID 11050

31

1   happened.

2              And so I wonder what the justification

3   is for sort of after the fact -- maybe, I don't

4   know -- after the fact then seizing up Highland simply

5   based on the way that things have played out in other

6   cases.

7              MR. CHRISTENSEN:  So I think I can

8   explain why we didn't act earlier, and why it wouldn't

9   have been justified to act earlier, and so why we

10  shouldn't be subject to *laches* on this argument.

11             When we started, we had no reason to

12  believe that those assets had gone anywhere other than

13  Highland.  Then the Acis bankruptcy discussed that

14  Dondero was moving out tens of millions of dollars to

15  his charitable foundation.  That was another brick in

16  the wall.  Then we got the discovery responses that

17  were not responsive.

18             And to be clear, we have not given up

19  on that.  We had a meet-and-confer as recently as this

20  morning, and one on Friday of last week, in which we

21  are trying to get these documents.  It doesn't appear

22  that we're going to have much success on our own.  But

23  we are absolutely pursuing that and have pursued those

24  documents as vigorously as we pursued the Abrams &

Appellee Appx. 00298
APP. 0553

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 306 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 420 of 1828 PageID 9913
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 305 of 1803 PageID 11051

32

1  Bayliss documents.

2              To mix the metaphors, the straw that

3  broke the camel's back was the *Crusader Redeemer*

4  action where Highland said:  We cannot pay this

5  judgment right now.  We have more assets than

6  liabilities, but we cannot pay this right now.

7              And it's also important to remember

8  that it's not just large judgments that Highland has a

9  history of not paying, and it's not only Daugherty's

10 relatively small judgment that they refused to pay.

11 But in the Acis bankruptcy, it was an $8 million claim

12 at issue, and they made him go through -- or are still

13 going through involuntary bankruptcy.

14             So I think we acted when it was

15 prudent to act.  And before that occurred, I don't

16 think any member of this court would have been likely

17 to give us relief without something to point to, a

18 reason to believe that Highland wouldn't pay apart

19 from the history.

20             THE COURT:  And the reason is that

21 affidavit in the *Redeemer* case stating that Highland

22 doesn't have the liquid assets to pay the $175 million

23 judgment?  That's what you're interpreting to say that

24 they will not pay or will somehow manage to avoid

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 307 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 421 of 1828  PageID 9914
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 306 of 1803  PageID 11052

33

```
 1   paying Mr. Daugherty's -- what is allegedly owed to

 2   him?

 3                   MR. CHRISTENSEN:  We aren't sure about

 4   the damages, but effectively, yes.  That Highland --

 5   which is, we assume, the most solvent of any of the

 6   entities -- now has a cash flow solvency issue.  And

 7   so at that point we felt we needed to act.

 8                   THE COURT:  Understand.

 9                   MR. CHRISTENSEN:  The other thing that

10   I think Your Honor should consider, it doesn't fit

11   exactly within the three factors of a status quo or a

12   preliminary injunction standard; but I think Your

13   Honor should also take into account that it may not be

14   a question of whether or not Highland is able to

15   satisfy the judgment, but whether it will, even if it

16   is able.

17                   THE COURT:  That's what I'm wondering.

18   That's the part that I'm wondering how that's being

19   derived from the affidavit in the *Redeemer* case, if

20   that's the precipitating factor.  Am I understanding

21   you to read that affidavit only to inform solvency and

22   not intent?

23                   MR. CHRISTENSEN:  It is consistent

24   with an intent to make people work for their
```

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 308 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 422 of 1828    PageID 9915
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 307 of 1803    PageID 11053

34

1   judgments, but I mostly consider it separately.  And

2   what I'm really referring to, the short name for it is

3   spite.  It appears, if you look, not only at the

4   previous action in Texas, but also the Josh Terry

5   situation, that a major factor motivating whether or

6   not Highland pays judgments is how Highland feels or

7   how Jim Dondero feels about the people who are trying

8   to collect that judgment.

9                And so you have the court in the

10  bankruptcy case in *Acis* said that the expenditures

11  were out of whack versus what's at stake.  Or in the

12  *Credit Strategies Fund* case -- which the defendants

13  did not address -- the factual findings there refer to

14  some notes from a call between those parties and

15  Dondero.  Those notes read, "Dondero directly

16  threatens Concord and Brant personally.  We are very

17  good at being spiteful."

18                And so that spite doesn't -- it's not

19  one of the factors normally considered on a status quo

20  motion or a preliminary injunction.  I do think, as a

21  matter of equity, Your Honor ought to consider that.

22  And I think it's consistent with, and maybe grows out

23  of the kind of considerations that Vice Chancellor

24  Glasscock was taking into account in the *Trussway*

Appellee Appx. 00301
APP. 09356

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 309 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 423 of 1828 PageID 9916
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 308 of 1803 PageID 11054

1 action.

2 I think I'll skip to likelihood of

3 success on the merits. We do think the likelihood of

4 success on the merits prong of this analysis is fairly

5 straightforward. At a big-picture level, Daugherty

6 had a claim on these assets, either directly or

7 through HERA. He was entitled to that compensation,

8 he earned it, and it was taken from him after he

9 proved his entitlement not only to damages -- which he

10 received in the amount of 2.6 million and has never

11 seen, but also the underlying assets.

12 So for fraudulent transfer purposes,

13 we think actual intent to hinder, delay, or defraud

14 based on the documents that we have seen so far is

15 compelling evidence that there was actual intent to

16 hinder, delay, or defraud.

17 Your Honor only has to find that we

18 have a reasonable probability of success on one of our

19 claims. You do not have to decide that we have a

20 reasonable probability of success on all of them. And

21 that comes out of the *Destra Targeted Income* case.

22 But we also think our other claims are

23 quite strong, the alternative bases under fraudulent

24 transfer law. We do not believe that HERA got

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 310 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 424 of 1828   PageID 9917
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 309 of 1803   PageID 11055

36

 1   equivalent value, for example, in the transfer.

 2   Unjust enrichment, it's an equitable doctrine, so in

 3   some sense you back away and look at what really

 4   happened, what's the substance.

 5                    And again, what happened was Daugherty

 6   earned compensation, he proved his entitlement to it,

 7   and then it was taken from him.  That enriched

 8   Highland; it impoverished Daugherty to the extent that

 9   he was entitled to it.  There was obviously a

10   connection between those two results.

11                    And as far as their defense of

12   justification, the evidence doesn't seem to show that.

13   I take their justification argument to mean that they

14   were justified in taking the money because of the

15   legal expenses.  But the bills that we have seen so

16   far do not support that HERA was receiving the benefit

17   of those legal expenses.

18                    And just briefly on the promissory

19   estoppel claim -- I'm not going to spend much time on

20   that; you'll hear a lot about that in a minute.  But I

21   do want to refer to those quotations from the Texas

22   trial as additional reasons that support our

23   probability of success on the merits of that claim.

24   They demonstrate that throughout the trial, the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 311 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 425 of 1828 PageID 9918
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 310 of 1803 PageID 11056

37

1    strategy appears to have been to convince the jury

2    that Highland was the good guy because they were --

3    don't worry, they're going to hold on to the assets

4    for Pat.  Pat is going to get those assets if he

5    proves his entitlement to them.  But -- you know, so

6    don't think we're bad for taking them.  Tell us that

7    we win now and we don't have to give them to him.

8                    The narrowest way to grant the motion,

9    I think, is based on probability of success of the

10   fraudulent transfer claim for actual intent to hinder,

11   delay, or defraud.  And Your Honor only needs to find

12   that to issue the status quo order.

13                   On the balance of equities, also seems

14   very clear to us.  On the one hand, our client would

15   go through potentially another half a decade or decade

16   of litigation if he has to chase these assets again.

17   And it would be a real shame to have to do that twice.

18   On the other hand, the defendants, the harm that they

19   identify on their side is that it would lower the bar

20   for future plaintiffs against Highland that are

21   seeking monetary damages to obtain a status quo order.

22   And on that point, I just have to point out, again,

23   that it is not only monetary damages that we are

24   seeking, but seeking to move the escrow assets.

38

1            The other harm that they identify is

2     the harm to their reputation if they're required to

3     freeze these assets for what I take them to perceive

4     as a very small claim.  But again, we're not only

5     seeking monetary assets, so this is not just, as they

6     characterize it, a $3 million claim but a claim on

7     specific assets.  And their history of paying small

8     claims is not great.  So we think the balance of

9     equity also favors Daugherty.

10            Unless Your Honor has any other

11    questions, that's all I have.

12            THE COURT:  I don't.  Not at this

13    time.  Thank you.

14            MR. REED:  Good afternoon, Your Honor.

15    John Reed from DLA Piper for the defendants.

16            First of all, I want to apologize for

17    what happened at the last hearing.  We were only into

18    the case for like two days.  I had no idea that the

19    lawyer that was going to present was not going to be

20    able to answer Your Honor's questions.  I was not

21    happy about that, probably much more unhappy than the

22    Court was and the Court was very unhappy.

23            Mr. Katz is the lawyer most familiar

24    with everything in this case.  And he's here today to

39

1   present the arguments and should be able to answer all

2   of Your Honor's questions.

3            THE COURT:  I appreciate your comment.

4   Thank you.

5            MR. KATZ:  Your Honor, may I approach?

6            THE COURT:  Yes.

7            MR. KATZ:  Thank you for letting me be

8   heard today.

9            And as Mr. Reed said, I echo his

10  apologies for the last hearing.  I apologize that I

11  was not able to be here at that last hearing.  But if

12  Your Honor does have questions about -- I understand

13  Your Honor's ruling, but if Your Honor does have

14  questions about any of those matters, I'm happy to

15  address those as well.

16            THE COURT:  Thank you.

17            MR. KATZ:  With respect to the status

18  quo motion.  Obviously, the Court is aware of the

19  legal standard.  I'm not going to go into that.  I

20  just want to address a few of the points that counsel

21  addressed.

22            And I'd like to start with the

23  irreparable harm element, which is one of the required

24  elements.  And counsel said a number of times that

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 314 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 428 of 1828   PageID 9921
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 313 of 1803   PageID 11059

40

1    they're seeking the assets, not just monetary relief.

2    And I presume that that argument is being proffered

3    because they recognize, otherwise, the issue with

4    irreparable harm component that they have to show.

5                    And I note, just by way of background,

6    is that the Texas award was not in favor of

7    Mr. Daugherty vis-a-vis HERA.  It was not for specific

8    assets; it was a monetary award.  And, moreover,

9    Mr. Daugherty never had ownership of -- direct

10   ownership of any assets in HERA.  Mr. Daugherty was a

11   shareholder in an LLC and the LLC owned some assets.

12                   So if their lawsuit is now seeking

13   recovery of specific assets as opposed to monetary

14   relief, I note that there's a host of procedural and

15   substantive issues with that which I think goes well

16   to the likelihood of success on the merits.

17                   But the point for us today, Your

18   Honor, is that a monetary award would certainly be

19   sufficient to recompense Mr. Daugherty if he were to

20   prevail on any of his claims in this case.  And

21   there's no evidence -- and maybe more importantly,

22   there's no evidence that's been offered to the Court

23   in support of the status quo motion that would

24   demonstrate otherwise.  And when I say "demonstrate

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 315 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 429 of 1828   PageID 9922
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 314 of 1803   PageID 11060

41

1   otherwise," demonstrate that there are assets that

2   were in HERA that can't be valued, or some other basis

3   to show some sort of irreparable harm.  That issue is

4   not even addressed.

5                    We're -- this is, I think, very

6   apparently a case that -- where there is no

7   irreparable harm.  And money can certainly compensate

8   for any harm that Mr. Daugherty may be able to prove

9   ultimately that he suffered.  The only evidence on

10  that issue, I think as Your Honor correctly pointed

11  out, was the affidavit of Scott Ellington.  And that

12  affidavit says to the contrary.  It says, "... the

13  value of Highland's assets exceed[s] the amount of the

14  ... Award."

15                   There's absolutely no evidence in

16  connection with the status quo motion that would show

17  that there is irreparable harm or there is insolvency.

18  In fact, what a good counsel wants to do is make

19  allegations of what they believe is inappropriate

20  conduct some by Highland, some by Highland's

21  affiliates.  And I note that the conduct that they've

22  cited to in their motion are allegations taken from

23  pleadings in other cases, as opposed to direct

24  evidence of anything that has been done by Highland.

CHANCERY COURT REPORTERS

42

1    And most of it, again, is not directly Highland

2    allegations to any extent.

3                    There is -- and then also as Your

4    Honor appropriately, I believe, questioned counsel

5    about, there's no evidence of anything imminent on the

6    horizon that might give rise to any potential concern

7    that would support the status quo order.  And what

8    they're seeking is really, truly an extraordinary

9    remedy.  And I don't believe that they've pointed to

10   any concrete basis which they can meet the high

11   standard that they need to show to justify a status

12   quo order.

13                   THE COURT:  How do you justify the

14   situation here from the one in *Trussway*?

15                   MR. KATZ:  Well, I guess, Your Honor,

16   in two ways.  One, in *Trussway*, there's allegations of

17   specific conduct.  Where here, we've got -- there's no

18   allegations of any conduct that they believe is about

19   to occur or evidence to support that.

20                   THE COURT:  I suspect they would say

21   that's because you haven't answered their questions,

22   but I don't know.

23                   MR. KATZ:  Well, but, Your Honor, I

24   guess that it would also go back to the irreparable

Appellee Appx. 00309

APP. 0806

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 317 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 431 of 1828   PageID 9924
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 316 of 1803   PageID 11062

43

1    harm issue that, you know, there's nothing that --

2    even the allegations, that if they were able to

3    provide some supportive allegations in this case as

4    opposed to relying on allegations in other cases,

5    there would still be -- they still have not shown that

6    there's any risk of insolvency or potential

7    irreparable harm.

8              And the *Mitsubishi* case that they

9    cited in their brief I think is very on point.  And on

10   this issue where they had -- the Court noted that

11   there was an allegation -- actually more than an

12   allegation -- there actually was a prior incident that

13   the Court had very serious concerns about but that on

14   its own wasn't enough.  It was -- the Court

15   specifically found that the defendant in that case was

16   insolvent.  And they also found that there was a sale

17   being negotiated, actual evidence of a sale, where the

18   assets were going to be transferred.  But we don't

19   have that type of evidence with us in this case, Your

20   Honor.

21             On the likelihood of success on the

22   merits, Counsel spent a little bit of time on that

23   issue.  But I think it's important, Your Honor, again,

24   that this is an extraordinary remedy they're seeking

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 318 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 432 of 1828 PageID 9925
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 317 of 1803 PageID 11063

44

```
1    that has a heightened standard.  And their motion on

2    the likelihood of success on the merits simply has

3    conclusory allegations, that they believe they're

4    going to be able to prevail on the merits without

5    addressing the specific elements and what evidence

6    they've got to show the specific elements.

7                   I note, you know, Counsel, in a number

8    of pleadings has -- and I know Your Honor has noted

9    this as well -- that Judge Glasscock had expressed his

10   skepticism about when he was trying to determine what

11   the nature of the escrow agreement was.  And I note

12   that Judge Glasscock, when he was doing that, also

13   when he was talking about the formation of the escrow

14   agreement, he was not talking about the resignation of

15   Abrams & Bayliss or the -- what happened to the assets

16   that formerly were held by HERA.

17                  And, in fact, even Judge Glasscock

18   indicated at that time that it may be that this

19   fraudulent transfer claim was appropriate for summary

20   judgment.  I think his direct quote -- I know I wrote

21   it down.  His direct quote was that it wasn't

22   prepared -- on page 79 and 80 of the transcript, that,

23   "It may be ... perfectly fit ... for a motion for

24   summary judgment.  I'm just not convinced I can get
```

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 319 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 433 of 1828   PageID 9926
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 318 of 1803   PageID 11064

45

 1    rid of it on a motion to dismiss ...."  That was his

 2    quote.

 3                    But I think that has been turned on

 4    its head a little bit to say that because he didn't

 5    understand the purpose of the escrow agreement and why

 6    that was formed, that somehow that shows that the

 7    fraudulent transfer claim is a sure-fire winner.  In

 8    fact, I also note that Judge Glasscock dismissed the

 9    same fraudulent transfer claim against Mr. Dondero in

10    the motion to dismiss.

11                    So we think there's a number of

12    problems with each of the claims.  And I know we're

13    going to get to the promissory estoppel claim.  But I

14    think a couple of issues with that is that we've

15    got -- that claim is predicated on two statements that

16    were by individuals that I don't believe were clear

17    and unequivocal type of statements that could support

18    a promissory estoppel claim.  But moreover, they went

19    to the representation of what was in the terms of the

20    escrow agreement.

21                    And I believe the law is fairly clear

22    that if there is a contract provision that addresses

23    the issue at hand, then you cannot have a promissory

24    estoppel claim based on a representation about that

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 320 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 434 of 1828 PageID 9927
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 319 of 1803 PageID 11065

46

1    contract claim.  And Mr. Daugherty is absolutely

2    seeking relief pursuant to the provisions in the

3    escrow agreement.  And that, in and of itself, would

4    knock out his promissory estoppel claim.

5                  And then -- and maybe the biggest

6    problem -- I think he's got a number of problems with

7    the promissory estoppel claim, but maybe the biggest

8    one is reasonable reliance.  Again, Mr. Daugherty

9    hasn't even alleged that any of the statements were

10   made for the purpose of causing Mr. Daugherty to

11   reasonably -- to rely, and that it would be reasonable

12   to expect him to do so.

13                 But Mr. Daugherty's conduct -- he

14   alleges that he would not have paid the judgment and

15   that he would have sought to invalidate the escrow

16   agreement at trial.  And I think both of those are --

17   they're also, again, conclusory allegations that he's

18   made without sufficient -- he has not made allegations

19   in his complaint in this action sufficient to

20   withstand, I believe, a motion to dismiss, and

21   certainly not to show a likelihood of success on the

22   merits for the status quo motion.

23                 But what he's really said and what he

24   explained in the briefing that he meant by that is

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 321 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 435 of 1828 PageID 9928
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 320 of 1803 PageID 11066

47

```
 1    that he would have sought offset.  The problem that

 2    Mr. Daugherty has there is he -- offset is an

 3    affirmative defense.

 4              THE COURT:  I mean, we're all about to

 5    get into that very deeply, so ...

 6              MR. KATZ:  Okay, Your Honor.  Thank

 7    you, I appreciate that.

 8              But the likelihood of success on the

 9    merits on the promissory estoppel claim, I think, is

10    very low.  He's got similar issues on the unjust

11    enrichment claim because of the representations and

12    because of the equivalent value that HERA received in

13    exchange for the assets.

14              On the fraudulent transfer claim, we

15    don't believe that there was a transfer and there's

16    been evidence of a transfer.  And Counsel may respond

17    to that and say, "Well, that's because Highland hasn't

18    shown where the assets are."  I'm anticipating that to

19    be their response on that.

20              But I think Your Honor identified the

21    point that that's not why you get a status quo motion.

22    If they think there's evidence that they need, you

23    know, there's a motion to compel.  But for purposes of

24    their motion, they have not produced any -- have not
```

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 322 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 436 of 1828   PageID 9929
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 321 of 1803   PageID 11067

48

```
 1   cited to any evidence, have not even made the

 2   allegation that -- other than a conclusory

 3   allegation -- that they have a likelihood to succeed

 4   on the merits.

 5             And then finally, Your Honor, I think

 6   they have the same -- the last element, that with the

 7   harm to him, the harm to Mr. Daugherty would outweigh

 8   the harm to Highland.  They simply have a conclusory

 9   allegation in their motion without providing any

10   support for that, Your Honor.

11             And again, I just -- I'm happy to talk

12   about that issue further, but I think on a motion of

13   this seriousness with the heightened standard, that

14   they need to show that conclusory allegations are not

15   sufficient.

16             THE COURT:  Thank you.

17             MR. KATZ:  Thank you, Your Honor.

18             MR. CHRISTENSEN:  Just briefly, Your

19   Honor.

20             I suppose it's an interesting

21   philosophy of language, a question of what counts as

22   something being conclusory.  But we have certainly

23   done more than offer a conclusion.  We have laid out a

24   timeline of actual intent to delay or defraud with
```

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 323 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 437 of 1828 PageID 9930
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 322 of 1803 PageID 11068

49

1    respect to the fraudulent transfer claim.

2                    And just the items that are attached

3    to our motion at Exhibit N, O, P, and Q, are a series

4    of e-mails and events that I think anybody bringing a

5    fraudulent transfer claim might characterize any one

6    of them as a smoking gun.  That is more than a

7    conclusion.  Our conclusion that this transfer was

8    done with actual intent to defraud is based on very

9    particular, very detailed, minute-by-minute documents.

10   So it is certainly not conclusory.  It's sort of

11   conclusory to call that conclusory.

12                   And it's important, also, to remember

13   that when Vice Chancellor Glasscock suggested that

14   potentially the fraudulent transfer claim could be fit

15   for summary judgment disposition, he also said things

16   like "Maybe there's a perfectly reasonable explanation

17   for this."  I think discovery has shown that there is

18   not a perfectly reasonable explanation for this.  And

19   he did not have access to those documents, nor did we

20   at the time that he made that statement.

21                   As far as seeking this relief rather

22   than simply monetary damages, that has been in our

23   complaint since the beginning.

24                   THE COURT:  What is the -- can you

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 324 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 438 of 1828 PageID 9931
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 323 of 1803 PageID 11069

50

1   address the point that the Texas award is monetary and

2   not for the specific assets that are mentioned now in

3   your briefing?

4                 MR. CHRISTENSEN:  Sure.  I can.

5                 I'll address that by saying, quoting

6   again HERA's closing argument in the Texas trial.

7   "... [I]f Pat Daugherty happens to prevail in his

8   lawsuit against Lane, Patrick and HERA you heard Jim

9   Dondero testify, he gets his interest, which is

10  currently escrowed in the third-party escrow account,

11  all of it."

12                We have made a claim for promissory

13  estoppel that statements like that with codefendants

14  show clear evidence of a promissory estoppel claim.

15  That kind of statement shows how the statement was

16  meant to be perceived, it shows how people did

17  perceive it.

18                And I want to go to the jury question

19  because we actually have -- unlike many cases where

20  the idea of an objective standard, what would a

21  reasonable person do, is sort of an academic question.

22  But in this case we have a jury, which is sort of the

23  quintessential reasonable person, writing back to the

24  judge, "If we assign a dollar value to 'Fair Market

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 325 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 439 of 1828 PageID 9932
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 324 of 1803 PageID 11070

51

 1   Value of Daugherty's HERA units' in Question 18" --

 2   that's the question that awarded him $2.6 million --

 3   "is this in exchange for his HERA units currently in

 4   escrow, or in addition to them?"  The judge instructed

 5   back, "Do not discuss or consider the effect your

 6   answers will have."

 7                 And then the final judgment made clear

 8   that it was not in exchange for those assets in

 9   escrow, that it was in addition to them.  And there

10   was appellate litigation about that issue, and it was

11   settled that it was not a replacement for those units.

12   But my point really is:  We have very clear evidence

13   that the Texas judgment and the people making the

14   Texas judgment believed that those assets were being

15   held in escrow for Pat Daugherty, which is exactly

16   what the defendants tried to tell the jury to believe

17   in their closing arguments.

18                 So the fact that the Texas judgment

19   was purely monetary is, A, not entirely true; and, B,

20   it's not -- does not defeat the promises that they

21   made throughout that trial, nor the fact that they

22   transferred the assets once the judgment came through.

23                 Let's see.  On the promissory estoppel

24   claim, it's just not what they said at trial, that Pat

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 326 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 440 of 1828 PageID 9933
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 325 of 1803 PageID 11071

52

1  Daugherty had an interest in this LLC but, by the way,

2  there's nothing in it.  So if you award him anything,

3  it's going to be completely valueless.

4            I want to respond just briefly to the

5  point that these assets can be valued.  And they can

6  be.  This court is very experienced in appraisals.

7  But the easiest and most efficient way to deal with

8  this, the value, is to give the assets themselves

9  rather than require, effectively, a -- more than one

10 appraisal inside of this case, because there are

11 assets held by a private equity fund, and those assets

12 include private companies.  So we would have to have a

13 sort of quasi-appraisal action contained inside of

14 this, instead of doing what is much easier for the

15 parties and the Court and just addressing those assets

16 in an equitable manner and providing an equitable

17 remedy.

18            The affidavit does say that they are

19 solvent.  I believe the affidavit was also given by

20 the same person that the -- it was either the

21 arbitration panel in *Credit Strategies Fund* or the

22 Bankruptcy Court in *Acis* said that Isaac Levinson's

23 statements were not credible and that his statements

24 contradicted documentary evidence in a clear way.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 327 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 441 of 1828    PageID 9934
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 326 of 1803    PageID 11072

53

1              In addition, they don't say by how
2    much they are solvent.  It could be the case, based on
3    the face of that affidavit, that they are solvent by a
4    million dollars.  We simply don't know.  And again,
5    the question of solvency as it relates to irreparable
6    harm in most of these cases is in a sort of antiseptic
7    environment where it really is just a matter of:  Does
8    this party have sufficient assets?
9              And again, that's not the only
10   question in this case.  The question in this case is:
11   If the Court does nothing, what is the risk that
12   Highland will do exactly what it has done to these
13   assets vis-a-vis this litigant before?
14              That's all I have, Your Honor.
15              THE COURT:  Thank you.
16              My intention is to hear the status quo
17   order and the motion to dismiss and then take a break
18   and see if I can get something together to share my
19   thoughts.  So let's move on to the motion to dismiss,
20   unless folks want to take a short break.
21              MR. KATZ:  I'm prepared to proceed,
22   unless Counsel wants a break.
23              MR. UEBLER:  I'm prepared to go
24   forward.

Appellee Appx. 00320
APPX. 08733

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 328 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 442 of 1828 PageID 9935
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 327 of 1803 PageID 11073

54

1                    THE COURT:  All right.  You may

2       proceed.

3                    MR. KATZ:  Thank you, Your Honor.

4                    So I won't belabor the procedural

5       background, because I know Your Honor is familiar with

6       it, other than to say that after Judge Glasscock had

7       dismissed a large number of Mr. Daugherty's claims,

8       there was -- a promissory estoppel claim was then

9       added.  And we filed the motion to dismiss as to that

10      claim, and that's the motion that we're here for

11      today.

12                   To prevail on a promissory estoppel

13      claim, Mr. Daugherty has to allege a conceivable set

14      of circumstances that would allow a showing that there

15      was a promise that was made, that it was reasonable,

16      that the expectation of the promisor was to induce the

17      action of forbearance on the part of the promisee,

18      that the promisee reasonably relied on the promise and

19      took action to his detriment, and such promise is

20      binding because injustice can be avoided only by

21      enforcement of the promise.

22                   And I do want to -- I will be

23      efficient, but I want to address each of these

24      elements, Your Honor.  And the -- I want to start with

55

 1  the reasonable reliance.  As I mentioned a moment ago

 2  in connection with the status quo order, that

 3  Mr. Daugherty is really claiming that he would have

 4  sought offset had Mr. Dondero -- actually, I

 5  apologize, I want to take a quick step back.

 6              Although Counsel's pointed to a

 7  closing argument of HERA, that I believe he attributed

 8  to Highland's counsel, I just want to be clear for the

 9  record that the statement that Counsel just read from

10  the closing argument was for HERA, not for Highland,

11  and there was separate counsel.

12              THE COURT:  Hasn't there separately

13  been an assertion of a common interest?

14              MR. KATZ:  There was, Your Honor.  But

15  I just believe Counsel -- I'm sure it was

16  inadvertent -- said "Highland."  And I just want to be

17  clear for the record that that statement was on behalf

18  of HERA at closing argument.

19              But, more importantly, in the

20  complaint they only allege two statements: a statement

21  by Jim Dondero at trial and a statement by Mr. Klos in

22  a declaration made several months after the final

23  judgment.  And so when Mr. Daugherty claims that his

24  reasonable reliance was not seeking offset at the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 330 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 444 of 1828 PageID 9937
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 329 of 1803 PageID 11075

56

1  trial, the second statement can't be a basis of that;

2  and the issue that Mr. Daugherty has, that there can't

3  be a reasonably conceivable set of circumstances to

4  show reasonable reliance for a couple of reasons.

5          One, the date that Mr. Daugherty filed

6  his counterclaims with his claims, he had -- the LLC

7  agreement with Highland's offset provision against the

8  value of HERA was in that document.  In fact, that was

9  the basis of one of Mr. Daugherty's claims, that there

10 was going to be -- there was the risk of this improper

11 offset.  He was challenging those provisions.

12         But yet he never pled offset as a

13 defense.  And it is a required affirmative defense

14 under Texas law.  And it is clear that when the final

15 judgment was entered, that's *res judicata*, that issue

16 was barred.

17         So Mr. Daugherty is saying that now

18 had Jim Dondero not testified as he did on the stand,

19 that he would have filed the declaratory judgment

20 action to offset the judgment that Highland obtained

21 against him from the judgment he obtained against HERA

22 cannot serve as the basis for a promissory estoppel

23 claim in this action because he would be barred as a

24 matter of law.

57

 1                    THE COURT:  Is that a little too

 2    technical?  I mean, is the point a little more

 3    abstract than that, which is that had Dondero not

 4    testified as he did and assured everyone in the

 5    courtroom that the escrow was there for Daugherty's

 6    satisfaction down the road, that there are plenty of

 7    different options he could have taken?  I mean, any

 8    sort of resistance or leverage or anything like that

 9    in regards to paying his own judgment, whether or not

10    a technical offset was procedurally available to him,

11    seems to be kind of reducing this a little bit too far

12    down into the technicalities.

13                    MR. KATZ:  Well, I don't believe so,

14    for two reasons.  But the most important one being

15    there's no reasonably conceivable set of circumstances

16    where he could have taken action.  And I'll address

17    that momentarily.

18                    But to the point, that was his

19    response.  That's what's in his pleading, both in his

20    complaint and in response to the motion to dismiss.

21    That's what he said he would have done.  And that

22    wasn't available to him.

23                    And it wasn't just filing a

24    declaratory judgment action for offset that he would

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 332 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 446 of 1828   PageID 9939
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 331 of 1803   PageID 11077

58

1    have been barred from doing.  He had two years to

2    plead offset as a defense or to plead facts in the

3    Texas action that arguably could have given rise to

4    some reliance claim.

5                  THE COURT:  It seems odd to claim that

6    there was no reliance because he didn't do something

7    before the act in question happened.

8                  MR. KATZ:  Well, Your Honor, in fact,

9    quite the opposite.  As Mr. Daugherty said in his

10   reply brief to the status quo motion -- and this is on

11   page 2 and 3 of Daugherty's reply brief -- "In fact,

12   during the trial and before Daugherty won his

13   judgment, Defendants stressed that Daugherty was an

14   owner of HERA units."  Then he puts in a footnote, "At

15   the same time, Defendants took the position that

16   Daugherty held no economic interest in HERA.

17   Accordingly, Daugherty did not take the purported

18   admissions at face value and litigated for a judgment

19   that he retained his HERA units."

20                  And the significance of that, Your

21   Honor -- it's the same significance as what I was

22   trying to say a moment ago and I probably did not say

23   it very clearly -- is from the moment he filed this

24   claim, he was aware that, as he says here, that his

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 333 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 447 of 1828 PageID 9940
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 332 of 1803 PageID 11078

59

1   value -- the value of his shares in HERA were

2   valueless, as Highland was saying they were.  Because

3   that was one of his claims in the lawsuit.  And he did

4   not do anything to try to protect that vis-a-vis a

5   judgment that Highland might get against him at any

6   time during the trial.

7                    So to think that, "Oh, well, he was

8   about to do it" after two years, knowing everything

9   that he knew, the LLC agreement allowing the offset,

10  Highland taking the position that his units were

11  valueless even though he was suing for it, that

12  somehow he was going to try to offset his claim

13  against HERA against Highland's claim against him, and

14  he just didn't do it because Jim made the statement he

15  did on the stand is not a reasonably credible

16  position.  It's not something that could have a -- or

17  there could be a reasonably conceivable set of

18  circumstances to show a reasonable and detrimental

19  reliance.

20                   And I think -- and, Your Honor, if you

21  also look at the whole circumstances around

22  Mr. Dondero's statement on the stand, was not -- in

23  fact, the question -- it was by HERA's counsel that

24  was questioning him at the time.  And the question

Appellee Appx. 00326
APPX 08393

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 334 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 448 of 1828   PageID 9941
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 333 of 1803   PageID 11079

60

1   was:  The assets that are being escrowed, or the money

2   that's being escrowed right now, what happens to them?

3   And I think it's significant for a couple of reasons.

4            One, right now they're talking about

5   the day that the question was asked.  They're not

6   talking about a day in the future.  And I think it's

7   also significant that that was --

8            THE COURT:  Maybe that was the

9   question, but the answer was, "In the future they will

10  go to him."

11           MR. KATZ:  That's -- Your Honor,

12  respectfully, that's not the way I read it.  But I

13  think the point is -- two points, Your Honor.  One,

14  that was a question by HERA's counsel; that was not a

15  question by Daugherty's counsel.

16           If this was so important that

17  Daugherty was going to forego seeking to invalidate

18  the escrow agreement or trying to do trial amendment

19  and get a new claim in, there was no action by his

20  counsel to follow up and say:  Let's be clear.  Let's

21  not talk about right now, let's talk about in the

22  future.  And again -- or ask about what about the

23  resignation provisions, what about the termination

24  provisions.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 335 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 449 of 1828   PageID 9942
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 334 of 1803   PageID 11080

61

1           There's a whole host of conditional

2    circumstances that show that Mr. Daugherty,

3    purportedly relying on that statement to not try to

4    bring a declaratory judgment action for offset or to

5    seek to invalidate the escrow agreement would have

6    been reasonable reliance.  Again -- because, in fact,

7    up until that point, Mr. Daugherty not only waited two

8    years, he waited past the amended pleading deadlines.

9    In the face of what he says, I'm being told by

10   Highland that my assets are valueless.  You know, and

11   to the extent they say that I'm still owning HERA

12   units, I never believed that there was anything there.

13   But yet he didn't do anything about it before

14   Mr. Dondero made the statement to HERA's counsel.

15           So, again, all of those, all of that

16   goes to whether he could have -- show any circumstance

17   where he could have reasonably relied.

18           Similarly, I think if you look -- and

19   I bring in these things to show Your Honor what is not

20   in the complaint or not in the response to the motion

21   to dismiss.  After the judgment, he claims that he was

22   entitled to this offset, but yet he paid his full

23   judgment.  He could have just paid the difference in

24   the judgment.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 336 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 450 of 1828   PageID 9943
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 335 of 1803   PageID 11081

62

1          THE COURT:  That's the point, is that
2    he paid the whole judgment; right?  Kind of chipperly
3    wrote the check and thought it was all going to work
4    out in the end.
5          MR. KATZ:  Right.  Well, without --
6    but with the whole circumstances and you look at his
7    allegations, if his allegations are to be believed,
8    it's not reasonable to believe that somebody who was
9    going to do what he did but for Jim Dondero's
10   statement would have, again, waited for two years, not
11   filed -- not done -- taken the legal actions that he's
12   now claiming he would have taken.
13         He did seek to amend his pleadings
14   right before trial.  These were not in there.  That
15   was, again, before these statements.  Again, it's not
16   credible to believe that he reasonably relied.  And he
17   hasn't alleged anything.
18         Again -- and so that was why I said
19   initially to Your Honor's question, there are two
20   points.  One, when you look at the totality of what he
21   didn't allege and what he didn't do, that there can be
22   no set of circumstances where he reasonably relied,
23   but then when you look at what he says he would have
24   done, which is the offset.  And he would have been

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 337 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 451 of 1828   PageID 9944
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 336 of 1803   PageID 11082

63

 1  legally barred from doing that because he waived it.

 2  Also because -- and the law is cited in our motion,

 3  that because Highland and HERA are separate entities,

 4  there wouldn't have been an offset between those

 5  judgments anyway.

 6              So the two things he says that he

 7  would have done was seek to invalidate the escrow;

 8  which, again, he was aware of that escrow agreement

 9  before trial.  He sought to amend his pleadings before

10  trial but did not address that escrow agreement at

11  all.

12              He has shown that he believes that

13  his -- before Mr. Dondero made that statement, he

14  didn't -- he thought his HERA units had been rendered

15  valueless and that's how he was litigating the case.

16  But he didn't try to "invalidate" the escrow

17  agreement.  He also doesn't explain or provide any

18  allegation of what that means, to invalidate the

19  escrow settlement.

20              He doesn't provide any legal theory or

21  allegation of evidence to support a legal theory that

22  would show that had he sought to invalidate the escrow

23  agreement that the court would have allowed that

24  amendment and it would have changed the outcome.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 338 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 452 of 1828   PageID 9945
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 337 of 1803   PageID 11083

64

1          The next element I want to talk about

2   was that a promise was made.  And, again, he's

3   identified two promises: one by David Klos, one by Jim

4   Dondero.  There's -- the one by Mr. Klos, again, was

5   done several months after trial.  The one by

6   Mr. Dondero is obviously during trial.  But both of

7   those statements, when you look at them, are not

8   unequivocal statements of -- there was no set of

9   circumstances where Mr. Daugherty will not be paid

10  this money on a final, nonappealable judgment.  And --

11  which is what --

12          THE COURT:  Why is that not exactly

13  what Mr. Dondero said?

14          MR. KATZ:  Well, Your Honor,

15  Mr. Dondero was being asked a question about the

16  language in the escrow agreement, that specific

17  provision.  And he was being asked based on

18  circumstances right now.  And perhaps if I give you an

19  analogy.  If I hire an employee and I'm paying the

20  employee $50,000 a year and they're an at-will

21  employee, and somebody asks me, "Well, how much does

22  that employee make?" I'm not likely going to say,

23  "Well, annually $50,000 a year, but I can terminate

24  them at any time."  Or "$50,000 a year, but less

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 339 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 453 of 1828 PageID 9946
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 338 of 1803 PageID 11084

65

1    withholding," or other caveats.

2                       And the question that was asked to

3    Mr. Dondero is the -- right now the assets that are --

4    and I apologize, I don't -- I can grab the quotation.

5    I don't have it right in front of me.  But the key

6    part was that it was predicated on right now, what

7    happens right now if there's a final judgment.

8                       So -- and, again, this is Mr. Dondero

9    who's an individual defendant who is not being

10   questioned as a representative of Highland.  And what

11   they want to do is take that statement and say this is

12   an unequivocal statement that was binding Highland.

13   And it just doesn't rise to that level under the legal

14   standard.

15                      And, you know -- but, moreover --

16   again, because what -- Mr. Dondero was reading the

17   escrow agreement on the stand as a layman, but that's

18   really more significantly the point, is that if the

19   alleged promises are subject to termination by a

20   contract -- I know this is in our pleading, the

21   *TrueBlue HRS Holding* case -- promissory estoppel does

22   not apply where a fully integrated and enforceable

23   contract governs the promise at issue.

24                      And that's the issue, is the contract

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 340 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 454 of 1828   PageID 9947
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 339 of 1803   PageID 11085

66

1   is the contract; it means what it means.  And the --

2   unless there -- I don't believe, Your Honor, that they

3   even alleged that there is some promise, unequivocal

4   promise, that Mr. Dondero or Mr. Klos made that was

5   not subsumed by the escrow agreement.  And that's

6   really the basis of their claim here.

7                 They also have to show that the claim

8   is necessary to avoid injustice.  And obviously, they

9   have brought a fraudulent transfer claim and an unjust

10  enrichment claim arising out of the same course of

11  conduct, that they claim these representations are

12  related to those claims.  And I think the case law is

13  fairly clear on this, that this is exactly the type of

14  situation where a promissory estoppel claim is not

15  necessary to avoid injustice.

16                THE COURT:  But is the conclusion to

17  be taken from your argument that nothing can ever be

18  pled in the alternative to a promissory estoppel

19  claim?

20                MR. KATZ:  No, not at all.  But I

21  believe that you would have to have a set of

22  circumstances where there wasn't a fully integrated

23  enforceable contract, and that the underlying promises

24  weren't about the interpretation of that contract.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 341 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 455 of 1828   PageID 9948
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 340 of 1803   PageID 11086

67

 1                    And then, finally, Your Honor, I'm

 2    going to use the word "conclusory" again, that they --

 3    well, actually not even conclusory, Your Honor.  They

 4    didn't even plead that Highland intended to induce

 5    reliance or that Highland should have reasonably

 6    expected to induce reliance by Mr. Daugherty.

 7                    And I don't think that's necessarily

 8    an accident.  I think that's because the statements

 9    that they're relying on were not statements that were

10    made on behalf of Highland.  They're individual

11    statements.  And I think that it would be fairly

12    tortured to say otherwise.

13                    So, Your Honor, again, for each of

14    those reasons, we don't think that they have pled any

15    reasonably conceivable set of circumstances that could

16    support the promissory estoppel claim.

17                    THE COURT:  Thank you.

18                    MR. KATZ:  Thank you, Your Honor.

19                    MR. UEBLER:  Good afternoon again,

20    Your Honor.

21                    THE COURT:  Good afternoon.

22                    MR. UEBLER:  I'll start with the

23    promise that was made.  And before I do, I think I

24    heard Mr. Katz talking about the standard to prevail

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 342 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 456 of 1828   PageID 9949
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 341 of 1803   PageID 11087

68

1   on a claim.  And I understand we're a little bit late

2   in the game of this lawsuit.  But this is a 12(b)(6)

3   motion and the standard is reasonably conceivable.

4                   So I just want to reset where we are

5   on this motion and talk about the promise that was

6   made, briefly.  So what was the promise?  The promise

7   was Jim Dondero testifying at trial, under oath, that

8   Mr. Daugherty's assets would be held in escrow and

9   released to him through HERA if he won in Texas.  I

10  mean, it was as simple as that.

11                  You may have been left with the

12  impression from Mr. Katz's presentation that the line

13  of questioning was about the terms of the escrow

14  agreement.  I can save all of us and just refer to the

15  pages of the testimony, or I'd be glad to read the

16  preceding three or four questions to set that up.  But

17  it was not interpreting the escrow agreement.  And

18  Mr. Katz didn't have the testimony on hand, but I do.

19  And the question was:

20                  "Question:  Okay, so -- so if

21  Mr. Daugherty somehow prevails in his lawsuit against

22  Patrick Boyce and Lane Britian and HERA, what happens

23  to Mr. Daugherty's interest that's being escrowed

24  right now with a third-party escrow agent?

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 343 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 457 of 1828   PageID 9950
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 342 of 1803   PageID 11088

69

1                    "Answer:   They go to him.

2                    "Question:   I'm sorry?

3                    "Answer:   They go to him via to HERA

4      and then to him."

5                    Is that promise consistent with the

6      escrow agreement?  Yes.  Is that promise separate and

7      apart from the escrow agreement?  Yes.  Mr. Dondero

8      wasn't there interpreting a contract.  He was there

9      making a promise to Daugherty and to the jury.

10                   And just as we allege in paragraph 131

11     of our complaint, it was the reasonable expectation of

12     Highland, when that promise was made, that it was

13     going to be relied on.

14                   THE COURT:  Tell me more how the

15     statement was separate and apart from the contract.

16                   MR. UEBLER:  The statement is separate

17     and apart from the contract because I think --

18     Mr. Katz would be the first one to tell you that

19     Mr. Daugherty was not a party to the escrow agreement.

20     Mr. Daugherty, on the face of it, has no rights under

21     that escrow agreement.

22                   So this idea that Highland proposes

23     that because there's a contract out there that also

24     addresses the subject matter of the promise, the

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 344 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 458 of 1828   PageID 9951
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 343 of 1803   PageID 11089

70

1    promisee is, therefore, precluded from relying on that

2    promise, it just -- it doesn't hold water.  They

3    don't -- they didn't cite any cases.

4                    We said it's not the law of Delaware

5    and never should be.  Highland shouldn't be allowed to

6    contract with Abrams & Bayliss and then use that

7    contract to say that a promise made to Daugherty that

8    Daugherty seeks to enforce, that is -- you know,

9    follows the terms of that contract but doesn't

10   expressly give any rights to Daugherty, that's just --

11   that's not an argument that the Court should accept,

12   in our view.  So that's why I say it's separate from

13   the contract.

14                   And that also gets into the

15   alternative claim argument, too.  Are we entitled to

16   bring promissory estoppel and a fraudulent transfer

17   claim and an unjust enrichment claim?  I think the

18   *Chrysler* case in the Supreme Court settled that

19   question a long time ago.  And I think Rule 8 of this

20   court does, too.

21                   So, of course, there's overlap in what

22   was promised and what's in the escrow.  Although, I

23   will point out, the escrow -- Mr. Katz said something

24   like -- he referred to a host of conditional

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 345 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 459 of 1828 PageID 9952
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 344 of 1803 PageID 11090

71

1 circumstances in the escrow agreement. And I think

2 his point was paragraph 5 and paragraph 10 that they

3 had relied on when Abrams & Bayliss resigned. Well,

4 you won't find any of that in the promise that was

5 made by Jim Dondero under oath to Pat Daugherty and

6 the jury. So whatever conditional circumstances may

7 be in that contract, they're not in that promise.

8             And the notion that Jim Dondero was

9 testifying in his individual capacity, I think we

10 debunked that in Exhibit A to our answering brief --

11 which was Highland's own witness list -- that provided

12 an entire paragraph of what Mr. Dondero would be

13 testifying about, including testimony in support of

14 Highland's and Cornerstone's claims against Daugherty

15 and the damages suffered and the third-party

16 defendants' defenses to claims asserted against them.

17             So Jim Dondero is Highland. He is

18 HERA. He's HERA ERA management. He controls them

19 all. Mr. Katz pointed out that the closing argument

20 by HERA's lawyer in Texas was just HERA's lawyer.

21 Well, Jim Dondero controls HERA, just as he controls

22 Highland. So I view that as a distinction without a

23 difference.

24             But what that closing argument did was

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 346 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 460 of 1828 PageID 9953
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 345 of 1803 PageID 11091

72

 1  reaffirm the promise -- I thought I had it here.  So

 2  what was said on closing argument by HERA's counsel,

 3  just after Jim Dondero made the promise, was "... if

 4  Pat Daugherty happens to prevail in his lawsuit

 5  against Lane, Patrick and HERA you heard Jim Dondero

 6  testify he gets his interest, which is currently

 7  escrowed in the third-party escrow account, all of

 8  it."

 9              Then we had the other promise, which

10  was that September -- September of 2014, the Klos

11  affidavit.  It restated the promise.  This gets to the

12  reasonableness of the reliance of Daugherty's

13  promise -- the promise to Daugherty.  He kept hearing

14  this.

15              And the idea that Daugherty should

16  have somehow foreseen in either the six weeks between

17  when Highland sprung the escrow agreement on him

18  before trial or when Dondero testified or when Klos

19  submitted his affidavit -- by the way, as the senior

20  finance of Highland Capital -- that Daugherty should

21  have foreseen two years from now when he went to pay

22  the judgment that Highland was going to break that

23  promise.

24              So the idea that Daugherty should have

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 347 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 461 of 1828 PageID 9954
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 346 of 1803 PageID 11092

73

1  done something between December 2013 and December of

2  2016, I think entirely misses the point of our claim.

3  The reliance that we allege -- and it's paragraph 133

4  of our complaint -- is "In further reliance on the

5  promises of Highland Capital and its agents, on

6  December 14, 2016, nine days after Highland Capital

7  secretly obtained the Escrow funds, Daugherty wired

8  approximately $3.2 million in cash to Highland Capital

9  in satisfaction of its award of attorneys' fees in the

10  Texas Action."

11             That was the reliance.  What could

12  have been done, other than a cash payment, Daugherty

13  could have just engaged in self-help.  He could have

14  paid the difference between the 2.6 and the 2.8 of the

15  judgments.  He could have not paid anything at all.

16  He at least should have had the chance to go to court

17  like the petitioner did in the *Bonham Bank* case that

18  we cite from Texas to explain to a judge why, under

19  these circumstances, even though there are three

20  different litigants involved, these claims should be

21  offset.  But he didn't even get that chance because he

22  relied on Highland's promises and he wired the full

23  amount.  They took away that chance from him.

24             We don't have to prove today whether

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 348 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 462 of 1828    PageID 9955
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 347 of 1803    PageID 11093

74

1    he would have won on that setoff claim in Texas or

2    anywhere else.  We just have to prove that it's

3    reasonably conceivable that he was deprived of that

4    chance because he reasonably relied, to his detriment,

5    on a promise that was made under oath and repeated.

6                    In their opening brief, the defendants

7    stated that "Injustice can (and should) be avoided

8    through collection efforts in the Texas Action, which

9    Daugherty has not even attempted to pursue, making

10   this claim premature."

11                   I just wanted to point out, this was

12   in Exhibit B to Highland's own opening brief.  They

13   attached Mr. Daugherty's interrogatory responses.  And

14   if you look at Interrogatory 36 on page 25,

15   Mr. Daugherty stated that "... apart from filing this

16   action to collect his Texas judgment, he filed for a

17   writ of execution in Texas on July 7, 2017, which was

18   unsuccessful because Highland Capital claimed HERA had

19   no assets.  The return of service was dated

20   September 26, 2017."

21                   I think that's totally irrelevant to

22   the questions before the Court, but I wanted to point

23   out that Mr. Daugherty did, in fact, attempt some

24   collection efforts in Texas and those were

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 349 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 463 of 1828 PageID 9956
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 348 of 1803 PageID 11094

75

1   unsuccessful.

2            I'd also like to point out that in

3   addition to being able to plead alternative claims,

4   this is one of those cases where injustice can only be

5   avoided through the enforcement of this promise,

6   notwithstanding the other claims out there.  The

7   injustice to be avoided is allowing Highland Capital

8   to walk away with both judgments from the Texas

9   action.  They got Daugherty's 3.2 million, and they

10  got his HERA assets.  And that's the injustice to be

11  avoided.

12            When you and Mr. Katz were discussing

13  this element, he referred to a fully integrated

14  contract.  Again, he would be the first to tell you,

15  I'm sure, that Daugherty has no rights under that

16  fully integrated contract.  So the fact that there is

17  a similar contract out there is not relevant to the

18  analysis.

19            That's all I have, Your Honor.

20            THE COURT:  Thank you.

21            MR. UEBLER:  Thank you.

22            MR. KATZ:  Your Honor, can I just

23  address a couple points?

24            THE COURT:  Yes.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 350 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 464 of 1828   PageID 9957
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 349 of 1803   PageID 11095

76

1           MR. KATZ:  For clarity purposes,

2    Counsel -- this is the second time they've read the

3    statement from HERA's counsel during the closing

4    argument.  That was not part of the statements that

5    were alleged to be part of the detrimental reliance in

6    either the complaint or in the response to the motion

7    to dismiss.

8           And I think that's significant, again,

9    because Counsel is certainly correct that what they

10   say is that Daugherty would not have paid the judgment

11   against him by Highland.  But their explanation of

12   what that means is that he would have sought offset or

13   sought to invalidate the escrow agreement, both of

14   which could only have been done, been sought, during

15   trial.  I suspect that's why they are not relying on

16   the statement that was made at closing argument where

17   it would have been too late for them to make those

18   allegations.

19           Highland had a judgment, a fully

20   perfected final judgment, collectible judgment that

21   Mr. Daugherty paid.  And from the motion to dismiss

22   perspective, claiming that he would have filed either

23   or both of two things that were barred by *res judicata*

24   does not provide the basis to avoid -- where there's a

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 351 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 465 of 1828   PageID 9958
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 350 of 1803   PageID 11096

77

 1   reasonably conceivable set of circumstances that those

 2   allegations could support to avoid a motion to

 3   dismiss.

 4              And, again, we're really just talking

 5   about Jim Dondero's statement because, as Counsel

 6   recognized, the Klos statement was made, I believe,

 7   roughly five months after the -- four or five months

 8   after the final judgment was entered.

 9              And then, finally, lastly, I just want

10   to touch on the escrow agreement.  Of course we

11   recognize Mr. Daugherty is not a party to that

12   agreement.  But Mr. Daugherty's case is that he is

13   asserting rights under that escrow agreement.  He is

14   certainly saying that there was a transfer under that

15   agreement and that that agreement required the assets,

16   the money being held pursuant to that escrow

17   agreement, to go to HERA, which then Mr. Daugherty as

18   the shareholder of HERA would have had rights to.

19              And, you know, we disagree with some

20   of the underlying factual basis.  We don't agree that

21   there was a transfer.  But I think counsel for

22   Mr. Daugherty would certainly not say that there's not

23   a fully enforceable promise in that escrow agreement

24   that they are seeking relief under.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 352 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 466 of 1828 PageID 9959
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 351 of 1803 PageID 11097

78

1                    And that's -- and just as importantly,

2    Mr. Dondero's statement was exclusively an

3    interpretation of that promise.  And that's why -- and

4    I think that's exactly what the *TrueBlue* case is

5    referring to.  And there's a fully integrated contract

6    that has the promise that legally and factually

7    determines what the rights under that contract are.

8                    And Mr. Dondero's interpretation of

9    that contract -- even if it's the exact same as the

10   contract or even if it's different than the

11   contract -- doesn't change that the claim is pursuant

12   to the contract and not for promissory estoppel.

13                   THE COURT:  What is your understanding

14   of Mr. Daugherty's ability to sue to enforce the

15   escrow agreement in a way that benefits him?

16                   MR. KATZ:  Well, he is a shareholder

17   of HERA.  And as a shareholder of HERA -- I mean, I'd

18   have to think through all the *res judicata*, collateral

19   estoppel, statute of limitations issues that all have

20   come out about all the issues that have been

21   litigated.

22                   THE COURT:  I just mean from the terms

23   of the contract.

24                   MR. KATZ:  I don't believe that

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 353 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 467 of 1828   PageID 9960
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 352 of 1803   PageID 11098

79

1   Mr. Daugherty is a third-party beneficiary of the

2   contract, if that's Your Honor's question.  He's

3   certainly not a direct party to the contract, but he

4   is a shareholder of HERA.  And their allegations are

5   that Highland was contractually obligated to send

6   money to HERA under that agreement.

7                    I think there are potentially

8   technical legal issues under that.  That's, of course,

9   not the claim that Mr. Daugherty has brought.  And --

10  but if Mr. Daugherty had any rights, it would be

11  through HERA.

12                   THE COURT:  So is it your

13  understanding that the point of the doctrine that

14  you're relying on, that there can't be both a contract

15  and a claim for promissory estoppel, is that those

16  rights substantially overlap?

17                   MR. KATZ:  I would suspect that's

18  probably the policy reason behind those decisions.

19                   THE COURT:  So if Mr. Daugherty

20  doesn't have contractual rights under the escrow

21  agreement, why does that knock out his promissory

22  estoppel claim?

23                   MR. KATZ:  Because it's the same --

24  because whatever rights he has under the contract,

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 354 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 468 of 1828   PageID 9961
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 353 of 1803   PageID 11099

80

1    whether he has rights or not, are no different than

2    any rights he would have vis-a-vis Mr. Dondero's

3    interpretation of what that contract said, what that

4    contractual language says.

5                    THE COURT:  Go ahead.

6                    MR. KATZ:  I think that the policy is

7    is not to create quasi-contractual claims when there

8    is a contract, regardless of who's the party to the

9    contract.

10                   And, actually, I think it's even --

11   there's no wiggle room around this situation because

12   it's not -- Mr. Dondero was -- I mean, I think the

13   quote was, "They go to Mr. Daugherty through HERA" is

14   the quote.  He wasn't saying something -- there's not

15   been an allegation, for example, that Mr. Dondero's

16   statement or Mr. Klos' statement created a separate

17   contract between Mr. Dondero or Mr. Daugherty.

18                   I mean -- and that's not what -- I

19   mean, there hasn't been an allegation that that's what

20   they were saying -- that Mr. Dondero was saying that

21   or Mr. Klos was saying that.  The allegation is they

22   were saying that's what the contract, the escrow

23   agreement, means.  And that's why you can't have a

24   separate claim, because the contract means what it is

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 355 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 469 of 1828 PageID 9962
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 354 of 1803 PageID 11100

81

 1 | and the contract determines the rights.

 2 |      THE COURT:  I understand.

 3 |      MR. KATZ:  Thank you, Your Honor.

 4 |      THE COURT:  Thank you.

 5 |      MR. UEBLER:  May I, briefly?

 6 |      THE COURT:  Briefly.

 7 |      MR. UEBLER:  Just to be clear, Your

 8 | Honor, we very much rely on the Klos statement as a

 9 | separate promise on behalf of Highland in the

10 | affidavit.  We think it also supports the

11 | reasonableness of the reliance on Mr. Dondero's

12 | promise on behalf of Highland.  But we view the Klos

13 | affidavit as part of the promise generally.

14 |     With respect to the closing argument

15 | by HERA, we didn't use it sooner because we just --

16 | actually, I have to give credit where credit is due --

17 | my colleague, Mr. Christensen just found it.  We

18 | didn't try the Texas case, so we did find it in the

19 | record.

20 |     And fortunately for us, Highland

21 | agrees on pages 13 and 14 of their own motion to

22 | dismiss that the Court can "[consider] additional

23 | materials from related litigation that were not

24 | attached to the complaint if the plaintiff relied on

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 356 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 470 of 1828 PageID 9963
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 355 of 1803 PageID 11101

82

1    those materials in casting his complaint, as Daugherty

2    has done with regard to the Texas Action."

3                  The last paragraph on page 14 goes on

4    to say, "To the extent the Court finds that the Texas

5    Action materials are not already subject to

6    consideration based on Daugherty's extensive reliance

7    on them, Defendants respectfully request that the

8    Court take judicial notice of the documents under

9    Delaware Rule of Evidence 202(d)(2)."

10                  So we submit that the Court certainly

11    can consider the trial transcript from the Texas

12    action as further support for the reasonableness of

13    Mr. Daugherty's reliance.

14                  And my final point with respect to the

15    escrow agreement and the notion -- I think that what

16    Mr. Katz said is that Daugherty, in his view, has no

17    direct rights under that agreement.  The only real

18    direct relevance of the escrow agreement with respect

19    to the promissory estoppel claim is that it's even

20    more evidence of the reasonableness of Mr. Daugherty's

21    reliance on the promise because it's consistent with

22    that promise.

23                  Thank you, Your Honor.

24                  THE COURT:  Thank you.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 357 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 471 of 1828   PageID 9964
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 356 of 1803   PageID 11102

83

1            Anything to -- Mr. Katz, I'll give you
2    the last word.
3            MR. KATZ:  No, Your Honor.
4            Just to address Counsel's last point
5    about just finding the statement.  You know, again, I
6    think that the issue is what did Mr. Daugherty
7    actually rely on.  Their claim is that when he wired
8    $3.2 million -- not what statements Counsel has found
9    in the record recently that could be retroactively
10   applied that way.
11           And Counsel's -- again, the complaint
12   that is in front of Your Honor that has the
13   allegations rely on the two statements and is very
14   clear that -- it is explained in their briefing --
15   that the remedies -- that the detrimental reliance was
16   forbearance from taking action in the Texas lawsuit.
17           So anything that occurred anytime
18   after they could raise issues in a Texas lawsuit could
19   not have been a basis for detrimental reliance.
20           THE COURT:  Thank you.
21           I'm going to take a recess.  It will
22   be at least 20 minutes.  So stretch your legs, do
23   whatever.  It'll probably be longer than that.  But --
24   thanks for your patience, but it's faster this way in

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 358 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 472 of 1828   PageID 9965
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 357 of 1803   PageID 11103

84

1    the short term.

2                        So we are in recess.

3         (Recess taken from 3:35 p.m. until 4:18 p.m.)

4                        THE COURT:  Thank you for your

5    patience.

6                        I'm going to start with the motion for

7    a status quo order.  It is denied.  We have some time

8    constraints this afternoon, so I will cut to the

9    chase.  Daugherty has not established a threat of

10   imminent irreparable harm as he must.  It is clear

11   that Daugherty is pursuing this relief now based on

12   what happened in the *Redeemer* case.  This complaint

13   was filed in July 2017, and he did not seek the relief

14   that he's now seeking until after the papers on the

15   status quo order dispute were filed in the *Redeemer*

16   case.  And Daugherty cites Highland's submissions in

17   that case in his brief.

18                       I disagree with Daugherty's reading of

19   the *Redeemer* papers as indicating that Highland is in

20   "severe financial distress" and is "unable to satisfy"

21   the arbitration judgment at issue there.  And the

22   facts are very different as between the two cases.

23   Before going to arbitration, there were issues

24   involving control over assets that led to Highland

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 359 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 473 of 1828   PageID 9966
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 358 of 1803   PageID 11104

85

1  making representations to the Court in the *Redeemer*

2  case.  And in the more recent request for a status quo

3  order related to confirming an arbitration judgment,

4  there was no separate claim that this court needed to

5  adjudicate, like Daugherty's fraudulent transfer claim

6  here.

7            And, finally, the *Redeemer* parties

8  ultimately stipulated to a status quo order.  So I

9  don't think that anything that this court did in

10 entering the agreed-upon status quo order is helpful

11 in deciding whether to issue one in this case.

12           Daugherty says that Highland has a

13 pattern of avoiding judgments, but has given me no

14 reason to think that Highland is going to do something

15 between now and a post-trial opinion that would make

16 it incapable of satisfying a judgment, nor is there

17 anything in the *Redeemer* case that leads me to believe

18 that.

19           Quite frankly, if Highland is as good

20 at avoiding judgments as Daugherty claims, Highland

21 would have already moved the assets.  Daugherty, in

22 his reply, touches on that point and raises concerns

23 about whether the assets have already been

24 transferred.  He used a metaphor about the straw

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 360 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 474 of 1828   PageID 9967
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 359 of 1803   PageID 11105

86

1    breaking the camel's back.  I'm going to use a

2    different ungulate.  He's provided no reason to

3    believe the horse is not already out of the barn or

4    that the horse is going to imminently flee the barn.

5              So I fully appreciate that Daugherty

6    says that this is what happened to him in Texas, and

7    I've indicated before that I agree with Vice

8    Chancellor Glasscock's sentiment that what happened

9    here fails more than the smell test.  But that doesn't

10   mean that there is a sufficient imminent threat that

11   it's going to happen here with Highland.

12             I also distinguish this case from Vice

13   Chancellor Glasscock's entry of a status quo order in

14   the *Trussway* matter, which admittedly was, in part,

15   based on Highland's "prior history."  In that ruling,

16   Vice Chancellor Glasscock noted the unique appraisal

17   remedy that was at issue there, and distinguished that

18   property right -- which is meant to substitute for a

19   stockholder's ability to insist on unanimity in a

20   merger -- from recovery in a tort or contract case.

21   Daugherty is seeking the more common sort of recovery

22   here, so I do not find *Trussway* instructive.

23             So, in sum, because Daugherty's motion

24   for a status quo order is based on a recent

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 361 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 475 of 1828 PageID 9968
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 360 of 1803 PageID 11106

87

1   development that does not support a conclusion that

2   Daugherty faces imminent irreparable harm, the motion

3   for a status quo order is denied.

4           Mr. Christensen, do you have any

5   questions about that?

6           MR. CHRISTENSEN:  No, I do not.

7           THE COURT:  Okay.  Anything from DLA?

8           MR. KATZ:  No, Your Honor.

9           THE COURT:  Thank you.

10          Moving on to the motion to dismiss.

11  Highland's motion to dismiss Count IX of the amended

12  complaint is denied.  Count IX is a claim for a

13  promissory estoppel.  And to state a claim for

14  promissory estoppel, a plaintiff must plead four

15  elements.

16          The first is that a promise was made.

17  The second is that it was the reasonable expectation

18  of the promisor to induce action or forbearance on the

19  part of the promisee.  The third is the promisee

20  reasonably relied on the promise and took action to

21  his detriment.  The fourth is that the promise is

22  binding because injustice can be avoided only by

23  enforcement of the promise.  That's all from the

24  *Chrysler* case out of the Supreme Court in 2003.

Appellee Appx. 00354
APP. 08219

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 362 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 476 of 1828 PageID 9969
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 361 of 1803 PageID 11107

88

1          On Highland's motion to dismiss, I

2    applied a reasonable conceivability standard of

3    Rule 12(b)(6). Under that standard, I must accept all

4    well-pleaded factual allegations as true, accept even

5    vague allegations in the complaint as well-pleaded if

6    they provide the defendant notice, draw all reasonable

7    inferences in favor of the plaintiff, and deny the

8    motion unless the plaintiff could not recover under

9    any reasonably conceivable set of circumstances

10   susceptible of proof. That familiar standard is from

11   *Century Mortgage Company v. Morgan Stanley.*

12          Applying this standard, plaintiff has

13   adequately pled the four elements. First, Highland

14   made promises through representations it and its

15   agents made in the Texas action. Highland, through

16   testimony, explained that Daugherty would receive the

17   escrowed assets upon a judgment being finalized.

18          Daugherty cites testimony from James

19   Dondero, Highland's cofounder and president. On

20   direct examination, Dondero was asked what would

21   happen to Daugherty's interest that was being held in

22   escrow, and Dondero stated that it would go to

23   Daugherty via HERA if he won. This testimony is cited

24   in paragraphs 43 and 129 of the complaint.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 363 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 477 of 1828   PageID 9970
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 362 of 1803   PageID 11108

89

1              Highland tries to distance itself from

2      Dondero, but it cannot do so at this stage.  Highland

3      says Dondero was testifying in a personal capacity.

4      But the witness list Highland filed in the Texas

5      action shows that is not the case.  That is Exhibit A

6      to Daugherty's answering brief.  Highland had no

7      response to this in its reply brief, beyond

8      reiterating its original argument that Dondero was not

9      speaking on Highland's behalf.

10              Based on the allegations of the

11     complaint, including Dondero's role, it is reasonably

12     conceivable he was speaking on behalf of Highland.

13              Other support for the alleged promise

14     comes from an affidavit attached as Exhibit I to the

15     complaint from David Klos.  Klos submitted the

16     affidavit and stated he had "... personal knowledge of

17     the facts stated in this affidavit as the Senior

18     Manager of Finance for Highland Capital ..." and

19     because he oversaw accounting relating to HERA.  Klos

20     reiterated in his affidavit what the escrow agreement

21     says, and Dondero testified to, which is that after a

22     final nonappealable judgment, A&B, as the escrow

23     agent, would transfer the deposit assets to HERA.

24              Highland also tries to distance itself

Appellee Appx. 00356
APPX 03073

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 364 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 478 of 1828   PageID 9971
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 363 of 1803   PageID 11109

90

1    from Klos.  And it cannot do so, as the document

2    presented to the Texas court states Klos was providing

3    the affidavit in his capacity as Highland's Senior

4    Manager of Finance.  At this stage, that is

5    sufficient.

6                     Together, these allegations are

7    sufficient to establish that Highland made a promise

8    that the assets would be held in escrow and released

9    to Daugherty, via HERA, if Daugherty won in Texas.

10                    Second, the reasonable expectation of

11   Highland as the promisor was to induce action or

12   forbearance on the part of Daugherty as promisee.

13                    In briefing, Highland says the

14   statements were not directed to Daugherty, "... but

15   rather [to] the jury, the judge, legal counsel, the

16   public, and so forth."  That's a quote from page 20 of

17   Highland's reply.  It simply makes no sense to say

18   that the statements were directed to everyone else

19   involved in the legal proceeding -- indeed, in the

20   world by virtue of including "the public" -- but not

21   Daugherty, who had the greatest interest in that

22   proceeding.  It is reasonably conceivable the

23   reasonable expectation of someone discussing the

24   escrow agreement, as Highland did, would have been to

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 365 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 479 of 1828 PageID 9972
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 364 of 1803 PageID 11110

91

 1   induce action or forbearance by their adversary in the

 2   litigation.

 3               Third, it is reasonably conceivable

 4   that Daugherty reasonably relied on the promise and

 5   took action to his detriment.

 6               Daugherty could have pursued other

 7   strategies if the escrow was not in place.  Daugherty

 8   paid a judgment in the same case to Highland, which he

 9   alleges was in the amount of $3.2 million.  If

10   Daugherty knew what would happen with the escrow, he

11   could have fought tooth and nail for an offset of the

12   judgment amounts.

13               Highland focuses on the availability

14   of a triangular offset in this situation, asserting

15   that even if HERA owed Daugherty money, Daugherty was

16   legally unable to offset the judgment he owed Highland

17   by what he was owed from HERA.  I think that misses

18   the point, which is that Daugherty forewent even

19   trying to obtain the offset, and bringing the issue to

20   the attention of the Texas court.

21               He could have argued for other

22   provisions in the final judgment, but he didn't.  He

23   paid his judgment and expected HERA and Highland would

24   do the same as set forth in the escrow agreement.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 366 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 480 of 1828   PageID 9973
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 365 of 1803   PageID 11111

92

1              Other members of this court have
2   adopted a "no-chumps policy," meaning that good guys
3   should not feel like chumps for following the rules.
4   Daugherty played the game straight, and alleges
5   Highland and HERA didn't.  It is at least reasonably
6   conceivable that Daugherty pursued the strategy he did
7   because of the promises Highland made during the
8   course of the litigation.
9              And that reliance was reasonable.
10  Highland says Daugherty should have expected the worst
11  because the language of the escrow agreement allowed
12  the escrow agent to resign at any time, and so it was
13  never a sure thing that the assets would be available
14  to Daugherty.
15             In its reply, Highland says there was
16  never any promise "... that the Escrow Agreement would
17  never be terminated or that the Deposit Assets would
18  never be transferred back to Highland ...."  That
19  reflects a dim view of the world, the way adversaries
20  should evaluate the representations and promises made
21  during litigation, and how the people making those
22  promises should conduct themselves.  Daugherty has
23  adequately pled it was reasonable for him to rely on
24  the statements he's identified.

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 367 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 481 of 1828   PageID 9974
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 366 of 1803   PageID 11112

93

1               Fourth and finally, it is reasonably
2    conceivable that the promise is binding because
3    injustice can be avoided only by enforcement of the
4    promise.
5               Daugherty has made the point that
6    Highland walked away from the Texas litigation with
7    the benefit of both judgments.  It received the assets
8    supposedly held in escrow to satisfy the judgment for
9    Daugherty, and it received payment from Daugherty to
10   satisfy the judgment against him.
11              Black's Law Dictionary defines
12   "injustice" as "an unjust state of affairs;
13   unfairness."  As myself and Vice Chancellor Glasscock
14   have indicated, Daugherty's allegations raise serious
15   concerns over the fairness of how things played out in
16   Texas.  It may be that the only way to avoid injustice
17   is to enforce the promises.
18              It is not fatal to Daugherty that he
19   has pled alternative theories of relief.  Our Rule 8
20   allows it, and our Supreme Court has blessed doing so
21   for promissory estoppel in the *Chrysler v. Chaplake*
22   *Holdings* case.  At the pleadings stage, those
23   alternative theories of relief can go forward.
24              Highland also claims promissory

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 368 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 482 of 1828   PageID 9975
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 367 of 1803   PageID 11113

94

```
 1   estoppel is not needed to prevent injustice because
 2   the alleged promises are incorporated within the
 3   escrow agreement, an enforceable contract.  But
 4   Daugherty is not a party or a third-party beneficiary,
 5   and so cannot sue under the contract's terms.  For
 6   those reasons, the motion to dismiss is denied.
 7                   Mr. Katz, any questions?
 8                   MR. KATZ:  No, Your Honor.
 9                   THE COURT:  Anything from you,
10   Mr. Uebler?
11                   MR. UEBLER:  No, Your Honor.
12                   THE COURT:  I'd like to, then, talk
13   about how we're going to get the summary judgment
14   briefing done in time for trial and in time for me to
15   have a minute to think about it.
16                   MR. KATZ:  Your Honor, we conferred --
17   my colleague conferred with Mr. Uebler this morning.
18   I think we've worked out a schedule.
19                   THE COURT:  How long does that
20   schedule leave me to think about it?
21                   MR. UEBLER:  Let me take a stab at
22   this, Your Honor, and see if it makes any sense to
23   you.  So it's my understanding that the defendants are
24   going to cross-move, or Highland -- it's a claim
```

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 369 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 483 of 1828 PageID 9976
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 368 of 1803 PageID 11114

95

1 against Highland. Highland will cross-move for

2 summary judgment, and we will receive an answering

3 brief/opening brief by June 14th. We'll reply by

4 June 28th. And then looks like July 17th will be the

5 final brief.

6                And I'm sure I speak for all the

7 parties when I say we have no intention of imposing a

8 burden on the Court to resolve that motion prior to

9 trial. I think -- at least my view, and Mr. Katz and

10 Mr. Reed can chime in -- we don't necessarily need to

11 resolve the summary judgment/indemnification claim

12 before trial because there's really not that much, if

13 any, issue of fact to try regarding indemnification.

14                I would propose that we resolve on the

15 papers, when the Court's able to do so, the issue of

16 entitlement. And then, to the extent there's an issue

17 of allocation or reasonableness, we can get together

18 and propose something similar to Vice Chancellor

19 Laster's *Fitracks* opinion. That was an advancement

20 case, but I would envision something similar here.

21                So we're working in parallel and not

22 burdening anybody prior to trial on those issues.

23                THE COURT: Anything to add?

24                MR. KATZ: No, Your Honor.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 370 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 484 of 1828   PageID 9977
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 369 of 1803   PageID 11115

96

1                    THE COURT:  All right.  That works for

2     me, then, especially with the logical conclusion that

3     this can just kind of float in parallel to the real

4     merits issues to be handled at trial.

5                    Anything else that we need to discuss

6     today while we're all together?

7                    MR. KATZ:  Not from our side.

8                    THE COURT:  We pretty much handled

9     every aspect of the case today.  Thank you, all, for

10    your presentations, they were helpful.  And we'll be

11    in touch.

12                    We're adjourned.

13                    (Court adjourned at 4:33 p.m.)

14                         -  -  -

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 371 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 485 of 1828   PageID 9978
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 370 of 1803   PageID 11116

97

1                        CERTIFICATE

2

3              I, KAREN L. SIEDLECKI, Official Court

4   Reporter for the Court of Chancery of the State of

5   Delaware, Registered Merit Reporter, and Certified

6   Realtime Reporter, do hereby certify that the

7   foregoing pages numbered 3 through 96 contain a true

8   and correct transcription of the proceedings as

9   stenographically reported by me at the hearing in the

10  above cause before the Vice Chancellor of the State of

11  Delaware, on the date therein indicated, except for

12  the rulings at pages 3 through 19 and 84 through 94

13  which were revised by the Vice Chancellor.

14              IN WITNESS WHEREOF I have hereunto set

15  my hand at Wilmington, this 22nd day of May, 2019.

16

17

18

19          /s/Karen L. Siedlecki
20        ----------------------------
              Karen L. Siedlecki
21           Official Court Reporter
            Registered Merit Reporter
22          Certified Realtime Reporter

23

24

CHANCERY COURT REPORTERS

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 372 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 486 of 1828 PageID 9979
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 371 of 1803 PageID 11117

# APPENDIX 5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 373 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 487 of 1828 PageID 9980
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 372 of 1803 PageID 11118

**EFiled: Jul 08 2019 04:21PM EDT**
**Transaction ID 63518449**
**Case No. 2017-0488-MTZ**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PATRICK DAUGHERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0488-MTZ |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, | ) | |
| L.P., HIGHLAND EMPLOYEE | ) | |
| RETENTION ASSETS LLC, | ) | |
| HIGHLAND ERA MANAGEMENT LLC, | ) | |
| and JAMES DONDERO, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HIGHLAND EMPLOYEE | ) | |
| RETENTION ASSETS LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## ORDER DENYING APPLICATION TO
## CERTIFY INTERLOCUTORY APPEAL

WHEREAS:

A.    Plaintiff Patrick Daugherty was a partner and senior executive of Defendant Highland Capital and certain of its affiliates from 1998 until his resignation in 2011.

B.    Highland sued Daugherty in Texas, and Daugherty countered with claims against Highland and Highland Employee Retention Assets LLC ("HERA") (the "Texas Action").

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 374 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 488 of 1828 PageID 9981
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 373 of 1803 PageID 11119

C. During the course of the Texas Action, Defendants represented to the Texas court that Highland had placed Daugherty's HERA interests, worth approximately $3.1 million, in escrow with Abrams & Bayliss LLP as escrow agent.

D. Highland received a judgment against Daugherty, and Daugherty received a judgment against HERA. Daugherty paid the judgment against him. HERA did not pay the judgment against it. The day after the Texas judgment became final and non-appealable, Abrams & Bayliss resigned as escrow agent and transferred the escrow assets it held back to Highland. HERA claimed to have no assets to satisfy a judgment.

E. Daugherty responded by filing his complaint in this action on July 6, 2017. Vice Chancellor Glasscock, who previously presided over this case, dismissed some of Daugherty's claims. Daugherty then filed his first amended complaint. The case was reassigned to me in October 2018. After Daugherty filed his second amended complaint, I denied a motion to dismiss. The surviving claims are for fraudulent transfer, unjust enrichment, and indemnification.

F. On February 2, 2018, Daugherty served a subpoena on Abrams & Bayliss.[1] Defendants moved to quash the subpoena "in its entirety given the privileged and sensitive nature of the information requested and Daugherty's

---

[1] D.I. 52.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 375 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 489 of 1828  PageID 9982
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 374 of 1803  PageID 11120

failure to demonstrate relevance to this lawsuit."[2]  Vice Chancellor Glasscock heard the motion to quash.  He started the argument by stating "general principles":

> First, information regarding the actions of Abrams & Bayliss in connection with its operation of the escrow as agents of Highlands, HERA, those documents, that information is relevant, and it doesn't appear to me to be generally privileged. Second, to the extent the subpoena requests attorney client privilege material, I'm going to need a privilege log to decide issues of privilege, waiver, and common interest doctrine. Third, it is appropriate to seek discovery from the escrow agent as well as from the defendants.  Fourth, the subpoena in question is overbroad as it seeks information far beyond Abrams & Bayliss' documents as escrow agents, and I'm not going to require a third party to answer overbroad discovery requests that surely implicate attorney-client privilege.  Fifth, I am therefore disposed to quash the subpoena with leave to file a more narrow subpoena. And once that subpoena is issued, there needs to be a meaningful meet and confer as to what is producible and what is not so that the disputes that come to me are tailored to the discoverability of the documents and any privilege that may apply.[3]

G.    Daugherty again subpoenaed Abrams & Bayliss, which produced 285 documents.  Daugherty and Abrams & Bayliss met and conferred.  Defendants asserted more than 300 documents were privileged.

H.    Daugherty challenged Defendants' privilege assertions by moving to compel (the "Motion").  Daugherty challenged whether documents relating to Abrams & Bayliss's work as escrow agent were properly withheld, and argued the

---

[2] D.I. 61 ¶ 2.

[3] D.I. 97 at 3-4.

Appellee Appx. 00368
APP. 0823

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 376 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 490 of 1828   PageID 9983
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 375 of 1803   PageID 11121

crime-fraud exception vitiated any proper assertion of privilege.  I heard argument

on April 12.[4]  The hearing was not productive as Defendants could not articulate

the scope of their claimed privilege.  I gave Highland yet another chance to defend

its privilege and reconsider its privilege log, and specifically requested Abrams &

Bayliss's engagement letter and billing records.  I also requested to review the

withheld documents *in camera*.[5]

I.      After receiving and reviewing the documents on the Defendants'

privilege log *in camera*, I granted the Motion (the "Motion to Compel Ruling").

The privilege log was organized chronologically, and the withheld documents fell

into four categories.   The first comprised documents regarding the initiation,

negotiation, and establishment of Abrams & Bayliss as Highland's escrow agent.

The second comprised Abrams & Bayliss's legal work during the pendency of the

Texas action to determine whether and how Daugherty might access the escrowed

assets.  The third category comprised Abrams & Bayliss's work responding to a

subpoena in Texas.  And the fourth comprised documents regarding Abrams &

Bayliss's resignation as Highland's escrow agent.

J.      For reasons set forth at length in the Motion to Compel Ruling, I

concluded that "unfortunately my *in camera* review confirmed Daugherty's fear

---

[4] D.I. 181.

[5] D.I. 181 at 37-38.

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 377 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 491 of 1828 PageID 9984
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 376 of 1803 PageID 11122

that Highland is improperly withholding documents in categories 1 and 4 illustrating A&B's service and resignation as escrow agent, which are nonprivileged materials."[6]   I decided any privilege related to the topics in categories 1 and 4 was waived, but stopped short of a broader waiver.[7] Additionally, I concluded that even assuming categories 1 and 4 were privileged, the crime fraud exception applied to categories 1, 2 and 4.[8]

K.    On May 24, 2019, Defendants moved for reargument.[9]   On June 3, Defendants moved to stay the implementation of the Ruling pending interlocutory appeal.  On June 17, I denied Defendants' motion for reargument and declined to stay the decision pending interlocutory appeal (the "Reargument Ruling" and together with the "Motion to Compel Ruling," the "Rulings").[10]   I ordered the parties to agree upon a framework under Delaware Rule of Evidence 510(f) to govern discovery under the Rulings, which was entered on June 27.

---

[6] D.I. 218 at 4.

[7] *Id*. at 10 ("Because Highland stuck by its position and continued to assert such a large percentage of improper privilege assertions while claiming it was producing documents concerning A&B's role as escrow agent, any privilege related to that topic is waived, and a full waiver of Highland's privilege could be an appropriate consequence. … I conclude Highland's unjustified withholding of other documents related to the escrow was not so egregious as to waive any privilege over these two sets of documents.").

[8] *Id*. at 10-15.

[9] D.I. 211.

[10] D.I. 253 (unredacted, filed under seal); D.I. 254 (redacted).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 378 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 492 of 1828 PageID 9985
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 377 of 1803 PageID 11123

L.      On June 17, Defendants applied for certification of an interlocutory
appeal of the Rulings (the "Application").[11]   Defendants identified three issues for
certification:

>       1.      Can Delaware courts apply the crime-fraud exception to
>               destroy both attorney-client privilege and work-product
>               protection without sufficient prima facie evidence that a
>               party committed or attempted a fraud?
>
>       2.      Can Delaware courts apply the crime-fraud exception to
>               destroy both attorney-client privilege and work-product
>               protection with respect to communications years before
>               an alleged fraudulent transfer and without specific
>               findings that each communication at issue was made in
>               furtherance of the alleged fraud?
>
>       3.      Can the Court impose a waiver of privilege as
>               punishment from a party's good faith, but ultimately
>               incorrect, assertion of privilege?[12]

M.      Plaintiff filed his opposition to the Application on June 27.

N.      Under Supreme Court Rule 42(b), there are to be no interlocutory
appeals "unless the order of the trial court decides a substantial issue of material
importance that merits appellate review before a final judgment."[13]

O.      "If the 'substantial issue' requirement is met, this Court will then
analyze whether 'there are substantial benefits that will outweigh the certain costs

---

[11] D.I. 231.

[12] D.I. 231 at 5.

[13] Supr. Ct. R. 42(b)(i).

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 379 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 493 of 1828   PageID 9986
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 378 of 1803   PageID 11124

that accompany an interlocutory appeal.'"[14]  Under Supreme Court Rule 42(b)(iii)

the Court weighs the following factors along with "its own assessment of the most

efficient and just schedule to resolve the case":

> (A) The interlocutory order involves a question of law resolved for the first time in this State; (B) The decisions of the trial courts are conflicting upon the question of law; (C) The question of law relates to the constitutionality, construction, or application of a statute of this State, which has not been, but should be, settled by this Court in advance of an appeal from a final order; (D) The interlocutory order has sustained the controverted jurisdiction of the trial court; (E) The interlocutory order has reversed or set aside a prior decision of the trial court, a jury, or an administrative agency from which an appeal was taken to the trial court which had decided a significant issue and a review of the interlocutory order may terminate the litigation, substantially reduce further litigation, or otherwise serve considerations of justice; (F) The interlocutory order has vacated or opened a judgment of the trial court; (G) Review of the interlocutory order may terminate the litigation; or (H) Review of the interlocutory order may serve considerations of justice.

P.      "If the balance is uncertain, the trial court should refuse to certify the

interlocutory appeal."[15]

**IT IS ORDERED**, this 8th day of July, 2019, that the Application is

DENIED based on the following:

1.      The Rulings did not decide "a substantial issue of material importance

that merits appellate review before a final judgment."[16]  "The 'substantial issue'

---

[14] *Sider v. Hertz Glob. Hldgs., Inc.*, 2019 WL 2501481, at *4 (Del. Ch. June 17, 2019) (quoting Supr. Ct. R. 42(b)(ii)).

[15] Supr. Ct. R. 42(b)(iii).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 380 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 494 of 1828 PageID 9987
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 379 of 1803 PageID 11125

requirement is met when an interlocutory order decides a main question of law which relates to the merits of the case, and not to collateral matters."[17] "Generally speaking, the substantive element of the appealability of an interlocutory order must relate to the merits of the case, not to matters of discovery."[18] That "proscription against interlocutory review of discovery rulings 'does not change merely because the discovery/disclosure order implicates the attorney-client privilege.'"[19] The Rulings decided the application and waiver of the attorney-client and work product privileges, not a main issue on the merits. The Rulings did not decide a substantial issue of material importance that warrants appellate review before a final judgment.

2. Highland argues that it is not seeking "appellate review simply so that an appellate court can re-review each communication at issue and evaluate the privilege determinations made. . . . What [it] seeks is different. It challenges the

---

[16] Supr. Ct. R. 42(b)(i).

[17] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2861717, at *1 (Del. Ch. July 22, 2008).

[18] *In re Examworks Grp., Inc.*, 2018 WL 1672991, at *2 (Del. Ch. Apr. 05, 2018) (ORDER) (quoting *Castaldo v. Pittsburgh-Des Moines Steel Co.*, 301 A.2d 87, 87 (Del. 1973)); *accord Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1993 WL 478084, at *1 (Del. Nov. 16, 1993) (ORDER); *see also Deloitte LLP v. Klig*, 2010 WL 3736141, at *1 (Del. Sept. 27, 2010) (ORDER) (refusing interlocutory appeal of order finding waiver of privilege).

[19] *Certain Underwriters at Lloyd's, London v. Monsanto Co.*, 1991 WL 134471, at *1 (Del. June 7, 1991) (ORDER) (citations omitted) (quoting *In re Rinehardt*, 575 A.2d 1079, 1081 (Del. 1990)).

8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 381 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 495 of 1828   PageID 9988
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 380 of 1803   PageID 11126

Order's _legal conclusions_ that will reverberate throughout this action."[20]  This is a distinction without a difference.  Whether a party properly asserted a privilege, or whether an exception to the privilege applies, is a legal conclusion.  The question is whether it is the type of legal conclusion that warrants interlocutory review.  It is not.

3.    Turning to the factors underpinning whether there are substantial benefits that will outweigh the costs of interlocutory appeal, Highland identifies only Supreme Court Rule 42(b)(iii)(B) and (H) as favoring its Application.  I therefore "limit[] my review principally to those" issues.[21]  In short, the high costs of piecemeal litigation and interlocutory appeals outweigh the value of this Application.  This is particularly true here where trial will start on September 10 and there are other ongoing discovery disputes requiring the parties' attention.[22]

4.    The Rulings do not conflict with decisions of other trial courts.[23] Defendants have not identified any Delaware decision at odds with the Rulings on the crime-fraud exception.  Defendants cite authorities, such as _Buttonwood Tree_

---

[20] D.I. 231 at 6 (emphasis in original).

[21] _Chemours Co. v. DowDuPont Inc._, 2019 WL 2404817, at *3 (Del. Ch. June 7, 2019).

[22] On July 5, I attempted to quantify and remedy Defendants' other discovery shortcomings by appointing a third-party neutral to collect documents.  D.I. 255.  It is possible that trial will have to be postponed.  But this possibility, borne from Defendants' failure to collect their own documents, should not support the relief Defendants seek here.

[23] Supr. Ct. R. 42(b)(iii)(B).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 382 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 496 of 1828 PageID 9989
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 381 of 1803 PageID 11127

*Value Partners, L.P. v. R.L. Polk & Co.*,[24] and *Princeton Ins. Co. v. Vergano*,[25]

discussed in the Rulings, and argue the Court erred in ruling Daugherty had made a

*prima facie* showing of fraud. Defendants do not dispute that Abrams & Bayliss

assisted Highland in the transaction that Daugherty claims was fraudulent, but

argue he "has not established through a prima facie showing [] that the transaction

*was* fraudulent."[26]

    5.    Distilled, Defendants' argument is that Daugherty has not shown

sufficient evidence of fraud in Highland's "desire to avoid paying money to

Daugherty."[27]  In arguing the Court applied a standard that was too low,

Defendants advocate for a standard that is too high. As explained in the

Reargument Ruling, "the party opposing the privilege is not required to introduce

evidence sufficient to support a verdict of crime or fraud or even to show that it is

more likely than not that the crime or fraud occurred."[28] Discovery to date, and *in

camera* review, indicate that Defendants used Abrams & Bayliss as their escrow

agent, made numerous representations to the Texas court and Daugherty that assets

to satisfy any judgment were held in escrow, held the assets in escrow differently

---

[24] 2018 WL 346036 (Del. Ch. Jan. 10, 2018).

[25] 883 A.2d 44 (Del. Ch. 2005).

[26] D.I. 231 at 9 (emphasis in original).

[27] *Id*. at 9 n.2.

[28] D.I. 254 at 11 (quoting *Kickflip, Inc. v. Facebook, Inc.*, 2016 WL 5929003, at *5 (D. Del. Sept. 14, 2016)).

Appellee Appx. 00375
APP. 08732

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 383 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 497 of 1828 PageID 9990
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 382 of 1803 PageID 11128

than represented, and then at the end of it all directed Abrams & Bayliss to transfer assets from that same escrow to Highland to avoid satisfying the judgment to Daugherty.[29] Daugherty met his burden of showing a *prima facie* case of fraud sufficient to warrant the crime-fraud exception. Defendants cite no Delaware decisions that conflict with this analysis. As a result, they have not shown interlocutory review is warranted to resolve conflicting decisions.

6. Defendants also argue that the Court applied the crime-fraud exception too broadly and "did not make the factual finding needed to support its conclusion that each communication [] 'was made in furtherance of a fraud' and thus fell within the exception."[30] In fact, *in camera* review showed that the documents in category 2 reflected "efforts that culminated in the allegedly fraudulent acts."[31] The Court made the factual finding Defendants seek. Again, Defendants cannot identify Delaware decisions that conflict with this analysis, and so have not shown interlocutory review is warranted.

7. Finally, Defendants argue the Rulings conflict with precedent concerning the sanction of a punitive waiver. Defendants have failed to present a conflict among trial court decisions that merits interlocutory review. Waiver was

---

[29] I described specific documents in the Reargument Ruling, but sealed that portion of the transcript pending resolution of Defendants' Application and will not repeat that description here. *See* D.I. 253 at 13-15.

[30] D.I. 231 at 10.

[31] D.I. 218 at 13.

11

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 384 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 498 of 1828 PageID 9991
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 383 of 1803 PageID 11129

based on Defendants' persistence in claiming privilege over the work of their escrow agent, after Vice Chancellor Glasscock informed them that work was not privileged, and after they were given multiple opportunities to follow those instructions.[32] The waiver component of the Rulings "applied settled principles of law" on the application and waiver of privilege.[33] "An improperly asserted claim of privilege is no claim at all."[34] Further, for reasons explained in the Reargument Ruling, Defendants misconstrued the Motion to Compel Ruling: I concluded categories 1 and 4 were not privileged, but went on to make the point that even if they were, that privilege would have been waived. Defendants have not identified any documents or testimony that they assert are privileged but that they must produce as a result of the waiver.

8. The second factor Defendants address is that interlocutory review may serve considerations of justice.[35] Defendants seek interlocutory relief on the secondary holding that categories 1 and 4 would be waived if they were privileged, and on the crime-fraud exception, in pursuit of a different set of guideposts for the remainder of the case. The Supreme Court has declined to intervene to move discovery guideposts, even where the attorney-client privilege (and any harm

---

[32] Ex. 254 at 19-22.

[33] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *9 (Del. Ch. Sept. 7, 2010) (describing decisions applying principle).

[34] *Id*. at *4.

[35] Supr. Ct. R. 42(b)(iii)(H).

Appellee Appx. 00377
APP. 08744

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 385 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 499 of 1828   PageID 9992
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 384 of 1803   PageID 11130

flowing from disclosure) is at issue.[36]  This factor does not support interlocutory appeal.

9.     Neither side argues any of the remaining factors set out in Supreme Court Rule 42(b)(iii).  None of those factors apply here.

10.     In line with our State's general preference against interlocutory appeals, I decline to certify the Rulings for interlocutory review.


                                   /s/ Morgan T. Zurn
                                  Vice Chancellor Morgan T. Zurn

---

[36] *Supra* ¶ 1.

Appellee Appx. 00378
APP. 08345

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 386 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 500 of 1828   PageID 9993
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 385 of 1803   PageID 11131

# APPENDIX 6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 387 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 501 of 1828 PageID 9994
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 386 of 1803 PageID 11132
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 1 of 16

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Hearing Date: TBD** |
| | ) **Objection Deadline: TBD** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

The official committee of unsecured creditors (the "Committee") of Highland Capital

Management, L.P. (the "Debtor"), hereby submits this motion (this "Motion") for entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to

28 U.S.C. §§ 1408 and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure

("Bankruptcy Rules"), transferring the venue of the above-captioned chapter 11 case to the United

States Bankruptcy Court for the Northern District of Texas.

## PRELIMINARY STATEMENT

1.     Although a debtor's choice of venue generally warrants deference, this case

presents unique facts that make a change in venue appropriate.  The Debtor has only one location

in the United States—its Dallas, Texas headquarters, which houses the Debtor's management and

key personnel.  In fact, the Debtor's headquarters sit less than two miles from the United States

Bankruptcy Court for the Northern District of Texas (the "Dallas Bankruptcy Court"), making the

venue clearly more convenient for the Debtor and its management than Delaware.  Additionally,

---

[1]     The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 388 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 502 of 1828   PageID 9995
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 387 of 1803   PageID 11133
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 2 of 16

although the Debtor's creditors span the nation, a substantial number of the Debtor's creditors (including several of the top twenty unsecured creditors and Committee members) are concentrated in Texas, or the Midwest more broadly.  Likewise, nearly all of the professionals active in this case are concentrated in Texas, Chicago, or Los Angeles.  The Dallas Bankruptcy Court is more centrally located and easily accessible to the key parties in this case, along with their advisors.  Transferring venue from Wilmington, Delaware to Dallas, Texas would result in greater efficiencies and significant cost savings for the Debtor's estate.

2.      Moreover, the Dallas Bankruptcy Court is already intimately familiar with the Debtor's principals and complex organizational structure—the involuntary chapter 11 cases of the Debtor's former affiliates and current Committee members, Acis Capital Management, L.P. and Acis Capital Management GP, L.P. (collectively, "Acis") are pending in the Dallas Bankruptcy Court.  Specifically, the Dallas Bankruptcy Court has (a) heard multiple days' worth of material testimony from the Debtor's principal owner (James Dondero), the Debtor's minority owner (Mark Okada), the Debtor's general counsel, at least two assistant general counsels, and numerous other employees of the Debtor and other witnesses; and (b) issued at least six published opinions to date, many of which have been affirmed on appeal to the United States District Court for the Northern District of Texas (the "Dallas District Court") in subsequent published opinions.  The Dallas Bankruptcy Court is still presiding over an adversary proceeding commenced by the Debtor and its affiliates, and the Debtor's appeal of Acis's confirmed chapter 11 plan is still pending before the Fifth Circuit.  As evidenced by the published opinions, the Dallas Bankruptcy Court and the Dallas District Court are intimately familiar with the Debtor's business, principal owner, and key executives.  For these reasons, the Dallas Bankruptcy Court is uniquely positioned to oversee this chapter 11 case.

Appellee Appx. 00381
APP. 00386

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 389 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 503 of 1828 PageID 9996
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 388 of 1803 PageID 11134
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 3 of 16

3.    The Committee respectfully submits that, for the reasons set forth above and discussed more fully below, based on the unique facts of this case, both the interests of justice and convenience of the parties justify an exception to the general deference granted to a debtor's choice of venue and warrant the transfer of venue to the Dallas Bankruptcy Court.

## JURISDICTION

4.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Committee confirms its consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.    The statutory and other bases for the relief requested herein are 28 U.S.C. §§ 1408 and 1412, Bankruptcy Rule 1014, and Local Rule 1014-1.

## BACKGROUND

6.    On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Committee was appointed by the United States Trustee on October 29, 2019 [Docket No. 65].

**I.    The Debtor's Connections to Dallas.**

7.    As noted in the Voluntary Petition [Docket No. 1], the Debtor's principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201, which also serves as the Debtor's

Appellee Appx. 00382
APP. 08249

international headquarters, and, in fact, its only office in the United States. *See Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 9] (the "First Day Declaration"), ¶ 7. Although it is unclear how many of the Debtor's 76 employees are based in the Debtor's international offices, presumably those employees based in the U.S. live in or around the Debtor's headquarters in Dallas, Texas. Furthermore, all but one of the Debtor's equity holders are also located in Dallas, Texas. *See* Voluntary Petition [Docket No. 1], at pg. 14. In sum, Dallas, Texas is the epicenter of the Debtor's operations.

**II.      The Dallas Bankruptcy Court's Familiarity with the Debtor.**

8.      Prior to the commencement of this chapter 11 case, the Debtor was (and currently remains) actively involved in the involuntary chapter 11 case of Acis, its then-affiliate and current Committee member, captioned *In re Acis Capital Mgmt., L.P.*, Case No. 18-30264 (SGJ) (the "Acis Bankruptcy"). Until 2019, Acis was the "structured credit arm of Highland." *In re Acis Capital Mgmt., L.P.*, Nos. 18-30264 (SGJ), 2019 Bankr. LEXIS 292, at *17 n. 21 (Bankr. N.D. Tex. Jan. 31, 2019) (the "Acis Confirmation Opinion"), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019).[2] Acis did not have any of its own employees and, instead, contracted with the Debtor to perform all day-to-day functions, meaning that all Acis corporate representatives and witnesses in the Acis Bankruptcy were employees of the Debtor. *Id.* at *9. Moreover, there was complete overlap between Acis and the Debtor at the executive level, with the Debtor's CEO James Dondero serving as President of Acis and the Debtor's CFO, and first day declarant, Frank Waterhouse serving as Treasurer.

9.      The Acis Bankruptcy commenced on January 30, 2018, when Joshua N. Terry filed involuntary petitions against Acis to commence chapter 7 cases in the Dallas Bankruptcy Court.

_____

[2] The Acis Confirmation Opinion is attached hereto as **Exhibit B**.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 391 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 505 of 1828 PageID 9998
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 390 of 1803 PageID 11136
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 5 of 16

In connection with a hotly-contested trial on the involuntary petitions, the Dallas Bankruptcy Court heard seven days of testimony and argument, entered orders for relief and issued a written opinion, which is attached hereto as **Exhibit C** (the "Acis Involuntary Opinion"). Testimony included that of the Debtor's co-founder and CEO, James Dondero, the Debtor's co-founder and then-Chief Investment Officer, Mark Okada, the Debtor's General Counsel, Scott Ellington, the Debtor's Controller, David Klos, and the Debtor's Assistant General Counsel, Isaac Leventon.

10. In May 2018, the Acis bankruptcy cases were converted from Chapter 7 to Chapter 11, and a Chapter 11 Trustee was appointed "due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management." *See* Acis Confirmation Op. at *15.

11. The Debtor and its affiliates were, and remain, exceptionally active throughout the Acis Bankruptcy, objecting to virtually every action proposed by the Chapter 11 Trustee throughout the case. *See In re Acis Capital Mgmt., L.P.*, 603 B.R. 300, 302 (Bankr. N.D. Tex. 2019). As a result, the Dallas Bankruptcy Court was forced to conduct many evidentiary hearings, during which the Debtor's executives and employees were often called to testify. Overall, between the Acis Bankruptcy and related adversary proceedings, the Dallas Bankruptcy Court has to date reviewed approximately 700 exhibits, heard more than thirty days of testimony and oral argument, and issued six opinions. The Dallas District Court has also ruled on three appeals related to the Acis Bankruptcy, all of which were filed by the Debtor and/or its affiliates. The Debtor's appeal of the Acis confirmation order is now pending before the Fifth Circuit.[3]

12. The Dallas Bankruptcy Court is also currently adjudicating a number of fraudulent transfer causes of action that Acis has brought against the Debtor and certain of its non-debtor

---

[3] *See generally Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 69] and

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 392 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 506 of 1828 PageID 9999
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 391 of 1803 PageID 11137
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 6 of 16

affiliates in a consolidated adversary case (the "Acis Adversary Proceeding"). Distilled to its

essence, the Acis Adversary Proceeding concerns actions taken by the Debtor and its affiliates to

denude the Acis debtors' estates of their value and frustrate an imminent, substantial judgment

against Acis. *See Acis Capital Mgmt., GP, LLC v. Highland Capital Mgmt., L.P. (In re Acis*

*Capital Mgmt., L.P.)*, 600 B.R. 541, 549 (Bankr. N.D. Tex. 2019) (the "Acis Arbitration

Opinion").[4]

13.     In sum, the Dallas Bankruptcy Court and the Dallas District Court are already

intimately familiar with the Debtor's complex structure, its management, and key personnel, and

are well-versed in the contentious relationship between the Debtor and several of its largest

creditors, including members of the Committee. Accordingly, the Dallas Bankruptcy Court is

uniquely situated to oversee this chapter 11 case.

## **RELIEF REQUESTED**

14.     By this Motion, the Committee requests entry of the Proposed Order, substantially

in the form attached hereto as **Exhibit A**, transferring the venue of this chapter 11 case to the

Dallas Bankruptcy Court.

## **BASIS FOR RELIEF**

**III.     The Dallas Bankruptcy Court is an Appropriate Venue Under 28 U.S.C. § 1408.**

15.     Section 1408 of title 28 of the United States Code provides that bankruptcy cases

may be commenced in the district court for the district "in which the domicile, residence, principal

place of business in the United States, or principal assets in the United States" of the debtor is

---

*Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel Nunc Pro Tunc to the Petition Date* [Docket No. 70] (describing the Debtor's ongoing litigation and involvement with the Acis Bankruptcy).

[4] A copy of the Acis Arbitration Opinion is attached hereto as **Exhibit D**.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 393 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 507 of 1828 PageID 10000
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 392 of 1803 PageID 11138
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 7 of 16

located or the district "in which there is a pending case under title 11 concerning such person's affiliate."

16.     The Debtor's headquarters, and indeed its only office in the United States, is located in Dallas, Texas.  Moreover, had this chapter 11 case commenced mere months ago, the Acis Bankruptcy would be a "pending case under title 11 concerning" the Debtor's affiliate.[5]   The Dallas Bankruptcy Court easily satisfies the statutory venue requirements under 28 U.S.C. § 1408.

**IV.    The Court Should Exercise its Discretion to Transfer Venue to the Dallas Bankruptcy Court.**

17.     It is within a court's discretion to transfer a case to another venue if it is "in the interest of justice or for the convenience of the parties."  28 U.S.C. § 1412.  Courts have interpreted this statutory provision to create two distinct bases upon which transfer of venue may be granted: interest of justice *or* convenience of the parties.  *See In re Qualtec Inc.*, No. 11-12572 (KJC), 2012 WL 527669, at *6 (Bankr. D. Del. Feb. 16, 2012).  Movants for transfer of venue have the burden of showing that a transfer is warranted based on the preponderance of the evidence.[6]  *Id.* at *5.

**A.     Transferring Venue to the Dallas Bankruptcy Court Would Serve the Convenience of the Parties.**

18.     In determining whether a venue transfer would serve the convenience of the parties, courts generally examine the following six factors: "(a) proximity of the creditors of every kind to the court; (b) proximity of the debtor; (c) proximity of the witnesses who are necessary to the administration of the estate; (d) the location of the debtor's assets; (e) the economic administration of the estate; and (f) the necessity for ancillary administration in the event of liquidation."  *In re*

---

[5] The Debtor ceased to be an affiliate of Acis following confirmation of the Acis plan of reorganization in January 2019, when equity in reorganized Acis was distributed to Mr. Terry in exchange for a reduction of his allowed claim.

[6]  To meet its burden herein, the Committee is relying on the record of this case, including the First Day Declaration, and the established record of the Acis Bankruptcy.  The Committee therefore does not anticipate there being any need to hold an evidentiary hearing on this Motion.

Appellee Appx. 00386
APP. 03253

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 394 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 508 of 1828 PageID 10001
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 393 of 1803 PageID 11139
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 8 of 16

*Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *2 (Bankr. D. Del. Mar. 4, 2016) (*quoting Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir. 1979)). Under this analysis, the factor given the most weight is the economic and efficient administration of the estate. *Id.*

### 1. Proximity of Creditors of Every Kind to the Court.

19. Of the Debtor's twenty largest unsecured creditors, at least seven[7] are listed as having Texas addresses: Acis, Joshua and Jennifer Terry, McKool Smith, P.C., Foley Gardere, DLA Piper LLP (US), Lackey Hershman LLP, and Andrews Kurth LLP. *See* Voluntary Petition [Docket No. 1]. Additionally, of the total known claims at this juncture, it appears that a significant number of the Debtor's creditors are located in Texas, and the rest of the creditors appear to be scattered across the United States. No known creditors appear to be based in Delaware. *See id.*

20. Courts may also focus on the location of the debtor's and creditors' professionals in deciding whether to transfer venue. *See In re Caesars Entm't Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL 492529, at *6 (Bankr. D. Del. Feb. 2, 2015). The Committee's proposed counsel is primarily located in Chicago, Illinois, but also maintains an office in Dallas, Texas (where its litigation team for this case is based). If this case were to proceed before this Court, the Committee would have to retain Delaware co-counsel.[8] Additionally, several of the Debtor's largest creditors are separately represented by counsel based in the Midwest: the Acis is represented by the Rogge Dunne Group and Winstead PC in Dallas [Docket No. 81], the Redeemer Committee of the Highland Crusader Fund is represented by Jenner & Block LLP primarily out of its Chicago office

---

[7] Additionally, although listed with a North Carolina address, CLO Holdco, Ltd. is an affiliate of and controlled by the Debtor, whose principal place of business is in the Northern District of Texas. The Debtor also lists Reid Collins & Tsai's New York office, despite the fact that the firm is a Texas limited liability partnership based in Texas.

[8] Under Local Rule 9010-1(d), the Committee has until November 27, 2019, to obtain Delaware co-counsel, if necessary.

Appellee Appx. 00387
APP. 08252
APP. 08344

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 395 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 509 of 1828 PageID 10002
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 394 of 1803 PageID 11140
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 9 of 16

[Docket Nos. 1, 36], and USB Securities LLC and UBS AG London Branch is represented by Latham & Watkins LLP, which has an office in Houston [Docket No. 85].

21.     Considering the proximity of both the Debtor's creditors and their professionals to the Dallas Bankruptcy Court, this factor should weigh in favor of transfer.  *See In re Rehoboth Hosp., LP*, No. 11-12798 (KG), 2011 WL 5024267, at *3 (Bankr. D. Del. Oct. 19, 2011) (concluding that, on balance, this factor favored transfer to Texas when the overwhelming majority of creditors were located in Texas).

### 2.     Proximity of the Debtor to the Court.

22.     Courts have noted that this inquiry should focus primarily on the parties that must appear in court.  *See Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *6.  The Debtor's headquarters, and only office located in the United States, is in Dallas, Texas.  *See* First Day Decl., at ¶ 7.  As a result, it is likely that any of the Debtor's personnel who would have to appear in court are located in Dallas, Texas.  The Debtor has no connection to Delaware other than the fact that it was formed there.

23.     The Committee concedes that Debtor's counsel maintains an office in Delaware but does not have an office in Dallas.  That said, Debtor's counsel represents itself as having a "national presence," including in the Fifth Circuit,[9] and its lead lawyers on this matter are based in Los Angeles.  The Debtor's proposed financial advisor team is also predominantly based in Los Angeles with several members located in Chicago.  No proposed advisor from Development Specialists, Inc. is located on the East Coast, let alone in Delaware.  *See Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and*

---

[9] *See* http://www.pszjlaw.com/about-presence.html#circuit5.

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 396 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 510 of 1828   PageID 10003
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 395 of 1803   PageID 11141
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 10 of 16

*Restructuring-Related Services,* Nunc Pro Tunc *as of the Petition Date* [Docket No. 75], Ex. A.

Accordingly, the Committee respectfully submits that this factor weighs in favor of transferring

venue to the Dallas Bankruptcy Court.

### 3. Proximity of the Witnesses Necessary to the Administration of the Estate.

24.     The Committee anticipates that the witnesses likely to be necessary in this

chapter 11 case are the Debtor's management, who are all located in Dallas, Texas, or the Debtor's

financial advisors, who are all located in either Chicago, Illinois, or Los Angeles, California.

Dallas, Texas, is significantly closer to any potential witness than Wilmington, Delaware.  Thus,

the Committee respectfully submits that this factor also weighs in favor of transferring venue to

the Dallas Bankruptcy Court.

### 4. Location of the Assets.

25.     The location of the Debtor's assets is not as important as other factors where "the

ultimate goal is rehabilitation rather than liquidation." *See In re Caesars Entm't Operating Co.,

Inc.*, 2015 WL 495259, at *6 (quoting *In re Enron Corp.*, 274 B.R. 327, 347 (Bankr. S.D.N.Y.

2002)).  Although the Committee believes that the Debtor's U.S. assets would be located at the

Debtor's headquarters in Dallas, Texas, the Committee does not believe this factor important to

the Court's decision.

### 5. Economic Administration of the Estate.

26.     As noted above, the most important factor is the economic and efficient

administration of the Debtor's estate. *Id.*  The Committee does not dispute the ability of this Court

to administer this chapter 11 case in a just and efficient manner.  That said, there are many factors

that make the Dallas Bankruptcy Court the more economical venue.  As discussed in more detail

below as part of the "interests of justice" analysis: (1) there is a higher concentration of creditors

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 397 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 511 of 1828 PageID 10004
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 396 of 1803 PageID 11142
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 11 of 16

and creditors' counsel in Texas and the Midwest than elsewhere in the country; (2) the Debtor and all of its U.S. personnel are in Dallas, Texas; (3) Dallas, Texas is more centrally located in the United States than Wilmington, Delaware and arguably easier and cheaper for parties to travel to; (4) most creditors would need to obtain Delaware co-counsel if venue remains before this Court; and (5) the Dallas Bankruptcy Court and the Dallas District Court has already expended great time and effort familiarizing itself with the Debtor, the Debtor's operations, and the disputes between the Debtor and some of its largest creditors. For these reasons and the reasons set forth below in Section II.B, this factor weighs heavily in favor of transferring venue to the Dallas Bankruptcy Court. *See In re Qualteq, Inc.* 2012 WL 527669, at *6 (noting that same considerations for this factor arise in applying the "interest of justice" prong).

### 6. Necessity for Ancillary Administration if Liquidation Should Result.

27. "Most cases do not consider liquidation because it is illogical to focus on liquidation contingencies when the goal of the bankruptcy is reorganization." *In re Dunmore Homes, Inc.*, 380 B.R. 663, 672 (Bankr. S.D.N.Y. 2008). However, should this case be converted to a liquidation, the Debtor's personal property would be predominantly located in Dallas, Texas. As a result, this factor also weighs in favor of transfer.

### B. Interests of Justice.

28. When determining whether a transfer would serve the interests of justice, courts consider whether such transfer "would promote the efficient administration of the estate, judicial economy, timeliness, and fairness." *Caesars Entm't Operating Co., Inc.*, 2015 WL 495259, at *7 (quotations omitted). The interests of justice standard is a "broad and flexible standard which must be applied on a case-by-case basis." *In re Safety-Kleen Corp.*, Adv. Proc. No. 00-1984, 2001 Bankr. LEXIS 1296, at *6 (Bankr. D. Del. Aug. 27, 2001) (citing *Gulf States Expl. Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1391 (2d Cir. 1990)).

Appellee Appx. 00390
APP. 00243

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 398 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 512 of 1828   PageID 10005
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 397 of 1803   PageID 11143
Case 19-12239-CSS   Doc 86   Filed 11/01/19   Page 12 of 16

### 1.    Judicial Economy.

29.    Judicial economy would be served by transferring this case to the Dallas Bankruptcy Court.  At the time of this filing, this Court has only held one hearing, granting interim relief for a handful of routine "first day" motions.  In contrast, the Dallas Bankruptcy Court has heard at least 30 days of testimony, including that of the Debtor's executives, and conducted countless hearings in the Acis Bankruptcy.  With the exception of the Debtor's proposed chief restructuring officer and Mr. Waterhouse, the Dallas Bankruptcy Court is familiar with nearly all of the Debtor's senior management.  As summarized above, the Dallas Bankruptcy Court and Dallas District Court have already devoted multiple days of court time to the Debtor.

30.    Additionally, Acis's claim against the Debtor (which is listed on the list of twenty largest unsecured creditors) and the Debtor's proof of claim and administrative claim against Acis (which is technically an asset of the Debtor's estate) are currently pending in the Dallas Bankruptcy Court.  Judicial economy would best be served by utilizing the time and resources already extended by the Dallas Bankruptcy Court in connection with these claims.   This factor weighs overwhelmingly in favor of transfer.  Indeed, it is hard to imagine a case where judicial economy would be better served by a transfer of venue under 28 U.S.C. § 1412.

31.    Courts in this district have historically placed a particular emphasis "on the "learning curve" that typically militates against a transfer.  *See In re Rests. Acquisition I, LLC*, No. 15-12406 (KG), 2016 WL 855089, at *5 (Bankr. D. Del. Mar. 4, 2016).  This case is unique in that the "learning curve" that typically militates against a transfer in the interests-of-justice basis is actually *inverted*.  That is, it is not the proposed transferee court that will have a "learning curve," but rather it is this Court that would.  Given that this Court has only considered first day relief, and on an interim basis, while the Dallas Bankruptcy Court and Dallas District Court both have

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 399 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 513 of 1828   PageID 10006
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 398 of 1803   PageID 11144
Case 19-12239-CSS    Doc 86   Filed 11/01/19   Page 13 of 16

intimate familiarity with the parties and their businesses, transferring the venue would be in furtherance of judicial economy.

     **2.    Economic and Efficient Administration of the Bankruptcy Estate**.

32.     As previously noted, there are economic efficiencies available in Dallas, Texas that are not available in Wilmington, Delaware.  Venue in Dallas would allow the Debtor's employees to easily attend hearings in this case and thus eliminate the need for air travel for most witnesses. The Debtor's headquarters are located in The Crescent in Dallas, Texas, approximately 1.2 miles from the Dallas Bankruptcy Court.  By contrast, this Court is located approximately 1,437 miles from the Debtor's headquarters.  Travel to this Court from the Debtor's headquarters requires, at a minimum, a 30-minute car ride to Dallas/Fort Worth International Airport, approximately three hours flying time to Philadelphia International Airport, and then a 30-minute car ride to Wilmington, Delaware.  The foregoing does not take into account recommended early arrival times at airports for check-in, flight delays, traffic, or the need for overnight stays in Wilmington.  If this case remains in Delaware, critical management personnel will be required to spend extended periods away from their offices when they should be focused on maximizing value for all creditors.

33.     Additionally, as the Debtor's professionals and proposed CRO are primarily located in Los Angeles, venue in Dallas would eliminate hours of travel time and the administrative expense associated with the same.  Dallas-Fort Worth International Airport, consistently the third-busiest airport in the country (behind Chicago O'Hare and Atlanta Hartsfield-Jackson), offers nearly 1,800 flights per day.  American Airlines alone offers approximately 14 non-stop flights per day from LAX to DFW.  According to FlightSphere.com, there are approximately 20 total flights per day from LAX to DFW and 7 flights per day from DAL to LAX.  By contrast, according to FlightSphere.com, there are approximately 10 flights per day from DFW to Philadelphia and approximately 8 flights per day from DAL to Philadelphia.  The flight from LAX to DFW is

**Appellee Appx. 00392**
**APPX. 08257**
**APP. 03249**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 400 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 514 of 1828 PageID 10007
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 399 of 1803 PageID 11145
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 14 of 16

approximately 3 hours, whereas the flight from LAX to Philadelphia is approximately 6 hours.

*See In re Rehoboth Hosp., LP,* No. 11-1279 (KG), 2011 Bankr. LEXIS 3992, at *15 (Bankr. D.

Del. October 19, 2011) (transferring venue of a single asset real estate case from Delaware to

Texas because "the estate may incur significant travel costs to obtain the testimony of witnesses

that are located in Texas").

34.     Additionally, Rule 45 of the Federal Rules of Civil Procedure, incorporated by

Bankruptcy Rule 9016, mandates that contested non-party discovery disputes (potentially like

those related to the Debtor's approximately 2,000 non-debtor affiliates) be heard in the place of

compliance, which would most likely be in the Northern District of Texas.  The Committee is

already aware of the Debtor's history of contesting discovery.  *See, e.g., Hamilton Partners, L.P.*

*v. Highland Capital Mgmt., L.P.*, CV 6547-VCN, 2016 WL 61223, at *1 (Del. Ch. Feb. 2, 2016).

It is therefore likely that the Dallas District Court and Dallas Bankruptcy Court will need to hear

and resolve multiple discovery disputes.  In light of that inevitability, it would be sensible to

transfer this case so that related disputes aren't being heard in multiple venues.

35.     There is no doubt that transferring venue to Dallas would promote the economic

and efficient administration of this chapter 11 case.  This factor weighs in favor of transfer.

### 3.     Timeliness.

36.     As of the date of this Motion, this case has only been pending for 16 days.  The

Committee is also seeking to have this Motion heard on an expedited basis, as set forth in the

motion to shorten notice filed concurrently herewith.  *Cf. In re Jones*, 39 B.R. 1019, 1020 (Bankr.

S.D.N.Y. 1984) ("[t]he debtor's motion to change venue is untimely given the fact that this case

was commenced over one and one-half years ago").  The Court has only considered the Debtor's

request for first day relief on an interim basis.  The next hearing is not scheduled until

November 19, 2019.  The Motion is timely and this factor weighs in favor of transfer.

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 401 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 515 of 1828    PageID 10008
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 400 of 1803    PageID 11146
Case 19-12239-CSS    Doc 86    Filed 11/01/19    Page 15 of 16

**4.    Fairness.**

37.    Transferring this chapter 11 case to a venue where employees, creditors, and numerous other parties-in-interest may more easily participate in the restructuring process would be manifestly fair.  To the extent the Debtor chose this forum in order to distance itself from largely unfavorable findings, fairness dictates that this case should be transferred.

\*        \*        \*        \*        \*

38.    For the foregoing reasons, it is both in the interest of justice and for the convenience of the parties that this chapter 11 case be transferred to the Dallas Bankruptcy Court.  The majority of the parties and professionals involved in this chapter 11 cases are more centrally located to Dallas, Texas than Wilmington, Delaware, which would create significant costs savings to the Debtor's estate compared to keeping the case in Delaware.  Moreover, the Dallas Bankruptcy Court and Dallas District Court are both well-versed in the facts and issues that will undoubtedly need to be addressed in this chapter 11 case.  As such, the Committee respectfully requests that this Court transfer venue of this case to the Dallas Bankruptcy Court.

## <u>NOTICE</u>

39.    Notice of this Motion will be provided to (i) the Debtor, (ii) the Office of the United States Trustee for the District of Delaware, and (iii) any party that has requested notice pursuant to Local Rule 2002-1 as of the date of this Motion.  In light of the nature of the relief requested herein, the Committee submits that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

Appellee Appx. 00394
APP. 08259

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 402 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 516 of 1828 PageID 10009
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 401 of 1803 PageID 11147
Case 19-12239-CSS Doc 86 Filed 11/01/19 Page 16 of 16

WHEREFORE, the Committee respectfully requests that the Court enter the Proposed

Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein

and such other and any further relief as the Court may deem just and proper.

Dated: November 1, 2019          SIDLEY AUSTIN LLP
      Wilmington, Delaware

                                            */s/ Bojan Guzina*
                                            Bojan Guzina
                                            Matthew A. Clemente
                                            Alyssa Russell
                                            One South Dearborn Street
                                            Chicago, Illinois 60603
                                            Telephone: (312) 853-7000
                                            Facsimile: (312) 853-7036

                                                      -and-

                                            Jessica C. K. Boelter
                                          787 Seventh Avenue
                                          New York, New York 10019
                                          Telephone: (212) 839-5300
                                          Facsimile: (212) 839-5599

                                                      -and-

                                            Penny P. Reid
                                          Paige Holden Montgomery
                                          2021 McKinney Avenue
                                          Suite 2000
                                          Dallas, Texas 74201
                                          Telephone: (214) 981-3300
                                          Facsimile: (214) 981-3400

                                          PROPOSED ATTORNEYS FOR THE OFFICIAL
                                          COMMITTEE OF UNSECURED CREDITORS

ACTIVE 250501748

Appellee Appx. 00395
APP. 08262

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 403 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 517 of 1828 PageID 10010
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 402 of 1803 PageID 11148
Case 19-12239-CSS Doc 86-1 Filed 11/01/19 Page 1 of 3

**<u>Exhibit A</u>**

**Proposed Order**

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 404 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23    Page 518 of 1828  PageID 10011
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 403 of 1803  PageID 11149
Case 19-12239-CSS    Doc 86-1    Filed 11/01/19    Page 2 of 3

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Ref. Docket No.:** ___ |

### ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

Upon the motion (the "Motion")[2] of the Committee requesting entry of an order (this "Order") transferring the venue of the above-captioned chapter 11 case to the United States Bankruptcy Court for the Northern District of Texas; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the opportunity for a hearing on, the Motion having been given; and it appearing that no other or further notice need be provided; and this Court having found that the relief requested in the Motion and provided for herein is in the best interest of the Debtor, creditors of the Debtors, and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record herein, and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 405 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 519 of 1828 PageID 10012
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 404 of 1803 PageID 11150
Case 19-12239-CSS Doc 86-1 Filed 11/01/19 Page 3 of 3

1. Pursuant to Rule 1014(b), in the interest of justice and for the convenience of parties, the above-captioned chapter 11 case shall proceed in the Dallas Bankruptcy Court. Accordingly, the Court will transfer this case to the Dallas Bankruptcy Court pursuant to 28 U.S.C. § 1412.

Dated: _____, 2019
Wilmington, Delaware

_____
Honorable Christopher S. Sontchi
United States Bankruptcy Judge

ACTIVE 250501748

Appellee Appx. 00398
APP. 08263

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 406 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 520 of 1828   PageID 10013
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 405 of 1803   PageID 11151
Case 19-12239-CSS   Doc 86-2   Filed 11/01/19   Page 1 of 48

**Exhibit B**

**Acis Confirmation Opinion**

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 407 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 521 of 1828   PageID 10014
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 406 of 1803   PageID 11152
Case 18-30264-sgj11  Doc 832-73  Filed 01/31/19   Entered 01/31/19 15:12:04  Page 1 of 47



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 31, 2019**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-11** |
| | § | **(Chapter 11)** |
| Debtor. | § | |

_____

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.L.C.,** | § | **CASE NO. 18-30265-SGJ-11** |
| | § | **(Chapter 11)** |
| | § | |
| Debtor. | § | |

### BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
### (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
### CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 408 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 522 of 1828   PageID 10015
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 407 of 1803   PageID 11153
Case 18-30264-sgj11 Doc 1383-5 Filed 01/31/19   Entered 01/31/19 15:13:04   Page 2 of 47

Joint Plan of Reorganization,[1] as amended, modified or supplemented (the "Plan"), for the two

above-referenced debtors:  (1) Acis Capital Management, L.P. (the "Debtor-Acis"), a Delaware

limited partnership, and (2) Acis Capital Management GP, LLC, a Delaware limited liability

company (the general partner of the Debtor-Acis; collectively, the "Debtors").  The two chapter

11 cases have been administratively consolidated.[2]

The hearing on these matters transpired over multiple days in December 2018, and the

court considered the testimony of more than a dozen witnesses, more than 700 exhibits, and

hundreds of pages of legal briefing.  Based on the foregoing, the court ***overrules all objections***

and will confirm the Plan, including all proposed modifications to it.  The Chapter 11 Trustee has

demonstrated, by a preponderance of the evidence, that the Plan, as modified, satisfies the

applicable provisions of the Bankruptcy Code including but not limited to Sections 1122, 1123,

1127, and 1129 of the Bankruptcy Code.[3]  The court also approves on a final basis the adequacy

of the accompanying disclosure statement to the Plan, determining that it meets the requirements

set forth in Section 1125 of the Bankruptcy Code.  Notice and solicitation with respect to the

---

[1] Exhs. 508 & 509; *see also* DE ## 660, 661, 693, 702, & 769.  References to "DE # __" from time to time in this ruling relate to the docket number at which a pleading or other item appears in the docket maintained in these administratively consolidated Bankruptcy Cases, in Case # 18-30264.

[2] Note that the Debtor-Acis is, essentially, the debtor that is the operating company.  As a general partner, Acis Capital Management GP, LLC is legally obligated on all of the operating company's debt. *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law").  The Plan jointly addresses both of the Debtors' debts.

[3] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Sears Methodist Ret. Sys.,* No. 14-32821-11, 2015 Bankr. LEXIS 709, at *8 (Bankr. N.D. Tex. Mar. 5, 2015); *In re Couture Hotel Corp.,* 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015); *In re Mirant Corp.,* No. 03-46590, 2007 Bankr. LEXIS 4951, at *19-20 (Bankr. N.D. Tex. Apr. 27, 2007).

Appellee Appx. 00401
APP. 08266

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 409 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 523 of 1828   PageID 10016
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 408 of 1803   PageID 11154
Case 18-30264-sgj11  Doc 2372-5  Filed 04/30/19   Entered 01/39/19  Page 1 of 48 Page 3 of 47

Plan is determined to have complied with the applicable Bankruptcy Rules and due process.  The court provides reasoning for its ruling below.  The court directs the Chapter 11 Trustee to submit to the court for signing the proposed Findings of Fact and Conclusions of Law and Order that were filed at DE # 814.  This Bench Ruling supplements those Findings of Fact and Conclusions of Law and Order and, where appropriate, should be considered additional findings and conclusions as contemplated by Fed. R. Bankr. Proc. 7052.

## I.    **Background.**[4]

The above-referenced bankruptcy cases (the "Bankruptcy Cases") have been pending since January 30, 2018 and have been astonishingly contentious.  The Chapter 11 Trustee has been in place since on or about May 14, 2018.  The Plan (which is the fourth one proposed by the Chapter 11 Trustee) has been objected to by three related entities: (a) Highland Capital Management, L.P. ("Highland"), (b) Highland CLO Funding Ltd. ("HCLOF Guernsey"), and (c) Neutra, Ltd. ("Neutra Cayman").  The Chapter 11 Trustee loosely refers to these three objectors (the "Objectors") as "the Highlands" because they are not only related to each other (*i.e.,* they are all, directly or indirectly, part of the Highland 2,000-member corporate organizational structure), but they also have been in "lockstep" with one another in objecting to virtually every position taken by the Chapter 11 Trustee during the Bankruptcy Cases.[5]  These Objectors' parties-in-interest status will be explained below.

---

[4] For a complete set of background facts, the court incorporates herein by reference its Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Petitions, entered April 13, 2018.  DE # 118.  Exh. 243.

[5] It is also undisputed that, prior to the appointment of the Chapter 11 Trustee, *the Debtors* and Highland were affiliated and had a close relationship.  Exhs. 17, 18, 22-27, 251, 619 & 649.

**Appellee Appx. 00402**
**APP. 08267**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 410 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 524 of 1828   PageID 10017
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 409 of 1803   PageID 11155
Case 18-3026a-sgj11-123392755ed01c3661e2   Filed 01/09/19   15 04148Page 4 of 47

In simplest terms, the Debtor-Acis, which was formed in the year 2011, is primarily a
CLO portfolio manager. [6]  It manages hundreds of millions of dollars' worth of CLOs (which is
an acronym for "collateralized loan obligations").  Specifically, it provides fund management
services to various special purpose entities that hold CLOs.  The Debtor-Acis was providing
management services for five such special purpose entities (the "Acis CLOs") as of the time that
it and its general partner were put into the involuntary Bankruptcy Cases.  The parties have
informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-
Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs") are
structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of
senior debt owed by large corporations and, therefore, earn revenue from the variable interest
payments made by those corporations on such senior debt; and (b) on the liability side of their
balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest
rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are
mostly institutions and pension funds (these tranches of notes are usually rated anywhere from
Triple A to Single B, depending upon things such as their interest rate and perceived risk).  The
CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of
interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the
fixed rates of interest that the CLO SPEs must pay on their own tranches of debt.  At the bottom
of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes,"
but these "notes" are genuinely equity).  As portfolio manager, the Debtor-Acis manages the
CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs'

---

[6] The Debtor-Acis has managed other funds, from time to time, besides CLOs.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 411 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 525 of 1828   PageID 10018
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 410 of 1803   PageID 11156
Case 18-30264-sgj11   Doc 3927-35   Filed 01/31/19   Entered 01/31/19 16:04:48   Page 5 of 47

portfolios) and communicates with investors in the CLO SPEs.  The CLO SPEs' tranches of
notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves are in bankruptcy.  This has
never been threatened or a concern.  Only the Debtor-Acis which ***manages*** the CLO business is
in bankruptcy.  For the most part, the CLO SPEs have continued somewhat "business as usual"
during the Chapter 11 Bankruptcy Cases (*i.e.,* they have continued to receive interest payments
on their baskets of loans; the usual interest payments on their tranches of debt have been paid;[7]
and baskets of loans have been bought and sold from time to time).  The CLO SPEs have
retained their own separate counsel during the Chapter 11 cases, have appeared from time-to-
time on matters, and are not currently objecting to the Plan.  There is also an indenture trustee
(U.S. Bank National Association) for the CLO SPEs' debt, that has seemingly faithfully carried
on its role during the Chapter 11 Bankruptcy Cases without many objections to the bankruptcy
process—only making occasional statements aimed at ensuring that the indentures for the CLOs
are not interfered with or disrespected.  The indenture trustee has retained and appeared through
its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting
to the Plan.

Historically, the Debtor-Acis has had four main sets of contracts that were at the heart of
its business and allowed it to function.  The Chapter 11 Trustee has from time-to-time credibly

---

[7] The evidence reflected that there have been a couple of occasions recently when there were insufficient
funds to make distributions to the equity.  *E.g.,* Transcript 12/11/18 (PM) [DE # 790], at p. 15 (line 2)
through p. 16 (line 18).  But it appears to this court that these missed distributions were due to actions of
Highland—as later explained herein—in improperly, surreptitiously attempting to liquidate the Acis
CLOs, from the time period after the Chapter 11 Trustee was appointed, until the bankruptcy court issued
an injunction to temporarily halt Highland's actions.  *E.g.,* Transcript 12/11/18 (AM) [DE # 789], p. 67
(line 14) through p. 68 (line 6).

Appellee Appx. 00404
APP. 03869

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 412 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 526 of 1828   PageID 10019
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 411 of 1803   PageID 11157
Case 18-30264-sgj11 Doc 3927 Filed 11/01/19   Entered 11/01/19 11:51:04   Page 6 of 47

testified that these agreements essentially created an "eco-system" that allowed the Acis CLOs to

be effectively and efficiently managed by the Debtor-Acis.

> 1. The PMAs with the CLO SPEs.[8]

First, the Debtor-Acis has various portfolio management agreements (the "PMAs") ***with***

***the CLO SPEs***, pursuant to which the Debtor-Acis earns management fees.  The PMAs have

been the primary "assets" (loosely speaking) of the Debtor-Acis (to be more precise, the PMAs

are executory contracts pursuant to section 365 of the Bankruptcy Code).  They are what

generate revenue for the Debtor-Acis.

> 2. The Sub-Advisory Agreement with Highland.[9]

Second, the Debtor-Acis had a Sub-Advisory Agreement (herein so called) with an

insider, ***Highland*** (*i.e.,* one of the Objectors).  Highland's "insider" status will be further

explained below.  Pursuant to this agreement, the Debtor-Acis essentially sub-contracted for the

use of Highland front-office personnel/advisors to perform management services for the Debtor-

Acis (*i.e.,* so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs).

The Debtor-Acis paid handsome fees to Highland pursuant to this agreement.  This, too, was an

executory contract pursuant to section 365 of the Bankruptcy Code.  As explained below, this

agreement was rejected (with bankruptcy court approval)[10] by the Chapter 11 Trustee during the

Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found

resources to provide these services at a much lower cost to the estate, but he also had begun to

---

[8] Exhs. 6-10.

[9] Exh. 17.

[10] *See* 11 U.S.C. § 365(a).

Appellee Appx. 00405

APPX. 03972

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 413 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 527 of 1828   PageID 10020
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 412 of 1803   PageID 11158
Case 18-30264-sgj11 Doc 1387-2 Filed 01/31/19   Entered 01/31/19 15:18:04   Page 7 of 47

believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment

of the Debtor-Acis's creditors.[11]

    3.  The Shared Services Agreement with Highland.[12]

    Third, the Debtor-Acis also had a Shared Services Agreement (herein so called) with

Highland, pursuant to which the Debtor-Acis essentially sub-contracted for the use of Highland's

back-office services (again, so that the Debtor-Acis could fulfill its obligations to the CLO SPEs

under the PMAs).  To be clear, the Debtor-Acis had no employees of its own—only a couple of

officers and members.  The Debtor-Acis paid handsome fees to Highland for the personnel and

back-office services that Highland provided to the Debtor-Acis.  This, too, was an executory

contract pursuant to section 365 of the Bankruptcy Code.  As explained below, this agreement

was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with bankruptcy court

approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

    4.  The Equity PMA.[13]

    Fourth, until a few weeks before the Bankruptcy Cases were filed, the Debtor-Acis also

had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs)

whereby the Debtor-Acis provided services not just to the CLO SPEs themselves, but separately

to the equity holder in the CLO SPEs.  This portfolio management agreement with the equity

holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would

probably be easier to refer to it as the "Equity PMA" (for ease of reference, the court will refer to

---

[11] *See* Transcript 12/11/18 (AM) [DE # 789], at p. 48 (line 15) through p. 49 (line 16); p. 50 (line 12) through p. 52 (line 7).

[12] Exh. 18.

[13] Exh. 11.

Appellee Appx. 00406
APP. 08373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 414 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 528 of 1828   PageID 10021
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 413 of 1803   PageID 11159
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19   Entered 01/31/19 15:04:48  Page 8 of 47

it as the "Equity/ALF PMA"). [14]   The Debtor-Acis did not earn a specific fee pursuant to the

Equity/ALF PMA, but the Chapter 11 Trustee and certain of his witnesses credibly testified that

the Debtor-Acis considered the agreement valuable and very important, because it essentially

gave the Debtor-Acis the ability to control the whole Acis CLO eco-system—in other words,

gave the Debtor-Acis the ability to make substantial decisions on behalf of the CLO SPEs'

*equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs.

The more credible evidence before the court suggests that the Equity/ALF PMA delegated to the

portfolio manager (*i.e.,* the Debtor-Acis) the right to control the terms of any liquidation of

collateral in an optional redemption under the terms of the CLO indentures. [15]   In any event,

shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling the

Debtor-Acis (including but not limited to Mr. James Dondero—the chief executive officer of

both the Debtor-Acis and of Highland):  (a) caused the Debtor-Acis to terminate this Equity/ALF

PMA (notably, the counter-party to this agreement, the equity owner, would have only been able

to terminate it "for cause"[16]); and (b) then caused the equity owner to enter into a new Equity

PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. ("Highland

HCF"). [17]   Mr. Dondero, in addition to being the chief executive of Highland and the Debtor-

Acis, also became the president of the newly formed Highland HCF. [18]   The Equity/ALF PMA

---

[14] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

[15] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 11 at §§ 5 and 6.

[16] The Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager "for cause" at § 14(a)-(e).  Exh. 11.  On the contrary, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.

[17] Exh. 23 (testimony of Scott Ellington), p. 175 (lines 6-25); *see also* Transcript 12/11/18 (AM) [DE # 789], at p. 54 (line 11) through p. 55 (line 5).

[18] *Id.* at p. 266 (lines 1-4).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 415 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 529 of 1828 PageID 10022
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 414 of 1803 PageID 11160
Case 18-30265 Document 1288 Filed 08/15/22 Entered 01/31/19 Page 9 of 47

would have been an executory contract of the Debtor-Acis, pursuant to section 365 of the
Bankruptcy Code, if it had not been terminated shortly before the Bankruptcy Cases. The court
has heard credible testimony that leads it to conclude that the Equity/ALF PMA would have been
assumed by the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if not terminated
by agents of Highland on the eve of bankruptcy. The court has heard credible testimony that it is
important for a portfolio manager to have not only the PMAs with the CLO SPEs themselves,
but also with the equity owners of the CLO SPEs.

## II.    A Few More Basics About CLOs.

In the world of CLOs (like other public debt instruments) there are occasionally
redemptions, refinancings, and resets. A redemption is essentially when the equity in the CLO,
before maturity, calls for the liquidation of the collateral in the CLO and the repayment of the
tranches of notes, so that the CLO comes to an end. A refinancing is when a lower interest rate
can be accomplished in the market place on the tranches of debt of the CLO, but the maturity
date and other terms remain in place (similar to a refinancing on a home mortgage). This can
happen typically after a two-year non-call period. A reset is when the maturity date, the
reinvestment period, or other changes in the terms of a CLO (beyond simply interest rate) are
accomplished.[19]

It should be noted that the top tranche of notes in the CLO SPEs (AAA-rated) is
considered the "controlling" class, and a majority of holders in this class can terminate the CLO
manager (*i.e.*, the Debtor-Acis LP) for cause on 45 days' notice, but these folks have apparently
been content to ignore the Bankruptcy Cases and the fighting between the Debtor-Acis and

---

[19] *See generally* Transcript 2/9/2018 [DE # 26], at p. 74-75.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 416 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 530 of 1828 PageID 10023
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 415 of 1803 PageID 11161
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19 Page 10 of 47

Highland (as further described below)—no doubt because they are earning their fixed income

stream without a hitch. And the bottom tranche of "notes" in the CLO SPEs (the equity) has

voting rights and is a capital provider and, in certain ways, controls the CLO SPEs, by virtue of

having the ability to make a redemption call after a certain "no-call" period—which would force

a liquidation of the basket of loans in the CLO, with the proceeds paying down the tranches of

notes, starting at the top with the Triple A's. But, by virtue of the Equity/ALF PMA, the Debtor-

Acis was really acting for the equity. It seems substantially likely to the court that this is why

Highland and its agents caused the Debtor-Acis to terminate the Equity/ALF PMA (which, as

mentioned above, was an agreement that the equity could have only terminated "for cause"—and

it appears there would have been no "cause").

### III.    The Non-Insider Creditors.

The Debtor-Acis does not have many creditors. The non-insider creditors are, for the

most part, Joshua Terry ("Mr. Terry") and a few vendors (most of which are law firms).

Mr. Terry commenced the Bankruptcy Cases with the filing of involuntary bankruptcy

petitions. Mr. Terry was the human being who formerly, quite successfully served as the

portfolio manager for the Debtor-Acis for many years. Mr. Terry was terminated under

contentious circumstances on June 9, 2016, after getting into disagreements with Mr. Dondero.

Mr. Terry was technically an employee of Highland itself (like all employees are, in the

Highland family of companies—no matter which subsidiary or affiliate they work for). After his

employment termination, Highland sued Mr. Terry in September 2016. Mr. Terry asserted

claims back against Highland and both of the above-referenced Debtors. The litigation was

referred to arbitration, and, after a ten-day arbitration trial in September 2017 before "JAMS,"

Mr. Terry obtained an Arbitration Award (herein so called), on October 20, 2017, jointly and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 417 of
Case 3:23-cv-00726-S Document 8-22 1804 12/29/23 Page 531 of 1828 PageID 10024
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 416 of 1803 PageID 11162
Case 18-30264-sgj11 Doc 2927-3 Filed 01/31/19 Entered 01/31/19 Page 11 of 47 Page 11 of 47

severally, against both of the Debtors in the amount of $7,949,749.15, plus post-award interest at

the legal rate. A Final Judgment (the "Terry Judgment") confirming the Arbitration Award was

entered on December 18, 2017, in the same amount as that contained in the Arbitration Award—

$7,949,749.15.

Mr. Terry commenced the Bankruptcy Cases when he became concerned that the Debtor-

Acis was being rendered insolvent and unable to pay creditors including himself, due to actions

undertaken by Highland and its agents immediately after entry of the Arbitration Award (*e.g.,*

transfers of assets, contracts, and business away from the Debtor-Acis).

The Debtor-Acis also is obligated on large administrative expense claims, since: (a) a

Chapter 11 Trustee was appointed very early—due to what the bankruptcy court perceived to be

massive conflicts of interest with regard to the Debtors' management; and (b) the Objectors have

opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases,

resulting in many long hearings.

**IV.** **The Objectors (all of which are "Insiders").**

*There are no non-insider creditors objecting to the Plan*. Mr. Terry supports the Plan.

The CLO SPEs and Indenture Trustee do not oppose the Plan. None of the vendors oppose the

Plan. The U.S. Trustee is not opposing the Plan. As a technical matter, two impaired classes of

creditors voted to accept the Plan.[20] *So who are the Objectors to the Plan (which Plan will be*

*further described below) and what is their party-in-interest status here?*

As earlier mentioned, the Objectors are: (a) Highland, (b) HCLOF Guernsey, and (c)

Neutra Cayman. As noted earlier, the Chapter 11 Trustee frequently refers to them collectively

as "The Highlands"—but the Objectors do not like this conflation. At one time Highland and

---

[20] Classes 2 and 3. *See* Exh. 613.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 418 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 532 of 1828 PageID 10025
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 417 of 1803 PageID 11163
Case 18-30264-sgj11 Doc 3927-35 Filed 10/31/19 Entered 11/01/19 Page 11 of 49 Page 12 of 47

HCLOF Guernsey had the same lawyers. They do not anymore. However, they frequently file joint pleadings and take the same positions. Highland and Neutra Cayman do still have the same lawyers.

    1.  <u>Highland.</u>

    Highland is a Dallas, Texas-based company that is a Registered Investment Advisor. Highland was founded in 1993 by Mr. Dondero, originally with a 75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest. As mentioned earlier, Mr. Dondero is the chief executive of Highland. Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles including CLOs, private equity funds, and mutual funds. Highland provides employees to entities in the organizational structure, such as it did with the Debtor-Acis, through the mechanism of shared services agreements and sub-advisory agreements (as mentioned above). ***Notably, Highland's chief executive, Mr. Dondero, served as the President of the Debtor-Acis at all relevant times prepetition.***[21] Highland claims to be a large creditor of the Debtor-Acis for services provided to the Debtor-Acis under the Shared Services Agreement and the Sub-Advisory Agreement. The Chapter 11 Trustee disputes these claims and has asserted numerous claims back against Highland in an adversary proceeding (the "Highland Entities Adversary Proceeding").

    In any event, Highland is a ***disputed insider creditor***. It is an "insider," as contemplated by Bankruptcy Code section 101(31)(C), because it, beyond any shadow of a doubt, controlled the Debtor-Acis until these Bankruptcy Cases developed to the point of having a Chapter 11

---

[21] One witness, Hunter Covitz, referred to the Debtor-Acis as the "structured credit arm of Highland." Transcript 12/13/18 (AM) [DE # 793], at p. 57.

Appellee Appx. 00411
APPX. 09376

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 419 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 533 of 1828 PageID 10026
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 418 of 1803 PageID 11164
Case 18-30264-sgj11 Doc 3927-5 Filed 01/30/19 Entered 01/31/19 Page 13 of 47
Case 18-30264-sgj11 Doc 1392 Filed 11/04/19 Page 13 of 47

Trustee take charge of the Debtor-Acis. Highland does not seem to dispute that it is an insider.[22]
But, for the avoidance of doubt, Highland should be considered an insider of the Debtor-Acis for
at least the following reasons: (a) the same human being (Mr. Dondero) was president of the
Debtor-Acis and was the chief executive of Highland; (b) Highland's General Counsel, Scott
Ellington, testified that Mr. Dondero controlled them both;[23] and (c) Highland provided the
Debtor-Acis with employees and management services pursuant to the Sub-Advisory Agreement
and Shared Services Agreement.[24]

Additionally, the court believes that the Chapter 11 Trustee made a convincing argument
in connection with Plan confirmation (and his justification for the separate classification of
Highland's claim in the Plan from other general unsecured creditors) that Highland should also
be regarded as a "competitor" of the Debtor-Acis at this juncture, since they are both in the fund
management business and Highland's control over the Debtor-Acis has now been divested.
Highland's competitor status, in addition to its insider status, warrants additional scrutiny of its

---

[22] Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as an officer of the debtor, affiliate, *etc.* Further, the list of enumerated "insiders" is not exclusive or exhaustive. *See Wilson v. Huffman (In re Missionary Baptist Foundation of Am., Inc.),* 712 F.2d 206, 210 (5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts have additionally recognized as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.' The conferral of that status often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length." *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the parties and (2) whether the transaction . . . [was] conducted at arm's length." *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

[23] *E.g.,* Exh. 23, at pp. 160 (line 15) through 161 (line 4); p. 196 (lines 14-19); p. 219 (lines 1-21).

[24] *See* 11 U.S.C. §§ 101(2)(D); (31)(C)(5). The court notes that, although Highland has, from time to time, alleged that Mr. Terry is a "non-statutory insider" of the Trustee, it has never put on any credible evidence to support this contention.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 420 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 534 of 1828   PageID 10027
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 419 of 1803   PageID 11165
Case 18-30264-sgj11 Doc 1392-73 Filed 01/31/19   Entered 01/31/19 15:15:04   Page 14 of 47

motivations in objecting to the Plan.  More importantly, it provides a sound legal and business

justification for separately classifying its claim in the Plan.

    2.  HCLOF Guernsey.

    The second Objector, HCLOF Guernsey, is an entity formed in the island nation of

Guernsey.  It has two allegedly independent Directors from Guernsey who have provided

testimony in connection with confirmation of the Plan.  It was enormously clear to the court (as

will be elaborated upon below) that the two Directors of HCLOF Guernsey are—stated in the

kindest way possible—mere "figureheads" for HCLOF Guernsey and they defer to Highland

*entirely* to tell them what to do, what to say, and when.  In any event, HCLOF Guernsey is the

owner of the equity in the CLO SPEs (as earlier mentioned, this equity is sometimes referred to

as the "subordinated notes" in the CLO SPEs).  According to HCLOF Guernsey's 2017 Annual

Report and Audited Financials, all of its subordinated notes issued by the Acis CLOs are

physically held at and are pledged to HCLOF Guernsey's lender, NexBank, which happens to be

a Dallas bank that is an affiliate of Highland.[25]  HCLOF Guernsey was created in the year 2015

and was formerly known as "ALF."[26]  Its name was changed on October 30, 2017 (ten days after

Mr. Terry's Arbitration Award was entered), to allegedly distance itself from the Debtor-Acis.

The equity owner HCLOF Guernsey, in turn, has three equity owners:  (i) a 49% equity owner

that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions

from **Highland**, is managed/advised by **Highland**, and whose **independent trustee is a long-time**

**friend of Highland's chief executive officer, Mr. Dondero**; (ii) 2% is owned by **Highland**

**employees**; and (iii)  a 49% equity owner that is a third-party institutional investor based in

---

[25] Exh. 647.

[26] "ALF" is short-hand for Acis Loan Funding, Ltd.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 421 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 535 of 1828 PageID 10028
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 420 of 1803 PageID 11166
Case 18-3026-sgj11 Doc 3923 Filed 01/31/19 Page 15 of 47

Boston, Massachusetts that only recently invested in HCLOF Guernsey (*i.e.,* in November 2017, just after the Terry Arbitration Award was issued), and desires to remain passive and anonymous (hereinafter, the "Passive Investor").[27] Notably, the Debtor-Acis itself owned a small percentage of HCLOF Guernsey, in addition to providing management services to it, until October 24, 2017 (four days after the Terry Arbitration Award was issued).

The court has allowed HCLOF Guernsey to vigorously participate in the confirmation hearing (and other hearings during the Bankruptcy Cases), although its party-in-interest status has been questionable. So how is HCLOF Guernsey a party-in-interest? The answer is a bit of a stretch—but the court has decided it is impacted by the Plan, so it should have the right to object. Its party-in-interest status has evolved during the Bankruptcy Cases.

First, early on in these Bankruptcy Cases, HCLOF Guernsey (together with Highland) sued the Chapter 11 Trustee in the above-mentioned "Highland Entities Adversary Proceeding"—mostly, if not entirely, seeking injunctive relief. At that point, the Chapter 11 Trustee treated HCLOF Guernsey as a disputed creditor,[28] since it was seeking equitable relief that could arguably be monetized.[29] However, HCLOF Guernsey subsequently withdrew its requests for relief in that Highland Entities Adversary Proceeding. But then, the Chapter 11 Trustee subsequently filed claims *against* HCLOF Guernsey in the Highland Entities Adversary Proceeding (along with his claims against Highland and a couple of other Highland entities) asserting avoidance actions and other causes of action against HCLOF Guernsey (among other

---

[27] The testimony was that the Passive Investor committed to a $150 million investment ($75 million immediately and $75 million callable over the next several years).

[28] In fact, on August 15, 2018, the Chapter 11 Trustee filed a proof of claim on behalf of HCLOF Guernsey. HCLOF Guernsey has since objected to the proof of claim.

[29] *See* 11 U.S.C. §§ 101(5)(B) & 101(10).

Appellee Appx. 00414
APP. 0379

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 422 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 536 of 1828   PageID 10029
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 421 of 1803   PageID 11167
Case 18-30264-sgj11 Doc 1339 Filed 01/31/19   Entered 01/31/19 15:11:04 Page 16 of 47

things, the Chapter 11 Trustee alleged that HCLOF Guernsey schemed with Highland to

terminate the Equity/ALF PMA, in a step toward systematically dismantling the Debtor-Acis of

its value). Thus, HCLOF Guernsey may ultimately owe money to this estate. But most

importantly, HCLOF Guernsey should be deemed a party-in-interest because of a proposed

temporary injunction in the Plan that essentially would enjoin (for a finite, defined period)

HCLOF Guernsey from exercising certain of its rights with regard to its equity in the CLO SPEs,

pending resolution of the Highland Entities Adversary Proceeding. This temporary injunction in

the Plan, directed towards HCLOF Guernsey and affiliates, will be further described below.

3.   Neutra Cayman.

Neutra Cayman is a Cayman island exempted company that is the equity owner *of the*

*Debtor-Acis itself* (in contrast to HCLOF Guernsey, which only owns equity in the CLO SPEs).

Neutra Cayman only acquired its equity interest in the Debtor-Acis the day after the Terry

Judgment was entered (on December 18, 2017), and for no consideration, from the Dugaboy

Investment Trust (a family trust on which Mr. Dondero's sister is named trustee, that previously

owned 74.9% of the Debtor-Acis) and from Mr. Akada (who previously owned 25% of the

Debtor-Acis).[30] The court concludes that Neutra Cayman has standing to object to the Plan,

---

[30] The court is repeatedly referring to the Debtor-Acis but, to be clear, there are two consolidated Debtors: Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP/LLC"). *See* note 2, *supra*. When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) the Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest. When Acis GP/LLC was formed (*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment Trust. After Mr. Terry was terminated by Highland, his 25% limited partnership interest in Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his interest by 10% up to 25%), and the Dugaboy Investment Trust (increasing its interest by 15% up to 74.9%). But, most importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on December 18, 2017), both Mr. Akada and the Dugaboy Investment Trust conveyed their entire limited partnership interests in Acis LP—25% and 74.9%, respectively—to Neutra Cayman. The Dugaboy Investment Trust also conveyed its 100% membership interest in Acis GP/LLC to Neutra Cayman.

Appellee Appx. 00415
APP. 0332

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 423 of
Case 3:23-cv-00726-S Document 8-22 1804/29/23 Page 537 of 1828 PageID 10030
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 422 of 1803 PageID 11168
Case 18-30264-sgj11 Doc 2392755 Filed 01/31/19 Page 17 of 47
Case 19-12239 Doc 31619 Entered 11/01/19 15:18:04 Page 17 of 47

since it is an equity owner of the Debtors (albeit only having acquired its equity about a month

before the bankruptcy). As with HCLOF Guernsey, the court also concludes that Neutra-

Cayman is absolutely, beyond any reasonable doubt, controlled by Highland, as explained

further below.

## V.     **The Plan.**

The Plan is fairly simple, considering the complexity of the business and the

relationships, and the contentiousness of the Bankruptcy Cases. Again, there aren't many

creditors.

The Plan proposes[31] that the Debtor-Acis, as a "Reorganized Debtor," will continue with

the business operations of the Debtors after the Effective Date[32] of the Plan. Specifically, the

Debtor-Acis will assume, pursuant to section 365 of the Bankruptcy Code, its CLO PMAs and

continue to serve as the portfolio manager to the CLO SPEs (and as to any resets of the CLOs

therein). The Reorganized Debtor will continue to earn fees and will pay claims from post-

Effective Date income as provided in the Plan. The Reorganized Acis will actively pursue

additional fund management contracts. Again, there is no objection by the CLO SPEs to the

Plan, and the indenture trustee on the tranches of CLO notes has no objection.

Mr. Terry (again, the former human manager of the Debtor-Acis and also the largest

creditor) shall receive 100% of the equity interests in the Reorganized Debtor, in exchange for a

negotiated $1 million reduction in his partially secured claim.[33] The remainder of his claim will

---

[31] This is merely a high-level summary of the Plan. The Plan terms, as modified, shall in all ways govern, not this summary.

[32] The "Effective Date" is defined, essentially, as the first business day which is fourteen (14) days after entry of an order confirming the Plan, if the confirmation order is not stayed.

[33] Mr. Terry has asserted partial secured status as to his claim in the proofs of claim he has filed in these cases. The Chapter 11 Trustee credibly testified that there was no other logical party to take the equity of

Appellee Appx. 00416
APP. 08273

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 424 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 538 of 1828    PageID 10031
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 423 of 1803    PageID 11169
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19    Entered 01/31/19 15:11:04    Page 18 of 47

be treated as an unsecured claim.  Each unsecured creditor will receive on the Plan Effective

Date an unsecured cash flow note in the full amount of its claim, which notes will mature three

years after the Effective Date of the Plan, with equal quarterly payments of principal and interest,

at 5% interest per annum.  These cash flow notes are expected to yield payment in full (actually

102%) to the unsecured creditors.[34]

     As for the sub-advisory and shared services agreements with Highland, as noted earlier,

the Chapter 11 Trustee, with bankruptcy court approval, has already (as of August 2018) rejected

these during the Bankruptcy Cases, pursuant to section 365 of the Bankruptcy Code.  The

Chapter 11 Trustee caused the Debtor-Acis to subsequently contract, with bankruptcy court

approval, with a different entity, Brigade Capital Management, L.P. ("Brigade"), to provide the

sub-advisory and shared services going forward, for a minimum two-year term (unless the

Reorganized Debtor and Brigade otherwise agree), at a much cheaper cost than Highland.[35]

Thus, Brigade will provide sub-servicing and sub-advisory services to the Reorganized Debtor.

---

the Reorganized Debtor, at this juncture, and that he had negotiated this reduction to Mr. Terry's secured
claim, and he thought it was justified by the circumstances of this case.  While the Objectors have argued
that the secured status of Mr. Terry's claim may be subject to challenge under section 547(b) of the
Bankruptcy Code, section 547(b) is discretionary (*e.g.*, a "trustee may avoid any transfer" that might be
avoidable as a preference).  The Chapter 11 Trustee credibly emphasized that this was negotiated
treatment of an asserted secured claim, and he had no "exclusivity" on proposing a plan if someone else
had wanted to propose something different.  Transcript 12/11/18 (AM) [DE # 789], at p. 70 (line 3)
through p. 71 (line 2).

[34] Insider claims—namely Highland—are separately classified from general unsecured claims under the
Plan.  To the extent such claims are ultimately allowed (after any allowed defenses and offsets), and to the
extent such claims are not equitably subordinated by Bankruptcy Court adjudication, these claims will
receive the same treatment as other general unsecured claims (cash flow notes).  To the extent any of
these claims are ultimately allowed but equitably subordinated, they will receive subordinated promissory
notes, accruing interest at 5% per annum, that will not be payable until all non-subordinated claims have
been paid in full (they will have maturity dates to occur on the earlier of:  (i) the date that is two years
after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five years after the Effective
Date).  The expected recovery under the Plan for the insider claims is from 65% to 100%.

[35] An entity named Cortland Capital Markets Services LLC ("Cortland") is actually providing some of the
back-office shared services agreement type functions.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 425 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 539 of 1828    PageID 10032
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 424 of 1803    PageID 11170
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19    Entered 01/31/19 15:12:04    Page 19 of 47

As for the Equity/ALF PMA, it is not an agreement with the Debtor-Acis anymore to either be assumed or rejected, pursuant to section 365.  However, in the Highland Entities Adversary Proceeding, the Chapter 11 Trustee seeks to avoid the termination of the Equity/ALF PMA.  Pursuant to the Plan, the Reorganized Debtor will be vested with certain Assets of the Debtors, including Estate Claims and Estate Defenses, to be administered and liquidated by the Reorganized Debtor.

    1.   The Highland Entities Adversary Proceeding (Adv. Proc. No. 18-03212).

Suffice it to say that the Highland Entities Adversary Proceeding is a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan.  With regard to the Highland Entities Adversary Proceeding, the Defendants in it (there are five of them) are: (i) Highland; (ii) HCLOF Guernsey; (iii) Highland HCF (*i.e.,*  the Cayman Island entity that was recently formed to essentially replace the Debtor-Acis under the Equity/ALF PMA); (iv) Highland CLO Management, Ltd. ("Highland Management") (an entity registered in the Cayman Islands on October 27, 2017—seven days after Mr. Terry's Arbitration Award); and (v) Highland CLO Holdings, Ltd. (yet another entity incorporated in the Cayman Island on October 27, 2017).  The Highland Entities Adversary Proceeding is essentially a multi-faceted fraudulent transfer action. The statutory predicates for the relief sought are sections 502, 542, 544, 547, 548, and 550 of the Bankruptcy Code and Texas Business & Commerce Code § 24.001 et seq. ("TUFTA").

Distilled to its essence, the Highland Entities Adversary Proceeding argues that Highland, along with its related Co-Defendants, ***orchestrated a systematic transfer of value away from the Debtor-Acis to other Highland entities*** (all of those transferee-entities are offshore entities—whereas the Debtor-Acis is a Delaware entity), beginning almost immediately after Mr. Terry

<div align="center">19</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 426 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 540 of 1828   PageID 10033
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 425 of 1803   PageID 11171
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19   Entered 01/31/19 Page 214 of Page 20 of 47

was terminated in June 2016, and continuing on during Mr. Terry's litigation/arbitration with the

Debtor-Acis, and then rapidly unfolding after the Arbitration Award.  This was allegedly done to

denude the Debtor-Acis of value and make the Debtors "judgment proof."  This was allegedly

also done to ensure that the Debtor-Acis's very valuable business as portfolio manager would be

taken over by other Highland entities and remain under Highland's and Mr. Dondero's control.[36]

The evidence is rather startling on this point.  Among other things, pursuant to

amendments made to the Debtor-Acis's Sub-Advisory Agreement and Shared Services

Agreements with Highland, starting soon after Mr. Terry was terminated, the fees owed by the

Debtor-Acis to Highland under these agreements shot up to an enormously higher level.  Then,

in April 2017, a new CLO was issued (or actually a former Acis CLO was reset) and a new

Highland-affiliated Cayman Island entity was ultimately put in place to manage it instead of the

Debtor-Acis (even though the Debtor-Acis managed all other CLOs in the Highland corporate

empire).  Numerous other transactions were undertaken through the Fall of 2017, removing

assets and agreements away from the Debtor-Acis.  For example, a multi-million dollar note

receivable owed to the Debtor-Acis by Highland was transferred out of the Debtor-Acis,[37] and

---

[36] Exh. 627.

[37] On November 3, 2017, the Debtor-Acis, Highland, and Highland Management (a newly created, offshore Highland affiliate) entered into that certain Agreement for Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement").  Exh. 225.  The Note Assignment and Transfer Agreement, among other things, transferred a $9.5 million principal amount promissory note executed by Highland and payable to the Debtor-Acis (the "Note"), Exh. 218, from the Debtor-Acis to Highland Management (the "Note Transfer").  The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for the Debtor-Acis.  The document recites that (i) Highland is no longer willing to continue providing support services to the Debtor-Acis, (ii) the Debtor-Acis, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland Management agrees to step into the collateral manager role if the Debtor-Acis will assign the Note to it.  Notably, Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer.  Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement.  To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the CLO PMAs in an international forum that would be difficult for Mr. Terry to reach.  The Debtor-

20

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 427 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 541 of 1828   PageID 10034
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 426 of 1803   PageID 11172
Case 18-30264-sgj11  Doc 3927-5  Filed 01/31/19   Entered 01/31/19 15:12:04   Page 21 of 47

shares in HCLOF Guernsey held by the Debtor-Acis were sold back to HCLOF Guernsey (four

days after the Arbitration Award).  And then the Equity/ALF PMA was terminated so that the

Debtor-Acis would no longer have management-control over HCLOF Guernsey as its portfolio

manager—arguably putting Highland in a position to liquidate the Acis CLOs and put the

Debtor-Acis out of business.  Specifically, on October 27, 2017, just seven days after Mr. Terry's

Arbitration Award, the Debtor-Acis ostensibly terminated its own portfolio management rights

under the Equity/ALF PMA[38] and transferred its authority and its valuable portfolio management

rights—for no value—to Highland HCF, an affiliate of Highland.  It appears that the only alleged

consideration for these transfers, to the extent there was any, was the satisfaction of purported

debts owed to other Highland entities or their representatives.

---

Acis appears to have received no or insufficient consideration for the Note Transfer.  The primary
consideration for the Note Transfer was an alleged payable due from the Debtor-Acis to Highland in the
approximate amount of $7.5 million for participation fees, which was transferred to Highland
Management shortly before the Note Assignment and Transfer Agreement was entered.  The validity of
the alleged "participation fees" is unknown.  The remainder of the consideration for the Note Transfer is a
promise to pay certain expenses of the Debtor-Acis, which has apparently never occurred.  In any event, it
appears highly likely that the Note Transfer took away the Note as an asset from which Mr. Terry could
collect his judgment.

[38] As mentioned earlier, the Equity/ALF PMA provided that the Debtor-Acis could only be removed as
portfolio manager by the equity owner (now known as HCLOF Guernsey) *"for cause"* at § 14(a)-(e).
Exh. 11.  Meanwhile, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least
ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.  It would appear that these terms were wholly
ignored by the persons orchestrating the Equity/ALF PMA termination.  It appears that the Debtor-Acis
was simply manipulated to consent and agree to its removal and replacement as portfolio manager of
HCLOF Guernsey.  This transfer of the Debtor-Acis's portfolio management rights to the offshore entity
Highland HCF was accomplished by way of a new portfolio management agreement entered into by the
equity owner (now known as HCLOF Guernsey) and Highland HCF on October 27, 2017, which
empowered Highland HCF with the same broad authority to direct the management of HCLOF Guernsey
as was previously held by the Debtor-Acis LP under the Equity/ALF PMA.  *See* Exh. 19, October 27,
2017 PMA §§ 1 & 5(a)-(q).  This agreement appears to have been further solidified in a second portfolio
management agreement dated November 15, 2017.  Exh. 215.  The Debtor-Acis received no consideration
for this transfer.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 428 of
Case 3:23-cv-00726-S  Document 8-22  Filed 02/29/23  Page 542 of 1828  PageID 10035
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 427 of 1803  PageID 11173
Case 18-30264-sgj11 Doc 839-75 Filed 01/31/19  Entered 01/31/19 15:23:04  Page 22 of 47

The Highland Defendants argue that the Equity/ALF PMA (its termination being arguably the most significant transfer referenced in the Highland Entities Adversary Proceeding) did not have value.  But the evidence convinces the court that it absolutely did.  A witness, Mr. Zachary Alpern, credibly testified that the portfolio manager (under the Equity/ALF PMA) made decisions regarding the underlying financial instruments including seeking an optional redemption and negotiating a reset.  Mr. Alpern also credibly testified about the importance, in the CLO industry, of the portfolio manager having control of a CLO's equity to ensure an "evergreen fee stream."[39]  Additionally, Mr. Terry also credibly testified that the portfolio manager (not the CLO equity interest holder) has the right to control the terms of the liquidation of collateral in an optional redemption under the terms of the indentures.[40]  The Chapter 11 Trustee also credibly testified that the Equity/ALF PMA allowed the Debtor-Acis to have control of an optional redemption.[41]  Finally, a witness, Mr. Klein, credibly testified about the value of the Equity/ALF PMA and the negative impact of its transfer on the Debtor-Acis LP. [42]

To be clear, Highland and HCLOF Guernsey have argued in opposition to the Chapter 11 Trustee's position that it is HCLOF Guernsey—the actual equity holder of the CLO SPEs—that had/has the absolute power and authority to control the CLO SPEs' destinies and it is ludicrous to suggest otherwise.  However, not only does the Equity/ALF PMA appear to this court to have delegated the relevant power and authority **to the Debtor-Acis**, but Highland's own expert on this

---

[39] Exh. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-40, 46, and 49.

[40] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 405, Transcript 8/27/18 (AM) at pp. 63-75.

[41] Exh. 405, Transcript 8/27/18 (AM) at p. 53.

[42] Exh. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207.

22

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 429 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 543 of 1828   PageID 10036
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 428 of 1803   PageID 11174
Case 18-30264-sgj11 Doc 3927-5 Filed 01/18/19   Entered 01/18/19 19:12:04   Page 23 of 47

topic, Mr. Castro, testified that the "actual humans" who would make the decision for HCLOF

Guernsey as to whether to request an optional redemption of the Acis CLOs were not the

HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and

Highland employee Mr. Covitz (acting for Highland HCF).[43]  Moreover, Mr. Alpern credibly

testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager

under the Equity/ALF PMA, rather than the HCLOF Guernsey's directors, issued the notices of

optional redemption for HCLOF Guernsey.[44]

        The court concludes that the Chapter 11 Trustee has demonstrated a likelihood of

success on the merits with regard to his claims set forth in the Highland Entities Adversary

Proceeding.  Therefore, the Temporary Injunction that is part of the Plan is supportable (as

further explained below).  Of course, the nature and extent of the rights ultimately recovered by

the Debtor-Acis will either be determined in the Highland Entities Adversary Proceeding or, as

HCLOF Guernsey's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas

under the terms of the Equity/ALF PMA.[45]

        2.    The Plan Injunction.

        The most controversial aspect of the Plan—the aspect of it that seems to be the primary

focus of the Objectors—is a *portion* of an injunction in the Plan (the "Temporary Injunction").

The Temporary Injunction would *temporarily* enjoin the following parties *from effectuating an*

*optional redemption or liquidating the Acis CLOs* and related actions: (i) Highland; (ii) HCLOF

---

[43] Exh. 406, Transcript 8/28/18 (PM) at pp. 61-63.

[44] Exh. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exhs. 323-325 (Notices of Optional Redemption
signed by the Debtor-Acis as portfolio manager of HCLOF).

[45] Transcript 12/13/18 (PM) [DE #794], at pp. 116, 118-19, 122, 124 (Corfield); *see also*, p. 140
(McGuffin).

Appellee Appx. 00422
APP. 08289

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 430 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 544 of 1828 PageID 10037
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 429 of 1803 PageID 11175
Case 18-30264-sgj11 Doc 3922-5 Filed 11/31/19 Filed 11/01/19 Page 25 of 48 Page 24 of 47

Guernsey; (iii) CLO Holdco, Ltd. (the donor advised fund, seeded with Highland contributions

and managed by Highland that owns 49% of HCLOF Guernsey); (iv) Neutra Cayman; (v)

Highland HCF (the Cayman Island entity created shortly before the Bankruptcy Cases to replace

the Debtor-Acis under the Equity/ALF PMA); (vi) Highland Management (the Highland-created

entity that entered into a portfolio management agreement with a new Acis-CLO that was

established in 2017); and (vii) any affiliates of Highland and their respective employees, agents,

representatives, transferees, assigns, and successors.[46] This Temporary Injunction is proposed to

only last until the earlier of when: (a) the creditors of the Debtors are paid in full; (b) resolution

of the Highland Entities Adversary Proceeding; (c) a material breach in the Plan; or (d) the

bankruptcy court terminates the Temporary Injunction upon request of a party-in-interest. ***Fully

consensual resets of the Acis CLOs are permissible if HCLOF Guernsey, as the equity owner

in the CLO SPEs, chooses to agree to resets***. The basis for the Temporary Injunction is as

follows: The Chapter 11 Trustee has asserted numerous claims in the Highland Entities

Adversary Proceeding against Highland, HCLOF Guernsey, and affiliates, including claims to

recover the Debtor-Acis's rights under the Equity/ALF PMA.[47] The Temporary Plan Injunction

essentially provides for the continuation, after the Effective Date, of injunctive relief that the

bankruptcy court previously granted in its Preliminary Injunction Order (the "Preliminary

Injunction") [DE # 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Highland

Entities Adversary Proceeding. The Preliminary Injunction was originally set to expire by its

---

[46] There is another portion of this Plan injunction that is more of a general plan injunction (*i.e.,* very typical) that would prohibit actions against the Debtors, Reorganized Debtor and the Estate Assets, based on acts occurring before the Effective Date, which would be permanent and would not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[47] *See* Exh. 627, Trustee's Counterclaims and Claim Objection.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 431 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 545 of 1828 PageID 10038
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 430 of 1803 PageID 11176
Case 18-3026 Case 19-12392 TS Filed Doc 3361 Entered 01/31/19 Page 25 of 47

own terms upon confirmation of the Plan but would be extended pursuant to an order confirming

the Plan, through the Effective Date of the Plan.

As the Fifth Circuit has stated, the four elements to justify a preliminary injunction are (a)

substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer

irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the

defendant; and (d) the injunction is in the public interest.[48]  Each element is present in these

cases.

*Immediate and Irreparable Harm.*  The court finds and concludes that the Temporary

Injunction is legally permissible, necessary, and appropriate to avoid immediate and irreparable

harm to the Reorganized Debtor (*i.e.,* evisceration of the Acis CLOs, by parties with unclean

hands, that would have no authority to effectuate a liquidation of the CLOs, absent the

prepetition wrongful termination of the Equity/ALF PMA).  Mr. Scott, a director of HCLOF

Guernsey, testified that, absent the Temporary Plan Injunction, HCLOF Guernsey would call for

an optional redemption of the Acis CLOs.[49]  The testimony of Ms. Bestwick, the other director

of HCLOF Guernsey, also implied that, when the injunction expires, HCLOF Guernsey would

redeem the Acis CLOs so that they could once again be managed by Highland.[50]  The Chapter 11

Trustee credibly testified that if the Acis CLOs are liquidated, there is nothing for the Debtor-

Acis to manage.[51]  The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction

---

[48] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. of N.W. Houston v. Bell*, 248
F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

[49] Exh. 721, Mr. Scott Depo. at pp. 204.

[50] Exh. 719, Bestwick Depo. at p. 112.

[51] Exh. 405, Transcript 8/27/18 (AM) at p. 40.

**Appellee Appx. 00424**

**APP. 08389**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 432 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 546 of 1828 PageID 10039
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 431 of 1803 PageID 11177
Case 18-30264-sgj11 Doc 2275 Filed 01/30/19 Entered 01/31/19 15:12:04 Page 26 of 47

is very important because it protects the revenues under the Acis PMAs, which is a source of potential recovery to creditors under the Plan.[52] Mr. Terry credibly testified that the Temporary Plan Injunction is a critical component of the Plan and that the Debtor-Acis would have no going concern value without it. In fact, without the Plan Injunction, Mr. Terry will be precluded from reorganizing the business and paying creditors.[53]

The Objectors have argued that the Chapter 11 Trustee cannot suffer irreparable harm because he has an adequate remedy at law. This argument misses the mark. The destruction of the Debtors' ongoing business, which has the potential to repay creditors under the Plan in two years, constitutes irreparable harm. The fact that the estate possesses a number of avoidance claims for damages against Highland and its affiliates, and could potentially obtain damages on such claims, does not render the destruction of the Debtor-Acis's ongoing business any less harmful. Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.' For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions.[54]

*Likelihood of Success on the Merits.* The Chapter 11 Trustee has also demonstrated a likelihood of succeeding on the merits in the Highland Entities Adversary Proceeding.

---

[52] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[53] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[54] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934) ("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold the remedy by injunction.")).

Appellee Appx. 00425

APP. 08392

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 433 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 547 of 1828   PageID 10040
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 432 of 1803   PageID 11178
Case 18-30264-sgj11  Doc 392-35  Filed 01/31/19   Entered 01/31/19 12:04:49  Page 27 of 47

The record contains substantial evidence of both intentional and constructive fraudulent

transfers with regard to the Equity/ALF PMA and other assets.[55]  The numerous prepetition

transfers that occurred around the time of and after the Terry Arbitration Award appear more

likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to

hinder, delay or defraud the Debtors' creditors.  Highland's only purported business justifications

for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-

Acis's brand was toxic in the market place.[56]  However, these business justifications were not

supported (and, in fact, were contradicted) by the evidence.

Indeed, while representatives of Highland and its affiliates said that the Passive Investor's

demands were the reason for the termination (*i.e.,* essentially a "transfer") of the Equity/ALF

PMA, the Passive Investor's representative testified that this was untrue and that these alleged

demands were never made by the Passive Investor.[57]  In fact, the Passive Investor was just that—

a passive, minority investor in HCLOF Guernsey with no ability to influence or control any of

---

[55] *E.g.,* Exh. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein; Exh. 201, Transcript 3/21/18 at pp. 110-133 & 186-191; Exh. 24, Transcript 3/22/18 at pp. 71-75 & pp. 204-205; Transcript 12/11/18 [DE # 789], at pp. 52-56; *see also* Transcript 8/27/18 (AM) [DE # 552], at p. 52; Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98;

[56] Highland General Counsel Scott Ellington testified that the Passive Investor said it had no interest in doing business with the Debtor-Acis because the Debtor-Acis brand was purportedly toxic and, consequently, nothing associated with the Debtor-Acis could be managed or marketed as a CLO.  Exh. 23, Transcript 2/7/18 at pp. 55-58.  Mr. Ellington further testified that the Passive Investor demanded that the Equity/ALF PMA be transferred.  Exh. 23, Transcript 2/7/18 at pp. 203-204.  Mr. Ellington also testified that, because the Passive Investor would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions.  Exh. 23, Transcript 2/7/18 at p. 226.  Additionally, Highland executive Mark Okada testified that a reset transaction could not be performed by the Debtor-Acis because the market would not accept the Debtor-Acis as a portfolio manager and the Debtor-Acis was no longer risk-retention compliant.  Exh. 25, Transcript 3/23/18 at p. 53.  Additionally, Mr. Dondero testified that the "Boston investor" deal was contingent on getting away from the Debtor-Acis and getting a new collateral manager.  Exh. 25, Transcript 3/23/18 at pp. 143-144.

[57] *See* Exh. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157.

Appellee Appx. 00426
APP. 08291

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 434 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 548 of 1828   PageID 10041
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 433 of 1803   PageID 11179
Case 18-30264-sgj11 Doc 3892 Filed 01/31/19   Entered 01/31/19 12:50:4 Page 28 of 47

the actual investment decisions.[58]  The only other business justification Highland and HCLOF

Guernsey have suggested for the prepetition transfers was that the Debtor-Acis "was a shell" and

not capable of being risk retention compliant.[59]  However, Highland portfolio manager Hunter

Covitz testified that in October 2017, prior to the Terry Arbitration Award, there was a structure

in place that would comply with risk retention.[60]  Mr. Covitz could not convincingly distinguish

why the "shell" status of the Debtor-Acis was distinguishable from the "shell" status of other

Highland-related entities that were the recipients of various fraudulent transfers.[61]  Mr. Covitz

also subsequently admitted that the Passive Investor did not request that the Debtor-Acis end its

involvement with HCLOF Guernsey through the Equity/ALF PMA fraudulent transfer or request

that ALF change its name to HCLOF [Guernsey].[62]  Mr. Covitz's testimony contradicted the

testimony provided by Scott Ellington, General Counsel[63] and Mr. Dondero.[64]  And, at bottom, if

the Debtor-Acis was a thinly capitalized "shell," it appears to be only because Highland

systematically made it that way after the Terry Arbitration Award.

    The evidence established overwhelmingly that there is a substantial likelihood that the

transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.

Highland put on an expert, Mr. Greenspan, who testified that he did not consider whether the

---

[58] Exh. 720, Depo. of Passive Investor representative at pp. 32-33.

[59] Transcript 12/13/18 (AM) [DE # 793], at pp. 55-58.

[60] Transcript 12/13/18 (AM) [DE # 793], at pp. 77-78.

[61] Transcript 12/13/18 (AM) [DE # 793], at p. 78; Transcript 12/18/18 [DE # 804], at pp. 59-63.

[62] Transcript 12/13/18 (AM) [DE # 793], at p. 103.

[63] *See* Exh. 23, Transcript 2/7/18 at pp. 177-178.

[64] *See* Ex. 25, Transcript 3/23/28 at pp. 143-44.

Appellee Appx. 00427
APP. 08294

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 435 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 549 of 1828    PageID 10042
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 434 of 1803    PageID 11180
Case 18-30264-sgj11  Doc 1239-2  Filed 01/31/19  Entered 01/31/19  Page 29 of 47

Equity/ALF PMA transfer was an "actual" fraudulent transfer, but only considered whether the

transfer was "constructively" fraudulent.[65]  While Highland has taken the position that

termination of the Equity/ALF PMA was not a transfer, Mr. Greenspan testified that the

termination of a contract can constitute a transfer and acknowledged that the definition of a

transfer in the Bankruptcy Code does not include a value component.[66]

   *Balance of Harms.*  The Chapter 11 Trustee has also shown the balance of harms weighs

in his and the estates' favor in granting the Plan's Temporary Injunction.  The Chapter 11

Trustee is entitled to the Temporary Injunction pending resolution of the claims asserted in the

Highland Entities Adversary Proceeding.  The Chapter 11 Trustee credibly testified that the

Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the

CLO management to be collected by the Reorganized Debtor, and that is the source of revenue

available at this time to pay creditors.[67]  Mr. Terry also credibly testified that the Temporary Plan

Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern

value and allow the Reorganized Debtor to generate new business and repay creditors.[68]

Conversely, in this court's view, there is no real harm to Highland or the Co-Defendants because

they can ask for a reset under the Plan.[69]  Mr. Scott, a director of HCLOF Guernsey, testified that

---

[65] Transcript 12/12/18 (PM) [DE # 792], at pp. 116-117 and 161.

[66] Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98.  Section 548(a)(1)(A) of the Bankruptcy Code only
requires that a transfer be made with actual intent to hinder, delay or defraud creditors.  In the context of
an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A).
The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not
include a value component.  Tex. Bus. & Comm. Code Ann. § 24.002(12) (West, Westlaw through 2017).

[67] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[68] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[69] Transcript 12/11/18 (AM) [DE # 792], at p. 92.

Appellee Appx. 00428
APP. 08293

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 436 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 550 of 1828 PageID 10043
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 435 of 1803 PageID 11181
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19 Entered 01/31/19 15:13:04 Page 30 of 47

HCLOF Guernsey can sell its interest in the subordinated notes in the market.[70]  The Chapter 11

Trustee credibly testified that the Temporary Plan Injunction would not impair the value of the

subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but

rather would acquire them to do a reset under the Plan.[71]  Mr. Terry credibly testified that even if

the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs.[72]

    *Public Interest.*  Finally, issuance of the Plan Injunction is consistent with public policy.

Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those

assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and

safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and

potentially wasteful way.  Public policy also supports successful reorganizations.[73]  The public

interest is furthered by confirming a plan that saves the Debtor-Acis's business operations and

allows it to pay its creditors under a successful plan of reorganization.  The public interest is also

furthered by maintaining the status quo through the Temporary Plan Injunction so that the

avoidance action relating to the Equity ALF PMA can be determined on its merits.  The public

interest is not furthered by allowing potential wrongdoers to complete the last step in what

appears likely to have been a scheme to strip the Debtor-Acis of its assets, steal its business, and

leave it unable to pay creditors.  The public interest is not furthered by leaving the Debtors

---

[70] Exh. 721, Mr. Scott Depo. at p. 28.

[71] Transcript 12/11/18 (PM) [DE # 790], at pp. 23-24.

[72] Transcript 12/12/18 (AM) [DE #791], at p. 82.

[73] *Tex. Comptroller of Pub. Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d 571, 580 (5th Cir. 2002).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 437 of
Case 3:23-cv-00726-S Document 8-22 1804 12/29/23 Page 551 of 1828 PageID 10044
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 436 of 1803 PageID 11182
Case 18-3026-sgj11 Doc 3445-8 Filed 01/31/19 Page 31 of 47

without sufficient resources to pursue and effectively litigate potentially valuable causes of action.

In sum, the court finds and concludes that the proposed Plan injunction (including the Temporary Injunction) is legally permissible and justified under all the circumstances. It is narrowly tailored to address the specific harm to which it is directed and comports with governing case and statutory authority and applicable rules of bankruptcy and civil procedure. The Plan Injunction is consistent with Fifth Circuit precedent.[74] Such an injunction would not violate section 524(e) of the Bankruptcy Code. That subsection provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[75] The Plan Injunction would not affect the liability of any entity, or the liability of any property. The injunction would only temporarily prohibit Highland and its Co-Defendants from exercising one form of economic recourse, thereby preserving the status quo while the Chapter 11 Trustee and/or Reorganized Debtor has a fair opportunity to prosecute the

---

[74] The Fifth Circuit, in an unpublished opinion, has recognized the propriety of an injunction to preserve the status quo in cases where equitable relief is sought. *See Animale Group v. Sunny's Perfume, Inc.,* 256 F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze."). The Chapter 11 Trustee's claims in the Highland Entities Adversary Proceeding to avoid fraudulent transfers seek equitable relief. *See United States ex rel. Rahmen v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir. 1999) ("The complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy."); *Dong v. Miller,* No. 16-CV-5836 (NGG) (JO), 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar. 23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief."). *See also Iantosca v. Step Plan Servs.,* 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance"); *Seidel v. Warner (In re Atlas Fin. Mortg., Inc.),* Adv. No. 13-03222, 2014 Bankr. LEXIS 140 at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (granting preliminary injunction where complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489 (JMF), 2013 U.S. Dist. LEXIS 66858, at *7 (S.D.N.Y. May 9, 2013) (authority to grant preliminary injunction existed because plaintiff alleged not only a legal claim for money damages, but also an equitable claim to avoid fraudulently transferred assets).

[75] 11 U.S.C. § 524(e).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 438 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 552 of 1828   PageID 10045
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 437 of 1803   PageID 11183
Case 18-30264-sgj11 Doc3 3927 Filed 01/31/19 Filed 01/31/19 Page 1304 of 49 Page 32 of 47

Highland Entities Adversary Proceeding.[76]  Likewise, the proposed injunction does not

contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules.[77]  Finally, the

Chapter 11 Trustee's avoidance claim relating to the Equity/ALF PMA transfer under TUFTA

also provides a statutory basis for injunctive relief.[78]

     **3.**  <u>Feasibility of the Plan—Specific Findings and Conclusions Regarding Mr. Terry and Brigade.</u>

The Objectors have challenged the feasibility of the Plan.[79]  The court finds and

concludes that the preponderance of the evidence supported the feasibility of the Plan.  Among

other things, the Chapter 11 Trustee credibly testified that Mr. Terry has an excellent track

record as a portfolio manager, and that there is no reason why Mr. Terry will not be able to

obtain new business—that is, new portfolios to manage which will provide additional revenue

streams for the Reorganized Debtor.[80]  The evidence was credible and compelling that Mr. Terry

---

[76] *See In re Seatco, Inc.*, 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan).

[77] *Compare Omni Mfg. v. Smith (In re Smith),* 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Chiasson v. Bingler (In re Oxford Mgmt.),* 4 F.3d 1329, 1334 (5th Cir. 1993) (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Unites States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)).

[78] Tex. Bus. & Comm. Code Ann. § 24.008 (West, Westlaw through 2017) (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require.").  TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction."  *Sargeant v. Al Saleh*, 512 S.W.2d 399, 413 (Tex. App.—Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

[79] 11 U.S.C. § 1129(a)(11).

[80] Transcript 12/11/18 (AM) [DE # 789], at p. 90 (lines 5-12).  Moreover, to the extent there are any gaps, recoveries from the Highland Entities Adversary Proceeding might eventually be available for ongoing operations and payment of creditors.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 439 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 553 of 1828 PageID 10046
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 438 of 1803 PageID 11184
Case 18-3026 sgj11 Doc 3927-5 Filed 01/33/19 Entered 01/31/19 15:13:04 Page 33 of 47

will be capable of fulfilling the equity owner position in the Reorganized Debtor (stepping in to essentially run the Reorganized Debtor) and will be able to ensure the feasibility of the Plan. He is well qualified to reorganize the Debtor-Acis. Mr. Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for the Debtor-Acis.[81] The Debtor-Acis received numerous awards during Mr. Terry's service as the portfolio manager of the Acis CLOs.[82] The arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors.[83] Mr. Terry credibly testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed.[84]

Moreover, the court finds and concludes that Brigade (who stepped in as sub-advisor in place of Highland during the Bankruptcy Cases and is a registered investment advisor) is qualified to serve as a sub-advisor to the Reorganized Acis. Mr. Jared Worman, a portfolio manager for Brigade,[85] credibly testified that Brigade, founded in the year 2007, currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs.[86] Mr. Worman credibly testified that Brigade has issued 17 CLOs and has reset or refinanced several of them.[87] Mr. Worman and Mr. Terry credibly

---

[81] Transcript 12/11/18 (PM) [DE # 790], at pp. 172-73.

[82] Transcript 12/11/18 (PM) [DE # 790], at pp. 162-163 and Exh. 752.

[83] Transcript 12/11/18 (PM) [DE # 790], at pp. 161-62.

[84] Transcript 12/12/18 (AM) [DE # 791], at pp. 16-18.

[85] Mr. Worman has an undergraduate degree from Emory University and an MBA from Wharton.

[86] Transcript 12/11/18 (PM) [DE # 790], at p. 84.

[87] Transcript 12/11/18 (PM) [DE # 790], at p. 86.

Appellee Appx. 00432
APP. 08297

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 440 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 554 of 1828   PageID 10047
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 439 of 1803   PageID 11185
Case 18-3026 Case 19-12389-CSS Filed 01/31/19 Entered 01/31/19 Page 34 of 47

testified that Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis
points.[88]  Highland attempted to show with evidence and argument that Brigade had made some
failed trades since stepping in as sub-advisor to the Acis CLOs and that this perhaps made them
unfit to serve in this role.  But Mr. Terry credibly testified that the fact that a few failed trades
were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis,
and that trades out of compliance with the applicable CLO tests occasionally happen, and
Brigade has handled them appropriately.[89]  In fact, the evidence suggested that at least ten failed
trades occurred while Highland was acting as sub-advisor to the Debtor-Acis.[90]

Highland's suggestions that Brigade is not up to the task to manage the Reorganized
Debtor are specious.  Likewise, HCLOF Guernsey's insistence that it will not be getting the
benefit of its bargain if the Acis CLOs are not managed by Highland personnel going forward
appears to be a manufactured position aimed at thwarting Mr. Terry at all costs.  Not only is
there no credible evidence of Brigade mismanagement but, to the contrary, it appears that
Highland (prior to the Debtor-Acis's rejection of the Sub-Advisory Agreement and Shared
Services Agreement), intentionally liquidated assets of the CLO SPEs and built up cash without
reasonable justification.  Specifically, Mr. Terry credibly testified that there were $85 million in
purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but
virtually no purchases of loans in the CLOs afterwards—only sales.[91]  And Mr. Worman further

---

[88] Transcript 12/11/18 (PM) [DE # 790], at p. 89; Transcript 12/12/18 (AM) [DE # 791], at p. 62.

[89] Transcript 12/11/18 (PM) [DE # 790], at pp. 182-83; Transcript 12/18/18 [DE # 804], at pp. 72-73.

[90] *See* Exhs. 727, 728; Transcript 12/11/18 (PM) [DE # 790], at pp. 71-74, 182-83.

[91] Transcript 12/12/18 (AM) [DE # 791], at pp. 18-19, 28-31; Transcript 12/18/18 [DE # 804], at pp. 87-89; *see also,* Terry Demonstrative.

Appellee Appx. 00433
APP. 03296

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 441 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 555 of 1828 PageID 10048
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 440 of 1803 PageID 11186
Case 18-30264-sgj11 Doc 1392-75 Filed 01/31/19 Entered 01/31/19 Page 35 of 47

credibly testified that Highland, while acting as sub-advisor, allowed approximately $380 million

in cash to build up in the Acis CLOs. Meanwhile, Brigade has subsequently reduced that cash

balance by $280 million to approximately $100 million.[92] Mr. Worman also credibly testified

that Brigade has purchased approximately $300 million in loans for the Acis CLOs.[93] The

Chapter 11 Trustee and Mr. Terry both credibly testified that the build-up of cash in the Acis

CLOs while Highland was sub-advisor, rather than the loans acquired by Brigade, left the Acis

CLOs without sufficient interest income to make a distribution to the equity holders.[94] Certain

contradictory testimony of Hunter Covitz was not convincing that: (a) there were very few

conforming loans available to be purchased for the Acis CLOs in the approximately four months

that elapsed between the entry of the Order for Relief and the time when Highland was

terminated as sub-advisor;[95] and (b) it made more sense to accumulate cash to pay down the

AAA notes rather than invest in new loans.[96] The court found more convincing the testimony of

Mr. Terry: (a) that there was $310 billion of performing loans rated above CCC in the S&P loan

index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted

average life test;[97] (b) that Highland purchased loans for CLO-7 that would have satisfied the

weighted average life constraints in the Debtor-Acis's CLO-4, CLO-5, and CLO-6;[98] and (c)

---

[92] Transcript 12/11/18 (PM) [DE # 790], at p. 100.

[93] Transcript 12/11/18 (PM) [DE # 790], at pp. 70, 94.

[94] Transcript 12/11/18 (AM) [DE # 789], at pp. 67-69; Transcript 12/11/18 (PM) [DE # 790], at pp. 70-71; Transcript 12/12/18 (AM) [DE # 791] at pp. 34-37.

[95] Transcript 12/13/18 (AM) [DE # 793], at pp. 12-13.

[96] Transcript 12/13/18 (AM) [DE # 793], at pp. 13-16.

[97] Transcript 12/18/18 [DE # 804], at p. 87.

[98] Transcript 12/18/18 [DE # 804], at pp. 87-88.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 442 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 556 of 1828   PageID 10049
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 441 of 1803   PageID 11187
Case 18-30264-sgj11 Doc 1387-5 Filed 01/31/19   Entered 01/31/19 15:13:04   Page 36 of 47

that, although there was no change in market conditions, Highland essentially stopped buying

collateral for the Acis CLOs[99] after the entry of the Orders for Relief.[100]

> 4.   Resets—Non-impairment of Anyone's Rights.

The Plan only contemplates **consensual** resets of the Acis CLOs—in other words, only if

HCLOF Guernsey requests resets.[101]  Messrs. Worman and Terry both credibly testified that they

believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis

CLOs.[102]  Mr. Terry credibly testified that other asset managers have been able to issue or reset

CLOs after a bankruptcy proceeding.[103]  Mr. Terry also credibly testified that he wants to come

to a resolution with HCLOF Guernsey and consensually reset the Acis CLOs.[104]

HCLOF Guernsey has taken the position that it and its new Passive Investor (new as of

mid-November 2017—just before the Bankruptcy Cases) only want to be involved with CLOs

that are managed by Highland or Highland affiliates.  Is the Plan impairing their rights—to the

extent the Plan (and any subsequent re-sets) brings in Brigade as the sub-advisor to the

Reorganized Debtor (whereas Highland was in that sub-advisor role before)?  It appears no.  The

---

[99] Transcript 12/18/18 [DE # 804], at pp. 88-89.

[100] Highland has also argued that the Plan is not feasible because the administrative expense claims are
extremely high (to which the Chapter 11 Trustee responds, it is of Highland's making, since Highland has
objected to literally every action proposed by the Chapter 11 Trustee).  The court does not believe there is
a legitimate feasibility problem here.  Not only has the court not ruled yet on final professional fee
applications, but the Chapter 11 Trustee represented that certain professionals have agreed to defer their
fees (beyond payment in full on the Effective Date) as necessary.

[101] *See* Plan § 6.08.

[102] Transcript 12/11/18 (PM) [DE # 790], at pp. 86-90, 176-178; Transcript 12/12/18 (AM) [DE # 793], at
pp. 16-18.

[103] Transcript 12/11/18 (PM) [DE # 790], at pp. 179-180.

[104] Transcript 12/18/18 [DE # 804], at p. 74.

Appellee Appx. 00435
APP. 08902

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 443 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 557 of 1828   PageID 10050
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 442 of 1803   PageID 11188
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19   Entered 01/31/19 15:13:04   Page 37 of 47

Offering Memorandum between HCLOF Guernsey and the Passive Investor, dated November 15, 2017, pursuant to which the Passive Investor agreed to invest in HCLOF Guernsey, provided that there may be a change in circumstances following the date of the Offering Memorandum and that any forward-looking statements in the Offering Memorandum involved risks and uncertainties "because they relate to events and depend on circumstances that may or may not occur in the future."[105]  Heather Bestwick, one of the HCLOF Guernsey directors, testified that the Offering Memorandum does not require HCLOF Guernsey to invest only in Highland-managed funds[106] and instead expressly provides that HCLOF Guernsey will invest in "CLOs managed by other asset managers."[107]  Another witness, Mr. McGuffin, testified that the HCLOF Guernsey directors' fiduciary duties require them to act independently and objectively in the best interests of HCLOF Guernsey, and also require them to consider a change in circumstances.[108] HCLOF Guernsey's counsel, HCLOF Guernsey's director, and the Passive Investor have all testified that they would consider doing a reset with the Reorganized Acis in the event the Plan is confirmed.[109]

Mr. Terry credibly testified that a reset of the Acis CLOs can occur after the expiration of the reinvestment periods of the Acis CLOs.[110]  The Plan is feasible regardless of whether a reset of the Acis CLOs is requested by HCLOF Guernsey.  Messrs. Phelan and Terry both credibly

---

[105] See Exh. 90, HCLOF Guernsey Offering Memorandum, at pp. 4-5.

[106] See Exh. 719, Bestwick Depo., at pp. 109, 118-121.

[107] See Exh. 90, HCLOF Offering Memorandum, at p. 12.

[108] Transcript 12/13/18 (PM) [DE # 794], at pp. 142-145.

[109] See Exh. 602, p. 12 of 70 (statement by HCLOF Guernsey's Counsel); Exh. 719 at pp. 166-167 (Heather Bestwick); Exh. 720, p. 72.

[110] Transcript 12/18/18 [DE # 804], at pp. 82-83.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 444 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 558 of 1828   PageID 10051
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 443 of 1803   PageID 11189
Case 18-30264-sgj11 Doc 1392755 Filed 01/31/19   Entered 01/31/19 15:19:04   Page 38 of 47

testified that the Reorganized Debtor will have cash flow from multiple potential sources—

including the revenues from the CLO PMAs with the Acis CLOs, potential new business

developed by the Reorganized Acis, and the outcome of any potential litigation claims.[111]

## VI.     General Credibility Assessments.

In ruling in a contested matter such as confirmation, and weighing the preponderance of

the evidence, the credibility of witnesses and contradictions in their testimony naturally can be

significant.  Here, there were some noteworthy problems and contradictions with some of the

testimony provided by the Objectors' witnesses.  They are summarized below.

### 1.     Scott Ellington: A Seemingly Manufactured Narrative to Justify Prior Actions.

Scott Ellington testified on February 7, 2018 at the trial on the involuntary petitions, and

the court was asked to consider his testimony again in connection with confirmation (he did not

attend the confirmation hearing).  He is the General Counsel, Chief Legal Officer, and a Partner

at Highland.  Mr. Ellington testified that the Debtor-Acis's name is "toxic" in the market place

and that, due to the litigation with Mr. Terry and allegations in that litigation, "nothing can be

associated with the Acis brand and be managed as a CLO or marketed as a CLO."[112]  Mr.

Ellington elaborated that it had been determined in late 2016 or 2017 that re-sets or re-financings

of the Acis CLOs were a prudent thing to pursue (in fact, there was indeed a trend of

refinancings and resets for this vintage of CLOs in the market place) and, in connection with

that, the Debtor-Acis's contracts and assets needed to be diverted to different, newly created

entities because:  (a) the "Acis" name was toxic and underwriters and investors were not going to

---

[111] Transcript 12/11/18 (AM) [DE # 789], at pp. 72, 88-90; Transcript 12/12/18 (AM) [DE # 791], at p. 53.

[112] Exh. 23, p. 55 (line 17) through p. 56 (line 7); p. 98 (lines 8-12).

Appellee Appx. 00437
APPX. 0994

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 445 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 559 of 1828  PageID 10052
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 444 of 1803  PageID 11190
Case 18-30264-sgj11 Doc 1392 Filed 11/08/19  Entered 11/08/19 15:41:04  Page 39 of 47

be interested in re-financings or resets for CLOs managed by the Debtor-Acis;[113] and (b) the new

Passive Investor wanted the Debtor-Acis out of the picture.[114]  Mr. Ellington further elaborated:

"The equity, you know, calls the tune, so to speak, in terms of the CLO . . .."[115]  In summary, an

overarching theme of Mr. Ellington's testimony was that the Debtor-Acis was tainted or toxic in

the marketplace and the Passive Investor wanted the Debtor-Acis out of the picture—thus, this

was the motivation for the prepetition transactions orchestrated by Highland prior to the

Bankruptcy Cases.  The problems with the Scott Ellington testimony were at least two-fold.

First, there is no credible evidence that the Debtor-Acis is/was toxic in the market place.  In fact,

in April 2017 (well after the litigation with Mr. Terry commenced), the Debtor-Acis issued a

new CLO (CLO-7).  And in market publications as recently as August 21, 2017, Highland was

touting the *Acis* structure stating "our vehicle will allow us to issue between six and 12 CLOs

over the next few years."[116]  Second, the Passive Investor denies demanding that the Debtor-Acis

be removed as the CLO manager.  Term sheets as recent as August 21, 2017 contemplated the

Debtor-Acis as the continuing portfolio manager of CLOs, with apparently no protestations by

the Passive Investor.[117]

---

[113] *E.g., Id.* at p. 177 (line 21) though p. 178 (line 12); p. 184 (lines 13-17) ("The underwriters in this case, Mizuho, Goldman, et al., the equity, they said we want every possible relation to anything that could be legacy Acis or Acis-related affiliates to be severed").

[114] *Id.* at p. 202 (lines 11-13) ("we have third-party investors that said we don't want to be involved in this brand; and their equity is one of the reasons that new CLOs can be launched"); p. 203 (lines 7-8) ("It was call the deal and terminate the CMAs or transfer the CMAs"); p. 223 (lines 8-12) ("Because if the involuntary remains, and I'm just – I'm just being frank – we've already been told by equity holders, including the separate account, BBK, that you may have seen on some of the exhibits, they're pulling everything.").

[115] *Id.* at p. 74 (lines 3-6).

[116] Exh. 801, pp. 3 & 5.

[117] Exh. 802, p.1.

**Appellee Appx. 00438**
**APP. 03303**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 446 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 560 of 1828   PageID 10053
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 445 of 1803   PageID 11191
Case 18-30264-sgj11 Doc 1392 Filed 01/31/19   Entered 01/31/19 15:11:04   Page 40 of 47

2.  <u>Michael Pugatch: The Passive Investor Made Into a Scapegoat.</u>

The reality is that Highland, indeed, started working on the concept of doing resets of

some of the older vintage Acis CLOs in at least early 2017 (and perhaps late 2016). Highland, in

fact, completed a reset of one Acis CLO in April 2017 (with the Debtor-Acis still in place as the

portfolio manager for that reset in April 2017). As part of that process of implementing resets

for the Acis CLOs, Highland worked on bringing in a new investor or investors to have a share

of the equity tranche of the Acis CLOs. Highland finally obtained the commitment of the

Passive Investor in November 2017, after starting initial discussions with them in the second

quarter of 2017.[118]  A representative for the Passive Investor referred to itself as "passive" in a

deposition.[119]  Concepts and documentation for the Passive Investor's investment in the Acis

CLOs were discussed for a while during 2017. As recently as August 2017, the negotiations

with the Passive Investor appeared to contemplate the Debtor-Acis still as the portfolio manager

for the CLOs.[120]  Then the arbitration trial with Mr. Terry began in September 2017 and the

Terry Arbitration Award was issued on October 20, 2017. Suddenly, it appears that the

dismantling of the Debtor-Acis began with all deliberate speed. The court believes, based on the

totality of the evidence, that it was Highland who did not want the Debtor-Acis as CLO manager

going forward, so that Highland could keep reaping the benefits of the reset CLOs. Specifically,

when deposed on the topic, a representative for the Passive Investor, Mr. Pugatch, denied the

accuracy of Mr. Ellington's testimony, stating that the Passive Investor "viewed Acis and

Highland as interchangeable from the perspective of the—you know, the actual investment

---

[118] *See* Exh. 720, Pugatch Deposition Transcript dated November 27, 2018, p. 18, lines 14-20.

[119] *Id.* at p. 22 (lines 2-3) ("we're you know, 49 percent sort of passive minority investor").

[120] Exh. 802, p. 1.

opportunity."[121]  When asked, "Are you aware that Scott Ellington, general counsel for HCM, testified that [the Passive Investor] said with absolute certainty that they had no interest in doing business with Acis because the Acis brand was purportedly toxic and, consequently, nothing associated with Acis could be managed or marketed as a CLO?" Mr. Pugatch testified that he had read that testimony and that the statement was not true.[122]  He further stated that "the ultimate sort of name change did not come from [the Passive Investor]."[123]  In fact, when further asked whether the Passive Investor knew why Acis CLO Funding Limited changed its name to Highland CLO Funding Limited (*i.e.,* HCLOF Guernsey), Mr. Pugatch testified, "We were told that it was a change in the brand or the name, as requested by Highland."[124]  And when asked "Did [the Passive Investor] request that the name be changed?" he answered "No."[125]  When asked whether the Passive Investor considered "Acis toxic in the industry?" Mr. Pugatch answered:  "No. What I would say is, when the suggested name change did occur, there were commercial reasons given to us as to why that would be beneficial in terms of the ongoing management of those CLOs and the intended investment thesis around the investment that we had made, which seemed to make commercial sense."[126]  When Mr. Pugatch was asked, "Those reasons were given by Highland, correct?" he replied "Correct" and confirmed that they were not demanded by the Passive Investor.[127]  Mr. Pugatch was emphatic that the Passive Investor was

---

[121] *Id.* at p. 30 (lines 19-20).

[122] *Id.* at p. 31 (lines 6-19).

[123] *Id.* (lines 24-25).

[124] *Id.* at p. 27 (lines 24-25).

[125] *Id.* at p. 28 (lines 1-3).

[126] *Id.* at p. 32 (lines 1-8).

[127] *Id.* at p. 32 (lines 9-12).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 448 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 562 of 1828    PageID 10055
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 447 of 1803    PageID 11193
Case 18-30264-sgj11 Doc 3445-8 Filed 11/01/19    Entered 11/01/19 15:14:30 f 49 Page 42 of 47

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate the terms of any reset transactions.[128]  When asked if the Passive Investor was concerned about the Terry Arbitration Award, Mr. Pugatch replied:  "The award itself, no.  I think the only thing we were concerned about or focused on was that vis-à-vis our equity investment in Highland CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market" but that it had no interaction with them historically.[130]  The Passive Investor also testified that it was concerned about the cash buildups that had happened recently due to actions while Highland had still been the sub-advisor on the Acis CLOs.[131]

> **3.** **The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses.**

The court was presented with video depositions of HCLOF Guernsey's two non-executive directors (*i.e.,* its only directors):  Mr. William Scott[132] and Ms. Heather Bestwick.[133] It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way. Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal figureheads who are paid to act like they are in charge, while they are not.  They are both

---

[128] *Id.* at p. 32 (lines 16-17); pp. 33-35.

[129] *Id.* at p. 43 (lines 3-9); p. 89.

[130] *Id.* at p. 68 (lines 11-13).

[131] *Id.* at p. 82, lines 9-24.

[132] *See* Exh. 721.

[133] *See* Exh. 719.

Appellee Appx. 00441
APPX. 08906

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 449 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 563 of 1828 PageID 10056
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 448 of 1803 PageID 11194
Case 18-30264-sgj11 Doc 2392-5 Filed 11/01/19 Entered 11/01/19 Page 43 of 47

basically professional directors-for-hire, for companies that choose to form/organize in the nation
of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey
(none of the others are in the CLO business).[134] She testified that she earned £35,000 per year to
serve as a director of HCLOF Guernsey.[135] She testified that she was selected by Highland[136]
and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy
Cases.[137] Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the
Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that
she was told it was "a condition precedent to the new Passive Investor" coming in and that she
was told this by Highland.[138] She also testified that she had never talked to the Passive Investor
(who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the
charitable organization that owns 49% of HCLOF Guernsey).[140] She reiterated that she only
talks to Highland employees. She also was under the impression that terminating the
Equity/ALF PMA would improve marketability of the CLOs going forward but that it was the
same people and "business as usual for us."[141] She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

Appellee Appx. 00442

APP. 03907

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 450 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 564 of 1828   PageID 10057
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 449 of 1803   PageID 11195
Case 18-30264-sgj11   Doc 392-55   Filed 01/31/19    Entered 01/31/19 15:15:04    Page 44 of 47
Case 19-12239-CSS   Doc 361-2   Filed 11/08/19   Page 450 of 49

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to

ask Highland"[143] why it did not inform her sooner.  Her testimony was clear that she defers to

Highland on everything, stating that as directors they were "heavily reliant on our service

providers, and that means Highland."[144]  With regard to a lawsuit that HCLOF Guernsey filed

against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her

nor the other director, William Scott's, idea.

Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15

Guernsey companies[145]—all of which are "paying assignments."[146]  He became rather incensed

when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF

Guernsey, stating that board minutes and other documents would show that they took a great

level of interest in running the company.[147]  He testified that he earned £40,000 per year to serve

as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he

also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally,

that it required participation in court hearings by a director of HCLOF Guernsey each time that

HCLOF Guernsey took a position in court).  Mr. Scott confirmed that he was not aware of the

litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149]  He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 451 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 565 of 1828    PageID 10058
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 450 of 1803    PageID 11196
Case 18-30264-sgj11 Doc 3892-75 Filed 01/31/19    Entered 01/31/19 15:14:04    Page 45 of 47

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases

and that he had never disagreed with Highland's advice.[150]  He confirmed that all investment

decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service

providers.[151]  Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor

had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152]

But he had not talked to the Passive Investor.[153]  As if all this deference to Highland were not

enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in

Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as

security for its loans from NexBank.[154]  Also, interestingly, when asked about the adversary

proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the

Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally

commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we

haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by

counsel.

     This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently

a typical thing in the world of off-shore jurisdictions that are large financial centers.[155]  Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV commercial in which an actor states, "I am not a doctor, but I play one on TV."  The court could not help but conclude that these were not real directors but were playing them (when legally necessary).

Appellee Appx. 00444
APPX. 10309

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 452 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 566 of 1828 PageID 10059
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 451 of 1803 PageID 11197
Case 18-30264-sgj11 Doc 3392 Filed 11/08/19 Page 46 of 47

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

## VII.   Conclusion.

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) *the unique status of the Objectors* (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) *the appropriateness and legality of the proposed Plan Injunction* that would temporarily prevent nonconsensual redemptions/liquidations (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 453 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 567 of 1828    PageID 10060
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 452 of 1803    PageID 11198
Case 18-30264-sgj11 Doc 3927-5 Filed 01/31/19    Entered 01/31/19 15:14:04    Page 47 of 47

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their

contemplated roles).

The court will separately sign the Findings of Fact, Conclusions of Law and Order

Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

**#### End of Bench Ruling and Memorandum Opinion ####**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 454 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 568 of 1828   PageID 10061
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 453 of 1803   PageID 11199
Case 19-12239-CSS   Doc 86-3   Filed 11/01/19   Page 1 of 54

**<u>Exhibit C</u>**

**Acis Involuntary Opinion**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 455 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 569 of 1828   PageID 10062
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 454 of 1803   PageID 11200
Case 18-30264-sgj11 Doc 133  Filed 04/13/18   Entered 04/13/18 12:58:54  Page 1 of 53



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 13, 2018

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-7** |
| | § | |
| Alleged Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.L.C.,** | § | **CASE NO. 18-30265-SGJ-7** |
| | § | |
| | § | |
| Alleged Debtor. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
### ORDERS FOR RELIEF ISSUED AFTER TRIAL ON
### CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 456 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 570 of 1828 PageID 10063
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 455 of 1803 PageID 11201
Case 18-30264-sgj11 Doc 3918 Filed 04/13/18 Entered 04/13/18 16:35:54 Page 2 of 53

companies (the "Alleged Debtors") on January 30, 2018.[1]  The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]  This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]  As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

### I. FINDINGS OF FACT

#### A. Introduction.

1.      The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

2.      Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss. Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C. § 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute— 11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their business headquarters in this district.

Appellee Appx. 00449
APPX. 03006

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 457 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 571 of 1828 PageID 10064
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 456 of 1803 PageID 11202
Case 18-30264-sgj11 Doc 391-13 Filed 04/13/18 Entered 04/13/18 14:53:54 Page 3 of 53

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.      Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial.  Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer.  Mr. Dondero is also the president of each of the two Alleged Debtors.

4.      Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from:  collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.      Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions.  The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.      The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.      Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016.  Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

Appellee Appx. 00450
APPX. 10307

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 458 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 572 of 1828   PageID 10065
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 457 of 1803   PageID 11203
Case 18-30264-sgj11   Doc 391-8   Filed 04/13/18   Entered 04/13/18 16:54:55   Page 4 of 53

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was
deemed forfeited without any payment of consideration to him.

8.      In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court
of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing,
disparagement, breach of contract, and various other causes of action and theories.  Mr. Terry
asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr.
Dondero, and others and demanded arbitration.  On September 28, 2016, State Court 1 stayed the
litigation and ordered the parties to arbitrate.  The parties participated in ten days of arbitration in
September 2017 before JAMS.  On October 20, 2017, Mr. Terry obtained an Arbitration Award
(herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of
$7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach
of contract and breach of fiduciary duties.

9.      There are still claims pending between and among the Petitioning Creditor,
Highland, and others (not including the Alleged Debtors) in State Court 1.

10.     A Final Judgment (herein so called) confirming the Arbitration Award was
entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on
December 18, 2017, in the same amount as that contained in the Arbitration Award—
$7,949,749.15.[6]

11.     Mr. Terry began pursuing post-judgment discovery soon after obtaining his
Arbitration Award and even more so after entry of the Final Judgment.  Mr. Terry undertook a
UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

---

[5] Exh. 1.

[6] Exh. 105.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 459 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 573 of 1828   PageID 10066
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 458 of 1803   PageID 11204
Case 18-30264-sgj11   Doc 391-1355   Filed 04/13/18    Entered 04/13/18 16:34:58   Page 5 of 53

Debtors' assets (none appeared).[7]  Mr. Terry also pursued a garnishment of an Acis LP bank

account (at a time when there was only around $2,000 in the account).  Mr. Terry's counsel

deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a

representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how

many creditors the Alleged Debtors had, [8] and (b) whether Acis LP was able to pay its debts as

they became due,[9] but did not receive meaningful answers.

12.    Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on

January 24, 2018, after discovering certain transactions and transfers involving Acis LP's

interests, that he believed were pursued without any legitimate business purpose and with the

purpose of denuding Acis LP of its assets and to make it judgment proof.  Most particularly, it

appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO

management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10]

At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2

ordered that, between that hearing and a later hearing on a request for a temporary injunction, no

CLO management contracts would be transferred away from Acis LP and that no monies would

be diverted from it.[11]

13.    Then, on January 29, 2018, the Controller of and CPA for Highland  (David Klos)

submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 460 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 574 of 1828   PageID 10067
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 459 of 1803   PageID 11205
Case 18-30264-sgj11 Doc 391-8 Filed 04/13/18    Entered 04/13/18 23:45:54   Page 6 of 53

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12]  Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it.  Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14.    On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13]  Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15.    Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests.  On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15]  Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265.  Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

**Appellee Appx. 00453**
**APPX. 10310**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 461 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23    Page 575 of 1828  PageID 10068
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 460 of 1803  PageID 11206
Case 18-30264-sgj11  Doc 391-35  Filed 04/13/18    Entered 11/01/19 18:38:56  Page 7 of 53

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's

counsel that the Alleged Debtors were "judgment proof."[16]

16.     At approximately 11:57 p.m. on January 30, 2018 (on the evening before a

scheduled temporary injunction hearing in State Court 2—at which time State Court 2

presumably might have considered the Alleged Debtors' request to post the $495,070.50

supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary

Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.     For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute

that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section

303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the

Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to

liability or amount and that aggregates at least $15,775 in unsecured amount.  However, the

Alleged Debtors argue that:  (a) the Alleged Debtors have *12 or more creditors* and, thus, three

or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to

Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to

Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their*

*debts as such debts become due* unless such debts are the subject of a bona fide dispute as to

liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests

in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as

an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with

the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and

also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 462 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 576 of 1828 PageID 10069
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 461 of 1803 PageID 11207
Case 18-30264-sgj11 Doc 3918-3 Filed 04/13/18 Entered 04/13/18 Page 8 of 53

nevertheless *abstain* in this matter, pursuant to Bankruptcy Code *section 305*, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.     The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a ***"special circumstances"*** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here ***do not warrant section 305 abstention*** because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.     As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a ***"special circumstances"*** exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.     Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 463 of

Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 577 of 1828   PageID 10070

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 462 of 1803   PageID 11208

Case 18-30264-sgj11 Doc 1189-5 Filed 04/18/18   Entered 04/18/18 16:34:53   Page 9 of 53

21.     Finally, the Alleged Debtors also have ***not shown facts here that warrant section***

***305 abstention*** because they have not shown that the interests of creditors and the Alleged

Debtors would be better served by dismissal.

**B.      The CLO Business:  Understanding the Alleged Debtors' Business
Operations, Structure, and What Creditors and Interest Holders They
Actually Have.**

22.     Highland set up its first CLO in the year 1996.  Highland was one of the early

participants in the CLO industry.

23.     The Alleged Debtors were formed in 2011 to be the new "brand" or face of the

Highland CLO business, after Highland's name had suffered some negative publicity in the

marketplace.

24.     Acis LP has acted as the portfolio manager of Highland's CLOs since 2011.  Acis

LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which

were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO

2016-6.  CLOs typically have an 8-12 year life.  Thus, there are still several years of life left on

these CLOs (since the oldest one was established in the year 2013).

25.     The key "players" in and features with regard to the Highland CLOs, during the

time period relevant to the issues adjudicated at the Trial, have been:

(a)     <u>The CLO manager.</u>  As mentioned earlier, the CLO manager is the Alleged

Debtor, Acis LP.  Acis LP, has collateral management agreements (hereinafter,

the "CLO Collateral Management Agreements") with the CLOs (which CLOs

were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7), set up in April 2017, as to which Acis LP's
contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

**Appellee Appx. 00456**

**APPX. 10373**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 464 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 578 of 1828   PageID 10071
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 463 of 1803   PageID 11209
Case 18-3026-sgj11   Doc 18391855   Filed 04/13/18   Entered 04/13/18 Page 16 of 57 Page 10 of 53

management fees[19] from the CLOs in exchange for managing the pool of assets

within the CLOs and communicating with investors in the CLOs.[20]  As mentioned

earlier, Mr. Terry was the human being that performed the management function

at Acis LP until Highland fired him on June 9, 2016 and also terminated his

limited partnership interest in Acis LP.  Mr. Terry, and all employees who have

ever provided services to the CLO manager, are Highland employees—which

were provided to Acis LP through shared and sub-advisory services agreements—

as further explained below.  Thus, to be clear, Acis LP has always essentially

subcontracted its CLO managerial function out to Highland.

(b)      The pool of assets. Within each CLO that the CLO manager manages is a basket

of loans that the CLO manager purchases.  The basket of loans typically consists

of approximately 200 loans-payable (or portions of loans payable), on which large

well-known companies typically are the makers/obligors (and which loans,

collectively, provide a variable rate of interest).[21]  The CLO manager can

typically decide to buy and sell different loans to go into the pool of assets, with

certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-15.

[20] *See,* as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3).  Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

Appellee Appx. 00457
APPX. 10322

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 465 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 579 of 1828 PageID 10072
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 464 of 1803 PageID 11210
Case 18-30264-sgj11 Doc 391-85 Filed 04/13/18 Entered 04/13/18 Page 11 of 53

(c)   The CLO investors (*i.e.,* CLO note holders).  These may be any number of persons or entities, including pension funds, life insurance companies, or others who decide to invest in the CLOs and contribute capital to fund the purchase of a CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on which can range anywhere from Triple-A to Single-B, depending upon the risk option the investor chooses.  There are typically five or six traunches of notes issued by the CLO (with the top AAA-rated traunche being the least risky and the bottom traunche being the most risky) and—to be clear—the CLO itself (again, in each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO manager receives income from the pool of loans in the CLO, he distributes that income to the CLO investors, in accordance with their note indentures,[22] starting with the top traunche of notes and then down to the other traunches.  The top traunche of notes (AAA-rated) is considered the "controlling" class and a majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for cause on 45 days' notice, although all parties seem to agree this would be a rare event.

(d)   The CLO equity holder.  The CLO equity holder actually is a holder of subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on which the CLO special purpose entity is obligated), and has voting rights and is itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for purposes of making the quarterly note payments to holders.

11

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 466 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 580 of 1828    PageID 10073
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 465 of 1803    PageID 11211
Case 18-30264-sgj11    Doc 1391-8    Filed 04/13/18    Entered 04/13/18 18:30:08    Page 12 of 53

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for example, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the traunches of notes, starting at the top with the Triple A's).  Note that, until recently, a separate entity known as Acis Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island nation of Guernsey,[24] was the CLO equity holder.  To be clear, ***ALF was essentially the equity owner in the CLO special purpose entities—not the equity owner of Acis LP***.  Acis LP was a party to a separate portfolio management agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"— not to be confused with the CLO Collateral Management Agreements that Acis LP separately has with the special purpose CLOs).  No fees were paid from ALF to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees are only paid to Acis LP on the CLO Collateral Management Agreements).  The complicated structure of the CLO business—all parties seemed to agree—has been developed, among other reasons, to comply with "risk-retention requirements" imposed by the U.S. Congress's massive Dodd-Frank financial reform legislation[25] enacted in year 2010, in response to the financial crisis and recession that first began in 2008.

---

[23] The top tranche of AAA notes also has certain control—such as the ability to terminate the portfolio manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21, 2010), which was implemented over a period of several years, was that, ***subsequent to December 2016***, managers of securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

Appellee Appx. 00459
APPX. 103726

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 467 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 581 of 1828   PageID 10074
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 466 of 1803   PageID 11212
Case 18-3026-cag-19-1233918-55led 04/13/18   Filed 04/13/18 Page 13 of 53

(e)    <u>The Equity Owners of ALF</u>.  Until recently (*i.e.,* until October 24, 2017—four

days after the Arbitration Award), Acis LP itself, as required for a CLO manager,

had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The

parties sometimes refer to ALF (and the web of ownership between it and Acis

LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that

ALF (which has recently been renamed), now, has three equity owners:  (i) a 49%

equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that

was seeded with contributions from Highland, is managed/advised by Highland,

and whose independent trustee is a long-time friend of Highland's chief executive

officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally,

ALF *may* be 49% owned by a third-party institutional investor based in Boston

that Highland believed it was required to keep anonymous at the Trial.  Not only

is the court unaware of who this independent third-party is, but the evidence

seems to suggest that it may have acquired its interest fairly recently or may have

simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could
be either all at the equity level or vertically, up and down the note tranches).  There are multiple ways to
accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or
doing it through a controlled subsidiary).  This particular rule was announced in **December 2014** and the SEC
thereafter issued a no action letter stating that *if a CLO was issued prior to December 2014*, then any refinancing of
such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,*
changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk
retention in place.  **Four of Acis LP's current CLOs were issued prior to December 2014**.  Thus, these four CLOs
are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-
middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on
October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra*.

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017
were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also*
Exh. 82, p. 162, lines 2-7.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 468 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 582 of 1828   PageID 10075
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 467 of 1803   PageID 11213
Case 18-30264-sgj11 Doc 2391-85 Filed 04/13/18   Entered 04/13/18 Page 345 of 53 Page 14 of 53

(f)  <u>The underwriter for the CLO notes.</u>  As with any publicly traded notes, there is

an underwriter for the CLO notes which solicits investors for the CLO notes

(examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP

Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

(g)  <u>The independent indenture trustee for the CLO notes.</u>  As also with any issuance

of publicly traded notes, there is an indenture trustee (example given at the Trial:

U.S. Bank).[30]

26.    Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for

Highland in 2005 until his employment was terminated on June 9, 2016.

27.    Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees

that work for any of the Highland family of companies (including Mr. Terry) have, almost

without exception, been employees of Highland itself.  Highland has approximately 150

employees in the United States.  Highland provides employees to entities in the organizational

structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared

Services Agreement (herein so called),[31] which provides "back office" personnel—such as

human resources, accounting, legal and information technology to the Highland family of

companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front

office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence

indicated that this is typical in the CLO industry to have such agreements.  The court notes that

---

[29] *See* Exh. 193.

[30] *See* Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

Appellee Appx. 00461
APPX. 103328

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 469 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 583 of 1828   PageID 10076
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 468 of 1803   PageID 11214
Case 18-30264-sgj11   Doc 1855   Filed 04/13/18   Entered 04/13/18 Page 15 of 53

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP

and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the

General Partner of Highland.

28.     Because Acis LP essentially subcontracts out all of its functions to Highland

pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very

few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP

through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most

frequent creditor.

29.     The evidence reflected that at all times Mr. Dondero has been the President of

both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It

appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse,

Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank

Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as

Secretary at one time.[35]

30.     Mr. Dondero testified that he has decision making authority for the Alleged

Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington

(General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant

General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes

instructions will come to him from the compliance group headed up by Chief Compliance

Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

---

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 470 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 584 of 1828   PageID 10077
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 469 of 1803   PageID 11215
Case 18-30264-sgj11 Doc 239-8 Filed 04/18/18   Entered 04/13/18 Page 16 of 53

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his

assistant the authority to sign his name.  As set forth above, Mr. Ellington (who **did *not*** testify at

the Trial)[36] and Mr. Leventon (who **did** testify at the Trial) are not officers, directors, or

employees of the Alleged Debtors.  Mr. Leventon is designated to be the representative for the

Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he

explained that this representative-authority derives from the Shared Services Agreement.  Mr.

Leventon testified that he takes his instructions generally through his direct supervisor, Mr.

Ellington, although Highland partners can ask him to perform legal services for any of

Highland's 2,000 entities.

### C. Transfers and Transactions Involving the Alleged Debtors Since the Litigation with Mr. Terry Commenced—and Especially After the Arbitration Award.

31.     Below is a listing of some (but not necessarily all) of the transfers and

transactions that the Alleged Debtors, Highland, and related parties undertook **after** the litigation

with Mr. Terry commenced.

(a)     Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow

Stream.  On October 7, 2016 (approximately one month after the litigation arose

among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland

a participation interest in its expected future cash flow from the CLO Collateral

Management Agreements—specifically, it sold a portion of the cash flow it

expected to earn from November 2016 to August 2019 (not the full life of the

CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence. *See* Exh. 25.

Appellee Appx. 00463
APPX. 10320

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 471 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 585 of 1828   PageID 10078
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 470 of 1803   PageID 11216
Case 18-30264-sgj11 Doc 1835 Filed 04/13/18    Entered 04/13/18 16:45:54    Page 17 of 53

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland"). Mr. Dondero signed the purchase and sale agreement for both purchaser and seller.[37] Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued interest at 3% per annum. It appears that the $666,665 cash down payment was actually paid, and a payment required on the Acis LP Note Receivable from Highland of $3,370,694 on May 31, 2017, was actually made. The Acis LP Note Receivable from Highland was payable in three installments, with a $5,286,243 payment required on May 31, 2018, and a $4,677,690 payment required on May 31, 2019. When viewed in complete isolation, this transaction does not necessarily appear problematic. Although there was evidence that Acis LP had been managing the five CLOs for about $10 million per year of fees, some of the recitals in the purchase and sale agreement suggest that there may have been a sound business reason for the transaction and the arbitration panel,[38] viewing this transaction in isolation, did not think it was necessarily problematic or actionable. In any event, Highland is adamant it was a net neutral transaction.

(b)     Transfer of Acis LP's interest in ALF.  Recall that ALF was the entity that held equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held voting rights and was a capital provider to the overall risk retention structure supporting the CLOs. And Acis LP, in turn, held a 15% indirect interest in ALF. On October 24, 2017 (***four days after the Arbitration Award***), Acis, LP entered into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

Appellee Appx. 00464

APPX. 10329

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 472 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 586 of 1828 PageID 10079
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 471 of 1803 PageID 11217
Case 18-3026 Case 19-12239 135 Filed 04/13/18 Entered 04/13/18 Page 18 of 5 Page 18 of 53

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]  No

credible business justification was offered for this transaction, other than mostly

uncorroborated (and self-serving) statements from Highland witnesses that Acis

LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this

was a step in the process of extricating Acis LP from the CLO business.[40]  The

court finds the testimony about Acis LP's toxicity in the marketplace to not be

credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.)

was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover,

Acis LP subcontracts all of its CLO management function to Highland—and there

was no evidence to suggest that anyone in the marketplace at this juncture

differentiates between Acis LP (whose president is Mr. Dondero) and Highland

(whose president is Mr. Dondero).  ***In any event, the October 24, 2017***

***transaction had the highly consequential effect of making Acis LP***

***"noncompliant" or unable to continue serving as a CLO manager for***

***regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of***

***any of the Highland CLOs that had been created after December 2014)[41]***

***because aspects of the federal Dodd Frank legislation require CLO managers to***

***have "skin in the game" with regard to the CLOs they manage (i.e., they must***

***retain at least 5% of CLOs they manage).***  Mr. Akada, who testified that he had

been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs. 19-22.

[41] *See* n.23 *supra*.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 473 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 587 of 1828    PageID 10080
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 472 of 1803    PageID 11218
Case 18-30264-sgj11 Doc 1855 Filed 04/13/18    Entered 04/13/18 Page 20 of 53    Page 19 of 53

reported to him (including Mr. Terry before his termination), testified that he had

no knowledge of this particular transaction.  The document effectuating this

transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis

LP, acting by its general partner, Acis GP/LLC.[42]

(c)     ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it

with a new Highland Cayman Island Entity.  On October 27, 2017 (seven days

after the Arbitration Award), ALF—having purchased back the ownership interest

that Acis LP had in it, just three days earlier—decided that it would no longer use

Acis LP as its portfolio manager and entered into a new portfolio management

agreement to supersede and replace the ALF Portfolio Management Agreement.

Specifically, on October 27, 2017, ALF entered into a new Portfolio Management

Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd.,

replacing Acis LP in its role with ALF.[43]  This agreement appears to have been

further solidified in a second portfolio management agreement dated November

15, 2017.[44]

(d)     The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet

Another Highland Cayman Island Entity.  On November 3, 2017 (10 days after

the Arbitration Award), Acis LP assigned and transferred its interests in the Acis

LP Note Receivable from Highland—which at that point had a balance owing of

over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 474 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 588 of 1828   PageID 10081
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 473 of 1803   PageID 11219
Case 18-30264-sgj11   Doc 3445-8   Filed 04/13/18   Entered 04/13/18 16:32:58   Page 20 of 53

Management Ltd. which apparently was created sometime recently to be the new collateral manager of the CLOs (in other words, the new Acis LP).[45]  The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for Acis LP and Mr. Dondero for Highland and some undecipherable name for Highland CLO Management Ltd.[46]  The document recites that (i) Highland is no longer willing to continue providing support services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into the collateral manager role if Acis  LP will assign to it the Acis LP Note Receivable from Highland.   One more thing:  since Acis LP was expected to potentially incur future legal and accounting/administrative fees, and might not have the ability to pay them when due, ***Highland CLO Management Ltd.*** agreed to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal expenses and up to $1 million of future accounting/administrative expenses.[47]

(e)     Various Additional Transactions that further Transitioned CLO Management and Fees Away from Acis LP to Highland Cayman Island Entity.  On December 19, 2017—just one day after the Arbitration Award was confirmed with the entry of the Final Judgment—the vehicle that can most easily be described as the Acis LP "risk retention structure" (necessitated by federal Dodd Frank law) was transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] *Id.* at p.6.

[47] *Id.* at pp. 1 & 2.

Appellee Appx. 00467
APPX. 10332

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 475 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 589 of 1828   PageID 10082
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 474 of 1803   PageID 11220
Case 18-3026 Case 19-12391-BLS Filed 04/13/18   Entered 04/13/18 Page 225 of 5 Page 21 of 53

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f)    In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49]   In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g)    <u>Change of Equity Owners of the Alleged Debtors</u>.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners:  (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.   When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] *See* Ex. 45 (the Transfer Document); *see also* Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] *See* Exhs. 161 & 162.

Appellee Appx. 00468
APPX. 10333

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 476 of
Case 3:23-cv-00726-S  Document 8-22  Filed 02/29/23  Page 590 of 1828  PageID 10083
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 475 of 1803  PageID 11221
Case 18-3026 Case 19-1283918 Filed 04/13/18  Entered 04/13/18 Page 350 of 52 Page 22 of 53

(*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment
Trust.  After Mr. Terry was terminated by Highland, his 25% limited partnership
interest in Acis LP was forfeited and divided among the two remaining limited
partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy
Investment Trust (increasing its interest by 15% up to 74.9%).  But, more
importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on
December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed
their entire limited partnership interests in Acis LP—25% and 74.9%,
respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands
exempted company.  Dugaboy Investment Trust also conveyed its 100%
membership interest in Acis GP/LLC to Neutra, Ltd.  Mr. Akada testified that he
did this on advice of counsel.  He also did not dispute that he had made millions
of dollars of equity dividends from his equity investment in Acis LP in recent
years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)  <u>The Intended Reset of Acis CLO 2014-3.</u>  With all of the above maneuverings
having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3
in February 2018 (until Mr. Terry filed the Involuntary Petitions).  The investment
bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final
offering circular was issued in January 2018[53]—contemplating a reset of Acis
CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

Appellee Appx. 00469
Appx. 03324

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 477 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 591 of 1828   PageID 10084
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 476 of 1803   PageID 11222
Case 18-30264-sgj11  Doc 391  Filed 04/13/18   Entered 04/13/18 Page 23 of 53

Identified as the new portfolio manager, rather than Acis LP.  The act of

implementing a reset on the CLO was not in itself suspect.  However, the reset

would, of course, have the effect of depriving Acis LP from a valuable asset—an

agreement that could realistically be expected to provide millions of dollars of

future collateral management fees—coincidentally (or not) just after Mr. Terry

obtained his large judgment.

**D.      Findings Regarding Credibility of Witnesses.**

32.      The court found the testimony of Mr. Terry to be very credible.  He was very

familiar with the financial condition of the Alleged Debtors, since he presided over the business

of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed

publicly available information regarding the companies since his termination.  Mr. Terry credibly

testified that the Alleged Debtors have never had a significant number of creditors, since most of

the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland

simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland

family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement

and Sub-Advisory Agreement.  Thus, Highland should at all times be the Alleged Debtors' main

creditor.  The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only

a handful of creditors (maybe four or so) besides him and Highland.  The court also finds that

Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the

Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort

to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

Appellee Appx. 00470
APPX. 10323

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 478 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 592 of 1828   PageID 10085
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 477 of 1803   PageID 11223
Case 18-30264-sgj11  Doc 391  Filed 04/13/18   Entered 04/13/18 Page 24 of 53

less than reasonably equivalent value), which started with intensity after issuance of the

Arbitration Award (if not sooner).[54]

33.     The court found the testimony of almost all of the witnesses for the Alleged

Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey

plausible deniability.  For example, sometimes business decisions concerning the Alleged

Debtors were said to have been made by a "collective," and other times the in-house Highland

lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC)

stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision

making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision

making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington

and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must

rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of

each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While

Mr. Dondero is the chief executive of a multi-billion dollar international investment company,

and naturally has widespread responsibilities and must delegate to and rely upon others including

lawyers, this court simply does not believe that he never read the Arbitration Award.  The court

perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr.

Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and

Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr. Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on behalf of Mr. Terry.

Appellee Appx. 00471
APPX. 10328

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 479 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 593 of 1828    PageID 10086
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 478 of 1803    PageID 11224
Case 18-30264-sgj11 Doc 391-8 Filed 04/13/18    Entered 04/13/18 Page 25 of 53    Page 25 of 53

with the Acis brand).[55]  If that were the case, it strains credulity to suggest Mr. Dondero never

even read the Arbitration Award.

34.    As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by

a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family

trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and

Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another

Cayman Island entity, but the Highland Assistant General Counsel could not remember the

names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr.

Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified

that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No

tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of

the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor

anyone else from the compliance group testified.

35.    Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely

person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs

generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know

whom its officers were.  He could not testify as to the meaning of certain transactions in which

Acis LP had engaged in during recent weeks and said that he signed certain documents on advice

of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary

Petitions.

36.    Again, there was a lot of plausible deniability at Trial as to the "whos" and

"whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

Appellee Appx. 00472
APPX. 003729

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 480 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 594 of 1828 PageID 10087
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 479 of 1803 PageID 11225
Case 18-30264-sgj11 Doc 391-5 Filed 04/13/18 Entered 04/13/18 Page 26 of 53

since the Arbitration Award. The one thing that the court was wholly convinced of was that conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out for the interests of the Alleged Debtors as a fiduciary should.

### E. Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]

37. The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of counting creditors under section 303(b) of the Bankruptcy Code. However, Mr. Terry asserts that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact. Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original Notice of Creditors").[57] The Alleged Debtors subsequently filed on February 5, 2018, a First Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58] Finally, the Alleged Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed. R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of Creditors").[59] The following chart summarizes the name, amount, and nature of the 20 creditors listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective number of creditors for both of the Alleged Debtors. This seems legally appropriate, since Acis LP is the entity that incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & DE # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

Appellee Appx. 00473
APPX. 10330

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 481 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 595 of 1828   PageID 10088
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 480 of 1803   PageID 11226
Case 18-30264-sgj11 Doc 3191-1 Filed 04/13/18    Entered 04/13/18 16:25:58    Page 27 of 53

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims, which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61] This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

27

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 482 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 596 of 1828   PageID 10089
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 481 of 1803   PageID 11227
Case 18-30264-sgj11 Doc 391-8 Filed 04/13/18   Entered 04/13/18 Page 28 of 53

39.     Additionally, there were certain creditors that filed sworn statements saying they

were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by

agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global

Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and

the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged

Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

---

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

28

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 483 of

Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 597 of 1828   PageID 10090

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 482 of 1803   PageID 11228

Case 18-30264-sgj11 Doc 2391855 Filed 04/13/18   Entered 04/13/18 Page 30 of 53 Page 29 of 53

| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40.    Next, the court finds that there are certain creditors included in the "Law Firm

Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really

creditors of the individual law firms and/or Highland, and that these law firm vendor creditors

should not be considered creditors of the Alleged Debtors.  For these, there was no evidence of a

direct contractual obligation on the part of either the Alleged Debtors or Highland—although the

court certainly understands that, when the law firms would retain vendors, they would bill these

to either the Alleged Debtors or Highland as an expense to be reimbursed.  Most of these were

already eliminated with agreement of the Alleged Debtors but, from the remaining list of

creditors, this would include David Langford (a Dallas County court reporter).[66]  To be clear,

while the individual law firm creditors may ultimately have a right to reimbursement for these

vendor expenses from Highland (who may then potentially have a right to reimbursement from

the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not

find this vendor to have a claim ***directly*** against the Alleged Debtors for purposes of section

303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

Appellee Appx. 00476

APPX. 10333

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 484 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 598 of 1828 PageID 10091
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 483 of 1803 PageID 11229
Case 18-30264-sgj11 Doc 391-8 Filed 04/18/18 Entered 04/18/18 Page 30 of 53

41.     Next, as to the Stanton Law Firm, the court finds that this creditor should also be removed from the pool of creditors that "count," for section 303(b) purposes, since this claim appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the evidence presented at the Trial.  First, there was no engagement letter between either of the Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr. Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P. to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP, LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No. 13**: Is any other party also liable for the debt of Acis Capital Management L.P. to the Firm? If so, please state the liable party and portion of Acis Capital Management L.P. debt the other party is liable for to the Firm.

---

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

**Appellee Appx. 00477**
**Appx. 10334**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 485 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 599 of 1828 PageID 10092
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 484 of 1803 PageID 11230
Case 18-3026 Case 19-12391835 Filed 04/18/18 Entered 04/19/18 Page 35 of 57 Page 31 of 53

**Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.

**Question No**. **14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.

**Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .

**Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.

**Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?

**Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees. The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

Appellee Appx. 00478
APPX. 10333

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 486 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 600 of 1828   PageID 10093
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 485 of 1803   PageID 11231
Case 18-30264-sgj11 Doc 18 Filed 04/13/18   Entered 04/13/18 Page 32 of 53

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*, Highland, Mr. Dondero, etc.). Accordingly, the court finds that there is a bona fide dispute as to whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42.     Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| ~~2~~ | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| ~~3~~ | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| ~~4~~ | ~~David Langford~~ | ~~Court Reporter/Law Firm Vendor~~ | ~~$550~~ |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| ~~6~~ | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| ~~8~~ | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| ~~9~~ | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |

---

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section 303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy Code (which instructs that transferees of voidable transfers should not be counted). *See, e.g.*, Exh. 124 & Exh. 131. Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and Highland-affiliates, not just the Alleged Debtors. To elaborate, many of these law firm creditors were employed to represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors). *See, e.g.*, Ex. 123 (McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins & Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group, Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.     Finally, on the topic of creditor numerosity, the court further finds that the evidence

strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and

Highland, in order to bolster an argument that having a sole petitioning creditor was legally

inadequate in this case.[75]  For example, the Klos Declaration and other information, that was

provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating alleged fraudulent conveyance count considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

Appellee Appx. 00480

Appx. 10335

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 488 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 602 of 1828 PageID 10095
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 487 of 1803 PageID 11233
Case 18-30264-sgj11 Doc 391-5 Filed 04/13/18 Entered 04/13/18 12:35:08 Page 34 of 53

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that

he thought there were less than 12 creditors based on his review of such information, as well as

his understanding of the Alleged Debtors' business. Yet, only a few days later, the Alleged

Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended

twice to add another creditor and then yet another. This simply does not jive in the court's mind

and supports this court's belief that the Alleged Debtors were scurrying to determine which

Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry

from being able to file the Involuntary Petitions as the single, petitioning creditor.

> **F.    Evidence Regarding Whether the Alleged Debtors are Generally Not Paying Debts as They Become Due (Unless Such Debts are the Subject of a Bona Fide Dispute as to Liability or Amount).**

44.    The evidence submitted reflects that, for the 11 creditors identified above, 9 out of

11 have unpaid invoices that were more than 90 days old. The remaining 2 of the 11 were

McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76]

The court makes findings with regard to each of the 11 creditors below—focusing specifically on

whether the Alleged Debtors have been paying these creditors as their debts have become due.

45.    First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected

that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it—

$173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition

Date). Other, smaller amounts were invoiced on a monthly basis in each of the months August

2017, September 2017, October 2017, November 2017, and December 2017. Although

requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

Appellee Appx. 00481
APPX. 10336

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 489 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 603 of 1828   PageID 10096
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 488 of 1803   PageID 11234
Case 18-3026-sgj11  Doc 393  Filed 04/13/18  Entered 04/13/18  Page 35 of 53

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In any event, AKK represented that both the Alleged Debtors and Highland are jointly and severally liable for the fees owed to it.[80]  AKK also represented that, to its knowledge, the amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The court makes a logical inference that AKK expected timely payment of its invoices—the largest of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally not been paid timely.

46.     Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its $6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.     Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.     Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August 30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh. 98, Questions 73-75.

[83] Exh. 40K.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 490 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 604 of 1828 PageID 10097
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 489 of 1803 PageID 11235
Case 18-3026 Case 19-12391855 Filed 04/13/18 Entered 04/13/18 Page 36 of 53

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not
been paid timely.

49. Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his
liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on
October 20, 2017 (although such award was not confirmed by State Court 2 until December 18,
2017). The judgment was unstayed as of the January 30, 2018 Petition Date, although the
Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an
arbitration award. The court makes a logical inference that the Alleged Debtors had, on the
Petition Date, no intention of paying this claim any time soon based on their conduct after the
Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-
half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly
insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been
ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way
that they have in the past. Thus, this court finds that this large claim, as of the Petition Date, was
not being paid timely.

50. Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the
service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated
March 1, 2017.[84] KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis
LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was
due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill
was sent. Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was
overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

---

[84] Exh. 40M.

Appellee Appx. 00483
APPX. 10346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 491 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 605 of 1828   PageID 10098
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 490 of 1803   PageID 11236
Case 18-30264-sgj11 Doc 3918-33 Filed 04/13/18    Entered 04/13/18 Page 356 of 57 Page 37 of 53

due).  The court makes a logical inference that KPMG LLP expected payment of its audit fees in accordance with its engagement letter and, thus, it has generally not been paid timely.

51.      Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed to it was for legal services provided to the Alleged Debtors and Highland in connection with the arbitration and litigation with Mr. Terry.  No engagement letter was provided, but the invoices for their services are all directed to Highland.[85]  The evidence reflected that three invoices had not been paid as of the Petition Date:  an October 31, 2017 invoice in the amount of $56,909.53; a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86]  The court makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices (if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has generally not been paid timely.

52.      Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date" (five months before the Petition Date).[88] Although requested in discovery, no engagement letter for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery that none existed.[89]  Moreover, written discovery propounded on the law firm indicated that, while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

Appellee Appx. 00484
APPX. 010349

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 492 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 606 of 1828 PageID 10099
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 491 of 1803 PageID 11237
Case 18-30264-sgj11 Doc 391-35 Filed 04/13/18 Entered 04/13/18 Page 38 of 53

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.     Next with regard to CT Corporation and the $517.12 indebtedness that the Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT Corporation produced several invoices in discovery, all showing due upon receipt, and one was dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the court makes a logical inference that CT Corporation expected prompt payment on its invoices and, thus, has not been paid timely.

54.     Next with regard to David Simek, the Petitioning Creditor concedes that his $1,233.19 indebtedness (which is apparently an expense reimbursement relating to some consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

Appellee Appx. 00485
APPX. 10342

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 493 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 607 of 1828 PageID 10100
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 492 of 1803 PageID 11238
Case 18-30264-sgj11 Doc 391-85 Filed 04/13/18 Entered 04/13/18 Page 39 of 53

55.     In summary, the evidence reflects that the creditors of the Alleged Debtors are
generally not being paid timely (except for perhaps four that are relatively insignificant and
which may also be able to look to Highland for payment).[96]

56.     Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant
General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are
submitted, that approximately 70% of bills are later than 120 days after they are submitted, and
some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP
receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for
example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day,
that he would probably not approve it and allocate it until say February 8th.  By that time, Acis
LP would have already used up all its cash, and that particular creditor would need to wait until
the next quarterly payment was received in order to be paid.  He further testified that he
explained this to law firms before their engagements and that, if they wanted the business, they
would need to understand the process.  There are several things the court finds problematic about
this testimony.  First, no testimony was offered showing that this was, in fact, the understanding
of the law firms or other creditors, and, moreover, none of the engagement letters or invoices
submitted into evidence reflect such payment terms.  Without this additional evidence, the court
believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-
serving and did not support a finding that the Alleged Debtors were generally paying their debts

---

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors.  *See, e.g., In re Moss*, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.*, Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

Appellee Appx. 00486
APPX. 10343

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 494 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 608 of 1828   PageID 10101
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 493 of 1803   PageID 11239
Case 18-3026sgj19-D33J1855edD4c1361B   Entered 1/04/13/18age4158f 5Page 40 of 53

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the Financial Statements of Acis LP submitted into evidence do not support the notion that the cash balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

Appellee Appx. 00487
APPX. 10352

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 495 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 609 of 1828 PageID 10102
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 494 of 1803 PageID 11240
Case 18-30264-sgj11 Doc 3915 Filed 04/13/18 Entered 04/13/18 16:45:41 Page 41 of 53

## II.     Conclusions of Law

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an involuntary bankruptcy case. First, pursuant to section 303(b) of the Bankruptcy Code, an involuntary case may be filed against a person by the filing with the bankruptcy court of a petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... [that] aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims aggregating $15,775.00. If there are less than twelve creditors, a single creditor with an unsecured claim of $15,775.00 may file the involuntary petition. To the extent a bankruptcy court finds that the requisite number of petitioning creditors have commenced the involuntary case, the court shall order relief against the debtor under the chapter under which the petition was filed only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

Appellee Appx. 00488
APPX. 10353

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 496 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 610 of 1828    PageID 10103
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 495 of 1803    PageID 11241
Case 18-30264-sgj11 Doc 2391 Filed 04/13/18    Entered 04/13/18 Page 42 of 53

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

> ### A.    *Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?*

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors.  After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102]  Here, the court has found that the Alleged

Debtors have, *at most*, 11 qualified creditors.[103]  Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions.  While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that *Acis LP* has—as opposed to the liability or amount that Highland or other insiders bear responsbility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors.  *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

Appellee Appx. 00489
APPX. 10346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 497 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 611 of 1828 PageID 10104
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 496 of 1803 PageID 11242
Case 18-30264-sgj11 Doc 3391-8 Filed 04/13/18 Entered 04/13/18 Page 43 of 53

### B. Are the Alleged Debtors Generally Paying Their Debts as They Become Due?

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . ."[105] Again, the burden is on the Petitioning Creditor to prove this element by a preponderance of the evidence.[106] The determination is made as of the filing date of the Involuntary Petitions.[107] In determining whether an alleged debtor is generally paying its debts as they come due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall conduct in its financial affairs.[108] No one factor is more meritorious than another; what is most relevant depends on the facts of each case.[109] Courts typically hold that "generally not paying debts" includes regularly missing a significant number of payments *or* regularly missing payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980). See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

Appellee Appx. 00490
Appx. 10345

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 498 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 612 of 1828 PageID 10105
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 497 of 1803 PageID 11243
Case 18-30264-sgj11 Doc 3913 Filed 04/13/18 Entered 04/13/18 Page 458 of 5 Page 44 of 53

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are—are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment).  Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

**C.   With the Section 303 Statutory Requirements Being Met by the Petitioning Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions Because They Were Filed in Bad Faith?**

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry.  As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).  While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are:  Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

Appellee Appx. 00491
APPX. 10356

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 499 of
Case 3:23-cv-00726-S  Document 8-22    Filed 12/29/23    Page 613 of 1828    PageID 10106
Case 3:21-cv-00879-K  Document 21    Filed 07/28/21    Page 498 of 1803  PageID 11244
Case 18-30264-sgj11 Doc 391-35 Filed 04/13/18    Entered 04/13/18 Page 45 of 53

independent finding of "bad faith," the court need not ultimately decide the efficacy or
applicability of such authority, because the court does not believe that the evidence demonstrated
any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions.
Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out
of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets
and value and that a bankruptcy filing was the most effective and efficient way to preserve value
for the Acis LP creditors.  The court concludes that Mr. Terry was wholly justified in pursuing
the Involuntary Petitions.

> **D.    Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions
> Pursuant to Section 305 of the Bankruptcy Code?**

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or
> may suspend all proceedings in a case under this title, at any time if—
>     (1) the interests of creditors and the debtor would be better served by such
> dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a
properly filed bankruptcy case is an ***extraordinary remedy***.[114]  Moreover, granting an abstention
motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple
balancing of harm to the debtor and creditors; rather, the interests of ***both*** the ***debtor*** and its
***creditors*** must be served by granting the request to abstain.[115]  The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de
Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718,
726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing *AMC Investors, LLC*, 406 B.R. at
488).

Appellee Appx. 00492
APPX. 10349

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 500 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 614 of 1828    PageID 10107
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 499 of 1803    PageID 11245
Case 18-30264-sgj11 Doc 239 Filed 04/13/18    Entered 04/13/18 ... Page 46 of 53

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]  Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

(1) the economy and efficiency of administration;
(2) whether another forum is available to protect the interests of both parties or
there is already a pending proceeding in state court;
(3) whether federal proceedings are necessary to reach a just and equitable solution;
(4) whether there is an alternative means of achieving an equitable distribution of
assets;
(5) whether the debtor and the creditors are able to work out a less expensive out-
of-court arrangement which better serves all interests in the case;
(6) whether a non-federal insolvency has proceeded so far in those proceedings that
it would be costly and time consuming to start afresh with the federal bankruptcy
process; and
(7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

    *i.*      *Factor 1: The Economy and Efficiency of Administration.*

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D. Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for "cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at 464).

Appellee Appx. 00493
APPX. 10360

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 501 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 615 of 1828   PageID 10108
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 500 of 1803   PageID 11246
Case 18-30264-sgj11 Doc 3391-8 Filed 04/13/18   Entered 04/13/18 Page 453 of 5 Page 47 of 53

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code.  Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court.  The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland.  This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120]  Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee.  Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

> ii.   *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded so Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

Appellee Appx. 00494
APPX. 10359

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 502 of
Case 3:23-cv-00726-S   Document 8-22   1802/29/23    Page 616 of 1828   PageID 10109
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 501 of 1803   PageID 11247
Case 18-3026 Case 19-D3391855 filed 04/13/18  Entered 04/13/18 Page 34958 of 53 Page 48 of 53

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an *equitable* distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

Appellee Appx. 00495
APPX. 10360

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 503 of
Case 3:23-cv-00726-S   Document 8-22    Filed 12/29/23    Page 617 of 1828   PageID 10110
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 502 of 1803   PageID 11248
Case 18-30264-sgj11 Doc 3391-1 Filed 04/13/18   Entered 04/13/18 16:35:56   Page 49 of 53

Second, this court heard considerable evidence involving potentially voidable transfers that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and, while the state court certainly provides a forum for eventually bringing fraudulent transfer claims, the court also heard evidence that none of these claims have actually been brought in the state court.[124]  Moreover, to the extent fraudulent transfer claims were to be pursued in state court and were successful, the state court would still need the ability to reach the assets of alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates located in the Cayman Islands).  The bankruptcy court has concerns whether a state court process could efficiently accomplish this task.[125]  Similarly, it is worth noting that, while a request for a receiver was filed in the state court by Mr. Terry, such request had not yet been heard and decided by the state court.  Thus, at the present time, it does not appear that there is an alternative forum to address the pertinent issues in this case, without the necessity of significant, additional steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to achieve an equitable result in this case.  Specifically, the court heard evidence from the Alleged Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged Debtors would ultimately pay all of their creditors in full, except for Mr. Terry.  This clearly demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC,* Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr. S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade*, 258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith*, 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

Appellee Appx. 00496
APPX. 10363

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 504 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 618 of 1828   PageID 10111
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 503 of 1803   PageID 11249
Case 18-30264-sgj11 Doc 391-35 Filed 04/13/18   Entered 04/13/18 Page 50 of 53   Page 50 of 53

distribution to **all creditors**, including Mr. Terry.  Additionally, a federal bankruptcy court has

certain tools available to it that are not available to a state court such as the ability to invalidate

potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell

assets free and clear of liens, claims and encumbrances pursuant to section 363 of the

Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy

Code.  These are all useful tools available to the Alleged Debtors in a bankruptcy case that would

be lost if this court were to ultimately abstain.

 Finally, there was more than enough evidence showing the acrimonious and bitter

relationship that exists between Mr. Terry and Mr. Dondero.  Thus, the availability of an out-of-

court arrangement being obtained in this case is, in this court's mind, slim to none.

 In summation, the court finds that all of the factors above support this case staying with

the bankruptcy court.

  iii. *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought.*

 The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith

and as a litigation tactic to gain some sort of advantage in the state court proceedings.  The court

has already found above that these cases were not filed in bad faith and that Mr. Terry has met

the necessary statutory requirements of section 303 of the Bankruptcy Code.  Moreover, it is

worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition

is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a

fact-dependent determination.[126]  Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would not effectively be dealt with in another forum).

Appellee Appx. 00497

APPX. 10362

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 505 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 619 of 1828   PageID 10112
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 504 of 1803   PageID 11250
Case 18-30264-sgj11 Doc 391-35 Filed 04/13/18   Entered 04/13/18 Page 52 of 5 Page 51 of 53

behind Mr. Terry's decision to file the Involuntary Petitions.  Specifically, Mr. Terry repeatedly and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that creditors (including him) were treated fairly and received an equal distribution from the Alleged Debtors' assets, not to gain some sort of advantage in the state court.  This testimony was absolutely consistent with additional evidence showing that, since the entry of the arbitration award, there has been a calculated effort (largely by Highland) to effectively liquidate the Alleged Debtors.  Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have not credibly shown how both the Alleged Debtors and the creditors are better served outside of bankruptcy.  If this matter were to remain outside of bankruptcy, there seems to be a legitimate prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors, to the detriment of Acis LP creditors.  Abstention would fly in the face of fundamental fairness and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

Appellee Appx. 00498
APPX. 10363

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 506 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 620 of 1828 PageID 10113
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 505 of 1803 PageID 11251
Case 18-30264-sgj11 Doc 239 Filed 04/13/18 Entered 04/13/18 16:35:58 Page 52 of 53

significant harm to the "equity" of the Alleged Debtors. Specifically, the Alleged Debtors have

argued that, if this court were to enter orders for relief, the equity would be forced to "call" and

ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in

substantial losses to the equity on their investments. First, to be clear, the current equity of the

Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only

became the equity of the Alleged Debtors on December 19, 2017. But this is not the "equity"

being referred to by the Alleged Debtors in its argument. Rather, the so-called "equity," about

which the Alleged Debtors seemed so concerned, is actually ***certain parties that own the equity***

***of the entity that owns the equity in the CLOs***—which includes (a) an unnamed third-party

investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate

(49%), and (c) Highland employees (2%). However, abstention under section 305 of the

Bankruptcy Code does not require this court to look at what is in the best interests of these third-

parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what

is in the best interests of the Alleged Debtors and the creditors. Accordingly, the Alleged

Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating

abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who

the Alleged Debtors are really out to protect—Highland and Highland-affiliates. Moreover, the

court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby

ending the Alleged Debtors' right to receive future management fees, there would still be

potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which

include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry
of orders for relief in these cases.

Appellee Appx. 00499
Appx. 10366

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 507 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 621 of 1828   PageID 10114
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 506 of 1803   PageID 11252
Case 18-30264-sgj11  Doc 3445-8 Filed 04/13/18   Entered 04/13/18 16:35:50 of 57  Page 53 of 53

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the November 3, 2017 transfer of the Acis LP Note Receivable from Highland.  Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen, there is still a potential benefit to creditors if this court chooses not to abstain.

### III.     CONCLUSION

In conclusion, these involuntary proceedings were appropriately filed under section 303, and orders for relief will be issued forthwith.   This court declines to exercise its discretion to abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP, as discussed above.  A chapter 7 trustee appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and Highland.  A chapter 7 trustee will have tools available to preserve value that a state court receiver will not have.  The bankruptcy court is single handedly the most efficient place to administer property of the estate for creditors.  This is not just a two party dispute between Mr. Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not warranted.

**###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###**

Appellee Appx. 00500
APPX. 10367

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 508 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 622 of 1828   PageID 10115
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 507 of 1803   PageID 11253
Case 19-12239-CSS   Doc 86-4   Filed 11/01/19   Page 1 of 31

**<u>Exhibit D</u>**

**Acis Arbitration Opinion**

ACTIVE 250501748

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 509 of
Case 3:23-cv-00726-S   Document 8-22    Filed 12/29/23    Page 623 of 1828    PageID 10116
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 508 of 1803    PageID 11254
Case 18-03078-sgj Doc 123 Filed 04/16/19   Entered 04/16/19 Page 1 of 30



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed April 16, 2019**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, GP, | § | CASE NO. 18-30265-SGJ-11 |
| LLC, | § | (Jointly Administered Under |
|     Debtors. | § | Case No. 18-30264-SGJ-11) |
| _____ | § | (Chapter 11) |
| | § | |
| ROBIN PHELAN, CHAPTER 11 | § | |
| TRUSTEE, | § | |
|     Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 18-03078-SGJ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., HIGHLAND CLO FUNDING | § | |
| LTD, HIGHLAND HCF ADVISOR, LTD., | § | |
| HIGHLAND CLO MANAGEMENT, LTD., | § | |
| and HIGHLAND CLO HOLDINGS, LTD., | § | |
|     Defendants. | § | |

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO COMPEL
## ARBITRATION [DE # 102]

Page 1 of 30

Appellee Appx. 00502
APPX. 10367

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 510 of
Case 3:23-cv-00726-S  Document 8-22   Filed 02/29/23    Page 624 of 1828  PageID 10117
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 509 of 1803  PageID 11255
Case 18-03078-sgj Doc 221 Filed 04/08/19    Entered 04/16/19 Page 326 of 31 Page 2 of 30

## I.    Introduction.

Before this court is a Motion to Compel Arbitration (the "Arbitration Motion"),[1]

requesting that the bankruptcy court send to arbitration only a *sub-set* of claims asserted in the

above-referenced adversary proceeding (the "Adversary Proceeding").  Some procedural context

is crucial in analyzing the merits of the Arbitration Motion and, thus, is set forth immediately

below.

This Adversary Proceeding has morphed into a large, complex lawsuit—at this stage

primarily involving 35 claims, 20 of which are grounded in fraudulent transfer theories.[2]  The

Arbitration Motion, as explained below, seeks arbitration of *eight* of the 35 claims (*i.e.,* Counts

1-8).

The Arbitration Motion was filed by party Highland Capital Management, L.P.

("Highland").  Highland and a related company, Highland CLO Funding Ltd. ("HCLOF"), were

originally the plaintiffs in this Adversary Proceeding, suing the Chapter 11 Trustee for injunctive

relief (arguing early during the above-referenced Chapter 11 bankruptcy cases that the Chapter

11 Trustee was interfering with their business rights and decisions, essentially).  The Chapter 11

Trustee fired back with 35 counterclaims against Highland and HCLOF (adding three parties

related to Highland as third-party defendants with regard to some of those 35 counterclaims).

Notably, these 35 counterclaims—*as directed toward Highland*—were also alleged to be

objections to Highland's two $4,672,140.38 proofs of claim filed in the underlying bankruptcy

cases.[3]  In that regard, the Chapter 11 Trustee stated that his Answer and Counterclaims included

---

[1] DE # 102.

[2] There is also a preference count and a section 550 recovery count—thus, 22 out of the 35 claims are chapter 5
avoidance actions and recovery.  11 U.S.C. §§ 544, 547, 548 & 550.

[3] *See Defendant's Amended Answer, Counterclaims (Including Claim Objections) and Third-Party Claims* (DE #
84), filed November 13, 2018, in response to the *Original Complaint and Request for Preliminary Injunction of*

Appellee Appx. 00503
APPX. 10360

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 511 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 625 of 1828   PageID 10118
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 510 of 1803   PageID 11256
Case 18-03078-sgj Doc 236-35 Filed 04/06/19   Entered 04/06/19 Page 3 of 31   Page 3 of 30

"an objection to Highland Capital's proofs of claim pursuant to Federal Rule of Bankruptcy

Procedure 3007(b), and the counterclaims asserted herein shall constitute recoupment and/or

offset to such proofs of claim, to the extent such claims are otherwise allowed."[4]  In fact, after

the 35 counts were articulated in the Chapter 11 Trustee's Answer and Counterclaims, there were

20 paragraphs (¶¶ 252-271, pp. 70-77) solely articulating the Chapter 11 Trustee's objections to

Highland's proofs of claim.[5]  The Chapter 11 Trustee also filed yet a separate adversary

proceeding, Adv. Proc. No. 18-03212, seeking his own injunctive relief, which has recently been

consolidated with this Adversary Proceeding.[6]

　　　The Chapter 11 Trustee ultimately proposed and obtained confirmation of a Chapter 11

plan in the underlying bankruptcy cases, and the Reorganized Debtors, now under new

ownership and management, were vested in that plan with the counterclaims in this Adversary

Proceeding (among other rights and claims).  The injunctive relief initially sought by Highland

and HCLOF, as plaintiffs in the Adversary Proceeding, later became mooted by various orders in

---

*Highland CLO Funding, Ltd and Highland Capital Management Against Chapter 11 Trustee of Acis Capital Management, L.P. and Acis Capital Management GP, LLC* (DE # 1), filed May 30, 2018, and also in response to the proofs of claims filed by Highland Capital Management, L.P. (*see Proof of Claim No. 27,* filed in Case No. 18-30264, and *Proof of Claim No. 13* filed in Case No. 18-30265, each in the amount of $4,672,140.38, with the basis of each of the proofs of claim listed as "Sub-Advisory Services and Shared Services"; these proofs of claim are virtually identical).

[4] DE # 84, ¶ 6.  The Chapter 11 Trustee has argued that the Highland proofs of claim should be disallowed under (i) section 502(b)(1) of the Bankruptcy Code (in that the Highland proofs of claim are allegedly unenforceable against the Debtors under the limited partnership agreement of Acis Capital Management, L.P. and applicable law); (ii) section 502(b)(4) of the Bankruptcy Code (in that the proofs of claim are for services of an insider of the Debtors and allegedly exceed the reasonable value of the services); and (iii) under section 502(d) of the Bankruptcy Code (in that the Trustee has asserted avoidance actions against Highland).  Finally, to the extent allowed at all, the Trustee has argued that the Highland proofs of claim should be equitably subordinated under section 510(c) of the Bankruptcy Code.  In summary, pursuant to section 502(b) and (d) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3007, the Trustee has sought entry of an order disallowing and expunging the Highland proofs of claim from the Debtors' claims registers.  *See id.* at ¶¶ 251-272.

[5] *Id.*

[6] DE # 124.

Appellee Appx. 00504

APPX. 10369

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 512 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 626 of 1828 PageID 10119
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 511 of 1803 PageID 11257
Case 18-03078-sgj Doc 396 Filed 04/16/19 Entered 04/16/19 Page 4 of 30

the bankruptcy cases and such claims were voluntarily dismissed without prejudice.[7]  Thus,

Highland, which is pursuing the Arbitration Motion, now wears the hat of only a defendant (and

proof of claimant), and the Reorganized Debtors are the plaintiffs asserting the 35 original

"counterclaims" asserted by the Chapter 11 Trustee against Highland (which 35 claims are also

objections to Highland's proof of claim).  The separate adversary proceeding that was filed by

the Chapter 11 Trustee seeking injunctive relief  (Adv. Proc. No 18-03212) was consolidated into

this Adversary Proceeding, and the style of this Adversary Proceeding was adjusted to reflect

that the Chapter 11 Trustee had become situated as plaintiff.[8]  But, to be clear, the Reorganized

Debtors are actually now plaintiffs in place of the Chapter 11 Trustee.  The Reorganized Debtors

are Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis

GP"), and they oppose the Arbitration Motion.[9]

   Citing to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq*., Highland argues

that the bankruptcy court must enter an order compelling arbitration as to counts 1-8 because:

(a) these eight counts revolve around the interpretation of certain prior versions of a Sub-

Advisory Agreement and Shared Services Agreement (later defined); and (b) the aforementioned

agreements contained binding arbitration clauses.  Highland also requests that the Adversary

Proceeding be stayed regarding counts 1-8, pending binding arbitration.  The Reorganized

Debtors dispute that there are binding arbitration clauses applicable to counts 1-8.  As explained

further below, the aforementioned agreements were amended many times and the arbitration

clauses were eventually eliminated in the last versions of the agreements.  The Reorganized

---

[7] DE # 79.

[8] DE # 124.

[9] DE # 123.

Appellee Appx. 00505

APPX. 10362

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 513 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 627 of 1828    PageID 10120
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 512 of 1803    PageID 11258
Case 18-03078-sgj Doc 236 Filed 04/03/19    Entered 04/11/19 Page 5 of 30    Page 5 of 30

Debtors also urge that, even if there are applicable arbitration clauses, the court may and should

exercise discretion and decline to order arbitration, since core bankruptcy matters are involved

and arbitration would conflict with the purposes of the Bankruptcy Code.  For the reasons set

forth below, the Arbitration Motion is denied.  This means that Counts 1-26 & 33-35 will go

forward and be adjudicated in this Adversary Proceeding.[10]  But as will be explained in a

separate order that is being issued shortly following this order, there are certain counts

complaining of **_postpetition_** state law torts and breaches of contract in this Adversary Proceeding

(Counts 27-32) that this court believes should be separated out into a different adversary

proceeding and consolidated with a contested matter involving a Highland request for allowance

of a postpetition administrative expense claim [DE # 772].

**II.**    **Background Facts.**

**A.**    **First, the Agreements Between the Parties.**

As this court has noted on various occasions, Acis LP was formed in the year 2011, and

is primarily a CLO portfolio manager. [11]  Specifically, Acis LP provides fund management

services to various special purpose entities that hold CLOs (which is an acronym for

"collateralized loan obligations").  Acis LP was providing management services for five such

special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put

into the above-referenced involuntary bankruptcy cases (the "Bankruptcy Cases").  The parties

have informally referred to the special purpose entities themselves as the "CLO Issuers" or

"CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs")

---

[10] The court notes that a Supplemental Motion to Withdraw the Reference in this Adversary Proceeding has recently been filed by Highland and HCLOF [DE # 134] and that motion will be addressed in due course hereafter.  The ruling herein with regard to the Arbitration Motion does not affect such motion and such motion will be separately addressed, after a status conference, and through a report and recommendation to the District Court.

[11] Acis LP has managed other funds, from time to time, besides CLOs.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 514 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 628 of 1828   PageID 10121
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 513 of 1803   PageID 11259
Case 18-03078-sgj Doc 2396-5 Filed 04/08/19   Filed 11/11/19   Page 273 of 3   Page 6 of 30

are structured as follows:  (a) on the asset side of their balance sheets, the entities own pieces of
senior debt owed by large corporations and, therefore, earn revenue from the variable interest
payments made by those corporations on such senior debt; and (b) on the liability side of their
balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest
rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are
mostly institutions and pension funds.  The CLO SPEs make a profit, based on the spread or
"delta" between:  (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,*
the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on
their own tranches of debt.  At the bottom of the CLO SPEs' capital structure is their equity
(sometimes referred to as "subordinated notes," but these "notes" are genuinely equity).  As
portfolio manager, Acis LP manages the CLO SPEs' pools of assets (by buying and selling
senior loans to hold in the CLO SPEs' portfolios) and communicates with investors in the CLO
SPEs.  The CLO SPEs' tranches of notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves have been in bankruptcy.  Only
Acis LP which ***manages*** the CLO business and its general partner, Acis GP, were put into
bankruptcy.

Historically, Acis LP has had four main sets of contracts that were at the heart of its
business and allowed it to function.  They are described below.  The second and third agreements
set forth below are highly relevant to the Arbitration Motion before the court.  The Chapter 11
Trustee, from time-to-time, credibly testified that these agreements collectively created an "eco-
system" that allowed the Acis CLOs to be effectively and efficiently managed by Acis LP.

Appellee Appx. 00507
APPX. 10307

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 515 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 629 of 1828   PageID 10122
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 514 of 1803   PageID 11260
Case 18-03078-sgj11 Doc 296-5  Filed 04/03/19   Entered 04/11/19 21:18:28  Page 7 of 30

1.      <u>The PMAs with the CLO SPEs.</u>

First, Acis LP has various portfolio management agreements ("PMAs") ***with the CLO***

***SPEs***, pursuant to which Acis LP earns management fees.  The PMAs have been the primary

"assets" (loosely speaking) of Acis LP.  They are what generate revenue for Acis LP.

2.      <u>The Sub-Advisory Agreement with Highland.</u>

Second, Acis LP had a Sub-Advisory Agreement (herein so called) with ***Highland***.

Pursuant to this agreement, Acis LP essentially sub-contracted for the use of Highland front-

office personnel/advisors to perform management services for Acis LP (*i.e.,* so that Acis LP

could fulfill its obligations to the CLO SPEs under the PMAs).  Acis LP paid handsome fees to

Highland pursuant to this agreement.  This agreement was rejected (with bankruptcy court

approval) by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee

credibly represented that he had not only found resources to provide these services at a much

lower cost to the estate, but he also had begun to believe that Highland was engaging in stealth

efforts to liquidate the Acis CLOs, to the detriment of Acis LP's creditors.

***There were five iterations of the Sub-Advisory Agreement between the parties over***

***time***:  (a) the initial Sub-Advisory Agreement, "made effective January 1, 2011" (which had an

arbitration clause at section 16(f));[12] (b) an Amended and Restated Sub-Advisory Agreement,

"made" May 5, 2011, "to be effective January 1, 2011" (which also had an arbitration clause at

section 16(f))[13]; (c) an Amendment to Amended and Restated Sub-Advisory Agreement "entered

into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration

---

[12] Exh. 1 to Arbitration Motion.

[13] Exh. 2 to Arbitration Motion.

Appellee Appx. 00508
APPX. 10373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 516 of

Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 630 of 1828   PageID 10123

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 515 of 1803   PageID 11261

Case 18-03078-sgj Doc 396-758 Filed 04/03/19   Entered 04/16/19 23:28:26   Page 8 of 30

clause);[14] (d) Second Amended and Restated Sub-Advisory Agreement "made" on July 29, 2016, "to be effective January 1, 2016" (which had an arbitration clause at section 16(f));[15] and (e) the Third Amended and Restated Sub-Advisory Agreement "dated as of March 17, 2017" (*which suddenly contained no arbitration clause, with no explanation*).[16]

     3.     The Shared Services Agreement with Highland.

Third, Acis LP also had a Shared Services Agreement (herein so called) with Highland, pursuant to which Acis LP essentially sub-contracted for the use of Highland's back-office services (again, so that Acis LP could fulfill its obligations to the CLO SPEs under the PMAs). To be clear, Acis LP had no employees of its own—only a couple of officers and members.  Acis LP paid handsome fees to Highland for the personnel and back-office services that Highland provided to Acis LP.  This agreement was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with Bankruptcy Court approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

*There were five iterations of the Shared Services Agreement between the parties over time*:  (a) the initial Shared  Services Agreement "effective as of January 1, 2011" (which had an arbitration clause at section 9.14);[17] (b) an Amendment to Shared Services Agreement, "entered into as of" July 1, 2011 (which did not seem to affect in any way the aforementioned arbitration clause);[18] (c) a Second Amended and Restated Shared Services Agreement "dated effective

---

[14] Exh. 3 to Arbitration Motion.

[15] Exh. 4 to Arbitration Motion.

[16] Exh. 5 to Arbitration Motion.

[17] Exh. 6 to Arbitration Motion.

[18] Exh. 7 to Arbitration Motion.

Appellee Appx. 00509

APPX. 10376

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 517 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 631 of 1828   PageID 10124
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 516 of 1803   PageID 11262
Case 18-03078-sgj-DOC 338-CBE Fed D416G-4    Filed 11/01/15/19 Page 1108 of Page 9 of 30

January 1, 2015" (which had an arbitration clause at section 9.14);[19] (d) a Third Amended and
Restated Shared Services Agreement "dated effective as of January 1, 2016 (which had an
arbitration clause at section 9.14);[20] and (e) a Fourth Amended and Restated Shared Services
Agreement "dated as of March 17, 2017" (***which suddenly contained no arbitration clause, with
no explanation***).[21]

    <u>4.</u>    <u>The Equity/ALF-PMA.</u>

    Fourth, until a few weeks before the Bankruptcy Cases were filed, Acis LP also had yet
another portfolio management agreement (distinct from its PMAs with the CLO SPEs) whereby
Acis LP provided services not just to the CLO SPEs themselves, but separately to the equity
holder in the CLO SPEs.  This portfolio management agreement with the equity holder in the
CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would probably be
easier to refer to it as the "Equity PMA"[22] (for ease of reference, the court will refer to it as the
"Equity/ALF PMA").  Acis LP did not earn a specific fee pursuant to the Equity/ALF PMA, but
the Chapter 11 Trustee and others credibly testified during the Bankruptcy Cases that Acis LP
considered the agreement valuable and very important, because it essentially gave Acis LP the
ability to control the whole Acis CLO eco-system—in other words, it gave Acis LP the ability to
make substantial decisions on behalf of the CLO SPEs' ***equity***—distinct from making decisions
for the CLO SPEs themselves pursuant to the PMAs.  In any event, shortly before the
Bankruptcy Cases were filed, agents of Highland and/or others controlling Acis LP:  (a) caused

---

[19] Exh. 8 to Arbitration Motion.

[20] Exh. 9 to Arbitration Motion.

[21] Exh. 10 to Arbitration Motion.

[22] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another
dated December 22, 2016.

Appellee Appx. 00510
APPX. 10373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 518 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 632 of 1828   PageID 10125
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 517 of 1803   PageID 11263
Case 18-03078-sgj   Doc 236   Filed 04/03/19    Entered 04/16/19 23:12:23   Page 10 of 30

Acis LP to terminate this Equity/ALF PMA; and (b) then caused the equity owner to enter into a

new Equity PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. (one

of the Defendants in this Adversary Proceeding).

     5.     Limited Partnership Agreement of Acis LP.

There is actually a fifth agreement that should be mentioned.  Although not as integral as

the previous four agreements, there was a certain Amended and Restated Agreement of Limited

Partnership of Acis Capital Management, L.P., dated to be effective as of January 1, 2011 (the

"LPA"), entered into among the general partner and limited partners of Acis LP.  Reorganized

Acis has argued in the Adversary Proceeding that this LPA limited in some respects the

compensation that could be paid to Highland under the Sub-Advisory Agreement and the Shared

Services Agreement.

**B.**    **Next, the 35 Counts Asserted Against Highland in this Adversary
Proceeding.**

The Adversary Proceeding, distilled to its essence—and as currently framed—is all about

certain activities of Highland and some of its affiliates and actors who controlled it, which

activities were allegedly aimed at ***denuding Acis LP of all of its value,*** at a time when the former

portfolio manager for Acis LP was on the verge of obtaining a very large judgment claim against

Acis LP.  Specifically, these activities of Highland began soon after:  (a) it terminated former

Acis CLO manager Joshua Terry ("Terry") in June 2016; (b) it began litigating with him (which

litigation was sent to arbitration) in September 2016; and (c) Terry obtained an approximately $8

million arbitration award against Acis LP in October 2017, which was confirmed by a judgment

in December 2017.  The activities and counts revolve around:  (a) Highland's alleged

overcharging of Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and

Shared Services Agreement, as limited by the LPA (Counts 1-4); (b) alleged fraudulent transfers

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 519 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 633 of 1828 PageID 10126
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 518 of 1803 PageID 11264
Case 18-03078-sgj11 Doc 396 Filed 04/16/19 Entered 04/16/19 Page 12 of 31 Page 11 of 30

of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory
and Shared Services Agreements (Counts 5-8); (c) an alleged fraudulent transfer as to the
Equity/ALF PMA (Counts 9-12); (d) an alleged fraudulent transfer pertaining to Acis LP's
conveyance away of its so-called ALF Equity (Counts 13-16); (e) an alleged fraudulent transfer
of a $9.5 million note receivable Acis LP held (Counts 17-20); (f) various other fraudulent
transfers (Counts 21-24); (g) preferences (Count 25); (h) assertion of a section 550 recovery
remedy for the aforementioned avoidance actions (Count 26); and (i) requests for punitive
damages, an alter ego/veil piercing remedy, and attorneys' fees (Counts 33-35). There are also
some counts complaining of postpetition state law torts and breaches of contract (Counts 27-32).

As mentioned earlier, Highland's Arbitration Motion only requests the court defer to
arbitration Counts 1-8—that is the counts relating to: (a) Highland's alleged overcharging of
Acis LP by more than $7 million for fees/expenses under the Sub-Advisory and Shared Services
Agreement, as perhaps limited by the LPA (Counts 1-4); and (b) the alleged fraudulent transfers
of value out of Acis LP, by virtue of various amendments and modifications of the Sub-Advisory
and Shared Services Agreements (Counts 5-8). Highland argues that, *since all of these counts*
*pertain to the Sub-Advisory Agreement and Shared Services Agreement* between Acis LP and
Highland, the arbitration clauses in those agreements dictate that the counts be carved out from
this Adversary Proceeding and sent to binding arbitration. Highland acknowledges that these
two agreements were amended and restated numerous times, and that the last time they were
amended (March 17, 2017) the arbitration clauses were eliminated, but Highland argues that,
since all of the activity complained of in Counts 1-8 occurred *prior* to March 17, 2017, *the older*
*iterations of the Sub-Advisory and Shared Services Agreements, with arbitration clauses,*
*govern*. Highland zeroes in on the fact that Counts 1-4, at their essence, are assertions that the

Appellee Appx. 00512
APPX. 10367

fees for services charged by Highland in the Sub-Advisory and Shared Services Agreements

were excessive for the years 2013, 2014, 2015, and through May 2016 (all before the March 17,

2017 iteration of the agreements).  And Counts 5-8, while articulated as fraudulent transfer

claims, pertain to the modifications made to the Sub-Advisory and Shared Services Agreements

at various stages up to the March 17, 2017 versions.

The Reorganized Debtors have argued that it is quite clear that the last iterations

of the Sub-Advisory and Shared Services Agreements intended to supersede in every way

the prior versions.  That includes the provisions directing arbitration.  And, they argue, it

does not matter *when* the causes of action occurred/accrued or not.  What matters is that

the parties agreed at some point that their disputes would not be sent to arbitration and

this was the last governing document.

**C.     The Relevant Language in the Sub-Advisory and Shared Services Agreements
         Pertaining to (i) Arbitration and (ii) Superseding of Prior Agreements.**

As mentioned earlier, there was an arbitration clause at Section 16(f) of the Sub-

Advisory Agreement until the last March 17, 2017 version.  The clause read as follows:

> [I]n the event there is an unresolved legal dispute between the parties and/or any of
> their respective officers, directors, partners, employees, agents, affiliates or other
> representatives that involves legal rights or remedies arising from this Agreement,
> the parties agree to submit their dispute to binding arbitration under the authority
> of the Federal Arbitration Act. . . .[23]

In the Shared Services Agreement, an arbitration clause appeared at Section 9.14, as follows:

> Notwithstanding anything contained in this Agreement or the Annexes hereto to the
> contrary, in the event there is an unresolved legal dispute between the parties and/or
> any of their respective officers, directors, partners, employees, agents, affiliates or
> other representatives that involves legal rights or remedies arising from this
> Agreement, the parties agree to submit their dispute to binding arbitration under the
> authority of the Federal Arbitration Act. . . .[24]

---

[23] Exh. 1 of Arbitration Motion, at 7-8.

[24] Exh. 6 of Arbitration Motion, at 9-10.

Appellee Appx. 00513

Appx. 10376

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 521 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 635 of 1828   PageID 10128
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 520 of 1803   PageID 11266
Case 18-03078-sgj11 Doc 2396-38 Filed 04/16/19   Entered 04/16/19 Page 128 of Page 13 of 30

As earlier mentioned, these two agreements were later amended and restated several

times. The arbitration provisions remained identical until they were completely eliminated in

March 2017.  The Reorganized Debtor argues that this is a short analysis:  there was no longer an

operative arbitration provision as of March 17, 2017.

In the March 17, 2017 version of the Shared Services Agreement, the parties agreed "that

the courts of the State of Texas and the United States District Court located in the Northern

District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether

contractual or noncontractual) which may arise out of or in connection with this Agreement and

that accordingly any action arising out of or in connection therewith (together referred to as

'Proceedings') may be brought in such courts."[25]

The same type language appeared in the March 17, 2017 version of the Sub-Advisory

Agreement:  "The parties unconditionally and irrevocably consent to the exclusive jurisdiction of

the courts located in the State of Texas and waive any objection with respect thereto, for the

purpose of any action, suit or proceeding arising out of or relating to this Agreement or the

transactions contemplated hereby."[26]

More generally, the March 17, 2017 versions of the agreements each provided that they

"amended, restated and replaced the existing agreements *in [their] entirety*."[27]  The March 17,

2017 agreements also each provided that they "supersede[d] all prior agreements and

undertakings, both written and oral, between the parties with respect to such subject matter."[28]

---

[25] Exh. 10 of Arbitration Motion, § 8.04(b).

[26] Exh. 5 of Arbitration Motion, § 13.

[27] Exhs. 5 and 10 of Arbitration Motion, each at p. 1 (emphasis added).

[28] Exh. 5 of Arbitration Motion, ¶ 20; Exh.10 of Arbitration Motion, ¶ 8.14.

Appellee Appx. 00514
APPX. 10379

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 522 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 636 of 1828 PageID 10129
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 521 of 1803 PageID 11267
Case 18-03078-sgj Doc 239 Filed 04/16/19 Entered 04/16/19 Page 13 of Page 14 of 30

In summary, the Reorganized Debtors argue that, under Texas common law, basic principles of contract interpretation, and the plain language of the March 17, 2017 version of the agreements, there is no agreement to arbitrate. "A contract's plain language controls."[29] Because the prior versions of the agreements were "amended, restated and replaced in [their] entirety" with the March 17, 2017 agreements—which not only omit an arbitration provision, but also expressly provide for jurisdiction and venue in Texas state or federal courts—the Reorganized Debtors argue that there exists no valid agreement to arbitrate between Highland and Acis LP. The court's inquiry can and should end there. But, if the court concludes the arbitration clauses are still applicable, the Reorganized Debtors argue that the bankruptcy court has discretion *not* to compel arbitration when (a) bankruptcy core matters are involved, and (b) arbitration would conflict with the purposes of the Bankruptcy Code. Therefore, this is further reason why the Arbitration Motion should be denied.

### III. Legal Analysis.

#### A. The Federal Arbitration Act and Arbitration Clauses Generally.

The FAA provides that arbitration agreements are always "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[30] Thus, the FAA reflects a liberal federal policy favoring arbitration, and requires arbitration agreements to be rigorously enforced according to their terms.[31] The FAA "expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the

---

[29] *Great Am. Ins. Co. v. Primo,* 512 S.W.3d 890, 893 (Tex. 2017).

[30] 9 U.S.C. § 2.

[31] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

Appellee Appx. 00515
Appx. 10379

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 523 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 637 of 1828 PageID 10130
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 522 of 1803 PageID 11268
Case 18-03078-sgj Doc 239 Filed 04/06/19 Entered 04/16/19 Page 15 of 30

arbitrability of claims should be resolved in favor of arbitration."[32] "There is a strong presumption in favor of arbitration and the party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity."[33]

When considering a motion to compel arbitration, the Fifth Circuit has held there are two threshold questions: (1) whether an arbitration agreement is valid; and (2) whether the dispute falls within the scope of the agreement.[34] To evaluate the enforceability of an arbitration agreement, courts apply the contract law of the state that governs the agreement,[35] whereas the scope of the agreement is a matter of federal substantive law.[36]

## B. Is There a Valid Agreement to Arbitrate that Applies Here and is Still Enforceable?[37]

With respect to the first element—whether a valid agreement to arbitrate exists—federal courts "apply ordinary state-law principles that govern the formation of contracts."[38] Here, the choice of law provisions of the Highland-Acis Agreements state: "This Agreement shall be

---

[32] *Primerica Life Ins. Co. v. Brown,* 304 F.3d 469, 471 (5th Cir. 2002) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)).

[33] *Carter v. Countrywide Credit Indus., Inc.,* 362 F.3d 294, 297 (5th Cir. 2004).

[34] *See Agere Sys. Inc. v. Samsung Elecs. Co. Ltd.*, 560 F.3d 337, 339 (5th Cir. 2009).

[35] *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) (citation omitted).

[36] *Graves v. BP Am., Inc.,* 568 F.3d 221, 222-23 (5th Cir. 2009); *see also Neal v. Hardee's Food Sys., Inc.,* 918 F.2d 34, 37 (5th Cir. 1990) (under federal law, courts "resolve doubts concerning the scope of coverage of an arbitration clause in a contract in favor of arbitration," and arbitration should not be denied "unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue").

[37] The court is assuming, without analysis, that the Chapter 11 Trustee (and the Reorganized Debtors) are bound by the arbitration clauses, if Acis LP affirmatively agreed to be bound by them and would still be bound by them outside of bankruptcy. Case law has stated that a bankruptcy trustee "stands in the shoes of the debtor for the purposes of [an] arbitration clause" and "the trustee-plaintiff is bound by the clause to the same extent as would the debtor." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153 (3d Cir. 1989); *see also Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910 at *6 (N.D. Tex. July 30, 2014) (quoting *Hays*).

[38] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004).

Appellee Appx. 00516
APPX. 10373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 524 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 638 of 1828    PageID 10131
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 523 of 1803    PageID 11269
Case 18-03078-sgj   Doc 236-8   Filed 04/06/19   Entered 04/06/19 21:38:28   Page 16 of 30

governed by the laws of Texas. . . ."[39]  "Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied."[40]  Accordingly, Texas law governs whether the parties are subject to an enforceable agreement to arbitrate.

Here, obviously the parties entered into an agreement to arbitrate in both the Sub-Advisory Agreement (Section 16(f))[41] and the Shared Services Agreement Section 9.14.[42]  And, it would seem to be beyond peradventure that this was, at one time, enforceable between the parties, with regard to any disputes that arose regarding the agreements.  The tricky conundrum here is that those arbitration provisions were deleted in the most recent iterations of the agreements—that is, the March 17, 2017 versions of the agreements.  Highland argues that, since Counts 1-8 involve alleged overcharges under the agreements in years 2013-2016, and alleged fraudulent transfers up to March 17, 2017 (such fraudulent transfers allegedly occurring by virtue of modifications to the agreements that were made up to March 17, 2017), the pre-March 17, 2017 version of the agreements must be applied with respect to these Counts 1-8 and, thus, the arbitration provisions apply.  In other words, what matters is when causes of action *accrue* not when they are ultimately asserted.

The parties have cited a handful of cases to the court, but the one that the court believes is most analogous is the *Coffman v. Provost * Umphrey Law Firm, L.L.P.* case.[43]  In the *Coffman* case,

---

[39] *See, e.g.,* Exh. 1 to Arbitration Motion, § 16(a); Exh. 5 to Arbitration Motion, § 13; Exh. 6 to Arbitration Motion, § 9.05; Exh. 10 to Arbitration Motion, § 8.04(a).

[40] *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

[41] Exhs. 1-4 of the Arbitration Motion.

[42] Exhs. 6-9 of the Arbitration Motion.

[43] *Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720 (E.D. Tex. 2001).

Appellee Appx. 00517
APPX. 10334

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 525 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 639 of 1828   PageID 10132
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 524 of 1803   PageID 11270
Case 18-03078-sgj Doc 23 Filed 04/16/19   Entered 04/16/19 Page 18 of 9 Page 17 of 30

the plaintiff was a former non-equity partner of a law firm and brought a lawsuit against the firm

and its equity partners, alleging *inter alia*, breach of contract, breach of fiduciary duty, violations

of Title VII and/or the Texas Commission on Human Rights Act ("TCHRA"), and violations of

the Equal Pay Act.  The law firm filed a motion to compel arbitration with regard to all of these

claims.  The law firm's motion to compel was based upon various partnership agreements which

governed the law firm.  The original partnership agreement was first effective on August 26,

1986, and the plaintiff did not sign that agreement.  Subsequent to that time, however, the

original partnership agreement was amended and restated on several occasions.  The plaintiff

admitted that she signed four partnership agreement documents:  (1) a Restated Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P.—Effective January 1, 1994 ("1994

Partnership Agreement"); (2) a Restated Partnership Agreement of Provost * Umphrey Law

Firm, L.L.P.—Effective January 1, 1996 ("1996 Partnership Agreement"); (3) an Amendment

No. 1 to the Restated Partnership Agreement of Provost * Umphrey Law Firm, L.L.P., Dated

January 1, 1996—Effective January 1, 1997 ("1996 Amendment No. 1"); and (4) a Partnership

Agreement of Provost * Umphrey Law Firm, L.L.P., As Restated —Effective January 1, 1998

("1998 Partnership Agreement").  The earlier two agreements—*i.e.,* the 1994 and 1996

Partnership Agreements—did *not* contain an arbitration clause. The 1996 Amendment No. 1 and

the 1998 Partnership Agreement, on the other hand, both contained an identical arbitration clause

as follows:

> Binding Arbitration. The equity partners and non-equity partners shall make a good
> faith effort to settle any dispute or claim arising under this partnership agreement.
> If the equity or non-equity partners fail to resolve a dispute or claim, such equity or
> non-equity partner shall submit the dispute or claim to binding arbitration under the
> rules of the American Arbitration Association then in effect. Judgment on
> arbitration awards may be entered by any court of competent jurisdiction.[44]

---

[44] *Id.* at 723.

Appellee Appx. 00518
APPX. 10373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 526 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 640 of 1828   PageID 10133
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 525 of 1803   PageID 11271
Case 18-03078-sgj   Doc 23-8   Filed 04/16/19   Entered 04/16/19 Page 18 of 30

Additionally, all four of the above-referenced partnership agreements contained an integration clause stating that "[t]his agreement contains the entire agreement . . . and all prior agreements . . . are terminated."[45]

Interestingly, the plaintiff **conceded** that claims she asserted involving the 1996 Amendment No. 1 and the 1998 Partnership Agreement were required to go to arbitration (such claims requested determinations regarding: (1) the enforceability of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (2) breach of the 1996 Amendment No. 1 and the 1998 Partnership Agreement; (3) repudiation; and (4) breach of the duty of good faith and fair dealing). However, the plaintiff disagreed that her remaining claims were also required to go to arbitration and those were: (a) breach of the 1994 and 1996 Partnership Agreements; (b) breach of fiduciary duty; (c) violations of Title VII and/or TCHRA; and (d) violations of the Equal Pay Act. The district court granted in part and denied in part the motion to compel arbitration, holding that: (1) the plaintiff's contract claims arising under **earlier** partnership agreements, which **did not** contain arbitration clauses, were **not arbitrable**; (2) a common law breach of fiduciary duty claim was arbitrable under the agreements (it appears that these claims arose after the 1996 Amendment No. 1 and 1998 Partnership Agreement); and (3) statutory sex-based discrimination claims were not arbitrable under the agreements.[46]

Relevant to the case at bar, the *Coffman* court noted, first, that the conduct underlying the alleged breaches of the 1994 and 1996 contracts occurred at a time when no arbitration clause was in effect. The plaintiff's complaint specifically alleged that, during the time the four

---

[45] *Id.*

[46] *Id.* at 733.

Appellee Appx. 00519
APPX. 10334

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 527 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 641 of 1828 PageID 10134
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 526 of 1803 PageID 11272
Case 18-03078-sgj Doc 236-3 Filed 04/03/19 Entered 04/16/19 Page 20 of Page 19 of 30

agreements were in effect, the law firm failed to properly calculate Plaintiff's compensation, failed to promote her, and deprived her of benefits from a tobacco case. The court noted that, if the law firm did participate in such conduct during the time that the 1994 and 1996 Partnership Agreements were in effect, such conduct could not have "arisen under" the 1996 Amendment No. 1 or the 1998 Partnership Agreement *because those agreements did not even exist at that time*. But, to the extent that the conduct Plaintiff complained of occurred when the 1996 Amendment No. 1 and the 1998 Partnership Agreement were in effect, her claims would be subject to arbitration.[47]

The court further noted that the arbitration clause should not be interpreted as covering the plaintiff's claims for breach of the 1994 and 1996 Partnership Agreements because the plain grammatical language of the arbitration clause gave no indication that it would apply retroactively. "To interpret the arbitration clause to apply retroactively would cause Plaintiff to forego her vested right to litigate an accrued claim."[48]

---

[47] *Id.* at 726 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (arbitration provision in 1994 shipping agreement did not cover conduct that occurred under prior shipping agreements); *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965) (claim based on conduct which had arisen "prior to" effective date of arbitration clause was not within scope of arbitration agreement); *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 533-34 (E.D.Va. 1999) (arbitration clause in fourth contract did not cover conduct that occurred when third contract was in effect); *Connett v. Justus Enters. of Kansas, Inc.*, Civ. A. No. 87–1739–T, 1989 WL 47071, at *2 (D. Kan. March 21, 1989) (arbitration clause did not apply when alleged fraudulent conduct occurred before plaintiff executed contract with arbitration clause); *George Wash. Univ. v. Scott*, 711 A.2d 1257, 1260-61 (D.C. Ct. App. 1998) (conduct that occurred before arbitration clause took effect was not arbitrable).

[48] *Coffman*, 161 F. Supp. 2d at 726-27 (citing *Sec. Watch*, 176 F.3d at 372–73 (arbitration clause did not reach disputes arising under earlier agreements because it is "nonsensical to suggest that [the plaintiff] would abandon its established right to litigate disputes arising under the [prior] contracts"); *Choice Sec. Sys. v. AT&T Corp*, No. 97-1774, 1998 WL 153254, at *1 (1st Cir. Feb.25, 1998) (arbitration clause in 1994 contracts did not apply to pre–1994 contracts when the language of the arbitration clause did not indicate "that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements"); *Hendrick*, 50 F. Supp. 2d at 535 (arbitration clause was not retroactive when the text of the clause expressed no language providing that it "reache[d] back in time to require an employee to arbitrate a claim which had accrued before the contract was signed or the [arbitration clause] took effect"); *Connett*, 1989 WL 47071, at *2 (arbitration clause did not apply retroactively when it did not specify that it applied to past conduct); *Kenworth of Dothan, Inc. v. Bruner–Wells Trucking, Inc.*, 745 So.2d 271, 275-76 (Ala. 1999) (arbitration clause was not retroactive when language of the clause did not so state); *George Wash. Univ.*, 711 A.2d at 1261 (arbitration clause was not retroactive when "the arbitration clause itself contained no indication whatsoever that its terms would apply . . . before [its effective date]").

Appellee Appx. 00520
APPX. 10333

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 528 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 642 of 1828   PageID 10135
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 527 of 1803   PageID 11273
Case 18-03078-sgj   Doc 396   Filed 04/01/19   Entered 04/16/19 Page 22 of Page 20 of 30

Bottom line, the court in *Coffman* seemed to focus on **when each cause of action accrued** and looked to the **agreement that governed at such time**.  This court agrees with that reasoning and sees no reason why the result should be different in the case at bar, simply because the arbitration clauses in the case at bar were in **earlier** versions of the Sub-Advisory and Shared Services Agreements as opposed to being in the **later** versions of those agreements (in other words, the opposite sequence as in the *Coffman* case).

The Reorganized Debtors have cited a couple of cases that they believe justify a determination that there is no binding arbitration clause in the case at bar.  One is the case of *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*[49]  This case involved a motion to compel arbitration that was denied (which denial was affirmed by the Fifth Circuit).  Like the case at bar, it involved a situation where there had been a succession of agreements, with earlier agreements containing arbitration provisions and the last agreement containing no arbitration clause.  Specifically, in the *Goss-Reid* case, there were three agreements that were relevant.  First, a **Franchise Agreement** between a franchisor named Transformational Technologies, Inc. ("TTI") and a party named Rittenhaus-Tate Organization ("RTO").  RTO was a business owned by Tracy Goss and Sheila Reid.  The Franchise Agreement, among other things, provided that RTO's owners Tracy Goss and Sheila Reid would be "licensed franchisees of TTI" and would have use of certain of TTI's intellectual property.  During the term of the Franchise Agreement, Tracy Goss and Sheila Reid developed certain consulting services technology they called "The Winning Strategy" and it apparently was built off of TTI's intellectual property.  This first agreement contained a mandatory arbitration provision.  Second, there was a **License**

---

[49] *Goss-Reid & Assocs. Inc. v. Tekniko Licensing Corp.*, 54 Fed. Appx. 405 (5th Cir. 2002) (per curium opinion which is designated as having no precedential effect).

Appellee Appx. 00521
APPX. 10338

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 529 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 643 of 1828   PageID 10136
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 528 of 1803   PageID 11274
Case 18-03078-sgj Doc 23-8 Filed 04/03/19   Entered 04/03/19 Page 22 of Page 21 of 30

**Agreement** between the apparent successor-in-interest of TTI called Tekniko, Inc., on the one

hand, and Tracy Goss, Sheila Reid and Goss-Reid & Associates, Inc. (collectively, "Goss/Reid"),

on the other, pursuant to which Goss/Reid obtained a "a non-exclusive license to use the same

intellectual property covered by the Franchise Agreement." This second agreement also

contained a mandatory arbitration agreement. Third, there was a **Transfer Agreement** that

appears to have been entered into by the same parties as the second agreement (Tekniko, Inc. and

Goss/Reid). The Transfer Agreement "permanently transferred [to Goss/Reid] the non-exclusive

right to use the intellectual property that was the subject of the prior agreements in exchange for

a percentage of [Goss & Reid's] adjusted gross profits for that year." There was no arbitration

provision in this third agreement and the agreement did not adopt or refer to the arbitration

provisions contained in the earlier agreements. The third agreement stated that it constituted "an

amendment to the License Agreement . . . between you and this company ('TEKNIKO'),

supersedes all prior agreements between you and TEKNIKO and, except as provided below, will

terminate your rights and those of TEKNIKO under the License Agreement."

At some subsequent time, Goss/Reid filed a lawsuit alleging improper use of "The

Winning Strategy" by the entities Tekniko Licensing Corporation and Landmark Education

Company. These Defendants (hereafter so called) asserted ownership themselves of "The

Winning Strategy" based on the Franchise Agreement. The Defendants—citing to the arbitration

clauses in both the Franchise Agreement and the License Agreement—filed a motion to compel

arbitration, which was denied at the district court level and also at the Fifth Circuit. The district

court determined that New York law applied (*i.e.,* the Transfer Agreement was governed by New

York law and apparently the parties agreed that New York law applied), and that the Transfer

Agreement constituted a novation and extinguished the arbitration provisions of the previous

Appellee Appx. 00522
APPX. 10339

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 530 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 644 of 1828   PageID 10137
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 529 of 1803   PageID 11275
Case 18-03078-sgj Doc 22 396 75 8d 04 06364    Fi te d 1/04/16 61 9 P5 ge 22 3of P1 age 22 of 30

agreements.  On appeal, the Fifth Circuit stated that the issue before it was "whether the

arbitration provisions of the Franchise and License Agreements were superseded by the Transfer

Agreement.  Thus, the question before us is one of contractual interpretation."[50]

The Fifth Circuit stated certain principles that apply under both New York and Texas

law.  Among other principles, the Fifth Circuit noted that courts construing contracts "should

strive to give effect to the intentions of the parties, as expressed in the terms of the contract."[51]

The Transfer Agreement stated that "it supersedes all prior agreements" between Goss/Reid and

the predecessor-in-interest of one of the Defendants, Tekniko Licensing Corporation.[52]  "This

type of agreement clearly constitutes a novation under New York law."[53]  The court also noted

that it was not appropriate to consider any extrinsic or parol evidence, since there was no

ambiguity in the Transfer Agreement.  The court further stated that "[t]he only potential

ambiguity raised by the Defendants is that the Transfer Agreement refers to itself as an

'amendment to the License Agreement.'  Read as a whole, however, the Transfer Agreement

plainly manifests an intention to supersede all prior agreements between the parties and, except

as specifically provided, to terminate all rights and obligations under the License Agreement."[54]

The other case that the Reorganized Debtors have significantly relied upon to justify a

determination that there is no binding arbitration clause in the case at bar is *Valero Energy Corp.*

*v. Teco Pipeline Co.*[55]  In *Valero*, there had been numerous agreements entered into over time

---

[50] *Id.* at *1.

[51] *Id.*

[52] *Id.*

[53] *Id.* (citing various New York state court cases).

[54] *Id.* at *2.

[55] *Valero Energy Corp. v. Teco Pipeline Co.,* 2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Appellee Appx. 00523
APPX. 10386

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 531 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 645 of 1828 PageID 10138
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 530 of 1803 PageID 11276
Case 18-03078-sgj Doc 1123 Filed 04/16/19 Entered 04/16/19 Page 23 of Page 23 of 30

amongst the litigating parties, all of which involved gas pipelines and transportation rights, and those various agreements were not amendments or restatements of one initial agreement. Rather, there was an Operating Agreement, there were documents that were alleged to create a joint venture or partnership, a Purchase Agreement, an Ownership Agreement, a Transportation Agreement, and a couple of Settlement Agreements entered into later when various disputes arose. One of the key agreements, the so-called Operating Agreement, contained an arbitration clause. When party Teco Pipeline sued party Valero and other related parties, Valero moved to compel arbitration, arguing that the litigation was subject to the arbitration clause in the Operating Agreement. The trial court denied Valero's motion, but the court of appeals reversed.

Teco had argued that the claims it was asserting were not based on the Operating Agreement that contained the arbitration clause but, even if they were, a later Settlement Agreement essentially redefined the parties' relationship—essentially superseding the parties' relationship that had been set forth in the numerous prior agreements—and it did not have an arbitration clause. Rather the Settlement Agreement stated that:

> Each party irrevocably consents and agrees that any legal action, suit or proceeding against any of them with respect to their obligations, liabilities, or any other matter under or arising out of or in connection with this Agreement may be brought in the United States District Court for the Western District of Texas, San Antonio Division, or in the courts of the State of Texas, and hereby irrevocably accepts and submits to the jurisdiction of each of the aforesaid court in personam, generally and unconditionally with respect to any such action, suit or proceeding for itself and in respect of its properties, assets and revenues.[56]

Teco asserted that the quoted clause provided for the procedure to be used in future disputes, *i.e.,* that the parties would go through judicial channels, not arbitration. Teco also asserted that the intent to revoke the arbitration clause was signified by a typical merger clause contained in the

---

[56] *Id.* at 587.

Appellee Appx. 00524
Appx. 10339

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 532 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 646 of 1828   PageID 10139
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 531 of 1803   PageID 11277
Case 18-03078-sgj Doc 22-8 Filed 04/16/19 Entered 04/16/19 Page 23 of Page 24 of 30

Settlement Agreement.  The appeals court disagreed with Teco's argument and determined arbitration was required.  First, the court determined that the provision regarding litigation applied only to disputes arising under the Settlement Agreement not the previously executed Operating Agreement, Purchase Agreement, Ownership Agreement, or Transportation Agreements.  There was nothing to indicate that all the terms of those previous agreements had been superseded by the Settlement Agreement.  In fact, it appeared that only select terms of the earlier agreements were being modified.  Significantly, the Settlement Agreement referred to an "Amendment No. 1" to the Operating Agreement being attached as an Exhibit D to the Settlement Agreement—suggesting that it remained in intact (except for the amendment attached).  Moreover, there was a post-Settlement Agreement letter submitted into evidence stating that the prior Operating Agreement and arbitration provision were still in effect.  The court addressed many other arguments made by Teco and, in the end, found nothing had superseded or otherwise revoked the prior arbitration clause.

This bankruptcy court does not consider the *Valero* or *Goss-Reid* cases to be dispositive of the situation in the case at bar.  Those cases clearly dealt with a myriad of agreements—for example, in *Valero*, one key agreement had an arbitration clause, and an allegedly superseding Settlement Agreement (with no arbitration clause) was determined not to have been intended to supersede or replace the agreement with the arbitration clause.  In *Goss-Reid*, there were also a myriad of agreements (*i.e.,* a franchise agreement, a license agreement and then a transfer agreement), and the last one containing no arbitration clause was held to have been a novation of the prior agreements.   In *Valero* and *Goss-Reid*, the various agreements were not amendments or restatements of one initial agreement.  The case at bar is more analogous to the *Coffman* case (involving amendments and restatements of an initial agreement) and the logic of that holding

Appellee Appx. 00525
APPX. 10392

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 533 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 647 of 1828 PageID 10140
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 532 of 1803 PageID 11278
Case 18-03078-sgj Doc 239-6 Filed 04/06/04 Entered 04/16/19 Page 25 of Page 25 of 30

seems sound to apply here—especially given the fact that there is nothing in the March 17, 2017

version of the agreements that suggests that the agreement to submit disputes to litigation in

Texas and the deletion of the arbitration clauses should be applied retroactively. The court

believes it should look at when a cause of action accrued and determine if there was a binding

arbitration clause between the parties at that time in the governing version of the agreement.

Thus, the court determines that there were valid arbitration agreements that applied to all

disputes arising out of the Sub-Advisory Agreement and Shared Services Agreement—to the

extent that those disputes involved conduct prior to March 17, 2017. Since Counts 1-8 involve

conduct prior to March 17, 2017, Counts 1-8 fall within the scope of the arbitration agreements

in the Sub-Advisory Agreement and Shared Series Agreement.

**C.   But Wait, this is Bankruptcy and Core Matters and a Proof of Claim Objection are Involved.**

The analysis does not end here. Yes, there is an otherwise valid, binding arbitration

clause that was contained in each of the Sub-Advisory and Shared Services Agreements (prior to

March 17, 2017). And, yes, Counts 1-8 involve conduct and disputes arising under these pre-

March 17, 2017 agreements. But what about the fact that these disputes arise in an adversary

proceeding that involves mostly, if not entirely, "core" matters (*e.g.,* Counts 5-25 are all

fraudulent transfers or preference claims under Section 544,[57] 547,[58] or 548;[59] Count 2 is a

Section 542 turnover request;[60] Count 26 is a request for Section 550 recovery[61])? And what

---

[57] *See* 28 U.S.C. § 157(b)(2)(H).

[58] *See* 28 U.S.C. § 157(b)(2)(F).

[59] *See* 28 U.S.C. § 157(b)(2)(H).

[60] *See* 28 U.S.C. § 157(b)(2)(E).

[61] *See* 28 U.S.C. § 157(b)(2)(F) & (H).

Appellee Appx. 00526
APPx. 10393

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 534 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 648 of 1828   PageID 10141
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 533 of 1803   PageID 11279
Case 18-03078-sgj Doc 239 Filed 04/16/19 Entered 04/16/19 Page 27 of Page 26 of 30

about the fact that Highland (the counter-party to the Sub-Advisory and Shared Services

Agreement who has asked for enforcement of the arbitration clauses in those agreements) has

filed proofs of claim?[62]  And what about the fact that Counts 1-8 (as with every count in the

Adversary Proceeding) are all urged to be ***offsets*** to Highland's proofs of claim?[63]  Highland's

proofs of claim are based on the post-March 17, 2017 versions of the Sub-Advisory and Shared

Services Agreements (*i.e.,* the versions that have no arbitration clauses).  Highland has not

argued that its proofs of claim are subject to arbitration (likely because they are governed by the

post-March 17, 2017 versions of the Sub-Advisory and Shared Services Agreements).  But,

again, Highland argues that Counts 1-8 must be sent to arbitration, and the Reorganized Debtors

argue that each of these counts present potential offsets to Highlands' proofs of claim.  As a

reminder, these counts are:

**COUNT 1**:    Declaratory Judgment of Ultra Vires Acts by Acis LP in Violation of the LPA
(Highland allegedly overcharged expenses by $7M+ (*i.e.*, excessive fees) under
the Sub-Advisory and Shared Services Agreements).

**COUNT 2**:    Turnover of Property of the Estate Under § 542 for Unauthorized Overpayments
(turnover the $7M+ overcharged).

**COUNT 3**:    Money Had and Received for Overcharges and Unauthorized Overpayments
(again, seeking redress for the $7M+ overcharged—implicating the Sub-Advisory
Agreement and Shared Services Agreement).

**COUNT 4**:    Conversion for Unauthorized Overpayments (again, seeking redress for the $7M+
overcharged implicating the Sub-Advisory Agreement and Shared Services
Agreement).

**COUNT 5**:    Actual Fraudulent Transfer under § 548 related to the Sub-Advisory Agreement
(modifications to the Sub-Advisory Agreement in subsequent iterations were
allegedly fraudulent transfer, as were payments thereunder).

---

[62] *See* 28 U.S.C. § 157(b)(2)(B).

[63] *See* 28 U.S.C. § 157(b)(2)(C).

Appellee Appx. 00527
APPX. 10394

**COUNT 6**:    Actual Fraudulent Transfer Under TUFTA, § 24.005(a)(1) related to the Sub-Advisory Agreement (same theory as Count 5, asserted through section 544 of the Bankruptcy Code).

**COUNT 7**:    Constructive Fraudulent Transfer Under § 548(a)(1)(B) related to the Sub-Advisory Agreement (same facts as Count 5 only constructive not actual fraud).

**COUNT 8**:    Constructive Fraudulent Transfer Under TUFTA §§ 24.005(a)(2) and 24.006(a) related to the Sub-Advisory Agreement (same facts as Count 5, only constructive fraud under TUFTA, and asserted through section 544 of the Bankruptcy Code).

Thus, to recap, *five of the eight counts that Highland wants arbitrated* (Counts 2, and 5-8) clearly involve statutory core matters.[64]   Moreover, *all* of the counts in the Adversary Proceeding are asserted *defensively* to two proofs of claim—meaning *all eight counts that Highland wants arbitrated* (even Counts 1, 3, and 4) have transformed into statutory core matters.[65]   Does this matter?  This court believes yes.

The Fifth Circuit has shed some light on this topic in the cases of *In re Gandy* and *In re National Gypsum*.[66]  In those cases, the Fifth Circuit instructed that a bankruptcy court may decline to enforce arbitration clauses when it finds:  (a) the underlying nature of the proceeding

---

[64] *See* 28 U.S.C. § 157(b)(2)(E), (F), and (H).

[65] *See* 28 U.S.C. § 157(b)(2)(C).  This court realizes that, from a *Stern v. Marshall* perspective, 131 S. Ct. 2594 (2011), being a *statutory* "core" matter does not necessarily mean a bankruptcy court has Constitutional authority to issue final orders or judgments in the matter.  However, even if this *Stern* pronouncement has any relevance, when evaluating an arbitration clause/right, the court perceives that the various counterclaims here (*i.e.*, all 35 counts) are likely *inexplicably intertwined* with the Highland proofs of claim, such that the bankruptcy court would likely have Constitutional authority to adjudicate them.  While Highland's proofs of claim merely seek payment for services under the post-March 17, 2017 versions of the agreements—which is *after* the time frame that Counts 1-8 implicate—it is not so simple as dividing claims and counterclaims into discreet time periods.  For one thing, the Reorganized Debtors argue that modifications to the Sub-Advisory and Shared Services Agreements that increased fees that Highland could charge (and that Highland is now seeking in its proofs of claim) were tantamount to fraudulent transfers.  Thus, how does one evaluate the proofs of claim separately from this argument?  Additionally, Highland *has asserted unliquidated indemnification claims* in its proofs of claim that presumably reach back to earlier iterations of the Sub-Advisory and Shared Services Agreement (meaning that claims ultimately awarded to the Reorganized Debtors under earlier versions of the agreements might result in indemnification claims being asserted back against them by Highland relating to those very claims).  The point being that all of Highland's assertions in its proofs of claim seem inextricably intertwined with all the Counts in the Adversary Proceeding.

[66] *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489 (5th Cir. 2002); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997).

Appellee Appx. 00528

APPX. 10393

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 536 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 650 of 1828    PageID 10143
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 535 of 1803    PageID 11281
Case 18-03078-sgj Doc 22 Filed 04/08/19    Entered 04/16/19 Page 28 of 30

derives from the provisions of the Bankruptcy Code; and (b) that enforcement of the arbitration

provision would conflict with the purposes/goals of the Bankruptcy Code.[67]  Some

purposes/goals of the Code that might support a denial of arbitration, include: (1) the equitable

and expeditious distribution of assets of the Debtor's estate; (2) centralized resolution of pure

bankruptcy issues; (3) protection of creditors and reorganizing debtors from piecemeal litigation,

and (4) the undisputed power of a bankruptcy court to enforce its orders.[68]

The *In re Gandy* opinion from the Fifth Circuit is worthy of discussion here.  In *Gandy*,

an individual Chapter 11 debtor had first, prepetition, filed a state court lawsuit against various

business partners, asserting causes of action against them for making transfers out of a

partnership affecting her ownership interests, and the causes of action included breach of

contract, negligence, breach of fiduciary duty, fraud and constructive trust.  There was an

arbitration clause in the applicable partnership agreement and the state court granted a motion to

compel arbitration.  Then, the debtor filed a Chapter 11 case and removed the state court lawsuit

to the bankruptcy court and filed new claims under sections 544, 548, 550, civil "RICO," and

alter ego in a separate adversary proceeding, and requested substantive consolidation.  The

bankruptcy court granted consolidation of the two actions and then the defendants filed a motion

to compel arbitration.  The bankruptcy court denied the motion, after finding that the debtor was

essentially seeking avoidance of fraudulent transfers.  The Fifth Circuit affirmed the bankruptcy

court's refusal to enforce an arbitration clause contained in the underlying partnership

agreement.  The court agreed with the bankruptcy court that the complaint essentially—more

than anything else—sought avoidance of fraudulent transfers, and the court not only determined

---

[67] *Id.* at 1069.

[68] *Id.*

Appellee Appx. 00529
APPX. 10336

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 537 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 651 of 1828    PageID 10144
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 536 of 1803    PageID 11282
Case 18-03078-sgj Doc 23 Filed 04/03/19  Entered 04/16/19 Page 330 of Page 29 of 30

that such rights derived from the Bankruptcy Code (fully acknowledging the fact that there were

state law tort claims and breach of contract also asserted) but also—in looking at whether

enforcing the arbitration clause would conflict with the purposes of the Bankruptcy Code—noted

that one central purpose of the Bankruptcy Code is the expeditious and equitable distribution of

the assets of a debtor's estate.  The court thought the avoidance actions predominated over the

"peripheral" contract and tort claims and, in such a circumstance, "the importance of the federal

bankruptcy forum provided by the Code is at its zenith."[69]  The court stated that "[s]ome of the

purposes of the Code we mentioned in *National Gypsum*[70] as potentially conflicting with the

Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to

protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of

the bankruptcy court to enforce its own orders."[71]

   This court believes, like the court in *Gandy*, that this Adversary Proceeding—more than

anything else—seeks avoidance of fraudulent transfers.  Such avoidance theories derive from the

Bankruptcy Code.  Sections 542, 547, 548 and 550 of the Bankruptcy Code are front and center,

as are the "strong arm" powers of section 544(a).  Enforcing the arbitration clause here would

conflict with the purposes of the Bankruptcy Code—one of the central purposes of which is the

---

[69] *Gandy,* 299 F.3d at 497.

[70] In the *National Gypsum* case, an asbestos litigation trust created under a confirmed plan filed a post-confirmation adversary proceeding against debtor's liability insurer, seeking a declaratory judgment that the plan had discharged its obligations to the insurance company.  The insurance company, in response to the litigation, sought to exercise its rights to seek arbitration under a certain agreement.  The Fifth Circuit, in affirming the lower courts' refusal to compel arbitration, stated that, "We believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code."  *Nat'l Gypsum Co.*, 118 F.3d at 1067.  Because the debtor sought to bar the insurance company's actions either by invoking section 524(a)'s discharge injunction or by invoking the terms of a confirmed plan, the proceeding derived entirely from the provisions of the Bankruptcy Code, and, hence, the *National Gypsum* court would not send the dispute to arbitration.

[71] *Gandy*, 299 F.3d at 500.

Appellee Appx. 00530
APPX. 10397

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 538 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 652 of 1828   PageID 10145
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 537 of 1803   PageID 11283
Case 18-03078-sgj Doc 183-8 Filed 04/06/21   Entered 04/06/21 Page 32 of Page 30 of 30

expeditious and equitable distribution of the assets of a debtor's estate.  The avoidance actions in

this Adversary Proceeding predominate over all other counts and, in such a circumstance, "the

importance of the federal bankruptcy forum provided by the Code is at its zenith."  Arbitrating

Counts 1-8 would seriously jeopardize the Adversary Proceeding because they are an integral

part of determining Highland's proofs of claim and the other core counts in the Adversary

Proceeding.  The bankruptcy court's quintessential duties are to adjudicate proofs of claim and to

provide a central forum for litigation, whenever feasible and jurisdictionally sound.  Indeed, in

*Gandy*, the Fifth Circuit noted that when a proof of claim is filed, one of the "peculiar powers" of

the bankruptcy court has been invoked and the nature of estate claims becomes "different from

[their] nature . . . following the filing of a proof of claim."[72]

In summary, this court believes it has discretion under established Fifth Circuit authority

to decline to order arbitration here.[73]  It is, therefore,

**ORDERED** that the Arbitration Motion is **DENIED**.

#### #### END OF MEMORANDUM OPINION AND ORDER####

---

[72] *Id.* at 499 (citing *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).

[73] *See also Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 389-90 (2d Cir. 2018) (in proceeding
involving whether section 524 discharge was violated by credit card company whose agreement with debtor
contained arbitration clause, Second Circuit held that bankruptcy court had discretion to decline to enforce the
arbitration agreement; Second Circuit engaged in a particularized inquiry into the nature of the claim and the facts of
the specific bankruptcy and determined that arbitrating claims for violations of the 524 injunction would "seriously
jeopardize a particular core bankruptcy proceeding" because: "(1) the discharge injunction is integral to the
bankruptcy court's ability to provide debtors with a fresh start, (2) the claim relates to an ongoing matter with
continuing court supervision, and (3) the equitable powers of the court to enforce its own injunctions are central to
the structure of the Code.").

Appellee Appx. 00531
APPX. 10396

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 539 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 653 of 1828 PageID 10146
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 538 of 1803 PageID 11284

## <u>CERTIFICATE OF SERVICE</u>

I, Elliot Bromagen, certify that I am not less than 18 years of age, and that service of the foregoing was caused to be made on November 1, 2019, in the manner indicated on the parties on the attached service list.

Date:  November 1, 2019                    _/s/ Elliot Bromagen_____
                                           Elliot Bromagen

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 540 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 654 of 1828 PageID 10147
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 539 of 1803 PageID 11285

Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 2 of 7

**HAND DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19899 (Courier 19801)

**OVERNIGHT DELIVERY**
([Proposed] Counsel for the Debtor and
Debtor in Possession)
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE 19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE 19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Jose F. Bibiloni, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE 19801

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 541 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 655 of 1828   PageID 10148
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 540 of 1803   PageID 11286
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 3 of 7

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Hunter Mountain Trust)
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
901 North Market Street, Suite 1300
Wilmington, DE  19801

**OVERNIGHT DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX  75201

**OVERNIGHT DELIVERY**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC  20530-0001

**OVERNIGHT DELIVERY**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE  19903

**OVERNIGHT DELIVERY**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE  19904

**OVERNIGHT DELIVERY**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC  20220

**OVERNIGHT DELIVERY**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC  20554

**OVERNIGHT DELIVERY**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA  19103

**OVERNIGHT DELIVERY**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY  10281

**OVERNIGHT DELIVERY**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC  20005-4026

**OVERNIGHT DELIVERY**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA  19101

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 542 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 656 of 1828 PageID 10149
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 541 of 1803 PageID 11287
Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 4 of 7

**OVERNIGHT DELIVERY**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX 75206

**OVERNIGHT DELIVERY**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**OVERNIGHT DELIVERY**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**OVERNIGHT DELIVERY**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**OVERNIGHT DELIVERY**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**OVERNIGHT DELIVERY**
Frontier State Bank
Attn: Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**OVERNIGHT DELIVERY**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

Appellee Appx. 00535
APPX. 003492

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**OVERNIGHT DELIVERY**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**Appellee Appx. 00536**

**APPX. 10493**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 544 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 658 of 1828   PageID 10151
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 543 of 1803   PageID 11289
Case 19-12239-CSS   Doc 86-5   Filed 11/01/19   Page 6 of 7

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

**OVERNIGHT DELIVERY**
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street  NW Suite 1000
Washington, DC 20004-130

**OVERNIGHT DELIVERY**
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC  20005

**OVERNIGHT DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

Appellee Appx. 00537
APPX. 10404

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 545 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 659 of 1828 PageID 10152
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 544 of 1803 PageID 11290
Case 19-12239-CSS Doc 86-5 Filed 11/01/19 Page 7 of 7

**OVERNIGHT DELIVERY**

(Counsel to California Public Employees'
Retirement System ("CalPERS")
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**OVERNIGHT DELIVERY**

(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**OVERNIGHT DELIVERY**

(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**OVERNIGHT DELIVERY**

(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**OVERNIGHT DELIVERY**

(Counsel to Jefferies)
Patrick Maxcy, Esq.
Dentons US LLP
233 South Wacker Drive Suite 5900
Chicago, Illinois 60606-6361

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Bojan Guzina, Esquire
Matthew Clemente, Esquire
Alyssa Russell, Esquire
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Jessica Boelter, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

**OVERNIGHT DELIVERY**

(Proposed Official Committee of Unsecured
Creditors)
Penny P. Reid, Esquire
Paige Holden Montgomery, Esquire
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201

Appellee Appx. 00538
Appx. 03493

# APPENDIX  7

**Appellee Appx. 00539**

**APPX. 10494**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 547 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 661 of 1828   PageID 10154
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 546 of 1803   PageID 11292
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 1 of 4





**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 20, 2018**

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 18-30264-SGJ-7** |
| | § | |
| **Alleged Debtor.** | § | |

_____

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **ACIS CAPITAL MANAGEMENT GP, L.P.,** | § | **CASE NO. 18-30265-SGJ-7** |
| | § | |
| | § | |
| **Alleged Debtor.** | § | |

## ORDER DENYING ALLEGED DEBTORS' JOINT MOTION TO DISMISS THE INVOLUNTARY PETITIONS FILED BY JOSHUA N. TERRY FOR LACK OF SUBJECT MATTER JURISDICTION OR, ALTERNATIVELY, TO COMPEL ARBITRATION[1] [DE ## 72 & 73]

_____

[1] DE ## 72 & 73 in Case No. 18-30264; DE ## 69 & 70 in Case No. 18-30265.

**Appellee Appx. 00540**
**APPX. 10349**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 548 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 662 of 1828   PageID 10155
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 547 of 1803   PageID 11293
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 2 of 4

Late at night on March 19, 2018—on the day before a long-scheduled Trial of an

Involuntary Bankruptcy Petition filed against the above-referenced Alleged Debtors—and

despite the provisions of an Agreed Scheduling Order dated February 26, 2018 (which clearly

contemplated that motions to dismiss, supplements, and other pleadings would have been filed

significantly prior to March 19, 2018)—the Alleged Debtors filed a Joint Motion to Dismiss the

Involuntary Petitions filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or,

Alternatively, Motion to Compel Arbitration (the "Motions to Dismiss/Compel"),[2] and a

supplement thereto on March 20, 2018.[3]  The Motions to Dismiss/Compel argue a lack of subject

matter jurisdiction, with regard to this court's ability to adjudicate the Involuntary Bankruptcy

Petitions, because allegedly Petitioning Creditor Joshua Terry (the "Petitioning Creditor") lacked

standing to file the Involuntary Bankruptcy Petitions because of an arbitration clause in an

Amended and Restated Agreement of Limited Partnership of ACIS Capital Management, L.P.

(the "Partnership Agreement") dated January 21, 2011, which required parties to the Partnership

Agreement to arbitrate disputes.  The arbitration clause at issue is found at Section 6.12 of the

Partnership Agreement.  The Motions to Dismiss/Compel alternatively argue that this court

should enforce/recognize the arbitration clause and order the parties to arbitrate whether the

above-referenced Alleged Debtors should be in bankruptcy.  The Motions to Dismiss/Compel are

**DENIED** for the following reasons:

---

[2] DE # 74 in Case No. 18-30264; DE # 71 in Case No. 18-30265.

[3] The court will presume that the Alleged Debtors thought that a subject matter jurisdiction argument—and
the fact that courts can consider their subject matter jurisdiction at all times during litigation—warranted their
blatant violation of the Agreed Scheduling Order.  The court will expect a good explanation in court as to why this
subject matter jurisdiction argument was made 47 days after the case was filed, and after a previous answer and
motion to dismiss were filed by the Alleged Debtor, and, of course, in violation of a court order.

Appellee Appx. 00541
APPX. 10340

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 549 of
Case 3:23-cv-00726-S   Document 8-22    Filed 12/29/23    Page 663 of 1828    PageID 10156
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 548 of 1803    PageID 11294
Case 18-30264-sgj11 Doc 75 Filed 03/20/18    Entered 03/20/18 17:26:53    Page 3 of 4

(1) The parties involved here have already arbitrated prepetition.  In fact, it is undisputed that

the Petitioning Creditor obtained an arbitration award that was confirmed with a

judgment in state court.

(2) Section 6.12 of the Partnership Agreement is not applicable because filing an involuntary

bankruptcy case is a *collection remedy* available to creditors with unsecured claims that

are not the subject of a bona fide dispute and whose claims aggregate at least $15,775 in

amount.  It is not a *claim* or *controversy* in and of itself, and is certainly not a claim or

controversy "arising of, relating to or in connection with the [Partnership] Agreement."

(3) Even if Section 6.12 of the Partnership Agreement is applicable, the filing of an

involuntary bankruptcy case, such as in the case at bar, presents a "core" bankruptcy

proceeding and a bankruptcy court has discretion to decline to stay its proceedings in

deference to arbitration where the underlying nature derives exclusively from the

Bankruptcy Code (*i.e.,* is "core") and arbitration conflicts with the purposes of the Code.

Arbitration in the case at bar would irreconcilably conflict with the purposes and goals of

the Bankruptcy Code (including, but not limited to, the goal of centralized resolution of

purely bankruptcy issues, the need to protect creditors and debtors from piecemeal

litigation, and the expeditious and equitable distribution of assets of a debtor's estate).

*See In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1069-70 (5th Cir. 1997) (a bankruptcy court

can deny enforcement of arbitration provisions when it finds either: (1) that enforcement

of the provision would irreconcilably conflict with the Code; or (2) in exercising its

discretion in a core case where the only rights at issue were created by the Code rather

than inherited from pre-petition property of the debtors); *In re Gandy*, 299 F.3d 489, 499-

500 (5th Cir. 2002) (same).

Appellee Appx. 00542
APPX. 10407

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 550 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 664 of 1828   PageID 10157
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 549 of 1803   PageID 11295
Case 18-30264-sgj11 Doc 75 Filed 03/20/18   Entered 03/20/18 17:26:53   Page 4 of 4

**WHEREFORE** the Motions to Dismiss/Compel are **DENIED.**

**###END OF ORDER###**

Appellee Appx. 00543
APPX. 10406

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 551 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 665 of 1828   PageID 10158
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 550 of 1803   PageID 11296

# APPENDIX 8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 552 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 666 of 1828    PageID 10159
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 551 of 1803    PageID 11297
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 1 of 229





CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

_____
**United States Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | |
| | § | **(Jointly Administered Under Case** |
| DEBTORS. | § | **No. 18-30264-SGJ-11)** |
| | § | |
| | § | **Chapter 11** |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING FINAL
APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMING THE THIRD AMENDED
JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL
MANAGEMENT GP, LLC, AS MODIFIED**

On December 11, 12 and 13, 2018, the Court held a hearing (the "Combined Hearing")

to consider (a) final approval of the *Disclosure Statement Pursuant to Section 1125 of the*

*United States Bankruptcy Code with Respect to the Third Amended Joint Plan for Acis Capital*

*Management, L.P. and Acis Capital Management GP, LLC* (the "Disclosure Statement") [Docket

No. 661] and (b) confirmation of the *Third Amended Joint Plan for Acis Capital Management,*

*L.P. and Acis Capital Management GP, LLC* (the "Third Amended Plan") [Docket No. 660], a

**Appellee Appx. 00545**
**Appx. 10112**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 553 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 667 of 1828   PageID 10160
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 552 of 1803   PageID 11298
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 2 of 229

copy of which is attached hereto as **Exhibit "1,"** as modified by (i) the *First Modification to the*

*Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management*

*GP, LLC* (the "First Modification") [Docket No. 693], a copy of which is attached hereto as

**Exhibit "2,"** and (ii) the *Second Modification to the Third Amended Joint Plan for Acis Capital*

*Management, L.P. and Acis Capital Management GP, LLC* (the "Second Modification") [Docket

No. 702], a copy of which is attached hereto as **Exhibit "3,"** as supplemented by the

*Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital*

*Management, LP and Acis Capital Management GP, LLC* [Docket No. 769], a copy of which is

attached hereto as **Exhibit "4,"** filed by Robin Phelan (the "Chapter 11 Trustee"), as Chapter 11

Trustee for Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC

("Acis GP," and together with Acis LP, the "Debtors").  The Third Amended Plan, as modified by

the First Modification and Second Modification (as supplemented), is hereafter referred to as the

"Plan;" *provided that*, as provided in the last sentence of paragraph 13 of this Order, the

schedule of assumed executory contracts attached hereto as Exhibit 5 to this Order replaces, is

substituted for, and supersedes Exhibit B to the Third Amended Plan.  Capitalized terms used in

this Order, unless otherwise specifically defined herein, shall be given the same meaning as in

the Plan and/or the Disclosure Statement.

The Combined Hearing was commenced at the time and date scheduled.  Based on the

testimony, evidence admitted, judicial notice of the records of the Chapter 11 Cases, and the

arguments of counsel, the Court makes this *Findings of Fact, Conclusions of Law, and Order*

*Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan*

*for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified*

("Order").

ACCORDINGLY, IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED

AND ORDERED THAT:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 554 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 668 of 1828 PageID 10161
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 553 of 1803 PageID 11299
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 3 of 229

A.     _Findings and Conclusions_.  All findings of fact or conclusions of law made by the

Court on the record at the Combined Hearing are hereby incorporated in their entirety into this

Order.  All findings of fact contained in the Court's _Findings of Fact and Conclusions of Law in

Support of Orders for Relief Issued After Trial on Contested Involuntary Bankruptcy Petitions_

entered on April 13, 2018 [Docket No. 118] are hereby incorporated in their entirety into this

Order.  The findings and conclusions set forth herein and in the record of the Combined Hearing

constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052

as made applicable herein by Bankruptcy Rule 9014.  To the extent any of the following findings

of fact constitute conclusions of law, they are adopted as such.  To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such.

B.     _Jurisdiction; Venue; Core Proceeding_.  The Court has jurisdiction over these

bankruptcy cases pursuant to 28 U.S.C. sections 157(b) and 1334.  Venue is proper before this

Court pursuant to 28 U.S.C. sections 1408 and 1409.  Final approval of the Disclosure

Statement and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. section

157(b)(2)(A), (L) and (O) over which the Court has exclusive jurisdiction and full constitutional

jurisdiction and authority to enter final orders with respect thereto.

C.     _Eligibility for Relief_.  The Debtors were and are eligible for relief under section

109 of the Bankruptcy Code.[1]

D.     _Commencement and Joint Administration of the Debtors' Cases_.  On January 30,

2018, Joshua N. Terry ("Terry") filed involuntary petitions under chapter 7 of the Bankruptcy

Code against both of the Debtors in the United States Bankruptcy Court for the Northern District

of Texas, Dallas Division (the "Court").  Acis LP's bankruptcy case was assigned Case No. 18-

30264, and Acis GP's bankruptcy case was assigned Case No. 18-30265.  The involuntary

petitions were contested and the Court held a multi-day trial spanning March 21, 22, 23, 27 and

---

[1] Unless otherwise indicated, section references are to the Bankruptcy Code.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 555 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 669 of 1828    PageID 10162
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 554 of 1803    PageID 11300
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 4 of 229

29, 2018.  On April 13, 2018, the Court entered an *Order for Relief in an Involuntary Case* in

both cases [Docket No. 119 in Case No. 18-30264 and Docket No. 114 in Case No. 18-30265].

Diane G. Reed (the "Chapter 7 Trustee") was appointed Chapter 7 Trustee in both cases.  On

motion of the Chapter 7 Trustee, the Court entered an *Order Directing Joint Administration*

[Docket No. 137],[2] which provides for the joint administration of the Debtors' respective

bankruptcy cases under Case No. 18-30264.

       E.     *Conversion of the Debtors' Cases and Appointment of the Chapter 11 Trustee*.

On motion of the Chapter 7 Trustee, the Court entered an *Order Granting Trustee's Expedited*

*Motion to Convert Cases to Chapter 11* [Docket No. 205] on May 11, 2018, converting the

Debtors' bankruptcy cases to cases under chapter 11 of the Bankruptcy Code.  On motion of

Terry, the Court entered an *Order Granting Emergency Motion for an Order Appointing A*

*Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital*

*Management GP, LLC Pursuant to Bankruptcy Code Section 1104(A)* [Docket No. 206] on May

11, 2018, directing the United States Trustee (the "U.S. Trustee") to appoint a Chapter 11

Trustee in the Chapter 11 Cases.  The U.S. Trustee appointed Robin Phelan as Chapter 11

Trustee in the Chapter 11 Cases.  Mr. Phelan's appointment as Chapter 11 Trustee in Acis LP's

case was approved pursuant to an *Order Approving Appointment of Chapter 11 Trustee* [Docket

No. 221] entered by the Court on May 17, 2018 and his appointment as Chapter 11 Trustee in

Acis GP's case was approved pursuant to an *Order Approving Appointment of Chapter 11*

*Trustee* [Docket No. 184 in Case No. 18-30265] entered by the Court on June 12, 2018.

       F.     *No Official Committee of Unsecured Creditors*.  The U.S. Trustee has not

appointed an official committee of unsecured creditors in the Chapter 11 Cases.

       G.     *Claims Bar Date*.   October 15, 2018 was originally fixed as the deadline for all

holders of alleged Claims (except for governmental units) to file proofs of Claim.  However, on

---

[2] Unless otherwise indicated, all references to the "Docket" refer to the Docket in Case No. 18-30264.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 556 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 670 of 1828 PageID 10163
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 555 of 1803 PageID 11301
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 5 of 229

motion of the Chapter 11 Trustee, the Court entered the Bar Date Order on July 9, 2018 [Docket

No. 387]. Pursuant to the Bar Date Order, August 1, 2018 was established as the deadline for

all holders of alleged Claims (except for governmental units) to file proofs of Claim and October

10, 2018 was established as the deadline for governmental units to file proofs of Claim.

H.        *Adequacy of Disclosure Statement*.  The Disclosure Statement contains

"adequate information," as that term is defined in section 1125 of the Bankruptcy Code and

satisfies all requirements of section 1125 of the Bankruptcy Code.

I.        *Solicitation Order Compliance*.  On October 3, 2018, the Chapter 11 Trustee filed

his *Chapter 11 Trustee's Amended Motion for Entry of Order (A) Conditionally Approving

Disclosure Statement; (B) Scheduling Combined Hearing on Final Approval of Disclosure

Statement and Confirmation of Second Amended Joint Plan, and Setting Related Deadlines; (C)

Approving Forms for Voting and Notice; and (D) Granting Related Relief* (the "Conditional

Approval Motion") [Docket No. 622].  The Chapter 11 Trustee filed a *Supplement to Amended

Motion for Entry of Order (A) Conditionally Approving Disclosure Statement; (B) Scheduling

Combined Hearing on Final Approval of Disclosure Statement and Confirmation of Second

Amended Joint Plan, and Setting Related Deadlines; (C) Approving Forms for Voting and

Notice; and (D) Granting Related Relief* (the "Supplement to Conditional Approval Motion")

[Docket No. 646] on October 19, 2018.  The Court conducted a hearing on the Conditional

Approval Motion, as supplemented, on October 24, 2018.  On October 25, 2018, the Court

entered an *Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined

Hearing on Final Approval of Disclosure Statement and Confirmation of Second Amended Joint

Plan, and Setting Related Deadlines, (III) Approving Forms for Voting and Notice, and (IV)

Approving Related Matters* (the "Solicitation Order") [Docket No. 659] granting the Conditional

Approval Motion.  The Conditional Approval Motion was filed in connection with a second

amended plan of reorganization and disclosure statement with respect thereto.  However, for

convenience and ease of review, the modifications to the second amended plan and disclosure

statement with respect thereto, including modifications discussed at the October 24, 2018

hearing, were incorporated into the Third Amended Plan and Disclosure Statement filed on

October 25, 2018.  Consequently, the Solicitation Order approved solicitation of votes on the

Third Amended Plan and distribution of the Disclosure Statement in connection with solicitation

of votes on the Third Amended Plan.  Pursuant to the Solicitation Order, the Court, among other

things: (a) conditionally approved the Disclosure Statement for use in soliciting votes on the

Third Amended Plan; (b) established procedures and deadlines for the solicitation and

submission of votes to accept or reject the Third Amended Plan (the "Solicitation Procedures");

(c) fixed deadlines for objections to final approval of the Disclosure Statement and/or

confirmation of the Third Amended Plan and related briefing deadlines; (d) fixed a deadline for

serving notice of the Combined Hearing; and (e) set the Combined Hearing to commence on

December 11, 2018, at 9:30 a.m., Central Time.  The Solicitation Order approved the following

documents (collectively the "Solicitation Materials") to be served on Creditors entitled to vote on

the Third Amended Plan:

> (i)     the Third Amended Plan;
>
> (ii)    the Disclosure Statement;
>
> (iii)   the Ballots for voting on the Third Amended Plan;
>
> (iv)    the Solicitation Order;
>
> (v)     a Notice (the "Combined Hearing Notice") [Docket No. 667] reflecting the
>         deadlines and other information relating to the Combined Hearing; and,
>
> (vi)    a letter (the "Transmittal Letter") from counsel for the Chapter 11 Trustee.

The Solicitation Order directed the Chapter 11 Trustee to serve the Solicitation Materials on

holders of Claims in Classes 2 and 3 and Subclasses 4A and 4B under the Third Amended

Plan.  The Solicitation Order also authorized the tabulation of Ballots on a consolidated basis.

The Solicitation Order further directed the Chapter 11 Trustee to serve on various parties

defined in the Supplement to Conditional Approval Motion as the "Noteholders," "Highlands" and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 558 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 672 of 1828   PageID 10165
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 557 of 1803   PageID 11303
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 7 of 229

"Notice Parties" certain notices and copies of the following documents (the "Notice-Only Materials"):  the Disclosure Statement, the Third Amended Plan, the Solicitation Order and the Combined Hearing Notice.  The Chapter 11 Trustee has complied with the Solicitation Order, including the Solicitation Procedures contained therein, in all respects.

> J.     *Transmittal and Mailing of Solicitation Materials; Notice*.  Due, adequate, and sufficient notice of the Third Amended Plan, Disclosure Statement and Combined Hearing, together with all deadlines for voting on the Third Amended Plan and for objecting to final approval of the Disclosure Statement and/or confirmation of the Third Amended Plan, has been given to known holders of Claims and Interests and, to the extent required, to all other known parties-in-interest, in compliance with the applicable Bankruptcy Rules and the Solicitation Order, as evidenced by the: (i) Combined Hearing Notice (and Certificate of Service included therewith) filed at Docket No. 667; (ii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Noteholders* (and Certificate of Service included therewith) filed at Docket No. 664; (iii) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Highland Entities* (and Certificate of Service included therewith) filed at Docket No. 665; (iv) *Notice of Solicitation of Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Notice Parties* (and Certificate of Service included therewith) filed at Docket No. 666; and (v) *Certificate of Service* filed at Docket No. 676.  The packages containing the Solicitation Materials, the packages containing the Notice-Only Materials, and all other materials relating in any way to the solicitation process were transmitted and served in substantial compliance with the Solicitation Order and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth in the Solicitation Order, and all other applicable rules, laws and regulations.

> K.     *Adequacy of Solicitation*.  The Chapter 11 Trustee distributed packages containing the Solicitation Materials to the holders of Claims entitled to vote on the Third

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 559 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 673 of 1828 PageID 10166
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 558 of 1803 PageID 11304
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 8 of 229

Amended Plan and sufficient time was prescribed for such holders of Claims to vote on the

Third Amended Plan in substantial compliance with the Solicitation Order and the applicable

provisions of the Bankruptcy Code, the Bankruptcy Rules, the Solicitation Procedures set forth

in the Solicitation Order, and all other applicable rules, laws and regulations. Transmittal and

service were adequate and sufficient, and no further notice is or shall be required. In addition,

holders of Claims not entitled to vote on the Amended Plan, and certain other parties-in-interest,

were provided with certain non-voting materials approved by the Court in compliance with the

Solicitation Order. All procedures used to distribute the Solicitation Materials to holders of

Claims entitled to vote on the Third Amended Plan were fair and conducted in good faith and in

accordance with the Bankruptcy Code, Bankruptcy Rules, the Solicitation Procedures contained

in the Solicitation Order, and all other applicable rules, laws and regulations.

L. _Good Faith Solicitation – Section 1125(e)_. Based on the Record, the Chapter 11

Trustee and Estate Professionals have acted in good faith within the meaning of sections

1125(e) and 1129(a)(3), and in compliance with the applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules, and the Solicitation Order, in connection with all of their respective

activities relating to the solicitation of acceptances of the Third Amended Plan and their

participation in the activities described in section 1125, and are entitled to the protections

afforded by section 1125(e).

M. _Voting Tabulation_. In accordance with the Solicitation Order, on December 3,

2018 the _Tabulation of Ballots in Connection with Confirmation of the Third Amended Joint Plan

for Acis Capital Management, L.P. and Acis Capital Management GP, LLC_ (the "Ballot

Tabulation") [Docket No. 746] was filed and served on all parties that filed a timely objection to

confirmation of the Plan. All procedures used to tabulate the Ballots (which were tabulated on a

consolidated basis) were fair and conducted in accordance with the Solicitation Order, the

Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 560 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 674 of 1828    PageID 10167
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 559 of 1803    PageID 11305
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 9 of 229

N.      _Classes Deemed to Have Accepted or Rejected the Third Amended Plan_.  As
set forth in the Third Amended Plan and Disclosure Statement: (i) Class 1 is unimpaired and is
conclusively deemed to have accepted the Third Amended Plan pursuant to section 1126(f),
and (ii) Class 5, consisting of Interests in the Debtors, is Impaired, but because the Third
Amended Plan provides that holders of Class 5 Interests shall not receive or retain any property
on account of their Interests, Class 5 is conclusively deemed to have rejected the Third
Amended Plan pursuant to section 1126(g).

O.      _Impaired Classes of Creditors Voting to Accept or Reject the Third Amended_
_Plan_.  Based upon the Ballot Tabulation, the Court finds that the following Impaired Classes
have voted on the Third Amended Plan as follows:

(i)      Class 2 (the Terry Partially Secured Claim) voted to accept the Third
Amended Plan as follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $8,060,827.84 100% | 1 100% | $0.00 0.00% | 0 0.00% |

Two Ballots were submitted by Terry in Class 2.  One of the Ballots was based on a proof of
Claim recorded in the Claims Register for Case No. 18-30264 as Claim No. 26-1 and filed by
Terry for the benefit of his IRAs ("Claim No. 26").  Highland filed an objection [Docket No. 522]
on August 17, 2018 seeking an order disallowing Claim No. 26 and striking any vote (on a prior
plan of reorganization) by Terry on account of Claim No. 26.  Although the Ballot Tabulation
reflects the Ballot submitted by Terry on account of Claim No. 26, the Court disregards that
Ballot and does not take it into account in its determination regarding acceptance of the Third
Amended Plan.  The other Ballot submitted by Terry accepted the Third Amended Plan.

(ii)      Class 3 (General Unsecured Claims) voted to accept the Third Amended
Plan as follows:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 561 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 675 of 1828   PageID 10168
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 560 of 1803   PageID 11306
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 10 of 229

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $667,550.00 100% | 2 100% | $0.00 0.00% | 0 0.00% |

Three Ballots were submitted in Class 3.  One of the Ballots was submitted by Jennifer G. Terry.

Such Ballot is based on a proof of Claim recorded in the Claims Register for Case No. 18-30264

as Claim No. 25-1 and filed by Jennifer G. Terry for the benefit of her IRAs and 401k ("Claim

No. 25").  Highland filed an objection [Docket No. 521] on August 17, 2018 seeking an order

disallowing Claim No. 25 and striking any vote (on a prior plan of reorganization) by Jennifer G.

Terry on account of Claim No. 25.  Although the Ballot Tabulation reflects the Ballot submitted

by Jennifer G. Terry on account of Claim No. 25, the Court disregards that Ballot and does not

take it into account in its determination regarding acceptance of the Plan.  The other two Ballots

submitted in Class 3 accepted the Third Amended Plan.

   (iii) Class 4 (Insider Claims) voted to reject the Third Amended Plan as

follows:

| Ballots Accepting | | Ballots Rejecting | |
|---|---|---|---|
| Amount | Number | Amount | Number |
| $0.00 0.00% | 0 0.00% | $4,172,140.38 100% | 1 100% |

  Based on the foregoing, and as evidenced by the Ballot Tabulation, at least one

Impaired Class of Claims (excluding the acceptance by any Insiders of the Debtors) has voted

to accept the Third Amended Plan in accordance with the requirements of sections 1124 and

1126 of the Bankruptcy Code.

  P. *Modifications to the Third Amended Plan*.  The modifications to the Third

Amended Plan set forth in the First Modification, the Second Modification (as supplemented),

and as set forth in this Order constitute non-material or technical changes and do not materially

or adversely affect or change the treatment of any Claims against or Interests in the Debtors

---

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED   PAGE 10 of 46

**Appellee Appx. 00554**
**APPX. 10419**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 562 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 676 of 1828 PageID 10169
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 561 of 1803 PageID 11307
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 11 of 229

under the Third Amended Plan (the "Non-Material Modifications"). The filing of the First

Modification on November 8, 2018 constitutes due and sufficient notice thereof under the

circumstances of these Chapter 11 Cases. The filing of the Second Modification on November

16, 2018 (as supplemented on December 10, 2018) constitutes due and sufficient notice thereof

under the circumstances of these Chapter 11 Cases. The Non-Material Modifications neither

require additional disclosure under section 1125 of the Bankruptcy Code nor re-solicitation of

votes on the Plan under section 1126 of the Bankruptcy Code and Bankruptcy Rules 3018 and

3019. In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all

holders of Claims against the Debtors who voted to accept the Third Amended Plan are hereby

deemed to have accepted the Third Amended Plan as modified consistent with the Non-Material

Modifications. No Holder of a Claim against the Debtors who has voted to accept the Third

Amended Plan shall be permitted to change its acceptance to a rejection as a consequence of

the Non-Material Modifications. The Non-Material Modifications incorporated in the Plan comply

with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

Q. _Bankruptcy Rule 3016_. The Plan is dated and identifies the Chapter 11 Trustee

as the Person submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the

Disclosure Statement satisfied Bankruptcy Rule 3016(b). The Plan provides for the Temporary

Plan Injunction (as defined herein), which constitutes an injunction against conduct not

otherwise enjoined under the Bankruptcy Code. The Plan and Disclosure Statement both

describe in specific and conspicuous language all acts to be enjoined and identify the entities

subject to the Temporary Plan Injunction. Therefore, the Plan and Disclosure Statement satisfy

the requirements of Bankruptcy Rule 3016(c).

R. _Bankruptcy Rule 3017_. The Chapter 11 Trustee has given notice of the

Combined Hearing as required by the applicable provisions of Bankruptcy Rule 3017 and the

Solicitation Order. The materials transmitted and notice given by the Chapter 11 Trustee to

holders of Claims entitled to vote on the Third Amended Plan and the materials transmitted by

Appellee Appx. 00555
APPX. 10442

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 563 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 677 of 1828    PageID 10170
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 562 of 1803    PageID 11308
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 12 of 229

the Chapter 11 Trustee to holders of Interests and other parties-in-interest satisfy the applicable provisions of Bankruptcy Rules 3017(d)-(f) and the Solicitation Order.  Therefore, the requirements of Bankruptcy Rule 3017 have been satisfied.

S. _Bankruptcy Rule 3018_.  The solicitation of votes to accept or reject the Third Amended Plan satisfies Bankruptcy Rule 3018.  The Third Amended Plan was transmitted to all holders of Claims entitled to vote, sufficient time was prescribed for such parties to accept or reject the Third Amended Plan, and the Solicitation Materials used and Solicitation Procedures followed comply with sections 1125 and 1126, thereby satisfying the requirements of Bankruptcy Rule 3018.  Further, the Chapter 11 Trustee filed the Ballot Tabulation in accordance with the provisions of the Solicitation Order.

T. _Burden of Proof_.  The Chapter 11 Trustee, as proponent of the Plan, has the burden of proving the elements of sections 1122, 1123 and 1129 of the Bankruptcy Code by a preponderance of the evidence.  The Court finds that the Chapter 11 Trustee has met each element of such burden with respect to the Plan.

U. _Judicial Notice_.  The Court takes judicial notice of the entire record of proceedings in the Chapter 11 Cases and related adversary proceedings, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Court during the Chapter 11 Cases and related adversary proceedings, including, without limitation, the Combined Hearing.  Any resolutions of objections to final approval of the Disclosure Statement or confirmation of the Plan explained on the record at the Combined Hearing are hereby incorporated by reference.

V. _The Record_.  The record established at the Combined Hearing (the "Record") to support final approval of the Disclosure Statement and confirmation of the Plan includes:

(i)    All documents identified by the Chapter 11 Trustee at the Combined Hearing and all exhibits admitted into evidence at the Combined Hearing, including but not limited to admitted exhibits which are listed on the _Joint_

Appellee Appx. 00556
APPX. 10413

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 564 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 678 of 1828   PageID 10171
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 563 of 1803   PageID 11309
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 13 of 229

*Witness and Exhibit List* [Docket No. 767] filed jointly by the Chapter 11 Trustee, Highland and HCLOF with the Court on December 7, 2018;

(ii)    The Ballot Tabulation;

(iii)    The testimony of witnesses; and

(iv)    The statements and arguments of counsel.

W.    *Objections to Final Approval of Disclosure Statement and Confirmation of Plan*.

The Solicitation Order established November 26, 2018 as the deadline for filing objections to final approval of the Disclosure Statement and/or confirmation of the Plan.  The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order:

(i)    *Objection by Stinson Leonard Street LLP to Debtors' Second Modification to the Third Amended Joint Plan* [Docket No. 720];

(ii)    *Joint Objection of Highland Capital Management, L.P. and Highland CLO Funding, Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket no. 722]; and

(iii)    *Objection of Neutra Ltd. to Final Approval of Disclosure Statement and to Confirmation of the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC* [Docket No. 723].

X.    *Transfer and Vesting of Assets*.  Pursuant to Article VI of the Plan, all Assets shall be transferred to and vested in the Reorganized Debtor as of the Effective Date.  The transfer of the Assets to the Reorganized Debtor pursuant to the Plan is consistent with, and authorized by, section 1123(a)(5)(B) of the Bankruptcy Code and will be fully effectuated through this Order as of the Effective Date without the necessity of any other or further assignment or transfer.

Y.    *Claim Objections and Resolutions*.  Pursuant to the Plan, the Reorganized Debtor has the sole power and exclusive standing and authority to object to any Claim.  Without limiting the generality of the foregoing, the Reorganized Debtor shall have the power:  (i) to

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 565 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 679 of 1828    PageID 10172
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 564 of 1803    PageID 11310
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 14 of 229

object to any Claim on any legal or equitable basis; (ii) to seek subordination of any Claim on

any legal or equitable basis; (iii) to assert any right of setoff or recoupment, including without

limitation, any such right pursuant to section 553 of the Bankruptcy Code; (iv) to assert any and

all Estate Defenses to any Claim, whether legal or equitable, including any affirmative defenses

or any right of setoff; (v) to assert all Estate Claims as a counterclaim against any Claim,

whether arising out of the same or different transactions, both for an affirmative recovery and as

an offset against any such Claim; and (vi) to object to any Claims on the basis of section 502(d).

Vesting such exclusive power and standing in the Reorganized Debtor is reasonable and

appropriate, and is authorized by, and in compliance with, section 1123(b)(3) of the Bankruptcy

Code.

   Z. *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*. The

Plan complies with the applicable provisions of the Bankruptcy Code, as follows:

   (i) *Section 1129(a)(1) – Compliance of the Plan with the Applicable*

*Provisions of the Bankruptcy Code*.  The Plan complies with all applicable provisions of the

Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections

1122 and 1123.

   (a) *Sections 1122 and 1123(a)(1) – Proper Classification*.  The

classification of Claims and Interests in the Plan is proper under the Bankruptcy Code.

Pursuant to sections 1122(a) and 1123(a)(1), the Plan provides for the separate classification of

Claims and Interests into six (6) Classes (Class 1, Class 2, Class 3, Subclass 4A, Subclass 4B

and Class 5), based on differences in the legal nature and priority of such Claims and Interests

(other than Claims for Administrative Expenses, Priority Tax Claims and U.S. Trustee's quarterly

fees, which are not required to be designated as separate Classes pursuant to section

1123(a)(1)).  Based upon the Record, valid business, factual and legal reasons exist for the

separate classification of the various Classes of Claims and Interests created under the Plan,

the classifications were not created for any improper purpose and the creation of such Classes

---

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED   PAGE 14 of 46

**Appellee Appx. 00558**

**Appx. 10443**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 566 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 680 of 1828   PageID 10173
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 565 of 1803   PageID 11311
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 15 of 229

does not unfairly discriminate between or among holders of Claims or Interests.  In accordance with section 1122(a), each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code have been satisfied.

(b)      _Section 1123(a)(2) – Specification of Unimpaired Classes_.  The Plan specifies that Claims in Class 1 are unimpaired under the Plan.  Therefore, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

(c)      _Section 1123(a)(3) – Specification of Treatment of Impaired Classes_.  Other than Class 1, all Classes of Claims and Interests (Class 2, Class 3, Subclass 4A, Subclass 4B and Class 5) are Impaired under the Plan.  The Plan specifies the treatment of each Impaired Class of Claims and Interests under the Plan.  The treatment of Impaired Classes of Claims and Interests is specified in Article IV of the Plan.  Therefore, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

(d)      _Section 1123(a)(4) – No Discrimination_.  The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.  Therefore, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

(e)      _Section 1123(a)(5) – Adequate Means for Plan Implementation_.  The Plan provides for adequate and proper means for the Plan's implementation.  This includes means for implementation set forth in Article VI of the Plan.  Therefore, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

(f)      _Section 1123(a)(6) – Prohibition on Issuance of Non-Voting Securities_.  The Debtors are not corporations.  Therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable.

(g)      _Section 1123(a)(7) – Selection of Officers, Directors and Trustees_.  Under the Plan, Terry shall receive 100% of the equity interests in the Reorganized Debtor.  The

Appellee Appx. 00559
APPX. 10412

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 567 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 681 of 1828    PageID 10174
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 566 of 1803    PageID 11312
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 16 of 229

Plan does not provide for the selection or appointment of any officers or directors of the

Reorganized Debtor as of the Effective Date and Terry, as the sole owner of the Reorganized

Debtor, shall be free to structure the Reorganized Debtor's management as he wishes.

Therefore, to the extent section 1123(a)(7) of the Bankruptcy Code is applicable to the Plan, its

requirements have been satisfied.

(h)    *Section 1123(a)(8) – Payment of Individual Debtor's Earnings*.

The Debtors are not individuals.  Therefore, section 1123(a)(8) of the Bankruptcy Code is

inapplicable.

(i)    *Section 1123(b) – Discretionary Contents of the Plan*.  The Plan

contains various provisions that are properly construed as discretionary and not required for

confirmation of the Plan under the Bankruptcy Code.  As set forth below, all such discretionary

provisions comply with section 1123(b) of the Bankruptcy Code, are not inconsistent with the

applicable provisions of the Bankruptcy Code and are hereby approved.  Therefore, section

1123(b) of the Bankruptcy Code has been satisfied.

(1)    *Section 1123(b)(1) – Impairment / Unimpairment of Claims*

*and Interests*.  The Plan impairs or leaves unimpaired each Class of Claims and Interests.

Therefore, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

(2)    *Section 1123(b)(2) – Assumption / Rejection of Executory*

*Contracts and Unexpired Leases*.  Article XI of the Plan provides that all of the Debtors'

Executory Contracts and Unexpired Leases shall be deemed rejected upon the Effective Date

unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected

pursuant to an order of the Court, (b) is identified in **Exhibit 5** to this Order to be (i) assumed or

(ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the

Confirmation Date.  Therefore, the Plan is consistent with section 1123(b)(2) of the Bankruptcy

Code.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 568 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 682 of 1828   PageID 10175
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 567 of 1803   PageID 11313
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 17 of 229

(3)      *Section 1123(b)(3) – Settlement / Retention of Claims and*

*Causes of Action*.  The Chapter 11 Trustee has delineated the Estate Claims and Estate

Defenses to be retained in the Plan.  The terms "Estate Claims" and "Estate Defenses" are

defined in sections 1.55 and 1.56 of the Plan, respectively, and together include all claims,

causes of action, defenses, affirmative defenses, counterclaims, or offsets held by the Debtors'

Estate.  The identification and retention of the Estate Claims and Estate Defenses in the Plan is

reasonable and appropriate and reflects a proper exercise of the good faith business judgment

of the Chapter 11 Trustee.  Articles VI and IX of the Plan, including Exhibit A to the Plan, contain

a specific and unequivocal reservation of Estate Claims and Estate Defenses as required under

applicable Fifth Circuit authority.  The Estate Claims and Estate Defenses are expressly,

specifically, and unequivocally retained and reserved pursuant to Articles VI and IX of the Plan

(including Exhibit A to the Plan) in accordance with section 1123(b)(3)(B) of the Bankruptcy

Code.  Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and Estate

Defenses are hereby reserved for the benefit of the Reorganized Debtor and the Reorganized

Debtor shall be entitled to file, prosecute and/or settle each of the Estate Claims so reserved in

accordance with the terms of the Plan.  The provisions of the Plan regarding reservation of

Estate Claims and Estate Defenses are appropriate and in the best interests of the Debtors, the

Estate, and holders of Claims and Interests.

(4)      *Section 1123(b)(5) – Modification of Creditors' Rights*.

With the exception of holders of Class 1 Claims, which are unimpaired, the Plan modifies the

rights of all holders of Claims against the Debtors.  Accordingly, the Plan is consistent with

section 1123(b)(5) of the Bankruptcy Code.

(ii)      *Section 1129(a)(2) – Compliance of the Chapter 11 Trustee with the*

*Applicable Provisions of the Bankruptcy Code*.  The Chapter 11 Trustee, as proponent of the

Plan, has complied with all applicable provisions of the Bankruptcy Code as required by section

1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1127 and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 569 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 683 of 1828 PageID 10176
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 568 of 1803 PageID 11314
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 18 of 229

1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019. Votes to accept or reject the Third Amended Plan were solicited after the Court conditionally approved the adequacy of the Disclosure Statement. The Chapter 11 Trustee and his present and former representatives, advisors, attorneys, professionals and agents have solicited and tabulated the votes on the Third Amended Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly and in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code. The Chapter 11 Trustee and his present and former representatives, advisors, attorneys, professionals and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with respect to the offering, issuance and distribution of recoveries under the Plan and, therefore, are not (and on account of such distributions, will not be) liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Third Amended Plan or distributions made pursuant to the Plan, so long as distributions are made consistent with and pursuant to the Plan.

(iii) *Section 1129(a)(3) – Proposal of the Plan in Good Faith*. The Chapter 11 Trustee has proposed the Plan (and all other agreements, documents and instruments necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Court has examined and considered the totality of the circumstances surrounding the formulation of the Plan, including both the Record at the Combined Hearing and the record of the Chapter 11 Cases. The Chapter 11 Trustee's good faith is evident from the facts and Record of the Combined Hearing. The Chapter 11 Trustee proposed the Plan for legitimate and honest purposes.

**Appellee Appx. 00562**
**APPX. 10429**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 570 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 684 of 1828   PageID 10177
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 569 of 1803   PageID 11315
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 19 of 229

(iv)      *Section 1129(a)(4) – Court Approval of Certain Payments as Reasonable*.

All payments made or to be made by the Reorganized Debtor for services or for costs and

expenses in or in connection with the Chapter 11 Cases or in connection with the Plan and

incident to the Chapter 11 Cases, have either been approved by, or are subject to final approval

of, the Court as reasonable.  Notwithstanding anything to the contrary in the Plan, the provisions

of section 3.01(e) of the Plan governing the filing of final fee applications by Estate

Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to

the Chapter 11 Trustee.  Compensation sought by the Chapter 11 Trustee through a final fee

application shall be subject to final approval of the Court as reasonable in accordance with

section 330(a)(3) of the Bankruptcy Code.  Therefore, the requirements of section 1129(a)(4) of

the Bankruptcy Code are satisfied.

(v)      *Section 1129(a)(5) – Disclosure of Identity of Proposed Management,*
*Compensation of Insiders and Consistency of Management Proposals with the Interests of*
*Creditors and Public Policy*.  Under the Plan, Terry, who does not constitute an Insider, shall

receive 100% of the equity interests in the Reorganized Debtor.  The Plan does not provide for

appointment of any officers or directors of the Reorganized Debtor as of the Effective Date and

Terry, as the sole owner of the Reorganized Debtor, shall be free to structure the Reorganized

Debtor's management as he wishes.  Terry's identity and affiliations have been fully disclosed

and, to the extent that Terry serves as an officer of the Reorganized Debtor after confirmation of

the Plan, Terry's appointment to any such role is consistent with the interests of Creditors,

holders of Interests and public policy.  Therefore, the requirements of section 1129(a)(5) of the

Bankruptcy Code are satisfied.

(vi)      *Section 1129(a)(6) – No Rate Changes*.  The Plan does not contain any

rate changes subject to the jurisdiction of any governmental regulatory commissions and will not

require governmental regulatory approval.  Therefore, section 1129(a)(6) is not applicable to the

Chapter 11 Cases.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 571 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 685 of 1828 PageID 10178
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 570 of 1803 PageID 11316
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 20 of 229

(vii)   *Section 1129(a)(7) – Best Interest of Creditors Test*.  The Plan satisfies section 1129(a)(7).  The Liquidation Analysis attached as Exhibit 4 to the Disclosure Statement and the other exhibits and evidence proffered or adduced at the Combined Hearing related thereto: (a) are persuasive and credible; (b) have not been controverted by other evidence; (c) are based upon sound methodology; and (d) conclusively establish that each holder of an Impaired Claim or Interest either (1) has accepted the Plan, or (2) will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

(viii)  *Section 1128(a)(8) – Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of Plan by Each Impaired Class*.  Class 1 is unimpaired under the Plan and is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Classes 2 and 3 are Impaired under the Plan and have voted to accept the Plan.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Class 5 is Impaired under the Plan.  Holders of Class 5 Interests will not receive or retain any property on account of their Interests under the Plan and are therefore conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Notwithstanding the fact that the Plan was not accepted by all Classes of Impaired Claims and Interests, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

(ix)    *Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code*.  The treatment of Allowed Claims for Administrative Expenses and Priority Tax Claims under Article III of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.  Accordingly, the requirements of section 1129(a)(9) are satisfied.

(x)    *Section 1129(a)(10) – Acceptance by at Least One Impaired Class*.  As set forth in the Ballot Tabulation and in this Order, Classes 2 and 3 voted to accept the Plan.  As

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 572 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 686 of 1828    PageID 10179
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 571 of 1803    PageID 11317
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 21 of 229

such, at least one Class of Claims that is Impaired under the Plan has accepted the Plan

without including the acceptance of the Plan by any Insider.  Therefore, the requirements of

section 1129(a)(10) of the Bankruptcy Code have been satisfied.

(xi)    _Section 1129(a)(11) – Feasibility of the Plan_.  The evidence submitted at

the Combined Hearing regarding feasibility, together with all evidence proffered or advanced at

or prior to the Combined Hearing, (a) is persuasive and credible, (b) has not been controverted

by other evidence, and (c) establishes that confirmation of the Plan is not likely to be followed by

the liquidation or the need for further financial reorganization of the Reorganized Debtor.

Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been

satisfied.

(xii)    _Section 1129(a)(12) – Payment of Bankruptcy Fees_.  The Plan provides

that all fees due and payable under 28 U.S.C. section 1930 as of the Confirmation Date will be

paid in full on the Effective Date or as soon thereafter as is practicable, thus satisfying the

requirements of section 1129(a)(12) of the Bankruptcy Code.

(xiii)    _Section 1129(a)(13), (14), (15) and (16) – Non-Applicability_.  The Debtors

do not provide any retiree benefits within the meaning of section 1114, do not owe any domestic

support obligations, are not individuals, and are not non-profit corporations.  Thus, sections

1129(a)(13), 1129(a)(14), 1129(a)(15) and 1129(a)(16) do not apply to the Chapter 11 Cases.

(xiv)    _Section 1129(b) – Confirmation of the Plan Over Non-Acceptance of_
_Impaired Classes_.  Class 4 is Impaired under the Plan and voted to reject the Plan.  Holders of

Class 5 Interests are deemed to have rejected the Plan.  Nevertheless, the Plan may be

confirmed pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that the

requirements of section 1129(a)(8) have not been met because the Chapter 11 Trustee has

demonstrated by a preponderance of the evidence that the Plan (a) satisfies all of the other

requirements of section 1129(a) of the Bankruptcy Code and (b) does not "discriminate unfairly"

and is "fair and equitable" as to each Impaired Class which has not voted to accept (or is

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 573 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 687 of 1828    PageID 10180
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 572 of 1803    PageID 11318
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 22 of 229

deemed to reject) the Plan.  The Plan therefore satisfies the requirements of section 1129(b) of

the Bankruptcy Code and may be confirmed despite the fact that not all Impaired Classes have

voted to accept the Plan.

(xv)    _Section 1129(c) – Only One Plan_.  Other than the Plan (including

previous versions thereof), no other plan has been filed in the Chapter 11 Cases.  Accordingly,

the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

(xvi)    _Section 1129(d) – Principal Purpose of the Plan is Not the Avoidance of_

_Taxes_.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of

application of Section 5 of the Securities Act of 1933 and there has been no filing by a

Governmental Unit asserting any such attempted avoidance.  Therefore, the requirements of

section 1129(d) of the Bankruptcy Code are satisfied.

(xvii)    _Section 1129(e) – Small Business Case_.  Neither of the Chapter 11

Cases is a "small business case," as that term is defined in the Bankruptcy Code and,

accordingly, section 1129(e) is inapplicable to the Chapter 11 Cases.

AA.    _Executory Contracts and Unexpired Leases_.  The Chapter 11 Trustee has

satisfied the provisions of section 365 of the Bankruptcy Code with respect to the assumption

and rejection of the Executory Contracts and Unexpired Leases pursuant the Plan.  The

Chapter 11 Trustee has exercised reasonable business judgment prior to the Combined

Hearing in determining whether to assume or reject each of the Executory Contracts and

Unexpired Leases as set forth in Article XI of the Plan, **Exhibit "5"** to this Order, or otherwise.

Each assumption or rejection of an Executory Contract or Unexpired Lease pursuant to this

Order and in accordance with Article XI of the Plan, or otherwise by order of this Court, shall be

valid, legal, and binding upon the applicable Debtor, Reorganized Debtor, Estate, and all non-

Debtor persons or entities party to such Executory Contract or Unexpired Lease.  Executory

Contracts and Unexpired Leases not previously assumed by order of this Court and which the

Chapter 11 Trustee has determined to assume are identified in **Exhibit "5"** to this Order.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 574 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 688 of 1828   PageID 10181
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 573 of 1803   PageID 11319
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 23 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.

BB.   *Compromise and Settlement*.  The Court finds and concludes that, pursuant to

section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of

the Distributions and other benefits provided under the Plan, the provisions of the Plan

constitute a good faith compromise and settlement of all Impaired Claims and Interests.  Such

settlement and compromise, which was made at arms'-length in exchange for good and

valuable consideration, is in the best interests of the holders of Impaired Claims and Interests, is

within the range of possible litigation outcomes, and is fair, equitable, and reasonable.  Each

element of the compromise and settlement reflected in the Plan is integrated and inexorably

linked.

CC.   *Plan Injunction*.  The Plan Injunction is necessary and appropriate to facilitate the

transactions and distributions to Creditors pursuant to the Plan.  The Plan Injunction constitutes

an essential and integral part of the Plan without which the holders of Claims against the

Debtors could potentially interfere with implementation and performance of the Plan.  The Plan

Injunction protects the best interests of the holders of Allowed Claims and facilitates the efficient

performance of the Plan.  Consequently, the Plan Injunction is appropriate pursuant to sections

105(a) and 1123(a)(5) of the Bankruptcy Code.

DD.   *Temporary Plan Injunction*.  The Temporary Plan Injunction (as defined herein) is

a temporary injunction which provides for the continuation, after the Effective Date, of injunctive

relief the Court previously granted in its *Preliminary Injunction Order* (the "Preliminary

Injunction") [Docket No. 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the

Trustee's Adversary.  The Preliminary Injunction was originally set to expire by its own terms

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 575 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 689 of 1828   PageID 10182
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 574 of 1803   PageID 11320
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 24 of 229

upon confirmation of the Plan, but is extended by this Order through the Effective Date of the Plan. Based on the record of prior proceedings in the Chapter 11 Cases, including in the Trustee's Adversary, and the Record at the Combined Hearing, no grounds have been shown to give the Court reason to reconsider any findings supporting its prior Preliminary Injunction. Furthermore, as set forth below, the Record at the Combined Hearing demonstrates that the four elements required for issuance of injunctive relief are present, the Temporary Plan Injunction is necessary and appropriate in all respects, and it complies with the applicable requirements of the Bankruptcy Rules.

(i)      *Substantial Likelihood of Success on the Merits*.  In the Highland Adversary, the Chapter 11 Trustee has asserted a counterclaim seeking to avoid the prepetition transfer of Acis LP's rights under the ALF PMA (the "ALF PMA Transfer") as a fraudulent transfer under the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act.  Such fraudulent transfer actions seek an equitable remedy and involve claims to specific assets of Highland HCF.  But for the ALF PMA Transfer, HCLOF could not have attempted to direct and effectuate an optional redemption of the Acis CLOs (which it has twice attempted to do postpetition in the Chapter 11 Cases).  The rights transferred in the ALF PMA Transfer appear to have been fraudulently transferred for no apparent value.  The Court found in the Preliminary Injunction, and the Court finds again for purposes of this Order, that the Chapter 11 Trustee has demonstrated a substantial likelihood of success on the merits of his claim to avoid the ALF PMA Transfer as a fraudulent transfer.

(ii)      *Irreparable Harm*.  Revenue to be generated by the Reorganized Debtor under the PMAs is a primary source of funding Distributions to Creditors under the Plan.  Absent the Temporary Plan Injunction, HCLOF will be free to direct an optional redemption before this Court can adjudicate the fraudulent transfer actions with respect to the ALF PMA Transfer.  Such an optional redemption – or similar call or liquidation of the Acis CLOs – would not only render such fraudulent transfer actions moot, but would effectively terminate and destroy all

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 576 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 690 of 1828 PageID 10183
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 575 of 1803 PageID 11321
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 25 of 229

value in the PMAs. This would, in turn, effectively destroy the Reorganized Debtor's ability to perform under the Plan to the detriment of the Reorganized Debtor, Creditors and other parties-in-interest. Consequently, the Reorganized Debtor faces immediate and irreparable harm if the Temporary Plan Injunction is not issued.

(iii)     *Balance of Harms*. The balance of harms weighs in favor of issuing the Temporary Plan Injunction because any alleged harm to HCLOF, Highland or their affiliates is substantially outweighed by the imminent and irreparable harm that would be suffered by the Reorganized Debtor, Creditors and other parties-in-interest if the Temporary Plan Injunction is not issued and an optional redemption, call or other liquidation of the Acis CLOs follows. At a minimum, the Temporary Plan Injunction is appropriate to maintain the status quo pending adjudication of the fraudulent transfer actions with respect to the ALF PMA Transfer. Highland, HCLOF and their affiliates will not suffer any material, recognizable harm if temporarily enjoined from pursuing an optional redemption, call or other liquidation of the Acis CLOs before the Court adjudicates the fraudulent transfer actions concerning the ALF PMA Transfer and thereby determines whether HCLOF has any legitimate right to direct an optional redemption, call or other liquidation of the Acis CLOs in the first instance.

(iv)     *Public Policy*. Public policy favors maximization of a debtor's assets and successful reorganization. Because an optional redemption, call or other liquidation of the Acis CLOs would destroy the value of the PMAs and the Reorganized Debtor's ability to perform under the Plan, issuance of the Temporary Plan Injunction is consistent with public policy. Furthermore, public policy favors disposition of cases on their merits. Absent the Temporary Plan Injunction, HCLOF could be expected to immediately direct an optional redemption, call or other liquidation of the Acis CLOs following confirmation of the Plan, thus rendering the fraudulent transfer actions concerning the ALF PMA Transfer moot. Issuance of the Temporary Plan Injunction will avoid the potential for such fraudulent transfer actions being mooted prior to adjudication of such actions on their merits and is consistent with public policy.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 577 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 691 of 1828    PageID 10184
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 576 of 1803    PageID 11322
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 26 of 229

(v)      _Section 105(a)_.  Section 105(a) empowers this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  The Temporary Plan Injunction is essential to the Reorganized Debtor's ability to perform the Plan and to maintain the status quo during prosecution of the fraudulent transfer actions concerning the ALF PMA Transfer.  The Temporary Plan Injunction is therefore both necessary and appropriate to carry out the provisions of the Bankruptcy Code in the Chapter 11 Cases.

(vi)     _Compliance with Technical Requirements_.  Bankruptcy Rule 3020(c) requires that the Temporary Plan Injunction (a) describe the acts enjoined in reasonable detail; (b) be specific in its terms with regard to the injunction; and (c) identify the entities subject thereto.  The Temporary Plan Injunction satisfies each of these requirements.  The description of acts enjoined is specific and particular and the language of the Temporary Plan Injunction is therefore reasonably detailed.  The Temporary Plan Injunction is also specific in its terms, as its language clearly describes the condition triggering the injunction and the specific events which will serve to terminate it.  The Temporary Plan Injunction also specifically identifies the entities subject to its terms.  Federal Rule of Civil Procedure 65(d)(1), made applicable by Bankruptcy Rule 7065, also requires that the Temporary Plan Injunction be specific in its terms and describe the enjoined acts in reasonable detail.  Federal Rule of Civil Procedure 65(d)(1) further requires that the reasons for issuance of the Temporary Plan Injunction are stated.  The reasons for this Court's issuance of the Temporary Plan Injunction are stated herein.  Therefore, the Temporary Plan Injunction satisfies all requirements of the applicable Bankruptcy Rules.

EE.     _Substantive Consolidation of the Debtors_.  The Court finds and concludes that the substantive consolidation of the Debtors for the purpose of implementing the Plan, including for purposes of distributions under the Plan, is in the best interests of the Debtors, the Estate, and holders of Claims and Interests.  Substantive consolidation recognizes the Debtors' common business purpose and the fact that Acis GP's liability is derived from the liabilities of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 578 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 692 of 1828    PageID 10185
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 577 of 1803    PageID 11323
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 27 of 229

Acis LP based on Acis GP's status as general partner of Acis LP.  The Court further finds that

substantive consolidation of the Debtors constitutes an integral part of the Plan.

FF.    _Retention of Jurisdiction_.  This Court finds and concludes that this Court's

retention of jurisdiction as set forth herein and in the Plan comports with 28 U.S.C. sections 157

and 1334.  Consequently, the Court may properly retain jurisdiction over the matters set forth in

Article XV of the Plan.

GG.    _Implementation of Other Necessary Documents and Agreements_.  All documents

and agreements necessary to implement the Plan are essential elements of the Plan and entry

into and consummation of the transactions contemplated by each of such documents and

agreements is in the best interests of the Debtors, the Estate, and holders of Claims and

Interests.  The Chapter 11 Trustee has exercised reasonable business judgment in determining

which agreements to enter into and has provided sufficient and adequate notice of such

documents and agreements.  The terms and conditions of such documents and agreements

have been negotiated in good faith, at arm's length, are fair and reasonable, and are reaffirmed

and approved.

HH.    _Conditions Precedent to the Effective Date_.  Each of the conditions precedent to

the Effective Date, as set forth in Article XIII of the Plan, has been satisfied or waived in

accordance with the provisions of the Plan, or is reasonably likely to be satisfied or waived.

II.    _Satisfaction of Confirmation Requirements_.  Based upon the foregoing, all other

filed pleadings, exhibits and documents filed in connection with confirmation of the Plan and all

evidence and arguments made, proffered, or adduced at the Combined Hearing, the Plan

satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## <u>ORDER</u>

Based on the foregoing, it is hereby ORDERED:

1.    <u>Findings of Fact and Conclusions of Law</u>.  The above-referenced findings of fact

and conclusions of law are incorporated by reference as though fully set forth herein.  To the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 579 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 693 of 1828    PageID 10186
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 578 of 1803    PageID 11324
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 28 of 229

extent any of the prior findings of fact or conclusions of law constitutes an order of this Court,

they are adopted as such.

2.    <u>Objections to Final Approval of Disclosure Statement and Confirmation of Plan</u>.

To the extent that any of the Objections have not been resolved, withdrawn, waived or settled

prior to entry of this Order or otherwise resolved as stated on the Record of the Combined

Hearing or as set forth in this Order, they are hereby overruled on their merits.

3.    <u>Final Approval of Disclosure Statement</u>.  The Disclosure Statement is hereby

approved on a final basis as containing adequate information as required by section 1125 of the

Bankruptcy Code.

4.    <u>Confirmation of Plan</u>.  All requirements for confirmation of the Plan have been

satisfied.  The Third Amended Plan, as modified by the First Modification and Second

Modification (as supplemented) and as modified herein, is hereby CONFIRMED in accordance

with section 1129 of the Bankruptcy Code, and all terms and conditions set forth in the Plan are

hereby APPROVED.  The terms of the Plan are incorporated by reference into, and as an

integral part of, this Order.

5.    <u>Solicitation and Notice</u>.  Notice of the Combined Hearing complied with the terms

of the Solicitation Order, was appropriate and satisfactory based on the circumstances of the

Chapter 11 Cases and was in compliance with the applicable provisions of the Bankruptcy Code

and the Bankruptcy Rules.  The solicitation of votes on the Third Amended Plan and the

Solicitation Materials complied with the Solicitation Procedures, was appropriate and

satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance

with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

6.    <u>Plan Classification Controlling</u>.  The terms of the Plan shall solely govern the

classification of Claims and Interests for purposes of distributions to be made thereunder.  The

classifications set forth on the Ballots tendered to or returned by the Holders of Claims in

connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 580 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 694 of 1828    PageID 10187
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 579 of 1803    PageID 11325
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 29 of 229

accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding upon the Debtors and the Reorganized Debtor except for voting purposes.

7.    <u>Resolution of Stinson Objection</u>.    Stinson Leonard Street LLP ("<u>Stinson</u>") has asserted a Claim against the Debtors for $158,552.98.  On July 31, 2018, Stinson initially asserted its Claim as an unsecured Claim by filing proof of Claim number 12 in the Acis LP case and proof of claim number 2 in the Acis GP case.  Those Claims represent a single Claim for satisfaction of a total alleged debt of $158,552.89.  All proofs of Claim filed by Stinson will be referred to collectively as the "<u>Stinson Claim</u>."  The Stinson Claim is treated as part of Class 3 under the Plan.  On November 9, 2018, Stinson amended the Stinson Claim to assert a secured Claim based on a possessory lien on legal files belonging to the Debtors.  The Chapter 11 Trustee currently intends to object to the Stinson Claim, including Stinson's claim to secured status.  Stinson filed an Objection to the Plan on November 26, 2018 [Docket No. 720] which was subsequently withdrawn based on this proposed paragraph being included in any Order confirming the Plan.  This paragraph resolves Stinson's Objection as follows:  Notwithstanding any contrary provision of the Plan or this Order, the Stinson Claim, to the extent it is Allowed by a Final Order of the Bankruptcy Court as a Secured Claim, shall be considered a separate class under the Plan and paid by the Reorganized Debtor within thirty (30) days after entry of such Final Order.  To the extent it is an Allowed Secured Claim, the Stinson Claim will be removed from Class 3.  To the extent it is an Allowed General Unsecured Claim, the Stinson Claim will remain a Class 3 Claim.  This recognizes that the Stinson Claim may be allowed as partly secured (*i.e.* only secured to the extent of the value of its collateral) and be paid accordingly. The Chapter 11 Trustee reserves all rights to object to Stinson's proofs of Claim, and Stinson reserves all rights to defend its proofs of Claim.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 581 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 695 of 1828 PageID 10188
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 580 of 1803 PageID 11326
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 30 of 229

8. <u>Plan Implementation</u>.  Upon the Effective Date of the Plan, the Chapter 11

Trustee and the Reorganized Debtor are hereby authorized and directed to take all actions

necessary or appropriate to implement, effectuate or consummate the Plan, the terms of this

Order and the transactions respectively contemplated therein, and to otherwise fully perform

and execute their duties under the Plan or this Order.  Without limiting the generality of the

foregoing, pursuant to section 1142(b) of the Bankruptcy Code, each and every Person

(including, without limitation, the Chapter 11 Trustee, HCLOF, Highland, any and all affiliates of

HCLOF and Highland, the Issuers and Co-Issuers, and the Indenture Trustee), to the extent

necessary, is hereby directed to execute or deliver, or to join in the execution or delivery of, any

instrument required to effect the transfers of property dealt with under the Plan and this Order,

and to perform all other acts necessary for the consummation of the Plan.  Further pursuant to

section 1142(b) of the Bankruptcy Code, to the extent that any Person fails to execute or deliver

any instrument required to effect the transfers of property pursuant to the Plan and this Order,

the Chapter 11 Trustee is hereby authorized to execute and deliver on behalf of any such

Person (including, without limitation, HCLOF, Highland, and any and all affiliates of HCLOF and

Highland) any instrument required to effect the transfers of property pursuant to the Plan and

this Order.  In the event of an appeal of this Order, the Chapter 11 Trustee and the Reorganized

Debtor are hereby authorized and directed to take all steps necessary to make the Plan

effective and, from and after the Effective Date, execute their duties, responsibilities and

obligations under the Plan, this Order and the Plan Documents unless and until this Order is

stayed by order of a court of appropriate jurisdiction.

9. <u>Restructuring Transactions</u>.  On the Effective Date or as soon as reasonably

practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or

appropriate to effect any transaction described in, approved by, contemplated by, or necessary

to effectuate the Plan; <u>provided</u>, <u>however</u>, that no such restructuring transactions may violate

the terms of any assumed Executory Contract or Unexpired Lease.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 582 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 696 of 1828    PageID 10189
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 581 of 1803    PageID 11327
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 31 of 229

10.     <u>Approval of Plan Documents</u>.  The form and substance of the Plan Documents

are all hereby APPROVED.  The Chapter 11 Trustee is authorized and directed, without the

need for further corporate or other organizational action by or on behalf of the Debtors or further

order or authorization of this Court, to take such actions and do all things as may be necessary

or required to implement and effectuate the Plan Documents and to make the Plan effective.

11.     <u>Transfer and Vesting of Assets; Assumption of Obligations</u>.  On the Effective

Date, without the execution of any other or further document or any further order by the Court,

all Assets shall be deemed as fully, completely and irrevocably transferred to, and vested in, the

Reorganized Debtor in accordance with the Plan.  All transfers of Assets to the Reorganized

Debtor shall be free and clear of all Liens, Claims, rights, Interests and charges, except as

otherwise expressly provided in the Plan or any agreement, instrument, or other document

incorporated therein, or this Order.  Upon the Effective Date, the Reorganized Debtor shall be

deemed to have assumed the obligations to make all Distributions pursuant to the Plan and this

Order.

12.     <u>Estate Claims and Estate Defenses</u>.  Upon the Effective Date, without the

necessity of the execution of any further documents or further order of the Court, all Estate

Claims and Estate Defenses, including without limitation all Estate Claims and Estate Defenses

identified in Exhibit A to the Plan, shall be deemed as fully, completely and irrevocably

transferred to, and vested in, the Reorganized Debtor.  From and after the Effective Date, the

Reorganized Debtor shall have the exclusive standing and authority to assert, prosecute,

collect, compromise and settle all Estate Claims and Estate Defenses pursuant to the terms of

the Plan.

13.     <u>Treatment of Executory Contracts and Unexpired Leases</u>.  The Executory

Contract and Unexpired Lease provisions of Article XI of the Plan, as modified herein**,** are

hereby approved in their entirety.  The assumption of Executory Contracts and Unexpired

Leases as set forth in the Plan, this Order, and **Exhibit "5"** to this Order are hereby approved.

Appellee Appx. 00575
APPX. 10142

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 583 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 697 of 1828   PageID 10190
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 582 of 1803   PageID 11328
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 32 of 229

Because no defaults exist under the Executory Contracts and Unexpired Leases identified in

**Exhibit "5"** to this Order, the Chapter 11 Trustee is not required to make any cure payments,

provide any other compensation, cure any nonmonetary defaults, or provide adequate

assurance of future performance under section 365(b) of the Bankruptcy Code as a condition to

the assumption of such Executory Contracts and Unexpired Leases.  All other Executory

Contracts and Unexpired Leases that have not been previously assumed or rejected shall be

deemed as rejected as of the Effective Date in accordance with the terms of the Plan.  All

Rejection Claims must be filed within the time specified in section 11.03 of the Plan, failing

which any such Rejection Claim shall be forever barred and precluded from receiving any

Distribution pursuant to the Plan.  Notwithstanding anything to the contrary herein or in the Plan,

Exhibit 5 to this Order hereby replaces, is substituted for, and supersedes Exhibit B to the Third

Amended Plan and any explicit or inferred references herein or in the Plan to Exhibit B to the

Third Amended Plan shall refer to Exhibit 5 to this Order.

14.     Executory Contracts with Issuers and Co-Issuers.  Pursuant to the Plan and as

provided in this Order, the Debtors are authorized to assume executory contracts that include as

a party ACIS CLO 2014-3 Ltd., ACIS CLO 2014-4 Ltd., ACIS CLO 2014-5 Ltd., ACIS CLO 2015-

6 Ltd., ACIS CLO 2014-3 LLC, ACIS CLO 2014-4 LLC, ACIS CLO 2014-5 LLC, and/or ACIS

CLO 2015-6 LLC solely if and to the extent that one or more of the Debtors is a signatory to

each such executory contract.

15.     Approval of Brigade as Sub-Advisor and Shared Services Provider.  Pursuant to

an *Order Granting Emergency Motion to Approve Replacement Sub-Advisory and Shared

Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services

LLC* [Docket No. 464] entered on August 1, 2018, the Court authorized the Chapter 11 Trustee

to engage Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services

LLC to perform the services previously provided by Highland under the Sub-Advisory

Agreement and Shared Services Agreement, on an interim basis.  The Chapter 11 Trustee

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 584 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 698 of 1828    PageID 10191
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 583 of 1803    PageID 11329
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 33 of 229

selected Brigade as the party to provide both sub-advisory and shared services to the

Reorganized Debtor.  Based on the record of prior proceedings in the Chapter 11 Cases and

the Record at the Combined Hearing, the Chapter 11 Trustee has demonstrated that Brigade is

fully qualified to perform such services, and that the Chapter 11 Trustee's selection of Brigade is

an exercise of his sound business judgment.  Furthermore, adequate assurance of future

performance by Brigade has been shown.  Therefore, the selection of Brigade as the provider to

the Reorganized Debtor of the sub-advisory and shared services previously provided by

Highland under the Sub-Advisory Agreement and Shared Services Agreement is hereby

approved in all respects.

   16. <u>Substantive Consolidation</u>.  The substantive consolidation of the Debtors for

purposes of implementation of and distributions under the Plan is hereby approved as of the

Effective Date such that on the Effective Date:  (a) all assets and liabilities of the Debtors will be

deemed merged; (b) all guaranties by one Debtor of the obligations of the other Debtor will be

deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed

by the other Debtor and any joint or several liability of the Debtors will be deemed to be one

obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the

case of either of the Debtors will be deemed filed against the consolidated Debtors and will be

deemed one Claim against and a single obligation of the consolidated Debtors.

   17. <u>Compromise and Settlement</u>.  Pursuant to section 363 of the Bankruptcy Code

and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and

other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith

compromise and settlement of all Claims, Interests and controversies subject to, or dealt with,

under the Plan, including, without limitation, all Claims against the Debtors or Estate arising

prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or

unasserted, fixed or contingent, arising out of, relating to or in connection with the business or

affairs of, or transactions with, the Debtors or the Estate.  The entry of this Order constitutes the

ORDER GRANTING FINAL APPROVAL OF DISCLOSURE STATEMENT
AND CONFIRMING THIRD AMENDED PLAN, AS MODIFIED     PAGE 33 of 46

**Appellee Appx. 00577**
**Appx. 10434**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 585 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 699 of 1828    PageID 10192
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 584 of 1803    PageID 11330
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 34 of 229

Court's approval of each of the foregoing compromises or settlements embodied in the Plan, and all other compromises and settlements provided for in the Plan, as well as a finding by the Court that such compromises and settlements are in the best interest of the Debtors, the Estate, holders of Claims and Interests, and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests therein are in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets. Except as otherwise provided in the Plan or this Order, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's assets, the Estate, or the Assets, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

18.    <u>Discharge</u>.  Except for the obligations expressly set forth in the Plan or this Order, on the Effective Date, the Debtors, the Reorganized Debtor and their successors in interest and assigns shall be deemed and they each are discharged and released to the fullest extent permitted by applicable law, including pursuant to section 1141(d)(1) of the Bankruptcy Code, from any and all Claims, Interests, demands, debts and liabilities that arose before the Effective Date.  Without limiting the generality of the foregoing, the discharge shall apply to and cover both known and unknown Claims although the Court makes no determination in this Order as to which Creditors may constitute holders of unknown Claims.  In addition, all such discharged Claims, both known and unknown, shall be subject to the Plan Injunction.

19.    <u>Injunctions</u>.  The following injunction provisions set forth in Article XIV of the Plan are hereby approved and authorized in their entirety:

(a)    **Permanent General Plan Injunction:**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 586 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 700 of 1828   PageID 10193
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 585 of 1803   PageID 11331
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 35 of 229

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING:  (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THE PLAN APPLICABLE TO SUCH CLAIM OR INTEREST.**

The above injunction is an integral term of this Order and shall be fully binding upon, and enforceable against, all Persons through and as a part of this Order.  Furthermore, notwithstanding anything to the contrary in the Plan or this Order, the above injunction is permanent and shall not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

(b)      **Temporary Injunction Against the Liquidation of the Acis CLOs and Related Actions (the "Temporary Plan Injunction"):**

**EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 587 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 701 of 1828   PageID 10194
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 586 of 1803   PageID 11332
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 36 of 229

**THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF: (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS.  FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENJOINED PARTIES" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS.  FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

The above Temporary Plan Injunction is an integral term of this Order and the Temporary Plan Injunction shall be fully binding upon, and enforceable against, the Enjoined Parties through and as a part of this Order.  For the avoidance of doubt, the occurrence of any event specified in the Temporary Plan Injunction that results in expiration of the Temporary Plan Injunction shall not cause any of the other injunctive relief set forth in the first paragraph of section 14.03 of the Plan and paragraph 18(a) of this Order to expire, such other injunctive relief being permanent.

20.    Notwithstanding anything to the contrary in the Plan or this Order, nothing in the Plan or in this Order shall discharge, release, enjoin or otherwise bar (a) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of Claim, (b) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, and (d) any police or regulatory action by a Governmental Unit.  In addition, nothing in the Plan or this Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any

Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date. For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

21. <u>Extension of the Preliminary Injunction</u>. Notwithstanding anything to the contrary in the terms of the Preliminary Injunction entered in the Trustee's Adversary, the Preliminary Injunction shall not expire upon confirmation of the Plan. The Preliminary Injunction is hereby extended to and through the Effective Date of the Plan and shall remain in full force and effect until the Effective Date of the Plan.

22. <u>Exculpation</u>. The exculpation provisions set forth in section 16.06 of the Plan are hereby approved in all respects.

23. <u>Priority and Secured Tax Claims</u>. The treatment of Priority Tax Claims and Secured Tax Claims is specified in the Plan. Nothing in the Plan or this Order shall modify or affect the Lien rights of a Taxing Authority under applicable non-bankruptcy law. In the event of a default on the payment of a Priority Tax Claim or Secured Tax Claim under the Plan, the Taxing Authority to which the payment is owed may pursue all administrative and judicial remedies under applicable law to collect the unpaid Priority Tax Claim or Secured Tax Claim.

24. <u>Injunctions and Automatic Stay</u>. Except as otherwise provided in the Plan or this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

25. <u>Setoffs</u>. Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off

Appellee Appx. 00581

APPX. 10148

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 589 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 703 of 1828   PageID 10196
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 588 of 1803   PageID 11334
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 38 of 229

against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate may possess against such Claimant.  In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion with the Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

26.    Recoupment.  Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor unless (a) such holder actually provides notice thereof in writing to the Debtors or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Reorganized Debtor consents to the requested recoupment.  The Debtors and the Reorganized Debtor shall have the right, but not the obligation, to seek an order of the Court allowing any or all of the proposed recoupment.  In the absence of a written response from the Debtors or the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 590 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 704 of 1828   PageID 10197
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 589 of 1803   PageID 11335
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 39 of 229

Reorganized Debtor consenting to a recoupment or an order of the Court authorizing a

recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

27.     <u>Preservation of Causes of Action</u>.  Articles VI and IX of the Plan, including Exhibit

A to the Plan, contain a specific and unequivocal reservation of Estate Claims and Estate

Defenses as required under applicable Fifth Circuit authority.  The Estate Claims and Estate

Defenses are expressly, specifically, and unequivocally retained and reserved pursuant to

Articles VI and IX of the Plan (including Exhibit A to the Plan) in accordance with section

1123(b)(3)(B) of the Bankruptcy Code.  Such reservation of the Estate Claims and Estate

Defenses is hereby approved.  **No person may rely on the absence of a specific reference**

**in the Plan or the Disclosure Statement to any cause of action against them as any**

**indication that the Debtors or the Reorganized Debtor will not pursue any and all**

**available causes of action (including all Estate Claims, Estate Defenses and Avoidance**

**Actions) against any Person, <u>except</u> as otherwise provided in the Plan.**  Unless any

causes of action against a Person are expressly waived, relinquished, exculpated, released,

compromised or settled in the Plan or a Final Order, such causes of action are hereby expressly

reserved (including all Estate Claims, Estate Defenses and Avoidance Actions) for later

adjudication and, therefore, no preclusion doctrine, <u>including without limitation</u>, the doctrines of

res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable

or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or

consummation of the Plan.

28.     Unless otherwise expressly stated in the Plan or this Order, all Estate Claims and

Estate Defenses are hereby reserved for the benefit of the Reorganized Debtor notwithstanding

the occurrence of the Effective Date or the rejection or repudiation of any Executory Contract or

Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  All such reserved

Estate Claims and Estate Defenses shall be vested with the Reorganized Debtor and the

Reorganized Debtor shall have the exclusive right, authority and standing to assert, file,

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 591 of
Case 3:23-cv-00726-S   Document 8-22    Filed 12/29/23    Page 705 of 1828    PageID 10198
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 590 of 1803   PageID 11336
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 40 of 229

prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment each of the Estate Claims and Estate Defenses so reserved in accordance with the terms of the Plan without the consent or approval of any third party or further notice to or action, order or approval of the Court.

29.     <u>Subordinated Claims</u>.  The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to seek to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

30.     <u>Release of Liens</u>.  Except as otherwise provided in the Plan, this Order, or in any contract, instrument, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date all Liens against any Assets transferred to and vested in the Reorganized Debtor are hereby deemed to be released, terminated and nullified without the necessity of further order of this Court.

31.     <u>Provisions Governing Distributions</u>.  The distribution provisions of Articles VII and VIII of the Plan shall be, and hereby are, approved in their entirety; provided, however, that notwithstanding anything to the contrary set forth in Section 7.02 of the Plan, the Reorganized Debtor may, but shall not be required to, reserve for Distributions to holders of Allowed Subclass 4B Claims.  The Reorganized Debtor shall make all Distributions required under the Plan.

32.     <u>Procedures for Resolving Contested and Contingent Claims</u>.  The Claims resolution procedures contained in Article X of the Plan are hereby approved.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 592 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 706 of 1828    PageID 10199
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 591 of 1803    PageID 11337
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 41 of 229

33.     <u>Section 1145 Exemption</u>.  The solicitation of acceptances and rejections of the

Plan was exempt from the registration requirements of the Securities Act of 1933 and applicable

state securities laws, and no other nonbankruptcy law applies to the solicitation.

34.     <u>Exemption from Certain Transfer Taxes and Recording Fees</u>.  Section 1146(a)

shall apply to the transfers of Assets pursuant to the Plan and, therefore, such transfers may not

be taxed under any law imposing a stamp tax or similar tax.

35.     <u>Governmental Approvals Not Required</u>.  This Order shall constitute all approvals

and consents required, if any, by the laws, rules or regulations of any state or any other

governmental authority with respect to the implementation or consummation of the Plan and any

documents, instruments or agreements, and any amendments or modifications thereto, and any

other acts referred to in or contemplated by the Plan, the Disclosure Statement and any

documents, instruments or agreements, and any amendments or modifications thereto.

36.     <u>Allowance and Payment of Certain Administrative Expense Claims</u>

(a)     <u>Administrative Expense Claims (Generally)</u>.  The holder of a Claim for an

Administrative Expense, other than (i) such a Claim by an Estate Professional, (ii) an Ordinary

Course Claim, (iii) a Claim for U.S. Trustee fees under 28 U.S.C. § 1930, or (iv) an Allowed

Administrative Expense, must file with the Court and serve upon the Reorganized Debtor and its

counsel, as set forth in the Plan, a written notice of such Claim for an Administrative Expense

within thirty (30) days after the Effective Date (the "<u>Administrative Bar Date</u>").  Such notice of

Claim for an Administrative Expense shall include at a minimum: (i) the name, address,

telephone number and fax number (if applicable) or email address of the holder of such Claim,

(ii) the amount of such Claim, and (iii) the basis of such Claim.  ***The failure to timely and***

***properly file and serve a notice of Claim for an Administrative Expense on or before the***

***Administrative Bar Date shall result in such Claim for an Administrative Expense being***

***forever barred and discharged without further order of the Court and the holder thereof***

***shall be barred from receiving any Distribution from the Reorganized Debtor on account***

Appellee Appx. 00585
APPX. 03452

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 593 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 707 of 1828   PageID 10200
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 592 of 1803   PageID 11338
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 42 of 229

_**of such Claim for an Administrative Expense.**_  A Claim for an Administrative Expense with respect to which a notice of Claim for an Administrative Expense has been timely and properly filed and served shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the date of filing and service of the applicable notice of Claim for an Administrative Expense, or such later date as may be approved by the Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Claim for an Administrative Expense shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(b)  <u>Estate Professional Compensation</u>.  All final requests for compensation or reimbursement by any Estate Professional shall be filed no later than sixty (60) days after the Effective Date in accordance with the Plan.  A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed shall become an Allowed Administrative Expense only to the extent allowed by Final Order and, if so Allowed, shall be paid in accordance with the terms of the Plan.  Notwithstanding anything to the contrary in the Plan, the provisions of the Plan governing the filing of final fee applications by Estate Professionals and allowance of Administrative Expense Claims of Estate Professionals apply to the Chapter 11 Trustee.  Compensation or reimbursement sought by the Chapter 11 Trustee through a final fee application shall be subject to final approval of the Court as reasonable in accordance with section 330(a)(3) of the Bankruptcy Code.

(c)  <u>U.S. Trustee Fees</u>.  Any U.S. Trustee fees incurred pursuant to 28 U.S.C. § 1930 which are past due as of the Confirmation Date shall be paid in full by the Chapter 11 Trustee on or before the earlier of (i) December 21, 2018, or (ii) that day which is ten (10) days after the Confirmation Date.  After the Confirmation Date, the Reorganized Debtor shall continue to pay U.S. Trustee fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 594 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 708 of 1828  PageID 10201
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 593 of 1803  PageID 11339
Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 43 of 229

37.  <u>Effectuating Documents and Further Transactions</u>.  The Chapter 11 Trustee and

the Reorganized Debtor, and their respective representatives, agents and attorneys, may take

all actions to execute, deliver, file, or record such contracts, instruments, releases, and other

agreements or documents and take such actions as may be necessary or appropriate to

effectuate and implement the provisions of the Plan without the need for any approvals,

authorizations, actions, or consents except for those expressly required pursuant hereto.  This

Order shall constitute all approvals and consents required, if any, by the laws, rules and

regulations of all states and any other governmental authority with respect to the implementation

or consummation of the Plan and any documents, instruments, agreements, any amendments

or modifications thereto and any other acts and transactions referred to in or contemplated by

the Plan, the Plan Documents, the Disclosure Statement, and any documents, instruments, and

agreements and any amendments or modifications thereto.

38.  <u>Filing and Recording</u>.  This Order is and shall be binding upon and shall govern

the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state and local officials, and

all other persons and entities who may be required, by operation of law, the duties of their office,

or contract, to accept, file, register or otherwise record or release any document or instruments.

Each and every federal, state and local government agency is hereby directed to accept any

and all documents and instruments necessary, useful or appropriate to effectuate, implement

and consummate the transactions contemplated by the Plan and this Order.

39.  <u>Inconsistency between Documents</u>.  In the event of an inconsistency between

the terms of the Plan and the terms of the Disclosure Statement, the Plan shall control.  In the

event of any inconsistency between the terms of the Plan or the terms of the Disclosure

Statement and the terms of this Order, this Order shall control.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 595 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 709 of 1828 PageID 10202
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 594 of 1803 PageID 11340
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 44 of 229

40. <u>References to Plan Provisions</u>. The failure specifically to include or to refer to any particular article, section, or provision of the Plan or any related document in this Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Court that the Plan and any related documents be confirmed in their entirety.

41. <u>Applicable Nonbankruptcy Law.</u> Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of the Plan and this Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

42. <u>Notice of Entry of the Confirmation Order</u>. No later than the third Business Day after the entry of this Order, the Chapter 11 Trustee shall serve a copy of this Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest.

43. <u>Notice of the Effective Date</u>. No later than the third Business Day after the occurrence of the Effective Date, the Reorganized Debtor shall file a notice of occurrence of the Effective Date with the Clerk of the Court and shall serve a copy on all holders of Claims and Interests, the U.S. Trustee, the Persons specifically identified in the Temporary Plan Injunction as subject thereto, and all other known parties-in-interest. Such notice shall include notice of (a) the Administrative Bar Date, (b) the deadline for filing Rejection Claims set forth in section 11.03 of the Plan, and (c) the deadline for filing final requests for compensation and reimbursement by Estate Professionals. The filing of such notice shall conclusively establish that all conditions precedent have been satisfied or waived and shall constitute adequate and sufficient notice to all parties entitled thereto of the occurrence of the Effective Date.

44. <u>Retention of Jurisdiction</u>. The Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising in, arising under, and related to, the Chapter 11 Cases, including the matters set forth in Article XV of the Plan and section 1142 of the Bankruptcy Code. Without limitation as to the generality of the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 596 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 710 of 1828   PageID 10203
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 595 of 1803   PageID 11341
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 45 of 229

preceding sentence, the Court retains exclusive jurisdiction (a) to interpret and enforce this Order and the Plan; (b) to enforce the provisions of this Order and the Plan; (c) to resolve any disputes arising under or related to this Order or the Plan; and (d) over all transactions contemplated in this Order and the Plan.  All Persons are hereby forever prohibited and enjoined from taking any action (including, without limitation, legal action) that would adversely affect or interfere with the ability of any Person to complete any of the transfers of property contemplated by this Order and the Plan other than in this Court or in connection with any appeals from this Court.

45.    <u>Headings</u>.  Paragraph headings contained in this Order are for convenience of reference only and shall not affect the meaning or interpretation of this Order.

46.    <u>Final Order</u>.  This Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

47.    <u>Appeal or Motion for Reconsideration; Reversal.</u>  In the event this Order is appealed or a motion for reconsideration is filed, the Chapter 11 Trustee and the Reorganized Debtor, and their respective representatives, agents and attorneys, are all hereby authorized to proceed with the consummation and performance of the Plan unless and until this Order is stayed, reversed or modified by a court of competent jurisdiction.  If any or all of the provisions of this Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Chapter 11 Trustee's or Reorganized Debtor's receipt of written notice of any such order.  Notwithstanding any such reversal, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan (including the Plan Documents) and any amendments or modifications thereto.

### END OF ORDER ###

Appellee Appx. 00590

Appx. 03453

**SUBMITTED BY:**

/s/ Jeff P. Prostok
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthew G. Maben
State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

-and-

Rakhee V. Patel
State Bar No. 00797213
Phillip Lamberson
State Bar No. 00794134
Joe Wielebinski
State Bar No. 21432400
Annmarie Chiarello
State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Confirmation Order (3rd Amended Plan) 1.31.18.docx

Appellee Appx. 00591
APPX. 03456

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 599 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 713 of 1828    PageID 10206
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 598 of 1803    PageID 11344
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 48 of 229

# EXHIBIT "1"

**[Third Amended Joint Plan for Acis Capital Management, L.P.
and Acis Capital Management GP, LLC – Dkt. No. 660]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 600 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 714 of 1828   PageID 10207
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 599 of 1803   PageID 11345

Case 18-30264-sgj11 Doc 830 Filed 01/31/19   Entered 01/31/19 18:49:06   Page 49 of 229
Case 18-30264-sgj11 Doc 680 Filed 10/25/18   Entered 10/25/18 18:29:08   Page 1 of 62

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case |
| | § | No. 18-30264-SGJ-11) |
| DEBTORS. | § | |
| | § | Chapter 11 |

**THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, L.P. AND**
<u>**ACIS CAPITAL MANAGEMENT GP, LLC**</u>

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

DATED:      October 25, 2018
              Dallas, Texas

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 601 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 715 of 1828 PageID 10208
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 600 of 1803 PageID 11346
Case 19-30924-sgj11 Doc 280 Filed 10/25/18 Entered 10/25/18 18:42:06 Page 50 of 229

## ARTICLE I.
## DEFINITIONS

A.　<u>Defined Terms</u>. In addition to such other terms as are defined in other sections of the Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined).

1.01.　"<u>Acis CLOs</u>" refers collectively to CLO-3, CLO-4, CLO-5, and CLO-6.

1.02.　"<u>Acis GP</u>" means Acis Capital Management, GP, LLC, one of the Debtors in the above-referenced Chapter 11 Cases.

1.03.　"<u>Acis LP</u>" means Acis Capital Management, LP, one of the Debtors in the above-referenced Chapter 11 Cases.

1.04.　"<u>Administrative Bar Date</u>" means the deadline to file Claims for Allowance as an Administrative Expense set forth in section 3.01(c) of the Plan.

1.05.　"<u>Administrative Expense</u>" means any cost or expense of administration of the Chapter 11 Cases allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estate of the Debtors, any actual and necessary expenses of operating the business of the Debtors, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under section 1930, chapter 123 of title 28 of the United States Code.

1.06.　"<u>Affiliate</u>" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code.

1.07.　"<u>ALF PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and Acis Loan Funding, Ltd. dated December 22, 2016.

1.08.　"<u>Allowed</u>," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; *provided, however*, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court. "<u>Allowed</u>," when used with respect to an Administrative Expense, shall mean an Administrative Expense approved by application to the Bankruptcy Court.

1.09.　"<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code. Without limiting the foregoing, this shall include all

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 602 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 716 of 1828 PageID 10209
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 601 of 1803 PageID 11347
Case 18-30264-sgj11 Doc 880 Filed 10/25/18 Entered 10/25/18 17:84:06 Page 51 of 229

1.10. "Available Cash" means any Cash over and above the amount needed for the Reorganized Debtor to maintain business operations and pursue the Estate Claims, as determined in the sole discretion of the Reorganized Debtor.

1.11. "Avoidance Action" means a cause of action assertable by the Debtors pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought or which may be brought under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code. Such causes of action may be asserted to recover, among other things, the transfers listed in the Debtors' respective Schedules, including in response to Question 3 of the statements of financial affairs.

1.12. "Ballot" means the form of ballot provided to holders of Claims or Interests entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.13. "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified at Title 11 of the United States Code.

1.14. "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over all or any part of the Chapter 11 Cases.

1.15. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, including applicable local rules of the Bankruptcy Court.

1.16. "Brigade" means Brigade Capital Management, LP.

1.17. "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.18. "Cash" means legal tender of the United States of America, cash equivalents and other readily marketable securities or instruments, including, but not limited to, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks or commercial paper.

1.19. "Chapter 11 Cases" refers collectively to the Acis LP bankruptcy case, Case No. 18-30264-sgj11, and the Acis GP bankruptcy case, Case No. 18-30265-sgj11, which are being jointly administered under Case No. 18-30264-sgj11.

1.20. "Chapter 11 Trustee" refers to Robin Phelan, the chapter 11 trustee for the Debtors.

1.21. "Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 603 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 717 of 1828    PageID 10210
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 602 of 1803    PageID 11348
Case 19-30064-sgj11 Doc 660 Filed 10/25/19    Entered 10/25/19 17:84:06    Page 52 of 229

1.22.    "<u>Claimant</u>" means the holder of a Claim.

1.23.    "<u>Class</u>" means a class of Claims or Interests as described in the Plan.

1.24.    "<u>CLO</u>" means collateralized loan obligations.

1.25.    "<u>CLO-1</u>" means Acis CLO 2013-1 LTD.

1.26.    "<u>CLO-1 Indenture</u>" means that certain Indenture, dated as of March 18, 2013, issued by CLO-1, as issuer, Acis CLO 2013-1 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.27.    "<u>CLO-1 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013.

1.28.    "<u>CLO-3</u>" means Acis CLO 2014-3 LTD.

1.29.    "<u>CLO-3 Indenture</u>" means that certain Indenture, dated as of February 25, 2014, issued by CLO-3, as issuer, Acis CLO 2014-3 LLC, as co-Issuer and US Bank, as Indenture Trustee

1.30.    "<u>CLO-3 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014.

1.31.    "<u>CLO-4</u>" means Acis CLO 2014-4 LTD.

1.32.    "<u>CLO-4 Indenture</u>" means that certain Indenture, dated as of June 5, 2014, issued by CLO-4, as issuer, Acis CLO 2014-4 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.33.    "<u>CLO-4 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014.

1.34.    "<u>CLO-5</u>" means Acis CLO 2014-5 LTD.

1.35.    "<u>CLO-5 Indenture</u>" means that certain Indenture, dated as of November 18, 2014, issued by CLO-5, as issuer, Acis CLO 2014-5 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.36.    "<u>CLO-5 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014.

1.37.    "<u>CLO-6</u>" means Acis CLO 2015-6 LTD.

1.38.    "<u>CLO-6 Indenture</u>" means that certain Indenture, dated as of April 16, 2015, issued by CLO-6, as issuer, Acis CLO 2015-6 LLC, as co-Issuer and US Bank, as Indenture Trustee.

1.39.    "<u>CLO-6 PMA</u>" means that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015.

1.40.    "<u>CLO Holdco</u>" means CLO Holdco, Ltd.

1.41.    "<u>Collateral</u>" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim.

1.42. "<u>Confirmation Date</u>" means the date of entry of the Confirmation Order.

1.43. "<u>Confirmation Hearing</u>" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as such hearing may be continued from time to time.

1.44. "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.45. "<u>Contested</u>," when used with respect to a Claim, means a Claim against the Debtors that is listed in the Debtors' Schedules as disputed, contingent, or unliquidated; that is listed in the Debtors' Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; that is not listed in the Debtors' Schedules, but as to which a proof of Claim has been filed with the Bankruptcy Court; or as to which an objection has been or may be timely filed and has not been denied by Final Order. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

1.46. "<u>Creditor</u>" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.47. "<u>Cure Claim</u>" means the payment or other performance required to cure any existing default under an Executory Contract or Unexpired Lease.

1.48. "<u>Debtors</u>" means, collectively, Acis GP and Acis LP, the debtors in the above-captioned Chapter 11 Cases.

1.49. "<u>Disallowed</u>," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an objection or motion to disallow has been sustained by a Final Order.

1.50. "<u>Disclosure Statement</u>" means the Disclosure Statement filed with respect to the Plan, as it may be amended, modified, or supplemented from time to time.

1.51. "<u>Distribution</u>" means any payment or other disbursement of property pursuant to the Plan.

1.52. "<u>Effective Date</u>" means the first Business Day which is fourteen (14) days after the Confirmation Date if the Confirmation Order is not stayed or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay which is at least fourteen (14) Business Days after the Confirmation Date, and upon which all conditions to the effectiveness of the Plan set forth in Article XIII below are satisfied.

1.53. "<u>Estate</u>" shall collectively refer to the bankruptcy estates of the Debtors in the Chapter 11 Cases.

1.54. "<u>Estate Accounts Receivable</u>" shall include all accounts receivable of the Estate, including from all sums payable to the Debtors on account of goods or services provided by the Debtors.

Appellee Appx. 00597

APPX. 10364

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 605 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 719 of 1828 PageID 10212
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 604 of 1803 PageID 11350
Case 19-34054-sgj11 Doc 3807 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 54 of 229

1.55.   "Estate Claims" shall include all claims and causes of action held by the Debtors' Estate, including, without limitation, the Estate Claims listed on the attached **Exhibit A** and all Avoidance Actions.

1.56.   ""Estate Defenses" means all defenses, affirmative defenses, counterclaims, or offsets by the Debtors' Estate against any Person, including but not limited to any Creditor.

1.57.   "Estate Insurance" means any insurance policy or interest in an insurance policy in which the Estate has an interest or rights.

1.58.   "Estate Professionals" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.59.   "Executory Contract" means any executory contract which is subject to section 365 of the Bankruptcy Code and which is not an Unexpired Lease.

1.60.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body, as to which the time to appeal or seek rehearing or petition for certiorari shall have expired or which order or judgment shall no longer be subject to appeal, rehearing, or certiorari proceeding and with respect to which no appeal, motion for rehearing, or certiorari proceeding or stay shall then be pending.

1.61.   "General Unsecured Claim" means any Claim against the Debtors that is not an Administrative Expense, Priority Tax Claim, Priority Non-Tax Claim, Secured Tax Claim, Secured Claim, or Insider Claim, but includes any Rejection Claims pursuant to section 502(g) of the Bankruptcy Code.

1.62.   "Governmental Unit" means a "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code.

1.63.   "HCLOF" means Highland CLO Funding, Ltd.

1.64.   "Highland" means Highland Capital Management, L.P.

1.65.   "Highland Adversary" means Adversary Proceeding No. 18-03078-sgj.

1.66.   "Highland Claim" means all Claims asserted by Highland or any Affiliates of Highland against the Debtors, including any Claim resulting from the termination of the Sub-Advisory Agreement and Shared Services Agreement.

1.67.   "Highland CLOM" means Highland CLO Management, Ltd.

1.68.   "Highland HCF" means Highland HCF Advisors, Ltd.

1.69.   "Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.70.   "Indentures" refers collectively to the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture, and the CLO-6 Indenture.

Appellee Appx. 00598
APPX. 10466

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 606 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 720 of 1828    PageID 10213
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 605 of 1803    PageID 11351
Case 19-30264-sgj11 Doc 2380 Filed 10/15/18    Entered 10/15/18 17:34:06    Page 55 of 229

1.71.   "Indenture Trustee" refers to US Bank solely in its capacity as Indenture Trustee under the CLO-1 Indenture, the CLO-3 Indenture, the CLO-4 Indenture, the CLO-5 Indenture and the CLO-6 Indenture, as applicable

1.72.   "Initial Distribution Date," when used with respect to any Contested Claim or Rejection Claim, shall mean the later of (i) the first Business Day at least thirty (30) days after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim.  The Initial Distribution Date shall be separately determined with respect to each Contested Claim or Rejection Claim based upon the date each such Claim becomes an Allowed Claim.

1.73.   "Insider" means a Person described in section 101(31) of the Bankruptcy Code.

1.74.   "Insider Claim" means any Claim asserted by Insiders of the Debtors, including but not limited to any Claim asserted by Highland or any Affiliate thereof, unless otherwise indicated in the Plan.

1.75.   "Interests" means any equity or stock ownership interest in the Debtors.

1.76.   "Issuers and Co-Issuers" means CLO-1, CLO-3, CLO-4, CLO-5, CLO-6, Acis CLO 2013-1, Acis CLO-2014-3, LLC, Acis CLO 2014-4, LLC, Acis CLO 2014-5, LLC, and Acis 2015-6, LLC.

1.77.   "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtors contemplated by section 101(37) of the Bankruptcy Code.

1.78.   "Management Fees" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.79.   "Neutra" means Neutra, Ltd.

1.80.   "Objection" means (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.

1.81.   "Objection Deadline" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.82.   "Optional Redemption" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.83.   "Person" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

Appellee Appx. 00599
APPX. 10456

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 607 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 721 of 1828   PageID 10214
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 606 of 1803   PageID 11352
Case 18-30264-sgj11 Doc 860 Filed 10/25/18    Entered 10/25/18 17:34:06    Page 56 of 229

1.84.    "<u>Petition Date</u>" means January 30, 2018.

1.85.    "<u>Plan</u>" means this Third Amended Joint Chapter 11 plan, either in its present form or as it may be altered, amended, or modified from time to time.

1.86.    "<u>Plan Documents</u>" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court.

1.87.    "<u>Plan Rate</u>" means a rate of interest of five percent (5%) per annum.

1.88.    "<u>PMAs</u>" refers collectively to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA.

1.89.    "<u>Priority Claim</u>" means a Claim (other than a Claim for an Administrative Expense) to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.90.    "<u>Priority Non-Tax Claim</u>" means a Priority Claim other than a Priority Tax Claim.

1.91.    "<u>Priority Tax Claim</u>" means a Claim of a Governmental Unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

1.92.    "<u>Professional</u>" means those persons retained pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code.

1.93.    "<u>Pro Rata Distribution</u>" means an optional Distribution made in accordance with section 4.03(c), 4.04(e), or 4.04(i) of the Plan.  Each Creditor entitled to receive a portion of a Pro Rata Distribution shall receive such Creditor's Pro Rata Share of such Distribution.

1.94.    "<u>Pro Rata Share</u>' means, as to the holder of a specific Claim, the ratio that the amount of such holder's Claim bears to the aggregate amount of all Claims included in the particular Class or category in which such holder's Claim is included.

1.95.    "<u>Refinancing Proceeds</u>" shall, when used in relation to any of the Acis CLOs, have the meaning set forth in the applicable Indenture.

1.96.    "<u>Rejection Claim</u>" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract or Unexpired Lease.

1.97.    "<u>Reorganized Debtor</u>" refers collectively to the Debtors, as reorganized, acting from and after the Effective Date if the Plan is confirmed based on the terms and provisions herein.

1.98.    "<u>Reserve</u>" or "<u>Reserves</u>" means any reserves set aside by the Reorganized Debtor pursuant to this Plan, including reserves set aside to fund any Distributions, make payments pursuant to the Plan, or pursue the Estate Claims.

1.99.    "<u>Schedules</u>" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements have been or may be subsequently amended.

1.100.    "<u>Secured Claim</u>" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law, and which is duly Allowed, but only to the

Appellee Appx. 00600
APPX. 010157

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 608 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 722 of 1828   PageID 10215
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 607 of 1803   PageID 11353
Case 18-30264-sgj11 Doc 280 Filed 10/15/18   Entered 10/15/18 18:34:06   Page 57 of 229

extent of the value of the holder's interest in the Collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the Class of which the Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent Allowed.

1.101.  "Secured Tax Claim" means any ad valorem tax Claim that arises or is deemed to have arisen on or before the Petition Date, irrespective of the date on which such Claim is assessed or due.

1.102.  "Shared Services Agreement" means that certain Fourth Amended and Restated Shared Services Agreement by and between Acis LP and Highland dated March 17, 2017.

1.103.  "Sub-Advisory Agreement" means that certain Third Amended and Restated Sub-Advisory Agreement by and between Acis LP and Highland dated March 17, 2017

1.104.  "Subordinated Notes" means the subordinated notes in the Acis CLOs held by HCLOF, and expressly does not include any subordinated notes in the Acis CLOs held by any other party.

1.105.  "Substantial Consummation" means the day on which a Creditor first receives a Distribution of any kind under the terms and provisions of the Plan.

1.106.  "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.107.  "Terry" means Joshua N. Terry.

1.108.  "Terry Partially Secured Claim" means any Claim asserted against the Debtors by Terry, including as asserted in Proof of Claim No. 1 in both Chapter 11 Cases and Proof of Claim No. 26 against Acis LP.

1.109.  "Unclaimed Property" means any cash, Distribution, or any other property of the Debtors unclaimed for a period of one (1) year after the applicable Initial Distribution Date.

1.110.  "Unexpired Lease" means any unexpired lease or agreement which is subject to section 365 of the Bankruptcy Code and which is not an Executory Contract.

1.111.  "US Bank" means U.S. Bank National Association.

1.112.  "Other Acis-Managed Funds" refers collectively to CLO-1, Acis CLO 2013-2, Ltd., Hewitt's Island CLO 1-R, Ltd, and BayVK R2 Lux S.A., SICAV-FIS.

B.      Interpretation. Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the

9

same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof. The rules of construction set forth in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to construction of the Plan. For the purposes of construction of the Plan, "or" is disjunctive.

      C.    <u>Other Terms</u>. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1) of the Bankruptcy Code. Otherwise, a term used herein that is not specifically defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

      D.    <u>Exhibits and Plan Documents</u>. All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. Any Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing. Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1290, Fort Worth, Texas 76102, Attention: Linda Breedlove; Fax number (817) 877-4151; email: lbreedlove@forsheyprostok.com.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01.    The following is a designation of the Classes of Claims and Interests under the Plan. Administrative Expenses, Priority Claims of the kinds specified in sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code and Priority Tax Claims have not been classified, are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code, and their treatment is set forth in Article III of the Plan. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class.

> Class 1 – Secured Tax Claims
> Class 2 – Terry Partially Secured Claim
> Class 3 – General Unsecured Claims
> Class 4 – Insider Claims
> Class 5 – Interests

2.02.    <u>Impaired Classes of Claims and Interests</u>. Class 1 is unimpaired. Classes 2 through 5 are Impaired.

2.03.    <u>Impairment or Classification Controversies</u>. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

## ARTICLE III.
## TREATMENT OF UNCLASSIFIED CLAIMS

3.01.    <u>Administrative Expenses</u>

Appellee Appx. 00602

APPX. 10457

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 610 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 724 of 1828    PageID 10217
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 609 of 1803    PageID 11355
Case 19-30264-sgj11 Doc 820 Filed 10/24/19    Entered 10/24/19 17:34:06    Page 59 of 229

(a)      The Reorganized Debtor shall pay, in accordance with the ordinary business terms applicable to each such expense or cost, the reasonable and ordinary expenses incurred in operating the Debtors' businesses or administering the Estate before the Effective Date ("Ordinary Course Claims"). The remaining provisions of this section 3.01 shall not apply to the Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtor may move the Bankruptcy Court to apply the provisions of Article III below relating to Contested Claims and require the holder of the Contested Ordinary Course Claim to assert such Claim through the Chapter 11 Cases.

(b)      Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Estate Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

(c)      Unless the Bankruptcy Court orders to the contrary or the Reorganized Debtor agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim by an Estate Professional, an Ordinary Course Claim, or an Administrative Expense which is already Allowed, shall file with the Bankruptcy Court and serve upon the Reorganized Debtor and its counsel a written notice of such Claim for an Administrative Expense within thirty (30) days after the Effective Date. This deadline is the "Administrative Bar Date." Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable) or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim. **Failure to timely and properly file and serve such notice by the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred and discharged and the holder thereof shall be barred from receiving any Distribution from the Reorganized Debtor on account of such Claim for an Administrative Expense**.

(d)      A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.01(c) above, shall become an Allowed Administrative Expense if no Objection is filed within thirty (30) days of the filing and service of such notice. If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order.

(e)      The procedures contained in subsections 3.01(a), (c) and (d) above shall not apply to Administrative Expense Claims asserted by Estate Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date. A Claim for an Administrative Expense by an Estate Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense only to the extent Allowed by order of the Bankruptcy Court and, if so Allowed, shall be paid in accordance with subsection 3.01(b) above. Professional fees and expenses to any Estate Professional incurred on or after the Effective Date may be paid by the Reorganized Debtor without necessity of application to or order by the Bankruptcy Court.

(f)      If the Reorganized Debtor asserts any Estate Claims as counterclaims or defenses to a Claim for Administrative Expense, the Administrative Expense Claim shall be determined through an adversary proceeding before the Bankruptcy Court. The Bankruptcy

Appellee Appx. 00603
APPX. 10460

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 611 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 725 of 1828   PageID 10218
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 610 of 1803   PageID 11356
Case 19-30264-sgj11 Doc 839 Filed 01/28/19   Entered 01/28/19 17:34:08   Page 62 of 229

Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

3.02.    Priority Non-Tax Claims.  Each holder of an Allowed Priority Non-Tax Claim shall receive (i) the amount of such holder's Allowed Priority Non-Tax Payment in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim and a determination has been made that such Allowed Priority Non-Tax Claim is not subject to equitable subordination under section 510(c) of the Bankruptcy Code, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.

3.03.    Priority Tax Claims. Each holder of an Allowed Priority Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Priority Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Priority Tax Claim may be paid without penalty, no later than sixty (60) days after each such Claim becomes an Allowed Claim, or (b) such other treatment as may be agreed to in writing by the holder of the Priority Tax Claim and the Reorganized Debtor.

3.04.    U.S. Trustee's Fees. The Reorganized Debtor shall pay the U.S. Trustee's quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) which are due as of the Confirmation Date in full on the Effective Date or as soon thereafter as is practicable.  After the Confirmation Date, the Reorganized Debtor shall continue to pay quarterly fees as they accrue until a final decree is entered and the Chapter 11 Cases are closed.  The Reorganized Debtor shall file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial reports for each quarter, or portion thereof, that the Chapter 11 Cases remain open.

## ARTICLE IV.
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

4.01.    Class 1 – Secured Tax Claims. Each holder of an Allowed Secured Tax Claim shall receive (a) one Cash payment in an amount equal to the principal amount of such Allowed Secured Tax Claim, plus interest at the rate and in the manner prescribed by applicable state law from the later of the Petition Date or the first day after the last day on which such Secured Tax Claim may be paid without penalty, on the Initial Distribution Date, or (b) such other treatment as may be agreed to in writing by the holder of the Secured Tax Claim and the Reorganized Debtor.  The Liens securing such Secured Tax Claims shall remain unimpaired and unaffected until each such Class 1 Claim is paid in full.  All Distributions on account of Allowed Class 1 Claims shall be made by the Reorganized Debtor.  Class 1 is unimpaired. Holders of Class 1 Claims are conclusively presumed to have accepted the Plan and, accordingly, are not entitled to vote on the Plan.

4.02.    Class 2 – Terry Partially Secured Claim.  In exchange for a one million dollar ($1,000,000.00) reduction in the amount of the Terry Partially Secured Claim, Terry shall receive one hundred percent (100%) of the equity interests in the Reorganized Debtor as of the Effective Date.  The remaining balance of any Allowed Terry Partially Secured Claim shall be treated and paid as a Class 3 General Unsecured Claim.  Class 2 is Impaired.  The Holder of the Class 2 Terry Partially Secured Claim is entitled to vote on the Plan.

4.03.    Class 3 – General Unsecured Claims.

Appellee Appx. 00604
APPX. 10469

(a)      Each holder of an Allowed General Unsecured Claim shall receive a promissory note issued by the Reorganized Debtor (each an "Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's General Unsecured Claim becomes an Allowed Class 3 Claim.  Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(b)      To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date.  Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full.  Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note.  If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more.  Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(c)      If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class.  Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(d)      Class 3 is Impaired.  Holders of Class 3 Claims are entitled to vote on the Plan.

4.04.    Class 4 – Insider Claims.  Holders of Class 4 Insider Claims shall be treated as follows:

(a)      Class 4 Claims shall be divided into two (2) subclasses.  Subclass 4A shall consist of all Allowed Class 4 claims which are not subject to equitable subordination.  Subclass 4B shall consist of all Class 4 claims which are determined by the Bankruptcy Court to be subject to equitable subordination.  If only a part of a Class 4 Claim is subject to equitable subordination, then the portion of such claim subject to equitable subordination shall be included in Subclass 4B and the remainder not subject to equitable subordination shall be included in Subclass 4A.  Subclass 4A and Subclass 4B will vote separately on the Plan, although Subclass 4B is currently an empty class.

13

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 613 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 727 of 1828 PageID 10220
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 612 of 1803 PageID 11358
Case 18-30264-sgj11 Doc 830 Filed 01/28/19 Entered 01/28/19 17:34:06 Page 62 of 229

(b) All Class 4 Claims (regardless of which subclass) shall be and remain subject to all Estate Defenses and all Estate Claims, including any rights of offset, recoupment, and/or to an affirmative recovery against the Holder of any Class 4 Claim.

(c) Each holder of an Allowed Subclass 4A Claim shall receive an Unsecured Cash Flow Note on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim. Each Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on that date that is the three (3) years after the Effective Date.

(d) To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of an Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 180th day after the Effective Date. Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Unsecured Cash Flow Note is paid in full. Notwithstanding the foregoing, in the event that an Unsecured Cash Flow Note is first issued more than one hundred eighty (180) days after the Effective Date, the first Distribution made on account of such Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Unsecured Cash Flow Note had such Unsecured Cash Flow Note been issued prior to ninety (90) days after the Effective Date, such that the first Distribution shall bring all payments current on account of such Unsecured Cash Flow Note. If on any date on which a quarterly Distribution is due to the holder of an Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more. Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Unsecured Cash Flow Note.

(e) If the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims. The amount of the Pro Rata Distribution made to each such holder shall be determined as if Class 3 and Subclass 4A constituted a single Class. Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Unsecured Cash Flow Note.

(f) Unless otherwise provided by Order of the Bankruptcy Court, holders of Allowed Subclass 4B claims shall not be entitled to any Distribution from the Reorganized Debtor until all Allowed Claims included in Classes 1 through 3 and Subclass 4A, including all Unsecured Cash Flow Notes, have been paid in full.

(g) Holders of Allowed Subclass 4B Claims shall receive a subordinated promissory note issued by the Reorganized Debtor ("Subordinated Unsecured Cash Flow Note") on the later of (a) that date that is as soon as practicable after the Effective Date, or (b) that date that is as soon as practicable after such holder's Subclass 4A Claim becomes an Allowed Subclass 4A Claim. Each Subordinated Unsecured Cash Flow Note shall be dated as of the Effective Date, bear interest at the Plan Rate and shall mature on the earlier to occur of (i) the date that is two

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 614 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 728 of 1828 PageID 10221
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 613 of 1803 PageID 11359
Case 19-34054-sgj11 Doc 880 Filed 01/28/19 Entered 01/28/19 17:34:06 Page 63 of 229

(2) years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five (5) years after the Effective Date.

(h)     To the extent of Available Cash, the Reorganized Debtor shall make substantially equal quarterly Distributions of principal and accrued interest to each holder of a Subordinated Unsecured Cash Flow Note, with the first such quarterly Distribution being due and payable on the 90th day after the payment in full of the Unsecured Cash Flow Notes. Thereafter, like Distributions shall be made each quarter by the Reorganized Debtor until the Subordinated Unsecured Cash Flow Note is paid in full. Notwithstanding the foregoing, in the event that a Subordinated Unsecured Cash Flow Note is first issued after payments have been made on one or more other Subordinated Unsecured Cash Flow Notes, the first Distribution made on account of such Subordinated Unsecured Cash Flow Note shall be made upon the date that the next Distribution would otherwise be due, but such first Distribution shall also include amounts that would have been distributed to the holder of such Subordinated Unsecured Cash Flow Note had such Subordinated Unsecured Cash Flow Note been issued at the time the first payment on any Subordinated Unsecured Cash Flow Note was made, such that the first Distribution shall bring all payments current on account of such Subordinated Unsecured Cash Flow Note. If on any date on which a quarterly Distribution is due to the holder of a Subordinated Unsecured Cash Flow Note the remaining principal and accrued interest owing on account of such Subordinated Unsecured Cash Flow Note is less than the regular quarterly Distribution amount, the Reorganized Debtor shall make a Distribution to the holder of such Subordinated Unsecured Cash Flow Note in an amount sufficient to fully satisfy the remaining principal and accrued interest owed, but no more. Nothing contained herein shall preclude the Reorganized Debtor from prepaying any Subordinated Unsecured Cash Flow Note.

(i)     Subject to section 4.04(f) above, if the Reorganized Debtor obtains additional Cash, through litigation recoveries or otherwise, and the Reorganized Debtor determines, in its sole discretion, that the Reorganized Debtor holds Available Cash sufficient to allow one or more Pro Rata Distributions to be made to holders of Allowed Subclass 4B Claims, the Reorganized Debtor may, but shall not be required to, make one or more Pro Rata Distributions to holders of Allowed Subclass 4B Claims. Any such additional Distributions shall be applied to reduce the outstanding balance of each holder's Subordinated Unsecured Cash Flow Note.

(j)     The Reorganized Debtor may establish appropriate Reserves as to any Contested Claim included in Class 4.

(k)     Class 4 is Impaired. Holders of Class 4 Claims are entitled to vote on the Plan.

4.05.   <u>Class 5 – Interests</u>. All Interests in the Debtors shall be extinguished and shall cease to exist as of the Effective Date. The holders of such Interests shall not receive or retain any property on account of such Interests under the Plan. Class 5 is Impaired. Holders of Class 5 Interests are conclusively presumed to have rejected the Plan and, accordingly, are not entitled to vote on the Plan.

<div align="center">

**ARTICLE V.**
**<u>ACCEPTANCE OR REJECTION OF THE PLAN</u>**

</div>

5.01.   <u>Classes Entitled to Vote</u>. Creditors in Classes 2 through 4 are entitled to vote and shall vote separately to accept or reject the Plan. Any unimpaired Class shall not be entitled to vote to accept or reject the Plan. Any unimpaired Class is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 615 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 729 of 1828 PageID 10222
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 614 of 1803 PageID 11360
Case 19-30264-sgj11 Doc 830 Filed 01/23/18 Entered 01/23/18 17:34:06 Page 16 of 229

5.02.    <u>Class Acceptance Requirement</u>. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.

5.03.    <u>Cramdown</u>. This section shall constitute the request by the Plan proponent, pursuant to section 1129(b) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) of the Bankruptcy Code have not been met.

<div align="center">

**ARTICLE VI.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

</div>

6.01.    <u>Vesting of Assets</u>. As of the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets, including the PMAs, all Cash, Estate Accounts Receivable, Estate Insurance, Estate Claims and Estate Defenses, shall be transferred from the Estate to, and vested in, the Reorganized Debtor, free and clear of all rights, title, interests, claims, liens, encumbrances and charges, except as expressly set forth in the Plan.  On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

6.02.    <u>Continued Existence of the Debtors</u>.  The Debtors shall continue to exist after the Effective Date, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents.  On or after the Effective Date, each Reorganized Debtor may, within its sole and exclusive discretion, take such action as permitted by applicable law and its constituent documents as it determines is reasonable and appropriate.

6.03.    <u>Retention and Assertion of Causes of Action and Defenses</u>.

(a)    Except as expressly set forth in this Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Estate Claims, Estate Defenses and Avoidance Actions) belonging to the Debtors (collectively, the "<u>Retained Causes of Action</u>") shall, upon the occurrence of the Effective Date, be reserved, retained and preserved for, and transferred to, received by and vested, in the Reorganized Debtor for the benefit of the Debtors and the Debtors' estates.  Without limitation, the Retained Causes of Action include the claims and causes of action described on **Exhibit A** attached hereto.

(b)    Except as expressly set forth in this Plan, the rights of the Reorganized Debtor to commence, prosecute or settle the Retained Causes of Action shall be retained, reserved, and preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Debtors or the Reorganized Debtor will not pursue any and all available causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) against them. The Debtors and their Estate expressly reserve all rights to prosecute any and all of the Retained Causes of Action (including all**

<div align="center">16</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 616 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 730 of 1828   PageID 10223
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 615 of 1803   PageID 11361
Case 18-30264-sgj11 Doc 830 Filed 10/25/18    Entered 10/25/18 16:34:06    Page 65 of 229

**Estate Claims, Estate Defenses and Avoidance Actions) against any Person, <u>except</u> as otherwise provided in this Plan**. Unless any causes of action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, the Debtors expressly reserve all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication, and, therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan. The Debtors and the Reorganized Debtor may also assert Estate Defenses as a defense to the allowance of any Claim not otherwise Allowed.

6.04.    <u>Assumption of Obligations to Make Distributions</u>.  The Reorganized Debtor shall be deemed to have assumed the obligations to make all Distributions pursuant to this Plan.

6.05.    <u>Actions by the Debtors and the Reorganized Debtor to Implement Plan</u>.  The entry of the Confirmation Order shall constitute all necessary authorization for the Debtors and the Reorganized Debtor to take or cause to be taken all actions necessary or appropriate to consummate, implement or perform all provisions of this Plan on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, (a) all transfers of Assets, including to the Reorganized Debtor, that are to occur pursuant to the Plan; (b) the cancellation of Interests and issuance of 100% of the equity interests in the Reorganized Debtor to Terry; (c) the performance of the terms of the Plan and the making of all Distributions required under the Plan; and (d) subject to the terms of the Plan, entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

6.06.    <u>Termination of Highland as Shared Services Provider and Sub-Advisor</u>.  The Bankruptcy Court authorized the Chapter 11 Trustee to terminate the Shared Services Agreement and Sub-Advisory Agreement and engage Brigade to perform the services previously provided by Highland.  The Shared Services Agreement and Sub-Advisory Agreement were terminated by the Chapter 11 Trustee on or about August 1, 2018, and the services previously performed by Highland were transitioned to Brigade on an interim basis.  Brigade has agreed to continue to provide shared services and sub-advisory services to the Reorganized Debtor with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs) subject to a minimum two (2) year term unless otherwise agreed as between the Reorganized Debtor and Brigade.  Consequently, any agreement between the Reorganized Debtor and Brigade shall provide that Brigade cannot be removed without cause for a period of two (2) years except as may be otherwise agreed as between the Reorganized Debtor and Brigade.

6.07.    <u>Continued Portfolio Management by the Reorganized Debtor</u>.  The PMAs and any other Executory Contracts and Unexpired Leases identified on Exhibit B to the Plan or in the Confirmation Order shall be assumed and the Reorganized Debtor shall, from an after the Effective Date, serve as the portfolio manager with respect to the Acis CLOs and the Other Acis-Managed Funds (and any reset Acis CLOs).  Consistent with Section 15 of the PMAs, the Reorganized Debtor may only be removed as portfolio manager under the assumed PMAs for cause as set forth in the PMAs.

6.08.    <u>Reset of the Acis CLOs</u>.  HCLOF has maintained that it desires to reset the Acis CLOs. The Reorganized Debtor, with the assistance of Brigade as its shared services provider and sub-advisor, is prepared to promptly seek to perform such reset transactions as set forth herein.

Appellee Appx. 00609
APPX. 10476

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 617 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 731 of 1828    PageID 10224
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 616 of 1803    PageID 11362
Case 18-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 68 of 229

HCLOF shall have the right to submit one or more notice(s) of Optional Redemption solely for the purpose of effectuating a reset of one or more of the Acis CLOs under this section 6.08 of the Plan utilizing Refinancing Proceeds (a "Reset Optional Redemption") for each of the Acis CLOs.  If HCLOF requests a Reset Optional Redemption of an Acis CLO, the Reorganized Debtor, with the assistance of Brigade, shall thereafter seek to reset the Acis CLOs, either consecutively or simultaneously, in its good faith business judgment and consistent with then-prevailing market terms; *provided, however*, (i) the Management Fees to be charged by the Reorganized Debtor to any reset Acis CLOs shall remain the same going forward and shall not be increased, and no transaction fee shall be charged by the Reorganized Debtor (other than, for avoidance of doubt, transaction expense reimbursements consistent with market standards), and (ii) HCLOF shall be granted a right of first refusal for any funding of debt or equity required to effectuate a reset of each of the Acis CLOs.  The terms of the Indentures shall control any Reset Optional Redemption.  If HCLOF elects not to reset one or more of the Acis CLOs, then the Acis CLOs will continue to be managed in accordance with market standards.

6.09.    Post-Effective Date Service List.  Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "Service List"): (a) any Person directly affected by the relief sought in the pleading, (b) the U.S. Trustee, (c) parties which have filed a Notice of Appearance in the Chapter 11 Cases, and (d) the Reorganized Debtor.

6.10.    Section 505 Powers.  All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date.

6.11.    Section 510(c) Powers.  All rights and powers to seek or exercise any right or remedy of equitable subordination are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor as of the Effective Date as an Estate Defense.

6.12.    Section 506(c) Powers.  The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor.

6.13.    Plan Injunction.  The Reorganized Debtor shall each have full power, standing and authority to enforce the Plan Injunction against any Person, either through an action before the Bankruptcy Court or any other tribunal having appropriate jurisdiction.

6.14.    Cancellation of Interests.  Except as otherwise specifically provided herein, upon the Effective Date of the Plan: (a) all Interests in the Debtors shall be cancelled; and (b) all obligations or debts of, or Claims against, the Debtors on account of, or based upon, the Interests shall be deemed as cancelled, released and discharged, including all obligations or duties by the Debtors relating to the Interests in any of their respective formation documents, including Acis LP's limited partnership agreement and bylaws, Acis GP's articles of formation and company agreement, or any similar formation or governing documents.

**ARTICLE VII.**
**PROVISIONS GOVERNING DISTRIBUTION**

7.01.    Distributions from Reorganized Debtor.  The Reorganized Debtor shall be responsible for making Distributions to holders of Allowed Claims only to the extent this Plan requires Distributions to be made by the Reorganized Debtor.  The priority of Distributions from the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 618 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 732 of 1828   PageID 10225
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 617 of 1803   PageID 11363
Case 19-30264-sgj11 Doc 820 Filed 10/28/19   Entered 10/28/19 17:34:06   Page 67 of 229

Reorganized Debtor shall be in accordance with the terms of this Plan and the Confirmation Order as follows:

(a)   First, to satisfy Allowed Class 1 Secured Tax Claims;

(b)   Second, to satisfy Allowed Administrative Expenses and Allowed Priority Claims in accordance with Article III above, including all U.S. Trustee quarterly fees due and owing as of the Effective Date;

(c)   Third, to make Distributions to holders of any Allowed Class 3 General Unsecured Claims and Allowed Subclass 4A Claims; and

(e)   Fourth, to make Distributions to holders of any Allowed Subclass 4B Claims

7.02.   Reserves.  The Reorganized Debtor may estimate, create and set aside Reserves as may be necessary or appropriate, including without limitation, Reserves on account of Contested Claims.  The Reorganized Debtor may, but shall not be required to, move the Bankruptcy Court to approve: (a) the amount of, and terms on which, such Reserves shall be held, maintained and disbursed, or (b) the amount and timing of any proposed interim Distribution to holders of Allowed Class 3 Claims and Allowed Subclass 4A Claims.  The Reorganized Debtor may elect to seek approval by the Bankruptcy Court for the creation and amount of any Reserves or regarding the amount or timing of any Distribution on account of any Allowed Claims.  Except as otherwise expressly provided herein, the Reorganized Debtor, in the exercise of its good faith business judgment, may transfer funds out of any of the Reserves as necessary or appropriate.  However, the Reorganized Debtor shall not be required to create separate accounts for such Reserves which may be created and memorialized by entries or other accounting methodologies, which may be revised from time-to-time, to enable the Reorganized Debtor to determine the amount of Cash available for Distributions under the Plan.  Subject to any specific deadlines set forth herein, the Reorganized Debtor, shall determine, from time-to-time, in the exercise of the Reorganized Debtor's good faith business judgment: (x) the amount of Cash available for Distribution, (y) the timing of any Distributions, and (z) the amount and creation of any Reserves for Contested Claims.  The Reorganized Debtor shall not be entitled to reserve for, and this section 7.02 does not apply to, Distributions to holders of Allowed Subclass 4B Claims.

7.03.   Prosecution and Settlement of Estate Claims.  Upon the Effective Date, the Reorganized Debtor (a) shall automatically be substituted in place of the Chapter 11 Trustee as the party representing the Estate in respect of any pending lawsuit, motion or other pleading pending before the Bankruptcy Court or any other tribunal, and (b) is authorized to file a notice on the docket of each adversary proceeding or the Chapter 11 Cases regarding such substitution.  The Reorganized Debtor shall have exclusive standing and authority to prosecute, settle or compromise Estate Claims for the benefit of the Estate in the manner set forth in this Plan.

7.04.   Plan Injunction.  The Reorganized Debtor shall be entitled to the full protection and benefit of the Plan Injunction and shall have standing to bring any action or proceeding necessary to enforce the Plan Injunction against any Person.

7.05.   Relief from the Bankruptcy Court.  The Reorganized Debtor shall be authorized to seek relief from the Bankruptcy Court or any other tribunal having jurisdiction as to any matter relating or pertaining to the consummation, administration or performance of this Plan, including without

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 619 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 733 of 1828 PageID 10226
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 618 of 1803 PageID 11364
Case 19-30264-sgj11 Doc 830 Filed 01/23/18 Entered 01/23/18 17:34:06 Page 62 of 229

limitation seeking any relief from the Bankruptcy Court which the Reorganized Debtor deems necessary or appropriate to the performance of its duties or the administration of this Plan.

## ARTICLE VIII.
## SOURCE OF DISTRIBUTIONS

8.01.  <u>Source of Distributions</u>.  All Distributions under this Plan shall be made by the Reorganized Debtor in the manner provided in this Plan and the Confirmation Order.

8.02.  <u>Timing and Amount of Distributions</u>.  No Distribution shall be made on account of any Claim until such Claim is Allowed, except as otherwise set forth in this Plan or otherwise ordered by the Bankruptcy Court.  No Distribution shall be made on account of any Contested Claim until such Claim is Allowed.  Except as expressly set forth in the Plan or in the Confirmation Order, the Reorganized Debtor shall, in the exercise of its good faith business judgment, determine the timing and amount of all Distributions which are required to be made under the Plan, consistent with the goal of making such Distributions as expeditiously as reasonably possible.  The Reorganized Debtor may, but shall not be required to, seek approval of, or any other appropriate relief from, the Bankruptcy Court with respect to any of such Distributions.  Any Unclaimed Property may be paid into the registry of the Bankruptcy Court or otherwise distributed in accordance with the orders of the Bankruptcy Court.

8.03.  <u>Means of Cash Payment</u>.  Cash payments pursuant to this Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

8.04.  <u>Record Date for Distributions</u>.  As of the close of business on the Effective Date (the "<u>Distribution Record Date</u>"), the register for Claims will be closed, and there shall be no further changes in the holders of record of any Claims.  Although there is no prohibition against the transfer of any Claim by any Creditor, the Reorganized Debtor shall have no obligation to recognize any transfer of a Claim occurring after the Distribution Record Date, and the Reorganized Debtor shall instead be authorized and entitled to recognize and deal for all purposes under this Plan, including for the purpose of making all Distributions, with only those holders of Claims so reflected as of the Distribution Record Date.  However, the Reorganized Debtor may, in the exercise of its good faith business judgment, agree to recognize transfers of Claims after the Distribution Record Date, but shall have no obligation to do so.

8.05.  <u>Delivery of Distributions</u>.  All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in the Chapter 11 Cases by such Claimants or, if the Distribution is to be made based on a Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules.  Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to this Plan when deposited in the United States Mail, postage prepaid, addressed as required in the preceding sentence.  If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim.  However, all notices to the Reorganized Debtor reflecting new or updated addresses for undeliverable Distributions shall be made on or before one hundred twenty (120) days after the date of the attempted Distribution or such longer period as the Reorganized Debtor may fix in the exercise of its sole discretion.  After such date, all Unclaimed Property shall revert to the Reorganized Debtor and the Claim of any holder with respect to such property shall be discharged and forever barred.

Appellee Appx. 00612
APPx. 10347

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 620 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 734 of 1828 PageID 10227
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 619 of 1803 PageID 11365
Case 18-30264-sgj11 Doc 830 Filed 10/25/18 Entered 10/25/18 16:34:06 Page 69 of 229

8.06. <u>W-9 Forms</u>. Each holder of an Allowed Claim must provide a W-9 form or other such necessary information to comply with any withholding requirements of any Governmental Unit (collectively the "<u>W-9 Form</u>") to the Reorganized Debtor prior to receiving any Distribution from the Reorganized Debtor. In the event a holder of an Allowed Claim does not provide a W-9 Form to the Reorganized Debtor within thirty (30) days of the Effective Date, the Reorganized Debtor shall, at an appropriate time, issue a written request to each holder of an Allowed Claim that has not previously provided a W-9 Form to the Reorganized Debtor. The request shall be in writing and shall be delivered to the last address known to the Debtors or Reorganized Debtor, as appropriate. The request shall conspicuously advise and disclose that failure to provide a W-9 Form to the Reorganized Debtor within thirty (30) days shall result in a waiver of any right or rights to a Distribution from the Reorganized Debtor. In the event any holder of an Allowed Claim fails to provide the Reorganized Debtor with a W-9 Form within thirty (30) days after the date of written request described herein, then the holder of such Allowed Claim shall be deemed to have waived the right to receive any Distribution whatsoever from the Reorganized Debtor.

8.07. <u>Time Bar to Cash Payments</u>. Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any check shall be made directly to the issuer of the check by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Reorganized Debtor may fix. After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.08. <u>Cure Period</u>. Except as otherwise set forth herein, the failure by the Reorganized Debtor to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Reorganized Debtor has been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default. Until the expiration of such thirty (30) day cure period, the Reorganized Debtor shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes. Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.

8.09. <u>Pre-Payment of Claims</u>. Unless the Plan expressly prohibits or conditions the pre-payment of an Allowed Claim, the Reorganized Debtor may pre-pay any Allowed Claim in whole or in part at any time and may do so without penalty.

8.10. <u>Distributions after Substantial Consummation</u>. All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

Appellee Appx. 00613
APPX. 03470

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 621 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 735 of 1828   PageID 10228
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 620 of 1803   PageID 11366
Case 18-302264-sgj11 Doc 830 Filed 01/28/19    Entered 01/28/19 17:34:06    Page 72 of 229

## ARTICLE IX.
## RETENTION OF ESTATE CLAIMS AND ESTATE DEFENSES.

9.01.    Retention of Estate Claims.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Claims shall be transferred to, and vested in, the Reorganized Debtor, both for purposes of seeking an affirmative recovery against any Person and for the purposes of offset, recoupment or defense against any Claim asserted against the Estate or Reorganized Debtor.  All Estate Claims shall be deemed to have been transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

        Without limiting the effectiveness or generality of the foregoing reservation, out of an abundance of caution, the Debtors and the Estate hereby specifically reserves, retains, and preserves the Estate Claims reflected in the attached **Exhibit A**.  Reference is here made to **Exhibit A** which constitutes an integral part of this Plan.  The provisions of this Article of the Plan, as well as the descriptions and disclosures relating to the Estate Claims in the Disclosure Statement, are provided in the interest of providing maximum disclosure of the Estate Claims of which Debtors are presently aware and shall not act as a limitation on the potential Estate Claims that may exist.  It is the specific intention of this Plan that all Avoidance Actions and all associated remedies, and any other Estate Claims, whether arising before or after the Petition Date, and whether arising under the Bankruptcy Code or applicable state or federal non-bankruptcy laws, shall all be reserved, retained and preserved under this Plan to be transferred to, and vested in, the Reorganized Debtor.  All Estate Claims are reserved, retained and preserved both as causes of action for an affirmative recovery and as counterclaims and for the purposes of offset or recoupment against any Claims asserted against the Estate.

9.02.    Retention of Estate Defenses.  Except as otherwise specifically provided in this Plan, pursuant to section 1123(b)(3) of the Bankruptcy Code, all Estate Defenses shall be transferred to, and vested in, the Reorganized Debtor.  For this purpose, all Estate Defenses are hereby reserved, retained and preserved by the Debtors and the Estate, including without limitation all such Estate Defenses available to the Estate pursuant to section 558 of the Bankruptcy Code, and shall be deemed as transferred to, and vested in, the Reorganized Debtor as of the Effective Date based on the entry of the Confirmation Order.

9.03.    Assertion of Estate Claims and Estate Defenses.  The Reorganized Debtor shall have, and be vested with, the exclusive right, authority and standing to assert all Estate Claims and Estate Defenses for the benefit of the Reorganized Debtor.

## ARTICLE X.
## PROCEDURES FOR RESOLVING AND TREATING
## CONTESTED AND CONTINGENT CLAIMS

10.01.  Claims Listed in Schedules as Disputed.  Any General Unsecured Claim which is listed in the Schedules as unliquidated, contingent or disputed, and for which no proof of Claim has been timely filed, shall be considered as Disallowed as of the Effective Date without the necessity of any further action by the Reorganized Debtor or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

10.02.  Responsibility for Objecting to Claims and Settlement of Claims.  The Reorganized Debtor shall have the exclusive standing and authority to either object to any Claim or settle and compromise any Objection to any Claim, including as follows:

Appellee Appx. 00614
APPX. 10479

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 622 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 736 of 1828   PageID 10229
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 621 of 1803   PageID 11367
Case 19-30264-sgj11 Doc 830 Filed 10/25/19   Entered 10/25/19 17:34:06   Page 23 of 229

(a)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim.  Any Contested Claim may be litigated to Final Order by the Reorganized Debtor; and

(b)     From and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court.  Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested Claim after the Effective Date.

10.03.  Objection Deadline.  All Objections to Claims shall be served and filed by the Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  The Reorganized Debtor may seek to extend the Objection Deadline pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim.  Any such motion may be granted without notice or a hearing.  In the event that the Reorganized Debtor files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such motion.  Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtor.  Nothing contained herein shall limit the right of the Reorganized Debtor to object to Claims, if any, filed or amended after the Objection Deadline.

10.04.  Response to Claim Objection.  If the Reorganized Debtor files an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within twenty-four (24) days after the filing and service of the Objection upon the holder of the Contested Claim.  Each such Objection shall contain appropriate negative notice advising the Creditor whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing.  The negative notice language in the Objection shall satisfy the notice requirement in section 3007(a) of the Bankruptcy Rules, and the Reorganized Debtor shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

10.05.  Distributions on Account of Contested Claims.  If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance, and thereafter Distribution shall be made on account of such Allowed Claim pursuant to the provisions of the Plan.  No Distribution shall be made on account of a Contested Claim until Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

10.06.  No Waiver of Right to Object.  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan, or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtor's right to object to any Claim.

10.07.  Offsets and Defenses.  The Reorganized Debtor shall be vested with and retain all Estate Claims and Estate Defenses, including without limitation all rights of offset or recoupment and all counterclaims against any Claimant holding a Claim.  Assertion of counterclaims by the

Appellee Appx. 00615
APPX. 10472

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 623 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 737 of 1828    PageID 10230
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 622 of 1803    PageID 11368
Case 19-30264-sgj11 Doc 830 Filed 01/22/19    Entered 01/22/19 17:34:06    Page 24 of 229

Reorganized Debtor against any Claim asserted against the Estate or Reorganized Debtor shall constitute "core" proceedings.

10.08.  Claims Paid or Reduced Prior to Effective Date.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court.  To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Debtors or the Reorganized Debtor from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

## ARTICLE XI.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

11.01.  Assumption and Rejection of Executory Contracts.  All Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected by the Debtors upon the Effective Date unless an Executory Contract or Unexpired Lease (a) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) is identified in **Exhibit B** to this Plan and/or the Confirmation Order to be (i) assumed or (ii) assumed and assigned, or (c) is the subject of a motion to assume filed on or before the Confirmation Date. The Plan shall constitute a motion to reject all Executory Contracts and Unexpired Leases except as stated in this paragraph.  However, the Debtors may file a separate motion for the assumption or rejection of any Executory Contract or Unexpired Lease at any time through the Confirmation Date.

11.02.  Cure Payments.  All payments that may be required by section 365(b)(1) of the Bankruptcy Code to satisfy any Cure Claim shall be made by the Reorganized Debtor as soon as reasonably practical after the Effective Date or upon such terms as may be otherwise agreed between the Reorganized Debtor and the holder of such Cure Claim; *provided, however*, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, or any other matter pertaining to assumption or assignment of an Executory Contract, the Reorganized Debtor shall make such cure payments and cure such other defaults, all as may be required by section 365(b)(1) of the Bankruptcy Code, following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

11.03.  Bar to Rejection Claims.  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract or Unexpired Lease shall be forever barred and shall not be enforceable against the Reorganized Debtor or the Reorganized Debtor's assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor and its counsel by the earlier of thirty (30) days after the Effective Date or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract or Unexpired Lease.

11.04.  Rejection Claims.  Any Rejection Claim not barred by section 11.03 of the Plan shall be classified as a Class 3 General Unsecured Claim subject to the provisions of sections 502(b)(6) and 502(g) of the Bankruptcy Code; *provided, however*, that any Rejection Claim by a lessor based upon the rejection of an unexpired lease of real property, either prior to the Confirmation Date, upon the entry of the Confirmation Order, or upon the Effective Date, shall be limited in accordance with section 502(b)(6) of the Bankruptcy Code and state law mitigation requirements.  All Rejection Claims shall be deemed as Contested Claims until Allowed. Nothing contained herein shall be deemed an admission by the Debtors or the Reorganized

Appellee Appx. 00616
Appx. 10483

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 624 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 738 of 1828 PageID 10231
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 623 of 1803 PageID 11369
Case 19-30264-sgj11 Doc 830 Filed 10/24/19 Entered 10/24/19 16:34:08 Page 73 of 229

Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtors or the Reorganized Debtor of any objections or defenses to any such Rejection Claim if asserted.

11.05. <u>Reservation of Rights</u>. Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtor have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

<div align="center">

**ARTICLE XII.**
**SUBSTANTIVE CONSOLIDATION OF THE DEBTORS**

</div>

12.01. Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the substantive consolidation of the Debtors for the sole purposes of implementing the Plan, including for purposes of voting and Distributions to be made under the Plan. Pursuant to such order: (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of the other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by the other Debtor and any joint or several liability of the Debtors will be deemed to be one obligation of the consolidated Debtors; and (c) each and every Claim filed or to be filed in the Chapter 11 Case of either Debtor will be deemed filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors.

<div align="center">

**ARTICLE XIII.**
**CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN**

</div>

13.01. <u>Conditions to Confirmation and Effectiveness of Plan</u>. The Plan shall not become effective until the following conditions shall have been satisfied and which may occur concurrently with the Effective Date: (a) the Confirmation Order shall have been entered, in form and substance acceptable to the Chapter 11 Trustee; (b) the necessary Plan Documents have been executed and delivered, and (c) all other conditions specified by the Chapter 11 Trustee have been satisfied. Any or all of the above conditions other than (a) may be waived at any time by the Chapter 11 Trustee.

13.02. <u>Notice of the Effective Date</u>. On or as soon as reasonably practical after the occurrence of the Effective Date, the Reorganized Debtor shall cause a notice of the Effective Date to be filed with the Bankruptcy Court and served on all Creditors and parties-in-interest.

13.03. <u>Revocation of Plan</u>. The Chapter 11 Trustee may revoke and withdraw the Plan at any time before the Effective Date. If the Chapter 11 Trustee revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then this Plan shall be deemed null and void and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, as the case may be, or any other Person, or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

Appellee Appx. 00617
APPX. 03484

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 625 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 739 of 1828 PageID 10232
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 624 of 1803 PageID 11370
Case 19-30264-sgj11 Doc 830 Filed 01/28/19 Entered 01/28/19 17:34:08 Page 26 of 229

## ARTICLE XIV.
## EFFECT OF THE PLAN ON CLAIMS AND INTERESTS

14.01. Compromise and Settlement

      (a)    Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtors or Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors or the Estate. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtors, the Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness. The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtors, the Estate, and the Assets. Except as otherwise provided herein, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtors and their affiliates, successors, assigns, the Reorganized Debtor or the Reorganized Debtor's Assets, or the Estate, any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

      (b)    It is not the intent of this Plan that confirmation of the Plan shall in any manner alter or amend any settlement and compromise (including those contained in agreed orders) between the Debtors and any Person that has been previously approved by the Bankruptcy Court (each, a "Prior Settlement"). To the extent of any conflict between the terms of the Plan and the terms of any Prior Settlement, the terms of the Prior Settlement shall control and such Prior Settlement shall be enforceable according to its terms.

14.02. Discharge. The Debtors and their successors in interest and assigns shall be deemed discharged and released pursuant to section 1141(d)(1) of the Bankruptcy Code from any and all Claims provided for in the Plan.

14.03. **PLAN INJUNCTION.**

      **THIS SECTION IS REFERRED TO HEREIN AS THE "PLAN INJUNCTION." EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, AS OF THE EFFECTIVE DATE ALL HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE ESTATE OR ANY OF THE ASSETS THAT AROSE PRIOR TO THE EFFECTIVE DATE ARE HEREBY PERMANENTLY ENJOINED AND PROHIBITED FROM THE FOLLOWING: (a) THE COMMENCING OR CONTINUATION IN ANY MANNER, DIRECTLY OR INDIRECTLY, OF ANY ACTION, CASE, LAWSUIT OR OTHER PROCEEDING OF ANY TYPE OR NATURE AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS WITH RESPECT TO**

Appellee Appx. 00618
Appx. 10473

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 626 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 740 of 1828 PageID 10233
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 625 of 1803 PageID 11371
Case 19-30264-sgj11 Doc 829 Filed 01/22/19 Entered 01/22/19 17:34:08 Page 75 of 229

ANY SUCH CLAIM OR INTEREST ARISING OR ACCRUING BEFORE THE EFFECTIVE DATE, INCLUDING WITHOUT LIMITATION THE ENTRY OR ENFORCEMENT OF ANY JUDGMENT, OR ANY OTHER ACT FOR THE COLLECTION, EITHER DIRECTLY OR INDIRECTLY, OF ANY CLAIM OR INTEREST AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS; (b) THE CREATION, PERFECTION OR ENFORCEMENT OF ANY LIEN, SECURITY INTEREST, ENCUMBRANCE, RIGHT OR BURDEN, EITHER DIRECTLY OR INDIRECTLY, AGAINST THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, OR (c) TAKING ANY ACTION IN RELATION TO THE DEBTORS, THE ESTATE, THE REORGANIZED DEBTOR, OR THE REORGANIZED DEBTOR'S ASSETS, EITHER DIRECTLY OR INDIRECTLY, WHICH VIOLATES OR DOES NOT CONFORM OR COMPLY WITH THE PROVISIONS OF THIS PLAN APPLICABLE TO SUCH CLAIM OR INTEREST. THE PLAN INJUNCTION SHALL ALSO BE INCORPORATED INTO THE CONFIRMATION ORDER.

IN ADDITION TO THE FOREGOING, EXCEPT TO THE EXTENT NECESSARY TO ALLOW HCLOF, THE REORGANIZED DEBTOR AND BRIGADE TO EFFECTUATE THE RESET OF ONE OR MORE OF THE ACIS CLOS IN ACCORDANCE WITH SECTION 6.08 OF THE PLAN, PURSUANT TO SECTIONS 105(a), 1123(a)(5), 1123(b)(6), AND 1142(b) OF THE BANKRUPTCY CODE, THE ENJOINED PARTIES (DEFINED BELOW) ARE HEREBY ENJOINED FROM: (a) PROCEEDING WITH, EFFECTUATING, OR OTHERWISE TAKING (i) ANY ACTION IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS PREVIOUSLY OR CURRENTLY ISSUED BY ANY SUCH PARTIES, AND (ii) ANY OTHER ATTEMPT TO LIQUIDATE THE ACIS CLOS BY ANY MEANS, (b) TRADING ANY ACIS CLO COLLATERAL IN FURTHERANCE OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, (c) EXERCISING ANY RIGHTS TO ASK OR DIRECT THE ISSUERS, CO-ISSUERS OR INDENTURE TRUSTEE TO PERFORM ANY ACTION IN RELATION TO THE ACIS CLOS THAT THE ENJOINED PARTIES ARE PROHIBITED FROM TAKING UNDER THE TERMS OF THE PLAN INJUNCTION, (d) INTERFERING IN ANY WAY WITH THE CAPITAL MARKETS PROCESS OF RESETTING ANY ACIS CLO, AND (e) SENDING, MAILING, OR OTHERWISE DISTRIBUTING ANY NOTICE TO THE HOLDERS OF THE NOTES IN THE ACIS CLOS IN CONNECTION WITH THE EFFECTUATION OF ANY OPTIONAL REDEMPTION, CALL, OR OTHER LIQUIDATION OF THE ACIS CLOS, UNTIL THE EARLIER TO OCCUR OF: (w) THE DATE UPON WHICH A FINAL ORDER IS ENTERED RESOLVING THE ESTATE'S AVOIDANCE CLAIMS AGAINST ALL ENJOINED PARTIES RELATING TO ACIS LP'S RIGHTS UNDER THE ALF PMA; (x) THE DATE UPON WHICH ALL ALLOWED CLAIMS AGAINST THE DEBTORS HAVE BEEN PAID IN FULL, (y) THE ENTRY OF AN ORDER BY THE BANKRUPTCY COURT FINDING THAT A MATERIAL DEFAULT HAS OCCURRED UNDER THE TERMS OF THE PLAN, OR (z) THE ENTRY OF A SUBSEQUENT ORDER BY THE BANKRUPTCY COURT PROVIDING OTHERWISE WITH RESPECT TO ONE OR MORE OF THE ACIS CLOS. FOR PURPOSES OF THIS PARAGRAPH, THE TERM "ENJOINED PARTIES" SHALL INCLUDE HIGHLAND, HCLOF, CLO HOLDCO, NEUTRA, HIGHLAND HCF, HIGHLAND CLOM, ANY AFFILIATES OF

27

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 627 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 741 of 1828   PageID 10234
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 626 of 1803   PageID 11372
Case 18-30264-sgj11 Doc 830 Filed 01/28/19   Entered 01/28/19 17:34:06   Page 28 of 229

**HIGHLAND, AND THEIR RESPECTIVE EMPLOYEES, AGENTS, REPRESENTATIVES, TRANSFEREES, ASSIGNS, AND SUCCESSORS. FOR PURPOSES OF CLARIFICATION AND AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL PRECLUDE ORDINARY DAY-TO-DAY TRADING OF THE COLLATERAL IN THE ACIS CLOS BY THE REORGANIZED DEBTOR.**

Notwithstanding anything to the contrary in the Plan: (a) third-party professionals employed by the Reorganized Debtor shall not be released or exculpated from any losses, claims, damages, liabilities, or expenses arising from their duties and services provided to the Reorganized Debtor; and (b) any third-party professionals employed by the Reorganized Debtor shall only be entitled to be indemnified by the Reorganized Debtor to the extent provided by applicable law.

Notwithstanding anything to the contrary in the Plan or Confirmation Order, nothing in the Plan or in the Confirmation Order shall discharge, release, enjoin or otherwise bar (i) any liability of the Debtors, the Estate, the Reorganized Debtor, or the Reorganized Debtor's assets ("Released Parties") to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring after the Confirmation Date, provided that the Released Parties reserve the right to assert that any such liability is a Claim that arose on or prior to the Confirmation Date and constitutes a Claim that is subject to the deadlines for filing proofs of claim, (ii) any liability to a Governmental Unit that is not a Claim subject to the deadlines for filing proofs of Claim, (iii) any valid right of setoff or recoupment of a Governmental Unit, and (iv) any police or regulatory action by a Governmental Unit. In addition, nothing in the Plan or Confirmation Order discharges, releases, precludes or enjoins any environmental liability to any Governmental Unit that any Person other than the Released Parties would be subject to as the owner or operator of the property after the Effective Date. For the avoidance of any doubt, nothing in this paragraph shall be construed to limit the application of the Plan Injunction to any Claim which was subject to any bar date applicable to such Claim.

14.04.  <u>Setoffs</u>.  Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Reorganized Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Estate Claims and Estate Defenses of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Estate Claims and Estate Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided, however</u>, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Estate Claims and Estate Defenses that the Estate may possess against such Claimant. In no event shall any Claimant or Interest holder be entitled to setoff any Claim or Interest against any Claim, right, or Estate Claim of the Debtors without the consent of the Debtors or the Reorganized Debtor unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

14.05.  <u>Recoupment.</u>  Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Estate Claim of the Debtors or the Reorganized Debtor unless (a) such holder actually provides notice thereof in writing to the Debtors or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be

Appellee Appx. 00620
Appx. 10483

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 628 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 742 of 1828 PageID 10235
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 627 of 1803 PageID 11373
Case 19-30264-sgj11 Doc 830 Filed 10/25/19 Entered 10/25/19 17:34:06 Page 79 of 229

recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Debtors or the Reorganized Debtor have provided a written response to such Claim or Interest holder, stating unequivocally that the Debtors or the Reorganized Debtor consents to the requested recoupment. The Debtors and the Reorganized Debtor shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment. In the absence of a written response from the Debtors or the Reorganized Debtor consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

14.06.  Turnover.  On the Effective Date, any rights of the Estate to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtor.

14.07.  Automatic Stay.  The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtors, the Estate and all Assets.  As of the Effective Date, the automatic stay shall be replaced by the Plan Injunction.

**ARTICLE XV.
JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN**

15.01.  Retention of Jurisdiction.  Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)     To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)     To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Estate Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

(c)     To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and Unexpired Leases and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract or Unexpired Lease;

(d)     To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

(e)     To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset or recoupment; and (iv) determinations of Objections to Contested Claims;

Appellee Appx. 00621
APPX. 10478

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 629 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 743 of 1828 PageID 10236
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 628 of 1803 PageID 11374
Case 19-30264-sgj11 Doc 830 Filed 01/28/19 Entered 01/28/19 17:34:06 Page 30 of 229

(f)     To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)     To administer Distributions to holders of Allowed Claims as provided herein;

(h)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)     To enable the Reorganized Debtor to prosecute any and all proceedings which may be brought to set aside transfers, Liens or encumbrances and to recover any transfers, Assets, properties or damages to which the Reorganized Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Reorganized Debtor and any other party, including but not limited to, any causes of action or Objections to Claims, preferences or fraudulent transfers and obligations or equitable subordination;

(j)     To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(k)     To enforce the discharge and Plan Injunction against any Person;

(l)     To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan and the transactions required or contemplated pursuant thereto;

(m)     To hear and determine any motion or application which the Reorganized Debtor is required or allowed to commence before the Bankruptcy Court pursuant to this Plan;

(n)     To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(o)     To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(p)     To enter a final decree closing the Chapter 11 Cases; and

(q)     To determine any other matter or dispute relating to the Estate, the Estate Claims, the Estate Defenses, the Assets, or the Distributions by the Reorganized Debtor.

15.02. Abstention and Other Courts. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Chapter 11 Cases, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.03. Non-Material Modifications. The Reorganized Debtor may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable. The Reorganized Debtor may undertake such nonmaterial modification pursuant

Appellee Appx. 00622
Appx. 10479

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 630 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 744 of 1828   PageID 10237
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 629 of 1803   PageID 11375
Case 19-30264-sgj11 Doc 820 Filed 01/24/19   Entered 01/24/19 17:34:06   Page 79 of 229

to this section insofar as it does not adversely change the treatment of the Claim of any Creditor
or the Interest of any Interest holder who has not accepted in writing the modification.

15.04.  Material Modifications.  Modifications of this Plan may be proposed in writing by the
Chapter 11 Trustee at any time before confirmation, provided that this Plan, as modified, meets
the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Chapter 11
Trustee shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be
modified at any time after confirmation and before its Substantial Consummation, provided that
the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy
Code, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified,
under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.
A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have
accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed
by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

<div align="center">

**ARTICLE XVI.**
**MISCELLANEOUS PROVISIONS**

</div>

16.01.  Severability.  Should the Bankruptcy Court determine any provision of the Plan is
unenforceable either on its face or as applied to any Claim or Interest or transaction, the
Reorganized Debtor may modify the Plan so that any such provision shall not be applicable to
the holder of any Claim or Interest.  Such a determination of unenforceability shall not (a) limit or
affect the enforceability and operative effect of any other provision of the Plan or (b) require the
resolicitation of any acceptance or rejection of the Plan.

16.02.  Oral Agreements; Modification of Plan; Oral Representations or Inducements.  The
terms of the Plan, Disclosure Statement and Confirmation Order may only be amended in
writing and may not be changed, contradicted or varied by any oral statement, agreement,
warranty or representation.  None of the Debtors, any representative of the Estate, including
Robin Phelan in his capacity as Chapter 11 Trustee, nor their attorneys have made any
representation, warranty, promise or inducement relating to the Plan or its confirmation except
as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other
order of the Bankruptcy Court.

16.03.  Waiver.  The Reorganized Debtor shall not be deemed to have waived any right, power
or privilege pursuant to the Plan unless the waiver is in writing and signed by the Reorganized
Debtor.  There shall be no waiver by implication, course of conduct or dealing, or through any
delay or inaction by the Reorganized Debtor, of any right pursuant to the Plan, including the
provisions of this anti-waiver section.  The waiver of any right under the Plan shall not act as a
waiver of any other or subsequent right, power or privilege.

16.04.  Notice.  Any notice or communication required or permitted by the Plan shall be given,
made or sent as follows:

     (a)    If to a Creditor, notice may be given as follows: (i) if the Creditor has not filed a
proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a
proof of Claim, then to the address reflected in the proof of Claim.

     (b)    If to the Reorganized Debtor, notice shall be sent to the following addresses:

**Appellee Appx. 00623**

**APPX. 10480**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 631 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 745 of 1828   PageID 10238
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 630 of 1803   PageID 11376
Case 19-30264-sgj11 Doc 830 Filed 10/28/19   Entered 10/28/19 17:34:08   Page 82 of 229

|                                  |                                 |
|----------------------------------|---------------------------------|
| Jeff P. Prostok                  | Josh Terry                      |
| Suzanne K. Rosen                 | c/o Brian P. Shaw               |
| Forshey Prostok LLP              | Rogge Dunn Group, PC            |
| 777 Main Street, Suite 1290      | 1201 Elm Street, Suite 5200     |
| Fort Worth, Texas 76102          | Dallas, Texas 75270             |

(c)     Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtor of its new address in accordance with the terms of this section.

(d)     Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

16.05.  Compliance with All Applicable Laws.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtor shall comply with such law, rule, regulation, or order; provided, however, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate Reserve has been set aside on the books of the Reorganized Debtor.

16.06.  Duties to Creditors; Exculpation.  Neither the Chapter 11 Trustee nor any agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Chapter 11 Trustee or the Debtors, including but not limited to Estate Professionals (collectively, the "Exculpated Parties"), shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Debtors' bankruptcy Estate, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following: (a) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.  All such Exculpated Parties shall be fully exculpated and released from any and all claims and causes of action by any Person, known or unknown, in connection with, or arising out of, or relating to, any of the following:  (x) the Debtors' Chapter 11 Cases, including all matters or actions in connection with or relating to the administration of the Estate, (y) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (z) any act or omission relating to the administration of the Plan after the Effective Date, except for claims and causes of action arising out of such Exculpated Party's gross negligence or willful misconduct.

16.07.  Binding Effect.  The Plan shall be binding upon, and shall inure to the benefit of, the Reorganized Debtor, the holders of the Claims or Liens, and their respective successors-in-interest and assigns.

16.08.  Governing Law, Interpretation.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan

Appellee Appx. 00624
APPX. 10189

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 632 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 746 of 1828 PageID 10239
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 631 of 1803 PageID 11377
Case 19-30264-sgj11 Doc 830 Filed 10/28/19 Entered 10/28/19 17:34:06 Page 83 of 229

Documents without regard to conflicts of law. The Plan shall control any inconsistent term or provision of any other Plan Documents.

16.09. <u>Payment of Statutory Fees</u>. All accrued U.S. Trustee Fees as of the Confirmation Date shall be paid by the Reorganized Debtor on or as soon as practicable after the Effective Date, and thereafter shall be paid by the Reorganized Debtor as such statutory fees become due and payable.

16.10. <u>Filing of Additional Documents</u>. On or before Substantial Consummation of the Plan, the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

16.11. <u>Computation of Time</u>. Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan. If the final day for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day. Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

16.12. <u>Elections by the Reorganized Debtor</u>. Any right of election or choice granted to the Reorganized Debtor under this Plan may be exercised, at the Reorganized Debtor's election, separately as to each Claim, Creditor or Person.

16.13. <u>Release of Liens</u>. Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred to and vested in the Reorganized Debtor shall be deemed to be released, terminated and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order.

16.14. <u>Rates</u>. The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

16.15. <u>Compliance with Tax Requirements</u>. In connection with the Plan, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

16.16. <u>Notice of Occurrence of the Effective Date</u>. Promptly after occurrence of the Effective Date, the Reorganized Debtor, as directed by the Bankruptcy Court, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of the occurrence of the Effective Date.

16.17. <u>Notice of Entry of Confirmation Order</u>. Promptly after entry of the Confirmation Order, the Chapter 11 Trustee, as directed by the Bankruptcy Court in the Confirmation Order, shall serve on all known parties-in-interest and holders of Claims and Interests, notice of entry of the Confirmation Order.

**Appellee Appx. 00625**
**APPX. 003492**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 633 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 747 of 1828   PageID 10240
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 632 of 1803   PageID 11378
Case 18-30264-sgj11 Doc 830 Filed 10/25/18    Entered 10/25/18 16:34:06    Page 84 of 229

Dated:  October 25, 2018.

Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
    Robin Phelan
    Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:/s/ *Robin Phelan*
    Robin Phelan
    Chapter 11 Trustee

APPROVED:

/s/ *Jeff P. Prostok*
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ *Rahkee V. Patel*
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Third Amended Joint Plan 10.25.18.docx

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 634 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 748 of 1828    PageID 10241
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 633 of 1803    PageID 11379
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 83 of 229

# EXHIBIT A

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

**[ESTATE CLAIMS]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 635 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 749 of 1828    PageID 10242
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 634 of 1803    PageID 11380
Case 18-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 84 of 229

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.    Defined Terms.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.    Estate Claims Reserved, Retained and Preserved.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "Estate Claims," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.    Highland Claims.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "Highland Adversary") and Adversary Proceeding No. 18-03212-sgj (the "Trustee's Adversary").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

**Appellee Appx. 00628**
**APPX. 10493**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 636 of
Case 3:23-cv-00726-S  Document 8-22  Filed 02/29/23    Page 750 of 1828  PageID 10243
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 635 of 1803  PageID 11381
Case 18-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 85 of 229

(d)      All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)      All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)      All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)      All Claims for breach of the PMAs or the Indentures;

(h)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)      All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)      All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)      All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)      All Claims based on alter ego or rights to pierce the corporate veil of Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 637 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 751 of 1828   PageID 10244
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 636 of 1803   PageID 11382
Case 18-30264-sgj11 Doc 830 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 86 of 229

control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 638 of
Case 3:23-cv-00726-S  Document 8-22  Filed 02/29/23   Page 752 of 1828  PageID 10245
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21   Page 637 of 1803  PageID 11383
Case 18-30264-sgj11 Doc 830 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 87 of 229

HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

       (m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

       (a)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

       (b)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

       (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

       (d)    All Avoidance Actions against Highland HCF;

       (e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

       (f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

       (g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

       (h)    All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

       (i)    All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

       (j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 639 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 753 of 1828   PageID 10246
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 638 of 1803   PageID 11384
Case 18-30264-sgj11 Doc 830 Filed 10/25/19   Entered 10/25/19 17:34:06   Page 86 of 229

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.      <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland CLOM;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00632
APPX. 10499

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 640 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 754 of 1828   PageID 10247
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 639 of 1803   PageID 11385
Case 18-30264-sgj11 Doc 830 Filed 10/31/18   Entered 10/31/18 17:34:06   Page 89 of 229

Estate;

      (k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

      (l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

      7.    <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

      (a)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

      (b)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

      (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

      (d)    All Avoidance Actions against CLO Holdco;

      (e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

      (f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

      (g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

      (h)    All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

      (i)    All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00633
APPX. 10490

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00634

APPX. 10499

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 642 of
Case 3:23-cv-00726-S  Document 8-22   Filed 02/29/23   Page 756 of 1828  PageID 10249
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 641 of 1803   PageID 11387
Case 18-30264-sgj11 Doc 830 Filed 10/25/18   Entered 10/25/18 17:34:06   Page 91 of 222

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.    Claims against Issuers, Co-Issuers and Indenture Trustee.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)    All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 643 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 757 of 1828   PageID 10250
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 642 of 1803   PageID 11388
Case 18-30264-sgj11 Doc 830 Filed 10/25/19   Entered 10/25/19 13:35:06   Page 92 of 229

(i)      All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)      All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.      <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against any Highland Affiliate;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 644 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 758 of 1828   PageID 10251
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 643 of 1803   PageID 11389
Case 18-30264-sgj11 Doc 839 Filed 10/25/18   Entered 10/25/18 13:34:06   Page 93 of 229

owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 645 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 759 of 1828 PageID 10252
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 644 of 1803 PageID 11390
Case 18-30264-sgj11 Doc 830 Filed 10/25/18 Entered 10/25/18 17:34:06 Page 94 of 229

unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13. <u>Preference Claims</u>. All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date. A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**. The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code. All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date. While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee. Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14. <u>Claims Against Officers, Managers and Members</u>. All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy. Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15. <u>Retention of Claims Against Specific Persons or Categories of Persons</u>. In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

        (a)    William Scott;

        (b)    Heather Bestwick;

        (c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

**Appellee Appx. 00638**
**APPX. 10593**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 646 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 760 of 1828    PageID 10253
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 645 of 1803    PageID 11391
Case 18-30264-sgj11 Doc 830 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 95 of 229

16.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

21.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 647 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 761 of 1828 PageID 10254
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 646 of 1803 PageID 11392
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 96 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 48 of 62

Schedule 1 to Exhibit A to

Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|----------------------------------|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 648 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 762 of 1828 PageID 10255
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 647 of 1803 PageID 11393
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 97 of 229
Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 49 of 62
Schedule 1 to Exhibit A to

Second Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|----------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 649 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 763 of 1828    PageID 10256
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 648 of 1803    PageID 11394
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 98 of 229

# EXHIBIT B

## TO THIRD AMENDED JOINT PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

### [EXECUTORY CONTRACTS ASSUMED UNDER THE PLAN]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 650 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 764 of 1828 PageID 10257
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 649 of 1803 PageID 11395
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 99 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 51 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1, Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | March 18, 2013 | $0 |

1

Appellee Appx. 00643
APPX. 03506

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 651 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 765 of 1828 PageID 10258
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 650 of 1803 PageID 11396
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 100 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 52 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Indenture | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Supplemental Indenture | February 26, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2013-1 | Supplemental Indenture | February 26, 2014 | $0 |
| Acis CLO 2013-1 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Limited Liability Company Agreement<br>(requested from HCM) | -- | $0 |

2

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 652 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 766 of 1828    PageID 10259
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 651 of 1803    PageID 11397
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 101 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 53 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A.<br>601 Travis Street, 16th Floor<br>Houston, Texas 77002<br>Attn: Global Corporate Trust –<br>Acis CLO 2013-2 | Indenture | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd.<br>c/o Estera Trust (f/k/a Appleby Trust)<br>Clifton House 75 Fort St., P.O. Box 1350<br>Grand Cayman, Cayman Islands KY1-1108 | Governing Document<br>(requested from HCM) | -- | $0 |

3

Appellee Appx. 00645
APPX. 10510

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 653 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 767 of 1828 PageID 10260
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 652 of 1803 PageID 11398
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 102 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-3 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | February 25, 2014 | $0 |

4

Appellee Appx. 00646
APPX. 03513

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 654 of 1804
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 768 of 1828   PageID 10261
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 653 of 1803   PageID 11399
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 103 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-3 | Indenture | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Memorandum and Articles of Association of Acis CLO 2014-3 Ltd. | December 24, 2013 | $0 |
| Acis CLO 2014-4 Chemical Holdings, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1 -1102 | Portfolio Management Agreement | June 5, 2014 | $0 |

5

Appellee Appx. 00647
APPX. 03514

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 655 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 769 of 1828 PageID 10262
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 654 of 1803 PageID 11400
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 104 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Indenture | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Island KY1-1102 | Memorandum and Articles of Association of Acis CLO 2014-4 Ltd. | April 1, 2014 | $0 |
| Acis CLO 2014-5 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |

6

Appellee Appx. 00648
Appx. 10513

**EXHIBIT B**

**Executory Contracts and Unexpired Leases**

**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 LLC<br>850 Library Ave., Suite 204<br>Newark, DE 19711 | Indenture | November 18, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-5 | Indenture | November 18, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1 -1102 | Memorandum and Articles of Association<br>of Acis CLO 2014-5 Ltd. | August 21, 2014 | $0 |
| Acis CLO 2015-6 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | October 28, 2016 | $0 |

7

Appellee Appx. 00649

Appx. 03516

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 657 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 771 of 1828 PageID 10264
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 656 of 1803 PageID 11402
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 106 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18 Entered 10/25/18 18:23:08 Page 58 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Limited Liability Company Agreement | October 28, 2016 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Indenture | April 16, 2015 | $0 |
| Acis CLO 2015-6 LLC 850 Library Ave., Suite 204 Newark, DE 19711 | Indenture | April 16, 2015 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Indenture | April 16, 2015 | $0 |

8

Appellee Appx. 00650
APPX. 03513

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 658 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 772 of 1828    PageID 10265
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 657 of 1803    PageID 11403
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 107 of 229

Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 59 of 62

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2015-6 Ltd. P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, KY1-1102, Cayman Islands | Memorandum and Articles of Association of Acis CLO 2015-6 Ltd. | February 11, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC P.O. Box. 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP. 300 Crescent Court Suite 700 Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC 1209 Orange Street Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |
| Acis CLO Value Master Fund II, LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd. 300 Crescent Court Suite 700 Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |

9

Appellee Appx. 00651
APPX. 10518

**EXHIBIT B**

**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| BayVK R2 Lux S.A., SICAV FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Power of Attorney<br>86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>c/o Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement<br>(Requested from HCM) | November 20, 2007 | $0 |

10

Appellee Appx. 00652

Appx. 10509

Case 18-30264-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 660 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 774 of 1828    PageID 10267
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 659 of 1803    PageID 11405
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 109 of 229

**EXHIBIT B**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

Case 18-30264-sgj11 Doc 660 Filed 10/25/18    Entered 10/25/18 18:23:08    Page 61 of 62

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd. *c/o* Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Indenture | November 20, 2007 | $0 |
| Deutsche Bank Trust Company Americas 1761 East St. Andrew Place Santa Ana, CA 92705 Attn: CDO Business Unit – Hewett's Island CLO 1-R | Indenture | November 20, 2007 | $0 |
| State Street (Guernsey Limited) First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A. 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| Acis Loan Funding, Ltd. First Floor, Dorey Court St. Peter Port, Guernsey GY1 6HJ Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |

11

Appellee Appx. 00653
APPX. 03510

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 661 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 775 of 1828    PageID 10268
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 660 of 1803    PageID 11406
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 110 of 229

**EXHIBIT B**

**Executory Contracts and Unexpired Leases
to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Capital Management, LP<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Agreement of Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Limited Liability Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1.  Acis CLO 2013-1, Ltd.
2.  Acis CLO 2013-2, Ltd.
3.  Acis CLO 2014-3, Ltd.
4.  Acis CLO 2014-4, Ltd.
5.  Acis CLO 2014-5, Ltd.
6.  Acis CLO 2015-6, Ltd.
7.  Acis CLO Value Fund II, L.P.
8.  Acis CLO Value Fund II (Cayman), L.P.
9.  Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS
11. Hewitt's Island CLO 1-R, Ltd.
12. Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit B.

12

Appellee Appx. 00654

APPX. 10519

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 662 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 776 of 1828    PageID 10269
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 661 of 1803    PageID 11407
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 111 of 229

# EXHIBIT "2"

**[First Modification to the Third Amended Joint Plan for Acis
Capital Management, L.P. and Acis Capital Management GP,
LLC – Dkt. No. 693]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 663 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 777 of 1828 PageID 10270
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 662 of 1803 PageID 11408
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 12 of 29

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

### FIRST MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
### ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this First Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP*

*and Acis Capital Management GP, LLC* [Docket No. 660] (the "Plan").

1.    Reference is here made to the Plan for all purposes. This First Modification

modifies the Plan.

2.    **Modification to Section 1.09.** Section 1.09 of the Plan is hereby modified to read

Appellee Appx. 00656
APPX. 10573

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 664 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 778 of 1828   PageID 10271
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 663 of 1803   PageID 11409
Case 19-30265-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 13 of 29

as follows:

> 1.09    "<u>Assets</u>" includes all right, title, and interest in and to all property of every type or nature owned or claimed by the Debtors as of the Petition Date, together with all such property of every type or nature subsequently acquired by the Debtors through the Effective Date, whether real or personal, tangible or intangible, and wherever located, and including, but not limited to, property as defined in section 541 of the Bankruptcy Code.

3.    The change to section 1.09 above merely corrects a typographical error in the definition of the term "Assets."  Specifically, the revised definition removes the incomplete phrase "Without limiting the foregoing, this shall include all" from the end of the definition of Assets.

4.    **Modification to Exhibit "A"**.  The copy of the Exhibit "A" reflecting Estate Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached hereto as **Exhibit "1."**

5.    A copy of the document reflecting the modifications to Exhibit A to the Plan in redline format is attached hereto as **Exhibit "2."**

6.    This First Modification is a non-material change.  It merely corrects a typographical error and revises the Estate Claims being reserved, retained and preserved under the Plan.  Further, even if this First Modification were deemed material, it does not adversely affect any creditor because no ballots have yet been received in relation to the Plan and this First Modification is being sent to all creditors and parties in interest eighteen (18) days in advance of the deadline for parties to submit ballots and any objections to the Plan.  Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this modification prior to voting on the Plan.

Dated:  November 8, 2018.          Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
     Robin Phelan
     Chapter 11 Trustee

Appellee Appx. 00657
APPX. 10572

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 665 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 779 of 1828    PageID 10272
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 664 of 1803    PageID 11410
Case 18-30264-sgj11 Doc 829 Filed 01/31/18    Entered 01/31/18 17:34:00    Page 3 of 43
Case 18-30264-sgj11 Doc 829 Filed 01/31/18    Entered 01/31/18 17:34:00    Page 114 of 229

ACIS CAPITAL MANAGMENET GP, LLC

By: /s/ *Robin Phelan*
Robin Phelan
Chapter 11 Trustee

APPROVED:                                    APPROVED:

/s/ *Jeff P. Prostok*                         /s/ *Rahkee V. Patel*
Jeff P. Prostok –  State Bar No. 16352500    Rakhee V. Patel – State Bar No. 00797213
J. Robert Forshey – State Bar No. 07264200   Phillip Lamberson – State Bar No. 00794134
Suzanne K. Rosen –  State Bar No. 00798518   Joe Wielebinski – State Bar No. 21432400
Matthew G. Maben – State Bar No. 24037008    Annmarie Chiarello –State Bar No. 24097496
**FORSHEY & PROSTOK LLP**                    **WINSTEAD PC**
777 Main St., Suite 1290                     500 Winstead Building
Ft. Worth, TX 76102                          2728 N. Harwood Street
Telephone: (817) 877-8855                    Dallas, Texas 75201
Facsimile: (817) 877-4151                    Telephone: (214) 745-5400
jprostok@forsheyprostok.com                  Facsimile:  (214) 745-5390
bforshey@forsheyprostok.com                  rpatel@winstead.com
srosen@forsheyprostok.com                    plamberson@winstead.com
mmaben@forsheyprostok.com                    jwielebinski@winstead.com
                                             achiarello@winstead.com
**COUNSEL FOR ROBIN PHELAN,**
**CHAPTER 11 TRUSTEE**                       **SPECIAL    COUNSEL    FOR    ROBIN**
                                             **PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 8, 2018.

/s/ *Jeff P. Prostok*
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\First Modification to Third Amended Plan 11.8.18.docx

Appellee Appx. 00658
APPX. 03523

# Exhibit "1"

## [Revised Exhibit "A" to the Third Amended Joint Plan]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 667 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 781 of 1828   PageID 10274
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 666 of 1803   PageID 11412
Case 19-30264-sgj11 Doc 829 Filed 01/31/18   Entered 01/31/18 17:34:00   Page 15 of 229
Case 18-30264-sgj11 Doc 839 Filed 01/31/18   Entered 01/31/18 17:34:00   Page 5 of 43

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00660
APPX. 10573

Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)    All Claims for breach of the PMAs or the Indentures;

(h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)    All Claims based on alter ego or rights to pierce the corporate veil of

Appellee Appx. 00661

APPX. 10528

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 669 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 783 of 1828 PageID 10276
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 668 of 1803 PageID 11414
Case 18-30264-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:34:00 Page 18 of 29

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00662
Appx. 10575

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 670 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 784 of 1828   PageID 10277
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 669 of 1803   PageID 11415
Case 19-30924-sgj11 Doc 829 Filed 01/31/18    Entered 01/31/18 13:49:00    Page 119 of 229

(l)    All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland HCF;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 671 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 785 of 1828    PageID 10278
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 670 of 1803    PageID 11416
Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:00  Page 120 of 229

Estate;

    (k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

    (l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

    6.    <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

    (a)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

    (b)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

    (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

    (d)    All Avoidance Actions against Highland CLOM;

    (e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

    (f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

    (g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

    (h)    All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

    (i)    All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00664
APPX. 10529

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 672 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 786 of 1828   PageID 10279
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 671 of 1803   PageID 11417
Case 19-34054-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 120 of 489

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.     CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against CLO Holdco;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00665
APPX. 10352

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 673 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 787 of 1828 PageID 10280
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 672 of 1803 PageID 11418
Case 18-30664-sgj11 Doc 893 Filed 01/30/18 Entered 01/30/18 17:34:00 Page 11 of 28

(j) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k) All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8. <u>Neutra, Ltd. Claims</u>. All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary. The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a) All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b) All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c) All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d) All Avoidance Actions against Neutra;

(e) All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f) All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g) All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h) All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i) All Claims against Neutra for the unauthorized use of Estate Assets

Exhibit "A" to Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC     Page 7

**Appellee Appx. 00666**
**APPX. 10523**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 674 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 788 of 1828   PageID 10281
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 673 of 1803   PageID 11419
Case 18-30064-sgj11 Doc 893 Filed 01/04/18   Entered 01/04/18 17:34:00   Page 23 of 28

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.      <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)      All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 675 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 789 of 1828   PageID 10282
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 674 of 1803   PageID 11420
Case 18-30064-sgj11 Doc 693 Filed 01/04/18   Entered 01/04/18 17:34:06   Page 13 of 23

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    <u>Highland Affiliate Claims</u>. All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Highland Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Appellee Appx. 00668
APPX. 10523

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 676 of
Case 3:23-cv-00726-S  Document 8-22  Filed 02/29/23  Page 790 of 1828  PageID 10283
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 675 of 1803  PageID 11421
Case 18-30664-sgj11 Doc 893 Filed 01/30/18  Entered 01/30/18 17:36:00  Page 25 of 49

(h)     All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 677 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 791 of 1828   PageID 10284
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 676 of 1803   PageID 11422
Case 18-30064-sgj11 Doc 889 Filed 01/30/18   Entered 01/30/18 17:30:00   Page 26 of 28

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 678 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 792 of 1828    PageID 10285
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 677 of 1803    PageID 11423
Case 18-30064-sgj11 Doc 693 Filed 01/30/18    Entered 01/30/18 17:34:06    Page 12 of 28

(a)     Cole Schotz, P.C.

(b)     Michael D. Warner

(c)     Jacob Frumkin

(d)     Warren A. Usatine

(e)     McKool Smith

(f)     Gary Cruciani

(g)     Michael Fritz

(h)     Carson Young

(i)     Lackey Hershman, LLP

(j)     Stinson Leonard Street LLP

(k)     Paul Lackey, Esq.

(l)     Michael Aigen, Esq.

(m)     Abrams & Bayliss, LLP

(n)     Kevin G. Abrams

(o)     A. Thompson Bayliss

(p)     Jones Day

(q)     Hilda C. Galvan

(r)     Michael Weinberg

(s)     Reid Collins & Tsai, LLP

(t)     Lisa Tsai

(u)     Stanton, LLP

(v)     James M. Stanton

(w)     Hunton Andrews Kurth

(x)     Marc Katz

(y)     Greg Waller

(z)     any other law firm or attorney who may be so named at a later date by the
Reorganized Debtor.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 679 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 793 of 1828    PageID 10286
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 678 of 1803   PageID 11424
Case 18-30264-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 129 of 239

16.    <u>Retention of Claims Against Specific Persons or Categories of Persons</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Any other Person who may be so named at a later date by the Reorganized Debtor.

17.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an
equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of
the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.
Without limiting the generality of the foregoing, this shall include all rights and remedies to
recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers,
directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 681 of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 795 of 1828 PageID 10288
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 680 of 1803 PageID 11426
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 130 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 19 of 45

**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

Schedule 1 to Exhibit "A" to

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 682 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 796 of 1828   PageID 10289
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 681 of 1803   PageID 11427
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 131 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18   Entered 11/08/18 13:03:00   Page 20 of 45

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|------|---------|-----------------|----------------|---------------------------------|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 683 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 797 of 1828    PageID 10290
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 682 of 1803    PageID 11428
Case 19-30064-sgj11 Doc 829 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 132 of 229

# Exhibit "2"
## [Redline – Plan Exhibit "A"]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 684 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 798 of 1828   PageID 10291
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 683 of 1803   PageID 11429
Case 18-30664-sgj11 Doc 289 Filed 01/30/19    Entered 01/30/19 17:34:06   Page 33 of 289

**EXHIBIT "A"**
**to**
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

     1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

     2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, <u>negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior</u>, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

     3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

          (a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

          (b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

          (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC          Page 1

**Appellee Appx. 00677**
**Appx. 10554**

Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)    All Claims for breach of the PMAs or the Indentures;

(h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)    all claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)    All Claims based on alter ego or rights to pierce the corporate veil of

Exhibit "A" to Second Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                   Page 2

Appellee Appx. 00678

APPX. 10253

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 686 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 800 of 1828   PageID 10293
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 685 of 1803   PageID 11431
Case 18-30664-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 35 of 289

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                  Page 3

Appellee Appx. 00679
Appx. 10536

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 687 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 801 of 1828   PageID 10294
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 686 of 1803   PageID 11432
Case 18-30064-sgj11 Doc 829-3 Filed 11/30/18   Entered 01/30/18 17:30:00   Page 136 of 289

(l)      All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.      <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland HCF;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Exhibit "A" to ~~Second~~<u>Third</u> Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                    Page 4

**Appellee Appx. 00680**
**APPX. 10547**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 688 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 802 of 1828   PageID 10295
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 687 of 1803   PageID 11433
Case 18-30064-sgj11 Doc 893 Filed 01/30/18   Entered 01/30/18 17:34:06   Page 137 of 289

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Exhibit "A" to ~~Second~~ <u>Third</u> Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC
Page 5

**Appellee Appx. 00681**
**APPX. 10256**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 689 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 803 of 1828   PageID 10296
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 688 of 1803   PageID 11434
Case 18-30064-sgj11 Doc 829 Filed 01/30/19  Entered 01/30/19 17:34:00  Page 139 of 289

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.      <u>CLO Holdco, Ltd. Claims</u>.  All Estate Claims against CLO Holdco, Ltd. ("<u>CLO Holdco</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                Page 6

**Appellee Appx. 00682**
**APPX. 10359**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 690 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 804 of 1828   PageID 10297
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 689 of 1803   PageID 11435
Case 18-30264-sgj11 Doc 893 Filed 01/30/18   Entered 01/30/18 17:34:00   Page 13 of 28

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

**Appellee Appx. 00683**
**APPX. 10546**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 691 of
Case 3:23-cv-00726-S   Document 8-22    Filed 12/29/23    Page 805 of 1828   PageID 10298
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 690 of 1803   PageID 11436
Case 18-30064-sgj11 Doc 3893 Filed 01/30/18   Entered 01/30/18 17:36:06   Page 49 of 289

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)      All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.      <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)      All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 692 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 806 of 1828   PageID 10299
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 691 of 1803   PageID 11437
Case 18-30064-sgj11 Doc 889 Filed 01/30/19   Entered 01/30/19 17:36:06   Page 141 of 289

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     <u>Highland Affiliate Claims</u>.  All Estate Claims against any Affiliates of Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against any Affiliates of Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any Highland Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any Highland Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                           Page 9

**Appellee Appx. 00685**
**APPX. 10552**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 693 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 807 of 1828   PageID 10300
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 692 of 1803   PageID 11438
Case 18-30264-sgj11 Doc 889 Filed 01/30/19    Entered 01/30/19 17:36:00    Page 42 of 89

(h)	All Claims against any Highland Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)	All Claims against any Highland Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)	All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Highland Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)	All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, Neutra, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)	All Claims based on alter ego or rights to pierce the corporate veil of any Highland Affiliate as to any Person, including as against any other Affiliates of Highland or any officers, directors, equity interest holders, or Persons otherwise in control of any Highland Affiliates; and,

(m)	All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.	Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.	Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC	Page 10

Appellee Appx. 00686
Appx. 10553

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 694 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 808 of 1828   PageID 10301
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 693 of 1803   PageID 11439
Case 19-30064-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:30:00   Page 43 of 289

Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.     <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.     <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

<u>15.     Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:</u>

Exhibit "A" to ~~Second~~<u>Third</u> Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                                    Page 11

Appellee Appx. 00687
Appx. 10552

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 695 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 809 of 1828   PageID 10302
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 694 of 1803   PageID 11440
Case 18-30064-sgj11 Doc 829 Filed 01/30/18   Entered 01/30/18 17:34:06   Page 44 of 49

 

    (a)     Cole Schotz, P.C.

    (b)     Michael D. Warner

    (c)     Jacob Frumkin

    (d)     Warren A. Usatine

    (e)     McKool Smith

    (f)     Gary Cruciani

    (g)     Michael Fritz

    (h)     Carson Young

    (i)     Lackey Hershman, LLP

    (j)     Stinson Leonard Street LLP

    (k)     Paul Lackey, Esq.

    (l)     Michael Aigen, Esq.

    (m)     Abrams & Bayliss, LLP

    (n)     Kevin G. Abrams

    (o)     A. Thompson Bayliss

    (p)     Jones Day

    (q)     Hilda C. Galvan

    (r)     Michael Weinberg

    (s)     Reid Collins & Tsai, LLP

    (t)     Lisa Tsai

    (u)     Stanton, LLP

    (v)     James M. Stanton

    (w)     Hunton Andrews Kurth

    (x)     Marc Katz

    (y)     Greg Waller

    (z)     any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

Exhibit "A" to ~~Second~~Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC        Page 12

Appellee Appx. 00688
APPX. 103553

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 696 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 810 of 1828   PageID 10303
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 695 of 1803   PageID 11441
Case 18-30664-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 45 of 289

15.16.  Retention of Claims Against Specific Persons or Categories of Persons.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

   (a)  William Scott;

   (b)  Heather Bestwick;

   (c)  Any other Person who may be so named at a later date by the Reorganized Debtor.


16.17.  Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

17.18.  Piercing the Corporate Veil.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

18.19.  Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

19.20.  Estate Defenses.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.  All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

20.21.  Equitable Subordination.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity

Appellee Appx. 00689
APPX. 10556

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 697 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 811 of 1828   PageID 10304
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 696 of 1803   PageID 11442
Case 18-30064-sgj11 Doc 829 Filed 01/30/19   Entered 01/30/19 17:34:00   Page 46 of 289

interest owners of the Debtors, Highland, or any Affiliates thereof.

21. 22. Recharacterization.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Exhibit "A" to Second Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC                                                 Page 14

Appellee Appx. 00690
APPX. 10555

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 698 of 1804
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 812 of 1828   PageID 10305
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 697 of 1803   PageID 11443
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 147 of 229

Case 18-30264-sgj11 Doc 693 Filed 11/08/18   Entered 11/08/18 13:03:00   Page 36 of 45

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 699 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 813 of 1828 PageID 10306
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 698 of 1803 PageID 11444
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 148 of 229
Case 18-30264-sgj11 Doc 693 Filed 11/08/18 Entered 11/08/18 13:03:00 Page 37 of 45

Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 700 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 814 of 1828    PageID 10307
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 699 of 1803    PageID 11445
Case 18-30264-sgj11 Doc 829 Filed 01/30/19    Entered 01/30/19 17:34:00    Page 149 of 289

# Exhibit "3"
## [Service Lists]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 701 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 815 of 1828    PageID 10308
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 700 of 1803    PageID 11446
Case 18-30264-sgj11 Doc 693 Filed 01/30/19    Entered 01/30/19 17:34:06    Page 59 of 229

**Notice Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

BNP Paribas Securities Services
Luxembourg Branch
60 Avenue John F. Kennedy
1855 Luxembourg

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis Funding GP, Ltd.
Acis Funding L.P.
c/o Maples Corporate Services Limited
P0 Box 309, Ugland House
Grand Cayman, Cayman Islands KY1 -1104

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Robin Phelan, Chapter 11 Trustee
Phelenlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Dallas County
c/o Sherrel K Knighton
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

Acis CLO Value Fund II (Cayman), L.P.
Acis CLO Value Fund II GP, LLC
Acis CLO Value Master Fund II, L.P.
PO Box 309, Ugland House
Grand Cayman, Cayman Islands KY1-1104

CLO Holdco, Ltd.
c/o Intertrust Corp. Srvs. (Cayman) Ltd.
190 Elgin Ave., George Town
Grand Cayman, Cayman Islands KY1-9005

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX  76102

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C.  20530

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

State Street (Guernsey) Limited
First Floor Dorey Court
Admiral Park, St. Peter Port, Guernsey

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

BayVK R2 Lux S.A., SICAV-FIS
15 Rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA  1901-7346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 702 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 816 of 1828   PageID 10309
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 701 of 1803   PageID 11447
Case 19-34054-sgj11 Doc 893 Filed 01/30/19   Entered 01/30/19 17:34:06   Page 50 of 289

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

Universal-Investment-Luxembourg S.A.
15 Rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Andrew Zollinger
DLA Piper LLP
1717 Main St., Suite 4600
Dallas, TX 75201-4629

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Hewett's Island CLO I-R, Ltd.
c/o Maples Finance Limited
PO Box 1093, Queensgate House
South Church St., George Town
Grand Cayman, Cayman Island KY1-1102

Universal-Inv.-Luxembourg SA/BayVK R2 Lux
c/o Thomas Califano/Shmuel Klahr
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Highland HCF Advisor, Ltd.
c/o Maples Corporate Services, Ltd.
P.O. Box 309, Ugland House,
South Church Street, George Town
Grand Cayman, Cayman Island KY1-1004

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Maples Corporate Services, Ltd.
P.O. Box 309, Ugland House,
South Church Street, George Town
Grand Cayman, Cayman Island KY1-1004

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Acis CLO 2013-1 Ltd.
Acis CLO 2013-2
c/o Estera Trust (f/k/a Appleby Trust)
Clifton House 75 Fort St., P.O. Box 1350
Grand Cayman, Cayman Islands KY 1-1108

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 Ltd.
Acis CLO 2014-4 Ltd.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall, Cricket Sq
Grand Cayman, Cayman Islands KY1-1102

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 Ltd.
Acis CLO 2015-6 Ltd.
c/o MaplesFS Limited
P.O. Box 1093, Boundary Hall, Cricket Sq
Grand Cayman, Cayman Islands KY1-1102

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 Ltd.
P.O. Box 1093, Boundary Hall, Cricket Sq
Grand Cayman, KY1-1102, Cayman Islands

Deutsche Bank Trust Company Americas
Attn:  CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

Acis Loan Funding, Ltd.
First Floor, Dorey Court
St. Peter Port, Guernsey GYI 6HJ
Channel Islands

Acis CLO 2017-7 Ltd.
c/o MapleFS Limited, Attn: Directors
PO Box 1093, Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1 -1102

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 703 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 817 of 1828 PageID 10310
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 702 of 1803 PageID 11448
Case 18-30264-sgj11 Doc 893 Filed 01/31/19 Entered 01/31/19 17:34:00 Page 52 of 89

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

## Noteholders List

## [Confidential]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 705 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 819 of 1828 PageID 10312
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 704 of 1803 PageID 11450
Case 18-30264-sgj11 Doc 893 Filed 01/30/18 Entered 01/30/18 17:36:06 Page 153 of 239

**Creditors Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

## Class 2

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

## Class 3

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 706 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 820 of 1828 PageID 10313
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 705 of 1803 PageID 11451
Case 18-30264-sgj11 Doc 893 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 55 of 289

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422-1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Directors - Acis CLO 2013-1 Ltd.**
**75 Fort St., Clifton House**
**PO Box 1350**
**George Town, Grand Cayman**
**Cayman Island, KY1-1108**

**Directors - Acis CLO 2014-3 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-4 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-5 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2015-6 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Acis CLO 2013-1, Ltd.**
**c/o Appleby Trust, Attn: Directors**
**Clifton House 75 Fort St., P0 Box 13**
**Grand Cayman, Cayman Islands KY1-1108**

**Acis CLO 2013-2 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-3 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

**Acis CLO 2017-7 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 707 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 821 of 1828 PageID 10314
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 706 of 1803 PageID 11452
Case 19-34054-sgj11 Doc 893 Filed 01/30/19 Entered 01/30/19 17:34:06 Page 156 of 229

**Class 4**

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 708 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 822 of 1828   PageID 10315
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 707 of 1803   PageID 11453
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 157 of 229

# EXHIBIT "3"

**[Second Modification to the Third Amended Joint Plan for
Acis Capital Management, L.P. and Acis Capital Management
GP, LLC – Dkt. No. 702]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 709 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 823 of 1828   PageID 10316
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 708 of 1803   PageID 11454
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 158 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | CHAPTER 11 CASES |
| ACIS CAPITAL MANAGEMENT, L.P., ACIS CAPITAL MANAGEMENT GP, LLC, | § § § | CASE NO. 18-30264-sgj11 (Jointly Administered) |
| Debtors. | § § | |

## SECOND MODIFICATION TO THE THIRD AMENDED JOINT PLAN FOR
## ACIS CAPITAL MANAGEMENT, LP AND ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this Second Modification (the "First

Modification") to the *Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP

and Acis Capital Management GP, LLC* [Docket No. 660], as modified by the *First Modification

to the Third Amended Joint Chapter 11 Plan for Acis Capital Management, LP and Acis Capital

Management GP, LLC* [Docket No. 693] (together, the "Plan").

1.      Reference is here made to the Plan for all purposes.  This Second Modification

Appellee Appx. 00702
Appx. 10569

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 710 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 824 of 1828   PageID 10317
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 709 of 1803   PageID 11455
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:08   Page 159 of 229

modifies the Plan.

2.     **Modification to Exhibit "A".**  The copy of the Exhibit "A" reflecting Estate

Claims is hereby deleted in its entirety and replaced with the version of the "Exhibit A" attached

hereto as **Exhibit "1."**

3.     A copy of the document reflecting the modifications to Exhibit A to the Plan in

redline format is attached hereto as **Exhibit "2."**

4.     This Second Modification is a non-material change.  It merely revises the Estate

Claims being reserved, retained and preserved under the Plan.   Further, even if this First

Modification were deemed material, it is being sent to all creditors and parties in interest ten (10)

days in advance of the deadline for parties to submit ballots and any objections to the Plan.

Consequently, creditors and parties in interest will have an adequate opportunity to evaluate this

modification prior to voting on the Plan or to change their previous acceptance or rejection upon

consideration of the modification.

Dated:  November 16, 2018.          Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
     Robin Phelan
     Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:  /s/ *Robin Phelan*
     Robin Phelan
     Chapter 11 Trustee

Appellee Appx. 00703
APPX. 10560

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 711 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 825 of 1828    PageID 10318
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 710 of 1803    PageID 11456
Case 19-30064-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 160 of 229

APPROVED:

/s/ Jeff P. Prostok
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ Rakhee V. Patel
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL    COUNSEL    FOR    ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system and via U.S. Mail, postage prepaid (and via Express Mail to out of country recipients) on the parties on the service lists attached as **Exhibit "3"** hereto on November 16, 2018.

/s/ Jeff P. Prostok
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Second Modification to Third Amended Plan 11.16.18.docx

Appellee Appx. 00704
Appx. 10569

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 712 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 826 of 1828    PageID 10319
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 711 of 1803    PageID 11457
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 161 of 229

# Exhibit "1"

## [Revised Exhibit "A" to the Third Amended Joint Plan]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 713 of 1804
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 827 of 1828   PageID 10320
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 712 of 1803    PageID 11458
Case 19-30265-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:34:05 Page 162 of 229

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

    1.  <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

    2.  <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

    3.  <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)  All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)  All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)  All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 714 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 828 of 1828    PageID 10321
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 713 of 1803    PageID 11459
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 163 of 229

Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)      All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)      All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)      All Claims for breach of the PMAs or the Indentures;

(h)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)      All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)      All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)      All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)      All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 715 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 829 of 1828 PageID 10322
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 714 of 1803 PageID 11460
Case 18-30264-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:34:05 Page 164 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     <u>HCLOF Claims</u>.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 716 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 830 of 1828   PageID 10323
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 715 of 1803   PageID 11461
Case 18-30264-sgj11 Doc 829 Filed 01/31/18   Entered 01/31/18 17:54:06   Page 165 of 229

(l)      All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.      <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland HCF;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 717 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 831 of 1828 PageID 10324
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 716 of 1803 PageID 11462
Case 18-30264-sgj11 Doc 829 Filed 01/31/18 Entered 01/31/18 17:34:05 Page 166 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00710
APPX. 10573

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 718 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 832 of 1828   PageID 10325
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 717 of 1803   PageID 11463
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 167 of 289

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.    CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against CLO Holdco;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 719 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 833 of 1828   PageID 10326
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 718 of 1803   PageID 11464
Case 18-30064-sgj11 Doc 792 Filed 01/16/18    Entered 01/16/18 17:34:06    Page 168 of 209

   (j)  All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

   (k)  All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

   (l)  All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

  8.  <u>Neutra, Ltd. Claims</u>.  All Estate Claims against Neutra, Ltd. ("<u>Neutra</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

   (a)  All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

   (b)  All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

   (c)  All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

   (d)  All Avoidance Actions against Neutra;

   (e)  All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

   (f)  All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

   (g)  All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

   (h)  All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

   (i)  All Claims against Neutra for the unauthorized use of Estate Assets

Exhibit "A" to Third Amended Joint Plan for Acis Capital Management, LP
and Acis Capital Management GP, LLC         Page 7

Appellee Appx. 00712
APPX. 10357

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 720 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 834 of 1828   PageID 10327
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 719 of 1803   PageID 11465
Case 18-30264-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 69 of 209

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.    <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)    All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 721 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 835 of 1828    PageID 10328
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 720 of 1803    PageID 11466
Case 18-30264-sgj11 Doc 3782 Filed 01/16/18    Entered 01/16/18 17:34:05    Page 79 of 289

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.    Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.  All Estate Claims against any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 722 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 836 of 1828   PageID 10329
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 721 of 1803   PageID 11467
Case 18-30664-sgj11 Doc 829 Filed 01/16/19   Entered 01/16/19 17:34:06   Page 71 of 209

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Appellee Appx. 00715
Appx. 10570

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 723 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 837 of 1828   PageID 10330
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 722 of 1803   PageID 11468
Case 18-30264-sgj11 Doc 792 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 72 of 209

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved, retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

**Appellee Appx. 00716**
**APPX. 10373**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 724 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 838 of 1828 PageID 10331
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 723 of 1803 PageID 11469
Case 18-30064-sgj11 Doc 792 Filed 01/16/19 Entered 01/16/19 17:34:06 Page 18 of 29

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the
following:

|     |     |
| --- | --- |
| (a) | Cole Schotz, P.C. |
| (b) | Michael D. Warner |
| (c) | Jacob Frumkin |
| (d) | Warren A. Usatine |
| (e) | McKool Smith |
| (f) | Gary Cruciani |
| (g) | Michael P. Fritz |
| (h) | Carson D. Young |
| (i) | Nicholas Matthews |
| (j) | Lackey Hershman, LLP |
| (k) | Stinson Leonard Street LLP |
| (l) | Jamie R. Welton |
| (m) | Paul B. Lackey |
| (n) | Michael Aigen |
| (o) | Roger L. Mandel |
| (p) | Abrams & Bayliss, LLP |
| (q) | Kevin G. Abrams |
| (r) | A. Thompson Bayliss |
| (s) | Jones Day |
| (t) | Hilda C. Galvan |
| (u) | Michael Weinberg |
| (v) | Reid Collins & Tsai, LLP |
| (w) | Lisa Tsai |
| (x) | Stanton, LLP |
| (y) | James M. Stanton |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 725 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 839 of 1828   PageID 10332
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 724 of 1803   PageID 11470
Case 18-30064-sgj11 Doc 792 Filed 01/31/19    Entered 01/31/19 17:34:05    Page 14 of 29

      (z)    Hunton Andrews Kurth

      (aa)   Marc Katz

      (bb)   Greg Waller

      (cc)   any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

     16.    <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

      (a)    William Scott;

      (b)    Heather Bestwick;

      (c)    Scott Ellington

      (d)    Isaac Leventon

      (e)    Jean Paul Sevilla

      (f)    Hunter Covitz

      (g)    The Dugaboy Investment Trust

      (h)    Nancy Dondero, Trustee of the Dugaboy Trust

      (i)    Grant Scott

      (j)    Any other Person who may be so named at a later date by the Reorganized Debtor.

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 726 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 840 of 1828    PageID 10333
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 725 of 1803    PageID 11471
Case 18-30264-sgj11 Doc 792 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 75 of 229

17.  <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.  <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.  <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.  <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.  <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.  <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 727 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 841 of 1828    PageID 10334
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 726 of 1803    PageID 11472
Case 18-30264-sgj11 Doc 820-2 Filed 01/31/98    Entered 01/31/98 17:34:06    Page 76 of 289

# Exhibit "2"
## [Redline – Plan Exhibit "A"]

EXHIBIT "A"
to
Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

    1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

    2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, breach, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

    3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

        (a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

        (b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

        (c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Appellee Appx. 00721

APPX. 10378

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 729 of
1804
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 843 of 1828   PageID 10336
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 728 of 1803   PageID 11474
Case 18-30264-sgj11 Doc 1692 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 73 of 209

Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

(e)      All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

(f)      All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

(g)      All Claims for breach of the PMAs or the Indentures;

(h)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(i)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(j)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(k)      All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

(l)      All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(m)      All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(n)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(o)      All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(p)      All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 730 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 844 of 1828    PageID 10337
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 729 of 1803    PageID 11475
Case 18-30264-sgj11 Doc 820 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 179 of 229
Case 18-30264-sgj11 Doc 670-1 Filed 11/16/18    Entered 11/16/18 17:34:05    Page 179 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.    HCLOF Claims.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against HCLOF;

(e)    All Claims for breach of the PMAs or the Indentures;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Appellee Appx. 00723
APPX. 10586

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 731 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 845 of 1828   PageID 10338
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 730 of 1803   PageID 11476
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 180 of 219

(l)    All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.    <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland HCF;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Appellee Appx. 00724
Appx. 10589

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 732 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 846 of 1828    PageID 10339
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 731 of 1803    PageID 11477
Case 18-30264-sgj11 Doc 820 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 181 of 229

Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Highland HCF as to any Person, including as against any Affiliates of Highland HCF or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland HCF; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

6.    Highland CLO Management, Ltd. Claims.  All Estate Claims against Highland CLO Management, Ltd. ("Highland CLOM") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against Highland CLOM asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against Highland CLOM;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against Highland CLOM for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against Highland CLOM for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 733 of 1804

Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 847 of 1828 PageID 10340

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 732 of 1803 PageID 11478

Case 18-30264-sgj11 Doc 872 Filed 01/16/19 Entered 01/16/19 17:34:06 Page 182 of 229
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:05 Page 96 of 209

       (j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

       (k)     All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

       (l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

       7.    CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

       (a)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

       (b)     All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

       (c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

       (d)     All Avoidance Actions against CLO Holdco;

       (e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

       (f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

       (g)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

       (h)     All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

       (i)     All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Appellee Appx. 00726

APPX. 03593

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 734 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 848 of 1828   PageID 10341
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 733 of 1803   PageID 11479

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 182 of 229
Case 18-30264-sgj11 Doc 782 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 88 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8.      Neutra, Ltd. Claims.  All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Neutra;

(e)      All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Neutra for the unauthorized use of Estate Assets

Appellee Appx. 00727
APPX. 10594

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 735 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 849 of 1828   PageID 10342
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 734 of 1803   PageID 11480
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 184 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)        All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)        All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)        All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)        All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.        Claims against Issuers, Co-Issuers and Indenture Trustee.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "Issuers"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "Co-Issuers"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)        All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)        All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)        All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)        All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)        All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)        All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)        All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00728
APPX. 10503

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 736 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 850 of 1828   PageID 10343
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 735 of 1803   PageID 11481

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 185 of 209
Case 18-30264-sgj11 Doc 791 Filed 01/16/19   Entered 01/16/19 17:34:05   Page 85 of 209

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11 Trustee, or Estate; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

10.     ~~Highland Affiliate~~ Claims~~.~~ *Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates.* All Estate Claims against any Affiliates of Highland*, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates (collectively, the "Affiliates" and each, an "Affiliate")* are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against ~~any~~ *such* Affiliates ~~of Highland~~ shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)     All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against any ~~Highland~~ Affiliate asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against any ~~Highland~~ Affiliate;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Appellee Appx. 00729
APPX. 03594

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 737 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23    Page 851 of 1828  PageID 10344
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 736 of 1803  PageID 11482
Case 18-30264-sgj11 Doc 829 Filed 01/31/19  Entered 01/31/19 17:34:06  Page 136 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19  Entered 01/16/19 17:34:05  Page 10 of 16

(g)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)    All Claims against any ~~Highland~~ Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)    All Claims against any ~~Highland~~ Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any ~~Highland~~ Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, ~~or any~~the Affiliates ~~thereof~~, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of any ~~Highland~~ Affiliate as to any Person, including as against ~~any other~~Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates ~~of Highland~~, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any ~~Highland~~ Affiliates; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.    <u>Dondero Claims</u>.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.    <u>Okada Claims</u>.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 738 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 852 of 1828   PageID 10345
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 737 of 1803   PageID 11483

Case 18-30264-sgj11 Doc 879-1 Filed 01/16/18   Entered 01/16/18 17:34:06   Page 187 of 229

care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.   Preference Claims.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.   Claims Against Officers, Managers and Members.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.   Claims Against Former Attorneys and Law Firms.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims

Appellee Appx. 00731

Appx. 10598

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 739 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 853 of 1828    PageID 10346
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 738 of 1803    PageID 11484

Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 88 of 229
Case 18-30264-sgj11 Doc 792 Filed 01/16/19    Entered 01/16/19 17:34:05    Page 88 of 229

for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which rendered legal services to the Debtors on a prepetition basis including, but not limited to, the following:

      (a)    Cole Schotz, P.C.

      (b)    Michael D. Warner

      (c)    Jacob Frumkin

      (d)    Warren A. Usatine

      (e)    McKool Smith

      (f)    Gary Cruciani

      (g)    Michael P. Fritz

      (h)    Carson D. Young

      (i)    Nicholas Matthews

      (i)(j)    Lackey Hershman, LLP

      (j)(k)    Stinson Leonard Street LLP

      (l)    Jamie R. Welton

      (k)(m)    Paul B. Lackey, Esq.

      (l)(n)    Michael Aigen, Esq.

      (o)    Roger L. Mandel

      (m)(p)    Abrams & Bayliss, LLP

      (n)(q)    Kevin G. Abrams

      (o)(r)    A. Thompson Bayliss

      (p)(s)    Jones Day

      (q)(t)    Hilda C. Galvan

      (r)(u)    Michael Weinberg

      (s)(v)    Reid Collins & Tsai, LLP

      (t)(w)    Lisa Tsai

      (u)(x)    Stanton, LLP

(v)(y) James M. Stanton

(w)(z) Hunton Andrews Kurth

(x)(aa) Marc Katz

(y)(bb) Greg Waller

(z)(cc) any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16. Retention of Claims Against Specific Persons or Categories of Persons. In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against the following Persons:

16. Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates. In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act. Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a) William Scott;

(b) Heather Bestwick;

(c) Scott Ellington

(d) Isaac Leventon

(e) Jean Paul Sevilla

(f) Hunter Covitz

(g) The Dugaboy Investment Trust

(h) Nancy Dondero, Trustee of the Dugaboy Trust

(i) Grant Scott

Case 18-30264-sgj11 Doc 792 Filed 01/16/19 Entered 01/16/19 17:34:05 Page 99 of 229

(j)    Any other Person who may be so named at a later date by the
Reorganized Debtor.

(c)

17.    Counterclaims.  All Estate Claims as defined in paragraph 2 above are reserved,
retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for
an affirmative recovery against the Person against whom such Claims are asserted and as a
counterclaim or offset against any Person who asserts a Claim against the Estate or
Reorganized Debtor.

18.    Piercing the Corporate Veil.  With respect to all Estate Claims against any
Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and
preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the
generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including
reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate
a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to
establishing personal liability against James D. Dondero or Mark K. Okada.

19.    Avoidance Actions.  All Avoidance Actions are hereby reserved, retained and
preserved as to all Persons.  The reservation, retention and preservation of such Avoidance
Actions shall include the reservation, retention and preservation for the benefit of the Estate and
Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    Estate Defenses.  All Estate Defenses are hereby reserved, retained and
preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any
Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or
counterclaim or right of recoupment against, any Person asserting a Claim against the Estate.
All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained
and preserved for the benefit of the Estate and the Reorganized Debtor, including without
limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel,
failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*,
collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse
domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to
Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    Equitable Subordination.  All rights or remedies for Equitable Subordination are
hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against
any Person asserting any Claim against the Estate, including all such rights or remedies
pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the
foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim
asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity
interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    Recharacterization.  All rights or remedies to recharacterize any Claim as an
equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of
the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate.
Without limiting the generality of the foregoing, this shall include all rights and remedies to
recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers,
directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

# Exhibit "3"
## [Service Lists]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 743 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 857 of 1828 PageID 10350
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 742 of 1803 PageID 11488
Case 18-30264-sgj11 Doc 820 Filed 01/31/19 Entered 01/31/19 17:34:05 Page 98 of 229

**Notice Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

**BNP Paribas Securities Services**
**Luxembourg Branch**
**60 Avenue John F. Kennedy**
**1855 Luxembourg**

United States Trustee
Lisa Lambert
1100 Commerce St., Room 976
Dallas, TX 75242

Acis CLO 2013-1 Chemical Holdings, LLC
Acis CLO 2013-2 Chemical Holdings, LLC
Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Dallas County
c/o Laurie Spindler
Linebarger, Goggan, Blair & Sampson LLP
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Dallas County
c/o Sherrel K Knighton
Linebarger, Goggan, Blair & Sampson, LLP
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

Acis CLO 2014-4 Chemical Holdings, LLC
Acis CLO 2014-5 Chemical Holdings, LLC
Acis CLO 2015-6 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Management, LLC
Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

**Acis CLO Value Fund II (Cayman), L.P.**
**Acis CLO Value Fund II GP, LLC**
**Acis CLO Value Master Fund II, L.P.**
**PO Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1-1104**

Acis CLO Value Fund II, L.P.
Acis Loan Funding, Ltd.
Acis Capital Management GP, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

**Acis Funding GP, Ltd.**
**Acis Funding L.P.**
**c/o Maples Corporate Services Limited**
**P0 Box 309, Ugland House**
**Grand Cayman, Cayman Islands KY1 -1104**

U. S. Bank National Association
Attn: Michael Zak
60 Livingston Ave., EP-MN-WS3D
Saint Paul, MN 55107-2292

**State Street (Guernsey) Limited**
**First Floor Dorey Court**
**Admiral Park, St. Peter Port, Guernsey**
**Channel Islands GYl 6HJ**

Mizuho Securities USA Inc.
320 Park Ave., 12th Floor
New York, NY 10022-6848

US Bank National Association
c/o Mark D. Kotwick, Arlene Alves
Seward & Kissell LLP
One Battery Park Plaza
New York, NY 10004-1405

Acis Capital Management, LP
c/o Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

US Bank National Association
c/o Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, TX 75201-2348

Acis Capital Management, LP
c/o Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street
New York, NY 10286-0001

Robin Phelan, Chapter 11 Trustee
Phelanlaw
4214 Woodfin Drive
Dallas, TX 75220-6416

Securities and Exchange Commission
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

**Acis Loan Funding, Ltd.**
**First Floor, Dorey Court**
**St. Peter Port, Guernsey**

Texas Comptroller of Public Accounts
c/o John M. Stern, Asst. Attorney General
Bankruptcy & Collection Div. MC 008
PO Box 12548
Austin, TX 78711-2548

Office of the Attorney General
Main Justice Building, Room 5111
10th & Constitution Avenue, N.W.
Washington, D.C. 20530

Acis CLO 2013-1 LLC
Acis CLO 2013-2 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Office of the United States Attorney
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242-1699

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc., Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Internal Revenue Service
Special Procedures – Insolvency
P.O. Box 7346
Philadelphia, PA 1901-7346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 744 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 858 of 1828   PageID 10351
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 743 of 1803   PageID 11489
Case 18-30264-sgj11 Doc 879 Filed 01/31/19   Entered 01/31/19 17:34:05   Page 93 of 229

US Bank
PO Box 5229
Cincinnati, OH 45201-5229

Diane G. Reed
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

Diane G. Reed
c/o David W. Elmquist
Reed & Elmquist, PC
501 N. College St.
Waxahachie, TX 75165-3361

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Acis CLO 2013-1 Ltd.**
**Acis CLO 2013-2**
**c/o Estera Trust (f/k/a Appleby Trust)**
**Clifton House 75 Port St., P.O. Box 1350**
**Grand Cayman, Cayman Islands KY 1-1108**

**Acis CLO 2014-3 Ltd.**
**Acis CLO 2014-4 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**Acis CLO 2015-6 Ltd.**
**c/o MaplesFS Limited**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102**

**Hewett's Island CLO I-R, Ltd.**
**c/o Maples Finance Limited**
**PO Box 1093, Queensgate House**
**South Church St., George Town**
**Grand Cayman, Cayman Island KY1-1102**

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2013-1 and 2013-2190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-3 and 2014-4190 S. LaSalle
Street, 8th Floor
Chicago, IL 60603

U.S. Bank National Association
Attention: Global Corporate Trust –
Acis CLO 2014-5 and Acis CLO 2015-6190 S.
LaSalle Street, 8th Floor
Chicago, IL 60603

Deutsche Bank Trust Company Americas
Attn:  CDO Business Unit – Hewett's
Island CLO 1-R
1761 East St. Andrew Place
Santa Ana, CA 92705

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Acis CLO 2015-6 Ltd.**
**P.O. Box 1093, Boundary Hall, Cricket Sq**
**Grand Cayman, Cayman Islands KY1-1102,**

Acis CLO 2014-3 LLC
Acis CLO 2014-4
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Acis CLO 2017-7 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 745 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 859 of 1828 PageID 10352
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 744 of 1803 PageID 11490
Case 18-90054-sgj11 Doc 870-2 Filed 01/31/19 Entered 01/31/19 17:34:05 Page 94 of 209

*Highlands Service List*
*ACIS #5980*

Highland CLO Funding Ltd.
c/o Mark M. Maloney/W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street NE
Atlanta, GA 30309

**Highland CLO Funding, Ltd.**
**First Floor, Dorey Court**
**Admiral Park, St. Peter Port**
**Guernsey GY1 6HJ, Channel Islands**

**Highland CLO Management, Ltd.**
**P.O. Box 309 Ugland House**
**South Church Street**
**George Town, Grand Cayman KY1-1004**

**Highland HCF Advisor, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

Neutra, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

**CLO Holdco, Ltd.**
**c/o Intertrust Corp. Srvs. (Cayman) Ltd.**
**190 Elgin Ave., George Town**
**Grand Cayman, Cayman Islands KY1-9005**

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

Highland CLO Funding, Ltd.
c/o Paul R. Bessette/Rebecca Matsumura
King & Spalding LLP
500 West 2nd St., Suite 1800
Austin, TX 78701-4684

Highland CLO Funding, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**P.O. Box 32311**
**Grand Cayman, KY1-1209**
**Cayman Islands**

Highland HCF Advisor, Ltd.
c/o James Dondero, President
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

CLO Holdco, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o Daniel Elms/Heather Jobe/Scott Larson
Bell Nunnally & Martin LLP
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

Highland CLO Funding, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Highland CLO Management, Ltd.**
**c/o Maples Corporate Services, Ltd.**
**P.O. Box 309, Ugland House,**
**South Church Street, George Town**
**Grand Cayman, Cayman Island KY1-1004**

**Highland CLO Management, Ltd.**
**c/o Summit Management Ltd.**
**Suite #4-210 Governor's Square**
**23 Lime Tree Bay Avenue**
**Grand Cayman, Cayman Islands**

Highland CLO Management, Ltd.
c/o Strand Advisors, Inc.
Attn. James Dondero
300 Crescent Court, Suite 700
Dallas, TX 75201

Neutra, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

CLO Holdco, Ltd.
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

**Creditors Service List**
**Acis Capital Mgmt./Phelan**
**#5980**

**Class 2**

Joshua N. Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2726

Joshua N. Terry
c/o Brian P. Shaw/John M. Lynch
Rogge Dunn Group, PC
1201 Elm St., Suite 5200
Dallas, TX 75270

Joshua N. Terry
350 9 Princeton Ave.
Dallas, TX 75205-3246

**Class 3**

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062 - 2778

CT Corporation
P0 Box 4349
Carol Stream, IL 60197-4349

Case Anywhere LLC
21860 Burbank Blvd., Suite 125
Woodland Hills, CA 91367-7447

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Drexel Limited
309 23rd Street, #340
Miami Beach, FL 33139-1700

Elite Document Technology
400 N. Saint Paul St., Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Ave., Suite 215
Dallas, TX 75204-2421

JAMS, Inc.
18881 Von Karman Ave., Suite 350
Irvine, CA 92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Lackey Hershman LLP
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219-4259

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Ave., Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph St., Suite 5500
Chicago, IL 60601-6607

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Reid Collins & Tsai, LLP
Building C, Suite 300
1301 S. Capital of Texas Highway
Austin, TX 78746-6550

Stanton Advisors LLC
300 Coles St., Apt. 802
Jersey City, NJ 07310-1047

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 747 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 861 of 1828 PageID 10354
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 746 of 1803 PageID 11492
Case 18-30264-sgj11 Doc 820-7 Filed 01/31/19 Entered 01/31/19 17:34:05 Page 96 of 209

Stanton Law Firm
9400 North Central Expwy., Suite 1304
Dallas, TX 75231-5047

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

Acis CLO 2013-1, Ltd., et al.
c/o David Neier
Winston & Strawn LLP
200 Park Ave.
New York, NY 10166-4193

Acis CLO 2013-1 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-3 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-4 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2014-5 LLC
850 Library Ave., Suite 204
Newark, DE 19711

Acis CLO 2015-6 LLC
850 Library Ave., Suite 204
Newark, DE 19711

**Directors – Acis CLO 2013-1 Ltd.**
**75 Fort St., Clifton House**
**PO Box 1350**
**George Town, Grand Cayman**
**Cayman Island, KY1-1108**

**Directors – Acis CLO 2014-3 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-4 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors - Acis CLO 2014-5 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Directors – Acis CLO 2015-6 Ltd.**
**PO Box 1093**
**KY1-1102, Cricket Square**
**Grand Cayman**

**Acis CLO 2013-1, Ltd.**
**c/o Appleby Trust, Attn: Directors**
**Clifton House 75 Fort St., P0 Box 13**
**Grand Cayman, Cayman Islands KY1-1108**

**Acis CLO 2013-2 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-3 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-4 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2014-5 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1-1102**

**Acis CLO 2015-6 Ltd.**
**c/o MapleFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

**Acis CLO 2017-7 Ltd.**
**c/o MaplesFS Limited, Attn: Directors**
**PO Box 1093, Boundary Hall, Cricket Sq.**
**Grand Cayman, Cayman Islands KY1 -1102**

Acis CLO 2013-1, Ltd., et al.
c/o Thomas Melsheimer/Lane Webster
Winston & Strawn LLP
2501 N. Harwood St., 17th Floor
Dallas, TX 75201

Jennifer G. Terry
25 Highland Park Village, Suite 100-848
Dallas, TX 75205

Hunton Andrews Kurth LLP
c/o M. Christine Klein, Dep. Gen. Counsel
Riverfront Plaza, East Tower
951 East Byrd St.
Richmond, VA 23219

Patrick H. Daugherty
3621 Cornell Ave.
Dallas, TX 75250

Stinson Leonard Street LLP
Attn: Paul Lackey
3102 Oak Lawn Ave., Suite 777
Dallas, TX 75219

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 748 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 862 of 1828 PageID 10355
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 747 of 1803 PageID 11493
Case 19-34054-sgj11 Doc 872 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 97 of 229

**Class 4**

Highland Capital Management, LP
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, LP
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, LP
c/o Michael K. Hurst/Ben A. Barnes
Lynn Pinker Cox & Hurst LLP
2100 Ross Ave., Suite 2700
Dallas, TX 75201

Highland Capital Management, LP, Highland
c/o H. O'Neil, J. Binford, S. Beck, M. Bales
Foley Gardere Foley & Lardner, LLP
2021 McKinney Ave., Suite 1600
Dallas, TX 75201

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 749 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 863 of 1828    PageID 10356
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 748 of 1803    PageID 11494
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 198 of 229

# EXHIBIT "4"

**[Supplement to Second Modification to the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC – Dkt. No. 769]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 750 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 864 of 1828 PageID 10357
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 749 of 1803 PageID 11495
Case 18-30264-sgj11 Doc 829-5 Filed 01/31/19 Entered 01/31/19 17:54:06 Page 199 of 229

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 CASES |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-sgj11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |

## SUPPLEMENT TO SECOND MODIFICATION TO THE THIRD AMENDED JOINT
## PLAN FOR ACIS CAPITAL MANAGEMENT, LP AND
## ACIS CAPITAL MANAGEMENT GP, LLC

Robin Phelan ("Trustee"), the Chapter 11 Trustee for Acis Capital Management, LP and

Acis Capital Management GP, LLC (the "Debtors"), files this Supplement to the Second

Modification (the "Second Modification") to the *Third Amended Joint Chapter 11 Plan for Acis*

*Capital Management, LP and Acis Capital Management GP, LLC* [Docket No. 660], as modified

by the *First Modification to the Third Amended Joint Chapter 11 Plan for Acis Capital*

*Management, LP and Acis Capital Management GP, LLC* [Docket No. 693] (together, the "Plan").

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 751 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 865 of 1828   PageID 10358
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 750 of 1803   PageID 11496
Case 19-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 200 of 229

1.      On November 16, 2018, the Trustee filed the Second Modification.  The Second
Modification modified the Plan to replace the Exhibit "A," reflecting Estate Claims, with a revised
version of Exhibit A.  The Schedule "1" to Exhibit A, which reflects the Estate's Preference
Claims, was not changed from the version attached to the Plan but was inadvertently omitted from
the Second Modification.  For completeness and to avoid any confusion regarding the Preference
Claims being reserved, retained and preserved for the benefit of the Estate and Reorganized
Debtor, the Second Modification is hereby supplemented with the Schedule "1" to Exhibit "A" to
the Plan.

2.      A copy of the Schedule "1" is attached hereto as **Exhibit 1**.

3.      A copy of the complete Exhibit "A" to the Plan, including Schedule "1," is attached
hereto as **Exhibit "2."**

4.      A redline is not necessary because the attached Schedule "1" is unchanged from the
version attached to the Plan and included in the Trustee's solicitation materials.

Dated:  December 10, 2018.          Respectfully submitted,

ACIS CAPITAL MANAGEMENT, L.P.

By:  /s/ *Robin Phelan*
        Robin Phelan
        Chapter 11 Trustee

ACIS CAPITAL MANAGMENET GP, LLC

By:  /s/ *Robin Phelan*
        Robin Phelan
        Chapter 11 Trustee

Appellee Appx. 00744
APPX. 10509

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 752 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 866 of 1828    PageID 10359
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 751 of 1803    PageID 11497
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 201 of 229
Case 18-30264-sgj11 Doc 261 Filed 12/10/18    Entered 12/10/18 18:40:10    Page 3 of 3

APPROVED:

/s/ Jeff P. Prostok
Jeff P. Prostok –  State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen –  State Bar No. 00798518
Matthew G. Maben – State Bar No. 24037008
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mmaben@forsheyprostok.com

**COUNSEL FOR ROBIN PHELAN,
CHAPTER 11 TRUSTEE**

APPROVED:

/s/ Rakhee V. Patel
Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello –State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL    COUNSEL    FOR    ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document and the attached exhibits were served electronically via the Court's Electronic Court Filing (ECF) notification system on December 10, 2018.

/s/ Jeff P. Prostok
Jeff P. Prostok

\L:\JPROSTOK\ACIS Capital Management (Trustee Rep)\Plan and Disclosure Statement\Supplement to Second Modification to Third Amended Plan 12.10.18.docx

Appellee Appx. 00745
APPX. 08612

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 753 of
1804
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 867 of 1828   PageID 10360
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 752 of 1803   PageID 11498
Case 19-30264-sgj11 Doc 829-5 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 202 of 229
Case 18-30264-sgj11 Doc 855 Filed 12/10/18   Entered 12/10/18 18:40:10   Page 2 of 23

# EXHIBIT "1"

Schedule "1" to Exhibit "A" to
Third Amended Plan

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 754 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 868 of 1828 PageID 10361
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 753 of 1803 PageID 11499
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 203 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18 Entered 12/10/18 15:10:10 Page 5 of 23
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| | | Payments within 90 Days of Petition Date | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| | | Payments to Insiders within One Year of Petition Date | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 755 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 869 of 1828   PageID 10362
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 754 of 1803   PageID 11500
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 204 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18   Entered 12/10/18 15:10:10   Page 6 of 23
Schedule 1 to Exhibit "A" to
Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 756 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 870 of 1828 PageID 10363
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 755 of 1803 PageID 11501
Case 19-30926-sgj11 Doc 829-5 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 205 of 229

# EXHIBIT "2"

[Exhibit "A" to Third Amended Plan
as Supplemented]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 757 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 871 of 1828   PageID 10364
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 756 of 1803   PageID 11502
Case 19-30265-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:54:10 Page 206 of 229

**EXHIBIT "A"**
to
**Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

1.    <u>Defined Terms</u>.  This Exhibit "A" constitutes an integral part of the Plan of which it is a part.  Defined terms in the Plan are to be given the same meaning in this Exhibit "A".  The rules of construction set forth in Article I.B. of the Plan shall likewise apply to this Exhibit "A".

2.    <u>Estate Claims Reserved, Retained and Preserved</u>.  All Estate Claims are hereby reserved, retained and preserved, and shall all be transferred to, and vested in, the Reorganized Debtor pursuant to this Plan, and shall include without limitation all of the Estate Claims described below.  In reserving, retaining, and preserving Estate Claims against any named Person or category of Persons, it is the intent of this Plan to so reserve, retain, and preserve any and all Estate Claim against each such Person or category of Persons, including all such Estate Claims pursuant to any applicable common law, based on any contract or agreement or based upon any law, statute or regulation of any political entity, including the United States and any state or political subdivision thereof, as well as all applicable remedies, whether legal or equitable.  Without limiting the generality of the foregoing, the reservation, retention, and preservation of Estate Claims against any Person, and the term "<u>Estate Claims</u>," shall encompass all Estate Claims against any such Person, including without limitation, all such Estate Claims for breach of contract, all rights to enforce any contract, any form of estoppel, fraud, constructive fraud, abuse of process, malicious prosecution, defamation, libel, slander, conversion, trespass, intentional infliction of emotional distress or other harm, negligence, gross negligence, negligent misrepresentation, fraudulent misrepresentation, vicarious liability, respondeat superior, breach of any duty owed under either applicable law or any contract, breach of any fiduciary duty or duty of loyalty or due care, aiding and/or abetting breach of fiduciary duty, aiding and/or abetting breach of duty of loyalty or due care, alter ego, veil piercing, self-dealing, usurpation of corporate opportunity, ultra vires, turnover of Estate Assets, unauthorized use of Estate Assets, including intellectual property rights or Assets owned by the Debtors or Chapter 11 Trustee, quantum merit, tortious interference, duress, unconscionability, undue influence, and unjust enrichment, as well as any cause of action for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, or claims arising from or relating to the filing of the involuntary bankruptcy petitions against the Debtors.

3.    <u>Highland Claims</u>.  All Estate Claims against Highland are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in Adversary Proceeding No. 18-03078-sgj (the "<u>Highland Adversary</u>") and Adversary Proceeding No. 18-03212-sgj (the "<u>Trustee's Adversary</u>").  The Estate Claims against Highland shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 758 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 872 of 1828   PageID 10365
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 757 of 1803   PageID 11503
Case 18-30264-sgj11 Doc 829 Filed 01/31/18   Entered 01/31/18 17:34:06   Page 207 of 229

Chapter 11 Trustee or Estate;

      (d)    All Avoidance Actions against Highland, including any claims to avoid and recover amounts transferred by the Debtors to Highland under the Shared Services Agreement or Sub-Advisory Agreement;

      (e)    All Claims for breach of the Shared Services Agreement or Sub-Advisory Agreement;

      (f)    All Claims against Highland for amounts paid by the Debtors to Highland under the Shared Services Agreement and Sub-Advisory Agreement, including any Claim that Highland overcharged Acis LP for services under such agreements, charged excessive fees in violation of Acis LP's limited partnership agreement and/or Acis GP's limited liability company agreement, and/or that the Shared Services Agreement and Sub-Advisory Agreement or any related or predecessor agreements are void or voidable based on ultra vires or any other theories of avoidance and recovery, including turnover, conversion and Avoidance Actions under the Bankruptcy Code;

      (g)    All Claims for breach of the PMAs or the Indentures;

      (h)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

      (i)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

      (j)    All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

      (k)    All claims for tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS;

      (l)    All Claims against Highland for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

      (m)    All Claims against Highland for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

      (n)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

      (o)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

      (p)    All Claims based on alter ego or rights to pierce the corporate veil of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 759 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 873 of 1828   PageID 10366
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 758 of 1803   PageID 11504
Case 18-30064-sgj11 Doc 829 Filed 12/14/18   Entered 12/14/18 15:40:50   Page 208 of 229

Highland as to any Person, including as against any Affiliates of Highland, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland, and,

(q)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

4.     HCLOF Claims.  All Estate Claims against HCLOF are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the Trustee's Adversary.  The Estate Claims against HCLOF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)     All such Claims against HCLOF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against HCLOF;

(e)     All Claims for breach of the PMAs or the Indentures;

(f)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(h)     All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)     All Claims against HCLOF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)     All Claims against HCLOF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(k)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by HCLOF against the Debtors, Chapter 11 Trustee, or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 760 of
Case 3:23-cv-00726-S   Document 8-22    Filed 12/29/23    Page 874 of 1828    PageID 10367
Case 3:21-cv-00879-K   Document 21    Filed 07/28/21    Page 759 of 1803    PageID 11505
Case 18-30264-sgj11 Doc 820 Filed 01/31/18  Entered 01/31/18 17:34:06   Page 209 of 229

(l)      All Claims based on alter ego or rights to pierce the corporate veil of HCLOF as to any Person, including as against any Affiliates of HCLOF or Highland, William Scott, Heather Bestwick, or any other officers, directors, equity interest holders, or Persons otherwise in control of HCLOF; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

5.      <u>Highland HCF Advisor, Ltd. Claims</u>.  All Estate Claims against Highland HCF Advisor, Ltd. ("<u>Highland HCF</u>") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against Highland HCF shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against Highland HCF asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against Highland HCF;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against Highland HCF for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against Highland HCF for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland HCF against the Debtors, Chapter 11 Trustee, or

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 761 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 875 of 1828   PageID 10368
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 760 of 1803   PageID 11506
Case 18-30264-sgj11 Doc 788 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 210 of 229

Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of
Highland HCF as to any Person, including as against any Affiliates of Highland HCF or
Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control
of Highland HCF; and,

(l)     All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

6.     <u>Highland CLO Management, Ltd. Claims</u>.  All Estate Claims against Highland
CLO Management, Ltd. ("<u>Highland CLOM</u>") are reserved, retained and preserved for the benefit
of the Estate and Reorganized Debtor, including without limitation all such Estate Claims
asserted by the Chapter 11 Trustee in the Highland Adversary.  The Estate Claims against
Highland CLOM shall include all Estate Claims set forth in paragraph 2 above, including without
limitation the following:

(a)     All such Claims against Highland CLOM asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Highland Adversary;

(b)     All such Claims against Highland CLOM asserted by the Chapter 11
Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in,
the Trustee's Adversary;

(c)     All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)     All Avoidance Actions against Highland CLOM;

(e)     All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)     All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)     All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against Highland CLOM for the turnover of Estate Assets,
including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363
of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets
owned by the Debtors or Estate, as well as the turnover of any books, documents, records and
papers relating to the Debtors' property or financial affairs;

(i)     All Claims against Highland CLOM for the unauthorized use of Estate
Assets including, without limitation, any intellectual property rights or Assets owned by the
Debtors or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 762 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 876 of 1828   PageID 10369
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 761 of 1803   PageID 11507
Case 18-30064-sgj11 Doc 785 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 211 of 229

(j)      All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland CLOM against the Debtors, Chapter 11 Trustee, or Estate;

(k)      All Claims based on alter ego or rights to pierce the corporate veil of Highland CLOM as to any Person, including as against any Affiliates of Highland CLOM or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Highland CLOM; and,

(l)      All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

7.    CLO Holdco, Ltd. Claims.  All Estate Claims against CLO Holdco, Ltd. ("CLO Holdco") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against CLO Holdco shall include all Estate Claims set forth in paragraph 2 above, including without limitation, the following:

(a)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)      All such Claims against CLO Holdco asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)      All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)      All Avoidance Actions against CLO Holdco;

(e)      All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f)      All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g)      All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)      All Claims against CLO Holdco for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)      All Claims against CLO Holdco for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 763 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 877 of 1828 PageID 10370
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 762 of 1803 PageID 11508
Case 18-30664-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 212 of 229

(j) All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Highland against the Debtors, Chapter 11 Trustee, or Estate;

(k) All Claims based on alter ego or rights to pierce the corporate veil of CLO Holdco as to any Person, including as against any Affiliates of CLO Holdco or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of CLO Holdco; and,

(l) All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

8. Neutra, Ltd. Claims. All Estate Claims against Neutra, Ltd. ("Neutra") are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary. The Estate Claims against Neutra shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a) All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b) All such Claims against Neutra asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c) All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d) All Avoidance Actions against Neutra;

(e) All Claims for breach of fiduciary or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(f) All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

(g) All Clams for usurpation of a corporate opportunity belonging to either of the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h) All Claims against Neutra for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i) All Claims against Neutra for the unauthorized use of Estate Assets

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 764 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 878 of 1828   PageID 10371
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 763 of 1803   PageID 11509
Case 18-30064-sgj11 Doc 3785 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 213 of 229

including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)    All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by Neutra against the Debtors, Chapter 11 Trustee, or Estate;

(k)    All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Neutra, Highland, or any Affiliates thereof, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)    All Claims based on alter ego or rights to pierce the corporate veil of Neutra as to any Person, including as against any Affiliates of Neutra or Highland, or any other officers, directors, equity interest holders, or Persons otherwise in control of Neutra; and,

(m)    All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

9.    <u>Claims against Issuers, Co-Issuers and Indenture Trustee</u>.  All Estate Claims against CLO-3, CLO-4, CLO-5, and CLO-6 (collectively, the "<u>Issuers</u>"), Acis CLO 2014-3 LLC, Acis CLO 2014-4 LLC, Acis CLO 2014-5 LLC, and Acis CLO 2015-6 LLC (collectively, the "<u>Co-Issuers</u>"), and the Indenture Trustee are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims asserted by the Chapter 11 Trustee in the Trustee's Adversary.  The Estate Claims against the Issuers, Co-Issuers and/or Indenture Trustee shall include all Estate Claims set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Highland Adversary;

(b)    All such Claims against the Issuers, Co-Issuers, and/or Indenture Trustee asserted by the Chapter 11 Trustee or Estate in, or which could be asserted based on the facts or transactions alleged in, the Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or transactions alleged in any other adversary proceedings or Claim Objections filed by the Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against the Issuers, Co-Issuers and/or Indenture Trustee;

(e)    All Claims for breach of the Indentures, PMAs or any other agreements between Acis LP and the Issuers, Co-Issuers, and/or Indenture Trustee;

(f)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed to the Debtors or Chapter 11 Trustee;

(g)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of duty loyalty or due care, or any other unlawful act;

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 765 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 879 of 1828   PageID 10372
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 764 of 1803   PageID 11510
Case 19-30064-sgj11 Doc 820 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 214 of 229

(h)    All Clams for usurpation of a corporate opportunity belonging to either of
the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(i)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for
the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use,
sell or lease under section 363 of the Bankruptcy Code including, without limitation, any
intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of
any books, documents, records and papers relating to the Debtors' property or financial affairs;

(j)    All Claims against the Issuers, Co-Issuers and/or Indenture Trustee for
the unauthorized use of Estate Assets including, without limitation, any intellectual property
rights or Assets owned by the Debtors or Estate;

(k)    All Claims, rights or remedies for Equitable Subordination or
Recharacterization of any Claim by the Issuers or Co-Issuers against the Debtors, Chapter 11
Trustee, or Estate; and,

(l)    All Claims for conspiracy to commit any unlawful act, aiding and/or
abetting any such unlawful act, or assisting, encouraging, and/or participating in any such
unlawful act.

10.    <u>Claims Against Any Affiliates of Highland, HCLOF, Highland HCF, Highland
CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  All Estate Claims against any
Affiliates of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their
Respective Affiliates (collectively, the "<u>Affiliates</u>" and each, an "<u>Affiliate</u>") are reserved, retained
and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation
all such Estate Claims asserted by the Chapter 11 Trustee in the Highland Adversary and the
Trustee's Adversary.  The Estate Claims against such Affiliates shall include all Estate Claims
set forth in paragraph 2 above, including without limitation the following:

(a)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee
or Estate in, or which could be asserted based on the facts or transactions alleged in, the
Highland Adversary;

(b)    All such Claims against any Affiliate asserted by the Chapter 11 Trustee
or Estate in, or which could be asserted based on the facts or transactions alleged in, the
Trustee's Adversary;

(c)    All such Claims and Defenses asserted by the Chapter 11 Trustee or
Estate, or which could be asserted by the Chapter 11 Trustee or Estate, based on the facts or
transactions alleged in any other adversary proceedings or Claim Objections filed by the
Chapter 11 Trustee or Estate;

(d)    All Avoidance Actions against any Affiliate;

(e)    All Claims for breach of fiduciary duty or duty of loyalty or due care owed
to the Debtors or Chapter 11 Trustee;

(f)    All Claims for aiding and/or abetting breach of fiduciary duty, breach of
duty loyalty or due care, or any other unlawful act;

(g)    All Clams for usurpation of a corporate opportunity belonging to either of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 766 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 880 of 1828   PageID 10373
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 765 of 1803   PageID 11511
Case 18-30664-sgj11 Doc 785 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 215 of 229

the Debtors, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs;

(h)     All Claims against any Affiliate for the turnover of Estate Assets, including Estate property that the Chapter 11 Trustee may use, sell or lease under section 363 of the Bankruptcy Code including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate, as well as the turnover of any books, documents, records and papers relating to the Debtors' property or financial affairs;

(i)     All Claims against any Affiliate for the unauthorized use of Estate Assets including, without limitation, any intellectual property rights or Assets owned by the Debtors or Estate;

(j)     All Claims, rights or remedies for Equitable Subordination or Recharacterization of any Claim by any Affiliate against the Debtors, Chapter 11 Trustee, or Estate;

(k)     All Claims based on alter ego or rights to pierce the corporate veil of Acis LP as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any other officers, directors, equity interest holders, or Persons otherwise in control of Acis LP;

(l)     All Claims based on alter ego or rights to pierce the corporate veil of any Affiliate as to any Person, including as against Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, the Affiliates, James D. Dondero, Mark K. Okada, or any officers, directors, equity interest holders, or Persons otherwise in control of any Affiliates; and,

(m)     All Claims for conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act.

11.     Dondero Claims.  All Estate Claims as defined in paragraph 2 above against James D. Dondero, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against James D. Dondero for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold James D. Dondero individually liable.

12.     Okada Claims.  All Estate Claims as defined in paragraph 2 above against Mark K. Okada, individually, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor, including without limitation all such Estate Claims against Mark K. Okada for fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other

Appellee Appx. 00759
Appx. 10824

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 767 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 881 of 1828   PageID 10374
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 766 of 1803   PageID 11512
Case 18-30664-sgj11 Doc 8785 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 16 of 22

Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and participating in any unlawful act, as well as any Claim to pierce the corporate veil of any entity to hold Mark K. Okada individually liable.

13.    <u>Preference Claims</u>.  All Avoidance Actions pursuant to section 547 of the Bankruptcy Code against any Person are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor for any payment made to any Person by either of the Debtors within ninety (90) days of the Petition Date (which was January 30, 2018), or made by either of the Debtors to any insider within one (1) year of the Petition Date.  A non-exhaustive list of Persons who are believed to have received payments from either of the Debtors during the 90-day preference period, and the one-year preference period for Insiders, is attached to this **Exhibit "A"** as **Schedule "1"**.  The Plan reserves, retains and preserves for the benefit of the Estate and Reorganized Debtor all potential Claims arising out of or relating to the transfers reflected in **Schedule "1"**, including all Avoidance Actions pursuant to section 547 of the Bankruptcy Code.  All rights and remedies are also reserved. retained and preserved with respect to the transfers reflected in **Schedule "1"** pursuant to section 550 of the Bankruptcy Code.

**Schedule "1"** reflects transfers made by the Debtors during the 90 days prior to the Petition Date and transfers made by the Debtors to any insiders within one (1) year of the Petition Date.  While the Plan reserves, retains and preserves all Avoidance Actions relating to the transfers reflected in **Schedule "1"**, the Chapter 11 Trustee recognizes that certain of these transfers may not constitute a preferential transfer pursuant to section 547(b) of the Bankruptcy Code as a transfer made in the ordinary course of business transactions or based upon new value subsequently given by the transferee.  Consequently, the listing of a payment on **Schedule "1"** does not necessarily mean that a transferee will ever be sued to avoid and recover the payment, the transfer, or the value thereof, but only that the Plan reserves, retains and preserves all rights (including Avoidance Actions) as to that payment.

14.    <u>Claims Against Officers, Managers and Members</u>.  All Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, employees, members and managers of the Debtors, including all such Estate Causes of Action based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of duty of loyalty or due care, self-dealing, usurpation of corporate opportunity, gross negligence or conspiracy.  Without limiting the generality of the foregoing, this shall include all D&O Claims as against any present or former officer, director, employee, member, manager, or partner.

15.    <u>Claims Against Former Attorneys and Law Firms</u>.  All Estate Claims as defined in paragraph 2, above, including Claims for breach of any fiduciary duty or duty of loyalty or due care, conspiracy to commit any unlawful act, aiding and/or abetting any such unlawful act, or assisting, encouraging, and/or participating in any such unlawful act, including knowingly aiding, abetting, or assisting with a fraudulent transfer to avoid paying a judgment, negligent or fraudulent misrepresentation, vicarious liability, and respondeat superior, as well as all Claims for legal or professional malpractice, are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all law firms and attorneys who and which

Appellee Appx. 00760
Appx. 10875

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 768 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 882 of 1828    PageID 10375
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 767 of 1803    PageID 11513
Case 18-30264-sgj11 Doc 789 Filed 12/31/18    Entered 12/31/18 17:34:06    Page 13 of 229

rendered legal services to the Debtors on a prepetition basis including, but not limited to, the
following:

    (a)    Cole Schotz, P.C.

    (b)    Michael D. Warner

    (c)    Jacob Frumkin

    (d)    Warren A. Usatine

    (e)    McKool Smith

    (f)    Gary Cruciani

    (g)    Michael P. Fritz

    (h)    Carson D. Young

    (i)    Nicholas Matthews

    (j)    Lackey Hershman, LLP

    (k)    Stinson Leonard Street LLP

    (l)    Jamie R. Welton

    (m)    Paul B. Lackey

    (n)    Michael Aigen

    (o)    Roger L. Mandel

    (p)    Abrams & Bayliss, LLP

    (q)    Kevin G. Abrams

    (r)    A. Thompson Bayliss

    (s)    Jones Day

    (t)    Hilda C. Galvan

    (u)    Michael Weinberg

    (v)    Reid Collins & Tsai, LLP

    (w)    Lisa Tsai

    (x)    Stanton, LLP

    (y)    James M. Stanton

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 769 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 883 of 1828 PageID 10376
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 768 of 1803 PageID 11514
Case 18-30064-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 218 of 229

(z)    Hunton Andrews Kurth

(aa)    Marc Katz

(bb)    Greg Waller

(cc)    any other law firm or attorney who may be so named at a later date by the Reorganized Debtor.

16.    <u>Claims Against Officers, Directors, Employees, Members, and Managers, of Highland, HCLOF, Highland HCF, Highland CLOM, CLO Holdco, Neutra, and Their Respective Affiliates</u>.  In addition to the foregoing, all Estate Claims as defined in paragraph 2 above are hereby reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor against all present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates, including all such Estate Causes of Action based on fraud, constructive fraud, breach of fiduciary duty, breach of duty of loyalty or due care, aiding and abetting breach of fiduciary duty, aiding and abetting breach of duty of loyalty or due care, self-dealing, ultra vires, conversion, usurpation of corporate opportunity, including in relation to Acis CLO 2017-7, Ltd and any other Acis CLOs, tortious interference, including in relation to Universal-Investment-Luxembourg S.A. and BayVK R2 Lux S.A., SICAV-FIS, conflict of interest, negligence, gross negligence, all Avoidance Actions, breach of contract, breach of the Shared Services Agreement, breach of the Sub-Advisory Agreement, breach of the Debtors' limited partnership agreement or limited liability company agreement, conspiracy to commit any unlawful act, aiding and abetting any unlawful act, and assisting, encouraging, and/or participating in any unlawful act.  Such present and past officers, directors, employees, members and managers of Highland, HCLOF, Highland HCF, Highland CLOM, and their respective Affiliates include, but are not limited to, the following Persons:

(a)    William Scott;

(b)    Heather Bestwick;

(c)    Scott Ellington

(d)    Isaac Leventon

(e)    Jean Paul Sevilla

(f)    Hunter Covitz

(g)    The Dugaboy Investment Trust

(h)    Nancy Dondero, Trustee of the Dugaboy Trust

(i)    Grant Scott

(j)    Any other Person who may be so named at a later date by the Reorganized Debtor.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 770 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 884 of 1828    PageID 10377
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 769 of 1803    PageID 11515
Case 18-30064-sgj11 Doc 785 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 19 of 229

17.    <u>Counterclaims</u>.  All Estate Claims as defined in paragraph 2 above are reserved, retained and preserved for the benefit of the Estate and Reorganized Debtor both as a basis for an affirmative recovery against the Person against whom such Claims are asserted and as a counterclaim or offset against any Person who asserts a Claim against the Estate or Reorganized Debtor.

18.    <u>Piercing the Corporate Veil</u>.  With respect to all Estate Claims against any Person, all rights to pierce or ignore the corporate veil are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor.  Without limiting the generality of the foregoing, this shall include: (a) any right to pierce the corporate veil, including reverse piercing, on any theory or basis, including alter ego or any theory of sham to perpetrate a fraud, and (b) any Claim or basis to pierce the corporate veil of any entity with respect to establishing personal liability against James D. Dondero or Mark K. Okada.

19.    <u>Avoidance Actions</u>.  All Avoidance Actions are hereby reserved, retained and preserved as to all Persons.  The reservation, retention and preservation of such Avoidance Actions shall include the reservation, retention and preservation for the benefit of the Estate and Reorganized Debtor of all rights and remedies pursuant to section 550 of the Bankruptcy Code.

20.    <u>Estate Defenses</u>.  All Estate Defenses are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor as against any Person asserting any Claim against the Estate.  This includes asserting all Estate Claims as an offset to, or counterclaim or right of recoupment against, any Person asserting a Claim against the Estate. All defenses and affirmative defenses pursuant to applicable law are hereby reserved, retained and preserved for the benefit of the Estate and the Reorganized Debtor, including without limitation, accord and satisfaction, assumption of risk, contributory negligence, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, collateral estoppel, statute of frauds, statute of limitations or repose, discovery rule, adverse domination doctrine or similar doctrines, set off, recoupment, waiver, and all other defenses to Claims under the Bankruptcy Code, including under sections 502(b)(4) and 502(d).

21.    <u>Equitable Subordination</u>.  All rights or remedies for Equitable Subordination are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate, including all such rights or remedies pursuant to section 510(c) of the Bankruptcy Code.  Without limiting the generality of the foregoing, this shall include all rights and remedies to Equitable Subordination as to any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

22.    <u>Recharacterization</u>.  All rights or remedies to recharacterize any Claim as an equity interest in either of the Debtors are hereby reserved, retained and preserved in favor of the Estate and Reorganized Debtor against any Person asserting any Claim against the Estate. Without limiting the generality of the foregoing, this shall include all rights and remedies to recharacterize any Claim asserted by Highland, any Affiliates of Highland, or any officers, directors, employees or equity interest owners of the Debtors, Highland, or any Affiliates thereof.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 771 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 885 of 1828 PageID 10378
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 770 of 1803 PageID 11516
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 220 of 229

Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC

Schedule 1 to Exhibit "A" to

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| **Payments within 90 Days of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | Services |
| David Simek | 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | Services |
| FINRA | 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | Suppliers or Vendors |
| Highland CLO Management, Ltd. | PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | Services |
| **Payments to Insiders within One Year of Petition Date** | | | | |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $976,688.47 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/1/2017 | $1,096,033.37 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/2/2017 | $3,574.80 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 2/14/2017 | $67.44 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/17/2017 | $315,574.30 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $438,497.51 | Services |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 772 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 886 of 1828   PageID 10379
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 771 of 1803   PageID 11517
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 221 of 229

Case 18-30264-sgj11 Doc 769 Filed 12/10/18    Entered 12/10/18 15:10:10    Page 23 of 23

**Schedule 1 to Exhibit "A" to**

**Third Amended Joint Plan for Acis Capital Management, LP and Acis Capital Management GP, LLC**

| NAME | ADDRESS | DATE OF PAYMENT | PAYMENT AMOUNT | REASON FOR PAYMENT ON SCHEDULES |
|---|---|---|---|---|
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/18/2017 | $375,855.01 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 4/19/2017 | $330,249.69 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/1/2017 | $974,426.41 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 5/31/2017 | $581,036.15 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 7/18/2017 | $373,167.08 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/1/2017 | $971,603.02 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/7/2017 | $1,339,422.12 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 8/16/2017 | $53.41 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $372,872.82 | Contractual Payment |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/18/2017 | $728,702.26 | Services |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $46,648.82 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 10/25/2017 | $67,966.85 | Expense Reimbursement |
| Highland Capital Management, LP | 300 Crescent Court, Ste. 700 Dallas, TX 75208 | 11/1/2017 | $967,223.91 | Contractual Payment |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 773 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 887 of 1828   PageID 10380
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 772 of 1803   PageID 11518
Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 222 of 229

# EXHIBIT "5"

## [Executory Contracts and Unexpired Leases to be Assumed by the Trustee]

Appellee Appx. 00766

Appx. 10623

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 774 of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 888 of 1828 PageID 10381
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 773 of 1803 PageID 11519
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 223 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | March 18, 2013 | $0 |
| U.S. Bank National Association 190 S. LaSalle Street, 8th Floor Chicago, IL 60603 Attention: Global Corporate Trust – Acis CLO 2013-1 | Collateral Administration Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-1 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | March 18, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Collateral Administration Agreement | October 3, 2013 | $0 |
| The Bank of New York Mellon Trust Co., N.A. 601 Travis Street, 16th Floor Houston, Texas 77002 Attn: Global Corporate Trust – Acis CLO 2013-2 | Collateral Administration Agreement | October 3, 2013 | $0 |
| Acis CLO 2013-2 Ltd. c/o Estera Trust (f/k/a Appleby Trust) Clifton House 75 Fort St., P.O. Box 1350 Grand Cayman, Cayman Islands KY1-1108 | Portfolio Management Agreement | October 3, 2013 | $0 |
| Acis CLO 2014-3 Ltd. c/o MaplesFS Limited P.O. Box 1093, Boundary Hall, Cricket Sq Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | February 25, 2014 | $0 |

1

Appellee Appx. 00767
Appx. 10324

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 775 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 889 of 1828    PageID 10382
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 774 of 1803    PageID 11520
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 224 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-3 | Collateral Administration Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-3 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | February 25, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | June 5, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-4 | Collateral Administration Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-4 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | June 5, 2014 | $0 |
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | November 18, 2014 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2014-5 | Collateral Administration Agreement | November 18, 2014 | $0 |

2

Appellee Appx. 00768
APPX. 003623

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 776 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 890 of 1828 PageID 10383
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 775 of 1803 PageID 11521
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 225 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO 2014-5 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | November 18, 2014 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement | April 16, 2015 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2015-6 | Collateral Administration Agreement | April 16, 2015 | $0 |
| Acis CLO 2015-6 Ltd.<br>c/o MaplesFS Limited<br>P.O. Box 1093, Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Portfolio Management Agreement | April 16, 2015 | $0 |
| Acis CLO Value Fund II (Cayman), LP.<br>P.O. Box 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II GP, LLC<br>P.O. Box. 309, Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II, LP.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801 | Limited Liability Company Agreement | July 19, 2010 | $0 |

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 777 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 891 of 1828   PageID 10384
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 776 of 1803   PageID 11522
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 226 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis CLO Value Master Fund II, LP. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Investment Management Agreement | May 1, 2016 | $0 |
| Acis CLO Value Fund II (Cayman), L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis CLO Value Master Fund II, L.P. P.O. Box 309, Ugland House Grand Cayman, Cayman Islands KY1-1104 | Third Amended and Restated Exempted Limited Partnership Agreement | May 1, 2016 | $0 |
| Acis Loan Funding, Ltd. 300 Crescent Court Suite 700 Dallas, TX 75201 | FATCA and Non-FATCA Services Agreement | June 23, 2017 | $0 |
| BayVK R2 Lux S.A., SICAV FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Agreement for the Outsourcing of the Asset Management of BayVK R2 Lux S.A., SICAV-FIS | February 27, 2015 | $0 |
| BayVK R2 Lux S.A., SICAV-FIS 15 rue de Flaxweiler L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |
| BNP Paribas Securities Services Luxembourg Branch 60 Avenue John F. Kennedy 1855 Luxembourg | Power of Attorney 86578 | February 20, 2015 | $0 |
| Hewett's Island CLO 1-R, Ltd. c/o Maples Finance Limited P.O. Box 1093, Queensgate House Grand Cayman, Cayman Islands KY1-1102 | Confidentiality Agreement | April 11, 2011 | $0 |

4

Appellee Appx. 00770
APPX. 10637

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 778 of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 892 of 1828 PageID 10385
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 777 of 1803 PageID 11523
Case 18-30264-sgj11 Doc 829 Filed 01/31/19 Entered 01/31/19 17:34:06 Page 227 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Hewett's Island CLO 1-R, Ltd.<br>*c/o* Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Governing Documents<br>(Requested from HCM) | -- | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>*c/o* Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Management Agreement | July 18, 2011 | $0 |
| Hewett's Island CLO 1-R, Ltd.<br>*c/o* Maples Finance Limited<br>P.O. Box 1093, Queensgate House<br>Grand Cayman, Cayman Islands KY1-1102 | Collateral Administration Agreement<br>(Requested from HCM) | November 20, 2007 | $0 |
| State Street (Guernsey Limited)<br>First Floor, Dorey Court, Admiral Park,<br>St. Peter Port, Guernsey | FATCA and Non-FATCA Services<br>Agreement | June 23, 2017 | $0 |
| U.S. Bank National Association<br>190 S. LaSalle Street, 8th Floor<br>Chicago, IL 60603<br>Attention: Global Corporate Trust –<br>Acis CLO 2015-6 | Confidentiality Agreement | March 5, 2014 | $0 |
| Universal-Investment-Luxembourg S.A.<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Agreement for the Outsourcing of the<br>Asset Management of BayVK R2 Lux<br>S.A., SICAV-FIS | February 27, 2015 | $0 |
| Universal-Investment-Luxembourg S.A.<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Power of Attorney | February 20, 2015 | $0 |
| Universal-Investment-Luxembourg S.A.<br>15 rue de Flaxweiler<br>L-6776 Grevenmacher | Service Level Agreement | February 27, 2015 | $0 |

5

Appellee Appx. 00771
APPX. 10526

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 779 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 893 of 1828    PageID 10386
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 778 of 1803    PageID 11524
Case 18-30264-sgj11 Doc 829 Filed 01/31/19    Entered 01/31/19 17:34:06    Page 228 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

| Party | Contract Description | Contract Date | Cure Amount |
|---|---|---|---|
| Acis Loan Funding, Ltd.<br>First Floor, Dorey Court<br>St. Peter Port, Guernsey GY1 6HJ<br>Channel Islands | Portfolio Management Agreement | December 22, 2016 | $0 |
| Acis Capital Management, LP<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Agreement of<br>Limited Partnership | January 21, 2011 | $0 |
| Acis Capital Management GP, LLC<br>c/o *PHELANLAW*<br>4214 Woodfin Drive<br>Dallas, Texas 75220 | Amended and Restated Limited Liability<br>Company Agreement | January 21, 2011 | $0 |

For the avoidance of doubt, to the extent not otherwise included above, the Trustee intends to assume any additional executory contracts that relate to the funds set forth below as may be necessary or beneficial to the Reorganized Debtor under the Plan:

1. Acis CLO 2013-1, Ltd.
2. Acis CLO 2013-2, Ltd.
3. Acis CLO 2014-3, Ltd.
4. Acis CLO 2014-4, Ltd.
5. Acis CLO 2014-5, Ltd.
6. Acis CLO 2015-6, Ltd.
7. Acis CLO Value Fund II, L.P.
8. Acis CLO Value Fund II (Cayman), L.P.
9. Acis CLO Master Fund II, L.P.
10. BayVK R2 Lux S.A., SICAV FIS

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 780 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 894 of 1828   PageID 10387
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 779 of 1803   PageID 11525

Case 18-30264-sgj11 Doc 829 Filed 01/31/19   Entered 01/31/19 17:34:06   Page 229 of 229

**EXHIBIT "5"**
**Executory Contracts and Unexpired Leases**
**to Be Assumed by the Trustee**

11.   Hewitt's Island CLO 1-R, Ltd.

12.   Acis Loan Funding, Ltd.

The Trustee reserves the right to amend or supplement this Exhibit 5.

7

Appellee Appx. 00773

APPX. 10636

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 781 of 1804
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 895 of 1828   PageID 10388
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 780 of 1803   PageID 11526

# APPENDIX 9

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 782 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 896 of 1828   PageID 10389
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 781 of 1803   PageID 11527

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| NEUTRA, LTD., et al., | § § | Civil Action No. 3:18-CV-1056-D (Consolidated with Civil Action Nos. 3:18-CV-1057-D, 3:18-CV-1073-D, and 3:18-CV-1084-D) |
| Appellants, | § § § | |
| VS. | § § | (Bank. Ct. Nos. 18-30264-SGJ-7; 18-30265-SGJ-7) |
| JOSHUA N. TERRY, et al., | § § § | |
| Appellees. | § § | |
| IN RE ACIS CAPITAL MANAGEMENT, L.P., et al., | § § § | |
| Debtors. | § § | |
| HIGHLAND CLO FUNDING, LTD., et al., | § § § | Civil Action No. 3:18-CV-1822-D (Bank. Ct. Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11) |
| Appellants, | § § | |
| VS. | § § | |
| ROBIN PHELAN, CHAPTER 11 TRUSTEE, et al., | § § § | |
| Appellees. | § § | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 783 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 897 of 1828 PageID 10390
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 782 of 1803 PageID 11528
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 2 of 84 PageID 97995

| | | |
|---|---|---|
| IN RE ACIS CAPITAL | § | |
| MANAGEMENT, L.P., et al., | § | |
| | § | |
| Debtors. | § | |
| | § | Civil Action No. 3:19-CV-0291-D |
| HIGHLAND CAPITAL | § | (Bank. Ct. Nos. 18-30264-SGJ-11 and |
| MANAGEMENT, L.P., et al., | § | 18-30265-SGJ-11) |
| | § | |
| Appellants, | § | |
| | § | |
| VS. | § | |
| | § | |
| ROBIN PHELAN, CHAPTER 11 | § | |
| TRUSTEE, et al., | § | |
| | § | |
| Appellees. | § | |

APPEALS FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

FITZWATER, Senior Judge:

In multiple appeals taken from two involuntary bankruptcy cases, the principal

questions presented are whether the bankruptcy court erred by issuing orders for relief and

denying the debtors' motion to dismiss or compel arbitration; whether the bankruptcy court

erred by approving a seven-figure break-up fee in favor of a potential transaction partner; and

whether the bankruptcy court erred by confirming a reorganization plan ("the Plan") that

enjoins a non-debtor, non-creditor entity from exercising certain contractual rights. The

court must also decide questions of the bankruptcy court's subject matter jurisdiction and of

one appellant's standing to appeal. For the reasons that follow, the court DISMISSES the

appeal from the orders for relief, AFFIRMS the break-up fee order, and AFFIRMS the order

- 2 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 784 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 898 of 1828    PageID 10391
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 783 of 1803    PageID 11529
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 3 of 84    PageID 97996

approving the Plan.  The court need not address the bankruptcy court's denial of the motion
to dismiss.

<div align="center">I</div>

The following factual summary is based on the bankruptcy court's findings of fact in
support of the orders for relief and the Plan confirmation order.  *See In re Acis Capital
Mgmt., L.P.* (*Acis II*), 2019 WL 417149, at \*2-7 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan,
J.) (confirmation order); *In re Acis Capital Mgmt., L.P.* (*Acis I*), 584 B.R. 115, 119-42
(Bankr. N.D. Tex. 2018) (Jernigan, J.) (orders for relief).[1]

<div align="center">A</div>

Appellant Highland Capital Management, L.P. ("Highland") is a Dallas-based
registered investment advisor that manages nearly $15 billion of assets through an
organizational structure comprised of roughly 2,000 different entities.  Its investment
vehicles include mutual funds, private equity funds, and (relevant here) collateralized loan
obligation funds ("CLOs").  Highland conducted its CLO business through an entity called
Acis Capital Management, L.P. ("Acis LP") and Acis LP's general partner, Acis Capital
Management GP, L.L.C. ("Acis GP") (collectively, "Acis," unless otherwise indicated), both
debtors in these appeals.

In 2005 Highland hired appellee Joshua Terry ("Terry") as a portfolio analyst.  Terry

---

[1]"The court reviews the bankruptcy court's . . . fact findings only for clear error."  *In
re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000) (Fitzwater, J.) (quoting *In re ICH Corp.*, 230
B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).

<div align="center">- 3 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 785 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 899 of 1828   PageID 10392
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 784 of 1803   PageID 11530
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 4 of 84   PageID 97997

rose through the ranks at Highland until he became the portfolio manager for Highland's

CLO business, and, in turn, received a 25% limited partnership interest in Acis LP.  Terry

successfully managed billions of dollars of assets on Highland's behalf until June 2016, when

Highland terminated him.  The reason for Terry's termination is disputed.[2]  As a result of the

termination, Terry's partnership interest in Acis LP was deemed forfeited without

compensation.

In September 2016 Highland sued Terry in the 162nd Judicial District Court of Dallas

County, seeking to recover, *inter alia*, on theories of breach of fiduciary duty, disparagement,

and breach of contract.  Terry asserted counterclaims against Highland, Acis, and others, and

demanded arbitration.  The state court stayed the proceeding and ordered arbitration, and in

October 2017 the arbitration panel rendered an award in Terry's favor for $7,949,749.15,

plus post-judgment interest, against Acis ("the Award").  Terry sought and obtained

confirmation of the Award in the 44th Judicial District Court of Dallas County.

After the Award was confirmed, Terry began conducting post-judgment discovery,

which revealed some transactions that appeared suspicious to Terry.  Terry thought that

Highland was denuding Acis of assets in an effort to make Acis judgment-proof.  At a

January 24, 2018 hearing, Terry requested a temporary restraining order ("TRO") to restrain

---

[2]According to the bankruptcy court, "[t]he arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors."  *Acis II*, 2019 WL 417149, at *14; *see also* P. 1st Supp. to Pet. to Confirm Arbitration Award Exh. 1, No. DC-17-15244 (44th Dist. Ct., Dall. Cty., Tex. filed Nov. 13, 2017).

- 4 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 786 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 900 of 1828 PageID 10393
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 785 of 1803 PageID 11531
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 5 of 84 PageID 97998

Acis LP from transferring any more assets pending a January 31 temporary injunction hearing. Acis LP agreed to the request, and the court issued a TRO. Five days later, Terry filed supplemental pleadings alleging that Acis LP was engaging in more wrongdoing, and requested appointment of a receiver. Instead of proceeding with the January 31 state-court hearing, however, Terry took a different tack. At 11:57 p.m. the night before the hearing, Terry filed involuntary bankruptcy petitions against both Acis LP and Acis GP.[3]

<div align="center">B</div>

To comprehend some of the key issues in these appeals, it is helpful to recount some of the fundamentals of CLOs and how Highland structured its CLO business.

At the most basic level, a CLO is a "basket of loans." *Acis I*, 584 B.R. at 123. A special-purpose CLO entity ("CLO-SPE") purchases variable-rate commercial loans at the direction of the CLO manager, and collects them into a pool of loans. The obligors of the loans are usually large, well-known companies. Investors, such as pension funds, life insurance companies, and others, buy into the CLO by purchasing fixed-rate, secured notes on which the CLO-SPE itself is the obligor. These notes are typically sold in tranches representing different levels of risk. The CLO-SPE pays its obligations on the secured notes using the income it receives from its pool of loans, starting with the top tranche of notes and then proceeding through the lower tranches. These payments are made according to the terms of certain indenture agreements between the CLO-SPE and the indenture trustee (here,

---

[3]The bankruptcy court administratively consolidated the two cases, appointed a single trustee, and ultimately confirmed one Plan applicable to both alleged debtors.

<div align="center">- 5 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 787 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 901 of 1828 PageID 10394
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 786 of 1803 PageID 11532
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 6 of 84 PageID 97999

U.S. Bank, N.A.) to whom the CLO-SPE pledges collateral to secure the notes.

The last investor to be paid is the "equity" holder, who does not own actual equity but instead holds a subordinated, unsecured note. The equity investor earns money when the variable interest rates paid to the CLO-SPE on the commercial loans exceed the fixed interest rates that the CLO-SPE must pay to the secured note holders. Although the equity investor assumes the most risk, it also possesses certain rights that allow it to control the CLO—most significantly, the right to call for an optional redemption of the CLO.[4] When an optional redemption is effected, the CLO's pool of loans is liquidated and the resulting cash is used to pay back the outstanding secured notes, beginning with the top tranche and proceeding downward.[5]

In the present cases, Acis LP acts as the portfolio manager—*not* as the equity holder—of four CLO-SPEs, and is contractually entitled to receive portfolio management fees from them. Appellant Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey[6] entity formerly known as Acis Loan Funding, Ltd.,[7] is the primary equity investor in the CLOs.

---

[4]It is disputed whether the equity holder in this case had the right to compel Acis LP to effect an optional redemption of the relevant CLOs against Acis LP's will. The court need not resolve this dispute and therefore suggests no view on this question.

[5]The holders of the top tranche of secured notes also have special rights—namely, the right to terminate the CLO manager for cause on 45 days' notice. The note holders in these cases have so far not exercised that right.

[6]Guernsey is a small island nation located in the English Channel.

[7]For clarity, the court will refer to this entity as HCLOF, even when describing events that occurred before the entity changed its name.

- 6 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 788 of

Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 902 of 1828 PageID 10395

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 787 of 1803 PageID 11533

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 7 of 84 PageID 98000

HCLOF does not own Acis; to the contrary, Acis LP once owned an indirect 15% stake in HCLOF for regulatory compliance reasons. Acis itself has never had any employees. Instead, it subcontracts all front office advising and back office support services to another entity. Highland was originally Acis LP's subcontractor, but, under the Plan, an entity called Brigade Capital Management, L.P. ("Brigade") fills that role (for a much lower cost).

Historically, all of these entities—Acis LP, Highland, HCLOF, and the CLO-SPEs—operated within an ecosystem of contracts that allowed Acis to manage the CLOs effectively. First, Acis LP had various fee-generating portfolio management agreements ("PMAs") with the CLO-SPEs . These contracts remain in place under the Plan. Second, Acis LP and Highland had a sub-advisory agreement, which obligated Highland to provide advisory and management services in exchange for substantial fees. Third, Acis LP and Highland had a shared services agreement, through which Highland provided back office services to Acis for a significant fee. And, fourth, Acis LP had a separate PMA with HCLOF ("the Equity PMA"). While the parties dispute the exact effect of the Equity PMA—i.e., to whom it gave power over whom—it is undisputed that Acis LP earned no fees from this contract.

<div align="center">C</div>

Circumstances changed after the state-court litigation between Highland and Terry began. As noted above, Highland and Acis LP engaged in numerous transactions that caused Terry to believe "that Highland was dismantling and denuding Acis LP of all of its assets and value." *Acis I*, 584 B.R. at 144. In October 2017, four days after Terry obtained the Award,

<div align="center">- 7 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 789 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 903 of 1828 PageID 10396
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 788 of 1803 PageID 11534
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 8 of 84 PageID 98001

Acis LP sold its stake in HCLOF back to HCLOF in exchange for about $990,000 in cash.

As a result, Acis LP could no longer lawfully manage any new CLOs under the applicable

regulatory scheme. Three days later, HCLOF entered into a new PMA—a replacement for

the Equity PMA—with a recently-formed Cayman Islands entity called Highland HCF

Advisor, Ltd. At around the same time, Acis LP terminated the original Equity PMA. In

early November 2017, Acis LP transferred one of its most significant assets—a $9.5 million

note receivable that Highland owed to it—to another Cayman Islands entity, Highland CLO

Management, Ltd. ("Highland Management"). Acis LP transferred the note pursuant to a

contract that provided that Highland Management would step into Acis LP's shoes as the

portfolio manager for the CLOs. Highland Management also promised to reimburse Acis LP

for up to $2 million of future legal fees and up to $1 million of future administrative

expenses. One day after the Award was confirmed, Acis LP transferred away "the vehicle

that can most easily be described as the Acis LP 'risk retention structure' (necessitated by

[the] federal Dodd Frank law)" to Highland CLO Holdings Ltd., yet another Cayman Islands

entity. *Acis I*, 584 B.R. at 129. That same day, Acis LP conveyed to the same Cayman

Islands entity its contractual right to receive management fees from a particular CLO-SPE.

This contractual right was worth $5 million, but all Acis LP received in return was

forgiveness of a $2.8 million receivable that it owed to Highland.

On the day after Terry obtained his final judgment in the 44th Judicial District Court

of Dallas County, Acis LP underwent a sudden change in ownership. Previously, Acis LP's

limited partners were Mark Okada ("Okada"), Highland's chief investment officer, and the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 790 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 904 of 1828    PageID 10397
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 789 of 1803    PageID 11535
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 9 of 84    PageID 98002

Dugaboy Investment Trust, a family trust of Highland's CEO, James Dondero.  But on December 18, 2017 Okada and the Dugaboy Investment Trust both conveyed their interests in Acis LP to appellant Neutra, Ltd. ("Neutra"), a Cayman Islands exempted company.  The Dugaboy Investment Trust also conveyed its 100% ownership interest in Acis GP to Neutra.  Thus Neutra became Acis' sole equity owner.

Highland asserts that these transactions were part of a market-driven restructuring, or "reset," of Highland's CLOs.  According to Highland's witnesses, Acis LP had become "'toxic' in the market place" due to the litigation with Terry, and had to be excised from Highland's CLO business.  *Acis I*, 584 B.R. at 128; *accord Acis II*, 2019 WL 417149, at *11. HCLOF also has an anonymous, third-party institutional investor ("the Passive Investor") who purportedly demanded that Acis LP be removed as Highland's CLO manager.  But the Passive Investor's representative testified at a hearing that the Passive Investor had made no such demand, and the bankruptcy court found that Highland's testimony about Acis' supposed toxicity was not credible.  According to the bankruptcy court, Highland's explanations for the transfers described above were "a seemingly manufactured narrative to justify prior actions."  *Acis II*, 2019 WL 417149, at *16 (capitalization omitted).  The bankruptcy court rejected this narrative, finding that "[t]he evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor."  *Id.* at *12.

- 9 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 791 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 905 of 1828    PageID 10398
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 790 of 1803    PageID 11536
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 10 of 84    PageID 98003

D

Terry filed the involuntary petitions against Acis LP and Acis GP in order to stop the apparent transfer of assets away from Acis LP. *See Acis I*, 584 B.R. at 144. Fast-paced litigation followed.

On March 19, 2018—two days before the scheduled trial on the involuntary petitions—Acis filed a motion to dismiss for lack of subject matter jurisdiction, or, in the alternative, to compel arbitration ("the Arbitration Motion"). The bankruptcy court's decision to deny this motion is at issue in all three of the instant appeals. The Arbitration Motion was based on the Acis LP limited partnership agreement ("the Acis LPA"), which governed the relationship between Terry and Acis. The Acis LPA provides a dispute resolution procedure for "any controversy or claim . . . arising out of, relating to or in connection with the [Acis LPA] or otherwise involving the Partnership, its Partners and/or any GP Party." Third Appeal R. 4504 (brackets in original). Under this dispute resolution procedure, the parties must first attempt to mediate any dispute; only after mediating may they resort to binding arbitration. Any party who fails to mediate a claim, or who files a judicial lawsuit, ostensibly waives that claim. Acis argued in the Arbitration Motion that the Acis LPA's dispute resolution provisions applied to the involuntary petitions, and that because Terry failed to comply with those provisions, the bankruptcy court lacked subject matter jurisdiction over the controversy. The bankruptcy court denied the Arbitration Motion on the eve of trial.

In the early morning hours of the day the trial was scheduled to begin (at 2:33 a.m.),

- 10 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 792 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 906 of 1828 PageID 10399
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 791 of 1803 PageID 11537
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 11 of 84 PageID 98004

several Highland-related entities—including Neutra and HCLOF—filed a motion to intervene. They sought intervention as of right under Fed. R. Bankr. P. 7024, or, alternatively, permissive intervention under Rule 2018.[8] The putative intervenors did not, however, intend to participate in the trial; they sought only to preserve their right to appeal any adverse ruling. The bankruptcy court denied the motion.

The trial of the involuntary petitions began as scheduled on March 21, 2018, and spanned five days. On the first day of trial, the putative intervenors informed the bankruptcy court of their objection to the involuntary petitions, and they appeared via counsel during each day of the trial. Following the trial, the bankruptcy court ruled in favor of Terry as the petitioning creditor, concluding that Acis had fewer than 12 eligible creditors; Acis was not generally paying its debts as they came due; Terry filed the involuntary petitions in good faith; and abstention under 11 U.S.C. § 305 was not warranted. The bankruptcy court issued orders for relief on April 13, 2018.

E

Highland and its related entities continued to participate in the bankruptcy court proceedings after the orders for relief were issued. The bankruptcy court, after finding that a "trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP . . . [and] to resolve the inherent conflicts of interest between [Acis] and Highland," appointed Robin Phelan ("the Trustee") as trustee. *See Acis I*, 584 B.R. at 149-

---

[8]Unless otherwise indicated, all citations in this opinion to a "Rule" are to the Federal Rules of Bankruptcy Procedure.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 793 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 907 of 1828   PageID 10400
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 792 of 1803   PageID 11538
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 12 of 84   PageID 98005

50. On April 30, 2018 HCLOF—acting in its capacity as the equity note holder—sent five notices to Acis LP directing it to effect an optional redemption of the Acis CLOs on June 14, 2018.  The Trustee analyzed the notices and concluded that they were defective.

Highland and HCLOF responded by filing an adversary proceeding against the Trustee, seeking to compel the Trustee to effect a redemption.[9]  The bankruptcy court *sua sponte* issued a TRO forbidding all relevant parties (including HCLOF) from taking any action in furtherance of an optional redemption of the CLOs.  HCLOF then informed the bankruptcy court at a June 14, 2018 hearing that it had withdrawn the optional redemption notices.  Because of HCLOF's representation, the Trustee did not seek to extend the TRO. The next day, HCLOF sent a *second* set of notices to Acis LP, again demanding that Acis LP effect an optional redemption of the CLOs.  The Trustee then filed his own adversary proceeding ("the Trustee Adversary") against Highland, HCLOF, and others, seeking a *second* TRO.[10]  The bankruptcy court granted the TRO, and, after an evidentiary hearing, converted the TRO into a preliminary injunction.

While these adversary proceedings were taking place, the Trustee was preparing a chapter 11 reorganization plan for Acis.[11]  The Trustee initially proposed three plans: Plan A, Plan B, and Plan C.  Under Plan A, the Trustee—using the doctrine of equitable

---

[9]Adversary Proceeding No. 18-03078-SGJ.

[10]Adversary Proceeding No. 18-03212-SGJ.

[11]When the bankruptcy court issued the orders for relief, the cases were under chapter 7 of the Bankruptcy Code.  The bankruptcy court later converted the cases to chapter 11 cases.

- 12 -

subrogation—would have transferred HCLOF's subordinated equity notes to a third party—Oaktree Capital Management LP ("Oaktree")—in exchange for a $100 million payment to HCLOF, and would have paid off Acis' other creditors with additional funds provided by Oaktree.  Plans B and C would have amended the indenture agreements to prohibit any redemption right from being exercised until all allowed claims were paid in full. The purpose of Plans B and C was to prevent HCLOF from calling for an optional redemption of the CLOs, which would have rendered Acis LP's fee-paying PMAs worthless. The bankruptcy court ultimately held that all three of these proposed plans were unconfirmable.

Before proposing Plans A, B, and C, the Trustee asked the bankruptcy court to approve the payment of a $2.5 million break-up fee ("the Break-Up Fee") to Oaktree if Plan A was not confirmed within a certain time period.  This Break-Up Fee was a small percentage of the total value of the Plan A transaction—which was roughly $108 million—but represented a large percentage of the $8.6 million that Acis LP would retain after HCLOF was compensated for its subordinated notes.  The Trustee's motion also sought to substitute Oaktree for Highland as Acis LP's investment advisor and service provider.  The Trustee also requested that Oaktree be reimbursed for any reasonable expenses it might incur in connection with the proposed transaction ("the Expense Reimbursement").  The bankruptcy court granted the motion with minor modifications.[12]

_____

[12]Brigade—not Oaktree—now provides advisory and back office services to Acis.

- 13 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 795 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 909 of 1828 PageID 10402
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 794 of 1803 PageID 11540
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 14 of 84 PageID 98007

After the bankruptcy court rejected Plans A, B, and C, the Trustee proposed—and the bankruptcy court confirmed—Plan D. Under the confirmed Plan, Terry received full equity ownership of Acis in exchange for a $1 million reduction in the value of his claim. Acis LP continues to serve as the portfolio manager for the Acis CLOs and continues to earn management fees. The cash flow resulting from Terry's operation of Acis will be used to pay the claims of Acis' creditors, including Terry. To prevent Highland and HCLOF from disrupting this cash flow, the bankruptcy court entered an injunction ("the Temporary Injunction")[13] prohibiting various parties and non-parties—including HCLOF—from taking any steps to effect an optional redemption or liquidation of the Acis CLOs. The Temporary Injunction is actually an extension of the preliminary injunction that the bankruptcy court issued in the Trustee Adversary. It is set to expire upon the earlier of the following: (1) the entry of a final order in the Trustee Adversary; (2) the satisfaction of all allowed claims against Acis; (3) the bankruptcy court's entry of an order finding that a material default has occurred under the Plan; or (4) any subsequent order of the bankruptcy court providing otherwise as to one or more of the CLOs.

F

Three appeals (the first consisting of four consolidated appeals)[14] taken from the

---

[13]Because the briefing refers to the plan injunction as a "temporary" injunction rather than a "preliminary" injunction, which is the federal nomenclature, the court will do so as well.

[14]The First Appeal consists of four consolidated appeals. No. 3:18-CV-1056-D is an appeal of the order denying Neutra the right to intervene in the involuntary proceeding

- 14 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 796 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 910 of 1828   PageID 10403
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 795 of 1803   PageID 11541
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 15 of 84   PageID 98008

bankruptcy court's rulings are now before this court. For clarity, the court will refer to the

appeals as the First, Second, and Third Appeals.

In the First Appeal (No. 3:18-CV-1056-D), appellant Neutra[15] contends that the

bankruptcy court erred by denying the Arbitration Motion,[16] failing to dismiss the involuntary

petitions on the ground that they were filed in bad faith, and declining to abstain under 11

U.S.C. § 305.

---

against Acis GP. No. 3:18-CV-1073-D is an appeal of the order for relief as to Acis LP. No.
3:18-CV-1084-D is an appeal of the order denying Neutra the right to intervene in the
involuntary proceeding against Acis LP.

No. 3:18-CV-1057-D is *supposed* to be an appeal of the order for relief as to Acis GP,
but, due to a filing error, the notice of appeal actually challenges the order denying
intervention as to Acis GP—the same order at issue in 3:18-CV-1056-D. Neutra attempted
to remedy this mistake by filing a second amended notice of appeal in the bankruptcy court,
but that notice was erroneously transmitted to the docket of 3:18-CV-1084-D instead of 3:18-
CV-1057-D. Because these are ministerial errors that do not affect the court's jurisdiction,
the court will correct them at the conclusion of this opinion. *See, e.g., In re Smith*, 133 B.R.
800, 804 (N.D. Tex. 1991) (Fitzwater, J.) ("In contrast to the failure properly to designate an
appellant, which is a jurisdictional defect, the failure to specify the correct judgment is
irrelevant where it is clear which judgment the appellant is appealing." (citations omitted)).

[15]HCLOF and an entity called CLO Holdco Ltd. are also named as appellants in the
First Appeal. Neutra is the only appellant, however, who has submitted briefing.

[16]Neutra did not file a separate notice of appeal with respect to the order denying the
Arbitration Motion. Instead, it contends that this order is an interlocutory order that merged
into the orders for relief, which are final orders for the purposes of 28 U.S.C. § 158(a)(1).
*See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*,
459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Terry does not contest this assertion. Neutra also
maintains that mandatory arbitration agreements implicate subject matter jurisdiction, which
any party can raise at any time.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 797 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 911 of 1828 PageID 10404
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 796 of 1803 PageID 11542
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 16 of 84 PageID 98009

In the Second Appeal (No. 3:18-CV-1822-D), appellant Highland[17] contends that the bankruptcy court erred by denying the Arbitration Motion and approving the Break-Up Fee and Expense Reimbursement.[18]

In the Third Appeal (No. 3:19-CV-0291-D), appellants Highland and Neutra contend that the bankruptcy court erred by denying the Arbitration Motion; confirming the Plan while the appeal of the orders for relief was still pending; confirming the Plan even though the statutory requirements of 11 U.S.C. § 1129 were not met; and entering the Temporary Injunction. HCLOF submitted a separate brief in the Third Appeal, arguing that the Temporary Injunction is beyond the constitutional authority of the bankruptcy court, is overbroad, and is not supportable under the four-part preliminary-injunction test.

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal.

The appeals and Acis' motion are before the court for decision.

## II

"The court reviews the bankruptcy court's conclusions of law *de novo*, but reviews its fact findings only for clear error." *In re Nary*, 253 B.R. 752, 756 (N.D. Tex. 2000)

---

[17]HCLOF is also named as an appellant in the Second Appeal, but it did not submit or join in any briefing.

[18]The notice of appeal in the Second Appeal also challenges the bankruptcy court's decisions to deny a preliminary injunction requested by HCLOF and to grant the Trustee's request for a preliminary injunction in the Trustee Adversary. These appeals were separately docketed and subsequently dismissed.

Appellee Appx. 00790
APPX. 10855

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 798 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 912 of 1828   PageID 10405
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 797 of 1803   PageID 11543
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 17 of 84   PageID 98010

(Fitzwater, J.) (quoting *In re ICH Corp.*, 230 B.R. 88, 91 n.10 (N.D. Tex. 1999) (Fitzwater, J.)).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed."  *In re Johnson Sw., Inc.*, 205 B.R. 823, 827 (N.D. Tex. 1997) (Fitzwater, J.) (quoting *In re Placid Oil Co.*, 158 B.R. 404, 412 (N.D. Tex. 1993) (Fitzwater, J.)).  "If the trier of fact's account of the evidence is plausible in light of the record viewed in its entirety, the appellate court may not reverse it."  *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412).  "[T]his court does not find facts.  Neither is it free to view the evidence differently as a matter of choice."  *Id.* (alteration in original) (quoting *Placid Oil Co.*, 158 B.R. at 412). "The bankruptcy judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected."  *Id.* (quoting *Placid Oil Co.*, 158 B.R. at 412) (internal quotation marks omitted).

In reviewing matters committed to the bankruptcy court's discretion—such as whether to approve a break-up fee and expense reimbursement—the court applies an abuse of discretion standard.  *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 205 (3d Cir. 2010).  "To constitute an abuse of discretion, the [bankruptcy] court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous." *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 799 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 913 of 1828 PageID 10406
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 798 of 1803 PageID 11544
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 18 of 84 PageID 98011

## III

In the First Appeal, appellee Terry contends that appellant Neutra lacks standing to appeal the orders for relief.[19]

### A

### 1

"Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994)). But there are still limits on who may appeal a bankruptcy court order. *See In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018). Before 1978, those limits were provided by the Bankruptcy Act, which granted appellate standing only to "person[s] aggrieved" by a bankruptcy court order. *Coho Energy*, 395 F.3d at 202 (quoting 11 U.S.C. § 67(c) (1976)). Congress repealed the relevant statutory provision when it passed the Bankruptcy Reform Act of 1978, but courts—including the Fifth Circuit—nonetheless still apply the person aggrieved test to bankruptcy appeals. *See id.* Because "[b]ankruptcy cases often involve numerous parties with conflicting and overlapping interests," and "[a]llowing each and every party to appeal each and every order

---

[19]The other appellants in the First Appeal have not briefed the issue of standing. They have therefore failed to meet their burden to assert that they have standing. *See Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994) ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal.").

- 18 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 800 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 914 of 1828 PageID 10407
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 799 of 1803 PageID 11545
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 19 of 84 PageID 98012

would clog up the system and bog down the courts," it is necessary for courts to limit who

may appeal any given order. *Technicool Sys.*, 896 F.3d at 385.

The person aggrieved test "is 'more exacting' than the test for Article III standing."

*Id.* (quoting *In re Delta Produce, L.P.*, 845 F.3d 609, 619 (5th Cir. 2016)). "Rather than

showing the customary 'fairly traceable' causal connection, a bankruptcy appellant must

instead show that he was 'directly and adversely affected pecuniarily by the order of the

bankruptcy court.'" *Id.* (footnotes omitted) (first quoting *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560-61 (1992), then quoting *Fortune Nat. Res. Corp. v. U.S. Dep't of Interior*, 806

F.3d 363, 366 (5th Cir. 2015)).[20]

2

Equally important to deciding whether Neutra has standing is the "shareholder

standing rule," which is "a longstanding equitable restriction that generally prohibits

shareholders from initiating actions to enforce the rights of the corporation" absent special

circumstances. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). The

doctrine derives from the third-party standing rule: "the plaintiff generally must assert his

---

[20]Some courts have imposed an additional prerequisite: that the appellant have
attended and objected at the underlying bankruptcy proceedings. *See, e.g., In re Palmaz Sci.,
Inc.*, 262 F.Supp.3d 428, 435 (W.D. Tex. 2017); *In re Camp Arrowhead, Ltd.*, 451 B.R. 678,
693-94 (Bankr. W.D. Tex. 2011) (quoting *In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010)). But
other courts have held that appearance and objection are not indispensable to appellate
standing. *See In re Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1192-93 (9th Cir. 2018); *In re
Urban Broad. Corp.*, 401 F.3d 236, 244 (4th Cir. 2005). The Fifth Circuit has not yet
decided the question. *See Palmaz*, 262 F.Supp.3d at 434. This court need not decide the
issue because it disposes of the question of Neutra's standing on other grounds.

- 19 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 801 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 915 of 1828 PageID 10408
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 800 of 1803 PageID 11546
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 20 of 84 PageID 98013

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see In re Troutman Enters., Inc.*, 286 F.3d 359, 364 (6th Cir. 2002). This court has recognized that "[u]nder federal common law [and] Texas law . . . only a corporation and not its shareholders, not even sole shareholders, can complain of an injury sustained by, or a wrong done to, the corporation." *Rigco, Inc. v. Rauscher Pierce Refsnes, Inc.*, 110 F.R.D. 180, 183 (N.D. Tex. 1986) (Fitzwater, J.). Although the rule is phrased in terms of corporations and shareholders, it applies with equal force to limited partnerships like Acis LP. *See CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 122-23 (2d Cir. 2013) (applying federal common law); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 220-22 (5th Cir. 1994) (applying Texas law); *see also In re A.S. Acquisition Corp.*, 56 Fed. Appx. 415, 416 (9th Cir. 2003) (memorandum) (holding that limited partner lacked standing to appeal bankruptcy court order that affected partnership property). It also applies to limited liability companies like Acis GP. *See Heyer v. Schwartz & Assocs. PLLC*, 319 F.Supp.3d 299, 304-05 (D.D.C. 2018) (applying federal common law); *Schoen v. Underwood*, 2012 WL 13029591, at *4 (W.D. Tex. May 15, 2012) (applying Texas law).

The Supreme Court has "treated standing as consisting of two related components: the constitutional requirements of Article III and nonconstitutional prudential considerations." *Franchise Tax Bd.*, 493 U.S. at 335. The shareholder standing rule falls within the latter category, and thus can operate to bar a lawsuit even if Article III standing is satisfied. *See id.* at 336. Recently, the Supreme Court called into question the continuing vitality of

- 20 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 802 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 916 of 1828 PageID 10409
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 801 of 1803 PageID 11547
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 21 of 84 PageID 98014

prudential standing, observing that it is in tension with the principle that "a federal court's

obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B.*

*Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Lexmark Int'l, Inc. v. Static*

*Control Components, Inc.*, 572 U.S. 118, 126 (2014)) (internal quotation marks omitted); *see*

*also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, Nat'l Ass'n*, 758 F.3d 592, 603

n.34 (5th Cir. 2014) ("[T]he continued vitality of prudential 'standing' is now uncertain in

the wake of the Supreme Court's recent decision in *Lexmark*[.]").  But the Fifth Circuit has

since reaffirmed the third-party standing doctrine in particular. *See Superior MRI Servs., Inc.*

*v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015).  The doctrine therefore

remains binding in this circuit.

The court is aware of no binding precedent requiring it to apply the shareholder

standing rule in the context of a bankruptcy appeal, but other courts have done so. *See, e.g.,*

*In re Heyl*, 770 F.3d 729, 730 (8th Cir. 2014) (per curiam); *In re AFY*, 734 F.3d 810, 822-23

(8th Cir. 2013); *A.S. Acquisition Corp.*, 56 Fed. Appx. at 416; *In re Troutman Enters.*, 286

F.3d at 365; *In re Dein Host, Inc.*, 835 F.2d 402, 404-06 (1st Cir. 1987); *Rose v. Logan*, 2014

WL 1236008, at *5-7 (D. Md. Mar. 25, 2014).  This court concludes that it should do so as

well, for at least two reasons.

First, the person aggrieved test already includes a version of the third-party standing

rule.  It requires that the appellant be "*directly* and adversely affected pecuniarily by the

order of the bankruptcy court." *Technicool Sys.*, 896 F.3d at 385 (emphasis added) (quoting

*Fortune Nat. Res. Corp.*, 806 F.3d at 366).  "An 'indirect financial stake' in another's claims

Appellee Appx. 00795
APPX. 103662

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 803 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 917 of 1828    PageID 10410
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 802 of 1803    PageID 11548
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 22 of 84    PageID 98015

is insufficient for standing." *In re The Watch Ltd.*, 257 Fed. Appx. 748, 749 (5th Cir. 2007)

(per curiam) (quoting *Rohm*, 32 F.3d at 208).

Second, the person aggrieved doctrine is itself a creature of prudential standing—it

is distinct from, and narrower than, constitutional standing, and it is justified by practical

considerations. *See Coho Energy*, 395 F.3d at 202 ("To prevent unreasonable delay, courts

have created an *additional* prudential standing requirement in bankruptcy cases: The

appellant must be a 'person aggrieved' by the bankruptcy court's order." (quoting *In re

P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *see also Technicool Sys.*, 896 F.3d at

384-86 (distinguishing constitutional standing from bankruptcy standing, and offering

prudential justifications for the latter). The policy underlying the person aggrieved doctrine

would be well-served by including within it a third-party standing or shareholder standing

rule. Without such a limitation, any one of a debtor's numerous shareholders could

separately appeal bankruptcy court orders affecting the value of the debtor—thus resulting

in "umpteen appeals raising umpteen issues." *Technicool Sys.*, 896 F.3d at 384. Neutra does

not argue that the shareholder standing rule is inapplicable to bankruptcy appeals generally.

Instead, Neutra maintains that it is asserting a direct, rather than a derivative, interest in the

orders for relief. The court therefore holds that the shareholder standing rule applies in the

context of bankruptcy appeals.

Although no party cites it, the court is aware of one Fifth Circuit decision that allowed

a debtor's majority shareholder to appeal an order of the bankruptcy court. In *In re First

Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), *superseded by statute on other

- 22 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 804 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 918 of 1828 PageID 10411
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 803 of 1803 PageID 11549
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 23 of 84 PageID 98016

*grounds as recognized by In re Woerner*, 783 F.3d 266, 274 (5th Cir. 2015) (en banc),[21] the

Fifth Circuit authorized a debtor's majority shareholder to appeal an order awarding

attorney's fees to the trustee's attorneys (one of whom was himself the trustee). But as the

*First Colonial* panel was careful to point out, the case involved unique circumstances. *See*

*id.* at 1297 ("Although the attorneys and the trustee are correct in stating that in the usual

case the bankrupt and its shareholders do not have an interest in the disposition of the assets

of the estate . . . this is hardly the usual case."). The appeal involved an issue on which the

interests of the trustee and the debtor diverged, because "[w]here the trustee serves as his

own attorney there is no disinterested trustee to ensure that the attorney is paid only for

professional services necessary to the administration of the estate." *Id.* Thus the panel made

an exception: it allowed the shareholder to appeal, thereby "refusing to permit [the trustee]

to use his position as trustee to prevent [the shareholder] from contesting the size of his

attorneys' fee." *Id.* There are no such circumstances present here: the Trustee lacks a

similarly-direct "personal financial stake" in the orders for relief, and he is not using his

special position to insulate a favorable order from review. *Cf. AFY*, 734 F.3d at 823

(distinguishing *First Colonial* because trustee lacked personal financial stake in outcome of

appealed orders). *First Colonial* therefore does not prevent this court from applying the

shareholder standing rule to a bankruptcy appeal.

---

[21]Although *First Colonial* was decided before the passage of the Bankruptcy Reform
Act of 1978, the "person aggrieved" test applied by the courts post-1978 was taken directly
from pre-1978 jurisprudence. *See Coho Energy*, 395 F.3d at 202. *First Colonial*'s analysis
is therefore still relevant.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 805 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 919 of 1828    PageID 10412
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 804 of 1803    PageID 11550
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 24 of 84    PageID 98017

B

Neutra asserts four different interests in the orders for relief.  None of these interests

suffices to give Neutra standing to appeal.

Neutra contends that it "is watching its interest in Acis being decimated by

administrative expenses."  Neutra First Appeal Br. 19.  In other words, Neutra's ownership

interest in Acis is losing value as a result of the inherent expenses of bankruptcy.  Under the

shareholder standing rule, however, this interest is quintessentially derivative of Acis' own

interests, and therefore cannot confer standing.  *See, e.g., Stevens v. Lowder*, 643 F.2d 1078,

1080 (5th Cir. Unit B Apr. 1981) ("Plaintiffs' individual injury arises only from the loss in

value of their stock as a result of injury to the corporation.  Under these circumstances,

plaintiffs have no independent cause of action.").  The First Circuit rejected a nearly-identical

argument in *Dein Host*, 835 F.2d 402.  It held that an appellant lacked standing where his

only interest in the bankruptcy court order was "that his beneficial interest in [another

entity]—his stock—[was] in jeopardy and subject to shrinkage."  *Id.* at 405.  In so

concluding, the court relied on the principle that "[t]he fact that the injury may indirectly

harm a stockholder by diminishing the value of his corporate shares does not bestow upon

him a right to sue on his own behalf."  *Id.* at 405-06 (quoting *Papilsky v. Berndt*, 466 F.2d

251, 255 (2d Cir. 1972)).  Thus even if Acis loses value as a result of its plunge into

bankruptcy, Neutra cannot appeal on this basis.

Neutra also posits that it "has lost its right to protect its interest [in Acis] via control

of [Acis]."  Neutra First Appeal Br. 19.  This interest is insufficient to confer standing

- 24 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 806 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 920 of 1828 PageID 10413
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 805 of 1803 PageID 11551
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 25 of 84 PageID 98018

because losing control over an entity is not, in itself, a *pecuniary* injury. *See Technicool Sys.*,
896 F.3d at 385 (requiring that appellant be "directly and adversely affected *pecuniarily* by
the order of the bankruptcy court" (emphasis added)); *see also Rose*, 2014 WL 1236008, at
*5-7 (holding that shareholder standing rule applies with full force to entity's *sole* equity
owner). Control rights may enhance the value of Neutra's ownership interest, or may allow
Neutra to protect the value of that interest via advantageous business decisions. But, as the
court has already discussed, any diminishment in the value of Neutra's interest in Acis does
not confer standing on Neutra.

Neutra also asserted, at the time it filed its briefing in the First Appeal, that it would
soon "be forced to partner with Oaktree against its wishes, and may be completely divested
from its equity interests without its consent." Neutra First Appeal Br. 19-20. But this
outcome was by no means an inevitable result of the *orders for relief*. The person aggrieved
test does not take into account every injury caused by the bankruptcy case as a whole, but
instead asks whether "the *order* of the bankruptcy court . . . directly and adversely affect[s]
the appellant pecuniarily." *Fortune Nat. Res. Corp.*, 806 F.3d at 367. And "bankruptcy
standing requires 'a higher causal nexus between act and injury'" than does traditional
Article III standing. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*,
806 F.3d at 366). Thus although the orders for relief created the possibility that Neutra might
suffer harm in the future, Neutra was not aggrieved by them for standing purposes because
"[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit." *Id.* at 386;
*see also id.* at 384-86 (concluding that equity owner was not aggrieved by order allowing

Appellee Appx. 00799
APPX. 103564

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 807 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 921 of 1828 PageID 10414
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 806 of 1803 PageID 11552
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 26 of 84 PageID 98019

trustee to employ special counsel, even though special counsel's purpose was to pierce the corporate veil to reach equity owner's other companies and assets).

Of course, the future harms identified by Neutra in the First Appeal did actually come to pass: the bankruptcy court appointed first Oaktree, and then Brigade, as the new service provider for Acis, and later divested Neutra of its equity interest in Acis. But this court cannot take these events into account in its analysis of the First Appeal. A district court hearing a bankruptcy appeal may only consider information if it is "part of the record before the bankruptcy court" or if it "meets the narrow purpose of judicial notice." *In re SI Restructuring Inc.*, 480 Fed. Appx. 327, 329 (5th Cir. 2012) (per curiam). The subsequent events that are asserted to have injured Neutra are not part of the record in the First Appeal. No party has asked this court to take judicial notice of any subsequent bankruptcy court orders in the First Appeal, and the court has no duty to do so *sua sponte*.[22] Moreover, Neutra would lack standing even if the court *did* take these events into account. That a once-speculative harm actually came to pass does not mean that the harm was initially *likely* to happen—so Neutra would still fail to show the "higher causal nexus between act and injury" that the person aggrieved test demands. *Technicool Sys.*, 896 F.3d at 385-86 (quoting *Fortune Nat. Res. Corp.*, 806 F.3d at 366); *cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 101 (N.Y. 1928) (finding no liability for negligence where, *ex ante*, "there was nothing in the

---

[22]The Fifth Circuit has indicated that when no party asks the district court to take judicial notice of a fact, and the district court does not do so *sua sponte*, the Fifth Circuit is unlikely to do so for the first time on appeal. *See United States v. Herrera-Ochoa*, 245 F.3d 495, 502 & n.6 (5th Cir. 2001) (citing cases).

Appellee Appx. 00800
APPX. 10867

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 808 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 922 of 1828  PageID 10415
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 807 of 1803  PageID 11553
Case 3:19-cv-00291-D  Document 75  Filed 07/18/19  Page 27 of 84  PageID 98020

situation to suggest to the most cautious mind" that defendant's actions would result in harm to plaintiff, even though harm actually occurred).

The court therefore dismisses the First Appeal, i.e., all the appeals of the orders for relief.

<div align="center">C</div>

The court's conclusion that Neutra lacks standing[23] is buttressed by the fact that the bankruptcy court properly denied Neutra's motion to intervene.[24]

<div align="center">1</div>

Neither Neutra nor Terry has substantially briefed the question whether the bankruptcy court erred by denying Neutra's motion to intervene. Neutra contends that the ruling on its motion to intervene has no bearing on whether it can appeal as a person

---

[23]This conclusion does not mean that *no one* has standing to appeal. The Trustee likely could have appealed the orders for relief on Acis' behalf had he believed the orders were not in the best interests of the estates. *See In re C.W. Mining Co.*, 636 F.3d 1257, 1261-66 (10th Cir. 2011); *see also* 11 U.S.C. § 323(a) ("The trustee in a case under this title is the representative of the estate.").

[24]The parties agree that this court has jurisdiction over the orders denying intervention because they are interlocutory orders that merged into the orders for relief, which are final for the purposes of 28 U.S.C. § 158(a)(1). *See In re Manuel Mediavilla, Inc.*, 568 B.R. 551, 566 (B.A.P. 1st Cir. 2017); *In re Marciano*, 459 B.R. 27, 36 (B.A.P. 9th Cir. 2011). Neutra only asserts that it has standing to appeal the orders for relief; it does not contend that it has standing to appeal independently the orders denying intervention. *Cf. Rohm*, 32 F.3d at 208 ("[T]he putative appellant shoulders the burden of alleging facts sufficient to demonstrate that it is a proper party to appeal."). Thus even though the court concludes—in the context of this standing analysis—that the orders denying intervention were correctly decided, it does not affirm them. Instead, it dismisses the entire First Appeal for lack of standing.

<div align="center">- 27 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 809 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 923 of 1828    PageID 10416
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 808 of 1803    PageID 11554
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 28 of 84    PageID 98021

aggrieved; Terry, meanwhile, maintains that the bankruptcy court's decision was correct, but also contends that any error was harmless because Neutra had no intention of participating in the trial on the involuntary petitions.  The court is not persuaded, however, that the question is irrelevant.

Some courts have suggested that the bankruptcy court's proper denial of a motion to intervene is dispositive of the movant's right to appeal.  *See, e.g., In re Living Hope Sw. Med. Servs., LLC*, 598 Fed. Appx. 467, 467 (8th Cir. 2015) (per curiam) (concluding that appellant lacked standing because bankruptcy court correctly denied his motion to intervene); *In re Thompson*, 965 F.2d 1136, 1140-46 & n.9 (1st Cir. 1992) (equating person aggrieved test with the test for intervention under Rule 7024, and concluding that because bankruptcy court properly denied motion to intervene in adversary proceeding, appellant lacked standing to appeal judgment); *In re S. State St. Bldg. Corp.*, 140 F.2d 363, 367 (7th Cir. 1943) ("If one who has a right to intervene, but does not, has no standing to appeal, a fortiori, one who has no right to intervene, and does not, has no standing to appeal."); *see also In re Blair*, 2016 WL 8608454, at *5 (D. Colo. Aug. 24, 2016) ("One might expect that [the person aggrieved] doctrine would not apply to a party that sought and was denied intervention.  Or, at a minimum, it seems incongruous to permit a party to file an unsuccessful motion to intervene and nonetheless be permitted to appeal under the persons aggrieved doctrine and immediately attack the Bankruptcy Court's substantive rulings, rather than first challenging the denial of intervention.").  Other courts disagree.  *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991) (holding that "[Rule 2018,] governing permissive

Appellee Appx. 00802
APPX. 10867

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 810 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 924 of 1828   PageID 10417
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 809 of 1803   PageID 11555
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 29 of 84   PageID 98022

intervention, does not limit the rights of a 'person aggrieved' to be heard" on appeal).

It is also possible that, had Neutra been allowed to intervene, it would have had standing to appeal by virtue of its intervention alone. *See First Colonial*, 544 F.2d at 1296-98 (finding that appellant was a person aggrieved, and then adding, as alternative ground for its holding, that "[appellant] has standing to appeal from all of the fee awards because the bankruptcy judge granted its motion to intervene [under what is now Rule 7024] without qualifying its right to participate in the proceeding"); *see also Int'l Trade Admin.*, 936 F.2d at 747 (stating that permissive intervention under Rule 2018 "provides a formal mechanism that expands the right to be heard to a wider class than those who qualify under the 'person aggrieved' standard"). *But see Troutman Enters.*, 286 F.3d at 363-64 (holding that parties who were permitted to intervene in bankruptcy proceeding nonetheless lacked appellate standing because they were not persons aggrieved).

Because the bankruptcy court's decision to deny intervention could affect Neutra's standing to bring the present appeal, the court will consider the merits of Neutra's appeal of that decision.

2

"A ruling denying intervention of right is reviewed *de novo*." *St. Bernard Par. v. Lafarge N. Am., Inc.*, 914 F.3d 969, 973 (5th Cir. 2019) (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)). Although generally "the timeliness of an intervention motion is reviewed for abuse of discretion," if the bankruptcy court did not explain its ruling on timeliness, review is *de novo*. *See id.* (citing *Sommers v. Bank of Am.,*

- 29 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 811 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 925 of 1828   PageID 10418
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 810 of 1803   PageID 11556
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 30 of 84   PageID 98023

*N.A.*, 835 F.3d 509, 513 (5th Cir. 2016)).  The court reviews the denial of a motion for permissive intervention for "clear abuse of discretion," and will disturb the bankruptcy court's ruling "only under extraordinary circumstances." *Id.* (quoting *Edwards*, 78 F.3d at 995).

Neutra sought intervention as of right under Rule 1018, which provides that Rule 7024 applies in proceedings to contest an involuntary petition.  Rule 7024, in turn, states that "[Fed. R. Civ. P. 24] applies in adversary proceedings."

> A party is entitled to an intervention of right under Rule 24(a)(2) if (1) the motion to intervene is timely, (2) the interest asserted by the potential intervenor is related to the action, (3) that interest may be impaired or impeded by the action, and (4) that interest is not adequately represented by the existing parties.

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2012 WL 2133667, at *1 (N.D. Tex. June 12, 2012) (Fitzwater, C.J.) (citing *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247 (5th Cir. 2009); *Sierra Club v. Espy*, 18 F.3d 1202, 1204-05 (5th Cir. 1994)), *rev'd on other grounds*, 747 F.3d 275 (5th Cir. 2014), *aff'd*, ___ U.S. ___, 135 S. Ct. 2507 (2015).  "Failure to satisfy any one requirement precludes intervention of right." *Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs*, 493 F.3d 570, 578 (5th Cir. 2007).

Neutra also sought permissive intervention under Rule 2018.  That rule provides that "after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."  Rule 2018(a).

- 30 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 812 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 926 of 1828 PageID 10419
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 811 of 1803 PageID 11557
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 31 of 84 PageID 98024

> In deciding whether to permit intervention under Rule 2018(a), courts look to various factors, including (1) whether the moving party has an economic or similar interest in the matter; (2) whether the interest of the moving party [is] adequately represented by the existing parties; [(3)] whether the intervention will cause undue delay to the proceedings; and (4) whether the denial of the movant's request will adversely affect their interest.

*Pasternak & Fidis, P.C. v. Wilson*, 2014 WL 4826109, at *6 (D. Md. Sept. 23, 2014) (collecting cases). Thus "[t]he standards under Rule 2018 and [Rule] 24 overlap." *In re Adilace Holdings, Inc.*, 548 B.R. 458, 462 (Bankr. W.D. Tex. 2016). "The decision whether to allow intervention is wholly discretionary under Rule 2018 . . . even where each required element is met." *Id.* at 463 (citing *Staley v. Harris County*, 160 Fed. Appx. 410, 414 (5th Cir. 2005) (per curiam); *In re Durango Ga. Paper Co.*, 336 B.R. 594, 596 (Bankr. S.D. Ga. 2005)).

3

Neutra was not entitled to intervention of right in the trial of the involuntary petitions because it did not have a sufficiently direct interest in the proceedings. The only interest that Neutra asserted was its property interest in Acis. But in the intervention context, "[t]he term 'interest' is narrowly read to mean a *direct* and substantial interest in the proceedings . . . that the substantive law recognizes as belonging to or being owned by *the party seeking intervention*." *Rigco*, 110 F.R.D. at 183 (emphasis added). Accordingly, the shareholder standing rule applies to Rule 24(a) motions to intervene. *See id.* at 183-84. Neutra's property interest in the alleged debtors therefore could not support Neutra's claimed right to

- 31 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 813 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 927 of 1828 PageID 10420
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 812 of 1803 PageID 11558
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 32 of 84 PageID 98025

intervene in the trial on the involuntary petitions. *See supra* § III(B). Because one of the four Rule 24(a) factors was not met, the bankruptcy court did not err by denying Neutra's motion to intervene as of right. *See Haspel*, 493 F.3d at 578.

For similar reasons, the bankruptcy court did not abuse its discretion by denying Neutra permissive intervention under Rule 2018. This is because Neutra lacked a sufficiently direct interest in the proceedings. And even if Neutra had such an interest, this court still would not disturb the bankruptcy court's ruling. This court reviews the bankruptcy court's denial of a Rule 2018 motion under a deferential standard—the bankruptcy court has discretion to deny such a motion even if all four factors are met. *See Adilace Holdings*, 548 B.R. at 463; *see also St. Bernard*, 914 F.3d at 973 (providing that orders as to permissive intervention are reviewed for clear abuse of discretion). Neutra offers no argument on appeal that the bankruptcy court committed a clear abuse of its discretion by denying its motion. *Cf. Brinkmann v. Dall. Cty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987) (holding that arguments not briefed on appeal are deemed abandoned). In the absence of such an argument, the court will not disturb the bankruptcy court's ruling.

IV

Neutra argues in the First Appeal that, regardless whether it has standing to appeal the orders for relief, it can challenge the bankruptcy court's denial of the Arbitration Motion because mandatory arbitration agreements implicate the court's subject matter jurisdiction. The appellants in the Second Appeal and Third Appeal make the same argument, and contend that every subsequent order entered by the bankruptcy court is void for lack of

- 32 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 814 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 928 of 1828 PageID 10421
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 813 of 1803 PageID 11559
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 33 of 84 PageID 98026

subject matter jurisdiction.

The Fifth Circuit recently reiterated that it has not yet decided the question whether a dismissal based on an arbitration provision is a dismissal for lack of subject matter jurisdiction. *See McDonnel Grp., L.L.C. v. Great Lakes Ins. SE, UK Branch*, 923 F.3d 427, 430 n.5 (5th Cir. 2019); *see also McGee v. W. Express, Inc.*, 2016 WL 1622632, at *2 (N.D. Tex. Apr. 5, 2016) (Horan, J.) (explaining that the Fifth Circuit has not yet decided the issue), *rec. adopted*, 2016 WL 1627662, at *1 (N.D. Tex. Apr. 22, 2016) (Kinkeade, J.). Neutra relies, however, on another Fifth Circuit opinion, *Gilbert v. Donahoe*, 751 F.3d 303 (5th Cir. 2014), in which the panel stated: "We have held that a district court lacks subject matter jurisdiction over a case and should dismiss it pursuant to Federal Rule of Civil Procedure 12(b)(1) when the parties' dispute is subject to binding arbitration." *Id.* at 306. The *Gilbert* panel cited two supporting cases in a footnote: *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012), and *Omni Pinnacle, LLC v. ECC Operating Services, Inc.*, 255 Fed. Appx. 24 (5th Cir. 2007) (per curiam). In both of these supporting cases the Fifth Circuit affirmed a district court's dismissal of a case under Rule 12(b)(1) pursuant to an arbitration agreement. The *Gilbert* opinion also acknowledged precedent indicating that the issue was previously unsettled. *See Gilbert*, 751 F.3d at 306 n.1 (citing *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472 n.3 (5th Cir. 2010) ("Our court has not previously definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause.")). Thus *Gilbert*—if read in a vacuum—appears to settle the issue in a precedential decision.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 815 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 929 of 1828   PageID 10422
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 814 of 1803   PageID 11560
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 34 of 84   PageID 98027

But in *Ruiz v. Donahoe*, 784 F.3d 247 (5th Cir. 2015) (on petition for rehearing),
Judge Owen—who authored *Gilbert* just one year before—wrote for the panel that
"[a]lthough in *Gilbert* we spoke in terms of subject-matter jurisdiction, we used the term
imprecisely." *Id.* at 249.  The *Ruiz* panel observed that whereas subject matter jurisdiction
can be raised at any time and cannot be waived by the parties, a party *can* waive its right to
compel arbitration.  *See id.*  And "[i]f a dispute is subject to mandatory grievance and
arbitration procedures, then the proper course of action is usually to stay the proceedings
pending arbitration." *Id.*  Thus "agreements to arbitrate implicate forum selection and
claims-processing rules *not subject matter jurisdiction*." *Id.* at 250 (emphasis added).

This court is persuaded by the reasoning of *Ruiz* and follows *Ruiz*'s explanation that
the *Gilbert* panel was imprecise when it spoke in terms of subject matter jurisdiction.  It is
well-established in the Fifth Circuit that a party can waive its right to compel arbitration.
*See, e.g., Petroleum Pipe Ams. Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009);
*Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991); *Tenneco Resins, Inc. v.
Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985).  It is equally well-established that a party
*cannot* waive challenges to the court's subject matter jurisdiction; the issue can be raised at
any time by any party or by the court *sua sponte.  See, e.g., Simon v. Wal-Mart Stores, Inc.*,
193 F.3d 848, 850 (5th Cir. 1999).  Moreover, in the Fifth Circuit a court may order a stay
pending arbitration instead of dismissing a case outright.  *See, e.g., Williams v. Cigna Fin.
Advisors, Inc.*, 56 F.3d 656, 662 (5th Cir. 1995); *see also* 9 U.S.C. § 3 (authorizing courts to
grant stays pending arbitration*).  But when a court lacks subject matter jurisdiction over a

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 816 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 930 of 1828 PageID 10423
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 815 of 1803 PageID 11561
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 35 of 84 PageID 98028

controversy, it cannot enter a stay order—or *any* order besides an order dismissing the case.
*See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 434 (2007) ("[O]nce
a court determines that jurisdiction is lacking, it can proceed no further and must dismiss the
case on that account."). Thus if the *Gilbert* panel actually held that a dismissal based on an
arbitration clause is jurisdictional, then it impliedly overruled many years of precedent set
by many prior panels. Under the Fifth Circuit's rule of orderliness, however, the *Gilbert*
panel lacked the power to do so. *See, e.g., Odle v. Flores*, 683 Fed. Appx. 288, 289 (5th Cir.
2017) (per curiam) ("[U]nder the rule of orderliness, to the extent that a more recent case
contradicts an older case, the newer language has no effect." (alteration in original) (quoting
*Arnold v. U.S. Dep't of Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000))). Fifth Circuit
precedent instead supports the conclusion that a dismissal based on an arbitration agreement
does *not* implicate the court's subject matter jurisdiction.

Indeed, it would be strange if parties by contract could divest a federal court of subject
matter jurisdiction or confer such jurisdiction. "Only Congress may determine a lower
federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004)
(citing U.S. Const. art. III, § 1). "[N]o action of the parties can confer subject-matter
jurisdiction upon a federal court" if such jurisdiction is otherwise lacking. *Ins. Corp. of Ir.,
Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). And federal courts
have long resisted attempts by private parties to manipulate their jurisdiction—including
attempts to deprive courts of removal jurisdiction where that jurisdiction properly exists.
*See, e.g., Smallwood v. Ill. Cent. R.R. Co.*, 385 U.S. 568, 576 (5th Cir. 2004) (en banc) ("The

Appellee Appx. 00809
APPX. 10876

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 817 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 931 of 1828 PageID 10424
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 816 of 1803 PageID 11562
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 36 of 84 PageID 98029

doctrine of improper joinder implements our duty to not allow manipulation of our jurisdiction."). It follows that "if a court has jurisdiction of an action, the parties cannot deprive the court thereof by contract." 17A C.J.S. *Contracts* § 309 (2019). Parties may not, in the course of ordering their private affairs, enlarge *or shrink* Article III or the federal statutes governing subject matter jurisdiction.[25]

Nor does the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, mandate that a dismissal based on an arbitration agreement is a dismissal for lack of subject matter jurisdiction. The Supreme Court has urged caution in interpreting statutory provisions to be jurisdictional. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("'Jurisdiction,' this Court has observed, 'is a word of many, too many, meanings.' This Court, no less than other courts, has sometimes been profligate in its use of the term." (citation omitted) (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998))). This is because calling an issue "jurisdictional" has profound consequences. If an issue implicates the court's subject matter jurisdiction, then it cannot be waived or forfeited, and the court has a duty to raise the issue on its own; the trial judge (instead of a jury) can resolve factual disputes underlying the issue; and if subject matter jurisdiction is lacking, the court must dismiss the entire complaint. *See id.* at 514-15. The Supreme Court has therefore established clear interpretive rules on the subject:

---

[25]For similar reasons, the waiver clause in the Acis LPA does not divest this court or the bankruptcy court of subject matter jurisdiction.

- 36 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 818 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 932 of 1828 PageID 10425
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 817 of 1803 PageID 11563
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 37 of 84 PageID 98030

> [i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* at 515-16 (footnote and citation omitted).

Nothing in the FAA indicates that Congress intended arbitration agreements to divest federal courts of subject matter jurisdiction. To the contrary, the FAA authorizes courts to issue orders that would be beyond the power of a court that lacks jurisdiction. *See Sinochem Int'l*, 549 U.S. at 434. For instance, courts must, in certain circumstances, issue orders staying their proceedings pending arbitration, *see* 9 U.S.C. § 3; orders compelling recalcitrant parties to submit to arbitration, *see id.* § 4; orders appointing an arbitrator, *see id.* § 5; and orders compelling witnesses to appear before an arbitrator, *see id.* § 7. Thus the text of the FAA—far from containing a clear statement that arbitration agreements are jurisdictional—suggests instead that the opposite is true. The court therefore concludes that Congress did not intend for dismissals based on arbitration agreements to be dismissals for lack of subject matter jurisdiction.[26]

---

[26]Neutra contends in the First Appeal that the Acis LPA's arbitration clause deprived Terry of *standing*, and that a creditor who lacks *standing* cannot confer subject matter jurisdiction on the bankruptcy court by filing an involuntary petition. But "[s]tanding is a species of subject matter jurisdiction." *In re Rhinesmith*, 450 B.R. 630, 631 (Bankr. W.D. Tex. 2011) (citing *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir. 2009)). To conclude that arbitration agreements do not implicate a court's subject matter jurisdiction is also to conclude that they do not implicate standing. Thus Neutra's circuitous logic does not allow it to escape the court's conclusion on this issue.

- 37 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 819 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 933 of 1828   PageID 10426
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 818 of 1803   PageID 11564
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 38 of 84   PageID 98031

Because the bankruptcy court's order denying the Arbitration Motion does not implicate subject matter jurisdiction, it can only be challenged by a party with standing. Neutra lacks standing to do so in the First Appeal. *See supra* § III. In the Second and Third Appeals, the appellants who challenge the order do not contend that they have standing to do so; instead, they rely on what they maintain is the jurisdictional nature of the order. They have therefore failed to carry their burden to establish standing. *See Rohm*, 32 F.3d at 208. Thus the court will not consider the merits of appellants' challenges to the bankruptcy court's order denying the Arbitration Motion.

V

Highland argues in the Second Appeal that the Break-Up Fee does not satisfy the requirements of 11 U.S.C. § 503, which governs administrative expenses; the Break-Up Fee is unreasonably large; and the Expense Reimbursement was not a reasonable exercise of the Trustee's business judgment under 11 U.S.C. § 363(b).[27]

A

The court first considers whether the bankruptcy court abused its discretion by finding that the Break-Up Fee satisfies § 503(b)(1)(A).[28]

_____

[27]As a creditor of the estates, Highland has standing to appeal the order approving the Break-Up Fee and Expense Reimbursement because that order disposes of estate assets. *See, e.g., In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997). Neither Oaktree nor the Trustee contends otherwise.

[28]The parties do not dispute that § 503 applies to the bankruptcy court's decision to approve a break-up fee. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 602 (5th Cir. 2011) (suggesting, in *dicta*, that § 503 is "the proper channel for requesting payment" of a break-up

- 38 -

Appellee Appx. 00812
APPX. 10367

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 820 of

Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 934 of 1828 PageID 10427

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 819 of 1803 PageID 11565

Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 39 of 84 PageID 98032

In bankruptcy, administrative expenses—such as the "actual and necessary costs and expenses of preserving the estate"—are given priority over other non-secured claims in the distribution of the estate. *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). "In order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee that benefi[t]ed the estate." *Id.* (citing *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)). Such claims "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate." *Id.* "Crucial to satisfying the § 503 test is that the estate receive a 'discernible benefit' as a result of the expenditure." *In re ASARCO LLC*, 441 B.R. 813, 824 (S.D. Tex. 2010) (quoting *Jack/Wade Drilling*, 258 F.3d at 387), *aff'd*, 650 F.3d 593 (5th Cir. 2011); *see also In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) ("The court's administrative expense inquiry centers upon whether the estate has received an *actual benefit, as opposed to the loss a creditor might experience*[.]" (quoting *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994))). The claimant bears the burden of proving by a preponderance of the evidence that its claim qualifies as an administrative expense. *See TransAmerican*, 978 F.2d at 1416. Once the claimant has established a prima facie case, the burden of production shifts to the objector—but the burden of persuasion remains at all times upon the claimant. *See id.*

---

fee).

Appellee Appx. 00813

APPX. 03870

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 821 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 935 of 1828    PageID 10428
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 820 of 1803    PageID 11566
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 40 of 84    PageID 98033

The bankruptcy court did not abuse its discretion by concluding that the Break-Up Fee was an actual and necessary expense that conferred a discernible benefit upon the debtors' estates. Courts have recognized that a break-up fee can confer a benefit on the estate even though the contemplated transaction with the claimant was not consummated. *See, e.g., In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018) (recognizing that break-up fee can benefit estate if, *inter alia*, the "assurance of a break-up fee promote[s] more competitive bidding," or the fee "induce[s] a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely"); *In re Lamb*, 2002 WL 31508913, at *1 (Bankr. D. Md. Oct. 11, 2002) (recognizing that break-up fees are appropriate where they incentivize a "stalking horse" bidder).

Here, the primary benefit identified by the bankruptcy court was that the Break-Up Fee facilitated the plan confirmation process. Without the Break-Up Fee, the Trustee would have had no ready, willing, and able partner for the proposed Plan A transaction, because Oaktree would not have made an offer or undertaken the expense and effort of preparing for the contemplated transaction. In this respect, the present case is similar to a traditional "stalking horse" situation, where a break-up fee induces a bidder to research a potential transaction and make an initial bid. *See, e.g., Energy Future Holdings*, 904 F.3d at 313-14. Without Plan A, the bankruptcy court faced the possible "doomsday" scenario, Second Appeal R. 78, of Acis' fee-generating PMAs being rendered worthless by HCLOF's exercise of its optional redemption right. The bankruptcy court did not abuse its discretion by recognizing these benefits.

- 40 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 822 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 936 of 1828   PageID 10429
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 821 of 1803   PageID 11567
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 41 of 84   PageID 98034

The record also reflects that the Break-Up Fee conferred other benefits on the estates, although the bankruptcy court did not expressly acknowledge them. Oaktree's initial bid was meant to start a public sale process. *Cf. Energy Future Holdings*, 904 F.3d at 313-14 (citing *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)) (acknowledging that break-up fees can benefit estate by initiating a public bidding process, even where claimant was eventually outbid). And the Break-Up Fee was part of a transaction by which Oaktree agreed to step into Highland's shoes as Acis LP's sub-advisory and shared services provider, for a significantly lower price than what Highland was charging.

Of course, the Break-Up Fee is unique in one significant respect: it was expressly conditioned on the bankruptcy court's approval of Plan A. Plan A was based on the doctrine of equitable subrogation, "the legal fiction through which a person or entity, the subrogee, is substituted, or subrogated, to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible." *Gen. Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949-50 (5th Cir. 1999). Under the Trustee's theory, HCLOF was to be treated as a creditor of the estates on the basis of its adversary claim against the Trustee seeking specific performance of its optional redemption right. The Trustee proposed to monetize HCLOF's claim, and to satisfy that claim by paying HCLOF the sum of $100 million (provided by Oaktree). The Trustee would then, as subrogee, substitute himself as the holder of HCLOF's rights in the subordinated CLO notes. Finally, the Trustee would use his position as subrogee to transfer HCLOF's interest in the subordinated notes to Oaktree. The bankruptcy court acknowledged that "[t]he legal theories [underpinning Plan A] are not

- 41 -

at all clear cut and are likely to be hotly contested by [HCLOF] and Highland."  Second

Appeal R. at 78. Despite this uncertainty, the bankruptcy court approved the Break-Up Fee.[29]

Break-up fees are by nature contingent upon uncertain future events.  If a transaction were sure to happen, there would be no need for a break-up fee.  Highland essentially contends that there was *too much* uncertainty here—that the bankruptcy court abused its discretion by approving the Break-Up Fee "in the face of [a] huge execution risk and the substantial legal authority that the Trustee's proposed transaction with Oaktree could not be approved."  Highland Second Appeal Br. 31.  But Highland overstates the degree to which the Trustee's theory was foreclosed by existing law.  The bankruptcy court was aware of authority suggesting that, in some circumstances, an entity's claim for specific performance may be treated as a monetary claim against the bankruptcy estate under 11 U.S.C. § 101(5). *See In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993).  And under New York law, which ostensibly governs the PMAs between Acis and the CLO-SPEs, the doctrine of equitable subrogation is interpreted

> broad[ly] enough to include every instance in which one party
> pays a debt for which another is primarily answerable and which
> in equity and good conscience should have been discharged by
> the latter, so long as the payment was made either under
> compulsion or for the protection of some interest of the party

---

[29]The bankruptcy court later decided that Plan A was unconfirmable because the Trustee could not be subrogated to the rights of an entity that did not hold a claim against the estates.  The bankruptcy court concluded that HCLOF did not hold such a claim because the Equity PMA was not then in effect, and HCLOF could not sue to enforce the PMAs between Acis and the CLO-SPEs because HCLOF was not a party to, or a third-party beneficiary of, those PMAs.  This decision is not part of the record in the Second Appeal.

- 42 -

making the payment, and in discharge of an existing liability.

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, 878 N.Y.S.2d 97, 112 (N.Y. App. Div. 2009) (quoting *Gerseta Corp. v. Equitable Tr. Co. of N.Y.*, 150 N.E. 501, 504 (N.Y. 1926)).  The bankruptcy court was thus within its discretion to conclude that the Trustee's theory was at least colorable.

More important, whether the benefits of the Break-Up Fee outweighed the risks is not for this court to decide.  Unless the bankruptcy court committed a clear error of fact or incorrectly applied the law, this court cannot disturb its decision. *See Grigson*, 210 F.3d at 528.  There is no indication that the bankruptcy court committed such an error here.  The bankruptcy court recognized the potential benefits *and* the potential risks of approving the Break-Up Fee, and it properly applied the correct legal test—the § 503(b)(1)(A) standard—in coming to its conclusion that the Break-Up Fee benefited the estate.

The principal authority on which Highland relies, *Energy Future Holdings*, is not to the contrary.  In that case, the Third Circuit affirmed the bankruptcy court's reconsideration of its own decision to authorize a break-up fee. *See Energy Future Holdings*, 904 F.3d at 301.  The bankruptcy court originally approved the break-up fee on the premise that the fee would not be paid if a certain regulatory body did not permit the proposed transaction to go forward. *See id.* at 304.  When the bankruptcy court learned that this premise was incorrect, it reconsidered the order and came to a different conclusion. *See id.* at 307.  The Third Circuit, in affirming the bankruptcy court, *deferred to the bankruptcy court's discretion* to weigh the potential risks and benefits of allowing the fee:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 825 of

Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 939 of 1828    PageID 10432

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 824 of 1803    PageID 11570

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 44 of 84    PageID 98037

> In sum, the Termination Fee provision had the potential of providing a large benefit to the estates, but it also had the possibility to be disastrous.   Once it had a complete understanding, the Bankruptcy Court properly weighed the various considerations and determined that the potential benefit was outweighed by the harm that would result under predictable circumstances.  In other words, the risk was so great that the Fee was not necessary to preserve the value of Debtors' estates. Having made such a determination, the Bankruptcy Court did not abuse its discretion in denying the Fee in part.

*Id.* at 315 (footnote omitted).  Likewise, the bankruptcy court in the present appeal was within its discretion to conclude that the benefits of the Break-Up Fee outweighed the risks, despite the uncertainty of the Trustee's legal theory.

<div align="center">B</div>

The court considers next whether the Break-Up Fee was so large as to be unreasonable.

Highland cites no binding authority for the proposition that a break-up fee that meets the requirements of § 503(b)(1)(A) must be rejected if it is "unreasonable," nor does Highland explain what test a break-up fee must pass in order to be "reasonable."  *See* Highland Second Appeal Br. 32-33.  Assuming *arguendo* that it would be error to approve an "unreasonable" break-up fee, the court concludes that the bankruptcy court did not err in this respect.  The bankruptcy court found that the Break-Up Fee constituted roughly 2.3% of the total price that Oaktree would pay under the terms of the proposed transaction.  This amount is in line with break-up fees authorized by other courts.  *See, e.g., In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("Except in extremely large transactions,

<div align="center">- 44 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 826 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 940 of 1828 PageID 10433
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 825 of 1803 PageID 11571
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 45 of 84 PageID 98038

break-up fees ranging from one to two percent of the purchase price have been authorized

by some courts."); *see also Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614,

625 (S.D.N.Y. 1987) (approving 2% break-up fee); *In re Sea Island Co.*, 2010 WL 4393269,

at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% break-up fee).

Highland contends that the relevant benchmark is not the total transaction price, but

is instead the amount of money that Acis LP would retain after the transaction was complete.

Applying Highland's logic, the Break-Up Fee is actually *26%* of the transaction's value. But

Highland's logic does not stand up in light of the legal theory proposed by the Trustee in

support of the transaction. Under Plan A, Oaktree was not purchasing HCLOF's

subordinated notes outright. Rather, it was funding the proposed plan so that Acis could

satisfy all of its creditors' claims—including HCLOF's liquidated claim for specific

performance—in exchange for the Trustee's promise to use the doctrine of equitable

subrogation to transfer the subordinated notes to Oaktree. There is no principled reason to

compare the Break-Up Fee to the amount of money retained by Acis *after* paying off

HCLOF's claim, but *before* paying off any other creditor's claim. Highland's

unreasonableness argument lacks merit.

<center>C</center>

Finally, the court considers whether the bankruptcy court abused its discretion by

concluding that the Expense Reimbursement was a proper exercise of the Trustee's business

judgment.

Expense reimbursements are governed by 11 U.S.C. § 363(b), which incorporates a

<center>- 45 -</center>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 827 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 941 of 1828   PageID 10434
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 826 of 1803   PageID 11572
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 46 of 84   PageID 98039

business judgment standard. *See ASARCO*, 650 F.3d at 601-03. Section 363(b) permits a trustee, after notice and a hearing, to use, sell, or lease estate property other than in the ordinary course of business. *See id.* at 601. "In such circumstances, 'for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.'" *Id.* (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)). "The business judgment standard in section 363 is flexible and encourages discretion." *Id.*; *see also GBL Holding Co. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (N.D. Tex. 2005) (Lynn, J.) ("Great judicial deference is given to the Trustee's exercise of business judgment.").

The bankruptcy court acknowledged that "Oaktree has spent significant time and expense related to the [Plan A] Transaction," and that "[i]t is reasonable to anticipate that Oaktree will continue to incur additional significant time and expense." Second Appeal R. 78. The bankruptcy court found that the Expense Reimbursement, along with the Break-Up Fee, was an "essential inducement[]" for Oaktree's continuing commitment to the Plan A transaction. *Id.* Oaktree's commitment to the proposed transaction was beneficial to the estates for the reasons explained *supra* at § V(A). Thus the bankruptcy court concluded that "the Trustee has established, in his business judgment, that the Expense Reimbursement is necessary here." *Id.* at 77. The bankruptcy court did not abuse its discretion.

Highland's arguments to the contrary are unavailing. Highland contends that the Trustee lacked any reasonable business justification for allowing the Expense

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 828 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 942 of 1828    PageID 10435
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 827 of 1803    PageID 11573
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 47 of 84    PageID 98040

Reimbursement because he knew in advance that Plan A was unconfirmable, as evidenced

by his proposing Plans B and C at the same time. The court disagrees. If the Trustee knew

that Plan A could not be confirmed, then he would have had *no reason* to propose it in the

first place—let alone any reason to go through the effort and expense of negotiating with

Oaktree. Highland also argues that Oaktree "assume[d] the risk" of losing any money it

spent in relation to the Plan A transaction, because Oaktree was experienced enough to know

that Plan A could not be approved. Highland Second Appeal Reply 16. But the question is

not whether Oaktree assumed any particular risk; the question is whether the Trustee had an

"articulated business justification for" the Expense Reimbursement. *ASARCO*, 650 F.3d at

601 (quoting *Cont'l Air Lines*, 780 F.2d at 1226). The bankruptcy court did not abuse its

discretion by concluding that he did.

The court therefore affirms the bankruptcy court's order approving the Break-Up Fee

and Expense Reimbursement.

## VI

In the Third Appeal, Highland and Neutra contend that the filing of the First Appeal

divested the bankruptcy court of subject matter jurisdiction to confirm the Plan.

## A

"It is a fundamental tenet of federal civil procedure that—subject to certain, defined

exceptions—the filing of a notice of appeal from the final judgment of a trial court divests

the trial court of jurisdiction and confers jurisdiction upon the appellate court." *In re

Transtexas Gas Corp.*, 303 F.3d 571, 578-79 (5th Cir. 2002) (citing *Griggs v. Provident*

Appellee Appx. 00821
APPX. 10578

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 829 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 943 of 1828 PageID 10436
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 828 of 1803 PageID 11574
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 48 of 84 PageID 98041

*Consumer Co.*, 459 U.S. 56, 58 (1982)). "This rule applies with equal force to bankruptcy cases." *Id.* at 579. Thus while an appeal is pending, the bankruptcy court cannot exercise control over "those aspects of the case involved in the appeal." *In re Scopac*, 624 F.3d 274, 280 (5th Cir. 2010) (quoting *Griggs*, 459 U.S. at 58), *modified on denial of reh'g*, 649 F.3d 320 (5th Cir. 2011)*.

But "the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal." *Transtexas*, 303 F.3d at 580 n.2. The Fifth Circuit "has specifically rejected 'the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any impact on the order on appeal.'" *Scopac*, 624 F.3d at 280 (quoting *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991)). Instead, the Fifth Circuit has adopted a "functional test: 'once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process.'" *Id.* (quoting *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007)).

Where courts have held that a bankruptcy court was divested of jurisdiction to enter a subsequent order, it is usually because the subsequent order would have modified, or would have been inconsistent with, an order pending on appeal. *See, e.g., Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court was divested of jurisdiction to supplement plan confirmation order that was then pending on appeal); *Whispering Pines*, 369 B.R. at 760

- 48 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 830 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 944 of 1828 PageID 10437
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 829 of 1803 PageID 11575
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 49 of 84 PageID 98042

(concluding that bankruptcy court could not issue stay relief order that essentially modified confirmed plan while plan confirmation order was pending on appeal); *In re BNP Petroleum Corp.*, 2012 WL 7620694, at *3 (S.D. Tex. Feb. 27, 2012) (observing that bankruptcy court can consider motion to set aside sale agreement, and can deny that motion, but cannot *grant* it while the order approving the sale agreement is pending on appeal); *In re Southold Dev. Corp.*, 129 B.R. 18, 19, 21 (E.D.N.Y. 1991) (invalidating order that modified reorganization plan, where plan confirmation order was already pending on appeal); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 1648725, at *1, *3-6 (Bankr. D.N.J. Apr. 24, 2014) (refusing to consider motion to clarify plan confirmation order that was pending on appeal, because a court "cannot take action that will alter or modify its prior order while that order is pending on appeal"); *In re New Century TRS Holdings, Inc.*, 2012 WL 2064500, at *1-3 (Bankr. D. Del. June 7, 2012) (dismissing motion for sanctions where motion essentially repackaged issues and arguments then pending in appeal of motion for reconsideration); *In re Wallace's Bookstores, Inc.*, 330 B.R. 193, 195 (Bankr. E.D. Ky. 2005) (denying adversary plaintiff's motion to dismiss claims whose resolution was then pending on appeal); *see also Wireless Agents, LLC v. Sony Ericsson Mobile Comms. AB*, 2006 WL 1189687, at *3 (N.D. Tex. May 3, 2006) (Fitzwater, J.) ("Because Wireless has appealed the court's denial of a preliminary injunction, the Federal Circuit has exclusive jurisdiction over the preliminary injunction motion, and this court cannot modify its preliminary findings of fact and conclusions of law during the pendency of the appeal."). Attempting to modify an order pending on appeal, or issuing a subsequent order that is inconsistent with the order being

Appellee Appx. 00823
APPX. 10580

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 831 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 945 of 1828   PageID 10438
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 830 of 1803   PageID 11576
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 50 of 84   PageID 98043

appealed, circumvents the appellate process.  *Cf. Scopac*, 624 F.3d at 280 (holding that a bankruptcy court cannot "interfere with or effectively circumvent the appeal process").

<div align="center">B</div>

Neutra identifies three issues on appeal in the First Appeal that supposedly divested the bankruptcy court of jurisdiction to confirm the Plan: (1) whether the bankruptcy court erred by denying the Arbitration Motion; (2) whether the bankruptcy erred by not abstaining under 11 U.S.C. § 305; and (3) whether Terry filed the involuntary petitions in good faith.

The appeal of the bankruptcy court's denial of the Arbitration Motion did not divest the bankruptcy court of jurisdiction to issue further orders.  In *Weingarten Realty Investors v. Miller*, 661 F.3d 904 (5th Cir. 2011), the Fifth Circuit held that the appeal of an order denying a motion to compel arbitration does not divest a district court of jurisdiction to decide the merits of a case, even though a motion to compel arbitration—if granted—would effectively end the case.  *See id.* at 907-10.  The *Weingarten* panel interpreted the divestiture doctrine "narrowly."  *See id.* at 908-09.  It reasoned that, because the denial of a motion to compel arbitration does not, as a matter of law, determine the merits of the case, the merits question is not an "aspect[] of the case involved in the appeal," and the district court may decide it.  *See id.* at 909 (alteration in original) (quoting *Griggs*, 459 U.S. at 58).  The Fifth Circuit rejected the Seventh Circuit's reasoning that the appeal of a motion to compel arbitration—much like the appeal of a motion to dismiss based on double jeopardy, sovereign immunity, or qualified immunity—results in an automatic stay of the proceedings below because "the appeal is to determine whether the matter should be litigated in the district court

<div align="center">- 50 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 832 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 946 of 1828   PageID 10439
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 831 of 1803   PageID 11577
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 51 of 84   PageID 98044

at all." *Id.* at 908 (citing *Bradford-Scott Data Corp. v. Physician Comput. Network*, 128 F.3d

504, 505-06 (7th Cir. 1997)).  Under *Weingarten*, because the bankruptcy court's ruling on

the Arbitration Motion is separate from the merits of Plan confirmation, the appeal of that

prior ruling did not divest the bankruptcy court of jurisdiction to confirm the Plan.

The reasoning of *Weingarten* applies with full force to the § 305 abstention issue.

Highland and Neutra have not shown that there is any overlap, as a matter of law, between

the bankruptcy court's decision to confirm the Plan and its decision not to abstain from ruling

on the involuntary petitions.  Thus even though the bankruptcy court's abstention decision

"determine[d] whether the matter should be litigated in the [bankruptcy] court at all," *id.* at

908, the appeal of that decision did not divest the bankruptcy court of jurisdiction to confirm

the Plan.

The issue of Terry's good faith in filing the involuntary petitions presents a closer

question.  For the bankruptcy court to confirm a plan, it must find, *inter alia*, that the plan

was "proposed in good faith and not by any means forbidden by law."   11 U.S.C.

§ 1129(a)(3).  The Eleventh Circuit has held that where an involuntary petition is filed in bad

faith, any subsequently-proposed reorganization plan is *necessarily* proposed in bad faith and

cannot be confirmed.  *See In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *but*

*see In re Landing Assocs., Ltd.*, 157 B.R. 791, 812 (Bankr. W.D. Tex. 1993) ("Bank United

relies on the legal standard established in several bad-faith filing cases for this proposition.

However, a different legal standard is employed when evaluating good faith for plan

confirmation purposes under [11 U.S.C.] § 1129(a)(3)." (citations omitted)).  Under the

Appellee Appx. 00825
APPX. 10592

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 833 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 947 of 1828 PageID 10440
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 832 of 1803 PageID 11578
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 52 of 84 PageID 98045

Eleventh Circuit's rule, the bankruptcy court's ruling that Terry filed the involuntary petitions in good faith has some bearing on its decision to confirm the Plan.

But even assuming that the Eleventh Circuit's rule applies, the court is not convinced that, under these circumstances, the First Appeal divested the bankruptcy court of jurisdiction to confirm the Plan. In issuing the confirmation order, the bankruptcy court did not directly exercise jurisdiction over the question of Terry's good faith in filing the involuntary petitions—it did not revisit, comment upon, or supplement its earlier decision. *See In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016) ("[A] confirmation order does not 'tamper' with prior rulings in the case; rather, to state the obvious, it confirms a plan of reorganization."); *cf. Transtexas*, 303 F.3d at 574, 582 (holding that bankruptcy court lacked jurisdiction to supplement plan confirmation order that was then pending on appeal); *Southold Dev. Corp.*, 129 B.R. at 18, 21 (vacating order that modified reorganization plan that was pending on appeal); *710 Long Ridge, II, LLC*, 2014 WL 1648725, at *1, *3-6 (refusing to consider motion to clarify plan confirmation order that was pending on appeal). Nor did the bankruptcy court issue any order that was inconsistent with, or that implicitly modified, its previous ruling. *Cf. Whispering Pines*, 369 B.R. at 760 (concluding that bankruptcy court could not issue stay relief order that was inconsistent with confirmed plan while plan confirmation order was pending on appeal). Instead, the bankruptcy court proceeded in accordance with that ruling. It was entitled to do so—just as it was entitled to carry out the confirmed Plan in the absence of a stay order, even while the Plan confirmation order was pending on appeal. *See In re Prudential Lines, Inc.*, 170 B.R. 222, 243-44

Appellee Appx. 00826
APPX. 10993

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 834 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 948 of 1828 PageID 10441
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 833 of 1803 PageID 11579
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 53 of 84 PageID 98046

(S.D.N.Y. 1994). If the bankruptcy court had instead *denied* plan confirmation on the ground that Terry filed the involuntary petitions in *bad faith*, the divestiture analysis might be different. *Cf. BNP Petroleum*, 2012 WL 7620694, at *3 (observing that bankruptcy court can deny motion to set aside sale agreement, but cannot grant it while the order approving the sale agreement is pending on appeal). As it is, however, the bankruptcy court's Plan confirmation order did not in any way interfere with, or circumvent, this court's consideration of the First Appeal.

Moreover, to conclude that Neutra's appeal of the orders for relief divested the bankruptcy court of jurisdiction to confirm the Plan would be to hold that whenever an order for relief is entered, any disappointed litigant—even a litigant who *lacks standing to appeal*—can bring the bankruptcy case grinding to a halt. But the divestiture doctrine is not intended to "cede control of the conduct of a chapter 11 case to disappointed litigants. This cannot be, and is not, the law." *Sabine*, 548 B.R. at 680. And such a decision would be contrary to Fifth Circuit precedent indicating that "a narrow interpretation [of divestiture doctrine] is normally appropriate." *See Weingarten*, 661 F.3d at 908. The court thus concludes that the First Appeal did not divest the bankruptcy court of jurisdiction to confirm the Plan.

VII

The court now turns to the contention of HCLOF (joined by Highland and Neutra) in the Third Appeal that the bankruptcy court erred by confirming the Plan because the Temporary Injunction—a crucial part of the Plan—is unlawful.

- 53 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 835 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 949 of 1828 PageID 10442
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 834 of 1803 PageID 11580
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 54 of 84 PageID 98047

A

The bankruptcy court had authority to enter the Temporary Injunction under 11 U.S.C.

§§ 105(a) and 1123(b)(6), and had jurisdiction to do so under 28 U.S.C. § 157(b)(2)(L).

Section 157(b)(2)(L) grants the bankruptcy court jurisdiction to enter final orders concerning

the confirmation of plans.[30]  Section 1123(b)(6) gives bankruptcy courts residual authority

to include in a plan "any other appropriate provision not inconsistent with the applicable

provisions of this title."  11 U.S.C. § 1126(b)(6).  The bankruptcy court can exercise its

residual authority via § 105(a), which provides that "[t]he court may issue any order, process,

or judgment that is necessary or appropriate to carry out the provisions of this title."  11

U.S.C. § 105(a).

Section 105(a) permits a bankruptcy court "to fashion such orders as are necessary to

further the substantive provisions of the Bankruptcy Code."  *In re Sadkin*, 36 F.3d 473, 478

(5th Cir. 1994) (per curiam) (quoting *In re Oxford Mgmt. Inc.*, 4 F.3d 1329, 1333 (5th Cir.

1993)).  But the bankruptcy court's § 105(a) powers are not unlimited: the statute "does not

authorize the bankruptcy courts to create substantive rights that are otherwise unavailable

---

[30]To the extent that a temporary plan injunction restrains a third-party *lawsuit*, the bankruptcy court must have statutory "related to" jurisdiction over that lawsuit per 28 U.S.C. § 157(a).  *See In re Seatco, Inc.*, 257 B.R. 469, 475-76 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.).  For the reasons discussed *infra* at note 34, the bankruptcy court has statutory "related to" jurisdiction over all lawsuits potentially restrained by the Temporary Injunction.  For the reasons discussed *infra* at § VII(B), the Supreme Court's decision in *Stern v. Marshall*, 564 U.S. 462 (2011), does not affect the bankruptcy court's statutory jurisdiction to issue a temporary plan injunction.

Appellee Appx. 00828
APPX. 10593

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 836 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 950 of 1828 PageID 10443
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 835 of 1803 PageID 11581
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 55 of 84 PageID 98048

under applicable law, or constitute a roving commission to do equity." *Id.* (quoting *Oxford Mgmt.*, 4 F.3d at 1333). The Trustee[31] contends that the bankruptcy court's § 105(a) powers are broad enough to allow it to temporarily enjoin a non-debtor, non-creditor entity—HCLOF—from attempting to assert certain contractual rights, at least where such an injunction is necessary to the debtors' successful reorganization.[32]

Fifth Circuit precedent indicates that § 105(a) *does*, under some circumstances, permit a bankruptcy court to enjoin a non-debtor, non-creditor entity from taking particular actions. *In re Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), involved a challenge to a § 105(a) injunction that prohibited certain nonparties from filing lawsuits against certain other nonparties. *See id.* at 750-51. The Fifth Circuit—citing 11 U.S.C. § 524, which forbids the discharge of the debts of nondebtors—invalidated the injunction insofar as it constituted a *permanent* release of the nonparties' claims. *See id.* at 760-61. But the court noted that "[t]he impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions." *Id.* at 761. The court provided a non-exhaustive list of "unusual circumstances" that might justify such an injunction: "1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to

---

[31]On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third Appeal, arguing that once the Plan took effect, Acis became the Trustee's successor-in-interest. The court addresses this motion *infra* at § XI.

[32]The court expresses no opinion on the question whether the Equity PMA or any other contract presently entitles HCLOF to demand an optional redemption of the CLOs.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 837 of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 951 of 1828 PageID 10444
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 836 of 1803 PageID 11582
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 56 of 84 PageID 98049

accomplish reorganization." *Id.* Bankruptcy judges in this district have approved temporary injunctions under *Zale* multiple times. *See In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 117 (Bankr. N.D. Tex. 2002) (Hale, J.); *In re Seatco, Inc.*, 257 B.R. 469, 476-78 (Bankr. N.D. Tex.) (Houser, J.), *modified on reh'g by* 259 B.R. 279 (Bankr. N.D. Tex. 2001) (Houser, J.); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 749-53 (Bankr. N.D. Tex. 2015) (Houser, J.) (applying *Zale* unusual-circumstances test and declining to issue injunction). As discussed below, the second unusual circumstance described in *Zale* is present here.[33]

The court recognizes that the bankruptcy court did not rely on this rationale. Instead, it based the Temporary Injunction on its ostensible authority over the Trustee Adversary. The bankruptcy court described the Trustee Adversary as "a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan." *Acis II*, 2019 WL 417149, at *8. It conducted its four-prong preliminary-injunction analysis in the context of, and based on the likelihood of success of, the Trustee Adversary. *See id.* at *10-12. This court, of course, can affirm the bankruptcy court on alternative grounds. *See, e.g., Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1011 (N.D. Tex. 1987)

---

[33]The *Zale* panel ultimately vacated the temporary injunction because it was not issued after an adversary proceeding, as required at the time by Rule 7001(7). *See Zale*, 62 F.3d at 764-65. But Rule 7001(7) was amended in 1999 so that it does not apply where, as here, "a . . . chapter 11 . . . plan provides for the [injunctive] relief." Rule 7001(7); *see* Rule 7001 advisory committee's note (1999 amendments). And HCLOF, unlike the objectors in *Zale*, had a full and fair opportunity to present its objections to the bankruptcy court. *Cf. Zale*, 62 F.3d at 763-64.

Appellee Appx. 00830
APPX. 10893

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 838 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 952 of 1828   PageID 10445
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 837 of 1803   PageID 11583
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 57 of 84   PageID 98050

(Fitzwater, J.) ("[T]his court may affirm a correct judgment for reasons not given by the court below or advanced to it.").  But here, the bankruptcy court's rationale is significant because "[i]f the bankruptcy court does not determine that unusual circumstances exist, the court may not enter an injunction of the third-party actions."  *Zale*, 62 F.3d at 761.

The bankruptcy court's factual findings are nonetheless sufficient to satisfy the "unusual circumstances" requirement.  The bankruptcy court expressly found that the Temporary Injunction is a "critical component of the Plan," *Acis II*, 2019 WL 417149, at *10, and that "[t]he Temporary Plan Injunction is essential to [Acis'] ability to perform the Plan," *In re Acis Capital Mgmt., L.P.*, 2019 WL 406137, at *14 (Bankr. N.D. Tex. Jan. 31, 2019) (Jernigan, J.).  HCLOF has twice demanded that Acis effect an optional redemption of the CLOs, and its directors testified that it will do so again if given the chance.  *See Acis II*, 2019 WL 417149, at *10.  The bankruptcy court found that an optional redemption would be an economically "[ir]rational" transaction that would serve as the last step in Highland's "intentional scheme to keep assets away from Mr. Terry as a creditor."  *Id.* at *12.  It further found that if HCLOF succeeds in forcing an optional redemption, Acis "[will] have no going concern value," and "Terry will be precluded from reorganizing the business and paying creditors" in accordance with the Plan.  *Id.* at *10.  Thus the Temporary Injunction enjoins third-party conduct that would adversely impact the ability of Acis to reorganize.  These are unusual circumstances that justify the bankruptcy court's Temporary Injunction.  *Cf. Zale*, 62 F.3d at 762 ("We hold that [the bankruptcy court's] language satisfies the 'unusual circumstances' requirement because it clearly identifies the settlement as providing

Appellee Appx. 00831
APPX. 10586

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 839 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 953 of 1828 PageID 10446
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 838 of 1803 PageID 11584
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 58 of 84 PageID 98051

'substantial consideration' to the estate and constituting part of a 'key provision' of the

plan.").[34]

<p style="text-align:center">B</p>

HCLOF argues that the Trustee cannot invoke § 105(a) to support an injunction that

is prohibited under *Stern v. Marshall*, 564 U.S. 462 (2011). In *Stern* the Supreme Court

concluded that certain claims and controversies must, as a constitutional matter, be resolved

by an Article III court, even if they are statutorily committed to the jurisdiction of the

bankruptcy court. *See id.* at 482. HCLOF contends that the Trustee Adversary, which "is

---

[34]The Fifth Circuit's recent decision in *SEC v. Stanford International Bank, Ltd.*, 927
F.3d 830, ___, 2019 WL 2496901, at *5-7 (5th Cir. June 17, 2019), is not to the contrary.
The *Stanford* panel interpreted *Zale*'s discussion of certain limits on a bankruptcy court's
statutory "related to" jurisdiction to be a broad "maxim of law" that applies to all
receiverships, regardless of the statutory basis of jurisdiction. *See id.* at ___, 2019 WL
2496901, at *6. *Zale* and *Stanford* thus stand for the proposition that a court overseeing a
receivership lacks jurisdiction to enjoin third-party lawsuits whose resolution would have no
effect on the *res* of the estate. *See id.* at ___, 2019 WL 2496901, at *7 (stating that courts
lack jurisdiction "to permanently bar and extinguish independent, non-derivative third-party
claims that do not affect the *res* of the receivership estate"); *Zale*, 62 F.3d at 752 ("Those
cases in which courts have upheld 'related to' jurisdiction over third-party actions do so
because the subject of the third-party dispute is property of the estate, or because the dispute
over the asset would have an effect on the estate." (footnotes omitted)); *see also In re
FoodServiceWarehouse.com, LLC*, 601 B.R. 396, ___, 2019 WL 1877006, at *10 (E.D. La.
Apr. 26, 2019) ("If the outcome of a proceeding could conceivably have *any effect* on the
estate being administered in bankruptcy, then 'related to' jurisdiction will generally exist."
(citing *Zale*, 62 F.3d at 755)). The Temporary Injunction, however, enjoins certain acts that
*would* affect the *res* of the bankruptcy estate. The bankruptcy court found that after an
optional redemption, Acis "would have no going-concern value" because it would no longer
receive any management fees with which to pay creditors. *Acis II*, 2019 WL 417149, at *10.
Thus the equitable principles endorsed by *Stanford* do not prevent the bankruptcy court from
issuing the Temporary Injunction pursuant to § 157(b)(2)(L)'s conferral of subject matter
jurisdiction.

<p style="text-align:center">- 58 -</p>

essentially a multi-faceted fraudulent transfer action," *Acis II*, 2019 WL 417149, at *8,

involves such a claim. Thus, according to HCLOF, the bankruptcy court lacks authority to

grant final relief in the Trustee Adversary, and where a court lacks the power to grant a

litigant *final* relief, it cannot grant *preliminary* relief. *See* HCLOF Third Appeal Br. 22

(citing *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561-62 (5th Cir. 1987)).

HCLOF maintains that, because *Stern* prohibits the bankruptcy court from issuing the

Temporary Injunction in the context of the Trustee Adversary, the bankruptcy court cannot

issue the Temporary Injunction as part of the confirmed Plan.

     Assuming *arguendo* that a fraudulent transfer claim brought by a bankruptcy trustee

against a non-creditor is a *Stern* claim—i.e., "a claim designated for final adjudication in the

bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a

constitutional matter," *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25, 30-31

(2014)—the court disagrees with HCLOF's contention. Whatever the precise contours of

*Stern*, it only concerns the power of a bankruptcy court to enter a "final judgment" on certain

causes of action. *See Stern*, 564 U.S. at 503 ("The Bankruptcy Court below lacked the

constitutional authority to enter a *final judgment* on a state law counterclaim that is not

resolved in the process of ruling on a creditor's proof of claim." (emphasis added)). When

the bankruptcy court exercises powers that are *independent of* its authority to enter a final

judgment on a claim—e.g., when it makes use of its authority under § 105(a) to issue a

temporary plan injunction—*Stern* simply does not apply. *See, e.g., In re Yellowstone

Mountain Club, LLC*, 646 Fed. Appx. 558, 558-59 (9th Cir. 2016) (per curiam) (holding that

- 59 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 841 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 955 of 1828 PageID 10448
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 840 of 1803 PageID 11586
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 60 of 84 PageID 98053

*Stern* did not apply because "the bankruptcy court issued a preliminary injunction [pursuant to § 105(a)], not a final judgment"); *In re Quigley Co.*, 676 F.3d 45, 52 (2d Cir. 2012) ("[A]t issue here [is] the stay of litigation during the pendency of [debtor's] bankruptcy, rather than the entry of final judgment on a common law claim.").

This conclusion is consistent with the Article III concerns underlying *Stern*. According to *Stern*, Article III creates an independent judiciary by guaranteeing federal judges life tenure and an irreducible salary. *See Stern*, 564 U.S. at 483-84. But "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Id.* at 484. Thus, as a general rule, "Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty,'" and place that matter within the authority of an Article I bankruptcy court. *Id.* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)).

The Temporary Injunction does not "withdraw from judicial cognizance any matter" of any kind whatsoever. *Id.* (quoting *Murray's Lessee*, 59 U.S. (18 How.) at 284). Instead, it *temporarily* enjoins a number of parties and non-parties from taking any action—including, presumably, pursuing a lawsuit—in furtherance of an optional redemption or liquidation of the Acis CLOs. To the extent that the Temporary Injunction affects any legal claims, it does not prevent an Article III court from entering a final judgment on those claims after the Temporary Injunction is lifted. In other words, it has no *res judicata* effect on those claims.

- 60 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 842 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 956 of 1828    PageID 10449
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 841 of 1803    PageID 11587
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 61 of 84    PageID 98054

*Cf.* 43A C.J.S. *Injunctions* § 378 (2019) ("A temporary or preliminary injunction does not adjudicate the ultimate rights in controversy and it is not conclusive on the court on a subsequent hearing.").  In this respect, the Temporary Injunction is similar to other mine-run, temporary bankruptcy injunctions—including the automatic stay, a hallmark of bankruptcy law that bars creditors from commencing or continuing any judicial action to recover a debt from the debtor after a bankruptcy petition is filed.  *See* 11 U.S.C. § 362(a); *see also In re Quigley*, 676 F.3d at 52 ("Enjoining litigation to protect bankruptcy estates during the pendency of bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts.").  Thus even if *Stern* prevents the bankruptcy court from entering a final judgment in the Trustee Adversary, it has no bearing on whether the bankruptcy court can issue the Temporary Injunction as part of the confirmed Plan.[35]

<p style="text-align:center">C</p>

When a bankruptcy court issues a temporary injunction under § 105(a) as part of a confirmed plan, the bankruptcy court must still consider the four-prong preliminary injunction test.  *See, e.g., Seatco*, 257 B.R. at 477 (applying traditional preliminary-injunction factors in approving a temporary plan injunction under *Zale*).  The factors are (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury

---

[35]The present appeal does not involve, and the court does not address, the propriety of a plan provision that finally adjudicates a *Stern* claim.  Nor does the court decide whether a bankruptcy court can grant preliminary relief on a *Stern* claim outside the context of a plan confirmation order.

<p style="text-align:center">- 61 -</p>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 843 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 957 of 1828   PageID 10450
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 842 of 1803   PageID 11588
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 62 of 84   PageID 98055

if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See, e.g., Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

The first factor, when applied to a temporary plan injunction, turns on whether the reorganization plan is likely to succeed. *See Seatco*, 257 B.R. at 477. In support of the Temporary Injunction, the bankruptcy court evaluated the likelihood of success of the Trustee Adversary, not the likelihood of success of the Plan. *See Acis II*, 2019 WL 417149, at *11-12. But the bankruptcy court separately determined that the Plan is feasible, *see id.* at *14, and its factual findings in that context support the conclusion that the Plan is substantially likely to succeed. The bankruptcy court found that Terry has an excellent track record as a portfolio manager; that Terry will be able to generate new business for Acis; and that Brigade is qualified to serve as the sub-advisor to Acis. *See id.* Thus in the absence of an optional redemption, it is substantially likely that the reorganized Acis will be able to satisfy its creditors' claims and emerge from bankruptcy.

The bankruptcy court did not clearly err in finding that, without the Temporary Injunction, Acis faces a substantial threat of irreparable injury: specifically, "evisceration of the Acis CLOs, by parties with unclean hands." *Id.* at *10. The bankruptcy court found that an optional redemption would leave Acis with nothing to manage, and thus no going-concern value and no means of satisfying its creditors' claims. *See id.* Highland and Neutra argue that Acis has an adequate remedy at law because all it stands to lose is money—i.e., the

- 62 -

management fees generated by the PMAs—and it can recover that money via a final

judgment in the Trustee Adversary. But there is more at stake here than money. Without the

Temporary Injunction, Acis will have no opportunity to *reorganize* instead of *liquidate*—and,

"[a]s the Code contemplates, the Debtor should be given the opportunity to successfully

reorganize." *Seatco*, 257 B.R. at 477. To deny Acis the chance to reorganize would be to

subject it to a substantial threat of irreparable injury.

The bankruptcy court likewise did not clearly err in finding that the risk of harm to

Acis in the absence of an injunction outweighs any potential harm to HCLOF. Indeed, the

bankruptcy court found that there *is* no potential harm to HCLOF because "a rational investor

would not want to liquidate the Acis CLOs, but rather would acquire them to do a reset under

the Plan." *Acis II*, 2019 WL 417149, at *12. The Plan allows for just such a reset.[36] Thus

HCLOF's complaint that it is losing money on the CLOs as they are currently structured

lacks force.

Finally, the bankruptcy court did not clearly err in finding that the public interest

favors an injunction. The public has an interest in allowing businesses to reorganize instead

of liquidate. And, more important, there is a strong public interest *against* "allowing

potential wrongdoers to complete the last step in what appears likely to have been a scheme

---

[36]HCLOF contends that a reset is impossible under the terms of an offering
memorandum that it issued in November 2017—i.e., within a month after Terry's arbitration
award was issued—but the bankruptcy court did not find this contention to be credible, and
this court will not disturb the bankruptcy court's credibility findings in the absence of clear
error.

to strip [Acis] of its assets, steal its business, and leave it unable to pay creditors." *Id.* The bankruptcy court therefore did not err by concluding that the four-part preliminary injunction test supports the Temporary Injunction.

## VIII

Highland and Neutra argue that the Trustee proposed the Plan in bad faith, contrary to 11 U.S.C. § 1129(a)(3).

### A

The first contention that Highland and Neutra advance is that Terry filed the involuntary petitions in bad faith per 11 U.S.C. § 303(i)(2), and, as a result, any subsequently-proposed plan was necessarily proposed in bad faith. Highland and Neutra base their argument on *Natural Land Corp.*, 825 F.2d 296, in which the Eleventh Circuit held that "the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal." *Id.* at 298. It is not clear that this rule applies in the Fifth Circuit, and at least one bankruptcy court has declined to apply it. *See Landing Assocs.*, 157 B.R. at 812. But assuming *arguendo* that *Natural Land Corp.* does apply, Highland and Neutra have nonetheless failed to establish that Terry filed the involuntary petitions in bad faith.

### 1

The first question the court must resolve is what standard of review to apply. In their briefing in the First Appeal, Neutra and Terry agreed that the question whether Terry filed the involuntary petitions in good faith is a factual determination governed by the clear error standard. At oral argument, however, Neutra challenged whether this is the correct standard

- 64 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 846 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 960 of 1828 PageID 10453
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 845 of 1803 PageID 11591
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 65 of 84 PageID 98058

of review. But case law supports applying the clear error standard to the question of the

petitioner's good faith. *See, e.g., In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 245 (B.A.P.

9th Cir. 2007) ("The bankruptcy court's finding of the absence of bad faith is reviewed under

the clearly erroneous standard."); *In re Funnel Sci. Internet Mktg., LLC*, 551 B.R. 262, 269

(E.D. Tex. 2016) ("The Court reviews the Bankruptcy Court's determination of bad faith for

clear error as a finding of fact."); *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R.

768, 785 (E.D. Pa. 2014) ("'Proving an involuntary petition was filed in bad faith requires

an inquiry into the creditor's knowledge,' a factual question that is reviewed for clear error."

(quoting *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005))), *aff'd sub nom.*

*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). Moreover, Fifth

Circuit case law provides that, post-filing, "[a] bankruptcy court's determination that a debtor

has acted in bad faith is a finding of fact reviewed for clear error." *In re Jacobsen*, 609 F.3d

647, 652 (5th Cir. 2010). The parties do not cite any cases suggesting that *de novo* review

would apply; nor would it make sense to conduct a *de novo* review of what is, in large part,

a question of the petitioner's intentions. The court will therefore apply the clear error

standard.[37]

---

[37]There is some case law suggesting that, where a bankruptcy court dismisses an
involuntary petition on the ground that the petitioner filed it in bad faith, the *dismissal* is
reviewed for abuse of discretion. *See, e.g., Forever Green*, 804 F.3d at 335. But even then,
the bankruptcy court's finding that the petitioner acted in bad faith is reviewed for clear error.
*See In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *see also Jacobsen*, 609 F.3d at 652
(observing that "[a] bankruptcy court's determination that a debtor has acted in bad faith is
a finding of fact reviewed for clear error," even while "[t]he decision to convert a Chapter
13 case to Chapter 7" on that ground "is reviewed for abuse of discretion").

Appellee Appx. 00839
APPX. 10379
APPX. 10379

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 847 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 961 of 1828   PageID 10454
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 846 of 1803   PageID 11592
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 66 of 84   PageID 98059

2

The court next considers what legal test governs a determination of bad faith.  This is not a clear-cut or easy question: courts have developed a "dizzying array of standards" that can be applied to the issue.  *Forever Green*, 804 F.3d at 335.  Some of these tests include:

> (1) the "improper use" test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy proceedings in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum[;]
>
> (2) the "improper purpose" test, which finds bad faith based upon the petitioner's improper motivation for filing the petition. Cases under this line of reasoning have emphasized that the petition was motivated by ill will, malice or for the purpose of harassing the debtor[;]
>
> (3) the "objective test," which essentially asks the question whether or not a reasonable person would have filed the involuntary petition under the same circumstances;
>
> (4) the "subjective test" which is almost identical to the "improper purpose" test in that they both look to the subjective motivation of the petitioning creditor for the filing; and
>
> (5) the "combined" or "two part" test which finds bad faith based upon consideration of both the subjective motivation and the objective reasonableness of the petitioning creditor(s).[38]

---

[38] The "combined test" is often guided by principles from Rule 9011, which mirrors Fed. R. Civ. P. 11.  *See In re Landmark Distribs., Inc.*, 189 B.R. 290, 310 n.24 (Bankr. D.N.J. 1995).  The Second and Eleventh Circuits have likewise observed that "a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011." *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 106 (2d Cir. 2000) (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997)).

- 66 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 848 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 962 of 1828 PageID 10455
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 847 of 1803 PageID 11593
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 67 of 84 PageID 98060

*In re Landmark Distribs., Inc.*, 189 B.R. 290, 309-10 (Bankr. D.N.J. 1995) (citations and footnotes omitted). Courts have also applied a "totality of circumstances" test, which essentially combines the improper use, improper purpose, and objective tests. *See, e.g., Forever Green*, 804 F.3d at 336 (citing *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 255 n.2 (6th Cir. 2006)). This test has been used by at least one bankruptcy court in this circuit. *See In re TRED Holdings, L.P.*, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010).

The Fifth Circuit has not expressly endorsed any particular standard, but it has considered both objective and subjective factors in deciding whether an involuntary petition was filed in bad faith. *See In re Sims*, 994 F.2d 210, 222 (5th Cir. 1993) (considering whether "the filing of the petitions was 'motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor[s],'" and whether petitioners "conducted a reasonable inquiry into the facts and the law prior to filing the petitions, as required by Bankruptcy Rule 9011" (alteration in original) (quoting *In re W. Side Cmty. Hosp., Inc.*, 112 B.R. 243, 258 (Bankr. N.D. Ill. 1990))). Any test that considers *only* subjective or objective factors thus cannot be correct. The court will therefore apply a totality of circumstances or combined test in analyzing Terry's good faith.

3

Applying the above principles, the court concludes that the bankruptcy court did not clearly err by holding that Terry filed the involuntary petitions in good faith.

On the question of Terry's alleged bad faith, the bankruptcy court found:

- 67 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 849 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 963 of 1828   PageID 10456
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 848 of 1803   PageID 11594
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 68 of 84   PageID 98061

> the evidence suggested that Mr. Terry and his counsel filed the
> Involuntary Petitions out of a legitimate concern that Highland
> was dismantling and denuding Acis LP of all of its assets and
> value and that a bankruptcy filing was the most effective and
> efficient way to preserve value for the Acis LP creditors.

*Acis I*, 584 B.R. at 144.  This finding is not clearly erroneous.  The record before the

bankruptcy court showed that Acis and Highland had engaged in numerous transactions that

stripped Acis of much of its value, and that Terry only filed the involuntary petitions after

learning about these transactions during post-judgment discovery.  *See supra* § I(C).  Terry

testified that he believed bankruptcy was the best way to stop Acis from making further

fraudulent transfers, so that the entire community of Acis' creditors could receive an

equitable distribution of assets.  The bankruptcy court was entitled to credit this testimony.

Terry also took the objectively reasonable step of consulting with bankruptcy counsel, albeit

briefly, before making the filing.  He reasonably believed that Acis had fewer than 12

creditors based on a net-worth affidavit he received during post-judgment discovery in the

44th Judicial District Court of Dallas County.  As for whether Acis was paying its debts as

they came due, Terry was aware of a number of accruing debts that Acis owed—including

his own judgment against Acis.  He also reasonably concluded that if Acis were stripped of

its assets, then *no* creditor would be paid.  The bankruptcy court did not clearly err by finding

that Terry filed the petitions based on a legitimate, good-faith belief that Acis was

fraudulently transferring assets to the detriment of all creditors.

Terry's motive, as characterized by the bankruptcy court, is a proper bankruptcy

purpose.  The Third Circuit, in a case relied upon by Neutra, describes "protect[ing] against

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 850 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 964 of 1828 PageID 10457
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 849 of 1803 PageID 11595
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 69 of 84 PageID 98062

the preferential treatment of other creditors or the dissipation of the debtor's assets" as legitimate purposes of an involuntary petition. *Forever Green*, 804 F.3d at 335. An additional "purpose of an involuntary procedure is to provide a method for creditors to protect their rights against debtors who are not meeting their debts" by "forc[ing] [them] to submit to the jurisdiction of the bankruptcy court." *In re All Media Props., Inc.*, 5 B.R. 126, 137 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. Unit A May 1981) (adopting opinion of bankruptcy court). The bankruptcy court's characterization of Terry's "concern that Highland was dismantling and denuding Acis LP of all of its assets and value," to the detriment of all of Acis' creditors, fits comfortably into the bankruptcy purposes described above. *See Acis I*, 584 B.R. at 144.

Neutra argues that the timing of Terry's petitions reveals that he was not actually concerned about fraudulent asset transfers. Neutra points out that Terry filed the involuntary petitions mere hours before a scheduled temporary injunction hearing in Texas state court, and following a single meeting with bankruptcy counsel. According to Neutra, Terry's real motive was to collect his judgment in a more favorable forum. But Neutra's argument constitutes, at best, a plausible alternative view of the evidence. On appellate review, this court may not substitute its own interpretation of the evidence for that of the bankruptcy court in the absence of clear error. *See Johnson Sw.*, 205 B.R. at 827. Because the bankruptcy court did not commit clear error, its pertinent factual findings must be affirmed. *See id.*

Neutra cites a number of cases for the proposition that when an involuntary petition

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 851 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 965 of 1828  PageID 10458
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 850 of 1803  PageID 11596
Case 3:19-cv-00291-D  Document 75  Filed 07/18/19  Page 70 of 84  PageID 98063

is filed as a collection remedy in what is essentially a two-party dispute, the petition is necessarily filed in bad faith. But Neutra's cases are distinguishable.

In *In re Smith*, 243 B.R. 169 (Bankr. N.D. Ga. 1999), the court found bad faith using a combined subjective and objective test where: (1) the petitioning creditor based its petition on the claim that the alleged debtor was fraudulently transferring assets, but had no evidence of any such transfers; (2) the case involved essentially a two-party dispute, and the petitioning creditor had sufficient remedies under state law; (3) the evidence showed that the petitioning creditor was motivated by a desire to shut down the debtor's business operations and to have the debtor criminally prosecuted; (4) the petitioning creditor failed to conduct critical research before filing its petition; and (5) the petitioning creditor failed to disclose the existence of additional creditors. *See id.* at 195-201. Here, by contrast, there *is* evidence that Highland was denuding Acis of assets; the bankruptcy court found that this is not a two-party dispute and that Terry's remedies under state law were insufficient; Terry conducted sufficient research before filing; and the bankruptcy court did not find that Terry was motivated by ill will or malice toward the debtor.

In *In re Frailey*, 144 B.R. 972 (Bankr. W.D. Pa. 1992), the court stated that "[a] bankruptcy court should refuse to enter an order for relief where petitioning creditors can go into state court to satisfy a debt." *Id.* at 977-78. But the cases cited by the *Frailey* court indicate that it did not make this statement in the context of a bad-faith filing analysis. *See id.* (citing *In re Cent. Hobron Assocs.*, 41 B.R. 444, 451 (D. Haw. 1984) (applying balancing test to exclude unpaid debt from "not generally paying" determination); *In re Kass*, 114 B.R.

Appellee Appx. 00844
APPX. 03709

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 852 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 966 of 1828 PageID 10459
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 851 of 1803 PageID 11597
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 71 of 84 PageID 98064

308, 309 (Bankr. S.D. Fla. 1990) (conducting abstention analysis under 11 U.S.C. § 305)).

Indeed, the court in *Frailey* declined (on other grounds) to award the alleged debtor damages

under § 303(i). *See id.* at 978. The case is therefore inapposite.[39]

*In re Tichy Elec. Co.*, 332 B.R. 364 (Bankr. N.D. Iowa 2005), states: "[t]he power of

an involuntary petition must be exercised for the good of the entire creditor body and for

legitimate bankruptcy purposes. It is not intended to be used in an exclusively self-serving

manner as a collection device." *Id.* at 376. But in the present case, the bankruptcy court

found that Terry acted out of concern for the entire body of Acis' creditors. And the

petitioning creditors in *Tichy* did not actually intend to liquidate or reorganize the debtor.

Rather, "[t]hey understood that after filing, some negotiations would occur, payments would

be made, and the case dismissed." *Id.* In other words, the petitioning creditor intended to

use the threat of bankruptcy as leverage to negotiate a settlement with the debtor. That does

not appear to be the case here. Finally, unlike the present appeals, there is no indication in

*Tichy* that the alleged debtor was fraudulently transferring assets in order to frustrate

collection efforts. *See generally id.*

---

[39]Similarly, *In re Tarletz*, 27 B.R. 787 (Bankr. D. Colo. 1983), states that "it is obvious that the use of the bankruptcy court as a routine collection device would quickly paralyze this Court." *Id.* at 794. But this was in the context of 11 U.S.C. § 305 abstention, *not* a bad-faith filing analysis. *See id.* at 793. And *In re Spade*, 258 B.R. 221 (Bankr. D. Colo. 2001), holds that where a petitioning creditor seeks only to gain a litigation advantage over the debtor, and does not seek the orderly distribution of the debtor's assets to all creditors, § 305 abstention is appropriate. *See id.* at 233. Not only does *Spade* not involve a § 303(i) bad-faith analysis, it is also factually inapposite: the bankruptcy court here found that Terry *was* motivated by concern for all of Acis' creditors.

- 71 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 853 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 967 of 1828 PageID 10460
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 852 of 1803 PageID 11598
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 72 of 84 PageID 98065

In sum, because the bankruptcy court did not commit clear error in determining that Terry filed the involuntary petitions in good faith, its relevant findings on this issue must be affirmed. Neutra and Highland's argument that the proposed Plan was tainted by Terry's bad-faith filing therefore fails to establish that the bankruptcy court committed reversible error.

## B

Highland and Neutra maintain that the Plan fails to satisfy § 1129(a)(3) because it effects an unlawful result: allowing a portfolio manager to veto the wishes of the portfolio's owner. They cite *In re Noll*, 172 B.R. 122 (Bankr. M.D. Fla. 1994), for the premise that a reorganization plan cannot be proposed in order to obtain a result that would be unobtainable in state court. Highland and Neutra's reliance on *Noll* is misplaced. *Noll* is, by its own terms, of limited instructive value—it states that "one cannot define [bad faith] but will readily recognize it when one sees it." *Id.* at 124. The case is factually distinguishable because it involves a proposed plan that, in essence, would have constituted self-dealing by the plan proponent (who was not a disinterested trustee). *See id.* And it is difficult to square Highland and Neutra's characterization of the holding of *Noll*—that a reorganization plan cannot be used to obtain results that are unobtainable in state court—with Neutra's argument in the bad-faith filing context that filing involuntary petitions is *only* appropriate when the petitioner lacks adequate remedies in state court.

Highland and Neutra argue that the Plan is unlawful because it contains an overbroad release. They complain about language "vesting assets in the reorganized debtor 'free and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 854 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 968 of 1828    PageID 10461
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 853 of 1803    PageID 11599

Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 73 of 84    PageID 98066

clear of all right, title, interests, claims, liens, encumbrances and charges'; purporting to

compromise all claims against the estates; preserving estates' right of setoff and recoupment;

and enjoining the 'continuation' of lawsuits against the debtors." Highland & Neutra Third

Appeal Br. 30. But this language merely effects the express terms of 11 U.S.C. §§ 524(a)

and 1141(c). *See* 11 U.S.C. § 524(a) ("A discharge in a case under this title . . . operates as

an injunction against the commencement or continuation of an action, the employment of

process, or an act, to collect, recover or offset any such debt as a personal liability of the

debtor[.]"); 11 U.S.C. § 1141(c) ("[A]fter confirmation of a plan, the property dealt with by

the plan is free and clear of all claims and interests of creditors, equity security holders, and

of general partners in the debtor."); *see also In re Coho Res., Inc.*, 345 F.3d 338, 343 (5th

Cir. 2003) ("11 U.S.C. § 524(a) operates as an injunction against actions against a debtor

subsequent to a discharge of a debt. The bankruptcy discharge and § 524 injunction serve

to give the debtor a financial fresh start." (internal quotation marks, emphasis, and footnote

omitted)). The challenged language does not render the Plan unlawful.[40] Highland and

Neutra have failed to demonstrate reversible error much less any error.

<div align="center">IX</div>

The court now considers the argument of Highland and Neutra that the Plan fails to

meet the requirements of 11 U.S.C. § 1129(a)(5).

---

[40]Highland and Neutra also cite several cases for the proposition that a plan is proposed in bad faith when it seeks merely to delay or frustrate the efforts of a secured creditor. But Highland and Neutra are not secured creditors.

<div align="center">- 73 -</div>

A

Section 1129(a)(5) provides that a plan may only be confirmed if:

> (A)(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

> (B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

*Id.* Neutra and Highland contend that the Plan is deficient because Terry is actually a non-statutory insider, and because Terry's ownership of Acis is not in the best interests of creditors, Acis' investors, or public policy.[41]

B

The court affirms the bankruptcy court's conclusion that Terry is not an insider.

---

[41]Neutra and Highland also contend that § 1129(a)(5)(A)(i) requires disclosure of the corporate structure of the reorganized debtor, and that the confirmed Plan is deficient because it merely states that Terry will have control over the structure of Acis instead of defining that structure in advance.  In support of this argument, Neutra and Highland cite *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 765-66 (Bankr. N.D. Ill. 2013).  But the plan in *GAC Storage* did not fail because it left the management structure of the reorganized debtor undefined; rather, it failed because it did not disclose that the reorganized debtor's sole owner "intend[ed] to bring on either himself or another entity which he would control as the manager of [the debtor] and that the manager would have a 1% ownership interest in [the debtor]."  *Id.* at 766.  Thus *GAC Storage* is not controlling.

- 74 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 856 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 970 of 1828 PageID 10463
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 855 of 1803 PageID 11601
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 75 of 84 PageID 98068

11 U.S.C. § 101(31) provides a list of persons who are considered to be "insiders" of the debtor based on their relationship with the debtor. A person not included in the statutory list can nonetheless qualify as a "non-statutory insider" under certain circumstances. In deciding whether a person is a non-statutory insider, the court considers two factors: "(1) the closeness of the relationship between the [putative insider] and the debtor; and (2) whether the transactions between the [putative insider] and the debtor were conducted at arm's length." *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992); *accord In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002). Highland and Neutra contend that a person can be a non-statutory insider based on his relationship with a statutory insider of the debtor, regardless of his relationship with the debtor itself. *See A. Tarricone*, 286 B.R. at 263-64. They then assert that the Trustee, as a person in control of the debtor, is a statutory insider. *See In re GSC, Inc.*, 453 B.R. 132, 158 n.31 (Bankr. S.D.N.Y. 2011). The court will assume *arguendo* that these legal assertions are correct. Highland, Neutra, and the Trustee agree that the bankruptcy court's determination of insider status is a question of fact that is reviewed for clear error. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, ___ U.S. ___, 138 S. Ct. 960, 966 (2018).

Highland and Neutra posit that the relationship between the Trustee and Terry is unusually close. The controlling question under the first factor is whether the relationship is close enough for the alleged insider to gain advantage due to affinity. *See In re Rexford Props., LLC*, 557 B.R. 788, 797 (Bankr. C.D. Cal. 2016). Among the indicators of closeness cited by Highland and Neutra are: that the lawyers who represented Terry in the filing of the

Appellee Appx. 00849
APPX. 03706

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 857 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 971 of 1828 PageID 10464
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 856 of 1803 PageID 11602
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 76 of 84 PageID 98069

involuntary petitions now represent the Trustee; that the Trustee relied on Terry's financial advice for a period of time after the Trustee's appointment; that Terry's expert witness in the arbitration was engaged by the Trustee to testify at the confirmation hearings; that Terry's counsel in related litigation in Guernsey testified as an expert at the confirmation hearings; and that Terry introduced Oaktree to the Trustee's predecessor. As for whether the Plan was negotiated at arm's length, Highland and Neutra point out that the Trustee did not solicit competing bids for Acis' equity, and that there was essentially no negotiation between the Trustee and Terry regarding that price.

But after reviewing the record, the court is not "left with the definite and firm conviction that a mistake has been committed." *Johnson Sw.*, 205 B.R. at 827 (quoting *Placid Oil*, 158 B.R. at 412). The Trustee testified that, before the bankruptcy cases, he had no relationship with Terry—and after he was appointed, his relationship with Terry was typical of that between a trustee and the debtor's largest creditor. He relied on Terry's financial advice for a brief time out of necessity, not affinity. Terry appears to have been represented by independent counsel in his dealings with the Trustee. The lack of an auction can be explained by the Trustee's assertion—credited by the bankruptcy court—that no other creditor was a logical choice to be Acis' equity owner. And the record indicates that there was at least some negotiation between Terry and the Trustee regarding the amount of the reduction of Terry's claim against the estates. Indeed, according to the Trustee's testimony, Terry thought the price for Neutra's equity was *too high*, but the Trustee held firm and Terry gave in. These facts plausibly support the findings that Terry and the Trustee were not so

Appellee Appx. 00850
APPX. 10703

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 858 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 972 of 1828    PageID 10465
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 857 of 1803    PageID 11603
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 77 of 84    PageID 98070

close as to give Terry an advantage based on affinity, and that the Plan was negotiated at

arm's length.  The bankruptcy court thus did not commit clear error by finding that Terry was

not an insider.[42]

<div align="center">C</div>

Highland and Neutra's remaining § 1129(a)(5) arguments—that Terry's appointment

as Acis' new equity owner is contrary to the interests of creditors, investors, and the

public—are unavailing.

Highland and Neutra first contend that "[c]onfirmation of a Chapter 11 plan of

reorganization that was designed to allow an *insider* to obtain ownership of the reorganized

debtor for an improper purpose is against public policy."  Highland & Neutra Third Appeal

Br. 43 (emphasis added) (citing *In re S. Beach Sec., Inc.*, 606 F.3d 366, 371 (7th Cir. 2010)).

But Terry is not an insider, and—as discussed *supra* at § VIII(A)(3)—he pursued Acis'

involuntary bankruptcy in good faith and for a proper bankruptcy purpose.

Highland and Neutra also assert that "a bankruptcy court must, by considering the

broader public policy interests, prevent the appointment of a proposed leader who has a

conflict of interest or other financial or personal affiliation that would make his or her control

inappropriate."  Highland & Neutra Third Appeal Br. 44.  They note that Terry is embroiled

in a battle with HCLOF over control of the subordinated notes, and with Highland itself over

---

[42]As an additional ground for finding that Terry is an insider, Highland and Neutra
assert that Terry had access to voluminous insider information during the pendency of these
cases.  But they cite no evidence in the record on appeal in support of this assertion.

<div align="center">- 77 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 859 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 973 of 1828    PageID 10466
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 858 of 1803    PageID 11604
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 78 of 84    PageID 98071

myriad issues in state court.  But this assertion is not entirely accurate: it is *Acis*, not Terry,

who is battling with HCLOF over the subordinated notes.  And even if Terry has

disagreements with Highland in state court, this fact is not necessarily dispositive of whether

the Plan is in the public interest.  According to case law cited by Highland and Neutra, there

are numerous factors to consider in deciding whether a proposed plan is in the public interest,

and the weight given to each factor varies depending on the circumstances of the case.  *See*

*In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014).

Relevant factors include whether the appointment "perpetuate[s] incompetence, lack of

direction, [or] inexperience," and whether "the individual [is] capable and competent to serve

in the proposed capacity assigned to him."  *Id.*  The bankruptcy court found that Terry is

"well qualified to reorganize" Acis and that his new role "will be similar to the role he very

successfully performed for" Acis.  *Acis II*, 2019 WL 417149, at *14.  Giving appropriate

weight to all of the public policy factors in the context of this case—particularly in light of

the bankruptcy court's finding that Highland has "unclean hands," *id.* at *10—the court

concludes that the bankruptcy court did not clearly err by finding that confirmation of the

Plan was consistent with public policy.

<center>X</center>

Finally, the court considers the contention of Highland and Neutra that the Plan does

not satisfy the cram-down requirements of 11 U.S.C. § 1129(b).

It is familiar jurisprudence that the acceptance of all impaired classes of claims or

interests required by § 1129(a)(8) is not necessary for plan confirmation when § 1129(b) is

<center>- 78 -</center>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 860 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 974 of 1828   PageID 10467
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 859 of 1803   PageID 11605
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19    Page 79 of 84   PageID 98072

satisfied. Section 1129(b) permits confirmation when all other requirements of § 1129(a) are

met and "the plan does not discriminate unfairly, and is fair and equitable, with respect to

each class of claims or interests that is impaired under, and has not accepted, the plan."

§ 1129(b)(1).   The court reviews the bankruptcy court's finding that the cram-down

requirements are met for clear error.  *See In re Block Shim Dev. Co.-Irving*, 118 B.R. 450,

452 (N.D. Tex. 1990) (Fitzwater, J.).

Highland and Neutra challenge the bankruptcy court's finding that the Plan meets

these requirements, contending the Plan is neither fair nor equitable to them, in violation of

§ 1129(b)(1).[43]   More specifically, Highland and Neutra assert that the Plan violates the

absolute priority rule and its corollaries.

Under the absolute priority rule, "fairness and equity require[] that 'the creditors . . .

be paid before the stockholders [can] retain [equity interests] for any purpose whatever.'"

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle Street P'ship*, 526 U.S. 434, 444 (1999)

(last alteration in original) (quoting *N. Pac. R.R. Co. v. Boyd*, 228 U.S. 482, 508 (1913)).

The reason for the rule is "the danger inherent in any reorganization plan proposed by a

debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners."

*Id.*  The rule is embodied in § 1129(b)(2)(B)(ii).  *See LaSalle*, 526 U.S. at 449.  The debtor's

old equity owners *can* retain their interest in the debtor if they contribute new value to the

bankruptcy estate, and this new value "makes the senior creditors (and the estate as a whole)

---

[43]Highland and Neutra also argue that the requirements of § 1129(a)(3) are not met.
For the reasons discussed *supra* at § VIII, the court rejects this argument.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 861 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 975 of 1828   PageID 10468
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 860 of 1803   PageID 11606
Case 3:19-cv-00291-D   Document 75   Filed 07/18/19   Page 80 of 84   PageID 98073

better off." *In re Castleton Plaza, LP*, 707 F.3d 821, 821 (7th Cir. 2013).  The way to assess

whether the value contributed by the old equity owners makes the senior creditors better off

is to allow for a market valuation of the debtor's equity.  *See LaSalle*, 526 U.S. at 454-58.

Highland and Neutra contend that the Plan violates the absolute priority rule because

there was no market test to assess the value of Acis' equity—instead, the Trustee unilaterally

selected the $1 million number without soliciting competing bids.  But the absolute priority

rule, by its own terms, only applies when the debtor's old equity owners will retain their

equity interest after bankruptcy.  *See LaSalle*, 526 U.S. at 444.  Where, as here, a non-insider

creditor becomes the debtor's new owner, there is no "danger . . . that the plan will simply

turn out to be too good a deal for the debtor's [old] owners."  *Id.*  Whatever the significance

of the Trustee's failure to solicit competing bids, it does not violate the absolute priority rule

in this instance.

Highland and Neutra also argue that the Plan violates a corollary of the absolute

priority rule: "that a senior class cannot receive more than full compensation for its claims."

*In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health

Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)).  They assert that "to obtain

confirmation of a reorganization plan that completely extinguishes equity interests, the plan's

proponent must prove that there is no value left once the creditors have had their turn."

Highland & Neutra Third Appeal Br. 47 (quoting *In re Dave's Detailing, Inc.*, 2015 WL

4601726, at *16 (Bankr. S.D. Ind. July 30, 2015)).  This, in turn, requires a showing that no

creditor is paid more than in full.  *See In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D.

Appellee Appx. 00854
APPX. 10719

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 862 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 976 of 1828 PageID 10469
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 861 of 1803 PageID 11607
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 81 of 84 PageID 98074

Tex. 1992), *abrogated on other grounds by In re Briscoe Ents., Ltd., II*, 994 F.2d 1160, 1164 n.11 (5th Cir. 1993). Highland and Neutra maintain that the Plan violates this rule in two ways.

First, they contend that the bankruptcy court wrongly inflated the value of the secured portion of Terry's partially-secured claim from approximately $634,000 to $1 million. This argument rests on an erroneous understanding of the Plan. The Plan reduces the *total* value of Terry's partially-secured claim—i.e., the sum of both the secured and unsecured portions of his claim—by $1 million, and then treats the remaining *total* balance of Terry's claim as a general unsecured claim. The Plan does not inflate the value of his secured claim.

Second, Highland and Neutra argue that, without a market test of Acis' value, the bankruptcy court could not have determined whether Terry was overcompensated when he received Acis' equity in exchange for a $1 million reduction in his claim. But there *was* a market valuation in the present case. In *LaSalle* the Supreme Court suggested (but did not decide) that the termination of exclusivity—i.e., allowing any interested person to submit a competing reorganization plan—can constitute a sufficient market test of a debtor's value. *See LaSalle*, 526 U.S. at 458. Since then, courts have concluded in a number of cases that opening the bankruptcy process to competing plan proposals is a valid market test. *See H.G. Roebuck & Son, Inc. v. Alter Commc'ns, Inc.*, 2011 WL 2261483, at *7 (D. Md. June 3, 2011) ("Indeed, if the Bankruptcy Court simply allowed Roebuck to file a competing plan, and the creditors found that plan to be inferior, they could still vote for Alter's original plan, and [*LaSalle*] would have been satisfied."); *Dave's Detailing*, 2015 WL 4601726, at *18

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 863 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 977 of 1828 PageID 10470
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 862 of 1803 PageID 11608
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 82 of 84 PageID 98075

("The termination of exclusivity provides an open market for competition in the form of competing plans."); *In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 866 (Bankr. D. Mass. 2000) ("[T]he competing plan approach provides for a more informed process for creditors and to interested bidders than an auction of equity interests in the context of a Debtor's plan."); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 716-17 (Bankr. N.D. Ga. 1996) ("Competing plans certainly would foster alternate bids for control of the reorganized debtor, and would thereby dispel any concerns regarding the necessity and value of the shareholder's offer."); *In re SM 104 Ltd.*, 160 B.R. 202, 227 (Bankr. S.D. Fla. 1993) ("[A]t least in all but the largest bankruptcy cases, the disclosure and confirmation procedures provided by Chapter 11 offer an acceptable alternative for marketing the ownership interests of the reorganized debtor.").[44]

No party in the present case held the exclusive right to propose a reorganization plan. Highland and Neutra could have proposed a competing plan if they believed that the Trustee's plan undervalued Acis' equity. They did not do so. Thus the bankruptcy court did not err by approving a Plan that valued Acis' equity at $1 million.

---

[44]Highland and Neutra's argument to the contrary, based on the Seventh Circuit's opinion in *Castleton*, 707 F.3d 821, is unpersuasive. The court in *Castleton* concluded that the termination of exclusivity was insufficient to constitute a market test in the context of the absolute priority rule. *See id.* at 823-24. The court applied that rule because the person receiving the debtor's equity under the plan was an insider. *See id.* In contrast, Terry is not an insider, and the absolute priority rule does not apply in the present case. *See Dave's Detailing*, 2015 WL 4601726, at *18 ("The holding in *Castleton Plaza* applies to shareholders or insiders—not to non-insider third parties—obtaining equity in a reorganized debtor.").

- 82 -

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 864 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 978 of 1828 PageID 10471
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 863 of 1803 PageID 11609
Case 3:19-cv-00291-D Document 75 Filed 07/18/19 Page 83 of 84 PageID 98076

<div align="center">XI</div>

On April 12, 2019 Acis filed a motion to substitute itself as the appellee in the Third

Appeal. It maintains that, once the Plan took effect, Acis became the Trustee's successor-in-

interest. But as Acis recognizes, "the Federal Rules of Bankruptcy Procedure applicable to

this case, those numbered 8001-8028, do not provide a specific rule governing substitution

of parties in bankruptcy appeals to the district court." Acis Mot. Substitute 3. Acis also fails

to cite, and the court has not found, any case in which a district court allowed such party

substitution while an appeal was pending. Accordingly, the court in its discretion denies

Acis' motion. *Cf. Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th

Cir. 1985) (holding that substitution of parties under an analogous rule, Fed. R. Civ. P. 25(c),

is within court's discretion). If Acis wishes to take the place of the Trustee in any further

appeal to the Fifth Circuit, it may make a request under the procedure prescribed by Fed. R.

App. P. 43.

<div align="center">* * *</div>

In the First Appeal, the clerk is directed to strike ECF Doc. No. 2 from the docket of

No. 3:18-CV-1084-D and to refile that document in No. 3:18-CV-1057-D with a filing date

of April 27, 2018.

The court DISMISSES the appeals of the orders denying intervention in Nos. 3:18-

CV-1056-D and 3:18-CV-1084-D, and DISMISSES the appeals of the orders for relief in

Nos. 3:18-CV-1057-D and 3:18-CV-1073-D.

The court AFFIRMS the Break-Up Fee and Expense Reimbursement order at issue

<div align="center">- 83 -</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 865 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 979 of 1828    PageID 10472
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 864 of 1803    PageID 11610
Case 3:19-cv-00291-D    Document 75    Filed 07/18/19    Page 84 of 84    PageID 98077

in the Second Appeal, No. 3:18-CV-1822-D.

In the Third Appeal, No. 3:19-CV-0291-D, the court AFFIRMS the bankruptcy court's order confirming the Plan and approving the disclosure statement.

The court DENIES Acis' April 12, 2019 motion to substitute party.

AFFIRMED in part; DISMISSED in part.

July 18, 2019.

SIDNEY A. FITZWATER
SENIOR JUDGE

Appellee Appx. 00858
Appx. 10473

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 866 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 980 of 1828    PageID 10473
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 865 of 1803    PageID 11611

# APPENDIX 10

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 867 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 981 of 1828 PageID 10474
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 866 of 1803 PageID 11612

Case: 19-10847    Document: 00515903826    Page: 1    Date Filed: 06/17/2021

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 17, 2021

Lyle W. Cayce
Clerk

No. 19-10847

IN THE MATTER OF: ACIS CAPITAL MANAGEMENT, L.P.,

*Debtor*,

-----------------------------

NEUTRA LIMITED;

*Appellant*,

*versus*

ROBIN E. PHELAN, CHAPTER 11 TRUSTEE,

*Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CV-291

No. 19-10847

Before Smith, Ho, and Oldham, *Circuit Judges*.

Per Curiam:*

Having thoroughly reviewed the parties' briefs and arguments, we conclude the district court's judgment affirming the bankruptcy court's order confirming the Chapter 11 plan must be AFFIRMED. We further conclude the appeal of the district court's plan injunction is moot and must be DISMISSED.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 869 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 983 of 1828    PageID 10476
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 868 of 1803    PageID 11614
Case: 19-10847    Document: 00515903827    Page: 1    Date Filed: 06/17/2021

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 17, 2021

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

        No. 19-10847    Neutra v. Phelan
                        USDC No. 3:19-CV-291

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and 5th Cir. R. 35, 39, and 41
govern costs, rehearings, and mandates.  **5th Cir. R. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and 5th Cir. R. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

Direct Criminal Appeals.  5th Cir. R. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari**.  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 870 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 984 of 1828   PageID 10477
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 869 of 1803   PageID 11615

Case: 19-10847    Document: 00515903827    Page: 2    Date Filed: 06/17/2021

The judgment entered provides that appellant pay to appellee the
costs on appeal.  A bill of cost form is available on the court's
website www.ca5.uscourts.gov.

                              Sincerely,

                              LYLE W. CAYCE, Clerk

                              By: _____
                              Charles B. Whitney, Deputy Clerk

Enclosure(s)

Ms. Annmarie Antoniette Chiarello
Mr. Phillip Lewis Lamberson
Mr. Jeffrey Scott Levinger
Mrs. Rakhee V. Patel

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 871 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 985 of 1828    PageID 10478
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 870 of 1803    PageID 11616

# APPENDIX 11

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 872 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 986 of 1828 PageID 10479
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 871 of 1803 PageID 11617

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 1 of 27

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) | **Related to Docket No. 86** |
|  | ) |  |

**OBJECTION OF THE DEBTOR TO MOTION OF
OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO TRANSFER VENUE OF THIS CASE TO THE UNITED STATES
<u>BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS</u>**

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") hereby

objects to the motion to transfer venue of this case [Docket No. 86] (the "<u>Motion to Transfer</u>") to

the Northern District of Texas (the "<u>Texas Bankruptcy Court</u>"), filed by the Official Committee

of Unsecured Creditors (the "<u>Committee</u>").

In support of this objection, the Debtor respectfully states as follows:

**<u>Preliminary Statement</u>**

1.      The Debtor owns and manages a sophisticated financial services and

money management business that has assets and interests all over the world.  The amounts at

stake in this case involve hundreds of millions of dollars in terms of asset values and asserted

liabilities.  The Debtor's creditors are sophisticated parties who are either represented by highly

qualified counsel or are attorneys themselves.  The top 20 unsecured creditors in this case consist

almost entirely of litigation claimants and law firms.  There are no "mom and pop" creditors who

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appellee Appx. 00865
APPX. 10722

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 873 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 987 of 1828    PageID 10480
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 872 of 1803    PageID 11618
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 2 of 27

would be prejudiced if they were not provided with ready access to a local bankruptcy court.

2.       Further, the Texas Bankruptcy Court has no special familiarity with the Debtor or its current management.  The Debtor's restructuring efforts are now led by Bradley Sharp as Chief Restructuring Officer (the "CRO") who has had no prior involvement with either Acis (as defined below) or the Texas Bankruptcy Court with respect to this matter.  The Texas Bankruptcy Court also knows little about the Debtor's business or financial affairs, aside from its prior relationship with Acis.  The Debtor is no longer affiliated with Acis and, in fact, is directly adverse to Acis, which now asserts various contested litigation claims against the Debtor.  Hence, the Committee's opening position that this case should be transferred to the Texas Bankruptcy Court is little more than a litigation ploy.  The Committee has decided, based on prior rulings of the Texas Bankruptcy Court in the Acis cases, that such forum would be more advantageous from a litigation perspective *vis-à-vis* the Debtor.  That is not an appropriate basis to transfer venue.

3.       The fact that the Debtor is headquartered in Dallas, Texas also does not mean that this case should be transferred there.  The Debtor's assets, interests, and contractual entanglements are dispersed throughout this country and the world.  As an example, the Debtor has assets under management, including its own proprietary assets and those of its clients, through various related parties in Asia, South America, and Europe.  The Debtor has already brought a motion in this case to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68], including those in pending proceedings in Bermuda and the Cayman Islands.  The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country.  The Debtor's primary brokerage

Appellee Appx. 00866
APPx. 10473

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 874 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 988 of 1828   PageID 10481
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 873 of 1803   PageID 11619
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 3 of 27

accounts that hold the bulk of the Debtor's liquid and illiquid securities are located in New York

City with Jefferies, LLC ("Jefferies").  The Debtor is also the subject of two pending lawsuits in

the Delaware Chancery Court, one of which involves claims brought by the Redeemer

Committee of the Highland Crusader Fund (the "Redeemer Committee"), a member of the

Committee.  Another member of the Committee, UBS Securities LLC and UBS AG London

Branch ("UBS"), has longstanding litigation pending against the Debtor in New York state court

(not Texas).  Predictably, the Debtor's professionals and those of its creditors are located around

the country.  Given the amounts at stake in this case and the complexity of the Debtor's assets

and liabilities, venue should not be determined by how many miles the Debtor's employees or

professionals or those of its creditors are located from the courthouse.  All parties reside at

various commercial centers around this country and can easily travel wherever necessary in order

to handle the important matters in this case.

      4.     Further, the pendency of the involuntary bankruptcy cases of Acis Capital

Management, L.P. and Acis Capital Management GP, LLP (together, "Acis") in Dallas, Texas

does not make the Texas Bankruptcy Court a preferable forum for this case.  Acis's involuntary

cases were commenced by Joshua Terry ("Terry"), who now owns and manages Acis and

represents that entity on the Committee.  Terry assumed ownership of Acis by virtue of a

contested plan of reorganization that was confirmed by the Texas Bankruptcy Court and which is

now the subject of a pending appeal.[2] ***The interests of Acis are directly adverse to those of this***

---

[2]  Although a stay of the confirmation order was sought, no stay was granted despite the ongoing appeal of that
order.  The Texas Bankruptcy Court thus has limited ongoing jurisdiction at this juncture.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 875 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 989 of 1828 PageID 10482
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 874 of 1803 PageID 11620

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 4 of 27

*estate.*[3] The Debtor and Acis have been, and continue to be, involved in highly contentious litigation, including matters that are the subject of multiple appeals from decisions of the Texas Bankruptcy Court and pending fraudulent transfer claims brought by Acis against the Debtor in the Texas Bankruptcy Court. The Debtor and Acis assert various substantial disputed and unliquidated claims against each other. Further, ***the Debtor's current business is unrelated to Acis***, which is focused on managing certain collateralized loan obligations (or CLOs) in which the Debtor no longer has any direct interest. The Committee also does not establish how the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the instant chapter 11 case.[4] Aside from the Debtor's prior relationship with Acis, the Texas Bankruptcy Court is not familiar with the Debtor's business and assets or the Debtor's liabilities that need to be restructured in this case. ***The Debtor's restructuring efforts are now managed by an independent and highly qualified CRO*** who has had no prior involvement with Acis or its bankruptcy proceedings. Hence, while it may be in the interests of ***the Acis estate*** for this matter to be transferred to the Texas Bankruptcy Court, it is certainly not in the best interests of ***the Debtor's estate*** or the parties to these proceedings, which is the only thing that matters.

    5.    As the Committee admits, the Debtor is entitled to substantial deference with respect to its choice of forum for its bankruptcy case. This Court is indisputably a legally proper forum given that the Debtor is a Delaware limited partnership. This Court also presents a convenient forum given that the Debtor's assets are so widely dispersed and there has been

---

[3] Terry, in his personal capacity and on behalf of his spouse, also purports to hold an unsecured claim against the Debtor's estate in the amount of $425,000, which the Debtor has designated as contingent, unliquidated, and disputed.

[4] Presumably, senior management personnel of the Debtor have provided all manner of testimony in the various pending litigation matters around the country involving or otherwise implicating the Debtor.

<div align="center">4</div>

**Appellee Appx. 00868**

**APPX. 10473**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 876 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 990 of 1828   PageID 10483
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 875 of 1803   PageID 11621

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 5 of 27

extensive ongoing litigation against the Debtor in the Delaware Chancery Court, including

litigation commenced by the Redeemer Committee, a member of the Committee.  In sum, aside

from the Committee's perceived litigation advantage before the Texas Bankruptcy Court, there is

no credible, let alone valid, basis for this case to be transferred to the Texas Bankruptcy Court

where an adverse proceeding is pending when this Court presents a perfectly appropriate forum

for effectuating a successful reorganization of the Debtor's affairs.  The Debtor therefore urges

this Court to deny the Motion to Transfer filed by the Committee.

### Background

**A.**    **The Debtor's Bankruptcy Filing**

6.    On October 16, 2019 (the "Petition Date"), the Debtor commenced this

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The

factual background regarding the Debtor, including its current and historical business operations

and the events precipitating the chapter 11 filing, is set forth in detail in the *Declaration of Frank*

*Waterhouse in Support of First Day Motions*, which is incorporated herein by reference.

7.    The Debtor continues in the possession of its property and continues to

operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.

8.    No trustee or examiner has been appointed in the Debtor's chapter 11

case.

9.    On October 29, 2019, the United States Trustee appointed the Committee,

which consists of four members:  (1) the Redeemer Committee; (2) UBS; (3) Acis; and (4) Meta-

e Discovery.  The Committee is represented by Sidley & Austin, with one of its lead attorneys

5

DOCS_SF:102198.7 36027/002

**Appellee Appx. 00869**

**APPX. 10724**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 877 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 991 of 1828   PageID 10484
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 876 of 1803   PageID 11622

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 6 of 27

based in New York City.  Since retaining counsel, the Committee's first order of business was to

file the Motion to Transfer.

**B.      The Debtor's Organizational Structure and Governance**

10.      The Debtor is a Delaware limited partnership.  Its limited partnership

interests are owned as follows: (a) 99.5% by Hunter Mountain Trust, a Delaware statutory trust

based in New York, (b) 0.1866% by Dugaboy Investment Trust, a Delaware trust, (c) 0.0627%

by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand Advisors, Inc., a

Delaware corporation.  In sum, 99.94% of the Debtor's partnership interests are held through

Delaware entities.  Strand Advisors, Inc. also owns 100% of Debtor's general partnership

interest.  This Delaware entity, through its principal James Dondero, ultimately controlled the

Debtor as of the Petition Date.

11.      There is now new governance in place.  On October 29, 2019, the Debtor

filed its motion to retain Bradley Sharp as the CRO [Docket No. 75] (the "CRO Motion").

Pursuant to the CRO Motion, the Debtor seeks to retain the CRO with certain independent and

exclusive powers and significant restrictions on termination.  Specifically, the CRO will have

sole authority over claims and transactions involving insiders.  The CRO was previously

appointed chief restructuring officer in Delaware cases such as *Variant Holding Company LLC*

before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin

Carey (retired).  The CRO Motion is set for hearing on November 19, 2019, the same date as the

Motion to Transfer.[5]

---

[5] In an apparent effort to prevent this Court from considering the CRO Motion, the Committee sought to have the Motion to Transfer set for hearing on shortened notice for November 7, but this Court denied that request before the Debtor filed its response.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 878 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 992 of 1828    PageID 10485
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 877 of 1803    PageID 11623

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 7 of 27

12.     Also on October 29, 2019, the Debtor filed its motion for approval of

certain protocols with respect to ordinary course transactions [Docket No. 77] (the "Protocols

Motion").  Pursuant to the Protocols Motion, the Debtor seeks approval of certain protocols to

allow the Debtor to conduct ordinary course business in an uninterrupted and transparent

manner, both for the benefit of the Debtor's estate and its creditors and for the investors to whom

the Debtor provides services.  The Protocols Motion also is set for hearing on November 19.

13.     The CRO Motion and the Protocols Motion are intended to bring

independence and clarity to the Debtor's governance structure.  Based on these motions, there

should be no doubt that qualified, independent management is in place with the Debtor and will

be operating under a specified set of protocols and procedures to ensure that estate assets are

properly preserved.

**C.     The Debtor's Business, Assets, and Creditor Relationships are
         Complex and International in Scope**

14.     The Debtor is a multibillion-dollar global alternative investment manager.

The Debtor operates a diverse investment platform, serving both institutional and retail investors

worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public

equities, real estate, private equity and special situations, structured credit, and sector- and

region-specific verticals built around specialized teams.  The Debtor also provides shared

services to its affiliated registered investment advisors.

15.     Pursuant to various contractual arrangements, the Debtor provides money

management and advisory services for approximately $2.5 billion of assets under management.

Separately, the Debtor provides shared services for approximately $7.5 billion of assets managed

7

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 879 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 993 of 1828   PageID 10486
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 878 of 1803   PageID 11624

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 8 of 27

by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.

16.     Although the Debtor is headquartered in Dallas, Texas, and most of its employees are based there, the Debtor's affiliates and related entities maintain offices in many international locales, including in Buenos Aires, Rio de Janeiro, Singapore, and Seoul.  The Debtor primarily generates revenue from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates.  These funds have investments all over the world.  Specifically, the Debtor has its own proprietary investment assets and those of its clients held through various affiliates in Asia, South America, and Europe.

17.     On October 29, 2019, the Debtor filed a motion to appoint a foreign representative in order to manage its various foreign interests [Docket No. 68] (the "Foreign Representative Motion"), including those in pending proceedings filed by the Redeemer Committee in Bermuda and the Cayman Islands.

18.     The Debtor's principal assets in the United States consist of custodial and non-custodial interests in investments located all over the country.  The Debtor has brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and illiquid securities.  As of the Petition Date, the Debtor owed Jefferies approximately $30 million on account of margin borrowings.  The Debtor's other principal secured creditor, Frontier State Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 880 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 994 of 1828   PageID 10487
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 879 of 1803   PageID 11625

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 9 of 27

**D.**     **The Debtor Has Litigation Pending in Delaware Chancery Court and New York**

19.     Aside from Acis, no Committee members are based in Dallas and two of them have litigation pending against the Debtor outside of Texas.  As discussed further below, the Redeemer Committee commenced litigation against the Debtor in the Delaware Chancery Court and UBS commenced litigation against the Debtor in New York state court.  The chairman and the majority of the members of the Redeemer Committee are located in Chicago.  UBS's business representatives are based in or around New York City.  The only trade vendor on the Committee, Meta-e Discovery, is based in Connecticut.  Yet another allegedly substantial creditor of the Debtor, Patrick Daugherty ("Daugherty"), also has litigation pending against the Debtor in Delaware Chancery Court, including a matter that went to trial on October 14, 2019, just prior to the Petition Date, before it was stayed.

20.     *Redeemer Committee Litigation:  Delaware Chancery Court and New York Arbitration.*  The Debtor's bankruptcy filing was precipitated by an arbitration award in favor of the Redeemer Committee (the "Award") initially issued against the Debtor in March 2019 by a panel of the American Arbitration Association based in New York City.  The Debtor was formerly the investment manager for the Highland Crusader Fund (the "Crusader Fund"), which was based in Bermuda and the subject of insolvency proceedings there.  On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor in New York City, and (c) commenced litigation against the Debtor in Delaware Chancery Court.  In September 2018, the Debtor and the Redeemer Committee participated in a multi-day evidentiary hearing in New York City.  In March 2019, following post-trial briefing, the arbitration panel issued its Award

9

Appellee Appx. 00873

APPX. 10730

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 881 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 995 of 1828 PageID 10488
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 880 of 1803 PageID 11626

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 10 of 27

finding in favor of the Redeemer Committee on a variety of claims and requiring the Debtor to

pay a gross amount of $189 million, subject to certain offsets and deductions. The Redeemer

Committee set a hearing in the Delaware Chancery Court for October 8, 2019, in order to seek

entry of a judgment with respect to the Award. The hearing was subsequently continued to

October 16, 2019. The Debtor filed this case just prior to that hearing. The Redeemer

Committee is represented by Jenner & Block attorneys based in Chicago, Illinois.

21. *UBS Litigation: New York State Court.* The Debtor and UBS are parties

to a long-running litigation originally filed by UBS in February 2009 in the New York Supreme

Court, County of New York. At bottom, UBS alleges that the Debtor and certain funds

fraudulently induced UBS to restructure a transaction at the expense of UBS and then these

parties and other entities fraudulently diverted certain assets to prevent UBS from obtaining a

recovery on its claims. There have been numerous prejudgment motions and appeals in this

case. The claims that remain consist primarily of breach of contract, fraudulent inducement and

alter ego claims against certain defendants, a breach of implied covenant of good faith and fair

dealing claim against the Debtor, and fraudulent conveyance claims against all defendants. UBS

has asserted damages in excess of $686 million in the litigation, which the Debtor and the other

defendants continue to vigorously dispute. The case was bifurcated, and the contract claims

against certain fund defendants as well as the Debtor's counterclaim were addressed at a bench

trial in July 2018. The court has not yet ruled on phase one of the trial. If the court finds a

breach of contract occurred and awards damages against the fund defendants, then the remaining

claims will be tried in a second phase of the trial. While awaiting a decision on phase one, the

defendants filed a motion for judgment before trial with respect to the fraudulent transfer claims

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 882 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 996 of 1828    PageID 10489
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 881 of 1803    PageID 11627

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 11 of 27

based on the fact that UBS is not a creditor of the parties who made the alleged fraudulent

transfers.  The motion was withdrawn due to its timing without prejudice to defendants' right to

refile the motion after a decision has been made on phase one of the trial.  UBS is represented by

Latham & Watkins attorneys based in Washington, DC.

        22.    *Daugherty Litigation:  Delaware Chancery Court.*  Another allegedly

substantial creditor of the Debtor who is not on the Committee, Daugherty, also commenced

litigation against the Debtor in Delaware Chancery Court.  Daugherty appears on the top 20 list

in this case in the amount of $11.7 million, scheduled as contingent, unliquidated, and disputed.

Daugherty is a former senior management employee of the Debtor.  Among other matters,

Daugherty sued the Debtor and certain of its affiliates in Delaware Chancery Court in July 2017

arising from his separation from the Debtor.  In June 2018, the Delaware Chancery Court

dismissed many of the claims asserted by Daugherty in the litigation.  The remaining counts

went to trial just prior to the Petition Date and have since been stayed by virtue of the Debtor's

bankruptcy filing.  Daugherty is represented by Delaware counsel.

### E.    The Debtor's Relationship with Acis and Ongoing Adverse Claims and Litigation

        23.    The Debtor previously provided sub-manager and sub-advisory services to

Acis pursuant to certain contractual agreements that were terminated during the course of the

Acis bankruptcy in or around August 2018.  Since that time, the Debtor has not had, and does not

currently have, any direct business dealings with respect to Acis or the CLO assets for which

Acis serves as the CLO portfolio manager.[6]

---

[6]  The Debtor, through an affiliate, manages a client account that owns a notional value of approximately $150 million in securities issued by Acis CLOs.  All of the Debtor's affiliated CLOs are currently in wind-down, meaning that they are not making any new investments.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 883 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 997 of 1828 PageID 10490
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 882 of 1803 PageID 11628

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 12 of 27

24. Prior to his termination in June 2016, Terry was one of the Debtor's senior management employees who handled Acis and also had a partnership interest in Acis. After Terry was discovered surreptitiously tape recording internal meetings and conversations with numerous Highland personnel, he was terminated by the Debtor and subsequently asserted claims against Acis that went to arbitration. Terry ultimately obtained an arbitration award against Acis is the approximate amount of $8 million. Notably, although Terry asserted claims against the Debtor and other persons at Highland, the arbitration panel did not find liability against any party besides Acis.

25. Terry commenced involuntary chapter 7 bankruptcy cases against Acis in the Texas Bankruptcy Court in January 2018 on his own behalf. No other creditors joined in the petitions, which Terry asserted was appropriate on the basis that Acis had fewer than 12 creditors. The Debtor is a major prepetition creditor of Acis, owed in excess of $8 million for various contractual services provided to Acis before and after the Acis bankruptcy filings. Acis, the alleged debtor in those matters, objected to the involuntary bankruptcy filings and presented evidence from certain of the Debtor's employees relating to whether the technical requirements for involuntary bankruptcy filings were met. These objections were ultimately overruled by the Texas Bankruptcy Court, which decision remains on appeal. Acis's bankruptcy cases were later converted to chapter 11 and a chapter 11 trustee (Robin Phelan) (the "Acis Trustee") was appointed in May 2018. No Chief Restructuring Officer was ever appointed in the Acis cases, much less a CRO with expanded powers.

26. Subsequently, the Debtor and two of its related, affected parties in interest objected to the confirmation of a chapter 11 plan proposed by the Acis Trustee (and supported by

12

Appellee Appx. 00876
APPX. 10733

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 884 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 998 of 1828    PageID 10491
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 883 of 1803    PageID 11629

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 13 of 27

Terry) for a multitude of reasons, including that certain injunctive provisions were

inappropriately targeted at the Debtor and related parties.  The Texas Bankruptcy Court

ultimately overruled all objections and confirmed the plan in January 2019, which decision

remains on appeal.  During the course of the Acis bankruptcy cases, the Texas Bankruptcy Court

heard no material evidence from the Debtor's employees about the details of its business, assets,

or liabilities, aside from its prior involvement with Acis.  The Committee does not establish how

the prior testimony of the Debtor's representatives in the Acis bankruptcy is relevant to the

instant chapter 11 case.  Hence, the Texas Bankruptcy Court has no specialized knowledge with

respect to the Debtor generally or the issues that will be relevant in this chapter 11 case.

27.    Pursuant to the Acis Trustee's confirmed chapter 11 plan, Terry is Acis's

sole equity holder and controls and manages that entity.  The Acis Trustee had previously

commenced litigation in the Texas Bankruptcy Court against the Debtor and other parties for

breach of contract, breach of fiduciary duties, fraudulent transfers, and conspiracy, and has

sought to offset and/or subordinate the Debtor's claims against Acis.  In a nutshell, the causes of

action in that lawsuit revolve around the hotly contested allegations that the Debtor conspired to

strip Acis of its assets at Terry's expense.  Through his ownership and control of Acis pursuant

to the Acis Trustee's confirmed plan, Terry now controls these claims against the Debtor, which

remain at an early stage in the Texas Bankruptcy Court and have been stayed as to the Debtor.[7]

---

[7]  The defendants have filed motions to withdraw the reference as well as motions to dismiss.  The Texas
Bankruptcy Court held a status conference on the motions to withdraw the reference on September 4, 2019 and was
required to submit a "Report and Recommendation" to the United States District Court for the Northern District of
Texas.  As of the Petition Date, the Texas Bankruptcy Court had not issued its Report and Recommendation.  This
adversary proceeding is now subject to the automatic stay of 11 U.S.C. §362(a).  This proceeding has yet to reach
the procedural stage where any of the defendants have had to file their answers.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00877
APPX. 10734

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 885 of
Case 3:23-cv-00726-S Document 8-22 1804/29/23 Page 999 of 1828 PageID 10492
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 884 of 1803 PageID 11630

Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 14 of 27

28. The respective bankruptcy estates of Acis and the Debtor are adverse to each other. Acis has claims and pending litigation against the Debtor and the Debtor has outstanding claims against Acis that total no less than $8 million for services rendered. The various litigation claims of Acis against the Debtor are prepetition claims that have been stayed.

29. The Committee now seeks to move the Debtor's bankruptcy case to the Texas Bankruptcy Court -- Acis's "home court" -- in order to obtain some perceived litigation advantage. The Debtor objects to the Motion to Transfer as completely contrary to the interests of this estate.

<u>Legal Basis for Objection to Motion to Transfer</u>

A. **The Debtor's Case is Properly Venued in This District Because the Debtor is Organized in the State of Delaware**

30. The Debtor is a limited partnership formed under the laws of Delaware. Consequently, venue of this case is proper in Delaware as a matter of law under 28 U.S.C. § 1408. *See, e.g., In re Restaurants Acquisition I, LLC*, 2016 Bankr. LEXIS 684, at *6 (Bankr. D. Del. Mar. 4, 2016) ("Because the Debtor is organized under the laws of Delaware, this forum is proper under the statute."); *In re Innovative Communication Co., LLC*, 358 B.R. 120, 125 (Bankr. D. Del. 2006) ("Venue is appropriate in the state of incorporation, 28 U.S.C. § 1408(1), so venue is proper in Delaware with respect to the corporate Debtors."). The Committee does not (and cannot) challenge this point.

B. **The Debtor's Choice of Forum in Delaware is Entitled to Substantial Weight and Should Not Be Disturbed**

31. Given that venue in this District is legally proper, the Debtor's choice of this forum is entitled to great weight. *See, e.g., Restaurants Acquisition*, 2016 Bankr. LEXIS at

14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 886 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1000 of 1828    PageID 10493
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 885 of 1803   PageID 11631
Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 15 of 27

*7 ("movant bears the burden of demonstrating that the factors strongly weigh in favor of a

transfer as courts will generally grant substantial deference to a debtor's choice of forum"); *In re

Ocean Properties of Delaware, Inc.*, 95 B.R. 304, 305 (Bankr. D. Del. 1988) (same).  Therefore,

a court considering a venue transfer motion "should exercise its power to transfer cautiously, and

the party moving for the transfer must show by a preponderance of the evidence that the case

should be transferred."  *In re Commonwealth Oil Refining Co., Inc. (Commonwealth of Puerto

Rico v. Commonwealth Oil Refining Co., Inc.)*, 596 F.2d 1239, 1241 (5th Cir. 1979), *cert. denied*,

444 U.S. 1045 (1980) ("*CORCO*") (internal citations omitted); *accord In re Fairfield Puerto

Rico, Inc.*, 333 F. Supp. 1187, 1989 (D. Del. 1971) ("This Court should not freely abandon to

any other district its duty to determine a matter clearly within its jurisdiction."); *In re Rehoboth

Hospitality, LP*, 2011 WL 5024267, at *3 (Bankr. D. Del. 2011) ("The burden of proof is on the

moving party requesting transfer.").

32.     These principles apply with even greater force in a case such as this where

a Delaware-organized partnership seeks the protection of Delaware courts.  As noted above, over

99% of the Debtor's limited interests and 100% of its general partnership interests are held by

Delaware entities.  There is a "fundamental legal tenet that every citizen of a state is entitled to

take advantage of the state and federal judicial process available in that state."  *In re PWS

Holdings*, 1998 Bankr. LEXIS 549, at *14 (Bankr. D. Del. Apr. 28, 1998).  Further, "Delaware

has an interest in protecting the rights of its citizens," and correspondingly, change of venue can

only be granted upon a strong showing of equities favoring the transfer.  *Intel Corp. v. Broadcom

Corp.*, 167 F. Supp. 2d 692, 706 (D. Del. 2001).

DOCS_SF:102198.7 36027/002

Appellee Appx. 00879
APPX. 10744

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 887 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 1001 of 1828   PageID 10494
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 886 of 1803   PageID 11632

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 16 of 27

33.     Given the strong presumption that a debtor's choice of forum should not be disturbed, courts rarely grant such relief.  In those few cases where venue has been transferred, there was generally some unique compelling factor that justified transfer, such as the debtor's consent, the matter was a single asset real estate case, or there was non-stayed litigation that warranted consolidation of cases before a single court or judge.  None of these factors are present here.

34.     In fact, the various adversary claims pending against the Debtor that currently linger in the Texas Bankruptcy Court weigh strongly *against* a transfer of venue there. The claims asserted by Acis against the Debtor are prepetition claims that are stayed.  Whether those claims are ever unstayed, they are clearly adverse to the interests of the Debtor's estate, particularly where Acis is asserting such claims as a basis to offset and/or subordinate the large claims that the Debtor holds against Acis.  Notably, Acis is no longer affiliated with the Debtor. It is merely a litigation claimant.  Yet, the Committee chose to file the Motion to Transfer to the Texas Bankruptcy Court in order to achieve a litigation advantage at the expense of this estate. The Debtor urges the Court to see through this blatant litigation tactic which fails to come close to overcoming the strong presumption in favor of the Debtor's proper choice of venue in Delaware.

**C.     The Convenience of the Parties Weighs in Favor of Retaining Venue in Delaware**

35.     When a bankruptcy court is asked to transfer an entire bankruptcy case to another bankruptcy court, it must examine whether the transfer would be (a) in the interest of justice, or (b) the convenience of the parties.  28 U.S.C. § 1412.  In considering the "convenience

16

Appellee Appx. 00880
APPX. 10473

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 888 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23    Page 1002 of 1828  PageID 10495
Case 3:21-cv-00879-K  Document 21    Filed 07/28/21    Page 887 of 1803  PageID 11633

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 17 of 27

of the parties," courts have identified six factors, among others, to help guide their discretion.

These six factors are:

      i.  the economic administration of the estate;

     ii.  the location of the assets;

    iii.  the proximity of creditors of every kind to the court;

    iv.  the proximity of the debtor to the court;

     v.  the proximity of the witnesses necessary to the administration of the
estate; and

    vi.  the necessity for ancillary administration if liquidation should result.

*See, e.g., CORCO*, 596 F.2d at 1247; *Restaurants Acquisition*, 2016 Bankr. LEXIS at *7

(applying *CORCO* factors); *Innovative*, 358 B.R. at 125 (citing *CORCO* factors and other private

and public interests that may be relevant).  As discussed herein, the Committee has failed to meet

its "heavy burden of proof . . . to demonstrate that the balance of convenience weighs in [its]

favor." *Lionel Leisure, Inc. v. Trans Cleveland Warehouses, Inc. (In re Lionel Corp.)*, 24 B.R.

141, 142 (Bankr. S.D.N.Y. 1982).  Consequently, the Motion to Transfer must be denied.

### *i.   The Economic Administration of the Estate*

36.     The economic and efficient administration of the estate is the most

important factor when considering a motion to transfer venue.  *CORCO*, 596 F.2d at 1247; *In re*

*Caesars Entertainment Operating Co.*, 2015 Bankr. LEXIS 314, at *22 (Bankr. D. Del. Feb. 2,

2015); *In re Industrial Pollution Control, Inc.*, 137 B.R. 176, 182 (Bankr. W.D. Pa. 1992).

Despite the importance of this factor, however, the Committee makes little effort to explain why

<div align="center">17</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 889 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1003 of 1828   PageID 10496
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 888 of 1803   PageID 11634

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 18 of 27

the economic administration of the estate would be improved if this case was transferred, other

than to argue that the Texas Bankruptcy Court heard days of evidence in an unrelated matter of

questionable relevance to the chapter 11 proceedings at hand. *See* Motion to Transfer at ¶¶11 –

13, 29 – 31. The pendency of the Acis bankruptcy in the Texas Bankruptcy Court should not

form a basis for transferring venue for the following six (6) reasons.

      37.    First, the Debtor is now managed by the CRO, who is charged with

administering the restructuring efforts of the Debtors in this case and has independent authority

as to insider claims and insider transactions.  Whatever may have been said by the Debtor's

management in the context of the Acis bankruptcy is irrelevant to the tasks at hand in this case

that will be carried out by the CRO, an independent and highly qualified professional who has

had no involvement in the Acis cases.

      38.    Second, the evidence presented by the Debtor's employees in the Acis

bankruptcy cases is irrelevant to the case at hand.  Their testimony generally focused on (a)

whether Terry satisfied the legal requirements to file involuntary cases against Acis and (b) the

structure of actively managed CLOs.  None of this testimony by the Debtor's employees is

relevant to the Debtor's present chapter 11 case.  Acis was the sole branch of the Debtor's

affiliated structure that managed active CLOs.  As a result of the confirmed chapter 11 plan in

the Acis cases, Acis is no longer part of the Debtor's organizational structure.  The Debtor owns

no equity in Acis.  The Debtor no longer advises or sub-advises any active CLOs.  The Debtor

only has CLOs that are in liquidation -- monetizing their underlying assets and paying off their

remaining investors.  While the Texas Bankruptcy Court learned much about the complexities of

managing active CLOs, that information is irrelevant to this Debtor.

<div align="center">18</div>

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 890 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1004 of 1828 PageID 10497
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 889 of 1803 PageID 11635
Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 19 of 27

39.     Third, the core issue in the reorganization of Acis was maintaining the cash flows from Acis's managed CLOs. However, the CLOs currently managed by the Debtor provide just 10% of the Debtor's revenue, and that number will shrink over time as the CLOs liquidate. The Debtor derives the other 90% of its revenue from managing asset classes that were never implicated in the Acis proceeding, including private equity, mutual funds, open-ended retail funds, hedge funds, and real estate funds.

40.     Fourth, the Committee neither attaches evidence demonstrating what relevant facts the Texas Bankruptcy Court learned about the Debtor, nor explains how any such evidence could possibly implicate an insurmountable "learning curve" for this Court. *See* Motion to Transfer at ¶31. The Committee does not attach any of the 700 allegedly relevant exhibits or any of the testimony from the Acis proceeding. The Committee references three published opinions of the Texas Bankruptcy Court from the Acis proceeding, but provides no reasoning or even citations demonstrating how these opinions evidence the Texas Bankruptcy Court's purportedly extensive knowledge of the Debtor's current structure and management.

41.     Fifth, even assuming it learned anything relevant about the Debtor's corporate structure, the Texas Bankruptcy Court knows little about the details of the Debtor's business, assets, or liabilities, or its restructuring efforts. To the extent it addressed the Debtor's business, the evidence in the Acis proceeding focused on a CLO business that the Debtor no longer operates nor manages in any way. The evidence in the Acis proceeding never focused on the Debtor's assets and liabilities. Even at this early stage of the Debtor's chapter 11 case, this Court is already more familiar with the Debtor than the Texas Bankruptcy Court, which is appropriately charged with overseeing the Acis proceeding and not this one.

19

Appellee Appx. 00883
APPX. 10740

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 891 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1005 of 1828   PageID 10498
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 890 of 1803   PageID 11636

Case 19-12239-CSS   Doc 118   Filed 11/12/19   Page 20 of 27

42.   <u>Sixth</u>, the level of conflicts between the Debtor and Acis make the
economic and fair administration of this case in the Texas Bankruptcy Court highly problematic.
There is a pending adversary proceeding by Acis against the Debtor, which proceeding has been
stayed.  The Committee does not explain how the Texas Bankruptcy Court is supposed to preside
over the Debtor's estate and the pending adversary proceeding in the Acis case concurrently.[8]
Indeed, the only reason for the Committee to seek a transfer of venue to the Texas Bankruptcy
Court in the first place is to obtain some perceived litigation advantage *vis-à-vis* the Debtor's
estate, which is not a proper basis to transfer venue.[9]  Given the substantial adverse interests that
exist between the Debtor and Acis, the Debtor submits that this chapter 11 case can be much
more effectively administered by this Court.

### ii.   *The Location of the Assets*

43.   Although the Debtor's headquarters is located in Dallas, Texas and most
of its employees are based there, the Debtor's assets are widely dispersed all over the world.  The
Debtor has over $2.5 billion of assets under management and receives management and advisory
fees from a multitude of sources around the world.  The Debtor also provides shared services for
approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities,
including other affiliated registered investment advisors.  The Debtor's affiliates and related
parties maintain offices in many international locales, including Buenos Aires, Rio de Janeiro,

---

[8]  *See supra* n. 8.
[9]  As part of this ongoing litigation strategy, Acis has objected to the Debtor retaining Foley & Lardner LLP
("<u>Foley</u>") and Lynn, Pinker, Cox, & Hurst LLP ("<u>Lynn Pinker</u>") as counsel to pursue the Debtor's claims against
Acis and to defend the Debtor and certain of its wholly owned subsidiaries against Acis's claims.  *See* Dkt. 116.
Acis's objection to Foley and Lynn Pinker's retention does not even attempt to explain the benefit to the Debtor's
estate of stripping the Debtor of its counsel litigating both affirmative and defensive claims against Acis.  This
highlights the conflict that the Texas Bankruptcy Court would face in handling both the Acis and Highland matters.

20

DOCS_SF:102198.7 36027/002

Appellee Appx. 00884
APPX. 10749

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 892 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1006 of 1828 PageID 10499
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 891 of 1803 PageID 11637
Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 21 of 27

Singapore, and Seoul. And the Debtor has its own proprietary investment assets and those of its

clients held through various affiliates in Asia, South America, and Europe. The Debtor has

already filed the Foreign Representative Motion in order to assist the Debtor in managing its

various foreign interests.

44.     Similarly, the Debtor's principal assets in the United States consist of

custodial and non-custodial interests in investments located across the country. The Debtor has

brokerage accounts at Jefferies in New York City that hold the bulk of the Debtor's liquid and

illiquid securities. As of the Petition Date, the Debtor owed Jefferies approximately $30 million

on account of margin borrowings. The Debtor's other principal secured creditor, Frontier State

Bank, is based in Oklahoma City and is owed approximately $5.2 million as of the Petition Date.

Relatively speaking, the Debtor has minimal assets in Texas.

45.     Nonetheless, even if most of the Debtor's assets were construed to be

located in Texas (which they are not), numerous courts have found that the location of assets is

not a significant factor in deciding whether venue should be transferred unless the case involves

liquidation as opposed to rehabilitation or is a single asset real estate case. *See Restaurants

Acquisition*, 2016 Bankr. LEXIS at \*12 ("the location of a company's assets is not as crucial to

the analysis where the ultimate goal is rehabilitation rather than liquidation"); *In re Safety-Kleen

Corp.*, 2001 Bankr. LEXIS 1296, at \*10 (Bankr. D. Del. Aug. 27, 2001) ("location of assets is

generally only significant in a single asset real estate case or liquidation"); *see also In re Enron

Corp.*, 274 B.R. 327, 348 (Bankr. S.D.N.Y. 2002) ("[W]hile a debtor's location and the location

of its assets are often important considerations in single asset real estate cases, these factors take

on less importance in a case where a debtor has assets in various locations.").

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 893 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1007 of 1828   PageID 10500
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 892 of 1803   PageID 11638

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 22 of 27

46.     The outcome of this case will not turn on the day-to-day management of the Debtor's assets, but instead will be driven by the Debtor's ability to restructure its balance sheet and maximize the value of its assets, many of which are illiquid.  This Court will be focused on matters such as plan confirmation and governance, which the Debtor proposes to place into the capable hands of the CRO pursuant to the terms of the pending CRO Motion and subject to the guidelines set forth in the Protocols Motion.  Most of the objections to the key issues that will arise in this case will be grounded in the Bankruptcy Code and not based on any particular facts or circumstances unique to the Debtor's assets wherever located.  However, to the extent this Court gives weight to the location of the Debtor's assets, this factor weighs in favor of denying the Motion to Transfer because the Debtor's interests and assets are widely dispersed throughout the country and the world.

### iii.    *The Proximity of Creditors of Every Kind*

47.     The Committee spends a substantial portion of the Motion to Transfer evaluating the location of the Debtor's creditors and their professionals, and the relative amount of time that it takes to travel to this Court as compared to the Texas Bankruptcy Court.  This analysis is misguided and irrelevant under the circumstances of this case.  The Debtor does not have thousands of small or unsophisticated creditors who cannot navigate their way to Delaware. The creditors here are generally litigants or attorneys.  They are located in commercial centers all over the country.  The amounts at stake total hundreds of millions of dollars.  It is of no consequence whether a creditor or an attorney is based in Chicago, New York, or Los Angeles. The creditors and professionals involved in this case will travel wherever necessary in order to advocate their respective positions, and Delaware is certainly just as convenient as Dallas.

22

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 894 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 1008 of 1828    PageID 10501
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 893 of 1803   PageID 11639

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 23 of 27

*Caesars*, 2015 Bankr. LEXIS 314, at *23 ("in this day of law firms with multiple offices across

the nation, convenient and accessible airports, electronic access to information and court dockets

at every lawyer's fingertips, it is fair to say that both this [Delaware Bankruptcy] Court and the

Illinois Court are convenient forums for purposes of the *CORCO* analysis.").

48.    Further, one of the Committee members and the Debtor's largest creditor,

the Redeemer Committee, has commenced litigation that is pending in the Delaware Chancery

Court.  In fact, the main trigger for the Debtor's bankruptcy filing was a hearing set by the

Redeemer Committee in the Delaware Chancery Court to obtain a judgment on a $189 million

Award.  If Delaware is convenient enough for the Redeemer Committee, it is certainly an

appropriate forum for this case.  Daugherty is another allegedly significant creditor of the Debtor

who chose to commence litigation in Delaware Chancery Court, which matter commenced trial

just prior to the Petition Date.  UBS, another member of the Committee, has litigation pending

against the Debtor in New York.

49.    The bottom line is that in a case of the size and complexity of this one,

involving highly sophisticated and well-represented creditors, there is absolutely no reason to

transfer venue on the basis of the proximity of creditors to the Texas Bankruptcy Court.

### iv.   *The Proximity of the Debtor and Witnesses Necessary to the Administration of the Estate*

50.    As discussed in *CORCO*, the Court's consideration of the location of the

Debtor should focus on the proximity to the Court of the Debtor's employees and representatives

who must appear in court, not with the employees who conduct the day-to-day business activities

of the Debtor.  *CORCO*, 596 F.2d at 1248; *see also Restaurants Acquisition*, 2016 Bankr. LEXIS

DOCS_SF:102198.7 36027/002

Appellee Appx. 00887

APPX. 03742

at *11 ("Courts have noted the inquiry should focus primarily on the location of parties that must appear in court.").

51.    In this case, the CRO is expected to take the lead in managing the Debtor's restructuring efforts and testifying on behalf of the Debtor.  The CRO is a highly accomplished and independent professional based in Los Angeles who regularly appears in this Court and was previously chief restructuring officer in Delaware cases such as *Variant Holding Company LLC* before Judge Brendan Shannon and *Woodbridge Group of Companies LLC* before Judge Kevin Carey (retired).  Few Debtor employees should be required to testify in this case on a going forward basis and, even if they were, travel to this Court is easily accomplished and consistent with the many prior trips required of such employees by the Redeemer Committee and Daugherty in choosing to commence litigation in Delaware Chancery Court.  The Debtor's bankruptcy counsel also has an office in Delaware and has no need to hire local counsel here, whereas in Dallas, local counsel would need to be retained.

52.    Given what is at stake, the Debtor and its employees, including the CRO, are conveniently located within sufficient proximity of this Court such that this factor does not weigh in favor of a venue transfer to the Texas Bankruptcy Court.

*v.    The Necessity for Ancillary Administration if Liquidation Should Result*

53.    The final factor relates to the necessity for ancillary administration if liquidation should result.  As the courts in *CORCO*, *Enron* and *Fairfield Puerto Rico* recognized, "anticipation of the failure of the [Chapter 11] proceeding is an illogical basis upon which to predicate a transfer." *CORCO*, 596 F.2d at 1248; *see also Enron*, 274 B.R. at 349; *In re Fairfield Puerto Rico, Inc.*, 333 F. Supp. at 1191.  Indeed, "[t]his factor is often discounted by

24

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 896 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1010 of 1828 PageID 10503
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 895 of 1803 PageID 11641
Case 19-12239-CSS Doc 118 Filed 11/12/19 Page 25 of 27

courts." *Enron*, 274 B.R. at 343, n. 11. The Debtor's focus in this case is to propose a chapter
11 plan that will maximize value for all constituents, and the Committee offers no factual basis
for this Court to contemplate the failure of the Debtor's chapter 11 case. *See In re Fairfield
Puerto Rico, Inc.*, 333 F. Supp. at 1191. Accordingly, this factor does not favor transfer of
venue.

**D.      The Interest of Justice is Not Served By Transferring Venue**

54.      In determining whether a transfer would be "in the interest of justice," the
court should consider "whether transfer of venue will promote the efficient administration of the
estate, judicial economy, timeliness, and fairness." *Enron,* 274 B.R. at 387. These factors have
generally been discussed above and support keeping this case in Delaware. Additional concerns
that would speak to the "interest of justice" include facts such as the importance of a debtor to
the welfare and economic stability of a jurisdiction, and are not present in this case. *See
CORCO,* 596 F.2d at 1248 (even though the importance of the debtor, a major supplier of
petroleum to Puerto Rico, to the welfare and economic stability of Puerto Rico implicated
"interest of justice" considerations, the court determined not to transfer venue to Puerto Rico).

55.      As noted above, venue is legally proper in this Court and the Debtor is
entitled to substantial deference as to its choice of forum. But even if the Court considered the
interests of justice and the convenience of the parties, there is no legitimate basis to transfer this
case to the Texas Bankruptcy Court given the sophistication, complexity, and scope of the
Debtors' business, domestic and foreign assets, and creditor constituents, and pendency of
creditor actions in the Delaware Chancery Court and New York.

DOCS_SF:102198.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 897 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 1011 of 1828  PageID 10504
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 896 of 1803  PageID 11642

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 26 of 27

56.    The Texas Bankruptcy Court is also the venue where the unaffiliated and adverse bankruptcy case of Acis has been pending.  Acis has asserted fraudulent transfer and other disputed claims against the Debtor, which claims are all prepetition in nature.  The Debtor, in turn, has contract claims against Acis totaling in excess of $8 million.  The efficient administration of this estate, judicial economy, timeliness, and fairness would not be served by having the Texas Bankruptcy Court adjudicate these countervailing claims and interests.  The interests of justice also would not be served by transferring venue in order for the Committee to realize a tactical litigation advantage before the Texas Bankruptcy Court.

57.    For all these reasons, the Debtor urges this Court to maintain venue of this case in Delaware.

WHEREFORE, the Debtor respectfully requests that this Court enter an order denying the Motion to Transfer and granting such other and further relief as this Court deems appropriate.

DOCS_SF:102198.7 36027/002

Appellee Appx. 00890

APPX. 10755

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 898 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1012 of 1828    PageID 10505
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 897 of 1803    PageID 11643

Case 19-12239-CSS    Doc 118    Filed 11/12/19    Page 27 of 27

Dated:  November 12, 2019                    PACHULSKI STANG ZIEHL & JONES LLP

                                            /s/ James E. O'Neill
                                            Richard M. Pachulski (CA Bar No. 62337)
                                            Jeffrey N. Pomerantz (CA Bar No.143717)
                                            Ira D. Kharasch (CA Bar No. 109084)
                                            Maxim B. Litvak (CA Bar No. 215852)
                                            James E. O'Neill (DE Bar No. 4042)
                                            919 North Market Street, 17th Floor
                                            Wilmington, DE 19899 (Courier 19801)
                                            Telephone: (302) 652-4100
                                            Facsimile:  (302) 652-4400
                                            E-mail:     rpachulski@pszjlaw.com
                                                        jpomerantz@pszjlaw.com
                                                        ikharasch@pszjlaw.com
                                                        mlitvak@pszjlaw.com
                                                        joneill@pszjlaw.com

                                            *Proposed Counsel for the Debtor
                                            and Debtor in Possession*

DOCS_SF:102198.7 36027/002

Appellee Appx. 00891
APPX. 10758

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 899 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1013 of 1828   PageID 10506
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 898 of 1803   PageID 11644

# APPENDIX 12

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 900 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1014 of 1828    PageID 10507
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 899 of 1803    PageID 11645
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 1 of 18

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

## MOTION OF THE DEBTOR FOR APPROVAL OF SETTLEMENT
## WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING
## GOVERNANCE OF THE DEBTOR AND
## PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") files this

motion (the "<u>Motion</u>") for the entry of an order (the "<u>Order</u>") approving the terms of a settlement

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 901 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1015 of 1828   PageID 10508
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 900 of 1803   PageID 11646
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 2 of 18

between the Debtor and the Committee (as defined below) regarding governance of the Debtor

and procedures for operations in the ordinary course of business, as embodied in the term sheet

attached hereto as **Exhibit A** (the "Term Sheet").  In support of this Motion, the Debtor respectfully

represents as follows:

### Preliminary Statement

1.     Following weeks of negotiations, the Debtor and the Committee have

reached a proposed settlement, which contemplates the creation of a new independent board of

directors (the "Independent Directors") at Strand Advisors, Inc. ("Strand"), the Debtor's general

partner and ultimate party in control, and the implementation of certain protocols governing the

operation of the Debtor's business in the ordinary course.  The Independent Directors will consist

of the following three highly qualified and independent individuals:  James Seery, John Dubel,

and a third director to be selected by or otherwise acceptable to the Committee.[2]  Two of the

Independent Directors were chosen by the Committee and the third Independent Director will be

selected by or otherwise acceptable to the Committee.  Background information for each of the

Independent Directors is attached hereto as **Exhibit B**.

2.     Pursuant to the Term Sheet, and effective upon entry of the Order, James

Dondero will no longer be a director, officer, managing member, or employee of the Debtor or

Strand and will have no authority, directly or indirectly, to act on the Debtor's behalf.  Going

forward, the Independent Directors, through Strand, will have sole and exclusive management and

control of the Debtor.  The Independent Directors will have the discretion to appoint an interim

---

[2] The Committee's agreement to the Term Sheet in its entirety is contingent upon the selection of a third
Independent Director acceptable to the Committee.  In the event the Committee and the Debtor cannot reach an
agreement on an acceptable Independent Director to fill the third seat of the Board of Directors, the Term Sheet shall
be null and void.

Appellee Appx. 00894
APPX. 10759

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 902 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 1016 of 1828   PageID 10509
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 901 of 1803   PageID 11647
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 3 of 18

Chief Executive Officer (the "CEO") who will manage the Debtor's day-to-day business operations. Subject to Court approval, the Debtor still intends to retain Development Specialists, Inc. ("DSI") to provide a Chief Restructuring Officer (the "CRO") that will serve at the direction of the Independent Directors (or CEO, if appointed).

3.      It bears emphasis that the Independent Directors will not be mere figureheads. The Debtor and the Committee envision that the Independent Directors will be actively involved and intimately familiar with all material aspects of the Debtor's business and restructuring efforts. Moreover, with guidance of the CRO and CEO (if appointed), the Independent Directors will endeavor to prevent any negative influence Mr. Dondero or any of his affiliates or agents may have on the Debtor and its employees. Further, as part of the Term Sheet, the Committee will be granted standing to pursue estate claims against Mr. Dondero and other former insiders of the Debtor who were not employed by the Debtor as of the execution of the Term Sheet. The Committee will also retain the right to move for a chapter 11 trustee.

4.      In sum, the Term Sheet resolves months of litigation between the Debtor and the Committee over the Debtor's governance structure and operating protocols, allowing all parties to refocus on a path forward for this chapter 11 case. With the Independent Directors in place, the Debtor can move forward expeditiously, efficiently, and effectively with the substantive aspects of this case and consider any available restructuring options that will maximize value for all constituents. The Debtor therefore urges the Court to approve the Term Sheet and allow the key economic interest holders to proceed with a productive restructuring effort.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00895
Appx. 03752

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 903 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1017 of 1828   PageID 10510
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 902 of 1803   PageID 11648
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 4 of 18

**Jurisdiction and Venue**

5.      The United States Bankruptcy Court for the District of Northern District of

Texas, Dallas Division (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105(a) and

363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

**Background**

8.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District

of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9.      To assist and coordinate the restructuring process, the Debtor retained DSI

and Bradley D. Sharp to serve as the CRO on October 7, 2019.  On October 29, 2019, the Debtor

filed the *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain*

*Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and*

*Financial Advisory and Restructuring Related Services, Nunc Pro Tunc as of the Petition Date*

[Docket No. 74] (the "CRO Motion") seeking to formally retain the CRO.  The CRO Motion

remains pending, and the Debtor is filing a supplement to the CRO Motion concurrently herewith.

10.      On October 29, 2019, the Official Committee of Unsecured Creditors (the

"Committee") was appointed by the U.S. Trustee in the Delaware Court.  On November 12, 2019,

the Committee filed an omnibus objection to the CRO Motion, cash management motion, and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 904 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1018 of 1828 PageID 10511
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 903 of 1803 PageID 11649
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 5 of 18

motion for approval of ordinary course protocols [Docket No. 130] (the "Committee Objection"),

raising various concerns regarding the Debtor's governance and business practices.

11.     On December 4, 2019, the Delaware Court entered an order transferring

venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[3] The Debtor has continued

in the possession of its property and has continued to operate and manage its business as a debtor

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or

examiner has been appointed in this chapter 11 case.

12.     On December 23, 2019, the U.S. Trustee filed a motion in this Court to

appoint a chapter 11 trustee for the Debtor [Docket No. 271] (the "Trustee Motion"). Although

the Debtor will be filing a separate response to the Trustee Motion, it suffices to say that the Trustee

Motion (filed without even considering the proposed Term Sheet) completely lacks merit given

the governance changes and other resolutions encompassed in the Term Sheet agreed to by the

Committee, as the representative of the primary economic stakeholders here.

**Terms of the Proposed Settlement**

13.     Pursuant to the Term Sheet, the Debtor and the Committee have agreed to:

(a) implement certain changes to the Debtor's governance, including the appointment of the

Independent Directors; (b) provide the Committee with additional transparency into the operation

of the Debtor's business; (c) retain the CRO on updated terms; and (d) implement certain protocols

governing the ordinary course business operations of the Debtor. The terms of this agreement are

contained in the Term Sheet.[4] A summary of the Term Sheet is as follows:

---

[3] All docket numbers refer to the docket maintained by this Court.

[4] In the event of any inconsistency between the summary of the Term Sheet contained herein and the Term Sheet, the Term Sheet will govern.

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 905 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1019 of 1828   PageID 10512
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 904 of 1803   PageID 11650
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 6 of 18

**Independent Directors**

The Debtor's general partner, Strand will appoint the following three (3) Independent Directors: James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached to the Term Sheet (the "Governing Documents"), which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

The Independent Directors shall be compensated in a manner to be determined, with an understanding that the source of funding, whether directly or via reimbursement, will be the Debtor.

As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether a CEO should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.

The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also

DOCS_NY:39973.7 36027/002

**Appellee Appx. 00898**
**APPX. 10753**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 906 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1020 of 1828    PageID 10513
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 905 of 1803    PageID 11651
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 7 of 18

|  | participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
|---|---|
| **Role of Mr. James Dondero** | Upon approval of the Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | Bradley Sharp and DSI shall, subject to approval of the Court, be retained as the CRO to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO.   Mr. Sharp's and DSI's retention is subject to this Court's approval.  The Debtor has filed the CRO Motion, as supplemented as of the date hereof, which requests authority to retain Mr. Sharp and DSI.[5] |
|  | DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Mark Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached to the Term Sheet, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol"). |
|  | Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are |

---

[5] For the avoidance of doubt, the Debtor is not seeking retention of the CRO pursuant to this Motion.  The Debtor is seeking such relief pursuant to the CRO Motion (as supplemented).

DOCS_NY:39973.7 36027/002

Appellee Appx. 00899
Appx. 10756

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 907 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1021 of 1828   PageID 10514
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 906 of 1803   PageID 11652
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 8 of 18

within the Debtor's possession, custody, or control ("<u>Shared Privilege</u>").

With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege.  The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver.

**Reporting Requirements**          The Debtor shall be subject to and comply with the reporting requirements attached to the Term Sheet, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "<u>Reporting Requirements</u>").

**Plan Exclusivity**          The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code.

**Operating Protocols**          The Debtor shall comply with the operating protocols attached to the Term Sheet, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order (the "<u>Operating Protocols</u>" and, together with the Reporting Requirements, the "<u>Protocols</u>").

14.     By this Motion, the Debtor is seeking the Court's approval of the Term Sheet, the terms contained therein, and the exhibits attached thereto.  For the avoidance of doubt, approval of the Term Sheet includes the approval of the following:

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 908 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1022 of 1828    PageID 10515
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 907 of 1803    PageID 11653
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 9 of 18

- <u>Independent Directors</u>:  The appointment of James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee as the Independent Directors of Strand, the Debtor's general partner, with power to oversee the operations of the Debtor as set forth in the Term Sheet.  Mr. Seery and Mr. Dubel were selected by the Committee, and the Debtor agreed to their appointment as Independent Directors.  The Debtor is also seeking approval of the Governing Documents appointing the Independent Directors, to the extent required, and the authority to compensate the Independent Directors either directly from the assets of the Debtor or via the reimbursement of Strand of any compensation paid to the Independent Directors.

- <u>Document Management and Preservation</u>:  The implementation of the Document Production Protocol, which will govern how the Debtor retains and produces documents and information to the Committee during the pendency of its bankruptcy case.  The Debtor is also agreeing to the allow the Committee to access certain documents that are otherwise subject to the Shared Privilege to assist the Debtor in investigating the Estate Claims.

- <u>Estate Claims</u>.  The Debtor has agreed to grant the Committee standing to pursue any Estate Claims.  Estate Claims do not include claims or causes of action against any current employees of the Debtor; however, if any employee ceases to be employed by the Debtor, the Committee will have standing to pursue claims against such former employee.

- <u>Reporting Requirements and Operating Protocols</u>:  The Debtor has agreed to provide certain reporting to the Committee and to operate under certain protocols, which set forth the parameters of how the Debtor can conduct its business without the requirement of Court approval.  The Protocols provide, in certain circumstances, how the CRO and the Independent Directors will oversee the Debtor's operations.  The purpose of the Protocols is to allow the Debtor to function in the ordinary course of its business while providing transparency to the Committee.

15.     The Debtor believes that appointing the Independent Directors and otherwise effectuating the terms of the Term Sheet is in the best interests of the Debtor, its estate, and its creditors.   The Term Sheet will allow the Debtor to proceed with a productive reorganization effort that will maximize value for all constituents.  Accordingly, the Debtor seeks approval of the Term Sheet.

## Relief Requested

16.     By this Motion, the Debtor seeks entry of an order pursuant to sections 105(a), 363(b)(1), and 363(c)(1) of the Bankruptcy Code and Bankruptcy Rule 9019: (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

Appellee Appx. 00901

APPX. 10756

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 909 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1023 of 1828 PageID 10516
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 908 of 1803 PageID 11654
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 10 of 18

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of

the Term Sheet, including entering into the Governing Documents and compensating – either

directly or through reimbursement – the Independent Directors; (c) granting the Committee

standing to pursue the Estate Claims; and (d) granting related relief.

### Authority for the Relief Requested

**A.      Section 363(c)(1) of the Bankruptcy Code Authorizes the Debtor to Enter
Into Certain Aspects of the Term Sheet in the Ordinary Course**

17.      Because the Debtor is not settling any claims or causes of action through

the Term Sheet or otherwise expending estate resources, the Debtor believes that it has the

authority to effectuate the majority of the transactions and compromises set forth in the Term Sheet

without Court approval under section 363(c)(1) of the Bankruptcy Code.  Specifically, section

363(c)(1) provides:

> [i]f the business of the debtor is authorized to be operated under
> section. . . 1108. . . of this title. . . the trustee may enter into
> transactions, including the sale or lease of property of the estate, in
> the ordinary course of business, without notice or a hearing, and may
> use property of the estate in the ordinary course of business without
> notice or a hearing.

11 U.S.C. § 363(c)(1).  As such, a debtor may engage in postpetition actions if the debtor is

authorized to operate its business under section 1108 and such transactions are "in the ordinary

course of business."

18.      An activity is "ordinary course" if it satisfies both the "horizontal test" and

the "vertical test."  *See, e.g., Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd.* (*In re Denton Cty.*

*Elec. Coop.*), 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002); *see also In re Roth American, Inc.*,

975 F.2d 949, 952 (3d Cir. 1992).  The vertical test looks to "whether the transaction subjects a

DOCS_NY:39973.7 36027/002

Appellee Appx. 00902
Appx. 10759

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 910 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1024 of 1828   PageID 10517
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 909 of 1803   PageID 11655
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 11 of 18

hypothetical creditor to a different economic risk than existed when the creditor originally extended credit." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). The horizontal test considers "whether the transaction was of the sort commonly undertaken by companies in the industry." *Id.* Here, both the vertical test and horizontal test are satisfied.

19.     Under the Term Sheet, the Debtor is seeking authority to (a) appoint the Independent Directors at Strand (a non-debtor entity), (b) have Mr. Dondero removed from his role at the Debtor and Strand; (c) agree to seek the retention of the CRO under a revised engagement letter that provides that the CRO will report to the Independent Directors; (d) grant the Committee standing to pursue the Estate Claims; (e) enter into and implement the Document Production Protocols; (f) grant the Independent Directors the exclusive right to determine whether to waive exclusivity; and (g) enter into and implement the Protocols.  Only the compensation of the Independent Directors, the entrance into the Protocols (which provide the Committee with certain right to object to the Debtor engaging in a "Transaction" (as defined in the Protocols) and allow the Debtor to seek a hearing before this Court on an expedited basis), and the grant of standing to the Committee to pursue Estate Claims could be construed as outside of the ordinary course of business.  The balance of the terms of the Term Sheet either involve non-debtors[6] or will be the subject of separate motions seeking Court approval at the appropriate time.

**B.      The Court Should Approve the Term Sheet Under
         Rule 9019 of the Bankruptcy Code**

20.     Although the Debtor believes that it has authority to implement the majority of the Term Sheet in the ordinary course of its business under section 363(c), the Debtor is seeking

---

[6] With respect to the Independent Directors, they are being appointed to a new independent board of Strand, the Debtor's general partner, and Strand is not a debtor in this case or subject to this Court's jurisdiction.

Appellee Appx. 00903

APPX. 10766

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 911 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1025 of 1828    PageID 10518
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 910 of 1803    PageID 11656
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 12 of 18

this Court's approval of the Term Sheet under section 105 of the Bankruptcy Code and Rule 9019

of the Bankruptcy Rules out of an abundance of caution.  Section 105(a) of the Bankruptcy Code

provides in relevant part that "[t]he court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section

105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers

to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the

Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex

rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc); *see also Southmark

Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 (5th Cir. 1995) (stating that section

105(a) of the Bankruptcy Code "authorizes bankruptcy courts to fashion such orders as are

necessary to further the substantive provisions of the Code").

> 21.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court
> may approve a compromise or settlement.  Notice shall be given to
> creditors, the United States trustee, the debtor, and indenture
> trustees as provided in Rule 2002 and to any other entity as the
> court may direct.

Fed. R. Bankr. P. 9019(a).

> 22.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases*.  Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also

Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 912 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1026 of 1828 PageID 10519
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 911 of 1803 PageID 11657
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 13 of 18

a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best

interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately,

"approval of a compromise is within the sound discretion of the bankruptcy court." *See United*

*States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*,

624 F.2d at 602–03.

23.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-party test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Committee of Unsecured Creditors v. Cajun Elec. Power*

*Coop. by & through Mabey (In re Cajun Elec. Power Coop.)*, 119 F. 3d 349, 356 (5th Cir. 1997)

(citing *Jackson Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the

following factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of

the compromise." *Id.*

24.     Under the rubric of the third factor referenced above, the Fifth Circuit has

specified two additional factors that bear on the decision to approve a proposed settlement. First,

the court should consider "the paramount interest of creditors with proper deference to their

reasonable views." *Id.; Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg.*

*Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which

the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age*

*Ref. Inc.*, 801 F.3d at 540; Foster Mortg. Corp., 68 F.3d at 918 (citations omitted).

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 913 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1027 of 1828   PageID 10520
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 912 of 1803   PageID 11658
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 14 of 18

25.     Here, the Debtor submits that effectuating the transactions set forth in the Term Sheet satisfies the Fifth Circuit's three-part test.  The settlement embodied in the Term Sheet was driven in large part by the Debtor's creditors and has the support of the Committee, which consists of the Debtor's principal creditors.  The Term Sheet was negotiated at arm's length, and there was no fraud or collusion in its negotiation.  The settlement is also fair and reasonable and in the best interests of the Debtor's estate and also resolves the open disputes regarding the CRO Motion, the *Motion of Debtor for Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System, (B) Continued Use of the Prime Account, (C) Limited Waiver*, as supplemented [Docket Nos. 51 & 259], and *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76].

26.     The Debtor and members of the Committee have been entangled in highly contentious litigation that has spanned many years and multiple venues.  As evidenced by the brief history of the Debtor's bankruptcy case,[7] that contention and mistrust has carried over into this proceeding and could derail any chance that the Debtor has to successfully reorganize and structure a plan to pay its creditors.  The governance and operational changes set forth in the Term Sheet, will provide greater transparency to the Committee and start the process of rebuilding the trust necessary to negotiate a successful resolution of this case.  Without the Term Sheet, the Debtor

---

[7] *See, e.g., Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 11], *Motion of the Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the  United States Bankruptcy Court for the Northern District of Texas* [Docket No. 85], *Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtor's (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officers, and (III) Precautionary Motion for Approval of Protocol for "Ordinary Course" Transactions* [Docket No. 130], and *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 271].

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 914 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1028 of 1828   PageID 10521
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 913 of 1803   PageID 11659
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 15 of 18

anticipates that the Committee would move to appoint a chapter 11 trustee and the U.S. Trustee

has already done so (without even seeing the Term Sheet).  The Debtor will contest such motions

because the appointment of a chapter 11 trustee could gravely harm the Debtor's business.  The

implementation of the Term Sheet will head off any potential issues that could arise, eliminate

costly, time consuming and uncertain litigation, and give the Debtor sufficient breathing room to

work towards rebuilding trust with its creditor body and allow the Debtor to exit bankruptcy and

preserve the value of its business.  The Debtor's bankruptcy case has been pending for over two

and a half months, and it is time for the parties to put the acrimony that marked the initial stages

of this case behind them and to move forward in a productive manner – precisely what the Term

Sheet seeks to accomplish.

C.     **Consummating the Settlement Agreement
       is a Sound Exercise of the Debtors' Business Judgment.**

27.    Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession

to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after

notice and a hearing.  It is well established in this jurisdiction that a debtor may use property of

the estate outside the ordinary course of business under this provision if there is a good business

reason for doing so.  *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d

593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to

the debtor, creditors, and equity holders, there must be some articulated business justification for

using, selling, or leasing the property outside the ordinary course of business.") (*quoting In re

Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex.

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 915 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1029 of 1828 PageID 10522
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 914 of 1803 PageID 11660
Case 19-34054-sgj11 Doc 281 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 16 of 18

2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

28.     The transactions contemplated by the Term Sheet are within the sound business judgment of the Debtor.  The Term Sheet resolves potentially costly and protracted litigation with the Committee over the Debtor's corporate governance and will give the Debtor the breathing room necessary to negotiate and effectuate the terms of a plan acceptable to the Debtor's creditors.  Further, providing standing to the Committee to investigate Estate Claims and the payment of the Independent Directors from the assets of the estate are each necessary components of the Term Sheet.  The Committee would not have agreed to the Term Sheet without the grant of standing to investigate Estate Claims.  Moreover, Strand, a non-debtor, is unable to cover the costs of the Independent Directors.  As such, there is a good business reason for the Debtor's payment of the Independent Directors' compensation: the Term Sheet and the appointment of the Independent Directors would not have been agreed to or possible without that condition.[8]  The foregoing is sufficient grounds to approve the Term Sheet and authorize the Debtor to effectuate the terms of the Term Sheet under Section 363(b)(1).

### No Prior Request

29.     No previous request for the relief sought herein has been made to this, or any other, Court.

---

[8] Further, although the Debtor seeks to reimburse Strand for the cost of the Independent Directors, the Debtor is otherwise obligated to reimburse Strand for any costs or expenses incurred by Strand in its management of the Debtor. *See* Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., § 3.10(b).

DOCS_NY:39973.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 916 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1030 of 1828   PageID 10523
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 915 of 1803   PageID 11661
Case 19-34054-sgj11 Doc 281 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 17 of 18

## <u>Notice</u>

30.     Notice of this Motion shall be given to the following parties or, in lieu

thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of

the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured

parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy

Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or

further notice need be given.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests

that the Court enter an Order, substantially in the form attached hereto as **<u>Exhibit C</u>**, (a) approving

the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of

the Term Sheet, including entering into the Governing Documents and compensating – either

directly or through reimbursement – the Independent Directors; and (c) granting related relief.

DOCS_NY:39973.7 36027/002

Appellee Appx. 00909
Appx. 10776

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 917 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1031 of 1828    PageID 10524
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 916 of 1803    PageID 11662
Case 19-34054-sgj11 Doc 281 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 18 of 18

Dated:  December 27, 2019                    PACHULSKI STANG ZIEHL & JONES LLP
                                             Jeffrey N. Pomerantz (CA Bar No.143717)
                                             (*admitted pro hac vice*)
                                             Ira D. Kharasch (CA Bar No. 109084)
                                             (*admitted pro hac vice*)
                                             Maxim B. Litvak (Texas Bar No. 24002482)
                                             Gregory V. Demo (NY Bar No. 5371992)
                                             (*admitted pro hac vice*)
                                             10100 Santa Monica Blvd., 13th Floor
                                             Los Angeles, CA 90067
                                             Telephone: (310) 277-6910
                                             Facsimile: (310) 201-0760
                                             E-mail:    jpomerantz@pszjlaw.com
                                                        ikharasch@pcszjlaw.com
                                                        mlitvak@pszjlaw.com
                                                        gdemo@pszjlaw.com

                                             -and-

                                             */s/ Melissa S. Hayward*
                                             HAYWARD & ASSOCIATES PLLC
                                             Melissa S. Hayward
                                             Texas Bar No. 24044908
                                             MHayward@HaywardFirm.com
                                             Zachary Z. Annable
                                             Texas Bar No. 24053075
                                             ZAnnable@HaywardFirm.com
                                             10501 N. Central Expy, Ste. 106
                                             Dallas, Texas 75231
                                             Tel: (972) 755-7100
                                             Fax: (972) 755-7110

                                             *Counsel and Proposed Counsel for the Debtor and*
                                             *Debtor in Possession*

DOCS_NY:39973.7 36027/002

Appellee Appx. 00910
Appx. 10773

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 918 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1032 of 1828   PageID 10525
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 917 of 1803   PageID 11663
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 1 of 61

**<u>Highland Capital Management, L.P.</u>**

**Preliminary Term Sheet**

  This term sheet ("<u>Term Sheet</u>") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "<u>Debtor</u>") and the Official Committee of Unsecured Creditors (the "<u>Committee</u>") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "<u>Chapter 11 Case</u>"), pending in the Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125].  This Term Sheet shall be subject to approval by the Bankruptcy Court.

| Topic | Proposed Terms |
|---|---|
| **Parties** | Highland Capital Management, L.P. (the "<u>Debtor</u>").<br><br>The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "<u>Committee</u>"). |
| **Independent Directors** | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "<u>Independent Directors</u>"): James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee.  The Independent Directors will be granted exclusive control over the Debtor and its operations.  Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).<br><br>The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 919 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1033 of 1828   PageID 10526
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 918 of 1803   PageID 11664
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 2 of 61

| | source of funding, whether directly or via reimbursement, will be the Debtor. |
| | |
| | As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "CEO") should be appointed for the Debtor.  If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors.  Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court. |
| | |
| | The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("CRO") to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO.  The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**. |
| | |
| | DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 920 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1034 of 1828   PageID 10527
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 919 of 1803   PageID 11665
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 3 of 61

| | include any estate claim or cause of action against any then-current employee of the Debtor. |
|---|---|
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "<u>Document Production Protocol</u>").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("<u>Shared Privilege</u>").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "<u>Reporting Requirements</u>"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 921 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1035 of 1828   PageID 10528
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 920 of 1803   PageID 11666
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 4 of 61

| Reservation of Rights | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date.  Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |
|---|---|

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 922 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1036 of 1828   PageID 10529
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 921 of 1803   PageID 11667
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 5 of 61

**Exhibit A**

**Debtor's Corporate Governance Documents**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 923 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1037 of 1828   PageID 10530
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 922 of 1803   PageID 11668
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 6 of 61

## Exhibit B

**Amended DSI Retention Letter**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 924 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1038 of 1828   PageID 10531
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 923 of 1803   PageID 11669
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 7 of 61

**<u>Exhibit C</u>**

**Document Production Protocol**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 925 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1039 of 1828    PageID 10532
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 924 of 1803    PageID 11670
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 8 of 61

*PSZJ Revisions 12/23/19*
*Privileged & Confidential*
*Subject to FRE 408*

<u>**Exhibit D**</u>

**Reporting Requirements**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 926 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1040 of 1828 PageID 10533
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 925 of 1803 PageID 11671
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 9 of 61

## WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR

## OF

## STRAND ADVISORS, INC.

[ _____ ]

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

I.     AMENDMENT OF BYLAWS

WHEREAS, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

WHEREAS, pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors; and

NOW, THEREFORE, BE IT RESOLVED, that the Bylaws Amendment is hereby authorized and approved and the Board is increased from one (1) to three (3) directors;

RESOLVED FURTHER, that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

RESOLVED FURTHER, that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

II.     ELECTION OF DIRECTORS

WHEREAS, the Stockholder desires to appoint James Seery, John Dubel, and _____ to the Board and desires that such individuals constitute the whole Board;

NOW, THEREFORE, BE IT RESOLVED, that James Seery, John Dubel, and _____, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

RESOLVED FURTHER, that any officer of the Company is authorized to take any such actions as

DOCS_DE:227001.2 36027/002

Exhibit A
Appellee Appx. 00919
APPX. 10734

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 927 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1041 of 1828   PageID 10534
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 926 of 1803   PageID 11672
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 10 of 61

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

**RESOLVED FURTHER**, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

**RESOLVED FURTHER**, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

### III.   STIPULATION WITH THE BANKRUPTCY COURT

**WHEREAS**, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

**WHEREAS**, the Company is the general partner for HCMLP;

**WHEREAS**, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

**WHEREAS**, the Company and the Stockholder wish to enter into a stipulation with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by this resolutions to be re-elected at upon the expiration of his or her term; and (c) upon the death, disability, or resignation of _____, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and acceptable to the Stockholder and the Committee (the "Stipulation");

**WHEREAS,** for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

**WHEREAS,** it is in the intent of the parties that the Stipulation will no longer be effective or bind Strand or the Stockholder following the termination of the Bankruptcy Case.

**NOW, THEREFORE, BE IT RESOLVED**, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 928 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1042 of 1828   PageID 10535
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 927 of 1803   PageID 11673
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 11 of 61

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 929 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1043 of 1828 PageID 10536
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 928 of 1803 PageID 11674
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 12 of 61

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**

_____

James Dondero

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 930 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1044 of 1828   PageID 10537
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 929 of 1803   PageID 11675
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 13 of 61

### First Amendment to Bylaws of
### Strand Advisors, Inc.

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.** Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.** The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the stockholders, (y) a retired bankruptcy judge and nominated jointly by the stockholders and any official committee of unsecured creditors in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Committee") currently pending in the Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11; or (z) nominated by the Committee and reasonably acceptable to the stockholders.

**3.** The following shall be added as Section 7 to Article III of the Bylaws:

Section 7. Removal of Directors.  Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 931 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1045 of 1828 PageID 10538
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 930 of 1803 PageID 11676
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 14 of 61

IN WITNESS WHEREOF, the Company has caused this amendment to be signed this [ __ ]
day of [ __ ], 20__.

### STRAND ADVISORS, INC.

_____

By: Scott Ellington
Its: Secretary

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 932 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1046 of 1828    PageID 10539
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 931 of 1803    PageID 11677
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 15 of 61

## INSERT STRAND ADVISORS, INC. LETTERHEAD

[ _____ ]

[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

**Re:**    **Strand Advisors, Inc. – Director Agreement**

Dear [ _____ ]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

**1.    APPOINTMENT TO THE BOARD OF DIRECTORS.**

a.    Title, Term and Responsibilities.

i.    Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

ii.    You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding pending in the Northern District of Texas (the "Bankruptcy"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

b.    Mandatory Board Meeting Attendance. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board and no fewer than fifty percent (50%) of these meetings of the Board in person, and no more than fifty percent (50%) of such meetings by telephone or teleconference. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

c.    Independent Contractor. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

d.    Information Provided by the Companies. The Company shall: (i) provide you with reasonable access to management and other representatives of the Company, except to the extent that any such access may impair any attorney client privilege to which the Company may be entitled; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows,

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 933 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1047 of 1828    PageID 10540
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 932 of 1803    PageID 11678
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 16 of 61

properties, financial condition and prospects of the Company that you reasonably request in connection with the services to be provided to the Company. You will rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns. You are under no obligation to update data submitted to you or to review any other information unless specifically requested by the Board to do so.

2.    **COMPENSATION AND BENEFITS.**

a.    Retainer. The Company will pay you a retainer for each month you serve on the Board (the "Retainer") to be paid in monthly installments of $[TBD]. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b.    Expense Reimbursement. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c.    Invoices; Payment.

i.    In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment will be due to you within 10 business days after receipt of each such invoice, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii.    You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d.    Indemnification; D&O Insurance. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated December 5, 2019, a copy of which is attached hereto as **Appendix A** (the "Indemnification Agreement"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e.    Tax Indemnification. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3.    **PROPRIETARY INFORMATION OBLIGATIONS.**

a.    Proprietary Information. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

Appellee Appx. 00926
APPX. 10793

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 934 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1048 of 1828 PageID 10541
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 933 of 1803 PageID 11679
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 17 of 61

      b.    <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose itto anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

      c.    <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

## 4. OUTSIDE ACTIVITIES.

      a.    <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

      b.    <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

      c.    <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

## 5. TERMINATION OF DIRECTORSHIP.

      a.    <u>Voluntary Resignation, Removal Pursuant to Bylaws and Stockholder Action</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law or by an affirmative vote of a majority of the stockholders of the Company.

      b.    <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

      c.    <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

## 6. GENERAL PROVISIONS.

      a.    <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

Appellee Appx. 00927
APPX. 10794

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 935 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1049 of 1828   PageID 10542
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 934 of 1803   PageID 11680
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 18 of 61

b.      Entire Agreement. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

c.      Successors and Assigns. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder without the written consent of the Company.

d.      Governing Law. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**




By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

**Appellee Appx. 00928**
**Appx. 10793**

**ACCEPTED AND AGREED:**


_____
[NAME]
Date: _____

Appellee Appx. 00929

Appx. 10796

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 937 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1051 of 1828    PageID 10544
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 936 of 1803    PageID 11682
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 20 of 61

## INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), and [_____] (the "**Indemnitee**").

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company to retain and attract as directors the most capable Persons is in the best interests of the Company and that the Company therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in <u>Section 1(g)</u> below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties agree as follows:

1.    <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b)    "**Claim**" means:

(i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 938 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1052 of 1828   PageID 10545
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 937 of 1803   PageID 11683
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05    Page 21 of 61

any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii)      any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c)      "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d)      "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e)      "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f)      "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit

2

Appellee Appx. 00931
Appx. 02796

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 939 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1053 of 1828    PageID 10546
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 938 of 1803    PageID 11684
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 22 of 61

plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g)    "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i)    "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j)    "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k)    "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)    "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee

3

**Appellee Appx. 00932**
**APPX. 10799**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 940 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1054 of 1828   PageID 10547
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 939 of 1803   PageID 11685
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 23 of 61

benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)    "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)    "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)    References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.    Indemnification.

(a)    Subject to Section 9 and Section 10 of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)    For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

<div style="text-align: center">4</div>

Appellee Appx. 00933
APPX. 03796

3.      Contribution.

        (a)      Whether or not the indemnification provided in Section 2 is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

        (b)      The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

        (c)      To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.      Advancement of Expenses. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of

5

**Appellee Appx. 00934**

**APPX. 10799**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 942 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 1056 of 1828   PageID 10549
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 941 of 1803   PageID 11687
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 25 of 61

the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this Section 4, the final sentence of Section 9(b), or Section 11(b) in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to Section 9, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.    Indemnification for Expenses in Enforcing Rights. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with Section 4, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.    Partial Indemnity. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    Notification and Defense of Claims.

(a)    Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 943 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1057 of 1828   PageID 10550
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 942 of 1803   PageID 11688
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 26 of 61

prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)    Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with Section 9 below.

9.    Determination of Right to Indemnification.

(a)    Mandatory Indemnification; Indemnification as a Witness.

(i)    To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with Section 2, and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 944 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23    Page 1058 of 1828   PageID 10551
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 943 of 1803   PageID 11689
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 27 of 61

(ii)    To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

(b)    Standard of Conduct. To the extent that the provisions of Section 9(a) are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

(i)    if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

(ii)    if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)    Making the Standard of Conduct Determination. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under Section 9(b) to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under Section 9(b) shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to Section 8 (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

8

Appellee Appx. 00937
APPX. 03804

(d)     <u>Payment of Indemnification</u>. If, in regard to any Losses:

(i)     Indemnitee shall be entitled to indemnification pursuant to <u>Section 9(a)</u>;

(ii)     no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)     Indemnitee has been determined or deemed pursuant to <u>Section 9(b)</u> or <u>Section 9(c)</u> to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)     <u>Selection of Independent Counsel for Standard of Conduct Determination</u>. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(i)</u>, the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(ii)</u>, the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in <u>Section 1(k)</u>, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this <u>Section 9(e)</u> to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this <u>Section 9(e)</u> or Indemnitee gives its initial notice pursuant to the second sentence of this <u>Section 9(e)</u>, as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court

9

Appellee Appx. 00938

APPX. 104993

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 946 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1060 of 1828   PageID 10553
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 945 of 1803   PageID 11691
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 29 of 61

shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

(f)      <u>Presumptions and Defenses</u>.

(i)      <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)      <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)      <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.      <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

<div align="center">10</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 947 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1061 of 1828 PageID 10554
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 946 of 1803 PageID 11692
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 30 of 61

(a)     indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)     proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)     where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)     indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)     indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    <u>Remedies of Indemnitee</u>.

(a)     In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this <u>Section 11(a)</u>. The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)     In the event that Indemnitee, pursuant to this <u>Section 11</u>, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)     In the event that a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification, any judicial proceeding commenced

DOCS_NY:39915.4 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 948 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1062 of 1828 PageID 10555
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 947 of 1803 PageID 11693
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 31 of 61

pursuant to this Section 11 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 9.

(d)     If a determination shall have been made pursuant to Section 9 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 11, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.     Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this Section 12, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.     Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.     Other Indemnitors. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other

12

Appellee Appx. 00941
APPX. 103808

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 949 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1063 of 1828   PageID 10556
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 948 of 1803   PageID 11694
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 32 of 61

Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Section 14.

15.    Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.    Liability Insurance. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.    No Duplication of Payments. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.    Subrogation. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.    Indemnitee Consent. The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek

13

Appellee Appx. 00942
Appx. 103807

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 950 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1064 of 1828   PageID 10557
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 949 of 1803   PageID 11695
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 33 of 61

indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.    Amendments. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.    Binding Effect. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.    Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.    Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

(a)    if to Indemnitee, to the address set forth on the signature page hereto.

(b)    if to the Company, to:

Strand Advisors, Inc.
Attention:    Isaac Leventon

14

Appellee Appx. 00943
Appx. 03906

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 951 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1065 of 1828 PageID 10558
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 950 of 1803 PageID 11696
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 34 of 61

| Address: | 300 Crescent Court, Suite 700 |
| | Dallas, Texas 75201 |
| Email: | ileventon@highlandcapital.com |

Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24. Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25. Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26. Enforcement.

(a) Without limiting Section 15, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b) The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27. Headings and Captions. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28. Counterparts. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the

DOCS_NY:39915.4 36027/002

**Appellee Appx. 00944**
**APPX. 10809**

same agreement. Facsimile counterpart signatures to this Agreement shall be binding and
enforceable.

16

Appellee Appx. 00945

Appx. 10912

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 953 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1067 of 1828   PageID 10560
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 952 of 1803   PageID 11698
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 36 of 61

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____
Name:
Title:

[SIGNATURE PAGE – INDEMNIFICATION AGREEMENT]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 954 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1068 of 1828   PageID 10561
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 953 of 1803   PageID 11699
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 37 of 61

INDEMNITEE:

_____

Name:    [_____]
Address: _____
             _____
             _____
Email:

[SIGNATURE PAGE – INDEMNIFICATION AGREEMENT]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 955 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1069 of 1828   PageID 10562
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 954 of 1803   PageID 11700
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 38 of 61

December ___, 2019

Attn:  Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX  75201

> Re:     Development Specialists, Inc. ("DSI")
>           Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide restructuring support services to Highland Capital Management, L.P. (the "Company").  This Agreement replaces and supersedes in all respects the letter agreement between DSI and the Company, dated October 7, 2019, as amended and revised by the letter agreement dated October 29, 2019.  However, all fees and expenses incurred by DSI prior to the date hereof in accordance with such prior letter agreements will be paid by the Company, subject to allowance of such fees and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  The Agreement will become effective upon execution by duly authorized representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, as CRO, Mr. Sharp will assume control of the Company's restructuring and direct the Company with respect to its bankruptcy filed on October 16, 2019 (the "Chapter 11 Case"), which Chapter 11 Case has now been transferred to the Bankruptcy Court.
3. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and will comply with the Company's corporate governance requirements.
4. As directed by the Independent Directors and/or CEO, the CRO will be responsible for the implementation and prosecution of the Chapter 11 Case, including negotiations with creditors, reconciliation of claims, and confirmation of a plan or plans of reorganization.
5. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support services as requested or required to the Company, which may include but are not limited to:

Exhibit B

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 956 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1070 of 1828   PageID 10563
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 955 of 1803   PageID 11701
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 39 of 61

Highland Capital Management, LP
December ____, 2019
Page 2

    a.  assisting the Company in the preparation of financial disclosures required by the Bankruptcy Code, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs and Monthly Operating Reports;

    b.  advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

    c.  attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

    d.  providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

    e.  rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information.  The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements.  The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports.  Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 957 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1071 of 1828   PageID 10564
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 956 of 1803   PageID 11702
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 40 of 61

Highland Capital Management, LP
December ___, 2019
Page 3

also be involved, we have listed below certain of the DSI personnel (along with their
corresponding billing rates) who would likely constitute the Additional Personnel.   The
individuals are:

| | |
|---|---|
| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience,
capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company.  The purpose of the
retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor
should such be required for DSI to continue to provide the Services.  As such, should a need
arise to increase this retainer due to the level of Services DSI is providing or projected to
provide, we will send the Company a supplement to this Agreement requesting the necessary
increases and discuss with the Company the amount and timing of providing such increase to the
retainer.

This retainer will be applied to our final invoice.  If the retainer exceeds the amount of our final
invoice, we will refund the difference to the Company at that time.  In the event that periodic
invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices
and, if applicable, any related late charges, and we will stop work until the retainer is replenished
to the full amount required.  If the retainer is not replenished within ten (10) days after the
application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in
accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and
expenses may include, among others, charges for messenger services, photocopying, travel
expenses, long distance telephone charges, postage and other charges customarily invoiced by
consulting firms. Airfare for international flights will be charged at the business class fare;
provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation
and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation,
pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be
contingent upon such approval.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 958 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1072 of 1828   PageID 10565
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 957 of 1803   PageID 11703
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 41 of 61

Highland Capital Management, LP
December ___, 2019
Page 4

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice.  Notwithstanding anything to the contrary contained herein, the Company shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication.  DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company.  DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law.  Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 959 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1073 of 1828 PageID 10566
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 958 of 1803 PageID 11704
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 42 of 61

Highland Capital Management, LP
December ___, 2019
Page 5

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies. Any such indemnity shall survive the expiration or termination by either party of this Agreement. Except as provided in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the Company, or any party asserting claims on behalf of the Company, except for direct damages found in a final determination (not subject to further appeal) by a court of competent jurisdiction to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case. Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's professional staff, neither DSI nor its professionals have any known conflicts with the parties in this case. DSI will separately provide its connections to parties in this case and/or their professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business planning and operations. DSI's engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of one year subsequent to the completion and/or termination of this Agreement; provided that the Company shall not be prohibited from (x) making general advertisements for employment not specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited requests for employment.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 960 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1074 of 1828 PageID 10567
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 959 of 1803 PageID 11705
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 43 of 61

Highland Capital Management, LP
December ____, 2019
Page 6

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of
DSI employees, and all other provisions necessary to the enforcement of the intent of this
Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of
Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of
this Agreement and supersedes and is intended to nullify any other agreements, understandings
or representations relating to the subject of this Agreement. This Agreement may not be
amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance
by signing an original copy of this Agreement on the signature lines below, then returning one
fully-executed Agreement to DSI's office. The Agreement will become effective upon execution
by duly authorized representatives of the respective parties.

Very truly yours,

Bradley Sharp
Development Specialists, Inc.


AGREED AND ACKNOWLEDGED:


Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner


_____
By: _____, Independent Director
Date: _____

Appellee Appx. 00953
APPX. 10810

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 961 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1075 of 1828   PageID 10568
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 960 of 1803   PageID 11706
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 44 of 61

**A. Definitions**

    a. Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**

    a. Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**

    a. For email, Debtor uses Outlook Email on an Exchange server.  Veritas Enterprise Vault is used to archive emails.  Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email .communications have been preserved and are not at risk of deletion due to normal document retention practices.  Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

    b. The file server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created and stored on a portable hard drive at a secured location.

    c. The Sharepoint server used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

    d. The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago.  A copy of this backup shall be created in a format and stored at a secured location.

    e. The Advent Geneva accounting system used by Debtor was backed up approximately one week ago.  Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva.  Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein..

    f. The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago.  A copy of this backup shall be created in a format and stored at a secured location.

    g. For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data.  Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

    h. Bloomberg data is archived for five years.  Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

Exhibit C

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 962 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1076 of 1828   PageID 10569
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 961 of 1803   PageID 11707
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 45 of 61

i. Files may be saved locally on laptops/work computers used by employees of Debtor. This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere. Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees. Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

**D. Not Reasonably Accessible Documents**

a. Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost. The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

   i. Deleted, slack, fragmented, or other data only accessible by forensics;
   ii. Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and
   iii. On-line access data such as temporary internet files, history, cache, cookies, and the like.

b. To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

**E. Collection and Search Methodology**

a. Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than [date]. DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates. Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs). Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

b. The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

c. A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above.

ACTIVE 252191584

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 963 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1077 of 1828   PageID 10570
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 962 of 1803   PageID 11708
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 46 of 61

Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d. The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e. Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f. Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g. Debtor shall propose a format for producing Sharepoint data.  The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

**F.  Format of Documents Produced**

a. Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b. The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c. The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d. The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e. In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

f. For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 964 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1078 of 1828   PageID 10571
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 963 of 1803   PageID 11709
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 47 of 61

original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g. For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h. For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i. The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

      i. Production Bates begin
      ii. Production Bates end
      iii. Production Bates begin attachment
      iv. Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's. Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j. Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are

Appellee Appx. 00957
APPX. 10572

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 965 of
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1079 of 1828   PageID 10572
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 964 of 1803   PageID 11710
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 48 of 61

typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k. Exceptions to the Production Format

l. Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

m. To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

**G. Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status**

a. No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b. Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c. Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d. Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e. Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the document | 2 |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 966 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1080 of 1828   PageID 10573
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 965 of 1803   PageID 11711
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 49 of 61

| | | |
|---|---|---|
| Global Custodian | Custodian name produced in format:  Lastname, Firstname. | Smith, Jane; Taylor, Michael |
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted:  "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID | |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available | |
| Extension | The file extension | .doc |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 967 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1081 of 1828   PageID 10574
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 966 of 1803   PageID 11712
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 50 of 61

| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 968 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1082 of 1828   PageID 10575
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 967 of 1803   PageID 11713
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 51 of 61

I.    **Definitions**

    A.    "<u>Court</u>" means the United States Bankruptcy Court for the Northern District of Texas.

    B.    "<u>NAV</u>" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

    C.    "<u>Non-Discretionary Account</u>" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

    D.    "<u>Related Entity</u>" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "<u>Related Entities Listing</u>"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

    E.    "<u>Stage 1</u>" means the time period from the date of execution of a term sheet incorporating the protocols contained below (the "<u>Term Sheet</u>") by all applicable parties until approval of the Term Sheet by the Court.

    F.    "<u>Stage 2</u>" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

    G.    "<u>Stage 3</u>" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

    H.    "<u>Transaction</u>" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Exhibit D

Appellee Appx. 00961
APPX. 10578

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

**II.  Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.  **Covered Entities**: N/A (See entities above).

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

   a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

   b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

   a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b)  Stage 3:

      (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      (2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages)

   a)  Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 970 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1084 of 1828    PageID 10577
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 969 of 1803    PageID 11715
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 53 of 61

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  Redemption requests payable to Related Entities will be held in escrow and will not prevent the winding up or liquidation of any fund or entity.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III.    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 971 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1085 of 1828   PageID 10578
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 970 of 1803   PageID 11716
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 54 of 61

        (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.     Third Party Transactions (All Stages)

      a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.  The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV.    Transactions involving entities that the Debtor manages but in which the Debtor does <u>not hold a direct or indirect interest</u>**

A.    **Covered Entities**: See **<u>Schedule A</u>** hereto.  **<u>Schedule A</u>** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.    **Operating Requirements**

1.     Ordinary Course Transactions do not require Court approval (All Stages).

      a)     <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

      b)     <u>Stage 3</u>: ordinary course determined by the Debtor.

2.     Related Entity Transactions

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 972 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1086 of 1828   PageID 10579
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 971 of 1803   PageID 11717
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 55 of 61

a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    <u>Stage 3</u>:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages):

a)    Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 973 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1087 of 1828   PageID 10580
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 972 of 1803   PageID 11718
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 56 of 61

**V.    Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto.   **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.    Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.   Transactions involving Non-Discretionary Accounts**

A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appellee Appx. 00966
APPX. 10583

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 974 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1088 of 1828   PageID 10581
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 973 of 1803   PageID 11719
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 57 of 61

**VIII.   Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.   Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.   Representations and Warranties**

    A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

**Appellee Appx. 00967**

**Appx. 10584**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 975 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1089 of 1828 PageID 10582
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 974 of 1803 PageID 11720
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 58 of 61

*PSZJ Draft 12/27/19*

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

**Appellee Appx. 00968**
**APPX. 10823**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 976 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1090 of 1828   PageID 10583
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 975 of 1803   PageID 11721
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 59 of 61

*PSZJ Draft 12/27/19*

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

Appellee Appx. 00969
APPX. 10526

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 977 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1091 of 1828   PageID 10584
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 976 of 1803   PageID 11722
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 60 of 61

*PSZJ Draft 12/27/19*

**<u>Schedule B</u>**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.14 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 978 of
Case 3:23-cv-00726-S    Document 8-22    Filed 02/29/23    Page 1092 of 1828    PageID 10585
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 977 of 1803    PageID 11723
Case 19-34054-sgj11 Doc 281-1 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 61 of 61

*PSZJ Draft 12/27/19*

### Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.14 36027/002

**Appellee Appx. 00971**

**APPX. 10826**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 979 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1093 of 1828   PageID 10586
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 978 of 1803   PageID 11724
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 1 of 19

November 2019

**James P. Seery, Jr.**

New York, NY



 James P. Seery, Jr. is a high yield and distressed investing professional who was most recently a Senior Managing Director and co-Head of Credit at Guggenheim Securities LLC, where he is responsible for helping direct the development of a leveraged finance and credit distribution business.  Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, a $1.3bn global credit fund manager.  In that role, he developed and led many of the firm's most profitable credit investments.  Mr. Seery is a licensed attorney and was formerly a partner and co-Head of the Sidley Austin LLP New York Corporate Reorganization and Bankruptcy Group, and he also recently served as a Commissioner on The American Bankruptcy Institute's Commission to Study the Reform of Chapter 11.

Before his joining Sidley Austin, Mr. Seery was a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business. In that position, he was responsible for managing the Lehman Brothers' Fixed Income investment grade and high yield loan businesses, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management, and restructuring. Mr. Seery was also a member of the Lehman Brothers' Fixed Income Operating Committee and Global Credit Products Operating Committee as well as the High Yield Commitment and New Business Committees.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for management of distressed corporate debt investments, and in 2008 he was a key member of the small team that successfully sold Lehman to Barclays.

Mr. Seery was selected as one of the Top Restructuring Lawyers in the U.S. Under 40 by *Turnarounds and Workouts* in 1999. Mr. Seery graduated in 1990 from New York Law School, *magna cum laude*, where he was an editor of the Law Review and Colgate University in 1984. He was a member of the Board of Directors of the Loan Syndications and Trading Association from 2006 to 2008 and a member of the INSOL International Lenders Group from 2016-2017.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 980 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1094 of 1828   PageID 10587
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 979 of 1803   PageID 11725

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 2 of 19

# JAMES P. SEERY, JR.

795 Columbus Ave., 12A
New York, New York 10025
631-804-2049 · jpseeryjr@gmail.com

### Experience

**Guggenheim Securities LLC,** New York, New York          Aug. 2017-Nov. 2019
Senior Managing Director, Co-Head Credit
- Responsible for developing leveraged finance and credit portfolio advisory businesses
- Management of teams of leveraged finance bankers and trading and sales professionals

**River Birch Capital, LLC**, New York, New York          April 2012-July 2017
President, River Birch Capital, LLC
- President and senior investing partner at New York based $1.3bn global long-short credit fund focused on corporate credit from investment grade to distressed
- Responsible for originating, executing and managing stressed and distressed credit investments with a team of 6 investing partners and 5 analysts and traders
- Led finance and operations team with CFO/CCO; firm grew from approx. $200mm in 2012 to $1.3bn in 2017

**Sidley Austin LLP**, New York, New York          May 2009-April 2012
Co-head New York Corporate and Reorganization Group
- Built and managed a creditor focused restructuring group as part of an international company side practice in a nearly 2000 attorney firm
- Represented banks, corporations, hedge funds, and structured investment vehicles in a variety of restructuring, financing and litigation matters

**Lehman Brothers**, New York, New York          April 1999-May 2009
Global Head Fixed Income Loans
- Managing Director responsible for managing the global fixed income loan business, including investment grade and high yield commitments, global distribution, hedging, trading and sales, CLO origination, portfolio management, and restructuring; managed underwritten loan commitments and teams of credit sales and trading professionals as well as structuring, portfolio management and work-out specialists
- Member Fixed Income Operating Committee, Global Credit Products Operating Committee, and High Yield Commitment and New Business Committees
- Responsible for originating, structuring and managing proprietary distressed debt investments, rescue financings, and restructurings 1999-2004
- Key member of team that negotiated and completed the sale of Lehman Brothers to Barclays Sept. 2008; remained at Barclays through April 2009

**Phillips Nizer**, Garden City, New York          May 1995-April 1999
- Senior Associate in corporate reorganization group of boutique New York City law firm

**Cadwalader, Wickersham & Taft**, New York, New York          May 1989-May 1995
- Associate in corporate reorganization group of New York City based international law firm

### Education

New York Law School, New York, New York, J.D., *magna cum laude*, Editor Law Review          1990
Colgate University, Hamilton, New York, B.A. History          1984

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 981 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1095 of 1828   PageID 10588
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 980 of 1803   PageID 11726

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 3 of 19

**Experience**

| | |
|---|---|
| Director, River Birch International, Ltd. Board | 2015-2017 |
| Director, Camphill Foundation Board | 2017-2019 |
| Member, INSOL International Lenders Group Board | 2016-2017 |
| Commissioner, ABI Commission to Study Reform of Ch. 11 | 2012-2015 |
| Director, Loan Syndications and Trading Association | 2006-2008 |

**Selected River Birch Sample Investments**

Cash America International *5.75% Senior Unsecured Notes due 2018 and Litigation Claim – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper spin of payday lending business; U.S. District Court published decision in note holders' favor led to settlement*

Chesapeake Energy Corp *6.775% Senior Notes due 2019 Litigation Claims – Developed and led execution of successful note purchase and make-whole litigation strategy based on company's improper call of notes; ultimately prevailed in $450mm judgment discussed in published Second Circuit and U.S. District Court decisions*

Caesars Entertainment Resort Properties *8% 1st Lien Notes due 2020; 11% 2d Lien Notes due 2021 – Developed and led (with senior investment analyst partner) execution of successful bankruptcy investment strategy focused on lower beta part of the capital structure of bankrupt casino operator; investment designed for high return with significant downside protection*

Intelsat Jackson Holdings *9.5% Senior Secured Notes due 2022 – Developed and led (with senior investment analyst partner) execution of successful new issue stressed secured note investment strategy; responsible for structuring and tightening covenant package and increasing size of offering after determining that potential litigation threat was low risk; responsible for recommending ICF 12.5% note investment in the low 80s in February 2018*

Motors Liquidation Company *GUC Trust Publicly Traded Units – Developed and led successful investment strategy in publicly traded bankruptcy liquidation units (GM); took the opposite side of sell-side analyst recommendations and engineered a successful settlement in high return/low downside position*

Hypo Alpe Adria Bank (Hetar) *Senior Guaranteed Notes – Developed and led (with senior investment analyst partner) execution of successful investment strategy in insolvent Austrian bank with notes guaranteed by an Austrian State*

Presidio Inc. *10.25% Senior Notes due 2023 – Developed and led execution of successful investment strategy to purchase newly developed mezzanine part of the capital structure on struggling new issue deal; ultimately sponsor purchased the mezzanine but aggressive structuring and bidding for the mezzanine tranche led to outsized allocation of new notes*

Nortel Networks Ltd. *6.875% Senior Notes due 2023 – Developed and led (with senior investment analyst partner) execution of bankruptcy liquidation strategy based on litigation and ultimate leverage of Canadian liquidating estate*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 982 of
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1096 of 1828 PageID 10589
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 981 of 1803 PageID 11727

**Selected Speaking Engagements**

American Law Institute/ NYU Law – Credit Markets and Corporate Reorganization, New York City, April 2017
Moderator, *Auctions and Asset Sales In and Out of Bankruptcy*

University of Texas Law/American Bankruptcy Institute -- Emerging Valuation Issues in Bankruptcy, Las Vegas,
March 2017
Panelist, *Determining Valuation and the Fulcrum Security*
Panelist, *Distressed Investments Strategies*

NYU Law – Claim Priority Roundtable, New York City, September 2016
Panelist, *Allocating Value in and Out of Bankruptcy*

University of Texas Law/ABI – Emerging Valuation Issues in Bankruptcy, Las Vegas, March 2016
Panelist, *ABI Commission Report Proposed Amendments and Their Impact on Valuation*

The M&A Advisor – Distressed Investing Summit, Palm Beach, January 2016
Panelist, *Using Options to Bridge Value Gaps*

NYU Law – Seligman Bankruptcy and Business Reorganization Workshop, New York City, September 2015
Panelist, *Valuation Approaches and Methodologies*

Skadden Arps/Colgate University – Law and Finance Summit, New York City, November 2014
Presenter, *Recent Developments in Bankruptcy and Distressed Debt*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 983 of
Case 3:23-cv-00726-S   Document 8-22   Filed 08/29/23   Page 1097 of 1828   PageID 10590
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 982 of 1803   PageID 11728



Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 984 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1098 of 1828   PageID 10591
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 983 of 1803   PageID 11729
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 6 of 19

**Dubel & Associates, L.L.C.**

# John S. Dubel
# Board of Directors Experience

- **Purdue Pharma Inc. – July 2019 to Present  -** Independent Board Member and Chair of the Special Committee of Directors

  In addition to being a member of the Board of Directors of Purdue Pharma Inc., I am the Chair of the Special Committee of Independent Directors charged with overseeing the investigation of relationships between Purdue and Purdue owners, the Sackler family.

- **WMC Mortgage, LLC – Indirect Subsidiary GE – July 2018 to December 2019  -** Independent Board Member and Chair of the Special Independent Committee of Directors

  WMC's chapter 11 plan was recently confirmed and WMC will emerge from Chapter 11 in early December 2019. I am the Chair of the Special Independent Committee of Independent Directors for this indirect subsidiary of GE. The Special Committee was tasked with reviewing the relationship between the insolvent WMC and GE and resolving its insolvency issues through a court supervised chapter 11 proceeding. I was the lead person responsible for negotiations with the parent concerning the level of support that the parent was required to provide and worked with our creditors to negotiate a resolution amongst all parties.

- **Werner Co.** – January 2013 to Present – Sole Independent Director

  Werner is a global leader in access equipment, secure storage, light duty construction and fall protection products with operations across all geographies. A consortium of private equity investors bought the assets out of a bankruptcy proceeding in 2007. I was asked to serve on the Board as the sole Independent Director by the largest shareholder. Werner more than doubled the size of its business, diversified its product offering and substantially improved its EBITDA prior to its sale in July 2017. As an independent director, working with one other director, we lead the effort in the sale process that achieved an additional $180 million increase in the sale price of the company for its distressed investors.  I am currently the lead director responsible for the resolution of post-sale purchase price adjustments.

- **Old PSG f/k/a Performance Sports Group** – August 2017 to December 2017

  Asked to serve on the Board, by the Official Equity Committee, after the sale of Performance Sports Group's assets. My role was to oversee the plan of reorganization process to drive to a smooth confirmation.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 985 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1099 of 1828   PageID 10592
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 984 of 1803   PageID 11730
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 7 of 19

## Dubel & Associates, L.L.C.

- **FXI Holdings** – September 2010 to October 2017 – Independent Director

  FXI is a leading producer of engineered polyurethane foam solutions serving the largest customers in the largest markets. It has the broadest customer and consumer reach of any North American foam producer. FXI's assets where purchased during a bankruptcy proceeding in 2009. I was asked to serve on the board of directors by one of the two private equity firms that owned FXI. Shortly after joining the Board, I was asked to Chair a Special Committee of the Board to manage certain litigation and government investigations related to alleged anti-trust infractions. FXI was the subject of over 50 different class action and individual litigations alleging damages in excess of $3 billion. Over a period of several years, FXI was able to settle all of its litigation for a minor fraction of the alleged damages and all investigations by the government were dropped. During this time, the company's performance improved in a consistent manner with EBITDA more than doubling. Once these litigations were settled, the company was marketed and ultimately sold in October 2017.

- **ResCap Liquidating Trust** – December 2013 to March 2017 – Chairman of the Board - December 2013 to late 2015

  After the ResCap chapter 11 plan was confirmed, I served on the Board of the ResCap Liquidating Trust, as FGIC's representative, to guide the wind down of the remaining assets and prosecute claims in excess of $4 billion against institutions that caused harm to ResCap. During this time, I also served as Liquidating Trustee while we brought on board a new in-house lawyer to prosecute these claims and transitioned this individual into the permanent Liquidating Trustee role.

- **FGIC Corporation and FGIC** - December 2008 to April 2014 – Chairman of the Board during various parts of that time frame – while serving as CEO

- **Barneys New York** – February 2012 to May 2012 – Sole Independent Director

  After Barneys' 2007 sale to Istithmar World, the Government of Dubai's private investment fund, Barneys was impacted by the recession in the late 2000's. I was brought in to serve as the sole independent director during the out of court restructuring process which resulted in a consensual change of control for Barneys to its distressed investor creditors.

- **The Leslie Fay Companies** – April 1993 to May 1996 – while serving as the EVP of Restructuring and CFO

- Mr. Dubel has also served as a member and chairperson of various ad hoc and official creditor committees.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 986 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1100 of 1828   PageID 10593
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 985 of 1803   PageID 11731
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 8 of 19

**Dubel & Associates, L.L.C.**

# John S. Dubel
# Key Management Experience

- **Noble Environmental Power –** Restructuring Advisor to the Company - 2018

  Noble was the owner of two utility scale wind power plants in upstate New York which were in default on their debt instruments. Working closely with Noble's investment bankers we were able to complete a sale of these plants while keeping the companies out of chapter 11 and returning net sale proceeds to its shareholders.

- **SunEdison, Inc.** – Chief Executive Officer and Chief Restructuring Officer – 2016-2017

  SunEdison was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SunEdison had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents. A decline in energy prices along with loss of faith in management by investors and numerous litigations filed against the company caused the closing of the capital markets for SunEdison which led to its filing for chapter 11. I was brought in as a requirement of the DIP agreement. SunEdison's assets were sold in a manner to preserve the greatest value for its creditors. I am currently assisting the wind down SunEdison entity as requested.

- **Financial Guaranty Insurance Company** – Chairman and Chief Executive Officer – 2008-2014

  FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts with over $4 billion of capital. After the collapse of the residential mortgage market in the 2007/08 timeframe, FGIC lost its AAA ratings and experienced tremendous losses on its insurance contracts. This led to an insolvency proceeding under NY State insurance law with an innovative resolution through a pre-arranged rehabilitation plan. This enabled it to continue to pay its policy holders in a timely manner.

- **Residential Capital** – Co-Chairman of the Official Creditors Committee – 2012-2013

  ResCap, a wholly owned subsidiary of Ally Financial, was one of the largest mortgage originators in the US. FGIC was its 2nd largest creditor and after its chapter 11 filing in May of 2012, I was appointed as the Co-Chair of ResCap's Official Unsecured Creditors Committee. As the lead negotiator for the UCC, the UCC was able to negotiate an increase in the contribution to the plan of reorganization by the parent, Ally, from approximately $650 million to $2.1 billion. This contribution settled all of the litigation between Ally and Rescap and enabled ResCap to emerge from chapter 11.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 987 of
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1101 of 1828 PageID 10594
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 986 of 1803 PageID 11732
Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19 Entered 12/27/19 21:33:05 Page 9 of 19

### Dubel & Associates, L.L.C.

- **Anchor Glass Container Corporation** – Chief Restructuring Officer – 2005-2006

  Anchor Glass was the 3rd largest manufacturer of glass containers in the US, with Anheuser Busch and Snapple as its largest customers, where it provided "just in time" deliveries to enable its customers plants to operate 24/7. Its third trip through chapter 11 resulted from poor contract pricing and high legacy costs. I worked closely with the CEO to renegotiate these contracts and reduce the cost structure which enabled it to emerge from chapter 11 as a viable business which continues to operate today.

- **RCN Corporation** – President and Chief Operating Officer - 2004

  RCN was a Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets with over $1.7 billion of debt incurred during its build out period. Working with the Lead Director, a pre-arranged chapter 11 plan was negotiated with all of its creditor constituencies to enable it to emerge as a profitable business in its markets where it continues to operate today.

- **Cable & Wireless America** – Chief Executive Officer – 2003-2004

  C&W America was a premier hosting business with 14% share of the US market and world class a Tier 1 IP Network. When its British parent company experienced financial difficulties, they attempted to abandon C&W America which caused stress for its major customers, including Yahoo, Google and others. A plan was put in place, though a chapter 11 process, to dramatically reduce its daily cash burn and sell the entity while maintaining its customer base.

- **Acterna Corporation** – Chief Restructuring Officer - 2003

  Acterna was a multi-national manufacturer of telecommunications and cable equipment with revenues of approximately $1.7 billion and debt of $1 billion prior to the industry down turn. I worked closely with the CEO to stabilize the operations and avoid a fire sale of the business. A quick turn through chapter 11 enabled it to emerge as a viable business, where upon the CEO was able to regrow the business and position it for a successful sale to an industry player 18 months later.

- **WorldCom, Inc.** – Chief Financial Officer – 2002, Advisor – 2003

  WorldCom was one of the largest telecommunication companies with assets of over $107 billion and operations across the globe. It filed for chapter 11 during 2002 due to a massive fraud which covered up the significant operational deficiencies and losses it was experiencing. I was brought in as a condition of the DIP agreement and worked closely with the CEO and other members of the senior management to stabilize the company, restructure the operations to reduce opex, provide stability to the international operations and assist with the plan of reorganization negotiations and confirmation.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 988 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1102 of 1828   PageID 10595
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 987 of 1803   PageID 11733

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 10 of 19

## Dubel & Associates, L.L.C.

- **CellNet Data Systems, Inc.** – Chief Restructuring Officer – 1999-2001

  CellNet was a startup technology company that provided smart grid and smart metering and billing solutions for the utility industry. After burning through in excess of $600 million of initial funding it was not able to access the capital markets to continue to build out its platform and realize the cost synergies across contracts that would make it profitable. Working closely with the new CEO, we reduced the cost structure and sold the company to one of its meter suppliers enabling it to continue to operate in a successful manner.

- **Barneys New York** – Chief Financial Officer – 1996-1999

  Barneys was, at this time, a family owned high end retail store chain operating with over 30 stores and international affiliations in Asia. After an uncontrolled growth plan and management that did not understand its cost structure, it filed for chapter 11. I was brought in a the request of the DIP lender to oversee the family's management, to control its costs, close unprofitable locations, renegotiate store leases and work out a consensual chapter 11 plan that included its largest creditors providing financing through a rights offering to enable Barneys to successfully emerge from chapter 11 as a profitable retailer.

- **The Leslie Fay Companies** – EVP Restructuring and Chief Financial Officer – 1993-1995

  Leslie Fay was one of the larger designer and manufacturer of ladies dresses, sportwear and suits in the US. A public company, it was the victim of fraud by its financial management team to hide the true cost of operations and manufacturing of its products. This led to a chapter 11 filing. I worked closely with the CEO and President to stabilize its financial management team, reduce costs and position it for an emergence from chapter 11.

- **Robert Maxwell Group** – Head of US Private Companies – 1991-1993

  Robert Maxwell was a British entrepreneur who invested heavily in the publishing space. After financial improprieties were uncovered and his subsequent suicide, I was appointed by the UK Administrators to run all of his US operations, which included over 40 private companies. I worked closely with the UK administers to realize value through sales of these US operations and turn those proceeds over to the UK Administrators.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 989 of
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1103 of 1828   PageID 10596
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 988 of 1803   PageID 11734

## Dubel & Associates, L.L.C.

Mr. Dubel is a past board member and officer of the Association of Insolvency and
Reorganization Advisors, a Certified Insolvency and Reorganization Advisor and is
a member of the Turnaround Management Association and the American
Bankruptcy Institute. Mr. Dubel received a Bachelor in Business Administration
degree from the College of William and Mary.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 990 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1104 of 1828    PageID 10597
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 989 of 1803    PageID 11735

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 12 of 19

## Dubel & Associates, LLC

## Selected Case Studies

## SunEdison, Inc.
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation | Actions Taken | Results |
|---|---|---|
| ‣ SunEdison (SUNE) was the largest global renewable energy development company prior to its filing for chapter 11 in April 2016. SUNE had over $10 billion of liabilities and 4,500 employees spread across operations in over 50 countries on 6 continents<br><br>‣ Continued downward pressure on energy prices caused renewable energy projects to experience stress. Lack of proper integration of acquisitions and overpayment on other acquisitions caused a liquidity crisis. Public spin-offs of profitable yieldco assets cut off cash flow that was needed to run the operations.<br><br>‣ Senior management control of the Yieldcos enabled borrowings from the Yieldcos which could not be repaid | ‣ Hired initially as CRO with a clear mandate to take on CEO responsibilities<br><br>‣ An immediate assessment of the opportunity to maintain a going concern was initiated.<br><br>‣ Programs were put in place to plug the employee exodus that SUNE was experiencing<br><br>‣ In consultation with our lenders made the determination that an orderly sale of assets was the best path to optimum value realization<br><br>‣ Maintained an open line of communication with the DIP, 1L and 2 L lenders to build back trust in the company<br><br>‣ Engaged with the Board of the Yieldcos, TERP and GLBL, to work towards a resolution of the disputes between the Yieldcos and SUNE | ‣ Took on CEO role after a short transition with the former CEO<br><br>‣ Reorganization of key personnel functions including the hiring of a new CFO and Controller provided stability in the Finance functions for the company to operate within the limits of the DIP agreement.<br><br>‣ Executed a global marketing process which resulted in over 60 asset sales with approximately $1.5 billion of gross proceeds<br><br>‣ Executed a plan which resulted in the transition of administrative and operational functions from SUNE to the Yieldcos which helped stabilize the value of our ownership stake in these entities |

Appellee Appx. 00984

APPX. 10849

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 992 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1106 of 1828    PageID 10599
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 991 of 1803    PageID 11737

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 14 of 19

## SunEdison, Inc. (continued)
### John Dubel – Chief Executive Officer and Chief Restructuring Officer

| Situation |
|---|

- Class and individual litigation against SUNE and the Yieldcos related to these control issues ensued.
- Shortly after a Feb 2016 2L financing the company has exhausted those funds and was out of available funds to operate the business.
- Additional litigation commenced related to cancelled acquisitions.
- During this timeframe, the creditors lost faith in the CEO and CFO.
- SUNE filed for chapter 11 in late April 2016 funded by a DIP provided by the 1L and 2L creditors.

| Actions Taken |
|---|

- Engaged with the Board and management of the Yieldcos, TERP and GLBL, to start to work towards a resolution of the disputes between the Yieldcos and SUNE
- Put in place a path to seek resolution of all of the Class Action and individual shareholder litigations by seeking a mediation in the District Court and Bankruptcy Court litigation related to both SUNE and the Yieldcos
- Commenced negotiations to settle the various litigations amongst SUNE's creditor groups and between SUNE and its Yieldcos
- Worked closely with Chief Judge Morris, the mediator appointed in the case, to craft a resolution to all intercreditor disputes

| Results |
|---|

- Drove a plan, through a directed litigation strategy, to force a resolution of the over $3 billion of claims brought against SUNE by the Yieldcos which resulted in a cooperative sale of the Yieldcos netting SUNE approximately $825 million
- A replacement DIP agreement was put in place to eliminate certain concerned creditors and align the interests of the DIP lenders and the prepetition secured creditors.
- Settlements of the vast majority of class and individual shareholders were negotiated
- A mediated resolution amongst SUNE's creditor resulted in a successful chapter plan of reorg funded by a rights offering led by SUNE's 2L creditors

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 993 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1107 of 1828   PageID 10600
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 992 of 1803   PageID 11738

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 15 of 19

## Financial Guaranty Insurance Company
### John Dubel – Chief Executive Officer and member of the Board of Directors

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- FGIC was the third largest monoline bond insurer, insuring in excess of $300 billion of public finance instruments, RMBS securitizations and CDS contracts
- At the start of 2008, FGIC was at risk of losing its AAA ratings
- The residential real estate meltdown caused FGIC to face billions of dollars of claims from CDS and RMBS contracts it had insured
- In addition, several of FGIC's largest public finance deals were on the cusp of defaulting
- In late 2009, FGIC's statutory capital went negative and was subject to immediate takeover by the NYS Department of Financial Services

**Actions Taken**

- Raised capital surplus by $830 million through reinsurance agreements and preferred stock
- Negotiated settlements of CDS contracts
- Managed the workout of multiple public finance insurance contracts
- Managed affirmative litigation actions to recover from parties that harmed FGIC's insurance contracts
- Developed an innovative restructuring plan to allow FGIC to file a pre-arranged rehabilitation plan in NYS Court
- Positioned the company to be able to operate in the post rehabilitation environment to pay claims to policyholders in a timely manner

**Results**

- Planned and executed an orderly Rehabilitation Plan process which resulted in an innovative and precedent setting proceeding for FGIC's policyholders
- Managed down the overall exposure from $312 billion to under $30 billion
- Settled parent/subsidiary issues without litigation
- Recovered in excess of $1.25 billion for policyholders from parties that harmed FGIC's contracts
- All of these results were accomplished while maintaining an independent view towards protecting all policyholders interests

Appellee Appx. 00986
APPX. 10843

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 994 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1108 of 1828   PageID 10601
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 993 of 1803   PageID 11739

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 16 of 19

## RCN Corporation – Integrated Triple Play Service Provider
### John Dubel – President and Chief Operating Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- Bundled 3-product cable provider offering integrated voice, video and data products in the US Northeast, Midwest and West Coast markets
- Revenues of approximately $500 million
- Over 1 million connections
- $1.7 BN of debt in default
- Secured creditors pushing the Company to a forced liquidation
- Lack of confidence in management's business plan and ability to rationalize the business
- Company lacked adequate liquidity to maintain operations

**Actions Taken**

- Hired as President and CRO to lead RCN during this crisis.
- Implemented reorganization of operating costs achieving positive EBITDA and cash flow
- Actions included:
  - Rationalized customer base
  - Segmented Customer Service activity and automated where possible
  - Consolidated Network Operations to drive efficiency
  - Reduced IT functions
  - Reduced customer service call volume through web-based solutions
  - Simplified product offering
  - Generated Tech Operations savings

**Results**

- Streamlined operations and reduced breakeven costs achieving positive cash flow and EBITDA
- Reduced annualized SG&A costs by 20%
- Reduced headcount by 25%
- Improved Customer Service quality
- Company emerged with over $125 million of cash in hand
- Instituted rigorous cost reduction procedures within the company
- Positioned the company for future positive growth

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 995 of
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1109 of 1828   PageID 10602
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 994 of 1803   PageID 11740

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19   Entered 12/27/19 21:33:05   Page 17 of 19

## Cable & Wireless America – Successfully Positioned the Company for a Sale
### John Dubel – Chief Executive Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- Premier hosting business with 14% share of the US market by revenue and World Class Tier 1 IP Network

- Parent company's announcement of intention to exit the US market created uncertainty for customers, suppliers, and employees

- Daily cash burn estimated at $2M

- Need to stabilize standalone operations and facilitate a sale transaction

**Actions Taken**

- Negotiated terms of separation from parent company and obtained ongoing funding commitment

- Stabilized skittish customer base

- Took control of cash management and forecasting process

- Implemented cost cutting strategy to achieve cash flow breakeven within 9 months

- Managed extensive due diligence process by multiple bidders

**Results**

- Reduced daily cash burn to $0.7M

- Planned and executed orderly Chapter 11 filing with the support of a "stalking horse" bidder to facilitate a 363 sale

- Active auction process resulted in total bid consideration of $167.5M, a threefold increase over the stalking horse bid value

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 996 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 1110 of 1828  PageID 10603
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 995 of 1803  PageID 11741

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19  Entered 12/27/19 21:33:05  Page 18 of 19

## Acterna – Reduced Costs, Drove a Successful Turnaround
### John Dubel – Chief Restructuring Officer

### Situation

- Leading Telecom Network equipment supplier with worldwide operations that was facing a severe liquidity crisis

- Test equipment market was crippled by the drought of capital spending from Telecom Network companies

- Debt levels were not sustainable in then current market conditions

### Actions Taken

- Assumed role of CRO to lead company through Chapter 11
- Restructured $1.0 BN of debt
- Preserved non-domestic assets across 30 countries necessary to a successful reorganization.
- Focused sales activity on core markets
- Worked with management to reduce SG&A costs
- Rationalized headcount through centralization of manufacturing activity
- Managed the subsidiary divestiture program
- Integrated worldwide cash control procedures improving liquidity

### Results

- Acterna emerged from Chapter 11 with 80% less debt and a reduction of 85% of interest costs in less than 6 months
- Improved international cash liquidity sufficiently for non-US operations to become self funding
- Cash at emergence was over $60 million
- Reduced operating cash costs so the company was self funding and the DIP was never used to operate the company
- 18 months after C-11, Acterna announced a sale to JDS Uniphase, for a three fold increase in value.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 997 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1111 of 1828    PageID 10604
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 996 of 1803    PageID 11742

Case 19-34054-sgj11 Doc 281-2 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 19 of 19

## WorldCom – Stabilized Operations and Finance Function
### John Dubel – Chief Financial Officer

| Situation | Actions Taken | Results |
|---|---|---|

**Situation**

- A massive fraud which masked operational, financial and reporting issues crippled the company's credibility
- WorldCom suffered from excess debt with declining value of assets, financial fraud issues, contentious relationship with creditors, and a substantial cash burn
- Significant negative cash flow from international operations
- WorldCom filed for bankruptcy in July of 2002, becoming the largest bankruptcy filing in history at the time

**Actions Taken**

- Assumed role  Chief Financial Officer until a permanent management team could be put in place then worked as financial advisor for pendency of Chapter 11 case
- Put turnaround teams, operational restructuring plans, and cash management plans in place
- Led the international restructuring efforts
- Assisted in negotiations with creditors
- Implemented an achievable 2003 business plan, facilitated several cost reduction initiatives, and managed the 13-week cash flow forecast
- Reduced capital spending

**Results**

- Achieved $2 BN of operational savings
- Increased cash flow by more than $100M in international operations and avoided bankruptcy in many jurisdictions
- Worked with all stakeholders to reach consensus on a plan of reorganization
- Successfully restructured the balance sheet

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 998 of
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1112 of 1828    PageID 10605
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 997 of 1803    PageID 11743
Case 19-34054-sgj11 Doc 281-3 Filed 12/27/19    Entered 12/27/19 21:33:05    Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

**ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR**
**AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of*

*Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the*

*Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**Appellee Appx. 00991**
**APPX. 10846**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 999 of
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23  Page 1113 of 1828  PageID 10606
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 998 of 1803  PageID 11744
Case 19-34054-sgj11 Doc 281-3 Filed 12/27/19  Entered 12/27/19 21:33:05  Page 2 of 2

jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding

pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under

the circumstances and no other or further notice is required; and having determined that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

having determined that the relief sought in the Motion is in the best interests of the Debtor and its

estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED on the terms and conditions set forth herein.

2. The Term Sheet is approved and the Debtor is authorized to take such steps

as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not

limited to: (i) entering into the Governing Documents and compensating the Independent Directors

for their services either directly or by reimbursing Strand for any costs incurred in connection with

the appointment and compensation of the Debtor; (ii) implementing the Document Production

Protocol; and (ii) implementing the Protocols.

3. Subject to the Protocols and the Term Sheet, the Debtor is authorized to

continue operations in the ordinary course of its business.

4. Notwithstanding any stay under applicable Bankruptcy Rules, this Order

shall be effective immediately upon entry.

5. The Court shall retain jurisdiction over all matters arising from or related to

the interpretation and implementation of this Order, including matters related to the Committee's

approval rights over the appointment and removal of the Independent Directors.

## END OF ORDER ##

DOCS_NY:39973.7 36027/002

# APPENDIX 13

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1001
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1115 of 1828 PageID 10608
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1000 of 1803 PageID 11746
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 1 of 16

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Related to Docket Nos. 69, 70, 116,** |
| | ) **and 120** |

**DEBTOR'S OMNIBUS REPLY IN SUPPORT OF (I) APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE; AND (II) APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

The above-captioned debtor and debtor in possession (the "Debtor") hereby

submits this reply (the "Reply") in support of its (i) *Application for an Order Authorizing the*

*Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel,*

*Nunc Pro Tunc to the Petition Date* [Docket No. 69] (the "Foley Application"); and (ii)

*Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox &*

*Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No.

70] (the "Lynn Pinker Application," and together with the Foley Application, the

"Applications").

In further support of the Applications, the Debtor respectfully states as follows:

**Preliminary Statement**

1.    As set forth in the Applications, and as discussed more fully below, Foley

Gardere, Foley & Lardner, LLP ("Foley") and Lynn Pinker Cox & Hurst LLP ("Lynn Pinker")

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

have represented the Debtor and certain of its affiliates and related entities in highly-contested,

prepetition litigation against Acis Capital Management, L.P. ("Acis LP") and Acis Capital

Management GP, LLC ("Acis GP," and together with Acis LP, "Acis").  Lynn Pinker also

represented the Debtor in litigation concerning Joshua Terry – Acis's sole owner[2] – and Mr.

Terry's wife, Jennifer Terry.  In the Applications, the Debtor seeks authority to retain Foley and

Lynn Pinker on a postpetition basis to continue the defense of the Debtor and related entities as

described herein and the prosecution of the Debtor's rights against Acis and Mr. Terry.

2.     Two objections to the Applications were filed:  (i) *Limited Objection of
the Official Committee of Unsecured Creditors to the Debtor's Application for an Order
Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP and Lynn
Pinker Cox & Hurst as Special Texas Counsel and Special Texas Litigation Counsel, Nunc Pro
Tunc to the Petition Date* [Docket No. 120] (the "Committee Objection") and (ii) *Limited
Objection to the Debtor's: (I) Application for an Order Authorizing the Retention and
Employment of Foley Gardere, Foley & Lardner, LLP as Special Texas Counsel, Nunc Pro Tunc
to the Petition Date; and (II) Application for an Order Authorizing the Retention and
Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro
Tunc to the Petition Date* [Docket No. 116] (the "Acis Objection").

3.     The Committee Objection, filed by the Official Unsecured Creditors

Committee (the "Committee"), seeks certain additional disclosures concerning the services to be

provided by Foley and Lynn Pinker and the entities to which those services will be provided.

---

[2] Mr. Terry obtained 100% of the equity in the Acis entities through the confirmation of Acis's bankruptcy plan.
The Debtor is currently appealing that confirmation order as discussed herein.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1003
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1117 of 1828   PageID 10610
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1002 of 1803   PageID 11748
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 3 of 16

The Committee Objection also seeks additional disclosure concerning how the Debtor will pay for those services and their benefit to the Debtor's estate.  The Debtor has endeavored to provide the additional disclosures requested by the Committee as set forth herein and in the Supplemental Declaration of Michael Hurst (the "Hurst Declaration") attached hereto as **Exhibit A**, the Supplemental Declaration of Holland O'Neil (the "O'Neil Declaration") attached hereto as **Exhibit B**, and the Declaration of Bradley Sharp (the "Sharp Declaration," and together with the Hurst Declaration and the O'Neil Declaration, the "Declarations") attached hereto as **Exhibit C**.

4.      In contrast, the Acis Objection, filed by Acis LP and Acis GP, seeks to import the highly acrimonious and contentious nature of the Debtor's ongoing litigation with Acis and Acis's counsel, Winstead PC ("Winstead"), into this Court and to use the retention process to secure a litigation advantage in its ongoing dispute with the Debtor in Texas.  In short, Acis is seeking to disqualify the Debtor's chosen law firms – law firms that have represented the Debtor for the past twenty (20) months specifically in connection with the Acis and Terry Litigation – from continuing to represent the Debtor in matters adverse to Acis.  That tactic is improper and an abuse of the bankruptcy process.  Regardless, the Debtor has endeavored to be transparent and to respond to Acis's requests for additional disclosures herein and in the Declarations.  Although not relevant to the Applications, the Debtor has also responded to Acis's improper accusations concerning the Acis Litigation.

**Reply**

5.      In the Committee Objection, the Committee lists two objections to the Applications.  The first, and the Committee's "principal concern," is "the lack of clear delineation of [Foley's and Lynn Pinker's] proposed engagements and representations, and the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1004
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1118 of 1828 PageID 10611
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1003 of 1803 PageID 11749
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 4 of 16

Debtor's obligation to pay for the same." (Committee Objection, ¶ 3.) The second is that "the Applications do not provide for an allocation of attorneys' fees and expenses among the Debtor and non-debtor defendants." (*Id.*, ¶ 4.) Parsing the vitriol in the Acis Objection, it is apparent that Acis is generally asserting the same two objections as the Committee. (Acis Objection, ¶¶ 5; 8.) These two concerns are addressed below.

## I. Foley's and Lynn Pinker's Proposed Engagements

6. Prior to the Petition Date, the Debtor was represented by both Foley and Lynn Pinker acting as co-counsel. Lynn Pinker is a highly- regarded litigation boutique based in Dallas, Texas, but does not have bankruptcy attorneys on staff. Conversely, Foley has a large and well-established bankruptcy practice. Because each of the matters set forth below includes both a bankruptcy and litigation component, the Debtor utilized the services of both Foley and Lynn Pinker. Foley provided the bankruptcy expertise – but, in light of the Debtor's retention of Lynn Pinker, does not have litigators staffed on the matters – and Lynn Pinker primarily handled litigation strategy but deferred to Foley on the bankruptcy components. As such, despite both Lynn Pinker and Foley being retained, there was limited overlap in the services they provided to the Debtor other than the overlap necessary to collaborate on overall progress and strategy.

7. The following are the matters in which Foley and Lynn Pinker represented the Debtor prepetition (collectively, the "Acis Litigation"). The list also includes entities related to the Debtor which were also represented by Foley and/or Lynn Pinker and whose legal fees were paid – prepetition – by the Debtor (as discussed below). The Debtor believes that one of these matters, the Adversary Proceeding (as defined below), has been stayed as a result of the Debtor's bankruptcy filing, and that there will only be de minimis, if any, legal work required on

DOCS_NY:39826.11 36027/002

such matter during the Debtor's bankruptcy.[3]  As set forth below, the Debtor is only seeking to

retain Foley and Lynn Pinker with respect to the Acis Bankruptcy, Neutra Appeal, Debtor

Appeal, and the Winstead Matter (each as defined below) at this time.

| Matter | Clients | Case Summary | Procedural Posture |
|---|---|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.*), Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy") | Debtor<br><br>Neutra Limited[4] (Foley client only) | Acis involuntary bankruptcy proceeding initiated by Mr. Terry.  The Debtor has a claim in excess of $8 million for pre- and post-petition services provided to Acis.[5]  Neutra is nominally involved in the Acis Bankruptcy as a party in interest.  Other than Mr. Terry, the Debtor is Acis's only material creditor. | The Debtor's claims in the Acis Bankruptcy have been consolidated with the Adversary Proceeding (defined below). |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) (collectively, the "Adversary Proceeding") | Debtor<br><br>Highland HCF Advisors, Ltd.<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. | The Debtor is currently a defendant in the Adversary Proceeding.  The bankruptcy court consolidated resolution of the Debtor's claims with this Adversary Proceeding.  The defendants have filed a motion to withdraw the reference, which has been argued to the bankruptcy court and is pending.  The bankruptcy court has not yet produced its Report and Recommendation to the District Court as to whether to withdraw the reference. | The Debtor believes this matter is stayed as to the Debtor and the other defendants, and will likely remain so for the foreseeable future due to the nature of the action. |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) (the "Neutra Appeal") | Neutra (Foley client only) | Neutra is appealing the involuntary order for relief entered in the Acis Bankruptcy.  If successful, certain CLO management agreements may revert to the Debtor.  The Debtor previously received in excess of $12 million annually under those agreements.[6] | The Neutra Appeal is not stayed and is proceeding.  Neutra filed its reply brief on November 20, 2019. |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) (the "Debtor Appeal") | Debtor<br><br>Neutra (Foley client only) | The Debtor and Neutra are appealing entry of the confirmation order in the Acis Bankruptcy. | This appeal is not stayed, and the Debtor's reply brief is due December16, 2019. |

[3] If circumstances change, the Debtor proposes to return to this Court to discuss the changed circumstances and to update the Applications if necessary.

[4] The economic interests in Neutra Limited ("Neutra") are owned, indirectly, 25% by Mark Okada and 75% by James Dondero.  Prior to the confirmation of the contested plan in the Acis Bankruptcy, Neutra owned 100% of the limited partnership interests in Acis LP and 100% of the membership interests in Acis GP.  In his deposition, Mr. Sharp stated that Lynn Pinker represented Neutra; however, Neutra is represented by Foley.

[5] *See* Highland Capital Management, L.P. Proof of Claim #27 in the Acis LP case and Proof of Claim # 13 in the Acis GP case, attached hereto as Exhibit D and E, respectively,  and Highland Capital Management, L.P.'s Application for Administrative Expense Claim Pursuant to 11 U.S.C. §503(b), Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. Dec. 11, 2018) [Docket No. 772], attached hereto as Exhibit F.

[6] *See* Acis LP's Statement of Financial Affairs, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. April 30, 2018) [Docket No. 165], relevant excerpts of which are attached hereto as Exhibit G.

Appellee Appx. 00998

APPX. 10863

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1006
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1120 of 1828 PageID 10613
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1005 of 1803 PageID 11751
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 6 of 16

| | | | |
|---|---|---|---|
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) (the "Winstead Matter") | Debtor | The Debtor is appealing a ruling allowing Winstead to represent both Acis's chapter 11 trustee and Mr. Terry, individually and as a creditor of Acis, to the District Court. If successful, Winstead will be required to disgorge fees and expenses improperly billed to Acis's estate.[7] | The "Record of Appeal" has not yet been docketed and no briefing schedule has been set. This matter will proceed once docketed. |

8.     In addition, Lynn Pinker represented the Debtor and certain of the

Debtor's officers in the following prepetition matter in which Foley was not involved:

| Matter | Clients | Case Summary | Procedural Posture |
|---|---|---|---|
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) (the "Terry Litigation") | Debtor<br><br>J. Dondero<br><br>T. Surgent | The Debtor, Mr. Dondero, and Mr. Surgent are currently defendants in this matter and are facing claims for breach of contract, conversion, violation of Texas Theft Liability Act, and related civil conspiracy claims. Mr. Dondero is individually facing a claim for defamation. | Currently stayed as to the Debtor. |

9.     As set forth above, the Debtor believes that the Terry Litigation and the

Adversary Proceeding are stayed. At this time, the Debtor only intends to continue Foley's and

Lynn Pinker's representations post-petition with respect to the Acis Bankruptcy, the Neutra

Appeal, the Debtor Appeal, and the Winstead Matter. However, the Debtor reserves the right to

supplement the Applications to the extent that Foley and Lynn Pinker's services are needed in

the Adversary Proceeding and the Terry Litigation. Further, in light of the allegations being

asserted by the Committee in the *Motion of the Official Committee of Unsecured Creditors for*

*an Order Transferring Venue of this Case to the United States Bankruptcy Court for the*

*Northern District of Texas* [Docket No. 86] (the "Venue Motion"), as well as the joinder thereto

by Acis [Docket No. 122], the Debtor's bankruptcy professionals have sought input from these

---

[7] *See* Statement of Issues by Appellant Highland Capital Management, L.P., Case No. 18-30264-SGJ-11 (Bankr. N.D. Texas July 1, 2019) [Docket No. 1058], attached hereto as Exhibit H.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1007
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1121 of 1828 PageID 10614
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1006 of 1803 PageID 11752
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 7 of 16

firms due to their significant history and familiarity with the Acis Litigation.

10.     The Debtor believes that the continued retention of Foley and Lynn Pinker in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter will provide a substantial benefit to the estate.  The Debtor has significant claims against Acis, and Foley and Lynn Pinker are an integral part of that litigation.  As discussed above, the Debtor has a claim in the Acis Bankruptcy in excess of $8 million, and, if the Neutra Appeal is successful, the Debtor will be in a position to once again receive the benefit of the CLO management agreements, which historically have provided the Debtor with annual revenues in excess of $12 million.  If the Debtor Appeal is successful, Neutra will regain its interests in Acis and will be able to reinstate the Debtor to resume providing management services to certain collateralized loan obligations.  Finally, if the Debtor is successful in the Winstead Matter, Winstead will be required to disgorge its fees and expenses charged to the Acis estate.  The Debtor believes such amounts are currently in excess of $2 million.[8]  As such, there is substantial benefit to the Debtor's estate in the Debtor continuing to protect its rights in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter.

11.     Conversely, any delay in the retention of Foley and Lynn Pinker will have a substantial and negative impact on the Debtor's estate and the value of its claims in its litigation with Acis.  If the Debtor is not allowed to continue with the engagement of Foley and Lynn Pinker, the Debtor would be severely disadvantaged by the loss of critical knowledge and expertise these law firms have devoted to this representation over the course of the past twenty

---

[8] For the avoidance of doubt, any of Winstead's fees and expenses that are disgorged will not flow directly to the Debtor but will instead be returned to the Acis estate for distribution to Acis's creditors of which the Debtor is now the largest.

DOCS_NY:39826.11 36027/002

Appellee Appx. 01000
APPX. 10567

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22     Entered 08/15/22 16:45:41     Page 1008
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23     Page 1122 of 1828   PageID 10615
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21     Page 1007 of 1803   PageID 11753
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 8 of 16

(20) months.  Further, the costs to replace these firms would be substantial, and the risk of loss of

important tactical litigation strategy would be detrimental to the Debtor.

### II.      Prepetition Allocation of Attorneys' Fees and Expenses

12.      Prior to the Petition Date, legal fees incurred by Foley and Lynn Pinker for

their representations of the Debtor and non-Debtor parties in the Acis Litigation and the Terry

Litigation were paid by either (i) the Debtor or by (2) Highland CLO Funding, Ltd. ("HCLOF")

via an indemnification obligation to the Debtor.  *See* ¶17 *infra*.

### The Acis Litigation:

13.      The Debtor paid for Foley and Lynn Pinker's services in the Acis

Litigation for non-Debtor entities.  However, with the exception of Neutra, each such non-Debtor

entity  (i) is either directly or indirectly 100% owned by the Debtor; (ii) has no assets; (iii) is

only involved in the Acis Litigation because Acis alleged that the Debtor caused such entities to

engage in certain acts that harmed Acis; and (iv) is subject to the exact same claims as the

Debtor.  Additionally, absent funding by the Debtor, the non-Debtor defendants that are wholly

owned by the Debtor would be have no way to defend against Acis's claims.  Any attempt to

collect on those claims from such non-Debtor entities would also lead back to their general

partners or members, which are the Debtor.  As such, the Debtor believed and believes such

entities are only nominal parties to the Acis Litigation and that Foley's and Lynn Pinker's

defense of such parties is part and parcel of the Debtor's defense of itself and its assets.

14.      The Debtor historically paid Foley's fees and expenses incurred by

Neutra.  As disclosed above, the economic interests in Neutra are owned, indirectly, 25% by Mr.

Okada and 75% by Mr. Dondero.  As a special purpose entity, Neutra, however, has no assets,

Appellee Appx. 01001
Appx. 103868

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1009
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1123 of 1828 PageID 10616
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1008 of 1803 PageID 11754
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 9 of 16

and had no assets prior to the Acis Bankruptcy except for its interests in Acis. Although the Debtor is not a direct appellant in the Neutra Appeal,[9] if Neutra is successful in the Neutra Appeal, Neutra will regain its interests in Acis and intends to cause certain services and advisory agreements to revert back to the Debtor. The Debtor then would be in a position to earn revenue from those agreements, as it did prior to the filing of the involuntary bankruptcy petitions against Acis LP and Acis GP and prior to its contracts being terminated in the Acis Bankruptcy. By way of example, in the one year period prior to the filing of the involuntary petitions, Acis LP compensated the Debtor more than $12 million for its services.

15.     Although the economic interests in Neutra are indirectly owned by Mr. Dondero and Mr. Okada, Mr. Dondero and Mr. Okada will likely not see a return on their equity for some time. If the Neutra Appeal is successful, Neutra will regain its interest in Acis and Acis will also be required to pay the Debtor (i) approximately 85% of its revenue for services provided under the services agreements and (ii) for its claims against Acis for pre- and postpetition services rendered, which are currently in excess of $8 million. As such, it is estimated that Acis would owe approximately four years of revenue to the Debtor, including payment of services and pay down of the $8 million previously accrued and unpaid.

16.     For the foregoing reasons, the Debtor has agreed to pay Neutra's fees in the Neutra Appeal, the Acis Bankruptcy, and the Debtor Appeal. Paying those fees makes economic sense for the Debtor, but does not make sense for Mr. Dondero, Mr. Okada, or any other party[10] as they would not see a return on that investment for a significant amount of time.

---

[9] Under the "person aggrieved" standing for purposes of appeal, Neutra was the proper appellant.

[10] As previously stated, as a special purpose entity, Neutra has no assets other than its prior ownership of the equity in Acis.

DOCS_NY:39826.11 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1010
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1124 of 1828   PageID 10617
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1009 of 1803   PageID 11755
Case 19-12239-CSS   Doc 159   Filed 11/21/19   Page 10 of 16

17.     Finally, although the Debtor has agreed to pay Foley and Lynn Pinker for the services provided to the Debtor and the non-Debtors set forth above in the Acis Litigation, the majority of those fees and expenses actually were paid by a non-Debtor entity, HCLOF.[11] The Debtor owns less than 1% of the economic interest in HCLOF.  As part of HCLOF's agreement with the Debtor, HCLOF indemnifies the Debtor if the Debtor incurs any legal fees on HCLOF's behalf.  Pursuant to that indemnification, HCLOF, prior to the Petition Date, either paid directly or reimbursed the Debtor for the majority of Foley's and Lynn Pinker's fees and expenses incurred in the matters set forth above.

**The Terry Litigation:**

18.     The Debtor historically paid all of Lynn Pinker's fees and expenses with respect to their representation of the Debtor, Mr. Dondero, and Mr. Surgent in the Terry Litigation.  The Debtor paid Mr. Dondero's and Mr. Surgent's legal fees in this matter as Mr. Dondero and Mr. Surgent were entitled to indemnification under the Debtor's limited partnership agreement.  (Exh G., § 4.1(h).)

### III.     Postpetition Allocation of Fees

19.     As set forth above, the Debtor believes that all matters except for the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter are stayed and will remain stayed during the pendency of the Debtor's case.  The Debtor is the only party in the Winstead Matter.  The Debtor, for the reasons set forth above, intends to compensate Foley for its representation of Neutra – the only non-Debtor party – in the Acis Bankruptcy, the Neutra

---

[11] HCLOF is a party to the Acis Bankruptcy, the Debtor Appeal, and the Adversary Proceeding.  HCLOF is represented by the law firm, King & Spalding, and is not represented by Foley or Lynn Pinker.  HCLOF pays King & Spalding's fees and expenses directly.

DOCS_NY:39826.11 36027/002

Appellee Appx. 01003
Appx. 10360

Appeal, and the Debtor Appeal, subject to this Court's order.[12] The Debtor believes that if Neutra is successful in the Neutra Appeal, the Debtor and its estate will be a significant beneficiary of such an outcome and will receive a direct and substantial benefit. In the Acis Bankruptcy and the Debtor Appeal, Neutra is only a nominal party, and the Debtor is receiving the primary benefit of Foley's legal services in those matters. Further, a substantial portion of Foley's and Lynn Pinker's fees and expenses may continue to be reimbursed by HCLOF although the exact amount of such reimbursement is not yet known.

20. To the extent that the other matters set forth above are not stayed, as to any party, the Debtor intends to supplement the Applications to seek authority to pay the costs of the non-Debtor parties represented by Foley and Lynn Pinker.

## IV.    Additional Issues Raised in the Acis Objection

21. The balance of the issues raised in the Acis Objection are irrelevant or misleading and in all cases constitute an inappropriate attempt by Acis to use this Court's authority and the Bankruptcy Code to secure a litigation advantage against the Debtor. Consequently, the Debtor is compelled to respond to each point.

22. **Rule 2017(a) of the Federal Rules of Bankruptcy Procedure**: Acis has reserved its right "to compel disclosure" of information relating to the amounts billed by Foley and Lynn Pinker prior to the Petition Date pursuant to Rule 2017(a).[13] (Acis Objection, ¶ 5.) By

---

[12] The Debtor and Neutra currently contemplate entering into an agreement pursuant to which Neutra will repay the Debtor for Foley's fees and expenses incurred on Neutra's behalf. Under the proposed agreement, Neutra would reimburse the Debtor from any net proceeds it receives as a result of the transactions discussed herein and would also agree not to make any equity distributions or similar payments to any of Neutra's shareholders, Mr. Dondero, Mr. Okada, or any of their affiliates until after the Debtor is repaid for Foley's legal fees and expenses incurred on Neutra's behalf.

[13] Acis has also stated that Foley and Lynn Pinker should disclose payments made to them pursuant to Rule 2017(b), which requires disclosure of fees incurred after a petition is filed. As set forth in the Applications, Foley and Lynn Pinker intend to comply with Rule 2017(b) – and their other obligations to this Court – and to file fee applications

---

Appellee Appx. 01004

APPX. 10369

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1012
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1126 of 1828 PageID 10619
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1011 of 1803 PageID 11757
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 12 of 16

its terms, Rule 2017(a) only applies to payments "in contemplation of the filing of a petition

under the Code by or against the debtor. . . ." FRBP 2017(a). As set forth in the Declarations,

neither Foley nor Lynn Pinker received payments in contemplation of the bankruptcy. However,

Acis's reservation of rights is noted, and the Debtor anticipates Acis will continue its attempts to

use this proceeding to influence the Acis Litigation by objecting to Foley's and Lynn Pinker's

fees. The Debtor will respond appropriately if and when such objections are filed.

23. **HRA Holdings, LLC**: Foley initially sought a conflict waiver with

respect to HRA Holdings, LLC, when it entered into its engagement letter with the Debtor in

April 2018. At that time, the Debtor was contemplating a potential investment in HRA

Holdings, LLC, another Foley client. However, that investment never occurred, and thus no

conflict ever arose.

24. **Lynn Pinker Engagement Letter:** As set forth in the Hurst Declaration,

Lynn Pinker does not have an engagement letter with the Debtor and consequently could not

attach an engagement letter to its retention application. The terms of Lynn Pinker's engagement

were previously disclosed and are re-disclosed in the Hurst Declaration.

25. **Expert Retention of Scott Ellington**: In 2018, Lynn Pinker and the Pettit

Law Firm retained Scott Ellington, the Debtor's general counsel, as an expert witness in *Robert

A. Imel v. Legacy Texas Bank, N.A. and Energy Reserves Group, LLC*, Cause No. DC-16-01372

(134th Judicial District Court of Dallas County, Texas). The *Imel* litigation was wholly

unrelated to the Debtor and did not involve the Debtor or any entities affiliated or related to the

---

subject to appropriate review following their retention. If any of Foley's or Lynn Pinker's fees or expenses are
thought to be excessive or inappropriate, parties in interests are entitled to object at the time the fee application is
filed, not before.

DOCS_NY:39826.11 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1013
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1127 of 1828 PageID 10620
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1012 of 1803 PageID 11758
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 13 of 16

Debtor, James, Dondero, or Mark Okada. (Hurst Decl, ¶ 5.) Mr. Ellington's retention in the

*Imel* litigation was in Mr. Ellington's individual capacity, not in his capacity as the Debtor's

general counsel, and was limited to Mr. Ellington preparing a six page expert report and offering

his deposition and trial testimony. As such, Mr. Ellington's retention by Lynn Pinker was not a

representation by Lynn Pinker of the Debtor or any of the Debtor's interested parties. The *Imel*

litigation concluded in 2018.

26. **Charitable Donor Advised Fund, L.P. ("Charitable DAF"):** Despite

Acis's attempts to kick up mud, Lynn Pinker's representation of Charitable DAF is *not* related to

the Debtor's bankruptcy. Charitable DAF is proceeding against U.S. Bank, N.A., and U.S. Bank,

N.A., is not a party in interest in this case.[14] Further, Acis admits that Lynn Pinker's

representation of Charitable DAF is at best a step removed from even the Acis Litigation. Acis

has not alleged that Charitable DAF's proceedings are connected to the Debtor's bankruptcy

proceedings.

27. **CLO Holdco, Ltd.:** As disclosed in the O'Neil Affidavit, Foley has not

represented CLO Holdco, Ltd., since approximately May 2018, and, on information and belief,

CLO Holdco, Ltd. has retained separate counsel to represent it in the Debtor's bankruptcy.

28. **Foley and Lynn Pinker's Prepetition Claims:** Acis alleges that Foley's

and Lynn Pinker's prepetition claims render them adverse to the Debtor. While this could be

true with respect to professionals engaged under 11 U.S.C. § 327(a),[15] it is not true with respect

---

[14] As disclosed in the Hurst Declaration, Lynn Pinker also represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund in confidential matters unrelated to the Debtor's bankruptcy.

[15] *See, e.g., Staiano v. Pillowtex (In re Pillowtex, Inc.)*, 304 F.3d 246 (3rd Cir. 2002).

Appellee Appx. 01006
APPX. 10673

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1014
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1128 of 1828 PageID 10621
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1013 of 1803 PageID 11759
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 14 of 16

to professionals, like Foley and Lynn Pinker, seeking retention under 11 U.S.C. § 327(e).

Instead, Section 327(e) contemplates professionals having and retaining prepetition claims

against a debtor so long as they do not "hold any interest adverse to the debtor or to the estate

***with respect to the matter on which such attorney is to be employed***." 11 U.S.C. § 327(e)

(emphasis added); *see also* Colliers on Bankruptcy, 16th ed., ¶327.04[0]. Consequently, Foley

and Lynn Pinker would be disqualified from representing the Debtor under Section 327(e) in the

Acis Litigation and Terry Litigation only if they had a conflict with respect to those specific

matters. They do not, and Acis's allegation of a debilitating conflict on account of their

prepetition claims is not well founded.

29. **Winstead's Conflict of Interest:** Unlike Acis and its counsel, the Debtor

does not wish to litigate in this Court matters properly before another court. However, to clarify

the record, the Debtor believes that it is important to distinguish Foley and Lynn Pinker's

representation of the Debtor in the Acis Litigation from Winstead's representation of both Acis's

Chapter 11 Trustee and Mr. Terry in the Acis Bankruptcy. This matter is currently being

litigated and is referred to as the Winstead Matter above.

30. Mr. Terry was, and currently is, a creditor of Acis, and he was, and

currently is, represented by Winstead in the filing of his involuntary petitions against Acis.

Concurrently with its representation of Mr. Terry as a substantial creditor of Acis (and while the

orders for relief were on appeal), Winstead sought and was retained by the Chapter 11 trustee in

Acis's bankruptcy under 11 U.S.C. § 327(a).[16] Consequently, Winstead represented both Acis's

---

[16] *See Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. May 30, 2018) [Docket No. 246], attached hereto as Exhibit I, and *Order (I) Approving the Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee and (II) Denying the Motion to*

Appellee Appx. 01007
APPX. 10374

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1015
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1129 of 1828 PageID 10622
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1014 of 1803 PageID 11760
Case 19-12239-CSS Doc 159 Filed 11/21/19 Page 15 of 16

Chapter 11 trustee and one of Acis's largest creditors at the same time despite being opposed to Acis in the prosecution of the involuntary petitions. Further, both the approval of the involuntary petition and the confirmation of Acis's chapter 11 plan, respectively, are actively being appealed. Winstead is thus representing Mr. Terry in his action to put Acis into bankruptcy while also representing Acis's Chapter 11 trustee in the confirmation of Acis's bankruptcy plan.

31.     Winstead's situation in the Acis Bankruptcy is thus wildly different from Foley and Lynn Pinker's in the Debtor's bankruptcy. Neither Foley nor Lynn Pinker have a conflict of interest with respect to their representation of the Debtor in the Acis and Terry Litigation. Unlike Winstead, they have also never been directly or indirectly adverse to their clients. In addition, Foley and Lynn Pinker are being retained under 11 U.S.C. § 327(e) in the Debtor's bankruptcy as special litigation counsel; they are not being retained as the Debtor's bankruptcy counsel under Section 327(a).

*[Remainder of Page Intentionally Blank]*

---

*Disqualify Winstead PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. June 21, 2018) [Docket No. 313], attached hereto as Exhibit J.

DOCS_NY:39826.11 36027/002

Appellee Appx. 01008
Appx. 10673

WHEREFORE, for the reasons set forth above, the Debtor's proposed retention of

(i) Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, and (ii) Lynn Pinker Cox &

Hurst LLP as Special Texas Litigation Counsel are in the best interests of the Debtor's estate and

should be approved on the terms set forth in the Applications.

Dated:  November 21, 2019                    PACHULSKI STANG ZIEHL & JONES LLP


                                             */s/ James E. O'Neill*
                                             Richard M. Pachulski (CA Bar No. 62337)
                                             Jeffrey N. Pomerantz (CA Bar No.143717)
                                             Ira D. Kharasch (CA Bar No. 109084)
                                             Maxim B. Litvak (CA Bar No. 215852)
                                             James E. O'Neill (DE Bar No. 4042)
                                             919 North Market Street, 17th Floor
                                             Wilmington, DE 19899 (Courier 19801)
                                             Telephone: (302) 652-4100
                                             Facsimile:  (302) 652-4400
                                             E-mail:     rpachulski@pszjlaw.com
                                                         jpomerantz@pszjlaw.com
                                                         ikharasch@pszjlaw.com
                                                         mlitvak@pszjlaw.com
                                                         joneill@pszjlaw.com

                                             *Proposed Counsel for the Debtor*
                                             *and Debtor in Possession*

DOCS_NY:39826.11 36027/002

Appellee Appx. 01009

Appx. 10806

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1017
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1131 of 1828   PageID 10624
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1016 of 1803   PageID 11762

# Exhibit A

**Supplemental Hurst Declaration**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1018
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1132 of 1828 PageID 10625
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1017 of 1803 PageID 11763
Case 19-12239-CSS Doc 159-1 Filed 11/21/19 Page 2 of 5

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) |  |

**SUPPLEMENTAL DECLARATION OF MICHAEL K. HURST IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Michael K. Hurst, declare under penalty of perjury as follows:

1. I am a partner with the law firm of Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), located in Dallas, Texas. I am submitting this supplemental declaration ("Declaration") in further support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

2. In the *Declaration of Michael K. Hurst in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP, as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date*, dated October 29, 2019 [Docket No. 70-2], I disclosed, that the Firm has represented (a) the Debtor since March 2016; (b) certain other entities related to the Debtor, including the Cayman Defendants in the Pending Acis Proceedings and the defendants in the Texas Lawsuit who are executives of the Debtor; and (c)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Appellee Appx. 01011
APPX. 10808

the Charitable DAF (the Charitable Donor Advised Fund, L.P.) in a case unrelated to the Debtor

pending before the Southern District of New York, case number 1:19-cv-09857-NRB.

3.      To supplement that prior disclosure, as of the Petition Date, the Firm

specifically represented the Debtor and the following entities related to the Debtor in the following

matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) | Debtor |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.*, Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) | Debtor

Highland HCF Advisors, Ltd.,

Highland CLO Management, LLC

Highland CLO Holdings, Ltd. |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) | Debtor |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) | Debtor |
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) | Debtor

J. Dondero

T. Surgent |
| *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association*, Case No. 1:19-cv-09857-NRB (S.D.N.Y. 2019) | Charitable DAF |

4.      In addition, the Firm represents the following entities related to the Debtor

in a non-public matter: (i) NexPoint Strategic Opportunities Fund, (ii) Highland Global Allocation

Fund, and (iii) Highland Income Fund. The Firm inadvertently failed to disclose this

representation as the representation is limited and involves a non-public matter not related to the

Debtor's bankruptcy.

5.      Additionally, in 2018, the Firm, along with the Pettit Law Firm, retained

Scott Ellington, the Debtor's general counsel, to act as an expert witness in *Robert A. Imel v.*

*Legacy Texas Bank, N.A. and Energy Reserves Group, LLC*, Cause No. DC-16-01372 (134th

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1020
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1134 of 1828 PageID 10627
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1019 of 1803 PageID 11765
Case 19-12239-CSS Doc 159-1 Filed 11/21/19 Page 4 of 5

Judicial District Court of Dallas County, Texas). The *Imel* litigation was wholly unrelated to the Debtor and did not involve the Debtor or any entities affiliated or related to the Debtor, James, Dondero, or Mark Okada. Mr. Ellington's retention in the *Imel* litigation was in Mr. Ellington's individual capacity, not in his capacity as the Debtor's general counsel, and was limited to Mr. Ellington preparing a six page expert report and offering his deposition and trial testimony. Mr. Ellington was retained by the Firm and the Pettit Law Firm in the *Imel* litigation. The Firm's retention of Mr. Ellington was not previously disclosed as the Firm was not retained to provide legal services to Mr. Ellington. The *Imel* litigation concluded in 2018.

6. The Firm, as a matter of practice, does not have an engagement letter with the Debtor or any entities related to the Debtor that it represents. However, as previously disclosed, with respect to all matters, the Debtor has (subject to Court approval) agreed to compensate the Firm on an hourly basis at rates that do not (and will not) exceed the rates that the Firm customarily charges to its other clients for work of this type. As of the Petition Date, the applicable hourly rates for timekeepers for the matters that the Firm is engaged to perform legal services ranged from $365 to $800 for attorneys and $180 to $235 for paraprofessionals. The Firm will also charge the Debtor for certain expenses incurred in connection with providing services to the Debtor, including, without limitation, travel, lodging, vendor charges, delivery services and other expenses incurred in providing professional service, and for other services actually provided, including word processing and other charges, excluding secretarial overtime.

7. The Firm did not bill the Debtor any amounts prior to the Petition Date in contemplation of the Debtor's bankruptcy filing. Any amounts billed and paid prior to the Petition Date by the Debtor were in connection with the matters set forth above.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1021
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1135 of 1828 PageID 10628
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1020 of 1803 PageID 11766
Case 19-12239-CSS Doc 159-1 Filed 11/21/19 Page 5 of 5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Dated: November 21, 2019

/s/ Michael K. Hurst
Michael K. Hurst, Partner

DOCS_NY:39835.3 36027/002

# Exhibit B

**Supplemental O'Neil Declaration**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1023
Case 3:23-cv-00726-S Document 8-22 Filed 01/24/23 Page 1137 of 1828 PageID 10630
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1022 of 1803 PageID 11768
Case 19-12239-CSS Doc 159-2 Filed 11/21/19 Page 2 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) |  |

**SUPPLEMENTAL DECLARATION OF HOLLAND N. O'NEIL IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Holland N. O'Neil, declare under penalty of perjury as follows:

1.      I am a partner with the law firm of Foley Gardere, Foley & Lardner LLP (the "Firm"), and I maintain my office in Dallas, Texas.[2]  I am submitting this supplemental declaration ("Declaration") in further support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[3]

2.      In the *Declaration of Holland N. O'Neil in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date*, dated October 29, 2019 [Docket No. 69-2] (the "Initial Declaration"), I disclosed that the Firm has represented the Debtor and

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] The Firm has offices in Austin, Boston, Chicago, Dallas, Denver, Detroit, Houston, Jacksonville, Los Angeles, Madison, Mexico City, Miami, Milwaukee, New York, Orlando, Sacramento, San Diego, San Francisco, Silicon Valley, Tallahassee, Tampa, Washington, D.C., Brussels and Tokyo.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Appellee Appx. 01016
APPX. 10573

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1024
Case 3:23-cv-00726-S Document 8-22 Filed 01/24/23 Page 1138 of 1828 PageID 10631
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1023 of 1803 PageID 11769
Case 19-12239-CSS Doc 159-2 Filed 11/21/19 Page 3 of 4

certain other related entities, including Neutra, HCLOF and the Cayman Defendants since April

2018 in the Acis Proceedings.

     3.     To supplement that prior disclosure, as of the Petition Date, the Firm

specifically represents the Debtor and the following entities related to the Debtor in the following

matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.),* Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Neutra Limited |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.,* Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) | Debtor<br><br>Highland HCF Advisors, Ltd.,<br><br>Highland CLO Management, LLC<br><br>Highland CLO Holdings, Ltd. |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.),* Case No. 19-10846 (5th Cir. 2019) | Neutra Limited |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee,* Case No. 19-10847 (5th Cir. 2019) | Debtor<br><br>Neutra Limited |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee,* Case No. 3:19-cv-1477D (N.D. Tex. 2019) | Debtor |

     4.     As disclosed in the Firm's engagement letter attached to the Initial

Declaration, the Firm initially sought a conflict waiver with respect to HRA Holdings, LLC, when

it entered into that engagement letter. At that time, the Debtor was contemplating a potential

investment in HRA Holdings, LLC, another Foley client. That investment never occurred, and the

Firm does not believe that a conflict ever arose.

     5.     The Firm previously represented CLO Holdco, Ltd., in matters unrelated to

the Debtor's bankruptcy. Since approximately May 2018, the Firm has not represented CLO

Holdco, Ltd.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1025
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1139 of 1828   PageID 10632
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1024 of 1803   PageID 11770
Case 19-12239-CSS   Doc 159-2   Filed 11/21/19   Page 4 of 4

6.      The Firm did not bill the Debtor any amounts prior to the Petition Date in contemplation of the Debtor's bankruptcy filing.  Any amounts billed and paid prior to the Petition Date by the Debtor were in connection with the matters set forth above.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  November 21, 2019

/s/ Holland N. O'Neil
Holland N. O'Neil, Partner

4850-8126-8394.6

Appellee Appx. 01018
Appx. 10573

Case 19-12239-CSS    Doc 159-3    Filed 11/21/19    Page 1 of 6

# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF BRADLEY SHARP IN SUPPORT OF DEBTOR'S APPLICATIONS (I) FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE, AND (II) FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Bradley Sharp, hereby declare under penalty of perjury:

1.      I am the proposed Chief Restructuring Officer of Highland Capital Management, L.P., the above-captioned debtor and debtor in possession (the "Debtor").

2.      I submit this declaration (the "Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* (the "Foley Application") and *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP, as Special Texas Litigation Counsel, Nunc Pro Turn to the Petition Date* (the "Lynn Pinker Application," and together with the Foley Application, the "Applications").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Applications.

4850-8126-8394.6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1028
Case 3:23-cv-00726-S   Document 8-22   Filed 02/24/23   Page 1142 of 1828   PageID 10635
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1027 of 1803   PageID 11773

Case 19-12239-CSS    Doc 159-3   Filed 11/21/19   Page 3 of 6

3.      This Declaration is being submitted to supplement the (i) *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner, LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69-6], and (ii) *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst, LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 70-5].

4.      Prior to the Petition Date, Foley and/or Lynn Pinker represented the Debtor and certain the Debtor's related entities in the following matters:

| Matter | Clients |
|---|---|
| *In re Acis Capital Management, L.P.*, Case No. 18-30264-SGJ-11 (Bankr. N.D. Tex. 2018) & *In re Acis Capital Management GP, L.L.C.)*, Case No. 18-30265-SGJ-11 (Bankr. N.D. Tex. 2018) (the "Acis Bankruptcy") | Debtor (Foley/Lynn Pinker)<br><br>Neutra Limited (Foley) |
| *Acis Capital Management GP, LLC. and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al*, Adv. Proc. No. 18-03078 (Bankr. N.D. Tex. 2018) & *Acis Capital Management, L.P. and Acis Capital Management GP, LLC v. Highland Capital Management, L.P., et al.,* Adv. Proc. No. 18-03212 (Bankr. N.D. Tex. 2018) ("Adversary Proceeding") | Debtor (Foley/Lynn Pinker)<br><br>Highland HCF Advisors, Ltd. (Foley/Lynn Pinker)<br><br>Highland CLO Management, LLC (Foley/Lynn Pinker)<br><br>Highland CLO Holdings, Ltd. (Foley/Lynn Pinker) |
| *Neutra Limited v. Josh Terry (In re Acis Capital Management, L.P.)*, Case No. 19-10846 (5th Cir. 2019) ("Neutra Appeal") | Neutra (Foley) |
| *In re Matter of Acis Management GP, LLC and Acis Capital Management, L.P. v. Highland Capital Management, L.P., et al, v. Robin Phelan, Chapter 11 Trustee*, Case No. 19-10847 (5th Cir. 2019) ("Debtor Appeal") | Debtor (Foley/Lynn Pinker)<br><br>Neutra (Foley) |
| *Highland Capital Management, L.P. v. Robin Phelan, Chapter 11 Trustee*, Case No. 3:19-cv-1477D (N.D. Tex. 2019) ("Winstead Matter") | Debtor (Foley/Lynn Pinker) |
| *Joshua N. Terry, Individually and on Behalf of IRAs #146771 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., et al*, Case No. DC-16-11396 (162nd Judicial District Court of Dallas County, Texas) (the "Terry Litigation") | Debtor (Lynn Pinker)<br><br>J. Dondero (Lynn Pinker)<br><br>T. Surgent (Lynn Pinker) |

5.      Prior to the Petition Date, the Debtor paid Foley's and/or Lynn Pinker's legal fees and expenses with respect to the Debtor and all the Debtor's related entities in the foregoing matters.

6.      On advice of counsel, I understand that all matters except for the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter are stayed and will remain stayed during the pendency of the Debtor's case.

7.      I believe that it is in the best interests of its estate to continue paying the legal fees incurred by the Debtor's related entities in the Acis Bankruptcy, the Neutra Appeal, the Debtor Appeal, and the Winstead Matter during the pendency of this bankruptcy case for the following reasons:

8.      <u>Neutra Appeal</u>:  The economic interests in Neutra are owned, indirectly, 25% by Mr. Okada and 75% by Mr. Dondero.  As a special purpose entity, Neutra, however, has no assets, and had no assets prior to the Acis Bankruptcy except for its interests in Acis. Although the Debtor is not a direct appellant in the Neutra Appeal, if Neutra is successful in the Neutra Appeal, I believe that Neutra will regain its interests in Acis and that Neutra intends to cause certain services and advisory agreements to revert back to the Debtor.  The Debtor then would be in a position to earn revenue from those agreements, as it did prior to the filing of the involuntary bankruptcy petitions against Acis LP and Acis GP and prior to its contracts being terminated in the Acis Bankruptcy.  By way of example, in the one year period prior to the filing of the involuntary petitions, Acis LP compensated the Debtor more than $12 million for its services.

9.      If the Neutra Appeal is successful, I believe that Neutra will regain its interest in Acis and Acis will also be required to pay the Debtor (i) approximately 85% of its

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1030
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1144 of 1828 PageID 10637
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1029 of 1803 PageID 11775
Case 19-12239-CSS Doc 159-3 Filed 11/21/19 Page 5 of 6

revenue for services provided under the services agreements and (ii) for its claims against Acis for pre- and postpetition services rendered, which are currently in excess of $8 million. As such, it is estimated that Acis would owe approximately four years of revenue to the Debtor, including payment of services and pay down of the $8 million previously accrued and unpaid. For that reason, I also believe that Mr. Dondero and Mr. Okada, as the holders of the economic interests in Neutra, will likely not see a return on their equity for some time.

10. For the foregoing reasons, I believe paying Neutra's fees in the Neutra Appeal, the Acis Bankruptcy, and the Debtor Appeal makes economic sense for the Debtor, but does not make sense for Mr. Dondero, Mr. Okada, or any other party as they would not see a return on that investment for a significant amount of time.

11. <u>Acis Bankruptcy and Debtor Appeal</u>: In addition to paying the Debtor's legal fees and expenses, the Debtor historically paid Foley's fees for Neutra, a non-Debtor, in the Acis Bankruptcy and the Debtor Appeal as, discussed above, Neutra's economic interests are owned, indirectly, 25% by Mark Okada and 75% by James Dondero. As a special purpose entity, Neutra has no assets.

12. <u>Winstead Matter</u>: The Debtor is the only party to the Winstead Matter, and the Debtor intends to continue paying Lynn Pinker's and Foley's fees for the Debtor subject to this Court's approval.

13. Prior to the Petition Date, the majority of Foley's and Lynn Pinker's fees and expenses were paid by a non-Debtor entity, Highland CLO Funding, Ltd. ("<u>HCLOF</u>").[3] The Debtor owns less than 1% of the economic interest in HCLOF. As part of HCLOF's agreement with the Debtor, HCLOF indemnifies the Debtor if the Debtor incurs any legal fees on HCLOF's

---

[3] HCLOF is represented by the law firm, King & Spalding, and is not represented by Foley or Lynn Pinker. HCLOF pays King & Spalding's fees and expenses directly.

behalf.  Pursuant to that indemnification, HCLOF, prior to the Petition Date, either paid directly or reimbursed the Debtor for the majority of Foley's and Lynn Pinker's fees and expenses incurred in the matters set forth above.  I understand, based on the advice of counsel, that a substantial portion of Foley's and Lynn Pinker's fees and expenses may continue to be reimbursed by HCLOF following the Petition Date but that the exact amount of such reimbursement is not yet known.

14.    Although the Debtor has paid certain of Lynn Pinker's and Foley's invoices for the services it provided in the matters set forth above, all prepetition payments to such firms were made in connection with the matters set forth above and not in contemplation of the Debtor's bankruptcy filing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:    November 21, 2019

HIGHLAND CAPITAL MANAGEMENT, L.P.


/s/ Bradley Sharp

Bradley Sharp
Proposed Chief Restructuring Officer

Case 19-12239-CSS   Doc 159-4   Filed 11/21/19   Page 1 of 54

# EXHIBIT D

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1033
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1147 of 1828 PageID 10640
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1032 of 1803 PageID 11778

Case 18-30264-sgj11 Doc 527 Filed 09/01/18 Filed 15/21 Main Document Page 2 of 54 Page 1 of 3

**Fill in this information to identify the case:**

Debtor 1    Acis Capital Management, L.P.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Northern District of Texas

Case number   18-30264-sgj11

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:   Identify the Claim

| | | |
|---|---|---|
| 1. Who is the current creditor? | Highland Capital Management, L.P.<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor | |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Holland O'Neil, Foley Gardere, Foley & Lardner<br>Name<br><br>2021 McKinney Ave, Suite 1600<br>Number    Street<br><br>Dallas    TX    75201<br>City    State    ZIP Code<br><br>Contact phone 214-999-3000<br><br>Contact email honeil@foley.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): | **Where should payments to the creditor be sent?** (if different)<br><br>Scott Ellington, Highland Capital Management<br>Name<br><br>300 Crescent Court, Suite 700<br>Number    Street<br><br>Dallas    TX    75201<br>City    State    ZIP Code<br><br>Contact phone<br><br>Contact email |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____<br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ | |

Appellee Appx. 01026
Appx. 10893

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |
| 7. How much is the claim? | $ _____ 4,672,140.38 . Does this amount include interest or other charges?<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Sub-Advisory Services and Shared Services |
| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property: $ _____<br>Amount of the claim that is secured: $ _____<br>Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition: $ _____<br><br>Annual Interest Rate (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____ |
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410        Proof of Claim        page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ Yes. *Check one:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 3 ) that applies.    $ 2,049,564.35

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   08/01/2018
    MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Scott Ellington | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Counsel | | |
| Company | Highland Capital Management, L.P. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 300 Crescent Court, Suite 700 | | |
| | Number   Street | | |
| | Dallas | TX | 75201 |
| | City | State | ZIP Code |
| Contact phone | | Email | |

Appellee Appx. 01028

APPX. 10893

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

## EXHIBIT A TO PROOF OF CLAIM

1.      <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim (the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below), Highland provided sub-advisory and shared services to the Debtors (defined below). Highland has provided portfolio management and advisory services to the Debtors pursuant to that certain Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically, Highland has acted as an investment manager and has identified, evaluated, and recommended investments to investment vehicles advised or sub-advised by the Debtors.  Highland has also provided the Debtors with back and middle office services pursuant to that certain Fourth Amended and Restated Shared Services Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the Debtors with all of the employees and staff necessary to manage the portfolios.  Highland continued to provide the same sub-advisory and shared services to the Debtors throughout the Gap Period (defined below). To date, Highland continues to provide such services.

2.      <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the "**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the United States Bankruptcy Court for the Northern District of Texas. Highland provides the service at the following address:  300 Crescent Court, Suite 700, Dallas, Texas 75201.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1037
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23    Page 1151 of 1828   PageID 10644
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1036 of 1803   PageID 11782
Case 18-30264-sgj11 Doc 2237 Part 2 Filed 08/01/21 Desc Exhibit A Page 2 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

3.    <u>Indebtedness</u>: Because the Debtors were put into bankruptcy involuntarily, the amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims (defined below).

a.    <u>Pre-Petition</u>: Joshua Terry, the petitioning creditor, filed the involuntary petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the outstanding indebtedness owing from the Debtors to Highland was as set forth below by account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
|  | **Totals** | **$2,622,576.03** |

b.    <u>Gap Period</u>: When a debtor files bankruptcy, the order for relief is typically entered on the date the petition is filed. However, an involuntary bankruptcy case diverges from the simultaneous entry of an order for relief in that an order for relief is entered at a later date than when a petition is filed. This creates a period of time, referred to as the "gap period", where the debtor may accrue post-petition but pre-order for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section…the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1038
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1152 of 1828   PageID 10645
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1037 of 1803   PageID 11783
Case 18-30264-sgj11 Doc 237 Part 2 Filed 08/01/18/Desc Exhibit A 54 Page 3 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.    <u>Reservation of Rights as to Administrative Claim</u>: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.    <u>Indemnity Claims</u>: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement. According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement, "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

    4.    <u>Reservation of Rights; Other Rights</u>: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

    5.    <u>Notices</u>: All notices to Highland are to be sent to:

    Highland Capital Management, L.P.
    Attn: David Klos
    300 Crescent Court
    Suite 700
    Dallas, Texas 75201

    *with copies to:*

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1040
Case 3:23-cv-00726-S Document 8-22 Filed 02/24/23 Page 1154 of 1828 PageID 10647
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1039 of 1803 PageID 11785
Case 18-30264-sgj11 Doc 2159 Filed 08/01/21 Desc Exhibit A Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Foley Gardere
Foley & Lardner, LLP
c/o Holland O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

6.  <u>Payments</u>:  All payments and distributions to Highland with respect to this proof

of claim are to be made as follows:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201
Re: *In re Acis Capital Management, L.P.*

7.  <u>Miscellaneous</u>:  This proof of claim is filed under compulsion of the bar date

established in this bankruptcy case solely out of an abundance of caution to protect Highland

from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this

proof of claim shall not be construed as an admission by Highland as to the amounts due and

owing outside of this bankruptcy proceeding. The filing of this proof of claim is **<u>not:</u>**  (a) a

waiver or release of and/or Highland's rights or remedies against any person, entity or property;

(b) a consent by Highland to entry of final judgment by this Court in any core proceeding

commenced in this bankruptcy case, consistent with the United States Supreme Court's holding

in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the

reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury

trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a

waiver of the right to assert a different or enhanced classification of priority for its Claim in

respect of the other claims asserted in this bankruptcy case.

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1041
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23  Page 1155 of 1828  PageID 10648
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1040 of 1803  PageID 11786

Case 18-30264-sgj11 Doc 1239-7 Filed 06/01/18 Doc 3159-4 Filed 08/11/21 Desc Exhibit 101 of 54 Page 1 of 21

**EXECUTION VERSION**

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

**Appellee Appx. 01034**

**APPX. 10599**

# TABLE OF CONTENTS

**Page**

1. Appointment; Limited Scope of Services .................................................................... 1

2. Compensation ............................................................................................................. 3

3. Representations and Warranties ................................................................................. 3

4. Standard of Care; Liability; Indemnification ............................................................ 4

5. Limitations on Employment of the Sub-Advisor; Conflicts of Interest .................... 7

6. Termination; Survival ................................................................................................ 8

7. Cooperation with Management Company .................................................................. 8

8. Management Agreements and Related Agreements ................................................... 8

9. Amendments; Assignments ....................................................................................... 9

10. Advisory Restrictions ................................................................................................ 9

11. Records; Confidentiality .......................................................................................... 10

12. Notice ....................................................................................................................... 11

13. Governing Law ......................................................................................................... 11

14. WAIVER OF JURY TRIAL ..................................................................................... 11

15. Severability .............................................................................................................. 11

16. No Waiver ................................................................................................................. 11

17. Counterparts ............................................................................................................. 12

18. Third Party Beneficiaries ......................................................................................... 12

19. No Partnership or Joint Venture ............................................................................... 12

20. Entire Agreement ..................................................................................................... 12

Appellee Appx. 01035

APPX. 03902

## THIRD AMENDED AND RESTATED
## SUB-ADVISORY AGREEMENT

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.      Appointment; Limited Scope of Services.

(a)      Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1044
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1158 of 1828 PageID 10651
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1043 of 1803 PageID 11789
Case 18-30264-sgj11 Doc 527 Part 3 Filed 08/01/21 Desc Exhibit 3 Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of Section 8, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)    Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)    make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)    place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)    identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)    assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)    provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)    assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)    assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "Services."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company. Furthermore, the

Appellee Appx. 01037
APPX. 10594

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01038

APPX. 10399

(ii)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)     no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)     neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)     The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission.  The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.     Standard of Care; Liability; Indemnification.

(a)     Sub-Advisor Standard of Care.  Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1047
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1161 of 1828 PageID 10654
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1046 of 1803 PageID 11792
Case 18-30264-sgj11 Doc 1237-5 Filed 08/11/21 Desc Exhibit 5 Page 7 of 21

Related Agreements. To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)          Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01040
APPX. 10597

(c)   <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)   <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1049
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1163 of 1828 PageID 10656
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1048 of 1803 PageID 11794
Case 18-30264-sgj11 Doc 3445-8 Part 3 Filed 08/01/18 Desc Exhibit 18 Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)     Rights of Heirs, Successors and Assigns.   The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f)     Reliance.   A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)     Rights Under Management Agreements and Related Agreements.   The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

5.     Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

(a)     The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)     So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01042
APPX. 013997

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)  The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.  Termination; Survival.

(a)  This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)  This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements. Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)  All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.  Cooperation with Management Company. The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor. Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.  Management Agreements and Related Agreements. The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement. The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company. No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

Appellee Appx. 01043

APPX. 10900

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1051
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1165 of 1828 PageID 10658
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1050 of 1803 PageID 11796
Case 18-30264-sgj11 Doc 1239-6 Part 5 Filed 01/11/19 Desc Part 5 Page 11 of
21

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9.   Amendments; Assignments.

(a)     Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 9, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)     Except as otherwise provided in this Section 9, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)     The Sub-Advisor may, without satisfying any of the conditions of Section 9(a) other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.   Advisory Restrictions. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01044
Appx. 10309

11.  <u>Records; Confidentiality</u>.

(a)    The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)    The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1053
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1167 of 1828 PageID 10660
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1052 of 1803 PageID 11798
Case 18-30264-sgj11 Doc 1239-6 BS27 Doc 159-7 Filed 08/01/21 Desc Exhibit 22 of 54 Page 13 of
21

12.    Notice.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

      (a)    If to the Management Company:

            Acis Capital Management, L.P.
            300 Crescent Court
            Suite 700
            Dallas, TX 75201

      (b)    If to the Sub-Advisor:

            Highland Capital Management, L.P.
            300 Crescent Court
            Suite 700
            Dallas, TX 75201

13.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.    Severability.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.    No Waiver.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1054

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1168 of 1828   PageID 10661

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1053 of 1803   PageID 11799

Case 18-30264-sgj11 Doc 1239-6 Part 3 Filed 08/01/18 Entered 08/01/18 Desc Exhibit Page 14 of 21

17.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.  <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.  <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.  <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1055

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1169 of 1828   PageID 10662
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1054 of 1803   PageID 11800

Case 18-30264-sgj11 Doc 1223 Class 27 Part 159-4 Filed 02/01/18 Desc Exhibit 24 of 54 Page 15 of 21

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President


ACIS CAPITAL MANAGEMENT, L.P.,
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:   President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1056
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1170 of 1828   PageID 10663
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1055 of 1803   PageID 11801

Case 18-30264-sgj11 Doc 1223 Class 27 Part 359-4 Filed 08/01/18 Desc Exhibit 6 Page 16 of 21

### Appendix A

  The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank]*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1057
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1171 of 1828   PageID 10664
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1056 of 1803   PageID 11802
Case 18-30264-sgj11   Doc 1239-8   Document 159-1   Filed 01/11/21   Desc Page 26 of 54   Page 17 of 21

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1058
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1172 of 1828 PageID 10665
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1057 of 1803 PageID 11803
Case 18-30264-sgj11 Doc 659 Part 5 Filed 08/01/21 Desp Ege 27 of 54 Page 18 of
21

# APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account. Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise. Without limiting the generality of the Sub-Advisor and its Related Entities may:

      (a)    serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

      (b)    receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

      (c)    be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

      (d)    be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

      (e)    sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

      (f)    underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01051
APPX. 10918

(g)    serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)    act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01052

Appx. 03909

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appellee Appx. 01054

Appx. 10919

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1062
Case 3:23-cv-00726-S  Document 8-22  Filed 02/29/23  Page 1176 of 1828  PageID 10669
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1061 of 1803  PageID 11807

**EXECUTION VERSION**

# FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT

by and between

## ACIS CAPITAL MANAGEMENT, L.P.

and

## HIGHLAND CAPITAL MANAGEMENT, L.P.

Dated March 17, 2017

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................................. 2

    Section 1.01    Certain Defined Terms ............................................................ 2

    Section 1.02    Interpretation ............................................................................ 3

ARTICLE II SERVICES ...................................................................................................... 4

    Section 2.01    General Authority. ................................................................... 4

    Section 2.02    Provision of Services. ............................................................. 4

    Section 2.03    Shared Employees ................................................................... 6

    Section 2.04    Applicable Asset Criteria and Concentrations. ..................... 8

    Section 2.05    Compliance with Management Company Policies and
                     Procedures. .............................................................................. 8

    Section 2.06    Authority. ................................................................................ 8

    Section 2.07    Third Parties. ........................................................................... 9

    Section 2.08    Management Company to Cooperate with the Staff and
                     Services Provider. ................................................................... 9

    Section 2.09    Power of Attorney. .................................................................. 9

ARTICLE III CONSIDERATION AND EXPENSES ....................................................... 9

    Section 3.01    Consideration .......................................................................... 9

    Section 3.02    Costs and Expenses .............................................................. 10

    Section 3.03    Deferral ................................................................................. 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ............................................ 10

    Section 4.01    Representations ..................................................................... 10

ARTICLE V COVENANTS ............................................................................................... 10

    Section 5.01    Compliance; Advisory Restrictions. .................................... 10

    Section 5.02    Records; Confidentiality. ...................................................... 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION .......................................... 12

    Section 6.01    Standard of Care ................................................................... 12

    Section 6.02    Exculpation. .......................................................................... 12

    Section 6.03    Indemnification by the Management Company. ................... 13

    Section 6.04    Other Sources of Recovery etc ............................................ 14

    Section 6.05    Rights of Heirs, Successors and Assigns ............................. 14

    Section 6.06    Reliance ................................................................................. 14

i

# TABLE OF CONTENTS
(continued)

**Page**

ARTICLE VII TERMINATION ....................................................................................... 14

    Section 7.01    Termination........................................................................ 14

ARTICLE VIII MISCELLANEOUS ................................................................................ 15

    Section 8.01    Amendments ...................................................................... 15

    Section 8.02    Assignment and Delegation. ............................................. 15

    Section 8.03    Non-Recourse; Non-Petition............................................ 15

    Section 8.04    Governing Law. ................................................................. 16

    Section 8.05    WAIVER OF JURY TRIAL............................................... 17

    Section 8.06    Severability ....................................................................... 17

    Section 8.07    No Waiver ......................................................................... 17

    Section 8.08    Counterparts ...................................................................... 17

    Section 8.09    Third Party Beneficiaries .................................................. 17

    Section 8.10    No Partnership or Joint Venture ........................................ 17

    Section 8.11    Independent Contractor ..................................................... 17

    Section 8.12    Written Disclosure Statement ........................................... 18

    Section 8.13    Headings ........................................................................... 18

    Section 8.14    Entire Agreement ............................................................. 18

    Section 8.15    Notices ............................................................................. 18

Appellee Appx. 01057

Appx. 03922

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

# ARTICLE I

## DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advisers Act" shall have the meaning set forth in the Recitals to this Agreement.

"Advisory Restriction" shall have the meaning set forth in Section 5.01(b).

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble to this Agreement.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"CLO or Account" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

Appellee Appx. 01059

Appx. 103926

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01060

APPX. 03923

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

<div align="center">

**ARTICLE II**

**SERVICES**

</div>

Section 2.01   <u>General Authority</u>.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   <u>Provision of Services</u>.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)   *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)   *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)   *Management of Collateral Obligations and CLOs and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)   *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

<div align="center">4</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1069
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1183 of 1828 PageID 10676
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1068 of 1803 PageID 11814
Case 18-30264-sgj11 Doc 457 Part 4 Filed 08/01/21 Desc Exhibit 3 Page 8 of 24

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)     *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)     *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)     *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)     *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)     *Shared Employees.* The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)     *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)     *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01062
APPX. 10929

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e) Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f) The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g) The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable. To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h) The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i) The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j) The Staff and Services Provider shall require that each Shared Employee:

(i) certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii) be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii) provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01064

APPX. 10829

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   Applicable Asset Criteria and Concentrations. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.2 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   Compliance with Management Company Policies and Procedures. The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

8

Appellee Appx. 01065

APPX. 10932

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1073
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1187 of 1828 PageID 10680
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1072 of 1803 PageID 11818
Case 18-30264-sgj11 Doc 623-7 Part 9 Filed 01/11/19 Entered 01/11/19 Desc Exhibit 2 Page 12 of 54 Page 12 of 24

Section 2.07    Third Parties.

    (a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

    (b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto. The "Staff and Services Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

    From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Section 3.03    <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    <u>Compliance; Advisory Restrictions</u>.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01067

APPX. 10692424

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1075
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1189 of 1828 PageID 10682
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1074 of 1803 PageID 11820
Case 18-30264-sgj11 Doc 1239-8 S27 Doc 459 Filed 06/11/21 Desc Exhibit 2 Page 14 of 24

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b) This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure.  This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1077
Case 3:23-cv-00726-S Document 8-22 Filed 04/24/23 Page 1191 of 1828 PageID 10684
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1076 of 1803 PageID 11822
Case 18-30264-sgj11 Doc 1239-6 27 Part 159 Filed 01/21/19 Desc Exhibit 42 Page 16 of 24

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03 <u>Indemnification by the Management Company</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Appellee Appx. 01070
APPX. 10923

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1078
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1192 of 1828 PageID 10685
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1077 of 1803 PageID 11823
Case 18-30264-sgj11 Doc 6527 Part 59 Filed 08/01/19 Desc Exhibit 2 Page 17 of 24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04 Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05 Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06 Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01 Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01071
Appx. 10928

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1079
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1193 of 1828   PageID 10686
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1078 of 1803   PageID 11824
Case 18-30264-sgj11 Doc 827 Part 459 Filed 01/11/19 Desc Exhibit 2 Page 18 of
24

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

Appellee Appx. 01072
APPX. 10929

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1080
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1194 of 1828 PageID 10687
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1079 of 1803 PageID 11825
Case 18-30264-sgj11 Doc 427 Part 159 Filed 01/11/19 Desc Exhibit 42 of 54 Page 19 of 24

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     Governing Law.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

16

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.    This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.    Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.    Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Appellee Appx. 01074

APPX. 10639

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

    (a)    If to the Management Company:

        Acis Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

    (b)    If to the Staff and Services Provider:

        Highland Capital Management, L.P.
        300 Crescent Court
        Suite 700
        Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01075

APPX. 03942

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President


*Signature Page to Fourth Amended and Restated Shared Services Agreement*

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1086
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1200 of 1828   PageID 10693
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1085 of 1803   PageID 11831

Case 19-12239-CSS   Doc 159-5   Filed 11/21/19   Page 1 of 54

# EXHIBIT E

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1087
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1201 of 1828 PageID 10694
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1086 of 1803 PageID 11832

Case 18-30265-sgj11 Doc 513 Filed 09/01/18 Entered 09/01/18 Main Document Page 1 of 3

**Fill in this information to identify the case:**

Debtor 1    Acis Capital Management, G.P.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Northern District of Texas

Case number   18-30265-sgj11

## Official Form 410
# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Highland Capital Management, L.P.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Holland O'Neil, Foley Gardere, Foley & Lardner
Name

2021 McKinney Ave, Suite 1600
Number   Street

Dallas     TX     75201
City    State    ZIP Code

Contact phone 214-999-3000

Contact email honeil@foley.com

Where should payments to the creditor be sent? (if different)

Scott Ellington, Highland Capital Management
Name

300 Crescent Court, Suite 700
Number   Street

Dallas     TX     75201
City    State    ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1088
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1202 of 1828 PageID 10695
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1087 of 1803 PageID 11833

Case 18-30265-sgj11 Doc 123-1 Filed 09/01/18 Filed 12/12/18 Main Document Page 3 of 54 Page 2 of 3

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ 4,672,140.38 **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Sub-Advisory Services and Shared Services

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

Basis for perfection: _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____
Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Appellee Appx. 01081
APPX. 10946

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1089
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1203 of 1828   PageID 10696
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1088 of 1803   PageID 11834
Case 18-30285-sgj11 Doc 3445-8 Filed 08/01/18  Filed 12/18/19 Page 4 of 54 Page 3 of 3

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☑ Yes. Check one: | Amount entitled to priority |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☑ Other. Specify subsection of 11 U.S.C. § 507(a)( 3 ) that applies.    $    2,049,564.35

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    08/01/2018
                    MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Scott Ellington | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Counsel | | |
| Company | Highland Capital Management, L.P. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 300 Crescent Court, Suite 700 | | |
| | Number     Street | | |
| | Dallas | TX | 75201 |
| | City | State | ZIP Code |
| Contact phone | | Email | |

Appellee Appx. 01082
APPX. 10869

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

## EXHIBIT A TO PROOF OF CLAIM

1.  <u>Claimant</u>: Highland Capital Management, L.P. ("**Highland**") maintains its business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. Highland files its proof of claim (the "**Claim**") pursuant to 11 U.S.C. §§ 105(a), 501, and 502(f) and the Federal Rules of Bankruptcy Procedure 3002 and 3003. Prior to the Involuntary Petition Date (defined below), Highland provided sub-advisory and shared services to the Debtors (defined below). Highland has provided portfolio management and advisory services to the Debtors pursuant to that certain Third Amended and Restated Sub-Advisory Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Sub-Advisory Agreement**") (**Exhibit 1**). Specifically, Highland has acted as an investment manager and has identified, evaluated, and recommended investments to investment vehicles advised or sub-advised by the Debtors.  Highland has also provided the Debtors with back and middle office services pursuant to that certain Fourth Amended and Restated Shared Services Agreement by and between the Debtors and Highland dated March 17, 2017 ("**Shared Services Agreement**") (**Exhibit 2**). Highland has provided the Debtors with all of the employees and staff necessary to manage the portfolios.  Highland continued to provide the same sub-advisory and shared services to the Debtors throughout the Gap Period (defined below). To date, Highland continues to provide such services.

2.  <u>Debtors</u>: Acis Capital Management, L.P. and Acis Capital Management, G.P. (the "**Debtors**"). The Debtors' cases have been consolidated under case number 18-30264 in the United States Bankruptcy Court for the Northern District of Texas. Highland provides the service at the following address:  300 Crescent Court, Suite 700, Dallas, Texas 75201.

EXHIBIT A to Proofs of Claim of Highland

4820-3752-6894.1

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
**United States Bankruptcy Court for the Northern District of Texas**

3.    Indebtedness: Because the Debtors were put into bankruptcy involuntarily, the amount included in the proof of claim accounts for pre-petition claims as well as Gap Claims (defined below).

a.    Pre-Petition: Joshua Terry, the petitioning creditor, filed the involuntary petition on January 30, 2018 (the "**Petition Date**"). As of the Petition Date, the outstanding indebtedness owing from the Debtors to Highland was as set forth below by account number:

| Invoice | Type | Balance |
|---|---|---|
| A1-A7; BVK[1] | Sub-Advisory | $1,605,362.41 |
| A1-A7; BVK | Shared Services | $1,017,213.62 |
|  | **Totals** | **$2,622,576.03** |

b.    Gap Period: When a debtor files bankruptcy, the order for relief is typically entered on the date the petition is filed. However, an involuntary bankruptcy case diverges from the simultaneous entry of an order for relief in that an order for relief is entered at a later date than when a petition is filed. This creates a period of time, referred to as the "gap period", where the debtor may accrue post-petition but pre-order for relief debt. Pursuant to Section 502(f) of the Bankruptcy Code:

> In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section…the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. 502(f).

---

[1] A1-A7 and BVK account for the following vehicles: Acis CLO 2013-1, Ltd.; Acis CLO 2013-2, Ltd.; Acis CLO 2014-3, Ltd.; Acis CLO 2014-4, Ltd.; Acis CLO 2014-5, Ltd.; Acis CLO 2015-6, Ltd.; Acis CLO 2017-7, Ltd.; BayVK R2 Lux S.A., SICAV-FIS.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1092
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1206 of 1828  PageID 10699
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1091 of 1803  PageID 11837
Case 18-30265-sgj11 Doc 33 Part 2-5 Filed 08/01/18    Desc Exhibit A Page 3 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Claims arising during the gap period are entitled to priority treatment under section 507(a)(3). The Court entered the Order for Relief on April 13, 2018 ("**Order for Relief Date**"). Highland continued to provide services to the Debtors from January 30, 2018 to April 13, 2018 ("**Gap Period**"). The outstanding balance owed from the Debtors to Highland for the sub-advisory and shared services during the Gap Period is set forth below (and shall be referred to as the "**Gap Claim**"):

| Account No. | Type | Balance |
|---|---|---|
| A1-A7; BVK | Sub-Advisory | $1,170,147.06 |
| A1-A7; BVK | Shared Services | $879,417.29 |
| | **Totals** | **$2,049,564.35** |

c.      Reservation of Rights as to Administrative Claim: Highland has provided uninterrupted sub-advisory and shared services since the Order for Relief Date. Highland reserves its rights to seek allowance of its administrative claims.

d.      Indemnity Claims: Highland has contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement. According to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement, "the Management Company [Debtors] hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless Covered Person [Highland and its representatives] from…any and all claims, demands, liabilities, costs…suits, proceedings, judgments, assessments, actions…of whatever nature, known or unknown, liquidated, or unliquidated...arising out of the investment or other activities of the Management Company." Highland reserves such contractual indemnification right.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1093
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1207 of 1828 PageID 10700
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1092 of 1803 PageID 11838
Case 18-30264-sgj11 Claim 153 Part 2 Filed 08/01/18 Desc Exhibit A Page 4 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

4.    Reservation of Rights; Other Rights: The Claims described in this Attachment are legal, binding, enforceable, allowed, and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature, whatsoever; provided, however, the Chapter 11 Trustee alleges that he may offset Highland's Claims and recover from Highland through his current adversary proceeding against Highland (Adversary Proceeding 18-03212). Highland disputes such contention, and believes all Claims sought herein are recoverable despite the Chapter 11 Trustee's allegations. No portion of the Claims or any funds previously paid to Highland are subject to impairment, avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, without limitation, Bankruptcy Code § 502) or applicable non-bankruptcy law. Highland expressly reserves the right in the future to assert any and all claims that it may have, including, without limitation, imposition of a constructive trust, equitable lien, security interest, subrogation, marshaling, or other legal or equitable remedies to which it may be entitled. The filing of this proof of claim is not to be construed as an election of remedies. Highland further reserves the rights (a) to amend, modify or supplement this proof of claim, including any exhibit, schedule or annex, or to file an amended proof of claim for the purpose of modifying or liquidating the amount of any interest, fees, costs and expenses accrued or incurred subsequent to the Petition Date or any contingent or unliquidated claims or rights of Highland set forth herein; (b) file additional proofs of claim; and (c) against third parties.

5.    Notices: All notices to Highland are to be sent to:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201

*with copies to:*

EXHIBIT A TO PROOFS OF CLAIM OF HIGHLAND
4820-3752-6894.1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 1094
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1208 of 1828   PageID 10701
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1093 of 1803   PageID 11839
Case 18-30265-sgj11 Doc 159 Part 2 Filed 08/01/18 Desc Exhibit A Page 5 of 5

*In re Acis Capital Management, L.P.*- Case No. 18-30264
*In re Acis Capital Management, G.P.*- Case No. 18-30265
United States Bankruptcy Court for the Northern District of Texas

Foley Gardere
Foley & Lardner, LLP
c/o Holland O'Neil
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201

6.    <u>Payments</u>:  All payments and distributions to Highland with respect to this proof

of claim are to be made as follows:

Highland Capital Management, L.P.
Attn: David Klos
300 Crescent Court
Suite 700
Dallas, Texas 75201
Re: *In re Acis Capital Management, L.P.*

7.    <u>Miscellaneous</u>:  This proof of claim is filed under compulsion of the bar date

established in this bankruptcy case solely out of an abundance of caution to protect Highland

from forfeiture of its claim within this bankruptcy proceeding. The amounts set forth in this

proof of claim shall not be construed as an admission by Highland as to the amounts due and

owing outside of this bankruptcy proceeding. The filing of this proof of claim is **<u>not</u>:**  (a) a

waiver or release of and/or Highland's rights or remedies against any person, entity or property;

(b) a consent by Highland to entry of final judgment by this Court in any core proceeding

commenced in this bankruptcy case, consistent with the United States Supreme Court's holding

in *Stern v. Marshall*, 131 S. Ct. 2594 (2011); (c) a waiver of the right to move to withdraw the

reference or otherwise challenge the jurisdiction of this Court; (d) a waiver of the right to a jury

trial; (e) an election of a remedy which waives or otherwise affects any other remedy; or (f) a

waiver of the right to assert a different or enhanced classification of priority for its Claim in

respect of the other claims asserted in this bankruptcy case.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1095
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23   Page 1209 of 1828  PageID 10702
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21   Page 1094 of 1803  PageID 11840

**THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1096
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1210 of 1828 PageID 10703
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1095 of 1803 PageID 11841
Case 18-30264-sgj11 Doc 3593-3 Filed 08/01/21 Desc Exhibit 1 Page 2 of 21

# TABLE OF CONTENTS

**Page**

1. Appointment; Limited Scope of Services ...................................................................... 1

2. Compensation ................................................................................................................. 3

3. Representations and Warranties ..................................................................................... 3

4. Standard of Care; Liability; Indemnification ................................................................ 4

5. Limitations on Employment of the Sub-Advisor; Conflicts of Interest ......................... 7

6. Termination; Survival .................................................................................................... 8

7. Cooperation with Management Company ...................................................................... 8

8. Management Agreements and Related Agreements ...................................................... 8

9. Amendments; Assignments ........................................................................................... 9

10. Advisory Restrictions .................................................................................................... 9

11. Records; Confidentiality .............................................................................................. 10

12. Notice ........................................................................................................................... 11

13. Governing Law ............................................................................................................ 11

14. WAIVER OF JURY TRIAL ........................................................................................ 11

15. Severability .................................................................................................................. 11

16. No Waiver .................................................................................................................... 11

17. Counterparts ................................................................................................................. 12

18. Third Party Beneficiaries ............................................................................................ 12

19. No Partnership or Joint Venture .................................................................................. 12

20. Entire Agreement ......................................................................................................... 12

Appellee Appx. 01089
APPX. 103956

## THIRD AMENDED AND RESTATED
## SUB-ADVISORY AGREEMENT

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

    1.    Appointment; Limited Scope of Services.

        (a)    Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1098
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1212 of 1828   PageID 10705
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1097 of 1803   PageID 11843
Case 18-30264-sgj11 Doc 3559-3 Part 3 Filed 08/01/21 Desc Exhibit 3 Page 4 of 21

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of Section 8, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)      Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)      make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)      place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)      identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)      assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)      provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)      assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)      assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "Services."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1099
Case 3:23-cv-00726-S Document 8-22 Filed 04/24/23 Page 1213 of 1828 PageID 10706
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1098 of 1803 PageID 11844
Case 18-30265-sgj11 Doc 3459-5 Filed 08/01/21 Desc Exhibit 4 Page 5 of 21

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01092
APPX. 10947

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1100
Case 3:23-cv-00726-S Document 8-22 Filed 04/24/23 Page 1214 of 1828 PageID 10707
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1099 of 1803 PageID 11845
Case 18-30264-sgj11 Doc 3-13 Part 3-5 Filed 08/01/18 Desc Exhibit 15 of 54 Page 6 of 21

(ii)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)     no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)     neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)     The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.     Standard of Care; Liability; Indemnification.

(a)     Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

Appellee Appx. 01093
APPX. 10950

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1101
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1215 of 1828   PageID 10708
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1100 of 1803   PageID 11846
Case 18-30265-sgj11 Doc 1239-5 Part 3 Filed 08/01/18 Desc Exhibit 16 of 54 Page 7 of 21

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)        Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01094
APPX. 10959

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1102
Case 3:23-cv-00726-S   Document 8-22   Filed 04/24/23   Page 1216 of 1828   PageID 10709
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1101 of 1803   PageID 11847
Case 18-30264-sgj11 Doc 1239-6 13 Part 3 Filed 08/01/18/21   Desc Exhibit 17 of 54 Page 8 of 21

(c)    <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)    <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1103
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1217 of 1828 PageID 10710
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1102 of 1803 PageID 11848
Case 18-30264-sgj11 Doc 3.59-13 Part 3.59 Filed 08/01/18 Desc Exhibit 18 of 54 Page 9 of 21

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)     Rights of Heirs, Successors and Assigns.   The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f)     Reliance.   A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)     Rights Under Management Agreements and Related Agreements.   The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

5.     Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

(a)     The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)     So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in <u>Appendix B</u> hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such <u>Appendix B</u>, as amended from time to time with mutual consent of the Parties.

6.     <u>Termination; Survival</u>.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements.  Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and <u>Appendix A</u> hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     <u>Cooperation with Management Company</u>.  The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor.  Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     <u>Management Agreements and Related Agreements</u>.  The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement.  The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company.  No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

Appellee Appx. 01097

Appx. 10364

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9.  Amendments; Assignments.

(a)  Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 9, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)  Except as otherwise provided in this Section 9, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)  The Sub-Advisor may, without satisfying any of the conditions of Section 9(a) other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.  Advisory Restrictions. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01098

Appx. 10363

11. <u>Records; Confidentiality</u>.

(a)     The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b)     The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business.  Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01099

APPX. 10966

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1107
Case 3:23-cv-00726-S  Document 8-22  Filed 01/24/23    Page 1221 of 1828  PageID 10714
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1106 of 1803  PageID 11852
Case 18-30264-sgj11 Doc 1239-6 13 Part 159 Filed 02/01/21/19 Desc Exhibit 22 of 54 Page 13 of 21

12.  <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

     (a)    If to the Management Company:

         Acis Capital Management, L.P.
         300 Crescent Court
         Suite 700
         Dallas, TX 75201

     (b)    If to the Sub-Advisor:

         Highland Capital Management, L.P.
         300 Crescent Court
         Suite 700
         Dallas, TX 75201

13.  <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.  <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.  <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.  <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01100
APPX. 10667

17.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.   This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.     <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.     <u>No Partnership or Joint Venture</u>.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.   Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.     <u>Entire Agreement</u>.   This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as the Sub-Advisor

By: Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title: President


ACIS CAPITAL MANAGEMENT, L.P.,
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title: President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

### **Appendix A**

    The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank]*

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1112
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23  Page 1226 of 1828  PageID 10719
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1111 of 1803  PageID 11857
Case 18-30265-sgj11 Doc 3613 Part 359 Filed 08/01/21 Desc Exhibit 27 of 54  Page 18 of 21

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account.  Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise.  Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)     serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)     receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)     be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)     be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)     sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)     underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01105
APPX. 10372

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1113
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1227 of 1828 PageID 10720
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1112 of 1803 PageID 11858
Case 18-30264-sgj11 Doc 1239-6 Part 1 Filed 05/01/18 Entered 05/01/18 Desc Exhibit D-4 Page 19 of 21
Case 18-30265-11 Doc 883-13 Part 159 Filed 08/01/18 Desc Page 20 of 54 Page 19 of 21

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Appellee Appx. 01107

APPX. 10974

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1115
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1229 of 1828 PageID 10722
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1114 of 1803 PageID 11860
Case 18-30265-sgj11 Doc 659-13 Part 3 Filed 08/01/18 Desc Exhibit Page 21 of 21

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1116
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1230 of 1828   PageID 10723
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1115 of 1803   PageID 11861

Case 18-30265-sgj11 Doc 853 Part 4 Filed 08/01/18 Desc Exhibit 12 Page 1 of 24

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ............................................................................................ 2

    Section 1.01    Certain Defined Terms ........................................................ 2

    Section 1.02    Interpretation .................................................................... 3

ARTICLE II SERVICES ............................................................................................... 4

    Section 2.01    General Authority. ............................................................. 4

    Section 2.02    Provision of Services. ....................................................... 4

    Section 2.03    Shared Employees. ........................................................... 6

    Section 2.04    Applicable Asset Criteria and Concentrations. .................... 8

    Section 2.05    Compliance with Management Company Policies and Procedures. ....................................................................... 8

    Section 2.06    Authority. ......................................................................... 8

    Section 2.07    Third Parties. .................................................................... 9

    Section 2.08    Management Company to Cooperate with the Staff and Services Provider. ............................................................. 9

    Section 2.09    Power of Attorney. ............................................................ 9

ARTICLE III CONSIDERATION AND EXPENSES ....................................................... 9

    Section 3.01    Consideration ................................................................... 9

    Section 3.02    Costs and Expenses ....................................................... 10

    Section 3.03    Deferral ......................................................................... 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ............................................... 10

    Section 4.01    Representations .............................................................. 10

ARTICLE V COVENANTS .......................................................................................... 10

    Section 5.01    Compliance; Advisory Restrictions. ................................ 10

    Section 5.02    Records; Confidentiality. ................................................ 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION .............................................. 12

    Section 6.01    Standard of Care ............................................................ 12

    Section 6.02    Exculpation. ................................................................... 12

    Section 6.03    Indemnification by the Management Company. ................. 13

    Section 6.04    Other Sources of Recovery etc ....................................... 14

    Section 6.05    Rights of Heirs, Successors and Assigns .......................... 14

    Section 6.06    Reliance ......................................................................... 14

i

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1118
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1232 of 1828   PageID 10725
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1117 of 1803   PageID 11863
Case 18-30265-sgj11 Doc 553 Part 4 Filed 06/11/21 Desc Exhibit 2 Page 3 of 24

# TABLE OF CONTENTS
(continued)

<div align="right">**Page**</div>

| | | |
|---|---|---|
| ARTICLE VII TERMINATION | | 14 |
| Section 7.01 | Termination | 14 |
| ARTICLE VIII MISCELLANEOUS | | 15 |
| Section 8.01 | Amendments | 15 |
| Section 8.02 | Assignment and Delegation. | 15 |
| Section 8.03 | Non-Recourse; Non-Petition | 15 |
| Section 8.04 | Governing Law. | 16 |
| Section 8.05 | WAIVER OF JURY TRIAL | 17 |
| Section 8.06 | Severability | 17 |
| Section 8.07 | No Waiver | 17 |
| Section 8.08 | Counterparts | 17 |
| Section 8.09 | Third Party Beneficiaries | 17 |
| Section 8.10 | No Partnership or Joint Venture | 17 |
| Section 8.11 | Independent Contractor | 17 |
| Section 8.12 | Written Disclosure Statement | 18 |
| Section 8.13 | Headings | 18 |
| Section 8.14 | Entire Agreement | 18 |
| Section 8.15 | Notices | 18 |

Appellee Appx. 01111
Appx. 103976

### FOURTH AMENDED AND RESTATED
### SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

# ARTICLE I

## DEFINITIONS

Section 1.01  <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Advisers Act</u>" shall have the meaning set forth in the Recitals to this Agreement.

"<u>Advisory Restriction</u>" shall have the meaning set forth in <u>Section 5.01(b)</u>.

"<u>Affiliate</u>" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble to this Agreement.

"<u>Applicable Asset Criteria and Concentrations</u>" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"<u>Applicable Law</u>" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"<u>CLO or Account</u>" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"<u>Covered Person</u>" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"<u>Governmental Authority</u>" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1121
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1235 of 1828 PageID 10728
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1120 of 1803 PageID 11866
Case 18-30265-sgj11 Doc 513 Part 4 Filed 08/01/21 Desc Exhibit 2 of 4 Page 6 of 24

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.


Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01114
APPX. 10979

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   <u>General Authority</u>.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   <u>Provision of Services</u>.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)     *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)     *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)     *Management of Collateral Obligations and CLOs and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)     *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e)    *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f)    *Marketing*.  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g)    *Reporting*.  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h)    *Administrative Services*.   The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i)    *Shared Employees*.  The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

(j)    *Ancillary Services*.  Assistance and advice on all things ancillary or incidental to the foregoing; and

(k)    *Other*.  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01116

Appx. 10973

Section 2.03    Shared Employees.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company. The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01118

APPX. 10373

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    <u>Applicable Asset Criteria and Concentrations</u>.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.2</u> above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    <u>Compliance with Management Company Policies and Procedures</u>.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    <u>Authority</u>.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

8

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).  Any such power shall be revocable in the sole discretion of the Management Company.

# ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "Staff and Services Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Appellee Appx. 01120

APPX. 10933

Section 3.03    Costs and Expenses.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    Deferral.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b) This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02  Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

12

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03 <u>Indemnification by the Management Company</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1132
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1246 of 1828 PageID 10739
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1131 of 1803 PageID 11877
Case 18-30265-sgj11 Doc 13 Part 159 Filed 08/01/19 Desc Exhibit 2 Page 17 of 24

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01125
APPX. 03992

# ARTICLE VIII

# MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

15

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this <u>Section 8.03</u> shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     <u>Governing Law</u>.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Appellee Appx. 01127

APPX. 03994

Case 19-34054-sgj11   Doc 3445-8   Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1135
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1249 of 1828   PageID 10742
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1134 of 1803   PageID 11880
Case 18-30265-sgj11   Doc 668-13   Part 159   Filed 01/11/19   Page 50 of 54   Page 20 of 24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.   EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   Severability.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   No Waiver.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party.  Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   Counterparts.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   Third Party Beneficiaries.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   No Partnership or Joint Venture.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   Independent Contractor.   Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

17

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1136
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1250 of 1828   PageID 10743
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1135 of 1803   PageID 11881
Case 18-30265-sgj11 Doc 459-5 Filed 01/11/21 Desc Exhibit Q4 Page 21 of 24

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01129
APPX. 03996

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**,
as the Sub-Advisor

By: Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.**,
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder. Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1140
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1254 of 1828 PageID 10747
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1139 of 1803 PageID 11885

Case 19-12239-CSS Doc 159-6 Filed 11/21/19 Page 1 of 76

# EXHIBIT F

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1141
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1255 of 1828   PageID 10748
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1140 of 1803   PageID 11886
Case 18-30264-sgj11 Doc 897-8 Filed 12/15/18   Entered 11/21/19 18:02:23 of 76 Page 1 of 12

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

### HIGHLAND CAPITAL MANAGEMENT, L.P.'s APPLICATION FOR
### ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503(b)

Highland Capital Management, L.P. ("**Highland**"), hereby files this *Application for Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)* (the "**Application**") and requests this Court's approval of an administrative expense claim for the actual and necessary costs and expenses for services to Acis Capital Management, LP and Acis Capital Management GP, LLC (the "**Debtors**") rendered post-petition in the current known amount of **$3,554,224.29**, as well as such other amounts that may arise, as referenced herein, related to Highland's indemnity rights and other potential claims that may be asserted against the estates, as applicable.  In support of the Application, Highland respectfully states as follows:

### JURISDICTION & VENUE

1.      This Court has jurisdiction over the subject matter of this Application pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of this Application is a core proceeding within

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1142

Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1256 of 1828 PageID 10749

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1141 of 1803 PageID 11887

Case 18-30264-sgj11 Doc 897-23 Filed 12/15/18 Entered 11/21/19 09:23:31 Page 2 of 12 Page 2 of 12

the meaning of 28 U.S.C. § 157(b)(2)(A) and (B). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## **BACKGROUND**

**A.      The Contracts**

2.      Debtor Acis Capital Management, L.P. ("**Acis LP**") was formed in 2011 as an affiliated investment advisor to manage Highland's collateralized loan obligations. Acis LP and Highland are parties to a number of different agreements. Debtor Acis Capital Management GP, LLC ("**Acis GP**") is the general partner of Acis LP.

*(a)      The PMAs and the CLOs*

3.      Prior to the Petition Date (defined below), Acis LP had contractual obligations to provide portfolio management services to five collateralized loan obligation entities known as Acis CLO 2013-1 Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd., and Acis CLO 2015-6 Ltd. (the "**CLOs**") through certain portfolio management agreements (the "**PMAs**") with the CLOs. For those services, Acis LP was entitled to certain portfolio management fees pursuant to the PMAs.

4.      Each CLO holds a portfolio of diversified syndicated leveraged commercial loans through the private placement of rated secured notes (the "**Secured Notes**") and unsecured subordinated securities (the "**Equity Notes**," together with the Secured Notes, the "**Notes**"). Highland CLO Funding, Ltd. ("**HCLOF**") is the holder of the Equity Notes. Each Note is subject to an indenture (the "**Indenture**") that establishes the rights of the noteholders and indenture trustee investment criteria. Neither of the Debtors are a party to any of the Indentures. Rather, the Indentures are between each CLO entity, as issuer, and U.S. Bank, N.A. as indenture trustee (the "**Indenture Trustee**").

**Appellee Appx. 01135**

**APPX. 104092**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1143
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1257 of 1828   PageID 10750
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1142 of 1803   PageID 11888
Case 18-30264-sgj11 Doc 911-2 Filed 12/15/18   Entered 11/21/19 18:09:29431of 76  Page 3 of 12

5.      Pursuant to the Indentures, the CLOs can redeem the Secured Notes under certain conditions, including at the written direction of 66 2/3% of the aggregate outstanding amount of the Equity Notes.  Through this right of redemption, the Equity Noteholders can restructure the CLOs when they no longer meet their investment objectives.  Because changes in interest rates affect the return on the CLOs' investments, HCLOF has the contractual right to "reset" the CLOs, which is a process of refinancing the existing collateral loan obligations.

### (b)      *The Outsourcing Agreement*

6.      Also prior to the Petition Date, Acis LP was party to an Agreement for the Outsourcing of the Asset Management (the "**Outsourcing Agreement**") with Universal-Investment-Luxembourg S.A. ("**Universal**") whereby Universal outsourced to Acis LP the asset management of an entity called BAYVK R2 Lux S.A., SICAV-FS – Highland (the "**Sub-Fund**"), which is a sub-fund of an entity called BAYVK R2 Lux S.A., SICAV-FIS.  A copy of the Outsourcing Agreement is attached hereto as **Exhibit A**.   In return for Acis LP's management services, Universal paid Acis LP management fees, which were ultimately charged to the Sub-Fund, as provided by section 5.3 of the Outsourcing Agreement.  Section 2.6 of the Outsourcing Agreement provided that, subject to the prior consent of Universal, Acis LP was permitted to utilize the asset management services of third parties.  Pursuant to that provision, Acis LP engaged Highland to provide sub-advisory services with respect to the management of the Sub-Fund.[1]

7.      Acis LP does not have, nor has it ever had, any employees.  All employees who have ever provided services to Acis LP were Highland employees, which were provided to Acis LP through shared and sub-advisory services agreements.  Acis LP has always essentially

---

[1] The Sub-Fund is funded indirectly by an entity called Bayerische Versogungskammer ("**BVK**").  In the case, the term "BVK" has been used by the parties as shorthand to refer to the Sub-Fund arrangement under the Outsourcing Agreement.

**PAGE 3**

**Appellee Appx. 01136**
**APPX. 10693**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1144

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1258 of 1828    PageID 10751
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1143 of 1803   PageID 11889
Case 18-30264-sgj11 Doc 897-2 Filed 02/15/18    Entered 11/21/18 09:53:31 Page 4 of 12

subcontracted its CLO managerial function out to Highland.  As a result, independently, Acis LP was not able to provide the services necessary to fulfill the contractual obligations under the PMAs or the Outsourcing Agreement.  Since the inception of Acis LP until August 2, 2018, Highland provided all front, middle, and back-office services to Acis LP through sub-advisory and shared services agreements.

### (c)    The Shared Services Agreement

8.    Prior to being replaced on August 2, 2018 (as described below), Highland provided back- and middle-office services to Acis LP pursuant to the Fourth Amended and Restated Shared Services Agreement, executed on March 17, 2017, (as amended and restated from time to time, the "**Shared Services Agreement**").  A copy of the Shared Services Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.  The multitude of services provided by Highland are set forth in Article II of the Shared Services Agreement.

9.    Highland provided these shared services in exchange for management fees, currently averaging 15 basis points ("**bps**") of the total balances of the CLO accounts.  *See* Exhibit 1 at Section 3.01 and Appendix A. The management fees were due to be paid to Highland approximately every quarter.

### (d)    The Sub-Advisory Agreement

10.    Highland also provided front-office services to Acis LP pursuant to the Third Amended and Restated Sub-Advisory Agreement, executed March 17, 2017 (as amended and restated from time to time, the "**Sub-Advisory Agreement**," collectively with the Shared Services Agreement, the "**Contracts**").  A copy of the Sub-Advisory Agreement is attached hereto as **Exhibit C** and incorporated herein by reference.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1145
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1259 of 1828 PageID 10752
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1144 of 1803 PageID 11890
Case 18-3027-sgj11 Doc 97-CS Filed 12/11/18 Entered 11/21/19 18:09:31 Page 5 of 12

11.   The Sub-Advisory Agreement appointed Highland "as Sub-Advisor to the Management Company [Acis LP] for the purpose of assisting the Management Company [Acis LP] in managing the Portfolios of each Account . . . ." *See* Sub-Advisory Agreement at Section 1(a)). The Sub-Advisory Agreement directs Highland to perform a multitude of investment advisory services set forth in Section 1(b) of the agreement.

12.   Highland was the sole provider of these services to Acis LP. *See id* at § 5(6) ("So long as this [Sub-Advisory] Agreement or any extension, renewal or amendment of this [Sub-Advisory] Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company."). Given that Acis LP has no employees, Highland therefore was the sole provider of these services to the CLOs and the BVK Sub-Fund.

13.   For these investment advisory services, Highland received a sub-advisory fee that averaged 20 bps of the total average 40 bps Acis LP received as portfolio manager. *See id.* at § 2(a) and Appendix A. The sub-advisory fees were due to be paid to Highland approximately every quarter. Acis LP has not made a payment to Highland for sub-advisory services since November of 2017.

**B.   The Bankruptcy Cases**

14.   On January 30, 2018 (the "**Petition Date**"), Joshua N. Terry ("**Terry**") filed involuntary petitions (the "**Involuntary Petitions**") for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis LP and Acis Capital Management GP, LLC (the "**Debtors**").

15.   The Debtors filed answers to the Involuntary Petitions and moved to dismiss the petitions, asserting among other defenses that the Court lacked subject matter jurisdiction.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1146
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1260 of 1828 PageID 10753
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1145 of 1803 PageID 11891
Case 18-30264-sgj11 Doc 1594-6 Filed 11/21/18 Entered 11/21/18 Page 6 of 12

16.     A five-day contested trial on the Involuntary Petitions was held in late March 2018. On April 13, 2018, the Court entered orders for relief (the "**Orders for Relief**"). Diane Reed was thereafter appointed as the Chapter 7 trustee (the "**Chapter 7 Trustee**").

17.     On April 17, 2018, the Chapter 7 Trustee filed her Expedited Motion to Operate the Debtors' Business in Chapter 7 [Doc. No. 127] (the "**Motion to Operate**"). By the Motion to Operate, the Chapter 7 Trustee determined there was "an immediate need to obtain authorization to continue the business operations of the Debtors by the [Chapter 7] Trustee continuing Acis LP's performance of the Sub-Advisory Agreement and the Shared Services Agreement." Motion to Operate at ¶ 5.

18.     During this time period, HCLOF evaluated the situation and determined that having a bankrupt portfolio manager was an untenable situation. HCLOF therefore decided to take action related to redeeming the CLOs. Accordingly, on April 30, 2018, HCLOF instructed the Indenture Trustee and Acis LP to initiate an optional redemption (the "**Optional Redemption Notices**"). Pursuant to the terms of the Indentures, there was a 45-day notice period prior to the occurrence of the redemption. Thus, the redemption was scheduled to occur on June 14, 2018.

19.     Highland, which had related responsibilities as sub-manager, was well-aware of the timeline related to the Optional Redemption Notices and was operating under the assumption that the Debtors would no longer be operating as of June 14, 2018. As such, on May 3, 2018, Highland filed its *Motion of Highland Capital Management, L.P. for Order Compelling Chapter 7 Trustee to Reject Certain Executory Contracts* [Doc. No. 169] ("**Motion to Reject**"). By the Motion to Reject, Highland sought an order compelling the Debtors to reject the Contracts. Highland's intention was to file the Motion to Reject on a timeline such that any order granting

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1147
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1261 of 1828 PageID 10754
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1146 of 1803 PageID 11892
Case 18-30264-sgj11 Doc 971-2 Filed 12/15/18 Entered 12/21/18 09:29:31 Page 7 of 12

the Motion to Reject would be on or about the same time as the optional redemption on June 14, 2018.

20. On May 4, 2018, the Chapter 7 trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**"). Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

21. On May 6, 2018, following an expedited hearing on the matter, the Court entered an order granting the Motion to Operate [Doc. No. 178] (the "**Operation Order**").[2] The Operation Order authorized the Chapter 7 Trustee to operate the Debtors, explicitly pursuant to the terms of the Contracts with Highland. The Operations Order did not contemplate long-term operations of the Debtors as illustrated by the fact that the Court set a further status conference for June 25, 2018 to "consider the status of the cases and any modifications to the relief granted" in the Operations Order. *See* Operations Order at p. 3.

22. Thereafter, on May 11, 2018, after a hearing on the matter, the Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206]. On May 17, 2018, the Court entered an order granting appointment of Robin Phelan as Chapter 11 Trustee (the "**Chapter 11 Trustee**").

23. The Chapter 11 Trustee refused to authorize the process to allow Highland, as sub-manager, to take the actions necessary to effectuate the noticed optional redemptions. The Chapter 11 Trustee, Highland, and HCLOF exchanged a number of letters related to that issue in late May 2018.

---

[2] The Operations Order was preceded by an interim order entered by the Court on April 18, 2018 [Doc. No. 130] pending a hearing on the Motion to Operate.

24.     On May 24, 2018, the Chapter 11 Trustee filed his *Objection to the Motion of Highland Capital Management, L.P. for Order Compelling Chapter 7 Trustee to Reject Certain Executory Contracts and Request for Expedited Hearing* [Doc. 237] ("**Trustee's Objection**"). By the Trustee's Objection, the Chapter 11 Trustee argued that rejection of the Contracts was premature, given the conversion of the cases to Chapter 11.  The Chapter 11 Trustee made clear his intention to continue to bind Highland to the terms of the Contracts, and to enjoy the services provided by Highland that made Acis LP's operations possible.

25.     On May 31, 2018, the Court held a status conference and entered a *sua sponte* temporary restraining order (the "**TRO**") staying the optional redemption process.   In recognition of this fact, HCLOF subsequently withdrew the Optional Redemption Notices.

26.      On June 11, 2018, Highland filed a withdrawal [Doc. No. 273] of its Motion to Reject.  The conversion of the case and the entry of the TRO made it perfectly clear that the Debtors' business would continue to operate past the late June time period Highland originally contemplated when it filed the Motion to Reject.  Thus, Highland continued to perform the sub-advisory and shared services it provided the Debtors pre-petition, throughout the involuntary, and post-petition pursuant to the terms of the Contracts.

27.     On July 30, 2018, less than a month after the Chapter 11 Trustee complained about Highland's attempts to free itself of the obligations under the Contracts, the Chapter 11 Trustee filed his *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC* [Doc. No. 448] (the "**Replacement Motion**").  By the Replacement Motion, the Chapter 11 Trustee sought to replace Highland with Brigade Capital Management, LP ("**Brigade**") based on vague

allegations by the Chapter 11 Trustee that Highland was "mismanaging" and "overcharging" the Debtors.

28.     The Court held a hearing on the Replacement Motion on August 1, 2018.  At the hearing, counsel for the Chapter 11 Trustee stated that the issue of mismanagement was "not the issue" for the hearing and reserved rights.[3]  Rather, the issue related solely to whether the Chapter 11 Trustee's business judgment supported the relief sought in the Replacement Motion. As such, the Court never took up the mismanagement issue.

29.     On August 1, 2018, the Court entered an order [Doc. 464] granting the Chapter 11 Trustee's Replacement Motion, thereby replacing Highland with Brigade Capital Management, LP as service provider to Acis LP.  Highland provided transitional services through August 2, 2018.

**C.     Highland's Post-Petition Services Under the Contracts**

30.     Highland provided Acis LP with uninterrupted services during three legally-distinct time periods: (i) the period prior to the filing of the Involuntary Petitions; (ii) the "gap" period between the filing of Involuntary Petitions and the entry of the Orders for Relief; and (iii) the post-petition period following the entry of the Orders for Relief until Highland's replacement on August 2, 2018 (the "**Post-Petition Period**").  Highland has filed a proof of claim asserting its pre-petition unsecured claim and its priority gap claim pursuant to Bankruptcy Code section 507(a)(3).[4]  This Application seeks an administrative expense claim relating solely to the Post-Petition Period and Highland reserves all rights related to any other period.

---

[3] See Hr'g Tr (Aug. 1, 2018) at 154:17-24 (MS. PATEL: "And with respect to these – to issues surrounding mismanagement, et cetera, as I said sort of at the opportunity to cross-examine Mr. Covitz, it's just not an issue today.  That's why we would want to reserve our rights at a later date to the extent that that is an actual material issue in dispute.  That's when that needs to be brought up, but that's it.  We reserve our rights, Your Honor.  It's just not an issue for today.  Thank you."

[4] *See* Proof of Claim [No. 27] filed on August 1, 2018 (the "**Proof of Claim**") whereby Highland asserts an unsecured claim in the amount of $4,672,140.38, constituting $2,622,576.03 for the pre-petition period and

### RELIEF REQUESTED

31.    By this Application, Highland seeks allowance of an administrative expense claim for services rendered under the Contracts during the Post-Petition Period.  The total accrued amount for such services is $3,554,224.29, as set forth in the summary attached hereto as **Exhibit D**, composed of $3,007,678.41 for sub-servicing and sub-advisory fees and $543,545.88 for expenses.

32.    Section 503(b) provides for an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate" as well as "the actual, necessary expenses" incurred by a creditor "in making a substantial contribution" in a Chapter 11 case.  *See* 11 U.S.C. §§ 503(b)(1); *see also In re ASARCO, LLC*, 650 F.3d 593, 601 (5th Cir. 2011) (providing that administrative expense claims under 503 "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate.") (internal citation omitted). "A prima facie case under section 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the [debtor]; and (2) the goods or services supplied enhanced the ability of the [debtor's] business to function as a going concern." *Matter of TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992).  The burden then shifts to the objector to put on sufficient evidence to rebut the movant's prima facie case. *Id.*  Mere allegations, unsupported by evidence, are insufficient to rebut the movant's prima face case.  *Id.*

33.    It is undisputed that Highland provided services under the Contracts during the Post-Petition Period and that Highland has not been paid for such services.  Because Acis LP has

---

$2,049,564.35 for the gap period.  In the Proof of Claim, Highland specifically reserves its right to seek an administrative expense claim, and also related to contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  *See id.* at Proof of Claim Exhibit A.

no employees, it is self-evident that Highland's services benefited the estates because, absent such services, Acis LP would have been completely incapable of operating.  In addition, while the Chapter 11 Trustee apparently has furthered a theory that Highland overcharged the Debtors (despite the fact that the terms of the Contracts are not in dispute), the Chapter 11 Trustee is required to provide evidence, not simply allegations, to rebut the prima facie case that Highland is entitled to an administrative expense claim.  To date, the Chapter 11 Trustee has provided no such evidence.  Rather, the Contracts speak for themselves and are the best evidence of the validity of the claim asserted by Highland.

34.     In addition, Highland reserves all indemnity rights against the Debtors pursuant to section 6.03 of the Shared Services Agreement and section 4(c) of the Sub-Advisory Agreement. This includes, but is not limited to, in relation to the thirty-for (34) causes of action (the "**Causes of Action**") asserted against Highland by the Chapter 11 Trustee in the *Amended Answer, Counterclaims (Including Claims Objections) and Third Party Claims* filed by the Chapter 11 Trustee on November 13, 2018 in Adversary Proceeding No. 18-03078 [Adv. Proc. Doc. No. 84].  Many – if not all – of such Causes of Action appear to arguably fall within the coverage of the applicable indemnity provisions of the Contracts.

WHEREFORE, Highland respectfully requests that the Court enter an order: (i) awarding it an administrative expense claim at least in the amount of $3,554,224.29; (ii) awarding an administrative expense for any indemnity claims payable to Highland under the Contracts; and (iii) providing any such other relief the Court deems just and proper.

4817-3498-0226.1

**Appellee Appx. 01144**

**APPX. 010409**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1152
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1266 of 1828 PageID 10759
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1151 of 1803 PageID 11897
Case 18-30264-sgj11 Doc 2159-8 Filed 11/21/18 Page 131 of 78 Page 12 of 12

Dated: December 11, 2018 Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

## CERTIFICATE OF SERVICE

This is to certify that on December 11, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Jason B. Binford*
Jason B. Binford

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1153
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1267 of 1828 PageID 10760
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1152 of 1803 PageID 11898

Case 18-30261 Case 19-12239-CSS Doc 2759-68 Filed 12/11/91 Page 1 of 14 Page 1 of 14

# EXHIBIT A

Appellee Appx. 01146
APPX. 04703

## Agreement
## for the Outsourcing of the Asset Management (the "Agreement") of

## BayVK R2 Lux S.A., SICAV-FIS (the "Fund")

entered into between

Universal-Investment-Luxembourg S.A.,

with registered office at 15, rue de Flaxweiler, L-6776 Grevenmacher and registered with the Luxembourg Trade and Companies Register under number B75014

(hereinafter referred to as "**Management Company**")

and

**Acis Capital Management, L.P.**

**with its principal office at 300 Crescent Court, Suite 700, Dallas, Texas, 75201**

(hereinafter referred to as "**Acis**" or "**Asset Manager**")

– referred to individually as the "Party" and jointly as the "Parties" –

### RECITALS

(1) Universal-Investment-Luxembourg S.A. is a management company within the meaning of Chapter 15 of the Luxembourg Law of 17 December 2010 on undertakings for collective investment, as amended (hereinafter the "**Law of 2010**") which manages, amongst others, investment funds according to part I and part II of the Law of 2010 and specialised investment funds according to the Luxembourg law of 13 February 2007 on specialised investment funds (hereinafter the "**Law of 2007**") as last amended by the Law of 12 July 2013 on alternative investment fund managers.

(2) Acis is an investment advisor registered with the U.S. Securities and Exchange Commission.

1



UNIVERSAL INVESTMENT
LUXEMBOURG



Appellee Appx. 01147

APPX. 104014

(3)     Under an agreement dated 8 October 2014 (the "**Fund Management Agreement**"), the Fund has appointed the Management Company as its management company in accordance with the Law of 2010 and the Law of 2007. Under the Fund Management Agreement, the Management Company is, among other things, responsible for the asset management of the Fund. Under the Fund Management Agreement, the Management Company may, under its own responsibility and supervision, delegate its functions to third parties.

(4)     By virtue of this Agreement, the asset management of the sub-Fund(s) specified in **ANNEX A** (hereinafter referred to as the "**Sub-Funds**") is to be outsourced by the Management Company to Acis in accordance with Luxembourg legislation, the issuing document of the Fund, as amended from time to time (the "**Issuing Document**"), the articles of association of the Fund, as amended from time to time (the "**Articles**"), attached hereto as **ANNEX B1**, as well as directions by the regulatory authority in Luxembourg, the *Commission de Surveillance du Secteur Financier* (hereinafter referred to as "**CSSF**"). Additional Sub-Funds may be included herein provided that the attached **ANNEXES** (if and to the extent necessary) are amended and signed by both parties and **ANNEX A** is supplemented accordingly.

(5)     In view of the Asset Manager's skills and abilities in asset management and the representations made and obligations assumed by it hereunder, the Management Company intends to engage the Asset Manager for the management of the Sub-Funds listed in **ANNEX A**.

(6)     Therefore, the Parties agree to the following:

### Section 1
### Appointment of the Asset Manager

1.     The Management Company hereby appoints the Asset Manager to perform the asset management of the Sub-Funds upon the terms hereinafter contained and in accordance with the applicable laws and regulations, the Articles, the Issuing Document or as otherwise determined by the Management Company in accordance with Article 42ter lit. g) of the Law of 2007 from time to time. The Asset Manager hereby accepts its appointment and agrees to assume the obligations set forth herein.

2.     The Asset Manager represents and warrants that it is duly authorised to carry out the activities stipulated in this Agreement and that due to its professional infrastructure and human resources it is capable of providing its services on a secure and permanent basis. Furthermore it represents and warrants that it is familiar with the statutory investment restrictions as well as any other requirements relating to the management of funds in general and in particular with the requirements of the Luxembourg Law of 2007, the relevant circulars issued by the CSSF and all other applicable Luxembourg legislation. The Asset Manager represents and warrants that adequate risk management procedures have been put in place for the management of the relevant Sub-Funds. The Asset Manager will keep itself continuously informed about any amendments or changes in the statutory investment restrictions or other requirements. In particular, the Asset Manager will ensure sufficient professional competence of those employees who are entrusted with the performance of the Asset Manager's duties according to this Agreement, as well as establish and continuously maintain, at





least for the term of this Agreement, the necessary infrastructure, especially for the purpose of monitoring compliance with investment restrictions.

3.  Neither the regulatory and supervisory responsibility of the Management Company nor the liability of the Management Company under civil law towards the shareholders of the respective Sub-Funds will be affected by the appointment of the Asset Manager.

4.  This Agreement shall not confer any right on the part of the Asset Manager to conduct advertising or distribution activities of any kind.

5.  The appointment of the Asset Manager does not create any legal relationship between the Asset Manager and the shareholders of the Fund, but between the Parties only.

6.  The Asset Manager may provide similar asset management services to other clients and may execute transactions which differ from the transactions executed hereunder.

### Section 2
### Duties of the Asset Manager

1.  The Asset Manager will make all asset management decisions on behalf of the Sub-Funds. The Asset Manager shall be entitled and obligated to perform the asset management services of the respective Sub-Funds listed in **ANNEX A** (subject to the approval and supervision of the Management Company).

2.  Management tasks include, where applicable, purchasing and selling of assets, securities transactions, futures transactions, entering into and closing out of derivative positions both for investment and hedging purposes, managing cash and implementing corporate actions in accordance with the Issuing Document and the Articles and as applicable to one or more Sub-Funds (please refer to **ANNEX B1**).

    However, these tasks do not include the exercise of any proxy voting rights attached to securities contained in the Sub-Funds, which is reserved to the Management Company itself. Business days in the sense of this Agreement are defined as stock exchange days on which banks would be open for general business in Luxembourg and Frankfurt am Main.

3.  When performing its management tasks, the Asset Manager will duly observe the provisions of the Law of 2007, the Issuing Document and the Articles, as well as specific instructions/investment guidelines of the Management Company, if any, attached hereto in **ANNEX B2**. The Management Company is obligated to inform the Asset Manager of changes in the investment limits and rules as contained in the **ANNEX B1 and ANNEX B2**.

    When rendering management services, the Asset Manager will observe the principle of risk spreading as defined by the Law of 2007, the statutory investment restrictions, the provisions of the code of conduct, conflict of interest, organisational measures and the prohibition of insider trading according to the applicable law, the administrative customs of relevant supervisory authorities and their directives and circulars, as set out in the valid version of the Issuing Document and the Articles as attached hereto as **ANNEX B1**.



UNIVERSAL INVESTMENT
LUXEMBOURG

47

Appellee Appx. 01149


APPX. 104016

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1157
Case 3:23-cv-00726-S   Document 8-22   Filed 01/24/23    Page 1271 of 1828   PageID 10764
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1156 of 1803   PageID 11902
Case 18-30264-sgj11 Doc 1233-72 Filed 12/19/18  Entered 12/19/18 20:31:76 Page 5 of 14

The Management Company reserves the right to give comprehensive instructions to the Asset Manager and any sub-manager, if applicable, in connection with the management of the Sub-Funds, as far as legally required.

4.  Brokers and counterparties will be selected by the Asset Manager at its sole discretion, taking into account all laws and regulations applicable to the Asset Manager and always in accordance with the Asset Manager's best execution policy, which has been communicated to, and is hereby approved by, the Management Company and which is attached hereto as **ANNEX H**. However, the Asset Manager's right to select brokers and counterparties at its sole discretion is limited to the list of brokers and the list of counterparties respectively attached hereto as **ANNEX C**. The Management Company's prior consent has to be obtained for the selection of brokers or counterparties not included in **ANNEX C**. The Asset Manager will issue at all times prompt and complete instructions to the Fund's custodian bank (hereinafter referred to as "**Custodian Bank**") to enable the Custodian Bank to settle transactions with brokers and counterparties. In this regard the Asset Manager is responsible for the careful choice, instruction and monitoring of the brokers or other counterparties.

5.  The Asset Manager may provide similar asset management services to other customers and may effect transactions which differ from the transactions executed hereunder. Furthermore the Asset Manager may consolidate portfolio management measures hereunder with asset or portfolio management measures to be taken on behalf of other customers and aggregate customer orders without prior communication with the Management Company if and to the extent that this is consistent with the fiduciary duties imposed upon it under applicable law and this Agreement as well as the Asset Manager's conflicts of interests policy (the "**Conflicts of Interest Policy**"), which has been communicated to, and is hereby approved by, the Management Company and which is attached hereto as **ANNEX G**.

6.  When fulfilling its obligations hereunder, the Asset Manager may contract the services of third parties if and to the extent that this is permitted under applicable law, particularly in accordance with the Law of 2007. Principally the Asset Manager is entitled to sub-delegate portions of its asset management function to an affiliate of the Asset Manager which consent shall also extend specifically to the modalities of the sub-delegation as defined in a separate sub-delegation agreement. For the avoidance of doubt, the Management Company's prior consent must be obtained for the sub-delegation of asset management services, which will not be unreasonably withheld. The Asset Manager will ensure that any sub-delegation will be in accordance with this Agreement and in particular with Law of 2007. In any case of sub-delegation to third parties the Asset Manager remains the sole party responsible to the Management Company for compliance with the duties pursuant to this Agreement.

7.  The Asset Manager does not guarantee and the Management Company acknowledges and agrees that the Asset Manager does not guarantee, the future performance or any specific level of performance for the Sub-Funds, the success of any investment decision or strategy that the Asset Manager may use, or the success of the Asset Manager's overall management of the Sub-Funds. The Management Company understands that investment decisions made for the Sub-Funds by the Asset Manager are subject to various risks, including but not limited to, market, interest rate, foreign currency, equity, credit, counterparty, economic, political, legal and operational risks and that investment decisions will not always be profitable and may result in significant loss or depreciation in the value of the Sub-Funds.

8.  The Asset Manager shall provide for adequate arrangements for the handling of both avoidable and unavoidable conflicts of interest. The Asset Manager shall be obliged to

4



SƎ UNIVERSAL
INVESTMENT
LUXEMBOURG

Appellee Appx. 01150
APPX. 04013

identify conflicts of interest in conjunction with the asset management services and to establish, respect and maintain a conflict of interest policy. This policy has to take into consideration conflicts of interest which may arise between the Asset Manager, including its employees and the Management Company and the persons who are directly or indirectly linked with the Asset Manager and its clients or between its clients. The Asset Manager further undertakes to make its conflict of interest policy available to the Management Company. The Asset Manager shall review its conflict of interest policy on an on-going basis, however at least in yearly intervals, and inform the Management Company of material changes to the policy as soon as reasonably practicable.

To the extent that the organisational arrangements of the Asset Manager are not suitable for the prevention of conflicts of interest, the Asset Manager shall be obliged to document the general nature and source of the remaining conflicts of interest, to promptly disclose these conflicts of interest to the Management Company and to initiate corrective measures in consultation with the Management Company.

9. The Asset Manager has, as of the date hereof, and shall maintain for the term of this Agreement, insurance; the relevant documents have been provided to the Management Company within the due-diligence process. .

10. The Asset Manager shall at all times observe and comply with the applicable laws and regulations, the Articles and with the applicable provisions of the Issuing Document or any such document relating to the Fund and its Sub-Funds distributed from time to time on behalf of the Fund and all lawful resolutions of the Management Company and other lawful orders and directions given to it from time to time by the Management Company. All activities engaged in by the Asset Manager shall at all times be subject to the control, approval and review by the Management Company.

### Section 3
### Own dispositions of the Management Company, Authorisations

1. To avoid contradicting dispositions with respect to the Sub-Funds' assets, the Management Company will refrain from any direct dispositions of the Sub-Funds' assets without prior consultation with the Asset Manager. This applies in particular to the cash management required to meet liabilities incurred by the Asset Manager on behalf of the Management Company for the account of the respective Sub-Funds. However, if it is deemed imperative by the Management Company, in its sole discretion and under own responsibility, to take its own management measures to protect the shareholders of the Sub-Funds, the Management Company reserves the right to immediately implement its own measures without prior notification of the Asset Manager. In this case the Management Company has to fully inform the Asset Manager either in advance or, as soon as reasonably possible after execution of the relevant management measure.

2. For the purpose of the asset management of the Sub-Funds, the Management Company will grant the Asset Manager all authorisations as required, in particular, the power to instruct the respective Custodian Bank to settle and accept settlement of transactions for the respective Sub-Fund. These authorisations are restricted to the accounts opened for the respective Sub-Fund. They do not include the Asset Manager's right to debit its remuneration or eventual expenses directly to the Sub-Fund concerned.



UNIVERSAL
INVESTMENT
LUXEMBOURG

42

Appellee Appx. 01151

Appx. 04018

### Section 4
### Reporting

1.  The Asset Manager will report to the Management Company each transaction concluded by the Asset Manager on the trading day or in the case of transactions executed after the Management Company's business hours on the following business day to enable the Management Company to duly include the relevant transaction in its Fund accounts.

2.  The Asset Manager will ensure that the Custodian Bank will receive settlement instructions for all transactions according to the Custodian Bank's deadlines. The Asset Manager will also ensure that the Custodian Bank for the relevant Sub-Fund is informed of trades in financial instruments not being settled through a stock exchange or a recognised organised market.

3.  The Asset Manager will inform the Management Company as soon as reasonably practicable after becoming aware of any determined breaches of investment restrictions, whether caused actively or passively, and communicate all essential information and data relating thereto to the Management Company.

### Section 5
### Fees and Reimbursement of Expenses

1.  The Asset Manager is entitled to receive a fee for its services rendered under this Agreement which is set out in the fee schedule attached as **ANNEX D**. The Asset Manager's fee is understood as inclusive any statutory VAT or other duties and taxes where applicable.

2.  The Asset Manager is not entitled to reimbursement of any expenses incurred in connection with the performance of its obligations hereunder unless any such reimbursement of expenses has been agreed upon with the Management Company in advance in writing or is stated in the Issuing Document of the Fund.

3.  The Asset Manager's fees will be paid by the Management Company and ultimately charged to the respective Sub-Fund.

### Section 6
### Liability and Risk Considerations

1.  The Asset Manager shall act in compliance with the duties stated in this Agreement and in the relevant Service Level Agreement attached hereto as **ANNEX I** and shall be liable for the violation of investment restrictions and the conduct of unpermitted transactions caused by wilful misconduct, bad faith or negligence of the Asset Manager and shall compensate the Management Company for any losses or damages accordingly. The Asset Manager will not be liable for any action taken, omitted or suffered to be taken by it in its reasonable judgment, in good faith and believed by it to be authorised or within the discretion or rights or powers conferred upon it by this Agreement, or in accordance with (or in the absence of) specific directions or instructions from the Management Company. Notwithstanding anything to the contrary

6


UNIVERSAL
INVESTMENT
LUXEMBOURG

contained herein, the Asset Manager shall not be liable to the Management Company, the Sub-Fund or any other party for any losses due to the performance of the Sub-Fund's investments so long as the Asset Manager acted in accordance with the investment guidelines contained in Annex B2.

The Asset Manager is liable in the same manner for its agents of vicarious liability including commissioned third parties. If a transaction executed by the Asset Manager is, at the time of that transaction, in conflict with the provisions hereof, the Asset Manager will, upon the Management Company's request, arrange for the Management Company or the relevant Sub-Fund or the shareholder to be in a position as if, on demand of the Management Company, the transaction had not been executed for the relevant Sub-Fund or alternatively been concluded in accordance with this Agreement.

2. The Asset Manager shall not be liable for losses and/or financial damages arising from transactions initiated by the Management Company (in particular pursuant to Section 3.1) with regard to the assets of the Sub-Funds and/or from transactions executed in accordance with instructions of the Management Company except in case (and to the extent) the Asset Manager materially breached this Agreement and (i) the transactions so initiated and/or instructions given by the Management Company were required and suitable to correct such material breach, and (ii) the Management Company acted with due care and diligence when initiating such transactions and/or giving or implementing such instructions.

3. The Management Company shall indemnify the Asset Manager against any loss sustained or incurred by the Asset Manager in connection with the performance of its duties under this Agreement except to the extent that such losses are due to the wilful misconduct, bad faith or negligence of the Asset Manager.

4. The Asset Manager is expressly authorized to rely upon any and all instructions, approvals and notices given on behalf of the Management Company by any one or more of those persons designated as representatives of the Management Company whose names, titles and specimen signatures appear in ANNEX E attached hereto and incorporated herein by reference.

5. It is mutually understood and agreed that in providing services pursuant to this Agreement, the Asset Manager is at all times performing services as an independent contractor and its employees are at all times performing services as independent contractors and not as agents or employees of Management Company. Nothing contained in this Agreement is intended nor shall be construed to create an employer/employee relationship or to allow Management Company to exercise control or direction over the manner or method by which the Asset Manager performs services which are the subject matter of this Agreement; provided, however that the services to be rendered hereunder shall be rendered in a manner consistent with the standards governing such services, the provisions of this Agreement and all applicable provisions of law and other rules and regulations of any and all governmental authorities relating thereto.

6. Statutory or contractual examination duties of the Management Company or the Custodian Bank do not diminish the Asset Manager's duties of due care.



UNIVERSAL
INVESTMENT
LUXEMBOURG

42

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1161
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1275 of 1828 PageID 10768
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1160 of 1803 PageID 11906
Case 18-30264-sgj11 Doc 3972-5 Filed 12/19/18 Entered 12/19/18 22:31:76 Page 9 of 14

7. Force majeure, as such term is interpreted by Luxembourg courts, which seriously impedes or renders temporarily impossible delivery or performance for one of the parties prolongs the time for fulfilment of the duties by the duration of the impediment and the time necessary to restore normal working conditions. Force majeure is among others defined as lawful labour dispute measures, emergency measures taken by the state or other circumstances for which the affected party is not responsible.

### Section 7
### Confidentiality

1. It is understood by the parties that - except as otherwise provided in this Section 7 - the conditions hereof must neither be disclosed nor notified to any third parties. For the avoidance of doubt, the Fund shall not be considered as being a third party. This Section 7 does not apply to any legally required disclosure of information or the disclosure of information to shareholder(s) of the Fund, relevant governmental or regulatory authorities, the employees of the parties (on a need-to-know-basis), independent auditors and independent legal advisors. Entities and persons that are affiliated with or a contractual partner of the Asset Manager in accordance with this Agreement for the purpose of performing its obligations hereunder, are not deemed to be third parties within the meaning of this Section 7.

2. In the event that submission of any information relating to this Agreement, including its **ANNEXES**, is requested by a supervisory authority or other governmental or regulatory authority, the party to which the respective request is addressed shall, to the extent practicable, notify the other party thereof prior to submitting any such information unless the party to which the request is addressed is prohibited to notify the other party thereof under any applicable statutory or administrative regulations or in accordance with any instructions contained in the request of the respective supervisory authority.

3. Each party undertakes to keep confidential any and all information in its possession which relates to data processing systems and know-how of the other party as well as any and all general information relating to the affairs of the other party and its clients which is not publicly known; in addition, each party agrees to neither use nor disclose any such data except for the purposes hereof, subject to the prior written consent of the other party, or if and to the extent that it is subject to a statutory, regulatory or legal disclosure obligation.

4. The Asset Manager undertakes to observe the confidentiality rules owed by the Management Company with regard to all data relating to customers of the Management Company; the Management Company will inform the Asset Manager of such confidentiality rules in advance and the Management Company undertakes to only convey data to the Asset Manager which it may lawfully convey under such confidentiality rules; moreover, the Asset Manager agrees to make available any such data in connection herewith only to those employees of the Asset Manager or a sub-manager who are subject to comparable rules of confidentiality owed by the Management Company or any data protection obligations, and to do so only to the extent as is absolutely necessary to perform the management tasks in accordance herewith.

8


UNIVERSAL
INVESTMENT
LUXEMBOURG

Appellee Appx. 01154
APPX. 14019

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1162
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1276 of 1828 PageID 10769
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1161 of 1803 PageID 11907
Case 18-30264-sgj11 Doc 2397-2 Filed 12/19/18 Entered 12/19/18 Page 2331 of 76 Page 10 of 14

5. The Asset Manager will take technical, personnel-related and organisational measures so as to ensure that the confidentiality of all confidential information of the Management Company and the Fund is maintained as provided in Section 7 hereof not only towards any third parties, but also between various other outsourcing institutions on behalf of which the Asset Manager is acting as a service provider and other clients of the Asset Manager.

### Section 8
### Notices and Instructions

1. All notices and instructions are only binding upon the receiving party if given by representatives of the performing units, whose names and specimen signatures are listed in the attached **ANNEX E** hereto. The parties will inform the respective other party immediately of any changes in the list. Each party shall appoint a head co-ordinator for all service areas.

2. Notices and instructions given by telephone must be confirmed in writing or by fax as soon as practical.

3. The parties may record all telephone calls between the Asset Manager and the Management Company. Both parties hereby agree to the recording and storage of such conversations and will inform their employees hereof.

### Section 9
### Duration

1. This Agreement is concluded for an indefinite period of time. It may be terminated (i) by the Management Company – in respect of one or more of the Sub-Funds – at any time upon providing written notice to the Asset Manager whereupon notwithstanding Section 10 (3) the asset management authorisation is immediately revoked for the relevant Sub-Fund(s) or (ii) by the Asset Manager upon providing 30 (thirty) calendar days' notice to expire at the end of a calendar quarter.

2. The right to terminate this Agreement immediately for cause is given if

   a) the other party seriously violates its duties pursuant hereto and such a violation – insofar as it can be remedied or reversed – is not remedied or reversed within 10 (ten) calendar days following receipt of written notice hereof from the respective other party;

   b) the other party has become the subject of insolvency proceedings opened against it, or said party has applied for insolvency or composition proceedings, or if the opening of insolvency proceedings is refused due to lack of assets sufficient to cover the costs of such proceedings;

   c) the CSSF orders or demands the ending of this Agreement;

   d) the other party discontinues its main business operation, pursues liquidation or is dissolved;

   e) the CSSF or a court of law orders the appointment of an administrator or liquidator or a supervisor for a party;



UNIVERSAL
INVESTMENT
LUXEMBOURG

9



Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1163
Case 3:23-cv-00726-S   Document 8-22   Filed 04/24/23   Page 1277 of 1828   PageID 10770
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1162 of 1803   PageID 11908
Case 18-30264-sgj11 Doc 2397-25 Filed 12/19/18   Entered 12/19/18 09:29:43   Page 11 of 14

f)   a significant change of the participation or control circumstances occurs at the other party (except as a result of restructuring for economic reasons within the corporate group and which does not foresee distribution or other pay-outs of the company capital to shareholders, unit holders, partners, creditors, or a capital decrease).

3.   In case of a notice of termination of this Agreement (a "**Termination Notice**") being served for whatever reason, all acts, deeds and dealings carried out or instructed prior to the date of receipt of the Termination Notice (the "**Notice Date**") shall be valid and legally binding upon the parties. Transactions instructed by the Asset Manager after the Notice Date must be settled according to the instructions of the Management Company. The parties will co-operate to ensure an orderly transition to another asset manager or to enable the Management Company to take over the asset management itself. The Asset Manager will continue to perform the asset management tasks until the transition is completed regardless of termination of this Agreement. Such a transition must be accomplished within an appropriate timeframe and may not be impeded or postponed without cause. So long as the Asset Manager conducts asset management activities it is entitled to the fee according to this Agreement. This notwithstanding, the Management Company is entitled at any time to terminate the Asset Manager's assignment with immediate effect and without awaiting conclusion of the transition.

4.   If a Sub-Fund under this Agreement is transferred to another management company or is dissolved, the Management Company's contractual relationship under this Agreement in respect of this relevant Sub-Fund shall terminate as per the date of the transfer or dissolution of this Sub-Fund. There is no requirement for a separate notice of termination, but the Management Company is obliged to inform the Asset Manager within a reasonable time frame before such transfer or dissolution of a Sub-Fund.

5.   Section 6 and Section 7 shall survive termination hereof.

### Section 10
### Miscellaneous

1.   This Agreement shall be governed by Luxembourg law. Exclusive place of jurisdiction for any disputes arising from or in connection with this Agreement shall be Luxembourg, Grand Duchy of Luxembourg.

2.   No rights under this Agreement shall be assigned by either party to any third parties in whole or in part without the prior written consent of the other party.

3.   In the event that, for whatever reason, any provision hereof is ineffective, unlawful or impracticable, any such ineffectiveness, unlawfulness or impracticability shall not affect the remaining provisions hereof. Any such ineffective, unlawful or impracticable provision shall be replaced by an effective, lawful and practicable provision corresponding to the economic interests of the parties. The same shall apply for any gaps in this Agreement.



UNIVERSAL
INVESTMENT
LUXEMBOURG

42

4.   The **ANNEXES** in their current versions are each an integral part of this Agreement. These contain any and all agreements between the parties concerning the services to be performed according to this Agreement.

5.   Any amendment hereto, including to this Section 10 (5), must be made in writing.

6.   Executed in duplicate. This Agreement will come into effect on 27 February 2015.

*(Signature page follows)*

UNIVERSAL
INVESTMENT
LUXEMBOURG



Appellee Appx. 01157

Appx. 04022

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1165
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1279 of 1828 PageID 10772
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1164 of 1803 PageID 11910

Case 18-30264-sgj11 Doc 2397-3 Filed 12/17/18 Entered 12/17/18 Page 13 of 14

Grevenmacher, _26 February 2015_          Dallas, _3 March 2015_

**Universal-Investment-Luxembourg S.A.**          **Acis Capital Management, L.P.**

By: _(signature)_          By: _(signature)_

Name: Rainer Krenz    Dirk Schmidt          Name: _Joshua N Terry_

Title: Senior Manager Authorized Signatory          Title: _Portfolio Manager_

UNIVERSAL
INVESTMENT
LUXEMBOURG

## ANNEXES

A:  List of Sub-Funds
B:  B1: Issuing Document and articles of incorporation of the Fund
    B2: Investment Guidelines
C:  Lists of Brokers and Counterparties
D:  Fee Schedule
E:  Lists of Authorised Signatories
F:  intentionally omitted
G:  Conflicts of interest policy of the Asset Manager
H:  Best execution policy of the Asset Manager
I:  Operating Memorandum / Service Level Agreement





Appellee Appx. 01159

Appx. 104026

Case 18-30264-sgj11 Doc 972-2 Filed 02/59/18   Entered 02/19/18 23:31:76 Page 1 of 25

# EXHIBIT B

Appellee Appx. 01160

Appx. 04023

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1168
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1282 of 1828 PageID 10775
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1167 of 1803 PageID 11913

**EXECUTION VERSION**

# FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT

by and between

## ACIS CAPITAL MANAGEMENT, L.P.

and

## HIGHLAND CAPITAL MANAGEMENT, L.P.

Dated March 17, 2017

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................................................... 2

    Section 1.01    Certain Defined Terms.............................................................................. 2

    Section 1.02    Interpretation............................................................................................ 3

ARTICLE II SERVICES ................................................................................................................... 4

    Section 2.01    General Authority. ................................................................................... 4

    Section 2.02    Provision of Services. ............................................................................. 4

    Section 2.03    Shared Employees.................................................................................. 6

    Section 2.04    Applicable Asset Criteria and Concentrations. ..................................... 8

    Section 2.05    Compliance with Management Company Policies and
                      Procedures. ............................................................................................. 8

    Section 2.06    Authority. ............................................................................................... 8

    Section 2.07    Third Parties. .......................................................................................... 9

    Section 2.08    Management Company to Cooperate with the Staff and
                      Services Provider. .................................................................................. 9

    Section 2.09    Power of Attorney.................................................................................. 9

ARTICLE III CONSIDERATION AND EXPENSES ....................................................................... 9

    Section 3.01    Consideration ......................................................................................... 9

    Section 3.02    Costs and Expenses ............................................................................. 10

    Section 3.03    Deferral ................................................................................................ 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ............................................................ 10

    Section 4.01    Representations .................................................................................... 10

ARTICLE V COVENANTS............................................................................................................. 10

    Section 5.01    Compliance; Advisory Restrictions. .................................................... 10

    Section 5.02    Records; Confidentiality. ...................................................................... 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION........................................................... 12

    Section 6.01    Standard of Care .................................................................................. 12

    Section 6.02    Exculpation. ......................................................................................... 12

    Section 6.03    Indemnification by the Management Company................................... 13

    Section 6.04    Other Sources of Recovery etc ........................................................... 14

    Section 6.05    Rights of Heirs, Successors and Assigns ........................................... 14

    Section 6.06    Reliance................................................................................................ 14

i

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| ARTICLE VII TERMINATION | | 14 |
| Section 7.01 | Termination. | 14 |
| ARTICLE VIII MISCELLANEOUS | | 15 |
| Section 8.01 | Amendments | 15 |
| Section 8.02 | Assignment and Delegation. | 15 |
| Section 8.03 | Non-Recourse; Non-Petition. | 15 |
| Section 8.04 | Governing Law. | 16 |
| Section 8.05 | WAIVER OF JURY TRIAL | 17 |
| Section 8.06 | Severability | 17 |
| Section 8.07 | No Waiver | 17 |
| Section 8.08 | Counterparts | 17 |
| Section 8.09 | Third Party Beneficiaries | 17 |
| Section 8.10 | No Partnership or Joint Venture | 17 |
| Section 8.11 | Independent Contractor | 17 |
| Section 8.12 | Written Disclosure Statement | 18 |
| Section 8.13 | Headings | 18 |
| Section 8.14 | Entire Agreement | 18 |
| Section 8.15 | Notices | 18 |

Appellee Appx. 01163

Appx. 04728

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1171
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1285 of 1828 PageID 10778
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1170 of 1803 PageID 11916

Case 18-30264-sgj11 Doc 1223-25 Filed 12/19/18 Entered 12/19/18 22:31:76 Page 5 of 25

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

    This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

    WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

    WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

    WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

    WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

    WHEREAS, the Management Company  may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

    WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

    WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

    NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1172
Case 3:23-cv-00726-S Document 8-22 Filed 06/29/23 Page 1286 of 1828 PageID 10779
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1171 of 1803 PageID 11917
Case 18-30264-sgj11 Doc 3972-5 Filed 12/19/18 Entered 12/19/18 23:31:76 Page 6 of 25

# ARTICLE I

## DEFINITIONS

Section 1.01 <u>Certain Defined Terms</u>. As used in this Agreement, the following terms shall have the following meanings:

"<u>Advisers Act</u>" shall have the meaning set forth in the Recitals to this Agreement.

"<u>Advisory Restriction</u>" shall have the meaning set forth in <u>Section 5.01(b)</u>.

"<u>Affiliate</u>" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble to this Agreement.

"<u>Applicable Asset Criteria and Concentrations</u>" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"<u>Applicable Law</u>" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"<u>CLO or Account</u>" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"<u>Covered Person</u>" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"<u>Governmental Authority</u>" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

Appellee Appx. 01165
APPX. 104032

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Highland" shall have the meaning set forth in the preamble to this Agreement.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Management Company" shall have the meaning set forth in the preamble to this Agreement.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"Parties" shall have the meaning set forth in the preamble to this Agreement.

"Portfolio" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Staff and Services Fee" shall have the meaning set forth in Section 3.01 of this Agreement.

"Staff and Services Provider" shall have the meaning set forth in the preamble to this Agreement.

"Shared Employee" shall have the meaning set forth in the Recitals to this Agreement.

Section 1.02 Interpretation. The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1174
Case 3:23-cv-00726-S Document 8-22 Filed 01/04/23 Page 1288 of 1828 PageID 10781
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1173 of 1803 PageID 11919
Case 18-30264-sgj11 Doc 1239-72 Filed 01/29/68 Entered 12/11/18 22:35:31 Page 8 of 25

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

# ARTICLE II

## SERVICES

Section 2.01  <u>General Authority</u>.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02  <u>Provision of Services</u>.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)  *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)  *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)  *Management of Collateral Obligations and CLOs and Accounts*. Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)  *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1175
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1289 of 1828 PageID 10782
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1174 of 1803 PageID 11920
Case 18-30264-sgj11 Doc 2397-2 Filed 12/59/18 Entered 12/91/18 09:26:31 Page 9 of 25

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e) *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f) *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g) *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h) *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i) *Shared Employees.* The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(j) *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

(k) *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01168
APPX. 04023

Section 2.03    <u>Shared Employees</u>.

(a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)    Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

6

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e) Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f) The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g) The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable. To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h) The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i) The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j) The Staff and Services Provider shall require that each Shared Employee:

(i) certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii) be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii) provide services hereunder and take actions hereunder only as approved by the Management Company;

Appellee Appx. 01170

APPX. 104037

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.2 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures. The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1179
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1293 of 1828   PageID 10786
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1178 of 1803   PageID 11924
Case 18-3026   Case 19-12379-CSS   Doc 215-11   Filed 12/01/18   Page 24 of 76   Page 13 of 25

Section 2.07    <u>Third Parties</u>.

     (a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

     (b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    <u>Power of Attorney</u>.  If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).  Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    <u>Consideration</u>.  As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto.  The "<u>Staff and Services Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

     From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement.  Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1180
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1294 of 1828 PageID 10787
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1179 of 1803 PageID 11925
Case 18-30264... Case 19-32272-S Doc... Filed 12/11/18 Page 14 of 25

Section 3.03    <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    <u>Compliance; Advisory Restrictions</u>.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01173
APPX. 04036

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1181
Case 3:23-cv-00726-S Document 8-22 Filed 08/29/23 Page 1295 of 1828 PageID 10788
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1180 of 1803 PageID 11926
Case 18-30264 Case 19-02007-2-S Doc 21-13 Filed 12/11/18 Page 24 of 76 Page 15 of 25

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)     This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02   Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01174
APPX. 10739

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, provided that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

12

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1183
Case 3:23-cv-00726-S   Document 8-22   Filed 01/24/23   Page 1297 of 1828   PageID 10790
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1182 of 1803   PageID 11928
Case 18-30264 Case 19-D3397-S Filed Doc 3459-46   Entered 12/19/19 Page 24311 76 Page 17 of 25

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05   Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

14

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

15

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1186
Case 3:23-cv-00726-S Document 8-22 Filed 04/24/23 Page 1300 of 1828 PageID 10793
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1185 of 1803 PageID 11931
Case 18-30264 Case 19-DQ3972-S Filed Doc 2159-8 Filed 04/22/19 Page 24731 76 Page 20 of 25

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this <u>Section 8.03</u> shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     <u>Governing Law</u>.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1187
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1301 of 1828 PageID 10794
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1186 of 1803 PageID 11932
Case 18-3026 Case 19-12237-CSS Filed Doc 215948 Filed 11/21/19 Page 24831 of 76 Page 21 of 25

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06 <u>Severability</u>. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07 <u>No Waiver</u>. The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09 <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10 <u>No Partnership or Joint Venture</u>. Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11 <u>Independent Contractor</u>. Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Appellee Appx. 01180
APPX. 1047

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1188
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1302 of 1828   PageID 10795
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1187 of 1803   PageID 11933
Case 18-30264-sgj11 Doc 2397-2 Filed 12/19/18   Entered 12/19/18 Page 2493 of 76 Page 22 of 25

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1191
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23   Page 1305 of 1828   PageID 10798
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1190 of 1803   PageID 11936

Case 18-30264-sgj11 Doc 2397-2 Filed 12/19/18   Entered 12/19/18 09:52:30 of 76 Page 25 of 25

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1192
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1306 of 1828   PageID 10799
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1191 of 1803   PageID 11937

Case 18-30264-sgj11 Doc 3973-23 Filed 02/59/18   Entered 02/21/91/18 09:53:31 76 Page 1 of 22

# EXHIBIT C

Appellee Appx. 01185
APPX. 104052

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1193
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23  Page 1307 of 1828  PageID 10800
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1192 of 1803  PageID 11938

**EXECUTION VERSION**

# THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT

by and between

## ACIS CAPITAL MANAGEMENT, L.P.

and

## HIGHLAND CAPITAL MANAGEMENT, L.P.

Dated March 17, 2017

# TABLE OF CONTENTS

**Page**

1.  Appointment; Limited Scope of Services .................................................................... 1

2.  Compensation ............................................................................................................. 3

3.  Representations and Warranties.................................................................................. 3

4.  Standard of Care; Liability; Indemnification............................................................ 4

5.  Limitations on Employment of the Sub-Advisor; Conflicts of Interest...................... 7

6.  Termination; Survival ................................................................................................ 8

7.  Cooperation with Management Company ................................................................... 8

8.  Management Agreements and Related Agreements .................................................... 8

9.  Amendments; Assignments ......................................................................................... 9

10. Advisory Restrictions.................................................................................................. 9

11. Records; Confidentiality............................................................................................. 10

12. Notice .......................................................................................................................... 11

13. Governing Law ........................................................................................................... 11

14. WAIVER OF JURY TRIAL......................................................................................... 11

15. Severability ................................................................................................................. 11

16. No Waiver .................................................................................................................... 11

17. Counterparts ............................................................................................................... 12

18. Third Party Beneficiaries ........................................................................................... 12

19. No Partnership or Joint Venture ................................................................................ 12

20. Entire Agreement ........................................................................................................ 12

Appellee Appx. 01187

Appx. 10452

**THIRD AMENDED AND RESTATED**
**SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1.    Appointment; Limited Scope of Services.

(a)    Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1196
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1310 of 1828 PageID 10803
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1195 of 1803 PageID 11941
Case 18-30264-sgj11 Doc 39-25 Filed 12/19/18 Entered 12/19/18 09:31:76 Page 5 of 22

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of Section 8, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b) Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i) make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii) place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii) identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv) assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v) provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi) assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii) assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "Services."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company. Furthermore, the

Appellee Appx. 01189
APPX. 01456

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1197
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1311 of 1828 PageID 10804
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1196 of 1803 PageID 11942
Case 18-30264-sgj11 Doc 3972-3 Filed 12/19/18 Entered 12/19/18 20:58:31 Page 6 of 22
Case 19-12239-CSS Doc 59-68 Filed 12/11/19 Page 59 of 76

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

Appellee Appx. 01190
APPX. 04057

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1198
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1312 of 1828 PageID 10805
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1197 of 1803 PageID 11943
Case 18-30264-sgj11 Doc 1973-2 Filed 02/19/18 Entered 02/19/18 19:31:76 Page 7 of 22

(ii)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)     no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)     neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)     The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.     Standard of Care; Liability; Indemnification.

(a)     Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1199
Case 3:23-cv-00726-S Document 8-22 Filed 04/24/23 Page 1313 of 1828 PageID 10806
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1198 of 1803 PageID 11944
Case 18-30264-sgj11 Doc 1397-25 Filed 12/59/68 Entered 12/01/18 20:31:76 Page 8 of 22

Related Agreements.  To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)    Exculpation.  To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01192
APPX. 10457

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1200
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1314 of 1828 PageID 10807
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1199 of 1803 PageID 11945
Case 18-30264-sgj11 Doc 1239-23 Filed 12/19/18 Entered 12/19/18 09:31:76 Page 9 of 22

(c)  <u>Indemnification</u>.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person.  The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder.  The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives.  Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

(d)  <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled.  If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

Appellee Appx. 01193
APPX. 10450

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1201
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1315 of 1828 PageID 10808
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1200 of 1803 PageID 11946
Case 18-30264-sgj11 Doc 2397-2 Filed 12/21/18 Entered 12/21/18 22:52:31 Page 10 of 22

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

      (e)   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 4(c)</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

      (f)   <u>Reliance</u>. A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

      (g)   <u>Rights Under Management Agreements and Related Agreements</u>. The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to <u>Section 8</u> if such indemnification and exculpation rights are not reasonably acceptable to it.

     5.   <u>Limitations on Employment of the Sub-Advisor; Conflicts of Interest</u>.

      (a)   The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

      (b)   So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company. The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder. It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01194

APPX. 010759

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in <u>Appendix B</u> hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such <u>Appendix B</u>, as amended from time to time with mutual consent of the Parties.

6.     <u>Termination; Survival</u>.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements. Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and <u>Appendix A</u> hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     <u>Cooperation with Management Company</u>. The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor. Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     <u>Management Agreements and Related Agreements</u>. The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement. The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company. No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1203
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1317 of 1828 PageID 10810
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1202 of 1803 PageID 11948
Case 18-30264 Case 19-02397-S Filed Doc 2159-13 Entered 11/21/19 11:59:43 Page 12 of 22

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9.     Amendments; Assignments.

(a)     Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 9, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b)     Except as otherwise provided in this Section 9, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c)     The Sub-Advisor may, without satisfying any of the conditions of Section 9(a) other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10.     Advisory Restrictions. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01196
APPX. 104763

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1204
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1318 of 1828 PageID 10811
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1203 of 1803 PageID 11949
Case 18-3026 Case 19-12397-CSS Filed Doc 2159-63 Filed 12/19/18 Page 2953 of 76 Page 13 of 22

11. <u>Records; Confidentiality</u>.

(a) The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b) The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business. Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01197
APPX. 10464

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1205
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1319 of 1828 PageID 10812
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1204 of 1803 PageID 11950
Case 18-30264-sgj11 Doc 2397-2-S Filed 12/19/18 Entered 12/19/18 Page 2631 of 76 Page 14 of 22

12.    <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

(a)    If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)    If to the Sub-Advisor:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

13.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.    <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.    <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01198
APPX. 004063

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1206
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1320 of 1828   PageID 10813
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1205 of 1803   PageID 11951
Case 18-3026   Case 19-D2397-2-SS   Filed Doc 215946   Filed 11/21/11/18 Page 2973 of 76 Page 15 of 22

17.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18.   <u>Third Party Beneficiaries</u>.  Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19.   <u>No Partnership or Joint Venture</u>.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties.  Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20.   <u>Entire Agreement</u>.  This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01199
APPX. 104066

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:   President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1208
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1322 of 1828   PageID 10815
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1207 of 1803   PageID 11953

## **Appendix A**

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

*[Remainder of Page Intentionally Left Blank]*

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br>Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1210
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1324 of 1828 PageID 10817
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1209 of 1803 PageID 11955
Case 18-30264-sgj11 Doc 2397-2 Filed 12/19/18 Entered 12/19/18 Page 19 of 76 of 22

**APPENDIX B**

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account. Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise. Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a) serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b) receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c) be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d) be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e) sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f) underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01203
APPX. 04066

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1211
Case 3:23-cv-00726-S Document 8-22 Filed 01/24/23 Page 1325 of 1828 PageID 10818
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1210 of 1803 PageID 11956
Case 18-30264 Case 19-12297-CSS Filed 12/15/18 Entered 12/17/19 Page 2831 of 76 Page 20 of 22

(g)     serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)     act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1212
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1326 of 1828 PageID 10819
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1211 of 1803 PageID 11957
Case 18-30264-sgj11 Doc 2397-5 Filed 12/19/18 Entered 12/19/18 20:33:16 Page 21 of 22

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Case 18-30264-sgj11 Doc 2397-4 Filed 12/19/18 Entered 12/19/18 09:29:31 Page 1 of 2

# EXHIBIT D

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1215
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1329 of 1828   PageID 10822
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1214 of 1803   PageID 11960
Case 18-30264-sgj11 Doc 3977-8   Filed 12/31/18   Entered 01/21/11   Page 29 of 176 Page 2 of 2

**HIGHLAND CAPITAL MANAGEMENT, LP**
**POST-PETITION FEE ACCRUAL UNDER THE**
**SUB-ADVISORY AND SHARED SERVCIES AGREEMENTS**

Period:  April 13, 2018 to August 2, 2018

| Management Contact | Sub-Advisory Agreement | Shared Services Agreement | Expense Reimbursement | Subtotal |
|---|---|---|---|---|
| Acis CLO 2013-1, Ltd. | $196,144.32 | $147,108.24 | $62,252.97 | $405,505.53 |
| Acis CLO 2014-3, Ltd. | $238,710.43 | $179,032.82 | $81,545.25 | $499,288.50 |
| Acis CLO 2014-4, Ltd. | $290,184.32 | $217,638.24 | $101,087.78 | $608,910.34 |
| Acis CLO 2014-5, Ltd. | $299,518.82 | $224,639.11 | $107,246.57 | $631,404.50 |
| Acis CLO 2015-6, Ltd. | $340,546.52 | $255,409.89 | $125,264.41 | $721,220.82 |
| BVK | 353,568.97 | $265,176.73 | $66,148.90 | $684,894.60 |
| | | | | |
| **TOTAL** | | | | **$3,551,224.29** |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1216
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1330 of 1828   PageID 10823
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1215 of 1803   PageID 11961

# EXHIBIT G

| Debtor | Acis Capital Management, L.P. | | Case number (if known)  18-30264 |
|---|---|---|---|

**3. Certain payments or transfers to creditors within 90 days before filing this case**
List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None.

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>Check all that apply |
|---|---|---|---|---|
| 3.1. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 11/2/2017 | $234,013.63 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.2. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 11/3/2017 | $941,958.57 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.3. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75208 | 12/8/2017 | $89,655.14 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.4. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 11/15/2017 | $2,068.13 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.5. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 11/30/2017 | $24,266.71 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.6. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 12/12/2017 | $1,718.79 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |
| 3.7. | David Simek<br>31 Woodacres Road<br>Brookville, NY 11545 | 12/29/2017 | $25,000.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>■ Services<br>☐ Other___ |

Appellee Appx. 01210

APPX. 104073

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1218
Case 3:23-cv-00726-S Document 8-22 Filed 10/24/23 06/08/23 Page 1332 of 1828 PageID 10825
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1217 of 1803 PageID 11963

Case 18-30264-sgj11 Doc 295-7 Filed 04/30/18 Entered 04/30/18 17:18:13 Page 3 of 13

| Debtor | Acis Capital Management, L.P. | | Case number (if known) | 18-30264 |
|---|---|---|---|---|

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer Check all that apply |
|---|---|---|---|---|
| 3.8. | FINRA 1735 K Street, NW Washington, DC 20006 | 11/22/2017 | $70.00 | ☐ Secured debt ☐ Unsecured loan repayments ■ Suppliers or vendors ☐ Services ☐ Other___ |
| 3.9. | Highland CLO Management, Ltd. PO Box 309, Ugland House Grand Cayman, KY1-1104, Cayman Islands | 12/19/2017 | $2,830,459.22 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| | Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 2/1/2017 | $976,688.47 | Contractual payment |
| 4.2. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 2/1/2017 | $1,096,033.37 | Services |
| 4.3. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 2/2/2017 | $3,574.80 | Expense reimbursement |
| 4.4. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 2/14/2017 | $67.44 | Expense reimbursement |
| 4.5 | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 4/17/2017 | $315,574.30 | Services |
| 4.6. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 4/18/2017 | $438,497.51 | Services |
| 4.7. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 4/18/2017 | $315,955.91 | Contractual payment |

Appellee Appx. 01211
APPX. 104038

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1219
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1333 of 1828 PageID 10826
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1218 of 1803 PageID 11964
Case 18-30264-sgj11 Doc 396-5 Filed 04/30/18 Entered 04/30/18 Page 4 of 5 Page 4 of 13

Debtor __Acis Capital Management, L.P.__    Case number *(if known)* __18-30264__

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.8. Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 4/19/2017 | $330,249.69 | Services |
| 4.9. Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/1/2017 | $974,426.41 | Services |
| 4.10 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/1/2017 | $974,426.41 | Contractual Payment |
| 4.11 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments incl interest |
| 4.12 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/31/2017 | $581,036.15 | Services |
| 4.13 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 7/18/2017 | $373,167.08 | Contractual payment |
| 4.14 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/1/2017 | $971,603.02 | Contractual payment |
| 4.15 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/7/2017 | $1,339,422.12 | Services |
| 4.16 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/16/2017 | $53.41 | Expense reimbursement |
| 4.17 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/18/2017 | $372,872.82 | Contractual payment |
| 4.18 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/18/2017 | $728,702.26 | Services |
| 4.19 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |

Appellee Appx. 01212
Appx. 04039

| Debtor | Acis Capital Management, L.P. | | Case number *(if known)* | 18-30264 |
|--------|------|--|--|--|

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.20 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/25/2017 | $46,648.82 | Expense reimbursement |
| 4.21 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/25/2017 | $67,966.85 | Expense reimbursement |
| 4.22 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 11/1/2017 | $967,223.91 | Contractual payment |

5. **Repossessions, foreclosures, and returns**
   List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

   ■ None.

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6. **Setoffs**
   List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

   ■ None.

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

**Part 3:** Legal Actions or Assignments

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
   List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

   ☐ None.

| Case title Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1. Joshua N. Terry v. Acis Capital Management, L.P. and Acis Capital Management GP, LLC DC-17-15244 | Petition to confirm arbitration award | 44th District Court Hon. Bonnie Lee Goldstein, Presiding George L. Allen, Sr. Courts Building 600 Commerce Street, 5th Floor New Tower Dallas, TX 75202 | ☐ Pending ■ On appeal ☐ Concluded |

Appellee Appx. 01213

APPX. 104076

Case 19-12239-CSS   Doc 159-8   Filed 11/21/19   Page 1 of 5

# EXHIBIT H

Appellee Appx. 01214

APPX. 04079

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Melina N. Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Tel: 214.999.3000
Fax: 214.999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
David S. Coale (TX 00787255)
Ruben A. Garcia (TX 24101787)
LYNN PINKER COX & HURST, LLP
2100 Ross, Suite 2700
Dallas, Texas 75201
Tel: 214.981.3800
Fax: 214.981.3839
mhurst@lynnllp.com

CO-COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., and | § § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § § § | (Jointly administered under Case No. 18-30264-SGJ-11) |
| Debtors. | § § § | Chapter 11 |

## STATEMENT OF ISSUES BY APPELLANT
## HIGHLAND CAPITAL MANAGEMENT, L.P.

Appellant Highland Capital Management, L.P. states the following issues for the

appeal of the *Order (I) Approving the Application to Employ Winstead PC as Special*

*Counsel to the Chapter 11 Trustee and (II) Denying the Motion to Disqualify Winstead*

*PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* [Doc. No. 313];

*Order Approving in Part and Denying in Part the Supplemental Application Regarding*

*the Scope of Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee*

1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1223
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1337 of 1828 PageID 10830
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1222 of 1803 PageID 11968
Case 18-30264-sgj11 Doc 1823 Filed 07/05/19 Entered 07/05/19 09:48:05 Page 2 of 4
Case 19-12239-CSS Doc 703-8 Filed 11/21/19 Page 105

[Doc. No. 703]*; and* Findings of Fact, Conclusions of Law, and Order Granting

*Winstead PC's Fee Application for Compensation and for Reimbursement of Expenses*

[Doc. No. 999]:

1. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given that Winstead represents interests adverse to the estates and is not "disinterested," as required by the Bankruptcy Code?

2. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given that Winstead PC has an actual conflict of interest?

3. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given the broad scope of Winstead PC's actual representation in the case?

4. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's expanded scope of representation as special counsel?

5. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the impropriety of its appointment as special counsel?

6. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the lack of benefit to the estates?

7. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the duplication of effort between Winstead PC and Forshey & Prostok LLP?

8. Did the bankruptcy court commit any error or any abuse of discretion in granting the amount of fees as reasonable in Winstead PC's final fee application given that the fees were disproportionate to the size of the bankruptcy case?

9. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application, even if retention of Winstead PC was otherwise proper?

10. Were fact findings supporting these rulings clearly erroneous?

Respectfully submitted,


/s/ Jason B. Binford                                      /s/ Michael K. Hurst
Holland N. O'Neil                                         Michael K. Hurst
Texas Bar No. 14864700                                    Texas Bar No. 10316310
Jason B. Binford                                          David S. Coale
Texas Bar No. 24045499                                    Texas Bar No. 00787255
Melina N. Bales                                           Ruben A. Garcia
Texas Bar No. 24106851                                    Texas Bar No. 24101787
Foley Gardere                                             Lynn Pinker Cox & Hurst LLP
Foley & Lardner LLP                                       2100 Ross Avenue, Ste. 2700
2021 McKinney, Suite 1600                                 Dallas, Texas 75201
Dallas, Texas 75201                                       Tel:  214.981.3800
Tel:  214.999.3000                                        Fax: 214.981.3839
Fax: 214.999.4667                                         mhurst@lynnllp.com
honeil@foley.com
jbinford@foley.com
mbales@foley.com                                          **Co-Counsel for:**
                                                          **Highland Capital Management, L.P.**

**Appellee Appx. 01217**

**Appx. 04732**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1225
Case 3:23-cv-00726-S   Document 8-22   Filed 04/24/23   Page 1339 of 1828   PageID 10832
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1224 of 1803   PageID 11970
Case 18-30264-sgj11 Doc 3905-5 Filed 07/09/19   Entered 07/09/19 09:46:05   Page 4 of 4

## CERTIFICATE OF SERVICE

I certify that on July 1, 2019, a copy of this document was served through the court's ECF system on all counsel and on all others who registered for electronic notice.

*/s/ Jason B. Binford*
Jason B. Binford

4818-4512-8603.2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1226
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1340 of 1828   PageID 10833
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1225 of 1803   PageID 11971

Case 19-12239-CSS    Doc 159-9    Filed 11/21/19    Page 1 of 34

# EXHIBIT I

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

**PROPOSED SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

### APPLICATION TO EMPLOY WINSTEAD PC
### AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

TO THE HONORABLE STACEY G. C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

Robin Phelan (the "Trustee"), the Chapter 11 trustee of Acis Capital Management, L.P.

("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the

"Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the

"Cases"), files this his *Application to Employ Winstead PC as Special Counsel to the Chapter 11*

*Trustee* (the "Application"), and in support thereof, respectfully states as follows:

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1228
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1342 of 1828   PageID 10835
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1227 of 1803   PageID 11973
Case 18-30264-sgj11 Doc 3445-8 Filed 05/30/18   Entered 11/25/18 08:31:35   Page 2 of 16

## I.    JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334.  This Application constitutes a "core" proceeding within the meaning of the provisions of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are §§ 105, 327, and 328 of title 11 of the United States Code, § 101 *et seq.* (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), as well as Rule 2014-1 of the Local Rules of Bankruptcy Procedure for the Northern District of Texas ("Local Rules").

## II.    RELEVANT PROCEDURAL BACKGROUND

2.    On January 30, 2018 (the "Petition Date"), Joshua N. Terry ("Mr. Terry"), as petitioning creditor, filed the *Involuntary Petition Against a Non-Individual* [Case No. 18-30264, Docket No. 1] (the "Acis LP Petition"), thereby initiating the Acis LP bankruptcy case.

3.    On the Petition Date, Mr. Terry, as petitioning creditor, also filed the *Involuntary Petition Against a Non-Individual* [Case No. 18-30265, Docket No. 1] (the "Acis GP Petition," together with the Acis LP Petition, the "Involuntary Petitions"), thereby initiating the Acis GP bankruptcy case.

4.    On April 13, 2018, after six days of testimony and argument, this Court entered its *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Involuntary Bankruptcy Petition* [Case No. 18-30264, Docket No. 118 & Case No. 18-30265, Docket No. 113] and the *Order for Relief in an Involuntary Case* [Case No. 18-30264, Docket No. 119 & Case No. 18-30265, Docket No. 114] (the "Order for Relief").

5.    Also on April 13, 2018, Diane Reed was appointed as interim Chapter 7 trustee (the "Chapter 7 Trustee") for the Debtors' bankruptcy estates (the "Estates").  *See* Case No. 18-30264, Docket No. 120 & Case No. 18-30265, Docket No. 115.

---

6.    On April 18, 2018, this Court entered its *Order Directing Joint Administration* [Docket No. 137],[1] ordering that the Cases be jointly administered under Case No. 18-30264.

7.    On May 4, 2018, the Chapter 7 Trustee filed the *Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 171].

8.    Also on May 4, 2018, Mr. Terry filed his *Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 173] (the "Trustee Motion").

9.    On May 11, 2018, this Court entered the *Order Granting Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 205] (the "Conversion Order"), which converted these Cases to Cases under Chapter 11 of the Bankruptcy Code.

10.    Also on May 11, 2018, this Court entered the *Order Granting the Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 206] (the "Trustee Order").

11.    On May 14, 2018, the United States Trustee filed the *Chapter 11 Notice of Appointment of Trustee and of Amount of Bond* [Docket No. 213] (the "Trustee Notice"), which provided notice to the Trustee of his appointment as Chapter 11 Trustee of Acis LP.

12.    On May 16, 2018, this Court entered the *Order Supplementing Order Granting the Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 219] (the "Supplemental Trustee Order"), by which the Court

---

[1] Hereinafter, unless otherwise specified, any docket numbers referenced are under Case No. 18-30264.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1230

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1344 of 1828   PageID 10837
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1229 of 1803   PageID 11975
Case 18-30265-sgj11 Doc 245-8 Filed 06/19/19    Entered 01/25/19 18:10:35 30 Page 4 of 16

directed that the United States Trustee "appoint only one Chapter 11 Trustee for the Debtors' estates[.]"

13.     Also on May 16, 2018, the United States Trustee filed the *Application of the United States Trustee to Approve the Appointment of Trustee* [Docket No. 220] (the "<u>Trustee Application</u>"), requesting the Court's approval of the Trustee's appointment as Chapter 11 Trustee of Acis LP.

14.     On May 17, 2018, this Court entered its *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 221], thereby approving of the Trustee's appointment as Chapter 11 Trustee of Acis LP.

15.     Also on May 17, 2018, the Trustee filed his *Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Docket No. 222] (the "<u>F&P Application</u>"), requesting authority to retain Forshey & Prostok, LLP ("<u>Forshey & Prostok</u>") as general counsel to the Trustee.

16.     On May 29, 2018, the United States Trustee filed the *Chapter 11 Notice of Appointment of Trustee and of Amount of Bond* [Case No. 18-30265, Docket No. 182] (the "<u>Second Trustee Notice</u>"), which provided notice to the Trustee of his appointment as Chapter 11 Trustee of Acis GP.

17.     On May 30, 2018, the United States Trustee filed the *Application of the United States Trustee to Approve the Appointment of Trustee* [Case No. 18-30265, Docket No. 183] (the "<u>Second Trustee Application</u>"), requesting the Court's approval of the Trustee's appointment as Chapter 11 Trustee of Acis GP.

### III.     <u>RELIEF REQUESTED</u>

18.     By this Application, the Trustee seeks to employ and retain Winstead PC ("<u>Winstead</u>") as his special counsel to perform certain legal services during the course of the

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1231
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1345 of 1828   PageID 10838
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1230 of 1803   PageID 11976
Case 18-30264-sgj11 Doc 911-2 08-2465 Filed 06/365-9   Entered 11/25/30/18 Page 7613 of 34   Page 5 of 16

Cases. Accordingly, the Trustee requests the entry of an order, pursuant to § 327(a) and (c) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, permitting him to employ and retain Winstead as his special counsel for the limited purposed described below.[2]

**A.    <u>Basis for Selection of Counsel</u>**

19.    As the Court knows, Winstead represented Mr. Terry in connection with the trial on the Involuntary Petitions.  Indeed, the Trustee's selection of Winstead is based, in part, upon the fact that Winstead has gained significant familiarity with, and considerable knowledge of, the unique factual circumstances and complex legal issues in the Cases through its representation of Mr. Terry.  In addition, due to the need for the Trustee to take immediate action on a variety of fronts after his appointment, as well as the substantial fees that new counsel would incur to familiarize itself with the intricate and impending legal issues in the Cases, the Trustee believes that his engagement of Winstead for the limited purposes described below would lead to efficiencies that would be lost if the Trustee were forced to employ different counsel.

20.    The Trustee has also selected Winstead as special counsel because of Winstead's extensive experience and knowledge in the field of debtor and creditor rights and business reorganizations under Chapter 11 of the Bankruptcy Code, as well as Winstead's experience and expertise in providing legal services related to all aspects of the investment management and private funds industry, including formation, advisor/manager mergers and acquisitions, portfolio transactions, and regulatory and compliance matters.  Accordingly, the Trustee believes that his retention of Winstead as special counsel for the limited purposes described below is in the best interests of the Estates and their creditors.

---

[2] To the extent, however, that the Court finds Winstead's proposed retention more appropriate under section 327(e) of the Bankruptcy Code, the Trustee reserves its rights to seek approval for such retention under section 327(e).

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                    **Page 5 of 16**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1232
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1346 of 1828 PageID 10839
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1231 of 1803 PageID 11977
Case 18-30264-sgj11 Doc 246-5 Filed 06/15/19 Entered 11/25/30/18 Page 77:13 Page 6 of 16

21.     Importantly, upon the Trustee's retention of Winstead as set forth in this Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in connection with the pending appeals related to the Involuntary Petitions (the "<u>Appeals</u>") and that Mr. Terry would have to retain new counsel for representation in these Cases.[3]  Mr. Terry has consented to such limited representation by Winstead.  Further, both the Trustee and Winstead believe that such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

22.     The Trustee believes the employment of Winstead is appropriate and necessary to enable the Trustee to execute faithfully his duties under the Bankruptcy Code, and the Trustee further believes that Winstead and its attorneys are fully qualified to perform the specified legal services referenced below.

23.     Winstead maintains its principal offices at 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201; Telephone: (214) 745-5400; Facsimile: (214) 745-5390.  The Trustee and Winstead have designated Rakhee Patel, a shareholder of Winstead who offices in Winstead's Dallas office, to serve as the attorney in charge with respect to the representation.

24.     In support of this Application, the Declaration of Rakhee V. Patel (the "<u>Declaration</u>") is attached hereto as Exhibit "A" and is incorporated herein for all purposes.

---

[3] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed later in this Application, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1233

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1347 of 1828   PageID 10840

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1232 of 1803   PageID 11978

Case 18-30264-sgj11 Doc 2465 Filed 06/15/19   Entered 11/25/18 Page 7 of 34   Page 7 of 16

**B.**     <u>Services to be Rendered</u>

25.     The Trustee has requested that Winstead provide legal services to the Trustee for matters specifically involving the:

    a)  management, liquidation, disposition, and monetization of the CLO assets;

    b)  Investment Advisers Act;

    c)  operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

    d)  certain other litigation matters related to or arising in these Cases, as requested by the Trustee.

26.     Subject to this Court's approval of the Application, Winstead is willing to serve as the Trustee's special counsel in the Cases to perform the services described above.

27.     Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

**C.**     <u>Compensation and Reimbursement</u>

28.     The Trustee proposes to retain Winstead on a customary hourly rate basis, subject in all respects to this Court's authorization for payment.  Winstead's customary hourly rates of attorneys and paralegals for a representation of this nature are presently in a range up to: $785 for shareholders, $485 for associates, and $290 for paralegals.

29.     Winstead's rates are adjusted on a periodic basis.  Winstead will not charge the Trustee at a rate for its services greater than the standard rates Winstead charges to its clients, generally, for similar engagements.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1234
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1348 of 1828   PageID 10841
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1233 of 1803   PageID 11979
Case 18-30264-sgj11 Doc 309-9 Filed 11/30/18 Page 8 of 16   Page 8 of 16

30.    Winstead's billing rates are consistent with rates charged by other professionals in
the Northern District of Texas with similar experience.  These rates are set at a level designed to
compensate Winstead for the work of its attorneys and paralegals and to cover fixed and routine
overhead expenses.  Winstead's hourly rates for the attorneys who it anticipates will most likely
be working on the Cases are:

| | |
|---|---|
| Rakhee Patel, Shareholder | $585.00 per hour |
| Philip Lamberson, Shareholder | $655.00 per hour |
| Joseph Wielebinski, Shareholder | $655.00 per hour |
| Toby Galloway, Shareholder | $550.00 per hour |
| Andrew Rosell, Shareholder | $585.00 per hour |
| Annmarie Chiarello, Associate | $380.00 per hour |
| Jason Enright, Associate | $390.00 per hour |
| Courtney Mitchell, Associate | $485.00 per hour |
| Laura Thetford, Associate | $385.00 per hour |

31.    The attorneys who will provide services to the Trustee are duly licensed to
practice in the State of Texas and are admitted to practice law in the Northern District of Texas.
As  necessary,  certain  other  attorneys  and/or  paraprofessionals  may  provide  services  in
connection with the engagement.

32.    Subject to this Court's approval, the Trustee has also agreed to the reimbursement
of Winstead for all out-of-pocket expenses incurred by Winstead. These expenses include, but
are not limited to, costs for long-distance telephone charges, facsimile charges, photocopying,
travel,  parking,  business  meals,  computerized  research,  UCC  searches,  messengers,  couriers,
postage, filing fees and other fees related to trials and hearings. Winstead will charge for all such
actual and necessary expenses in a manner and at rates consistent with charges made generally to
Winstead's other clients and consistent with the applicable Local Rules of the Court.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1235
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1349 of 1828 PageID 10842
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1234 of 1803 PageID 11980
Case 18-30264-sgj11 Doc 2265 Filed 05/30/19 Entered 05/30/18 Page 9 of 16

33.    Winstead will apply to the Court for compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code and the Local Rules of this District and Court.

34.    As set forth in the Declaration: (i) Winstead has no agreement with any other entity to share any compensation received and no such agreement will be made, except as permitted under section 504(b)(1) of the Bankruptcy Code; and (ii) no attorney at Winstead is related to any United States Bankruptcy Judge or United States District Court Judge for the Northern District of Texas or to the United States Trustee. Winstead has received no prior consideration to act as special counsel for the Trustee.

35.    Winstead has not received a retainer in connection with this engagement.

**D.    Disinterestedness of Winstead**

36.    To the best of Winstead's knowledge, other than as set out below, the shareholders and associates of Winstead: (i) do not have any connection with the Trustee, the Debtors, their creditors, or any other party-in-interest or their respective attorneys and accountants; (ii) do not have any connection with the United States Trustee or any person employed in the Office of the United States Trustee; (iii) are "disinterested persons," pursuant to §§ 101(14) and 327(c) of the Bankruptcy Code; and (iv) do not hold or represent any interest adverse to the Estates:

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| Joshua N. Terry | Creditor | Winstead previously represented Mr. Terry in connection with the Involuntary Petitions and in connection with governmental investigations of certain non-debtor parties; as of May 14, 2018, Winstead represents Mr. Terry in connection with only the appeals related to the Involuntary Petitions and, as necessary, in connection with governmental investigations of certain non-debtor |

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| | | parties-in-interest; such current representations are not adverse to the Debtors or their Estates. [4] |
| U.S. Bank National Association | Counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| BNP Paribas | Affiliate of counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| The Bank of New York Mellon Trust Co., N.A. | Counter-party to executory contract | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Andrews & Kurth LLP | Creditor | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Highland Capital Management, L.P. | Creditor/Affiliate | Winstead is a party to certain litigation, which is wholly unrelated to these Cases, styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC*, DC-15-01816, in the 193rd Judicial District Court of Dallas County, Texas, stemming from Winstead's prior representation of Highland Capital Management, L.P., in connection with a foreclosure. |

37.    As set forth in the herein, Winstead may have rendered, or may now be rendering, legal services to certain creditors or other parties-in-interest, or may have been, or may now be involved, in projects in which attorneys or accountants for these creditors or parties-in-interest were involved and in matters unrelated to the Debtors and the Trustee.  Except as otherwise indicated herein, none of the services provided include any matters related to the Cases and none constitute an interest materially adverse to the Trustee. Accordingly, Winstead does not hold an adverse interest to the Debtors or their Estates.  Moreover, as part of its practice, Winstead appears in cases, proceedings, and transactions involving many different attorneys, accountants,

---

[4] With respect to Winstead's representation of Mr. Terry in connection with such governmental investigations, Winstead is engaged pursuant to a hybrid fee arrangement.

---

financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors and parties-in-interest in the Cases.  Winstead will not represent any such entities in the Cases.

38.    As set forth in the Declaration, Winstead has conducted a comprehensive conflict search regarding the creditors and parties-in-interest as provided by the Debtors on their schedules and disclosures.  Winstead will supplement its conflicts check as additional creditors are disclosed and shall promptly disclose to the Court any other connections that Winstead discovers it has or has had with any such creditors of the estate pursuant thereto.

39.    Winstead began performing services for the Trustee on May 14, 2018, when he agreed to retain Winstead, subject to the Court's approval, as his special counsel.  Accordingly, the Trustee respectfully requests that the approval of this Application be effective as of May 14, 2018.  As set forth in Local Rule 2014-1(b)(1), such timing renders this Application contemporaneous with the initiation of services.

## IV.    **AUTHORITIES**

40.    Under the Bankruptcy Code, "the trustee with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties[.]" 11 U.S.C. § 327(a).

41.    Further, a "disinterested person" is defined under the Bankruptcy Code as a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor." *Id.* § 101(14)(C).

42.    The Fifth Circuit has commented that the phrases under sections 101(14)(C) and 327(a) of the Bankruptcy Code, regarding whether a party has an "adverse interest," are "nearly

identical." *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005). Thus, "with an eye to the specific facts of each case," to determine whether a proposed professional holds an adverse interest under section 327(a), the Fifth Circuit examines whether they:

> (1) [] possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

> (2) [] possess a predisposition under circumstances that render such a bias against the estate.

*Id.*; *accord Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 461-62 (5th Cir. 2012).

43. Still, in these Cases, "a person is not disqualified for employment under [section 327] solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an *actual conflict of interest*." 11 U.S.C. § 327(c) (emphasis added).

44. To determine whether a proposed professional should be disqualified pursuant to sections 327(a) and (c), courts look to the nature of any purported conflict of interest: (i) if there is an *actual* conflict, the professional is *per se* disqualified; (ii) if there is a *potential* conflict, the court may use its discretion to determine whether the professional should be disqualified; and (iii) if there is only an *appearance* of a conflict, the court may not disqualify the professional. *In re AGE Ref., Inc.*, 447 B.R. 786, 802-06 (Bankr. W.D. Tex. 2011) (citing *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 476 (3rd Cir. 1998)).

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1239
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1353 of 1828  PageID 10846
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1238 of 1803  PageID 11984
Case 18-30264-sgj11 Doc 940-5 Filed 06/06/19    Entered 11/05/18 Page 143 of 3 Page 13 of 16

45.    In evaluating whether an "actual conflict" exists, courts examine the specific circumstances of the proposed retention and whether there would be a direct conflict between the interests of estate and the creditor that was previously represented by proposed counsel:

> Generally, when an actual conflict exists there is "active competition between two interests, in which one interest can only be served at the expense of another." Actual conflicts arise when (1) the interests of the trustee and the creditor are in direct conflict or (2) the creditor is receiving a preference denied to the other creditors. The conflict must be direct and actual; a court should not disqualify an attorney solely because there is an appearance of a conflict. The burden of proving an actual conflict lies on the objecting party.

*In re Hanckel*, 517 B.R. 609, 614 (Bankr. D.S.C. 2014) (internal citations omitted); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 819 (5th Cir. 1991) (finding an actual conflict when "counsel's loyalty to . . . the debtor's estate would be tested at every turn by the very real, continuing interest of his client [in the prior representation]").

46.    Additionally, to determine whether Winstead has an adverse interest under section 327(a), the Court should examine whether Winstead has such an adverse interest "with respect to the specific [services] for which the Trustee seeks to hire the firm." *In re AGE Ref., Inc.*, 447 B.R. at 802; *see also Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 621-30 (2d Cir. 1999) (holding that, under sections 327(a) and (c), proposed special counsel was not disqualified from representing the trustee for limited purposes, including to pursue Chapter 5 claims against a certain creditor, when proposed counsel had previously represented another creditor).

47.    Here, the issue is whether Winstead's prior representation of Mr. Terry should preclude the Trustee from retaining Winstead as special counsel for the limited purposes set forth herein.  With Winstead's ongoing representation of Mr. Terry related to these Cases being limited only to his representation in connection with the Appeals, the Trustee believes Winstead

---

APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

has no *actual* conflict of interest with the Estates as a result of such representation. Further, as a result of Winstead's limited representation of Mr. Terry, the Trustee believes Winstead does not possess any economic interest that would tend to lessen the value of the Estates or that would create either an actual or potential dispute in which either Estate is a rival claimant. *See W. Delta Oil Co.*, 432 F.3d at 356. Moreover, Winstead has no bias against the Estates due to its representation of Mr. Terry. *See id.* Indeed, the Trustee submits that Mr. Terry's interests and the Estate's interests are aligned with the Trustee's goal of maximizing the value of the Estates, which inures to the benefit of all creditors, including Mr. Terry.

48.    As set forth above, the Trustee requests to employ Winstead to provide legal services only regarding matters involving the (i) management, liquidation, disposition, and monetization of the CLO assets; (ii) Investment Advisers Act; and (iii) operation of the portfolio management agreement and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and (iv) certain other litigation matters related to or arising in these Cases, as requested by the Trustee. With respect to these specified purposes, the Trustee submits that Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same.  Accordingly, except to the extent necessary to effectuate the specific services outlined above, Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code.  With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

49.    In sum, based on Winstead's familiarity with the unique factual circumstances and complex legal issues in the Cases (particularly with respect to the CLO assets, the portfolio management agreement, indentures, and related structures), Winstead's bankruptcy expertise and considerable experience and knowledge in handling such matters, the need for immediate action by the Trustee on a variety of fronts related to these specific matters, as well as the substantial expense the Estates would incur as a result of new counsel needing to familiarize itself with the intricate and impending legal issues in the Cases, the Trustee believes that Winstead's engagement as special counsel for the limited purposes described herein in is in the best interests of the Estates and their creditors.

50.    In accordance with section 327(c) of the Bankruptcy Code, the Trustee submits that Winstead has no actual conflict of interest in these Cases resulting from Winstead's prior representation of Mr. Terry or from Winstead's limited representation of Mr. Terry in connection with the Appeals.

51.    Therefore, the Trustee submits that the employment of Winstead as special counsel is permissible under section 327(a) of the Bankruptcy Code, is advisable, and is in the best interests of the Estates and their creditors.

52.    In addition, Winstead's fees and expenses incurred as special counsel to the Trustee would be subject to such interim and final fee applications as are otherwise appropriate under sections 330 and 331 of the Bankruptcy Code, and under applicable local rules and standing orders.

## V.    PRAYER

WHEREFORE, the Trustee respectfully requests that the Court enter an order: (i) approving this Application; (ii) authorizing the Trustee's retention of Winstead as special counsel in accordance with this Application, effective as of May 14, 2018; (iii) providing for the

compensation of Winstead pursuant to sections 330 and 331 of the Bankruptcy Code; and (iv)

granting the Trustee such other and further relief to which he may be entitled.

**DATED: May 30, 2018**

Respectfully submitted,

*/s/ Robin Phelan*_____
Robin Phelan, Chapter 11 Trustee
SBT #15903000
PHELANLAW
4214 Woodfin Drive
Dallas, Texas 75220
Phone: (214) 704-0222

**ROBIN PHELAN, CHAPTER 11 TRUSTEE
FOR ACIS CAPITAL MANAGEMENT L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 30th day of May, 2018, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, and that, additionally, on the same date he caused true and correct copies of this document to be served by U.S. first class mail, postage prepaid, on the parties listed on the Service List attached hereto.

*/s/ Jason A. Enright*_____
One of Counsel

**Appellee Appx. 01235**

**APPX. 04792**

Case 18-3026-sgj11 Doc 3245-5 Filed 05/30/18   Entered 05/90/18 23:18:34 Page 1 of 11

EXHIBIT "A"

Appellee Appx. 01236

APPX. 04193

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1244
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23  Page 1358 of 1828  PageID 10851
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1243 of 1803  PageID 11989
Case 18-30264-sgj11 Doc 2345 SS Filed 05/30/18  Entered 05/30/18 19:13:34  Page 2 of 11

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **(Jointly Administered Under Case No. 18-30264-SGJ-11)** |
| | § | |
| **Debtors.** | § | **Chapter 11** |

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION TO EMPLOY WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

I, Rakhee V. Patel, hereby declare the following and hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that it is true and correct to the best of my knowledge and belief:

1.      "My name is Rakhee V. Patel, I am over the age of 18 years, and I am competent and otherwise qualified to make this Declaration.  I am a shareholder in the law firm of Winstead PC ("Winstead"), proposed special counsel for Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the "Cases").[1]  I submit this Declaration (the "Declaration") in support of the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Application") for the purposes of making all of the required disclosures pursuant to 11 U.S.C. §§ 327 and 328, and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, and to advise this Court of Winstead's qualifications.

2.      "I have personal knowledge of each of the facts stated in this Declaration, except for those facts stated on information and belief, and, as to those facts, I am informed and I

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application.

DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE       Page 1 of 10

Appellee Appx. 01237
Appx. 04794

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1245
Case 3:23-cv-00726-S Document 8-22 Filed 10/24/23 Page 1359 of 1828 PageID 10852
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1244 of 1803 PageID 11990
Case 18-30264-sgj11 Doc 2345-5 Filed 05/30/18 Entered 05/30/18 20:13:34 Page 3 of 11

believe them to be true. If called as a witness, I would testify as to the matters set forth below based upon my personal knowledge, except where otherwise indicated below. To the extent that I obtain additional information, which requires further disclosure or modification of the Application or this Declaration, a supplemental declaration will be submitted to this Court.

3. "I am admitted and in good standing to practice before the State Courts of the State of Texas, the United States District and Bankruptcy Courts for the Northern, Eastern, Southern and Western Districts of Texas, and the Fifth Circuit Court of Appeals. The other attorneys of Winstead who are designated as most likely to appear in this representation are also admitted to practice in the State of Texas and are admitted to the U.S. District Court for the Northern District of Texas.

4. "My office address is 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201; Telephone: (214) 745-5400; Facsimile: (214) 745-5390.

## QUALIFICATIONS OF COUNSEL

5. "As set forth in the Application, on May 14, 2018, the Trustee requested to retain Winstead, subject to the Court's approval, as his special counsel in these Cases. Winstead immediately began rendering services to and for the Trustee for the limited purposes set forth in the Application.

6. "Winstead maintains offices in Dallas, Fort Worth, Austin, San Antonio, The Woodlands, and Houston, Texas, as well as in Charlotte, North Carolina. Winstead currently has approximately three-hundred fifty (350) lawyers, and its client base includes many public and private corporations, partnerships, governmental entities, banks, insurance companies, non-profit organizations, and individuals. Winstead has expertise in many fields of law including bankruptcy, business reorganization, restructuring, complex litigation, and creditors' rights, as

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**     **Page 2 of 10**

**Appellee Appx. 01238**
**APPX. 04793**

well as in the investment management and private funds industry, including with respect to fund formation, advisor/manager mergers and acquisitions, portfolio transactions, and regulatory and compliance matters.

7.      "Winstead has substantial experience in Chapter 11 bankruptcy cases and trustee representations.    I and other attorneys at Winstead have represented debtors, committees, trustees, secured and unsecured creditors, and significant stakeholders in numerous other bankruptcy cases, locally and nationally.  I and other attorneys at Winstead have received various awards and recognition for our reorganization services, have published numerous scholarly reorganization articles, and have spoken at multiple professional seminars.

8.      "In addition, the Trustee's selection of Winstead is based, in part, upon the fact that Winstead has gained significant familiarity with, and considerable knowledge of, the unique factual circumstances and complex legal issues in the Cases through its representation of Mr. Terry in connection with the trial on the Involuntary Petitions.  Once the Court entered orders for relief in the Cases, and the Trustee was appointed, there was an immediate need for the Trustee to seek counsel and advice regarding the various intricate issues impending in the Cases related to the business of the Debtors, for which the Trustee needed to take action. If the Trustee were to retain new counsel for the purposes set forth below, the Estates would incur substantial fees as new counsel would need to familiarize itself with such factual background and legal issues in the Cases, with which Winstead is already familiar. Thus, the engagement of Winstead for the limited purposes described below would lead to efficiencies that would be lost if the Trustee were forced to employ different counsel.

9.      "Importantly, upon the Trustee's retention of Winstead as set forth in the Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          **Page 3 of 10**

connection with the pending appeals related to the Involuntary Petitions (the "Appeals"), and that Mr. Terry would have to retain new counsel for representation in these Cases.[2]  Mr. Terry has consented to such limited representation by Winstead.  Further, such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

10.    "Accordingly, I believe the employment of Winstead is appropriate and necessary to enable the Trustee to execute faithfully his duties under the Bankruptcy Code and that Winstead and its attorneys are fully qualified to perform the specified legal services referenced below.

## SERVICES TO BE RENDERED

11.    "The Trustee has requested that Winstead provide special counsel services to the Trustee for matters specifically involving the:

   a)   management, liquidation, disposition, and monetization of the CLO assets;

   b)   Investment Advisers Act;

   c)   operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

   d)   certain other litigation matters related to or arising in these Cases, as requested by the Trustee.

12.    "Subject to this Court's approval of the Application, Winstead is willing to serve as the Trustee's special counsel in the Cases to perform the services described above.

---

[2] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed later in this Declaration, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          **Page 4 of 10**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1248
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1362 of 1828  PageID 10855
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1247 of 1803  PageID 11993
Case 18-30264-sgj11 Doc 3245 Filed 05/30/18  Entered 05/30/18 23:13:34 Page 6 of 11

13.     "Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

14.     "With respect to these specified purposes, Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same. Accordingly, except to the extent necessary to effectuate the specific services outlined above, Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code.  With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

## COMPENSATION AND REIMBURSEMENT

15.     "Winstead has agreed to perform such legal services on an hourly fee basis at its customary hourly rates for cases of the size and complexity as these Cases.  Winstead's customary hourly rates of attorneys and paralegals for a representation of this nature are presently in a range up to: $785 for shareholders, $485 for associates, and $290 for paralegals.

16.     "Winstead's rates are adjusted on a periodic basis.  Winstead will not charge the Trustee at a rate for its services greater than the standard rates Winstead charges to its clients, generally, for similar engagements.

17.     "Winstead's billing rates are consistent with rates charged by other professionals in the Northern District of Texas with similar experience.  These rates are set at a level designed to compensate Winstead for the work of its attorneys and paralegals and to cover fixed and

DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE          Page 5 of 10

Appellee Appx. 01241
APPX. 04196

routine overhead expenses. Winstead's hourly rates for the attorneys who it anticipates will most likely be working on the Cases are:

| | |
|---|---|
| Rakhee Patel, Shareholder | $585.00 per hour |
| Philip Lamberson, Shareholder | $655.00 per hour |
| Joseph Wielebinski, Shareholder | $655.00 per hour |
| Toby Galloway, Shareholder | $550.00 per hour |
| Andrew Rosell, Shareholder | $585.00 per hour |
| Annmarie Chiarello, Associate | $380.00 per hour |
| Jason Enright, Associate | $390.00 per hour |
| Courtney Mitchell, Associate | $485.00 per hour |
| Laura Thetford, Associate | $385.00 per hour |

18. "Winstead will maintain detailed, contemporaneous records of time and any actual and necessary expenses incurred in connection with the rendering of the legal services for the Trustee as described in the Application and in accordance with the rules of this Court.

19. "Subject to this Court's approval, the Trustee has also agreed to the reimbursement of Winstead for all out-of-pocket expenses incurred by Winstead. These expenses include, but are not limited to, costs for long-distance telephone charges, facsimile charges, photocopying, travel, parking, business meals, computerized research, UCC searches, messengers, couriers, postage, filing fees and other fees related to trials and hearings. Winstead will charge for all such actual and necessary expenses in a manner and at rates consistent with charges made generally to Winstead's other clients and consistent with the applicable Local Rules of the Court.

20. "Winstead will apply to the Court for compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code and the Local Rules of this District and Court.

21. "Winstead has no agreement with any other entity to share any compensation received and no such agreement will be made, except as permitted under section 504(b)(1) of the

DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE Page 6 of 10

Appellee Appx. 01242

Appx. 04799

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1250
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1364 of 1828 PageID 10857
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1249 of 1803 PageID 11995
Case 18-30264-sgj11 Doc 245-5 Filed 05/30/18 Entered 05/30/18 21:35:13 Page 8 of 11

Bankruptcy Code; and no attorney at Winstead is related to any United States Bankruptcy Judge or United States District Court Judge for the Northern District of Texas or to the United States Trustee. Winstead has received no prior consideration to act as special counsel for the Trustee.

22. "Winstead has not received a retainer in connection with this engagement.

## DISINTERESTEDNESS OF PROFESSIONALS

23. "To the best of my knowledge, other than as set out below, the shareholders and associates of Winstead: (i) do not have any connection with the Trustee, the Debtors, their creditors, or any other party-in-interest or their respective attorneys and accountants; (ii) do not have any connection with the United States Trustee or any person employed in the Office of the United States Trustee; (iii) are "disinterested persons," pursuant to §§ 101(14) and 327(c) of the Bankruptcy Code; and (iv) do not hold or represent any interest adverse to the Estates:

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| Joshua N. Terry | Creditor | Winstead previously represented Mr. Terry in connection with the Involuntary Petitions and in connection with governmental investigations of certain non-debtor parties; as of May 14, 2018, Winstead represents Mr. Terry in connection with only the appeals related to the Involuntary Petitions and, as necessary, in connection with governmental investigations of certain non-debtor parties-in-interest; such current representations are not adverse to the Debtors or their Estates.[3] |
| U.S. Bank National Association | Counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| BNP Paribas | Affiliate of counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |

---

[3] With respect to Winstead's representation of Mr. Terry in connection with such governmental investigations, Winstead is engaged pursuant to a hybrid fee arrangement.

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**     Page 7 of 10

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1251
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1365 of 1828 PageID 10858
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1250 of 1803 PageID 11996
Case 18-30264-sgj11 Doc 3245-5 Filed 05/30/18 Entered 05/30/18 21:26:33 Page 9 of 11

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| The Bank of New York Mellon Trust Co., N.A. | Counter-party to executory contract | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Andrews & Kurth LLP | Creditor | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Highland Capital Management, L.P. | Creditor/Affiliate | Winstead is a party to certain litigation, which is wholly unrelated to these Cases, styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC,* DC-15-01816, in the 193rd Judicial District Court of Dallas County, Texas, stemming from Winstead's prior representation of Highland Capital Management, L.P., in connection with a foreclosure. |

24.    "Due to the diversity of Winstead's practice areas, Winstead may have rendered, or may now be rendering, legal services to certain creditors or other parties-in-interest, or may have been, or may now be involved, in projects in which attorneys or accountants for these creditors or parties-in-interest were involved and in matters unrelated to the Debtors and the Trustee. Except as otherwise indicated herein, none of the services provided include any matters related to the Cases and none constitute an interest materially adverse to the Trustee. Accordingly, I believe that Winstead does not hold an adverse interest to the Debtors or their Estates. Moreover, as part of its practice, Winstead appears in cases, proceedings, and transactions involving many different attorneys, accountants, financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors and parties-in-interest in the Cases. Winstead will not represent any such entities in the Cases.

25.    "Importantly, upon the Trustee's retention of Winstead as set forth in the Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in connection with the pending appeals related to the Involuntary Petitions (the "Appeals") and that

DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE          Page 8 of 10

Appellee Appx. 01244
APPX. 10809

Mr. Terry would have to retain new counsel for representation in these Cases.[4]  Mr. Terry has consented to such limited representation by Winstead.  Further, I believe that such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

26.    "In addition, with Winstead's ongoing representation of Mr. Terry related to these Cases being limited only to his representation in connection with the Appeals, I believe Winstead has no *actual* conflict of interest with the Estates as a result of such representation. Further, as a result of Winstead's limited representation of Mr. Terry, Winstead does not possess any economic interest that would tend to lessen the value of the Estates or that would create either an actual or potential dispute in which either Estate is a rival claimant. Moreover, Winstead has no bias against the Estates due to its representation of Mr. Terry. Indeed, I believe that Mr. Terry's interests and the Estate's interests are aligned with the Trustee's goal of maximizing the value of the Estates, which inures to the benefit of all creditors, including Mr. Terry.

27.    "Winstead has conducted a comprehensive conflict search regarding the creditors and parties-in-interest as provided by the Debtors on their schedules and disclosures.  Winstead will supplement its conflicts check as additional creditors are disclosed and shall promptly disclose to the Court any other connections that Winstead discovers it has or has had with any such creditors of the Estates pursuant thereto.

28.    "I have reviewed the results of the foregoing efforts of Winstead to determine the existence of any interests adverse to the Trustee or which would otherwise create a conflict of interest in connection with its engagement in this matter.  Based on this review, I believe

---

[4] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed above, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**        **Page 9 of 10**

**Appellee Appx. 01245**

**APPX. 10802**

Winstead does not have any interest adverse to the Trustee or which would otherwise create a conflict of interest in connection with its limited engagement in this matter.

29.    "In sum, based on Winstead's familiarity with the unique factual circumstances and complex legal issues in the Cases (particularly with respect to the CLO assets, the portfolio management agreement, indentures, and related structures), Winstead's bankruptcy expertise and considerable experience and knowledge in handling such matters, the need for immediate action by the Trustee on a variety of fronts related to these specific matters, as well as the substantial expense the Estates would incur as a result of new counsel needing to familiarize itself with the intricate and impending legal issues in the Cases, I believes that Winstead's engagement as special counsel for the limited purposes described herein in is in the best interests of the Estates and their creditors.

30.    "In light of the foregoing, I believe that the employment of Winstead as counsel for the Trustee is appropriate and in the best interests of the Estates, pursuant to sections 327 and 328 of the Bankruptcy Code, and should be approved.

31.    "I reserve the right to supplement this Declaration.

DECLARED under penalty of perjury this 30th day of May, 2018.


/s/ *Rakhee V. Patel*
Rakhee V. Patel

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

**ORDER APPROVING THE APPLICATION TO EMPLOY**
**WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Came on for consideration the *Application to Employ Winstead PC as Special Counsel to*

*the Chapter 11 Trustee* (the "Application"), filed by Robin Phelan, Chapter 11 trustee (the

"Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP,

LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above

styled and numbered bankruptcy cases (the "Cases"),[1] and having considered the Application,

the Declaration of Rakhee V. Patel in support of the Application, arguments of counsel, and any

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application.

---

**Appellee Appx. 01247**

**Appx. 10804**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1255
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1369 of 1828   PageID 10862
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1254 of 1803   PageID 12000
Case 18-30264-sgj11 Doc 2205-3 Filed 05/30/18 Entered 05/30/18 16:10:34 Page 2 of 3

timely filed objections to the Application, the Court finds that (a) the proposed employment of

Winstead PC ("Winstead") as special counsel for the Trustee, for the limited purposes set forth in

the Application, is appropriate and in the best interest of the Debtors' Estates and creditors, (b)

the Trustee and Winstead have represented to the Court that Winstead and its shareholders and

associates do not represent or hold any interest adverse to the Debtors' Estates such that

Winstead would be disqualified from representing the Trustee in these Cases, and (c) the Trustee

and Winstead have represented to the Court that Winstead and each of its shareholders and

associates is a "disinterested person" pursuant to 11 U.S.C. §§ 101(14) and 327(c).  Accordingly,

the Court finds that the Application should be approved.  Therefore, pursuant to 11 U.S.C.

§ 327(a) and (c), it is hereby:

ORDERED that the Application is **APPROVED**.  It is further

ORDERED that the Trustee is authorized to retain and employ Winstead as his special

counsel, effective as of May 14, 2018, to perform the services more particularly set forth in the

Application.  It is further

ORDERED that Winstead shall be compensated for services rendered and for expenses

incurred, subject to the Court's interim and final approval and in accordance with the provisions

of sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy

Procedure, the Local Bankruptcy Rules, and such other procedures as may be fixed by order of

this Court.

ORDERED that that this Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this order.

### # # # END OF ORDER # # #

---

**Appellee Appx. 01248**
**APPX. 10803**

**SUBMITTED BY:**

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

*PROPOSED SPECIAL COUNSEL FOR ROBIN PHELAN,*
*CHAPTER 11 TRUSTEE*

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE** **Page 3 of 3**
4812-2677-1046v.1

61588-3 5/30/2018

SERVICE

Acis Capital Management Gp, LLC
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201-7849

Acis CLO 2013- 1, Ltd.
c/o Appleby Trust
Attn : The Directors Clifton House 75 Fort St.,
P. 0. Box 13
Grand Cayman, Cayman Islands KY1-1108

Acis CLO 2013-1 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2013-2 Ltd.
c/o MaplesFS Limited, Attn: Directors
P.O. Box 1093
Boundary Hall, Cricket Sq
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014- 3 Ltd.
c/o MapleFS Limited
Attn: The Directors
P.O. Box 1093
Boundary Hall, Cricket Sq
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-3 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-4 Ltd .
c/o MapleFS Limited
Attn : The Director
P.O. Box 1093
Boundary Hall, Cricket Sq.
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2014-5 Chemical Holdings, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO 2014-5 Ltd.
c/o MapleFS Limited
Attn: The Directors
P.O. Box 1093
Boundary Hall, Cricket Sq
Grand Cayman, Cayman Islands KY1-1102

Acis CLO 2015-6 Ltd .
c/o MapleFS Limited
Attn: The Directors
P.O. Box 1093
Boundary Hall, Cricket Sq
Grand Cayman , Cayman Islands KY1 -1102

Acis CLO 2015-6
Chemical Holdings, LLC
1209 Orange Street
Wilmington , DE 19801-1120

Acis CLO 2017-7 Ltd.
c/o MapleFS Limited
Attn: The Directors
PO Box 1093
Boundary Hall, Cricket Sq
Grand Cayman, Cayman Islands KY1-1102

Acis CLO Management, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Fund II (Cayman), L.P.
P.O. Box 309
Ugland House
Grand Cayman, Cayman Islands KY1-1104

Acis CLO Value Fund II GP, LLC
P.O. Box 309
Ugland House
Grand Cayman, Cayman Islands KY1-1104

Acis CLO Value Fund II, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Acis CLO Value GP, LLC
1209 Orange Street
Wilmington, DE 19801-1120

Acis CLO Value Master Fund II, L.P.
P.O. Box 309
Ugland House
Grand Cayman, Cayman Islands KY1-1104

Acis Funding GP, Ltd.
c/o Maples Corporate Service Limited
P.O. Box 309
Ugland House
Grand Cayman, Cayman Islands FY1-1104

Acis Funding L.P.
c/o Maples Corporate Services Limited
P.O. Box 309
Ugland House
Grand Cayman, Cayman Islands KY1-1101

Acis Loan Funding, Ltd.
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002-2929

BayVK R2 Lux S.A.,
SICAV-FIS
15 Rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

BNP Paribas Securities Services
Luxembourg Branch
60 Avenue John F. Kennedy
1855 Luxembourg

Case Anywhere LLC
218 60 Burbank Boulevard, Suite 125
Woodland Hills, CA 91367-7447

CLO Holdco, Ltd.
c/o Intertrust Corp. Srvs. (Cayman) Ltd.
190 Elgin Ave, George Town
Grand Cayman, Cayman Islands KY1-9005

CLO Holdco, Ltd.
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave., #1400
Dallas, TX 75204-7422

CSI Global Deposition Services
4950 N. O'Connor Road, Suite 152
Irving, TX 75062- 2778

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1258
Case 3:23-cv-00726-S   Document 8-22   Filed 04/24/23    Page 1372 of 1828    PageID 10865
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1257 of 1803   PageID 12003
Case 18-30264-sgj11 Doc 2205 Filed 05/30/18 Entered 05/30/18 21:37:13 Page 2 of 3

CT Corporation
P. O. Box 4 34 9
Carol Stream, IL 60197-4349

Dallas County
Linbarger, Goggan, Blair & Sampson LLP
c/o Laurie Spindler
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

Dallas County
Linebarger Goggan Blair & Sampson, LLP
c/o Sherrel K Knighton
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Diane G. Reed
Reed & Elmquist, P.C.
501 N. College Street
Waxahachie, TX 75165-3361

Drexel Limited
309 23rd Street 340
Miami Beach, FL  33139-1700

Elite Document Technology
4 00 N. Saint Paul Street Suite 1300
Dallas, TX 75201-6881

Highfield Equities, Inc.
3131 McKinney Avenue, Suite 215
Dallas, TX 75204-2421

Highland Capital Management, L. P.
1209 Orange Street
Wilmington, DE 19801-1120

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland Capital Management, L.P.
c/o Foley Gardere
Holland O'Neil, Jason Binford
2021 McKinney Avenue, Ste. 1600
Dallas, TX 75201-3340

Highland CLO Funding
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave., #1400
Dallas, TX 75204-7422

Highland CLO Funding
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave, #1400

JAMS, Inc.
18881 Von Karman Avenue, Suite 350
Irvine, CA  92612-6589

Jones Day
2727 N. Harwood Street
Dallas, TX  75201-1568

Joshua N. Terry
25 Highland Park Village, Suite 100- 848
Dallas, TX 75205-2726

Joshua N. Terry
350 9 Princeton Ave
Dallas, TX  75205-3246

Joshua N. Terry
c/o Winstead PC
Attn: Rakhee V. Patel
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201-1516

Joshua Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2789

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

KPMG LLP
2323 Ross Avenue, Suite 1400
Dallas, TX 75201-2721

KPMG LLP
Aon Center
200 E. Randolph Street, Suite 5500
Chicago, IL  60601-6607

Lackey Hershman LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX  75219-4259

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201-6970

Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

Mizuho Securities USA Inc.
320 Park Avenue
12th Floor
New York, NY 10022-6848

Neutra, Ltd.
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave., #1400
Dallas, TX 75204-7422

O. S. Bank National Association
Attn: Michael Zak
60 Livingston Avenue
EP-MN-WS3D
Saint Paul, MN 55107-2292

Rakhee V. Patel
WINSTEAD PC
2728 N. Harwood Street
Suite 500
Dallas, TX 75201-1743

Appellee Appx. 01251
APPX. 10810

Case 18-30264-sgj11 Doc 2405 Filed 05/30/18 Entered 05/30/18 21:37:13 Page 3 of 3

Reid Collins & Tsai, LLP
1301 S. Capital of Texas Highway
Building C, Suite 300
Austin, TX  78746-6500

Robin Phelan
4214 Woodfin Drive
Dallas, TX 75220-6416

Robin Phelan
Chapter 11 Trustee
c/o Matthias Kleinsasser
Forshey & Prostok, LLP
777 Main St., Suite 1290
Fort Worth, TX 76102-5316

Robin Phelan, Chapter 11 Trustee
c/o Suzanne K. Rosen
Forshey & Prostok, LLP
777 Main St., Suite 1290
Fort Worth, TX 76102-5316

Stanton Advisors LLC
300 Coles Street Apartment 802
Jersey City, NJ 07310-1047

Stanton Law Firm
9400 North Central Expressway
Suite 1304
Dallas, TX 75231-5047

State Street (Guernsey) Limited
First Floor Dorey Court
Admiral Park
St. Peter Port, Guernsey
The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street New York, NY 10286-0001

Texas Comptroller of Public Accounts
John Stern
1100 Commerce Street Room 1254
Dallas, TX 75242-1305

Texas Comptroller of Public Accounts
John Stern
1100 Commerce Street Room 1254
Dallas, TX 75242-1305

Texas Comptroller of Public Accounts
John Stern
P.O. Box 12548
Austin, TX 78711-2548

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

U.S. Attorney General
Department of Justice
Washington, DC 20001

U.S. Attorney
1100 Commerce, 3rd Floor
Dallas, TX 75242-1074

United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-0996

Universal-Investment-Luxembourg S.A.
15, rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

US Bank National Association
Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court. Ste 350
Dallas, TX 75201-2348

US Bank National Association
Mark D. Kotwick
One Battery Park Plaza
New York, New York 10004-1405

US Bank
P. O. Box 5229
Cincinnati, OH 45201-5229

Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Case 19-12239-CSS    Doc 159-10    Filed 11/21/19    Page 1 of 6

# EXHIBIT J

Appellee Appx. 01253

APPx. 10810

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1261
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1375 of 1828  PageID 10868
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1260 of 1803  PageID 12006
Case 18-30264-sgj11 Doc 3445-8 Filed 06/21/18    Entered 06/21/18 Page 1 of 6 Page 1 of 5



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed June 21, 2018**

_____
**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

**ORDER (I) APPROVING THE APPLICATION TO EMPLOY
WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE
AND (II) DENYING THE MOTION TO DISQUALIFY WINSTEAD PC AS
PROPOSED SPECIAL COUNSEL TO ROBIN PHELAN, CHAPTER 11 TRUSTEE**

On June 14, 2018, the Court heard: (1) the _Application to Employ Winstead PC as_
_Special Counsel to the Chapter 11 Trustee_ [Docket No. 246] (the "Application"), filed by Robin
Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and
Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or
"Acis"), the debtors in the above captioned and jointly administered bankruptcy cases (the

---

**Appellee Appx. 01254**

**Appx. 10819**

"Cases")[1] and (2) the *Motion to Disqualify Winstead P.C. as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* (the "Motion to Disqualify") [Docket No. 244]. Having considered the Application, the *Supplement to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Supplement") [Docket No. 266], Rakhee V. Patel's Declaration and Supplemental Declaration in support of the Application, the Motion to Disqualify, the *Objection of Highland Capital Management, L.P. to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Docket No. 267], the *United States Trustee's Objection to Application to Employ Winstead as Special Counsel to the Chapter 11 Trustee* [Docket No. 279], the arguments of counsel and evidence admitted at the hearing on the Application and the Motion to Disqualify, the Court read its findings of fact and conclusions of law into the record in accordance with Fed. R. Bankr. P. 7052(a).  For the reasons stated, the Court, pursuant to 11 U.S.C. § 327(a) and (c), **ORDERS AS FOLLOWS:**

1**.**      The Motion to Disqualify is **DENIED**.

2.      The Application is **APPROVED** to the extent set forth herein.

3.      The Trustee is authorized to retain and employ Winstead as his special counsel, effective as of May 14, 2018, to provide legal services to the Trustee for matters specifically involving:

    a)  management, liquidation, disposition, and monetization of the CLO assets;

    b)  the Investment Advisers Act of 1940, as amended; and

    c)  operation of the portfolio management agreements and the indentures, issues arising therefrom,[2] and, specifically including, litigation related thereto or arising therefrom.

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application or the Supplement, as applicable.

[2] For the avoidance of doubt, such issues may include issues related to securities laws, including the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended.

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                                                                 **Page 2 of 5**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1263
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1377 of 1828 PageID 10870
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1262 of 1803 PageID 12008
Case 18-30264-sgj11 Doc 1299-15 Filed 06/25/18 Entered 06/25/18 Page 4 5 of 6 Page 3 of 5

4. If the Trustee wishes to retain Winstead to provide legal services in any capacity other than in the three items identified in paragraph 2, the Trustee must obtain Court approval by application with the Court.

5. Winstead may not provide legal services to Joshua Terry or to the Trustee in connection with the preparation or defense of, or any objection to, Joshua Terry's proofs of claim,[3] or such claims as may be amended.

6. Winstead will establish an ethical wall between any of Winstead's attorneys engaged in these Cases and those of Winstead's attorneys involved in that certain litigation styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC,* DC-15-01816, pending in the 193rd Judicial District Court of Dallas County, Texas. Notwithstanding the foregoing, the Winstead attorneys engaged in these Cases may seek counsel from Don Campbell, in his capacity as Winstead's general counsel, as they deem necessary regarding issues related to any potential conflicts or other ethics issues that may arise during these Cases.

7. With respect to those certain Appeals pending in the District Court for the Northern District of Texas, specifically under case numbers 3:18-cv-01056-D, 3:18-cv-01057-D, 3:18-cv-01073-D, and 3:18-cv-01084-D, any parties to such Appeals may not seek agreed dismissal of any such Appeals by compromise or settlement without providing proper notice to parties-in-interest in these Cases, as required under the Federal Rules of Bankruptcy Procedure or as otherwise required under applicable law.

8. Winstead shall be compensated for services rendered and for expenses incurred, subject to the Court's interim and final approval and in accordance with the provisions of sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy

---

[3] Joshua Terry has filed two claims in these Cases: Claim No. 1 in the Claims Register for Case No. 18-30264 and Claim No. 1 in the Claims Register for Case No. 18-30265.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1264
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1378 of 1828   PageID 10871
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1263 of 1803   PageID 12009
Case 18-30264-sgj11 Doc 2393-3 Filed 06/25/19   Entered 06/25/19 Page 4 of 6 Page 4 of 5

Procedure, the Local Bankruptcy Rules, and such other procedures as may be fixed by order of this Court.

9. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

**# # # END OF ORDER # # #**

Appellee Appx. 01257
Appx. 10812

**SUBMITTED BY:**

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

*SPECIAL COUNSEL FOR ROBIN PHELAN,*
*CHAPTER 11 TRUSTEE*

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                                                     **Page 5 of 5**
4846-6789-0026v.2

62112-1 6/15/2018

**Appellee Appx. 01258**

**APPX. 10813**

# APPENDIX 14

**Appellee Appx. 01259**

**APP. 01276**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (Eastern time)**
**Hearing Date: November 19, 2019 at 12:00 p.m. (Eastern time)**

## DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

Highland Capital Management, L.P., the debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), files this application (the "Application"), pursuant to section 327(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order authorizing the Debtor to retain and employ Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH") as Special Texas Litigation Counsel in this Chapter 11 Case, *nunc pro tunc* to the Petition Date (defined below). In support of the Application, the Debtor relies upon and incorporates by reference the Declaration of Michael K. Hurst the ("Hurst Declaration"), a copy of which is attached hereto as **Exhibit A**. In further support of the Application, the Debtor respectfully states as follows:

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1268
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1382 of 1828    PageID 10875
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1267 of 1803   PageID 12013

Case 19-12239-CSS   Doc 70   Filed 10/29/19   Page 2 of 10

### Jurisdiction

1.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.       Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory bases for the relief requested herein are sections 327(e) and 328 of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1.

### Background

4.       On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition").  The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.

5.       As of the date of the filing of this Application, the Office of the United States Trustee (the "U.S. Trustee") has yet to appoint an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

6.       A more detailed description of the business and operations of the Debtor, and the events leading to the commencement of this chapter 11 case, is provided in the *Declaration of Frank Waterhouse in Support of First Day Motion*, [Docket No. 9] (the "First Day Declaration") and incorporated herein by reference.[2]

---

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Declaration.

DOCS_NY:39760.1 36027/002

Appellee Appx. 01261

APPX. 10328

### Relief Requested

7.      By this Application, the Debtor seeks entry of an order authorizing the employment of the Firm as its Special Texas Litigation Counsel, *nunc pro tunc* to the Petition Date.  The Debtor requests that the Firm be retained to perform the services described in this Application.

### Basis for Relief

8.      Section 327(e) of the Bankruptcy Code authorizes a debtor, with court approval, to retain

> for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

9.      Section 327(e) of the Bankruptcy Code authorizes the retention of an attorney who represented a debtor prior to the bankruptcy petition date, provided: (a) such retention is for a special purpose; (b) the purpose of the retention is not to conduct the case; (c) the retention is in the best interests of the estate; and (d) the attorney does not hold any interest adverse to the debtor with respect to the subject of its retention.  The Firm's retention as the Debtor's Special Texas Litigation Counsel falls within the scope of section 327(e) of the Bankruptcy Code.

### The Firm's Qualifications

10.      The Debtor believes that the attorneys at the Firm are well qualified to act as Special Texas Litigation Counsel on behalf of the Debtor in this Chapter 11 Case.  The Firm is a boutique trial litigation firm and the specific attorneys engaged to represent the Debtor have substantial experience and expertise in trial litigation, including in complex commercial bankruptcy cases such as this case.

DOCS_NY:39760.1 36027/002

Appellee Appx. 01262

APPX. 10819

11. The Firm has provided legal services to the Debtor in at least six separate matters since March 2016. In particular, and in regard to active litigation, the Firm acts as trial litigation counsel to the Debtor as it relates to the lawsuit captioned *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC*, jointly administered under Case No. 18-30264-SGJ-11 pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, and various appeals related thereto (the "Pending Acis Proceedings"). The Debtor expects that the Firm, in its role as Special Texas Litigation Counsel, will continue to provide services to the Debtor with regard to matters that were handled by the Firm before the Petition Date. The Firm also represents entities related to the Debtor in the Pending Acis Proceedings including Highland HCF Advisor, Ltd., Highland CLO Management, Ltd., Highland CLO Holdings, Ltd. (collectively, the "Cayman Defendants").

12. The Firm also acts as trial litigation counsel to the Debtor in a Texas State court litigation captioned *Joshua N. Terry, Individually and on Behalf of IRAs #1467711 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., James D. Dondero, and Thomas J. Surgent* Cause No. DC-16-11396 (the "Texas Lawsuit"). In the Petition, the Debtor identified an unsecured claim arising from the Texas Lawsuit. Certain disputed matters in the Texas Lawsuit were scheduled to proceed for resolution in a bench trial, scheduled to occur in November 2019. The Firm continues to represent the Debtor in the Texas Lawsuit, albeit that proceeding is currently subject to the automatic stay as to the Debtor.[3]

---

[3] The Firm also represents a related entity, the Charitable Donor Advised Fund, L.P. ("the Charitable DAF"), in a separate lawsuit in the Southern District of New York, case number 1:19-cv-09857-NRB, which is unrelated to the Debtor and this Chapter 11 Case, and unrelated to the Texas Lawsuit and the Pending Acis Proceedings. *See* Hurst Declaration.

4

Appellee Appx. 01263

APPX. 10820

13.     Among other services provided to the Debtor in the Texas Lawsuit and/or in the Pending Acis Proceedings, the Firm counsels the Debtor on trial strategy, general litigation strategy, represents the Debtor at oral argument in various hearings, conducts research, conducts motion practice, and during discovery, manages discovery efforts when ongoing.

14.     The Firm's partners Mr. Hurst and Mr. David Coale both provide services to the Debtor in the above-referenced matters. Mr. Hurst, lead counsel for the Debtor within the Firm, is Board Certified in Civil Trial Law by the Texas Board of Legal Specialization. Mr. Coale, lead appellate counsel for the Debtor within the Firm, is Board Certified in Civil Appellate Law by the Texas Board of Legal Specialization.

15.     For these reasons, the Debtor believes that the Firm possesses the requisite expertise to serve as Special Texas Litigation Counsel in this case, and can do so in an efficient and cost-effective manner.

16.     In light of the Firm's relationship with the Debtor and the extensive work it has performed for the Debtor prior to the Petition Date, the Debtor believes that the Firm's retention is in the best interests of its estate and creditors.  Since its engagement, the Firm has become intimately familiar with the Debtor's business and operations as they pertain to the Pending Acis Proceedings and to the Texas Lawsuit, and to obtain new counsel now would result in the additional and unnecessary expenditure of both time and money.  For example, the Firm represents the Debtor in an appeal that is pending at the Fifth Circuit Court of Appeals and another appeal that is pending at the District Court in the Northern District of Texas.  The Firm continues to represent the Debtor in a pending adversary proceeding in the Pending Acis Proceedings, albeit that proceeding is currently subject to the automatic stay as to the Debtor.  The Firm, and co-

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1272
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1386 of 1828 PageID 10879
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1271 of 1803 PageID 12017

Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 6 of 10

litigation counsel, Foley Gardere, Foley & Lardner LLP ("Foley Gardere")[4] have worked cooperatively on the Pending Acis Proceedings and have endeavored to avoid unnecessary duplication of services to the Debtor. The Firm is uniquely qualified to handle the representation in a most efficient and timely manner. As such, the Firm should be retained as the Debtor's Special Texas Litigation Counsel.

### Services to Be Provided By the Firm

17. The Firm's proposed retention pursuant to section 327(e) of the Bankruptcy Code is for the limited purpose of representing the Debtor as Special Texas Litigation Counsel. Subject to approval by the Bankruptcy Court, the services that the Debtor proposes that the Firm render, and the Firm has agreed to provide, include advising the Debtor in connection with all aspects of the Pending Acis Proceedings and the Texas Lawsuit, and performing the range of services normally associated with matters such as this as the Debtor's Special Texas Litigation Counsel, which the Firm is in a position to provide in connection with the matter referred to above.

18. The Firm's proposed retention is for the discrete matters referenced above, and the Firm will not be rendering services typically performed by a debtor's bankruptcy counsel. Among other things, the Firm ordinarily will not be involved in interfacing with this Court or be primarily responsible for the Debtor's general restructuring efforts. By delineating the Firm's role, the Debtor has ensured there will be no duplication of services.

### Compensation and Fee Applications

19. As required by Bankruptcy Code section 329 and Bankruptcy Rule 2016, the Hurst Declaration discloses that, in the one year period preceding the Petition Date, the Firm received payments from the Debtor totaling $1,110,508.49 (the "Prepetition Payments") with respect to

---

[4] The Debtor is simultaneously filing a request to employ the Foley Gardere firm as Special Texas Counsel.

6

Appellee Appx. 01265
APPX. 10832

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1273
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1387 of 1828 PageID 10880
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1272 of 1803 PageID 12018

Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 7 of 10

services rendered to the Debtor. The Prepetition Payments were paid by, and the sources of such funds were, the Debtor. According to the Hurst Declaration, as of September 30, 2019,[5] the Firm submits that it has earned fees and incurred reimbursable expenses on account of its services to Debtor in the amount of $1,419,928.07 (the "Aggregate Amounts"). As of September 30, 2019, approximately $319,419.58 of the Aggregate Amounts was outstanding and unpaid.

20. The Firm intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the guidelines promulgated by the United States Trustee, and pursuant to any additional procedures that may be established by the Court in this Chapter 11 Case. The Firm's fees for professional services are based upon its hourly rates, which are periodically adjusted. The hourly rates are currently $365 to $800 for attorneys and $180 to $235 for paraprofessionals.

21. The Firm will maintain records in support of any actual and necessary costs and expenses incurred in connection with the rendering of its services in this Chapter 11 Case. Subject to application for and allowance by the Court, the Firm will receive reimbursement for reasonable and documented out-of-pocket expenses incurred in connection with the services rendered to the Debtor.

22. All compensation and expenses will be sought in accordance with section 328(a) of the Bankruptcy Code, as incorporated in sections 329 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of the Court.

---

[5] Due to the timing of the bankruptcy filing, fees and expenses for October 2019 were not fully reflected in LPCH's accounting system. The Firm will supplement the Hurst Declaration with those additional sums once available.

DOCS_NY:39760.1 36027/002

23.    The Debtor believes that the compensation arrangements with the Firm are reasonable and at market rates, and similar to the rates charged to other clients in similar circumstances.

### Disinterestedness and Disclosure of Connections

24.    To check and clear potential conflicts of interest in this Chapter 11 Case, the Firm researched its client database to determine whether it had any relationships with the following entities in its engagement as Special Texas Litigation Counsel (collectively, the "Interested Parties"):

    a.    the Debtor and its non-debtor affiliates;

    b.    the Debtor's secured creditors;

    c.    the Debtor's directors, officers and board members;

    d.    the Debtor's equity security holders;

    e.    the creditors of the Debtor holding the 20 largest unsecured claims; and

    f.    any person employed in the office of the U.S. Trustee or any Bankruptcy Judge currently serving on the United States Bankruptcy Court for the District of Delaware.

25.    To the extent that the Firm's research of its relationships with the Interested Parties indicates that the Firm has represented, or currently represents any of these entities in matters *unrelated* to this Chapter 11 Case, the identities of such entities and, for current clients, a brief description of the type of work performed by the Firm for these clients are set forth in Schedule 1 to the Hurst Declaration.

26.    In reliance on the Hurst Declaration, the Debtor believes that (a) the Firm has no connection with the Debtor, its creditors, the U.S. Trustee, any person employed in the office of

8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1275
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1389 of 1828 PageID 10882
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1274 of 1803 PageID 12020

Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 9 of 10

the U.S. Trustee or any Bankruptcy Judge currently serving on the United States Bankruptcy Court for the District of Delaware, or any other party with an actual or potential interest in this Chapter 11 Case or their respective attorneys or accountants, except as set forth in the Hurst Declaration; (a) the Firm is not and has not been an investment banker for any outstanding securities of the Debtor; and (b) the Firm neither holds nor represents any interest adverse to the Debtor or its estate with respect to the matter on which the Firm is to be employed. Accordingly, the Debtor believes that the Firm's representation of the Debtor is permissible under section 327(e) of the Bankruptcy Code and is in the best interest of the Debtor's estate.

27. Where, as here, there is no conflict concerning the subject matter of the proposed special engagement, an application to employ Special Texas Litigation Counsel should be granted. "[Section] 327(e) bars engagement of special counsel only in the presence of an actual conflict of interest concerning the subject matter of the engagement." *In re Carla Leather, Inc.*, 44 B.R. 457, 474 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985) (citations omitted); *see also In re Polaroid Corp.*, 424 B.R. 446, 453 (Bankr. D. Minn. 2010) (section 327(e) only disqualifies counsel when they have conflicts related to the matter on which the attorney is to be employed); *In re J.S. II, LLC*, 371 B.R. 311 (Bankr. N.D. Ill. 2007) (section 327(e) has more relaxed conflict of interest standard than section 327(a)); *In re EBW Laser, Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005) (counsel not disqualified under section 327(e) because it holds prepetition claim).

28. Finally, the Debtor notes that the Firm will have no involvement with respect to actually conducting the Debtor's Chapter 11 Case. The Debtor has filed an application to retain Pachulski Stang Ziehl & Jones LLP ("PSZ&J") as bankruptcy counsel. The Debtor is specifically retaining PSZ&J, subject to court approval, to conduct its Chapter 11 Case. Although PSZ&J and

DOCS_NY:39760.1 36027/002

the Firm may coordinate on matters that generally concern the Debtor, the Firm will not conduct the Debtor's bankruptcy case.

### Notice

29.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Debtor's principal secured parties; (d) counsel to any statutory committee appointed in the case; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

30.     No prior application or motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated:     October 29, 2019             HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ Frank Waterhouse
By Strand Advisors, Inc., its Sole General Partner
Frank Waterhouse, Treasurer

DOCS_NY:39760.1 36027/002

Appellee Appx. 01269

APPX.10826

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (ET)**
**Hearing Date: November 19, 2019 at 12:00 p.m. (ET)**

### NOTICE OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

TO:   (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Debtor's principal secured parties; (d) counsel to any statutory committee appointed in the case; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that on October 29, 2019, the above-captioned debtor and debtor in possession (collectively, the "Debtor"), filed the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court"). A copy of the Application is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that any response or objection to the Application must be filed with the Bankruptcy Court on or before **November 12, 2019 at 4:00 p.m. (Eastern Time)**.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_DE:226022.1 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1278

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1392 of 1828   PageID 10885
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1277 of 1803   PageID 12023

Case 19-12239-CSS    Doc 70-1    Filed 10/29/19    Page 2 of 3

**PLEASE TAKE FURTHER NOTICE** that at the same time, you must also serve a copy of the response or objection upon: (i) proposed counsel for the Debtor: Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Attn: James E. O'Neill, Esq. (joneill@pszjlaw.com) and Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067, Attn: Jeffrey N. Pomerantz, Esq. (jpomerantz@pszjlaw.com); and (ii) the Office of the United States Trustee: 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jane M. Leamy, Esq. (jane.m.leamy@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE** THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE APPLICATION WITHOUT FURTHER NOTICE OR HEARING.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING TO CONSIDER THE RELIEF SOUGHT IN THE APPLICATION WILL BE HELD ON **NOVEMBER 19, 2019 AT 12:00 P.M. (EASTERN TIME)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, CHIEF UNITED STATES BANKRUPTCY COURT JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DELAWARE 19801.

DOCS_DE:226022.1 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1279
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23   Page 1393 of 1828   PageID 10886
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1278 of 1803   PageID 12024

Case 19-12239-CSS    Doc 70-1    Filed 10/29/19    Page 3 of 3

Dated: October 29, 2019

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

Richard M. Pachulski (CA Bar No. 62337)
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:     rpachulski@pszjlaw.com
            jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            mlitvak@pszjlaw.com
            joneill@pszjlaw.com

Proposed Counsel for the Debtor and Debtor in
Possession

DOCS_DE:226022.1 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1280
Case 3:23-cv-00726-S   Document 8-22   Filed 10/29/23   Page 1394 of 1828   PageID 10887
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1279 of 1803   PageID 12025
Case 19-12239-CSS    Doc 70-2    Filed 10/29/19   Page 1 of 7

# EXHIBIT A

**Hurst Declaration**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1281
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1395 of 1828 PageID 10888
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1280 of 1803 PageID 12026

Case 19-12239-CSS Doc 70-2 Filed 10/29/19 Page 2 of 7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-12239 (CSS) |
| Debtor. | |

**DECLARATION OF MICHAEL K. HURST IN SUPPORT OF DEBTOR'S
APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND
EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS
LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

I, Michael K. Hurst, declare under penalty of perjury as follows:

1. I am a partner with the law firm of Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), located in Dallas, Texas. I am submitting this declaration ("Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

2. Neither I, the Firm, nor any partner, of counsel or associate thereof, insofar as I have been able to ascertain, has any connection with Highland Capital Management, L.P., the above-captioned debtor (the "Debtor" or "Highland"), its creditors or any other parties in interest herein, or their respective attorneys, except as set forth below.

3. The Firm has represented the Debtor since March 2016. Since that time, the Firm has also represented certain other entities related to the Debtor, including the Cayman Defendants in the Pending Acis Proceedings, the defendants in the Texas Lawsuit who are executives of the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Debtor. The Firm also represents the Charitable DAF in case pending before the Southern District of New York, case number 1:19-cv-09857-NRB, a case that is unrelated to the Debtor, this Chapter 11 Case, the Texas Lawsuit, and the Pending Acis Proceedings.

4.      The Firm has, as of September 30, 2019, received $1,110,508.49 in payments from Highland during the year before the Petition Date.

5.      With respect to all matters, the Debtor has, subject to Court approval, agreed to compensate the Firm on an hourly basis at rates that do not (and will not) exceed the rates that the Firm customarily charges to its other clients for work of this type.  As of the Petition Date, the applicable hourly rates for timekeepers for the matters that the Firm is engaged to perform legal services ranged from $365 to $800 for attorneys and $180 to $235 for paraprofessionals.

6.      It is the Firm's policy to charge its clients for certain expenses incurred in connection with providing certain client services, including, without limitation, travel, lodging, vendor charges, delivery services and other expenses incurred in providing professional service, and for other services actually provided, including word processing and other charges, excluding secretarial overtime.

## **Disclosures**

7.      The Firm maintains a database containing the name of each current and former client of the Firm, the name of the parties who are or were related or adverse to such client, and the names of the Firm personnel who are or were responsible for the matters.  The Firm has searched its database to determine potential conflicts with the Debtor and its non-debtor affiliates, the Debtor's secured creditors, the Debtor's directors, officers and board members, the Debtor's equity security holders, the creditors of the Debtor holding the 20 largest unsecured claims, and any person employed in the office of the U.S. Trustee or any Bankruptcy Judge currently serving

2

Appellee Appx. 01275

APPX. 10832

on the United States Bankruptcy Court for the District of Delaware relating to its limited engagement by Debtor as Special Texas Litigation Counsel (collectively, the "Searched Parties"). Using such database, the Firm assessed the Searched Parties to ascertain the Firm's current relationship with parties that may be adverse to the Debtor in this Chapter 11 Case.

8.　Except as disclosed herein or in the attached Schedule 1, the Firm does not represent the Searched Parties or any other known creditor or party-in-interest of the Debtor with respect to the matters for which the Debtor seeks to retain the Firm pursuant to the Application and, therefore the Firm holds no material adverse interest to the Debtor or the Debtor's estate. Accordingly, the Firm is eligible for retention.

9.　The Firm may have performed services in the past, may currently perform services, and may perform services in the future, in matters unrelated to this Chapter 11 Case, for persons that are parties-in-interest in the Debtor's Chapter 11 Case. Except as set forth herein, I am not aware of the Firm performing any services for any such person or entity in connection with this case, or having any relationship with any such person or entity, their attorneys or accountants that we understand are adverse to the Debtor or its estate.

10.　From time to time, the Firm may have provided, and/or may currently provide, services to certain other parties-in-interest, or affiliates thereof, in all instances on matters in which such party does not or did not hold or represent an interest adverse to the Debtor or its estate with respect to the services for which the Firm is being retained.

11.　That said, the Debtor has and will retain various professionals during the pendency of this Chapter 11 Case. The Firm has previously worked with and will continue to work with these professionals on various representations. Further, the Firm and certain of its partners, of counsel, and associates may have in the past represented, may currently represent, and may in the

<div align="center">3</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1284
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1398 of 1828 PageID 10891
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1283 of 1803 PageID 12029

Case 19-12239-CSS Doc 70-2 Filed 10/29/19 Page 5 of 7

future represent stockholders and creditors of the Debtor and other parties of interest in connection with matters unrelated to the Debtor and this Chapter 11 Case. At this time, the Firm is not aware of such representations except as noted above. If the Firm identifies any further such representations, the Firm shall make further disclosures as may be appropriate at that time.

12. To my knowledge, neither the Firm nor any of its members have any connections with the United States Trustee or any person employed in the Office of the United States Trustee and/or the U.S. Bankruptcy Court for the District Of Delaware.

13. The Firm intends to apply for compensation for professional services rendered and associated costs in connection with this Chapter 11 Case, subject to approval of this Court and compliance with applicable provisions of the Bankruptcy Code, as set forth in the Application.

14. Pursuant to the Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Case (the "2013 UST Guidelines"), the Firm makes certain disclosures herein.

15. Pursuant to Part D1 of the 2013 UST Guidelines, the Firm is seeking employment as Special Texas Litigation Counsel for the Debtor under section 327 of the Bankruptcy Code and it hereby provides the following responses set forth below:

| Questions required by Part D1 of 2013 UST Guidelines: | Answer: | Further explanation: |
|---|---|---|
| Did you agree to any variations from, or alternatives to, your standard or customary billing arrangements for this engagement? | No | N/A |
| Do any of the professionals included in this engagement vary their rate based on the geographic location of the bankruptcy case? | No | N/A |

4

Appellee Appx. 01277
APPX. 10834

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1285
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1399 of 1828   PageID 10892
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1284 of 1803   PageID 12030

Case 19-12239-CSS    Doc 70-2    Filed 10/29/19    Page 6 of 7

| If you represented the client in the 12 months prepetition, disclose your billing rates and material financial terms for the prepetition engagement, including any adjustments during the 12 months prepetition. If your billing rates and material financial terms have changed postpetition, explain the difference and reasons for the difference. | LPCH's rates are adjusted on an annual basis within the ranges previously disclosed. | Standard annual hourly rate adjustments. |
| Has your client approved your respective budget and staffing plan, and, if so, for what budget period? | The Debtor and the Firm expect to develop a prospective budget and staffing plan. | In accordance with the 2013 UST Guidelines, the budget may be amended as necessary to reflect changed circumstances or unanticipated developments. |

16.    No promises have been received by the Firm or by any member, of counsel, or associate thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code. The Firm has no agreement with any other entity to share with such entity any compensation received by the Firm in connection with this Chapter 11 Case, except among the members, of counsel, and associates of the Firm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 29, 2019

_____
Michael K. Hurst, Partner

5

Appellee Appx. 01278
APPX. 01633

## SCHEDULE 1

### Disclosures

### None

**<u>EXHIBIT B</u>**

**Proposed Order**

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1288
Case 3:23-cv-00726-S   Document 8-22   Filed 04/24/23   Page 1402 of 1828   PageID 10895
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1287 of 1803   PageID 12033

Case 19-12239-CSS    Doc 70-3    Filed 10/29/19    Page 2 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-12239 (CSS) |
| Debtor. | **Re docket No. ___** |

### ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

Upon consideration of the application (the "Application")[2] of Highland Capital Management, L.P., debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case") for entry of an order (this "Order"), authorizing the Debtor to retain and employ Lynn Pinker Cox & Hurst LLP (the "Firm") as Special Texas Litigation Counsel in this Chapter 11 Case; and upon the *Statement Under Rule 2016 of the Federal Rules of Bankruptcy Procedure* (the "Statement"), the *Declaration of Michael K. Hurst in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Hurst Declaration"), and the *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Waterhouse Declaration") that were submitted concurrently with the Application; and the Court being satisfied based on the representations made in the Application, the Statement, the Hurst Declaration, and the Waterhouse

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms, unless otherwise defined herein, shall have the meanings ascribed to them in the Application.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1289
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1403 of 1828 PageID 10896
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1288 of 1803 PageID 12034

Case 19-12239-CSS Doc 70-3 Filed 10/29/19 Page 3 of 4

Declaration that the Firm holds no interest materially adverse to the Debtor or the Debtor's estate with respect to the matters upon which it is to be engaged, and that the employment of the Firm as Special Texas Litigation Counsel to the Debtor is necessary and in the best interests of the Debtor and its estate; and it appearing that the Court has jurisdiction to consider the Application; and it appearing that due notice of the Application has been given and no further notice need be given; and upon the proceedings before the Court; and after due deliberation and good and sufficient cause appearing; it is hereby ORDERED that:

7.      The Application is GRANTED as set forth herein.

8.      Pursuant to section 327(e) of the Bankruptcy Code, the Debtor is authorized to retain and employ the Firm as Special Texas in this Chapter 11 Case, *nunc pro tunc* to the Petition Date, pursuant to the terms set forth in the Application.

9.      The Firm shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtor's Chapter 11 Case in compliance with sections 330 and 331 of the Bankruptcy Code and applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any other applicable procedures and orders of the Court. The Firm also intends to make a reasonable effort to comply with the U.S. Trustee's requests for information and additional disclosures as set forth in the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases Effective as of November 1, 2013 (the "Revised UST Guidelines"), both in connection with this Application and any interim and final fee application to be filed by the Firm in these Chapter 11 Case.

10.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1290
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1404 of 1828   PageID 10897
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1289 of 1803   PageID 12035

Case 19-12239-CSS    Doc 70-3    Filed 10/29/19    Page 4 of 4

Dated: _____, 2019

_____
CHIEF JUDGE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

DOCS_NY:39760.1 36027/002

Appellee Appx. 01283
Appx. 10840

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1291
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1405 of 1828 PageID 10898
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1290 of 1803 PageID 12036

Case 19-12239-CSS Doc 70-4 Filed 10/29/19 Page 1 of 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) |  |

**STATEMENT UNDER RULE 2016 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), pursuant to Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 329 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), hereby makes this statement in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP, as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

1. The Debtor has agreed to pay the Firm for the legal services rendered or to be rendered by its various attorneys and paralegals, and to reimburse the Firm for its actual and necessary expenses in connection with the matters described in the Application.

2. In the one year period preceding the Petition Date, the Firm received payments from the Debtor totaling $1,110,508.49 (the "Prepetition Payments") with respect to services rendered to the Debtor. As of September 30, 2019,[3] the Firm submits that it has earned fees and incurred reimbursable expenses on account of its services to the Debtor in the amount of $1,419,928.07 (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.
[3] Due to the timing of the bankruptcy filing, fees and expenses for October 2019 were not fully reflected in LPCH's accounting system. The Firm will supplement the Hurst Declaration with those additional sums once available.

"Aggregate Amounts"). As of September 30, 2019, approximately $319,419.58 of the Aggregate Amounts was outstanding and unpaid on account of services rendered. The Prepetition Payments were paid by, and the source of such funds were, the Debtor.

3. The Firm will seek approval of the payment of compensation for its hourly services and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the District of Delaware, and orders of this Court.

4. The Firm further states that it has neither shared nor agreed to share (a) any compensation it has received or may receive with another party or person, other than with the members, of counsel and associates of the Firm, or (b) any compensation another person or party has received or may receive.

Dated: October 29, 2019

_____
Michael K. Hurst, Partner

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1293
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1407 of 1828 PageID 10900
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1292 of 1803 PageID 12038

Case 19-12239-CSS Doc 70-5 Filed 10/29/19 Page 1 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) |

### DECLARATION OF FRANK WATERHOUSE IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

I, Frank Waterhouse, hereby declare under penalty of perjury:

1.     I am the Treasurer of Strand Advisors, Inc., the sole General Partner of Highland Capital Management, L.P., the above-captioned debtor and debtor in possession (the "Debtor").

2.     I submit this declaration (the "Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

### The Debtor's Selection of the Firm as Special Texas Litigation Counsel

3.     Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH") began representing the Debtor in March 2016.   The Firm has provided legal services related to the bankruptcy proceedings, *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC*, jointly administered under Case No. 18-30264-SGJ-11 in the United States Bankruptcy Court for the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Application.

Appellee Appx. 01286
APPX. 10843

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1294
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1408 of 1828 PageID 10901
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1293 of 1803 PageID 12039
Case 19-12239-CSS Doc 70-5 Filed 10/29/19 Page 2 of 4

Northern District of Texas, Dallas Division, and various appeals related thereto. Ultimately, the Debtor retained the Firm because of its extensive experience trial litigation in such proceedings and its prepetition representation of the Debtor. Thus, I believe that the Firm is well qualified to represent the Debtor in this Chapter 11 Case as Special Texas Litigation Counsel in an efficient and timely manner.

### Rate Structure

4. In my capacity as Chief Financial Officer of the Debtor and Treasurer of the General Partner of the Debtor, I am involved in supervising outside counsel retained by the Debtor in the ordinary course of business along with other executives of the Debtor. The Firm has informed the Debtor that its rates listed in the Application are comparable to non-bankruptcy representations. As discussed below, I am also responsible for reviewing the invoices regularly submitted by the Firm, and can confirm that the rates the Firm charged the Debtor in the prepetition period are the same as the rates the Firm charged the Debtor in the post-petition period. The Firm has informed the Debtor that the Firm's standard hourly rates are subject to periodic adjustment in accordance with the Firm's practice.

### Cost Supervision

5. The Debtor and the Firm expects to develop a prospective budget and staffing plan, recognizing that in the course of a large chapter 11 case like this Chapter 11 Case, it is possible that there may be a number of unforeseen fees and expenses that will need to be addressed by the Debtor and the Firm. The Debtor recognizes that it is its responsibility to closely monitor the billing practices of its counsel to ensure the fees and expenses paid by the estate remain consistent with the Debtor's expectations and the exigencies of the Chapter 11 Case. The Debtor will

DOCS_NY:39760.1 36027/002

continue to timely review the invoices that the Firm regularly submits, and periodically amend the budget and staffing plans, as the case develops.

6.      While every chapter 11 case is unique, the budgets will provide guidance on the periods of time involved and the level of the attorneys and professionals that will work on various matters, as well as projections of average hourly rates for the attorneys and professionals for various matters.

*[remainder of page intentionally left blank]*

DOCS_NY:39760.1 36027/002

Appellee Appx. 01288

APPX. 04163

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1296
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1410 of 1828 PageID 10903
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1295 of 1803 PageID 12041
Case 19-12239-CSS Doc 70-5 Filed 10/29/19 Page 4 of 4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:    October 29, 2019

/s/ Frank Waterhouse
Frank Waterhouse

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1297
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1411 of 1828 PageID 10904
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1296 of 1803 PageID 12042

Case 19-12239-CSS Doc 70-6 Filed 10/29/19 Page 1 of 7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## **CERTIFICATE OF SERVICE**

I, James E. O'Neill, hereby certify that on the 29th day of October, 2019, I caused

a copy of the following document(s) to be served on the individual(s) on the attached service

list(s) in the manner indicated:

> **Notice of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel,** *Nunc Pro Tunc* **to the Petition Date**
>
> **Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel,** *Nunc Pro Tunc* **to the Petition Date**
>
> **Statement Under Rule 2016 of the Federal Rules of Bankruptcy Procedure**
>
> **Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel,** *Nunc Pro Tunc* **to the Petition Date**

*/s/ James E. O'Neill*
James E. O'Neill (Bar No. 4042)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_DE:226022.1 36027/002

Highland Capital 2002 Service List FCM
Case No. 19-12239 (CSS)
Document No. 225797
01 – Interoffice Mail
09 – Hand Delivery
51 – First Class Mail


*([Proposed] Counsel for the Debtor and
Debtor in Possession)*
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE  19899 (Courier 19801)

**INTEROFFICE MAIL**
*([Proposed] Counsel for the Debtor and
Debtor in Possession)*
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA  90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE  19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE  19801

**FIRST CLASS MAIL**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX  75201

**FIRST CLASS MAIL**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC  20530-0001

**FIRST CLASS MAIL**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE  19903

**FIRST CLASS MAIL**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE  19904

**FIRST CLASS MAIL**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC  20220

**FIRST CLASS MAIL**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC  20554

**FIRST CLASS MAIL**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA  19103

**FIRST CLASS MAIL**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY  10281

**FIRST CLASS MAIL**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC  20005-4026

**FIRST CLASS MAIL**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA  19101

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1300
Case 3:23-cv-00726-S  Document 8-22  Filed 10/24/23  Page 1414 of 1828  PageID 10907
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1299 of 1803  PageID 12045

Case 19-12239-CSS  Doc 70-6  Filed 10/29/19  Page 4 of 7

**FIRST CLASS MAIL**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX  75206

**FIRST CLASS MAIL**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**FIRST CLASS MAIL**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**FIRST CLASS MAIL**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**FIRST CLASS MAIL**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**FIRST CLASS MAIL**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**FIRST CLASS MAIL**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**FIRST CLASS MAIL**
Frontier State Bank
Attn:  Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**FIRST CLASS MAIL**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

Appellee Appx. 01293
APPX. 01850

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1301
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1415 of 1828 PageID 10908
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1300 of 1803 PageID 12046

Case 19-12239-CSS Doc 70-6 Filed 10/29/19 Page 5 of 7

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
  and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**FIRST CLASS MAIL**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1302
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1416 of 1828 PageID 10909
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1301 of 1803 PageID 12047

Case 19-12239-CSS Doc 70-6 Filed 10/29/19 Page 6 of 7

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

FIRST CLASS MAIL
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street NW Suite 1000
Washington, DC 20004-130

FIRST CLASS MAIL
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC 20005

FIRST CLASS MAIL
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

Appellee Appx. 01295
APPX. 04952

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1303
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1417 of 1828 PageID 10910
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1302 of 1803 PageID 12048

Case 19-12239-CSS Doc 70-6 Filed 10/29/19 Page 7 of 7

**FIRST CLASS MAIL**
(Counsel to California Public Employees'
Retirement System ("CalPERS")
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**FIRST CLASS MAIL**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**FIRST CLASS MAIL**
(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**FIRST CLASS MAIL**
(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**FIRST CLASS MAIL**
(Counsel to Jefferies)
Lee S. Attanasio, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Appellee Appx. 01296
APPX. 10853

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1304
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1418 of 1828 PageID 10911
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1303 of 1803 PageID 12049

# APPENDIX 15

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1305

Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1419 of 1828   PageID 10912
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1304 of 1803   PageID 12050
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 1 of 9

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Case No. 19-12239 (CSS) |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| LP,[1] | § | |
| | § | **Re: Docket Nos. 69, 70** |
| Debtor. | § | |

Objection Deadline: November 12, 2019 at 4:00 p.m. (Eastern time)
Hearing Date: November 19, 2019 at 12:00 p.m. (Eastern time)

**LIMITED OBJECTION TO THE DEBTOR'S: (I) APPLICATION FOR
AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF
FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS
COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE; AND
(II) APPLICATION FOR AN ORDER AUTHORIZING THE
RETENTION AND EMPLOYMENT OF LYNN PINKER COX &
HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL,
*NUNC PRO TUNC* TO THE PETITION DATE**

Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC

(collectively "Acis"), creditors and parties-in-interest, object on a limited basis to the Debtor's:

(i) *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley*

*& Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69]

(the "Foley Application"); and (ii) *Application for an Order Authorizing the Retention and*

*Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro*

*Tunc to the Petition Date* [Docket No. 70] (the "Lynn Pinker Application" and together with the

Foley Application, the "Applications").

**Statement of Facts**

1.     On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under Chapter 11 of the Bankruptcy Code.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1306
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1420 of 1828 PageID 10913
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1305 of 1803 PageID 12051
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 2 of 9

2.  On October 29, 2019, the Debtor filed the Foley Application, seeking to employ the law firm of Foley Gardere, Foley & Lardner LLP ("Foley") as special Texas litigation counsel pursuant to 11 U.S.C. §327(e).

3.  Also on October 29, 2019, the Debtor filed the Lynn Pinker Application, seeking to employ the law firm of Lynn Pinker Cox & Hurst LLP ("Lynn Pinker") as special Texas litigation counsel pursuant to 11 U.S.C. § 327(e).

4.  Foley and Lynn Pinker are both being hired to represent the Debtor in connection with Acis' post-confirmation bankruptcy case (the "Acis Bankruptcy Case"),[2] two appeals from the Acis Bankruptcy Case (both initiated by the Debtor as an appellant)[3] and an adversary proceeding pending in the Acis Bankruptcy Case.[4]

## Objection

### A. The Applications Lack Important Disclosures.

5.  The Applications disclose that Foley and Lynn Pinker represent and have performed work in the Acis Bankruptcy Case for clients related to the Debtor – clients they identify as Neutra and the Cayman Defendants. The Foley Application also admits that, before the Petition Date, Foley billed the Debtor for work performed for Neutra and the Cayman Defendants.[5] There is no disclosure from Lynn Pinker on this point, but presumably its payment arrangements were similar because Lynn Pinker represents many, if not all, of the same clients as

---

[2] Jointly administered Case Nos. 18-30264 and 18-30265 in the United States Bankruptcy Court for the Northern District of Texas.

[3] *Highland Cap. Mgmt, L.P. v. Phelan*, Case No. 19-10847 in the United States Court of Appeals for the Fifth Circuit; *Highland Cap. Mgmt, L.P. v. Winstead PC*, Case No. 3:19-cv-01477-D in the United States District Court for the Northern District of Texas

[4] Adversary No. 18-03078 in the United States Bankruptcy Court for the Northern District of Texas.

[5] See ¶ 3 of Declaration of Holland O'Neil attached as Exhibit A to the Foley Application [Docket No. 69-2] ("The Firm billed Highland for all services as to the related other parties since there was significant overlap among legal issues for Highland, Neutra and the Cayman Defendants.").

Appellee Appx. 01299
APPX. 04554

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1307
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1421 of 1828 PageID 10914
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1306 of 1803 PageID 12052
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 3 of 9

Foley in the Acis Bankruptcy Case. While the Applications disclose the amounts paid by the Debtor to each of Foley and Lynn Pinker during the year prior to the Petition Date, the Applications do not disclose the proportionate amounts billed to and paid by the Debtor for work performed for Neutra and the Cayman Defendants. Acis reserves its rights to compel disclosure of this information including under Fed. R. Bankr. P. 2017(a).[6]

6. This structure creates significant fraudulent transfer concerns and highlights the multifarious nature of the Debtor's operations including its pervasive use of offshore shadow companies controlled by James Dondero. As both District Judge Sidney Fitzwater and Bankruptcy Judge Stacey Jernigan found in published opinions arising from the Acis Bankruptcy Case, Neutra and the Cayman Defendants are actually offshore companies that were created around the time Joshua Terry obtained a judgment against Acis in order receive transfers of Acis' assets and Acis' equity. *Neutra, Ltd. v. Terry (In re Acis Cap. Mgmt. L.P.)*, 604 B.R. 484, 501-02 (N.D. Tex. 2019); *In re Acis Cap. Mgmt. L.P.*, 584 B.R. 115, 127-31 (Bankr. N.D. Tex. 2018). Even more, the business justification proffered by the Debtor for these transfers from Acis was found to be "a seemingly manufactured narrative to justify prior actions" and that "the evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from [Terry]." *Neutra,* 604 B.R. at 502 *(*citing *In re Acis Cap. Mgmt. L.P.*, 2019 Bankr. Lexis 292 (Bankr. N.D. Tex. January 31, 2019)). It was clear to everyone in the Acis Bankruptcy Case that Neutra and the Cayman Defendants were simply fronts for Dondero's machinations.

---

[6] Fed. R. Bankr. P. 2017(a) provides: "Payment or Transfer to Attorney Before Order for Relief. On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive."

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1308
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1422 of 1828 PageID 10915
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1307 of 1803 PageID 12053
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 4 of 9

7.      The Debtor's Schedules and Statement of Financial Affairs will not be filed by the time parties must object to the Foley Application and Lynn Pinker Application, or by the time the Court will hold a hearing on the Applications.[7] Thus, the scope of these payments and liabilities (or other connections) will not be disclosed until well after the engagement of Foley and Lynn Pinker.

8.      The Applications also do not disclose whether the Debtor intends to continue to be billed and pay Foley and Lynn Pinker for work performed for Neutra and the Cayman Defendants once Foley and Lynn Pinker are engaged by the Debtor pursuant to the Applications. If this is the Debtor's intent, it should be specifically disclosed and approval of such employment should be requested in accordance with the Bankruptcy Code and the applicable rules.  For example, Bankruptcy Rule 2017(b) specifically requires disclosure of payments made by a debtor to *any attorney* for services *in any way related to the case.*  Fed. R. Bankr. P. 2017(b).[8]  In any event, if the Debtor does intend to pay Neutra and the Cayman Defendants' legal expenses, Acis would oppose this relief.  The fact that Neutra and the Cayman Defendants are sham entities created only to receive fraudulent transfers and, thus, have no substance does not change, and in fact compels, this result.[9]

---

[7] The Debtor has requested an additional 30-day extension of time to file its Schedules and Statement of Financial Affairs [Docket No. 4].  If granted, this would make such disclosures due December 13, 2019.

[8] For example, Fed R. Bankr. P. 2017(b) provides: "Payment or Transfer to Attorney After Order for Relief.  On motion by the debtor, the United States trustee, or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property, or any agreement therefor, by the debtor to an attorney after entry of an order for relief in a case under the Code is excessive, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the case."

[9] To be clear, Neutra and the Cayman Defendants' are entitled to hire counsel to represent them and Dondero or some other non-debtor entity that he controls are certainly welcome to pay the litigation costs.  But this is not a cost the Debtor should bear.

Appellee Appx. 01301
APPX. 10556

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1309
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1423 of 1828   PageID 10916
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1308 of 1803   PageID 12054
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 5 of 9

9.      Further, the Foley engagement letter[10] discloses a conflict with Foley's representation of HRA Holdings, LLC that required the consent of the parties in order for Foley to proceed with its initial representation of the Debtor.  This conflict, or potential conflict, is not disclosed or discussed anywhere in the Foley Application or the various disclosure affidavits that accompany it.  Thus, the nature of the conflict is unclear, and it is unknown how it might limit Foley's representation of the Debtor.

10.      The Debtor did not attach Lynn Pinker's engagement letter to the Lynn Pinker Application, so this Court and the creditors in this case do not know the full terms of the Lynn Pinker engagement.  However, Acis is aware of various connections between Lynn Pinker and the Debtor and its related parties that are not disclosed or are only partially disclosed in the Lynn Pinker Application.  For example, Lynn Pinker hired the Debtor's General Counsel, Scott Ellington, as an expert witness in a case tried in Dallas just last year.[11]  It is unclear if this is a regular occurrence or what compensation Mr. Ellington receives for providing these services to Lynn Pinker and its clients.

11.      Further, in a footnote the Lynn Pinker Application discloses that it represents the Charitable Donor Advised Fund, L.P. (the "DAF") in "unrelated" litigation.  However, this is only the tip of the iceberg in describing this allegedly "unrelated" litigation.

12.      On August 6, 2019, Lynn Pinker, at that time representing NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund and Highland Income Fund (collectively, the "Highland Retail Funds"),[12] sent nearly identical letters to Moody's Investor Services and

---

[10] Attached as Exhibit B to the Foley Application [Docket No. 69-3].

[11] See attached **Exhibit A** found at https://www.pettitfirm.com/legacytexas.  Highlighting has been added to some exhibits.

[12] The Highland Retail Funds are affiliates of, or are managed by affiliates of, the Debtor and Dondero.  *See* attached **Exhibits B, C** and **D** found at https://www.highlandcapital.com/nexpoint-strategic-opportunities-fund-announces-the-regular-monthly-dividend-2/ (NexPoint Strategic Opportunities Fund); https://www.highlandfunds.com/global-

Appellee Appx. 01302
APPX. 10457

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1310
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1424 of 1828 PageID 10917
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1309 of 1803 PageID 12055
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 6 of 9

S&P Global.[13]  In essence, these letters request a ratings downgrade or withdrawal on certain Acis CLO securities which the Highland Retail Funds purport to own.  Obviously, it is highly unusual for an investor to request a ratings downgrade for its own investment.  Curiously, when Lynn Pinker filed the litigation it threatened in these letters, Lynn Pinker no longer represented the Highland Retail Funds, but now represented the DAF.[14]

13.     In its current form, the DAF litigation seeks: (i) damages from US Bank, as indenture trustee for various Acis CLOs, for failing to take what the DAF believes was appropriate action in the Acis Bankruptcy Case and otherwise failing to perform its obligations as indenture trustee; and (ii) damages from Moody's for refusing to downgrade the Acis CLO securities or withdraw the ratings altogether as demanded in Lynn Pinker's letters.[15]  A downgrade or ratings withdrawal in the Acis CLO securities or the resignation of US Bank as indenture trustee may precipitate liquidation of the Acis CLOs, which would violate the plan injunction entered as part of Acis's bankruptcy plan since it was clearly procured by the Debtor and its affiliates (and their proposed counsel).[16]  None of this tangled web is disclosed in the Lynn Pinker Application, rather it is simply written off in a footnote as "unrelated."

---

allocation-fund/ (Highland Global Allocation Fund); https://www.highlandfunds.com/income-fund/ (Highland Income Fund).

[13] Copies of these letters are attached hereto as **Exhibits E** and **F**.  Other letters were later sent to Moody's and S&P, but Acis does not have copies of these later letters.

[14] The Highland Retail Funds are publicly traded closed end funds.  Further, one of the Highland Retail Funds, Highland Global Allocation Fund, and its advisors are already being sued by an investor for self-dealing and conflicts of interest with other funds affiliated with the Debtor.  *See Lanotte v. Highland Capital Mgt. Fund Adv., L.P., et al.*, Case No. 18-cv-02360, in the United States District Court for the Northern District of Texas.  Thus, the Highland Retail Funds may have realized that publicly acknowledging that they inexplicably requested a ratings downgrade or withdrawal for their own investment is not a helpful fact in this or future litigation, and Dondero and Lynn Pinker then simply donned another hat to file the lawsuit.

[15] Amended Complaint attached hereto as **Exhibit G**.

[16] *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 292 * 30-32 (Bankr. N.D. Tex., Jan. 31, 2019) (confirmation opinion from Acis Bankruptcy Case); *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 294 * 59-62 (Bankr. N.D. Tex., Jan. 31, 2019) (confirmation order and confirmed plan from Acis Bankruptcy Case).  Acis reserves all rights in this regard and obviously has been monitoring the situation.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1311
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1425 of 1828 PageID 10918
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1310 of 1803 PageID 12056
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 7 of 9

**B.** **Acis Reserves the Right to Seek Disqualification and Disgorgement of Foley and Lynn Pinker Based on Conflict Of Interest Allegations the Debtor Made and is Appealing in the Acis Bankruptcy Case.**

14.     In the Acis Bankruptcy Case, the Debtor has alleged an actual conflict of interest prohibiting employment of special counsel for Acis' Chapter 11 trustee (Winstead) and requiring disgorgement of all fees paid to counsel. The Debtor's objection to counsel's employment and payment has been rejected and overruled multiple times. The issue is currently being appealed in the Northern District of Texas, and this is one of the matters for which Foley and Lynn Pinker are to be engaged.

15.     The alleged conflict is based on Winstead's engagement as special counsel by the Chapter 11 trustee for Acis (then a debtor in the Acis Bankruptcy Case) when Winstead represented a creditor of Acis (Josh Terry) and Winstead was retained to be adverse to another creditor of Acis (the Debtor).[17] Per the Debtor's argument, engagement as counsel to be adverse to a creditor while concurrently representing a different creditor creates a *per se* actual conflict of interest under 11 U.S.C. § 327(c).[18] Indisputably, Foley represents CLO Holdco, Ltd., which is one of the Debtor's largest creditors.[19] And in fact, Foley is *itself* one of the Debtor's ten largest creditors, and Lynn Pinker is likewise a significant creditor of the Debtor.[20] Foley and Lynn Pinker will also be engaged as special counsel to litigate with (and be adverse to) Acis and Mr.

---

[17] *See* ¶ 24 and 25 of Objection of Highland Capital Management, L.P. to Supplemental Application Regarding the Scope of Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee filed in the Acis Bankruptcy Case and attached hereto as **Exhibit H**.

[18] Although neither the Foley Application nor the Lynn Pinker Application reference § 327(c), that section is clearly applicable to their retention. As outlined below, the Foley and Lynn Pinker attorneys that will be engaged by the Debtor are employed by creditors of the Debtor and represent at least one known creditor of the Debtor.

[19] *See* Notice of Appearance filed by Foley in the Acis Bankruptcy Case and attached hereto as **Exhibit I**; *see also* Foley engagement letter attached as Exhibit B to the Foley Application [Docket No. 69-3].

[20] *See* Docket No. 1 disclosing that Foley is owed $1,398,432.44 by the Debtor. Although it is not listed on the top 20 creditor list, according to its Rule 2016 statement Lynn Pinker is owed $319,419.58 by the Debtor. *See* Docket No. 70-4.

Appellee Appx. 01304
APPX. 10869

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1312
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1426 of 1828 PageID 10919
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1311 of 1803 PageID 12057
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 8 of 9

Terry, also creditors of the Debtor. Thus, Foley and Lynn Pinker now have the exact "conflict" that they alleged disqualified Winstead and required disgorgement from Winstead in the Acis Bankruptcy Case.

16.    All rights are reserved to raise this as an issue for disqualification and disgorgement of fees by Foley and Lynn Pinker if the Debtor prevails on its argument on appeal.[21]

*[Remainder of page intentionally left blank]*

---

[21] To be clear, Acis believes this argument and related appeal are frivolous, and all rights are reserved to seek sanctions against the Debtor, Foley and Lynn Pinker in the appropriate forum.

Appellee Appx. 01305
APPX. 10572

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1313
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1427 of 1828   PageID 10920
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1312 of 1803   PageID 12058
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 9 of 9

WHEREFORE, Acis respectfully (i) requests Foley and Lynn Pinker provide full and complete disclosure of all connections with the Debtor as required under the Bankruptcy Code, Bankruptcy Rules and Local Rules in order to assess their employment Applications; (ii) objects to the employment of Foley and Lynn Pinker to the extent that the Debtor intends to be responsible for fees and expenses incurred by other Foley and Lynn Pinker clients, including the Cayman Defendants and Neutra; (iii) reserves all rights to seek disqualification and disgorgement of fees from Foley and Lynn Pinker based on conflicts of interest that may become apparent as this case moves forward; and (iv) requests such other further relief as is just and proper.

**BLANK ROME LLP**

Dated: November 12, 2019
Wilmington, Delaware

*/s/ Josef W. Mintz*
John E. Lucian (*pro hac vice*)
Josef W. Mintz (DE No. 5644)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email: lucian@blankrome.com
mintz@blankrome.com

**WINSTEAD PC**
Rakhee V. Patel (*pro hac vice*)
Phillip Lamberson (*pro hac vice*)
Annmarie Chiarello (pro hac pending)
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (713) 650-8400
Facsimile: (713) 650-2400
Email: rpatel@winstead.com
plamberson@winstead.com
achiarello@winstead.com

*Attorneys for Acis Capital Management GP*
*LLC and Acis Capital Management, L.P.*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1314
Case 3:23-cv-00726-S   Document 8-22   Filed 01/24/23   Page 1428 of 1828   PageID 10921
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1313 of 1803   PageID 12059

Case 19-12239-CSS   Doc 116-1   Filed 11/12/19   Page 1 of 3

**Exhibit A**

Press Release re: Scott Eillington

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1315
of 1804
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1429 of 1828   PageID 10922
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1314 of 1803   PageID 12060





## The Pettit Law Firm and Lynn Pinker Cox Hurst Secure a $4.2 Million Fraud and Breach of Fiduciary Duty Judgment Against LegacyTexas Bank

### December 28, 2018

The judgment was signed on December 28, 2018 following a 2-week trial earlier this fall before Judge Dale Tillery in the 134th District Court in Dallas County, Texas.

Co-lead counsel Julie Pettit and Michael K. Hurst represent Plaintiff Robert Imel, an oil and gas entrepreneur in a suit against LegacyTexas bank for fraud, breach of fiduciary duty, declaratory judgment, conspiracy, and breach of contract.

LegacyTexas Bank, through its head of energy finance, Chris Parada, represented to Imel that it would release Imel from a personal guaranty related to his oil and gas company's financing agreement if certain oil and gas assets were sold and a loan by LegacyTexas was paid off by a time certain. LegacyTexas then acted as a broker and persuaded Imel to negotiate the sale of the assets to Energy Reserves Group, LLC ("ERG"). Meanwhile, LegacyTexas Bank and ERG secretly negotiated a sale of the note and Imel's personal guaranty to ERG so that ERG could pursue Imel under the guaranty and force Imel to surrender the assets as well as valuable non-collateral oil and gas assets.

The Court found Legacy liable for its tortious conduct for $3.6 million in actual damages and over $636,000 in attorneys' fees. The Court also found ERG liable in the amount of $159,000 in attorneys' fees.

"We are pleased with the decision," said Julie Pettit, co-lead counsel for Imel. "The judgment affirms our position regarding LegacyTexas' misrepresentations and fraudulent conduct toward its own borrower."

"This important judgment underscores that in business, no one has a license to hide the truth, steal and double-deal– especially from those who they are entrusted to protect," said Michael K. Hurst, co-lead counsel for Imel.

Along with Pettit and Hurst, the trial team included David Urteago and Jane Cherry of The Pettit Law Firm.

Trial Days:  10

Settlement Negotiations:  Nothing meaningful

Expert for Imel:  Scott Ellington, Chief Legal Officer, General Counsel and Secretary, Highland Capital Management L.P.

The case is Robert A. Imel v. LegacyTexas Bank and Energy Reserves Group, case number DC-16-01372, in the 134th District Court in Dallas County, Texas. LegacyTexas was represented by John Leininger, Steve Shapiro, and Alexis Relier of Shapiro Bieging Barber Otteson LLP. ERG was represented by Marty Brimmage, Molly Whitman, and Keertan Chauhan of Akin Gump Strauss Hauer & Feld LLP.

A copy of the judgment can be found here.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1316
of 1804

Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1430 of 1828    PageID 10923
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1315 of 1803    PageID 12061

Case 19-12239-CSS    Doc 116-1    Filed 11/12/19    Page 3 of 3

Victory Against Legacy Texas Law Firm    Page 2 of 4



HOME    FIRM    SERVICES    NEWS    TESTIMONIALS    CONTACT US

## CONTACT US

The Pettit Law Firm
2101 Cedar Springs Rd, Suite 1540
Dallas, TX 75201
Phone: 214.329.0151
Fax: 214.329.4076

Name *

Email *

Subject

Message

Send



© 2019 by The Pettit Law Firm.

The principal offices of Pettit Rice PC dba The Pettit Law Firm are located in Dallas, Texas. Attorney responsible for the content of
this homepage: Julie Pettit. Pettit Rice PC Phone: 214.329.0151 All Rights Reserved. Member of the Texas State Bar.

Appellee Appx. 01309
APPX. 01676

Case 19-12239-CSS    Doc 116-2    Filed 11/12/19    Page 1 of 5

**Exhibit B**

NexPoint Strategic Opportunities Fund



HIGHLAND CAPITAL     HIGHLAND FUNDS     AFFILIATES ⌄     LOG IN

# NexPoint Strategic Opportunities Fund Announces the Regular Monthly Dividend

July 3, 2018     Nexpoint Advisors, Nexpoint Funds, Sites

DALLAS, July 2, 2018 /PRNewswire/ — NexPoint Strategic Opportunities Fund (NYSE: NHF) ("NHF" or the "Fund") today announced its regular monthly dividend on its common stock of **$.20** per share. The dividend will be payable on July 31, 2018 to shareholders of record at the close of business July 23, 2018.

The Fund is a closed-end fund managed by NexPoint Advisors, L.P. (the "Manager"), an affiliated adviser of Highland Capital Management, L.P. The Fund invests primarily in below investment grade debt, equity securities and real estate and has the ability to hedge risk. The Manager attempts to deliver consistent returns in excess of the Dow Jones Credit Suisse Hedge Fund and the HFRX Global Hedge Fund indices in a transparent, registered fund format consistent with monthly dividends.

| Total Returns as of 06/30/18 | 1-year | 3-year | 5-year | 10-year | Since Inception (6/29/06) |
|---|---|---|---|---|---|
| NexPoint Strategic Opportunities Fund (NAV) | 13.63% | 4.71% | 15.21% | 7.07% | 5.17% |
| NexPoint Strategic Opportunities Fund (Market Price) | 16.06% | 4.60% | 14.76% | 6.72% | 3.80% |

Appellee Appx. 01311

APPX. 010978

Appx. 04678

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1319 of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1433 of 1828 PageID 10926
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1318 of 1803 PageID 12064

NexPoint Strateg Case 19-12239-CSS An Doc 4-16-2 R Filed 11/12/19 Di Page 3 of 5 hl... Page 2 of 6

| Total Returns as of 03/31/18 | 1-year | 3-year | 5-year | 10-year | Since Inception (6/29/06) |
|---|---|---|---|---|---|
| NexPoint Strategic Opportunities Fund (NAV) | 17.20% | 3.65% | 16.21% | 7.19% | 5.13% |
| NexPoint Strategic Opportunities Fund (Market Price) | 14.95% | 3.97% | 15.30% | 7.16% | 3.72% |

**HIGHLAND CAPITAL**
**MANAGEMENT**
EXPERIENCED. DISCIPLINED. BOLD.

Total operating expenses as of the most recent fund annual report are 2.21%. Performance data represents past performance, which does not guarantee future results. Current performance may be higher or lower than the figures shown. Investment return and principal value will fluctuate with market conditions, and you may have a gain or loss when you sell your shares. For most recent month-end performance please visit www.nexpointadvisors.com or call 866-351-4440.

**Investors should consider the investment objectives, risks, charges and expenses of the NexPoint Strategic Opportunities Fund carefully before investing. This and other information can be found in the Fund's prospectus, which may be obtained by calling 1-866-351-4440 or visiting www.nexpointadvisors.com. Please read the prospectus carefully before you invest.**

**Interest Rate Risk.** Interest rate risk is the risk that debt securities, and the Fund's net assets, may decline in value because of changes in interest rates. Generally, fixed rate debt securities will decrease in value when interest rates rise and increase in value when interest rates decline.

**Leverage Risk.** The Fund uses leverage through borrowings from notes and a credit facility, and may also use leverage through the issuances of preferred shares. The use of leverage magnifies both the favorable and unfavorable effects of price movements in the investments made by the Fund. Insofar as the Fund employs leverage in its investment operations, the Fund will be subject to substantial risks of loss.

**Appellee Appx. 01312**
**APPX. 10867**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1320 of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1434 of 1828 PageID 10927
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1319 of 1803 PageID 12065

NexPoint Strateg Case 19-12239-CSS Announces the Regula Filed 11/12/19 Di Page 4 of 6... Page 3 of 6

**Closed-End Fund Risk.** The Fund is a closed-end investment company designed primarily for long-term investors and not as a trading vehicle. No assurance can be given that a shareholder will be able to sell his or her shares on the NYSE when he or she chooses to do so, and no ch any such sale may be effected.

st invest at least 25% of the value of its total assets at the time of purchase in securities of issuers conducting their principal business activities in the real estate industry. The Fund may be subject to greater market fluctuations than a fund that does not concentrate its investments in a particular industry. Financial, economic, business, and other developments affecting issuers in the real estate industry will have a greater effect on the Fund, and if securities of the real estate industry fall out of favor, the Fund could underperform, or its NAV may be more volatile than, funds that have greater industry diversification.

**Credit Risk.** Investments rated below investment grade are commonly referred to as high-yield, high risk or "junk debt." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and/ or interest payments. Non-payment of scheduled interest and/or principal would result in a reduction of income to the Fund, a reduction in the value of the asset experiencing non-payment and a potential decrease in NAV of the Fund.

**Illiquidity of Investments Risk.** The investments made by the Fund may be illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund.

### About NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund (formerly known as NexPoint Credit Strategies Fund) is a closed-end fund managed by NexPoint Advisors, L.P. The Fund's investment objectives are to provide both current income and capital appreciation. The Fund is invested primarily in below investment grade debt, equity securities and real estate and has the ability to hedge risk. The Fund's investment adviser attempts to deliver consistent returns in excess of the Dow Jones Credit Suisse Hedge Fund and the HFRX Global Hedge Fund Indices in a transparent, registered fund format consistent with monthly dividends. No assurance can be given that the Fund will achieve its investment objectives.

Shares of closed-end investment companies frequently trade at a discount to net asset value. The price of the Fund's shares is determined by a number of factors, several of which are

**Appellee Appx. 01313**
**APPX. 10876**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1321 of 1804
Case 3:23-cv-00726-S  Document 8-22  Filed 12/29/23   Page 1435 of 1828  PageID 10928
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21   Page 1320 of 1803  PageID 12066

beyond the control of the Fund. Therefore, the Fund cannot predict whether its shares will trade at, below or above net asset value. Past performance does not guarantee future results.



+1 (972) 419-2555

Recent Posts

Adviser on Highland Capital Management Investment Platform Plans Reorganization, Initiates Voluntary Bankruptcy Proceedings October 16, 2019

CNBC | FA 100: CNBC ranks the top-rated financial advisory firms of 2019 October 10, 2019

Mark Okada to Retire from Highland Capital Management September 30, 2019

NexPoint Selects IHG® as Operator for New InterContinental® Hotel at Cityplace Tower August 14, 2019

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 1322
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1436 of 1828   PageID 10929
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1321 of 1803   PageID 12067

Case 19-12239-CSS    Doc 116-3    Filed 11/12/19   Page 1 of 11

**Exhibit C**

Highland Global Allocation Fund



HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES    FINRA'S BROKERCHECK    LOG IN

# HIGHLAND CAPITAL
# MANAGEMENT

HOME    ABOUT    FUNDS    ETF    RESOURCE LIBRARY    NEWS CENTER

# Global Allocation Fund

PORTFOLIO MANAGER



JAMES DONDERO, CFA
Co-Founder,
President

BIO >

FACTS

**Fund Overview**

Appellee Appx. 01316

Appx. 10873

### Investment Objective

The Global Allocation Fund, managed by James Dondero, invests primarily in U.S. and foreign equity and debt securities that the portfolio manager considers to be undervalued by the market but have solid growth prospects. Undervalued securities are those securities that are undervalued relative to the market, their peers, their historical valuation or their growth rate.

### Low Correlation to Domestic Equity Markets

The Fund seeks above-average risk-adjusted total returns by investing in U.S. and foreign equities and fixed income securities, along with select alternative investments in the pursuit of long-term capital growth and future income.

- Rigorous top down allocation process
- Collaborative management structure where highly experienced portfolio managers in six disciplines bring their best ideas to the fund
- Global thematic investment style
- Extensive analytical support
- Relative value discipline
- May complement a portfolio of only U.S. securities as well as one of only stocks or fixed income

### Fund NAV (As of Nov 07, 2019)

| SYMBOL | NAV |
|--------|-----|
| HGLB | $12.03 |

### Fund AUM (As of Nov 07, 2019)

| | AUM |
|--------|-----|
| Total Net Assets | $271.77 M |

VIEW FULL PERFORMANCE

| Symbol | HGLB |
|--------|------|

Appellee Appx. 01317

APPX. 10872
Appx. 04734

| | |
|---|---|
| Inception | 01/05/98 |
| Gross Expense Ratio | 2.67% |
| Net Expense Ratio[1] | 2.67% |

PERFORMANCE

LITERATURE

INSIGHTS

The performance data quoted here represents past performance and is no guarantee of future results. Investment returns and principal value will fluctuate so that an investor's shares when redeemed may be worth more or less than their original cost. Current performance may be lower or higher than performance data quoted.

Note: Effective April 9, 2013, Highland Core America Equity Fund was renamed Highland Global Allocation Fund. At the same time, Highland Capital Management Fund Advisors, L.P. became the sole Adviser to the Fund and the Fund no longer utilizes a sub-adviser. In addition to these changes, the Fund's investment strategies were revised and the Fund will no longer invest at least 80% of its assets in domestic equity securities. For more information, please view the Fund's prospectus which can be found under the "Literature" tab above or by calling 877-665-1287.

Please consider the investment objectives, risks, charges and expenses of Highland Funds carefully before investing. A prospectus with this and other information about Highland's mutual funds can be found on the Literature tab above. You may also obtain a prospectus for our mutual funds by calling 877-665-1287. Please read the prospectus carefully before investing.

Appellee Appx. 01318

Appx. 10873

1. Performance results reflect the contractual waivers and/or reimbursements of fund expenses by the Advisor. Absent this limitation, performance results would have been lower. The Advisor has contractually agreed to limit the total annual operating expenses through at least January 31, 2019.

*The maximum sales charge for Class A shares is 5.75%.

**Securities Market Risk.** The value of the securities may go up or down, sometimes rapidly or unpredictably, due to factors affecting particular companies or the securities market generally. A general downturn in the securities market may cause multiple asset classes to decline in value simultaneously, although equity securities generally have greater price volatility than fixed income securities.

**Illiquid and Restricted Securities Risk.** Certain investments made by the Funds are, and others may be, illiquid, and consequently the Funds may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Funds. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale and other factors. Furthermore, the nature of the Funds' investments, especially those in financially distressed companies, may require a long holding period prior to profitability. Restricted securities (i.e., securities acquired in private placement transactions) and illiquid securities may offer higher yields than comparable publicly traded securities. The Funds, however, may not be able to sell these securities when the Investment Adviser considers it desirable to do so or, to the extent they are sold privately, may have to sell them at less than the price of otherwise comparable securities. Restricted securities are subject to limitations on resale which can have an adverse effect on the price obtainable for such securities. Also, if in order to permit resale the securities are registered under the Securities Act at a Fund's expense, the Fund's expenses would be increased. A high percentage of illiquid securities in a Fund creates risk that such a Fund may not be able to redeem its shares without causing significant dilution to remaining shareholders.

**Focused Investment Risk** is the risk that although the Fund is a diversified fund, it may invest in securities of a limited number of issuers in an effort to achieve a potentially greater investment return than a fund that invests in a larger number of issuers. As a result, price movements of a single issuer's securities will have a

Appellee Appx. 01319

APPX. 10876

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1327
of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1441 of 1828 PageID 10934
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1326 of 1803 PageID 12072

Global Allocation Highland Funds Case 19-12239-CSS Doc 116-3 Filed 11/12/19 Page 6 of 11 Page 5 of 7

greater impact on the Fund's net asset value, causing it to fluctuate more than that of a more widely diversified fund.

MLP Risk is the risk of investing in MLP units, which involves some risks that differ from an investment in the equity securities of a company. The Fund currently holds and may in the future hold a significant investment in MLP units. Holders of MLP units have limited control and voting rights on matters affecting the partnership. Holders of units issued by an MLP are exposed to a remote possibility of liability for all of the obligations of that MLP in the event that a court determines that the rights of the holders of MLP units to vote to remove or replace the general partner of that MLP, to approve amendments to that MLP's partnership agreement, or to take other action under the partnership agreement of that MLP would constitute "control" of the business of that MLP, or a court or governmental agency determines that the MLP is conducting business in a state without complying with the partnership statute of that state. Holders of MLP units are also exposed to the risk that they will be required to repay amounts to the MLP that are wrongfully distributed to them. Additionally: • A sustained reduced demand for crude oil, natural gas and refined petroleum products could adversely affect MLP revenues and cash flows. • Changes in the regulatory environment could adversely affect the profitability of MLPs. Investments in MLP units also present special tax risks. See "MLP Tax Risk" in the prospectus.

Value Investing Risk. The risk of investing in undervalued stocks that may not realize their perceived value for extended periods of time or may never realize their perceived value. Value stocks may respond differently to market and other developments than other types of stocks.

Foreign Investment Risk. The risk that investing in foreign (non-U.S.) securities may result in the Fund experiencing more rapid and extreme changes in value than a fund that invests exclusively in securities of U.S. companies, due to smaller markets, differing reporting, accounting and auditing standards, nationalization, expropriation or confiscatory taxation, currency blockages and political changes of diplomatic developments. The cost of investing in many foreign markets are higher than the U.S. and investments may be less liquid.

Currency Risk. The risk that the values of foreign investments may be affected by changes in the currency rates or exchange control regulations. If a foreign currency

Appellee Appx. 01320
Appx. 10933

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1328
of 1804
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1442 of 1828   PageID 10935
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1327 of 1803   PageID 12073

Global Allocation Case 19-12239-CSS Doc 116-3   Filed 11/12/19   Page 7 of 11      Page 6 of 7

weakens against the U.S. dollar, the value of a foreign investment denominated in that currency would also decline in dollar terms.

**Credit Risk.** The risk that the Fund could lose money if the issuer or guarantor of a fixed income security, or the counterparty of a derivatives contract or repurchase agreement, is unable or unwilling (or is perceived to be unable or unwilling) to make a timely payment of principal and/or interest, or to otherwise honor its obligations.

**Interest Rate Risk.** The risk that fixed income securities will decline in value because of changes in interest rates. A fund with a longer average portfolio duration will be more sensitive to changes in interest rates than a fund with a shorter average portfolio duration.

**Derivatives Risk.** The risk that an investment in derivatives may not correlate completely to the performance of underlying securities and may be volatile, and may result in a loss greater than the principal amount invested. Equity derivatives may also be subject to liquidity risk as well as the risk the derivative may be different than what would be produced through the use of another methodology or if it had been priced using market quotations.

**Glossary:** Click for important terms and definitions

Source: State Street Bank and Trust Company

Highland Funds' mutual funds are distributed by Highland Capital Funds Distributor

FUND DOWNLOADS

Fund Fact Sheet

Appellee Appx. 01321
APPX. 104738



Summary Prospectus

Annual Report





📂  View all Literature & Forms

© 2018 Highland Capital Management, LP. | All Rights Reserved

Disclosure Statement

Privacy · Terms

Appellee Appx. 01322

Appx. 10879

# Highland Global Allocation Fund Completes Conversion from Open-End Fund to Closed-End Fund



NEWS PROVIDED BY
**Highland Capital Management Fund Advisors, L.P.** →
Feb 13, 2019, 19:26 ET

DALLAS, Feb. 13, 2019 /PRNewswire/ -- Highland Capital Management Fund Advisors, L.P. (together with its affiliates "Highland") announced today that the Highland Global Allocation Fund, a series of Highland Funds II (the "Fund") successfully converted from an open-end fund to a closed-end fund (the "Conversion"). The Conversion was approved by shareholders during the November 8, 2018 special meeting. The Fund expects to list its shares for trading on the New York Stock Exchange (the "NYSE") on or about February 19, 2019.

As a result of the Conversion, the Fund will effect a reverse stock split of Class A, Class C and Class Y shares of the Fund and will combine such shares into a single class of common shares under the CUSIP 43010T104 with an initial net asset value of $15.00 per share.

Conversion ratios will be available on February 14, 2019.

Appellee Appx. 01323

APPX. 04886

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1331
of 1804
Case 3:23-cv-00726-S    Document 8-22    Filed 12/29/23    Page 1445 of 1828    PageID 10938
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1330 of 1803    PageID 12076

Highland Global Allocation Fund Completes Conversion to Closed-End... ...    Page 2 of 3

Shareholders will not receive fractional shares because of the Conversion, but instead will receive a number of shares, rounded down to a whole number. Shareholders will receive a cash-in-lieu check related to the fractional portion of their shares shortly after the Conversion.

The shares will be listed under the ticker "HGLB" and at an initial listing price of $15.00. Any shareholder seeking to move shares to a brokerage account will need an adviser or broker dealer to transfer the shares through the Depository Trust Company's ("DTC") Profile System. Shares of the Fund are DTC Eligible.

Effective February 14, 2019, American Stock Transfer & Trust Company, LLC ("AST") will serve as the Fund's transfer agent and dividend disbursing agent. All shareholder records have been transferred to AST. Shareholders may obtain more information on the shareholder services to be offered to the converted Fund by calling AST at the Fund's dedicated toll free number 1-800-357-9167.

Additional details regarding the Conversion are available on the Fund's website at www.highlandfunds.com/global-allocation-fund/.

**About Highland Capital Management Fund Advisors, L.P.**

Highland Capital Management Fund Advisors, L.P. is the retail arm of Highland Capital Management, L.P., a multibillion-dollar global alternative investment manager founded in 1993 by Jim Dondero and Mark Okada. A pioneer in the leveraged loan market, the firm has evolved over 25 years, building on its credit expertise and value-based approach to expand into other asset classes. Today, Highland operates a diverse investment platform, serving both institutional and retail investors worldwide. In addition to high yield credit, Highland's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built round

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1332 of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1446 of 1828 PageID 10939
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1331 of 1803 PageID 12077

Highland Global... Case 19-12239-CSS Doc 116-3 sion Filed 10/12/19 and Page 1 of 11... Page 3 of 3

specialized teams. Highland is headquartered in Dallas, Texas and maintains offices in New York, Buenos Aires, Rio de Janeiro, Singapore, and Seoul. For more information visit www.highlandfunds.com.

*Before investing, you should carefully consider the Fund's investment objectives, risks, charges and expenses. For a copy of a prospectus or summary prospectus, which contains this and other information, please visit our website at* www.high-landfunds.com *or call 1-877-665-1287. Please read the fund prospectus carefully before investing.*

### CONTACTS

**Media Relations:**
Lucy Bannon
lbannon@highlandcapital.com
1-972-419-6272

**Fund Transfer Agent:**
American Stock Transfer & Trust Company, LLC
1-800-357-9167

SOURCE Highland Capital Management Fund Advisors, L.P

Related Links

https://www.highlandfunds.com

Appellee Appx. 01325
Appx. 10892

**Exhibit D**

Highland Income Fund

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1334
of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1448 of 1828 PageID 10941
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1333 of 1803 PageID 12079

Income Fund | Highland Funds Case 19-12239-CSS Doc 116-4 Filed 11/12/19 Page 2 of 9    Page 1 of 8



HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES    FINRA'S BROKERCHECK    LOG IN

# HIGHLAND CAPITAL
# MANAGEMENT

Q

HOME    ABOUT    FUNDS    ETF    RESOURCE LIBRARY    NEWS CENTER

# Income Fund



**JAMES DONDERO, CFA**
Co-Founder, President

Bio »



**JON POGLITSCH, CFA**
Head of Credit Research

Bio »

Appellee Appx. 01327
Appx. 10894

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1335
of 1804

Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1449 of 1828   PageID 10942

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1334 of 1803   PageID 12080

Income Fund | Highland Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 3 of 9       Page 2 of 8

## Oct. 4, 2019 - Update on the Claymore Holdings LLC v. Credit Suisse AG Case Related to the Highland Income Fund

October 4, 2019 – The Texas Supreme Court released an order today on the case against Credit Suisse, AG, Cayman Islands Branch, and Credit Suisse Securities (USA), LLC ("Credit Suisse"), which granted a hearing of the case. The case was filed in 2013 by Claymore Holdings LLC, the Highland and NexPoint affiliate (together "Highland") that pursued the collective claims on behalf of the Highland Income Fund (formerly, Highland Floating Rate Opportunities Fund) (NYSE:HFRO) ("HFRO") and the NexPoint Strategic Opportunities Fund (NYSE:NHF) ("NHF") (together the "Funds").

Per the order, the Texas Supreme Court will review the case at a hearing scheduled for January 8, 2020. While this prolongs the legal process, it does not affect Highland's conviction in our claims against Credit Suisse or our commitment to recovering damages for investors.

The total aggregate award stands at $393.2 million today; it is comprised of the $287.5 million judgment initially awarded by the trial court and now twice confirmed on appeal, plus $105.7 million in accrued interest. The award will continue to accrue interest in the event that the judgment becomes final.

Any final judgment amount would be reduced by attorney's fees and other litigation-related expenses. The net proceeds would then be allocated to the Funds based on respective damages (approximately 82% to HFRO and 18% to NHF).

We do not know the exact timing of the Texas Supreme Court's decision following the January hearing; however, the decision should be issued by the end of the Court's term in June 2020 at the latest.

We knew this would be a long process but have been committed to recovering damages for our investors since day one.

Appellee Appx. 01328

Appx. 104993

## FACTS

**Effective May 20, 2019, the Highland Floating Rate Opportunities Fund is named the Highland Income Fund. For more information, please read the press release from March 20, 2019.**

## Fund Overview

### Investment Objective

The investment objective of the closed-end Highland Floating Rate Opportunities Fund is to provide a high level of current income, consistent with the preservation of capital.

### Attractive Alternatives for Income-Oriented Investors

- High income potential in all markets
- Yields that reset when short-term interest rates move, which may mitigate price declines in a rising short-term interest rate environment
- Low correlation to other asset classes
- Access to one of the largest and most experienced senior loan managers
- Most fixed rate securities experience price declines when interest rates rise. Floating Rate Senior loans are different.

They are short-duration, floating-rate securities. So, as interest rates rise, yields on bank loans increase, while their short duration helps keep prices relatively stable.

**Fund NAV** (As of Nov 07, 2019)

| SYMBOL | NAV |
|--------|-----|
| HFRO | $13.65 |

**Fund AUM** (As of Nov 07, 2019)

| | AUM |
|--------|-----|
| Total Net Assets | $982.33 M |

Appellee Appx. 01329

APPX. 10886

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1337
of 1804
Case 3:23-cv-00726-S   Document 8-22   Filed 12/29/23   Page 1451 of 1828   PageID 10944
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1336 of 1803   PageID 12082

Income Fund | Highland Capital 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 5 of 9    Page 4 of 8

Fund AUM (As of Nov 07, 2019)

AUM

VIEW FULL PERFORMANCE

| Symbol | HFRO |
| Inception | 01/13/00 |
| Gross Expense Ratio | 1.26% |
| Net Expense Ratio[1] | 1.26% |

PERFORMANCE

LITERATURE



THOMSON REUTERS

Lipper Award Winner - Loan Participation Funds

2014 Best Fund Over 3 Years
2015 Best Fund Over 3 Years
2015 Best Fund Over 5 Years
2016 Best Fund Over 3 Years

Appellee Appx. 01330
APPX. 10887

The performance data quoted here represents past performance and is no guarantee of future results. Investment returns and principal value will fluctuate so that an investor's shares when redeemed may be worth more or less than their original cost. Current performance may be lower or higher than performance data quoted.

Effective shortly after close of business on November 3, 2017, the Highland Floating Rate Fund converted from an open-end fund to a closed-end fund, and began trading on the NYSE under the symbol HFRO on November 6, 2017. The performance data presented above reflects that of Class Z shares of the Fund when it was an open-end fund, HFRZX. The closed-end Fund pursues the same investment objective and strategy as it did before its conversion.

[1] The expense ratio shown is reported in the Fund's Semi-annual Report dated December 31, 2017.

Closed-end funds, unlike open-end funds, are not continuously offered. There is a one-time public offering and once issued, shares of closed-end funds are sold in the open market through a stock exchange and frequently trade at prices lower than their net asset value, which may increase an investor's risk of loss. Net Asset Value (NAV) is total assets less total liabilities, which includes preferred shares, divided by the number of common shares outstanding. At the time of sale, your shares may have a market price that is above or below NAV, and may be worth more or less than your original investment. For additional information, please contact your investment adviser or visit our website www.highlandfunds.com.

Please consider the investment objectives, risks, charges and expenses of Highland Floating Rate Opportunities Fund carefully before investing. A prospectus with this and other information about Highland Floating Rate Opportunities Fund can be found on the Literature tab above.

**Closed-End Fund Risk.** The Fund is a closed-end investment company designed primarily for long-term investors and not as a trading vehicle. No assurance can be given that a shareholder will be able to sell his or her shares on the NYSE when he or she chooses to do so, and no assurance can be given as to the price at which any such sale may be effected.

**Non-Payment Risk.** Senior Loans, like other corporate debt obligations, are subject to the risk of non-payment of scheduled interest and/or principal. Non-payment

Appellee Appx. 01331

APPX. 10886

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1339 of 1804
Case 3:23-cv-00726-S Document 8-22 Filed 12/29/23 Page 1453 of 1828 PageID 10946
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1338 of 1803 PageID 12084

Income Fund | Highland Fu... Case 19-12239-CSS Doc 116-4 Filed 11/12/19 Page 7 of 9 Page 6 of 8

would result in a reduction of income to the Fund, a reduction in the value of the Senior Loan experiencing non-payment and a potential decrease in the NAV of the Fund.

Credit Risk. The Fund may invest all or substantially all of its assets in Senior Loans or other securities that are rated below investment grade and unrated Senior Loans deemed by Highland to be of comparable quality. Securities rated below investment grade are commonly referred to as "high yield securities" or "junk securities." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and interest payments. Non-payment of scheduled interest and/or principal would result in a reduction of income to the Fund, a reduction in the value of the Senior Loan experiencing non-payment and a potential decrease in the NAV of the Fund. Investments in high yield Senior Loans and other securities may result in greater NAV fluctuation than if the Fund did not make such investments.

Senior Loans Risk. The risks associated with senior loans are similar to the risks of below investment grade securities in that they are considered speculative. In addition, as with any debt instrument, senior loans are also generally subject to the risk of price declines and to increases in prevailing interest rates. Senior loans are also subject to the risk that, as interest rates rise, the cost of borrowing increases, which may also increase the risk and rate of default. In addition, the interest rates of floating rate loans typically only adjust to changes in short-term interest rates; long term interest rates can vary dramatically from short term interest rates. Therefore, senior loans may not mitigate price declines in a rising long-term interest rate environment.

Illiquidity of Investment Risk. The investments made by the Fund may be illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund.

Ongoing Monitoring Risk. On behalf of the several Lenders, the Agent generally will be required to administer and manage the Senior Loans and, with respect to collateralized Senior Loans, to service or monitor the collateral. Financial diffiulties of Agents can pose a risk to the Fund.

Glossary: Click for important terms and definitions

Appellee Appx. 01332
Appx. 108397

Source: State Street Bank and Trust Company

FUND DOWNLOADS

Fund Fact Sheet



Summary Prospectus

Annual Report



Fund Commentary



📁  View all Literature & Forms                                                                           ⌃

Appellee Appx. 01333

APPX.10890

Income Fund | Highland Funds  Case 19-12239-CSS Doc 116-4 Filed 11/12/19 Page 9 of 9  Page 8 of 8

© 2018 Highland Capital Management, LP. | All Rights Reserved

Disclosure Statement

Appellee Appx. 01334

APPX.10899

**Exhibit E**

Letter to Moody's re U.S. Bank

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**VIA EMAIL:** Shana.Sethi@moodys.com
Shana Sethi
Vice President- Senior Credit Officer
Moody's Investors Service

Re:   **Mismanagement of the Acis CLOs, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Ms. Sethi:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis Indentures dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

For your reference, enclosed to this correspondence is a copy of the demand letter served by the Highland Retail Funds on August 6, 2019 to U.S. Bank National Association, the Trustee of the Acis Indentures. The demand letter puts U.S. Bank on notice of its material violations of the terms of the Acis Indentures, by among others, mismanaging and allowing the impermissible gaming of the Acis Indentures by the portfolio manager thereof, and failing to perform required tasks with due care. The Highland Retail Funds are prepared to take all actions necessary to protect their rights from further deterioration.

Representatives of the Highland Retail Funds are available to meet with Moody's to discuss whether U.S. Bank's wrongful conduct has caused a default, such that the ratings on some or all rated tranches should be reconsidered or withdrawn.

---

[1] The Acis Indentures collectively include: that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1344
Case 3:23-cv-00726-S   Document 8-22   Filed 08/29/23   Page 1458 of 1828   PageID 10951
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1343 of 1803   PageID 12089

Case 19-12239-CSS   Doc 116-5   Filed 11/12/19   Page 3 of 9

Ms. Sethi
Moody's Investors Service
August 6, 2019
Page 2


We look forward to engaging with you on this serious matter.


Yours very truly,


Michael K. Hurst

MKH/ceb

Enclosure

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**VIA EMAIL: dnovakov@fbtlaw.com**
Daniel P. Novakov
FROST BROWN TODD LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201
Tel: (214) 580-5840
Fax: (214) 545-3473

Re:     **US Bank's mismanagement of the Acis Indentures, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Mr. Novakov:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis CLOs dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

This letter provides formal notice that your client, U.S. Bank National Association ("US Bank" or "Indenture Trustee"), has: (1) materially violated the terms of the Acis Indentures, and (2) failed to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care. US Bank's wrongful conduct is actionable under New York law, and has caused the Highland Retail Funds to sustain significant damages, discussed below.

---

[1] The Acis Indentures are abbreviated herein as follows: "Indenture 3" means that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 4" means that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 5" means that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; "Indenture 6" means that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee. Together, such CLOs are referred to "Acis CLOs" and each, an "Acis CLO" or "CLO" herein.

US Bank
August 6, 2019
Page 2

**I. US Bank's allowance of continued failure of the collateral quality test, as well as rampant portfolio mismanagement, violates the Acis Indentures.**

Every purchase or sale made under the Acis Indentures must satisfy the collateral quality test imposed by each Acis Indenture.[2] As such, US Bank is required to ensure that every purchase or sale made under the Acis Indentures maintains or improves any failing collateral quality test. US Bank failed to satisfy this requirement by, among others, allowing transactions to be effectuated that do not maintain or improve the failing Weighted Average Life Test ("WAL") for trades made under the Acis Indentures.

*First*, US Bank violated its obligation to seek best execution on trades reasonably available to the Acis CLOs. By allowing multiple same day trades, US Bank has disregarded the obligation in the Acis Indentures requiring maintenance or improvement of the collateral quality test in each respective Acis CLO for each individual trade made. US Bank has allowed a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, in so doing, creating the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by US Bank cannot maintain or improve the WAL test on an individual basis. US Bank cannot perform its duties by allowing such Acis CLOs to act as a market taker, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures. Indeed, the value destruction of this forced "bunched trading" is clear when prices at trade date vs. prices on the day before trade date are compared. For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|-----|-------|--------|-----------|------|----------|-----------|----------------|-------------|----------------|--------|-----|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

---

[2] *See e.g.*, Indenture 3 at p. 16 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.17, and 12; Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

US Bank
August 6, 2019
Page 3

What's more, this artificial trading philosophy, disguised as "responsible management", has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors. For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

Tellingly, the transaction history authorized by US Bank makes clear that it appreciates the import of trading on specific days. In connection with Indenture 5, US Bank allowed the sale of varying amounts of the same term loan, Doncasters, over three different days: June 28, 2019, July 3, 2019, and July 8, 2019. US Bank allowed this because these selected dates positively impacted the collateral quality of the term loan sold. However, US Bank cannot ensure that the Acis CLOs enjoy best execution on purchases under the Acis Indentures if it turns a blind eye to the date on which purchases are made.

An analysis of the individual trades made under US Bank's approval further underscores the Trustee's failure to adhere to the respective indenture's collateral quality requirements. On July 12, 2019, in connection with Indenture 5, US Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024. But, to maintain or improve the WAL test for Indenture 5, US Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. US Bank facilitated similar misconduct across the Acis Indentures.

*Second*, the Weighted Average Rating Factor ("WARF") of each of the Acis CLO's portfolios has steadily increased this year, further demonstrating US Bank's facilitating the mismanagement of the Acis Indentures' collateral. On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). Plan D approved Brigade Capital Management, LP ("Brigade") to perform certain services related to the Acis Indentures, previously provided by Highland Capital Management.[3] Since the entry of Plan D, and Brigade's "management" of the Acis Indentures, US Bank allowed the collective WARF of the Acis CLO's portfolios to change from one of the cleanest pools in the market, to one of the dirtiest pools in

---

[3] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1348
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1462 of 1828 PageID 10955
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1347 of 1803 PageID 12093
Case 19-12239-CSS Doc 116-5 Filed 11/12/19 Page 7 of 9

US Bank
August 6, 2019
Page 4

the market in a matter of months. As of August 2019, since Brigade's involvement with the Acis Indentures, the WARF of each Acis CLO has dramatically increased, as follows:

CLO 3: 2522 ➞ 2678
CLO 4: 2680 ➞ 2941
CLO 5: 2673 ➞ 3004
CLO 6: 2627 ➞ 2917

*Third*, US Bank failed to protect the cash flow levels of its equity holders. Since the entry of Brigade, equity holders under Indentures 3-5 have received a total of **zero** cash flows. This damage has metastasized into the secured tranches of the CLOs and created direct harm to the Highland Retail Funds. The value decline of the equity positions is obvious:

| ACIS Equity Positions | CUSIP | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 |
|---|---|---|---|---|---|---|---|
| ACIS 2014-3A 0.0000% - 2/2026 - SUB - 00100GAE3 @0.0000 02/01/2026 | 00100GAE3 | 14.5000 | 16.5000 | 17.3333 | 15.8333 | 13.0000 | 11.8333 |
| ACIS 2014-4A 0.0000% - 5/2026 - SUB - 00100HAE1 @0.0000 05/01/2026 | 00100HAE1 | 24.8333 | 22.1667 | 22.0000 | 22.1667 | 21.0000 | 19.8333 |
| ACIS 2014-5A 0.0000% - 11/2026 - SUB - 00101WAC1 @0.0000 11/01/2026 | 00101WAC1 | 34.2500 | 33.2500 | 32.7500 | 31.7500 | 31.0000 | 30.0000 |
| ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | 004524AD6 | 36.5000 | 36.5000 | 35.6667 | 35.0000 | 33.6667 | 32.0000 |

*Fourth*, US Bank has allowed the Acis CLOs to incur exorbitant expenses under its watch, at levels which exceed market standards.

In sum, US Bank's facilitation and approval of extensive portfolio mismanagement, and failure to require trades in accordance with industry standards and contrary to the best interests of its investors, violates the express terms of the Acis Indentures. US Bank's wrongful conduct has diluted the value of the Highland Retail Funds' Secured Notes and deteriorated the credit profile of the Acis CLOs. The Highland Retail Funds cannot allow US Bank to shirk its contractual obligations under the Acis Indentures. As Holders of Secured Notes, the Highland Retail Funds negotiated for superior rights under the Acis Indentures with the expectation that at a minimum, their collateral would remain protected in accordance with industry standards. *Indeed, US Bank must explain how this blatant gaming and chicanery in the name of artificially maximizing management fees is not a default under the Acis Indentures or a clear, actionable conflict of interest.*

## II. US Bank Failed to reserve rights, or otherwise protect the Highland Retail Funds' rights affected by Plan D.

The Acis Indentures do not permit US Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1349
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1463 of 1828 PageID 10956
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1348 of 1803 PageID 12094
Case 19-12239-CSS Doc 116-5 Filed 11/12/19 Page 8 of 9

US Bank
August 6, 2019
Page 5

Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person." (emphasis added).[4] Despite these express terms, US Bank tacitly accepted or adopted the entry of Plan D, which contains provisions that directly affect the Secured Notes that the Highland Retail Funds hold. Among others, Plan D imposes an injunction that adversely affects the Highland Retail Funds' rights by prohibiting beneficial trading activity that would serve to protect Noteholder interests. In addition to other restrictions, Plan D impedes the ability of Noteholders under the Acis Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each Acis CLO.[5]

US Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D. US Bank's election to take no action regarding the entry of Plan D amplified the exposure, and overall risk that the Highland Retail Funds face during the pendency of the Plan D injunction. In fact, the Bankruptcy Court set a deadline for all parties, including US Bank, to submit any objections to the final approval of the Disclosure Statement and/or confirmation of Plan D.[6] As recognized by the Bankruptcy Court, US Bank failed to file objections to Plan D.[7] In fact, the Bankruptcy Court explicitly identified US Bank's failure to oppose the Plan in its opinion, making clear that notably, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan."[8] What's more, US Bank previously filed prior reservations of rights and/or objections in the Adversary Proceeding.[9] In relation to Plan B and Plan C (previously implemented as part of the Chapter 11 Trustee's First Amended Joint Plan), which each proposed re-writing the Acis Indentures to protect Acis' management fee stream for several years, US Bank acknowledged that the Plans "adversely affect[ed] the rights of Noteholders."[10] The same holds true for Plan D. US Bank is not excused from failing to protect the Highland Retail Funds' rights affected by Plan D, and the Adversary Proceeding.

---

[4] See e.g., Indenture 3 at § 5.3; Indenture 4 at § 5.3; Indenture 5 at § 5.3; Indenture 6 at § 5.3.

[5] See e.g., the Adversary Proceeding at Dkt. No. 830 p. 75, Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified Findings of Fact and Conclusions of Law.

[6] See e.g., the Adversary Proceeding at Dkt. No. 829 ¶ W ("The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order [identifying three Objections filed, none of which filed by US Bank].) (emphasis original).

[7] See id.

[8] See e.g., the Adversary Proceeding at Dkt. No. 827 p. 5.

[9] See e.g., the Adversary Proceeding at Dkt. Nos. 499-505.

[10] See e.g., the Adversary Proceeding at Dkt. No. 505 ¶ 3.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1350
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1464 of 1828 PageID 10957
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1349 of 1803 PageID 12095
Case 19-12239-CSS Doc 116-5 Filed 11/12/19 Page 9 of 9

US Bank
August 6, 2019
Page 6

**III.** **The Highland Retail Funds are not limited to filing contract claims against US Bank.**

In addition to contract claims based on US Bank's violations of the Acis Indentures, US Bank's failure to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care subjects it to additional tort liability. *See e.g.*, *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: **a trustee must still** '(1) avoid conflicts of interest, and (2) **perform all basic, non-discretionary, ministerial tasks with due care**.'") (emphasis added). And, consistent with the Trust Indenture Act, US Bank is not relieved "from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct…"[11] Succinctly, US Bank appears unwilling or unable to fulfill its duties to the Noteholders. The four corners of each Indenture create a framework of Noteholder protections, and such investors deserve an Indenture Trustee that will enforce the spirit and the letter of the Indentures. If US Bank cannot do its duty, it should resign as Indenture Trustee.

The Highland Retail Funds are prepared to take all action necessary to preserve their rights, and remedy their losses sustained to date due to US Bank's misconduct. The Highland Retail Funds demand that US Bank provide written assurances by **August 15, 2019** detailing: (1) the specific measures that US Bank will take, effective immediately, to remediate the wrongful conduct described herein, and (2) US Bank's offer to resolve this matter and make the Highland Retail Funds whole.

You are advised to review this letter carefully. Nothing in this letter shall constitute a waiver of any of the Highland Retail Funds' rights and/or remedies at law and at equity, all of which they expressly reserve should this matter proceed to litigation.

Your immediate attention to this matter is appreciated.

Sincerely,

*Michael K. Hurst* (signature)

Michael K. Hurst

MKH/sb

cc: David Coale (*of the Firm*)
Chisara Ezie-Boncoeur (*of the Firm*)

---

[11] *Compare* Indenture 3 at § 6.1(c), Indenture 4 at § 6.1(c), Indenture 5 at § 6.1(c), and Indenture 6 at § 6.1(c) with 15 U.S.C. § 77ooo (d).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1351
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1465 of 1828   PageID 10958
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1350 of 1803   PageID 12096

Case 19-12239-CSS   Doc 116-6   Filed 11/12/19   Page 1 of 9

**Exhibit F**

Letter to S&P Global re U.S. Bank

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
**lynnllp.com**

August 6, 2019

**VIA EMAIL: lauren.fastiggi@spglobal.com**
Lauren Fastiggi
Director and Lead Analyst
S&P Global

**Re:    Mismanagement of the Acis CLOs, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Ms. Fastiggi:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis Indentures dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

For your reference, enclosed to this correspondence is a copy of the demand letter served by the Highland Retail Funds on August 6, 2019 to U.S. Bank National Association, the Trustee of the Acis Indentures. The demand letter puts U.S. Bank on notice of its material violations of the terms of the Acis Indentures, by among others, mismanaging and allowing the impermissible gaming of the Acis Indentures by the portfolio manager thereof, and failing to perform required tasks with due care. The Highland Retail Funds are prepared to take all actions necessary to protect their rights from further deterioration.

Representatives of the Highland Retail Funds are available to meet with S&P Global to discuss whether U.S. Bank's wrongful conduct has caused a default, such that the ratings on some or all rated tranches should be reconsidered or withdrawn.

---

[1] The Acis Indentures collectively include: that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1353
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1467 of 1828   PageID 10960
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1352 of 1803   PageID 12098

Ms. Fastiggi
S&P Global
August 6, 2019
Page 2


We look forward to engaging with you on this serious matter.


Yours very truly,


Michael K. Hurst

MKH/ceb

Enclosure

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
**lynnllp.com**

August 6, 2019

**VIA EMAIL: dnovakov@fbtlaw.com**
Daniel P. Novakov
FROST BROWN TODD LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201
Tel: (214) 580-5840
Fax: (214) 545-3473

Re: **US Bank's mismanagement of the Acis Indentures, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Mr. Novakov:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis CLOs dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

This letter provides formal notice that your client, U.S. Bank National Association ("US Bank" or "Indenture Trustee"), has: (1) materially violated the terms of the Acis Indentures, and (2) failed to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care. US Bank's wrongful conduct is actionable under New York law, and has caused the Highland Retail Funds to sustain significant damages, discussed below.

---

[1] The Acis Indentures are abbreviated herein as follows: "Indenture 3" means that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 4" means that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 5" means that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; "Indenture 6" means that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee. Together, such CLOs are referred to "Acis CLOs" and each, an "Acis CLO" or "CLO" herein.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1355
Case 3:23-cv-00726-S Document 8-22 Filed 02/14/23 Page 1469 of 1828 PageID 10962
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1354 of 1803 PageID 12100
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 5 of 9

US Bank
August 6, 2019
Page 2

**I. US Bank's allowance of continued failure of the collateral quality test, as well as rampant portfolio mismanagement, violates the Acis Indentures.**

Every purchase or sale made under the Acis Indentures must satisfy the collateral quality test imposed by each Acis Indenture.[2] As such, US Bank is required to ensure that every purchase or sale made under the Acis Indentures maintains or improves any failing collateral quality test. US Bank failed to satisfy this requirement by, among others, allowing transactions to be effectuated that do not maintain or improve the failing Weighted Average Life Test ("WAL") for trades made under the Acis Indentures.

*First*, US Bank violated its obligation to seek best execution on trades reasonably available to the Acis CLOs. By allowing multiple same day trades, US Bank has disregarded the obligation in the Acis Indentures requiring maintenance or improvement of the collateral quality test in each respective Acis CLO for each individual trade made. US Bank has allowed a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, in so doing, creating the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by US Bank cannot maintain or improve the WAL test on an individual basis. US Bank cannot perform its duties by allowing such Acis CLOs to act as a market taker, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures. Indeed, the value destruction of this forced "bunched trading" is clear when prices at trade date vs. prices on the day before trade date are compared. For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|-----|-------|--------|-----------|------|----------|-----------|----------------|-------------|----------------|--------|-----|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

---

[2] *See e.g.*, Indenture 3 at p. 16 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.17, and 12; Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1356
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1470 of 1828 PageID 10963
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1355 of 1803 PageID 12101
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 6 of 9

US Bank
August 6, 2019
Page 3

What's more, this artificial trading philosophy, disguised as "responsible management", has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors. For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

Tellingly, the transaction history authorized by US Bank makes clear that it appreciates the import of trading on specific days. In connection with Indenture 5, US Bank allowed the sale of varying amounts of the same term loan, Doncasters, over three different days: June 28, 2019, July 3, 2019, and July 8, 2019. US Bank allowed this because these selected dates positively impacted the collateral quality of the term loan sold. However, US Bank cannot ensure that the Acis CLOs enjoy best execution on purchases under the Acis Indentures if it turns a blind eye to the date on which purchases are made.

An analysis of the individual trades made under US Bank's approval further underscores the Trustee's failure to adhere to the respective indenture's collateral quality requirements. On July 12, 2019, in connection with Indenture 5, US Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024. But, to maintain or improve the WAL test for Indenture 5, US Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. US Bank facilitated similar misconduct across the Acis Indentures.

**Second**, the Weighted Average Rating Factor ("WARF") of each of the Acis CLO's portfolios has steadily increased this year, further demonstrating US Bank's facilitating the mismanagement of the Acis Indentures' collateral. On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). Plan D approved Brigade Capital Management, LP ("Brigade") to perform certain services related to the Acis Indentures, previously provided by Highland Capital Management.[3] Since the entry of Plan D, and Brigade's "management" of the Acis Indentures, US Bank allowed the collective WARF of the Acis CLO's portfolios to change from one of the cleanest pools in the market, to one of the dirtiest pools in

---

[3] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1357
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23   Page 1471 of 1828  PageID 10964
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21   Page 1356 of 1803  PageID 12102
Case 19-12239-CSS   Doc 116-6   Filed 11/12/19   Page 7 of 9

US Bank
August 6, 2019
Page 4

the market in a matter of months. As of August 2019, since Brigade's involvement with the Acis Indentures, the WARF of each Acis CLO has dramatically increased, as follows:

CLO 3: 2522 ⟶ 2678
CLO 4: 2680 ⟶ 2941
CLO 5: 2673 ⟶ 3004
CLO 6: 2627 ⟶ 2917

*Third*, US Bank failed to protect the cash flow levels of its equity holders. Since the entry of Brigade, equity holders under Indentures 3-5 have received a total of **zero** cash flows. This damage has metastasized into the secured tranches of the CLOs and created direct harm to the Highland Retail Funds. The value decline of the equity positions is obvious:

| ACIS Equity Positions | CUSIP | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 |
|---|---|---|---|---|---|---|---|
| ACIS 2014-3A 0.0000% - 2/2026 - SUB - 00100GAE3 @0.0000 02/01/2026 | 00100GAE3 | 14.5000 | 16.5000 | 17.3333 | 15.8333 | 13.0000 | 11.8333 |
| ACIS 2014-4A 0.0000% - 5/2026 - SUB - 00100HAE1 @0.0000 05/01/2026 | 00100HAE1 | 24.8333 | 22.1667 | 22.0000 | 22.1667 | 21.0000 | 19.8333 |
| ACIS 2014-5A 0.0000% - 11/2026 - SUB - 00101WAC1 @0.0000 11/01/2026 | 00101WAC1 | 34.2500 | 33.2500 | 32.7500 | 31.7500 | 31.0000 | 30.0000 |
| ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | 004524AD6 | 36.5000 | 36.5000 | 35.6667 | 35.0000 | 33.6667 | 32.0000 |

*Fourth*, US Bank has allowed the Acis CLOs to incur exorbitant expenses under its watch, at levels which exceed market standards.

In sum, US Bank's facilitation and approval of extensive portfolio mismanagement, and failure to require trades in accordance with industry standards and contrary to the best interests of its investors, violates the express terms of the Acis Indentures. US Bank's wrongful conduct has diluted the value of the Highland Retail Funds' Secured Notes and deteriorated the credit profile of the Acis CLOs. The Highland Retail Funds cannot allow US Bank to shirk its contractual obligations under the Acis Indentures. As Holders of Secured Notes, the Highland Retail Funds negotiated for superior rights under the Acis Indentures with the expectation that at a minimum, their collateral would remain protected in accordance with industry standards. *Indeed, US Bank must explain how this blatant gaming and chicanery in the name of artificially maximizing management fees is not a default under the Acis Indentures or a clear, actionable conflict of interest.*

## II. US Bank Failed to reserve rights, or otherwise protect the Highland Retail Funds' rights affected by Plan D.

The Acis Indentures do not permit US Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1358
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23  Page 1472 of 1828  PageID 10965
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1357 of 1803  PageID 12103
Case 19-12239-CSS  Doc 116-6  Filed 11/12/19  Page 8 of 9

US Bank
August 6, 2019
Page 5

Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person." (emphasis added).[4] Despite these express terms, US Bank tacitly accepted or adopted the entry of Plan D, which contains provisions that directly affect the Secured Notes that the Highland Retail Funds hold. Among others, Plan D imposes an injunction that adversely affects the Highland Retail Funds' rights by prohibiting beneficial trading activity that would serve to protect Noteholder interests. In addition to other restrictions, Plan D impedes the ability of Noteholders under the Acis Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each Acis CLO.[5]

US Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D. US Bank's election to take no action regarding the entry of Plan D amplified the exposure, and overall risk that the Highland Retail Funds face during the pendency of the Plan D injunction. In fact, the Bankruptcy Court set a deadline for all parties, including US Bank, to submit any objections to the final approval of the Disclosure Statement and/or confirmation of Plan D.[6] As recognized by the Bankruptcy Court, US Bank failed to file objections to Plan D.[7] In fact, the Bankruptcy Court explicitly identified US Bank's failure to oppose the Plan in its opinion, making clear that notably, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan."[8] What's more, US Bank previously filed prior reservations of rights and/or objections in the Adversary Proceeding.[9] In relation to Plan B and Plan C (previously implemented as part of the Chapter 11 Trustee's First Amended Joint Plan), which each proposed re-writing the Acis Indentures to protect Acis' management fee stream for several years, US Bank acknowledged that the Plans "adversely affect[ed] the rights of Noteholders."[10] The same holds true for Plan D. US Bank is not excused from failing to protect the Highland Retail Funds' rights affected by Plan D, and the Adversary Proceeding.

---

[4] *See e.g.,* Indenture 3 at § 5.3; Indenture 4 at § 5.3; Indenture 5 at § 5.3; Indenture 6 at § 5.3.

[5] *See e.g.,* the Adversary Proceeding at Dkt. No. 830 p. 75, Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified Findings of Fact and Conclusions of Law.

[6] *See e.g.,* the Adversary Proceeding at Dkt. No. 829 ¶ W ("The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order [identifying three Objections filed, none of which filed by US Bank].) (emphasis original).

[7] *See id.*

[8] *See e.g.,* the Adversary Proceeding at Dkt. No. 827 p. 5.

[9] *See e.g.,* the Adversary Proceeding at Dkt. Nos. 499-505.

[10] *See e.g.,* the Adversary Proceeding at Dkt. No. 505 ¶ 3.

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1359
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1473 of 1828   PageID 10966
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1358 of 1803   PageID 12104
Case 19-12239-CSS   Doc 116-6   Filed 11/12/19   Page 9 of 9

US Bank
August 6, 2019
Page 6

**III.    The Highland Retail Funds are not limited to filing contract claims against US Bank.**

In addition to contract claims based on US Bank's violations of the Acis Indentures, US Bank's failure to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care subjects it to additional tort liability. *See e.g.*, *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: **a trustee must still** '(1) avoid conflicts of interest, and (2) **perform all basic, non-discretionary, ministerial tasks with due care**.'") (emphasis added). And, consistent with the Trust Indenture Act, US Bank is not relieved "from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct…"[11] Succinctly, US Bank appears unwilling or unable to fulfill its duties to the Noteholders. The four corners of each Indenture create a framework of Noteholder protections, and such investors deserve an Indenture Trustee that will enforce the spirit and the letter of the Indentures. If US Bank cannot do its duty, it  should resign as Indenture Trustee.

The Highland Retail Funds are prepared to take all action necessary to preserve their rights, and remedy their losses sustained to date due to US Bank's misconduct. The Highland Retail Funds demand that US Bank provide written assurances by **August 15, 2019** detailing: (1) the specific measures that US Bank will take, effective immediately, to remediate  the wrongful conduct described herein, and (2) US Bank's offer to resolve this matter and make the Highland Retail Funds whole.

You are advised to review this letter carefully.  Nothing in this letter shall constitute a waiver of any of the Highland Retail Funds' rights and/or remedies at law and at equity, all of which they expressly reserve should this matter proceed to litigation.

Your immediate attention to this matter is appreciated.

Sincerely,

Michael K. Hurst

MKH/sb

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

---

[11] *Compare* Indenture 3 at § 6.1(c), Indenture 4 at § 6.1(c), Indenture 5 at § 6.1(c), and Indenture 6 at § 6.1(c) with 15 U.S.C. § 77ooo (d).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1360
Case 3:23-cv-00726-S    Document 8-22    Filed 04/29/23    Page 1474 of 1828    PageID 10967
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1359 of 1803    PageID 12105



Case 19-12239-CSS    Doc 116-7    Filed 11/12/19    Page 1 of 18

**Exhibit G**

Complaint, *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association, et al.*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1361
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1475 of 1828 PageID 10968
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1360 of 1803 PageID 12106
Case 1:19-cv-09857-NRB Document 7 Filed 11/12/19 Page 2 of 817

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THE CHARITABLE DONOR ADVISED
FUND, L.P.,

                *Plaintiff,*

    v.

U.S. BANK NATIONAL ASSOCIATION and
MOODY'S INVESTORS SERVICE, INC.,

                *Defendants.*

**CASE NO.: 1:19-CV-09857-NRB**

**PLAINTIFF'S FIRST
AMENDED COMPLAINT
AND JURY DEMAND**

TO THE HONORABLE COURT:

    Plaintiff The Charitable Donor Advised Fund, L.P. ("The Charitable DAF"), by and through its attorneys of record, files this First Amended Complaint against Defendants U.S. Bank National Association ("U.S. Bank") and Moody's Investors Service, Inc. ("Moody's"), and in support thereof, respectfully states and alleges as follows:

## NATURE OF LAWSUIT

    The Charitable DAF files this lawsuit to enforce and protect its rights. U.S. Bank, which serves as Trustee of certain indentures, has severely compromised The Charitable DAF's rights thereunder through its misconduct and failure to act. The Charitable DAF, a Holder of Secured Notes under those ACIS indentures, possesses beneficial interests in the collateral that U.S. Bank has mismanaged and failed to protect. U.S. Bank's wrongful and negligent conduct has diluted the value of The Charitable DAF's Secured Notes, deteriorated the credit profile of the collateralized loan obligations ("CLOs"), and caused The Charitable DAF to incur other direct damages. To protect its rights, The Charitable DAF seeks two things through this lawsuit.

*First*, it seeks to recover the losses it sustained in connection with U.S. Bank's negligence and breach of its extra-contractual duties to The Charitable DAF, including the duties to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

*Second*, The Charitable DAF seeks judicial intervention to protect its interests before U.S. Bank commits or facilitates any further wrongful conduct. The Charitable DAF cannot allow U.S. Bank to continue to shirk its duties as indenture Trustee.

## PARTIES

1.      Plaintiff The Charitable Donor Advised Fund, L.P. is a limited partnership, with its principal place of business at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

2.      Defendant U.S. Bank National Association is a national banking association that is Trustee of the ACIS Indentures, as defined further herein. Pursuant to the ACIS Indentures, Defendant U.S. Bank may be served at its corporate office located at 190 South LaSalle Street, 8th Floor, Chicago, Illinois 60603.

3.      Defendant Moody's Investors Service, Inc., is a Delaware corporation registered to do business in New York State. Moody's may be served through its registered agent CT Corporation System, located at 28 Liberty Street, New York, New York 10005. Moody's is a nationally recognized statistical rating organization ("NRSRO").

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen of a foreign state.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1363
Case 3:23-cv-00726-S Document 8-22 Filed 10/24/23 Page 1477 of 1828 PageID 10970
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1362 of 1803 PageID 12108
Case 19-12095-CSS Document 116-7 Filed 11/12/19 Page 4 of 18

5.      Jurisdiction and venue over Moody's are proper in this District because Moody's is registered to do business in New York, and the transactions and occurrences that are the subject of The Charitable DAF's claims against Moody's took place in New York, New York.

6.      Jurisdiction and venue over US Bank are proper in this District because, pursuant to Section 14.10 of the ACIS Indentures, as defined further herein, each party to such indentures, including U.S. Bank:

> [H]ereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of . . . the United States District Court of the Southern District of New York . . . in any action or proceeding arising out of or relating to the notes or th[ese] indenture[s] . . .

7.      Venue is also proper because U.S. Bank waived any objection to venue in this District under the ACIS Indentures, as defined further herein. Section 14.10 specifically provides that:

> Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to th[ese] indenture[s] in any court referred to in the previous paragraph. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

8.      New York law governs the claims in this lawsuit.

## STATEMENT OF FACTS

**A.   U.S. Bank is Trustee of certain ACIS collateralized loan obligations.**

9.      Between 2014 and 2015, U.S. Bank agreed to serve as the Trustee of three indentures governing CLOs to which The Charitable DAF holds beneficial interests as a Holder of Secured Notes, including: (i) the Indenture dated June 5, 2014 among ACIS CLO 2014-4 LTD., as Issuer, ACIS CLO 2014-4 LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 4"); (ii) the Indenture dated November 18, 2014 among ACIS CLO 2014-5 LTD., as Issuer, ACIS CLO 2014-5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1364
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1478 of 1828 PageID 10971
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1363 of 1803 PageID 12109
Case 19-12395-CSS RBD Document 116-7 Filed 01/12/09/19 Page 5 of 817

LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 5"); and (iii) the Indenture dated

April 16, 2015 among ACIS CLO 2015-6 LTD., as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer,

and U.S. Bank as Trustee ("Indenture 6", and together with Indenture 4 and Indenture 5, the "ACIS

Indentures"). The ACIS Indentures impose a number of obligations on U.S. Bank in connection

with its role as Trustee.

10. **_First,_** the ACIS Indentures provide that U.S. Bank shall hold in trust, for the

"benefit and security" of the noteholders, all "Collateral Obligations" that secure the Co-Issuers'

financial obligations to the noteholders. In connection therewith, the ACIS Indentures also provide

that, for future purchases and sales of collateral obligations, the Trustee shall only consummate

these transactions where certain investment criteria are satisfied. One such criterion is that, for all

purchases, "either (A) each requirement . . . of the . . . Collateral Quality Test will be satisfied or

(B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such

requirement or test will be maintained or improved after giving effect to the reinvestment." *See,*

*e.g.*, Indenture 4 § 12.2(a)(iv). The ACIS Indentures define "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the
> aggregate, the Collateral Obligations owned (or, for purposes of *pro
> forma* calculations in relation to a proposed purchase of a Collateral
> Obligation, proposed to be owned) by the Issuer satisfy . . . the
> Maximum Moody's Rating Factor Test . . . [and the] Weighted
> Average Life Test.

*Id*. at 15.

11. These tests are defined, in turn, as follows:

> "Maximum Moody's Rating Factor Test": The test that will be
> satisfied on any date of determination if the Weighted Average
> Adjusted Moody's Rating Factor[1] of the Collateral Obligations is

---

[1] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1365
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1479 of 1828 PageID 10972
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1364 of 1803 PageID 12110
Case 19-12239-CSS RBD Document 1 Filed 11/12/19 Page 5 of 817

less than or equal to the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Rating Factor Adjustment Amount.

"Weighted Average Life Test": A test that is satisfied if the Aggregate Weighted Average Life[2] on such date of determination is not later than June 5, 2022.

*See, e.g.*, Indenture 4 at 37-38, 66.

12.     These provisions seek to maintain the integrity of the collateral securing the Co-Issuers' obligations by requiring certain parties, including the Trustee, to ensure that any purchase or sale of such collateral complies with detailed, industry-recognized, and bargained-for tests.

13.     ***Second***, the ACIS Indentures provide that, in performing its duties as Trustee, U.S. Bank may not "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof". Like the provisions concerning collateral quality, these provisions also seek to ensure that the Trustee does not prejudice the rights of any secured noteholder under the ACIS Indentures, like The Charitable DAF.

---

as having been updated by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 4 at 66.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id.*

[2] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (a) the number of years following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination. *Id.* at 6.

---

14.    The ACIS Indentures do more than require that U.S. Bank observe certain safeguards – they also grant U.S. Bank the broad power to "execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians, or attorneys".

ii.    *U.S. Bank must also satisfy extra-contractual obligations owed to The Charitable DAF.*

15.    U.S. Bank must satisfy certain extra-contractual obligations in connection with its role as Trustee, and the broad powers associated therewith.  These pre-default extra-contractual obligations include the duty to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

16.    For example, U.S. Bank was required to perform all basic, non-discretionary, ministerial tasks with due care, including, but not limited to, the following extra-contractual tasks: reserving noteholder rights impacted by active litigation, such as bankruptcy proceedings; exercising due care in connection with the payment of expenses; collecting and distributing the interest and dividends due on the portfolio securities; and  providing noteholders with periodic reports concerning the interest received, amounts distributed and securities in the portfolio.

17.    Notably, no provisions of the ACIS Indentures "shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct".

**B.    U.S. Bank fails to reserve or otherwise protect The Charitable DAF's rights in connection with bankruptcy proceedings.**

18.    The Charitable DAF's rights as a secured noteholder under the ACIS Indentures have been compromised by certain proceedings and judicial rulings in a consolidated Chapter 11 bankruptcy proceeding, and related adversary proceeding, pending before the United States

---

Appellee Appx. 01359

APPX. 10326

Bankruptcy Court for the Northern District of Texas, jointly administered under case number 18-30264-SGJ-11 (the "Bankruptcy Proceeding").[3]

19.     On July 29, 2018, the Chapter 11 Trustee in the Bankruptcy Proceeding filed a First Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management, GP, LLC (the "First Amended Plan").

20.     The First Amended Plan provided for certain amendments to the ACIS Indentures that would be effected through a certain Plan B and Plan C.  These proposals concerned, among other things, re-writing the ACIS Indentures to protect Acis' management fee stream for several years.

21.     In full recognition that the First Amended Plan encroached on the rights of noteholders under the ACIS Indentures like The Charitable DAF, the Trustee filed a Reservation of Rights and Limited Objections to the First Amended Plan in the Bankruptcy Proceeding. The Trustee took prompt measures to protect noteholder rights, filing these pleadings only fifteen days after the filing of the First Amended Plan.

22.     Among other infringements on the rights of noteholders under the ACIS Indentures, the Trustee explained that: "In other words, both Plan B and Plan C purport to ignore the express terms of the Indenture and the rights of the Noteholders with respect to amending the Indenture."[4]

23.     On January 31, 2019, a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC was entered in the Bankruptcy Proceeding ("Plan D").

---

[3] The two case numbers in the consolidated Bankruptcy Proceeding include case numbers 18-30264-SGJ-11 and 18-30265-SGJ-11.

[4] *See* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. Nos. 500, 501, and 500; *see id.* at Dkt. No. 505.

PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND                                                    PAGE 7

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1368

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1482 of 1828   PageID 10975
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1367 of 1803   PageID 12113
Case 19-12099-CSS-RBD Document 16-7 Filed 11/12/19 Page 9 of 17

24.     Like Plan B and C, Plan D also substantially impacted the rights of noteholders under the ACIS Indentures, including The Charitable DAF.

25.     Among other infringements, Plan D imposes an injunction that adversely affects The Charitable DAF's rights by prohibiting beneficial trading activity that would serve to protect noteholder interests.

26.     In addition to other restrictions, Plan D impedes the ability of noteholders under the ACIS Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each CLO covered by the ACIS Indentures.

27.     Moreover, Plan D conflicts with the express terms of the ACIS Indentures. Specifically, the ACIS Indentures do not permit U.S. Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**". (emphases added).

28.     Tellingly, in its Reservation of Rights filed in 2018, U.S. Bank acknowledged that the specific plans "adversely affect[ed] the rights of Noteholders."[5]  The same holds true for Plan D.

29.     Notwithstanding its ability to do so, U.S. Bank did not reserve any noteholders' rights, or otherwise object to the entry of Plan D.

30.     Instead, as noted by the court's ruling approving confirmation of Plan D on January 31, 2019, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases **and is not currently objecting to the Plan**."[6] (emphasis added).

---

[5] *See e.g.,* Bankruptcy Proceeding at Dkt. No. 505 ¶ 3; *see also,* Bankruptcy Proceeding at Dkt. Nos. 499-505
[6] *See e.g.,* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. No. 827 p. 5.

31.     U.S. Bank's election to take no action regarding the entry of Plan D amplified the exposure of The Charitable DAF and the overall risk that it faces during the pendency of the Plan D injunction. Though U.S. Bank has a duty to avoid conflicts of interest, its election to take no action regarding the entry of Plan D underscores the Trustee's self-serving conduct.

**C.** **U.S. Bank fails to ensure that certain transactions satisfy the collateral quality tests.**

32.     As set forth above, U.S. Bank must ensure that every purchase made under the ACIS Indentures satisfies the collateral quality tests, including the Weighted Average Life Test ("WAL test") and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM test"), or maintains or improves any failing collateral quality tests.  U.S. Bank failed to satisfy these obligations in at least two ways.

33.     *First*, U.S. Bank allowed the "Portfolio Manager" under the ACIS Indentures to effectuate certain transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.  Specifically, U.S. Bank allowed the Portfolio Manager to make multiple same-day trades and to consolidate the weighted average maturity date for these trades.  In so doing, U.S. Bank permitted the Portfolio Manager to create the false appearance of a maintained or improved WAL test.  Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL tests on individual bases.

34.     The value destruction of this forced "bunched trading" is clear when one compares the prices at trade date against the prices from the previous day.  For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|-----|-------|--------|-----------|------|----------|-----------|-----------------|--------------|-----------------|--------|-----|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1370
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1484 of 1828   PageID 10977
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1369 of 1803   PageID 12115
Case 19-12039-CSS Doc 16-7 Filed 11/12/19 Page 11 of 18

| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

35.     What is more, this artificial trading philosophy, disguised as "responsible management," has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors.  For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

36.     The transaction history of the ACIS Indentures makes clear that U.S. Bank appreciates the import of trading on specific days.  In connection with one such indenture, U.S. Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024.  But, to maintain or improve the WAL test for this indenture, U.S. Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. U.S. Bank facilitated similar misconduct across the ACIS Indentures.

37.     **Second**, the Weighted Average Moody's Rating Factor" ("WARF") a factor on which the WAM test turns, has steadily increased this year for each portfolio of the ACIS Indentures.

38.     U.S. Bank turned a blind eye to The Charitable DAF's collateral quality, which has suffered under Plan D's new management. Plan D, which was implemented in the Bankruptcy Proceeding on January 31, 2019, appointed Brigade Capital Management, LP ("Brigade") to

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1371
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1485 of 1828 PageID 10978
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1370 of 1803 PageID 12116
Case 19-12239-CSS RBD Document 6-7 Filed 11/12/19 Page 21 of 817

perform certain services related to the ACIS Indentures, previously performed by Highland Capital

Management, L.P.[7]

39. Since the entry of Plan D, and Brigade's "management" of the ACIS Indentures,

U.S. Bank has allowed the collective Weighted Average Moody's Rating Factor" ("WARF") of

the portfolios to become one of the dirtiest pools in the market in a matter of months. As of October

2019, and since Brigade's involvement with the ACIS Indentures, the WARF of each such

indenture has dramatically increased, as follows:

| | | |
|---|---|---|
| CLO 4: | ~~2680~~ | 2941 |
| CLO 5: | ~~2673~~ | 3004 |
| CLO 6: | ~~2627~~ | 2917 |

40. U.S. Bank is not excused from failing to protect The Charitable DAF's rights

affected by Plan D or by the Bankruptcy Proceeding generally.

**D. U.S. Bank's conduct has damaged The Charitable DAF substantially.**

41. U.S. Bank's conduct, described herein, has resulted in myriad damage to The

Charitable DAF, including, but not limited to, the following.

42. U.S. Bank's failure to ensure that transactions under the ACIS Indentures comply

with the collateral quality tests set forth therein constitute violations of U.S. Bank's contractual

and extra-contractual obligations to The Charitable DAF. By facilitating extensive portfolio

mismanagement, U.S. Bank has further violated its contractual and extra-contractual obligations

to The Charitable DAF. These violations have compromised, among other things, the credit

profile of the ACIS Indentures and the value of The Charitable DAF's secured notes thereunder.

43. Under its watch, since the appointment of Brigade, U.S. Bank has allowed the ACIS

Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF

---

[7] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1372
Case 3:23-cv-00726-S Document 8-22 Filed 10/24/23 Page 1486 of 1828 PageID 10979
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1371 of 1803 PageID 12117
Case 19-12995-CSS-RBD Document 116-7 Filed 11/12/19 Page 13 of 18

owns indirectly pursuant to the ACIS Indentures. Specifically, because of the payment of uncharacteristically high fees, equity holders under certain ACIS Indentures have received **zero** cash flows.

44.     Further, as Trustee, U.S. Bank owed a duty to The Charitable DAF to avoid conflicts of interest. It shirked this duty by, among other things, facilitating trades that did not comply with the collateral test in order to artificially maximize certain management fees. Likewise, despite U.S. Bank's duty to avoid conflicts of interest, in failing to object or otherwise reserve **any** noteholder rights impacted by Plan D, U.S. Bank further demonstrated its inability to prioritize or protect the rights of noteholder The Charitable DAF.

### E. Moody's knowingly or recklessly published false ratings of the ACIS Indentures.

45.     Moody's is a nationally recognized statistical rating organization ("NRSRO"). As an NRSRO, Moody's "evaluate[s] a debt offering based on public, and sometimes nonpublic, information regarding the assets of an issuer and assign[s] the debt offering a rating to convey information to a potential creditor/investor about the creditworthiness of the issuer's debt." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 164 (S.D.N.Y. 2009). This rating is important to issuers and investors because, among other things, a "[debt offering]'s success depends on the credit quality of the [underlying] assets," and "[i]f stable [assets] comprise the [debt offering], then []investors are much less likely to suffer a loss." *Id.* at 165; *see also In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003) ("[Moody's] endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO ratings.")

46.     Between June and November 2014, Moody's gave both Indenture 4 and Indenture 5 a AAA rating. This is a top rating, and the "same as those usually assigned by the Rating

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1373
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1487 of 1828   PageID 10980
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1372 of 1803   PageID 12118
Case 19-12239-CSS-RBD Document 116-7 Filed 11/12/19 Page 14 of 18

Agencies to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills." *Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 165. The rating is "commonly understood in the marketplace to [indicate an investment is] stable, secure, and safe." *Id.*

47.     Still, depending upon the circumstances, an NRSRO like Moody's can downgrade a particular rating to reflect new information. To that end, on August 6, 2019, certain ACIS noteholders provided Moody's with written notice of U.S. Bank's misconduct, including its practice of bunched trading under the ACIS Indentures by effectuating multiple same day transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.

48.     The same noteholders provided Moody's with a supplemental notice of U.S. Bank's trading misconduct on September 13, 2019.

49.     Nevertheless, and since that time, Moody's has continued to publish false ratings of those assets. Indeed, Moody's has continued to rate Indenture 4 and Indenture 5 as AAA investments, notwithstanding its notice of the facts set forth in more detail above.

50.     This, in turn, has allowed U.S. Bank and the portfolio manager to continue disregarding their obligations under the ACIS Indentures, further compromising the value of the assets securing the Co-Issuers' obligations thereunder. Moody's wrongful conduct has therefore diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

## <u>COUNT I: BREACH OF THE DUTY TO PERFORM ALL BASIC, NON-DISCRETIONARY, MINISTERIAL TASKS WITH DUE CARE</u>

51.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

52.     As Trustee, U.S. Bank has an extra-contractual duty to perform all basic, non-discretionary, ministerial tasks under the ACIS Indentures with due care. This duty subjects U.S. Bank to tort liability.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1374
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1488 of 1828 PageID 10981
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1373 of 1803 PageID 12119
Case 19-12389-CSS RBD Document 116-7 Filed 11/12/19 Page 15 of 18

53.     U.S. Bank breached this duty in at least two ways.

54.     First, it breached this duty by permitting the ACIS Indentures to incur exorbitant expenses, which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

55.     Second, U.S. Bank breached its duty by negligently failing to act, and by accepting the entry of "Plan D" in the Bankruptcy Proceeding, which directly affects the secured noteholders. Among other things, Plan D adversely impacts the rights of The Charitable DAF by imposing an injunction that prohibits beneficial trading activity, and impeding the ability of noteholders to make optional redemptions.

56.     U.S. Bank's omission to act was not in good faith. In 2018, U.S. Bank filed multiple pleadings in the Bankruptcy Proceeding, including, but not limited to, a Reservation of Rights, and Limited Objections to the entry of the predecessor plans to Plan D. U.S. Bank failed to take any action whatsoever in regard to Plan D.

57.     These breaches were the proximate cause of damages to Charitable DAF.

58.     Based on investigation to date, such damages include, but are not limited to, The Charitable DAF's inability to make certain trades or redemptions, which restriction has decreased the value of The Charitable DAF's investment across the capital stack of each contract. They also include the diminished value of the collateral securing the issuer and co-issuer's financial obligations to The Charitable DAF. U.S. Bank's failure to reserve or otherwise protect The Charitable DAF's rights impacted by the Bankruptcy Proceeding has caused it to suffer damages.

### COUNT II: BREACH OF THE DUTY TO AVOID CONFLICTS OF INTEREST

59.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1375
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1489 of 1828  PageID 10982
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1374 of 1803  PageID 12120
Case 19-12395-CSS-RBD Document 116-7 Filed 11/12/19 Page 16 of 18

60.     As Trustee, U.S. Bank has an extra-contractual duty to avoid conflicts of interest. This duty subjects U.S. Bank to tort liability.

61.     Under this duty, U.S. Bank is prohibited from advancing its own interests at the expense of The Charitable DAF.

62.     U.S. Bank breached this duty by, among other things, facilitating extensive portfolio mismanagement and failing to ensure compliance with the collateral quality tests in order to artificially maximize management fees. Such facilitation of noncompliant trades gives rise to an inference of bad faith.

63.     U.S. Bank also breached this duty by allowing the ACIS Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

64.     U.S. Bank's breaches were the proximate cause of damages to The Charitable DAF.

65.     These breaches were the proximate cause of damages to Charitable DAF.

66.     Based on investigation to date, such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Charitable DAF.

67.     U.S. Bank's breaches, set forth herein, have damaged The Charitable DAF in not less than $5,000,000.00.

## COUNT III: DEFAMATION (AGAINST MOODY'S)

68.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

69.     On August 6, 2019, certain ACIS noteholders provided Moody's with credible information regarding U.S. Bank's wrongful trading conduct and portfolio mismanagement, as

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1376
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1490 of 1828   PageID 10983
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1375 of 1803   PageID 12121
Case 19-12995-CSS   Document 116-7   Filed 11/12/19   Page 16 of 18

described in more detail above. Since that date, Moody's has had actual or constructive notice of US Bank's wrongful trading conduct.

70.    Notwithstanding such notice, Moody's has continued to publish a false rating of AAA for Indenture 4 and Indenture 5 to investors.

71.    Moody's published these ratings with knowledge of their falsity or with reckless disregard thereto.

72.    In so doing, Moody's has caused The Charitable DAF to suffer special damages. Specifically, by continuing to provide an AAA rating for Indenture 4 and Indenture 5, Moody's has enabled U.S. Bank and the portfolio manager to compromise the value of the assets securing the Co-Issuer's obligations under the ACIS Indentures.  Since August 2019, when Moody's first learned of U.S. Bank's misconduct, these assets have continued to decrease in value.

## CONDITIONS PRECEDENT

73.    Pursuant to Federal Rule of Civil Procedure 9(c), Charitable DAF hereby pleads that all conditions precedent have occurred or been performed.  Although the ACIS Indentures contain "no-action" clauses that require certain noteholders to make written request to U.S. Bank to institute any judicial proceedings in its own name, the Second Circuit has held that noncompliance with a no-action provision is excused in a suit against the indenture trustee.  *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) ("The district court held that the 'no action' clause applied only to the debenture holder suits against [the issuer], not the Indenture Trustees . . . This construction of [the limitation on suits provision] obviously is correct, as it would be absurd to require the debenture holders to ask the Trustee to sue itself.").

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1377
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1491 of 1828 PageID 10984
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1376 of 1803 PageID 12122
Case 19-12395-CSS-RBD Document 116-7 Filed 11/12/19 Page 18 of 18

### DEMAND FOR ATTORNEYS' FEES

74.    Pursuant to Section 5.15 of the ACIS Indentures, Charitable DAF hereby makes a demand for the attorneys' fees and court costs it has sustained in bringing this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff The Charitable Donor Advised Fund, L.P. respectfully requests that judgment be entered in its favor and against Defendants U.S. Bank and Moody's as follows:

A.    An award of damages sustained as a result of U.S. Bank National Association's activities in not less than $5,000,000.00;

B.    An award of damages sustained as a result of Moody's conduct in an amount to be determined at trial;

C.    An award of reasonable attorneys' fees and court costs;

D.    An award of pre-judgment and post-judgment interest on all sums awarded; and

E.    For such other and further relief as the Court may deem just, equitable and appropriate.

DATED: November 1, 2019                    Respectfully submitted,

/s/ V. Chisara Ezie-Boncoeur
Michael K. Hurst (*pro hac admission pending*)
Texas State Bar No. 10316310
*mhurst@lynnllp.com*
V. Chisara Ezie-Boncoeur
New York Bar No. 5333224
*cezie-boncoeur@lynnllp.com*
John R. Christian (*pro hac admission pending*)
Texas State Bar No. 24109727
*jchristian@lynnllp.com*
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 – Telephone
214-981-3839 – Facsimile
**ATTORNEYS FOR THE CHARITABLE DONOR ADVISED FUND, L.P.**

Appellee Appx. 01370
Appx. 04237

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1378
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1492 of 1828   PageID 10985
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1377 of 1803   PageID 12123

Case 19-12239-CSS   Doc 116-8   Filed 11/12/19   Page 1 of 16

**Exhibit H**

Highland Objection to Supplemental Application re Winstead PC's Retention

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 1379
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1493 of 1828   PageID 10986
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1378 of 1803   PageID 12124
Case 18-30264-sgj11 Doc 968-8 Filed 01/05/18   Entered 11/12/05/18 13:25:59 16 Page 1 of 15

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

### OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

Highland Capital Management, L.P., party-in-interest and creditor ("Highland") to Acis

Capital Management, L.P. and Acis Capital Management GP, LLC (collectively the "Debtors"),

files this objection (the "Objection") to the *Supplemental Application Regarding the Scope of*

*Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee* [Docket No. 669] (the

"Supplemental Application").  In support of the Objection, Highland states as follows:

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION**
**REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE**
**CHAPTER 11 TRUSTEE – Page 1**

**Appellee Appx. 01372**
**APPX. 00239**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1380
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1494 of 1828 PageID 10987
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1379 of 1803 PageID 12125
Case 18-30264-sgj11 Doc 968-55 Filed 11/05/18 Entered 11/12/05/18 Page 359 of 16 Page 2 of 15

## BACKGROUND

**A.     The Bankruptcy Case and the Winstead Application**

1.     On May 30, 2018, after weeks of protesting Winstead's purported representation of the Chapter 11 Trustee in light of Winstead's ongoing representation of Josh Terry – the sole involuntary petitioning creditor who forced the Debtors into bankruptcy – Highland filed the *Motion to Disqualify Winstead PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* (the "Motion to Disqualify") [Doc. No. 244].

2.     After the Motion to Disqualify was filed to compel the conflict issues to be brought before the Court, later that evening on May 30, 2018, the Chapter 11 Trustee filed the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Doc. No. 246] (the "Winstead Application"). The Chapter 11 Trustee had already sought the employment of Forshey & Prostok, LLC ("Forshey & Prostok") to serve as counsel to the estates pursuant to 11 U.S.C. § 327(a), via the *Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Doc. No. 222] (the "Forshey & Prostok Application"). The Forshey & Prostok Application was later approved on June 18, 2018 without contest. *See Order Granting Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Doc No. 296] (the "Forshey & Prostock Retention Order"). Notably, the Forshey & Prostok Application sought the firm's representation for, among other things, "[p]reparing on behalf of the Trustee all necessary and appropriate motions, pleadings, proposed orders, and other documents that are necessary in connection with these chapter 11 cases, including in connection with any adversary proceedings or appeals associated therewith," and "[i]nvestigating and prosecuting chapter 5 causes of action and other potential litigation that may be brought by the Trustee." *See* Forshey & Prostock

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1381
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1495 of 1828   PageID 10988
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1380 of 1803   PageID 12126
Case 18-30264-sgj11 Doc 1208-8 Filed 12/05/18   Entered 11/12/05/18 Page 3 of 16   Page 3 of 15

Application at ¶¶ 9(b), (c) (emphasis added).  The Forshey & Prostock Retention Order so provided.  *See* Forshey & Prostok Retention Order at ¶ 2 (granting the Forshey & Prostok Application "on the terms and conditions, set forth in the Application.").

3.    By the Winstead Application, the Chapter 11 Trustee sought to distinguish his retention of Winstead from that of Forshey & Prostok by presenting them as special counsel under 11 U.S.C. § 327(a) and (c)[1] to provide legal services for the following "limited" purposes:

    a.    Management, liquidation, disposition, and monetization of the CLO assets;

    b.    Investment Advisors Act;

    c.    Operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

    d.    <u>Certain other litigation matters related to or arising in these Chapter 11 cases, as requested by the Chapter 11 Trustee</u> (emphasis added).

*See* Winstead Application at ¶ 25(d).   The Winstead Application was supported by the *Declaration of Rakhee Patel in Support of Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "<u>Patel Declaration</u>").

4.    Notably, the Patel Declaration stated:

Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

With respect to these specified purposes, Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same.  Accordingly, except to the extent necessary to effectuate the specific services outlined above,

---

[1] The Winstead Application also provided that the Trustee "reserves its rights to seek approval for such retention under Section 327(e)."  Winstead Application at fn. 2.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 3**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1382
Case 3:23-cv-00726-S Document 8-22 Filed 01/24/23 Page 1496 of 1828 PageID 10989
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1381 of 1803 PageID 12127
Case 18-30264-sgj11 Doc 968-5 Filed 11/05/18 Entered 11/05/18 Page 4 of 15

> Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code. With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

5.      On June 9, 2018, the Trustee filed the *Supplement to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Doc. No. 266] (the "Supplement"). The Supplement acknowledged that Winstead would continue to represent Josh Terry, but asserted that the representation did not conflict with Winstead's representation of the Trustee. The Supplement was supported by the *Supplemental Declaration of Rakhee Patel in Support of the Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Supplemental Patel Declaration"). Again, the Supplement and the Supplemental Patel Declaration reiterated that "Winstead will not represent the estate with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters purely under the Bankruptcy Code." *See* Supplement at ¶ 6; Supplemental Patel Declaration at ¶ 14.

6.      In addition to its pending Motion to Disqualify, on June 11, 2018, Highland filed its objection to the Winstead Application [Doc. No. 267] (the "Highland Objection"). By the Highland Objection, Highland asserted that retention of Winstead as special counsel was impermissible and inappropriate because: (1) the delineated services proposed to encompass the scope of services operated as Winstead's *de facto* general representation of the Trustee; (2) retention under Bankruptcy Code section 327(a) was improper because Winstead was not disinterested; and (3) Winstead had an actual conflict of interest relating to certain state court litigation with Highland (the "Winstead Litigation").

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1383
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1497 of 1828 PageID 10990
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1382 of 1803 PageID 12128
Case 18-30265-sgj11 Doc 586-8 Filed 11/05/18 Entered 11/05/18 Page 355 of 16 Page 5 of 15

7.      Likewise, on June 11, 2018, the Office of the United States Trustee filed its objection to the Winstead Application [Doc. No. 279] (the "U.S. Trustee Objection").  By the U.S. Trustee Objection, the U.S. Trustee asserted substantively similar objections as in the Highland Objection, including that the relief sought in ¶ 12(d) of the Winstead Application was "too broad a delegation of the Court's retention authority" and that "given Winstead's prior retention of Terry, any employment should be cabined and specifically defined, with any necessary supplemental disclosures."  U.S. Trustee Objection at ¶ 23.

8.      The Court held a hearing on the Winstead Application on June 14, 2018.  The following representations were made by the Trustee:

> Winstead is going to do a lot of the CLO stuff.  But Forshey & Prostok, he's doing the real bankruptcy stuff.  For example, they're drafting the plan.  They're doing the turnover stuff.  They will do the claim objections. . . . They're doing the bankruptcy stuff in this Chapter 11 case, but they aren't CLO experts, they'll readily admit that.[2]

9.      After considering the arguments of counsel for Highland and the U.S. Trustee, the Court approved the Winstead Application, in part, but not without materially paring back the scope.  Specifically, the Court did not authorize part (d) of the proposed scope of services, thus rejecting Winstead's employment by the Trustee as to "[c]ertain other litigation matters related to or arising in these Chapter 11 cases, as requested by the Chapter 11 Trustee."  The Court stated:

> We're going to scratch D, Certain Other Litigation Matters.  Anything beyond those three tasks [A, B, and C], Mr. Phelan, you'll have to file another application on notice to creditors and parties in interest, and we'll have a hearing deciding whether an expanded scope is appropriate or not.[3]

---

[2] June 14, 2018 Hr'g Tr. at 63:11-19 (testimony of Trustee, emphasis added).  Excerpts of the hearing transcript are attached hereto as **Exhibit A**.
[3] *Id.* at 68:16-21.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 5**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1384
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1498 of 1828   PageID 10991
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1383 of 1803   PageID 12129
Case 18-30264-sgj11 Doc 363 Filed 11/05/18   Entered 11/05/18 Page 6 of 15

10.     On June 21, 2018, the Court entered its order consistent with its ruling [Doc. No.

313] (the "Winstead Employment Order").[4]

## B.     The Court's Limitations Have Been Ignored

11.     From the inception of these bankruptcy cases and despite the Court's limitations

on the scope of Winstead's employment (and Winstead's own representations in the Winstead

Application and the Supplement), Winstead has appeared on every pleading filed by the Trustee,

appeared at every hearing in this case, and has *de facto* served as lead counsel to the Trustee.

The Court need only review the record in this case as evidence that Winstead has ignored the

limits of the Court's ruling.  In short, it has proceeded in these cases unrestrained.

12.     As an example, representation of the Trustee during the prior failed Plan process

was dominated by Winstead.[5]  In addition, Winstead has taken the lead role in the Adversary

Proceedings and in every one of the Appeals, each as defined and described below.

13.     As the Court is aware, the Trustee is currently in the process of seeking

confirmation of "Plan D."  Once again, any reasonable review of Winstead's role in the plan

process to-date demonstrates that neither Winstead nor the Trustee are taking seriously their

responsibility to adhere to the Court's limits on Winstead's role.

## C.     The Adversary Proceedings

14.     There are currently two adversary proceedings pending in this case that involve

Highland and Highland related entities: Adversary Case No. 18-03078, and Adversary Case No.

---

[4] Highland sought leave to appeal this interlocutory order to the District Court, but was denied leave to appeal. Highland reserves the rights to appeal and, at this time, intends to pursue the appeal of the Trustee's retention of Winstead when the matter is otherwise deemed final and appealable.

[5] Winstead attorney Rakhee Patel examined Trustee witness Zach Alpern and cross examined witnesses Daniel Castro, Hunter Covitz and Isaac Leventon.  Winstead attorney Joseph Wielebinski examined Trustee witness Richard Klein.  Winstead attorney Rakhee Patel was the only Trustee attorney to make closing arguments.  Notably, no fee applications reflecting time expended in the failed Plan endeavor have been filed.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 6**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1385
Case 3:23-cv-00726-S  Document 8-22  Filed 02/29/23  Page 1499 of 1828  PageID 10992
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1384 of 1803  PageID 12130
Case 18-30264-sgj11 Doc 1208 CASE Doc 10-58   Filed 11/12/05/18 Page 13 of 16 Page 7 of 15

18-03212 (collectively referred to herein as the "Adversary Proceedings").  Adversary Case No.
18-03078 was originally filed by Highland and HCLOF against the Trustee, seeking an
injunction related to a June 14, 2018 optional redemption.  The Trustee thereafter filed
counterclaims and third party claims against Highland and HCLOF, including a fraudulent
transfer claim that the Trustee has alleged is fundamental to this bankruptcy case.

15.    Given the passage of time and circumstances that mooted the original relief
sought by Highland and HCLOF, the parties in case no. 18-03078 agreed to the form of agreed
order dismissing Highland and HCLOF's claims without prejudice and allowing the Trustee to
amend his answer.  The order was entered on November 1, 2018.

16.    Adversary Case No. 18-03212 was brought by the Trustee against Highland,
HCLOF, Neutra, Ltd. and the CLOs seeking a temporary restraining order and preliminary
injunction preventing optional redemptions and also seeking related declaratory judgments.

17.    In both Adversary Proceedings, Winstead has taken a lead role, despite the limits
of the Court's Order.[6]

18.    Discovery in the Adversary Proceedings and in the bankruptcy case is governed
by an *Agreed Protective Order* entered by this Court on August 21, 2018 [Doc. No. 535] (the
"Protective Order").

**D.    The Appeals**

19.    There are a number of appeals to the District Court currently pending in relation
to this bankruptcy case and the Adversary Proceedings (the "Appeals").  Once again, despite the

---

[6] The Court need only consider one of the most recent hearings on the adversaries held October 9, 2018, where
Winstead attorney Phil Lamberson presented all of the arguments on behalf of the Trustee.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 7**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1386
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1500 of 1828 PageID 10993
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1385 of 1803 PageID 12131
Case 18-30264-sgj11 Doc 968 Filed 11/05/18 Entered 11/05/18 Page 8 of 15

limits of this Court's Order, Winstead has consistently taken the lead in such "other litigation matters related to or arising in these Chapter 11 cases."[7]

## E.    The Supplemental Application

20.    After almost 4½ months of ignoring the limitations prescribed by the Court's ruling (and contradicting prior representations to the Court), on October 28, 2018, the Trustee filed the Supplemental Application.  The basis provided for expanding the scope of Winstead's retention includes:

> a.    The need of Winstead to "reference . . . and [have] a comprehensive understanding of <u>all agreements and documents underlying Acis's business</u> . . . ."  Application at ¶ 2 and ¶ 11 (emphasis added).

> b.    The need for Winstead to continue "evaluating the estates' numerous claims, counterclaims, third-party claims and defenses . . . ."  Application at ¶ 9.

21.    The Trustee is seeking to employ Winstead in relation to "[a]ny litigation against Highland Capital and/or any of its affiliates, including Highland CLO Funding, Ltd., Highland CLO Management, Ltd. and Highland CLO Holdings, Ltd."  Application at ¶ 13(a).  The Supplemental Application also identifies the pending Adversary Proceedings and appeals involving Highland and Highland-related entities.  Application at ¶ 13(b) and (c).  But, practically speaking, the all-inclusive scope of "any litigation" in Application paragraph 13(a) would make paragraphs 13(b) and (c) superfluous.

---

[7] *See, e.g., Robin Phelan, Chapter 11 Trustee's Response to Emergency Motion of Appellants Highland and HCLOF to Consolidated Appeals and Expedited Briefing and Brief in Support, filed by Winstead* (signed by Rahkee Patel) on behalf of the Trustee on July 30, 2018 in District Court Case No. 3:18-cv-01822 (Highland CLO Funding Ltd. v. Robin Phelan, Chapter 11 Trustee, et al.); *see also Notice of Appearance and Designation of <u>Lead Counsel</u>* (emphasis added, each signed by Rahkee Patel) in Case Nos. 3:18-cv-01822-B, 3:18-cv-01810-S, and 3:18-cv-01817-G.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 8**

22.    On October 29, 2018, the Trustee filed a motion seeking to expedite the hearing

on the Supplemental Application [Doc. No. 672] (the "Motion to Expedite").  The Trustee stated

in the Motion to Expedite that the hearing on the Application will be "merely a rehashing of the

hearing on the [original] Application."  Motion to Expedite at ¶ 4.  Whether or not that is the

case, it would be for good reason, since the Trustee and Winstead have demonstrably ignored the

Court's Order.

## OBJECTION

**A.    The Circumstance of the Case Clearly Demonstrate that Winstead Has a Conflict of Interest**

23.    As noted above, Highland's appeal of the Order was dismissed by the District

Court as interlocutory.  As such, there is nothing preventing the Court at this point from

reconsidering issues that were previously asserted by the parties in this matter.  Both Highland

and the U.S. Trustee asserted that Bankruptcy Code section 327(c) prohibited Winstead's

retention because it has an actual conflict of interest related to the Winstead Litigation and

related to Winstead's on-going representation of Terry.  As to the Winstead Litigation, the Court

ordered Winstead to erect an ethical wall.[8]

24.    The issue of Winstead's representation of Terry, however, remains and constitutes

an unwaivable, actual conflict of interest.  At the June 14, 2018 hearing on the Application, both

Highland and the U.S. Trustee expressed concerns to the Court of various ways Winstead's

concurrent representation was problematic.  Subsequent events have proven the point.  The lead

law firm in the Adversary Proceedings (Winstead) currently represents Highland's principal

adversary (Terry).  The parties are currently engaged in discovery related to the Adversary

---

[8] June 14, 2018 Hr'g Tr. at 71:19-25.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 9**

Proceedings and Highland has designated certain of the documents "Confidential," and a much smaller portion of the documents "Attorneys Eyes Only," as is permitted under the Protective Order.  Notably, the Trustee has directed Winstead to handle the recent discovery, including documents currently in the process of being produced by Highland to Winstead.  One of Highland's principal concerns is that sensitive documents or information dealing with Highland's business operations will fall into the hands of Terry, who is a current adversary <u>and a potential future competitor.</u>[9]  It simply has to be the case that some of the attorneys at Winstead who are reviewing the produced documents will be the very same attorneys advising Terry in the related appeals.  What if certain Confidential Information reviewed by Winstead has nothing to do with maximizing value for the estate, but would be helpful for Terry to compete against Highland and/or to advance his appeal?  As it stands, Winstead will be under Court order not to discuss or otherwise reveal that information.  Winstead attorneys are in the impossible positon of parsing every piece of information to determine whether it falls under the Trustee's duty to maximize value, as opposed to merely being useful information for an adversary and competitor of Highland.  Furthermore, Winstead attorneys must keep track of exactly where they obtained every piece of information they discuss with their client Terry when prosecuting his appeal.  For that reason alone, it is not possible for Winstead to simultaneously maintain confidences for both the Trustee and Terry.  In addition, Winstead's duty of loyalty is being violated because Winstead is in the position of affirmatively protecting Confidential Information available to one client (the Trustee) against the other client (Terry).

---

[9] The prior Plans attempted, and the current Plan D is attempting again, to put into place a mechanism where Terry will be a direct competitor of Highland.  Terry thus is not motivated simply to recover on his claim.  Terry has a non-creditor interest that is furthered by learning as much non-public information about Highland's recent actions and investment activities as possible.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 10**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1389
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1503 of 1828 PageID 10996
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1388 of 1803 PageID 12134
Case 18-30299-sgj11 Doc 568-8 Filed 11/12/18 Entered 11/12/18 Page 11 of 15

25.     This is untenable situation and there is no good reason to permit it.  As previously stated in this matter by the U.S. Trustee, these circumstances directly challenge Winstead's ethical duty of loyalty and duty to maintain confidences.  *See* U.S. Trustee Objection at ¶ 15 (citing *In re American Airlines*, 972 F.2d 605, 618 (5th Cir. 1992) and *Humble Place Joint Venture v. Fory (In re Fory)*, 936 F.2d 814, 819 (5th Cir. 1991)).   Winstead is conflicted and Bankruptcy Code section 327(c) prohibits its retention in this case.

## B.     Winstead Cannot Maintain the Façade: It Has Represented, and is Seeking to Represent, the Chapter 11 Trustee Without Any Meaningful Limitation

26.     This Court chose to limit the scope of Winstead's retention to exclude the broadly-worded "certain other litigation matters."  The Court did that to put into place "prophylactic measures" to ensure that the Trustee's goal of maximizing value lines up with Terry's goal of recovering as a creditor in the case.[10]  The Court recognized that the Application, as originally requested, was not tied in any way to Winstead's alleged CLO expertise and giving Winstead free reign to litigate such matters could create problems relating to changing "bedfellows" and "crossway" motivations.[11]

27.     Since the entry of the Order, a critical point seems to have gotten lost in the various litigation fronts among the parties: Winstead was retained as special counsel based on the Trustee's assertion that Winstead had unique expertise related to CLOs.  The hearing on the Supplemental Application provides the Court with an opportunity to address whether Winstead and the Trustee actually complied with the limitation imposed by the Court.  To that end, at hearing on this matter, the Court should: (1) review the evidence related to the scope of Winstead's representation since being retained, and (2) consider whether the role Winstead

---

[10] June 14, 2018 Hr'g Tr. at 68:4-6.
[11] *Id.*

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 11**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1390
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1504 of 1828 PageID 10997
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1389 of 1803 PageID 12135
Case 18-30264-sgj11 Doc 968-8 Filed 11/12/18 Entered 11/12/18 11:35:59 Page 12 of 15

proposes going forward has any realistic tie to the concept of "special counsel." To the first point, as noted above, Winstead clearly did not limit its role to CLO related matters following its retention. There was absolutely no meaningful distinction between Winstead and Forshey & Prostok during the failed contested Plan process. Moreover, any assertion by Winstead that it worked to limit duplication of effort with Forshey & Prostok is not relevant to the scope of employment point before the Court. *See In re Polaroid Corp.*, 424 B.R. 446, 452 (Bankr. D. Minn. 2010) (holding that special counsel should not provide general advice to a debtor); *see also In re Abrass*, 250 B.R. 432, 455 (Bankr. M.D. Fla. 2000); *In re Running Horse, L.L.C.*, 371 B.R. 446, 452 (Bankr. E.D. Cal. 2007). Special counsel requires retention based on specialized knowledge and, naturally, the firm should limit itself to matters involving such knowledge. Winstead's demonstrated track record fails that test. This is especially problematic given that every representation by the Trustee and Winstead to this Court was that Winstead would be taking on such a limited role.

28. On the second point, after months of violating the Court's Order requiring limitations on its representation, Winstead has now explicitly dispensed with any pretense of special counsel and is requesting to be involved in any litigation involving Highland and to allow Winstead to review and provide analysis on any agreement and document of the Debtors. Any pretext that Winstead is in this case because of its CLO expertise has been cast aside.

29. The Trustee has also chosen to challenge Highland's motivations related to this Objection. Specifically, the Trustee suggests improper motive in the Supplemental Application by stating that Highland and HCLOF opposed the original Application because they were "highly motivated to attempt to hamstring and otherwise limit the Trustee's ability to litigate effectively with them." Supplemental Application at ¶ 6. This is simply inaccurate. Highland is

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 12**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1391
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1505 of 1828   PageID 10998
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1390 of 1803   PageID 12136
Case 18-30264-sgj11 Doc 3845-8 Filed 11/05/18   Entered 11/05/18 13:39 of 18 Page 13 of 15

one of the largest creditors in this case and it has valid concerns that enforcing no meaningful

limits on purported special counsel is an impermissible use of estate funds.  The Trustee and

Winstead have ignored the limitations put into place by this Court.  The Court should refuse to

grant the Supplemental Application.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 13**

**WHEREFORE**, Highland respectfully requests that the Court deny the relief sought in the Supplemental Application and provide such other and further relief that this Court deems just and proper.

Dated:  November 5, 2018                    Respectfully submitted,

                                            */s/ Jason B. Binford*
                                            Holland N. O'Neil (TX 14864700)
                                            Jason B. Binford (TX 24045499)
                                            Shiva D. Beck (TX 24086882)
                                            Melina N. Bales (TX 24106851)
                                            **FOLEY GARDERE**
                                            **FOLEY & LARDNER LLP**
                                            2021 McKinney Avenue, Ste. 1600
                                            Dallas, Texas  75201
                                            Telephone:  (214) 999.3000
                                            Facsimile:  (214) 999.4667
                                            honeil@foley.com
                                            jbinford@foley.com
                                            sbeck@foley.com
                                            mbales@foley.com

                                            and

                                            Michael K. Hurst (TX 10316310)
                                            Ben A. Barnes (TX 24092085)
                                            **LYNN PINKER COX & HURST, LLP**
                                            2100 Ross Avenue, Ste. 2700
                                            Dallas, Texas 75201
                                            Telephone: (214) 981.3800
                                            Facsimile: (214) 981.3839
                                            mhurst@lynnllp.com
                                            bbarnes@lynnllp.com

                                            **COUNSEL FOR HIGHLAND CAPITAL**
                                            **MANAGEMENT, L.P.**

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION**
**REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE**
**CHAPTER 11 TRUSTEE – Page 14**

**Appellee Appx. 01385**
**APPx. 01252**

## CERTIFICATE OF SERVICE

This is to certify that on November 5, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Jason B. Binford*
Jason B. Binford

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 15**

Appellee Appx. 01386

APPX. 10943

**Exhibit I**

Foley Notice of Appearance for Highland CLO Funding, Ltd.,
CLO Holdco, Ltd. and Neutra, Ltd.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1395
Case 3:23-cv-00726-S Document 8-22 Filed 04/24/23 Page 1509 of 1828 PageID 11002
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1394 of 1803 PageID 12140
Case 18-30264-sgj11 Doc 138-3 Filed 04/18/18 Entered 04/18/18 Page 1 of 3

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

**COUNSEL FOR HIGHLAND CLO FUNDING,**
**LTD., CLO HOLDCO, LTD. AND NEUTRA, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 18-30264-SGJ7** |
| | § | |
| **Alleged Debtor.** | § | |

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, GP,** | § | **Case No. 18-30265-SGJ7** |
| **L.L.C.,** | § | |
| | § | |
| **Alleged Debtor.** | § | |

### NOTICE OF APPEARANCE AND
### REQUEST FOR SERVICE OF PAPERS

PLEASE TAKE NOTICE that Holland N. O'Neil, Jason B. Binford, Shiva D. Beck, Melina N. Bales and the law firm of Foley Gardere, Foley & Lardner LLP, attorneys for Highland CLO Funding, Ltd., CLO Holdco, Ltd. and Neutra, Ltd. (collectively, the "**Equity Holders**"), parties-in-interest in the above-referenced matter, and pursuant to Rules 2002, 3017, and 9010 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 1109(b), request that all notices given or required to be given in this case and all papers served or required to be served in this case be given to and served upon them at the following address:

NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS          Page 1
4840-5970-3906.1

**Appellee Appx. 01388**
**APPX. 10943**

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

Please take further notice that the foregoing request includes notices and papers referred to in the Federal Rules of Bankruptcy Procedure and includes, without limitation, any plans of reorganization, objections, notices of hearings, orders, pleadings, motions, applications, complaints, demands, requests, petitions, disclosure statements, memoranda, briefs and any other documents brought before this Court with respect to these proceedings, whether formal or informal, whether written or oral, whether transmitted or conveyed by mail, hand delivery, telephone, telecopier, telegraph, or telex.

This Notice of Appearance and Request for Notices shall not be deemed or construed to be a waiver of the rights of the Equity Holders (i) to have final orders in non-core matters entered only after de novo review by a District Judge, (ii) to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to this case, (iii) to have a District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (iv) respecting in personam jurisdiction, or (v) any other rights, claims, actions, setoffs, or recoupments to which the Equity Holders are or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

**NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS**   **Page 2**
4840-5970-3906.1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1397
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1511 of 1828 PageID 11004
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1396 of 1803 PageID 12142
Case 18-3025-cgj11 Doc 891-35 Filed 04/18/18 Entered 04/18/18 Page 29 of 4 Page 3 of 3

Dated: April 18, 2018

Respectfully submitted,

*/s/ Holland N. O'Neil*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

**COUNSEL FOR HIGHLAND CLO FUNDING, LTD., CLO HOLDCO, LTD. AND NEUTRA, LTD.**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing Notice of Appearance and Request for Service of Papers was served electronically by the Court's PACER system on April 18, 2018.

*/s/Melina N. Bales*
Melina N. Bales

**Appellee Appx. 01390**
**Appx. 10255**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1398
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1512 of 1828 PageID 11005
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1397 of 1803 PageID 12143
Case 19-12239-CSS Doc 116-10 Filed 11/12/19 Page 1 of 1

## CERTIFICATE OF SERVICE

I, Josef W. Mintz, hereby certify that on November 12, 2019, I served or caused to be served the *Limited Objection to Debtor's: (I) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel,* Nunc Pro Tunc *to the Petition Date; and (II) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel,* Nunc Pro Tunc *to the Petition Date* upon the following persons listed in the manner indicated and upon all subscribed parties via CM/ECF.

Via Email and Hand Delivery:

>Pachulski Stang Ziehl &Jones LLP
>919 N. Market Street, 17th Floor
>Wilmington, DE 19801
>Attn: James E. O'Neill, Esq.
>joneill@pszjlaw.com

>Office of the United States Trustee
>844 King Street, Suite 2207, Lockbox 35
>Wilmington, DE 19801
>Attn: Jane M. Leamy, Esq.
>jane.m.leamy@usdoj.gov

Via Email and First Class Mail:

>Pachulski Stang Ziehl &Jones LLP
>10100 Santa Monica Blvd., 13th Floor
>Los Angeles, CA 90067
>Attn: Jeffrey N. Pomerantz, Esq.
>jpomerantz@pszjlaw.com

*/s/Josef W. Mintz*
Josef W. Mintz (DE No. 5644)

10

# APPENDIX 16

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1400
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1514 of 1828   PageID 11007
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1399 of 1803   PageID 12145
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 1 of 6

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) | **Hearing Date: Nov. 19, 2019, at 12:00 p.m. (ET)** |
|  | ) | **Obj. Deadline: Nov. 12, 2019, at 4:00 p.m. (ET)** |
|  | ) |  |
|  | ) | **Docket Ref. Nos. 69 & 70** |

## LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AND LYNN PINKER COX & HURST AS SPECIAL TEXAS COUNSEL AND SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

The official committee of unsecured creditors (the "Committee") of Highland Capital Management, L.P. (the "Debtor" or "Highland"), hereby submits this limited objection (this "Limited Objection") to the Debtors' applications, pursuant to Sections 327(e), 328(a), and 330 of the Bankruptcy Code, for entry of orders authorizing the retention and employment of Foley Gardere, Foley & Lardner LLP ("Foley") and Lynn Pinker Cox & Hurst LLP ("Lynn Pinker," and together with Foley, the "Proposed Special Counsel") as Special Texas Litigation Counsel and Special Texas Litigation Counsel, respectively, *nunc pro tunc* to the Petition Date (collectively, the "Applications") [Docket Nos. 69 & 70].[2]  In support of this Objection, the Committee respectfully states as follows:

---

[1]   The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]   Citations to "Foley Application" are to Docket No. 69 and citations to "Lynn Pinker Application" are to Docket No. 70.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Applications.

25579780.1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1401
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1515 of 1828   PageID 11008
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1400 of 1803   PageID 12146
Case 19-12239-CSS    Doc 120    Filed 11/12/19    Page 2 of 6

## INTRODUCTION

1.       Proposed Special Counsel have represented the both the Debtor and non-debtor defendants – including Mr. James Dondero, the founder of the Debtor – in various matters since 2016.[3]  The Committee was formed two weeks ago, on October 29, 2019,[4] and is in the process of gathering information and familiarizing itself with the Debtor's opaque and complex organizational structure, business operations, and assets under management.  Importantly, the Committee has requested relevant information, but as of yet has not been able to fully familiarize itself with the Debtor's web of contractual relationships and transaction histories with its many non-debtor affiliates.[5]  Without the benefit of a full understanding of the Debtor's relationships and prepetition transactions with its affiliates, the Committee is unable to determine the appropriateness of Proposed Special Counsel representing both the Debtor and non-debtors in matters going forward, and whether it is appropriate for the costs of such non-debtor representation, especially in matters wholly unrelated to the Debtor, to be borne by the Debtor.[6]

2.       The Committee recognizes that Proposed Special Counsel have developed knowledge and expertise from their pre-petition representation of the Debtor.  The Committee

---

[3]     See Lynn Pinker Application Ex. A ¶ 3.

[4]      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief commencing this chapter 11 case, and the United States Trustee appointed the Committee nearly two weeks later on October 29, 2019 [Docket No. 65].  The Committee moved quickly following its appointment to bring in Sidley Austin LLP ("Sidley") as its proposed counsel on October 30, 2019 and FTI Consulting Inc. ("FTI") as its proposed financial advisor on November 6, 2019.  Sidley and FTI quickly engaged the Debtor's advisors to get up to speed on this chapter 11 case, but there has not yet been sufficient time for the Committee to even familiarize itself with the Debtor's prepetition transactions.

[5]     The Committee and its advisors intend to closely scrutinize all prepetition transactions involving the Debtor to determine whether any are avoidable and/or give rise to claims against affiliated entities.

[6]     Relatedly, both the Foley Application and the Lynn Pinker Applications disclose large sums of unpaid fees and expenses that have been billed to the Debtor but remain unpaid as of the Petition Date.  See Foley Application ¶ 16; Lynn Pinker Application ¶ 19.  The Committee is uncertain whether such amounts should be borne by the Debtor and reserves the right to challenge such unsecured claims at the appropriate time.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1402
Case 3:23-cv-00726-S Document 8-22 Filed 02/14/23 Page 1516 of 1828 PageID 11009
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1401 of 1803 PageID 12147
Case 19-12239-CSS Doc 120 Filed 11/12/19 Page 3 of 6

therefore has no objection to the Proposed Special Counsel continuing to represent the Debtor in matters which provide a benefit to the Debtor's estate. The Committee does object, however, to any continuation of Proposed Special Counsels' joint representation of Debtor and non-debtor defendants without certainty of reimbursement for such fees and costs and with no justifying benefit to the Debtor's estate.

## **OBJECTION**

3.    The principal concern the Committee has with respect to the Applications is the lack of clear delineation of the Proposed Special Counsel's proposed engagements and representation, and the Debtor's obligation to pay for the same. For example, the Hurst Declaration discloses Lynn Pinker's representation of Mr. Dondero in the Texas Lawsuit,[7] and within the application itself describes the services to be provided by Lynn Pinker as "Subject to approval by the Bankruptcy Court, the services that the Debtor proposes that the Firm render, and the Firm has agreed to provide, include advising the Debtor in connection with all aspects of the Pending Acis Proceedings and the Texas Lawsuit, and performing the range of services normally associated with matters such as this as the Debtor's Special Texas Litigation Counsel, which the Firm is in a position to provide in connection with the matter referred to above."[8] It is unclear whether Lynn Pinker's proposed retention is limited to representing the Debtor, or includes representation of non-debtors, including Mr. Dondero. It is also unclear if Lynn Pinker will be limited to representing the Debtor (and others) in connection with the Acis Proceedings and the Texas Lawsuit, or if these are just two matters which have been mentioned in the Lynn

---

[7] *See* Lynn Pinker Application Ex. A ¶ 3.

[8] *See* Lynn Pinker Application ¶ 17

Pinker Application.[9]   As the proposed order approving the Lynn Pinker Application merely approves the retention of Lynn Parker as Special Texas Litigation Counsel "pursuant to the terms set forth in the Application,"[10]  the Committee is unsure which parties Lynn Pinker proposes to represent, and in what matters, and whether the Debtor has agreed to pay for such representations.

4.      The Committee also notes that the Applications do not provide for an allocation of attorneys' fees and expenses among the Debtor and non-debtor defendants.[11]  The Committee is concerned that the Debtor may be bearing the cost for representations of non-debtors without any justifiable benefit to the Debtor's estate, and without any regard for whether such representations may cause a conflict of interest.  Courts have found that such arrangements where the Debtor pays all fees of non-debtor defendants without explicitly justifying such arrangement in the application are improper under Section 327(e).  *See In re Perez*, 389 B.R. 180, 184 (Bankr. D. Colo. 2008) (denying application pursuant to Section 327(e) where bankruptcy estate alone was to pay attorneys' fees of special counsel representing debtor and non-debtor co-defendants in appeal of a state court judgment; that "arrangement *may* have been benign enough and 'all in the family' before the Debtor's bankruptcy was filed, but once the bankruptcy case was filed, things changed" and "Debtor became a fiduciary and others had a stake") (emphasis in original).

---

[9] The Lynn Pinker Application also mentions representation of non-debtor related entity Charitable Donor Advised Fund, L.P. in an unrelated matter.

[10] *See* Lynn Pinker Application Ex. B ¶ 8.

[11] The absence of such an allocation is alone grounds to deny any fee request submitted by Proposed Special Counsel.  *See In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 234 (Bankr. E.D. Cal. 1988) (finding proposed special counsel under Section 327(e) retained to represent debtors and non-debtors in lawsuit not entitled to recovery of fees because "[t]here [was] no allocation of the bill among the various clients" and "[s]ome services were rendered for the ultimate benefit of persons other than the debtor").  In the event this Court authorizes the retention of Proposed Special Counsel to represent Debtor and non-debtor defendants, the Committee reserves its right to contest fee applications for failure to properly allocate fees and expenses among clients.

25579780.1

4

5.      Without greater clarity into the proposed representations included in the Applications, the Committee must request that the Court reject the Applications to the extent that they seek authorization for the Proposed Special Counsel to represent both the Debtor and non-debtor parties and, to the extent the Court is otherwise inclined to approve the Applications, the Court should require the non-debtor entities to deposit on a monthly basis the highest amount incurred in a single month in the prior 12 months to ensure the Debtor's estate will be reimbursed for the fees and costs incurred in connection with the representation of the non-debtor entities.

<div align="center">

\*      \*      \*      \*      \*

</div>

<div align="center">

*[Remainder of Page Intentionally Left Blank]*

</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1405
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1519 of 1828 PageID 11012
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1404 of 1803 PageID 12150
Case 19-12239-CSS Doc 120 Filed 11/12/19 Page 6 of 6

WHEREFORE, the Committee respectfully requests that the Court deny the relief requested in

the Applications to the extent they seek authorization for the Proposed Special Counsel to

represent both the Debtor and non-debtor parties and provide such other and any further relief as

the Court may deem just and proper.

Date: November 12, 2019   YOUNG CONAWAY STARGATT & TAYLOR, LLP
Wilmington, Delaware

           */s/ Jaclyn C. Weissgerber*
           Michael R. Nestor (No. 3526)
           Edmon L. Morton (No. 3856)
           Sean M. Beach, Esq. (No. 4070)
           Jaclyn C. Weissgerber, Esq. (No. 6477)
           Rodney Square
           1000 North King Street
           Wilmington, DE 19801
           Telephone: (302) 571-6600

           -and-

           SIDLEY AUSTIN LLP

           Bojan Guzina, Esq. (*admitted pro hac vice*)
           Matthew Clemente, Esq. (*admitted pro hac vice*)
           Alyssa Russell, Esq. (*admitted pro hac vice*)
           One South Dearborn Street
           Chicago, IL 60603
           Telephone: (312) 853-7000

           - and –

           Jessica Boelter, Esq.
           787 Seventh Avenue
           New York, NY 10019
           Telephone: (212) 839-5300

           - and –

           Penny P. Reid, Esq. (*admitted pro hac vice*)
           Paige Holden Montgomery, Esq. (*admitted pro hac vice*)
           2021 McKinney Avenue, Suite 2000
           Dallas, TX 74201
           Telephone: (214) 981-3300

           *Proposed Counsel for the Official Committee of Unsecured*
           *Creditors*

25579780.1

# APPENDIX 17

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1407
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1521 of 1828 PageID 11014
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1406 of 1803 PageID 12152
Case 19-34054-sgj11 Doc 2590 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 1 of 2

Docket #2590 Date Filed: 07/20/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

## DECLARATION OF JOHN A. MORRIS IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019 AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:43685.1 36027/002



1934054210720000000000003

Appellee Appx. 01400

APPX. 10257

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1408
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1522 of 1828   PageID 11015
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1407 of 1803   PageID 12153
Case 19-34054-sgj11 Doc 2590 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 2 of 2

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1       I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP (the "Firm"), counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith* (the "Motion").   Unless stated otherwise, this Declaration is based on my personal knowledge and review of the documents listed below.

2       Attached as **Exhibit 1** is a true and correct copy of that certain Settlement Agreement dated as of July 16, 2021 (the "Settlement Agreement"), by and among the Parties (as that term is defined in the Settlement Agreement).

Dated: July 20, 2021.

                                        */s/ John A. Morris*
                                        John A. Morris

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 1 of 20

# **EXHIBIT 1**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1410
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1524 of 1828 PageID 11017
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1409 of 1803 PageID 12155
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 2 of 20

## SETTLEMENT AGREEMENT

This settlement agreement (the "Agreement") by and between Highland Capital Management, L.P., as debtor-in-possession (the "Debtor"), on the one hand, and Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA" and together with HCMFA, the "Advisors"), Highland Income Fund ("HIF"), NexPoint Strategic Opportunities Fund ("NSOF"), and NexPoint Capital, Inc. ("NCI" and together with HIF and NSOF, the "Funds," and together with the Advisors, the "Defendants," and the Defendants and the Debtor, together the "Parties"), on the other hand.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is managing and operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtor's chapter 11 case is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, the Debtor manages certain collateralized loan obligations ("CLOs") pursuant to the terms of certain portfolio management and servicing agreements (collectively, the "CLO Management Agreements");[1]

WHEREAS, on January 6, 2021, the Debtor commenced an adversary proceeding (the

---

[1] The CLOs managed by the Debtor include ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., and Valhalla CLO, Ltd.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1411
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1525 of 1828 PageID 11018
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1410 of 1803 PageID 12156
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 3 of 20

"Adversary Proceeding") against Defendants by filing its complaint (the "Complaint") [Docket No. 1][2] (the "Complaint");

WHEREAS, on January 8, 2021, the Court issued its *Order Regarding Adversary Proceedings Trial Setting and Alternative Scheduling Order* [Docket No. 12] (the "Alternative Scheduling Order");

WHEREAS, on January 13, 2021, the Court entered that certain *Agreed Order Granting Defendant's Motion for a Temporary Restraining Order Against Certain Entities Owned and/or Controlled by Mr. James Dondero* [Docket No. 20] (the "Consensual TRO");

WHEREAS, on January 24, 2021, the Advisors and Funds moved to dismiss the Complaint [Docket No. 43] (the "Motion to Dismiss");

WHEREAS, on January 26, 2021, the Debtor and CLO Holdco, Ltd. filed that certain *Notice of Settlement* pursuant to which the Debtor and CLO Holdco, Ltd. resolved their disputes and CLO Holdco, Ltd. was dismissed from this Adversary Proceeding [Docket No. 50];

WHEREAS, on January 26, 2021, the Court held an evidentiary hearing on the Debtor's motion for a preliminary injunction (the "Preliminary Injunction Hearing"), and such hearing has been continued;

WHEREAS, on February 10, 2021, the Court entered that certain *Agreed Order Extending Temporary Restraining Order* [Docket No. 64], pursuant to which the Consensual TRO was extended;

WHEREAS, on February 24, 2021, the Court entered that certain *Agreed Order Further Extending Temporary Restraining Order* [Docket No. 76], pursuant to which the Consensual TRO was further extended;

WHEREAS, on March 1, 2021, the Debtor filed its opposition to the Motion to Dismiss

---

[2] Refers to the docket number maintained in the above-captioned Adversary Proceeding.

Appellee Appx. 01404
APPX. 10369

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1412
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1526 of 1828 PageID 11019
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1411 of 1803 PageID 12157
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 4 of 20

and a memorandum of law in support thereof [Docket Nos. 79, 80] (the "Debtor's Opposition");

WHEREAS, on March 17, 2021, the Defendants filed their reply to the Debtor's Opposition [Docket No. 85];

WHEREAS, on April 21, 2021, the Parties entered into that certain *Stipulation Regarding Agreed (I) Scheduling Order and (II) Order Further Extending Temporary Restraining Order* [Docket No. 91] (the "Scheduling Stipulation") pursuant to which, among other things, the Parties agreed to: (a) dispense with the completion of the Preliminary Injunction Hearing and move to the trial on the merits, (b) hold a single trial on all of the Debtor's claims asserted in this Adversary Proceeding, including the claim for a permanent injunction, (c) entered into a schedule set forth therein, and (d) continued the Consensual TRO until the Court enters an order determining the Debtor's claim for permanent injunctive relief against the Defendants;

WHEREAS, on June 29, 2021, the Parties entered into that certain *Stipulation Converting Trial Dates to Status Conference* [Docket No. 101] ("Second Stipulation") which the Court adopted by its *Order Approving Stipulation Converting Trial Dates to Status Conference* {Docket No. 102] on June 30, 2021;

WHEREAS, the Parties have agreed to settle and resolve all claims and disputes that were brought or that could have been brought in the Adversary Proceeding on the terms set forth in the Second Stipulation as memorialized herein:

<div align="center">**AGREEMENT**</div>

**NOW, THEREFORE**, after good faith, arms-length negotiations, in consideration of the foregoing, it is hereby stipulated and agreed that:

1. <u>Restrictions and Limitations on Termination of CLO Management Agreements</u>.

   a. Each of the Funds agrees that no action will be taken to terminate any CLO Management Agreement to which the Debtor is a party or to remove the

<div align="center">3</div>

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1413
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1527 of 1828   PageID 11020
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1412 of 1803   PageID 12158
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 5 of 20

portfolio manager thereunder where termination or removal is permissible on a "no cause" basis[3] for a period of twelve (12) months beginning June 1, 2021 and ending May 31, 2022.

b. Each of the Funds agrees that no action will be taken to terminate any CLO Management Agreement to which the Debtor is a party or to remove the portfolio manager thereunder where termination or removal is only permitted on a "for cause" basis,[4] except that a Fund may seek termination or removal by moving for a determination from the Bankruptcy Court that such claim "for cause" is colorable (which means proving to the Bankruptcy Court by a preponderance of the evidence that it has a good faith basis to assert that "cause" exists for termination or removal) for a period that ends on the later of (i) May 31, 2022 or (ii) a decision by the Fifth Circuit Court of Appeals reversing the confirmation order, confirming of the Debtor's Plan of Reorganization, or otherwise eliminating the Gatekeeper provision from the Plan.

2.    <u>Representations and Warranties</u>.

a. To the best of their knowledge after due inquiry, including inquiring of the Advisors, each of the Funds represents and warrants that (i) their ownership interests in any CLO managed by the Debtor as of December 1, 2020, is as set forth on **<u>Exhibit A</u>** hereto, and none of the Funds owned any other interests in

---

[3] The CLOs in which termination is arguably permissible on a "no cause" basis are Liberty CLO, Ltd., Southfork CLO Ltd., Gleneagles CLO, Ltd., Highland Legacy Limited, Jasper CLO, Ltd., Valhalla CLO, Ltd., and ACIS CLO 2017-7 Ltd.

[4] The CLOs in which termination is arguably only permitted on a "for cause" basis are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Westchester CLO, Ltd., Grayson CLO, Ltd., Stratford CLO Ltd., Greenbriar CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Eastland CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Red River CLO, Ltd., PamCo Cayman Ltd.,

Appellee Appx. 01406
APPX. 10973

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1414
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1528 of 1828   PageID 11021
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1413 of 1803   PageID 12159
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 6 of 20

any CLO managed by the Debtor as of that date, (ii) they have not sold, transferred, participated, or assigned any ownership interest in any CLO managed by the Debtor since December 1, 2020, and (iii) their respective percentage ownership interests in the CLOs managed by the Debtor are as set forth on **Exhibit B** hereto on the date of the execution of this Agreement and none of the Funds own any other interests in any CLO managed by the Debtor on the date of the execution of this Agreement.

b. Each of the Funds represents and agrees that it will not transfer any interest in any CLO identified on Exhibits A and B ("Debtor-Managed CLO" or together, "Debtor Managed CLOs") to any current or former Debtor employee or any entity in which any current or former Debtor employee has any direct or indirect interest whatsoever, including, without limitation, (i) a direct or indirect ownership interest (regardless of whether such interest is passive, provides a control right, or is de minimis), (ii) a board seat or management position (regardless of whether such board seat or management position is at the entity, a direct or indirect parent of the entity, or a beneficial owner of such entity), and (iii) any other interest that confers upon such current or former Debtor employee any right to control or the ability to influence management of such entity (collectively, "Prohibited Transferee"). For the avoidance of doubt, Prohibited Transferee includes the Charitable Donor Advised Fund, L.P. and any of its direct and indirect parents and subsidiaries, including CLO Holdco, Ltd. Notwithstanding the foregoing, each of the Funds may transfer (a "Permitted Transfer") any interest in a Debtor-Managed CLO

5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1415
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1529 of 1828   PageID 11022
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1414 of 1803   PageID 12160
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 7 of 20

where no change in beneficial ownership would result from such transfer (such as a transfer between a Fund and its subsidiary or among a Fund's subsidiaries) or where a transfer occurs between the Funds (such as resulting from a Fund merger, reorganization, or similar transaction, to the extent permitted by applicable law) (the recipient of a Permitted Transfer, a "Permitted Transferee").

Further, and notwithstanding the foregoing, each of the Funds may transfer and shall not be prohibited from transferring any interest in any of the Debtor-Managed CLOs to a Prohibited Transferee if such transfer is necessary for a Fund's compliance with tax or other applicable regulatory needs (any such transfer, a "Subject Transfer").

Notwithstanding anything else contained herein, in the event of a Permitted Transfer or a Subject Transfer, the Fund shall (a) notify the Debtor of such Transfer and the Permitted Transferee or Prohibited Transferee, as applicable, shall agree to be bound by the terms of Paragraph 1 and this Paragraph 2(b) of this Agreement by executing an undertaking in the form set forth on **Exhibit C** to this Agreement (the "Undertaking") and (b) deliver the Undertaking to the Debtor before the Transfer becomes effective.

c. Each of the Advisors represents and warrants that it is (a) controlled by James Dondero, and (b) is a "Related Entity" (as that term is defined in section I.D(ii) of Exhibit D to the *Preliminary Term Sheet* (filed at Docket No. 354-1)) for purposes of paragraph 9 of the January 9, 2020 Order (Docket No. 339).

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1416
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1530 of 1828 PageID 11023
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1415 of 1803 PageID 12161
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 8 of 20

3.     This Agreement shall become binding and effective on the date an order approving this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "9019 Order") is entered by the United States Bankruptcy Court for the Northern District of Texas (the "Agreement Effective Date"), irrespective of whether the 9019 Order is subject to appeal. If no appeal of the 9019 Order is timely filed in accordance with Bankruptcy Rule 8002, then the Parties shall thereafter cooperate to take all steps reasonably necessary to dismiss the Adversary Proceeding with prejudice with all Parties bearing their own costs.

4.     Except for the representations and warranties set forth in Section 2 hereof, which shall bind each of the Parties hereto, this Agreement is without prejudice to the Parties' respective positions in connection with all pending appeals arising out of the Bankruptcy Case and each party hereby reserves any and all rights, positions, arguments, claims and defenses in connection with all such appeals, including without limitation, the Defendants' respective appeals of the Confirmation Order and requests for stay pending appeal of the Confirmation Order.

5.     This Agreement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties relating thereto.

6.     This Agreement may not be modified other than by a signed writing executed by the Parties.

7.     Each person who executes this Agreement represents that he or she is duly authorized to do so on behalf of the respective Party and that each Party has full knowledge and has consented to this Agreement.

8.     To the extent a notice is required or appropriate under this Agreement such

Appellee Appx. 01409
APPX. 10976

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1417
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1531 of 1828 PageID 11024
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1416 of 1803 PageID 12162
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 9 of 20

notice shall be deemed delivered upon the following business day if sent via email as follows:

<u>If to the Debtor:</u> By email to James P. Seery, Jr, the Debtor's Chief Executive officer, at jpseeryjr@gmail.com with a copy to Jeffrey N. Pomerantz via email at Jpomerantz@pszjlaw.com.

<u>If to the Advisor:</u> By email to legalnotices@nexpoint.com with a copy to DC Sauter by email at DSauter@Nexpoint.com and Davor Rukavina by email at drukavina@munsch.com.

<u>If to the Funds:</u> By email to legalnotices@nexpoint.com with a copy to A. Lee Hogewood III via email at lee.hogewood@klgates.com.

9. This Agreement may be executed in counterparts, each of which will be deemed an original but all of which together constitute one and the same instrument, and it constitutes sufficient proof of this Agreement to present any copy, copies, or faxes signed by the Parties to be charged.

10. This Agreement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Texas without regard to its conflicts of law principles, and all claims relating to or arising out of this Agreement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Texas, excluding Texas conflicts of law principles.

11. The Court shall retain exclusive jurisdiction over all disputes arising out of or otherwise concerning the interpretation and enforcement of this Agreement.

[*Remainder of Page Intentionally Blank*]

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

Its: General Partner

By: _____

James P. Seery

**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**
By: Strand Advisors XVI, Inc., its
general partner

By:      _____
Name:   Frank Waterhouse
Title:    Treasurer

**NEXPOINT ADVISORS, L.P.**
By: NexPoint Advisors GP, LLC, its
general partner

By:      _____
Name:    Frank Waterhouse

Title:    Treasurer, Principal
          Accounting Officer &
          Principal Financial Officer

**HIGHLAND INCOME FUND**

By: _____
    Name: Dustin Norris
    Title:  Executive Vice President

9

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:


**HIGHLAND  CAPITAL MANAGEMENT, L.P.,**  as debtor-in-possession,

By: _____
   Its: General Partner

By: _____
   James P. Seery


**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**
By: Strand Advisors XVI, Inc., its
general partner

By:         
Name:   Dustin Norris
Title:     Executive Vice President

**NEXPOINT ADVISORS, L.P.**
By: NexPoint Advisors GP, LLC, its
general partner


By:     _____
Name:   James Dondero
Title:    President




**HIGHLAND INCOME FUND**

By: _____
   Name: Dustin Norris
   Title:   Executive Vice President


9

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:

**HIGHLAND  CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

Its: General Partner

By: _____

James P. Seery

**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**

By: Strand Advisors XVI, Inc., its
general partner

By: _____

Name:   Dustin Norris

Title:    Executive Vice President

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its
general partner

By: _____

Name:   James Dondero

Title:    President

**HIGHLAND INCOME FUND**

By: _____

Name: Dustin Norris

Title:   Executive Vice President

Appellee Appx. 01413

APPX. 04276

**NEXPOINT STRATEGIC OPPORTUNITIES FUND**

By: _____

Name:   James Dondero

Title:   President and

Principal Executive Officer

**NEXPOINT CAPITAL, INC.**

By: _____

Name:   James Dondero

Title:   President and

Principal Executive Officer

APPROVED AS TO FORM BY COUNSEL DESIGNATED BELOW:

**MUNSCH HARDT KOPF & HARR, P.C.**

Davor Rukavina
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
E-mail: drukavina@munsch.com

*Counsel for Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*

**K&L GATES LLP**

A. Lee Hogewood III (w/ permission)
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, NC 27609
Telephone: (919) 743-7306

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5659

*Counsel for Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc.*

10

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1422
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1536 of 1828   PageID 11029
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1421 of 1803   PageID 12167
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55   Page 14 of 20

- and -

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569) 10100 Santa
Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail: jpomerantz@pszjlaw.com ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908 MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075 ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110


*Counsel for Highland Capital Management, L.P.*

11

## EXHIBIT A

**FUNDS' INTERESTS IN DEBTOR-MANAGED CLOS
AS OF DECEMBER 1, 2020**

**Exhibit A to Settlement Agreement**

**CLO Equity as of December 1, 2020**

| CLO | Global Equity | CLO Equity Held by NexPoint Strategic Opportunities Fund | CLO Equity Held by Highland Income Fund | CLO Equity Held by NexPoint Capital, Inc. | Total | Ownership % |
|---|---|---|---|---|---|---|
| Aberdeen | 48,000,000 | 14,500,000 | - | | 14,500,000 | 30.2% |
| Brentwood | 71,400,000 | 28,600,000 | - | | 28,600,000 | 40.1% |
| Eastland | 123,500,000 | 13,006,000 | 38,480,000 | | 51,486,000 | 41.7% |
| Grayson | 127,500,000 | 13,700,000 | 62,600,000 | 800,000 | 77,100,000 | 60.5% |
| Greenbriar | 80,000,000 | 42,750,000 | - | | 42,750,000 | 53.4% |
| Red River | 81,000,000 | 8,500,000 | - | | 8,500,000 | 10.5% |
| Stratford | 63,000,000 | 43,500,000 | - | | 43,500,000 | 69.0% |
| Westchester | 80,000,000 | 35,507,000 | - | | 35,507,000 | 44.4% |
| Rockwall | 78,600,000 | 10,500,000 | - | | 10,500,000 | 13.4% |
| Rockwall 2 | 86,200,000 | 4,871,000 | 12,553,000 | | 17,424,000 | 20.2% |
| Gleneagles | 91,000,000 | 7,750,000 | 8,860,000 | | 16,610,000 | 18.3% |
| Jasper | 70,000,000 | 5,000,000 | - | | 5,000,000 | 7.1% |
| Liberty | 94,000,000 | 10,000,000 | - | | 10,000,000 | 10.6% |
| Southfork | 82,000,000 | 6,000,000 | - | | 6,000,000 | 7.3% |
| Valhalla | 82,000,000 | 1,500,000 | - | - | 1,500,000 | 1.8% |
| | | | | | | |
| **TOTALS** | 1,258,200,000 | 245,684,000 | 122,493,000 | 800,000 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1425
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1539 of 1828   PageID 11032
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1424 of 1803   PageID 12170

## EXHIBIT B

**FUNDS' INTERESTS IN DEBTOR-MANAGED CLOS
AS OF THE DATE OF THIS AGREEMENT**

**Exhibit B to Settlement Agreement**

**CLO Equity as of Date of Settlement Agreement**

| **CLO** | **Global Equity** | **CLO Equity Held by NexPoint Strategic Opportunities Fund** | **CLO Equity Held by Highland Income Fund** | **CLO Equity Held by NexPoint Capital, Inc.** | **Total** | **Ownership %** |
|---|---|---|---|---|---|---|
| Aberdeen | 48,000,000 | 14,500,000 | - | | 14,500,000 | 30.2% |
| Brentwood | 71,400,000 | 28,600,000 | - | | 28,600,000 | 40.1% |
| Eastland | 123,500,000 | 13,006,000 | 38,480,000 | | 51,486,000 | 41.7% |
| Grayson | 127,500,000 | 13,700,000 | 62,600,000 | 800,000 | 77,100,000 | 60.5% |
| Greenbriar | 80,000,000 | 42,750,000 | - | | 42,750,000 | 53.4% |
| Red River | 81,000,000 | 8,500,000 | - | | 8,500,000 | 10.5% |
| Stratford | 63,000,000 | 43,500,000 | - | | 43,500,000 | 69.0% |
| Westchester | 80,000,000 | 35,507,000 | - | | 35,507,000 | 44.4% |
| Rockwall | 78,600,000 | 10,500,000 | - | | 10,500,000 | 13.4% |
| Rockwall 2 | 86,200,000 | 4,871,000 | 12,553,000 | | 17,424,000 | 20.2% |
| Gleneagles | 91,000,000 | 7,750,000 | 8,860,000 | | 16,610,000 | 18.3% |
| Jasper | 70,000,000 | 5,000,000 | - | | 5,000,000 | 7.1% |
| Liberty | 94,000,000 | 10,000,000 | - | | 10,000,000 | 10.6% |
| Southfork | 82,000,000 | 6,000,000 | - | | 6,000,000 | 7.3% |
| Valhalla | 82,000,000 | 1,500,000 | - | - | 1,500,000 | 1.8% |
| | | | | | | |
| **TOTALS** | 1,258,200,000 | 245,684,000 | 122,493,000 | 800,000 | | |

## EXHIBIT C

**PROHIBITED TRANSFEREE UNDERTAKING**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1428
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1542 of 1828   PageID 11035
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1427 of 1803   PageID 12173

**Exhibit C to Settlement Agreement**

**UNDERTAKING TO BE BOUND TO PARAGRAPH 1 AND PARAGRAPH 2(b) OF SETTLEMENT AGREEMENT DATED JULY 16, 2021 ("Agreement")**

**[Prohibited Transferee], upon receipt of a transfer of an interest in one of the Debtor-Managed CLOs (as defined in the Agreement) from one of the Funds (as defined in the Agreement), is and shall forever be bound by the terms of Paragraph 1 and Paragraph 2(b) of the Agreement.**

**This __ day of _____ 202_**

**[Prohibited Transferee]**
**By:  [Authorized signatory]**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1429
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1543 of 1828 PageID 11036
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1428 of 1803 PageID 12174

# APPENDIX 18

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1430
Case 3:23-cv-00726-S   Document 8-22   Filed 01/24/23   Page 1544 of 1828   PageID 11037
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1429 of 1803   PageID 12175
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 1 of 8

Docket #1661  Date Filed: 01/05/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
J. Robertson Clarke
State Bar I.D. No. 24108098
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

ATTORNEYS FOR JAMES DONDERO

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| Debtor. | § | **Chapter 11** |

### JAMES DONDERO'S OBJECTION TO FIFTH AMENDED PLAN OF
### REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

James Dondero ("Respondent"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, hereby files this objection (the "Objection") to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan").[1] In support thereof, Respondent respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      On October 16, 2019, Highland Capital Management, L.P. ("Highland" or the "Debtor") initiated a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 Case was subsequently transferred to this Court. The case was

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

JAMES DONDERO'S OBJECTION TO PLAN CONFIRMATION

1934054210105000000000007

Appellee Appx. 01423
APPX. 10236

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1431
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1545 of 1828   PageID 11038
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1430 of 1803   PageID 12176
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 2 of 8

commenced with the expectation that Highland would emerge from Chapter 11 as a going concern. However, during the case and leading up to the confirmation hearing on the Plan, Highland's assets have been liquidated at below value prices. Under the Plan, Highland's assets will continue to be liquidated for less than optimal prices, with a view to ultimately terminating Highland's existence.

2.       Confirmation of the Plan should be denied due to numerous deficiencies and improprieties. The problems with the Plan as drafted include, but are not limited to, exculpation and injunction provisions that extend far beyond permissible limits, a lack of transparency following confirmation, inappropriate post-confirmation jurisdictional terms, and the wrongfully obtained votes of certain affiliates of HarbourVest Partners, LLC (collectively, "HarbourVest"). The Plan severs Respondent's rights and fails to comply with the Bankruptcy Code and applicable case law. Therefore, confirmation of the Plan should be denied.

## <u>OBJECTION</u>

### I.    <u>Both the Exculpation and Injunction Sections Violate Fifth Circuit Precedent.</u>

3.       The proposed exculpatory and injunction provisions are simply impermissible. Both contravene established case law in the Fifth Circuit regarding the proper boundaries of such provisions and merit denial of Plan confirmation.

4.       First, Article IX.D proposes to exculpate each and every "Exculpated Party" for all post-petition liability relating to the Debtor's bankruptcy case. The term "Exculpated Party" includes not just the Debtor but also, among others, the Debtor's Employees, the Independent Directors, the CEO/CRO, and the Related Persons of such parties. These exculpations in favor of the Exculpated Parties are prohibited under Fifth Circuit precedent. *See, e.g., In re Pacific Lumber, Co.*, 584 F.3d 229 (5th Cir. 2009); *Dropbox Inc. v. Thru Inc.*, Case No. 17-1958-G, 2018 U.S. Dist.

---

**Appellee Appx. 01424**
**APPX. 10039**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1432
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1546 of 1828   PageID 11039
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1431 of 1803   PageID 12177
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 3 of 8

LEXIS 179769 * 66-68 (N.D. Tex. Oct. 19, 2018) (finding that the scope of an exculpation clause provided insulation to nondebtor third parties in contravention of Fifth Circuit law).

5.      In *Pacific Lumber*, the Fifth Circuit made clear that section 524(e) prohibits the exoneration of nondebtors such as a debtor's management and professionals, but excluding official committees and their members acting within the scope of their official duties, from negligence during the course of their participation in the bankruptcy. The Fifth Circuit in *Pacific Lumber* stated: "[T]he essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Pacific Lumber*, 584 F.2d at 252. Despite these clear limits, the exculpation provisions in the Plan go far beyond what is permissible through the Bankruptcy Code's intended "fresh start" to encompass virtually all acts or omissions taken in connection with the Debtor's bankruptcy case by a wide range of parties, thus effectively exculpating an unknown number of individuals.

6.      Second, Article IX.F creates a channeling injunction with respect to certain "Protected Parties." The injunction requires Bankruptcy Court approval to pursue any claims related to the Debtor brought by any entity, including claims arising from a Protected Party's post-confirmation conduct. Much like the overbroad definition of "Exculpated Parties", the definition for "Protected Parties" includes a wide swath of individuals and entities beyond simply the Debtor. As a result, the channeling injunction would bring into the Bankruptcy Court all claims against such Exculpated Parties by any party who happens to have a claim or interest in the Debtor. The proposed injunction is effectively a non-consensual third-party release, which is expressly prohibited. *See Dropbox*, 2018 U.S. Dist. LEXIS 179769 * at 65 (disallowing similar injunction). Moreover, the Fifth Circuit has held that a permanent injunction cannot be justified under the broad

Appellee Appx. 01425
APPX. 10892

equity powers of Bankruptcy Code section 105 "if it effectively discharges a nondebtor." *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 760 (5th Cir. 1995) (overturning permanent injunction effectively discharging a nondebtor because such an injunction violates section 524 of the Bankruptcy Code, which was designed only to discharge the debtor, not nondebtor parties).

7.      Furthermore, the channeling injunction in Article IX.F limits the jurisdiction to hear claims against Protected Parties to only the Bankruptcy Court. In doing so, the Plan would improperly disregard parties' rights to bring claims even in courts with exclusive jurisdiction and would ignore those courts with specialized jurisdiction to hear certain types of cases. Respondent therefore objects to isolating (and potentially even providing) jurisdiction of any and all claims against Protected Parties in the Bankruptcy Court through this channeling injunction.

8.      In addition, the proposed injunction in Article IX.F is impermissibly vague and broad and, as noted, applies to post-confirmation conduct and claims.

9.      FED. R. BANKR. P. 3016(c) requires that, "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." The Debtor fails to provide such "specific and conspicuous language" about the proposed injunction here. The Plan instead issues a blanket prohibition on entities from:

> (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the

Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, . . . ; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Plan at IX.F. Much like the overbroad exculpation and channeling injunction provisions, this vague and potentially limitless injunction is improper. As a result, the Plan should not be confirmed.

## II.   The Plan Fails to Meet Section 1129(a)(7) due to Lack of Appropriate Sale Procedures for Post-Confirmation Operations.

10.   The Plan envisions the liquidation of the Debtor's assets by the Reorganized Debtor and the Claimant Trust. This wind down, however, is subject to no oversight or predetermined procedures to ensure that the process is both value-maximizing and transparent. This is critically important because, during the course of the Debtor's bankruptcy case, Respondent would allege on information and belief that the Debtor has sold a number of assets of significant value outside the ordinary course of the Debtor's business as it was conducted prepetition without notice to parties in interest or a complete marketing plan.

11.   The proposed Plan's lack of appropriate marketing and the resulting dampening of competitive bidding requirements for the Reorganized Debtor's assets indicates that the Debtor's creditors and equity holders could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sales procedures are governed by the Bankruptcy Court to ensure maximization of value through auction or other market-testing means. As it is, for the Debtor to meet its burden to establish all elements of 11 U.S.C. § 1129, specifically including the best interest test of section 1129(a)(7), the Debtor must detail why the proposed liquidation process will test the market as fully as would be the case in Chapter 7.

12.   Moreover, Respondent believes that notice and an opportunity for other potential bidders to come forward will not only provide transparency to the process but also will result in

**Appellee Appx. 01427**

**APPX. 10334**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1435
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1549 of 1828   PageID 11042
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1434 of 1803   PageID 12180
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 6 of 8

competitive bidding, increasing the value received by the beneficiaries of the Debtor's liquidation. An asset sale without transparency, on the other hand, will presumptively be done without comprehensive market exposure. Courts have long recognized the need for competitive bidding when approving sales. *In re Muscongus Bay Company,* 597 F.2d 11 (1st Cir. 1979); *In re Alves,* 52 B.R. 353 (Bankr. D. R.I. 1985); *In re Dartmouth Audio Inc.,* 42 B.R. 871, 874 (Bankr. D. N.H. 1984). Competitive bidding yields higher offers and thus benefits the estate. The objective is "to maximize the bidding, not to restrict it." *In re The Ohio Corrugating Company,* 59 B.R. 11, 13 (Bankr. N.D. Ohio 1985) (quoting *In re Beck Industries Inc.,* 605 F.2d 624, 637 (2d Cir. 1979)). Additionally, because the Plan states that equity will receive some recovery under the Plan— Article III.F states that there are no Classes deemed to reject the Plan or being excluded from recovery—equity holders as well as all creditors should receive, *inter alia,* notice and an opportunity to be heard on all significant liquidations and other transactions performed by the Reorganized Debtor.

### III.   Post-Confirmation Jurisdiction under the Plan is Improper.

13.     The various jurisdictional provisions of the Plan are overbroad and mandate that the Bankruptcy Court hear any matter involving the Debtor or its operations post-Effective Date. First, as noted above, the injunction with respect to "Protected Parties" requires that "the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted." Plan at Art. IX.F. There is no legal basis for barring recourse to other courts with exclusive jurisdiction—possibly providing the Bankruptcy Court with jurisdiction it does not legally have, especially post-confirmation. *See, e.g., Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1436
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1550 of 1828   PageID 11043
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1435 of 1803   PageID 12181
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 7 of 8

thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."). Second, the Bankruptcy Court's jurisdiction should not encompass claims and causes of action arising from the Reorganized Debtor's post-confirmation operations.

**IV.    The Subordination Provisions are Improper.**

14.    The elimination of vacant Classes pursuant to Article IV.I would potentially eliminate certain Classes on the Effective Date and any recovery for such Classes, including Class 9 for Subordinated Claims (assuming the HarbourVest claim in Class 9 is disallowed), despite the later re-allocation of claims into such eliminated Classes.

15.    The Plan contemplates subordination of Claims and Equity Interests yet provides no mechanism, hearing requirement, or deadlines for such subordination. Instead, the Debtor reserves in Article III.J the right to subordinate any Claim and the Claimant's resulting Plan treatment apparently without hearing.

**V.    Any Acceptance of the Plan by HarbourVest Should be Disallowed.**

16.    HarbourVest agreed to accept the Plan pursuant to the settlement with the Debtor submitted to the Court pursuant to FED. R. BANK. P. 9019. If that settlement is approved by the Court, HarbourVest will have, under the Plan, a Class 8 claim of $45 million and a Class 9 claim of $35 million. Respondent would allege on information and belief that the Debtor's CEO/CRO has stated on multiple occasions that HarbourVest has no valid claim against the Debtor and that its dispute with the Debtor could be settled for $5 million or less.

17.    By including in the settlement agreement the requirement that HarbourVest vote both its Class 8 and Class 9 claim to accept the Plan, the settlement agreement, on its face, reflects the exchange of HarbourVest's acceptance of the Plan for the vastly inflated claims agreed to by

the Debtor. In other words, the Debtor **purchased** HarbourVest's acceptance. This constitutes a violation of Bankruptcy Code section 1129(a)(3) in that HarbourVest's acceptance and the payment for it were not in good faith.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the Bankruptcy Court enter an order (i) denying confirmation of the Plan, and (ii) granting Respondent such other and further relief to which he may be justly entitled.

Dated: January 5, 2021                    Respectfully submitted,

*/s/ D. Michael Lynn*
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
J. Robertson Clarke
State Bar I.D. No. 24108098
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: joshua@bondsellis.com
Email: robbie.clarke@bondsellis.com

**ATTORNEYS FOR JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 5, 2021, a true and correct copy of the foregoing document was served via the Bankruptcy Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

*/s/ J. Robertson Clarke*
J. Robertson Clarke

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1438
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1552 of 1828 PageID 11045
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1437 of 1803 PageID 12183

# APPENDIX 19

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1439
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1553 of 1828   PageID 11046
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1438 of 1803   PageID 12184
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 1 of 34

Docket #1667  Date Filed: 01/05/2021

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**OBJECTION TO CONFIRMATION OF THE
DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The Dugaboy Investment Trust and Get Good Trust (jointly, "<u>Movants</u>"), submit this Objection for the purpose of objecting to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Dkt. 1472] (the "<u>Plan</u>") submitted by Highland Capital Management, L.P. ("<u>Debtor</u>"). The Dugaboy Investment Trust is an equity owner of the Debtor and has filed proofs of claim. See Claim Numbers 131 and 177. The Get Good Trust has filed proofs of claim in this case. See Claim Numbers 120, 128 and 129. If the Claims[1] filed by Movants are allowed,

---

[1] Capitalized terms not defined in this Objection are taken from the Plan and shall have the meanings given to them in the Plan.

1934054210105000000000013
**Appellee Appx. 01432**
Appx. 10389

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1440
Case 3:23-cv-00726-S Document 8-22 Filed 04/24/23 Page 1554 of 1828 PageID 11047
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1439 of 1803 PageID 12185
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 2 of 34

Claimants possess claims in Class 7 or 8. The Dugaboy Investment Trust is a member of Class 11 of the Plan.

Movants assert that the Plan does not meet the requirements contained in the Bankruptcy Code, Rules, and applicable case law to be confirmed.

**The Plan Violates 11 U.S.C. § 1129(a)(1)**

In order to confirm a plan, the plan must meet the requirements set forth in 11 U.S.C. §§ 1122, 1123 and 1129. The Plan proposed by the Debtor fails to meet the requirements set forth in the Bankruptcy Code and, as such, confirmation of the Plan must be denied. 11 USC § 1129(a) (1) requires that the Plan comply with the applicable provisions of this title. The cases interpreting this section have held that a plan must meet the requirements of 11 U.S.C. §§ 1122 and 1123. See *In re Star Ambulance Service*, 540 B.R. 251, 260 (N.D.Tex. 2015); *In re Save Our Springs,* 632 F.3d 168 174 5th Cir. 2011); *In Re Counsel of Unit Owners of 100 Harborview Drive Condo*, 572 B.R. 131, 137-139 (Bankr.D.Md. 2017).

**The Plan Contains an Impermissible Claim Subordination Provision**

Article III.J of the Plan contains the following provision:

Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or seek to subordinate, any Claim. . . .

The section gives the named parties the discretion upon "notice" to either subordinate a Claim or re-characterize a Claim whether or not a legal basis exists to either re-characterize the Claim or subordinate it. The term "notice" is nowhere defined, and any time the Bankruptcy Code uses the term notice, it is always accompanied by the words "and a hearing". 11 U.S.C. §§ 1112, 707 and 554 are examples of Bankruptcy Code sections that require both notice and a hearing prior to a party obtaining the relief sought in a pleading. Nowhere in the Bankruptcy

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1441
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1555 of 1828   PageID 11048
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1440 of 1803   PageID 12186
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 3 of 34

Code can a debtor obtain relief without affording the parties affected by the requested relief an opportunity for a hearing.

Under Bankruptcy Rule 7001(8), the subordination of a claim, as a general rule, requires the filing of an adversary proceeding. However, an exception to the rule is that a subordination of a claim can occur through a Plan. The Plan provision, as written, allows the designated parties the ability to subordinate a claim or re-characterize a claim merely by sending a letter.

The Plan, Plan Supplements and Disclosure Statement do not identify any specific Claim for which subordination is sought. Rather, in the recent Plan Supplement that was filed on January 4th (Dkt. No. 1656), retained claims are lumped in with all other possible claims and a laundry list of possible targets. (See Plan Supplement Dkt. No. 1656-1 Exhibit L.) Notwithstanding the conflicting 5th circuit case law concerning the necessary designation for the retention of claims (See *In re SI Restructuring*, 714 F.3d 860 (5th Cir. 2013) and *In re Texas Wyoming Drilling,* 647 F.3d 547, 549 and 551 (5th Cir 2011) and *In re United Operating,* LLC, 540 F.3d 351 (5th Cir. 2008), the cases do require some notice to the creditor of the potential for the subordination of such creditor's claim. Bankruptcy Rule 7001 (8) cannot be read to allow a complex "equitable subordination claim" that requires evidence and findings consistent with *In Re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977) to occur with only written notice immediately prior to a confirmation hearing. The provision, as written, does not provide any party subject to the so-called notice with due process and violates 11 U.S.C. § 1129(a)(1).

**The Plan is Not Final and Contains an Impermissible Plan Modification Provision**

In addition to the Plan, the Debtor must file a Plan Supplement which will include various documents that will 1) govern the operations of the Highland Claimant Trust and the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1442
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1556 of 1828   PageID 11049
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1441 of 1803   PageID 12187
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 4 of 34

Litigation Trust, 2) identify retained causes of action; and 3) list the executory contracts and leases that will be assumed by the Debtor and Plan Documents.

The problem with the Plan Supplement is that, as of the writing of this Objection and possibly even after the hearing on the confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan. Article IV.J on page 36 of the Plan states:

> The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the Order Directing Mediation entered on August 3, 2020 [D.I. 912].

It is clear that no requirement exists in the Plan that the Plan Documents be finalized prior to hearing on the confirmation of the Debtor's Plan so that creditors can object if any terms of the Plan Documents filed in the Plan Supplement adversely impact a creditor's rights or are inconsistent with the Bankruptcy Code and Rules.

The Plan contains a provision allowing modification of the Plan. It is not clear from the language of the modification section the extent of judicial oversight that exists with respect to a Plan modification and whether this Court will have the ability to determine if the proposed plan modification is material or an immaterial. Article XII.B (p. 55) of the Plan provides that the Debtor reserves the right in accordance with the Bankruptcy Code and Rules to amend or modify the Plan prior to the entry of the Confirmation Order with the "consent" of the Committee. The provision does not require compliance with 11 U.S.C. § 1127(a) which specifically provides that the proposed modification prior to confirmation must meet the requirements of 11 U.S.C. §1122 and 11 U.S.C. §1123. In contrast to the Plan provision concerning modification prior the entry of the Confirmation Order, Article XII.B of the Plan does recognize that any modification after the entry of the Confirmation Order must meet the requirements set forth in 11 U.S.C. §§

1127(b).  From a textual point of view, modifications of the Plan both before and after the entry of the Confirmation Order must meet the requirements of 11 U.S.C. §§ 1122 and 1123.

**The Plan violates 11 U.S.C. § 1129(a)(7)**

Under 11 U.S.C. § 1129(a)(7), in order for a plan to be confirmed, each creditor as of the effective date of the plan will receive or retain under the plan on account of claim or interest an amount that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7.

While the Debtor's Plan is a liquidation plan, creditors from a valuation point of view are receiving an amount less than they would receive if the Debtor were liquidated under chapter 7. The amount received by creditors under the Debtor's Plan cannot be viewed solely in the dollars they receive but, rather, the amount actually received must be discounted by two provisions in the Debtor's Plan that reduce the present value of the creditors' recovery under the Plan.  The two discounting factors are the following provisions in the Highland Claimant Trust:

a)  The  Reorganized Debtor has  no affirmative obligation to report any activity or results to the holders of beneficial interests in the Claimant Trust or potential holders of beneficial interests; and

b)  The holders of beneficial interests in the Claimant Trust are required to agree to a standard of liability for the Claimant Trustee that only allows claims against the Claimant Trustee for acts that constitute "fraud, willful misconduct or gross negligence" (See Article 8 of the Highland Claimant Trust).   A notable omission from the standard of liability is a breach of fiduciary duty.  This omission is contrary to the statement contained in the Plan "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duty as a Chapter 7 trustee." (See Plan Page 28)

Appellee Appx. 01436

APPX. 10993

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1444
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1558 of 1828   PageID 11051
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1443 of 1803   PageID 12189
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 6 of 34

c)    A Chapter 7 trustee, if it attempted to sell assets, would have to obtain Court authority for the sale and would provide Notice to creditors of the sale.  Under the Plan no such requirement exists.

**The Plan And Related Documentation Provide For Impermissible Non-debtor Exculpation, Releases and Injunctions That Are Not Allowed Under Applicable 5th Circuit Case Law**

**A.    Exculpation and Releases**

Article IX of the Plan contains extensive exculpation and release provisions that far exceed those allowed in the Fifth Circuit.

Article IX.C (the "Exculpation Clause") exculpates each "Exculpated Party" from, *inter alia*, any liability for conduct occurring **on** or after the Petition Date in connection with or arising out of the filing and administration of the case, the funding, consummation and implementation of the Plan, and any negotiations, transactions and documents pertaining to same that could be asserted in their own name or on behalf of any holder of a claim or interest excluding acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.

The term "Exculpated Parties" is defined[2] in Article I.B.61 of the Plan to include:

1.    The Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the "Managed Funds," which is defined in Article I.B.83 of the Plan to include Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to the executory contracts assumed under the Plan;

2.    Strand Advisors, Inc., the Debtor's general partner ("Strand");

---

[2] The definition of "Exculpated Parties" includes references to numerous other defined terms that also are defined in Article I.B, some of which are summarized here.  For the sake of brevity, the definition of each defined term contained in the definition of Exculpated Parties is not reproduced here *verbatim*.

Appellee Appx. 01437
APPX. 10994

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1445

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1559 of 1828   PageID 11052

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1444 of 1803   PageID 12190

Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 7 of 34

3.  John S. Dubel, James P. Seery, Jr. and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors appointed between then and the effective date of the Plan (collectively, the "Independent Directors");

4.  The Official Committee of Unsecured Creditors appointed in the case (the "Committee");

5.  The members of the Committee in their official capacities;

6.  Professionals retained by the Debtor and the Committee in the case (the "Professionals");

7.  James P. Seery, Jr., the Debtor's chief executive office and chief restructuring officer (the "CEO/CRO"); and

8.  "Related Persons" of the Independent Directors, the Committee, the members of the Committee, the Professionals and the CEO/CRO, which is defined to include, *inter alia*, predecessors, successors, assigns, officers, directors, employees, managers, attorneys, consultants, subsidiaries thereof.

The definition does expressly exclude from the definition certain named individuals and entities.

In addition to Article IX of the Plan, the Claimant Trust Agreement [Dkt. 1656-2, Exhibit M] for which approval is sought as part of the Plan confirmation, also provides in Section 8.1 for a reduced standard of care by the parties described therein as the Claimant Trustee, the Delaware Trustee, and the Oversight Board, any individual member thereof, by limiting their liability to that for fraud, willful misconduct, or gross negligence.[3]

---

[3] With respect to the Claimant Trustee, this appears to contradict Plan Article IV.B.5 (p. 28), which provides: "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee."

{00374857-13}                                  7

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1446
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1560 of 1828 PageID 11053
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1445 of 1803 PageID 12191
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 8 of 34

The scope of the Exculpation Clause is ambiguous because it does not specify a time frame to which the exculpation applies. Rather than stating that it applies for actions during a definite time period, such as occurring between the petition date and the effective date of the plan, it runs from the petition date through "implementation of the Plan." The word "implementation" is not defined, which leaves the term subject to interpretation. Does it mean the execution of documents to be executed pursuant to the Plan or the actual implementation of the Plan through administration of assets and payment of claims? The ambiguity is exacerbated by the introduction to the Exculpation Clause, which provides for its effect "to the maximum extent permitted by applicable law". Thus, one could expect that Debtor intends the Exculpation Clause to apply to actions of exculpated parties for actions taken far into the future.

Article IX.D (the "Release Clause") provides that each Released Party is deemed released by the Debtor and the Estate, including the trusts created by the Plan (the Claimant Trust and Litigation Sub-Trust) release each Released Party from, *inter alia*, any and all Causes of Action that the Debtor or its estate could legally assert, except for obligations of the party under the Plan certain other agreements, confidentiality and noncompetition agreements, avoidance actions, or acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.[4]

The term "Released Parties" is defined in Article I.B.111 of the Plan to include:

1. The Independent Directors

2. Strand, solely from the date of the appointment of the Independent Directors through the effective date of the Plan;

3. The CEO/CRO;

4. The Committee;

5. The members of the Committee;

---

[4] There are some additional limitations specific to "Senior Employees."

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1447
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1561 of 1828 PageID 11054
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1446 of 1803 PageID 12192
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 9 of 34

6. The Professionals; and

7. The "Employees," which is defined as the employees of the Debtor set forth in the plan supplement.

The term "Causes of Action" is an 18 line definition in Article I.B.19 to include just about any type of cause of action, whether arising before or after the commencement of the bankruptcy case.

The Release Clause applies to causes of action having no relationship to the case. The Release Clause also waives claims of the newly created Claimant Trust and Litigation Sub-Trust "existing or hereafter arising," which means that these entities, which have conducted no business as of the confirmation of the Plan, are releasing future, unknown claims against the Released Parties, such as a future negligent breach of fiduciary duty claim.

The Exculpation Clause, the Release Clause and the Claimant Trust Agreement clearly bestow protection from liability upon numerous non-debtor parties. Some of the parties covered by the Exculpation Clause as Exculpated Parties, namely Managed Funds Highland Multi-Strategy Credit Fund, L.P. and Highland Restoration Capital Partners, L.P., and possibly by the use of "catch-all phrasing, SSPI Holdings, Inc., recently were argued to be outside the scope of this Court's oversight but for an agreement reached by the Debtor with the Committee allowing for some notice protocols. *See* Debtor's Response to Mr. James Dondero's Motion For Entry of An Order Requiring Notice And Hearing For Future Estate Transactions Occurring Outside The Ordinary Course Of Business [Dkt. 1546]¶ 12

The Fifth Circuit decision in *In re Pacific Lumber Co*. 584 F.3d 229 (5th Cir. 2009) is dispositive. In that case, the plan proposed to release the plan proponents and post-reorganization owners of the reorganized debtor, the two new entities created by the plan, and

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1448
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23    Page 1562 of 1828   PageID 11055
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1447 of 1803   PageID 12193
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 10 of 34

the creditor's committee (and their personnel) from liability—other than for willfulness and gross negligence—related to proposing, implementing and administering the plan. *Pacific*, 584 F.3d at 251. This language is similar to the language of the Exculpation Clause. The *Pacific* court cited the principle of 11 U.S.C. § 524(e), which states that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." *Id.* The court noted that: "We see little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization." Pacific, 584 F.3d at 252. It went on to cite other Fifth Circuit authority establishing that 11 U.S.C. 524(e) only releases the debtor, not co-liable third parties, and that the cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. *Pacific*, 584 F.3d at 252, citing *In re Coho Resources, Inc.,* 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.,* 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993), *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir. 1995). Finally, the court stated:

> There are no allegations in this record that either [plan proponents/owners of reorganized debtors] or their or the Debtors' officers or directors were jointly liable for any of [debtors'] pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Pacific,* 584 F.3d at 252-253.

The *Pacific* court struck down all of the non-debtor releases except those in favor of the creditor's committee and its members. The rationale for allowing the exculpation of the creditor's committee and its members is that the law effectively grants them qualified immunity for actions within the scope of their duties. *Pacific*, 584 F.3d at 253. The court also noted that the creditor's committee and its members were the only disinterested volunteers among those among the parties sought to be released, and reasoned that it would be extremely difficult to find

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1449
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1563 of 1828 PageID 11056
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1448 of 1803 PageID 12194
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 11 of 34

members to serve on the committee if they can be sued by persons unhappy with the committee's performance or the outcome of the case. *Id.*

The Fifth Circuit noted the continuing viability of the rule of *Pacific* in *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1059 (5th Cir. 2012) (". . . a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief," citing *Pacific.*) Lower courts from within the Fifth Circuit have strictly followed the precedent and struck down various plan clauses dealing with releases and exculpation. *See In re Thru, Inc.*, 2018 WL 5113124, *22 (D.C.N.D.Tex 2018), affirmed 782 Fed.Appx. 339 (5th Cir. 2019) (exculpation provision and injunction); *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit has concluded that a bankruptcy court may not confirm a plan that provides "non-consensual non-debtor releases.""); *In re National Truck Funding LLC*, 588 B.R. 175, 177 (Bankr. S.D. Miss. 2018) ("At hearing, the parties agreed that the Release and Exculpation . . . of the Plan . . . will be further amended by language protecting only the Official Committee of Unsecured Creditors and its representatives, as the Court has previously approved."); *In re LMCHH PCP LLC*, 2017 WL 4408162, at *16 (Bankr. E.D. La. Oct. 2, 2017) ("The modification [to the plan] filed was done to ensure that the exculpation provision complied with [*Pacific*] which held that a plan could not exculpate outside of the Debtors, the Official Unsecured Creditors Committee, and those who act for them, where 'the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy.'"); *In re Patriot Place, Ltd.*, 486 B.R. 773, 823–24 (Bankr. W.D. Tex. 2013) (Non-debtor releases and exculpation clauses struck down as violative of Fifth Circuit precedent and render the plan unconfirmable.).

Appellee Appx. 01442
APPX. 10909

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1450
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1564 of 1828   PageID 11057
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1449 of 1803   PageID 12195
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 12 of 34

All parties exculpated and released other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed from the Plan and the Claimant Trust Agreement, or the Plan is not confirmable.

## B. Injunction Provisions

Article IX.F of the Plan contains extensive injunction provisions (the "Injunction Provisions") that far exceed those allowed in the Fifth Circuit. Although not broken down into sections, the Article contains multiple separate and distinct provisions, as follows:

1. The first paragraph enjoins claimants and equity holders from interfering with plan implementation of consummation;

2. The second paragraph **permanently** enjoins entities with claims or equity interests and their related persons from, with respect to such interests, *inter alia*, commencing actions, enforcing judgments, creating or enforcing encumbrances, setting off against or affecting the Debtor, the Independent Directors, the Reorganized Debtor created by the Plan or the Claimant Trust created by the Plan, except as otherwise provided by the Plan or other order of this Court;

3. The third paragraph extends the injunctions of the Article to any successors of the Debtor, the Reorganized Debtor and the Claimant Trust and their respective property and interests in property; and

4. The fourth paragraph provides that no "Entity[5]" may commence or pursue a claim or cause of action against a "Protected Party"[6] that arose from or is related to the

---

[5] Defined as any "entity" as defined in 11 U.S.C. § 101(15) and also includes any "Person" or any other entity.
[6] The Plan does not define the term "Protected Party." It defines "Protected Parties" as follows:
"*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the

Appellee Appx. 01443
APPX. 14300

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1451
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1565 of 1828  PageID 11058
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1450 of 1803  PageID 12196
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 13 of 34

bankruptcy case, the negotiation of the Plan, the administration of the Plan, the wind down of the business, the administration of the Claimant Trust, or transactions in furtherance of the foregoing, without this Court first finding that the claim or cause of action represents a colorable claim of bad faith, criminal misconduct, fraud or gross negligence against the Protected Party, and specifically authorizes such Entity to bring a claim against the Protected Party.[7]  It further provides that this Court has the sole jurisdiction to adjudicate any such claim for which approval to pursue the claim has been granted.

Even the most cursory reading of the language of Article IX.F, especially the fourth paragraph, reveals that it goes farther than the exculpation and release provisions in terms of the parties protected by the permanent injunctions.

Although the Court in *Pacific* did not appear to expressly deal with an injunction, as noted above the court concluded that its own cases ". . . seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Pacific*, 584 F.3d at 252. In addition, the Fifth Circuit in *Vitro*, *supra*, construed *Pacific* as denying a non-debtor permanent injunction, wherein it cited *Pacific* and added: "(discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction.)"  *Vitro*, 701 F.3d at 1059.  The logic for applying the same principle to both releases/exculpations and injunctions is simple to understand—if a non-debtor cannot be released from claims but

---

Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

[7] The provision is expressly limited as to Strand and Employees to the period from the date of appointment to the effective date of the Plan.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1452
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1566 of 1828   PageID 11059
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1451 of 1803   PageID 12197
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 14 of 34

claimants can be enjoined by the bankruptcy court from prosecuting them against the non-debtor, the exclusion of a release *ab initio* or the striking of a release from a plan is meaningless. For example, the fourth paragraph effectively releases from negligence claims a broad category of persons and entities not entitled to exculpation or releases under *Pacific,* because the paragraph only allows an aggrieved party to proceed after this court has determined that their allegations represent a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud or gross negligence. As noted by the Fifth Circuit in *Zale, supra,* "Accordingly, we must overturn a § 105 injunction if it effectively discharges a nondebtor." *Zale,* 62 F.3d at 760, citing *In re Vitek,* 51 F.3d 530, 536, n. 27, as follows: "('[N]on-debtor property thus should not ordinarily be shielded by the powers of the bankruptcy court.')" *Id. See also In re Thru, Inc.,* 2018 WL 5113124, *21-22 (striking down a plan injunction that "would effectively discharge numerous non-debtor third parties").

All parties protected by the Injunction Provisions other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed or the Plan is not confirmable.

### C. The Claims Released Do Not Meet the Few Exceptions Allowing Release or Injunctions in Favor of Third Parties

There are a few situations where it may be *possible* to argue that third party releases are permissible within the Fifth Circuit, but none are applicable here.   The *Pacific* court distinguished one set of cases cited by the plan proponents by saying that they concerned global settlements of mass claims.   *Pacific,* 584 F.3d at 252.   Another has cited *Pacific* for the proposition that, absent a **meaningful** contribution by the released party, the release would probably be invalid under *Pacific.  In re Texas Rangers Baseball Partners,* 431 B.R. 706, 717 FN 29 (Bankr. N.D. Tex. 2010); *See also Zale,* 62 F.3d at 762 (holding that one plan provision temporarily enjoining certain contract claims was valid as an unusual circumstance because it

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1453
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1567 of 1828   PageID 11060
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1452 of 1803   PageID 12198
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 15 of 34

involved a settlement providing substantial consideration being paid into to the estate). Another referred to a narrowly tailored release of the type found in § 363(f) sales of property free and clear of liens. *In re Patriot Place, Ltd.,* 486 B.R. 773, 821-822 (Bankr. W.D. Tex. 2013). Such releases and injunctions are entered to ensure that the purchaser of the debtor's property (as well as the debtor's property being sold) is insulated from claims that creditors might have against the debtor and the property being sold by the debtor to the purchaser. *Id*.

The court in *Zale* indicated that a **temporary** injunction **may** be proper when unusual circumstances exist. *Zale*, 62 F.3d at 761. These conditions are when the non-debtor and the debtor party enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor and when the third party action will have an adverse impact upon the debtor's ability to accomplish reorganization. *Id*. Even in such cases, neither of which is applicable here, an injunction would not be permanent, but would only delay the actions.

None of the foregoing exceptions are applicable in the instant case.

**D. Jurisdiction**

Even if the Bankruptcy Code were to permit some exculpation, releases and injunctions protecting non-debtor parties, this Court does not have the power to retain exclusive, indefinite, post-confirmation jurisdiction to determine whether actions against Protected Parties may proceed or, thereafter, to adjudicate claims pertaining thereto.

The fourth paragraph of the Injunction Provisions prohibits the commencement of certain actions against any Protected Party with respect to claims or causes of action that arose from or are related to the case, administration of the case, the wind down of the business of the Debtor or Reorganized Debtor, and the administration of the Claimant Trust. It also channels claims by requiring that any such claims or causes of action be first brought to this Court to determine that

Appellee Appx. 01446
APPX. 01403

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1454
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1568 of 1828    PageID 11061
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1453 of 1803    PageID 12199
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 16 of 34

the claims are outside the scope of protection granted a Protected Party, and to obtain an express authorization from this Court allowing the action to proceed.  It then provides that this Court has sole jurisdiction to adjudicate the claim. Because the Reorganized Debtor and the Claimant Trust have engaged in no activity as of the confirmation of the Plan, this provision clearly is intended to extend to unknown, future conduct by Protected Parties in addition to pre-confirmation Protected Parties.

As noted by the Fifth Circuit in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores)*, 266 F.3d 388, 389 (5th Cir. 2001), bankruptcy court jurisdiction does not last forever.  Under 28 U.S.C. § 1334, a federal district court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." *In re Superior Air Parts, Inc.*, 516 B.R. 85, 92 (Bankr.N.D.Tex. 2014). The district court is authorized under 28 U.S.C. § 157 to refer to the bankruptcy court "any or all proceedings arising under title 11 or arising in or related to a case under title 11." *Id.*  By virtue of an order adopted on August 3, 1984, this Court has jurisdiction over any or all proceedings arising under title 11 or arising in or related to a case under title 11.  *Id.*

"Arising Under" jurisdiction involves causes of action "created or determined by a statutory provision of title 11."  *Wood v. Wood (Matter of Wood)*, 825 F.2d 90, 96 (5th Cir. 1987); *Superior*, 516 B.R. at 93.  Nothing involved in the exculpations, releases or injunctions on non-debtor parties involves such a cause of action.  By their nature, negligence claims and intentional tort claims arise by operation of law generally applicable to all persons and entities regardless of whether or not they are in bankruptcy.  They could exist totally outside a bankruptcy context.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1455
Case 3:23-cv-00726-S   Document 8-22   Filed 08/04/23   Page 1569 of 1828   PageID 11062
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1454 of 1803   PageID 12200
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 17 of 34

"Arising in" jurisdiction involves those actions "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood*, 825 F.2d at 97; *Faulkner v. Eagle View Capital Mgmt. (In re Heritage Org., LLC)*, 454 B.R. 353, 360 (Bankr.N.D.Tex. 2011); *Superior*, 516 B.R. at 94-95. The example given the by the *Wood* court is "'administrative' matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 97 (emphasis supplied by the court). Again, negligence claims and intentional torts against non-debtors obviously do not meet these criteria.

The final category, "related to" jurisdiction, involves the issue of "'whether the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy.'" *Wood*, 825 F.2d at 93, citing *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (emphasis supplied by the court). Because it is obvious that the non-debtor claims being released, exculpated and enjoined do not "arise under" or "arise in" a bankruptcy case, the only possibly arguable basis for jurisdiction is "related to" jurisdiction. The fourth paragraph of the Injunction Provisions contemplates application to any claim or cause of action "that arose from or is related" to the case.

Initially, it should be noted that there simply is no way that even a massive judgment against the non-debtors could have any impact whatsoever on the estate. Considering that there will be no **estate** being administered **in bankruptcy** post-confirmation, it is inconceivable how releases of non-debtor parties could possibly impact the administration of a now defunct bankruptcy estate of the Debtor. The court in *Craig's* appeared to recognize this principle when it adopted the view that confirmation of a plan changes bankruptcy court jurisdiction. *Craig's*, 266 F.3d at 390. Expansive bankruptcy court jurisdiction is no longer "required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id.*

{00374857-13}

17

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1456
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1570 of 1828   PageID 11063
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1455 of 1803   PageID 12201
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 18 of 34

In *Craig's,* the Fifth Circuit was dealing with a fact pattern that differs from the instant case in two ways.  First, the case involved a dispute between the aggrieved party and the reorganized debtor, not totally non-debtor parties.  Second, it only partially involved the fact pattern of the instant case, because it only dealt with claims characterized as post-confirmation rather than the mix of pre- and post-confirmation claims against the non-debtor parties protected by the Exculpation Clause, Release Clause and Injunction Provisions.  The case involved a pre-confirmation contract that had been assumed, and a post-confirmation dispute involving state law for damages that at least partially arose post-confirmation.[8]  The court held that there was no jurisdiction over a claim that "principally dealt with post-confirmation relations between the parties."  *Craig's,* 266 F.3d at 390.

The later Fifth Circuit case of *Newby v. Enron Corp. (In re Enron Corp. Securities),* 535 F.3d 325 (5th Cir. 2008) also involved the issue of post-confirmation jurisdiction.[9]  The court summarized the *Craig's* decision as one dealing with the post-confirmation relations between the parties, where there was no antagonism between the parties as of the date of the reorganization, and no facts or law deriving from the plan were necessary to the claim. *Enron,* 535 F.3d at 335.

Under the general principles of *Craig's,* there should be not "related to" jurisdiction involving the claims involved in this case, which purely involve non-debtor parties and non-bankruptcy related claims with no potential impact upon the pre- or post-confirmation estates.

---

[8] The facts are not totally clear.  They indicate that the plan was confirmed in December 1994, and that the claims for damages arose in 1994 and 1995.  *Craig's,* 266 F.3d at 389.  Therefore, at least the 1995 claims arose post-confirmation.

[9] The *Enron* case involved lawsuits against non-debtors that had been removed prior to the commencement of the case, that were dismissed with prejudice after the confirmation of the plan. *Enron,* 535 F.3d at 333.  The plaintiffs alleged that there was no jurisdiction to dismiss the case because "related to" jurisdiction had ceased after the plan was confirmed.  535 F.3d at 334.  However, the parties did not dispute whether the federal courts had "related to" bankruptcy jurisdiction over the cases at the time of removal, so the court framed the question as whether the court, after confirming Enron's plan, maintained "related to" jurisdiction.  535 F.3d at 334-335.  Therefore, the case stands for the proposition of whether "related to" jurisdiction, once conferred, continues post-confirmation.  535 F.3d at 335-336.

**Appellee Appx. 01449**
**Appx. 04906**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1457
Case 3:23-cv-00726-S Document 8-22 Filed 10/29/23 Page 1571 of 1828 PageID 11064
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1456 of 1803 PageID 12202
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 19 of 34

This is especially true with respect to post-confirmation future releases of non-debtor parties involved with as yet uncreated entities.

The case of *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594 (2011), decided after *Wood*, *Craig's* and *Enron*, adds additional jurisdictional barriers to confirmation of a Plan containing the language of Article IX.(C), (D) and (F). In *Stern*, Pierce had filed a proof of claim in Marshall's bankruptcy proceedings, alleging a right to recover damages as a result of alleged defamation on the part of Marshall. *Stern*, 131 S.Ct. at 2601. Marshall filed a counterclaim against Pierce alleging tortious interference with a gift that Marshall had expected to receive from her husband, who was Pierce's father. *Id.* The claim was classified by the Supreme Court as a common law tort claim. *Id.* The Supreme Court found that Pierce had consented to resolution of the counterclaim by the Bankruptcy Court. 131 S.Ct. at 2606. After being cast in judgment by the Bankruptcy Court in the amount of over $425 Million, Pierce argued that the Bankruptcy Court did not have jurisdiction over the counterclaim. 131 S.Ct. at 2601. The Supreme Court agreed with Pierce, holding that Article III of the U.S. Constitution did not permit the Bankruptcy Court to enter a final judgement on Marshall's counterclaim. 131 S.Ct. at 2608.

Some claims involved in the instant case are simple tort claims against non-debtors. They occupy the same category as the defamation suit in *Stern*. Movants are entitled to an actual adjudication of their claims, which would mean an adjudication by a state court or an Article III federal court of competent jurisdiction and venue. This Court's submission of a report and recommendation on confirmation to the District Court would not constitute an actual adjudication. Because the Plan provision at issue provides that this Court will **actually adjudicate** the claims, it runs afoul of *Stern* on its face. Similarly, the provision literally would

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1458
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1572 of 1828   PageID 11065
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1457 of 1803   PageID 12203
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 20 of 34

preclude Movants from seeking to withdraw the reference to have the case actually decided by an Article III court.  Because this Court could not adjudicate the case, the Plan's attempt to grant to this Court sole jurisdiction to adjudicate the claims renders the Plan nonconfirmable.

Even if jurisdiction *could* exist for the purpose of determining whether a claim could go forward against a Protected Party, it does not follow that this Court would have jurisdiction to adjudicate the claim.  At the point at which this Court determines that a claim could proceed, the action no longer involves any interpretation of either bankruptcy law or the Plan, nor could it have any impact upon the pre- or post-confirmation estate.[10]

**The Plan Prohibits Claimants From Asserting Rights Under The Plan Rendering the Plan Not Confirmable**

Aside from protecting parties not entitled to protection, the Exculpation, Release Injunction Provisions contain provisions that far exceed the scope permitted by bankruptcy law.

The second paragraph of the Injunction Provisions is broad enough to permanently preclude claimants from pursing their rights under the Plan against the Reorganized Debtor and the Claimant Trust because it precludes any attempt to enforce rights, many of which are created pursuant to the Plan, and the third paragraph of the Injunction Provisions goes even farther by extending the injunctions to any successors of the Reorganized Debtor and the Claimant Trust. Under the Plan, the Class 2 claimant is to be given a new promissory in treatment for its claim, the Class 3 claimants have the option to retain collateral, and Class 5 claims are reinstated.  If the Reorganized Debtor defaults under any of its obligations, the Injunction Provisions literally prevent any attempt to enforce their rights under the Plan.

---

[10] Movants are aware of *In re Pilgrim's Pride*, 2010 WL 200000 (Bankr.,N.D.Tex 2010) and *In re Camp Arrowhead, Ltd.*, (Bankr.W.D.Tex 2011).  Movants believe that these cases blatantly disregard the letter and spirit of *Pacific* and are, therefore, wrongfully decided.  In addition, they were decided before *Stern v. Marshall*.

Appellee Appx. 01451
APPX. 04308

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1459
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1573 of 1828   PageID 11066
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1458 of 1803   PageID 12204
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 21 of 34

The best way to demonstrate this issue is to cite a different plan.  Although the injunction in *In re Thru, Inc.*, *supra*, was struck down on the basis that it impermissibly released third parties, the injunction contained language that the second paragraph in the instant case is missing.  It starts out:

> Except as otherwise expressly provided in this Plan or in the Confirmation Order **and except in connection with the enforcement of the terms of this Plan (including the payment of Distributions hereunder) or any documents provided for or contemplated in this Plan**, all entities . . . are permanently enjoined from. . . .

> *Thru*, 2018 WL 5113124, *21

Compare this language to the second paragraph of the Injunction Provisions, which provides:

> Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities . . . are permanently enjoined. . . .

The Plan literally would require a claimant to come back to this Court for an order if the Reorganized Debtor or the Plan-created trusts default.  This goes against the concept espoused by the Fifth Circuit in *Craig's*, indicating that confirmation allows the debtor to go about its business without further supervision or approval, but also without the protection of the bankruptcy court.  *Craig's*, 266 F.3d at 390, citing *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991).

**The Plan Contains a DeFacto Channeling Injunction**

As noted earlier, paragraph 4 of the Injunction Provisions in the Plan provide that no Entity may commence or pursue a claim or cause of action against a Protected Party without this Court:

> (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; . . . .

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1460
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1574 of 1828 PageID 11067
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1459 of 1803 PageID 12205
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 22 of 34

Plan, Article IX.F, fourth unnumbered paragraph.

Thereafter, the Plan provides that this Court retains sole jurisdiction to adjudicate the claim. *Id.*

The above provisions have the effect of channeling all post-petition claims against the Reorganized Debtor, the Creditor Trust and others into the Bankruptcy Court to determine whether a claim can be asserted and then as the forum with the "exclusive jurisdiction" to adjudicate the claim. The provisions are not authorized under the Bankruptcy Code.

Congress, when it enacted 11 U.S.C. § 524(g), provided a limited channeling injunction for asbestos and in some mass tort cases. Section 524(g) was not created to shield parties that are liquidating a debtor and its reach does not extend to garden variety unsecured creditors or serve as a barrier to claims that arose after the Effective Date of the Plan. The impact of Section 524(g) is to address pre-petition claims and future claims arising out of pre-petition activity where the claims have yet to manifest.

In addition, 11 USC 524 § (g) is only applicable to a Debtor that obtains a discharge pursuant to 11 USC § 1141. The Debtor in its approved Disclosure Statement [See DKT 1473, pp. 8-9] classifies the Debtor's post confirmation activities as one of "wind down" of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. In addition, the Claimant Trust formed pursuant to the Plan is a "liquidation trust" [See DKT 1656-2 section 2.2], which makes the Plan a Plan that " liquidates all or substantially all of the property of the estate". Pursuant to 11 U.S.C. § 1141(d)(3), a Debtor whose Plan is none that liquidates all or substantially all of the property of the estate is not eligible for a discharge. 11 U.S.C. § 524(g) cannot authorize any channeling injunction for the Debtor in its Plan.

**Conclusion**

For the reasons set forth herein, confirmation of the Plan must be denied.

Appellee Appx. 01453
APPX. 014316

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1461
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1575 of 1828   PageID 11068
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1460 of 1803   PageID 12206
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 23 of 34

January 5, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
*and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 5th day of January, 2021, a copy of the above and foregoing *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com,kjohnson@joneswalker.com,sbuchanan@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com

Appellee Appx. 01454
Appx. 04319

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1462
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1576 of 1828   PageID 11069
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1461 of 1803   PageID 12207
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 24 of 34

- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com,
  gpronske@spencerfane.com;jkathman@spencerfane.com;lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@d
  entons.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com

Appellee Appx. 01455
APPX. 01372

- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com, cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com

Appellee Appx. 01456

Appx. 04373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1464

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1578 of 1828    PageID 11071

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1463 of 1803    PageID 12209

Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 26 of 34

- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

I also caused same to be served on January 5, 2021, by Docusource via U.S. First Class Mail, postage prepaid upon the following parties who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service):

Paul N. Adkins
11 Mount Emily Road #07-27
Singapore, 228493

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Jeffrey E. Bjork
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100

Appellee Appx. 01457

Appx. 04322

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1465
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1579 of 1828    PageID 11072
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1464 of 1803    PageID 12210
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 27 of 34

Los Angeles, CA 90071

Jessica Boelter
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

Matthew G. Bouslog
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612

William P. Bowden
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899

Candace C. Carlyon
CARLYON CICA CHTD.
265 e. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Joseph L. Christensen
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Louis J. Cisz
Nixon Peabody LLP
One Embarcadero Center, 32nd Fl
San Francisco, CA 94111

Kevin M. Coen
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Debra A. Dandeneau
Baker & McKenzie LLP
425 5th Ave.
New York, NY 10018

Deloitte Tax LLP
1111 Bagby Street, Ste. 4500

Appellee Appx. 01458
Appx. 04323

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1466
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1580 of 1828 PageID 11073
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1465 of 1803 PageID 12211
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 28 of 34

Houston, TX 77002

Mark. L. Desgrosseilliers
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Development Specialists, Inc.
333 South Grand Ave., Ste. 4070
Los Angeles, CA 90071

Fair Harbor Capital, LLC
Ansonia Finance Station
PO Box 237037
New York, NY 10023

Bojan Guzina
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd. Ste. 300
McKinney, TX 75069

Hain Capital Group, LLC
301 Route 17, 6th Floor
Rutherford, NJ 07070

Marc B. Hankin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Michelle Hartman
Baker & McKenzie LLP
1900 N. Pearl, Ste. 1500
Dallas, TX 75201

Hayward & Associates PLLC
10501 N. Central Expwy., Ste 106
Dallas, TX 75231

William A. Hazeltine

Appellee Appx. 01459
APPX. 014326

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1467
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1581 of 1828   PageID 11074
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1466 of 1803   PageID 12212
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 29 of 34

Sullivan Hazeltine Allinson LLC
901 North Market Street
Suite 1300
Wilmington, DE 19801

Kuan Huang
Latham & Watkins LLP
855 Third Avenue
New York, NY 10022

Ira D Kharasch
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

Marshall R. King
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
Suite 1400
New York, NY 10066

Alan J. Kornfeld
Pachulski Stang Ziehl & Jones LLPL
10100 Santa Monica Blvd., 13 Fl
Los Angeles, CA 90067

Kurtzman Carson Consultants LLC
Attn: Drake Foster
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245

Kurtzman Carson Consultants, LLC
222 N. Pacific Coast Highway, Ste. 300
El Segundo, CA 90245

M. Natasha Labovitz
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Richard B. Levin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Maxim B Litvak

Appellee Appx. 01460
APPX. 014375

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1468
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23   Page 1582 of 1828   PageID 11075
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1467 of 1803   PageID 12213
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 30 of 34

Pachulski Stang Ziehl & Jones LLP
150 California Street
15th Floor
San Francisco, CA 94111

John E. Lucian
Blank Rome LLP
1201 N. Market Street, Sutie 800
1000 North King Street
Wilmington, DE 19801

Lauren Macksoud
1221 Avenue of the Americas
New York, NY 10020-1089

Mark M. Maloney
King & Spalding LLP
191 Peachtree St.
Suite 4900
Atlanta, GA 30303-1763
mmaloney@kslaw.com, pwhite@kslaw.com

Mark M. Maloney
King & Spalding LLP
1180 Peachtree Steet, NE
Atlanta, GA 30309

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

Patrick C. Maxcy
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

R. Stephen McNeill
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Mercer (US) Inc.
155 N. Wacker Drive, Ste. 1500
Chicago, IL 60606

Appellee Appx. 01461
Appx. 04326

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1469
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23   Page 1583 of 1828   PageID 11076
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1468 of 1803   PageID 12214
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 31 of 34

Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
one Rodney Square
920 North King Street
Wilmington, DE 19801

Curtis S. Miller
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Josef W. Mintz
Blank Rome LLP
1201 Market Street, Suite 800
1000 North King Street
Wilmington, DE 19801

Joseph T. Moldovan
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Alan A. Moskowitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Michael R. Nestor
YOUNG CONAWAY STARGATT & TAYLOR, LL
Rodney Square
1000 North King Street
Wilmington, DE 19801

James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Fl.
Wilmington, DE 19801

Tracy M. O'Steen
CARLYON CICA CHTD.
265 E. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP

Appellee Appx. 01462
APPX. 014323

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1470
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1584 of 1828 PageID 11077
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1469 of 1803 PageID 12215
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 32 of 34

10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Kathleen Preston
Winston & Strawn LLP
800 Capitol Street, Ste. 2400
Houston, TX 77002

Michael A. Rosenthal - DO NOT USE
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Jeremy W. Ryan
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

James P. Seery
795 Columbus Ave., 12A
New York, NY 10025

Sally T. Siconolfi
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Sarah E. Silveira
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

D. Ryan Slaugh
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Tracy K. Stratford
Jones Day
North Point

Appellee Appx. 01463
Appx. 04326

901 Lakeside Ave.
Cleveland, OH 44114

Daniel E. Stroik
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304

Stephen G. Topetzes
K&L Gates LLP
1601 King St., N.W.
Washington, DC 20006

Thomas A. Uebler
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Michael L. Vild
CROSS & SIMON, LLC
1105 N. Market Street, Suite 901
1000 North King Street
Wilmington, DE 19801

Elissa A. Wagner
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003

Erica S. Weisgerber
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Wright
K&L Gates LLP

Appellee Appx. 01464

APPX. 01329

State Street Financial Center
One Lincoln St.
Boston, MA 02111

Sean M. Young Conway Stargatt & Taylor, LLP
Young Conway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801


/s/Douglas S. Draper
Douglas S. Draper, LA Bar No. 5073

Appellee Appx. 01465

Appx. 04322

# APPENDIX 20

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1474
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1588 of 1828 PageID 11081
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1473 of 1803 PageID 12219
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 1 of 42

Docket #1670 Date Filed: 01/05/2021

| | |
|---|---|
| K&L GATES LLP<br>Artoush Varshosaz (TX Bar No. 24066234)<br>1717 Main Street, Suite 2800<br>Dallas, TX 75201<br>Tel: (214) 939-5659<br>artoush.varshosaz@klgates.com<br><br>Stephen G. Topetzes (*pro hac vice*)<br>1601 K Street, NW<br>Washington, DC 20006-1600<br>Tel: (202) 778-9328<br>stephen.topetzes@klgates.com<br><br>A. Lee Hogewood, III (*pro hac vice*)<br>4350 Lassiter at North Hills Ave., Suite 300<br>Raleigh, NC 27609<br>Tel: (919) 743-7306<br>Lee.hogewood@klgates.com<br><br>*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund* | Davor Rukavina, Esq.<br>Texas Bar No. 24030781<br>Julian P. Vasek, Esq.<br>Texas Bar No. 24070790<br>MUNSCH HARDT KOPF & HARR, P.C.<br>3800 Ross Tower<br>500 N. Akard Street<br>Dallas, Texas 75202-2790<br>Telephone: (214) 855-7500<br>Facsimile: (214) 978-4375<br><br>*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund* |

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

### OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF
### REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

1934054210105000000000016

Appellee Appx. 01467

APPX. 04324

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1475
Case 3:23-cv-00726-S   Document 8-22   Filed 02/09/23    Page 1589 of 1828   PageID 11082
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1474 of 1803   PageID 12220
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 2 of 42

Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. (each, an "**Advisor**," and collectively, the "**Advisors**"), Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund (each, a "**Fund**," and collectively, the "**Funds**," and together with the Advisors, the "**Funds and Advisors**" or "**Objectors**"), by and through their undersigned counsel, hereby submit this objection (the "**Objection**") to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1472], together with that certain Plan Supplement [Dkt. No. 1648] filed December 30, 2020 (the "**Fifth Amended Plan**").[1]  In support of the Objection, the Funds[2] and Advisors respectfully submit to the Court as follows:

<u>**SUMMARY OF OBJECTION**</u>

The Debtor owes strict statutory and contractual fiduciary obligations to manage the billions of dollars of other peoples' money that it manages.  No actual or hypothetical conflict of interest is allowed.  Yet, the Fifth Amended Plan, by purporting to assume various agreements pursuant to which the Debtor manages portfolios of assets, places the interests of the Debtor's creditors ahead of the interests of the beneficial interest holders in those portfolios,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] The Funds are investment companies and a business development company registered under the Investment Company Act of 1940 as open-end or "mutual" funds, closed end funds or a business development company. None of the Funds are private or hedge funds.

Appellee Appx. 01468
APPX. 01323

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1476
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1590 of 1828   PageID 11083
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1475 of 1803   PageID 12221
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 3 of 42

thereby representing a clear conflict of interest and breach of fiduciary duty in violation of the Advisers Act (defined below) and the 1940 Act (defined below).

This is because the Plan provides for the assumption of numerous management agreements in connection with, among other investments, interests in collateralized loan obligations ("**CLOs**") owned in part by the Funds and/or Advisors, together with other investors.  In some cases, either the Funds, the Advisors or these entities in conjunction with other objecting creditor(s) own or manage a majority of the remaining beneficial interests in such CLOs.  To be clear, the CLO -- not the Funds nor the Advisors nor the Debtor -- is the issuer of these interests.  Nevertheless, it is the Funds and Advisors who hold the beneficial and economic interests and who, pursuant to the underlying agreements, in many instances have the ability to control who the servicer or manager of the portfolios is.  However, the Plan reveals that the Debtor intends to dismiss its investment management employees by the end of January 2021 and to employ a subagent to perform its current portfolio manager/servicer role.  The Debtor intends to effectively wind-down and liquidate the CLOs' assets within two years—an arbitrary proposition having nothing to do with what is in the best interests of the CLOs.  The Debtor also intends to strip the Funds and the Advisors of their contractual and statutory rights, and to improperly insulate itself from potential future liabilities that it may incur on account of its portfolio management.

The Plan cannot be confirmed so long as it provides for the assumption of these agreements. First, these agreements cannot be assigned under the Advisers Act or the 1940 Act, meaning that they cannot be assumed pursuant to section 365(c) of the Bankruptcy Code. Second, these agreements cannot be assumed under section 365(b) of the Bankruptcy Code because the Debtor cannot adequately assure its future performance under the agreements.

Appellee Appx. 01469
APPX. 04326

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1477
Case 3:23-cv-00726-S    Document 8-22    Filed 08/29/23    Page 1591 of 1828    PageID 11084
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1476 of 1803    PageID 12222
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 4 of 42

Third, these agreements cannot be assumed if the Plan purports to change their provisions or relieve the Debtor from its fiduciary obligations and resulting potential liabilities. Fourth, the Plan is not feasible and is illusory so long as it depends on future income from these non-assumable agreements. Fifth, the Plan fails to comply with applicable law by seeking to relieve the Debtor of the strict duties imposed on it by the Advisers Act and 1940 Act. Indeed, the Plan is an invitation for future litigation against the Debtor for future breaches by the Debtor of its contractual obligations and violations by the Debtor of federal law.

The Plan is not merely a disagreement between the Debtor, on the one hand, and the Funds and Advisers, on the other hand, as to how to manage the CLOs. The Plan instead represents an attempt by the Debtor to strip beneficial interest holders of their contractual and statutory rights, to improperly insulate itself against its future actions and liabilities, to avoid the dictates of the Advisers Act, and to use assets that it manages—assets that do not belong to the Debtor—to benefit the Debtor's creditors at the expense of the actual owners of those assets. It is one thing for the Debtor to liquidate and to seek to repay its creditors, but it is another thing entirely for the Debtor to do this on the backs, and at the expense, of those investors whose interests the Debtor is charged with serving first.

For these and other reasons argued below, the Objectors object to the confirmation of the Plan.

The purported contract assumption is also illusory in that the Debtor's plan is premised upon the liquidation of assets in which the Debtor has no interest and which a majority of the beneficial owners has expressed, and continue to express, a desire for a different portfolio management strategy than the one the Debtor intends to continue to employ. The contracts the Debtor proposes to assume contain provisions requiring the maximization of the return to or

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1478
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1592 of 1828 PageID 11085
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1477 of 1803 PageID 12223
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 5 of 42

preservation of the value of the collateral for the preference shareholders; these parties prefer that the assets not be liquidated, but maximized or preserved. Moreover, the Advisers Act[3] requires the Debtor to comply with the portfolio management contracts for the protection of the investors in the Funds, CLOs and other products. The Debtor's purported assumption of these agreements, while other provisions of the Fifth Amended Plan make clear key provisions of the assumed contracts will be ignored and rejected in this context, is a similar form of "cherry picking" that section 365 does not countenance.[4]

## BACKGROUND

### A. General Background on Funds and Advisors

1. Each Advisor is registered with the U.S. Securities and Exchange Commission ("**SEC**") as an investment adviser under the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b-1 *et. seq.* (the "**Advisers Act**").

2. Each of the Funds is a registered investment company or business development company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1, *et. seq.* (the "**1940 Act**") and is advised by one of the Advisors.

3. As an investment company or business development company, each Fund is managed by an independent board of trustees subject to 1940 Act requirements. That board determines and contracts with one of the Advisors for each Fund. As is typical for nearly all

---

[3] The Advisers Act and the 1940 Act (defined in numbered paragraph 2 below) are two separate acts, both adopted in 1940, and provide the essential statutory and regulatory structure for the Debtor's business, as well as the Advisors and the Funds, to operate legally and transparently for the benefit of the public.

[4] The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis.

**Appellee Appx. 01471**
**APPX. 014328**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1479
Case 3:23-cv-00726-S   Document 8-22   Filed 08/29/23    Page 1593 of 1828   PageID 11086
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1478 of 1803   PageID 12224
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 6 of 42

investment companies, the Funds do not have employees. Instead, pursuant to the 1940 Act, each Fund's board oversees the Advisor and the Advisor, acting pursuant to the advisory agreements, provides the services necessary to the Fund's operations.[5]   The Funds are each managed by one of the two Advisors.  The Advisors have some employees, but they also rely heavily on the Debtor to provide a variety of services.  Further, certain individuals employed or affiliated with the Debtor also hold roles for the Advisors and/or the Funds, and some of these roles are fiduciary in nature (the "**Fiduciaries**"). The Fiduciaries are privy to confidential commercial information about the Funds and Advisors, including data relating to the Funds' investment holdings and investment strategies.

### B.    *Shared Services and Payroll Reimbursement Agreements with the Debtor*

4.    Each Advisor is party with the Debtor to a shared services agreement. Specifically, NexPoint Advisors, L.P. ("**NexPoint**") and the Debtor are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (as amended, the "**NexPoint SSA**"), and Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and the Debtor are parties to a Second Amended and Restated Shared Services Agreement dated February 8, 2013 (as amended, the "**HCMFA SSA**," and collectively with the NexPoint SSA, the "**Shared Services Agreements**").[6]

5.    Under the Shared Services Agreements, the Debtor provides a variety of services, including operational, financial and accounting, human resources, information technology, legal, tax, and compliance services, to the Advisors.  As part of its provision of

---

[5] Each of the Funds' respective boards meets quarterly and, consistent with statutory requirements, each is advised by independent counsel.

[6] Copies of the Shared Services Agreements and the Payroll Reimbursement Agreements (as defined below) are attached to the proofs of claim filed by the Advisors at Claim Nos. 95, 104, 108 and 119.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1480
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1594 of 1828   PageID 11087
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1479 of 1803   PageID 12225
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 7 of 42

services, the Debtor maintains books and records (the "**Books and Records**") on behalf of the Advisors.

6.      Under the HCMFA SSA, the costs of the Debtor's services are allocated on a percentage of use basis.  The Debtor submits quarterly expense statements to HCMFA to reconcile amounts due to the Debtor.  In addition, with respect to certain taxes related to the Shared Services, the Debtor collects those taxes from HCMFA on the same basis as with the Debtor's other customers.  To the extent of a related tax refund, the Debtor is obligated to submit the refund to HCMFA.

7.      Under the NexPoint SSA, NexPoint pays the Debtor a fixed monthly fee for the provision of services.

8.      The Advisors and the Debtor are also parties to separate payroll reimbursement agreements (as amended, the "**Payroll Reimbursement Agreements**").  The Payroll Reimbursement Agreements address the splitting of costs for certain employees that are "dual employees" of the Debtor and an Advisor and who provide advice to funds, such as the Funds, advised by the Advisors.  The Payroll Reimbursement Agreements provide for the subject Advisor to reimburse the Debtor at a set cost.

9.      The Advisors also participate in the Debtor's self-insured healthcare plan (the "**Self-Insured Plan**"), which provides employee healthcare coverage.  Depending on the contributions made and the claims submitted to the Self-Insured Plan at any given time, an Advisor may be owed money by, or owe additional contributions to, the Self-Insured Plan.

10.     The Plan proposes to reject those executory contracts [Fifth Am. Plan, Dkt. No. 1472 at p. 37] that are not otherwise listed for assumption in a plan supplement.  The Debtor has filed its Plan Supplement listing executory contracts to be assumed [Dkt. No. 1648], which

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1481

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1595 of 1828   PageID 11088

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1480 of 1803   PageID 12226

Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 8 of 42

Plan Supplement does not include the foregoing executory contracts. Accordingly, it appears that the Plan proposes to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan. The Advisors will therefore have potentially sizable rejection damages claims, on account of which they are preparing to file corresponding proofs of claim.

### C.    *The CLOs*

11.    The Funds also have economic interests in certain collateralized loan obligations (the "**CLOs**") (the Fifth Amended Plan refers to the CLOs as "Issuers"), for which the Debtor serves as portfolio manager.

12.    The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC,[7] and Westchester CLO, Ltd.

13.    The CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual priority of payments, or waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preferred shares.

14.    The CLOs were created many years ago. Most of the CLOs have, at this point, paid off all the tranches of notes or all but the last tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preferred

---

[7] The portfolio management agreements with Loan Funding VII, LLC is not proposed to be assumed.

Appellee Appx. 01474

APPX. 014339

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1482
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1596 of 1828 PageID 11089
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1481 of 1803 PageID 12227
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 9 of 42

shares.

15.     Further, such ownerships represent in many cases the total remaining outstanding interests in such CLOs, the noteholders otherwise having been paid.  In others, the remaining noteholders represent a small percentage only of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco represent a majority of the investors in the CLOs as follows:

> a.   CLOs in which NexPoint or HCMFA manage owners of a majority of the preference shares:  Stratford CLO, Ltd. 69.05%, Grayson CLO, Ltd. 60.47% and Greenbriar CLO, Ltd. 53.44%.

> b.   CLOs in which a combination of NexPoint and HCMFA managed funds and CLO Holdco hold all, a supermajority or majority of preference shares:  Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%*[8], Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*, Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%, Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%*

16.     The issuer of each CLO has separately contracted with the Debtor for the Debtor to serve as the CLO's portfolio manager or servicer (the "**Servicing Agreements**").[9]  In this capacity, the Debtor is responsible for, among other things, making decisions to buy or sell the CLOs' assets in accordance with the indenture and its obligations under the Servicing Agreements.  Although the Servicing Agreements vary, they generally impose a duty on the

---

[8] CLOs marked with an asterisk (*) appear in the foregoing list as well.

[9] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Objection, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

Appellee Appx. 01475
APPX. 014742

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1483
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1597 of 1828   PageID 11090
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1482 of 1803   PageID 12228
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 10 of 42

Debtor when acting as portfolio manager to maximize the value of the CLOs' assets for the

benefit of the CLOs' noteholders and preferred shareholders.   In particular, the Servicing

Agreements contain language providing for the maximization or preservation of value for the

benefit of the preference shares as shown in the following examples:

> In performing its duties hereunder, the Portfolio Manager shall seek to maximize the value of the Collateral for the benefit of the Noteholders and the Holders of the Preference Shares taking into account the investment criteria and limitations set forth herein and in the Indenture and the Portfolio Manager shall use reasonable efforts to manage the Collateral in such a way that will (i) permit a timely performance of all payment obligations by the Issuer under the Indenture and (ii) subject to such objective, maximize the return to the Holders of the Preference Shares; provided, that the Portfolio Manager shall not be responsible if such objectives are not achieved so long as the Portfolio Manager performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Portfolio Manager with respect to the Notes or the Preference Shares.

Liberty Portfolio Management Agreement, Sec. 2(b) containing language above.

> In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

Aberdeen Servicing Agreement, Sec. 2(b).

Appellee Appx. 01476
Appx. 04343

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1484
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1598 of 1828   PageID 11091
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1483 of 1803   PageID 12229
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 11 of 42

17.     Moreover, each of the Servicing Agreements contain express language that the portfolio manager's obligations thereunder are for the benefit of and "shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or Holders of Preference Shares, as applicable, as provided in the Indenture of the Preference Share Paying Agency Agreement, as applicable."  Servicing Agreement Sec. 9.

18.     The Servicing Agreements also generally allow the holders of preference shares to remove the portfolio manager for cause, while their affirmative consent is required to an assignment of the agreements.  Cause includes the anticipated "ipso facto" provisions related to insolvency and bankruptcy, but cause is not so limited and includes material breach of the Servicing Agreement which would clearly include the failure to maximize value or the failure to preserve collateral. Servicing Agreement, Sec. 14.  However, certain Servicing Agreements provide for a certain percentage of holders of preference shares to remove the portfolio manager without cause.  *See, e.g.*, Gleneagles CLO , Ltd., Portfolio Management Agreement, Sec. 12(c).

### *E.     The Fifth Amended Plan and Disclosure Statement*

19.     On November 24, 2020, the Debtor filed the Fifth Amended Plan and the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1473] (the "**Disclosure Statement**").

Appellee Appx. 01477
APPX. 04344

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1485
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1599 of 1828  PageID 11092
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1484 of 1803  PageID 12230
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 12 of 42

20.    The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries.  The Debtor's rights to manage investment vehicles managed by the Debtor pursuant to executory contracts that are assumed pursuant to the Fifth Amended Plan, defined as the "Managed Funds," are to remain with the Reorganized Debtor, which, in turn, is to be managed by New GP LLC, a wholly-owned subsidiary of the Claimant Trust.  The Disclosure Statement states that "[t]his structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets." Dkt. No. 1473 at 11.  Ultimately, however, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets."  *Id.*  More specifically, the Reorganized Debtor will manage the wind down of the Managed Funds in addition to any other remaining Assets.  Moreover, the Financial Projections attached as Exhibit C to the Disclosure Statement make clear that, assuming confirmation of the Plan in its current form, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

21.    The Disclosure Statement further states that the Debtor does not anticipate either the Reorganized Debtor or the Claimant Trust assuming or assuming and assigning the contracts between the Debtor and certain of its Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services relating to such Related Entities.  Dkt. No. 1473 at 42.  Accordingly, it appears that the Debtor's intent is to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan.

---

[10] Footnote 10 to the Disclosure Statement clarifies that the Debtor does not consider any of the Issuers to be a Related Entity.

Appellee Appx. 01478
APPX. 104348

22.    With respect to the Shared Services Agreements, the Disclosure Statement provides that the cost of staffing to fulfil the agreements has historically resulted in a net loss to the Debtor and is not beneficial to the estate.  The Disclosure Statement further states that the agreements contain anti-assignment provisions which it believes to be enforceable under section 365(c) of the Bankruptcy Code, and moreover, are terminable at will by either party.  In light of these considerations, the Debtor apparently does not believe that the agreements may be assumed or assumed and assigned, and even if they could, there would not be any corresponding benefit to the estate.  Notwithstanding the foregoing, the Disclosure Statement indicates that the Debtor is still assessing whether to assume and assign the agreements with a Related Entity.  Dkt. No. 1473 at 42.

23.    The Disclosure Statement also discusses the Debtor's role as portfolio manager for the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32).  After explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

> The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

24.    The Debtor's Supplement to the Plan, filed on December 30, 2020 at Dkt. No. 1648, indicates that the Debtor intends to assume the Servicing Agreements with all of the CLOs except Loan Funding VII, LLC.  *See* Dkt. No. 1648, Sched. A.

Appellee Appx. 01479

APPX. 014346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1487
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1601 of 1828 PageID 11094
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1486 of 1803 PageID 12232
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 14 of 42

## OBJECTION

**A.** ***The Debtor Cannot Assume the Servicing Agreements Pursuant to Section 365(c)(1) of the Bankruptcy Code***

25.     The Objectors object to the assumption of the Servicing Agreements for the fundamental reason that the Debtor will not manage the CLOs' assets appropriately in order to maximize value for the CLOs and the Objectors, but will instead breach its fiduciary duties by managing a winding-down those CLOs and assets in order to provide a recovery for its creditors, in what is an obvious and irreconcilable conflict of interest.

26.     As explained below, the Debtor and the Servicing Agreements which it seeks to assume are subject to the Advisers Act. As the Supreme Court has repeatedly held, it is a fundamental purpose of the Advisers Act to impose strict fiduciary duties on investment advisors and to "eliminate conflicts of interest between the investment adviser and the clients." *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963). This extends to any "conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Id*. "[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations." *Transamerica Mort. Advisors v. Lewis*, 444 U.S. 11, 17 (1979).

27.     Under the Plan, the Debtor would be owned by its creditors. The Debtor and the Claimant Trust would be managed by a person holding fiduciary duties to the Debtor's creditors. The Debtor would manage and presumably wind-down and liquidate the assets of the CLOs within a span of two years, not for the benefit of the CLOs and their beneficial interest holders, but for the benefit of the Debtor's creditors. And, it would do this without employees or resources, or by impermissibly delegating its duties to yet a different party—something that it is not permitted to do under applicable law and the governing contracts. In sum, the Debtor

would manage the CLOs and their assets for the benefit of the Debtor's creditors, which it is fundamentally impossible to do without simultaneously violating the Debtor's strict fiduciary duties to others and which represents a clear conflict of interest under the Advisers Act.

28.     This inescapable conclusion is precisely why the Bankruptcy Code prohibits an assumption of personal service contracts like the Servicing Agreements.  The Bankruptcy Code provides that:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

29.     The first question is whether "applicable law" excuses the counterparties to the Servicing Agreements from accepting performance from the Debtor.  In this respect, both the Advisers Act and the 1940 Act represent "applicable law" that provides for precisely that.

30.     The Advisers Act governs "investment advisors."  The Advisers Act defines an investment advisor as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

31.     There is no question that the Debtor receives compensation under the Servicing Agreements.  The only question is whether, under the Servicing Agreements, and in connection

15

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1489
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1603 of 1828 PageID 11096
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1488 of 1803 PageID 12234
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 16 of 42

with managing the investments and securities of the CLOs, the Debtor satisfies the remaining element(s). Case law confirms that, in providing investment services and investment management under the Servicing Agreements, is acting as an "investment advisor" under the Advisers Act. The Second Circuit authoritatively considered and decided the issue of whether a portfolio manager is an investment advisor in *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977). The case concerned general partners who managed various investments on behalf of limited partners. *See id*. at 866. Regarding whether the general partners were investment advisors on account of managing the investments, the court concluded that they were "on two independent grounds":

> First, the monthly reports which contained the alleged fraudulent representations were reports which provided investment advice to the limited partners. The general partners' compensation depended in part upon the firm's net profits and capital gains. These in turn were affected by the size of the total funds under their control. The monthly reports were an integral part of the general partners' business of managing the limited partners' funds. In deciding whether or not to withdraw their funds from the pool, the limited partners necessarily relied heavily on the reports they received from the general partners.
>
> Second, wholly aside from the monthly reports, we believe that the general partners as persons who managed the funds of others for compensation are 'investment advisers' within the meaning of the statute. This is borne out by the plain language of Section 202(a)(11) and its related provisions, by evidence of legislative intent and by the broad remedial purposes of the Act.

*Id*. at 870. Thus, by virtue of managing the underlying investments and related activities, the general partners were providing investment advice and were therefore investment advisors subject to the Advisers Act.

32. The court in *SEC v. Smith*, 1995 U.S. Dist. LEXIS 22352 (E.D. Mich. 1995), considered a similar issue. In that case, the SEC sought summary judgment that the defendant was an investment adviser under the Advisers Act. The defendant argued that he was not an investment adviser merely by virtue of managing a portfolio of accounts on behalf of third

16

parties.  *See id.* at \*12-\*13.  Specifically, the defendant argued that he was not giving investment advice, but that he was instead "a professional trustee who exercises sole discretionary control over trust investments. . .  I am the trustee. I have absolute full power and authority to make all buy, hold and sell decisions. And, therefore, I am the one that receives information and research and I make the decisions." *Id*. at \*13.  In other words, because he had sole discretion and control over how to manage the invested assets, he was not giving "advice" within the meaning of the Advisers Act.  The court rejected this argument: "Smith is clearly an investment advisor under the Advisers Act." *Id*. at \*15.

33.    The court in *SEC v. Saltzman*, 127 F. Supp. 2d 660 (E.D. Pa. 2000) reached the same conclusion with respect to a portfolio manager:

> Saltzman maintained exclusive control over the investment portfolio, brokerage accounts, and bank account of Saltzman Partners, L.P.  He made all investment decisions for the portfolio. As the Act intended to embrace those who wield power over their clients' money, as Saltzman did over the investments of the limited partners, the facts alleged qualify Saltzman as an investment adviser.

*Id*. at 669.  Therefore, the Debtor, by virtue of managing the CLO assets, and even though it has the sole control and authority over that management, is providing investment advice and is therefore an investment advisor with respect to the Servicing Agreement.

34.    More particularly, the Servicing Agreements, because they provide for investment advice, are "Investment Advisory Contracts" under the Advisers Act.  This is further confirmed by the language of the Advisers Act with respect to the definition of Investment Advisory Contract:

> any contract or agreement whereby a person agrees to act as investment adviser to <u>or to manage any investment</u> or trading account <u>of another person</u> other than an investment company registered under title I of this Act.

15 U.S.C. § 80b-5(d) (emphasis added).  Managing the investments of others is of course

Appellee Appx. 01483

APPX. 014340

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1491
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1605 of 1828 PageID 11098
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1490 of 1803 PageID 12236
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 18 of 42

precisely what the Debtor does under the Servicing Agreements.

35.     There should therefore be no question that the Servicing Agreements are "investment advisory contracts" subject to the Advisers Act. Should there be any doubt, the Servicing Agreements in multiple places reference the Advisers Act and subject the agreements to the requirements of the Advisers Act.

36.     The Advisers Act prohibits an assignment of an investment advisory contract without consent. The Advisers Act defines "assignment" as including "any direct or indirect transfer or hypothecation of an investment advisory contract." 15 U.S.C. § 80b-2(a)(1). With respect to an assignment, the Advisers Act provides as follows:

> No investment adviser registered or required to be registered with the Commission shall enter into, extend, or renew any investment advisory contract, or in any way perform any investment advisory contract entered into, extended, or renewed on or after the effective date of this title, if such contract—
>
> (2) fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract.

15 U.S.C. § 80b-5(a)(2).

37.     Each of the Servicing Agreements contain substantially similar provisions related to any assignment:

> any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares.

38.     Accordingly, the Advisers Act represents "applicable law" under section 365(c)(1) that excuses the counterparty to an investment advisory contract from accepting performance from an assignee. As such, because the agreement cannot be assigned, it cannot

Appellee Appx. 01484
APPX. 04349

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1492
Case 3:23-cv-00726-S   Document 8-22   Filed 06/29/23    Page 1606 of 1828   PageID 11099
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1491 of 1803   PageID 12237
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 19 of 42

be assumed by the Debtor without consent.

39.    It is true that courts in this District construe section 365(c)(1) such that, where the applicable law is merely a general prohibition on assignment, the section does not prevent an assumption. *See, e.g., In re Lil' Things*, 220 B.R. 583, 590-91 (Bankr. N.D. Tex. 1998). Here, however, the Advisers Act is not a general law that would prohibit an assignment; it is a very specific law, applicable to a very narrow set of persons, and one which prohibits only the assignment of an investment advisory agreement.

40.    Even so, this District recognizes that section 365(c)(1) becomes paramount "where the identity of the party rendering performance under the contract is material to the contract, and the contract is non-delegable under applicable non-bankruptcy law." *Id.* at 591. This is certainly true where, as here, a party has contracted with someone to manage that party's property and investments: that is a fiduciary relationship of the highest trust where the identity of the person providing the services is absolutely paramount.  The Fifth Circuit recognized this fundamental principle the highly analogous situation of an attorney retention agreement: the contract was not assumable under otherwise applicable law because the contract was a highly personal one involving elements of trust, legal, and ethical considerations. *See In re Tonry*, 724 F.2d 467, 468-69 (5th Cir. 1984).

41.    In *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), this Court concluded that the debtor-in-possession may assume a contract even if section 365(c) would prevent a trustee from being able to assume the contract.  In large part, the Court construed the addition, in 1984, of the term "debtor-in-possession" into the statute as evidence that Congress intended for a debtor-in-possession to be able to assume its contracts even if section 365(c) would otherwise prohibit a trustee from assuming the contract. *See id.* at 333.  "The specific

Appellee Appx. 01485
APPX. 014352

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1493
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1607 of 1828 PageID 11100
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1492 of 1803 PageID 12238
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 20 of 42

use of the words 'the debtor or the debtor in possession' leads the court to conclude that a contract to be performed by a debtor or debtor in possession (as opposed to a trustee) is subject to assumption whether or not applicable law limits its assignability. *Id.* However, the Fifth Circuit has not adopted this view and the logic of *In re Mirant Corp.* is not correct.

42.     The statute begins by providing that the "trustee may not assume or assign any executory contract . . ." 11 U.S.C. § 365(c)(1). That "trustee" must include a debtor-in-possession, for it is the same "trustee" as in section 365(a) which provides that a "trustee . . . may assume or reject any executory contract." *Id.* at § 365(a). Thus, the section 365(c)(1) prohibition on a trustee must also extend to a "debtor-in-possession," unless the Court concludes that the use of the word "trustee" in the same statute means two different things. Rather, what *In re Mirant Corp.* was referring to was the following language in section 365(c)(1):

> applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession.

*Id.* at § 365(c)(1).

43.     The addition of the term "debtor-in-possession" to this statute does not change the result; *i.e.* it does not mean that a debtor-in-possession, unlike a trustee, may assume, but not assign, its own contracts. The question is whether applicable law excuses a party from accepting performance from an entity other than the debtor-in-possession. The Debtor is a debtor-in-possession and, if the counterparty is excused by applicable law from accepting performance from anyone else, then the contract may not be assumed by the Debtor. *In re Mirant Corp.* was simply wrong in concluding that the 1984 amendment somehow excepted a debtor-in-possession's assumption of its own contracts from the operation of section 365(c)(1).

44.     The Fifth Circuit's opinion in *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392

(5th Cir. 2001) is on point.  That opinion was rendered after the 1984 amendment at issue in *Mirant*, and that opinion concerned a Chapter 11 debtor.  The question was whether a non-assignable partnership agreement could be assumed under section 365(c)(1).  The Fifth Circuit held that "the agreement was *not* assumable under § 365(c)(1)."  *Id*. at 402 (emphasis in original).  And, as here, the confirmed plan provided for a postconfirmation liquidating trust.  *See id*. at 396.  The only difference was that, in *In re O'Connor*, a Chapter 11 trustee proposed the confirmed plan.  This difference does not matter because the Fifth Circuit held that the agreement itself was not assumable; not that one person may assume it while a second not.  *See id*. at 402 and 404 (twice holding that the "agreement is *not* assumable" (emphasis in original)).[11]  Only one person may assume an executory contract, and that person is the trustee, even if the debtor-in-possession is exercising the powers of a trustee.  Thus, if the contract itself is not assumable, then it is not assumable period.  This difference also does not matter because the identity of the plan proponent is immaterial: the question is still whether it is the debtor-in-possession, or the estate, that can assume the executory contract.

45.     The Debtor will respond that the Fifth Circuit, in *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006), rejected the so-called "hypothetical test" and adopted instead the "actual test" regarding the assignment of an executory contract or lease.  In *Mirant*, the issue concerned section 365(e)(2) of the Bankruptcy Code and whether an *ipso facto* clause was enforceable against a debtor-in-possession because the executory contract was not assignable.  The

---

[11] In *Strumpf*, the Fifth Circuit held that, because the agreement was not assumable, it passed through the Chapter 11 unaffected.  However, *Strumpf* itself concluded that this "pass-through" principle does not apply in a liquidating plan, as further confirmed by *In re Tex. Rangers Baseball Partners*, 521 B.R. 134,183 (Bankr. N.D. Tex. 2014). Even if the agreements could pass through unaffected to the reorganized debtor, even though it is liquidating, the Plan cannot limit the ability to terminate the agreements in the future based on the change in control and other facts that are present.  Otherwise, the agreements would be affected by the Plan, meaning that they would have to first be assumed, as recognized in *Strumpf* by holding that a plan effect on the executory contract means that it cannot pass through bankruptcy unaffected.  *Strumpf, 258 F.3d at 405.*

Appellee Appx. 01487

Appx. 14352

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22     Entered 08/15/22 16:45:41     Page 1495
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23     Page 1609 of 1828   PageID 11102
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21     Page 1494 of 1803   PageID 12240
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 22 of 42

"hypothetical test" required a court to review whether a hypothetical assignment was prohibited by applicable law; if it was, then the *ipso facto* clause could be enforced even though no assignment was proposed.  *See id*. at 246-47.  The Fifth Circuit rejected this approach and instead applied the "actual test," which looked at whether an assignment was actually being proposed. *See id*. at 249-50.  The Debtor will argue that this same logic should apply to section 365(c)(1) such that, when no actual assignment is being proposed, the section is not implicated.

46.     *Mirant* and its logic, however, do not apply to section 365(c)(1).  First, and most obviously, the Fifth Circuit stated that "[a]lthough this Circuit has addressed § 365(c)(1), we have yet to address § 365(e)," and then it cited to its *In re O'Connor* and *In re Braniff Airways* precedent.  *See id*. at 248-49.  The circuit, in analysing this prior precedent, noted that it was the contract itself that was not assumable ("declaring the contract unassumable," *id*.) and reaffirmed the holdings of both prior opinions notwithstanding the change in the language of section 365(c)(1).  Thus, and having been afforded the opportunity to revisit its prior precedent or to find that the added "debtor-in-possession" language to section 365(c)(1) compelled a different result, the circuit instead reaffirmed its prior precedent holding that the contract itself was not assumable.  More precisely, the "actual test" cannot apply to section 365(c)(1) because that section provides that a trustee may not "assume or assign" an executory contract.  If the test were an actual one, *i.e.* whether an actual assignment was being proposed, then the section would simply provide that the trustee may not "assume and assign" the executory contract.  But, in preventing an assumption even without a proposed assignment, section 365(c)(1) necessarily applies the "hypothetical test" such that, even though no assignment is proposed, if an assignment is prohibited then so is an assumption.

47.     Thus, were the Fifth Circuit presented with the precise issue with respect to

Appellee Appx. 01488
APPX. 01353

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1496
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1610 of 1828 PageID 11103
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1495 of 1803 PageID 12241
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 23 of 42

section 365(c)(1), to the extent it was not in *In re O'Connor*, the Objectors submit that the Fifth

Circuit would join its sister circuits in concluding that, so long as even a hypothetical

assignment would be prohibited, so too is an assumption, whether by a trustee, debtor, or debtor-

in-possession. *See In re Catapult Entertainment*, 165 F.3d 747, 750 (9th Cir. 1999) ("a debtor

in possession may not assume an executory contract . . . if applicable law would bar assignment

to a hypothetical third party, even where the debtor in possession has no intention of assigning

the contract in question to any such third party"); *In re James Cable Partners L.P.)*, 27 F.3d

534, 537 (11th Cir. 1994); (holding that debtor-in-possession may not assume executory

contract under section 365(c)(1) notwithstanding that no assignment was proposed); *In re

Catron*, 1994 U.S. App. LEXIS 14585 (4th Cir. 1994) (affirming holding that "agreement was

the type of executory contract that could not be assumed by Catron, a debtor-in-possession,

absent consent of the nondebtor parties as required by § 365(c)(1)(B)"); *In re West Electronics

Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) ("the relevant inquiry is not whether [applicable law] would

preclude an assignment from West as a debtor to West as a debtor in possession, but whether it

would foreclose an assignment by West to another defense contractor");[12] *but see Institut

Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir. 1997).

    48.    The result may not be to the liking of the Debtor and, in other circumstances, the

result may be harsh on a debtor-in-possession. But this case aptly demonstrates why the section

---

[12] In fact, as recognized in *West*, the addition of the term "debtor-in-possession" into section 365(c)(1) demonstrates Congress's intent to prevent a debtor-in-possession from assuming its own personal services contracts:

> We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1) Congress anticipated an argument like the one here made and wanted that section to reflect its judgment that in the context of the assumption and assignment of executory contracts, a solvent contractor and an insolvent debtor in possession going through bankruptcy are materially distinct entities.

*In re West Electronics*, 852 F.2d at 83.

Appellee Appx. 01489
Appx. 01356

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1497
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1611 of 1828   PageID 11104
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1496 of 1803   PageID 12242
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 24 of 42

exists and why the result is fair.  Many innocent parties have entrusted billions of dollars of their property to the Debtor to manage, for their benefit.  Now, the Debtor wants to manage that property for the benefit of its creditors, and with insufficient experience, resources, and employees at that.  This is not a case where the debtor is a person, who holds investment management contracts.  That person is the same before, during, and after a Chapter 11 case.  But here the Debtor is the same entity in name only: no reasonable fund would contract with the postconfirmation Debtor here to manage a penny, let alone life savings and the investments of many.  That is the whole point of why personal services contracts cannot be assumed without consent.

49.    Moreover, the Court should not permit the Debtor to place form over substance, especially when the rights of innocent, third party funds and investors are concerned.  While technically the post-confirmation Debtor will still be the same corporate shell, it will have been gutted of everything that made the Debtor the Debtor.  It is in substance and in every real and practical consideration an assignment of the contracts.  Indeed, it appears that the only reason why the Debtor will even maintain a corporate existence after confirmation is an attempt to obviate the prohibition on assumption under section 365(c)(1), as all other property of the Debtor is transferred to the Claimant Trust.  On this point, the Plan expressly provides that the "Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees."  Plan at p. 32-33.  If the intent of this provision is to provide services required by the Servicing Agreements, then this is a blatant violation of the Servicing Agreements' and the Advisers Act's anti-assignment and anti-delegation provisions.  In other words, this admission in the Plan may well be precisely the type of assignment, or subsequent assignment, that would be prohibited by section 365(c)(1) regardless of any

Appellee Appx. 01490
APPX. 01357

discussion between the "hypothetical test" and the "actual test."

50.    Separate and apart from the above discussion, and understand that there is uncertainty in the law as to the interplay between sections 365(f) and 365(c)(1), it is clear that a "personal services contract" falls squarely within the protection of section 365(c)(1).  As the Fifth Circuit has held, a personal services contract is subject to section 365(c)(1): "Congress' enactment of § 365(c) was to preserve the pre-Code rule that 'applicable law' precluding assignment of personal service contracts is operative in bankruptcy."  *In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).  A personal services contract is one which "involves a matter of personal trust and confidence between the original contracting parties."  *In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996).  "A personal services contract has been defined as a contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability."  *In re Wofford*, 608 B.R. 494, 496 (Bankr. E.D. Tex. 2019) (internal quotation omitted).

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, the <u>debtor-in-possession or trustee</u> is unable to assume or assign the rights of the bankrupt in such contract.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996) (emphasis added).

51.    The Service Agreements are clearly personal service contracts: the Debtor's position is one of trust and that of a fiduciary, the Debtor's performance requires personal confidence and high skill and knowledge, the agreements provide that the Debtor's duties are not delegable, and no person entrusting another with managing billions of dollars in assets would want the underlying contract to be assumable by a trustee or a liquidating debtor.  Indeed, the Supreme Court has recognized the "personalized character of the services of investment advisors."  *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963).  This Court

Appellee Appx. 01491

APPX. 014358

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1499
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1613 of 1828   PageID 11106
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1498 of 1803   PageID 12244
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 26 of 42

has characterized financial advisory and brokerage contracts as personal services contracts. *See In re Consolidated Capital Equities Corp.*, 157 B.R. 280, 283 (Bankr. N.D. Tex. 1993). Other courts have held that the Investors Act imposes a trust relationship. *See e.g. In re Peterson*, 96 B.R. 314, 323 (Bankr. D. Colo. 1988). The strict fiduciary and anti-assignment provisions of the Advisor Act and the 1940 Act further confirm Congress' strong view that these contracts are in the nature of personal service contracts.

52.     Even if the Court is inclined to adopt the "actual test" under section 365(c)(1) such that an assumption is possible where there is no assignment, and recognizing that section 365(c)(1) is broader in application than to only personal services contracts, the law overwhelmingly confirms that a personal services contract is not assumable in the first instance. *See, e.g., In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).

53.     The final issue concerning section 365(c)(1) is consent. Assuming that the CLOs do not object to the assumption of the Servicing Agreements, the statute requires affirmative consent to the assumption. The statute prohibits the assumption if "such party does not consent to such assumption." 11 U.S.C. § 365(c)(1)(B). The plain meaning of this language is that consent is required, as opposed to merely the absence of an objection. In *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392 (5th Cir. 2001), the issue concerned an executory contract that was neither expressly assumed nor assigned under a Chapter 11 plan. The Fifth Circuit held that the contract was not assumable under section 365(c)(1) and concluded that the counterparty "did not consent" to an assumption. *See id*. at 402. If the absence of an objection was all that was required, then the Fifth Circuit would not have so held. In fact, the Fifth Circuit expressly rejected the argument that the "Appellees consented to the assumption by failing to object to the Plan." *Id*. at 400. This is in line with the case law, which requires affirmative, or actual,

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1500
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1614 of 1828   PageID 11107
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1499 of 1803   PageID 12245
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 27 of 42

consent to the assumption.  *See In re Allentown Ambassadors Inc.*, 361 B.R. 422, 448 n. 60 (Bankr. E.D. Pa. 2007).

54.    Finally, there is the issue of the Objectors' standing to make the foregoing arguments.  The Objectors have standing for at least four reasons.  First, as creditors and parties in interest,[13] they have the right to object to the Plan.  11 U.S.C. § 1109(b).  Insofar as it is the Fifth Amended Plan that provides for assumption of the Servicing Agreements, the Objectors may object to said assumption, especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole.   Second, the Objectors have standing and the right to object to confirmation of the Fifth Amended Plan under sections 1129(a)(1), (a)(2), and (a)(3) of the Bankruptcy Code.  Insofar as the Fifth Amended Plan and the Debtor propose to impermissibly assume the Servicing Agreements in violation of the law, the Objectors may object to such assumption on those bases.  Third, in several of the Servicing Agreements, the Objectors have the right to remove the Debtor or to control who the servicer under the agreements is.  They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements.  Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the Objectors have standing to object to their rights being limited or eliminated.  Likewise, under the 1940 Act, an investment adviser must be approved by a majority of the voting securities, and the Servicing Agreements cannot continue in effect for more than two years without the consent of either the CLOs' boards of directors or a majority of the outstanding voting securities--i.e., the Objectors.  15 U.S.C. § 80a-15(a)(2).  Insofar as the Fifth Amended Plan purports to limit the

---

[13] "The term 'party in interest' is not defined in the Bankruptcy Code."  *Khan v. Xenon Health, LLC (In re Xenon Anesthesia of Tex., PLLC)*, 698 Fed. Appx. 793, 794 (5th Cir. 2017) (quoting *In re Megrelis*, No. 13-35704-H3-7, 2014 Bankr. LEXIS 3905, at *2 (Bankr. S.D. Tex. Sept. 12, 2014)).  "It generally 'means anyone who has a legally protected interest that could be affected by the bankruptcy case.'"  *Id.*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1501
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1615 of 1828 PageID 11108
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1500 of 1803 PageID 12246
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 28 of 42

Objectors' right to withhold their consent or influence the CLOs' boards of directors, the Objectors have standing to challenge any modification of those rights. Fourth, in several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the Objectors. The Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the Objectors.

55. The Fifth Amended Plan does not comply with section 1129(a)(1) of the Bankruptcy Code because it violates a fundamental principal of contract assumption under section 365 of the Bankruptcy Code. Contracts must be assumed or rejected; there is no such thing as a partial assumption. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*--the debtor accepts both the obligations and the benefits of the executory contract."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("An executory contract cannot be rejected in part and assumed in part; the debtor must assume both the benefits and the burdens on the contract.").

56. The Fifth Amended Plan contravenes established law with respect to the proposed treatment of the CLOs and the Debtor's obligations under the portfolio management agreements.

57. First, the Fifth Amended Plan reveals that the Debtor, while claiming to assume the various Servicing Agreements, also intends to deprive the counterparties to those agreements from exercising their rights to change management.

28

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1502
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1616 of 1828 PageID 11109
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1501 of 1803 PageID 12247
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 29 of 42

58.     Under the Servicing Agreements at issue, either a majority, or in some cases, a supermajority of owners may initiate a change in management.  See attached Exhibit A.

59.     The Debtor's Plan makes clear, however, that it intends to engage a subagent to perform the management and servicing function and, implicitly to deprive the CLOs as issuers from exercising contractual rights with respect to making a change in management.

60.     Second, the Debtor's duties under the Servicing Agreements, which themselves have been adopted under the Advisers Act, subject to Rule 206(4)-8 thereunder as noted below, are owed to, and provide the rights of, the preference shareholders under the portfolio management agreements.  The Debtor's proposed liquidation of Managed Assets (which it does not own) is contrary to the performance of its contractual and statutory duties under the portfolio management agreements.

61.     The preference shareholders, as the only remaining owners of the Managed Assets of many of the CLOs, contend that the Debtor's (i) sales of  Managed Assets and  (ii) continued management of the Managed Assets, notwithstanding the Debtor's stated intention to wind down and liquidate all assets, violates the provisions of Section 2(b) of the portfolio management agreements.

62.     These violations are detrimental to the counterparties to the assumed contracts because:

        a.  liquidation sales of Managed Assets the Debtor does not own are unlikely to maximize the value of the Managed Assets when compared to the long term investment horizon of the beneficial owners of the Managed Assets;

        b.   liquidation sales of Managed Assets are likely to subtract value when duress sales occur based on the short term horizon and liquidation

Appellee Appx. 01495
APPX. 014762

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1503
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1617 of 1828   PageID 11110
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1502 of 1803   PageID 12248
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 30 of 42

strategy of the Debtor;

c.   the Debtor has announced the termination of its personnel, resulting in loss of knowledgeable portfolio managers; and

d.   any potential consultant engaged by the Debtor in the absence of its terminated personnel will be subservient to the Debtor's short-term objective of liquidation in violation of the assumed contracts and applicable securities law.

63.     Manifestly, where the investors in a pooled vehicle state to the manager both that their objectives and desires differ from those of the portfolio manager, and that the portfolio manager's actions are contrary to the manager's duties to maximize returns for the benefit of the investors established under the agreement, that portfolio manager is not acting reasonably under or in accordance with its agreement.  The owners of the Managed Assets, in requisite majority or supermajority,[14] have expressly requested that the Managed Assets not be liquidated as contemplated by the Debtor's business plan.  In that context, the Debtor is unreasonably acting contrary to the required contractual objective and therefore statutory obligation to maximize value for the preference shareholders.   In implementing the Fifth Amended Plan, the Debtor is likely to violate its duty of reasonableness under Section 2(b) under these circumstances, because the Debtor is not "perform[ing] its duties under [the] Agreement in the manner provided for" in the Agreement.

64.     As the Debtor is an investment management firm familiar with established securities laws, the Fifth Amended Plan's violations of such laws is blatant and should not be permitted.

---

[14] Objectors acknowledge that they do not hold a majority in all of the CLOs, for example, Jasper.

Appellee Appx. 01496
APPX. 014963

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1504
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1618 of 1828   PageID 11111
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1503 of 1803   PageID 12249
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 31 of 42

65.     Based upon the Fifth Amended Plan's attempt to assume contracts partially, and not fully, the Court should find that the Fifth Amended Plan fails to satisfy section 1129(a)(1) of the Bankruptcy Code and cannot be confirmed

66.     Moreover, as discussed below, with respect to the injunction and release provisions of the Fifth Amended Plan, the Plan purports to release the Debtor from its contractual and statutory obligations with respect to the Servicing Agreements.  As explained above, those agreements require the Debtor to preserve and to maximize the value of the CLOs assets, for the benefit of the CLOs and the holders of beneficial interests in them.  The Advisers Act requires the same.  The Fifth Amended Plan purports to enjoin parties from "taking any actions to interfere with the implementation or consummation of this Plan."  Plan at p. 50.  This is an unprecedented, overbroad injunction that does not comport with fundamental due process, as what "interference," "implementation," or "consummation" mean is not specified.  Are the Objectors to be enjoined from enforcing future rights under the Servicing Agreements even if the Debtor commits future malfeasance?

67.     The Fifth Amended Plan likewise enjoins all creditors and other parties, and their "Related Persons" (who may not even have notice of the injunction) from "commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor."  Plan at p. 51.  Read literally, this means that the Objectors and the CLOs will not be able to assert any claims, or seek any relief, against the Debtor or Reorganized Debtor for any present or future actionable wrongs under the Servicing Agreements and the Advisers Act.  Again, so broad an injunction, not limited in time, is unprecedented, legally impermissible, violates due

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1505
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23  Page 1619 of 1828  PageID 11112
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1504 of 1803  PageID 12250
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21  Entered 01/05/21 16:42:55  Page 32 of 42

process, and seeks to strip parties of their contractual and Advisers Act rights—even as the Debtor purports to assume the Servicing Agreements which, as is black letter law, means that the Debtor is requiring to provide full future performance (and suffer potential future obligations and liabilities).

68.     The balance of the Plan injunction is equally fatally defective.  If there are future obligations and defaults, and even if there are present ones, under the Servicing Agreements and applicable law, affected parties have to have the right to seek legal redress, enforce awards and injunctions, and assert setoff rights.  On this last basis in particular, if there are setoff rights under the CLOs or other agreements, those rights cannot be permanently enjoined.  And, the same injunction applies to any "successors" of the Debtor and its property interests, meaning that, if the Debtor assigns or delegates its duties under the Servicing Agreements, some future and unknown party may claim protections under these injunctions without any protection to the Objectors or the CLOs.

69.     The Plan's channeling injunction is similarly improper and defective, at least with respect to post-confirmation actions.  *See* Plan at p. 51.  That injunction requires *anyone* with any complaint against a "Protected Party" that is "related to the Chapter 11 Case," or to the "wind down of the business of the Debtor or the Reorganized Debtor," to first seek relief from this Court, including by proving that a colourable claim exists and obtaining leave.  The same section then purports to grant "sole jurisdiction" to this Court to "adjudicate" any such dispute.  Read literally, this means that the Objectors and the CLOs will have to first seek leave from this Court before enforcing any right under the Servicing Agreements and the Advisers Act, which is unprecedented and is incompatible with respect to the assumption of those agreements for post-assumption claims, and then this Court would adjudicate the claims.  This

Court will have no jurisdiction to adjudicate such post-confirmation claims, however, and the channeling injunction is am impermissible attempt to confer such jurisdiction where none exists.

70.     All of the foregoing affects, limits, and eviscerates future rights under the assumed Servicing Agreements—something that defeats the whole purpose of an assumption of an executory contract and that contradicts the established law that an executory contract, and its future obligations, must be assumed *in toto*.

###     B.     *Other objections to the Fifth Amended Plan*

The Debtor's Fifth Amended Plan is objectionable for other reasons as well.  Those Objections are discussed briefly below.  The Funds and Advisors reserve the right to object upon any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. The Funds and Advisors also reserve the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### *Section 1129(a)(5)*

71.     In order to be confirmed, the Debtor must satisfy the following non-waiveable requirements:

> (i) the proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.

11 U.S.C. § 1129(a)(5).

72.     This is of particular importance here, where the Debtor proposes to manage billions of dollars of other entities' assets, and ties in as well to section 362(b)'s requirement of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1507
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1621 of 1828   PageID 11114
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1506 of 1803   PageID 12252
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 34 of 42

demonstrating adequate assurance of future performance. Yet, the Debtor fails completely with respect to even an attempt to satisfy these requirements.

73.     In this respect, the sole disclosure in the Plan and Disclosure Statement with respect to who will manage these billions of dollars in assets is as follows:

> Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

Plan at p. 32-33.

74.     Neither the identity nor the compensation of the people who will control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer. While Mr. Seery is disclosed as the Claimant Trustee who will be responsible for "winding down the Reorganized Debtor's business operations," this is insufficient.  All the more so because, without additional disclosures and facts, not only can adequate assurance of future performance not be proven, but the Debtor cannot prove that the employment and compensation of these unnamed officers and managers of the Reorganized Debtor is "is consistent with the interests of creditors and equity security holders and with public policy."  Public policy in particular, given the dictates of the Advisers Act, is implicated.

Accordingly, the Plan is fatally defective with respect to section 1129(a)(5) and cannot be confirmed on that basis alone.

### *The Fifth Amended Plan is not feasible*

75.     Section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by liquidation or the need for further reorganization. "Establishing a likelihood that a plan itself will be successful is a question of feasibility." *In re Dernick*, Case No. 18-32417,

Appellee Appx. 01500
APPX. 104367

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1508
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1622 of 1828 PageID 11115
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1507 of 1803 PageID 12253
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 35 of 42

2020 WL 6833833, at *17 (Bankr. S.D. Tex. Nov. 20, 2020). Feasibility contemplates whether the plan is workable and offers a reasonable assurance of success. *Id.*; *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007). "An obvious illegality . . . exposes the plan on feasibility grounds." *In re Food City*, 110 B.R. at 813 n. 12; *see also In re McGinnis*, 453 B.R. at 773 (chapter 13 plan premised on illegal activity could not be confirmed); *In re Frascella*, 360 B.R. at 445, 456 (citing *Food City*, 110 B.R. at 812 n. 10) (debtor failed to establish plan was feasible where it rested on questionable legal basis).

76.    As discussed above, the proposed treatment with respect to the portfolio management agreements and the CLOs contravenes section 365 of the Bankruptcy Code and the Adviser Act. This illegality hampers the feasibility of the Fifth Amended Plan, and accordingly, the Court should find that it is not feasible and deny confirmation.

### *The Debtor's proposed assumption of the Servicing Agreements is improper under section 365 because there is no adequate assurance of future performance*

77.    Under section 365(b) of the Bankruptcy Code, an executory contract may only be assumed if the Debtor "provides adequate assurance of future performance under such contract[.]" 11 U.S.C. § 365(b)(1)(C).

78.    Although the Fifth Amended Plan provides for the assumption of the Servicing Agreements with many of the CLOs, it does not offer any assurance with respect to the Debtor's ability to perform under such agreements. Indeed, given the Debtor's plan to wind down and liquidate its remaining assets, and in light of the contractual and statutory breaches discussed above, the Debtor cannot possibly provide such assurance. Furthermore, it is uncertain whether sufficient employees will be retained by the Debtor to fulfil its obligations under the portfolio management agreements, even its most significant duties are delegated to a Sub-Advisor. Accordingly, assumption is improper and must be disallowed under section 365(b).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1509
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1623 of 1828 PageID 11116
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1508 of 1803 PageID 12254
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 36 of 42

79.     Equally important, the Debtor's failure to offer or provide adequate assurance is intensified because the purported assumption is, in reality, a *sub rosa* assumption *and assignment* to an as yet unnamed third party. This unidentified third party has also not offered adequate assurance of future performance as required in the context of such assignments.

### *The Release and Exculpation Provisions of the Fifth Amended Plan are overly broad and extend beyond the Effective Date*

80.     In the Fifth Circuit, permanent injunctions against nondebtors are not permissible. *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995). In fact, and quite to the contrary, the case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009). Such permanent injunctions would "improperly insulate nondebtors in violation of section 524(e)," and "without any countervailing justification of debtor protection." *Id.* at 760 (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990)); *see also In re Pac. Lumber*, 584 F.2d at 252 (noting that costs that the released parties might incur defending against suits are unlikely to swamp such parties or the reorganization).

81.     Indeed, courts within this District have found that injunctions and release provisions substantively identical to that proposed in Fifth Amended Plan, and which purport to release causes of action against non-debtor third parties, violate Fifth Circuit precedent and are impermissible. *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018) (finding that bankruptcy court erred by approving injunction that would have effectively discharged non-debtor third parties); *In re Pac. Lumber*, 584 F.3d at 251-53 (striking release provision purporting to release non-

**Appellee Appx. 01502**
**APPX. 010367**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1510
Case 3:23-cv-00726-S   Document 8-22   Filed 09/29/23    Page 1624 of 1828   PageID 11117
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1509 of 1803   PageID 12255
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 37 of 42

debtor third parties from liability relating to the proposal, implementation, and administration of the plan).

82.    The injunction contained in Article XI.F of the Fifth Amended Plan is almost identical to that struck down in *In re Thru*.  Like the injunction provision in *In re Thru*, the Debtor's proposed injunction would bar the Debtor's creditors "from pursuing causes of action against a number of non-debtor third parties, if those causes of action relate to the creditors' claims against the debtor."  2018 WL 5113124, at *21.  The Fifth Amended Plan purports to release creditors' claims against not only the Debtor, but also the Independent Directors.  Dkt. No. 1472 at 56-57.  Not only that, but the Fifth Amended Plan purports to release creditors' claims stemming from the bankruptcy case, as well as the negotiation, administration and implementation of the Plan, as against many of the specific third parties that the courts in this Circuit have found to be impermissible, including, but not limited to, employees, officers and directors, and professionals retained by the Debtor, among others.  *Id.*; *In re Thru*, 2018 WL 5113124, at *21 (concluding it was "clearly erroneous" for the bankruptcy court to approve an injunction covering causes of action against such parties); *In re Pac. Lumber*, 584 F.3d at 252-53.

83.    Furthermore, the exculpation provision contained in Article XI.C of the Fifth Amended Plan is incompatible with Fifth Circuit precedent, as explained by the court in *In re Thru*.  The court in *In re Thru* found that it was clear error for the bankruptcy court to approve an exculpation provision that exculpated non-debtor third parties, including the debtor's employees, officers, directors, advisors, affiliates and professionals, from liability in connection with formulating, implementing, and consummating the plan of reorganization.  2018 WL 5113124, at *22.  The exculpation provision in the Fifth Amended Plan provides the "same

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1511
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1625 of 1828   PageID 11118
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1510 of 1803   PageID 12256
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 38 of 42

insulation" as the impermissible provision in the *In re Thru* plan, and as such, it cannot be approved. *See also In re Pac. Lumber*, 584 F.3d at 252 ("We see little equitable [sic] about protecting the released non-debtors from negligence suits arising out of the reorganization.").

84.     In sum, the Fifth Amended Plan impermissibly seeks to exculpate certain non-debtor third parties from a broad array of claims relating to such entities' pre- and post-petition conduct.  The Funds and Advisors submit there is no authority that would permit such broad exculpatory and/or injunctive language in favor of third parties.

### *The Fifth Amended Plan appears to eliminate the right of setoff*

85.     The Funds and Advisors object to the extent that the Plan purports to divest them of their rights of setoff against the Debtor.

### *The Fifth Amended Plan violates section 365(d)(2) by impermissibly allowing the Debtor to assume or reject executory contracts and unexpired leases after confirmation*

86.     Section 365(d)(2) of the Bankruptcy Code provides that, in a case under chapter 11, the debtor may assume or reject an executory contract or unexpired lease "at any time *before confirmation of a plan* . . . ."  11 U.S.C. § 365(d)(2) (emphasis added).

87.     Notwithstanding this clear language, the Fifth Amended Plan authorizes the Debtor to amend the Plan Supplement by adding or removing a contract or lease from the list of contracts to be assumed, or assign an Executory Contract or Unexpired Lease, at any time up until the Effective Date.  Dkt. No. 1472 at 43.  Further, the Disclosure Statement indicates that the Debtor is still evaluating whether to assume and assign the Shared Services Agreements. This is contrary to the explicit language of the Bankruptcy Code.

88.     Accordingly, the Advisors object to the Fifth Amended Plan to the extent that it purports to reserve the Debtor's right and ability to assume or assume and assign the Shared

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1512
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1626 of 1828   PageID 11119
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1511 of 1803   PageID 12257
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 39 of 42

Services Agreements or the Payroll Reimbursement Agreements post-confirmation. Furthermore, the Funds object to the Fifth Amended Plan to the extent it purports to reserve the Debtor's right and ability to alter the proposed treatment of the Servicing Agreements.

### *The Debtor is not entitled to a discharge*

89.     Although section 1141(d) of the Bankruptcy Code discharges a debtor from most pre-confirmation debt, it expressly <u>does not</u> discharge a debtor if:

> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

90.     Here, the Plan provides for liquidation of all of the Debtor's property over a period of time. Although the Debtor may technically continue business for a brief period of time, its ultimate goal is liquidation. Further, the Debtor would be denied a discharge under section 727(a)(1) because it is not an individual. Accordingly, the Court should find that the Debtor is not entitled to a discharge under section 1141 of the Bankruptcy Code.

### *The Fifth Amended Plan may violate the absolute priority rule*

91.     Section 1129(b)(2)(B)(ii) provides that the holder of any claim or interest that is junior to the claims of unsecured creditors may not retain any property unless general unsecured creditors are paid in full. 11 U.S.C. § 1129(b)(2)(B)(ii). The "absolute priority rule is a bedrock principle of chapter 11 practice." *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 703 (Bankr. N.D. Tex. 2013). "Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009) (comparing subordination

Appellee Appx. 01505
APPX. 14972

under section 510 to absolute priority rule) (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002)).

92.     In the event the unsecured creditor classes (Class 7 and 8) vote against the Fifth Amended Plan, the absolute priority rule prohibits the retention of equity in the Reorganized Debtor by existing equity holders in the absence of a new investment and opportunity for competitive bidding for that investment opportunity.

## CONCLUSION

93.     For the reasons set forth above, the Funds and Advisors respectfully request that the Court deny confirmation of the Fifth Amended Plan and grant such other and further relief as the Court deems just and proper.

Dated:     January 5, 2020

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
        Davor Rukavina, Esq.
        Texas Bar No. 24030781
        Julian P. Vasek, Esq.
        Texas Bar No. 24070790
        3800 Ross Tower
        500 N. Akard Street
        Dallas, Texas  75201-6659
        Telephone: (214) 855-7500
        Facsimile: (214) 855-7584
        Email:     drukavina@munsch.com

        - and -

        K&L GATES LLP

        Artoush Varshosaz (TX Bar No. 24066234)
        1717 Main Street, Suite 2800
        Dallas, TX 75201
        Tel: (214) 939-5659
        artoush.varshosaz@klgates.com

        Stephen G. Topetzes (*pro hac vice*)
        1601 K Street, NW
        Washington, DC 20006-1600

Appellee Appx. 01506

APPX. 04973

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1514
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1628 of 1828   PageID 11121
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1513 of 1803   PageID 12259
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 41 of 42

Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management
Fund Advisors, L.P., NexPoint Advisors,
L.P., Highland Funds I and its series
Highland Healthcare Opportunities Fund,
Highland/iBoxx Senior Loan ETF,
Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund,
Highland Funds II and its series Highland
Small-Cap Equity Fund, Highland Socially
Responsible Equity Fund, Highland Fixed
Income Fund, and Highland Total Return
Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland
Income Fund, Highland Global Allocation
Fund, and NexPoint Real Estate Strategies
Fund, and NexPoint Latin America
Opportunities Fund*

Appellee Appx. 01507
Appx. 14374

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1515
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1629 of 1828   PageID 11122
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1514 of 1803   PageID 12260

Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 42 of 42

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 5th day of January, 2021, and in addition to electronic service on parties entitled to notice thereon through the Court's ECF system, the undersigned caused the foregoing document to be served, by U.S. first class mail, postage prepaid, on the following:

Pachulski Stang Ziehl & Jones LLP
Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Hayward & Associates PLLC
Attn: Melissa S. Hayward and Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Sidley Austin LLP
Attn: Matthew A. Clemente and Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603

Office of the United States Trustee
U.S. Department of Justice, Region 6: Northern District of Texas
1100 Commerce Street, Room 976
Dallas, TX 75242

and, on the same day, by e-mail, on the following:

jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
mclemente@sidley.com
Alyssa.russell@sidley.com
Lisa.L.Lambert@usdoj.gov

*/s/ Davor Rukavina*
Davor Rukavina

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1516

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1630 of 1828   PageID 11123

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1515 of 1803   PageID 12261

Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 1 of 8

**Highland Capital Management Fund Advisors, L.P.**

**CLOs Review**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Aberdeen Loan Funding, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Shares Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Brentwood CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

1

308393059.4

**Exhibit A**

**Appellee Appx. 01509**

**Appx. 10476**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1517
Case 3:23-cv-00726-S   Document 8-22   Filed 03/29/23   Page 1631 of 1828   PageID 11124
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1516 of 1803   PageID 12262
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 2 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| Eastland CLO, Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| Gleneagles CLO, Ltd. | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c).  The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).  For cause removal may be effected in connection with the Portfolio Manager | 66 2/3% of Preference Shares Holders. PMA § 12(c). |

2

308393059.4

Appellee Appx. 01510
Appx. 04973

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1518

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1632 of 1828   PageID 11125

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1517 of 1803   PageID 12263

Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 3 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Grayson CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Greenbriar CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture.  SA § 9. The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Jasper CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(a). <br><br> The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 15% IRR since the Closing Date). PMA § 12(a). <br><br> For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | 66 2/3% of Preference Shares Holders. PMA § 12(a). |
| **Liberty CLO, Ltd.** | Requisite percentage of Class E Certificates Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Class E | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Class E Certificates holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Class E Certificates Holders (excluding Class E Certificates held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(c). | 66 2/3% of Class E Certificates Holders. PMA § 12(c). |

4

Appellee Appx. 01512

Appx. 14379

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1520
Case 3:23-cv-00726-S   Document 8-22   Filed 04/24/23   Page 1634 of 1828   PageID 11127
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1519 of 1803   PageID 12265
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 5 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Certificates Paying Agency Agreement. PMA § 9. | | The Portfolio Manager may avoid removal by purchasing all Class E Certificates voting for removal (and Class E Certificates not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Red River CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

Appellee Appx. 01513
APPX. 04376

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1521
Case 3:23-cv-00726-S   Document 8-22   Filed 10/29/23   Page 1635 of 1828   PageID 11128
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1520 of 1803   PageID 12266
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 6 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Rockwall CDO Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |
| **Rockwall CDO II Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |

308393059.4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1522
Case 3:23-cv-00726-S   Document 8-22   Filed 08/04/23   Page 1636 of 1828   PageID 11129
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1521 of 1803   PageID 12267
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 7 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Southfork CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 63% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c).  The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).  For cause removal may be effected upon the Portfolio Manager authorizing or filing a voluntary petition in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | 63% of Preference Shares Holders. PMA § 12(c). |
| **Stratford CLO Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Servicer | 66 2/3% of Preference Shares Holders. SA § 14. |

7

**Appellee Appx. 01515**

**Appx. 10432**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1523
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1637 of 1828   PageID 11130
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1522 of 1803   PageID 12268
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 8 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Servicer, as provided in the Indenture.  SA § 9. The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | | and affiliates, or for which they have discretionary voting authority, but HFP may vote Preference Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | |
| **Valhalla CLO, Ltd.** | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | |
| **Westchester CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

8

Appellee Appx. 01516
Appx. 01573

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1524
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1638 of 1828 PageID 11131
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1523 of 1803 PageID 12269

# APPENDIX 21

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1525
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1639 of 1828   PageID 11132
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1524 of 1803   PageID 12270
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 1 of 7

Docket #1673 Date Filed: 01/05/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC
F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |

## NEXPOINT REAL ESTATE PARTNERS LLC'S OBJECTION
## TO DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP") files this Objection to the Debtor's Fifth Amended Plan of Reorganization (the "Objection") and respectfully states as follows:

### I. INTRODUCTION

1.    On November 24, 2020, the Debtor filed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1472] and Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1473] (the "Disclosure Statement"). On November 13, 2020, the Debtor filed its Initial Plan Supplement [Docket No. 1389], on December 18, 2020, the Debtor filed its Second Plan Supplement [Docket No. 1606] and on January 4, 2021, the Debtor filed its Third Plan Supplement [Docket No. 1656]

---

1934054210105000000000020

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1526
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1640 of 1828    PageID 11133
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1525 of 1803   PageID 12271
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 2 of 7

(together with the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., the "Fifth Amended Plan").

2.      The hearing on confirmation of the Fifth Amended Plan is scheduled for January 13, 2021 at 9:30 a.m. (the "Confirmation Hearing") and the deadline to file any objections to confirmation of the Fifth Amended Plan is January 5, 2021. *See* Docket No. 1476.

3.      The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries. However, ultimately, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *See* Disclosure Statement, p. 11. Based on the Financial Projections attached as Exhibit C to the Disclosure Statement, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

4.      NREP filed a proof of claim in this case. *See* Claim Number 146. The Debtor has objected to NREP's claim. If NREP's claim is allowed, NREP possesses a claim in Class 7 or Class 8 under the Fifth Amended Plan.

5.      The Fifth Amended Plan also contains provisions to subordinate unidentified claims, a seemingly unfettered ability to set-off claims, and extremely broad exculpation, injunction, and release provisions, all of which fail to comply with the Bankruptcy Code. For the reasons set forth in detail below, NREP respectfully requests the Court deny confirmation of the Fifth Amended Plan.

## II. OBJECTIONS

6.      A debtor in bankruptcy bears the burden of proving every element of Bankruptcy Code Section 1129(a) by a preponderance of the evidence in order to attain confirmation of its

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1527
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1641 of 1828   PageID 11134
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1526 of 1803   PageID 12272
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 3 of 7

plan. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160 (5th Cir. 1993); *In re Barnes*, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (citing *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)). In addition, a court has a mandatory duty to determine whether a plan has met all the requirements for confirmation, whether specifically raised by dissenting parties in interest or not. *Williams v. Hibernia Nat'l Bank*, 850 F.2d 250, 253 (5th Cir. 1988). The Debtor in this case is unable to meet its burden for confirmation.

**A.    The Fifth Amended Plan provides for the improper subordination of unidentified claims.**

7.    The Fifth Amended Plan provides for a class of subordinated claims, which claims may be subordinated to the general unsecured claims or both the general unsecured claims and convenience class. The Fifth Amended Plan then provides that

> Under section 510 of the Bankruptcy Code, upon written notice, the Debtor, the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

*See* Fifth Amended Plan, Article III(J).

8.    In the Fifth Circuit, equitable subordination is appropriate when (i) the claimant engaged in inequitable conduct; (ii) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the Bankruptcy Code. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 121 (5th Cir. 2019). Further, a claim should only be subordinated to the extent necessary to offset the harm which the creditors have suffered as a result of the inequitable conduct. *Id.*

9.    However, section 510 of the Bankruptcy Code only allows equitable subordination of claims "after notice and a hearing." 11 U.S.C. § 510(c). Equitable subordination generally

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1528
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1642 of 1828   PageID 11135
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1527 of 1803   PageID 12273
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 4 of 7

requires an adversary proceeding and while it may be satisfied through a chapter 11 plan, the debtor must at least satisfy its burden of demonstrating such claim should be subordinated under equitable subordination principles. Fed. R. Bankr. P. 7001(8).

10.    Here, the Fifth Amended Plan does not provide for the subordination of any specific claims but, instead, provides for a procedure to subordinate claims that fails to comply with the statutory requirements under section 510 of the Bankruptcy Code or applicable case law. The Fifth Amended Plan provides no notice of the potential targets of such subordination, the basis upon which such subordination of claims may be justified, or any evidence supporting equitable subordination principles. Nor does the Fifth Amended Plan provide any means for due process, adequate notice, or opportunity to oppose such unidentified subordinations. Instead, the Fifth Amended Plan attempts to provide a means by which the Debtor, Reorganized Debtor, and Claimant Trustee can escape the "notice and hearing" requirements of section 510. This does not comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**B.    The Fifth Amended Plan provides for the improper set-off of unidentified claims against the Debtor.**

11.    Similarly, the Fifth Amended Plan also provides the Distribution Agent unfettered set-off rights in violation of section 553 of the Bankruptcy Code. The Fifth Amended Plan provides that:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim…. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1529
Case 3:23-cv-00726-S Document 8-22 Filed 08/04/23 Page 1643 of 1828 PageID 11136
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1528 of 1803 PageID 12274
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 5 of 7

*See* Fifth Amended Plan, Article VI(M). Thus, under the Fifth Amended Plan, the Distribution Agent may setoff the distribution amount on account of any Allowed Claim, without otherwise providing notice to the Holder of such Allowed Claim and without providing any support for or evidence that such setoff is justified. Instead, after the Distribution Agent arbitrarily determines a setoff is appropriate, the Holder of the Allowed Claim must initiate a proceeding challenging such setoff and seeking its full distribution under the Fifth Amended Plan. In addition, under the Fifth Amended Plan, the Distribution may setoff a pre-petition Allowed Claim on account of not only pre-petition claims but also post-petition claims of the Reorganized Debtor and/or Distribution Agent.

12. However, setoff is only available in bankruptcy when the opposing obligations arise on the same side of the bankruptcy date—*i.e.,* both had arisen prior to the petition date or both subsequent to the petition date. *In re Thomas*, 529 B.R. 628, 637 n.2 (Bankr. W.D. Pa. 2015); *In re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992). A creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *In re Univ. Med. Center*, 973 F.2d at 1079. In addition, the burden of proof is on the party asserting the right to setoff. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). The party seeking to enforce a setoff right must establish (i) it has a right to setoff under nonbankruptcy law; and (ii) this right should be preserved in bankruptcy under section 553. *Id.*

13. Here, contrary to the provisions in section 553 of the Bankruptcy Code, the Fifth Amended Plan attempts to both expand the right to setoff by allowing post-petition claims be setoff against pre-petition Allowed Claims and transfer the burden of proof to the Holder of such Allowed Claim, requiring such Holder disprove the Distribution Agent's right to setoff. This does not

Appellee Appx. 01522
Appx. 04379

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1530
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23    Page 1644 of 1828   PageID 11137
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1529 of 1803   PageID 12275
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 6 of 7

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**C.    The Fifth Amended Plan provides for improper and overly broad injunctions, releases and exculpation.**

14.    In addition, the Fifth Amended Plan provides for broad releases and permanent injunctions against nondebtors. *See* Article IX(F). However, permanent injunctions against nondebtors are not permissible in the Fifth Circuit because such a permanent injunction would "improperly insulate nondebtors in violation of section 524(e)…without any countervailing justification of debtor protection." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995) (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 601-02 (10th Cir. 1990)). Contrary to such prohibition, the Fifth Amended Plan seeks to exculpate certain "Exculpated Parties" and "Protected Parties" from a broad array of claims relating to such entities' post-petition conduct and would bar creditors from pursing claims against various non-debtor parties if such claims relate to their claims against the Debtor. In addition, the language purports to release creditors' claims arising not only from the bankruptcy case but also the administration and implementation of the Fifth Amended Plan and the period of time covered by the release and exculpation provisions extend beyond the effective date and purport to cover post-effective date conduct. Neither the Bankruptcy Code nor applicable case law permits such broad exculpatory and/or injunctive language in favor of third parties. *See In re Zale Corp.*, 62 F.3d at 761, *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009). The injunction, release, and exculpation provisions in the Fifth Amended Plan do not comply with section 524(e) of the Bankruptcy Code or applicable case law and the Court should deny confirmation.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1531
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1645 of 1828   PageID 11138
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1530 of 1803   PageID 12276
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 7 of 7

**D.      Reservation of Rights**

15.      NREP reserves the right to amend or supplement this Objection to add any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. In addition, NREP reserves the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### III.  CONCLUSION

For these reasons, the NREP respectfully requests that the Court deny confirmation of the Fifth Amended Plan and grant NREP such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

### CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, a true and correct copy of the foregoing Joinder was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1532
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1646 of 1828   PageID 11139
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1531 of 1803   PageID 12277

# APPENDIX 22

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1533
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1647 of 1828   PageID 11140
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1532 of 1803   PageID 12278
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 1 of 6

Docket #1671  Date Filed: 01/05/2021

United States Department of Justice
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(202) 834-4233

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| | § | |
| | § | |
| Debtors-in-Possession. | § | |

---

### United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization (Docket Entry No. 1472)

---

**To the Honorable Stacey J. Jernigan,**
**United States Bankruptcy Judge:**

The United States Trustee for Region 6 files this Limited Objection (the "**Objection**") to the Debtor's Fifth Amended Plan of Reorganization (the "Plan" -- docket entry [D.E.] 1472, filed 11/24/2020).  In support of the relief requested, the United States Trustee respectfully submits as follows:

#### <u>Summary</u>

The United States Trustee objects to confirmation of the Plan because the releases exceed the scope permitted by Fifth Circuit precedent.  The United States Trustee has resolved other objections with the Debtors, and these resolutions will be announced and incorporated in the confirmation order.

**United States Trustee's Confirmation Objection**

1934054210105000000000017
Appellee Appx. 01526
APPX. 104393

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1534
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1648 of 1828   PageID 11141
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1533 of 1803   PageID 12279
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 2 of 6

<u>**Facts: Relevant Plan Provisions**</u>

**Salient Definitions:**

1.      The Plan defines exculpated and released parties as follows:

a.   "Exculpated Parties" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

b.   "Released Parties" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

Plan, D.E. 1472; definitions 61, 111, p. 16.

**Releasing Third Parties:**

2.   The Plan releases third parties who would share liability with the Debtor:

**United States Trustee's Confirmation Objection**                                   **Page 2 of 6**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1535
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1649 of 1828   PageID 11142
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1534 of 1803   PageID 12280
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 3 of 6

"[E]ach Released Party is deemed to be, hereby conclusively, absolutely, unconditionally,
irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on
behalf of themselves and their respective successors, assigns, and representatives, including,
but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of
Action, including any derivative claims, asserted on behalf of the Debtor, whether known or
unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law,
equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally
entitled to assert in their own right (whether individually or collectively) or on behalf of the
holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, D.E. 1472, p. 48.

3.       The releases for Released Parties exclude "any Causes of Action arising from
willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released
Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction."
Plan, D.E. 1472, pp. 48-49.

4.       The Plan releases do not contemplate any type of channeling injunction.

**Exculpating Third Parties:**

5.       The exculpation provisions broadly cover third parties:

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted
by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is
hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt,
right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the
Petition Date in connection with or arising out of (i) the filing and administration of the
Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or
the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or
consummation of the Plan (including the Plan Supplement) or any related agreements,

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1536
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1650 of 1828 PageID 11143
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1535 of 1803 PageID 12281
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 4 of 6

instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## **Argument and Authority**

**Plan Contains Non-Consensual Third-Party Releases and Exculpation in Contravention of Fifth Circuit Precedent.**

6.      The Plan contains non-consensual third-party releases that should be stricken under Fifth Circuit precedent.

7.      The Plan's exculpation provisions are similarly overbroad.

8.      While the Plan specifies that the releases and exculpation are allowed to "the maximum extent allowed by law," the law in the Fifth Circuit is that they are not allowed.

9.      Like the Highland Capital Plan, the *Pacific Lumber* plan contained exculpation and release provisions that carved out willful or intentional conduct. *Scotia Pacific Co., LLC v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.),* 584 F.3d 229

**Appellee Appx. 01529**
**APPX. 14396**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1537
Case 3:23-cv-00726-S   Document 8-22   Filed 02/24/23    Page 1651 of 1828   PageID 11144
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1536 of 1803   PageID 12282
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21   Entered 01/05/21 16:46:20   Page 5 of 6

(5th Cir. 2009).  Reviewing four prior Fifth Circuit bankruptcy cases, the *Pacific Lumber* court concluded these cases "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252 (citations omitted). The Fifth Circuit struck these non-consensual provisions as to parties who were co-liable with the debtor but noted that committee members and committee professionals received qualified immunity.  *Id.*

10.     The *Pacific Lumber* court disallowed the exculpation and releases of the debtors' officers, directors, and professionals because there was no evidence that they "were jointly liable for any . . . pre-petition debt.  They are not guarantors or sureties, nor are they insurers.  Instead, the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy.  The fresh start § 524(e) provides to debtors is not intended to serve this purpose."  *Id.* at 252-53.

11.     Bankruptcy Courts in the Northern District of Texas have resolved objections to exculpation or release provisions by replacing such provisions with channeling injunctions.  *See* Memorandum Opinion and Order, Docket Entry No. 4614, *In re Pilgrim's Pride Corporation, et al.*, Case No. 08-45664-DML-11 (January 14, 2010); Fourth Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors (Section 10.8), Docket Entry No. 1701, *In re CHC Group, Ltd.*, Case No. 16-31854-BJH-11, United States Bankruptcy Court for the Northern District of Texas, Dallas Division (February 16, 2017).

12.     The Plan release and exculpation provisions should be limited.  Unless they exclude the Debtors' professionals, the Debtors' officers and directors, and others not protected by quasi-immunity, confirmation should be denied.

**Appellee Appx. 01530**
**Appx. 14397**

**Conclusion**

Wherefore, the United States Trustee requests that the Court deny approval of the Plan

and grant to the United States Trustee such other and further relief as is just and proper.

DATED: January 5, 2021                    Respectfully submitted,

                                          WILLIAM T. NEARY
                                          UNITED STATES TRUSTEE

                                          */s/ Lisa L. Lambert*
                                          Lisa L. Lambert
                                          Asst. U.S. Trustee, TX 11844250
                                          Office of the United States Trustee
                                          1100 Commerce Street, Room 976
                                          Dallas, Texas  75242
                                          (202) 834-4233

**Certificate of Service**

There undersigned hereby certifies that on January 5, 2020, a copy of the foregoing

pleading was served via ECF to parties requesting notice via ECF.

                                          */s/  Lisa L. Lambert*
                                          Lisa L. Lambert

**Appellee Appx. 01531**

**APPX. 014396**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1539
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1653 of 1828 PageID 11146
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1538 of 1803 PageID 12284

# APPENDIX 23

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1540
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1654 of 1828   PageID 11147
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1539 of 1803   PageID 12285
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 1 of 68

Docket #1814  Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

<div align="center">

**DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF
HIGHLAND CAPITAL MANAGEMENT L.P.**

</div>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000019
Appellee Appx. 01533
APPX. 104990

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1541
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1655 of 1828   PageID 11148
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1540 of 1803   PageID 12286
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01    Page 2 of 68

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................. 1

Background ................................................................................................................... 4

    I.    Procedural Background ...................................................................................... 4

    II.   Solicitation and Notification Process .................................................................. 6

Argument ................................................................................................................... 13

    III.  The Plan Satisfies Each Requirement for Confirmation. ..................................... 13

        A.    The Plan Complies with the Applicable Provisions of the
               Bankruptcy Code (Section 1129(a)(1)) ..................................................... 13

        B.    The Debtor Has Complied with the Applicable Provisions  of the
               Bankruptcy Code (Section 1129(a)(2)) ..................................................... 23

        C.    The Debtor Proposed the Plan in Good Faith and Not by Any
               Means Forbidden by Law (Section 1129(a)(3)) ......................................... 26

        D.    The Debtor is Seeking to Pay Certain Professional Fees and
               Expenses Subject to Bankruptcy Court Approval (Section
               1129(a)(4). ............................................................................................ 28

        E.    The Debtor Has Complied with the Bankruptcy Code's
               Governance Disclosure Requirement (Section 1129(a)(5)) ....................... 29

        F.    The Plan Does Not Require Government Regulatory Approval of
               Rate Changes (Section 1129(a)(6)) ........................................................... 34

        G.    The Plan Is in the Best Interests of Holders of Claims and Interests
               (Section 1129(a)(7)) ................................................................................ 34

        H.    The Plan Complies with the Requirements of Section 1129(a)(8) of
               the Bankruptcy Code ................................................................................ 40

        I.    The Plan Complies With Statutorily Mandated Treatment of
               Administrative and Priority Tax Claims (Section 1129(a)(9)). ............... 40

        J.    At Least One Impaired Class of Claims Has Accepted the Plan,
               Excluding the Acceptances of Insiders (Section 1129(a)(10)). ............... 42

Appellee Appx. 01534

APPX. 104399

K. The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)). .................. 43

L. The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ....................................................... 44

M. The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code. ....................................................................................... 44

N. Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ........................................ 45

O. The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ...... 45

P. The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code. .................................................................... 48

Q. The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)). ......................................... 51

IV. The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply. ........................................ 51

A. The Debtor Complied with Section 1129(d) of the Bankruptcy Code. ....................................................................................... 52

B. Modifications to the Plan. ....................................................... 52

Conclusion ................................................................................... 56

DOCS_SF:104703.16 36027/002

Appellee Appx. 01535

Appx. 04492

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1543
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1657 of 1828   PageID 11150
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1542 of 1803   PageID 12288
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 4 of 68

## TABLE OF AUTHORITIES

<div align="right">

**Page(s)**

</div>

### CASES

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
   526 U.S. 434 n.13 (1999)................................................................................... 34, 46, 48

*Boullion v. McClanahan,*
   639 F.2d 213 (5th Cir. 1981) ............................................................................... 39

*In re Acis Capital Management,*
   2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) .................... 38

*In re Ambanc La Mesa Ltd. P'ship,*
   115 F.3d 650 (9th Cir. 1997) ........................................................................... 47, 48

*In re American Solar King Corp.,*
   90 B.R. 808 (Bankr. W.D. Tex. 1988)................................................................. 53

*In re Aztec Co.,*
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................................. 47

*In re Block Shim Dev. Company-Irving,*
   939 F.2d 289 (5th Cir. 1991) ............................................................................... 26

*In re Bowles,*
   48 B.R. 502 (Bankr. E.D. Va. 1985).................................................................... 47

*In re Cypresswood Land Partners, I,*
   409 B.R. 396 (Bankr. S.D. Tex. 2009) ...................................................... 13, 23, 26

*In re Freymiller Trucking, Inc.,*
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ............................................................. 47

*In re Friendship Dairies,*
   2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ........................ 54

*In re Global Safety Textiles Holdings LLC,*
   No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009)...... 53

*In re J T Thorpe Co.,*
   308 B.R. 782 (Bankr. S.D. Tex. 2003) ................................................................ 13

*In re Johns-Manville Corp.,*
   68 B.R. 618 (Bankr. S.D.N.Y. 1986).................................................................. 47

*In re Joint E. & S. Dist. Asbestos Litig.,*
   982 F.2d 721 (2d Cir. 1992) ............................................................................... 18

*In re Kolton,*
   No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990)............ 47

*In re Landing Assocs., Ltd.,*
   157 B.R. 791 (Bankr. W.D. Tex. 1993)........................................................ 29, 43

*In re Lason, Inc.,*
   300 B.R. 227 (Bankr. D. Del. 2003) ................................................................... 40

<div align="center">

iii

</div>

*In re Mirant Corp.*,
   348 B.R. 725 (Bankr. N.D. Tex. 2006) ..................................................................... 46

*In re Neff*,
   60 B.R. 448 (Bankr. N.D. Tex. 1985) ....................................................................... 40

*In re Quigley Co., Inc.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007) ...................................................................... 18

*In re Sentry Operating Co. of Tex., Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001) ..................................................................... 14

*In re Sentry Operating Co. of Texas, Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001) ..................................................................... 53

*In re Star Ambulance Service, LLC*,
   540 B.R. 251 (Bankr. S.D. Tex. 2015) ..................................................................... 43

*In re Sun Country Dev., Inc.*,
   764 F.2d 406 (5th Cir. 1985) ................................................................................... 26

*In re Tex. Extrusion Corp.*,
   844 F.2d 1142 n. 23 (5th Cir. 1988) ........................................................................ 34

*In re T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ................................................................................... 43

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d. Cir 2013) ................................................................................... 18

*In re Wilson Metal Fabricators*,
   No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020) ................................ 38

*John Hancock*,
   987 F.2d at 157 n.5 ................................................................................................. 48

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ................................................................................... 47

*Mabey v. Sw. Elec. Power Co.*
   *(In re Cajun Elec. Power Coop., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ................................................................................... 28

*Matter of Cajun Elec. Power Co-op., Inc.*,
   150 F.3d 503 (5th Cir. 1998) ................................................................................... 24

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners*
   *(In re Tex. Rangers Baseball Partners)*,
   521 B.R. 134 (Bankr. N.D. Tex 2014) ..................................................................... 54

*Pub. Fin. Corp. v. Freeman*,
   712 F.2d 219 (5th Cir. 1983) ................................................................................... 26

## STATUTES

11 U.S.C. § 101 ........................................................................................... 22, 51

11 U.S.C. § 1114 ............................................................................................... 44

11 U.S.C. § 1123 ................................................................................. 17, 21, 23, 51

iv

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1545
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1659 of 1828   PageID 11152
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1544 of 1803   PageID 12290
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 6 of 68

11 U.S.C. § 1125 ................................................................................................ 23

11 U.S.C. § 1126 ........................................................................................... 6, 25

11 U.S.C. § 1129 ..................................................................................... passim

### OTHER AUTHORITIES

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977),
   *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368 ........................................................... 13

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978),
   *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 .......................................................... 13

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1546
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1660 of 1828 PageID 11153
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1545 of 1803 PageID 12291
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 7 of 68

The above-captioned debtor and debtor in possession (the "Debtor") files this memorandum of law (this "Memorandum") in support of confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as Modified) (the "Plan").[2] Concurrently herewith, the Debtor has filed its *Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "Omnibus Reply"), which addresses and responds to the each of objections to confirmation of the Plan.[3]

**Preliminary Statement**

1. After fourteen long months in a chapter 11 process that has often times been contentious between the Debtor, the Committee, and the estate's largest creditors, the Debtor seeks confirmation of its Plan that enjoys the support of the Committee and virtually all of its non-affiliated creditors. As the Debtor told the Court when it approved the installation of the Independent Board on January 9, 2020, the new Board intended to change the culture of litigation that was the Debtor's trademark prepetition. While the negotiations have been difficult and testy at times, the Debtor successfully resolved its disputes with the Redeemer Committee, Acis and HarbourVest and has reached settlements in principal with UBS—an accomplishment that seemed impossible a few months ago. In fact, the Plan is supported by the holders of approximately 95% of creditors who collectively hold $345 million in claims against the estate that voted on the Plan. In accomplishing these goals, the Independent Board has resolved litigation that has been pending in some cases for over a decade and in several courts, including

---

[2] Unless otherwise noted, capitalized terms used in this Memorandum have the meanings ascribed in the Plan.

[3] To the extent that a party has raised a specific objection to the statutory provisions set forth in 1123 and 1129 of the Bankruptcy Code, those objections are addressed herein as part of the Debtor's *prima facie* showing that it has satisfied the statutory requirements to confirm the Plan.

Appellee Appx. 01539

APPX. 104904

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1547
Case 3:23-cv-00726-S   Document 8-22   Filed 08/04/23   Page 1661 of 1828   PageID 11154
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1546 of 1803   PageID 12292
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01    Page 8 of 68

this Court in the Acis bankruptcy case, has positioned the Debtor to be able to put contentious litigation with legitimate creditors behind it and promptly monetize its assets and make distributions to general unsecured creditors.   The Debtor worked extremely hard during the bankruptcy case to develop a "grand bargain" plan that would achieve a global resolution of all disputes between the Debtor, its creditors and Mr. Dondero.  Unfortunately, such a plan was not attainable.

2.      What stands in the Debtor's way to confirmation of the Plan is a series of objections filed by Mr. Dondero and entities owned and/or controlled by him (collectively, the "Dondero Entities") and certain of the Debtor's current and ex-employees, two of whom the Debtor recently terminated for cause and others whose blind fealty to Mr. Dondero led them to vote against the Plan for no apparent economic reason.  The common theme in all of the objections is not a desire for better treatment of creditors, which is not surprising since the objectors' economic interests in the Debtor are tenuous at best.   Rather, the focus of the objections are challenges to Plan provisions, including the injunction, release and exculpation provisions, which will limit the Dondero Entities' ability to continue their litigation crusade against anyone who dared stand in Mr. Dondero's way long after the Plan has been confirmed. As the Court is aware from its experience, according to Mr. Dondero, no claim is too frivolous to be brought, no appeal too impossible to succeed and no court too far away in which to commence litigation.  As will be discussed herein, the Court has the authority and jurisdiction to approve provisions in the Plan which will minimize the Dondero Entities' ability to harass parties with vindictive litigation designed to interfere with post-confirmation efforts.  For the

DOCS_SF:104703.16 36027/002

Court's convenience, attached as **Exhibit A** hereto is a chart that sets for the relationships between the various Dondero Entities.

3.     As more fully set forth in the Omnibus Reply, and as summarized on **Exhibit B** hereto, the Dondero Entities' interests in this case arise primarily from their direct and indirect equity interests in the Debtor.  While certain of the Dondero Entities assert claims against the Debtor, those claims either arise out of their equity interests that the Debtor will seek to subordinate under Section 510 of the Bankruptcy Code or are frivolous claims that target certain conduct of the Independent Directors.  Other Dondero Entities object to the Debtor's attempt to assume certain executory contracts to which they are not a party and lack standing to do so.  Accordingly any objections to the Plan based upon the treatment of claims or the manner in which assets are proposed to be monetized post-confirmation are a smokescreen.

4.     Moreover, any argument that the Dondero Entities are seeking to protect the value of their equity interests is specious.  Mr. Dondero has told the Court on numerous occasions that his so-called "pot plan" proposal to acquire substantially all of the assets of the Debtor for $160 million (which is really $130 million because the proposal acquires approximately $30 million of the Debtor's cash) fairly values the Debtor's assets.  Accordingly, under Mr. Dondero's own assumptions, equity is out of the money as the total amount of allowed claims in this case exceeds Mr. Dondero's valuation by a factor of more than two.  The only way creditors in the Debtor's estate will receive full payment on account of their claims—a prerequisite to any distributions to the Dondero Entities' indirect equity interests and related claims arising from such interests—would be for the Estate to monetize its multiple claims against the Dondero

Appellee Appx. 01541

APPX. 01406

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1549
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1663 of 1828   PageID 11156
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1548 of 1803   PageID 12294
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 10 of 68

Entities for well in excess of $100 million.  It is through this lens that the Court should view the Dondero Entities' confirmation objections.

5.      The hard-fought victories obtained by the Debtor in negotiating the settlement of substantially all of the litigation that has plagued it for years should not be singularly undone by the Dondero Entities and his army of loyal employees and ex-employees.  Mr. Dondero should not be allowed to use this Court and his frivolous litigation to upend the settlements achieved to date by the Debtor.  The Plan should be confirmed to allow the Reorganized Debtor and the Claimant Trustee to complete the process of winding down the Debtor's assets, satisfying creditor claims, and implementing the other wind-down provisions of the Plan without interference by the Dondero Entities.

## Background

### I.  Procedural Background

6.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

8.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[4]

---

[4] All docket numbers refer to the docket maintained by this Court.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1550
Case 3:23-cv-00726-S   Document 8-22   Filed 06/29/23   Page 1664 of 1828   PageID 11157
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1549 of 1803   PageID 12295
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 11 of 68

9.      The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case. However, on January 9, 2020, the Court entered its *Order Approving Settlement With Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] pursuant to which the Court approved the appointment of an Independent Board of Directors for Strand Advisors, Inc., the general partner of the Debtor (the "Settlement Order").  On July 16, 2020, the Court entered its *Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 854], pursuant to which James Seery, Jr., was approved as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.

10.     On November 24, 2020, the Bankruptcy Court entered the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling a Hearing to Confirm the Fifth Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; And (E) Approving Form and Manner of Notice* [D.I. No. 1476] (the "Disclosure Statement Order").  The Disclosure Statement Order approved the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1551
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1665 of 1828   PageID 11158
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1550 of 1803   PageID 12296
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 12 of 68

and also approved, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").

11.    The deadline for all Holders of Claims and Equity Interests entitled to vote on the Plan to cast their ballots and the deadline to file objections to confirmation of the Plan was January 5, 2021, at 5:00 p.m. (prevailing Central Time) subject to extension by the Debtor, in its discretion (the "Voting Deadline").  On January 19, 2021, the Debtor filed the Voting Report, which is summarized below.  The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled for January 26, 2021, at 9:30 a.m. (prevailing Central Time).[5]

**II. Solicitation and Notification Process.**

12.    In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Equity Interests in Impaired Classes receiving or retaining property on account of such Claims or Equity Interests were entitled to vote to accept or reject the Plan.[6] Holders of Claims and Equity Interests were not entitled to vote if their rights are Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code).[7]  The voting results, as reflected in the Voting Report, are summarized as follows:

---

[5] The Confirmation Hearing was initially scheduled to take place on January 13, 2021, but was continued by the Bankruptcy Court at the Debtor's request.

[6] *See* 11 U.S.C. § 1126.

[7] There were no Impaired Classes of Claims or Equity Interests conclusively deemed to reject the Plan pursuant section 1126(g) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01544
APPX. 104109

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1552
Case 3:23-cv-00726-S   Document 8-22   Filed 01/24/23   Page 1666 of 1828   PageID 11159
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1551 of 1803   PageID 12297
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 13 of 68

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) |
|---|---|---|---|---|
| Class 2 Frontier Secured Claim | $5,209,963.62 (100%) | 1 (100%) | $0 (0%) | 0 (0%) |
| Class 7 Convenience Claims | $2,765,906.51 (100%) | 14 (100%) | $0 (0%) | 0 (0%) |
| Class 8 General Unsecured Claims[8] | $301,826,418.36 (93.54%) | 12 (27.9%) | $20,833,059.67 (6.46%) | 31 (72.10%) |
| Class 9 Subordinated Claims | $35,000,000 (100%) | 6 (100%) | $0 (0%) | 0 (0%) |
| Class 10 B/C Limited Partnership Interests | None | None | None | None |
| Class 11 Class A Limited Partnership Interests | 0% | 0% | $100% | 100% |

13.    <u>Class 2</u>.    Class 2 consists of one member (Frontier Secured Claim) and this creditor voted to accept the Plan.

14.    <u>Class 7</u>.    Class 7 consists of the Convenience Claims.  100% of the fourteen valid members of Class 7 each voted to accept the Plan.[9]  The votes of the Senior Employees—Mr. Ellington and  Mr. Leventon—who attempted to partially vote certain Claims in Class 7 and

---

[8] The Debtor recently settled the objections filed by Senior Employees Thomas Surgent and Frank Waterhouse, who previously were included in the Senior Employee Objection. Mssrs. Surgent and Waterhouse have each agreed to execute the Senior Employee Stipulation and to vote their Class 7 and Class 8 Claims to accept the Plan.  This chart reflects the results of the voting report filed with Court on January 19, 2021 [D.I. 1772] and does not reflect the subsequent settlements with Mssrs. Surgent and Waterhouse and their acceptance of the Plan.

[9] In accordance with the Voting Procedures Order, the Debtor accepted the late vote of Siepe Systems (which was cast on the Voting Deadline, but after the 5:00 Central Time cut off).  The Debtor also accepted the late votes of each of: (i) Stinson Leonard Street, who also voted to accept the Plan on January 14, 2021, and (ii) the HarbourVest entities, who were entitled to both Class 8 General Unsecured Claims and Class 9 Subordinated Claims pursuant to the Court's allowance of these claims at a hearing conducted on January 14, 2021 [D.I. 1788] with respect to the compromise of HarbourVest's claims against the Debtor, as explained below.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1553
Case 3:23-cv-00726-S   Document 8-22   Filed 08/24/23   Page 1667 of 1828   PageID 11160
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1552 of 1803   PageID 12298
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 14 of 68

other Claims in Class 8—should be disallowed for the reasons more specifically addressed in the Omnibus Reply. However, regardless of the invalid votes cast by the Senior Employees are counted, Class 7 Convenience Claims have accepted the Plan in both requisite dollar amount and voting number. First, each of these two "Senior Employees"[10] filed unliquidated proofs of claim with the Bankruptcy Court, yet are attempting to split their claims between Class 7 and Class 8 without having executed the Senior Employee Stipulation and in violation of the Plan, the Voting Procedures Order, and applicable law. Second, even if the Senior Employees were deemed to hold separate, liquidated claims on account of their asserted annual bonus and deferred compensation claims that could be split from their Class 8 Claims, the Plan's Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim for voting purposes. A valid election of the Convenience Class Election would only entitle the electing creditor to receive the treatment under Class 7, not to vote its claim in that class. *See* Plan, §1.B.43.

15.    <u>Class 8</u>. Over 93% of the dollar amount of Class 8 Claims voted to accept the Plan. However, more than 50% of the holders of Class 8 Claims did not accept the Plan as a result of the votes cast by approximately 27 employees holding contingent claims (including the split Class votes cast by Mssrs. Ellington and Leventon[11]) to reject the Plan. The contingent claims of the Debtor's other employees that voted against the Plan are (i) in respect to the

---

[10] As the Court is aware, the Debtor terminated the employment of both Mssrs. Ellington and Leventon on January 5, 2021 and these individuals are no longer employees of the Debtor.

[11] As noted above, the Debtor has agreed to a settlement of the Senior Employee Objection with respect to Mr. Surgent and Mr. Waterhouse, each of whom will vote their claims to accept the Plan.

Appellee Appx. 01546
APPX. 11103

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22   Entered 08/15/22 16:45:41    Page 1554
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1668 of 1828   PageID 11161
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1553 of 1803   PageID 12299
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 15 of 68

unvested claims under the Debtor's deferred compensation bonus plan[12] for amounts that would not be payable, if at all, until May 2021 and May 2022 and would only be payable if such employees were employed as of those vesting dates, which they will not be; and (ii) PTO Claims, which are unimpaired and treated by either Class 4 (PTO Claim) or Class 6 (Priority Non-Tax Claims).

16.    Class 9.  Class 9 consists of the subordinated claims of HarbourVest that were allowed pursuant to the Court's granting of the *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion") at a hearing conducted on January 14, 2021, pursuant to which HarbourVest was granted both allowed Class 9 Claims in the aggregate amount of $35 million and Allowed Class 8 Claims in the amount of $45 million with respect to the claims filed by HarbourVest.[13]  The HarbourVest Subordinated Claims are the only current members of Class 9.  Although Class 9 has unanimously accepted the Plan, the Debtor is not asserting that Class 9 constitutes the accepting impaired class of claims,

---

[12] On January 14, 2021, the Debtor terminated its annual bonus plan.  The Debtor's employees previously held contingent claims under the annual bonus plan for amounts that would have vested in February 2021 and August 2021 (subject to the employee remaining employed as of those dates and other conditions) and replaced it with a proposed retention plan that is subject of the Debtor's *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief* filed on January 20, 2021.  These employees (except for Mssrs. Surgent, Waterhouse, Ellington and Leventon, who were not paid any postpetition amounts with respect to either bonus plan) were paid the vested amounts owed to them under the annual bonus plan and deferred bonus plan, as applicable, in the ordinary course of business and in accordance with the *Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related relief* [D.I. 380] entered on January 22, 2020.  Thus, the Debtor's non-Senior Employees no longer have any contingent claims under the now-terminated annual bonus plan because they have already been paid their vested amounts.

[13] The $345 million claims estimate includes the claim of UBS Securities, LLC which has been allowed in the amount of $94,761,076 for voting purposes only.  As the Debtor has informed the Court, the Debtor has reached an agreement in principal with UBS to resolve its claims which agreement is subject to internal approvals at UBS and documentation.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01547
APPX. 04414

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1555
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1669 of 1828   PageID 11162
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1554 of 1803   PageID 12300
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 16 of 68

exclusive of insiders, required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, as discussed below in the cramdown section of the Memorandum.

17.    Several objections address the mechanics of how Class 9 Claims may be subordinated and the scope of any such subordination.  Mr. Dondero, Dugaboy, NexBank, and NexPoint each argue that section III.J of the Plan provides "no mechanism, hearing requirement or deadline" to subordinate claims.   Dondero Objection, at IV; NexPoint Objection, at 7; NexBank Objection at II.A.

18.    Section III.J of the Plan does not categorically subordinate claims.  Rather, Class 9 provides that holders of Subordinated Claims will receive the treatment provided to General Unsecured Claims unless they are subordinated either pursuant to an order of the Court upon notice to the relevant party or otherwise consensually.  In other words, the Debtor, Reorganized Debtor or Claimant Trustee must obtain an order from the Bankruptcy Court subordinating the subject Claim.  To the extent the Bankruptcy Court orders subordination of the Claim, it will receive the treatment provided for Class 9 Subordinated Claims.  If no subordination order is obtained, then the Claim will receive the treatment afforded to Class 8 General Unsecured Claims.  To illustrate this point, the vote cast by Raymond Joseph Dougherty as a Class 9 Subordinated Claim should be tabulated in Class 8 because there is no order or agreement with this creditor to subordinate his claims to those of Class 8 General Unsecured Claims.  As discussed below, the Plan is being amended to clarify this treatment.   Thus, the Plan does not afford the Debtor (or any other party) with the discretion to subordinate claims on their own.  This determination will be made by the Court.

DOCS_SF:104703.16 36027/002

19.     In order to clarify the treatment and procedure to subordinate claims, the Debtor

has made the following amendments to the Plan.  Section III.J of the Plan has been amended

with the bolded language below to clarify the requirement of an opportunity for a hearing with

respect to any proceeding to subordinate any claims:

> Under section 510 of the Bankruptcy Code, upon written notice **and hearing,** the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to **seek entry of an order by the Bankruptcy Court** to re-classify or to ~~seek to~~ subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan.

20.     In addition, the Debtor has amended the treatment of Subordinated Claims in

Section III.H.9 of the Plan to only treat claims that are or have been subordinated under section

510 of the Bankruptcy Court order entered by the Bankruptcy Court and which fall within the

Plan definition of Subordinated Claims:

> *Treatment*:  On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.
>
> ~~*Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.~~

21.     In response to Mr. Dondero's objection asserting the lack of a time period to

commence proceedings to subordinate Claims, the Debtor has amended the Plan to clarify that

the timing by which parties in interest may object to the allowance of a potentially Subordinated

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1557
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1671 of 1828 PageID 11164
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1556 of 1803 PageID 12302
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 18 of 68

Claim and seek to have the claim treated as a Class 9 Subordinated Claim is now included in the

Claims Objection Deadline by the addition of the bolded language to Section VII.B of the Plan.

> Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, **request the Bankruptcy Court subordinate any Claims to Subordinated Claims**, or any other appropriate motion or adversary proceeding with respect ~~thereto which shall be litigated to Final Order~~ **to the foregoing by the Claims Objection Deadline**, or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court…

22.      Finally, the limited objection to the Plan filed by Jack Yang and Brad Borud [D.I.

1666] and joined by Deadman, Travers and Kaufmann [D.I. 1674, 1679] also objects to the Plan

definition of "Subordinated Claims" and asserts that the Plan is not permissible under

Bankruptcy Code section 510 to the extent it intends to subordinate any and all claims of partners

of the Debtor, including claims "solely in respect of compensation owed to such person for their

services as an employee." The Plan does not intend to categorically subordinate these claims or

expand the reach of section 510 of the Bankruptcy Code. However, in order to clarify this

treatment and address the concerns raised by these individuals, the Plan has been amended as set

forth below.

> "Subordinated Claim" means any claim that ~~(i)~~ is ~~or may be~~ subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by ~~Final Order of~~ the Bankruptcy Court ~~or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest~~.

23.      <u>Class 10 and Class 11</u>.  Class 10 and 11 consist of the separate classes of Equity

Interests in the Debtor owned by affiliates of Mr. Dondero.  Class 10 did not cast a vote to accept

or reject the Plan.  Class 11 voted to reject the Plan.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1558
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1672 of 1828   PageID 11165
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1557 of 1803   PageID 12303
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 19 of 68

24.    As explained more fully below, the Debtor may confirm the Plan pursuant to the cram down provisions of 1129(b) of the Bankruptcy Code notwithstanding the rejection and/or non-acceptance of the Plan by Classes 8, 10 and 11.

**Argument**

25.    To confirm the Plan, the Bankruptcy Court must find that the Debtor has satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[14]  As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.  The Plan is supported by voting creditors holding $345 million in claims consisting of approximately 95% of the claims in this case.  As set forth in this Memorandum and based upon the evidence that will be presented at the Confirmation Hearing, the Debtor will satisfy the evidentiary requirements necessary to confirm the Plan.  The Debtor thus respectfully requests that the Bankruptcy Court confirm the Plan.

**III.    The Plan Satisfies Each Requirement for Confirmation.**

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

26.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[15]  The principal goal of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[16]  Accordingly, the determination of

---

[14] *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

[15] 11 U.S.C. § 1129(a)(1).

[16] *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368.

Appellee Appx. 01551
APPX. 04418

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1559
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1673 of 1828   PageID 11166
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1558 of 1803   PageID 12304
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 20 of 68

whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis
of sections 1122 and 1123 of the Bankruptcy Code.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

27.     Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or
an interest in a particular class only if such claim or interest is substantially similar to the other
claims or interests of such class."  Because claims only need to be "substantially" similar to be
placed in the same class, plan proponents have broad discretion in determining how to classify
claims.[17]

28.     The Plan's classification of Claims and Equity Interests satisfies the requirements
of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into
a number of separate Classes, with each Class differing from the Claims and Equity Interests in
each other Class in a legal or factual nature or based on other relevant criteria.[18]  Specifically, the
Plan provides for the separate classification of Claims and Equity Interests into the following
Classes:

> Class 1: Jefferies Secured Claim;
>
> Class 2: Frontier Secured Claim
>
> Class 3: Other Secured Claims;
>
> Class 4: Priority Non-Tax Claims;

---

[17] *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that section 1122 is broadly permissive of any classification scheme that is not specifically proscribed, and that substantially similar claims may be separately classified where separate classification has a basis independent of the plan proponent's efforts to secure a class of claims that will accept the plan).

[18] Plan, Art. III.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01552
APPX. 04419

Class 5: Retained Employee Claims;

Class 6: PTO Claims;

Class 7: Convenience Claims;

Class 8: General Unsecured Claims;

Class 9: Subordinated Claims;

Class 10: Class B/C Limited Partnership Interests; and

Class 11: Class A Limited Partnership Interests.

29.    Claims and Equity Interests assigned to each particular Class described above are substantially similar to the other Claims or Equity Interests in such Class.  Valid business, legal, and factual reasons justify the separate classification of the particular Claims or Equity Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Equity Interests.  For example, the PTO Claims in Class 6 relate solely to claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims.  The treatment of the unsecured Convenience Claims in Class 7 is to allow holders of eligible and liquidated claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's claim or such holders *pro rata* share of the Convenience Claims Cash Pool.  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01553

APPX. 04410

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1561
Case 3:23-cv-00726-S    Document 8-22    Filed 04/29/23    Page 1675 of 1828    PageID 11168
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1560 of 1803    PageID 12306
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 22 of 68

30.     Section III.C of the Plan provides for the elimination of classes that do not have a least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for purposes "of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class." Plan, § III.D.  The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan.

31.     Mr. Dondero objects to the elimination of the "vacant" Class provision in Article III.C because such elimination would not provide for treatment of a Claim that may be later classified in vacant class.  Dondero Objection, at IV.14.  However, the reference to vacant Classes in Article III.C refers only to the tabulation of votes cast to accept or reject the Plan, not to the treatment of claims that may later be classified in a class even if there were no voting members as of the Confirmation Hearing.  For example, Class 5 (Retained Employee Claims) does not have any voting members because the existence of any Claims in this Class would not arise except for any current employees of the Debtor who will be employed on the Effective Date.  Plan, § I.B.116.  Thus, Class 5 is disregarded solely for purposes of determining whether or not the Plan has been accepted or rejected under Section 1129(a)(8) of the Bankruptcy Code because there are no current members in that Class.  However, the Plan may treat Claims that may eventually become members of Class 5 post-confirmation.

32.     The Debtor submits that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.  Each of these categories of Claims and Equity Interests have distinct

DOCS_SF:104703.16 36027/002

Appellee Appx. 01554
APPX. 04419

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1562

Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1676 of 1828   PageID 11169

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1561 of 1803   PageID 12307

Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 23 of 68

rights under the Plan (and applicable non-bankruptcy law), and the Debtor has a valid business justification for the respective treatments of the Classes of Claims and Equity Interests.  The Plan's classifications not only serve the purpose of facilitating ease of distributions on the Effective Date but also acknowledge the fundamental differences between those types of Claims and Equity Interests.  For the foregoing reasons, the Plan satisfies section 1122 of the Bankruptcy Code.

### 2. The Plan Satisfies the Seven Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

33.    The applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan.  The Plan satisfies each of these requirements.

34.    Specification of Classes, Impairment, and Treatment.  The first three requirements of section 1123(a) are that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the plan.[19]  The Plan sets forth these specifications in detail in satisfaction of these three requirements in Article III.[20]

35.    Equal Treatment.  The fourth requirement of section 1123(a) is that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment."  The Plan meets this

---

[19] 11 U.S.C. § 1123(a)(1)-(3).

[20] Plan, Art. III.A–B.

17

Appellee Appx. 01555

APPX. 01442

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1563
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1677 of 1828   PageID 11170
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1562 of 1803   PageID 12308
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 24 of 68

requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such Holders' respective Class.  Thus, the Plan satisfies section 1123(a)(4).[21]

36.    Mr. Daugherty and the Senior Employees each argue that the Plan does not satisfy Bankruptcy Code section 1123(a)(4).  Mr. Daugherty asserts that the Plan provides for different treatment of Disputed Claims versus Allowed Claims, and therefore provides disparate treatment in violation of Section 1123(a)(4) of the Bankruptcy Code.  This is not correct because the Plan provides for the same <u>treatment</u> of claims within a particular class.  The Disputed Claims Reserve shall reserve funds for the potential allowance of Claims that are not allowed at the time the Claimant Trustee makes distributions.[22]  The Disputed Claims Reserve also does not allow the Debtor to unilaterally determine the amount of any reserve; that will be decided by the Bankruptcy Court absent agreement by the relevant parties.  The Debtor—or any holder of a Disputed Claim—may file a motion with the Bankruptcy Court and request that the Claimant Trustee set aside a specific amount in the Disputed Claims Reserve pending the ultimate allowance/disallowance of the Claim.

---

[21]  *See In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("[s]ection 1123(a)(4) does not require precise equality, only approximate equality"; and"); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d. Cir 2013) (same); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("[T]he 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money.").

[22]  The Plan provides that the Disputed Claims Reserve amount is either (1) the amount set forth on either the Schedules or applicable Proof of Claim; (2) the amount agreed by the Holder of the Disputed Claim and the Reorganized Debtor or Claimant Trustee; (3) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim, or (4) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.  *See* Plan, § 1.B.49.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1564
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1678 of 1828 PageID 11171
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1563 of 1803 PageID 12309
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 25 of 68

37.     Mr. Daugherty's suggestion that the Bankruptcy Court's estimation of disputed claims for purposes of establishing a Disputed Claims Reserve somehow constitutes disparate treatment of similarly classified claims is also devoid of merit. Mr. Daugherty's argument would effectively mean that the Debtor would have to set aside the asserted amount of any Disputed Claim, regardless of how specious it may be, until the claim is ultimately resolved pursuant to a final order. Such a requirement would essentially provide a creditor with a stay pending appeal of the ultimate of allowance of the claim. Moreover, such a requirement would effectively prevent the Debtor from distributing <u>any</u> portion of the reserved funds to holders of Allowed Claims until the Disputed Claim is litigated to final order of the Supreme Court or such other applicable court of last resort—a process that could take years, and as evidenced by the length of time of the pending litigation in this case already waged by Mr. Daugherty, Mr. Dondero and others. If Mr. Daugherty—or any creditor—believes the Debtor's proposed estimate for its Disputed Claim is insufficient, Mr. Daugherty has an adequate remedy under the Plan and can request that the Bankruptcy Court estimate a sufficient amount for deposit into the Disputed Claims Reserve to satisfy his Claim to the extent it is ultimately Allowed.

38.     The Senior Employees argue that the Plan violates section 1123(a)(4) because the Senior Employees are treated differently than other employees in that they are required to sign the Senior Employee Stipulation in order to obtain the benefit of the Debtor's release provided in Section IX.D. This assertion is patently false and conflates treatment of claims within a Class with the Debtor's voluntary release of <u>its own</u> claims and causes of action. First, the treatment of all Class 8 Claims for the Debtor's employees is the same and nothing in the Plan provides for

19

Appellee Appx. 01557
APPX. 014122

any disparate or different treatment.  Any affirmative claims that belong to the Debtor against the Senior Employees (and other parties) are irrelevant to the claims held by creditors against the Debtor and treated by the Plan.  The Plan provides that in order to obtain the benefit of the Debtor release, the Debtor's employees must provide sufficient consideration to obtain this release.  They do not get it for free—this issue was substantially argued before this Court at prior hearings.[23]  One of the conditions of obtaining the Debtor release for the Senior Employees is that they would be required to execute the Senior Employee Stipulation (in addition to the fulfilling the other Plan requirements of the Debtor's release of employee claims) to provide consideration for the release of claims against these high level Senior Employees, two of whom were recently terminated for cause.  As the Debtor's counsel explained at the Disclosure Statement Hearing conducted on November 23, 2020, the decision to purchase the Debtor release and execute the Senior Employee Stipulation (or not) rested with each Senior Employee, but has no nexus to the treatment of claims of the Senior Employee against the Debtor.[24]

---

[23] The limitations on the release of all Employees (including the Senior Employees) is also intended to address the Bankruptcy Court's concerns on this issue articulated at the first Disclosure Statement Hearing on October 27, 2020, and at a hearing held on October 28, 2020.

"With regard to these releases—and they are, I'll just be clear, Debtor releases, not third parties releasing third parties.  But nevertheless, you know, I think there's an issue thereof they would need to be fair and equitable, in the best interest of creditors, and in the paramount interest of creditors would be something the Court would focus on there . . .  This is not your normal case where this is the type of provision you see in many, many, many Chapter 11 plans."  Transcript of Proceedings Conducted on October 27, 2020; pg 32, lines 10-20.

[24] As explained at the Disclosure Statement Hearing by Debtor's counsel:

"With respect to senior employees—who include Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent—if they want to obtain a release, and there's no requirement that they agree, they must also execute what we refer to as the Senior Employee Stipulation, which is included in the supplement, in order to receive their release.  If they execute that stipulation, they would receive their release.  If they don't execute that stipulation, they wouldn't."  Transcript of Proceedings Conducted on November 23, 2021, pg 9, lines 12-19.

Appellee Appx. 01558

APPX. 011413

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1566
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1680 of 1828 PageID 11173
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1565 of 1803 PageID 12311
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 27 of 68

39.     Thus, there is no disparate treatment of Claims within each Class and the Plan does not violate section 1123(a)(4) of the Bankruptcy Code.

40.     <u>Adequate Means for Implementation</u>.  The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation.[25]  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  Essentially, the Plan's various mechanisms provide for the Debtor's continued operation after the Effective Date, the monetization of the Debtor's remaining assets, and payment of the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, any residual value would then flow to the Debtor's equity security holders in accordance with the Bankruptcy Code's priority scheme.

41.     Article IV of the Plan, in particular, sets forth the means for implementation of the Plan with the establishment of:  (i) the Claimant Trust, (ii) the Litigation Sub-Trust; and (iii) the Reorganized Debtor.  The Claimant Trust Agreement provides for the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust and which will manage the Reorganized Debtor).[26]  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets and the management of the

---

[25] 11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  *Id.*

As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor they are no longer eligible to execute the Senior Employee Stipulation.

[26] For the avoidance of doubt, the Reorganized Debtor's general partner will not be named "New GP LLC."  That name is simply a placeholder.

Appellee Appx. 01559
Appx. 04426

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1567
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1681 of 1828 PageID 11174
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1566 of 1803 PageID 12312
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 28 of 68

Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.

42.     The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements. The Litigation Trustee is charged with pursuing any Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. Finally, the Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds. The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub Trust Agreement, and the Schedule of Retained Causes of Action.[27] Thus, the Plan satisfies section 1123(a)(5).

43.     <u>Non-Voting Stock</u>. The sixth requirement of section 1123(a) is that, with respect to a corporate debtor, a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default. The Debtor is a limited partnership and there not a corporation.[28]

44.     <u>Selection of Officers and Directors</u>. Finally, section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity

---

[27] *See* Notices of Filing Plan Supplements [Docket Nos. 1389, 1606, 1656 and on January 22, 2021] (as modified, amended, or supplemented from time to time, the "<u>Plan Supplements</u>").

[28] *See* 11 U.S.C. § 101(9) (B) ("The term 'corporation' . . . does not include limited partnerships").

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1568
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1682 of 1828   PageID 11175
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1567 of 1803   PageID 12313
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01    Page 29 of 68

security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[29]  The disclosure of the individuals to provide services to the Reorganized Debtor and entities created under the Plan and qualifications of these individuals is discussed below in section I.E of this Memorandum in conjunction with the Debtor's satisfaction of the provisions of section 1125(a)(5) of the Bankruptcy Code which overlap and address similar issues.

**B.      The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

45.      Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. Case law and legislative history indicate this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code,[30] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[31]

**1.      The Debtor Complied with Section 1125 of the Bankruptcy Code.**

46.      Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[32]  Section

---

[29] 11 U.S.C. § 1123(a)(7).

[30] *See Cypresswood*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[31] 11 U.S.C. § 1125(b).

[32] *Id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01561
APPX. 04428

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1569
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1683 of 1828   PageID 11176
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1568 of 1803   PageID 12314
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 30 of 68

1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[33]

47.      Section 1125 of the Bankruptcy Code is satisfied here.   Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.[34]  The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[35]  The Debtor, through the Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.  The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.  The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan.[36]

48.      Based on the foregoing, the Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

---

[33] *See Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[34] *See* Disclosure Statement Order [Docket No. 576].

[35] *See id.*

[36] *See id.*

### 2.    The Debtor Complied with Section 1126 of the Bankruptcy Code.

49.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[37]   Accordingly, the Debtor did not solicit votes on the Plan from the following Classes:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claims | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |

50.    The Debtor solicited votes only from Holders of Allowed Claims in Classes 2, 7, 8 and 9 and Equity Interests in Classes 10 and 11 (collectively, the "Voting Classes") because each of these Classes is Impaired and entitled to vote to accept or reject the Plan.[38]   The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[39]   Based on the foregoing, the Debtor has satisfied the requirements of section 1129(a)(2).

---

[37] *See* 11 U.S.C. § 1126.

[38] *See* Plan, Art. III. A–B.

[39] A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of section 1126, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of section 1126, that have accepted or rejected such plan.  11 U.S.C. § 1126(c).  A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.  11 U.S.C. §1126(d).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01563

APPX. 04428

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 2 | Frontier Secured Claim | Impaired | Entitled To Vote |
| 7 | Convenience Claims | Impaired | Entitled To Vote |
| 8 | General Unsecured Claims | Impaired | Entitled To Vote |
| 9 | Subordinated Claims | Impaired | Entitled To Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled To Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled To Vote |

**C.** **The Debtor Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

51. Section 1129(a)(3) of the Bankruptcy Code requires that the proponent of a plan propose the plan "in good faith and not by any means forbidden by law."[40] In assessing the good faith standard, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[41] A plan must also achieve a result consistent with the Bankruptcy Code.[42] The purpose of chapter 11 is to enable a distressed business to reorganize and achieve a fresh start.[43] Whether a plan is proposed in good faith must be determined in light of the totality of the circumstances of the case.[44]

52. During the last several months, the Debtor has negotiated extensively with the Committee regarding all aspects of the Plan. Such negotiations have been hard fought and intense. As the Court will recall, the Committee objected to approval of the Disclosure Statement

---

[40] 11 U.S.C. § 1129(a)(3).

[41] *See In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

[42] *See In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

[43] *See Sun Country Dev.*, 764 F.2d at 408 ("The requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start.").

[44] *See id.*; *see also Pub. Fin. Corp. v. Freeman*, 712 F.2d 219 (5th Cir. 1983); *Cypresswood*, 409 B.R. at 425.

Appellee Appx. 01564

APPX. 011429

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1572
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1686 of 1828   PageID 11179
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1571 of 1803   PageID 12317
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 33 of 68

at the initial Disclosure Statement hearing which objection resulted in a continuance of that hearing.  In the subsequent weeks the Debtor and the Committee continued their negotiations and ultimately reached substantial agreement on the terms of the Plan prior to the November 23, 2020 Disclosure Statement hearing. The parties continued their negotiations over the subsequent weeks which resulted in the Plan currently before the Court for confirmation.  This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of Section 1129(a)(3).

53.    Moreover, the mechanical distributions contemplated under the Plan were proposed in good faith, are not prohibited by applicable law, and were crafted to efficiently monetize the Debtor's assets and pursue Causes of Action while bestowing the Claimant Trustee Oversight Committee with ultimate oversight over this process.  The Plan provides for the transfer of the majority of the Debtor's Assets to the Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor.  The Reorganized Debtor will be managed by New GP LLC—a wholly-owned subsidiary of the Claimant Trust.  This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets.  The Claimant Trust, the Litigation Sub-Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant

DOCS_SF:104703.16 36027/002

Appellee Appx. 01565
APPX. 04412

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1573
Case 3:23-cv-00726-S   Document 8-22   Filed 08/29/23    Page 1687 of 1828   PageID 11180
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1572 of 1803   PageID 12318
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 34 of 68

Trust Agreement, or the Reorganized Limited Partnership Agreement.  The Plan also provides

for the reconciliation and potential objection to Claims filed against the Debtor and a procedure

to administer Disputed Claims.  Thus, the Plan satisfies section 1129(a)(3) of the Bankruptcy

Code.

**D.    The Debtor is Seeking to Pay Certain Professional Fees and Expenses Subject to Bankruptcy Court Approval (Section 1129(a)(4)).**

54.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses

paid by the plan proponent, by the debtor, or by a person receiving distributions of property

under the plan, be approved by the Bankruptcy Court as reasonable or subject to approval by the

Bankruptcy Court as reasonable.  The Fifth Circuit has held this is a "relatively open-ended

standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not

necessarily require that a bankruptcy court review the amount charged.[45]  As to routine legal fees

and expenses that have been approved as reasonable in the first instance, "the court will

ordinarily have little reason to inquire further with respect to the amount charged."[46]

55.    In general, the Plan provides that the Claims held by professionals retained by the

Debtor or the Committee (the "Professionals") for their services and related expenses are subject

to prior Court approval and the reasonableness requirements under sections 328 or 330 of the

Bankruptcy Code.  Moreover, Article II.B of the Plan provides that Professionals shall file all

final requests for payment of Professional Fee Claims no later than 60 days after the Effective

---

[45] *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517-18 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[46] *Id.* at 517.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01566
APPX. 104423

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1574
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1688 of 1828 PageID 11181
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1573 of 1803 PageID 12319
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 35 of 68

Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.[47]  The Plan also provides for the establishment of the Professional Fee Escrow Account by the Claimant Trustee to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.  Plan, § I.B.101.  For the foregoing reasons, the Debtor submits that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

> ### E. The Debtor Has Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).

56.     The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[48]  It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[49]  Lastly, it requires that the plan proponent has disclosed the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.[50]  Courts have held that these provisions ensure that the post-confirmation governance of a reorganized debtor is in "good hands."[51]

57.     The Plan provides that James P. Seery, Jr., the Debtor's current Chief Executive Officer, Chief Financial Officer and Foreign Representative, shall serve as the Claimant Trustee

---

[47] Plan. Art. II.B.

[48] 11 U.S.C. § 1129(a) (5)(A)(i).

[49] 11 U.S.C. § 1129(a)(5)(A)(ii).

[50] 11 U.S.C. § 1129(a)(5)(B).

[51] *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors").

DOCS_SF:104703.16 36027/002

Appellee Appx. 01567
APPX. 041422

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1575
Case 3:23-cv-00726-S Document 8-22 Filed 04/24/23 Page 1689 of 1828 PageID 11182
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1574 of 1803 PageID 12320
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 36 of 68

and Marc S. Kirschner shall serve as the Litigation Trustee. *See* Plan Supplement at Exhibits M and O. Mr. Seery currently serves as the Debtor's Chief Executive Officer and Chief Restructuring Officer and also serves as one of the Independent Directors. Mr. Seery shall be paid $150,000 per month, for services rendered after the Effective Date and for his services as Claimant Trustee, plus a success fee that shall be the subject of negotiation between him and the Claimant Trust Oversight Committee post-Effective Date, which negotiation shall take place within forty-five (45) days after the Effective Date. Finally, the Claimant Trust Agreement discloses the five members of the Claimant Trust Oversight Committee, which consists of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Josh Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-e Discovery; and (5) David Pauker. *See* Plan Supplement at Exhibits A, M, and N.

58. HCMFA's objection asserts that "neither the identity nor the compensation of the people who control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer." HCMFA Objection ¶ 74. The identity of the individuals who will manage the Reorganized Debtor, the Claimant Trust, and Litigation Sub-Trust are set forth above, along with the proposed compensation for any insider. Moreover, the Claimant Trust Agreement provides that the Claimant Trustee "shall engage professionals from time to time in conjunction with the services provided hereunder. Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Committee as set forth in Section 3.3(b) [of the Claimant Trust Agreement]." Claimant Trust Agreement, § 3.13(b).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01568
APPX. 011423

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1576
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1690 of 1828 PageID 11183
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1575 of 1803 PageID 12321
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 37 of 68

59. In addition to satisfying the disclosure requirements of Bankruptcy Code section 1125(a)(5), the appointment of Messrs. Seery, Kirschner and the members of the Claimant Trust Oversight Committee is consistent with the interests of creditors and equity security holders and with public policy pursuant to section 1123(a)(7) of the Bankruptcy Code. As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020. As set forth in the CEO/CRO Motion, Mr. Seery has extensive management and restructuring experience. Mr. Seery recently served as a Senior Managing Director at Guggenheim Securities, LLC, where he was responsible for helping direct the development of a credit business. Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, where he was responsible for originating, executing, and managing stressed and distressed credit investments. Mr. Seery is also a long-time attorney licensed to practice in New York who has run corporate reorganization groups and numerous restructuring matters. He also served as a Commissioner of the *American Bankruptcy Institute's Commission to Study the Reform of Chapter 11*. Mr. Seery was also a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business where he was responsible for managing the firm's investment grade and high yield loans business, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management and restructuring. From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for the management of distressed corporate debt investments and was a key member of the small team that successfully sold Lehman Brothers to Barclays in 2008.

Appellee Appx. 01569
APPX. 104424

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1577
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1691 of 1828 PageID 11184
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1576 of 1803 PageID 12322
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 38 of 68

60.     In addition to his ample qualifications, as the Court is aware from the numerous times Mr. Seery has testified before the Court, Mr. Seery has made substantial demonstrative contributions to the success of this chapter 11 case through both the resolution of the Debtor's pending litigation claims and the development of the Plan.  In his roles with the Debtor, he is familiar with the Debtor's operations and its business as well as the Claims that will be treated under the Plan.  Accordingly, it is reasonable to continue his employment post-emergence as the Claimant Trustee, subject to the supervision of the Claimant Trust Oversight Committee, which is comprised of several of the largest creditors of the Debtor, including UBS, Redeemer Committee and Acis, as well as Meta-e, all of whom currently serve on the Committee.

61.     Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particular with respect to his prior experience as a litigation trustee.  He serves as the trustee for:  the Tribune Litigation Trust; Millennium Health Corporate Claim and Lender Claims Trusts; and the Nine West Trust.  He is currently a Senior Managing Director at Goldin Associates, LLC specializing, among other things in, restructuring advisory, valuation, solvency/fraudulent conveyance issues.  He is also a member of the American College of Bankruptcy.  Mr. Kirschner was also a partner and the former head of the New York Restructuring of the global law firm of Jones Day.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter.[52]  In addition, Mr. Kirchner

---

[52] Mr. Kirschner will receive support services from his consulting firm, Teneo.  Teneo will provide services at a 10% discount from their rates. Teneo has agreed to freeze their rates in effect for 2021 through the end of 2022. Teneo shall also be entitled to reimbursement of expenses.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01570
APPX. 004437

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1578
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1692 of 1828 PageID 11185
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1577 of 1803 PageID 12323
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 39 of 68

will receive a 1.50% fee of any "Net Litigation Trust Proceeds"[53] up to $100 million, and an additional 2% fee of any Net Litigation Trust Proceeds in excess of $100 million.

62.     As noted above, four of the members of the Claimant Trust Oversight Committee are the holders of most of the largest Claims against the Debtor and current members of the Committee. Each of these creditors have actively participated in the Debtor's case both through their roles as Committee members and in their separate capacities as individual creditors. They are therefore familiar with the Debtor, its operations and assets.

63.     The fifth member of the Clamant Trustee Oversight Committee, David Pauker, is a restructuring advisor and turnaround manager with more than 25 years of experienced advising public and private companies and their investors. Mr. Pauker is a fellow of the American College of Bankruptcy. Mr. Pauker has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies and private investor parties, including Lehman Brothers, Monarch Capital, Government Development Bank Debt Recovery Authority of Puerto Rico, MCorp, Refco, and Residential Capital. Mr. Pauker, who will be the only paid member of the initial Claimant Trust Oversight Board, will be paid $250,000 for the first year of his service and $150,000 per year thereafter. The Plan therefore satisfies the requirements of Bankruptcy Code

---

[53] Net Litigation Trust Proceeds is defined as gross Litigation Trust proceeds, less Teneo and Litigation Trust counsel hourly fees, expert witness, e-discovery, court and discovery expenses. Gross recoveries are not to be reduced by the cost of insurance, tax accounting work which would be outsourced, potential contingency fees, or litigation funding financing and/or related contingent fee charges.

Appellee Appx. 01571
APPX. 04428

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1579
Case 3:23-cv-00726-S   Document 8-22   Filed 04/24/23    Page 1693 of 1828   PageID 11186
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1578 of 1803   PageID 12324
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 40 of 68

sections 1129(a)(5) and 1123(a)(7) with respect to the individuals responsible for the post-confirmation administration and oversight of the Reorganized Debtor.

**F.     The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)).**

64.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.  No such rate changes are provided for in the Plan.  Thus, section 1129(a)(6) of the Bankruptcy Code is inapplicable to this chapter 11 case.

**G.     The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).**

65.     The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[54]  The best interests test applies to each non-consenting member of an impaired class, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[55]

66.     As demonstrated in the liquidation analysis and financial projections attached to the Disclosure Statement as Exhibit C (the "<u>Liquidation Analysis</u>"), which was prepared by the

---

[54] 11 U.S.C. § 1129(a) (7).

[55] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n. 23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code a bankruptcy court was required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01572
APPX. 1044.29

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1580
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1694 of 1828 PageID 11187
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1579 of 1803 PageID 12325
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 41 of 68

Debtor with the assistance of its advisors, all Holders of Claims and Equity Interests in all Impaired Classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.[56] Specifically, the projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of Claims estimates a 92.51% distribution to holders of general unsecured claims under the Plan compared to an estimated 66.14% distribution under a hypothetical liquidation of the Debtor.[57]

67.     Mr. Dondero argues that the Plan fails to satisfy the requirements of Bankruptcy Code section 1129(a)(7) due to "lack of appropriate sale procedures for post-confirmation operations" and because there is no oversight or predetermined procedures to ensure that the liquidation of the Debtor's assets is both value maximizing and transparent. *See* Dondero Objection, ¶10. Dugaboy—Mr. Dondero's family trust—filed a similar objection and asserts that the absence of reporting requirements to the beneficial holders of Claimant Trust, lack of oversight on the Claimant Trustee's ability to liquidate assets violates section 1129(a)(7) and that a chapter 7 trustee would require to obtain court approval to effect the same sales. Dugaboy also argues that the Claimant Trustee's limitation of liability only applies to gross negligence and willful misconduct, so that the Claimant Trustee cannot be held liable for breach of fiduciary duty and, therefore, derives great protections than a hypothetical chapter 7 trustee would have.

---

[56] *See* Disclosure Statement Ex. C.

[57] *See* Disclosure Statement Ex C. With respect to the other impaired classes of Claims and Equity Interests, the Liquidation Analysis projects a 100% distribution on account of the Class 2 Frontier Secured Claim under either scenario and projects no distributions holders of Class 9 Subordinated Claims, Class 10 Class B/C Limited Partnership Interests and Class 11 Class A Limited Partnership Interests either under the Plan or under a hypothetical liquidation of the Debtor.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1581
Case 3:23-cv-00726-S  Document 8-22  Filed 08/29/23    Page 1695 of 1828  PageID 11188
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1580 of 1803  PageID 12326
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 42 of 68

68.     This objection is being made by parties with virtually no economic interest in the Debtor.  Neither Dugaboy nor Mr. Dondero have any legitimate claims against the Debtor and based upon Mr. Dondero's "pot plan" proposal their equity is completely out of the money. Moreover, as discussed below, the argument that increased reporting obligations to creditor beneficiaries (who they are not), a requirement to seek Court approval of sales and the establishment of a standard of care for the Claimant Trustee somehow translates into creditors doing better in a chapter 7 makes no sense, and, in any event, is not an argument supported by any creditor not related to Mr. Dondero..

69.     As set forth above, the Liquidation Analysis filed with the Disclosure Statement provides a side by side comparison of distributions to creditors under a hypothetical chapter 7 liquidation and under the Plan and clearly demonstrates that creditors will receive at least as much under the Plan as they would in a chapter 7 proceeding.  None of the objectors provide any arguments to refute the analysis in the Liquidation Analysis or how a hypothetical chapter 7 trustee would liquidate the Debtor's remaining assets that would definitively provide a greater distribution to creditors in chapter 7 liquidation rather than in chapter 11. To the contrary, Mr. Dondero suggests (without any factual basis) that the Debtor's creditors and equity holders "could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sale procedures are governed by the Bankruptcy Court to ensure maximization or value through auction or other market-testing means."  Dondero Objection ¶ 11.

70.     Nothing in the opposition suggests that the Claimant Trustee (subject to supervision by the Claimant Trust Oversight Committee) will not undertake the same value

Appellee Appx. 01574
APPX. 01439

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1582
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1696 of 1828 PageID 11189
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1581 of 1803 PageID 12327
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 43 of 68

maximizing measures suggested by Mr. Dondero in order to maximize the value of the Reorganized Debtor's assets. The only difference is that the Claimant Trustee would be able to consummate these sales in the ordinary course of business compared to a trustee, who would have to negotiate (and presumably discount) every sale with the caveat that it is subject to court approval and a period of time by which parties, such as Mr. Dondero has throughout this case, can object and potentially frustrate any proposed sale. Mr. Dondero also assumes that the chapter 7 trustee could operate the Debtor's business in chapter 7.[58] Aside from the complete lack of institutional knowledge of the Debtor and its business, it is doubtful that a chapter 7 trustee would be able to operate the Debtor's business without the benefit of the executory contracts and unexpired leases that the Reorganized Debtor seeks to assume in order to monetize the remaining assets. There is no factual basis to conclude that a hypothetical chapter 7 trustee could monetize the Debtor's remaining assets any better than the Claimant Trustee, who has both the expertise and institutional knowledge of the Debtor and who is subject to an oversight committee consisting of the largest creditors in the Debtor's case.

71. Second, it is standard for a chapter 11 plan to allow the post confirmation administrators (in this case, the Claimant Trustee, the Litigation Trustee, and Reorganized Debtor) to monetize a debtor's assets without having to first obtain court approval or otherwise condition any sales on the consent to the holders of claims or interests. It is neither novel nor unusual for chapter 11 plans to allow the post-confirmation vehicle to sell assets, compromise

---

[58] Even if a hypothetical trustee were appointed under Mr. Dondero's argument, the trustee would be subject to election pursuant 11 U.S.C. § 702. The largest creditors of the Debtor (most of whom are serving on the Claimant Trust Oversight Committee) would control the selection of the trustee of the Debtor after conversion. Yet these creditors support confirmation of the Plan and the structure by which they, as members of the Claimant Trust Oversight Committee, will oversee the Claimant Trustee's monetization of assets.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01575
APPX. 01432

controversies and employ professionals without mandatory application to the Court to approve these standard post-confirmation transactions, including chapter 11 cases confirmed by this Court. *See, e.g. In re Acis Capital Management*, 2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) (plan providing "[o]n and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order."); *In re Wilson Metal Fabricators,* No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020), ECF No. 92 (Order confirming plan providing that reorganized debtor "may deal with its assets and property and conduct its affairs without any supervision by, or permission from, the Court or the Office of the United States Trustee, and free of any restriction imposed on the Debtor by the Bankruptcy Code or by the Court during the case.").

72.    Finally, Dugaboy's argument that the standard of liability for the Claimant Trustee provided in the Claimant Trust Agreement is not appropriate and confers greater protections those applicable to a chapter 7 trustee is wrong.  This objection is yet another example of the Dondero Entities' efforts to place as many roadblocks as possible to halt post-confirmation asset sales and maintain the ability to litigate (or threaten to litigate) against the entities charged with implementing the monetization of assets required under the Plan.

73.    The standard of liability imposed on the Claimant Trustee pursuant to the Clamant Trust Agreement is appropriately limited to gross negligence and willful misconduct and Dugaboy and the Dondero Entities do not describe how the standard of liability has any impact

DOCS_SF:104703.16 36027/002

on the distributions creditors will receive under the Plan.  First, the Claimant Trustee does have fiduciaries duties to the trust beneficiaries under the terms of the Claimant Trust Agreement, but claims against the Claimant Trustee are limited to acts of gross negligence and willful misconduct.[59]   Second, Dugaboy misstates the standard of liability that would otherwise be imposed on a chapter 7 trustee.   A chapter 7 trustee would actually have a more relaxed standard of liability than that imposed on the Claimant Trustee because it is well established that trustees have qualified immunity for acts taken within the scope of their appointment.  *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("The question in this case is whether a trustee acting at the direction of a bankruptcy judge is clothed with absolute immunity against tort actions grounded on his conduct as trustee …. In the instant case, the court-approved trustee was acting under the supervision and subject to the orders of the bankruptcy judge.  We hold that since [the trustee], as an arm of the Court, sought and obtained court approval of his actions, he is entitled to derived immunity.")  Thus, a chapter 7 trustee's qualified immunity would protect it from heightened negligent breach of fiduciary duty claims whereas the Claimant Trust Agreement provides that the Claimant Trustee is only protected from simple negligent breach of fiduciary claims.

---

[59] *See, e.g.*. Claimant Trust Agreement Section 2.3(b)(vii).  "The  Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the following purpose …  (viii) to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds.  The Debtor has amended the Plan to conform with the Claimant Trust Agreement.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01577

Appx. 01434

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1585
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23   Page 1699 of 1828   PageID 11192
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1584 of 1803   PageID 12330
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 46 of 68

74.     Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.[60]

### H.     The Plan Complies with the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

75.     The Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[61]  Each of the non-Voting Classes that were not entitled to vote on the Plan are Unimpaired and conclusively deemed to accept the Plan.

### I.     The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).

76.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.   Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—which generally include domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must

---

[60] *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) aff'd, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan"); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[61] 11 U.S.C. § 1129(a) (8).

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1586
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1700 of 1828 PageID 11193
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1585 of 1803 PageID 12331
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 47 of 68

receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan). Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim

77. The Plan satisfies section 1129(a)(9) of the Bankruptcy Code. First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time as defined in Article II.A of the Plan. Second, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[62] Finally, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each Holder of an Allowed Priority Tax Claim shall receive payment in an amount equal to the amount of the Allowed Priority Tax Claim unless otherwise agreed between such holder and the Debtor. .[63] Thus, the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

---

[62] *See* Plan, Art. III.B.

[63] As noted below in the discussion on Plan modifications, the Debtor has clarified the treatment of priority tax claims in accordance with 11 U.S.C. §1129(a)(9)(C) pursuant to the objection raised on this point by the Internal Revenue Service ("IRS").

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1587
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1701 of 1828 PageID 11194
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1586 of 1803 PageID 12332
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 48 of 68

78.     The IRS and certain Texas taxing authorities (the "<u>Texas Taxing Authorities</u>") each filed objections to the Plan.  The Debtor is in the process of negotiating "neutrality" language with the Texas Taxing Authorities concerning the application of the Plan injunction and other provisions to the claims asserted by this creditor. The Debtor expects to consensually resolve the Texas Taxing Authorities' objection with agreeable language in the Confirmation Order.  As more fully explained in the Omnibus Reply in response to the IRS's plan objection, the IRS has rejected the Debtor's Plan neutrality language and is insisting on the modification of the Plan to contain litany of provisions that are ambiguous, overbroad and, most importantly, attempt to pre-determine the IRS's rights and remedies as opposed to having these issues determined in accordance with nonbankruptcy law with each parties' rights and defenses preserved.

### J.     At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).

79.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider."  As detailed herein and in the Voting Report, Class 2 (Frontier Secured Claim) and Class 7 (Convenience Claims) are impaired classes of claims and each voted to accept the Plan, exclusive of any acceptances by insiders. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. However, as explained below, even though not all of the Voting Classes accepted the Plan, the Plan may still be confirmed by cram down because the requirements of section 1129(b) are satisfied.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01580
APPX. 104443

**K.    The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).**

80.    Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."[64]  To satisfy this standard, the Fifth Circuit has held that a plan need only have a "reasonable probability of success."[65]  Indeed, a relatively low threshold of proof will satisfy section 1129(a)(11) so long as adequate evidence supports a finding of feasibility.[66]  In particular, according to Fifth Circuit law, "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible."[67]

81.    The Plan provides for the Reorganized Debtor to manage the wind down of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets.  As set forth in the Liquidation Analysis, the projections prepared by the Debtor show that it will be able to meet its obligations under the Plan.  The Plan also does not provide any guaranty as to what holders of Class 8 General Unsecured Claims will receive; they will receive their *pro rata* payment of whatever net funds realized from the asset monetization process reflected in the projections.  Therefore, the Plan is feasible.  Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code under Fifth Circuit law.

---

[64] 11 U.S.C. § 1129(a) (11).

[65] *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) (quoting *In re Landing Assocs., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993)).

[66] *In re Star Ambulance Service, LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015).

[67] *T-H New Orleans*, 116 F.3d at 802.

43

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1589
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1703 of 1828   PageID 11196
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1588 of 1803   PageID 12334
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 50 of 68

**L.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

82.      The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[68]   The Plan includes an express provision requiring payment of all such fees.[69]   In addition, at the request of the United States Trustee, the Debtor has added language to the Confirmation Order that makes the Reorganized Debtor, the Claimant Trustee and Litigation Trustee jointly and severally liable for payment of statutory fees owed to the United States Trustee.  The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

**M.      The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.**

83.      The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  Section 1114(a) of the Bankruptcy Code defines retiree benefits as medical benefits.[70]   Article IV.K of the Plan provides for the assumption of the Pension Plan (to the extent that this plan is governed under section 1114 of the Bankruptcy Code) as well as additional language requested by the Pension Benefits Guaranty Corporation.   Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

---

[68] 11 U.S.C. § 1129(a) (12).

[69] Plan, Art. XIII.D.

[70] Section 1114(a) defines "retiree benefits" as: ". . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title."  11 U.S.C. § 1114(e) (emphasis added).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01582
Appx. 04440

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1590
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1704 of 1828   PageID 11197
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1589 of 1803   PageID 12335
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 51 of 68

**N.     Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

84.     A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan. Section 1129(a)(14) of the Bankruptcy Code does not apply because the Debtor is not subject to any domestic support obligations.[71]  Section 1129(a)(15) of the Bankruptcy Code is inapplicable because the Debtor is not an "individual" as defined in the Bankruptcy Code.[72] Section 1129(a)(16) of the Bankruptcy Code is inapposite because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[73]

**O.     The Plan Satisfies the Cramdown Requirements (Section 1129(b)).**

85.     If an impaired class has not voted to accept the plan, the plan must be "fair and equitable" and not "unfairly discriminate" with respect to that class.[74]  The Plan has been accepted by Voting Classes 2, 7, and 9.[75]  Voting Classes 8 (General Unsecured Claims) and Class 11 (Class A Limited Partnership Interests) voted to reject the Plan and Class 10 (Class B/C Limited Partnership Interests), did not vote.  However, the Plan still satisfies the "cramdown" requirements with respect to non-accepting Classes of Claims and Equity Interests.

---

[71] *See* 11 U.S.C. § 1129(a) (14).

[72] *See* 11 U.S.C. § 1129(a)(15).

[73] *See* 11 U.S.C. § 1129(a)(16).

[74] *See* 11 U.S.C. § 1129(b)(1).

[75] As noted below, Class 9 has also accepted the Plan, but the Debtor is not including Class 9 as one of the accepting impaired classes to satisfy the cram down requirements of section 1129(b)(1) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01583

Appx. 01146

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1591
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1705 of 1828   PageID 11198
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1590 of 1803   PageID 12336
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 52 of 68

### 3. The Plan Is Fair and Equitable.

86.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects the plan (or is deemed to reject the plan) if it follows the "absolute priority rule."[76]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[77]  The Plan satisfies section 1129(b) of the Bankruptcy Code.  The objecting parties' arguments that the Plan is not "fair and equitable" ignore this standard.

87.     As explained earlier, all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's classification mechanics rests on a legally acceptable rationale.  To the extent any impaired rejecting class of claims or interests is not paid in full, no class junior to the impaired rejecting class will receive any distribution under the Plan on account of its junior claim or interest.  Therefore, the Plan satisfies the "fair and equitable" requirement.

### 4. The Plan Does Not Unfairly Discriminate Against the Rejecting Classes.

88.     The Bankruptcy Code does not provide a standard for determining "unfair discrimination."  Rather, courts typically examine the facts and circumstances of the particular

---

[76] *Bank of Am. Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999) ; *In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

[77] *Id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01584

APPX. 04449

case to determine whether unfair discrimination exists.[78]    At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[79]  The unfair discrimination requirement, which involves a comparison of classes, is distinct from the equal treatment requirement of section 1123(a)(4), which involves a comparison of the treatment of claims within a particular class.  A plan does not unfairly discriminate where it provides different treatment to two or more classes which are comprised of dissimilar claims or interests.[80]  Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[81]

89.    The Plan's treatment of these Classes is proper because all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.  Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

---

[78] *See In re Kolton*, No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) (quoting *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis . . . ")); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[79] *See Idearc Inc.*, 423 B.R. at 171, ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[80] *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997) ; *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[81] *Aztec Co.*, 107 B.R. at 590.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1593
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1707 of 1828  PageID 11200
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1592 of 1803  PageID 12338
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 54 of 68

**P.**     **The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code.**

90.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[82]

91.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[83]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[84]  The Debtor submits that the Plan satisfies the "fair and equitable" requirement notwithstanding the non-acceptance of the Plan by Classes 8, 10 and 11.

92.     With respect to Class 8 General Unsecured Claims, there is no Class of equal priority receiving more favorable treatment and no classes that are junior to Class 8 will receive or retain any property under the Plan unless Class 8 creditors receive or retain, on account of

---

[82] *See John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997)  ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[83] *See Bank of Amer.*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[84] *See id.*

DOCS_SF:104703.16 36027/002

their claims, a value as of the Effective Date equal to the amount of such Claim, plus interest as provided under the Plan.  Thus, Holders of Class 9 Subordinated Claims will not receive any distributions unless and until Class 8 Claims are fully paid pursuant to section 1129(b)(2)(B) of the Bankruptcy Code.  Holders of Equity Interests in Class 10 and 11 will not receive any distributions absent full payment to holders of Allowed Class 8 General Unsecured Claims and Allowed Class 9 Subordinated Claims.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Therefore, the Plan is fair and equitable as to Equity Interests in Class 10 and 11 because no class junior to equity will receive or retain any property under the Plan.  11 U.S.C. § 1129(b)(2)(C).

93.     Moreover, while Class 8 did not accept the Plan, requiring the Debtor to resort to "cram down" under Section 1129(b), over 93% of the dollar amount of claims in Class 8 voted to accept the Plan.  Those votes included the votes of Redeemer, Acis, UBS, and the HarbourVest entities.  Similarly, the Committee, as the fiduciary for all Class 8 General Unsecured Claims, also enthusiastically supports the Plan. As discussed above, the only reason Class 8 General Unsecured Claims voted to reject the Plan was because of (i) 24 employees holding contingent $1.00 claims with respect to unvested amounts under the Debtor's deferred compensation program voted against the Plan;[85] yet these employees ultimately will not have any General Unsecured Claims because the Debtor will terminate their employment before their entitlement to such amounts will vest, thereby eliminating the contingent claims and (ii) certain other employees, including Scott Ellington and Isaac Leventon who are loyal to Mr. Dondero and who

---

[85] As noted above, the Debtor resolved the confirmation objection of Mr. Surgent and Mr. Waterhouse, each of whom voted to reject (Waterhouse) or voted to abstain (Surgent) with respect to the Plan.

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1595

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1709 of 1828   PageID 11202

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1594 of 1803   PageID 12340

Case 19-34054-sgj11  Doc 1814  Filed 01/22/21    Entered 01/22/21 19:25:01    Page 56 of 68

also rejected the Plan.  Based upon the foregoing, the Plan may satisfy the cram down requirements and can be confirmed notwithstanding the non-acceptance of the Plan by Class 8, Class 10 and Class 11.

94.    NPA argues that Plan violates the absolute priority rule with respect to unsecured creditors to the extent that it provides equity in the Reorganized Debtor to existing equity holders.  NPA Objection, ¶ 92.  This assertion is incorrect.  As explained above, Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan until Allowed Claims in Class 8 and Class 9 are paid in full (with appropriate interest) pursuant to the terms of the Plan.  The Contingent Claimant Trust Interests granted to Equity Interests in Classes 10 and 11 will not vest unless and until the Claimant Trustee files a certification that all Holders of Allowed unsecured claims have been indefeasibly paid, inclusive of interest.  *See* Plan, § I.B.44.  Thus, the absolute priority rule is not violated by because the treatment of Class 8 and Class 9 Claims satisfies section 1129(b)(2)(B).[86]  Indeed, the failure to provide a mechanism for the potential distribution of Equity Security Interests after payment of all senior Claims would violate the treatment of the equity security interests in the Debtor because such senior Claims would be receiving more than the full amount of their Claims.  *See* 11 U.S. § 1129(b) (2)(C)(i).

---

[86] The absolute priority rule is also satisfied with respect to Class 7 Convenience Claims. First, Class 7 has accepted the Plan. Second, even if Class 7 were not to have accepted the Plan, the members of Class 7 were afforded the option on their ballots to accept the treatment provided under Class 8 if they so elected.

Appellee Appx. 01588

APPX. 011153

**Q.**     **The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)).**

95.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed Plan.[87]

96.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

97.     Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because the Debtor's chapter 11 case is not a "small business case."[88]

98.     In sum, the Plan satisfies all of the Bankruptcy Code's mandatory chapter 11 plan confirmation requirements.

**IV.     The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply.**

99.     The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[89]  Among other discretionary provisions, the Plan contains certain Debtor releases,[90] an exculpation provision, and an injunction provision.[91]

---

[87] 11 U.S.C. § 1129(c).

[88] 11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,000,000 (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101 (51D)(B)(i).

[89] 11 U.S.C. § 1123 (b)(1)-(6).

[90] Plan, Art. IX

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1597
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1711 of 1828   PageID 11204
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1596 of 1803   PageID 12342
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 58 of 68

Notably, the Plan does <u>not</u> contain a mechanism typically included in chapter 11 plans, which contain broad third party releases by creditors or other parties in interest, unless they opt out of the release.  While certain objectors argue that the Plan nonetheless contains inappropriate third party releases in disguise, such arguments lack merit as set forth in the Omnibus Reply.  These provisions are the product of extensive good faith, arms'-length negotiations and comply with the Bankruptcy Code and prevailing law.  The Debtor has separately responded to the objections filed by certain parties to these provisions in the Omnibus Reply, which also addresses the proposed modifications made to the Plan injunction provision.  Accordingly, the Debtor respectfully requests that the Bankruptcy Court approve the Plan's Debtor release, exculpation, and injunction provisions for the reasons set forth in the Omnibus Reply.

### A.    The Debtor Complied with Section 1129(d) of the Bankruptcy Code.

100.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

### B.    Modifications to the Plan.

101.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

---

[91] *Id.*

DOCS_SF:104703.16 36027/002

accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[92]

102.    The Senior Employees argue that the Debtor and the Committee seek "carte blanche to make amendments to the Plan post-confirmation without complying with § 1127 of the Bankruptcy Code." Senior Employee Objection, at p. 15.

103.    These arguments are baseless and are contradicted by Article XII of the Plan, which explicitly requires that modifications to the Plan be in compliance with section 1127.

> After the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

Plan, Art. XII.B.

104.    Dugaboy objects that the Plan does not comply with section 1127(a) of the Bankruptcy Code and asserts that the Plan is not "final" and "as of the writing of this Objection and possibly even after the hearing on confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan." Dugaboy Objection, page 4.

---

[92] *See, e.g.*, *In re American Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (finding that nonmaterial modifications that do not adversely impact parties who have previously voted on the plan do not require additional disclosure or resolicitation); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 857 (Bankr. S.D. Tex. 2001) (same). *See also In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation).

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1599
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1713 of 1828 PageID 11206
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1598 of 1803 PageID 12344
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 60 of 68

105.    As noted earlier in the Memorandum, the Debtor has already filed three Plan

Supplements and will file a fourth Plan Supplement prior to the Confirmation Hearing.  The Plan

Supplements filed to date already contain the Retained Causes of Action, the Claimant Trust

Agreement, the Litigation Trust Agreement that Dugaboy complains are lacking.  The Debtor

has also filed three notices of executory contracts and unexpired leases to be assumed under the

Plan.    Thus, the Plan will be "final" will contain final version of all of the post-confirmation

documents and executory contracts to be assumed in advance of the Confirmation Hearing, in

compliance with section 1127(a) of the Bankruptcy Code.  *See, e.g., In re Friendship Dairies*,

2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ("Section 1127(a) of the Code

allows a plan proponent, the Debtor here, to modify its plan at any time before confirmation. In

addition, '[a]fter the proponent of a plan files a modification of such plan with the court, the plan

as modified becomes *the plan*.'") (quoting 11 U.S.C. §1127(a) emphasis in original); *Paradigm*

*Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521

B.R. 134, 176 (Bankr. N.D. Tex 2014) ("As a modified plan becomes the confirmed plan

pursuant to section 1127(a) of the Bankruptcy Code, this maxim applies equally to plans as

modified").    As Dugaboy concedes, the Plan appropriately restates the standards for post-

confirmation plan modifications under section 1127(b), which would require notice and a

hearing, among other requirements.  *See* Plan, §XII.B.

106.    As noted in this Memorandum, the Debtor has made certain modifications to the

Plan in order to both (1) clarify language in response to certain of the objections raised by the

Objectors and (2) additional modifications to the Plan.  These modifications comply with section

1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019.   A summary of the Plan

modifications is set forth in the chart below:

| **Plan Modification and Applicable Plan Section** |
|---|
| Treatment of Subordinated Claims Treatment Procedural Requirements.   Modifications that are responsive to the objections to the definition and treatment of Subordinated Claims, including (1) the definition of Subordinated Claims to eliminate categorical subordination of claims relating to limited partnership interests and replacement of Final Order to order entered by the Bankruptcy Court (Section I.B.129); (2) the classification and treatment of Subordinated Claims in Class 9 is only to the extent an order subordinating the claim is entered (Section III.H.9); (3) the addition of requirement of a  hearing, in addition to notice, with respect to any subordination proceeding and subject to entry of order of the Bankruptcy Court (Section III.J); and (4) a requirement to bring subordination proceedings by Claims Objection Deadline and the ability to request that the Bankruptcy Court subordinate claims by the Claims Objection Deadline (Section VII.B). |
| Priority Tax Claims.   Modification in response to IRS Objection to provide that the payment of Allowed Priority Tax Claims to be in accordance with section 1129(a)(9)(C) unless such Allowed Claim is either paid in full on the Initial Distribution Date or otherwise agreed by the parties (Section II.C). |
| Assumption/Rejection of Executory Contracts.   Modifications in response to objections to require assumption/rejection of contracts to be determined by Confirmation Hearing, rather than the Effective Date (Section V.A-C). |
| Claimant Trust and Related Provisions.  Modification to permit Claimant Trustee to set aside a reserve for potential indemnification claims (Section IV.B.5); modification to conform Claimant Trustee's fiduciary duties to Claimant Trust Agreement (Section IV.B.5). |
| Issuance of New Partnership Interests.   Clarifications that Reorganized Limited Partnership Agreement not providing indemnification obligations (Section IV.C.3). |
| Conditions to Effective Date.   Modifications to conditions to effectiveness of Plan to require (1) Confirmation Order must be become a Final Order; (2) obtaining acceptable directors and officers insurance coverage which coverage is acceptable to the Debtor, Committee, the Oversight Committee Board, Claimant Trustee, and Litigation  Trustee (Section VIII.A); (3) deletion of section VIII.C of Plan regarding effect of non-occurrence of conditions to effectiveness. |
| Retention of Jurisdiction.   Modification in response to objections to clarify existing language that provides that the Bankruptcy Court shall retain jurisdiction "to the maximum extent" legally permissible (Section XI). |
| Injunction and Related Provisions.   Modifications to the Plan injunction, term of injunction and continuance of January 9 Order provisions (Sections IX.F, G and H). Inclusion of additional Plan |

DOCS_SF:104703.16 36027/002

> definitional changes/additions for "Affiliate" (Section I.B.5, "Enjoined Parties" (Section I.B.56) and "Related Entity" (Section I.B.110); "Related Entity List" (Section I.B.111) and "Related Persons" (Section I.B.112).  Also, Injunction language highlighted pursuant to Bankruptcy Rule 3016 (Section IX.F).

107.    Accordingly, the Debtor submits that no additional solicitation or disclosure is required on account of the Plan modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

### **Conclusion**

108.    For the reasons set forth herein, the Debtor respectfully requests that the Bankruptcy Court confirm the Plan and enter the Confirmation Order.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1602
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1716 of 1828   PageID 11209
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1601 of 1803   PageID 12347
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 63 of 68

Dated:  January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             gdemo@pszjlaw.com

          -and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01595
Appx. 11452

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1603
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1717 of 1828 PageID 11210
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1602 of 1803 PageID 12348
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 64 of 68

**EXHIBIT A**

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1604

Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1718 of 1828 PageID 11211
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1603 of 1803 PageID 12349

Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 65 of 68

# Plan Objections from Dondero-Related Entities: Organizational Charts



Appellee Appx. 01597
APPX. 11162
Appx. 04464

**EXHIBIT B**

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1606
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1720 of 1828   PageID 11213
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1605 of 1803   PageID 12351
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 67 of 68

| Objector | Objection | Claim | Status |
|---|---|---|---|
| James Dondero | D.I. 1661 | Claim No. 138 | Withdrawn with prejudice [D.I. 1510] |
| | | Claim No. 141 | Arises from equity; subject to subordination |
| | | Claim No. 142 | Arises from equity; subject to subordination |
| | | Claim No. 145 | Arises from equity; subject to subordination |
| | | Claim No. 188 | Withdrawn with prejudice [D.I. 1510] |
| | | Indirect Equity Interest | Represents an indirect interest in Class A interests. Subordinated to Class B/C. Structurally subordinate. Represents 0.25% of total equity. |
| Get Good Trust | D.I. 1667 | Claim No. 120 | Arises from equity; subject to subordination |
| | | Claim No. 128 | Arises from equity; subject to subordination |
| | | Claim No. 129 | Arises from equity; subject to subordination |
| Dugaboy Investment Trust | D.I. 1667 | Claim No. 113 | Arises from equity; subject to subordination |
| | | Claim No. 131 | Objection filed and in litigation. Seeks to pierce the veil and hold the Debtor liable for subsidiary debts. Debtor believes claim is frivolous. |
| | | Claim No. 177 | Objection filed and in litigation. Seeks damages for postpetition management of estate. Debtor believes claim is frivolous. |
| | | Class A Interests | Subordinated to Class B/C. Represents 0.1866% of total equity. |
| Highland Capital Management Fund Advisors, L.P. | D.I. 1676 | Claim No. 95 | Expunged [D.I. 1233] |
| | | Claim No. 119 | Expunged [D.I. 1233] |
| Highland Fixed Income Fund | D.I. 1676 | Claim No. 109 | Expunged [D.I. 1233] |
| Highland Funds I and its series | D.I. 1676 | Claim No. 106 | Expunged [D.I. 1233] |
| Highland Funds II and its series | D.I. 1676 | Claim No. 114 | Expunged [D.I. 1233] |
| Highland Global Allocation Fund | D.I. 1676 | Claim No. 98 | Expunged [D.I. 1233] |
| Highland Healthcare Opportunities Fund | D.I. 1676 | Claim No. 116 | Expunged [D.I. 1233] |
| Highland Income Fund | D.I. 1676 | Claim No. 105 | Expunged [D.I. 1233] |
| Highland Merger Arbitrate Fund | D.I. 1676 | Claim No. 132 | Expunged [D.I. 1233] |
| Highland Opportunistic Credit Fund | D.I. 1676 | Claim No. 100 | Expunged [D.I. 1233] |
| Highland Small-Cap Equity Fund | D.I. 1676 | Claim No. 127 | Expunged [D.I. 1233] |
| Highland Socially Responsible Equity Fund | D.I. 1676 | Claim No. 115 | Expunged [D.I. 1233] |
| Highland Total Return Fund | D.I. 1676 | Claim No. 126 | Expunged [D.I. 1233] |
| Highland/iBoxx Senior Loan ETF | D.I. 1676 | Claim No. 122 | Expunged [D.I. 1233] |
| NexPoint Advisors, L.P. | D.I. 1676 | Claim No. 104 | Expunged [D.I. 1233] |
| | | Claim No. 108 | Expunged [D.I. 1233] |
| NexPoint Capital, Inc. | D.I. 1676 | Claim No. 107 | Expunged [D.I. 1233] |
| | | Claim No. 140 | Expunged [D.I. 1233] |
| NexPoint Real Estate Strategies Fund | D.I. 1676 | Claim No. 118 | Expunged [D.I. 1233] |

| NexPoint Strategic Opportunities Fund | D.I. 1676 | Claim No. 103 | Expunged [D.I. 1233] |
|---|---|---|---|
| CLO Holdco, Ltd. | D.I. 1675 | Claim No. 133 | Claim voluntarily reduced to $0.00 |
| | | Claim No. 198 | Claim voluntarily reduced to $0.00 |
| NexBank Title, Inc. | D.I. 1676 | None | N/A |
| NexBank Securities, Inc. | D.I. 1676 | None | N/A |
| NexBank Capital, Inc. | D.I. 1676 | None | N/A |
| NexBank | D.I. 1676 | Claim No. 178 | Expunged [D.I. 1155] |
| NexPoint Real Estate Finance Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Capital, LLC | D.I. 1677 | None | N/A |
| NexPoint Residential Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Hospitality Trust | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners, LLC | D.I. 1677 | None | N/A |
| NexPoint Multifamily Capital Trust, Inc. | D.I. 1677 | None | N/A |
| VineBrook Homes Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors II, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors III, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors IV, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors V, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VI, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VIII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC | D.I. 1673 | Claim No. 146 | Objection filed and in litigation.   Debtor believes claim is frivolous. |
| Scott Ellington | D.I. 1669 | Claim No. 187 | Terminated for cause.   Debtor exploring options. |
| | | Claim No. 192 | Terminated for cause.   Debtor exploring options. |
| Isaac Leventon | D.I. 1669 | Claim No. 184 | Terminated for cause.   Debtor exploring options. |

# APPENDIX 24

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1609
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1723 of 1828   PageID 11216
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1608 of 1803   PageID 12354
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 106

Docket #1807  Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Case No. 19-34054 |
| L.P.,[1] | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S OMNIBUS REPLY TO OBJECTIONS
TO CONFIRMATION OF THE FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P. (WITH
TECHNICAL MODIFICATIONS)**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:104855.7 36027/002

1934054210122000000000012

## TABLE OF CONTENTS

| | | Page |
|---|---|---|

INTRODUCTION ................................................................................................................. 1

OBJECTIONS ....................................................................................................................... 3

I. Objections Addressed in the Memorandum ................................................. 3

II. The Plan Impermissibly Allows for Set Off ............................................... 4

III. The Plan Impermissibly Allows Assumption or Rejection After Confirmation ................................................................................................ 6

IV. The Attack on the Plan's Release Is Baseless ............................................. 6

    A. Debtor Release Provisions ............................................................... 6

    B. Objections and Responses ................................................................ 7

V. The Court Has Already Exculpated the Independent Directors and their agents For Negligence Pursuant to the January 9, 2020 Settlement Order and, to the Extent Not Covered Therein, the Plan's Exculpation Provisions Effectuate Essential Protections for Estate Fiduciaries and their agents, and Are Fully Supported by the Bankruptcy Code and Applicable Law. ........... 11

    A. The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation ............................ 12

    B. Plan Exculpation Provisions ............................................................ 14

    C. Pacific Lumber ................................................................................. 16

    D. Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by *Pacific Lumber*. ........................................................ 19

    E. Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan ............................ 24

VI. The Plan Injunction Is Appropriate and is Narrowly Tailored to Effectuate the Plan and related provisions of the bankruptcy code. ..................................... 28

    A. Plan Injunction Provisions ............................................................... 29

    B. Objections ........................................................................................ 32

    C. An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate. ............. 33

    D. The Injunction Is Not a Disguised Non-Debtor Third-Party Release. ............................................................................................. 35

E.      The Injunction Does Not Prevent the Holders of Claims or Equity
        Interests from Enforcing Rights Arising under the Plan or
        Confirmation Order.................................................................................. 37

VII.    The Gatekeeper Provision Is Necessary and Appropriate, and Supported
        by Applicable Law. ........................................................................................ 38

        A.      The Gatekeeper Provision.......................................................................... 38

        B.      The Gatekeeper Provision Is Permissible under Sections 105,
                1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code................ 39

        C.      The Gatekeeper Provision Is not an Impermissible Extension of the
                Post-Confirmation Jurisdiction of the Bankruptcy Court. ....................... 44

        D.      The Gatekeeper Provision Is Consistent with the Barton Doctrine. ........ 51

        E.      The Gatekeeper Provision Is a Necessary and Appropriate Shield
                against the Actions of Dondero and his Related Entities......................... 54

VIII.   the exception to discharge does not apply ................................................... 55

IX.     The Senior Employee Objection .................................................................... 57

        A.      The Senior Employee Objection Should Be Overruled........................... 57

        B.      Background Related to Senior Employees .............................................. 58

        C.      Treatment of Senior Employee Claims Under Plan................................ 62

        D.      Plan Solicitation ..................................................................................... 63

        E.      The Plan Does Not Violate Section 1123(a)(4) ...................................... 64

        F.      The Senior Employees Are Not Permitted to Make Convenience
                Class Election......................................................................................... 66

        G.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Applicable
                Bankruptcy Law ..................................................................................... 66

        H.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Disclosure
                Statement Order for Voting Purposes ..................................................... 68

        I.      Even if Convenience Claim Election Were Available, Convenience
                Claim Election Does Not Impact Voting ................................................ 69

X.      The HCMFA/NPA Gates Objection .............................................................. 70

        A.      The HCMFA/NPA Objection, the CLO Holdco Objection, and
                NREP Joinder Should Be Overruled....................................................... 72

        B.      The CLO Objectors Cannot Override the CLOs' Consent to
                Assumption ............................................................................................. 74

        C.      The CLO Objectors Lack Standing to Object to the Plan....................... 76

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1612
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1726 of 1828   PageID 11219
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1611 of 1803   PageID 12357
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 4 of 106

|  | D. | Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit | 82 |
|  | E. | Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable | 86 |
|  | F. | The Inadequate Assurance of Future Performance Objection is Meritless | 90 |
|  | G. | The "Impermissible Partial Assignment" Objection is Meritless | 92 |
| XI. | | State Taxing Authority Objection | 92 |
| XII. | | IRS Objection | 93 |
| CONCLUSION | | | 99 |

DOCS_SF:104855.7 36027/002

Appellee Appx. 01605

Appx. 04472

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1613
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23  Page 1727 of 1828  PageID 11220
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1612 of 1803  PageID 12358
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 5 of 106

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp.*
*(In re Peabody Energy Corp.),*
933 F.3d 918 (8th Cir. 2019) ................................................................. 65

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.*
*(In re Pac. Lumber Co.),*
584 F.3d 229 (5th Cir. 2009) ................................................................. 64

*Bonneville Power Admin. v. Mirant Corp.*
*(In re Mirant Corp.),*
440 F.3d 238 (5th Cir. 2006) ................................................................. 83

*Cajun Elec. Members Comm. v. Mabey*
*(In re Cajun Elec. Power Coop., Inc.),*
230 B.R. 693 (Bankr. M.D. La. 1999) ................................................ 84, 85

*Cargill, Inc. v. Nelson (In re LGX, LLC),*
2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) ................................ 75

*Concord Square Apartments v. Ottawa Properties*
*(In re Concord Square Apartments),*
174 B.R. 71 (Bankr. S.D. Ohio 1994) .................................................... 67

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC,*
2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018) ............. 88

*Figter Ltd. v. Teachers Ins. Annuity Ass'n  (In re Figter Ltd.),*
118 F.3d 635, 640-641 (9th Cir. 1997) ................................................... 67

*Goldstein v. SEC,*
451 F.3d 873 (D.C. Cir. 2006) ............................................................... 71

*Hertz Corp. v. ANC Rental Corp.*
*(In re ANC Rental Corp.),*
278 B.R. 714 (Bankr. D. Del. 2002) ......................................... 74, 75, 80

*Hertz Corp. v. ANC Rental Corp.*
*(In Re ANC Rental Corp.),*
280 B.R. 808 (D. Del. 2002) ................................................................. 75

*In re Acequia, Inc.,*
787 F.2d 1352 (9th Cir. 1986) ............................................................... 65

*In re ANC Rental Corp.,*
277 B.R. 226 (Bankr. D. Del. 2002) ....................................................... 89

*In re Gilbert,*
104 B.R. 206 (Bankr. W.D. Mo. 1989) ................................................... 67

*In re Hartec Enters., Inc.,*
117 B.R. 865 (Bankr. W.D. Tex. 1990) .................................................. 85

iv

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1614
Case 3:23-cv-00726-S   Document 8-22   Filed 02/14/23   Page 1728 of 1828   PageID 11221
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1613 of 1803   PageID 12359
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 6 of 106

*In re Irwin Yacht Sales, Inc.,*
    164 B.R. 678 (Bankr. M.D. Fla. 1994) ................................................................... 75

*In re Jacobsen,*
    465 B.R. 102 (Bankr. N.D. Miss. 2011) .................................................................. 84

*In re Jones,*
    2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) .......................................... 67

*In re Latham Lithographic Corp.,*
    107 F.2d 749 (2d Cir. 1939) ................................................................................... 67

*In re Lil' Things, Inc.,*
    220 B.R. 583 (Bankr. N.D. Tex. 1998) ................................................................... 84

*In re Lindell Drop Forge Co.,*
    111 B.R. 137 (Bankr. W.D. Mich. 1990)................................................................. 66

*In re Riverside Nursing Home,*
    43 B.R. 682 (Bankr. S.D.N.Y. 1984) ...................................................................... 75

*In re Virgin Offshore USA, Inc.,*
    No. 13-79, 2013 U.S. Dist. LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013) ........ 84

*In re Visser,*
    232 B.R. 362 (Bankr. N.D. Tex. 1999) ................................................................... 66

*Mabey v. Sw. Elec. Power Co.*
    *(In re Cajun Elec. Power Coop., Inc.),*
    150 F.3d 503 (5th Cir. 1998) .................................................................................. 65

*Riemer & Braunstein LLP v. DeGiacomo*
    *(A & E 128 North Corp.),*
    528 B.R. 190, 199 (1st Cir. B.A.P. 2015)................................................................ 66

*Texaco Inc. v. Louisiana Land & Exploration Co.,*
    136 B.R. 658 (Bankr. M.D. La.1992) ............................................................... 84, 85

## STATUTES

11 U.S.C. § 365...................................................................................................... 83, 86

## OTHER AUTHORITIES

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter
    (12/23/1997)............................................................................................................ 89

Investment Management Staff Issues of Interest,
    http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012].................. 89

v

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1615
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1729 of 1828   PageID 11222
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1614 of 1803   PageID 12360
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 7 of 106

The above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") files this omnibus reply to the objections (this "<u>Reply</u>") to the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with technical modifications)*[2] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>"). Concurrently herewith, the Debtor has filed its *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "<u>Memorandum</u>"). To the extent the Debtor is unable to consensually resolve the Objections, the Debtor respectfully requests that the Bankruptcy Court overrule any remaining or pending Objections as of the Confirmation Hearing and confirm the Plan.

## INTRODUCTION

1.      The Debtor received twelve objections to confirmation of the Plan, inclusive of joinders (collectively, the "<u>Objections</u>" and each objecting party, an "<u>Objector</u>"). As discussed in greater detail in the Memorandum, seven of the twelve objections were filed by Mr. Dondero either individually or via his related entities (collectively, the "<u>Dondero Entities</u>"). **Exhibit A** lists the Dondero Entities and their relationships to each other.[3] The following are the Objections filed by the Dondero Entities:

- *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661];

- *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667] (the "<u>Dugaboy Objection</u>");

---

[2] Unless otherwise noted, capitalized terms used in this Reply have the meanings ascribed in the Plan.

[3] As set forth in the Memorandum, none of the Dondero Entities, including the NexPoint RE Entities (defined below), has an actual economic interest in the Estate.

Appellee Appx. 01608
APPX. 11173

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1616
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1730 of 1828   PageID 11223
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1615 of 1803   PageID 12361
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 8 of 106

- *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669] (the "Senior Employee Objection");[4]

- *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670] (the "NPA/HCMFA Objection");[5]

- *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673] (the "NREP Objection");

- *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675] (the "CLOH Objection"); and

- *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676] (the "NexBank Objection").

2.    That leaves the following as the only non-Dondero related Objections:

- *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662] (the "State Taxing Authority Objection");

---

[4] Subsequent to the filing of the Senior Employee Objection, Mr. Waterhouse and Mr. Surgent reached an agreement with the Debtor and will withdraw their objections to the Plan.

[5] The NPA/HCMFA Objection is joined (1) by CLO Holdco, Ltd., through the CLOH Objection, and (2) by the following Dondero-controlled entities: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing (collectively, the "NexPoint RE Entities") [Docket No. 1677] (the "NPRE Joinder").

Appellee Appx. 01609
APPX. 104476

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1617

Case 3:23-cv-00726-S   Document 8-22   Filed 08/24/23    Page 1731 of 1828   PageID 11224

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1616 of 1803   PageID 12362

Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 9 of 106

- *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666];

- *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668] (the "IRS Objection");

- *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671] (the "UST Objection"); and

- *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].

As of the date hereof, the Date is working to resolve certain of the non-Dondero related Objections.

3.    To avoid duplication, this Reply does not address each objection individually. Rather, it is organized by substantive objection where possible because of the cross-over in the issues raised in the Objections.  Also, as discussed below, where the Debtor has addressed an Objection in the Memorandum, the response is not repeated here.  However, parts of the Senior Employee Objection, the NPA/HCMFA Objection, State Taxing Authority Objection, and the IRS Objection, are addressed individually below.  A summary chart addressing each Objection and the Debtor's response thereto is attached as **Exhibit B**.

<u>**OBJECTIONS**</u>

**I.     OBJECTIONS ADDRESSED IN THE MEMORANDUM**

4.    The Memorandum addresses the Debtor's compliance with the statutory requirements of sections 1123 and 1129 of the Bankruptcy Code.  As part of the analysis in the Memorandum, the Debtor addresses the portions of the Objections alleging that the Debtor failed to comply with and/or violated the statutory provisions set forth in sections 1123 and 1129 of the Bankruptcy Code.  Specifically, the Debtor addresses the arguments that (i) the Plan provides for

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1618
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1732 of 1828 PageID 11225
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1617 of 1803 PageID 12363
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 10 of 106

improper subordination; (ii) the Disputed Claims Reserve violates due process; (iii) the Plan does

not satisfy the "best interests test;" (iv) the Plan impermissibly provides no Bankruptcy Court

oversight of post-effective date transactions; (v) the elimination of vacant classes does not allow

for post-Effective Date reclassification of Claims; (vi) the Plan violates the absolute priority rule;

(vii) the Plan does not disclose the insiders or the compensation of insiders retained post-

Effective Date; (viii) the Plan impermissibly allows modifications to the Plan without

Bankruptcy Court approval; and (ix) the Plan is not final because the Plan Supplement is not

final.

## II.    THE PLAN IMPERMISSIBLY ALLOWS FOR SET OFF

5.     The NREP Objection and the NexBank Objection erroneously contend that

Article VI.M of the Fifth Amended Plan provides for "improper set-off of unidentified claims."

NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  The challenged language in the NREP Objection

and the NexBank Objection is as follows:

> The Distribution Agent may, to the extent permitted under applicable law, set off
> against any Allowed Claim and any distributions to be made pursuant to this Plan
> on account of such Allowed Claim, the claims, rights and causes of action of any
> nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may
> hold against the Holder of such Allowed Claim….  Any Holder of an Allowed
> Claim subject to such setoff reserves the right to challenge any such setoff in the
> Bankruptcy Court or any other court with jurisdiction with respect to such
> challenge.

Plan, Art. VI.M.

6.     Article VI.M of the Plan accords with Bankruptcy Code section 558 (formerly

section 541(e)), which provides that "[t]he estate shall have the benefit of any defense available

to the debtor as against any entity other than the estate, including statutes of limitation, statutes

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1619
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1733 of 1828   PageID 11226
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1618 of 1803   PageID 12364
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 11 of 106

of frauds, usury, and other personal defenses." 11 U.S.C. § 558; *see In re Braniff Airways, Inc.*,

42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) (a debtor in possession may exercise setoff rights

pursuant to Bankruptcy Code section 558 (then section 541(e)); *In re Circuit City Stores, Inc.*,

2009 Bankr. LEXIS 4011 (Bankr. E.D. Va. Dec. 3, 2009) (same); *In re Women First Healthcare,

Inc.*, 345 B.R. 131, 135 (Bankr. D. Del. 2006) (same); *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr.

D. Del. 2002) (same); *Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft

Corp.)*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) (same).

7.      In support of the argument that the provision is improper, the NREP Objection

and the NexBank Objection contend that Bankruptcy Code section 553 and cases construing that

provision limit parties' right of setoff in bankruptcy only to prepetition claims.  NREP Obj. ¶¶

11-13; NexBank Obj. ¶¶ 10-12.  However, the issue of the scope of the Distribution Agent's

setoff rights and the application of section 553 is not even adjudicated by the Plan.[6]  Rather, on

its face, the Plan states that the Distribution Agent may exercise setoff rights only "to the extent

permitted by law."  Thus, it does not purport to expand setoff rights of the Distribution Agent

beyond what is permitted by the Bankruptcy Code but only preserves whatever setoff rights the

estate has – no more and no less.  Moreover, as quoted above, it expressly preserves the right of

creditors to challenge any setoff that the Distribution Agent seeks to take.

8.      Accordingly, whether the Distribution Agent may take any specific setoffs is

reserved by the Plan for another day.  The NREP Objection and the NexBank Objections on this

issue are not well-taken, and both such objections should be overruled.

---

[6] The Debtor reserves its rights with respect to the applicability of section 553 to the Distribution Agent's preserved rights of setoff, if any.

### III.    THE PLAN IMPERMISSIBLY ALLOWS ASSUMPTION OR REJECTION AFTER CONFIRMATION

9.      The NPA/HCMFA Objection contends that the Plan violates section 365(d)(2) because it allows the Debtor to assume or rejection executory contracts or unexpired leases on or prior to the Effective Date.  While the Debtor believes that the original language in the Plan is defensible, the Debtor has elected to amend the Plan to clarify that all executory contracts and leases must be assumed or rejected on or prior to the Confirmation Date.

### IV.    THE ATTACK ON THE PLAN'S RELEASE IS BASELESS.

#### A.    Debtor Release Provisions

10.     Article IX of the Plan provides for releases only by the Debtor, its Estate, and the Reorganized Debtor (including their successors, the Claimant Trust and the Litigation Sub-Trust) of any and all Causes of Action, including any derivative claims that might be asserted on behalf of, or in the name of, the Debtor, that the Debtor or the Estate could otherwise assert against the Released Parties[7] (the "<u>Debtor Release</u>").  The Debtor Release is the product of extensive good faith, arm's-length negotiations and complies fully with the Bankruptcy Code and prevailing law. The Debtor Release provides:

> On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged **by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust** from any and all Causes of Action, including any derivative claims, **asserted on behalf of the Debtor,** whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise,

---

[7] The "Released Parties" under the Plan are: (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities); (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.  Plan, Art. I.B., Def. 111.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1621

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1735 of 1828   PageID 11228

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1620 of 1803   PageID 12366

Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 13 of 106

*that the Debtor or the Estate would have been legally entitled to assert in their own right* (whether individually or collectively) *or on behalf of* the holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, Art. IX.D (emphasis added.)

11.    The Debtor Release releases, among others, the Independent Directors (each of whom was appointed by the Bankruptcy Court post-petition), Strand (solely from January 9, 2020, the date of the appointment of the Independent Directors, through the Effective Date), the CEO/CRO (who is also an Independent Director and whose role was expanded to include the CEO/CRO role on July 16, 2020), the Committee and its members in their official capacities, the Professionals retained with this Court's approval by the Debtor or by the Committee and, to a more limited extent, the Employees.[8]

12.    The Debtor Release is a release of the Released Parties by the Debtor, the Estate and their successors on account of Causes of Action that belong to the Debtor or the Estate, whether directly or derivatively.  *The Debtor Release does not release any Causes of Action of any person other than the Debtor, the Estate and their successors and does not release any claims that could not have been asserted by the Debtor or the Estate prior to the Effective Date.*

**B.**    **Objections and Responses**

13.    Three parties in interest have objected to the Debtor Release.  The Dugaboy Objection objects to the Debtor Release under the mistaken view that the Claimant Trust and Litigation Sub-Trust are (in Dugaboy's view) granting releases of claims that have not yet arisen,

---

[8] The Debtor Release contains restrictions on the releases of the Employees, as may be determined by the Claimant Trust Oversight Committee.  Plan, Art. IX.D.

DOCS_SF:104855.7 36027/002

*i.e.,* causes of action of the Claimant Trust and Litigation Sub-Trust that arise after the Effective Date against the Released Parties. *See Dugaboy Objection* at p. 9. The U.S. Trustee Objection erroneously argues the Debtor Release is an impermissible non-consensual third-party release. *See UST Objection* at pp. 2-3. The Senior Employee Objection objects to the Debtor Release because the Senior Employees believe that the Debtor should not be able to condition a release of the Senior Employees on concessions not required of other Employees obtaining a release. *See Senior Employee Objections* at p. 3.

14. Both Dugaboy and the U.S. Trustee misread the Debtor Release provision. The Claimant Trust and Litigation Sub-Trust are included solely in their capacity as "successors, assigns and representatives" of the Debtor and the Estate, and the Debtor Release applies solely to Causes of Action that ***the Debtor or the Estate*** themselves would have against the Released Parties (whether a direct claim or a derivative claim, but in either case, only Causes of Action owned by the Debtor or the Estate). By its express terms, the Debtor Release does not apply to any future claims or Causes of Action that the Claimant Trust or the Litigation Sub-Trust would have in its own right, based on post-Effective Date acts or omissions, rather than as a successor to or assignee of Causes of Action of the Debtor and the Estate.

15. The U.S. Trustee's contention that the Debtor Release provision includes a third-party release is incorrect. The Debtor Release applies only to claims held by the Debtor and the Estate, on behalf of themselves and each of their successors, assigns and representatives in favor of the Released Parties. Any direct claims and causes of action owned by any other person are not released by the Debtor Release, and nothing in the language of the provision implicates any

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1623
Case 3:23-cv-00726-S  Document 8-22  Filed 10/24/23  Page 1737 of 1828  PageID 11230
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1622 of 1803  PageID 12368
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21  Entered 01/22/21 18:52:03  Page 15 of 106

non-derivative claims or causes of action that any third party might have against any of the Released Parties.

16.     The Senior Employees' objection to the proposed Debtor Release also is devoid of merit.  As discussed at length, in Section IX, herein, Employees are not entitled, either contractually or legally, to any release.  Nor does a release given to one Employee entitle any other employee to a similar release.  Releases are discretionary and can be provided, in an exercise of discretion, to persons who have provided consideration to the Debtor and the Estate. Unlike the other Released Parties, the Senior Employees have not yet fully provided that consideration.  As the Court is aware, the Committee and the Court have consistently voiced concerns regarding the potential release of the Employees, and specifically, the Senior Employees.  The Plan resolves these concerns by imposing significant restrictions and affirmative requirements for any Employee to obtain the benefit of the Debtor Release and additional requirements for the Senior Employees to do so.  *See* Plan, Art. IX.D.

17.     The Bankruptcy Code explicitly provides for and sanctions the inclusion of debtor releases in plans.  Section 1123(b)(3)(A) of the Bankruptcy Code states clearly that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  The Debtor Release is an essential *quid pro quo* for the Released Parties' significant contributions to the Debtor's restructuring, which has been highly complex and contentious.  There are multiple precedents in which courts have approved releases by a debtor's estate of its own claims against a far more extensive group of persons than those

DOCS_SF:104855.7 36027/002

included here.[9]  The Committee and its members (who are Released Parties), who have had over a year to investigate potential claims against the Employees, among others, fully support the Debtor Release as to the other identified Released Parties.

18.    It is also important to bear in mind that the Debtor Release applies to claims *of the Debtor or the Estate* against the Released Parties that others might purport to assert derivatively on behalf of the Debtor or the Estate.  To the extent that Released Parties have indemnification rights against the Debtor, the assertion of such derivative claims – no matter how specious – would trigger claims for indemnification that would deplete the assets available for distribution to creditors. Moreover, regardless of such rights of indemnification, the assertion of such purported derivative claims on behalf of the Debtor would subject the Debtor to the costs – both economic, in terms of legal fees, and of the time and distraction of personnel – that would result from becoming embroiled in such derivative litigation – again, no matter how specious the claim.

19.    Both the U.S. Trustee and Dugaboy erroneously cite *Pacific Lumber*[10] for the proposition that releases of third parties – even by the debtor – are always impermissible. *Pacific Lumber*, however, did not involve the release of claims by a debtor.  The issue addressed in *Pacific Lumber* was whether a bankruptcy court could approve injunction and exculpation provisions in a plan that effectively mandated that *holders of claims* release, or be precluded

---

[9] *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provisions were acceptable settlement under § 1123(b)(3) because the debtors and the estate were releasing claims that were property of the estate); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[10] *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d 229, 251-253 (5th Cir. 2009) ("*Pacific Lumber*")

DOCS_SF:104855.7 36027/002

Appellee Appx. 01617

Appx. 04484

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1625
Case 3:23-cv-00726-S  Document 8-22  Filed 08/04/23    Page 1739 of 1828  PageID 11232
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1624 of 1803  PageID 12370
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 17 of 106

from imposing liability on, **non-debtor third parties**.  Nothing in *Pacific Lumber* prevents a debtor or its estate on its own behalf and on behalf of assignees and successors created pursuant to a plan, from releasing its own claims against third parties.  Indeed, any such ruling would be directly contrary to the express provisions of section 1123(b)(3)(A).

20.    The Debtor Release is a customary plan provision consistent with the business judgement rule, is fair and equitable and in the best interest of the Estate and its creditors and should be approved.  No party that has objected to it has cited any case or statutory basis for preventing a debtor and its successors from releasing the debtor's own claims against third parties, or has demonstrated any basis for believing that any claims of the Debtor or the Estate even exist against the Released Parties.

V.    **THE COURT HAS ALREADY EXCULPATED THE INDEPENDENT DIRECTORS AND THEIR AGENTS FOR NEGLIGENCE PURSUANT TO THE JANUARY 9, 2020 SETTLEMENT ORDER AND, TO THE EXTENT NOT COVERED THEREIN, THE PLAN'S EXCULPATION PROVISIONS EFFECTUATE ESSENTIAL PROTECTIONS FOR ESTATE FIDUCIARIES AND THEIR AGENTS, AND ARE FULLY SUPPORTED BY THE BANKRUPTCY CODE AND APPLICABLE LAW.**

21.    Exculpation provisions effectuate the entitlement of court-supervised fiduciaries to qualified immunity for their actions.  *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *In re A.P.I., Inc.*, 331 B.R. 828, 868 (Bankr. D. Minn. 2005), *aff'd sub nom., OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 U.S. Dist. LEXIS 34297 (D. Minn. May 25, 2006); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994).  Such provisions also allow the parties to a chapter 11 case "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1626
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1740 of 1828   PageID 11233
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1625 of 1803   PageID 12371
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 18 of 106

potentially negligent actions in those proceedings" and, on that rationale, have even been approved when necessary to protect non-fiduciary participants in the chapter 11 process. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020).

22.    As discussed in detail below, the Settlement Order[11] previously entered by this Court has already exculpated the Independent Directors and their agents from potential negligence claims. Accordingly, as it relates to the Independent Directors and their agents, the Plan's Exculpation Provisions simply respect the integrity of the Settlement Order. Moreover, it would be a mistake to construe *Pacific Lumber as* categorically prohibiting exculpation provisions. In fact, *Pacific Lumber* itself expressly endorsed a plan provision exculpating the committee and its members. For the reasons set forth below, exculpating the Exculpated Parties in respect of their post-petition services for the Estate is entirely consistent with *Pacific Lumber*, other applicable law, and the purposes and policies of chapter 11. Exculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue.

A.    **The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation**

23.    The Objectors challenge the Exculpation Provisions on the grounds that they constitute an impermissible third-party release that is prohibited by *Pacific Lumber*. What the

---

[11] *See, Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* entered January 9, 2020 [D.I. 339] (the "Settlement Order") and *Order Approving Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* entered July 16, 2020 [D.I. 854].

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1627
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1741 of 1828    PageID 11234
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1626 of 1803    PageID 12372
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 19 of 106

Objectors ignore, however, is that this Court has *already* exculpated the Independent Directors and their agents for negligence pursuant to the terms of the Settlement Order – a final order to which Dondero agreed as a means of avoiding the appointment of a chapter 11 trustee, and which has been in place for over a year and was never appealed by any of the Objectors, all of whom had notice of it.[12]  Accordingly, the Court should reject Objectors challenge to exculpation of the Independent Directors and their agents as a collateral attack on the Settlement Order which is indisputably a final order of this Court.[13]

> 24.    Paragraph 10 of the Settlement Order expressly provides:
>
> *No entity may commence or pursue a claim or cause of action of any kind* against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of <u>will</u>ful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Settlement Order, ¶ 10 (emphasis added).  Thus, as to the Independent Directors and their agents, they have already been exculpated for negligence, and the Plan Exculpation Provisions simply preserve the necessary protections and standard of liability already established by the Court for these court-appointed fiduciaries by final order which continues in effect pursuant to the plan.[14]

---

[12] *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (*res judicata* barred a debtor from bringing a claim that was specifically and expressly released by a confirmed reorganization plan because the debtor failed to object to the release at confirmation and was now collaterally attacking the release).

[13] *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("[e]ven though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

[14] *See* Plan, Art. IX.H (Paragraphs 9 and 10 of the Settlement Order remain in effect post-Confirmation).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1628
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1742 of 1828   PageID 11235
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1627 of 1803   PageID 12373
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 20 of 106

25.     Unlike in *Pacific Lumber*, the Independent Directors (which include the CEO/CRO) are not prepetition officers and directors of the Debtor. The Independent Directors were appointed post-petition by the Court pursuant to the Settlement Order as an urgent measure to address serious concerns raised by the Committee as to extensive breaches of fiduciary duty and lack of disinterestedness by the Debtor's prepetition management. In recognition of the extraordinarily complex, litigious and volatile situation the Independent Directors were getting into, the Court expressly exculpated the Independent Directors (including the CEO/CRO) and their agents from claims for negligence in connection with their actions in the case.

### B.     Plan Exculpation Provisions

26.     Article IX.C of the Plan addresses the exculpation of certain Exculpated Parties[15] and provides that each Exculpated Party shall be exculpated from any Cause of Action arising out of acts or omissions in connection with this chapter 11 case and certain related transactions, except for any acts or omissions that are determined by Final Order to have constituted bad faith, fraud, willful misconduct, criminal misconduct, or gross negligence (the "Exculpation Provisions"). Although the Exculpation Provisions apply to Strand and certain Employees, the Exculpation Provisions apply solely with respect to actions taken by Strand and such Employees

---

[15] The Plan defines the "Exculpated Parties" as: (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO, and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

Appellee Appx. 01621
APPX. 104478

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1629
Case 3:23-cv-00726-S   Document 8-22   Filed 08/04/23    Page 1743 of 1828   PageID 11236
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1628 of 1803   PageID 12374
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 21 of 106

from and after the date of the post-petition appointment of the Independent Directors, through

the Effective Date of the Plan, and expressly exclude James Dondero and a number of other

specified entities.[16]   The provision provides:

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent
> permitted by applicable law, no Exculpated Party will have or incur, and each
> Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment,
> damage, demand, debt, right, Cause of Action, remedy, loss, and liability for
> conduct occurring on or after the Petition Date in connection with or arising out of
> (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and
> pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or
> confirmation of, the Plan; (iii) the funding or consummation of the Plan
> (including the Plan Supplement) or any related agreements, instruments, or other
> documents, the solicitation of votes on the Plan, the offer, issuance, and Plan
> Distribution of any securities issued or to be issued pursuant to the Plan, including
> the Claimant Trust Interests, whether or not such Plan Distributions occur
> following the Effective Date; (iv) the implementation of the Plan; and (v) any
> negotiations, transactions, and documentation in connection with the foregoing
> clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or
> omissions of an Exculpated Party arising out of or related to acts or omissions that
> constitute bad faith, fraud, gross negligence, criminal misconduct, or willful
> misconduct or (b) Strand or any Employee other than with respect to actions taken
> by such Entities from the date of appointment of the Independent Directors
> through the Effective Date. This exculpation shall be in addition to, and not in
> limitation of, all other releases, indemnities, exculpations, any other applicable
> law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2,
> protecting such Exculpated Parties from liability.

27.    An exculpation provision differs from a release.[17]   An exculpation provision sets a

standard of liability that absolves a person from liability for ordinary negligence, but not from

liability for more egregious conduct.  In this respect, it is consistent with the duty of care and

duty of loyalty standards of the business judgment rule that protects business entities and

---

[16] To the extent there is any conflict between the descriptions of the Exculpation Provisions herein and the Plan, the Plan shall control.

[17] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans," does not affect the liability of these parties, but rather states the standard of liability under the Code, and as it exculpated the named parties for actions during the course of the case did not implicate section 524(e).)

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1630
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1744 of 1828 PageID 11237
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1629 of 1803 PageID 12375
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 22 of 106

individual fiduciaries from liability when their actions are taken within their authority and good faith.[18]

28.    Various objections have been raised to the inclusion of the Exculpation Provisions in the Plan.  Each of the Objectors argues that, except with regard to the Committee and its Professionals, the Exculpation Provisions are impermissible based upon their misunderstanding and overly-broad reading of the opinion of the Fifth Circuit in *Pacific Lumber*.[19]

### C.    Pacific Lumber

29.    Because every argument relied upon by the Objectors as to the permissibility of the Exculpation Provisions is premised on *Pacific Lumber*, it is important to analyze exactly what the Fifth Circuit actually held based on the appeal and the briefing before it.  The portion of the *Pacific Lumber* opinion addressing non-debtor exculpation and releases is less than two pages long and, when appropriately construed, is inapposite to this case, except insofar as it approved the exculpation of the creditors' committee and its members.

30.    In *Pacific Lumber*, a prepetition secured creditor joined with a competitor of one of the debtors to propose a chapter 11 plan (the "MRC/Marathon Plan").  The MRC/Marathon Plan included a provision that exculpated the plan proponents, the reorganized debtors, the unsecured creditors' committee and each of their respective professionals, officers and directors from liability (other than for willful misconduct and gross negligence) relating to proposing, implementing and administering the chapter 11 plan.  The bankruptcy court approved the

---

[18] *See* Bernard S. Sharfman, *Importance of the Business Judgement Rule*, Harvard Law School Forum on Corporate Governance, posted at https://corpgov.law.harvard.edu/2017/01/19/the-importance-of-the-business-judgment-rule/

[19] The Objectors acknowledge the Fifth Circuit expressly held that the exculpation of the unsecured creditors' committee and its members and professionals was appropriate.  Therefore, the Exculpation Provisions as applied to these parties will not be discussed further herein.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01623
APPX. 04480

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1631
Case 3:23-cv-00726-S Document 8-22 Filed 08/04/23 Page 1745 of 1828 PageID 11238
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1630 of 1803 PageID 12376
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 23 of 106

discharges, releases, exculpations and injunctions pursuant to sections 105, 524, 1123(a)(5) and

1129.

31.     The appellants were an indenture trustee and certain bondholders who had voted

against the MRC/Marathon Plan and were the unsuccessful proponents of a competing plan

which, incidentally, contained non-debtor third-party releases and exculpation provisions

identical in scope to those in the MRC/Marathon Plan.[20]  On appeal, the Fifth Circuit either

affirmed or dismissed on mootness grounds in respect of every issue raised on appeal, other than

the release and exculpation provisions.  While the issues on appeal had been broadly worded,[21]

the only issue in respect of the release and exculpation provisions actually briefed by the

appellants was the impropriety of the release and exculpation provisions for the benefit of the

non-debtor plan proponents and the committee.[22]

32.     The Fifth Circuit relied ***exclusively*** on section 524(e) of the Bankruptcy Code for

its observation that non-consensual releases or exculpations of non-debtors are not allowed, even

for actions taken during the case.  *Id.* at 252-3.  Section 524 is entitled "Effect of discharge" and

subsection 524(e) provides that a "discharge of a debt of a debtor does not affect the liability of

---

[20] *See First Amended Chapter 11 Plan for Scotia Pacific Company LLC proposed by the Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes (as modified on April 28, 2008)* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 2774], Sections 10.1, 10.3 and 10.4.

[21] *See The Indenture Trustee's Statement of Issues on Appeal of the Order Confirming the MRC/Marathon Plan* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 3431] at p. 4, Issue No. 18.

[22] *See Brief of Appellants* [*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee,* Case No.08-40746, U.S. Court of Appeals for the Fifth Circuit, August 25, 2008], at pp. 55-56 ("The Plan contains an expansive "Exculpation Clause" which purports to release claims of non-consenting creditors against numerous non-debtors, including "officers, directors, professionals, members, agents and employees" of MRC, Marathon and the Committee. . . . ***Having obtained confirmation of the Plan through the erroneous means set forth above, the Plan Proponents propose to use this overbroad release language to exonerate*** themselves.") (emphasis added; record cites omitted)

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1632
Case 3:23-cv-00726-S Document 8-22 Filed 08/24/23 Page 1746 of 1828 PageID 11239
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1631 of 1803 PageID 12377
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 24 of 106

any other entity on . . . such debt." Thus, on its face, section 524(e), only prohibits a plan from discharging obligations of third parties who are liable with the debtor on its debts. The Fifth Circuit focused on co-liability for "pre-petition debts,"[23] yet applied the prohibition to causes of action for "any negligent conduct that occurred during the course of the bankruptcy."[24]

33. Notably, the briefing on the issue presented to the Fifth Circuit had dealt with the impropriety of the exculpation of the non-debtor plan proponents and the committee, but not with the officers and directors of the Debtor. Thus, to the extent the Fifth Circuit included the debtor's officers and directors in its discussion, that discussion constituted mere *dicta*.

34. Although the Fifth Circuit ruled that section 524(e) did not support exculpation for certain persons, such as the non-debtor plan proponents in that case, the Court did not treat section 524(e) as an absolute bar to exculpation provisions in a plan that were supportable by other sections of the Bankruptcy Code, by other applicable law or by legitimate policy considerations relating to the chapter 11 process. In approving the exculpation as to the committee and its members, the court cited to the qualified immunity of committees under section 1103(c) of the Bankruptcy Code and to an important policy concern regarding the effect of denying exculpation on the chapter 11 process: "actions 'against committee members in their capacity as such should be discouraged. If members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee.' The

---

[23] *Id.* at 252.
[24] *Id.*

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1633
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1747 of 1828 PageID 11240
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1632 of 1803 PageID 12378
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 25 of 106

Creditors' Committee and its members are the only disinterested volunteers among the parties sought to be released here." *Id.,* at 252 (cites omitted).

35.     The Debtor is, of course, not asking this court to override the Fifth Circuit's holding in *Pacific Lumber*. Rather, as discussed below, the facts of this case are such that the rationale applied by the Fifth Circuit to permit exculpation of the committee and its members fully supports the Plan Exculpation Provisions. The need for exculpation has already been recognized by this Court in the Settlement Order. Furthermore, as the *Pacific Lumber* ruling was based solely on section 524(e), nothing in that opinion precludes approval of the Exculpation Provisions pursuant to other provisions of the Bankruptcy Code or other applicable law.

     **D.**     **Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by** ***Pacific Lumber*.**

36.     The propriety of the Plan Exculpation Provisions should be considered as they apply to each respective Exculpated Party.

37.     <u>The Debtor</u>. The Debtor and its successors and assigns are entitled to the relief embodied in the Exculpation Provision. With exceptions not applicable here, the Debtor, as debtor in possession, has all the rights and powers of a trustee. 11 U.S.C. § 1107(a). Accordingly, the Debtor's right to qualified immunity is co-extensive with that of a trustee. Moreover, granting the Debtor such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code. *See* 11 U.S.C. §§ 524 and 1141. The Claimant Trust and Litigation Sub-Trust are successors to and assigns of the Debtor, and thus, to the extent applicable to the scope of the Exculpation Provisions, should be similarly protected. In the context of this Plan, the Claimant Trust and Litigation Sub-Trust are court-approved fiduciaries

**Appellee Appx. 01626**
**APPX. 01493**

whose sole purpose is to operate the Debtor's business for a limited period of time to effectuate an orderly monetization of the Debtor's assets and pay the claims of creditors. Post-Confirmation, the Debtor and its successors are entitled to exculpation.

38.    <u>The Independent Directors</u>.    Even if the Settlement Order did not plainly provide the Independent Directors with exculpation, in the context of this case, the Independent Directors are akin to committee members and the same rationale the Fifth Circuit used in *Pacific Lumber* to uphold the exculpation of committee members applies to the Independent Directors. The use of independent directors has become commonplace in large complex commercial cases, both on the eve of bankruptcy[25] and post-petition,[26] especially where there are allegations of mismanagement, breaches of fiduciary duty or other conflicts that cast shadows on the relationship between the debtor in possession and its creditors, who question whether existing officers and directors can faithfully perform their fiduciary duties as the face of the debtor in possession.[27]    Independent directors tend to be either experienced restructuring professionals

---

[25] Some examples of major bankruptcy cases in which independent directors have been appointed just prior to bankruptcy, usually due to accounting  irregularities and other events that resulted in distrust of management by major creditor constituencies, include: *Neiman Marcus Group, Inc.* (S.D. Tex); *WorldCom* (S.D. N.Y.); *Sears* (S.D. N.Y.); *California Pizza Kitchen* (S.D. Tex.); *PG&E Corp.* (N.D. Cal.); *Adelphia Communication Corp.* (S.D. N.Y.); Station Casinos (D. Nev.); and *Cengage Learning Centers* (E.D. N.Y.).

[26] *See* Regina Kelbon and Michael DeBaecke, *Appointment of Independent Directors on the Eve of Bankruptcy: Why the Growing Trend*, paper prepared for the Penn. Bar Institute 19th Annual Bankruptcy Institute, June 27, 2014, at pp. 17-23, available at https://www.blankrome.com/siteFiles/publications//B3795676DF921A7E3BED8A9F15E7FDF3.pdf (discussing use of independent directors both pre- and post-petition and certain cases utilizing same).

[27] *See, e.g., In re Natrol, Inc*., Case No. 14-22446 (Bankr. D. Del.) Motion and Order Appointing Independent Directors [Docket Nos. 248 and 305] (independent directors appointed to settle motion for appointment of trustee by large creditor); *In re 4 West Holdings, Inc.,* Case No. 18-30777 (Bankr. N.D. Tex) Motion and Order Appointing Independent Directors [Docket Nos. 311 and 383] (independent director appointed to review propriety of certain settlements and business and marketing plan); *In re Synergy Pharmaceuticals, Inc*., Case No. 18-14010 (Bankr. S.D.N.Y.) Motion and Stipulation and Order Appointing Independent Directors [Docket Nos. 373 and 553] (independent directors appointed because of pending shareholder derivative actions against prepetition board members); *In re Zohar III, Corp.*, Case No. 18-10512 (Bankr. D. Del.) Order Appointing Independent Director [Docket No. 267] (independent director appointed as part of a mediated settlement over sale of a portfolio of financial services entity debtor]; *In re Interlogic Outsourcing, Inc.*, Case No. 19-31444 (Bankr. N.D. Ind.) Motion

---

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1635
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1749 of 1828   PageID 11242
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1634 of 1803   PageID 12380
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 27 of 106

(attorneys or financial advisors) or seasoned industry professionals with immaculate corporate records.  Reliance on the use of independent directors has thus become a critical tool in proper corporate governance and restoring creditor confidence in management in modern day corporate restructurings.  Failure to protect independent directors from claims of ordinary negligence will discourage sophisticated restructuring personnel from accepting appointment to such roles and will have a substantial negative effect on the efficacy of the chapter 11 process and the efficient realization of its purposes and goals.

39.    The Independent Directors appointed in this case are persons of such stature, as they include a former bankruptcy judge, former commercial bankruptcy practitioners and a person with expertise in hedge fund operations.  As indicated by the Fifth Circuit in *Pacific Lumber*, if estate fiduciaries who are "disinterested volunteers" can be sued for actions taken during the course of a case pursuant to the Bankruptcy Code and under judicial supervision, qualified people would not serve, and the integrity of the chapter 11 process would be compromised.  This policy concern is particularly acute where, as here, the Independent Directors undertook their duties in the midst of a highly contentious and litigious case.

40.    In this case, the Independent Directors also are analogous to bankruptcy trustees. Section 1107(a) of the Bankruptcy Code provides that a debtor in possession has all of the rights and powers, and substantially all of the duties, of a bankruptcy trustee, and the case law makes it clear that the debtor in possession and its officers and directors serve in the same fiduciary capacity as a trustee.  The Independent Directors were approved by the court to serve as post-

---

and Order Appointing Independent Directors [Docket Nos. 198 and 394] (independent director appointed for general corporate oversight).

Appellee Appx. 01628
APPX. 014493

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1636
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1750 of 1828   PageID 11243
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1635 of 1803   PageID 12381
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 28 of 106

petition fiduciaries in this case in order to resolve insistent and urgent demands for the appointment of a trustee to supplant the prepetition directors and senior officers.  In fact, the Court denied the U.S. Trustee's motion seeking appointment of a chapter 11 trustee based primarily on its approval of the Independent Directors to act as court-supervised fiduciaries for the Debtor and the Estate – the functional equivalent of a chapter 11 trustee.  It is well established that trustees have qualified immunity for acts taken within the scope of their appointment.  *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981).  Like trustees, the Independent Directors are estate fiduciaries.  *In re Houston Regional Sports Network, L.P.*, 505 B.R. 468, 481-82 (Bankr. S.D. Tex. 2014) (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)

41.    For the same reasons that the Fifth Circuit upheld the exculpation of committee members in *Pacific Lumber*, and pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code and the related applicable non-bankruptcy law governing the immunity and exculpation of fiduciaries, none of which were actually addressed in *Pacific Lumber*, the Exculpation Provisions should be approved as to the Independent Directors and CEO/CRO.

42.    Professionals.  The Debtor's Professionals are entitled to exculpation.  *See, In re Ondova Ltd. Co. v. Sherman*, 914 F.3d 990 (5th Cir. 2019) (protecting counsel for trustee from suit when acting pursuant to direction of its client within the scope of its employment); *Harris v. Wittman (In re Harris),* 590 F.3d 730 (9th Cir. 2009)(same).  There is no distinction in the Bankruptcy Code between counsel for a trustee and counsel for a debtor in possession – both are

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1637
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1751 of 1828 PageID 11244
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1636 of 1803 PageID 12382
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 29 of 106

subject to court approval of their retention, both serve as counsel to estate fiduciaries and both

are subject to their actions and compensation being reviewed and approved by the Court.[28]

43.    Additionally, under applicable Texas law, attorneys are immune from civil

liability to non-clients for actions taken in connection with representing a client in litigation. *See*

*Cantey Hanger, LLP v. Byrd, 467 S.W.3d 477, 481* (Tex. 2015); *see also Troice v. Proskauer*

*Rose, L.L.P.,* 816 F.3d 341 (5th Cir. 2016) (dismissing securities fraud litigation brought by third

parties against counsel for certain companies related to Ponzi scheme perpetrator Allen

Stanford).

44.    Strand.  It is appropriate to include Strand in the Exculpation Provisions.  Strand

is the Debtor's general partner, and the Independent Directors are the directors of Strand.  Strand

should be protected to the same extent as the Debtor and the Independent Directors, and for the

same reasons. *See In re Houston Reg'l Sports Network, L.P.,* (directors of a non-debtor general

partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties

to the estate are paramount.)  In regard to Strand, the Exculpation Provisions apply solely with

respect to actions taken by Strand from and after the date of the post-petition appointment of the

Independent Directors, through the Effective Date of the Plan.

45.    Employees.  The Employees, as agents of the Independent Directors, are already

covered by the Settlement Order's exculpation provision for acts taken in furtherance of and

---

[28] *See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),* 200 F.3d 382  (5th Cir. 2000) (order approving final fee application of court-appointed professional was *res judicata* in respect of subsequent lawsuit by trustee alleging malpractice and negligence where potential claims were known to trustee at the time of final fee hearing.).  *See also, Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.),* 163 F.3d 925 at 931 (5th Cir.), *cert. denied,* 527 U.S. 1004 (1999) (judgment in bankruptcy court lawsuit brought by reorganized debtor seeking fee disgorgement against accountant for debtor for failure to disclose relationship with potential litigant was *res judicata* in respect of subsequent state court lawsuit by debtor for malpractice).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1638
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1752 of 1828 PageID 11245
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1637 of 1803 PageID 12383
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 30 of 106

under the direction and supervision of the Independent Directors in administering, managing and operating the Debtors. However, even if the Employees were not already covered by the Settlement Order, it would be appropriate to include the Employees in the Exculpation Provisions. The Exculpation Provisions apply to the Employees solely with respect to actions taken by the Employees from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

> **E.** **Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan**

46. The Debtor is seeking approval of the Exculpation Provisions in its Plan pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code; the qualified immunity of bankruptcy trustees and their agents, and the correlative qualified immunity of debtors in possession; the related applicable non-bankruptcy law on immunity and exculpation of fiduciaries; and the strong policy reasons offered by the Fifth Circuit as to committee members, which apply to the Independent Directors in the same way as the Fifth Circuit applied them to committee members. The Bankruptcy Code makes it clear that "any appropriate provision not inconsistent with the applicable provisions of this title" may be included in a chapter 11 plan.[29]

47. The Fifth Circuit's *Pacific Lumber* ruling denying exculpation to certain parties was based on section 524(e). Some recent court decisions approving exculpation provisions have held, however, that in dealing with complex and litigious bankruptcy cases, section 524(e)

---

[29] 11 U.S.C. § 1123(b)(6).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1639
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1753 of 1828   PageID 11246
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1638 of 1803   PageID 12384
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 31 of 106

is not a bar to setting a standard of liability that limits liability for negligence for acts taken during the course of the case in furtherance of the purpose of chapter 11.  For example, in *Blixseth*,[30] the Ninth Circuit (which generally does not permit third-party releases in plans) determined that the exculpation clause at issue did not implicate section 524(e) because it related to post-petition actions that occurred during the bankruptcy process, and did not implicate any potential liability on prepetition debts of the debtor.  The Court further explained that, despite prior Ninth Circuit decisions disproving third-party releases relating to such prepetition debts of the debtor, exculpation provisions with third-party releases are permissible because chapter 11 cases are often "highly litigious" where "oxes [sic] are gored" and such releases limited in time and scope "allow the settling parties. . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Id*. at 1084.  Finally, the court held, as many of its sister circuits have held, that under sections 105(a) and 1123 "the bankruptcy court here had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable." *Id*.  Significantly, the creditor whose exculpation was at issue in *Blixseth* was not even an estate fiduciary. *Id*. at 1081.

48.    Another court recently dealing with exculpation issues discussed the need for an appropriately-constructed exculpation of estate fiduciaries and exculpation relating to court approved transactions in order to preserve the basic integrity of the chapter 11 process.  In *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y 2019), the bankruptcy

---

[30] 961 F.3d 1074 (9th Cir. 2020)

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1640
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1754 of 1828 PageID 11247
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1639 of 1803 PageID 12385
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 32 of 106

court was presented with a broad exculpation clause in a plan that protected not only court-supervised fiduciaries, but also entities such as the acquirer, the acquirer's professionals, the pre- and post-petition lenders and the indenture trustees. As here, the exculpation provision pertained to acts and omissions taken in connection with and during the bankruptcy case, but excluded acts of fraud, willful misconduct or gross negligence.

49. The court declined to approve the exculpation provision as written, holding that it was overly broad, but nevertheless provided significant guidance on what an appropriate exculpation provision should provide:

> *I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.* If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do. *Cf. Airadigm Commc'ns., Inc. v. FCC (In Re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from liability arising out of or in connection with the confirmation of the Plan, except for willful misconduct); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that was limited to conduct during the bankruptcy case and noting that the effect of the provision is to require "that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation.").

599 B.R. at 720-721 (emphasis added). The Exculpation Provisions in the Plan here are consistent with the policy-based and chapter 11 process-based guidelines provided by Judge Wiles in *Aegean Marine*, in that they apply to court-supervised fiduciaries and transactions entered into under the auspices of the court.

DOCS_SF:104855.7 36027/002

50.     Additionally, the bankruptcy court's power to approve an exculpation provision in a chapter 11 plan flows naturally from the fact that it cannot confirm a chapter 11 plan unless it finds that the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code and the plan has been proposed in good faith.[31]  The plan is the culmination of the chapter 11 case.  By confirming a plan and making the "good faith" finding, the court is determining that the plan proponent (usually, the debtor) and its officers and directors have acted appropriately throughout the case, consistent with their fiduciary duties and have been administering, managing and operating the debtor in accordance with the provisions of the Bankruptcy Code and applicable law.[32]  Once the court makes its good faith finding, it is appropriate to set the standard of liability of the fiduciaries (and, as in *Blixseth*, other parties) involved in the formulation of that chapter 11 plan.[33]

51.     An exculpation provision appropriately prevents future collateral attacks against fiduciaries of the debtor's estate.  Here, the Exculpation Provisions are appropriate because they provide protection to those parties who served as post-petition court-approved fiduciaries during the restructuring process – relief that in this litigious case, as all participants are painfully aware, is indispensable.  The Exculpation Provisions are in consideration for services rendered, hard work, and perseverance in the face of threats to professional reputation and bodily harm.  The Exculpation Provisions should be approved, and the objections, asserted for the most part by the

---

[31] *See* 11 U.S.C. § 1129(a)(2) and (3).

[32] *See* 11 U.S.C. § 1129(a).

[33] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

very individual and entities that have created the need for such provisions by turning this case into a war zone, should be overruled.

VI.   **THE PLAN INJUNCTION IS APPROPRIATE AND IS NARROWLY TAILORED TO EFFECTUATE THE PLAN AND RELATED PROVISIONS OF THE BANKRUPTCY CODE.**

52.   The Court should approve the injunction provisions (the "Injunction" or "Injunction Provisions"), set forth in Article IX.F of the Plan. This is because the Injunction Provisions are necessary and appropriate to enable the Debtor and its successors to carry out, and obtain the benefits of, the provisions of the Bankruptcy Code relating to the Plan and the proper implementation and consummation of the Plan. Approval of the requested Injunction Provisions is well within this Court's powers.

53.   The Objectors have objected to the Injunction Provisions on several grounds. The Debtor has reviewed the Injunction Provisions and revised them to address certain of the Objectors' concerns as follows:

- The Injunction and Gatekeeper Provisions have been narrowed to apply only to Enjoined Parties.[34]

- The Independent Directors are no longer included in the second paragraph of the Injunction.

- The Reorganized Debtor and the Claimant Trust have been deleted from the second paragraph of the Injunction in order to eliminate any potential confusion that they were included in any capacity other than as successors to the Debtor, which is now clarified in the third paragraph of the Injunction.

---

[34] "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing. Plan, Art. I.B., Def. 56 (new definition in the Plan (as amended)).

28

Appellee Appx. 01635

APPX. 04592

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1643
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1757 of 1828   PageID 11250
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1642 of 1803   PageID 12388
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 35 of 106

- The Injunction is subject to parties' rights to set off to the extent permitted post-confirmation under sections 553 and 1141 of the Bankruptcy Code.

- The Gatekeeper Provision has been amended to clarify the actions for which parties must first seek the approval of the Bankruptcy Court to pursue.

- The grant of exclusive jurisdiction over the merits previously contained in the Gatekeeper Provision has been removed, and the Gatekeeper Provision has been modified to provide that if the Bankruptcy Court, as gatekeeper, decides an action can be brought, the Bankruptcy Court will adjudicate that action on the merits *only* to the extent the court has jurisdiction to do so.

- Articles IX.G and H of the Plan have been modified to clarify the duration of the automatic stay and other injunctions which are either currently in effect or contained in the Plan.

54.     The Injunction Provision, as modified, merely implement and enforce the Plan's discharge, release, and Exculpation Provisions and related provisions of the Bankruptcy Code and enjoin the Enjoined Parties from commencing or maintaining actions to interfere with the implementation or consummation of the Plan.  The Injunction Provisions are a necessary part of the Plan because they protect the Plan implementation provisions required to monetize the Debtor's assets and pursue the Causes of Action, all of which has been vociferously and continually opposed and litigated by Dondero and his numerous Related Entities, with such vexatious opposition likely to continue post-confirmation.  Several parties – principally Dondero, Dugaboy and his Related Entities – have objected to the Injunction, which is not surprising because Dondero and his Related Entities undoubtedly intend to continue their litigation crusade against the Debtor and its successors after confirmation of the Plan.

### A.    Plan Injunction Provisions

55.     Section IX.F of the Plan is entitled "Injunction" and applies post-Effective Date. The Injunction contains three distinct provisions:

Appellee Appx. 01636

APPX. 104503

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1644
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1758 of 1828 PageID 11251
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1643 of 1803 PageID 12389
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 36 of 106

56. Paragraph 1, as amended, provides:

**Upon entry of the Confirmation Order, all** ~~holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons,~~ **Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

57. As revised, paragraphs 2 and 3 provide:

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all** ~~Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan)~~ ~~and other parties in interest, along with their respective Related Persons, are~~ **Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to** ~~such~~ **any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner** ~~, directly or indirectly~~ **any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means** ~~, whether directly or indirectly~~ **, any judgment, award, decree, or order against the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (iii) creating, perfecting, or otherwise enforcing in any manner,** ~~directly or indirectly,~~ **any security interest, lien or encumbrance of any kind against the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (iv) asserting any right of setoff, directly or indirectly, against any obligation due** ~~from~~ **to the Debtor** ~~Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or against property or interests in property of** ~~any of the Debtor, Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding**

Appellee Appx. 01637
Appx. 04504

> **paragraph against** any successors of the Debtor, **including, but not limited to,** the Reorganized Debtor, **the Litigation Sub-Trust,** and the Claimant Trust and their respective property and interests in property.

Plan, Art. IX.F.

58.    As amended, paragraph 4 of Section IX.F contains a gatekeeper provision (the "Gatekeeper Provision") which provides:

> **Subject in all respects to ARTICLE XII.D, no** ~~Entity~~ **Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of** ~~this~~ **the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such** ~~Entity~~ **Enjoined Party to bring such claim or cause of action against any such Protected Party;** *provided, however,* **the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such** ~~Entities~~ **Employee from the date of appointment of the Independent Directors through the Effective Date.** ~~As set forth in ARTICLE XI, the~~ **The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate** ~~any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted~~ **the underlying colorable claim or cause of action.**

Plan, Art. IX.F.

59.    To the extent an Enjoined Party believes it has any claims against a Protected Party, such Enjoined Party must first seek permission of the Bankruptcy Court to file such action and demonstrate that the claims it seeks to assert are colorable claims.  Subject to certain carve outs, Protected Parties are defined collectively as:

Appellee Appx. 01638

APPX. 01593

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); . . . .

Plan, Art. I.B. Def. 105.   If the Bankruptcy Court determines a claim is colorable, the Bankruptcy Court will make a separate determination as to whether it has jurisdiction to adjudicate such claim on its merits in accordance with the terms of the Plan and applicable law.

### B.    Objections

60.    A number of parties, including Dondero and many of his affiliated, controlled or influenced entities, object to the Injunction Provisions (as identified in the chart of objections attached as Exhibit B).  The Objectors all raise similar arguments and allege:

- The Injunction is ambiguous and overly-broad because the meaning of the phrase "implementation and consummation of the plan" is unclear.

- The Injunction operates post-effective date and enjoins post-confirmation claims against non-debtor third parties for post confirmation conduct.

- The Injunction is a disguised non-debtor third party release.

- The Injunction Provisions prevent holders of Claims and Equity Interests from enforcing rights created by the Plan after the Effective Date.

- The Gatekeeper Provision effectuates an impermissible extension of the jurisdiction of the Bankruptcy Court.

61.    As summarized above and discussed more fully below, the Injunction Provisions, as amended, have addressed certain of these arguments.  The remaining objections, however,

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1647
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1761 of 1828 PageID 11254
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1646 of 1803 PageID 12392
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 39 of 106

lack merit and are based on either a misreading of the actual Injunction Provisions or a misstatement of applicable law. Each objection will be addressed below.

**C.** **An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate.**

62. Certain objectors argue that the first paragraph of the Plan Injunction, which enjoins all holders of Claims or Equity Interests and other parties in interest, along with their Related Persons, from taking any action to interfere with the "implementation or consummation of the Plan," is overly-broad and ambiguous because the meaning of the phrase "implementation and consummation of the plan" is somehow unclear. These objections are specious.

63. An injunction in aid of the effectuation of a confirmed plan is typically included in a plan and confirmation order to prevent actions to impede or frustrate the plan proponent's necessary and appropriate actions after confirmation to effectuate the plan and carry out the court's confirmation order. The Injunction is supported by the express provisions of sections 1123(a)(5), 1123(b)(6), 1141(a), 1141(c), and 1142. The Injunction effectuates the purposes of plan confirmation and chapter 11 and preserves and protects the integrity of the chapter 11 process and the court's orders.

64. The terms "implementation" and "consummation" are neither vague nor overly-broad; they are both terms found in the text of chapter 11 of the Bankruptcy Code and are well understood – and injunctions against interfering with them are common features of plans confirmed throughout the country, including in this District.[35] Section 1123(a)(5) expressly

---

[35] *See, e.g., In re Tuesday Morning Corp.* (Case No. 20-31476, Bankr. N.D. Tex.) *Debtor's Second Amended Plan of Reorganization* [D.I. 1913-1] attached to *Order Confirming the Revised Second Amended Joint Plan of Reorganization,* at pp. 90-91/137; *In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States*

DOCS_SF:104855.7 36027/002

Appellee Appx. 01640
APPX. 104507

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1648
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1762 of 1828   PageID 11255
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1647 of 1803   PageID 12393
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 40 of 106

mandates that "a plan <u>shall</u> . . . provide adequate means for the plan's <u>implementation</u>" (emphasis added) and contains a non-exclusive list of what means that could include.   In compliance with section 1123(a)(5), this Plan expressly sets out the means for its "implementation."  *See* Plan, Article IV: Implementation of Plan.  *See also* 11 U.S.C. § 1142. The Injunction would enjoin any interference with these implementation steps.

65.    The word "consummation" is also found in the Bankruptcy Code and has been discussed by numerous courts.   For example, section 1101(2) defines "substantial consummation" of a plan to be (A) the transfer of the assets to be transferred under the plan; (B) the assumption by the debtor or the successor to the debtor of the management of all of the property dealt with by the plan; and (C) commencement of distribution under the plan.   Of course, the term "consummation," without the qualifier "substantial," is more expansive and would extend, for example, to the completion of distributions under the Plan and the disposition of all of the property dealt with by the Plan.  *See, e.g., United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (distinguishing "substantial consummation" of a plan from final consummation of a plan, which occurs after the effective date when the plan distributions are concluded.)

66.    This portion of the Injunction merely prevents holders of Claims or Equity Interests and other Enjoined Parties from interfering with the actions the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust must take

---

*Bankruptcy Code* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, Sec. 10.5.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1649
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23    Page 1763 of 1828   PageID 11256
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1648 of 1803   PageID 12394
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 41 of 106

to effectuate the terms of the Plan after the Plan is confirmed by the Court.  There is nothing nefarious or unusual about this provision and it should be approved.

**D.      The Injunction Is Not a Disguised Non-Debtor Third-Party Release.**

67.      The Injunction does not contain a non-debtor third-party release.  As set forth in the Plan, as amended, the Debtor has provided clarification to address the concerns of the Objectors who interpreted the prior provision to effectuate a non-debtor third-party release.  The amended second and third paragraphs of the Injunction prevent the Enjoined Parties from taking the enumerated actions on or after the Effective Date against the Debtor or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, except as set forth in the Plan or in the Confirmation Order.  The Debtor has eliminated the Independent Directors from these provisions of the Injunction.  As revised, nothing in this section of the Injunction does anything more than prevent the Enjoined Parties from taking actions that do not comply with or conform to the provisions of the Plan, and limit holders of Claims and Equity Interests with respect to such Claims and Equity Interests to the recoveries provided under the Plan, all as contemplated by sections 1123(b)(6) and 1141 in respect of claims or interests arising either prepetition or post-petition.  The ultimate goal of a chapter 11 case is for a debtor to confirm a plan which, after confirmation, effectively channels all claims and interests of creditors and interest holders to the treatment provided for the pre- and post-petition claims and interests under the plan, and limits the liability of the debtor (including the

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1650
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1764 of 1828   PageID 11257
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1649 of 1803   PageID 12395
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 42 of 106

"reorganized debtor") and any successor that receives property of the debtor dealt with by the plan (such as a plan trust) to the liability imposed by that treatment.

68.    Sections 1123 and 1129 of the Bankruptcy Code require a plan to describe how it will treat the claims of creditors and the interests of equity holders, both those that existed prepetition and those that arise during the course of a case. The purpose of the Injunction is to protect the Debtor and its successors under the Plan – the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust –against litigation to pursue the very same prepetition and post-petition claims and interests that are being treated under the Plan. As described below, providing the protection of the Injunction to all of such entities is both legal and appropriate.

69.    As to the Debtor, the Injunction is appropriate, because it implements the injunctive relief the Bankruptcy Code affords the Debtor, whether or not it gets a discharge, as a result of plan confirmation. If the Debtor is entitled to the discharge as contemplated by the Plan, then it is accorded the injunction provided by sections 1141(d) and 524(a). But even if the Debtor does not receive a discharge then, pursuant to section 362(c)(2)(A), the automatic stay will remain in effect until the case is closed, and the Injunction is in aid of that stay. Moreover, pursuant to section 1141(c) of the Bankruptcy Code, because *all* of the Debtor's property is "dealt with by the plan," all of that property will be "free and clear of all claims and interests . . . .," both as to property retained by the Debtor, and property transferred to its successors. Accordingly, the Injunction is an appropriate means of enforcing section 1141(c).

70.    Nothing in the Injunction effectuates a third-party release in contravention of section 524(e) of the Bankruptcy Code. As to the "Reorganized Debtor," this term simply means

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1651
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1765 of 1828 PageID 11258
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1650 of 1803 PageID 12396
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 43 of 106

the Debtor on and after the Effective Date. *See* Plan, Art. I.B., Definition 112. The Reorganized Debtor, therefore, should be entitled to the same injunctive relief as the Debtor. To hold otherwise would be illogical.

71.     The Claimant Trust and Litigation Sub-Trust are successors to the Debtor – both in structure and in assets. Neither the Claimant Trust nor the Litigation Sub-Trust come into existence until the Effective Date, and thus, the only liability they could have to the holders of Claims and Equity Interests would be the liability to treat such Claims and Equity Interests as set forth in the Plan. All of the property of the Claimant Trust and Litigation Sub-Trust is property of the Debtor and the Estate that these Trusts will receive from the Debtor and the Estate pursuant to the Plan on the Effective Date and is "dealt with" by the Plan. Accordingly, under section 1141(c), that property will be received and held by the Claimant Trust and the Litigation Sub-Trust "free and clear of all claims and interests of creditors and equity security holders." Paragraph 2 of the Injunction is in aid of this provision and, in the words of section 105, is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code, *i.e.,* section 1141(c).

### E.     The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order.

72.     The Injunction does not prevent holders of Claims or Equity Interests from enforcing, after the Effective Date, rights arising under the Plan or the Confirmation Order. The scope of the Injunction is specifically subject to the Plan, the Confirmation Order and any other order of the Court. Thus, the right of the holder of a Claim or Equity Interest to receive its plan distributions, as set out in the Plan, is not impacted – such persons are merely enjoined from

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1652
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1766 of 1828   PageID 11259
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1651 of 1803   PageID 12397
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 44 of 106

taking the enumerated actions to enforce their Claims or Equity Interests outside of the Plan process and treatment.  If, for example, the Claimant Trust made distributions to certain creditors but not others, those who did not receive their distribution, would be free to enforce the provisions of the Plan contract.  This is clear from the language of the Injunction, which begins "[e]xcept as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . ."  Plan, Art. IX.F.

73.    The Injunction is not a third-party release, does not prevent enforcement of the provisions of the Plan itself, and is neither vague nor overly-broad.  The Court should overrule the objections and approve the Injunction in aid of the consummation and administration of the Plan as appropriate and consistent with sections 362, 1123 and 1141 of the Bankruptcy Code.

**VII.    THE GATEKEEPER PROVISION IS NECESSARY AND APPROPRIATE, AND SUPPORTED BY APPLICABLE LAW.**

   **A.    The Gatekeeper Provision**

74.    Paragraph 4 of Section IX.F contains neither a release nor an injunction.  Rather, Paragraph 4 contains a provision that requires any Enjoined Party that believes it has any claims against a Protected Party "**that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing**" to first seek leave from the Bankruptcy Court to pursue such alleged claims and present evidence as to why it believes it has a colorable claim against the

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1653
Case 3:23-cv-00726-S   Document 8-22   Filed 08/04/23    Page 1767 of 1828   PageID 11260
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1652 of 1803   PageID 12398
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 45 of 106

Protected Person.  As discussed below, provisions such as this one, which have been referred to

as "gatekeeper" or "channeling" provisions, are neither uncommon nor impermissible.

75.     It should come as no surprise that Dondero and his cohorts are the only ones who

object to the Gatekeeper Provision.  The last thing they want is for a court that has had the

misfortune of familiarizing itself with their antics to pass on the *bona fides* of any new tactics

and lawsuits they may conjure up to stymie this case. However, as set forth below, their

challenges to this Court's power and jurisdiction to pre-screen if their new lawsuits are colorable

represent wishful thinking.

### B.     The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code.

76.     The Gatekeeper Provision is a legitimate exercise of this Court's powers under

sections 105,[36] 1123(b)(6),[37] and 1141(a), (b) and (c).[38]  The Bankruptcy Court serves as the

literal guardian at the gate – determining whether a litigant has a colorable claim and may pass

---

[36] Section 105 is entitled "Power of court" and provides: (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[37] Section 1123(b)(6) provides: (b) Subject to subsection (a) of this section, a plan may— (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

[38] Section 1141 is entitled "Effect of confirmation" and provides, in relevant part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

DOCS_SF:104855.7 36027/002

through the gate to the applicable clerk of court and file a lawsuit.  The Debtor recognizes that a Gatekeeper Provision is not found in every chapter 11 plan.  However, this case is not a typical case.  Indeed, recognizing the need for, and importance of, this role under the facts of this case, the Court previously entered the Settlement Order (agreed to by Dondero) which itself contains a gatekeeper provision protecting the Independent Directors.  The purpose of the Gatekeeper Provision in the Plan is to insulate the Protected Persons, many of whom will be either successors to the Debtor or the fiduciaries charged with continuing the administration of the Debtor's property and causes of action post-Effective Date (which essentially involves the wind-down of the business, the monetization of the Debtor's assets and the distribution of the proceeds of same to pay the Claims of legitimate creditors), from non-stop, vexatious litigation in multiple jurisdictions over every conceivable action they take to implement and consummate the Plan.

77.    Based upon the history and record of this case – including increased activity during the past several weeks – this Court is well aware of the reality of that threat and risk in this case.  During the course of this case, many of the significant actions taken by the Independent Directors have been challenged, litigated and appealed.  Moreover, Dondero has interfered with the Debtor's business operations, resulting in the Court's entry of a Temporary Restraining Order and Preliminary Injunction against him.[39]  A hearing on the Debtor's Motion to Hold Dondero in Contempt is scheduled for February 5, 2021.  The Independent Directors, CEO/CRO, Employees, Committee and its members, and the Professionals of the Debtor and the

---

[39] *Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P)*, Adv. No. 20-03190 (Bankr. N.D. Tex), December 10, 2020 *Order Granting Debtor's Motion for Temporary Restraining Order against James D. Dondero* [D.I. 10] and January 11, 2021 *Order Granting Debtor's Motion for Preliminary Injunction against James D. Dondero* [D.I. 59].

Committee have been harassed and threatened by Dondero and his Related Entities.  There is no reason to believe these litigious tactics, threats and intimidation will cease post-Confirmation and post-Effective Date; and their unchecked continuance will seriously impair the ability of the Claimant Trust and the Litigation Sub-Trust to implement and effectuate the Plan and carry out the orders of this Court.  The Gatekeeper Provision is essential to the confirmation of this Plan and the efficient effectuation and consummation of the Plan post-Effective Date.

78.    The need for the Gatekeeper Provision is illustrated by the fact that the Independent Directors would not have been able to obtain Directors' & Officers' insurance coverage, upon their appointment, in the absence of the Settlement Order.  Insurers were unwilling to underwrite coverage without a broad exclusion restricting any type of coverage for the Independent Directors if the Settlement Order did not contain the exculpation and gatekeeper provision found in Paragraph 10 of the Settlement Order.  Similarly, the Claimant Trustee, the Litigation Trustee and the Claimant Trust Oversight Board will not be able to obtain coverage for the period of time after the Effective Date without a similar gatekeeper provision. Accordingly, the failure to approve the Gatekeeper Provision as part of the Plan will completely frustrate the Debtor's ability to carry out the Plan and Confirmation Order.

79.    Gatekeeper provisions are not some new creative attempt to circumvent limitations on bankruptcy court jurisdiction or restrictions on non-consensual third-party releases.  They are utilized by many courts to provide a single clearing court to determine whether a claim is colorable or appropriate under the applicable facts of the main case.  For example, in the *Madoff* cases, the bankruptcy court has served as the gatekeeper for determining

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1656
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1770 of 1828 PageID 11263
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1655 of 1803 PageID 12401
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 48 of 106

whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust.)[40] In the *General Motors* cases, certain issues arose post-effective date in regard to defects in ignition switches. Questions arose as to whether the causes of action arising from those defects were such that "New GM" had liability for them, notwithstanding that it had purchased the assets of the debtor "Old GM" free and clear. The bankruptcy court serves as a gatekeeper for this litigation, determining whether a lawsuit can go forward against New GM or is more properly dealt with as a claim against Old GM.[41]

80. Gatekeeper or channeling provisions similar to this one, and in some instances, more extensive than the proposed Gatekeeper Provision in this Plan, have been approved by other courts in this district. In *In re Pilgrim's Pride Corp.*, 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. January 14, 2010), Judge Lynn, after concluding that *Pacific Lumber* precluded the court from granting certain requested releases and exculpations, determined that nothing in *Pacific Lumber* prevented the court from retaining exclusive jurisdiction over some of the suits against third parties which might otherwise have been covered by the third party protections. *Id*. at *16-17. Judge Lynn then expressly held that the bankruptcy court would "channel to itself any claims that may be asserted against Debtors' management (including their boards of directors and Chief Restructuring Officer) and the professionals based upon their conduct in pursuit of

---

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussion of court's gatekeeper function).
[41] *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing court's gatekeeper function); *In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same).

Appellee Appx. 01649
Appx. 04516

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1657
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1771 of 1828   PageID 11264
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1656 of 1803   PageID 12402
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03    Page 49 of 106

their responsibilities during the Chapter 11 Cases." *Id.* at *18, 20-21.  In furtherance of this, the confirmation order provided that the court "shall retain **exclusive** jurisdiction over any suit brought on any claim or causes of action related to the Chapter 11 Cases that exists as of the Effective Date against a Committee; any member of a Committee; any Committee's Professionals; Debtors; Reorganized Debtors; or any Protected Person for conduct pertaining to Debtors during the Chapter 11 Cases, and that any entity wishing to bring such suit shall do so in this court;" *Id.* (emphasis added).  Thus, in *Pilgrim's Pride*, the court approved a broad retention of exclusive jurisdiction to adjudicate the ultimate merits of certain types of suits against protected parties, rather than merely a gatekeeper provision.

81.    Other courts in this district have agreed with Judge Lynn and ordered similarly. *See, e.g., In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*], Section 10.8(b) at p. 57 (court retained **exclusive** jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added).

82.    In regard to the Independent Directors, the proposed Gatekeeper Provision is a continuation of the provision set forth in Paragraph 10 of the Settlement Order, which, by its terms never expires and is expressly to remain in effect after the Effective Date under the Plan. Moreover, because of the Independent Directors' rights of indemnification against the Debtor,

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1658
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1772 of 1828  PageID 11265
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1657 of 1803  PageID 12403
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 50 of 106

the Gatekeeper Provision serves the important function of protecting assets that would otherwise be available for distribution to creditors from being depleted by indemnification claims resulting from the assertion of frivolous claims against the Independent Directors.

83.     As to the remaining Protected Parties, the Gatekeeper Provision is a valid exercise of the Court's authority under sections 105 and 1123(b)(6) to prevent the Protected Parties from being embroiled in frivolous litigation designed to derail implementation of the Plan. Importantly, if, in the exercise of its gatekeeper role, the Bankruptcy Court were to determine that a colorable claim exists, then it would allow the prosecution of such claim and the filing of the lawsuit in the court with applicable jurisdiction.[42]

### C.     The Gatekeeper Provision Is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court.

84.     Nor is the Gatekeeper Provision an impermissible extension of the post-confirmation jurisdiction of the bankruptcy court.  As discussed above, the Debtor modified the Gatekeeper Provision to eliminate the provision that granted the Bankruptcy Court exclusive jurisdiction to hear any claim that the Court allows to pass through the gate.  The Gatekeeper Provision requires a putative plaintiff to obtain Bankruptcy Court approval prior to bringing an action and is in aid of the Court's enforcement of the Confirmation Order and the Plan.  It is supported by sections 1141(a), (b) and (c), and thus, by section 105.  As amended, nothing in the Gatekeeper Provision is determinative of the jurisdiction of the Court over any particular claim or cause of action.  The Gatekeeper Provision only requires the court to determine <u>if a claim is</u>

---

[42] *Texas & P. R. Co. v. Gulf, C. & S. F. R. Co.*, 270 U.S. 266, 274 (1926) (Court always has jurisdiction to determine its own jurisdiction).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01651
APPX. 104518

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1659
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1773 of 1828   PageID 11266
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1658 of 1803   PageID 12404
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 51 of 106

colorable.  This is a determination commonly made by bankruptcy courts in the analogous context of determining whether a creditors' committee should be granted standing to file litigation on behalf of a recalcitrant debtor.  *See, e.g., Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir. 1988) (court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor).  Thus, the Bankruptcy Court has the jurisdiction to determine if a claim is colorable.

85.    Section 1142(b) provides that post-confirmation, the bankruptcy court may direct any parties to "perform any act" necessary for the consummation of the plan).  *See United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (holding that bankruptcy court had jurisdiction to determine whether arbitration could be used to liquidate claims post-effective date; while the plan had been substantially consummated, it had not been fully consummated, the dispute related directly to the plan, the outcome would affect the parties' post confirmation rights and responsibilities and the proceeding would impact compliance with, or completion of the plan; specifically referencing section 1142(b)).

86.    Several objectors attempt to rely on *Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir.  2001) to argue that the bankruptcy court cannot exercise a gatekeeper role and adjudicate matters related to the administration of the case and the plan.  In fact the opposite is true.  In *Craig's Stores*, the Fifth Circuit expressly recognized that post-confirmation bankruptcy jurisdiction ***continues to exist for "matters pertaining to the implementation or execution of the plan*.*"  *Id.* at 390 (*citing In re*

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1660
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1774 of 1828   PageID 11267
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1659 of 1803   PageID 12405
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 52 of 106

*Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7

F.3d 32, 34 (2d Cir. 1993) (emphasis added).

87.    *Craig's Stores* did not involve a gatekeeper provision necessary to enable the

debtor to implement its plan.[43]  In contrast to *Craig's Stores*, the Plan provision that Dondero and

other Objectors are challenging pertains to the Court's jurisdiction over matters specifically in

aid of the implementation and effectuation of the Plan – acting as gatekeeper – and does not

implicate an improper extension of bankruptcy court jurisdiction.  As previously explained, the

Gatekeeper Provision is necessary to obtain insurance coverage for the Claimant Trustee, the

Litigation Trustee, and the members of the Claimant Trust Oversight Board – all of whom will

play critical roles in the implementation of the Plan.  Moreover, unchecked rampant litigation

against the Protected Persons, many of whom have indemnification rights against the Debtor,

Reorganized Debtor or Claimant Trust would predictably engulf the Reorganized Debtor and

Claimant Trust negatively impacting their ability to effectuate and implement the Plan and

wasting valuable resources.  *See, In re Farmland Industries, Inc.,* 567 F.3d 1010, 1020 (8th Cir.

2010) (bankruptcy court had "related to" jurisdiction over a claim by a disgruntled bidder against

the post-effective date liquidating trustee because the estate was actually paying legal fees of the

non-debtor defendants under the estate's indemnification obligations.); *see also Buffets, Inc. v.*

---

[43] In *Craig's Stores*, the issue was whether the court could hear a post-confirmation action brought by the debtor for damages against a bank that was administering the debtor's post-confirmation private label credit card program under an agreement that had been assumed by the debtor in its chapter 11 plan.  On appeal, the Fifth Circuit held that the bankruptcy court did not have jurisdiction to hear the dispute, reasoning that (1) the debtor's claim principally dealt with post-confirmation relations between the parties, (2) no facts or law derived from the reorganization or the plan were necessary to the claim, and (3) the claim did not bear on the interpretation or execution of the debtor's plan. *Id.* at 391.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01653
Appx. 04516

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1661
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1775 of 1828   PageID 11268
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1660 of 1803   PageID 12406
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 53 of 106

*Leischow*, 732 F.3d 889 (8th Cir. 2013) (related-to jurisdiction existed where bankruptcy estate was obligated to indemnify non-debtor defendants for attorney's fees and other amounts).

88.    In addition, *Craig's* Stores did not involve a liquidating chapter 11 plan, and this case does involve such a plan.  There is persuasive case law, including this Court's decision in *TMXS Real Estate* (discussed below) and circuit-level authority, holding that the scope of the bankruptcy court's post-confirmation jurisdiction in the case of a liquidating chapter 11 plan is broader than that in the case of a chapter 11 plan that is not a liquidating plan.

89.    In *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr., Inc.)*, 410 F.3d 100 (1st Cir. 2005), the debtor, a charitable hospital, brought an adversary proceeding against a testator trust, seeking to compel payment from the trust of an amount allegedly due to the hospital as a residual beneficiary under the trust.  The testator had died prepetition, but before the estate's assets were distributed, and the litigation was filed after confirmation of the debtor's liquidating plan of reorganization because the hospital had been unaware it was a beneficiary under the trust.  The trustee had argued that the bankruptcy court had no residual jurisdiction over the debtor's lawsuit against the trustee because the plan had been confirmed, but the bankruptcy court found it had "related to" jurisdiction.

90.    The First Circuit first analyzed the long line of cases (including *Craig's Stores*) which hold that after a debtor emerges from bankruptcy, it enters the marketplace and is no longer under the aegis of the bankruptcy court.  *Id.* at 106-107.  The court did not end its analysis there, however, but dug deeper into the significant distinctions between a liquidating plan and a true reorganization.   Under a liquidating plan, the debtor is not really re-entering the

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1662
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1776 of 1828 PageID 11269
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1661 of 1803 PageID 12407
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 54 of 106

marketplace; rather its "sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *Id.* at 107. Thus, while a reorganized debtor may have litigation that clearly is outside the scope of its prior bankruptcy proceeding, that is generally not the case with a liquidating debtor. The court determined that 28 U.S.C. § 1334 had to be applied in conjunction with the applicable facts of the case, and jurisdiction was appropriate. *Id.* A "liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11." *Id.*

91. This Court has also recognized the jurisdictional distinction between liquidating plans and operational reorganizations. In *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 2020 Bankr. LEXIS 3205 (Bankr. N.D. Tex. Nov. 12, 2020), this Court held it had jurisdiction to hear a post-confirmation dispute concerning the ability of a liquidating trust, which had been formed pursuant to the plan, to liquidate the stock of the reorganized debtor it received under the plan which involved the issue of whether such action would effectuate a "change in control" that would constitute a default under a lease that had been assumed by the reorganized debtor pursuant to the plan. This Court held that (i) the liquidating trust had been formed for the purpose of liquidating the assets transferred to it pursuant to the plan and distributing the proceeds of those assets to creditors; (ii) the litigation at issue was an attempt to limit the ability of the liquidating trust to effectuate the very purpose for which it had been formed and had to be resolved prior to full consummation of the plan; (iii) resolution of the dispute would require the review of the plan, the confirmation order and possibly other orders of

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1663
Case 3:23-cv-00726-S   Document 8-22   Filed 08/24/23    Page 1777 of 1828   PageID 11270
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1662 of 1803   PageID 12408
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 55 of 106

the court; (iv) the litigation would impact compliance with, or completion of the plan; and (v) the litigation directly related to the plan's implementation or execution. *Id.* at *21-23.

92.    Just as in the *TXMS Real Estate* and *Boston Regional* cases, the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor exist solely for the purpose of operating the Debtor's business and properties to monetize its assets and pay creditors.  Any "post-confirmation operations" of the Reorganized Debtor will, therefore, be directed towards that monetization process and, furthermore, properly subject to the Court's purview to ensure consummation of the Plan and creditor distributions pursuant to section 1142 of the Bankruptcy Code.  Any prospective, but baseless, litigation over the acts taken by these entities in effectuating the Plan will have a significantly negative impact on the ability of the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor to effectuate the Plan and will deplete the assets otherwise available for distribution to creditors.  The Gatekeeper Provision simply ensures that any such prospective litigation is colorable before it can be filed.

93.    The Fifth Circuit's decision in *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 266-67 (5th Cir. 2005), is instructive.  In *Stonebridge*, the liquidating trustee under a confirmed chapter 11 plan sued a landlord in connection with the landlord's draw on a letter of credit that had been provided as security in connection with a real property lease the debtor had rejected during its bankruptcy case, where the trustee was assigned the issuing bank's claim against the landlord for alleged misrepresentation.  Although the Fifth Circuit had concerns over jurisdiction of the bank's assigned claim to the trustee, the court went on to opine that "[u]pon closer review, however,

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1664
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1778 of 1828   PageID 11271
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1663 of 1803   PageID 12409
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 56 of 106

additional effects on the estate are evident: a claim by the Bank against [the landlord] affects the need for the Bank to seek reimbursement from Stonebridge's bankruptcy estate. [The landlord's] draw on the Letter of Credit triggered [the debtor's] contractual responsibility to reimburse the Bank for the draw on the Letter of Credit. . . . If the Bank is successful against [the landlord] on its negligent misrepresentation claims, the need for reimbursement from [the bankruptcy] estate is alleviated." *Id.* at 266-267. Accordingly, the court held that the negligent misrepresentation claims of the bank against the landlord fell within bankruptcy jurisdiction. The court noted other cases that involved litigation between third parties that have been found to have an effect on the administration of the bankruptcy estate, including suits by creditors against guarantors and a suit by creditors of a debtor against defendants that allegedly perpetrated a fraud. *Id.* at 267 (*citing* 3 *Collier on Bankruptcy* ¶ 3.01 (15th ed. rev. 2005)).

94.    Based on the reasoning of *Stonebridge*, other courts, including this Court, have held that contingent indemnification rights trigger "related to" subject-matter jurisdiction of state law disputes between two non-debtors in the pre-confirmation context. *See, e.g.*, Principal *Life Ins. Co. v. JP Morgan Chase Bank, N.A. (In re Brook Mays Music Co.)*, 363 B.R. 801 (Bankr. N.D. Tex. 2007) (contingent right of indemnity in pre-confirmation litigation between two non-debtors triggers bankruptcy court's pre-confirmation "related to" jurisdiction (*citing Stonebridge*)). In *In re Farmland Industries, Inc.*, the Eighth Circuit has similarly held that it had post-confirmation subject-matter jurisdiction over state law claims between non-debtors where the liquidating trustee was paying the legal fees incurred to defend individuals (former officers and directors) in the dispute.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1665
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23    Page 1779 of 1828   PageID 11272
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1664 of 1803   PageID 12410
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 57 of 106

95.    In sum, in light of the proposed amendments to the Plan and under the circumstances here, Dondero's objection to this Court's jurisdiction to serve as a gatekeeper is not well-taken and should be overruled.  The retention of the *de minimis* jurisdiction to perform the gatekeeper function is clearly supported by Fifth Circuit law.

**D.    The Gatekeeper Provision Is Consistent with the Barton Doctrine.**

96.    Support for the Gatekeeper Provision can be found in the Barton Doctrine, which by analogy, should be applied to many of the Protected Parties identified in the Gatekeeper Provision.  The Barton Doctrine is based on the U.S. Supreme Court case, *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881) dealing with receivers.  As this Court has recognized, the Barton Doctrine:

> provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.*, the bankruptcy court) must be obtained. The *Barton* doctrine is ***not*** an immunity doctrine but – strange as this may sound – has been held to be a ***jurisdictional*** provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee ***unless and until*** the bankruptcy court has granted leave for the lawsuit to be filed).

Baron v. Sherman (In re Ondova Ltd. Co.), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, Baron v. Sherman (In re Ondova Co.), 2018 U.S. Dist. LEXIS 13439 (N.D. Tex., Jan. 26, 2018), aff'd., In re Ondova Ltd., 2019 U.S. App. LEXIS 3493 (5th Cir. Tex., Feb. 4, 2019).  The Barton Doctrine originated as a protection for federal receivers, but courts have applied the concept to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including trustees,[44] debtors in

---

[44] *Id.*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1666
Case 3:23-cv-00726-S    Document 8-22    Filed 08/04/23    Page 1780 of 1828    PageID 11273
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1665 of 1803    PageID 12411
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 58 of 106

possession,[45] officers and directors of a debtor,[46] the general partner of the debtor,[47] employees,[48] and attorneys retained by debtors and trustees.[49]   The Barton Doctrine has also been applied to non-court appointed agents who are retained by the trustee for purposes relating to the administration of the estate.[50]   The Barton Doctrine continues to protect those who are within its scope post-Confirmation and post-Effective Date.[51]

97.   The Fifth Circuit has expressly recognized the continuing viability of the Barton Doctrine, notwithstanding the jurisdictional issues raised by *Stern v. Marshall*.[52]   Since the Barton Doctrine is jurisdictional only as to the ability of the prospective plaintiff to file the lawsuit, it does not implicate the issue of expansive post-effective date bankruptcy court jurisdiction as to the actual underlying lawsuit.   Thus, the gatekeeper court can determine if a

---

[45] *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also*, 11 U.S.C §§ 1107(a) of the Bankruptcy Code, providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity.

[46] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 an.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[47] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

[48] *Lawrence v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (affirming dismissal of lawsuit under the Barton Doctrine due to the plaintiff's failure to seek leave in the bankruptcy court to file an action against the trustee and other parties assisting the trustee in carrying out his official duties).

[49] *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[50] *See, e.g., Wells Fargo Fin. Leasing, Inc. v. Jones*, 2015 WL 1393257, at *3-*5 (W.D. Ky. Mar. 25, 2015) (holding that because defendant acted as bankruptcy trustee's agent in performing duties at the direction of and in furtherance of the trustee's responsibilities, claims asserted against defendant were essentially clams against trustee, and court lacked jurisdiction over the claims under *Barton* Doctrine); *Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*, 883 F. Supp. 2d 797, 817 (E.D. Mo. 2012) (property management company engaged by receiver).

[51] *Helmer v. Pogue* at *15, *citing Carter*, 220 F.3d at 1252-53.  *See also, Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972-73 (9th Cir. 2005) (Barton Doctrine applies to trustee of a post-confirmation liquidating trust formed pursuant to a plan of liquidation); *Muratore v. Darr*, 375 F.3d 140, 147 (1st Cir. 2004) (doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands; suit was for malfeasance of trustee in performing his duties filed after estate was closed.)

[52] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (holding that a litigant must still seek authority from the bankruptcy court that appointed the trustee before filing suit even if the bankruptcy court might not have jurisdiction over the suit itself.)

Appellee Appx. 01659
Appx. 104524

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1667
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1781 of 1828 PageID 11274
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1666 of 1803 PageID 12412
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 59 of 106

proposed lawsuit asserts colorable claims, and, if it does, the gatekeeper court can then turn to the separate issue of whether it has jurisdiction over the merits of the lawsuit.

98.    The Barton Doctrine requires a litigant to obtain approval of the appointing or approving court before commencing a suit against court-appointed or court approved officers and their agents – which arguably encompasses most, if not all, of the Protected Parties. The Gatekeeper Provision preserves the integrity of the process, and prevents valuable estate resources from being spent on specious litigation, without impairing the rights of legitimate prospective litigants with potentially valid causes of action. The Gatekeeper Provision is not only a prudent use of the Court's authority under section 105 and is within the spirit of the protections afforded fiduciaries and their agents under the Barton Doctrine – it is also critical to ensuring the success of the Plan.

99.    The Gatekeeper Provision does not effectuate a non-consensual third-party release. It merely requires potential litigants to first vet their alleged causes of action with a single court – the bankruptcy court – before they can be prosecuted. If there has ever been a case where a Gatekeeper Provision is appropriate it is this case. As the Court is well aware, Dondero appears to thrive on litigation. This Court has remarked on many occasions during this case that prepetition, the Debtor operated under a culture of litigation under the control of Dondero. It was the years of sharp practices by the Debtor and an avalanche of litigation against it that resulted in the Debtor commencing a chapter 11 case and the ultimate appointment of the Independent Directors. Faced with impending confirmation and the loss of his company forever, Dondero has turned the tables and the Debtor and the Protected Parties have become his target

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1668
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1782 of 1828   PageID 11275
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1667 of 1803   PageID 12413
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 60 of 106

for litigation.  Left unchecked, there is no doubt that Dondero will continue his litigation crusade after the Effective Date and attempt to thwart implementation of the Plan at every turn by commencing baseless lawsuits.  Requiring this Court, which approved the appointment of the Independent Directors and has extensive familiarity with the Debtor and this case to first determine whether alleged claims are colorable is prudent and within this Court's authority.  Moreover, centralizing the gatekeeper function in one court puts that court in a unique position to ascertain whether there is a pattern of spurious litigation by certain entities and their related parties.

### E.    The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities.

100.    The Fifth Circuit has recognized that in appropriate circumstances, a federal court can enjoin or issue other appropriate sanctions against vexatious litigants – persons who have a history of filing repetitive and spurious litigation for the purposes of harassment and intimidation.  *See* All Writs Act, 28 U.S.C. §1651.  In *Caroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017), the Fifth Circuit held that a bankruptcy court could properly sanction certain debtors as vexatious litigants when the debtors and their various family members continually filed litigation to prevent the bankruptcy trustee from performing his duties.  When considering whether to enjoin future filings, the court must consider the circumstances of the case, including four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

Appellee Appx. 01661
Appx. 04528

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1669
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1783 of 1828   PageID 11276
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1668 of 1803   PageID 12414
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 61 of 106

*Id.* at 815, *citing Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) (*quoting Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004)).

101.    In some circumstances where courts feel that enjoining all future litigation by a vexatious litigant may be too difficult to articulate or have potential due process implications, courts essentially issue a gatekeeper injunction.  *See, e.g., Baum v. Blue Moon Ventures, LLC,* 513 F.3d at 189 (after the bankruptcy court and district court were able to piece together that the Baums interjected themselves in various bankruptcy proceedings by filing vexatious, abusive and harassing litigation, an injunction was entered preventing the Baums from filing litigation without the consent of the district court judge.); *Safir v. United States Lines, Inc.,* 792 F.2d 19, 25 (2d Cir. 1986) (Second Circuit agreed the litigant's conduct warranted a pre-filing injunction, but narrowed the scope such that the litigant had to seek permission from the district court before filing certain types of additional actions.)

102.    Dondero and his Related Entities are the quintessential vexatious litigants, and the Gatekeeper Provision is a legitimate tool for the Bankruptcy Court, properly within the jurisdiction of the Bankruptcy Court, and less burdensome on Dondero and his Related Entities than a full injunction – which the Debtor believes would be justified in seeking in this case.

## VIII.   THE EXCEPTION TO DISCHARGE DOES NOT APPLY

103.    The exception to discharge contained in 11 U.S.C. § 1141(d)(3) does not apply. Section 1141(d)(3) provides that:

> Confirmation of a plan does not discharge a debtor if --
>
> > (A) The plan provides for the liquidation of all or substantially all of the property estate;

(B) The debtor does not engage in business after consummation of the plan; and

(C) The debtor would be denied a discharge under section 727(a) of this title if the case were a case under Chapter 7 of this title.

*See* 11 U.S.C. § 1141(d)(3).

104.    Since the provisions of § 1141(d)(3) are in the conjunctive, if any one of the three prongs of the test is lacking, confirmation of a plan results in the discharge of debt. House Rep. No. 95-595, 95th Cong. 1st Sess. 418-19 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6374-75 ("if all or substantially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, **and** if the debtor would be denied a discharge under section 727 … then the Chapter 11 discharge is not granted.") (emphasis added); *Financial Sec. Assur. v. T-H New Orleans Lt. Pshp. (In re T-H New Orleans Lt. Pshp.)*, 116 F.3d 790, 804 (5th Cir. 1997) ("[T]his section requires that all three requirements be present in order to deny the debtor a discharge."); *In re River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991) (the provisions of § 1141(d)(3) are in the conjunctive).

105.    Here, only subpart C of § 1141(d)(3) clearly applies.[53]  With respect to the subpart A of § 1141(d)(3), here, the Plan clearly provides for a gradual liquidation of all or substantially all the estate's assets.  However, a discharge is nonetheless appropriate because an orderly wind down is anticipated to last for up to two years, and the Reorganized Debtor will continue to manage various funds during that period.  Under similar circumstances, at least one court has suggested that the plan would fall outside the policies of § 1141(d)(3)(A).  *In re Enron Corp.*,

---

[53] As a corporate debtor, the Debtor would not receive a discharge under section 727(a) in a Chapter 7.

Appellee Appx. 01663

APPX. 01526

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1671
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1785 of 1828   PageID 11278
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1670 of 1803   PageID 12416
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 63 of 106

2004 Bankr. LEXIS 2549, **215-17 (Bankr. S.D.N.Y. July 15, 2004) ("[T]the indeterminate period of retention of the assets after the Effective Date and the clear need for ongoing business operations to maximum value for all creditors in liquidating the assets necessitates the application of the section 1141 discharge to the Reorganized Debtors."). Moreover, even if subpart A of § 1141(d)(3) is met, subpart B of § 1141(d)(3) – engaging in business – is lacking. *T-H New Orleans Lt. Pshp.*, 116 F.3d at 804, n. 15 (holding that the reorganized entity's likelihood of conducting business for two years following plan confirmation satisfies § 1141(d)(3)(B)); *In re River Capital Corp.*, 155 B.R. at 387 (discharge warranted where current management stated its intention to continue to engage in business after consummation of the plan).

## IX.    THE SENIOR EMPLOYEE OBJECTION

### A.    The Senior Employee Objection Should Be Overruled

106.    Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent (collectively, the "Senior Employees")[54] filed the Senior Employee Objection. Subsequent to its filing, Mr. Waterhouse and Mr. Surgent executed a Senior Employee Stipulation (as discussed below) and will withdraw their support of the Senior Employee Objection. The only remaining Senior Employees objecting to the Plan are Mr. Ellington and Mr. Leventon. Mr. Ellington and Mr. Leventon argue, among other previously addressed objections, that the Plan is not confirmable because (1) the Plan violates section 1123(a)(4)'s requirement that claims in the same class be treated the same, and (2) the Debtor has prevented the Senior Employees from

---

[54] Although Mr. Ellington and Mr. Leventon are included in the definition of Senior Employees, they were both terminated for cause and are no longer employees of the Debtor.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1672
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1786 of 1828 PageID 11279
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1671 of 1803 PageID 12417
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 64 of 106

making the Convenience Class Election. These objections are meritless, and the Senior Employee Objection should be overruled.

### B. Background Related to Senior Employees

107. The Debtor's employees, including the four Senior Employees, were eligible to receive compensation under two separate bonus plans: an annual bonus plan and deferred compensation plan. Both of these plans required the employee to remain employed as of the applicable vesting date to receive the bonus. On December 4, 2019, the Debtor filed a motion seeking authorization to pay bonuses under these plans, to which the Committee objected to the inclusion of the Senior Employees. At a hearing on the motion, the Debtor agreed to remove the Senior Employees (*see* 1/21/2019 Hearing Tr., Docket No. 393 at 119:21-22), and the motion was granted as presented at the hearing [Docket No. 380]. Accordingly, the rank and file employees were paid on account of their bonuses that vested in 2020, with the exception of the Senior Employees who have vested bonus claims.

108. On May 26, 2020, each of the Senior Employees filed a single proof of claim against the Debtor in an unliquidated amount.[55] *See* Proof of Claim Nos. 192 (claim of Ellington claiming "not less than $7,604,375"); 184 (claim of Leventon claiming "not less than $1,342,379.68"); (collectively, the "Proofs of Claim"). The Proofs of Claim did not provide any calculations or breakdown of amounts to support the minimum claimed.

---

[55] An amended proof of claim was filed by Mr. Ellington on July 16, 2020. Each Senior Employee asserted that a portion thereof, in a liquidated amount pursuant to the statutory cap of section of section 507(a)(4), is entitled to priority under the Bankruptcy Code. In addition, the portion of the claim related to PTO was classified in Class 6 under the Plan.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1673
Case 3:23-cv-00726-S Document 8-22 Filed 10/24/23 Page 1787 of 1828 PageID 11280
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1672 of 1803 PageID 12418
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 65 of 106

109.    Each Proof of Claim sets forth the following with respect to "compensation"

owed:

> Claimant is owed compensation for his services, including, without limitation, (i)
> all salaries and wages; benefits; (ii) bonuses (including performance bonuses,
> retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv)
> retirement contributions, pensions and deferred compensation.  The amount of the
> Claim for such compensation includes both liquidated and unliquidated amounts.

*See* Claim Nos. 192, 182, 184, 183, each at Attachment ¶3.

110.    The official claims register maintained by KCC lists the general unsecured claim

amount for each Senior Employee as "UNLIQUIDATED."  The claim of each Senior Employee

not requiring separate classification under the Plan (*i.e.*, the priority and PTO portions), was

classified as a General Unsecured Claim in Class 8 (each, a "GUC Claim").

111.    On October 27, 2020, during a hearing on the Debtor's then-existing disclosure

statement, this Court and the Committee were highly critical of the proposed plan provisions

concerning employee releases and strongly suggested that the plan was unlikely to be confirmed

as drafted.  As a result, the Debtor began negotiating with the Committee concerning the terms

on which Senior Employees would be permitted to obtain a release.  Ultimately, the Debtor and

the Committee agreed that the Senior Employee would be required to execute a stipulation with

the Debtor providing for the resolution and payment of deferred compensation at reduced rates

and other consideration in exchange for a Plan release.  Specifically, the Senior Employee

Stipulation, if approved by this Court and signed by the Senior Employee, would allow the

"Earned Bonus" (as defined in the Senior Employee Stipulation) portion of the Senior

Employees' to be treated as a separate Convenience Claim (subject to reduction as set forth in

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1674
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1788 of 1828 PageID 11281
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1673 of 1803 PageID 12419
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 66 of 106

the Senior Employee Stipulation). In exchange for this reduction, and together with the Senior Employee's agreement to (a) cooperate with the Claimant Trustee and Reorganized Debtor, (b) refrain from taking certain actions against those parties, and (c) support and vote in favor of the Plan, the Senior Employee would receive a Plan release and the treatment provided with respect to the "Earned Bonus" in the Plan and Senior Employee Stipulation.

112. As part of its settlement discussions with the Senior Employees, the Debtor provided the Senior Employees with a chart outlining how the reduction of the "Earned Bonus" would work if the Senior Employees executed the Senior Employee Stipulation. This chart was the same chart provided to the Committee in connection with the negotiation of the Senior Employee Stipulation. This chart was never publicly-filed and did not contain "representations" or promises. It was a chart provided to the Senior Employees to illustrate how a portion of the Senior Employees' total claims would be treated if they signed the Senior Employee Stipulation and to describe the consideration that the Senior Employee would provide in exchange for the release contained in the Plan. Notably, the Disclosure Statement included the same calculation that was set forth in the chart provided to the Senior Employees.[56]

113. In no world was the chart – provided in settlement discussions and for substantive purposes – a promise to pay.

---

[56] *See* Disclosure Statement, page 71, which states:

> In addition to the obligations set forth in Article IX.D. of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million. That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

Appellee Appx. 01667
Appx. 104524

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1675
Case 3:23-cv-00726-S   Document 8-22   Filed 10/24/23    Page 1789 of 1828   PageID 11282
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1674 of 1803   PageID 12420
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 67 of 106

114.    Despite this, the Senior Employee Objection argues that such chart "shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it separately shows the reduced recovery" if they sign the Senior Employee Stipulation.  The Senior Employees further argue that the chart evidences the Debtor's intent that the Senior Employees could elect Convenience Class treatment of their "Earned Bonus" whether or not they executed the Senior Employee Stipulation.  As set forth above, nothing in the chart supports that argument.  The chart was simply a illustration of how the Senior Employee Stipulation would work if executed and the consideration that would be given by each Senior Employee for the release.[57]

115.    Finally, the Senior Employees' comments were solicited on all but the economic terms of the Senior Employee Stipulation.  The Senior Employees were also encouraged to raise any issues they had with the Senior Employee Stipulation to the Committee and/or this Court. The Senior Employees' counsel at Winston & Straw provided comments on the Senior Employee Stipulation, which both the Debtor and the Committee accepted.  The Senior Employees themselves, however, refused to comment despite having the opportunity to do so and instead demanded that the Debtor retract the Senior Employee Stipulation because it did not reflect an agreement between the Senior Employees and the Debtor. On information and belief,

---

[57] As part of the Plan negotiations, Mr. Seery engaged in multiple conversations with all or some of the Senior Employees. Some of these conversations were with counsel; some were not. In each case, however, the conversations were part of a broader settlement discussion.  During these discussions, the Senior Employees asked questions about how the Senior Employee Stipulation would work but also made blatant threats about how they would react if they were not treated in the manner they deemed appropriate.  Mr. Seery made no promises to the Senior Employees during these conversations.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1676
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1790 of 1828 PageID 11283
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1675 of 1803 PageID 12421
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 68 of 106

the Senior Employees never approached the Committee to discuss the Senior Employee Stipulation. The only communication with this Court has been the Senior Employee Objection.

116. None of the Senior Employees elected to sign the Senior Employee Stipulation. Subsequent to the filing of the Senior Employee Objection, Mr. Seery discussed with Mr. Waterhouse and Mr. Surgent the possibility of signing the Senior Employee Stipulation, and Mr. Waterhouse and Mr. Surgent elected to sign the Senior Employee Stipulation (with certain revisions). However, as Mr. Ellington and Mr. Leventon are not currently employed by the Debtor, they are no longer eligible to sign the Senior Employee Stipulation.

**C.      Treatment of Senior Employee Claims Under Plan**

117. The Plan provides the following treatment to the Class 8 GUC Claims of the Senior Employees:

> Treatment: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

Plan, III.H.8.

118. The Plan provides that a Holder of a General Unsecured Claim may make a "Convenience Class Election" as follows:

> "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim *that is a liquidated Claim as of the Confirmation Date on their Ballot* to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.[58]

---

[58] A "Convenience Claim" is defined as:

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1677
Case 3:23-cv-00726-S  Document 8-22   Filed 08/29/23   Page 1791 of 1828   PageID 11284
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21   Page 1676 of 1803  PageID 12422
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 69 of 106

Plan, I.B.43 (emphasis added).

119.     As discussed above, the Senior Employees' claims are unliquidated and were disclosed as unliquidated on the official claims register maintained by KCC. As unliquidated and unsecured claims, the Senior Employees' claims are, in each case, Class 8 (General Unsecured Claims), and, as holders of unliquidated GUC Claims, none of the Senior Employees were entitled to make the Convenience Class Election.

120.     Irrespective of their claims, the Senior Employees are not entitled to a release under of the Plan unless they execute a Senior Employee Stipulation. *See* Article IX.D.

### D.      Plan Solicitation

121.     Although each of the Senior Employee's GUC Claim was classified *in toto* as Class 8 (General Unsecured Claims), the Senior Employees erroneously received both a Class 7 (Convenience Class) and Class 8 (General Unsecured) Ballot.  Except for Mr. Surgent, each of the Senior Employees voted their Class 8 (General Unsecured Claim) ballot to reject the Plan, and each of the Senior Employees voted their erroneously Class 7 (Convenience Class) ballot to reject the Plan.  Mr. Surgent abstained from voting on the Plan.  Because they have now executed the Senior Employee Stipulation, Mr. Waterhouse and Mr. Surgent's votes will be cast to accept the Plan.

---

any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.
Plan, I.B.41.

DOCS_SF:104855.7 36027/002

### E.    The Plan Does Not Violate Section 1123(a)(4)

122.    Section 1123(a)(4) requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).

123.    The Senior Employees argue that the Plan does not treat them the same as other Employees in the same class because the Senior Employees are not automatically being granted a release under the Plan, whereas other Employees are being granted a release automatically upon confirmation.  However, the Senior Employees conflate treatment of their claims with the decision not to automatically provide them a release.  The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The releases under the plan are not part of the "treatment" of Class 7 or Class 8 claims.

124.    Indeed, the releases granted under the Plan are part of an entirely different section of the Plan (Article IX).  Debtors are not required to grant releases to anyone nor are they required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees.[59]  Nonetheless, the Debtor, after extensive negotiations with the Committee (which did not want to provide *any* release to the Senior Employees) presented the Senior Employees with a mechanism by which the Senior Employees could obtain a release *if* they agreed to the conditions of the Senior Employee

---

[59] Indeed, the grant of third party releases is heavily scrutinized and could not be granted to all general unsecured creditors across the board as part of the Plan's treatment of general unsecured claims.  *See Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01671

Appx. 04526

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1679
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1793 of 1828  PageID 11286
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1678 of 1803  PageID 12424
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 71 of 106

Stipulation.[60]  But just as the Senior Employees were not required to sign the stipulation,[61] the Debtor cannot be forced to provide a release to each Senior Employee just because it has provided releases to other Employees.  Nor would this Court or the Committee have allowed the Debtor to provide releases to the Senior Employees without those Senior Employees providing additional consideration to the Debtor's estate.  As the Court will recall, at the October 28, 2020, the Court specifically told the Debtor that it would be hard-pressed to approve releases to certain of the Debtor's employees if such employees did not provide consideration for the releases.[62] The Senior Employee Stipulation was crafted to address the Court's concerns by conditioning the release of *certain* of the Debtor's employees on the provision of other consideration.

125.    Finally, the Senior Employees devote considerable time arguing that the proposed Senior Employee Stipulation suffers from numerous defects and that the terms are too harsh.  But

---

[60]As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor, they are not eligible to sign the Senior Employee Stipulation.  Accordingly, they are not entitled to a release regardless of the Senior Employee Stipulation.

[61] While voluntary agreement is expressly excepted from section 1123(a)(4) anyway, debtors are permitted to treat one set of claim holders more favorably than another so long as the treatment is not on account of the claim but for distinct, legitimate rights or contributions from the disparately-treated group separate from the claim. *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 925 (8th Cir. 2019).  The Ninth Circuit, for instance, upheld a plan that provided preferential treatment to one of a debtor's shareholders apparently because the preferential treatment was tied to the shareholder's service to the debtor as a director and officer of the debtor, not to the shareholder's ownership interest.  *See In re Acequia, Inc*., 787 F.2d 1352, 1362-63 (9th Cir. 1986) ("[The shareholder's] position as director and officer of the Debtor is separate from her position as an equity security holder."); *see also Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518-19 (5th Cir. 1998) (plan proponent's payments to certain members of power cooperative did not violate § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor]").  Here, too, the release consideration required from the Senior Employees *solely in order for the Senior Employees' to obtain a release* relates to their positions as senior employees rather than their position as general unsecured creditors.

[62] *See* Hearing Transcript, Oct. 28, 2020, at 30:17-22:

> So, and I'll just throw in one last bit of food for thought. . . the Debtor has had a year now, close to a year now, to knock some of these out, you know, maybe reach some compromises with some of the related Highland parties and officers, to maybe participate in the plan with some sort of contribution, and it's just not happening. It's not happening. . . . So, at this point, I would be hard-pressed to protect any nondebtor defendants who aren't ponying up something to the whole plan reorganization process.

65

Appellee Appx. 01672
Appx. 104529

those objections are irrelevant to confirmation.  If the Senior Employees believed that the cost of the release was too high, they had no obligation to sign the Senior Employee Stipulation.

### F.     The Senior Employees Are Not Permitted to Make Convenience Class Election

126.     The Senior Employees next argue that the Debtor has improperly prevented the Senior Employees from electing Convenience Class treatment for a portion of their Claims. Under applicable bankruptcy law, the Plan, and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.[63]   Further, even if the Senior Employees were entitled to elect a Convenience Class Election for a *portion* of their Class 8 Claims for distribution purposes, as discussed below, their Claims are only entitled to be voted in Class 8 for voting and numerosity purposes.

### G.     Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law

127.     The Senior Employees argue that the "Earned Bonus" portion of each GUC Claim is "liquidated"[64] and therefore eligible for the Convenience Class Election.[65]   The "Earned

---

[63] The Senior Employees claim the Debtor's statements contradict the plan; however, any purported contradiction stems from the Senior Employees' misstatement of the Debtor's position.  Indeed, even if the Debtor had made contradictory statements, it is irrelevant.  The Plan says what it says and the Debtor cannot unilaterally change the terms of the Plan with respect to a select group of creditors.  While a Class 7 Ballot was mistakenly sent to the Senior Employees, the Senior Employees cannot make the Convenience Class Election under the Plan because they each hold a single, unliquidated Class 8 Claim.

[64] The Plan did not need to define the term "liquidated."  Generally, a debt is liquidated if the amount due and the date on which it was due are fixed or certain, or when they are ascertainable by reference to (1) an agreement or (2) to a simple mathematical formula.  *In re Visser*, 232 B.R. 362, 364-65 (Bankr. N.D. Tex. 1999).  However, even if the Earned Bonus *portion* is liquidated in that the amount is capable of being ascertained, it is not considered liquidated for purposes of voting where the amount owed or formula for calculation are missing from the proof of claim.  *See In re Lindell Drop Forge Co*., 111 B.R. 137, 142-43 (Bankr. W.D. Mich. 1990); *see also Riemer & Braunstein LLP v. DeGiacomo (A & E 128 North Corp.)*, 528 B.R. 190, 199 (1st Cir. B.A.P. 2015) (court looks to proof of claim forms to determine if they sufficiently demonstrate liquidated claims).

[65] None of the Senior Employees' Proofs of Claim contains any liquidated amount with respect to any component of

---

Appellee Appx. 01673

APPX. 104536

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1681
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1795 of 1828 PageID 11288
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1680 of 1803 PageID 12426
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 73 of 106

Bonus" portion, even if liquidated, is not a standalone claim entitled to make a Convenience

Class Election, nor can the Senior Employees split their GUC Claim after filing a single proof of

claim. The Senior Employees do not cite any law to support their contention that claims of a

single creditor in a given class, set forth in a single proof of claim, may be split into multiple

claims.[66] Indeed, case law holds the opposite. Courts have found that where a claimant files a

single proof of claim, even if it covers multiple debts, he is not entitled to split his claims. *In re*

*Jones*, 2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) (noting that the creditor could have

filed multiple proofs of claim to avoid the issue); *see also In re Latham Lithographic Corp.*, 107

F.2d 749 (2d Cir. 1939) (claimant cannot split claim into multiple claims for the purpose of

creating multiple creditors who could vote in a trustee election). The Senior Employees each

filed a single proof of claim: they cannot split their GUC Claim in order to make the

Convenience Class Election under the Plan and applicable bankruptcy law. And the Plan is clear

on this; no other Holder of an unliquidated or partially liquidated Class 8 claim attempted to split

its claim or make the Convenience Class Election.

---

the GUC Claim, including the "Earned Bonus." The Senior Employees appear to make the stunning assertion that the Debtors' books and records establish whether a claim is liquidated and the amount of such claim, even when the proof of claim lists no such amounts. There is no proof of claim on file listing a liquidated amount, no executed stipulation agreeing on a liquidated amount, and no order of the Court setting a liquidated amount. The Senior Employees' assertion that any portion of their GUC Claims is liquidated is untenable.

[66] The cases the Senior Employees cite only support that separate claims, each covered by a separate proof of claim, **_purchased_** from other creditors, are entitled to be counted as separate claims. *See Figter Ltd. v. Teachers Ins. Annuity Ass'n (In re Figter Ltd.)*, 118 F.3d 635, 640-641 (9th Cir. 1997) (claimant entitled to vote multiple claims where it "purchased a number of separately incurred and separately approved claims (each of which carried one vote) from different creditors"); *Concord Square Apartments v. Ottawa Properties (In re Concord Square Apartments)*, 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) ("purchaser of claims is entitled to a vote for each separate claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) (purchased claim arose out of a separate transaction, evidencing a separate obligation for which a separate proof of claim was filed). Notably, in each of these cases a separate proof of claim had been filed for each separate claim, evidencing an entirely separate obligation, and owed to a different party. Here in contrast, each single Senior Employee filed a single proof of claim, and the "Earned Bonus" is a mere *component* of an overall compensation claim stemming from obligations under an employment contract.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1682

Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1796 of 1828   PageID 11289

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1681 of 1803   PageID 12427

Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 74 of 106

H.      **Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes**

128.    Even if splitting claims contained in a single proof of claim were allowed under applicable case law (which it is not) and the Senior Employees were entitled to make the Convenience Claim Election with respect to a portion of their GUC Claim, this Court's Disclosure Statement Order prohibits the splitting of claims within a given class for voting purposes:

> Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

Disclosure Statement Order ¶ 25.b.

129.    Similarly, paragraph 23 provides:

> For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

*Id*. ¶ 23.h.

130.    Read together, these provisions clearly establish that there can be no claim splitting within a class, and no claim splitting between Class 7 and Class 8.  Accordingly, even if claims classified in a given class set forth in a single proof of claim could be split and the Senior Employee were entitled to make the Convenience Class Election, the Disclosure Statement Order precludes the Senior Employees from splitting their claims for voting purposes.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1683
Case 3:23-cv-00726-S   Document 8-22   Filed 02/29/23   Page 1797 of 1828   PageID 11290
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1682 of 1803   PageID 12428
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 75 of 106

#### I. Even if Convenience Claim Election Were Available, Convenience Claim Election Does Not Impact Voting

131.    Even if the Senior Employees were deemed to hold separate, liquidated claims on account of their "Earned Bonuses" that could be split from the remainder of their GUC Claims, a Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim *for voting purposes*. Specifically, the Class 8 Ballot, approved by the Disclosure Statement Order, provides:

> If you check the box below and elect to have your Class 8 General Unsecured Claim treated as a Class 7 Convenience Claim; ***(i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 8 with respect to the Plan, but your Claim (as reduced) will receive the treatment afforded to Class 7 Convenience Claims;***

Disclosure Statement Order, Exhibit A at 26 (emphasis added).[67]  Accordingly, at most, the Convenience Class Election only impacts the Senior Employees' treatment for distribution purposes.  Moreover, even if the Court finds that Mr. Leventon has a liquidated claim that was entitled to be classified in Class 7 and vote in that class, Mr. Ellington's claim, which exceeds $1 million could not vote in Class 7.  Mr. Ellington would only be entitled to reduce his Class 8 Claim and elect treatment in Class 7 but his claim would otherwise be included in Class 8 for voting purposes.

132.    For each of the foregoing, independent reasons, each Senior Employee holds a single, unliquidated claim in Class 8.  No Senior Employee is entitled to split his GUC Claim under applicable bankruptcy law, and such an action is further prohibited by the Disclosure Statement Order.  Even if any GUC Claim could be split and the Convenience Class Election

---

[67] The Plan itself is also clear that the Convenience Class Election only impacts *treatment*, and does not impact *voting*. *See* Plan, I.B.43; III.H.8.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1684
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23  Page 1798 of 1828  PageID 11291
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1683 of 1803  PageID 12429
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21  Entered 01/22/21 18:52:03  Page 76 of 106

was made, the Convenience Class Election only impacts treatment but does not impact voting. Finally, the Senior Employees' argument that their entitlement to make the Convenience Class Election stems from an erroneously mailed ballot is misplaced. As set forth above, the mailing of the Class 7 Ballot was an administrative error and cannot entitle the Senior Employees to rights that contradict the Plan and the Disclosure Statement Order.

## X.    THE HCMFA/NPA GATES OBJECTION

133.    The Debtor manages fifteen collateralized loan obligations ("<u>CLOs</u>") pursuant to certain agreements, which are referred to sometimes as portfolio management agreements and sometimes as servicer agreements (the "<u>Management Agreements</u>"). Each CLO is a Cayman-domiciled entity that owns a portfolio of loans. They are passive single purpose entities with no ability to self-manage. The CLOs have no employees; however, they do have Cayman-based boards of directors, which have limited duties under Cayman law and which do not actively manage the CLOs. Each CLO contracted with the Debtor as a third-party "Portfolio Manager" to manage the loan portfolio pursuant to the terms of the various Management Agreements. As discussed below, the only parties to the Management Agreements are the Debtor and the respective CLO.

134.    To finance its acquisition of the loans, each CLO issued notes to third party investors. Those notes come in different tranches with different payment priorities. The lowest in priority are called "preference shares," which receive the available residual cash flow after the CLO has made the required payments on the notes. Although called equity, the preference shares are not common equity. The CLOs themselves are purely creatures of contract, and

DOCS_SF:104855.7 36027/002

Appellee Appx. 01677
APPX. 01544

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1685
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1799 of 1828   PageID 11292
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1684 of 1803   PageID 12430
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 77 of 106

investor rights are governed by the terms of the indentures governing the CLOs (collectively, the "Indentures"), the preference share paying agency agreements, and in certain cases the Management Agreements.[68]  The Indentures define the procedures for buying, managing, and selling the CLOs' assets.  *See generally* Indenture § 12.1; Management Agreement § 2. Fiduciary duties under the Investment Advisers Act of 1940 (the "Advisers Act") are owed solely to the CLOs and not their investors.[69]    Nothing in the Indentures or the Management Agreements gives any investor in the CLOs the right to block, interfere with, influence, control, or otherwise direct the asset sale process.  The Management Agreements set forth the Portfolio Manager's duties and obligations and the requirements for removing the Portfolio Manager if investors are not satisfied.

135.    By agreement with CLOs, which are the sole counterparties to the Management Agreements, the Debtor will assume the Management Agreements pursuant to the Plan.  The Debtor and the CLOs have agreed, in summary, that in full satisfaction of the Debtor's cure obligations under section 365(b)(1) of the Bankruptcy Code, the CLOs will receive a total of $525,000, comprising $200,000 within five days of the Effective Date and $325,000 in four equal quarterly payments of $81,250, and that the Debtor and the CLOs will exchange mutual releases.  The Debtor and the CLOs agreed to seek approval of this compromise by adding

---

[68] The Debtor's role is referred to as either the Servicer or Portfolio Manager.  All of the Management Agreements and Indentures are governed by New York law, and the relevant provisions of those agreements are identical in all material respects across the CLOs at issue.

[69] The Debtor's fiduciary duties under the Advisers Act are owed to the CLO, not to its investors.  *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006) (under Section 206 of the Investment Advisers Act of 1940 and other provisions "[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . . If the investors are owed fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.").  The Debtor's duties, as Portfolio Manager, to the underlying investors in the CLO, if any, are prescribed by contract.

DOCS_SF:104855.7 36027/002

language to the Confirmation Order.  A copy of that language is attached hereto as Exhibit C and will be included in the Confirmation Order.

> **A.**  **The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP Joinder Should Be Overruled**

136.    As the Court is well aware, Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA" and, together with HCMFA, the "Advisors"), are controlled by Mr. James Dondero.  Mr. Dondero is also the portfolio manager of each of the investment funds objecting to the Debtor's assumption of the Management Agreements (the "Funds").[70]  The Advisors and three of the Funds have actively interfered in the Debtor's management of the CLOs and sought to exercise management authority over the CLOs.  This Court ruled on these issues in connection with the Advisors and Funds' *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] (the "CLO Motion").

137.    Now, the Funds and Advisors have objected to confirmation of the Plan and are joined only in their objection by other Dondero-controlled entities –the NexPoint RE Partners and CLO Holdco, Ltd. ("CLO Holdco" and, together with the Funds and the Advisors, the "CLO Objectors").  Although the NPA/HCMFA Objection makes different arguments than those contained in the CLO Motion, the goal of the NPA/HCMFA Objection is the same.  It seeks to use this Court to transfer control of the CLOs away from the Debtor and back to Mr. Dondero.

---

[70] The Funds are Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund.

Appellee Appx. 01679

APPX. 104544

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1687
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1801 of 1828  PageID 11294
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1686 of 1803  PageID 12432
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 79 of 106

138.    The CLO Objectors contend that the Advisers Act prohibits assignment of the Management Agreements and/or that they are non-assignable personal service contracts.  From this, the CLO Objectors argue that the Management Agreements may not be assumed by the Debtor under Section 365(c) because the "*hypothetical test*" applies in the Fifth Circuit.  They also contend that there is inadequate assurance of future performance because of staff reductions and that the contracts are being modified and thus are being only partially (and so impermissibly) assumed.  The CLO Objectors also speculate that they may be harmed by future investment decisions made by the Debtor because the time-frame contemplated by the Plan for disposition of assets may be shorter than what they believe is optimal to maximize the value of the preference shares.  The objections should be overruled on several grounds:

- The contract counterparties – the CLOs – consent to assumption and will release the Debtor from all claims.

- The CLO Objectors are non-contracting parties with no standing to object on behalf of the CLOs and have pointed to no contractual basis for their assertion of management authority over the CLOs.

- The CLO Objectors cannot create standing by asserting they are creditors of the estate.  Each CLO Objector agreed to the expungement of its claims or has no claims.

- Even if the CLO Objectors were creditors, their standing to object to assumption would be limited to whether it benefits the Estate, and they would *still* lack standing to assert rights belonging to the contracting parties.

- Even if the CLO Objectors had the right to object to assignment, that does not give them the standing to object to the Debtor's assumption of the Management Agreements.

- Even if the Management Agreements were non-assignable, the Debtor could still assume the Management Agreements without consent because the *actual test* applies in the Fifth Circuit.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1688
Case 3:23-cv-00726-S   Document 8-22   Filed 10/29/23   Page 1802 of 1828   PageID 11295
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1687 of 1803   PageID 12433
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 80 of 106

- Even if the *hypothetical test* applies, "applicable law" does not prevent assignment of the Management Agreements.

- There is no detriment to the Estate in assuming the Management Agreements, and there is no mismatch in investing timelines between the Debtor and the CLOs' investors.

**B.     The CLO Objectors Cannot Override the CLOs' Consent to Assumption**

139.    The Debtor and its counterparties (the CLOs) agreed to the assumption of the Management Agreements.  Any objections were waived.  Hence the CLO Objectors' argument is *not* that there is no consent to assume the Management Agreements; it is that the *correct* party has not consented.  In other words, the CLO Objectors are arguing that the CLO Objectors (and therefore Mr. Dondero) have the authority and prerogative to dictate the actions of the CLOs and whether the CLOs should consent to assumption.  This has to be the CLO Objectors' argument because unless the CLO Objectors have such right, they have no standing as non-contracting parties to object under section 365 to the assumption of the Management Agreements.

140.    Only parties to contracts have standing to object to assumption, even when the objector claims that assumption will result in a breach of that contract or violate the law.  *See Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.*), 278 B.R. 714, 718-19 (Bankr. D. Del. 2002), *aff'd*, 280 B.R. 808 (D. Del. 2002), 57 F. App'x 912 (3d Cir. 2003).  As the district court explained:

> The language of section 365 is clearly intended to protect the rights of those persons or entities who share contractual relationships with the debtors. In other words, in order to invoke the protections provided in section 365, an entity must be a party to a contract with the debtor.

> \* \* \*

> Although section 365 does confer the right to refuse assignment where excused by applicable law, that right is nevertheless conferred only upon parties to the

DOCS_SF:104855.7 36027/002

**Appellee Appx. 01681**

**APPX. 104548**

contracts at issue. It creates no separate right of enforcement for other creditors of the estate who are not parties to the contract. Therefore, even if the appellants feel that the alleged violation of the law may effect them, they have not demonstrated that they have the legal right to enjoin such a violation.

*Hertz Corp. v. ANC Rental Corp. (In Re ANC Rental Corp.)*, 280 B.R. 808, 817-18 (D. Del. 2002); *see also Cargill, Inc. v. Nelson (In re LGX, LLC)*, 2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) (creditor had standing on whether court should approve settlement between trustee and another creditor, but no standing under § 365 on whether quitclaim license from trustee to that creditor violated applicable patent law because it was not party to contract); *In re Riverside Nursing Home*, 43 B.R. 682, 685 (Bankr. S.D.N.Y. 1984) (assignee of rents is not "party to such contract or lease" so as to confer standing under section 365); *In re Irwin Yacht Sales, Inc.*, 164 B.R. 678 (Bankr. M.D. Fla. 1994) (denying standing to co-owner notwithstanding her economic interest since she was not party to the lease); *see also ANC Rental*, 57 F. App'x at 916 (citations omitted) ("Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.")

141.    The only parties to the Management Agreements are the Debtor and the respective CLOs. Consequently, the CLO Objectors are effectively asking the Court to treat them as the contracting parties, so that they, rather than the CLOs, may decide whether to oppose assumption. But an adjudication of the CLO Objectors' rights vis-à-vis the CLOs is not before the Court. Regardless, this assertion of management authority over the CLOs was already

DOCS_SF:104855.7 36027/002

rejected by Court as "almost Rule 11 frivolous." In the CLO Motion, the movants sought to restrict sales of the CLOs' assets on terms that they believed might be disadvantageous to the holders of preference shares, but they could not substantiate any contractual basis for the exercise of such management authority.[71]

142.    The only acknowledgement of this Court's ruling in the NPA/HCMFA Objection is offered in a footnote, in which the CLO Objectors suggest that the issues are different "in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed."[72] In all honesty, the Debtor has no idea what the Objector's statement means, but whatever it means, the underlying issue and rationale are the same here as in the CLO Motion. As before, the issue is who has the right to make business decisions for the CLOs, and in both the CLO Motion and here, the proffered justification is a nonspecific risk that investment decisions may be made with which the CLO Objectors disagree.

**C.**    **The CLO Objectors Lack Standing to Object to the Plan**

      **1.**    **The CLO Objectors Rights Under the Management Agreements Are Not Affected by the Plan**

---

[71] 12/16/20 Tr. of Proceedings at 64:1-10.

     This is almost Rule 11 frivolous to me. You know, we're -- we didn't have a Rule 11 motion filed, and, you know, I guess, frankly, I'm glad that a week before the holidays begin we don't have that, but that's how bad I think it was, Mr. Wright [of K&L Gates] and Mr. Norris. This is a very, very frivolous motion. Again, no statutory basis for it. No contractual basis. You know, you didn't even walk me through the provisions of the contracts. I guess that would have been fruitless. But you haven't even shown something resembling, some lack of reasonable business judgment.

[72] The CLO Objectors state: "The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis." Obj. at 5, n. 4.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01683

Appx. 01546

143.    The CLO Objectors offer four bases for standing in the Objection.  The first is that "in several of the Servicing Agreements, the CLO Objectors have the right to remove the Debtor or to control who the servicer under the agreements is.  They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements.  Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the CLO Objectors have standing to object to their rights being limited or eliminated."  Obj. at 27.  Elsewhere they state that the Management Agreements "generally allow the holders of preference shares to remove the portfolio manager for cause" and may provide for a certain percentage of holders of Preference Shares to remove a manager without cause. Obj. at 11.

144.    As an initial matter, nowhere in the NREP Joinder do any of the NexPoint RE Partners allege or state that they have any interest in the CLOs.  Without an interest in the CLOs, the NexPoint RE Partners cannot allege that any of their rights are affected.  Further, nowhere in the NPA/HCMFA Objection is there any attempt to establish any basis on which the CLO Objectors are presently entitled to replace the Debtor as the Portfolio Manager or authorized to decide for the CLOs whether the CLOs should consent to the Debtor's assumption of the Management Agreements.  This is telling.

145.    As set forth in the Management Agreements, the Debtor can only be removed as Portfolio Manager *for cause* by a majority of the preference shares that are *not* held by affiliates of the Debtor.  By the CLO Objectors own admission, they only hold a majority of the preference shares in eight of the fifteen CLOs at issue.  That means that the CLO Objectors have

Appellee Appx. 01684

APPX. 104549

*no* right to remove the Portfolio Manager in approximately half of the Management Agreements. However, even with respect to the CLOs in which they hold a majority of the preference shares, the CLO Objectors cannot remove the Debtor unless cause exists – and cause does not exist. Moreover, the CLO Objectors, under the Management Agreements, are prohibited from replacing the Debtor because each of the CLO Objectors should be considered an affiliate of the Debtor for purposes of the Management Agreements and therefore be prohibited from exercising removal rights. Finally, on January 9, 2020, this Court entered an order (the "January Order"), which, in pertinent part, stated that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor." [Docket No. 339] It is beyond dispute that each of the CLO Objectors is for all intents and purposes Mr. Dondero, and Mr. Dondero should not be allowed to do by proxy what he was prohibited by this Court from doing directly.

146.    However, whether the CLO Objectors have the right to remove and replace the Debtor as Portfolio Manager is not a question that will be decided by the Plan nor will the CLO Objectors' rights to remove the Debtor – whatever they are – be impacted by the Plan. On January 6, 2021, the Debtor filed that certain *Debtor's Memorandum of Law in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero*, Adv. Proc. No. 20-03000-sgj, Docket No. 6] (the "Adversary Complaint"). In the Adversary Complaint, the Debtor seeks a declaratory judgment that the CLO Objectors have no right to replace the Debtor under the Management Agreements for the reasons set forth above, among others. The CLO Objectors should assert their rights, if any, at the hearing on the Adversary Complaint, not through an objection to

78

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1693
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1807 of 1828   PageID 11300
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1692 of 1803   PageID 12438
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 85 of 106

assumption.  Consequently, the CLO Objectors' rights, if any, under the Management Agreement will be determined by this Court in a separate hearing, and will not be impacted by the Plan.

### 2. The CLO Objectors Lack Standing to Object to Assumption as Creditors or Parties in Interest

147.    Two of the CLO Objectors' four claimed bases for standing are that they are creditors, or at least parties in interest, and as such have standing to object to assumption of the Management Agreements "especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole," and under sections 1129(a)(1)-(3) because assumption of the Management Agreements purportedly violates the law. Obj. at 27.  These arguments fail for numerous reasons.

148.    First, these arguments for standing are circular.  If a party lacks standing to object to assumption of a contract because it has no protected interest in the contract under section 365, it cannot argue that a plan should not be confirmed because of the assumption of such contract. A party cannot use an objection to a plan to create standing under section 365.

149.    Second, the CLO Objectors are not creditors.  As set forth in the Memorandum, each of the Advisors, the Funds, and CLO Holdco filed claims in this Case; however, each of those parties voluntarily agreed to have their Claims expunged or reduced to $0.00.  None of the NexPoint RE Entities filed claims.  As such, the CLO Objectors are barred from asserting that they have prepetition claims against the Debtor or its Estate.  The CLO Objectors also cannot create claims by asserting that they will have claims arising from the rejection of the shared services agreements with the Debtor.  *None* of the shared services agreements are being rejected. Each of the shared services agreements is freely terminable.  In November 2020, the Debtor

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1694
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23    Page 1808 of 1828   PageID 11301
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1693 of 1803   PageID 12439
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 86 of 106

provided notice that the shared services and other agreements were being terminated.   Such agreements will terminate no later than January 31, 2021, which is prior to the anticipated Effective Date of the Plan.  Because none of the shared services agreements are being rejected, none of the CLO Objectors will have a rejection damages claim.

150.    Third, *even if* any of the CLO Objectors were creditors: "[E]ven creditors do not have standing to raise the rights of a landlord or contract party under section 365. . . While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another."  *In re ANC Rental*, 278 B.R. at 718-19 (citations omitted).   As the bankruptcy court held in *ANC Rental*, the CLO Objectors cannot usurp the CLO's standing to object to assumption.

151.    Fourth, as set forth below, there is no "applicable law" prohibiting assumption and/or assignment for purposes of Section 365(c) and therefore no argument under section 1129(a).  Each of the Management Agreements can be assumed and could be assigned without the consent of any party (although the CLOs have consented to assignment).  Therefore, there is no violation of law.

152.    Finally, the CLO Objectors cannot boot strap into standing by arguing that the assumption of the Management Agreements will not benefit the estate.  First, it is anticipated that the Debtor's chief executive officer and chief restructuring officer will testify as to how assumption benefits the estate.  Second, granting the relief requested by the CLO Objectors would be catastrophic to the Debtor's estate.  The Debtor's inability to assume the Management

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1695
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1809 of 1828   PageID 11302
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1694 of 1803   PageID 12440
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 87 of 106

Agreements does not mean that the CLO Objectors will be magically installed as Portfolio Manager.  It means that the Management Agreements will be rejected and that *none* of the CLOs will have a Portfolio Manager following the Confirmation Date.  Any damage to the CLOs will presumably be part of the claims asserted by the CLOs against the Debtor in connection with that rejection.  Those claims are currently incalculable.  The Debtor also has exposure to each of the CLOs and any loss in value caused by having no Portfolio Manager would directly impact the Reorganized Debtor's and Claimant Trust's assets.  Even assuming the CLO Objectors can appoint themselves Portfolio Manager in the CLOs in which they hold a majority of the preference shares (which is contested and which in no event would happen by the Confirmation Date), that still leaves approximately half of the CLOs without a manager.  It is beyond disingenuous for the CLO Objectors to argue that there is no benefit to the estate in assuming the Management Agreements while at the same time arguing that those same agreements should be rejected with the Debtor suffering the consequences.

### 3.    The Contractual Right to Object to Assignment of the Management Agreements Does Not Create Standing to Object to Their Assumption

153.    The fourth and final basis for standing is: "[I]n several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the CLO Objectors. The CLO Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the CLO Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the CLO Objectors."  Obj. at 28.

DOCS_SF:104855.7 36027/002

154.    For purposes of standing, the CLO Objectors asserted contractual right to object to assignment of the Management Agreements is irrelevant, for three reasons.  First, there is no assignment here.  The Debtor is assuming the Management Agreements with the consent of the CLOs.  Second, even if it were correct that (a) the CLO Objectors have a contractual right to object to assignment, and (b) the *hypothetical test* applies, they still have no interest in the contract that would permit them to enforce section 365's protections for their benefit in derogation of the rights of the actual contracting parties.  Third, as discussed immediately below, the *actual test* applies in the Fifth Circuit, and thus the Management Agreements would be assumable even if they were not assignable.

**D.**    **Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit**

155.    As the CLO Objectors recognize, there is a split of authority among the circuits regarding the appropriate test to apply to determine whether:

- a contract that is otherwise non-assignable under applicable non-bankruptcy law  can be assumed by a debtor  under Bankruptcy Code section 365(c)(1); and

- whether the same contract can be terminated if it contains an "ipso facto" clause pursuant to Bankruptcy Code section 365(e)(2)(A).

The Fifth Circuit has ordered lower courts to apply the so-called *actual test* in considering whether an ipso facto termination clause can be enforced under Bankruptcy Code section 365(e)(2)(A).  For the reasons set forth below, even though the Fifth Circuit has not ruled on the issue directly, the *actual test* has been applied by every bankruptcy court that has considered the issue in the Fifth Circuit to assumption of contracts under Bankruptcy Code section 365(c)(1).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1697
Case 3:23-cv-00726-S Document 8-22 Filed 02/29/23 Page 1811 of 1828 PageID 11304
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1696 of 1803 PageID 12442
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 89 of 106

Accordingly, the *actual test* should be applied in this Case to conclude that the Management Contracts can be assumed by the Reorganized Debtor without the consent of any party.

156. The Fifth Circuit's decision in *Bonneville Power Administration v. Mirant Corporation* applied the *actual test* to a determination of whether a contract can be terminated as a result of the filing of a bankruptcy case under Bankruptcy Code section 365(e)(2). *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir. 2006). The reasoning in *Mirant* also supports application of the *actual test* to Bankruptcy Code section 365(c)(1). Specifically, in *Mirant,* a non-debtor counterparty sought to terminate its executory contract with the chapter 11 debtor based on an ipso facto clause after the debtor filed for bankruptcy. In support of its argument, the non-debtor counterparty relied on section 365(e)(2)(A) and asserted that, under applicable law, the Anti-Assignment Act, 41 U.S.C. § 15 (which generally prohibits the transfer of contracts to which the United States is a party), it was excused from accepting performance from or rendering performance to the trustee or an assignee. Critically, in reaching its conclusion that the *actual test* applied, the Fifth Circuit relied on cases analyzing section 365(c)(1).

157. While the CLO Objectors would like this Court to believe there is some risk that if faced with the direct question of whether the *actual* test also applies under section 365(c)(1), the Fifth Circuit would reach a different result, that argument strains credibility. Notwithstanding the technical language differences[73] between the two statutes, the same test

---

[73] Subsection (e)(2) provides that the invalidation of ipso facto clauses does not apply to an executory contract where "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties[.]" 11 U.S.C. § 365(e)(2). This language is very similar—but not identical—to the language employed by subsection (c)(1), which speaks to excusing

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22     Entered 08/15/22 16:45:41     Page 1698
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1812 of 1828   PageID 11305
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1697 of 1803   PageID 12443
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 90 of 106

must apply to both the assumption of a contract under section 365(c)(1) and the termination of a contract under section 365(e)(2)(A).  There is no logical reading of these two subsections that would support application of different tests.  The language of section 365(e)(2)(A) is intended to allow the counterparty to a contract that cannot be assumed or assigned to enforce its remedy of termination so that it is not in limbo while the bankruptcy case proceeds.  Section 365(c) cannot be read in isolation from the other subsections.  It would make no sense for a court to hold that a contract cannot be assumed because the *hypothetical test* applies, but nonetheless cannot be terminated because the *actual test* applies.  For this reason, every lower court in the Fifth Circuit that has considered the issue has held that the *actual test* applies to a debtor's assumption of contracts under section 365(c).  *See In re Virgin Offshore USA, Inc.*, No. 13-79, 2013 U.S. Dist. LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013):

> Though the *Mirant* court used the actual test in the context of § 365(e), which was not amended in the same way as § 365(c) and thus is not subject to the same circuit split, the Court nonetheless finds this decision to be an indicator of the way that the Fifth Circuit would undertake an analysis under § 365(c).  Further, in *In re O'Connor*, the Fifth Circuit appears to have applied an actual test to determine that a partnership interest was strictly personal under Louisiana law, thus not assumable under § 365(c).  The court did not expressly adopt the actual test because, regardless of the test applied, the partnership interest would have been unassumable under § 365(c); however, the language used in the opinion indicated a predilection for the actual test.

*See also In re Jacobsen*, 465 B.R. 102, 105-06 (Bankr. N.D. Miss. 2011); *Cajun Elec. Members Comm. v. Mabey (In re Cajun Elec. Power Coop., Inc.)*, 230 B.R. 693, 705 (Bankr. M.D. La. 1999); *In re Lil' Things, Inc.,* 220 B.R. 583, 587 (Bankr. N.D. Tex. 1998); *Texaco Inc. v. Louisiana Land & Exploration Co.,* 136 B.R. 658, 669 (Bankr. M.D. La.1992); *In re Hartec*

---

performance from, or rendering performance to, "an entity other than the debtor or the debtor in possession" as opposed to just "the trustee or [] an assignee." Compare *id*. § 365(c)(1) with § 365(e)(2).

Appellee Appx. 01691
APPX. 01556

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1699
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1813 of 1828 PageID 11306
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1698 of 1803 PageID 12444
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 91 of 106

*Enters., Inc.,* 117 B.R. 865, 871 (Bankr. W.D. Tex. 1990), *vacated by settlement,* 130 B.R. 929

(W.D.Tex. 1991).

158.   Moreover, other bankruptcy courts within the Fifth Circuit have expressly

rejected the *hypothetical test*, concluding that:

> If the court were to adopt the [hypothetical test] and focus primarily upon
> assignability, a chapter [sic] 11 filing would have the virtual effect of rejecting
> executory contracts covered by section 365(f). As suggested by the court in
> *Texaco,* this analysis would extend section "365(c) beyond its fair meaning and
> intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's
> enterprise."

*Cajun Elec.,* 230 B.R.at 705 (Bankr. M.D. La. 1999) (quoting *Texaco,* 136 B.R. at 670).

159.   The CLO Objectors prediction that the Fifth Circuit would apply a different test

under subsection 365(c) than it does under 365(e) is based solely on the use of the word "or"

rather than "and" in subsection 365(c).  However, the language cited by the CLO Objectors in

the statute is the same language that was considered by each of the lower courts in the Fifth

Circuit; each of those courts nonetheless applied the *actual test*.  The CLO Objectors reading is

overly simplistic and imposes a literal reading that, as noted by the *Cajun Electric* Court above,

is "beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation

of the debtor's enterprise."  *Id.*  Accordingly, the argument that assumption of the Management

Contracts must be evaluated using the *hypothetical test* is unavailing and contrary to this

Circuit's case law.

DOCS_SF:104855.7 36027/002

E.      **Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable**

160.    The CLO Objectors, assuming the *hypothetical test* applies, contend the Management Agreements cannot be assigned or assumed under section 365(c)(1) without the consent of the contracting party because they are non-assignable personal services contracts and because Section 205(a)(2) of the Advisers Act proscribes assignment of such contracts without consent.  Under these circumstances, the CLO Objectors argue that "applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from . . . an entity other than the debtor. . . ."  11 U.S.C. § 365(c)(1)(A).

161.    This Court has previously (and correctly) rejected both of these arguments – at that time made by the Debtor under the control of Mr. Dondero – in *In re Acis Capital Management, L.P., et al*, Case No. 18-30264-sgj, Docket No. 549 (Bankr. N.D. Tex. Aug. 30, 2018) (the "Acis Order").  In the Acis Order, this Court held that: (a) the portfolio management agreements at issue were not personal services contracts; and (b) Section 205(a)(2) of the Advisers Act is not "applicable law" precluding assignment under section 365.  Specifically, this Court ruled as follows:

> The court overrules any objection that there is some applicable law that excuses the counterparties to the PMAs [portfolio management agreements] (i.e., the CLO Issuers) from accepting performance from a party other than the debtor. First, these are not personal services contracts. . . . [I]n order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable. Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. If this were the standard, the exception would swallow the rule – any prudent party contracting for another's services considers the other party's skill, expertise, and reputation – and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party

86

Appellee Appx. 01693

APPX. 104550

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1701
Case 3:23-cv-00726-S  Document 8-22  Filed 04/29/23    Page 1815 of 1828    PageID 11308
Case 3:21-cv-00879-K  Document 21   Filed 07/28/21    Page 1700 of 1803    PageID 12446
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 93 of 106

providing services is skilled and reputable – it is whether such services are unique in nature.  *See Compass Van & Storage Corp.*, 65 B.R. at 1011. . . . Here. . . [p]ursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs.  While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique – as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers.  Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties: "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii).  And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement."  *Id.* § 14(a).  Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager."  Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." . . .  As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." . . .  Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2).

Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision – the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs.  Indeed, in the Southern District of New York, the court held:

> "Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1702
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1816 of 1828 PageID 11309
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1701 of 1803 PageID 12447
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 94 of 106

> investment adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2)."

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the counterparties to the PMAs from accepting or rendering performance without such consent.

162. For the exact reasons found by this Court in the Acis Order, the CLO Objectors' argument that "applicable law" prevents assignment under 11 U.S.C. § 365(c) should be overruled. First, the Management Agreements are on all fours with the management agreements discussed in the Acis Order. The Management Agreements have the same delegation provisions, the same assignment provisions, and the same provisions on merger, consolidation, and amalgamation.[74] The Court has already ruled on these exact agreements and found that they preclude a finding that the Management Agreements are personal services contracts.

---

[74] *See, e.g.,* Servicing Agreement, dated as of November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. ("Grayson Agreement"):

> In providing services hereunder the Servicer may employ third parties including its Affiliates to render advice including advice with respect to the servicing of the Collateral and assistance provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.

(*Id.*, § 2(d))

> In addition any successor Servicer must be an established institution which has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder

(*Id.*, § 12(e))

> Any corporation partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated or any corporation partnership or limited liability company resulting from any merger conversion or consolidation to which the Servicer shall be party or any corporation partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer shall be the successor to the Servicer without any further action by the Servicer the Co-Issuers the Trustee the

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1703
Case 3:23-cv-00726-S   Document 8-22   Filed 10/29/23    Page 1817 of 1828   PageID 11310
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1702 of 1803   PageID 12448
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 95 of 106

163.    Second, as this Court ruled, the Advisers Act does not prohibit assignment without consent.  It simply requires that an advisory agreement contain certain language and that any failure to obtain consent is a breach, not a nullification of the assignment.  If the CLO Objectors had done their diligence, they would have realized that the Acis Order is not unique. The SEC has expressly stated that:

> Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2).

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter (12/23/1997); *see also* Investment Management Staff Issues of Interest, http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ("In particular, the staff previously has clarified that Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent.  The section merely provides that the contract must contain the specified provision.").

164.    As such, there is no applicable law prohibiting the assignment – let alone the assumption – of the Management Agreements.  "[F]or section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue."  *In re ANC Rental Corp.*, 277 B.R. 226, 236 (Bankr. D. Del. 2002).

---

Noteholders or any other person or entity

(*Id.*, § 31)

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1704
Case 3:23-cv-00726-S   Document 8-22   Filed 04/29/23   Page 1818 of 1828   PageID 11311
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1703 of 1803   PageID 12449
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 96 of 106

### F.    The Inadequate Assurance of Future Performance Objection is Meritless

165.    The CLO Objectors contend that the reorganized Debtor will have inadequate resources to perform its obligations under the Management Agreements, and so has not given adequate assurance of future performance.  The CLO Objectors also allege that there is a mismatch between the Debtor's investment timeline and the timeline expected by the investors in the CLOs.  Both of those arguments fail.  First, assurance of future performance is a protection conferred by section 365 on contracting parties, which the CLO Objectors are not.  They lack standing to invoke it when the actual contracting parties – the CLOs – are satisfied.  Second, even if they had standing, the objection is without merit.  The CLO Objectors argue (i) because the Debtor is terminating all of its employees, it will not be able to manage the CLOs post-Effective Date and (ii) the Debtor cannot hire a Sub-Servicer to manage the CLOs without violating the Management Agreements.  As an initial matter, the Debtor is not retaining a Sub-Servicer to manage the CLOs, and, although the Debtor will terminate a number of employees, it will retain sufficient and appropriate staff to manage the CLOs post-Effective Date.  However, even if the Debtor were terminating all employees, the Management Agreements *expressly* allow the Debtor to retain a Sub-Servicer to manage the CLOs.[75]

166.    Similarly, the CLO Objectors' contention that the Debtor's timeline for monetizing the assets in the CLOs is contrary to the timeline expected by the CLOs' investors also ignores the facts.  As disclosed in the CLOs' offering memoranda, the notes and preference shares issued by the CLOs have come due or will, with two exceptions, come due shortly.

---

[75] *See* Grayson Agreement, § 2(d) ("In providing services hereunder **the Servicer may employ third parties** including its Affiliates **to render advice including advice with respect to the servicing of the Collateral and assistance** provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.") (emphasis added).

DOCS_SF:104855.7 36027/002

| **CLO** | **Note Maturity** | **Preference Share Redemption** |
|---|---|---|
| Aberdeen | November 2018 | November 2018 |
| Brentwood | February 2022 | February 2022 |
| Eastwood | May 2022 | May 2022 |
| Gleneagles | November 2017 | November 2017 |
| Grayson | November 2021 | November 2021 |
| Greenbriar | November 2021 | November 2021 |
| Highland Legacy Limited | June 2011 | N/A |
| Highland Loan Funding V | August 2014 | August 2014 |
| Highland Park CDO I | November 2051 | November 2051 |
| Jasper | August 2017 | August 2017 |
| Pam Capital | May 2010 | N/A |
| PamCo | August 2009 | N/A |
| Red River | July 2018 | July 2018 |
| Rockwall | August 2021 | N/A |
| Rockwall II | August 2021 | N/A |
| Southfork | February 2017 | February 2017 |
| Stratford | November 2021 | November 2021 |
| Valhalla | April 2038 | April 2038 |
| Westchester | August 2022 | August 2022 |

As such, there is no mismatch between the expectations of the CLOs' investors and the Debtor. With the exception of the CLO Objectors who presumably want the CLOs to stay extant forever, the expectations of the CLOs' investors are set by the offering memoranda, which clearly disclose the expected timeline for the CLOs.

167.    Finally, the disingenuousness of the CLO Objectors' arguments on future performance cannot be overstated.  The CLO Objectors are arguing that the Debtor must *reject* the Management Agreements because – in their estimation – the Reorganized Debtor will not be able to satisfactorily manage the CLOs.  The CLO Objectors' argument is therefore that it is

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1706
Case 3:23-cv-00726-S   Document 8-22   Filed 10/04/23    Page 1820 of 1828   PageID 11313
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1705 of 1803   PageID 12451
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 98 of 106

better for the CLOs to have no manager at all.  The CLO Objectors arguments are an abject

danger to the Estate and could create potential liability in the millions of dollars.

### G.    The "Impermissible Partial Assignment" Objection is Meritless

168.    The CLO Objectors contend that their rights are being modified by the Debtor's

assumption of the Management Agreements, effectively resulting in an impermissible "partial

assumption" of the contracts.  Once again, they are not contracting parties with standing to object

on this basis.  But even if they were, the factual predicate is missing.  The Management

Agreements are being assumed *in toto*.  There is no modification of any contract rights of the

CLO Objectors.  And, as set forth above, the Debtor filed the Adversary Complaint in which it

sought a declaratory judgment on the CLO Objectors' rights to replace the Debtor as Portfolio

Manager under the Management Agreements.  Regardless of whether the Plan is confirmed, the

CLO Objectors will have their rights under the Management Agreements as those rights are

determined by this Court in connection with the adjudication of the Adversary Complaint.

### XI.    STATE TAXING AUTHORITY OBJECTION

169.    Following the filing of the State Taxing Authority Objection, the Debtor reached

out to Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County

(collectively, the "State Authorities") to see whether the State Taxing Authority Objection could

be resolved consensually.  Although the Debtor and the State Taxing Authority have not yet

reached resolution, the Debtor is optimistic that the State Taxing Authority Objection will be

resolved and will continue working with the State Authorities.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01699
APPX. 104564

## XII.    IRS OBJECTION

170.    The Internal Revenue Service ("IRS") raises three objections to the Plan in the IRS Objection, two of which are not controversial, and the Debtor has amended the plan to address these points.

171.    First, in paragraph 1 of the IRS Objection, the IRS requests that the Debtor provide it with interest on account of its Allowed Claim as required under 11 U.S.C. 1129(a)(9)(C).  The Plan previously provided for payment of the full amount of the Allowed Priority Tax Claims (which would include any applicable interest on account of such Allowed Claim) on the Initial Distribution Date in order to fully satisfy these tax claims and avoid the incurrence of any unnecessary interest.  To clarify this issue and resolve this first objection, the Debtor has amended the Plan to provide for an additional treatment mechanism that provides that Allowed Claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code in the event the entirety of the IRS's Allowed Claims (inclusive of any interest pursuant to which such claims are entitled to) are not paid on the Initial Distribution Date, as provided in section II.C of the Plan.

172.    Second, in paragraph 3 of the IRS Objection, the IRS argues that its claims should not be "fixed" unless and until any required tax returns are filed.  The Debtor does not dispute this contention and believes that the proposed language that was provided to the IRS and reprinted below addresses this concern because it provides that the IRS's claims shall survive the bankruptcy as if the cases had not yet been filed, which is standard in chapter 11 confirmation orders.  Further, the Debtor believes that it has filed all applicable returns but, in an effort to resolve the IRS Objection, proposes the language below.

93

173.    In paragraph 2 of the IRS Objection, the IRS asserts that it has no record of the Debtor having filed its Form 720 with respect to its self-insured health plan for the June 30, 2014, June 30, 2016 and June 30, 2018 tax periods.  Because of this alleged non-compliance, the IRS proposes certain default provisions detailed in the chart below (the "Default Provisions"). The Debtor asserts that the Default Provisions are not warranted because that Debtor has filed all applicable tax returns.  Specifically, with respect to Form 720, on April 22, 2020, the Debtor responded to an IRS inquiry about the forms and provided an explanation about forms which were not required and provided the IRS with Form 720 for the 2015, 2016 and 2017 tax periods. Further the Default Provisions are not warranted because the IRS has adequate collection and enforcement remedies available through applicable law and should not be granted additional remedies through the Plan.  Finally, the Default Provisions are vague and contain undefined terms which will result in confusion if enforcement is ever attempted.  Certain examples of these problems are discussed below.

174.    Default Provision (1) provides certain remedies to the IRS in the event of certain failures to pay taxes or timely file returns by the Debtor, the Reorganized Debtor or any successor in interest.  The Debtor asserts that the Default Provisions are unnecessary since the Debtor has provided all applicable returns.  Default Provisions (2) and (3) are not needed and are problematic because of their vagueness.  The Debtor would agree to Default Provision (1) provided that it is clarified to state that nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that

Appellee Appx. 01701

APPX. 01568

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1709
Case 3:23-cv-00726-S Document 8-22 Filed 04/29/23 Page 1823 of 1828 PageID 11316
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1708 of 1803 PageID 12454
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 101 of 106

the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States.

175. Default Provision (2), presumably intended to provide remedies in addition to those provided under Default Provision (1), would allow the IRS to declare the Debtor to be in **"default"** if the certain failures were not cured within fourteen (14) days and then the **"entire imposed liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, an/or any successor in interest."** The term **"entire imposed liability"** is not defined in the proposed Default Provision. The ability of the IRS to unilaterally declare the Debtor to be in default and the imposition of a fourteen (14) day deadline is inappropriate and the IRS should rely on applicable law without imposing additional requirements through the confirmation process. Further, if this provision is intended to cut off the Debtor's right to challenge any obligation that is asserted against it by the IRS, it goes beyond applicable law and would deprive the Debtor of valuable rights to legitimately challenge such asserted amounts, including applicable appeal rights. Further, to the extent that the Debtor may legitimately dispute certain tax obligations, acceleration of payment of other tax obligations is not appropriate and not in accordance with applicable law.

176. Default Provision (3) requires full payment of the entire imposed liability, together with an unpaid current liabilities within fourteen (14) days of demand and also purports to extend the collection statute expiration date again attempting to augment remedies available to the IRS. Such remedies are not warranted. Again, the IRS has adequate remedies available to it

Appellee Appx. 01702
APPX. 104567

under applicable law and should not seek to augment them through the bankruptcy plan confirmation process.

177.   Aside from the fact that the pre-determination of the parties' applicable rights and defenses under applicable non-bankruptcy law does not belong in a chapter 11 plan or confirmation order, the IRS's language is problematic for another reason.  By grafting these requirements to a chapter 11 plan and or a court order, the IRS is creating additional remedies that it would otherwise not be entitled to under non-bankruptcy law because it could then use the Confirmation Order to hold the Debtor in contempt, and potentially foreclose any applicable defenses or other substantive rights in a later proceeding that contravene the IRS's Court-ordered default language.

178.   The Debtor has proposed (and the IRS has rejected) the standard "neutrality" language that protects the parties' respective rights and defenses and places them in the "the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated if the bankruptcy case had not been commenced" which is where they belong.

179.   The Debtor believes that the Court should not pre-adjudicate either the Debtor's or the IRS's applicable rights and remedies with respect to any unfiled tax returns or claims asserted by the IRS and these issues should be preserved for adjudication in the appropriate forums post-confirmation.  The Debtor believes that its neutrality language initially proposed is consistent with language approved by this Court and in other cases without pre-adjudicating the parties' substantive rights.  While the Debtor does not believe that any of the proposed Default Provisions are warranted because it has complied with applicable filing requirements, the Debtor

Appellee Appx. 01703

APPX. 104560

would agree to include Default Provision (1) as modified below. The Debtor believes that the language proposed to the IRS for insertion to the Confirmation Order[76] preserves each party's respective rights and defenses and adequately protects the IRS form enforcing any statutory claims or rights it may possess.

| Proposed Resolution of Objection of United States of America. | Default Provision - IRS. Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): |
|---|---|
| **Default Provision - IRS.** Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): | (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: |
| (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: | (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; |
| (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; | (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may |
| (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire | |

---

[76] The Debtor discussed its concerns with IRS counsel provided it with certain neutrality language to resolve the IRS objection. The IRS responded that it could not agree to such language and would stand on its objection and its requested default language

imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed; and

(3) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service;

(4) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States; and

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.  The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2) If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, **shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest**.  Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3) **If full payment is not made within fourteen (14) days of such demand**, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code.  **The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel.  The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan.**

(4) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS.  The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and

DOCS_SF:104855.7 36027/002

| | after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.  The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. |
|---|---|

## **CONCLUSION**

For the reasons set forth herein and in the Memorandum, the Debtor respectfully requests

that the Bankruptcy Court overrule the Objections for the reasons set forth herein and confirm

the Plan as requested by the Debtor.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01706

APPX. 04573

Dated:  January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

            -and-

*/s/ Zachery Z. Annable*

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104855.7 36027/002

Appellee Appx. 01707

Appx. 01574