Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1715
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1 of 1726   PageID 11322
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1714 of 1803   PageID 12460

Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 2

# **EXHIBIT A**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1716
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 2 of 1726 PageID 11323
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1715 of 1803 PageID 12461
Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 2 of 2



Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 14

# **EXHIBIT B**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1718
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 4 of 1726   PageID 11325
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1717 of 1803   PageID 12463
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 14

## OBJECTION SUMMARY[1]

| Objecting Party | Objection | Response |
|---|---|---|
| U.S. Trustee | The release is overbroad and releases non-debtors in violation of Pacific Lumber | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
|  | The exculpation is overbroad and releases non-debtors in violation of Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| Internal Revenue Service | Plan does not state that the Debtor will pay IRS priority tax claims on the Effective Date. | The Plan provides that Allowed Priority Claims would be paid on the Initial Distribution Date.  In response to this objection, the Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
|  | The plan does not provide for statutory interest on the IRS claims under Section 511 | Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
|  | The IRS asserts that the Debtor failed to file tax Form 720 returns related to its self-insured health plan for 2014, 2016, and 2017 and requests that the Plan be amended to include certain "Default Provisions" that, among other things, allow the IRS to declare defaults, demand that the "entire imposed liability" become due and payable, and the ability to collect unpaid liabilities upon 14 days' notice of demand for payment | The Debtor has provided all applicable tax forms and the proposed Default Provisions are unwarranted.  The Debtor would agree, however, to modified Default Provisions.<br><br>The IRS' proposed Default Provisions graft the IRS' potential non-bankruptcy and arguably additional rights and remedies into the Plan, including the IRS' unilateral rights to declare defaults, impose successor liability, and to require payments of "entire imposed liabilities" upon 14 days' notice of demand.  The Debtor does not think it is appropriate for the Plan or Confirmation Order to dictate these rights and they should be determined under applicable non bankruptcy law. |

---

[1] The following are summaries only.  Parties should read the entirety of the Debtor's Reply.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1719
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 5 of 1726 PageID 11326
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1718 of 1803 PageID 12464
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 3 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County | Plan does not appropriately apply for treatment of postpetition and effective date interest on tax claims, Plan does not provide for continued security interest and Plan does not provide that failure to pay tax claims is a default under the plan | The Debtor is currently negotiating language with these taxing authorities to resolve the issues raised in their objection through insertion of language in the Confirmation Order in order to consensually resolve this objection. |
| Jack Yang and Brad Borud (joined by Deadman, Travers, Kauffman [D.I. 1674; 1679]) | Subordinated Claims are defined overly broad as not just claims subordinated under § 510 but also claims arising from Class A/B/C Limited Partnership interests in a way that impermissibly broadens § 510(b) | The Plan has been amended to clarify that it does not provide for categorical subordination of claims relating to partnership interests to address this objection |
| Patrick Daugherty | The Disputed Claims Reserve allows the Debtor to estimate claims for distribution, which provides for impermissible disparate treatment under § 1123(a)(4) | The Plan does not provide for disparate treatment of claims. The Plan provides for a mechanism for the Debtor or Mr. Daugherty (or any creditor) to file a motion to estimate any Disputed Claim for purposes of establishing the amount of the Disputed Claims Reserve pending the allowance or disallowance of his claim. Neither Daugherty or any other creditor is entitled to a reserve for the full amount of a disputed claim. This procedure does not constitute disparate treatment of claims under section 1123(a)(4) |
| Dugaboy Investment Trust and Get Good Investment Trust | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan is not complete as it doesn't list final documents governing the claimant trust/litigation trust/reorg debtor, retained causes of action, executory contracts | Dugaboy's reference to documents still under negotiation with the Committee was a vestige from a prior draft. Three Plan Supplements have been filed that contain those documents. An additional Plan Supplement is being filed concurrently herewith. |
| | Plan violates 1129(a)(7) because it doesn't provide the value that would be received in a chapter 7 liquidation because: (i) Reorg Debtor has no affirmative obligation to report to holders of beneficial interests in the Claimant Trust, (ii) Claimant Trustee is only liable for fraud, willful misconduct, or gross negligence and not breach of fiduciary duty; and (iii) a chapter 7 trustee would need to get court authority to sell assets and no such requirement exists for Claimant Trustee [ | The Liquidation Analysis provides that creditors will receive distributions under the Plan that are not less than the value they would receive under a hypothetical chapter 7. This objection does not contest the conclusions set forth in the Liquidation Analysis. The Plan, consistent with other plans including ones confirmed in this court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. Moreover, a chapter 7 trustee would enjoy qualified immunity for its actions. |

Appellee Appx. 01712
Appx. 01579

| Objecting Party | Objection | Response |
|---|---|---|
| | Exculpation provisions are overbroad as (i) they do not relate to a specific time period (just apply from Petition Date through implementation), especially when read in connection with the exculpation provision in the Claimant Trust Agreement, (ii) cover non-Debtors, and (iii) violates Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The CTA includes standard language limiting liability and is not an improper exculpation. |
| | Release provision (i) is overbroad and releases claims not related to the BK; (ii) waives future claims of the Claimant Trust | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and the LST only as successors to the Debtor, not any claims the CT or LST might subsequently have of their own.   No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The injunction provisions in Article IX.F are overbroad and arguably violates Pacific Lumber as an improper release and In re Zale and Thru, which prevents a non-debtor injunction if it effectively discharges a no debtor | The Injunction Provisions have been modified to address these concerns.  The Injunction Provision, as modified, merely implements the Plan's discharge, release, and Exculpation Provisions by enjoining the Enjoined Parties from commencing or maintaining any actions to interfere with the implementation or consummation of the Plan.  Implementation and consummation are words used in the Code and have meanings known by practitioners and the Court.  The injunction is only applicable to the Debtor and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust – none of whom are non-debtor third parties as the debtor has eliminated the Independent Directors from these provisions. |
| | The release provided to released parties does not meet the standards for a release as there is no meaningful contribution to the BK and is not necessary to protect non-debtor entities that are essentially the debtor | Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The consideration provided by the Released Parties will be presented.  The Released Parties are only being released by the Debtor and its successors. |

Appellee Appx. 01713

Appx. 04570

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1721
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 7 of 1726   PageID 11328
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1720 of 1803   PageID 12466
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 5 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | The "channeling injunction" and retention of jurisdiction is improper because it expands the BK court's jurisdiction to actions not arising under, related to, or arising in the BK.  This is especially so since there is no post-effective date Reorganized Debtor | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the Court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. |
| | The injunction prevents parties from enforcing the rights created by the plan post-effective date | Art. IX.F starts with "Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . . "  It does not prevent enforcement of rights created under the Plan |
| | The "channeling injunction" is not a proper channeling injunction under Section 524(j) and even if it were, 524(j) only applies to debtors that are eligible for a discharge under 1141 and HCMLP is not eligible for a discharge because it is a liquidation plan. | The Gatekeeper Provision has nothing to do with Section 524(j).  Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| James Dondero | The exculpation provision in IX.D is overbroad as it relates to non-debtors under Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | The "channeling injunction" in Article IX.F includes post-confirmation conduct and non-debtors and is effectively a third party release prohibited under Dropbox. | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the Court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed |

Appellee Appx. 01714
Appx. 10457

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1722
Case 3:23-cv-00726-S Document 8-23 Filed 01/29/23 Page 8 of 1726 PageID 11329
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1721 of 1803 PageID 12467
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 6 of 14

| Objecting Party | Objection | Response |
|---|---|---|
|  |  | and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. There is no "release" in the Gatekeeper Provision as it does not prevent claims from being brought – it merely requires that the Bankruptcy Court determine the claim is colorable before it can be brought. |
|  | The "channeling injunction" limits jurisdiction to the Bankruptcy Court and ignores other courts with exclusive jurisdiction and specialized jurisdiction | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. |
|  | The "channeling injunction" is impermissibly vague under FRBP 3016(c) | The Gatekeeper Provision is not vague and, to the extent FRBP 3016(c) is applicable, expressly complies with the rule in that the Gatekeeper Provision describes in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identifies the entities that would be subject to the injunction |
|  | The Plan does not provide appropriate mechanisms for oversight of post-confirmation sales and would allow impermissible sales similar to that which occurred during the BK | This is the same objection filed by other Dondero Entities to prevent the post-confirmation monetization of assets. The Plan, consistent with other plans including ones confirmed in this Court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. |
|  | The jurisdictional provisions are overbroad and would require all claims to be heard in the BK without regard to whether they arise in connection with implementation of the plan or otherwise | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. The Bankruptcy Court has jurisdiction to determine if a claim is colorable |
|  | The elimination of vacant classes on the effective date would impermissibly limited later re-allocation of claims | The elimination of the only vacant class (Class 5 (Retained Employees)) is for voting tabulation purposes only. This provision permissibly provides for the treatment of any claims that may arise or become Allowed as a Class 5 Claim post-confirmation. |
|  | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| NexPoint Real Estate Partners LLC, f/k/a HCRE Partners, LLC | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |

Appellee Appx. 01715

Appx. 10432

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1723
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 9 of 1726 PageID 11330
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1722 of 1803 PageID 12468
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 7 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The "channeling injunction" improperly insulates non-debtors under s. 524(e). | The Gatekeeper Provisions do not implicate section 524(e). There is no insulation of any non-debtor. The Gatekeeper Provision simply requires the Bankruptcy Court to determine if a claim is colorable before it can be brought. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | Period of time covered by the release and exculpation provisions impermissibly extends post-effective date. Cf. Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexPoint Advisors, Highland Capital Management Fund Advisors, and related funds<br><br>(joined by CLO Holdco)<br><br>(joined by NexPoint RE Entities [D.I. 1677] | Investment Advisers Act is "applicable law" that prohibits assumption/assignment of the Portfolio Management Agreements ("PMAs") under 365(c) | As this Court has ruled in Acis, and as SEC No Action Letters advise, the Investment Advisers Act does not prohibit assignment. The "actual test" applies and thus even if the PMAs were nonassignable, they would still be assumable. |
| | PMAs are "personal services contracts" and cannot be assigned under 365(c) | As this Court ruled in Acis, the PMAs are not nonassignable personal services contracts. Further, the counterparties have consented, and under the "actual test" the PMAs would be assumable even if nonassignable. |

Appellee Appx. 01716

Appx. 04573

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1724
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 10 of 1726 PageID 11331
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1723 of 1803 PageID 12469
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 8 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Fifth Circuit applies the hypothetical test under Section 365(c), not the actual test | Fifth Circuit has applied the actual test under §365(e) and lower courts within the Fifth Circuit have applied the actual test to §365(c). |
| | Even if "actual" test applies, the Reorg Debtor is not the Debtor because of slimmed down staff and use of subservicers | The objectors lack standing to object. As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer. However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date. This is an adequate assurance issue, and the contract counterparties have consented. |
| | There is no consent to assumption under 365(c) | CLO issuers are the counterparties and they consent. The objectors have no contract right to object to assumption. |
| | The objectors have standing because they have claims against the estate or will have large rejection claims under shared services agreements. | The Funds, Advisors and CLO Holdco are not creditors and will not be creditors. They agreed to expungement of their claims or reduction to zero. There will be no rejection damages because the contracts are freely terminable upon notice and are being terminated, not rejected. Even if objectors were creditors, that would give them standing only as to whether assumption benefits the estate, not their particular interests. |
| | The objectors have standing because the plan violates 1129 because it provides for assumption of contracts in violation of law. | The objectors have no standing as creditors, they have no standing to object to assumption of contracts to which they are not parties and to which the counterparties have consented, and assumption of the PMAs does not violate any law. |
| | The objectors have standing because the plan seeks to limit their right to remove the manager | The Plan does not limit their removal rights. |
| | Debtor should take direction from the majority of the preference shareholders in the CLOs | The objectors have no contractual right to control the management of the CLOs. |
| | The injunction and release provisions are overbroad because they do not appropriately define their scope and prevent the movants from suing for future malfeasance | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors. No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable. Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The injunction prevents the objectors and the CLOs from seeking relief against the | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1725
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 11 of 1726   PageID 11332
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1724 of 1803   PageID 12470
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 9 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | debtor/reorg debtor from any present or future actionable wrongs under the servicing agreements and advisers act | and attempts to collect the claims and interests dealt with by the Plan. |
| | Injunction prevents set off or other damages under the servicing agreements and to seek legal redress | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | "Channeling Injunction" is defective with respect to post-confirmation actions and is overly broad | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable.  The Bankruptcy Court has jurisdiction to determine if a claim is colorable. |
| | Plan does not disclose who will be operating the reorganized debtor and claimant trust or their comp as required under s 1123(a)(7) or insider compensation under 1129(a)(5) | The Plan Supplement discloses the identity of the Claimant Trustee, Litigation Trustee and Oversight Committee members. The Debtor discloses in the Confirmation Brief the compensation of insiders pursuant 1129(a)(5) under the Plan who will serve post-confirmation in their Confirmation Brief |
| | The plan is not feasible because the treatment of the CLO management agreements is illegal and violates s. 365 | The Plan does not impact any party's rights under the CLO management agreements, and applicable law does not prohibit the Debtor's assumption of the CLO management agreements. |
| | The plan does not provide assurance of future performance with respect to the assumption of the CLO management agreement as required by 365(b) | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | Release and injunction provisions are overbroad under Pacific Lumber because they release third parties | Neither the Release nor the Injunction Provisions release non-debtor third parties. |
| | Exculpation provisions are overbroad under Thru | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |

Appellee Appx. 01718

Appx. 04573

Case 19-34054-sgj11   Doc 3445-8   Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1726
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 12 of 1726   PageID 11333
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1725 of 1803   PageID 12471
Case 19-34054-sgj11   Doc 1807-2   Filed 01/22/21   Entered 01/22/21 18:52:03   Page 10 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | The plan divests movants from their set off rights | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The plan provides that contracts can be assumed until the Effective Date in violation of 365(d)(2) | The Plan has been amended to address this objection. |
| | Debtor is not entitled to a discharge under 1141 because it's a liquidating plan | Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds. |
| | The plan violates the absolute priority rule because equity gets to keep assets while senior creditors may not be paid in full | This assertion is false. Equity Interests will not receive any property on account of the their interests pursuant to the Plan unless and until the claims of creditors are full paid, inclusive of interests, as provided in the Plan. |
| CLO Holdco Ltd. | CLO Holdco has standing to object because of its interests in the CLOs | As set forth above, CLO Holdco has no standing to assert the rights of the contracting parties to the PMAs. It is also not a creditor, having reduced its claim to zero and having no rejection claim. Even if it was a creditor it would not have standing to object to assumption on the basis of rights held by contracting parties. |
| | Joined NPA/HCMFA objection | NPA/HCMFA objection responses are set forth above. |
| | Plan provides for impermissible "partial assumption" because it cherry picks provisions of the CLO management agreements that are going to be assumed by preventing removal of the CLO manager by the preference shares | For the reasons set forth above, CLO Holdco has no standing to assert objections to assumption held by the contracting parties, who consent to assumption. Further, the Plan does not deprive preference shareholders of removal rights. |
| | Injunction and exculpation prohibits creditors from interfering with implementation or consummation of the plan and would prevent the movants from removing the Debtor as the CLO manager | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The plan impermissibly modifies the movants' rights under the CLO management agreements without their consent | The Plan does not modify CLO Holdco's rights under the PMAs |
| | Exculpation and indemnification provisions are third party releases in violation of applicable law under Pacific Lumber | The Plan does not contain an" indemnification provision." The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity |

Appellee Appx. 01719

Appx. 10457.6

| Objecting Party | Objection | Response |
|---|---|---|
| | | of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., and NexBank | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | The Debtor amended Plan section III.J of the Plan to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | |
| | The exculpation and release provisions violate Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The Release is only a release of claims owned by the Debtor and its estate and does not implicate Pacific Lumber which had nothing to do with debtor released which are permitted under section 1123(b)(3). |
| Senior Employees | The Plan violates § 1123(a)(4) because it treats the Senior Employees differently than similarly situated employees by requiring the Senior Employees to sign a Senior Employee Stipulation and reduce a portion of their claim to obtain a release. | The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The potential Debtor release of its own claims against employees or ex-employees under the Plan does not constitute "treatment" of Class 7 or Class 8 claims. |

Appellee Appx. 01720

Appx. 01577

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1728
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 14 of 1726   PageID 11335
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1727 of 1803   PageID 12473
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 12 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The Senior Employee Stipulation was not approved by the Senior Employees and contains material problems. | Whether or not the Senior Employees voluntary elect to sign the Senior Employee Stipulation does not constitute a valid basis to object to Plan confirmation.  The voluntary decision to execute the Senior Employee Stipulation was at the option of the employee.  Moreover, the Debtor has settled this objection with respect to Mr. Surgent and Mr. Waterhouse. |
| | The Debtor has improperly prevented the Senior Employees from making the Convenience Class Election because, as reflected in the chart prepared by the Debtor, the Senior Employees have liquidated claims which are not in dispute. | Under applicable bankruptcy law, the Plan and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.

Each Senior Employee filed a single proof of claim and the Senior Employees have not cited any authority supporting the proposition that a claimant may split claims listed in a single proof of claim; to the contrary, courts have stated that claim splitting is impermissible when covered by a single proof of claim.  Further, the Plan and Disclosure Statement Order prohibit claim splitting for voting purposes.  Finally, as explicitly set forth on the ballots approved by the Disclosure Statement Order, even if a Senior Employee could split his claims in order to elect Convenience Class treatment, the Convenience Class Election only impacts *treatment*, and explicitly does not impact voting. |
| | The Plan provides that a Class 8 Creditor can make the Convenience Class Election for a liquidated claim.  Since a portion of each Senior Employee's claim is liquidated, the Senior Employees have a right to make the Convenience Class Election under the Plan.

The Debtor has contradicted the Plan in how in its conversations with the Senior Employees.  Each Senior Employee received two ballots (one Class 7 and one Class 8) and this confusion justifies the Senior Employees review of the Plan.

The fact that the Plan splits employee claims into PTO claims and other claims is evidence that the Plan allows Claim splitting.  The | As set forth directly above, each Senior Employee would have to split his claim in order to also retain the remainder of his Class 8 claim.  This is impermissible under applicable case law and the Plan.

The Debtor's statements have been consistent with the Plan.  In any event, the Plan governs.  The Senior Employee's receipt of two ballots was an administrative error and cannot override the express terms of the Plan and Disclosure Statement Order.

As to the PTO Claims, those were separately classified *by the Plan*.  The Senior Employees seek to split claims *within the same class*.  It is splitting claims within the same class that is prohibited by applicable case law and the Plan and Disclosure Statement Order. |

Appellee Appx. 01721

APPX. 104578

| Objecting Party | Objection | Response |
|---|---|---|
| | exhibit is a representation that the Senior Employee claims have the right to a split claim because it discusses a Convenience Class claim. | |
| | The Plan identifies no basis for disparate and unfair treatment of the Senior Employees. | Debtors are not required to grant releases to anyone nor are their required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees. |
| | The Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the Claimant Trustee the unfettered power to "reclassify" any claim as a Subordinated Claim. | Section III.J of the Plan has been amended to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan allows the Debtor to make changes to the Plan without Court approval, including changes to the plan supplement documents. | To the contrary, Article XII of the Plan explicitly requires that modifications to the Plan be in compliance with section 1127. |

12

Appellee Appx. 01722

Appx. 104579

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1730
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 16 of 1726   PageID 11337
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1729 of 1803   PageID 12475
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 14 of
14

Appellee Appx. 01723
Appx. 04586

Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 3

# **EXHIBIT C**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1732
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23  Page 18 of 1726  PageID 11339
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1731 of 1803  PageID 12477
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21  Entered 01/22/21 18:52:03  Page 2 of 3

On the Effective Date, the Debtor will assume the agreements set forth on Appendix [_] hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[1] a cumulative amount of $525,000 (the "Cure Amount") as follows:

- $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

- $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and this Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

Effective as of the Effective Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the

---

[1] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1733
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 19 of 1726 PageID 11340
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1732 of 1803 PageID 12478
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 3 of 3

"<u>Debtor Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "<u>Issuer Released Claims</u>").

Effective as of the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe, (xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "<u>Issuer Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "<u>Debtor Released Claims</u>"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.

Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs [ ] hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

Appellee Appx. 01726
APPX. 04591

# APPENDIX 25

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1735
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23  Page 21 of 1726  PageID 11342
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1734 of 1803  PageID 12480
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 1 of 13

Docket #1822  Date Filed: 1/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
|  | § |  |
| Debtor. | § |  |

### DEBTOR'S WITNESS AND EXHIBIT LIST WITH RESPECT TO
### CONFIRMATION HEARING TO BE HELD ON JANUARY 26, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following witness and

exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of Reorganization of*

*Highland Capital Management, L.P.* [Docket No. 1472] which the Court has set for hearing at

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000028

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1736
Case 3:23-cv-00726-S    Document 8-23    Filed 04/29/23    Page 22 of 1726    PageID 11343
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1735 of 1803    PageID 12481
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 2 of 13

9:30 a.m. (Central Time) on January 26, 2021 (the "Hearing") in the above-styled bankruptcy

case (the "Bankruptcy Case").

A.    **Witnesses:**

1.    James P. Seery, Jr.;

2.    John S. Dubel;

3.    James Dondero;

4.    Marc Tauber, a representative of Aon plc;

5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

6.    Any witness identified by or called by any other party; and

7.    Any witness necessary for rebuttal.

B.    **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1737
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 23 of 1726   PageID 11344
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1736 of 1803   PageID 12482
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 3 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as  of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1738
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 24 of 1726 PageID 11345
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1737 of 1803 PageID 12483
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 4 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1739
Case 3:23-cv-00726-S    Document 8-23    Filed 04/29/23    Page 25 of 1726    PageID 11346
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1738 of 1803    PageID 12484
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 5 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1740
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 26 of 1726 PageID 11347
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1739 of 1803 PageID 12485
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 6 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01733
Appx. 14590

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1741
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 27 of 1726 PageID 11348
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1740 of 1803 PageID 12486
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 7 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1742
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23    Page 28 of 1726  PageID 11349
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1741 of 1803  PageID 12487
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 8 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 | | |

Appellee Appx. 01735
APPX. 014892

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1743
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23  Page 29 of 1726  PageID 11350
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1742 of 1803  PageID 12488
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 9 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01736
APPX. 11503

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1744
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 30 of 1726   PageID 11351
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1743 of 1803   PageID 12489
Case 19-34054-sgj11  Doc 1822  Filed 01/22/21   Entered 01/22/21 21:50:07   Page 10 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01737
APPX. 014804

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1745
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 31 of 1726   PageID 11352
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1744 of 1803   PageID 12490
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 11 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01738
APPX. 14503

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1746
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 32 of 1726   PageID 11353
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1745 of 1803   PageID 12491
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 12 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| BBBBBBB. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| CCCCCCC. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| DDDDDDD. | All exhibits identified by or offered by any other party at the Hearing | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1747
Case 3:23-cv-00726-S    Document 8-23    Filed 04/29/23    Page 33 of 1726    PageID 11354
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1746 of 1803    PageID 12492
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 13 of 13

Dated:  January 22, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# APPENDIX 26

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1749
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23    Page 35 of 1726   PageID 11356
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1748 of 1803   PageID 12494
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 1 of 13

Docket #1866  Date Filed: 01/29/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

### DEBTOR'S AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO
### CONFIRMATION HEARING TO BE HELD ON FEBRUARY 2, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following amended

witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210129000000000012

Appellee Appx. 01742

Appx. 04897

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1750
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23    Page 36 of 1726  PageID 11357
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1749 of 1803  PageID 12495
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 2 of 13

set for hearing at 9:30 a.m. (Central Time) on February 2, 2021 (the "Hearing") in the above-

styled bankruptcy case (the "Bankruptcy Case").

      **A.**    **Witnesses:**

          1.    James P. Seery, Jr.

          2.    John S. Dubel

          3.    James Dondero

          4.    Marc Tauber, a representative of Aon plc

          5.    Patrick M. Leathem (by certification filed at Docket No. 1772)

          6.    Any witness identified by or called by any other party; and

          7.    Any witness necessary for rebuttal.

      **B.**    **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01743
APPX. 014500

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1751
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23  Page 37 of 1726  PageID 11358
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1750 of 1803  PageID 12496
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 3 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01744
APPX. 10609

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1752
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 38 of 1726   PageID 11359
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1751 of 1803   PageID 12497
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 4 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01745
APPX. 04612

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1753
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 39 of 1726 PageID 11360
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1752 of 1803 PageID 12498
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21 Entered 01/29/21 18:30:16 Page 5 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1754
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 40 of 1726 PageID 11361
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1753 of 1803 PageID 12499
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21 Entered 01/29/21 18:30:16 Page 6 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01747
APPX. 11514

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1755
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23  Page 41 of 1726  PageID 11362
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1754 of 1803  PageID 12500
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 7 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1756
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 42 of 1726   PageID 11363
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1755 of 1803   PageID 12501
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 8 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1757
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23  Page 43 of 1726  PageID 11364
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1756 of 1803  PageID 12502
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 9 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1758
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 44 of 1726   PageID 11365
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1757 of 1803   PageID 12503
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 10 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1759
Case 3:23-cv-00726-S   Document 8-23  Filed 04/29/23   Page 45 of 1726   PageID 11366
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1758 of 1803   PageID 12504
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 11 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1760
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 46 of 1726   PageID 11367
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1759 of 1803   PageID 12505
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 12 of 13

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| GGGGGGG. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| HHHHHHH. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| IIIIIII. | All exhibits identified by or offered by any other party at the Hearing | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1761
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 47 of 1726   PageID 11368
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1760 of 1803   PageID 12506
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 13 of 13

Dated:  January 29, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**APPENDIX 27**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1763
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 49 of 1726   PageID 11370
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1762 of 1803   PageID 12508
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 1 of 14

Docket #1877  Date Filed: 02/01/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## DEBTOR'S SECOND AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO CONFIRMATION HEARING TO BE HELD ON FEBRUARY 2, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following second

amended witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan*

*of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which the Court

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054212020100000000000011

Appellee Appx. 01756
APPX. 10673

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1764
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23   Page 50 of 1726  PageID 11371
Case 3:21-cv-00879-K  Document 21   Filed 07/28/21   Page 1763 of 1803  PageID 12509
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 2 of 14

has set for hearing at 9:30 a.m. (Central Time) on February 2, 2021 (the "Hearing") in the above-

styled bankruptcy case (the "Bankruptcy Case").

     **A.**    <u>**Witnesses:**</u>

        1.    James P. Seery, Jr.;

        2.    John S. Dubel;

        3.    James Dondero;

        4.    Marc Tauber, a representative of Aon plc;

        5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

        6.    Any witness identified by or called by any other party; and

        7.    Any witness necessary for rebuttal.

     **B.**    <u>**Exhibits:**</u>

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01757
APPX. 10457

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1765
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23  Page 51 of 1726  PageID 11372
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1764 of 1803  PageID 12510
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 3 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1766
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 52 of 1726 PageID 11373
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1765 of 1803 PageID 12511
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 4 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01759
APPX. 104626

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1767
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 53 of 1726 PageID 11374
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1766 of 1803 PageID 12512
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 5 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1768
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23    Page 54 of 1726  PageID 11375
Case 3:21-cv-00879-K  Document 21    Filed 07/28/21    Page 1767 of 1803  PageID 12513
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 6 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1769
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 55 of 1726 PageID 11376
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1768 of 1803 PageID 12514
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 7 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation [TO BE OFFERED UNDER SEAL] | | |
| IIII. | Highland CLO Funding Members Agreement [TO BE OFFERED UNDER SEAL] | | |
| JJJJ. | Highland CLO Funding Offering Memorandum [TO BE OFFERED UNDER SEAL] | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1770
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 56 of 1726 PageID 11377
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1769 of 1803 PageID 12515
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 8 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Appellee Appx. 01763
APPX. 01620

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1771
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 57 of 1726   PageID 11378
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1770 of 1803   PageID 12516
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 9 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01764
APPX. 01629

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1772
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 58 of 1726 PageID 11379
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1771 of 1803 PageID 12517
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 10 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01765
APPX. 04632

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01766

APPX. 11623

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1774
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23    Page 60 of 1726   PageID 11381
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1773 of 1803   PageID 12519
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 12 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Docket, *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent* (Case No. DC- 16-11396) | | |
| GGGGGGG. | Docket, *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018) | | |
| HHHHHHH. | Docket, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) | | |
| IIIIIII. | Docket, *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) | | |
| JJJJJJJ. | Docket*, In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) | | |
| KKKKKKK. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650097/2009 | | |
| LLLLLLL. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650752/2010 | | |

Appellee Appx. 01767
APPX. 10452

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1775
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 61 of 1726 PageID 11382
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1774 of 1803 PageID 12520
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 13 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| MMMMMMM. | Docket, *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 12533-VCG) | | |
| NNNNNNN. | Docket, *Daugherty v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 2017-0488-MTZ) | | |
| OOOOOOO. | Court Admitted Exhibits for January 21, 2020 Hearing | | |
| PPPPPPP. | Amended Liquidation Analysis/Financial Projections [Docket No. 1875-1] | | |
| QQQQQQQ. | Stipulation in Support of Settlement with Committee Regarding Governance and Procedures [Docket No. 383] | | |
| RRRRRRR. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| SSSSSSS. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| TTTTTTT. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| UUUUUUU. | All exhibits identified by or offered by any other party at the Hearing | | |

Appellee Appx. 01768
Appx. 04623

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1776
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23    Page 62 of 1726   PageID 11383
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1775 of 1803   PageID 12521
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 14 of 14

Dated:  February 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01769
APPX. 01626

# APPENDIX 28

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1778
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 64 of 1726 PageID 11385
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1777 of 1803 PageID 12523
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 1 of 14

Docket #1895 Date Filed: 02/04/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S THIRD AMENDED WITNESS AND EXHIBIT LIST WITH
RESPECT TO CONFIRMATION HEARING HELD ON FEBRUARY 3, 2021**

Highland Capital Management, L.P. (the "Debtor") submits the following third amended

witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of

Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which was set for

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210204000000000004

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1779
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23    Page 65 of 1726  PageID 11386
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1778 of 1803  PageID 12524
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 2 of 14

hearing at 9:30 a.m. (Central Time) on February 3, 2021 (the "Hearing") in the above-styled

bankruptcy case (the "Bankruptcy Case").

> **A.**     <u>Witnesses</u>:

> 1.    James P. Seery, Jr.;

> 2.    John S. Dubel;

> 3.    James Dondero;

> 4.    Marc Tauber, a representative of Aon plc;

> 5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

> 6.    Any witness identified by or called by any other party; and

> 7.    Any witness necessary for rebuttal.

> **B.**    <u>Exhibits</u>:

| Letter | Exhibit | Offered | Admitted |
|:------:|---------|:-------:|:--------:|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1780
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 66 of 1726   PageID 11387
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1779 of 1803   PageID 12525
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 3 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01773
APPX. 04636

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1781
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 67 of 1726   PageID 11388
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1780 of 1803   PageID 12526
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 4 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

**THIRD AMENDED WITNESS AND EXHIBIT LIST FOR HEARING HELD ON FEBRUARY 3, 2021**          **PAGE 4 OF 14**
DOCS_NY:42031.4 36027/002

Appellee Appx. 01774
APPX. 104639

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1782
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 68 of 1726   PageID 11389
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1781 of 1803   PageID 12527
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 5 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

**THIRD AMENDED WITNESS AND EXHIBIT LIST FOR HEARING HELD ON FEBRUARY 3, 2021**        **PAGE 5 OF 14**
DOCS_NY:42031.4 36027/002

Appellee Appx. 01775
APPX. 014632

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1783
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 69 of 1726   PageID 11390
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1782 of 1803   PageID 12528
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 6 of 14

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

**THIRD AMENDED WITNESS AND EXHIBIT LIST FOR HEARING HELD ON FEBRUARY 3, 2021**        **PAGE 6 OF 14**
DOCS_NY:42031.4 36027/002

Appellee Appx. 01776
APPX. 04653

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1784
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 70 of 1726 PageID 11391
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1783 of 1803 PageID 12529
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 7 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1785
Case 3:23-cv-00726-S  Document 8-23  Filed 04/29/23  Page 71 of 1726  PageID 11392
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1784 of 1803  PageID 12530
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 8 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Appellee Appx. 01778

APPX. 014633

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1786
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 72 of 1726 PageID 11393
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1785 of 1803 PageID 12531
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 9 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01779
APPX. 10656

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1787
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 73 of 1726 PageID 11394
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1786 of 1803 PageID 12532
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 10 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01780

APPX. 04647

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01781

APPX. 11398

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1789
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 75 of 1726 PageID 11396
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1788 of 1803 PageID 12534
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 12 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Docket, *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent* (Case No. DC- 16-11396) | | |
| GGGGGGG. | Docket, *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018) | | |
| HHHHHHH. | Docket, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) | | |
| IIIIIII. | Docket, *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) | | |
| JJJJJJJ. | Docket*, In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) | | |
| KKKKKKK. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650097/2009 | | |
| LLLLLLL. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650752/2010 | | |

Appellee Appx. 01782
APPX. 01659

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1790
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 76 of 1726 PageID 11397
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1789 of 1803 PageID 12535
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 13 of 14

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| MMMMMMM. | Docket, *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 12533-VCG) | | |
| NNNNNNN. | Docket, *Daugherty v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 2017-0488-MTZ) | | |
| OOOOOOO. | Court Admitted Exhibits for January 21, 2020 Hearing | | |
| PPPPPPP. | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1875] | | |
| QQQQQQQ. | Stipulation in Support of Settlement with Committee Regarding Governance and Procedures [Docket No. 338] | | |
| RRRRRRR. | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P. (With Technical Modifications) [Docket No. 1807] | | |
| SSSSSSS. | Email exchange between Gregory Demo, Amy Anderson, and Joseph Bain re HCM Issuers **[REDACTED]** | | |
| TTTTTTT. | Statement of Financial Affairs, with any amendments, filed in 19-34054 [Docket No. 248] | | |
| UUUUUUU. | Schedules filed in 19-34054, with any amendments [Docket No. 247] | | |
| VVVVVVV. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| WWWWWWW. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| XXXXXXX. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| YYYYYYY. | All exhibits identified by or offered by any other party at the Hearing | | |

Appellee Appx. 01783
APPX. 01546

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1791
Case 3:23-cv-00726-S    Document 8-23    Filed 04/29/23    Page 77 of 1726    PageID 11398
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1790 of 1803    PageID 12536
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 14 of 14

Dated:  February 4, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01784
APPX. 01649

**APPENDIX 29**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1793
Case 3:23-cv-00726-S    Document 8-23    Filed 04/29/23    Page 79 of 1726    PageID 11400
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1792 of 1803    PageID 12538
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 546 of 852    PageID 2451

# EXHIBIT 5

000543

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1794
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 80 of 1726 PageID 11401
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1793 of 1803 PageID 12539
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 547 of 852 PageID 2452

**UPDATED SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION***

*In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

**9/23/20**   *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith [D.I. 1087]*

| Objectors: | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal is being briefed. |

**11/18/20**   *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements [D.I. 1424]*

| Objectors: | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459] | N/A |

**11/19/20**   *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course [D.I. 1439]*

| Movant: | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |

**12/8/20**   *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [D.I. 1522]*

| Movants: | Advisors Funds | Movants argued that the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

* **The following is by way of summary only and does not include discovery disputes or similar matters. Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact. The Debtor reserves all rights that it may have whether in law or in equity.**

| 12/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith* **[D.I. 1625]** | | | | |
|---|---|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal is being briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* **[D.I. 1752]** | | | | |
| | **Movants**: | Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | *James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith* **[D.I. 1784]** | | | | |
| | **Objector**: | Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1796
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 82 of 1726 PageID 11403
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1795 of 1803 PageID 12541
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 549 of 852 PageID 2454

| 1/22/20 | *Objections to Fifth Amended Plan of Reorganization* [D.I. 1472] | | | |
|---|---|---|---|---|
| | **Objectors**:[1] | | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | | | |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | *Application for Allowance of Administrative Expense Claim* [D.I. 1826] | | | |
| | **Movants**: | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | *NexBank's Application for Allowance of Administrative Expense Claim* [D.I. 1888] | | | |
| | **Movant**: | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

000546

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1797

Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 83 of 1726   PageID 11404
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1796 of 1803   PageID 12542
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 550 of 852   PageID 2455

| 2/8/21 | _James Dondero Motion for Status Conference_ [D.I. 1914] | | | |
|---|---|---|---|---|
| | **Movant**: | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N/A. |

| 2/28/21 | _Motions for Stay Pending Appeal_ | | | |
|---|---|---|---|---|
| | **Movants**: | | The only parties requesting a stay pending appeal were the Dondero Entities. They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| | Dondero [D.I. 1973] | Advisors [D.I. 1955] | | |
| | Funds [D.I. 1967] | Trusts [D.I. 1971] | | |

| 3/18/21 | _James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455_ [D.I. 2060] | | | |
|---|---|---|---|---|
| | **Movants**: | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. |
| | | Advisors | | |
| | | Trusts | | |
| | | HCRE | | |

| 4/15/21 | _Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith_ [D.I. 2199] | | | |
|---|---|---|---|---|
| | **Movants**: | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "UBS") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008. The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293]. The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308]. UBS also filed a reply [D.I. 2310]. The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors have until June 7 to appeal. |

Appellee Appx. 01790

Appx. 014653

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1798
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 84 of 1726 PageID 11405
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1797 of 1803 PageID 12543
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 551 of 852 PageID 2456

| 4/23/21 | *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* **[D.I. 2247]** | | | | |
|---|---|---|---|---|---|
| | **Movants**: | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders. The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |

| 4/23/21 | <u>*Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction*</u> **[D.I. 2242]** | | | | |
|---|---|---|---|---|---|
| | **Movants**: | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | The Court denied DAF and CLOH have appealed. [D.I. 2513] |

| 4/20/21 | <u>*Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief*</u> **[D.I. 2229]** | | | | |
|---|---|---|---|---|---|
| | **Movants**: | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility. The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness. Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |

Appellee Appx. 01791

APPX. 01658

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1799
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 85 of 1726 PageID 11406
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1798 of 1803 PageID 12544
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 552 of 852 PageID 2457

| 4/29/21 | _Motion to Compel Compliance with Bankruptcy Rule 2015.3_ **[D.I. 2256]** | | | |
|---|---|---|---|---|
| **Movants:** | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424]. | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

### _Highland Capital Management, L.P. v. James D. Dondero_, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)

| 12/7/20 | _Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero_ **[D.I. 2]** | | | |
|---|---|---|---|---|
| **Movant:** | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

000549

Appellee Appx. 01792

Appx. 04657

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1800
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 86 of 1726   PageID 11407
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1799 of 1803   PageID 12545
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 553 of 852   PageID 2458

| | | | | |
|---|---|---|---|---|
| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* **[D.I. 48]** | | | |
| | Movant: | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd.*, Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)

| | | | | |
|---|---|---|---|---|
| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* **[D.I. 2]** | | | |
| | Movant: | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor believes it has reached an agreement in principle with the Funds and Advisors that will settle this matter. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

000550

*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*, Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | | |
|---|---|---|---|---|
| | Movant: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the action was moot. | N/A |

*Highland Capital Management, L.P. v. James Dondero*, Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | Movant: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* [D.I. 21] | | | |
| | Movant: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. | N/A |

Appellee Appx. 01794

APPX. 104659

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1802
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 88 of 1726 PageID 11409
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1801 of 1803 PageID 12547
Case 3:21-cv-00842-B Document 43 Filed 07/13/21 Page 555 of 852 PageID 2460

*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* [D.I. 20] | | | |
| | **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 52]. | N/A |

*Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note. NPA did not pay the note when and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* [D.I. 19] | | | |
| | **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 42].. | N/A |

*Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("HCMS"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | *Defendants Motion to Withdraw the Reference* [D.I. 19] | | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. | |

000552

Appellee Appx. 01795

APPx. 01662

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1803
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 89 of 1726   PageID 11410
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1802 of 1803   PageID 12548
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 556 of 852   PageID 2461

*Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | *Defendants Motion to Withdraw the Reference* [D.I. 20] | | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. |

*Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd.*, Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)

| 4/12/21 | *Original Complaint* | | | |
|---|---|---|---|---|
| | **Movants**: | DAF CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22]. On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26] | N/A |
| 4/19/21 | *Plaintiff's Motion for Leave to File First Amended Complaint in the District Court* | | | |
| | **Movants**: | DAF CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1804
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 90 of 1726   PageID 11411
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1803 of 1803   PageID 12549
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 557 of 852   PageID 2462

***PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*, Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)**

4/12/21      <u>*Original Complaint*</u>

| Movants: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous.  The Debtor will take all appropriate actions. | The Complaint was recently filed and is currently in litigation. | N/A |

***The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)**

4/12/21      <u>*Original Complaint*</u>

| Movants: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

000554

**Appellee Appx. 01797**

**Appx. 10562**

# EXHIBIT 9

Case 19-34054-sgj11 Doc 3445-9 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 5
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 92 of 1726   PageID 11413
Case 3:21-cv-00879-K   Document 28   Filed 12/10/21   Page 1 of 4   PageID 12588

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL MANAGEMENT, L.P., Debtor | § § § | |
| ——————————————— | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") Notice of Appeal  was filed in this Court on April 18, 2021.  *See* Doc. No. 1.  Appellants appeal an order of the Bankruptcy Court denying Appellants' motion to recuse.  *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16).  Intervenor/Debtor Highland Capital Management, L.P. filed its Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23).

ORDER – PAGE 1

Until a final judgment is issued, the bankruptcy court's denial of the motion to recuse "is not an appealable order, not subject to the collateral order doctrine, and is not an appealable interlocutory order under 28 U.S.C. § 1292(a)." *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012) (citing *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 86 & n.3 (5th Cir. 1992) ("We decline to review the court's denial of the City's motion to recuse, however, because the judge's decision is not an appealable interlocutory order . . . . the City must await a final judgment to appeal the judge's refusal to recuse himself.")); *accord Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001) ("The denial of a recusal motion is not an appealable interlocutory order or an appealable collateral order."); *see also United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995) ("An order denying a motion for the recusal of a district judge is not immediately appealable."). Moreover, "despite the more flexible definitions of finality accorded to bankruptcy orders, denial of a motion to disqualify is not recognized as an exception to the rule requiring finality of judgment of appeal." *In re Global Marine, Inc.*, 108 B.R. 1007, 1008 (S.D. Tex. 1988) (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368 (1981); *In re Delta Servs. Indus., Etc.*, 782 F.2d 1267 (5th Cir. 1986)).

The bankruptcy court's ruling on a motion to recuse must "conclusively and permanently decide the existence of a conflict of interest" for it to come within the collateral doctrine exception. *In re Global Marine*, 108 B.R. at 1008. In this case, the

ORDER – PAGE 2

Case 19-34054-sgj11 Doc 3445-9 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 5
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 94 of 1726 PageID 11415
Case 3:21-cv-00879-K Document 28 Filed 12/10/21 Page 3 of 4 PageID 12590

Bankruptcy Court expressly "reserve[d] the right to supplement or amend this ruling" in the Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"). R. on Appeal, Vol. 1 (Doc. No. 9-1) at 42; *see In re Global Marine*, 108 B.R. at 1008 ("Rather, the Bankruptcy Court reserved the right to review the issue should a conflict appear to arise in the future."). If the bankruptcy court's order denying recusal is "not a final order appealable by right," leave of the district court is required to bring an interlocutory appeal. 28 U.S.C. § 158(a); *cf. In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ.) ("Generally, interlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases.").

In this appeal, it is not apparent from the Bankruptcy Court Record on Appeal that jurisdiction lies over this appeal, nor have Appellants clearly established this Court's jurisdiction over the appeal of this order. Accordingly, the Court **ORDERS** Appellants to file a brief on this discrete issue of the Court's appellate jurisdiction. This jurisdictional brief shall be no more than ten (10) pages in length and may cite only to the Bankruptcy Court Record on Appeal already transmitted in this case. **The brief must be filed on or before December 15, 2021**. Appellee may file a responsive brief, no more than ten (10) pages in length, **on or before December 20, 2021**. There shall be no reply brief unless otherwise ordered by the Court.

ORDER – PAGE 3

Case 19-34054-sgj11 Doc 3445-9 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of 5
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 95 of 1726   PageID 11416
Case 3:21-cv-00879-K   Document 28   Filed 12/10/21   Page 4 of 4   PageID 12591

Appellants' failure to timely file this jurisdictional brief will result in the immediate dismissal of this appeal without further notice.

**SO ORDERED.**

Signed December 10th, 2021.

_____

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 4

# EXHIBIT 10

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 97 of 1726 PageID 11418
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 1 of 10 PageID 12592

# IN THE UNITED STATES DISTICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

## APPELLANTS' RESPONSE TO THE COURT'S DECEMBER 10, 2021
## MEMORANDUM OPINION AND ORDER

James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P.,

NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real

Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company

(collectively, "Appellants") file this Response to the Court's December 10, 2021 Memorandum

Opinion and Order [Dkt. 28]:

1.     Appellants recognize that, ordinarily, an order denying recusal is not a final,

appealable order in civil litigation under 28 U.S.C. § 1291 and 1292, at least in the District Court,

until "completion of the entire case, *i.e.*, when the decision terminates the action or ends the

litigation on the merits and leaves nothing for the court to do but execute the judgment."[1]

---

[1] *Ritzen Grp., Inc. v. Jackson Masonry, LLC,* 140 S. Ct. 582, 586 (2020) (In civil litigation generally, 28 U.S.C. §
1291 governs appeals from "final decisions." Under that provision, a party may appeal to a court of appeals as of right
from "final decisions of the district courts." The provision on appeals to U. S. district courts from decisions of

APPX. 04669

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 98 of 1726 PageID 11419
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 2 of 10 PageID 12593

2.      However, "[a] bankruptcy case embraces an aggregation of individual controversies," and "[o]rders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."[2] It is therefore common for a bankruptcy court to resolve discrete disputes, thereby allowing separate appeals "from discrete, controversy-resolving decisions," even "while the umbrella bankruptcy case remains pending."[3]

3.      In other words, bankruptcy is not one dispute susceptible to one final judgment, but rather a series of discrete disputes. When a bankruptcy order puts a discrete dispute to rest, it is therefore a final order for appellate purposes.  Accordingly:

> This circuit has long rejected adoption of a rigid rule that a bankruptcy case can only be appealed as a single judicial unit at the end of the entire bankruptcy proceeding.  Instead, an appealed bankruptcy order must constitute either a 'final determination of the rights of the parties to secure the relief they seek,' or a final disposition 'of a discrete dispute within the larger bankruptcy case for the order to be considered final.'[4]

4.      This standard is "a lower threshold" for meeting the finality requirement than that which is ordinary applicable to District Court practice.[5]  Thus, the rule for bankruptcy finality is considered "more liberally or flexibly."[6]

5.      The reasoning for a more flexible finality standard in bankruptcy is demonstrated by the facts of this case: if the Court must await the Final Decree in a Chapter 11 case (the technical instrument that closes a Chapter 11 case) to determine an appeal of an order denying recusal, and the appeal is determined in favor of the appellants, then each and every subset of the Chapter 11

---

bankruptcy courts is 28 U.S.C. § 158(a). Under that provision, an appeal of right lies from "final judgments, orders, and decrees" entered by bankruptcy courts "in cases and proceedings." By providing for appeals from final decisions in bankruptcy "proceedings," as distinguished from bankruptcy "cases," Congress made "orders in bankruptcy cases ... immediately appeal[able] if they finally dispose of discrete disputes within the larger [bankruptcy] case.").
[2] *Id.*
[3] *Ritzen Grp.*, 140 S. Ct. at 586–87.
[4] *In re Bartree*, 212 F.3d 277, 282 (5th Cir. 2000) (internal quotations and citations omitted).
[5] *See In re Orr*, 180 F.3d 656, 659 (5th Cir. 1999).
[6] *In re Bartree*, 212 F.3d at 282.

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 99 of 1726 PageID 11420
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 3 of 10 PageID 12594

proceeding will be subject to reversal. This could cause massive uncertainty and burden on bankruptcy courts and the parties. As the Fifth Circuit has explained:

> a determination that appellate jurisdiction arises only when the bankruptcy judge enters an order which ends the entire bankruptcy case, leaving nothing for the court to do but execute the judgment, would substantially frustrate the bankruptcy system. This is so particularly when, as here, one independent decision materially affects the rest of the bankruptcy proceedings. Separate and discrete orders in many bankruptcy proceedings determine the extent of the bankruptcy estate and influence creditors to expend or not to expend effort to recover monies due them. The reversal of such an order would waste exorbitant amounts of time, money, and labor and would likely require parties to start the entire bankruptcy process anew. This potential waste of judicial and other resources has influenced this Court and other courts of appeals to view finality in bankruptcy proceedings in a more practical and less technical light.[7]

6.      Consequently, the question is whether the Bankruptcy Court's Recusal Order is a "final determination of the rights of the parties to secure the relief they seek,' or a final disposition 'of a discrete dispute within the larger bankruptcy case.'"[8] The United States Supreme Court has held that bankruptcy court rulings are final if the motion was: (1) a distinct proceeding which the bankruptcy court fully and unequivocally disposed of all issues and relief requested; and (2) separate from the adversary claims-adjudication process.[9]

7.      Here, both elements are met. *First*, Appellants moved to recuse. The Bankruptcy Court denied Appellants' motion and the requested relief in its entirety.[10] There is nothing left for the Bankruptcy Court to do or to consider on the issue. Instead, there is a final disposition of the recusal dispute. Stated differently, the Recusal Order is "an order which ends a discrete judicial unit in the larger case concludes a bankruptcy proceeding and is a final judgment."[11] *Second*, the Motion to Recuse was separate from the adversary claims-adjudication process. As a result, the

---

[7] *In re England*, 975 F.2d 1168, 1171 (5th Cir. 1992).
[8] *In re Bartree*, 212 F.3d at 282.
[9] *Ritzen Grp., Inc.*, 140 S. Ct. at 586.
[10] R 31.
[11] *In re England*, 975 F.2d at 1172.

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 100 of 1726 PageID 11421
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 4 of 10 PageID 12595

Recusal Order is final and appealable, and this Court has jurisdiction.

8. Moreover, the Bankruptcy Court's reservation in the Recusal Order to supplement or amend its ruling does not change this conclusion. Similar to *Ritzen*, the Recusal Order "ended the [motion to recuse adjudication] and left nothing more for the Bankruptcy Court to do in that proceeding",[12] and "conclusively resolved the movant's entitlement to the requested relief."[13] Importantly, allowing catch-all reservation language in an order that conclusively ended the recusal adjudication to prevent finality would unnecessarily delay the appeal of a fully adjudicated issue. This is especially true here, where it is undisputed that the Recusal Order fully resolved all issues presented and relief requested in the Motion to Recuse.

9. In fact, the Recusal Order itself suggests an expectation that Appellants would immediately appeal it (…"*if a movant appeals a decision not to disqualify and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record*.").[14] This indicates that the Bankruptcy Court intended for the Recusal Order to be a final order and, perhaps, included its catch-all reservation language in the event of remand (since the Bankruptcy Court did not conduct a hearing on the recusal motion).

10. Moreover, there is a question as to the Bankruptcy Court's ability to amend the Recusal Order after this appeal was perfected, since "the filing of a notice of appeal is an event of jurisdictional significance –it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."[15] In a similar bankruptcy

---

[12] *Ritzen Grp., Inc.*, 140 S. Ct. at 592.
[13] *Id.* at 591.
[14] R 37 (Recusal Order at p. 7).
[15] *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). As the Fifth Circuit has held, "[t]his rule applies with equal force to bankruptcy cases." *In re Transtexas Gas Corp.*, 303 F.3d 571, 579 (5th Cir. 2002).

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 101 of 1726 PageID 11422
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 5 of 10 PageID 12596

appeal, this Court concluded that the Bankruptcy Court lacked jurisdiction to enter supplemental findings of fact and conclusions of law after the appeal of the underlying order had been perfected, holding: "[a]s a timely notice of appeal from the sanctions order had been filed, Judge Tillman was powerless—after December 1, 1987—to supplement, amend, or modify his November 17 sanctions order with additional findings of fact or conclusions of law."[16] Thus, if the Bankruptcy Court's reservation language had any application before this appeal, it no longer does, since the Bankruptcy Court is now without jurisdiction to supplement or amend the Recusal Order.

11.      The cases cited in the December 10, 2021 Memorandum Order and Opinion do not change this analysis. For example, *In re Global Marine Inc.* involved a dispute regarding whether a debtor's counsel had a conflict of interest warranting a denial of interim compensation.[17] In that case, the bankruptcy court denied the motion to disqualify the law firm because: (1) it found that, at that time, there was not yet a conflict of interest (but reserved the right to review the issue should a conflict appear to arise in the future); and (2) the interim orders on professional compensation were subject to full review in the context of a final order awarding or denying compensation.[18] The *Global Marine* court effectively denied the motion to disqualify without prejudice.

12.      Here, unlike in *Global Marine*, the Recusal Order is not an "interim" recusal ruling that is subject to a "final recusal application." While the Bankruptcy Court reserved the right to "supplement and amend" the Recusal Order, there are no adjustments of future awards, amendments, or anything for the court to supplement with respect to any relief requested in the Motion to Recuse.

13.      The case *In re Dorsey*, which was also cited in the Recusal Order, involved an

---

[16] *Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 360 (N.D. Tex. 1988).
[17] *In re Global Marine, Inc.*, 108 B.R. 1007 (S.D. Tex. 1988).
[18] *See id.* at 1008. *See also In re Teraforce Tech. Corp.*, 347 B.R. 838, 850 (Bankr. N.D. Tex. 2006) ("an interim fee award is interlocutory in nature and can be reexamined and adjusted by the awarding court").

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 102 of 1726 PageID 11423
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 6 of 10 PageID 12597

appeal from the district court to the Fifth Circuit Court of Appeals under 28 U.S.C. § 1291.[19] In

that case, the bankruptcy court denied a motion to recuse.[20] The order denying the recusal was

appealed to the district court, which found error and remanded the case back to the bankruptcy

court.[21] On remand, the bankruptcy court again denied the motion to recuse, and another appeal

followed.[22] The district court dismissed the appeal as moot because, at that time, the judge at issue

no longer presided over the bankruptcy. However, the district court did not rule on a separate

appeal of a "gatekeeper" injunction, which remained pending in the district court.[23] The district

court's dismissal of the appeal on the motion to recuse was appealed to the Fifth Circuit. The Fifth

Circuit expressly considered the "final order" requirement under 28 U.S.C. § 1291 and *not* the

bankruptcy appellate statute of 28 U.S.C. § 158(a), which applies the more liberal and flexible

standard discussed above.[24] Because the proceeding before the district court had not been

concluded, the Fifth Circuit found that it lacked jurisdiction over the recusal decision under section

1291.[25]

14. In *Dorsey* or elsewhere, the Fifth Circuit has not addressed the question of the

finality of an order denying recusal under the bankruptcy appellate statutes, *i.e.*, 28 U.S.C. § 158(a)

(applicable to the district courts) or § 158(d) (applicable to the courts of appeal). The general rule

for finality in the bankruptcy context should therefore control, especially considering the

---

[19] *In re Dorsey*, 489 Fed. Appx. 763 (5th Cir. 2012).

[20] *Id.* at 763-64 ("In a lengthy order from the bench, Judge Hunter denied the motion to disqualify without hearing any evidence. He then orally ruled on the § 727 objection and the injunction, leaving his previous decision on those issues unchanged. Friendly Finance appealed the decision on the injunction and § 727 objection and moved for rehearing of the motion to disqualify. After Judge Hunter denied rehearing, Friendly Finance appealed that decision as well. On appeal, Judge Robert G. James ruled that Judge Hunter erred in failing to give Friendly Finance an opportunity to present evidence to support its motion to disqualify. As a result, Judge James vacated Judge Hunter's order on disqualification and remanded the case for reconsideration.").

[21] *Id.*

[22] *Id.* at 764.

[23] *Id.*

[24] *Id.*

[25] *Id.*

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 103 of 1726 PageID 11424
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 7 of 10 PageID 12598

potentially drastic consequences for all involved, including Debtor, if Appellants prevailed on appeal *after* the close of the bankruptcy case.[26] As the Supreme Court noted in *Ritzen*, the appropriate "judicial unit" in a bankruptcy case is not the overall case but the discrete issue.[27]

15.    Alternatively, if the Recusal Order is not a final order, then the collateral order doctrine should apply. Under that doctrine, appellate jurisdiction lies "when an order: (1) conclusively determined the disputed question; (2) resolved an important issue separate from the merits of the case; and (3) is effectively unreviewable on appeal from a final judgment."[28] The collateral order doctrine has been applied to bankruptcy appeals,[29] and the elements of this doctrine, which are similar to the elements governing the finality of bankruptcy orders, are met here. *First*, the Recusal Order fully determined the disputed question of recusal. *Second*, the issue of a court's impartiality is certainly an important one and is separate from the merits of the underlying disputes. *Third*, if the Recusal Order cannot be reviewed until the bankruptcy case itself is final and closed, the appeal might be years in the future. At that time, Debtor and others are certain to argue the doctrine of equitable mootness bars appellate review, as the Debtor will have already implemented its plan, paid its creditors, etc. (the estate being fully administered being the standard for the entry of a final decree).[30]

16.    If the Court disagrees with the foregoing arguments and concludes that the Recusal

---

[26] *See In re England*, 975 F.2d at 1171; *see also Ritzen Grp., Inc.*, 140 S. Ct. at 591 ("Finally, Ritzen protests that the rule we adopt will encourage piecemeal appeals and unduly disrupt the efficiency of the bankruptcy process. As we see it, classifying as final all orders conclusively resolving stay-relief motions will avoid, rather than cause, 'delays and inefficiencies.' Immediate appeal, if successful, will permit creditors to establish their rights expeditiously outside the bankruptcy process, affecting the relief sought and awarded later in the bankruptcy case. The rule Ritzen urges 'would force creditors who lose stay-relief motions to fully litigate their claims in bankruptcy court and then, after the bankruptcy case is over, appeal and seek to redo the litigation all over again in the original court.'").

[27] *Ritzen Grp., Inc.*, 140 S. Ct. at 586.

[28] *In re Deepwater Horizon*, 793 F.3d 479, 484 (5th Cir. 2015).

[29] *See, e.g., In re Tullius*, 500 Fed. Appx. 286, 291-92 (5th Cir. 2012) (applying collateral order doctrine to bankruptcy order, but denying application of the doctrine under the facts of the appeal).

[30] *See* FED. R. BANKR. P. 3022.

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 104 of 1726 PageID 11425
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 8 of 10 PageID 12599

Order is an interlocutory order, then the Court nevertheless can and should review the Recusal

Order either: (1) pursuant to its original jurisdiction (by withdrawing the reference of the recusal

motion *sua sponte*);[31] (2) by granting a permissive appeal; or (3) by treating the appeal as a petition

for a writ of mandamus.[32] The factors normally applicable to a permissive withdraw of the

reference include: "the goals of promoting uniformity in bankruptcy administration, reducing

forum shopping and confusion, fostering the economical use of the debtors' and creditors'

resources, and expediting the bankruptcy process."[33] These factors support a withdrawal of the

reference here. Appellants are not forum shopping. Appellants are seeking this Court's review of

the Recusal Order. In addition, a prompt review of the Recusal Order would conserve the parties'

and the bankruptcy court's resources and expedite the bankruptcy process, as opposed to the

inevitable future proceedings that would occur if Appellants were forced to wait to appeal until

the conclusion of the bankruptcy case.

      17.     With respect to a permissive appeal, this Court may treat Appellants' Notice of

Appeal as a motion for leave to appeal.[34] Permissive appeals generally involve the following

factors: "(1) a controlling issue of law must be involved; (2) the question must be one where there

is substantial ground for difference of opinion; and (3) an immediate appeal must materially

advance the ultimate termination of the litigation."[35] Here, while not be a controlling issue of law

in the traditional sense, judicial disqualification is solely an issue of law.[36] And, when a recusal

---

[31] *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 *2 (5th Cir. 2003) (*sua sponte* vacating judgment and ordering recusal and reassignment).

[32] *In re City of Houston*, 745 F.2d 925, 927 (5th Cir. 1984) (The question of disqualification is reviewable on a petition for writ of mandamus, but a writ will not lie in the absence of exceptional circumstances.).

[33] *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985).

[34] *See, e.g., Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 359-60 (N.D. Tex. 1988) (treating notice of appeal of interlocutory order as a motion for permissive appeal and granting same). *See also* FED. R. BANKR. P. 8003(a)(2).

[35] *In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991).

[36] *Njie v. Lubbock County, Tex.*, 999 F.Supp. 858, 860 (N.D. Tex. 1998)

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 105 of 1726 PageID 11426
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 9 of 10 PageID 12600

motion is based upon section 455 (as here), a failure to disqualify is reviewed by looking to whether it was an "abuse of sound judicial discretion."[37] A litigant's right to an impartial judge is fundamental. Here, there appears to be grounds for difference of opinion, and an immediate appeal will advance the ultimate termination of this discrete dispute. Indeed, there is nothing else that can.

18. With respect to a writ of mandamus, Appellants have presented the Court with a substantial case for recusal of the Bankruptcy Court. At present, the Bankruptcy Court is presiding over a dozen or more proceedings in which Debtor and a post-confirmation trustee are seeking hundreds of millions of dollars from Appellants and entities related to Mr. Dondero. As set forth above and in *Ritzen*, the inefficiencies that would result if Appellants prevailed on appeal *after* the close of the bankruptcy case create exceptional circumstances that warrant mandamus.[38]

19. Issues and concerns of such magnitude, made in good faith and with an extensive evidentiary record, merit this Court's review through whatever process is appropriate and available—and there are several. This review is not only to protect Appellants but to protect the integrity of this Court, whose jurisdiction its adjunct exercises.

## CONCLUSION

FOR THE FOREGOING REASONS, Appellants respectfully request the Court determine that the Recusal Order is a final and appealable order; reverse the Bankruptcy Court's order denying the motion to recuse; order that the Bankruptcy Court is recused from the Adversary Proceedings and any future contested matters involving Appellants or any entity connected to Mr.

---

[37] *Id.* at 861.

[38] *See In re England*, 975 F.2d at 1171; *see also Ritzen Grp., Inc.*, 140 S. Ct. at 591 ("Finally, Ritzen protests that the rule we adopt will encourage piecemeal appeals and unduly disrupt the efficiency of the bankruptcy process. As we see it, classifying as final all orders conclusively resolving stay-relief motions will avoid, rather than cause, 'delays and inefficiencies.' Immediate appeal, if successful, will permit creditors to establish their rights expeditiously outside the bankruptcy process, affecting the relief sought and awarded later in the bankruptcy case. The rule Ritzen urges 'would force creditors who lose stay-relief motions to fully litigate their claims in bankruptcy court and then, after the bankruptcy case is over, appeal and seek to redo the litigation all over again in the original court.'").

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 106 of 1726   PageID 11427
Case 3:21-cv-00879-K   Document 29   Filed 12/15/21   Page 10 of 10   PageID 12601

Dondero; and grant Appellants all other further relief, at law or equity, to which they are justly

entitled.

Dated: December 15, 2021                    Respectfully submitted,


                                            By: /s/ Michael J. Lang
                                            Michael J. Lang
                                            Texas State Bar No. 24036944
                                            mlang@cwl.law
                                            CRAWFORD, WISHNEW & LANG PLLC
                                            1700 Pacific Ave, Suite 2390
                                            Dallas, Texas 75201
                                            Telephone: (214) 817-4500

                                            *Counsel for Appellants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 15, 2021, a true and correct copy of the above

and foregoing document was served on all parties of record via the Court's e-filing system.


                                            /s/ Michael J. Lang
                                            Michael J. Lang

**EXHIBIT 11**

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 108 of 1726   PageID 11429
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 1 of 12   PageID 12608

**Case No. 3:21-cv-00879-K**

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

### JAMES DONDERO, et al.,

### <u>Appellants,</u>

### v.

### HON. STACEY G. C. JERNIGAN,

### <u>Appellee.</u>

---

**On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court**

**In re: Highland Capital Management, L.P.
Case No. 19-34054**

---

## DEBTOR'S RESPONSE TO APPELLANTS' BRIEF REGARDING THE
## COURT'S DECEMBER 10, 2021 MEMORANDUM OPINION AND ORDER

---

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 109 of 1726 PageID 11430
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 2 of 12 PageID 12609

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 110 of 1726 PageID 11431
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 3 of 12 PageID 12610

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "HCMLP")[1]

in the above-captioned chapter 11 case and intervenor in this appeal (the "Appeal") from an order

of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the

"Bankruptcy Court"), by and through its undersigned counsel, hereby files this response to the

*Appellants' Response to the Court's December 10, 2021 Memorandum Opinion and Order* filed

on December 15, 2021 [Docket No. 29] (the "Appellants' Brief") pursuant to this Court's

*Memorandum Opinion and Order* [Docket No. 28] (the "Memorandum Opinion")[2] issued on

December 12, 2021. In support of this response, the Debtor respectfully states as follows:

**A.      The Recusal Order Is Not an Appealable Interlocutory
         Order under Controlling Fifth Circuit Law**

1.      The Memorandum Opinion correctly sets forth the long-standing rule in the Fifth

Circuit that "the denial of a recusal motion is not an appealable interlocutory order or appealable

collateral order." *Willis v. Kroger*, 2001 U.S. App LEXIS 31841 (5th Cir. June 13, 2001)

(unpublished); *United States v. Henthorn*, 1995 US. App LEXIS 42268 (5th Cir. Aug. 23, 1995)

(unpublished); *Nobby Lobby, Inc. v. Dallas*, 970 F.2d. 82, 86 n.3 (5th Cir. 1992) ("We decline to

review the court's denial of the City's motion to recuse, however, because the judge's opinion is

not an appealable interlocutory order under 28. U.S.C. § 1292(a)"); *Friendly Fin. Serv. - Eastgate

Inc. v Dorsey (In re Dorsey)*, 489 F. App'x 763 (5th Cir. Oct. 12, 2012) ("The denial of a motion

to disqualify is not an appealable final order under 28 U.S.C. § 1291, is not subject to the collateral

order doctrine, and is not an appealable interlocutory order under 28 U.S.C. § 1292(a)."); *Steering*

---

[1] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of
Reorganization (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943], which confirmed the *Fifth
Amended Plan of Reorganization of Highland Capital Management, L.P.*, as modified (the "Plan"). The Plan became
effective on August 11, 2021.

[2] Unless otherwise noted, (i) capitalized terms used herein have the same meanings ascribed in the Memorandum
Opinion, and (ii) statutory references herein refer to title 28 of the United States Code.

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 111 of 1726 PageID 11432
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 4 of 12 PageID 12611

*Comm. v Mead Corp. (In re Corrugated Container Antitrust Litig.)*, 614 F.2d 958, 960-61 (5th Cir. 1980) ("Disqualification questions are fully reviewable on appeal from final judgment"); *In re Schweitzer*, 2007 Bankr. LEXIS 75033, *2 (E.D. La. Oct.9, 2007) ("the law is quite clear that an order denying disqualification of a judge is an interlocutory order for which no appeal lies prior to final judgment in the case"); *Moerbe v. U.S. Horticultural Supply, Inc. (In re Moerbe)*, 2005 U.S. Dist. LEXIS 32468, *8 (W.D. Tex. September 1, 2005) ("Because an 'order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable,' it would seem to follow that the order in this case granting the recusal but denying its permanency is likewise interlocutory") (quoting *In re Am. Ready Mix*, 14 F.3d 1497, 1499 (10th Cir. 1994)). Thus, the rule in the Fifth Circuit is crystal clear: denial of a recusal motion is not an appealable interlocutory order or an appealable collateral order.

2.      Appellants do not dispute these holdings. Rather, Appellants urge the Court to simply disregard the long line of Fifth Circuit authority holding that orders denying a judge's recusal are interlocutory orders. Instead, Appellants propose that the Court apply section 158(a) and then determine that the Recusal Order is a final order because the rule for bankruptcy finality should be "considered more liberally or flexibly."[3] This argument should be rejected. First, as noted above, the law in the Fifth Circuit is clear that appeals of orders denying recusal orders are *interlocutory orders*. Those decisions apply to the recusal of both bankruptcy and district court judges, as section 455(a) applies to "justices, judges, and magistrate judges."[4] Therefore, section

---

[3] Appellants' Brief ¶ 4.

[4] Section 455(a) does not distinguish between bankruptcy judges, district court judges, or appellate judges and broadly states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality may be questioned." 28 U.S.C. § 455(a). Appellants acknowledge that section 455(a) applies to bankruptcy judges because they characterize the issues on appeal as "[w]hether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.SC. § 455 as untimely" and "[w]hether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits." *Appellants' Brief* [Docket 16] at 1 ("Appellants' Opening Brief").

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 112 of 1726 PageID 11433
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 5 of 12 PageID 12612

158(a)(1) (which grants district courts appellate jurisdiction over final judgments, orders, and decrees)[5] and section 1291(a) (which grants courts of appeals jurisdiction over final orders of district courts) are completely inapplicable to the issues raised in the Memorandum Opinion. Appellants' references to the finality of orders under either section 158(a)(1) or section 1291 are irrelevant because those statutes do not apply to interlocutory orders. The only available avenues to appeal the interlocutory Recusal Order are if it: (1) falls into any of the enumerated subsections of section 1292(a)[6] allowing for appellate jurisdiction over certain categories of interlocutory appeals (which it does not); (2) falls within the collateral order exception doctrine articulated by the Supreme Court[7] (which it does not, for the reasons discussed below); or (3) if this Court, in its discretion, finds that the appeal should be granted by leave only if Appellants can satisfy the applicable stringent standards for discretionary appeals (which they do not, as discussed below).

3.     Appellants acknowledge that the Fifth Circuit has not addressed the finality of an order denying a recusal order under section 158(a), as they request this Court to do.[8] Appellants primarily rely on two cases to support their attempted end-run around applicable Fifth Circuit law

---

[5] Section 158(a)(1) provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgements, orders and decrees . . . ." 28 U.S.C. § 158(a)(1).

[6] Section 1292(a) governs the court's jurisdiction of appeals from interlocutory orders and provides as follows:

(a)  Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

   (1)  Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

   (2)  Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

   (3)  Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

28 U.S.C. § 1292(a).

[7] *See Cohen v. Beneficial Indus. Loan Corp.*, 69 S. Ct. 1221 (1949).

[8] Appellants' Brief ¶ 14.

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 113 of 1726 PageID 11434
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 6 of 12 PageID 12613

but neither even addresses the issue of recusal. The narrow issue in *Bartee v Tara Colony Homeowners Ass'n (In re Bartee)*[9] was an appeal of an order sustaining a creditor's objection to a chapter 13 bankruptcy plan.[10] The Fifth Circuit prefaced its analysis by noting "[s]ince this case *does not involve interlocutory orders*, injunctions, or any other orders specified in § 1292, we have jurisdiction over this case only to the extent that the judgments below are considered 'final' within the meaning of § 158 or § 1291."[11] Yet this Appeal *does* involve an interlocutory order, so *Bartee* is inapplicable (in addition to being factually inapposite because it addressed the finality of a chapter 13 plan).

4.      Appellants also heavily rely on *Ritzen Grp. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020). However, *Ritzen* is also legally and factually inapposite to the instant Appeal. *Ritzen* addressed another narrow issue regarding the finality of a bankruptcy court's order denying a creditor's request for relief from the automatic stay.[12] The Supreme Court held that the adjudication of a motion for relief from stay "forms a discrete procedural unit within the embracive bankruptcy case. That unit yields a final, appealable order when the bankruptcy court *unreservedly* grants or denies relief."[13] The Supreme Court therefore relied on the bankruptcy court's order "conclusively denying that the motion is 'final' and that the "order ended the stay relief adjudication and left nothing more for the Bankruptcy Court to do in that proceeding."[14]

---

[9] 212 F.3d 277 (5th Cir. 2000).

[10] *Id.* at 280.

[11] *Id.* at 282 (emphasis added).

[12] *Ritzen*, 140 S. Ct. at 586 ("The precise issue the Court today decides: Does a creditor's motion for relief from the automatic stay initiate a distinct proceeding in a final appealable order when the bankruptcy court rules dispositively on the motion?")

[13] *Id.* (emphasis added).

[14] *Id.* at 592.

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 114 of 1726 PageID 11435
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 7 of 12 PageID 12614

5. *Ritzen* is not applicable to the case *sub judice* for several reasons. **First**, even in the limited context of the appeal of a relief-from-stay order that *Ritzen* addressed, the Supreme Court held that the order had to "conclusively" deny the motion as "final" in order for it to be immediately appealable. On this critical issue, the Supreme Court stated it did "not decide whether finality would attach to an order denying stay relief if the bankruptcy court enters it 'without prejudice' because further developments might change the stay calculus"[15] This is precisely the issue identified by this Court in the Memorandum Opinion by which Judge Jernigan "reserve[d] the right to supplement or amend this ruling" in the Recusal Order.[16] The Recusal Order is not final because, as noted in *Ritzen*, Judge Jernigan's potential future supplementation or amendment of the Recusal Order "might change the calculus" of the order.

6. **Second**, the Supreme Court expressly limited its decision to the issue of whether the conclusive denial of a motion for relief from the automatic stay was a final order capable of immediate appeal. *Ritzen* does not address the standard for the appeal of recusal orders, which are interlocutory orders in this Circuit.[17]

7. **Third**, Appellants' attempt to equate a court's final adjudication of a relief-from-stay order with the denial of a recusal motion misstates the holding of *Ritzen*. Unlike a relief-from-stay order, recusal of a judge is not a "procedural unit" separate from the remaining case.[18] A relief-from-stay proceeding constitutes a discrete dispute within the larger context of the general bankruptcy case. The basis for the *Ritzen* holding is that the adjudication of the stay-relief motion "determines whether a creditor can isolate its claim from those of other creditors and go it alone

---

[15] *Id.* n.4.

[16] ROA Vol.1 (Doc No. 9-1) at 42.

[17] *See supra* n.5.

[18] *Ritzen*, 140 S. Ct. at 591.

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 115 of 1726 PageID 11436
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 8 of 12 PageID 12615

outside of bankruptcy."[19]   However, the Recusal Order is not a discrete issue within the larger case.  It affects the entire case as Appellants seek to recuse Judge Jernigan from presiding over all matters arising under the chapter 11 case, including the more than fifteen pending adversary proceedings that are currently before her.

8.     None of the cases cited by Appellants rebut the authorities cited in the Memorandum Opinion demonstrating that the Recusal Order is interlocutory.  Appellants' attempt to evade the Fifth Circuit law holding that orders denying recusal are interlocutory should be rejected.

**B.     Fifth Circuit Law Provides that Recusal Orders Do Not Fall Within the Collateral Order Doctrine**

9.     Appellants next argue that if the Recusal Order is not a final order (which it is not), the collateral-order doctrine should apply.[20]  But as noted above, the Fifth Circuit has already ruled that orders denying recusal motions are not appealable collateral orders.[21]   In addition, the bankruptcy court's ruling on a motion to recuse must "conclusively and clearly decide the existence of a conflict of interest" for the collateral-doctrine exception to apply.[22]  The Recusal Order does not conclusively and clearly decide this issue because Judge Jernigan reserved the right to supplement or amend the Recusal Order.  Finally, the collateral-order doctrine does not apply to this Appeal because the Recusal Order is not "effectively unreviewable on appeal."  As the Fifth Circuit explained, "[d]isqualification questions are *fully reviewable on appeal from final judgment.*

---

[19] *Id.* at 590.

[20] To fall within *Cohen's* collateral order doctrine, an "order must (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 171 (5th Cir. 2009).

[21] *Willis*, 2021 U.S. App. LEXIS 31841, at *1 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Bank of Am. v. Weil Gotshal & Manges (In re Global Marine),* 108 B.R. 1007, 1008 (S.D. Tex. 1988); *Dorsey*, 489 F. App'x 763 (denial of a motion to disqualify is not subject to the collateral-order doctrine).

[22] *Global Marine*, 108 B.R. at 1008.

APPX. 10459

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 116 of 1726 PageID 11437
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 9 of 12 PageID 12616

Precisely because disqualification issues are reviewable following entry of judgment, as a threshold matter the *Cohen* doctrine is unavailing."[23] Therefore, the collateral-order doctrine is not applicable to the Appeal.

**C.    Appellants Never Filed a Motion for Leave to Appeal the Recusal Order as an Interlocutory Order and Have Not Satisfied the Standards for Discretionary Appeal**

10.    Appellants' final argument is that the Recusal Order may be immediately appealable as an interlocutory order through leave of this Court pursuant to section 1292(b).[24] Interlocutory appeals are, as noted by Judge Fish, "'sparingly granted' and reserved for 'exceptional cases.'"[25] Appellants have never moved for an interlocutory appeal as required under Rule 8004(a) of the Federal Rules of Bankruptcy Procedure. Even if the Court were willing to treat the notice of appeal as a motion for leave to appeal, the standards governing interlocutory appeals cited in Appellants' Brief are not satisfied in this case. First, there is no "controlling issue of law involved" here. Appellants want Judge Jernigan recused because they allege her to have an "undeniable animus against Mr. Dondero and the resulting prejudicial effect that animus has on the due process rights of Mr. Dondero, the Trusts and the Affected Entities."[26] This Appeal therefore does not involve any controlling issue of law. Second, there is no substantial ground for difference of opinion in this Appeal. A substantial ground for difference of opinion exists when "'a trial court rules in manner which appears contrary to the rulings of all Court of Appeals which

---

[23] *Corrugated Container*, 614 F.2d at 960-61 (emphasis added; citations omitted).

[24] The determination of whether to grant leave to appeal an interlocutory order from a bankruptcy court is the standard used under section 1292(b). *In re Bernardi & Assocs. v. I. Kunik Co. (In re Delta Produce)*, 2013 U.S. Dist. LEXIS 91579 (W.D. Tex. June 28, 2013). The standard consists of the following elements: (1) a controlling issue of law must be involved; (2) the question must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of litigation. *Id*. at **5-6.

[25] *Balestri v. Hunton & Williams LLP (In re Hallwood Energy)*, 2013 U.S. Dist. LEXIS 18165 at *6 (N.D. Tex. Feb. 11, 2013).

[26] *See* Appellants' Opening Brief ¶ 31.

APPX. 14586

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 117 of 1726 PageID 11438
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 10 of 12 PageID 12617

have reached the issue.'"[27] There is nothing in the record of this Appeal that demonstrates that the Recusal Order is contrary to the rulings of the Fifth Circuit. Rather, the Recusal Order extensively cites controlling authorities in the Fifth Circuit governing a motion to recuse.[28] As to the third factor, immediate appeal will not advance the ultimate termination of litigation. Appellants, along with their related entities, have filed several civil actions and appeals of orders of the Bankruptcy Court, including an appeal of the order confirming the Debtor's Plan which is currently pending before the Fifth Circuit. The resolution of this Appeal will (unfortunately) not advance the termination of the morass of litigation that has enveloped the Debtor's chapter 11 case, which litigation addresses many substantive issues unrelated to Appellants' request to recuse Judge Jernigan from the bankruptcy case.[29]

## Conclusion

For the reasons set forth herein and in the Memorandum Opinion, Appellants have not established that the Court has appellate jurisdiction to directly review the Recusal Order because it is an interlocutory order, the collateral doctrine exception is not applicable to this case, and Appellants cannot satisfy the standards for a discretionary appeal to the extent that the Court is even willing to consider that relief.

---

[27] *Bernardi*, 2013 U.S. Dist. LEXIS 91579 at *10 (quoting *In re Cent. Grain Co-op*, 489 B.R. 403, 412 (Bankr. M.D. La. 2013)).

[28] ROA Vol.1 (Doc No. 9-1) at 5-10 (Judge Jernigan's reliance on among other cases, *United States v. Jordan*, 49 F.3d 152 (5th Cir. 1995); *Davis v. Board of School Comm'rs*, 517 F.2d 1044 (5th Cir. 1975); and *Chitmacha Tribe of La. v. Harry L. Laws Co*, 690 F.2d 1157 (5th Cir. 1982), with respect to standards governing recusal).

[29] Appellants also request that the Court treat the Appeal as a petition for a writ of mandamus. The Memorandum Opinion required briefing "on the discrete issue of the Court's appellate jurisdiction." The Debtor submits this request is not appropriate under the terms of the Memorandum Opinion, should be denied, and in any event, is not appropriate for the reasons articulated herein. *See In re City of Houst*on, 745 F.2d 925, 927 (5th Cir. 1984) (petition for writ of mandamus will not lie in the absence of extraordinary circumstances with respect to appeal of denial of recusal motion); *Corrugated Container Antitrust Litig.*, 614 F.2d at 961 ("In addition to their claim that the decision of the district court is immediately appealable . . . defendants 'out of an abundance of caution' also petition for a writ of mandamus. The contention does not merit extended discussion. We refuse issuance of the writ").

Dated:  December 20, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 119 of 1726   PageID 11440
Case 3:21-cv-00879-K   Document 31   Filed 12/20/21   Page 12 of 12   PageID 12619

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on December 20, 2021, a true and correct copy of the foregoing response was served electronically upon all parties registered to receive electronic notice in this case via the Court's CM/ECF system.

/s/ *Zachery Z. Annable*
Zachery Z. Annable

APPX. 014593

**EXHIBIT 12**

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 121 of 1726   PageID 11442
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 1 of 14   PageID 12647

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL MANAGEMENT, L.P., Debtor | § § § § § | |
| JAMES DONDERO, *et al.*, | § § | |
| Appellants, | § § | |
| v. | § § | Civil Action No. 3:21-CV-0879-K |
| HON. STACEY G. C. JERNIGAN, | § § | |
| Appellee. | § | |

## MEMORANDUM OPINION AND ORDER

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") appeal the Bankruptcy Court's Order Denying [Appellants'] Motion to Recuse Pursuant to 28 U.S.C. § 455 which was entered March 23, 2021. *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16).  Because the Court lacks jurisdiction over this appeal, the Court hereby **dismisses** this appeal.

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 122 of 1726    PageID 11443
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 2 of 14    PageID 12648

## I.    Relevant Background

Appellants filed a Motion to Recuse under § 455 with the Bankruptcy Court, asking United States Bankruptcy Judge Stacey G. C. Jernigan (the "Bankruptcy Judge") to recuse herself from presiding over the bankruptcy proceeding of Debtor Highland Capital Management, L.P.  In an 11-page Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"), the Bankruptcy Judge denied the Motion while also reserving the right to supplement or amend the ruling.  *See* Am. Notice of Appeal (Doc. No. 1-1) at 5-15.  The Bankruptcy Court entered the Recusal Order on March 23, 2021.  *See id.*; Appellants' Br. (Doc. No. 16).  On April 18, 2021, the Clerk of the Bankruptcy Court transmitted the Notice of Appeal filed by Appellants on April 6, 2021.  *See generally* Doc. No. 1.  It is the Recusal Order that forms the basis of this appeal.  *See id.*  Appellants designated the Bankruptcy Judge as "Appellee".  *See id.*

Before appellate briefing began, Debtor Highland Capital Management, L.P. moved the Court for leave to intervene in this appeal.  *See* Mot. to Intervene (Doc. No. 2).  Debtor Highland Capital Management, L.P. argued that it is the real party-in-interest, not the Bankruptcy Judge.  Mot. to Intervene at 3.  After the Motion to Intervene was fully briefed and ripe, the Court granted the Motion and allowed Debtor Highland Capital Management, L.P. ("Debtor/Intervenor") to file a responsive brief as accorded to an appellee under the bankruptcy rules.  *See generally* Order (Doc. No. 10).

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 123 of 1726    PageID 11444
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 3 of 14    PageID 12649

Appellants then filed their Appellants' Brief identifying and arguing two issues on appeal:  (1) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely; and (2) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits.   Appellants' Br. at 1. Intervenor/Debtor filed an Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23).  The Bankruptcy Record on Appeal does not reflect that a final judgment has been entered by the Bankruptcy Court in this matter.

Upon an initial review of the appellate briefing, the Court *sua sponte* questioned its jurisdiction over this appeal.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level.").  The Court issued an Order (Doc. No. 28) directing the parties to file briefs, respectively, addressing this Court's jurisdiction over an appeal of the Bankruptcy Judge's order denying a motion to recuse when final judgment has not yet been entered.  The parties timely filed their respective jurisdictional briefs, and the Court has carefully considered the arguments, the applicable and binding law, and relevant portions of the record.  The Court turns now to this threshold jurisdictional issue.

ORDER – PAGE 3

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 124 of 1726 PageID 11445
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 4 of 14 PageID 12650

## II.     Applicable Law

Section 455 of Chapter 28 of the United States Code provides, in relevant part,

that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
>     (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

28 U.S.C. § 455(a) & (b)(1).  Bankruptcy Rule 5004(a) provides that "A bankruptcy

judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the

proceeding or contested matter in which the disqualifying circumstances arises or, if

appropriate, shall be disqualified from presiding over the case."  FED. R. BANKR. P.

5004(a).

District courts have jurisdiction over appeals from the following entered by a

bankruptcy judge:

> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
> (3) with leave of the court , from other interlocutory orders and decrees.

28 U.S.C. § 158(a).

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 125 of 1726   PageID 11446
Case 3:21-cv-00879-K   Document 39   Filed 02/09/22   Page 5 of 14   PageID 12651

III.   **Analysis**

    A.   **Recusal Order is an Interlocutory Order and Not Immediately
Appealable as a Matter of Right**

It is well-established law in the Fifth Circuit that a court's order denying a recusal

motion is not a final order, is not an appealable interlocutory order, and is not an

appealable collateral order, therefore it is reviewable on appeal only from final

judgment. *Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001); *United States v. Henthorn*,

68 F.3d 465, 465 (5th Cir. 1995); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690

F.2d 1157, 1164 n.3 (5th Cir. 1982); *In re Corrugated Container Antitrust Litig.*, 614 F.2d

958, 960 (5th Cir. 1980); *Martin v. Driskell*, 2021 WL 4784756, at *1 (5th Cir. July

12, 2021); *In re Gordon*, 2019 WL 11816606, at *1 (5th Cir. Apr. 10, 2019); *Stancu v.

Hyatt Corp./Hyatt Regency Dallas*, Civ. Action No. 3:18-CV-1737-E-BN, 2020 WL

853859, at *2 (N.D. Tex. Jan. 30, 2020), *adopted by* 2020 WL 833645 (Feb. 20,

2020)(Brown, J.); *Prather v. Dudley*, Civ. Action No. 9:06cv100, 2006 WL 3317124,

at *2 (E.D. Tex. Oct. 18, 2006); *Hardy v. Fed. Express Corp.*, No. Civ.A 97-1620, 1998

WL 104686, at *1 (E.D. La. Mar. 6, 1998).  Moreover, both the Fifth Circuit and

district courts in this Circuit have applied this very clear, decades-old law in appeals

taken from a bankruptcy court's order denying a motion to recuse.  *In re Dorsey*, 489 F.

App'x 763, 764 (5th Cir. 2012); *In re Schweitzer*, Civ. Action No. 07-4036, 2007 WL

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 126 of 1726 PageID 11447
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 6 of 14 PageID 12652

2965045, at *1 (E.D. La. Oct. 9, 2007); *In re Moerbe*, No. 03-57260-LMC/04-5043-

LMC/SA-04-CA-801-FB, 2005 WL 3337634, at *3 (W.D. Tex. Sept. 1, 2005).

In this case, the Bankruptcy Record on Appeal does not establish that a final

judgment has been entered. The law in the Fifth Circuit specifies that a court's order

on a motion to disqualify the judge "is not an appealable final order" and "a party 'must

await final judgment to appeal [a] judge's refusal to recuse.'" *In re Dorsey*, 489 F. App'x

at 764 (holding court was without jurisdiction to review bankruptcy court's decision

on motion to recuse because, although final judgment had been entered, the appeal of

it had not yet been resolved). Appellants attempt to get around this law by arguing

that the courts have considered the "finality" of an order on a motion to recuse only

under 28 U.S.C. § 1291 (which applies to jurisdiction of courts of appeals over appeals

from final orders of district courts) and not § 158(a) (which applies to jurisdiction of

district court over appeals from bankruptcy court orders). Appellants contend this is

crucial because the bankruptcy appellate statute, § 158(a), applies here and that statute

contemplates the more liberal and flexible "finality" standard accorded to bankruptcy

courts, rather than the finality standard under § 1291 pertaining to district court

orders. Resp. Br. (Doc. No. 31) at 2-7.

The Court rejects Appellants' suggestion that the Court should or even can

construe this Recusal Order under a different "finality" standard mere because the

ORDER – PAGE 6

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 127 of 1726 PageID 11448
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 7 of 14 PageID 12653

Bankruptcy Court entered it. There is nothing in the Court's own research, nor anything provided by Appellants, to suggest that the Court should ignore this binding precedent and apply a more liberal and flexible "finality" standard to this appeal of the Recusal Order merely because it is an order of the Bankruptcy Court. Indeed, courts in this Circuit have not hesitated in applying this well-settled law to an appeal of a bankruptcy court order on a motion to recuse. *See, e.g., In re Schweitzer*, 2007 WL 2965045, at \*1 (court found jurisdiction lacking over appeal from bankruptcy court's order denying motion to recuse because "the law is quite clear that an order denying a motion to disqualify a judge is an interlocutory order from which no appeal lies prior to final judgment in the case."); *In re Moerbe*, 2005 WL 3337634, at \*3 ("Because an order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable, it would seem to follow that the [the bankruptcy court's] order in this case granting recusal but denying its permanency is likewise interlocutory."). The Court finds no justification for straying from the well-settled law in the Fifth Circuit and finds that the Bankruptcy Court's Recusal Order is not a final appealable order.

The Court also finds that the Recusal Order is not subject to the collateral order doctrine and it is not an interlocutory order that is not immediately appealable. Appellants ask the Court to treat the Recusal Order as subject to the collateral order

ORDER – PAGE 7

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 128 of 1726 PageID 11449
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 8 of 14 PageID 12654

doctrine. The Court rejects this request as there is no legal basis for doing so. Appellants again ignore very clear Fifth Circuit law that a court order denying a recusal motion is not an appealable collateral order. *Willis*, 263 F.3d at 163 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Henthorn*, 68 F.3d at 465; *Chitimacha Tribe of La.*, 690 F.2d at 1164 n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960; *In re Dorsey*, 489 F. App'x at 764; *Martin*, 2021 WL 4784756, at *1; *In re Gordon*, 2019 WL 11816606, at *1. There is no justification to stray from this well-settled law. Moreover, the Recusal Order is not an appealable interlocutory order under § 1292(a). *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Dorsey*, 489 F. App'x at 764.

For these reasons, the Court finds, as it must, that the Recusal Order is an interlocutory order from which no appeal lies prior to the Bankruptcy Court entering a final judgment. *See Willis*, 263 F.3d at 163; *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960. Therefore, the Court lacks jurisdiction over this appeal.

## B. Leave to Bring an Interlocutory Appeal

Appellants' last hope for their appeal is securing leave of this Court to bring an interlocutory appeal of the Recusal Order. 28 U.S.C. § 158(a)(3) (district courts may hear appeals "with leave of the court, from other interlocutory orders" of the bankruptcy court). Appellants were required to file a motion for leave to appeal

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 129 of 1726 PageID 11450
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 9 of 14 PageID 12655

contemporaneously with their notice of appeal. FED. R. BANKR. P. 8004(a). The

motion for leave to appeal must also include certain contents. *Id.* 8004(b). Despite

these unambiguous requirements of the Bankruptcy Rules, Appellants did not comply

with them. Their failure, however, does not foreclose the appeal entirely because

Bankruptcy Rule 8004(d) permits the Court to "treat the notice of appeal as a motion

for leave and either grant it or deny it." FED. R. BANKR. P. 8004(c). In their

jurisdictional brief, Appellants ask the Court to treat their Notice of Appeal as a motion

for leave to appeal should the Court find the Recusal Order is an interlocutory order.

Appellants' Resp. (Doc. No. 29) at 8. The Court turns now to this analysis.

Section 158(a)(3) does not articulate the standard a district court must use in

deciding whether to grant leave in its discretion, but "[c]ourts in the Fifth Circuit . . .

have applied 28 U.S.C. § 1292(b), the standard governing interlocutory appeals

generally." *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL

524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ) (citing *In re Ichinose*, 946 F.2d 1169,

1177 (5th Cir. 1991); *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, 2011 WL 610016, at

*3 (N.D. Tex. Feb. 14, 2011)(Kinkeade, J.)); *accord Rivas v. Weisbart*, 2019 WL

5579726, at *2 (E.D. Tex. Oct. 28, 2019); *Celadon Trucking Servs., Inc. v. Moser*, 2019

WL 4226854, at *2 (E.D. Tex. Sept. 4, 2019). There are three elements of the

§ 1292(b) standard: "(1) a controlling issue of law must be involved; (2) the question

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 130 of 1726 PageID 11451
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 10 of 14 PageID 12656

must be one where there is substantial ground for difference of opinion; and (3) an

immediate appeal must materially advance the ultimate termination of the litigation."

*In re Ichinose*, 946 F.2d at 1177. An appeal of an interlocutory order is appropriate only

where all three elements are satisfied. *See In re Genter*, Civ. Action No. 3:19-CV-1951-

E, 2020 WL 3129637, at *2 (N.D. Tex. June 12, 2020)(Brown, J.) (citing *Arparicio v.

Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981)). "The Fifth Circuit disfavors

interlocutory appeals and leave to appeal is sparingly granted." *Id.* (internal citations

omitted); *In re Hallwood Energy*, 2013 WL 524418, at *2 ("[I]nterlocutory appeals are

'sparingly granted' and reserved for 'exceptional' cases.") (internal citations omitted).

The decision whether to grant an interlocutory appeal is firmly within the district

court's discretion. *Panda Energy Int'l*, 2011 WL 610016, at *3.

     In this case, there is no controlling question of law with substantial grounds for

disagreement for which resolution would materially advance the end of the bankruptcy

litigation. It is well-settled that a recusal motion under § 455 is left to the sound

discretion of the judge. *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157,

1166 (5th Cir. 1982); *see In re Pendergraft*, 745 F. App'x 517, 520 (5th Cir. 2018) (citing

*Trevino v. Johnson*, 168 F.3d 173, 178 (5th Cir. 1999)). "[C]ontrolling issue of law is

one that has 'the potential for substantially accelerating the disposition of the litigation'

and does not concern 'matters that are entrusted to the discretion of the bankruptcy

ORDER – PAGE 10

court.'" *In re Moerbe*, 2005 WL 3337634, at *4 (W.D. Tex. Sept. 1, 2005) (quoting *In re Aquatic Dev. Group, Inc.*, 196 B.R. 666, 669 (S.D.N.Y. 1996)). The Recusal Order was an exercise of the Bankruptcy Judge's discretion, so there is no controlling issue of law presented. *Cf. In re Tullius*, 2011 WL 5006673, at *3 (W.D. Tex. Oct. 20, 2011). Appellants also cannot satisfy the second factor because the Court cannot find there exists substantial ground for difference of opinion as to the Recusal Motion.

> [C]ourts have found substantial ground for difference of opinion where a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006)(Boyle, J.) (internal citation omitted). The Recusal Order does not fall within any of those categories. Simply because Appellants believe the Bankruptcy Court ruled incorrectly does not demonstrate substantial ground for disagreement. *Id.* at 724. Finally, the third element eludes Appellants as well. An interlocutory appeal of the Recusal Order will in no way materially advance the ultimate end to this bankruptcy matter.

The Fifth Circuit strongly disfavors interlocutory appeals and, accordingly, they are rarely granted and reserved for "exceptional cases". *See, e.g., In re Genter*, 2020 WL 3129637, at *2. Appellants failed to satisfy any of the three § 1292(b) criteria. *Id.*

ORDER – PAGE 11

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 132 of 1726 PageID 11453
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 12 of 14 PageID 12658

Therefore, in its discretion, the Court **denies** Appellants leave to take an interlocutory appeal of the Bankruptcy Court's Recusal Order.

Finally, the Court turns to the remaining arguments Appellants assert. First, the Court declines to *sua sponte* withdraw the reference of Appellants' motion for the bankruptcy judge to recuse herself. The case Appellants cite in support of this suggestion is inapposite here. In the unpublished Fifth Circuit opinion, *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 (5th Cir. 2003), the appellant sought leave to appeal the dismissal of his 28 U.S.C. § 2254 petition. *See generally Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958. The magistrate judge recommended dismissal the § 2254 petition and the district judge adopted the recommendation and dismissed the petition. *See id.* at *1-2. The Fifth Circuit did not address the merits of the dismissal, but, instead, *sua sponte* vacated the district court's final judgment and remanded with instructions to assign the case to a different district judge. *Id.* at *2. The Fifth Circuit's reasoning—the district judge was the spouse of the magistrate judge and the *pro se* prisoner likely did not know nor could he have reasonably known this. *Id.* Unlike the unusual and exceptional facts in *Maddox*, the Court does not find this appeal to justify *sua sponte* withdrawing the reference of and ruling on Appellants' motion to recuse.

The Court also finds no justification for treating Appellants' notice of appeal as a petition for writ of mandamus, which Appellants also request. A question of recusal

is reviewable on a petition for writ of mandamus. *United States v. Gregory*, 656 F.2d 1132, 1136 (5th Cir. 1981); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986); *In re Cameron Int'l Corp.*, 393 F. App'x 133, 134-35 (5th Cir. 2010). "However, the writ will not lie in the absence of exceptional circumstances, and the party seeking the writ has the burden of proving a clear and indisputable right to it." *In re Placid Oil Co.*, 802 F.2d at 786 (citing *Gregory*, 656 F.2d at 1136); *accord In re Cameron Int'l Corp.*, 393 F. App'x at 134-35. Appellants fail to make the required showing. The Court refuses to construe Appellants' appeal as a petition for writ of mandamus.

### C.    Conclusion

The well-established precedent in the Fifth Circuit is that no jurisdiction lies over an appeal of a motion to recuse until final judgment has been entered. Appellants make arguments about potential inefficiency and wasted resources if they must wait to appeal the Recusal Order until the final judgment has been entered. But these arguments are not novel. The Court is certain those same arguments have been advanced in other courts considering this same issue and those courts have rejected them, as this Court does here. Appellants would have this Court carve out an exception to the well-settled law for them without any justifiable basis other than because they think the Bankruptcy Judge was wrong. Appellants must await final judgment, or other

ORDER – PAGE 13

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 134 of 1726    PageID 11455
Case 3:21-cv-00879-K    Document 39    Filed 02/09/22    Page 14 of 14    PageID 12660

final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order.
This Court has no jurisdiction to hear this appeal.

## IV.    Conclusion

The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292(a) and the Court is **without jurisdiction** over this appeal of the Bankruptcy Court's Recusal Order.  The Court further **denies** Appellants leave to appeal the Recusal Order under § 1292(b), **denies** Appellants' request to withdraw the reference of their motion to recuse, and **denies** Appellants' request to construe their appeal as a petition for writ of mandamus.  Accordingly, the Court **dismisses** this appeal for lack of jurisdiction.

**SO ORDERED.**

Signed February 9th, 2022.

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 14

APPX. 10479

# EXHIBIT 13

```
1                      IN THE UNITED STATES BANKRUPTCY COURT
                        FOR THE NORTHERN DISTRICT OF TEXAS
2                                  DALLAS DIVISION

3    In Re:                           )    Case No. 19-34054-sgj-11
                                       )    Chapter 11
4    HIGHLAND CAPITAL                  )
     MANAGEMENT, L.P.,                 )    Dallas, Texas
5                                      )    Thursday, June 10, 2021
                                       )    9:30 a.m. Docket
6              Debtor.                 )
                                       )    MOTION TO COMPEL COMPLIANCE
7                                      )    WITH BANKRUPTCY RULE 2015.3
                                       )    FILED BY GET GOOD TRUST AND
8                                      )    THE DUGABOY INVESTMENT TRUST
                                       )    (2256)
9    _____       )
                                       )
10   HIGHLAND CAPITAL                  )    Adversary Proceeding 21-3006-sgj
     MANAGEMENT, L.P.,                 )
11                                     )
               Plaintiff,              )    DEFENDANT'S MOTION FOR LEAVE
12                                     )    TO FILE AMENDED ANSWER AND
     v.                                )    BRIEF IN SUPPORT [15]
13                                     )
     HIGHLAND CAPITAL                  )
14   MANAGEMENT SERVICES, INC.,        )
                                       )
15             Defendant.              )
     _____       )
16                                     )
     HIGHLAND CAPITAL                  )    Adversary Proceeding 21-3007-sgj
17   MANAGEMENT, L.P.,                 )
                                       )
18             Plaintiff,              )    DEFENDANT'S MOTION FOR LEAVE
     TO                                )    TO AMEND ANSWER TO PLAINTIFF'S
19   v.                                )    COMPLAINT [16]
                                       )
20   HCRE PARTNERS, LLC                )
     N/K/A NEXPOINT REAL               )
21   ESTATE PARTNERS, LLC,             )
                                       )
22             Defendant.              )
     _____       )

23                        TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
24                      UNITED STATES BANKRUPTCY JUDGE.

25
```

```
 1   WEBEX APPEARANCES:

 2   For the Get Good Trust        Douglas S. Draper
     and Dugaboy Investment        HELLER, DRAPER & HORN, LLC
 3   Trust:                        650 Poydras Street, Suite 2500
                                   New Orleans, LA  70130
 4                                 (504) 299-3300

 5   For the Debtor:               Jeffrey Nathan Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
 6                                 10100 Santa Monica Blvd.,
                                    13th Floor
 7                                 Los Angeles, CA  90067-4003
                                   (310) 277-6910
 8
     For the Debtor:               John A. Morris
 9                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
10                                 New York, NY  10017-2024
                                   (212) 561-7700
11
     For the Official Committee    Matthew A. Clemente
12   of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
13                                 Chicago, IL  60603
                                   (312) 853-7539
14
     For James Dondero:            Clay M. Taylor
15                                 BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
16                                 420 Throckmorton Street,
                                    Suite 1000
17                                 Fort Worth, TX  76102
                                   (817) 405-6900
18
     For the NexPoint              Lauren K. Drawhorn
19   Parties:                      WICK PHILLIPS
                                   3131 McKinney Avenue, Suite 100
20                                 Dallas, TX  75204
                                   (214) 692-6200
21
     Recorded by:                  Michael F. Edmond, Sr.
22                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
23                                 Dallas, TX  75242
                                   (214) 753-2062

24

25
```

3

1  Transcribed by:              Kathy Rehling
                                311 Paradise Cove
2                               Shady Shores, TX  76208
                                (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
            Proceedings recorded by electronic sound recording;
24            transcript produced by transcription service.

25

                                                                4

 1              DALLAS, TEXAS - JUNE 10, 2021 - 9:44 A.M.

 2          THE COURT:  All right.  Let me change my stacks here.

 3   I will now hear what was Matter No. 1 on the docket, Highland

 4   Capital, Case No. 19-34054.  We have a motion from the Dugaboy

 5   and Get Good Trusts seeking compliance with Bankruptcy Rule

 6   2015.3.

 7       Who do we have appearing for the trusts this morning?

 8          MR. DRAPER:  Douglas Draper, Your Honor.

 9          THE COURT:  All right.  And for the Debtor this

10   morning?

11          MR. POMERANTZ:  Good morning, Your Honor.  Jeffrey

12   Pomerantz; Pachulski Stang Ziehl & Jones; on behalf of the

13   Debtor.

14          THE COURT:  All right.  Do we have any other parties

15   wishing to make an appearances?  These are the only parties

16   who filed pleadings, but I'll go ahead and ask if anyone wants

17   to appear for any reason.

18          MR. CLEMENTE:  Good morning, Your Honor.  It's Matt

19   Clemente at Sidley on behalf of the Committee.  I'm here.

20          THE COURT:  All right.  Thank you, Mr. Clemente.

21       All right.  Mr. Draper, how did you want to proceed?

22          MR. DRAPER:  I'd just -- I think the issue is

23   primarily a legal issue, Your Honor.

24          THE COURT:  Uh-huh.

25          MR. DRAPER:  So we've filed with the Court our

5

1  response to the Debtor's opposition, I have some comments I'd

2  I like to make, and just leave it at that.  I think -- as I

3  said, I believe the issue is purely a legal issue --

4          THE COURT:  Uh-huh.  Okay.

5          MR. DRAPER:  -- and can go from that.

6          THE COURT:  All right.

7          MR. DRAPER:  All right.  We are here -- thank you,

8  Your Honor.  Can I start?

9          THE COURT:  Yes, you may.

10         MR. DRAPER:  Thank you.  We're here before the Court

11  today on what should be a rather routine matter.  All I'm

12  asking the Court to do is to require the Debtor to do what it

13  should have done when the case was filed and is required

14  pursuant to Bankruptcy Rule 2015.3.

15     2015.3 uses the term "shall" and requires the Debtor to

16  file an official form -- and this is important, because I'm

17  going to come back to the official form -- with respect to the

18  value, operations, and profitability of each entity in which

19  the Debtor has a substantial or controlling interest.

20     The reports, the Rule says, shall be filed seven days

21  before the first meeting of creditors and every six months

22  thereafter.

23     Under 2015.3(d), I recognize a court may, after notice and

24  a hearing, modify the reporting requirement.  No request has

25  been made by counsel for the Debtor, who I will stipulate

6

1   knows the Rules, are experienced, and understand that the rule

2   existed the day they came into the case.  And quite frankly,

3   what we have now is, from what I can see, an intentional

4   decision not to file the report.

5       As the Court knows, this matter was brought before this

6   Court in February, when the confirmation hearing was held.

7   And if the Court will recall, Mr. Seery's comment was (a) it

8   slipped through the cracks; and (b) he implied that it would

9   be done.  That was February.  I had hoped, and I think

10  everybody had hoped, that Mr. Seery, Highland, and Debtor's

11  counsel would be so embarrassed by the fact that they didn't

12  file [sic] the rule that they would have either (a) filed

13  [sic] the rule; or (b) sought -- sought a waiver of the rule.

14  They did neither.

15      Now, let's -- let's go through the 2015.3(d).  There are

16  two items that are not exclusive, and so I recognize it.  The

17  first is that they can't do it, and second is with respect to

18  the information is publicly available.  If you look at the

19  cases that the Debtor has cited in support of their position

20  that courts have waived compliance with the rule, you'll note

21  that three of the four cases deal with first day motions when

22  in fact they ask for extensions of time to file their

23  schedule, Statement of Financial Affairs, and other things.

24  These are normal first day motions.  I understand the

25  extension in that case.  And quite frankly, those extensions

7

 1    are -- fall into the "I can't do it."

 2         The only excuse the Debtor has offered, other than their

 3    response to date, was, oh, I forgot, or it slipped through the

 4    cracks.  That is not a legitimate excuse.  It never has been

 5    and never will be, and should not be countenanced by the

 6    Court.

 7         And so let's start with the after-the-fact excuses offered

 8    by the Debtor.  The first is the bad guy defense -- *i.e.*,

 9    Dugaboy is a Dondero entity; they're asking for this

10    information for nefarious purposes.  That has to -- that

11    should be completely disregarded by the Court.  This is a

12    systematic issue that neither you nor I nor the Debtor's

13    counsel put in the Code or put in the Rules.  It is a

14    requirement, it's systematic, and we, as counsel and people

15    acting on behalf of the estate and sort of people who oversee

16    the system, should insist that this be filed.  The bad guy

17    defense is not an excuse.  And quite frankly, this is

18    information that is required.

19         So what I'm asking for today is not gamesmanship.  I don't

20    think it is ever gamesmanship when you ask for the compliance

21    with a rule that says shall.  Again, it's systematic, and we

22    are here -- and I don't know why -- either the U.S. Trustee

23    was asleep at the switch or anybody else was asleep at the

24    switch -- that this matter hadn't been brought to the Court's

25    attention.

8

1     So the word "shall" is not strained in any fashion.  It's

2   not limited in any fashion.  The word "shall" is absolute.

3       So, again, had -- was there some secret deal between the

4   Trustee -- U.S. Trustee and the Debtor?  I don't know.  That

5   may have been.  But quite frankly, --

6             THE COURT:  A secret deal?

7             MR. DRAPER:  -- the Code, in 2015 --

8             THE COURT:  Did you just use the term "a secret

9   deal"?

10            MR. DRAPER:  Well, some --

11            THE COURT:  What --

12            MR. DRAPER:  I'm not using the term.  What I --

13            THE COURT:  That's highly charged, that --

14  =         MR. DRAPER:  No, --

15            THE COURT:  -- choice of words.

16            MR. DRAPER:  What I mean, what I really mean is

17  sometimes we go to the U.S. Trustee and say, look, can we have

18  an extension?  Can we have -- can we do this a little bit

19  later?  And the U.S. Trustee, in fairness to them, basically

20  says, okay, you can do this or that.  I don't know if that

21  occurred in this case.  But quite frankly, what we have are 20

22  months of noncompliance.  And so I don't know if they said,

23  look, --

24            THE COURT:  Okay.

25            MR. DRAPER:  -- you don't have to file it now.

9

```
 1        THE COURT:  So you meant an informal deal, not secret

 2   deal?

 3        MR. DRAPER:  Yes.

 4        THE COURT:  A secret deal, that sounds like something

 5   nefarious.  Okay?  So, --

 6        MR. DRAPER:  No, it is not intended in that -- it's

 7   --

 8        THE COURT:  Okay.

 9        MR. DRAPER:  Judge, it's not intended in that

10   fashion.

11        THE COURT:  Okay.

12        MR. DRAPER:  This goes to my issue that it's

13   systematic.  It's a systematic compliance.

14      And let's also go the fact that the Bankruptcy Code

15   requires complete and open disclosure.  It does not matter who

16   or why compliance is requested.

17      The next objection is I waited too long.  And they offer

18   an excuse, Judge, we're going to go effective.  Let's look at

19   what the Code requires -- the rule requires.  It says it shall

20   be filed, it has to be filed at certain points, through the

21   effective date of a plan.  It doesn't say after the effective

22   date of a plan is filed or after the effective date of a -- of

23   a plan occurs, your compliance is not required.

24      And I'll point out something where you ruled against me,

25   and we've contrasted that in our motion -- in our opposition.
```

10

1    If you look at the examiner statute, which I know the Court

2    has looked at and completely disagreed with my reading of it,

3    it basically says after confirmation you don't have to do it.

4    This statute doesn't say that.  This statute says you have to

5    file these through the effective date of a plan.

6        And so, you know, that "You waited too long" is really not

7    a legitimate excuse.

8        The next issue is -- and --

9            THE COURT:  Well, on that point, --

10           MR. DRAPER:  And let's look at the cases.

11           THE COURT:  On that point, can I just ask, what is

12   the utility?  I mean, let's say we're one -- okay.  Let's say

13   we're one month away from the effective date.  Let's say we're

14   three months away from the effective date.  What is the

15   utility at this point?  There's a confirmed plan.  Now,

16   granted, it's on appeal.  But, you know, what -- what would

17   you --

18           MR. DRAPER:  Well, --

19           THE COURT:  What would you do with this information

20   at this point?  We have a confirmed plan.

21           MR. DRAPER:  Well, there are two responses to that.

22   First of all, the rule says you have to file it through the

23   effective date of a plan.  Somebody in rulemaking authority

24   made that determination.  And so it's not for you or I to

25   question.  That's the rule.

11

1        The second is the utility may be for further actions in

2    the case that occur after the effective date.  We just don't

3    know.

4        And so the rule is designed to require things to be filed

5    --

6            THE COURT:  Wait.  What did that last statement mean,

7    --

8            MR. DRAPER:  -- through the effective date.

9            THE COURT:  -- for actions that might occur after the

10   effective date?

11           MR. DRAPER:  It may be --

12           THE COURT:  What does that mean?

13           MR. DRAPER:  After the effective date of a plan.

14   There may be some -- some matter that comes up before the

15   Court.  And I'll give you the best example --

16           THE COURT:  Well, --

17           MR. DRAPER:  -- of all of them.

18           THE COURT:  Okay.

19           MR. DRAPER:  If you look -- if you look at the form,

20   all right, and what I'd ask the Court to look at is -- I think

21   it's Exhibit E that's required on the form.  And what Exhibit

22   E requires is disclosure of information where one of the

23   subsidiaries has either paid or has decided -- has incurred a

24   liability to somebody who would have an administrative expense

25   against the Debtor.

                                                                    12

1        The utility of that post-effective date is important,

2    because post-effective date you'll be dealing with fee

3    applications and other things.  So the rule envisions

4    disclosure --

5              THE COURT:  Okay, I -- say that again for me slowly.

6    How --

7              MR. DRAPER:  Okay.

8              THE COURT:  How could there be an administrative

9    expense --

10             MR. DRAPER:  If you'll --

11             THE COURT:  -- claim against the estate in your

12   scenario, again?

13             MR. DRAPER:  Well, my scenario, if you look at

14   Exhibit E that's required in the form, --

15             THE COURT:  Do I have that, Nate?

16             MR. DRAPER:  -- it basically requires a disclosure.

17             THE COURT:  Okay.  I don't know if I have it in my

18   stack of paper.  I --

19             MR. DRAPER:  Well, let me read it to -- I can read it

20   to you, Your Honor.  It's easy.  Let me pull it up.

21       Exhibit E, "Describe any payment by the controlled

22   nondebtor entity of any claim, administrative expense, or

23   professional fee that have been paid or could be asserted

24   against the Debtor or the incurrence of any obligation to make

25   such payments, together with the reason for the entity's

13

 1   payment thereof or the incurrence of any obligation with

 2   respect thereof."

 3       That is clearly a post-effective date issue that the Court

 4   should be concerned about, all parties should be concerned

 5   about, and so if that occurred, then everybody needs to know

 6   about it.

 7       So E envisions something that is absolutely after the

 8   effective date that will be -- has a utility after the

 9   effective date.

10       Let's look at B.  Again, something that may have something

11   to do with after the effective date.  That deals with tax-

12   sharing agreements and tax-sharing attributes.

13       So -- and then C, which also has something to do with

14   after the effective date and how things sort out through the

15   liquidation, is described claims between controlled debtor,

16   controlled nondebtor entity and any other controlled nondebtor

17   entity.

18       So there needs to be a disclosure of due-to's and due-

19   from's between the entities.  This is -- this is not secret

20   stuff.  This is stuff that transcends the effective date of a

21   plan.

22       And so when I focused on the rule, what I think the Court

23   really needs to look at for the utility of this is exactly

24   what the -- is required by a 2015.3 disclosure.

25       Does that answer the Court's question?

14

1          THE COURT:  Yes.

2          MR. DRAPER:  Now, my favorite excuse that's been

3   offered is really what I'll call the secret sauce dispute --

4   excuse, or the former lawyers for the Debtor.  Again, let's

5   break this down and let's look at the form.

6       What the form requires is there's nothing the Debtor's

7   former lawyers did or who were working for Mr. Dondero.  If

8   you look at Exhibit A that's required, is contains the most

9   readily-available balance sheet.  That's not a legal issue.

10  Statement of income or loss.  That's -- that's just an

11  accounting concept.  Statement of cash flows.  That's also an

12  accounting concept.  And statement of changes in shareholders

13  or partners equity for the period covered by the entire

14  report.

15      B again has nothing to do with the lawyers, is describe

16  the controlled nondebtor business entity's business

17  operations.

18      So the information that's here is purely accounting

19  information and it is not secret.

20      Let's, again, let's focus on A, which -- which I think

21  just deals with financial information.  The first one is

22  balance sheet.  All right.  They've argued that this tells

23  what the value -- what we think the value of an asset is.

24  That's not true.  A balance sheet may have a fair market

25  value.  A balance sheet may have a book value.  I don't know

15

1    what they have here.  But quite frankly, if you or I sell my

2    house, our house, we go to our agent and we say, hey, look,

3    agent, you know, this is my listing price.  That's my opinion

4    as to value.  It may not be somebody else's opinion as to

5    value.  And quite frankly, when somebody asks or wants to buy

6    an asset, what they come to, don't they ask, hey, what do you

7    want for it?

8        You know, book value does not equal value.  And I know the

9    Court has held -- has had before it many clients or many

10   debtors, and I've represented a lot of debtors, who think a

11   Bic pen that they have is not worth ten cents but is worth a

12   gazillion dollars.

13       So that issue doesn't go to any secret information.  The

14   statement of income doesn't go to secret information.

15   Statement of cash flows does not.  And changes in shareholders

16   does not.  There's no secret information.  The only person who

17   this may be kept away from, possibly, and that -- that, I

18   don't think applies, is a competitor who may want to look at

19   these.  And a court can fashion that relief and say, okay,

20   let's put this under seal.  If somebody signs a

21   confidentiality agreement, they can have access to this.

22       But this is purely accounting information.  It's nothing

23   more.

24       And the reference to trade secrets that the Debtor

25   attempts to make is just not true.  This is not a trade

1    secret.  There's no confidential research or development or

2    commercial information that's being disclosed.  And 9018 that

3    they cite is truly an evidentiary rule.  We're not -- this --

4    this requirement does not go to customers.  It does not go to

5    pricing.  It does not go to business processes.  It just goes

6    to financial information.

7         So the global argument that they're making is undercut

8    significantly by the -- by what is required under the rule.

9    I'm just asking for mere compliance with the rule, nothing

10   more.

11        And so, you know, what -- I still don't understand what

12   the issue is, why it hadn't been done.  And quite frankly,

13   again, this is systematic.  It has nothing to do with who is

14   requesting it, what is requesting it.  It should have been

15   done.  It should have been done probably by the U.S. Trustee.

16   You know, somebody -- you know, and quite frankly, I've been

17   in this case since December.  It was raised in February.  You

18   know, I don't understand why, from February to the time I

19   filed this motion, they didn't come in and either (a) file the

20   reports, which on their face appear to be benign; or (b) ask

21   for some reason other than, oops, I forgot.

22        And so I'd ask the Court to require compliance.  I don't

23   think the information here falls into any category of for

24   cause.  They can do it.  This -- and the cases -- any case

25   they cite does not support their proposition that it shouldn't

17

1    be done.

2        Does the Court have any questions for me?

3            THE COURT:  Well, I do.  My brain just constantly

4    goes to standing.  And remind me again, the trusts you

5    represent have each filed proofs of claim, correct?

6            MR. DRAPER:  Yes.  And they're objected to, --

7            THE COURT:  They are objected to.

8            MR. DRAPER:  -- just so the Court's aware.

9            THE COURT:  Okay.  Remind me again what the substance

10   of the claim is about.

11           MR. DRAPER:  The substance of the claim is I have a

12   -- I have a $17 million debt owed to me by Highland Select.

13   And it is our position that this Debtor is also liable for the

14   Highland Select debts through its general partner status,

15   through its comingling of things, and how these assets fit

16   together, between Highland Select, which is a hundred percent

17   owned by the -- ultimately owned by this Debtor.  So I'd --

18   again, the standing issue --

19           THE COURT:  And the debt is --

20           MR. DRAPER:  And I am also an equity holder.

21           THE COURT:  And the debt is pursuant to a note?

22           MR. DRAPER:  It's pursuant to a loan agreement

23   between my client and Highland Select.

24           THE COURT:  All right.  And was an administrative

25   expense filed by your client?

18

```
1            MR. DRAPER:  Not by my client.  No.  And I'm also an

2   equity holder in the Debtor that, when the plan goes

3   effective, I ultimately have, at best, a residual interest

4   when the Star Trek Enterprise returns.

5            THE COURT:  Okay.  And what is that residual

6   interest?  Remind me again.  Isn't it less than one percent --

7            MR. DRAPER:  After the --

8            THE COURT:  -- of a subordinated --

9            MR. DRAPER:  After all the class --

10           THE COURT:  Go ahead.

11           MR. DRAPER:  Right.  Well, after all the classes are

12   paid in full plus a hundred cents on the dollar -- get a

13   hundred cents on the dollar plus some interest factor, and the

14   -- there's another party who has an equity interest that's

15   ahead of me get paid, I get some -- some money.

16      Again, I have a residual interest.  It's very tangential.

17   And I'll be very frank to the Court and honest, I think

18   ultimately I will receive nothing under that residual

19   interest.

20      However, my -- the standing is not really an issue here.

21   Honestly, this is a systematic issue.  I've tried to make that

22   clear for the Court.  It's something that should be employed,

23   and who is asking for it is irrelevant.  The Code requires --

24   the Rules require it.  There is no excuse that they've given

25   that should absolve them of that.  And whatever excuse they've
```

19

1  given basically falls in -- falls in the face of what the rule

2  -- the official form requires.

3      I'm not asking for a variance of the official form.  I'm

4  asking that this Court not allow a "Oops, I forgot" or "It

5  slipped through the cracks" excuse.

6          THE COURT:  All right.  And who is the current

7  trustee of these trusts now?

8          MR. DRAPER:  My trusts?  Nancy Dondero is the trustee

9  of the Dugaboy Trust, and I think Grant Scott is the trustee

10  of the Get Good Trust.

11          THE COURT:  Okay.  I'm asking because we heard

12  earlier this week that Grant Scott has resigned from certain

13  roles.

14      All right.  Mr. Pomerantz, do you have evidence, --

15          MR. POMERANTZ:  Yes, Your Honor.

16          THE COURT:  -- or argument only?

17          MR. POMERANTZ:  Argument only, Your Honor.

18          THE COURT:  Okay.

19          MR. POMERANTZ:  As with -- as with many of the other

20  motions that have been filed with this -- in this case and has

21  burdened the Court's docket over the last several months, I

22  really can't help to wonder why we are here.

23      Eighteen months after the case was filed, after plan

24  confirmation, and with the effective date that's set to occur

25  soon, Dugaboy and Get Good, the family trusts, ask the Court

20

 1 │ to compel the Debtor's compliance with 2015.3.  It reminds me

 2 │ of the motion that Mr. Draper mentioned that he filed on the

 3 │ eve of confirmation, the eve of confirmation, fourteen months

 4 │ after the case had been filed, seeking an examiner.  And the

 5 │ Court denied that motion without a hearing.

 6 │     Now they're back again with, as Your Honor mentioned and

 7 │ I'll get to in a little bit, with the same tangential

 8 │ connection to the bankruptcy case and the same tenuous

 9 │ standing that the Court has alluded to on several occasions,

10 │ including just a couple minutes ago.

11 │     It's clear that the motion, which is not supported by any

12 │ other creditor in the case and is actually opposed by the

13 │ Official Unsecured Creditors' Committee, is not about

14 │ financial transparency, as Mr. Draper would like Your Honor to

15 │ believe, but it's filed as a further litigation tactic to gain

16 │ access to information that Mr. Dondero would not be able to

17 │ obtain through discovery, who has tried to obtain through

18 │ other means, and that the Debtor believes will be used for

19 │ improper purposes.

20 │     One of the Movants, Dugaboy, is actually the holder of two

21 │ claims against the Debtor.  I guess Mr. Draper forgot about

22 │ his administrative claim, which really goes to the validity of

23 │ it.  One is the claim against the Select Fund, a subsidiary of

24 │ the Debtor, for which Mr. Draper says they should be liable,

25 │ including under an alter ego theory.

21

1      Yes, Your Honor heard me right.  Dugaboy is saying that
2  the Debtor is an alter ego with a nondebtor entity.  One would
3  think that, given the recent disclosures and commencement of
4  litigation -- and I'm talking about the UBS litigation -- that
5  Mr. Dondero would be the last one to raise alter ego.  In any
6  event, that claim is disputed.
7      The second claim is an administrative claim that Mr.
8  Draper filed on account of their 1.71 percent interest in
9  Multistrat, saying they were damaged by decisions Mr. Seery
10  made by selling certain life insurance policies in the spring
11  of 2020.
12     There is a theme here, Your Honor:  Claims that Mr. Seery
13  made decisions that harmed -- in this case -- Dugaboy's 1.71
14  percent interest.
15     The claim has no merit.  The Debtor will contest it.  But
16  even if it was allowed, the claim would be paid a hundred
17  cents on the dollar under the plan.  And accordingly, the
18  information under 2015.3 is not relevant.
19     Get Good filed a claim which alleges they may have a claim
20  from its limited partnership interest in the Debtor.  But for
21  the record, Get Good is not a limited partner of the Debtor.
22     So, how did we get here, Your Honor?  The Dondero entities
23  sandbagged the Debtor by raising the issue for the first time
24  during the confirmation trial.  Not in their briefs, not in
25  communications to the Debtor in advance of the confirmation,

22

1   but while the Debtor had its witness on the stand.

2       And why did they do it that way?  Because they wanted to

3   be able to argue, and they did argue to Your Honor, that the

4   Court couldn't confirm the plan because the Debtor did not

5   comply with Rule 2015.3, was in violation of 1129(a)(2), and

6   the Court could not confirm the plan.

7       Of course, the Court rejected that argument.  And when the

8   Debtor entity -- when the Dondero entities raised it as a

9   reason for Your Honor to enter a stay pending appeal, Your

10  Honor commented that that claim bordered on frivolous.  And of

11  course, that issue has been raised to the Fifth Circuit as one

12  of the reasons to overturn Your Honor's confirmation order.

13      And why are the Dondero entities persisting now in their

14  effort to obtain disclosure?  It's because they're desperate

15  to obtain financial information about the Debtor because they

16  want to become involved in the Debtor's future asset

17  dispositions at the nondebtor affiliates and they want to get

18  information.

19      As Your Honor will recall, Mr. Dondero filed a motion in

20  January asking for this Court to require the Debtor to bring

21  affiliated -- affiliated entity asset sales to the Court.  The

22  Debtor opposed the motion, and before the hearing it was

23  withdrawn.

24      Your Honor has heard testimony from Mr. Seery throughout

25  the case that Mr. Dondero previously interfered with the

23

```
 1    Debtor's asset sales and that -- and on that basis, the Debtor
 2    was not comfortable including Mr. Dondero in sale processes.
 3    And I'm not talking about the AVYA and the SKY stock from the
 4    CLO funds, but rather certain transactions regarding SSP and
 5    OmniMax which were subject to a motion made by, I believe, the
 6    Funds or the Advisors -- I get them confused sometimes --
 7    accusing the Debtor of mismanaging the CLOs.  And if Your
 8    Honor recalls, Your Honor denied that motion based upon a
 9    directed verdict.
10         So, having been rebuffed by the Debtor in its attempts to
11    obtain financial information that they're not entitled to, the
12    trusts have one last effort.  Press 2015.3 arguments, because,
13    of course, they're very interested in the integrity of the
14    process, in the institution, in the following of the
15    Bankruptcy Code.  That is exactly what their motivation is.
16         But there's yet another reason, Your Honor, the Debtor
17    believes Mr. Dondero, through the trusts, is pursuing this
18    motion.  As Your Honor is aware, the Debtor recently
19    discovered some extremely troubling information regarding a
20    massive fraud involving a previous --
21         (Audio cuts out.)
22              THE COURT:  Uh-oh.
23              THE CLERK:  He froze up.
24         (Pause.)
25              THE COURT:  All right.  Mr. Pomerantz, you're frozen.
```

1    Is everybody frozen, or is it just him?

2            MR. POMERANTZ:  There'll be some judicial estoppel.

3            THE COURT:  Okay.  Mr. Pomerantz?

4            MR. POMERANTZ:  Yes.

5            THE COURT:  You were frozen for about one minute.  So

6    I am sorry, --

7            MR. POMERANTZ:  Uh-huh.

8            THE COURT:  -- you're going to need to repeat the

9    past minute for me.

10            MR. POMERANTZ:  Just to check if you were listening,

11   Your Honor, what was the last thing you remember me saying?

12            THE COURT:  I was listening.

13            MR. POMERANTZ:  Okay.  So I will -- did you hear me

14   talk about Mr. Seery's testimony throughout the case?

15            THE COURT:  No.  No.

16            MR. POMERANTZ:  Okay.  I'll go back a paragraph

17   before.  Okay.  Okay.

18        And why are the Debtor -- why are the Dondero entities

19   persisting now in their effort to obtain disclosure?  It's

20   because the Dondero entities are desperate to try to obtain

21   financial information, information they would not otherwise be

22   entitled to under discovery rules, because they want to become

23   involved, he wants to become involved in the Debtor's asset

24   dispositions in the future regarding affiliated nondebtor

25   entities.

25

1      If Your Honor will recall, Mr. Dondero made a motion in

2   January seeking an order from this Court requiring the Debtor

3   to bring to this Court asset sales from nondebtor affiliates.

4   The Debtor opposed the motion, and before the hearing on the

5   motion it was withdrawn.

6      Your Honor has heard testimony from Mr. Seery throughout

7   the case that Mr. Dondero previously interfered or tried to

8   interfere with the Debtor's asset sales, and on that basis the

9   Debtor was not comfortable inviting Mr. Dondero into its asset

10  sale processes.

11     And I'm not talking about the AVYA and SKY stock from the

12  CLOs, but rather certain transactions regarding SSP and

13  OmniMax, which were closed for fair value, which were subject

14  of a motion that the Advisors or the Funds -- and I often get

15  them confused -- that they made, accusing the Debtor of

16  mismanaging the CLOs.  And I'm sure Your Honor recalls.  Your

17  Honor denied that motion on a directed verdict basis.

18     So, having been rebuffed in their attempts to try to get

19  the information that they weren't entitled to, they're now

20  proceeding under 2015.3.  And, of course, Mr. Draper say he is

21  a protector of the process, the integrity of the system

22  demands it.  It has nothing to do with Mr. Dondero's

23  interests, of course, because Mr. Draper is just there to make

24  sure everything runs on time and everything is done according

25  to the law, notwithstanding the fact that the U.S. Trustee

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 161 of 1726 PageID 11482

26

1  hasn't brought this motion, notwithstanding the fact that the

2  Unsecured Creditors' [Committee] supports our position, and

3  notwithstanding the fact that not one creditor, not one

4  unaffiliated creditor, has asked this Court for that

5  information and relief.

6       There's yet another reason, Your Honor, the Debtor

7  believes that the trusts are pursuing this motion.  As Your

8  Honor is aware, the Debtor recently discovered some extremely

9  troubling information regarding a massive fraud involving a

10  previously-unknown entity called Sentinel Reinsurance.  And

11  that information is the subject of an adversary proceeding

12  filed by UBS, which Your Honor heard substantial information

13  about both in connection with hearings on that motion practice

14  and also at the UBS 9019 motion.

15       The Debtor believes that the 2015.3 motion is a veiled or

16  pretty transparent effort of Dondero trying to find out what

17  the Debtor knows and what the Debtor doesn't know and trying

18  to get the Debtor to go on record with information that later

19  in litigation they will use as a judicial estoppel.

20       Your Honor, that's not an appropriate predicate for the

21  motion.  Mr. Draper will deny that that's the reason, of

22  course, but I leave it for Your Honor to look at the

23  circumstances and make your own conclusions.

24       As the Court has mentioned many times, context matters,

25  and the Court should take this context into account in looking

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 28 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 162 of 1726   PageID 11483

27

1    at the motion and the requested relief.

2        In our opposition, we argue that the Court should either

3    waive the 2015.3 compliance, given the anticipated effective

4    date, or continue the hearing to September 1 for a further

5    status conference if the effective date doesn't occur.

6        The burden on the estate if it was required to comply with

7    2015.3 is significant, and this goes to the issue Your Honor

8    mentioned, that, really, what's the point at this stage of the

9    case?  There are more than 150 entities that arguably meet the

10   definition of substantial or controlling interest for which

11   the Debtor would be required to file reports under 2015.3.  As

12   the Court knows, the Debtor is down to 12 staff, 13 if you

13   include Mr. Seery.  And if those employees working with the

14   Debtor's financial advisors were required to devote the

15   necessary time and effort to prepare the reports, the time and

16   the cost it would take would be substantial.  The Debtor just

17   doesn't have the bandwidth to comply.

18       More importantly, Your Honor, as we mention in our

19   opposition, Mr. Seery and the board are extremely concerned

20   with the quality of information it has received from the

21   Debtor's employees who have since been terminated by the

22   Debtor and now most of them are working for Mr. Dondero and

23   his related entities in one form or another.  It's not just

24   the lawyers, as Mr. Draper says.  It's the financial advisors,

25   who, in other contexts, and you'll hear a little later, are

28

1   coming up with new information, new defenses on notes, et

2   cetera.  The Debtor has no confidence that the information in

3   its records is accurate from a financial perspective or from a

4   legal perspective.

5       As I mentioned, the Court is aware of the Sentinel cover-

6   up.  And uncovering just the facts regarding Sentinel was a

7   very difficult process and required the Debtor to essentially

8   conduct discovery against itself.  It just couldn't rely on

9   its information.  So conducting the diligence that would be

10  required to provide accurate information for 150 entities,

11  intercompany claims, administrative claims, back and forth,

12  due-to's, due-from's, tax issues, all the stuff required by

13  the forms would be an extremely arduous task.  It would take

14  millions of dollars of forensic accounting.  And it wouldn't

15  -- and for what purpose?  There is no purpose.

16      In addition, Your Honor, to waiving filing the reports,

17  2015.3 also allows the Court to modify the reports requirement

18  for cause when the debtor is not able, in making a good faith

19  effort, to comply with the requirements.  Your Honor, in this

20  case, cause is clearly established under 2015.3.

21      Dugaboy spends a lot of time in their reply attacking the

22  cases that the Debtor cites in its opposition.  While the

23  facts in those cases are different from the case here, they

24  all share something in common which is the key point:  All of

25  the cases involve a waiver of the 2015.3 requirement for plans

29

1  that will be confirmed or will soon become effective.

2      Mr. Draper doesn't contest that this Court has the power

3  to waive.  He says, well, those requests were made in the

4  first 30 days of the case or in the initial part of the case.

5  But they all granted relief where the effective date -- where

6  either the confirmation date occurred and they were waiting

7  for the effective date, or the confirmation case was -- was

8  pending.

9      And Your Honor, we would ask the Court to treat the

10  Debtor's opposition as a motion to waive the requirement under

11  2015.3.  We could file a separate motion after this hearing.

12  It would be a waste of time.  But we would ask Your Honor,

13  treat our opposition as a motion.

14      Dugaboy spends the rest of its time, in the papers and its

15  argument that Mr. Draper made, challenging several arguments,

16  other arguments the Debtor makes in its opposition.  First,

17  they argue that there is no deadline for seeking compliance

18  and that the insinuation that we made that this is

19  gamesmanship is off base.  I'll acknowledge, Your Honor,

20  2015.3 does not contain a deadline for a party seeking

21  compliance.  But as I said before, context matters.  And given

22  how this motion has come to be before your court, I will leave

23  it for Your Honor to determine which party is the true one

24  playing games here.

25      Second, Dugaboy argues that there's nothing confidential

30

```
 1    in any of the information required to be filed in the 2015.3
 2    reports and that the disclosure of information will facilitate
 3    interest in the assets and maximization of the Debtor's
 4    assets.  Twenty months into this case, Your Honor, no party
 5    other than Mr. Dondero or his related entities has complained
 6    to the Court that the Debtor is not being transparent or
 7    forthcoming.
 8         And there's good reason for that.  Even during the early
 9    stages of this case, when the Debtor and the Committee had
10    their differences, the Debtor was entirely forthcoming with
11    information about its assets, nondebtor affiliates, and
12    strategy for maximizing assets of the Debtor and its
13    affiliated entities.  That collaborative effort continues
14    today, and I suspect is one of the reasons that the Committee
15    has joined in the Debtor's opposition here.
16         Similarly, the Debtor's nondebtor affiliates have
17    transacted business with third parties postpetition.  The
18    Debtor has provided information to those parties as
19    appropriate, subject to nondisclosure agreement, and several
20    successful processes have been run that have maximized value.
21         And just to make clear, Your Honor, we do not believe that
22    Mr. Dondero or his related entities signed a nondisclosure
23    agreement that they would comply with the obligations.  So we
24    have no interest and no desire, unless ordered by the Court,
25    either in this context or another context, to provide Mr.
```

31

1   Dondero or his related entities with information that the

2   Debtor believes would prejudice its ability to monetize

3   assets.

4       The alleged transparency that Mr. Draper and the trusts

5   seek is not borne out of a desire to open the playing field

6   and make it level and put financial information in the public

7   domain for the good of the case.  It's about getting access to

8   information that the Debtor, in the exercise of its business

9   judgment -- should not be disclosed.

10      Lastly, Mr. Draper again, during oral argument, harped on

11  Mr. Seery's testimony that the reason the reports were not

12  filed is that they fell through the cracks.  It's misleading.

13  He also stated that Mr. Seery said they would file the

14  reports.  I've looked at the testimony.  That's not what he

15  said.  But he did say at confirmation that it slipped through

16  the cracks.  No doubt.  That's in the transcript.

17      And yes, the Debtor stands behind the fact that, in the

18  months leading to the confirmation hearing, neither Mr. Seery

19  nor the Debtor's professionals even thought about 2015.3.

20      But Your Honor, it's what has happened since that

21  justifies the Debtor's request for a waiver.  The plan is soon

22  to become effective.  As I said, the Debtor is down to 12

23  employees, who could not possibly prepare this information

24  without substantial time and effort.  Their effort and their

25  time should be focused on monetizing assets that will put

32

1    money in creditors' pockets, hopefully sooner than later.

2        And on top of that, given the massive fraud that

3    management has uncovered, and continues to uncover information

4    to this day, Your Honor, on matters separate from the Sentinel

5    matter -- every week, we are finding out new information that

6    has not been made public that causes us real concern, and at

7    the appropriate time that information will be brought before

8    the Court -- the Debtors simply can't rely on that

9    information.  And to be required to go through the effort to

10   put that information out in the public record so Mr. Dondero

11   can later say that the Debtor was judicially estopped, or use

12   that information for an ulterior purpose or a litigation

13   strategy, just does not make sense.

14       Based upon the foregoing, Your Honor, we would ask that

15   the Court deny the motion and grant the Debtor a waiver of the

16   2015.3 requirements.

17       Does Your Honor have any questions?

18           THE COURT:  I do not think so.  Well, I just -- am I

19   correct in remembering the Debtor had somewhere around 75

20   employees at the beginning of this case?  And I didn't know it

21   was down to 12.  I knew it was down very low.  But that's what

22   we're talking about?

23           MR. POMERANTZ:  Yeah, that -- that sounds about

24   right, Your Honor.

25           THE COURT:  Okay.

1          MR. POMERANTZ:  And I should mention, you know, I was

2    there at the beginning.  I was there before the board.  The

3    first couple months of the case, it was extremely difficult to

4    get the Debtor's employees focused on trying to get the

5    information for the 2015.3.  They did not want that

6    information disclosed.  And it's sort of a -- sort of a little

7    ironic that now they're here asking for disclosure.

8       But, look, we're not going to walk away from the fact

9    that, yeah, it slipped through the cracks.  After the board

10   took over, Your Honor has heard many times what they did, the

11   efforts they went to.  If the U.S. Trustee had approached us,

12   if Mr. Dondero had approached us early on, we would have

13   figured out a way to address that and deal with that.  The

14   fact of the matter, it wasn't.  The fact of the matter, it was

15   brought up as a litigation tactic on confirmation, to defeat

16   confirmation of the plan.  And as I mentioned, for the

17   reasons, it's being used as a tactic now as well.

18          THE COURT:  All right.  Thank you.

19          MR. DRAPER:  Your Honor, I -- can I -- can I make a

20   few comments?

21          THE COURT:  No, not --

22          MR. DRAPER:  I'll be short.

23          THE COURT:  Not yet.  Mr. Clemente, --

24          MR. DRAPER:  Okay.

25          THE COURT:  -- I neglected to mention when I was

34

1  taking appearances, you filed a joinder on behalf of the

2  Committee with regard to --

3            MR. CLEMENTE:  That's correct, Your Honor.

4            THE COURT:  So I need to hear from you next, and then

5  I'll circle back to Mr. Draper.

6            MR. CLEMENTE:  That's correct, Your Honor.  And just

7  for the record, Matt Clemente from Sidley Austin.

8            THE COURT:  I should say, a joinder in the

9  opposition.  That was a confusing statement I just made.

10            MR. CLEMENTE:  Yeah, that's correct, Your Honor.

11            THE COURT:  Uh-huh.

12            MR. CLEMENTE:  And so I will be very brief, because

13  Mr. Pomerantz was obviously very thorough.  But just to echo

14  what he said, you know, the Committee is comfortable with the

15  information that it has received.  And as Your Honor knows, we

16  haven't been and won't be shy about coming to the Court if we

17  felt that that was not the case.

18      You know, we obviously had our issues early on in the

19  case, including with respect to getting information from the

20  Debtor.  But, again, the Committee, you know, has been

21  comfortable with the information that it's received from the

22  Debtor.

23      Therefore, at this point, Your Honor, from the Committee's

24  perspective, there doesn't seem to be any bona fide purpose to

25  making the Debtor go through the cost and the expensive effort

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 36 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 170 of 1726   PageID 11491
92

35

 1   that Mr. Pomerantz said would be required to create the Rule

 2   2015.3 reports.  And, again, I -- without casting aspersions,

 3   it would suggest, based on previous activity, that there's

 4   really only a nefarious purpose for what is being pressed

 5   before Your Honor today.

 6        So, Your Honor, again, we support the Debtor's position.

 7   I absolutely agree with Mr. Pomerantz's arguments.  We would

 8   request that Your Honor, you know, enter the relief that the

 9   Debtor is requesting today.

10             THE COURT:  All right.  And Mr. Clemente, I just --

11             MR. CLEMENTE:  Yes?

12             THE COURT:  I just want to seal in my brain the

13   context that I think applies here.  The January 2020 corporate

14   governance settlement order.  In there, we all know there were

15   lots of protocols about lots of things, but one of them or a

16   set of the protocols dealt with transfers of assets in these

17   nondebtor subs or entities controlled by the Debtor.  And, of

18   course, Mr. Pomerantz alluded to this, but I'm just going to

19   make sure I'm crystal clear on what I remember.  You know, the

20   whole -- well, it was a protocol that the Committee would have

21   to be consulted on transfers of assets of those nondebtor

22   subs, those nondebtor controlled entities, and, you know,

23   there was a discussion that 363 doesn't apply, of course, to

24   nondebtor assets, and you could really argue all day, even if

25   it did apply, about whether these are ordinary course or non-

36

1   ordinary course because of the business Highland is in.  But

2   the Debtor negotiated with you and your clients:  We're going

3   to have full transparency to let you all get notice of

4   transfers of assets of these subs, and you could even object

5   and bring a motion.  I mean, you can file some sort of

6   pleading, even though we were not so sure 363 under any

7   stretch might apply.

8        Am I correctly restating the context that -- you know, Mr.

9   Pomerantz alluded to it, but I just want to make sure I'm

10  clear and the record is clear.

11            MR. CLEMENTE:  Your Honor, you are -- you are

12  absolutely correct.  There's a very complex set of protocols

13  that we painstakingly negotiated with the Debtor that had

14  different categories depending upon the asset --

15            THE COURT:  Uh-huh.

16            MR. CLEMENTE:  -- and the Debtor's ownership and its

17  relationship with respect to the nondebtor entities or the

18  related parties.  That required the Debtor to come to the

19  Committee in certain sets of circumstances and explain a

20  potential transaction and get the input from the Committee,

21  and either the Committee could consent to the transaction, or

22  if the Committee did not consent to the transaction, the

23  Debtor could seek relief from the Court.

24       Your Honor will remember that, in fact, one of the

25  hearings we had with respect to the monies that were placed in

37

 1   the Court registry arose out of the protocols.  So the

 2   protocols worked from that perspective in requiring the Debtor

 3   to come to the Committee, allow the Committee to make an

 4   evaluation, and then the Debtor would make a decision from the

 5   perspective of how it wished to proceed.

 6      So, Your Honor is absolutely correct.  That was all part

 7   of the governance settlement that was negotiated back in

 8   January.  And from the Committee's perspective, again, it

 9   hasn't always been lemon water and rose petals, but we believe

10   that those protocols worked, and worked to provide the

11   Committee with information so it could appropriately evaluate

12   what the Debtor was doing.

13        THE COURT:  All right.  So I'm correct, you would

14   say, in thinking there was a lot of transparency built in?  It

15   didn't always work smoothly in the beginning, and as we know,

16   there were document production requests, many of them from the

17   Committee.  That all came to a head last July, with more

18   protocols put in place.  But lots of transparency was

19   negotiated by the Committee with regard to all of these

20   controlled entities and subs?

21        MR. CLEMENTE:  That was a critical, Your Honor, that

22   was a critical component of the governance settlement.

23        THE COURT:   Okay.

24        MR. CLEMENTE:  Because that was obviously the impetus

25   for us wanting that governance settlement, so we could get

38

1   that transparency.

2       So, to answer your question, Your Honor, yes, the

3   protocols served that function of providing the Committee with

4   information on transactions that the Debtor was proposing to

5   enter into.

6           THE COURT:  Okay.  And of course, there was a waiver

7   of the privilege -- I don't know if that's the word; I guess

8   that is the right word -- with regard to possible estate

9   causes of action.  Maybe I'm getting into something unrelated.

10  Maybe I'm not.  But that was part of the protocol, too, right,

11  the Debtor would waive its --

12          MR. CLEMENTE:  That's correct, Your Honor.

13          THE COURT:  -- privilege with regard to --

14          MR. MORRIS:  Your Honor, I apologize for

15  interrupting.  This is John Morris from Pachulski Stang.  I

16  just want to recharacterize that a bit.

17          THE COURT:  Okay.

18          MR. MORRIS:  It's not a waiver of the privilege.  We

19  agreed to share the privilege --

20          THE COURT:  Share the privilege.  Okay.

21          MR. MORRIS:  -- with the Debtor.  The Debtor --

22          MR. CLEMENTE:  I --

23          MR. MORRIS:  I'm sorry to -- sorry to correct you,

24  but it's a --

25          THE COURT:  Well, no, --

39

```
1            MR. MORRIS:  -- very important point.
2            THE COURT:  -- that's why I hesitated on that word.
3     I wasn't sure if that was the word, the concept.
4            MR. MORRIS:  There's no waiver.
5            THE COURT:  Okay.  Okay.  I'm not always --
6            MR. CLEMENTE:  That is -- and that is correct, Your
7     Honor.
8            THE COURT:  Okay.
9            MR. CLEMENTE:  Mr. Morris is correct.  As are you.
10           THE COURT:  Okay.  So I'm asking you, is all of this
11    protocol that was in place, I mean, is it reasonable for me to
12    think maybe that's the reason you all never pressed the 2015.3
13    issue, because you were getting a full look, as best you could
14    tell, and more?  You were getting more information, perhaps,
15    than these reports would have provided, even.  Is that fair
16    for me to think?
17           MR. CLEMENTE:  It is fair for you to think that, Your
18    Honor.  We viewed the protocols as our mechanism to get the
19    information that was necessary for the Committee to evaluate
20    the transactions that the Debtor wanted to engage in.  And so
21    we were looking to the protocols, and in fact, I think the
22    protocols were very broad in certain respects, and we were not
23    thinking about the Rule 2015 reports, nor would we have said
24    that that would have been a substitute for negotiating those
25    protocols and implementing them.
```

Case 19-34054-sgj11  Doc 3445-13  Filed 08/15/22   Entered 08/15/22 16:45:41   Page 41 of
Case 3:23-cv-00726-S  Document 8-23  Filed 12/29/23   Page 175 of 1726  PageID 11496

40

1          THE COURT:  Uh-huh.

2          MR. CLEMENTE:  So that's how the Committee was

3    looking at it, Your Honor.

4          THE COURT:  Okay.  All right.  Well, okay.  Mr.

5    Draper, I'm going to come back to you.  You get the last word

6    on that.

7          MR. DRAPER:  Thank you.  First of all, the answer is

8    yes, there are extensive protocols between the Debtor and the

9    Committee.  I one hundred percent agree with you.  And the

10   other point I'd make with that is this information is a

11   scaled-down version of what they're giving the Committee on a

12   regular basis.  So the argument that it would take hundreds of

13   man hours and millions of dollars to do that is absolutely not

14   true.  This information, in large measure, even vaster

15   portions of it have already been given to the Committee.

16   Number one.

17       Number two, we as lawyers are literalists --

18          THE COURT:  But I presume not in this format.  I

19   presume not in the format of filling out the form A through E

20   exhibits.  I mean, maybe it's an email.

21          MR. DRAPER:  Well, --

22          THE COURT:  Maybe it's a phone call.

23          MR. DRAPER:  -- it's not in a form -- no, there is --

24   there is -- they both have financial advisors who I'm sure

25   you're going to see whopping fee applications from who have

41

 1    pored through all of this.  My bet, and I'd bet big dollars on

 2    this, is that financial -- balance sheets are given to them on

 3    a regular basis, statements of financial information for

 4    subsidiaries and changes in cash flow are given to them.

 5    Otherwise, there's no way the Creditors' Committee could

 6    monitor what's going on and what's happening.

 7         So, really, this is -- this is not a phone call thing.

 8    There is real financial data that's being given that is

 9    available and can be given on a scaled-down basis.

10         My real point of this is we as lawyers are literalists

11    until it suits our purposes not to be literalists.  There is

12    no exception in 2015.3 for information being given to a

13    creditors' committee.  In fact, when you look at 2015.3, it

14    basically figures there is information going to a creditors'

15    committee.  This is for the others who don't have access to

16    that information.

17         And the interesting part of that is, as the Court's aware,

18    the Bankruptcy Code was amended that if I had gone to the

19    Creditors' Committee and made a request as a creditor, I

20    probably have a right to get even more information than 2015.3

21    allows me to get.

22         Next, which is the giant smokescreen.  We're basically

23    dealing now with the gee, Mr. Dondero's a bad guy; gee, they

24    want this information because they want to uncover what we

25    know.  That's just not true with respect to these reports.  If

42

1   you look at what the reports do, the reports start from the

2   day that the case was filed and ask for changes in financial

3   condition from the day the case was filed going forward.  It

4   is all postpetition in its effect.  And to the extent they've

5   uncovered things that are incorrect in the Debtor's schedules,

6   the truth is the amendment of the schedules is warranted.

7   2015.3 does not deal with prepetition activity in any way,

8   shape, or form.  They are balance sheets that ask for -- or

9   changes in financial condition that go from the filing of the

10  case, or seven days before, and require reports every six

11  months.

12       So this giant smokescreen that there's a massive fraud,

13  there's all this other stuff that's been uncovered, is just

14  not true.  It is an attempt to cover up or give an excuse that

15  is unwarranted with respect to why they haven't done the

16  2015.3.

17       Next point.  There is no secret stuff that's being done.

18  There's no valuation that we're asking for.  2015.3 asks for

19  balance sheet information.  So, in fact, if they own ten

20  pieces of property, 2015.3 would bind them together in a

21  balance sheet and say, this is the total real estate that we

22  have.  If an entity has 15 entities under its umbrella, it

23  would have a balance sheet entry.  Assets and liabilities.

24  It's not broken down.  The assets are probably at book value

25  or some sort of mark to market.

43

1    But honestly, this is -- there is no way that this

2  information gives anybody any benefit in terms of any bidding.

3    And the other point that's problematic is anybody who

4  wants to buy these assets would walk in and say, look, I want

5  a data room, let me look at this.  If what Mr. Pomerantz is

6  saying, which I don't understand, is that we're not going to

7  let a Dondero entity buy an asset, notwithstanding the fact

8  that they may pay more for the asset than somebody else would,

9  I think that's -- I have a huge problem with that.  We're here

10  for monetization of assets.  We're here to maximize the value.

11  And if, in fact, somebody walks in that may be a tangentially-

12  related Dondero entity and is willing to pay more, they should

13  be thrilled with that fact, not jettison it or disregard it.

14  That is -- their job is to maximize value, not minimize value

15  through a controlled sale process.

16    Again, I'm looking at the Code section.  I'm looking at

17  2015.3.  It basically says what it says.  It's designed to

18  give basic financial information.  It has nothing to do and

19  offers no disclosures of anything Mr. Pomerantz has thrown up

20  before the Court or that Mr. Dondero or any of his entities or

21  people are alleged to have done.

22    And the last is, if in fact there's financial information

23  that's incorrect in any of these entities, I question what the

24  Debtor's financial advisors have been doing for the last

25  months.  Honestly, they should be poring over these books.  If

44

```
 1    they find a problem, they should correct 'em and address them.
 2    And so there's no basis under the Code.  We've -- what's been
 3    given to you and what their argument is is an excuse for not
 4    doing something they should have done.  It can't be couched as
 5    to who's asking.  It is systematic in nature.  And what's been
 6    thrown up before the Court in Mr. Pomerantz's arguments are
 7    just not true when you look at what the form requires.
 8              THE COURT:  You know, I can't remember ever being in
 9    a contested matter involving this rule.  And I was kind of
10    pondering before coming out here, I wonder why that is.  And,
11    you know, I'm thinking the vast majority of our complex
12    Chapter 11s that involve many, many, many entities, they all
13    file.  Okay?  You know, they're kind of a different animal, if
14    you will, from Highland.
15        You know, we know how it normally works.  You've got maybe
16    the mothership, holding company, and many, many subs, and
17    you've got asset-based lending, right, where, you know, maybe
18    the majority of the entities in the big corporate complex are
19    liable, so you just put them all in.  Okay?
20        We don't have -- I have not experienced a lot of Chapter
21    11s where you have basically just the mothership and then you
22    keep subs and lots of affiliates out.  Okay?  So I'm thinking
23    that's one reason.
24        Another thing, I can't remember how old this rule is.
25    Does anyone -- can anyone educate me?  How long has this rule
```

45

1   been around?

2          MR. DRAPER:  Your Honor, this is Douglas.  I think it

3   came in after Lehman Brothers.  And it came --

4          THE COURT:  Uh-huh.

5          MR. DRAPER:  It was put in to deal with off-balance

6   sheet items.

7          THE COURT:  Uh-huh.

8          MR. POMERANTZ:  2008, Your Honor.

9          THE COURT:  2008?

10          MR. DRAPER:  Which is exactly right.  It --

11          THE COURT:  Okay.

12          MR. DRAPER:  Yep.

13          THE COURT:  Okay.  So that, that's another reason.

14   Because I was thinking like *Enron* days.  You know, that's a

15   big giant, a gazillion entities, and, of course, a whole huge

16   slew of them were all put in.

17       So, there's not a lot of case law.  And you know, maybe

18   there are other situations where a judge ruled on this issue

19   but without issuing an opinion.  So, anyway, that's neither

20   here nor there.

21       Mr. Draper, you've urged me to focus on the literal

22   wording of the rule.  It's "shall" language.  You've talked

23   about essentially the integrity of the system as being the

24   reason for the rule.  You've told me not to accept the

25   Debtor's "bad guy" defense, you know, as an excuse.  This is

46

 1  just Dondero, you know, wanting the information, and therefore

 2  I should discount the motivations here.

 3      But let me tell you something that is nagging very, very

 4  much at me, and I'll hear whatever response you want to give

 5  to this.  I just had an all-day hearing a couple of days ago,

 6  and this involved the Charitable DAF entities and a contempt

 7  motion the Debtor filed because those entities went into the

 8  U.S. District Court upstairs in April and filed a lawsuit that

 9  was all about Mr. Seery's alleged mismanagement with regard to

10  HarbourVest.

11      So what I'm really worried about is the idea that your

12  client wants this information to cobble together a new

13  adversary alleging mismanagement.  How can I not be worried

14  about that?

15          MR. DRAPER:  It's real simple.  Because the

16  information that's here doesn't go to management decisions.

17  The information that's requested here has balance sheet items.

18  It has to do with changes in cash flow.  It is not something

19  that you can cobble together a claim, because it doesn't deal

20  with discrete transactions.  It deals with only transactions

21  between affiliated entities.  It only deals with disclosure of

22  administrative expenses that are incurred by a subsidiary for

23  which the Debtor is liable.  It only deals with changes in

24  condition on a go-forward basis and a balance sheet.  It

25  doesn't say, gee, we have to disclose that, with respect to

47

1  HarbourVest or with respect to the MGM stock or whatever,

2  we're doing A, B, or C.  It doesn't go there.

3      That's why I asked the Court in my opening, look at the

4  form.  Because the form is what I'm asking for adherence to.

5  I'm not asking the form to be varied.  I'm just asking the

6  form to be approved -- to be addressed.  And the form

7  controls.  It is not something you can cobble together a

8  complaint with.

9          THE COURT:  Well, you left out when I asked, you

10  know, did your client have an administrative expense claim in

11  this case, and Mr. Pomerantz corrected the record on that.

12  Your client, while it's not a lawsuit in another court, has

13  filed an administrative expense that there was mismanagement

14  of a nondebtor sub or nondebtor controlled entity, --

15          MR. DRAPER:  That -- that's --

16          THE COURT:  -- Multistrat.

17          MR. DRAPER:  No, that's not -- if -- if I understand

18  the claim -- again, I didn't file it, and I forgot, that's an

19  oops on me as opposed to an oops on Mr. Seery for not filing,

20  and I apologize for the Court for that.  But if I understand

21  that claim, is when he acquired whatever he acquired, he

22  should have offered it to the other -- to the other members of

23  the -- that group.  Again, I'm not -- that's not -- I'm a

24  bankruptcy lawyer, as the Court's well aware.  This other

25  stuff is beyond me.

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 183 of 1726 PageID 11504

48

1          But the truth is, my understanding of the claim, it goes

2     to who should have benefited by the transaction and whether

3     the Debtor got CLO interests or got cash for it is irrelevant

4     and that it should have been offered.  That's what I

5     understand the claim.

6                THE COURT:  Okay.  So the same sort of theory --

7                MR. DRAPER:  So, the claim --

8                THE COURT:  -- as HarbourVest?  The same sort of

9     theory as HarbourVest?

10               MR. DRAPER:  No.  No.  Well, no, I'm just saying,

11    that's -- that's what -- again, you're asking me for something

12    that's outside my expertise.

13               THE COURT:  Okay.

14               MR. DRAPER:  Yes, we may have filed a claim.

15               THE COURT:  Who filed a proof of claim?

16               MR. DRAPER:  And the point I'm making --

17               THE COURT:  Who filed the proof of claim?

18               MR. DRAPER:  What?  I did not -- I have not filed the

19    proof of claims that were asserted by Dugaboy.

20               THE COURT:  I mean, --

21               MR. DRAPER:  I think that was --

22               THE COURT:  -- request for administrative expense.

23    Who filed this?  You say you don't -- you didn't file it.

24               MR. DRAPER:  I did -- I don't think I did.

25               MR. POMERANTZ:  Your Honor, to clarify, it was filed

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 184 of 1726 PageID 11505

49

1   as a proof of claim, but it related to postpetition actions.

2   And, again, I don't have it before me.  This has been raised

3   --

4           MR. DRAPER:  I --

5           MR. POMERANTZ:  -- several times in the confirmation

6   hearing when Mr. Draper was there, so I guess he must have

7   just forgotten about it.  But I don't know who actually filed

8   it.  But it is -- it is -- it is a proof of claim that is on

9   the record.

10          MR. DRAPER:  Mr. Pomerantz, God forbid that I should

11  forget something.  I'm sure you never have.

12          THE COURT:  Okay.  Well, here's what I'm going to do.

13  I'm not going to grant the relief being sought today, but I

14  will continue the hearing to a date in early September.  And

15  Mr. Draper, you can coordinate with my courtroom deputy, Traci

16  Ellison, with regard to a setting in early September.

17      I can assure you it's not going to be until after Labor

18  Day.  I think Labor Day falls on the 6th, maybe, and I plan to

19  be far away the first few days of September, far away from

20  this country.

21      But here are a few things I want to say.  First, I care

22  about transparency, and I tend to strictly construe a rule

23  like this.  I think, you know, it should be very clear for

24  anyone who's appeared before me that I really like -- I say

25  open kimono.  I probably shouldn't use that expression, but I

50

1   use that expression a lot.  You know, when you're in Chapter

2   11, the world changes and you have to be very transparent.

3        But while I generally feel that way, we have -- as I also

4   always say, facts matter, contexts matter -- and here we are

5   twenty months into a case and we're post-confirmation.  This

6   motion was filed post-confirmation.  So I acknowledge that the

7   Rule 2015.3(b) has the requirement of filing reports as to

8   these nondebtor controlled entities until the effective date

9   of a plan.  We're so -- we're presumably so very close to the

10  effective date that I think I should exercise my discretion

11  under Subsection (d) of this rule to, after notice and a

12  hearing, vary the reporting requirements for cause.  I think

13  there's cause, and that cause is I think we're oh so close to

14  the effective date.  That's number one.  Number two, we're

15  down to 12 staff members.  And I've heard that 150 entities

16  may be implicated, and I don't think that is a necessary and

17  reasonable use of staff members at this extremely late

18  juncture of the case.

19       And my third reason for cause under Subsection (d) of this

20  rule is we have had an active, a very active Creditors'

21  Committee in this case with sophisticated members and

22  sophisticated professionals who negotiated getting more

23  information, I think more useful information than this rule

24  even contemplates with the various form blanks.

25       Now, obviously, I'm continuing this to September because,

1    if we don't have an effective date by early September, well,

2    context matters, maybe that causes me to view this in a whole

3    different light.  But that is the ruling of the Court.

4         You know, I just want to say on behalf of the U.S.

5    Trustee, I don't know if anyone's listening in, but it was an

6    unfortunate use of words earlier, I think, saying, you know,

7    secret deal with them.  And I use unfortunate words all the

8    time.  I'm not being critical.  But I just want to defend

9    their honor here.  Oh my goodness, they --

10        (Phone ringing.)

11            THE COURT:  -- exercise integrity in every case I see

12   to the utmost degree, and I suspect they were satisfied that

13   the Committee was getting so much access to the Debtor, with

14   the sharing of the privilege and the protocols, that it just

15   didn't seem necessary in the facts and circumstances of this

16   case to require strict compliance with 2015.3.

17        So I'm going to ask Mr. Pomerantz to upload a form of

18   order reflective of my ruling.  And, again, if --

19        Whose phone is ringing?  Is there something going on with

20   our equipment?

21            THE CLERK:  No.

22            THE COURT:  I don't know where that phone ringing is

23   coming from.

24            THE CLERK:  I can hear it.

25            THE COURT:  Okay.  So, you'll get a day from Ms.

52

1  Ellison in -- after labor day, and we'll see where we are.

2  This will be a moot matter as far as I'm concerned if we've

3  had an effective date at that point.

4      (Continued phone ringing.)

5          MR. POMERANTZ:  Your Honor, one clarification I would

6  ask to have.  I don't think -- I think Your Honor intends that

7  to be a status conference, so to save the Debtor from, you

8  know, spending time in doing a pleading, and Mr. Draper as

9  well, and Your Honor from reading them, I would say that there

10  should be no pleadings filed in advance.  We will appear

11  before Your Honor with a status conference.  And to the extent

12  Your Honor determines there's further briefings or further

13  issues that need to be decided, you could decide at that

14  point.  But no further briefing.

15          THE COURT:  Okay.  I think that is a fair request.

16      (Ringing stops.)

17          THE COURT:  And so that -- that is the way we'll set

18  this up.  Status conference.  No further pleading.

19          MR. DRAPER:  Your Honor?

20          THE COURT:  All right?  Mr. Draper?

21          MR. DRAPER:  Can I make a request, Your Honor?  Can I

22  change -- can I make a comment about the Court's ruling?

23  Because I want to be transparent about this.  And I think the

24  Court's ruling, I would request that you shapeshift it a

25  little bit.

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 54 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 188 of 1726 PageID 11509

53

1    If, in fact, you're going to take the position that if the

2  plan goes effective, this issue -- this -- this motion is moot

3  and will be denied, I think, quite frankly, why don't we enter

4  that order now, rather than waiting.  Because that at least

5  gives me the ability to address the issue.

6    I don't think the rule has a waiver of it on the effective

7  date.  Let's -- let's get the issue before the -- before

8  everybody.  Because, again, as I said, if in fact your

9  position is that if it goes effective I'm going to deny the

10  relief and claim it's -- and assert it's moot in a ruling, I'm

11  fine, let's get the ruling now.  Because -- because my

12  position is that that waiver -- there is no basis for that

13  waiver due to time.  The rule requires being filed through a

14  point.

15    And, look, again, that way I'm not wasting the Court's

16  time.  We're not rearguing it.  If we're not having new

17  pleadings, let's get it over with.

18        MR. POMERANTZ:  Your Honor, I would reject that.

19  It's pretty transparent what Mr. Draper wants.  He wants

20  another appeal --

21        THE COURT:  Uh-huh.

22        MR. POMERANTZ:  -- because he wants to go to another

23  court, and he's unhappy that Your Honor has essentially given

24  an interlocutory order that he will be stuck with.

25    So we have, I think, close to a dozen appeals.  We're

54

1  spending millions of dollars.  And I find -- I find Mr.

2  Draper's request, quite honestly, offensive, that it would

3  require us to -- a lot more time and money on an issue we

4  shouldn't.  So, I would ask Your Honor to reject Mr. Draper's

5  request.

6          THE COURT:  All right.  I do --

7          MR. DRAPER:  And again, my --

8          THE COURT:  -- reject it.  That's exactly where my

9  brain went, Mr. Draper.  This is an order continuing your

10 motion.  Okay?  And we'll have a status conference in early

11 September on your motion.

12    And you know, again, I'm just letting you know my view it

13 will be moot if the effective date has occurred, and then

14 we'll get some sort of order to that effect issued at that

15 time.  And then I guess you'll have your final order that you

16 can appeal if you want at that point.

17    The last thing I'm going to say is this.  Mr. Draper, as

18 I'm sure you remember, at some point many weeks back -- I

19 think it was in January, actually -- I ordered that Mr.

20 Dondero should be on the WebEx, or if we're live in the court

21 for a hearing, live in the court, any time there's a hearing

22 where he, his lawyers, have taken a position, filed an

23 objection or filed the motion himself.  If he and his lawyers

24 are requesting relief or --

25          MR. DONDERO:  I'm here.

55

1          THE COURT:  -- objecting to relief, that he has to be

2    in the courtroom.

3      I am now going to make the same requirement with regard to

4    the trusts.  Any time the trusts file a pleading seeking

5    relief, object to a pleading seeking relief, file any kind of

6    position paper, I'm going to require a trust representative to

7    be in court.

8      Now, I don't know if that's the trustee, Nancy Dondero.  I

9    don't know if that's Mr. Dondero's wife, a sister, who that

10   is.  But it'll either be her or whoever the trustee is or Mr.

11   Dondero as beneficiary.  But it has gotten to that point.

12   Okay?  And --

13          MR. DRAPER:  Your Honor?

14          THE COURT:  And it's not -- it's not personal.  I

15   have said this before.  I've done this in many cases.  If we

16   have a party who feels so invested in what's going on that

17   they're waging litigation, litigation, litigation, at some

18   point very often I will make this order.  Like, okay, we're

19   all spending a lot of time on what you want, so you need to

20   show you're invested in it and be here with the rest of us.

21   And, you know, potentially we're going to want testimony in

22   certain contexts.  Okay?

23      So I don't know who that human being is for the trusts,

24   but I'm now to the point where I'm making that same order that

25   I did with regard to Mr. Dondero personally.  All right?

56

```
 1            MR. POMERANTZ:  Your Honor?

 2            THE COURT:  Yes?

 3            MR. POMERANTZ:  Your Honor, just to clarify, that's

 4   Mr. Dondero and the trustee.

 5       And I would also ask Your Honor, I know Mr. Dondero will

 6   say that he was on, and that's what Mr. Taylor is going to

 7   say, he was on audio.  I think, in order to have them actively

 8   participating, they should be on the video the entire hearing.

 9   Because if they're just on the phone on mute, Your Honor is

10   not able to really tell if they are really listening.  So I

11   would ask Your Honor to clarify to both Mr. Draper and Mr.

12   Taylor that, for both the trustee and Mr. Dondero, they should

13   be on video.

14            THE COURT:  All right.

15            MR. DRAPER:  Your Honor, Mr. Dondero is on.  You can

16   see him down in the lower screen.

17            THE COURT:  All right.  Just so you know, I mean, the

18   screen I'm looking at is not quite the same screen you're

19   looking at.  We have this Polycom.  And I show that there are,

20   you know, thirty-something people, but I only see the people

21   who have most recently talked.  Okay?  So, I see you, Mr.

22   Draper.  I see Mr. Pomerantz.  I see Mr. Clemente.  A few

23   minutes ago, I saw Mr. Morris.  But, you know, we've set it up

24   where I'm not overwhelmed with blocks; I'm just seeing the

25   people when they speak.
```

57

```
 1              MR. POMERANTZ:  Your Honor, and those were the only

 2    four people whose videos were on during the entire hearing.

 3              THE COURT:  Oh, okay.

 4              MR. POMERANTZ:  So I hope Mr. Draper is not going to

 5    say that Mr. Dondero was on video, because he was not.

 6              THE COURT:  Okay.

 7              MR. DRAPER:  No, you can see -- Mr. Pomerantz, what I

 8    said is you can see him on the screen here.  You can see that

 9    he has dialed in.  I don't see him jumping up and down or his

10    person.

11              THE COURT:  Oh, okay.

12              MR. DRAPER:  But it is clear that somebody dialed in

13    on his behalf.

14              MR. POMERANTZ:  Well, --

15              MR. DRAPER:  Or he dialed in.  He is -- he is

16    present.

17              MR. POMERANTZ:  Exactly.  That's my point, Your

18    Honor, that someone may have dialed in on his behalf.  And I

19    think Mr. Dondero, for them to have active, meaningful

20    participation, because I think that's what Your Honor is

21    getting at, that they should be here, engaged.  And if we were

22    in court like we were the other day, Mr. Dondero would have

23    had to sit in Your Honor's courtroom.  And if he is going to

24    take up the time of Your Honor and all the parties, he and the

25    trustee should be really engaged, which you cannot be if
```

58

1  you're only on the phone.

2          THE COURT:  Okay.  All right.  Well, --

3          MR. DRAPER:  Your Honor?

4          THE COURT:  Go ahead, Mr. Draper.

5          MR. DRAPER:  Mr. Dondero just talked a few moments

6  ago, so Mr. Pomerantz heard him.  This is -- this is truly

7  unwarranted.  He's appeared, he's here, and he's made a

8  comment to the Court.  So, again, we are invested.  He was

9  present at this hearing.  He heard the hearing.  And so, you

10 know, I just don't know where this is coming from.  I

11 understand he missed a hearing before, but he is here for this

12 one.

13         THE COURT:  Okay.  Well, I'm not going to get bogged

14 down in this issue.  I am going to issue an order, though,

15 that is going to be reflective of what I said, and we'll just

16 -- we'll make sure we have him check in or whoever the

17 representative is of the trusts in future hearings and turn

18 the video on and we'll make sure.

19     Again, this is -- I used the word frustrated the other

20 day.  I'm very frustrated.  This is just -- this is -- it's

21 out of control.  Okay?  I ordered mediation earlier in this

22 case.  I believed that an earnest effort was put in.  But if

23 we're not going to have settlement of issues, you know, I'll

24 address these issues, but everyone who files a pleading,

25 whether it's Mr. Dondero personally or the trusts, the family

59

1  trusts, and, of course, we're going to get -- I'm going to go

2  the same direction, actually, with all these other entities.

3  You know, it's -- I've gotten to where I had my law clerk the

4  other day prepare me basically what was like a program from a

5  sports event, you know, who represents which entities, because

6  it's gotten overwhelming.  And --

7          MR. POMERANTZ:  Your --

8          THE COURT:  And I mentioned the other day, I'm very

9  close to requiring some sort of disclosures about the

10  ownership of each of these entities, because I -- you know,

11  the standing is just so tenuous, so tenuous with regard to

12  certain of these entities.  And I've erred on the side of

13  being conservative and, you know, okay, we maybe have

14  prudential standing, constitutional standing, even if it's

15  kind of hard finding statutory standing under the Bankruptcy

16  Code.  But it's gotten to the point where it's just costing

17  too much time and expense for me to not press some of these

18  issues and hold people accountable.

19    So, Mr. Pomerantz, were you about to say something?  I

20  know that we had talked at another hearing about the Court

21  maybe requiring some sort of disclosures for me to really

22  understand party in interest status maybe better than I do.

23          MR. POMERANTZ:  That, Your Honor, was where I was

24  going to go before Your Honor made the comment.  Your Honor

25  made that comment a few weeks ago.  I think, since then, quite

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 195 of 1726 PageID 11516

60

1  honestly, nothing really has changed.  And I think it would be

2  helpful -- it would be helpful for the Debtor, and more

3  importantly, I think it would be helpful to the Court to have

4  a list that you can refer to every time we are in a hearing of

5  every entity that has appeared that Mr. Dondero has a

6  relationship with, who the lawyers are, what the claims they

7  filed, what the status of the claims they filed, and maybe

8  even what litigation they are in pending with the Debtor.

9      We're happy with -- part of it we could prepare.  But I

10  would think Your Honor should order that from Mr. Dondero's

11  related entities, because it might cut through a lot of it,

12  and give Your Honor the information Your Honor needs and the

13  context and perspective as you're hearing a lot of these

14  motions.

15             THE COURT:  All right.  Well, is there anything else

16  before we move on to the other matter?  I'm about to close the

17  loop on this by saying I am --

18             MR. TAYLOR:  Your Honor?  Your Honor?

19             THE COURT:  Who is that speaking?

20             MR. TAYLOR:  This is Clay -- this is Clay Taylor,

21  Your Honor, --

22             THE COURT:  All right.

23             MR. TAYLOR:  -- representing Jim Dondero

24  individually.

25             THE COURT:  Okay.

61

1           MR. TAYLOR:  And I just wanted to be heard.  I've

2    just listened in, even though Mr. Dondero was not the movant,

3    because sometimes issues like this do come up where his name

4    is thrown about.

5           First of all, Jim Dondero was indeed, as Mr. Draper said,

6    was indeed present.  He did indeed try to speak.  I kind of

7    overrode him.  And because, you know, he needs to speak

8    through his lawyer most of the time and shouldn't address the

9    Court directly.  But I wanted to let you know that Mr. Dondero

10   was indeed on the line, was actively listening, and was

11   participating.

12          As far as additional disclosures, it would be, I would

13   just note, somewhat ironic if the Court denies the motion for

14   what appears to be mandatory disclosures under Rule 2015.3 but

15   then imposes additional disclosure requirements on somebody --

16   on another party, without any rule stating that there is such

17   disclosures.  It just -- it strikes me as ironic, and I would

18   like Your Honor to consider that, at least, as Your Honor

19   says, context matters.

20          You know, that's the context in which this arises.  And we

21   would just ask Your Honor to reflect upon that before she

22   imposes additional duties upon my client.

23          But there is -- and the Debtor has asked for the response

24   to be taken as a motion for leave to not comply with a rule,

25   but yet Mr. Seery is not here.  The UCC regularly

62

1    participates.  Its members are not here.  And so I just, to

2    the extent Your Honor is going to impose duties upon certain

3    parties, then what's good for the goose is good for the

4    gander, Your Honor.

5            THE COURT:  All right.

6            MR. POMERANTZ:  Your Honor, I would point out that

7    Mr. --

8            THE COURT:  I respect your argument.  I always

9    respect your arguments, Mr. Taylor.

10        By the way, you aren't wearing a jacket.  You know, next

11   time you need to wear a jacket.  And forgive me if I seem

12   nagging, but I'm letting you all know, if you all are soon

13   going to be having lots of litigation in the District Court, I

14   promise you the district judges are way more formal than me

15   and sticklers for every rule.  You'll also be doing everything

16   live in the courtroom, too.  I'm just letting you know that.

17        But while I respect your argument, apples and oranges.  I

18   mean, the 2015.3 rule, not only is it not -- not -- I wouldn't

19   say mandatory, since the Court has discretion for cause to

20   waive the requirement.  But it's a very onerous set of forms

21   that would have to be filled out for 150 entities by 12 staff

22   members.  I don't really consider that the same as the

23   disclosure that I'm now going to require.

24        But my law clerk and I will -- we'll craft a form of order

25   that will be specific as far as what I'm going to require.

63

1     And, again, I think it's way beyond the point of this

2   being necessary. And just so -- again, I'm wanting to explain

3   this thoroughly. You know, standing -- for the nonlawyers; I

4   don't know how many nonlawyers are on the phone, WebEx -- it's

5   a subject matter jurisdiction thing. Okay? And, you know, if

6   there's a dispute and someone involved in a dispute

7   technically doesn't have standing, that means the Court didn't

8   have subject matter jurisdiction to be adjudicating it. Okay?

9   That's first year law school concept.

10     And it's been mentioned we have lots and lots of appeals,

11   and I can promise you, if you've never been through the

12   appellate process, that's the very first thing they'll look at

13   -- you know, District Court, Fifth Circuit, any Court of

14   Appeals -- because they have an overwhelming docket. And if

15   there's a reason to push out this appeal before then because

16   of lack of subject matter jurisdiction, which would include

17   lack of standing, of course they are going to quickly get it

18   off their plates because they have other things to get to,

19   like criminal matters that are, you know, their top priority

20   because of the Constitution.

21     So this has been an evolving thing with me. At some

22   point, I feel like the Courts of Appeals that are involved

23   with all of these appeals, they might be really, really

24   zeroing in on the standing of parties more than perhaps even I

25   have. So I want to do my job and I want it clear on the

64

1   record, this is why this person has standing or doesn't have

2   standing.  Okay?  I just feel like we've gotten to that point.

3   And so we'll issue an order in that regard, and it will, I

4   promise you, be crystal clear.

5        Anything else?

6        MR. POMERANTZ:  Your Honor, one last point.  Mr.

7   Taylor insinuated that the board is not present here, which is

8   incorrect.  A member or two members or three members of the

9   board have been present at every hearing before Your Honor.

10  And that's without an order requiring them to do so, because

11  they are -- they are interested, they are engaged.  Mr. Dubel

12  is on the phone.  He has been on the phone.  I think this may

13  have been only the second hearing that Mr. Seery has missed,

14  felt it wasn't necessary to take him away from his running the

15  company.  So the Debtor has been, through its board members,

16  fully engaged, and I just wanted Your Honor to know that, that

17  we would never have a hearing before Your Honor without at

18  least one member of the independent board listening in and

19  participating as necessary.

20        THE COURT:  All right.  Thank you.

21       All right.  Well, let's move on to the other contested

22  matters, or adversary proceeding matters, I should say.  And

23  they're Adversary 21-3006 and 21-3007.  We have Motions for

24  Leave to Amend Answers.  And do we have Ms. Drawhorn appearing

25  for that motion or those motions?

65

```
 1          MS. DRAWHORN:  Yes, Your Honor.  Lauren Drawhorn with
 2    Wick Phillips on behalf of Highland Capital Management
 3    Services, Inc. and NexPoint Real Estate Partners, LLP,
 4    formerly known as HCRE Partners, LLC.
 5          THE COURT:  All right.  And who will be making the
 6    argument for the Debtor on this one?
 7          MR. MORRIS:  John Morris, Your Honor; Pachulski Stang
 8    Ziehl & Jones; for the Debtor.
 9          THE COURT:  All right.  Are there any other
10    appearances on this?
11       Okay.  Ms. Drawhorn?
12          MS. DRAWHORN:  Yes, Your Honor.  We are -- so, my
13    clients are seeking leave to amend the answer to add two
14    affirmative defenses.  As you know, under Rule 15(a), there is
15    a bias towards granting leave, and leave should be freely
16    granted unless there's a substantial reason to deny it.
17       The main factors that are considered in determining
18    whether there is a substantial reason to deny a motion for
19    leave to amend are prejudice, bad faith, and futility.
20       Here, there is no prejudice to the Plaintiff.  Under the
21    case law, if the -- as long as a proposed amendment is not
22    presented on the eve of trial, continuing deadlines or
23    reopening discovery does not constitute sufficient prejudice
24    to deny leave.
25       Here, discovery does not close until July 5th for Highland
```

66

1  Capital Management Services, and it does not close until July

2  26th for NexPoint Real Estate Partners.

3      The Plaintiff has not -- neither party has taken any

4  depositions in this case.  And we are open and willing to

5  extend the discovery deadlines if necessary.  We think that

6  discovery can be extended as necessary without extending any

7  dispositive motion deadline or the docket call which are set

8  in August.  Dispositive motions are August 16th for Highland

9  Capital Management and September 6th for NexPoint Real Estate

10 Partners, with docket call in those cases being October and

11 November.

12     So there's significant time.  If the -- if the party just

13 wants to conduct additional written discovery, I think that

14 that -- they would be easily be able to do that.

15     We're also open to continuing all the deadlines in this

16 case, and practically speaking, those -- the deadlines may be

17 continued depending on what happens with the pending motion to

18 withdraw the reference and the motion to stay.

19     So we don't think -- we don't see any reason why our

20 amended additional affirmative defenses will result in any

21 prejudice to the Plaintiff, and don't see that as a reason --

22 a substantial reason to deny the motion for leave.

23     There is no bad faith here.  The motion for leave was

24 filed two months after our original answer.  Again, this is

25 not a situation where we're trying to add a new defense on the

1  eve of trial.  We're not even waiting until after discovery is

2  closed to try and add this new defense.  And it's not after

3  one of our prior defenses failed.  Instead, we've been

4  conducting additional investigations, preparing for written

5  discovery.  And as set forth in more detail in the Sauter

6  declaration that was filed yesterday, we discovered these

7  additional defenses through that additional investigation.

8      So there's certainly no bad faith here in adding these two

9  defenses.  We are just trying to make sure that we can prove

10  up our defenses and prove up our case on the merits, as we

11  need to.

12      And then the last factor, the new affirmative defenses

13  we're seeking to add, they're not futile.  I cited some cases

14  in the pleadings.  There are some judges in the Northern

15  District of Texas that refrain from even evaluating futility

16  at this stage, at a motion for leave to amend stage,

17  preferring to address those on a motion for summary judgment

18  situation.  But even when it is considered, futility looks

19  more at is there a statute of limitations that prevents the

20  claim from being successful, or does the court lack subject

21  matter on its face, based on this defense?  And that's not the

22  case here.

23      The Debtor -- the Plaintiff tries to argue on the merits

24  of our affirmative defenses, and a motion for leave to amend

25  is not a basis for that.  This isn't a motion for summary

68

 1   judgment.  This is just -- just a motion for leave to add

 2   these defense, and they can certainly address the merits later

 3   on in the case.

 4       So we think we provided sufficient notice in our proposed

 5   amendment.  I mean, our proposed amended answer.  To the

 6   extent we need to add any specifics, we are certainly open to.

 7   We've noted them in our reply.  The ambiguity is -- is to the

 8   notes as a whole.  We noted the Highland Capital Management,

 9   there's two notes that are signed by Frank Waterhouse without

10   indication of corporate capacity, which creates some

11   ambiguity.  The notes reference other related agreements,

12   which create some ambiguity.  So we think there's sufficient

13   pleading of these new defenses to support leave to amend and

14   address those on the merits.

15       And then the condition subsequent defenses, while we --

16   the schedules and the SOFAs, the notes related to that

17   reference that some loans between parties and related -- to

18   affiliates and related entities may not be enforceable, we

19   think that supports our position and this defense here, now

20   that we've furthered our investigation and heard about this

21   additional subsequent agreement that supports the condition

22   subsequent.

23       And the opposition, the Plaintiff's opposition notes that

24   there has been some discovery on this defense.  It's similar

25   to one that's asserted in a related note adversary.  And

69

1  while, again, they try to assert the merits and the
2  credibility of certain testimony, that's -- that's a decision,
3  credibility of a witness is a decision for a fact finder and
4  not for this stage of the proceedings and not for a motion for
5  leave to amend.
6     So we don't believe there's a substantial reason to deny
7  leave.  Again, under Rule 15, leave should be granted freely.
8  And so we would request that the Court grant our motion for
9  leave to amend so that we can have our amended answer and
10  affirmative defenses in this case.
11          THE COURT:  All right.  Well, Mr. Morris, you know,
12  the law is not too much in your favor on this one.  So what do
13  you have to say?
14          MR. MORRIS:  I have to say a few things first, Your
15  Honor.  The notes are one of the most significant assets of
16  the estate.  As the Court will recall at the confirmation
17  hearing, Mr. Dondero and all of his affiliated entities
18  objected to confirmation on the ground -- challenging, among
19  other things, both the liquidation analysis as well as the
20  projections on feasibility going forward.
21     One of the assumptions in those projections and in the
22  liquidation analysis was indeed the collection of these notes
23  in 2021.  They all sat on their hands, attacked the
24  projections, attacked the liquidation analysis, but never on
25  the grounds that the notes wouldn't be collectable in 2001

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 71 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 205 of 1726   PageID 11526
92

70

1  [sic], never informing the Court that there was some agreement

2  by which collection would be called into question, never ever

3  disclosing to anybody that the plan might not be feasible or

4  the liquidation analysis might not be accurate because these

5  notes were uncollectable.

6      So what happened after that, Your Honor?  We commenced

7  these actions.  Actually, before the hearing.  We actually

8  commenced these actions before the confirmation hearing, when

9  they sat silently on this.

10      And Mr. Dondero's first answer, because this is all very

11  important because they say that they're -- they're

12  piggybacking on Mr. Dondero.  Mr. Dondero's first answer to

13  the complaint said, I don't have to pay because there is an

14  agreement by which the Debtor said they would not collect.

15  It's in the record.  It's attached to my declaration.  And

16  that was it.  Full stop.  I don't have to pay because the

17  Debtor agreed that I would not have to collect.

18      So we served a request for admission.  Admit that you

19  didn't pay taxes.  He realized, okay, that defense doesn't

20  work, so he changes it completely and he amends his answer.

21  Now the amended answer says, I don't -- the Debtor agreed that

22  I wouldn't have to pay based on conditions subsequent.

23      And we said, what are those conditions subsequent?  Please

24  tell us in an interrogatory response.  And under oath, Mr.

25  Dondero said, I don't have to pay if the Debtor sells their

71

1   assets in the future.  At a favorable price, I think it says.

2   Again, this is in the record.  And we asked him under oath,

3   who made that agreement on behalf of the Debtor?  And he said,

4   I did.

5       And Your Honor will recall that we had a hearing on that

6   very defense, on the motion to compel, where they said Mr.

7   Seery has to come in and testify to the defense that Mr.

8   Dondero made this agreement with himself.  And then the

9   following week, on a Tuesday, we had the hearing on the motion

10  to withdraw the reference, and Your Honor said finish

11  discovery, because we told you discovery was going to be

12  concluded on Friday with Mr. Dondero's deposition.  You know

13  what they did, Your Honor?  The night before the hearing, they

14  amended Mr. Dondero's interrogatory.  Again, these are sworn

15  statements.  They amended it again to say he didn't enter the

16  agreement on behalf of the Debtor; Nancy Dondero, his sister,

17  did.

18      And then I took his deposition.  And we're going to get to

19  that in a moment, because I'm going to put it up on the screen

20  so you can see these answers, Your Honor.  And I say this by

21  way of background because it goes to both good faith -- or,

22  actually, bad faith -- as well as the lack of a bona fide

23  affirmative defense here.

24      This is -- there are five notes litigation.  One against

25  Mr. Dondero.  So that's package number one.  And they're

72

1  represented by the Stinson firm, who is signing all of these

2  things.  The Stinson firm is out there claiming that in good

3  faith each of these -- each of these amendments, each of these

4  amendments to the interrogatories, are in good faith.  They're

5  not in good faith, Your Honor.  They're just not.

6      And the Bonds firm.

7      Then bucket two is what we have here today.  That's HCRE

8  and Highland Capital Management Services.  They're represented

9  by Ms. Drawhorn.  I think the Stinson firm has now also

10 entered an appearance in those two adversary proceedings.

11     And the other two are against the two Advisors.  More

12 entities controlled by Dondero.  And Mr. Rukavina, I believe,

13 last night filed his motion to amend to add these same

14 defenses.

15     Okay?  Is this good faith?  I don't think this is good

16 faith.

17     Let's look at Mr. Dondero's testimony so that the Court

18 has an understanding of what we're talking about here.  I

19 think I have Ms. Canty on the phone, and I'd ask her to go to

20 Page 178.  3.  Just going to read (garbled) so you can see.

21 This was Mr. Dondero's testimony the day after telling me that

22 he amended his interrogatory -- sworn interrogatory answer to

23 say that he didn't enter the agreement on behalf of the Debtor

24 but Ms. -- but Ms. Dondero, his sister, did.

25     Question.  Are we -- 178, please.

73

```
 1              MS. DRAWHORN:  Your Honor, I would --

 2              MR. MORRIS:  Question.  Please --

 3              MS. DRAWHORN:  This is not testimony in this

 4    adversary and I was not -- my clients were not present at this

 5    deposition that Mr. Morris is referring to, so I --

 6              MR. MORRIS:  Your Honor, with all due respect, she's

 7    interrupting me, and I would ask her to allow me to finish my

 8    presentation and then she can make whatever comments she

 9    wants.  Because -- because --

10              MS. DRAWHORN:  Well, I'm objecting to this testimony

11    --

12              THE COURT:  Okay.

13              MS. DRAWHORN:  -- coming into evidence.

14              THE COURT:  Okay.  So your objection is -- if you

15    could just articulate your objection for the record, please,

16    Ms. Drawhorn.

17              MS. DRAWHORN:  I would object to this -- this

18    deposition is not in this proceeding, this adversary

19    proceeding, either of these two the adversary proceedings, and

20    my client was not present at this deposition, so I would

21    object to it as hearsay.

22              THE COURT:  Response?

23              MR. MORRIS:  Your Honor, if I may, I think this --

24    this points to just one of the fundamental problems that we

25    have here.  As we pointed out in our objection, the Debtor, as
```

1    we sit here right now, still has no notice of the facts and

2    circumstances surrounding this alleged agreement.  We still

3    don't know who entered into the agreement on behalf of the

4    Debtor.  We don't know what the terms of the agreement were.

5    We don't know when the agreement was entered into.  We don't

6    -- right?

7        If they're going to assert that there's an agreement --

8    and they seem to be piggybacking on this conversation between

9    Mr. Dondero and his sister.  If there's a different one, they

10   need to say that right now.  They need to put their cards on

11   the table and they need to inform the Debtor who entered the

12   agreement on behalf of the Debtor pursuant to which the Debtor

13   agreed to waive millions and millions of dollars without

14   telling anybody.

15           THE COURT:  Okay.  I overrule the objection.  We can

16   go through the transcript.

17           MR. MORRIS:  So, I'm just going to use part of it,

18   Your Honor.  But on Lines 3 to 7:

19       "Q   Did anybody else participate -- did anybody

20       participate in any of the conversations other than you

21       and your sister?

22       "A   I don't believe it was necessary.  It didn't

23       include anybody else."

24       Go down to Line 19, please.

25       "Q   Was the agreement subject to any negotiation?  Did

75

1    she make any kind of -- any counterproposal of any

2    kind?

3    "A   No."

4    Page 179, Line 2.

5    "Q   Do you know if she sought any independent advice

6    before entering into the agreement that you have

7    described?

8    "A   I don't know."

9    Line 23, please.

10   "Q   Do you know if there were any resolutions that

11   were adopted by Highland to reflect the agreement

12   that's referred to in the -- in the answer?

13   "A   Resolutions that -- no.  Not that I'm aware of."

14   Page 180, Line 5.

15   "Q   Did you give Nancy a copy of the promissory notes

16   that were a subject of the agreement?

17   "A   No."

18   Continue.

19   "Q   Did she ask to see any documents before entering

20   into the agreement that's referred to?

21   "A   I don't remember."

22   Page 181, Line 19.

23   "Q   Under the agreement that you reached with Nancy

24   that's referred to in Paragraph 40, was it your

25   understanding that Highland surrendered its right to

76

1        make  a  demand  for  payment  of  unpaid  principal  and

2        interest under the notes?

3        "A   Essentially, I think so."

4        Page 219.  I'll just summarize 219, Your Honor.  Mr.

5  Dondero has no recollection of telling Mr. Waterhouse, the

6  chief financial officer, or any other employee of Highland

7  that he'd entered into this agreement with his sister pursuant

8  to which the Debtor agreed to not collect almost $10 million

9  of principal and interest.

10       Now let's -- let's go -- I think it's really -- because it

11 took me an awfully long time to get there.  On Page 214 at

12 Lines 16 through 24.  This is what the agreement was, because

13 this is -- this is -- this is his third try to describe the

14 agreement.  Right?  The first time -- it's just his third try,

15 and this is what the agreement is, Your Honor.

16       "Q   Did  you  and  Nancy  agree  in  January  or  February

17       2019 that if Highland sold either MGM or Cornerstone or

18       Trussway for an amount that was equal to at least one

19       dollar more than cost, that Highland would forgive your

20       obligations under the three notes?

21       "A   I believe that is correct."

22       That's -- that's the agreement.  It took him three times

23 to get there, but look at -- look at that.  He and his sister

24 did that.

25       And I do want to point out, Your Honor, that in their

77

1    opposition that they filed last night, the Defendants claim

2    that Ms. Dondero was authorized because she was -- she was the

3    trustee of Dugaboy and Dugaboy holds the majority of the

4    limited partnership interests in the Debtor and therefore she

5    had the authority to enter into the agreement on behalf of the

6    Debtor.

7        There is that flippant -- there is just that unsupported

8    statement out there.  Section 4.2(b) of the limited

9    partnership agreement says, and I quote, "No limited partner

10   shall take part in the control of the partnership's business,

11   transact any business in the partnership's name, or have the

12   power to sign documents for or otherwise bind the partnership,

13   other than as specifically set forth in the agreement."

14       So I look forward to hearing what basis there was to

15   submit a document to this Court that Nancy Dondero had the

16   authority to bind the Debtor in an agreement with her brother

17   pursuant to which tens of millions of dollars was apparently

18   forgiven.

19       Can we go to Page 238?  This is the last piece, Your

20   Honor.  The Debtor's outside auditors were

21   PricewaterhouseCoopers.  There's management representation

22   letters signed by both Mr. Dondero and Mr. Waterhouse

23   attesting that they had given their auditors all of the

24   information necessary to conduct the audit.  We will get to

25   that in due course, but these are very important questions

                                                              78

1  right here.

2       What page are we on?  Is it 238?  Okay.  So, Line 16, I

3  believe.

4       "Q   You knew at the time -- you knew at the time the

5       audited  financials  were  finalized  that  Highland  was

6       carrying  on  its  balance  sheet  notes  and  other  amounts

7       due from affiliates?

8       "A    Yep."

9       And if we could just keep going, Your Honor, you will see:

10      "Q    Did    you    personally    tell    anybody    at

11      PricewaterhouseCoopers    in    connection    with    the

12      preparation  of  the  audited  financial  statements  for

13      2018  that  you  and  your  sister  had  entered  into  the

14      agreement with your sister Nancy in January or February

15      of 2019?

16      "A    Not that I recall."

17      There's a lot more here, Your Honor.  I'm really just

18  touching the surface.  I am going to take Nancy's deposition

19  later this month.  But there is -- this is wrong.  This is

20  just all so wrong.  For three different reasons.  At least.

21  This is not a viable defense and will never be a viable

22  defense.

23      The audited financial statements carry these loans as

24  assets on the books, without qualification, and they were

25  subject to Mr. Dondero and Mr. Waterhouse's representations.

79

1     There is partial performance.  These entities that we're

2   talking about today, they made payments on these notes.  How

3   do you make payments on the notes and then come to this Court

4   and say the notes are ambiguous?  How do you -- how do you

5   make payments on the notes and come to this Court and tell

6   this Court, I just learned that there was an agreement by

7   which I don't have to pay, subject to conditions precedent in

8   the future.

9     Mr. Sauter submits a declaration in support of this

10  motion.  He has no personal knowledge.  He states in Paragraph

11  14 that his review of the Defendants' books and records did

12  not reveal any background facts regarding the notes.  Mr.

13  Dondero is the maker on all of the notes except for two of

14  them.  Mr. Dondero owns and controls the Defendants.  Mr.

15  Dondero was not employed or otherwise affiliated with the

16  Debtor after these actions were commenced.  Mr. Sauter takes

17  Mr. Seery to task for telling the Debtor's employees not to

18  take actions that were adverse, and he uses that as his excuse

19  for not knowing these facts.  He is the general counsel.  He

20  was served with a complaint that alleged that his clients were

21  liable for millions and millions of dollars.  His boss is

22  James Dondero.  He had unfettered access to James Dondero.

23  Mr. Dondero is the one who signed the notes, except for two of

24  them.  There is absolutely no excuse for not doing the

25  diligence to find out from Mr. Dondero that this defense

80

1   existed.

2       And you know why it didn't happen?  Because the defense is

3   not real.  It is completely fabricated.  It continues to

4   change and evolve every single time I -- every single time I

5   talk about these note cases, it's a new defense, it's a

6   different defense, the contours change, somebody else is

7   involved.  This is an abuse of process, Your Honor.  It is bad

8   faith.  It just really is.  And somebody's got to start to

9   take responsibility and say, I won't do this.  I won't do

10  this.

11      Somebody's got to stand up and say that, because, I'm

12  telling you, it's not enough, Your Honor, that the Debtor is

13  going to collect all of its fees under the notes at the end of

14  this process.  It's not enough,  because we're now giving an

15  interest-free loan.  These are -- these are notes that are

16  part of the Debtor's plan that nobody objected to, that nobody

17  suggested were the subject of some condition subsequent.

18      This is not your normal, you know, gee, I'd like leave to

19  amend the complaint.  They're simply following what Mr.

20  Dondero did.  And I would really ask the Court to press the

21  Defendants to identify specifically who made the agreement on

22  behalf of the Debtors, when was the agreement made, is there

23  any document that they know of today that reflects this

24  agreement, and what were the terms of the agreement?  Is it

25  really that he would sell -- if he sells MGM for a dollar over

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 82 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 216 of 1726   PageID 11537

81

1  cost, $70 million of notes get forgiven?  How is that

2  possible?  How is that possible?  It doesn't pass the good

3  faith test.  The Court should deny the motion.

4      Thank you, Your Honor.

5          THE COURT:  Mr. Morris, in all of your listing of

6  allegedly problematic things, one trail my brain was going

7  down is this:  Is this adversary going to morph even further

8  to add fraudulent transfer allegations?  I mean, if notes --

9          MR. MORRIS:  Here's the --

10          THE COURT:  -- were forgiven or agreements were made

11  --

12          MR. MORRIS:  Yeah, I --

13          THE COURT:  -- that they would be forgiven if, you

14  know, assets are sold at a dollar more than cost, is the

15  Debtor going to say, well, okay, if this is an agreement,

16  there was a fraudulent transfer?

17          MR. MORRIS:  Your Honor, that is an excellent

18  question, one which I was discussing with my partners just

19  this morning.  You know, we have to -- we're balancing a

20  number of things on our side, including the delay that that

21  might entail; including, you know, what happens if we go down

22  that path.  You know, the benefit of suing under the notes, of

23  course, is that he's contractually obligated to pay all of our

24  fees.

25      And so we're balancing all of those things as these -- as

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 83 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 217 of 1726 PageID 11538
92

82

1  these defenses metastasize.  But it's something that we're

2  considering, and we reserve the right to do exactly that, as

3  these defenses continue to get -- and it would be fraudulent

4  transfer, it would be breach of fiduciary duty against Nancy

5  Dondero, it would be breach of fiduciary duty against Jim

6  Dondero.  I'm sure that there are other claims, Your Honor.

7  But if they want to -- if I'm forced to go down that path, I'm

8  certainly going to use every tool that I have available to

9  recover these amounts from the -- for the Debtor and their

10  creditors.  This is just an abuse of process.

11      How do you -- how does one enter into agreements of this

12  type without telling your CFO, without telling your auditors,

13  without putting it in writing?  And I asked Mr. Dondero, what

14  benefit did the Debtor get from all of this?  And you know

15  what his answer was, Your Honor?  Because it's really -- it's

16  appalling.  It was going to give him heightened focus on

17  getting the job done because of this agreement that he entered

18  into with his sister, Nancy, acting on behalf of the Debtor,

19  with no information, with no documents, with no notes, with no

20  advice, with no corporate resolutions.  The Debtor was going

21  to get Mr. Dondero's heightened focus to sell MGM, Trussway,

22  or Cornerstone for one dollar above cost.

23      I think the fraudulent transfer claim is probably a pretty

24  solid one.  But why do we have to do this?  Why do we have to

25  do this?

1           THE COURT:  Well, one of the reasons I'm asking is I

2    would not set the motion to withdraw the reference status

3    conference on an expedited basis, which I was asked to do a

4    few days ago in these two adversary proceedings, and I can't

5    remember when I've set it, but now I'm even worried, if I

6    grant this motion, is it going to be premature to have that

7    status conference in a month or so, whenever I've set it,

8    because if I grant this motion I'm wondering, am I going to

9    have your motion to amend to add fraudulent transfer claims?

10   It's -- you know, I want to give as complete a package to the

11   District Court as I can whenever I have that motion to

12   withdraw the reference.

13       All right.  Ms. Drawhorn, back to you.  As I said --

14           MS. DRAWHORN:  Yes.

15           THE COURT:  -- before inviting Mr. Morris to make his

16   argument, I know the law is very much on your clients' favor

17   as far as the law construing Rule 15(a).  But my goodness, I'm

18   wondering if your client needs -- your client needs to be

19   careful what they're asking for here, after what I've just

20   heard.

21       Anyway, what -- you get the last word on this.

22           MS. DRAWHORN:  Yes.  Thank you, Your Honor.  My

23   response is that Mr. Morris's argument was all on the merits

24   of the defenses, and certainly he is free to argue on the

25   merits, but that's not a determination for today and that's

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 219 of 1726 PageID 11540

84

1    not a determination for the motion for leave to amend.  That's

2    a determination for if he files a dispositive motion.

3        Like I said, we are still in the discovery phase.  Mr.

4    Morris mentioned at least three parties that will be -- likely

5    be deposed and potentially give us the additional information

6    that he's asking for to support this defense.  He mentioned

7    PricewaterhouseCoopers; Nancy Dondero, who he's already got

8    scheduled in a different adversary; Frank Waterhouse.

9        So it's too early, as you know, to look at the merits.

10   That's not -- that's not what's the focus of a motion for

11   leave to amend.

12       As to the -- the what amendment, what agreement, what are

13   the conditions subsequent, I believe we provided sufficient

14   information in our reply.  And if the Court would like us to

15   update our proposed amended answer, if the Court is inclined

16   to grant our motion, we can certainly do that.  But I think

17   the Plaintiff seems to be well aware of what the defenses are,

18   especially after his argument today on why he thinks it's not

19   a valid defense.

20       And then, on the due diligence, we did -- we did do due

21   diligence.  That's why we're seeking to amend the answer,

22   obviously, and add these claims.

23       If the Court -- if the Plaintiff wants to file a motion to

24   amend later, then we can address those amendments then.

25       But I think, on the Rule 15 standard, we have met our

85

1  burden and there's no substantial reason to deny the motion to

2  amend to add these defenses.

3          THE COURT:  All right.  By the way, have your

4  clients, have they filed proofs of claim?  And I'm asking for

5  a different reason than maybe I was asking earlier.  NexPoint

6  Real Estate Partners?

7          MS. DRAWHORN:  They're -- NexPoint Real Estate

8  Partners, LLC, formerly known as HCRE Partners, does have a

9  proof of claim on file.  It's unrelated to the notes.  And it

10  is subject to a contested matter that's pending -- that's a

11  separate matter that's before the Court being addressed.

12     And then HCMS initially filed a proof of claim that was

13  objected to in the Debtor's first omnibus objection and then

14  was disallowed.  There was no response to that omnibus

15  objection, so there's no longer a proof of claim for Highland

16  Capital Management Services.

17          THE COURT:  Okay.  Again, I'm just thinking ahead to

18  this report and recommendation I'm eventually going to have to

19  make on the motions to withdraw the reference.  And as I

20  alluded to, if this morphs to the point of including

21  fraudulent transfer claims, that certainly --

22          MS. DRAWHORN:  And Your Honor, one --

23          THE COURT:  It's going to affect the report and

24  recommendation.  And, you know, proofs of claim affect that,

25  too.  So, --

86

```
 1              MS. DRAWHORN:  Uh-huh.  Yes.  And I understand that,
 2    Your Honor.  And the issue, I think, with you -- we need to
 3    have this motion resolved, because it -- unless the Court is
 4    going to continue discovery or stay.  You know, one of the
 5    reasons why we had initially requested the expedited hearing
 6    was because of the discovery is continued -- continuing to --
 7    discovery deadlines are continuing to move.  And obviously
 8    whatever the Court decides on this motion for leave to amend
 9    will determine what the scope of that discovery is.
10         Similarly, if the Debtor decides to amend, that could
11    change the scope of discovery as well.
12         So we are open to continuing deadlines, and I think, you
13    know, might end up filing a motion to continue.  I haven't
14    conferred with Mr. Morris yet.  I suspect he's opposed, based
15    on our prior conversations.  But that's something that might
16    be helpful, especially if the Court is concerned on how it
17    will affect the motion to withdraw the reference, to -- maybe
18    we continue some of these upcoming deadlines, and that might
19    appease, you know, solve some of your concerns.
20              THE COURT:  All right.  Well, Rule 15(a), of course,
21    is the governing rule here, and the case law is abundant that
22    courts "should freely give leave when justice so requires."
23    And the law is also abundantly clear that the rule "evinces a
24    bias in favor of granting leave to amend."  And again and
25    again, cases say that leave should be granted unless there's
```

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 88 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 222 of 1726 PageID 11543

87

1   substantial reason to deny leave, and courts may consider

2   factors such as delay or prejudice to the non-movant, bad

3   faith or dilatory motives on the part of the movant, repeated

4   failure to cure deficiencies, or futility of the amendment.

5       While the Debtor has presented arguments that there might

6   be bad faith here on the part of the Movants and there might

7   be futility in allowing the amendments because of various

8   strong arguments and defenses the Debtor believes it has to

9   this issue of agreements with regard to the notes that

10  allegedly provide affirmative defenses, the Court believes the

11  rule requires me to allow leave to amend the answer.

12      Now, a couple of things.  I am going to require, though,

13  that the amended answer be more specific than has been

14  suggested.  I am going to agree that if new affirmative

15  defenses are made that there was this agreement to forgive

16  when certain conditions happened, then there does need to be

17  identification of who the human beings were that were involved

18  in making the agreement, the date of any agreement or

19  agreements, and disclose what documents substantiate the

20  agreement or reflect the agreement.  All right?  So if that

21  could --

22          MR. MORRIS:  Your Honor?

23          THE COURT:  Yes?

24          MR. MORRIS:  John Morris.  I apologize for

25  interrupting, but just a fourth thing is what is the

88

1    agreement?  I mean, what is the agreement?

2            THE COURT:  Well, okay.  That's fair enough.  What is

3    the agreement?  I guess --

4            MR. MORRIS:  And -- and --

5            THE COURT:  -- that needs to be spelled out.  I mean,

6    I guess I was assuming that that would be spelled out in --

7    but maybe it's not.  So we'll go ahead and add that.

8        As far as extension of the discovery, Ms. Drawhorn has

9    offered that.  I think it would be reasonable if the Debtor or

10   Plaintiff wants that.  Do you want an extension of discovery?

11           MR. MORRIS:  What I really want, Your Honor, is a

12   direction for them to serve this amended answer within 24 or

13   48 hours and grant leave to the Debtor to promptly file

14   written discovery.  We've got Nancy Dondero -- if it turns out

15   -- and maybe Ms. Drawhorn can just answer the question right

16   now.  Who entered the agreement on behalf of the Debtor?

17   Because I'm already taking Nancy Dondero's deposition on the

18   28th.  And it seems to me, if they would just answer the

19   question of whether Ms. Dondero is the person who did that, I

20   could just add a notice of deposition and take the deposition

21   on that date, too, and it would be, really, more efficient for

22   everybody.

23           THE COURT:  Ms. Drawhorn, who was the human being?

24           MS. DRAWHORN:  Yes.  It was -- yes, Nancy Dondero

25   entered into the -- the subsequent agreement.

89

 1             MR. MORRIS:  Okay.  Super.

 2             THE COURT:  All right.  You said you've already --

 3             MR. MORRIS:  So, --

 4             THE COURT:  -- got a depo scheduled of her?

 5             MS. DRAWHORN:  Well, what's the date --

 6             MR. MORRIS:  I do --

 7             MS. DRAWHORN:  -- Mr. Morris?

 8             MR. MORRIS:  I believe it's the 28th.  Your co-

 9    counsel can confirm, but I think it's the 28th.

10        And I'll just get another deposition notice for that one,

11    and we'll figure out a time to take Mr. Sauter's deposition,

12    too.

13        But I don't think that there is a need, frankly, for --

14    having been told by Mr. Dondero that there's no documents

15    related to this, having the Court just ordered the Defendants

16    to disclose the identity of any documents that relate to this

17    agreement, I don't think we need to extend the discovery

18    deadline at all.  I can take Ms. Dondero's deposition, I can

19    take Mr. Dondero's deposition, and I can take Mr. Sauter's

20    deposition in due course over the next four weeks.

21             THE COURT:  All right.  Well, Ms. Drawhorn, we'll say

22    that this amended answer needs to be filed by midnight Friday

23    night, 11:59.  That gives you a day and a half to get it done.

24    All right.  If you could please --

25             MS. DRAWHORN:  Yes, Your Honor.

90

1           THE COURT:  Please upload an order, Ms. Drawhorn,

2    granting your motion with these specific requirements that

3    I've orally worked in.

4       I think clients need to be careful what they ask for.  I'm

5    very concerned.  And I know it was just argument and I'll hear

6    evidence, but of all of the things that I guess -- well, I'm

7    concerned about a lot of things, but do we have audited

8    financial statements that didn't disclose these agreements

9    with regard to --

10          MR. MORRIS:  Yes, Your Honor.

11          THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 11:58 a.m.)

17                        --oOo--

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                         **06/12/2021**

23   _____    _____
     Kathy Rehling, CETD-444                    Date
24   Certified Electronic Court Transcriber

25

91

<div align="center">INDEX</div>

PROCEEDINGS                                                            4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

19-34054-sgj

Motion to Compel Compliance with Bankruptcy Rule 2015.3  49/54
filed by Get Good Trust, The Dugaboy Investment Trust
(2256)

21-3006-sgj

Motion for Leave to File Amended Answer and Brief in      86
Support filed by Defendant Highland Capital Management
Services, Inc. (15)

21-3007-sgj

Motion for Leave to Amend Answer to Plaintiff's           86
Complaint filed by Defendant HCRE Partners, LLC (n/k/a
NexPoint Real Estate Partners, LLC) (16)

END OF PROCEEDINGS                                                    90

INDEX                                                                 91

**EXHIBIT 14**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
  1                 FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
  2
                                   )   Case No. 19-34054-sgj-11
  3    In Re:                      )   Chapter 11
                                   )
  4    HIGHLAND CAPITAL            )   Dallas, Texas
       MANAGEMENT, L.P.,           )   December 10, 2020
  5                                )   9:30 a.m. Docket
                                   )
  6            Debtor.             )
       _____    )
  7                                )
       HIGHLAND CAPITAL            )   Adversary Proceeding 20-3190-sgj
       MANAGEMENT, L.P.,           )
  8                                )
                                   )
  9            Plaintiff,          )   - MOTION FOR PRELIMINARY
                                   )     INJUNCTION
 10    v.                          )   - MOTION FOR TEMPORARY
                                   )     RESTRAINING ORDER
 11    JAMES D. DONDERO,           )
                                   )
               Defendant.          )
 12    _____    )

 13                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 14                 UNITED STATES BANKRUPTCY JUDGE.

 15    WEBEX/TELEPHONIC APPEARANCES:

 16    For the Plaintiff:          Jeffrey N. Pomerantz
                                   PACHULSKI STANG ZIEHL & JONES, LLP
 17                                10100 Santa Monica Blvd.,
                                    13th Floor
 18                                Los Angeles, CA  90067-4003
                                   (310) 277-6910
 19
       For the Plaintiff:          John A. Morris
 20                                PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
 21                                New York, NY  10017-2024
                                   (212) 561-7700
 22
       For the Official Committee  Matthew A. Clemente
 23    of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                   One South Dearborn
 24                                Chicago, IL  60603
                                   (312) 853-7539
 25
```

2

1   APPEARANCES, cont'd.:

2   For the Defendant:          D. Michael Lynn
                                John Y. Bonds, III
3                               BONDS ELLIS EPPICH SCHAFER JONES,
                                  LLP
4                               420 Throckmorton Street,
                                  Suite 1000
5                               Fort Worth, TX  76102-5304
                                (817) 405-6903
6
    For the NexPoint Parties:   James A. Wright, III
7                               K&L GATES
                                State Street Financial Center
8                               One Lincoln Street
                                Boston, MA  02111
9                               (617) 261-3193

10  For the CLOs/Issuer Group:  James E. Bain
                                JONES WALKER, LLP
11                              811 Main Street, Suite 2900
                                Houston, TX  77002
12                              (713) 437-1820

13  Recorded by:               Michael F. Edmond, Sr.
                                UNITED STATES BANKRUPTCY COURT
14                              1100 Commerce Street, 12th Floor
                                Dallas, TX  75242
15                              (214) 753-2062

16  Transcribed by:            Kathy Rehling
                                311 Paradise Cove
17                              Shady Shores, TX  76208
                                (972) 786-3063
18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.

3

1          DALLAS, TEXAS - DECEMBER 10, 2020 - 9:58 A.M.

2          THE COURT:  We only have left today the Highland

3    matter.  There may be people on the line for the RE Palm

4    Springs matter, but if you're on the line for that, the Court

5    granted a motion for continuance that was filed by SR

6    Construction, Inc. a few days ago.  So if you were on the line

7    for that, that's been continued at the Movant's request.  Or

8    the Objector's request, I should say.  And it's to be reset at

9    such point in time as the lawyers seek that.

10       All right.  So, with that, I am going to turn to Highland

11   and our emergency motion for a temporary restraining order

12   against James Dondero that was filed by the Debtor.  First,

13   for the Debtor team, who do we have appearing?

14          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

15   Pomerantz, also with John Morris.  John Morris will be handling the

16   hearing today on behalf of the Debtor.

17          THE COURT:  All right.  Thank you.  For Mr. Dondero, who

18   do we have appearing?

19          MR. BONDS:  Your Honor, John Bonds and Michael Lynn.

20          THE COURT:  All right.  Thank you.  The Committee, I know,

21   is interested in this.  Who do we have appearing for the Committee?

22          MR. CLEMENTE:  Good morning, Your Honor.  Matthew

23   Clemente; Sidley Austin; on behalf of the Committee.

24          THE COURT:  All right.  I'm going to ask, do we have

25   anyone appearing for certain parties who filed another emergency

1   motion yesterday, I think involving what seemed like very

2   overlapping issues.  The parties that I'm talking about are Highland

3   Fixed Income Fund; NexPoint Advisors, LP; NexPoint Capital, Inc.;

4   and NexPoint Strategic Opportunities Fund.  Do we have anyone -- I

5   think it was the K&L Gates firm who filed an emergency motion

6   yesterday on, like I said, what I think are some overlapping issues

7   with what we're going to hear about today.  Anyone here on the line

8   for those entities?

9          MR. WRIGHT:  Yes.  Good morning, Your Honor.  It's James

10  Wright, K&L Gates.  I wasn't expecting this matter to be on today,

11  so I need to apologize for not having a coat and a tie.

12         THE COURT:  Okay.  Well, I realize I picked you out.  But

13  could you, for the court reporter, say your last name again?  It was

14  a little garbley.

15         MR. WRIGHT:  Yes.  It's James Wright, W-R-I-G-H-T.

16         THE COURT:  Okay.  Thank you.  Well, we have a lot of

17  other folks on the line, so I'll just ask:  Is there anyone else out

18  there who desires to appear?  This was obviously set very expedited,

19  so maybe people did not file a pleading to weigh in, but maybe

20  they're wanting to appear.  If so, go ahead.  (No response.)  All

21  right.  Hearing no others, I will go to you, I guess, Mr. --

22         MR. BAIN:  Your Honor?

23         THE COURT:  Oh, go ahead.

24         MR. BAIN:  Your Honor?

25         THE COURT:  Yes?

5

1          MR. BAIN:  I'm sorry.  I was on mute.  This is Joseph Bain

2   of the law firm of Jones Walker.  I represent the CLOs.  And Your

3   Honor, at the appropriate time, if Your Honor doesn't mind, I have a

4   few comments that may help inform the Court on kind of what's going

5   on.  But I'm happy to wait until the appropriate time.

6          THE COURT:  Okay.  Very good.  Well, and the reason why I

7   picked out Mr. Wright regarding that newest emergency motion is, you

8   know, I know they've asked for an emergency setting next Tuesday,

9   and I have not -- I've not made a decision on that.  I kind of

10  wanted to see what I hear about today and figure out if there's

11  really, you know, a need for that or not.

12      So, thank you, Mr. Bain.  We'll talk to you at some point

13  today.

14          MR. BAIN:  Thank you, Your Honor.

15          THE COURT:  Any other appearances?

16      All right.  Well, I was about to go back to or go to Mr.

17  Morris.  But let me ask Mr. Bonds or Mr. Lynn:  Did you file a

18  responsive pleading?  When I left here yesterday afternoon, I

19  did not see one.  But was there one filed late at night, by

20  chance, that I just haven't seen?

21          MR. BONDS:  No, Your Honor, we have not.

22          THE COURT:  Okay.  Thank you.

23          MR. BONDS:  (garbled)

24          THE COURT:  All right.  Mr. Morris, go ahead.

25          MR. MORRIS:  Thank you, Your Honor.  John Morris;

6

```
 1   Pachulski, Stang, Ziehl & Jones; for the Debtor.

 2      Let me begin by thanking Your Honor for hearing us on such

 3   shortened notice.  What I thought I'd do is spend a few

 4   minutes, Your Honor, talking about why we're here, summarizing

 5   the facts, and then summarizing for the Court the relief that

 6   we're seeking.

 7      As Your Honor, I presume, is aware, we filed this motion

 8   on Monday, together with a declaration from Jim Seery, the

 9   Debtor's CEO and CRO, with 29 separate exhibits.  And if it

10   pleases the Court, I'd like to proceed in that manner.

11         THE COURT:  All right.  You may.

12         MR. MORRIS:  Okay.  Your Honor, we do regret that

13   we're here, frankly.  The Debtor has worked very hard during

14   the course of this case to get to where we are.  We have a

15   plan on file that calls for the monetization of the Debtor's

16   assets for distribution to holders of allowed claims, we have

17   an approved disclosure statement, and confirmation is just

18   five weeks away.

19      Unfortunately, in the last couple of weeks, Mr. Dondero

20   has engaged in what we firmly believe is wrongful conduct and

21   can't really be credibly disputed or justified.  As Mr. Seery

22   lays out in his declaration and as Mr. Dondero's own written

23   words show, Mr. Dondero recently interfered with the Debtor's

24   operations and decisions and made some rather explicit

25   threats.
```

7

1       We're not here to punish Mr. Dondero.  We're not here

2   seeking sanctions for violation of the automatic stay.

3   Rather, we're here to simply set some very clear and firm

4   ground rules on a go-forward basis so the Debtor can get

5   across the finish line without interference or coercion by Mr.

6   Dondero or anyone acting on his behalf.  That's all we're here

7   to do today.

8       We tried to work with Mr. Dondero's counsel on a

9   stipulation, but regrettably were unable to do so.

10      So let me describe for the Court the facts that support

11  the motion, and at the end of that I will offer our exhibits

12  into evidence.

13      I do want to provide some context into how we got here.

14  The facts are pretty simple.  As Your Honor will recall, back

15  in January, with this Court's approval, Mr. Dondero

16  surrendered control of the Debtor to an independent board of

17  directors, including Mr. Seery.  As Your Honor knows, though,

18  Mr. Dondero was retained as a portfolio manager and as an

19  unpaid employee of the Debtor.

20      Pursuant to the Court's order and the term sheet entered

21  into with the Unsecured Creditors' Committee, Mr. Dondero's

22  responsibilities were to be determined by the board, and he

23  agreed to resign at the board's request.

24      Over the summer, as Your Honor will recall, Mr. Seery was

25  appointed the Debtor's CEO and CRO.  Throughout this time, Mr.

8

1  Seery worked closely with Mr. Dondero.  And one of the things
2  they worked on was trying to come up with a so-called pot
3  plan, the goal of which was to come to a consensual resolution
4  of this case.  Mr. Seery's goal, the (garbled) goal, the
5  Debtor's goal, was to try to give the estate an alternative to
6  the monetization of the Debtor's assets, and Mr. Seery worked
7  hard and in good faith in that regard.

8      As Your Honor will also recall, in late summer the Debtor
9  and certain litigation creditors agreed to mediate these
10 disputes.  In September, the Debtor announced that it had
11 reached an agreement with Josh Terry and Acis to resolve their
12 claims.  I don't need to remind the Court of the nature of the
13 disputes between Mr. Dondero and Mr. Terry, but suffice it to
14 say that Mr. Dondero made clear that he opposed not only the
15 settlement that was reached at the mediation, but, really, any
16 settlement at all with Mr. Terry.

17     At around the same time, while still trying to get to the
18 pot plan and a consensual resolution, the Debtor did present
19 its plan of reorganization that provides for the monetization
20 of the assets for the benefit of creditors.  By the end of
21 September, Mr. Dondero made it clear that he would oppose both
22 the Acis settlement and the Debtor's plan.

23     He has every right to do that, Your Honor.  Well, those
24 steps are contrary to the interests of the Debtor.  In
25 addition, it also became clear that Mr. Dondero, through

9

1  (garbled) trust, has continued to press his claims that the

2  Debtor had -- that the Debtor had mismanaged Multi-Strat

3  during the case.

4      For these reasons, I think on October 2nd the board asked

5  Mr. Dondero to resign, and he did so on October 9th.

6      With confirmation on the horizon, in the last couple of

7  weeks, regrettably, Mr. Dondero has, in fact, interfered with

8  the Debtor's business.  There's no dispute that the Debtor

9  serves as the manager of certain CLOs.  There's no dispute

10 that Mr. Dondero and certain of his affiliates hold a portion

11 of the preferred notes in the CLOs managed by the Debtors.  I

12 don't think there's any dispute that the Debtor's duty is to

13 the CLOs and not to any particular holder of CLO interests.

14      In late November, in furtherance of his duties, Mr. Seery

15 directed that certain assets held by the CLOs be sold.  Mr.

16 Dondero and certain entities he controls, the ones that we

17 mentioned earlier, Your Honor, the ones that are the

18 (garbled), apparently disagreed with Mr. Seery's business

19 judgment, and that happens.

20      I do want to point out, I don't know if Your Honor has had

21 a chance to read the competing TRO, --

22          THE COURT:  I have.

23          MR. MORRIS:  -- but what's notable -- okay.  What's

24 notable in there, Your Honor, is that they expressly admit,

25 and I'm quoting, the Debtor is responsible for making

10

1   decisions to sell the CLOs' assets.  They admit that in their

2   request for a TRO.

3       So there's no dispute that Mr. Seery has the right to do

4   what he set out to do.  Nevertheless, Mr. Dondero intervened

5   and personally stopped the trades that Mr. Seery authorized.

6   It's in writing.  It can't be disputed.  In fact, it's set

7   forth in Exhibit 8, which is attached to Mr. Seery's

8   declaration, which can be found at Docket 4 to the adversary

9   proceeding.

10      Not only did Mr. Dondero cause the trades to halt, he told

11  certain people, including the Debtor's chief compliance

12  officer, not to do it again, and (inaudible) that they would

13  face personal liability if they did so.

14      The Debtor sent cease-and-desist letters to Mr. Dondero

15  and his affiliated entities.  Those letters are attached as

16  Exhibits 9 and 10 to Mr. Seery's declaration.  And the fact

17  is, Your Honor, for this particular part of the episode, Mr.

18  Seery's conduct is simply unacceptable and was one of the

19  events that precipitated the filing of this motion.

20          THE COURT:  You said Mr. Seery.  I think you meant

21  Mr. Dondero.

22          MR. MORRIS:  I apologize, Your Honor.  I certainly

23  did, yes.

24          THE COURT:  Okay.

25          MR. MORRIS:  The other event that caused the Debtor

11

1   to file this motion was a rather explicit written threat that

2   Mr. Dondero made to Mr. Seery promptly after the Debtor acted

3   to fulfill its fiduciary duties to the estate.

4       As the Court may generally be aware, Mr. Dondero and

5   certain of his affiliates are the makers under a series of

6   promissory notes in favor of the Debtor. The notes are

7   attached as Exhibits 11 through 23 to Mr. Seery's declaration.

8   Certain of these notes are demand notes, meaning that they

9   don't have a term, they don't expire at some defined point in

10   the future, they're payable upon demand by the holder. The

11   Debtor is the holder of these notes.

12       Last week, the Debtor exercised its right to make a demand

13   for payment of all unpaid principal and accrued interest,

14   estimated to be approximately $30 million in the aggregate.

15   Those demands are set forth in Exhibits 24 through 27 in Mr.

16   Seery's declaration.

17       The demand notes are property of the Debtor's estate,

18   collection of the notes is part of the Debtor's liquidity

19   plan, and the proceeds are expected to be used to pay

20   creditors' claims.

21       Shortly after the demand for payment on the notes was

22   made, Mr. Seery [sic] sent a short text that can be found at

23   Exhibit 28, saying simply, Be careful what you do. Last

24   warning.

25       To Mr. Seery's surprise, Mr. Dondero called him the

12

1  following morning, ostensibly to talk about his pot plan.  As

2  laid out in his declaration, Mr. Seery expressed considerable

3  concern over the threat, expressed his view that he thought it

4  was unlawful, and was surprised, really, at the nature of the

5  conversation.

6       Mr. Dondero didn't apologize during that call.  He didn't

7  express regret.  Instead, he suggested that the lawyers would

8  handle that issue.  And only at the end of the call, when Mr.

9  Seery pressed, did Mr. Dondero begrudgingly say that he didn't

10  mean any physical harm.

11       Your Honor, we're five weeks away from confirmation.  The

12  Debtor is laser-focused on getting there.  We are -- continue

13  -- we have resolved substantial claims.  We continue to

14  resolve substantial claims.  And though if there was a viable

15  pot plan the Debtor would still pursue it, the Debtor is

16  seeking a smooth transition into its post-bankruptcy state.

17  We continue to negotiate with creditors who have outstanding

18  claims.  And we need peace.  We need the freedom to get there.

19       As a result of the foregoing, the Debtor seeks the entry

20  of a temporary restraining order in the form of Exhibit A

21  attached to the motion, which is on Docket #2 in the adversary

22  proceeding.  In substance, the form is intended to prevent Mr.

23  Dondero from interfering with the Debtor's business, engaging

24  in threatening or coercive conduct, and using his affiliates

25  or others acting on his behalf to do the same.

13

1    In our discussions with Mr. Dondero's counsel, it became

2 clear that Mr. Dondero was not interested at this time in

3 resolving the entirety of the dispute.  We wanted to get this

4 whole adversary proceeding open and closed and put this behind

5 us.  But regrettably, we're here today to press the motion

6 because we were unable to come to that agreement.

7    So, in addition to the entry of the order attached to the

8 motion, the Debtor also requests that the Court hold an

9 evidentiary hearing on the Debtor's request for a preliminary

10 injunction on January 4th, when we already have time on the

11 Court's calendar.

12    And so that there's no misunderstanding, if the parties

13 cannot resolve this matter beforehand, the Debtors do intend

14 to take discovery during the intervening period.  We will be

15 prepared on January 4th, and we would expect, if forced to, to

16 call Mr. Dondero as a witness at that hearing.

17    I have nothing further, Your Honor.  Oh, actually, I do

18 have something further.  The Debtor moves for the entry into

19 evidence of the declaration of Mr. James P. Seery, Jr.

20 (muffled).

21         THE COURT:  Okay.  You got a little garbley.  I think

22 someone unmuted their device during your --

23         THE CLERK:  Mr. Bonds --

24         THE COURT:  Okay.  But the request was that the Court

25 admit into evidence the declaration of Mr. Seery at Docket

14

```
 1   Entry #4, along with the 29 exhibits that were attached to

 2   that declaration.  Any objection?  (No response.)  All right.

 3   Those will be admitted into evidence.

 4       (Debtor's 29 exhibits are received into evidence.)

 5           THE COURT:  All right.  Mr. Bonds, what does Mr.

 6   Dondero wish to tell the Court?  All right.  I think you put

 7   yourself back on mute when I made the comment.  Please unmute

 8   your device.

 9           MR. BONDS:  I'm sorry, Your Honor.  Can you hear me?

10           THE COURT:  I can.

11           MR. BONDS:  Your Honor, I would first like to

12   apologize for Mr. Dondero's email to Mr. Seery.  It should not

13   have been sent.  It is unfortunate that Mr. Dondero had

14   several good points to make, but the message he was trying to

15   send to the Debtor seems to have been lost, and for that I

16   apologize.

17       Mr. Dondero had serious concerns about the way in which

18   the Debtor's employees have been treated in this case.  As the

19   Court knows, the employees who built this company will be

20   terminated either on December 31st or upon confirmation of the

21   Debtor's most recent plan.  Mr. Dondero does not agree to such

22   termination or the financial treatment of the employees,

23   especially the treatment over the last few months, in which

24   they have seen their claims be substantially reduced.

25       Your Honor, Mr. Dondero is further concerned with the
```

15

1    Debtor's lack of sale of assets, especially the lack of

2    competitive bidding.  Mr. Dondero may want to bid on some of

3    those assets, and under the Debtor's procedure, he is being

4    precluded from bidding, even if the sale is outside of the

5    ordinary course of business.

6        Mr. Dondero is further frustrated by the Debtor's sale of

7    certain CLOs under applicable law.  Is this an attempt around

8    the hearing on the 16th?  I don't know, Your Honor, but we are

9    set for the 16th on the issue of whether or not the sales are

10   being made outside the ordinary course of business.  Is the

11   Debtor trying to sell its assets without competitive business

12   -- bidding?  Why is that?

13       And what the Debtor would like you to sign is as an overly

14   broad TRO written, I suspect, with a peppering of anger

15   throughout.  The relief requested is basically in the

16   declaration of Jim Seery.  It contains a number of acts which

17   the Debtor seeks to have this Court determine are prohibited

18   conduct.  That term is defined in the Debtor's motion for TRO.

19   We assert that such language is overly broad and its

20   (inaudible) behavior which Debtor seeks to prohibit is not

21   justified, inapplicable, or simply does not make common sense.

22       Your Honor, in the second paragraph of the proposed TRO,

23   there are five general concepts that are listed as prohibited

24   conduct.  The first category of prohibited conduct which we

25   have issues with relates to Mr. Dondero communicating with the

16

1   Debtor's employees except as it relates to the shared services

2   provided by or controlled by Mr. Dondero.  Such a prohibition

3   is unreasonably broad and seemingly may well violate the First

4   and the Fourth Amendments.

5       Your Honor, we ask the question:  Can Mr. Dondero

6   communicate something as basic as an employment contract with

7   an employee who is going to be let go without violating the

8   TRO?

9       The second category of prohibited conduct relates to

10  allegedly interfering or otherwise impeding, directly or

11  indirectly, the Debtor's business concerning its operations,

12  management, treatment of claims, disposition of assets owned

13  or controlled by the Debtor, and pursuit of the plan or any

14  alternative to the plan.  Your Honor, what does the word

15  indirectly mean?  Does such prohibition prohibit the Debtor

16  from pursuing -- or Mr. Dondero from pursuing his Acis 9019

17  motion or appeal?  What does the language mean with regard to

18  pursuit of the plan or any plan alternative?  Has the Debtor

19  turned the shield into a sword?  Can the Debtor -- can Mr.

20  Dondero try to sell his pot plan which he and the mediators

21  have worked so diligently on?  Does Mr. Dondero violate the

22  terms of the TRO simply by voting against the plan?

23      Is this really what the Debtor wants, or does the Debtor

24  want to return the most money that it can to the Debtor's

25  creditors?

1      Can Mr. Dondero even (inaudible) in the organization

2   without violating the TRO?

3      Finally, the proposed order provides that Mr. Dondero is

4   further temporarily causing -- temporarily enjoined and

5   restrained from causing, encouraging, or conspiring with (a)

6   an entity owned or controlled by him and/or any person or any

7   entity acting on his behalf from directly or indirectly

8   engaging in any prohibited conduct. Again, what does the word

9   causing mean? What about the word encouraging? Does that

10  mean that the Debtor simply cannot do any action to protect

11  himself -- Mr. Dondero cannot take any action to protect

12  himself? Are we setting up Mr. Dondero to fail?

13     Your Honor, what we would ask, what we would ask the Court

14  to do is either deny the TRO as being overly broad or order

15  the Debtor to come up with some reasonable restrictions going

16  forward. We are happy to consider anything reasonable, but

17  the proposed TRO is anything but reasonable.

18     In summary, we ask the Court how the status quo would be

19  altered by a TRO.

20     Your Honor, I think Mr. Morris has indicated that the

21  Debtor intends to be able to confirm a plan on the 5th -- or

22  the 12th, excuse me, of January. Your Honor, we don't believe

23  that that's appropriate. Is Mr. Dondero prohibited from

24  trying to get his plan confirmed? Is he -- I mean, it seems

25  to me that he basically is.

18

1      Your Honor, with regard to two arguments made by Mr.

2   Morris, or at least one, we deny that any demand notes

3   precipitated Mr. Dondero's email.  It had absolutely nothing

4   to do with it.  But we're not here to talk about Mr. Dondero's

5   demand notes at this point.

6      I don't think I have anything further.

7           MR. MORRIS:  If I may respond very briefly, Your

8   Honor?

9           THE COURT:  You may.  Go ahead.

10           MR. MORRIS:  Okay.  Your Honor, we are cognizant, and

11   we don't mean, with all due respect to Mr. Bonds, to infringe

12   on any way Mr. Dondero's right to make applications to this

13   Court, to file motions.  I think I heard mention of, you know,

14   questions as to whether Mr. Dondero could pursue his motion

15   against Acis, his appeal of the Acis, about whether or not or

16   he could file things in this Court.  We expressly put in a

17   footnote, in order to try to make it clear, that Mr. Dondero

18   has and will continue to have a right to make any application

19   he wants to this Court, to object to any motion that's made.

20   That's not the point of the exercise.  The point of the

21   exercise is to protect the Debtor from interference -- to

22   protect the Debtor (echoing) from interference, coercion, and

23   from threats.  It's really that simple.  I don't know why

24   words that we use in common language every day, such as

25   causing or conspiring or encouraging, should be deemed to be

19

```
 1   ambiguous.  I think, given the importance of these issues, one

 2   ought to be able to stay on the right side of that line

 3   without questioning whether or not they're actually conspiring

 4   with somebody or encouraging somebody to do something that

 5   they're otherwise prohibited from doing.

 6       What the Debtor will not tolerate, Your Honor, is play

 7   whack-the-mole, where we get an order against Mr. Dondero,

 8   only to have one of his affiliated entities or somebody acting

 9   on his behalf attempt to say, oh, no, I'm here acting on my

10   own independent behalf, and they're going to do exactly what

11   Mr. Dondero is prohibited from doing.  So that's all.

12       Again, Your Honor, we're not here with hysteria.  I don't

13   think our papers were intended to nor did they project any

14   hysteria.  I think, with counsel, as provided for in the

15   proposed order, we would be delighted to continue to work with

16   Mr. Dondero constructively.  If he's got ideas on his pot

17   plan, we're not precluding him from doing that at all.  All

18   we're saying is that he's got to participate with counsel and

19   that he's not going to make any further direct communications

20   to the Debtor's officers, directors, or employees.  That's

21   all, Your Honor.  We think it's really quite reasonable under

22   the circumstances.

23       I have nothing further.

24           THE COURT:  All right.  Well, --

25           MR. BAIN:  Your Honor?
```

20

1           THE COURT:  Who just spoke up?

2           MR. BAIN:  (garbled)  Yes.  Joseph Bain on behalf of

3    the CLOs, if I may be heard.

4           THE COURT:  Okay.  Everybody else mute their line.

5    Okay.  Go ahead, Mr. Bain.

6           MR. BAIN:  Yes, Your Honor.  And can you hear me

7    okay?

8           THE COURT:  I can.

9           MR. BAIN:  Wonderful.  Your Honor, for the record,

10   Joseph Bain of the law firm of Jones Walker on behalf of the

11   CLOs.

12       Our role in this is obviously very sensitive, given the

13   nature and relationships that exist.  One of the things I did

14   want to let Your Honor know, though, is that -- two things.

15   One, one of the most outstanding issues, at least in my

16   opinion, regarding confirmation of the plan is essentially

17   what to do with the CLOs and collateral management agreements.

18   That's still an open issue.  If that's not resolved, there are

19   significant rejection damages that could come from that.  So

20   that's the bad news.

21       The good news, however, is, up until this week, we've been

22   negotiating with the Debtors and we have calls set for

23   NexPoint -- with NexPoint to negotiate what all parties kind

24   of refer to as a soft landing for the CLOs, which, to a large

25   extent, involve the issues that are before you today.

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 248 of 1726 PageID 11569

21

```
 1        I just, I just wanted to provide that context because the

 2   parties are talking and we are kind of taken aback by kind of

 3   the most recent event this week, because from an outsider's

 4   perspective, the current issues that are currently kind of at

 5   dispute here, we thought everyone was working towards a deal.

 6   And I think it is a little ironic that -- and as Your Honor

 7   knows, I was involved in the Hoactzin case, and I thought that

 8   that was a very -- I represented Mac Murray (phonetic) in that

 9   case, and I thought Ms. Byrnes and Mr. Hendricks did an

10   excellent job of pulling all the parties together.

11        And Your Honor, I don't want to stray too far outside of

12   my lane to suggest that that same approach is what is needed

13   here, but I just want to raise for Your Honor to let you know

14   that we are here.  We're kind of the party stuck in the

15   middle.  And we're hoping and we're -- remain willing to

16   negotiate all the outstanding issues.  But obviously, given

17   the nature of some of the allegations, it's more complicated

18   right now.

19             THE COURT:  Okay.

20             MR. BAIN:  And that's all I have, Your Honor.

21             THE COURT:  All right.  Well, I appreciate you

22   speaking up.  And you may or may not remember that the Court

23   ordered mediation last July, global mediation, including Mr.

24   Dondero, mediation among the Debtor, Mr. Dondero, UBS, Acis,

25   the Crusader Redeemer Committee, and we had a co-mediation
```

22

1   team.  Retired Bankruptcy Judge Allan Gropper and former Weil

2   Gotshal partner Sylvia Mayer.  And while I don't communicate

3   with mediators, I fully believe from the parties' reports that

4   was mediation that the parties and lawyers tried very, very

5   hard in to get to some settlements, and in fact, they did get

6   to a settlement with Acis and the Redeemer Committee.

7        So, I have a heck of a lot of thoughts here, and I'll

8   refrain from sharing every one of them, but I'm going to share

9   a few of them.  While I appreciate Mr. Bonds doing what was an

10  honorable thing and apologizing on behalf of his client for

11  the written communications that were worded in such a way

12  where someone might think they were threatening or a violation

13  of the stay, it wasn't an apology from Mr. Dondero directly.

14  I think the really, really honorable thing might have been if

15  Mr. Dondero came here, hat in hand, willing to go under oath

16  and explain himself.  You can share that with him, that's what

17  this judge thinks, that the apology through counsel fell a

18  little short, although I definitely appreciate counsel

19  expressing the apology.

20       You know, I've been going back and forth looking at my

21  computer screen today, and, you know, it's rather shocking to

22  see in writing, you know, with the photo shot of a text where

23  Dondero says, "Be careful what you do-last warning."  I mean,

24  that's just pretty shocking.

25            MR. BONDS:  Your Honor?  Your Honor?

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 250 of 1726 PageID 11571
59

23

1      THE COURT:  Yes.

2      MR. BONDS:  Can I have a second?  Mr. Dondero did

3  apologize to counsel and to Mr. Seery as well, and so the idea

4  that Mr. Dondero has not apologized is not entirely correct.

5      THE COURT:  Okay.  Well, if I misunderstood, I

6  apologize.  But I guess what I was really trying to convey is,

7  in a situation like this, I think coming into court and taking

8  his lumps and saying things under oath might have been a

9  better way to proceed.

10     I guess the second thing I want to say is I wish Mr.

11  Dondero was here, because maybe I'm reading this wrong, but I

12  think he needs to hear and know he is not in charge anymore of

13  Highland.  It may have been his baby.  He may have created its

14  wealth.  But when he and the board made the decision to file

15  Chapter 11, number one, that changed everything.  And then

16  number two, when the Committee was formed and was threatening

17  "We think we need a Chapter 11 trustee because of conflicts of

18  interest of Mr. Dondero and others," and when the Committee

19  negotiated something short of that with the Debtor in January

20  2020, you know, a settlement that involved Mr. Dondero no

21  longer being in charge, no longer being CEO, no longer having

22  any role except portfolio manager with the Debtor, and when

23  various protocols were negotiated, heavily negotiated, for

24  weeks, detailed, complex protocols, life changed even further.

25  It changed when he filed Chapter 11, when he put his baby,

24

1    Highland, in Chapter 11, and then it changed further in

2    January 2020 when this global corporate governance settlement

3    was reached.  As we know, it involved independent new board

4    members coming in and eventually a new CEO.  He's not in

5    charge.

6        Now, that doesn't mean he's not a party in interest, and

7    he can certainly weigh in with pleadings in the bankruptcy

8    court.  But these communications that I've admitted into

9    evidence, and the declaration, the sworn declaration of Mr.

10   Seery, suggest to me that he's not fully appreciating that,

11   sorry, you're not in charge.  And when you chose to put the

12   company in bankruptcy because of the overwhelming debt, it

13   started a cascade of events, so that now I'm depending on a

14   debtor-in-possession with a new board and a new CEO and a

15   Committee of very sophisticated members and professionals who

16   are working in tandem with the Debtor to be in charge,

17   basically.  All right?  So that's another thing I just feel

18   compelled to say for Mr. Dondero's benefit.

19       I guess another thing is there was a little bit of a

20   theme, Mr. Bonds, in your comments that Mr. Dondero is just

21   concerned, more than anything else, about the way employees

22   are being treated, or at least that's a major concern.  And I

23   don't find that to be especially compelling.  I mean, maybe if

24   he was sworn under oath and testified, I would believe that,

25   but it doesn't feel like what's really going on here.  Again,

25

1   he took the step of deciding that the company should file

2   Chapter 11.  We had the change in corporate governance in

3   January.  And he has the ability -- everyone, I think, would

4   very much be interested in a plan that he supports.  You know,

5   he wants to get the company back.  That has been made clear in

6   hearings from time to time, and I believe, from Seery's

7   declaration and Highland's lawyers, that they've been and will

8   remain receptive to Mr. Dondero's ideas for a different type

9   of plan that might allow him to get back into control of

10  Highland, if he puts in adequate consideration that makes the

11  Committee and others happy.

12      But we're in a proverbial the-train-is-leaving-the-station

13  posture right now.  Okay?  We've got confirmation coming up

14  the second week of January or something like that.  Okay.  So

15  the train is leaving the station, so we're running out of time

16  to hear what Dondero might want to do as far as an alternative

17  plan.

18      So, as far as the requested TRO, I appreciate that Mr.

19  Dondero and his counsel are worried about some ambiguity, but

20  I'm looking through the literal wording that has been

21  proposed, and the wording proposed is that Dondero is

22  temporarily enjoined and restrained for communicating, whether

23  orally, in writing, or otherwise, directly or indirectly, with

24  any board member, unless Mr. Dondero's counsel and counsel for

25  the Debtor are included in such communications.  Not ambiguous

26

 1  at all to me, and not unreasonable.  Okay?  Time to have

 2  counsel involved in these conversations because, you know, we

 3  can't have businesspeople-to-businesspeople sending texts that

 4  look like threats to me.

 5       Second, making any express or implied threats of any

 6  nature against the Debtor or any of its directors, officers,

 7  employees, professionals, or agents.  I don't think that's too

 8  much to ask.  Please don't let him make threats to us anymore.

 9       C, communicating with any of the Debtor's employees,

10  except as it specifically relates to shared services currently

11  provided to affiliates owned or controlled by Mr. Dondero.

12  That seems reasonable to me because of the evidence in front

13  of me.

14       Then D, interfering with or otherwise impeding, directly

15  or indirectly, the Debtor's business, including but not

16  limited to the Debtor's decisions concerning its operations,

17  management, treatment of claims, disposition of assets owned

18  or controlled by the Debtor, and pursuit of the plan or any

19  alternative to the plan.

20       Now, I guess maybe you're confused or feel like that is

21  ambiguous.  I will just say, for the sake of any doubt, and I

22  think I heard Mr. Morris saying precisely this, that, you

23  know, Dondero can file pleadings.  Okay?  He can file

24  pleadings asking for relief.  He can object to the plan.  He

25  can vote against the plan.  And they are completely still open

27

1    to hearing about -- and I think they would have a fiduciary

2    duty -- to hear about a pot plan that might be more favorable

3    than what's on the table right now.  But Mr. Morris, have I

4    put words into your mouth?  Isn't that exactly what you were

5    saying?

6              MR. MORRIS:  That is exactly right, Your Honor.  And

7    if you look, I think there's a footnote there that expressly

8    provides -- gives Mr. Dondero the right --

9              THE COURT:  Okay.

10             MR. MORRIS:  -- confirms his right to do exactly what

11   you just described.

12        (Echoing.)

13             THE COURT:  Okay.  Thank you for that.  And I should

14   say exclusivity is still in place, right?  We don't -- I mean,

15   I'm not inviting him to file a plan right now in violation of

16   the exclusivity provisions, but I'm just saying discussions

17   among lawyers, I think, are not only not prohibited but

18   encouraged here.

19        And then, last, otherwise violating Section 362 of the

20   Bankruptcy Code.  Okay, the sky is blue.  That is obviously

21   not problematic.

22        Okay.  So the next paragraph, James Dondero is further

23   temporarily enjoined and restrained from causing, encouraging,

24   or conspiring with any entity owned or controlled by him

25   and/or any person or entity acting on his behalf from directly

28

 1   or indirectly engaging in any prohibited conduct.

 2        You know, I don't -- I understand that indirectly, you

 3   know, there might be some concern about the ambiguity, but it

 4   looks like to me just sort of a catchall, okay, to the extent

 5   we didn't explicitly say it in the preceding paragraph, we

 6   don't want Dondero causing some employee of an affiliate he

 7   controls to do exactly what Dondero himself is prohibited from

 8   doing.

 9        I don't think it's ambiguous.  And if it is, if someone

10   runs in here, he's violated Paragraph 3 of the TRO, well,

11   obviously we would have a contested hearing where I'm not

12   going to hold him in contempt of court unless I've got an

13   evidentiary showing that would convince me of that.

14        So, I guess, on balance, I'm overruling the objections and

15   I am granting the TRO.

16        And just to be clear, I'll make a record that bankruptcy

17   courts certainly under Section 105 can issue a TRO, and courts

18   are usually bound by the traditional factors of Rule 65 --

19   that is, looking at has there been a showing of immediate and

20   irreparable harm?  Is there a probability of success on the

21   merits that the Debtor will be entitled to this when we have a

22   later more fulsome hearing on the preliminary injunction

23   request?  Would the balance of equities favor the Movant

24   Debtor here?  And would the injunction serve the public

25   interest?

29

 1     I find from the evidence, the declaration of Mr. Seery,

 2  and the supporting documents, that all four prongs for a TRO

 3  are met here, so I am ordering it.

 4     A couple of remaining things.  We'll come back on January

 5  4th to consider whether extension of this relief in a

 6  preliminary injunction is appropriate.  I don't have at my

 7  fingertips the time of day where it's set on the 4th.  Is it

 8  -- I think that's the Monday after the New Year's Day holiday.

 9  So I'm guessing we're set at 1:30.

10     Traci, if you're out there, can you confirm it's 1:30 on

11  January 4th?

12     Okay.  I'm not hearing a response from her.  But Nate,

13  maybe you can double-check that.

14     (Echoing.)

15     All right.  Well, let's talk a minute about what is going

16  to happen next week.

17     Mr. Bonds, I set -- okay, back on November -- please take

18  your phone off mute when I am talking.  Or put it on mute when

19  I'm talking, please.

20     On November 19th, you filed the motion, basically -- I

21  can't remember the wording of it -- but something like wanting

22  to change the protocol for non-ordinary-course sales of

23  assets.  And you asked for an emergency hearing, and I denied

24  that.  And I was very concerned that it looked like an attempt

25  to renegotiate the January protocol order that the Committee

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 257 of 1726 PageID 11578

30

1  had worked so hard to negotiate on.  But it's set, finally.  I

2  think it's this next Thursday, a week from today.

3       But meanwhile, you know, again, I feel like the issues

4  raised in that are very much overlapping with what we talked

5  about today, as well as I feel like the January protocol order

6  controls here, and it's an attempt to revisit that a month

7  before confirmation.

8       But this newest emergency motion filed by Mr. Wright's

9  client, it feels like, as I think I mentioned, the same type

10  of motion dressed a little bit differently from entities

11  controlled by Dondero rather than Dondero directly.  And

12  meanwhile, Mr. Wright has asked for a hearing next Tuesday.

13  I'm not going to have three hearings on the same issue.  So I

14  guess I'll hear first from Mr. Dondero's counsel.  I mean,

15  what do you think I'm going to hear next Thursday that is

16  going to change my mind about this was all covered in the

17  January protocol order and I'm not going to revisit it a month

18  before confirmation?  Mr. Lynn, are you here to address that

19  one?

20       MR. LYNN:  Yes, Your Honor.  First of all, I think

21  the hearing is actually set for next Wednesday.

22       THE COURT:  Okay.

23       MR. LYNN:  Secondly, the motion filed by Mr. Wright,

24  as I understand it, has to do with sales of assets by the CLOs

25  that the Debtor manages as portfolio manager and not -- and

31

1    does not have to do with any sales of assets by the Debtor or

2    its estate.  So they're two different issues.

3        As I understand Mr. Wright's pleading, he is arguing that

4    under the Advisers Investment Act, if I have that name right,

5    that Mr. Seery, on behalf of the Debtor, ought not to ignore

6    directions from or suggestions, requests, as they actually

7    are, from investors in the CLOs with respect to the assets of

8    the CLOs.  That's entirely different from the concern that we

9    are expressing with respect to sales of assets by the Debtor.

10       Secondly, while Mr. Dondero may have some influence on the

11   CLOs, it is my understanding that the investors that Mr.

12   Wright represents are governed by an independent board of

13   directors, which Mr. Dondero may be on.  I don't know whether

14   he is or not.

15       Third, we are not trying to change the protocols.  We do

16   not believe anything in the protocols at all -- we've

17   identified nothing in the protocols at all that says that the

18   Debtor, and, by extension, Mr. Seery and the independent

19   board, may take actions outside the ordinary course of

20   business without notice and an opportunity for hearing before

21   this Court.

22       We have asked in the alternative that if somehow the

23   protocols authorize these actions, that the Court alter the

24   protocols.

25       What triggered this, Your Honor, was a sale of an entity

1  known as SSP, which belonged to Trussway, which in turn

2  belongs to the Debtor.  We believe but we do not know for sure

3  that the sale is below the price that could have been

4  obtained.  However, the sale was undertaken, as we understand,

5  without competitive bidding, without notice -- certainly,

6  there was no notice to Mr. Dondero -- and without an

7  opportunity for anyone to be heard.

8      We do not think that the intention of the protocols was

9  for this Court to abdicate its authority to oversee the

10  Debtor's operations and to limit the authorities entitled to

11  participate in decisions involving disposition of assets of

12  major value, to limit the decision-makers to the independent

13  board -- in particular, Mr. Seery -- and to limit it to the

14  members of the Creditors' Committee, rather than providing

15  notice generally to creditors, rather than providing a method

16  for competitive bidding, rather than letting people know what

17  is going on.

18      Your Honor has often stated, not just in this case, your

19  concern that the process should be transparent.  We believe

20  that at this point the Debtor is attempting to use the

21  protocols in an effort to avoid the transparency that

22  creditors, equity interest owners, and most of all, this

23  Court, are entitled to.

24          THE COURT:  All right.  Well, I don't know if anyone

25  wants to respond to that, but --

1            MR. MORRIS:  If I may, Your Honor.

2            THE COURT:  Go ahead, Mr. Morris.

3            MR. MORRIS:  Just very briefly.  I think I heard

4    Judge Lynn say that there's nothing in the protocols that

5    authorizes the Debtor to sell assets outside the ordinary

6    course of business.  And if he made that admission, I still

7    don't see the point of this motion next week.  All they're

8    doing is questioning the Debtor's business judgment.  They

9    don't really have a right to do that.  Mr. Dondero doesn't

10   have a right to participate in the sale of those assets.  The

11   Debtor -- you know, there's no evidence before the Court,

12   there will be no evidence before the Court, as to how the

13   Debtor decided, what factors they considered when deciding to

14   sell these assets.  This is just completely improper.

15       (Echoing.)

16       Mr. Dondero personally participated in the corporate

17   governance resolution last January.  There has been no

18   complaint by him or anybody else about the protocols, about

19   the Debtor having operated outside the protocols.  The Debtor

20   is transparent.  Every single month, we file monthly operating

21   reports.  You can see what's happening with assets, right?  We

22   work with the Committee.  The Committee's not here joining in

23   this motion.  The Committee hasn't complained about the

24   process.  It's just Mr. Dondero.  He's simply trying to

25   exercise -- this is just another attempt to further exercise

 1   control.  He can make his motion.  It will be denied because

 2   the facts simply don't support it.

 3            THE COURT:  Mr. Clemente, is it wrong of me to assume

 4   that you and your clients are very vigilant in paying

 5   attention to trades, transfers, outside the ordinary course?

 6   I assume since, again, you have a committee of sophisticated

 7   parties who are owed hundreds of millions of dollars, and you

 8   so heavily negotiated the January protocol order, that you're

 9   following it meticulously and paying attention to what's

10   happening.  Do you care to comment?

11            MR. CLEMENTE:  Thank you, Your Honor.  I do.  Matt

12   Clemente, for the record, on behalf of the Committee.

13       You're exactly right, Your Honor, and Your Honor actually

14   touched on several things that I would have said earlier.

15       First of all, the Committee is made up of very

16   sophisticated members, which makes my job sometimes easy and

17   sometimes challenging, because they are very hands-on and they

18   do understand the business of Highland and we did heavily

19   negotiate the protocols early in the case, Your Honor, and

20   they were designed with exactly these types of transactions in

21   mind, so that the Debtor had to come to the Committee and lay

22   out its case for a particular transaction.

23       With respect to the transaction at issue, that's exactly

24   what happened, Your Honor.  We're not going to get into,

25   obviously, Committee deliberations, but I can tell you that

35

 1   the protocols have been followed.

 2       As Your Honor knows, when we've had an issue under the

 3   protocols, I remember several months ago when we argued about

 4   certain distributions being made, the Committee certainly was

 5   not shy about bringing it to Your Honor's attention.

 6       So we have been very vigilant and very diligent in holding

 7   the Debtor accountable under the protocols.  And we believe

 8   that -- although, again, when we've had an issue, we've come

 9   to Your Honor.  We believe that the protocols have worked as

10   they were intended to and as they were designed, Your Honor.

11       So I can assure you that the Committee has been very

12   vigilant and the Committee will continue to be very vigilant.

13   These issues were all raised in the context of negotiating the

14   protocols.  That was before Your Honor.  Mr. Dondero was

15   involved with that.  It was very difficult negotiations, Your

16   Honor.

17       But this does seem like somebody now trying to renegotiate

18   what it was that the parties agreed to and Your Honor approved

19   early on in this case.

20       So, Your Honor, rest assured, the Committee has been very

21   vigilant and will continue to be very vigilant.

22           THE COURT:  All right.  And I guess the last thing

23   I'll say on that point is, while of course we always want

24   transparency --

25       (Interruption.)

36

1            THE COURT:  While we, of course, always want

2    transparency and notice and opportunity to object, I mean,

3    these are not your typical run-of-the-mill assets.  They're

4    not a parcel of real property or a building somewhere or

5    inventory somewhere or intellectual property.  I mean, these

6    are -- you know, again, we have a unique business here.  And I

7    think that was very much recognized in the process of

8    negotiating the protocols, that this is not the type of

9    business where you do a 363 motion on 21 days' notice any time

10   you feel like, oh, today's a great day to trade this or that

11   in whatever fund.

12        Well, we will go forward on this motion, because Mr.

13   Dondero is entitled to his day in court to make his argument,

14   put on his evidence, and try to convince me that this is not

15   just trying to renegotiate something Mr. Dondero agreed to 11

16   months ago on the eve of confirmation.  But I want to make

17   sure -- oh, we're getting --

18        (Echoing.)

19        (Clerk advises Court.)

20            THE COURT:  Okay.  You're on mute.  You're on mute,

21   Mr. Lynn.

22            MR. LYNN:  Your Honor, may I explain briefly?  This

23   is very distressing.  Mr. Morris says that it is the ordinary

24   course of this Debtor's business to sell a subsidiary.  This

25   is not the ordinary course of the Debtor's business.  There is

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 38 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 264 of 1726   PageID 11585
59

37

1    nothing in the protocols that says that the independent board

2    and just the creditors on the Creditors' Committee may make

3    decisions concerning major sales.  We will present evidence to

4    that effect when it occurs, and we believe strongly -- and I

5    want to state, Your Honor, I didn't participate in

6    negotiations of those protocols.  I wasn't involved.  And I've

7    looked at them.  There's nothing that says that this can occur

8    without going to a hearing.  And there is nothing in the

9    protocols that defines ordinary course of business to involve

10   this.

11        This motion was not filed because Mr. Dondero wanted to

12   get in the way.  It was filed because I thought it was the

13   right thing to do because I thought that this was contrary to

14   the way bankruptcy and Chapter 11 should work.  And it was

15   reasoned by me, with Mr. Dondero's consent.  And I very, very

16   much am upset to hear things people say that he's trying to

17   get in the way with this.  He is not.  He's asking for

18   something that is very, very, very reasonable.  If they have

19   nothing to hide, and I hope they don't and don't believe they

20   do, but if the Debtor has nothing to hide, what is wrong with

21   notice and a chance for hearing?

22             MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

23   If I briefly may be heard.

24             THE COURT:  Go ahead.

25             MR. POMERANTZ:  I actually did negotiate the

38

 1    protocols.  And I think what Mr. Lynn is conflating is the

 2    Debtor selling Debtor assets and the Debtor acting in its

 3    management capacity to sell assets of entities it manages.

 4        We will also present the case law that basically an entity

 5    that is not a debtor whose assets are being sold by the Debtor

 6    acting as a manager is not within the purview of this Court.

 7        So Mr. Lynn can be frustrated, could be upset with what's

 8    happening, but we dealt with these issues last year.  Because

 9    as Your Honor mentioned, this Debtor is not the typical

10    debtor.  And we had long negotiations with the Committee on

11    what is ordinary course and what is not ordinary course.  And

12    as I mentioned to you the last time we were here, Your Honor,

13    as I mentioned to you in January when we had this approved, we

14    were not seeking to get authority to sell assets out of the

15    ordinary course of business or do any transactions out of the

16    ordinary course of business.

17        Mr. Lynn thinks that what's happening is out of the

18    ordinary course of the business.  This Court has said it's

19    not.  So we are prepared to go forward with the hearing.

20    We've also spoken to the affiliated entities about putting

21    their hearing on for the same date, because we also agree they

22    -- both motions raise similar issues.  And I think we're close

23    to an agreement on having both of those motions heard at the

24    same time on the 16th.

25        Thank you, Your Honor.

39

1          THE COURT:  All right.  So it's the 16th, Wednesday.

2     Did we look that up, Nate?

3          THE CLERK:  It's at 1:30.

4          THE COURT:  It's at 1:30?  All right.  So we will go

5     forward with the Dondero motion Wednesday, December 16th, at

6     1:30, and we will go ahead and set the what I consider closely

7     overlapping motion filed by the NexPoint entities and Highland

8     Fixed Income Fund by Mr. Wright, we'll go ahead and set that

9     at the same time.

10          Let me say this as clearly as I can.  If there's going to

11    be a challenge to the Debtor's business judgment, Mr. Dondero,

12    he needs to be present at the hearing on video and he needs to

13    testify, okay?  I understand what Mr. Lynn said, that this was

14    his idea, he thought the January protocol order violated the

15    Bankruptcy Code, blah, blah, blah, but I am going to order

16    that Mr. Dondero be present December 16th at 1:30 and testify.

17    Okay?

18          So I've kind of modified that.  I said if the business

19    judgment of the Debtor is being challenged, but no, I'm

20    broadening that.  I think Mr. Dondero just needs to provide

21    testimony on Wednesday.  Given everything I heard today with

22    the TRO request, and given that, in substance, he's -- he is

23    challenging the Debtor's business judgment and the mechanism

24    where the Committee oversees it, he just needs to testify.

25    All right?  So please convey that to him.

40

```
 1      Now, Mr. Wright, I'm first going to ask, I know you

 2  weren't -- you were just listening in today, but do you want

 3  to say anything?  I see you put your jacket on now.  Thank

 4  you.

 5          MR. WRIGHT:  I did.  I did find a jacket.  I'm sorry,

 6  Your Honor.

 7          THE COURT:  Okay.  Go ahead.

 8          MR. WRIGHT:  (muffled)  So I, you know, I can address

 9  why we're asking for limited relief.  I can also address the

10  underlying motion, which (inaudible) some of -- in the

11  underlying motion --

12          THE COURT:  Okay.  Your sound is very difficult to

13  hear.  Could you repeat what you just said?  I didn't get it.

14          MR. WRIGHT:  Yes, Your Honor.  I'm happy to address

15  our motion for an emergency hearing.  I'm also happy to

16  address the underlying motion we're asking be heard on an

17  emergency basis.  I didn't know, do you want me to address

18  both or just the motion for why we're asking for emergency

19  relief?

20          THE COURT:  Well, I've gone ahead and said I will set

21  it next Wednesday.  It sounds like the Debtor saw the

22  efficiencies maybe in having this one heard at the same time

23  as the Dondero motion.

24      I have a couple of things I want to say for the benefit of

25  you and your client, but I was giving you the chance to say
```

41

1    something first.

2        Here's what I'm thinking, going into this, so you can be

3    prepared to address this next Wednesday.  Your motion feels to

4    me exactly like what we litigated *ad nauseam* in the Acis case.

5    Now, if any of the Acis lawyers are on the line or Mr. Terry

6    is on the line, I wonder if they are chuckling.  And what I

7    mean is -- I heard a chuckle.  I don't know if that was Ms.

8    Patel.  We had hearings --

9            MS. PATEL:  It was, Your Honor.

10            THE COURT:  Okay.  We had hearings in the Acis case.

11    Remember, Acis was a portfolio manager for CLOs.  And the

12    party that was in the bottom tranche of the CLOs, okay, the

13    equivalent, I think, to your clients here, the NexPoint

14    entities and Highland Fixed Income Fund, we sometimes called

15    them the subordinated debtholders or the equity-holders, that

16    party -- it was a party named HCLOF -- began during the *Acis*

17    case trying to do a call, trying -- redemption notice.  Acis,

18    liquidate these CLOs.  We are -- we're done.  We're tired.

19    You know, we're outside the reinvestment period.  We want you

20    to liquidate.  And started to kind of force that issue.

21    Highland was the sub-manager of Acis at that time.  So, guess

22    what, the Chapter 11 trustee filed an adversary proceeding

23    asking for TROs, saying, you know, this is the portfolio

24    manager's discretion.  And not only that, what they're doing

25    isn't a reflection of reasonable business judgment because,

42

1    you know, we don't think it's the right time actually to

2    liquidate these CLOs, they're just trying to deprive the

3    portfolio manager of his stream of revenue for managing this.

4        So we had multiple hearings about this.  I issued a TRO

5    saying stop it, bottom tranche of the CLOs.  It seems

6    transparent you're just trying to deprive Acis, the portfolio

7    manager, of value.  And you know, irony, irony, it's like the

8    backwards situation here.  They were saying, but we're so late

9    in the life of these CLOs, it makes sense to liquidate them.

10   Why would you want to keep these things going?  We're not

11   violating the stay.  We're not jacking with the estate value

12   and trying to deprive Acis of its revenue stream.  Anybody

13   knows it makes sense to liquidate these late-in-life CLOs.

14   Very ironic to me, although maybe it's not the situation,

15   apples to apples, but here, you see what I'm saying, it feels

16   like same situation, only flip-flopped.  The portfolio manager

17   here, Highland, is going to be engaged in liquidating the

18   CLOs, and your client, bottom tranche of equity, is saying no,

19   don't do that.  You know, there's still value there.

20       Now, I will say, in my Acis case, the equity tranche, they

21   kind of -- their theory evolved over time.  They were like,

22   well, we actually just want CLOs managed by Highland, a

23   Highland entity, and Acis isn't a Highland entity.

24       So, bottom line, I issued a TRO.  Stop it, equity tranche.

25   This is not your call, it's the portfolio manager, and I think

43

 1    you're just jacking with the portfolio manager to screw up the

 2    reorganization.  And guess what, we even had then a

 3    preliminary injunction and then a plan injunction.  And of

 4    course, there were bells and whistles on what would evaporate

 5    the injunction.  But that's now on appeal to the Fifth

 6    Circuit.

 7        So, you know, at my confirmation hearing at least in Acis,

 8    if not previous hearings, we even had expert witnesses and we

 9    pored through the language of the portfolio management

10    agreements.  And I don't know if here we have the same

11    situation, but it was complicated in Acis because we had the

12    portfolio management agreements between the CLO manager and

13    the CLO issuers, but then there was a separate management

14    agreement between the equity tranche and, I don't know, I

15    can't remember who the counterparty to that one was.  But

16    there, there were multiple agreements, and you had to parse

17    through it, and we had experts testifying about, you know,

18    discretion of the equity-holder versus not, or portfolio

19    manager, da, da, da, da, da.  And I ruled as I ruled.  I

20    granted the injunction, to the detriment of the equity

21    tranche.  And maybe the Fifth Circuit one day will tell me I

22    was wrong.  You know, I really think it's a hard, hard, hard

23    issue.

24        But I'm just telling you, that's how I ruled on, I think,

25    three occasions.

44

1        Maybe the portfolio management agreements are worded

2    differently here.  You know, maybe -- maybe it's a different

3    issue.  But I will say I read your motion yesterday with

4    frustration.  I'm like, haven't I ruled on this like three

5    times in the Acis case?  And then, you know, maybe I haven't.

6    Again, maybe, maybe the portfolio management agreements in

7    this case would convince me differently.  But were you aware

8    of how I ruled in Acis?

9            MR. WRIGHT:  Your Honor, I'm aware of the Acis case,

10   but no, I wasn't aware that this particular issue was

11   addressed in such depth.

12            THE COURT:  Okay.

13            MR. WRIGHT:  (muffled)  I will, of course, go take a

14   look at all those hearings.  I anticipate that I'm going to

15   try to draw some distinctions between my situation and the

16   situations there, but I certainly will be prepared to address

17   that next week.

18        I think the thing that I would say just very broadly is

19   that we are not -- I think our request is very limited in what

20   we're asking for.  All we are asking for is that there is a

21   temporary pause on the Debtor exercising its right as

22   portfolio manager to direct sales that we don't agree with for

23   a ten-day period.  And we would then use that period of time

24   to explore, either consensually or through rights that we

25   (inaudible).  And then in the process of looking at this, Your

Honor, under the documents effecting a transfer of portfolio management, you know, these documents, they're based on the rights of the preference holders.

You know, my client's concern is really about the, you know, the investment time window of claim today versus the funds, the relevant -- again, Mr. Macur (phonetic) -- my clients include two advisors that are, you know, that are ultimately I think controlled by a vehicle that Mr. Dondero controls, but also I have a few clients that are funds that are required by SEC rules, as I understand it, to have a majority independent board. So I dispute that they're a Dondero-controlled entity, but I understand that that's testimony (inaudible). But I -- that's -- that's not right.

And so the funds, --

THE COURT: Who are the board members?

MR. WRIGHT: I can have that for you next week, Your Honor.

THE COURT: Okay.

MR. WRIGHT: I don't have it in front of me. But they're required by SEC rules to have a majority independent board. And so we -- the funds that are an advisor of my clients, they have a much longer-term investment horizon. So, you know, in my mind, I probably overly-simplistically analogize it to the difference between saving money for a house you intend to buy in a year and how you might invest

46

```
 1   that versus saving money for retirement that you might do in
 2   20 years.  And I think any investment advisor will tell you
 3   you're going to -- you're going to do that differently,
 4   because with a long horizon you can accept (inaudible) and
 5   bucket changes and stuff like that.  When they go out a long
 6   time, you know, it'll be okay.  And on a short horizon, you
 7   know, you need to sort of make sure you're holding onto what
 8   you have and just approach it differently.
 9       Highland, under its plan, is intending to liquidate at the
10   end of 2022, which that's -- that's fine.  That's what they're
11   intending to do.  But that's a very different investment time
12   horizon than my clients, and so we -- you know, and they're --
13   they're proceeding to run, you know, their liquidations that
14   way.  I don't think that there's anything wrong with that.
15   You know, that's their discretion.  But we think that we'd be
16   better served with a portfolio manager that is taking a long-
17   term time horizon, which once was Highland but now not, given
18   the bankruptcy case.  And so, you know, we'd like to ask that
19   -- and we're just -- we're really not -- we're not asking for
20   a TRO.  I think Mr. Morris (inaudible) a TRO.  I understand
21   that's their position.  But I dispute it.
22       Highland is in bankruptcy, and so it's subject to the, you
23   know, it's subject to the bankruptcy system and subject to the
24   control of the Court.  What we are asking would be for the
25   Court to use its power under 363 and 1107 and 105 to tell
```

1   Highland rough -- for 30 -- within 30 days to figure out if

2   they can replace you under the documents or if there can be a

3   deal, as Mr. -- Mr. Bain mentions, there will be discussion of

4   a (inaudible) to reach a consensual resolution in which the

5   portfolio manager would change that would have to involve the

6   CLOs and probably my clients and also the Debtor, probably, to

7   see if we can get there.  And, you know, if we can't, we

8   can't.  That's really the limited nature of what we're asking

9   for now.  It may be different than what you were describing in

10  the Acis case.  But again, I will go and read those cases and

11  I will be prepared to address that more fully next week.

12           MR. POMERANTZ:  I mean, Your Honor, this is Jeff

13  Pomerantz, if I may briefly respond.

14           THE COURT:  Go ahead.

15           MR. POMERANTZ:  I think there's a fundamental problem

16  with the argument that Mr. Wright just made.  First of all,

17  there are other investors and other people with interests in

18  those CLOs.  It's not Mr. Wright's clients only.

19       And also, the premise that the decisions that are being

20  made in terms of liquidating those assets have to do with the

21  Debtor's timeline on liquidation, just, you'll hear from Mr.

22  Seery next week, is fundamentally incorrect.  Mr. Seery is

23  making decisions on behalf of Highland that he believes are

24  within his fiduciary duty to the funds to maximize value.

25       So the whole premise of the argument that this is between

1  a long-term horizon and a short-term horizon is just

2  incorrect.  And there are other people that Mr. Seery has to

3  worry about.  He has a duty to the CLO, and just because one

4  set of investors wanted to do certain things, they don't have

5  that right.  It's -- it's -- it wasn't lost on us that, in Mr.

6  Wright's motion, he did not point to any language in any

7  agreements that in any way give him that right.

8      So while we appreciate that these CLOs have to be

9  addressed, and we have engaged in discussions with Mr.

10  Wright's client and Mr. Bain's client to try to have a soft

11  landing, they have not occurred yet.  And in the interim, the

12  Debtor has to do what it is obligated to do and act in a

13  fiduciary manner and act consistent with the agreements.

14  That's why we objected and we will be objecting to any

15  moratorium on any of those efforts.

16          THE COURT:  Okay.  All right.  So, Mr. Wright, I am

17  also going to direct that you have a client witness to testify

18  about these things.  And I do want to understand, you know,

19  who you're taking instructions from and who is on the board on

20  these entities.

21      You know, we had a hearing before I think you were

22  involved where the Committee was seeking discovery of

23  documents, and a lot of the what I'm going to call Highland

24  affiliates -- and I know people sometimes cringe when I use

25  that word affiliates; you know, it may or may not meet the

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 276 of 1726 PageID 11597

49

1    Bankruptcy Code 101 definition of affiliate.  But entities in

2    the Highland umbrella, many of them resisted production of

3    documents from the Committee.  And I got concerned at that

4    point in time of who is instructing the lawyers, because I

5    felt like, in many instances -- not all, but in several

6    instances -- you know, I was concerned it's in the estate's

7    best interest to get these documents.  You know, the Committee

8    was the one seeking the documents, but we've got entities in

9    the Highland umbrella resisting.  And so it felt like there

10   was a conflict.  And if the same human beings were employees

11   of the Debtor, and --

12       Anyway, I think we got through a lot of that, but I

13   remember, in connection with all of that, looking at the list

14   of Highland entities who filed proofs of claim in the

15   bankruptcy case.  And I remember asking, in some cases, like,

16   who filed the proof of claim, and I was told that Mr.

17   Dondero's counsel prepared a lot of these proofs of claim of

18   the different entities.  And at least signatories, I saw that

19   Frank Waterhouse has signed the proofs of claim at least for

20   NexPoint Advisors, NexPoint Capital, Inc., NexPoint Strategic

21   Opportunities Fund.

22       Anyway, we had a discussion about my concerns about

23   conflicts back around that time, but here's what I'm getting

24   at.  I'm worried all over again about do we have any human

25   beings involved calling the shots for your client, Mr. Wright,

```
 1   that have fiduciary duties to the Debtor, and maybe this is
 2   getting in conflict with that.  I just don't know.  I just
 3   don't know.  But it's concerning to the Court.  So, what would
 4   help is if we have a human being testify for your clients so
 5   we can clear the air on that one.  Okay?
 6       So, next Wednesday, December 16th, at 1:30, we'll have a
 7   hearing on the Dondero motion and on these NexPoint motions of
 8   your client, Mr. Wright.  And we're going to have a witness
 9   for Mr. Wright's client and we're going to have a witness --
10   and we're going to have Dondero being a witness.  And Mr.
11   Morris is going to upload your TRO, and we're going to have a
12   follow-up hearing on January 4th on the preliminary injunction
13   request.
14       All right.  So, anything else?
15           MR. MORRIS:  Yes, Your Honor.  It's John Morris for
16   the Debtor.  I've got Mr. Seery on the phone, the Debtor's CEO
17   --
18           THE COURT:  Okay.
19           MR. MORRIS:  -- and CRO.  And if it pleases the
20   Court, he would just like to spend a moment giving the Court
21   an update as to where he is in the process.
22           THE COURT:  Thank you.  He may.
23           MR. MORRIS:  Is that okay?
24           THE COURT:  Uh-huh.
25           MR. MORRIS:  Okay.
```

51

1          MR. SEERY:  Thank you, Your Honor.  Can you hear me?

2          THE COURT:  Yes.

3          MR. SEERY:  I appreciate the Court's time.  I think

4    with the overlapping motions it would be useful just to tick

5    through very quickly, not to take too much of your time, where

6    we are and why some of these things have come before you in

7    the last couple days.

8        First, as you're aware, we have a plan out for a vote.  We

9    believe we're going to get confirmed.  We believe we'll get

10   the votes.  We're still waiting on the votes.  And we're still

11   working on claims.  So, as we speak, including even this

12   morning, trying to resolve certain of the other open claims.

13       The Debtor is still managing its assets.  And what that

14   means is we're addressing financing with underlying assets

15   that are in portfolio companies.  We are addressing our own

16   debtor-owned assets, some of which we are selling in the

17   ordinary course.  So, for example, securities.  Where we have

18   securities in an account, we have been selling those where we

19   think the market opportunity was ripe.

20       Up until mid-March, Mr. Dondero controlled those accounts.

21   He was the portfolio manager.  We took them away after they

22   lost considerable amounts of money, about ninety million

23   bucks.  Real money.  So we took over control of those accounts

24   since then, and we've been managing to sell them down to

25   create cash where we think the market opportunity is correct.

1      With respect to subsidiaries, we don't have any plans to

2  sell any PV assets now.  These are companies that are part-

3  owned, either directly or indirectly, through subsidiaries,

4  with a number of other (inaudible) who are interest holders.

5      SSP, for example, there's been a lot of noise this

6  morning, no real facts.  I will tell you that we did sell SSP.

7  We did it in conjunction, as Mr. Clemente indicated, with the

8  Committee.  We looked at number of bids.  That entity was a

9  private-equity-owned asset.  We believe that it was sold

10  appropriately.  It wasn't selling an asset of the estate.  It

11  was actually a thrice-removed asset, also with other interest

12  holders, including mostly completely independent, including

13  SIBC -- SBIC owners who wanted to choose off that asset as

14  well.  We believe we got a very good price and executed that

15  well.  Happy to litigate and defend that at any time.

16      The CLOs, we're the manager of the CLOs.  What we're

17  trying to do in our plan is assign CLOs back to NexPoint

18  Advisors.  The reason for that is, while they do generate

19  income, we didn't believe that the income was enough to

20  justify us maintaining them.  They would not be assets that we

21  would continue to hold through the case.  Or through the

22  liquidation.  Unclear whether NexPoint wants those assets now

23  back or not.  We have been working, as Mr. Bain indicated,

24  closely with the Issuers and the Issuers' counsel, because

25  there's very particular, specific ways to deal with those

53

 1   assets under the documents that protect the various investors.

 2   As Mr. Morris pointed out, entities related, controlled by,

 3   managed by Mr. Dondero are not the only investors in these

 4   CLOs.  Our duty is to the CLOs.  We believe that we are

 5   adhering to that duty.  We are happy to at some day litigate

 6   that.

 7        With respect to asset sales, the Debtor has a team that

 8   manages these assets.  The team came to me to sell certain

 9   assets.  Mr. Dondero, NexPoint Advisors, they don't monitor

10   these assets.  They don't know anything about them.  The

11   assets we're talking about are loans, though the Debtor hasn't

12   sold any of those, or securities that trade, equity securities

13   that trade in the liquid markets.  These are securities, you

14   can go on the screen, you can go on Yahoo Finance and see how

15   they trade.

16        Our team came to us and suggested that we sell some.  I

17   sat down with the analyst and the analyst suggested we sell.

18   The manager of the day-to-day operations of CLOs suggested we

19   sell.  We set the sell notice within the context of the

20   market.  This wasn't a dumping.  We thought that the market

21   would support what we were doing, and it did.

22        Another asset that we were going to sell is an asset we

23   don't have an analyst on.  Haven't had one for years,

24   apparently.  It's not very much money.  Mr. Dondero's related

25   entities don't hold very much of the interests in the CLOs

54

1   that have that.  They have debt which is owned by third

2   parties.  It's a good trade, in our opinion.  Our analysis was

3   it made sense to sell it within the context of the market.

4   The Equity has no decision as to whether we do that.  We're

5   the manager.

6      Mr. Wright's example and his offer is, frankly, silly.  If

7   those public funds want to indemnify the Debtor and CLOs for

8   any potential losses, that would be great, we can do that, we

9   can talk about that, how to arrange that.

10     As to the pot plan, nobody has worked harder on the pot

11  plan -- and I include Mr. Dondero -- than I have.  Nobody.  I

12  didn't do it because I was trying to help Mr. Dondero.  I

13  thought it would be in the best interest of the estate, which

14  means the creditors, the employees, and the investors whose

15  funds we manage, to try to get a consensual deal done.  So

16  far, we've been unable to do that.  In my declaration, there's

17  a footnote.  Not only did I help work on the idea, I actually

18  drafted the term sheet.  (inaudible) to do it, I presented it

19  to the Creditors' Committee.  Not that I wanted to do it.  I

20  thought they should do it.  I did it.  No one has worked

21  harder for that.

22     The employees, unbelievably frustrated to hear that.  Mr.

23  Dondero put this company into bankruptcy.  Our management of

24  this estate has required that we fight with a lot of folks

25  about keeping the team together.  Again, we did it, not so

55

1    much for the individual team members, but we thought that

2    would be the best way to enhance value for the estate and it

3    would encourage an alternative plan that could be value-

4    maximizing.

5        The employees have deferred compensation.  That was all

6    set up by Mr. Dondero.  The money that was taken out and used

7    in this -- by this company for other things rather than paying

8    employees cash on a regular basis was used by Mr. Dondero well

9    before I ever came into this case.  If there are repercussions

10   to employees because we are liquidating this entity or

11   monetizing these assets, and because we have to do it through

12   this vehicle, Mr. Dondero can stay in the mirror and not

13   abort.  It's very insulting and frustrating to hear that from

14   counsel, who doesn't understand a thing about what we've done

15   to try to keep the business together.

16       The CLO part of the business, we'd like to assign.  We

17   would like to assign as many of the employees over to help

18   manage the business and have those go to Mr. Dondero's

19   entities.  And that's fine with us.  You know, that is a

20   concrete benefit to him, because it's also beneficial to the

21   estate.  We're not in the anger business.  We are independent.

22   The only thing that makes us angry is that when somebody just

23   makes up noise, not facts, just statements that have no basis

24   in reality of what's happened in this case, when we're trying

25   to hold it together and come to a conclusion.

56

1       Sorry if I sound frustrated, Your Honor, because I really

2   am, and I thought you should see that going forward before we

3   go into next week.  If the NexPoint entities want the CLOs,

4   let's just work on that transfer.  We have Mr. Bain and his

5   clients.  They are very good.  They are CLO specialists.  His

6   co-counsel at Schulte is renowned in this space.  We will work

7   through it and make sure it works for the Issuers, make sure

8   it works for NexPoint, and of course make sure it works for

9   the estate.

10      Thank you, Your Honor.

11          THE COURT:  All right.  Mr. Seery, I really

12  appreciate these comments.  They've been very helpful to my

13  thinking.  In fact, I want to make sure it's under oath in

14  case I ever want to take judicial notice of anything you've

15  said just now.  Do you solemnly swear or affirm that the

16  statements you made were true and correct today, so help you

17  God?

18          MR. SEERY:  I do, Your Honor.

19          THE COURT:  All right.

20          MR. SEERY:  And just to be clear, if I ever make a

21  statement to the Court, I consider it under oath.

22          THE COURT:  Okay.  Thank you.  I appreciate that.

23      All right.  So, again, I feel like that was so very

24  helpful.  And, you know, this is a precise example of why I am

25  directing, if Mr. Dondero is going to urge a position with the

1   Court next Wednesday, he needs to testify.  And if NexPoint,

2   through whoever their decision-maker is, is wanting to urge a

3   position to the Court, they need a human being to testify.

4   And I'll hear Seery and I'll hear Dondero and I'll hear

5   whoever that person is, and that's what's going to matter, you

6   know, most to me.  Yeah, we have some legal issues, certainly,

7   but I like to hear business people explain things, no offense

8   to the lawyers.  But it's always very helpful to hear the

9   business people in addition to the lawyers.  All right.  So,

10  Mr. Morris, you're going to upload that TRO for me.

11          MR. MORRIS:  Yes, Your Honor.

12          THE COURT:  Mr. Wright, you can upload your order

13  setting your motion for hearing next Wednesday at 1:30.  And I

14  think we have our game plan for now.  Anything else?  All

15  right.  We're adjourned.

16          THE CLERK:  All rise.

17      (Proceedings concluded at 11:33 a.m.)

18                      --oOo--

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
22  the proceedings in the above-entitled matter.

23   **/s/ Kathy Rehling**                        **12/11/2020**

24  _____        _____

    Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

```
                                                        58
                            INDEX
 1
     PROCEEDINGS                                          3
 2
     WITNESSES
 3
     -none-
 4
     EXHIBITS
 5
     Debtor's Exhibits                        Received 14
 6
     RULINGS                                  21/36/39/48
 7
     END OF PROCEEDINGS                                 57
 8
     INDEX                                              58
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 286 of 1726   PageID 11607
174

# EXHIBIT 15

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )    Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    Thursday, January 14, 2021
 5                                  )    9:30 a.m. Docket
                                    )
 6            Debtor.               )    - MOTION TO PREPAY LOAN
                                    )      [1590]
 7                                  )    - MOTION TO COMPROMISE
                                    )      CONTROVERSY [1625]
 8                                  )    - MOTION TO ALLOW CLAIMS OF
                                    )      HARBOURVEST [1207]
 9   _____)

10                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11               UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:          Jeffrey Nathan Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
14                            10100 Santa Monica Blvd.,
                               13th Floor
15                            Los Angeles, CA  90067-4003
                              (310) 277-6910
16
     For the Debtor:          John A. Morris
17                            Gregory V. Demo
                              PACHULSKI STANG ZIEHL & JONES, LLP
18                            780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
19                            (212) 561-7700

20   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
21                               One South Dearborn Street
                                 Chicago, IL  60603
22                               (312) 853-7539

23   For CLO Holdco, Ltd.:    John J. Kane
                              KANE RUSSELL COLEMAN LOGAN, P.C.
24                            901 Main Street, Suite 5200
                              Dallas, TX  75202
25                            (214) 777-4261
```

2

1   APPEARANCES, cont'd.:

2   For James Dondero:        John T. Wilson
                              D. Michael Lynn
3                             John Y. Bonds, III
                              Bryan C. Assink
4                             BONDS ELLIS EPPICH SCHAFER
                                JONES, LLP
5                             420 Throckmorton Street,
                                Suite 1000
6                             Fort Worth, TX  76102
                              (817) 405-6900
7
    For Get Good Trust and    Douglas S. Draper
8   Dugaboy Investment Trust: HELLER, DRAPER & HORN, LLC
                              650 Poydras Street, Suite 2500
9                             New Orleans, LA  70130
                              (504) 299-3300
10
    For HarbourVest, et al.:   Erica S. Weisgerber
11                            M. Natasha Labovitz
                              Daniel E. Stroik
12                            DEBEVOISE & PLIMPTON, LLP
                              919 Third Avenue
13                            New York, NY  10022
                              (212) 909-6621
14
    For Highland CLO Funding, Rebecca Matsumura
15  Ltd.:                     KING & SPALDING, LLP
                              500 West 2nd Street, Suite 1800
16                            Austin, TX  78701
                              (512) 457-2024
17
    Recorded by:              Michael F. Edmond, Sr.
18                            UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
19                            Dallas, TX  75242
                              (214) 753-2062
20
    Transcribed by:           Kathy Rehling
21                            311 Paradise Cove
                              Shady Shores, TX  76208
22                            (972) 786-3063

23

24
            Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.

3

1        DALLAS, TEXAS - JANUARY 14, 2021 - 9:41 A.M.

2            THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, the Honorable Stacey Jernigan presiding.

5            THE COURT:  Good morning.  Please be seated.  All

6    right.  We're a little late getting started because we had

7    lots of reading material for the Court today.  All right.

8    This is Judge Jernigan, and we have a couple of Highland

9    settings.  The HarbourVest matters are the primary thing we

10   have set today, and then we also have a Debtor's motion

11   pursuant to protocols for authority for Highland Multi-Strat

12   to prepay a loan.

13       All right.  Well, let's get a few appearances.  First, for

14   the Debtor team, who do we have appearing this morning?

15           MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

16   Pomerantz, John Morris, and Greg Demo here on behalf of the

17   Debtor.

18           THE COURT:  Okay.  Thank you.

19       All right.  We have objections on HarbourVest.  Who do we

20   have appearing for Mr. Dondero this morning?

21           MR. WILSON:  Your Honor, it's John Wilson, and I'm

22   also joined by Michael Lynn, John Bonds, and Bryan Assink.

23           THE COURT:  Okay.  I'm sorry.  Could -- the court

24   reporter does yeoman's work in this case.  Let me just make

25   sure we got all three of those names.  Say again, Mr. Wilson.

Case 19-34054-sgj11   Doc 3445-15   Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 290 of 1726   PageID 11611
174

4

1           MR. WILSON:  John Bonds and Michael Lynn and Bryan

2    Assink.

3           THE COURT:  Oh, okay.  So, see, I thought I heard

4    somebody Wilson in all of that, which was why I was pressing

5    the issue.

6       All right.  Is Mr. Dondero present on the video for

7    today's hearing?

8           MR. WILSON:  I believe he is, Your Honor.

9           THE COURT:  Mr. Dondero, could you confirm that you

10   are out there?  (No response.)  Okay.  My court reporter says

11   he sees the name out there.  Is he in your office?

12          MR. WILSON:  Your Honor, he is appearing remotely

13   from my office.  I'm not sure exactly where he's appearing

14   from.

15          THE COURT:  Okay.  Well, Mr. Dondero, if you're out

16   there and you're speaking up to confirm you're present, we're

17   not hearing you.  Maybe your device is on mute.  So please

18   unmute yourself.

19       (No response.)

20          THE COURT:  All right.  I'm going to take some other

21   appearances and you -- you need to try to communicate with

22   your client and let him know I need to confirm he's present.

23   Okay?

24       All right.  Meanwhile, let's go to our other Objectors.

25   CLO Holdco.  Who do we have appearing today?

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 291 of 1726   PageID 11612
174

5

 1          MR. KANE:  John Kane; Kane Russell Coleman & Logan;
 2    on behalf of CLO Holdco.
 3          THE COURT: All right.  Thank you, Mr. Kane.
 4      We had an objection from Dugaboy Investment Trust and Get
 5    Good Trust.  Who do we have appearing?
 6          MR. DRAPER:  Douglas Draper, Your Honor, for -- for
 7    Draper.
 8          THE COURT:  All right.  Thank you, Mr. Draper.
 9      All right.  I think those were the only written objections
10    we had.  Mr. Pomerantz, do you confirm, we don't have any
11    other objectors for the motions set, correct?
12          MR. POMERANTZ:  Your Honor, there was those three.
13          THE COURT:  I'm sorry.  I didn't catch your full
14    sentence.
15          MR. POMERANTZ:  That is correct, Your Honor.  There
16    were three objections to the motion.
17          THE COURT:  Okay.  Mr. Clemente, you're there for the
18    Creditors' Committee?
19          MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt
20    Clemente on behalf of the Official Committee of Unsecured
21    Creditors.
22          THE COURT:  All right.  Good morning.  Thank you.
23    All right.  We have a lot of other folks on the video.  I'm
24    not going to go ahead and take a roll call of other lawyers.
25          MS. WEISGERBER:  Your Honor?

6

 1          THE COURT:  Yes?

 2          MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

 3  Weisgerber from Debevoise on behalf of HarbourVest.

 4          THE COURT:  Okay.

 5          MS. WEISGERBER:  And I'm joined by Natasha Labovitz

 6  and Dan Stroik --

 7          THE COURT:  Okay.

 8          MS. WEISGERBER:  -- from Debevoise as well.

 9          THE COURT:  Thank you.  I was neglectful in not

10  getting your appearance, because, of course, you're at the

11  front and center of this motion to compromise, and I did see

12  that you filed a reply brief yesterday afternoon.  Okay.

13  Thank you.

14     All right.  Do we have -- do we have Mr. Dondero on the

15  line?  I'm going to check again.

16     (No response.)

17          THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18  so please unmute your device.

19          MR. WILSON:  Your Honor, it appears to me that Mr.

20  Dondero's device was unmuted as soon as you asked if he was

21  available.  I sent him a communication a second ago asking if

22  he's having technical difficulties.  I have not received a

23  response, so I --

24          MR. DONDERO:  Hello.  Can anybody hear me?

25          THE COURT:  Oh.

7

1            MR. WILSON:  Okay.  I hear him.

2            THE COURT:  Mr. Dondero?

3            MR. DONDERO:  Hello?

4            THE COURT:  Is that you?

5            MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

6    everything since the beginning.  It's just we've had technical

7    difficulties.  I couldn't use the Highland offices.  We've

8    been trying to set up something else.

9            THE COURT:  All right.

10           MR. DONDERO:  But I'm on now, if -- yes.

11           THE COURT:  All right.  Very good.  Well, I'm glad

12   we've got you.

13        All right.  Well, Mr. Pomerantz, how did you want to

14   proceed this morning?

15           MR. POMERANTZ:  Your Honor, we could take up the

16   HarbourVest motion first, and I will turn it over to John

17   Morris.  He and Greg Demo will be handling that.  And then

18   after that we can handle the other motion, which is unopposed.

19           THE COURT:  All right.  Mr. Morris?

20           MR. KANE:  Your Honor, this is -- sorry.  This is

21   John Kane for CLO Holdco.  Just very briefly, if I may.  And

22   this will affect, I think, the Debtor's case in chief, so I'll

23   expedite things a little bit, I believe.

24        CLO Holdco has had an opportunity to review the reply

25   briefing, and after doing so has gone back and scrubbed the

8

1    HCLOF corporate documents. Based on our analysis of Guernsey

2    law and some of the arguments of counsel in those pleadings

3    and our review of the appropriate documents, I obtained

4    authority from my client, Grant Scott, as Trustee for CLO

5    Holdco, to withdraw the CLO Holdco objection based on the

6    interpretation of the member agreement.

7            THE COURT: All right. Well, thank you for that, Mr.

8    Kane. I think that -- that eliminates one of the major

9    arguments that we had anticipated this morning. So, thank you

10   for that.

11      Any other housekeeping matters that maybe someone had that

12   I didn't ask about?

13           MS. MATSUMURA: Yes, Your Honor. This is Rebecca

14   Matsumura from King & Spalding representing Highland CLO

15   Funding, Ltd. I just wanted to put on the record, we -- our

16   client had requested that some of its organizational documents

17   be filed under seal. But we have given permission for the

18   parties to present the relevant excerpts, to the extent it's

19   still relevant after Mr. Kane's announcement, in court. And

20   we'd just ask that the underlying documents remain sealed, but

21   we're not going to object if they show them on a PowerPoint or

22   anything like that.

23      So, to the extent that you had that on your radar, I just

24   wanted to clear that up for the proceedings.

25           THE COURT: All right. Well, I did sign an order

9

 1   late last night.  I don't know if it's popped up on the

 2   docket.

 3          MS. MATSUMURA:  Yes, Your Honor.  That's what this

 4   referred to.  That was what -- these are the documents that

 5   were being sealed.  And so I just wanted to note, if you --

 6   you know, if the Debtor puts up an excerpt of those documents

 7   and you're like, wait a minute, didn't I seal those, that we

 8   were the party that requested them be under seal and we're

 9   fine with them being shown in court, as long as the underlying

10   documents aren't publicly accessible.

11          THE COURT:  Okay.  Got you.  Thank you.

12      All right.  Any other housekeeping matters?

13          MR. MORRIS:  Yes, Your Honor.  This is John Morris

14   from Pachulski Stang for the Debtor.  Good morning.

15          THE COURT:  Good morning.

16          MR. MORRIS:  The only other matter that I wanted to

17   raise, and I can do it now or I can do it later, or Your Honor

18   may tell me that it's not appropriate to do at this time, is

19   to schedule the Debtor's motion to hold Mr. Dondero in

20   contempt for violation of the TRO.

21          THE COURT:  All right.  Well, let's do that at the

22   conclusion today.  And please make sure I do it.  I think I

23   was going to address this last Friday, and we went very late

24   and it slipped off my radar screen.  But I did see from my

25   courtroom deputy that you all were reaching out to her

10

1   yesterday to get this set, and then Mr. Dondero's counsel

2   reached out to her and said, We're going to file an objection

3   to a setting next Wednesday, or I think you had asked for a

4   setting next Tuesday or Wednesday.

5        MR. MORRIS:  I did.

6        THE COURT:  And I don't -- I don't know if that

7   response/objection was ever filed last night.  I haven't seen

8   it if it was.  So, we'll -- please, make sure I don't forget.

9   We'll take that up at the end of today's matters.  All right.

10  Well, --

11       MR. MORRIS:  All right.  So, --

12       MS. WEISGERBER:  Your Honor, one last housekeeping

13  item from -- I'm joined this morning by Michael Pugatch of

14  HarbourVest, who will present some testimony this morning.  I

15  just want to confirm he's on the line and confirm no

16  objections to him sitting in for the rest of the hearing.

17       THE COURT:  All right.  Mr. Pugatch, this is Judge

18  Jernigan.  Could you respond?  Are you there with us?

19       MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20  Pugatch from HarbourVest here.

21       THE COURT:  All right.  Very good.  I think we had

22  you testify once before in the Acis matter, if I'm not

23  mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24  I can't remember.

25       All right.  So, we're going to let Mr. Pugatch sit in on

11

 1   this.  Anyone want to say anything about that?  I consider him

 2   a party representative, so I don't -- I don't think anyone

 3   could invoke the Rule.

 4        All right.  Very good.  Well, let's go forward if there

 5   are no more housekeeping matters.

 6             MR. MORRIS:  Okay.

 7             THE COURT:  Mr. Morris?

 8             MR. MORRIS:  Thank you.  Thank you very much, Your

 9   Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10   Debtor.

11        It's a rather straightforward motion today.  It's a motion

12   under Rule 9019, pursuant to which the Debtor requests the

13   Court's authority and approval to enter into a settlement

14   agreement with HarbourVest that will resolve a number of

15   claims that HarbourVest has filed against the Debtor.

16        What I -- the way I propose to proceed this morning, Your

17   Honor, is to give what I hope is an informative but relatively

18   brief opening statement.  I'll defer to HarbourVest and its

19   counsel as to whether they want to make a presentation in

20   advance of the offer of evidence.  Any objecting party, I

21   suppose, should then be given the opportunity to present their

22   case to the Court.  Then the Debtor will call Jim Seery, the

23   Debtor's CEO and CRO.  We will offer documents into evidence.

24   I would propose then that the objecting parties take the

25   opportunity to ask Mr. Seery any questions they'd like on the

12

1  matter.

2      After the Debtor rests, I think HarbourVest would like to

3  put Mr. Pugatch on the stand to offer some testimony on their

4  behalf.  And I think that that will conclude the case.  We can

5  finish up with some closing arguments as to what we believe

6  the evidence showed, but that's the way that I'd like to

7  proceed, if that's okay with the Court.

8          THE COURT:  All right.  That sounds fine.

9          OPENING STATEMENT ON BEHALF OF THE DEBTOR

10         MR. MORRIS:  Okay.  So, as I said, Your Honor, this

11  is a -- this should be a very straightforward motion under

12  Rule 9019.  The standard is well-known to the Court.  There

13  are four elements to a 9019 motion.  The Debtor clearly has

14  the burden of proof on each one.  And we easily meet that

15  burden, Your Honor.

16     The standard, just to be clear, the first part is that we

17  have to establish a probability of success, with due

18  consideration for uncertainty of law and fact.  The second one

19  is the complexity, likely duration, expense and inconvenience

20  of the litigation.  The third part of the test is the

21  paramount interest of creditors.  And the fourth part of the

22  test is whether or not the proposed settlement was reached

23  after arm's-length negotiations.

24     The Debtor believes that it easily meets this standard,

25  and frankly, is a little bit frustrated that it's being forced

1    to incur the expense by Mr. Dondero in going through this

2    process.

3         A plain reading, a fair reading of the economics here

4    relative to the claim shows that this is a very reasonable

5    settlement. I don't need to go beyond that, Your Honor. I

6    don't even need to use the word reasonable. It surely meets

7    the lowest standard.

8         We've prepared a couple of demonstrative exhibits, Your

9    Honor. I'm going to use them with Mr. Seery. But I'd like to

10   just put one up on the screen now, if I may.

11        Ms. Canty, can you please put up Demonstrative Exhibit #3?

12        Demonstrative Exhibit #3 is an outline of the economics of

13   the settlement. It includes the various pieces, the

14   components that the parties have agreed to. And it shows, at

15   least from the Debtor's perspective, just what HarbourVest is

16   being given here.

17        Up on the screen is a demonstrative exhibit. It has

18   citations to the evidence that will be admitted by the Court.

19   The first line shows that HarbourVest will receive a $45

20   million allowed general unsecured nonpriority claim. And that

21   -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22   Page 2.

23        That claim is discounted by the expected recovery that

24   general unsecured creditors are supposed to get. As of

25   November, in the liquidation analysis that was part of the

14

 1   disclosure statement -- that's the citation in the footnote --

 2   the Debtor believed that unsecured creditors were estimated to

 3   recover approximately eighty-seven and a half cents on the

 4   dollar.  And so we just did the arithmetic there to get to the

 5   net economic value of the proposed general unsecured claim.

 6       And from that, we reduced $22-1/2 million because that is

 7   the net asset value of HarbourVest's interest in HCLOF, which,

 8   pursuant to the settlement agreement, it will transfer back to

 9   the Debtor, so that the net economic value is approximately

10   $16.8 million.

11       You will hear testimony from Mr. Seery that this number

12   is, in fact, overstated, and it's overstated because, since

13   the time the disclosure statement was filed in November, a

14   number of events have occurred that will -- that have caused

15   the estimated recovery percentage to be reduced from

16   approximately 87-1/2 percent to something lower than that.  We

17   don't have the exact number, Your Honor, but Mr. Seery will --

18   and the evidence will show that there's been more expenses,

19   that there's been some resolution of certain claims.  There's

20   been some positive issues, too.  But that number is probably

21   in the 70s somewhere.

22       And in any event, I think the point here is, Your Honor,

23   HarbourVest invested $80 million in HCLOF, which was going to

24   participate in the investment in CLOs.  They filed a claim for

25   $300 million, through treble damages and other claims.  But

15

1  the net economic impact of this is going to be somewhere

2  probably in between $12 and $14 million.  I'll let Mr. Seery

3  give more precision to that.  And it represents less than -- a

4  less than five percent recovery on the total claim.

5      And we think it's important for the Court to keep that in

6  mind.  What are the economics here?  Are we overpaying?  Is

7  this an unreasonable settlement?  And I think the evidence

8  will show that the Debtor is not, but that this settlement

9  that you see before you was the product of arm's length, and

10  I'm going to go in reverse order of the four-part test under

11  9019.

12      So, the last part is whether or not the settlement, the

13  proposed settlement was the product of arm's-length

14  negotiation.  You'll hear lots of evidence that this

15  settlement that's up on the screen right now very much was the

16  product of arm's-length negotiation.

17      The third part of the test, Your Honor, is whether it

18  meets the paramount interest of creditors.  You know,

19  regrettably, Mr. Dondero is the only purported creditor who is

20  objecting here.  He may have done so through different

21  vehicles, but every objecting party here is a debtor [sic]

22  owned and controlled by Mr. Dondero.  No other creditor -- not

23  the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty

24  -- nobody is objecting to this settlement except for Mr.

25  Dondero.  And we believe that that highlights the Debtor's

16

1  ability to meet the third prong of the test, and that is these

2  are -- this settlement is in the paramount interest of

3  creditors.

4       Again, going in reverse, the second part of the test is

5  the complexity, duration, and expense of litigation.  There

6  will be no disputed evidence that we meet -- the Debtor easily

7  meets this prong of the test.  The evidence is going to show

8  that HarbourVest's claim is based on fraud, fraud in the

9  inducement, fraudulent statements and omissions, the kind of

10 case, Your Honor, that I'm sure you're familiar with that is

11 incredibly fact-intensive, that will be incredibly difficult

12 to navigate through.  It will be prolonged, it will be

13 expensive, because you're necessarily relying on he said/she

14 said, basically.  And so we're going to have to get testimony

15 from every person that spoke in connection with the events

16 leading up to the transaction.  So we think the second prong

17 will be easily met, Your Honor.

18      And then the last prong -- the first prong, if you will --

19 is the likelihood of success on the merits.  We think that the

20 settlement, the economic recovery that's up on the screen

21 here, which ultimately will be less than five percent of the

22 claimed amount, in and of itself shows that the settlement is

23 consistent with the Debtor's perception of its likely success

24 on the merits.  I'm certain that HarbourVest disagrees, but

25 that's okay, we're here today and that's the Debtor's view,

17

1  and the Court is here to assess the Debtor's business judgment

2  and whether the Debtor has properly analyzed the issues and

3  gone through the process.  And the evidence will show

4  conclusively that it will.  That it has.

5      Mr. Seery will testify at some length as to the risks that

6  he saw.  I think that you'll hear counsel for Mr. Dondero ask

7  both Mr. Seery and Mr. Pugatch a number of questions designed

8  to elicit testimony about this defense or that defense.  And

9  it's a little -- it's a little ironic, Your Honor, because,

10  really, every defense that they're going to try to suggest to

11  the Court was a valid defense is a defense that the Debtor

12  considered.  In fact, it's, you know, it's a little spooky,

13  how they've -- how they've been able to identify kind of the

14  arguments that the Debtor had already considered in the

15  prosecution of their objections here.

16      But be that as it may, the evidence will conclusively show

17  that the Debtor acted consistent with its fiduciary duties,

18  acted in the best interests of the Debtor's estate, acted

19  completely appropriately here in getting yet another very

20  solid achievement for the Debtor, leaving very few claims that

21  are disputed at this point, all but one of which I believe are

22  in the hands of Mr. Dondero.

23      So, that's what we think that the evidence will show.

24      I do want to express my appreciation to Mr. Kane for

25  reflecting on the arguments that we made with respect to the

18

1    ability of the Debtor to engage in the transfer or the

2    acquisition of the asset from HarbourVest.  I would -- I would

3    respectfully request that we just enter into a short

4    stipulation on the record reflecting that the Debtor's

5    acquisition of HarbourVest's interests in HCLOF is compliant

6    with all of the applicable agreements between the parties.

7        And with that, Your Honor, I look forward to putting Mr.

8    Seery on the stand and presenting the Debtor's case.

9            THE COURT:  All right.  Other opening statements?

10           OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11           MR. KANE:  Yes, Your Honor.  Sorry.  John Kane on

12   behalf of CLO Holdco.

13       In response to Mr. Morris, I'm not going to enter into a

14   stipulation on behalf of my client, but the Debtor is

15   compliant with all aspects of the contract.  We withdrew our

16   objection, and we believe that's sufficient.

17           THE COURT:  All right.  Well, I'm content with that.

18       Other opening statements?

19            OPENING STATEMENT ON BEHALF OF HARBOURVEST

20           MS. WEISGERBER:  Your Honor, Erica Weisgerber on

21   behalf of HarbourVest.

22       HarbourVest joins in Mr. Morris's comments in support of

23   the settlement, and we believe that the question of whether

24   the settlement between HarbourVest and the Debtor satisfies

25   the Rule 9019 standard is not even a close one.

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 20 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 305 of 1726   PageID 11626

19

1       Some Objectors have made arguments about the merits of

2   HarbourVest's claims, which is why we're here.  As Your Honor

3   will hear this morning, HarbourVest has meaningful and

4   meritorious claims against Highland, but made the business

5   decision to avoid the time, expense, and inherent risk of

6   litigation in the interest of preserving value, both for

7   itself and for the estate.

8       Today, Michael Pugatch, a managing director of

9   HarbourVest, will testify before the Court.  He'll explain

10  that HarbourVest claims against Highland arise out of certain

11  misrepresentations and omissions by Highland to HarbourVest in

12  connection with HarbourVest's purchase of an interest in

13  HCLOF, one of Highland's managed funds.  Those

14  misrepresentations and omissions, as Your Honor will hear,

15  relate to Highland's litigation with its former employee,

16  Joshua Terry, and transfers that were conducted in 2017 to

17  strip Acis of value and prevent Mr. Terry from collecting on

18  an $8 million judgment.

19      Mr. Pugatch will further explain that HarbourVest would

20  not have invested in HCLOF had it known the underlying facts

21  about those Acis transfers.

22      Mr. Pugatch will also testify that not only did

23  HarbourVest not know about those transfers, it learned about

24  those transfers when it was accused of orchestrating the

25  transfers itself in the Acis bankruptcy.  Your Honor will hear

 1    that the Acis trustee sought extensive discovery from

 2    HarbourVest after numerous accusations that HarbourVest was

 3    behind the transfers.

 4        Mr. Pugatch will also testify that Highland charged legal

 5    fees for itself and its affiliates to HCLOF, essentially

 6    forcing HCLOF to fund the litigation involving the Acis

 7    bankruptcy and Mr. Terry.

 8        In total, HarbourVest's claims for damages are over a

 9    hundred million dollars in investment-related losses, lost

10    profits, legal fees inappropriately charged to HCLOF, its own

11    legal fees.  And that's before interest or trebling damages.

12        But HarbourVest stands ready to litigate its claims, but

13    following hard-fought and extensive negotiations with the

14    Debtors, the parties reached the settlement that's now before

15    the Court.  Mr. Pugatch's testimony regarding the strong

16    factual bases for HarbourVest's claims against Highland and

17    its recoverable damages will further underscore the risks that

18    the Debtors faced if they chose to litigate these claims, and

19    why this settlement is fair, equitable, and in the best

20    interest of the estate.

21            THE COURT:  All right.  Thank you, Counsel.

22        Other opening statements?

23     OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24            MR. DRAPER:  Your Honor, this is Douglas Draper on

25    behalf of one of the Objectors.  I'd like to just make a few

21

1   comments with respect to what I've heard and what the Court is

2   going to hear.

3       The first issue I'd like to address is the comment by

4   counsel for the Debtor that no other party has objected.  The

5   9019 motion is one of the issues that this Court has to rule

6   on, whether or not there was an objection or not.  So the fact

7   that this may be -- bankruptcy is not a popularity contest and

8   not an issue of who votes for what and doesn't vote.  This,

9   along with the 1129(a) tests, are clearly within your

10  province, and you need to listen carefully because you'll have

11  to make your own independent analysis whether my objection is

12  correct or incorrect.

13      Two other points I'd like to make that I think are very

14  salient.  Number one is, if you look at the Debtor's

15  disclosure statement, it basically took the position that the

16  HarbourVest claim is of little or no value.  And lo and

17  behold, thirty days later, there's a settlement that brings

18  about a significant recovery to HarbourVest.  The timing is

19  interesting, and I think the Court needs to pay careful

20  attention to what transpired between the two dates.

21      And then the last point I'd like to make is, as you listen

22  to the evidence, and what I learned abundantly clear from

23  hearing the depositions, is that the claim of HarbourVest, if

24  there is a claim at all, is probably one hundred percent --

25  should be subordinated in that it appears to arise out of the

22

1 purchase or sale of a security.  And, again, I would ask the

2 Court to listen carefully to this because that's what it

3 appears to be and that's what the evidence is going to show to

4 the Court.

5         THE COURT:  All right.  Mr. Draper, let me clarify

6 something I'm not sure if I heard you say or not.  Were you

7 saying that the Court still needs to drill down on the issue

8 of whether the Debtor can acquire HarbourVest's interest in

9 HCLOF?

10         MR. DRAPER:  No.

11         THE COURT:  Okay.  I was confused whether you were

12 saying I needed to take an independent look at that, now that

13 the objection has been withdrawn of Holdco.  You are not

14 pressing that issue?

15         MR. DRAPER:  No, I am not.  Basically, I think it's

16 the fairness of the settlement.  I think the transferability

17 of the interest is separate and apart from the fairness of the

18 settlement itself.  I think the fairness -- the

19 transferability was a contractual issue between two parties

20 that the Court does not have to drill down on.

21         THE COURT:  All right.  I have another question for

22 you.  I want to clarify your client's standing.  Tell me --

23 I'm looking through a chart I printed out a while back.  I

24 guess Dugaboy Investment Trust filed a couple of proofs of

25 claim; is that right?

23

```
 1              MR. DRAPER:  Yes.

 2              THE COURT:  Okay.  What --

 3              MR. DRAPER:  And objections are pending.

 4              THE COURT:  Pardon?

 5              MR. DRAPER:  Objections to those claims are pending

 6    before the Court, Your Honor, --

 7              THE COURT:  Okay.

 8              MR. DRAPER:  -- and have not been litigated.

 9              THE COURT:  And what about Get Good Trust?

10              MR. DRAPER:  Get Good Trust has a proof of claim also

11    that objections are pending to.  Pending.

12              THE COURT:  Okay.  I don't want to get too

13    sidetracked here, but I know standing was -- was mentioned as

14    a legal argument today.  What is the basis for those proofs of

15    claim?

16              MR. DRAPER:  The first one is, with respect to the

17    proof of claim for Dugaboy, there is an investment that

18    Dugaboy made that was then funneled, we believe, up to the

19    Debtor.  And the -- the loan that exists, we believe is a

20    Debtor loan, as opposed to a loan to the entity that we made

21    the loans to.

22         And, again, it's a matter that the Court is going to hear.

23    The claim may or may not be allowed.  It has not been

24    disallowed yet.

25         The second part to the Dugaboy ownership is we own an
```

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 310 of 1726 PageID 11631

24

1    interest in the Debtor.  And so we are, in fact, a party in

2    interest.

3              THE COURT:  Okay.

4              MR. DRAPER:  It may be a small interest, but it is an

5    interest.

6              THE COURT:  It has a limited partnership interest in

7    the Debtor?

8              MR. DRAPER:  Yes.

9              THE COURT:  Is that correct?

10             MR. DRAPER:  Yes.

11             THE COURT:  Okay.  Well, I'll move forward.  Thank

12   you.

13      Does that cover -- any other opening statements?  I think

14   that covered everyone who was -- who filed some sort of

15   pleading today.  No.

16             MR. WILSON:  Your Honor, John Wilson on behalf of --

17             THE COURT:  I'm sorry.  I'm sorry.

18             MR. WILSON:  -- Mr. Dondero.

19             THE COURT:  I missed Mr. Dondero's counsel.  I knew

20   we had visited at some point this morning.  I just got

21   confused there.  Go ahead, Mr. Wilson.

22             MR. WILSON:  No problem, Your Honor.  I was just

23   going to say that we will reserve our comments until after the

24   conclusion of the testimony.

25             THE COURT:  All right.  Very well.

1    Mr. Morris, you may call your first witness.

2         MR. MORRIS:  Thank you, Your Honor.  Before I do,

3  just two very, very quick points.

4         THE COURT:  Okay.

5         MR. MORRIS:  To be clear, Dugaboy's interest in the

6  Debtor is 0.1866 percent.  Less than two-tenths of one

7  percent.

8    Secondly, the argument that Mr. Draper just made with

9  respect to subordination is one that appears in nobody's

10 papers.  And, in fact, not only doesn't it appear in anybody's

11 papers, but Mr. Dondero, I believe, specifically took issue

12 with the fact that a portion of the consideration that

13 HarbourVest would receive would be on a subordinated basis,

14 and he would -- and I think he took the position there is no

15 basis to give them a subordinated claim.

16   So, I just wanted to point those items out to the Court,

17 not that I think either one makes a large difference today,

18 but I do want to deal with the facts.

19        THE COURT:  Thank you.

20        MR. MORRIS:  The Debtor would call -- you're welcome,

21 Your Honor.  The Debtor calls Mr. James Seery.

22        THE COURT:  All right.  Mr. Seery, welcome back to

23 virtual court.  If you could say, "Testing, one, two" so I can

24 see you and swear you in.

25        MR. SEERY:  Testing, one, two.

Seery - Direct                           26

1           THE COURT:  All right.  I heard you but I'm not yet

2    seeing your video.  Is your video turned on?

3           MR. SEERY:  Video is on.  Yes, Your Honor.

4           THE COURT:  Okay.  I see you now.  Please raise your

5    right hand.

6               JAMES SEERY, DEBTOR'S WITNESS, SWORN

7           THE COURT:  Thank you.  Mr. Morris?

8           MR. MORRIS:  Thank you, Your Honor.

9                   DIRECT EXAMINATION

10   BY MR. MORRIS:

11   Q    Good morning, Mr. Seery.  Can you hear me?

12   A    I can.  Thank you, Mr. Morris.

13   Q    Okay.  Let's just cut to the chase here.  Are you familiar

14   with HarbourVest's claims filed against the Debtor?

15   A    I am, yes.

16   Q    And did you personally review them?

17   A    I did, yes.

18   Q    Do you recall that over the summer the Debtor objected to

19   HarbourVest's claim?

20   A    Yes, we did.

21   Q    Why -- can you explain to the judge why Harbour -- why the

22   Debtor objected to HarbourVest's claim last summer?

23   A    Sure.  The HarbourVest claims, I believe there are about

24   six of them, initially were filed, and they were -- they were

25   relatively vague in terms of what the specifics of the claims

Seery - Direct                                    27

1  were.

2      So, we saw the claims but didn't, frankly, pay a lot of

3  attention to the underlying transaction that was referred to

4  in the proofs of claim and the losses that HarbourVest had

5  claimed to suffer -- to suffer with respect to their purchase

6  of securities related to HCLOF and the damages caused by the

7  Acis case.  So we filed a pretty pro forma objection.  I

8  believe it was a simply stated objection that we didn't have

9  any record that there was anything in the Debtor's books and

10  records that they had a valid claim for any amount against the

11  Debtor.

12  Q   Are you aware that HarbourVest subsequently filed a

13  response to the Debtor's objection to their claims?

14  A   Yes.  Yes, I am aware.

15  Q   And did you familiarize yourself with that particular

16  response?

17  A   I did indeed.  It was a pretty extensive response, really

18  developing the full panoply of their claims, which included

19  claims for expenses relating to the Acis case, which

20  HarbourVest viewed as being improperly charged to HCLOF by its

21  manager, which is effectively Highland.  Those expenses,

22  HarbourVest took the view, were excessive, had nothing to do

23  with the investment, and were simply a pursuit of a personal

24  vendetta against Mr. Terry and his interests by Mr. Dondero,

25  and using HCLOF's money to actually pursue those interests.

Seery - Direct                        28

1      In addition, and this was the first time we saw that,

2   HarbourVest brought forth its claims that it was entitled to

3   effectively rescind the transaction.  And I say rescind the

4   transaction:  In security parlance, they claim that they were

5   induced by fraud, I think as most are -- to enter into the

6   transaction.

7      As most are aware, the liability limitations in the OMs

8   and the exculpation in the documents are pretty broad, and

9   HarbourVest's position was that they weren't going to be

10  subject to those limitations because the actual transaction

11  that they entered into was a fraud on them, designed by Mr.

12  Dondero, Mr. Ellington, and the Highland team.

13  Q   All right.  Let's talk about your understanding, the

14  Debtor's understanding of the factual background to

15  HarbourVest's claim.  What is your understanding of the

16  investment that HarbourVest made?

17  A   Well, HarbourVest made an investment in the Highland CLO

18  business.  The Highland CLO business was -- was Acis.  And

19  effectively, the business had been separated, but in name

20  only.  Acis was just a shell, with a few partners --

21  obviously, Mr. Terry as well -- but it was all Highland

22  personnel doing all the work.

23     And what they were trying to do with Acis was, in essence,

24  resuscitate a business that had been in a bit of a decline

25  from its pre-crisis heyday.

Seery - Direct                              29

1        They were looking to take additional outside capital.

2    They would -- they would pay down or take money out of the

3    transaction, Highland would, or ultimately Mr. Dondero, and

4    they would -- they would seek to invest in Acis CLOs,

5    Highland's 1.0 CLOs.  And then with respect to the Acis CLOs,

6    and potentially new CLOs, but with the Acis CLOs, they'd seek

7    to reset those and capture what they thought would be an

8    opportunity in the market to -- to really use the assets that

9    were there, not have to gather assets in the warehouse but be

10   able to use those assets to reset them to market prices for

11   the liabilities and then make money on the equity.

12   Q    Do you have an understanding --

13   A    Then --

14   Q    I'm sorry.  Go ahead.

15   A    Why don't I continue?  So, the transaction, they found

16   HarbourVest as a potential investor, and the basis of the

17   transaction was that they would make an investment into Acis.

18       Shortly before the transaction, and while they were doing

19   diligence, Mr. Terry received his arbitration award.  I

20   believe that was in October of 2017.  The transaction with

21   HarbourVest closed in mid- to late November of 2017.  But Mr.

22   Terry was not an integral part.  Indeed, he wasn't going to be

23   a key man.  He had been long gone from Highland by that time.

24       What the -- I think you asked me originally what the basis

25   of their claim was.  The transaction went forward, and the

Seery - Direct                              30

1   basis of their claim is that they really were never -- nothing

2   was disclosed to them about the nature of the dispute with Mr.

3   Terry other than in the highest-level terms; the animosity

4   with respect to which that dispute was held by Highland and

5   potentially Mr. Terry; and really, how those costs would be

6   borne and risks be borne by the investment that they were

7   making.

8        That was, in essence, the transaction and the high-level

9   view of their claim.

10  Q    Okay.  Just a few very specific facts.  Do you have an

11  understanding as to how much HarbourVest invested and what

12  they got in exchange for that investment?

13  A    Yeah.  HarbourVest invested in a couple tranches, and I

14  forget the exact dates, but approximately $75 million

15  originally, and then they added another five.  Some

16  distributions were made in the first half of 2018, putting

17  their net investment in the mid-seventies on the investment,

18  which now is worth about 22-1/2 million bucks.

19  Q    And what percentage interest in HCLOF did HarbourVest

20  acquire, to the best of your knowledge?

21  A    They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22  -- the Court is, I think, well aware of this, but to refresh,

23  is a Guernsey entity.  Not -- not atypical for structures of

24  this type to use offshore jurisdictions and sell the

25  securities under -- at least to U.S. -- can't sell them to

Seery - Direct                                  31

1   U.S. investors unless they qualify, and these are sold under

2   Reg S to -- to investors that otherwise qualify.  And

3   HarbourVest was investing in that transaction through the

4   Guernsey structure.

5   Q   And do you have an understanding as to who owned the 50-

6   plus percent of HCLOF that HarbourVest was not going to

7   acquire?

8   A   Yeah.  There's -- you can tell by the name.  HCLOF is

9   Highland CLO Funding.  This is a Highland vehicle.  So

10  Highland owned and controlled the vehicle.  The DAF, which is

11  -- which is Dondero-controlled trusts, have the -- 49 percent.

12  Highland has, I believe, around .63-65 percent directly.  And

13  then Highland employees at the time who were involved in the

14  business owned another small percentage.

15      So the majority was going to be controlled by Highland

16  through its control of DAF and its control of the employees

17  that worked for it.  HarbourVest would be a minority investor.

18  Q   Okay.  And I believe you testified that the investment was

19  made in mid-November; is that right?

20  A   That's correct.  I think it was the 15th, may have been

21  the 17th of November.

22  Q   And do you recall when in October the Terry arbitration

23  award was rendered?

24  A   It was about a month before.  I think it was right around

25  the 20th, the 17th to the 20th.  I may be slightly wrong on

Seery - Direct                                    32

1   each of those dates.

2   Q    Okay.  What is your understanding as to what happened

3   after the issuance of the award that is the basis or at least

4   one of the bases for HarbourVest's claim?

5   A    I don't think there's -- I don't think there's any

6   dispute.  And there certainly are judicial findings.  Dondero

7   and Highland went about stripping Acis of all of its assets.

8   So, remember that Acis is not a separate standalone company,

9   in any event.  It's controlled and dominated completely by

10  Highland at the time.  But it did have contracts.  And those

11  contracts had value.

12       So the first idea was to strip out the management contract

13  and put it into a separate vehicle, which we called HCF

14  Advisor, which Highland still owns.  The second piece was to

15  strip out some valuable assets, the risk retention piece,

16  which was a loan that in essence was equity that Highland had

17  put into Acis but structured as a loan, as many of the

18  transactions we'll see down the road are, in order to deal

19  with some -- avoid taxes in any way possible.  And that

20  structure, that value moved value out of Acis for the express

21  purpose of trying to run, in essence, the Highland business

22  back in Highland.

23       Remember, as I said, Acis is just a Highland business

24  moved to a separate shell.  When Mr. Terry got his arbitration

25  award against Acis and was seeking to enforce it, it was

Seery - Direct                                    33

1   pretty straightforward, let's take all the assets -- Dondero
2   scheme -- let's take all the assets and move them back into
3   Highland so Terry can't get anything.
4   Q    And how does that scheme relate to the HarbourVest claim,
5   to the best of your knowledge?
6   A    Well, HarbourVest -- HarbourVest's position is that they
7   invested in Acis and -- and whether Acis was called Acis or
8   called Highland, it doesn't really matter; there were valuable
9   assets in the -- in the entity that they were going to be
10  investing in through the equity in these CLOs and some of the
11  debt securities in those CLOs.
12      And then the stripping out and the fraudulent conveyances
13  out of Acis caused them damages because that's what left the
14  damage to Mr. Terry.
15      The quick math on Acis, by the way, is Acis has probably
16  lost, total damages, 175 million bucks.  And that's pretty
17  easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of
18  fees charged to HCLOF.  Another five million of fees, at
19  least, incurred by Mr. Terry.  Ten million that went to Mr.
20  Terry, 15 to Highland fees, another five, plus Mr. Terry's
21  settlement in this case, over eight million bucks.
22      So HarbourVest's position, which, on a factual basis, you
23  know, is problematic for the estate, is, wait a second, we
24  invested in this vehicle with Highland.  That was supposed to
25  invest in Highland CLOs.  They were called Acis, but they were

Seery - Direct                    34

1   Highland CLOs.  And then you went about causing tremendous

2   damage to that vehicle that we ultimately were investing in,

3   and then charge us for the pleasure.

4   Q    You used the phrase earlier "OM," I believe.

5   A    Offering memorandum.

6   Q    Offering memorandum?  Can you just explain to the Court

7   your understanding of what an offering memorandum is?

8   A    Typically, under U.S. law, and foreign jurisdictions have

9   similar laws, you have to have a document that explains the

10  securities that you're selling.  And it goes into extreme

11  detail about the securities and the risks related to those

12  securities.

13       And the idea is not to have a document that tells you

14  whether it's a good investment or a bad investment, but it's a

15  document that discloses to the potential investor all of the

16  risks with respect to that security or related to the

17  investment over the duration of the security.  It doesn't

18  predict the future, but it's supposed to make sure that it

19  gives you a very clean view of the past and a very clean view

20  of what the facts from the past are and how they would

21  implicate the future of the investment.

22  Q    And in the course of its diligence, did the Debtor have an

23  opportunity to review the offering memorandum in the context

24  of the claims that were being asserted by HarbourVest?

25  A    Oh, absolutely.  It was originally effectively -- it's an

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 321 of 1726    PageID 11642
174

Seery - Direct                          35

1   HCLOF offering memorandum.  But as I said, HCLOF was managed

2   and controlled by Highland, and Highland originally prepared

3   it.  And then, of course, in connection with -- with this

4   dispute and these claims, we reviewed it, both myself and my

5   legal team.

6   Q   All right.

7          MR. MORRIS:  Your Honor, the offering memorandum is

8   on the Debtor's exhibit list, and I think this is an

9   appropriate time to move into evidence Debtor's Exhibits A

10  through EE, all of which appear at Docket No. 1732.

11         THE COURT:  1732?

12         MR. MORRIS:  It's the Debtor's Second Amended Witness

13  and Exhibit List.

14         THE COURT:  All right.  Any objection to admission of

15  A through EE?

16         MR. DRAPER:  Douglas Draper.  No objection, Your

17  Honor.

18         THE COURT:  All right.  Mr. --

19         MR. MORRIS:  May I proceed?

20         THE COURT:  Yeah.  Mr. Wilson, did you want to

21  confirm no objection?

22     (Echoing.)

23         THE COURT:  All right.  Hearing no objection,

24  Debtor's A through EE are admitted.

25     (Debtor's Exhibits A through EE are received into

Seery - Direct                                  36

1   evidence.)

2            THE COURT:  Go ahead, Mr. Morris.

3            MR. MORRIS:  Thank you, Your Honor.  The offering

4   memorandum itself is one of the documents that we filed under

5   seal, and we did so at the request of counsel to HCLOF.  But

6   HCLOF has consented to our sharing up on the screen certain

7   very limited provisions of the document, without waiving the

8   request that the agreement otherwise be maintained under seal.

9            THE COURT:  All right.

10           MR. MORRIS:  So may I proceed on that basis, Your

11  Honor?

12           THE COURT:  You may.  Uh-huh.

13           MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14  on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15  is there a way to just expand that just a bit, Ms. Canty?

16  Thank you very much.  And if we could just scroll it up?

17  Thank you very much.  Perfect.

18     Okay.  So, Your Honor, this, as the footnote says, is an

19  excerpt from the offering memorandum that can be found at

20  Debtor's Exhibit AA.  Double A.  And this particular portion

21  of the offering memorandum is at Page 35.

22           THE COURT:  Okay.

23  BY MR. MORRIS:

24  Q   Mr. Seery, have you seen this portion of the offering

25  memorandum before?

Seery - Direct                              37

1   A    Yes, I have.  But before I continue, I just -- I should

2   have checked.  Are you able to hear me clearly?  Am I speaking

3   too quickly or am I cutting out?  I just want to make sure.

4   I'm using a different set of audio today.

5            THE COURT:  All right.

6            MR. MORRIS:  That's fine.

7            THE COURT:  I hear you very well.

8            MR. MORRIS:  Yeah.

9            THE COURT:  So I think we're good right now.  Thank

10  you.

11           THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12  just checking.

13           THE COURT:  Okay.

14           THE WITNESS:  In response to your question, Mr.

15  Morris, yes, I have seen this before.

16  BY MR. MORRIS:

17  Q    Okay.  And can you -- did you form a view in doing the due

18  diligence as to the adequacy of this disclosure?

19  A    Yes, I did.

20  Q    Can you share your -- or share with Judge Jernigan the

21  Debtor's view as to the adequacy of this disclosure concerning

22  the litigation between Highland and Acis?

23  A    With respect to the litigation between Highland and Acis,

24  or, really, between Acis, Highland, and Highland's principals

25  and Acis's principal, totally inadequate.  The disclosure here

Seery - Direct                                        38

1   is very high-level.  And if there were no other litigation

2   going on, it might serve to suffice.  It basically says, In

3   our business, because we invest in distressed loans, there's a

4   lot of litigation around distressed investments, and that's

5   what we have.  And then it says, We've talked with the

6   investor about other things and we're -- we think that's

7   enough.

8   Q    Is there anything in this portion or anywhere in the

9   offering memorandum that you're aware of that disclosed to

10  HarbourVest that in the weeks leading up to the investment

11  Highland was engaged in the fraudulent transfer of assets away

12  from Acis?

13  A    No.  And I apologize, because I think it's -- I've

14  conflated two provisions.  This one only deals with the very

15  high-level nature of the business.  It doesn't give any

16  indication that there's any material litigation going on

17  elsewhere with respect to Acis.

18       I believe there's another provision that says, We -- we

19  have talked to -- oh, here -- I'm sorry.  It is here.

20  Shareholders have had an opportunity to discuss with Highland

21  to their satisfaction all litigation matters against Highland

22  and its affiliates unrelated to its distressed business.

23       That, in my opinion, is wholly inadequate.

24  Q    Okay.

25            MR. MORRIS:  And let's put up -- actually, let's just

                              Seery - Direct                        39

 1   move on.

 2   BY MR. MORRIS:

 3   Q    Let's go to the settlement itself.

 4           MR. MORRIS:  Can we put back up Demonstrative Exhibit

 5   #3?

 6   BY MR. MORRIS:

 7   Q    Mr. Seery, can you see that?

 8   A    Yes, I can.

 9   Q    Does this generally describe the net economic recovery of

10   the HarbourVest settlement based on estimated recoveries for

11   general unsecured creditors as of November 2020?

12   A    As of November 2020, it does.  And you alluded to this in

13   your opening, but to be clear, the numbers have shifted.

14   Costs have increased.  The -- so the -- effectively, the

15   numerator, in terms of distributable value that we estimate,

16   is lower.  And settlements, the denominator, have also

17   increased.  So the claims against the estate that have been

18   recognized have increased.  And that, that probably takes it

19   down closer, in our view, to about seventy cents distribution,

20   a number closer to nine to ten million, maybe a little bit

21   less.

22       However, there's also some additional value that we -- we

23   believe we will recover directly.  There are north of $150

24   million of intercompany notes owed by Dondero entities to

25   Highland.  A number of those notes are demand notes, and we've

Seery - Direct                          40

1    already made demand.  We'll be initiating actions next week.

2    So those are -- those value, we believe, we'll recover

3    directly from Mr. Dondero and from related entities.

4        To the extent those related entities don't have value, we

5    feel very strongly about our ability to pierce the veil and

6    reach in to Mr. Dondero.  And then his assets, either his

7    personal assets or the assets that he claims are in trusts.

8        In addition, there are a significant amount of notes that

9    were extended in two -- I believe around 2017, for no

10   consideration.  Those notes were demand notes, I believe, and

11   then extended it 30 years.  So they have 2047 maturities.

12   Those were probably going to have to be subject to fraudulent

13   conveyance type actions or -- or some sort of sale at a very

14   discounted value because third parties wouldn't want long-

15   dated notes with Mr. Dondero as the counterparty for very much

16   money.

17       Those -- they defaulted on some of those parties, so we

18   effectively turned them into demand notes.  We've accelerated,

19   and we'll be bringing actions against those entities next week

20   as well.

21       So I think (garbled) have come up, so I apologize.  One

22   way of saying I think the sixteen and a half is a bit high

23   right now, based upon what we know, but the value is going to

24   be higher than our estimate a couple of weeks ago because we

25   do believe we'll be able to recover on the notes.

Seery - Direct                          41

1      One additional caveat, just to be fully transparent here.

2   This summary with the 16.8 doesn't include the subordinated

3   piece of this -- of this claim and our resolution.  That --

4   recovery of that piece will be dependent upon the success of

5   litigations.

6      In order for the subordinated piece to get paid, all

7   general unsecured claims in Class -- Classes 7 and 8 will have

8   to be paid in full.  And then -- and then the subordinated

9   class in Class 9, which we believe UBS will have a piece of,

10  and HarbourVest will have a piece of by this settlement, those

11  will be able to recover, and those will be based upon other

12  claims of action against -- primarily against related parties.

13  Q   And then that last point, is that what's reflected in

14  Footnote 3 on this page?

15  A   That's correct, yes.

16  Q   Okay.  And just for the record, there's a reduction in

17  value of $22-1/2 million.  Do you see that?

18  A   Yes.

19  Q   And can you just explain to the Court what that is and how

20  that value was arrived at?

21  A   Yes.  I may be getting slightly ahead of you, Mr. Morris.

22  But to give the Court a reflection of the transaction -- and

23  we can go into the details in a moment -- ultimately, the

24  transaction we structured we think is very fair both

25  economically to the Debtor, but there -- there is some

Seery - Direct                          42

1   complexity to it to satisfy some of HarbourVest's concerns

2   that they be able to effectively rescind the transaction, at

3   least from an optical perspective.  Value was important, but

4   optics were as well.  The twenty-two and a half is the current

5   -- actually, the November value of HCL -- the HarbourVest

6   interests in HCLOF.  And that's based upon Highland's

7   evaluation of those interests.

8       So we do believe that that is a fair value as of that

9   date.  It has not gone done.  It hasn't gone up explosively,

10  either, but it hasn't gone down.  We think that's good, real

11  value.  That value is in the Acis CLOs, the equity in those

12  CLOs, which is 2 through 6, that we -- we will be working with

13  the HCLOF folks to get Mr. Terry to monetize those assets and

14  those longer-dated CLOs.

15      In addition, I think it's 85 percent of the equity in Acis

16  7 -- Acis 7 is managed by Highland -- that is also beyond its

17  reinvestment period.  And in talking to the directors -- and

18  they're new directors, and I'll get to that in a minute, for

19  HCLOF -- they'll seek to push Highland, which is the

20  reorganized Highland, to monetize that asset, with due regard

21  to fair value.

22      In addition, Harbour -- HCLOF owned a significant amount

23  of the preferred or equity pieces, if you will, in the

24  Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25  really CLOs.  Those are effectively closed-end funds with

Seery - Direct                                          43

1  illiquid assets, primarily illiquid assets in them.  We've had

2  some dispute in front of the Court about selling the liquid

3  assets in them, which we can go into it another time.  Those

4  are being liquidated in the market at fair value.

5      But HCLOF also is a significant holder of those preferred

6  shares, and those directors would -- have indicated to me that

7  they would like to see those interests also monetized.

8  Q   All right.  Let's shift gears for a moment to talk about

9  the diligence that the Debtor did before entering into this

10  agreement.  Can you just describe for the Court generally the

11  diligence that was undertaken at your direction?

12  A   Well, when we first received the reply to our objection,

13  we dug into that reply and the specifics in it very

14  aggressively.  So we reviewed all of the underlying documents

15  related to the original transaction.  We discussed with

16  counsel the legal basis for the HarbourVest claims.  We

17  interviewed our own HCMLP employees who were involved in the

18  transaction and tested their recollection, specifically around

19  who dealt with HarbourVest, who had the discussions with

20  HarbourVest, what was disclosed to HarbourVest with respect to

21  the Terry dispute and the Acis litigation.

22      We also had done, as I think the Court is well aware from

23  prior 9019 testimony, extensive work around the transfers and

24  the issues related to Acis.  So we were familiar with their

25  impact on HCLOF.

Seery - Direct                                    44

1    We also did extensive work valuing the remaining HCLOF

2    interests to get a good feel of not only how much HarbourVest

3    originally invested, but how much they actually lost in this

4    transaction.  And as I said, their original investment was

5    around, in total, in two tranches, about $80 million, of which

6    they got about $5 million back, and they've lost $22 million.

7    So it -- I mean, remaining with $22 million.  So they've lost,

8    you know, in excess of $50 million.

9    Q    Do you recall whether the Debtor reviewed and analyzed all

10   of the documents that were cited in HarbourVest's response to

11   the Debtor's objection to the HarbourVest proofs of claim?

12   A    Yeah.  I think -- I forget, to be honest, which -- exactly

13   what documents were in there.  But we went through their

14   objection with a fine-toothed comb, not only with respect to

15   the issues related to the Acis case, but also their references

16   to Guernsey law, other U.S. law, any of the documents between

17   the parties.  And obviously, as I mentioned before, the

18   offering memorandum.

19        MR. MORRIS:  Your Honor, I would just note for the

20   record that Debtor's Exhibits I through X are all of the

21   documents that are cited in HarbourVest's response to the

22   Debtor's objection to the HarbourVest proofs of claim, and

23   those are the documents that Mr. Seery just referred to.

24        THE COURT:  All right.

25        MR. MORRIS:  Just, they're in evidence now, and I

Seery - Direct                                      45

1    just wanted the Court to understand why they're in evidence.

2              THE COURT:  Okay.  Thank you.

3              MR. MORRIS:  You're welcome.

4    BY MR. MORRIS:

5    Q   Let's talk about the Debtor and whether or not it had or

6    has any viable defenses.  Did the Debtor form any views as to

7    whether or not it had any defenses to the HarbourVest claims?

8    A   Yes, we did.

9    Q   Can you describe for the Court the defenses that were

10   reviewed and analyzed by the Debtor?

11   A   Yeah.  I think we -- we had very significant defenses.

12   So, first and foremost, with respect to the original proof of

13   claim, as I mentioned earlier, it alluded to the expenses and

14   the overcharge.  And I think with respect to the 15 million of

15   fees that were charged to HCLOF by Highland, we didn't have a

16   lot of defenses to that claim.

17       It's pretty clear, by any fair view of the Acis case, that

18   HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19   had no real responsibility for fighting with Acis and Josh

20   Terry and shouldn't have been charged those fees.  I don't --

21   I don't think there's a legitimate investor that would

22   actually think that that was an appropriate amount to be

23   charged to a fund.

24       However, the claim was not as broad -- the proof of claim

25   was not as fulsome in terms of discussing and only vaguely

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 332 of 1726 PageID 11653
174

Seery - Direct                                        46

1    referred to other damages.  So we did -- we did, as a

2    threshold matter, think about whether we could argue that it

3    was time-barred because they had not met their obligations to

4    fully disclose under the proof of claim.

5        Secondly, we considered the defenses to the overall claim

6    of fraudulent inducement.  Our perspective was that if we

7    could stop the claim of fraudulent inducement, the damages

8    would likely be limited to the 15 and maybe some -- some other

9    damages.  With respect to the 15, again, the problem that we

10   had when we got past -- past motions for summary judgment is

11   the factual predicate for our defense was going to be that we

12   divulged these things to HarbourVest and that they did not

13   reasonably -- it was -- reasonably rely on some failure to

14   divulge because they're a sophisticated investor.

15       The problem with that defense is that our witnesses, which

16   really would have primarily been Mr. Dondero and Mr.

17   Ellington, and one other employee who runs the CLO business,

18   Mr. Covitz, would not be pretty good.  They've been -- two of

19   them have been in front of this Court and they're not viewed

20   favorably and their testimony would be challenged and

21   potentially suspect.

22       So that gave us a real focus on trying to make sure that

23   we could, if we had to litigate, that we would litigate around

24   the fraudulent inducement.

25       As I said, reasonable reliance, what was disclosed, lack

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 48 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 333 of 1726   PageID 11654
174

Seery - Direct                                        47

1    of digging into the public record, because you don't have to

2    go far on Google to find "fraud" within two words of

3    "Highland," and the tremendous, you know, litigious nature of

4    Highland.  You know, even at that point, when this investment

5    was made, aside from Mr. Terry's arbitration, which by that

6    point, at least by the time (inaudible) was public, there was,

7    you know, significant public disclosure around the Credit

8    Strat and the litigation, the Crusader litigation, the UBS

9    litigation, the, gosh knows, the Daugherty litigation.

10       So our defense was going to be that you should have

11   figured this out, you're a sophisticated investor, and you

12   should have been able to figure out that there was significant

13   risk that, with respect to Mr. Terry, that Mr. Dondero would

14   not stop litigating and that those costs would put significant

15   risk on the investment.

16       The problem with that, as I mentioned earlier, is that the

17   OM is wholly deficient.  If you have a typical risk factor in

18   the offering memorandum, you would have disclosed that there

19   was a litigation with Mr. Terry, a former partner in the

20   business, and that the Debtor had no intention of settling it.

21   There was no intention of settling.  That litigation would go

22   on.  It could go on for years and it could result in

23   bankruptcy or attachments and other risks to the business, and

24   that the investor should be fully aware that the Offeror does

25   not intend to be involved in any -- or the manager, in any

Seery - Direct                                    48

1   settlement with Mr. Terry, and the fact it undermined the

2   investment.  That wasn't there.

3        But that was our preliminary focus, to try to stop fraud

4   in the inducement.  And then we -- we had specific facts

5   related to that.  You know, once they knew about the

6   bankruptcy in HarbourVest of -- I'm sorry, of Acis,

7   HarbourVest made a second funding, which was there was a -- it

8   was an initial $75 million draw, and then a second, I believe,

9   about a $5 million draw, which was in -- I believe in

10  February.  And they made it without -- without objection, and

11  that was after the commencement of the bankruptcy.

12       In addition, they were -- they were active in the

13  bankruptcy, so the -- some of the things that happened in the

14  bankruptcy, there were many opportunities to settle that case,

15  from our examination, all of which were turned down to -- by

16  Mr. Dondero.  But you don't see HarbourVest pounding the table

17  to settle, either, either with respect to the Oaktree

18  transaction or any other transaction.

19       Now, HarbourVest's defense to that is, well, we were

20  taking advice and all of our information from Highland, and we

21  were getting that information directly from senior folks at

22  Highland why -- what the value was and why we shouldn't do

23  those things.  We thought that that would mitigate some of the

24  arguments that -- some of the damages that we might have, I'm

25  sorry, if we -- if we lost.

Seery - Direct                                49

1       But the focus at that point, you know, our legal strategy,

2   was can we stop HarbourVest at the very forefront to say,

3   You've got to come into the factual realm and get out of the

4   fraud in the inducement realm.  And then the defenses and the

5   exculpations and the liability limitations in the documents

6   would also come into play.

7       So that -- those are some of the defenses that we focused

8   on and our analytical thinking around them.

9   Q   So, if the Debtor had viable defenses, why is it settling?

10  A   Well, this is a significant claim.  And we -- we looked at

11  it with respect to both the impact on the case, but, really,

12  the merits of the claim.

13      As I said, there's really little dispute that the legal

14  fees should not have been charged to HarbourVest.  We think

15  based upon the testimony in Acis, the suspect credibility of

16  those who would have been our witnesses, and the experience in

17  Acis that the Court has had in terms of the completely hell-

18  bent on litigation, it would be hard for anyone to justifiably

19  defend those fees being charged.  So, as an initial matter, we

20  had exposure there.

21      In addition, if HarbourVest got by our defense of -- was

22  able, for example, to claim fraud in the inducement, then we

23  were open to significant damages.

24      We really didn't put much value, frankly, on the RICO part

25  of it.  We think that that's waved around often to show treble

Seery - Direct                          50

1   damages.  Although in this case certainly somebody could lay

2   out the predicate acts and put forth a RICO-type argument, we

3   just didn't think that that had real merit in this commercial

4   dispute, even with a fraud claim.

5        But even without the trebling of the damages, there's no

6   dispute that HarbourVest lost more than $50 million in this

7   investment.  You know, we -- we thought about that risk as

8   well.

9        In addition, because the case would really be fact-based,

10  even if we had a high degree of confidence based upon our

11  discussions with our employees and the factual testimony, it

12  was going to be expensive to litigate this case, and time-

13  consuming.

14       And so we looked at the economic value, the potential

15  risks, and the actual value that we were giving up, and found

16  this to be an extremely, extremely reasonable settlement.

17       Importantly, and I think what drove it, you -- one of --

18  one of the things that drove it is another one of our defenses

19  on why, notwithstanding their -- what they held out as

20  meritorious claims, I don't think HarbourVest really wanted to

21  publicly litigate this claim.  And we were aggressive in our

22  discussions with HarbourVest of how we would litigate it,

23  which would be quite publicly.

24       Now, that may or may not be fair, but that does put risk

25  on the counterparty.  And so I think that helped drive the

Seery - Direct                                51

1   settlement.

2       In addition, the structure of the settlement we think is

3   extremely favorable to the Debtor and to the estate because,

4   rather than taking the full claim and putting it into a senior

5   unsecured position, we have bifurcated it.  We did think about

6   whether this was a claim that could be subordinated under 510.

7   There won't be any arguments, I would be surprised if there's

8   arguments today that we didn't actually give to the Highland

9   employees who have given them to Mr. Dondero's respective

10  counsel.

11      We did structure it in a way that we thought gave

12  HarbourVest the opportunity to effectively claim a rescission,

13  even though that's not really what it is, and then be able to

14  claim that their recovery is based on the bankruptcy, which it

15  is, but not really dilute all the other stakeholders in the

16  case.

17      (Pause.)

18          THE COURT:  Mr. Morris?  Anything else?

19          MR. MORRIS:  I can hear you, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  I can hear you.

22          THE COURT:  Okay.  Now can you --

23          MR. MORRIS:  I got cut off from Mr. Seery for a

24  moment.

25          THE COURT:  Okay.

                              Seery - Direct                        52

 1   BY MR. MORRIS:

 2   Q    Okay.  I appreciate that.  Are you done giving the

 3   Debtor's basis for entering into this settlement, Mr. Seery,

 4   if you can hear me?

 5   A    I think so, but I think as the Court has probably seen, I

 6   can go on.

 7   Q    Yes.

 8   A    So I will try to be -- I'll try to be more concise.  But

 9   this was a -- this was a difficult settlement.  We felt good

10   about our defenses.  Felt that we could -- we could try them.

11   But it would be extremely expensive, time-consuming, and there

12   would be a lot of risk.  And settling at a level which we

13   believe is actually below the damages that were clearly caused

14   only by the fees was a -- was a -- is a -- is a very

15   reasonable settlement.

16   Q    Okay.  Let's just talk about the process by which we got

17   to the settlement.  Do you recall generally when the

18   settlement negotiations have -- were commenced?

19   A    I believe it was -- was late summer, early -- early fall.

20   Q    Okay.  Before I move on, I just want to go back to the

21   Acis matter that you were talking about, one last issue.  Do

22   you know how, if at all, the injunction that was entered in

23   the Acis bankruptcy impacted or related to the HarbourVest

24   claims?

25   A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

Seery - Direct                                         53

1    think there's an argument, and we analyzed it thoroughly, that

2    the injunction effectively caused a lot of the damages.

3    Because if you look at the values of the equity that

4    HarbourVest had, the -- and HCLOF had in the CLOs, it went

5    down dramatically after the Trustee in the Acis case took over

6    and then subsequently, when the case was reorganized and Mr.

7    Terry took over, you know, with Brigade as the sub-advisor.

8         Now, that would -- you know, we would -- we could

9    certainly attempt to throw, in our defense, the causation at

10   Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's

11   retort is that none of this would have occurred but for the

12   burn-it-down litigation that Mr. Dondero engaged in with

13   Highland.

14        In addition, in Mr. Terry's defense, you know, he did try

15   multiple times with HCLOF, tried to petition, if you will, the

16   HCLOF entity to -- and directors, former directors, to reset

17   the CLOs to make them more economically viable, based upon the

18   current level of asset returns versus the debt costs in the

19   CLOs.  And that was rejected by the HCLOF and the Debtor as

20   the controlling party of HCLOF.  So, we thought about those

21   risks.

22        You know, similarly, the economic values in Acis 7 went

23   down pretty significantly from that date as well.  So I think

24   there's -- there are some defenses, but that's really Mr.

25   Terry's issue, not our issue.  So we thought about those

Seery - Direct                          54

1    issues, we analyzed them, and we certainly did all the work

2    around month-to-month reductions in NAVs and how different

3    events in the Acis case might have -- might have caused those

4    and was that some sort of break from the original

5    transgression that HarbourVest claims, which was the

6    fraudulent inducement.

7    Q    Do you recall that in November HarbourVest's motion under

8    3018 was scheduled to be heard?

9    A    Yes.

10   Q    And can you just tell the Court your understanding of what

11   the 3018 motion was about?

12   A    Well, the 3018 motion was going to be on voting.  And we

13   took the view that it really was not -- it shouldn't have been

14   that big an issue and HarbourVest should have been content

15   with just taking their actual losses of roughly a $50-$60

16   million claim for voting purposes and then we would move on.

17        HarbourVest was very insistent that they have a $300

18   million claim, because they took the position -- and with

19   extensive documentation; not only the pleadings they filed,

20   but also detailed decks that were prepared by their counsel,

21   which they had presented to us on the merits of their claim --

22   that they were going to litigate for -- the 3018 and for the

23   full $300 million value.

24        And that became the genesis, if you will, of the

25   negotiations to settle.

Seery - Direct                         55

1    So, we started talking about the 3018.  It was very

2    contentious.  My apologies to Ms. Weisgerber and her counsel,

3    her partners, because it was a significant and contentious

4    negotiating call.  But the reasons for that I think were that

5    -- their insistence on litigating the 3018 and our view that

6    this was just, you know, another -- another of a series of

7    delays and costs in this case that we really were hoping to

8    avoid.

9        That led to Mr. Pugatch and I stepping away from counsel,

10   no offense to counsel, you know, ours and his, to begin

11   negotiations around the potential for a settlement.  First, it

12   started with a 3018, and then, you know, argued that we would,

13   if we got past the 3018, we were going to litigate this,

14   because we effectively had -- thought we could get everyone

15   else done at -- in and around that time.  And I think we were

16   also probably a little bit optimistic about UBS at that time

17   and the mediation, which subsequently we have settled.  But

18   that was the genesis of those settlements.

19   Q    And how did the structure, how did the Debtor and

20   HarbourVest derive at the structure whereby there is a general

21   unsecured claim, there is a subordinated piece, and there's

22   the takeback of the HCLOF interest?

23   A    Well, as I outlined, we -- we aggressively set forth our

24   various defenses.  Their position was that they -- they should

25   never have been in this transaction before.  And they --

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 57 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 342 of 1726 PageID 11663
174

Seery - Direct                              56

1   HarbourVest is, in essence, a fund of funds, and they have

2   investors, and it certainly wouldn't be their, I'm sure, the

3   best-performing asset in their portfolio, to have made this

4   investment and lost $50 million over this period of time.  So

5   they felt strongly that they should never have been in this

6   investment, and but for the failure to disclose and the

7   improper disclosures, they would not have been in this

8   investment.

9       So, optically, getting out of it was important to them,

10  and that led to our idea and construction of a subordinated

11  claim and the transfer of the HCLOF interests to the estate.

12      Importantly, the HCLOF interests, as I mentioned, are --

13  the investments are in the Acis CLOs controlled by Acis and

14  Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15  the Acis 7.

16      So we were keenly focused on, if we were going to get that

17  interest, would we then have the majority control in HCLOF,

18  which we will, and would we be able to drive the recoveries,

19  as opposed to what Highland typically does in these

20  investments is use other people's money, drive down the value,

21  and then try to buy back the interest on the cheap.

22  Q   Just in terms of timing, because I think there was a

23  suggestion in one of the openings that there was something

24  untoward about the timing here:  At the time the liquidation

25  analysis was prepared on November 24th, had the Debtor reached

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 343 of 1726 PageID 11664

Seery - Direct                                    57

1  any agreement in principle with HarbourVest?
2  A    If we had, it would have been reflected, so I don't -- I
3  don't think we were agreed by then.  I don't recall the
4  specific dates, but if we had, it would have -- it would have
5  been reflected.
6  Q    If I can refresh your recollection that the motion was
7  filed on December 24th, does that help form your understanding
8  or refresh your recollection that there was no agreement in
9  principle on November 24th?
10 A    Yeah.  Well, I'm quite sure there was no agreement in
11 principle or we would have reflected it minimally by a
12 footnote.  There's -- there's no chance.  It's a material
13 reduction in the claims pool that we were previously telling
14 people that, at least for purposes of distribution, like UBS
15 and a couple others we said we thought we would get to zero
16 on.  So we didn't calculate in that amount.  So I'm quite sure
17 we didn't have a deal when we filed the disclosure statement.
18      In terms of the timing, anyone who's done this business
19 for any degree of time knows that the crucible of bankruptcy
20 brings people to the settlement when they see something
21 happening in the case, and not before.  I think HarbourVest
22 looked at our -- this is my supposition -- HarbourVest looked
23 at our plan, our ability to get this done, our settlement with
24 Redeemer, our settlement with Mr. Terry and Acis, and saw that
25 this plan was coming together, and if they didn't think about

Seery - Direct                                    58

1    the settlement, they were going to think about not only the

2    risks that we laid forth for them with respect our defenses,

3    but also the opportunity to litigate with the Claimant Trustee

4    over a long period of time, which couldn't have been

5    particularly appetizing.

6    Q    Can you describe for the Court the role played by the

7    independent board of Strand, the general partner of the

8    Debtor, in analyzing and participating in the approval

9    process?

10   A    Yes.  I think, as the Court is aware and I've testified

11   before, Mr. Russell Nelms and Mr. John Dubel are fellow

12   independent directors with me, appointed pursuant to the Court

13   order.  They are kept abreast of every detail, and -- along

14   the way, not just in a summary form at the end.  We have

15   reviewed and analyzed collectively each of the issues.  Mr.

16   Dubel has extensive experience in these types of litigation

17   matters.  Obviously, Mr. Nelms, from his -- both his practice

18   and his time on the bench, has a keen insight into how to

19   resolve and what the risks and benefits are from settling

20   litigation.  So I consult them every step of the way.

21   Q    And as part of this process, did the Debtor reach out to

22   the directors of HCLOF?

23   A    Yes, we did.  So, we reached out and we've had several

24   conversations on video chats with the directors.  The

25   directors of HCLOF are two new gentlemen, Mr. Richard Boleat

Seery - Direct                                    59

1   and Mr. Dicky Burwood.  They are extremely professional.  They

2   are exceptionally well-informed.  They are truly careful, and

3   I would say very experienced professional not only directors,

4   but experienced in -- in these matters, both in respect of

5   structured finance as well as these types of vehicles and

6   litigation.

7         They were appointed by the old directors, Scott and

8   Bestwick, and they have been in control.  They have outside

9   counsel, which is King & Spalding in the U.S.  They have

10  Guernsey counsel.  They have accountants and professional

11  advisors, and are being, in my opinion, exceptionally careful.

12  I've got -- very quickly developed a lot of respect for them,

13  and we consulted with them on this settlement and how it would

14  work.

15        They've been very clear that they represent HCLOF and they

16  work for the benefit of the equity, whomever owns it, and

17  taking a view that they would like to see these assets

18  monetized swiftly, with due regard to value, for the benefit

19  of the equity.

20  Q   And is it your understanding that the directors of HCLOF

21  approved of this transaction?

22  A    They -- I don't know that their approval was required.

23  It's really -- there are a number of hoops to jump through

24  under the documentation, including opinion of outside counsel

25  that we received from WilmerHale in terms of the effectiveness

Seery - Direct                            60

1  of the transfer under the documents.  We had a negotiation

2  with -- with those directors, and making sure that we did

3  everything correct -- correctly, excuse me -- with respect to

4  the requirements for the transfer under the documents.  And

5  they've indicated their support and acknowledgement that we're

6  doing it correctly.

7      I don't know if it's fair to say they approved it.  I'd

8  just have to go check the documents.  But they certainly

9  support it.  And I think they generally support our position

10 with respect to how to move forward with the assets.

11 Q   I appreciate that.  I guess I meant approval with a small

12 a and not a capital A.

13     You mentioned WilmerHale.  Who do they represent in all of

14 this?

15 A   WilmerHale is the Debtor's outside corporate counsel, in

16 particular with respect to the fund issues that we don't

17 handle in-house.  We have significant support for fund issues

18 from the expertise of Mr. Surgent, who's been the CCO, and he

19 is also a lawyer, with respect to, you know, some of the

20 difficult fund issues that Highland has.  But when we use

21 outside counsel, we use WilmerHale for that, and they've been

22 -- they've been exceptional.

23 Q   Okay.  Just the last two points that were made in Mr.

24 Dondero's objection, I believe.  Did the Debtor overpay in

25 this settlement in order to gain the support of HarbourVest in

Seery - Direct                                    61

1    connection with its -- with the Debtor's attempt to get its

2    plan confirmed?

3    A    Not in any way.  My -- I believe the settlement is

4    extremely reasonable.  As I testified, it's -- it's less than

5    the -- the actual value going out, depending on unless there's

6    successful litigation, and there well could be, is less than

7    on a pro forma basis the fees that were taken and charged to

8    HCLOF.  We didn't do this for votes.  We will have Class 2,

9    Class 7, Class 8, and Class 9.  So I don't think that's a --

10   there's no vote purchasing, I think you called it.  No, not at

11   all.

12   Q    Yeah.  Well, on that topic, I think the phrase that was

13   used was gerrymandering.  Are you aware of the argument that's

14   been made that the subordinated claim was dropped in there in

15   order to gerrymander a positive vote for the impaired class of

16   Class 9, I believe?

17   A    In a word, I would say that's preposterous.  The -- as I

18   said, we have a number of classes that will vote for the plan.

19   The plan is -- the plan is a monetization plan.  And if -- if

20   the creditors determine that they don't want to pursue this

21   plan, we'll go forward with another -- we'll try to get

22   another plan.  We tried to have a grand bargain plan.  We

23   tried to have a pot plan, as I've testified previously.  I'm

24   quite certain that I've done more work on that than anyone

25   else, including Mr. Dondero and anybody who works for him.

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 63 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 348 of 1726   PageID 11669
174

                              Seery - Direct                    62

1   And he hasn't been willing to do that.

2       This is a -- this is a plan that's come together.  We

3   think it's going to be in the best interests of the estate.

4   That'll be confirmation next week.  Or two weeks, I guess.

5   But I don't see how this is any way related -- this settlement

6   is not any way related to the voting on that -- on that -- on

7   that plan.

8   Q   Just to put the finest point on it, is the Debtor relying

9   on Class 9 to be the impaired consenting class?

10  A   No.  I think -- I think what I've -- as I said, I believe

11  we already have the votes in Class -- I think it's 2 or 3, 7,

12  8, and -- and 9 will vote in favor as well.  So that won't be

13  an issue.

14          MR. MORRIS:  Your Honor, I have no further questions

15  of Mr. Seery.

16          THE COURT:  All right.  Pass the witness.  I'll ask

17  HarbourVest counsel first:  Do you have any questions of Mr.

18  Seery?

19          MS. WEISGERBER:  No, Your Honor.

20          THE COURT:  All right.  Thank you.

21      What about cross-examination?  Mr. Dondero's counsel?

22                       CROSS-EXAMINATION

23  BY MR. WILSON:

24  Q   Mr. Seery, how are you doing today?

25  A   I'm well, thank you.

Seery - Cross                                63

1  Q   I'm John Wilson, and I represent Jim Dondero.  I have a
2  few questions for you today.
3      Now, the HarbourVest proof of claims were filed on April
4  8th, 2020; is that your recollection?
5  A   I believe that's correct.  I don't recall the specific
6  date.
7  Q   Okay.  And do you know when you first became aware of the
8  HarbourVest claims?
9  A   I believe it was early in the summer when we filed the
10 omnibus objection.  It may have been in late spring, shortly
11 after that.  I don't recall the specific date of the filing.
12 Q   And before the time of the filing of the omnibus
13 objection, did Highland educate itself regarding the
14 HarbourVest proof of claims?
15 A   I'm sorry, could you say that again?  I didn't quite
16 understand it.
17 Q   Before the omnibus objection was filed, did HarbourVest --
18 I'm sorry, did Highland educate itself on the HarbourVest
19 proof of claims?
20 A   Not especially, no.
21 Q   Okay.  And -- but at some point, Highland did investigate
22 those proofs of claim, correct?
23 A   That's correct.
24 Q   And when would you -- when do you recall that that
25 investigation began?

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 65 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 350 of 1726   PageID 11671
174

Seery - Cross                              64

1  A    I don't recall the date, but the triggering event was

2  HarbourVest's response to our omnibus objection.

3  Q    Okay.  And that would have been filed September 11th of

4  2020?

5  A    I'll take your representation.  I don't -- I don't recall

6  the specific date.

7  Q    Okay.  And so when you began to investigate the

8  HarbourVest claims, what was your initial reaction?

9  A    My initial reaction was that the -- the larger claims that

10  they were asserting -- the fraud in the inducement, the RICO

11  -- that those claims were, in my view, attorney-made and that

12  when we dug in and did the work, we saw that HarbourVest

13  clearly lost north of $50 million on the investment.  We had

14  just started to uncover the fee issue and saw the risk we had

15  there.

16      But I thought the bulk of those claims were attorney-made.

17  Clever, but attorney-made, as opposed to what I would think

18  are more legitimate.  And so we started to develop our

19  defenses around that.

20  Q    And was your initial reaction that the HarbourVest claims

21  were largely worthless?

22  A    I think with respect to the claim around the fees, I

23  believed there was significant risk.  With respect to the

24  other claims, I thought our defenses would make them

25  worthless, yes.

Seery - Cross                                65

1   Q    And did you ever represent to any party that the

2   HarbourVest claim was worth, at most, $5 million?

3   A    I think I represented often, including to HarbourVest,

4   that it was worth nothing.  I don't recall if I specifically

5   said $5 million.  $5 million would have been a nominal amount

6   to -- which is litigation costs.  So it may -- it may have

7   been in my models that I put in that as a settlement amount,

8   but I -- I thought that there were valid and good defenses to

9   those larger claims.

10  Q    And you recognize that HarbourVest was a large,

11  sophisticated investor, correct?

12  A    Yes.  I think they manage north of -- right around a

13  hundred billion dollars.

14  Q    And you recognize that HarbourVest routinely structured

15  complex customized investments, correct?

16  A    I believe that -- I don't know the intricate part of their

17  businesses, but as a fund of funds who does creative

18  investments, I think that they do do quite a bit of that.

19  This, I believe, was their first investment in the CLO space.

20  Q    And it was not -- or I should say, you did not believe

21  that HarbourVest was simply a passive investor in HCLOF,

22  correct?

23  A    I don't think that that's true, no.

24  Q    You don't -- you don't believe that you denied their claim

25  to be a passive investor?

Seery - Cross                                    66

1    A    Oh, I think -- I'm sure that in defense of their claims I

2    would argue that they were -- they were more than a passive

3    investor.  But it was pretty clear when you look at the

4    structure of what they invested that there was an intent that

5    they be passive on their part.  They didn't take a majority

6    interest.

7         In fact, Highland made it clear in the structure of the

8    deal that they couldn't -- it would be hard for them to get a

9    majority interest because Highland entities would control that

10   and Dondero-controlled entities or individuals would control

11   the majority.

12        I think that they -- they had hoped to be a passive

13   investor.

14   Q    But was it not your position that HarbourVest was actually

15   an active, involved investor?

16   A    I think our defense was going to be that they knew exactly

17   what was going on, that they participated, that they were

18   active, and that, indeed, that they were in and around some of

19   the subsequent issues in the Acis case.

20   Q    And you understood that HarbourVest played a material role

21   in the various outcomes in the Acis bankruptcy case, correct?

22   A    I don't believe that to be correct, no.

23   Q    Have you ever made that representation to anyone before?

24   A    Not -- not that I recall.

25   Q    Well, do you recall giving statements to a reporter named

Seery - Cross                                              67

1  Syed Khaderi?

2  A   I've never spoken to a reporter named Syed Khaderi in my

3  life.

4  Q   Well, did you participate in the preparation of statements

5  to be given to Syed Khaderi?

6  A   I've never heard of Syed Khaderi, nor have I participated

7  in any preparation of statements.  I don't know who that is.

8          MR. WILSON:  All right.  I'm going to have Bryan

9  Assink put on the screen a document.

10      And Bryan, can you go to Page 7?  Bottom of -- the top of

11  Page 7.  Well, actually, before you do that, go to the very

12  top of the document.

13  BY MR. WILSON:

14  Q   Now, Mr. Seery, are you familiar with Lucy Bannon?

15  A   Yes.

16  Q   And who is Lucy Bannon?

17  A   She is the Highland public relations person.

18          MR. WILSON:  Okay.  Now go back to Page 7.

19  BY MR. WILSON:

20  Q   Now, do you -- do you see on your screen an email of

21  September 14th from Syed Khaderi that says, Hi, Lucy, how are

22  you?

23  A   Yes.

24  Q   Have you seen this email before?

25  A   Not that I recall, no.

                               Seery - Cross                        68

1    Q   All right.  It continues on that, I saw the filing on

2    Friday about HarbourVest claims against Highland for a CLO

3    investment, and I'm looking to put out a report tomorrow

4    morning London time.  Ahead of that, I wanted to check if

5    Highland would like to comment on the matter.

6             MR. MORRIS:  Your Honor, this is -- the Debtor

7    respectfully objects.  A, this document is not in evidence.

8    B, it's rank hearsay.

9             THE COURT:  Response, Mr. Wilson?

10            MR. WILSON:  Your Honor, I am attempting to

11   authenticate this document, but I'm using it in rebuttal to

12   the testimony that Mr. Seery just offered.

13            THE COURT:  All right.  I'll allow it.  Overrule the

14   objection.

15            MR. WILSON:  All right.  Thank you, Your Honor.

16   BY MR. WILSON:

17   Q   All right.  Now, if we -- and oh, that September 14th

18   date, that was three days after the September 11th date that

19   we discussed was the date that HarbourVest filed its response

20   to the omnibus objection, correct?

21   A   Yes.  If that's the date that they filed it, then I -- if

22   you're representing that, I concede that the 14th is three

23   days after the 11th.

24   Q   All right.  And if you go back to the first page of this,

25   it looks like, on the following day, Lucy Bannon sends an

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 355 of 1726    PageID 11676
174

Seery - Cross                                   69

1   email to you, and is that your email address,

2   jpseeryjr@gmail.com?

3   A    That's correct, yes.

4   Q    And do you recall receiving this email from Lucy Bannon?

5          MR. MORRIS:  Your Honor, I renew my objection that

6   this is hearsay.  He's not rebutting anything that Mr. Seery

7   testified to.  He testified that he'd never heard of the

8   gentleman at the bottom of the document.  There's nothing in

9   this document that rebuts Mr. Seery's testimony at all.

10          THE COURT:  Response, Mr. Wilson?

11          MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12   his statement that he hadn't -- that he hadn't heard of Syed

13   Khaderi.  My rebuttal is attempted to -- attempting to show

14   that he has made various statements that he denied.

15          THE COURT:  I'll overrule the objection.

16   BY MR. WILSON:

17   Q    All right.  So, back to this exhibit, Mr. Seery.  You

18   recall receiving this email from Lucy Bannon on Tuesday,

19   September 15, 2020?

20   A    Not specifically.  But to be clear, I recall talking to

21   Lucy Bannon about the HCMLP dispute with HarbourVest.

22   Q    Okay.  And --

23          MR. WILSON:  Bryan, can you go down to the next page?

24   Scroll down to where -- the James Seery email.

25   BY MR. WILSON:

Seery - Cross                                    70

1  Q    Do you see this email on your screen that's dated

2  September 15, 2020 at 10:33 p.m.?

3  A    Yes, I do.

4  Q    And do you recall sending this email to Lucy?

5  A    Not specifically, no.

6  Q    Well, do you deny that you sent this email to Lucy?

7  A    It appears to be my email.

8          MR. WILSON:  Your Honor, we would move to admit this

9  document into evidence as Dondero Exhibit Letter N.

10         THE COURT:  Any objections?

11         MR. MORRIS:  I would consent to the admission of Mr.

12 Seery's email, but the balance of it ought to be excluded as

13 hearsay.

14         THE COURT:  What about that?

15         MR. WILSON:  Well, Your Honor, I think that this

16 document -- and I'll get into this in a little more detail in

17 a second -- but I think this document is a combination of the

18 work product of Lucy Bannon and Mr. Seery in preparing a

19 response for the reporter who requested comment from Highland.

20         THE COURT:  Okay.  I --

21         MR. MORRIS:  Your Honor, um, --

22         THE COURT:  Go ahead.

23         MR. MORRIS:  I just -- I do question how they got

24 this document, but that's for another day.  That's number one.

25 Number two, in addition to the hearsay argument, I just --

                                    Seery - Cross                          71

 1   relevance grounds.

 2           THE COURT:  Okay.  I'll allow the portion that is the

 3   communication of Seery, that portion of Exhibit N.  All right?

 4           MR. WILSON:  Okay.  With due -- thank you, Your

 5   Honor.  With due respect, I -- to use that portion, I need to

 6   refer to the portion below it, because he says, Good to submit

 7   with your final edit/revisions.  And so we need to know what

 8   those final edit/revisions are, which are contained in the

 9   email directly below that on the document that was four

10   minutes earlier in time.

11           THE COURT:  All right.  Fair enough.  That'll be

12   allowed.

13           MR. WILSON:  All right.  Thank you, Your Honor.

14       (James Dondero's Exhibit N is received into evidence as

15   specified.)

16           MR. WILSON:  So, Bryan, now can you scroll to the

17   next page?  Oh, actually, let's just -- let's just stop at the

18   top -- at the bottom of the page.  What's this statement?

19   BY MR. WILSON:

20   Q   So, to be clear, Mr. Seery, when -- in response to Mr.

21   Khaderi's request for information and comment, you prepared

22   actually two responses, and one of those was a statement on

23   the record attributed to a spokesperson for HCMLP or something

24   along those lines.  And then --

25           MR. WILSON:  Can you scroll down to that next page?

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 73 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 358 of 1726 PageID 11679
174

Seery - Cross                                    72

1  BY MR. WILSON:

2  Q   And this says -- I think part of this got cut off for some

3  reason, but it looks like the official statement is in

4  quotation marks.  It says, "We dispute the allegations made in

5  the filing and believe the underlying claims are invalid and

6  will be found to be without merit.  Our focus continues to be

7  treating all valid claims in a transparent, orderly, and

8  equitable manner, and vigorously disputing meritless in the

9  court.  That focus will assure that HCMLP's reorganization

10 process -- progress is towards an efficient and equitable

11 resolution."

12      And then below that there's another section of this email

13 that says, Background/Clarification, Not for Attribution.  And

14 do you know the purpose of this second section of the

15 response?

16 A   Do I know the purpose of that?  Yes.

17 Q   And what would that purpose be?

18 A   Ms. Bannon was speaking on background to reporters.  As I

19 said earlier, I've -- I never heard of the gentleman from

20 London.  If he's at the bottom of the email, I didn't pay any

21 mind, never heard of him.  Nor have I heard it since.  Ms.

22 Bannon didn't ever reference the specific person.

23      But she is the public relations person.  So, as I

24 testified earlier, she does communicate with the press.  And

25 as I previously testified when Mr. Morris questioned me, one

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 74 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 359 of 1726   PageID 11680
174

Seery - Cross                          73

1    of our tactics and our defenses for HarbourVest was going to

2    be that we were going to be very public and aggressive about

3    the investment and it would have a negative impact or negative

4    perspective for viewers, in our opinion, about HarbourVest's

5    investment.

6    Q    All right.  Well, look with me in the middle of that

7    paragraph right after the closed parenthetical, where it says,

8    "But it's important to note the background of HarbourVest's

9    active and deep involvement in the investment of which it now

10   complains."

11        And so it was your position that HarbourVest had an active

12   and deep involvement in the investment, correct?

13   A    No.  I don't think that's correct.  Ms. Bannon prepared

14   the statement, it was a litigation defense on background, and

15   that's our -- that was our position for this purpose.  It was

16   not my view that they were active and deeply involved.  They

17   were certainly involved.  There's no doubt about it.  But they

18   got all their information, in our estimation and our research,

19   from Highland.

20   Q    But in any event, you would agree with me that four

21   minutes after receiving this email, you approved this

22   statement to go out to the reporter, correct?

23   A    No, that's not correct.  That's -- this portion is on

24   background.  That statement doesn't go out.  The previous

25   statement was the official statement.  This is the background

Seery - Cross                                74

1  discussion that she would have.  So, no, she was not

2  authorized in any way whatsoever to send that out.  She was

3  authorized to have conversations with those general facts.

4          MR. WILSON:  Okay.  Bryan, go to the top, or the

5  bottom of the page immediately preceding that.  That's it.

6  Yes, that's it right there.

7  BY MR. WILSON:

8  Q   Now, you'll see that this email from Lucy Bannon on

9  September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10 what you think of the below.  And, again, the first would be

11 on the record and the second will be sent for information

12 purposes to ensure accuracy, not for attribution."

13     So the intent was that this -- that this entire statement

14 be sent to the reporter, correct?

15 A   I don't believe that's correct.  I think when she goes on

16 background she doesn't send them a written doc.  It's got to

17 be clear to the reporter, at least my understanding is that

18 what on background means -- I've been involved with this

19 before -- is that typically that's done orally.  I don't know

20 if she's done it in a written statement before.  I have never

21 seen that done in a written statement before.  You give the

22 official statement and then you walk the reporter through your

23 other views on background.  And you're not quoted.  And it's

24 usually attributed to a source with knowledge.

25 Q   Okay.  We'll come back to that in a minute.  The next

Seery - Cross                                    75

1   sentence after the one I just read to you --

2           MR. WILSON:  Go back to where we were on the

3   background.

4   BY MR. WILSON:

5   Q   Now, we just read you the sentence that starts with, "Then

6   it's important."  The following sentence says, "HarbourVest

7   was not simply invested in HCLOF as an ignorant,

8   unsophisticated, passive investor, but was an active and

9   informed participant in the inception of its investment

10  through all of the Acis bankruptcy proceedings, and

11  HarbourVest played a material role in various outcomes related

12  to that case and its impact on HCLOF."

13      And is it -- did you not just tell me before we

14  investigated this document that HarbourVest did not play a

15  material role in the various outcomes of the Acis bankruptcy?

16  A   I don't know exactly what I said, but I think that's

17  correct, after we'd done the research on it, yeah.

18  Q   But you took the position in this email that you approved

19  to go out to a reporter that says that -- that HarbourVest was

20  an active and informed participant in the inception of -- of

21  its investment through all of the Acis bankruptcy proceedings

22  and played a material role in various outcomes related to that

23  case and its impact on HCLOF.  Can we agree with that?

24  A   Yes.

25  Q   And then the final sentence of this paragraph says that,

Seery - Cross                                 76

1   We believe that neither the facts nor the law support

2   HarbourVest's, quote, We-were-too-lazy-to-know allegations.

3        Whose words were those, "We-were-too-lazy-to-know

4   allegations"?

5   A    I don't recall.  They may be mine.  It's aggressive the

6   way I am, so that -- that may well be the case.

7            MR. WILSON:  All right.  Go -- go down to the next

8   page.

9   BY MR. WILSON:

10  Q   And with respect your comment that that second paragraph

11  would not have gone to the reporter, look at this email in the

12  middle of the page from Lucy Bannon to Syed Khaderi, September

13  16, 2020, at 1:51 a.m.  And --

14           MR. MORRIS:  Your Honor, this I will object to as

15  hearsay.  There is no witness here to testify to anything on

16  this document.

17           THE COURT:  All right.  How about that?

18           MR. WILSON:  Well, it's -- well, scroll up just a

19  little bit.  This email at the top of the page is three

20  minutes after the one in the middle of the page, where Lucy

21  Bannon is forwarding this to James Seery, saying, See below

22  for responses sent to *Creditflux*.  Will follow up with the

23  story when it runs or with any other updates.

24           MR. MORRIS:  Your Honor, these --

25           MR. WILSON:  So I think this --

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 78 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 363 of 1726   PageID 11684
174

Seery - Cross                         77

1          MR. MORRIS:  These documents don't appear on the

2    witness list.  They're not being offered to impeach anything.

3    They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5    trying to rebut the statements that Mr. Seery made.  In fact,

6    he told me just a minute ago that that second paragraph would

7    not have gone out to the reporter.  However, this email from

8    Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10   questioning, with an undisclosed document, is to rebut the

11   earlier testimony he gave before you even put this exhibit in

12   front of him.

13         MR. WILSON:  I'm trying to rebut multiple statements

14   that Mr. Seery has made today, and I think it -- you know, if

15   he's going to testify that this information did not go out to

16   a reporter, I think I'm allowed to rebut that to demonstrate

17   that it did.

18         THE COURT:  All right.  Why didn't you disclose this

19   in advance?  It's feeling less and less like an impeachment

20   document the more we go through it.

21         MR. WILSON:  Your Honor, I did not -- I did not

22   actually have this document at the time we filed our witness

23   and exhibit list, but I would also say that I didn't have any

24   purpose to use it if I didn't need it for rebuttal.

25         THE COURT:  Okay.  First off, you're supposed to

Seery - Cross                                        78

1   disclose all exhibits you anticipate using except those for

2   purposes of impeachment.  Okay?  Not rebuttal, to be

3   technical.

4       So, if you didn't disclose this exhibit, the only way you

5   can use it, subject to other possible objections, is if you're

6   impeaching a statement.  And I'm just saying I think we're

7   going beyond trying to impeach the original statement and now

8   we're trying to impeach statements he's made after seeing

9   portions of the document.

10      What did you mean, you didn't have this document in time

11  to disclose it?

12          MR. WILSON:  Well, I actually just received this

13  document this morning, Your Honor.

14          THE COURT:  Where did you receive it from?

15          MR. MORRIS:  From who?

16          MR. WILSON:  I -- I honestly do not know the source

17  of this document, although it was provided to me by my client.

18          MR. MORRIS:  Your client being Mr. Dondero?

19          THE COURT:  Could you answer that, Mr. Wilson?

20          MR. WILSON:  Yes, that's -- yes, that's correct.

21          THE COURT:  All right.  I will -- that's --

22          MR. MORRIS:  Your Honor, I'd like to --

23          THE COURT:  That's a different can of worms.  But for

24  now, I sustain the objection.  You're done questioning on this

25  document.

Seery - Cross                                      79

 1              MR. WILSON:  That's fine, Your Honor.  I can move on.

 2    BY MR. WILSON:

 3    Q    Now, Mr. Seery, you would agree with me that whether or

 4    not HarbourVest played an active role in the Acis bankruptcy,

 5    it was kept apprised of the -- of the ongoings in the

 6    bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?

 7    A    Yes.  My understanding is that -- that they were.

 8    Q    And in fact, did Highland have weekly conference calls

 9    with HarbourVest during the Acis bankruptcy to discuss what

10    was going on in the bankruptcy?

11    A    I don't know if they were weekly.  I've been told that

12    they had regular calls updating HarbourVest, yes.

13    Q    Okay.  And did Highland produce over 40,000 pages of

14    documents to HarbourVest related to the Acis bankruptcy?

15    A    I'm not aware of that, no.

16    Q    Have those documents been provided to you?

17    A    I hope not.

18    Q    So, in your role --

19    A    I'm sorry.  I don't -- I didn't receive 40,000 documents

20    from anybody.

21    Q    Well, did you receive any number of documents that were

22    provided by Highland to HarbourVest during the Acis

23    bankruptcy?

24    A    I wasn't involved in this during the Acis bankruptcy.  I'm

25    sorry.

Seery - Cross                         80

1   Q    Well, I'm referring to, after you became involved in this
2   Highland bankruptcy, whether you were provided with these
3   documents that were sent from Highland to HarbourVest.
4   A    I don't -- I don't know what the documents are.  I've
5   reviewed tons of documents with respect to the HarbourVest
6   claims, but I don't know of the documents to which you're
7   referring.
8   Q    Okay.  And after you performed your investigation into the
9   HarbourVest claim, what was your opinion as to the cause in
10  the reduction in value of HarbourVest's investment in HCLOF?
11  A    I think the main cause of the reduction in the investment
12  was the imposition of the Trustee and the failure of Highland
13  HCLOF and then subsequently with the injunction to reset the
14  CLOs.
15      You know, these are -- these are some of the worst-
16  performing CLOs in the market because they weren't reset.  And
17  when the liabilities of the CLOs are set at a level to match
18  assets, and then liability -- the assets run off, and the
19  asset financings or the new deals come in at much lower
20  levels, and the obligations of the CLO are not reset, the
21  arbitrage that is the CLO shrinks.  And that's what happened
22  to these CLOs.
23  Q    And during the course of the Acis bankruptcy, Acis and
24  Brigade were given management responsibilities over the CLOs
25  and HCLOF, correct?

Seery - Cross                        81

1   A    I believe that the Trustee had the overall, and then

2   subsequently, with the confirmation of the plan, they took it

3   over.  So I think that ultimately Mr. Terry had the management

4   authority, full management authority, and some advice through

5   Brigade.  But I think technically it wasn't actually during

6   the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

7   Phelan had the actual authority.

8       (Echoing.)

9   Q    I'm sorry.  And so your testimony is that Mr. Phelan had

10  the actual authority but he delegated that authority to Josh

11  Terry and Brigade?

12  A    I think that's fair, yes.

13  Q    And do you know when that occurred?

14  A    I believe that the control of the CLOs was in July of

15  2018, and then the ultimate confirmation of the case was at

16  the very beginning of '19.

17  Q    So, after being instituted as portfolio manager, and

18  during the time when Acis and Brigade were working under the

19  direction of the Trustee, who would have receive the fees for

20  managing those portfolios?

21  A    I believe -- I don't know.  I believe the -- that the Acis

22  estate would have received those fees.

23  Q    And who -- and so is that your testimony, that prior to

24  confirmation the Acis estate would have received the

25  management fees?

Seery - Cross                                          82

1   A    I believe that -- I believe they would have if they were

2   the manager, yeah.

3   Q    Okay.  And who would have received the fees after

4   confirmation?

5   A    Acis.

6   Q    Okay.  And who would have had the discretion to set the

7   amount of those management fees?

8   A    They would be agreed to in the -- in the investment

9   management agreement.

10  Q    They would be agreed to?

11  A    Yes.  As far as I've seen, I've -- I haven't seen

12  unilateral ability of a manager to set fees at its -- at its

13  whim.

14  Q    So is it your understanding that Acis and Brigade ended up

15  charging substantially more fees than Highland had charged

16  when it was under Highland's management?

17  A    I think the fees were -- the fees were -- the fees were

18  set by the agreement.

19         MR. MORRIS:  Your Honor, I just object to the line of

20  questioning on relevance grounds.  This is a 9019 hearing,

21  Your Honor.  How -- I just don't think this has any relevance

22  at all.

23         THE COURT:  All right.  Mr. Wilson, what is the

24  relevance?

25         MR. WILSON:  The relevance is that Mr. Seery has

Seery - Cross                                            83

1   testified that these Acis CLOs were among the worst-performing

2   in the market, and frankly, we would agree with that, and I'm

3   trying to get his understanding as to why, because I think

4   there's direct relevance in the reason that the value of the

5   HarbourVest investment diminished.

6          MR. MORRIS:  I don't think that was his testimony,

7   Your Honor.  But at the end of the day, Your Honor has heard

8   the litany of reasons why the Debtor is entering into this

9   agreement.  I just, I just think it's irrelevant, Your Honor.

10         THE COURT:  All right.  Mr. Wilson, I barely think

11  this is relevant.  I mean, I'm going to give you some benefit

12  of the doubt on that because of, you know, the testimony that

13  HarbourVest lost $50 million of value and --

14     (Echoing.)

15         THE COURT:  -- maybe that shouldn't, you know, lie at

16  the feet of Highland.  I think the compromise reflects that

17  they don't -- it doesn't lie entirely at the feet of Highland.

18  But, you know, maybe two or three more questions.

19         MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20  didn't have very much more on this point.  But to be a hundred

21  percent honest, I can't remember my question right before the

22  objection.

23         THE WITNESS:  I think you were asking me about the

24  fees and somehow alluding or implying that the manager could

25  unilaterally set fees.

Seery - Cross                        84

1      The fees are set in the investment management contract.

2   The manager doesn't get to wake up on Wednesday and say, you

3   know, I'd like another half a basis point.  It doesn't work

4   that way.

5   BY MR. WILSON:

6   Q    But you would agree with me that the fees and expenses

7   charged to an investment would impact the performance of that

8   investment in the market?

9   A    Absolutely.

10  Q    Would you also agree with me that there was one CLO -- and

11  I think you referred to it in your direct testimony -- but CLO

12  7, which continued to be managed by Highland?

13  A    That's correct.

14  Q    And is it fair to say that CLO 7 exceeded the performance

15  of the CLOs that were managed by Acis and Brigade?

16  A    I think that's fair.  I don't -- I don't recall the

17  magnitude, but I think it's outperformed those -- those CLOs,

18  yes.

19  Q    All right.  Well, thank you.  I want to turn your

20  attention to the portion of the settlement agreement that

21  deals with voting of the HarbourVest claim.  How did

22  HarbourVest's commitment to vote for the plan become a part of

23  the settlement?

24  A    Pretty straightforward negotiation.  We -- in negotiating

25  the settlement, one of the key factors was the cost and

Seery - Cross                                85

1   expense of the litigation, in addition to the risk on the --

2   on the fees, and whether we could wrap this up in a global

3   settlement now.  So in my experience, it's fairly typical, we

4   would try to do this in every settlement, have the settling

5   party, be that the claimant, agree to support the case and the

6   plan.

7       You know, we did not do that with the Committee members,

8   although we wanted to.  (Echoing) I frankly still wish I had.

9   Those little -- little bits that have been difficult

10  (echoing).  The Committee members have a different interest in

11  (echoing) than their more global interest for creditors at

12  large, which is more difficult than traditionally in

13  bankruptcy cases, less likely to have a Committee member, a

14  sitting Committee member, actually support the (echoing) of

15  the plan.

16          THE COURT:  Mr. Wilson, could you be careful to put

17  your device on mute every time you're not talking?  Because

18  we're getting some feedback loop from you when Mr. Seery

19  answers your questions.  Okay?

20      (Echoing continues.)

21          THE COURT:  Like right now.  I'm hearing feedback of

22  my own voice through your speakers.

23      Right, Mike?  Isn't that what --

24          A VOICE:  I am, too.

25          THE COURT:  Yes.  Okay.  So please be sure you put

Seery - Cross                                      86

 1   your device on mute whenever you are not speaking.  All right.

 2   Go ahead.

 3   BY MR. WILSON:

 4   Q    I mean, I think you just answered this question, but there

 5   was -- there was no similar voting provision in the Acis or

 6   the Redeemer settlements, correct?

 7   A    There is not, no.  And just as a -- by way of explanation,

 8   if it's okay, the reason was my counsel advised against it.  I

 9   did ask for it.

10   Q    Your counsel advised against putting that voting

11   requirement in the Acis and Redeemer settlements?

12   A    For the reasons I stated.  And in my experience, that's

13   consistent, where sitting members of Committees don't

14   generally sign up to resolve their own claims and support the

15   plan because of their larger fiduciary duties to the creditor

16   body as a whole.

17   Q    And during the settlement negotiations of the HarbourVest

18   claim, was this commitment to vote a topic of discussion?

19   A    Not -- not particularly, no.  It was pretty clear that

20   HarbourVest, if they were going to agree to the settlement and

21   the numbers, could see structure.  Obviously, it wanted to

22   understand what the potential distributions would be under the

23   plan, but this was not a hotly-negotiated point.

24   Q    And would you consider HarbourVest's commitment to vote

25   for the plan an important part of the settlement?

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 88 of
Case 3:23-cv-00726-S  Document 8-23  Filed 12/29/23  Page 373 of 1726  PageID 11694
174

Seery - Cross                                              87

1   A    I think it's an important part of the settlement, that the

2   part of the settlement is the subordinated claim.  We could

3   put that into presumably any plan.  But our plan does -- does

4   have a Class 9 for that.  So I think it's a -- it's a part of

5   the settlement that is important or we wouldn't have included

6   it.  It clearly wraps everything up and moves us towards

7   confirmation.

8   Q    And would you have made the deal with HarbourVest if they

9   had pushed back on the commitment to vote for the plan?

10  A    Yeah, I would have.

11  Q    All right.  Thank you.

12       MR. WILSON:  No further questions.

13       THE COURT:  All right.  Mr. Draper, anything from

14  you?

15       MR. DRAPER:  Yes, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. DRAPER:

18  Q    Mr. Seery, I may not understand the settlement, and I

19  apologize, but the way I think the settlement reads, the

20  interest that you're acquiring, you have the right to place in

21  any entity.  Is that my -- is that correct?

22  A    I don't recall the -- the specifics, but just from a

23  structural standpoint, we wanted to be able to put it into a

24  subsidiary as opposed to putting it directly in HCMLP.  If we

25  couldn't do that, we would -- we would put it into HCMLP.  So

Seery - Cross                              88

1    there wasn't a -- I don't recall the actual specifics, but we

2    certainly thought about holding that interest in a -- in a

3    subsidiary, just to have a cleaner hold.

4    Q    Why aren't you putting it into the Debtor so the Court and

5    the estate have jurisdiction over that?

6    A    I think the Court certainly has jurisdiction over an

7    entity that the estate owns a hundred percent of.  I don't

8    think that's -- that's even a close call.  So the important --

9    Q    Now, --

10   A    Can I finish?

11   Q    Sure.

12   A    You asked me why.  To the extent that somebody thinks that

13   problematic, I will consent to the Court having complete

14   jurisdiction over it, since I control it a hundred percent.

15   Q    No.  The real reason is, if I remember correctly, Mr.

16   Dondero and Judge Lynn filed a motion to have some say or some

17   information as to sales by subsidiaries, and I think you took

18   the position that they weren't entitled to it.  And so my

19   concern was that putting this in a subsidiary in a sense gave

20   you unfettered control without any review of the item.

21   A    I don't -- I don't think that's the case where we --

22   there's a directly-held subsidiary where we own a hundred

23   percent of it.  I don't think that that's the case.

24   Q    Okay.  But you're willing to (a) put this into the Debtor,

25   number one; and number two, have the estate and have the Court

Seery - Cross                                    89

1   have complete control over the disposition of it and its

2   actions, correct?

3   A    That's not correct, no.

4   Q    What -- what is incorrect about my statement?

5   A    The debtor-in-possession has control of its assets.  The

6   Court doesn't have complete control over its assets.  There's

7   --

8   Q    Well, --

9   A    -- issues -- hold on a second.  This is not -- this is not

10  a game and a trap.  We put it in a subsidiary for specific

11  reasons.  You asked why.  I'm giving you the why.  It's not to

12  hide it from anybody.  We're not going to sell the asset

13  unless somebody comes up with a great price for it.  We're

14  going to monetize the assets.  We're going to control HCLOF by

15  a majority.

16  Q    But, again, the issue is, if it's in the estate, the Court

17  has supervision over it.  If it's not in the estate, the Court

18  has no supervision of it.

19  A    I don't think that's correct, because the Court has

20  supervision over the estate, which owns a hundred percent of

21  the special-purpose entity that will own the shares.

22  Q    Okay.  All right.  Now, let's talk about the $15 million

23  that you discussed and the legal fees that were incurred.  Is

24  that the total amount that was spent, or is -- or is that --

25  was the total amount $30 million and HarbourVest was only

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 91 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 376 of 1726   PageID 11697
174

Seery - Cross                                90

1   responsible for one half of it or functionally took the brunt

2   of one half of it?

3   A   I think the total amount is between $15 and $20 million.

4   I don't have the exact numbers.

5   Q   So, in fact, the HarbourVest loss due to its ownership

6   would have been one half of that, not $15 million?

7   A   Well, the vehicle lost the money.  HarbourVest owned 49.98

8   percent of it, and Highland controlled the rest.  So if you

9   allocate it that way, I suppose that would be a -- that's how

10  you would divide it, in -- roughly in half, yes.

11  Q   And so HarbourVest's actual dollar loss due to the legal

12  fees is really the 49-point-whatever percent of $15 million,

13  not $15 million?

14  A   I don't know if -- I certainly would argue that.  I don't

15  think that HarbourVest has that position.

16  Q   Okay.  Now, in connection -- you were asked a question

17  about the documentation that was provided by Highland to

18  HarbourVest both during the bankruptcy of Acis and before.

19  You have control over the Harbour -- over the Highland server,

20  correct?

21  A   I'm sorry.  Can -- can we do two things?  One is, Mr.

22  Draper, I can't see you, so it would be better if I could see

23  you during the questioning.

24  Q   Okay.

25  A   And could you repeat the question?

Seery - Cross                                    91

1   Q    All right.  I'll be happy to.  You were asked a question

2   about the documentation that was provided by Highland to

3   HarbourVest during the Acis bankruptcy and meetings that took

4   place between the parties.  Correct?

5   A    Yes.

6   Q    And you stated you were unaware of the material that was

7   sent over?

8   A    I think I testified that I didn't receive the 40,000

9   documents that were mentioned.

10  Q    Did you do any search or order a search of the Highland

11  server to see what material was sent over by any party to

12  HarbourVest to analyze what -- what information they had

13  available to them and what was provided to them?

14  A    Yes, we did a search.

15  Q    And did you review the documentation that was sent over?

16  A    The -- the documentation that we looked at was very

17  specific to the investment and to the OM.  So we didn't look

18  for the -- the supposed 40,000 documents, no.

19  Q    Did you look for the material that was provided to them

20  during the Acis bankruptcy and the periodic meetings that you

21  discussed?  Or that you testified to earlier?

22  A    The answer is no.

23  Q    One last question.  I think, and just so I understand your

24  testimony, you've broken out the HarbourVest claim into two

25  pieces.  One is the legal fee amount that we've just

                          Seery - Cross                       92

1    discussed, and I gather the other piece of that is the fraud

2    in the inducement to enter into the CLO purchase?

3    A   It's -- it's more -- it's much more than that.

4    Q   Okay.  Well, let me say it in a different way.  The other

5    part of it is the losses as a result of the fraud in the

6    inducement to purchase the interest?

7    A   I don't think that's -- that's fair.  If I could explain?

8    Q   Sure.

9    A   Yeah.  The legal fee piece is pretty clear.  The other

10   piece starts with fraud in the inducement, but it's extensive

11   fraud claims.  Fraud in the inducement, as I testified

12   earlier, would get them around the exculpation and liability

13   limitations in the OM.  You don't get around all of those with

14   just the fraud.  And so that's -- that's the split of that

15   claim.  So the fraud in the inducement contains fraud

16   allegations.  Even if you didn't have inducement, you'd have

17   other potential fraud claims.

18   Q   But let me state it in a different fashion.  But for the

19   investment, the fraud that you allege wouldn't have occurred?

20   A   I -- HarbourVest alleges it.

21   Q   No, I'm just -- in your analysis of the claim, but for the

22   inducement, the rest of the damages wouldn't have flowed?

23   A   That's HarbourVest's position, yes.  But for the fraud,

24   they wouldn't have made the investment.

25   Q   All right.

                         Seery - Redirect                  93

 1            MR. DRAPER:  I have nothing further for this witness.

 2            THE COURT:  All right.  Any redirect, Mr. Morris?

 3            MR. MORRIS:  Just a few very questions, Your Honor.

 4    Just a very few questions.

 5                     REDIRECT EXAMINATION

 6    BY MR. MORRIS:

 7    Q   Mr. Seery,  you were asked about that document that Lucy

 8    prepared.  Do you remember that?

 9    A   Yes, I do.

10    Q   In your experience, don't defendants often deny liability

11    before entering into settlements, or even worse, getting

12    adverse judgments entered against them?

13    A   Of course.  Yes.

14    Q   Okay.  And in response to Mr. Draper's questions, isn't

15    the Guernsey claim another claim that the Debtor took into

16    account in assessing the potential risks of this settlement?

17    A   There's a number of claims contained in it.  As I

18    mentioned earlier, I mentioned the RICO claim.  But there is a

19    Guernsey shadow director claim, which is not dissimilar to

20    U.S. claims that somebody effectively controls an enterprise,

21    notwithstanding them not having the official role.

22    Q   Okay.

23            MR. MORRIS:  I have nothing further, Your Honor.

24            THE COURT:  All right.  Any recross on that redirect?

25    All right.

```
                    Seery - Redirect                    94

1              MR. WILSON:  No, Your Honor.

2              MR. DRAPER:  No, Your Honor.

3              THE COURT:  Thank you.  Mr. Seery, that concludes

4  your testimony.  Thank you.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  We need to take a bathroom break.  Before

7  we do, I just want to be clear with what we have left.  As I

8  understood it, we were having Mr. Pugatch from HarbourVest.

9  Mr. Morris, will that conclude the Debtor's evidence?

10 (Pause.)  Okay.  You were on mute, but I think you were saying

11 yes.

12             MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13 going to be putting their witness on the stand.

14             THE COURT:  Okay.

15             MR. MORRIS:  But it's part of the evidence in support

16 of the motion.

17             THE COURT:  All right.  Do the Objectors have any

18 witnesses today?

19             MR. WILSON:  Your Honor, Mr. Dondero intends to

20 examine Mr. Pugatch, but if he's going to be called by his

21 counsel, then we will do that as a cross-examination.

22             THE COURT:  All right.

23             MR. DRAPER:  This is Douglas Draper.  I have no

24 witnesses.

25             THE COURT:  Okay.  All right.  Well, I'm asking --
```

95

 1  well, I do want to ask:  Can we get a time estimate

 2  potentially for Mr. Pugatch?

 3          MS. WEISGERBER:  For my examination, Your Honor,

 4  twenty minutes, perhaps.

 5          THE COURT:  Okay.

 6          MS. WEISGERBER:  Or less.

 7          THE COURT:  All right.  Well, let me tell you what

 8  we're going to do.  We're going to take a ten-minute bathroom

 9  break.  But I have a 1:30 hearing and I have a 2:00 o'clock.

10  Well, I have a 1:30 docket, multiple matters, and a 2:00

11  o'clock docket.  So, you know, I'm really intending that we

12  get finished in time to give me and my staff a little bit of a

13  lunch break before launching into the 1:30 docket, so I'm

14  hopeful we can get done around 1:00-ish.  If we can't, then

15  we're going to have to reconvene, I'm going to say probably

16  3:00-ish Central time.  So let's hope we can get through

17  everything.  All right?  Ten-minute break.

18          THE CLERK:  All rise.

19     (A recess ensued from 11:58 a.m. until 12:08 p.m.)

20          THE CLERK:  All rise.

21          THE COURT:  All right.  Please be seated.  We're

22  going back on the record in the Highland matters.  Do we have

23  everyone?  It looks like we do.  Ms. Weisgerber is going to

24  call the next witness; is that correct?

25          MS. WEISGERBER:  Yes, Your Honor.  We call Michael

Pugatch - Direct                                                96

1   Pugatch of HarbourVest to the stand.

2            THE COURT:  All right.  Mr. Pugatch, if you could

3   turn on your video and say, "Testing one, two."

4            MR. PUGATCH:  Two.

5            THE COURT:  All right.  There you are.  Please raise

6   your right hand.

7            MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

8            THE COURT:  Thank you.  You may proceed.

9            MS. WEISGERBER:  Thank you, Your Honor.

10                          DIRECT EXAMINATION

11  BY MS. WEISGERBER:

12  Q    Good morning.  Can you please state your name for the

13  record?

14  A    Sure.  It's Michael Pugatch.

15  Q    And where do you work, Mr. Pugatch?

16  A    HarbourVest Partners.

17  Q    And what is your title?

18  A    I'm a managing director in our secondary investment

19  group.

20  Q    Did HarbourVest file claims in the Highland bankruptcy,

21  Mr. Pugatch?

22  A    We did, yes.  Several claims, in fact.

23  Q    What was the basis for those claims?

24  A    Yeah.  Among other things, fraudulent inducement based on

25  misrepresentations and omissions on the part of Highland in

Pugatch - Direct                              97

1  connection with our original investment, mismanagement at the

2  HCLOF level, including inappropriate fees that were charged

3  to investors, among a number of other items as well.

4  Q   Can you explain what you mean by misrepresentations made

5  to HarbourVest by Highland?

6  A   Yeah, sure.  So, you know, based on a number of

7  statements that were made to us around the litigation

8  involving Mr. Terry, some of the intentions found, the

9  structural changes that came to light with respect to HCLOF

10 and our investment, as well as the fact that the arbitration

11 award specifically against Mr. Terry would have no impact or

12 implication on Highland's sale or business.

13 Q   And can you explain what you mean by omissions made by

14 Highland to HarbourVest?

15 A   Sure.  So I would say, really, the implications behind

16 the structural changes that were made at the time of our

17 investment into HCLOF.  Also, the intention, clear intentions

18 that Highland had to never, in fact, pay the arbitration

19 award that came to light during our due diligence period to

20 Mr. -- to Mr. Terry as part of the investment.  And

21 ultimately the -- what Highland went about doing in terms of

22 stripping assets of Acis that led to the material value

23 declines and destruction of value that we've experienced

24 since our investment.

25 Q   You mentioned a diligence period.  Did HarbourVest

Pugatch - Direct                                   98

1   conduct diligence on the investment?

2   A    We did.  We conducted very detailed due diligence, as we

3   do for all of our investments.  That diligence period lasted

4   several months ahead of our investment decision.

5   Q    And did HarbourVest conduct that diligence by itself?

6   A    No.  So, in addition to internal investment professionals

7   at HarbourVest, we engage with outside advisors, both

8   consultants as well as legal advisors, in connection with

9   that due diligence.

10  Q    And did Highland answer all of HarbourVest's questions

11  during that diligence period?

12  A    They did.  And they were numerous.  But yes, they

13  answered all the questions that we had for them.

14  Q    Was the Terry dispute part of HarbourVest's diligence?

15  A    It was.  That came up as one of the outstanding items of

16  litigation as part of our due diligence.

17  Q    I'm going to ask my colleague to pull up on the screen an

18  exhibit that was on our exhibit list as Items -- Exhibits 34

19  and 35.  It's an August 15, 2017 email from Brad Eden to

20  Dustin Willard.  Mr. Pugatch, do you recognize this document?

21  A    I do, yes.

22  Q    And what is it?

23  A    This was an email sent to us during our due diligence

24  period in response to a request for more information on the

25  outstanding litigation that Highland was involved with.

Pugatch - Direct                    99

1          MS. WEISGERBER:  And if my colleague can just scroll

2     to the attachment to that email.

3     BY MS. WEISGERBER:

4     Q    And do you recall the attachment as well, Mr. Pugatch?

5     A    Yes, I do.

6          MS. WEISGERBER:  And if you can scroll back up to the

7     first email.

8     BY MS. WEISGERBER:

9     Q    Who is Dustin Willard?

10    A    Yes.  Dustin is a colleague of mine at HarbourVest who

11    worked closely with me on this investment.

12    Q    And you said that this document was shared with

13    HarbourVest during the diligence period before the HCLOF

14    investment?

15    A    It was, correct.

16    Q    Is it typical during diligence to receive a description

17    of litigation such as this?

18    A    It is.  It's a question that we always ask.  Certainly a

19    component of our diligence to understand any outstanding

20    litigation on the part of our counterparty or manager that

21    we're investing in.

22         MS. WEISGERBER:  Your Honor, I'd move to offer this

23    exhibit into evidence.

24         THE COURT:  Any objection?

25         MR. DRAPER:  No objection, Your Honor.

Pugatch - Direct                    100

1          MR. MORRIS:  No objection from the Debtor, Your

2    Honor.

3          THE COURT:  All right.  What is the letter or number

4    for this exhibit?

5          MS. WEISGERBER:  It's HarbourVest Exhibit 34.

6          THE COURT:  All right.  So HarbourVest Exhibit 34 is

7    admitted.

8        (HarbourVest's Exhibit 34 is received into evidence.)

9          THE COURT:  And I need to be clear where it appears

10   on the docket.  Can someone tell me?

11         MS. WEISGERBER:  So, it's identified on our exhibit

12   list, not -- it's not attached to the exhibits.  It is on the

13   docket.  We were -- when we initially filed the exhibit list,

14   we were working out confidentiality issues.  But it was

15   subsequently filed with our reply last night.  It's at Docket

16   No. 1735 --

17         THE COURT:  All right.

18         MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19         THE COURT:  All right.  Very well.  Thank you.

20   BY MS. WEISGERBER:

21   Q   Mr. Pugatch, we'll just scroll down to the second page of

22   the attachment.  Can you describe generally what the

23   litigation says regarding the Terry dispute?

24   A   Yes.  Generally speaking, this dispute was described as

25   an employee dispute, employment agreement dispute, with Mr.

Pugatch - Direct                                        101

1  Terry, who was a former employee of Highland involved in

2  their CLO business, and is described by Highland to us really

3  having to do with a series of false claims, in their opinion,

4  but having to do with a disgruntled former employee.

5  Q    And did it strike you as an unusual or significant

6  dispute?

7  A    No.  I would say we often -- we'll see, you know, former

8  employees with, you know, claims against a former employer in

9  connection with wrongful termination.  I wouldn't say it's

10 extremely common, but certainly not entirely out of the

11 ordinary.  And based on the explanations that we'd received

12 from Highland, seemed to be more of an ordinary-course type

13 former employee litigation suit.

14 Q    Based on what you now know about the Terry dispute, do

15 you believe that this was an adequate disclosure regarding

16 the dispute?

17 A    I would say very clearly not, you know, based on the

18 facts that came to light subsequently, the various rulings in

19 connection with the Acis bankruptcy case.  What was very

20 clearly not stated are the actual facts and implications of

21 the ongoing litigation with Mr. Terry.

22       MS. WEISGERBER:  I'd ask my colleague to put up the

23 next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24 list, which is Document No. 1723.  It's Exhibit 36 on that.

25 Same issue with respect to initially not filed, but it is on

Pugatch - Direct                                    102

1    the docket at our response last evening at ECF No. 1735 at

2    Page A351.

3              THE COURT:  Page what?

4              MS. WEISGERBER:  A351.

5              THE COURT:  A351.  Thank you.

6              MS. WEISGERBER:  You're welcome.

7    BY MS. WEISGERBER:

8    Q    Mr. Pugatch, I just put up a November 29, 2017 email from

9    Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10   Bellisario.  Do you recall this document?

11   A    I do, yes.

12   Q    And what is this document?

13   A    This was an email sent to us by Highland a couple weeks

14   after we closed on our investment on the (inaudible) in

15   response to a *Wall Street Journal* article that had come out

16   regarding Highland, a number of actions that they had taken,

17   and what Highland was articulating to us, a number of false

18   claims that had been made about Highland's prior actions, and

19   specifically trying to explain some of that and also share

20   with HarbourVest a letter that was being sent to the editor

21   of the *Wall Street Journal* highlighting, in their view, some

22   of the inaccuracies around the reporting.

23   Q    And did you receive this document?

24   A    We did, yes.

25             MS. WEISGERBER:  I'd move to offer this, so

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 104
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 389 of 1726   PageID 11710

Pugatch - Direct                          103

 1   HarbourVest Exhibit 36, into evidence.

 2            THE COURT:  Any objections?

 3            MR. WILSON:  Your Honor, John Wilson.  I would object

 4   as to the relevance of this document.

 5            THE COURT:  All right.  What's your response?

 6            MS. WEISGERBER:  Your Honor, it shows

 7   misrepresentations that the witness will testify how it

 8   relates back to prior representations prior to HarbourVest's

 9   investment, as well as misrepresentations at that time.

10            THE COURT:  Okay.  I overrule the objection.  I'm

11   going to admit it.

12       (HarbourVest's Exhibit 36 is received into evidence.)

13   BY MS. WEISGERBER:

14   Q   Mr. Pugatch, can you describe generally -- we spoke about

15   this a little bit -- just what this communication from

16   Highland was conveying to HarbourVest at the time?

17   A   Yes.  Specifically, again, responding to this *Wall Street*

18   *Journal* article that had been published, trying to defend,

19   again, Highland's own views why there were inaccuracies in

20   the reporting.  But importantly, from our perspective, trying

21   to reassure us as to the fact that, you know, these

22   accusations would have no bearing and any results from it

23   would have no bearing on their ongoing business or

24   partnership or the investment that we had made in HCLOF.

25            MS. WEISGERBER:  And if you can scroll to the second

Pugatch - Direct                          104

1   page.

2   BY MS. WEISGERBER:

3   Q   We'll just look at the last paragraph of another email

4   from Mr. Covitz.  Can you just read that first sentence of

5   the last paragraph?

6   A   Sure.  (reading)  While the dispute has no impact on our

7   investment activities, as always, we welcome any questions

8   you may have.

9   Q   Mr. Pugatch, was this email and the discussion regarding

10  the Terry dispute consistent with the representations made to

11  you prior to HarbourVest's investment into HCLOF?

12  A   It was, yes.  Both the message, the lack of any impact

13  that ultimately the dispute with Mr. Terry, the arbitration

14  award would have around Highland's ongoing CLO business, or

15  HCLOF specifically, was all, you know, very clear in this

16  document, but all consistent with the representations that

17  had been made to us leading up to our investment in the

18  middle of November 2017 as well.

19  Q   Thank you.

20        MS. WEISGERBER:  And you can take down the exhibit,

21  Emily.  Thank you.

22  BY MS. WEISGERBER:

23  Q   You mentioned, Mr. Pugatch, an arbitration award to Mr.

24  Terry.  How did you learn about that arbitration award?

25  A   That was initially disclosed to us by Highland as we were

Pugatch - Direct                            105

1   in the late stages of our diligence and closing process on

2   the investment into HCLOF.

3   Q    And generally, what did Highland tell you about the

4   arbitration award?

5   A    We were aware of its existence.  We were aware of the

6   quantum of the award, I think it was around an $8 million

7   arbitration award in the favor of Mr. Terry, and that was

8   following the litigation around the wrongful termination and

9   employee dispute that Highland had described to us

10  previously.

11  Q    Did you ask to see a copy of the arbitration award?

12  A    No, we did not.

13  Q    Why not?

14  A    Ultimately, we -- you know, the explanations that

15  Highland had provided to us all seemed very reasonable.  We

16  relied on their representations that this was, again, nothing

17  more than a dispute with a former disgruntled employee, in

18  their words, that had no bearing or, you know, would not have

19  any bearing on our investment in HCLOF or their ongoing CLO

20  business, which all very clearly was not the case, as

21  we've -- as we've learned over the last several years.

22  Q    Following learning about the arbitration award, did

23  HarbourVest do other diligence?

24  A    We did.  So, in addition to asking questions related to

25  the arbitration award and any impact that it would have, we

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 107
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 392 of 1726   PageID 11713

Pugatch - Direct                                106

 1  also spent some time diligencing a couple of structural

 2  changes that were proposed by Highland, and, in fact, ended

 3  up delaying the closing of our investment by about two weeks

 4  as we vetted some of those structural changes that Highland

 5  had proposed.  Vetted those both, you know, internally with

 6  Highland directly and with external counsel in order to make

 7  sure that those structural changes were in fact legally sound

 8  in ultimately making our investment.

 9  Q   And were those changes proposed following the arbitration

10  award?

11  A   They were, yes.

12  Q   Did Highland tell you the reason for the structural

13  changes?

14  A   Yeah.  So, so some of this -- and specifically, this

15  involved a change of the portfolio manager at the HCLOF level

16  that was really in connection with a rebranding as Highland

17  was going through a rebuild of its CLO business and wanting

18  to align, from a brand perspective, their business on an

19  ongoing basis with the Highland brand as opposed to the Acis

20  brand.  But more specifically, in the case of a late change

21  from a structured standpoint, the -- part of the intention

22  and the investment thesis of HCLOF was to pursue a reset, a

23  refinancing of all the underlying CLOs as they approached the

24  end of their investment period or came out of their

25  investment period.

Pugatch - Direct                                    107

1       And in connection with that, in light of the arbitration

2    award, Highland's view was that there may be difficulties in

3    the market in resetting certain of those Acis CLOs with the

4    Acis brand associated with them, given, again, the existence

5    of the arbitration award and concerns in the market around

6    the Acis brand reputation.

7    Q    And what did they tell you was the market view of Acis,

8    or the Acis brand?

9    A    Yeah.  Their view or their concern was that the, you

10   know, because of the existence of that arbitration award, the

11   brand would be viewed as toxic.

12   Q    Didn't this put you on notice that perhaps there was

13   something wrong with the structural changes?

14   A    I mean, we -- I mean, short answer, no.  We ultimately

15   asked questions, we diligenced the legal structure, but

16   relied on the representations that were made to us by

17   Highland around the rationale for the structural changes,

18   that these are all changes that were within a Highland-

19   managed vehicle or sat below the vehicle that we were

20   investing in, and so ultimately were in Highland's purview,

21   was the representations that we relied on.

22   Q    And did HarbourVest alone do that diligence of the

23   structural changes?

24   A    So, no.  I mean, in connection with the diligence that we

25   did internally and with Highland directly, we engaged with

Pugatch - Direct                          108

1   outside counsel who was working with us at the time to vet

2   those structural changes as well.

3   Q    Did HarbourVest rely on Highland's representations

4   regarding the arbitration award and the structural changes in

5   making its investment in HCLOF?

6   A    We did, absolutely.

7   Q    If Highland had disclosed the nature of the structural

8   changes, of removing Acis as the portfolio manager and

9   related transfers, would HarbourVest have proceeded with its

10  investment?

11  A    Definitively, no, we would not have.

12  Q    Why not?

13  A    I think the reality is if we had understood the intent,

14  you know, that Highland was ultimately undertaking here, we

15  would not have wanted to be any part of this, and certainly

16  getting dragged into all of this, the hassle, the value

17  destruction that we've seen on behalf of the investors and

18  the funds that we manage.  And I would say, lastly, we just

19  full stop would not have done business with a firm who

20  engages with this type of behavior, had we actually known the

21  truth.

22  Q    Mr. Pugatch, are you familiar with the bankruptcy that

23  followed of Acis?

24  A    Yes.

25  Q    And what was your -- or, did HarbourVest participate in

Pugatch - Direct                              109

 1   that bankruptcy?

 2   A    So, initially, no.  Subsequently, we ended up getting

 3   dragged into that on account of a number of misstatements by

 4   Highland about the role that HarbourVest had played as part

 5   of our investment into HCLOF and some of that structure and

 6   the structural changes that I alluded to.

 7   Q    How did HarbourVest learn about those misstatements in

 8   the bankruptcy about HarbourVest's role?

 9   A    So, ultimately, those came to light on -- you know, on

10   account of the ongoing proceedings within the Acis bankruptcy

11   process, and specifically brought to light to us by the Acis

12   trustee at the time, who decided to pursue, you know, further

13   diligence or discovery around the claims that Highland had

14   made around HarbourVest's involvement in those changes.

15   Q    And what is your understanding of what the allegations

16   were that caused the Acis trustee to investigate HarbourVest?

17   A    Sure.  So, you know, our understanding was that Highland

18   had made statements, again, false statements that HarbourVest

19   had actually instructed some of those structural changes,

20   that we were the ones that had said that we would not do

21   business with Acis and had ordered some of the underlying

22   transfer of assets or, again, structural changes, that, you

23   know, very clearly I would say were not the case.  Also, that

24   HarbourVest was -- was calling the shots as it relates to any

25   of the ongoing management or future resets of the CLOs.

Pugatch - Direct                    110

1   Q    Did HarbourVest instruct any of those structural changes

2   or transfers to occur?

3   A    We did not.  Absolutely not.

4   Q    Why didn't HarbourVest itself appear in the Acis

5   bankruptcy and file a claim?

6   A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7   passive investor in a Highland-managed company.  We had no

8   direct interaction with or relationship with Acis.  There was

9   really no reason for us to be directly involved until we were

10  subsequently dragged into involvement on account of those

11  misstatements.  And then at that point our focus really

12  pivoted to, you know, whether we needed to defend ourselves

13  against those accusations that had been made by Highland and

14  after a request for further information in discovery by the

15  Acis trustee.

16  Q    Did HCLOF participate in the Acis bankruptcy?

17  A    They did, yes.

18  Q    Did HCLOF incur fees for participating in the Acis

19  bankruptcy?

20  A    Yes.  In fact, very meaningful fees, to the tune of well

21  in excess of $15 million of legal fees, as we understand it,

22  that have been incurred, largely in connection with the

23  ongoing Acis bankruptcy and Highland's continued pursuit of

24  and in connection with the litigation with Mr. Terry, which

25  we firmly believe was entirely inappropriate that HCLOF and

Pugatch - Direct                        111

1   ultimately investors in HCLOF bear those expenses, which were

2   not just expenses of HCLOF but of Highland and a number of

3   other Highland affiliates.

4   Q    Do those expenses form a basis of separate claims filed

5   by HarbourVest against Highland?

6   A    They do, yes.  One of the multiple claims that we had

7   filed against Highland.

8   Q    And a few more questions, just for the record, Mr.

9   Pugatch.  How much did HarbourVest initially invest in HCLOF?

10  A    Sure.  So, our initial investment in November of 2017 was

11  right about $73-1/2 million, I believe.

12  Q    Did HarbourVest invest any additional money in HCLOF?

13  A    We did.  There was a subsequent capital call investment

14  of about $5 million, bringing our total investment to just

15  under $80 million in aggregate.

16  Q    When HarbourVest initially made the investment, did it

17  anticipate making a profit on it?

18  A    We did, yes.

19  Q    How much did HarbourVest anticipate earning from the

20  investment?

21  A    Yeah.  So, our -- based on the original $73-1/2 million

22  investment, we had expected a total return of about $137

23  million on that -- on that investment.

24  Q    What was that projection based on?

25  A    So, that projection was based on materials that we had

Pugatch - Direct                                  112

1    received from Highland, their internal projection models on

2    the future performance of the underlying CLOs that we were

3    acquiring exposure to through our investment in HCLOF, and

4    was one of the inputs or formed the basis in connection with

5    our diligence that we ultimately ran different sensitivities

6    -- projections around and helped employ -- helped inform our

7    investment thesis.

8    Q    Do you know the current value of HarbourVest's investment

9    in HCLOF?

10   A    Yes.  The current value is right around $22-1/2 million.

11   Q    So roughly how much has the investment itself decreased

12   from HarbourVest's initial investment?

13   A    So, net of what was about $4-1/2 million of distributions

14   that we received early on in the investment, we've lost, to

15   date, in excess of $50 million on our original investment.

16   Q    And just for -- to close out, Mr. Pugatch, knowing all

17   that you know, if HarbourVest had known that -- about the

18   nature of the transfers by Acis or Highland's intent with

19   respect to the arbitration award, would HarbourVest have made

20   this investment?

21   A    No.  The reality is, had we known the truth, or even had

22   a sense of the truth, the true intentions behind some of

23   those transfers and ultimately what would have happened, we

24   never would have made this investment, full stop.

25   Q    Thank you, Mr. Pugatch.

Pugatch - Cross                                  113

1          THE COURT:  All right.  I didn't hear you, Ms.

2   Weisgerber.  Do you pass the witness?

3          MS. WEISGERBER:  Yes, I pass the witness.

4          THE COURT:  All right.  Thank you.

5      Mr. Morris, any examination from you?

6          MR. MORRIS:  No, thank you, Your Honor.

7          THE COURT:  All right.

8      (Interruption.)

9          THE COURT:  All right.  I'm not sure whose voice that

10  was, but please, again, mute your devices when you're not

11  talking.

12      Any cross-examination of Mr. Pugatch?  I'll start with

13  you, Mr. Wilson.

14          MR. WILSON:  Yes, Your Honor.

15          THE COURT:  Okay.

16                    CROSS-EXAMINATION

17  BY MR. WILSON:

18  Q    How are you -- I guess we're afternoon now.  How are you

19  this afternoon, Mr. Pugatch?

20  A    I'm doing well.  Yourself?

21  Q    I'm doing well as well.  Do you recall that on Monday of

22  this week I took your deposition?

23  A    Yes, I do.

24  Q    And so you understand that my name is John Wilson and I

25  represent Jim Dondero, who has filed an objection to the 9019

Pugatch - Cross                             114

1  motion filed by the Debtor?

2      I've got a few questions for you today.  Has HarbourVest

3  been around for over 35 years?

4  A    We have, yes.

5  Q    And does HarbourVest have ten offices around the world?

6  A    Correct, yes.

7  Q    And does HarbourVest employ over 150 investment

8  professionals?

9  A    Yes.

10  Q   Does HarbourVest have over $74 billion in assets under

11  management?

12  A    Correct, yes.

13  Q    And is HarbourVest's client base largely comprised of

14  institutional investors?

15  A    Also correct.

16  Q    And you would agree with me that HarbourVest is a

17  sophisticated investor, right?

18  A    I would, yes.

19  Q    How long have you worked for HarbourVest?

20  A    I've been employed by HarbourVest for 17 years now.

21  Q    And how long have you been a managing director?

22  A    I've been a managing director for approximately six

23  years.

24  Q    And you were, in fact, the managing director for the

25  investment that HarbourVest made in Highland CLO Funding,

Pugatch - Cross                          115

1    Ltd., which has been referred to today as HCLOF, correct?

2    A    I was, correct.

3    Q    And HarbourVest, I think you just testified, invested

4    approximately $73 million as its initial investment in HCLOF?

5    A    Yes, correct.

6    Q    And before HarbourVest made that investment, it had made

7    many investments of this type, correct?

8    A    Yeah.  We've made hundreds of investments into

9    partnerships over our history, correct.

10   Q    So HarbourVest was well-experienced in evaluating and

11   deciding whether to invest in large investments, correct?

12   A    It was, yes.

13   Q    Now, in your -- and by your, I mean HarbourVest -- in the

14   response to the Debtor's omnibus objection, it says that by

15   summer 2017 HarbourVest was engaged in preliminary

16   discussions with Highland regarding the investment.  Is that

17   a correct statement?

18   A    Correct, yes.

19   Q    And, in fact, those talks began in the second quarter of

20   2017, correct?

21   A    Yes.

22   Q    And so the investment closed ultimately on November 15th,

23   2017?

24   A    Yes, that's correct.

25   Q    So it's fair to say that HarbourVest considered and

Pugatch - Cross                                    116

1   evaluated this transaction for over six months before

2   investing its $73 million, right?

3   A    From the time of the initial conversations that we had

4   with Highland, yes.

5   Q    And one of the reasons that it took over six months to

6   complete the investment is that HarbourVest performs due

7   diligence before it makes an investment, correct?

8   A    Correct.

9   Q    And when you're performing due diligence -- well, first

10  off, you would agree with me that that's a common practice

11  amongst sophisticated investors such as HarbourVest, correct?

12  A    To perform due diligence?

13  Q    Yes.

14  A    Yes.

15  Q    And describe -- describe what HarbourVest does in a

16  general sense when it performs its due diligence.

17  A    Sure.  So, we spend time with the manager -- in this

18  case, Highland -- certainly around the investment thesis, the

19  opportunity, receive materials around the underlying assets.

20  We take that and perform our own independent due diligence

21  around the value of those assets, perform due diligence on

22  the manager itself, the go-forward opportunity.  In many

23  cases, and certainly in this case, engage with outside

24  advisors to assist with that due diligence.  It's a very

25  robust and thorough process.

Pugatch - Cross                              117

1   Q    And by outside advisors, are you referring to the outside

2   counsel that you testified about earlier?

3   A    Yes.  Both outside counsel and outside consultants.

4   Q    Okay.  And so did you say that it's typical to engage

5   outside counsel when performing due diligence?

6   A    Yes.

7   Q    And which outside counsel did you retain with respect to

8   this due diligence?

9   A    Debevoise and Plimpton as well as Milbank.

10  Q    And during the course of HarbourVest's due diligence, did

11  it identify some items of concern?

12  A    As with any investment, there are always items that are

13  identified that require further diligence, risks that are

14  identified that we look to mitigate through our due

15  diligence, et cetera.

16  Q    And if Harbour -- I'm sorry, did you say something else?

17  A    No.

18  Q    You were finished?  Okay.  Now, if HarbourVest identifies

19  an item of concern, is it typical to request additional

20  information regarding those items of concern?

21  A    It is, yes.

22  Q    And so that actually happened with respect to the HCLOF

23  investment, correct?

24  A    In certain cases, yes.

25  Q    HarbourVest identified several litigation matters that it

Pugatch - Cross                                    118

1  had questions about, correct?

2  A   Correct.  As we would with any investment.

3  Q   And it went back to Highland and asked them to explain

4  their position on those litigation matters?

5  A   Correct.

6  Q   And one of those litigation matters was the Joshua Terry

7  litigation, correct?

8  A   Yes.

9  Q   And at the time that HarbourVest was considering this

10 investment, beginning in the second quarter and continuing

11 through the summer, that Josh Terry litigation had not

12 resulted in an award or a final judgment, correct?

13 A   Correct.

14 Q   And I think we looked earlier at a document that your

15 counsel admitted as HarbourVest Exhibits 34 and 35.  There

16 was an email from a HarbourVest -- or, I'm sorry, from a

17 Highland representative to a HarbourVest representative that

18 was discussing Highland's position on the litigation,

19 including the Terry litigation, correct?

20 A   Are you referring to the document that we looked at

21 earlier?

22 Q   I am.  And I can put it on the screen if we need to.

23 A   No.  Right, I recall that, and yes, that's correct.

24 Q   Okay.  And just to be clear, that document, which stated

25 Highland's positions on the -- and summaries of the

Pugatch - Cross                                        119

1  litigation, was issued months before the arbitration award to

2  Josh Terry, correct?

3  A   I don't remember the exact timing, but it was certainly

4  during our due diligence period and prior to the arbitration

5  award, yes.

6  Q   Well, it seems to me that that email that you -- your

7  counsel admitted as an exhibit was issued in August of 2017.

8  Does that sound right to you?

9  A   If that's what the email said, yes.

10 Q   And if the Terry arbitration award came out in October,

11 then you would agree with me that that is several months

12 prior to the -- or at least two months prior to the

13 arbitration award?

14 A   Yes.

15 Q   And so when HarbourVest made requests of Highland to

16 provide information regarding its items of concern, Highland

17 complied with those requests, correct?

18 A   It did, correct.

19 Q   And was there ever a time when HarbourVest requested

20 Highland to provide information and that information was not

21 provided?

22 A   Our requests for information, or at least, you know,

23 responses or color to a question, were always met either

24 with, you know, written or verbal communication back to us,

25 yeah.

Pugatch - Cross                                    120

1  Q    And you would agree with me that, in fact, HarbourVest

2  delayed the closing of the investment by two weeks to

3  continue its due diligence, correct?

4  A    Correct, related to the structural changes that were made

5  close to closing.  That's right.

6  Q    And after conducting that due diligence, HarbourVest

7  satisfied itself that the investment was sound?

8  A    That the legal structure that had been put in place in

9  connection with those proposed changes by Highland was -- was

10 legally sound, yes, and on the back of, again, statements and

11 misrepresentations on the part of Highland around the nature

12 and potential impact to their ongoing CLO business and HCLOF.

13          MR. WILSON:  Well, I'm going to object to the latter

14 part of your response as nonresponsive.

15          THE COURT:  Sustained.

16 BY MR. WILSON:

17 Q    Now, after you conducted the due diligence, HarbourVest

18 made the investment of $73 million on November 15th, 2017,

19 correct?

20 A    Correct.

21 Q    And so I think you testified earlier that prior to that

22 investment HarbourVest had become aware that that Josh Terry

23 litigation had resulted in an arbitration award, correct?

24 A    Yes.

25 Q    But I think you've also testified that HarbourVest did

Pugatch - Cross                              121

1   not request that Highland provide a copy of the arbitration

2   award, correct?

3   A    That's correct.

4   Q    And you further testified that you were represented by

5   outside counsel at the time, correct?

6   A    Correct.

7   Q    And as of Monday of this week, you had not reviewed that

8   arbitration award; is that correct?

9   A    That's correct.

10  Q    Have you reviewed that arbitration award since Monday of

11  this week?

12  A    I have not.

13  Q    But in any event, you testified that Highland told you

14  about the award?

15  A    Yes.

16  Q    And they told you the amount of the award?

17  A    Yes.

18  Q    And then they told you that the award had been converted

19  to a judgment?

20  A    When you say the award had been converted to a judgment,

21  can you be more specific?

22  Q    Well, I don't know how familiar you are with the

23  litigation process, but in this instance, that award was

24  taken to a court and the court entered a judgment on the

25  arbitration award.  Did you -- were you aware of that?

1  A    I don't recall the specific legal terms of judgment

2  against it.  I was award of the existence of the arbitration

3  award and the -- and the obligation for Highland to comply

4  with that arbitration award.

5  Q    And HarbourVest did not make an appearance in the Acis

6  bankruptcy, right?

7  A    We did not.

8  Q    But you were aware of the Acis bankruptcy, correct?

9  A    Yes.

10 Q    And you were kept apprised of the Acis bankruptcy by

11 Highland individuals, correct?

12 A    We had conversations with a couple of Highland

13 individuals throughout the Acis bankruptcy process, yes.

14 Q    Right.  And in fact, you testified that you participated

15 in regular conference calls with Highland regarding that

16 bankruptcy?

17 A    That's correct, yes.

18 Q    And do you recall having been provided with over 40,000

19 documents by Highland related to the Acis bankruptcy?

20 A    I do not recall that, no.

21 Q    Would those documents have been provided to your outside

22 counsel, had you received them?

23 A    I don't know the answer to that.

24 Q    Did the outside counsel that represented you in the due

25 diligence continue to represent you throughout the Acis

Pugatch - Cross                              123

1   bankruptcy?

2   A    They did.  One of the counsels did, correct.

3   Q    And which counsel was that?

4   A    Debevoise.

5   Q    So was your counsel actively involved with monitoring the

6   Acis bankruptcy?

7   A    They were, yes, particularly after we were ultimately

8   accused of having something to do with the original structure

9   and -- as a result of misstatements by Highland.

10  Q    Did your counsel attend hearings in the Acis bankruptcy?

11  A    I don't recall.

12  Q    Are you familiar with the PACER system?

13  A    I am not.

14  Q    Now, I think that HarbourVest has been described as a

15  passive investor.  You recall that description of HarbourVest

16  in this instance?

17  A    Yes.

18  Q    But, in fact, HarbourVest invested substantial assets

19  such that it owned a 49.98 percent share of HCLOF.  Would you

20  agree with that?

21  A    That's correct.

22  Q    And in fact, the next largest investor was CLO Holdco,

23  which owned 49.02 percent of the shares, correct?

24  A    That sounds right.

25  Q    And there was an advisory board that was created pursuant

Pugatch - Cross                        124

1   to the formation documents of this investment, correct?

2   A    That's correct.

3   Q    And in fact, that advisory board only had two members,

4   and one was a representative of HarbourVest and one was a

5   representative of CLO Holdco, correct?

6   A    Correct.

7   Q    And the advisor -- I'm sorry, the portfolio manager was

8   not allowed to disregard the recommendations of the advisory

9   board, correct?

10  A    With respect to the limited set of items that the

11  advisory board could opine on, that is correct.

12  Q    All right.  I want to go over a couple of the

13  misrepresentations that HarbourVest has identified in its

14  filings related to its claim.  The first one is -- and just

15  for the record, I'm reading from Docket No. 1057 filed on

16  September 11, 2020, HarbourVest Response to Debtor's First

17  Omnibus Objection.

18       But the first misrepresentation identified in that

19  document says that Highland never informed HarbourVest that

20  Highland had no intention of paying the arbitration award.

21  And was -- was Highland obligated to pay the Josh Terry

22  arbitration award against Acis?

23       MR. MORRIS:  Objection to the question to the extent

24  it calls for a legal conclusion.

25       THE COURT:  Sustained.

Pugatch - Cross                          125

 1          MS. WEISGERBER:  Join in that objection.

 2          THE COURT:  Sustained.  I think --

 3   BY MR. WILSON:

 4   Q    Your understanding was --

 5          MR. WILSON:  I'm sorry, Judge?

 6          THE COURT:  I sustained the objection as calling for

 7   a legal conclusion.  So, next question.

 8          MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

 9   Honor.

10   BY MR. WILSON:

11   Q    In your understanding, was Highland responsible for

12   paying the arbitration award to Josh Terry?

13   A    My understanding is on the account of the fact that Acis

14   --

15          MS. WEISGERBER:  Objection, Your Honor.  Objection,

16   Your Honor, same basis.

17          THE COURT:  Sustained.  It was essentially the same

18   question.

19          MR. WILSON:  Well, Your Honor, I didn't ask --

20          THE COURT:  It was essentially the same question, Mr.

21   Wilson.  Move on.

22          MR. WILSON:  Okay.

23   BY MR. WILSON:

24   Q    The next misrepresentation identified by HarbourVest said

25   that Highland did not inform HarbourVest that it undertook

1    the transfers to siphon assets away from Acis, LP and that

2    such transfers would prevent Mr. Terry from collecting on the

3    arbitration award.  So the basis for that allegation would be

4    that Highland was siphoning assets from Acis to avoid having

5    Acis pay the arbitration award, correct?

6    A    That -- that would be the implication, yes.

7    Q    Okay.  And then that misrepresentation continues on and

8    says that Highland represented to HarbourVest that it was

9    changing the portfolio manager because Acis was toxic.  And

10   do you recall that representation being made to you?

11   A    Yes, I do.

12   Q    And would you agree with me that whether or not Acis is

13   toxic in the industry would be an opinion?

14   A    I suppose it would be an opinion, but by the manager of

15   the vehicle responsible for managing the HCLOF investment and

16   the underlying CLOs.  Yeah, we viewed the Acis name and the

17   Highland name as synonymous, if you will.  I mean, Acis was a

18   subsidiary of Highland.  For all intents and purposes, it was

19   the same from our perspective as we made the investment into

20   HCLOF.

21   Q    So did HarbourVest have an independent understanding of

22   whether or not the Acis name was toxic in the industry?

23   A    We did not, no.  We relied on Highland's views of that as

24   manager of HCLOF.

25              MR. WILSON:  Your Honor, just a brief housekeeping

Pugatch - Cross                          127

1    item.  Did you say that we need to be done at 1:00 o'clock?

2              THE COURT:  Well, I said I really wanted you to be

3    done by 1:00 o'clock because I have a 1:30 docket and a 2:00

4    o'clock docket and I'd rather not have to hang up 70-

5    something people and reconnect them again at 3:00 o'clock.

6    How close are you to being finished?

7              MR. WILSON:  Well, --

8              THE COURT:  This is going at a very slow pace.

9              MR. WILSON:  Well, I apologize for that, Your Honor.

10   I think I've got at least ten more minutes, but -- but I know

11   we also have closing remarks.  And I was just going to ask if

12   Your Honor had a preference of --

13             THE COURT:  Keep going.

14             MR. WILSON:  -- of breaking now --

15             THE COURT:  Keep -- let's --

16             MR. WILSON:  -- or keep going?  Okay.

17             THE COURT:  Let's talk fast and try to get through.

18   You know, even if I'm sacrificing lunch today, I don't want

19   to inconvenience 75 people this way.  So we'll just probably

20   start our 1:30 hearing a little late and inconvenience those

21   people.

22        All right.  Go ahead.

23             MR. WILSON:  All right.  Thank you, Your Honor.

24   BY MR. WILSON:

25   Q    Did Acis form its -- I can't recall if you answered this

Pugatch - Cross                    128

 1   question, but did Acis form its own opinion on whether or not

 2   -- I'm sorry, strike that.  Did HarbourVest form its own

 3   opinion on whether or not the Acis name was toxic in the

 4   industry?

 5           MS. WEISGERBER:  Objection, --

 6           THE WITNESS:  We did not.  We didn't have a basis.

 7           THE COURT:  I'm sorry, did I have an objection?

 8   BY MR. WILSON:

 9   Q   You did not --

10           THE COURT:  Did I have an objection?

11           MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,

12   asked and answered, Your Honor.

13           THE COURT:  Overruled.  He can answer.

14   BY MR. WILSON:

15   Q   Okay.  But --

16   A   We did not.

17   Q   Did Highland have the ability to investigate the Acis

18   name and make its own determination of whether that name was

19   toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.

20   A   HarbourVest had the ability to do that, yes.

21   Q   I apologize I misspoke.  I meant HarbourVest.  Did

22   HarbourVest have the ability to investigate that name and

23   determine if it was toxic?

24   A   It was irrelevant to our investment thesis.  And as I

25   said before, Acis was a subsidiary of Highland.  We viewed

Pugatch - Cross                                129

1   them as interchangeable in the context of our investment.

2   Q   Okay.  The next misrepresentation that you refer to says

3   that Highland indicated to HarbourVest that the dispute with

4   Mr. Terry would have no impact on its investment activities.

5   Would you agree with me that that is also an opinion?

6   A   It was a statement that --

7          MS. WEISGERBER:  Your Honor, I'm going to object to

8   the extent these questions are seeking a legal conclusion

9   regarding, you know, if something's an opinion or not.

10          THE COURT:  Okay.  Overruled.  He can answer.

11          THE WITNESS:  It was -- it was a statement that was

12   made to us by Highland and represented in multiple different

13   formats as fact.  And a representation that we relied on in

14   connection with our investment.

15   BY MR. WILSON:

16   Q   And finally, the misrepresentation, the last

17   misrepresentation identified, is that Highland expressed

18   confidence in the ability of HCLOF to reset or redeem the

19   CLOs.  Would you agree with me that that statement is an

20   opinion?

21   A   On the basis that it was the core investment thesis of

22   the -- of the investment of HCLOF.  Again, whether that's

23   legally viewed as an opinion or a fact, it  was -- it was

24   certainly the investment thesis that we made the investment

25   predicated upon.

Pugatch - Cross                                    130

```
 1   Q    And you just testified that you thought that Acis and
 2   Highland were interchangeable from the perspective of the
 3   investment opportunity, correct?
 4   A    Correct.
 5   Q    But you also accepted Highland's recommendation because
 6   HarbourVest agreed that the change in the -- to a Highland
 7   manager made commercial sense, correct?
 8   A    We took at face value what Highland recommended because
 9   this all had to do with the structuring of an entity that
10   they fully managed with respect to multiple underlying
11   subsidiaries that weren't managed by Highland.
12   Q    But would you agree that, at the time, you -- HarbourVest
13   thought that made commercial sense?
14   A    It did not seem unreasonable to us based on the
15   explanation we were given.
16   Q    Okay.
17             MR. WILSON:  I want to refer to HarbourVest Exhibit
18   39.
19        (Pause.)
20             THE COURT:  What are we waiting on?  What are we
21   waiting on?
22             MR. WILSON:  I'm trying to get the document on the
23   screen, Your Honor.
24        (Pause.)
25             THE COURT:  We can't hear you.  We can't hear you.
```

Pugatch - Cross                                131

1          MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

2    speaking with my --

3          THE COURT:  Okay.

4          MR. WILSON:  -- co-counsel here.

5          THE COURT:  All right.

6       (Pause.)

7          MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

8    you're referring to?

9          MR. WILSON:  39.   HarbourVest 9019 motion on the

10   main -- on the Dondero file.  And then there's the -- it's --

11   it's John  -- and then there's the HarbourVest, and then the

12   exhibits are all in one file.

13         MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14   was subject to confidentiality based on HCLOF's request.

15   HCLOF's counsel is present.  I think they know it's an

16   excerpt.  But I'd just -- that for HCLOF's counsel.

17         MR. WILSON:  Well, is there an objection to showing

18   this document on the screen?  Yes.  All right.  We're not

19   going to put Document 39 on the screen.

20         A VOICE:  Yes.

21         MR. WILSON:  All right.  Scroll down to the next

22   page.

23   BY MR. WILSON:

24   Q   This is a -- this is a document that was produced to us

25   this week, the Highland production.  It appears to be a

                        Pugatch - Cross                    132

1   Highland CLO Funding, Ltd. Statement of Operations for the

2   Year Ended 31 December 2017.  Do you see at the top of that --

3   at the top of that document where it says total investment

4   income of $26 million?

5   A    I do, yes.

6   Q    And total expenses were roughly $1.8 million?

7   A    Yes.

8   Q    And then net change and unrealized depreciation on

9   investments and net realized loss on investments was $4.26

10  million cumulative, resulting in a net increase in net assets

11  resulting from operations of $20.224 million.  Do you agree

12  with that?

13  A    Yes.

14  Q    Okay.

15          MR. WILSON:  Go to the next one.

16  BY MR. WILSON:

17  Q    And you understand that, in the course of the Acis

18  bankruptcy, the portfolio managers for certain of the CLOs

19  were changed by the Trustee, correct?

20  A    Yes, around the underlying CLOs.  That's -- that's my

21  understanding, yes.

22  Q    And, in fact, Mr. Seery testified earlier today that that

23  occurred in the summer of 2018, correct?

24          MR. WILSON:  Scroll.

25          THE WITNESS:  I don't recall the timing, but that's

                        Pugatch - Cross                    133

 1   what he testified to.

 2   BY MR. WILSON:

 3   Q    Well, this document is HarbourVest Exhibit 40, and this is

 4   the statement of operations for the financial year ended 31

 5   December 2018.  Here, the total investment income is only

 6   $11.1 million.  Do you see that?

 7   A    I do.

 8   Q    And do you see where the expenses have increased to $13.6

 9   million?

10   A    I do, yes.

11        MR. WILSON:  Okay.  Scroll down some more.

12   BY MR. WILSON:

13   Q    And do you see where it says net change and unrealized

14   loss on investments of $48.47 million?

15   A    Yes.

16   Q    And so after Acis and Brigade took over the managements of

17   these CLOs, we had a net decrease in net assets resulting from

18   operations of $52.483 million in the year 2018, correct?

19        MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20   fact not in evidence.

21        THE COURT:  Overruled.  He --

22        MR. WILSON:  Your Honor, --

23        THE COURT:  We're just looking at this statement and

24   testifying about it says, so I overrule the objection.

25        MR. WILSON:  Thank you, Your Honor.  Thank you, Your

Pugatch - Cross                              134

1    Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

2    right.  I'll --

3    BY MR. WILSON:

4    Q    Did you answer the question, Mr. Pugatch?

5    A    No, I -- I would agree with the second part of your

6    statement that for the year 2018 the -- the loss was $52

7    million.  I don't -- I don't believe that jives with the first

8    part of your statement that that was after Acis and Brigade

9    took over.  As I understand, that was in the middle of the

10   year.

11   Q    But in any event, Acis and Brigade had been managing this

12   for at least six months of 2018 when that loss occurred,

13   correct?

14   A    They had been managing a portion of the underlying CLO

15   portfolio held by Highland CLO Funding.

16   Q    All right.  We're now looking at Exhibit #41, which is the

17   Draft Unaudited Statement of Comprehensive Income, 31 December

18   2019.  Total income has now dropped to $4.664 million.

19          MR. WILSON:  And scroll down.

20   BY MR. WILSON:

21   Q    Expenditures are at $3.645 million.  And then it says

22   investment gains and losses net out to $11.493 million, a

23   negative $11.493 million.  And --

24          MR. WILSON:  Scroll down to the --

25   BY MR. WILSON:

Pugatch - Cross                    135

1   Q    And so would you agree with me that in the year 2019,

2   HCLOF showed a net loss of $10.476 million?

3   A    Yes, that's what the financial statements say.

4   Q    And in this year, the Acis CLOs were solely managed by

5   Acis and Brigade, correct?

6   A    The Acis CLOs were.  Yes, correct.

7   Q    All right.

8          MR. WILSON:  Now, go to 42.

9   BY MR. WILSON:

10  Q    Now, this is HarbourVest #42.

11         MR. WILSON:  Go down to the next page.

12  BY MR. WILSON:

13  Q    And this is the Highland CLO Funding, Ltd. Unaudited

14  Condensed Statement of Operations for the Financial Period

15  Ended 30 June 2020.  And so this is just half a year of

16  operations.  And would you -- and this actually has a

17  comparison between 2019 and 2020.  But do you see where it

18  says investment income has dropped from a million dollars in

19  the first half of 2019 to $381,000 in the first half of 2020?

20  A    Yes.

21         MR. WILSON:  Okay.  Scroll down.

22  BY MR. WILSON:

23  Q    And do you see where, in the first half of 2019, total

24  expenses were $1.85 million, and then in the first half of

25  2020 total expenses were $2.16 million?  Do you see that?

Pugatch - Cross                      136

1   A    I do.

2   Q    And if you go down below that, where it says Net Realized

3   and Unrealized Gain/Loss on Investments, the first half of

4   2019 HCLOF lost $12 million, and in the first half of 2020 it

5   lost $39.472 million?

6          MR. MORRIS:  Your Honor, I'm going to object.  It's

7   John Morris for the Debtor.  I'm happy to stipulate.  In fact,

8   he can offer this document into evidence.  There's no

9   foundation that Mr. Pugatch has any particularized knowledge

10  about any of the numbers behind this.  All he's asking him to

11  do is to confirm what the document says.  It says what it

12  says.  But this -- I'll object on that basis, Your Honor.

13         THE COURT:  All right.  Mr. Wilson, what about it?

14  You're just getting him to read numbers off of these exhibits.

15         MR. WILSON:  Well, --

16         THE COURT:  Shall we just --

17         MR. WILSON:  -- I understood --

18         THE COURT:  -- by stipulation get them into evidence?

19         MR. WILSON:  Well, --

20         MR. MORRIS:  No objection, Your Honor.

21         MS. WEISGERBER:  No objection.

22         THE COURT:  All right.  So these are exhibits what?

23  We've gone through 39, 41, and I don't know what else.  40,

24  maybe?

25         MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

Pugatch - Cross                    137

1   were on the HarbourVest exhibit list.

2          THE COURT:  All right.  Those will be admitted, and

3   we've already discussed what docket entry number they appear

4   at.

5      (HarbourVest's Exhibits 39 through 42 are received into

6   evidence.)

7          THE COURT:  All right.  Anything else?  You told me

8   you had 10 more minutes about 15 minutes ago.

9          MR. WILSON:  Well, I'm sorry if I -- I think I had

10  said I had at least ten more minutes, and I was looking at the

11  -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12  have longer than that.  I'm sorry, Your Honor.

13         THE COURT:  Well, --

14         MR. WILSON:  But --

15         THE COURT:  -- I feel like I'm being --

16         MR. WILSON:  -- I'll try to proffer --

17         THE COURT:  Okay, Mr. Wilson, let me just tell you

18  something.  I feel like I'm being disrespected now, and the

19  parties are.  We really need to pick up the pace.  I've told

20  you I've got a 1:30 docket -- with four or five matters on it,

21  by the way.  I've got a 2:00 o'clock docket.  I'm starting

22  them late.  No one advised my courtroom deputy that we were

23  going to need all day today for this, okay?  So you've got

24  five more minutes to wrap it up, and then, of course, I have

25  to go to Mr. Draper and see if he has cross.  All right?  So

Pugatch - Cross                          138

 1   please don't test my patience any more.  Five minutes to

 2   finish.

 3           MR. DRAPER:  Judge, I have no questions.

 4           THE COURT:  I didn't hear you, Mr. Draper.  What did

 5   you say?

 6           MR. DRAPER:  I have no questions.

 7           THE COURT:  All right.  Very good.

 8           MR. WILSON:  I apologize, Your Honor.  I was actually

 9   trying to be respectful of your time when I informed you that

10   I had at least ten more minutes left at 12:50, but I will try

11   to be as expedient as I can as I finish up.

12   BY MR. WILSON:

13   Q   And I don't see you on my screen.

14           MR. WILSON:  You can take that document down.

15           THE WITNESS:  Here.

16   BY MR. WILSON:

17   Q   Mr. Pugatch, do you have an opinion as to what caused

18   these incredible losses of value at HCLOF?

19           MS. WEISGERBER:  Objection to the extent it calls for

20   a legal conclusion.

21           THE COURT:  Overruled.  He can answer.

22           THE WITNESS:  I would say that there's no one cause

23   for the decline in value.  I can point to a number of

24   different things, including the exorbitant fees that were

25   charged to HCLOF, including the inability to be able to re --

Pugatch - Cross                                    139

1   refinance the CLOs on the part of HCLOF, all of which stems

2   from the actions that Highland took prior to our investment in

3   HCLOF.

4   BY MR. WILSON:

5   Q    And you've -- I think it's been referenced several times

6   in HarbourVest's arguments that -- that the reset was a

7   fundamental -- the inability to get a reset was a fundamental

8   cause of the loss in value.  Is that -- is that HarbourVest's

9   position?

10  A    That -- that is a part of the -- the cause in the

11  declining value of the CLOs, yes.

12  Q    And you would agree with me that a reset is fundamentally

13  a reset of interest rates, correct?

14  A    Of the interest rates of the liabilities of the -- the

15  timing for repayment of those liabilities, yes.

16  Q    Now, just say with -- for the sake of a hypothetical

17  example.  If you had a home that was valued at $5 million, or

18  let's just say $500,000, let's make it more realistic.  If you

19  had a $500,000 home and you had a mortgage on that home at

20  five percent interest, your inability to refinance that home

21  at a lower interest rate would not affect the underlying value

22  of that home, correct?

23        MS. WEISGERBER:  Objection, Your Honor.  Hypothetical.

24  And objection to relevance as well.

25        THE COURT:  Sustained.

Pugatch - Cross                             140

1            MS. WEISGERBER:  Calls for speculation.

2            THE COURT:  Sustained.

3   BY MR. WILSON:

4   Q   Is there any reason to believe that the change in the

5   interest rate would have prevented the massive losses of

6   investment value that occurred in HCLOF?

7            MS. WEISGERBER:  Object on the same grounds.

8            THE COURT:  Sustained.

9            THE WITNESS:  The short -- the short answer is yes,

10  with a -- with the amount of leverage --

11           MS. WEISGERBER:  I --

12           THE WITNESS:  -- that exists.  Oh, sorry.

13           MS. WEISGERBER:  The objection was sustained.

14           THE COURT:  Yeah, I sustained the objection.  That

15  means you don't answer.

16           THE WITNESS:  I'm sorry, Your Honor.

17  BY MR. WILSON:

18  Q   So, would you agree with me that if the expenses and the

19  fees charged by the portfolio manager increased dramatically,

20  that would -- that would impact the value of the investment,

21  correct?

22           MS. WEISGERBER:  Objection on the same grounds, and

23  relevance.  This is a 9019 hearing, Your Honor.  We are not

24  here to try every minutia.  And in fact, we're trying to avoid

25  a trial on the merits.  And it feels like we're getting a bit

Pugatch - Cross                                141

1   far afield now.

2           THE COURT:  I sustain.

3           MR. WILSON:  All right.  I'll pass the witness.

4           THE COURT:  All right.  Mr. Draper said he had no

5   cross.  So, any redirect, Ms. Weisgerber?

6           MS. WEISGERBER:  No, Your Honor.

7           THE COURT:  All right.  Mr. Morris, did you have any

8   redirect?

9           MR. MORRIS:  I do not, Your Honor.  I have a very

10  brief closing and then some additional remarks if -- if we

11  finish.

12          THE COURT:  All right.  So, Mr. Pugatch, that

13  concludes your testimony.  Thank you.  You're excused if you

14  want to be.

15      All right.  So, as I understood it, there would be no more

16  evidence after this.

17          MR. WILSON:  Well, Your Honor, along those lines, as

18  a housekeeping measure, I think everything on my exhibit list

19  is included on someone else's exhibit list, but just for belt

20  and suspenders I would move to admit all of the exhibits on

21  the -- on Mr. Dondero's exhibit list.

22          THE COURT:  Well, is that agreed or not?  Because we

23  didn't have a witness to get them in.

24          MR. MORRIS:  No objection, Your Honor.

25          THE COURT:  Any objection?  All right.  If there's no

142

1   objection, I'll --

2           MR. MORRIS:  Your Honor, --

3           THE COURT:  I'm sorry.  Was there an objection?  I

4   will admit Dondero Exhibits A through M, and those appear at

5   Docket Entry 1721, correct, Mr. Wilson?

6           MR. WILSON:  That is correct, Your Honor.

7           THE COURT:  All right.

8           MR. WILSON:  That is correct, Your Honor.

9      (James Dondero's Exhibits A through M are received into

10  evidence.)

11          MR. WILSON:  And one final matter is, during the

12  examination of Mr. Seery, you at least partially admitted

13  Dondero's Exhibit N, and I was wondering if we need to -- how

14  we'd need to submit that for the record.

15          THE COURT:  Okay.  First, I'm confused.  I think you

16  said Mr. Terry's testimony.  You --

17          MR. WILSON:  I said Seery.  I'm sorry.

18          THE COURT:  Oh, Seery?

19          MR. WILSON:  Or I may have said Terry, but I meant to

20  say Seery.

21          THE COURT:  Okay.  Maybe you said it.  Okay.  During

22  Mr. Seery's testimony -- oh, the email that I admitted a

23  portion of?

24          MR. WILSON:  That is -- that's correct, Your Honor.

25          THE COURT:  What -- what are you asking?  It's not in

143

1   your notebook.  Are you asking do you need to separately

2   submit it or what?

3          MR. WILSON:  Yeah, I was just asking what the Court's

4   preference on how we submit that for the -- put it in the

5   record.

6          THE COURT:  Okay.  That was so garbled I didn't hear

7   you.  You need to file that on the docket as a supplemental

8   exhibit that was admitted, okay?

9          MR. WILSON:  Okay.  Thank you, Your Honor.

10         THE COURT:  All right.  Closing arguments?  Mr.

11  Morris?

12              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13         MR. MORRIS:  Yes, very briefly, Your Honor.  The

14  Debtor easily meets the standard here.  The settlement

15  consideration relative to the claim establishes and reflects

16  the likelihood of success on the merits.

17      You know, I've never -- I did hear Mr. Pugatch in the

18  deposition the other day, but I otherwise haven't heard from

19  him.  I found him to be incredibly credible, Your Honor, and I

20  regret the fact that he and HarbourVest are being blamed twice

21  here.  The fact that they got 40,000 documents or didn't read

22  the arbitration award, it's just -- it's a shame that they're

23  being dragged through this yet again.

24      The fact is, Your Honor, there is no evidence that they

25  made the disclosures that HarbourVest claims -- complains

144

1   about.  They just don't.  The fraudulent transfers led to the

2   bankruptcy, led to the appointment of a trustee, led to --

3   right?  So, so it's -- that's why -- but they're getting

4   something for their claim.

5       It was a hard negotiation, Your Honor.  There is no

6   dispute that if we litigated this it would be complex.  It

7   would fact-intensive.  The Debtor would be forced to rely upon

8   witnesses who are no longer employed by it.  That it would be

9   expensive, for sure.  There's no dispute about any of that.

10  There's no dispute that the creditor body has spoken loudly

11  here by unanimously refraining from objecting except for Mr.

12  Dondero and the entities controlled by him.

13      And you heard Mr. Seery's testimony.  I think he

14  exhaustively informed the Court as to the process by which the

15  transaction was analyzed and negotiated, and there's no

16  evidence to the contrary that this was an arm's-length

17  negotiation.

18      Unless Your Honor has any questions, we would request that

19  the motion be granted.

20          THE COURT:  Thank you.  Ms. Weisgerber, your closing

21  argument?

22          CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23          MS. WEISGERBER:  Sure.  Thank you, Your Honor.  I'll

24  also be brief.  We again join in Mr. Morris's arguments and

25  comments.

Case 19-34054-sgj11  Doc 3445-15  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 146
Case 3:23-cv-00726-S   Document 8-23   Filed 11/29/23   Page 431 of 1726   PageID 11752

145

1      The Court has now heard testimony from Mr. Pugatch

2  regarding the factual detail underlying HarbourVest's claims.

3  The Court has also heard about the significant damages that

4  HarbourVest stands to recover for those claims.  And

5  HarbourVest came to this Court ready to litigate.  It would --

6  it's ready to do so if needed.  It believes it would prevail

7  on its claims if it had to do so.

8      But the Court also heard from Mr. Seery about his

9  understanding of HarbourVest's claims, his calculus, and his

10  decision to settle them.  And we submit that nothing further

11  is needed by this Court in order to approve the settlement.

12  This is a question of the Debtor's business judgment.  We're

13  not here to have a trial on the merits of HarbourVest's

14  claims.  The Objectors have made various arguments, including

15  about the cause of HarbourVest's damages.  But even the nature

16  of the legal claims that HarbourVest is asserting, some do not

17  require a loss causation.  So we submit that's not even

18  relevant to the merits of the claims.

19      The settlement is clearly in the best interest of the

20  estate, and we respectfully request that the Court approve it.

21          THE COURT:  Thank you.  All right.  Mr. Wilson, your

22  closing argument?

23          MR. LYNN:  Michael Lynn.  I will give the closing

24  argument, if that's satisfactory to the Court.

25          THE COURT:  All right.  Go ahead.

  1        CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

  2        MR. LYNN:  Good afternoon, Your Honor.  I just want

  3  to make a few points, and I'll try to do it as quickly as

  4  possible.

  5     First, I feel compelled to address the argument of the

  6  Debtor that Mr. Dondero is repeating his litigious behavior

  7  from the Acis case.  I don't know about the Acis case.  I

  8  wasn't involved except very, very peripherally.  But with

  9  respect to this case, we have only taken positions in court

10  that we believed -- that is, his lawyers -- believed were

11  warranted by law, facts as we knew them, and that are

12  consistent with professionalism.  I'd be glad to explain any

13  position we took.

14     Often, through the Debtor's very persuasive powers, we

15  never had the chance to explain our position previously to the

16  Court.  In fact, for the most part, as today, we have been

17  reactive rather than commencing proceedings.  In fact, during

18  the first seven months of this case, we only appeared in court

19  a few times, when we felt we had to -- for example, when

20  discovery was being sought by the Creditors' Committee that we

21  feared might invade privilege.  Then, much to the Debtor's

22  fury, we opposed the Acis 9019.  We did so because we thought

23  it was too much.

24     Since, as the Court can see, the principal instigators of

25  litigation have been the Debtor, and to a lesser extent, the

147

1  Committee.

2      Indeed, in an apparent effort to drown Mr. Dondero and his

3  counsel in litigation, the Debtor has repeatedly sought court

4  action on a very short fuse, claiming need for expedited

5  hearing.

6      Perhaps the most startling example of this is the recent

7  contempt motion, for which there is no good reason for a quick

8  hearing.  Resolution of that motion is not necessary to reach

9  the confirmation hearing.  The motion could be heard after the

10 confirmation hearing.  There is no need to put Mr. Dondero and

11 his professionals in a position where they have to respond in

12 a couple of days, two business days, and then will have two

13 days to prepare for trial.

14     Second, Your Honor, Mr. Seery has repeatedly asserted,

15 contrary to today's motion, that the HarbourVest claim was of

16 no merit.  That is why, when he came in to settle for tens of

17 millions of dollars, we opposed this motion.  It appears that

18 the motion is occurring without any cross-party discovery.

19 There is no consideration, apparently, of trying dispositive

20 -- dispositive motions first.  There is no consideration for

21 junior classes of equity, which Mr. Seery has previously

22 opined were in the money.  This, even though there's no reason

23 that this settlement is necessary pre-confirmation, unless Mr.

24 Seery wants HarbourVest's vote.

25     Third, for whatever reason, that seems to be the driving

148

1    factor for settling.  On its face, the vote seems to be a key

2    factor of the settlement.  About the longest provision of the

3    settlement agreement relates to voting.  The motion itself --

4    in the motion itself, five of seven bullet points cited by the

5    Debtor for approval of the settlement deal with and emphasize

6    support of the plan or the vote that is to be cast for the

7    plan.

8        If the settlement is a good deal, it didn't need to have

9    as one of its parts the requirement that HarbourVest vote for

10   the plan.

11       Your Honor, I'll stop there.  I know Your Honor would like

12   to get just a few minutes before your 1:30 docket.  I've been

13   there and I understand that, and I do apologize for taking the

14   time we have, but I think that responsibility is shared with

15   the Debtor and HarbourVest.

16       Thank you, Your Honor.

17          THE COURT:  All right.  Thank you for that.

18       Mr. Draper, any closing argument from you?

19    CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

20          MR. DRAPER:  Yes, I have three comments.  The first

21   is the claim -- the loss claim, absent the fraud claim, is, at

22   best, $7 million.  I think Mr. Seery's argument that a hundred

23   -- one hundred percent is attributable to there is just wrong.

24   If he and I both invested in a company 50-50 and it goes

25   broke, we only lost 50 cents each.

1     Number two, I think the Court heard the evidence. I think

2    this is, at best, a subordinated claim under 5 -- under the

3    Bankruptcy Code. It's really a "But for the

4    misrepresentations, we wouldn't have invested."

5     And the last one is the -- Judge Lynn represented the

6    voting, so I won't deal with that. But the one that troubles

7    me the most is the fact that this asset that is ultimately

8    being paid for in claim dollars that's being transferred over

9    to the Debtor and being put it outside the estate, outside the

10   purview of this Court, and placed in some subsidiary, this --

11   this transaction, if it is approved, must -- should contain a

12   provision that the asset that's being acquired come into the

13   Debtor and be owned by the Debtor.

14        THE COURT: All right.

15        MR. DRAPER: I have nothing further, Your Honor.

16        THE COURT: Thank you, Mr. Draper.

17   Mr. Morris, you get the last word since it's your motion.

18        MR. MORRIS: Very quickly, Your Honor. The

19   subordination argument doesn't hold water. This is not a

20   claim against the Debtor for the security; it's a claim for

21   fraud. Okay? So, so 510(b), if it was a claim against HCLOF,

22   that might make sense, but this is a claim against the Debtor.

23   And it's a Debtor -- it's a claim for fraud. That's number

24   one.

25     Number two, we need to keep this exactly as it's been

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 151
Case 3:23-cv-00726-S Document 8-23 Filed 11/29/23 Page 436 of 1726 PageID 11757

150

1    structured in order to avoid litigation.  Mr. Seery told the

2    Court.  I'm sure the Court can make its own assessment as to

3    Mr. Seery's credibility as to whether or not the Debtor is

4    intending to somehow get this asset beyond the Court.

5        But there are reasons why we've done this, Your Honor.

6    They could have made an objection on that basis.  In fact, if

7    they did, it would be overruled, because there's no -- there's

8    no basis for this Court to find that somehow the Debtor and

9    Mr. Seery are doing something untoward to get assets away from

10   this Court's jurisdiction.

11       You know, I don't know what to say about Mr. Lynn's

12   commentary.  Much of it had nothing to do with any evidence in

13   the record.

14       The fact remains, Your Honor, that this settlement is

15   fair.  It's reasonable.  It's in the best interest of the

16   estate.  And we would respectfully request that the Court

17   grant the motion.

18           THE COURT:  All right.  Thank you.  Well, I

19   appreciate all the arguments and evidence I have heard today.

20   I'm going to be brief in my ruling here, but I reserve the

21   right to supplement in a more fulsome written order, which I'm

22   going to instruct Mr. Morris to submit.  I am approving the

23   motion to compromise the HarbourVest claim today, and I guess

24   subsumed in that is granting the motion to allow their claim

25   for 3018 voting purposes.

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 152
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 437 of 1726 PageID 11758

151

1     I in all ways find this compromise to meet the required

2  legal standard set forth in such cases as *TMT Trailer Ferry*,

3  *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4  cases.

5     First, I'm going to specifically say for the record that I

6  found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7  very credible.  Very credible testimony and meaningful

8  testimony was provided to the Court today.  And based on that

9  testimony, I find, first, that this compromise was the product

10  of arm's-length negotiations.  It was a hard-fought

11  negotiation, as far as I'm concerned.  The Debtor objected to

12  these numerous HarbourVest proofs of claim.  The Debtor did

13  not want to allow HarbourVest a significant claim for voting

14  purposes.  I duly note the statements made in the disclosure

15  statement before this compromise was reached suggesting, you

16  know, the Debtor didn't think HarbourVest should have a large

17  claim.

18     That is consistent with everything I typically see in a

19  bankruptcy case when there's a claim objection.  The objector

20  vehemently denies the claimant should have a proof of claim,

21  and then people sit down and think about the risks and rewards

22  of litigating things.  And I believe very fervently that's

23  what happened here.  There were good-faith, arm's-length

24  negotiations that resulted in this proposed compromise.

25     I find the compromise -- and I'll add to that point, on

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 153
Case 3:23-cv-00726-S Document 8-23 Filed 04/29/23 Page 438 of 1726 PageID 11759

152

1    the good-faith point, I find nothing sinister or improper

2    about the fact that the compromise includes a commitment of

3    HarbourVest to vote in favor of the plan.  Again, we see this

4    a lot.  You know, there's even a buzz word that doesn't even

5    exist in the Bankruptcy Code:  "plan support agreement."  You

6    know, we see those a lot -- you know, oftentimes negotiated

7    before the case, but sometimes after.  You know, it may be

8    improper in certain situations, but there was nothing here

9    that troubles me about that component of the compromise.

10       I find the compromise to meet the paramount interest of

11   creditors here.  Notably, we have very large creditors in this

12   case who have not objected.  The *Foster Mortgage* case from the

13   Fifth Circuit tells me I am supposed to consider support or

14   opposition of creditors.  No opposition of UBS.  No opposition

15   of the Redeemer Committee Crusader Fund.  No opposition from

16   Josh Terry or Acis.  No opposition from Daugherty.

17       But moreover, when considering the paramount interest of

18   creditors, I find this compromise to be in all ways fair and

19   equitable and in the best interest of the estate, and

20   certainly within the range of reasonableness.  The evidence

21   showed that HarbourVest asserted over $300 million.  Over $300

22   million.  Granted, that was based on all kinds of legal

23   theories that would be contested and expensive to litigate,

24   but the evidence also showed that they invested over $70

25   million.  You know, close to $75 million.  I forget the exact

153

1   number.  $75 or $80 million, somewhere in that range.  And now

2   the credible evidence is that investment is worth about $22

3   million.

4        So, certainly, while the claim may not have, at the

5   ultimate end of the day in litigation, resulted in a $300

6   million proof of claim, certainly, certainly there were strong

7   arguments for a very sizeable claim, more than this compromise

8   amount.  So it's certainly fair and equitable and reasonable

9   when considering the complexity and duration of further

10  litigation, the risks and rewards, the expense, delay, and

11  likely success.

12       A couple of last things I'm going to say are these.  I

13  understand, you know, there is vehement disagreement on the

14  part of our Objectors to the notion that Highland might have

15  caused a $50 million loss to HarbourVest.  But I will tell

16  you, for what it's worth -- I want the record clear that this

17  is part of my evaluation of the reasonableness of the

18  settlement -- my reaction is that, indeed, Highland's

19  litigation strategy in the Acis case caused HCLOF to lose a

20  huge portion of its value, to the detriment of HarbourVest.

21  You know, whether all evidence at the end of the day would

22  convince me of that, I don't know, but that's -- that is

23  definitely this judge's impression.

24       I'm very sympathetic to HarbourVest.  It appears in all

25  ways from the record, not just the record before me today, but

154

1  the record in the Acis case that I presided over, that

2  Highland back then would have rather spent HarbourVest's

3  investment for HCLOF legal fees than let Josh Terry get paid

4  on his judgment.  They were perfectly happy to direct the

5  spending of other people's money, is what the record suggested

6  to me.

7      And then, you know, I have alluded to this very recently,

8  as recently as last Friday:  I can still remember Mr.

9  Ellington sitting on the witness stand over here to my left

10  and telling the Court, telling the parties under oath, that

11  HarbourVest -- he didn't use its name back then, okay?  For

12  the first phase of the Acis case, or most of the Acis case, we

13  were told it was an investor from Boston.  And at some point

14  someone even said their name begins with H.  I mean, it seemed

15  almost humorous.  But Mr. Ellington said it was they,

16  HarbourVest, the undisclosed investor, who was insistent that

17  the Acis name was toxic, and so that's what all of this had

18  been about:  the rebranding, the wanting to extract or move

19  things away from Acis.

20      So, you know, I have heard for the -- well, at least the

21  second time today, from Mr. Pugatch, what I perceive to be

22  very credible testimony that that's just not the way it

23  happened.

24      And I guess the last thing I want to say here today, and

25  you know, I guess I have multiple reasons for saying this, not

155

1  just in connection with approving the settlement, you know,

2  I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

3  you know, a crazy amount of value, that they underperform in

4  the market, that, you know, during the Acis/Brigade tenure

5  and, you know, they should have been reset.  You know, I hope

6  those who have not been around as long as some of us in this

7  whole saga know that the -- Mr. Terry, Mr. Phelan, I think

8  Brigade, they all desperately wanted to reset these things,

9  but it was HCLOF, I believe directed by Highland, that wanted

10  to redeem, wanted to liquidate, take the pot of money,

11  warehouse it, and then do their own thing.

12      And there was, I think, from my vantage point, a

13  monumental effort to try to get everyone to the table to do

14  reasonable resets that would be good for the stakeholders at

15  HCLOF and be good for the creditors of Acis, including Josh

16  Terry.  That was always the balancing act that most of us were

17  focused on during the Acis bankruptcy.  But Highland, I

18  believe, directing HCLOF's strategy, just did not want the

19  resets to happen.

20      So, again, part of me, I suppose, just wants to make the

21  record clear on something that I fear not everyone is clear

22  about.  And I say that because the comment was made that the

23  injunctions, the preliminary injunctions sought by the Acis

24  trustee caused the plummet in value, and I think that's just

25  not an accurate statement.  I think litigation strategies are

156

1    what caused the plummet in value, and that's why I think

2    ultimately HarbourVest would potentially have a meritorious

3    claim here in a significant amount if this litigation were to

4    go forward.

5        So, I approve this under 9019. And again, Mr. Morris,

6    you'll upload an order.

7        It is now 1:41, so let's as quickly as possible hear the

8    other motion that I don't think had any objections. Mr.

9    Morris?

10           MR. MORRIS: Your Honor, just -- yes, just very

11   quickly, just four things.

12       With respect to the order, I just want to make it clear

13   that we are going to include a provision that specifically

14   authorizes the Debtor to engage in -- to receive from

15   HarbourVest the asset, you know, the HCLOF interest, and that

16   that's consistent with its obligations under the agreement.

17       The objection has been withdrawn, I think the evidence is

18   what it is, and we want to make sure that nobody thinks that

19   they're going to go to a different court somehow to challenge

20   the transfer. So I just want to put the Court on notice and

21   everybody on notice that we are going to put in a specific

22   finding as to that.

23           THE COURT: All right. Fair --

24           MR. MORRIS: Number two is --

25           THE COURT: Fair enough. I do specifically approve

157

 1  that mechanism and find it is appropriate and supported by the

 2  underlying agreements.

 3      And just so you know, I spent some time noodling this

 4  yesterday before I knew it was going to be settled, so I'm not

 5  just casually doing that.  I think it's fine.

 6      Okay.  Next?

 7          MR. MORRIS:  Thank you very much, Your Honor.  Number

 8  two, with respect to the motion to pay, there is no objection.

 9  If we can just submit an order.  Or if Your Honor has other

10  guidance for us, we're happy to take it.

11          THE COURT:  Okay.  Does anyone have anything they

12  want to say about that motion?

13      Again, I looked at it.  I didn't see any objections.  I

14  didn't see any problem with it.  It's -- you know, you're

15  going through this exercise because of the earlier protocol

16  order.

17          MR. MORRIS:  Correct.

18          THE COURT:  All right.  Well, if there's nothing,

19  then, I will approve that, finding there is good cause to

20  grant that motion.

21          MR. MORRIS:  Okay.

22          THE COURT:  All right.  Is the only other

23  housekeeping matter --

24          MR. MORRIS:  I --

25          THE COURT:  -- we have the contempt motion?

158

1          MR. MORRIS:  It is, and I do -- I do have to point

2     out how troubled the Debtor is to learn that Mr. Dondero was

3     still receiving documents from Highland as late as this

4     morning.  It's got to be a violation of both the TRO -- I

5     guess it's now the preliminary injunction.

6        I would respectfully request -- I know that time is what

7     it is -- but maybe Mr. Dondero can answer now where he got the

8     document, who he got the document from, what other documents

9     he's gotten from the Debtor since Your Honor ordered him not

10    to communicate with the Debtor's employees.

11       This is not saying hello in the hallway.  I mean, this is

12    just -- it is really troubling, Your Honor, and it's why we

13    need the contempt motion heard as soon as possible.

14          THE COURT:  Well, Mr. Wilson, do you want to address

15    that?  I think the words I heard were that you just got the

16    document this morning, and you got it from Mr. Dondero, but we

17    don't know where and when Mr. Dondero got it.  Mr. Wilson, are

18    you there?

19          MR. LYNN:  I'm afraid I'm back, Your Honor.

20          THE COURT:  Okay.

21          MR. LYNN:  I am not sure whether Mr. Dondero had it

22    in his files from some -- from back before he was asked not to

23    communicate with members or with employees of the Debtor.  I

24    believe -- I believe he's with us, though I don't think he's

25    available by video.

159

 1      Are you there, Mr. Dondero?

 2              THE COURT:  We can't hear you, Mr. Dondero.

 3              MR. DONDERO:  Judge?

 4              THE COURT:  Oh, go ahead.

 5              MR. DONDERO:  Can you hear me now?

 6              THE COURT:  Yes.

 7              MR. DONDERO:  Yes, I -- I -- when I moved offices, I

 8    found it in a stack of paper, and --

 9              MR. LYNN:  I understand it shows that his microphone

10    is working.

11              THE COURT:  Okay.  Go ahead.

12              MR. DONDERO:  Can you hear me?

13              THE COURT:  Yes, go ahead.

14              MR. DONDERO:  Yeah, I -- I'm sitting in new offices.

15    I've got everything in boxes.  I was going through everything

16    yesterday, and I found those emails in a stack of papers and I

17    sent them over because I thought they would be relevant

18    relative to Seery's initial impression.

19              THE COURT:  Okay.  Well, let's talk about the timing

20    of this hearing.  Mr. Morris, I'm going to -- I'm going to ask

21    you why --

22              MR. LYNN:  Michael Lynn, Your Honor.  I don't want to

23    waste the Court's time.  We have not made available anything

24    to the Court objecting to the expedited hearing on the

25    contempt motion.  We've been here.

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 161
Case 3:23-cv-00726-S   Document 8-23   Filed 11/29/23   Page 446 of 1726   PageID 11767

160

1    I would say to Your Honor that if Mr. Dondero is indeed in

2    contempt, or was in contempt toward the motion, which has

3    nothing to do with the document that was presented as Dondero

4    Exhibit N, there is no need to hear this on an expedited

5    basis.

6    Every time we turn around, Your Honor, the Debtor is

7    asking that something be heard on an expedited basis.  And we

8    have not opposed that.  We have not fought that, to speak of,

9    to date.  But this is getting a little ridiculous.  We're

10   within days of confirmation of the Debtor's plan, and it is

11   simply a means of causing pain and suffering to Mr. Dondero

12   and those who are working with him and for him.  And he does

13   have employees at NexPoint who are assisting him.

14   So we most strongly object to being put on a schedule

15   where we are expected to get a response to the contempt motion

16   on file by Monday, today being Thursday, and a weekend

17   intervening.  And we strongly object to any setting of this

18   contempt motion on Tuesday or Wednesday.  It is absurd, and it

19   is done solely, solely, Your Honor, to cause pain.

20        THE COURT:  All right.

21        MR. MORRIS:  Your Honor, if I may?

22        THE COURT:  Please.

23        MR. MORRIS:  Just very briefly, we had a hearing the

24   other day.  The evidence is the exact same.  The evidence is

25   crystal clear that the violations are meaningful, they're

161

1  substantial, and they are repeated.

2      After the TRO was entered into, Mr. Dondero and only Mr.

3  Dondero chose to interfere with the Debtor's business.  Mr.

4  Dondero and only Mr. Dondero chose to communicate with the

5  Debtor's employees, not about saying hello in the hallway but

6  about coordinating a legal defense strategy against the

7  Debtor.

8      The need is immediate, Your Honor, and I would

9  respectfully request that the hearing be set for Tuesday or

10  Wednesday.  They've had this motion now since the 7th of

11  January.  They had a full evidentiary hearing, so they know

12  most of the evidence that's going to be presented.  They have

13  a whole team of -- they have an army of lawyers, Your Honor,

14  and half a dozen firms working on behalf of Mr. Dondero and

15  his interests.  For him to cry here, for him to cry that this

16  is too much is really -- it's obscene.  It just is.

17          THE COURT:  All right.  I'm going to say a couple --

18          MR. LYNN:  That is absurd.

19          THE COURT:  I'm going to say a couple of things.  One

20  is that I -- well, the one time I remember getting reversed

21  for holding someone in contempt of court, the District Court

22  felt like I had not given enough notice of that.  The District

23  Courts, what they think is reasonable notice, is sometimes

24  very different from what the bankruptcy judges think.  We're

25  used to going very lickety-split fast in the bankruptcy

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 163
Case 3:23-cv-00726-S   Document 8-23   Filed 04/29/23   Page 448 of 1726   PageID 11769

162

1    courts.  And the Courts of Appeals, District Court, Courts of

2    Appeals obviously, for good reason, are very concerned about

3    due process in this kind of context.  So I'm sensitive to

4    that.

5        I'm also sensitive to the fact that it is monetary damages

6    that are being sought here to purge the contempt.  Okay?  The

7    shifting of attorneys' fees is basically what I understand is

8    being sought at this point.  You know, we have a preliminary

9    injunction halting behavior at this point, and so I think

10   that's another reason I'm hesitant to give an emergency

11   hearing.  I feel like monetary damages can wait and we can

12   give 21-plus days' notice of the hearing.

13       But I'm going to throw this out there as well.  If I do

14   feel like there is a showing of contempt, if I do feel like

15   the phone -- as I told you the other day, I'm very, very

16   fixated on the phone that may have been destroyed or thrown

17   away, maybe at Mr. Dondero's suggestion.  I mean, the

18   potential monetary sanction here may be very, very large if

19   the evidence plays out in the way I fear it might play out.

20   So I need to make sure everybody has adequate time to prepare

21   for that hearing and make sure I get all the evidence I need

22   to see.  All right?  Contempt of court is very, very, very,

23   very serious, and I don't think anyone would deny that.

24       So, with that, it was filed what day?  January 4th?  Is

25   that what I heard?  Or --

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 164
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 449 of 1726   PageID 11770

163

1            MR. MORRIS:  January 7th, I believe, Your Honor.

2            THE COURT:  January 7th?  All right.  Well, Traci,

3    are you there?  Hopefully, you're not in a hunger coma at this

4    point.

5            THE CLERK:  I am here.

6            THE COURT:  Okay.  We have -- we're going to have to

7    go to that first week of February, right?  Because we've got

8    the confirmation hearing that, you know, late in January, and

9    then --

10           THE CLERK:  Yes.  Uh-huh.

11           THE COURT:  Okay.  Do you have an available date to

12   give right now?

13           THE CLERK:  How about -- if you're willing to hear

14   them on Friday, February 5th.

15           THE COURT:  Okay.  I can do that.  February 5th at

16   9:30.  Any -- anybody want to argue about that?

17           MR. MORRIS:  Thank you, Your Honor.  That's

18   acceptable to the Debtor.

19           THE COURT:  Okay.  Mr. Lynn, is that good with you?

20           MR. LYNN:  We'll do that, Your Honor.  I would say,

21   by the way, that I'll be happy to buy Mr. Seery, out of my own

22   pocket, five cell phones, which ought to make up for the one

23   that was lost, though I recognize that those cell phones will

24   not have on them the privileged information, the conversations

25   between his lawyers and Mr. Dondero that I imagine he was

164

1   looking forward to seeing.

2          THE COURT:  Well, I wouldn't want him to see that

3   information, but I do think he's entitled to any nonprivileged

4   information, texting, or calls that are on that phone.  So,

5   again, I'm either going to hear good explanations for that or

6   not, but it's something very concerning to me.

7       All right.  So we have a game plan.

8       I'm going to ask, Did we have good-faith negotiations

9   between Dondero and the Committee and anything positive to

10  report?  I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11         MR. CLEMENTE:  Yes, Your Honor.  I'll go first, Your

12  Honor.  Mr. Lynn and I have exchanged several emails over the

13  weekend, and the message that I sent to Mr. Lynn was very

14  clear.  There had been a term sheet that Mr. Seery had sent

15  back to Mr. Dondero.  I had asked Mr. Lynn to take a pencil

16  out and be very specific as to what it was Mr. Dondero was

17  prepared to do in connection with the pot plan.  I instructed

18  him that some of the issues that the Committee still has is

19  obviously the overall value, along with the concept that's

20  signing up to a promise from Mr. Dondero to comply with

21  (indiscernible) as part of that value.  As Your Honor may

22  understand, the Committee is obviously very skeptical of Mr.

23  Dondero's future performance under an agreement that he enters

24  into.

25      Those are but a couple of issues, Your Honor, that I

1    advised Mr. Lynn were very concerning to the Committee.  And I

2    suggested to him that if he wanted to move things forward, the

3    best way to do it would be to come to us with a fulsome term

4    sheet that explained exactly what it was in clear and precise

5    detail that Mr. Dondero was proposing, and that would be the

6    best way to move the process forward, Your Honor.

7            THE COURT:  All right.  Mr. Lynn, anything to add to

8    that?

9            MR. LYNN:  Well, Your Honor, my experience in

10   negotiations is that it is useful to agree on substantive

11   terms, or at least be in the ballpark, before term sheets are

12   exchanged.  Long ago, a term sheet was prepared and presented

13   to the Committee.  Ultimately, I think it was rejected, though

14   I don't know if we ever received a formal rejection.

15       I explained in my emails, which I'm happy to share with

16   the Court if Your Honor wants to see them, why I was reluctant

17   to try to put into a term sheet form the proposal that I

18   suggested to Mr. Clemente.  As I said, I'm more than happy to

19   provide you with that email chain and let you form your own

20   judgment, Your Honor, as to whether we're proceeding in good

21   faith.

22           THE COURT:  All right.  Well I'm not going to ask --

23           MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

24   Pomerantz.

25           THE COURT:  -- to see any of that.  Mr. Pomerantz?

166

         1          MR. POMERANTZ:  May I just be heard real quickly?

         2          THE COURT:  Sure.

         3          MR. POMERANTZ:  Your Honor, we also took Your Honor's

         4  comments to heart.  We, Mr. Seery and I, had an over-an-hour

         5  conversation with Mr. Lynn and with Mr. Bonds.  We provided

         6  them with our thoughts as to what they needed to do in order

         7  to move forward.  Of course, it's not really the Debtor to

         8  agree.  It's the creditors to agree.  But as Mr. Seery has

         9  testified many times before and as I have told the Court, we

        10  would support a plan that the Committee and Mr. Dondero could

        11  get behind.

        12      So we again -- I'm not going to divulge the nature of

        13  those communications, but we suggested several things that Mr.

        14  Dondero could do in order to move the ball forward, and

        15  unfortunately, we have not seen any of those things done thus

        16  far.  So we are, at this point, not optimistic that there will

        17  be a grand bargain plan.

        18          THE COURT:  All right.

        19          MR. DONDERO:  Your Honor, could I comment for a

        20  second?  This is Mr. Dondero.

        21          THE COURT:  If you and your counsel want you to

        22  comment, you can comment.

        23          MR. DONDERO:  I'd love to do a pot plan.  I would

        24  love to reach some kind of settlement and everybody move on

        25  with their lives.  The estate started with $360 million of

1   third-party assets and $90 million of notes.  The $360 million

2   of third-party assets are down to $130 million.

3            MR. POMERANTZ:  Again, Your Honor, I must interrupt.

4   I did this at the last hearing, and it's not my practice to

5   interrupt, but issues regarding what the value is or not, it's

6   going to require a response, and that's not really before Your

7   Honor.  I think before Your Honor is --

8            MR. DONDERO:  Okay.

9            MR. POMERANTZ:  -- have there been negotiations?

10  Have they been in good faith?  If Mr. Dondero wanted to

11  address that, that's fine, but I object to having any

12  discussion at this point, especially with Mr. Dondero not even

13  under oath, on what the nature of the value of the assets and

14  why they have changed and what not.

15           THE COURT:  Well, --

16           MR. POMERANTZ:  It's just not appropriate.

17           THE COURT:  I understand --

18           MR. DONDERO:  Okay.  Can I --

19           THE COURT:  Stop.

20           MR. DONDERO:  Can I -- can I finish?

21           THE COURT:  Let me please respond to that.  I

22  understand your concern, but I've heard from Mr. Seery

23  testimony many months ago about the value plummeting during

24  the case.  And I asked why, and I got some explanations.  This

25  is not evidence.  This is just, you know, this is not going to

Case 19-34054-sgj11  Doc 3445-15  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 169
Case 3:23-cv-00726-S  Document 8-23  Filed 11/29/23  Page 454 of 1726  PageID 11775

168

1   be binding in any way.  Mr. Dondero can speak as to what he

2   thinks, you know, the situation is.

3       Go ahead, Mr. Dondero.

4           MR. DONDERO:  Okay.  I'm not trying to fixate on the

5   numbers.  And as far as the third-party assets are, we would

6   be willing to pay -- I would be willing to pay for those.  I'd

7   be willing to pay more, and even some value for the affiliate

8   notes that were really part of compensation agreements

9   throughout the history of Highland and avoid the POC

10  arguments.  I'd be willing to pay for the assets and I'd be

11  willing to pay even more than that.

12      I have no transparency in terms of what the assets are,

13  and there's no fulsome discussion in terms of, well, here are

14  the assets, here are the notes, here's what we think the

15  values are, can you get to this number?  It's just a -- you --

16  the -- it -- I don't view there is good-faith negotiations

17  going on because it's always just a:  You need to put a big

18  number on a piece of paper; otherwise, you're going to get run

19  over.

20      And there's no back and forth going on, but it's not due

21  to a lack of willingness on my part.  And maybe there needs to

22  be a committee set up.  Maybe there needs to be, I don't know,

23  a mediator or an examiner or somebody to try and push through

24  the pot plan, but there's nothing happening.  People are not

25  returning the judge's calls, I mean, Mr. Lynn's calls, or my

169

1  calls. They're -- there's -- despite efforts of our -- of my

2  own and a willingness of my own, there's no negotiations of

3  any sort going on at the moment.

4          THE COURT: All right. I don't want anyone to

5  respond to that. I know people have different views of what's

6  going on. But let me just say a couple of things, and then

7  we're done.

8     We do have a Committee in this case. We have a Committee

9  with very sophisticated members and very sophisticated

10 professionals. Okay? That's who I wanted you to be talking

11 to before the end of the day Tuesday.

12    We have had co-mediators in this case. Okay? And, you

13 know, I identified very sophisticated human beings for that

14 role. Okay? And in fact, there ended up being settlements

15 that flowed out of the co-mediator process.

16    We're now 15 months into the case. There are major,

17 significant compromises now: HarbourVest, UBS, Acis, Terry,

18 and Redeemer Committee. I hate to use a worn-out metaphor,

19 but the train is leaving the station. We've got confirmation.

20 I've pushed out two weeks. I mean, you all are either going

21 to get there in the next few days or we're just going to go

22 forward with I think what everyone, you know, would rather be

23 a pot plan, but if we can't get there, we're just going to

24 have to consider the plan that's on the table now. Okay?

25    You know, the Committee, again, they're sophisticated.

170

 1   They can compare apples to oranges and decide whether the plan

 2   on the table, with its risks of future litigation and

 3   recoveries, whether it's better or worse than whatever

 4   consideration you're offering, Mr. Dondero.

 5       And you know, as we all know, there is distrust here,

 6   there, and everywhere among these parties.  So I can totally

 7   understand them, you know, taking a hard line:  We either get

 8   all cash or we're just not going to mess with it.  We don't

 9   want to risk broken promises.  We'd rather just do litigation.

10       So, anyway, that's as much as I'm going to say except I am

11   going to further direct good-faith negotiations.  It sounds

12   like to me a written term sheet might be the appropriate next

13   step, given where I've heard things are at the moment.  But,

14   you know, I guess we don't have any hearings between now and

15   the 26th, right?  No Highland hearings that I can think of

16   between now and the 26th.

17           MR. POMERANTZ:  I don't think so.

18           MR. MORRIS:  I think that's correct, Your Honor.

19           THE COURT:  So you have all this time --

20           MR. MORRIS:  At the moment.

21           THE COURT:  You have all this time to negotiate and

22   simultaneously get ready for the confirmation hearing without

23   any other battles.  So I know you will use the time well.

24       All right.  We're adjourned.

25           THE CLERK:  All rise.

171

1        MR. BONDS:  Thank you, Your Honor.

2     (Proceedings concluded at 2:04 p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                 CERTIFICATE

21    I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23   **/s/ Kathy Rehling**                    **01/16/2021**

24 _____    _____
   Kathy Rehling, CETD-444                      Date
25 Certified Electronic Court Transcriber

172

                                INDEX

PROCEEDINGS                                                      3

OPENING STATEMENTS

- By Mr. Morris                                                12
- By Mr. Kane                                                  18
- By Ms. Weisgerber                                            18
- By Mr. Draper                                                20

WITNESSES

Debtor's Witnesses

James Seery
- Direct Examination by Mr. Morris                             26
- Cross-Examination by Mr. Wilson                              62
- Cross-Examination by Mr. Draper                              87
- Redirect Examination by Mr. Morris                           93

HarbourVest's Witnesses

Michael Pugatch
- Direct Examination by Ms. Weisgerber                         96
- Cross-Examination by Mr. Wilson                             113

EXHIBITS

Debtor's Exhibits A through EE                    Received  35

James Dondero's Exhibits A through M              Received 142
James Dondero's Exhibit N (as specified)          Received  71

HarbourVest's Exhibit 34                          Received 100
HarbourVest's Exhibit 36                          Received 103
HarbourVest's Exhibits 39 through 42              Received 137

CLOSING ARGUMENTS

- By Mr. Morris                                               143
- By Ms. Weisgerber                                           144
- By Mr. Lynn                                                 146
- By Mr. Draper                                               148

173

INDEX
Page 2

RULINGS

Motion to Compromise Controversy with HarbourVest 2017     150
Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
HarbourVest Dover Street IX Investment L.P., HV
International VIII Secondary L.P., HarbourVest Skew Base
AIF L.P., and HarbourVest Partners L.P. filed by Debtor
Highland Capital Management, L.P. (1625)

Motion to Allow Claims of HarbourVest Pursuant to Rule      150
3018(a) of the Federal Rules of Bankruptcy Procedure for
Temporary Allowance of Claims for Purposes of Voting to
Accept or Reject the Plan filed by Creditor HarbourVest
et al. (1207)

Debtor's Motion Pursuant to the Protocols for Authority     157
for Highland Multi-Strategy Credit Fund, L.P. to Prepay
Loan (1590)

END OF PROCEEDINGS                                          171

INDEX                                                   172-173

# EXHIBIT 16

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |
| | ) |
| Debtor. | ) |
| ——————————————————— | ) |
| | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) Adv. Proc. No. 20-03195-sgj |
| CREDITORS, | ) |
| | ) PLAINTIFF'S MOTION for |
| Plaintiff, | ) CONTINUANCE |
| | ) |
| v. | ) |
| | ) |
| CLO HOLDCO, LTD., et al., | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03003-sgj |
| | ) |
| Plaintiff, | ) |
| | ) DEFENDANT DONDERO'S MOTION |
| v. | ) to COMPEL DISCOVERY, the |
| | ) TESTIMONY of JAMES P. |
| JAMES DONDERO, | ) SEERY, JR. |
| | ) |
| Defendant. | ) May 20, 2021 |
| ——————————————————— | ) Dallas, Texas (Via WebEx) |

Appearances in 21-03003:

For Plaintiff Highland      John A. Morris
Capital Management,         Pachulski Stang Ziehl & Jones LLP
                            10100 Santa Monica Boulevard, 13th Floor
                            Los Angeles, California  90067

For Defendant-Movant        Michael P. Aigen
James Dondero:              Stinson, L.L.P.
                            3102 Oak Lawn Avenue, Suite 777
                            Dallas, Texas  75219

                            Bryan C. Assink
                            Bonds Ellis Eppich Schafer Jones LLP
                            420 Throckmorton Street, Suite 1000
                            Forth Worth, Texas  76102

Appearances continued on next page.

2

Appearances in 20-3195:

| | |
|---|---|
| For the Official<br>Committee of<br>Unsecured Creditors: | Paige Holden Montgomery<br>Sidley Austin LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas  75201 |
| | Matthew A. Clemente<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, Illinois  60603 |
| For Defendants<br>Highland Dallas<br>Foundation and<br>CLO Holdco Ltd.: | Louis M. Phillips<br>Kelly Hart & Pitre<br>301 Main Street, Suite 1600<br>Baton Rouge, Louisiana  70801 |
| | Amelia L. Hurt<br>Kelly Hart & Pitre<br>400 Poydras Street, Suite 1812<br>New Orleans, Louisiana  70130 |
| For Defendants The<br>Dugaboy Investment<br>Trust and The Get<br>Good Nonexempt Trust: | Douglas S. Draper<br>Heller, Draper, Patrick & Horn, L.L.C.<br>650 Poydras Street, Suite 2500<br>New Orleans, Louisiana  70130-6103 |
| For Grant James:<br>Scott, III: | John J. Kane<br>Kane Russell Coleman Logan<br>Bank of America Plaza<br>901 Main Street, Suite 5200<br>Dallas, Texas  75202 |
| For UBS Securities<br>LLC: | Andrew Clubok<br>Latham & Watkins, LLP<br>555 Eleventh Street, NW, Suite 1000<br>Washington, D.C.  20004-1304 |
| For Scott Ellington,<br>Jean Paul Sevilla,<br>Isaac Leventon, and<br>others: | Frances Smith<br>Ross & Smith, PC<br>Plaza of the Americas<br>700 North Pearl Street, Suite 1610<br>Dallas, Texas  75201 |
| Digital Court<br>Reporter: | United States Bankruptcy Court<br>Michael F. Edmond Sr., Judicial<br> Support Specialist<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242 |
| Certified Electronic<br>Transcriber: | Susan Palmer<br>Palmer Reporting Services |

          Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.

<u>I N D E X</u>

Adversary Proceeding 21-3003,
  Defendant Dondero's Motion to Compel:        page   5
      The Ruling of the Court:                 page  33


Adversary Proceeding 20-3195:
      Committee's Motion for Continuance:      page  35
      The Ruling of the Court:                 page  78


      Witnesses:
                          Direct    Cross    Redirect    Recross

      Marc Kirschner
       Declaration:            61
       By Mr. Phillips:               62
       By Ms. Montgomery:                        65



      Exhibits Received in Evidence:

          Defendants' 1 - 6:                   page  70

```
 1   Thursday, May 20, 2021                          9:40 o'clock a.m.

 2                        P R O C E E D I N G S

 3          THE COURT:  — settings in Highland Capital adversary

 4   proceedings.

 5          Before I start with that, I want to let anyone who is

 6   on the line for a different case, RE Palm Springs II, LLC, that

 7   the hearing we had on that matter was continued.  Certain of the

 8   parties filed an agreed motion to continue, and so I continued

 9   that to June 9th at 9:30.  So to the extent you are on the line

10   only for the Palm Springs matter, that matter is not going

11   forward today.

12          All right.  So turning to Highland, I will start with

13   the first-filed emergency motion.  It was in Highland versus

14   Dondero, Adversary 21-3003.  Counsel for Dondero filed a motion

15   to compel testimony of James Seery.  So who do we have appearing

16   for Mr. Dondero this morning?

17          All right.  So —

18          MR. [SPEAKER]:  I think he's on mute, Your Honor.

19          THE COURT:  Sir, you are on mute.  Try again.

20          MR. AIGEN:  Ah, I apologize, Your Honor.  Is this

21   better?

22          THE COURT:  Yes.

23          MR. AIGEN:  Okay.  Good morning, Your Honor.  Michael

24   Aigen from Stinson, representing Mr. Dondero.  I apologize for

25   that.
```

1      THE COURT:  All right.  So you are now co-counsel with

2  Bond Ellis, perceive?

3      MR. AIGEN:  That is correct.  The lead counsel from

4  our firm is Ms. Deborah Deitsch-Perez.  She unfortunately has

5  medical emergencies going on with her family and is

6  unfortunately unable to be here for this hearing.

7      THE COURT:  All right.  Thank you.

8      For Highland, who do we have appearing on this matter?

9      MR. MORRIS:  Good morning, Your Honor.  It's John

10 Morris From Pachulski Stang Ziehl and Jones for the debtor.

11     THE COURT:  All right.  Thank you.  I presume those

12 are the only appearances on this discovery dispute.

13     MR. AIGEN:  That's correct.

14     THE COURT:  All right.  Well, Ms. — Mr. Aigen, you're,

15 I guess, new on the scene in the Highland matters.  And let me

16 just tell you I've read all the pleadings.  So I am aware that

17 of our numerous adversary proceedings, this is the one only

18 involving Dondero as a defendant and only involving three notes.

19 So, to help you find your argument, I'm going to say this.  I

20 remember when I was in law school — here comes a story — one of

21 our law professors said a suit on a note is the simplest kind of

22 lawsuit there is.  And probably when you are a young lawyer and

23 if you go to a civil business practice type law firm, this is

24 probably where you're going to get your feet wet.

25     And so, with that in my brain and having read the

*Adversary 21-3003, Motion to Compel Discovery*                    6

1   pleadings, I'm asking:  Why is this going to be complicated

2   where we need extensive discovery from the CRO/CEO who came on

3   the scene post bankruptcy two plus years after the notes?

4           So that's what's in my brain having read the

5   pleadings.  And so convince me why I'm totally misreading the

6   situation.

7           MR. AIGEN:  Thank you, Your Honor.  I appreciate that.

8   One thing I want to make sure we understand is this is we're

9   seeking to compel deposition testimony for Mr. Seery in his

10  corporate rep capacity.  We're not specifically asking for Mr.

11  Seery.  We sent corporate rep depo topics over.  They told us

12  Mr. Seery would be the corporate rep but they objected to

13  certain topics, as is their right.  The specific topics, as you

14  know, we're seeking discovery on, there's Numbers 9, 14 through

15  17 go together, Number 20.  In that sense what we're seeking

16  discovery on is a defense that we have asserted in this

17  proceeding that's currently pending.

18          As I'm sure you know from reading the pleadings, one

19  of Mr. Dondero's defenses is that there was a subsequent oral

20  agreement that the home would be discharged based upon certain

21  conditions being met.  Highland, as is their right, believes

22  that this oral agreement never happened.  And, as a result, it

23  contends that the defense has no merit.  In their motion, I

24  think it was, or in their response, paragraph 4, they

25  specifically say that this defense has no basis in fact.  That's

1 their right.  The problem, however, is just taking this

2 position, based on this position they're also saying, well, we

3 don't get discovery on this event.

4        And although we're talking about six different

5 requests, it really comes down to three different areas, and

6 I'll jump into those and explain each one.  The first one, which

7 I think is the most straightforward, is topic nine, which asks

8 for testimony regarding Mr. Dondero's defenses.  Initially we

9 got a response saying that the objection wasn't relevant and

10 then they filed a response.  And I think they realized that

11 might not have made a lot of sense saying it wasn't relevant, so

12 they said it was vague or invalid.

13        Counsel's well aware, as you are, what are defenses in

14 this case.  They served discovery on these defenses.  We

15 responded.  They never complained that they're inadequate.  They

16 know that our defense, at least one of them, is there had been

17 oral agreement on the loan, that it would be forgiven if certain

18 conditions occur, and that's what we want to take discovery on.

19        I'm confident counsel has interviewed Highland

20 employees to see who knows anything about this agreement.  I'm

21 sure it's very possible that no one knows anything about this

22 agreement, and that's fine.  But we certainly have a right to

23 ask the corporate rep about this and find out if anyone's going

24 to talk about this oral agreement at trial.  This isn't

25 burdensome discovery —

1          THE COURT:  Can I — can I — let me ask a question

2    right there.  The defense is based on an oral agreement.  I mean

3    your client is the payee on the notes — excuse me — excuse me —

4    the maker.  It's easy to get confused here.  He's the maker on

5    the notes, but he was the CEO of the payee on the notes.  So

6    this is not Bank of America makes a loan to Joe, the plumber,

7    or, you know, I mean this is — he's on both sides of the

8    transaction.  So he knows who the oral agreement was made with,

9    right?

10         MR. AIGEN:  Correct, Your Honor.

11         THE COURT:  So, again, I'm trying to understand —

12         MR. AIGEN:  May I follow up —

13         THE COURT:  — the depth of the discovery needed.

14   Presumably, I think I read in here, that you're deposing — or I

15   don't know if it's agreed or not — you're deposing various other

16   Highland former employees.  But — but I don't understand why the

17   current CEO that was not around before the bankruptcy would have

18   any personal knowledge about oral agreements.  I mean this would

19   all be in Mr. Dondero's head, right?

20         MR. AIGEN:  Your Honor, I absolutely agree.  And there

21   are, I guess, two parts to that answer.  One is we aren't taking

22   other Highland employees' depositions.  We've asked for them,

23   and they have refused to give them to us and said they're

24   irrelevant.  We're trying to work that issue out.  And we may

25   get one of their depositions.  If they go give us one for a

1 couple hours and drop off, but this is — right now this is the

2 only discovery we're getting.  Their doc requests, they're not

3 going to give us any documents related to these topics.  So this

4 is our chance to get discovery on it.

5          As to his personal knowledge, he's their corporate

6 rep.  As a corporate rep, he can go figure out what other people

7 know.  But they're going to put someone on the stand — and I

8 think it's important, Your Honor, obviously they're going to

9 make a defense in this case — or, sorry — which stops our

10 defense with legal arguments saying even if this oral agreement

11 occurred and took place, it's not legally enforceable.  I

12 understand.

13          THE COURT:  Yeah, and what about —

14          MR. AIGEN:  I mean this is —

15          THE COURT:  — what about that?  What about that?  I

16 mean it's hard not to separate the need for discovery from that,

17 so what about that?

18          MR. AIGEN:  Well, your — yeah.  No, that's — if they

19 file a summary judgment on a legal issue, then we will address

20 that in our summary judgment legal issue, but right now we have

21 a pending defense.  And, Your Honor, one of their responses to

22 our defense, as they put in their response in paragraph 4, they

23 specifically state that this oral agreement never occurred.  So

24 I need to know how they know that, who are they going to put on

25 the stand.  I don't know which people are saying that.  So we

*Adversary 21-3003, Motion to Compel Discovery*                    10

1   ask for — to put it down into corporate rep topic.  They could

2   have given us anyone.  They decided to give us Mr. Seery.  But,

3   yes, he may not have personal knowledge, but that's who they

4   chose for their corporate rep to testify on this topic.

5          He's the only one I'm able to get this information

6   from.  And he may come up and say no one knows anything about

7   that.  That's fine.  But they have already said:  We're taking

8   the position that this oral agreement never occurred.  I don't

9   know how they know that, I don't know who they're going to put

10  on the stand, but they are taking a factual position on that.

11  So we should have a right to take discovery on it.  Whether they

12  don't think this is a legally-valid defense, well, that's fine,

13  they could have moved for summary judgment on day one.  They

14  didn't.  As of now, this defense is still pending.

15         We have less than two months until trial.  I don't

16  know when the summary judgment's going to come, so there's not

17  going to be a chance to wait until the legal aspects of these

18  defenses are heard and then take discovery.  This is our one

19  opportunity to do it.

20         THE COURT:  Okay.  So this is topic number nine.  And

21  you say why not, let us ask a few questions, it may be five

22  minutes of questioning if he doesn't really know anything.  Is

23  that a summary of your position?

24         MR. AIGEN:  Well, yeah, he may not know anything and

25  they may not know anything, or they may, yes.  I don't know how

*Adversary 21-3003, Motion to Compel Discovery*                    11

1   much time it's going to take.  The fact that they put in writing

2   that this agreement never occurred makes me think that someone

3   must know something, but I don't know.  It could be on that.

4   that —

5                THE COURT:  All right.

6                MR. AIGEN:  — it's certainly possible, Your Honor.

7                THE COURT:  All right.

8                MR. AIGEN:  That — and then the second topic or

9   second, I guess, group is 14 through 17 where we ask about

10  information about loans made by Highland or the debtor that were

11  particular to other people.  And the reason these requests are

12  relevant is, once again, — well, not once again — but it's our

13  position that Highland commonly entered into these types of

14  agreements.  They're saying:  Hey, this never happened, this

15  agreement didn't take place.

16               So the fact that Highland entered into other similar

17  type loan agreements with similar type business group

18  provisions, although maybe not dispositive, it certainly leads

19  to evidence that this agreement did in fact take place in the

20  situation where they're telling you and putting a pleading and

21  writing in the pleading, hey, this never — this agreement never

22  took place.  So this is relevant —

23               THE COURT:  So — so — so —

24               MR. AIGEN:  — and, like I said, —

25               THE COURT:  — on topics 14 through 17 you're saying

*Adversary 21-3003, Motion to Compel Discovery* 12

1  it's relevant if loans were made to other employees or officers

2  besides Mr. Dondero and it's relevant if those loans were

3  forgiven or not as to these three notes?

4        MR. AIGEN:  Correct, Your Honor.  Because they are

5  challenging that this agreement took place, for the —

6        THE COURT:  Well, —

7        MR. AIGEN:  — fact that other similar —

8        THE COURT:  — what if they did do this with another

9  employee, why is that relevant these three notes?

10       MR. AIGEN:  Well, because they're challenging that our

11  oral agreement took place.  The fact that oral agreements like

12  this were routine at Highland would make it more believable and

13  factual that our agreement took place, in light of their

14  challenge to the fact that the agreement took place.

15       Like I said, if they were just making legal challenges

16  to whether the agreement is enforceable, that would be one

17  thing.  So instead they're also taking the position, hey, we

18  don't think this actually took place.  So all — if Highland

19  routinely entered into agreements like this for other employees,

20  like I said, I understand that wouldn't be dispositive, but that

21  would tend to show that this pattern and practice of Highland

22  did include oral agreements like this.

23       THE COURT:  Okay.  I don't mean to get off on a

24  tangent here, but, you know, are there going to be a lot of

25  fraudulent-transfer lawsuits if in fact there was debt forgiven

*Adversary 21-3003, Motion to Compel Discovery* 13

1    in the couple of years or four years leading up to bankruptcy?

2    And are we going to have — well, I just don't understand, you

3    know, the obvious big tax exposure to your client and other

4    human beings if your — if your argument prevails, but I guess I

5    shouldn't — I shouldn't second guess legal strategy, but my

6    brain can't help to go there.

7              All right.  But, again to the relevance, your defense

8    is:  There was an agreement to forgive these notes.  It was oral

9    and we're entitled to discovery regarding other loans to other

10   employees for which there might have been oral forgiveness

11   because that will help establish our defense; that's the sum and

12   substance of categories 14 through 17?

13             MR. AIGEN:  That's correct, Your Honor.

14             THE COURT:  Okay.

15             MR. AIGEN:  And obviously I don't think there's any

16   need to try the ultimate legal issues here, but we're well aware

17   of these tax issues and we've worked into it, and so there are

18   different tax consequences depending on how conditions are

19   structured and it's my understanding that in situations like

20   this there wouldn't be sort of tax consequences, but that's an

21   issue for another day.  But because you raised it, Your Honor, I

22   want to make sure that you know we are aware of that issue and

23   that is something we're prepared to address when it — when it

24   comes before this.

25             So should I move on to the last — last topic, Your

1   Honor?

2              THE COURT: Okay.

3              MR. AIGEN: The last topic is Request Number 20 which

4   asks for testimony regarding compensation paid by Highland to

5   Mr. Dondero. And I know this might be a little unusual because

6   someone should know what they were paid, but obviously in a

7   situation like this where we don't have control of all the

8   records and the pay structure is complicated, we don't have all

9   of that, so it's a little different than your usual situation.

10  And the reason this is relevant, obviously this goes to the

11  forgiveness aspect of it, and basically information regarding

12  Mr. Dondero's compensation will be helpful or relevant because

13  it shows part of the story here is that if you look at his

14  compensation as a whole, he was underpaid and the notes were

15  forgiven as part of this compensation which goes along with the

16  underpaid. In other words, it puts this oral agreement into

17  context and explains why it is thus. Again, they're saying this

18  never happened, so as part of our presentation of our case,

19  we're going to explain why this was done and why it makes sense.

20  And to put that into context, we want information related to Mr.

21  Dondero's compensation. We're not asking for other people's

22  compensation on this, we said information related to Mr.

23  Dondero's own compensation.

24              And, again, I understand that counsel thinks that

25  these defenses have no merit. That's their right. That makes

*Adversary 21-3003, Motion to Compel Discovery* 15

1   sense.  And I assume they will file a summary judgment on these,
2   but they haven't done it.  These defenses are currently pending.
3   We're going to trial in less than two months.  We may not be
4   getting anyone else's depositions.  They're not giving us
5   documents on this topic.  And I understand it may be a little
6   unique to have Mr. Seery testify on this, but that's because we
7   just presented them with topics.  That's the witness they are
8   putting forward, which is their right.  I have no problem with
9   that.  But this is our one opportunity to get discovery on this
10  and that's why we're before the Court today.  Thank you for your
11  time.
12          THE COURT:  Okay.  Just to clarify, I think I heard
13  you saying Mr. Dondero doesn't have access to the records.  Mr.
14  Dondero doesn't have records regarding the compensation paid by
15  Highland to him and any agreements related to that?
16          MR. AIGEN:  He — he had some but not all.
17          THE COURT:  Okay.  Well, I don't understand that.  Why
18  would that be?  He's the founder, he was the CEO of this company
19  until three months after the bankruptcy was filed.  He — I mean
20  it sounds inconceivable to me that he wouldn't have everything
21  he needs as far as what he was paid in the agreements regarding
22  what he was paid by his company Highland.
23          MR. AIGEN:  Well, Your Honor, fortunately or
24  unfortunately I have not been involved what I understand is sort
25  of disagreements between the parties here on Mr. Dondero's

*Adversary 21-3003, Motion to Compel Discovery*                16

```
 1   access to certain documents of Highland, but my understanding is

 2   he — Highland now has possession of all its documents.  And he —

 3   I know there were requests between counsels on Dondero to get

 4   particular documents in other matters and other situations going

 5   on.  But he — Highland is the one that has possession of those

 6   documents now, not — not Mr. Dondero.

 7           THE COURT:  Okay.  He'd at least have his tax returns,

 8   right, and files regarding his tax returns?

 9           MR. AIGEN:  Correct, correct.  Correct.  Yes.  Yes,

10   Your Honor.

11           THE COURT:  All right.  Well, Mr. Morris, now for your

12   responses in — I'm playing devil's advocate with you.  If y'all

13   have named Mr. Seery as a 30(b) corporate rep and out of these

14   20 topics you agree to — two, three, four, five, six — I guess

15   13 of the subject matters, what's the big deal about a few extra

16   questions?

17           MR. MORRIS:  A few — a few issues.

18           First, Your Honor, is Mr. Dondero on the line?

19           THE COURT:  Well, that's a good question.  I forgot to

20   check that because I have ordered him in the past to be at every

21   hearing.

22           Mr. Dondero, are you with us this morning?

23           Mike, did you see him —

24           MR. ASSINK:  No, Your Honor.  This is —

25           THE REPORTER:  I haven't seen Mr. Dondero.
```

```
1              THE COURT:  Okay.  Well, Mr. Aigen, what do you know

2    about that?  Or I see Mr. Bryan Assink is out there as well.

3    What do y'all know about that?

4              THE REPORTER:  He's on mute, Your Honor.

5              THE COURT:  You're on mute, sir.

6              MR. ASSINK:  Your Honor, I apologize.  This is Bryan

7    Assink of Bonds Ellis.  I'm just trying to — I'm just trying

8    to —

9              THE COURT:  Okay.  It sounds like someone's speaking,

10   but I can't hear it.

11             THE REPORTER:  Bryan Assink, his voice is low.  He's —

12             THE COURT:  Okay.  Mr. Assink, please turn your volume

13   up.  We can barely, barely, barely hear you.

14             Mr. Assink.

15             MR. ASSINK:  Your Honor, is that — is that better?

16   I'm sorry.  I tested this before —

17             THE COURT:  Okay, it's better now.  Go ahead.

18             MR. ASSINK:  — I joined and —

19             THE COURT:  Go ahead.

20             MR. ASSINK:  Your Honor, this was set on an emergency

21   basis, and we just didn't coordinate with Mr. Dondero.  We

22   didn't think he needed to attend these kind of nonevidentiary

23   hearings and —

24             THE COURT:  Mr. Assink, you asked for the emergency

25   hearing.  And you filed your motion Friday afternoon.  We were
```

*Adversary 21-3003, Motion to Compel Discovery*                    18

1    in court Tuesday.  And I was happy that you resolved our

2    disputes Tuesday.  And I remember saying:  Preview of coming

3    attractions, I guess I'll see y'all Friday, right.  Right,

4    nobody said anything about, uh, we have an emergency setting,

5    we're hoping to have.

6            But, anyway, be that as it may, an hour or two after I

7    got out of court Tuesday, my Courtroom Deputy was telling me

8    that you were wanting the hearing this week.  And I first said

9    it'll have to be Monday.  I mean we're — we've got a backlog of

10   stuff in our queue that we're really trying to get out.  And —

11   and I understood that you really pressed for having this hearing

12   today.  I didn't see the — all the emails, but my Courtroom

13   Deputy said you all really wanted this hearing today, not

14   Monday.

15           So, with that, why would you press for today if Mr.

16   Dondero wasn't available, number one?  And, number two, why

17   would you think he wasn't needed?  I mean it was a couple of

18   hearings ago that I said someone pull out my order and see what

19   I said, because I couldn't remember the exact wording —

20           MR. ASSINK:  No, Your Honor, I apologize.  I'm sorry,

21   Your Honor.  I apologize.  There's been a lot going.  I think it

22   — the coordination might have just slipped.  I'm not sure, Your

23   Honor, I wasn't sure what order required him to be here today

24   with the preliminary injunction dissolves but, you know, it

25   wasn't our intention that he would not — he would not appear.

*Adversary 21-3003, Motion to Compel Discovery*                    19

1  We — it was more just a coordination thing.  We intend that he

2  will be at all hearings before, Your Honor, you know, Friday's

3  hearing and substantive hearings.  I just — I think this is more

4  of a coordination issue, Your Honor, and I apologize.

5          THE COURT:  Okay.

6          MR. ASSINK:  There has been a lot going on.

7          THE COURT:  Oh, don't I know.  There's two of us, me

8  and my Law Clerk working on this, and there are a bunch of

9  y'all.  So, yes, I feel — I feel absolutely what you feel and

10  more as far as a lot going on.

11          So let me clarify.  My language that ordered Mr.

12  Dondero to be at every hearing was in the preliminary injunction

13  that's now superseded by the agreed order y'all announced

14  Tuesday.  So are you telling me you thought now that mandate

15  didn't apply?  Is that one of the things —

16          MR. ASSINK:  Not — not specifically, Your Honor, —

17          THE COURT:  — I'm hearing?

18          MR. ASSINK:  Not specifically, Your Honor.  We thought

19  perhaps the formal mandate in the order was no longer applying,

20  but our understanding was you would want Mr. Dondero at

21  substantive hearings going forward, and that has been our

22  understanding.  And we would expect him to be before Your Honor

23  at all such hearings.  Part of the basis, the reasoning he's not

24  here today was perhaps as an oversight on my part due to the

25  scheduling, and I had a lot of deadlines yesterday and I think

*Adversary 21-3003, Motion to Compel Discovery* 20

1   it just maybe fell through the cracks, and I apologize, Your

2   Honor.

3           THE COURT: All right.

4           MR. ASSINK: You know, we — Your Honor, —

5           THE COURT: Well, I'm going to say a couple of things.

6   You know this could have been raised Tuesday, when we were here

7   on the adversary proceeding, in which the preliminary injunction

8   was issued, okay, it would have been — it would have been wise,

9   it would have been very wise to raise the issue.

10           Second, it screams irony, if nothing else, that at a

11   time when I have under advisement a motion to hold Mr. Dondero

12   in contempt of Court that there would be a trip-up, the

13   second-recent trip-up, by the way, where he didn't appear at a

14   hearing. There was a time a few weeks ago, two or three weeks

15   ago, can't remember what hearing it was then, but he wasn't

16   here.

17           Okay. The —

18           MR. ASSINK: Well, Your Honor, I just want to say —

19           THE COURT: — the third thing I'm going to say — the

20   third thing I'm going to say is I guess I'll issue an order in

21   the main case now, you know, a one- or two-sentence order in the

22   main case saying repeating the sentence that was in the

23   preliminary injunction, that he's going to show up at every

24   hearing. I never said only at substantive hearings. The only

25   thing I hesitated on at all, because I've done this in other

*Adversary 21-3003, Motion to Compel Discovery* 21

1  cases, is sometimes I'll say any hearing at which, you know, the

2  person is taking a position, okay, an opposition, an objection,

3  you know, even if you file a pleading taking a neutral stand, if

4  he's going to file a pleading that requires the Court and all

5  the lawyers' attention to some extent, he's going to need to be

6  in court.  So that's something I thought about doing, but then I

7  was reminded, that I said, no, he's just going to be at all

8  hearings in the future.

9          And procedural, substantive, I never made that

10  distinction and I never would because — because it's taking up

11  time, it's taking up time of the Court, lawyers, parties.  And

12  if he is going to use the offices of this Court or, you know,

13  take up the time of any lawyers, then he needs to be a part of

14  it, okay?

15          MR. ASSINK:  Your Honor, yes, I —

16          THE COURT:  So I thought I made that very clear the

17  last time he didn't show up, but I think —

18          MR. ASSINK:  Your Honor, I apologize.  You know that's

19  certainly not our intention here.  We've been rushing around.  I

20  think this is more — this is more on — on me and just the fast

21  pace with everything.  We would intend that he would be here at

22  all hearings.  We're not trying to make any exception.  We're

23  not trying to say that the preliminary injunction got rid of his

24  obligation to be before, Your Honor.  You know, we weren't clear

25  exactly what the directive was for these kinds of hearings, or

*Adversary 21-3003, Motion to Compel Discovery*                    22

1   at least perhaps I wasn't fully, and — but, nevertheless, Your

2   Honor, we would — we would have had him be here.  I think the

3   fast pace with the hearing settings and just everything going

4   on, it might have slipped through the cracks.  It's not — there

5   was no ill will with him not being here, Your Honor.  I

6   apologize.  It's just an oversight on our part.  We would

7   anticipate that he will be here for all future hearings.  You

8   know it's no disrespect to the Court.  It was not an intentional

9   thing.  We apologize, Your Honor.  So I understand the Court's

10  comments.  It's — but I just want to make clear it's we're not

11  trying to be cute, we're not trying to say that, oh, the

12  preliminary injunction is gone, he doesn't have to be here.

13  That's not our intention, Your Honor.  It was I think just an

14  oversight and a scheduling issue this time, but Mr. Dondero will

15  of course appear before Your Honor in all matters going forward,

16  so I apologize.

17          THE COURT:  All right.  Well, again, you're

18  scheduling.  You sought the scheduling, you sought the emergency

19  hearing, and this is the second time we've had this discussion

20  in less than a month.

21          All right.  So, Mr. Morris, back to you.  I think —

22          MR. MORRIS:  Yeah.

23          THE COURT:  — you were about to answer the question of

24  if Mr. Seery is going to be produced and talk about 13 different

25  topics, why is it a big deal to talk about these other seven

1    topics.

2            MR. MORRIS:  Because there is no way to prepare a

3    witness for the vague statements that are being offered by

4    counsel.  I'll point out that Mr. Aigen is yet another former —

5    a lawyer who formerly represented Highland and is now suing us,

6    but we'll dispense with the disqualification motion right now.

7            Your Honor, here is the deal.  There have to be some

8    limits, there have to be some reasonable limits.  As you

9    started, Your Honor, in law school you're taught that a

10   collection case under demand notes is the simplest thing there

11   is.  In fact, in New York there's a special provision in state

12   law that permits a plaintiff to file a motion for summary

13   judgment in lieu of a complaint when they have an instrument

14   such as a note, which is exactly what we have here.

15           Mr. Dondero has already admitted in his answer, in his

16   interrogatories, and in his answers to several requests to admit

17   that the notes are valid, that he received the money

18   contemporaneously with the notes.  When he signed the note, he

19   received the money.  The debtor has made demand and he hasn't

20   paid, so we will be moving for summary judgment on that basis.

21           So let's look at what the defenses are and why we just

22   feel like it's a burden on the debtor to even entertain these

23   concepts.  His first answer, Your Honor, said that the notes

24   were forgiven based on an agreement.  So we asked him in the

25   interrogatory or request to admit, I forget which, show us your

1   tax returns that you paid the taxes. Of course he didn't pay

2   taxes because of course the note wasn't forgiven. So instead he

3   amends his answers, he amends the affirmative defense to add the

4   words: Pursuant to a condition subsequent. Okay, he didn't say

5   that the first time.

6          The first time it was — it was forgiven and now it's

7   not forgiven but it's basically deferred until a condition

8   subsequent. So he is not even contending. If you look at his

9   amended answer, he's not even contending that it was forgiven,

10  he's simply saying that the obligation to repay has been

11  deferred pursuant to an oral agreement under which he does have

12  to pay until the debtor completes the liquidation of his assets,

13  basically, if you read it. That's what it says. And that's how

14  we got here.

15         I don't know if you picked up on it, Your Honor, but

16  in response to an interrogatory, when we said who made the

17  agreement on behalf of the debtor, Mr. Dondero said that he did.

18  Okay, this isn't an oral agreement unless he was talking to

19  himself. This is something that happened, according to him, in

20  his head; that somehow he, as the maker of the note, had a

21  discussion with himself in his capacity as the chief executive

22  officer of the debtor, and the two of them, in his head, agreed

23  that he wouldn't have to pay. Initially wouldn't have to pay at

24  all and now apparently doesn't have to pay until the debtor

25  completes its sale of assets. That is what the defense is here,

*Adversary 21-3003, Motion to Compel Discovery* 25

1    so let's be very, very clear about it.

2            It's not an oral agreement, it's something that he's

3    making up in his head that he didn't make up the first time,

4    that he changed the second time, and that he — that he can't

5    describe at all.  One of the interrogatories said:  When did

6    this take place.  He didn't answer that part of the

7    interrogatory.  He hasn't told us.

8            And here is the interesting thing, Your Honor.  He's

9    partially performed.  He has admitted in response to — I forget

10   if it was an interrogatory or a request to admit, it's in our

11   papers — he has admitted that in December 2019, after the

12   petition date, and while he was still in control of the debtor,

13   that he made a payment to the debtor, a portion of which was

14   used to pay principal and interest on one or more of the notes,

15   so.  So either he made that payment after he made his agreement

16   in his head that it would be deferred, which makes no sense, or

17   he entered the agreement in his head after the time that he made

18   the payment, which would be in violation of the automatic stay,

19   because how did he just get to forgive or to defer payment of an

20   obligation to the debtor without seeking permission from the

21   Bankruptcy Court.  Those are the only two possibilities here,

22   okay.

23           So I don't want to have to prepare my client for such

24   nonsense.  I don't think we should be required to prepare my

25   client for such nonsense.  And if you take a look at the other

1  so-called affirmative defenses, he's got waiver, but he doesn't

2  know — he doesn't identify how we waived, when we waived, who

3  waived.  And, in fact, it's completely contradicted from the

4  evidence that's already in the record.  Every single monthly

5  operating report, all of the debtor's contemporaneous books and

6  records, they're in the record.  I actually submitted them in

7  opposition to his first request for an adjournment of this

8  proceeding because I wanted — I put my cards on the table, Your

9  Honor.  I really don't — I don't like to play games.  I put my

10  cards on the table.  They see all of that.  All of that is

11  there.  The debtor has — can see them.  So how could we have

12  waived everything.

13       Consideration, I'm supposed to prepare my client to

14  answer questions on his defense of lack of consideration, when

15  Mr. Dondero has already admitted that he received the face

16  amount of each note at the time the note was executed?  What —

17  we should not be entertaining this.

18       And let's talk about topics 14 to 17, the so-called

19  other loans that were forgiven.  Mr. Dondero was the president

20  and chief executive officer of this company for decades.  Has he

21  identified one single person who received a forgiven loan?

22  Nope.  Has he identified one loan that was ever forgiven?  Nope.

23  Has he ever contended that he had a forgivable loan?  Nope.

24  He's got this vague and ambiguous defense that somehow — it's

25  not even a defense, frankly.  His defense is that he had an oral

*Adversary 21-3003, Motion to Compel Discovery*                27

1   agreement with himself, either he did or he didn't, right.

2   We've got document requests outstanding.  They were due weeks

3   ago.  Mr. Aigen has promised me in writing tomorrow, tomorrow,

4   Friday.  May 21st, he's going to complete his document

5   production.

6            We've gotten two documents so far, two bank statements

7   that show his receipt of the loan proceeds, right.  We don't

8   have — there is no evidence for this.  We don't have the

9   identification of a loan that was ever forgiven.  We don't have

10  the identification of a person whose loan was forgiven.  We have

11  nothing.  How can we possibly prepare?

12           Rule 30(b)(6) actually requires them to describe with

13  reasonable particularity the matters for examination.  How do I

14  prepare my client on — on these things?  What he's trying to do,

15  I think what they're trying to do is be cute, of course, and

16  they're trying to — they want to ask Mr. Seery and Mr. Seery

17  will say, 'I don't have any knowledge of this.'  And then

18  they're going to show up to trial and they're going to put on a

19  case and say, 'Mr. Seery didn't have any knowledge of it, so he

20  can't rebut,' or something — something silly like — I mean I

21  don't really know what they're doing.  This is just such bad

22  faith.

23           Your Honor, you heard counsel say that the loan was

24  forgiven or deferred, but it's not even forgiven.  So — so it

25  doesn't even make sense, but you heard him say that he was

*Adversary 21-3003, Motion to Compel Discovery* 28

1   underpaid, that Mr. Dondero was underpaid and that there's some

2   connection not with forgiveness because he's admitted that he's

3   now changed his story, it hasn't been forgiven.  It was

4   originally forgiven, now it's just deferred, and that that

5   happened because he was underpaid.  Does that make any sense at

6   all?

7           The guy who was in control of this enterprise from day

8   one, and I'm supposed to prepare my client to provide a history

9   of Mr. Dondero's compensation.  He doesn't know what he was —

10  did he not pay his taxes?  Should we go down that path and

11  should I now start subpoenaing his tax returns?  Because I think

12  that's appropriate.  If you want to ask what I have, I want to

13  know what you have.  So maybe Mr. Aigen can agree on the record

14  that I can have Mr. Dondero's tax returns.  If he'll do that

15  maybe I'll reconsider, because this is nonsense, Your Honor.

16  And that's really the point.  And I want to nip this in the bud

17  now because this is the first of five note cases for entities

18  owned and controlled by Mr. Dondero, and the same thing is

19  happening in some of these other cases, Your Honor.  It is.

20          And — and if we go down this path, you know you're the

21  Judge, you make the call, but we're going to be having a lot of

22  these because I'm not volunteering putting my client through

23  this process.  It's not right.  It's just not right.

24          He made an oral agreement with himself?  Please.  You

25  either violated the automatic stay or you partially performed,

*Adversary 21-3003, Motion to Compel Discovery*                                29

1    thereby proving it never happened.  Mr. Aigen says, oh, we

2    contest it.  We don't sit here and contest it.  The proof is in

3    the record.  The proof is his client's own words.  The proof of

4    the documents that we've already put before the Court.  (Briefly

5    garbled audio) — never happened.

6              And I just — I just want to nip this in the bud.

7    That's really our point, Your Honor.  To put forth a client in —

8    in a notes action, the simplest form of action there could

9    possibly be, to answer questions on 13 different topics, but

10   there's a limit to what we'll do, and this is our limit.  And

11   that's why we won't — we won't do it in the absence of a court

12   order.

13             THE COURT:  Okay.

14             MR. MORRIS:  Thank you, Your Honor.

15             THE COURT:  All right.  So I will give the last word

16   to you, Mr. Aigen.  What would you like to say in rebuttal?

17             All right.  You must be on mute.

18             MR. [SPEAKER]:  He's on mute.

19             MR. AIGEN:  Sorry.

20             THE COURT:  Okay.

21             MR. AIGEN:  A few quick points, Your Honor.  Number

22   one, counsel has referred to New York procedure on how he could

23   file a quick summary judgment.  Well, he can file summary

24   judgment here too.  They didn't do it.  These defenses are

25   pending, we have a right to take discovery on it.  I think

1    that's pretty straightforward.

2           Number two, counsel has repeatedly stated, as he

3    states in his pleading, that we changed our position and that

4    first answer it said that the notes were forgiven.  It doesn't

5    say that.  I'm reading from their pleading at paragraph 16 where

6    they quote our answer, the original one where it says,

7    "Defendant asserts that plaintiff's claim should be barred

8    because it was previously agreed by plaintiff that plaintiff

9    would not collect on the note."  There's no change in the

10   position.  It wasn't asserted before these notes were actually

11   forgiven, so that's just not true, and his own pleadings reflect

12   that.

13          We also heard a lot of conversation about what we have

14   given them.  We have answered their interrogatories.  They

15   didn't ask about other people who may have loans forgiven.  They

16   had never asked about that.  That's why we haven't told them.

17   They could get that information.  They could serve discovery.

18   They're the one that wanted this case on a fast track.  So keep

19   talking about discovery or answers he doesn't have because those

20   are answers to questions he never asked.  There is no discovery

21   out there where they said to us identify the individual who you

22   believe received loans that are forgiven.  They never asked

23   that.  That's why they don't —

24          THE COURT:  Let me —

25          MR. AIGEN:  — that answer, so I don't think that's

1    right.

2              THE COURT:  Let me ask you this.  If Bank of America

3    loaned money to Mr. Dondero and he defaulted and they sued him

4    on the note, do you think Mr. Dondero could get discovery

5    regarding all other borrowers or any other borrower that Bank of

6    America may have lent money to and did they forgive some of

7    their indebtedness, did they have special arrangements?  Do you

8    think in a million years a state court judge would allow

9    discovery on this?

10             MR. AIGEN:  Not under that hypothetical, but I would —

11   what I would say, Your Honor, if there was an oral condition as

12   part of that loan and it turns out that everyone knew that Bank

13   of America provided those same oral conditions to a subset other

14   group of lenders — or borrowers, for whatever reason, and the

15   parties disputed that, then I think it would be discoverable.

16   So I think the situation here is —

17             THE COURT:  Oral agreements —

18             MR. AIGEN:  — different from your situation.  I agree

19   with the hypothetical.

20             THE COURT:  I mean again I — you know, oral

21   agreements.  I mean give me examples of case law where oral

22   agreements somehow prevailed at the end of the day.  I mean I

23   just...

24             MR. AIGEN:  And, Your Honor, at summary judgment, when

25   we have to present our case, we'll present our case.  Like I

1  said, they could have filed the summary judgment on day one,

2  just like they could do in New York, and said, you know, on the

3  defenses, but we're doing this and we're doing it on a fast

4  track obviously with trial in less than two months. So this is

5  our one opportunity to get discovery. And when they filed their

6  summary judgment, we'll respond with the law. But until they

7  do, for whatever reason they have waived it. They have told you

8  that it would be burdensome to allow him to answer a few other

9  questions. I don't — for one thing, burden was not an objection

10 they made, so he's talking about how it's burdensome and he

11 doesn't want to do it. But this is our one opportunity to get

12 this information. And if they file summary judgment, and, you

13 know, these defenses go away, obviously it won't be an issue

14 later, but this is our one opportunity to get this discovery.

15          THE COURT: Okay.

16          MR. MORRIS: Your Honor, if I may? Just one last

17 point. There is zero chance, zero chance that if any loan was

18 ever forgiven by the debtor that it was on the same terms on

19 which Mr. Dondero now claims his loan would be forgiven or

20 deferred. And how do I know that? Because if you look at his

21 response to the interrogatory, the condition subsequent, by

22 them. And Mr. Aigen is just wrong, he did change his answer.

23 His original answer was that he wouldn't have to pay. And then

24 his new answer, his amended answer is that he wouldn't have to

25 pay until a condition subsequent. And when we asked him what

1   that condition subsequent was, it was the liquidation of certain

2   assets.  Since the liquidation of those assets has not been

3   completed, by definition, no other maker could have had a note

4   or an oral agreement or an agreement of any kind of the type

5   that Mr. Dondero has.  So yet another reason why it fails to

6   meet the burden, they fail to meet the burden under Rule 26.

7   Nobody could have ever had the same note forgiven or agreement,

8   because the condition subsequent hasn't been met yet.

9                 THE COURT'S RULING ON THE MOTION TO COMPEL

10              THE COURT:  All right.  Well, I'm going to deny the

11  motion to compel.  I don't think that the burden has been met to

12  establish the relevance of these, I guess it's — one, two,

13  three, four, five — six topics that are now at issue, topics 9,

14  14 through 17, or 20, and, you know, I don't think the

15  proportionality standard is met here.

16              I do think it would be not proportionate to the needs

17  of the case for the CEO, who came in place in 2020,

18  postpetition, two years after these notes were executed, to have

19  to go do research about any loans made by Highland to any

20  officers and employees over the years and, you know, I don't

21  know who he's going to question, what policy he is going to look

22  into that might be some substance or evidence as to oral

23  agreements or forgiveness.  I don't think he should have any

24  obligation to search files and interview people to figure out

25  what the affirmative defenses and Mr. Dondero are all about or

*The Court's Ruling on the Motion to Compel*                    34

1    based in.  And, again, no one would have better information

2    about his own compensation than Mr. Dondero himself.

3           I mean I want to stress that this comes against a

4    backdrop of — well, it seems like some antagonism, to say the

5    least, on the part of Mr. Dondero where Mr. Seery's concerned.

6    It seems like it's always a fight with Mr. Seery.  And you say,

7    well, we didn't handpick him as the 30(b)(6) witness, but, you

8    know, the motion to compel names him by name.  It just — it

9    feels like another antagonistic move.

10          You've got him for a deposition next Monday on 13 or

11   so different topics.  I think it is appropriate to draw the line

12   on these six or so topics that again just don't seem relevant or

13   proportional to the needs of the case.

14          All right.  So, Mr. Morris, would you please upload

15   just a simple order reflecting the Court's ruling?

16          MR. MORRIS:  I would be happy to, Your Honor.

17          THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18   to do it.  I'm sorry.  I need to be thinking about attorney's

19   fees and who should bear the costs of what.

20          So, Mr. Aigen, would you please electronically submit

21   an order?

22          MR. AIGEN:  Yes.

23          THE COURT:  All right.  Thank you.

24          All right.  Well, if there's nothing else on this

25   particular adversary, let me just double check.  Any

*Adversary 20-3195, Committee's Motion to Stay*                                    35

1    housekeeping matters before I move onto the other adversary?

2              MR. AIGEN:  Not from the debtor, Your Honor.

3              MR. CLUBOK:  Your Honor, —

4              THE COURT:  All right.

5              MR. CLUBOK:  I don't know if you're about to move on.

6    Your Honor, can you hear me?

7              THE COURT:  I'm sorry, Mr. Clubok?

8              MR. CLUBOK:  Your Honor, —

9              THE COURT:  Were you weighing in on —

10             MR. CLUBOK:  Yeah, I'm — I'm sorry.  It's not about

11   that proceeding, but are you about to move on beyond — beyond

12   the Highland matters?

13             THE COURT:  No, no, no.

14             MR. CLUBOK:  There was another Highland matter —

15             THE COURT:  I was next — I was next going to go to the

16   other adversary, the dispute between the committee and seven or

17   so defendants.  And, yes, I know we have UBS I guess all day

18   tomorrow unless anything has changed.  So we'll — we'll hear

19   before we're done any previews about tomorrow.

20             All right, so moving on —

21             MR. CLUBOK:  Thank you.

22             THE COURT:  — the Committee versus CLO Holdco,

23   20-3195.  We have a committee motion to basically stay the

24   adversary proceeding for 90 days.  So I will get lawyer

25   appearances on that.

*Adversary 20-3195, Committee's Motion to Stay*                    36

 1          Who do we have appearing for the committee, the

 2  movant?

 3          MS. MONTGOMERY:  Yes, Your Honor.  Paige Montgomery

 4  for the committee.

 5          THE COURT:  All right.  And for the defendants, who do

 6  we have appearing?

 7          MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

 8  Phillips on behalf of Highland Dallas Foundation and CLO Holdco

 9  Ltd., along with my associate Amelia Hurt.

10          THE COURT:  All right.  I saw your —

11          MR. DRAPER:  Good morning, Your —

12          THE COURT:  — pleading filed at 9:00 something last

13  night.

14          Any other defendant appearances?

15          MR. KANE:  Yes, Your Honor, —

16          MR. DRAPER:  Yes, Your Honor.  Douglas Draper on

17  behalf of the Dugaboy Investment Trust —

18          THE COURT:  All right.  Thank you.

19          MR. DRAPER:  — and Get Good.

20          THE COURT:  Oh, okay.  Thank you.

21          Other appearances?

22          MR. KANE:  Yes, Your Honor.  John Kane on behalf of

23  Grant James Scott, III.

24          THE COURT:  Okay.  Mr. Kane, your volume was very low.

25  You're — you're Mr. Scott's counsel as trustee for these trusts?

*Adversary 20-3195, Committee's Motion to Stay* 37

1  MR. KANE: In — in a sense, Your Honor, and in his

2  individual capacity. I no longer represent CLO Holdco.

3  THE COURT: Okay. I don't know if you got that at

4  all, Michael. It was so faint.

5  THE REPORTER: Yeah, I got a little of it, but it —

6  THE COURT: Okay. you're no longer representing CLO

7  Holdco, Ltd., but you're representing Grant Scott in his trustee

8  capacity for these two trusts?

9  MR. KANE: Your Honor, Grant Scott is no longer the

10 acting director or trustee of CLO Holdco, but he was a named

11 defendant in this action based on his time as trustee or

12 director of CLO Holdco, and I represent him in that capacity.

13 THE COURT: Okay. Any other defendant appearances?

14 MR. ASSINK: Good morning, Your Honor. This is Bryan

15 Assink for Mr. Dondero.

16 THE COURT: Okay. Any other appearances?

17 All right. Well, Ms. Montgomery, you may make your

18 argument.

19 MS. MONTGOMERY: Thank you, Your Honor. And thank you

20 for taking the time to consider our motion so quickly.

21 I'd like to just briefly address how we plan to

22 proceed today. To make more time, we'd like to give a brief

23 opening statement. I'm not sure who among the defendants

24 intends to be heard specifically today in opening, but at the

25 conclusion of that we would like to proceed to testimony. We

1    have Mr. Kirschner, who you can see on the screen, Your Honor,

2    and he's here today.  We plan, for efficiency sake, to put him

3    on by proffer to the extent that that is acceptable to the

4    Court.  And then he will be available to answer any questions

5    that the Court or the defendants may have.

6              THE COURT:  All right.

7              MS. MONTGOMERY:  As you can see in our motion, we're

8    requesting a 90-day stay of the adversary proceeding.  And the

9    purpose for that stay is to allow Mr. Kirschner and his firm,

10   Teneo, the time they need to get up to speed on this case.

11             Stepping back for a moment, it was always the

12   committee's intention have these claims prosecuted by the

13   ultimate litigation trustee.  However, due to a disagreement

14   about certain funds that are held in the Court's registry, the

15   clock started ticking on the committee's time to bring this

16   adversary proceeding.  So but for the order that the committee

17   commenced an adversary proceeding by a date certain, this action

18   would have been brought at a later time by a litigation trustee

19   post effective date as part of a comprehensive litigation

20   strategy related to all estate claims.

21             For a variety of reasons the effective date of the

22   plan has been repeatedly delayed, which has necessarily delayed

23   the formation of the litigation subtrust.  We're coming up on

24   two years since the filing of the bankruptcy proceeding and

25   there's limited time available for the trust to be formed and

1   the trustee to develop a comprehensive litigation strategy.

2          As the Court may have noted, as we are wrapping things

3   up, two of our four committee members have also recently

4   retired/withdrawn from the committee.  So as a result last

5   Friday, the committee filed an application —

6          THE COURT:  Just inquiring minds want to know.  I mean

7   did they — did they by chance sell their claims or they just

8   were tired of the committee role?

9          MR. CLEMENTE:  Your Honor, if I may?  It's Matt

10  Clemente.  I'll just jump in on that, Your Honor, —

11         THE COURT:  Um-hum.

12         MR. CLEMENTE:  — very quickly.  I don't know how

13  anybody could be tired of being on the committee, but the answer

14  is, Your Honor, that they both sold their claims and

15  claim-transfer notices have been placed on the docket.  The

16  United States Trustee is aware and the trustee's position at

17  this point is to keep the committee at the two members, which

18  are Meta E and UBS, as we continue forward here through the case

19  and hopefully to an effective date in the near future.

20         THE COURT:  All right.  Thank you.

21         All right.  Ms. Montgomery, continue.

22         MS. MONTGOMERY:  Thank you, Your Honor.

23         So as a result, last Friday the committee filed an

24  application to retain Mr. Kirschner and his firm as litigation

25  advisor to the committee until the plan goes effective and the

Case 19-34054-sgj11 Doc 3445-16 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 500 of 1726 PageID 11821

*Adversary 20-3195, Committee's Motion to Stay*                    40

1  litigation subtrust is formed.  At that point Mr. Kirschner will

2  become the litigation trustee under the plan and he'll be

3  responsible for all claims brought seeking recovery on behalf of

4  the estate.  So obviously under the terms of the plan, our

5  client, the committee, will cease to exist at that point and

6  responsibility for the adversary proceeding that we're currently

7  being heard in will pass to the litigation trustee.  And there

8  will be a new oversight committee, which has not been formed yet

9  either as of the effective date.

10         So because this adversary proceeding will transfer to

11  the litigation subtrust upon the effective date of the plan,

12  it's imperative that Mr. Kirschner be involved in the

13  prosecution of the adversary proceeding immediately and the

14  development of legal strategy for all of the estate claims as a

15  whole.  For a number of reasons, the 90-day stay of the

16  adversary proceeding will provide Mr. Kirschner with the

17  necessary time he needs to get up to speed.

18         Mr. Kirschner needs to familiarize himself with the

19  Byzantine structure of the debtor and the relationships among

20  the debtor and its thousands of related entities and insiders.

21  The corporate structure, as you have noted on several occasions,

22  is highly complicated.  And the ownership and beneficial

23  ownership of entities is confusing enough even before you

24  consider the variety of transfers of estate assets between and

25  among those entities — entities.  We've heard these

*Adversary 20-3195, Committee's Motion to Stay*                    41

 1  relationships described as tentacles.  I tend to think of them

 2  as a web, and the allegations of this adversary proceeding

 3  represent only a small section of strands.

 4          Mr. Kirschner also needs time to familiarize himself

 5  with the pending motions to withdraw the reference and the

 6  motions to dismiss, and to develop the strategy which could

 7  significantly change the trajectory of the adversary proceeding

 8  and future adversary proceedings.  Mr. Kirschner's decisions

 9  regarding how to respond to these motions may change the course

10  of the litigation in ways that are material to the pending

11  motions.  For example, he could determine to amend the complaint

12  or he could bring additional claims that the committee does not

13  have standing to bring on its own.  For example, breach of

14  fiduciary duty.  Importantly, there could be arguments

15  surrounding the motion to withdraw the reference and have

16  impacts on the other actions that may be brought by Mr.

17  Kirschner in his role as litigation trustee.

18          The strategy surrounding plaintiff's response to the

19  motion to withdraw the reference may also depend on facts that

20  have not yet been developed.  Mr. Kirschner should be given at

21  least some time to develop that strategy.

22          It's also worth noting that the notice period on Mr.

23  Kirschner's retention application does not end until June 7th,

24  which is after the current hearing date for the motions to

25  withdraw the reference, which are set for June 3rd.  Given his

*Adversary 20-3195, Committee's Motion to Stay* 42

1   proposed role as litigation advisor and his future role as

2   litigation trustee, he will be responsible for this adversary

3   proceeding, he should be involved in the strategy to oppose the

4   motions to withdraw the reference.

5          As you know, Your Honor, the Highland entities have an

6   extremely complex structure involving obscure relationships and

7   ownership structures. Mr. Kirschner not only has to get up to

8   speed with those facts, but he also needs to wrap his hands

9   around the transfer of information obtained from both the debtor

10  and the committee over the course of these proceedings. So this

11  adversary proceeding is just one part of the complexity that is

12  the estate claims, but it's an important part and he should have

13  time to ensure that he's proceeding in the most efficient way

14  and in the way that's best for the debtor's estate.

15         In addition to needing to get up to speed on the facts

16  giving rise to this case, Mr. Kirschner is also — will be

17  working on a comprehensive strategy for all estate claims. As

18  pointed out in the response that was filed last night, since he

19  is familiar with the adversary proceeding, obviously, we filed

20  it, and we did so after tedious review of thousands of

21  documents, and it took us months to put together a picture of

22  the transactions that are underlying the complaint, and those

23  months were after we had been actively involved in these

24  proceedings for over a year, so it's a very complicated —

25  there's some pretty complicated stuff going on there.

1     We also believe that we provide competent

2  representation, which is at least tangentially challenged in

3  that response, but we're the lawyers that represent the

4  committee.  We're not the party that's responsible for the

5  decisions of the underlying management of the litigation.

6  Obviously lawyers take direction from their clients and ours as

7  of the effective date will no longer exist, and Mr. Kirschner

8  will be the person who's responsible for making those decisions.

9     So to put it slightly differently, we may be driving

10  the car but we're not deciding, you know, where the car is

11  going.  That's the client's decision.

12     I am at least somewhat offended by opposing counsel's

13  implication that the motion to stay was brought in bad faith

14  because it smelled that there might be some litigation

15  advantage.  All I can do in response to that, Your Honor, is

16  assure the Court that the stay is not being sought for such a

17  purpose.  To the extent that there's any gamesmanship occurring

18  in these proceedings, it's not us that's engaging in it.

19     Mr. Kirschner is entitled to gain his own

20  understanding of the issues underlying this adversary and of the

21  litigation landscape as a whole, and to have an orderly

22  transition of responsibilities from the committee, the debtor,

23  and counsel for both before he's asked to make important

24  strategic decisions that could have long-lasting implications on

25  his work.

1      In short, Your Honor, there is no rush to have the

2 pending motions heard and no prejudice to defendants by a stay

3 of proceedings. As they point out in their response, the Court

4 has delayed the hearing on the motion to dismiss until after

5 consideration on the motion to withdraw the reference.

6 Additionally, as they make clear in their response, discovery is

7 not underway at this point. We still haven't effectuated

8 service as to all defendants. We have some defendants that are

9 foreign entities and we're still working through the service of

10 process. We're not entirely sure how much longer that's going

11 to take, but it has proven to be a lengthy process to date, and

12 we don't really have an estimated time for when that will be

13 done. So, if anything, there is an ideal time for a pause on

14 proceedings that won't prejudice any party.

15      The only purported harm our opponents have identified

16 is the delay itself, and I have to admit, Your Honor, that this

17 is the first time I've ever heard a defendant argue that they're

18 prejudiced by litigation against them not proceeding. In fact,

19 we reviewed the cases that are cited in the response that

20 purport to support a right of good — to a determination of

21 rights and liabilities without undue delay. Unsurprisingly,

22 both involve instances of a defendant seeking to delay

23 prosecution of a plaintiff's case rather than the reverse, as we

24 see here. And in those cases, the stays that were sought were

25 either indefinite or extremely long. They were not a brief

1  90-day extension of the sort recognize requested here.  There's

2  simply no prejudice to the defendant in the adversary by staying

3  the proceeding for 90 days.

4          On the other hand, the 90-day stay of the adversary

5  proceeding will provide Mr. Kirschner with the time that he

6  needs to develop an understanding of this adversary proceeding

7  and the litigation strategy as a whole.  And moving forward

8  without the stay may very well prejudice the future litigation

9  subtrust and harm the debtor's estate.

10         That's all I have for now, Your Honor.

11         THE COURT:  All right.  A couple of questions.  You

12  said there's been no service on certain defendants, and I know

13  that certain of these defendants are said to be Cayman Island

14  entities, these various Charitable — Charitable Daf (phonetic),

15  maybe CLO Holdco Ltd, Charitable Daf Fund, those three in

16  particular, right, right foreign entities?  Okay, so they have

17  gone —

18         MS. MONTGOMERY:  Yes, Your Honor.

19         THE COURT:  — they have not — those are the three, I

20  presume, that have not been served?

21         MS. MONTGOMERY:  CLO Holdco has been served, the

22  others have not.

23         THE COURT:  Okay, okay.  Thank you.  I'm sorry, I'm

24  getting a little mixed up.  So there's been money in the

25  registry of the Court and I remember that was why early on I

*Adversary 20-3195, Committee's Motion to Stay*                    46

1   sort of created a quick time table for you all getting this

2   filed.  How much money is still in the registry of the Court?  I

3   remember there were agreed orders that some of it could be paid

4   over, I think, to Mr. Rocatta (phonetic).  I can't remember who

5   — who all.  But is there still a substantial fund in the

6   registry of the Court without me going online and looking that

7   up?

8           MS. MONTGOMERY:  I'm going to have to look and get the

9   exact numbers as well, Your Honor, but it's the portion of the

10  moneys that were purportedly payable to CLO Holdco are still in

11  the Court's registry.

12          THE COURT:  Okay.  So it's just that defendant's

13  funds.  And am I also correct that now the debtor ultimately has

14  a majority interest in CLO Holdco, the debtor itself, because of

15  that Harbor Vest (phonetic) settlement?

16          MR. PHILLIPS:  No, Your Honor.

17          THE COURT:  Oh, that's not right?

18          MR. PHILLIPS:  I don't think so, no.

19          MR. KANE:  Your Honor, this is John Kane.  I can

20  actually provide some clarity on that.  The Harbor Vest

21  acquisition by the debtor's affiliate relates to HCLOF, Highland

22  CLO Funding, not CLO Holdco.  CLO Holdco is the 49-percent

23  interest owner in HCLOF.

24          THE COURT:  Okay.

25          MR. DEMO:  And this is Greg Demo, Your Honor, from the

1  debtor.  I can confirm what Mr. Kane just said.

2          THE COURT:  Okay, okay.  So CLO Holdco is just

3  strictly in that line of the Charitable Daf and as far as who

4  owns — who owns it —

5          MS. MONTGOMERY:  That is — that's my understanding,

6  Your Honor.

7          THE COURT:  Okay, okay, so I — once again I have

8  flipped the organizational structure.

9          All right.  And then my last question for you, Ms.

10  Montgomery, is the effective date of the plan has not occurred.

11  There's obviously an appeal now at the Fifth Circuit, a direct

12  appeal of the confirmation order.  Is there still a stay pending

13  appeal — a motion for a stay pending appeal pending out there

14  either at the District Court or Fifth Circuit, or have those

15  been ruled on one way or the other?

16          MS. MONTGOMERY:  Mr. Demo, could you — were you

17  popping on to answer that question?

18          MR. DEMO:  Yes, Ms. Montgomery.

19          This is Greg Demo, Your Honor, from Highland Capital

20  Management.  We still intend to try to go effective after the

21  hearing on the exit financing, which has been postponed until

22  June 25th.  That's counsel to NexPoint Advisors, and counsel to

23  Highland Capital Management Fund Advisors filed a motion last

24  night with the Fifth Circuit seeking a further stay of the — of

25  the effective date, pending the resolution of their appeal.  So

1  we don't know how that's going to shake out, but the debtor does

2  anticipate trying to go effective following June 25th.

3         THE COURT:  All right.  So has there been a stay of

4  the confirmation order?

5         MR. DEMO:  We've agreed to a short administrative

6  stay —

7         THE COURT:  Okay.

8         MR. DEMO:  — as all this stuff has been going on.  I

9  believe the administrative stay — actually I can't remember when

10  it expires, but we have agreed to a short administrative stay.

11         THE COURT:  Okay.  And so it's —

12         MR. DRAPER:  Your Honor, this is Douglas Draper.

13         THE COURT:  Okay, go ahead.

14         MR. DRAPER:  Just to give the Court some background, —

15         THE COURT:  Go ahead.

16         MR. DRAPER:  — there were two — you denied the stay

17  pending appeal.  There were two appeals taken from your ruling.

18  One by myself on behalf of Dugaboy and one by Devor (phonetic)

19  on behalf of other entities.  They both went up to Judge Godbey.

20  He has never ruled on the stays pending appeal.  So what was

21  done is inasmuch as the motion — the appeal of the confirmation

22  order is up in the Fifth Circuit, last night Devor filed a

23  motion for a stay pending appeal in the Fifth Circuit, and

24  that's pending.  So that's the procedural background of what's

25  gone on.

*Adversary 20-3195, Committee's Motion to Stay*            49

1          THE COURT:  All right.  Thank you, Mr. Draper.

2          All right.  Well, I'll hear opening statements from

3    our defendants.  And I ask you please not to be duplicative of

4    each other.  So who wants to go first for the defendants?

5          MR. PHILLIPS:  Your Honor, Louis M. Phillips on behalf

6    of Highland Dallas Foundation and CLO Holdco Ltd.  We filed a

7    response in opposition to the motion to stay.  And we are the

8    ones who, my firm and I, and I'm the one that filed, that sent

9    messages across to counsel for the committee in response to the

10   request for consent or notice of opposition.  So I guess since

11   we filed the response we ought to go forward.

12         We have reviewed the — we laid out a time line in our

13   response.  We've laid out communications between counsel and our

14   response.  We laid out what we think the burden is.  And we've

15   laid out the case law that we think establishes the burden for a

16   stay.

17         What we are concerned about is the — first of all, the

18   90-day stay, it might even come around as far as further

19   activity in the lawsuit because we don't know what the Court

20   would do on June 3rd.  We know that the Local Rules require that

21   — or set forth that the Court will issue a report after the

22   conference on June 3rd about — to the District Court concerning

23   the motion to withdraw reference.  We filed a motion to withdraw

24   reference.  We filed a first response to the litigation, A, a

25   motion to withdraw reference; and, B, a motion to dismiss under

APPX. 10503

1   Rule 12(b)(6) and a motion for a more definite statement as

2   well.  Both our filings were followed by other defendants who

3   sought withdrawal of the reference and also dismissal.

4           This Court has pushed aside the motion to dismiss

5   pending resolution of the — of the motion to withdraw reference,

6   which we think is entirely appropriate and we're fine with, so

7   where we are, Your Honor, —

8           THE COURT:  And let me — let me just interject there.

9   That is always 100 percent of the time my practice, and I think

10  the other bankruptcy judges here.  It's out of deference to the

11  District Court.  If the District Court ends up withdrawing the

12  reference, they may want to say, 'I want to withdraw the whole

13  darn thing.  We don't even want you doing pretrial matters,' so

14  we don't want to get ahead of them by considering a pretrial

15  matter.  So I did what I do in every case and will take the next

16  steps —

17          MR. PHILLIPS:  And we agree a hundred percent with

18  that approach, Your Honor.  We didn't really know how we were

19  going to proceed on the motions to dismiss.  But we had

20  deadlines to filing and we got very brief extensions for one of

21  our clients to file a response to the complaint after service.

22  On the other client, we didn't get any extension to file a

23  response.  So we filed timely responses and we didn't know how

24  the Court was going to handle the motion to dismiss.  And the

25  way the Court just handled them is entirely what we — we agreed

1  that that was the way to do it, because the District Court has

2  several alternatives if it determines to withdraw the reference.

3  And we know the courts, we've looked at the Court's Local Rule.

4  We just don't know how long, and we have no control and we're

5  fine with having no control over how long the Court would —

6  would have to take, given its docket, to issue its report to the

7  District Court.  And we have no control over what the District

8  Court would do.

9          Our problem with the motion for a stay is that we know

10  that the only things really pending now are motions to withdraw

11  reference.  Those are subject to being brought before Your Honor

12  at either kind of a hearing/conference where the parties will

13  put forth their legal arguments and any evidence, but the

14  evidence will basically be the nature of a litigation and the

15  situation of the docket.  So there's no real factual issues in

16  dispute.  We have a lawsuit, we have a motion to withdraw

17  reference that's been briefed.  We grant an extension of the

18  response deadline to May 21st in connection with the request by

19  counsel.  And we purposely asked the Court for the June 3rd

20  date, all with agreement of all counsel.  And then two days we

21  get the emergency motion — or last night, yesterday we get the

22  emergency motion to stay when the litigation assistant was, in

23  fact, retained on the day or two after we filed our responses.

24  And there was no mention in any way, shape, or form of a need to

25  stay at that time.

*Adversary 20-3195, Committee's Motion to Stay* 52

1    So we have one thing pending:  Motions to withdraw the

2  reference.  We have reviewed and set forth in our response the

3  scope of services for which Teneo was being retained.  It does

4  look to us like it is — it looks like litigation support and

5  litigation analysis.

6    And I hear what counsel for the plaintiff is saying,

7  but there have been — she's — we agree that there has been

8  months and months and months of analysis, there have been

9  millions and millions and millions of dollars spent on U.S. —

10  UCC counsel fees.  They have gone through thousands and

11  thousands of documents.  They came up with this piece of

12  litigation.  This is the one I know about.  This is the one

13  pending before the Court.  And there might be — there is a

14  suggestion that there is an overarching litigation strategy

15  being employed, but this is what we have right here.  And that's

16  speculation that we have no idea about and we assume the Court

17  has no idea about.

18    So we have one thing that we want decided and it's

19  easy for a plaintiff to say — and, look, we're chastised for

20  being defendants who want to move the lawsuit.  One of our

21  clients didn't even ask for an extension of the deadline to

22  respond.  We have — we asked for one extension for one of

23  clients.  And that extension dovetailed into the response date

24  for the other client so that we could file a single response for

25  both clients.  That was granted.  We appreciate that.  And when

1    the committee asked for an additional time, we granted it with

2    the proviso that we get the June 3rd date so that if we need to

3    file a reply, we'd have three or four days to file the reply.

4            We have been — we have not been the ones asking for

5    any delay and we're not going to ask for any delay.  And so I

6    don't care what other cases say, I don't care what the

7    plaintiff's lawyer says about defendants always want to delay.

8    We're not asking for any kind of delay.  We want to move

9    forward.  And we think we have the right to figure out and find

10   out what court is going to be handling our litigation.  That's

11   what we're asking for.

12           We've already said in the communications that we've

13   listed on our witness and exhibit list that we'll be more than

14   happy to talk about some type of stay about motions — you know,

15   discovery, whatever, whatever, if there — if the litigation

16   advisor needs to get up to speed on what documents are out

17   there, what documents it would have to review, that's fine.

18   We're probably going to do some discovery.  But we're only going

19   to discovery if our motion to dismiss under 12(b) are not

20   granted, because if they are there doesn't need to be any

21   litigation advice or any analysis about alternatives or

22   objectives or overarching strategy to deal with the motion to

23   dismiss under Rule 12(b).  That's a legal issue.  And the

24   counsel is very adept — we say counsel's adept.  We know they're

25   adept.  That's why we know that they are ready to proceed in

1    response to our motion to withdraw reference.

2            And then if the District Court takes it after Your

3    Honor gives her report, then we'll bring the motions, we'll get

4    with the lawyers for the plaintiff and we'll make — bring our

5    motion to dismiss before the District Court on some kind of

6    agreed schedule, but those are legal issues.  There is no advice

7    needed for a motion to withdraw reference.  There's no advice

8    needed for a motion to dismiss under 12(b).  Those are legal

9    questions and — and the idea that Sidley and Austin needs

10   assistance from an advisor as to how to approach a legal issue,

11   we don't think is meritorious.

12           So, Your Honor, we have put — we have a witness and

13   exhibit list of six documents.  One is — Document 1 is the

14   application to employ the Teneo firm.  2 is the — 2, 3, 4, 5,

15   and 6 are email communications we have provided them.  They are

16   between counsel that are before the Court here today, just to

17   show that we granted extension for them to respond, then they

18   ask, and we responded, and so that they were on notice that we

19   opposed the requested stay.  And we would like for the motion to

20   withdraw reference to go forward.

21           The parties will have plenty of time to work out

22   discovery, Rule 26 issues, motion for relief — motion to dismiss

23   under 12(b) in front of whichever court is going to handle it.

24   Certainly this Court is — if the motion to withdraw reference is

25   denied, this Court will be in full control of when we have

*Adversary 20-3195, Committee's Motion to Stay*                    55

 1  hearings on the motion to dismiss.  And we understand that.  So

 2  will the District Court if the District Court grants the motion

 3  to withdraw the reference.  The District Court will determine

 4  hearings on the motion to dismiss under Rule 12(b).  And then we

 5  have those two things to get past.  And those are legal

 6  questions, legal questions that are already before the Court or

 7  already there.  So we don't see how additional time is necessary

 8  with respect to that.

 9        We think by the time the stay — quote stay expires

10  we'll have a determination at least on the withdrawal motions.

11  And we can probably have a setting on the dismissal motions.

12  And if there — if the plaintiffs survive dismissal, then we'll

13  have discovery that all litigants will be involved in and

14  agreeing to and with scheduling orders, et cetera, from whatever

15  court is going to try this case.

16        And I'd like to say also that once we have — CLO

17  Holdco has been involved in the bankruptcy case.  We recognize

18  that.  I was not the lawyer for CLO Holdco, but I'm representing

19  CLO Holdco now.  The Highland Dallas Foundation has not been.

20  And the Highland Dallas Foundation is a charitable organization

21  that has institutional people on the board, has one donor seat

22  on the board, but it's — it's being sued for twenty something

23  million dollars.  And the idea that it has no interest in

24  getting this resolved is not correct.  It wants to get it

25  resolved and that's why we're opposing this stay.  Thank you,

1   Your Honor.

2          THE COURT:  All right.  A couple of follow-up

3   questions.  I'm struggling a bit with the fact that we have a

4   couple of defendants, two or three defendants that have not even

5   been served yet.  So is it appropriate for this Court to be

6   going forward on a motion to withdraw the reference when I don't

7   know what's going to happen with those two defendants.  Are they

8   going to be served?  If so, what sort of position are they going

9   to have with regard to the reference being withdrawn?

10         And, in any event, ultimately I'm going to have to

11  slice and dice this in a report to the District Court saying,

12  you know, these entities filed proofs of claim and that may

13  affect the authority of the Court, you know, maybe it does.  I

14  mean a part of me thinks what's going on here and should we just

15  wait till they have been served so we have the ability to report

16  to the District Court:  Here is every defendants' position on

17  this.

18         MR. PHILLIPS:  Your Honor, I can't answer the

19  question.  I don't — I mean it seems to me like we have — we

20  have — CLO Holdco was served.  And it is a foreign entity.  We

21  don't know why the other two have not been served.  I'm not — we

22  just don't know.  So I mean does that mean if we — I mean we had

23  to go forward, we had to answer, we had to respond.  We had a

24  deadline to do it.  It didn't matter that two hadn't been

25  served.  And so we — you know, if we hadn't responded, given our

*Adversary 20-3195, Committee's Motion to Stay*                    57

1    service, we would have had a default entered against us and a

2    request for a default judgment. So I don't know the answer to

3    the question because I can't imagine that a plaintiff can file a

4    lawsuit and then the lawsuit was filed months ago and not serve

5    two people and keep the defendants hung up.

6            I don't know if there is a problem of service. There

7    was one entity that got served that is a foreign entity. I

8    don't know why the other ones haven't been served. The Highland

9    Dallas Foundation was served. The other parties who have

10   appeared were served. So we have no control over that because

11   we're not serving anybody. And I would think that the part — I

12   did some looking in the — in the record and it seems to me like

13   we don't have — you know, I can't tell you whether we have —

14   what the arguments would be for the parties who have not been

15   served.

16           I would assume given that everybody has — my two

17   clients have filed what they filed. CLO Holdco filed a proof of

18   claim, but it was in effect disallowed and converted to a claim

19   for zero. My other client, Highland Dallas Foundation, has not

20   made any appearance in this case. So all I can say is we think

21   two — I think the two clients that I'm currently representing,

22   we know they have been served. We had a deadline to respond.

23   We have responded. And we think we're entitled to a jury trial

24   and withdrawal of the reference.

25           MS. MONTGOMERY: Your Honor, if I can answer the

1    question.   CLO Holdco was served through its counsel, whereas

2    the other two foreign entities require domestication of the

3    subpoena in the Caymans.  And it's our understanding that may

4    take as long as — just having heard — as another two months for

5    that process to be complete.

6            THE COURT:  All right.  My other question I guess is

7    maybe more rhetorical than something you could really answer.  I

8    — you know — on the one hand, you know, what Ms. Montgomery is

9    arguing:  Our true plaintiff contemplated for this lawsuit isn't

10   in place yet because the plan hadn't gone effective and, you

11   know, some — some of the defendants here or affiliates of

12   defendants are wanting to delay, delay, delay further when the

13   plan can go effective.  You know last night a motion for stay

14   pending appeal with the Fifth Circuit was filed.  So it's like,

15   no, don't let the plan go forward, let's not get Mr. Kirschner

16   in place.  But, oh, don't issue a stay on this lawsuit.  It just

17   feels a little bit inconsistent, the two positions.  What — do

18   you have anything to say to that?

19           MR. PHILLIPS:  I have — all I have to say, all I can

20   say, Your Honor, and that is CLO Holdco, as I understand it, is

21   not an appealing party.  My other client that's been served,

22   Highland Dallas Foundation, is not an appealing party.  We're a

23   defendant in — in this lawsuit.  And so we don't see — we're not

24   in a position to be inconsistent about anything.  We're not an

25   appellant.  We're not seeking any kind of relief on appeal.  And

1   we — but we are defendants who have been served and who have

2   filed motions to withdraw reference.  So you will have to ask

3   other people about that.  I'm completely consistent in my

4   position.

5           MR. DRAPER:  Your Honor, this is Douglas Draper on

6   behalf of Dugaboy, who has both —

7           THE COURT:  All right.

8           MR. DRAPER:  — appealed your decision —

9           THE COURT:  Okay.

10          MR. DRAPER:  — and has asked for a stay pending

11  appeal.

12          THE COURT:  Okay.

13          MR. DRAPER:  It's not an inconsistent position because

14  two reasons.  Number one, you gave the committee authority to

15  file this suit.  The committee took that authority and filed the

16  suit within the time period.  So whether the case is going

17  forward or — the stay — the case is stayed and the confirmation

18  order is stayed or not, this action and this entity and this

19  proceeding is going to go forward.

20          And so all we're talking about here, just so we — it's

21  all clear, we're just talking about who is going to try this

22  suit.  We're not talking about a master litigation strategy.

23  We're talking about a location.  And, quite frankly, it would

24  surprise the hell out of me if — if the new person, or whoever,

25  says, look, I want to go to the District Court.

1          This is just a location issue, nothing more.  You can

2    sift through each one of these defendants who have been served

3    as to whether we have a right to a jury trial or not.  And each

4    one, as the Court recognized, is on a — on a defendant-by-

5    defendant basis.  I did file a proof of claim.  Whether I have a

6    right to a jury trial, you're going to have to look at to see if

7    in fact my proof of claim relates to this claim.

8          Mr. — Mr. Phillips is a defendant set of facts.  And

9    these other defendants may be a different set of facts.  So all

10   we're talking about is location.  It is purely procedural.  And

11   I don't think the stay at the district — of the confirmation

12   order or not is — is in any way impacts this whatsoever.  This

13   is a location question.

14         THE COURT:  All right.  Any other opening statements

15   from defendants?

16         All right.  Ms. Montgomery, you may put on your

17   witness.  And I'm fine with the proffer, but we'll then swear

18   him in and see if there cross-examination from the others.  All

19   right, you may proceed.

20         MS. MONTGOMERY:  Yes, Your Honor.  At this point we'd

21   like to proffer Mr. Kirschner's declaration that was submitted

22   in support of our motion for the stay as the content of his

23   proposed testimony.  Mr. Kirschner is obviously here to answer

24   any questions you have or on cross-examination after he's been

25   sworn in.  And, Your Honor, we would just reserve our right to a

Case 19-34054-sgj11 Doc 3445-16 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 62 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 521 of 1726 PageID 11842

*Adversary 20-3195, Committee's Motion to Stay*                    61

 1  brief redirect should that prove necessary.

 2          THE COURT:  All right.  So I have in front of me the

 3  Declaration of Marc S. Kirschner.  It was actually attached to

 4  the committee's motion for stay.  It's about four pages long.

 5          Let me ask:  Are there lawyers who are going to want

 6  to cross-examine Mr. Kirschner?

 7          Going once, going twice, no one wishes to

 8  cross-examine him?

 9          THE REPORTER:  He's on mute.

10          THE COURT:  Oh, Mr. Phillips, —

11          MR. PHILLIPS:  Your Honor, I'm sorry.  I was on mute.

12  I'm on mute, as I probably already muted, but I was on mute and

13  I apologize.

14          Your Honor, this — this is — this declaration, there's

15  no way to cross-examine a declaration that speaks in conclusory

16  language.  The declaration, it was mimicked and mirrors —

17  mirrors exactly as the party looking into the mirror, not as the

18  reverse of the party looking into the mirror, argument by —

19  opening statement by counsel.  I would ask a couple of questions

20  of Mr. Kirschner, please.

21          THE COURT:  All right.  Mr. Kirschner, I need to swear

22  you in.  Would you speak up, say, "testing one, two."

23          MR. KIRSCHNER:  Yes.  Testing one, two.

24          THE COURT:  All right.

25          MR. KIRSCHNER:  Coming through?

*Kirschner - Cross/Phillips*                                            62

1          THE COURT:  I — I hear you, I don't see —

2          MR. KIRSCHNER:  Okay.

3          THE COURT:  There you are.  Please raise your right

4    hand.

5          MR. KIRSCHNER:  I can.

6      MARC S. KIRSCHNER, COMMITTEE'S WITNESS, SWORN/AFFIRMED

7          THE WITNESS:  I do.

8          THE COURT:  All right.  Thank you.

9          Mr. Phillips, go ahead.

10         MR. PHILLIPS:  Yes, Your Honor.  Thank you.  Just a

11   couple of questions.

12                       CROSS-EXAMINATION

13   BY MR. PHILLIPS:

14   Q.  Mr. Kirschner, in paragraph 7 of your declaration, if you

15   could find it.  Just let me know when you're there.

16   A.  I'm there.  Thank you.

17   Q.  Okay.  Thanks.  You say that it's important for your firm to

18   gain an understanding of the complex transactions described in

19   the adversary proceeding, particularly in connection with the

20   motion to dismiss and motions to withdraw reference and complex

21   issues before the Court.  What does that mean?

22   A.  That means that, as Ms. Paige indicated in her opening

23   statement and as the Court and all the defendants understand, I

24   was — when I was designated as litigation trustee in January,

25   there has been delay after delay after delay in the effective

1  date of the plan, and now we're even at the Fifth Circuit, so

2  the trust and my role as subtrustee has not yet gone into

3  effect.  Prior to April 15th, I had no access to the debtor, to

4  the committee, or any of the attorneys, no access through any

5  protected information.  I had no input on the complaint.

6         I became worried as the passage of time went on about

7  the possible running of statute of limitations later on this

8  year in October.  And it was I who suggested to Mr. Clemente to

9  come up with what is an extremely unusual procedure, to permit

10 the committee retain me on an interim basis until the

11 effectiveness of the trust, and then to flip my work effectively

12 into the trust.

13        This is very unusual.  It's not even yet approved by

14 the Court.  Nevertheless, I and my firm have worked very

15 diligently since April 15th to get up to speed on this entire

16 complex factual and legal situation.  I cannot just look at the

17 Holdco adversary in a vacuum.

18        There has been as the Court and all the parties here

19 know much better than I, there has been ongoing litigation on

20 many fronts for quite a long time.  There has been supplied a

21 Byzantine web of some 1400 entities —

22        MR. PHILLIPS:  Your Honor, Your Honor, —

23        THE WITNESS:  — to accomplish —

24        MR. PHILLIPS:  Your Honor, could I interrupt?  He

25 needs to answer the question.

*Kirschner - Cross/Phillips* 64

```
 1  BY MR. PHILLIPS:
 2  Q.  What does — what does — what does the understanding about
 3  the motion to withdraw reference mean?  What do you need to get
 4  up to date on the motion to withdraw reference?
 5  A.  I'm responding to your question.
 6          THE WITNESS:  If I may, Your Honor, I'm responding to
 7  the question.  I'm almost done —
 8          MR. PHILLIPS:  Your Honor, a narrative, a preexisting
 9  narrative —
10          THE COURT:  Ah, —
11          MR. PHILLIPS:  We just — I just want to know.  We have
12  legal issues.
13          THE COURT:  Okay, I sustain the objection —
14          MR. PHILLIPS:  I want to know what he —
15          THE COURT:  If you could reask the question and we'll
16  see if we can get an answer —
17          MR. PHILLIPS:  All right.  I'll reask the question,
18  Your Honor.  I'm sorry.  I apologize.
19          Your Honor, I'm going to withdraw any questions.  I'm
20  — this is — this is going to turn into just an argument.  His
21  declaration and conclusory and it's just going to be more
22  conclusion.  So I'm — I'm willing to argue from his declaration
23  in closing.
24          THE COURT:  All right.  Any other questions?
25          No other —
```

*Kirschner - Redirect/Montgomery*                                      65

1              MR. DRAPER:  None, Your Honor, from Dugaboy.

2              THE COURT:  Okay.  Anyone else?

3              Ms. Montgomery, do you have any redirect on that brief

4    cross?

5                       REDIRECT EXAMINATION

6              MS. MONTGOMERY:  Yes.  I think, Your Honor, I would

7    just ask if there is anything else that Mr. Kirschner feels the

8    Court should be aware of before reaching a decision on today's —

9    on today's motion?

10             MR. PHILLIPS:  Your Honor, we object to that question.

11   That's not even a question.

12             THE COURT:  I overrule.  He can answer.

13             THE WITNESS:  Okay.  Thank you very much, Your Honor.

14             As I was saying, there is a Byzantine web here of over

15   1400 entities, many moving intertwined parts.  I have literally

16   and my firm has literally had to triage the monumental amount of

17   work that is necessary to get my hands on this overall

18   situation.  There's allegations that money's been flying all

19   over the world —

20             MR. PHILLIPS:  Your Honor, this is not — this is not

21   appropriate testimony.  This is — that's hearsay.  There's

22   allegations all — money flowing all over the world.  This is —

23   this is a narrative that has nothing to do with the pending

24   motion to withdraw reference and is, in essence, an

25   assassination piece.  This is — what we —

*Kirschner - Redirect/Montgomery*                                         66

1          THE COURT:  I overrule.  He's trying to explain why he

2   needs 90 days at bottom here, so I think it's relevant.

3          MR. PHILLIPS:  Well, the long —

4          THE COURT:  And I understand everything's an

5   allegation subject to evidence.

6          MR. PHILLIPS:  Well, we're talking about

7   allegations, —

8          MR. [SPEAKER]:  Right.

9          MR. PHILLIPS:  — we're talking about — we just heard

10  they're allegations about money flying all over the world.

11  That's not an acceptable testimony.  You know that and everybody

12  on this call knows that.  That's absolute abject hearsay and the

13  idea that you could — you could buttress a motion for stay after

14  you've had 30 days to review a legal analysis about a motion to

15  withdraw reference, because there are allegations of money

16  flowing all over the world is ridiculous.  Your Honor, we — we

17  firmly and in this way object —

18         THE COURT:  Overruled.  I understand you don't like

19  the emotional, if you want to call it, emotional language.  You

20  think it's hyperbole, you think it's hearsay, but he didn't — he

21  didn't offer an out-of-court statement.  He's just saying the

22  allegations — you know, they're in pleadings, they're

23  allegations in many different adversaries, and so I overrule the

24  objection.

25         You can complete your answer, Mr. Kirschner.

*Kirschner - Redirect/Montgomery* 67

1      THE WITNESS:  Thank you very much, Your Honor.

2      All of these complexities in my view potentially

3  impact on the motions to withdraw.  I recently realized that I

4  cannot properly perform my fiduciary duty to all creditors by

5  the deadline for a response to the motion to withdraw and the

6  motions to dismiss.  I am in fact considering potential

7  amendments to the existing Holdco adversary to possibly other

8  issues that may impact the withdrawal motion.

9      Your Honor said this morning that it's important to

10  take into consideration both procedural and substantive matters.

11  I am worried about potential impacts of whatever I do.  And bear

12  in mind, as Ms. Paige indicated, I am — (brief garbled audio) —

13  no process plan.  All of this was supposed to have been put in

14  the litigation trust under my auspices.  I am now litigation

15  advisor, not yet approved by the Court.  It is the client, I,

16  who direct, after consultation, all strategy by lawyers.

17      I have a long history, as Your Honor has seen from my

18  C.V., of directing complex billions of dollars of litigations.

19  I rely on lawyers, but I am very involved in every aspect of the

20  case.  This is very confusing, not just the CLO Holdco itself

21  but the entire complexity of all of the potential matters here

22  that I need to study in a very short period of time.  I'm

23  concerned that dealing just with this in this couple of days is

24  going to be harmful to creditors ultimately and respectfully

25  request the Court to grant the 90-days adjournment.

*Committee's Motion for Continuance* 68

1    Maybe I'm being overly cautious and I apologize for

2 that, but I feel strongly about my fiduciary duty and want to do

3 the best I can to understand everything that's going on before

4 we have to respond both to the withdrawal motion and the motion

5 to dismiss.  So thank you, Your Honor.

6    THE COURT:  Thank you.

7    Anything else, Ms. Montgomery, as far as examination?

8    MS. MONTGOMERY:  No, Your Honor.  I have no further

9 questions.

10    THE COURT:  All right.  Mr. Phillips, or anyone else,

11 any recross on that redirect?

12    No?  All right.  Thank you.

13    All right.  This —

14    MR. PHILLIPS:  No, Your Honor.  I muted myself again.

15 No, Your Honor.

16    THE COURT:  Okay.  Is that all of the evidence you're

17 going to present, Ms. Montgomery?

18    MS. MONTGOMERY:  It is, Your Honor.

19    THE COURT:  All right.  Well, I'll turn to our

20 objectors —

21    MR. PHILLIPS:  We —

22    THE COURT:  I'm sorry?

23    MR. PHILLIPS:  We'd like the enter and offer — we'd

24 like to offer and introduce our exhibits that we put on our

25 witness and exhibit list, Your Honor.

1          THE COURT:  Okay.

2          MR. PHILLIPS:  And we've submitted them to the Court,

3    Exhibit 1 through 6, as itemized in our witness and exhibit

4    list.

5          THE COURT:  All right.  This is Docket Number 52 in

6    the adversary, correct?

7          MR. PHILLIPS:  Yes.  Yes, ma'am.

8          THE COURT:  All right.  So let me pull it up here.

9    Okay, we've got the application to employ Teneo and different

10   emails.

11         Any objection, Ms. Montgomery, to this?

12         MS. MONTGOMERY:  I have no objection to Exhibit 1,

13   Your Honor, the application, and obviously it's a pleading that

14   we filed.  I have questions about the relevance of the other

15   exhibits, but I have no objection to their admission.  They're

16   emails that went back and forth between the parties.

17         THE COURT:  All right.  Well, do you want to address

18   that relevance?  I'm not sure if it was an objection or — was it

19   an objection ultimately?  Was it —

20         MR. PHILLIPS:  I didn't hear an objection, Your Honor.

21         THE COURT:  Ms. Montgomery.

22         MS. MONTGOMERY:  Your Honor, for purposes of today's

23   hearing, I have — I have no concerns about their admission for

24   your consideration.

25         THE COURT:  Oh, okay, so —

1          MS. MONTGOMERY:  We're not contesting the history of

2    the back-and-forth between the parties.

3          THE COURT:  Okay.  I will admit 1 through 6.

4      (Defendants' Exhibits 1 through 6 received in evidence.)

5          THE COURT:  All right.  Any — any other evidence from

6    our defendants?

7          MR. PHILLIPS:  No, Your Honor.

8          THE COURT:  All right.  Well, anything in the way of

9    closing argument?  Ms. Montgomery, you are the movant.  You go

10   first.

11         MS. MONTGOMERY:  Yes, Your Honor, just very briefly to

12   address a couple of points.  First of all, I think that there's

13   been some sort of misconstruing of Mr. Kirschner's role as the

14   litigation advisor and ultimately the litigation trustee.  He —

15   functionally, the litigation advisor — we're in a very unique

16   situation here.

17         The parties never expected that the effective date

18   would be delayed in the way that it has been.  We're coming up

19   on the two-year anniversary of the filing of the proceedings.

20   There are a number of claims that need to be investigated and

21   decisions make about how they will be pursued in the next couple

22   of months.  And so this litigation advisor role, as Mr.

23   Kirschner testified, is somewhere unique in that we're trying to

24   work around the constraints that have been created by the way

25   that these proceedings have moved forward.

*Committee's Motion for Continuance*                                          71

1        The litigation advisor is really functionally a proxy

2   for the role that Mr. Kirschner will have upon the effective

3   date of the plan as litigation trustee. He's not acting in the

4   capacity of a law firm or like and FTI or a DSI, or any of the

5   other professionals that have been specifically retained in the

6   bankruptcy to date because the role isn't the same traditional

7   role. Right, he is functioning in a way that will allow him

8   access that he needs to the data to get up to speed to make the

9   decisions that have to be made so that he can, you know, proceed

10  in the way that is best for meeting his fiduciary duties to the

11  ultimate litigation subtrust.

12        So to the extent that there is any sort of argument

13  that, you know, he — that his role is duplicative or any of the

14  other things that we've heard today or that we've seen in the

15  response, I think that those are just a misunderstanding of what

16  he will actually be doing. He is going to be the client, Your

17  Honor. He is not going to be the lawyer.

18        The other thing I think that we talked about a bit is,

19  you know, this argument that Mr. Kirschner has been involved in

20  the case since April 15th and therefore he's had plenty of time

21  to understand everything that he needs to know to be able to

22  move forward. Technically, Your Honor, I think it goes without

23  saying he's not officially retained until after the return date

24  on the motion to withdraw. And even so, just based on the years

25  now that we've spent in this case, I can — I can argue to you

1    and I think Your Honor will feel the same way, there's too much

2    learn in that short a time period to be able to say that you are

3    proceeding in the way that is going to be best for the estate in

4    that short timeframe.

5            We're working to get Mr. Kirschner up to speed, the

6    debtor is working to get Mr. Kirschner up to speed, but there is

7    a lot that has happened here and that continues to change on a

8    daily basis, including the stay that was filed just last night.

9            And then, finally, Your Honor, I would argue that

10   there has been no harm established by virtue of the stay. And,

11   in fact, all of the things we've heard today established the

12   fact that there may be harm if the stay is denied. So, for

13   example, Your Honor you know very correctly pointed out that we

14   have two international defendants who haven't even appeared at

15   this proceeding yet, right. We may not effectuate service for

16   another two months. It may be another 60 of these 90 days that

17   we're requesting for a stay may be required just to get them

18   properly served and into this proceeding.

19           And, you know, I agree, Your Honor, that there may be

20   issues that surround those two defendants that, you know, we

21   won't be able to take into consideration until they're properly

22   here in the Court and able to file their own motion to withdraw,

23   if that's what they want, or state their position with regard to

24   it.

25           You know, Your Honor, moreover, there is a lot going

1   on here and Mr. Kirschner does realistically need time to be

2   able to develop his approach and make decisions about whether or

3   not there will be amendments to the complaint that could impact

4   the motion to withdraw.  He needs to make decisions about other

5   claims that may be brought.  There are a lot of moving parts.

6   It's a unique situation.  And we would urge the Court to allow

7   him the time that he needs to be able to effectuate his duties

8   in the way that he sees fit.

9              THE COURT:  And I know I have it right in front of me,

10  but the employment application for Mr. Kirschner and his firm to

11  potentially be litigation advisor until the plan goes effective,

12  when is that set for hearing?

13             MS. MONTGOMERY:  It's set for June 7th, Your Honor,

14  and the motion to withdraw is currently set for June 3rd.  And

15  that — that motion to retain Mr. Kirschner was only filed on

16  Friday of last week, and our motions that you're hearing today

17  were filed on Tuesday.

18             THE COURT:  Okay.

19             MS. MONTGOMERY:  So it's a very short delay of time

20  between the two.

21             THE COURT:  All right.  I'll hear other closing

22  arguments.

23             MR. PHILLIPS:  Your Honor, thank you.  As far as harm,

24  we have one — we have one client, Highland Dallas Foundation,

25  who has made no appearance in this case, as has very — and

1 assume they're being sued for $24 million, and that's not a

2 problem.

3         Under the argument structure we're hearing today, we

4 could never really get until a plaintiff has said, 'I have no

5 further ability to amend the complaint,' a hearing on a motion

6 to withdraw reference.  Look, we didn't file the complaint.  The

7 complaint was filed four or five months ago.  And very able

8 counsel looked, and as counsel has argued, has looked at

9 thousands and thousands of documents, have been paid millions

10 and millions of dollars for its work, and it came up with this

11 lawsuit that was filed — I've forgotten the filing date, but it

12 was filed at least four and a half months ago, January of this

13 year I believe.  Ms. Montgomery — counsel for plaintiff can say

14 the exact date.

15         But we've got two defendants who haven't been served,

16 but I've got one — I've got two that have been served.  And we

17 have established a basis upon which we can get — we have a right

18 to a jury trial and a right to withdrawal of the reference.  And

19 that motion has been filed.  And the idea that I'm going to

20 bring — I'm going to change clients — and it's really

21 complicated.  After we've done millions and millions and

22 millions of dollars worth of work, looked at thousands and

23 thousands and thousands of documents, that we may come in and do

24 a different lawsuit that pleads around a motion to withdraw

25 reference is no basis for a stay.

1          That — that — the narrative about, you know, the

2    hearsay, the narrative about the aspersions, the this and the

3    that, this is really complicated, this is really hard, well, we

4    have a lawsuit in front of you, Your Honor, and it's been

5    pending for months.  And it was filed by the committee that had

6    authority to file it and it was filed by the law firm for the

7    committee that had authority to represent the client who filed

8    it.  And that's what they came up with after months and months

9    and months of years of looking at stuff and looking at documents

10   and deciding what to bring as far as claims of this nature

11   against these defendants.  I'm worried about two of them.

12          I'm worried about — particularly worried with respect

13   to the stay, I'm worried about both of them for — with respect

14   to the stay, but one of my clients, Highland Dallas Foundation,

15   has had no involvement in this bankruptcy case.  And now let's

16   just wait around.  It's got a $24 million cloud hanging over its

17   head and it's expected to continue to try to raise money and try

18   to act as a charity while — while Mr. Kirschner gets familiar —

19   refamiliarized and gets familiar with the situation where

20   counsel and the committee have been working for, what, a year

21   and a half, two years, to get ready, and here's what the lawsuit

22   — here's the lawsuit they came up with.

23          So no harm has been alleged.  In fact, harm will be —

24   all you heard about the potential harm to the estate is that

25   notwithstanding millions and tens of millions of dollars of fees

Case 19-34054-sgj11 Doc 3445-16 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 77 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 536 of 1726 PageID 11857

*Committee's Motion for Continuance*                                       76

 1   paid to professionals to determine litigation claims and we have

 2   barely, what, two months left to bring them?  That's 22 months

 3   worth of looking into things, millions and millions of fees.

 4   The estate might be irretrievably harmed if a motion to withdraw

 5   reference moves forward, when the committee and counsel were

 6   responsible and filed this complaint, and they were responsible

 7   to file the complaint under the transaction and occurrences,

 8   standards such that whatever they haven't pled, whatever they

 9   haven't pled by the time to plead is gone.  And the idea that we

10   need another 22 months for Mr. Kirschner to get up to speed or

11   some other to come up with additional litigation and additional

12   amendments to postpone a withdrawal of reference means that you

13   can never get a hearing on a withdrawal of reference.

14          We think the pleadings are there.  They have been —

15   they have been investigated, we assume.  They're subject to

16   motions to dismiss, which are legal questions.  They're subject

17   to motions to withdraw reference, which are legal questions.

18   And we're ready for a decision on what court's going to handle

19   this.  And by the time that's done, Mr. Kirschner will have

20   whatever rights he has, as if he has any.  The plan will either

21   be confirmed and effective or it won't be, but that's not our

22   problem.  Thank you.

23          THE COURT:  Any other closing arguments?

24          Going once, going twice.

25          MR. ASSINK:  Your Honor, I apologize.  Just for the

1   record, this is Bryan Assink for Mr. Dondero.  And Mr. Dondero

2   joins in the objections made by defendants in this proceeding

3   and adopts the arguments made by Mr. Phillips.  That is all,

4   Your Honor.  Thank you.

5             MR. DRAPER:  Your Honor, can the Court hear me?

6             THE COURT:  Yes.

7             MR. DRAPER:  This is Douglas — okay.  What I'd like to

8   make, a short comment.  The argument that there are unserved

9   parties is a red herring and it's a red herring for the

10  following reason.  The Court has to go through each defendant to

11  determine if they have a right to — a right to withdraw a

12  reference.  The facts with respect to Mr. Phillips' clients are

13  different than the facts with respect to my clients.  So the two

14  unserved parties may have a right to do it, they may not, but it

15  doesn't affect your ruling with respect to Mr. Phillips' clients

16  or mine because we have either waived or didn't waive our right

17  to a jury trial.  And so this argument that there's two other

18  parties out there, again, is a red herring.  They have their own

19  right and it will not affect Mr. Phillips' right or mine.  So I

20  think that needs to be taken into account.

21            And, again, all we're talking about is location.  The

22  — if they want to amend their suit at a later point, that's

23  fine, but we are just talking about who's going to hear the

24  case.  And, quite frankly, Mr. Phillips is right, I don't think

25  the Court can in a very short period of time unpack these

*The Ruling of the Court on the Motion to Continue*                    78

1  withdrawal issues.  And so you may be looking at a

2  recommendation that you make that takes 30 or 60 days.  We don't

3  know what the District Court's going to do with it.  And, quite

4  frankly, you know we may be 90 or 120 days down the road before

5  the location is even determined.

6           That's all I have to say, Your Honor.

7           THE COURT:  All right.  Anyone else?

8                  <u>THE RULING OF THE COURT</u>

9           THE COURT:  All right.  I'll just be honest, I've

10  tried hard to understand where everyone is coming from here, but

11  this has been yet another hearing where I just frankly don't

12  understand why the big fight, why all the papers, and why all

13  the Court time used.

14          I mean I think I hear everyone agreeing that the

15  plaintiff is essentially going to get its/his 90-day stay here.

16  I mean if I were to go forward on the motions, plural, motions

17  to withdraw the reference, let's be real, it's going to take:

18  This Court two or three or four weeks to get a report and

19  recommendation to the District Court, given the complexity here

20  of the parties and, you know, we try to do a very clear roadmap

21  for the District Court, what's this lawsuit about, who are the

22  parties; and then it's going to take a few weeks for the

23  District Court to rule on that.  So I mean optimistically, the

24  most optimistic thing I can imagine is 60 days from now you have

25  an order from the District Court saying where the lawsuit's

1    going to go forward.

2             I mean so we're fighting, to me, over a big nothing

3    burger.  I think the stay is, in effect, going to happen.  So

4    all we're talking about here is pushing a plaintiff to go

5    forward, who at this point is working for free because the plan

6    hadn't gone effective and he hadn't been appointed.  I mean it

7    seems like from my perspective the defendants — again I'm trying

8    to understand the practicalities here, but I'm going to be

9    honest, it almost feels like defendants tweaking with the future

10   litigation trustee, 'We're going to make you go forward and work

11   for free when at the end of the day you're probably going to get

12   a stay anyway,' because there's no way a district judge is going

13   to rule on this in much sooner than 90 days.  It's like you're

14   just forcing him to work for free and move fast on the motion to

15   withdraw the reference.

16            And it is a red herring?  I don't know, maybe.  I

17   think likely this is ultimately going to be tried in the

18   District Court since certain parties haven't filed proofs of

19   claim.  But if the District Court does what it always does, in

20   my experience, I've never had, I can't remember ever having a

21   district court say, 'I'm withdrawing the whole darn thing.'

22   They almost always use the — they almost always use the

23   bankruptcy judges as their magistrates in a case when they

24   withdraw the reference.

25            Bankruptcy judge, handle all the pretrial stuff, the

*The Ruling of the Court on the Motion to Continue*                                     80

1    discovery disputes, the motions to dismiss, motions for summary

2    judgment.  If you were on a motion to dismiss or a motion for

3    summary judgment in a way that would finally dispose of any

4    claims, well, you have to do that in a report and recommendation

5    to me.  So I feel like we all know that's likely where this is

6    heading, so I don't know why we had to have an hour fight.

7            I don't know why it's any big shakes to just stay the

8    whole darn thing for 90 days, especially when we have the whole

9    reason the plaintiff, liquidating trustee is not in place yet,

10   because of a stay, that some of these defendants or their

11   affiliates have wanted.  It just seems silly to me.

12           And I do want to address one other thing.  There has

13   been an argument that Sidley and Austin and the committee have

14   had months to get up to speed on the issues in the lawsuit, they

15   had months to bring it.  It's been pending months.  But I'll say

16   something for the benefit of those who have not been around for

17   this whole case, in July of last year, July 2020, which by that

18   point was about 10 months into the case, it was front and center

19   to this Court the difficulty the committee was having getting

20   discovery.  They had served four requests for production, going

21   back to before this case was even pending before me.  When the

22   case was in Delaware, they were already filing, serving requests

23   for production of documents, wanting to get a protocol in place

24   for ESI, and then finally it all kind of came to a head in July.

25           And I remember saying, 'I'm sure there's a transcript

 1   out there you can access.' Gee, I may not have pressed the

 2   issue so much on this lawsuit being filed involving CLO Holdco.

 3   I may not have pressed the committee's feet to the fire so much

 4   on getting that filed if I had been fully aware at all of these

 5   efforts going on outside of the Court to get documents, to get

 6   documents, four requests for production, and then finally the

 7   protocol order, if you will, that the committee filed, asking

 8   this Court to put in place some protocol to get ESI from like

 9   nine different custodians of debtor records. So my point is

10   those who have not lived with this case for the whole time, they

11   don't know that I kind of live to regret pressing the committee

12   to get this lawsuit on file. You know I was worried because of

13   Holdco. I had like ordered money to be put in the registry of

14   the Court before I had, you know, litigation pending. So that's

15   why I put pressure. But then I learned and had a multi-hour

16   hearing on what the committee had gone through trying to get

17   documentation. So that's very much in the back of my mind here

18   in my ruling.

19          And my ruling is going to be that I grant the 90-day

20   continuance. Again, I hope that in 90 days, we — I don't know

21   if we'll know something from the Fifth Circuit on the plan or

22   not, but at least we'll be closer to that point. And, again,

23   we're looming, you know October 16th, 2021 as a deadline for

24   bringing claims, and I think that's relevant here. There's a

25   lot to be focused on that may or may not impact the way this

*The Ruling of the Court on the Motion to Continue*                    82

1   lawsuit ultimately is mapped out.  I think the fact that we have

2   two unserved defendants, I think it does matter.

3            I think a district court may be a little hesitant,

4   really want to see the complete picture on each defendants'

5   position before it rules.  So the 90-day stay is granted.

6            All right.  So please upload the order, Ms.

7   Montgomery.

8            Thank you, all, for your arguments.

9            Before we wrap it up, Mr. Clubok, if you're still with

10  us, I think you were hoping to raise something that might

11  pertain to tomorrow's hearing on the UBS debtor compromise.  If

12  you're still there, you may speak to whatever it was you wanted

13  to present.

14           MR. CLUBOK:  Good morning, Your Honor.  Still — still

15  the morning.  Hopefully you can hear me.

16           THE COURT:  I can.

17           MR. CLUBOK:  Your Honor, I'm really just previewing an

18  issue.  In light of the comment that you made earlier today

19  about having this motion, discovery, and then folks not

20  previewing it, I just wanted to alert you to the fact that in

21  our adversary proceeding we have sought discovery against five

22  third parties, Scott Ellington, Isaac Ellington, three other

23  folks, all of whom are represented by Ms. Smith, who is here,

24  you can see.  And we first sought —

25           MS. SMITH:  This is Frances Smith.  Your Honor,

*The Ruling of the Court on the Motion to Continue*                    83

1   Frances Smith on behalf of Mr. Ellington, J.P. Sevilla, Mr.

2   Isaac Leventon, Matt VRO, and Mary Catherine Lucas (phonetics).

3            I just received an email earlier this morning from Mr.

4   Clubok that he was going to do this preview for you.  To the

5   extent he gets into the substance of any motions that are not

6   filed, that's inappropriate.  And so —

7            THE COURT:  Okay.

8            MS. SMITH:  — if he wants to take Your Honor offer of

9   a preview to say what he is going to file, I'm fine with that.

10  But if he's going to start going into the substance, that is not

11  appropriate.

12           THE COURT:  Okay.  We'll let Mr. Clubok get a little

13  further into what he was going to say, and then we'll decide do

14  we need to cut it off.

15           Mr. Clubok, go ahead.

16           MR. CLUBOK:  Thank you, Your Honor.  I was about to

17  say that there were five — there's the five individuals that Ms.

18  Smith represents, we sought discovery from in April 2nd, and,

19  namely, depositions.  After a long period of time culminating in

20  a meet-and-confer last week, Ms. Smith filed a motion to quash

21  on behalf of these five individuals on Monday and set a hearing

22  date for July 29th.

23           All I'm — all I'm previewing, Your Honor, is to alert

24  you that in response to that motion to quash, a hearing date set

25  for July 29th, so effectively will end up being, you know,

*The Ruling of the Court on the Motion to Continue*                84

1    months and months of delay to these individuals who are needed

2    to move this conjunctive-relief proceeding forward, we are

3    filing our response today to Ms. Smith's motion and a

4    countermotion to compel.  And I'm merely flagging this issue for

5    Your Honor because we are going to ask either Your Honor or Ms.

6    Ellison, we're going to style our motion as an expedited

7    request, we would just simply love to have a hearing as early as

8    reasonably practicable on these issues.  And I have no intention

9    of getting into the merits now, but happy to do so.  I think it

10   will all be familiar to you from their discussions in the

11   Dondero deposition dispute, but we just — or simply I'm just

12   flagging for you, because you raised it this morning, you know,

13   why didn't people tell me, so we just are going to ask the

14   hearing, the soonest-possible hearing, and I don't think it has

15   to be a very long hearing, on whether or not we get third-party

16   discovery, depositions of Mr. Ellington, Mr. Leventon, and the

17   other three individuals that Ms. Smith represents; subject to

18   one of them is on maternity leave, and we're going to be

19   pursuing discovery of that while she's in that state, but —

20          THE COURT:  All right.

21          MR. CLUBOK:  — but other than that we just ask that a

22   hearing to be scheduled.  And I'm just alerting you that we're

23   going to be making that request.

24          THE COURT:  Okay.  Well, I have been forewarned.  I

25   have been forewarned.  And I'll wait to see the motion for

*The Ruling of the Court on the Motion to Continue*                    85

1    expedited hearing and decide if I think it's appropriate to give

2    an expedited hearing, okay?  I'll look at the pleadings and

3    likely just rule on the pleadings on the timing, okay?

4              Thank you.

5              MR. CLUBOK:  Your Honor, —

6              MS. SMITH:  Your Honor, since we're previewing, we

7    will be filing a response to that as well.

8              THE COURT:  All right.

9              MS. SMITH:  Thank you, Your Honor.

10             COURT SECURITY OFFICER:  All rise.

11        (The hearing was adjourned at 11:45 o'clock a.m.)

12                          —o0o—

13

14

15

16

17

18

19

20

21

22

23

24

25

State of California              )
                                 )      SS.
County of San Joaquin            )



        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.


Susan Palmer
Palmer Reporting Services

Dated May 22, 2021

# EXHIBIT 17

```
                     IN THE UNITED STATES BANKRUPTCY COURT
1                     FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION
2
                                      )    Case No. 19-34054-sgj-11
3        In Re:                       )    Chapter 11
                                      )
4        HIGHLAND CAPITAL             )    Dallas, Texas
         MANAGEMENT, L.P.,            )    Monday, May 10, 2021
5                                     )    1:30 p.m. Docket
                 Debtor.             )
6        _____)
                                      )
7        HIGHLAND CAPITAL             )    Adversary Proceeding 20-3190-sgj
         MANAGEMENT, L.P.,            )
8                                     )
                 Plaintiff,          )    - TRIAL DOCKET CALL
9                                     )    - DEFENDANT'S EMERGENCY MOTION
         v.                           )      TO STAY PROCEEDINGS PENDING
10                                    )      RESOLUTION OF DEFENDANT'S
         JAMES D. DONDERO,            )      PETITION FOR WRIT OF
11                                    )      MANDAMUS [154]
                 Defendant.          )
12       _____)

13                          TRANSCRIPT OF PROCEEDINGS
                      BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                          UNITED STATES BANKRUPTCY JUDGE.

15       WEBEX APPEARANCES:

16       For the Plaintiff:          John A. Morris
                                     PACHULSKI STANG ZIEHL & JONES, LLP
17                                   780 Third Avenue, 34th Floor
                                     New York, NY  10017-2024
18                                   (212) 561-7700

19       For the Plaintiff:          Jeffrey Nathan Pomerantz
                                     PACHULSKI STANG ZIEHL & JONES, LLP
20                                   10100 Santa Monica Blvd.,
                                       13th Floor
21                                   Los Angeles, CA  90067-4003
                                     (310) 277-6910
22

23

24

25
```

```
                                                                      2

  1   APPEARANCES, cont'd.:

  2   For the Defendant:        John T. Wilson
                                Clay M. Taylor
  3                             BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
  4                             420 Throckmorton Street,
                                   Suite 1000
  5                             Fort Worth, TX  76102
                                (817) 405-6900
  6
      Recorded by:              Michael F. Edmond, Sr.
  7                             UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
  8                             Dallas, TX  75242
                                (214) 753-2062
  9
      Transcribed by:           Kathy Rehling
 10                             311 Paradise Cove
                                Shady Shores, TX  76208
 11                             (972) 786-3063

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
             Proceedings recorded by electronic sound recording;
 25             transcript produced by transcription service.
```

3

1              DALLAS, TEXAS - MAY 10, 2021 - 1:40 P.M.

2          THE COURT:  All right.  The other matter we have set

3    on this docket is Highland Capital Management, LP versus

4    Dondero, Adversary 20-3190.  We had docket call, trial docket

5    call set, as well as Defendant's emergency motion to stay the

6    proceedings.  So I'll ask, first for Plaintiff Highland, who

7    do we have appearing today?

8          MR. MORRIS:  Good afternoon, Your Honor.  It's John

9    Morris from Pachulski Stang Ziehl & Jones on behalf of the

10   Debtor.

11         THE COURT:  All right.  And for Mr. Dondero, who do

12   we have appearing today?

13         MR. WILSON:  John Wilson and Clay Taylor.

14         THE COURT:  All right.  And I assume we have Mr.

15   Dondero out there listening in?

16         MR. TAYLOR:  Yes, Your Honor.  He's next to me.

17         THE COURT:  Okay.  Thank you.  All right.  Thank you.

18   Well, we'll start with the motion to stay proceedings.  Mr.

19   Taylor, will you be making that argument, or Mr. Wilson?

20         MR. WILSON:  I will, Your Honor.

21         THE COURT:  Okay.  You may proceed.

22         MR. WILSON:  Well, Your Honor, this motion to stay

23   is, as you've seen in our papers, it's largely based on the

24   pending proceeding at the Fifth Circuit on a writ of mandamus.

25   And as you are probably aware, that motion or that writ was

4

```
1    filed on the 8th of March.  The -- late in the evening,
2    actually.  The next morning, shortly after business hours
3    opened, the Fifth Circuit requested a response from the Debtor
4    by March 16th.  The Debtor timely filed that response, and we
5    are awaiting a ruling from the Court.
6         And due to all of the overlapping issues between the
7    preliminary injunction and the permanent injunction that's
8    sought by the Debtor, we thought it would be appropriate to
9    stay the trial on the permanent injunction for reasons of, you
10   know, potential inconsistent rulings or, you know, judicial
11   economy.  It only seems to make sense to, you know, give the
12   Fifth Circuit a little bit longer to consider these issues and
13   see what they're planning to do.
14        And I've got the -- Your Honor, my brief covers the
15   factors that the -- for a stay pending appeal.  Some courts
16   say that you have to apply those factors in this situation.
17   Other courts say that the Court -- the Fifth Circuit's
18   mandamus jurisdiction, there's inherent power to stay.  But in
19   any event, you know, we think that that factors are met here.
20        The four factors would be the showing of a likelihood of
21   success on the merits, and the courts, you know, are uniform
22   in saying that that doesn't mean the showing of a probability
23   of a success, just a likelihood.
24        I think the fact that the Fifth Circuit could have easily
25   denied this without an opinion quickly but instead has
```

5

1    requested a response and is now -- I think tomorrow will be

2    eight weeks since it's had full briefing in front of it -- you

3    know, we believe that we meet that test because obviously the

4    Fifth Circuit is considering the merits of this.

5        And this is, of course, a serious legal question, because

6    it's the entire issue in this case, is the appropriateness of

7    the injunctive relief that the Debtor seeks.

8        Of course, the second issue, irreparable injury, I think

9    anytime that you're dealing with an injunction, whether, you

10   know, you grant an injunction or are seeking to overturn one

11   or whatever, I mean, irreparable injury to one or the other

12   parties is always at issue.

13       You know, I think that we've raised some serious concerns

14   about Mr. Dondero's constitutional rights and his First

15   Amendment rights specifically.  You know, and being under a --

16   being under an order, a permanent order, is, of course -- you

17   know, exacerbates the seriousness of those matters.

18       Substantial harm to the debtor.  We believe there is none

19   to pushing this proceeding back.  As has been stated, there is

20   a preliminary injunction in place that runs until the

21   effective date of the plan.  That was the way the Debtor chose

22   to seek that relief.  And we think that, you know, the

23   Debtor's rights, if, you know, if they are potentially going

24   to be infringed on, are protected by the preliminary

25   injunction and the plan injunction itself.

6

1    And then finally, Your Honor, you know, this would stay --

2    granting of a stay would serve the public interest due to just

3    consistency and judicial economy. You know, it's going to be

4    a lengthy trial with multiple witnesses. You know, those

5    witnesses have to give up time out of their schedule to attend

6    the trial. You know, there's going to be a lot of attorney

7    time involved. And, of course, the Court's time.

8    So we just think that a, you know, a brief, appropriate

9    stay or continuance to allow the Fifth Circuit to issue a

10   ruling on this matter would be appropriate.

11        THE COURT: All right. Well, I have several

12   questions for both sides.

13   My first question is this. You've -- with your last

14   comment, you know, we think there's going to be a lengthy

15   trial and whatnot, it's really a judicial efficiency and

16   judicial economy, economy of the parties argument, right? I

17   mean, that's really what I'm hearing. Right?

18        MR. WILSON: Yes, Your Honor. I mean, that's

19   certainly -- that's certainly a big part of this. And, you

20   know, we're respectful of the Court's time and, you know, we

21   appreciate that the witnesses would have to give their time as

22   well. So, --

23        THE COURT: Okay. Well, here is a question I have.

24   I'm trying to think through the ifs -- if we do go forward, if

25   we don't go forward -- and here's how I come out on this one.

1  If we do go forward, doesn't that lead to judicial efficiency?

2  And here's why I ask.  Because then you've got a permanent

3  order.  A final order, I should say.  There is either a

4  permanent injunction or no injunction.  It's final.  Somebody

5  can appeal it without the procedural problems of, oh, it's

6  only interlocutory, need motion for leave.  And, in fact, if I

7  rule, the Fifth Circuit petition for mandamus becomes moot,

8  right?  Because now --

9          MR. WILSON:  Well, I don't know --

10         THE COURT:  -- forget about that preliminary

11  injunction, good, bad, or indifferent.  Now we have a final

12  order that someone can appeal without needing leave.  And so

13  what -- you know, my brain gravitates towards efficiency:  If

14  I just rule on a final basis in this adversary, then people

15  can go on about their way and appeal the final ruling,

16  whatever it is.

17         MR. WILSON:  Well, Your Honor, it's hard to know if

18  the Fifth Circuit's consideration of the former injunction

19  would be moot without -- without knowing, you know, how

20  they're going to rule.  You know, they could -- you know, as I

21  said, the underlying issues in the preliminary injunction and

22  the permanent are, you know, largely if not wholly

23  overlapping.  And you know, I just can't -- I can't speak for

24  the Fifth Circuit what, you know, what they're intending to do

25  with this thing and how they're intending to rule.  And, you

8

1  know, I think that their -- you know, they do have

2  jurisdiction over this and they can protect their

3  jurisdiction.

4      So, you know, I just can't really -- I can't really agree

5  that a trial on the permanent injunction would moot the

6  preliminary in this case, given the issues that are on

7  mandamus at this point.

8          THE COURT:  Well, I'm going to ask you to be more

9  specific on that, because I'm not -- I'm not on the same page

10  at all.  I mean, two ways I can rule.  I can say, grant a

11  permanent injunction.  Okay?  And so then you have a final

12  ruling of this Court that, if you appeal, the District Court

13  has to hear it because it's final.  And then if you appeal

14  beyond that, the Fifth Circuit has to hear it because it's

15  final.

16      On your -- meanwhile, on your petition for writ of

17  mandamus, what you have asked is:  Fifth Circuit, make the

18  District Court hear our appeal of an interlocutory order.

19  Okay?  They didn't grant leave.  It was interlocutory and they

20  wouldn't grant leave to hear the appeal.  Well, at that point,

21  the preliminary injunction that you wanted the District Court

22  to review on appeal has been replaced by a permanent

23  injunction.

24      So, what am I missing?  There's nothing --

25          MR. WILSON:  Well, I --

9

```
 1              THE COURT:  At that point, it's moot.  Isn't that
 2   classic mootness?
 3              MR. WILSON:  Well, that's the second part of the
 4   relief that we asked for that you just described, Your Honor,
 5   at the Fifth Circuit.
 6         So, the primary focus of the mandamus was on an order
 7   dissolving the preliminary injunction on the issues that are
 8   -- you know, were raised in this brief.  And they -- the
 9   issues that we've raised in this Court before, but -- the
10   overbreadth and the constitutional concerns and vagueness and
11   those types of things.  And to the extent that the exact same
12   relief is sought in the permanent injunction, while the Fifth
13   Circuit is, you know, considering -- you know, I can't speak
14   for them because they haven't -- they haven't spoken yet, but
15   to the extent that they are considering that aspect of the
16   mandamus, and that's the primary relief we sought, then that's
17   where I have a problem saying that the -- that the preliminary
18   injunction would become moot or the issues related to the
19   preliminary injunction would become moot when a final
20   injunction is issued.
21         And then I would, if Your Honor was to say that, you know,
22   no final injunction will issue and Your Honor was to say that
23   the preliminary injunction is over and ended, then I would
24   agree that the issues would be mooted.  But that's only one
25   scenario that would result from this -- that could result from
```

10

 1   this trial.

 2          THE COURT:  Okay.  So it will be moot if I deny the

 3   permanent injunction, but it might be useful to wait, you're

 4   saying, because the Fifth Circuit may say, you know,

 5   Subsection (d) of the preliminary injunction -- you know,

 6   2(d), let's say, hypothetically; I'm just plucking one out of

 7   the year -- that went too far.  We're ordering in mandamus

 8   fashion for you to vacate that order as to, you know, whatever

 9   provisions they may say went too far.  And then we would have

10   a hearing on the permanent injunction, and you would say,

11   well, that could be guidance to the Court.  You know you can't

12   do this.  They've already said that goes too far.  Is that

13   what you're saying?

14          MR. WILSON:  So, I think that's -- you know, that's

15   certainly part of it, Your Honor.

16          THE COURT:  All right.  My next question is I assume

17   you've told me everything you know as far as what you've heard

18   from the Fifth Circuit?  You know, the petition for writ of

19   mandamus was filed March 8th.  You said the next day they

20   asked Debtor to respond by March 16th.  The Debtor responded.

21   And it's just been silence since then?

22          MR. WILSON:  That is -- that is correct, Your Honor.

23   I mean, we -- we've actually called the Clerk's Office and,

24   you know, just made a generic inquiry as to the matter in

25   connection with filing this writ -- or, I'm sorry, this motion

 1  for stay.  But we -- you know, of course, there was no -- you

 2  know, no response other than the Court is still considering

 3  it.

 4          THE COURT:  Okay.  So your view is I ought to stay

 5  this until the sooner of the Fifth Circuit ruling one way or

 6  another or 60 days?  You're saying at 60 days, well, --

 7          MR. WILSON:  Well, that --

 8          THE COURT:  -- holy cow, who knows how they're going

 9  to rule, so we'll just go forward?

10          MR. WILSON:  I think that was just -- well, yeah, and

11  I don't -- I don't know if there's any -- anything behind that

12  60 days.  I think that was just -- just an example of what,

13  you know, the Court could do that we gave in our brief.

14      But, you know, I think that -- I think that probably the

15  most appropriate way to handle it would be to say that it's

16  going to be set, you know, for docket call, you know, say, 30

17  days after the Fifth Circuit's ruling, you know, if

18  appropriate.  Something like that.  But, you know, I -- 60

19  days wasn't like a magic number.

20          THE COURT:  My next question is, what would a trial

21  look like if we do go forward next week or whenever?  You said

22  it would be a "lengthy" trial.  The pretrial order says, "no

23  more than two days."  I'm just trying to figure out why it

24  would be a lengthy trial.

25          MR. WILSON:  Oh, I mean, I -- I agree that probably

12

```
 1    two days is in the realm of where it will be.  I thought that
 2    the joint order actually said two and a half days.  But I kind
 3    of considered -- kind of, you know, estimated that between the
 4    witnesses that we wanted to call and then the Debtor's
 5    witnesses and then the cross-examinations and all that, that
 6    we would have about two days of testimony, and then -- and
 7    then argument after that.
 8              THE COURT:  Okay.  Well, --
 9              MR. WILSON:  And so when I say lengthy, I mean, I was
10    -- I was considering that to be lengthy.
11              THE COURT:  Okay.  Well, this is maybe more of a
12    question for Mr. Morris, but maybe you have an answer as well.
13    I am wondering what a potential permanent injunction would
14    even look like at this point.  Again, this is probably more of
15    a Mr. Morris question, but I'll ask you.
16        I presume the shared services agreements are terminated at
17    this point, so, looking at the preliminary injunction, Columns
18    2C and 2D I'm guessing might go out the window.  You know,
19    maybe, maybe not.  But, again, I'm -- maybe this ties in to
20    why such a lengthy trial.  I'm guessing that the Debtor is
21    probably going to have a skinnied-down request at this point,
22    but maybe not.  What -- have you talked to Debtor's counsel
23    about that?  Do you have a response to that?
24              MR. WILSON:  The Debtor is not telling us any
25    different than what they've put in their papers at this point,
```

13

```
 1  Your Honor.
 2          THE COURT:  Okay.  Well, thank you.  I will turn to
 3  Mr. Morris now.  Mr. Morris?
 4          MR. MORRIS:  Good afternoon, Your Honor.  John
 5  Morris; Pachulski Stang Ziehl & Jones.
 6      Let me just start by pointing out several things that Mr.
 7  Wilson overlooked in terms of what's been told to the Fifth
 8  Circuit.
 9      At Page 5 of their petition, which was filed on March 9th,
10  two months ago, the Fifth Circuit was told, "The trial
11  concerning the Debtor's request for a preliminary injunction
12  is currently set for the week of May 17th, 2021."  So the
13  Fifth Circuit knows exactly when this trial is being
14  conducted.
15      Indeed, the Fifth Circuit was told by Mr. Dondero and the
16  Bonds Ellis law firm on March 9th that the Court was going to
17  hold a contempt hearing on March 22nd, and the Fifth Circuit
18  took no action to intervene to stop that.  I think that is a
19  much better indicator of their lack of interest in this
20  petition for writ of mandamus.  It's been sitting there for
21  two months.  They didn't act, despite having knowledge of the
22  contempt motion and the hearing that was going to be held.
23  They know exactly when this hearing is going to happen next
24  week.
25      And you know why they know that?  It's been -- they've
```

14

```
 1    been told that again, because Mr. Wilson didn't tell you that

 2    he also filed a motion in the Fifth Circuit for a stay of

 3    these proceedings.  We responded to that this morning, Your

 4    Honor, but I don't understand how you can ask him the question

 5    of what the Fifth Circuit knows and Mr. Wilson forget to tell

 6    you that he has made the exact same motion in the Fifth

 7    Circuit.

 8        Now let's talk about what their petition for writ of

 9    mandamus really is.  There is two parts.  Your Honor focused

10    on one part, and that is they're trying to get the Fifth

11    Circuit to order the District Court to exercise its discretion

12    to hear an interlocutory appeal.  I ask you, Your Honor:  What

13    is the likelihood of success on that?

14        The second thing they're asking the Court to do, the Fifth

15    Circuit Court of Appeals, they're asking the Fifth Circuit to

16    simply throw out the preliminary injunction.  We argued very

17    strongly in our opposition to the petition that the Fifth

18    Circuit doesn't even have jurisdiction to do that.  Yet in

19    their plea for a stay, a last-minute stay of this permanent

20    injunction proceeding, Mr. Dondero doesn't refute that

21    argument at all.

22        In fact, he doesn't address it.  He proffers no facts in

23    support of his position.  He gives no argument as to why the

24    Fifth Circuit is likely to direct the District Court to

25    exercise its discretion to hear an interlocutory appeal.  They
```

15

 1   make no argument at all.  There's no factual, legal, or

 2   equitable basis upon which this Court can find that Mr.

 3   Dondero is likely to succeed on the merits.

 4        The second prong, the harm.  You know exactly what the

 5   harm is going to be to the Debtors here, Your Honor.  They

 6   asked for 60 days.  What happens if the Fifth Circuit hasn't

 7   responded in 50 days?  Are you going to conduct the trial

 8   then?  Why would you do that?  You would have to wait longer.

 9        What if the Fifth Circuit actually rules and they direct

10   the District Court to exercise its direction [sic] to hear the

11   interlocutory appeal, and the District Court hears it and

12   overrules the appeal?  Then what?  They're going to say we

13   have to wait further so that they can appeal the District

14   Court's rejection of the interlocutory order to the Fifth

15   Circuit.  We will be here for years, and that is exactly what

16   the game is.

17        Your Honor had it exactly right.  It was in our brief,

18   it's never been rebutted by the Bonds Ellis law firm, that if

19   we simply have a trial next week and the Court -- if the Court

20   rules in Mr. Dondero's favor, everything's gone.  If the Court

21   issues the permanent injunction, he will have a final order.

22   There will be no waste of time, no waste of money, no waste of

23   effort dealing with judicial discretion, dealing with issues

24   of interlocutory orders.  He will have a final order.  And

25   what we have asked for is set forth very clearly in our

1    proposed findings of fact and conclusions of law.  The order

2    that we're asking for is set forth in Paragraphs 11, 12, and

3    13, and they largely mirror what's in the preliminary

4    injunction.

5        One tweak is exactly what Your Honor picked up on, and

6    that is there's no longer any shared services agreements so

7    there's no longer any exception for talking to the Debtor's

8    employees about shared services because there are no such

9    things anymore.  So we took that out.  Okay?

10       So, likelihood of success on the merits, I've addressed.

11       Irreparable injury.  You know, the Debtor is going to be

12   forced into a quagmire of Mr. Dondero's own making, and it

13   should not be required to do that.  Mr. Dondero, ironically,

14   if he was really here for justice, if he was really here for

15   justice, he would want the quickest possible trial he could

16   get in order to vindicate himself, or, if there's an adverse

17   judgment, to get that judgment reversed as soon as possible.

18   And the best way to do that is to have a speedy trial.

19       If he was honest, if their motives were pure, they would

20   be asking you for the quickest trial possible.  And that, Your

21   Honor, would be consistent with the public interest.  The

22   public interest is served by the speedy administration of

23   justice, and that's what we're looking for here.  Consistent

24   with ample Fifth Circuit precedent, trial courts are permitted

25   to proceed with trials on permanent injunctive relief,

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 564 of 1726 PageID 11885

17

1   notwithstanding a pending appeal of an interlocutory order on

2   a preliminary injunction.  We've cited a legion of cases.

3   Silence from the Bonds Ellis law firm.  Silence.  For good

4   reason.   There is nothing to say about it.  That is the law.

5   And we urge the Court to deny the motion.

6       Thank you, Your Honor.

7           THE COURT:  All right.  Mr. Morris, so just to

8   clarify, I do have up on the screen your proposed findings and

9   conclusions, but it might be a little easier for me to just

10  focus on the preliminary injunction that is dated January

11  12th.  I'm looking at Paragraph 2, decretal Paragraph 2, which

12  is where most of the injunction language is.  Are you saying

13  that you would seek the very same sort of permanent

14  injunction, only at Subsection (c) you would cross out the

15  "except as it specifically relates to shared services

16  currently provided to affiliates owned or controlled by Mr.

17  Dondero"?  Everything else would remain --

18          MR. MORRIS:  I don't have a -- yes.

19          THE COURT:  Okay.  So I'm looking --

20          MR. MORRIS:  As would the next paragraph, you know,

21  using his affiliated entities or other people who are acting

22  on his behalf.  That would be enjoined as well.  And from the

23  preliminary injunction, we would also adopt -- actually, it

24  should say permanently enjoined, so there's a typo there.  But

25  it should be permanently enjoined from entering the Highland

18

```
 1   offices.

 2       I think the only two things that -- the only changes that

 3   we made were to delete the requirement that he appear at all

 4   hearings.  That was something that I think Your Honor very

 5   appropriately included, but I'll leave that to the Court.  We

 6   also deleted the reference to shared services, as I indicated.

 7   And frankly, we've eliminated the reference to Ellington and

 8   Leventon because they're no longer employees of ours.

 9           THE COURT:  Okay.

10           MR. MORRIS:  And we think that that prohibition ought

11   to stay in effect until further order of the Court.  But until

12   there's a -- when there's a further order of the Court, that's

13   not a particular piece that we'll be seeking going forward.

14           THE COURT:  Okay.  I got a little lost.  So,

15   Paragraph 4, you would propose comes out?  Or no?

16           MR. MORRIS:  Is that -- I'm sorry, I don't have it in

17   front of me.

18           THE COURT:  That's the --

19           MR. MORRIS:  Is that Ellington and Leventon?

20           THE COURT:  -- Scott Ellington/Isaac Leventon

21   paragraph.

22           MR. MORRIS:  Yeah.  Right.  Now, they, of course,

23   would still be bound by their -- by their ethical and legal

24   obligations with respect to attorney-client privilege and they

25   couldn't disclose, because we hold the privilege.  So it
```

19

 1   doesn't matter that Mr. Dondero is the former CEO.  We have

 2   the privilege.  And so obviously they are duty-bound not to

 3   disclose privileged information.

 4       But other than that, given that they're no longer

 5   employees of the Debtor, we'd rather not get tied into the

 6   morass of that.  It's going to be very difficult to police, in

 7   any event.

 8           THE COURT:  Okay.  All right.  So my next question

 9   is, what do you think a trial will look like?  Two days?  A

10   lengthy trial?  I mean, I'm baffled --

11           MR. MORRIS:  I'll be perfectly honest.  I am, too,

12   Your Honor.  Because we've had this trial twice already.  Your

13   Honor, at -- I think our proposed findings of fact and

14   conclusions of law are at Docket 156 of the adversary

15   proceeding.  And I don't know if you've had a chance to look

16   at that yet, Your Honor, but from Paragraph -- I think it's

17   one -- Paragraph 30 to Paragraph 149 -- so, 120 paragraphs

18   long -- we set forth the evidence that was adduced at the

19   preliminary injunction hearing and at the contempt hearing.

20   We have a citation to every single exhibit and every single

21   page and line that we rely upon from the testimony.  And

22   because of that, Your Honor, we plan on relying on that.  I

23   wouldn't anticipate more than 30 or 45 minutes for an opening

24   statement, perhaps an hour of direct testimony from Mr. Seery

25   and Mr. Dondero, which will cover, I promise you, I promise

1    you, only topics that have not been previously covered.  And

2    then an hour for closing.  I could do this in two and half

3    hours, Your Honor.

4              THE COURT:  Okay.  You've named Seery and Dondero as

5    potential witnesses.  And Mr. Dondero has named Seery,

6    Dondero, Ellington, Leventon, Jason Post, Dustin Norris, and

7    JP Sevilla as potential witnesses.

8              MR. MORRIS:  Sure.

9              THE COURT:  Well, let me ask you this.

10             MR. MORRIS:  Can I address that issue first, Your

11   Honor?

12             THE COURT:  Okay.  Go ahead.

13             MR. MORRIS:  Because back in March, we actually

14   served an interrogatory that asked the Bonds Ellis firm to

15   identify the witnesses that Mr. Dondero intended to call at

16   trial.  And we were told that because we had served the

17   interrogatory near the end of the discovery deadline and they

18   didn't have 30 days, they had no obligation to answer.

19        I reached out to the Bonds Ellis firm and asked them, if

20   they needed more time, I had no problem with that.  I believe

21   I offered to accept the exact same interrogatory and to serve

22   it three days after they did, and they agreed.  Hadn't heard

23   from them again until I got their witness list and I saw this

24   litany of people on it.  And I wrote to them last week and I

25   expressed considerable concern about that list, witness list.

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 568 of 1726 PageID 11889

21

1    And I pointed out that Mr. Dondero has a history of including

2    a laundry list of people on a witness list and never calling

3    them.

4         Specifically, at Docket 83 and Docket 85, they identified

5    Ellington, Leventon, and Rothstein, and never called them.

6    But meanwhile, I have to prepare for all of that, right?  At

7    Docket 106, they put down Ellington, Leventon, and Post, and,

8    again, never called the people associated with that hearing.

9         Now we've got Ellington, Leventon, Post, Norris, and

10   Sevilla for this.  So I said, what are you doing?  Can't you

11   just tell me who you intend to call?  This isn't a case, for

12   example, where you're having a trial for the first time and

13   you're a defendant and you say, gee, I want to see how the

14   evidence comes in.  I can't really tell you for sure because I

15   have to see what the plaintiff's case looks like.

16        Mr. Dondero knows what the Plaintiff's case looks like

17   because we had a trial on January 8th.  We had another trial

18   on March 22nd and March 24th.  And he has my proposed findings

19   of fact and conclusions of law, which go into more detail than

20   you probably wanted to see.

21        And so I asked them again, can you just tell me who you

22   intend to call?  And they declined to tell me.

23        So I will just say at this point, and I will speak more

24   about this in my opening statement, whoever is called at this

25   point on the third try of these issues by definition has no

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 569 of 1726 PageID 11890
56

22

```
 1   credibility.  Their credibility has to be called into

 2   question.  Where were they the first time?  Where were they

 3   the second time?  And why are they just being called now,

 4   after you see the proposed findings of fact and conclusions of

 5   law?

 6        And if you look at Mr. Dondero's exhibit list, you will

 7   not find any documents that are going to support any testimony

 8   by any of these people who are now employed, directly or

 9   indirectly, by Mr. Dondero.

10        So I really think you asked the perfect question.  How

11   could this possibly be a lengthy trial and why are all these

12   people on the witness list?  And I would ask Mr. Wilson to

13   answer those questions.

14             THE COURT:  My last question for you is I presume the

15   plan has not gone effective yet?

16             MR. MORRIS:  No.  The plan has not gone effective

17   yet.  And I'll address that by just saying I'm not the right

18   person to answer that, but I will say, while there is no basis

19   -- the Debtor believes there is no basis to grant a stay here,

20   if Your Honor disagreed and the plan went effective, the order

21   specifically says that the preliminary injunction terminates

22   upon the effective date unless otherwise ordered by the Court.

23   And before -- before that effective date happens, I assure you

24   Mr. Dondero is not getting to -- not getting the benefit of a

25   stay and being unburdened by the preliminary injunction.  That
```

23

 1   will never happen.  Okay?

 2        So I don't think there's any basis to grant a stay.  I

 3   think for purposes of judicial economy we should just get this

 4   over with already and let the -- let him take his appeal

 5   wherever he wants to take his appeal.  But if Your Honor

 6   disagrees and the effective date occurs before there is a

 7   final order on the interlocutory appeal of the preliminary

 8   injunction, we'll be back with a motion to extend the

 9   preliminary injunction until that happens.

10             THE COURT:  Okay.  All right.  Thank you.

11        All right.  Mr. Wilson, first, what would you like to say

12   in reply to Mr. Morris?

13             MR. WILSON:  Well, I really want to make a few

14   comments in reply.  I mean, the first thing that struck me was

15   that Mr. Morris stated that the Fifth Circuit did nothing to

16   halt the contempt hearing proceeding, which I would agree

17   with, but on the other hand, no one ever asked them to.  We

18   did not make that request to the Fifth Circuit and they did

19   not do it on their own accord.

20        With respect to the motion to stay filed in the Fifth

21   Circuit, we did make a -- I don't think I improperly answered

22   your question.  I think your question was directed to what

23   have we heard about the mandamus.  We have not heard anything

24   about the mandamus.

25        We did file a kind of companion motion to this in the

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 571 of 1726 PageID 11892

24

```
 1   Fifth Circuit after receiving the setting for this -- for this

 2   hearing today.  Just in the interest of time, we -- we did

 3   tell the Fifth Circuit the entire situation, that we filed

 4   this motion, when it's set, and let them know that, you know,

 5   we were seeking this stay.  But we also believe that the Fifth

 6   Circuit has inherent authority to grant a stay in any event,

 7   and so we just wanted to keep them, you know, in the loop, in

 8   the interest of time.  And so -- but they have not responded,

 9   though.  The Debtor has filed a response to that motion, but

10   the Fifth Circuit has not given us any --

11              THE COURT:  When --

12              MR. WILSON:  -- guidance on that, either.

13              THE COURT:  When did you file the motion for stay --

14              MR. WILSON:  I believe it was on --

15              THE COURT:  -- with the Fifth Circuit?

16              MR. WILSON:  I believe it was on Thursday of last

17   week, Your Honor.

18              THE COURT:  And let me be clear about the

19   jurisdictional basis for that?

20              MR. WILSON:  Well, there is a -- there is a rule, I

21   think it's Federal Appellate Rule 8, that deals with stays

22   pending appeal.  And like I said, there's a difference in

23   interpretation of whether that applies to mandamus or not and

24   whether you have to go through the step of moving in the trial

25   court first.  And -- but in an abundance of caution, just
```

25

1   given the timing of all this, we went ahead and made that

2   filing in the Fifth Circuit, telling them that we've made this

3   filing but that it would not be heard until today, and told

4   them that -- that they had the jurisdiction to issue that

5   stay, should they want to, under their inherent authority, but

6   also they have the freedom to wait and see what Your Honor

7   does with it first, which they've apparently chosen to do.

8            THE COURT:  You know, if I had known you filed that,

9   I might have canceled this hearing.  Let the Fifth Circuit

10  rule.  He's asked for someone, you know, with higher authority

11  than me for a stay.  Why should I spend my time?

12           MR. WILSON:  Well, Your Honor, like we said, we filed

13  this motion -- I don't recall the date.  But we filed it well

14  over a week ago, and we -- we sought an emergency hearing, to

15  which the Debtor did not object.  And it wasn't until we found

16  that this hearing would not be until the 10th that we -- that

17  we decided that we needed to notify the Fifth Circuit --

18           THE COURT:  You filed it April 30th.  And you decided

19  I didn't --

20           MR. WILSON:  Okay.

21           THE COURT:  -- move fast enough by setting it ten

22  days out, --

23           MR. WILSON:  No, --

24           THE COURT:  -- so you'd go to the Fifth Circuit?

25           MR. WILSON:  Well, no, it was -- the timing is more

26

1    about the -- about the relation to the trial date than -- than

2    the date we filed the motion.

3              THE COURT:  All right.  Well, just so you know, I

4    think you should have told me you filed that.  I don't know

5    how I phrased my question about what have you heard from the

6    Fifth Circuit, but, again, if I had known you had filed that,

7    --

8              MR. WILSON:  Well, --

9              THE COURT:  -- I would have just canceled the

10   hearing.  Just let them rule at this point.

11             MR. WILSON:  I apologize for that, Your Honor.  I

12   honestly thought you were aware of this, but --

13             THE COURT:  Why would I be aware of it?

14             MR. WILSON:  Well, --

15             THE COURT:  Just FYI, the Fifth Circuit doesn't

16   notify the lower courts, oh, by the way, this pleading was

17   filed in an appeal or something affecting you.  That's not the

18   way it works.

19             MR. WILSON:  I apologize, Your Honor.  And like I

20   said, we -- we fully intended to give this Court the

21   opportunity to rule on this first, but in the interest of

22   time, we wanted to go ahead and get the process rolling at the

23   Fifth Circuit.

24       So, like I said, we hadn't heard anything from them in two

25   months, so we, you know, we didn't know if maybe that would

27

```
 1   prompt a quick opinion or what, and maybe just, you know, end
 2   the need for this whole proceeding today.
 3            THE COURT:  That's really not the way these things
 4   work.  I will just let you know, that's really not the way
 5   these things work.  Anyway, I don't know why I'm telling you
 6   that.  It isn't going to have repercussions on me.  But I
 7   don't know if you know, you know, they have death -- execution
 8   appeals and, you know, all kinds of really serious life-and-
 9   death things.  So, you know, the fact that they haven't ruled
10   --
11            MR. WILSON:  Well, I understand, Your Honor.
12            THE COURT:  -- in two months on something involving a
13   bankruptcy injunction is not shocking, really.
14            MR. WILSON:  I understand, Your Honor.  It's just
15   that this -- it's a mandamus proceeding, and, you know, there
16   was quick action by the Court right off the bat, and, you
17   know, and, you know, a quick briefing schedule.  So, you know,
18   it's a little different than your standard Fifth Circuit
19   procedure.
20            THE COURT:  All right.  Well, address this length of
21   trial thing again.  You know, I had a hearing on or about
22   December 10th on the TRO.  That wasn't a really lengthy all-
23   day hearing, but we heard evidence then.  Then we had the
24   preliminary injunction hearing in the second week of January.
25   Lots of evidence that day.  I think that was all day.  We have
```

28

1    had the contempt motion on March 22nd and 24th.  And I have

2    pulled up the proposed findings and conclusions of the Debtor,

3    and it is a lot of cross-referencing the evidence I've already

4    heard.

5         So, again, I'm really, really, really trying to understand

6    why we would have a lengthy hearing.  I'm just telling you

7    right now, I'm leaning towards setting this for trial next

8    week, and I'm leaning towards setting it for Friday.  Okay?

9    Partly because we have lots of Highland stuff Monday and

10   Tuesday next week, and so that's just what I'm leaning towards

11   doing.  But I'm trying to understand why Friday, an all-day

12   Friday, we could start at 9:00 o'clock, why wouldn't that be

13   plenty of time?  Maybe three hours of evidence each, plus

14   argument.  That's just where my brain is leaning right now.

15        So, again, help me to understand why that wouldn't be

16   enough time.

17            MR. WILSON:  Well, I think that, you know, as Mr.

18   Morris mentioned earlier, we've had witnesses on exhibit and

19   witness lists for prior hearings, and for various reasons they

20   did not end up being called.

21        I mean, you may recall at the contempt hearing that the

22   Debtor decided to release Ellington and Leventon and not call

23   them, on an agreement with their counsel, and we subsequently

24   decided that we could -- we could go without calling them as

25   well.  However, at the end of that hearing, we'd wished we'd

 1   had their testimony in there, and we asked you to reopen the

 2   evidence and allow them to testify.

 3        My point is, is that this is a permanent trial --

 4             THE COURT:  To be exact, it was not at the end of the

 5   day of evidence.  It was when we came back two days later that

 6   you wanted to reopen the evidence, after we made it very

 7   crystal clear the evidence had closed.  Okay?  I just -- I

 8   don't like things to get incorrectly in the record.

 9             MR. WILSON:  I mean, you stated that correctly, Your

10   Honor.  It was -- it was on March 24th that we asked you to

11   allow those witnesses to testify.

12        But in any event, you know, we deserve an opportunity to

13   put on our evidence and to make our record, which, you know,

14   as Mr. Morris told you, has not been done.  And I think Mr.

15   Dondero has that right.  And, you know, we're currently

16   evaluating the relief the Debtor is seeking, and of course

17   we're taking into consideration the comments Mr. Morris just

18   made.  We haven't had an opportunity to talk to my client

19   about that.

20        But, you know, we -- we should have a right to call

21   witnesses.  They've been on the witness and exhibit list, you

22   know, now for the appropriate amount of time.  Mr. Morris has

23   been aware of them.  And, in fact, he's deposed nearly all of

24   them, if not taken them on examination in a hearing as well.

25   And I don't think there's any surprise or whatnot to Mr.

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 577 of 1726 PageID 11898
56

30

1  Morris if any of these guys testify.

2     But, you know, I think that Mr. Dondero has the right to

3  evaluate, you know, what these witnesses could say and to put

4  on their testimony to the extent that we need to to rebut what

5  the Debtor is trying to -- what the -- the case the Debtor is

6  trying to make.

7          THE COURT:  All right.  So, Seery, Dondero,

8  Ellington, Leventon, Jason Post, Dustin Norris, JP Sevilla?

9  Your current plan --

10         MR. WILSON:  And I may be --

11         THE COURT:  Your current plan is to call seven

12  witnesses?

13         MR. WILSON:  I would say up to seven, but my current

14  plan is to call more than just Mr. Dondero and Mr. Seery, as

15  Mr. Morris intends to do.

16         THE COURT:  All right.  I think you were alluding to

17  this, but let me double-check.  Now that you've heard Mr.

18  Morris explain how the permanent injunction he would be

19  requesting is skinnied-down from the preliminary injunction,

20  and that is, you know, taking out references to shared

21  services agreements because those aren't in place anymore and

22  taking out the prohibition on Dondero communicating with Scott

23  Ellington and Isaac Leventon, does this impact the trial at

24  all, from your standpoint?

25     I mean, I know a big issue has been, you know, First

1   Amendment, prohibiting him from talking.  But with Paragraph 4

2   coming out, the Ellington/Leventon prohibition, and with the

3   fact that there's no shared services agreement in place, so,

4   you know, I don't know why he would need potentially to be

5   talking to Debtor personnel, is this -- does this skinny down

6   the trial, at least, in your view?

7           MR. WILSON:  I think it -- I think it very well may,

8   Your Honor.  I mentioned that a minute ago.  Unfortunately, I

9   haven't had the opportunity to visit with my client about that

10  so I can't commit to anything at this moment.  But I think you

11  may very well be right on that.

12          THE COURT:  All right.  Well, I'd like you to have

13  good faith discussions with Mr. Morris in the next 24 hours.

14  You know, Mr. Dondero is there in your office, so I would

15  think you all could caucus and get back with him in 24 hours

16  on that point.

17          MR. WILSON:  Well, yeah, with due respect, Your

18  Honor, Mr. Dondero is in the middle of a deposition with Mr.

19  Taylor, and they're at a separate office than I am at this

20  moment.  They took a break from their deposition to attend

21  this hearing.

22          THE COURT:  Okay.  They're not in your office?  I see

23  Mr. Taylor.  He's in some other office.  Mr. Dondero is

24  waving.

25          MR. TAYLOR:  Yes.  I'm in Dallas, Your Honor.

1          THE COURT:  I thought they were all there at Bonds

2    Ellis, but they're not all there at Bonds Ellis.

3          MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Mr.

4    Dondero.  Just so that you know, we've been in depositions for

5    -- where Mr. Dondero was subpoenaed as a third-party witness

6    in the UBS versus Highland Capital case where we moved for a

7    protective order on that but that was denied.  And so we are

8    appearing pursuant to that -- to that notice, and we're going

9    right back to it after this.  Mr. Clubok has, as counsel for

10   UBS, has indicated that it might be a lengthy day today.  I'm

11   hoping that that doesn't turn out to be the case.  But it's --

12   we've already been going at it for some time, and he indicates

13   that he has quite a bit more to ask.  So, just so you know.

14   And then we do have -- Mr. Wilson does indeed need to talk

15   with Mr. Dondero about a few things that we heard that we

16   weren't totally anticipating from Mr. Morris that might --

17   might skinny this down.

18          THE COURT:  Okay.  All right.  Well, thank you, Mr.

19   Taylor.

20        Here's what I'm going to do.  I'm going to deny the motion

21   for a stay.  I just don't think there is the required showing

22   here to stay trial in this adversary proceeding pending the

23   mandamus ruling.  You know, at this point, it's been over two

24   months since the petition for mandamus was filed.  I don't

25   know what that means, just like none of you know what that

 1   means.  But particularly with a stay pending mandamus pending

 2   before the Fifth Circuit right now, I mean, they'll do what

 3   they feel is appropriate to do, but I think it's appropriate

 4   for this Court to move forward in this trial until ordered

 5   otherwise.

 6        Again, when looking at the four prongs here, I think one

 7   of the most significant prongs here on evaluating should we

 8   stay this or not is the, does the stay serve the public

 9   interest?

10        And, again, I view the argument largely to be about

11   judicial economy and efficiency of the parties.  And at this

12   point, however I rule at trial, I feel like the mandamus

13   becomes moot and it's much more efficient for everyone to --

14   if someone wants to appeal my final ruling in this adversary,

15   there are not going to be the impediments of needing to seek

16   leave of needing to get mandamus.  It'll be a final ruling one

17   way or another.  That's the only way I can view this.

18        And, again, looking at the other prongs for a stay pending

19   appeal, likelihood of success on the merits.  You know, is

20   there a significant legal issue on a serious legal question?

21   I just don't see that prong having been met.  It's important

22   to people.  I know this litigation is important to people.

23   But it doesn't, in my estimation, meet that high hurdle.

24        So, the stay is denied.  I don't find the other prongs met

25   here.

```
1         I am, as I suggested, going to go ahead and set this for
2    trial a week from Friday.  So what's that, the 21st?
3             MR. WILSON:  Your Honor?
4             THE COURT:  Yes?  Who's speaking?
5             MR. WILSON:  Yes, Your Honor.  Is Friday the only day
6    next week where trial is available?
7             THE COURT:  Do you have a conflict?
8             MR. WILSON:  Well, I just got asked to participate in
9    a proceeding out in Midland on Friday, that we have to go
10   Thursday night.  If -- you know, if that -- if there's another
11   day around there that would work better, that would work
12   better for me personally.
13            THE COURT:  There's really not.  I'm looking at next
14   week, and I have Highland all day on Monday.  As far as I
15   know, a full-day setting is what I have down for the UBS
16   settlement.  Anyone disagree with that going all day?
17            MR. MORRIS:  We haven't gotten objections yet, Your
18   Honor, but that's what we're going to plan for.
19            THE COURT:  Okay.
20            MR. MORRIS:  It's John Morris.  John Morris for the
21   Debtor.
22            THE COURT:  Okay.  So, Tuesday at 9:30, I have
23   Highland matters.  Motion to disqualify Wick Phillips and then
24   various fee applications.  I show a three-hour time estimate
25   on the Wick Phillips matter.  Is that --
```

1          MR. MORRIS:  You know, Your Honor, this is John

2    Morris.  And I know that they're not here, or at least I don't

3    think they're on, I don't think there's representatives, so I

4    want to caveat what I'm about to say.  We received their

5    objection to the motion the other day, and I think it's going

6    to require discovery, and so I do intend to reach out to them

7    before the hearing to see if we could simply have a status

8    conference on Tuesday and just set a scheduling order that

9    will allow us to take some discovery, because we're a little

10   surprised at some of the positions that they're taking and

11   we're certainly not prepared to have an evidentiary hearing.

12      So, you know, I don't have their agreement to say that.

13   I'm just saying that that's what our intention is.  I don't

14   know what the Court's calendar looks like for the balance of

15   the day, but if the balance of the day is free, it's

16   conceivable we could be prepared to try this on Tuesday as

17   well.

18          THE COURT:  All right.  Well, I would be willing to

19   do that.  If the Wick Phillips thing comes off, that leaves

20   one, two, three fee applications.  So we could set the trial

21   for 9:30 and do the fee applications first on Tuesday and then

22   roll into this trial.

23      How does that sound?  Mr. Wilson, does that work better

24   for you?

25          MR. WILSON:  Is there time to roll into Wednesday if

36

1   that becomes necessary?

2           THE COURT:  There is actually some time to roll into

3   Wednesday, if that happens.  All right?  I still want you all

4   to talk about limiting your evidence.  I kind of spit-balled a

5   minute ago three hours each side of evidence, plus opening,

6   plus closing.  I want you to think about is that doable, but I

7   will commit to give you Wednesday morning next week as well if

8   we don't finish on Tuesday.  All right?  Work for everyone?

9           MR. MORRIS:  That's fine with the Debtor, Your Honor.

10  That's fine with the Debtor.

11      I do have one other issue to raise, if I may.  I don't

12  know if there's anything else on your agenda, Your Honor.

13          THE COURT:  Well, there is something else on my

14  agenda, but I'll let you go first.  But just to make the

15  record clear, trial is set on this matter next Tuesday at

16  9:30, and then I'll give you a half a day Wednesday, Wednesday

17  morning as well, if you need it.

18      So, could I ask -- I'll split up the job.  Mr. Wilson, if

19  you could upload an order denying your motion for stay.  And

20  then, Mr. Morris, if you could upload an order setting this

21  for trial next week at 9:30.

22      All right.  So what is your issue, before I get to mine?

23          MR. MORRIS:  Sure.  Just prior to this hearing, the

24  Bonds Ellis firm filed on behalf of Mr. Dondero objections to

25  the Debtor's exhibits.  We had filed our witness and exhibit

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 38 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 584 of 1726   PageID 11905
56

37

```
 1   list a couple weeks ago, I believe.  Maybe it was just a week
 2   ago.  And every -- I think maybe all but two or three of the
 3   exhibits on our exhibit list are exhibits that were previously
 4   admitted into evidence, mostly without objection, maybe a
 5   couple over their objections.  But they've all been admitted
 6   into evidence in this case in either the temporary restraining
 7   order proceeding, the preliminary injunction proceeding, or
 8   the contempt proceeding.  So all of it's happened in this
 9   adversary case with these lawyers representing the Defendant.
10   And nevertheless, they filed objections to almost every single
11   exhibit.  On authentication grounds.  On relevance grounds.
12   And I just -- I was struck by that because I've never seen
13   anything like that before, Your Honor.  And I was looking at
14   Rule 11.  Rule 11(b)(2) requires anybody filing a paper with
15   the Court to represent that the legal contentions are
16   warranted by existing law or by a non-frivolous argument for
17   extending, modifying, or reversing existing law.  And I just,
18   I just don't understand what existing law there is that would
19   allow a party to object to evidence that has already been
20   admitted in the adversary proceeding.  And before the Debtor
21   pays me money that it shouldn't, I think -- I think -- I'd
22   like to just raise this issue with the Court because they've
23   objected literally -- they've objected, for example, to one of
24   our exhibits that they cite in their proposed findings of fact
25   and conclusions of law.  Now, mind you, they have a totality
```

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 585 of 1726 PageID 11906

38

1   of four citations to the record in their proposed findings of

2   fact and conclusions of law, but two of them are to the

3   January 26th transcript.  Now, it is on our exhibit list, but

4   as Your Honor may recall, that hearing didn't have to do with

5   this adversary proceeding.  It actually had to do with the

6   injunction proceeding against the Advisors.

7       But so they've included -- some of the stuff there --

8   included in their proposed findings, they're objecting to the

9   exhibit on our exhibit list that has it.

10      But that's just, that's just kind of a funny fact.  What's

11  really not so funny is I don't understand how they can object

12  to evidence that's already been admitted in this adversary

13  proceeding.  And it would take -- this trial would be very

14  lengthy if I had to bring in a witness to authenticate

15  documents or to prove relevance for documents and evidence

16  that have already been admitted.

17      Not only has it been admitted, Your Honor, it's been

18  relied upon by the Debtor, as set forth in our proposed

19  findings of fact and conclusions of law.

20      Not only has it been only relied upon by the Debtor, it's

21  been relied upon by the Court in issuing the preliminary

22  injunction order.

23      And moreover, I just -- yeah, so -- so it's out there.

24  It's been out there forever, and I just don't understand how,

25  consistent with Rule 11, somebody could object to that

1   evidence now, because I don't know of an existing law and I

2   would really -- you know, it's going to create -- I don't

3   think this is done in good faith.  I really think it's, you

4   know, pursuant to Rule 11(b)(1), it's actually being presented

5   -- these objections are being presented for an improper

6   purpose and to needlessly increase the cost of litigation.

7   And I just -- I look for guidance from the Court, because I

8   don't want to do this unless the Court says I really need to

9   respond.

10          THE COURT:  First off, what time was this filed?

11   Because I thought my law clerk and I checked the docket right

12   before coming in here.  What time was this filed?

13          THE CLERK:  12:50 this afternoon.

14          THE COURT:  12:50?

15          THE CLERK:  Yes.

16          THE COURT:  Okay.  Shame on us for preparing early,

17   because we prepared before 12:50 for the 1:30 hearing.  This

18   was filed at 12:50.  And it shows Brian Assink filed it, Mr.

19   Wilson.  What do you have to say?  I'm looking at it.  This is

20   really the darnedest thing I've ever seen.  You have objected

21   to every exhibit except Exhibit #1, whatever #1 was.  You

22   didn't object to that.  You objected to Exhibits 2 through 65,

23   and most of them are, quote, hearsay, lack of foundation, lack

24   of authentication, relevance.  That's most of them.  Sometimes

25   you have merely hearsay, relevance.  Or relevance.

40

1       What are you doing?  I've already admitted most of these.

2   And, by the way, you stipulated to the admissibility of a lot

3   of these.

4               MR. WILSON:  Well, Your Honor, if I may, I understand

5   that, you know, a permanent injunction trial is a separate

6   proceeding, and that everything that may have been admitted

7   for a different purpose during the adversary or even some

8   other adversary proceedings, you know, is not part of the

9   record unless it's admitted in this proceeding.  And the way

10  we understood the requirements --

11              THE COURT:  Wait.  We're not talking about other

12  adversary proceedings.  We're talking about this adversary

13  proceeding.

14              MR. WILSON:  Well, we are, Your Honor, because --

15              THE COURT:  And the whole adversary proceeding is

16  about an injunction.  A TRO, preliminary, and now permanent.

17              MR. WILSON:  Well, but Your Honor, as Mr. Morris

18  mentioned, he's trying to also incorporate some testimony and

19  evidence from a separate adversary proceeding, the -- I think

20  it was the January 26th hearing.  But, you know, we understood

21  that --

22              THE COURT:  What hearing?  What hearing is that?  I

23  don't know.

24              MR. WILSON:  That was the hearing on the preliminary

25  injunction against the Funds and Advisors.

1          MR. MORRIS:  Your Honor, I don't believe there's one

2    citation in our proposed findings of fact and conclusions of

3    law to that transcript.  It's actually Mr. Dondero who cites

4    to that transcript twice in his proposed findings of fact and

5    conclusions of law.  At the same time, they're trying to

6    exclude the transcript from evidence.

7          THE COURT:  Mr. Wilson, got that one wrong?

8          MR. WILSON:  Well, no.  It's on their exhibit list so

9    it's one of the things that we noted an objection to.

10        But my point was, is that, you know, to the extent these

11   -- some of these items or maybe most of these items have been

12   admitted for one purpose or another in a different proceeding,

13   that was for a different purpose.  And, you know, we -- we

14   kind of thought we were starting with a clean record for our

15   permanent injunction trial and that we would, you know, make

16   more objections because there's a different purpose.  There's

17   more at stake and there's different issues.  And so that

18   doesn't mean that we're going to object to every single one,

19   but --

20         THE COURT:  What do you mean, there are different

21   issues?  Elaborate on that.

22         MR. WILSON:   Well, the whole --

23         THE COURT:  They're slightly narrower, I think is

24   what we established earlier.  What's new and different?

25         MR. WILSON:  Well, the whole preliminary versus

1  permanent.  I mean, I understand the -- well, right, I mean,

2  with respect to the relief being sought, but with respect to

3  preliminary (garbled) in attendance at the preliminary

4  injunction hearing.

5          THE COURT:  Okay.  Unfortunately, you have

6  connectivity issues suddenly.

7          MR. WILSON:  You know, I've got -- I've got a

8  different view on those things.  I mean, the contempt hearing

9  has some things --

10         THE COURT:  Mr. Wilson, I don't know if --

11         MR. WILSON:  And I think we lost Mr. Morris on the

12  screen.  Can you hear --

13         THE COURT:  -- you can hear me, but we suddenly have

14  very bad connectivity.

15         MR. WILSON:  Can you hear me?

16         THE COURT:  Your screen is frozen, your video is

17  frozen, and I really didn't get any of the last two minutes.

18         MR. WILSON:  Is it better now, Your Honor?

19         THE COURT:  Well, I heard you say, "Is it better

20  now?"

21         MR. WILSON:  I'm going to log off and log back on.

22         THE COURT:  Okay.  We're going to have to -- we're

23  going to have to cut this --

24         MR. WILSON:  I'm going to try to log off and log on.

25         THE COURT:  No.  I'm ready to be finished with this

43

1    hearing.  You need to go back and look at this, because I am

2    leaning towards what Mr. Morris is arguing, and that is that

3    this is really bad faith.  Okay?  There is no change of

4    issues.  It's been the same issue at the TRO hearing, at the

5    preliminary injunction hearing.  Okay.  The motion for

6    contempt, we were looking backwards a little at behavior.  But

7    the issues are not expanded.  Okay?  It's just duration of the

8    injunction.  And now a slightly skinnied-down injunction.

9         So, of course, I am willing to consider evidence I've

10   heard at the TRO hearing and the preliminary injunction

11   hearing.  And I would note that on many, many, many of these

12   exhibits, you didn't object.  Or if you did, you argued it and

13   I overruled it.

14        So you need to go back and look at this and think hard

15   whether you're really going to press these issues at the

16   trial.  Okay?  This is -- again, *Dondi*, we require counsel to

17   work in good faith to streamline trials and work with people.

18   If you can agree, if you can stipulate to evidence, that's

19   what you need to do.  And this looks like -- I don't know what

20   it looks like.  But if this is any guidance to you, it should

21   be, if I admitted it at the TRO hearing, if I admitted it at

22   the preliminary injunction hearing, it's fair game to consider

23   it now.

24        Here's the last thing I want to say, and this is very big-

25   picture, not unique to this adversary proceeding.

1          Can everyone hear me okay?  I don't know if we're having

2     connectivity issues.  Can everyone hear me?

3               MR. MORRIS:  Yes, Your Honor.

4               THE COURT:  Can you hear me, Mr. Wilson?

5               MR. MORRIS:  Yes, Your Honor.

6               MR. WILSON:  Yes, Your Honor.

7               THE COURT:  Okay.  I have been pondering something

8     the past few days.  And I haven't figured out how I want to

9     address it, but maybe Mr. Dondero's counsel and counsel from

10    some of the Dondero-controlled entities, maybe they can listen

11    to what I'm about to say and figure out a solution.

12          As you all know, there are so many law firms, so many

13    lawyers involved now that are basically singing the same tune

14    at a lot of these hearings as far as objections, me too, me

15    too, me too.  And so just quickly eyeballing what we have, we

16    obviously have Mr. Dondero represented by Bonds Ellis.  There

17    is another firm that represents Mr. Dondero that filed a

18    motion asking that I recuse myself.  I can't remember the name

19    of that firm, but I think they appealed my denial of that

20    motion.  So, I can't remember who that was.  Then we have the

21    various affiliates.  We have -- well, I'll just start

22    chronologically.  Highland CLO Funding, Ltd. has historically

23    been represented by King & Spalding.  I don't know if that's

24    -- I know there were some changes there with the ownership of

25    that entity, so maybe they're gone.  But then we have NexPoint

45

1    Advisors and Highland Capital Management Fund Advisors.  We

2    call them the Advisors and then the Funds.  Originally, they

3    were all represented by K&L Gates, but now they've divvied it

4    up and Munsch Hardt is representing, I guess, the Advisors,

5    and the Funds are represented by K&L Gates.  CLO Holdco, Ltd.,

6    it was Kane Russell Coleman & Logan representing them, but I

7    now think I'm seeing Kane Russell is representing Grant Scott

8    and -- individually.  I'm not sure if Kane Russell is still

9    representing CLO Holdco.  We have Dugaboy and Get Good Trusts

10   represented by Doug Draper, Heller Draper.  We have now Louis

11   Phillips representing the Charitable DAFs, Highland Dallas

12   Foundation.  We have NexPoint Real Estate Partners represented

13   by Wick Phillips, although there's the motion to disqualify

14   them.  And then I guess I'll just throw in we've had Baker &

15   McKenzie and Ross & Smith representing certain groups of

16   employees, but now I guess those proofs of claim have been

17   bought by Dondero entities and so I'm not sure who's

18   representing who there.

19       I'm not even sure I got everyone just now, but here's what

20   I'm getting at.  You talk about judicial efficiency and

21   judicial economy and economy of the partners.  We can't go on

22   efficiently with 12 law firms or whatever I just named filing

23   the very same type of motion or objection.  You know, I almost

24   -- if we were in different circumstances, I'd say we need to

25   have an ad hoc committee of these Dondero-controlled

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 593 of 1726 PageID 11914

46

 1    affiliates, something like that.

 2         But I've been thinking about this for a few days because I

 3    see, like in one adversary, I think we now have three motions

 4    to withdraw the reference.  And I haven't studied them all,

 5    but I'm pretty sure they're going to tell me the exact same

 6    thing.  And again, I'm just doing some predictions that the

 7    UBS settlement, I wouldn't be surprised if I get eight or ten

 8    or twelve objections that say the very same thing.

 9         We're going to have to work something out.  Okay?  This is

10    not efficient.  It's not useful.  I would think a person such

11    as Mr. Dondero would want to rein in legal fees, but maybe

12    not.

13         Do you all have any ideas, Mr. Taylor, Mr. Wilson?  How

14    can we rein this in?  There's got to be a better way --

15              MR. TAYLOR:  Your Honor?

16              THE COURT:  -- than twelve different law firms filing

17    almost identical pleadings.

18              MR. TAYLOR:  Your Honor, I understand what you're

19    saying, on the one hand.  On the other hand, each of these

20    entities do have -- are separate corporations.  They have

21    different duties to various stakeholders, and they are

22    controlled by different stakeholders.  And that is one of the

23    things that has been a consistent, at least from what I

24    understand from my limited understanding and length of time in

25    the case, that that is one thing that is very important to Mr.

47

```
 1   Dondero and those related entities, is that those duties do

 2   run to different parties.  So each party has to preserve its

 3   individual rights.

 4        Sure.  Could it be more efficient?  Of course.  But Mr.

 5   Dondero has a different set of duties than do the Advisor,

 6   than do the Funds, than do the Trusts that are controlled by a

 7   separate trustee.  And while of course there's some

 8   interrelated cooperation amongst them, amongst the joint

 9   defense agreement, it is very important that they maintain

10   their separate corporate identities and act independently from

11   each other, because they truly do have to act independently

12   from each other in many different circumstances.  They don't

13   want to lose sight of that.

14        So that is my initial explanation.  Of course, I can talk

15   with my client about it further, about seeing what can be

16   done, because he does indeed want to make it more efficient.

17   Has been hammering on me and my firm every month to try to do

18   so, and I'm sure he has with the other professionals.

19        But we do hear Your Honor, but we do want to make sure

20   that that -- those different separate corporate identities of

21   these entities is both recognized and laid out in this case.

22   It is very important to us and just integral to a lot of the

23   things that we've done in this case.

24             THE COURT:  You know what would help me understand

25   that better?  Is if in every case I had this entity is owned
```

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 49 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 595 of 1726   PageID 11916
56

48

 1    by, you know, 25 percent by this, this.  If I knew the owners,

 2    if I knew the equitable owners.  But I don't.  That's just all

 3    kind of glossed over.  And so that's how perceptions get

 4    created that Dondero, Dondero, Dondero, Dondero.  You know

 5    what I'm saying?

 6              MR. DONDERO:  Your Honor?

 7              THE COURT:  And I don't know if you want to share

 8    that information or not, but that's why I can't just accept a

 9    generalization that, oh, we have very different stakeholders

10    behind --

11              MR. TAYLOR:  Your Honor?  Wait, hold on a second.

12    Your Honor, --

13              THE COURT:  -- this entity versus this one versus

14    this one.

15              MR. TAYLOR:  Your Honor, if you would allow my

16    client, he would like to very briefly address the Court on

17    those points, if he may.

18              THE COURT:  Okay.

19              MR. DONDERO:  Your Honor, just a brief history from

20    my perspective, okay?  We filed with $450 million of assets

21    and $110 million of estimated, as presented by the independent

22    board and Pachulski to the Court, trying to do a quick

23    settlement the first three or four months into bankruptcy.

24    The claims, the awards, the Class 8, the Class 9 awards, the

25    people who didn't even have standing, have all of a sudden

49

```
 1    ballooned to $300-some-odd million.  And the assets in the
 2    estate, which we haven't had an examiner go through all these
 3    no-process asset sales at a loss, when I would have bought
 4    them for more, has driven the estate value down to less than
 5    $250 million.
 6        We made an offer to try and settle this thing a few months
 7    ago at 20 percent more than the estimated value in the
 8    recoveries.  But Seery and the UCC are emboldened because they
 9    feel in this Court there's going to be no respect of third-
10    party investors, no respect of other Dondero entities, and
11    they've been told that they can get more than a hundred cent
12    recovery by going after me and all my other entities going
13    back ten or twelve years.
14        So there's no chance that this case ever settles.  And
15    what you're going to see is there's a half a dozen or more --
16             MR. POMERANTZ:  Your Honor, I have to -- I have to --
17             MR. DONDERO:  -- there's a half a dozen more law
18    firms coming --
19             THE COURT:  Just a moment.
20             MR. DONDERO:  -- and there's a half a dozen -- there
21    are a half a dozen more --
22             MR. POMERANTZ:  Your Honor, this --
23             THE COURT:  Mr. Morris?
24             MR. POMERANTZ:  This is Jeff Pomerantz.
25             THE COURT:  Mr. Morris?
```

1           MR. POMERANTZ:  This is Jeff Pomerantz, Your Honor.

2           THE COURT:  Oh, Mr. Pomerantz?

3           MR. POMERANTZ:  This is Jeff Pomerantz, Your Honor.

4           THE COURT:  Uh-huh.

5           MR. POMERANTZ:  You know, I think what Mr. Dondero is

6    doing is totally inappropriate.  We're not here to relitigate

7    the history of the case.  We're not here to relitigate or

8    determine why a settlement hasn't been reached.  Your Honor

9    raised some important questions, (garbled) gave an answer, you

10   pushed him, but what Mr. Dondero is doing is just

11   inappropriate, and we shouldn't -- don't think he should be

12   doing this in this manner.

13       If he wants to at some point be put on to testify, he

14   could be cross-examined.  But he's testifying about things

15   that actually just happen not to be true and it's totally

16   inappropriate for this context.

17           THE COURT:  Okay.  Well, I understand --

18           MR. DONDERO:  But Your Honor, there's going to a half

19   dozen --

20           THE COURT:  -- that -- I understand, you know, Mr.

21   Pomerantz is concerned because I asked a specific question

22   aimed at how do we rein in all the lawyers, and the answer

23   was, well, they all are separate entities with separate

24   interests and separate stakeholders.  And my question was,

25   well, could I maybe see a list, a breakdown on all of these

51

1    entities?  Because, you know, in so many cases, --

2                MR. DONDERO:  But Your Honor, --

3                THE COURT:  -- in almost every case I have, I get a

4    big giant what I call spaghetti chart at the beginning of the

5    case where I get a breakdown of debtor affiliates and who owns

6    what.  And this hasn't been clear to me with all of these

7    affiliates.

8        But I do very much have the impression, Mr. Dondero, that

9    all roads lead back to you.  So I let you speak to this, and

10   we've kind of gone down a different trail.  And I want you to

11   know, I know --

12               MR. DONDERO:  Right.

13               THE COURT:  I know where you stand on this because

14   you have told me before.  You have huge concern that Highland

15   had *x* hundred million dollars of assets at the beginning of

16   the case and now it's a lot lower.  I know you have concerns

17   with liquidation at what you think were very inappropriate

18   times.  I know you have all kinds of beefs, beefs about the

19   settlement with Acis, and probably UBS and the Redeemer

20   Committee.  I understand that.  But what I'm talking about

21   right now is going forward.  Going forward, how do we rein

22   this in where we don't --

23               MR. DONDERO:  But going forward, there's going to be

24   more lawyers.  There's going to be more defense.  Because the

25   Debtor is just going to keep trying to broaden, because they

52

```
 1    feel empowered and enabled to go after anything related to
 2    Highland, me, et cetera.  But there's probably half a dozen
 3    more attorneys coming into this case.  I don't know what to
 4    tell you.  It's a circus.
 5              THE COURT:  Okay.  Well, I'm going to let you all
 6    think about this out of court.  Is there a way you can
 7    streamline?  I mean, I know -- I almost chuckle at myself at
 8    saying ad hoc committee of Dondero-controlled entities.  I
 9    know that that sort of sounds, I don't know, unworkable,
10    maybe.  Maybe not.  I'm not going to read 14 different
11    objections to the UBS settlement that say the very same thing.
12    I'm not going to read a different motion to withdraw the
13    reference by every single defendant in every single adversary
14    that gets filed.  This is just not an efficient way to go
15    forward.
16        So I want you all to think about how you can make this
17    more efficient.  You know, it -- a perception could exist that
18    you're trying to carpet-bomb us all with paper, the Court
19    included.  I mean, it's my job.  I'm going to read everything
20    that's put before me.  That's what I do.  That's what I'm
21    supposed to do.  But it's out of control.  So you all think of
22    a way to get it in control or I might impose something.  The
23    wheels are turning.  What could I do?  You know, page limits.
24              MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.
25    One suggestion might be, following up on what Your Honor made
```

 1   some comments about, and Your Honor has used the word ad hoc

 2   committees, and obviously it's sort of a different animal

 3   here.  But as Your Honor knows, that every time an ad hoc

 4   committee comes in, they have to file a 2019 statement.  So I

 5   think it would at least provide Your Honor with information,

 6   as it would provide all of us with information, to really

 7   understand and know, when people are appearing, is it all

 8   roads leading back to Dondero, or, as Mr. Taylor says, what

 9   are the different constituents?  Who are the different people?

10       As Your Honor has heard from us, we lump them all together

11   because we believe the evidence has shown throughout this case

12   that it all leads -- the road leads back to Dondero.  But Your

13   Honor may consider asking them to file sort of the equivalent

14   of a 2019 statement to provide Your Honor with that

15   information under oath that Your Honor could then see, when

16   you get several objections to the same thing, whether you

17   really need to be dealing with them as seven different matters

18   or whether dealing with them as one.

19           THE COURT:  Okay.  All right.  Well, I'm giving this

20   thought.  And again, I'll let you all think about it and make

21   a proposal.  But I may or may not accept any proposal you

22   make.  And I am leaning towards requiring information to be

23   filed of who owns what, who are the stakeholders.  That'll

24   help me understand, is it necessary to have this entity filing

25   a separate objection or motion from this other entity or not?

54

1   Can we just have an hoc committee each time?

2       I don't even think I listed all the law firms.  I know a

3   new law firm filed a lawsuit in front of Judge Jane Boyle

4   recently.  We've got a hearing on that coming up in June.  I

5   mean, and now you're -- I'm hearing there are going to be

6   more.  Well, if you don't figure out a way to rein it in, then

7   I'm just going to have to get that list of who are the

8   stakeholders in these entities, under oath, because I don't

9   understand it.  I don't understand why we need these many

10  lawyers filing position papers.

11      So, all right.  Well, we're going to adjourn, and I guess

12  I'll see you next Monday, right?

13              MR. MORRIS:  Thank you, Your Honor.  Yes.

14              THE COURT:  Okay.  Thank you.

15              THE CLERK:  All rise.

16      (Proceedings concluded at 3:07 p.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                      05/11/2021

24  _____     _____

25  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

                                                                        55

                              INDEX

1
     PROCEEDINGS                                                          3
2
     WITNESSES
3
     -none-
4
     EXHIBITS
5
     -none-
6
     RULINGS
7
     Defendant's Emergency Motion to Stay Proceedings Pending     32
8    Resolution of Defendant's Petition for Writ of Mandamus
9    or, Alternatively, Motion to Continue Trial Setting (154)
     - *Denied*
10
     END OF PROCEEDINGS                                                  54
11
     INDEX                                                              55
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 18

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                 )    Case No. 19-34054-sgj-11
 3   In Re:                       )    Chapter 11
                                  )
 4   HIGHLAND CAPITAL             )    Dallas, Texas
     MANAGEMENT, L.P.,            )    Friday, June 25, 2021
 5                                )    9:30 a.m. Docket
                                  )
 6         Debtor.                )
                                  )    EXCERPT:  MOTION FOR
 7                                )    MODIFICATION OF ORDER
                                  )    AUTHORIZING RETENTION OF JAMES
                                  )    P. SEERY, JR. DUE TO LACK OF
 8                                )    SUBJECT MATTER JURISDICTION
                                  )    (2248)
 9   _____)

10                       TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11                    UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:              Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
14                                10100 Santa Monica Blvd.,
                                    13th Floor
15                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
16
     For the Debtor:              John A. Morris
17                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
18                                New York, NY  10017-2024
                                  (212) 561-7700
19
     For CLO Holdco, Ltd. and     Jonathan E. Bridges
20   The Charitable DAF Fund,     Mazin Ahmad Sbaiti
     LP:                          SBAITI & COMPANY, PLLC
21                                JP Morgan Chase Tower
                                  2200 Ross Avenue, Suite 4900 W
22                                Dallas, TX  75201
                                  (214) 432-2899
23
     For Get Good Trust and       Douglas S. Draper
24   Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
                                  650 Poydras Street, Suite 2500
25                                New Orleans, LA  70130
                                  (504) 299-3300
```

2

1    APPEARANCES, cont'd.:

2    For the Official Committee    Matthew A. Clemente
     of Unsecured Creditors:       SIDLEY AUSTIN, LLP
3                                   One South Dearborn Street
                                    Chicago, IL  60603
4                                   (312) 853-7539

5    Recorded by:                   Michael F. Edmond, Sr.
                                    UNITED STATES BANKRUPTCY COURT
6                                   1100 Commerce Street, 12th Floor
                                    Dallas, TX  75242
7                                   (214) 753-2062

8    Transcribed by:                Kathy Rehling
                                    311 Paradise Cove
9                                   Shady Shores, TX  76208
                                    (972) 786-3063
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.

3

1          DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.

2       (Transcript excerpt begins at 11:33 a.m.)

3            THE CLERK:  All rise.

4            THE COURT:  All right.  Please be seated.  We are

5     back on the record, and our last motion this morning is the

6     Motion to Reconsider filed by CLO Holdco and the DAF.  Do we

7     have Mr. Bridges and Mr. Sbaiti back with us now?

8            MR. BRIDGES:  Yes, Your Honor.  I have changed seats

9     because of audio problems we're having here, but we're both

10    here.

11           THE COURT:  Okay.  Well, I think we heard an

12    agreement that you all have agreed that you're going to have

13    an hour and a half each, and I presume that means everything:

14    opening statements, arguments, evidence.  So, we'll start the

15    clock.  Nate, it's 11:35.  So, Mr. Bridges, your opening

16    statement?

17      OPENING STATEMENT ON BEHALF OF CLO HOLDCO AND THE CHARITABLE

18                            DAF, LP

19           MR. BRIDGES:  Thank you, Your Honor.  We're here on a

20    motion to modify an order that we'd submit has already been

21    modified by the plan confirmation order, although that order

22    has not yet become effective.

23        The modification there was to add the phrase "to the

24    extent legally permissible" to the Court's assertion of

25    jurisdiction in what is essentially the same gatekeeper

4

1   provision that's at issue here.  We submit that change is an

2   admission or at least a strong indication that the unmodified

3   order, at least as applied in some instances, contains

4   legally-impermissible provisions.  The entire argument today

5   from our side is about what's not legally permissible in that

6   order.

7       And that starts with our concerns regarding the

8   application of 28 U.S.C. § 959(a).  As Your Honor knows well,

9   959(a) is a provision of law that the Fifth Circuit and

10   *Collier on Bankruptcy* call an exception to the *Barton*

11   doctrine.  I know from the last time we were here that the

12   Court is already aware of what 959(a) says.  It's the second

13   sentence, I understand, which the Court pointed to in our

14   previous hearing that creates general equity powers or

15   authorizes the Court to use its general equity powers to

16   exercise some jurisdiction, some control over actions that

17   fall within the first sentence of 959(a).  But that second

18   sentence also prohibits explicitly the Court's using general

19   equity powers to deprive a litigant of his right to trial by

20   jury.

21       Here, we're not under *Barton*, the statutory exception to

22   *Barton* applies, because Mr. Seery is a manager of hundreds of

23   millions of third-party investor property.  Instead, we're

24   here under the Court's general equity powers, as authorized by

25   959(a).  And those equity powers cannot deprive the right to

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 608 of 1726 PageID 11929
20

5

1  trial by jury.

2      But the order does deprive trials by jury, first by

3  asserting sole jurisdiction here, where jury trials are

4  unavailable, and secondly, by abolishing any trial rights for

5  claims that do not involve gross negligence or intentional

6  misconduct.

7      Movants' third cause of action in the District Court case

8  is for ordinary negligence.  It comes with a Seventh Amendment

9  jury right.  But it's barred by the order because the order

10  only allows colorable claims involving gross negligence or

11  intentional conduct, not ordinary negligence.

12      Movants' second cause of action in the District Court case

13  is for breach of contract.  That comes with a Seventh

14  Amendment jury right, but it's barred by the order because the

15  order only allows colorable claims of gross negligence or

16  intentional misconduct, not negligent or faultless breaches of

17  contractual obligations.

18      Movants' first cause of action in the District Court case,

19  breach of Advisers Act fiduciary duties, comes with a jury

20  right.  It's also barred by the order because the order only

21  allows colorable claims involving gross negligence or

22  intentional misconduct.

23      You see there what I mean.  Congress couldn't have been

24  clearer.  Courts cannot deprive litigants of their day in

25  court before a jury of their peers by invoking general equity

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 609 of 1726   PageID 11930
202

6

1    powers.  Those powers don't trump the constitutional right to

2    a jury trial.

3        Yet this Court's order purports to do precisely that, not

4    only for the Movants, but also for future potential litigants

5    who may have claims that have not even accrued yet.  If those

6    claims are for ordinary negligence or breach of contract or

7    breach of fiduciary duties and don't rise to the level of

8    gross negligence or intentional misconduct, this order says

9    that those claims are barred, and it would deprive them of

10   their day in court.

11       The Court's general equity powers are simply not broad

12   enough to uphold such an order.

13       This issue is even more problematic when the causes of

14   action at issue fall within the mandatory withdrawal of the

15   reference provisions of 28 U.S.C. § 157(d).  As this Court

16   knows, it lacks jurisdiction over proceedings that require

17   consideration of non-bankruptcy federal law regulating

18   interstate commerce.  Some such claims -- Movants' Advisers

19   Act claim, for instance -- do not involve culpability rising

20   to the level of gross negligence or intentional misconduct,

21   but the order purports to bar them nonetheless, despite this

22   Court's lacking jurisdiction over the subject matter of those

23   claims.

24       Even if there is gross negligence or intentional

25   misconduct, the order states that this Court will have sole

7

1   jurisdiction over such claims.  And that can't be right if

2   withdrawal of the reference is mandatory.

3       Opposing counsel will tell you that 157(d) is inapplicable

4   here because they think our claims in the District Court won't

5   require substantial consideration of the Advisers Act or any

6   other federal laws regulating interstate commerce.  But their

7   cases don't come anywhere close to making that showing, as the

8   briefing demonstrates.

9       And in any case, that argument is beside the point.  This

10  order is contrary to 157(d) because it asserts jurisdiction

11  over claims that 157(d) does not apply -- I'm sorry, does

12  apply to.  And that's true regardless of whether Movants'

13  claims are among those.

14      The idea that there's no substantial consideration of

15  federal law, however, in the District Court case is undermined

16  by Mr. Seery's testimony in support of his appointment in

17  which he confirmed that the Advisers Act applies to him and

18  that he has fiduciary duties under that Act to the investors

19  of the funds he manages.

20      Your Honor, importantly, the Advisers Act isn't the

21  typical federal statute with loads of case law under it.  It's

22  actually an underdeveloped, less-relied-upon statute, and most

23  -- most of the law under that Act is promulgated by regulation

24  and supervised by the SEC.  As a registered investment

25  advisor, Mr. Seery is bound by that Act, which he admits, he

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 611 of 1726 PageID 11932
2012

8

```
 1    agrees to.  But to flesh out what his duties are requires a

 2    close exam of more than three dozen regulations under 17

 3    C.F.R. Part 275.

 4         The obligations include robust duties of transparency and

 5    disclosure, as well as duties against self-dealing and the

 6    necessity of obtaining informed consent, none of which are

 7    waivable, these duties.

 8         The proceedings here in this Court reflect an effort to

 9    have those unwaivable duties waived.  The allegations in the

10    District Court are essentially insider trading allegations

11    that the Debtor and Mr. Seery knew or should have known

12    information that they had a duty under the Advisers Act to

13    disclose to their advisees.  Both under the Act and

14    contractually, they had those duties.  And, instead, they did

15    not disclose and consummated a transaction that benefited

16    themselves nonetheless.

17         In considering those claims, the presiding court will have

18    to consider and apply the Advisers Act and the many

19    regulations promulgated under it, in addition to other federal

20    laws regulating interstate commerce.  For that reason,

21    withdrawal of the reference on the District Court action is

22    mandatory.  That's the two major -- that's two major problems

23    out of four with the order that we're here on today.

24         First, it deprives litigants of their right to trial, to a

25    jury trial, when Section 959(a) says that can't be done.  And,
```

9

1   two, the order asserts jurisdiction -- sole jurisdiction, even

2   -- over proceedings in which withdrawal of the reference is

3   mandatory under 157(d).

4       The fourth major problem is what the Court called

5   specificity at the previous hearing.  The Fifth Circuit's

6   *Applewood Chair* case holds that the rule from *Shoaf* does not

7   apply without a "specific discharge or release," and that that

8   release has to be enumerated and approved by the Bankruptcy

9   Court.  Thus, the order here can't exculpate Mr. Seery of

10  liability for ordinary negligence and the like in a blanket

11  fashion.  The claims being released must be identified.

12      That's what happened in *Shoaf*.  Shoaf's guaranty

13  obligation was explicitly released.  That's also what happened

14  in *Espinosa*.  Espinosa's plan listed his student loan as his

15  only specific indebtedness.  But it's not what happened here.

16  And it couldn't happen here, because the ordinary negligence

17  and similar claims being discharged by the order had not yet

18  accrued and thus were not even in existence at the time the

19  order issued.

20      Instead, what we have here is a nonconsensual, nondebtor

21  injunction or release that's precisely what the Fifth Circuit

22  refused to enforce in the *Pacific Lumber* case.

23      So, lack of specificity is the third major problem with

24  the order.  And that brings us to the fourth problem, which is

25  the *Barton* doctrine.  *Barton* is the only possible basis for

1    this Court to assert exclusive or sole jurisdiction over

2    anything.  Outside of *Barton*, it's plain black letter law that

3    the District Court's jurisdiction is equal to and includes

4    anything that this Court's derivative jurisdiction would also

5    reach.

6        But the exception to the *Barton* doctrine in 959(a) plainly

7    applies here, leaving no basis for exclusivity with regards to

8    jurisdiction and the District Court.  That's because Mr. Seery

9    is carrying on the business of a debtor and managing the

10   property of others, rather than merely administering the

11   bankruptcy estate.  The exclusive jurisdiction function of the

12   *Barton* doctrine has no applicability because 959(a) creates

13   that exception here.

14       Under its general equity powers, yes, 959(a) still

15   authorizes this Court to exercise some control over actions

16   against Mr. Seery, but short of depriving litigants of their

17   day in court.  And nothing in 959(a), that exception to

18   *Barton*, says that the Court can nonetheless exercise

19   exclusivity in that jurisdiction.  Those general equity powers

20   do not create exclusive or sole jurisdiction.  They do not

21   deprive the District Court of its Congressionally-granted

22   original jurisdiction.

23       Moreover, Mr. Seery is not an appointed trustee entitled

24   to the protections of the *Barton* doctrine in any case.  His

25   appointment was a corporate decision that the Court was asked

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 614 of 1726 PageID 11935

11

```
 1    not to interfere with.  The Court was asked to defer under the
 2    business judgment rule to the Debtor's appointment of Mr.
 3    Seery.  And the Court did so.
 4        As we asserted last time, no authority that we can find
 5    combines these two unrelated doctrines, the Barton doctrine
 6    and the business judgment rule.  And they don't go together.
 7    None of the testimony or the briefing or argument, in the July
 8    order, in the January order that preceded it, none of that
 9    indicated that Mr. Seery would be a trustee or the functional
10    equivalent of a trustee.  The word "trustee" does not appear
11    in any of those briefs or transcripts.
12        Opposing -- and because of that, the District Court suit
13    is not about -- well, not because of that.  The District Court
14    suit simply is not about any trustee-like role that Mr. Seery
15    may have played anyway.  Opposing counsel will try to convince
16    you otherwise, will tell you that the District Court case is a
17    collateral attack on the settlement, but it's not.  Wearing
18    his estate administrator hat, Mr. Seery can settle claims in
19    this court.  Wearing his advisor hat, he has to fulfill his
20    Advisers Act duties and properly advise his clients.
21        He doesn't have to wear both hats, and it seems highly
22    unusual that he would choose to fill both of those roles
23    simultaneously.  But he has chosen both roles.  And the
24    District Court case is a hundred percent about his role as an
25    advisor.  Did he comply with the Act?  Did he do the things
```

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 615 of 1726 PageID 11936

12

 1   that his advisor role obligated him to do as a manager of that

 2   property?

 3       The District Court suit really is only being used to

 4   illustrate the issues that we're raising here.  It's

 5   important, it's timely to address those issues now because of

 6   the District Court action, but that's an illustration of the

 7   problems with the order.  It is not exclusively that that

 8   action is what we're attempting to address.  Rather, the order

 9   exculpating Mr. Seery from ordinary negligence liability and

10   similar liability is problematic, is contrary to the law.  On

11   top of that, the Court is asserting jurisdiction over gross

12   negligence and intentional misconduct claims.  To the extent

13   that 157(d) applies, it is problematic and contrary to law as

14   well.

15           THE COURT:  Okay.  We're occasionally getting some

16   breakup of your sound.  So please -- I don't know what you can

17   do to adjust, but it was just now, and intermittently we get a

18   little bit of garbly.  So if you could just say your last

19   sentence one more time, and we'll see if it improves.

20           MR. BRIDGES:  Your Honor, I'm not sure I can say this

21   last sentence again.

22           THE COURT:  Okay.

23           MR. BRIDGES:  I was -- I was mentioning that the

24   District Court case is an illustration of our argument.  Our

25   argument is not merely that the District Court case should be

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 616 of 1726 PageID 11937
20

13

1    exempted or excepted from the order.  Our argument is that the

2    order is legally infirm and that the District Court case and

3    the claims there illustrate some of those infirmities, but

4    that the infirmities go beyond just what's at issue in the

5    District Court case.

6        In sum, there are four problems with the order that render

7    parts of it legally infirm.  It deprives the right of a jury

8    trial -- in fact, of any trial -- in contravention of 959(a)

9    for some causes of action.

10       It asserts jurisdiction -- two, it asserts jurisdiction

11   over claims that are subject to the mandatory withdrawal of

12   the reference provision (garbled) 157(d).

13       And three, it lacks the specificity required to discharge

14   future claims under *Applewood*.

15       Finally, Your Honor, number four, the order relies on the

16   *Barton* doctrine, which doesn't apply and which 959(a) creates

17   an exception to.

18       Movants respectfully submit the order should be modified

19   for those reasons.

20          MR. SBAITI:  Tell him Mark Patrick is here, for the

21   record.

22          THE COURT:  All right.  I have a couple of follow-up

23   questions for you.  I want to drill down on the issue of your

24   client not having appealed the July 2020 order.  Or the

25   HarbourVest settlement order, for that matter.  Tell me as

14

 1   directly as possible why you don't view that as a big problem.

 2   Because it's high on my list of possible problems here.

 3           MR. BRIDGES:  I understand, Your Honor.  The

 4   *Applewood Chair* case is our -- our defense to that argument,

 5   that without providing specifics as to the claims being

 6   discharged in the July order, that *Shoaf* cannot apply to

 7   create a res judicata effect from the failure to appeal that

 8   order.

 9           THE COURT:  But is that really what we're talking

10   about, a discharge of certain claims?  We're talking about a

11   protocol that the Court established which wasn't appealed.

12           MR. BRIDGES:  Your Honor, your order does many

13   things.  We're talking about a few of them in one paragraph of

14   the order.  And in that order -- in that paragraph, yes, it

15   creates a protocol for determining the colorability of some

16   claims, claims that rise to the level of gross negligence or

17   intentional misconduct.  It does not create a protocol for

18   claims that fall below that threshold, claims for ordinary

19   negligence, as an example.

20           THE COURT:  Okay.

21           MR. BRIDGES:  For breach of contract that's not

22   intentional, is not grossly negligent, it's just a breach of

23   contract.  It can even be faultless.  There's still liability.

24   There's still a jury right under the Seventh Amendment for

25   faultless breach of contract.

15

1      The protocols in the order do not address such claims

2   other than to bar them.  To discharge them.  And thus, yes,

3   it's a release, it's a discharge of those claims.  It can be

4   viewed as a permanent injunction against bringing such claims.

5   It's what's -- it's what's not allowed by the *Applewood Chair*

6   case and by *Pacific Lumber*.

7           THE COURT:  All right.  So you're arguing that was --

8   the wording of the order was not specific enough to apprise

9   affected parties of what they were releasing, they're

10  releasing claims based on ordinary negligence against Mr.

11  Seery?  That's not specific enough?

12          MR. BRIDGES:  Correct.  Future unproved claims, the

13  factual basis for which has not happened yet.  Those cannot be

14  and were not disclosed with any specificity in this order.

15      If we compare it to *Shoaf* and to *Espinosa*, in *Shoaf* what

16  we had was a guaranty, Shoaf's guaranty on a transaction that

17  was listed in the actual release, describing what the

18  transaction was that was being -- that the guaranty was being

19  released for.

20      In *Espinosa*, what we had was a student loan --

21          THE COURT:  Right.

22          MR. BRIDGES:  -- that was listed in the plan

23  specifically, as the only specific indebtedness.

24      Here, we don't have any of that specificity.  What we have

25  is a notice to the entire world, Your Honor, that for an

16

 1  unlimited period of time any claim for ordinary negligence,

 2  for ordinary breach of contract or fiduciary duty against Mr.

 3  Seery is barred if it relates to his CEO role.  And his CEO

 4  role means as a manager of property, exactly precisely what

 5  959(a) is talking about.

 6      Those jury rights (garbled) claims cannot be released,

 7  discharged, expunged, done away with, in an order that isn't

 8  explicit.

 9      On top of that, even in an explicit order, 959(a) tells

10  the Court it cannot deprive a litigant of its jury trial

11  right.

12          THE COURT:  Well, as anyone knows who's been around a

13  while in this case, my brain sometimes goes down an unexpected

14  trail, and maybe this one is one of those situations.  Are

15  there contracts that your clients would rely on in potential

16  litigation?

17          MR. BRIDGES:  Yes, Your Honor.

18          THE COURT:  What are those contracts?

19          MR. BRIDGES:  It is a management contract.  I don't

20  think I can give you the specifics at this moment, but I

21  probably can before we're done here today.  A management

22  contract in which the Debtor provides advisory and management

23  services to the DAF --

24          THE COURT:  Well, you know, the shared services

25  agreements that we heard so much about in this case?  A shared

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 620 of 1726 PageID 11941
20

17

1   service agreement?  I can't remember, you know, which entities

2   have them and which do not at times.  So, --

3           MR. BRIDGES:  The shared services agreement is one of

4   those contracts, Your Honor.

5           THE COURT:  Okay.

6           MR. BRIDGES:  It's not the only one.

7           THE COURT:  And what are the others?

8           MR. BRIDGES:  There's -- the other is the investment

9   advisory agreement.

10          THE COURT:  Those two?

11          MR. BRIDGES:  (no response)

12          THE COURT:  Those are the only two?

13          MR. BRIDGES:  There may be one other, Your Honor.

14   I'm not sure.

15          THE COURT:  Are they in evidence?

16          MR. BRIDGES:  I can find out shortly.

17          THE COURT:  Are they in evidence?  We haven't talked

18   about evidence yet, but are they going to be in evidence,

19   potentially?

20          MR. BRIDGES:  They are referenced in the District

21   Court case, the complaint, which is in evidence.

22          THE COURT:  I'm asking, are --

23          MR. BRIDGES:  But those contracts I don't believe are

24   listed as exhibits here in this motion, no.

25          THE COURT:  They are not?  Okay.

1     Well, what my brain is thinking about here is, of the
2 umpteen agreements I've seen -- more than umpteen -- of the
3 many, many agreements I've seen over time in this case, so
4 often there's a waiver of jury trial rights, as I recall, as
5 well as an arbitration clause.  I just was curious, hmm, you
6 know, you talked a lot about your clients' jury trial rights:
7 do we know that these agreements have not waived those?

8          MR. BRIDGES:  Your Honor, I think I can answer that
9 by the end of our hearing.  I don't have an answer off the top
10 of my head.  What I can tell you is a jury right has been
11 demanded in the federal court complaint, which is in evidence,
12 and that opposing counsel has brought no evidence indicating
13 that they have the defense of our having waived the right to a
14 jury trial here.

15          THE COURT:  Okay.  Well, I just --

16          MR. BRIDGES:  Or arbitra...

17          THE COURT:  -- would think that you would know that.
18 Does anyone know that on the Debtor's side off the top of your
19 head?

20          MR. POMERANTZ:  I do not, Your Honor.

21          THE COURT:  Uh-huh.

22          MR. POMERANTZ:  And to Mr. Bridges' last point, we
23 have filed a motion to dismiss.  We have not answered the
24 complaint.  So any time to object to their jury trial right
25 would be in the context of the answer.  So the implication

1  that we have not raised the issue and therefore it doesn't

2  exist is just not a correct implication and connection he's

3  trying to draw.

4           THE COURT:  Okay.  All right.

5      Well, let me also ask you about this.  I'm obsessing a

6  little over the *Barton* doctrine and your insistence that it

7  does not provide authority or an analogy here.

8      Well, for one thing, is there anything in the Fifth

9  Circuit case *Sherman v. Ondova* that you think either helps you

10  or hurts you on that point?  I'm intimately familiar with it,

11  although I haven't read it in a while, because it was my

12  opinion that the Fifth Circuit affirmed.  And I spent a lot of

13  time thinking about that.  It was a trustee, a traditional --

14  well, no, a Chapter 11 trustee and his counsel.  But anything

15  from that case that you think is worthy of pointing out here?

16           MR. BRIDGES:  No, Your Honor.  I'm not -- nothing

17  comes to mind.  That case is not fresh on my mind.

18      What I would tell you is that *Barton* doctrine and the

19  business judgment rule are incompatible, and the appointment

20  of a trustee never involves application of the business

21  judgment rule or deference to the Debtor or another party in

22  terms of making that appointment.

23      The *Barton* doctrine, as it applies to trustees, is viewed

24  as an extension, to some extent, of judicial immunity to the

25  trustee, who is chosen by, selected by the Court and assigned

20

1  by the Court to carry out certain functions.  That --

2          THE COURT:  Well, let me --

3          MR. BRIDGES:  -- quasi-immunity --

4          THE COURT:  -- stop you there.  You say it's an

5  extension of immunity.  But isn't it, by nature, really a

6  gatekeeping provision?  It's a gatekeeping provision, right?

7  Before you even get to immunity, maybe, in a lawsuit, it's a

8  gatekeeping function that the Supreme Court has blessed, you

9  know, obviously in the context of a receiver, but appellate

10 courts have blessed it in the bankruptcy context.  The

11 Bankruptcy Court can be the gatekeeper on whether the trustee

12 or someone I think in a similar position can get sued or not.

13    And then we had that Fifth Circuit case after *Ondova*.  It

14 begins with a V, *Villegas* or something like that.  Didn't

15 that, I don't know, further ratify, if you will, the whole

16 *Barton* doctrine by saying, oh, just because they're noncore

17 claims, state law or non-bankruptcy law claims, doesn't mean,

18 after *Stern*, the Bankruptcy Court still cannot serve the

19 gatekeeper function.

20    Tell me what you disagree.  That's my kind of combined

21 reading of all of that.

22          MR. BRIDGES:  Your Honor, I have to parse it out.

23 There's a lot to unpack there.  If I can make sure to get in

24 the follow-ups, I can start with saying it's okay for the

25 Court in many instances to act as a gatekeeper.

21

1          THE COURT:  Okay.

2          MR. BRIDGES:  Both under *Barton* -- under *Barton*, or

3    when the *Barton* exception in 959(a) applies, under the Court's

4    general equitable powers, that gatekeeping functions are not

5    across-the-board prohibited, --

6          THE COURT:  Okay.

7          MR. BRIDGES:  -- and we aren't trying to argue that

8    they're prohibited across the board.

9          THE COURT:  Okay.

10         MR. BRIDGES:  Now, to try to dig into that a little

11   deeper, the order does two things:  gatekeeping as to some

12   claims, and, frankly, discharging or barring other claims.

13   Those are two separate functions.

14       The first one, the gatekeeping, may be, in some

15   circumstances, which we'll come to, many circumstances, may be

16   allowable, may be even mandatory under *Barton*, not even

17   requiring an order from this Court, for the gatekeeping of

18   *Barton* to apply.  But nonetheless, allowable in many instances

19   under the Court's general equity powers under 959(a).  That

20   part is right about gatekeeping.

21       It does not create jurisdiction in this Court where 157(d)

22   deprives this Court of jurisdiction.  Just because it's

23   related to bankruptcy isn't enough to say that the Court

24   therefore has jurisdiction if, one, if mandatory withdrawal of

25   the reference is required.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 625 of 1726 PageID 11946

22

1    Furthermore, Your Honor, that gatekeeping function, under

2  the equity powers authorized by 959(a), will not allow a court

3  to discharge or -- or deprive, is the word I'm looking for --

4  deprive a litigant of their right to a trial -- a specific

5  kind of trial, a jury trial -- but a trial.  And by crafting

6  an order that says certain kinds of claims that do (garbled)

7  jury rights are barred, rather than just providing a

8  gatekeeper provision, flat-out bars them, that doesn't -- that

9  doesn't comply with 959.

10        THE COURT:  Okay.

11        MR. BRIDGES:  Your Honor, if I could add one last

12  thing.

13        THE COURT:  Go ahead.

14        MR. BRIDGES:  The Supreme Court's *Stern* case points

15  out that -- that it's -- well, actually, it's the *Villegas*

16  case from the Fifth Circuit --

17        THE COURT:  The one I mentioned.

18        MR. BRIDGES:  -- points out that *Stern* -- *Stern* --

19  yes, you did.  *Stern* did not create an exception to the *Barton*

20  doctrine.  And that gives -- that endorses a *Barton* court's

21  ability to perform gatekeeping, even over claims that *Stern*

22  says there would not be jurisdiction over.

23    Contrast that with 959(a), which *Collier on Bankruptcy* and

24  the Fifth Circuit have held is an exception to the *Barton*

25  doctrine.  Because of that exception, *Barton* no longer

23

1   applies, and what you're using in invoking a gatekeeper order

2   is the Court's inherent equitable powers, its general powers

3   in equity.  And those equity powers are cabined.  They're

4   broad, but they're cabined by 959(a)'s prohibition of doing

5   away with a litigant's right to a trial, a jury trial.

6        Now, I also -- counsel is telling me I should note for the

7   record that Mr. Mark Patrick is here as a representative of

8   our clients.  But Your Honor, I'll -- I will quit now unless

9   you have further questions for me.

10           THE COURT:  All right.  I do not at this time.  Mr.

11  Morris or Mr. Pomerantz, who's going to make the argument?

12           MR. POMERANTZ:  It's me, Your Honor.

13            OPENING STATEMENT ON BEHALF OF THE DEBTOR

14           MR. POMERANTZ:  And I'll start with the jury trial

15  right.  In the last few minutes, we have been able to

16  determine that the Second Amended and Restated Investment

17  Advisory Agreement between the DAF and the Debtor has a broad

18  jury trial waiver under 14(f).  And in addition, as I will

19  include in my discussion, there is no private right of action

20  under the Investment Advisers Act.

21      I think those two points are fatal to Movants' argument,

22  and probably I can get away with not even responding to the

23  others.  But since I prepared a lengthy presentation to

24  address the issues that were raised today, and also the half

25  hour that Mr. Bridges spent with Your Honor on June 8th in

24

1   which was his first opening statement on the motion for

2   reconsideration, I'll now proceed.

3          THE COURT:  All right.

4          MR. POMERANTZ:  The arguments that the Movants made

5   in the original motion essentially boil down to one legal

6   proposition, that the Court did not have jurisdiction to enter

7   the July 16th order because those orders impermissibly

8   stripped the District Court from jurisdiction, in violation of

9   (inaudible) Supreme Court precedent and 28 U.S.C. Section

10  157(d).

11     As with all things Dondero, the arguments continue to

12  morph, and you heard argument at the contempt hearing on June

13  8th and further argument today that now the prospective

14  exculpation for negligence in the order is also unenforceable

15  and should be modified.

16     Movants continue to try to distance themselves from the

17  January 9th order and argue that it is not relevant because

18  they seek to pursue claims against Mr. Seery as CEO and not as

19  an independent director.  Movants ignore, however, that the

20  January 9th order not only protects Mr. Seery in his role as

21  the independent director, but also as an agent of the board.

22  I will walk the Court through my arguments on that issue in a

23  few moments.

24     Of course, the Movants had no explanation, Your Honor, for

25  the question of why it took them until May of 2021, 10 months

25

1   after the entry of the July 16th order that appointed Mr.

2   Seery as CEO and CRO, and 16 months after the Court appointed

3   the independent board, with Mr. Dondero's blessing and

4   consent, as a substitute for what would have surely been the

5   imminent appointment of a Chapter 11 trustee.

6       Movants try to distance themselves from the prior orders

7   by essentially arguing that the DAF is a newcomer to the

8   Chapter 11 and is not under Mr. Dondero's control but is

9   rather managed separately and independently by Mr. Patrick,

10   who recently replaced Mr. Scott.

11      The Movants admit, as they must, that the DAF is the

12   parent and the sole shareholder of CLO Holdco and conducts its

13   business through CLO Holdco, and both entities conduct their

14   business through one individual.  It was Grant Scott then;

15   it's Mark Patrick now.  So even if Mr. Dondero does not

16   control the DAF and CLO Holdco, which issue was the subject of

17   lengthy testimony in connection with the DAF hearing, both the

18   DAF and the CLO Holdco are bound by the Debtor's res judicata

19   argument, which I will discuss shortly.

20      In any event, I really doubt the Court is convinced that

21   the DAF operates truly independently of Mr. Dondero any more

22   than the Court has been convinced that the Advisors, the

23   Funds, Dugaboy and Get Good, all operate independently from

24   Mr. Dondero.  The only explanation for the delay is that Mr.

25   Dondero has been and continues to be unhappy with the Court's

1   rulings and has now hired a new set of lawyers in a desperate

2   attempt to evade this Court's jurisdiction.  Having failed in

3   their attempt to recuse Your Honor from the case, this is

4   essentially their last hope.

5       And these new lawyers, Your Honor, have not only filed

6   this DAF lawsuit in the District Court which is the subject of

7   the contempt motion and today's motion, but they also filed

8   another lawsuit in the District Court on behalf of an entity

9   called PCMG, another Dondero entity, challenging yet another

10  of Mr. Seery's postpetition decisions.

11      And there's no doubt that this is only the beginning.  Mr.

12  Dondero recently told Your Honor at a hearing that there were

13  many more sets of lawyers waiting in the wings.  And as the

14  Court remarked at the hearing on the Trusts' motion to compel

15  compliance with Rule 2015.3, the Trusts were trying through

16  that motion to obtain information about the Debtor's control

17  entities so that they could file more lawsuits against the

18  Debtor, a concern that Mr. Draper unconvincingly denied.

19      I would like to focus the Court preliminarily on exactly

20  what the January 9th and July 16th orders do, because Movants

21  try to confuse things by casting the entire order with a broad

22  brush of their jurisdictional overreach arguments, and they

23  misinterpret Supreme Court and Fifth Circuit precedent.

24      I would like to put up on the screen the language of

25  Paragraph 10 of the January 9th order and Paragraph 35

27

1   (garbled) of the July 16th.

2        Your Honor is very familiar with these orders, I'm sure,

3   having dealt with them in connection with confirmation and in

4   prior proceedings.  But to recap, the orders essentially do

5   three things.

6        First, they require the parties to first come to the

7   Bankruptcy Court before commencing or pursuing a claim against

8   certain parties.

9        Second, they provided the Court with the sole jurisdiction

10  to make a finding of whether the party has asserted a

11  colorable claim of negligence -- of willful misconduct or

12  gross negligence.

13       And lastly, the orders provided the Court with exclusive

14  jurisdiction over any claims that the Court determined were

15  colorable.

16       The protected parties under the January 9th order are the

17  independent directors, their agents and advisors, which, as I

18  mentioned earlier, includes Mr. Seery -- who, at least as of

19  March 2020, was acting as the agent on the board's behalf as

20  the CEO -- for any actions taken under their direction.

21       The protected parties under the July 16th order are Mr.

22  Seery, as the CEO and CRO, and his agents and advisors.

23       Movants spend a lot of time in their moving papers and

24  reply arguing that the Court may not assert exclusive

25  jurisdiction over any claims that pass through the gate.  They

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 631 of 1726 PageID 11952

28

1    also spend a lot of time arguing that the Bankruptcy Court

2    does not even have jurisdiction at all to assert -- to

3    adjudicate claims against Mr. Seery because such claims are

4    subject to mandatory withdrawal under Section 157(d).

5        The Debtor doesn't agree, and has briefed why mandatory

6    withdrawal of the reference is inapplicable.  The Debtor has

7    also filed in the District Court a motion to enforce the

8    reference in effect in this district which refers cases in

9    this district arising under, arising in, or related to Chapter

10   11 to the Bankruptcy Court.

11       The motion to enforce the reference, Your Honor, which

12   extensively briefs this issue, is contained in Exhibit 3 of

13   the Debtor's exhibits.

14       We were somewhat surprised that the complaint filed in the

15   District Court wasn't automatically referred to this Court

16   under the standing order in effect in this district, given the

17   related bankruptcy case, the Court's prior approval of the

18   HarbourVest settlement, and the appeal in the District Court

19   of the HarbourVest settlement.

20       When we dug a little further, we found out that Movants

21   filed a civil case cover sheet accompanying the complaint in

22   the District Court.  They neglected in that initial filing to

23   point out that there was any related case to the lawsuit they

24   filed.

25       Mr. Bridges fell on his sword at the contempt hearing on

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 632 of 1726 PageID 11953

29

1    June 8th and took complete responsibility for the oversight.

2    I commend him for not trying to argue that the bankruptcy

3    case, the HarbourVest settlement, and the District Court

4    appeal are not related cases that would require disclosure, an

5    argument that surely would have been unsupportable.

6        But as I said at the contempt hearing, I find it curious

7    that such an important issue was overlooked, an issue which

8    would have likely changed the entire trajectory of the

9    proceedings and landed the DAF lawsuit in this Court rather

10   than the District Court.

11       And this Tuesday, Your Honor, Movants filed a revised

12   civil cover sheet with the District Court. Although they

13   referenced the bankruptcy case as a related case, they didn't

14   bother to mention the appeal already pending in the District

15   Court regarding the HarbourVest settlement -- surely, a

16   related case.

17       Your Honor also asked Mr. Bridges at the June 8th hearing

18   whether it was an oversight or intentional that he didn't

19   mention 28 U.S.C. Section 1334 as a basis for jurisdiction in

20   his complaint. Mr. Bridges had no answer for Your Honor then,

21   and has given no answer now. His only comment at the hearing

22   last time was that it must have been Ms. Sbaiti that wrote it

23   because he had no recollection of it.

24       So, Your Honor, it's no surprise that Movants conveniently

25   found themselves in the District Court, which was their

1   ultimate strategy from the get go.

2       In any event, Your Honor, we have briefed the withdrawal

3   of the reference issue.  A response by the Movants is due --

4   CLO Holdco and DAF is due on June 29th.  And we hope the

5   District Court will decide soon thereafter whether to enforce

6   the reference.

7       While I'm happy to argue why Movants' mandatory withdrawal

8   of the reference argument is [not] persuasive, I don't think

9   it's necessary, but I do, again, want to highlight that there

10  is no private right of action under the Investment Advisers

11  Act.

12      Your Honor, it's not really relevant to today's hearing,

13  since we have argued in opposition to the motion before Your

14  Honor that resolving the issue of the Bankruptcy Court's

15  jurisdiction to adjudicate claims contained in the complaint

16  as they relate to Mr. Seery is premature at this point.  The

17  January 9th and July 16th orders first require the Court to

18  determine whether a claim is colorable.  It's not until this

19  Court determines if a claim is colorable that the decision on

20  where the lawsuit should be tried is relevant.

21      Having said that, Your Honor, we read the Movants' reply

22  brief very carefully and noticed in Footnote 6 that the

23  Movants state that modifying the exclusive grant of

24  jurisdiction to adjudicate any claims that pass through the

25  gate to include the language "to the extent permissible by

31

1   law," in the same way the Debtor modified the plan, would

2   resolve the motion.  So let's look at the provision as it

3   exists in the plans.

4       Ms. Canty, if you can put up the next demonstrative,

5   please.

6       This provision provides that the Bankruptcy Court will

7   have sole and exclusive jurisdiction to determine whether a

8   claim or cause of action is colorable, and, only to the extent

9   legally permissible and provided in Article XI, shall have

10  jurisdiction to determine -- to adjudicate the underlying

11  colorable claim or cause of action.

12      The Movants request in their reply brief in Footnote 6

13  that the July 16th order be given the plan treatment.  That

14  treatment:  sole authority to determine colorability and

15  jurisdiction, and, to the extent legally permissible, to

16  adjudicate underlying claim, only if jurisdiction existed.

17      After reviewing the reply brief and prior to the June 8th

18  hearing, we decided that we would agree to modify both the

19  January 9th and the July 16th orders to provide that the

20  Bankruptcy Court would only have jurisdiction to adjudicate

21  claims that pass through the colorability gate to the extent

22  permissible by law.

23      Prior to the June 8th hearing, Mr. Morris and I had a

24  conversation with Mr. Bridges.  We conferred about a potential

25  resolution and a proposed modification.  Mr. Bridges indicated

32

```
 1   they were interested in exploring a resolution and wanted to
 2   --
 3           MR. BRIDGES:  Objection, Your Honor.
 4           THE COURT:  There's an objection?
 5           MR. BRIDGES:  Objection, Your Honor.  There's a Rule
 6   408 settlement discussion.  He's welcome to talk about the
 7   results, but he shouldn't be talking about what was -- what
 8   was proposed by opposing counsel in a settlement conversation.
 9           THE COURT:  Okay.  I overrule.
10           MR. POMERANTZ:  Your Honor, this was not --
11           THE COURT:  I don't think this is a 408 issue.
12   Continue.
13           MR. BRIDGES:  Thank you.
14           MR. POMERANTZ:  The stipulation and order which we
15   provided to counsel is attached to my declaration, which is
16   found at Document 2418, and it was filed in connection with a
17   Notice of Revised Proposed Orders that we filed at Docket
18   2417.  And I would like to put up on the screen the relevant
19   paragraphs of the order that we provided to the Movants.
20       So, you see, we agreed to modify each of the orders at the
21   end to do what the plan says.  The Court would only have
22   jurisdiction for claims passing through the gate if the Court
23   had jurisdiction and it was legally permissible.
24       Movants' counsel, however, responded with a mark-up that
25   went beyond -- went beyond what Movants proposed in Footnote 6
```

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 636 of 1726 PageID 11957

33

1    and sought to fundamentally change the January 9th and July

2    16th orders in ways that were not acceptable to the Debtor and

3    not even contemplated by the original motion.

4        Ms. Canty, can you put up on the screen the relevant

5    paragraphs of the response we received?

6        Specifically, Your Honor, you see at the first part they

7    wanted to provide that the only -- the order only applied to

8    claims involving injury to the Debtor, presumably as opposed

9    to alleged injuries to affiliated funds or third parties.

10   They also provided that the Court's ability to make the

11   initial colorability determination was also qualified by "to

12   the extent permissible by law" in the way that the Court --

13   that the Debtor agreed to modify the ultimate adjudication

14   jurisdiction provision.

15       Your Honor, Movants haven't even talked about this back

16   and forth.  They haven't talked about their about-face.  And

17   I'll leave it for Your Honor to read their Footnote 6 that

18   said it would resolve their motion, the back and forth, our

19   proposal, and now Mr. Bridges' modified, morphed arguments

20   that now point out other issues.

21       In any event, Your Honor, we made the change, and we think

22   it should resolve the motion, or at least it resolves part of

23   the motion.  There can't be any argument that the Court is

24   trying to exert exclusive jurisdiction on claims that pass

25   through the gate.

1       What apparently remains from the arguments raised by the

2   Movants is the argument that the Court does not even have

3   jurisdiction to act as a gatekeeper in the first place because

4   it doesn't have jurisdiction of the underlying lawsuit.  And

5   on June 8th and today, they've added a new argument, that the

6   orders impermissibly exculpate Mr. Seery and others, violate

7   their jury trial rights, and are contrary to the Fifth Circuit

8   precedent.

9       Movants claims that the orders are a jurisdictional

10  overreach, a violation of constitutional proportions, a

11  violation of due process, and inconsistent with several U.S.

12  Supreme Court cases.  But, of course, they cite no cases whose

13  facts are even remotely similar to this one.  Instead, they

14  are content to rely on general statements regarding bankruptcy

15  jurisdiction, how it is derived from district court

16  jurisdiction and is constitutionally limited, legal

17  propositions which are not terribly controversial or even

18  applicable to these facts.

19      There are several arguments -- I mean, there are several

20  reasons, Your Honor, why Movants' arguments fail.  Initially,

21  Movants have not cited any authority, any statute, or any rule

22  which would allow this Court to revisit the January 9th and

23  July 16th orders.  As I will discuss in a moment, Your Honor,

24  *Republic v. Shoaf*, a case the Court is very familiar in and

25  relied on in connection with plan confirmation, bars a

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 638 of 1726 PageID 11959

35

1   collateral attack on these orders under the doctrine of res

2   judicata.

3        Similarly, as the Court remarked on June 8th, the Supreme

4   Court's *Espinosa* decision, which rejected an attack based upon

5   Federal Rule of Civil Procedure 60(b)(4) to a prior order that

6   may have been unlawful, prohibits the Court from now

7   reconsidering the January 9th and July 16th orders.

8        But even if Your Honor rules that res judicata does not

9   apply, there are two independent reasons why the orders were

10  not an unlawful extension of the Court's jurisdiction.  The

11  first is because the Court had jurisdiction to enter both of

12  those orders as the ability to determine the colorability of

13  claims is within the jurisdiction of the Court.  The second is

14  because the orders are justified by the *Barton* doctrine.

15       Lastly, Your Honor, Movants' argument that the Court may

16  not act as a gatekeeper to determine the colorability of a

17  claim for which it may not have jurisdiction is incorrect, and

18  as Your Honor has mentioned and as Mr. Bridges unconvincingly

19  tried to distinguish, the Fifth Circuit *Villegas v. Schmidt*

20  case is a case on point and resolves that issue.

21       Turning to res judicata, Your Honor, it prevents the Court

22  from revisiting these governance orders.  CLO Holdco had

23  formal notice of the Seery CEO motion and the opportunity to

24  respond.  It failed to do so.  It is clearly bound.

25       As reflected on Debtor's Exhibit 4, CLO Holdco is a

36

1    wholly-owned subsidiary of the DAF.  The DAF is its sole

2    shareholder.  There is no dispute about that.  Importantly, at

3    the time of both the January and July orders, Grant Scott was

4    the only human being authorized to act on behalf of CLO Holdco

5    and the DAF.  The DAF did not respond to the Seery CEO motion,

6    either.

7        And why is that important, Your Honor?  It's because

8    Movants argue in their reply that the DAF cannot be bound by

9    res judicata because they did not receive notice of the July

10   16th order.  However, Your Honor, that is not the law.  Res

11   judicata binds parties to the dispute and their privies, and

12   the DAF is bound to the prior orders even though it did not

13   receive notice.

14       There are several cases, Your Honor, that stand for this

15   unremarkable proposition.  First I would point Your Honor to

16   the Fifth Circuit's opinion of *Astron Industrial Associates v.*

17   *Chrysler*, found at 405 F.2d 958, a Fifth Circuit case from

18   1968.  In that case, Your Honor, the Fifth Circuit held that

19   the appellant was barred by the doctrine of res judicata from

20   bringing a claim because its parent, which was its sole

21   shareholder, would have been bound by res judicata.

22       *Astron* is consistent with the 1978 Fifth Circuit case of

23   *Pollard v. Cockrell*, 578 F.2d 1002 (1978).  And the Northern

24   District of Texas in 2000 case of *Bank One v. Capital*

25   *Associates*, 2000 U.S. Dist. LEXIS 11652, found that a parent

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 640 of 1726 PageID 11961

37

1   and a sole shareholder of an entity couldn't assert res

2   judicata as a defense when those claims could have been

3   brought against its wholly-owned subsidiary.

4       And lastly, Your Honor, the 2011 Southern District of

5   Texas case, *West v. WRH Energy Partners*, 2011 LEXIS 5183, held

6   that res judicata applied with respect to a partnership's

7   general partner because the general partner was in privity

8   with the partnership.

9       These cases are spot on and make sense.  DAF is CLO

10  Holdco's parent.  Grant Scott was the only live person to

11  represent these entities in any capacity at the relevant

12  times.  Accordingly, just as CLO Holdco is bound, DAF is

13  bound.

14      Allowing DAF to assert a claim when its wholly-owned and

15  controlled subsidiary is barred would allow entities to

16  transfer claims amongst their related entities in order to

17  relitigate them and they would never be finality.  And, of

18  course, Jim Dondero, as we know, consented to the January 9th

19  order, which provided Mr. Seery protection in a variety of

20  capacities.

21      And as Your Honor has pointed out, and as Mr. Bridges

22  didn't have an answer for, neither CLO Holdco nor the DAF or

23  any other party appealed any of the governance orders.  And

24  nobody challenged the validity of these orders at the

25  confirmation hearing, where the terms of these orders were

38

```
1  │  front and center.
2  │      And importantly, Your Honor, the orders are clear and
3  │  unambiguous.  They require a Bankruptcy Court [sic] to seek
4  │  Bankruptcy Court approval before they commence or pursue an
5  │  action against the independent board, the CEO, CRO, or their
6  │  agents.  And they clearly and unambiguously set the standard
7  │  of care for actions prospectively:  gross negligence or
8  │  willful misconduct.
9  │      The Bankruptcy Court had jurisdiction to enter the
10 │  governance orders, which, as expressly indicated in the
11 │  orders, were core proceedings dealing with the administration
12 │  of the estate.  No one challenged this finding of core
13 │  jurisdiction.  And as I will discuss later, the failure to
14 │  challenge core jurisdiction is waived under applicable Supreme
15 │  Court and Fifth Circuit precedent.
16 │      Your Honor, the Court [sic] does not argue that Movants
17 │  have waived their right to seek adjudication of a lawsuit that
18 │  passes through the colorability gate by an Article III Court.
19 │  The issue is not before the Court, but the changes to the
20 │  order that the Debtor agreed to make clearly -- clearly will
21 │  provide Mr. Bridges' clients the ability to make that
22 │  determination.
23 │      The Debtor is, however, arguing that the Movants have
24 │  waived their right to contest the core jurisdiction of the
25 │  Bankruptcy Court to make the determination that the claims are
```

39

1  colorable in the first place, and to challenge the exculpation

2  provisions provided to the beneficiaries of those orders.

3      Accordingly, Your Honor, the elements of res judicata are

4  satisfied.  Both proceedings involve the same parties.  The

5  prior judgment was entered by a court of competent

6  jurisdiction.  The prior order was a final judgment on its

7  merits.  And they involved the same causes of action.

8      Importantly, the members of the independent board,

9  including Jim Seery, relied on the protections contained in

10  the January 9th and July 16th orders and would not have

11  accepted these appointments if the protections weren't

12  included.  And how do we know this?  Because each of them,

13  both Mr. Seery and Mr. Dubel, both testified at the

14  confirmation hearing on this very topic.

15      And I would like to put up on the screen an excerpt from

16  Mr. Seery's testimony at confirmation, which is testimony

17  included in the February 2nd, 2021 transcript, which is

18  Exhibit 2 of the Debtor's exhibits.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  And I would like to just read this,

21  Your Honor.

22      "Q   Okay.   You mentioned that there were certain

23      provisions of the January 9th order that were important

24      to you and the other independent directors.  Do I have

25      that right?"

40

1          MR. POMERANTZ:  A little bit later on, Mr. Seery

2     testifies:

3          "A    And then ultimately there'll be another provision

4          in the agreement here, I don't see it off the top of my

5          head, but a gatekeeper provision.  And that provision"

6          --

7          "Q   Hold on one second, Mr. Seery."

8          MR. POMERANTZ:  Please scroll.

9          "Q   So, Paragraph 4 and 5, were those -- were those --

10         were those provisions put in there at the insistence of

11         the prospective independent directors?

12         "A   Yes.

13         "Q   Okay.  Can we go to Paragraph 10, please?  There

14         you go."

15         Mr. Morris:  Is this the other provision that you were

16    referring to?

17         "A   This is -- it's become to be known as the

18         gatekeeper provision, but it's a provision that I

19         actually got from other cases -- again, another very

20         litigious case -- that I thought it was appropriate to

21         bring it into this case.  And the concept here is that

22         when you are dealing with parties that seem to be

23         willing to engage in decade-long litigation and

24         multiple forums, not only domestically but even

25         throughout the world, it seemed important and prudent

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 644 of 1726   PageID 11965
202

41

1    to me and a requirement that I set out that somebody

2    would have to come to this Court, the Court with

3    jurisdiction over these matters, and determine whether

4    there was a colorable claim.  And that colorable claim

5    would have to show gross negligence and willful

6    misconduct -- i.e., something that would not otherwise

7    be indemnifiable" --

8         MR. POMERANTZ:  Hold on one second.

9    "A   So, basically, it set an exculpation standard for

10   negligence.   It exculpates the directors from

11   negligence, and if somebody wants to bring a cause

12   against the directors, they have to come to this Court

13   first to get a finding that there's a colorable claim

14   for gross negligence or willful misconduct."

15   "Q   Would you have accepted the engagement as an

16   independent director without the Paragraphs 4, 5, and

17   10 that we just looked at?

18   "A   No, these were very specific requests.   The

19   language here has been smithed, to be sure, but I

20   provided the original language for Paragraph 10 and

21   insisted on the guaranty provisions above to ensure

22   that the indemnity would have some support.

23   "Q   And ultimately did the Committee and the Debtor

24   agree to provide all the protections afforded by

25   Paragraphs 4, 5, and 10?

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 645 of 1726 PageID 11966

42

1    "A    Yes."

2           MR. POMERANTZ:  So, Your Honor, these -- this

3    testimony also applied to as well as the CEO.

4       The testimony was echoed by Mr. Dubel, another member of

5    the board.  And I'm not going to put his testimony on the

6    screen, but it can be found at Pages 272 to 281 of Exhibit 2,

7    which is the February 2nd transcript.

8       Movants argue, however, that res judicata doesn't apply

9    because the Court didn't have jurisdiction to enter these

10   orders.  And they argue that the order stripped the District

11   Court of this jurisdiction.  As I previously described, the

12   Debtor is prepared to modify the governance orders to provide

13   that the Court shall retain jurisdiction to -- on claims that

14   pass through the gate only to the extent legally permissible.

15   The modification does not appear to be good enough for the

16   Movants.  They continue to argue that the Bankruptcy Court

17   can't even act as the exclusive gatekeeper to determine

18   whether such actions are colorable as a prerequisite for

19   commencing or pursuing an action.

20      The problem Movants run into is the Fifth Circuit's

21   opinion of *Republic v. Shoaf* and various Supreme Court

22   decisions, including *Espinosa*.

23      In *Shoaf*, the Fifth Circuit held that a party cannot

24   subsequently challenge a confirmed plan that clearly and

25   unambiguously released a third party, even if the Bankruptcy

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 646 of 1726   PageID 11967
202

43

 1   Court lacked jurisdiction to approve the release in the first

 2   place.  Movants' proper recourse was to appeal the governance

 3   orders, not to seek to collaterally attack them.

 4        In *Shoaf*, the Fifth Circuit held that the confirmed plan

 5   was res judicata with respect to a suit by the creditor

 6   against the guarantor.  And in so ruling, the Fifth Circuit

 7   says that the prong of res judicata standard that requires an

 8   order, prior order to be made by a court of competent

 9   jurisdiction is satisfied regardless of whether the issue was

10   actually litigated.  This is because whenever a court enters

11   an order, it does so by implicitly making a finding of its

12   jurisdiction, a determination that can't be attacked.  And in

13   fact, in the January 9th and the July 16th orders, it wasn't

14   implicit, the Court's jurisdiction; it was set out that the

15   Court had core jurisdiction.

16        Movants try to brush *Shoaf* aside, arguing that is the only

17   case the Debtor cites to support res judicata argument and is

18   a narrow opinion that has been questioned and distinguished.

19   That's just not correct, Your Honor.  Movants ignore that we

20   have cited two United States Supreme Court cases, *Stoll v.*

21   *Gottleib* and *Chicot County Drainage District*, upon which the

22   Fifth Circuit based its *Shoaf* decision.  In each case, the

23   U.S. Supreme Court gave res judicata effect to a Bankruptcy

24   Court order that made a ruling party -- that a ruling party

25   later claimed was beyond the Court's jurisdiction to do so.

Case 19-34054-sgj11  Doc 3445-18  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 45 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 647 of 1726   PageID 11968

44

1    In *Stoll*, it was a release of guaranty without jurisdiction,

2    like *Shoaf*.  In *Chicot*, it was an extinguishment of a bond

3    claim without jurisdiction.

4        Similarly, Your Honor, the U.S. Supreme Court held in

5    *Espinosa* that a party was not entitled to reconsideration of a

6    Bankruptcy Court order under Federal Rule of Civil Procedure

7    60(b)(4) discharging a student loan without making the

8    required statutory finding of undue hardship in an adversary

9    proceeding.  And the Supreme Court reasoned in that opinion as

10    follows:  A judgment is not void, for example, simply because

11    it may have been erroneous.  Similarly, a motion under

12    60(b)(4) is not a substitute for a timely appeal.  Instead,

13    60(b)(4) applies only in the rare instance where a judgment is

14    premised either on a certain type of jurisdictional error or a

15    violation of due process that deprives a party of notice or

16    the opportunity to be heard.

17        Federal courts considering Rule 60(b)(4) motions that

18    assert a judgment is void because of a jurisdictional defect

19    generally have reserved it only for the exceptional case in

20    which the court that rendered the judgment lacked even an

21    arguable basis for jurisdiction.  This case is not the

22    exceptional -- exceptional circumstance that was referred to

23    by *Espinosa*.

24        In addition, we argue in our brief, and I'll get to in a

25    few moments, that both of the orders are justified under the

45

1    *Barton* doctrine.

2         Actually, before I go to that, Your Honor, I think Movants

3    are really trying to distinguish *Espinosa* by arguing that the

4    Court's order exculpating Mr. Seery for negligence liability

5    did not provide people, mom-and-pop investors, with the due

6    process informing them that they would not be able to assert

7    duty claims based upon mere negligence.  I think that's the

8    core of Mr. Bridges' argument, that, hey, you entered an

9    order, you gave this exculpation, it was inappropriate, and it

10   couldn't be done.

11        There are several problems with Movants' argument.  First,

12   Movants mischaracterize both the facts and the law in

13   connection with the Debtor's relationship with its investors.

14   The Debtor is the registered investment advisor for HCLOF as

15   well as approximately 15 to 18 CLOs.  The only investor in

16   HCLOF other than the Debtor is CLO Holdco.  The investors in

17   the CLOs are the retail funds advised by the Dondero advisors

18   and the other -- and other institutional investors.

19   Accordingly, the thousands of investors, the mom-and-pop

20   investors whose due process rights have allegedly been

21   trampled by the January 9th and July 16th orders, are not

22   investors in any funds managed by the Debtor.

23        And, of course, I have mentioned, as I've mentioned

24   before, no non -- non-Dondero investor, be it a mom-and-pop

25   investor, another institutional investor, anyone unrelated to

46

1    Mr. Dondero, has ever appeared in this Court to challenge the

2    Debtor's activities.

3         But more fundamentally, Your Honor, the Debtor does not

4    owe fiduciary duties to investors in any of the funds that the

5    Debtor advises.  The fiduciary duty that the Debtor owes is to

6    the funds themselves, not the investors in the funds.

7         And while Movants point to Mr. Seery's prior testimony to

8    support the argument that the Debtor owes a duty to investors,

9    Mr. Seery was not testifying as a lawyer and his testimony

10   just cannot change the law.

11        As to each of the funds that the Debtor manages, HCLOF and

12   the CLOs, they were each provided with actual notice of the

13   January 16th -- the July 16th order and didn't object.  And as

14   Your Honor will recall, the Trustees for the CLOs, the party

15   that could potentially have claims for breach of fiduciary

16   duty, they participated in the January 9th hearing.  They came

17   to the Court and were concerned about the protocols that the

18   Debtor was agreeing to with the Committee.  We revised them.

19   The Trustees didn't object.  They didn't object then; they

20   didn't object now.  And, in fact, they consented to the

21   assumption of the contracts between the Debtor and the CLOs.

22        So the argument that the orders, by having this

23   exculpation for future conduct, violated due process rights of

24   anyone and is the type -- essentially, the type of order that

25   *Espinosa* would have contemplated could be attacked, is --

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 48 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 650 of 1726   PageID 11971

47

1   relies on faulty legal and factual premises.  No duty to

2   investors.  No private right of action.  And both -- and all

3   the funds received due process.

4       In addition, Your Honor, as we argue in our brief and I'll

5   get to in a few moments, both of the orders are justified

6   under the *Barton* doctrine, as Mr. Seery is entitled to

7   protection based upon how courts around the country have

8   interpreted the *Barton* doctrine.  As such, Mr. Seery is

9   performing his role both as an agent of the independent board

10  under the January 9th order, as a CEO under the July 16th

11  order, as a quasi-judicial officer.  And as Your Honor

12  examined in the *Ondova* opinion which you mentioned, trustees

13  are entitled to qualified immunity for damage to third parties

14  resulting from simple negligence, provided that the trustee is

15  operating within the scope of his duties and is not acting in

16  an *ultra vires* manner.

17      So, exculpating the independent directors, their agents,

18  and the CEO in the January 9th and July 16th orders was a

19  recognition by this Court that they would be entitled to

20  qualified immunity, much in the same way trustees are.

21      No doubt that Movants contend that this was error and that

22  the Court overreached.  However, the remedy for that overreach

23  was an appeal, not a reconsideration 16 months later.  The

24  Court's orders based upon the determination that in this

25  highly contentious case that these court officers needed to be

48

 1   protected from negligence suits is not the exceptional case

 2   where the Court lacked any arguable basis for jurisdiction.

 3   Accordingly, this Court must follow *Espinosa*, *Shoaf*, *Stoll*,

 4   and *Chicot* and reject the attack on the prior court orders.

 5        The only case Movants cite to challenge the Supreme

 6   Court's decision -- to challenge the Supreme Court precedent I

 7   mentioned and the Fifth Circuit's *Shoaf* decision is the

 8   *Applewood* case.  *Applewood* is totally consistent with *Shoaf*.

 9   *Applewood* also involved a plan that purported to release a

10   guaranty claim that the guarantor argued was res judicata in

11   subsequent litigation regarding the guaranty.  The Fifth

12   Circuit held in that case that the plan was not res judicata.

13   It made that ruling because the plan did not contain clear and

14   unambiguous language releasing the guaranty.  In that way, the

15   Fifth Circuit distinguished *Shoaf*.

16        *Applewood* and *Shoaf* are consistent.  A Bankruptcy Court

17   order will be given res judicata effect, even if the Court

18   didn't have jurisdiction to enter it, if the order was clear

19   and unambiguous.  In *Shoaf*, the release was.  In *Applewood*, it

20   wasn't.

21        Movants argued on June 8th and argue now that the

22   *Applewood* case really argues -- really deals with prospective

23   exculpation of claims.  I went back and read Mr. Bridges'

24   comments carefully of June 8th.  He said *Applewood*,

25   exculpation.  Well, that's just not correct.  *Applewood* is all

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 652 of 1726 PageID 11973

49

1    about requiring specificity of a (garbled) to give it res

2    judicata effect.  Claims that existed at that time, were they

3    described clearly and unambiguously?  Yes?  *Shoaf* applies.

4    No?  *Applewood* does -- applies.

5        So how should the Court apply these principles here?  The

6    Court approved a procedure for certain claims in the

7    governance orders.  The procedure:  come to Bankruptcy Court

8    before pursuing a claim against the independent directors and

9    Seery or their agents so that the Court can make a

10   colorability determination.  Clear and unambiguous.  The

11   governance orders each provide that the Bankruptcy Court had

12   jurisdiction to enter the orders, and the orders were not

13   appealed.

14       Movants attempt to confuse the Court and argue *Applewood*

15   is on point because the January 9th and July 16th orders do

16   not clearly identify specific claims that Movants now have

17   that are being released.  And because they're not specific,

18   then basically it's an ambiguous release and *Applewood*

19   applies.

20       The problem with the Movants' argument is that neither the

21   January 9th or July 16th orders released claims that existed

22   at that time.  If they did, and if there wasn't an adequate

23   description, I might agree with Mr. Bridges that *Applewood*

24   applied.  But there were no claims.  It was prospective.  It

25   was a standard of care.  The Court clearly and unambiguously

50

1   said what the standard of care would be going forward.

2   Clearly, under *Shoaf* and Supreme Court precedent, they are

3   entitled to res judicata because it's a clear and unambiguous

4   provision.  *Applewood* just simply doesn't apply.

5        Mr. Phillips at the last hearing made an impassioned plea

6   to the Court for a narrow interpretation of the exculpation

7   provisions in the January 9th and July 16th orders, and he

8   argued that the Court could not possibly have intended for the

9   exculpation for negligence to apply on a go forward basis.  He

10  thus argued to the Court that the Court should construe the

11  exculpation narrowly and only apply it to potential claims of

12  harm caused to the Debtor, as opposed to harm caused to third

13  parties, which he said included thousands of innocent

14  investors.

15       Of course, Mr. Phillips made those arguments unburdened by

16  the actual facts and the prior proceedings which led to the

17  entry of these orders, because, as he was the first to admit,

18  he only became involved in the case a month ago.

19       As the Court recalls, and as reinforced by Mr. Seery's and

20  Mr. Dubel's testimony I just mentioned, the exculpation

21  provisions were included precisely to prevent Mr. Dondero,

22  through any one of the entities he's owned and controlled, the

23  Movants being two of those, from asserting baseless claims

24  against the beneficiaries of those orders, exactly the

25  situation Mr. Seery now finds himself in.

51

1          And, again, it bears emphasizing:  throughout this case,

2     not one of the purported public investors Mr. Phillips

3     lamented would be prevented from holding Mr. Seery responsible

4     for his conduct has ever appeared in this case to object about

5     anything.  And none of the directors of the funds, the funds

6     where the Debtor acts as an investment adviser, have ever

7     stepped foot in this court, either.

8          Even if the Court declines to apply res judicata, Your

9     Honor, to prevent challenges to the governance orders, the

10    Court has the jurisdiction, had the jurisdiction to include

11    the gatekeeping provisions in those orders.  The Bankruptcy

12    Court derives its jurisdiction from 28 U.S.C. Section 157, and

13    bankruptcy jurisdiction is divided into two parts:  core

14    matters, which are those arising in or arising under Title 11,

15    and noncore matters, those matters which are related to a

16    Chapter 11 case.

17         Bankruptcy Courts may enter final orders in core

18    proceedings, and with the consent of parties, noncore

19    proceedings.  If a party does not consent to a final judgment

20    in the noncore matters or waives its right to consent, then

21    the Bankruptcy Court -- or does not waive its right to

22    consent, then the Bankruptcy Court issues a report and

23    recommendation to the District Court.

24         The seminal Fifth Circuit case on bankruptcy court

25    jurisdiction is the 1987 case of *Wood v. Wood*, 825 F.2d 90.

52

1    There, the Fifth Circuit held that the Bankruptcy Court has

2    related to jurisdiction over matters if the outcome of that

3    proceeding could conceivably have any effect on the estate

4    being administered in the bankruptcy.

5        More recently, the Fifth Circuit, in the 2005 case, in

6    *Stonebridge Tech's*, elaborated on when a matter has a

7    conceivable effect on the estate such as to confer Bankruptcy

8    Court jurisdiction.  There, the Fifth Circuit held that an

9    action is related to bankruptcy if the outcome could alter the

10   debtor's rights, liabilities, options, or freedom of action,

11   either positively or negatively, and which in any way impacts

12   upon the handling and the administration of the bankruptcy

13   estate.  It is against this backdrop, Your Honor, that the

14   Court should evaluate its jurisdiction to have entered the

15   orders.

16       So, again, what did the orders do?  They established

17   governance over the Chapter 11 debtor with new independent

18   directors being approved.  They established the procedures and

19   protocols of how transactions were going to be presented to

20   and approved by the Committee.  They vested in the Committee

21   certain related-party claims, and they provided for the

22   procedures parties would have to follow to assert any claims

23   against the independent directors and the CRO and the agents

24   and advisors.

25       Your Honor, it's hard to imagine that there is a more core

53

1   order than the entry of these orders.  At the time the orders

2   were entered, the Court was well aware of the potential for

3   acrimony from Mr. Dondero and his related entities, and

4   included the gatekeeper provisions to prevent the Debtor's

5   estate from being embroiled in frivolous litigation against

6   the board and the CEO.

7       Such protections were clearly within the Court's

8   jurisdiction, both to protect the administration of the estate

9   but also under applicable Fifth Circuit law dealing with

10   vexatious litigants, as set forth in the *Baum* and *Carroll*

11   cases that the Court cited in its confirmation order.

12       Not that it was hard to predict, but the last several

13   months have reinforced how important the gatekeeping

14   provisions in the order are and how important similar

15   provisions in the plan are.

16       The Court heard extensive testimony at the confirmation

17   hearing regarding the havoc continued litigation by Mr.

18   Dondero and his related entities would cause, which

19   predictions have unfortunately been borne out by the

20   unprecedented blizzard of litigation involving Mr. Dondero and

21   his related entities that has consumed the Court over the last

22   several months and caused the estate to incur millions of

23   dollars in fees that could have been used to pay its

24   creditors.

25       And these attacks are continuing.  As I mentioned before,

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 55 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 657 of 1726   PageID 11978
201

54

1    in addition to the DAF lawsuit, Sbaiti & Co. filed an action

2    against the Debtor on behalf of PCMG, another related entity,

3    alleging postpetition mismanagement of the Select Fund.

4         And to complete the hat trick, they are the lawyers

5    seeking to sue Acis in the Southern District of New York for

6    allegedly post-confirmation matters.

7         The Court knew then and certainly knows now that the

8    potential for sizable indemnification claims could consume the

9    estate.  The Court used that as the potential basis for

10   determining that the orders were within its jurisdiction, just

11   as it used that potential to justify the exculpation

12   provisions in the plan as being consistent with *Pacific*

13   *Lumber*.

14        Movants also ignore the cases -- and we cited in our

15   opposition -- where courts in this district, including Judge

16   Lynn in *Pilgrim's Pride* in 2010 and Judge Houser in the *CHC*

17   *Group* in 2016, approved gatekeeper provisions that provided

18   the Bankruptcy Court with exclusive jurisdiction to adjudicate

19   claims against postpetition fiduciaries.

20        Movants also ignore cases outside this district, including

21   *General Motors* and *Madoff*, which we cited in our brief as

22   examples of cases where Bankruptcy Courts have been used as

23   gatekeepers to determine if claims are colorable or being

24   asserted against the correct entity.

25        And there's another reason, Your Honor, why Movants may

55

 1   now not contest the Court's jurisdiction to have entered those

 2   orders.  Each of those orders, as I said before, include a

 3   finding that the Court had core jurisdiction to enter the

 4   orders.  No party contested that finding or refused to consent

 5   to the core jurisdiction.

 6       Under well-established Supreme Court precedent, parties

 7   can waive their right to challenge the Bankruptcy Court's

 8   jurisdiction, core jurisdiction, by failing to object.  In

 9   *Wellness v. Sharif* in 2015, the Supreme Court expressly held

10   that Article III was not violated if parties knowingly and

11   voluntarily consented to adjudication of *Stern v. Marshall*-

12   type alter ego claims, and that the consent need not be

13   express, so long as it was knowing and voluntary.

14       And *Wellness* confirmed the pre-*Stern* opinion of the Fifth

15   Circuit in the 1995 *McFarland* case, which held that a person

16   who fails to object to the Bankruptcy Court's assumption of

17   core jurisdiction is deemed to have consented to the entry of

18   a final order by the Bankruptcy Court.

19       Your Honor, I'd now like to turn to the *Barton* doctrine.

20   The Court also has jurisdiction to have entered the orders

21   based upon the *Barton* doctrine.  The *Barton* doctrine dates

22   back to an old United States Supreme Court case and provides

23   as a general rule that, before a suit may be brought against a

24   trustee, consent from the appointing court must be obtained.

25       Movants essentially make two arguments why the *Barton*

56

 1   doctrine doesn't apply.

 2       First, Movants, without citing any authority, argue that

 3   it does not apply to Mr. Seery because he is not a trustee or

 4   receiver and was not appointed by the Court.  Although the

 5   doctrine was originally applied to receivers, it has been

 6   extended over time to cover various court-appointed

 7   fiduciaries and their agents in bankruptcy cases, including

 8   debtors in possession, officers and directors of the debtor,

 9   and the general partner of the debtor.  And although Mr.

10   Bridges says he couldn't find one case that applied the *Barton*

11   doctrine to a court-retained professional, I will now talk

12   about several such cases.

13       In *Helmer v. Pogue*, a 2012 case cited in our brief, the

14   District Court for the Northern District of Alabama

15   extensively analyzed the *Barton* doctrine jurisprudence from

16   the Eleventh Circuit and beyond and concluded that it applied

17   to debtors in possession.  The *Helmer* Court relied in part on

18   a prior 2000 decision of the Eleventh Circuit in *Carter v.*

19   *Rodgers*, which held that the doctrine applies to both court-

20   appointed and court-approved officers of the debtor, which is

21   consistent with the law in other circuits.

22       And subsequently, the Eleventh Circuit again considered --

23   and in that case, the distinction of a court-appointed as a

24   court-retained professional was -- was not persuasive to the

25   Court, and the Court held that a court-retained professional

57

1    can still have *Barton* protection, notwithstanding that he

2    wasn't appointed, the argument that Mr. Bridges tries to make.

3        And subsequently, --

4            THE COURT:  I wonder, was that -- was that Judge

5    Clifton Jessup, by chance?  Or maybe Bennett?

6            MR. POMERANTZ:  Your Honor, this was -- this was the

7    Eleventh Circuit *Carter v. Rodgers*, so I think Judge Jessup

8    was --

9            THE COURT:  Oh, I thought you were still talking

10   about the Alabama case.  No?

11           MR. POMERANTZ:  Yeah, the Alabama -- well, the

12   Alabama case referred to the Eleventh Circuit case, *Carter v.*

13   *Rodgers*, --

14           THE COURT:  Okay.

15           MR. POMERANTZ:  -- and the appointment and -- or

16   retention issue was discussed in the *Carter v. Rodgers* case.

17           THE COURT:  Okay.

18           MR. POMERANTZ:  And subsequently, the Eleventh

19   Circuit again considered the contours of the *Barton* doctrine

20   in *CDC Corp.*, a 2015 case, 2015 U.S. App. LEXIS 9718.  In that

21   case, which Your Honor referenced in your *Ondova* opinion,

22   which I will discuss in a few moments, the Eleventh Circuit

23   held that a debtor's general counsel who had been approved by

24   the Court, who was appointed by a chief restructuring officer

25   who was also approved by the Court, was covered by the *Barton*

58

 1    doctrine for acts taken in furtherance of the administration

 2    of the estate and the liquidation of the assets.

 3         And the Eleventh Circuit last year, in *Tufts v. Hay*, 977

 4    F.3d 204, reaffirmed that court-approved counsel who function

 5    as the equivalent of court-appointed officers are entitled to

 6    protection under *Barton*.  While the Court in that case

 7    ultimately ruled that counsel could be sued without first

 8    going to the Bankruptcy Court, it did so because it determined

 9    that the suit between two sets of lawyers would not have any

10    effect on the administration of the estate.

11         So, Your Honor, not only is there authority, there is

12    overwhelming authority that Mr. Seery is entitled to the

13    protections.

14         In *Gordon v. Nick*, a District -- a case from 1998 from the

15    Fourth Circuit, the Court that the *Barton* doctrine applied to

16    a lawsuit against a general partner who was responsible for

17    administering the bankruptcy estate.

18         And as I mentioned, Your Honor, and as Your Honor

19    mentioned, Your Honor had reason to look at the *Barton*

20    doctrine in length and in depth in the 2017 *Ondova* opinion.

21    And in the course of the opinion, Your Honor discussed one of

22    the policy rationales for the doctrine, which you took from

23    the Seventh Circuit's *Linton* opinion, and you said as follows:

24    "Finally, another policy concern underlying the doctrine is a

25    concern for the overall integrity of the bankruptcy process

59

1    and the threat of trustees being distracted from or

2    intimidated from doing their jobs.  For example, losers in the

3    bankruptcy process might turn to other courts to try to become

4    winners there by alleging the trustee did a negligent job."

5        Here, the independent board was approved by the Court as

6    an alternative to the appointment of a Chapter 11 trustee.

7    And it and its agent, including Mr. Seery as the CEO, even

8    before the July 16th order, were provided protections in the

9    form of the gatekeeper order and exculpation.

10       I'm sure the Court has a good recollection of the January

11   9th hearing -- we've talked about it a lot in the proceedings

12   before Your Honor -- where the Debtor and the Committee

13   presented the governance resolution to Your Honor.  And as

14   Your Honor will recall, the appointment of the board was a

15   hotly-contested issue among the Debtor and the Committee and

16   was heavily negotiated.  And the appointment of the

17   independent board was even contested by the United States

18   Trustee at a hearing on January 20th, 2020.

19       I refer the Court to the transcripts of the hearings on

20   January 9th and January 20th of 2020, which clearly

21   demonstrate that appointing this board and giving it the

22   rights and protections and its agents the rights and

23   protections was not your typical corporate governance issue,

24   but it was essentially the Court's alternative to appointing a

25   trustee.  And recognizing that the members of the independent

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 61 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 663 of 1726   PageID 11984
2012

60

1   board were essentially officers of the Court, the Court

2   approved the gatekeeper provision, requiring parties first to

3   come and seek the Court's permission before suing them, in

4   order to prevent them from being harassed by frivolous

5   litigation.

6       And the independent board was given the responsibility in

7   the January 9th order to retain a CEO it deemed appropriate,

8   and it did so by retaining Mr. Seery.

9       Recognizing the *Barton* doctrine as it applies to Mr. Seery

10  is consistent with a legion of cases throughout the United

11  States, and Movants' argument that Mr. Seery is not court-

12  appointed is just wrong.

13      Second, Your Honor, Movants cite without any authority,

14  argue that even if the *Barton* doctrine applied there is an

15  exception which would allow it to pursue a claim against Mr.

16  Seery without leave of the Court.

17      The Debtor agrees the 28 U.S.C. § 959 is an exception to

18  the *Barton* doctrine.  Section 959(a) provides that trustees,

19  receivers, or managers of any property, including debtors in

20  possession, may be sued without leave of the court appointing

21  them with respect to any of their acts or transactions in

22  carrying on business connected with such property.

23      As the Court also pointed out at the June 8th hearing, and

24  Mr. Bridges alluded to in his argument, the last sentence of

25  959(a) provides that such actions -- clearly referring to

1    actions that may be pursued without leave of the appointing

2    court -- shall be subject to the general equity power of such

3    court, so far as the same may be necessary to the ends of

4    justice.

5        And Mr. Bridges made a plea, saying you can't take away my

6    jury trial right there.  You just cannot do that.  Well, I

7    have two answers to that, Your Honor.  One, they relinquished

8    their jury trial right.  We've established that.  Okay?

9        The second is allowing Your Honor to act as a gatekeeper

10   has nothing to do with their jury trial right.  Allowing Your

11   Honor to act as a gatekeeper allows you to determine whether

12   the action could go forward, and it'll either go forward in

13   Your Honor's court or some other court.

14       And the argument that the exculpation was essentially a

15   violation of 959 is just -- is just -- it just is twisting

16   what happened.  You have an exculpation provision.  We already

17   went through the authority the Court had to give an

18   exculpation.  With respect to these litigants who are before

19   Your Honor -- we're not talking about anyone else who's coming

20   in to try to get relief from the order; we're talking about

21   these litigants -- we've already established that they were

22   here, they're bound by res judicata.  So their 959 argument

23   goes away.

24       And as the Court -- and separate and apart from that, the

25   issue at issue in the District Court litigation is -- is not

62

1    even subject to 959.

2         Mr. Bridges says, well, of course it is because it deals

3    with the administration of the estate.  I'd like to refer to

4    what the Court said -- this Court said in its *Ondova* opinion:

5    The exception generally applies to situations in which the

6    trustee is operating a business and some stranger to the

7    bankruptcy process might be harmed, such as a negligence claim

8    in a slip-and-fall case, and is inapplicable to suits based

9    upon actions taken to further the administering or liquidating

10   the bankruptcy estate.

11        And your *Ondova* opinion is consistent with the Third and

12   Eleventh Circuit opinions Your Honor cited in your opinion, as

13   well as numerous other --

14        (Interruption.)

15             MR. POMERANTZ:  -- from the -- from around the

16   country, including cases from the First, Second, Sixth,

17   Seventh, and Ninth Circuits.  And I'm not going to give all

18   the cites to those cases, but it's not a -- it's not a

19   remarkable proposition that Your Honor relied on in *Ondova*.

20        In addition, several of these cases, including the

21   Eleventh Circuit's *Carter* opinion, have been cited with

22   approval by the Fifth Circuit in *National Business Association*

23   *v. Lightfoot*, a 2008 unpublished opinion for this very point.

24   The *Barton* exception of 959 does not apply to actions taken in

25   the administration of the case and the liquidation of assets

63

1   in the estate.

2       Suffice it to say that it's clear that the Section 959

3   exception to *Barton* has no applicability in this case.

4   Movants, hardly strangers to the bankruptcy case, want to sue

5   Mr. Seery for acts taken relating to a settlement of very

6   complex and significant claims against the estate.  They want

7   to sue a court-appointed fiduciary for doing his job,

8   resolving claims against the estate and his management of the

9   bankruptcy estate.  And they want to do this outside of the

10  Bankruptcy Court.

11      Settlement of the HarbourVest claim, which is where this

12  claim arises under -- whether it's a collateral attack now or

13  not, and we say it is, is for another issue -- but it clearly

14  arises in the context of settlement of the HarbourVest claim,

15  is the quintessential act to further the administration and

16  liquidation of the bankruptcy estate, and certainly doesn't

17  fall within the 959 exception.

18      Movants seem to be arguing that 959(a) makes a distinction

19  between claims against Mr. Seery that damaged the Debtor and

20  claims against Mr. Seery that damaged third parties.  However,

21  the Movants make up that distinction, and it's not in the

22  statute, it's not in the case law.  The focus is not on who

23  the conduct damages, but it's rather on whether the conduct

24  was taken in connection with the administration or the

25  liquidation of the estate.

And even if the Debtor is wrong, Your Honor, which it's not, the savings clause allows the Court to determine whether leave to be -- sue will be granted. Given that these claims are asserted by Dondero-related entities, if not controlled entities, no serious argument exists that the equities do not permit this Court to determine if leave to sue is appropriate.

Accordingly, Movants' argument that the orders create this tension with 959 is simply an over-dramatization. And in any event, Your Honor, there's a basis independent of *Barton* that supports the jurisdiction to enter the orders, as I mentioned.

But even if the orders only relied on *Barton*, there is an easy fix to Movants' concerns: let them come to court and argue that the type of suit they are bringing allegedly falls within the exception of 959.

Your Honor, Movants argue that the Bankruptcy Court may not act as a gatekeeper if it would not have jurisdiction to deal with the underlying action. They essentially argue that an Article I judge may not pass on the colorability of a claim, that it should be decided by an Article III judge. This is the same argument, Your Honor, that Your Honor rejected in connection with plan confirmation and which I touched on earlier.

And the reason why Your Honor rejected it is because there's no law to support it. In fact, there is Fifth Circuit law that holds to the contrary. And we talked about a little

65

 1   bit the Fifth Circuit case decided is *Villegas v. Schmidt* in

 2   2015.  And *Villegas* is a simple case.  Schmidt was appointed

 3   trustee over a debtor and liquidated its estate and the

 4   Bankruptcy Court approved his final fees.  Four years later,

 5   Villegas and the prior debtor sued Schmidt in District Court,

 6   the district in which the Bankruptcy Court was pending,

 7   arguing that he was negligent in the performance of his

 8   duties.  The District Court dismissed the case because

 9   Villegas failed to obtain Bankruptcy Court approval to bring

10   the suit under the *Barton* doctrine.

11       On appeal, Villegas argued *Barton* didn't apply for two

12   reasons.  First, that *Stern v. Marshall* created an exception

13   to the *Barton* doctrine for claims that the Bankruptcy Court

14   would not have the jurisdiction to adjudicate.  And second,

15   that *Barton* did not apply if the suit is brought in the

16   District Court, which exercises supervisory authority over the

17   Bankruptcy Court that appointed the trustee.  Pretty much the

18   argument that was made by Movants at the contempt hearing.

19       The Fifth Circuit rejected both arguments.  It held that

20   the existence of a *Stern* claim does not impact the Bankruptcy

21   Court's authority because *Stern* did not overrule *Barton* and

22   the Supreme Court had cautioned circuit courts against

23   interpreting later cases as impliedly overruling prior cases.

24       More importantly, the Fifth Circuit pointed to a post-

25   *Stern* 2014 case, *Executive Benefits v. Arkison*, 573 U.S. 25

66

1    (2014), which held that *Stern* does not decide how a Bankruptcy

2    Court or District Courts should proceed when a *Stern* creditor

3    is identified, as support for the argument that *Barton* is

4    still good law, even dealing with a *Stern* claim.

5        Second, the Fifth Circuit, joining every circuit to have

6    addressed the issue, ruled that the District Court and the

7    Bankruptcy Court are distinct from one another and the

8    Bankruptcy Court has the exclusive authority to determine the

9    colorability of *Barton* claims and that the supervisory

10   District Court does not.

11       Movants didn't address *Villegas* in their reply.  Briefly

12   tried to distinguish it, unconvincingly, today.  The bottom

13   line is *Villegas* is directly applicable.  Your Honor cited it

14   in the *Ondova* opinion for precisely the proposition that

15   *Barton* applies whether or not the Court has authority to

16   adjudicate the claim.

17       Accordingly, Your Honor, it was within the Court's

18   jurisdiction to require a party to seek approval of Your Honor

19   on the colorability of a claim before an action may be

20   commenced or pursued against the protected parties, even if

21   Your Honor wouldn't have authority to adjudicate the claim at

22   the end of the day.

23       In fact, some courts have even addressed the proper

24   procedure for doing so, requiring the putative plaintiff to

25   not only seek leave of Bankruptcy Court but also to provide a

67

1    draft complaint and a basis for the Court to determine if the

2    claim is colorable.

3        Movants have done neither, and they should not be

4    permitted to modify the final orders of the Court as a

5    workaround.

6        Your Honor, that concludes my presentation.  I'm happy to

7    answer any questions Your Honor may have.

8            THE COURT:  All right.  Not at this time.  All right.

9    I'm going to figure out, do we need a break or not, depending

10   on what Mr. Bridges tells me.  I assume we're just doing this

11   on argument today.  I think that's what I heard.  No witnesses

12   or exhibits.

13           MR. BRIDGES:  That is correct, Your Honor.

14           THE COURT:  Okay.  Mr. Bridges, how long do you

15   expect your rebuttal to take so I can figure out does the

16   Court need a break?

17           MR. BRIDGES:  Fifteen minutes plus whatever it takes

18   to submit agreed-to exhibits.

19           THE COURT:  Okay.  Let's take a five-minute bathroom

20   break.  We'll come back.  It's -- what time is it?  It's 1:11

21   Central time.  We'll come back in five minutes.

22           THE CLERK:  All rise.

23       (A recess ensued from 1:11 p.m. until 1:17 p.m.)

24           THE CLERK:  All rise.

25           THE COURT:  All right.  Please be seated.  We're

68

 1 | going back on the record in the Highland matters.

 2 |     Mr. Bridges, time for your rebuttal.  I want to ask you a

 3 | question right off the bat.  Mr. Pomerantz pointed out

 4 | something that was on my list that I forgot to ask you when

 5 | you made your initial presentation.  What is the authority

 6 | you're relying on?  You did not cite a statute or a rule *per*

 7 | *se*, but I guess we can probably all agree that Bankruptcy Rule

 8 | 9024 and Federal Rule 60 is the authority that would govern

 9 | your motion, correct?

10 |          MR. BRIDGES:  I don't agree, Your Honor.  I don't

11 | believe this is a final order that we're contesting here.  And

12 | I think that's demonstrated by the Court's final confirmation

13 | -- plan -- plan confirmation order that seeks to modify this

14 | order or will modify this order upon being -- being effective.

15 | So I don't think so.

16 |     In the alternative, if we are challenging a final order,

17 | then I think you're right as to the rules that would be

18 | controlling.

19 |          THE COURT:  All right.  Well, let me back up.  Why

20 | exactly do you say this would be an interlocutory order as

21 | opposed to a final order?

22 |          MR. BRIDGES:  Because of its nature, Your Honor.

23 | While the appointment in the order or the approval of the

24 | appointment in the order might, as a separate component of the

25 | order, have -- have finality, the provisions -- the provisions

69

1  in it relating to gatekeeping and exculpation are, we think,

2  by their very nature, quite obviously interlocutory and not

3  permanent.  They don't seem to indicate an intention by any of

4  the parties that, 30 years from now, if Mr. Seery is still CEO

5  at Highland, long after the bankruptcy case has ended, that

6  nonetheless parties would be prohibited from bringing claims,

7  strangers to this action would be prohibited from bringing

8  claims related to his CEO role.

9      I think the nature of it demonstrates that, the

10  modifications to it, and even the inclusion of it in the final

11  plan confirmation, as well as -- can't read that.

12          THE COURT:  Can you give me some authority?  Because

13  as we know, there's a lot of authority out there in the

14  bankruptcy universe on what discrete orders are interlocutory

15  in nature that a bankruptcy judge might routinely enter and

16  which ones are final.  You know, it would just probably, if I

17  flipped open *Collier's*, I could -- you know, it would be mind-

18  numbing.

19      So what authority can you rely on?  I mean, is there any

20  authority that says an employment order is not a final order?

21  That would be shocking to me if you have cases to that effect,

22  but, I mean, of course, sometimes we do interim on short

23  notice and then final.  But this would be shocking to me if

24  there is case authority to support the argument this is not a

25  final order.  But I learn something new every day, so maybe I

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 71 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 673 of 1726   PageID 11994
201

1  would be shocked and there is.

2         MR. BRIDGES:  Your Honor, I'd point you to *In re*

3  *Smyth*, 207 F.3d 758, and *In re Royal Manor*, 525 B.K. 338

4  [sic], for the proposition that retaining a bankruptcy

5  professional is an interlocutory order.

6         THE COURT:  Okay.  Stop for a moment.  The *Smyth*

7  case.  Which court is that?

8         MR. BRIDGES:  Fifth Circuit.

9         THE COURT:  Okay.  So tell me the facts.  I'm

10  surprised I don't know about this case.  But, again, I don't

11  know every case.  So, it held that an employment order is an

12  interlocutory order?

13         MR. BRIDGES:  Appointing counsel.  A professional in

14  the bankruptcy context, Your Honor.

15         THE COURT:  Counsel for a debtor-in-possession?  An

16  order approving counsel was an interlocutory order?

17         MR. BRIDGES:  Yes, or the Trustee's counsel.

18         THE COURT:  Or the Trustee's counsel?  Okay.  What

19  were the circumstances?  Was this on an expedited basis and

20  there wasn't a follow-up final order, or what?

21         MR. BRIDGES:  Your Honor, I don't have -- I don't

22  have that at the tip of my memory.  I'm sorry.

23         THE COURT:  Okay.  And the other one, 525 B.R. 338,

24  what court was that?

25         MR. BRIDGES:  It's a Bankruptcy Court within the

71

 1   Sixth Circuit.  I'm not certain which district.

 2         THE COURT:  All right.  Well, maybe one of you two

 3   over there can look them up and give me the context, because

 4   that is surprising authority.  Or other lawyers on the WebEx

 5   maybe can do some quickie research.

 6     Okay.  We'll come back to that.  But assuming that this

 7   was a final order, which I have just been presuming it was,

 8   Rule 60 is the authority you're going under?  9024 and Rule

 9   60, correct?

10         MR. BRIDGES:  Your Honor, we have not invoked those

11   rules.  Alternatively, I think you're right that they would

12   control if we are wrong about the interlocutory nature of the

13   order.

14         THE COURT:  Well, you have to be going under certain

15   -- some kind of authority when you file a motion.  So I'm --

16         MR. BRIDGES:  As an alternative --

17         THE COURT:  I'm approaching this exactly, I assure

18   you, as the District Court or a Court of Appeals would.  You

19   know, you start out, what is the legal authority that is being

20   invoked here?

21         MR. BRIDGES:  Well, --

22         THE COURT:  So I just assume Rule 60.  I can't, you

23   know, come up with anything else that would be the authority.

24         MR. BRIDGES:  Yes, Your Honor.  You also have

25   inherent power to modify orders that are in violation of the

72

 1   law.  And we pointed you to --

 2          THE COURT:  Now, is that right?  Is that really

 3   right?  Why do we have Rule 60 if I can just willy-nilly, oh,

 4   I feel like I got that wrong two years ago?  I can't do that,

 5   can I?  Rule 60 is the template for when a court can do that.

 6   Parties are entitled to rely on orders of courts.  And that's

 7   why we have Rule 60, right?  So, --

 8          MR. BRIDGES:  Your Honor, I think -- I think that

 9   we're miscommunicating.  I'm trying not to rely on Rule 60 in

10   the first instance because in the first instance we view this

11   as not a final order.  So, in the first instance, --

12          THE COURT:  I got that.  And I've got my law clerks

13   looking up your cases to see if they convince me.  But I'm

14   asking you to go to layer two.  Assuming I don't agree with

15   you these are final orders, what is your authority for the

16   relief you're seeking?

17          MR. BRIDGES:  Yes, Your Honor.  Rule 60 would apply

18   in the alternative.

19          THE COURT:  All right.

20          MR. BRIDGES:  That's correct.

21          THE COURT:  So, which provision?  Which provision of

22   Rule 60?  (b) what?

23          MR. BRIDGES:  Your Honor, I'm not prepared to concede

24   any of them.  I don't have the rule in front of me.

25          THE COURT:  You're not prepared to concede what?

73

```
 1              MR. BRIDGES:  Any of the provisions of Rule 60.  Just
 2    (b)(1), (b)(2), especially, but I'm -- I'm -- Rule 60 is our
 3    basis, as is the particulars (b)(1), (2), (6) --
 4          (Garbled audio.)
 5              THE COURT:  Okay.  You're breaking up.  Can you
 6    restate?
 7              MR. BRIDGES:  (b)(1), (2), and (6), as -- as well as
 8    any other provision, Your Honor, of Rule 60.
 9              THE COURT:  Okay.  Well, so (1), mistake,
10    inadvertence, surprise, excusable neglect.  Which one of
11    those?
12              MR. BRIDGES:  All of the above, Your Honor.
13              THE COURT:  Surprise?  Who's surprised?
14              MR. BRIDGES:  Your Honor, I think every potential
15    litigant who discovers that your order purports to bar
16    prospective unaccrued claims at the time the order issued
17    would be surprised.
18          Frankly, I think Mr. Seery would be surprised, given his
19    testimony that he owes fiduciary duty -- duties that he must
20    abide by and that he appears to have, as I continue to
21    represent to clients, to advisees, and to the SEC, that those
22    duties are owing.
23              THE COURT:  Okay.  I'm giving you one more chance
24    here to make clear on the record what provision of Rule 60(b)
25    are you relying on, okay?  I need to know.  It's not in your
```

74

1   pleading.

2           MR. BRIDGES:  Your Honor, --

3           THE COURT:  So tell me specifically.  I can only --

4           MR. BRIDGES:  -- (b)(1) --

5           THE COURT:  -- come up with a result here if I know

6   exactly what's being presented.

7           MR. BRIDGES:  Your Honor, (b)(1), (b)(2), and (b)(6)

8   --

9           THE COURT:  Which, okay, there are multiple parts to

10  (1).  You're saying somebody's surprised by the ruling.  I

11  don't know who.  Really, all that matters is your client, the

12  Movants.  You're saying, even though they participated, --

13          MR. BRIDGES:  Yes, Your Honor.

14          THE COURT:  -- got notice, they're somehow surprised?

15  Why are they surprised?

16          MR. BRIDGES:  Yes, Your Honor.

17          THE COURT:  Do you have evidence of their surprise?

18          MR. BRIDGES:  Your Honor, our brief shows the

19  intentions of all involved were not the interpretation of that

20  order being advanced at this -- at this point in time.  And

21  so, yes, I believe that is evidence.  The transcripts of the

22  hearings I believe evidence that as well, that the

23  understanding of everyone involved was not that future --

24  unspecified future claims that had not accrued yet would be

25  released under (b)(1).  Yes, Your Honor.

75

 1              THE COURT:  Okay.

 2              MR. BRIDGES:  Under (b)(2), --

 3              THE COURT:  I don't have any evidence of that.  All I

 4    have is the clear wording of the order.  Okay.  Let me just --

 5    just let me go through this.

 6         Assuming Rule 60 (1) through (6) are what you're arguing

 7    here, what about Rule 60(c):  a motion under Rule 60(b) must

 8    be made within a reasonable time?  We're now 11 months --

 9              MR. BRIDGES:  Your Honor, --

10              THE COURT:  We're now 11 months past the July 2020

11    order.  What is your authority for this being a reasonable

12    time?

13              MR. BRIDGES:  Yes, Your Honor.  If I may back up one

14    step before answering your question.  Under (b)(2), we're

15    relying on newly-discovered evidence that was discovered in

16    late March and caused both the filing of this motion and the

17    filing of the District Court action.

18         Under (b)(4), we believe that the order is --

19              THE COURT:  Let me stop.  Let me stop.  What is my

20    evidence that you're putting in the record that's newly

21    discovered?

22              MR. BRIDGES:  The evidence is detailed in the

23    complaint that is in the record.  You know, --

24              THE COURT:  That's not evidence.

25              MR. BRIDGES:  -- honestly, Your Honor, --

76

1          THE COURT:  That is not evidence.  Okay?  A lawyer-
2    drafted complaint in another court is not evidence.  Okay?
3          MR. BRIDGES:  Your Honor, I think, to be technical,
4    that there is not a record yet, that we have evidence yet to
5    be admitted on our exhibit list.  I believe in this
6    circumstance -- I understand that, in general, allegations in
7    a pleading are not evidence.  In this instance, when we're
8    talking about whether or not new facts led to the filing of a
9    lawsuit, I do believe that the allegations in the lawsuit are
10   evidence of those new facts.
11         THE COURT:  All right.  Go on.
12         MR. BRIDGES:  Under (b)(4), we believe the order is,
13   in part, void.  It is void because of the jurisdictional and
14   other defects noted in our argument.
15      And also, under (b)(6) (garbled) ground for relief that
16   we're appealing to the equitable powers of this Court to
17   correct errors and manifest injustice towards not just the
18   litigants here but to correct the order of the Court to make
19   it comply with -- with the law, with the statutes promulgated
20   by Congress and to respect the jurisdiction of the District
21   Court.
22         THE COURT:  All right.  Do you agree with Mr.
23   Pomerantz that the case law standard for Rule 60(b)(4) is
24   exceptional circumstances?  It's only applied so that a
25   judgment is voided in exceptional circumstances.  Do you

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 680 of 1726 PageID 12001
202

77

1  disagree with that case authority?

2          MR. BRIDGES:  I would -- I would agree, in part, that

3  unusual circumstances is not the ordinary case.  I'm not

4  entirely sure what you mean by exceptional, but I think we're

5  on the same page.

6          THE COURT:  Okay.  It's not what I mean.  That's just

7  the case law standard.  And I'm asking, do you agree with Mr.

8  Pomerantz that that is the standard set forth in case law when

9  applying 60(b)(4)?  There have to be some sort of exceptional

10 circumstances where there's just basically no chance the Court

11 had authority to do what it did.

12         MR. BRIDGES:  Out of the ordinary would be the phrase

13 I would use, Your Honor.

14         THE COURT:  Okay.  So I guess then I'll go from

15 there.  Is it your argument that gatekeeping provisions in the

16 bankruptcy world are out of the ordinary?

17         MR. BRIDGES:  The exculpation of Mr. Seery for

18 liability falling short of gross negligence or intentional

19 wrongdoing in connection with his continuing to conduct the

20 business of the Debtor as an investment advisor subject to the

21 Advisers Act, yes, I would say that is out of the ordinary,

22 that it is extraordinary, that it is --

23         THE COURT:  Okay.  What is your authority or evidence

24 on that?  Because this Court approves exculpation provisions

25 regularly in connection with employment orders, and pretty

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 79 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 681 of 1726 PageID 12002

78

1   much every judge I know does.  In fact, I'm wondering why this

2   isn't just a term of compensation.  You know, he's going to do

3   x, y, z in the case.  His compensation is going to be a, b, c,

4   d, e.  And by the way, we're going to set a standard of

5   liability for his performance as CEO or investment banker,

6   financial advisor, whatever, so that no one can sue him

7   regarding his performance of his job duties unless it rises to

8   the level of gross negligence, willful misconduct.

9       It's a term of employment that, from my vantage point,

10  seems to be employed all the time.  So it would be anything

11  but exceptional circumstances.  Do you have authority or

12  evidence --

13              MR. BRIDGES:  Your Honor, frankly, --

14              THE COURT:  -- to the contrary?

15              MR. BRIDGES:  Your Honor, frankly, I'm astonished at

16  your view of that situation, that it would merely be a term of

17  his employment, that vitiates the entire fiduciary duty

18  standard created by the Advisers Act that tells him, with

19  hundreds of millions of dollars of assets under management for

20  people he's advising as a registered investment advisor,

21  people he's advising who believe that he has a fiduciary duty

22  to them and that it's enforceable, that the SEC, who monitors,

23  believes he has an enforceable fiduciary duty to those people,

24  and that he's testified that he has fiduciary duties to those

25  people, and that Your Honor is saying no, just as a regular

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 80 of
Case 3:23-cv-00726-S   Document 8-23   Filed 2012/29/23   Page 682 of 1726   PageID 12003

79

1    term of employment we have undone the Advisers Act's

2    imposition of an unwaivable fiduciary duty.

3         Your Honor, the order is void to the extent that it

4    attempts to do so.

5         This is not an ordinary employment agreement, Your Honor.

6    This is an attempt to exculpate someone from the key thing

7    that our entire investment system depends upon, regulation by

8    the SEC and the requirement in investment advisors to act as

9    fiduciaries when they manage the money of another.

10        It would be the equivalent of telling lawyers who are

11   appointed in a bankruptcy proceeding that they don't have any

12   duties to their client, or at least not fiduciary duties.

13   That the lawyers merely owe a duty not to be grossly negligent

14   to their clients.  That's not an ordinary term of employment,

15   Your Honor.

16             THE COURT:  All right.  So I guess we're back to my

17   question, was this brought within a reasonable time under Rule

18   60(c)?

19             MR. BRIDGES:  It was brought very quickly after the

20   new evidence was discovered at the end of March, Your Honor,

21   yes.

22             THE COURT:  Okay.  Well, I guess I'll just ask you

23   one more question before you continue on with your rebuttal

24   argument.  I mean, again, I want your best argument of why

25   *Villegas* doesn't absolutely permit the gatekeeping provisions

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 683 of 1726 PageID 12004

80

1    that you're challenging.  And many cases were cited by Mr.

2    Pomerantz in his brief where courts have extended the *Barton*

3    doctrine to persons other than trustees.  And so what is your

4    best rebuttal to that?

5            MR. BRIDGES:  Your Honor, we've already given it.

6    I'm afraid --

7            THE COURT:  Okay.  If you don't want to say more, --

8            MR. BRIDGES:  -- what I have is not --

9            THE COURT:  -- I'm not going to make you say more.

10           MR. BRIDGES:  I --

11           THE COURT:  I'm just telling you what's on my brain.

12           MR. BRIDGES:  I do.  I want to -- I am apologizing in

13   advance for repeating, but yes, *Villegas*, *Villegas*, however

14   that case is pronounced, says that *Stern* is not an exception

15   to the *Barton* doctrine.

16           THE COURT:  Uh-huh.

17           MR. BRIDGES:  959(a) is an exception to the *Barton*

18   doctrine.  You are not operating under the *Barton* doctrine

19   here.  Even counsel's brief, the Debtor's brief, doesn't say

20   *Barton* applies.  It says it's consistent with *Barton*.

21       Your Honor, in our previous hearing, you directed me to

22   the second sentence of 959(a) because you believe it's what

23   empowers you to do the gatekeeping.  It limits the gatekeeping

24   that you can do by protecting jury rights, the right to trial,

25   says you cannot discharge, undo, deprive a litigant of their

81

1   right to a trial, a jury trial.

2           THE COURT:  Well, you mentioned it again, jury trial

3   rights.  Do you have any argument --

4           MR. BRIDGES:  Yes, Your Honor.

5           THE COURT:  -- of why that hasn't flown out the

6   window?

7           MR. BRIDGES:  Yes, Your Honor.  I am told that

8   Section 14(f) that counsel for the Debtor referred to is not a

9   waiver of jury rights at all.  It is an arbitration agreement.

10  Your Honor is probably familiar how arbitration agreements

11  work, is that they need not be elected.  They need not be

12  invoked by the parties.  When they are, they create a

13  situation where arbitration may be required.  But a waiver of

14  a jury right outside of arbitration is not part of this

15  arbitration clause, or of any.  The issue is not briefed or in

16  evidence before the Court.  We're relying on representations

17  of counsel as to what that provision contains.  That Mr. Seery

18  wasn't even a party to that agreement, the advisory agreement,

19  with the Charitable DAF.  The arbitration agreement is subject

20  to defenses that are not at issue here before the Court.  That

21  Movants' rights, their contractual rights to invoke the

22  arbitration clause, also appear to be terminated by the

23  orders' assertion of sole jurisdiction in this matter.

24      Your Honor, yes, our jury rights survive Section 14(f) in

25  the advisory agreement with the DAF for all of those potential

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 83 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 685 of 1726   PageID 12006
202

82

1   reasons.

2       On top of that, it doesn't go to all of our causes of

3   action.  It goes to the contract cause of action.  And to the

4   extent they can argue that the other claims are subject to

5   arbitration, that also is a defense and -- defensible and

6   complex issue requiring the application of the Federal

7   Arbitration Act, requiring consideration of the Federal

8   Arbitration Act, which this Court doesn't have jurisdiction to

9   do under 157(d).

10          THE COURT:  What?  Repeat that.

11          MR. BRIDGES:  Yes.  This Court does not have

12  jurisdiction to determine whether or not arbitration --

13  arbitration is enforceable due to the mandatory withdrawal of

14  the reference provisions of 157(d).

15          THE COURT:  That's just not consistent with Fifth

16  Circuit authority.  *National Gypsum*.  What are some of these

17  other arbitration cases?  I've written an article on it.  I

18  can't remember them.  That's just not right.  Bankruptcy

19  courts look at arbitration clauses all the time.  Motions to

20  compel arbitration.

21          MR. BRIDGES:  Your Honor, under 157(d), in the

22  circumstances of this case, if the Court is going to take into

23  consideration an arbitration clause under the Federal

24  Arbitration Act, when that clause is not in evidence and is

25  not before the Court, then Movants respectfully move to

83

1    withdraw the reference of your consideration of that issue and

2    of any proceeding and ask that you would issue only a report

3    and recommendation rather than an order on that issue.

4            THE COURT:  Okay.  I regret that we even got off on

5    this trail.  I'm sorry.  So just proceed with your rebuttal

6    argument as you had envisioned it, Mr. Bridges.

7            MR. BRIDGES:  Thank you, Your Honor.

8        Debtor's counsel says there's no private right of action

9    under the Advisers Act.  That is both inaccurate and

10   misleading.  The Advisory Act creates, imposes fiduciary

11   duties that state law provides the cause of action for.  It is

12   a state law breach of fiduciary duty claim regarding --

13   regarding fiduciary duties imposed as a matter of law by the

14   Investment Advisers Act that is Count One in the District

15   Court action.

16       Furthermore, that Act does create a private right of

17   action for rescission.  That would be rescission of the

18   advisory agreement with the Charitable DAF, not rescission of

19   the HarbourVest settlement.

20       Second, Your Honor, the notion that this Court has related

21   to jurisdiction is irrelevant and beside the point.  I would

22   like to note for the record that the District Court civil

23   cover sheet that omitted to state that this was a related

24   action has been corrected, has been amended, and that that has

25   taken place.

84

1      Counsel for the Debtor also appears to agree with us that

2   the order ought to be modified for having asserted exclusive

3   jurisdiction over colorable claims to the extent it's not

4   legally permissible to do.  And in trying to invoke the

5   discussions between us as to how the orders might be fixed,

6   what counsel does is tries to cabin the legally-permissible

7   caveat to just the second half of the paragraph at issue.  It

8   is both -- both portions, the gatekeeping and the subsequent

9   hearing of the claims, that should be limited to the extent it

10   would be impermissible legally for this Court to make those

11   decisions.

12      On top of that, Your Honor, merely stating "to the extent

13   legally permissible" would result in a considerable amount of

14   ambiguity in the order that would lead it, I fear, to be

15   unenforceable as a matter of law.

16      Next, Your Honor, when Debtor's counsel talks about the

17   authority in this case, it feels like we're ships passing in

18   the night.  He says that we're wrong in asserting that no case

19   we can find involves both the *Barton* doctrine and the

20   application of the business judgment rule where the Court is

21   asked to defer, and he mentions cases that apply the *Barton*

22   doctrine to an approval rather than an appointment.  The Court

23   is asked to --

24      (Garbled audio.)

25        THE COURT:  I lost you for a moment.  Could you

85

1  repeat the last 30 seconds?

2          MR. BRIDGES:  Thank you, Your Honor.  Yes.  He points

3  -- opposing counsel points us to case law where the *Barton*

4  doctrine has been applied despite the Bankruptcy Court having

5  merely approved rather than appointed the trustee or the, I'm

6  sorry, the professional.  But in doing so, he doesn't

7  reference any case that has done so in the context of business

8  judgment rule deference.  It's like we're ships passing in the

9  night.

10      What we're saying isn't that a mere approval can never

11  rise to the level of the *Barton* doctrine.  What we're saying

12  is that, in combination with the business judgment rule

13  deference, the two cannot go together.  There's no authority

14  for saying that they do.

15      We -- I further feel like we're ships passing in the night

16  when he talks about *Shoaf*.  Counsel says that in *Shoaf* there

17  was a confirmed final plan and it specifically identified the

18  released guaranty.  And yeah, that distinguishes it from this

19  case, just as it distinguished -- just as the *Applewood Chair*

20  case distinguished it when there's not that specific

21  identification.  And here, we don't even have a final plan

22  confirmation at the time these orders are being issued.

23  Without that express -- express notion of what the claims are

24  being discharged, *Shoaf* doesn't apply.

25          There, there was a guaranty to a party on a specific

1   indebtedness that was listed, identified with specificity, and

2   disappeared as a result of the judgment, as a result of the

3   judgment in the underlying case.  Here, we're talking about

4   any potential claim that might arise in the future.  As of the

5   July order's issuance, it didn't apply on its -- either it

6   didn't apply to future claims that had not yet accrued or else

7   in violation of *Applewood Chair*, it was releasing claims

8   without identifying them.

9       Who does Seery owe a fiduciary duty to?  Is it, as

10  Debtor's counsel says, only to the funds and not to the

11  investors, or does he also owe those duties to the investors

12  as well?  Your Honor, that is going to be a hotly-contested

13  issue in this litigation, and it involves -- it requires

14  consideration of the Advisers Act and the multitude of

15  accompanying regulations.  To just state that his fiduciary

16  duties are limited in a way that couldn't affect anyone that

17  is -- whose claims are precluded by the July order is both

18  wrong on the law and is invoking something that will be a

19  hotly-contested issue that falls under 157(d), where, again,

20  this Court doesn't have the jurisdiction to decide that, other

21  than in a report and recommendation.

22      The order is legally infirm because it's issued without

23  jurisdiction for doing that as well.

24      Finally, Your Honor, I think (garbled) wrong direction

25  with a statement that suggests that Mr. Seery is an agent of

87

1  the independent directors under the January order. He is, in

2  fact, not an independent agent -- not an agent of any of the

3  independent directors, but, at most, of the company that is

4  controlled by the board, not -- not of individual directors

5  who could confer on him -- who could confer on him any

6  immunity that they have obtained from the January order just

7  by having appointed him.

8      The proposed order from the other side failed to address

9  either the ambiguity in the order or its attempt to exculpate

10 Mr. Seery from the liability, including liability for which

11 there is a jury trial right, and it is not a fix to the

12 problem for that reason.

13     In order to make the order enforceable and to fix its

14 infirmities, the Court would have to do significantly more.

15 It would have to both apply the caveat from the final

16 confirmation plan order, rope that caveat to the first part of

17 the relevant paragraph, as well as the second part, and it

18 would have to provide directive clarity to be enforceable

19 rather than too vague.

20     Your Honor, I think that's all I have.

21     THE COURT: Okay. Just FYI, my law clerk pulled the

22 *Smyth* case from 21 years ago from the Fifth Circuit. And

23 while it more prominently deals with the issue of whether

24 trustees -- in this case, it was a Chapter 11 trustee -- could

25 be subjected to personal liability for damages to the

88

```
 1   bankruptcy estate --

 2       (Echoing.)

 3           THE COURT:  Someone, put your phone on mute.  I don't

 4   know who that is.

 5       It dealt with, you know, the standard of liability, that

 6   the trustee could not be sued for matters not to the level of

 7   gross negligence.

 8       But it does say, in the very last paragraph, to my shock

 9   and amazement, that -- it's just one sentence in a 10-page

10   opinion -- orders appointing counsel -- and it was talking

11   about the trustee's lawyer he hired to handle appeals to the

12   Fifth Circuit -- orders appointing counsel under the

13   Bankruptcy Code are interlocutory and are not generally

14   considered final and appealable.  And it cites one case from

15   1993, the Middle District of Florida.  Live and learn.  There

16   is one sentence in that opinion that says that.  But I don't

17   know that it's hugely impactful here, but I did not know about

18   that opinion and I'm rather surprised.

19       All right.  You were going to walk me through evidence,

20   you said?

21           MR. BRIDGES:  Well, do I -- Your Honor, do you want

22   to do that first before I submit --

23           THE COURT:  Yes, please.

24           MR. BRIDGES:  -- my rebuttal argument?

25           THE COURT:  Please.
```

89

```
1              MR. BRIDGES:  Okay.

2              THE COURT:  Uh-huh.

3              MR. BRIDGES:  Your Honor, we would submit and offer

4    Exhibits 1 through 44, with the exception of those that have

5    been withdrawn, that are 2, 13 --

6              THE COURT:  Okay.  Slow down.  Slow down.  I need to

7    get to the docket entry number we're talking about.  Are we

8    talking -- are your -- the Debtor's exhibits are at 2412.  But

9    Nate, I misplaced my notes.  Where are Charitable DAF and

10   Holdco's?

11             THE CLERK:  I have 2411.

12             THE COURT:  2411?  Is that it?

13             MR. BRIDGES:  2420, Your Honor.

14             THE COURT:  2420?  Okay.  Give me a minute.  (Pause.)

15   2420?

16             MR. BRIDGES:  Yes, Your Honor.

17             THE COURT:  Okay, I'm there.  And it's which

18   exhibits?

19             MR. BRIDGES:  It's Exhibits 1 through 44, Your

20   Honor, with four exceptions.  We have agreed to withdraw

21   Exhibit 2, 13, 14, and 29.

22             THE COURT:  All right.

23             MR. BRIDGES:  Also, Your Honor, we'd like to submit

24   Debtor's Exhibit 1, which is under Exhibit 49 on our list,

25   would be anything offered by the other side.  But we'd like
```

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 91 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 693 of 1726   PageID 12014

90

1  to make sure that Debtor's Exhibit 1 gets in the record as
2  well.
3         THE COURT:  Let me back up.  When I pull up the
4  docket entry you just told me, I have Exhibits 44, 45, and 46
5  only.  Am I misreading this?
6         MR. BRIDGES:  I have a chart showing Exhibits 1
7  through 49 titled Docket 2420 filed 6/7/21.
8         THE COURT:  Okay.  The docket entry number you told
9  me, 2420, it only has three exhibits:  44, 45, and 46.  So,
10 first off, I understand -- are you offering 45 and 46 or not?
11        MR. BRIDGES:  No, Your Honor.
12        THE COURT:  Okay.  So you said you were offering 1
13 through 44 minus certain ones.  44 is here.
14        MR. BRIDGES:  Yes.
15        THE COURT:  But I've got to go back to a different
16 docket number.
17        THE CLERK:  It's actually 2411.
18        THE COURT:  It's at 2411.  That has all the others?
19        THE CLERK:  Yes.
20        THE COURT:  Okay.
21    So, Mr. Pomerantz, do you have any objection to Exhibits
22 1 through 44, which he's excepted out 2, 13, 14, and 29, and
23 then he's added Debtor's Exhibit 1?  Any objection?
24        MR. POMERANTZ:  I don't believe so.  I just would
25 confirm with John Morris, who has been focused on the

91

```
 1    exhibits, just to confirm.

 2            THE COURT:  Mr. Morris?

 3            MR. MORRIS:  No objection, Your Honor.  It's fine.

 4            THE COURT:  Okay.  They're admitted.

 5        (Movants' Exhibits 1, 3 through 12, 15 through 28, and 30

 6    through 44 are received into evidence.  Debtor's Exhibit 1 is

 7    received into evidence.)

 8            THE COURT:  So, any --

 9            MR. BRIDGES:  Thank you, Your Honor.

10            THE COURT:  Anything you wanted to call to my

11    attention about these?

12            MR. BRIDGES:  Your Honor, the things that we

13    mentioned in the argument, for sure, but especially that the

14    word "trustee" is not used in the January hearing's

15    transcript, nor is it under discussion in that transcript

16    that it would be a trustee-like role being played by the

17    Strand directors, as well as the transcript of the July

18    hearing on the order at issue here, Your Honor, where you are

19    asked to defer both in that transcript and in the motion, the

20    motion that was at issue in that hearing, you are asked to

21    defer to the business judgment of the company.

22        And finally, Your Honor, I'd ask you to look at the

23    allegations in the District Court complaint.

24            THE COURT:  All right.

25        Mr. Pomerantz or Morris, let's see what exhibits you're
```

92

```
 1   wanting the Court to consider.  Your exhibits, it looks like,

 2   are at Docket Entry 2412.

 3           MR. MORRIS:  As subsequently amended at 2423.

 4           THE COURT:  Oh.  All right.  So which ones are you

 5   offering?

 6           MR. MORRIS:  We're offering all of the exhibits on

 7   2423, which is 1 through 17.

 8      (Echoing.)

 9           THE COURT:  Whoops.  We got some distortion there.

10   Say again?

11           MR. MORRIS:  Yeah.  All of the exhibits that are on

12   2423, which are Exhibits 1 through 17.  But I want to make

13   sure that, as I did earlier, that that has the exhibits that

14   we're relying on.  Does that --

15      (Pause.)

16           THE COURT:  Okay.  Let me make sure I know what's

17   going on here.  You're double-checking your exhibits, Mr.

18   Morris?

19           MR. MORRIS:  Yes, Your Honor.

20           THE COURT:  Okay.

21      (Pause.)

22           MR. MORRIS:  Your Honor, we start with Docket No.

23   2419, --

24           THE COURT:  Okay.

25           MR. MORRIS:  -- which was the amended exhibit list.
```

1   And that actually had Exhibits 1 through 17.  And then that

2   was amended at Docket 2423.  So, the exhibits on both of

3   those lists.

4            THE COURT:  Well, they're one and the same, it looks

5   like, right?

6            MR. MORRIS:  Yes.

7            THE COURT:  Okay.  So you're offering those?

8            MR. MORRIS:  I think -- yeah.

9            THE COURT:  Any objection?

10           MR. BRIDGES:  No objection.

11           THE COURT:  All right.  They're admitted.

12       (Debtor's Exhibits 1 through 17 are received into

13   evidence.)

14           MR. POMERANTZ:  Your Honor, if I may take a few

15   moments to respond to Mr. Bridges' reply?

16           THE COURT:  All right.  Is he still within his hour

17   and a half?

18           THE CLERK:  At an hour and one minute.

19           THE COURT:  Okay.  All right.  You have a little

20   time left, so go ahead.

21           MR. POMERANTZ:  Thank you, Your Honor.

22       So look, I -- it sort of was really not fair to us.  Mr.

23   Bridges was really making things up on the fly.  He was

24   changing the theories of his case and responding to Your

25   Honor.  But I'm going to do my best to respond to the

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 697 of 1726   PageID 12018

94

1    arguments made, many of which I sort of anticipated.

2        I'll first start with the issue that Your Honor raised,

3    which was whether this is under Rule 60 or not.  Mr. Bridges

4    identified a couple of cases, said that the order was

5    interlocutory, said that somehow the orders have anything to

6    do with a plan confirmation order.  They do not.  Your Honor

7    didn't hear that argument at the plan confirmation.  The

8    January 9th and July 16th orders are old and cold.  There's

9    an exculpation provision in the plan.  There's a gatekeeper

10   in the plan.  The provisions do not overlap entirely.  The

11   gatekeeper applies prospectively.  The exculpation provision

12   includes additional parties.

13       So the arguments that basically the plan had anything to

14   do -- and the fact that the plan is not a final order -- has

15   anything to do with the January 9th and July 16th orders is

16   just wrong.  It's just wrong.

17       More fundamentally, Your Honor, as Your Honor pointed

18   out, the *Smyth* case is a professional employment order.  And

19   ironically, if you abide by the *Smyth* case, that order is

20   never appealable because it's interlocutory.

21       But more fundamentally, Your Honor, that's dealing with

22   327 professionals.  And again, there's not much analysis in

23   the *Smyth* case, but we're not dealing with a 327

24   professional.  We're dealing with orders that were approved

25   under 363.

95

1       So the premise of the argument that Rule 60(b) -- 60
2   doesn't apply and they have other arguments just doesn't make
3   any sense.
4       Okay.  So now that gets us to Rule 60.  And Your Honor,
5   Your Honor hit the nail on the head.  They haven't presented
6   any evidence.  Allegations in a complaint aren't evidence.
7   They can't stand up there and say surprise evidence.  They
8   had the opportunity -- and this hearing's been continued a
9   few weeks -- they had the opportunity to bring it up, and
10  it's -- they had the opportunity to claim that there was
11  surprise, but they just didn't.  Okay?
12      So to go on to the Rule 60 arguments.  Surprise.
13  Surprise and reasonable delay are really -- go hand in hand
14  with Mr. Bridges' argument.  He says, well, we didn't find
15  out that -- months after the order was entered that he
16  violated a duty to us, so we are surprised by that, and it's
17  a reasonable time.  Well, Your Honor, the order provided for
18  an exculpation.  CLO Holdco and DAF knew that it applied to
19  an exculpation.  They were bound.  They knew based upon that
20  order that they would not be able to bring claims for normal
21  negligence.  There is no surprise.
22      If you take Mr. Bridges' argument to its conclusion, he
23  could wait until the end of the statute of limitations after
24  an order and have come in four years from now and say, Your
25  Honor, we just found out facts so we should go back four

96

1    years before.  That, Your Honor, that's not how the surprise

2    works.  That's not how the reasonable time works.

3        Mr. Bridges did not contest that they're bound by res

4    judicata.  He did not contest that the exculpation itself was

5    clear and unambiguous.  Of course he argued Your Honor

6    couldn't enter an order saying there was exculpation, again,

7    with no authority.  And he seemed surprised, as I suspect he

8    should, since he's not a bankruptcy lawyer, that retention

9    orders, whether it's investment bankers, financial advisors,

10   include exculpations all the time.  So there's no grounds

11   under surprise.

12       There's no grounds -- the motions are late under 60(c).

13       And they're not void.  I went through a painstaking

14   analysis, Your Honor, and I described in detail what the

15   *Espinosa* case held, and the exceptional circumstances which

16   Mr. Bridges tried to get away from as much as he could.

17   Maybe he can try to get away from language in a district

18   Court opinion, in a Bankruptcy Court opinion, in a Circuit

19   Court opinion.  You can't get away from language in a Supreme

20   Court opinion.  The Supreme Court opinion said exceptional

21   circumstances, where there was arguably no basis for

22   jurisdiction for what the Court did.  They have not even come

23   close to convincing Your Honor that there was absolutely no

24   basis.

25       Now, they disagree.  We granted, we think it's a good-

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 98 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 700 of 1726 PageID 12021
201

97

1   faith disagreement, but they haven't come close to

2   establishing the *Espinosa* standard, so their motion under 60

3   does not -- it fails.

4        And I don't think -- look, these are good lawyers.  Mr.

5   Bridges and Mr. Sbaiti are good lawyers.  They didn't just

6   inadvertently not mention Rule 60.  They never mentioned it

7   because they knew they had no claim under Rule 60.

8        Your Honor, Mr. Bridges has made comments about the

9   fiduciary duty of Mr. Seery, about what the Investor's Act

10  provides.  He's just wrong on the law.  Now, Your Honor

11  doesn't have to decide that.  Whichever court adjudicates the

12  DAF lawsuit will have to decide it.  But there is no private

13  cause of action for damages.  There are no fiduciary duties to

14  the investors.

15       And what Mr. Bridges doesn't even mention, in that the

16  investment agreement that's so prominent in his complaint,

17  they waived claims other than willful misconduct and gross

18  negligence against Highland.  They waived those claims.  So

19  for Mr. Bridges to come in here and argue that there's some

20  surprise, when he hasn't even bothered to look at the document

21  that's underlying the contractual relationship between the DAF

22  and the Debtor, is -- you know, I'll just say it's

23  inadvertence.

24       Your Honor, Mr. Bridges tried to argue that Mr. Seery is

25  not a beneficiary of the January 9th order.  He's not an

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 99 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 701 of 1726 PageID 12022

98

1    agent.  Well, again, Your Honor, Mr. Bridges wasn't there.

2    Your Honor and we were.  On January 9th, an independent board

3    was picked, and at the time Mr. Dondero ceased to become the

4    CEO.  So you have three gentlemen coming in -- Mr. Seery, Mr.

5    Dubel, and Mr. Nelms -- coming in to run Highland, in a very

6    chaotic time.  They had to act through their agents.  There

7    was no expectation that this board was going to actually run

8    the day-to-day operations of the Debtor.  Of course not.  They

9    needed someone to run.  And they picked Mr. Seery.  And the

10   argument that well, he's an agent of the company, he's not an

11   agent of the board, that just doesn't make sense.  The

12   independent board had to act.  The directors had to act.  And

13   the directors, how do they deal with that?  They acted through

14   Mr. Seery.  So he is most certainly governed by the January

15   9th order.

16       Your Honor, I want to talk about the jury trial right.

17   Mr. Bridges said that Paragraph 14 is an arbitration clause

18   and not a jury trial waiver.  Now, again, I will forgive Mr.

19   Bridges because I assume he didn't read the provision, okay,

20   and he -- somebody told him that, and that person just got it

21   wrong.  But what I would like to do is read for Your Honor

22   Paragraph 14(f).  It doesn't have to do with arbitration.

23   It's a waiver of jury trial.  14(f), Jurisdiction Venue,

24   Waiver of Jury Trial.  The parties hereby agree that any

25   action, claim, litigation, or proceeding of any kind

99

1   whatsoever against any other party in any way arising from or

2   relating to this agreement and all contemplated transactions,

3   including claims sounding in contract, equity, tort, fraud,

4   statute defined as a dispute shall be submitted exclusively to

5   the U.S. District Court for the Northern District of Texas, or

6   if such court does not have subject matter jurisdiction, the

7   courts of the State of Texas, City of Dallas County, and any

8   appellate court thereof, defined as the enforcement court.

9   Each party ethically and unconditionally submits to the

10  exclusive personal and subject matter jurisdiction of the

11  enforcement court for any dispute and agrees to bring any

12  dispute only in the enforcement court.  Each party further

13  agrees it shall not commence any dispute in any forum,

14  including administrative, arbitration, or litigation, other

15  than the enforcement court.  Each party agrees that a final

16  judgment in any such action, litigation, or proceeding is

17  conclusive and may be enforced through other jurisdictions by

18  suit on the judgment or in any manner provided by law.

19      And then the kick, Your Honor, all caps, as jury trial

20  waiver always are:  Each party irrevocably and unconditionally

21  waives to the fullest extent permitted by law any right it may

22  have to a trial by jury in any legal action, proceeding, cause

23  of action, or counterclaim arising out of or relating to this

24  agreement, including any exhibits, schedules, and appendices

25  attached to this agreement or the transactions contemplated

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 101
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 703 of 1726 PageID 12024

100

1    hereby.  Each party certifies and acknowledges that no

2    representative of the owner of the other party has represented

3    expressly or otherwise that the other party won't seek to

4    enforce the foregoing waiver in the event of a legal action.

5    It has considered the implications of this waiver, it makes

6    this waiver knowingly and voluntarily, and it has been induced

7    to enter into this agreement by, among other things, the

8    mutual waivers and certifications in this section.

9        Your Honor, I will forgive Mr. Bridges.  I assume he just

10   did not read that.  But to represent to the Court that that

11   language does not contain a jury trial waiver is -- is just

12   wrong.

13            THE COURT:  All right.  I'm going to stop right

14   there.  And you were reading from the Second Amended and

15   Restated Shared Services Agreement between Highland --

16            MR. POMERANTZ:  Not shared services.  I'm reading

17   from the Second Amended and Restated Investment Advisory

18   Agreement --

19            THE COURT:  Investment --

20            MR. POMERANTZ:  -- between the Charitable DAF, the

21   Charitable DAF GP, and Highland Capital Management.  The

22   agreement whereby the Debtor was the investment advisor to the

23   Charitable DAF Fund and the Charitable DAF GP.

24            THE COURT:  All right.  Well, Mr. Bridges, I'm going

25   to bounce quickly back to you.  This is your chance to defend

101

1   your honor.

2           MR. BRIDGES:  Yeah, we're -- we're looking at a

3   different agreement, where -- where literally the words that

4   were read to you are not in the agreement in front of us and

5   it is news to me.  So, Your Honor, this is a problem --

6           THE COURT:  What is the agreement you're looking at?

7           MR. BRIDGES:  It is the Amended -- I assume that

8   means First Amended -- Restated Advisory Agreement.

9           MR. POMERANTZ:  Your Honor, we are happy to file this

10  agreement with the Court so the Court has the benefit of it in

11  connection with Your Honor's ruling.

12          THE COURT:  Okay.  I would like you to do that.  Uh-

13  huh.

14          MR. BRIDGES:  I'd like -- I'd like to request -- I'll

15  withdraw that.

16          THE COURT:  Okay.  Go on, Mr. Pomerantz.

17          MR. POMERANTZ:  Mr. Bridges, if you could put us on

18  mute.  If you could put us on mute, Mr. Bridges, so I don't

19  hear your feedback.  Thank you.

20      Mr. Bridges also complains about the language "to the

21  extent permissible by law."  As Your Honor knows and as has

22  been my practice over 30 years, that language is probably in

23  every plan where there's a retention of jurisdiction:  to the

24  extent permissible by law.  And Mr. Bridges says that this

25  will create ambiguity in the order that couldn't be enforced.

 1   There's no basis for that.  Our including the language "to the

 2   extent permissible by law" in the orders, as we are prepared

 3   to do, is consistent with the plan confirmation order where we

 4   addressed that issue.  And we addressed that issue because we

 5   didn't want to put Your Honor in a position where thereby Your

 6   Honor may have an action before Your Honor that passes the

 7   colorability gate that Your Honor may not be able to assert

 8   jurisdiction.  And since jurisdiction can't be waived in that

 9   regard, we will agree to amend that.

10       There's nothing ambiguous about that, and there's no

11   reason, though, that clause has to modify the Court's ability

12   to act as a gatekeeper, because, as we've argued *ad nauseam*,

13   gatekeeper provisions where the Court has that ability is not

14   only part of general bankruptcy jurisprudence but also part of

15   the Bankruptcy Code.

16       Counsel says that *Barton* doesn't apply because the

17   business judgment of Your Honor was used in retaining Mr.

18   Seery as opposed to in some other capacity.  There's no basis

19   for that, Your Honor.  A court-appointed -- a court-approved

20   CEO, CRO, professional, they are all entitled to protection

21   under the *Barton* act.  And the argument -- and again, this is

22   separate and apart from whether he's entitled to protection

23   under the January 9th order. But the argument that because it

24   was the business judgment -- again, business judgment in doing

25   something that Your Honor expressly contemplated under the

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 104
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 706 of 1726 PageID 12027

103

1 | January 9th corporate governance order -- there's just no law

2 | to support that. And I guess he's trying to get around the

3 | plethora of cases that deal with the situation where *Barton*

4 | has been extended.

5 | Your Honor, Mr. Bridges, again, in arguing that we're

6 | ships passing in the night on *Shoaf* and *Applewood* and

7 | *Espinosa*, no, we're not ships passing in the night. We have a

8 | difference in agreement on what these cases stand for. These

9 | cases stand for the proposition that a clear and unambiguous

10 | provision, plain and simple, if it's clear and unambiguous, it

11 | will be given res judicata effect. The release in *Shoaf*,

12 | clear and unambiguous. The release in *Applewood*, not. The

13 | issue here is the exculpation language. That was clear and

14 | unambiguous. It applied prospectively. The argument makes no

15 | sense that we didn't identify -- we didn't identify claims

16 | that might arise in the future, so therefore an exculpation

17 | clause doesn't apply? That doesn't make any sense.

18 | Your Honor clearly exculpated parties. Mr. Dondero knew

19 | it. CLO Holdco knew it. The DAF knew it. So the issue Your

20 | Honor has to decide is whether that exculpation was a clear

21 | and unambiguous provision such that it should be entitled to

22 | res judicata effect. And we submit that the answer is

23 | unequivocally yes.

24 | That's all I have, Your Honor.

25 | THE COURT: All right. Well, --

1          MR. MORRIS:  Your Honor?  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  This is John Morris.

4          THE COURT:  Yes?

5          MR. MORRIS:  I just want to, with respect to the

6    exhibits, I know there was no objection, but I had cited to

7    Docket Nos. 2419 and 2423.  The original exhibit list is at

8    Docket No. 2412.  So it's the three of those lists together.

9    2412, as amended by 2419, as amended by 2423.  Thank you very

10   much.

11         THE COURT:  All right.  Thank you.  All right.

12         MR. BRIDGES:  Your Honor, I still have no objection

13   to that, but may I have the last word on my motion?

14         THE COURT:  Is there time left?

15         THE CLERK:  Yes.

16         THE COURT:  Okay.  Go ahead.

17         MR. BRIDGES:  I just need a minute, Your Honor.  They

18   agreed to change the order.  They proposed it to us.  They

19   proposed it in a proposed order to you.  They can't also say

20   that it cannot be changed.

21       Secondly, Your Honor, in *Milic v. McCarthy*, 469 F.Supp.3d

22   580, the Eastern District of Virginia points out that the

23   Fourth Circuit treats appointment of estate professionals as

24   interlocutory orders as well.

25       That's all.  Thank you, Your Honor.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 106
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 708 of 1726 PageID 12029

105

1          THE COURT:  All right.  Here's what we're going to

2    do.  We've been going a very long time.  I'm going to take a

3    break to look through these exhibits, see if there's anything

4    in there that I haven't looked at before and that might affect

5    the decision here.  So we will come back at 3:00 o'clock

6    Central Time -- it's 2:22 right now -- and I will give you my

7    bench ruling on this.  All right.

8        So, Mike, they can all stay on the line, right?

9        Okay.  You can stay on, and we'll be back at 3:00 o'clock.

10          THE CLERK:  All rise.

11      (A recess ensued from 2:22 p.m. to 3:04 p.m.)

12          THE CLERK:  All rise.

13          THE COURT:  All right.  Please be seated.  All right.

14    Everyone presented and accounted for.  We're going back on the

15    record.

16          MR. POMERANTZ:  Your Honor, before you start, this is

17    Jeff Pomerantz.  We had sent to your clerk, and hopefully it

18    got to you, a copy of the Second Amended and Restated

19    Investment Advisory Agreement.  We also copied Mr. Sbaiti with

20    it as well.  And we would also like to move that into

21    evidence, just so that it's part of the Court's record.

22          THE COURT:  All right.

23          MR. BRIDGES:  We would object to that, Your Honor.

24    We haven't had an opportunity to even verify its authenticity

25    yet.

106

```
 1          THE COURT:  All right.  Well, I'll tell you what.
 2    I'm going to address this in my ruling.  So it's not going to
 3    be part of the record for this decision, and yet -- well, I'll
 4    get to it.
 5       All right.  So we're back on the record in Case Number 19-
 6    34054, Highland Capital.  The Court has deliberated, after
 7    hearing a lot of argument and allowing in a lot of documentary
 8    evidence, and the Court concludes that the motion of CLO
 9    Holdco, Ltd. and The Charitable DAF to modify the retention
10    order of James Seery, which was entered almost a year ago, on
11    July 16th, 2020, should be denied.
12       This is the Court's oral bench ruling, but the Court
13    reserves discretion to supplement or amend in a more fulsome
14    written order what I'm going to announce right now, pursuant
15    to Rule 7052.
16       First, what is the Movants' authority to request the
17    modification of a bankruptcy court order that has been in
18    place for so many months, which was issued after reasonable
19    notice to the Movants, and after a hearing, which was not
20    objected to by the Movants, or appealed, when the Movants were
21    represented by sophisticated counsel, I might add, and which
22    order was relied upon by parties in this case, most notably
23    Mr. Seery and the Debtor, and in fact was entered after
24    significant negotiations involving a sophisticated court-
25    appointed Unsecured Creditors' Committee with sophisticated
```

 1   professionals and sophisticated members, and after negotiation

 2   with an independent board of directors, court-appointed, one

 3   of whose members is a retired bankruptcy judge?  What is the

 4   Movants' authority?

 5       Movants fumbled a little on that question, in that the

 6   exact authority wasn't set forth in the motion.  But Movants'

 7   primary argument is that Movants think the Seery retention

 8   order was an interlocutory order and that the Court simply has

 9   the inherent authority to modify it as an interlocutory order.

10       The Court disagrees with this analysis.  I do not think

11   the Fifth Circuit's *Smyth* case dictates that the Seery

12   retention order is still interlocutory.  The Seery retention

13   order was an order entered pursuant to Section 363 of the

14   Bankruptcy Code, not a Section 327 professionals to a debtor-

15   in-possession, professionals to a trustee employment order

16   such as the one involved in the *Smyth* case.

17       But even if the Seery retention order is interlocutory --

18   the Court feels strongly that it's not, but even if it is --

19   the Court believes it would be an abuse of this Court's

20   inherent discretion or authority to modify that order almost a

21   year after the fact and under the circumstances of this case.

22       Now, assuming Rule 60(b) applies to the Movants' request,

23   the Court determines that the Movants have not made their

24   motion anywhere close to within a reasonable time, as Rule

25   60(c) requires, nor do I think the Movants have demonstrated

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 109
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 711 of 1726 PageID 12032

108

1   any exceptional circumstances to declare the order or any of

2   its provisions void.  The Movants have put on no evidence that

3   constitutes surprise or constitutes newly-disputed evidence.

4   So why are there no exceptional circumstances here such that

5   the Court might find, you know, a void order or void

6   provisions of an order?

7       First, this Court concludes that there's no credible

8   argument that the Court overreached its jurisdiction with the

9   gatekeeping provisions in the order.  Gatekeeping provisions

10  are not only very common in the bankruptcy world -- in

11  retention orders and in plan confirmation orders, for example

12  -- but they are wholly consistent with the *Barton* case, the

13  U.S. Supreme Court's *Barton's* case, and its progeny that has

14  become known collectively as the *Barton* doctrine.  Gatekeeping

15  provisions are wholly consistent with 28 U.S.C. Section

16  959(a)'s complete language.

17      The Fifth Circuit has blessed gatekeeping provisions in

18  all sorts of contexts.  It has blessed them in the situation

19  of when *Stern* claims are involved in the *Villegas* case.  It

20  even blessed Bankruptcy Courts' gatekeeping functions a long

21  time ago, in 1988, in a case that I don't think anyone

22  mentioned in the briefing, but as I've said, my brain

23  sometimes goes down trails, and I'm thinking of the *Louisiana*

24  *World Exposition* case in 1988, when the Fifth Circuit blessed

25  there a procedure where an unsecured creditors' committee can

1   bring causes of action against persons, such as officers and

2   directors or other third parties, if they first come to the

3   Bankruptcy Court and show a colorable claim. They have to

4   come to the Bankruptcy Court, show they have a colorable claim

5   and they're the ones that should be able to pursue them. Not

6   exactly on point, but it's just one of many cases that one

7   could cite that certainly approve gatekeeper functions of

8   various sorts of Bankruptcy Courts.

9      It doesn't matter which court might ultimately adjudicate

10   the claims; the Bankruptcy Court can be the gatekeeper.

11      And the Court agrees with the many cases cited from

12   outside this circuit, such as the case in Alabama, in the

13   Eleventh Circuit, and there was another circuit-level case, at

14   least one other, that have held that the *Barton* doctrine

15   should be extended to other types of case fiduciaries, such as

16   debtor-in-possession management, among others.

17      Finally, as I pointed out in my confirmation ruling in

18   this case, gatekeeping provisions are commonplace for all

19   types of courts, not just Bankruptcy Courts, when vexatious

20   litigants are involved. I have commented before that we seem

21   to have vexatious litigation behavior with regard to Mr.

22   Dondero and his many controlled entities.

23      Now, as far as the Movants' argument that there was not

24   just improper gatekeeping provisions but actually an improper

25   discharge in the Seery retention order of negligence claims or

1  other claims that don't rise to the level of gross negligence

2  or willful misconduct, again, I reiterate there's nothing

3  exceptional in the bankruptcy world about exculpation

4  provisions like this.  They absolutely are a term of

5  employment very often.  Just like compensation, they're

6  frequently requested, negotiated, and approved.  They are

7  normal in the corporate governance world, generally.  They are

8  normal in corporate contracts between sophisticated parties.

9  And most importantly of all, even if this Court overreached

10 with the exculpation provisions in the Seery retention order,

11 even if it did, res judicata bars the attack of these

12 provisions at this late stage, under cases such as *Shoaf,*

13 *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14 case from the U.S. Supreme Court, and even *Applewood*, since

15 the Court finds the language in this order was clear,

16 specific, and unambiguous with regard to the gatekeeping

17 provisions and the exculpation provisions.

18     Last, and this is the part where I said I'm going to get

19 to this agreement that has been submitted, the Second Amended

20 and Restated Investment Advisor Agreement or whatever the

21 title is.  I am more than a little disturbed that so much of

22 the theme of the Movants' pleadings and arguments, and I think

23 even representations to the District Court, have been they

24 have these sacred jury trial rights, these inviolate jury

25 trial rights, and an Article I Court like this Court should

1   have no business through a gatekeeping provision impinging on

2   the possible pursuit of an action where there's a jury trial

3   right.

4       I was surprised initially when I thought about this.  I

5   thought, wow, I've seen so many agreements over the months.  I

6   can't say every one of them waived the jury trial right, but I

7   just remembered seeing that a lot, and seeing arbitration

8   provisions, and so that's why I asked.  It just was lingering

9   in my brain.  So I'm going to look at what is submitted.  I'm

10  not relying on that as part of my ruling.  As you just heard,

11  I had a multi-part ruling, and whether there's a jury trial

12  right or not is irrelevant to how I'm choosing to rule on this

13  motion.  But I do want to see the agreement, and then I want

14  Movants within 10 days to respond with a post-hearing trial

15  brief either saying you agree that this is the controlling

16  document or you don't agree and explain the oversight, okay?

17  Because it feels like a gross omission here to have such a

18  strong theme in your argument -- we have a jury trial right,

19  we have a jury trial right, by God, the gatekeeping

20  provisions, among other things, impinge on our sacred pursuit

21  of our jury trial right -- and then maybe it was very

22  conspicuous in the controlling agreement that you'd waived

23  that, the Movants had waived that.

24      So, anyway, I'm requiring some post-hearing briefing, if

25  you will, on whether omissions, misrepresentations were made

112

```
 1   to the Court.

 2      Anyway, so I reserve the right to supplement or amend this

 3   ruling with a more fulsome written order.  I am asking Mr.

 4   Pomerantz to upload a form of order that is consistent with

 5   this ruling, and --

 6           MR. POMERANTZ:  Your Honor, we will do so.  I do have

 7   one thing to bring to the Court's attention, unrelated to the

 8   motion, before Your Honor leaves the bench.

 9           THE COURT:  All right.  So just a couple of follow-up

10   things.  Have you -- I'm not clear I heard what you said about

11   this agreement.  Did you email it to my courtroom deputy or

12   did you file it on the docket?

13           MR. POMERANTZ:  We emailed it to your courtroom

14   deputy.  We're happy to file it on the docket.  And we also

15   provided a copy to Mr. Sbaiti.

16      I would note for the Court that it's signed both by The

17   Charitable DAFs by Grant Scott, just for what it's worth.

18           THE COURT:  Okay.  All right.  Well, I'm trying to

19   think what I want -- I do want you to file it on the docket,

20   and I'm trying to think of what you label it.  Just call it

21   Post-Hearing Submission or something and link it to the motion

22   that we adjudicated here today.  And then, again, you've got

23   10 days, Mr. Bridges, to say whatever you want to say about

24   that agreement.

25      I guess the last thing I wanted to say is we sure devoted
```

113

1   a lot of time to this motion today.  We have -- this is a

2   recurring pattern, I guess you can say.  We have a lot of

3   things that we devote a lot of time to in this case that I get

4   surprised, but it is what it is.  You file a motion.  I'm

5   going to give it all the attention Movants and Respondents

6   think it warrants.  I'm going to develop a full record,

7   because, you know, there's a recurring pattern of appeals

8   right now, 11 or 12 appeals, I think, not to mention motions

9   to withdraw the reference.  If we're going to have higher

10  courts involved in the administration of this case, I'm going

11  to make a very thorough record so nobody is confused about

12  what we did, what I considered, what my reasoning was.

13      So I kind of think it's unfortunate for us to have to

14  spend case resources and so much time and fees on things like

15  this, but I'm going to make sure a Court of Appeals is not

16  ever confused about what happened and what we did.  So that's

17  just the way it's going to be.  And I feel like we have no

18  choice, given, again, the pattern of appeals.

19      All right.  So, with that, Mr. Pomerantz, you had one

20  other case matter, you said?

21          MR. POMERANTZ:  Yes.  But before I get to that, Your

22  Honor, I assume that, in response to the Movants' submission

23  on the agreement, that we would have right at four or seven

24  days to respond if we deem it's appropriate?

25          THE COURT:  I think that's reasonable.  That's

1  reasonable.

2          MR. POMERANTZ:  Okay.  Thank you, Your Honor.

3          THE COURT:  So let me think of how I want to do this.

4  I'll just do a short scheduling order of sorts that just, it

5  says in one or two paragraphs, at the hearing on this motion,

6  the Court raised questions about the jury trial rights and the

7  Debtor has now submitted the controlling agreements, I'm

8  giving the Movants 10 days to respond to whether this is

9  indeed a controlling agreement, and why, if it is, the Movants

10  have heretofore taken the position they have jury trial

11  rights.  And then I will give you seven days thereafter to

12  reply, and then the Court will set a further status conference

13  if it determines it's necessary.  Okay?

14      So, Nate, we'll do a short little order to that effect.

15  Okay?

16          MR. POMERANTZ:  Thank you, Your Honor.

17      I -- again, before I raise the other issue, I want to pick

18  up on a comment Your Honor just made towards the end.  I know

19  the Court has been frustrated with the time and effort we've

20  been spending.  The Debtor and the creditors have been

21  extremely frustrated, because in addition to the time and

22  effort everyone's spending, we're spending millions of

23  dollars, millions of dollars on litigation that --

24          THE COURT:  It's one of the reasons you needed an

25  exit loan, right?

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 116
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 718 of 1726 PageID 12039

115

1           MR. POMERANTZ: Right. No, exactly. That's

2    frivolous, that we think is made in bad faith.

3       And Your Honor, and everyone else who's hearing this on

4    behalf of Mr. Dondero, should understand we're looking into

5    what appropriate authority Your Honor would have to shift some

6    of the costs. Your Honor did that in the contempt motion.

7    Your Honor can surely do that in connection with the notes

8    litigation. But all this other stuff that is requiring us to

9    spend hundreds and hundreds of hours and spend millions of

10   dollars, we are clearly looking into whether it would be

11   appropriate and what authority there is. I just wanted to let

12   Your Honor know that.

13      And in connection with that, the last point, Your Honor, I

14   can't actually even believe I'm saying this, but there was

15   another lawsuit filed -- we just found out in the break -- on

16   Wednesday night by the Sbaiti firm on behalf of Dugaboy in the

17   District Court.

18      Now, to make matters worse, Your Honor, the litigation

19   relates to alleged improper management by the Debtor of Multi-

20   Strat. If Your Honor will recall, at many times I've told

21   this Court what Dugaboy's claims they filed in this case.

22   Dugaboy has a claim that is filed in this case for

23   mismanagement postpetition of Multi-Strat. Now the Sbaiti

24   firm, in addition to representing CLO Holdco, in addition to

25   representing the DAF, and whatever the Plaintiffs' lawyers are

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 117
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 719 of 1726 PageID 12040

116

1   in that other District Court, PCMG, and in connection with the

2   Acis matter, they've decided they haven't had enough. They've

3   now filed another motion that -- you know, why they filed it

4   in District Court and there's a proof of claim on the same

5   issues, I don't know. But I thought Your Honor should know.

6   I'm not asking Your Honor to do anything about it. But we

7   will act aggressively, strongly, and promptly.

8        Thank you, Your Honor.

9        THE COURT: All right. Well, you've reminded me of

10  what came out earlier today about the entity -- I left my

11  notepad in my chambers -- PMC or PMG or something.

12       Mr. Bridges, we're not going to have a hearing right now

13  on me doing anything, but what are you thinking? What are you

14  doing?

15       MR. BRIDGES: Your Honor, I'm not trying to duck your

16  question. I literally have no involvement with any other

17  claim, and we would have to ask Mr. Sbaiti to answer your

18  questions.

19       THE COURT: All right. Is he there?

20       MR. BRIDGES: He is.

21       THE COURT: I'll listen.

22       MR. BRIDGES: I'll switch seats and give him this

23  chair.

24       MR. SBAITI: Sorry, Your Honor. We had two computers

25  going and weren't able to use the sound on one, so we ended up

117

1   turning that off.

2       Your Honor, I'm not sure what the question is about when

3   you say what are we thinking.  We have a client that's asked

4   us to file something, and when we're advised by bankruptcy

5   counsel that it's not prohibited for us to do so, and don't

6   know why we're precluded from doing so, and when the time

7   comes I'm sure we'll be able to explain to Your Honor --

8   someone will be able to explain to Your Honor why what we're

9   doing, despite Mr. Pomerantz's exacerbation, or excuse me,

10  exasperation, why that wasn't improper.  It's our belief that

11  it wasn't improper or a violation of the Court's rule.

12          THE COURT:  Just give me a quick shorthand *Readers'*

13  *Digest* of why you don't think it's improper.

14          MR. SBAITI:  Sure.  My understanding is, Your Honor,

15  there's not a rule that says we can't file it against the

16  Debtor for postpetition actions.  So that, that's as -- that's

17  as much as I understand.  And I'm going to -- I'm not trying

18  to duck it, either.  And if I'm wrong about that and someone

19  wants to correct me on our side offline and if we have to

20  explain to the Court why that's so or what rule has been

21  violated, I'm sure we'll be able to put together something for

22  that.  But that's what I've been advised.

23          THE COURT:  Have you done thorough --

24          MR. POMERANTZ:  Your Honor, I think what --

25          MR. SBAITI:  (garbled), Your Honor.

118

1          THE COURT:  Have you done thorough research yourself?

2     Your Rule 11 signature is on the line, not some bankruptcy

3     counsel you talked to.  Have you done the research yourself?

4          MR. SBAITI:  Well, Your Honor, I've relied on the

5     research and advice of people who are experts, and I believe

6     my Rule 11 obligations also allow me to do that, so yes.

7          MR. POMERANTZ:  Your Honor, I think we're entitled to

8     know if it's Mr. Draper's firm who has been representing

9     Dugaboy.  He's the bankruptcy counsel.  I don't think it's an

10    attorney-client privilege issue.  If Mr. Sbaiti is going to be

11    here and sort of say, hey, bankruptcy counsel said it was

12    okay, I think we would like to know and I'm sure Your Honor

13    would like to know who is that bankruptcy counsel.

14         THE COURT:  Yes.  Fair enough.  Mr. Sbaiti?

15         MR. SBAITI:  Your Honor, in consultation with Mr.

16    Draper and with consultation with other counsel that we've

17    spoken to, that has been our understanding.

18         THE COURT:  Who's the other counsel?

19         MR. SBAITI:  Well, we've talked to Mr. Rukavina about

20    some of these things for the PCMG and the Acis case.  We've

21    talked to the people who, when they tell us you can't do this

22    because they're bankruptcy counsel for our client, then we

23    don't do something.  So, and I'm not trying to throw anybody

24    under the bus, but my understanding of what goes on in

25    Bankruptcy Court is incredibly limited, so, you know, and if

119

 1   it's a mistake then I'll own it, if I have a mistaken

 2   understanding, but I also wasn't anticipating having to make a

 3   presentation about this right here right now, so --

 4           THE COURT:  Well, you're filing lawsuits that involve

 5   this bankruptcy case during the hearing, so --

 6           MR. SBAITI:  Oh, we didn't file it during the

 7   hearing, Your Honor.  It was filed last night, I believe.

 8           THE COURT:  Okay.  Well, I assume that you're going

 9   to go back and hit the books, hit the computer, and be

10   prepared to defend your actions, because your bankruptcy

11   experts, they may think they know a lot, but the judge is not

12   very happy about what she's hearing.

13           MR. POMERANTZ:  Your Honor, if I may ask when Your

14   Honor intends to issue the contempt ruling in connection with

15   the June 8th hearing?  I strongly believe -- and, obviously,

16   this has nothing to do with the contempt hearing; this

17   happened after -- but I strongly believe that sending a

18   message that Your Honor is inclined to hold counsel in

19   contempt, which obviously is one of the violators we said

20   should be held in contempt, it may be important to do that

21   sooner rather than later so that people know that Your Honor

22   is serious.

23           THE COURT:  All right.  Well, I understand and

24   respect that request.  And let me tell you all, I had a seven-

25   day -- okay.  You all were here on that motion June 8th.  I

120

1   had a seven-day, all-day, every-day, 9:00 to 5:00, 45-minute

2   lunch break, in-person hearing with a dozen or so live

3   witnesses that I just finished Tuesday at 5:00 o'clock.  So

4   you all were here on the 8th, and then -- what day was that --

5   what was -- Tuesday, I finished.  Tuesday was the 22nd.  So I

6   started on the 14th, okay?  So you all were here on the 8th

7   and I had a live jury trial -- I mean, not jury trial, a live

8   bench trial -- live human beings in the courtroom, beginning

9   June 14th.  So you're here the 8th.  June 14th through 22nd, I

10  did my trial.  And here we are on the 25th.  And guess what, I

11  have another live human-being bench trial next week, Monday

12  through Friday.

13      So we've been working in other things like this in between

14  those two.  So I'm telling you that not to whine, I'm just

15  telling you that, that's the only reason I didn't get out a

16  quick ruling on this, okay?

17              MR. POMERANTZ:  And Your Honor, I was not at all

18  making that comment to imply anything about the Court.

19              THE COURT:  Well, --

20              MR. POMERANTZ:  The time and effort that you have

21  given to this case is extraordinary, --

22              THE COURT:  Okay.

23              MR. POMERANTZ:  -- so please don't misunderstand my

24  comment.

25              THE COURT:  Okay.  And I didn't mean to express

121

1    annoyance or anything like that.  I guess what I'm trying to

2    do is I don't want anyone to mistake the delay in ruling on

3    the contempt motion to mean I'm just not that -- you know, I'm

4    not prioritizing it, other things are more serious to me or

5    important to me, or I'm going to take two months to get to it.

6    It's literally been I've been in trial almost all day long

7    every day since you were here.  But trust me, I'm about as

8    upset as upset can be about what I heard on June 8th, and I'm

9    going to get to that ruling, and I know what I'm going to do.

10   And, well, like I said, it's just a matter of figuring out

11   dollars and whom, okay?  There's going to be contempt.  I just

12   haven't put it on paper because I've been in court all day and

13   I haven't come up with a dollar figure.  Okay?

14       So I hope -- I don't know if that matters very much, but

15   it should.

16       All right.  We stand adjourned.

17       (Proceedings concluded at 3:35 p.m.)

18                        --oOo--

19

20                      CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **06/29/2021**

24   _____     _____

25   Kathy Rehling, CETD-444                      Date
     Certified Electronic Court Transcriber

122

INDEX
*Excerpt*
*11:33 a.m. to 3:35 p.m.*

PROCEEDINGS                                                        3

OPENING STATEMENTS

- By Mr. Bridges                                                   3
- By Mr. Pomerantz                                               23

WITNESSES

-none-

EXHIBITS

Movants' Exhibits 1, 3 through 12, 15 through    Received 91
28, and 30 through 44

Debtor's Exhibit 1                                Received 91
Debtor's Exhibits 1 through 17                    Received 93

RULINGS                                                          106

END OF PROCEEDINGS                                               121

INDEX                                                            122

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    IN THE UNITED STATES BANKRUPTCY COURT
  1                   FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION
  2
                                     )    Case No. 19-34054-sgj-11
  3    In Re:                        )    Chapter 11
                                     )
  4    HIGHLAND CAPITAL              )    Dallas, Texas
       MANAGEMENT, L.P.,             )    Friday, June 25, 2021
  5                                  )    9:30 a.m. Docket
                                     )
  6            Debtor.               )
                                     )    EXCERPT:
  7                                  )    - MOTION TO ENTER INTO EXIT
                                     )      FINANCING AGREEMENT [2229]
                                     )    - MOTION TO AUTHORIZE PAYMENT
  8                                  )      OF RESTRUCTURING FEE [2395]
                                     )
  9    _____)

                         TRANSCRIPT OF PROCEEDINGS
 10            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                     UNITED STATES BANKRUPTCY JUDGE.
 11
       WEBEX APPEARANCES:
 12
       For the Debtor:              Jeffrey Nathan Pomerantz
 13                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                    10100 Santa Monica Blvd.,
 14                                   13th Floor
                                    Los Angeles, CA  90067-4003
 15                                 (310) 277-6910

 16    For the Debtor:              John A. Morris
                                    PACHULSKI STANG ZIEHL & JONES, LLP
 17                                 780 Third Avenue, 34th Floor
                                    New York, NY  10017-2024
 18                                 (212) 561-7700

 19    For Get Good Trust and       Douglas S. Draper
       Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
 20                                 650 Poydras Street, Suite 2500
                                    New Orleans, LA  70130
 21                                 (504) 299-3300

 22    For the Official Committee   Matthew A. Clemente
       of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 23                                 One South Dearborn Street
                                    Chicago, IL  60603
 24                                 (312) 853-7539

 25
```

2

```
 1   APPEARANCES, cont'd.

 2   For CLO Holdco, Ltd. and    Jonathan E. Bridges
     The Charitable DAF Fund,    Mazin Ahmad Sbaiti
 3   LP:                         SBAITI & COMPANY, PLLC
                                 JP Morgan Chase Tower
 4                               2200 Ross Avenue, Suite 4900 W
                                 Dallas, TX  75201
 5                               (214) 432-2899

 6   Recorded by:                Michael F. Edmond, Sr.  VP
                                 UNITED STATES BANKRUPTCY COURT
 7                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
 8                               (214) 753-2062

 9   Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
10                               Shady Shores, TX  76208
                                 (972) 786-3063
11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

3

1          DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.

2          THE CLERK:  All rise.  United States Bankruptcy Court

3   for the Northern District of Texas, Dallas Division, is now in

4   session, The Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6   right.  We have three motions set this morning in Highland

7   Capital, Case No. 19-34054.  I'll get lawyer appearances at

8   this time.  Who do we have appearing for the Debtor team?

9          MR. POMERANTZ:  Good morning, Your Honor.  Jeff

10  Pomerantz and John Morris appearing for the Debtor.  Also in

11  the virtual courtroom are Mr. Jim Seery, the Debtor's CEO,

12  member of the board, and Chief Restructuring Officer, and also

13  John Dubel, member of the board and chairman of the Debtor's

14  Compensation Committee.

15         THE COURT:  All right.  Good morning.

16     We have an objection to the exit financing from the

17  Dugaboy Trust.  Mr. Draper, are you appearing for Dugaboy this

18  morning?

19         MR. DRAPER:  Yes, Your Honor.  Can you hear me?

20         THE COURT:  I can.  Uh-huh.  Well, I could, but now I

21  can't.  I lost you.

22         MR. DRAPER:  Your Honor, I'm here for the Dugaboy

23  Trust, but, quite frankly, the issues in connection with the

24  exit financing have been dramatically reduced, and I've been

25  in discussion with Mr. Pomerantz and Mr. Morris, so I think

4

1 that hearing is going to be much shorter and much easier.

2     MR. POMERANTZ:  Your Honor, we have been in

3 discussions with Mr. Draper.  We still intend to put on our

4 full case.  So after Your Honor gets appearances, I will give

5 Your Honor at least my view of how the day is going to go in

6 connection with the three motions.

7     THE COURT:  All right.  Well, Mr. Draper, you, of

8 course, are aware of the order I entered a week or so ago

9 regarding a client representative being in the virtual

10 courtroom whenever your client takes a position.  So I presume

11 you have a client representative here today?

12     MR. DRAPER:  Yes.  Nancy Dondero is in the virtual

13 courtroom.

14     THE COURT:  All right.  Ms. Dondero?

15     MS. DONDERO:  I'm present.  I'm present, Your Honor.

16 Good morning.

17     THE COURT:  Okay.  Well, I've got your audio but not

18 your video.  Can you turn on your video, please, just so we

19 can confirm?  (Pause.)  All right.

20     MS. DONDERO:  I'm right here, Your Honor.

21     THE COURT:  Okay.  Good morning.  Thank you.

22     MS. DONDERO:  Good morning.

23     THE COURT:  All right.  Well, as noted, we have three

24 matters set.  Let me see if we have CLO Holdco and The

25 Charitable DAF Fund making an appearance today.

5

1        MR. BRIDGES:  Yes, Your Honor.  Jonathan Bridges

2   here, with my colleague Mazin Sbaiti, on behalf of those

3   clients.

4        THE COURT:  All right.  I think those were our only

5   objectors.  Correct?  So, I'll ask if we have the Unsecured

6   Creditors' Committee counsel in the virtual courtroom.

7        MR. CLEMENTE:  Yes, good morning, Your Honor.  Good

8   morning, Your Honor.  Matthew Clemente from Sidley on behalf

9   of the Committee.

10        THE COURT:  All right.  Thank you.

11        MR. CLEMENTE:  Thank you.

12        THE COURT:  Anyone else who's wishing to appear?

13   Again, I think we just had the one objection on the exit

14   financing and then the one motion with regard to the July 2020

15   order that is contested.

16     All right.  Well, Mr. Pomerantz, how did you want to

17   proceed this morning?

18        MR. POMERANTZ:  Your Honor, as I mentioned, there are

19   three matters.  The first matter, the motion to approve a

20   restructuring fee to Mr. Seery has not been opposed.  We have

21   -- we do intend to proffer the testimony of John Dubel, who is

22   the chairman of the Compensation Committee.  I anticipate that

23   that presentation and proffer will take approximately 15

24   minutes, as Mr. Dubel is also on the WebEx and is available to

25   answer any questions Your Honor may have in connection with

6

1    the motion, but no parties have objected.

2        Second is the financing motion.  And while Mr. Draper has

3    indicated, we've been in discussions about certain issues, we

4    intend to put on our full case to address the issues raised in

5    the motion.  We intend to put on the testimony of Mr. Seery,

6    which will be done by my partner, John Morris.  I anticipate

7    that hearing taking an hour or less.

8        And then thirdly, Your Honor, is the motion to modify Your

9    Honor's July 16th order.  I've had discussions with Movants'

10   counsel and we have agreed to allocate an hour and a half for

11   each side.  Our understanding is that (garbled) will be the

12   only people appearing on behalf of the Movants.  And we would

13   again allocate an hour and a half each side.

14       I believe that, with those three motions, we can get

15   through all of them today, and that's how we would intend to

16   proceed if it makes sense to the Court.

17            THE COURT:  All right.  Anyone want to weigh in with

18   any comment about the sequence?

19            MR. BRIDGES:  Yes, Your Honor.  Jonathan Bridges on

20   behalf of CLO Holdco and The Charitable DAF.  Would just like

21   to know, we don't have an objection to the order, but would

22   like to know if it's acceptable for us to dial back in in a

23   couple of hours since that seems to fit the estimation of how

24   long the initial proceedings will take.

25            THE COURT:  Well, I'm happy to excuse you for a

7

1   while, but by my count it's maybe going to be an hour and a

2   half, right, Mr. Pomerantz?

3           MR. POMERANTZ:  I suspect that's correct, Your Honor.

4           THE COURT:  Okay.  So I would suggest you come back

5   at 11:15-ish.

6       (Echoing.)

7           MR. BRIDGES:  Thank you, Your Honor.

8           THE COURT:  All right.  Mr. Pomerantz, go ahead.

9           MR. POMERANTZ:  I'm ready to proceed, Your Honor.

10  Can you hear me?  I'm working at a different computer today

11  because my laptop wasn't working.  I just want to make sure

12  you can hear me well.

13          THE COURT:  Well, it could be better.  You're more

14  faint than usual.  So I don't know if you can adjust the

15  volume.

16          MR. POMERANTZ:  Is this any better?

17          THE COURT:  A little.  Not a lot.

18          MR. POMERANTZ:  How about this?  Is that any better?

19          THE COURT:  We'll see if we can make do.  Mike, are

20  you hearing him okay?  Okay, the court reporter is hearing you

21  okay, so we'll try to make this work.

22          MR. POMERANTZ:  Okay.  If at any time Your Honor is

23  having trouble hearing me, I will call my IT person in.

24  Again, for some reason, my laptop wasn't connecting in my

25  office, and I'm on my desktop, which I do not usually appear

8

1  before Your Honor with.  So if you have any problems hearing

2  me, please let me know.

3          THE COURT:  Okay.

4          MR. POMERANTZ:  With that, Your Honor, I'll proceed

5  with the motion for order authorizing payment of restructuring

6  fee to James Seery, the Debtor's chief executive officer and

7  chief restructuring officer.

8      Pursuant to the motion, Your Honor, the Debtor requests

9  approval of a restructuring fee to Mr. Seery, which was

10  contemplated by the letter agreement dated June 23rd, 2020,

11  between the Debtor and Mr. Seery.

12      As the Court will recall, Your Honor entered an order on

13  July 16th approving the Debtor's retention of Mr. Seery as the

14  CEO and the CRO.  At the time that we filed the motion, at the

15  time of the hearing, the Committee had not agreed on the

16  payment of a restructuring fee for Mr. Seery, so the board and

17  the Debtor agreed to defer that until a later time.

18      This motion presently before Your Honor was filed on June

19  1, 2021, and now it seeks payment of the fee.  And the motion

20  describes in detail the factual and legal support for the

21  restructuring fee, the establishment of the Compensation

22  Committee headed by Mr. Dubel, and the diligence undertaken by

23  the Compensation Committee to determine if the restructuring

24  fee was appropriate.

25      With the motion, the Debtor seeks authority to pay Mr.

9

1   Seery a fee in the amount of $2.25 million, which was

2   identified as the case resolution fee in the agreement.  As

3   you'll hear from the proffer of Mr. Dubel's testimony, the

4   Compensation Committee determined that confirmation of a plan

5   and resolution of all material nondebtor claims, including the

6   claims of Redeemer, Acis, HarbourVest, UBS, (garbled)

7   occurred, and that the combination of the confirmed plan and

8   the resolution of those claims entitle Mr. Seery to the fee.

9        You'll hear that the Compensation Committee conducted

10  additional diligence to determine that the $2.25 million fee

11  was justified based on the market for restructuring fees and

12  the nature and the complexity of work performed by Mr. Seery.

13       Pursuant to the motion, Mr. Seery has earned one million

14  of the fee by virtue of the confirmation of the plan, would

15  earn additional $500,000 of the fee upon the effective date,

16  and an additional $750,000 upon completion of distribution of

17  the plan.

18       Mr. Seery has agreed to defer the first two payments of

19  this fee based upon the Debtor's liquidity position, as I will

20  summarize in a couple of moments and explain to the Court what

21  the deal is and how each of the payments will be made and the

22  time they'll be made.

23       We've received no objections to the motion, and I would

24  now like to proffer the testimony of John Dubel, who is

25  chairman of the Compensation Committee, to provide evidentiary

Dubel - Proffer                    10

1    support for the motion.  And as I indicated, Your Honor, Mr.

2    Dubel is on the WebEx if Your Honor has any questions.

3             THE COURT:  All right.  You may --

4             MR. POMERANTZ:  May I proceed?

5             THE COURT:  You may proceed with the proffer.

6             MR. POMERANTZ:  Thank you.

7              JOHN DUBEL, PROFFER OF DIRECT TESTIMONY

8             MR. POMERANTZ:  Mr. Dubel, if called to testify in

9    connection with the motion, would testify that on June -- on

10   January 9, 2020, the Court approved his employment as one of

11   the independent directors of Strand Advisors, the Debtor's

12   general partner.

13       He would testify that the other members of the board were

14   former bankruptcy judge Russell Nelms and James Seery.

15       He would testify that the employment of the board was part

16   of a broader corporate governance agreement between the

17   Debtor, the Committee, and Mr. Dondero, pursuant to which --

18   things Mr. Dondero ceded control of the Debtor in order to

19   avoid the appointment of a Chapter 11 trustee.

20       He would testify that the corporate governance agreement

21   anticipated the potential need for a full-time chief executive

22   officer, and in the spring of 2020 the independent board

23   created a Compensation Committee consisting of John Dubel and

24   Mr. Nelms.

25       He would testify that this Compensation Committee

Dubel - Proffer                    11

1   considered Mr. Seery for the CEO position and subsequently

2   negotiated the terms of the engagement that were ultimately

3   approved by the Court's July 16, 2020 order, nunc pro tunc to

4   March 15, 2020.  And that order, Your Honor, is found at

5   Docket No. 854.

6       He would testify that Mr. Seery's employment agreement,

7   which was negotiated with the Compensation Committee, provided

8   for two possibilities for the potential payment of a

9   restructuring fee.

10      The first, which was called a case resolution fee, would

11  be paid on -- under two conditions.  One, the confirmation of

12  a plan, and second, the resolution of material claims.  It

13  would be payable $1 million at confirmation, $500,000 on the

14  effective date, and $750,000 upon completion of the

15  distributions.

16      The second fee, which was just a confirmation fee, just a

17  plan was confirmed but there wasn't any global plan and there

18  weren't material claims resolved, would be $500,000 upon

19  confirmation, $250,000 on the effective date, and then there

20  would be a potential discretionary bonus.

21      At the time, Mr. Dubel would testify, there were

22  negotiations with the Creditors' Committee with respect to the

23  payment of the restructuring fee, and that at that time the

24  Committee was not willing to support the payment of a

25  restructuring fee, so the Debtor, Mr. Seery, and the

Dubel - Proffer                    12

1    Compensation Committee agreed to defer consideration of the

2    restructuring fee to a later time.

3        Mr. Dubel would testify that starting even before his

4    March 15, 2020 appointment as the CEO, and continuing

5    thereafter, Mr. Seery spent substantial time to address and

6    resolve all the material claims against the estate.  The Court

7    is familiar with the facts and circumstances of each

8    settlement, including the mediation and the motion practice

9    that preceded the settlement, and Mr. Dubel would testify as

10   to each of those claims resolutions as follows:

11       The Redeemer Committee was resolved.  That settlement was

12   on appeal, but the appeal was subsequently withdrawn.  The

13   order approving the Redeemer Committee settlement is found at

14   Docket No. 1272.

15       Next was the Acis and Terry claims.  The Court conducted

16   an evidentiary hearing and ultimately approved the settlement.

17   That settlement is also on appeal.  The settlement order is

18   found at Docket No. 1347.

19       Then the court approved the HarbourVest settlement, after

20   an evidentiary hearing.  That settlement is on appeal, and

21   that's found -- the order is found at Docket No. 1788.

22       The UBS settlement was next.  That is found at Docket No.

23   2389.  That was also subject to an evidentiary hearing, and is

24   on appeal.

25       And lastly, the Debtor has reached an agreement with Mr.

Dubel - Proffer                13

1   Daugherty.  It's taking a little more time to document that

2   settlement, but we expect to submit a 9019 motion in the near

3   future approving that settlement.

4        Mr. Dubel would testify that Mr. Seery led the

5   negotiations in each of those matters and he testified at

6   length before the Court in support of the Debtor's motion to

7   approve each of the settlements.

8        Mr. Dubel would testify that, at the same time, under Mr.

9   Seery's leadership, the Debtor proposed a plan of

10  reorganization, and that the Debtor's fifth amended plan was

11  filed on November 24th, 2020, subsequently amended twice, and

12  then on February 2nd and 3rd Your Honor conducted confirmation

13  hearings and ultimately approved the plan and entered an order

14  confirming the plan.

15       Mr. Dubel would then testify that the Compensation

16  Committee started the process of reviewing the restructuring

17  fee for Mr. Seery in late February, shortly after confirmation

18  of the plan.  And he would testify that the Compensation

19  Committee had over a half a dozen informal telephonic meetings

20  in March, April, and May, with and without Mr. Seery, as

21  reflected in the minutes that were filed as Exhibits 1 through

22  3.  Three of the meetings that I referred to, Mr. Dubel would

23  testify were formal meetings subject to minutes and limited to

24  the record, but will be in the record.

25       Mr. Dubel would testify that as part of the Compensation

Dubel - Proffer                    14

1   Committee's deliberation, Mr. Nelms and he had reviewed the

2   terms of the engagement approved by the Court on July 20th and

3   also discussed with Mr. Seery his perspectives on the possible

4   payment of a restructuring fee and sought additional

5   information from them.

6       Mr. Dubel -- Nelms would testify -- Dubel would testify

7   that he and Mr. Nelms concluded that Mr. Seery had met the

8   benchmarks for the case resolution fee in that there was a

9   confirmed plan and that all material nonaffiliated claims had

10  been resolved.

11      Mr. Dubel would further testify that while the

12  Compensation Committee concluded that these benchmarks were

13  met, they still conducted additional diligence to determine

14  that the $2.25 million restructuring fee was reasonable under

15  the circumstances. And as part of that process, Mr. Dubel

16  would testify that they reviewed the market study for

17  compensation prepared by Mercer, the estate's compensation

18  consultant in the spring of 2020 in connection with the

19  original employment motion.

20      Mr. Dubel would testify that, to make sure that the

21  Compensation Committee took into account any changes that may

22  have occurred in market since March 2020, that the

23  Compensation Committee asked Mercer to update its analysis and

24  bring it forward, based upon events in the case and recent

25  comps and, actually, the length of the case, which has been

Dubel - Proffer                          15

1   longer than originally anticipated.

2       Mr. Dubel would testify that he and Mr. Nelms reviewed the

3   updated Mercer report and noted that, based upon the time

4   frame and the complexity of the case, that the restructuring

5   fee was well within the market for these types of services.

6       And finally, Mr. Dubel would testify that they analyzed

7   the restructuring fee in relation to what other professionals

8   would have charged if work was performed on an hourly basis,

9   both in this case and in the market globally.  He would

10  testify that the Compensation Committee's analysis showed that

11  the restructuring fee was fair and reasonable when compared to

12  what Mr. Seery would have received if paid on an hourly basis.

13  And he would testify that, while supportive of the

14  restructuring fee, the hourly rate does not take into

15  consideration the fact that the restructuring fee was designed

16  to incentivize CEO performance, and in his experience, when

17  there is a downside risk for non-performance, there is also an

18  upside risk for performance.

19      And as stated earlier, he would testify Mr. Seery's

20  performance was exemplary and deserving of the restructuring

21  fee.

22      While satisfied that Mr. Seery had earned the case

23  resolution fee and the fee was appropriate in the context of

24  the market and otherwise fair and reasonable, the Compensation

25  Committee asked Mr. Seery whether the payment of the case

Dubel - Proffer                    16

1   resolution fee consistent with the terms of the agreement on

2   the dates provided in the agreement fit within the Debtor's

3   liquidity.

4       He would testify that, in response, given his liquidity

5   concerns, Mr. Seery proposed to the Compensation Committee and

6   the Compensation Committee agreed to adjust the payment of the

7   restructuring fee to defer payment, given the Debtor's

8   liquidity condition, such that it would be paid as follows:

9   The $1 million payment which was earned on confirmation

10  February 22nd of 2021 and otherwise would have been payable

11  will be deferred and will not be payable until September 30th,

12  2021.  Second, the $500,000 fee that would be payable if and

13  when the Court -- the plan goes effective will not be payable

14  until the later of the effective date or September 30th, 2021.

15  And the remaining $750,000 will be paid on the earlier of the

16  distribution of not less than 75 percent of the estimated cash

17  available for Class 8 claims, as set forth in the amended

18  liquidation analysis and financial projections that were filed

19  at Document -- Docket No. 1875-1 or the substantial completion

20  of the monetization of assets.

21      He would testify that after reaching agreement with Mr.

22  Seery on the terms of payment of the case resolution fee, that

23  the Compensation Committee and the Debtor and counsel

24  discussed the proposal with the Creditors' Committee and were

25  informed that the Creditors' Committee would not oppose the

                          Dubel - Proffer                    17

1  Debtor's motion.

2      And after reviewing and analyzing the services performed,

3  the market data provided by Mercer's updated report, the

4  Compensation Committee determined that the restructuring fee

5  was appropriate and authorized the filing of this motion.

6      Your Honor, that concludes my proffer.  As I mentioned,

7  Mr. Dubel is on the WebEx and is happy to answer any questions

8  Your Honor may have.

9          THE COURT:  Mr. Dubel, can you hear me and will you

10  turn on your video and audio?

11          MR. DUBEL:  Yes, Your Honor.  I can hear you.  My

12  video is -- has been on, but I think I have to speak to get it

13  to come to the forefront of your screen.

14          THE COURT:  All right.  I've got you now.  Please

15  raise your right hand.

16      (Whereupon, the witness is sworn.)

17          THE COURT:  All right.  Thank you.  Well, is there

18  anything you want to add to what Mr. Pomerantz just proffered?

19          MR. DUBEL:  No, Your Honor.

20          THE COURT:  Okay.  All right.  Well, we had no

21  objections to this motion.  I'll just ask specifically, Mr.

22  Clemente, to weigh in.  Is there anything you want to say?

23  You confirm obviously the representations that were made with

24  regard to the Committee's role in this?

25          MR. CLEMENTE:  For the record, Your Honor, yes, Matt

18

1   Clemente from Sidley on behalf of the Committee. I confirm

2   that, Your Honor, and the Committee has no objection to the

3   relief requested by the Debtor.

4           THE COURT: All right. Anything else on this motion?

5           MR. POMERANTZ: No, Your Honor. I would seek entry

6   into evidence of Exhibits 1 through 3, which are found in

7   Documents 2472, 2472, and believe that we have established,

8   through the argument, the motion, and the evidence in support

9   of the motion, that the Debtor, acting within its business

10  judgment, through Section 363 of the Bankruptcy Code, has made

11  a compelling case for the payment of the fee to Mr. Seery, and

12  we would ask Your Honor approve the motion.

13          THE COURT: All right. I will admit into evidence

14  Exhibits 1 through 3 that are found at Docket Entry 2472.

15      (Whereupon, Debtor's Exhibits 1 through 3 are entered into

16  evidence.)

17      Based on this unrefuted evidence, the Court is going to

18  approve payment of the case resolution fee in the amount of

19  $2,250,000 as having been earned by Mr. Seery here.

20      Not only does it appear to be contemplated by the defined

21  term "Case Resolution Fee" as set forth in his retention order

22  because we have a confirmed plan, we have resolution of a

23  material amount of the outstanding claims against the estate,

24  but it appears to be in all ways justified based on the

25  marketplace and the facts and circumstances of this case.

19

1        The Court is of the belief that, because we had a

2   Compensation Committee and a consultant, that certainly gave

3   some wisdom to the Debtor and board here.

4        And so under 363(b)(1) as well as Section 503(c)(3), to

5   the extent it applies, this is within the sound business

6   judgment of the Debtor and justified by the facts and

7   circumstances of the case, to use the words of 503(c)(3).  So

8   I do approve it as slightly modified, as I understand.  I

9   guess you'd call it a modification, where there's a staggering

10  of the timing.  One million is deferred until September 30,

11  2021; $500,000 is deferred to the later of the effective date

12  or 9/30/2021; and then $750,000 paid at such time as 75

13  percent of the distributions have been made to the general

14  unsecured claims or substantial completion of monetization of

15  the assets.

16       All right.  So I will be looking for an order on that.

17  Shall we move to the next motion, Mr. Pomerantz?

18            MR. POMERANTZ:  Yes.  Yes, we can, Your Honor.  Thank

19  you, Your Honor.

20            THE COURT:  Okay.

21            MR. POMERANTZ:  So the next motion, Your Honor, is

22  the Debtor's motion to approve exit financing.  And by this

23  motion, Your Honor, the Debtor seeks entry -- Court authority

24  for the Debtor to enter into a secured exit financing facility

25  contemporaneously with the occurrence of the effective date

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 143
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 745 of 1726   PageID 12066

20

1  with Blue Torch Capital.

2       As detailed in the motion, Your Honor, the Debtor's

3  decision to enter the term sheet was the result of a

4  competitive, robust process involving several lenders who had

5  expressed an interest in providing the financing.  The terms

6  set forth in the term sheet represent the best terms available

7  to the Debtor to obtain the financing which not only provides

8  the Debtor and the Claimant Trust with needed liquidity, but

9  also results in the comprehensive restructuring of debt at the

10  Trussway entities, which, in addition to litigation claims, is

11  perhaps the most valuable asset of the estate.

12       Importantly, Your Honor, the Debtor is not asking this

13  Court to approve the terms of the financing between nondebtor

14  Trussway entities and Blue Torch.  Those entities are solvent

15  entities, they're nondebtors, and they do not require this

16  Court's approval to enter into the financing.

17       Even though the Trussway entities do not need court

18  approval, thereby rendering the majority of Dugaboy's

19  objections irrelevant, we believe it's important for the Court

20  to understand the relationship between the entities and

21  certain issues that are raised in the objection to the motion.

22       To facilitate that understanding, Your Honor, I would like

23  to put up a demonstrative, which is a construction chart.

24            THE COURT:  All right.

25            MR. POMERANTZ:  I've asked my -- Ms. Canty to do

21

1  that.

2      The exit financing contemplates two separate financing

3  facilities.  The first is a $32 million Term A loan, Term Loan

4  A, and the principle borrowers, which will be Trussway

5  Industries, LLC and Trussway, LLC.  And those are the two

6  orange rectangles with the red border at the bottom of the

7  middle of the chart.

8      Trussway Industries and LLC and will use the proceeds of

9  the financing to satisfy a $31.7 million loan owed by Trussway

10 Industries to certain (garbled) 1.0 CLOs which come due in

11 November 2021.

12     Entities related to Mr. Dondero will actually be paid off

13 by this refinancing at par plus accrued interest.

14     The refinancing of the Trussway Industries loan will also

15 enable Trussway, LLC, the operating entity, to refinance the

16 asset-based lending and term loan liquidity that it has on

17 advantageous terms, which, of course, this whole restructuring

18 facilitates the recovery by Mr. Dondero and his related

19 entities of the $31.7 million loan.

20     There is also a $20 million loan, Term Loan B, which will

21 be used by the Debtor and the Claimant Trust for working

22 capital and to fund obligations under the confirmed plan.  The

23 Term Loan B borrower is HCMLP, the Debtor, as reflected in the

24 green box, which is the second box from the top in the middle

25 of the chart.

1      The Claimant Trust and the Debtor will guarantee both the

2    Term Loan A and Term Loan B loans.

3      Trussway Holdings, LLC, T-Way Investments, LLC, Trussway

4    Industries, LLC, and Trussway, LLC, the four orange boxes in

5    the middle, will guarantee both the Term A and Term B loans.

6    And that is reflected in the red arrows to the right of the

7    middle of the chart.

8      And it is important to note that the trust, Trussway

9    Holdings, currently guarantees the existing 1.0 CLO loan of

10   $31.7 million.

11     As indicated, Your Honor, the Debtor received one

12   objection to the motion filed by Mr. Dondero's trust, the

13   Dugaboy Trust.  And in its objection, the Trust really only

14   raises one objection to the Debtor obtaining the financing.

15   The Trust argues that the Debtor doesn't need the financing.

16     As we have argued in the past, Your Honor, the Trust's

17   standing to object to the Debtor's actions are tenuous at

18   best, as the Trust does not have a valid claim against the

19   Debtor, and in the Debtor's estimation never will.

20     However, we are prepared to address the Trust's argument,

21   hear the testimony of Mr. Seery, as Your Honor still needs to

22   make a determination, separate and apart from the objection,

23   that the Debtor needs the financing.

24     Mr. Seery will testify that the Debtor requires the

25   financing because of several material changes in the Debtor's

23

1   cash flow projections from those that were put forth to the

2   Court in connection with confirmation of the plan.

3       First, the original plan projections contemplated the

4   Debtor's receipt of approximately $58 million on account of

5   demand notes payable by Mr. Dondero and his related entities.

6   And that was expected to occur in or around June 2021.  As

7   Your Honor is painfully aware, rather than satisfying the

8   objection -- their obligations in accordance with their terms,

9   Mr. Dondero and his related entities are throwing whatever

10  roadblocks they can to frustrate the Debtor's ability to

11  collect on such notes, such that they will not be paid in the

12  time frame originally projected.  Mr. Dondero's related

13  entities seem intent on dragging those litigations out as much

14  as possible, with a series of procedural maneuvers and

15  frivolous and fraudulent defenses.

16      Second, Your Honor, the Debtor anticipated that it would

17  sell Trussway in June 2021.  Trussway manufactures products

18  used in the building industry, and based upon Trussway's

19  strong performance in what was a volatile environment during

20  the pandemic, the Debtor has decided that deferring sale at

21  this time will maximize value from that asset.  Similar

22  restructuring of other assets, such as the Debtor's interest

23  in the MGM stock, will not be monetized on the timetable

24  originally contemplated, based upon events surrounding the MGM

25  stock, which the Court is aware and which was discussed at the

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 147
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 749 of 1726   PageID 12070

24

1   prior hearing.

2       Third, the burning-down-the-house litigation tactics that

3   have been employed by the Dondero entities have significantly

4   increased professional fees from the plan projections and has

5   caused the Debtor to incur millions of dollars of more fees

6   than anticipated.  While the Debtor had hoped to have some of

7   those costs reimbursed in light of Your Honor's contempt

8   order, Mr. Dondero has chosen to appeal and Your Honor

9   approved the posting of a $600,000 bond.

10      While we still expect to receive that $600,000 and other

11  reimbursement of recoveries due to the litigation and our

12  costs, it will take additional time defending against the

13  litigation defenses, the contemptuous and vexatious litigation

14  that the Debtor -- that Mr. Dondero and his entities have

15  caused the Debtor to undertake.

16      Exhibit 5, Your Honor, which Mr. Seery will testify about,

17  of the Debtor's exhibit list, which can be found at Docket No.

18  2477, is the Debtor's current cash flow projection.  And Mr.

19  Seery will testify that the cash flow projection reflects the

20  Debtor's needs for exit financing to maintain liquidity and

21  comply with its obligations under the plan.

22      The balance of the Trust's arguments against the motion

23  have nothing to do with approval of the motion as being a

24  proper exercise of the Debtor's business judgment, but rather

25  whether Trussway, LLC and its related subsidiaries and

25

 1  affiliates should be obligated under both Term Loan A and Term

 2  Loan B, where $20 million of Term Loan B proceeds are funding

 3  the obligations of the Reorganized Debtor and the Claimant

 4  Trust.

 5      As I mentioned, Your Honor, at the outset, the Debtor is

 6  not seeking court approval by this motion for Trussway and its

 7  related entities to enter into the exit financing, so the

 8  Trust's arguments are essentially irrelevant at today's

 9  hearing.

10      Nevertheless, Your Honor, to cut off what we expect could

11  be further frivolous litigation, Mr. Seery will testify as to

12  the solvency of each of the Trussway, LLC, Trussway

13  Industries, and Trussway Holdings Entities, each of the

14  entities which the Debtor directly or indirectly controls, and

15  definitively demonstrate that any objection to the proposed

16  financing is not only frivolous, but evidences bad faith.

17      After we filed our reply, Your Honor, Mr. Draper and I did

18  discuss the scope of today's hearing.  And I understand from

19  that discussion that a lot of the (inaudible) comments earlier

20  today, that in light of the Debtor's agreement that it is not

21  seeking approval of Trussway's entry into the loans, they

22  would essentially withdraw the objection related to whether

23  the exit facility is in the best interest of the Debtor's

24  estate.

25      Nevertheless, as I indicated, Your Honor, since the issues

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 149
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 751 of 1726   PageID 12072

26

1    were raised as part of the objection, and in order to provide

2    this Court with a complete record and answer many questions

3    this Court had after reading the Dugaboy objection, we are

4    going to present a response to each of those objections, in

5    the hope, again, that it will cut off some wasteful litigation

6    that we anticipate is on the horizon.

7        A threshold question relating to Dugaboy's Trussway

8    objection is why does Trussway's entry into the Dugaboy --

9    into the exit facility matter to Dugaboy?  And the answer to

10   that question, Your Honor, turns on two purported claims that

11   Dugaboy asserts against two of the nondebtor entities.  The

12   first claim is against Trussway Holdings.  That is the top

13   orange rectangle in the middle of the chart.  And the claim is

14   in the amount of approximately $2.8 million, when you include

15   accrued interest.

16       Trussway Holdings is not in default under that obligation,

17   and it does not mature until November 2021.

18       In our reply, we indicated that if Trussway Holdings is

19   required to pay the loan as a condition of closing the

20   financing of Blue Torch, that it will do so.  Trussway will

21   have the liquidity to do so either from the proceeds of the

22   financing or otherwise.  Neither the Debtor nor Trussway

23   Holdings will close the proposed financing into a potential

24   default.

25       That should resolve any concern that the Dugaboy Trust has

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 150
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 752 of 1726 PageID 12073

27

1    either in this Court or any other court with respect to

2    Trussway Holdings becoming obligated under the exit facility.

3    That claim will either be paid, or if there are defenses to

4    that claim, they will be litigated as appropriate.  There is

5    simply no risk to the payment of the Dugaboy-Trussway Holdings

6    note by entering into the exit facility.

7        The Dugaboy Trust also asserts in its opposition that it

8    has a claim of over $17 million against the Select Equity

9    Fund.  This claim arises from the loan of certain equity

10   securities that were used to shore up the Jefferies account.

11   You'll recall the Debtor had an active Jefferies account where

12   it traded stock at the beginning of the case in order to allow

13   additional borrowings or prevent a margin call.

14       As a preliminary matter, Your Honor, the Trust -- the

15   Trust is apparently now recognizing that its claim is not $17

16   million, but is actually much less.  Dugaboy filed as Exhibit

17   10 in its exhibits found at Docket No. 2475 a summary that

18   reflects that it believes now that it was -- or it believes

19   that as of September 30th the amount of the claim is actually

20   $12 million.

21       However, the amount of the claim, which fluctuates based

22   upon the value of the securities that were loaned to Select,

23   is more like $8.3 million, at most.  And there are additional

24   expenses.

25       But to be precise, which Dugaboy is not, that claim is not

1    against Highland Select Equity Fund, LLC, -- LP, which is the

2    light blue box in the middle of the entity and the owner of

3    the Trussway entity.  The claim actually is against Highland

4    Select Equity Master Fund of Bermuda, Limited Partnership,

5    which is the blue box on the left side of the page.  That

6    entity, which I'll refer to as the Select Master Fund, as I

7    said, is in the blue box.  It has very few assets, as its

8    trading account was seized by Jefferies while Mr. Dondero was

9    still managing it, subject to Mr. Seery's oversight, in the

10   first quarter of 2020.

11        And how do we know that this is the entity against whom

12   Dugaboy asserts its claim and that the claim is not asserted

13   against the Highland Select Equity Fund?  That is because

14   Dugaboy filed its proof of claim, which is Exhibit 8 in the

15   Debtor's exhibits, and reflects that the claim is against the

16   Select Master Fund.  And Dugaboy has included in Exhibit 9 to

17   its exhibit the underlying agreements relating to those

18   claims.  Those agreements reflect a loan of securities from

19   Dugaboy to the Select Master Fund.  Of course, Mr. Dondero

20   executed the lending agreement as the trustee of Dugaboy and

21   of course on behalf of the Select Master Fund.

22        And why does it matter?  It matters, Your Honor, because

23   the Select Master Fund does not have any interest in any of

24   the Trussway entities that are signing on to the exit

25   financing.  The Select Master Fund is neither a borrower nor a

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 152
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 754 of 1726   PageID 12075

29

1   guarantor under the proposed exit facility.  It will not be

2   impacted by the exit facility at all, and none of the assets

3   related to the financing are assets of the Select Master Fund

4   that could be used to pay whatever claim Dugaboy has.

5       This Highland Select Equity Fund, LP, as I said, the light

6   blue rectangle in the middle of the chart that has an interest

7   in Trussway Holdings, it is not obligated in any way to pay

8   the claims of the Select Master Fund.

9       Accordingly, Your Honor, the premise of Dugaboy's

10  argument, that its interest in Trussway is prejudiced by

11  Trussway obligating itself to pay $20 million on Term Loan B,

12  which is being used at the Debtor/Claimant Trust level, is

13  just not correct, and they know it.

14      Nevertheless, Mr. Seery will testify regarding the

15  circumstances leading up to the Debtor and Trussway's

16  determination to enter into the comprehensive restructuring

17  facility.  Mr. Seery will testify that the Debtor's equity in

18  Trussway, aside from litigation claims, is probably the

19  Debtor's most valuable asset.  He will testify that the

20  Trussway equities are significantly solvent.  Trussway

21  Industries, Trussway Holdings, and the other entities' --

22  value to not only pay the exit financing, but also provide

23  meaningful recovery to the Debtor.

24      He will testify that the ABL and the term loan at Trussway

25  Industries -- Trussway, LLC have covenant issues, do not

30

1    provide Trussway with its liquidity needs, and that Trussway

2    needed to obtain a replacement ABL and term loan to finance

3    its operations.

4        He will testify that the proposed replacement ABL lender

5    at Trussway, Wells Fargo, required Trussway Industries, the

6    indirect parent of the Trussway entities, to refinance its

7    $31.7 million debt maturing in 2021 as a condition of

8    providing the asset-based lending facility.

9        He will testify that, in the first quarter of 2021,

10   Trussway ran its own financing process and explored different

11   structures to enable it to address its financing needs,

12   including separate refinancings of the ABL, the term loan, and

13   the Industries loan, and a new (inaudible) facility and a

14   first and second lien structure.

15       He will also testify that certain lenders wanted to defer

16   financing with Trussway until the market stabilized, and that

17   the failure of financing negatively impacted Trussway's

18   ability to capture profitable business.

19       Therefore, Mr. Seery will testify that he determined that

20   having the Debtor provide credit support to Trussway and

21   pursue the Blue Torch financing, which followed a robust

22   process at the Debtor's level, was in the best interest of the

23   Debtor's estate and accomplished two goals:  one, liquidity

24   for the Debtor, and two, dealing with the Trussway financing

25   needs.

31

1    He will testify that the marketing process that led to the

2    exit financing included reaching out to six parties with

3    experience in providing complex restructuring financing.

4    Included substantial diligence of five of them, three term

5    sheets, and two verbal indications of interest.  And he will

6    testify that the Debtor had each of these lenders compete

7    against each other in order to get the best offers from what

8    ended up being Blue Torch, the potential lender.  And as a

9    result of that process, Your Honor, Mr. Seery will testify

10   that he chose Blue Torch.

11       Clearly, Your Honor, the evidence will overwhelmingly

12   demonstrate that obtaining the Blue Torch financing, which

13   addresses the Debtor's liquidity needs and solidifies the

14   financing of Trussway, is a valid exercise of the Debtor's

15   business judgment under Section 363 and the Court should

16   approve the motion.

17       Before we proceed with Mr. Seery's testimony, Your Honor,

18   I wanted to let the Court know that we've reached agreement

19   with Mr. Draper on the exhibits.  The Debtor's exhibits were

20   filed at Docket No. 2477, 1 through 8.  And we understand Mr.

21   Draper does not object to the entry into evidence of any of

22   the exhibits.  Dugaboy's Exhibits 1 through 10 were filed at

23   Document Number 2 -- Docket No. 2475, and we don't object to

24   any of the Dugaboy exhibits, provided, however, that the

25   exhibit which purports to be a summary of Dugaboy's claims,

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 155
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 757 of 1726 PageID 12078

32

1 which I think is Exhibit 10, is only being admitted to

2 demonstrate Dugaboy's belief as to what the claim is and it's

3 not being admitted for evidence as to the actual amount of the

4 claim.

5     So, with that, Your Honor, and I'm sure Your Honor wants

6 to hear if Mr. Draper agrees with my agreement on the

7 exhibits, we would be prepared to turn to the testimony of Mr.

8 Seery.

9         THE COURT: All right. Mr. Pomerantz, --

10         MR. DRAPER: Your Honor?

11         THE COURT: -- it was a little hard to hear you here

12 and there, so I ask you again to maybe try to turn up your

13 volume or make some adjustments.

14     All right. So, first, Mr. Draper, you confirm that you

15 are stipulating to the admissibility of Exhibits 1 through 8

16 of the Debtor that are found at Docket Entry 2477?

17         MR. DRAPER: Your Honor, let me make a few comments.

18 In light of the removal of the Trussway asking the Court for

19 authority with respect to Trussway, I think some of the

20 exhibits don't need to be introduced, and I would object on

21 relevancy grounds. And that's why I'd like to make a

22 statement --

23         THE COURT: Okay, so you did not stipulate to these

24 after all?

25         MR. POMERANTZ: He did stipulate yesterday. We had a

33

1   conversation and he agreed.  Now he's going back on that

2   agreement.

3          THE COURT:  Okay.  Mr. Draper, --

4          MR. DRAPER:  I'm not going back on it, Your Honor.

5   Your Honor, I am not going back on it.

6          THE COURT:  Okay.  Your audio is poor as well.  I

7   mean, it sounds like you're saying, well, now that we've

8   understood that the Debtor's not seeking approval of the terms

9   or borrowing as to Trussway, you don't think he should be able

10  to make his record with regard to some of these exhibits?

11         MR. DRAPER:  No.  No, Your Honor, what I'm saying to

12  you is some of the documents are now irrelevant in connection

13  with what the Debtor is really seeking.  If they want to put

14  it on to make their record, that's fine.  I will not object to

15  authenticity.  But I will make a comment to the Court that a

16  great deal of what Mr. Seery is going to testify to should be

17  -- is not relevant in light of where we are right now.

18     Number two is hearsay.  There's no -- there's no --

19  there's no representative or witness who is either an officer

20  or director of Trussway.  And I will be making objections to

21  that with respect to those items.

22     What -- can I -- let me go through what I -- where I think

23  we are.

24         THE COURT:  Well, I don't understand --

25         MR. DRAPER:  If -- if --

1          THE COURT:  Let me stop you.  I don't understand what

2    you just said.  You said you didn't have a problem or an

3    objection to their authenticity, and then you said we don't

4    have a representative of Trussway to testify about them.  So I

5    don't -- those seem inconsistent.

6          MR. DRAPER:  No.  I didn't say -- no.  The documents

7    can come in.  I'll agree to that, Your Honor.

8          THE COURT:  Okay.

9          MR. DRAPER:  What I'm stating to you --

10          THE COURT:  So Exhibits 1 through 8 at Docket 2477

11    are admitted by stipulation, and likewise the Debtor --

12          MR. DRAPER:  Yes.

13          THE COURT:  -- agrees that your Exhibits 1 through 10

14    at Docket 2475 are admitted?  Okay.  So those are admitted.

15          MR. DRAPER:  Yes.

16       (Whereupon, Debtor's Exhibits 1 through 8 and Dugaboy

17    Trust's Exhibits 1 through 10 are admitted into the record.)

18          THE COURT:  Now, what else did you want to say?

19          MR. DRAPER:  What I'd like to say is, again, I have

20    agreed and the Debtor has agreed that the issue as to the

21    Trussway entrance into the exit loan is not before the Court

22    today, that they're not seeking authority from this Court to

23    bless Trussway's entrance into that exit loan.  Trussway will

24    do what it's going to do separate and apart from a court

25    order.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 158
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 760 of 1726   PageID 12081

35

1      What that -- in addition, with that off the table now,

2   some of Mr. Seery's testimony with respect to both the

3   Trussway need for the exit loan as well as Mr. Seery's

4   testimony with respect to the conditions at Trussway are

5   either hearsay -- the process by which Trussway went to obtain

6   exit loans in the past are also hearsay.  I can deal with that

7   as the testimony comes up.

8      I have -- the only issue I have with respect to the exit

9   loan is both the need and are there -- is there a better way

10  to do it?  And that's it.  It's simple.  It's limited in scope

11  and appearance.  And this has now become a much more complex

12  hearing, inasmuch as this Court may be asked to address the

13  claims that Dugaboy has.  That's not before the Court today,

14  and nor is the issue with respect to Trussway and its entrance

15  into the exit loans.  That's -- that's the sole point that I'm

16  making.

17          THE COURT:  Okay.  Well, we'll address objections to

18  testimony as they may be made, but given that the Debtor is

19  asking for approval of borrowing $50 million, up to $50

20  million -- I think that was the amount, correct -- that it

21  would be obligated on even, if $30-something million is going

22  to Trussway, I think I need to hear, you know, in total the

23  facts and circumstances somewhat as to why --

24          MR. DRAPER:  I agree.

25          THE COURT:  -- Trussway is getting borrowing that the

1  Debtor will be on the hook for.

2          MR. DRAPER:  I have -- I understand that.  What I'm

3  really saying, though, is the adverse effect on the -- on

4  Dugaboy is not before the Court, because, quite frankly, if

5  the Debtor wants to borrow $50 million and the Debtor needs

6  it, that's -- that's for the Debtor's business decision.

7  That's not a Trussway business decision.  And that's the line

8  I'd ask the Court to understand where my position is coming

9  from.

10          THE COURT:  All right.

11          MR. POMERANTZ:  Your Honor, may I respond?

12          THE COURT:  You may.  Go ahead.

13          MR. POMERANTZ:  Your Honor, I think Your Honor hit

14  the nail on the head.  The Debtor is borrowing $52 million,

15  $32 million of which are being used at the Trussway level.

16  Independent of Trussway's -- of Dugaboy's objection, which

17  they did make -- they didn't have to oppose the motion, but

18  they did -- but independent of that, Your Honor has to make

19  findings and has to conclude that it's appropriate for the

20  Debtor to enter into that agreement and become obligated on

21  the $32 million.

22      That necessarily requires this Court having an

23  understanding.  And Mr. Seery is qualified to testify at -- at

24  Trussway.  Mr. Morris will handle any objections to his

25  testimony on any grounds of relevance or hearsay.  He will

37

1   testify on the circumstances that Your Honor needs to create

2   the record to demonstrate that what the Debtor is doing is

3   appropriate.

4        We agree.  We're not seeking approval of Trussway or

5   Trussway entities entering into the loan.  We're not doing

6   that today.  So that does not obviate his testimony.  Right?

7        And to allay Mr. Draper's concerns, we're not seeking to

8   litigate the allowability of the $17 million, now $12 million,

9   really $8 million or less claim, or the $2 million claim.  We

10  did it just to provide Your Honor with perspective that, as is

11  the case pretty much all the time when the Dondero entities

12  assert claims, (garbled) and -- and they don't really have

13  these claims that they say that -- excuse me, Your Honor.

14       So for that reason, Your Honor, I would ask the Court to

15  allow us to proceed with Mr. Seery's testimony.  We can deal

16  with any objections, evidentiary objections as they come up,

17  and then we can go to closing arguments.

18            THE COURT:  All right.  Well let's hear the evidence.

19  You call Mr. Seery at this time?

20            MR. MORRIS:  Good morning, Your Honor.  It's John

21  Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.  Can

22  you hear me?

23            THE COURT:  I can.  Loud and clear.

24            MR. MORRIS:  Okay.  Two things before I call Mr.

25  Seery.

1      First, I respectfully request that the Court ask all

2    people on the line to mute their lines, because I think that

3    feedback is what's causing the interference with some of the

4    sound.

5           THE COURT:  All right.  Well, could be, I guess, but

6    it doesn't hurt to say that.  So, we have 50-something people.

7    Please make sure your device is on mute until it's your turn

8    to speak.  All right?

9           MR. MORRIS:  Thank you, Your Honor.  And the second

10   thing, at the risk of reopening the door, which I don't intend

11   to do, I just want to clarify for the record the exhibits that

12   were referred to earlier.

13     The Debtor actually filed an initial exhibit list and then

14   an amended exhibit list.  And while the Exhibits 1 through 8

15   on Docket 2477 are the entirety of the exhibits that are

16   coming into evidence, the fact is that the physical exhibits 2

17   through 4 can be found at Docket 2473, and that -- that was

18   the original exhibit list, which also contained Exhibit No. 1,

19   but we're using the Exhibit No. 1 that's on the amended list

20   at 2477.

21     So, to summarize, the Exhibits 2 through 4 can be found at

22   Docket No. 2473 and Exhibits 1 and 5 through 8 can be found at

23   Docket No. 2477.

24           THE COURT:  Okay.  Thank you for clarifying.  And so

25   those are the places on the docket where 1 through 8 are

Seery - Direct                          39

1   found.

2           MR. MORRIS:  Okay.  Can I proceed?

3           THE COURT:  You can proceed.

4           MR. MORRIS:  Okay.  The Debtor calls James P. Seery,

5   Jr., please.

6           THE COURT:  All right.  Mr. Seery, let's see if we

7   can have you say, "Testing, one, two" so we pick up your video

8   here in the courtroom.

9           MR. SEERY:  Testing, one, two, Your Honor.

10          THE COURT:  All right.

11          MR. SEERY:  Testing, one, two.

12          THE COURT:  There you are.  Got you now.  Please

13  raise your right hand.

14      (Whereupon, the witness was sworn.)

15          THE COURT:  All right.  Thank you.  Mr. Morris?

16          MR. MORRIS:  Okay.

17          JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

18                    DIRECT EXAMINATION

19  BY MR. MORRIS:

20  Q    Okay.  Good morning, Mr. Seery.  Can you hear me?

21  A    I can, yes.  Thank you.

22  Q    Okay.  Mr. Seery, are you familiar with the Debtor's exit

23  financing motion?

24  A    I am, yes.

25  Q    And have you reviewed that before it was filed?

Seery - Direct                                    40

1    A    I have, yes.

2    Q    And did you authorize the Debtor to file that particular

3    motion?

4    A    I did.

5    Q    Can you describe for the Court why the Debtor is seeking

6    the relief that's set forth in the exit financing motion?

7    A    Well, the plan and the trust agreement contemplated the

8    potentiality of exit financing if it was needed.  Frankly,

9    when we were going through confirmation hearing, we expected

10   that our liquidity would be sufficient that we would not need

11   to go get any financing.  If we needed it down the road

12   because we needed to defer monetizations or because our costs

13   were higher, the plan and the trust agreement both had the

14   flexibility to get it.  However, because our costs have

15   increased and because we've delayed or have had delayed for us

16   certain monetizations, our liquidity is tight when we go

17   effective.

18   Q    And did the Debtor undertake any analysis to project their

19   future cash flows?

20   A    We did.  We went through in detail, and we do it

21   regularly, our cash flow statements, our projected liquidity.

22   We considered the deferral that Mr. Pomerantz mentioned in his

23   opening of the $58 million in demand notes that we expected to

24   collect.  We considered the timing of the effective date,

25   which has been considerably delayed, based upon a number of

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 164
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 766 of 1726   PageID 12087

                              Seery - Direct                    41

 1   litigations.  We pushed out our monetization of certain

 2   assets, including MGM and Trussway, because of market

 3   opportunities and conditions that we believe are better in the

 4   future.  And then because of our professional fee costs.

 5   We've had a considerable increase in those.

 6       All of those factors are factored into our liquidity

 7   analysis.

 8            MR. MORRIS:  I would ask Ms. Canty to put up Debtor's

 9   Exhibit No. 5.

10   BY MR. MORRIS:

11   Q   Is this the analysis that you were referring to?

12   A   This is.  This is a high-level view of our liquidity

13   forecast for the next 13 weeks.  And maybe to cut to the

14   chase, what it shows is an effective date around August 1st,

15   and anticipated financing.  That's the $19.8 million at the

16   Debtor level in the middle of the page in grey.  It's $19.8

17   million because there are some fees that will come out of

18   that.  And then it shows the liquidity that the Debtor would

19   have with and without the financing.

20       So at the bottom line, where you have it highlighted, it

21   shows our cash position less the financing.  So if we do not

22   have the financing, we would be negative in those last weeks

23   of the 13-week forecast.

24   Q   And based on this forecast, does the Debtor believe that

25   the financing provided in the proposed exit financing package

Seery - Direct                                42

 1  would be sufficient to get it through this projection

 2  period, --

 3  A    Yes.

 4  Q    -- making all of the assumptions set forth in this

 5  document?

 6  A    Yes.  This -- basically, we look at -- we think we've

 7  captured everything in it.  The cost to go effective, the

 8  payment of claims, the payment of administrative claims, the

 9  reserves we have to make, and the projected expenses that we

10  have litigating, both with respect to collections like the

11  notes, other expenses.  Frankly, litigating things that we can

12  anticipate other sort of crazy objections, as the Court is

13  well aware.  And then our timing of our monetization.  So we

14  do plan on monetizing assets during this period, but we want

15  to make sure we have the flexibility to do that and do it

16  efficiently.

17          MR. MORRIS:  Your Honor, I don't know who GR is.

18  There's still a lot of background --

19          THE COURT:  Okay.  GR?

20      (Court confers with Clerk.)

21          THE COURT:  Okay.  My court reporter says everyone's

22  on mute, so --

23          MR. MORRIS:  Okay.  Somebody's dialed in from area

24  code 303.  Now they're on mute.

25          THE COURT:  Okay.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 166
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 768 of 1726   PageID 12089

Seery - Direct                                    43

1          MR. MORRIS:  Maybe that was it.

2          THE COURT:  Okay.

3          MR. MORRIS:  They've just muted.  Okay.

4    BY MR. MORRIS:

5    Q    All right.  So, Mr. Seery, you started to mention some of

6    the factors that created the liquidity needs.  I just want to

7    make sure we've identified them all.  You mentioned the $58

8    million in notes from Mr. Dondero.  Do I have that right?

9    A    Yes.  Sorry.  I was just grabbing some water.

10   Q    That's okay.  And had that -- what changed with respect to

11   the original projections as it relates to the $58 million in

12   notes?

13   A    Well, as the Court is aware, we anticipated that those

14   notes would be collected.  We didn't anticipate that they

15   would be collected immediately, but we expected a swift

16   resolution because there, in our opinion, are no legitimate

17   defenses to them.  Those collection efforts have been dragged

18   out, both for procedural and now amendments to defenses and

19   claims of the Debtor giving away assets and things to that

20   nature, so that those collections, which we expected to take

21   place in the first half of this year, we now expect to be

22   deferred for some time.  Ultimately, we do expect full

23   collection.

24   Q    I think you mentioned the effective date.  What's

25   different about the effective date today as compared to the

Seery - Direct                            44

1  original projections?

2  A    Well, we originally anticipated that we would go effective

3  on March 1st.  We've had a number of additional delays related

4  to both collections and litigations that have deferred our

5  ability to go effective.

6       In addition, frankly, the timing of getting the financing

7  has also extended it, as well as insurance issues that we're

8  working our way through now.  So we do anticipate an exit on

9  August 1st, and we're pretty set on that date, frankly,

10 because of certain issues related to the financing.  We want

11 to make sure that we can get that done and make sure that we

12 maintain the value of the assets.  So we do expect to exit on

13 August 1st, which puts us out from the original time frame,

14 you know, a solid five months.

15 Q    Okay.  And I believe you mentioned MGM.  How does the MGM

16 issue impact liquidity today as compared to the original

17 projections at confirmation?

18 A    Well, we -- our view coming into this year was that MGM

19 was in play.  That was publically disclosed numerous places,

20 in addition to an illegal and improper disclosure that I

21 received in December.  But, frankly, again, we can wrestle

22 with that issue later.

23      But our view was that, with the MGM transaction that's

24 been publically announced, it doesn't make sense to monetize

25 that asset now.  The transaction with Amazon, which has been

Seery - Direct                                45

1   publically announced, we think is a very good transaction. We

2   do anticipate that it will close. We have a particular

3   perspective on the timing which I'd prefer not to share at

4   this time.

5   Q   Did the Debtor make any changes in its decisions regarding

6   the monetization of its Trussway asset that impacted

7   liquidity?

8   A   All of the monetizations impact liquidity to some degree,

9   because unlike an operating company, and Trussway certainly is

10  an operating company, but the Debtor, the Debtor is operating

11  with very little revenue. So if you look at the operating

12  receipts, our cash receipts are relatively modest compared to

13  our expenditures. Where we will generate liquidity is when we

14  sell assets.

15      We looked at Trussway last year, and I think folks are

16  aware that we engaged in a process of considerable interest,

17  even in COVID. However, as has been bandied about

18  considerably in the popular press, there have been some

19  significant movements in pricing for some of the commodities

20  that make up a significant portion of the cost of goods sold

21  of Trussway, most predominantly lumber, but steel as well.

22  Trussway is operating exceptionally well for a company its

23  size in that environment, and we are -- we're very positive on

24  that asset. But it doesn't make sense to sell it now while

25  it's -- while it's taking advantage of the market. So we've

Seery - Direct                                    46

1   deferred that sale to what we think will be a more opportune

2   time later down the road.

3   Q    Okay.  Let's talk about the efforts to identify a lender.

4   Did there come a time when the lender -- when the Debtor began

5   to seek third-party exit financing?

6   A    Yes.  In the early part of the spring, once we got -- we

7   looked up and noticed that we weren't going to make the March

8   1 date, that we were going to likely be starting to get

9   deferred on some of the note collections and that we were

10  considering pushing out some of our monetizations, we

11  considered that we would need to get financing for the Debtor,

12  and we started to investigate that opportunity.

13  Q    And can you describe for the Court the process that the

14  Debtor ran in order to identify a lender?

15  A    Well, working with each of the companies that we have, the

16  PE companies that we have, working closely with them, we

17  determined what their financing needs might be.  We worked on

18  those financings, and we also worked simultaneously on our own

19  financing.  And what we did was identify experienced -- for

20  our own financing, we identified experienced financiers who

21  would be interested in doing this type of financing.  We

22  discussed with them potential structures.  We discussed with

23  them potential costs.  We analyzed the market in terms of what

24  we thought of our situation, on the positive side, we'd be

25  able to get from various lenders.  And then we went out

Seery - Direct                                    47

1   seeking proposals from lenders.

2   Q    How many lenders -- how many potential lenders did the

3   Debtor contact, if you recall?

4   A    I believe the Debtor contacted about six lenders.  These

5   were all lenders that are experienced in this type of

6   financing.  And again, when I say this type of financing, I

7   mean a company that doesn't -- is not a typical, like the

8   Debtor, a typical operating company that generates EBITDA and

9   lenders look to a typical EBITDA leverage ratio or a coverage

10  ratio.

11       This is a financing where the financier really has to look

12  at the asset coverage and have confidence in our ability to

13  monetize the assets in accordance with our plan.

14  Q    Did the Debtor have these potential lenders execute

15  nondisclosure agreements?

16  A    Yes.  I believe we had five or six, again, lenders execute

17  NDAs.  Five of the total went into a data room that we

18  prepared which contained information relative to each of the

19  assets that the Debtor owns and the Debtor's plan.  Then we

20  sought to negotiate or work through with each of those

21  potential lenders what issues they might have around those

22  assets and how they viewed the value versus how we viewed the

23  value.  And then we began to negotiate terms.

24  Q    As part of the diligence process, did the prospective

25  lenders have access to the Debtor, its employees, and its

Seery - Direct                           48

1    advisors?

2    A    Yes.  We spent considerable time with each of the lenders.

3    I spent considerable time with each of them personally, with

4    our team, walking through, again, the structure of the plan,

5    the trust structure, how the Debtor would be governed, our

6    monetization schedule, what the potential benefits to that or

7    upsides in that schedule were in respect to both timing and

8    value, and what the potential risks might be with respect to

9    both timing and value.

10   Q   At the conclusion of the due diligence process, did any of

11   the prospective lenders tender preliminary term sheets to the

12   Debtor?

13   A    Yes.  My recollection is that we got three written term

14   sheets and one detailed oral proposal that was delivered

15   directly to me.  We then took those proposals and began to

16   compete them against one another, working through with the

17   prospective lenders where their hot buttons were and things

18   that were risky to them, as well as pushing them on cost.  So,

19   a combination of structure and cost.

20   Q   Do you believe, in your capacity as the Debtor's CEO, that

21   the terms that are proposed are the best available terms for

22   the Debtor?

23   A    I do.  It's a complicated financing.  Again,

24   sophisticated, arm's-length negotiations with multiple

25   potential lenders, ultimately with their respective counsel,

Seery - Direct                              49

1    detailed term sheets, negotiations regarding each of the

2    provisions of the term sheets.  I think we got the best of all

3    the financing we could get.

4    Q    Okay.  Let's talk about what the ultimate proposal is.

5          MR. MORRIS:  If we could put up what is actually

6    Dugaboy Exhibit 3 from Docket 2475.

7    BY MR. MORRIS:

8    Q    Can you see it, Mr. Seery?

9    A    Yes, I can.

10         MR. MORRIS:  If we could just scroll down a little

11   bit so he has a chance to see the balance of the document.

12   Okay.

13   BY MR. MORRIS:

14   Q    And is that your signature there, sir, on Page 6 of 29?

15   A    Yes, it is.

16   Q    Okay.  Can you tell the Court what this is?

17   A    This is a letter of intent from Blue Torch Capital.  Blue

18   Torch Capital is a private lender.  They have approximately $3

19   billion of their own capital they invest, and they also

20   leverage some of that capital to give them more lending power.

21   It's a -- it's probably a four-year-old entity, formed by a

22   pioneer in the direct lending business, extremely well-known

23   in the industry, and one of the -- I think one of the most

24   experienced players in the business.

25   Q    And while the document speaks for itself, can you

Seery - Direct                                    50

1   summarize for the Court your understanding of the proposed

2   terms (garbled)?

3   A    Basically, it's a $52 million exit financing broken into

4   two tranches, as has been loosely described.  There'll be a

5   $32 million tranche, which will be at Trussway Industries,

6   LLC, and then there will be a $20 million tranche, which will

7   be at the Debtor.  The Debtor and the Trust.  There'll be, in

8   essence, a combined credit for Blue Torch, but there is a

9   complicated sharing arrangement or intercreditor arrangement

10  between Blue Torch and the ABL lender at Trussway, LLC that

11  includes a standstill provision and certain other protections

12  for the ABL, to assure that if there's any issues at Highland,

13  HCMLP, or the Trust, that those won't cause any disruptions to

14  the operations of the operating company, Trussway, LLC.

15  Q    We'll talk in a few minutes about the Trussway aspect of

16  the exit financing, but can you just tell the Court generally

17  about sources and uses.  What's the use of the Tranche A

18  portion of the loan?

19  A    So the -- I hope I don't get my A's and B's mixed up.  But

20  Tranche A, I believe, is the $32 million.

21  Q    Yes.

22  A    That is going to be used to refinance seven what we call

23  1.0 CLOs that have approximately $31.7 million of an

24  outstanding term loan that sits at Trussway Industries, LLC.

25  That loan is currently 10 percent PIC.  It currently matures

Seery - Direct                    51

1   in November.  It's well, well covered, meaning that the asset

2   Trussway is worth multiples of the amount of the loan, so

3   there's not any issue with respect to its security and value.

4        It does, however, mature -- this loan is rather what's --

5   one might call it long in the tooth.  The Court may remember

6   that the original reason that Mr. Terry ended up leaving Acis

7   had to do with issues related to the Trussway loan.

8        So we -- we intend to refinance this loan in advance of

9   its maturity with this financing.  We expect to have it done

10  by August 1st.

11  Q   And can you describe for the Court what the intended use

12  of is for Tranche B, the $20 million loan?

13  A   That will be to the Debtor and to effectively the Trust.

14  It will be used to pay our exit costs, which include certain

15  creditor claims that have to be paid on exit, as well as our

16  administrative expenses that have to be either paid or

17  allocated on or around exit.  And there's some additional

18  capital that would be identified for general corporate

19  purposes that we would use for our liquidity.

20  Q   Okay.  Is it your understanding that if the Court grants

21  the motion the Debtor will be obligated to close on this exit

22  facility?

23  A   No, it won't be.  So, so this is a -- there's a letter of

24  intent.  Both Blue Torch and the Debtor are not obligated.

25  Again, we have a high degree of confidence in Blue Torch as a

Seery - Direct                                    52

1    lender.  They don't do these things easily.  They don't do

2    them cheaply.  But when they say they're going to close, they

3    will close.

4        But if we don't have to close, we won't.  So if, for

5    example, MGM closed tomorrow, we might reevaluate our needs.

6    If someone wanted to buy Trussway for what we think is the

7    proper amount, we wouldn't have to necessarily get this

8    facility.  If someone came along to buy one of the other

9    assets and we had liquidity, we might not need it.  Right now,

10   if the note litigation was settled and we received the $58

11   million that we're owed, plus the costs of collection,

12   tomorrow, we'd have to reevaluate our needs and may not need

13   it.

14       So we don't have to close the facility.  Right now, all

15   projections are that we will.

16   Q   And if the Debtor proceeds, do you have a timeline as to

17   when you expect to close?

18   A   Yes.  We expect to close by August 1st, and that's tied

19   very much to the ABL refinancing.  So we want to make sure

20   that Trussway has sufficient capital to attack what we think

21   is a really advantageous market opportunity at Trussway, and

22   they are doing that.  So the new ABL, which is from Wells

23   Fargo, it's robust, flexible, and gives Trussway Operating

24   Company sufficient capital to go out into this market and take

25   advantage of it.

Seery - Direct                                      53

1  Q   Okay.  Let's transition to the Trussway part.  Why is

2  Trussway involved in the Debtor's exit financing proposal?

3  A   Well, Trussway -- as I said, Trussway is an operating

4  company, and it's been operating in an environment right now

5  where there's a significant demand that they are meeting, but

6  there's also significant volatility in some of their material

7  costs of their operations, specifically lumber and steel, but

8  mostly lumber.  And as I mentioned earlier, the price of

9  lumber spiked tremendously during the first half of the year.

10 It's well-publicized as a potential inflation indicator.

11 While it's leveling off, that has made the business more

12 difficult to operate.  Trussway has done a great job doing it.

13 It's got price protections in its contracts.  It forward-buys

14 lumber.  But keeping up with the spike in that material has

15 been difficult.  It also created great opportunities, because

16 some of the Trussway competitors have just not been able to

17 deliver on jobs and Trussway has.

18     When we thought about the financing at Trussway with the

19 Trussway management team, and we spent considerable time

20 working with them on this and discussions that I personally

21 had with the Trussway management team, we considered the

22 opportunities for financing directly at Trussway.  Could we

23 initially -- we looked at could we do a financing of the $32

24 million plus a new ABL just at Trussway?  We thought about it

25 in respect of an ABL that was standalone with a second lien,

Seery - Direct                              54

 1    or what's sometimes referred to as a uni-tranche, where we

 2    would have one financing the $32 million plus the ABL.  We

 3    determined, with Trussway management, that it made much more

 4    sense to have Trussway stand alone and do a standalone ABL

 5    facility.  Why?  Trussway went out to 40-plus borrowers,

 6    examined various term sheets from various players, and worked

 7    with us --

 8              MR. DRAPER:  Your Honor?

 9              THE WITNESS:  -- to turn --

10              MR. DRAPER:  Your Honor?

11              MR. MORRIS:  Please don't interrupt the witness.

12              MR. DRAPER:  No, I'd like to make an objection.

13              MR. MORRIS:  You can't now.  After he's finished --

14    after he's finished his answer.  Please don't interrupt the

15    witness.

16              MR. DRAPER:  Your Honor, this is --

17              THE COURT:  I'll hear the objection.  Go ahead.

18              MR. DRAPER:  This is hearsay testimony --

19              THE COURT:  Say again?

20              MR. DRAPER:  Your Honor, this is hearsay testimony.

21    This is Douglas Draper.  This is hearsay testimony as to what

22    Trussway did.  There's not a Trussway representative.  Mr.

23    Seery is neither an officer or director of Trussway.  There's

24    been no foundation for this.

25         Now, he can testify as to what he understood, but this

Seery - Direct                              55

1   cannot be offered for the -- for the -- for the proof of the

2   item.  It may go into his understanding or his decision, but

3   it cannot be offered for what Trussway did in the past in

4   terms of its borrowing.

5          THE COURT:  Okay.  Well, first off, there was no out-

6   of-court statement, so I overrule a hearsay objection.

7       With regard to foundation, I'll sustain that.

8       Mr. Morris, you might explain the hierarchy or give us

9   some foundation to know how Mr. Seery has the knowledge about

10  what Trussway did.  All right?  So that's my ruling.

11         MR. MORRIS:  All right.  Thank you, Your Honor.

12  BY MR. MORRIS:

13  Q   Mr. Seery, what's the basis for your knowledge?

14  A   I worked very closely with the Trussway management team,

15  the CEO and CFO, as well as directly with the bankers at

16  Trussway.  I've personally been on calls with Trussway's ABL

17  lenders.  I've personally sat with the Trussway team by video

18  and gone through their liquidity needs and their business

19  plan, along with the people on my team who deal with it every

20  day.

21  Q   Can you explain to the Court the relationship that the

22  Debtor has to Trussway?

23  A   Sure.  You know, we're here out of sometimes an abundance

24  of caution, and I think at one earlier hearing Your Honor said

25  that, you know, the Debtor's a bit damned if it does and

Seery - Direct                          56

1   damned if it doesn't.  Trussway is an indirect subsidiary of

2   the Debtor, but it's -- effectively, the Debtor controls 90

3   percent of Trussway.  And the 10 percent is owned by current

4   or former Trussway executives or current or former Highland

5   executives, none of the -- none of the folks that have been

6   sort of day-to-day involved in any of the proceedings that you

7   would have heard of.  So these are former -- former employees

8   of Highland.  None of the Dondero, Okada, or any of those

9   folks have any interest in Trussway.

10  Q    And --

11  A    We do control -- we do effectively control Trussway

12  through our 90 percent control.  And the LLC agreement at

13  Trussway at the various levels gives us complete control as

14  the managing member to direct its operations.

15          MR. MORRIS:  Your Honor, I believe that establishes a

16  sufficient foundation for Mr. Seery to testify as to what he

17  did with respect to this matter.

18          THE COURT:  All right.  I agree with that.  So any

19  pending objection is overruled.

20  BY MR. MORRIS:

21  Q    Okay.  I'm not sure where we were, Mr. Seery, but let me

22  try -- is it your understanding that Trussway has a loan

23  that's coming due later this year?

24  A    Trussway has two facilities.  One doesn't come due this

25  year but has some covenant issues, and -- that's the ABL.  And

Seery - Direct                                      57

1   that's Trussway, LLC, the bottom box on the chart that we saw

2   earlier.  The intermediate loan is the Trussway Industries,

3   LLC.  That's the $32 million CLO loan that does come due in

4   November.

5   Q   Okay.  And I think you were -- I think you were describing

6   the efforts that had been made for Trussway to obtain its own

7   independent financing.  Do I have that right?

8   A   That's right.  So, when -- what I was explaining was that

9   we worked with Trussway and determined that the best

10  opportunity for Trussway was to get a very flexible ABL term

11  loan structure from one of the traditional lenders.  And they

12  competed a number of lenders in that proposal, all excellent,

13  first-rate institutions.  Ended with an agreement with Wells

14  Fargo, which is the financing that we expect to pursue and

15  expect to close at Trussway, LLC.

16      But we determined that the best way to do that was just to

17  do that standalone, for a couple reasons.  One is it's much --

18  it's difficult, particularly in a borrowing environment, for

19  management teams to operate in a leverage -- with more

20  leverage.  And so throwing the extra $32 million on the

21  shoulders and the operating day-to-day of Trussway would have

22  been a little bit more difficult and would have also made it

23  more expensive for Trussway from a working capital

24  perspective.

25      We looked at also doing a financing at -- just doing it at

Seery - Direct                                    58

1   Trussway Industries, which is the $32 million.  That, that

2   financing would have been very expensive.  Why?  Again,

3   borrowing environment, and you're only sitting secured by only

4   the Trussway assets.  So while the company's got sufficient

5   liquidity from the ABL, it's a much different financing than

6   if you -- if you have any kind of security at either Trussway

7   or collateral from the parent, from HCMLP.  And we determined

8   that the cost would be much lower, we'd have much more

9   flexibility if we used the Debtor to provide credit support to

10  Trussway Industries.

11  Q    And can you explain a little bit further how the

12  guarantees work within the total exit financing package?

13  A    In essence, the Debtor's assets stand for all of the

14  financing.  Trussway's assets effectively stand for all of the

15  financing as well, but there's a significant sharing

16  arrangement and a significant standstill that Wells Fargo

17  wanted to assure that, as I said earlier, nothing that

18  happened at the Debtor would somehow impact negatively the

19  operations, liquidity, and functionality of Trussway, LLC.

20      So the structure is that we expect to have the two

21  separate loans.  We expect that, from liquidity at Trussway,

22  we'll generally service the $32 million, which would be

23  effectively sending it up to its immediate parent.  We will --

24  we will not have any money go from Trussway's operating

25  company up to the Debtor.  We don't need it and we don't

1  expect to do that.  If we did that, we would have to satisfy

2  certain other equity holders, the 10 percent that is not held

3  by Highland directly or indirectly.  And so we don't expect to

4  need to do that.

5       But it's -- the financing is $52 million, effectively

6  guaranteed all by the Debtor and the Debtor's assets.  And we

7  do have a -- it doesn't have an amortization schedule, but we

8  do have a fairly sophisticated and well-negotiated sharing

9  arrangement in respect of, when we sell an asset, how we'll

10 use the proceeds from that asset sale to provide additional

11 liquidity to the Debtor as well as to pay down the Blue Torch

12 loan.

13 Q   Does the Debtor have a view as to whether adding Trussway

14 to the package creates any meaningful risk for the Debtor?

15 A   Oh, yeah, absolutely, it does not.  Trussway -- as I

16 testified earlier, Trussway, LLC is indisputably solvent.  The

17 company is a very valuable asset.  We believe that indirectly

18 we have over a hundred million dollars of current equity value

19 in that asset, just at our entity.

20      Trussway Industries is likewise solvent, because its only

21 asset is Trussway, LLC and its only claim is the $32 million

22 that's owed to the CLOs that we're refinancing.

23      Likewise, Trussway Holdings is indisputably solid.  It

24 owns the equity, ultimate equities in Trussway, LLC as well as

25 the equity in Targa, which is -- which is worth, we believe,

Seery - Direct                              60

1    at least $30 million, as well as it has cash on its balance

2    sheet of $4 million today.

3    Q    Okay.  Let's move to the objection at this time.  Are you

4    familiar with Dugaboy's objections?

5    A    I am, yes.

6    Q    Do you have an understanding as to the bases for these

7    objections?

8    A    I think generally, although I don't think that they're

9    well-founded.

10        So, my understanding is that Dugaboy, in essence, says,

11   I'm owed $2 million at Trussway Holdings, and although it's

12   not due, although it's not in default, although the entities

13   are solvent, I'd prefer if you didn't borrow any money.

14        Likewise, they seem to have a claim that -- the Master

15   Fund claim is, frankly, frivolous.

16   Q    All right.  Let's just take them one at a time.  Has the

17   Debtor made any assessment as to whether the proposed

18   financing will adversely impact Dugaboy's $2 million note

19   against Trussway Holdings?

20   A    Yes, it has.

21   Q    And what assessment have you made?

22   A    It won't negatively impact at all.  To the extent that we

23   close the financing and to the extent that Dugaboy is owed

24   money, and it does have covenants, we will pay that loan off.

25   We have sufficient liquidity in the facility to pay it off.

Seery - Direct                              61

1   We would pay it off and reserve our rights.  And I can go into

2   some detail as to what that loan actually comes from.  But,

3   strangely, when Trussway was converted from a corp. to an LLC,

4   that --

5            MR. DRAPER:  Your Honor?

6            THE WITNESS:  -- to handle appraisal rights that Mr.

7   --

8            MR. DRAPER:  Your Honor, let me object.

9            THE WITNESS:  -- gentleman had that Mr. Dondero

10  didn't want to satisfy.

11           THE COURT:  Okay.  There's an objection.  Go ahead,

12  Mr. Draper.

13           THE WITNESS:  I'm sorry.

14           MR. DRAPER:  Your Honor, there's a relevancy

15  objection.  Whether there are defenses or not to the loan and

16  what he's testifying to is irrelevant in connection with this

17  hearing.  That goes to the merits of the claim between the

18  parties.  If -- and there's no reason to raise that before

19  this Court today and in connection with this hearing.

20           THE COURT:  Your response, Mr. Morris?

21           MR. MORRIS:  Your Honor, I think Mr. Seery testified

22  as to why the Debtor has concluded that the financing won't

23  impact the Dugaboy note.  The defenses, I can leave for

24  another day, Your Honor.  So it's fine.

25           THE COURT:  All right.  Well, I think you're agreeing

Seery - Direct                              62

 1  to withdraw certain --

 2          MR. MORRIS:  Yes.

 3          THE COURT:  -- of your line of questioning.  Okay.

 4          MR. MORRIS:  I'll -- I'll --

 5          THE COURT:  So, based on that, I think the objection

 6  is resolved.

 7          MR. MORRIS:  Right.  And I'll agree to strike the

 8  portion of the testimony after Mr. Draper's objection.

 9          THE COURT:  All right.  Very well.  You may proceed.

10          MR. MORRIS:  All right.

11  BY MR. MORRIS:

12  Q   Let's just go to the second part of the Dugaboy objection

13  at least with respect to their claims.  Has the Debtor made an

14  assessment as to whether the proposed financing will adversely

15  impact Dugaboy's purported claim against Select?

16  A   It has, yes.

17  Q   Okay.  And can you describe generally for the Court the

18  nature of the assessment?

19  A   Yes.  Let me be really clear.  Number one, neither the

20  Debtor nor Blue Torch, knowing Blue Torch, is going to close

21  into a loan that will default.  I think it's very relevant to

22  the Court as to whether there was some obligation that has to

23  be satisfied at the close.  If it does, like every other loan,

24  we will provide a representation that we're in compliance with

25  all our agreements.  If the loan has to be paid off, it will

Seery - Direct                                    63

1   be paid off, and we have the liquidity built into the loan and

2   into our projections to do it.  We have $4 million currently

3   sitting in Trussway Holdings.  If that loan has to be paid

4   off, it will be paid off.

5       Number two, with respect to the Master Fund, it does not

6   have to be paid off.  The Select Master Fund is the obligor

7   that Dugaboy loaned securities to, and they borrowed those

8   securities in order to meet margin calls in the Jefferies

9   account that was managed by Mr. Dondero.  Mr. Dondero signed

10  for Dugaboy as the trustee -- that's interesting -- as well as

11  --

12              MR. DRAPER:  Your Honor, same objection.

13              THE WITNESS:  So there's no --

14              THE COURT:  Overruled.  Hs can continue.

15              THE WITNESS:  There's no possibility that that loan

16  is against Select, not Select Master.  There's no way Mr. --

17  I'm sure everyone's quite aware of what the requirements are

18  for piercing or alter ego.  Those would be pretty impossible

19  to meet.  Nonetheless, there is no current claim against

20  Select that is going to be in the chain of ownership of the

21  assets, and currently is in the chain of ownership of the

22  assets, and no amount could possibly be due under that note.

23  BY MR. MORRIS:

24  Q   Let's just put a finer point on this.

25              MR. MORRIS:  Can we please put up Dugaboy Exhibit 9

Seery - Direct                              64

1  from Docket 2475?

2  BY MR. MORRIS:

3  Q    Have you seen this before, Mr. Seery?

4  A    Yes, I have.

5  Q    Do you have an understanding as to what this is?

6  A    Yes.  This is a master securities loan agreement.  It's

7  the BMA form.  That's the Bond Market Association.  It's a

8  pretty standard form that you see for loaning securities.

9       This agreement was entered into by the Master Fund and the

10 Dugaboy Investment Trust in order to shore up the Jefferies

11 margin account.  Again, that account came into play early in

12 the case.  The Court may recall that while Mr. Dondero was the

13 portfolio manager of that account, it lost $54 million in

14 equity in the first quarter of 2020, as well as, from an asset

15 perspective, the $30 million of margin that had to be repaid

16 to Jefferies.

17            MR. MORRIS:  Can we go to the signature lines, just

18 to see who signed this agreement?  (Pause.)  Stop right there.

19 BY MR. MORRIS:

20 Q    Is it your understanding that Mr. Dondero signed this

21 agreement, both in his capacity as trustee of the Dugaboy

22 Investment Trust and in his capacity as the president of

23 Strand Advisors, Inc.?

24 A    Yes, it is.  I'm quite familiar with his signature and

25 I've seen it on hundreds of documents, many similar to this.

Seery - Direct                                                65

1   Q    And is it your understanding that this document is the

2   basis for what was originally asserted to be a $17 million

3   obligation from Select, and then I guess in Exhibit 10 was

4   reduced to 12, that Mr. Pomerantz referred to as perhaps eight

5   or less?

6   A    In our examination of claims in the case, this was one of

7   the documents, and this is the one that that claim is

8   purportedly based on.

9   Q    Okay.  Let's just see if we can help the judge understand

10  kind of where this fits into the loan.

11         MR. MORRIS:  If we could put up Debtor's Exhibit No.

12  1 from Docket 2477.

13  BY MR. MORRIS:

14  Q    Okay.  This was the document that Mr. Pomerantz used in

15  his opening.  Do you recall that?

16  A    Yes.

17  Q    Okay.  And can you describe for the judge who the

18  borrowers are under the proposed exit financing?

19  A    So, under the proposed exit financing, the borrowers are

20  Trussway Industries, LLC.  That's where the $31.7 million,

21  call it $32 million, approximately, sits right now.  Trussway

22  Holdings, which is the intermediate holding company right

23  below the Highland Select Equity Fund, which is the domestic

24  feeder that owns actual assets, as opposed to simply a

25  securities account.  And then HCMLP and the Trust.

Seery - Direct                              66

1   Q    Okay.  And we were just looking at the loan agreement

2   between Dugaboy and the Master Fund.  Can you just describe

3   for the Court where on this structure the Select Master Fund

4   is located?

5   A    On the left-hand side of the page, two-thirds of the way

6   down, there's a golden box that says Highland Select Equity

7   Master Fund.  It has two obligations.  It has -- it currently

8   has an asset, which is some -- some remaining securities

9   (garbled) at Jefferies, and most of them are illiquid.  They

10  don't have real value.  There's two obligations.  A $3 million

11  note to HCMLP.  That note was put in -- cash was put in the

12  first quarter of 2020 to try to shore up the margin calls that

13  Jefferies was making on a daily basis.  And the Dugaboy

14  securities loan, which was done in 2014, and those, those

15  securities were put into that master account, and very

16  importantly, directly put into the Jefferies account owned by

17  the master.  They didn't go through some circuitous route.

18  It's very clear that the Master Fund which controlled and

19  operated that account borrowed those shares, and those shares

20  have been effectively seized by Dugaboy -- I mean, by

21  Jefferies -- and the claim sits at that entity.

22       It's important to note that through all times relative to

23  -- until that seizure by Jefferies, Mr. Dondero was the

24  portfolio manager of that account.

25  Q    Does the Master Fund have any interest in any of the

Seery - Direct                                    67

 1  Trussway entities?

 2  A    No, none at all.  Zero.

 3  Q    And is that why the Debtor has concluded that this exit

 4  financing will have no impact on Dugaboy's purported claim

 5  against the Master Fund?

 6  A    Yes.

 7  Q    Okay.  Let's just finish up here, Mr. Seery.  Do you

 8  believe -- withdrawn.  Has the Debtor concluded that the

 9  proposed financing is in the Debtor's best interests?

10  A    We have.  It's financing that is needed.  The terms are

11  negotiated at arm's length, in good faith.  Hard-fought.  We

12  expect the documents will be cooperative, but I'm sure there

13  will be negotiated closing documents between now and closing

14  that will be hard-fought as well.

15       We have sufficient liquidity at each of the entities when

16  we get this loan to be able to satisfy any obligations,

17  including the purported $2 million, $3 million Dugaboy

18  obligation.  Trussway, LLC is solvent.  Trussway Industries is

19  solvent.  Trussway Holdings is solvent.  And when HCMLP gets

20  this loan and we do the conversion of all the creditor claims

21  to partnership interests or trust interests, HCMLP and the

22  Trusts will also be solvent.

23            MR. MORRIS:  I have no further questions, Your Honor.

24            THE COURT:  All right.  Pass the witness.  Mr.

25  Draper, questions?

                              Seery - Cross                    68

1              MR. DRAPER:  Your Honor, can you hear me?

2              THE COURT:  I can now.

3              MR. DRAPER:  Okay.  Great.

4                         CROSS-EXAMINATION

5    BY MR. DRAPER:

6    Q    Mr. Seery, I just have a few questions.  In connection

7    with HC -- in connection with the Debtor, do you have certain

8    assets that are easily liquefied or easily sold?

9              MR. MORRIS:  Objection to the form of the question.

10             THE WITNESS:  There are certain assets --

11             THE COURT:  Overruled.  You can answer.

12             THE WITNESS:  Yeah.  There are certain assets that

13   can be sold more easily than others.  We don't have, in the

14   Debtor, any truly liquid securities.

15   BY MR. DRAPER:

16   Q    Well, let me ask you.  In connection with the HarbourVest

17   settlement, you acquired certain interests in CLOs, correct?

18   A    Incorrect.

19   Q    Who acquired the interests?

20   A    The Debtor acquired interest in HCLOF, which is not a CLO.

21   Q    Okay.  Let's take HC -- let's take the interest that the

22   Debtor acquired.  Where is that interest presently housed?

23   A    In the -- I believe it's in a hundred-percent owned

24   subsidiary of the Debtor.  I don't recall the name.

25   Q    Which subsidiary is that?

Seery - Cross                                69

1    A    It's a standalone SPV.  I don't -- I don't recall the
2    name.  It's not on that chart.
3    Q    Was it created after the interest was acquired?
4    A    No.  It was created before the interest was acquired, and
5    we acquired it directly into that subsidiary.
6    Q    All right.  Now, that interest -- that entity is holding
7    that as nominee for the Debtor, correct?
8    A    I don't think it's technically a nominee.  I think it's
9    technically holding it and we own a hundred percent of it and
10   own and control the entity.
11   Q    Well, didn't the HarbourVest settlement in fact say that
12   the Debtor could acquire it or its nominee will acquire it?
13   A    I think it said -- be put into a subsidiary or it could
14   acquire it directly.
15   Q    And does the Debtor own a hundred percent of that
16   subsidiary?
17   A    Yes.
18   Q    Could that -- in fact, could that interest be easily
19   liquefied to solve the Debtor's liquidity problems?
20   A    No.
21   Q    Why not?
22   A    Doesn't have a liquid market.
23   Q    Does the Debtor -- does the SPV still own that interest?
24   A    Yes.
25   Q    So it has not been transferred?

Seery - Cross                            70

1   A    No.

2   Q    All right.  Now, let's talk about the MGM stock.  Is the

3   MGM stock restricted in terms of the Debtor's trading?

4   A    Which MGM stock?

5   Q    The MGM stock that's subject to the Amazon transaction.

6   A    Owned by the Debtor or owned by somebody else?

7   Q    That's what I'm asking you.  Is it owned by the Debtor?

8   A    The Debtor does own some, yes.

9   Q    And, just ballpark, what's the value of that MGM stock

10  that the Debtor owns?

11  A    Approximately $25 million in today's current market

12  values.

13  Q    And couldn't that asset be used to obtain a loan, as

14  opposed to what's being done here?

15  A    That asset is already liened up by Frontier Bank.

16  Q    All right.  Now, does the Debtor have a wholly-owned

17  subsidiary that has MGM stock that could be used?

18  A    No.

19  Q    Okay.  So, really, the only assets that are available for

20  the Debtor to solve its liquidity problems are, in fact, the

21  assets that are being used in the Blue -- in the loan that's

22  being proposed to the Court?

23  A    That's not correct.

24  Q    What other assets could be used that would generate, serve

25  as security for a loan?

Seery - Cross                          71

1   A    We're going to use not just the assets we've talked about

2   today but all of the estate's assets.

3   Q    No, I understand that.  What -- I guess what I'm asking is

4   I understand what this loan is and I understand what assets

5   are being used; I'm just asking, is there something that's

6   easily marketable?

7        And I'll give you an example.  When -- on my home loan, my

8   home loan is secured by my -- part of my stock portfolio, so I

9   have a lower rate.  And I'm asking, is there other collateral

10  that you could have used in order to get a better rate and

11  have a less complex transaction?

12  A    Just to be clear, we're using virtually all of the assets

13  that the Debtor owns to support the financing.  Some of it

14  will serve as collateral.  Other assets that are either more

15  difficult to transfer and put a lien on or require additional

16  time will serve as support but they won't be collateral, and

17  there'll be covenants around those assets, such that even if

18  they're not collateral, if they're sold, they'll be a sharing

19  mechanism and a sweep provision that will pay down the Blue

20  Torch facility.

21  Q    Great.

22          MR. DRAPER:  I have nothing further for this witness,

23  Your Honor.

24          THE COURT:  All right.  Redirect?

25          MR. MORRIS:  No, thank you, Your Honor.

Seery - Examination by the Court                    72

1          THE COURT:  Mr. Seery, I have just one follow-up

2   question.

3                  EXAMINATION BY THE COURT

4          THE COURT:  The pertinent terms were in the motion or

5   its attachments, but just to recap, the maturity is going to

6   be three years after closing; is that correct?

7          THE WITNESS:  That's correct, Your Honor.

8          THE COURT:  Okay.  And there is a prepayment premium

9   if prepaid, and remind me what that is.

10          THE WITNESS:  I believe -- if it's okay, can I grab a

11   copy of the term sheet, which I --

12          THE COURT:  Certainly.

13          THE WITNESS:  Basically, Your Honor, there's an up-

14   front fee of a point, and then there is call protection that

15   is basically another point.  And the way the facility works,

16   that if we pay it back very quickly, the lender is still

17   entitled to receive its minimum return.  And so if -- from a

18   return perspective for the lender, as it goes longer, it

19   actually is less, the rate is effectively lower.

20          THE COURT:  Okay.

21          THE WITNESS:  But overall, it's expensive.  So the

22   facility is designed so that when we get to where we believe

23   we'll be more flush because we have been able to monetize

24   assets, we'll be paying back the lender.  The lender will have

25   received the minimum return.  But it won't be -- the call

Seery - Examination by the Court            73

1   protection, I think, is pretty advantageous.

2       And just so Your Honor is aware, each of the lenders for

3   this type of facility required this.  So, while rates are very

4   low, both absolute rates and spreads, for either high-grade

5   companies or high-yield companies, a more customized bespoke-

6   type financing like this, where the company doesn't have, as I

7   mentioned earlier, a regular EBITDA that -- and cash flow that

8   the lender could look at, it tends to be more expensive.  And

9   each of the lenders we looked at specialized in this kind of

10  financing, and Blue Torch provided the best facility of the

11  group.

12          THE COURT:  Okay.  All right.  Thank you.

13      All right.  Well, we appreciate your testimony on this,

14  Mr. Seery.  You'll be excused from that virtual witness box.

15          THE WITNESS:  Thank you, Your Honor.

16      (The witness is excused.)

17          THE COURT:  Mr. Morris, anything else?

18          MR. MORRIS:  No, Your Honor.  The Debtor rests.

19          THE COURT:  All right.

20          MR. POMERANTZ:  Your Honor, a closing -- brief

21  closing argument, if that's -- pleases the Court.

22          THE COURT:  Okay.  Well, I want to double-check with

23  Mr. Draper.  Did you have a witness or any other evidence?

24          MR. DRAPER:  No, Your Honor.

25          THE COURT:  All right.  Then I'll hear your closing

74

1    arguments.

2           MR. POMERANTZ:  Your Honor, can you hear me better

3    now?  I've changed devices.  Hopefully, --

4           THE COURT:  Yes, I can hear you much better now.  Uh-

5    huh.

6           MR. POMERANTZ:  Great.  Thank you, Your Honor.

7             CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

8           MR. POMERANTZ:  Your Honor, Mr. Seery's testimony

9    provides the necessary evidentiary basis to demonstrate that

10   the Debtor's entry into the exit facility is a proper exercise

11   of the Debtor's business judgment and should be approved by

12   Your Honor under 363 of the Bankruptcy Code.

13       The terms of the bankruptcy -- the terms of the financing,

14   as Mr. Seery testified, were reached after a competitive

15   arm's-length process negotiated among multiple unrelated

16   parties.  The Debtor and Blue Torch engaged in good-faith

17   negotiations to reach the terms in the term sheet.  And each

18   of the parties are indisputably solvent.  And Mr. Seery

19   testified that none of them will close the loan into a default

20   under any binding agreement.

21       Mr. Seery's uncontroverted testimony demonstrated that the

22   Dondero entities' failure to honor their obligations under

23   several notes and litigious strategy have adversely affected

24   the Debtor's liquidity, and that those actions, coupled with

25   the (inaudible) delays on monetizing Trussway and MGM, have

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 198
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 800 of 1726   PageID 12121

75

1   impacted the Debtor's liquidity, thereby requiring the exit

2   facility.

3       The cash flow projections, which were Exhibit 5 and

4   admitted into evidence, demonstrate that the Debtor needs the

5   financing to maintain liquidity and comply with its

6   obligations under the plan.

7       Accordingly, Your Honor, there can be no serious argument

8   that the Debtor does not need the liquidity for -- that is

9   provided by the financing.

10      Mr. Seery also provided uncontroverted testimony regarding

11  the robust process the Debtor ran to seek the exit financing.

12  He testified that one of the goals of the financing process

13  was to obtain financing for Trussway in order to preserve and

14  enhance value at Trussway -- other than litigation claims, the

15  most valuable asset of the Debtor.

16      As I said, he testified that the process was arm's-length

17  and involved significant negotiations, and resulted in a term

18  sheet which is the best terms available to the Debtor.

19      He also testified as to the facts and circumstances which

20  led the Debtor and Trussway to agree to the comprehensive

21  financing facilities that resolved financing issues not only

22  at the Debtor but also at Trussway.  And I mention this, Your

23  Honor, not because we ask Your Honor to approve the Trussway

24  financing, we do not, and I made that clear at the closing.

25      Accordingly, for all these reasons, Your Honor, we request

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 199
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 801 of 1726    PageID 12122

76

1    that the Court overrule the objection and approve the motion.

2               THE COURT:  All right.  Thank you.

3         Mr. Draper, closing argument?

4           CLOSING ARGUMENT ON BEHALF OF THE DUGABOY TRUST

5               MR. DRAPER:  Yes, Your Honor.  I have a few comments.

6    And quite frankly, in light of both the testimony today and

7    the fact that this is -- they're not asking the Court to

8    approve the Trussway financing piece of this, I've agreed to

9    an order with Mr. Pomerantz that I have no issue with it being

10   uploaded and the Court entering the order.

11              THE COURT:  All right.  So that concludes your

12   remarks?

13              MR. DRAPER:  Yes.

14              THE COURT:  All right.  I'll just ask the Creditors'

15   Committee.  You obviously did not file a pleading to weigh in,

16   but I always like to hear from you.  Mr. Clemente, anything

17   you want to say about this?

18         CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

19              MR. CLEMENTE:  Your Honor, for the record, Matt

20   Clemente on behalf of the Committee.

21         Your Honor, the financing need has been demonstrated.  And

22   it is a complex structure, but that's necessitated by the

23   complex nature of the Debtor and its holdings.  So the

24   Committee believes it's an appropriate financing facility, and

25   the Committee believes that Your Honor should enter the order.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 200
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 802 of 1726 PageID 12123

77

1   So we support the financing facility, Your Honor.

2          THE COURT:  All right.  Well, based on the evidence

3   I've heard, the Court is going to approve the proposed exit

4   financing for up to a $52 million facility with Blue Torch

5   Capital.

6       First, I'll say, while reasonable minds might differ

7   whether 363 applies or 364, I think probably the better-

8   reasoned authority in this post-confirmation context would be

9   that 363 applies.  But under either legal standard, I find

10  this motion has met the legal standards.  The evidence

11  supported that the exit loan is necessary to address liquidity

12  needs of the company, of Highland, due to the reorganization

13  costs, litigation expenses being higher than anticipated, --

14      (Interruption.)

15         THE COURT:  Whoever has your phone not on mute,

16  please put it on mute.

17      Second, we have heard that there's a sound business

18  justification for holding onto certain assets of the Debtor

19  longer than earlier contemplated because of market conditions.

20  So there is a need for this.  The terms appear to be

21  reasonable.  And again, there was adequate and fulsome

22  marketing.  Many entities were contacted and executed NDAs and

23  went into the data room, spent time.  And so the Court finds

24  that the Debtor and Blue Torch have negotiated in good faith.

25      Finally, in all ways, the evidence supports this being an

78

1    exercise of reasonable business judgment and there being a

2    sound business justification.  I will add that there has been

3    evidence supporting these various fees and expenses that would

4    go to the lender.

5       The Court reserves the right to supplemental and amend in

6    a more detailed written order, but with this, this financing

7    is approved.  So I presume a written order will be submitted

8    promptly, Mr. Pomerantz or Mr. Morris.

9       All right.  Well, it's 11:25.  I suggest we take a five-

10   minute break, and then we'll come back and have the last

11   motion of CLO Holdco and the DAF, the motion to reconsider.

12   All right.  So, again, 11:25.  We'll come back in five

13   minutes.

14            THE CLERK:  All rise.

15            MR. POMERANTZ:  Thank you, Your Honor.

16      (Transcript excerpt concluded at 11:25 a.m.  Proceedings

17   concluded at 3:35 p.m.)

18                          --oOo--

19

20                       CERTIFICATE

21      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   /s/ Kathy Rehling                      06/29/2021

24   _____      _____

25   Kathy Rehling, CETD-444                       Date
     Certified Electronic Court Transcriber

79

<div align="center">
INDEX<br>
*Excerpt*<br>
*9:36 to 11:25 a.m.*
</div>

PROCEEDINGS                                                                 3

WITNESSES

Debtor's Witnesses

John Dubel
- Proffer of Direct Testimony                                             10

James P. Seery, Jr.
- Direct Examination by Mr. Morris                                        39
- Cross-Examination by Mr. Draper                                         68
- Examination by the Court                                                72

EXHIBITS

Debtor's Exhibits 1 through 3                        Received 18
Debtor's Exhibits 1 through 8                        Received 34

Dugaboy Trust's Exhibits 1 through 10               Received 34

CLOSING ARGUMENTS

- By Mr. Pomerantz                                                        74
- By Mr. Draper                                                           76
- By Mr. Clemente                                                         76

RULINGS

Debtor's Motion for Entry of an Order Authorizing          18
Payment of a Restructuring Fee to James P. Seery, Jr.,
the Debtor's Chief Executive Officer and Chief
Restructuring Officer (2395) - *Granted*

Debtor's Motion for Entry of an Order (I) Authorizing       77
the Debtor to (A) Enter into Exit Financing Agreement
in Aid of Confirmed Chapter 11 Plan and (B) Incur and Pay
Related Fees and Expenses, and (II) Granting Related
Relief (2229) - *Granted*

END OF PROCEEDINGS                                                        78

INDEX                                                                     79

Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 805 of 1726 PageID 12126

# EXHIBIT 19

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 806 of 1726   PageID 12127
86

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 1 of 86

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3    In Re:                        )    Chapter 11
                                    )
 4    HIGHLAND CAPITAL              )    Dallas, Texas
      MANAGEMENT, L.P.,             )    March 1, 2022
 5                                  )    1:30 p.m. Docket
                                    )
 6        Reorganized Debtor.       )
                                    )    - REORGANIZED DEBTOR'S MOTION
 7                                  )      FOR ENTRY OF AN ORDER
                                    )      APPROVING SETTLEMENT WITH
                                    )      PATRICK DAUGHERTY [3088]
 8                                  )    - REORGANIZED DEBTOR'S MOTION
                                    )      FOR ENTRY OF AN ORDER
 9                                  )      FURTHER EXTENDING THE PERIOD
                                    )      WITHIN WHICH IT MAY REMOVE
10                                  )      ACTIONS [3199]
      _____)
11                                  )
      ELLINGTON,                    )    Adversary Proceeding 22-3003-sgj
12                                  )
              Plaintiff,            )
13                                  )    STATUS CONFERENCE
      v.                            )    (NOTICE OF REMOVAL)
14                                  )
      DAUGHERTY,                    )
15                                  )
              Defendant.            )
16    _____)

17                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
18               UNITED STATES BANKRUPTCY JUDGE.

19    APPEARANCES:

20    For the Debtor:              John A. Morris
                                   PACHULSKI STANG ZIEHL & JONES, LLP
21                                 780 Third Avenue, 34th Floor
                                   New York, NY  10017-2024
22                                 (212) 561-7700

23    For Scott Ellington:        Debra A. Dandeneau
                                   Laura R. Zimmerman
24                                 BAKER & McKENZIE, LLP
                                   452 Fifth Avenue
25                                 New York, NY  10018
                                   (212) 626-4875
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 807 of 1726   PageID 12128

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 2 of 86

2

```
 1  APPEARANCES, cont'd.:

 2  For Patrick Daugherty:        Thomas A. Uebler
                                  MCCOLLOM D'EMILIO SMITH UEBLER,
 3                                  LLC
                                  2751 Centerville Road, Suite 401
 4                                Wilmington, DE  19808
                                  (302) 468-5967
 5
    For Patrick Daugherty,        Drew York
 6  Adversary Proceeding          GRAY REED & MCGRAW, LLP
    Counsel:                      1601 Elm Street, Suite 4600
 7                                Dallas, TX  75201
                                  (469) 320-6114
 8
    Recorded by:                  Michael F. Edmond, Sr.
 9                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
10                                Dallas, TX  75242
                                  (214) 753-2062
11
    Transcribed by:               Kathy Rehling
12                                311 Paradise Cove
                                  Shady Shores, TX  76208
13                                (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 808 of 1726 PageID 12129

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 3 of 86

3

```
 1              DALLAS, TEXAS - MARCH 1, 2022 - 1:33 P.M.

 2            THE COURT:  All right.  We have settings in Highland.

 3    We have a motion to approve a settlement with Patrick

 4    Daugherty.  We also had a status conference in a recently-

 5    removed adversary or state court action, but I'm not sure

 6    we're going to accomplish much on that one since there's a

 7    motion for remand that's set later in the month.

 8       So let's start with the Highland Motion to Approve

 9    Compromise with Mr. Daugherty.  And I'll get appearances.  Who

10    do we have appearing for the Reorganized Debtor?

11            MR. MORRIS:  Good afternoon, Your Honor.  It's John

12    Morris from Pachulski Stang Ziehl & Jones for the Reorganized

13    Debtor.

14            THE COURT:  All right.  Thank you.  For Mr.

15    Daugherty, do we have a lawyer appearance?

16            MR. UEBLER:  Good afternoon, Your Honor.  This is Tom

17    Uebler on behalf of Patrick Daugherty.  And Mr. Daugherty is

18    also attending today.

19            THE COURT:  All right.  Thank you.  That's U-E-B-L-E-

20    R, correct?

21            MR. UEBLER:  Yes.

22            THE COURT:  Okay.  All right.  We have an objection

23    from Scott Ellington, and we're going to talk about the

24    standing, but who do we have appearing for Scott Ellington?

25            MS. DANDENEAU:  Good afternoon, Your Honor.  This is
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 809 of 1726    PageID 12130
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 4 of 86

4

1   Debra Dandeneau from Baker & McKenzie.  I'm appearing here on

2   behalf of Scott Ellington.

3          THE COURT:  Okay.  Do we have any other lawyer

4   appearances before we get started?

5       (No response.)

6          THE COURT:  All right.  Well, I don't mean to steal

7   your thunder, Mr. Morris, on how we proceed here today.  As

8   I've already alluded to, I have a standing concern right off

9   the bat.  But how did you want to proceed, Mr. Morris, before

10  we address that?

11         MR. MORRIS:  Before we address that, my intention was

12  to make an opening statement, move my exhibits into evidence,

13  put Mr. Seery on the stand in order to adduce evidence that we

14  believe establishes the grounds for granting the 9019 motion,

15  and then turning it over to Ms. Dandeneau.

16         THE COURT:  All right.  Well, obviously, I need to

17  hear evidence and have a prove-up, whether we have a pending

18  objection or not.  So I'll let you go forward in that manner,

19  and then we'll talk to Ms. Dandeneau about the standing of her

20  client to pursue to the objection and see where we go from

21  there.  All right?

22         MR. MORRIS:  All right.  And I will mention the

23  standing issue as part of my presentation.  But we thought it

24  was important, you know, the Reorganized Debtor's position, as

25  stated in the papers, is that we don't believe that Mr.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 810 of 1726    PageID 12131
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 5 of 86

5

1    Ellington has standing, but even if the Court found that he

2    did, there is no basis to sustain the objection.  So we're

3    kind of prepared to proceed on that basis.

4        As Your Honor knows, the issue of standing has come up so

5    many times in this case.  The Court has observed countless

6    times the tenuous nature of various individuals and entities

7    who were pursuing various relief in this Court.  And

8    notwithstanding the tenuous nature, which, you know,

9    respectfully, we didn't think it existed in certain

10   circumstances, we've always gone to the merits.  And so I'd

11   like to tackle both issues today in case there is an appeal,

12   in case, you know, we just want to -- we just want to button

13   down the hatches and try to get done with Mr. Daugherty and

14   notch another hole in our belt, so to speak.

15       So if I may, Your Honor, I'd like to proceed.

16           THE COURT:  You may.

17             OPENING STATEMENT ON BEHALF OF THE DEBTOR

18           MR. MORRIS:  Okay.  So, as Your Honor pointed out,

19   we're here on a 9019 motion.  The Debtor seeks the Court's

20   authority to consummate a proposed settlement that it has

21   negotiated with Mr. Daugherty.  As the Court has also

22   observed, there's only one limited objection on file, the one

23   by Mr. Ellington.

24       As Your Honor may recall, just about a year ago, maybe a

25   little bit more than a year ago, actually, at confirmation, we

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 811 of 1726    PageID 12132

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 6 of 86

6

1   had announced a settlement in principle with Mr. Daugherty.

2   And it's taken some time to get to this point, and I'll

3   describe some of the reasons for that, and Mr. Seery will

4   certainly testify as to those issues.

5       But before I get into kind of the substance, I would like

6   to just move into evidence the documents that are listed on

7   the Reorganized Debtor's witness and exhibit list that can be

8   found at Docket No. 3270.  It's really a very modest set of

9   exhibits, in contrast to some of the other hearings that we've

10  had.  It is the 3018 order that Your Honor may recall entering

11  about a year and a half ago.  It is the settlement agreement

12  itself, which is attached to my declaration so that it would

13  be admissible for evidentiary purposes.  And it's the three

14  proofs of claim that Mr. Daugherty filed initially:  Claim 67,

15  which was amended by 77, which was amended by 205.

16      So we'd move for the admission of those documents into

17  evidence.

18          THE COURT:  All right.  I presume no one has an

19  objection to that.  Okay.

20          MS. DANDENEAU:  That's correct, Your Honor.  We don't

21  -- we don't object.

22          THE COURT:  Okay.

23      (Debtor's exhibits identified in Docket 3270 are received

24  into evidence.)

25          MR. MORRIS:  Okay.  So, with that, we do intend to

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 812 of 1726 PageID 12133

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 7 of 86

7

1  call Mr. Seery.  Mr. Seery is going to testify, you know, to

2  his understanding of the nature of Mr. Daugherty's claims.

3  He'll testify to the -- to some of the litigation.  We're not

4  going to go on at length here, but we do want to make a

5  record.

6      He'll testify as to the litigation that took place in this

7  Court, because it really was very important in establishing

8  some of the strengths and weaknesses of the case.  It was

9  important because we actually received Your Honor's opinion,

10 at least with respect to voting purposes.  And we all

11 acknowledge that that was for that limited purpose at that

12 time.

13     He'll describe the negotiations, the participation of the

14 Independent Board, the reasons why it took a little bit longer

15 to get here than we had hoped a year ago.

16     And so he will -- he will give you the evidence that I

17 hope the Court finds is sufficient to approve this settlement.

18     He'll also address the two issues raised by Mr. Ellington,

19 the observer access issue as well as the transfer of HERA and

20 ERA under the proposed settlement.

21     I just want to make sure the record is clear as to what

22 claim is being compromised here and the status of the other

23 claims.  Mr. Daugherty -- and this is all laid out in the

24 settlement agreement, so I don't think that I'm saying

25 anything controversial here.  But as set forth in the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 813 of 1726   PageID 12134
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 8 of 86

8

```
 1   settlement agreement, back in April of 2020 Mr. Daugherty
 2   filed his original proof of claim.  That was denoted as Claim
 3   No. 67.  A couple of weeks later, or maybe a week later, his
 4   claim was -- he amended his claim and superseded his claim.
 5   So Claim 67 is no longer an operable claim, and that was
 6   superseded by Claim No. 77.  And then in the fall he made a
 7   motion for leave to further amend his claim.  After a hearing,
 8   that motion was granted and Mr. Daugherty filed another
 9   superseding claim.  This one was denoted as Claim No. 205, in
10   the approximate amount of $40 million.
11       So Claim 205 is the operative claim here.  The other two
12   claims will be expunged as part of the order because they've
13   been superseded.  And that's, that's what we're here to
14   compromise today.
15       Mr. Seery is going to testify that he and the independent
16   directors, really early on in the case, familiarized
17   themselves with Mr. Daugherty.  You know, they communicated
18   with him and introduced themselves to him.  The evidence will
19   show that there's -- there's just a really voluminous record
20   that preceded the Highland bankruptcy filing.  Mr. Seery is
21   going to testify that, you know, he's somewhat familiar with
22   that record, that his lawyers became very familiar with that
23   record, and on the basis of that review he and the independent
24   directors really began to understand kind of the nature of Mr.
25   Daugherty's claims.
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 814 of 1726 PageID 12135

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 9 of 86

9

```
 1          The attachments to the proof of claim, Your Honor, as you
 2   may recall from the 3018 hearing, are enormous.  And they're
 3   enormous for good reason.  For probably seven or eight years
 4   before I ever heard of Highland Capital, Mr. Daugherty and Mr.
 5   Dondero and Highland and Mr. Ellington were engaged in very
 6   lengthy, acrimonious litigation.  The litigation started in
 7   Texas state court.  You know, this is a story that's been told
 8   many times.  It started in state court.  There were claims.
 9   There were counterclaims.  I think at the end of it Highland
10   had a $2.8 million verdict against Mr. Daugherty and Mr.
11   Daugherty had a $2.6 million verdict against Highland.  And I
12   think in a rational world, Your Honor, Mr. Daugherty would
13   have paid Highland $200,000, everybody would have said we've
14   taken our best shot, and people would have gone on with their
15   lives.
16          Regrettably, as so much happened, you know, with Highland
17   prepetition, that was not the case.  And it wasn't even close,
18   right?  During that whole litigation, you had -- you had
19   criminal contempt.  You had appeals.  And then Mr. Daugherty,
20   you know, made good on his judgment and he actually paid his
21   judgment to Highland, but Highland didn't return the favor.
22   Didn't comply, frankly, with their legal obligation.
23          And so Mr. Daugherty took the litigation from Texas up to
24   Delaware.  He sued Highland.  He sued HERA.  He sued Mr.
25   Dondero.  And he was seeking not only to collect on his
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 815 of 1726   PageID 12136
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 10 of 86

10

1    judgment but he was also seeking to collect on assets that had

2    been held on his behalf within HERA, which was, you know, a

3    form of deferred compensation program that was established

4    following the financial crisis in order to retain employees.

5         And during the course of that litigation -- again, this is

6    all documented in the proof of claim -- Mr. Seery can testify

7    not on the basis of personal knowledge but on the basis of his

8    review, the advice that he's received, and the litigation that

9    we've had before Your Honor -- I think the record is pretty

10   clear that Mr. Daugherty then learned that Highland had not

11   only stripped HERA of its assets but had, you know, engaged in

12   other wrongful conduct, including taking the money that was in

13   an escrow account that the Texas state court, I understand,

14   was specifically told was earmarked for the benefit of Mr.

15   Daugherty.  They took that, too.

16        And so, you know, Mr. Daugherty continued to pursue his

17   litigation.  Before the petition date, the Delaware Chancery

18   Court found that there was a likelihood of a fraud.  They

19   found an exception to the attorney-client privilege under the

20   crime-fraud exception.  And, again, all of this happened

21   before Jim Seery, the independent directors, my firm, anybody

22   came on the scene.  This was the nature -- this was the life

23   that these folks were living.

24        And then, you know, we got hired.  We took Highland into

25   bankruptcy as the trial was about to begin.  The automatic

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 816 of 1726   PageID 12137

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 11 of 86

11

1  stay went into effect.  And we moved, you know, obviously, in

2  a very different direction a few months later after the

3  Independent Board was appointed and put in place.

4      So, with that, you know, Mr. Daugherty had a very

5  substantial claim, and -- and we worked very hard, and Mr.

6  Seery is going to testify that he worked very hard to

7  understand the claim and to try to get down to the strengths

8  and weaknesses of the claim itself.  And we engaged in

9  substantial motion practice, as Your Honor may recall,

10  particularly in the fall of 2020, before we had a plan

11  confirmed.

12      We had -- Mr. Daugherty had the comfort motion, where he

13  sought the Court's approval to continue to pursue his claims

14  against nondebtor individuals and entities, and that motion

15  was granted.  We had another contested hearing where he moved

16  to amend his claim again.  The Court granted Mr. Daugherty's

17  motion at that time, and that's what resulted in the

18  preparation and filing of what became Claim No. 205 that we're

19  here to compromise today.

20      Mr. Daugherty then sought permission to lift the stay so

21  that he could go -- Highland -- go after Highland in Delaware,

22  and that's where Your Honor drew the line and said no, the

23  claims against the Debtor will be determined here.

24      And then, of course, we had the very lengthy contested

25  evidentiary hearing on Mr. Daugherty's 3018 motion.  And,

1    again, that motion was brought simply to allow his claim for

2    voting purposes.  That's where the two-thousand-some-odd-page

3    appendix was, you know, first presented to the Court.  And at

4    the conclusion of that, Your Honor granted the 3018 motion and

5    allowed his claim in the approximate amount of $9.1 million.

6    I believe that's Exhibit 1 on our witness and exhibit list.

7        And so with that background, having litigated not the

8    merits but pretty much -- pretty much everything but the

9    merits, and I daresay as close to the merits as you can get,

10   and with the Debtors at that point actively pursuing a viable

11   plan, because by the time Claim No. 205 was filed the Court

12   has approved the disclosure statement and we were trying to

13   get to confirmation, negotiations with Mr. Daugherty began in

14   earnest.

15       You'll hear Mr. Seery testify that, you know, he had a lot

16   on his plate.  The Independent Board had a lot on its plate.

17   But one of the things on their plate was Mr. Daugherty and

18   trying to get a resolution of his claim.  And there was a lot

19   of back and forth, you know, between the lawyers, between the

20   principals, and we were able to announce at the commencement

21   of the hearing -- I think Mr. Ellington quoted from it in the

22   very first paragraph of his limited objection -- the

23   presentation of the terms of the agreement as they existed at

24   that time.

25       Mr. Seery will testify that, you know, it took another

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 818 of 1726 PageID 12139
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 13 of 86

13

1   nine months or so to actually document the agreement.  He'll

2   testify that, you know, Pat Daugherty's settlement wasn't the

3   only thing that the Independent Board and that he were

4   involved with, that they were working very hard to get to an

5   effective date.

6       He'll testify that Mr. Daugherty is not an easy

7   negotiator.  And I mean this respectfully to Mr. Daugherty.

8   But he personally engaged in negotiations directly with Mr.

9   Seery.  We did it through lawyers.  We went through countless

10  drafts.  And Mr. Daugherty was a dogged negotiator.  He asked

11  for -- you know, the interesting thing here is we're having

12  this hearing today, Your Honor, and Mr. Ellington did not seek

13  any discovery at all.  Had he done so, he would have found out

14  that there were, you know, probably a dozen or more draft

15  settlement agreements that went back and forth.  And if you --

16  Mr. Seery will testify to some of the things that Mr.

17  Daugherty asked for that we said no to.

18      And, again, you know, Mr. Daugherty has the right to ask

19  for whatever he wants, and Mr. Seery and the Independent

20  Board, now the Oversight Board, certainly in consultation with

21  the Oversight Board, have the authority to decide what's in

22  the best interest of their estate.

23      And so it was -- it was a -- it was a difficult

24  negotiation.  And at the end of the day, we did get to yes,

25  and I think the Court will find that the settlement is very

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 819 of 1726   PageID 12140

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 14 of 86

14

 1  modestly different from what was presented to the Court back

 2  in February of 2021.

 3      And, you know, let's just talk about the two issues.  Mr.

 4  Seery -- Mr. Ellington, rather, seems to suggest in his papers

 5  that somehow, you know, Mr. Seery just caved and gave him

 6  these observer rights in HERA and ERA in order to enable Mr.

 7  Daugherty to have more weapons to go after Mr. Ellington.

 8  Ms. Dandeneau is free to ask Mr. Seery any questions she wants

 9  today, subject to the attorney-client privilege, but I don't

10  think there will be a scintilla of evidence that will show

11  that Mr. Seery thought about any of these issues that Mr.

12  Ellington is apparently taking quite personally.  What Mr.

13  Seery will testify to is that he was singularly focused on

14  getting to yes, on getting a deal done with Mr. Daugherty.

15      And with respect to the observer rights, I want to just

16  focus on that for a second because I think it's -- I think Mr.

17  Ellington mistakenly characterizes what that is, because it's

18  not a right at all.  Mr. Daugherty has no rights whatsoever

19  vis-à-vis the Oversight Board.  It is a very simple and

20  uncontro... it should be a relatively uncontroversial

21  provision.  It's Paragraph 3 of the settlement agreement, and

22  it simply says that Highland will use reasonable efforts --

23  not best efforts, as Mr. Ellington's pleading says --

24  reasonable efforts to see if the Oversight Board will give him

25  access to the meetings.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 820 of 1726    PageID 12141

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 15 of 86

15

1        Mr. Daugherty has absolutely no right to be in the

2    meeting.  The Oversight Board has the "sole discretion" to let

3    him into the meeting.  And so they can restrict him

4    arbitrarily.  They can restrict him for no reason.  They have

5    the sole discretion on whether to let him in.

6        And, importantly, Mr. Daugherty, if he's permitted to

7    participate or listen in or observe these meetings, he will be

8    required to abide by the Oversight Board's policies,

9    procedures, and agreements, including agreements concerning

10    confidentiality.

11        Mr. Daugherty has no decision-making authority.  He's not

12    a member of the Oversight Board.  He has no ability to bind

13    the Oversight Board.  He would merely be given access to

14    observe Oversight Board meetings, at the discretion of the

15    Oversight Board.  And it's no more, no less.  He has no rights

16    whatsoever, no ability to control the Oversight Board, no

17    right.

18        And I was actually thinking about this earlier.  And, you

19    know, Mr. Ellington's pleadings suggest that he's very

20    concerned that, you know, he may share information or that

21    kind of thing.  You know, this is America.  There's a First

22    Amendment.  Mr. Daugherty has the right to speak with whoever

23    he wants to speak with who's willing to speak with him.  And

24    so there is nothing right now preventing Mr. Daugherty from

25    picking up the phone and calling one of the Oversight Board

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 821 of 1726    PageID 12142

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 16 of 86

16

 1   members and say, I want to share something with you.

 2   Absolutely nothing in the trust agreement that prevents that,

 3   nor should it.  The Oversight Board should have the ability to

 4   hear views from anybody who they want to hear from.  They just

 5   should.

 6       The Oversight Board members are still going be bound by

 7   their fiduciary obligations.  They are going to be bound by

 8   their -- all of the duties that they have.  But we shouldn't

 9   sit here today and speculate that something untoward might

10   happen in the future.  It's not fair to the Oversight Board

11   members.  There is absolutely no evidence in the record to do

12   it.  And there's really no basis to suggest that this is

13   somehow a plan modification.  That's it.

14       The other piece is HERA and ERA.  You know what?  Before I

15   leave that, I did want to point out where Your Honor started,

16   and that is Mr. Ellington has no claims.  He's withdrawn every

17   single claim.  Therefore, he's not a beneficiary of the trust.

18   Therefore, the Oversight Board owes him no duty whatsoever.

19   And so he really has no standing to challenge that portion of

20   it.  I don't think he has standing, frankly, to challenge the

21   HERA/ERA portion, but that part of it is just crystal clear,

22   because he has no interest in the trust itself.

23       And so I don't understand how his interest can be -- he

24   may have a personal interest.  But that's not -- that's not

25   standing.  That's not a legally cognizable interest that would

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 18 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 822 of 1726   PageID 12143

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 17 of 86

17

1  allow him to object to the access that might be given to him,

2  subject to the Oversight Board's discretion.

3       HERA and ERA, Your Honor, is very simple.  Mr. Seery will

4  testify that, you know, Mr. Daugherty's claim itself seeks

5  over $26 million of damages related to the dissipation of the

6  assets from HERA, as well as Highland's acquisition of the

7  interests of the other limited partners, his theory of the

8  case.  And, frankly, we -- we disagree with this very hard,

9  and that's why the numbers don't bear any relation to what the

10  claim is.  But his theory is that Highland wrongfully bought

11  out all of the limited partners.  He became the last limited

12  partner.  And since Highland is not entitled to the assets

13  that Highland took, they should be given to him.

14       Again, not a theory that we put a lot of weight on, but it

15  is a theory.  And at the end of the day, Mr. Seery is going to

16  -- and this will be the most important part of his testimony,

17  I think -- he's going to testify that the issue of HERA and

18  ERA was of great concern to the Debtor, and it was of great

19  concern because we have seen Mr. Daugherty litigate with Mr.

20  Ellington, with Mr. Leventon, with Mr. Dondero, with Highland,

21  for the better part of a decade, and we wanted to make one

22  hundred percent certain that we were done with Mr. Daugherty

23  in terms of litigation and claims.

24       And so Mr. Seery is going to testify that we tried two or

25  three different ways to address the HERA/ERA issue, and this

1   is what we ultimately came up with.  Let's just give it to him

2   and get that release.  Really, one of the most important

3   aspects of the -- of the settlement agreement is attached as

4   an exhibit.  It's the HERA release itself, Your Honor.  And

5   that's what gives the Debtor finality with Mr. Daugherty.

6   That is among the most important pieces of the settlement

7   agreement.  It's attached as an exhibit.  It's all signed up

8   and ready to go.

9       But that's, that's really -- you know, when Mr. Ellington

10  says in his pleading that there's no basis for doing this

11  other than to help Mr. Daugherty, respectfully, Mr. Ellington

12  has it wrong.  And if he had taken any discovery, he would

13  have found that out and maybe we could have saved today's

14  hearing.  Because the Debtor had a vital interest in resolving

15  the HERA and ERA issues because it was part and parcel of

16  getting to yes -- it was part and parcel of both getting to

17  yes as well as making sure that Mr. Daugherty had his allowed

18  claim in the manner in which we've agreed but is otherwise

19  done with the Debtor.

20      So, with that, Your Honor, I think the evidence ultimately

21  is going to establish, you know, very, very easily that this

22  settlement is fair, reasonable, and in the best interests of

23  the Debtor and its stakeholders.

24      I have nothing further unless Your Honor has any

25  questions.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 824 of 1726 PageID 12145

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 19 of 86

19

1          THE COURT:  All right.  First, let's be clear for the

2     record that I have admitted the Debtor's exhibits at Docket

3     Entry 3270 that were earlier mentioned.

4        And next, I guess I'll hear any opening statement from a

5     friendly party.  Mr. Daugherty's counsel, did you want to say

6     anything as far as an opening statement?

7          MR. UEBLER:  Thank you, Your Honor.

8        OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

9          MR. UEBLER: I just want to say that Mr. Daugherty

10    joins in Highland's request that the settlement be approved,

11    but otherwise we'll rely on Mr. Morris's presentation today.

12         THE COURT:  All right.  Thank you.  Ms. Dandeneau,

13    we've obviously been speculating about the standing of your

14    client.  What did you want to say as far as an opening

15    statement and addressing that?

16        OPENING STATEMENT ON BEHALF OF SCOTT ELLINGTON

17         MS. DANDENEAU:  Your Honor, I would reserve any

18    comments on the settlement until after Mr. Seery's

19    examination.

20        But with respect to standing, we acknowledge that Mr.

21    Ellington is no longer a creditor of Highland's estate.  I

22    understand the typical standing requirements to appear in

23    bankruptcy court.

24        I would note that Mr. Ellington was very careful in terms

25    of his objection to the settlement agreement.  I thought it

1    was interesting that I've been criticized now for not taking

2    discovery.  That's probably a first in this case.

3         But he does not -- he made it very clear.  He does not

4    object to the economic terms of the Debtor's proposed

5    settlement.  And if you look at -- if you look at the nature

6    of our objection, it was more that there are -- there are

7    issues that we thought were important and should be considered

8    by the Debtor in the exercise of its business judgment that we

9    don't think it was raised.

10        And the reason why Mr. Ellington brought that to the

11   Court's attention and to the Debtor's attention, Mr. Ellington

12   -- what's unusual about this settlement is that, after the

13   terms of the settlement were announced to this Court at the

14   confirmation hearing, now over a year ago, the settlement was

15   amended to give Mr. Daugherty observer status to the Oversight

16   Board, but it also was amended to include the HERA provision.

17   And I understand Mr. Morris's -- I hear Mr. Morris's arguments

18   about that.

19        But the effect of the observer status provision with

20   respect to -- on the Oversight Board is if the Oversight Board

21   -- and, again, we don't challenge the fact that the Oversight

22   Board, according to the settlement agreement, has the

23   discretion on whether or not to allow Mr. Daugherty access --

24   but we believe the result of this is to give Mr. Daugherty

25   access to confidential information about Mr. Ellington.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 826 of 1726   PageID 12147

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 21 of 86

21

1      And also, by the way, Mr. Daugherty himself has stated

2    that one of the purposes of the transfer of the HERA shares is

3    to enable Mr. Daugherty to have access to nonpublic

4    information about Mr. Ellington.

5      These are noneconomic provisions, so I would argue, Your

6    Honor, whether Mr. Ellington is a beneficiary of the Claimant

7    Trust or not should not be relevant to the standing issues

8    with respect to these issues.

9      And Your Honor knows that Mr. Ellington has filed a

10   complaint.  He filed a complaint in state court against Mr.

11   Daugherty, alleging that Mr. Daugherty has engaged in stalking

12   activities with respect to Mr. Ellington, Mr. Ellington's

13   family, including his elderly father, his sister, and her

14   minor children.  And we're not here to argue the merits of

15   those, but we do think that those allegations and what the

16   Debtor would have done with respect to those allegations and

17   what the Debtor will do in light of those allegations is

18   important to consider.

19     And Mr. Daugherty, by the way, chose to remove that action

20   to this Court, but that's the subject of a separate adversary

21   proceeding.  It's subject to a remand and abstention motion.

22     But I do think, Your Honor, in light of everything that

23   has occurred, or even allegedly has occurred, we feel that it

24   is incumbent upon this Court and the Debtor to take notice of

25   these allegations and to really not put these -- not put

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 827 of 1726    PageID 12148

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 22 of 86

22

1    themselves in a position where they could generate additional

2    claims by providing Mr. Daugherty access to information that

3    could enable the activities of Mr. Daugherty.

4        So, on that basis, I understand, Your Honor, this is an

5    unusual argument, but we would respectfully request that we be

6    able to at least make our record at the hearing and be heard

7    on these issues.

8            THE COURT:  All right.  Well, with that, as I said

9    earlier, while I find the standing to be extremely I guess I

10   should say doubtful, the Debtor has to prove up the bona fides

11   of the settlement in any event.  Put on evidence for me to

12   assess whether it's fair and equitable, in the best interest

13   of the estate, and analyze it under all of the Fifth Circuit

14   standards.

15       So I'll allow you to examine Mr. Seery on behalf of Mr.

16   Ellington to ask him anything you think is pertinent to the

17   settlement.  I would hope we don't spend too much time in

18   court on this, because, again, I'm really doubtful about

19   whether a higher court would find standing in this situation

20   where he's not a creditor, he has no pending proofs of claim,

21   and, you know, is he a party aggrieved by this proposed

22   settlement?  Again, I think it's doubtful.  But I will give

23   Mr. Ellington the benefit of the doubt and let counsel ask

24   questions that you think are pertinent to the issues here.

25       All right.  Mr. Morris, do you call Mr. Seery at this

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 24 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 828 of 1726   PageID 12149

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 23 of 86

                           Seery - Direct                    23

 1   time?

 2           MR. MORRIS:  I do, Your Honor.

 3           THE COURT:  All right.  Mr. Seery, if you could say

 4   "Testing, one, two; testing, one, two" so we can --

 5           MR. SEERY:  Testing, one, two.  Good afternoon, Your

 6   Honor.

 7           THE COURT:  Good afternoon.  Please raise your right

 8   hand.

 9       (The witness is sworn.)

10           THE COURT:  All right.  Thank you.  Mr. Morris, go

11   ahead.

12           MR. MORRIS:  Thank you, Your Honor.  I'm going to try

13   to make this much briefer than I had originally intended.

14   JAMES P. "JIM" SEERY, JR., REORGANIZED DEBTOR'S WITNESS, SWORN

15                       DIRECT EXAMINATION

16   BY MR. MORRIS:

17   Q   Mr. Seery, can you hear me okay?

18   A   Yes, I can.

19   Q   Okay.  Can you just -- are you generally familiar with the

20   nature of Mr. Daugherty's claim against Highland?

21   A   Yes, I am.

22   Q   Can you just describe for the Court your understanding of,

23   you know, in general terms, the nature of the --

24   A   Basically, Mr. Daugherty has a claim that has one or more

25   of the components, but distilled down to the essence, there's

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 829 of 1726    PageID 12150

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 24 of 86

Seery - Direct                          24

1  five major components that come out of about 12 years' worth

2  of litigation with the Debtor.

3      The first is the enforcement of the HERA judgment that he

4  received in Texas state court.  This was -- I think we call it

5  Texas Litigation 1.  Highland got a judgment, as Mr. Morris

6  said in his opening, against Mr. Daugherty for about $2.8

7  million.  Mr. Daugherty got a judgment against Highland for

8  about $2.6 million.  Rather than offset, the parties appealed,

9  and it went on from there.

10     An important component of that piece is Mr. Daugherty's

11 argument that, throughout the case in Texas, Highland and the

12 other defendants maintained that there was an escrow that was

13 going to benefit Mr. Daugherty in the event that he got his

14 judgment.

15     And that relates to the second component of his claims,

16 which is the transfer of the HERA assets.  HERA was the

17 Highland Employee Retention vehicle, it was put in place after

18 the financial crisis, and it was purportedly designed to

19 retain employees.  Mr. Daugherty maintains that the removal of

20 the assets from HERA and the transfer of those assets to

21 Highland and perhaps other places was a detriment to him

22 because not only did he not get his roughly 20 percent

23 interest in HERA, he also had a claim that the structure of

24 HERA was a last-man-standing structure, meaning that it was a

25 pool of assets designed to hold a team of employees together.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 830 of 1726   PageID 12151

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 25 of 86

Seery - Direct                              25

```
1   If you left, the pool stayed the same.  In his reading, other
2   -- other employees -- the remaining employees picked up the
3   assets that you left behind.
4       We have defenses to each of these, but that's his
5   position.
6       The third component of his -- and that was a big piece.
7   That's over $25 million.  The first piece is, with interest,
8   around four.  The next piece is the indemnity.  Mr. Daugherty
9   maintains that he was a -- as a partner, he was entitled to
10  certain indemnification for acts that he did and costs that he
11  incurred in advancing the interests of Highland, and that's
12  around a $5 million piece.
13      In addition, he's got a claim from the 2008 compensation
14  -- this is from the 2007-2008 tax audit -- for about $2.7
15  million.  He received -- Mr. Daugherty received a net loss
16  from Highland that year which gave him an economic benefit by
17  reducing his taxes.  That tax year is still under audit at
18  Highland.  Amazingly.  But maybe not for Highland.  And we
19  thought it would be resolved by now.  That's -- that's, he
20  claims, around $2.7 [million].  I think our thought, that even
21  if it was -- there are a lot of defenses to it, but it would
22  be a much lower number.  That battle is still going on.  We
23  are not addressing that piece in this settlement.
24      And the final piece of his claim, distilled down, is fees,
25  fee-shifting, fees on fees, related to mainly the Delaware
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 831 of 1726   PageID 12152

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 26 of 86

Seery - Direct                    26

```
 1    action.  And I think the best support for that, for our
 2    defense, is that the best support for that is when you go
 3    through that materials that Mr. Daugherty received in the --
 4    from production related to the Delaware judge exercising the
 5    crime-fraud exception to the attorney-client privilege, it's a
 6    pretty torrid tale of stripping of HERA -- HERA's assets,
 7    stripping of the so-called escrow.  It actually looks like,
 8    frankly, the escrow was never really an escrow and it was a --
 9    it was a fraud from the beginning.  And that one's a pretty
10    disturbing one.  We think it's -- our defenses are it's very
11    hard to shift fees in the American system, but it's -- it's
12    not a bare claim.
13        And so that's the essence of his claim, distilled down.
14    Q   And -- thank you, Mr. Seery.  And just to move this along,
15    do you recall, in the fall of 2020, we had the contested 3018
16    hearing?
17    A   Yes.
18    Q   And were all of these issues analyzed, debated, and
19    presented to the Court, to the best of your recollection?
20    A   They were.  I would say that the fee-shifting one got
21    shorter shrift.  We probably had less information at the time
22    than we do now.  Mr. Daugherty clearly had the information.
23    But because it was an estimation hearing, it was a little more
24    truncated, and I think that at that time he was -- the fee
25    shifting was, at least from the Court's perspective, and I
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 832 of 1726    PageID 12153
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 27 of 86

Seery - Direct                                27

 1   think following the traditional American rule, looked on a

 2   little bit -- with a bit of a jaundiced eye in terms of its

 3   validity.  And he was going -- he was clear that he could in

 4   the future prove that up, but we didn't -- he didn't really

 5   explore that issue too often.  Or too much.

 6   Q    Can you describe for the Court what you and the

 7   Independent Board did between the end of the 3018 hearing and

 8   confirmation to negotiate the agreement in principle that was

 9   announced to the Court in early February 2021?

10   A    Sure.  As a quick prelude to that, let me just say that

11   the board, the Independent Board, along with counsel and

12   financial advisors, spent a tremendous amount of time on Mr.

13   Daugherty's claims as they evolved.

14       In addition, because the record is so voluminous, we spent

15   a tremendous amount of time deciphering the record and trying

16   to divine exactly where the risks were and where our better

17   defenses were.

18       So, coming into the 3018, we felt pretty -- pretty good

19   about where we -- where we were clearly exposed and where we

20   had good defenses.

21       Where we were clearly exposed, and we actually

22   acknowledged at the 3018, is on the HERA, the initial HERA

23   piece, which was his $2.6 million judgment plus interest.

24   There -- there really were no defenses to that.  It had been

25   affirmed on appeal.  Highland simply didn't pay the judgment.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 833 of 1726    PageID 12154

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 28 of 86

Seery - Direct                        28

1      After the 3018, we brought a new focus to trying to

2   resolve with Mr. Daugherty what the remaining components would

3   be.

4      We'd hoped to get a holistic settlement, including with

5   respect to the 2007-2008 tax piece, which is the loss

6   carryforward that he was able to use and the value of that.

7   We were not able to reach that conclusion, and I can go

8   through that a little bit more later.  But we did go through

9   each of the other components and negotiate with Mr. Daugherty

10   as we moved towards confirmation.

11  Q    And what took so long to get from February of 2021 until

12   the end of the year when you finally got signatures on the

13   page?  What was happening during that intervening period?

14  A    Well, I would say, first and foremost, while Mr.

15   Daugherty's claim was exceptionally important, he's a large

16   claim, UBS's claim was bigger, and we were in intense

17   negotiations with UBS.

18      As you'll recall, right around that time we discovered the

19   Sentinel fraud, and that was extremely problematic because it

20   upset the UBS negotiation.  That led to us focusing on the --

21   what we could divine on what happened with respect to the

22   transfers out of the Defendants of UBS and Highland's role in

23   that and the negotiations, which led to a renegotiation around

24   the terms of the UBS settlement.  That wasn't completed until

25   I believe it was March of '21.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 834 of 1726    PageID 12155

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 29 of 86

Seery - Direct                          29

1          We then turned to focus on the remaining claims, including

2     with -- obviously, other issues in terms of asset monetization

3     and trying to move towards effective date financing, indemnity

4     trust.  But we did turn to Mr. Daugherty and try to document

5     the settlement we had.

6          Mr. Daugherty took the perspective that, well, wait a

7     second, now that I see what happened with UBS and I see those

8     transfers, I think my claims regarding asset stripping are

9     even better.  Where he thought his only good third-party

10    support for asset tripping and the intentions of a personal

11    vendetta and sweeping it for personal gain was really around

12    Acis, he now -- he could now rely on both the Acis transfers

13    and the transfers that we had exposed with respect to SOHC and

14    CDO Fund, which were the two UBS defendants.  And from Mr.

15    Daugherty's perspective, that changed the nature of his claims

16    and his risk profile.  So, but I wouldn't say the negotiations

17    began in earnest again, but there was a renegotiation around

18    terms.

19    Q    Okay.  And during the negotiations, did the parties

20    exchange numerous drafts of the agreement?

21    A    It has to be at least a dozen.  And it was -- really, the

22    focus around those, after we got into negotiation, argument, I

23    don't think it's fair to call it a dispute, but certainly

24    healthy argument our respective positions, we still settled on

25    a Class 8 claim and a Class 9 claim.  I was very firm on where

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 835 of 1726    PageID 12156

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 30 of 86

Seery - Direct                               30

1   I thought the maximum exposure was on the Class 8/9 -- Class 8

2   claim, and then we settled on -- negotiated around the Class 9

3   number and not wanting to move, because our cash was tight,

4   any other kind of distribution to Mr. Daugherty.  And we had

5   healthy arm's-length negotiations with respect to each of

6   those components.

7        We then focused on the other terms.  Mr. Daugherty's

8   always been clear from the start that he was not releasing

9   anybody who wasn't a current employee at the time we settle.

10  He didn't want to do that.  That was -- that was my

11  insistence, and I had a team that I wanted to make sure we

12  were protecting, because we also have some obligations to them

13  as current employees. But he was -- he was certainly keeping

14  his litigations against Mr. Dondero, Mr. Ellington, some third

15  parties, as well as HERA and ERA.

16       And what he was looking for in the negotiations around the

17  terms were -- was as much flexibility around HERA and ERA,

18  because he had a judgment against HERA and ERA.  And he wanted

19  to make sure that he could -- I believe it's the only creditor

20  from our records of HERA and ERA -- that he could control that

21  entity, and he was going to try to do that through an

22  involuntary, if that's what it took.  And he wanted to be able

23  to use that in his continuing litigation against the other

24  parties that he thinks defrauded him with respect to the so-

25  called escrow.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 32 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 836 of 1726   PageID 12157

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 31 of 86

Seery - Direct                                31

1       And then the other component was I think he really was

2   pushing hard on the structure of the settlement so that it

3   might provide some value to him from an evidentiary

4   perspective, even around things like the whereas clauses.

5       So we took the perspective that I can only put in the

6   whereas clause what I have personal knowledge or that I have

7   been able to decipher from our own records, and that anything

8   else would be an assertion of his.  And Mr. Daugherty took the

9   perspective that if I had -- if he has court records in

10  Delaware, why can't I simply affirm those?  And that was a

11  rather healthy negotiation around those types of items.

12  Q    Before entering into the agreement, did you consider the

13  potential costs, and I think you've described some of the

14  risks, but if you could just perhaps concisely let the Court

15  know if you considered the costs and risks of litigation as

16  the alternative to the settlement before deciding that this

17  was the right thing to do.

18  A    Absolutely.  In all of our settlements, you know, we weigh

19  the risk of winning versus the cost of settling.  We also

20  factor in the cost of litigation.

21      To describe the various litigations that have gone on here

22  as acrimonious and personal and bitter is to grossly

23  understate how vituperative and how dug-in the parties are.

24  These are exceptionally deep-cutting litigations and personal

25  issues between the respective parties.  And our objective was,

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 33 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 837 of 1726   PageID 12158
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 32 of 86

Seery - Direct                              32

1   frankly, to extricate ourselves from that at what we think is

2   a reasonable price.  If the risk-reward wasn't balancing

3   correctly, we would have litigated on the components.

4        But litigating here would have been extremely difficult.

5   And the reason I say that is because we're talking, as I

6   mentioned, about a ten-plus year litigation record.  We're

7   talking about three separate litigations that are currently

8   either outstanding or have various components that have to be

9   dealt with.  Multiple parties in each of them.  A very

10  voluminous record.  And from our perspective, our witnesses we

11  don't think would have been -- one is they're hostile to us,

12  but two, we don't think that they would have been the best

13  witnesses from a credibility perspective.  So we would have

14  been weak on witnesses, relying on docs, a giant record.  It

15  would have been exceptionally expensive.

16  Q   All right.  Let's just finish up with the issues that Mr.

17  Ellington has raised.  Are you generally familiar with the two

18  issues that Mr. Ellington is objecting to?

19  A   I am, yes.

20  Q   Can you describe for Judge Jernigan how the issue of

21  oversight access came to be and what your understanding is of

22  the Reorganized Debtor's obligation under Section 3 of the

23  proposed settlement agreement?

24  A   Sure.  Mr. Daugherty has the perspective of a senior

25  partner at Highland.  And many of the assets that we own,

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 838 of 1726   PageID 12159

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 33 of 86

Seery - Direct                                33

 1   oddly, are still there from when he was there.

 2       Now, to be fair and to be sure, they are very different

 3   assets ten-plus years later.  But it's not unusual for

 4   settlements, particularly creditors of entities that are

 5   stressed, to want to give their input into how they think an

 6   asset should be monetized, what's the best way to bring that

 7   value, because that's going to inure to their benefit as a

 8   settling creditor.

 9       Mr. Daugherty had the perspective that he could bring a

10   significant amount of expertise to that endeavor.  Frankly,

11   since, as I said, he's been out for a long time, he does have

12   significant business acumen, and he put many of these

13   investments on, including MGM and Trussway, at Highland.  They

14   were his.  But the world has changed, but that's not an

15   unusual ask.

16       So I couldn't promise to him that I could put him on the

17   Oversight Board because I'm not on the Oversight Board.  I

18   couldn't promise him that I could even give him observer

19   status, because, again, I'm not on the Oversight Board.  I

20   have the -- I'm overseen by the Oversight Board in many

21   respects, and I do -- I am entitled to attend the Oversight

22   Board meetings.  But he asked for observer status, and I said

23   I would ask for it, but it would be entirely up to the

24   Oversight Board to make a determination if it should be

25   granted, how it should be granted, whether it can be

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 839 of 1726   PageID 12160

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 34 of 86

Seery - Direct                                34

1   rescinded, how -- what the terms would be.

2       Like any board that I've been around in these types of

3   situations, there are often observers.  They are either

4   contractual or granted other -- for other reasons.  And their

5   status is limited.  If -- oftentimes, if it's anything to do

6   with that particular creditor or anything that might be

7   extremely sensitive, they'll usually -- the boards go into

8   executive session without observers.

9   Q    Does --

10  A    So I agreed -- I agreed to ask for it.

11  Q    Okay.  Before getting to that agreement, did Mr. Daugherty

12  initially demand an actual seat on the Oversight Board?

13  A    I don't recall.  It would not surprise me at all, but I

14  just don't recall.

15  Q    And I appreciate the candor.  Under the settlement

16  agreement, does Mr. Daugherty have any right to participate in

17  any Oversight Board meeting?

18  A    No.  Again, it's -- I was very specific that I'm not the

19  Oversight Board.  I can't grant observer status.  I can simply

20  ask for it in good faith and the board will make its own

21  determination.

22  Q    Okay.  Does Mr. Daugherty have -- withdrawn.  Let's move

23  to the HERA and ERA.  Can you explain to the Court how, you

24  know, the issue of the treatment of HERA and ERA evolved and

25  how you wound up at the point of actually agreeing to transfer

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 36 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 840 of 1726   PageID 12161

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 35 of 86

Seery - Direct                                    35

1   those entities to Mr. Daugherty?

2   A    Yes.  So, recall that Mr. Daugherty has a judgment against

3   ERA.  And ERA is the management arm of HERA, but it has no

4   other business or assets.  And I think it has a very small few

5   hundred dollars, maybe a few thousand dollar checking account.

6   I don't recall what it is, but minimal assets.  So, really no

7   value to the estate.

8        One of the components, critical components to Mr.

9   Daugherty from the start was that he was not going to release

10  his claims against HERA and ERA, only the claims against

11  Highland, because if that Delaware -- I think we call it

12  Delaware 1 Litigation, but it might be Delaware 2 -- was still

13  outstanding, and he wanted to continue to pursue that

14  litigation with Highland severed off.

15       My concern was that if he was continuing to sue HERA and

16  ERA and he had a -- he has a judgment against HERA and ERA or

17  he has a joint and several judgment, HERA and ERA could find

18  itself in an insolvent situation, and then either Mr.

19  Daugherty or a trustee acting for Mr. Daugherty might come

20  after Highland or the estate.  I think it would be attenuated

21  and hard to do, but there was a risk of that.

22       So we initially started negotiations around a structure

23  where he would -- he could maintain his claims against HERA

24  and ERA, but if he received anything from Highland on account

25  of anything that happened to HERA and ERA, he had to turn it

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 841 of 1726 PageID 12162

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 36 of 86

Seery - Direct                                36

1   back over to us, so that he can use it to continue his

2   litigations with nonsettling parties but he couldn't back-door

3   that into something against the Reorganized Debtor or the

4   Highland estate.

5       The problem with that was that we were set up to

6   effectively maintain HERA and ERA as the owners of the GP and

7   the -- it effectively is a GP, but I believe it's an LLC

8   structure -- and the other membership interests.

9       He then wanted us to turn it over to him, because I think

10  he thought that was a more effective way to accomplish what he

11  wanted to anyway without having to go through the step of a

12  bankruptcy.  It was certainly more efficient for us.  But what

13  that led to was then negotiation around making it clear that,

14  once again, none of the -- since we're a settling party, we're

15  bringing those claims, none of the actions out of HERA and ERA

16  come against the former owner of HERA and ERA, either directly

17  or indirectly.

18      And so we structured it with a rather detailed and

19  extremely broad release of HCMLP and any of the Highland --

20  Highland Limited -- Capital Management Limited Partner related

21  parties.  And that's the structure of the deal that you see

22  now.

23      When the deal was originally announced in court, we had

24  not yet started to document.  We were just on the financial

25  terms.  But it was clear that these -- he wanted to maintain

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 842 of 1726 PageID 12163

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 37 of 86

Seery - Direct                                37

1   his litigations, and we were -- we were focused on the key

2   financial terms, the Class 8, the Class 9, the cash component,

3   which was really covering the expenses, some of the expenses

4   he's had, as well as the releases related to anybody who's

5   going to be a continuing employee at the Reorganized Debtor.

6        When we got into the documentation, it went to this

7   structure where he'd maintain his claims, but if he received

8   anything on account of a Highland loss, any Highland party

9   related loss, he would have to turn it over.  And then it

10  evolved to the structure where we are now, which is we'll give

11  him HERA and ERA.  They have no value to Highland.  And we

12  want to make sure that we are extricated completely from any

13  of the litigations or costs.

14  Q    And last question on this topic.  I guess last two

15  questions.  You're familiar with the HERA release that is

16  attached to the settlement agreement?

17  A    Yes.

18  Q    Okay.  Last question.  Is that an integral component of

19  the settlement agreement from the Reorganized Debtor's

20  perspective?

21  A    Essential to the transaction.  The basic terms of the deal

22  were initially approved by the Independent Board.  And that

23  included the initial deal that was announced in court as well

24  as the evolving financial terms.  But before the document was

25  done, the Independent Board -- we had the effective date, the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 843 of 1726   PageID 12164

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 38 of 86

Seery - Direct                        38

```
1    Independent Board is gone, and it's been approved by the
2    Oversight Board.  I believe it's a component of the trust
3    agreement that this type of settlement has to be approved by
4    the Oversight Board, that I can't do it on my own, but we're
5    running it so that I use the Oversight Board -- or rely on the
6    Oversight Board; I shouldn't say use -- as a true board of
7    directors.  This is a critical component, both to me as the
8    CEO of HCMLP, to me as the Claimant Trustee, and to the
9    Oversight Board sitting above me and observing and monitoring
10   my activities.
11             MR. MORRIS:  All right.  I have no further questions,
12   Your Honor.
13             THE COURT:  All right.  Friendly parties first.  Mr.
14   Uebler, do you have a question or questions of Mr. Seery?
15             MR. UEBLER:  I do not, Your Honor.  Thank you.
16             THE COURT:  All right.  Ms. Dandeneau, do you have
17   cross?
18             MS. DANDENEAU:  Yes, I do, Your Honor.  And thank you
19   again for your indulgence.  I will attempt to streamline my
20   examination of Mr. Seery as much as possible.
21        If I may, Your Honor, could the Court allow Laura
22   Zimmerman to share her screen for purposes of this
23   examination?
24             THE COURT:  All right.  That's fine.
25             MS. DANDENEAU:  Okay.  And so I would just ask Ms.
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 844 of 1726  PageID 12165

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 39 of 86

Seery - Cross                                39

```
 1   Zimmerman to put on the screen what is Exhibit 1 to the
 2   Debtor's Exhibit 2, which is the settlement agreement attached
 3   to Mr. Morris's declaration that's been admitted into
 4   evidence.  It's at Docket 3270-2.  And let's just go to Page 5
 5   of the -- 5 of the PDF, which is Paragraph 3 of the settlement
 6   agreement.  And if we can maybe just make it larger for some
 7   of us to see.
 8                      CROSS-EXAMINATION
 9   BY MS. DANDENEAU:
10   Q   All right.  Mr. Seery, I just wanted to -- this is, when
11   we talk about the observer rights, this Paragraph 3, I'm not
12   going to read it out loud, but this is the document, the
13   paragraph that has the heading Observation Access, is what
14   you've been referring to with respect to the provisions
15   relating to the observer status on the Oversight Board.  Is
16   that correct?
17   A   That's correct.  Just one clarification, again.  And I
18   hope it may just be nomenclature, but to the extent that
19   there's weight to it, it's observation access.  There are no
20   rights.  The rights vest with the Oversight Board and how
21   they'll grant access or not.
22   Q   Okay.  Thank you for that clarification.  And just for
23   simplicity, can we refer to this provision when we're talking
24   as the observer provision, --
25   A   Yes.
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 41 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 845 of 1726   PageID 12166

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 40 of 86

Seery - Cross                                    40

1   Q    -- or would you -- okay.  Thank you.

2          MS. DANDENEAU:  And so, Ms. Zimmerman, if we could

3   please turn to Page 10 of the settlement agreement, which I

4   believe is Page 14 of the PDF, and just look at the Paragraph

5   8.

6   BY MS. DANDENEAU:

7   Q    And again, I'm not going to -- I will spare everyone a

8   dramatic reading of the provision, but is this what we would

9   refer to as the HERA provision?

10  A    That's correct.

11  Q    Not really intending to leave ERA out, but just it's hard

12  enough to pronounce HERA.  So let's talk a little bit about

13  the changes made to the settlement agreement.

14         MS. DANDENEAU:  If we could please, Ms. Zimmerman,

15  pull up Docket -- Exhibit -- what we have marked as Exhibit

16  SE-5, which is found at Docket 3088.

17      I would note that Highland did incorporate in its witness

18  and exhibit list all pleadings in the case.  This is just

19  Highland's motion to approve the settlement agreement.  And we

20  are marking this as Exhibit SE-5.  No need, I believe, to move

21  it into evidence.  This is just as a demonstrative.

22      If we could please turn to Page 9 of the motion, which I

23  believe is Page 12 of the PDF.  And if we could just blow up

24  those bullets on Paragraph -- under Paragraph 40.  And maybe

25  move it down, just to make sure we've captured all of the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 42 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 846 of 1726   PageID 12167
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 41 of 86

Seery - Cross                              41

 1 | bullets.
 2 | BY MS. DANDENEAU:
 3 | Q    These bullets -- in these bullets, Highland recites the
 4 | material terms of the settlement.  Correct, Mr. Seery?
 5 | A    I believe so, yes.
 6 | Q    And the fifth bullet, okay, refers to what we call the
 7 | HERA provision.  Correct?
 8 | A    Yes.
 9 | Q    Now, there's -- there's -- if we scroll down a little bit,
10 | there is a Footnote 5.
11 |        MS. DANDENEAU:  And maybe we can blow that up a
12 | little bit.
13 | BY MS. DANDENEAU:
14 | Q    And the Footnote 5, but I'll read it, says, "With two
15 | exceptions, the settlement terms are materially the same as
16 | those announced on the record on February 2, 2021 in
17 | connection with the confirmation hearing on the Debtor's plan.
18 | The two exceptions are that (a) the Class 9 claim was
19 | increased by a million dollars; and (b) the Reorganized Debtor
20 | agreed to transfer its interests in HERA and ERA to Mr.
21 | Daugherty."
22 |      Did I read that correctly, Mr. Seery?
23 | A    I believe so, yes.
24 | Q    Okay.  And the granting of the observer provision, let's
25 | say, is not within these two exceptions mentioned in this

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 847 of 1726    PageID 12168

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 42 of 86

Seery - Cross                                42

1   footnote, correct?

2   A    That's correct.

3   Q    Okay.  And in fact, nowhere in the motion itself is there

4   a reference to the observer provision, correct?

5   A    I don't know, but I'll accept that.

6   Q    Okay.  When -- I don't think you testified to this.  When

7   did Highland agree to the observer provision?

8   A    Now, remember, we agreed to ask the board to give Mr.

9   Daugherty observer access.  So the -- if it's okay, I don't

10  recall the exact date; I can elaborate on the evolution of the

11  provision.

12  Q    Well, why don't we just agree, was it prior to the

13  confirmation hearing or after the confirmation hearing?

14  A    It would have been after.

15  Q    Okay.  And so just for what it's worth, if it's after the

16  confirmation hearing, the Footnote 5 is somewhat inaccurate,

17  correct, without -- because it does not reference the observer

18  provision?

19          MR. MORRIS:  Objection to the form of the question.

20          THE WITNESS:  I would disagree with you, --

21          THE COURT:  Sustained.

22          THE WITNESS:  -- Ms. Dandeneau, because I don't think

23  it's material.

24  BY MS. DANDENEAU:

25  Q    Okay.  Thank you.  Did you review the settlement motion

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 848 of 1726    PageID 12169

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 43 of 86

Seery - Cross                                    43

1  before it was filed?

2  A    Yes.

3  Q    Okay.  And did you review any prior drafts of the

4  settlement motion?

5  A    I don't recall.  Typically, and I apologize for

6  elaborating, but typically counsel sends me a very well-

7  developed draft.  Typically, I have comments.  And so I go --

8  I review virtually every pleading that's filed, probably every

9  pleading, and I comment on virtually every pleading.

10 Q    I have no doubt, Mr. Seery, that you get a well-developed

11 draft, and I sympathize with Mr. Morris.  Did anyone request

12 -- did any of the prior drafts contain an express reference to

13 the observer provision?  To your recollection?

14 A    Not that I recall.

15 Q    And to be clear, and I believe you testified to this, Mr.

16 Daugherty is the one who requested that the observer provision

17 be included in the settlement agreement, correct?

18 A    Yes.

19 Q    And also so the record is clear, the HERA provision, and I

20 believe this is what's stated in Footnote 5, is -- was agreed

21 to post-confirmation as well.  Is that correct?

22 A    I think, the way the provision works now, in that I

23 couldn't -- that is correct.  The evolution I described

24 earlier, I don't recall, other than he wasn't going to

25 maintain his claims against HERA and ERA, if that started

Seery - Cross                    44

1   before or after confirmation.  Certainly, before confirmation,

2   there was not a written agreement.  There was only agreement

3   in principle.

4   Q    All right.  Thank you.  And at the time of the

5   confirmation hearing, in accordance with the terms announced

6   on the record, Mr. Daugherty already was going to get under

7   his settlement a substantial claim against the estate pursuant

8   to that settlement.  Correct?

9   A    That's correct.

10  Q    Mr. Seery, I'd like to turn to the Claimant Trust

11  Agreement.  And this is a document that we have marked as

12  Exhibit SE-2.  It's at Docket 3265-2.  I would represent to

13  you and to the Court we were unable to locate a publicly-

14  available copy of the executed form of the Claimant Trust

15  Agreement, but this is the copy that was included in the plan

16  supplement.  I understand that there was an amendment that

17  changed, like, two provisions that are not material to what

18  we're going to discuss.

19       But I would ask, Mr. Seery, do you recognize this

20  agreement?  Or this form of agreement?

21  A    I do recognize the form, yes.

22  Q    Okay.  And you are the Claimant Trustee as that term is

23  used in this agreement, correct?

24  A    (no audible response)

25  Q    Okay.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 46 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 850 of 1726   PageID 12171
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 45 of 86

Seery - Cross                                45

1              MS. DANDENEAU:  Your Honor, I would move for

2      admission of the document that's been marked as SE-2 into

3      evidence.

4              THE COURT:  All right.  Any objection?

5              MR. MORRIS:  No objection.

6              THE COURT:  Okay.  So, --

7              MR. MORRIS:  No, Your Honor.

8              THE COURT:  -- it's admitted, but let's be clear

9      where it's found on the docket.

10             MS. DANDENEAU:  Your Honor, it is at 3265-2.

11             THE COURT:  Okay.  So that is admitted.  Thank you.

12             MS. DANDENEAU:  Thank you, Your Honor.

13         (Scott Ellington's Exhibit SE-2 is received into

14     evidence.)

15     BY MS. DANDENEAU:

16     Q    Mr. Seery, the Claimant Trust Agreement is the

17     organizational document for the Claimant Trust, correct?

18     A    Yes.

19     Q    And you would agree with me that one of the purposes of an

20     organizational document of an entity is to govern the

21     management and operations of that entity, correct?

22     A    Yes.

23     Q    All right.

24             MS. DANDENEAU:  So let's turn, Ms. Zimmerman, please,

25     to Section 4.1.  And, again, I'm going to try to spare

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 851 of 1726  PageID 12172

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 46 of 86

Seery - Cross                                46

 1  everybody from dramatic readings of these sections.

 2  BY MS. DANDENEAU:

 3  Q    So, Section -- so just so we -- before we start, Article 4

 4  is the provision that sets forth the rights and

 5  responsibilities of the members of the Oversight Board,

 6  correct?

 7  A    Essentially correct, yes.

 8  Q    Okay.  And so Section 4.1 describes the initial members of

 9  the Oversight Board, and I'm just going to ask you, and I'll

10  ask you this for every provision:  Is there anything in this

11  section that expressly allows the appointment of a third party

12  as an observer to the Oversight Board?

13  A    I don't believe so, no.

14  Q    And I believe you've talked about observation access as

15  opposed to observer.  And so we're clear, when I say observe

16  -- well, I can ask you, is there anything in here that allows

17  the Oversight Board to grant -- expressly allows the Oversight

18  Board to grant observation access?  So let's go with your

19  terminology with that question.

20  A    I think we can -- we can use them interchangeably.  No.

21  So, --

22  Q    Okay.

23  A    -- observation access, observer status, the concepts are

24  similar and quite common in most corporations.

25  Q    Thank you, Mr. Seery.  That will greatly ease the

Seery - Cross                                    47

1    questioning.

2        All right.  Well, then let's go to Section 4.2.  I will

3    ask you the same question.  Is there anything in this Section

4    4.2 that expressly permits the Claimant Trustee to share

5    information with a person not associated with a member of the

6    Oversight Board?

7    A    I don't believe there was a -- it's not -- it's not a

8    section dealing with sharing of information, but it does

9    reference myself, who's not a member of the Oversight Board,

10   obviously, and the Litigation Trustee, who's not a member of

11   the Oversight Board.  We do receive quite a bit of information

12   from the Oversight Board and share information with the

13   Oversight Board.  But I don't think this provision actually

14   deals with that.

15   Q    And I believe what you're referring to is Paragraph 4.C,

16   correct, where you as the Claimant Trustee are required to

17   provide the Oversight Board with information sufficient to

18   enable the Oversight Board to meet its obligations under the

19   Claimant Trust Agreement, correct?

20   A    That's, that's part of it.  There's also -- the way that

21   the structure of the board works is -- and it was highly

22   negotiated in terms of how each of the entities or persons

23   would function -- I'm entitled to be at Oversight Board

24   meetings, but the Oversight Board can exclude me if it's in

25   their reasonable determination to do so.  I'm entitled to

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 49 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 853 of 1726   PageID 12174
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 48 of 86

Seery - Cross                           48

 1  bring advisors, I believe is the term, and I forgot where it

 2  is in the -- exactly in the section, but I certainly can bring

 3  my advisors.

 4  Q    Okay.  Thank you, --

 5  A    The Oversight Board, once again, provided they're acting

 6  reasonably, can reasonably exclude me or my advisors.

 7  Q    Thank you, Mr. Seery.  And now let's go to -- I was just

 8  -- Section 4.4 and 4.6, which deal with meetings of the

 9  Oversight Board.  We'll start with 4.4.  Is there anything in

10  Section 4.4 that expressly permits an observer or any other

11  third party that is not acting as a representative of the

12  Claimant Trust, the Litigation Sub-Trust, or the Oversight

13  Board to participate in meetings of the Oversight Board?

14  A    Not that I recall.

15  Q    And same question, if we can move to Section 4.6.  Is

16  there anything in Section 4.6 that expressly permits an

17  observer or any other third party that is not acting as a

18  representative of the Claimant Trust, the Litigation Sub-

19  Trust, or the Oversight Board to participate in any meetings

20  of the Oversight Board?

21  A    I don't believe so.

22  Q    Okay.

23  A    Uh, --

24  Q    And to -- I'm sorry.  I did not mean to --

25  A    I apologize, because I didn't read the top section.  Some

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 50 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 854 of 1726   PageID 12175

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 49 of 86

Seery - Cross                          49

```
 1   of the former creditors have some specific reference in there,
 2   but I think that's really dealing with excluding Redeemer or
 3   Acis and/or UBS, depending on what the particular issue being
 4   discussed would be and how a quorum would work.  I think that
 5   -- I don't think there's a specific provision that allows you
 6   to bring somebody else in, and that doesn't surprise me at
 7   all.  I don't know that I've ever seen one.
 8   Q    Okay.  Thank you.  And just so that we're clear, at the
 9   time the Claimant Trust Agreement was drafted, those specific
10   creditors who are referenced, those were contemplated to be
11   members of the Oversight Board; is that correct?
12   A    I believe that is correct, yes.
13   Q    Okay.  And by the way, when I say participate, can we
14   agree that participate includes observing?
15   A    For -- for -- if we need to distinguish, we can.
16   Q    For --
17   A    Yeah.  I mean, typically, participating one would think
18   would be someone who's active, has a vote, has a discussion.
19   Observers, in my experience, whether they be creditors,
20   whether they be regulators, whether they be large
21   shareholders, only get to watch, unless asked something.
22   Q    So, so let's talk about attend, I guess.  There's nothing
23   -- because I didn't mean to (overspoken) --
24   A    Yeah, no, I'm not trying to (overspoken) the distinction.
25   Q    Okay.
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 51 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 855 of 1726   PageID 12176

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 50 of 86

Seery - Cross                        50

1   A    There's nothing in the agreement that would say some third

2   party can come in or that the board can invite some third

3   party in, just like there's nothing in the agreement that says

4   you -- the board could serve lunch at the meetings.

5   Q    All right.  Thank you, Mr. Seery.  Let's skip to Section

6   4.9.  And, again, this section purports to allow the removal

7   of a member of the Oversight Board for cause or disability.

8   Is that -- is there anything in that section that expressly

9   permits the Oversight Board to remove someone to whom it has

10  granted some form of observer status?

11  A    No.

12  Q    Now, Section 4.10, which sets forth in detail how a

13  successor member of the Oversight Board will be appointed

14  following the removal, death, or resignation of a member, does

15  this Section 4.10 expressly contain anything that would permit

16  the Oversight Board to grant observer status to any third

17  party?

18  A    No, not that I recall.

19  Q    Okay.  And Section 4.12 requires each member of the

20  Oversight Board to hold strictly confidential and not use for

21  personal gain any confidential trust information.  Is that

22  correct?

23  A    That's correct.

24  Q    Okay.  Is there anything in this Section 4.12 that sets

25  forth the same requirements for an observer or another -- a

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 52 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 856 of 1726   PageID 12177
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 51 of 86

Seery - Cross                               51

 1   third party attending an Oversight Board meeting?

 2   A    I'm sorry, Ms. Dandeneau.  I got lost in reading the

 3   section.  But I apologize; I missed the question.

 4   Q    Oh, I'll repeat it.  And it was a long question.  Sorry

 5   for that.  Is there anything in this Section 4.12 that sets

 6   forth the same confidentiality requirements for an observer or

 7   any other third party who is attending a meeting of the

 8   Oversight Board?

 9   A    I don't recall.  I would expect that if an Oversight Board

10   member brought a colleague, whether that be a junior colleague

11   or an outside professional because they had outside counsel or

12   expert, that that colleague or affiliate, if you will, small

13   A, will be bound by the confidentiality that binds the member.

14   But there's -- it doesn't deal with observer status.  I don't

15   think that's something in the document at all.

16   Q    Okay.  Thank you.  So, so in your view, I'd like to

17   understand how the sharing of confidential information with a

18   third party by the Oversight Board would work.  Does the

19   Oversight Board need to make a decision to share confidential

20   information with a third party, collectively, the Oversight

21   Board?

22          MR. MORRIS:  Objection, Your Honor.  This is a

23   hypothetical and it's being asked of a person who's not even a

24   member of the Oversight Board.

25          THE COURT:  Sustained.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 53 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 857 of 1726    PageID 12178

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 52 of 86

Seery - Cross                                    52

 1  BY MS. DANDENEAU:

 2  Q    Is there anything in the Claimant Trust Agreement that

 3  actually contemplates the sharing of confidential information

 4  with a third party?

 5  A    Not that I recall, except the sharing with professionals,

 6  which is clearly contemplated, and perhaps my employees.  When

 7  I mean mine, I mean the Reorganized Debtor.  It's not

 8  expressed that I recall, but employees of the Reorganized

 9  Debtor can and do attend Oversight Board meetings and they are

10  bound by confidentiality, as am I, on confidential issues.

11  There may be things that aren't particularly confidential that

12  are discussed at times.

13  Q    And Mr. Seery, I believe you testified that the Oversight

14  Board in your view would impose reasonable protections if they

15  were going to allow a third party to attend an Oversight Board

16  meeting or observe an Oversight Board meeting.  Is that

17  correct?

18  A    I apologize.  I don't recall actually saying that.  But I

19  would expect such.

20  Q    Okay.  Thank you.  Are you, sitting here today, prepared

21  to vouch to the Oversight Board that Mr. Daugherty is likely

22  to comply with confidentiality requirements imposed on him?

23  A    No.

24  Q    Now, for the sake of completeness, let's take a look at

25  Article 10 of the Claimant Trust Agreement.  Now, this allows

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 54 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 858 of 1726   PageID 12179

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 53 of 86

Seery - Cross                                  53

1   amendments to the agreement, correct?

2   A    Yes.

3   Q    Okay.  And for anything other than clarifying nonmaterial

4   provisions of the Claimant Trust Agreement, an amendment

5   requires an instrument signed in writing by you as the

6   Claimant Trustee, correct?

7   A    I haven't looked at the provision in a while, but I would

8   expect such, yes.

9   Q    Okay.  And an amendment to the Claimant Trust Agreement

10  requires the unanimous approval of the Oversight Board,

11  correct?

12  A    It -- that's -- that's what it appears to say, yes.  I

13  apologize.  I just haven't looked at the provision in a long

14  time.

15  Q    I'm not trying to rush you through this, so if you need

16  time to look at it --

17  A    No, that's okay.  I believe you're correct.

18  Q    Okay.  And then, finally, an amendment requires the

19  approval of the Bankruptcy Court, after notice and a hearing.

20  Is that correct?

21  A    A material amendment.  That's correct.  It seems a little

22  odd to me, as an aside, that, depending on when this happened,

23  whether the Court would undertake to hear that, but that's

24  what it says.

25  Q    Okay.  Well, just so we're clear, it says the Oversi...

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 55 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 859 of 1726    PageID 12180
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 54 of 86

Seery - Cross                              54

1    may amend this agreement to correct or clarify any nonmaterial

2    provisions.  And then it says, it may not otherwise be

3    amended, et cetera, without these components.  So, I believe

4    that that's -- that is how -- how it works.  I don't know if

5    that changes your answer, Mr. Seery.

6    A    No.  I believe my answer is sufficient.

7    Q    Okay.  Now, you've previously testified, and as the

8    observer provision states, whether Mr. Daugherty will be

9    granted observer access and any continuing access will remain

10   at the sole discretion of the Claimant Trust Oversight Board.

11   Correct?

12   A    Yes.

13   Q    And nothing in the observer provision actually references

14   your approval in your capacity as the Claimant Trustee for

15   granting observer -- what I'm going to say, observer status on

16   the Oversight Board to Mr. Daugherty.  Correct?

17   A    That -- that's correct.  I think it's presumed, since I'm

18   asking for it.

19   Q    Okay.  Have you signed anything in writing agreeing --

20   agreeing to grant Mr. Daugherty observer access or observer

21   status?

22            MR. MORRIS:  Objection to the form of the question.

23            THE WITNESS:  No, I've simply --

24            THE COURT:  Overruled.

25            THE WITNESS:  I'm sorry.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 56 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 860 of 1726   PageID 12181

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 55 of 86

Seery - Cross                              55

1          THE COURT:  Overruled.  You can answer.

2          THE WITNESS:  I simply -- I've simply signed the

3    settlement agreement which says that I will use my reasonable

4    efforts to request that the Oversight Board grant observer

5    status to Mr. Daugherty, and the terms, limitations,

6    provisions are for the Oversight Board, or even -- even

7    granting it.

8    BY MS. DANDENEAU:

9    Q    And as the Claimant Trustee, you have fiduciary duties to

10   the Claimant Trust and its beneficiaries, correct?

11   A    Correct.

12   Q    And nothing in the Claimant Trust Agreement or Delaware

13   trust law allows you to delegate those fiduciary duties,

14   correct?

15         MR. MORRIS:  Objection to the form of the question.

16         THE COURT:  Sustained.

17   BY MS. DANDENEAU:

18   Q    Nothing in the observer provision that's included in the

19   settlement agreement references any amendment to the Claimant

20   Trust Agreement; is that correct?

21   A    Yes.

22   Q    And nothing in the observer provision references the

23   requirement for further approval of an amendment by the

24   Bankruptcy Court after notice and a hearing; is that correct?

25   A    That's correct.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 57 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 861 of 1726   PageID 12182

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 56 of 86

Seery - Cross                              56

1  Q    Okay.  And I know you testified to this already, but is

2  there anything in the Claimant Trust Agreement that prohibits

3  the Claimant Trust from consulting with Mr. Daugherty if he is

4  not a member of the Oversight Board or granted some kind of

5  observer status?

6  A    I believe Mr. Morris testified to that, but the answer --

7  Q    Oh, I'm sorry.  I get confused sometimes when Mr. Morris

8  testifies.

9  A    No, the answer -- the answer, there's -- there is no

10 prohibition from consulting with whomever the Oversight Board

11 wants to consult, whether they're a professional, whether

12 they're Claimant Trustee, Litigation Trustee, whether they're

13 an observer, or whether they're someone on the street.

14 Q    And is there anything in the Claimant Trust Agreement that

15 prohibits the Claimant Trust from receiving information from

16 Mr. Daugherty?

17 A    No.

18 Q    Now, Mr. Daugherty stopped being employed by Highland in

19 2011; is that correct?

20 A    That's my recollection, yes.

21 Q    Yes.  With respect to the pending actions that are being

22 -- let's start with the Reorganized Debtor -- being pursued by

23 Highland as the Reorganized Debtor, does the estate require

24 any assistance from Mr. Daugherty?

25 A    I apologize.  I missed the first part.  You said with

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 862 of 1726  PageID 12183
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 57 of 86

Seery - Cross                          57

1    respect to the pending actions that Highland has brought.

2    Meaning litigation actions?

3    Q    Yes.  Mr. Seery, let me -- let me rephrase that terrible

4    question.  With respect to whatever litigation is currently

5    pending that is being pursued by Highland as the Reorganized

6    Debtor, as opposed to a Litigation Sub-Trust, does the estate

7    require -- does Highland require any assistance from Mr.

8    Daugherty?

9    A    No.

10   Q    Okay.  And in fact, Reorganized Highland and the Claimant

11   Trust are represented by the Pachulski firm, correct?

12   A    That's correct.

13   Q    And --

14   A    Generally, yes.

15   Q    Okay.  And in your view, does the Pachulski firm require

16   any assistance from Mr. Daugherty in connection with the

17   matters on which it is representing the Reorganized Highland

18   or the Claimant Trust?

19   A    No.  Those -- those matters are all wrapped -- packed and

20   ready to go.

21   Q    Okay.  Are you familiar with the action being generally

22   commenced by Mr. Kirschner as the Trustee of the Litigation

23   Sub-Trust --

24   A    Yes.

25   Q    -- against numerous defendants, including Mr. Ellington?

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 59 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 863 of 1726   PageID 12184

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 58 of 86

Seery - Cross                          58

1   A    Yes.

2   Q    Now, I will represent to you that there are certain counts

3   -- namely, Counts 1 and 2 -- that include causes of action for

4   the recovery of equity distributions going back as far as

5   April of 2010.  But putting those aside, would you agree with

6   me with respect to the Kirschner action that nearly all of the

7   relevant facts in that action arose after 2011?

8          MR. MORRIS:  Objection to the form of the question.

9   Just relevance, Your Honor.

10          THE COURT:  Okay.  What is the relevance?

11          MS. DANDENEAU:  Your Honor, what it is going to show,

12  and I think this is consistent with what Mr. Seery has

13  testified, is that nobody really needs the advice of Mr.

14  Daugherty with respect to whatever the Reorganized Debtor is

15  doing and also with respect to whatever the Litigation Sub-

16  Trust is doing.

17          THE COURT:  What does advice of Mr. Daugherty have to

18  do with anything?  Isn't it access, observer access?

19          MS. DANDENEAU:  Well, I believe that it is also

20  having him attend -- having him attend and do whatever

21  observers do with respect to the Oversight Committee.  But I

22  do believe that there was testimony that he might be useful in

23  connection with certain facets of liquidating Highland's --

24  kind of the longstanding, long-held assets.  But I think it is

25  worth at least getting -- having it recognized that there is

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 60 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 864 of 1726   PageID 12185

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 59 of 86

Seery - Cross                                 59

 1   really no utility served by having the Litigation Sub-Trust or

 2   even having Highland have "access" to Mr. Daugherty.

 3          THE COURT:  All right.  Well, I think it's of dubious

 4   relevance, but I'll allow the question.

 5      Mike, how long have we been going with this cross-

 6   examination, by the way?

 7          THE CLERK:  Approximately 29 minutes, Judge.

 8          THE COURT:  Okay.  Twenty-nine minutes.  All right.

 9   You may proceed.

10          THE WITNESS:  I think I have the gist of the

11   question.  I don't purport to understand exactly what Mr.

12   Kirschner's strategy is on every point, but I don't think

13   additional information from Mr. Daugherty is required for Mr.

14   Kirschner or the Quinn Emanuel firm to pursue the cause of

15   action.  Whether he would be helpful or not for certain

16   aspects, he may be, but I don't have specific information on

17   that and that would depend on the give and take of what

18   happens in the litigation.

19      And to clarify, I said earlier that Mr. Daugherty believes

20   that he could be useful in providing advice around certain of

21   the positions that he's familiar with that he put on.  But

22   aside from public information, which is certainly his right to

23   receive, and some of it is available for some of the

24   companies, he hasn't been involved with those companies for

25   ten years, so I don't -- I don't purport to say that he is

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 865 of 1726 PageID 12186
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 60 of 86

Seery - Cross                                        60

1    necessary for me to monetize those assets.

2    Q    Thank you, Mr. Seery.  Now, has Mr. Daugherty been

3    assisting the bankruptcy estate through his own

4    investigations?

5            MR. MORRIS:  Objection to the form of the question.

6    Your Honor, we've got -- we've got two -- we've got an

7    objection about access and we've got an objection about HERA

8    and ERA.  I don't think it's appropriate or relevant to try to

9    get discovery for a different lawsuit here.

10           MS. DANDENEAU:  Your Honor, I'm -- may I respond?

11           THE COURT:  Please.

12           MS. DANDENEAU:  Your Honor, first of all, this is a

13   quote from Mr. Daugherty's joinder to the motion, where Mr.

14   Daugherty says he's been assisting the bankruptcy estate

15   through his own investigations.  And we are particularly

16   concerned, we've made no surprise about it, with respect to

17   the observer -- granting of the observer status, the potential

18   granting of the observer status, and potentially giving Mr.

19   Daugherty access to confidential information.

20       And what we'd like to establish is whether the estate --

21   and we're not -- I'm not going to go in a lot of detail, but

22   this is what Mr. Daugherty has said, and we'd like to know

23   whether he has shared information with the estate up until

24   this point, personal nonconfi... you know, personal

25   confidential information that is -- that's not public --

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 62 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 866 of 1726 PageID 12187

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 61 of 86

Seery - Cross                           61

1            MR. MORRIS:  Your --

2            MS. DANDENEAU:  -- with the estate.

3            MS. DANDENEAU:  Your Honor, if I may just briefly.

4            THE COURT:  You may.

5            MR. MORRIS:  Mr. Daugherty -- Mr. Ellington does not

6    have standing to challenge the access.  He's not a beneficiary

7    of the trust, number one.

8        Number two, to the extent that they contend that it's a

9    plan modification, make the argument that it's a plan

10   modification.  You know, what discussions were had, I don't

11   understand how this is relevant.  It's clear that Mr.

12   Ellington thinks that somehow Mr. Seery is, you know, aiding

13   and abetting, I guess, whatever wrongdoing Mr. Ellington

14   alleges Mr. Daugherty is engaged it.  It's exactly why we're

15   trying to extricate ourselves from this.  Challenge --

16   challenge the provision.  You know, we've heard the analysis

17   and the questioning on the provision itself.  But we're going

18   very far afield, and it's just -- it's not relevant.

19           THE COURT:  Okay.  I agree --

20           MS. DANDENEAU:  Mr. Morris, I mean, I do --

21           THE COURT:  I agree we're going very far afield.

22   This feels like it's discovery relevant to what I'm going to

23   call the stalking action.  So, anyway, I sustain the

24   objection.

25           MS. DANDENEAU:  All right.  Thank you.  And for

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 63 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 867 of 1726    PageID 12188

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 62 of 86

Seery - Cross                          62

 1  record, Your Honor, I just want to make clear that we are not

 2  trying to allege in any respect -- I mean, to the contrary --

 3  that the Debtor was somehow kind of in cahoots with Mr.

 4  Daugherty with respect to any of the allegations.  So I do

 5  want to make that clear on the record.

 6          MR. MORRIS:  I appreciate that.

 7          THE COURT:  Okay.  Anything else?

 8          MS. DANDENEAU:  Well, Your Honor, there are -- I'd

 9  like to ask some questions, and maybe I -- I will try to

10  simplify them.  But -- and then wrap up very quickly.  And

11  then Mr. Morris is free to object, obviously.

12  BY MS. DANDENEAU:

13  Q   Mr. Seery, if prior to the execution of the settlement

14  agreement somebody had told you that there were allegations

15  that Mr. Daugherty had been observed outside someone's office,

16  residence, sister's residence, father's residence, no less

17  than 143 times, often taking photographs and video recordings,

18  or that Mr. Daugherty had been observed at least eight times

19  outside the home where Mr. Ellington's sister resides with her

20  husband and children, or that Mr. Daugherty was observed at

21  least seven times outside the home of Mr. Ellington's widower

22  father, again, putting aside whether those -- just on the

23  basis of those allegations, would any of those allegations

24  have changed your view about agreeing to the inclusion of the

25  observer provision in the settlement agreement?

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 64 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 868 of 1726    PageID 12189
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 63 of 86

Seery - Cross                                63

1             MR. MORRIS:  Objection; calls for a hypothetical.

2             THE COURT:  Sustained.

3   BY MS. DANDENEAU:

4   Q   Well, just so I can clarify for the record, let me ask

5   this.  Have you, Mr. Seery, have you read or has somebody

6   explained to you the allegations that were contained in the

7   state court petition filed against Mr. -- filed by Mr.

8   Ellington against Mr. Daugherty?

9   A   I read enough of the -- I'm sorry.  Did I cut you off,

10  John?

11            MR. MORRIS:  I was just going to say yes or no, to

12  the extent it involves attorney-client communications.  But

13  you can --

14            MS. DANDENEAU:  I'm only asking for a yes or no.

15            THE WITNESS:  It's hard to say yes or no.  But I

16  don't -- I don't recall (inaudible) under the state court

17  proceedings that I -- that I know of.  I have read the -- at

18  least glanced at the remand -- removal and remand documents

19  that have been filed in this Court.

20  BY MS. DANDENEAU:

21  Q   Okay.  And would you agree that one of the effects of

22  giving Mr. Daugherty observer status could be that Mr.

23  Daugherty will have access to confidential information that is

24  not otherwise publicly-available?

25  A   Around the assets, I don't -- I don't know what the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 869 of 1726    PageID 12190

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 64 of 86

Seery - Cross                              64

1    limitation -- I don't know because I don't know what the

2    limitations, if any, the Oversight Board would put on access

3    for Mr. Daugherty if they grant it.  It would be up to them.

4    But I would -- I would -- if there was confidential

5    information regarding either assets or regarding litigations,

6    we would -- I would assure and I'm sure the board would assure

7    that confidentiality agreements are in place and that

8    materials like that could not be released or used otherwise.

9    Q    But as we sit here today, there's nothing in the Claimant

10   Trust Agreement or the settlement agreement that provides

11   assurance that no member of the Oversight Board will share

12   confidential personal information with Mr. Daugherty?

13   A    I don't think that's true.  I think there's a specific

14   confidentiality provision that you have in the -- in the trust

15   agreement, and the language that we included in the settlement

16   agreement, which was that I would request that the board grant

17   Mr. Daugherty observer access or status, it's subject to the

18   types of confidentiality that one would typically expect from

19   a board-type deliberation.

20       So if one were to breach that, that would be a breach of

21   the agreement, would certainly abuse whatever observer status,

22   even as limited that you might have been granted.  But it

23   would also subject somebody to potential damages for breaching

24   the agreement if it hurt the Trust.

25   Q    And Mr. Seery, sitting here today -- this is my last

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 66 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 870 of 1726   PageID 12191

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 65 of 86

Seery - Cross                              65

1   question -- are you prepared to recommend to the Oversight

2   Board that they agree to grant observer status to Mr.

3   Daugherty?

4   A    I -- I don't know if I would recommend.  I said I would

5   ask, and I'll do it in good faith, and I'll provide my views

6   as they evolve depending on the discussion we have.  I

7   certainly think a significant creditor appearing -- observing

8   board deliberations around the monetization of assets is

9   nothing unusual, having done this for it seems like

10  forever.  I have been an observer.  I've had observers at

11  boards that -- observers on boards that I've been on.  It's a

12  pretty typical construct, where you have assets that are being

13  monetized, as opposed to necessarily -- or a straight board

14  with an operating committee, although you see them as

15  well.  And I -- I don't know that the limitations we're

16  talking about, how they would pertain, but it would depend on

17  each thing.

18       Obviously, the sensitivity around confidentiality and

19  attorney-client privilege and common interest related to

20  Litigation Trustee issues and note litigation issues, et

21  cetera, is a little bit different than the sensitivity and

22  confidentiality around private companies and their operations,

23  although that is still sensitive and we want to make sure it's

24  protected.

25  Q    All right.  Thank you, Mr. Seery.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 67 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 871 of 1726   PageID 12192

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 66 of 86

Seery - Redirect                          66

1            MS. DANDENEAU:  I have no further questions at this

2    time.

3            THE COURT:  All right.  Mr. Morris, redirect?

4            MR. MORRIS:  Yeah.  Just a couple of quick questions.

5                        REDIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Seery, in Paragraph 3, the observer access provision

8    of the proposed settlement agreement, did Mr. Daugherty agree

9    that he would be bound by all policies, procedures, and

10   agreements, including confidentiality agreements of the

11   Oversight Board, if he's given access?

12   A    I don't recall the specifics of the provision in that

13   regard, but the terms of the request would be that, if he gets

14   it, --

15   Q    All right.

16   A    -- he will be bound by whatever strictures the Oversight

17   Board puts on him.  And that -- again, this is -- I understand

18   the sensitivity by counsel, but it's a pretty common

19   provision.

20       It's also common that an observer's access is

21   circumscribed.  It's not something where it's just sit and

22   watch all the proceedings.  For example, if there's employee

23   discussions or how some -- the company, the Trust, might deal

24   with certain claims or taxes or things that may not deal with

25   or impact the observer's realization on their claim, I would

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 68 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 872 of 1726   PageID 12193

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 67 of 86

Seery - Redirect                          67

1   expect there would be limitations.  There typically are.

2   Q    Okay.  And can you just confirm that Paragraph 3, in

3   Paragraph 3 Mr. Daugherty agreed that he would have absolutely

4   no right of access to Oversight Board meetings unless the

5   Oversight Board made that determination in its sole

6   discretion?

7   A    That, that is correct.  I couldn't promise him something

8   that I can't deliver, and I wanted to make sure that I wasn't

9   in any way limiting the rights of the Oversight Board to

10  determine who, if anyone, could observe their deliberations.

11  Q    Okay.  Ms. Dandeneau took you through certain provisions

12  of the trust agreement and asked you whether or not certain

13  things were expressly authorized.  Do you recall that?

14  A    Yes.

15  Q    And you're generally familiar with the trust document; is

16  that right?

17  A    I am, although clearly from my testimony not as sharp as I

18  need to be.

19  Q    Okay.  Do you recall that there's anything in the trust

20  agreement that expressly prohibits the granting of observer

21  status to third parties?

22  A    I'm quite certain there isn't.

23  Q    Do you recall if there's anything in the trust agreement

24  that expressly prohibits the sharing of information with third

25  parties?

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 69 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 873 of 1726   PageID 12194

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 68 of 86

Seery - Redirect                          68

1   A    I'm quite certain there isn't.

2   Q    Are you aware of anything in the trust agreement that

3   expressly prohibits the Oversight Board from deciding that it

4   doesn't want to grant observer access to third parties?

5   A    There is not.

6   Q    Okay.  Is there anything that you're aware of in the trust

7   agreement that prohibits the observer access provision in

8   Paragraph 3 of the proposed settlement agreement?

9   A    No, there isn't.  And just, again, nor would there be.

10  There are observers at boards of directors or trusts.  It's

11  common.  I've never seen, never seen a corporate

12  organizational document or trust organizational document that

13  prohibits observers if the trustee or an oversight board or a

14  board of directors wants to have them.

15          MR. MORRIS:  Okay.  I have no further questions, Your

16  Honor.

17          THE COURT:  Any recross on that redirect?

18          MS. DANDENEAU:  No, Your Honor.  Thank you.

19          THE COURT:  All right.  Thank you, Mr. Seery.

20          THE WITNESS:  Thank you, Your Honor.

21      (The witness is excused.)

22          THE COURT:  Mr. Morris, anything else?

23      CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

24          MR. MORRIS:  Just really briefly, Your Honor.  The

25  Reorganized Debtor doesn't believe that Mr. Ellington has

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 874 of 1726    PageID 12195
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 69 of 86

69

1    standing to prosecute his objection because he holds no claim

2    against the Debtor, the Reorganized Debtor, the Trust, or any

3    aspect of the estate.

4        We believe that we've easily met the standard under 9019.

5    We believe this settlement is fair, reasonable, and in the

6    best interests of the estate.  We believe the evidence

7    conclusively shows that the proposed settlement is the subject

8    of arm's-length negotiations; that after doing an exhaustive

9    cost-benefit analysis, that the Debtor, in an exercise of its

10   reasonable judgment, believes that the benefits of the

11   proposed settlement greatly outweigh the costs and expenses of

12   litigation.

13       We believe specifically that with respect to the two items

14   that Mr. Ellington has objected to, that there's absolutely no

15   foundation for characterizing Paragraph 3 of the settlement

16   agreement as a plan modification.  It grants absolutely no

17   rights to Mr. Daugherty whatsoever.  It simply allows the

18   Oversight Board to exercise, in its sole discretion, whether

19   to give him access.  And if he's ever given access, it will be

20   subject to the policies and procedures and agreements of the

21   Oversight Board, including confidentiality.

22       HERA and ERA was an integral part of Mr. Daugherty's

23   claim.  You heard testimony from Mr. Seery that that issue was

24   debated and morphed several times into different types of

25   resolutions before ultimately settling on the final

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 71 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 875 of 1726    PageID 12196

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 70 of 86

70

1  resolution.

2      It's clear from Mr. Ellington's papers, from Mr.

3  Daugherty's papers, that the two of them are going to continue

4  their litigation pattern in the future whether or not the

5  HERA/ERA aspect is part of the agreement or not.  I mean, if

6  somehow that were not part of the agreement, I don't think

7  there's any evidence, I don't think there's any basis, and

8  indeed, it's contrary to what both of them have said, that

9  that would somehow end litigation between them.

10      So it doesn't really matter.  What does matter, Your

11  Honor, is that the Debtor had a very rational business reason

12  for agreeing to that particular term, and that business reason

13  is reflected not just in the transfer of the asset, but most

14  importantly, in the exhibit to the settlement agreement, the

15  HERA release.

16      So, on that basis, Your Honor, we respectfully request

17  that the Court overrule the objection and grant the motion in

18  its entirety.  Thank you.

19          THE COURT:  All right.  Mr. Uebler, any closing

20  argument from you?

21          CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

22          MR. UEBLER:  Your Honor, just that Mr. Daugherty

23  requests that the motion be approved.  Thank you for your time

24  this afternoon.

25          THE COURT:  All right.  Ms. Dandeneau, what would you

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 72 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 876 of 1726 PageID 12197

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 71 of 86

71

1    like to say as far as closing argument?

2            MS. DANDENEAU:  Thank you, Your Honor.

3            CLOSING ARGUMENT ON BEHALF OF SCOTT ELLINGTON

4            MS. DANDENEAU:  We fully understand that the standard

5    for approval of a compromise under Bankruptcy Rule 9019

6    focuses on what is in the best interest of the debtor's

7    estate.  And we know that the Court typically defers to the

8    debtor's business judgment.

9        As outlined in our objection, though, Mr. Ellington has

10    two principal concerns with the proposed settlement.  The

11    first raises a legal concern.  Mr. Morris addressed that, his

12    view of it, which is that Highland incorporated the Claimant

13    Trust Agreement into its plan.  The Claimant Trust Agreement

14    is the document that governs the management and operations of

15    the Claimant Trust.  That includes the activities of the

16    Claimant Trust Oversight Board.

17        Article 4 of the Claimant Trust Agreement has extensive

18    provisions dealing with the appointment of the board, the

19    replacement of members, and their rights and responsibilities.

20    And those rights and responsibilities include fiduciary duties

21    and a duty to keep confidential information confidential and

22    not use it for personal gain.  And nowhere in the Claimant

23    Trust Agreement is the granting of observer status to a third

24    party contemplated.

25        The Claimant Trust Agreement never reserved to the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 73 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 877 of 1726   PageID 12198

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 72 of 86

72

 1   Claimant Trust the right to invite third parties, otherwise

 2   unassociated with the Claimant Trust or the Oversight Board or

 3   the Litigation Sub-Trust, to obtain access to confidential

 4   information.  And granting that kind of provision

 5   substantially deviates from the terms of the Claimant Trust

 6   Agreement.

 7        Indeed, nothing in the Claimant Trust Agreement, other

 8   provisions of the plan, or even the settlement agreement even

 9   ever mentioned, much less truly defined, what an observer is.

10   That's a significant part of the problem.  We have a Claimant

11   Trust that goes to great lengths to lay out the rights and

12   responsibilities of all parties and to protect the Claimant

13   Trust from breaches of confidentiality.  And now what we have

14   is really Mr. Seery's word for what will happen with an

15   observer to the Claimant Trust, because those provisions are

16   not included in any document.

17        What are the duties of an observer?  What are the rights?

18   What is to prevent Mr. Daugherty from accessing confidential

19   information and then using it?  And why does Mr. Daugherty

20   even need access to confidential information?

21        Moreover, Highland would argue that the Claimant Trust has

22   the ability to grant observer status through an amendment.

23   Well, again, we don't believe -- I know that they're not

24   saying that, but we don't believe an amendment can be

25   accomplished through simply the exercise of the Oversight

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 878 of 1726 PageID 12199

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 73 of 86

73

1    Board's sole discretion.  Among other things, an amendment to

2    the Claimant Trust Agreement requires notice and a hearing

3    before this Court for this Court to expressly approve that

4    provision.

5        The second issue, Your Honor, goes to the issue of whether

6    Highland was fully and properly informed of the relevant facts

7    in exercising its business judgment to agree to the inclusion

8    of the observer provision and the HERA provision.  The effect

9    of both of these provisions is to give Mr. Daugherty, who has

10   been accused of stalking Mr. Ellington and family members and

11   other people closely associated with Mr. Ellington, including

12   children, of giving Mr. Daugherty access to information about

13   Mr. Ellington that is not otherwise publicly available.  And

14   there is nothing that we've heard today that provides

15   assurance that the Oversight Board will not provide that

16   access to Mr. Daugherty.

17       No one disputes, at least with respect to the observer

18   provision, that that is a -- that is a significant potential

19   effect.  And Mr. Daugherty himself has stated that he wants

20   the HERA equity so he can access otherwise-privileged

21   communications between HERA and its counsel.  Those are also

22   likely to include confidential information.

23       And I recognize Highland sits here today and says, we had

24   no idea when we signed, our hands are tied, well, this doesn't

25   really hurt Highland's estate.  Should the Court, which is a

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 879 of 1726 PageID 12200

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 74 of 86

74

1  court of equity, really allow a settlement to be approved when

2  one of the purposes of two provisions that were added after

3  the agreement in principle is to give an alleged stalker

4  better access to his victims?  Should the Court really allow a

5  settlement to be approved when Mr. Daugherty insisted on these

6  provisions that never disclosed to Highland what his so-called

7  investigations of Mr. Ellington and others entailed?

8      Maybe Highland decided to humor Mr. Daugherty, and maybe

9  Highland decided it just wanted to put Mr. Daugherty and all

10  his litigation against Highland behind it.  We get that.  But

11  did Highland really intend to do so in a manner that could

12  pose risk to individuals?

13      We would respectfully submit, Your Honor, that even if

14  Highland was humoring Mr. Daugherty, this is no laughing

15  matter.

16      And moreover, shouldn't this Court question why Mr.

17  Daugherty requested these provisions?  We've heard no credible

18  explanation for why Mr. Daugherty needed the observer

19  provision as a result of the so-called revelations following

20  the confirmation hearing.  I mean, we know that the only

21  effect on the estate from the Sentinel -- so-called Sentinel

22  transaction was that Highland agreed to give UBS a larger

23  claim.  But Highland also agreed to give Mr. Daugherty a

24  larger claim following those "revelations."

25      And if Mr. Daugherty, by the way, is not willing to do a

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 880 of 1726   PageID 12201
86

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 75 of 86

75

```
 1   settlement with Highland unless the observer provision is

 2   included, what does that tell us about Mr. Daugherty and his

 3   motivations?

 4        We would respectfully submit, Your Honor, that Mr.

 5   Daugherty was less than candid with Highland Capital in

 6   requesting these provisions.  Highland should have the

 7   opportunity to reject those provisions in light of the

 8   allegations, or at least have the opportunity to assure itself

 9   and to assure the Oversight Board, by whatever means it deems

10   necessary, that the allegations are not a concern before

11   Highland is bound to the terms of this settlement agreement.

12        Accordingly, Your Honor, so long as the observer provision

13   and the HERA provision remain in the settlement agreement, we

14   would respectfully ask Your Honor to refuse to approve

15   Highland's settlement with Mr. Daugherty.

16             MR. MORRIS:  Your Honor, can I have 15 seconds?

17             THE COURT:  Fifteen seconds.  Timer's on.

18          REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

19             MR. MORRIS:  Okay.  I think the -- I think the

20   rebuttal is to simply point Ms. Dandeneau to the two questions

21   she asked Mr. Seery, and that is, is there anything that

22   prohibits the members of the Oversight Board from consulting

23   with Mr. Daugherty outside a meeting?  Mr. Seery testified no.

24        Mr. Seery was asked whether there was anything that

25   prevented Oversight Board members from receiving information
```

1   from third parties outside of the Oversight Board meeting.

2   Mr. Seery said no.

3       That's it.  They -- this is form over substance.  They can

4   do exactly what she's trying to stop outside of -- there's

5   just no substance here.  There's no reason for an amendment.

6   There is no plan modification.  Thank you.

7           THE COURT:  All right.  Thank you.

8       All right.  This will be the Court's ruling on the

9   Reorganized Debtor's motion for an order approving its

10  proposed settlement with Patrick Daugherty.

11      First, the Court has jurisdiction over this contested

12  matter pursuant to 28 U.S.C. Section 1334, and this is a core

13  proceeding under 28 U.S.C. § 157(b).  Bankruptcy Rule 9019 is

14  the governing rule, as well as a multitude of cases, including

15  *AWECO*, *Foster Mortgage*, *Jackson Brewing*, and *TMT Trailer* from

16  the U.S. Supreme Court.

17      What those cases dictate is that a bankruptcy court, when

18  presented with a proposed settlement, should look at is it

19  fair and equitable and in the best interest of the estate,

20  when considering the probability of success if there were to

21  be further litigation, with due consideration of uncertainty

22  of law and fact; the complexity and likely duration of the

23  litigation and any attendant expense and delay; and all other

24  factors bearing on the wisdom of the compromise, keeping in

25  view at all times the paramount interests of creditors, with

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 882 of 1726 PageID 12203

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 77 of 86

77

1  deference to their reasonable views.

2      Here, the Court obviously just -- well, I'm going to say

3  that reasonable notice has been given of this proposed

4  compromise.  The motion has been on file since December 8,

5  2021, so close to three months.  And during that time frame,

6  we only had the one objection of Scott Ellington, who is the

7  former general counsel of Highland and holds no claim as a

8  creditor in this case.  At one time, he had pending proofs of

9  claim, but they have been disallowed.

10      So, with regard to the Ellington objection, we've talked

11  about standing or no standing.  I am of the view that he does

12  not have standing, either statutory or constitutional.  It

13  would not appear to be that he is a person affected by the

14  settlement in that he does not have a claim that remains

15  against the estate.  He does not seem to qualify as a person

16  aggrieved under case law interpreting that standard.

17      But if I'm wrong about this, I nevertheless overrule the

18  objection as having no merit.  This Court is in a unique

19  position to evaluate the bona fides of the settlement, that

20  being that the Court has had many hours of court time in which

21  it has seen evidence and heard argument from Patrick

22  Daugherty.

23      Significant, in the fall of 2020, there was a lengthy

24  multi-hour hearing on what we call a Rule 3018 motion to

25  estimate Mr. Daugherty's claim for voting purposes, for plan

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 79 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 883 of 1726  PageID 12204

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 78 of 86

78

1    voting purposes.  In hindsight, I cannot remember how many

2    hundreds of pages of exhibits I looked at in that multi-hour

3    hearing, but after that multi-hour hearing this Court ruled, I

4    think much to the Debtor's dismay and maybe other party in

5    interest dismay, that Mr. Daugherty should be given a claim

6    for voting purposes in the amount of $9,134,019.

7        Of course, that was an estimation based on some evidence

8    but not all evidence.  But again, it puts the Court in a

9    unique position today to not simply look forward on how on how

10   this Court might rule if there was litigation on the remaining

11   proof of claim and how a Court of Appeals might rule; I've

12   actually seen a lot of evidence.

13       So, based on that, I do find the settlement to be

14   certainly within the range of reasonableness, and fair and

15   equitable and in the best interest of the estate.

16       Again, despite what the Court earlier ruled on the 3018

17   motion, Daugherty is going to be given an $8.25 million

18   general unsecured claim, a subordinated general unsecured

19   claim of $3.75 million, a lump sum payment of $750,000 cash in

20   the short term, and then the various releases and transfer of

21   HERA and ERA to Daugherty, as well as this new provision that

22   -- to make sure I've got the wording -- Debtor will use

23   reasonable efforts to petition the Oversight Board to give

24   Daugherty observer access.

25       I find this all, again, to be within the range of

1   reasonableness.  The testimony was credible that there had

2   been not just arm's length but hard-fought negotiations over a

3   very long period of time.  Again, it's been a year, or 13

4   months, almost, since the settlement was orally announced.

5   The testimony was credible that there were many drafts, many

6   written drafts of the settlement documents that have gone back

7   and forth since the oral announcement.

8      With regard to the modifications that are objected to

9   here, the observer access to the Oversight Board that may or

10  may not actually happen and the transfer of Highland's

11  interests in HERA and ERA, and then I guess there was a slight

12  increase in the subordinated unsecured claim, none of these,

13  in this Court's view of the evidence and testimony, are

14  materially different from what was orally announced.  But more

15  importantly, they certainly don't rise to the level of plan

16  modifications.

17     And I will add just another word or two about this

18  observer access that has been such a trouble spot for Mr.

19  Ellington.  If this is granted, not only does it not seem

20  materially inconsistent with what might be construed to be

21  allowed under the Claimant Trust Agreement, but during the

22  hearing I couldn't help but think about a Bankruptcy Code

23  statute that I wondered if anybody was going to mention.  No

24  one did.  But it's 1102(b)(3).  Okay?

25     So the bankruptcy nerds on the WebEx will remember that in

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 81 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 885 of 1726   PageID 12206

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 80 of 86

80

 1    October 2005 1102(b)(3) was added to the Bankruptcy Code.  And

 2    it's a provision that deals with official committees of

 3    unsecured creditors during the pendency of the Chapter 11.  So

 4    it technically doesn't apply to the Oversight Board, this

 5    post-confirmation Oversight Board.  But it provides,

 6    1102(b)(3), in case you don't have it in front of you, that a

 7    committee, meaning an official unsecured creditors committee,

 8    shall, quote, provide access to information for creditors who

 9    hold claims of kinds represented by that committee and are not

10    appointed to the committee.  It shall solicit and receive

11    comments from the creditors that I just described, and be

12    subject to a court order that compels any additional report or

13    disclosure to be made to creditors described in Subparagraph

14    A.

15        So I guess my point is, even though we're in a post-

16    confirmation phase, what we're dealing with is an oversight

17    board that basically substitutes in many respects for an

18    official creditors committee when you're in a post-

19    confirmation stage of a Chapter 11.  And if Mr. Daugherty is

20    given access to deliberations, meetings, information of the

21    Oversight Board, it certainly doesn't feel offensive to me,

22    because in a pre-confirmation stage we have a Bankruptcy Code

23    section that is designed to give access to creditors like Mr.

24    Daugherty.  And certainly, you know, we see protocol orders

25    all of the time in Chapter 11s where, you know, people will be

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 82 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 886 of 1726    PageID 12207
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 81 of 86

81

1    worried, okay, yes, we have to give access, but we want to

2    require this person to sign confidentiality agreements if

3    there's something confidential about the information.

4        The point is, there are workarounds to deal with concerns

5    about confidentiality and sensitive information.

6        So not only do I determine that this observer access

7    concept is not by any stretch something that should be viewed

8    as a plan modification, but it is within the spirit of the

9    Claimant Trust Agreement, it doesn't run grossly afoul, or

10   afoul, I think, of anything in there.  And, again, it's just

11   observer status.  And it seems to be consistent also with the

12   spirit of this provision of the Bankruptcy Code I just cited.

13       So the Court reserves the right to supplement and amend in

14   the written form of order.  I direct, Mr. Morris, you to

15   submit a form of order, but I do hereby approve the compromise

16   as presented to me.

17       All right.  Well, we do have one other matter on the

18   calendar, as I mentioned in the beginning.  It is in the

19   adversary *Ellington v. Daugherty*, Adversary 22-3003.  This was

20   a routinely-set status conference after removal.  Okay?  This

21   was a state court action that was removed by Mr. Daugherty's

22   counsel to the Bankruptcy Court.  And we did here what we

23   always do:  Roughly 30 days after removal, we set a status

24   conference to see do we need a scheduling order, what kind of

25   case matters do we need to address, and are we going to have

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 83 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 887 of 1726   PageID 12208
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 82 of 86

82

```
 1   consent to Bankruptcy Court adjudication or are we going to

 2   have a motion for remand.

 3      So I don't know what we're going to attempt to accomplish

 4   here because later in this month we have set a hearing on Mr.

 5   Ellington's motion for remand and abstention.  So I'll ask

 6   counsel, did you all view this setting as something that, you

 7   know, we needed to address issues on, or is it premature

 8   before we have the hearing on the motion for remand and

 9   abstention?

10            MR. YORK:  Your Honor, this is Drew York from Gray

11   Reed.  I represent Mr. Daugherty in the adversary action.  And

12   I agree with the Court that it is, based upon the motion to

13   abstain and remand that was filed, it's premature.  We set the

14   status conference at the Court's request immediately after we

15   filed the removal notice.  I think we can address all of the

16   issues at the hearing at the end of the month.

17            THE COURT:  All right.  Ms. --

18            MS. DANDENEAU:  Your Honor?

19            THE COURT:  Go ahead.

20            MS. DANDENEAU:  We agree with Mr. York and the Court,

21   Your Honor.

22            THE COURT:  Okay.  Well, so I guess we will see you

23   at the end of the month.  I think, what is it, maybe March

24   28th, something like that?  March 29th?

25            MS. DANDENEAU:  I believe it's March 29th.
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 84 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 888 of 1726    PageID 12209

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 83 of 86

83

 1              THE COURT:  Okay.  And you know that I tend to

 2    sometimes share my views just to see if it will spur a fit of

 3    reasonableness or encourage people to settle or walk away.

 4    I'm pretty exasperated with that attempt in this case.  But

 5    this litigation is -- I'm going to call it the stalking

 6    lawsuit.  Okay?  Every time -- I don't know how much longer it

 7    will be in my court, but as long as it's in my court I'm going

 8    to call it what it is, a stalking lawsuit.  It is one grown

 9    man accusing another grown man of stalking.  You know, it's

10    just embarrassing to me, and it should be embarrassing to

11    those involved.

12        Now, I have read the lawsuit and I have read that Mr.

13    Ellington accuses Mr. Daugherty of driving by his house,

14    driving by his father's house, driving by his sister's house,

15    driving by his office, 143 sightings, he's taking pictures.

16    And you know, if that's true, again, that's embarrassing.  If

17    -- I don't even know what to say except this is embarrassing.

18    One grown man accusing another grown man of stalking.  Okay?

19    A statute, by the way, that was designed to protect, you know,

20    ex-wives, girlfriends, battered women, from abusive men.  You

21    know, gender doesn't matter, but wow.  It's just -- I don't

22    know what to say except people should be embarrassed, and so

23    that's what I'm going to say.

24        I don't know if it's going to make a whit of difference in

25    anyone's litigation posture.  But we'll come back on March

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 889 of 1726 PageID 12210

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 84 of 86

84

1    29th and we'll do what we need to do on the motions before the

2    Court.

3         (Proceedings concluded at 3:41 p.m.)

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                    **03/07/2022**

23   _____    _____
     Kathy Rehling, CETD-444                      Date
24   Certified Electronic Court Transcriber

25

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 86 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 890 of 1726   PageID 12211
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 85 of 86

85

INDEX

PROCEEDINGS                                                      3

OPENING STATEMENTS

By Mr. Morris                                                    5
By Mr. Uebler                                                   19
By Ms. Dandeneau                                                19

WITNESSES

Reorganized Debtor's Witnesses

James P. "Jim" Seery, Jr.
- Direct Examination by Mr. Morris                             23
- Cross-Examination by Ms. Dandeneau                           39
- Redirect Examination by Mr. Morris                           66

EXHIBITS

Debtor's Exhibits at Docket 3270                      Received  6

Scott Ellington's Exhibit SE-2                        Received 45

CLOSING ARGUMENTS

By Mr. Morris                                                  68
By Mr. Uebler                                                  70
By Ms. Dandeneau                                               71
By Mr. Morris                                                  75

RULINGS

19-34054-sgj

    Reorganized Debtor's Motion for Entry of an Order          76
    Approving Settlement with Patrick Hagaman Daugherty
    (Claim No. 205) and Authorizing Actions Consistent
    Therewith [3088] - Granted

    Reorganized Debtor's Motion for Entry of an Order          --
    Further Extending the Period Within Which It May
    Remove Actions [3199] - Court Approved Motion at
    Docket 3199 in Chambers Prior to Hearing

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 87 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 891 of 1726  PageID 12212

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 86 of 86

86

1                              INDEX
                              Page 2

2    RULINGS, cont'd.

3    22-3003-sgj

4    Status Conference (Notice of Removal)                    81

5    END OF PROCEEDINGS                                       84

6    INDEX                                                 85-86

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 20

Case 19-34054-sgj11 Doc 3445-20 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 4
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 893 of 1726 PageID 12214
Case 19-34054-sgj11 Doc 3328 Filed 04/28/22 Entered 04/28/22 17:01:50 Page 1 of 3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 28, 2022

_____
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

In re:

HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]

Reorganized Debtor.

§
§
§
§
§
§
§

Chapter 11

Case No. 19-34054-sgj11

## ORDER APPROVING SETTLEMENT WITH CPCM, LLC (CLAIM NO. 217) AND FRANK WATERHOUSE (CLAIM NO. 218) AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on the *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with CPCM, LLC (Claim No.217) and Frank Waterhouse (Claim No. 218) and Authorizing Actions Consistent Therewith* [Docket No. 3317] (the "Motion"),[2] filed by Highland Capital Management, L.P., the above-captioned reorganized debtor

_____

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



1934054220428000000000008

APPx. 05457

Case 19-34054-sgj11 Doc 3445-20 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 4
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 894 of 1726   PageID 12215
Case 19-34054-sgj11 Doc 3328 Filed 04/28/22   Entered 04/28/22 17:01:50   Page 2 of 3

(the "Reorganized Debtor" or "Debtor," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered the Motion; and no objections to the Motion having been filed; and the Motion being unopposed; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Reorganized Debtor, the Debtor's creditors, and other parties-in-interest; and this Court having found the Stipulation fair and equitable; and this Court having analyzed (1) the probability of success in litigating the claims subject to the Stipulation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is the product of arm's-length bargaining, and not of fraud or collusion; and this Court having found that the Reorganized Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and good and sufficient cause appearing therefor,

it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Stipulation attached as Exhibit 1 to the Demo Dec. is approved in all respects.

DOCS_NY:45342.6 36027/003

Case 19-34054-sgj11 Doc 3445-20 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 4
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 895 of 1726    PageID 12216
Case 19-34054-sgj11 Doc 3328 Filed 04/28/22    Entered 04/28/22 17:01:50    Page 3 of 3

3.      Claim 217 is **DISALLOWED** with prejudice.

4.      Claim 218 is **DISALLOWED** with prejudice.

5.      This Stipulation amends Section 5 of the Waterhouse Stipulation as follows:

    a.  The heading of Section 5 of the Waterhouse Stipulation is deleted in its entirety and replaced with the following:  "Senior Employee's Waiver of any Bonus Amount;" and

    b.  Section 5(a) of the Waterhouse Stipulation is deleted in its entirety and replaced with the following: "The Senior Employee agrees to irrevocably surrender and waive the Bonus Amount in consideration of the Employee Release and acknowledges that such agreement is an integral part of this Stipulation."

Except as specifically amended by this Order and the Stipulation, the Waterhouse Stipulation remains in full force and effect.

6.      CPCM has irrevocably and indefeasibly waived any right it may have to the CPCM Payment and has released the Reorganized Debtor from any and all obligations to make the CPCM Payment.  No amendment to the Former Employee Order is necessary to effectuate the foregoing waiver and release.

7.      The Reorganized Debtor, CPCM, and Mr. Waterhouse are authorized to take any and all actions necessary and desirable to implement the Stipulation without need of further approval or notice.

8.      To the extent applicable, the official claims register in the Debtor's Bankruptcy Case will be modified in accordance with this Order.

9.      The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

<p align="center">###End of Order###</p>

# EXHIBIT 21

Case 19-34054-sgj11 Doc 3445-21 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 5
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 897 of 1726    PageID 12218
Case 19-34054-sgj11 Doc 3298 Filed 03/08/22    Entered 03/08/22 13:06:09    Page 1 of 4



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 8, 2022**

_____

**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

**ORDER APPROVING**
**SETTLEMENT WITH PATRICK HAGAMAN DAUGHERTY (CLAIM NO. 205)**
**AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Reorganized Debtor's Motion for Entry*

*of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and*

*Authorizing Actions Consistent Therewith* [Docket No. 3088] (the "Motion"),[2] filed by Highland

Capital Management, L.P., the above-captioned reorganized debtor (the "Reorganized Debtor") in

_____

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357).  The headquarters and
service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



1934054220308000000000002

**APPx. 05469**

Case 19-34054-sgj11 Doc 3445-21 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 5
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 898 of 1726   PageID 12219
Case 19-34054-sgj11 Doc 3298 Filed 03/08/22   Entered 03/08/22 13:06:09   Page 2 of 4

the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered

(a) the Motion; (b) *Scott Ellington's Objection to the Reorganized Debtor's Motion for Entry of*

*an Order Approving Settlement with Patrick Daugherty* [Docket No. 3242] (the "Ellington

Objection"), filed by Scott Ellington ("Mr. Ellington"); (c) the *Reorganized Debtor's Reply in*

*Further Support of Motion for Entry of an Order Approving Settlement with Patrick Hagaman*

*Daugherty* [Docket No. 3257]; (d) *Patrick Daugherty's Joinder in Reorganized Debtor's Reply in*

*Further Support of Motion for Entry of an Order Approving Settlement with Patrick Hagaman*

*Daugherty (Claim No. 205)* [Docket No. 3258], filed by Patrick Hagaman Daugherty ("Mr.

Daugherty"); (e) the exhibits identified on *Highland Capital Management L.P.'s Witness and*

*Exhibit List with Respect to Evidentiary Hearing to Be Held March 1, 2022* [Docket No. 3270],

including the proposed Settlement Agreement signed by the Reorganized Debtor and Mr.

Daugherty (the "Settlement Agreement"), all of which were admitted into evidence without

objection; (f) Exhibit SE-2 identified on *Scott Ellington's Amended Witness and Exhibit List for*

*Hearing Scheduled for March 1, 2022 at 1:30 pm (Prevailing Central Time)* [Docket No. 3265]

("Exhibit SE-2"), which was admitted into evidence without objection; (g) the testimony of Mr.

James P. Seery, Jr. adduced during the hearing held on March 1, 2022 (the "Hearing"), including

assessing Mr. Seery's credibility; and (h) the arguments made during the Hearing; and this Court

having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having

found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found

that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§

1408 and 1409; and this Court having found that the relief requested in the Motion is in the best

interests of the Reorganized Debtor, the Debtor's creditors, and other parties-in-interest; and this

Court having found the Settlement Agreement fair and equitable; and this Court having analyzed

Case 19-34054-sgj11 Doc 3445-21 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 5
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 899 of 1726 PageID 12220
Case 19-34054-sgj11 Doc 3298 Filed 03/08/22 Entered 03/08/22 13:06:09 Page 3 of 4

(1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Reorganized Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, the Court makes the following findings of fact and conclusions of law:[3]

1. At the time of the Hearing, Mr. Ellington (i) did not hold any claims against the Debtor (*see Order Approving Stipulation and Agreed Order Resolving Third Omnibus Objection and Certain Other Claims* [Docket No. 3244]); (ii) was not a Claimant Trust Beneficiary (as that term is defined in Exhibit SE-2); and (iii) because he does not hold claims against the Debtor, could not become a Claimant Trust Beneficiary.

2. Accordingly, Mr. Ellington does not have standing to object to the Motion.

3. Even if Mr. Ellington had standing, the Reorganized Debtor has met its burden of proof under Bankruptcy Rule 9019 that the settlement embodied in the Settlement Agreement

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

Case 19-34054-sgj11 Doc 3445-21 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 5
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 900 of 1726    PageID 12221
Case 19-34054-sgj11 Doc 3298 Filed 03/08/22    Entered 03/08/22 13:06:09    Page 4 of 4

(and the exhibits annexed thereto) are fair, reasonable, and in the best interests of the Debtor, its successor(s), and all parties-in-interest.

4.    Mr. Daugherty's Proof of Claim No. 67 was superseded by Proof of Claim No. 77, and Proof of Claim No. 77 was superseded by Proof of Claim No. 205, such that Proof of Claim Nos. 67 and 77 shall be disallowed and Proof of Claim No. 205 shall be treated in the manner set forth in the Settlement Agreement.

Based on the foregoing, it is hereby **ORDERED** that:

1.    The Motion is **GRANTED** as set forth herein.

2.    The Ellington Objection is **OVERRULED** in its entirety.

3.    The Settlement Agreement is approved in all respects pursuant to Federal Rule of Bankruptcy Procedure 9019.

4.    The Reorganized Debtor and Mr. Daugherty are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

5.    Proofs of Claim Nos. 67 and 77 are **DISALLOWED** with prejudice.

6.    Proof of Claim No. 205 is **ALLOWED** in the amounts set forth in the Settlement Agreement.

7.    The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

DOCS_NY:45264.3 36027/003

APPX. 105464

# EXHIBIT 22

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 902 of 1726   PageID 12223
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22   Entered 02/17/22 17:31:58   Page 1 of 10

Docket #3244  Date Filed: 2/17/2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 17, 2022**

United States Bankruptcy Judge

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

### ORDER APPROVING STIPULATION AND AGREED ORDER RESOLVING THIRD OMNIBUS OBJECTION AND CERTAIN OTHER CLAIMS

Upon consideration of the *Stipulation and Agreed Order Resolving Third Omnibus Objection and Certain Other Claims* (the "Stipulation")[2] filed in the above-captioned case, it is

**HEREBY ORDERED THAT:**

1.  The Stipulation, a copy of which is attached hereto as **Exhibit A**, is approved.

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 6725. The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] All capitalized terms used but not defined herein have the meanings given to them in the Stipulation.

1934054220217000000000002

APPX. 05476

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 903 of 1726 PageID 12224
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 2 of 10

2.      The Reorganized Debtor will pay CPCM an amount equal to $100,000.00 on the later of the day (i) five business days after this Order becomes final and non-appealable and (ii) the day the Reorganized Debtor receives wire transfer instructions from CPCM.

3.      The withdrawal of the Former Employee Claims with prejudice is approved, and the Former Employee Claims are disallowed.

4.      The withdrawal of Claim 216 with prejudice is approved, and Claim 216 is disallowed.

5.      The withdrawal of Claim 244 with prejudice is approved, and Claim 244 is disallowed.

6.      The withdrawal of Claim 251 with prejudice is approved, and Claim 251 is disallowed.

7.      To the extent the Former Employee Claims were not validly transferred by the Former Employees to CPCM, each Former Employee Claim is disallowed with prejudice and expunged on the grounds that no Former Employee responded to the Third Omnibus Objection.

8.      Nothing in this Order or the Stipulation is intended to, or will, release or affect (i) the Waterhouse Claim (and CPCM and the Reorganized Debtor expressly reserve any and all rights they may have at law or in equity with respect to the Waterhouse Claim) and (ii) any rights that CPCM, the Former Employees, or the Reorganized Debtor may have under (a) the Plan or (b) the Confirmation Order.

9.      This Order and the Stipulation are and will be binding on CPCM's, Skyview's, Mr. Ellington's, Mr. Leventon's, and the Former Employees' predecessors, successors, transferees, and assigns.

10.     To the extent applicable, the official claims register in above-captioned bankruptcy case will be modified in accordance with this Order.

-2-

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 904 of 1726    PageID 12225
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22    Entered 02/17/22 17:31:58    Page 3 of 10

11.    This Court shall have and retain jurisdiction over all disputes arising out of or

otherwise concerning the interpretation and enforcement of this Order and the Stipulation.

### END OF ORDER ###

DOCS_NY:45159.5 36027/003

# **EXHIBIT A**

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 906 of 1726   PageID 12227
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22    Entered 02/17/22 17:31:58    Page 5 of 10

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

ROSS & SMITH, PC
Judith W. Ross (TX Bar No. 210010670)
Frances A. Smith (TX Bar No. 24033084)
Eric Soderlund (TX Bar No. 24037525)
700 N. Pearl St. Suite 1610
Dallas, TX 752010
Telephone:  (214) 377-7879
Facsimile:  (214) 377-9409

*Co-Counsel for CPCM, LLC, Scott Ellington, and
Isaac Leventon*

Michelle Hartmann
State Bar No. 24032402
**BAKER & McKENZIE LLP**
1900 North Pearl, Suite 1500
Dallas, TX 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Email: michelle.hartmann@bakermckenzie.com

Debra A. Dandeneau (admitted *pro hac vice*)
Blaire Cahn (admitted *pro hac vice*)
**BAKER & McKENZIE LLP**
452 Fifth Avenue
New York, NY  10018
Tel: 212-626-4100
Fax: 212 310-1600
Email:  debra.dandeneau@bakermckenzie.com
          blaire.cahn@bakermckenzie.com

*Co-Counsel for CPCM, LLC, Scott Ellington and Isaac
Leventon*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § | |

## STIPULATION AND AGREED ORDER RESOLVING THIRD OMNIBUS OBJECTION AND CERTAIN OTHER CLAIMS

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 6725. The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 11/29/23 Page 907 of 1726 PageID 12228
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 6 of 10

This *Stipulation and Agreed Order Resolving Third Omnibus Objection and Certain Other Claims* (the "Stipulation") is entered into between Highland Capital Management, L.P., the reorganized debtor (the "Reorganized Debtor"), CPCM, LLC ("CPCM"), Isaac Leventon ("Mr. Leventon"), Scott Ellington ("Mr. Ellington"), and Highgate Consulting, Inc., d/b/a Skyview Group ("Skyview").

## **RECITALS**

**WHEREAS,** on February 22, 2021, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") entered an *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") pursuant to which the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* was confirmed [Docket No. 1808] (the "Plan");[2]

**WHEREAS,** in February and March 2021, the Former Employees[3] filed proofs of claim (claim numbers 219-237, 241) (the "Former Employee Claims");

**WHEREAS**, on March 18, 2021, the Debtor Filed *Debtor's Third Omnibus Objection to Certain No Liability Claims* [Docket No. 2059] (the "Omnibus Objection") objecting to, among other claims, the Former Employee Claims;

**WHEREAS,** subsequent to the filing of the Omnibus Objection, the Former Employees purportedly transferred and assigned the Former Employee Claims to CPCM [Docket Nos. 2094, 2097-2115];

**WHEREAS**, CPCM is a wholly-owned subsidiary of Skyview;

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Plan.

[3] "Former Employees" means, collectively, Lucy Bannon, Jerome Carter, Brian Collins, Matthew DiOrio, Hayley Eliason, William Gosserand, Steven Haltom, Charles Hoedebeck, Mary Irving, Helen Kim, Kari Kovelan, William Mabry, Mark Patrick, Christopher Rice, Jason Rothstein, Jean Paul Sevilla, Kellie Stevens, Ricky Swadley, Lauren Thedford, and Stephanie Vitiello.

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 908 of 1726    PageID 12229
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22    Entered 02/17/22 17:31:58    Page 7 of 10

**WHEREAS**, on November 2, 2021, the Reorganized Debtor filed the *Reorganized Debtor's Amended Supplemental Objection to Certain Employee Claims* [Docket No. 2976] (the "Supplemental Objection," and together with the Omnibus Objection, the "Third Omnibus Objection");

**WHEREAS**, on January 27, 2022, CPCM filed *CPCM's Response to Debtor's Third Omnibus Objection* [Docket No. 3205];

**WHEREAS**, on February 10, 2022, the Reorganized Debtor filed *Highland Capital Management, L.P.'s Reply in Further Support of Debtor's Third Omnibus Objection to Certain No-Liability Claims, As Supplemented* [Docket No. 3230]);

**WHEREAS**, Mr. Leventon filed proofs of claim numbers 184, 214, 215, 216, and 253;

**WHEREAS**, proofs of claim 184, 214, 215, and 253 were subsequently withdrawn and expunged [Docket No. 3164];

**WHEREAS** , proof of claim 216 ("Claim 216") was transferred to CPCM and is still outstanding;

**WHEREAS**, Mr. Ellington filed proofs of claim numbers 187, 192, 244, 245, and 251;

**WHEREAS**, proofs of claim numbers 187, 192, and 245 were subsequently withdrawn and expunged [Docket No. 3164];

**WHEREAS**, proof of claim number 251 ("Claim 251") is still outstanding;

**WHEREAS**, proof of claim number 244 was transferred to CPCM and is still outstanding ("Claim 244");

**NOW, THEREFORE**, in consideration of the above recitals, and solely to avoid the cost and expense of litigating the Third Omnibus Objection, each of the Reorganized Debtor, CPCM, Skyview, Mr. Ellington, and Mr. Leventon agree and stipulate as follows:

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 909 of 1726   PageID 12230
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22    Entered 02/17/22 17:31:58    Page 8 of 10

## STIPULATION

1.      The Reorganized Debtor will pay CPCM an amount equal to $100,000.00 on the later of (i) five business days after the order approving this Stipulation becomes final and non-appealable and (ii) the day the Reorganized Debtor receives wire transfer instructions from CPCM.

2.      Skyview and CPCM represent and warrant to the Reorganized Debtor that (i) they have full and complete authority to dispose of, release, and resolve the Former Employee Claims, Claim 216, and Claim 244 and (ii) except as set forth in this Stipulation, (a) no other claims filed in this Chapter 11 case have been assigned or transferred to Skyview or CPCM and (b) CPCM and Skyview have no other claims against the Reorganized Debtor (other than claims arising in the ordinary course of business between Skyview and the Reorganized Debtor and claims arising from the Reorganized Debtor's conduct that are not known or knowable to CPCM or Skyview).

3.      The Former Employee Claims are hereby withdrawn with prejudice and disallowed.

4.      Claim 216 is hereby withdrawn with prejudice and disallowed.

5.      Claim 244 is hereby withdrawn with prejudice and disallowed.

6.      Claim 251 is hereby withdrawn with prejudice and disallowed.

7.      To the extent the Former Employee Claims were not validly transferred by the Former Employees to CPCM, each Former Employee Claim is disallowed with prejudice and expunged on the grounds that no Former Employee responded to the Third Omnibus Objection.

8.      Nothing in this Stipulation is intended to, or will, release or affect (i) proof of claim number 217 filed by Frank Waterhouse and purportedly transferred to CPCM [Docket No. 2093] or the *Senior Employee Stipulation and Tolling Agreement Extending Statutes of Limitations*, dated January 20, 2021, by and between Frank Waterhouse and the Debtor (together the "Waterhouse

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 910 of 1726    PageID 12231
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22    Entered 02/17/22 17:31:58    Page 9 of 10

Claim") (and CPCM and the Reorganized Debtor expressly reserve any and all rights they may

have at law or in equity with respect to the Waterhouse Claim); or (ii) any rights that CPCM, the

Former Employees, or the Reorganized Debtor may have under (a) the Plan or (b) the Confirmation

Order.

9.    This Stipulation is and will be binding on CPCM's, Skyview's, Mr. Ellington's,

Mr. Leventon's, and the Former Employees' predecessors, successors, transferees, and assigns.

10.    To the extent applicable, the official claims register will be modified in accordance

with this Stipulation.

11.    This Court shall have and retain jurisdiction over all disputes arising out of or

otherwise concerning the interpretation and enforcement of this Stipulation.

*[Remainder of Page Intentionally Blank]*

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 911 of 1726 PageID 12232
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 10 of 10

**IT IS SO STIPULATED:**

Dated: February 15, 2022

*/s/ Gregory V. Demo*
PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

*/s/ Frances A. Smith*
ROSS & SMITH, PC
Judith W. Ross (TX Bar No. 210010670)
Frances A. Smith (TX Bar No. 24033084)
Eric Soderlund (TX Bar No. 24037525)
700 N. Pearl St. Suite 1610
Dallas, TX 752010
Telephone: (214) 377-7879
Facsimile: (214) 377-9409

*Co-Counsel for CPCM, LLC, Scott Ellington, and
Isaac Leventon*

Michelle Hartmann
State Bar No. 24032402
**BAKER & McKENZIE LLP**
1900 North Pearl, Suite 1500
Dallas, TX 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Email: michelle.hartmann@bakermckenzie.com

*/s/ Blaire Cahn*
Debra A. Dandeneau (admitted *pro hac vice*)
Blaire Cahn (admitted *pro hac vice*)
**BAKER & McKENZIE LLP**
452 Fifth Avenue
New York, NY 10018
Tel: 212-626-4100
Fax: 212 310-1600
Email: debra.dandeneau@bakermckenzie.com
　　　 blaire.cahn@bakermckenzie.com

*Co-Counsel for CPCM, LLC, Scott Ellington and Isaac
Leventon*

-6-

# EXHIBIT 23

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 913 of 1726   PageID 12234
Case 21-03076-sgj Doc 151 Filed 04/06/22   Entered 04/06/22 13:15:41   Page 1 of 21



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 6, 2022**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-34054-SGJ-11** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **(CHAPTER 11)** |
| **L.P.,** | § | |
| | § | |
| **REORGANIZED DEBTOR.** | § | |
| _____ | § | |
| | § | |
| **MARC S. KIRSCHNER, AS LITIGATION** | § | |
| **TRUSTEE OF THE LITIGATION** | § | |
| **SUB-TRUST,** | § | |
| | § | **CIVIL ACTION NO. 3:22-CV-203-S** |
| **PLAINTIFF,** | § | |
| | § | |
| **v.** | § | **ADVERSARY NO. 21-03076** |
| | § | |
| **JAMES D. DONDERO; MARK A. OKADA;** | § | |
| **SCOTT ELLINGTON; ISAAC** | § | |
| **LEVENTON; GRANT JAMES SCOTT III;** | § | |
| **FRANK WATERHOUSE; STRAND** | § | |
| **ADVISORS, INC.; NEXPOINT ADVISORS,** | § | |

<div align="center">1</div>

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 914 of 1726 PageID 12235
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 2 of 21

| | |
|---|---|
| L.P.; HIGHLAND CAPITAL | § |
| MANAGEMENT FUND ADVISORS, L.P. | § |
| DUGABOY INVESTMENT TRUST | § |
| AND NANCY DONDERO, AS TRUSTEE | § |
| OF DUGABOY INVESTMENT TRUST; | § |
| GET GOOD TRUST AND GRANT JAMES | § |
| SCOTT III, AS TRUSTEE OF GET GOOD | § |
| TRUST; HUNTER MOUNTAIN | § |
| INVESTMENT TRUST; MARK & | § |
| PAMELA OKADA FAMILY TRUST – | § |
| EXEMPT TRUST #1 AND LAWRENCE | § |
| TONOMURA AS TRUSTEE OF MARK & | § |
| PAMELA OKADA FAMILY TRUST – | § |
| EXEMPT TRUST #1; MARK & PAMELA | § |
| OKADA FAMILY TRUST – EXEMPT | § |
| TRUST #2 AND LAWRENCE | § |
| TONOMURA IN HIS CAPACITY AS | § |
| TRUSTEE OF MARK & PAMELA | § |
| OKADA FAMILY TRUST – EXEMPT | § |
| TRUST #2; CLO HOLDCO, LTD.; | § |
| CHARITABLE DAF HOLDCO, LTD.; | § |
| CHARITABLE DAF FUND, LP.; | § |
| HIGHLAND DALLAS FOUNDATION; | § |
| RAND PE FUND I, LP, SERIES 1; | § |
| MASSAND CAPITAL, LLC; MASSAND | § |
| CAPITAL, INC.; SAS ASSET RECOVERY, | § |
| LTD.; AND CPCM, LLC, | § |
| | § |
| DEFENDANTS. | § |
| | § |

---

**REPORT AND RECOMMENDATION TO THE DISTRICT COURT PROPOSING THAT IT: (A) GRANT DEFENDANTS' MOTIONS TO WITHDRAW THE REFERENCE AT SUCH TIME AS THE BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY; BUT (B) DEFER PRE-TRIAL MATTERS TO THE BANKRUPTCY COURT**

2

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 915 of 1726 PageID 12236
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 3 of 21

## I.  INTRODUCTION

As further explained herein, there are 23 Defendants in the above-referenced adversary proceeding (the "Adversary Proceeding")—almost all of whom have jury trial rights and desire to have the reference withdrawn from the bankruptcy court, so that a jury trial may ultimately occur in the District Court. All parties agree (even the Plaintiff) that the reference *must* ultimately be withdrawn for final adjudication to occur in the District Court, since: (a) jury trial rights exist, and (b) the Defendants do not consent to a jury trial occurring in the bankruptcy court. However, there is a question of *timing* here.

Specifically, the Plaintiff believes that the bankruptcy court should, for the time being— that is, ***until the action is trial-ready***—essentially serve as a magistrate and preside over all pre-trial motions and other matters, with the District Court considering reports and recommendations with regard to any dispositive motions.

The Defendants, on the other hand, believe that the District Court should ***immediately*** withdraw the reference, taking the position that there is not even "related to" bankruptcy subject matter jurisdiction with regard to the 36 causes of action asserted in the Adversary Proceeding (*see* 28 U.S.C. § 1334(b))—since the Adversary Proceeding was brought ***after*** confirmation of a Chapter 11 debtor's plan, and the claims in the Adversary Proceeding do not require interpretation or implementation of the plan. Additionally, the Defendants argue that, even if there is "related to" bankruptcy subject matter jurisdiction, mandatory abstention applies with regard to certain of the causes of action in the Adversary Proceeding, since certain ***other*** federal laws—namely tax law and securities law—are implicated (*see* 28 U.S.C. § 157(d)).

The bankruptcy court disagrees with the Defendants. This Adversary Proceeding is a typical post-confirmation lawsuit being waged be a liquidating trustee, who was appointed

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 916 of 1726 PageID 12237
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 4 of 21

pursuant to a Chapter 11 bankruptcy plan to pursue pre-confirmation causes of action that were owned by the bankruptcy estate, for the benefit of creditors. Despite the "post-confirmation" timing of the *filing* of the lawsuit, there *is* still "related to" bankruptcy subject matter jurisdiction. Additionally, there will be no substantial or material consideration of "other laws of the United States regulating organizations or activities affecting interstate commerce." *Id.*

Accordingly, the bankruptcy court recommends that the District Court only withdraw the reference of this Adversary Proceeding *at such time as the bankruptcy court certifies that the action is trial-ready and defer to the bankruptcy court the handling of all pre-trial matters (as is most often the custom in this District)*. A more detailed explanation follows.

## II.     PROCEDURAL CONTEXT

This Adversary Proceeding is related to the bankruptcy case (the "Bankruptcy Case")[1] of Highland Capital Management, L.P. (the "Debtor," "Highland," or sometimes the "Reorganized Debtor").

Highland filed a voluntary Chapter 11 petition on October 16, 2019, in the United States Bankruptcy Court of Delaware. That court subsequently entered an order transferring venue to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), on December 4, 2019.

On February 22, 2021, the Bankruptcy Court entered an *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order") [Bankr. Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (as amended, the "Plan" or "Highland Plan") [Bankr. Docket No. 1808].

---

[1] Bankruptcy Case No. 19-34054.

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 917 of 1726 PageID 12238
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 5 of 21

The Highland Plan went effective on August 11, 2021 (the "Effective Date"). Thus, the Bankruptcy Case is now in what is referred to as a "post-confirmation" phase.

Like many Chapter 11 plans, the Highland Plan provided for the creation of a "Claimant Trust" for the benefit of holders of Highland's creditors. The Claimant Trust was vested with certain assets of Highland, including "all Causes of Action" and "any proceeds realized or received from such Assets." Plan §§ I.B.24, I.B.26, I.B.27. The Plan also provided for the creation of a "Litigation Sub-Trust," as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan. Plan §§ I.B.81, IV.B.1 ("[T]he Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims."), Plan § IV.B.4. The Litigation Trustee of the Litigation Sub-Trust is "responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust[.]" Plan § I.B.83. Under the Plan, proceeds from the Litigation Trust's pursuit of claims "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries[.]" Plan § IV.B.4.

On October 15, 2021, the Litigation Trustee ("Plaintiff") commenced the Adversary Proceeding for the benefit of Highland's creditors. [Adv. Proc. Docket. No. 1 (the "Complaint")].

The Complaint asserts *36 causes of action* against *23 Defendants*. The causes of action all arise from *pre-confirmation conduct* allegedly perpetrated by Highland's founder James Dondero and individuals and entities affiliated with him, which purportedly resulted in hundreds of millions of dollars in damages to Highland. It appears that all of the Defendants are owned, controlled, or related to Mr. Dondero, although some of the Defendants dispute this characterization.

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 918 of 1726 PageID 12239
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 6 of 21

The 36 causes of action seek: the avoidance and recovery of intentional and constructive fraudulent transfers and obligations under Sections 544, 548, and 550 of the Bankruptcy Code; illegal distributions under Delaware partnership law; breach of fiduciary duty; declaratory judgment that certain entities are liable for the debts of others under alter ego theories, successor liability, aiding and abetting, or knowing participation in breach of fiduciary duty; civil conspiracy; tortious interference with prospective business relations; breach of contract; conversion; unjust enrichment; and the disallowance or subordination of claims under Sections 502 and 510 of the Bankruptcy Code.

As further addressed below, the Bankruptcy Court has concluded that the 36 causes of action include some statutory *core* (*i.e.,* "arising under" or "arising in") claims, some *non-core* (*i.e.,* "related to") claims, and some causes of action that are a *mixture* of both core and non-core claims. The following three tables summarize the Bankruptcy Court's determination as to which counts are core, which are non-core, and which are a mixture:

| Count No. | Core ("Arising Under") Claims | Defendants Named |
|---|---|---|
| 31 | Avoidance and Recovery of One-Year Transfers as Preferential Under 11 U.S.C. §§ 547 and 550 | James Dondero and Scott Ellington |
| 34 | Disallowance of Claims Under Sections 502(b), 502(d), and 502(e) of the Bankruptcy Code | James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, and CPCM, LLC |
| 35-36 | Disallowance or Subordination of Claims Under Sections 502 and 510 of the Bankruptcy Code | James Dondero, Dugaboy Trust, Get Good Trust, Mark Okada, MAP #1, MAP #2, Hunter Mountain, and CLO Holdco |

| Count No. | Non-Core ("Related to") Claims | Defendants Named |
|---|---|---|
| 3 | Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act | James Dondero, Strand Advisors, Dugaboy Trust, Hunter Mountain |

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 919 of 1726 PageID 12240
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 7 of 21

| 4 | Breach of Fiduciary Duty Arising Out of Dondero's Lifeboat Scheme | James Dondero, Strand Advisors |
| 5 | Breach of Fiduciary Duty Arising Out of Conduct that Resulted in HCMLP Liabilities | James Dondero, Scott Ellington, Isaac Leventon, Strand Advisors |
| 6 | Declaratory Judgment that Strand is Liable for HCMLP's Debts in its Capacity as HCMLP's General Partner | Strand Advisors |
| 7 | Declaratory Judgment that Dondero is Liable for Strand's Debts as Strand's Alter Ego | James Dondero |
| 8 | Declaratory Judgment that Dondero and Strand are Liable for HCMLP's Debts in Their Capacities as HCMLP's Alter Ego | James Dondero, Strand Advisors |
| 9 | Declaratory Judgment that NexPoint and HCMFA are Liable for the Debts of HCMLP, Strand, and Dondero as Their Alter Egos | NexPoint Advisors, HCMFA |
| 10 | Declaratory Judgment that Dugaboy is Liable for the Debts of Dondero in Their Capacities as Dondero's Alter Ego | Dugaboy Trust |
| 13 | Successor Liability | NexPoint Advisors, HCMFA |
| 14 | Breach of Fiduciary Duty in Connection with Fraudulent Transfers and Schemes | James Dondero, Mark Okada, Scott Ellington, Strand Advisors |
| 15 | Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty Under Texas Law | Grant Scott, Strand Advisors, NexPoint Advisors, HCMFA, Get Good Trust, CLO Holdco, DAF Holdco, DAF Highland Dallas Foundation, and SAS |
| 16 | Civil Conspiracy to Breach Fiduciary Duties Under Texas Law | James Dondero, Scott Ellington, Isaac Leventon, Grant Scott, NexPoint Advisors, HCMFA, Get Good Trust, CLO Holdco, DAF Holdco, DAF, Highland Dallas Foundation, and SAS |
| 17 | Tortious Interference with Prospective Business Relations | James Dondero, NexPoint Advisors, HCMFA |
| 24 | Breach of Contract Arising Out of Hunter Mountain Note | Hunter Mountain and Rand |
| 25 | Conversion | James Dondero, Scott Ellington |
| 26-30 | Unjust Enrichment | James Dondero, Scott Ellington, Isaac Leventon, NexPoint Advisors, HCMFA, CLO Holdco, Massand Capital, and SAS |

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 920 of 1726 PageID 12241
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 8 of 21

| Count No. | Mixture of Core and Non-Core Claims | Defendants Named |
|---|---|---|
| 1 | Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law | James Dondero, Mark Okada, Strand Advisors, Dugaboy Trust, Hunter Mountain, MAP #1, and MAP #2 |
| 2 | Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law | James Dondero, Mark Okada, Strand Advisors, Dugaboy Trust, Hunter Mountain, MAP #1, and MAP #2 |
| 11 | Avoidance of Transfer of Management Agreements as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law | NexPoint Advisors and HCMFA |
| 12 | Avoidance of Transfer of Management Agreements as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law | NexPoint Advisors and HCMFA |
| 18 | Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, and Applicable State Law | James Dondero, Grant Scott, Get Good Trust, CLO Holdco, DAF Holdco, DAF, and Highland Dallas Foundation |
| 19 | Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, and Applicable State Law | James Dondero, Grant Scott, Get Good Trust, CLO Holdco, DAF Holdco, DAF, and Highland Dallas Foundation |
| 20 | Avoidance of Obligations Under Massand Consulting Agreement as Constructively Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law | Massand LLC |
| 21 | Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law | Massand Capital |
| 22 | Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law | James Dondero, Scott Ellington, Massand Capital, and SAS |
| 23 | Avoidance and Recovery of Certain Massand Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law | James Dondero, Scott Ellington, Massand Capital, and SAS |
| 32 | Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law | James Dondero and Scott Ellington |
| 33 | Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law | James Dondero and Scott Ellington |

APPX. 05494

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 921 of 1726   PageID 12242
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 9 of 21

Of the 23 Defendants, **only one** has a pending, unresolved proof of claim on file in the Bankruptcy Case: CLO Holdco.[2] The rest of the Defendants have either never filed proofs of claim, have withdrawn their proofs of claim, or have had them disallowed during the pendency of the Bankruptcy Case.[3] Thus, 22 of the 23 Defendants have jury trial rights.[4]  Further, none of the Defendants have consented to the Bankruptcy Court presiding over a jury trial or issuing final orders for that matter.[5]

Six motions to withdraw the reference (collectively, the "Motions to Withdraw") were subsequently filed by the following Defendants on the following dates:

• On January 18, 2022, Defendants Scott Ellington, Isaac Leventon, Frank Waterhouse, and CPCM, LLC (collectively, the "Former Employee Defendants") filed the Motion to Withdraw the Reference for Causes of Action in the Complaint Asserted Against the Former Employee Defendants [Adv. Docket No. 27] and their Brief in Support [Adv. Docket No. 28].

• On January 21, 2022, Defendants Mark A. Okada, The Mark & Pamela Okada Family Trust – Exempt Trust #1, Lawrence Tonomura in his Capacity as Trustee, The Mark & Pamela Okada Family Trust – Exempt Trust #2, and Lawrence Tonomura in his Capacity as Trustee (the "Okada Defendants") filed the Motion of the Okada Parties to Withdraw the Reference [Adv. Docket No. 36] and their Memorandum of Law in Support [Adv. Docket No. 37].

• On January 21, 2022, Defendants NexPoint Advisors L.P. ("NexPoint") and Highland Capital Management Fund Advisors L.P. ("HCMFA") filed the Motion to Withdraw the Reference for the Causes of Action in the Complaint Asserted Against Defendants [Adv. Docket No. 39] and their Memorandum of Law in Support [Adv. Docket No. 40].

---

[2] CLO Holdco's claim (Claim No. 198) was objected to by the Litigation Trustee in an omnibus claims objection. CLO Holdco's has moved to ratify a second amended proof of claim. These matters are currently set for hearing on May 2, 2022.

[3] Actually, there are two withdrawals of proofs of claim that are not quite final.  Specifically, those of Frank Waterhouse and CPCM. On March 24, 2022, the Reorganized Debtor filed a Bankruptcy Rule 9019 motion for the court to approve a settlement among the Litigation Trustee, Frank Waterhouse, and CPCM. Through the settlement motion, among other terms, Frank Waterhouse and CPCM have agreed to withdraw proofs of claim with prejudice. In return, the Litigation Trustee has agreed to withdraw Count 34 (the only claim asserted against Mr. Waterhouse), as to Mr. Waterhouse, with prejudice from the Complaint. The motion is currently set for hearing on May 2, 2022.

[4] *See, e.g., Grandfinanciera, S.A. v. Nordberg,* 109 S. Ct. 2782 (1989); *Lagenkamp v. Culp,* 111 S. Ct. 330 (1990).

[5] *See, e.g., Stern v. Marshall,* 564 U.S. 462 (2011).

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 922 of 1726   PageID 12243
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 10 of 21

• On January 25, 2022, Defendants James Dondero, Dugaboy Investment Trust, Get Good Trust, and Strand Advisors, Inc. (the "Dondero Defendants") filed Defendants James D. Dondero, Dugaboy Investment Trust, Get Good Trust, and Strand Advisors, Inc.'s Motion to Withdraw the Reference [Adv. Docket No. 45] and their Memorandum of Law in Support [Adv. Docket No. 46].

• On January 26, 2022, Defendant Grant James Scott III filed his Motion to Withdraw the Reference [Adv. Docket No. 50] and his Memorandum of Law in Support [Adv. Docket No. 41].

• On January 26, 2022, CLO Holdco, Ltd., Highland Dallas Foundation, Inc., Charitable DAF Fund, LP, and Charitable DAF Holdco, Ltd. (the "CLO Holdco-Related Defendants") filed their Motion to Withdraw the Reference [Adv. Docket No. 59] and their Brief in Support [Adv. Docket No. 59].

• On February 1, 2022, Defendants Hunter Mountain Investment Trust ("Hunter Mountain") and Rand PE Fund I, LP, Series 1 ("Rand" and together with Hunter Mountain, the "Hunter Mountain Defendants") filed a nominal joinder.

The six different Motions to Withdraw initially created six different civil actions before six different District Judges. These six actions were administratively consolidated, by an order signed and entered on March 22, 2022, in Civil Action No. 3:22-CV-203-S [Docket No. 13], and are now pending before District Judge Karen Scholer.

After holding a status conference on the Motions to Withdraw on March 17, 2022, as required by Local Bankruptcy Rule 5011, the Bankruptcy Court now submits the following report and recommendation to the District Court. Based on the reasoning set forth below, the Bankruptcy Court recommends that the Motions to Withdraw be granted, *but only at such time as the Bankruptcy Court certifies to the District Court that the lawsuit is trial-ready*. The Bankruptcy Court further recommends that the District Court *defer to the Bankruptcy Court the handling of all pre-trial matters*.

## III.  LEGAL STANDARDS

### A.  *Some General Principles Regarding Discretionary Withdrawal of the Reference*

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 923 of 1726    PageID 12244
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 11 of 21

First, some basic discussion is in order regarding discretionary or permissive withdrawal of the reference. The concept is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."

The statute does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the United States Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985). Courts in this District have placed an emphasis on the first two factors. *See Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006).

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy proceedings (*i.e.,* adversary proceedings or contested matters within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related to" a case under Title 11. 28 U.S.C. § 1334(b). *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011). Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters and those that are merely "related to" a Title 11 case are defined as "non-core" matters. The significance of the "core"/"non-core" distinction is that bankruptcy courts may statutorily enter

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 924 of 1726    PageID 12245
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 12 of 21

final judgments in "core" proceedings in a bankruptcy case, while in "non-core" proceedings, the
bankruptcy courts instead may only (absent consent from all of the parties) submit proposed
findings of fact and conclusions of law to the district court, for that court's review and issuance of
final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28
U.S.C. § 157. But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and
the bankruptcy court, therefore, has the **statutory** power to enter a final judgment on the claim
under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a
bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a)
whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final
judgment on a particular claim; but also (b) whether the conferring of that authority on an Article
I bankruptcy court is **constitutional** (and this turns on whether "the action at issue stems from the
bankruptcy itself or would necessarily be resolved in the claims allowance process"). *Stern*, 564
U.S. at 499.

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable
non-bankruptcy law, a bankruptcy court may only conduct the jury trial if: (a) the matters to be
finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district
court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all
of the parties consent.[6]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of
course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars
and the cause of action is to enforce statutory rights that are at least analogous to rights that were

---

[6] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy
judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the
district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 925 of 1726    PageID 12246
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 13 of 21

tried at law in the late 18th century English courts. *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999). Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).  This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first." *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process. *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990). Withdrawing a claim from the claims allowance process of the bankruptcy courts prior to the commencement of an adversary proceeding can serve to preserve a right to a jury trial. *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

**B.  *Post-Confirmation Bankruptcy Subject Matter Jurisdiction***

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 926 of 1726 PageID 12247
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 14 of 21

Defendants argue here that this is all more than simply a matter of "permissive withdrawal of the reference" being applicable. Specifically, the Defendants argue that bankruptcy subject matter jurisdiction is lacking with regard to the Plaintiff's various causes of action (*i.e.,* all 36 causes of action) pursuant to the Fifth Circuit's rulings in *Craig's Stores of Texas, Inc. v. Bank of Louisiana (In re Craig's Stores of Texas, Inc.)*, 266 F.3d 388 (5th Cir. 2001) and *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008).

In *Craig's Stores*, the Fifth Circuit held that a bankruptcy court could not exercise subject matter jurisdiction over a post-confirmation breach of contract claim asserted by a reorganized debtor against its bank in connection with an alleged post-confirmation breach. The Fifth Circuit stated that, following confirmation of a plan, "expansive bankruptcy court jurisdiction" is no longer "required to facilitate 'administration' of the debtor's estate," and further noted: "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Craig's Store's*, 266 F.3d at 390. *Craig's Stores* has often been cited for the notion that bankruptcy subject matter jurisdiction significantly narrows post-confirmation of a Chapter 11 plan.

The Fifth Circuit elaborated on its *Craig's Store's* holding in *Enron*, in holding that confirmation of a plan does not divest a court of bankruptcy subject matter jurisdiction with regard to an action commenced prior to confirmation. *Enron*, 535 F.3d at 335. Noting that "Section 1334 does not expressly limit bankruptcy jurisdiction upon plan confirmation," the Fifth Circuit explained that "three factors were critical to its decision" in *Craig's Stores*:

> [F]irst, the claims at issue "principally dealt with post-confirmation relations between the parties;" second, "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization;" and third, "no facts or law deriving from the reorganization or the plan [were] necessary to the

14

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 927 of 1726 PageID 12248
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 15 of 21

claim." *Craig's Stores*, 266 F.3d at 391. Notwithstanding its statement that
bankruptcy jurisdiction exists after plan confirmation only "for matters pertaining
to the implementation or execution of the plan," the facts in *Craig's Stores* were
narrow; they involved post-confirmation claims based on post-confirmation
activities.

*Id.* (citing *Craig's Stores*, 266 F.3d at 389–91).

Thereafter, numerous courts within the Fifth Circuit have held that the exception to

jurisdiction at issue in *Craig's Store's* does not arise where, as here, a trustee of a litigation trust

created under a confirmed plan of reorganization for the benefit of creditors pursues post-

confirmation causes of action, predicated on pre-confirmation conduct, for the creditors' benefit.

*See Faulkner v. Lane Gorman Trubitt, LLC (In re Reagor-Dykes Motors, LP)*, 2021 WL 4823525,

at *2–4 (Bankr. N.D. Tex. Oct. 14, 2021) (bankruptcy court had post-confirmation subject matter

jurisdiction over a litigation trustee's state law claims "based on pre-petition conduct," the

recoveries of which would "affect distributions to creditors under the confirmed plan"); *Dune*

*Operating Co. v. Watt (In re Dune Energy, Inc.),* 575 B.R. 716, 725–26 (Bankr. W.D. Tex. 2017)

(bankruptcy court had post-confirmation subject matter jurisdiction over lawsuit asserting state

law claims brought by liquidating trustee established under Chapter 11 plan); *Brickley for*

*Cryptometrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 830–

32 (W.D. Tex. 2017) (holding that post-confirmation "related to" subject matter jurisdiction

existed over creditors' trust's post-confirmation suit asserting pre-confirmation Chapter 5 claims

and non-core state law claims where the plan vested the claims in the trust); *Schmidt v. Nordlicht*,

2017 WL 526017, at *2–3 (S.D. Tex. Feb. 9, 2017) (holding that post-confirmation "related to"

subject matter jurisdiction existed over state law claims aimed at pre-confirmation conduct brought

by a litigation trustee established by a confirmed plan); *Ogle v. Comcast Corp. (In re Houston*

*Reg'l*, 547 B.R. 717, 736 (Bankr. S.D. Tex. 2016) (bankruptcy court had post-confirmation subject

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 928 of 1726 PageID 12249
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 16 of 21

matter jurisdiction over lawsuit brought by litigation trustee established under confirmed Chapter 11 plan that asserted state law claims); *Kaye v. Dupree (In re Avado Brands, Inc.)*, 358 B.R. 868, 878–79 (Bankr. N.D. Tex. 2006) (bankruptcy court had post-confirmation jurisdiction over litigation trustee's pre-confirmation core and non-core claims that were transferred to the trustee for prosecution under the plan, where proceeds were to be distributed to creditors); *Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.)*, 309 B.R. 217, 221 (Bankr. N.D. Tex. 2004) (bankruptcy court had post-confirmation jurisdiction over claims preserved under Chapter 11 plan and assigned to the creditor's trust for prosecution with recovery to be distributed to creditors).

The Bankruptcy Court agrees with these numerous holdings and believes that they are consistent with *Craig's Stores*. First, unlike the post-confirmation contract dispute at issue in *Craig's Stores*, the claims here all arise from ***pre-confirmation*** conduct. Second, "antagonism" plainly existed between the parties at the date of the reorganization. Contrary to Defendants' assertion that an action must be filed prior to confirmation, courts in the Fifth Circuit consistently hold that "where the claims are based on pre-petition conduct and the cause of action appears to have accrued before the bankruptcy, the antagonism factor is satisfied." *Faulkner*, 2021 WL 4823525, at \*3; *see also Schmidt v. Nordlicht*, 2017 WL 526017, at \*3 (while "no claim was pending before the bankruptcy," "antagonism existed in the relevant sense; the defendant's alleged wrongdoing harmed the company prior to the bankruptcy, and the company's cause of action appears to have accrued before the bankruptcy"); *Brickley*, 566 B.R. at 831 (confirming that "actual litigation is not necessary to find the existence of antagonism"); *Coho Oil*, 309 B.R. at 221 (finding this factor satisfied where "claims were preserved under the Plan and assigned to the creditor's trust for prosecution"). Moreover, the order confirming the Highland Plan expressly stated that "Implementation of the Plan" shall include the "establishment of" and "transfer of Estate

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 929 of 1726 PageID 12250
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 17 of 21

Causes of Action" to "the Litigation Sub-Trust," the Trustee of which is charged with "investigating, pursuing, and otherwise resolving any Estate Claims." *See* Confirmation Order at ¶ 42(b); *see also* Plan § IV. A ("the Plan will be implemented through . . . the Litigation Sub-Trust"); *id.* at § I.B.4 ("The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims," the proceeds of which "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries . . . ."). Courts within the Fifth Circuit have held that, where a plan "contemplates the prosecution of the claims and the distribution of . . . recovery to creditors under the Plan, and the prosecution of the claims will thus impact compliance with, or completion of, the Plan, the *Craig's Stores* test for post-confirmation jurisdiction is satisfied." *Ernst & Young LLP v. Pritchard (In re Daisytek, Inc.)*, 323 B.R. 180, 185–86 (N.D. Tex. 2005) (bankruptcy court had post-confirmation subject matter jurisdiction over a Rule 2004 motion brought by the trustee of a creditors' trust, established under a confirmed plan, relating to potential accounting malpractice investigation); *see also First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In Re Biloxi Casino Belle Inc.)*, 368 F.3d 491, 496 (5th Cir. 2004) (a suit pertained to the implementation and execution of the plan where recovery had been assigned to a "liquidating trust . . . for the benefit of unsecured creditors").

Accordingly, the Bankruptcy Court concludes that the 36 counts in the Adversary Proceeding "[w]ithout doubt . . . 'pertain[] to implementation and execution'" of the plan and the Defendants arguments to the contrary have no merit. *See Dune Energy*, 575 B.R. at 725–26 (quoting Craig's Stores).[7]

---

[7] The court in *Schmidt* also noted that "*Craig's* turned on the idea that a reorganized debtor's confirmed plan marked the end of the bankruptcy and the emergence of a new reorganized business entity not dependent on the bankruptcy court's protection," commenting that while "that rule makes a good deal of sense in the reorganization context . . . in a liquidation case like this one there is no entity that emerges from the bankruptcy to continue

APPX. 10593

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 930 of 1726 PageID 12251
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 18 of 21

### C. *Mandatory Withdrawal of the Reference*

Withdrawal of the reference pursuant to 28 U.S.C. § 157(d) provides for the possibility of mandatory withdrawal of the reference from the bankruptcy court: "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Under the precedent of this District, in *Nat'l Gypsum Co.* and *Pilgrim's Pride*, mandatory withdrawal of the reference must be granted when: (1) the motion was timely filed; (2) a non-Bankruptcy Code federal law at issue has more than a *de minimis* effect on interstate commerce; and (3) the proceeding involves a substantial and material question of non-Bankruptcy Code federal law. *See U.S. Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.),* 145 B.R. 539, 541 (N.D. Tex. 1992) (stating "withdrawal must be granted if it can be established (1) that the proceeding involves a substantial and material question of both Title 11 and non-Bankruptcy Code federal law; (2) that the non-Code federal law has more than a de minimis effect on interstate commerce; and (3) that the motion for withdrawal was timely."); *see also City of Clinton, Ark. v. Pilgrim's Pride Corp.*, No. 4:09-CV-386-Y, 2009 WL 10684933, at *1 (N.D. Tex. Aug. 18, 2009).

It has been well established that "mandatory withdrawal is to be applied narrowly" and to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009), *adopted in its entirety*, 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009). Unsubstantiated assertions that

---

operations." *Schmidt*, 2017 WL 526017, at *3. Here, although the Plan is one of reorganization, it is "an 'asset monetization plan' providing for the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds." Confirmation Order at ¶ 2. Thus, as in *Schmidt*, the role of the Litigation Trust "is nothing more or less than maximizing the pot of money for distribution to creditors." *Schmidt*, 2017 WL 526017, at *3.

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 931 of 1726 PageID 12252
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 19 of 21

non-bankruptcy federal law issues are substantial and material to an adversary proceeding are insufficient to warrant mandatory withdrawal. *Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.)*, 2015 U.S. Dist. LEXIS 74006, at *21-*23 (D. Me. June 8, 2015) (insufficient basis for mandatory withdrawal where party failed to demonstrate specifically why a court would have to "engage in anything beyond routine application of current law" and the party "tries to kick up some dust to make the relevant analysis seem complicated").

*Why is the issue of mandatory withdrawal of the reference even being raised here*—when the Bankruptcy Court and all the parties agree that permissive withdrawal of the reference should be exercised here, since mere non-core "related to" claims are pervasive and jury trial rights exist? In other words, everyone agrees the reference should be withdrawn—it's just a matter of *when*. Should withdrawal happen immediately or when the action is trial-ready?

The Defendants advocate for immediate withdrawal on the grounds that the Bankruptcy Court does not have authority to preside over the "other federal law" issues present with regard to certain causes of action—so this should preclude the Bankruptcy Court from even presiding over pre-trial matters.

The court does not agree with the Defendants. The "other federal law" issues that may be involved in this Adversary Proceeding are not pervasive or particularly complicated. There are, admittedly, one or more Tax Code provisions at issue. But bankruptcy courts routinely consider tax matters. Defendants' attempts to characterize what appear to be commonplace tax law issues here as sufficient to mandate withdrawal of the reference seem disingenuous.

Certain of the Defendants (HCMFA and NexPoint Advisors) contend that federal securities laws are implicated by the Adversary Proceeding. But the Plaintiff has not asserted any claims that are based on federal securities law statutes. Rather, HCMFA and NexPoint Advisors have

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 932 of 1726   PageID 12253
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 20 of 21

merely made barebone references to potential defenses that might implicate federal securities laws. While certain of the parties in the litigation are "registered investment advisors," this does not mean that the parties' alleged conduct will implicate broad questions of federal securities law. "If a party to a case is federally regulated, such as a bank or securities brokerage, but no federal regulation applies to the dispute at hand, the court need not withdraw the proceeding because no federal regulation will have to be considered." *Contemp. Lithographers, Inc. v. Hibbert*, 127 B.R. 122, 125 (M.D.N.C. 1991). The rule advanced by HCMFA and NexPoint Advisors would mean that bankruptcy courts would be unable to hear virtually any claims against any investment advisor or other financial entity regulated under the federal securities laws.

In summary, mandatory withdrawal of the reference is inapplicable here.

## D. CONCLUSION

In light of: (a) the non-core, related-to claims in the Complaint; (b) the jury trial rights of most Defendants; (c) the fact that only one Defendant out of 23 still has a proof of claim pending— that might arguably negate jury trial rights; and (d) the lack of consent by the Defendants to the Bankruptcy Court presiding over a jury trial or issuing final judgments, the Bankruptcy Court recommends that the District Court: refer all pre-trial matters to the Bankruptcy Court, and grant the Motions to Withdraw upon certification by the Bankruptcy Court that the parties are trial-ready.

With regard to such pre-trial matters, the Bankruptcy Court further recommends that, to the extent a dispositive motion is brought that the Bankruptcy Court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the Bankruptcy Court should submit a report and recommendation to the District Court for the District Court to either adopt or reject.

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 933 of 1726    PageID 12254
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 21 of 21

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

# EXHIBIT 24

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 935 of 1726 PageID 12256
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 1 of 45



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>     Defendant. | Adversary No. 21-03004-sgj<br><br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>     Defendants. | Adversary No.: 21-03005-sgj<br><br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff. | |

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 936 of 1726 PageID 12257
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 2 of 45

| | |
|---|---|
| v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj<br><br>Civ. Act. No. 3:21-cv-01010<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03006-sgj<br><br>Civ. Act. No. 3:21-cv-01378<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj<br><br>Civ. Act. No. 3:21-cv-01379<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

## REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS

### I.    Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to as simply the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 937 of 1726 PageID 12258
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 3 of 45

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).
[4] 28 U.S.C. § 157(c) & (e).

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 938 of 1726 PageID 12259
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 4 of 45

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition. The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5] As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee. More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

APPX. 05512

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 939 of 1726 PageID 12260
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 5 of 45

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen

notes.

The Note Actions morphed, so to speak, when **four** of the five Note Maker Defendants

defended the Note Actions by alleging that an ***oral agreement*** existed between Highland and each

of them—the substance of which was allegedly that Highland would not pursue collection on their

underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear,

the "oral agreement" defense was asserted by each of the Note Maker Defendants ***except*** HCMFA.

The four Defendants who assert the oral agreement defense are sometimes collectively referred to

by the Plaintiff as the ***"Alleged Agreement Defendants"*** and they are: Mr. Dondero; NexPoint;

HCMS; and HCRE. To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions
> subsequent. Specifically, sometime between December of the year in which each
> Note was made and February of the following year, Defendant Nancy Dondero, as
> representative for a majority of the Class A shareholders of Plaintiff agreed that
> Plaintiff would forgive the Notes if certain portfolio companies were sold for
> greater than cost or on a basis outside of Defendant James Dondero's control. The
> purpose of this agreement was to provide compensation to Defendant James
> Dondero, who was otherwise underpaid compared to reasonable compensation
> levels in the industry, through the use of forgivable loans, a practice that was
> standard at [Highland] and in the industry. This agreement setting forth the
> conditions subsequent to demands for payment on the Notes was an oral agreement;
> however, Defendant James Dondero believes there may be testimony or email
> correspondence that discusses the existence of this agreement that may be
> uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No.

21-3003]. *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel;
waiver; and ambiguity.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 46
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 940 of 1726 PageID 12261
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 6 of 45

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97 in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶ 99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and directors—which was audited by one of the largest and most iconic public accounting firms in the world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister Dondero"), acting on behalf of Highland. Notably, Sister Dondero was never an officer, manager, or held any role with Highland, but the position of the Alleged Agreement Defendants is that she nevertheless had authority to act for Highland, in connection with agreeing not to collect on the Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with his children as the future beneficiaries).[7] Here is the catch: Dugaboy happens to own a majority of the *limited partnership interests of Highland*—which, according to the Alleged Agreement Defendants, means Dugaboy can exert control over Highland and do things like release millions of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 8 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 941 of 1726   PageID 12262
Case 21-03003-sgj Doc 191 Filed 07/19/22   Entered 07/19/22 17:06:32   Page 7 of 45

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister
Dondero as additional defendants on new counts—the theories being that, if such an "oral
agreement" was made, it may have given rise to other causes of action on the part of the actors
involved.  Highland amended its complaints in each of the four applicable Note Actions, adding
new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III
and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement
(Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty
(Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant:  HCMFA. Another way in which
the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged
only with regard to the ***two notes on which Defendant HCMFA was the maker***.

The "mutual mistake" defense was articulated as follows.  First, the signature on the two
notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of
HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021
(when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized.
More pointedly, it was alleged that the creation of the notes was entirely a ***mistake*** because (a)
even though funds were frequently transferred between Highland and affiliates such as HCMFA,
and (b) even though the Debtor's in-house accountants usually papered these transfers as loans,
and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the
time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds
to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance.  The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 942 of 1726   PageID 12263
Case 21-03003-sgj Doc 191 Filed 07/19/22   Entered 07/19/22 17:06:32   Page 8 of 45

transfer was allegedly supposed to be treated as *compensation* to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals.  The HCMFA notes were allegedly not what *Mr. Dondero*—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes.  *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos.  In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes—the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes.  The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a *genuine* issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses.  Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11]  For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.
[11] *Id*. ¶¶ 5-18.

APPX. 05516

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 943 of 1726 PageID 12264
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 9 of 45

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the world of commercial finance, and not as described in any evidence submitted to the court.[12] The bankruptcy court hereby recommends that the District Court grant summary judgment in favor of the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the reasons set forth below.

## II. Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the "Notes"): (a) thirteen were demand notes; and (b) three were term notes. These notes were executed between 2013 and 2019 and are described below. These are the undisputed facts pertaining to the thirteen demand notes.

### A. *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18, Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in *very different circumstances from the Highland case*—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 944 of 1726 PageID 12265
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 10 of 45

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl.

Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19,

Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-

1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664;

Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively,

with Dondero's First Note and Dondero's Second Note, the "Dondero Notes"). Klos Dec. ¶ 20,

Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to

RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B. *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in

the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl.

Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at

Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl. Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv. Proc No. 21-3003 even when referring herein to the ***other*** Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or authorized. This allegation will be addressed later herein.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 945 of 1726 PageID 12266
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 11 of 45

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes"). Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

> C. *Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker*

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes"). Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized. This allegation will be addressed later herein.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 946 of 1726 PageID 12267
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 12 of 45

*D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker*

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

*E. The Identical Provisions in Each of the Demand Notes.*

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2. Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5. Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 947 of 1726 PageID 12268
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 13 of 45

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

    F.    *Demands by Plaintiff and Non-Payment*.

    The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020. The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes. Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

    Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 948 of 1726 PageID 12269
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 14 of 45

commenced these Note Actions. Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III.     Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

*A. The Three Term Notes*

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms. One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 949 of 1726 PageID 12270
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 15 of 45

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]

Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

B.    The Identical Provisions in Each of the Term Notes.

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141, Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities controlled by Mr. Dondero.

Appx. 05573

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 950 of 1726    PageID 12271
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 16 of 45

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior

Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes

the following provisions:

2.1    Annual Payment Dates.  During the term of this Note, Borrower shall pay
the outstanding principal amount of the Note (and all unpaid accrued interest
through the date of each such payment) in thirty (30) equal annual payments (the
"Annual Installment") until the Note is paid in full.  Borrower shall pay the Annual
Installment on the 31st day of December of each calendar year during the term of
this Note, commencing on the first such date to occur after the date of execution of
this Note.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment
hereunder as it becomes due shall, at the election of the holder hereof, without
notice, demand, presentment, notice of intent to accelerate, notice of acceleration,
or any other notice of any kind which are hereby waived, mature the principal of
this Note and all interest then accrued, if any, and the same shall at once become
due and payable and subject to those remedies of the holder hereof.  No failure or
delay on the part of Payee in exercising any right, power or privilege hereunder
shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment,
notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice
of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by
acceleration or otherwise) and is placed in the hands of an attorney for collection,
or if it is collected through a bankruptcy court or any other court after maturity, the
Maker shall pay, in addition to all other amounts owing hereunder, all actual
expenses of collection, all court costs and reasonable attorneys' fees and expenses
incurred by the holder hereof.

   C.  *Non-Payment/Defaults Under the Term Notes.*

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment

payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of

$1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-

outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which

reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

APPX. 05524

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 951 of 1726 PageID 12272
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 17 of 45

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12. Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

## IV.    Undisputed Corroborating Evidence Regarding the Sixteen Notes

### A.    *The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC*

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018. Pl. Ex. 34 at p. 39, Appx. 782. Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit. Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 952 of 1726  PageID 12273
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 18 of 45

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565.  All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized.  Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon.  Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558.  *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed.  Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21] "Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland.  *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 953 of 1726    PageID 12274
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 19 of 45

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 954 of 1726 PageID 12275
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 20 of 45

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate. Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes." Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding. Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782. *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

> B. *More Corroborating Evidence: During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes*

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 955 of 1726 PageID 12276
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 21 of 45

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds

themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail

Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA

and NexPoint, a process referred to as a "15(c) Review." As part of the 15(c) Review, the Retail

Board requests information from HCMFA and NexPoint. Pl. Ex. 99 at 129:17-130:3, Appx. 1844-

1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-

2092. Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers

of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board.

Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in

October 2020, to provide information regarding any outstanding amounts currently payable or due

in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided

services to the Funds." Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the

questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or

due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and
> its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP
> [Highland] from HCMFA. The Note between HCMLP [Highland] and NexPoint
> comes due on December 31, 2047. The earliest the Note between HCMLP
> [Highland] and HCMFA could come due is in May 2021. All amounts owed by
> each of NexPoint and HCMFA pursuant to the shared services arrangement with
> HCMLP [Highland] have been paid as of the date of this letter. The Advisor notes
> that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 956 of 1726 PageID 12277
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 22 of 45

*C. More Corroborating Evidence:  Before and During the Highland
Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records,
and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books

and records—before and after the Petition Date—recorded the Notes as valid debts due and owing

by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero,

show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively.  A

February 2018 internal monthly operating results of Highland, underneath a heading "Significant

Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on

February 2, 2018, as "($3.8M) partner loan."  Ex. 39 at 1, Appx. 801.  And in the Debtor's August

2018 internal monthly operating results, also under a heading "Significant Items Impacting

HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together

contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating

on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries").

The Loan Summaries identified amounts owed to Highland under affiliate notes and were created

by updating underlying schedules for activity and reconciling with Highland's general ledger.  Pl.

Ex. 199, Appx. 3245-3246 is an example of a Loan Summary.  The Loan Summaries identified

each Note Maker Defendant by reference to the "GL" number used in the general ledger.  *See* Pl.

Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"),

HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's

Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 957 of 1726 PageID 12278
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 23 of 45

control of Highland, included all of the Notes among the Debtor's assets. Pl. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor) included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx. 826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405 (October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr. DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020); Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905; Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020); Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710 (November 2020); Bankr. DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

## V. The Note Maker Defenses

### A. The "Oral Agreement" Defense involving Mr. Dondero's Sister

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold by a third party. Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 958 of 1726 PageID 12279
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 24 of 45

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense. To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent. Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control. The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23] This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 959 of 1726 PageID 12280
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 25 of 45

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel. Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement." Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost. *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 960 of 1726 PageID 12281
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 26 of 45

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged "oral agreement" altogether. *See* Pl. Ex. 201 ¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex. 204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave. Pl. Ex. 98 at 426:8-427:15, Appx. 1777. As earlier discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement" on behalf of Highland. For one thing, it is undisputed that Sister Dondero had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero resides in Vero Beach, Florida and represents that she owns a private investigations business.[24] The only information Sister Dondero purported to have regarding Mr. Dondero's compensation from Highland was that he had told her he "was not highly paid" and that, in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Pl. Ex. 100 at 51:11-22, Appx. 1887.[25] But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl. Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

APPX. 105524

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 961 of 1726 PageID 12282
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 27 of 45

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890. Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919. Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 962 of 1726 PageID 12283
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 28 of 45

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority **limited** partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

Appx. 105524

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 963 of 1726 PageID 12284
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 29 of 45

3 & 4). However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the
Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until
recently and only believes that it was subject to "milestones" that he cannot identify. Pl. Ex. 105
at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B. The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other
Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion
company with perhaps the world's most iconic and well-known public accounting firm serving as
its auditors. As set forth below, this court does not believe any reasonable jury could reach a
verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank
Waterhouse wore. Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006
and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early
2021. While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer
of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive
Officer of certain retail funds managed by HCMFA and NexPoint. As Treasurer and Principal
Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other
things, HCMFA's accounting and finance functions. Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-
15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19,
38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that
the HCMFA Notes are void or unenforceable because they were signed by mistake or without
authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 964 of 1726 PageID 12285
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 30 of 45

HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMFA from Highland*, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47, Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the "NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through insurance or its own funds, compensated the Defendant [HCMFA] for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of summary judgment evidence to support it. In fact, to the contrary, on May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error, and HCMFA *did not mention Highland*. Pl. Ex. 182, Appx. 2978-2980. In fact, no document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 965 of 1726 PageID 12286
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 31 of 45

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 33 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 966 of 1726   PageID 12287
Case 21-03003-sgj Doc 191 Filed 07/19/22   Entered 07/19/22 17:06:32   Page 32 of 45

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.   There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake."  If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000).  The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes.  At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789).  As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.*  In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056).  Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes.  *Id.* at 143:24-25, Appx. 2085.  To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089.  At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089.  In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085.  The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 34 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 967 of 1726   PageID 12288
Case 21-03003-sgj Doc 191 Filed 07/19/22   Entered 07/19/22 17:06:32   Page 33 of 45

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there—particularly when the defense is based on mostly self-serving conclusory statements of Mr. Dondero and not any tangible evidence.[28]

### C.  Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of consideration.  There is no summary judgment evidence in the record that supports his affirmative defenses of waiver, estoppel, or lack of consideration.  Pl. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker Defendants each also contend that they made prepayments on their Notes, such that they cannot be deemed to have defaulted, and also assert they did not default under those loans because of Annual Installment payments that they made.  First, the unrefuted summary judgment evidence of Plaintiff clearly dispels any argument that prepayments may have averted any defaults.  *See* Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries).  Moreover, the Annual Installment payments were due on December 31, 2020, and these Note Maker Defendants did not make their Annual Installment payments to Highland until mid-January 2021, after receiving notices of default.  These Note Maker Defendants had no right to cure in the loan documents.  Thus, this defense fails as a matter of law.  *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28]   One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

APPx. 10539

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 968 of 1726    PageID 12289
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 34 of 45

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

### V.    Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c)).  A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes.  Thus, he cannot rely on ambiguity as a defense.  *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing them to make their Annual Installment payments timely in December 2021.  First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland.  Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205.  Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

APPX. 05542

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 969 of 1726 PageID 12290
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 35 of 45

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI.    Legal Analysis

### A.   The Context Here Matters:  Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 970 of 1726 PageID 12291
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 36 of 45

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law,

the movant need not prove all essential elements of a breach of contract, but only must establish

(i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal

owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See*

*Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL

3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each

of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed

by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal

and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶

18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed

by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22,

Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed

by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-

26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by

HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

APPX. 05544

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶

27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by

NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec.

¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS

in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but

unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶

52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE

in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but

unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations

by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note

Maker Defendants under the Term Notes breached their obligations by failing to make the Annual

Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 972 of 1726    PageID 12293
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 38 of 45

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants' breaches in the amounts set forth above, plus the interest that has accrued under the Notes since those calculations, plus collection costs and attorneys' fees—which amounts Highland should separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

*B. The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement," such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal amount of any Note subject to the alleged "oral agreement."  Mr. Dondero and Sister Dondero

APPX. 05544

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 973 of 1726 PageID 12294
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 39 of 45

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement. Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement. The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement. There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds. In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at \* 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at \*5 (N.D. Tex. Sept. 4, 2014). *See also id.* at \*6

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 974 of 1726 PageID 12295
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 40 of 45

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

## C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

APPX. 05546

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 975 of 1726    PageID 12296
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 41 of 45

original) (citing Texas law).  In other words, "[m]utual mistake of fact occurs where the parties to

an agreement have a common intention, but the written instrument does not reflect the intention of

the parties due to a mutual mistake." *Id.* (internal quotations omitted).  "In determining the intent

of the parties to a written contract, a court may consider the conduct of the parties and the

information available to them at the time of signing in addition to the written agreement itself." *Id.*

(internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show

what the parties' true agreement was and that the instrument incorrectly reflects that agreement

because of a mutual mistake."  *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-

CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted).

"The question of mutual mistake is determined not by self-serving subjective statements of the

parties' intent … but rather solely by objective circumstances surrounding execution of the

[contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959,

2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted).  "The purpose

of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain."

*Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

    The undisputed documentary and testimonial evidence overwhelmingly establish that both

HCMFA and Highland intended the HCMFA Notes to be loans.  As discussed above: (i) Mr.

Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being

treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities

in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes

were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes

were represented as "liabilities" to third parties at all relevant times.

APPX. 05549

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 976 of 1726 PageID 12297
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 42 of 45

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual. The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney*, 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 977 of 1726 PageID 12298
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 43 of 45

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

### VII. Summary Judgment.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined. Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

APPX. 10554

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 978 of 1726 PageID 12299
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 44 of 45

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**Submission of Judgment. The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 979 of 1726    PageID 12300
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 45 of 45

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred.  The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs.  The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*

APPX. 05543

# EXHIBIT 25

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 981 of 1726    PageID 12302
46
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 1 of 45



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>    Defendant. | Adversary No. 21-03004-sgj<br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03005-sgj<br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff. | |

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 982 of 1726 PageID 12303
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 2 of 45

| | |
|---|---|
| v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | Adversary No. 21-03003-sgj<br><br>Civ. Act. No. 3:21-cv-01010<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | Adversary No.: 21-03006-sgj<br><br>Civ. Act. No. 3:21-cv-01378<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | Adversary No.: 21-03007-sgj<br><br>Civ. Act. No. 3:21-cv-01379<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

## <u>REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS</u>

### I.    Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

2

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 983 of 1726 PageID 12304
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 3 of 45

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).
[4] 28 U.S.C. § 157(c) & (e).

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 984 of 1726 PageID 12305
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 4 of 45

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition. The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5] As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee. More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

APPX. 05556

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 985 of 1726    PageID 12306
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 5 of 45

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen

notes.

The Note Actions morphed, so to speak, when **four** of the five Note Maker Defendants

defended the Note Actions by alleging that an **oral agreement** existed between Highland and each

of them—the substance of which was allegedly that Highland would not pursue collection on their

underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear,

the "oral agreement" defense was asserted by each of the Note Maker Defendants **except** HCMFA.

The four Defendants who assert the oral agreement defense are sometimes collectively referred to

by the Plaintiff as the **"Alleged Agreement Defendants"** and they are:  Mr. Dondero; NexPoint;

HCMS; and HCRE.  To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions
> subsequent. Specifically, sometime between December of the year in which each
> Note was made and February of the following year, Defendant Nancy Dondero, as
> representative for a majority of the Class A shareholders of Plaintiff agreed that
> Plaintiff would forgive the Notes if certain portfolio companies were sold for
> greater than cost or on a basis outside of Defendant James Dondero's control. The
> purpose of this agreement was to provide compensation to Defendant James
> Dondero, who was otherwise underpaid compared to reasonable compensation
> levels in the industry, through the use of forgivable loans, a practice that was
> standard at [Highland] and in the industry.  This agreement setting forth the
> conditions subsequent to demands for payment on the Notes was an oral agreement;
> however, Defendant James Dondero believes there may be testimony or email
> correspondence that discusses the existence of this agreement that may be
> uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No.

21-3003].  *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 986 of 1726 PageID 12307
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 6 of 45

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97 in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶ 99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and directors—which was audited by one of the largest and most iconic public accounting firms in the world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister Dondero"), acting on behalf of Highland. Notably, Sister Dondero was never an officer, manager, or held any role with Highland, but the position of the Alleged Agreement Defendants is that she nevertheless had authority to act for Highland, in connection with agreeing not to collect on the Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with his children as the future beneficiaries).[7] Here is the catch: Dugaboy happens to own a majority of the **limited partnership interests of Highland**—which, according to the Alleged Agreement Defendants, means Dugaboy can exert control over Highland and do things like release millions of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

APP. 10550

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 987 of 1726 PageID 12308
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 7 of 45

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister
Dondero as additional defendants on new counts—the theories being that, if such an "oral
agreement" was made, it may have given rise to other causes of action on the part of the actors
involved. Highland amended its complaints in each of the four applicable Note Actions, adding
new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III
and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement
(Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty
(Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant: HCMFA. Another way in which
the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged
only with regard to the ***two notes on which Defendant HCMFA was the maker***.

The "mutual mistake" defense was articulated as follows. First, the signature on the two
notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of
HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021
(when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized.
More pointedly, it was alleged that the creation of the notes was entirely a ***mistake*** because (a)
even though funds were frequently transferred between Highland and affiliates such as HCMFA,
and (b) even though the Debtor's in-house accountants usually papered these transfers as loans,
and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the
time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds
to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance. The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 988 of 1726 PageID 12309
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 8 of 45

transfer was allegedly supposed to be treated as *compensation* to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals. The HCMFA notes were allegedly not what *Mr. Dondero*—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes. *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos. In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes— the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes. The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a *genuine* issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses. Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11] For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

APPX. 05562

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 989 of 1726 PageID 12310
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 9 of 45

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the world of commercial finance, and not as described in any evidence submitted to the court.[12] The bankruptcy court hereby recommends that the District Court grant summary judgment in favor of the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the reasons set forth below.

## II.    Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the "Notes"): (a) thirteen were demand notes; and (b) three were term notes. These notes were executed between 2013 and 2019 and are described below. These are the undisputed facts pertaining to the thirteen demand notes.

### A.    *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18, Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in *very different circumstances from the Highland case*—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 990 of 1726    PageID 12311
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 10 of 45

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl.

Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19,

Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-

1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664;

Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively,

with Dondero's First Note and Dondero's Second Note, the "Dondero Notes").  Klos Dec. ¶ 20,

Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to

RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B.  *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in

the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl.

Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at

Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in
Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl.
Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv.
Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other
Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or
authorized.  This allegation will be addressed later herein.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 991 of 1726    PageID 12312
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 11 of 45

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes").  Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

C. *Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker*

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note").  Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes").  Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized.  This allegation will be addressed later herein.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 992 of 1726 PageID 12313
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 12 of 45

*D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker*

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

*E. The Identical Provisions in Each of the Demand Notes.*

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of

APP.105564

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 993 of 1726   PageID 12314
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 13 of 45

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

F.    *Demands by Plaintiff and Non-Payment.*

The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020.  The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes.  Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 994 of 1726 PageID 12315
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 14 of 45

commenced these Note Actions. Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III. Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

*A. The Three Term Notes*

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms. One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 995 of 1726 PageID 12316
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 15 of 45

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]
Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of
$30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-
44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02
(the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos
Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51
(the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos
Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of
each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and
HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr.
Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use
of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13,
Appx. 1783, and 450:3-24, Appx. 1783.

> B. *The Identical Provisions in Each of the Term Notes.*

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141,
Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636
(NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated
between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities
controlled by Mr. Dondero.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 996 of 1726    PageID 12317
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 16 of 45

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes the following provisions:

2.1     Annual Payment Dates.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "Annual Installment") until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

4.     Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*C.  Non-Payment/Defaults Under the Term Notes.*

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of $1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

APPX. 05560

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 997 of 1726    PageID 12318
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 17 of 45

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12.  Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

## IV.    Undisputed Corroborating Evidence Regarding the Sixteen Notes

### A.    *The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC*

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Pl. Ex. 34 at p. 39, Appx. 782.  Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 998 of 1726 PageID 12319
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 18 of 45

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized. Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558. *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed. Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21] "Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland. *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

APPX. 05572

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 999 of 1726 PageID 12320
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 19 of 45

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1000 of 1726 PageID 12321
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 20 of 45

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate. Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes." Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding. Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782. *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

> **B. *More Corroborating Evidence: During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes***

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1001 of 1726 PageID 12322
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 21 of 45

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA and NexPoint, a process referred to as a "15(c) Review." As part of the 15(c) Review, the Retail Board requests information from HCMFA and NexPoint. Pl. Ex. 99 at 129:17-130:3, Appx. 1844-1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092. Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board. Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in October 2020, to provide information regarding any outstanding amounts currently payable or due in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided services to the Funds." Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP [Highland] from HCMFA. The Note between HCMLP [Highland] and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP [Highland] and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP [Highland] have been paid as of the date of this letter. The Advisor notes that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1002 of 1726 PageID 12323
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 22 of 45

*C. More Corroborating Evidence: Before and During the Highland Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records, and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books and records—before and after the Petition Date—recorded the Notes as valid debts due and owing by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero, show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively. A February 2018 internal monthly operating results of Highland, underneath a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on February 2, 2018, as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. And in the Debtor's August 2018 internal monthly operating results, also under a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger. Pl. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary. The Loan Summaries identified each Note Maker Defendant by reference to the "GL" number used in the general ledger. *See* Pl. Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1003 of 1726    PageID 12324
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 23 of 45

control of Highland, included all of the Notes among the Debtor's assets.  Pl. Ex. 40, Appx. 812-
815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate
"Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a
description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland
bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor)
included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx.
826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405
(October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr.
DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020);
Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905;
Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020);
Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710
(November 2020); Bankr.  DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

## V.        The Note Maker Defenses

### A. The "Oral Agreement" Defense involving Mr. Dondero's Sister

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to
by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to
payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the
Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold
by a third party.  Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his
original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1004 of 1726    PageID 12325
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 24 of 45

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense.  To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent.  Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control.  The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23]  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate.  *Id.* at 189:24-192:10, Appx. 2005-2006.  *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1005 of 1726    PageID 12326
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 25 of 45

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel.  Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement."  Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost.  *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1006 of 1726    PageID 12327
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 26 of 45

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged "oral agreement" altogether.  *See* Pl. Ex. 201 ¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex. 204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave.  Pl. Ex. 98 at 426:8-427:15, Appx. 1777.  As earlier discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement" on behalf of Highland.  For one thing, it is undisputed that Sister Dondero had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero resides in Vero Beach, Florida and represents that she owns a private investigations business.[24] The only information Sister Dondero purported to have regarding Mr. Dondero's compensation from Highland was that he had told her he "was not highly paid" and that, in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark."  Pl. Ex. 100 at 51:11-22, Appx. 1887.[25]  But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl. Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

APPX. 05570

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1007 of 1726   PageID 12328
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 27 of 45

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890.  Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919.  Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

27

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1008 of 1726   PageID 12329
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 28 of 45

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority ***limited*** partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1009 of 1726   PageID 12330
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 29 of 45

3 & 4).  However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the

Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until

recently and only believes that it was subject to "milestones" that he cannot identify.  Pl. Ex. 105

at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B.  The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other

Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion

company with perhaps the world's most iconic and well-known public accounting firm serving as

its auditors.  As set forth below, this court does not believe any reasonable jury could reach a

verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank

Waterhouse wore.  Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006

and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early

2021.  While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer

of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive

Officer of certain retail funds managed by HCMFA and NexPoint.  As Treasurer and Principal

Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other

things, HCMFA's accounting and finance functions.  Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-

15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19,

38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that

the HCMFA Notes are void or unenforceable because they were signed by mistake or without

authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

Appx. 05573

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1010 of 1726   PageID 12331
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 30 of 45

HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to

HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMFA*

*from Highland*, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47,

Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in

calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation

Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the

"NAV Error").  HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various
> employees and representatives of the Plaintiff, the Defendant, and HGAF worked
> with the SEC to correct the error and to compensate HGAF and the various
> investors in HGAF harmed by the NAV Error. Ultimately, and working with the
> SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error
> to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the
> NAV Error itself, as well as rebating related advisor fees and processing costs; and
> (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid
> out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the
> Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having
> caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through
> insurance or its own funds, compensated the Defendant [HCMFA] for the above
> payments by paying, or causing to be paid, approximately $7.5 million to the
> Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of

summary judgment evidence to support it.  In fact, to the contrary, on May 28, 2019, HCMFA sent

a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV

Error, and HCMFA *did not mention Highland*.  Pl. Ex. 182, Appx. 2978-2980. In fact, no

document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange

Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1011 of 1726 PageID 12332
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 31 of 45

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1012 of 1726   PageID 12333
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 32 of 45

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.   There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake."  If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000).  The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes.  At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789).  As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.*  In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056).  Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes.  *Id.* at 143:24-25, Appx. 2085.  To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089.  At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089.  In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085.  The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

APPX. 05576

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1013 of 1726 PageID 12334
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 33 of 45

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there—particularly when the defense is based on mostly self-serving conclusory statements of Mr. Dondero and not any tangible evidence.[28]

### C. Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of consideration. There is no summary judgment evidence in the record that supports his affirmative defenses of waiver, estoppel, or lack of consideration. Pl. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker Defendants each also contend that they made prepayments on their Notes, such that they cannot be deemed to have defaulted, and also assert they did not default under those loans because of Annual Installment payments that they made. First, the unrefuted summary judgment evidence of Plaintiff clearly dispels any argument that prepayments may have averted any defaults. *See* Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries). Moreover, the Annual Installment payments were due on December 31, 2020, and these Note Maker Defendants did not make their Annual Installment payments to Highland until mid-January 2021, after receiving notices of default. These Note Maker Defendants had no right to cure in the loan documents. Thus, this defense fails as a matter of law. *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28] One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1014 of 1726 PageID 12335
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 34 of 45

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

## V.    Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c)). A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes. Thus, he cannot rely on ambiguity as a defense. *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing them to make their Annual Installment payments timely in December 2021. First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland. Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205. Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1015 of 1726 PageID 12336
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 35 of 45

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI. Legal Analysis

### A. The Context Here Matters: Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 37 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1016 of 1726   PageID 12337
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 36 of 45

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶ 18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22, Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1017 of 1726 PageID 12338
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 37 of 45

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶ 27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec. ¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶ 52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note Maker Defendants under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1018 of 1726    PageID 12339
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 38 of 45

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants' breaches in the amounts set forth above, plus the interest that has accrued under the Notes since those calculations, plus collection costs and attorneys' fees—which amounts Highland should separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

*B.   The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement," such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal amount of any Note subject to the alleged "oral agreement."   Mr. Dondero and Sister Dondero

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1019 of 1726   PageID 12340
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 39 of 45

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement.  Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement.  The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement.  There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds.   In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness."  *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted).  "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1020 of 1726 PageID 12341
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 40 of 45

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

*C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated*

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1021 of 1726 PageID 12342
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 41 of 45

original) (citing Texas law). In other words, "[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.* (internal quotations omitted). "In determining the intent of the parties to a written contract, a court may consider the conduct of the parties and the information available to them at the time of signing in addition to the written agreement itself." *Id.* (internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake." *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

The undisputed documentary and testimonial evidence overwhelmingly establish that both HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr. Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1022 of 1726   PageID 12343
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 42 of 45

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes.  The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual.  The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney*, 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1023 of 1726   PageID 12344
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 43 of 45

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

## VII.    Summary Judgment.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined.  Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 45 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1024 of 1726   PageID 12345
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 44 of 45

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**Submission of Judgment.  The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

APPX. 05596

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1025 of 1726   PageID 12346
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 45 of 45

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred. The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs. The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*

# EXHIBIT 26

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1027 of 1726   PageID 12348

Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 1 of 45



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>     Defendant. | Adversary No. 21-03004-sgj<br><br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>     Defendants. | Adversary No.: 21-03005-sgj<br><br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff. | |

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1028 of 1726   PageID 12349
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 2 of 45

| | |
|---|---|
| v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj<br><br>Civ. Act. No. 3:21-cv-01010<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03006-sgj<br><br>Civ. Act. No. 3:21-cv-01378<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj<br><br>Civ. Act. No. 3:21-cv-01379<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

### REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS

## I.    Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1029 of 1726 PageID 12350
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 3 of 45

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).

[4] 28 U.S.C. § 157(c) & (e).

APPX. 05803

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1030 of 1726   PageID 12351
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 4 of 45

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr.

Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition.  The

indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether:

thirteen demand notes and three term notes). The indebtedness represented by these notes remains

unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge

Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there

are overlapping facts and defenses.[5]   As alluded to above, the consolidated litigation involves

sixteen different promissory notes on which Highland is the payee.  More than $60 million of

unpaid principal and interest was alleged to be due and owing on the notes as of the time that the

five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr.

Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P.

("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker

on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five

notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real

Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note).

Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue

payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

APPX. 05804

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1031 of 1726   PageID 12352
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 5 of 45

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen notes.

The Note Actions morphed, so to speak, when **four** of the five Note Maker Defendants defended the Note Actions by alleging that an ***oral agreement*** existed between Highland and each of them—the substance of which was allegedly that Highland would not pursue collection on their underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear, the "oral agreement" defense was asserted by each of the Note Maker Defendants ***except*** HCMFA. The four Defendants who assert the oral agreement defense are sometimes collectively referred to by the Plaintiff as the ***"Alleged Agreement Defendants"*** and they are:  Mr. Dondero; NexPoint; HCMS; and HCRE.  To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at [Highland] and in the industry.  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No. 21-3003].  *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

APPX. 05893

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1032 of 1726 PageID 12353
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 6 of 45

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97 in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶ 99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and directors—which was audited by one of the largest and most iconic public accounting firms in the world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister Dondero"), acting on behalf of Highland. Notably, Sister Dondero was never an officer, manager, or held any role with Highland, but the position of the Alleged Agreement Defendants is that she nevertheless had authority to act for Highland, in connection with agreeing not to collect on the Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with his children as the future beneficiaries).[7] Here is the catch: Dugaboy happens to own a majority of the **limited partnership interests of Highland**—which, according to the Alleged Agreement Defendants, means Dugaboy can exert control over Highland and do things like release millions of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

APPX. 05804

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1033 of 1726 PageID 12354
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 7 of 45

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister Dondero as additional defendants on new counts—the theories being that, if such an "oral agreement" was made, it may have given rise to other causes of action on the part of the actors involved. Highland amended its complaints in each of the four applicable Note Actions, adding new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement (Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty (Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant: HCMFA. Another way in which the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged only with regard to the *two notes on which Defendant HCMFA was the maker*.

The "mutual mistake" defense was articulated as follows. First, the signature on the two notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021 (when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized. More pointedly, it was alleged that the creation of the notes was entirely a *mistake* because (a) even though funds were frequently transferred between Highland and affiliates such as HCMFA, and (b) even though the Debtor's in-house accountants usually papered these transfers as loans, and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance. The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1034 of 1726 PageID 12355
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 8 of 45

transfer was allegedly supposed to be treated as *compensation* to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals. The HCMFA notes were allegedly not what *Mr. Dondero*—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes. *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos. In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes—the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes. The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a *genuine* issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses. Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11] For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

APPX. 05898

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1035 of 1726    PageID 12356
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 9 of 45

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the world of commercial finance, and not as described in any evidence submitted to the court.[12]  The bankruptcy court hereby recommends that the District Court grant summary judgment in favor of the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the reasons set forth below.

## II.    Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the "Notes"): (a) thirteen were demand notes; and (b) three were term notes.  These notes were executed between 2013 and 2019 and are described below.  These are the undisputed facts pertaining to the thirteen demand notes.

### A.    *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18, Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in *very different circumstances from the Highland case*—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl.

Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19,

Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-

1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664;

Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively,

with Dondero's First Note and Dondero's Second Note, the "Dondero Notes"). Klos Dec. ¶ 20,

Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to

RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B.  *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in

the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl.

Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at

Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in
Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl.
Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv.
Proc No. 21-3003 even when referring herein to the ***other*** Note Actions (i.e., the Note Actions involving the other
Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or
authorized.  This allegation will be addressed later herein.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1037 of 1726 PageID 12358
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 11 of 45

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes"). Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

*C. Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker*

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes"). Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized. This allegation will be addressed later herein.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1038 of 1726 PageID 12359
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 12 of 45

*D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker*

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

*E. The Identical Provisions in Each of the Demand Notes.*

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2.     Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5.     Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1039 of 1726 PageID 12360
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 13 of 45

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

        F.    *Demands by Plaintiff and Non-Payment*.

        The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020. The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes. Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

        Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1040 of 1726 PageID 12361
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 14 of 45

commenced these Note Actions. Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III. Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

#### A. The Three Term Notes

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms. One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1041 of 1726 PageID 12362
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 15 of 45

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]

Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

    *B.*    *The Identical Provisions in Each of the Term Notes.*

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141, Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities controlled by Mr. Dondero.

APPX. 05303

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1042 of 1726   PageID 12363
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 16 of 45

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes the following provisions:

2.1     Annual Payment Dates.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "Annual Installment") until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

4.     Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

   C.  *Non-Payment/Defaults Under the Term Notes*.

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of $1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1043 of 1726 PageID 12364
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 17 of 45

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12. Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

## IV. Undisputed Corroborating Evidence Regarding the Sixteen Notes

### A. The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018. Pl. Ex. 34 at p. 39, Appx. 782. Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit. Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1044 of 1726   PageID 12365
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 18 of 45

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized. Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558. *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed. Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21] "Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland. *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

APPX. 05618

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1045 of 1726 PageID 12366
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 19 of 45

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1046 of 1726   PageID 12367
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 20 of 45

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate.  Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes."  Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782.  *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

   B.   *More Corroborating Evidence:  During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes*

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1047 of 1726   PageID 12368
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 21 of 45

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA and NexPoint, a process referred to as a "15(c) Review."  As part of the 15(c) Review, the Retail Board requests information from HCMFA and NexPoint.  Pl. Ex. 99 at 129:17-130:3, Appx. 1844-1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092.  Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board. Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in October 2020, to provide information regarding any outstanding amounts currently payable or due in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided services to the Funds."  Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the questions posed by the Retail Board.  As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP [Highland] from HCMFA.  The Note between HCMLP [Highland] and NexPoint comes due on December 31, 2047.  The earliest the Note between HCMLP [Highland] and HCMFA could come due is in May 2021.  All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP [Highland] have been paid as of the date of this letter.  The Advisor notes that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1048 of 1726   PageID 12369
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16    Page 22 of 45

C. *More Corroborating Evidence:   Before and During the Highland*
*Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records,*
*and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books and records—before and after the Petition Date—recorded the Notes as valid debts due and owing by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero, show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively.  A February 2018 internal monthly operating results of Highland, underneath a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on February 2, 2018, as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801.  And in the Debtor's August 2018 internal monthly operating results, also under a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Pl. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary.  The Loan Summaries identified each Note Maker Defendant by reference to the "GL" number used in the general ledger.  *See* Pl. Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1049 of 1726 PageID 12370
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 23 of 45

control of Highland, included all of the Notes among the Debtor's assets. Pl. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor) included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx. 826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405 (October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr. DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020); Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905; Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020); Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710 (November 2020); Bankr. DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

**V.      The Note Maker Defenses**

*A. The "Oral Agreement" Defense involving Mr. Dondero's Sister*

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold by a third party. Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1050 of 1726 PageID 12371
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 24 of 45

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense. To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent. Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control. The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23] This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 26 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1051 of 1726   PageID 12372
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 25 of 45

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel.  Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement."  Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost.  *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1052 of 1726   PageID 12373
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 26 of 45

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged "oral agreement" altogether.  *See* Pl. Ex. 201 ¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex. 204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave.  Pl. Ex. 98 at 426:8-427:15, Appx. 1777.  As earlier discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement" on behalf of Highland.  For one thing, it is undisputed that Sister Dondero had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero resides in Vero Beach, Florida and represents that she owns a private investigations business.[24] The only information Sister Dondero purported to have regarding Mr. Dondero's compensation from Highland was that he had told her he "was not highly paid" and that, in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark."  Pl. Ex. 100 at 51:11-22, Appx. 1887.[25]  But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl. Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1053 of 1726 PageID 12374
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 27 of 45

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890. Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919. Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority ***limited*** partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1055 of 1726   PageID 12376
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 29 of 45

3 & 4).  However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until recently and only believes that it was subject to "milestones" that he cannot identify.  Pl. Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B.  The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion company with perhaps the world's most iconic and well-known public accounting firm serving as its auditors.  As set forth below, this court does not believe any reasonable jury could reach a verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank Waterhouse wore.  Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006 and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early 2021.  While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive Officer of certain retail funds managed by HCMFA and NexPoint.  As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other things, HCMFA's accounting and finance functions.  Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that the HCMFA Notes are void or unenforceable because they were signed by mistake or without authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

APPX. 055829

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1056 of 1726   PageID 12377
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 30 of 45

HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMFA from Highland*, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47, Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the "NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through insurance or its own funds, compensated the Defendant [HCMFA] for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of summary judgment evidence to support it. In fact, to the contrary, on May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error, and HCMFA *did not mention Highland*. Pl. Ex. 182, Appx. 2978-2980. In fact, no document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 32 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1057 of 1726   PageID 12378
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16    Page 31 of 45

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123.  Pl. Ex. 182 at p. 2, Appx. 2980.  Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million.  It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1058 of 1726   PageID 12379
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 32 of 45

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.   There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake."  If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000).  The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes.  At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789).  As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.*  In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056).  Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes.  *Id.* at 143:24-25, Appx. 2085.  To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089.  At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089.  In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085.  The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1059 of 1726   PageID 12380
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 33 of 45

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii)

prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there—

particularly when the defense is based on mostly self-serving conclusory statements of Mr.

Dondero and not any tangible evidence.[28]

### C. Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of

consideration.  There is no summary judgment evidence in the record that supports his affirmative

defenses of waiver, estoppel, or lack of consideration.  Pl. Ex. 98 at 357:24-360:14, Appx. 1760-

1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker

Defendants each also contend that they made prepayments on their Notes, such that they cannot

be deemed to have defaulted, and also assert they did not default under those loans because of

Annual Installment payments that they made.  First, the unrefuted summary judgment evidence of

Plaintiff clearly dispels any argument that prepayments may have averted any defaults.  *See* Klos

Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries).  Moreover, the Annual Installment payments were

due on December 31, 2020, and these Note Maker Defendants did not make their Annual

Installment payments to Highland until mid-January 2021, after receiving notices of default.  These

Note Maker Defendants had no right to cure in the loan documents.  Thus, this defense fails as a

matter of law.  *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762,

370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28]    One    disturbing    aspect    of    both    the    "Mutual    Mistake"    defense    and    the
"oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and
the Note Maker Defendants were materially misleading for several years. What human being(s) would be held
accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1060 of 1726   PageID 12381
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 34 of 45

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

## V.    Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c)).   A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes.  Thus, he cannot rely on ambiguity as a defense.  *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing them to make their Annual Installment payments timely in December 2021.  First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland.  Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205.  Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1061 of 1726    PageID 12382
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 35 of 45

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

VI.    **Legal Analysis**

*A.    The Context Here Matters:  Promissory Notes are at Issue*

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 37 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1062 of 1726   PageID 12383
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 36 of 45

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶ 18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22, Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

APPX. 05624

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1063 of 1726 PageID 12384
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 37 of 45

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶ 27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec. ¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶ 52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note Maker Defendants under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

APPX. 05623

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 39 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1064 of 1726   PageID 12385
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 38 of 45

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants' breaches in the amounts set forth above, plus the interest that has accrued under the Notes since those calculations, plus collection costs and attorneys' fees—which amounts Highland should separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

*B.   The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement," such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal amount of any Note subject to the alleged "oral agreement."  Mr. Dondero and Sister Dondero

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1065 of 1726 PageID 12386
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 39 of 45

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement. Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement. The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement. There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds. In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1066 of 1726 PageID 12387
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 40 of 45

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 42 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1067 of 1726   PageID 12388
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 41 of 45

original) (citing Texas law).  In other words, "[m]utual mistake of fact occurs where the parties to

an agreement have a common intention, but the written instrument does not reflect the intention of

the parties due to a mutual mistake." *Id.* (internal quotations omitted).  "In determining the intent

of the parties to a written contract, a court may consider the conduct of the parties and the

information available to them at the time of signing in addition to the written agreement itself." *Id.*

(internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show

what the parties' true agreement was and that the instrument incorrectly reflects that agreement

because of a mutual mistake."  *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-

CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted).

"The question of mutual mistake is determined not by self-serving subjective statements of the

parties' intent … but rather solely by objective circumstances surrounding execution of the

[contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959,

2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted).  "The purpose

of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain."

*Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

        The undisputed documentary and testimonial evidence overwhelmingly establish that both

HCMFA and Highland intended the HCMFA Notes to be loans.  As discussed above: (i) Mr.

Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being

treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities

in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes

were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes

were represented as "liabilities" to third parties at all relevant times.

APPX. 10539

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1068 of 1726 PageID 12389
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 42 of 45

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual. The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney*, 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1069 of 1726   PageID 12390
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 43 of 45

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

## VII.    Summary Judgment.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined.  Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1070 of 1726 PageID 12391
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 44 of 45

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**Submission of Judgment. The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

44

APPX. 105642

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1071 of 1726   PageID 12392
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 45 of 45

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred.  The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs.  The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*

# EXHIBIT 27

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1073 of 1726   PageID 12394
Case 21-03007-sgj Doc 208 Filed 07/19/22   Entered 07/19/22 17:16:08   Page 1 of 45



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>    Defendant. | Adversary No. 21-03004-sgj<br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03005-sgj<br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff. | |

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1074 of 1726 PageID 12395
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 2 of 45

| | |
|---|---|
| v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj<br><br>Civ. Act. No. 3:21-cv-01010<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03006-sgj<br><br>Civ. Act. No. 3:21-cv-01378<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj<br><br>Civ. Act. No. 3:21-cv-01379<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

## REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS

### I.    Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1075 of 1726 PageID 12396
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 3 of 45

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).

[4] 28 U.S.C. § 157(c) & (e).

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1076 of 1726 PageID 12397
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 4 of 45

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition. The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5] As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee. More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

APPX. 05640

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1077 of 1726   PageID 12398
Case 21-03007-sgj Doc 208 Filed 07/19/22   Entered 07/19/22 17:16:08   Page 5 of 45

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen notes.

The Note Actions morphed, so to speak, when **four** of the five Note Maker Defendants defended the Note Actions by alleging that an ***oral agreement*** existed between Highland and each of them—the substance of which was allegedly that Highland would not pursue collection on their underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear, the "oral agreement" defense was asserted by each of the Note Maker Defendants *except* HCMFA. The four Defendants who assert the oral agreement defense are sometimes collectively referred to by the Plaintiff as the ***"Alleged Agreement Defendants"*** and they are:  Mr. Dondero; NexPoint; HCMS; and HCRE.  To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at [Highland] and in the industry.  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No. 21-3003].  *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

APPX. 05649

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1078 of 1726 PageID 12399
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 6 of 45

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97 in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶ 99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and directors—which was audited by one of the largest and most iconic public accounting firms in the world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister Dondero"), acting on behalf of Highland. Notably, Sister Dondero was never an officer, manager, or held any role with Highland, but the position of the Alleged Agreement Defendants is that she nevertheless had authority to act for Highland, in connection with agreeing not to collect on the Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with his children as the future beneficiaries).[7] Here is the catch: Dugaboy happens to own a majority of the **limited partnership interests of Highland**—which, according to the Alleged Agreement Defendants, means Dugaboy can exert control over Highland and do things like release millions of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

APPX. 10662

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1079 of 1726 PageID 12400
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 7 of 45

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister

Dondero as additional defendants on new counts—the theories being that, if such an "oral

agreement" was made, it may have given rise to other causes of action on the part of the actors

involved. Highland amended its complaints in each of the four applicable Note Actions, adding

new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III

and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement

(Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty

(Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant: HCMFA. Another way in which

the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged

only with regard to the ***two notes on which Defendant HCMFA was the maker***.

The "mutual mistake" defense was articulated as follows. First, the signature on the two

notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of

HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021

(when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized.

More pointedly, it was alleged that the creation of the notes was entirely a ***mistake*** because (a)

even though funds were frequently transferred between Highland and affiliates such as HCMFA,

and (b) even though the Debtor's in-house accountants usually papered these transfers as loans,

and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the

time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds

to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance. The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1080 of 1726 PageID 12401
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 8 of 45

transfer was allegedly supposed to be treated as **compensation** to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals. The HCMFA notes were allegedly not what **Mr. Dondero**—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes. *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos. In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes—the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes. The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a **genuine** issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses. Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11] For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

APPX. 10552

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1081 of 1726 PageID 12402
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 9 of 45

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the world of commercial finance, and not as described in any evidence submitted to the court.[12] The bankruptcy court hereby recommends that the District Court grant summary judgment in favor of the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the reasons set forth below.

## II.  Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the "Notes"): (a) thirteen were demand notes; and (b) three were term notes.  These notes were executed between 2013 and 2019 and are described below.  These are the undisputed facts pertaining to the thirteen demand notes.

### A.  *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18, Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in *very different circumstances from the Highland case*—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc. No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.

Appx. 05653

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1082 of 1726 PageID 12403
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 10 of 45

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl.

Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19,

Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-

1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664;

Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively,

with Dondero's First Note and Dondero's Second Note, the "Dondero Notes"). Klos Dec. ¶ 20,

Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to

RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B. *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in

the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl.

Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at

Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl. Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv. Proc No. 21-3003 even when referring herein to the ***other*** Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or authorized. This allegation will be addressed later herein.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1083 of 1726 PageID 12404
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 11 of 45

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes"). Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

   *C. Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker*

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes"). Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized. This allegation will be addressed later herein.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1084 of 1726 PageID 12405
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 12 of 45

*D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker*

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

*E. The Identical Provisions in Each of the Demand Notes.*

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2.     Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5.     Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1085 of 1726 PageID 12406
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 13 of 45

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.      Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.      Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

F.   *Demands by Plaintiff and Non-Payment.*

The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020. The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes. Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1086 of 1726   PageID 12407
Case 21-03007-sgj Doc 208 Filed 07/19/22   Entered 07/19/22 17:16:08   Page 14 of 45

commenced these Note Actions. Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III.    Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

*A.  The Three Term Notes*

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms.  One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

APPX. 05650

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1087 of 1726   PageID 12408
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 15 of 45

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]
Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of
$30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-
44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02
(the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos
Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51
(the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos
Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of
each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and
HCRE to enable those entities to make investments.  Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr.
Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use
of the loan proceeds.  Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13,
Appx. 1783, and 450:3-24, Appx. 1783.

B.    The Identical Provisions in Each of the Term Notes.

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141,
Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636
(NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated
between July 2015 and May 2017 (see Pl. Ex. 161))).
[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021.  He now works for entities
controlled by Mr. Dondero.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1088 of 1726 PageID 12409
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 16 of 45

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes the following provisions:

2.1 Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "Annual Installment") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

4. Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

   C. *Non-Payment/Defaults Under the Term Notes*.

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of $1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

APPX. 05562

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 18 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1089 of 1726   PageID 12410
Case 21-03007-sgj Doc 208 Filed 07/19/22   Entered 07/19/22 17:16:08   Page 17 of 45

of \$665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was \$24,383,877.27.12.  Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was \$6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was \$5,899,962.22.14. Klos Dec. ¶ 53.

IV.     **Undisputed Corroborating Evidence Regarding the Sixteen Notes**

> A. *The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC*

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Pl. Ex. 34 at p. 39, Appx. 782.  Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

APPX. 10563

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1090 of 1726 PageID 12411
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 18 of 45

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized. Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558. *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed. Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21] "Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland. *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1091 of 1726 PageID 12412
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 19 of 45

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

19

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1092 of 1726   PageID 12413
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 20 of 45

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate.  Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes."  Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782.  *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

> B.  *More Corroborating Evidence:  During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes*

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1093 of 1726 PageID 12414
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 21 of 45

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds

themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail

Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA

and NexPoint, a process referred to as a "15(c) Review." As part of the 15(c) Review, the Retail

Board requests information from HCMFA and NexPoint. Pl. Ex. 99 at 129:17-130:3, Appx. 1844-

1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-

2092. Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers

of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board.

Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

   The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in

October 2020, to provide information regarding any outstanding amounts currently payable or due

in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided

services to the Funds." Pl. Ex. 36 at p. 3, Appx. 793.

   On October 23, 2020, HCMFA and NexPoint provided their formal responses to the

questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or

due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and
> its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP
> [Highland] from HCMFA. The Note between HCMLP [Highland] and NexPoint
> comes due on December 31, 2047. The earliest the Note between HCMLP
> [Highland] and HCMFA could come due is in May 2021. All amounts owed by
> each of NexPoint and HCMFA pursuant to the shared services arrangement with
> HCMLP [Highland] have been paid as of the date of this letter. The Advisor notes
> that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 23 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1094 of 1726   PageID 12415
Case 21-03007-sgj Doc 208 Filed 07/19/22   Entered 07/19/22 17:16:08   Page 22 of 45

C.   *More Corroborating Evidence:   Before and During the Highland*
*Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records,*
*and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books
and records—before and after the Petition Date—recorded the Notes as valid debts due and owing
by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero,
show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively.  A
February 2018 internal monthly operating results of Highland, underneath a heading "Significant
Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on
February 2, 2018, as "($3.8M) partner loan."  Ex. 39 at 1, Appx. 801.  And in the Debtor's August
2018 internal monthly operating results, also under a heading "Significant Items Impacting
HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together
contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating
on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries").
The Loan Summaries identified amounts owed to Highland under affiliate notes and were created
by updating underlying schedules for activity and reconciling with Highland's general ledger.  Pl.
Ex. 199, Appx. 3245-3246 is an example of a Loan Summary.  The Loan Summaries identified
each Note Maker Defendant by reference to the "GL" number used in the general ledger.  *See* Pl.
Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"),
HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's
Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1095 of 1726   PageID 12416
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 23 of 45

control of Highland, included all of the Notes among the Debtor's assets.  Pl. Ex. 40, Appx. 812-

815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate

"Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a

description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland

bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor)

included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx.

826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405

(October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr.

DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020);

Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905;

Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020);

Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710

(November 2020); Bankr.  DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

V.        **The Note Maker Defenses**

*A. The "Oral Agreement" Defense involving Mr. Dondero's Sister*

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to

by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to

payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the

Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold

by a third party.  Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his

original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1096 of 1726 PageID 12417
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 24 of 45

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense. To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent. Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control. The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23] This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 26 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1097 of 1726   PageID 12418
Case 21-03007-sgj Doc 208 Filed 07/19/22   Entered 07/19/22 17:16:08   Page 25 of 45

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel.  Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement."  Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost.  *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1098 of 1726 PageID 12419
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 26 of 45

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged "oral agreement" altogether. *See* Pl. Ex. 201 ¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex. 204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave. Pl. Ex. 98 at 426:8-427:15, Appx. 1777. As earlier discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement" on behalf of Highland. For one thing, it is undisputed that Sister Dondero had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero resides in Vero Beach, Florida and represents that she owns a private investigations business.[24] The only information Sister Dondero purported to have regarding Mr. Dondero's compensation from Highland was that he had told her he "was not highly paid" and that, in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Pl. Ex. 100 at 51:11-22, Appx. 1887.[25] But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl. Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1099 of 1726   PageID 12420
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 27 of 45

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890.  Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919.  Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

27

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1100 of 1726 PageID 12421
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 28 of 45

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority ***limited*** partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1101 of 1726 PageID 12422
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 29 of 45

3 & 4). However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until recently and only believes that it was subject to "milestones" that he cannot identify. Pl. Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B. The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion company with perhaps the world's most iconic and well-known public accounting firm serving as its auditors. As set forth below, this court does not believe any reasonable jury could reach a verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank Waterhouse wore. Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006 and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early 2021. While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive Officer of certain retail funds managed by HCMFA and NexPoint. As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other things, HCMFA's accounting and finance functions. Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that the HCMFA Notes are void or unenforceable because they were signed by mistake or without authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1102 of 1726   PageID 12423
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 30 of 45

HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to
HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMFA
from Highland*, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47,
Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in
calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation
Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the
"NAV Error").  HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various
> employees and representatives of the Plaintiff, the Defendant, and HGAF worked
> with the SEC to correct the error and to compensate HGAF and the various
> investors in HGAF harmed by the NAV Error. Ultimately, and working with the
> SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error
> to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the
> NAV Error itself, as well as rebating related advisor fees and processing costs; and
> (ii) $1.4 million of losses to the shareholders of HGAF.
>
> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid
> out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the
> Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having
> caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through
> insurance or its own funds, compensated the Defendant [HCMFA] for the above
> payments by paying, or causing to be paid, approximately $7.5 million to the
> Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of
summary judgment evidence to support it.  In fact, to the contrary, on May 28, 2019, HCMFA sent
a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV
Error, and HCMFA *did not mention Highland*.  Pl. Ex. 182, Appx. 2978-2980. In fact, no
document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange
Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1103 of 1726 PageID 12424
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 31 of 45

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1104 of 1726   PageID 12425
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 32 of 45

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.   There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake."  If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000).  The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes.  At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789).  As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.*  In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056).  Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes.  *Id.* at 143:24-25, Appx. 2085.  To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089.  At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089.  In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085.  The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

APPX. 05678

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1105 of 1726   PageID 12426
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 33 of 45

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there—particularly when the defense is based on mostly self-serving conclusory statements of Mr. Dondero and not any tangible evidence.[28]

### C. Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of consideration. There is no summary judgment evidence in the record that supports his affirmative defenses of waiver, estoppel, or lack of consideration. Pl. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker Defendants each also contend that they made prepayments on their Notes, such that they cannot be deemed to have defaulted, and also assert they did not default under those loans because of Annual Installment payments that they made. First, the unrefuted summary judgment evidence of Plaintiff clearly dispels any argument that prepayments may have averted any defaults. *See* Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries). Moreover, the Annual Installment payments were due on December 31, 2020, and these Note Maker Defendants did not make their Annual Installment payments to Highland until mid-January 2021, after receiving notices of default. These Note Maker Defendants had no right to cure in the loan documents. Thus, this defense fails as a matter of law. *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28]    One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1106 of 1726 PageID 12427
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 34 of 45

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

## V. Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c)). A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes. Thus, he cannot rely on ambiguity as a defense. *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing them to make their Annual Installment payments timely in December 2021. First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland. Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205. Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

APPX. 05570

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1107 of 1726   PageID 12428
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 35 of 45

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI.    Legal Analysis

### A.    The Context Here Matters:  Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

APPX. 05579

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 37 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1108 of 1726   PageID 12429
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 36 of 45

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶ 18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22, Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1109 of 1726 PageID 12430
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 37 of 45

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶

27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by

NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec.

¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS

in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but

unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶

52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE

in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but

unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations

by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note

Maker Defendants under the Term Notes breached their obligations by failing to make the Annual

Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1110 of 1726 PageID 12431
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 38 of 45

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants' breaches in the amounts set forth above, plus the interest that has accrued under the Notes since those calculations, plus collection costs and attorneys' fees—which amounts Highland should separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

*B.  The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement," such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal amount of any Note subject to the alleged "oral agreement."  Mr. Dondero and Sister Dondero

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1111 of 1726   PageID 12432
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 39 of 45

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement.  Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement.  The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement.  There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds.   In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness."  *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted).  "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1112 of 1726 PageID 12433
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 40 of 45

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

APPX. 10576

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1113 of 1726   PageID 12434
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 41 of 45

original) (citing Texas law).  In other words, "[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.* (internal quotations omitted).  "In determining the intent of the parties to a written contract, a court may consider the conduct of the parties and the information available to them at the time of signing in addition to the written agreement itself." *Id.* (internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake."  *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted).  "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

The undisputed documentary and testimonial evidence overwhelmingly establish that both HCMFA and Highland intended the HCMFA Notes to be loans.  As discussed above: (i) Mr. Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1114 of 1726 PageID 12435
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 42 of 45

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual. The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney*, 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1115 of 1726   PageID 12436
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 43 of 45

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

**VII.    Summary Judgment**.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined.  Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 45 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1116 of 1726   PageID 12437
Case 21-03007-sgj Doc 208 Filed 07/19/22   Entered 07/19/22 17:16:08   Page 44 of 45

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**Submission of Judgment.  The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

APPX. 05680

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1117 of 1726    PageID 12438
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 45 of 45

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred.  The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs.  The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*

APPX. 05689

# EXHIBIT 28

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1119 of 1726 PageID 12440
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 1 of 8

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Case No.: 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC),** | § | |
| | § | |
| Defendant. | § | |

### NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
### MOTION FOR LEAVE TO FILE AMENDED ANSWER AND BRIEF IN SUPPORT

Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP" or

"Defendant") files this Motion for Leave to File Amended Answer and Brief in Support

("Motion")[1] in response to Highland Capital Management L.P.'s ("Plaintiff" or "Debtor")

---

[1] Defendant files its brief in the same document as the motion pursuant to Local Bankruptcy Rule 7007-1(d).

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1120 of 1726 PageID 12441
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 2 of 8

Complaint in the above-referenced adversary proceeding (the "<u>Adversary Proceeding</u>") and respectfully states as follows:

## I. RELEVANT BACKGROUND

1. On January 22, 2021, Plaintiff filed its Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (the "<u>Complaint</u>"), commencing this Adversary Proceeding. Defendant's counsel accepted service of the Complaint on February 1, 2021 and the parties agreed the Defendant's deadline to answer or otherwise respond to the Complaint was March 3, 2021. On March 3, 2021, Defendant filed its Answer to Plaintiff's Complaint ("<u>Original Answer</u>").

2. On March 11, 2021, Plaintiff and Defendant filed a Stipulation and Proposed Scheduling Order [ECF No. 8], setting forth a proposed joint scheduling order in lieu of the Alternative Scheduling Order issued by the Court. On March 16, 2021, the Court entered its Order Approving Stipulation Regarding Scheduling Order [ECF No. 10] (the "<u>Scheduling Order</u>").

3. Under the Scheduling Order, the deadline to serve discovery requests is May 31, 2021 and responses to discovery requests are due July 5, 2021. Fact discovery closes July 26, 2017, dispositive motions must be filed by September 6, 2021, and trial docket call is November 8, 2021 at 1:30 p.m.

4. Preparation of the defense of this adversary has been made extremely difficult by the constraints imposed by the Debtor with respect to access to witnesses and evidence. In connection with preparation of the defense, Defendant realized its affirmative defenses were not as clear as they could have been and that the additional defenses which it seeks to assert in this Adversary Proceeding should have been more fully set out as follows: (i) the Debtor's ability to make demand on the Notes was subject to a condition subsequent that has not yet become unable to be met, and (ii) the Notes are ambiguous. The original listing of affirmative defenses was

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1121 of 1726 PageID 12442
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 3 of 8

intended to cover such defenses, however, in an abundance of caution, Defendant seeks leave to amend and more clearly set out its intended defenses. The Scheduling Order does not contain a deadline to amend pleadings; therefore, Defendant's Motion is governed by Federal Rule of Civil Procedure 15(a)(2), made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7015, which favors liberal amendment of pleadings. *See* Fed. R. Civ. P. 15(a)(2); Fed. R. Bankr. P. 7015.

5.      Given the deadlines for discovery and pre-trial matters under the Scheduling Order, Defendant's proposed amendment will not delay the proceedings or otherwise prejudice the Plaintiff. Moreover, the proposed amendment is not sought in bad faith, but in furtherance of meritorious defenses based on additional investigation.

6.      Because Defendant's Motion is not sought in bad faith and will not result in undue delay or prejudice to Plaintiff, the Court should grant Defendant's Motion under the standard favoring liberal amendment of pleadings under Rule 15.

## II. ARGUMENT AND AUTHORITY

7.      Rule 15(a) governs amendments to pleadings and provides that a party may amend its pleading with the opposing party's written consent or the court's leave.  Fed. R. Civ P. 15(a). The court "should freely give leave when justice so requires."  *Id*. Rule 15 "evinces a bias in favor of granting leave to amend." *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 597 (5th Cir. 1981); *Marshall v. MarOpCo, Inc.*, 223 F.Supp.3d 562, 566 (N.D. Tex. 2017) ("Since *Dussouy*, the Fifth Circuit has repeatedly held that Rule 15(a) evinces a liberal amendment policy."). "The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading." *Dussouy*, 660 F.2d at 598. Leave to amend should be granted unless there is a substantial reason for denying leave. *InternetAd Sys., LLC v. Opodo Ltd.*, 481 F.Supp.2d 596, 603 (N.D. Tex. 2007).

APPX. 105093

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1122 of 1726 PageID 12443
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 4 of 8

Courts may consider the following factors in determining whether a substantial reason exists to deny leave: (i) delay or prejudice to the non-movant; (ii) bad faith or dilatory motives on the part of the movant; (iii) repeated failure to cure deficiencies; or (iv) futility of amendment. *InternetAd Sys*, 481 F.Supp.2d at 604; *Sabre, Inc. v. Lyn-Lea Travel Corp.*, No. Civ. A. 3:96-CV-2068R, 2003 WL 21339291, *4 (N.D. Tex. June 5, 2003).

8.      Here, there is no substantial reason to deny Defendant's Motion and, as such, the Court should grant Defendant leave to amend its answer. First, there is no undue delay or prejudice to Plaintiff. This is not a situation where there is an "unexplained delay" following the original answer. *See, e.g., In re Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996) (denying motion for leave to amend where the plaintiff sought to add a cause of action more than one year after the original complaint was filed and eleven months after the first amended complaint was filed with no reasonable explanation for such delay). Instead, Defendant was served with the Complaint less than three months ago and its answer was due less than two months ago. Defendant seeks to amend its answer to clarify its defense by adding two affirmative defenses based on its further investigation into the allegations of Plaintiff and in connection with its preparation for serving written discovery. Defendant determined these affirmative defenses applied in connection with its investigation and preparation for written discovery in connection with its defense of the case and within the expected timeline of this contested matter based on the Scheduling Order. Further, allowing Defendant to amend its answer will not result in prejudice to Plaintiff. Fact discovery does not close until July 26, 2021 and Plaintiff has not yet conducted any discovery. *See, e.g., Sabre, Inc.*, 2003 WL 21339291 at *4 (noting that undue prejudice arises where a new theory requires a reiteration of discovery proceedings). Accordingly, there is no undue delay or prejudice to Plaintiff.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1123 of 1726 PageID 12444
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 5 of 8

9.    Nor does Defendant seek to amend in bad faith. In determining bad faith, Courts

consider whether "the movant first presents a theory difficult to establish but favorable and, only

after that fails, presents a less favorable theory." *Sabre*, 2003 WL 21339291 at *6. Here,

Defendant is not seeking to add a new theory after the first theory failed – discovery has not yet

begun, and the dispositive motion deadline is approximately four months away – and the

circumstances do not give rise to an inference that Defendant is engaging in tactical maneuvers.

Defendant is seeking to amend its answer, less than two months after filing it, because it

determined additional defenses were applicable as it continued to investigate its defense of the

Plaintiff's allegations and prepare for discovery. Accordingly, Defendant's Motion is not brought

in bad faith or for dilatory motives.

10.    Third, this is not a situation where Defendant has repeatedly failed to cure

deficiencies with prior amendments. This is Defendant's first request for leave to amend and, if

granted, will be Defendant's first amendment to its answer. As such, repeated failure to cure

deficiencies is not a reason to deny Defendant's Motion.

11.    Last, Defendant's proposed amendments are not futile. Amendments to defenses

are futile "where they would necessarily fail or are so lacking in merit on their face." *Southpoint

Condo. Ass'n Inc. v. Lexington Ins. Co.*, Case No. 19-cv-61365, 2020 WL 639400, *6 (S.D. Fla.

Feb. 11, 2020). Some courts refuse to address the issue of futility in a motion for leave to amend

context and instead does so in the context of a Rule 12(b)(6) or Rule 56 motion, "where the

procedural safeguards are surer." *Garcia v. Zale Corp.*, 2006 WL 298156, *1 (N.D. Tex. Feb. 1,

2006) (Fitzwater, J.) ("…the court's almost unvarying practice when futility is raised is to address

the merits of the claim or defense in the context of a Rule 12(b)(6) or Rule 56 motion."). Here, the

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1124 of 1726   PageID 12445
Case 21-03007-sgj Doc 16 Filed 05/10/21   Entered 05/10/21 14:50:18   Page 6 of 8

proposed affirmative defenses are not futile,[2] and Defendant expects evidence supporting such defenses will be uncovered through discovery. *See, e.g., Don Stevenson Design, Inc. v. Randy Herrera Designer, LLC*, No. 5:16-CV-1130, 2017 WL 10581124, *1 (W.D. Tex. Sept. 8, 2017) ("Finally, Defendants' Motion for Leave is not futile because additional evidence substantiating the statute of limitations defense may come forward during the remainder of discovery.").

12. Further, "even if there is substantial reason to deny leave to amend, the court should consider prejudice to the movant, as well as judicial economy, in determining whether justice requires granting leave." *Allen v. Target Corporation*, 2007 WL 9735894, *1 (S.D. Tex. Nov 29, 2007). As a result, in considering a motion for leave to add additional affirmative defenses, Rule 8(c)'s requirement that affirmative defenses be pleaded or waived "must be applied in the context of the Federal Rules' liberal pleading and amendment policy, the goal of which is to do substantial justice." *Id.* At *1-2 (granting defendant's motion for leave to add affirmative defenses known previously because the delay did not constitute a substantial reason to deny leave and justice requires allowing the amendment).

13. Because there is no substantial reason to deny Defendant's request, Defendant's additional affirmative defenses could be waived if not allowed, and Plaintiff is free to challenge any of Defendant's affirmative defenses under Rule 56, made applicable to this Adversary Proceeding by Bankruptcy Rule 7056. Leave to amend should be freely granted and, as such, the Court should grant Defendant's Motion.

---

[2]   Plaintiff contemplated at least some of its loans to affiliates or related entities (such as the Notes at issue in this Adversary Proceeding) "may not result in allowed or enforceable claims" by the Plaintiff. *See* Global Notes and Statement of Limitations, Methods, and Disclaimers Regarding Debtor's Amended Schedules of Assets and Liabilities, p. 3 "Intercompany Claims" [Docket No. 1082-1], Global Notes and Statement of Limitations, methods, and Disclaimer Regarding Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, p. 3 "Intercompany Claims" [Docket No. 247-1]. Defendant believes the reason some of these intercompany loans may not be allowed or enforceable is because collectability was dependent on a condition subsequent and/or they are ambiguous – the very defense Defendant now seeks to include in its Answer.

---

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 8 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1125 of 1726   PageID 12446
Case 21-03007-sgj Doc 16 Filed 05/10/21   Entered 05/10/21 14:50:18   Page 7 of 8

### III.  PROPOSED AMENDED ANSWER ATTACHED

14.      Defendant's proposed First Amended Answer is attached hereto as **Exhibit A**.

### IV.  CONCLUSION

The Court should liberally grant leave to file amended pleadings absent a demonstration

that such amendment would result in undue delay, prejudice, or is sought in bad faith. There is no

such evidence of any of the foregoing here. For these reasons, Defendant respectfully requests the

Court (i) grant this Motion; (ii) deem Defendant's First Amended Answer filed as of the date of

the order granting this Motion; and grant Defendant such other relief at law or in equity to which

it may be entitled.

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
          lauren.drawhorn@wickphillips.com

**COUNSEL FOR HCRE PARTNERS, LLC (N/K/A
NEXPOINT REAL ESTATE PARTNERS, LLC)**

</div>

### CERTIFICATE OF CONFERENCE

Between April 21 and 25, 2021, I conferred with John Morris, counsel for the Plaintiff,
regarding the relief requested herein and Mr. Morris indicated that the Plaintiff is opposed to the
relief requested in Defendant's Motion.

<div style="margin-left:40%">

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

</div>

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1126 of 1726   PageID 12447
Case 21-03007-sgj Doc 16 Filed 05/10/21   Entered 05/10/21 14:50:18   Page 8 of 8

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

Case 21-03007-sgj Doc 16-1 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 1 of 10

# EXHIBIT A

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1128 of 1726   PageID 12449
Case 21-03007-sgj Doc 16-1 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 2 of 10

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § § § | **Case No.: 19-34054-sgj11** |
| Debtor. | § § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § § § | |
| Plaintiff, | § § | |
| vs. | § § § | **Adv. Pro. No. 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC),** | § § § § | |
| Defendant. | § § | |

**NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT**

Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP" or

"Defendant") files this First Amended Answer in response to Highland Capital Management L.P.'s

("Plaintiff" or "Debtor") Complaint for (I) Breach of Contract and (II) Turnover of Property of the

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1129 of 1726 PageID 12450
Case 21-03007-sgj Doc 16-1 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 3 of 10

Debtor's Estate (the "Complaint") in the above-referend adversary proceeding (the "Adversary Proceeding") and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.      The first sentence of Paragraph 1 sets forth Plaintiff's objective in bringing the Complaint and does not require a response. To the extent a response is required, Defendant denies the allegations in the first sentence of Paragraph 1. The second sentence contains a legal conclusion that does not require a response. To the extent a response is required, Defendant denies the allegations in the second sentence of Paragraph 1.

2.      Paragraph 2 contains a summary of the relief Plaintiff seeks and does not require a response. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

## JURISDICTION AND VENUE

3.      Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers constitutional authority on the Bankruptcy Court to adjudicate this dispute. Defendant denies any allegations in Paragraph 3 that are not expressly admitted.

4.      Paragraph 4 states a legal conclusion that does not require a response. To the extent a response is required, Defendant admits the Bankruptcy Court has statutory jurisdiction over this Adversary Proceeding but denies that the Court has constitutional authority over this Adversary Proceeding. Defendant denies any allegations in Paragraph 4 that are not expressly admitted.

5.      Defendant denies that Plaintiff's breach of contract claim is a core proceeding. Defendant further denies that a turnover proceeding under 11 U.S.C. § 542(b) is the appropriate mechanism to collect a contested debt. Defendant admits that a turnover proceeding under 11

---

[1]   The headings herein are from Plaintiff's Complaint and are solely included for the Court's convenience.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1130 of 1726 PageID 12451
Case 21-03007-sgj Doc 16-1 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 4 of 10

U.S.C. § 542(b) is a statutorily core proceeding but denies that it is constitutionally core under *Stern v. Marshall*. Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Defendant denies any allegations in Paragraph 5 that are not expressly admitted.

6.       Paragraph 6 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that venue is proper in this District.

## THE PARTIES

7.       Defendant admits the allegations in Paragraph 7 of the Complaint.

8.       Defendant admits the allegations in Paragraph 8 of the Complaint.

## CASE BACKGROUND

9.       Defendant admits the allegations in Paragraph 9 of the Complaint.

10.       Defendant admits the allegations in Paragraph 10 of the Complaint.

11.       Defendant admits the allegations in Paragraph 11 of the Complaint.

12.       Defendant admits the allegations in Paragraph 12 of the Complaint.

## STATEMENT OF FACTS

**A.       The Demand Notes**

13.       Defendant admits it has executed at least one promissory note under which the Debtor is the payee. Defendant denies any allegations in Paragraph 13 that are not expressly admitted.

14.       Defendant admits that it signed the document attached to the Complaint as Exhibit 1. Defendant denies any allegations in Paragraph 14 that are not expressly admitted.

15.       Defendant admits that it signed the document attached to the Complaint as Exhibit 2. Defendant denies any allegations in Paragraph 15 that are not expressly admitted.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1131 of 1726 PageID 12452
Case 21-03007-sgj Doc 16-1 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 5 of 10

16.     Defendant admits that it signed the document attached to the Complaint as Exhibit 3. Defendant denies any allegations in Paragraph 16 that are not expressly admitted.

17.     Defendant admits that it signed the document attached to the Complaint as Exhibit 4. Defendant denies any allegations in Paragraph 17 that are not expressly admitted.

18.     Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in Paragraph 18.

19.     Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in Paragraph 19.

20.     Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 of the Complaint in Paragraph 20.

**B.      Allegations regarding the Demand Notes**

21.     Defendant admits that Plaintiff sent it a copy of Exhibit 5. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of Paragraph 21. Defendant denies any allegations in Paragraph 21 that are not expressly admitted.

22.     To the extent Paragraph 22 asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits the allegations in Paragraph 22.

23.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 23 and, therefore, denies them.

24.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 24 and, therefore, denies them.

25.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 25 and, therefore, denies them.

26.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 26 and, therefore, denies them.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1132 of 1726 PageID 12453
Case 21-03007-sgj Doc 16-1 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 6 of 10

27.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 27 and, therefore, denies them.

28.     Defendant denies the allegations in Paragraph 28 of the Complaint.

**C.     The Term Note**

29.     Defendant admits that it has executed at least one promissory note under which Debtor is the payee. Defendant denies any allegations in Paragraph 29 that are not expressly admitted.

30.     Defendant admits it signed the document attached to the Complaint as Exhibit 6. Defendant denies any allegations in Paragraph 30 that are not expressly admitted.

31.     Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Complaint in Paragraph 31. Defendant denies any allegations in Paragraph 31 that are not expressly admitted.

32.     Defendant admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Complaint in Paragraph 32. Defendant denies any allegations in Paragraph 32 that are not expressly admitted.

33.     Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Complaint in Paragraph 33. Defendant denies any allegations in Paragraph 33 that are not expressly admitted.

34.     Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Complaint in Paragraph 34. Defendant denies any allegations in Paragraph 34 that are not expressly admitted.

**D.     Allegations regarding the Term Note.**

35.     To the extent Paragraph 35 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 35 of the Complaint.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1133 of 1726    PageID 12454
Case 21-03007-sgj Doc 16-1 Filed 05/10/21   Entered 05/10/21 14:50:18    Page 7 of 10

36.      Defendant admits that Plaintiff sent it a copy of Exhibit 7. Defendant admits that

Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of Paragraph 36 of the

Complaint. Defendant denies any allegations in Paragraph 36 that are not expressly admitted.

37.      To the extent Paragraph 37 of the Complaint asserts a legal conclusion, no response

is required, and it is denied. Defendant otherwise admits Paragraph 37 of the Complaint.

38.      Defendant is without sufficient information or knowledge to admit or deny the

allegations in Paragraph 38 of the Complaint and, therefore, denies them.

39.      Defendant denies Paragraph 39 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

40.      Paragraph 40 of the Complaint seeks to incorporate the allegations in the preceding

paragraphs and does not require a response. Defendant incorporates all prior denials herein by

reference.

41.      Paragraph 41 of the Complaint states a legal conclusion that does not require a

response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to

admit or deny the allegations and, therefore, denies them.

42.      Paragraph 42 of the Complaint states a legal conclusion that does not require a

response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to

admit or deny the allegations and, therefore, denies them.

43.      Paragraph 43 of the Complaint states a legal conclusion that does not require a

response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to

admit or deny the allegations and, therefore, denies them.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 17 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1134 of 1726   PageID 12455
Case 21-03007-sgj Doc 16-1 Filed 05/10/21   Entered 05/10/21 14:50:18   Page 8 of 10

44.     Paragraph 44 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

45.     Defendant denies Paragraph 45 of the Complaint.

46.     Defendant denies Paragraph 46 of the Complaint.

**SECOND CLAIM FOR RELIEF**
**(Turnover Pursuant to 11 U.S.C. § 549(b))**

47.     Paragraph 47 seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

48.     Paragraph 48 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

49.     Paragraph 49 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

50.     Paragraph 50 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

51.     Defendant admits that Plaintiff transmitted Exhibits 5 and 7 to the Complaint. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 51 of the Complaint and, therefore, denies them.

52.     Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 52 of the Complaint and, therefore, denies them.

53.     Defendant denies Paragraph 53 of the Complaint.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1135 of 1726   PageID 12456
Case 21-03007-sgj Doc 16-1 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 9 of 10

54.    Defendant denies that Plaintiff is entitled to the relief requested in the prayer of the

Complaint, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

55.    Plaintiff's claims are barred in whole or in part by the doctrine of justification

and/or repudiation.

56.    Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

57.    Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

58.    Plaintiff's claims are barred in whole or in part because prior to the demands for

payment, Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions

subsequent.

59.    Defendant further asserts that each Note is ambiguous.

## JURY DEMAND

60.    Defendant demands a trial by jury of all issues so triable under Federal Rule of

Civil Procedure 38 and Federal Rule of Bankruptcy Procedure 9015.

61.    Defendant does not consent to the Bankruptcy Court conducting a jury trial and

therefore demands such jury trial in the District Court.

## PRAYER

For these reasons, Defendant respectfully requests that, following a trial on the merits, the

Court deny the relief Plaintiffs seeks through its Complaint, enter a judgment that the Plaintiff take

nothing on the Complaint, and grant Defendant such other relief at law or in equity to which it

may be entitled.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1136 of 1726   PageID 12457
Case 21-03007-sgj Doc 16-1 Filed 05/10/21   Entered 05/10/21 14:50:18   Page 10 of 10

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
         lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1137 of 1726   PageID 12458
Case 21-03007-sgj Doc 16-2 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC),** | § | |
| | § | |
| | § | |
| Defendant. | § | |

**ORDER GRANTING NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S MOTION FOR
LEAVE TO AMEND ANSWER TO PLAINTIFF'S COMPLAINT**

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1138 of 1726    PageID 12459
Case 21-03007-sgj Doc 16-2 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 2 of 2

On this day, the Court considered Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC's ("Defendant") Motion for Leave to Amend its Answer to Plaintiff's Complaint (the "Motion"). Having considered the Motion, and finding good cause exists, the Court hereby, **GRANTS** the Motion.

IT IS THEREFORE ORDERED that Defendant's First Amended Answer to Plaintiff's Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate, is hereby **DEEMED FILED** as of the date of this Order.

### END OF ORDER ###

# EXHIBIT 29

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1140 of 1726 PageID 12461
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 1 of 12



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed July 14, 2021

_____
United States Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | **CASE NO. 19-34054-SGJ-11** |
| **L.P.,** | § | **(CHAPTER 11)** |
| DEBTOR. | § | |
| _____ | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **L.P.,** | § | **ADVERSARY NO. 21-03006** |
| PLAINTIFF, | § | **(CIV. ACTION #3:21-CV-01378-N)** |
| | § | |
| **VS.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC.,** | § | |
| DEFENDANT. | § | |

_____

**REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT:
(A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH
TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY;
AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT**

1

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1141 of 1726   PageID 12462
Case 21-03006-sgj Doc 47 Filed 07/14/21   Entered 07/14/21 15:53:20   Page 2 of 12

## I.   INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on October 16, 2019 in the United States Bankruptcy Court of Delaware.  That court subsequently entered an order transferring venue to the Northern District of Texas, Dallas Division, on December 4, 2019.  A Chapter 11 plan was confirmed by the bankruptcy court on February 22, 2021.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff, brought this Adversary Proceeding against the Defendant, Highland Capital Management Services, Inc. ("HCMS-Defendant").

The Adversary Proceeding pertains to five promissory notes (collectively, the "Notes") executed by HCMS-Defendant in favor of the Debtor from 2017 through 2019. The Notes consist of a term note (the "Term Note") with annual payments and four demand notes (the "Demand Notes").

On December 3, 2020, the Debtor sent HCMS-Defendant a letter demanding payment by December 11, 2020 on each of the Demand Notes, as allowed under the terms of the Demand Notes. The HCMS-Defendant failed to make payment on any of the Demand Notes. On December 31, 2020, HCMS-Defendant failed to make the annual payment due under the Term Note. On January 7, 2021, following HCMS-Defendant's failure to pay, the Debtor accelerated the Term

---

[1] Bankruptcy Case No. 19-34054.

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1142 of 1726 PageID 12463
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 3 of 12

Note, under its terms, and demanded full payment on $6,757,248.95 outstanding and due under the Term Note.

Following HCMS-Defendant's failure to pay on the Notes in response to the demand letters, the Debtor brought this action to collect on the Notes. The Debtor's Chapter 11 plan contemplates collection on the Notes (as well as several other notes of parties related to HCMS-Defendant) as part of its funding to pay creditors.

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court. HCMS-Defendant submitted a *Motion for Withdrawal the Reference*[3] (the "Motion") and *Brief in Support of Motion to Withdraw the Reference*[4] (the "Brief in Support") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on July 8, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, *but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready*. The bankruptcy court further recommends that the District Court *defer to the bankruptcy court the handling of all pretrial matters*.

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03006, Dkt. 19.
[4] Adversary Case No. 21-03006, Dkt. 20.

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1143 of 1726 PageID 12464
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 4 of 12

## II.     NATURE OF THE ADVERSARY PROCEEDING

### a.   The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[5] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Notes ("Count 2"). The principal amounts and execution dates for each of the four Demand Notes were: (i) $150,000, executed March 28, 2018, (ii) $200,000, executed June 25, 2018, (iii) $400,000, executed May 29, 2019, and (iv) $150,000, executed June 26, 2019. The principal amount of the Term Note was originally $20,247,628.02 and it was executed on May 31, 2017. The Debtor now seeks combined monetary damages on the Notes totaling $7,704,768.38, plus accrued but unpaid interest and cost of collection. Because the Debtor alleges the amount due on the Notes are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 25, 2021, HCMS-Defendant filed its *Original Answer*[6] on March 3, 2021 and *First Amended Answer*[7] on June 11, 2021.

HCMS-Defendant filed two proofs of claim in the Bankruptcy Case, Proof of Claim Nos. 175 and 176. Both proofs of claim were based on alleged post-petition actions or inaction of the Debtor as fund investment advisor in managing funds in which HCMS-Defendant is an investor. On October 9, 2020, the bankruptcy court entered a *First Supplemental Order Sustaining First Omnibus Claims Objection*[8], which disallowed both of HCMS-Defendant's proofs of claim. ***The disallowed proofs of claim did not relate to the Notes.***

---

[5] Adversary Case No. 21-03006, Dkt. 1.
[6] Adversary Case No. 21-03006, Dkt. 6.
[7] Adversary Case No. 21-03006, Dkt. 34.
[8] Bankruptcy Case No. 19-34054, Dkt. 1155.

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1144 of 1726 PageID 12465
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 5 of 12

#### b. The Motion to Withdraw the Reference, Response Opposed, and Reply

On June 3, 2021, HCMS-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. The Debtor never filed a responsive pleading to the Motion filed by the HCMS-Defendant. The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on July 8, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

#### i. The Movant's Position

HCMS-Defendant argues there is cause shown for permissive withdrawal of the reference because: (1) the Texas Constitution guarantees a party to a contract a right to a jury trial; (2) the contract claim is a purely state law, non-core claim; (3) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (4) efficiency, uniformity and forum shopping factors all favor withdrawal.[9]

Further, HCMS-Defendant contends it has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter final orders in the Adversary Proceeding or hold a jury trial. HCMS-Defendant argues it has never filed a proof of claim related to the Notes, thus negating any argument it has consented to the bankruptcy court having jurisdiction over the litigation of the Notes.

Finally, HCMS-Defendant alleges that permissive withdrawal is proper, because the turnover claim is being used as a "Trojan Horse" to attempt to make a non-core breach of contract claim become core.[10]

---

[9] Adversary Case No. 21-03006, Dkt. 20 at 6-11.
[10] *Id.* at 8-9; *see In re Soundview Elite Ltd.*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016).

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1145 of 1726 PageID 12466
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 6 of 12

As far as timing, HCMS-Defendant requests that the District Court immediately withdraw the reference and hear all pre-trial matters until the parties are trial-ready.

### III. THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE DISALLOWED PROOFS OF CLAIM OF HCMS-DEFENDANT ARE UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process.[11] Courts in this District have placed an emphasis on the first two factors.[12]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy *proceedings* (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related

---

[11] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).
[12] See *Mirant*, 337 B.R. at 115-122.

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1146 of 1726 PageID 12467
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 7 of 12

to" a case under Title 11.[13] Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters[14] and those that are merely "related to" a Title 11 case are defined as "noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in "noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157. But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the *statutory* power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is *constitutional* (and this turns on whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[15]

With respect to the claims asserted against HCMS-Defendant, it might be argued that both counts asserted against it are *statutorily* core in nature.[16] While Count 1 is a breach of contract claim for collection of amounts due under promissory notes—one of the simplest forms of a state law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28

---

[13] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).
[14] *Stern*, 564 U.S. at 473-474. Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).
[15] *Stern*, 564 U.S. at 499.
[16] 28 U.S.C. § 157(b)(2)(E), (O).

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1147 of 1726 PageID 12468
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 8 of 12

U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.*, it stems from alleged defaults on pre-petition notes) and would not be resolved through the claims allowance process (***since no pending proof of claim exists related to the Notes***). In other words, the resolution of Count 1 cannot be inextricably intertwined with the resolution of HCMS-Defendant's disallowed proofs of claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due under the Notes were undisputed, it is unrefuted by HCMS-Defendant that a turnover action under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. ***The issue is whether a turnover action to collect on disputed pre-petition promissory notes can be viewed as a core claim***. There is a split in authority on this issue. Authority exists that a turnover action is a core claim when collecting ***matured*** debts, as property of the estate, regardless of whether the indebtedness is ***disputed***.[17] In contrast, HCMS-Defendant cites authority that the scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts in dispute that arose outside of bankruptcy, including authority from this court.[18]

---

[17] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' …. While the Defendants assert there is no debt indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. … A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").

[18] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re*

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1148 of 1726 PageID 12469
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 9 of 12

This court views the turnover claim as derivative of the breach of contract claims. The breach of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to confer jurisdiction over them (absent consent—which does not exist here). A turnover action under 11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the dictates of the Supreme Court in *Marathon*.

In summary, this court believes that the turnover claim in the Complaint, to collect on a disputed indebtedness under the Notes, "do[es] not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[19] Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

## IV. JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[20]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and

---

*Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

[19] *Satelco*, 58 B.R. at 789.

[20] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

9

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1149 of 1726 PageID 12470
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 10 of 12

the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[21] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[22] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[23]

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[24] Thus, if both of HCMS-Defendant's proofs of claims were *pending*, it would have consented to the bankruptcy court's equitable jurisdiction and waived its right to a jury trial as to the subject matter of the *pending* proofs of claim.[25] However, as earlier noted, prior to the commencement of this Adversary Proceeding on January 22, 2021, HCMS-Defendant had both of its proofs of claim disallowed on October 9, 2020. Without a pending claim related to the Notes, the breach of contract claim is precisely the kind of action that would sound in law rather than in equity. By not having a filed proof of claim related to the Notes, HCMS-Defendant never subjected the Notes to the claims allowance process of the bankruptcy court and preserved its right to a jury trial on the Notes.[26] HCMS-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

---

[21] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).
[22] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).
[23] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).
[24] *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990).
[25] *Id.*
[26] *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840,

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1150 of 1726   PageID 12471
Case 21-03006-sgj Doc 47 Filed 07/14/21    Entered 07/14/21 15:53:20    Page 11 of 12

In summary, HCMS-Defendant's lack of waiver of its jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

## V.    PENDING MATTERS

On July 8, 2021, the bankruptcy court held a status conference with regard to the Motion.  At such time, the bankruptcy court approved, in part, *Defendant's Expedited Motion to Stay Pending the Resolution of Motion to Withdraw the Reference of Adversary Proceeding*.[27] In its oral ruling, the court granted the HCMS-Defendant's request for a stay pending resolution of the Motion as to dispositive motions in the Adversary Proceeding, but did not grant a stay as to any discovery. Under the *Agreed Scheduling Order,*[28] fact discovery concluded on July 5, 2021 and expert discovery will conclude on July 16, 2021. No dispositive motions have been filed at this time.  At this point, the parties are not trial-ready.

## VI.    RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the lack of a proof of claim or any other claim related to the Notes asserted by HCMS-Defendant; and (c) the lack of any other consent by HCMS-Defendant to the equitable jurisdiction of the bankruptcy court related to the Notes, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

---

2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.,* No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).
[27] Adversary Case No. 21-03006, Dkt. 26.
[28] Adversary Case No. 21-03006, Dkt. 9.

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 13 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1151 of 1726   PageID 12472
Case 21-03006-sgj Doc 47 Filed 07/14/21   Entered 07/14/21 15:53:20   Page 12 of 12

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

APPX. 05723

# EXHIBIT 30

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1153 of 1726   PageID 12474
Case 21-03007-sgj Doc 44 Filed 07/14/21   Entered 07/14/21 15:55:14   Page 1 of 12



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed July 14, 2021**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | CASE NO. 19-34054-SGJ-11 |
| L.P., | § | (CHAPTER 11) |
|     DEBTOR. | § | |
| _____ | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| L.P., | § | ADVERSARY NO. 21-03007 |
|     PLAINTIFF, | § | (CIV. ACTION #3:21-CV-01379-G) |
| | § | |
| VS. | § | |
| | § | |
| NEXPOINT REAL ESTATE PARTNERS, | § | |
| LLC, | § | |
|     DEFENDANT. | § | |

---

**REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT:
(A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH
TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY;
AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT**

1

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1154 of 1726 PageID 12475
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 2 of 12

## I.   INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on October 16, 2019 in the United States Bankruptcy Court of Delaware. That court subsequently entered an order transferring venue to the Northern District of Texas, Dallas Division, on December 4, 2019. A Chapter 11 plan was confirmed by the bankruptcy court on February 22, 2021.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff, brought this Adversary Proceeding against the Defendant, NexPoint Real Estate Partners, LLC ("NREP-Defendant").

The Adversary Proceeding pertains to five promissory notes (collectively, the "Notes") executed by NREP-Defendant in favor of the Debtor from 2013 through 2019. The Notes consist of a term note (the "Term Note") with annual payments and four demand notes (the "Demand Notes").

On December 3, 2020, the Debtor sent NREP-Defendant a letter demanding payment by December 11, 2020 on each of the Demand Notes, as allowed under the terms of the Demand Notes. The NREP-Defendant failed to make payment on any of the Demand Notes. On December 31, 2020, NREP-Defendant failed to make the annual payment due under the Term Note. On January 7, 2021, following NREP-Defendant's failure to pay, the Debtor accelerated the Term

---

[1] Bankruptcy Case No. 19-34054.

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1155 of 1726 PageID 12476
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 3 of 12

Note, under its terms, and demanded full payment on $6,145,466.84 outstanding and due under the Term Note.

Following NREP-Defendant's failure to pay on the Notes in response to the demand letters, the Debtor brought this action to collect on the Notes. The Debtor's Chapter 11 plan contemplates collection on the Notes (as well as several other notes of parties related to NREP-Defendant) as part of its funding to pay creditors.

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court. NREP-Defendant submitted a *Motion for Withdrawal the Reference*[3] (the "Motion") and *Brief in Support of Motion to Withdraw the Reference*[4] (the "Brief in Support") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on July 8, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, ***but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready***. The bankruptcy court further recommends that the District Court ***defer to the bankruptcy court the handling of all pretrial matters***.

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03007, Dkt. 20.
[4] Adversary Case No. 21-03007, Dkt. 21.

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1156 of 1726 PageID 12477
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 4 of 12

## II.    NATURE OF THE ADVERSARY PROCEEDING

### a.  The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[5] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Notes ("Count 2"). The principal amounts and execution dates for each of the four Demand Notes were: (i) $100,000, executed November 27, 2013, (ii) $2,500,000, executed October 12, 2017, (iii) $750,000, executed October 15, 2018, and (iv) $150,000, executed September 25, 2019. The principal amount of the Term Note was originally $6,069,831 and it was executed on May 31, 2017. The Debtor now seeks combined monetary damages on the Notes totaling $11,157,727.80, plus accrued but unpaid interest and cost of collection. Because the Debtor alleges the amount due on the Notes are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 25, 2021, NREP-Defendant filed its *Original Answer*[6] on March 3, 2021 and *First Amended Answer*[7] on June 11, 2021.

NREP-Defendant filed a proof of claim in the Bankruptcy Case, Proof of Claim No. 146. The proof of claim related to NREP-Defendant's interest in SE Multifamily Holdings, LLC. On July 30, 2020, the Debtor filed its *First Omnibus Claims Objection*,[8] which included an objection to NREP-Defendant's pending proof of claim. On October 19, 2020, NREP-Defendant filed *NREP's Response to Claim Objection*,[9] asserting the SE Multifamily Holdings LLC company

[5] Adversary Case No. 21-03007, Dkt. 1.
[6] Adversary Case No. 21-03007, Dkt. 7.
[7] Adversary Case No. 21-03007, Dkt. 34.
[8] Bankruptcy Case No. 19-34054, Dkt. 906.
[9] Bankruptcy Case No. 19-34054, Dkt. 1212.

4

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1157 of 1726 PageID 12478
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 5 of 12

agreement improperly allocates the ownership percentages of the members due to mutual mistake, lack of consideration, and/or failure of consideration and seeking to reform, rescind, and/or modify the company agreement. The NREP Proof of Claim has not yet been resolved, but any result finding in favor of NREP would result in modification of the company agreement, not a claim or setoff against the Debtor's estate. ***Therefore, the pending proof of claim does not relate to the Notes.***

### b. The Motion to Withdraw the Reference, Response Opposed, and Reply

On June 3, 2021, NREP-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. The Debtor never filed a responsive pleading to the Motion filed by the NREP-Defendant. The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on July 8, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

#### i. *The Movant's Position*

NREP-Defendant argues there is cause shown for permissive withdrawal of the reference because: (1) the Texas Constitution guarantees a party to a contract a right to a jury trial; (2) the contract claim is a purely state law, non-core claim; (3) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (4) efficiency, uniformity and forum shopping factors all favor withdrawal.[10]

Further, NREP-Defendant contends it has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter final orders in the Adversary Proceeding or hold a jury trial. NREP-Defendant argues it has never

---

[10] Adversary Case No. 21-03007, Dkt. 21 at 6-11.

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1158 of 1726   PageID 12479
Case 21-03007-sgj Doc 44 Filed 07/14/21    Entered 07/14/21 15:55:14    Page 6 of 12

filed a proof of claim related to the Notes, thus negating any argument it has consented to the

bankruptcy court having jurisdiction over the litigation of the Notes.

Finally, NREP-Defendant alleges that permissive withdrawal is proper, because the

turnover claim is being used as a "Trojan Horse" to attempt to make a non-core breach of contract

claim become core.[11]

As far as timing, NREP-Defendant requests that the District Court immediately withdraw

the reference and hear all pre-trial matters until the parties are trial-ready.

## III. THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE PENDING PROOF OF CLAIM OF NREP-DEFENDANT IS UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The

district court may withdraw, in whole or in part, any case or proceeding referred under this section,

on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does

not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting

the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified

a number of factors for courts to consider in determining whether permissive withdrawal of the

reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves

a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4)

whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would

foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would

---

[11] *Id.* at 8-9; *see In re Soundview Elite Ltd.*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016).

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1159 of 1726 PageID 12480
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 7 of 12

expedite the bankruptcy process.[12] Courts in this District have placed an emphasis on the first two factors.[13]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy ***proceedings*** (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related to" a case under Title 11.[14] Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters[15] and those that are merely "related to" a Title 11 case are defined as "noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in "noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157. But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the ***statutory*** power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is ***constitutional*** (and this turns on whether "the action

---

[12] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).

[13] See *Mirant*, 337 B.R. at 115-122.

[14] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).

[15] *Stern*, 564 U.S. at 473-474. Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).

APPX. 05723

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1160 of 1726 PageID 12481
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 8 of 12

at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[16]

With respect to the claims asserted against NREP-Defendant, it might be argued that both counts asserted against it are *statutorily* core in nature.[17] While Count 1 is a breach of contract claim for collection of amounts due under promissory notes—one of the simplest forms of a state law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28 U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.,* it stems from alleged defaults on pre-petition notes) and would not be resolved through the claims allowance process (*since no pending proof of claim exists related to the Notes*). In other words, the resolution of Count 1 cannot be inextricably intertwined with the resolution of NREP-Defendant's pending proof of claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due under the Notes were undisputed, it is unrefuted by NREP-Defendant that a turnover action under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. *The issue is whether a turnover action to collect on disputed pre-petition promissory notes can be viewed as a core claim*. There is a split in authority on this issue. Authority exists that a turnover action is a core claim when collecting *matured* debts, as property of the estate, regardless of whether the

---

[16] *Stern*, 564 U.S. at 499.
[17] 28 U.S.C. § 157(b)(2)(E), (O).

APPX. 05724

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 10 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1161 of 1726   PageID 12482
Case 21-03007-sgj Doc 44 Filed 07/14/21   Entered 07/14/21 15:55:14   Page 9 of 12

indebtedness is ***disputed***.[18] In contrast, NREP-Defendant cites authority that the scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts in dispute that arose outside of bankruptcy, including authority from this court.[19]

This court views the turnover claim as derivative of the breach of contract claims. The breach of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to confer jurisdiction over them (absent consent—which does not exist here). A turnover action under 11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the dictates of the Supreme Court in *Marathon*.

In summary, this court believes that the turnover claim in the Complaint, to collect on a disputed indebtedness under the Notes, "do[es] not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[20] Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

---

[18] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' …. While the Defendants assert they are not indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. … A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").

[19] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

[20] *Satelco*, 58 B.R. at 789.

APPX. 0572

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1162 of 1726   PageID 12483
Case 21-03007-sgj Doc 44 Filed 07/14/21    Entered 07/14/21 15:55:14    Page 10 of 12

## IV.    JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[21]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[22] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[23] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[24]

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[25]    Thus,    NREP-Defendant,    by    having    a **pending** proof of claim, has consented to the bankruptcy court's equitable jurisdiction and waived

---

[21] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

[22] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).

[23] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

[24] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

[25] *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990).

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1163 of 1726   PageID 12484
Case 21-03007-sgj Doc 44 Filed 07/14/21    Entered 07/14/21 15:55:14    Page 11 of 12

its right to a jury trial as to the subject matter of the *pending* proof of claim.[26] Without a pending claim related to the Notes, the breach of contract claim is precisely the kind of action that would sound in law rather than in equity. By not having a filed proof of claim related to the Notes, NREP-Defendant never subjected the Notes to the claims allowance process of the bankruptcy court and preserved its right to a jury trial on the Notes.[27] NREP-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

In summary, NREP-Defendant's lack of waiver of its jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

## V.   PENDING MATTERS

On July 8, 2021, the bankruptcy court held a status conference with regard to the Motion.  At such time, the bankruptcy court approved, in part, *Defendant's Expedited Motion to Stay Pending the Resolution of Motion to Withdraw the Reference of Adversary Proceeding*.[28] In its oral ruling, the court granted the NREP-Defendant's request for a stay pending resolution of the Motion as to dispositive motions in the Adversary Proceeding, but did not grant a stay as to any discovery. Under the *Agreed Scheduling Order,*[29] fact discovery will conclude on July 26, 2021 and expert discovery will conclude on August 23, 2021. No dispositive motions have been filed at this time. At this point, the parties are not trial-ready.

---

[26] *Id.*

[27] *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.,* No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.,* No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

[28] Adversary Case No. 21-03007, Dkt. 27.

[29] Adversary Case No. 21-03007, Dkt. 10.

APPX. 05733

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1164 of 1726    PageID 12485
Case 21-03007-sgj Doc 44 Filed 07/14/21    Entered 07/14/21 15:55:14    Page 12 of 12

## VI.    RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the lack of a proof of claim or any other claim related to the Notes asserted by NREP-Defendant; and (c) the lack of any other consent by NREP-Defendant to the equitable jurisdiction of the bankruptcy court related to the Notes, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

# EXHIBIT 31

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1166 of 1726   PageID 12487
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21    Entered 04/29/21 17:42:12    Page 1 of 9

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**MOTION TO COMPEL COMPLIANCE WITH BANKRUPTCY RULE 2015.3**

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT THE EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE STREET, RM. 1254, DALLAS, TEXAS 75242-1496 BEFORE CLOSE OF BUSINESS ON MAY 20, 2021, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**
**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**
**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

{00375628-16}

1

1934054210429000000000004

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1167 of 1726 PageID 12488
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 2 of 9

Now into Court, through undersigned counsel, come The Dugaboy Investment Trust and Get Good Trust ("Movers"), who file this motion to compel Highland Capital Management, L.P. ("Debtor") to comply with Bankruptcy Rule 2015.3 ("Motion"). In support of the Motion, Movers aver as follows:

## CASE BACKGROUND

1. The Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code on October 16, 2019 in the United States Bankruptcy Court for the District of Delaware.

2. The case was subsequently transferred to this Court on the 4th day of December, 2019 [Dkt. #1].

3. On November 24, 2020, the Debtor filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* ("Fifth Amended Plan of Reorganization") [Dkt. #1472].

4. The Fifth Amended Plan of Reorganization was confirmed by this Court's *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Order") on the 22nd day of February, 2021 [Dkt. #1943].

5. The Court's Order confirming the Debtor's Fifth Amended Plan of Reorganization has been appealed by Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. [Dkt. #1957].

6. In connection with the appeal, Motions for Stay Pending Appeal have been filed by (i) Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. [Dkt. #1955] (the "Advisors"); (ii) Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. [Dkt. #1967] (the

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1168 of 1726 PageID 12489
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 3 of 9

"Funds"); (iii) The Dugaboy Investment Trust and Get Good Trust [Dkt. 1971] (the "Movers"); and (iv) James Dondero [Dkt. 1973] ("Dondero").

7. This Court entered an *Order on Motions for Stay Pending Appeal* on March 23, 2021, denying the requests for a stay pending appeal ("Order Denying Requests") [Dkt. #2084].

8. Advisors, Funds, Movers and Dondero have appealed this Court's Order Denying Requests for a stay pending appeal.

9. The appeal of this Court's Order Denying Requests for stay pending appeal is presently before Judge Godbey, United States District Judge for the Northern District of Texas.

10. The Debtor has not filed any reports required by Bankruptcy Rule 2015.3 over the approximately thirty (30) months in which this case has been pending.

11. The Effective Date for the Fifth Amended Plan confirmed by this Court has yet to occur.

**OVERVIEW OF BANKRUPTCY RULE 2015.3**

Rule 2015.3 requires "periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or debtor . . . in which the estate holds a substantial or controlling interest." Fed. R. Bankr. P. 2015.3(a). The purpose of Rule 2015.3 is "to assist parties in interest taking steps to ensure that the debtor's interest in any entity . . . is used for payment of allowed claims against the debtor." Pub. L. No. 109-8 § 419(b) (2005).

The term "substantial or controlling interest" is not defined, nor does it appear elsewhere in the Bankruptcy Code or Bankruptcy Rules. 9 Collier on Bankruptcy § 2015.3.07 (16th ed. 2020). In the absence of other guidance, Collier suggests that a court may turn to the definition of an "affiliate"[1] or "insider"[2] in the Bankruptcy Code, or even state law on the definition of a

---

[1] Bankruptcy Code § 102(2) defines an affiliate:
(2) The term "affiliate" means—
(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1169 of 1726 PageID 12490
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 4 of 9

controlling or substantial interest. See 9 Collier on Bankruptcy § 2015.3.07 (16th ed. 2020)

("case law regarding the definition of 'insider' or 'affiliate' may be helpful. Additionally, there is

a substantial body of corporate case law regarding controlling interests that could be consulted.")

Under Rule 2015.3, there is a rebuttable presumption that the estate has a "substantial or

controlling interest" of an entity in which it "controls or owns at least a 20 percent interest."

Fed. R. Bankr. P. 2015.3(c).

The Court may, after notice and a hearing, vary the reporting requirement established by

subdivision (a) of this rule for cause, including that the trustee or debtor in possession is not able,

after a good faith effort, to comply with those reporting requirements, or that the information

---

(i)      in a fiduciary or agency capacity without sole discretionary power to vote such securities;
or
(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned,
controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or
holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity
that holds such securities—
(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
(C) person whose business is operated under a lease or operating agreement by a debtor, or person
substantially all of whose property is operated under an operating agreement with the debtor; or
(D) entity that operates the business or substantially all of the property of the debtor under a lease or
operating agreement.

[2] The Bankruptcy Code included a non-exclusive list of insiders:
(B) if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor;
(C) if the debtor is a partnership—
(i) general partner in the debtor;
(ii) relative of a general partner in, general partner of, or person in control of the debtor;
(iii) partnership in which the debtor is a general partner;
(iv) general partner of the debtor; or
(v) person in control of the debtor[.]

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1170 of 1726 PageID 12491
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 5 of 9

required by subdivision (a) is publicly available. The examples given for waiving cause are not exclusive. 9 Collier on Bankruptcy §2015.3.08 (16th ed. 2020).

When questioned at the confirmation hearing in connection with Bankruptcy Rule 2015.3, James Seery, on behalf of the Debtor, testified as to the following:

    a) He was familiar with BR 2015.3 [Dkt. #1905, pg. 48, lines 12-15];

    b) No report in compliance with BR 2015.3 has been filed by the Debtor [Dkt. #1905, pg. 48, lines 15-17]; and

    c) "There was no reason for it (failure to file the 2015.3) other than we did not get it done initially and it fell through the cracks" [Dkt. #1905, pg. 49, lines 18-21].

### EXISTING CASE LAW ON BANKRUPTCY RULE 2015.3

Little case law exists on the requirements of Bankruptcy Rule 2015.3. In general, cases where parties have sought and received a waiver fall into two categories: (1) cases where the subsidiary is in the process of being sold; and (2) prepacked bankruptcies if the plan is not confirmed by a certain date. See e.g., *In re RCS Capital Corp.*, Case No. 16-102233 (Bankr. D. Del. Mar. 4, 2016) [Dkt. 714 ¶17] ("The Purchase Agreement has already been approved by the Court . . . . Therefore, within a relatively short period of time . . . , the Debtor will no longer have a substantial or controlling interest in [the subsidiary]"); *In re HCR Manorcare*, Case No. 18-10467 (Bankr. D. Del. Oct. 3, 2018) [Dkt. 8 ¶ 47] (Seeking waiver of reporting requirements if a pre-packed bankruptcy plan is not confirmed within a set period of time).

The case law as it exists does not support a waiver of Bankruptcy Rule 2015.3 and especially for the "it slipped through the cracks excuse." It has been three (3) months since the issue of Debtor's failure to comply with Bankruptcy Rule 2015.3 was raised to the Debtor and

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1171 of 1726   PageID 12492
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21   Entered 04/29/21 17:42:12   Page 6 of 9

Debtor has not sought to remedy the failure and file the requisite 2015.3 reports for the applicable periods or seek leave of Court.  The Debtor must believe the issue will simply go away and not be brought to the attention of the Court and, therefore, the Debtor will not have to disclose the financial condition of the assets in which it possesses a controlling or substantial interest.  The Debtor's typical excuse in this case is the creditors committee has seen the information, however, Bankruptcy Rule 2015.3 requires a public filing and not a disclosure limited to a select few.

The Seery attempted excuse that "we were told we didn't have separate consolidating statements for every entity and it would be difficult" [Seery testimony Dkt. #1905, page 49, lines 14-20] is not credible in light of the fact that the majority of entities in which Debtor has a controlling or substantial interest are investment funds.  Most of the entities listed below in which the Debtor has a substantial or controlling interest are either regulated or have third party investors and, as such, separate accounting and statements on an entity by entity basis are required.  In addition, the fact that the Debtor lacked a "consolidated statement" on one entity is not a legitimate excuse for not filing a 2015.3 report for the other entities in which the Debtor has a controlling or substantial interest.

### ENTITIES IN WHICH THE DEBTOR OWNS OR MAY OWN A CONTROLLING INTEREST

There is no complete listing in any one place that identifies the entities in which the Debtor possesses a substantial or controlling interest.  To assemble the list, Mover has had to parse through various documents and filings. The entities include, but are not limited, to the following:

    a)  Highland Select Equity Fund [See ftn. 8, Debtor's Motion for Exit Loan Dkt. #2229].

        The Exit Loan Motion identifies Highland Select Entity Fund, L.P., Highland

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 8 of
Case 3:23-cv-00726-S  Document 8-23  Filed 12/29/23  Page 1172 of 1726  PageID 12493
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21  Entered 04/29/21 17:42:12  Page 7 of 9

Restoration Capital Partners, L.P. Highland CLO Funding, Ltd., Highland Multi Strategy Credit Fund L.P., Highland Capital Management Korea Limited, Cornerstone Healthcare and Trussway Industries and Trussway Holdings, LLC.[3]

b)   The Exit Financing Motion [Dkt. #2229, pg. 7, ftn. 9] indicates that the Debtor owns additional assets that, by the literal reading of ftn. 9, are not listed in the section of the motion that identifies the collateral for the loan.  These entities should be specifically identified and reports should be filed for these entities that are not listed in the collateral section of the motion.

c)  In the Deposition of James Seery taken on January 29, 2021, in addition to the entities listed above, James Seery generically identifies CCS Medical Inc., Targa International, PetroCap and JHT as entities controlled by Debtor or controlled through funds that are controlled by Debtor.  It is believed the corporate names are PetroCap LLC, PetroCap Partners II LP, PetroCap Incentive Partners II LP , Targa Resources Partners LP, Targa S.A and JHT Holding Inc.

d)  SSP Holdings Inc. and Omni Max, which were sold by the Debtor without Court approval based upon the Debtor's belief that Court approval was not required, should also have been the subject of a 2015.3 report for the period between the filing and the date of the sale.

## CONCLUSION

Throughout this case the Debtor has taken the position that it does not have to seek court approval for sales of assets or report to anyone relative to assets owned by entities in which it has

---

[3] a)    On information and belief, the Debtor asserted ownership of one hundred percent (100%) of Highland Select Entity Fund LP is incorrect and Mark Okata and PCMG Trading partners XXIII L.P.  own an interest.

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1173 of 1726 PageID 12494
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 8 of 9

either control or a substantial interest. See Dondero *Motion for Entry of an Order Requiring*
*Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of*
*Business* [Dkt. #1439] and the Debtor's Objection thereto [Dkt. #1546]. In its Objection, the
Debtor states in PP 9 that the sales at issue (Highland Multi Strategy Credit Fund L.P, Highland
Restoration Capital Partners L.P and SSI Holdings Inc.) were not subject to Court approval and
11 USC §363. It appears, however, that this restricted view of Bankruptcy Court jurisdiction no
longer suits the Debtor's new narrative and now it is seeking court authority to secure an exit
loan and to use the assets of a controlled non-debtor entity (See Debtor's Motion for an Exit
Loan, Dkt. # 2229) in order that the Debtor can pay its professionals and, in a second Motion,
settle the UBS claim using the assets of a different non-debtor controlled entity [Dkt. #2199].

Had the Debtor followed Bankruptcy Rule 2015.3, both this Court and the creditors, large
and small, of the Estate along with the creditors and minority owners of the controlled entities
would have had some insight over the Debtor's actions with respect to these entities over the
course of the Chapter 11. Bankruptcy Rule 2015.3 was designed to provide transparency and it
should be enforced as a matter of public policy.

April 29, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

APPX. 05743

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1174 of 1726   PageID 12495
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21    Entered 04/29/21 17:42:12    Page 9 of 9

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust
 and Get Good Trust*

# EXHIBIT 32

Case 19-34054-sgj11 Doc 3445-32 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 3
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1176 of 1726   PageID 12497
Case 19-34054-sgj11 Doc 2812 Filed 09/07/21    Entered 09/07/21 12:56:13    Page 1 of 2



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 6, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Reorganized Debtor. | ) | **Re: Docket Nos. 2256, 2341 2343, 2424, and 2442** |
|  | ) |  |

---

## ORDER DENYING MOTION TO COMPEL
## COMPLIANCE WITH BANKRUPTCY RULE 2015.3

On April 29, 2021, The Dugaboy Investment Trust and Get Good Trust (collectively, the "Movant") filed its *Motion to Compel Compliance with Bankruptcy Rule 2015.3* (the "Motion") [Docket No. 2256]. On May 20, 2021, the above-captioned reorganized debtor (the "Reorganized Debtor") filed its opposition to the Motion (the "Opposition") [Docket No. 2341] and the official committee of unsecured creditors appointed in this chapter 11 case (the "Committee") filed its

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:105924.1 36027/003

**APPX. 05746**

Case 19-34054-sgj11 Doc 3445-32 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 3
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1177 of 1726   PageID 12498
Case 19-34054-sgj11 Doc 2812 Filed 09/07/21   Entered 09/07/21 12:56:13   Page 2 of 2

joinder to the Opposition on May 20, 2021 (the "Joinder") [Docket No. 2343].  Movant filed a reply to the Opposition on June 8, 2021 (the "Reply") [Docket No. 2424].  The Court conducted a hearing on the Motion on June 20, 2021 (the "Hearing") and, following this Hearing, issued its minute order on June 20, 2021 (the "Minute Order") [Docket No. 2442].   The Minute Order provided that (i) the Motion would be continued to another hearing in early September; (ii) if the effective date of the Debtor's Plan[2] (the "Effective Date") occurs before such hearing, the matter would be moot; and (iii) if the Effective Date had not occurred by then, the Court would consider the Motion further.  The Effective Date of the Plan occurred on August 11, 2021.[3]  The Court finds and concludes that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  After due deliberation and based on the Motion, the Opposition, the Joinder, the Reply, the record of the Hearing, and the Minute Order; it is hereby

ORDERED that the Motion is **DENIED AS MOOT;** and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

### ### END OF ORDER ###

---

[2] *See Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1808] and *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943].

[3] *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on August 11, 2021 [Docket No. 2700].

# EXHIBIT 33

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1179 of 1726 PageID 12500
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 1 of 10 PageID 1719

CASE NO. 3:21-02268-S

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

HIGHLAND CAPITAL MANAGEMENT LP

(Debtor)

THE DUGABOY INVESTMENT TRUST AND
GET GOOD TRUST

(Appellants)

v.

HIGHLAND CAPITAL MANAGEMENT LP

(Appellee)

On appeal from the United States Bankruptcy Court for the Northern District of Texas, Dallas
Division

**APPELLANTS' RESPONSE TO**
**APPELLEE'S MOTION TO DISMISS APPEAL AS MOOT**

Filed by Heller, Draper & Horn, LLC
Douglas S. Draper
Leslie A. Collins
Michael E. Landis
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: mlandis@hellerdraper.com

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1180 of 1726 PageID 12501
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 2 of 10 PageID 1720

Appellants, Dugaboy Investment Trust ("Dugaboy") and the Get Good Trust ("Get Good", in accordance with Federal Rule of Bankruptcy Procedure 8013 and Local Rule 7.1, respectfully file this Response to Appellee's Motion to Dismiss Appeal as Moot. Although Appellants may have dismissed their direct prepetition claims against the Debtor, Highland Capital Management, L.P. (the "Debtor" or "Highland"), Dugaboy still owns a significant interest in some of the very entities that would have been involved in the Rule 2015.3 Reports, had they been filed. Because one of the purposes of the Rule 2015.3 Reports, in addition to assisting prepetition creditors, is to provide a complete accounting of all transactions involving non-debtor affiliates of the Debtor to determine any *post-petition* claims that may exist, Dugaboy still has both a substantive and pecuniary interest in the production of the 2015.3 Reports.[1]

Appellee seems to take the stance that no one (not even the Bankruptcy Court) needs to see what happened behind the scenes during the bankruptcy case and that the Bankruptcy Court, the United States Trustee, and all interest holders in the non-debtor affiliates (including Dugaboy) need to just zip it and stay quiet. Although the majority of the unsecured creditors may have accepted the Plan of Reorganization, that does not mean that the Bankruptcy Court's Order denying the Motion to Compel as moot did not harm the interest holders in the non-debtor affiliates—who are also affected by the Rule 2015.3 Reports. At the very least, amount of Dugaboy's pecuniary interest in the bankruptcy estate cannot be known because the Debtor has refused to provide the Rule 2015.3 Reports as required under the Bankruptcy Code and the Bankruptcy Court has denied Dugaboy the right to examine those reports. That is the point of this appeal: to determine what claims against the estate exist which arose from transactions with

---

[1] The Appellants concede that due to the dismissal of Get Good's claim and the lack of an ownership interest in any of the non-debtor affiliates or the Debtor, it has lost standing and consents to the dismissal of Get Good **only**.

APPX. 05752

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1181 of 1726 PageID 12502
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 3 of 10 PageID 1721

the non-debtor affiliates—a determination that was foreclosed because of the Bankruptcy Court's Order rendering production of the 2015.3 Reports moot.

**Dugaboy has a Direct Pecuniary Interest in the Production of the Rule 2015.3 Reports**

As outlined in the Appellants' Brief, at the confirmation hearing before the Bankruptcy Court, the Appellants raised the fact that the Debtor, after over a year, had not filed a single report as required under Federal Rule of Bankruptcy Procedure 2015.3. The explanation provided by the Debtor's Chief Restructuring Officer, James Seery, was that the reports simply slipped through the cracks and seemed to imply that once brought to the Debtor's attention, it would provide them. Needless to say, that did not occur, which prompted the subject Motion to Compel Compliance with Rule 2015.3, the Bankruptcy Court's final Order rendering the issue moot, and the instant appeal.

The Debtor's Motion to Dismiss is nothing more than an attempt to muddy the water and confuse the issues that are actually before this Court. While the amount of Dugaboy's claim against the estate is contingent upon the contents of the Rule 2015.3 Reports that were never produced, the issue here is the fact that Dugaboy was denied the right to even assert a claim in the first place due to the Bankruptcy Court's ruling that the Debtor would not be required to produce the Rule 2015.3 Reports at all. The Bankruptcy Court's Order caused actual and direct harm to Dugaboy by taking away that right to assert a claim based on the transactions that would be disclosed in the Rule 2015.3 Reports.

The Debtor correctly points out that in bankruptcy matters, a more exacting standard is applied to determine standing. That is, in order to have standing, a party must meet the "person aggrieved" test, which requires that the appellant show that it is directly and adversely affected

APPX. 05743

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1182 of 1726 PageID 12503
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 4 of 10 PageID 1722

pecuniarily by the order of the bankruptcy court.[2] The Debtor relies, primarily, on *Matter of Technicool Sys., Inc.*, 896 F.3d 382 (5th Cir. 2018), which denied standing to the debtor's owner, Robert Furlough, who's complained grievance was that the same firm who represented one of the estate's creditors was also representing the estate's chapter 7 trustee in its effort to consolidate claims and pierce the corporate veil against several of the owner's other non-debtor companies. The principal argument asserted by Furlough was that the firm may fail to disclose problems with the creditor's claims against the estate on account of its dual representation, which could harm the overall recovery to the unsecured creditors, which, in turn, would harm any potential recovery to him, as an equity holder.[3] The Fifth Circuit found this too tenuous and stated that while that scenario was a possibility, "it would not be a direct result of this appeal."[4]

The same cannot be said in the instant matter. The harm visited upon Dugaboy (as an owner of the non-debtor affiliates) is that it has *actually* been denied an opportunity to determine whether or not a claim against the estate exists. In other words, the Bankruptcy Court's Order denying the Motion to Compel as moot directly affected Dugaboy's rights. The extent of the pecuniary effect on Dugaboy's pocket is unknown because the Bankruptcy Court never bothered to allow proper examination through the production of the Rule 2015.3 Reports.

Other cases cited in the Debtor's Motion to Dismiss are also easily distinguished from the instant case. In *Harriman v. Vactronic Sci, Inc. (In re Palmaz Sci., Inc.)*, 262 F.Supp 3d 428 (W.D. Tex. 2017), the appellant in that case was found to have lacked standing because she never even filed a proof of claim in the case much less made an objection to the confirmed plan.

---

[2] *See, Gibbs & Bruns LLP v. Coho Energy, Inc. (In re Coho Energy, Inc.)*, 395 F.3d 198, 202–03 (5th Cir. 2004).

[3] *Id.* at 386.

[4] *Id.*

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1183 of 1726 PageID 12504
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 5 of 10 PageID 1723

"If a party fails to appear at a hearing or object to a motion or proceeding, it cannot expect or implore the bankruptcy court to address the issues raised by the motion or proceeding for a second time," and will lack standing to appeal that decision." *Id.* at 435 *quoting In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010). The Appellants, as the Debtor points out, have been active participants in the bankruptcy case and, in fact, did object to the Plan of Reorganization and raised the issue that the Rule 2015.3 Reports were not filed with the Bankruptcy Court at the confirmation hearing and in its Motion to Compel. It simply cannot be said that Dugaboy failed to make its concerns known to the Bankruptcy Court.

Similarly, in *Coho Energy*, the appellant claimed injury based on a settlement that the debtor reached in a contract dispute in which dispute the appellant had previously represented the debtor and was subsequently replaced by other counsel. The dispute at the heart of the appeal was over the fees awarded to both the appellant and subsequent counsel from the settlement. The original counsel complained that the amount of the attorneys fees awarded to the subsequent counsel was excessive and that the excessive award diminished the amount that would be available for its own fees. The settlement awarded $8.5 million to the estate.[5] Of that, $1.7 million was awarded to the former shareholders and $2.3 million was awarded to the subsequent firm, leaving approximately $4.5 million left for the appellant/original counsel's fees.[6] By the appellant's own admission, the high-end estimate of its fees was $3.4 million (substantially less than the $4.5 million left of the settlement funds). As such, the Fifth Circuit found that

---

[5] *Coho Energy*, 395 F.3d at 203.

[6] *Id.*

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1184 of 1726 PageID 12505
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 6 of 10 PageID 1724

"Thomas's conjectural injury as a claimant to the fund … is too tenuous to support 'aggrieved person' standing."[7]

As stated above, Dugaboy's injury in this appeal is far from conjectural. The harm is actual in that Dugaboy (and all other interest holders in the non-debtor affiliates) was denied the opportunity to even examine whether a claim exists. Nor can the possibility of post-petition claims be considered conjectural. In fact, the United States Supreme Court considered the possibility of claims arising from transactions with non-debtor affiliates plausible enough to create a rule that requires certain disclosures that would reveal such transactions: *Rule 2015.3*.

A case that was distinguished by the *Coho Energy* court is *Ergo Science, Inc. v. Martin*, 73 F.3d 595 (5th Cir. 1996), which is more applicable to the instant case. In *Ergo*, the appellant, ETI, was a claimant to a fund. The district court held that ETI had waived all claims against the fund in oral argument at the bankruptcy court. ETI appealed that order. At the Fifth Circuit, the standing of ETI was challenged on the grounds that its interest in the fund was too speculative. However, as the Fifth Circuit noted, the issue was not the contingent nature of the claimant's interest in the fund, rather, the issue was whether the claimant was denied its right to assert an interest in the first place.

> This dispute involves a potential claimant to the fund, not the stakeholder, and the very issue on appeal is whether ETI has waived its interest in the interpleaded funds or not. The district court's judgment decrees that ETI has no interest or right to the interpleaded funds. ETI, therefore, has standing to challenge this order because it is not faced with a hypothetical or indirect injury as in *Rohm*, but a real and immediate injury.[8]

---

[7] *Id.*

[8] *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 597 (5th Cir. 1996).

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1185 of 1726 PageID 12506
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 7 of 10 PageID 1725

That is the precise scenario at issue in this appeal. By not requiring the Debtor to make the Rule 2015.3 disclosures, the Bankruptcy Court denied Dugaboy (and the non-debtor affiliates in which it owns an interest) the right to assert post-petition claims against the estate. Just as in *Ergo*, this is not a hypothetical or indirect injury. Rather, this is a real and immediate injury to Dugaboy.

### Dugaboy's Standing Has Not Gone Away

In the Motion to Dismiss, the Debtor makes much over the fact that the Appellants' claims against the estate were dismissed, but it failed to address the statement in the Appellants' Brief that Dugaboy holds an ownership interest in several of the entities for which Rule 2015.3 Reports should have been filed. As an owner of those entities, any causes of action that arose during the bankruptcy case between the Debtor and those entities would have a direct effect on Dugaboy's pocketbook. While Dugaboy's claims against the Debtor may have been dismissed, its ownership interest in the non-debtor affiliates still exists and its pecuniary interest in those entities and any claims against the estate also exists.

Furthermore, Dugaboy is a contingent beneficiary under the terms of the Plan. As a former equity interest holder in the Debtor, Dugaboy is entitled to payment after all creditors are paid in full. How can the Debtor credibly argue that a contingent beneficiary under the Plan of Reorganization has no standing to appeal an order directly affecting the implementation of the Plan?

### Conclusion

The Bankruptcy Court's Order denying the Motion to Compel as moot directly harmed Dugaboy by taking away their right to even examine whether there exists a post-petition claim against the estate by the non-debtor affiliates. The propriety of that order is what is on appeal to

APPX. 05759

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1186 of 1726 PageID 12507
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 8 of 10 PageID 1726

this Court. This is an actual and direct harm to Dugaboy as an interest holder in the non-debtor affiliates. The potential amount of those claims is not at issue as that was never decided. The harm complained of is the deprivation to examine the disclosures that would have been provided by the Rule 2015.3 Reports had they been filed.

As such, Dugaboy respectfully requests that this Court deny the Motion to Dismiss Appeal as Moot as to Dugaboy and move forward with a determination of whether the Bankruptcy Court's Order was proper in the first place.

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1187 of 1726 PageID 12508
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 9 of 10 PageID 1727

# CERTIFICATE OF COMPLIANCE

In compliance with Rules 8013(f), I hereby certify that this document complies with the

type-volume limit of Fed. R. Bankr. P. 8013(f)(3) because this document contains 2000 words.


Dated January 5, 2022:

> */s/Douglas S. Draper*
> Douglas S. Draper, La. Bar No. 5073
> ddraper@hellerdraper.com
> Leslie A. Collins, La. Bar No. 14891
> lcollins@hellerdraper.com
> Michael E. Landis, La. Bar No. 36542
> mlandis@hellerdraper.com
>
> Heller, Draper & Horn, L.L.C.
> 650 Poydras Street, Suite 2500
> New Orleans, LA 70130
> Telephone: (504) 299-3300
> Fax: (504) 299-3399
> *Attorneys for Appellants*
> *The Dugaboy Investment Trust and*
> *The Get Good Nonexempt Trust*

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1188 of 1726    PageID 12509
Case 3:21-cv-02268-S    Document 15    Filed 01/05/22    Page 10 of 10    PageID 1728

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, hereby certify that on January 5, 2022, this Response was served
electronically upon all parties registered to receive service in this case via the Court's CM/ECF
system.

/s/ Douglas S. Draper
Douglas S. Draper

**EXHIBIT 34**

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 7
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1190 of 1726 PageID 12511

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 1 of 6 PageID 1769

# United States District Court

### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| THE DUGABOY INVESTMENT TRUST and GET GOOD TRUST, <br>     Appellants, <br>         v. <br><br> HIGHLAND CAPITAL MANAGEMENT, L.P., <br>     Appellee. | § § § § § § § § § § | CIVIL ACTION NO. 3:21-CV-2268-S |
| In re: <br> HIGHLAND CAPITAL MANAGEMENT, L.P., <br>     Debtor. | § § § § § | CASE NO. 19-34054-sgj11 |

## ORDER

Before the Court is Appellee's Motion to Dismiss Appeal as Moot ("Motion to Dismiss") [ECF No. 12]. The Court has reviewed and considered the Motion to Dismiss, Appellants' Response to Appellee's Motion to Dismiss Appeal as Moot ("Response") [ECF No. 15], Reply in Support of Appellee's Motion to Dismiss Appeal as Moot [ECF No. 16], Appellants' Sur-Reply to Appellee's Motion to Dismiss Appeal as Moot [ECF No. 22], the record on appeal ("Record") [ECF No. 9], and the applicable law. For the following reasons, the Court **GRANTS** the Motion to Dismiss and **DISMISSES** this appeal for lack of jurisdiction.

## I. BACKGROUND

This bankruptcy appeal arises from the bankruptcy court's denial of the Motion to Compel Compliance with Bankruptcy Rule 2015.3 (the "Motion to Compel") filed by Appellants The Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good") (collectively, "Appellants"). R. vol. 2 at 421. Appellee Highland Capital Management, L.P. ("Appellee" or

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 7
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1191 of 1726 PageID 12512

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 2 of 6 PageID 1770

"Debtor") initiated the underlying Chapter 11 bankruptcy proceeding in October 2019. Dugaboy subsequently filed three proofs of claim in April 2020, including a proof of claim as a purported "successor in interest" to Canis Major Trust. Around the same time, Get Good also filed three proofs of claim, including two as a purported "successor in interest" to Canis Major Trust.

In the meantime, Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan") in January 2021, and the bankruptcy court held a Plan confirmation hearing in February 2021. R. vol. 1 at 290. At the hearing, Appellants raised the issue of Debtor's failure to file any reports as required under Bankruptcy Rule 2015.3, which requires debtors to file "periodic financial reports of the value, operations, and profitability" of each non-debtor entity in which the debtor "holds a substantial or controlling interest." FED. R. BANKR. P. 2015.3(a). The bankruptcy court confirmed the Plan over Appellants' objections and entered the Confirmation Order on February 22, 2021. R. vol. 1 at 290.

Three months later, Appellants filed the Motion to Compel. R. vol. 2 at 421. Debtor filed its opposition, and the bankruptcy court conducted a hearing on the Motion to Compel on June 10, 2021. R. vol 1. at 356. Following the hearing, the bankruptcy court issued a minute order providing that (1) the hearing on the Motion to Compel would be continued to September 2021; (2) if the Plan effective date occurred before the hearing, the matter would become moot; and (3) if the Plan effective date had not occurred by the hearing, the court would consider the Motion to Compel further. *Id.* at 357. However, the Plan became effective on August 11, 2021, and the bankruptcy court therefore issued its Order Denying Motion to Compel Compliance with Bankruptcy Rule 2015.3 ("Order") on September 6, 2021. R. vol. 1 at 10. Appellants filed their notice of appeal of the Order on September 22, 2021. *See* Notice of Appeal [ECF No. 1].

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 7
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1192 of 1726    PageID 12513

Case 3:21-cv-02268-S    Document 21    Filed 08/08/22    Page 3 of 6    PageID 1771

After this appeal was filed, however, all of the proofs of claim filed by Dugaboy and Get Good were withdrawn with prejudice. Specifically, on October 27, 2021, with Dugaboy's consent, the bankruptcy court entered orders withdrawing two of the Dugaboy claims with prejudice, and on November 10, 2021, the bankruptcy court entered an order approving a stipulation between Dugaboy and Debtor withdrawing the third Dugaboy claim with prejudice. *See In re Highland Capital Management, L.P.*, (Bankr. N.D. Tex. Oct. 16, 2019), ECF Nos. 2965, 2966, 3007. Similarly, on November 10, 2021, all three of the Get Good claims were withdrawn with prejudice either by consent or pursuant to stipulation by Get Good. *Id.*, ECF Nos. 3008, 3009, 3010.

Shortly after all of Appellants' claims were withdrawn, Appellee filed its Motion to Dismiss, asserting that this appeal is constitutionally moot for lack of standing.

## II.    LEGAL STANDARD

Standing to appeal a bankruptcy court decision is a question of law. *In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018). Compared to traditional Article III standing, "standing to appeal a bankruptcy court order is, of necessity, quite limited." *In re Dean*, 18 F.4th 842, 844 (5th Cir. 2021). The Fifth Circuit applies the "person aggrieved" test, which imposes a "more exacting standard than traditional constitutional standing." *Id.* The "person aggrieved" test "demands a higher causal nexus between act and injury," and requires an appellant to show that she is "directly and adversely affected pecuniarily by the order of the bankruptcy court." *In re Coho Energy Inc.*, 395 F.3d 198, 202-03 (5th Cir. 2004) (citations omitted). It is not enough that an appellant is directly impacted by "the proceedings more generally." *In re Dean*, 18 F.4th at 844. Rather, to have standing, the exact order being appealed must "directly affect [appellants'] wallets." *Id.* Such a narrow standing inquiry "ensur[es] that only those with a direct, financial stake in a given order can appeal it." *Technicool*, 896 F.3d at 386. As the Fifth Circuit has observed, "in bankruptcy

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 7
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1193 of 1726 PageID 12514

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 4 of 6 PageID 1772

litigation, as in life, 'the more money we come across, the more problems we see.'" *Id.* (quoting NOTORIOUS B.I.G., *Mo Money Mo Problems*, on LIFE AFTER DEATH (Bad Boy/Arista 1997)).

Standing must exist both at the commencement of the litigation and throughout its existence. *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999) (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (internal alterations and quotation marks omitted)). A case becomes moot when a party loses standing, as "there are no longer adverse parties with sufficient legal interests to maintain the litigation." *Id.* (citation omitted). And when a case becomes moot, the court loses its "constitutional jurisdiction to resolve the issues it presents." *Id.* (citing *Hogan v. Miss. Univ. for Women*, 646 F.2d 1116, 1117 n.1 (5th Cir. 1981)).

### III. ANALYSIS

Appellee asserts that while Appellants had standing at the commencement of the appeal, they lost that standing when all of their claims were withdrawn on November 10, 2021, because at that point they were no longer creditors. Appellants concede that Get Good has lost standing to pursue the appeal,[1] but contend that Dugaboy still has standing because it owns an interest in some of the entities for which Rule 2015.3 reports would have been required. Dugaboy claims that because the purpose of requiring reports under Rule 2015.3 is to "provide a complete accounting of all transactions involving non-debtor affiliates of the Debtor to determine any post-petition claims that may exist," Dugaboy still has a pecuniary interest in the production of the 2015.3 reports themselves. Resp. 2.

The Court finds that Dugaboy is not "directly and adversely affected pecuniarily" by the Order as required to establish standing. *Coho*, 395 F.3d at 203. By withdrawing its remaining

---

[1] *See* Resp. 2 n.1 ("The Appellants concede that due to the dismissal of Get Good's claim and the lack of an ownership interest in any of the non-debtor affiliates or the Debtor, it has lost standing and consents to the dismissal of Get Good only.").

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 7
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1194 of 1726 PageID 12515

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 5 of 6 PageID 1773

claims against Debtor, Dugaboy no longer has any pecuniary interest in the bankruptcy estate and therefore is not a "person aggrieved" by the Order. *Id.* While Dugaboy does not dispute that it is no longer a creditor of the estate, it asserts that its pecuniary interest is its ownership interest in the non-debtor affiliates and a potential recovery under the Plan as one of Debtor's former equity holders. In other words, Dugaboy's primary contention is that, but for the bankruptcy court's failure to compel Debtor to file retroactive reports regarding its ownership interests in non-debtor subsidiaries as of the bankruptcy petition date, Dugaboy might have used the information in those reports to investigate whether any post-petition claims exist against Debtor's estate by any non-debtor affiliates. But such an injury is precisely the type of "hypothetical or indirect injury" that the Fifth Circuit has consistently found insufficient to confer standing. *Coho*, 395 F.3d at 203 (quoting *Ergo Science v. Martin*, 73 F.3d 595, 597 (5th Cir. 1996)).

Further, even if Dugaboy did still have some claim to the estate, "[e]ven a claimant to a fund must show a realistic likelihood of injury in order to have standing." *Id.* There is no such likelihood here. Were the Court to reverse the Order, the effect of the bankruptcy court granting the Motion to Compel is simply that Debtor would be required to file retroactive reports regarding its ownership interests in non-debtor subsidiaries. It is unclear how post-dated reports disclosing years-old facts could lead to any direct recovery by a creditor, let alone recovery by a non-creditor with a purported ownership in non-debtor affiliates. This attenuated interest in a potential future outcome is not sufficient: "the order must burden [Dugaboy's] pocket before [it] burdens the docket." *Technicool*, 896 F.3d at 386.

Dugaboy also argues that it has standing as a "contingent beneficiary" under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full. Resp. 7. This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited

5

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 7
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1195 of 1726   PageID 12516

Case 3:21-cv-02268-S   Document 21   Filed 08/08/22   Page 6 of 6   PageID 1774

partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan. As an initial matter, Dugaboy still does not demonstrate the requisite "causal nexus" between the actual Order being appealed and its purported interest in potential future recovery under the Plan. *Coho*, 395 F.3d at 202. But in any event, such a "speculative prospect of harm is far from a direct, adverse, pecuniary hit" as required to confer standing. *Technicool*, 896 F.3d at 386.

While Dugaboy may have a direct interest in the "proceedings more generally," bankruptcy standing requires that there is a direct, adverse, and pecuniary effect on the appellant, and that the effect is tied to the specific order being appealed. In the absence of any claim to Debtor's estate or direct financial injury flowing from the Order, Dugaboy simply cannot be a "person aggrieved" by the Order. Accordingly, the Court finds that Appellants lack standing and, as a result, this appeal is constitutionally moot.

## IV.    CONCLUSION

For the reasons set forth above, Appellee's Motion to Dismiss Appeal as Moot [ECF No. 12] is **GRANTED**, and this appeal is **DISMISSED** for lack of jurisdiction.

**SO ORDERED.**

SIGNED August 8, 2022.

_____
**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**

6

APPX. 05759

# EXHIBIT 35

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1197 of 1726 PageID 12518
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 1 of 22

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) **Re: Docket Nos. 1625, 1697, 1706,** |
| | ) **1707** |

### DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR
### ENTRY OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST
### (CLAIM NOS. 143, 147, 149, 150, 153, 154), AND AUTHORIZING ACTIONS
### CONSISTENT THEREWITH

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:41952.8 36027/002



APPX. 05769

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1198 of 1726 PageID 12519
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 2 of 22

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") in support of its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim No.143,147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion").[2]   In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      If granted, the Motion will resolve a $300 million general unsecured claim against the Debtor's estate for less than $16.8 million in actual value.[3]  The settlement is another solid achievement for the Debtor and – not surprisingly – is opposed by no one except Mr. Dondero and entities affiliated with him.

2.      As discussed in the Motion, in November 2017, HarbourVest invested $80 million in exchange for a 49.98% membership interest in HCLOF – an entity managed by a subsidiary of the Debtor.  The balance of HCLOF's interests are held by CLO Holdco, Ltd. (an entity affiliated with Mr. Dondero), the Debtor, and certain of the Debtor's employees.  Subsequent to its investment in HCLOF, HarbourVest incurred substantial losses on its investment in HCLOF and filed claims against the Debtor's estate.

3.      HarbourVest asserts claims for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

[3] Under the proposed settlement, HarbourVest would receive an allowed, general unsecured claim of $45 million and an allowed, subordinated claim of $35 million.  Based on the estimated recovery for general unsecured creditors of 87.44% (which is a recovery based on certain outdated assumptions discussed *infra*), HarbourVest's $45 million general unsecured claim is estimated to be worth approximately $39.3 million and the $35 million subordinated claim, which is junior to the general unsecured claim, is currently estimated to have value only if there are litigation recoveries.  In addition, HarbourVest is transferring to an affiliate of the Debtor its interest in HCLOF, which is estimated to be worth approximately $22.5 million.  Thus, HarbourVest's estimated recovery on its general unsecured and subordinated claims is estimated at approximately $16.8 million on a net economic basis.  This estimate, however, is dated and is based on the claims that were settled as of the filing of the Debtor's plan in November 2020.

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1199 of 1726   PageID 12520
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 3 of 22

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO.  In furtherance of these claims, HarbourVest alleges it was misled by the Debtor and its employees, including Mr. Scott Ellington (then the Debtor's general counsel), and that subsequent to investing in HCLOF, Mr. Dondero and the Debtor used HCLOF both as a piggybank to fund the litigation against Acis Capital Management, L.P. ("Acis") and as a scapegoat for the Debtor's litigation strategy, in each case to HarbourVest's substantial detriment.

4.    Specifically, HarbourVest alleges that:

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest about its intentions with respect to Mr. Terry's arbitration award against Acis and orchestrated a series of fraudulent transfers and corporate restructurings, the true purpose of which was to denude Acis of assets and make it judgment proof;

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest as to the intent and true purpose of these restructurings and led HarbourVest to believe that Mr. Terry's claims against Acis were meritless and a simple employment dispute that would not affect HarbourVest's investment;

- the Debtor, through Mr. Dondero, improperly exercised control over or misled HCLOF's Guernsey-based board of directors to cause HCLOF to engage in unnecessary, unwarranted, and resource-draining litigation against Acis;

- the Debtor improperly caused HCLOF to pay substantial legal fees of various entities in the Acis bankruptcy that were unwarranted, imprudent, and not properly chargeable to HCLOF; and

- the Debtor used HarbourVest as a scapegoat in its litigation against Acis by asserting that the Debtor's improper conduct and scorched-earth litigation strategy was at HarbourVest's request, which was untrue.

5.    The Debtor believed, and continues to believe, that it has viable defenses to HarbourVest's claims.  Nevertheless, those defenses would be subject to substantial factual disputes and would require expensive and time-consuming litigation that would likely be resolved only after a lengthy trial all while the Debtor (or its successor) assumes the risk that the defenses might fail.  The evidence will show that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1200 of 1726 PageID 12521
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 4 of 22

principals and their counsel. The evidence will also show that one of HarbourVest's primary concerns in settling its claim was that part of that settlement would include the extrication of HarbourVest from the Highland web of entities and the related litigation. The proposed settlement accomplishes that and does so in compliance with HCLOF's governing agreements.

6. Pursuant to the proposed settlement, (a) HarbourVest will receive (i) an allowed, general unsecured claim in the amount of $45 million, and (ii) an allowed, subordinated claim in the amount of $35 million; (b) HarbourVest will transfer its 49.98% interest in HCLOF (valued at approximately $22.5 million) to a wholly-owned subsidiary of the Debtor; and (c) the parties will exchange mutual and general releases. The Debtor believes that the proposed settlement is reasonable and results from the valid and proper exercise of its business judgment. And the Debtor's creditors apparently agree. None of the major parties-in-interest or creditors in this case has objected to the Motion: not the Committee, the Redeemer Committee, Acis, Patrick Daugherty, or UBS.

7. In distinction, the only objecting parties are Mr. Dondero, his family trusts (the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts")), and CLO Holdco (a wholly-owned subsidiary of Mr. Dondero's Charitable Donor Advised Fund, L.P. (the "DAF")) (collectively, the "Objectors"). Each of the Objectors has only the most tenuous economic interest in and connection to the Debtor's settlement with HarbourVest. Each of the Objectors is also controlled directly or indirectly by Mr. Dondero who has coordinated each of the Objectors litigation strategies against the Debtor.[4] Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy – should be rebuffed, and the objections overruled. The following is a brief summary of the objections.

---

[4] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q.

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1201 of 1726 PageID 12522
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 5 of 22

| Pleading | Objection/Reservation | Response |
|---|---|---|
| *Objection of James Dondero* [Docket No. 1697] (the "<u>Dondero Objection</u>") | Because HarbourVest was damaged by the injunction entered in Acis, the settlement seeks to revisit this Court's rulings in Acis. | Mr. Dondero is misdirecting the Court. HarbourVest's claim arises from the misrepresentations of Mr. Dondero, Mr. Ellington, and others, not this Court's rulings in Acis, including the failure to disclose the fraudulent transfer of assets. |
| | The settlement is not fair and equitable because it does not address (1) Acis's mismanagement, (2) how the Debtor is liable for HarbourVest's damages, (3) the success on the merits, (4) the costs of litigation, and (5) the Debtor's ability to realize the value of the HCLOF interests in light of the Acis injunction. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. The Debtor has assessed the value of the HCLOF interests in light of all factors, including the Acis injunction. |
| | The HarbourVest settlement represents a substantial windfall to HarbourVest. | Mr. Dondero ignores the economics of this case, which have value breaking in Class 8 (General Unsecured Claims). The value of the settlement is not $60 million; it is approximately $16.8 million against a claim of $300 million. There is no windfall. |
| | The HarbourVest settlement is improper gerrymandering because it provides HarbourVest with a general unsecured claim and a subordinated claim in order to secure votes for the plan. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| *Objection of the Dugaboy Investment Trust and Get Good Trust* [Docket No. 1706] (the "<u>Trusts Objection</u>") | The settlement represents a radical change in the Debtor's earlier position on the HarbourVest settlement. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. |
| | The settlement appears to buy HarbourVest's vote. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| | No information is provided as to whether the Debtor can acquire HarbourVest's interest in HCLOF or the value of that interest to the estate. | As discussed below, the HCLOF interest will be transferred to a wholly-owned subsidiary of the Debtor. Mr. Seery will testify as to the benefit of the HCLOF interests to the estate. |
| *Objection of CLO Holdco* [Docket No. 1707] ("<u>CLOH Objection</u>") | HarbourVest cannot transfer its interests in HCLOF unless it complies with the right of first refusal. | CLO Holdco misinterprets the operative agreements and tries to create ambiguity where none exists. |

DOCS_NY:41952.8 36027/002

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1202 of 1726   PageID 12523
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 6 of 22

8.      These objections are just the latest objections filed by Mr. Dondero and his related

entities to any attempt by the Debtor to resolve this case,[5] including the Debtor's settlement with

Acis [Docket No. 1087] and the seven separate objections filed by Mr. Dondero and his related

entities to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

[Docket No. 1472] (the "Plan").[6]  It will not shock this Court to hear that each of the Objectors is

also objecting to the Plan.  In contradistinction, the Debtor has heard this Court's admonishments

about old Highland's culture of litigation as evidenced by this case, Acis's bankruptcy, and

beyond.  Although the Debtor has vigorously contested claims when appropriate, the Debtor has

also sought to settle claims and limit the senseless fighting.  The Debtor has successfully

resolved the largest claims against the estate, including the claims of the Redeemer Committee,

Acis, and, as recently announced to this Court, UBS.  The Debtor would ask this Court to see

through the pretense of the Dondero-related entities' objections to the HarbourVest settlement

and approve it as a valid exercise of the Debtor's business judgment.

---

[5] As an example of Mr. Dondero's litigiousness, on January 12, 2021, Mr. Dondero filed notice that he will be appealing the preliminary injunction entered against him earlier on January 12, 2021.

[6] (1) *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661]; (2) *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667]; (3) *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]; (4) *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670]; (5) *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; (6) *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]; and (7) *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676].

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1203 of 1726   PageID 12524
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 7 of 22

## REPLY

### A.    Standing

9.    **James Dondero.**    In the Dondero Objection, Mr. Dondero asserts he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. While that claim is ostensibly true, it is tenuous at best.  On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[7] More than nine months later, Mr. Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[8]

10.    Mr. Dondero's claim as an "indirect equity security holder" is also a stretch.  Mr. Dondero holds no direct equity interest in the Debtor.  Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner.  Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests.  The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests.  The Class A interests are also junior to all other claims filed against the Debtor.  Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be satisfied.

11.    **Dugaboy and Get Good.**    Dugaboy and Get Good are sham Dondero "trusts" with only the most attenuated standing.  Dugaboy has filed three proofs of claim [Claim Nos. 113; 131; 177].  In two of these claims, Dugaboy argues that (1) the Debtor is liable to Dugaboy

---

[7] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice.  *See* Docket No. 1460.
[8] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

DOCS_NY:41952.8 36027/002

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1204 of 1726 PageID 12525
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 8 of 22

for its postpetition mismanagement of the Highland Multi Strategy Credit Fund, L.P., and (2) this Court should pierce the corporate veil and allow Dugaboy to sue the Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a Debtor-managed investment vehicle. The Debtor believes that each of the foregoing claims is frivolous and has objected to them. [Docket No. 906].

12. In its third claim, Dugaboy asserts a claim against the Debtor arising from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the total limited partnership interests in the Debtor). Similarly, Get Good filed three proofs of claim [Claim Nos. 120; 128; 129] arising from its prior ownership of limited partnership interests in the Debtor. Because each these claims arises from an equity interest, the Debtor will seek to subordinate them under 11 U.S.C. § 510 at the appropriate time. As set forth above, these interests are out of the money and are not expected to receive any economic recovery.

13. Consequently, Mr. Dondero, Dugaboy, and Get Good's standing to object to the HarbourVest settlement is attenuated and their chances of recovery in this case are extremely speculative at best. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing). Mr. Dondero, Dugaboy, and Get Good's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected. "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1205 of 1726   PageID 12526
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 9 of 22

holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

**B.    Mr. Dondero's Objection and his "Trusts" Objection Are Without Merit**

14.    As discussed in the Motion, under applicable Fifth Circuit precedent, a
bankruptcy court may approve a compromise or settlement as long as the proposed settlement is
fair, reasonable, and in the best interest of the estate.  *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530,
540 (5th Cir. 2015).  In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty
  of law and fact;

- complexity and likely duration of the litigation and any attendant expense,
  inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the
  paramount interest of creditors with proper deference to their reasonable views"
  and (ii) whether the settlement is the product of arm's length bargaining and not
  of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power
Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted).  *See also Age Ref. Inc.*, 801 F.3d at
540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d
914, 918 (5th Cir. 1995).

15.    **The Settlement Seeks to Revisit the Acis Orders.**   In the Dondero Objection,
Mr. Dondero argues that HarbourVest's claim is based on the financial harm caused to
HarbourVest from Acis's bankruptcy and the orders entered in the Acis bankruptcy.   Mr.
Dondero extrapolates from this that HarbourVest is seeking to challenge this Court's rulings in
Acis.   (Dondero Obj., ¶¶ 17-20)   Mr. Dondero misinterprets HarbourVest's claims and the
dangers such claims pose to the Debtor's estate.

16.    HarbourVest's claims are for fraud, fraudulent inducement, fraudulent
concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1206 of 1726   PageID 12527
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 10 of 22

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO.
HarbourVest is not arguing that Acis or this Court caused its damages; HarbourVest is arguing
that *the Debtor* – led by Mr. Dondero – (a) misled HarbourVest as to the nature of Mr. Terry's
claims against the Debtor and the litigation with Acis, (b) knowingly and intentionally failed to
disclose that the Debtor was engaged in the fraudulent transfer of assets to prevent Mr. Terry
from collecting his judgment, and (c) that *the Debtor* – under the control of Mr. Dondero –
improperly engaged in a crusade against Mr. Terry and Acis, which substantially damaged
HarbourVest and its investment in HCLOF, in each case in order to induce HarbourVest to invest
in HCLOF.

17.    Again, HarbourVest does not contend that Acis caused its damages.  Rather,
HarbourVest contends that the fraudulent transfer of assets as part of the Debtor's crusade
against Mr. Terry and Acis and the false statements and omissions about those matters caused
HarbourVest to make an investment it would never have made had Mr. Dondero and the Debtor
been honest and transparent.  The Acis litigation – in HarbourVest's estimation – never should
have happened.  Acis did not cause HarbourVest's damages.  Mr. Dondero's crusade against Mr.
Terry and the Debtor's allegedly fraudulent statements to HarbourVest about the fraudulent
transfers, Mr. Terry and Acis caused HarbourVest's damages.

18.    **The HarbourVest Claim Lacks Merit.**  In their objections, Mr. Dondero and the
Trusts argue that the HarbourVest settlement is not fair and equitable and not in the best interests
of the estate because (a) it does not address the Debtor's arguments against the HarbourVest
claims and (b) there is a lack of pending litigation seeking to narrow the claims against the estate.
These arguments only summarily address the first two factors of *Cajun Electric*, which deal with
success in the litigation, and, in doing so, mischaracterize the dangers to the Debtor's estate

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 12 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1207 of 1726   PageID 12528
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 11 of 22

posed by HarbourVest's claims.  (Dondero Obj., ¶¶ 21-25; Trusts Obj., ¶ 18(a))

19.     Both the Dondero Objection and – to a much lesser extent - the "Trusts"
Objection allege that (a) HarbourVest's losses were caused by Acis and its (mis)management of
HCLOF's investments (Dondero Obj.,¶ 22, 24), (b) there is no contract that supports
HarbourVest's claims (Dondero Obj. ¶ 23; Trusts Obj., ¶ 18(a)), (c) there is no causal connection
between HarbourVest's losses and the Debtor's conduct (Dondero Obj., ¶ 24), and (d) the Debtor
should litigate all or a portion of HarbourVest's claim before settling (Dondero Obj., ¶ 25).
Again, though, as set forth above, both Mr. Dondero and the "Trusts" seek to shift the cause of
HarbourVest's damages away from the Debtor's misrepresentations and to Mr. Terry's
management of HCLOF's investments.  This is simple misdirection.

20.     HarbourVest's claims are that it invested in HCLOF based on the Debtor's
fraudulent misrepresentations.  Fraudulent misrepresentation sounds in tort, not contract. *See,
e.g., Clark v. Constellation Brands, Inc.*, 348 Fed. Appx. 19, 21 (5th Cir. 2009) (referring to
party's claim based on fraudulent misrepresentation as a tort); *Eastman Chem. Co. v. Niro, Inc.*,
80 F. Supp. 2d 712, 717 (S.D. Tex. 2000) (noting that party had common law duty not to commit
intentional tort of fraudulent misrepresentation).  There is thus no need for HarbourVest to point
to a contractual provision to support its claim.[9]  Moreover, in order to defend against
HarbourVest's claims, the Debtor would need to elicit evidence showing that its employees did
not make misrepresentations to HarbourVest.  Such a defense would require the Debtor to rely
on the veracity of Mr. Ellington's testimony, among others.  That is a high hurdle, and no
reasonable person would expect the Debtor to stake the resolution of HarbourVest's $300 million
claim on the Debtor's ability to convince this Court that Mr. Ellington was telling HarbourVest

---

[9] Subsequent to filing the Motion, the Objectors requested all agreements between HarbourVest, HCLOF, and the
Debtor, and such agreements were provided.

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1208 of 1726   PageID 12529
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 12 of 22

the truth.  This is especially true in light of the evidence supporting Mr. Ellington's recent termination for cause and the evidence recently provided by HarbourVest supporting its claim for fraudulent misrepresentations.

21.    Finally, neither Mr. Dondero nor the "Trusts" even address the third factor analyzed by the Fifth Circuit:  all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views." This is telling because no creditor or party in interest has objected to the settlement.  Mr. Dondero and his proxies' preference for constant litigation should not outweigh the preference of the Debtor and its creditors for a reasonable and expeditious settlement of HarbourVest's claims.

22.    **The HarbourVest Settlement Is a Windfall to HarbourVest.**    Both the Dondero Objection and the "Trusts" Objection argue that the HarbourVest settlement represents a substantial windfall to HarbourVest.  Both Mr. Dondero and the "Trusts" ignore the facts. Specifically, Mr. Dondero argues that HarbourVest is receiving $60 million dollars in *actual* value for its claims.  Mr. Dondero's contention, however, wrongly assumes that both the $45 million general unsecured claim and the $35 million subordinated claim provided to HarbourVest under the settlement will be paid 100% in full and that HarbourVest will receive $80 million in cash.  From that $80 million, Mr. Dondero subtracts $20 million, which represents the value Mr. Dondero ascribes to HarbourVest's interests in HCLOF that are being transferred to the Debtor.  Mr. Dondero's math ignores the reality of this case.

23.    The Debtor very clearly disclosed in the projections filed with the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.,* [Docket No. 1473] (the "Projections") that general unsecured claims would receive an 87.44% recovery *only if* the claims of UBS, HarbourVest, Integrated Financial Associates, Inc., Mr.

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1209 of 1726    PageID 12530
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 13 of 22

Daugherty, and the Hunter Mountain Investment Trust were zero.  Because of the Debtor's success is settling litigation, that assumption is proving to be inaccurate.  Regardless, even if general unsecured claims receive a recovery of 87.44%, because the subordinated claims are junior to the general unsecured claims, the subordinated claims' projected recovery is currently zero.  As such, assuming the HCLOF's interests are worth $22.5 million,[10] the actual recovery to HarbourVest will be less than $16.8 million.  This is not a windfall.  HarbourVest's investment in HCLOF was $80 million and its claim against the estate was over $300 million.  The settlement represents a substantial discount.

24.    **Improper Gerrymandering and/or Vote Buying.**  Each of Mr. Dondero and the Trusts argue in one form or another that the HarbourVest settlement is improper as it provides HarbourVest a windfall on its claims in exchange for HarbourVest voting to approve the Plan.  These unsubstantiated allegations of vote buying should be disregarded.  As an initial matter, and as set forth above, HarbourVest is *not* getting a windfall.  HarbourVest is accepting a substantial discount in the settlement.  HarbourVest's incentive to support the Plan comes from HarbourVest's determination that the Plan is in its best interests.  There is also nothing shocking about a settling creditor supporting a plan.  Indeed, it would be nonsensical for a creditor to settle its claims and then object to the plan that would pay those claims.

25.    More importantly, HarbourVest's votes in Class 9 (Subordinated Claims) are not needed to confirm the Plan.  As will be set forth in the voting declaration, Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 8 (General Unsecured Claims) have voted in favor of the Plan.[11]  In brief, the Plan was approved without HarbourVest's Class 9 vote,

---

[10] It is currently anticipated that Mr. James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, will testify as to the value of the HCLOF interests to the Debtor's estate.

[11] The Debtor anticipates that Mr. Dondero and his related entities will argue that neither Class 7 nor Class 8 voted to accept the Plan because of the votes cast against the Plan in those Classes by current and former Debtor

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1210 of 1726    PageID 12531
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 14 of 22

and the Debtor, therefore, has no need to "buy" HarbourVest's Class 9 claims.  Accordingly, any claims of gerrymandering or vote buying are without merit.

### C.    CLOH Objection

26.    CLO Holdco (and to a much lesser extent, the "Trusts") object to HarbourVest's transfer of its interests in HCLOF as part of the settlement.    Currently, the settlement contemplates that HarbourVest will transfer 100% of its collective interests in HCLOF to HCMLP Investments, LLC ("HCMLPI"), a wholly-owned subsidiary of the Debtor.  As set forth in the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd*. (which was appended as Exhibit A to the Settlement Agreement) [Docket No. 1631-1], each of the Debtor, HarbourVest, Highland HCF Advisors, Ltd. (HCLOF's investment manager) ("HHCFA"), and HCLOF agree that HarbourVest is entitled to transfer its interests to HCMLPI pursuant to that certain *Members Agreement Relating to the Company*, dated November 15, 2017 (the "Members Agreement"),[12] without offering that interest to other investors in HCLOF.

27.    The *only* party to object to the transfer of HarbourVest's interests in HCLOF to HCMLPI is CLO Holdco.  CLO Holdco holds approximately a 49.02% interest in HCLOF and is the wholly-owned subsidiary of the DAF, Mr. Dondero's donor-advised fund.  CLO Holdco argues that the Member Agreement requires HarbourVest to offer its interest first to the other investors in HCLOF before it can transfer its interests to HCMLPI.  In so arguing, CLO Holdco attempts to create ambiguity in an unambiguous contract and to use that ambiguity to disrupt the Debtor's settlement with HarbourVest.

28.    As an initial matter, the Debtor and CLO Holdco agree that the transfer of HarbourVest's interests in HCLOF to HCMLPI is governed by Article 6 (Transfers or Disposals

---

employees, including Mr. Ellington and Mr. Isaac Leventon.  The Debtor will demonstrate at confirmation that those objections are without merit and that Class 7 and Class 8 voted to accept the Plan.

[12] A true and accurate copy of the Members Agreement is attached hereto as Exhibit A.

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1211 of 1726    PageID 12532
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 15 of 22

of Shares) of the Members Agreement (an agreement governed by Guernsey law). (CLOH Obj.,

¶ 3) The parties diverge, however, as to how to interpret Article 6. The Debtor, as set forth

below, believes Article 6 is clear in that it allows HarbourVest to transfer its interests in HCLOF

to any "Affiliate of an initial Member party" without requiring the right of first refusal in Section

6.2 of the Members Agreement. CLO Holdco's position appears to be that the Members

Agreement, despite its clear language, should be interpreted as limiting transfers to an "initial

Member's ***own*** affiliates" and that any other transfer requires the consent of HHCFA and

satisfaction of the right of first refusal. (*Id.* (emphasis added)) CLO Holdco's reading is

contrary to the actual language of the Members Agreement.

29.     First, Section 6.1 of the Members Agreement provides, in pertinent part:



(Members Agmt, § 6.1 (emphasis added)) Under the Members Agreement, "Affiliate" is

defined, in pertinent part, as "███████████████████████████████████████████

███████████████████████████████████████████████████████████████

(*Id.*, § 1.1) A "Member" in turn is a ████████████████████████." The "initial

Member[s]" are the initial Members of HCLOF listed on the first page of the Members

Agreement and include the Debtor, HarbourVest, and CLO Holdco.

30.     As such, under the plain language of Section 6.1, HarbourVest is entitled –

without the consent of any party – to "Transfer" its interests in HCLOF to an "Affiliate" of any

of the Debtor, HarbourVest, or CLO Holdco. And that is exactly what is contemplated by the

settlement. HarbourVest is transferring its interests to HCMLPI, a wholly owned and controlled

subsidiary of the Debtor, and therefore an "Affiliate" of the Debtor. That transfer is indisputably

DOCS_NY:41952.8 36027/002

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1212 of 1726   PageID 12533
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 16 of 22

allowed under Section 6.1; it is a transfer to an "Affiliate of an initial Member."  CLO Holdco

may, tongue in cheek, call this structure "convenient" but that sarcasm is an attempt to avoid the

fact that the Members Agreement clearly allows HarbourVest to transfer its interest to HCMLPI

without the consent of any party.[13]  The fact that CLO Holdco does not now like the language it

previously agreed to when CLO Holdco and the Debtor were both controlled by Mr. Dondero is

not a reason to re-write Section 6.1 of the Members Agreement.

31.    Second, Section 6.2 of the Members Agreement is also unambiguous and, by its

plain language, allows HarbourVest to "Transfer" its interests in HCLOF to "Affiliates of an

initial Member" (*i.e.*, HCMLPI) without having to first offer those interests to the other Members

(such obligation, the "ROFO").  CLO Holdco attempts to create ambiguity in Section 6.2 by

arguing that it must be read in conjunction with Section 6.1 and that interpreting the plain

language of Section 6.2 to allow HarbourVest to transfer its interests to HCMLPI without

restriction makes certain other language surplus and meaningless.  (CLOH Obj., ¶ 11-13)  Again,

CLO Holdco is attempting to create controversy and ambiguity where none exists.

32.    Section 6.2 of the Members Agreement provides, in pertinent part:

[REDACTED]

(Members Agmt., § 6.2 (emphasis added))  Like Section 6.1, Section 6.2 is clear on its face.  It

exempts from the requirement to comply with the ROFO two categories of "Transfers":  (1)

Transfers to "affiliates of an initial Member" from Members *other than* CLO Holdco and the

---

[13] Although HHCFA's consent is not necessary for HarbourVest to transfer its interests to HCMLPI, HHCFA will
consent to the transfer.

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1213 of 1726   PageID 12534
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 17 of 22

"Highland Principals" (*i.e.*, the Debtor and certain of its employees)[14] and (2) Transfers from CLO Holdco or a Highland Principal to the Debtor, the Debtor's "Affiliates," or another Highland Principal.  The fact that a narrower exemption is provided to CLO Holdco and the Debtor than to HarbourVest (or any other Member) under Section 6.2 is of no moment; the language says what it says and was agreed to by all Members, including CLO Holdco, when they executed the Members Agreement.

33.    In addition, and although not relevant, the language of Section 6.2 makes sense in the context of the deal.  Although CLO Holdco and the Debtor may have disclaimed an "Affiliate" relationship, they are related through Mr. Dondero and invest side by side with the Debtor in multiple deals.[15]  The different standards in Section 6.2 serve to ensure that HarbourVest's (or any successor to HarbourVest) right to Transfer its shares without satisfying the ROFO is limited to three parties:  (i) HarbourVest's Affiliates, (ii) the Debtor's Affiliates, and (iii) CLO Holdco's Affiliates.  This restriction keeps the relative voting power of each Member static and ensures that CLO Holdco and the Debtor, together, will *always* have more than fifty percent of HCLOF's total interests and that HarbourVest will *always* have less than fifty percent.  This counterintuitively also explains the greater restrictions placed on CLO Holdco and the "Highland Principals."  The Highland Principals include certain Debtor employees.  Those employees – as well as CLO Holdco and the Debtor – are prohibited from transferring their HCLOF interests outside of the Dondero family.  This restriction makes sense.  If, for example, a Debtor employee wanted to transfer its interests to an Affiliate of HarbourVest, HarbourVest could have more than fifty percent of the HCLOF interests because of the thinness

---

[14] "**Highland Principals**" means: ██████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████  (Members Agmt., § 1.1)
[15] There can be no real dispute that Mr. Dondero effectively controls CLO Holdco.

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1214 of 1726 PageID 12535
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 18 of 22

of the Dondero-family's majority (approximately 0.2%). At the time the Members Agreement was executed, CLO Holdco and the Debtor were under common control. Section 6.2 preserves those related entities' control over HCLOF by restricting transactions that would transfer that control unless the ROFO is complied with.

34.     As such, and notwithstanding CLO Holdco's protestations, Section 6.1 and Section 6.2 are consistent as written and clear on their face. This consistency is further evidenced by HCLOF's Articles of Incorporation[16] and HCLOF's offering memorandum, which each include language identical to Section 6.1 and 6.2 of the Members Agreement.[17] It seems highly unlikely, if not implausible, that sophisticated parties such as CLO Holdco would include the exact same language in six separate places over three documents without a reason for that language and without the intent that such language be interpreted as it is clearly written – not as CLO Holdco now wants it to be interpreted. Accordingly, since HarbourVest is transferring its interests to HCMLPI, an Affiliate of an initial Member, the plain language of Section 6.2

---

[16] *See* Articles of Incorporation, adopted November 15, 2017, a true and correct copy of which is attached hereto as Exhibit B.



(Articles of Incorporation, § 18.1)

(*Id.*, § 18.2)

[17] *See* Offering Memorandum, dated November 15, 2017, a true and correct copy of which is attached hereto as Exhibit C.



(Offering Memorandum, page 89)

18

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1215 of 1726 PageID 12536
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 19 of 22

exempts HarbourVest from having to comply with the ROFO.

35.     Third, and finally, CLO Holdco makes the nonsensical argument that because Section 6.2 provides different treatment to similarly situated Members that this Court should re-write Section 6.2. (CLOH Obj., ¶¶ 15-17)  Contracts provide different treatment to ostensibly similarly situated parties all the time and no one objects that that creates an absurd result.  It just means that different parties bargained for and received different rights.

36.     CLO Holdco's attempt to justify why this Court should re-write the Members Agreement to correct the "disparate treatment" is also unavailing.  As an example of the absurd result caused by the "disparate treatment," CLO Holdco states:   "[B]ecause the HarbourVest Members are technically Affiliates of an initial member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer."  (*Id.*, ¶ 16)  The scenario posited by CLO Holdco, however, is *exactly* the scenario prevented by the clear language of Section 6.2.  For HarbourVest to obtain control of HCLOF, it would – as a matter of mathematical necessity – need the interests held by CLO Holdco (49.02%) and/or the Highland Principals (1% in the aggregate).  Section 6.2, however, *expressly* prohibits CLO Holdco and the Highland Principals from transferring their interests to HarbourVest or its Affiliates without satisfying the ROFO.  As set forth above, it is Section 6.2 that prevents control from being transferred away from the Dondero family without compliance with the ROFO.  In fact, Section 6.2 would only break down if the limiting language in Section 6.2 were read out of it in the manner advocated by CLO Holdco.

37.     Ultimately, Article 6 of the Members Agreement is clear as written and expressly allows HarbourVest to transfer its interests to HCMLPI.  If CLO Holdco had an objection to the rights provided to HarbourVest under the Members Agreement, CLO Holdco

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1216 of 1726   PageID 12537
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 20 of 22

should have raised that objection three and a half years ago before agreeing to the Members Agreement.  CLO Holdco should not be allowed to create ambiguity in an unambiguous contract or to re-write that agreement to impose additional restrictions on HarbourVest. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996) (enforcing the "unambiguous language in a contract as written," noting that where a contract is unambiguous, a party may not create ambiguity or "give the contract a meaning different from that which its language imports") (internal quotations omitted); *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity.").

38.     It should go without saying, but CLO Holdco (and the other parties to the Members Agreement) should also be required to satisfy their obligations under the Members Agreement and execute the "Adherence Agreement" as required by Section 6.6 of the Members Agreement in connection with the Transfer of HarbourVest's interests to HCMLPI or any other permitted Transfer.

39.     Finally, and notably, although CLO Holdco spends considerable time arguing that HarbourVest should be required to comply with the ROFO, nowhere in the CLOH Objection does CLO Holdco state that it wishes to purchase HarbourVest's interests in HCLOF.  This omission is telling.  CLO Holdco and the other Objectors have no interest in actually exercising their alleged right of first refusal contained in the Members Agreement.  Rather, their only interest is in causing the Debtor to spend time and money responding to a legion of related (and coordinated) objections.[18]

---

[18] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q; Exhibit T (email from Mr. Dondero as forwarded to Mr. Ellington stating "Holy bananas….. make sure we object [to the HarbourVest Settlement]"); Exhibit Y.

DOCS_NY:41952.8 36027/002

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1217 of 1726 PageID 12538
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 21 of 22

*[Remainder of Page Intentionally Blank]*

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1218 of 1726   PageID 12539
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 22 of 22

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated:  January 13, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
               ikharasch@pszjlaw.com
               jmorris@pszjlaw.com
               gdemo@pszjlaw.com
               hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:41952.8 36027/002

# EXHIBIT 36

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1220 of 1726 PageID 12541
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 1 of 106

Docket #1807 Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

<div align="center">

**DEBTOR'S OMNIBUS REPLY TO OBJECTIONS
TO CONFIRMATION OF THE FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P. (WITH
TECHNICAL MODIFICATIONS)**

</div>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000012

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1221 of 1726 PageID 12542
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 2 of 106

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

OBJECTIONS ...................................................................................................................... 3

I.    Objections Addressed in the Memorandum ............................................................. 3

II.    The Plan Impermissibly Allows for Set Off ........................................................... 4

III.    The Plan Impermissibly Allows Assumption or Rejection After
Confirmation .......................................................................................................... 6

IV.    The Attack on the Plan's Release Is Baseless. ........................................................ 6

    A.    Debtor Release Provisions ............................................................................ 6

    B.    Objections and Responses ............................................................................ 7

V.    The Court Has Already Exculpated the Independent Directors and their
agents For Negligence Pursuant to the January 9, 2020 Settlement Order
and, to the Extent Not Covered Therein, the Plan's Exculpation Provisions
Effectuate Essential Protections for Estate Fiduciaries and their agents,
and Are Fully Supported by the Bankruptcy Code and Applicable Law. ........... 11

    A.    The Settlement Order Already Exculpates the Independent
Directors and Their Agents from Claims of Negligence and Those
Protections Should Be Continued Post-Confirmation ............................. 12

    B.    Plan Exculpation Provisions ..................................................................... 14

    C.    Pacific Lumber ......................................................................................... 16

    D.    Exculpation of the Exculpated Parties Is Permissible and Not
Prohibited by *Pacific Lumber.* ............................................................... 19

    E.    Approval of the Exculpation Provisions Is a Legitimate Exercise of
the Court's Powers and Follows Directly from the Findings and
Conclusions the Court Must Make to Confirm a Plan ............................. 24

VI.    The Plan Injunction Is Appropriate and is Narrowly Tailored to Effectuate
the Plan and related provisions of the bankruptcy code. ..................................... 28

    A.    Plan Injunction Provisions ........................................................................ 29

    B.    Objections .................................................................................................. 32

    C.    An Injunction against Interfering with the Implementation and
Consummation of the Plan Is Both Common and Appropriate. ............... 33

    D.    The Injunction Is Not a Disguised Non-Debtor Third-Party
Release. ..................................................................................................... 35

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1222 of 1726   PageID 12543
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 3 of 106

E.      The Injunction Does Not Prevent the Holders of Claims or Equity
        Interests from Enforcing Rights Arising under the Plan or
        Confirmation Order.................................................................................. 37

VII.    The Gatekeeper Provision Is Necessary and Appropriate, and Supported
        by Applicable Law. ........................................................................................ 38

        A.      The Gatekeeper Provision .......................................................................... 38

        B.      The Gatekeeper Provision Is Permissible under Sections 105,
                1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code................. 39

        C.      The Gatekeeper Provision Is not an Impermissible Extension of the
                Post-Confirmation Jurisdiction of the Bankruptcy Court. ........................ 44

        D.      The Gatekeeper Provision Is Consistent with the Barton Doctrine. ........ 51

        E.      The Gatekeeper Provision Is a Necessary and Appropriate Shield
                against the Actions of Dondero and his Related Entities........................... 54

VIII.   the exception to discharge does not apply ............................................................. 55

IX.     The Senior Employee Objection ............................................................................. 57

        A.      The Senior Employee Objection Should Be Overruled............................. 57

        B.      Background Related to Senior Employees ................................................. 58

        C.      Treatment of Senior Employee Claims Under Plan................................... 62

        D.      Plan Solicitation ....................................................................................... 63

        E.      The Plan Does Not Violate Section 1123(a)(4) ........................................ 64

        F.      The Senior Employees Are Not Permitted to Make Convenience
                Class Election............................................................................................. 66

        G.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Applicable
                Bankruptcy Law ......................................................................................... 66

        H.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Disclosure
                Statement Order for Voting Purposes ....................................................... 68

        I.      Even if Convenience Claim Election Were Available, Convenience
                Claim Election Does Not Impact Voting ................................................... 69

X.      The HCMFA/NPA Gates Objection ...................................................................... 70

        A.      The HMCFA/NPA Objection, the CLO Holdco Objection, and
                NREP Joinder Should Be Overruled......................................................... 72

        B.      The CLO Objectors Cannot Override the CLOs' Consent to
                Assumption ................................................................................................ 74

        C.      The CLO Objectors Lack Standing to Object to the Plan......................... 76

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1223 of 1726 PageID 12544
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 4 of 106

D. Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit ............................... 82

E. Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable ................... 86

F. The Inadequate Assurance of Future Performance Objection is Meritless ...................................................................................................... 90

G. The "Impermissible Partial Assignment" Objection is Meritless ............ 92

XI.   State Taxing Authority Objection ......................................................................... 92

XII.  IRS Objection ....................................................................................................... 93

CONCLUSION ..................................................................................................................... 99

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1224 of 1726    PageID 12545
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 5 of 106

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp.*
  (*In re Peabody Energy Corp.*),
  933 F.3d 918 (8th Cir. 2019) .................................................................... 65

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.*
  (*In re Pac. Lumber Co.*),
  584 F.3d 229 (5th Cir. 2009) .................................................................... 64

*Bonneville Power Admin. v. Mirant Corp.*
  (*In re Mirant Corp.*),
  440 F.3d 238 (5th Cir. 2006) .................................................................... 83

*Cajun Elec. Members Comm. v. Mabey*
  (*In re Cajun Elec. Power Coop., Inc.*),
  230 B.R. 693 (Bankr. M.D. La. 1999) ................................................. 84, 85

*Cargill, Inc. v. Nelson (In re LGX, LLC)*,
  2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) ................................ 75

*Concord Square Apartments v. Ottawa Properties*
  (*In re Concord Square Apartments*),
  174 B.R. 71 (Bankr. S.D. Ohio 1994) ..................................................... 67

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*,
  2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018) ........... 88

*Figter Ltd. v. Teachers Ins. Annuity Ass'n  (In re Figter Ltd.)*,
  118 F.3d 635, 640-641 (9th Cir. 1997) .................................................... 67

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) ................................................................. 71

*Hertz Corp. v. ANC Rental Corp.*
  (*In re ANC Rental Corp.*),
  278 B.R. 714 (Bankr. D. Del. 2002) ............................................ 74, 75, 80

*Hertz Corp. v. ANC Rental Corp.*
  (*In Re ANC Rental Corp.*),
  280 B.R. 808 (D. Del. 2002) .................................................................... 75

*In re Acequia, Inc.*,
  787 F.2d 1352 (9th Cir. 1986) ................................................................. 65

*In re ANC Rental Corp.*,
  277 B.R. 226 (Bankr. D. Del. 2002) ........................................................ 89

*In re Gilbert*,
  104 B.R. 206 (Bankr. W.D. Mo. 1989) ................................................... 67

*In re Hartec Enters., Inc.*,
  117 B.R. 865 (Bankr. W.D. Tex. 1990) ................................................... 85

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1225 of 1726 PageID 12546
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 6 of 106

*In re Irwin Yacht Sales, Inc.*,
  164 B.R. 678 (Bankr. M.D. Fla. 1994) ................................................................. 75

*In re Jacobsen*,
  465 B.R. 102 (Bankr. N.D. Miss. 2011) ............................................................... 84

*In re Jones*,
  2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) ........................................ 67

*In re Latham Lithographic Corp.*,
  107 F.2d 749 (2d Cir. 1939) ................................................................................. 67

*In re Lil' Things, Inc.*,
  220 B.R. 583 (Bankr. N.D. Tex. 1998) ................................................................. 84

*In re Lindell Drop Forge Co.*,
  111 B.R. 137 (Bankr. W.D. Mich. 1990) .............................................................. 66

*In re Riverside Nursing Home*,
  43 B.R. 682 (Bankr. S.D.N.Y. 1984) .................................................................... 75

*In re Virgin Offshore USA, Inc.*,
  No. 13-79, 2013 U.S. Dist. LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013) ........ 84

*In re Visser*,
  232 B.R. 362 (Bankr. N.D. Tex. 1999) ................................................................. 66

*Mabey v. Sw. Elec. Power Co.*
  (*In re Cajun Elec. Power Coop., Inc.*),
  150 F.3d 503 (5th Cir. 1998) ............................................................................... 65

*Riemer & Braunstein LLP v. DeGiacomo*
  (*A & E 128 North Corp.*),
  528 B.R. 190, 199 (1st Cir. B.A.P. 2015) ............................................................. 66

*Texaco Inc. v. Louisiana Land & Exploration Co.*,
  136 B.R. 658 (Bankr. M.D. La.1992) ............................................................. 84, 85

## STATUTES

11 U.S.C. § 365 ........................................................................................................ 83, 86

## OTHER AUTHORITIES

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter
  (12/23/1997) ......................................................................................................... 89

Investment Management Staff Issues of Interest,
  http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ................... 89

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1226 of 1726   PageID 12547
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 7 of 106

The above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") files this omnibus reply to the objections (this "<u>Reply</u>") to the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with technical modifications)*[2] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").  Concurrently herewith, the Debtor has filed its *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "<u>Memorandum</u>").  To the extent the Debtor is unable to consensually resolve the Objections, the Debtor respectfully requests that the Bankruptcy Court overrule any remaining or pending Objections as of the Confirmation Hearing and confirm the Plan.

## INTRODUCTION

1.      The Debtor received twelve objections to confirmation of the Plan, inclusive of joinders (collectively, the "<u>Objections</u>" and each objecting party, an "<u>Objector</u>").  As discussed in greater detail in the Memorandum, seven of the twelve objections were filed by Mr. Dondero either individually or via his related entities (collectively, the "<u>Dondero Entities</u>").  **Exhibit A** lists the Dondero Entities and their relationships to each other.[3]  The following are the Objections filed by the Dondero Entities:

- *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661];

- *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667] (the "<u>Dugaboy Objection</u>");

---

[2] Unless otherwise noted, capitalized terms used in this Reply have the meanings ascribed in the Plan.

[3] As set forth in the Memorandum, none of the Dondero Entities, including the NexPoint RE Entities (defined below), has an actual economic interest in the Estate.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:23-cv-00726-S  Document 8-23  Filed 12/29/23    Page 1227 of 1726   PageID 12548
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 8 of 106

- *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669] (the "<u>Senior Employee Objection</u>");[4]

- *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670] (the "<u>NPA/HCMFA Objection</u>");[5]

- *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673] (the "<u>NREP Objection</u>");

- *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675] (the "<u>CLOH Objection</u>"); and

- *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676] (the "<u>NexBank Objection</u>").

2.    That leaves the following as the only non-Dondero related Objections:

- *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662] (the "<u>State Taxing Authority Objection</u>");

---

[4] Subsequent to the filing of the Senior Employee Objection, Mr. Waterhouse and Mr. Surgent reached an agreement with the Debtor and will withdraw their objections to the Plan.

[5] The NPA/HCMFA Objection is joined (1) by CLO Holdco, Ltd., through the CLOH Objection, and (2) by the following Dondero-controlled entities: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing (collectively, the "<u>NexPoint RE Entities</u>") [Docket No. 1677] (the "<u>NPRE Joinder</u>").

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1228 of 1726   PageID 12549
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 9 of 106

- *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666];

- *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668] (the "IRS Objection");

- *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671] (the "UST Objection"); and

- *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].

As of the date hereof, the Date is working to resolve certain of the non-Dondero related Objections.

3.     To avoid duplication, this Reply does not address each objection individually. Rather, it is organized by substantive objection where possible because of the cross-over in the issues raised in the Objections.  Also, as discussed below, where the Debtor has addressed an Objection in the Memorandum, the response is not repeated here.  However, parts of the Senior Employee Objection, the NPA/HCMFA Objection, State Taxing Authority Objection, and the IRS Objection, are addressed individually below.   A summary chart addressing each Objection and the Debtor's response thereto is attached as **Exhibit B**.

<u>**OBJECTIONS**</u>

**I.     OBJECTIONS ADDRESSED IN THE MEMORANDUM**

4.     The Memorandum addresses the Debtor's compliance with the statutory requirements of sections 1123 and 1129 of the Bankruptcy Code.  As part of the analysis in the Memorandum, the Debtor addresses the portions of the Objections alleging that the Debtor failed to comply with and/or violated the statutory provisions set forth in sections 1123 and 1129 of the Bankruptcy Code.  Specifically, the Debtor addresses the arguments that (i) the Plan provides for

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1229 of 1726 PageID 12550
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 10 of 106

improper subordination; (ii) the Disputed Claims Reserve violates due process; (iii) the Plan does

not satisfy the "best interests test;" (iv) the Plan impermissibly provides no Bankruptcy Court

oversight of post-effective date transactions; (v) the elimination of vacant classes does not allow

for post-Effective Date reclassification of Claims; (vi) the Plan violates the absolute priority rule;

(vii) the Plan does not disclose the insiders or the compensation of insiders retained post-

Effective Date; (viii) the Plan impermissibly allows modifications to the Plan without

Bankruptcy Court approval; and (ix) the Plan is not final because the Plan Supplement is not

final.

## II.    THE PLAN IMPERMISSIBLY ALLOWS FOR SET OFF

5.    The NREP Objection and the NexBank Objection erroneously contend that

Article VI.M of the Fifth Amended Plan provides for "improper set-off of unidentified claims."

NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  The challenged language in the NREP Objection

and the NexBank Objection is as follows:

> The Distribution Agent may, to the extent permitted under applicable law, set off
> against any Allowed Claim and any distributions to be made pursuant to this Plan
> on account of such Allowed Claim, the claims, rights and causes of action of any
> nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may
> hold against the Holder of such Allowed Claim….  Any Holder of an Allowed
> Claim subject to such setoff reserves the right to challenge any such setoff in the
> Bankruptcy Court or any other court with jurisdiction with respect to such
> challenge.

Plan, Art. VI.M.

6.    Article VI.M of the Plan accords with Bankruptcy Code section 558 (formerly

section 541(e)), which provides that "[t]he estate shall have the benefit of any defense available

to the debtor as against any entity other than the estate, including statutes of limitation, statutes

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1230 of 1726 PageID 12551
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 11 of 106

of frauds, usury, and other personal defenses." 11 U.S.C. § 558; *see In re Braniff Airways, Inc.*, 42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) (a debtor in possession may exercise setoff rights pursuant to Bankruptcy Code section 558 (then section 541(e)); *In re Circuit City Stores, Inc.*, 2009 Bankr. LEXIS 4011 (Bankr. E.D. Va. Dec. 3, 2009) (same); *In re Women First Healthcare, Inc.*, 345 B.R. 131, 135 (Bankr. D. Del. 2006) (same); *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002) (same); *Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.)*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) (same).

7.      In support of the argument that the provision is improper, the NREP Objection and the NexBank Objection contend that Bankruptcy Code section 553 and cases construing that provision limit parties' right of setoff in bankruptcy only to prepetition claims.  NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  However, the issue of the scope of the Distribution Agent's setoff rights and the application of section 553 is not even adjudicated by the Plan.[6]  Rather, on its face, the Plan states that the Distribution Agent may exercise setoff rights only "to the extent permitted by law."  Thus, it does not purport to expand setoff rights of the Distribution Agent beyond what is permitted by the Bankruptcy Code but only preserves whatever setoff rights the estate has – no more and no less.  Moreover, as quoted above, it expressly preserves the right of creditors to challenge any setoff that the Distribution Agent seeks to take.

8.      Accordingly, whether the Distribution Agent may take any specific setoffs is reserved by the Plan for another day.  The NREP Objection and the NexBank Objections on this issue are not well-taken, and both such objections should be overruled.

---

[6] The Debtor reserves its rights with respect to the applicability of section 553 to the Distribution Agent's preserved rights of setoff, if any.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1231 of 1726   PageID 12552
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 12 of 106

### III.    THE PLAN IMPERMISSIBLY ALLOWS ASSUMPTION OR REJECTION AFTER CONFIRMATION

9.    The NPA/HCMFA Objection contends that the Plan violates section 365(d)(2) because it allows the Debtor to assume or rejection executory contracts or unexpired leases on or prior to the Effective Date.  While the Debtor believes that the original language in the Plan is defensible, the Debtor has elected to amend the Plan to clarify that all executory contracts and leases must be assumed or rejected on or prior to the Confirmation Date.

### IV.    THE ATTACK ON THE PLAN'S RELEASE IS BASELESS.

#### A.    Debtor Release Provisions

10.    Article IX of the Plan provides for releases only by the Debtor, its Estate, and the Reorganized Debtor (including their successors, the Claimant Trust and the Litigation Sub-Trust) of any and all Causes of Action, including any derivative claims that might be asserted on behalf of, or in the name of, the Debtor, that the Debtor or the Estate could otherwise assert against the Released Parties[7] (the "<u>Debtor Release</u>").  The Debtor Release is the product of extensive good faith, arm's-length negotiations and complies fully with the Bankruptcy Code and prevailing law. The Debtor Release provides:

> On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged *by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust* from any and all Causes of Action, including any derivative claims, *asserted on behalf of the Debtor,* whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise,

---

[7] The "Released Parties" under the Plan are: (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities); (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees. Plan, Art. I.B., Def. 111.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1232 of 1726   PageID 12553
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 13 of 106

> *that the Debtor or the Estate would have been legally entitled to assert in their*
> *own right* (whether individually or collectively) *or on behalf of* the holder of any
> Claim against, or Interest in, a Debtor or other Person.

Plan, Art. IX.D (emphasis added.)

11.     The Debtor Release releases, among others, the Independent Directors (each of
whom was appointed by the Bankruptcy Court post-petition), Strand (solely from January 9,
2020, the date of the appointment of the Independent Directors, through the Effective Date), the
CEO/CRO (who is also an Independent Director and whose role was expanded to include the
CEO/CRO role on July 16, 2020), the Committee and its members in their official capacities, the
Professionals retained with this Court's approval by the Debtor or by the Committee and, to a
more limited extent, the Employees.[8]

12.     The Debtor Release is a release of the Released Parties by the Debtor, the Estate
and their successors on account of Causes of Action that belong to the Debtor or the Estate,
whether directly or derivatively.  *The Debtor Release does not release any Causes of Action of*
*any person other than the Debtor, the Estate and their successors and does not release any*
*claims that could not have been asserted by the Debtor or the Estate prior to the Effective*
*Date.*

### B.     Objections and Responses

13.     Three parties in interest have objected to the Debtor Release.  The Dugaboy
Objection objects to the Debtor Release under the mistaken view that the Claimant Trust and
Litigation Sub-Trust are (in Dugaboy's view) granting releases of claims that have not yet arisen,

---

[8] The Debtor Release contains restrictions on the releases of the Employees, as may be determined by the Claimant
Trust Oversight Committee.  Plan, Art. IX.D.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1233 of 1726   PageID 12554
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 14 of 106

*i.e.,* causes of action of the Claimant Trust and Litigation Sub-Trust that arise after the Effective Date against the Released Parties. *See Dugaboy Objection* at p. 9. The U.S. Trustee Objection erroneously argues the Debtor Release is an impermissible non-consensual third-party release. *See UST Objection* at pp. 2-3. The Senior Employee Objection objects to the Debtor Release because the Senior Employees believe that the Debtor should not be able to condition a release of the Senior Employees on concessions not required of other Employees obtaining a release. *See Senior Employee Objections* at p. 3.

14.  Both Dugaboy and the U.S. Trustee misread the Debtor Release provision. The Claimant Trust and Litigation Sub-Trust are included solely in their capacity as "successors, assigns and representatives" of the Debtor and the Estate, and the Debtor Release applies solely to Causes of Action that ***the Debtor or the Estate*** themselves would have against the Released Parties (whether a direct claim or a derivative claim, but in either case, only Causes of Action owned by the Debtor or the Estate). By its express terms, the Debtor Release does not apply to any future claims or Causes of Action that the Claimant Trust or the Litigation Sub-Trust would have in its own right, based on post-Effective Date acts or omissions, rather than as a successor to or assignee of Causes of Action of the Debtor and the Estate.

15.  The U.S. Trustee's contention that the Debtor Release provision includes a third-party release is incorrect. The Debtor Release applies only to claims held by the Debtor and the Estate, on behalf of themselves and each of their successors, assigns and representatives in favor of the Released Parties. Any direct claims and causes of action owned by any other person are not released by the Debtor Release, and nothing in the language of the provision implicates any

DOCS_SF:104855.7 36027/002

APP.105097

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1234 of 1726   PageID 12555
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 15 of 106

non-derivative claims or causes of action that any third party might have against any of the Released Parties.

16.     The Senior Employees' objection to the proposed Debtor Release also is devoid of merit.  As discussed at length, in Section IX, herein, Employees are not entitled, either contractually or legally, to any release.  Nor does a release given to one Employee entitle any other employee to a similar release.  Releases are discretionary and can be provided, in an exercise of discretion, to persons who have provided consideration to the Debtor and the Estate. Unlike the other Released Parties, the Senior Employees have not yet fully provided that consideration.  As the Court is aware, the Committee and the Court have consistently voiced concerns regarding the potential release of the Employees, and specifically, the Senior Employees.  The Plan resolves these concerns by imposing significant restrictions and affirmative requirements for any Employee to obtain the benefit of the Debtor Release and additional requirements for the Senior Employees to do so.  *See* Plan, Art. IX.D.

17.     The Bankruptcy Code explicitly provides for and sanctions the inclusion of debtor releases in plans.  Section 1123(b)(3)(A) of the Bankruptcy Code states clearly that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  The Debtor Release is an essential *quid pro quo* for the Released Parties' significant contributions to the Debtor's restructuring, which has been highly complex and contentious.  There are multiple precedents in which courts have approved releases by a debtor's estate of its own claims against a far more extensive group of persons than those

APPX. 05806

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1235 of 1726    PageID 12556
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 16 of 106

included here.[9]  The Committee and its members (who are Released Parties), who have had over

a year to investigate potential claims against the Employees, among others, fully support the

Debtor Release as to the other identified Released Parties.

18.    It is also important to bear in mind that the Debtor Release applies to claims *of*

*the Debtor or the Estate* against the Released Parties that others might purport to assert

derivatively on behalf of the Debtor or the Estate.  To the extent that Released Parties have

indemnification rights against the Debtor, the assertion of such derivative claims – no matter

how specious – would trigger claims for indemnification that would deplete the assets available

for distribution to creditors. Moreover, regardless of such rights of indemnification, the assertion

of such purported derivative claims on behalf of the Debtor would subject the Debtor to the costs

– both economic, in terms of legal fees, and of the time and distraction of personnel – that would

result from becoming embroiled in such derivative litigation – again, no matter how specious the

claim.

19.    Both the U.S. Trustee and Dugaboy erroneously cite *Pacific Lumber*[10] for the

proposition that releases of third parties – even by the debtor – are always impermissible.

*Pacific Lumber*, however, did not involve the release of claims by a debtor.  The issue addressed

in *Pacific Lumber* was whether a bankruptcy court could approve injunction and exculpation

provisions in a plan that effectively mandated that **holders of claims** release, or be precluded

---

[9] *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provisions were acceptable settlement under § 1123(b)(3) because the debtors and the estate were releasing claims that were property of the estate); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[10] *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d 229, 251-253 (5th Cir. 2009) ("*Pacific Lumber*")

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1236 of 1726 PageID 12557
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 17 of 106

from imposing liability on, **non-debtor third parties**. Nothing in *Pacific Lumber* prevents a debtor or its estate on its own behalf and on behalf of assignees and successors created pursuant to a plan, from releasing its own claims against third parties. Indeed, any such ruling would be directly contrary to the express provisions of section 1123(b)(3)(A).

20.     The Debtor Release is a customary plan provision consistent with the business judgement rule, is fair and equitable and in the best interest of the Estate and its creditors and should be approved. No party that has objected to it has cited any case or statutory basis for preventing a debtor and its successors from releasing the debtor's own claims against third parties, or has demonstrated any basis for believing that any claims of the Debtor or the Estate even exist against the Released Parties.

## V.     THE COURT HAS ALREADY EXCULPATED THE INDEPENDENT DIRECTORS AND THEIR AGENTS FOR NEGLIGENCE PURSUANT TO THE JANUARY 9, 2020 SETTLEMENT ORDER AND, TO THE EXTENT NOT COVERED THEREIN, THE PLAN'S EXCULPATION PROVISIONS EFFECTUATE ESSENTIAL PROTECTIONS FOR ESTATE FIDUCIARIES AND THEIR AGENTS, AND ARE FULLY SUPPORTED BY THE BANKRUPTCY CODE AND APPLICABLE LAW.

21.     Exculpation provisions effectuate the entitlement of court-supervised fiduciaries to qualified immunity for their actions. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *In re A.P.I., Inc.*, 331 B.R. 828, 868 (Bankr. D. Minn. 2005), *aff'd sub nom., OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 U.S. Dist. LEXIS 34297 (D. Minn. May 25, 2006); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). Such provisions also allow the parties to a chapter 11 case "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1237 of 1726   PageID 12558
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 18 of 106

potentially negligent actions in those proceedings" and, on that rationale, have even been approved when necessary to protect non-fiduciary participants in the chapter 11 process. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020).

22.     As discussed in detail below, the Settlement Order[11] previously entered by this Court has already exculpated the Independent Directors and their agents from potential negligence claims. Accordingly, as it relates to the Independent Directors and their agents, the Plan's Exculpation Provisions simply respect the integrity of the Settlement Order. Moreover, it would be a mistake to construe *Pacific Lumber as* categorically prohibiting exculpation provisions. In fact, *Pacific Lumber* itself expressly endorsed a plan provision exculpating the committee and its members. For the reasons set forth below, exculpating the Exculpated Parties in respect of their post-petition services for the Estate is entirely consistent with *Pacific Lumber*, other applicable law, and the purposes and policies of chapter 11. Exculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue.

A.     **The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation**

23.     The Objectors challenge the Exculpation Provisions on the grounds that they constitute an impermissible third-party release that is prohibited by *Pacific Lumber*. What the

---

[11] *See, Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* entered January 9, 2020 [D.I. 339] (the "Settlement Order") and *Order Approving Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* entered July 16, 2020 [D.I. 854].

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1238 of 1726 PageID 12559
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 19 of 106

Objectors ignore, however, is that this Court has ***already*** exculpated the Independent Directors and their agents for negligence pursuant to the terms of the Settlement Order – a final order to which Dondero agreed as a means of avoiding the appointment of a chapter 11 trustee, and which has been in place for over a year and was never appealed by any of the Objectors, all of whom had notice of it.[12] Accordingly, the Court should reject Objectors challenge to exculpation of the Independent Directors and their agents as a collateral attack on the Settlement Order which is indisputably a final order of this Court.[13]

    24.    Paragraph 10 of the Settlement Order expressly provides:

> ***No entity may commence or pursue a claim or cause of action of any kind*** against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of <u>willful</u> misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Settlement Order, ¶ 10 (emphasis added). Thus, as to the Independent Directors and their agents, they have already been exculpated for negligence, and the Plan Exculpation Provisions simply preserve the necessary protections and standard of liability already established by the Court for these court-appointed fiduciaries by final order which continues in effect pursuant to the plan.[14]

---

[12] *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (*res judicata* barred a debtor from bringing a claim that was specifically and expressly released by a confirmed reorganization plan because the debtor failed to object to the release at confirmation and was now collaterally attacking the release).

[13] *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("[e]ven though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

[14] *See* Plan, Art. IX.H (Paragraphs 9 and 10 of the Settlement Order remain in effect post-Confirmation).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1239 of 1726   PageID 12560
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 20 of 106

25.      Unlike in *Pacific Lumber*, the Independent Directors (which include the

CEO/CRO) are not prepetition officers and directors of the Debtor.  The Independent Directors

were appointed post-petition by the Court pursuant to the Settlement Order as an urgent measure

to address serious concerns raised by the Committee as to extensive breaches of fiduciary duty

and lack of disinterestedness by the Debtor's prepetition management.   In recognition of the

extraordinarily complex, litigious and volatile situation the Independent Directors were getting

into, the Court expressly exculpated the Independent Directors (including the CEO/CRO) and

their agents from claims for negligence in connection with their actions in the case.

### B.      Plan Exculpation Provisions

26.      Article IX.C of the Plan addresses the exculpation of certain Exculpated Parties[15]

and provides that each Exculpated Party shall be exculpated from any Cause of Action arising

out of acts or omissions in connection with this chapter 11 case and certain related transactions,

except for any acts or omissions that are determined by Final Order to have constituted bad faith,

fraud, willful misconduct, criminal misconduct, or gross negligence (the "Exculpation

Provisions").  Although the Exculpation Provisions apply to Strand and certain Employees, the

Exculpation Provisions apply solely with respect to actions taken by Strand and such Employees

---

[15] The Plan defines the "Exculpated Parties" as: (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO, and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1240 of 1726 PageID 12561
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 21 of 106

from and after the date of the post-petition appointment of the Independent Directors, through

the Effective Date of the Plan, and expressly exclude James Dondero and a number of other

specified entities.[16] The provision provides:

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent
> permitted by applicable law, no Exculpated Party will have or incur, and each
> Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment,
> damage, demand, debt, right, Cause of Action, remedy, loss, and liability for
> conduct occurring on or after the Petition Date in connection with or arising out of
> (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and
> pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or
> confirmation of, the Plan; (iii) the funding or consummation of the Plan
> (including the Plan Supplement) or any related agreements, instruments, or other
> documents, the solicitation of votes on the Plan, the offer, issuance, and Plan
> Distribution of any securities issued or to be issued pursuant to the Plan, including
> the Claimant Trust Interests, whether or not such Plan Distributions occur
> following the Effective Date; (iv) the implementation of the Plan; and (v) any
> negotiations, transactions, and documentation in connection with the foregoing
> clauses (i)-(v); *provided*, *however,* the foregoing will not apply to (a) any acts or
> omissions of an Exculpated Party arising out of or related to acts or omissions that
> constitute bad faith, fraud, gross negligence, criminal misconduct, or willful
> misconduct or (b) Strand or any Employee other than with respect to actions taken
> by such Entities from the date of appointment of the Independent Directors
> through the Effective Date. This exculpation shall be in addition to, and not in
> limitation of, all other releases, indemnities, exculpations, any other applicable
> law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2,
> protecting such Exculpated Parties from liability.

27.    An exculpation provision differs from a release.[17] An exculpation provision sets a

standard of liability that absolves a person from liability for ordinary negligence, but not from

liability for more egregious conduct. In this respect, it is consistent with the duty of care and

duty of loyalty standards of the business judgment rule that protects business entities and

---

[16] To the extent there is any conflict between the descriptions of the Exculpation Provisions herein and the Plan, the Plan shall control.

[17] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans," does not affect the liability of these parties, but rather states the standard of liability under the Code, and as it exculpated the named parties for actions during the course of the case did not implicate section 524(e).)

15

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1241 of 1726    PageID 12562
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 22 of 106

individual fiduciaries from liability when their actions are taken within their authority and good faith.[18]

28.     Various objections have been raised to the inclusion of the Exculpation Provisions in the Plan.  Each of the Objectors argues that, except with regard to the Committee and its Professionals, the Exculpation Provisions are impermissible based upon their misunderstanding and overly-broad reading of the opinion of the Fifth Circuit in *Pacific Lumber*.[19]

### C.    Pacific Lumber

29.     Because every argument relied upon by the Objectors as to the permissibility of the Exculpation Provisions is premised on *Pacific Lumber*, it is important to analyze exactly what the Fifth Circuit actually held based on the appeal and the briefing before it.  The portion of the *Pacific Lumber* opinion addressing non-debtor exculpation and releases is less than two pages long and, when appropriately construed, is inapposite to this case, except insofar as it approved the exculpation of the creditors' committee and its members.

30.     In *Pacific Lumber*, a prepetition secured creditor joined with a competitor of one of the debtors to propose a chapter 11 plan (the "MRC/Marathon Plan").  The MRC/Marathon Plan included a provision that exculpated the plan proponents, the reorganized debtors, the unsecured creditors' committee and each of their respective professionals, officers and directors from liability (other than for willful misconduct and gross negligence) relating to proposing, implementing and administering the chapter 11 plan.  The bankruptcy court approved the

---

[18] *See* Bernard S. Sharfman, *Importance of the Business Judgement Rule*, Harvard Law School Forum on Corporate Governance, posted at https://corpgov.law.harvard.edu/2017/01/19/the-importance-of-the-business-judgment-rule/

[19] The Objectors acknowledge the Fifth Circuit expressly held that the exculpation of the unsecured creditors' committee and its members and professionals was appropriate.  Therefore, the Exculpation Provisions as applied to these parties will not be discussed further herein.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1242 of 1726    PageID 12563
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 23 of 106

discharges, releases, exculpations and injunctions pursuant to sections 105, 524, 1123(a)(5) and

1129.

31.     The appellants were an indenture trustee and certain bondholders who had voted

against the MRC/Marathon Plan and were the unsuccessful proponents of a competing plan

which, incidentally, contained non-debtor third-party releases and exculpation provisions

identical in scope to those in the MRC/Marathon Plan.[20]   On appeal, the Fifth Circuit either

affirmed or dismissed on mootness grounds in respect of every issue raised on appeal, other than

the release and exculpation provisions.  While the issues on appeal had been broadly worded,[21]

the only issue in respect of the release and exculpation provisions actually briefed by the

appellants was the impropriety of the release and exculpation provisions for the benefit of the

non-debtor plan proponents and the committee.[22]

32.     The Fifth Circuit relied ***exclusively*** on section 524(e) of the Bankruptcy Code for

its observation that non-consensual releases or exculpations of non-debtors are not allowed, even

for actions taken during the case.  *Id.* at 252-3.  Section 524 is entitled "Effect of discharge" and

subsection 524(e) provides that a "discharge of a debt of a debtor does not affect the liability of

---

[20] *See First Amended Chapter 11 Plan for Scotia Pacific Company LLC proposed by the Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes (as modified on April 28, 2008)* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 2774], Sections 10.1, 10.3 and 10.4.

[21] *See The Indenture Trustee's Statement of Issues on Appeal of the Order Confirming the MRC/Marathon Plan* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 3431] at p. 4, Issue No. 18.

[22] *See Brief of Appellants* [*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee,* Case No.08-40746, U.S. Court of Appeals for the Fifth Circuit, August 25, 2008], at pp. 55-56 ("The Plan contains an expansive "Exculpation Clause" which purports to release claims of non-consenting creditors against numerous non-debtors, including "officers, directors, professionals, members, agents and employees" of MRC, Marathon and the Committee. . . . ***Having obtained confirmation of the Plan through the erroneous means set forth above, the Plan Proponents propose to use this overbroad release language to exonerate*** themselves.") (emphasis added; record cites omitted).

17

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 25 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1243 of 1726   PageID 12564
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 24 of 106

any other entity on . . . such debt." Thus, on its face, section 524(e), only prohibits a plan from

discharging obligations of third parties who are liable with the debtor on its debts. The Fifth

Circuit focused on co-liability for "pre-petition debts,"[23] yet applied the prohibition to causes of

action for "any negligent conduct that occurred during the course of the bankruptcy."[24]

33.     Notably, the briefing on the issue presented to the Fifth Circuit had dealt with the

impropriety of the exculpation of the non-debtor plan proponents and the committee, but not

with the officers and directors of the Debtor. Thus, to the extent the Fifth Circuit included the

debtor's officers and directors in its discussion, that discussion constituted mere *dicta*.

34.     Although the Fifth Circuit ruled that section 524(e) did not support exculpation

for certain persons, such as the non-debtor plan proponents in that case, the Court did not treat

section 524(e) as an absolute bar to exculpation provisions in a plan that were supportable by

other sections of the Bankruptcy Code, by other applicable law or by legitimate policy

considerations relating to the chapter 11 process. In approving the exculpation as to the

committee and its members, the court cited to the qualified immunity of committees under

section 1103(c) of the Bankruptcy Code and to an important policy concern regarding the effect

of denying exculpation on the chapter 11 process: "actions 'against committee members in their

capacity as such should be discouraged. If members of the committee can be sued by persons

unhappy with the committee's performance during the case or unhappy with the outcome of the

case, it will be extremely difficult to find members to serve on an official committee.' The

---

[23] *Id.* at 252.

[24] *Id.*

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1244 of 1726   PageID 12565
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 25 of 106

Creditors' Committee and its members are the only disinterested volunteers among the parties sought to be released here." *Id.,* at 252 (cites omitted).

35.     The Debtor is, of course, not asking this court to override the Fifth Circuit's holding in *Pacific Lumber*. Rather, as discussed below, the facts of this case are such that the rationale applied by the Fifth Circuit to permit exculpation of the committee and its members fully supports the Plan Exculpation Provisions. The need for exculpation has already been recognized by this Court in the Settlement Order. Furthermore, as the *Pacific Lumber* ruling was based solely on section 524(e), nothing in that opinion precludes approval of the Exculpation Provisions pursuant to other provisions of the Bankruptcy Code or other applicable law.

**D.     Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by *Pacific Lumber*.**

36.     The propriety of the Plan Exculpation Provisions should be considered as they apply to each respective Exculpated Party.

37.     <u>The Debtor</u>. The Debtor and its successors and assigns are entitled to the relief embodied in the Exculpation Provision. With exceptions not applicable here, the Debtor, as debtor in possession, has all the rights and powers of a trustee. 11 U.S.C. § 1107(a). Accordingly, the Debtor's right to qualified immunity is co-extensive with that of a trustee. Moreover, granting the Debtor such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code. *See* 11 U.S.C. §§ 524 and 1141. The Claimant Trust and Litigation Sub-Trust are successors to and assigns of the Debtor, and thus, to the extent applicable to the scope of the Exculpation Provisions, should be similarly protected. In the context of this Plan, the Claimant Trust and Litigation Sub-Trust are court-approved fiduciaries

19

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 27 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1245 of 1726   PageID 12566
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 26 of 106

whose sole purpose is to operate the Debtor's business for a limited period of time to effectuate an orderly monetization of the Debtor's assets and pay the claims of creditors. Post-Confirmation, the Debtor and its successors are entitled to exculpation.

38.    <u>The Independent Directors</u>.    Even if the Settlement Order did not plainly provide the Independent Directors with exculpation, in the context of this case, the Independent Directors are akin to committee members and the same rationale the Fifth Circuit used in *Pacific Lumber* to uphold the exculpation of committee members applies to the Independent Directors. The use of independent directors has become commonplace in large complex commercial cases, both on the eve of bankruptcy[25] and post-petition,[26] especially where there are allegations of mismanagement, breaches of fiduciary duty or other conflicts that cast shadows on the relationship between the debtor in possession and its creditors, who question whether existing officers and directors can faithfully perform their fiduciary duties as the face of the debtor in possession.[27]    Independent directors tend to be either experienced restructuring professionals

---

[25] Some examples of major bankruptcy cases in which independent directors have been appointed just prior to bankruptcy, usually due to accounting irregularities and other events that resulted in distrust of management by major creditor constituencies, include: *Neiman Marcus Group, Inc.* (S.D. Tex); *WorldCom* (S.D. N.Y.); *Sears* (S.D. N.Y.); *California Pizza Kitchen* (S.D. Tex.); *PG&E Corp.* (N.D. Cal.); *Adelphia Communication Corp.* (S.D. N.Y.); Station Casinos (D. Nev.); and *Cengage Learning Centers* (E.D. N.Y.)

[26] *See* Regina Kelbon and Michael DeBaecke, *Appointment of Independent Directors on the Eve of Bankruptcy: Why the Growing Trend*, paper prepared for the Penn. Bar Institute 19th Annual Bankruptcy Institute, June 27, 2014, at pp. 17-23, available at
https://www.blankrome.com/siteFiles/publications//B3795676DF921A7E3BED8A9F15E7FDF3.pdf (discussing use of independent directors both pre- and post-petition and certain cases utilizing same).

[27] *See, e.g., In re Natrol, Inc.*, Case No. 14-22446 (Bankr. D. Del.) Motion and Order Appointing Independent Directors [Docket Nos. 248 and 305] (independent directors appointed to settle motion for appointment of trustee by large creditor); *In re 4 West Holdings, Inc.*, Case No. 18-30777 (Bankr. N.D. Tex) Motion and Order Appointing Independent Directors [Docket Nos. 311 and 383] (independent director appointed to review propriety of certain settlements and business and marketing plan); *In re Synergy Pharmaceuticals, Inc*., Case No. 18-14010 (Bankr. S.D.N.Y.) Motion and Stipulation and Order Appointing Independent Directors [Docket Nos. 373 and 553] (independent directors appointed because of pending shareholder derivative actions against prepetition board members); *In re Zohar III, Corp.*, Case No. 18-10512 (Bankr. D. Del.) Order Appointing Independent Director [Docket No. 267] (independent director appointed as part of a mediated settlement over sale of a portfolio of financial services entity debtor]; *In re Interlogic Outsourcing, Inc.*, Case No. 19-31444 (Bankr. N.D. Ind.) Motion

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1246 of 1726   PageID 12567
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 27 of 106

(attorneys or financial advisors) or seasoned industry professionals with immaculate corporate records.  Reliance on the use of independent directors has thus become a critical tool in proper corporate governance and restoring creditor confidence in management in modern day corporate restructurings.  Failure to protect independent directors from claims of ordinary negligence will discourage sophisticated restructuring personnel from accepting appointment to such roles and will have a substantial negative effect on the efficacy of the chapter 11 process and the efficient realization of its purposes and goals.

39.    The Independent Directors appointed in this case are persons of such stature, as they include a former bankruptcy judge, former commercial bankruptcy practitioners and a person with expertise in hedge fund operations.  As indicated by the Fifth Circuit in *Pacific Lumber*, if estate fiduciaries who are "disinterested volunteers" can be sued for actions taken during the course of a case pursuant to the Bankruptcy Code and under judicial supervision, qualified people would not serve, and the integrity of the chapter 11 process would be compromised.  This policy concern is particularly acute where, as here, the Independent Directors undertook their duties in the midst of a highly contentious and litigious case.

40.    In this case, the Independent Directors also are analogous to bankruptcy trustees. Section 1107(a) of the Bankruptcy Code provides that a debtor in possession has all of the rights and powers, and substantially all of the duties, of a bankruptcy trustee, and the case law makes it clear that the debtor in possession and its officers and directors serve in the same fiduciary capacity as a trustee.  The Independent Directors were approved by the court to serve as post-

---

and Order Appointing Independent Directors [Docket Nos. 198 and 394] (independent director appointed for general corporate oversight).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1247 of 1726    PageID 12568
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 28 of 106

petition fiduciaries in this case in order to resolve insistent and urgent demands for the appointment of a trustee to supplant the prepetition directors and senior officers.  In fact, the Court denied the U.S. Trustee's motion seeking appointment of a chapter 11 trustee based primarily on its approval of the Independent Directors to act as court-supervised fiduciaries for the Debtor and the Estate – the functional equivalent of a chapter 11 trustee.  It is well established that trustees have qualified immunity for acts taken within the scope of their appointment.  *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981).  Like trustees, the Independent Directors are estate fiduciaries.  *In re Houston Regional Sports Network, L.P.*, 505 B.R. 468, 481-82 (Bankr. S.D. Tex. 2014) (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)

41.    For the same reasons that the Fifth Circuit upheld the exculpation of committee members in *Pacific Lumber*, and <u>pursuant</u> to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code and the related applicable non-bankruptcy law governing the immunity and exculpation of fiduciaries, none of which were actually addressed in *Pacific Lumber*, the Exculpation Provisions should be approved as to the Independent Directors and CEO/CRO.

42.    <u>Professionals.</u>  The Debtor's Professionals are entitled to exculpation.  *See, In re Ondova Ltd. Co. v. Sherman*, 914 F.3d 990 (5th Cir. 2019) (protecting counsel for trustee from suit when acting pursuant to direction of its client within the scope of its employment); *Harris v. Wittman (In re Harris)*, 590 F.3d 730 (9th Cir. 2009)(same).  There is no distinction in the Bankruptcy Code between counsel for a trustee and counsel for a debtor in possession – both are

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1248 of 1726    PageID 12569
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 29 of 106

subject to court approval of their retention, both serve as counsel to estate fiduciaries and both

are subject to their actions and compensation being reviewed and approved by the Court.[28]

43.      Additionally, under applicable Texas law, attorneys are immune from civil

liability to non-clients for actions taken in connection with representing a client in litigation.  *See*

*Cantey Hanger, LLP v. Byrd, 467 S.W.3d 477, 481* (Tex. 2015); *see also Troice v. Proskauer*

*Rose, L.L.P.,* 816 F.3d 341 (5th Cir. 2016) (dismissing securities fraud litigation brought by third

parties against counsel for certain companies related to Ponzi scheme perpetrator Allen

Stanford).

44.      <u>Strand.</u>  It is appropriate to include Strand in the Exculpation Provisions.  Strand

is the Debtor's general partner, and the Independent Directors are the directors of Strand.  Strand

should be protected to the same extent as the Debtor and the Independent Directors, and for the

same reasons.  *See In re Houston Reg'l Sports Network, L.P.,* (directors of a non-debtor general

partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties

to the estate are paramount.)  In regard to Strand, the Exculpation Provisions apply solely with

respect to actions taken by Strand from and after the date of the post-petition appointment of the

Independent Directors, through the Effective Date of the Plan.

45.      <u>Employees.</u>  The Employees, as agents of the Independent Directors, are already

covered by the Settlement Order's exculpation provision for acts taken in furtherance of and

---

[28] *See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),* 200 F.3d 382  (5th Cir. 2000) (order approving
final fee application of court-appointed professional was *res judicata* in respect of subsequent lawsuit by trustee
alleging malpractice and negligence where potential claims were known to trustee at the time of final fee
hearing.).  *See also, Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.),* 163 F.3d 925 at 931 (5th
Cir.), *cert. denied,* 527 U.S. 1004 (1999) (judgment in bankruptcy court lawsuit brought by reorganized debtor
seeking fee disgorgement against accountant for debtor for failure to disclose relationship with potential litigant was
*res judicata* in respect of subsequent state court lawsuit by debtor for malpractice).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1249 of 1726   PageID 12570
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 30 of 106

under the direction and supervision of the Independent Directors in administering, managing and operating the Debtors. However, even if the Employees were not already covered by the Settlement Order, it would be appropriate to include the Employees in the Exculpation Provisions. The Exculpation Provisions apply to the Employees solely with respect to actions taken by the Employees from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

**E. Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan**

46. The Debtor is seeking approval of the Exculpation Provisions in its Plan pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code; the qualified immunity of bankruptcy trustees and their agents, and the correlative qualified immunity of debtors in possession; the related applicable non-bankruptcy law on immunity and exculpation of fiduciaries; and the strong policy reasons offered by the Fifth Circuit as to committee members, which apply to the Independent Directors in the same way as the Fifth Circuit applied them to committee members. The Bankruptcy Code makes it clear that "any appropriate provision not inconsistent with the applicable provisions of this title" may be included in a chapter 11 plan.[29]

47. The Fifth Circuit's *Pacific Lumber* ruling denying exculpation to certain parties was based on section 524(e). Some recent court decisions approving exculpation provisions have held, however, that in dealing with complex and litigious bankruptcy cases, section 524(e)

---

[29] 11 U.S.C. § 1123(b)(6).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1250 of 1726 PageID 12571
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 31 of 106

is not a bar to setting a standard of liability that limits liability for negligence for acts taken during the course of the case in furtherance of the purpose of chapter 11. For example, in *Blixseth*,[30] the Ninth Circuit (which generally does not permit third-party releases in plans) determined that the exculpation clause at issue did not implicate section 524(e) because it related to post-petition actions that occurred during the bankruptcy process, and did not implicate any potential liability on prepetition debts of the debtor. The Court further explained that, despite prior Ninth Circuit decisions disproving third-party releases relating to such prepetition debts of the debtor, exculpation provisions with third-party releases are permissible because chapter 11 cases are often "highly litigious" where "oxes [sic] are gored" and such releases limited in time and scope "allow the settling parties. . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Id*. at 1084. Finally, the court held, as many of its sister circuits have held, that under sections 105(a) and 1123 "the bankruptcy court here had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable." *Id*. Significantly, the creditor whose exculpation was at issue in *Blixseth* was not even an estate fiduciary. *Id*. at 1081.

48.     Another court recently dealing with exculpation issues discussed the need for an appropriately-constructed exculpation of estate fiduciaries and exculpation relating to court approved transactions in order to preserve the basic integrity of the chapter 11 process. In *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y 2019), the bankruptcy

---

[30] 961 F.3d 1074 (9th Cir. 2020)

APPX. 05824

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1251 of 1726 PageID 12572
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 32 of 106

court was presented with a broad exculpation clause in a plan that protected not only court-supervised fiduciaries, but also entities such as the acquirer, the acquirer's professionals, the pre- and post-petition lenders and the indenture trustees. As here, the exculpation provision pertained to acts and omissions taken in connection with and during the bankruptcy case, but excluded acts of fraud, willful misconduct or gross negligence.

49.     The court declined to approve the exculpation provision as written, holding that it was overly broad, but nevertheless provided significant guidance on what an appropriate exculpation provision should provide:

> *I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.* If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do. *Cf. Airadigm Commc'ns., Inc. v. FCC (In Re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from liability arising out of or in connection with the confirmation of the Plan, except for willful misconduct); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that was limited to conduct during the bankruptcy case and noting that the effect of the provision is to require "that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation.").

599 B.R. at 720-721 (emphasis added). The Exculpation Provisions in the Plan here are consistent with the policy-based and chapter 11 process-based guidelines provided by Judge Wiles in *Aegean Marine*, in that they apply to court-supervised fiduciaries and transactions entered into under the auspices of the court.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1252 of 1726 PageID 12573
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 33 of 106

50.     Additionally, the bankruptcy court's power to approve an exculpation provision in a chapter 11 plan flows naturally from the fact that it cannot confirm a chapter 11 plan unless it finds that the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code and the plan has been proposed in good faith.[31]  The plan is the culmination of the chapter 11 case.  By confirming a plan and making the "good faith" finding, the court is determining that the plan proponent (usually, the debtor) and its officers and directors have acted appropriately throughout the case, consistent with their fiduciary duties and have been administering, managing and operating the debtor in accordance with the provisions of the Bankruptcy Code and applicable law.[32]  Once the court makes its good faith finding, it is appropriate to set the standard of liability of the fiduciaries (and, as in *Blixseth*, other parties) involved in the formulation of that chapter 11 plan.[33]

51.     An exculpation provision appropriately prevents future collateral attacks against fiduciaries of the debtor's estate.  Here, the Exculpation Provisions are appropriate because they provide protection to those parties who served as post-petition court-approved fiduciaries during the restructuring process – relief that in this litigious case, as all participants are painfully aware, is indispensable.  The Exculpation Provisions are in consideration for services rendered, hard work, and perseverance in the face of threats to professional reputation and bodily harm.  The Exculpation Provisions should be approved, and the objections, asserted for the most part by the

---

[31] *See* 11 U.S.C. § 1129(a)(2) and (3).

[32] *See* 11 U.S.C. § 1129(a).

[33] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

very individual and entities that have created the need for such provisions by turning this case into a war zone, should be overruled.

## VI. THE PLAN INJUNCTION IS APPROPRIATE AND IS NARROWLY TAILORED TO EFFECTUATE THE PLAN AND RELATED PROVISIONS OF THE BANKRUPTCY CODE.

52.     The Court should approve the injunction provisions (the "Injunction" or "Injunction Provisions"), set forth in Article IX.F of the Plan.  This is because the Injunction Provisions are necessary and appropriate to enable the Debtor and its successors to carry out, and obtain the benefits of, the provisions of the Bankruptcy Code relating to the Plan and the proper implementation and consummation of the Plan.  Approval of the requested Injunction Provisions is well within this Court's powers.

53.     The Objectors have objected to the Injunction Provisions on several grounds.  The Debtor has reviewed the Injunction Provisions and revised them to address certain of the Objectors' concerns as follows:

- The Injunction and Gatekeeper Provisions have been narrowed to apply only to Enjoined Parties.[34]

- The Independent Directors are no longer included in the second paragraph of the Injunction.

- The Reorganized Debtor and the Claimant Trust have been deleted from the second paragraph of the Injunction in order to eliminate any potential confusion that they were included in any capacity other than as successors to the Debtor, which is now clarified in the third paragraph of the Injunction.

---

[34] "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.  Plan, Art. I.B., Def. 56 (new definition in the Plan (as amended)).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1254 of 1726    PageID 12575
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 35 of 106

- The Injunction is subject to parties' rights to set off to the extent permitted post-confirmation under sections 553 and 1141 of the Bankruptcy Code.

- The Gatekeeper Provision has been amended to clarify the actions for which parties must first seek the approval of the Bankruptcy Court to pursue.

- The grant of exclusive jurisdiction over the merits previously contained in the Gatekeeper Provision has been removed, and the Gatekeeper Provision has been modified to provide that if the Bankruptcy Court, as gatekeeper, decides an action can be brought, the Bankruptcy Court will adjudicate that action on the merits *only* to the extent the court has jurisdiction to do so.

- Articles IX.G and H of the Plan have been modified to clarify the duration of the automatic stay and other injunctions which are either currently in effect or contained in the Plan.

54.     The Injunction Provision, as modified, merely implement and enforce the Plan's discharge, release, and Exculpation Provisions and related provisions of the Bankruptcy Code and enjoin the Enjoined Parties from commencing or maintaining actions to interfere with the implementation or consummation of the Plan.  The Injunction Provisions are a necessary part of the Plan because they protect the Plan implementation provisions required to monetize the Debtor's assets and pursue the Causes of Action, all of which has been vociferously and continually opposed and litigated by Dondero and his numerous Related Entities, with such vexatious opposition likely to continue post-confirmation.  Several parties – principally Dondero, Dugaboy and his Related Entities – have objected to the Injunction, which is not surprising because Dondero and his Related Entities undoubtedly intend to continue their litigation crusade against the Debtor and its successors after confirmation of the Plan.

### A.     Plan Injunction Provisions

55.     Section IX.F of the Plan is entitled "Injunction" and applies post-Effective Date. The Injunction contains three distinct provisions:

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 37 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1255 of 1726   PageID 12576
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 36 of 106

56.     Paragraph 1, as amended, provides:

**Upon entry of the Confirmation Order, all** ~~holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons,~~ **Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

57.     As revised, paragraphs 2 and 3 provide:

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all** ~~Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan)~~ ~~and other parties in interest, along with their respective Related Persons, are~~ **Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to** ~~such~~ **any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner**~~, directly or indirectly~~ **any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~**, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means**~~, whether directly or indirectly,~~ **any judgment, award, decree, or order against the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~**, (iii) creating, perfecting, or otherwise enforcing in any manner,** ~~directly or indirectly,~~ **any security interest, lien or encumbrance of any kind against the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~**, (iv) asserting any right of setoff, directly or indirectly, against any obligation due** ~~from~~ **to the Debtor** ~~Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or against property or interests in property of** ~~any of the Debtor, Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding**

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1256 of 1726 PageID 12577
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 37 of 106

**paragraph against** any successors of the Debtor, **including, but not limited to,** the Reorganized Debtor, **the Litigation Sub-Trust,** and the Claimant Trust and their respective property and interests in property.

Plan, Art. IX.F.

58.     As amended, paragraph 4 of Section IX.F contains a gatekeeper provision (the "Gatekeeper Provision") which provides:

**Subject in all respects to ARTICLE XII.D, no ~~Entity~~ Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of ~~this~~ the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such ~~Entity~~ Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such ~~Entities~~ Employee from the date of appointment of the Independent Directors through the Effective Date. ~~As set forth in ARTICLE XI, the~~ The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate ~~any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted~~ the underlying colorable claim or cause of action.**

Plan, Art. IX.F.

59.     To the extent an Enjoined Party believes it has any claims against a Protected Party, such Enjoined Party must first seek permission of the Bankruptcy Court to file such action and demonstrate that the claims it seeks to assert are colorable claims.  Subject to certain carve outs, Protected Parties are defined collectively as:

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 39 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1257 of 1726   PageID 12578
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 38 of 106

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); . . . .

Plan, Art. I.B. Def. 105.   If the Bankruptcy Court determines a claim is colorable, the Bankruptcy Court will make a separate determination as to whether it has jurisdiction to adjudicate such claim on its merits in accordance with the terms of the Plan and applicable law.

### B.      Objections

60.      A number of parties, including Dondero and many of his affiliated, controlled or influenced entities, object to the Injunction Provisions (as identified in the chart of objections attached as Exhibit B).  The Objectors all raise similar arguments and allege:

- The Injunction is ambiguous and overly-broad because the meaning of the phrase "implementation and consummation of the plan" is unclear.

- The Injunction operates post-effective date and enjoins post-confirmation claims against non-debtor third parties for post confirmation conduct.

- The Injunction is a disguised non-debtor third party release.

- The Injunction Provisions prevent holders of Claims and Equity Interests from enforcing rights created by the Plan after the Effective Date.

- The Gatekeeper Provision effectuates an impermissible extension of the jurisdiction of the Bankruptcy Court.

61.      As summarized above and discussed more fully below, the Injunction Provisions, as amended, have addressed certain of these arguments.  The remaining objections, however,

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1258 of 1726 PageID 12579
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 39 of 106

lack merit and are based on either a misreading of the actual Injunction Provisions or a misstatement of applicable law. Each objection will be addressed below.

### C.   An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate.

62.   Certain objectors argue that the first paragraph of the Plan Injunction, which enjoins all holders of Claims or Equity Interests and other parties in interest, along with their Related Persons, from taking any action to interfere with the "implementation or consummation of the Plan," is overly-broad and ambiguous because the meaning of the phrase "implementation and consummation of the plan" is somehow unclear. These objections are specious.

63.   An injunction in aid of the effectuation of a confirmed plan is typically included in a plan and confirmation order to prevent actions to impede or frustrate the plan proponent's necessary and appropriate actions after confirmation to effectuate the plan and carry out the court's confirmation order. The Injunction is supported by the express provisions of sections 1123(a)(5), 1123(b)(6), 1141(a), 1141(c), and 1142. The Injunction effectuates the purposes of plan confirmation and chapter 11 and preserves and protects the integrity of the chapter 11 process and the court's orders.

64.   The terms "implementation" and "consummation" are neither vague nor overly-broad; they are both terms found in the text of chapter 11 of the Bankruptcy Code and are well understood – and injunctions against interfering with them are common features of plans confirmed throughout the country, including in this District.[35] Section 1123(a)(5) expressly

---

[35] *See, e.g., In re Tuesday Morning Corp.* (Case No. 20-31476, Bankr. N.D. Tex.) *Debtor's Second Amended Plan of Reorganization* [D.I. 1913-1] attached to *Order Confirming the Revised Second Amended Joint Plan of Reorganization,* at pp. 90-91/137; *In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States*

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 41 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1259 of 1726    PageID 12580
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 40 of 106

mandates that "a plan shall . . . provide adequate means for the plan's implementation" (emphasis added) and contains a non-exclusive list of what means that could include. In compliance with section 1123(a)(5), this Plan expressly sets out the means for its "implementation." *See* Plan, Article IV: Implementation of Plan. *See also* 11 U.S.C. § 1142. The Injunction would enjoin any interference with these implementation steps.

65.    The word "consummation" is also found in the Bankruptcy Code and has been discussed by numerous courts.    For example, section 1101(2) defines "substantial consummation" of a plan to be (A) the transfer of the assets to be transferred under the plan; (B) the assumption by the debtor or the successor to the debtor of the management of all of the property dealt with by the plan; and (C) commencement of distribution under the plan.    Of course, the term "consummation," without the qualifier "substantial," is more expansive and would extend, for example, to the completion of distributions under the Plan and the disposition of all of the property dealt with by the Plan.    *See, e.g., United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (distinguishing "substantial consummation" of a plan from final consummation of a plan, which occurs after the effective date when the plan distributions are concluded.)

66.    This portion of the Injunction merely prevents holders of Claims or Equity Interests and other Enjoined Parties from interfering with the actions the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust must take

---

*Bankruptcy Code* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, Sec. 10.5.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1260 of 1726    PageID 12581
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 41 of 106

to effectuate the terms of the Plan after the Plan is confirmed by the Court.  There is nothing nefarious or unusual about this provision and it should be approved.

### D.    The Injunction Is Not a Disguised Non-Debtor Third-Party Release.

67.    The Injunction does not contain a non-debtor third-party release.  As set forth in the Plan, as amended, the Debtor has provided clarification to address the concerns of the Objectors who interpreted the prior provision to effectuate a non-debtor third-party release.  The amended second and third paragraphs of the Injunction prevent the Enjoined Parties from taking the enumerated actions on or after the Effective Date against the Debtor or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, except as set forth in the Plan or in the Confirmation Order.  The Debtor has eliminated the Independent Directors from these provisions of the Injunction.  As revised, nothing in this section of the Injunction does anything more than prevent the Enjoined Parties from taking actions that do not comply with or conform to the provisions of the Plan, and limit holders of Claims and Equity Interests with respect to such Claims and Equity Interests to the recoveries provided under the Plan, all as contemplated by sections 1123(b)(6) and 1141 in respect of claims or interests arising either prepetition or post-petition.  The ultimate goal of a chapter 11 case is for a debtor to confirm a plan which, after confirmation, effectively channels all claims and interests of creditors and interest holders to the treatment provided for the pre- and post-petition claims and interests under the plan, and limits the liability of the debtor (including the

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1261 of 1726   PageID 12582
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 42 of 106

"reorganized debtor") and any successor that receives property of the debtor dealt with by the plan (such as a plan trust) to the liability imposed by that treatment.

68.    Sections 1123 and 1129 of the Bankruptcy Code require a plan to describe how it will treat the claims of creditors and the interests of equity holders, both those that existed prepetition and those that arise during the course of a case.  The purpose of the Injunction is to protect the Debtor and its successors under the Plan – the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust –against litigation to pursue the very same prepetition and post-petition claims and interests that are being treated under the Plan.  As described below, providing the protection of the Injunction to all of such entities is both legal and appropriate.

69.    As to the Debtor, the Injunction is appropriate, because it implements the injunctive relief the Bankruptcy Code affords the Debtor, whether or not it gets a discharge, as a result of plan confirmation.  If the Debtor is entitled to the discharge as contemplated by the Plan, then it is accorded the injunction provided by sections 1141(d) and 524(a).  But even if the Debtor does not receive a discharge then, pursuant to section 362(c)(2)(A), the automatic stay will remain in effect until the case is closed, and the Injunction is in aid of that stay.  Moreover, pursuant to section 1141(c) of the Bankruptcy Code, because *all* of the Debtor's property is "dealt with by the plan," all of that property will be "free and clear of all claims and interests . . . .," both as to property retained by the Debtor, and property transferred to its successors. Accordingly, the Injunction is an appropriate means of enforcing section 1141(c).

70.    Nothing in the Injunction effectuates a third-party release in contravention of section 524(e) of the Bankruptcy Code.  As to the "Reorganized Debtor," this term simply means

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1262 of 1726 PageID 12583
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 43 of 106

the Debtor on and after the Effective Date. *See* Plan, Art. I.B., Definition 112. The Reorganized Debtor, therefore, should be entitled to the same injunctive relief as the Debtor. To hold otherwise would be illogical.

71. The Claimant Trust and Litigation Sub-Trust are successors to the Debtor – both in structure and in assets. Neither the Claimant Trust nor the Litigation Sub-Trust come into existence until the Effective Date, and thus, the only liability they could have to the holders of Claims and Equity Interests would be the liability to treat such Claims and Equity Interests as set forth in the Plan. All of the property of the Claimant Trust and Litigation Sub-Trust is property of the Debtor and the Estate that these Trusts will receive from the Debtor and the Estate pursuant to the Plan on the Effective Date and is "dealt with" by the Plan. Accordingly, under section 1141(c), that property will be received and held by the Claimant Trust and the Litigation Sub-Trust "free and clear of all claims and interests of creditors and equity security holders." Paragraph 2 of the Injunction is in aid of this provision and, in the words of section 105, is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code, *i.e.,* section 1141(c).

### E. The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order.

72. The Injunction does not prevent holders of Claims or Equity Interests from enforcing, after the Effective Date, rights arising under the Plan or the Confirmation Order. The scope of the Injunction is specifically subject to the Plan, the Confirmation Order and any other order of the Court. Thus, the right of the holder of a Claim or Equity Interest to receive its plan distributions, as set out in the Plan, is not impacted – such persons are merely enjoined from

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1263 of 1726 PageID 12584
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 44 of 106

taking the enumerated actions to enforce their Claims or Equity Interests outside of the Plan process and treatment. If, for example, the Claimant Trust made distributions to certain creditors but not others, those who did not receive their distribution, would be free to enforce the provisions of the Plan contract. This is clear from the language of the Injunction, which begins "[e]xcept as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . ." Plan, Art. IX.F.

73. The Injunction is not a third-party release, does not prevent enforcement of the provisions of the Plan itself, and is neither vague nor overly-broad. The Court should overrule the objections and approve the Injunction in aid of the consummation and administration of the Plan as appropriate and consistent with sections 362, 1123 and 1141 of the Bankruptcy Code.

## VII. THE GATEKEEPER PROVISION IS NECESSARY AND APPROPRIATE, AND SUPPORTED BY APPLICABLE LAW.

### A. The Gatekeeper Provision

74. Paragraph 4 of Section IX.F contains neither a release nor an injunction. Rather, Paragraph 4 contains a provision that requires any Enjoined Party that believes it has <u>any</u> claims against a Protected Party "**that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing**" to first seek leave from the Bankruptcy Court to pursue such alleged claims and present evidence as to why it believes it has a colorable claim against the

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 46 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1264 of 1726   PageID 12585
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 45 of 106

Protected Person.  As discussed below, provisions such as this one, which have been referred to as "gatekeeper" or "channeling" provisions, are neither uncommon nor impermissible.

75.     It should come as no surprise that Dondero and his cohorts are the only ones who object to the Gatekeeper Provision.  The last thing they want is for a court that has had the misfortune of familiarizing itself with their antics to pass on the *bona fides* of any new tactics and lawsuits they may conjure up to stymie this case. However, as set forth below, their challenges to this Court's power and jurisdiction to pre-screen if their new lawsuits are colorable represent wishful thinking.

### B.      The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code.

76.     The Gatekeeper Provision is a legitimate exercise of this Court's powers under sections 105,[36] 1123(b)(6),[37] and 1141(a), (b) and (c).[38]  The Bankruptcy Court serves as the literal guardian at the gate – determining whether a litigant has a colorable claim and may pass

---

[36] Section 105 is entitled "Power of court" and provides: (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[37] Section 1123(b)(6) provides: (b) Subject to subsection (a) of this section, a plan may— (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

[38] Section 1141 is entitled "Effect of confirmation" and provides, in relevant part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1265 of 1726   PageID 12586
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 46 of 106

through the gate to the applicable clerk of court and file a lawsuit.  The Debtor recognizes that a

Gatekeeper Provision is not found in every chapter 11 plan.  However, this case is not a typical

case.  Indeed, recognizing the need for, and importance of, this role under the facts of this case,

the Court previously entered the Settlement Order (agreed to by Dondero) which itself contains a

gatekeeper provision protecting the Independent Directors.  The purpose of the Gatekeeper

Provision in the Plan is to insulate the Protected Persons, many of whom will be either

successors to the Debtor or the fiduciaries charged with continuing the administration of the

Debtor's property and causes of action post-Effective Date (which essentially involves the wind-

down of the business, the monetization of the Debtor's assets and the distribution of the proceeds

of same to pay the Claims of legitimate creditors), from non-stop, vexatious litigation in multiple

jurisdictions over every conceivable action they take to implement and consummate the Plan.

77.      Based upon the history and record of this case – including increased activity

during the past several weeks – this Court is well aware of the reality of that threat and risk in

this case.   During the course of this case, many of the significant actions taken by the

Independent Directors have been challenged, litigated and appealed.  Moreover, Dondero has

interfered with the Debtor's business operations, resulting in the Court's entry of a Temporary

Restraining Order and Preliminary Injunction against him.[39]  A hearing on the Debtor's Motion

to Hold Dondero in Contempt is scheduled for February 5, 2021.  The Independent Directors,

CEO/CRO, Employees, Committee and its members, and the Professionals of the Debtor and the

---

[39] *Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P)*, Adv. No. 20-03190 (Bankr. N.D. Tex), December 10, 2020 *Order Granting Debtor's Motion for Temporary Restraining Order against James D. Dondero* [D.I. 10] and January 11, 2021 *Order Granting Debtor's Motion for Preliminary Injunction against James D. Dondero* [D.I. 59].

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 48 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1266 of 1726   PageID 12587
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 47 of 106

Committee have been harassed and threatened by Dondero and his Related Entities.  There is no reason to believe these litigious tactics, threats and intimidation will cease post-Confirmation and post-Effective Date; and their unchecked continuance will seriously impair the ability of the Claimant Trust and the Litigation Sub-Trust to implement and effectuate the Plan and carry out the orders of this Court.  The Gatekeeper Provision is essential to the confirmation of this Plan and the efficient effectuation and consummation of the Plan post-Effective Date.

78.    The need for the Gatekeeper Provision is illustrated by the fact that the Independent Directors would not have been able to obtain Directors' & Officers' insurance coverage, upon their appointment, in the absence of the Settlement Order.  Insurers were unwilling to underwrite coverage without a broad exclusion restricting any type of coverage for the Independent Directors if the Settlement Order did not contain the exculpation and gatekeeper provision found in Paragraph 10 of the Settlement Order.  Similarly, the Claimant Trustee, the Litigation Trustee and the Claimant Trust Oversight Board will not be able to obtain coverage for the period of time after the Effective Date without a similar gatekeeper provision. Accordingly, the failure to approve the Gatekeeper Provision as part of the Plan will completely frustrate the Debtor's ability to carry out the Plan and Confirmation Order.

79.    Gatekeeper provisions are not some new creative attempt to circumvent limitations on bankruptcy court jurisdiction or restrictions on non-consensual third-party releases.  They are utilized by many courts to provide a single clearing court to determine whether a claim is colorable or appropriate under the applicable facts of the main case.  For example, in the *Madoff* cases, the bankruptcy court has served as the gatekeeper for determining

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 49 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1267 of 1726   PageID 12588
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 48 of 106

whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust.)[40]  In the *General Motors* cases, certain issues arose post-effective date in regard to defects in ignition switches.  Questions arose as to whether the causes of action arising from those defects were such that "New GM" had liability for them, notwithstanding that it had purchased the assets of the debtor "Old GM" free and clear.  The bankruptcy court serves as a gatekeeper for this litigation, determining whether a lawsuit can go forward against New GM or is more properly dealt with as a claim against Old GM.[41]

80.    Gatekeeper or channeling provisions similar to this one, and in some instances, more extensive than the proposed Gatekeeper Provision in this Plan, have been approved by other courts in this district.  In *In re Pilgrim's Pride Corp.*, 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. January 14, 2010), Judge Lynn, after concluding that *Pacific Lumber* precluded the court from granting certain requested releases and exculpations, determined that nothing in *Pacific Lumber* prevented the court from retaining exclusive jurisdiction over some of the suits against third parties which might otherwise have been covered by the third party protections.  *Id*. at *16-17.  Judge Lynn then expressly held that the bankruptcy court would "channel to itself any claims that may be asserted against Debtors' management (including their boards of directors and Chief Restructuring Officer) and the professionals based upon their conduct in pursuit of

---

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussion of court's gatekeeper function).
[41] *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing court's gatekeeper function); *In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1268 of 1726 PageID 12589
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 49 of 106

their responsibilities during the Chapter 11 Cases." *Id.* at \*18, 20-21. In furtherance of this, the

confirmation order provided that the court "shall retain **exclusive** jurisdiction over any suit

brought on any claim or causes of action related to the Chapter 11 Cases that exists as of the

Effective Date against a Committee; any member of a Committee; any Committee's

Professionals; Debtors; Reorganized Debtors; or any Protected Person for conduct pertaining to

Debtors during the Chapter 11 Cases, and that any entity wishing to bring such suit shall do so in

this court;" *Id.* (emphasis added). Thus, in *Pilgrim's Pride*, the court approved a broad retention

of exclusive jurisdiction to adjudicate the ultimate merits of certain types of suits against

protected parties, rather than merely a gatekeeper provision.

81.    Other courts in this district have agreed with Judge Lynn and ordered similarly.

*See, e.g., In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors'* Fourth

*Amended Joint Chapter 11 Plan of Reorganization* [D.I. 1671-1, attached to *Findings of Fact*

*and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11*

*Plan of Reorganization*], Section 10.8(b) at p. 57 (court retained **exclusive** jurisdiction to hear

claims against any "Protected Party," including any claims "in connection with or arising out of .

. . the administration of this Plan or the property to be distributed under this Plan, . . . or the

transactions in furtherance of the foregoing, . . . .") (emphasis added).

82.    In regard to the Independent Directors, the proposed Gatekeeper Provision is a

continuation of the provision set forth in Paragraph 10 of the Settlement Order, which, by its

terms never expires and is expressly to remain in effect after the Effective Date under the Plan.

Moreover, because of the Independent Directors' rights of indemnification against the Debtor,

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1269 of 1726 PageID 12590
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 50 of 106

the Gatekeeper Provision serves the important function of protecting assets that would otherwise be available for distribution to creditors from being depleted by indemnification claims resulting from the assertion of frivolous claims against the Independent Directors.

83.     As to the remaining Protected Parties, the Gatekeeper Provision is a valid exercise of the Court's authority under sections 105 and 1123(b)(6) to prevent the Protected Parties from being embroiled in frivolous litigation designed to derail implementation of the Plan. Importantly, if, in the exercise of its gatekeeper role, the Bankruptcy Court were to determine that a colorable claim exists, then it would allow the prosecution of such claim and the filing of the lawsuit in the court with applicable jurisdiction.[42]

### C.     The Gatekeeper Provision Is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court.

84.     Nor is the Gatekeeper Provision an impermissible extension of the post-confirmation jurisdiction of the bankruptcy court.  As discussed above, the Debtor modified the Gatekeeper Provision to eliminate the provision that granted the Bankruptcy Court exclusive jurisdiction to hear any claim that the Court allows to pass through the gate.  The Gatekeeper Provision requires a putative plaintiff to obtain Bankruptcy Court approval prior to bringing an action and is in aid of the Court's enforcement of the Confirmation Order and the Plan.  It is supported by sections 1141(a), (b) and (c), and thus, by section 105.  As amended, nothing in the Gatekeeper Provision is determinative of the jurisdiction of the Court over any particular claim or cause of action.  The Gatekeeper Provision only requires the court to determine if a claim is

---

[42] *Texas & P. R. Co. v. Gulf, C. & S. F. R. Co.*, 270 U.S. 266, 274 (1926) (Court always has jurisdiction to determine its own jurisdiction).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 52 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1270 of 1726    PageID 12591
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 51 of 106

colorable.  This is a determination commonly made by bankruptcy courts in the analogous

context of determining whether a creditors' committee should be granted standing to file

litigation on behalf of a recalcitrant debtor.  *See, e.g., Louisiana World Exposition v. Federal Ins.*

*Co.,* 858 F.2d 233 (5th Cir. 1988) (court must determine that claim is colorable before

authorizing a committee to sue in the stead of the debtor).  Thus, the Bankruptcy Court has the

jurisdiction to determine if a claim is colorable.

85.    Section 1142(b) provides that post-confirmation, the bankruptcy court may direct

any parties to "perform any act" necessary for the consummation of the plan).  *See United States*

*Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305

(5th Cir. 2002) (holding that bankruptcy court had jurisdiction to determine whether arbitration

could be used to liquidate claims post-effective date; while the plan had been substantially

consummated, it had not been fully consummated, the dispute related directly to the plan, the

outcome would affect the parties' post confirmation rights and responsibilities and the

proceeding would impact compliance with, or completion of the plan; specifically referencing

section 1142(b)).

86.    Several objectors attempt to rely on *Bank of La. v. Craig's Stores of Texas, Inc.*

*(In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir.  2001) to argue that the

bankruptcy court cannot exercise a gatekeeper role and adjudicate matters related to the

administration of the case and the plan.  In fact the opposite is true.  In *Craig's Stores*, the Fifth

Circuit expressly recognized that post-confirmation bankruptcy jurisdiction **continues to exist**

**for "matters pertaining to the implementation or execution of the plan**."  *Id.* at 390 (*citing In re*

APPX. 105844

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 53 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1271 of 1726   PageID 12592
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 52 of 106

*Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7

F.3d 32, 34 (2d Cir. 1993) (emphasis added).

87.    *Craig's Stores* did not involve a gatekeeper provision necessary to enable the

debtor to implement its plan.[43]  In contrast to *Craig's Stores*, the Plan provision that Dondero and

other Objectors are challenging pertains to the Court's jurisdiction over matters specifically in

aid of the implementation and effectuation of the Plan – acting as gatekeeper – and does not

implicate an improper extension of bankruptcy court jurisdiction.  As previously explained, the

Gatekeeper Provision is necessary to obtain insurance coverage for the Claimant Trustee, the

Litigation Trustee, and the members of the Claimant Trust Oversight Board – all of whom will

play critical roles in the implementation of the Plan.  Moreover, unchecked rampant litigation

against the Protected Persons, many of whom have indemnification rights against the Debtor,

Reorganized Debtor or Claimant Trust would predictably engulf the Reorganized Debtor and

Claimant Trust negatively impacting their ability to effectuate and implement the Plan and

wasting valuable resources.  *See, In re Farmland Industries, Inc.,* 567 F.3d 1010, 1020 (8th Cir.

2010) (bankruptcy court had "related to" jurisdiction over a claim by a disgruntled bidder against

the post-effective date liquidating trustee because the estate was actually paying legal fees of the

non-debtor defendants under the estate's indemnification obligations.); *see also Buffets, Inc. v.*

---

[43] In *Craig's Stores*, the issue was whether the court could hear a post-confirmation action brought by the debtor for damages against a bank that was administering the debtor's post-confirmation private label credit card program under an agreement that had been assumed by the debtor in its chapter 11 plan.  On appeal, the Fifth Circuit held that the bankruptcy court did not have jurisdiction to hear the dispute, reasoning that (1) the debtor's claim principally dealt with post-confirmation relations between the parties, (2) no facts or law derived from the reorganization or the plan were necessary to the claim, and (3) the claim did not bear on the interpretation or execution of the debtor's plan.  *Id.* at 391.

46

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 54 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1272 of 1726   PageID 12593
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 53 of 106

*Leischow*, 732 F.3d 889 (8th Cir. 2013) (related-to jurisdiction existed where bankruptcy estate was obligated to indemnify non-debtor defendants for attorney's fees and other amounts).

88.     In addition, *Craig's* Stores did not involve a liquidating chapter 11 plan, and this case does involve such a plan.  There is persuasive case law, including this Court's decision in *TMXS Real Estate* (discussed below) and circuit-level authority, holding that the scope of the bankruptcy court's post-confirmation jurisdiction in the case of a liquidating chapter 11 plan is broader than that in the case of a chapter 11 plan that is not a liquidating plan.

89.     In *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr., Inc.)*, 410 F.3d 100 (1st Cir. 2005), the debtor, a charitable hospital, brought an adversary proceeding against a testator trust, seeking to compel payment from the trust of an amount allegedly due to the hospital as a residual beneficiary under the trust.  The testator had died prepetition, but before the estate's assets were distributed, and the litigation was filed after confirmation of the debtor's liquidating plan of reorganization because the hospital had been unaware it was a beneficiary under the trust.  The trustee had argued that the bankruptcy court had no residual jurisdiction over the debtor's lawsuit against the trustee because the plan had been confirmed, but the bankruptcy court found it had "related to" jurisdiction.

90.     The First Circuit first analyzed the long line of cases (including *Craig's Stores*) which hold that after a debtor emerges from bankruptcy, it enters the marketplace and is no longer under the aegis of the bankruptcy court.  *Id.* at 106-107.  The court did not end its analysis there, however, but dug deeper into the significant distinctions between a liquidating plan and a true reorganization.   Under a liquidating plan, the debtor is not really re-entering the

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 55 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1273 of 1726    PageID 12594
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 54 of 106

marketplace; rather its "sole purpose is to wind up its affairs, convert its assets to cash, and pay
creditors a pro rata dividend." *Id.* at 107.  Thus, while a reorganized debtor may have litigation
that clearly is outside the scope of its prior bankruptcy proceeding, that is generally not the case
with a liquidating debtor.  The court determined that 28 U.S.C. § 1334 had to be applied in
conjunction with the applicable facts of the case, and jurisdiction was appropriate.  *Id.*  A
"liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court.
Any litigation involving such a debtor thus relates much more directly to a proceeding under title
11." *Id.*

91.    This Court has also recognized the jurisdictional distinction between liquidating
plans and operational reorganizations.  In *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC
(In re Senior Care Ctrs., LLC)*, 2020 Bankr. LEXIS 3205 (Bankr. N.D. Tex. Nov. 12, 2020), this
Court held it had jurisdiction to hear a post-confirmation dispute concerning the ability of a
liquidating trust, which had been formed pursuant to the plan, to liquidate the stock of the
reorganized debtor it received under the plan which involved the issue of whether such action
would effectuate a "change in control" that would constitute a default under a lease that had been
assumed by the reorganized debtor pursuant to the plan.  This Court held that (i) the liquidating
trust had been formed for the purpose of liquidating the assets transferred to it pursuant to the
plan and distributing the proceeds of those assets to creditors; (ii) the litigation at issue was an
attempt to limit the ability of the liquidating trust to effectuate the very purpose for which it had
been formed and had to be resolved prior to full consummation of the plan; (iii) resolution of the
dispute would require the review of the plan, the confirmation order and possibly other orders of

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1274 of 1726 PageID 12595
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 55 of 106

the court; (iv) the litigation would impact compliance with, or completion of the plan; and (v) the litigation directly related to the plan's implementation or execution. *Id.* at \*21-23.

92.     Just as in the *TXMS Real Estate* and *Boston Regional* cases, the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor exist solely for the purpose of operating the Debtor's business and properties to monetize its assets and pay creditors. Any "post-confirmation operations" of the Reorganized Debtor will, therefore, be directed towards that monetization process and, furthermore, properly subject to the Court's purview to ensure consummation of the Plan and creditor distributions pursuant to section 1142 of the Bankruptcy Code. Any prospective, but baseless, litigation over the acts taken by these entities in effectuating the Plan will have a significantly negative impact on the ability of the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor to effectuate the Plan and will deplete the assets otherwise available for distribution to creditors. The Gatekeeper Provision simply ensures that any such prospective litigation is colorable before it can be filed.

93.     The Fifth Circuit's decision in *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 266-67 (5th Cir. 2005), is instructive. In *Stonebridge*, the liquidating trustee under a confirmed chapter 11 plan sued a landlord in connection with the landlord's draw on a letter of credit that had been provided as security in connection with a real property lease the debtor had rejected during its bankruptcy case, where the trustee was assigned the issuing bank's claim against the landlord for alleged misrepresentation. Although the Fifth Circuit had concerns over jurisdiction of the bank's assigned claim to the trustee, the court went on to opine that "[u]pon closer review, however,

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 57 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1275 of 1726   PageID 12596
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 56 of 106

additional effects on the estate are evident: a claim by the Bank against [the landlord] affects the need for the Bank to seek reimbursement from Stonebridge's bankruptcy estate. [The landlord's] draw on the Letter of Credit triggered [the debtor's] contractual responsibility to reimburse the Bank for the draw on the Letter of Credit. . . . If the Bank is successful against [the landlord] on its negligent misrepresentation claims, the need for reimbursement from [the bankruptcy] estate is alleviated." *Id.* at 266-267. Accordingly, the court held that the negligent misrepresentation claims of the bank against the landlord fell within bankruptcy jurisdiction.  The court noted other cases that involved litigation between third parties that have been found to have an effect on the administration of the bankruptcy estate, including suits by creditors against guarantors and a suit by creditors of a debtor against defendants that allegedly perpetrated a fraud. *Id.* at 267 (*citing 3 Collier on Bankruptcy* ¶ 3.01 (15th ed. rev. 2005)).

94.    Based on the reasoning of *Stonebridge*, other courts, including this Court, have held that contingent indemnification rights trigger "related to" subject-matter jurisdiction of state law disputes between two non-debtors in the pre-confirmation context.  *See, e.g.*, Principal *Life Ins. Co. v. JP Morgan Chase Bank, N.A. (In re Brook Mays Music Co.)*, 363 B.R. 801 (Bankr. N.D. Tex. 2007) (contingent right of indemnity in pre-confirmation litigation between two non-debtors triggers bankruptcy court's pre-confirmation "related to" jurisdiction (*citing Stonebridge*)).  In *In re Farmland Industries, Inc.*, the Eighth Circuit has similarly held that it had <u>post</u>-confirmation subject-matter jurisdiction over state law claims between non-debtors where the liquidating trustee was paying the legal fees incurred to defend individuals (former officers and directors) in the dispute.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1276 of 1726   PageID 12597
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 57 of 106

95.    In sum, in light of the proposed amendments to the Plan and under the circumstances here, Dondero's objection to this Court's jurisdiction to serve as a gatekeeper is not well-taken and should be overruled.  The retention of the *de minimis* jurisdiction to perform the gatekeeper function is clearly supported by Fifth Circuit law.

### D.    The Gatekeeper Provision Is Consistent with the Barton Doctrine.

96.    Support for the Gatekeeper Provision can be found in the Barton Doctrine, which by analogy, should be applied to many of the Protected Parties identified in the Gatekeeper Provision.  The Barton Doctrine is based on the U.S. Supreme Court case, *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881) dealing with receivers.  As this Court has recognized, the Barton Doctrine:

> provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.*, the bankruptcy court) must be obtained. The *Barton* doctrine is ***not*** an immunity doctrine but – strange as this may sound – has been held to be a ***jurisdictional*** provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee ***unless and until*** the bankruptcy court has granted leave for the lawsuit to be filed).

Baron v. Sherman (In re Ondova Ltd. Co.), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, Baron v. Sherman (In re Ondova Co.), 2018 U.S. Dist. LEXIS 13439 (N.D. Tex., Jan. 26, 2018), aff'd., In re Ondova Ltd., 2019 U.S. App. LEXIS 3493 (5th Cir. Tex., Feb. 4, 2019).  The Barton Doctrine originated as a protection for federal receivers, but courts have applied the concept to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including trustees,[44] debtors in

---

[44] *Id.*

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1277 of 1726 PageID 12598
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 58 of 106

possession,[45] officers and directors of a debtor,[46] the general partner of the debtor,[47] employees,[48] and attorneys retained by debtors and trustees.[49] The Barton Doctrine has also been applied to non-court appointed agents who are retained by the trustee for purposes relating to the administration of the estate.[50] The Barton Doctrine continues to protect those who are within its scope post-Confirmation and post-Effective Date.[51]

97. The Fifth Circuit has expressly recognized the continuing viability of the Barton Doctrine, notwithstanding the jurisdictional issues raised by *Stern v. Marshall*.[52] Since the Barton Doctrine is jurisdictional only as to the ability of the prospective plaintiff to file the lawsuit, it does not implicate the issue of expansive post-effective date bankruptcy court jurisdiction as to the actual underlying lawsuit. Thus, the gatekeeper court can determine if a

---

[45] *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also*, 11 U.S.C §§ 1107(a) of the Bankruptcy Code, providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity.

[46] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[47] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

[48] *Lawrence v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (affirming dismissal of lawsuit under the Barton Doctrine due to the plaintiff's failure to seek leave in the bankruptcy court to file an action against the trustee and other parties assisting the trustee in carrying out his official duties).

[49] *Lowenbraun v. Canary* (*In re Lowenbraun*), 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[50] *See, e.g., Wells Fargo Fin. Leasing, Inc. v. Jones*, 2015 WL 1393257, at *3–*5 (W.D. Ky. Mar. 25, 2015) (holding that because defendant acted as bankruptcy trustee's agent in performing duties at the direction of and in furtherance of the trustee's responsibilities, claims asserted against defendant were essentially clams against trustee, and court lacked jurisdiction over the claims under *Barton* Doctrine); *Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*, 883 F. Supp. 2d 797, 817 (E.D. Mo. 2012) (property management company engaged by receiver).

[51] *Helmer v. Pogue* at *15, *citing Carter*, 220 F.3d at 1252-53. *See also, Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972-73 (9th Cir. 2005) (Barton Doctrine applies to trustee of a post-confirmation liquidating trust formed pursuant to a plan of liquidation); *Muratore v. Darr*, 375 F.3d 140, 147 (1st Cir. 2004) (doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands; suit was for malfeasance of trustee in performing his duties filed after estate was closed.)

[52] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (holding that a litigant must still seek authority from the bankruptcy court that appointed the trustee before filing suit even if the bankruptcy court might not have jurisdiction over the suit itself.)

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1278 of 1726 PageID 12599
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 59 of 106

proposed lawsuit asserts colorable claims, and, if it does, the gatekeeper court can then turn to the separate issue of whether it has jurisdiction over the merits of the lawsuit.

98.     The Barton Doctrine requires a litigant to obtain approval of the appointing or approving court before commencing a suit against court-appointed or court approved officers and their agents – which arguably encompasses most, if not all, of the Protected Parties.  The Gatekeeper Provision preserves the integrity of the process, and prevents valuable estate resources from being spent on specious litigation, without impairing the rights of legitimate prospective litigants with potentially valid causes of action.  The Gatekeeper Provision is not only a prudent use of the Court's authority under section 105 and is within the spirit of the protections afforded fiduciaries and their agents under the Barton Doctrine – it is also critical to ensuring the success of the Plan.

99.     The Gatekeeper Provision does not effectuate a non-consensual third-party release.  It merely requires potential litigants to first vet their alleged causes of action with a single court – the bankruptcy court – before they can be prosecuted.  If there has ever been a case where a Gatekeeper Provision is appropriate it is this case.  As the Court is well aware, Dondero appears to thrive on litigation.  This Court has remarked on many occasions during this case that prepetition, the Debtor operated under a culture of litigation under the control of Dondero.  It was the years of sharp practices by the Debtor and an avalanche of litigation against it that resulted in the Debtor commencing a chapter 11 case and the ultimate appointment of the Independent Directors.  Faced with impending confirmation and the loss of his company forever, Dondero has turned the tables and the Debtor and the Protected Parties have become his target

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 61 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1279 of 1726   PageID 12600
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 60 of 106

for litigation.  Left unchecked, there is no doubt that Dondero will continue his litigation crusade after the Effective Date and attempt to thwart implementation of the Plan at every turn by commencing baseless lawsuits.  Requiring this Court, which approved the appointment of the Independent Directors and has extensive familiarity with the Debtor and this case to first determine whether alleged claims are colorable is prudent and within this Court's authority. Moreover, centralizing the gatekeeper function in one court puts that court in a unique position to ascertain whether there is a pattern of spurious litigation by certain entities and their related parties.

> ### E.    The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities.

100.    The Fifth Circuit has recognized that in appropriate circumstances, a federal court can enjoin or issue other appropriate sanctions against vexatious litigants – persons who have a history of filing repetitive and spurious litigation for the purposes of harassment and intimidation.  *See* All Writs Act, 28 U.S.C. §1651.  In *Caroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017), the Fifth Circuit held that a bankruptcy court could properly sanction certain debtors as vexatious litigants when the debtors and their various family members continually filed litigation to prevent the bankruptcy trustee from performing his duties.  When considering whether to enjoin future filings, the court must consider the circumstances of the case, including four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 62 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1280 of 1726   PageID 12601
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 61 of 106

*Id.* at 815, *citing Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) (*quoting Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004)).

101.    In some circumstances where courts feel that enjoining all future litigation by a vexatious litigant may be too difficult to articulate or have potential due process implications, courts essentially issue a gatekeeper injunction. *See, e.g., Baum v. Blue Moon Ventures, LLC,* 513 F.3d at 189 (after the bankruptcy court and district court were able to piece together that the Baums interjected themselves in various bankruptcy proceedings by filing vexatious, abusive and harassing litigation, an injunction was entered preventing the Baums from filing litigation without the consent of the district court judge.); *Safir v. United States Lines, Inc.,* 792 F.2d 19, 25 (2d Cir. 1986) (Second Circuit agreed the litigant's conduct warranted a pre-filing injunction, but narrowed the scope such that the litigant had to seek permission from the district court before filing certain types of additional actions.)

102.    Dondero and his Related Entities are the quintessential vexatious litigants, and the Gatekeeper Provision is a legitimate tool for the Bankruptcy Court, properly within the jurisdiction of the Bankruptcy Court, and less burdensome on Dondero and his Related Entities than a full injunction – which the Debtor believes would be justified in seeking in this case.

## VIII.   THE EXCEPTION TO DISCHARGE DOES NOT APPLY

103.    The exception to discharge contained in 11 U.S.C. § 1141(d)(3) does not apply. Section 1141(d)(3) provides that:

Confirmation of a plan does not discharge a debtor if --

(A) The plan provides for the liquidation of all or substantially all of the property estate;

DOCS_SF:104855.7 36027/002

APP.105842

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 63 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1281 of 1726 PageID 12602
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 62 of 106

(B) The debtor does not engage in business after consummation of the plan; and

(C) The debtor would be denied a discharge under section 727(a) of this title if the case were a case under Chapter 7 of this title.

*See* 11 U.S.C. § 1141(d)(3).

104.    Since the provisions of § 1141(d)(3) are in the conjunctive, if any one of the three prongs of the test is lacking, confirmation of a plan results in the discharge of debt. House Rep. No. 95-595, 95th Cong. 1st Sess. 418-19 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6374-75 ("if all or substantially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, ***and*** if the debtor would be denied a discharge under section 727 … then the Chapter 11 discharge is not granted.") (emphasis added); *Financial Sec. Assur. v. T-H New Orleans Lt. Pshp. (In re T-H New Orleans Lt. Pshp.)*, 116 F.3d 790, 804 (5th Cir. 1997) ("[T]his section requires that all three requirements be present in order to deny the debtor a discharge."); *In re River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991) (the provisions of § 1141(d)(3) are in the conjunctive).

105.    Here, only subpart C of § 1141(d)(3) clearly applies.[53]  With respect to the subpart A of § 1141(d)(3), here, the Plan clearly provides for a gradual liquidation of all or substantially all the estate's assets.  However, a discharge is nonetheless appropriate because an orderly wind down is anticipated to last for up to two years, and the Reorganized Debtor will continue to manage various funds during that period.  Under similar circumstances, at least one court has suggested that the plan would fall outside the policies of § 1141(d)(3)(A).  *In re Enron Corp.*,

---

[53] As a corporate debtor, the Debtor would not receive a discharge under section 727(a) in a Chapter 7.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 64 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1282 of 1726 PageID 12603
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 63 of 106

2004 Bankr. LEXIS 2549, **215-17 (Bankr. S.D.N.Y. July 15, 2004) ("[T]the indeterminate period of retention of the assets after the Effective Date and the clear need for ongoing business operations to maximum value for all creditors in liquidating the assets necessitates the application of the section 1141 discharge to the Reorganized Debtors."). Moreover, even if subpart A of § 1141(d)(3) is met, subpart B of § 1141(d)(3) – engaging in business – is lacking. *T-H New Orleans Lt. Pshp.*, 116 F.3d at 804, n. 15 (holding that the reorganized entity's likelihood of conducting business for two years following plan confirmation satisfies § 1141(d)(3)(B)); *In re River Capital Corp.*, 155 B.R. at 387 (discharge warranted where current management stated its intention to continue to engage in business after consummation of the plan).

## IX. THE SENIOR EMPLOYEE OBJECTION

### A. The Senior Employee Objection Should Be Overruled

106. Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent (collectively, the "Senior Employees")[54] filed the Senior Employee Objection. Subsequent to its filing, Mr. Waterhouse and Mr. Surgent executed a Senior Employee Stipulation (as discussed below) and will withdraw their support of the Senior Employee Objection. The only remaining Senior Employees objecting to the Plan are Mr. Ellington and Mr. Leventon. Mr. Ellington and Mr. Leventon argue, among other previously addressed objections, that the Plan is not confirmable because (1) the Plan violates section 1123(a)(4)'s requirement that claims in the same class be treated the same, and (2) the Debtor has prevented the Senior Employees from

---

[54] Although Mr. Ellington and Mr. Leventon are included in the definition of Senior Employees, they were both terminated for cause and are no longer employees of the Debtor.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1283 of 1726   PageID 12604
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 64 of 106

making the Convenience Class Election. These objections are meritless, and the Senior Employee Objection should be overruled.

### B.    Background Related to Senior Employees

107.    The Debtor's employees, including the four Senior Employees, were eligible to receive compensation under two separate bonus plans: an annual bonus plan and deferred compensation plan. Both of these plans required the employee to remain employed as of the applicable vesting date to receive the bonus. On December 4, 2019, the Debtor filed a motion seeking authorization to pay bonuses under these plans, to which the Committee objected to the inclusion of the Senior Employees. At a hearing on the motion, the Debtor agreed to remove the Senior Employees (*see* 1/21/2019 Hearing Tr., Docket No. 393 at 119:21-22), and the motion was granted as presented at the hearing [Docket No. 380]. Accordingly, the rank and file employees were paid on account of their bonuses that vested in 2020, with the exception of the Senior Employees who have vested bonus claims.

108.    On May 26, 2020, each of the Senior Employees filed a single proof of claim against the Debtor in an unliquidated amount.[55] *See* Proof of Claim Nos. 192 (claim of Ellington claiming "not less than $7,604,375"); 184 (claim of Leventon claiming "not less than $1,342,379.68"); (collectively, the "Proofs of Claim"). The Proofs of Claim did not provide any calculations or breakdown of amounts to support the minimum claimed.

---

[55] An amended proof of claim was filed by Mr. Ellington on July 16, 2020. Each Senior Employee asserted that a portion thereof, in a liquidated amount pursuant to the statutory cap of section of section 507(a)(4), is entitled to priority under the Bankruptcy Code. In addition, the portion of the claim related to PTO was classified in Class 6 under the Plan.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 66 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1284 of 1726 PageID 12605
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 65 of 106

109. Each Proof of Claim sets forth the following with respect to "compensation" owed:

> Claimant is owed compensation for his services, including, without limitation, (i) all salaries and wages; benefits; (ii) bonuses (including performance bonuses, retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv) retirement contributions, pensions and deferred compensation. The amount of the Claim for such compensation includes both liquidated and unliquidated amounts.

*See* Claim Nos. 192, 182, 184, 183, each at Attachment ¶3.

110. The official claims register maintained by KCC lists the general unsecured claim amount for each Senior Employee as "UNLIQUIDATED." The claim of each Senior Employee not requiring separate classification under the Plan (*i.e.*, the priority and PTO portions), was classified as a General Unsecured Claim in Class 8 (each, a "GUC Claim").

111. On October 27, 2020, during a hearing on the Debtor's then-existing disclosure statement, this Court and the Committee were highly critical of the proposed plan provisions concerning employee releases and strongly suggested that the plan was unlikely to be confirmed as drafted. As a result, the Debtor began negotiating with the Committee concerning the terms on which Senior Employees would be permitted to obtain a release. Ultimately, the Debtor and the Committee agreed that the Senior Employee would be required to execute a stipulation with the Debtor providing for the resolution and payment of deferred compensation at reduced rates and other consideration in exchange for a Plan release. Specifically, the Senior Employee Stipulation, if approved by this Court and signed by the Senior Employee, would allow the "Earned Bonus" (as defined in the Senior Employee Stipulation) portion of the Senior Employees' to be treated as a separate Convenience Claim (subject to reduction as set forth in

DOCS_SF:104855.7 36027/002

APPX. 105856

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 67 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1285 of 1726   PageID 12606
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 66 of 106

the Senior Employee Stipulation).  In exchange for this reduction, and together with the Senior

Employee's agreement to (a) cooperate with the Claimant Trustee and Reorganized Debtor, (b)

refrain from taking certain actions against those parties, and (c) support and vote in favor of the

Plan, the Senior Employee would receive a Plan release and the treatment provided with respect

to the "Earned Bonus" in the Plan and Senior Employee Stipulation.

112.    As part of its settlement discussions with the Senior Employees, the Debtor

provided the Senior Employees with a chart outlining how the reduction of the "Earned Bonus"

would work if the Senior Employees executed the Senior Employee Stipulation.  This chart was

the same chart provided to the Committee in connection with the negotiation of the Senior

Employee Stipulation.  This chart was never publicly-filed and did not contain "representations"

or promises.  It was a chart provided to the Senior Employees to illustrate how a portion of the

Senior Employees' total claims would be treated if they signed the Senior Employee Stipulation

and to describe the consideration that the Senior Employee would provide in exchange for the

release contained in the Plan.  Notably, the Disclosure Statement included the same calculation

that was set forth in the chart provided to the Senior Employees.[56]

113.    In no world was the chart – provided in settlement discussions and for substantive

purposes – a promise to pay.

---

[56] *See* Disclosure Statement, page 71, which states:

In addition to the obligations set forth in Article IX.D. of the Plan, as additional consideration for
the foregoing releases, the Senior Employees will waive their rights to certain deferred
compensation owed to them by the Debtor.  As of the date hereof, the total deferred compensation
owed to the Senior Employees was approximately $3.9 million, which will be reduced by
approximately $2.2 million to approximately $1.7 million. That reduction is composed of a
reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience
Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment
of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of
approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1286 of 1726 PageID 12607
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 67 of 106

114.    Despite this, the Senior Employee Objection argues that such chart "shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it separately shows the reduced recovery" if they sign the Senior Employee Stipulation. The Senior Employees further argue that the chart evidences the Debtor's intent that the Senior Employees could elect Convenience Class treatment of their "Earned Bonus" whether or not they executed the Senior Employee Stipulation. As set forth above, nothing in the chart supports that argument. The chart was simply a illustration of how the Senior Employee Stipulation would work if executed and the consideration that would be given by each Senior Employee for the release.[57]

115.    Finally, the Senior Employees' comments were solicited on all but the economic terms of the Senior Employee Stipulation. The Senior Employees were also encouraged to raise any issues they had with the Senior Employee Stipulation to the Committee and/or this Court. The Senior Employees' counsel at Winston & Straw provided comments on the Senior Employee Stipulation, which both the Debtor and the Committee accepted. The Senior Employees themselves, however, refused to comment despite having the opportunity to do so and instead demanded that the Debtor retract the Senior Employee Stipulation because it did not reflect an agreement between the Senior Employees and the Debtor. On information and belief,

---

[57] As part of the Plan negotiations, Mr. Seery engaged in multiple conversations with all or some of the Senior Employees. Some of these conversations were with counsel; some were not. In each case, however, the conversations were part of a broader settlement discussion. During these discussions, the Senior Employees asked questions about how the Senior Employee Stipulation would work but also made blatant threats about how they would react if they were not treated in the manner they deemed appropriate. Mr. Seery made no promises to the Senior Employees during these conversations.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 69 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1287 of 1726   PageID 12608
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 68 of 106

the Senior Employees never approached the Committee to discuss the Senior Employee Stipulation.  The only communication with this Court has been the Senior Employee Objection.

116.    None of the Senior Employees elected to sign the Senior Employee Stipulation.  Subsequent to the filing of the Senior Employee Objection, Mr. Seery discussed with Mr. Waterhouse and Mr. Surgent the possibility of signing the Senior Employee Stipulation, and Mr. Waterhouse and Mr. Surgent elected to sign the Senior Employee Stipulation (with certain revisions).  However, as Mr. Ellington and Mr. Leventon are not currently employed by the Debtor, they are no longer eligible to sign the Senior Employee Stipulation.

### C.    Treatment of Senior Employee Claims Under Plan

117.    The Plan provides the following treatment to the Class 8 GUC Claims of the Senior Employees:

> Treatment:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

Plan, III.H.8.

118.    The Plan provides that a Holder of a General Unsecured Claim may make a "Convenience Class Election" as follows:

> "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim *that is a liquidated Claim as of the Confirmation Date on their Ballot* to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.[58]

---

[58] A "Convenience Claim" is defined as:

APPX. 05859

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 70 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1288 of 1726 PageID 12609
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 69 of 106

Plan, I.B.43 (emphasis added).

119.    As discussed above, the Senior Employees' claims are unliquidated and were disclosed as unliquidated on the official claims register maintained by KCC. As unliquidated and unsecured claims, the Senior Employees' claims are, in each case, Class 8 (General Unsecured Claims), and, as holders of unliquidated GUC Claims, none of the Senior Employees were entitled to make the Convenience Class Election.

120.    Irrespective of their claims, the Senior Employees are not entitled to a release under of the Plan unless they execute a Senior Employee Stipulation. *See* Article IX.D.

### D.    Plan Solicitation

121.    Although each of the Senior Employee's GUC Claim was classified *in toto* as Class 8 (General Unsecured Claims), the Senior Employees erroneously received both a Class 7 (Convenience Class) and Class 8 (General Unsecured) Ballot. Except for Mr. Surgent, each of the Senior Employees voted their Class 8 (General Unsecured Claim) ballot to reject the Plan, and each of the Senior Employees voted their erroneously Class 7 (Convenience Class) ballot to reject the Plan. Mr. Surgent abstained from voting on the Plan. Because they have now executed the Senior Employee Stipulation, Mr. Waterhouse and Mr. Surgent's votes will be cast to accept the Plan.

---

any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.
Plan, I.B.41.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 71 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1289 of 1726    PageID 12610
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 70 of 106

**E.      The Plan Does Not Violate Section 1123(a)(4)**

122.    Section 1123(a)(4) requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).

123.    The Senior Employees argue that the Plan does not treat them the same as other Employees in the same class because the Senior Employees are not automatically being granted a release under the Plan, whereas other Employees are being granted a release automatically upon confirmation.  However, the Senior Employees conflate treatment of their claims with the decision not to automatically provide them a release.  The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The releases under the plan are not part of the "treatment" of Class 7 or Class 8 claims.

124.    Indeed, the releases granted under the Plan are part of an entirely different section of the Plan (Article IX).  Debtors are not required to grant releases to anyone nor are they required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees.[59]  Nonetheless, the Debtor, after extensive negotiations with the Committee (which did not want to provide *any* release to the Senior Employees) presented the Senior Employees with a mechanism by which the Senior Employees could obtain a release *if* they agreed to the conditions of the Senior Employee

---

[59] Indeed, the grant of third party releases is heavily scrutinized and could not be granted to all general unsecured creditors across the board as part of the Plan's treatment of general unsecured claims.  *See Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 72 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1290 of 1726 PageID 12611
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 71 of 106

Stipulation.[60] But just as the Senior Employees were not required to sign the stipulation,[61] the Debtor cannot be forced to provide a release to each Senior Employee just because it has provided releases to other Employees. Nor would this Court or the Committee have allowed the Debtor to provide releases to the Senior Employees without those Senior Employees providing additional consideration to the Debtor's estate. As the Court will recall, at the October 28, 2020, the Court specifically told the Debtor that it would be hard-pressed to approve releases to certain of the Debtor's employees if such employees did not provide consideration for the releases.[62] The Senior Employee Stipulation was crafted to address the Court's concerns by conditioning the release of *certain* of the Debtor's employees on the provision of other consideration.

125. Finally, the Senior Employees devote considerable time arguing that the proposed Senior Employee Stipulation suffers from numerous defects and that the terms are too harsh. But

---

[60]As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor, they are not eligible to sign the Senior Employee Stipulation. Accordingly, they are not entitled to a release regardless of the Senior Employee Stipulation.

[61] While voluntary agreement is expressly excepted from section 1123(a)(4) anyway, debtors are permitted to treat one set of claim holders more favorably than another so long as the treatment is not on account of the claim but for distinct, legitimate rights or contributions from the disparately-treated group separate from the claim. *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 925 (8th Cir. 2019). The Ninth Circuit, for instance, upheld a plan that provided preferential treatment to one of a debtor's shareholders apparently because the preferential treatment was tied to the shareholder's service to the debtor as a director and officer of the debtor, not to the shareholder's ownership interest. *See In re Acequia, Inc.*, 787 F.2d 1352, 1362-63 (9th Cir. 1986) ("[The shareholder's] position as director and officer of the Debtor is separate from her position as an equity security holder."); *see also Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518-19 (5th Cir. 1998) (plan proponent's payments to certain members of power cooperative did not violate § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor]"). Here, too, the release consideration required from the Senior Employees *solely in order for the Senior Employees' to obtain a release* relates to their positions as senior employees rather than their position as general unsecured creditors.

[62] *See* Hearing Transcript, Oct. 28, 2020, at 30:17-22:

So, and I'll just throw in one last bit of food for thought. . . the Debtor has had a year now, close to a year now, to knock some of these out, you know, maybe reach some compromises with some of the related Highland parties and officers, to maybe participate in the plan with some sort of contribution, and it's just not happening. It's not happening. . . . So, at this point, I would be hard-pressed to protect any nondebtor defendants who aren't ponying up something to the whole plan reorganization process.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 73 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1291 of 1726    PageID 12612
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 72 of 106

those objections are irrelevant to confirmation.  If the Senior Employees believed that the cost of

the release was too high, they had no obligation to sign the Senior Employee Stipulation.

     **F.**    **The Senior Employees Are Not Permitted to Make Convenience Class Election**

    126.    The Senior Employees next argue that the Debtor has improperly prevented the

Senior Employees from electing Convenience Class treatment for a portion of their Claims.

Under applicable bankruptcy law, the Plan, and the Disclosure Statement Order, the Senior

Employees are not entitled to split their claims to create a liquidated claim for which

Convenience Class Election would even be possible.[63]  Further, even if the Senior Employees

were entitled to elect a Convenience Class Election for a *portion* of their Class 8 Claims for

distribution purposes, as discussed below, their Claims are only entitled to be voted in Class 8 for

voting and numerosity purposes.

    **G.**    **Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law**

    127.    The Senior Employees argue that the "Earned Bonus" portion of each GUC Claim

is "liquidated"[64] and therefore eligible for the Convenience Class Election.[65]  The "Earned

---

[63] The Senior Employees claim the Debtor's statements contradict the plan; however, any purported contradiction stems from the Senior Employees' misstatement of the Debtor's position.  Indeed, even if the Debtor had made contradictory statements, it is irrelevant.  The Plan says what it says and the Debtor cannot unilaterally change the terms of the Plan with respect to a select group of creditors.  While a Class 7 Ballot was mistakenly sent to the Senior Employees, the Senior Employees cannot make the Convenience Class Election under the Plan because they each hold a single, unliquidated Class 8 Claim.

[64] The Plan did not need to define the term "liquidated."  Generally, a debt is liquidated if the amount due and the date on which it was due are fixed or certain, or when they are ascertainable by reference to (1) an agreement or (2) to a simple mathematical formula.  *In re Visser*, 232 B.R. 362, 364-65 (Bankr. N.D. Tex. 1999).  However, even if the Earned Bonus *portion* is liquidated in that the amount is capable of being ascertained, it is not considered liquidated for purposes of voting where the amount owed or formula for calculation are missing from the proof of claim.  *See In re Lindell Drop Forge Co.*, 111 B.R. 137, 142-43 (Bankr. W.D. Mich. 1990); *see also Riemer & Braunstein LLP v. DeGiacomo (A & E 128 North Corp.)*, 528 B.R. 190, 199 (1st Cir. B.A.P. 2015) (court looks to proof of claim forms to determine if they sufficiently demonstrate liquidated claims).

[65] None of the Senior Employees' Proofs of Claim contains any liquidated amount with respect to any component of

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 74 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1292 of 1726   PageID 12613
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 73 of 106

Bonus" portion, even if liquidated, is not a standalone claim entitled to make a Convenience

Class Election, nor can the Senior Employees split their GUC Claim after filing a single proof of

claim.  The Senior Employees do not cite any law to support their contention that claims of a

single creditor in a given class, set forth in a single proof of claim, may be split into multiple

claims.[66]  Indeed, case law holds the opposite.  Courts have found that where a claimant files a

single proof of claim, even if it covers multiple debts, he is not entitled to split his claims.  *In re*

*Jones*, 2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) (noting that the creditor could have

filed multiple proofs of claim to avoid the issue); *see also In re Latham Lithographic Corp*., 107

F.2d 749 (2d Cir. 1939) (claimant cannot split claim into multiple claims for the purpose of

creating multiple creditors who could vote in a trustee election).  The Senior Employees each

filed a single proof of claim: they cannot split their GUC Claim in order to make the

Convenience Class Election under the Plan and applicable bankruptcy law.  And the Plan is clear

on this; no other Holder of an unliquidated or partially liquidated Class 8 claim attempted to split

its claim or make the Convenience Class Election.

---

the GUC Claim, including the "Earned Bonus."  The Senior Employees appear to make the stunning assertion that
the Debtors' books and records establish whether a claim is liquidated and the amount of such claim, even when the
proof of claim lists no such amounts.  There is no proof of claim on file listing a liquidated amount, no executed
stipulation agreeing on a liquidated amount, and no order of the Court setting a liquidated amount.  The Senior
Employees' assertion that any portion of their GUC Claims is liquidated is untenable.

[66] The cases the Senior Employees cite only support that separate claims, each covered by a separate proof of claim,
**_purchased_** from other creditors, are entitled to be counted as separate claims.  *See Figter Ltd. v. Teachers Ins.
Annuity Ass'n (In re Figter Ltd.)*, 118 F.3d 635, 640-641 (9th Cir. 1997) (claimant entitled to vote multiple claims
where it "purchased a number of separately incurred and separately approved claims (each of which carried one
vote) from different creditors"); *Concord Square Apartments v. Ottawa Properties (In re Concord Square
Apartments)*, 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) ("purchaser of claims is entitled to a vote for each separate
claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) (purchased claim arose out of a separate
transaction, evidencing a separate obligation for which a separate proof of claim was filed).  Notably, in each of
these cases a separate proof of claim had been filed for each separate claim, evidencing an entirely separate
obligation, and owed to a different party.  Here in contrast, each single Senior Employee filed a single proof of
claim, and the "Earned Bonus" is a mere *component* of an overall compensation claim stemming from obligations
under an employment contract.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 75 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1293 of 1726   PageID 12614
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 74 of 106

    **H.**      **Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes**

128.     Even if splitting claims contained in a single proof of claim were allowed under applicable case law (which it is not) and the Senior Employees were entitled to make the Convenience Claim Election with respect to a portion of their GUC Claim, this Court's Disclosure Statement Order prohibits the splitting of claims within a given class for voting purposes:

> Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

Disclosure Statement Order ¶ 25.b.

129.     Similarly, paragraph 23 provides:

> For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

*Id.* ¶ 23.h.

130.     Read together, these provisions clearly establish that there can be no claim splitting within a class, and no claim splitting between Class 7 and Class 8. Accordingly, even if claims classified in a given class set forth in a single proof of claim could be split and the Senior Employee were entitled to make the Convenience Class Election, the Disclosure Statement Order precludes the Senior Employees from splitting their claims for voting purposes.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1294 of 1726   PageID 12615
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 75 of 106

**I.      Even if Convenience Claim Election Were Available, Convenience Claim Election Does Not Impact Voting**

131.    Even if the Senior Employees were deemed to hold separate, liquidated claims on account of their "Earned Bonuses" that could be split from the remainder of their GUC Claims, a Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim *for voting purposes*. Specifically, the Class 8 Ballot, approved by the Disclosure Statement Order, provides:

> If you check the box below and elect to have your Class 8 General Unsecured Claim treated as a Class 7 Convenience Claim; *(i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 8 with respect to the Plan, but your Claim (as reduced) will receive the treatment afforded to Class 7 Convenience Claims;*

Disclosure Statement Order, Exhibit A at 26 (emphasis added).[67]    Accordingly, at most, the Convenience Class Election only impacts the Senior Employees' treatment for distribution purposes.  Moreover, even if the Court finds that Mr. Leventon has a liquidated claim that was entitled to be classified in Class 7 and vote in that class, Mr. Ellington's claim, which exceeds $1 million could not vote in Class 7.  Mr. Ellington would only be entitled to reduce his Class 8 Claim and elect treatment in Class 7 but his claim would otherwise be included in Class 8 for voting purposes.

132.    For each of the foregoing, independent reasons, each Senior Employee holds a single, unliquidated claim in Class 8.  No Senior Employee is entitled to split his GUC Claim under applicable bankruptcy law, and such an action is further prohibited by the Disclosure Statement Order.  Even if any GUC Claim could be split and the Convenience Class Election

---

[67] The Plan itself is also clear that the Convenience Class Election only impacts *treatment*, and does not impact *voting*. *See* Plan, I.B.43; III.H.8.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 77 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1295 of 1726    PageID 12616
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 76 of 106

was made, the Convenience Class Election only impacts treatment but does not impact voting. Finally, the Senior Employees' argument that their entitlement to make the Convenience Class Election stems from an erroneously mailed ballot is misplaced. As set forth above, the mailing of the Class 7 Ballot was an administrative error and cannot entitle the Senior Employees to rights that contradict the Plan and the Disclosure Statement Order.

## X.    THE HCMFA/NPA GATES OBJECTION

133.    The Debtor manages fifteen collateralized loan obligations ("CLOs") pursuant to certain agreements, which are referred to sometimes as portfolio management agreements and sometimes as servicer agreements (the "Management Agreements"). Each CLO is a Cayman-domiciled entity that owns a portfolio of loans. They are passive single purpose entities with no ability to self-manage. The CLOs have no employees; however, they do have Cayman-based boards of directors, which have limited duties under Cayman law and which do not actively manage the CLOs. Each CLO contracted with the Debtor as a third-party "Portfolio Manager" to manage the loan portfolio pursuant to the terms of the various Management Agreements. As discussed below, the only parties to the Management Agreements are the Debtor and the respective CLO.

134.    To finance its acquisition of the loans, each CLO issued notes to third party investors. Those notes come in different tranches with different payment priorities. The lowest in priority are called "preference shares," which receive the available residual cash flow after the CLO has made the required payments on the notes. Although called equity, the preference shares are not common equity. The CLOs themselves are purely creatures of contract, and

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 78 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1296 of 1726   PageID 12617
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 77 of 106

investor rights are governed by the terms of the indentures governing the CLOs (collectively, the
"Indentures"), the preference share paying agency agreements, and in certain cases the
Management Agreements.[68]  The Indentures define the procedures for buying, managing, and
selling the CLOs' assets.  *See generally* Indenture § 12.1; Management Agreement § 2.
Fiduciary duties under the Investment Advisers Act of 1940 (the "Advisers Act") are owed
solely to the CLOs and not their investors.[69]   Nothing in the Indentures or the Management
Agreements gives any investor in the CLOs the right to block, interfere with, influence, control,
or otherwise direct the asset sale process.  The Management Agreements set forth the Portfolio
Manager's duties and obligations and the requirements for removing the Portfolio Manager if
investors are not satisfied.

135.    By agreement with CLOs, which are the sole counterparties to the Management
Agreements, the Debtor will assume the Management Agreements pursuant to the Plan.  The
Debtor and the CLOs have agreed, in summary, that in full satisfaction of the Debtor's cure
obligations under section 365(b)(1) of the Bankruptcy Code, the CLOs will receive a total of
$525,000, comprising $200,000 within five days of the Effective Date and $325,000 in four
equal quarterly payments of $81,250, and that the Debtor and the CLOs will exchange mutual
releases.  The Debtor and the CLOs agreed to seek approval of this compromise by adding

---

[68] The Debtor's role is referred to as either the Servicer or Portfolio Manager.  All of the Management Agreements
and Indentures are governed by New York law, and the relevant provisions of those agreements are identical in all
material respects across the CLOs at issue.

[69] The Debtor's fiduciary duties under the Advisers Act are owed to the CLO, not to its investors.  *Goldstein v. SEC*,
451 F.3d 873, 881-82 (D.C. Cir. 2006) (under Section 206 of the Investment Advisers Act of 1940 and other
provisions "[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . . If the investors are
owed fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of
interest.").  The Debtor's duties, as Portfolio Manager, to the underlying investors in the CLO, if any, are prescribed
by contract.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 79 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1297 of 1726   PageID 12618
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 78 of 106

language to the Confirmation Order.  A copy of that language is attached hereto as Exhibit C and

will be included in the Confirmation Order.

### A. The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP Joinder Should Be Overruled

136.    As the Court is well aware, Highland Capital Management Fund Advisors, L.P.

("HCMFA") and NexPoint Advisors, L.P. ("NPA" and, together with HCMFA, the "Advisors"),

are controlled by Mr. James Dondero.  Mr. Dondero is also the portfolio manager of each of the

investment funds objecting to the Debtor's assumption of the Management Agreements (the

"Funds").[70]   The Advisors and three of the Funds have actively interfered in the Debtor's

management of the CLOs and sought to exercise management authority over the CLOs.  This

Court ruled on these issues in connection with the Advisors and Funds' *Motion for Order*

*Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by*

*Non-Debtor CLO Vehicles* [Docket No. 1528] (the "CLO Motion").

137.    Now, the Funds and Advisors have objected to confirmation of the Plan and are

joined only in their objection by other Dondero-controlled entities –the NexPoint RE Partners

and CLO Holdco, Ltd. ("CLO Holdco" and, together with the Funds and the Advisors, the "CLO

Objectors").   Although the NPA/HCMFA Objection makes different arguments than those

contained in the CLO Motion, the goal of the NPA/HCMFA Objection is the same.  It seeks to

use this Court to transfer control of the CLOs away from the Debtor and back to Mr. Dondero.

---

[70] The Funds are Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 80 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1298 of 1726   PageID 12619
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 79 of 106

138.    The CLO Objectors contend that the Advisers Act prohibits assignment of the Management Agreements and/or that they are non-assignable personal service contracts.  From this, the CLO Objectors argue that the Management Agreements may not be assumed by the Debtor under Section 365(c) because the "*hypothetical test*" applies in the Fifth Circuit.  They also contend that there is inadequate assurance of future performance because of staff reductions and that the contracts are being modified and thus are being only partially (and so impermissibly) assumed.  The CLO Objectors also speculate that they may be harmed by future investment decisions made by the Debtor because the time-frame contemplated by the Plan for disposition of assets may be shorter than what they believe is optimal to maximize the value of the preference shares.  The objections should be overruled on several grounds:

- The contract counterparties – the CLOs – consent to assumption and will release the Debtor from all claims.

- The CLO Objectors are non-contracting parties with no standing to object on behalf of the CLOs and have pointed to no contractual basis for their assertion of management authority over the CLOs.

- The CLO Objectors cannot create standing by asserting they are creditors of the estate.  Each CLO Objector agreed to the expungement of its claims or has no claims.

- Even if the CLO Objectors were creditors, their standing to object to assumption would be limited to whether it benefits the Estate, and they would *still* lack standing to assert rights belonging to the contracting parties.

- Even if the CLO Objectors had the right to object to assignment, that does not give them the standing to object to the Debtor's assumption of the Management Agreements.

- Even if the Management Agreements were non-assignable, the Debtor could still assume the Management Agreements without consent because the *actual test* applies in the Fifth Circuit.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 81 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1299 of 1726   PageID 12620
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 80 of 106

- Even if the *hypothetical test* applies, "applicable law" does not prevent assignment of the Management Agreements.

- There is no detriment to the Estate in assuming the Management Agreements, and there is no mismatch in investing timelines between the Debtor and the CLOs' investors.

**B.    The CLO Objectors Cannot Override the CLOs' Consent to Assumption**

139.    The Debtor and its counterparties (the CLOs) agreed to the assumption of the Management Agreements.  Any objections were waived.  Hence the CLO Objectors' argument is *not* that there is no consent to assume the Management Agreements; it is that the *correct* party has not consented.  In other words, the CLO Objectors are arguing that the CLO Objectors (and therefore Mr. Dondero) have the authority and prerogative to dictate the actions of the CLOs and whether the CLOs should consent to assumption.  This has to be the CLO Objectors' argument because unless the CLO Objectors have such right, they have no standing as non-contracting parties to object under section 365 to the assumption of the Management Agreements.

140.    Only parties to contracts have standing to object to assumption, even when the objector claims that assumption will result in a breach of that contract or violate the law.  *See Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp*.), 278 B.R. 714, 718-19 (Bankr. D. Del. 2002), *aff'd*, 280 B.R. 808 (D. Del. 2002), 57 F. App'x 912 (3d Cir. 2003).  As the district court explained:

> The language of section 365 is clearly intended to protect the rights of those persons or entities who share contractual relationships with the debtors. In other words, in order to invoke the protections provided in section 365, an entity must be a party to a contract with the debtor.
>
> * * *
>
> Although section 365 does confer the right to refuse assignment where excused by applicable law, that right is nevertheless conferred only upon parties to the

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 82 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1300 of 1726   PageID 12621
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 81 of 106

> contracts at issue.  It creates no separate right of enforcement for other creditors
> of the estate who are not parties to the contract. Therefore, even if the appellants
> feel that the alleged violation of the law may effect them, they have not
> demonstrated that they have the legal right to enjoin such a violation.

*Hertz Corp. v. ANC Rental Corp. (In Re ANC Rental Corp.)*, 280 B.R. 808, 817-18 (D. Del. 2002); *see also Cargill, Inc. v. Nelson (In re LGX, LLC)*, 2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) (creditor had standing on whether court should approve settlement between trustee and another creditor, but no standing under § 365 on whether quitclaim license from trustee to that creditor violated applicable patent law because it was not party to contract); *In re Riverside Nursing Home*, 43 B.R. 682, 685 (Bankr. S.D.N.Y. 1984) (assignee of rents is not "party to such contract or lease" so as to confer standing under section 365); *In re Irwin Yacht Sales, Inc*., 164 B.R. 678 (Bankr. M.D. Fla. 1994) (denying standing to co-owner notwithstanding her economic interest since she was not party to the lease); *see also ANC Rental*, 57 F. App'x at 916 (citations omitted) ("Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan.  In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.")

141.    The only parties to the Management Agreements are the Debtor and the respective CLOs.  Consequently, the CLO Objectors are effectively asking the Court to treat them as the contracting parties, so that they, rather than the CLOs, may decide whether to oppose assumption.  But an adjudication of the CLO Objectors' rights vis-à-vis the CLOs is not before the Court.  Regardless, this assertion of management authority over the CLOs was already

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 83 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1301 of 1726   PageID 12622
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 82 of 106

rejected by Court as "almost Rule 11 frivolous."  In the CLO Motion, the movants sought to restrict sales of the CLOs' assets on terms that they believed might be disadvantageous to the holders of preference shares, but they could not substantiate any contractual basis for the exercise of such management authority.[71]

142.   The only acknowledgement of this Court's ruling in the NPA/HCMFA Objection is offered in a footnote, in which the CLO Objectors suggest that the issues are different "in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed."[72]   In all honesty, the Debtor has no idea what the Objector's statement means, but whatever it means, the underlying issue and rationale are the same here as in the CLO Motion.  As before, the issue is who has the right to make business decisions for the CLOs, and in both the CLO Motion and here, the proffered justification is a nonspecific risk that investment decisions may be made with which the CLO Objectors disagree.

### C.   The CLO Objectors Lack Standing to Object to the Plan

#### 1.   The CLO Objectors Rights Under the Management Agreements Are Not Affected by the Plan

---

[71] 12/16/20 Tr. of Proceedings at 64:1-10.

  This is almost Rule 11 frivolous to me. You know, we're -- we didn't have a Rule 11 motion filed, and, you know, I guess, frankly, I'm glad that a week before the holidays begin we don't have that, but that's how bad I think it was, Mr. Wright [of K&L Gates] and Mr. Norris. This is a very, very frivolous motion.  Again, no statutory basis for it. No contractual basis. You know, you didn't even walk me through the provisions of the contracts. I guess that would have been fruitless. But you haven't even shown something equitable, some lack of reasonable business judgment.

[72] The CLO Objectors state: "The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis." Obj. at 5, n. 4.

76

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 84 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1302 of 1726 PageID 12623
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 83 of 106

143.    The CLO Objectors offer four bases for standing in the Objection. The first is that "in several of the Servicing Agreements, the CLO Objectors have the right to remove the Debtor or to control who the servicer under the agreements is. They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements. Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the CLO Objectors have standing to object to their rights being limited or eliminated." Obj. at 27. Elsewhere they state that the Management Agreements "generally allow the holders of preference shares to remove the portfolio manager for cause" and may provide for a certain percentage of holders of Preference Shares to remove a manager without cause. Obj. at 11.

144.    As an initial matter, nowhere in the NREP Joinder do any of the NexPoint RE Partners allege or state that they have any interest in the CLOs. Without an interest in the CLOs, the NexPoint RE Partners cannot allege that any of their rights are affected. Further, nowhere in the NPA/HCMFA Objection is there any attempt to establish any basis on which the CLO Objectors are presently entitled to replace the Debtor as the Portfolio Manager or authorized to decide for the CLOs whether the CLOs should consent to the Debtor's assumption of the Management Agreements. This is telling.

145.    As set forth in the Management Agreements, the Debtor can only be removed as Portfolio Manager *for cause* by a majority of the preference shares that are *not* held by affiliates of the Debtor. By the CLO Objectors own admission, they only hold a majority of the preference shares in eight of the fifteen CLOs at issue. That means that the CLO Objectors have

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 85 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1303 of 1726   PageID 12624
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 84 of 106

*no* right to remove the Portfolio Manager in approximately half of the Management Agreements. However, even with respect to the CLOs in which they hold a majority of the preference shares, the CLO Objectors cannot remove the Debtor unless cause exists – and cause does not exist. Moreover, the CLO Objectors, under the Management Agreements, are prohibited from replacing the Debtor because each of the CLO Objectors should be considered an affiliate of the Debtor for purposes of the Management Agreements and therefore be prohibited from exercising removal rights.  Finally, on January 9, 2020, this Court entered an order (the "January Order"), which, in pertinent part, stated that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."  [Docket No. 339]  It is beyond dispute that each of the CLO Objectors is for all intents and purposes Mr. Dondero, and Mr. Dondero should not be allowed to do by proxy what he was prohibited by this Court from doing directly.

146.    However, whether the CLO Objectors have the right to remove and replace the Debtor as Portfolio Manager is not a question that will be decided by the Plan nor will the CLO Objectors' rights to remove the Debtor – whatever they are – be impacted by the Plan.  On January 6, 2021, the Debtor filed that certain *Debtor's Memorandum of Law in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero*, Adv. Proc. No. 20-03000-sgj, Docket No. 6] (the "Adversary Complaint").  In the Adversary Complaint, the Debtor seeks a declaratory judgment that the CLO Objectors have no right to replace the Debtor under the Management Agreements for the reasons set forth above, among others.  The CLO Objectors should assert their rights, if any, at the hearing on the Adversary Complaint, not through an objection to

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 86 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1304 of 1726 PageID 12625
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 85 of 106

assumption. Consequently, the CLO Objectors' rights, if any, under the Management Agreement

will be determined by this Court in a separate hearing, and will not be impacted by the Plan.

> **2. The CLO Objectors Lack Standing to Object to Assumption as Creditors or Parties in Interest**

147. Two of the CLO Objectors' four claimed bases for standing are that they are

creditors, or at least parties in interest, and as such have standing to object to assumption of the

Management Agreements "especially because assumption of the Servicing Agreements and

future performance thereunder affect the feasibility of the Plan as a whole," and under sections

1129(a)(1)-(3) because assumption of the Management Agreements purportedly violates the law.

Obj. at 27. These arguments fail for numerous reasons.

148. First, these arguments for standing are circular. If a party lacks standing to object

to assumption of a contract because it has no protected interest in the contract under section 365,

it cannot argue that a plan should not be confirmed because of the assumption of such contract.

A party cannot use an objection to a plan to create standing under section 365.

149. Second, the CLO Objectors are not creditors. As set forth in the Memorandum,

each of the Advisors, the Funds, and CLO Holdco filed claims in this Case; however, each of

those parties voluntarily agreed to have their Claims expunged or reduced to $0.00. None of the

NexPoint RE Entities filed claims. As such, the CLO Objectors are barred from asserting that

they have prepetition claims against the Debtor or its Estate. The CLO Objectors also cannot

create claims by asserting that they will have claims arising from the rejection of the shared

services agreements with the Debtor. *None* of the shared services agreements are being rejected.

Each of the shared services agreements is freely terminable. In November 2020, the Debtor

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1305 of 1726 PageID 12626
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 86 of 106

provided notice that the shared services and other agreements were being terminated. Such agreements will terminate no later than January 31, 2021, which is prior to the anticipated Effective Date of the Plan. Because none of the shared services agreements are being rejected, none of the CLO Objectors will have a rejection damages claim.

150. Third, *even if* any of the CLO Objectors were creditors: "[E]ven creditors do not have standing to raise the rights of a landlord or contract party under section 365. . . While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another." *In re ANC Rental*, 278 B.R. at 718-19 (citations omitted). As the bankruptcy court held in *ANC Rental*, the CLO Objectors cannot usurp the CLO's standing to object to assumption.

151. Fourth, as set forth below, there is no "applicable law" prohibiting assumption and/or assignment for purposes of Section 365(c) and therefore no argument under section 1129(a). Each of the Management Agreements can be assumed and could be assigned without the consent of any party (although the CLOs have consented to assignment). Therefore, there is no violation of law.

152. Finally, the CLO Objectors cannot boot strap into standing by arguing that the assumption of the Management Agreements will not benefit the estate. First, it is anticipated that the Debtor's chief executive officer and chief restructuring officer will testify as to how assumption benefits the estate. Second, granting the relief requested by the CLO Objectors would be catastrophic to the Debtor's estate. The Debtor's inability to assume the Management

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 88 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1306 of 1726   PageID 12627
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 87 of 106

Agreements does not mean that the CLO Objectors will be magically installed as Portfolio Manager. It means that the Management Agreements will be rejected and that *none* of the CLOs will have a Portfolio Manager following the Confirmation Date. Any damage to the CLOs will presumably be part of the claims asserted by the CLOs against the Debtor in connection with that rejection. Those claims are currently incalculable. The Debtor also has exposure to each of the CLOs and any loss in value caused by having no Portfolio Manager would directly impact the Reorganized Debtor's and Claimant Trust's assets. Even assuming the CLO Objectors can appoint themselves Portfolio Manager in the CLOs in which they hold a majority of the preference shares (which is contested and which in no event would happen by the Confirmation Date), that still leaves approximately half of the CLOs without a manager. It is beyond disingenuous for the CLO Objectors to argue that there is no benefit to the estate in assuming the Management Agreements while at the same time arguing that those same agreements should be rejected with the Debtor suffering the consequences.

### 3.     The Contractual Right to Object to Assignment of the Management Agreements Does Not Create Standing to Object to Their Assumption

153.   The fourth and final basis for standing is: "[I]n several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the CLO Objectors. The CLO Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the CLO Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the CLO Objectors." Obj. at 28.

DOCS_SF:104855.7 36027/002

APPX. 05570

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 89 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1307 of 1726 PageID 12628
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 88 of 106

154. For purposes of standing, the CLO Objectors asserted contractual right to object to assignment of the Management Agreements is irrelevant, for three reasons. First, there is no assignment here. The Debtor is assuming the Management Agreements with the consent of the CLOs. Second, even if it were correct that (a) the CLO Objectors have a contractual right to object to assignment, and (b) the *hypothetical test* applies, they still have no interest in the contract that would permit them to enforce section 365's protections for their benefit in derogation of the rights of the actual contracting parties. Third, as discussed immediately below, the *actual test* applies in the Fifth Circuit, and thus the Management Agreements would be assumable even if they were not assignable.

**D. Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit**

155. As the CLO Objectors recognize, there is a split of authority among the circuits regarding the appropriate test to apply to determine whether:

- a contract that is otherwise non-assignable under applicable non-bankruptcy law can be assumed by a debtor under Bankruptcy Code section 365(c)(1); and

- whether the same contract can be terminated if it contains an "ipso facto" clause pursuant to Bankruptcy Code section 365(e)(2)(A).

The Fifth Circuit has ordered lower courts to apply the so-called *actual test* in considering whether an ipso facto termination clause can be enforced under Bankruptcy Code section 365(e)(2)(A). For the reasons set forth below, even though the Fifth Circuit has not ruled on the issue directly, the *actual test* has been applied by every bankruptcy court that has considered the issue in the Fifth Circuit to assumption of contracts under Bankruptcy Code section 365(c)(1).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 90 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1308 of 1726   PageID 12629
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 89 of 106

Accordingly, the *actual test* should be applied in this Case to conclude that the Management

Contracts can be assumed by the Reorganized Debtor without the consent of any party.

156.   The Fifth Circuit's decision in *Bonneville Power Administration v. Mirant*

*Corporation* applied the *actual test* to a determination of whether a contract can be terminated as

a result of the filing of a bankruptcy case under Bankruptcy Code section 365(e)(2). *Bonneville*

*Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir. 2006).  The

reasoning in *Mirant* also supports application of the *actual test* to Bankruptcy Code section

365(c)(1).  Specifically, in *Mirant,* a non-debtor counterparty sought to terminate its executory

contract with the chapter 11 debtor based on an ipso facto clause after the debtor filed for

bankruptcy.   In support of its argument, the non-debtor counterparty relied on section

365(e)(2)(A) and asserted that, under applicable law, the Anti-Assignment Act, 41 U.S.C. § 15

(which generally prohibits the transfer of contracts to which the United States is a party), it was

excused from accepting performance from or rendering performance to the trustee or an

assignee.  Critically, in reaching its conclusion that the *actual test* applied, the Fifth Circuit relied

on cases analyzing section 365(c)(1).

157.   While the CLO Objectors would like this Court to believe there is some risk that

if faced with the direct question of whether the *actual* test also applies under section 365(c)(1),

the Fifth Circuit would reach a different result, that argument strains credibility.

Notwithstanding the technical language differences[73] between the two statutes, the same test

---

[73] Subsection (e)(2) provides that the invalidation of ipso facto clauses does not apply to an executory contract
where "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance
from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract
or lease prohibits or restricts assignment of rights or delegation of duties[.]" 11 U.S.C. § 365(e)(2). This language
is very similar—but not identical—to the language employed by subsection (c)(1), which speaks to excusing

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 91 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1309 of 1726    PageID 12630
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 90 of 106

must apply to both the assumption of a contract under section 365(c)(1) and the termination of a

contract under section 365(e)(2)(A).  There is no logical reading of these two subsections that

would support application of different tests.  The language of section 365(e)(2)(A) is intended to

allow the counterparty to a contract that cannot be assumed or assigned to enforce its remedy of

termination so that it is not in limbo while the bankruptcy case proceeds.  Section 365(c) cannot

be read in isolation from the other subsections.  It would make no sense for a court to hold that a

contract cannot be assumed because the *hypothetical test* applies, but nonetheless cannot be

terminated because the *actual test* applies.  For this reason, every lower court in the Fifth Circuit

that has considered the issue has held that the *actual test* applies to a debtor's assumption of

contracts under section 365(c).  *See In re Virgin Offshore USA, Inc.*, No. 13-79, 2013 U.S. Dist.

LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013):

> Though the *Mirant* court used the actual test in the context of § 365(e), which was
> not amended in the same way as § 365(c) and thus is not subject to the same
> circuit split, the Court nonetheless finds this decision to be an indicator of the way
> that the Fifth Circuit would undertake an analysis under § 365(c).  Further, in *In
> re O'Connor*, the Fifth Circuit appears to have applied an actual test to determine
> that a partnership interest was strictly personal under Louisiana law, thus not
> assumable under § 365(c).  The court did not expressly adopt the actual test
> because, regardless of the test applied, the partnership interest would have been
> unassumable under § 365(c); however, the language used in the opinion indicated
> a predilection for the actual test.

*See also In re Jacobsen*, 465 B.R. 102, 105-06 (Bankr. N.D. Miss. 2011); *Cajun Elec. Members

Comm. v. Mabey (In re Cajun Elec. Power Coop., Inc.)*, 230 B.R. 693, 705 (Bankr. M.D. La.

1999); *In re Lil' Things, Inc.,* 220 B.R. 583, 587 (Bankr. N.D. Tex. 1998); *Texaco Inc. v.

Louisiana Land & Exploration Co.,* 136 B.R. 658, 669 (Bankr. M.D. La.1992); *In re Hartec*

---

performance from, or rendering performance to, "an entity other than the debtor or the debtor in possession" as
opposed to just "the trustee or [] an assignee." Compare *id*. § 365(c)(1) with § 365(e)(2).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 92 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1310 of 1726   PageID 12631
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 91 of 106

*Enters., Inc.,* 117 B.R. 865, 871 (Bankr. W.D. Tex. 1990), *vacated by settlement*, 130 B.R. 929

(W.D.Tex. 1991).

158.    Moreover, other bankruptcy courts within the Fifth Circuit have expressly

rejected the *hypothetical test*, concluding that:

> If the court were to adopt the [hypothetical test] and focus primarily upon
> assignability, a chapter [sic] 11 filing would have the virtual effect of rejecting
> executory contracts covered by section 365(f). As suggested by the court in
> *Texaco,* this analysis would extend section "365(c) beyond its fair meaning and
> intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's
> enterprise."

*Cajun Elec.,* 230 B.R.at 705 (Bankr. M.D. La. 1999)  (quoting *Texaco,* 136 B.R. at 670).

159.    The CLO Objectors prediction that the Fifth Circuit would apply a different test

under subsection 365(c) than it does under 365(e) is based solely on the use of the word "or"

rather than "and" in subsection 365(c).  However, the language cited by the CLO Objectors in

the statute is the same language that was considered by each of the lower courts in the Fifth

Circuit; each of those courts nonetheless applied the *actual test*.  The CLO Objectors reading is

overly simplistic and imposes a literal reading that, as noted by the *Cajun Electric* Court above,

is "beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation

of the debtor's enterprise."  *Id.*  Accordingly, the argument that assumption of the Management

Contracts must be evaluated using the *hypothetical test* is unavailing and contrary to this

Circuit's case law.

DOCS_SF:104855.7 36027/002

App. 05574

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 93 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1311 of 1726   PageID 12632
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 92 of 106

**E.      Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable**

160.    The CLO Objectors, assuming the *hypothetical test* applies, contend the Management Agreements cannot be assigned or assumed under section 365(c)(1) without the consent of the contracting party because they are non-assignable personal services contracts and because Section 205(a)(2) of the Advisers Act proscribes assignment of such contracts without consent.   Under these circumstances, the CLO Objectors argue that "applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from . . . an entity other than the debtor. . . ." 11 U.S.C. § 365(c)(1)(A).

161.    This Court has previously (and correctly) rejected both of these arguments – at that time made by the Debtor under the control of Mr. Dondero – in *In re Acis Capital Management, L.P., et al*, Case No. 18-30264-sgj, Docket No. 549 (Bankr. N.D. Tex. Aug. 30, 2018) (the "Acis Order").   In the Acis Order, this Court held that: (a) the portfolio management agreements at issue were not personal services contracts; and (b) Section 205(a)(2) of the Advisers Act is not "applicable law" precluding assignment under section 365.   Specifically, this Court ruled as follows:

> The court overrules any objection that there is some applicable law that excuses the counterparties to the PMAs [portfolio management agreements] (i.e., the CLO Issuers) from accepting performance from a party other than the debtor. First, these are not personal services contracts. . . . [I]n order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable. Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. If this were the standard, the exception would swallow the rule – any prudent party contracting for another's services considers the other party's skill, expertise, and reputation – and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party

86

APPX. 05573

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 94 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1312 of 1726   PageID 12633
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 93 of 106

providing services is skilled and reputable – it is whether such services are unique in nature. *See Compass Van & Storage Corp.*, 65 B.R. at 1011. . . . Here. . . [p]ursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs. While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique – as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers. Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties: "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii). And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." *Id.* § 14(a). Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager." Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." . . . As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." . . . Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2).

Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision – the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs. Indeed, in the Southern District of New York, the court held:

> "Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an

87

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1313 of 1726   PageID 12634
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 94 of 106

> investment adviser's assignment of an investment advisory contract
> without client consent. The section merely provides that the
> contract must contain the specified provision. Thus, the
> assignment of a non-investment company advisory contract,
> without obtaining client consent, could constitute a breach of the
> advisory contract, but not a violation of Section 205(a)(2)."

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 2018 U.S. Dist. LEXIS 90174, at *12

(S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply

constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the

counterparties to the PMAs from accepting or rendering performance without such consent.

162.    For the exact reasons found by this Court in the Acis Order, the CLO Objectors'

argument that "applicable law" prevents assignment under 11 U.S.C. § 365(c) should be

overruled. First, the Management Agreements are on all fours with the management agreements

discussed in the Acis Order. The Management Agreements have the same delegation provisions,

the same assignment provisions, and the same provisions on merger, consolidation, and

amalgamation.[74] The Court has already ruled on these exact agreements and found that they

preclude a finding that the Management Agreements are personal services contracts.

---

[74] *See, e.g.,* Servicing Agreement, dated as of November 30, 2006, by and among Grayson CLO Ltd., and Highland
Capital Management, L.P. ("Grayson Agreement"):

> In providing services hereunder the Servicer may employ third parties including its Affiliates to
> render advice including advice with respect to the servicing of the Collateral and assistance
> provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder
> regardless of the performance of any services by third parties.

(*Id.*, § 2(d))

> In addition any successor Servicer must be an established institution which has demonstrated an
> ability to professionally and competently perform duties similar to those imposed upon the
> Servicer hereunder

(*Id.*, § 12(e))

> Any corporation partnership or limited liability company into which the Servicer may be merged
> or converted or with which it may be consolidated or any corporation partnership or limited
> liability company resulting from any merger conversion or consolidation to which the Servicer
> shall be party or any corporation partnership or limited liability company succeeding to all or
> substantially all of the servicing and collateral management business of the Servicer shall be the
> successor to the Servicer without any further action by the Servicer the Co-Issuers the Trustee the

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 96 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1314 of 1726   PageID 12635
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 95 of 106

163.    Second, as this Court ruled, the Advisers Act does not prohibit assignment
without consent.  It simply requires that an advisory agreement contain certain language and that
any failure to obtain consent is a breach, not a nullification of the assignment.  If the CLO
Objectors had done their diligence, they would have realized that the Acis Order is not unique.
The SEC has expressly stated that:

> Section 205(a)(2) does not prohibit an adviser's assignment of an investment
> advisory contract without client consent. The section merely provides that the
> contract must contain the specified provision. Thus, the assignment of a non-
> investment company advisory contract, without obtaining client consent, could
> constitute a breach of the advisory contract, but not a violation of Section
> 205(a)(2).

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter
(12/23/1997);  *see also*  Investment  Management  Staff  Issues  of  Interest,
http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ("In particular,
the staff previously has clarified that Section 205(a)(2) does not prohibit an adviser's assignment
of an investment advisory contract without client consent.  The section merely provides that the
contract must contain the specified provision.").

164.    As such, there is no applicable law prohibiting the assignment – let alone the
assumption – of the Management Agreements.  "[F]or section 365(c)(1) to apply, the applicable
law must specifically state that the contracting party is excused from accepting performance
from a third party under circumstances where it is clear from the statute that the identity of the
contracting party is crucial to the contract or public safety is at issue."  *In re ANC Rental Corp*.,
277 B.R. 226, 236 (Bankr. D. Del. 2002).

---

Noteholders or any other person or entity
(*Id.*, § 31)

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 97 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1315 of 1726   PageID 12636
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 96 of 106

### F.      The Inadequate Assurance of Future Performance Objection is Meritless

165.    The CLO Objectors contend that the reorganized Debtor will have inadequate resources to perform its obligations under the Management Agreements, and so has not given adequate assurance of future performance.   The CLO Objectors also allege that there is a mismatch between the Debtor's investment timeline and the timeline expected by the investors in the CLOs.  Both of those arguments fail.  First, assurance of future performance is a protection conferred by section 365 on contracting parties, which the CLO Objectors are not.  They lack standing to invoke it when the actual contracting parties – the CLOs – are satisfied.  Second, even if they had standing, the objection is without merit.  The CLO Objectors argue (i) because the Debtor is terminating all of its employees, it will not be able to manage the CLOs post-Effective Date and (ii) the Debtor cannot hire a Sub-Servicer to manage the CLOs without violating the Management Agreements.  As an initial matter, the Debtor is not retaining a Sub-Servicer to manage the CLOs, and, although the Debtor will terminate a number of employees, it will retain sufficient and appropriate staff to manage the CLOs post-Effective Date.  However, even if the Debtor were terminating all employees, the Management Agreements *expressly* allow the Debtor to retain a Sub-Servicer to manage the CLOs.[75]

166.    Similarly, the CLO Objectors' contention that the Debtor's timeline for monetizing the assets in the CLOs is contrary to the timeline expected by the CLOs' investors also ignores the facts.  As disclosed in the CLOs' offering memoranda, the notes and preference shares issued by the CLOs have come due or will, with two exceptions, come due shortly.

---

[75] *See* Grayson Agreement, § 2(d) ("In providing services hereunder **the Servicer may employ third parties** including its Affiliates **to render advice including advice with respect to the servicing of the Collateral and assistance** provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.") (emphasis added).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 98 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1316 of 1726   PageID 12637
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 97 of 106

| CLO | Note Maturity | Preference Share Redemption |
|---|---|---|
| Aberdeen | November 2018 | November 2018 |
| Brentwood | February 2022 | February 2022 |
| Eastwood | May 2022 | May 2022 |
| Gleneagles | November 2017 | November 2017 |
| Grayson | November 2021 | November 2021 |
| Greenbriar | November 2021 | November 2021 |
| Highland Legacy Limited | June 2011 | N/A |
| Highland Loan Funding V | August 2014 | August 2014 |
| Highland Park CDO I | November 2051 | November 2051 |
| Jasper | August 2017 | August 2017 |
| Pam Capital | May 2010 | N/A |
| PamCo | August 2009 | N/A |
| Red River | July 2018 | July 2018 |
| Rockwall | August 2021 | N/A |
| Rockwall II | August 2021 | N/A |
| Southfork | February 2017 | February 2017 |
| Stratford | November 2021 | November 2021 |
| Valhalla | April 2038 | April 2038 |
| Westchester | August 2022 | August 2022 |

As such, there is no mismatch between the expectations of the CLOs' investors and the Debtor. With the exception of the CLO Objectors who presumably want the CLOs to stay extant forever, the expectations of the CLOs' investors are set by the offering memoranda, which clearly disclose the expected timeline for the CLOs.

167.    Finally, the disingenuousness of the CLO Objectors' arguments on future performance cannot be overstated.  The CLO Objectors are arguing that the Debtor must *reject* the Management Agreements because – in their estimation – the Reorganized Debtor will not be able to satisfactorily manage the CLOs.  The CLO Objectors' argument is therefore that it is

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 99 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1317 of 1726   PageID 12638
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 98 of 106

better for the CLOs to have no manager at all.  The CLO Objectors arguments are an abject

danger to the Estate and could create potential liability in the millions of dollars.

> **G.**    **The "Impermissible Partial Assignment" Objection is Meritless**

168.    The CLO Objectors contend that their rights are being modified by the Debtor's

assumption of the Management Agreements, effectively resulting in an impermissible "partial

assumption" of the contracts.  Once again, they are not contracting parties with standing to object

on this basis.  But even if they were, the factual predicate is missing.  The Management

Agreements are being assumed *in toto*.  There is no modification of any contract rights of the

CLO Objectors.  And, as set forth above, the Debtor filed the Adversary Complaint in which it

sought a declaratory judgment on the CLO Objectors' rights to replace the Debtor as Portfolio

Manager under the Management Agreements.  Regardless of whether the Plan is confirmed, the

CLO Objectors will have their rights under the Management Agreements as those rights are

determined by this Court in connection with the adjudication of the Adversary Complaint.

**XI.    STATE TAXING AUTHORITY OBJECTION**

169.    Following the filing of the State Taxing Authority Objection, the Debtor reached

out to Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County

(collectively, the "State Authorities") to see whether the State Taxing Authority Objection could

be resolved consensually.  Although the Debtor and the State Taxing Authority have not yet

reached resolution, the Debtor is optimistic that the State Taxing Authority Objection will be

resolved and will continue working with the State Authorities.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 100
Case 3:23-cv-00726-S Document 8-23 Filed 126/29/23 Page 1318 of 1726 PageID 12639
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 99 of 106

## XII.   IRS OBJECTION

170.    The Internal Revenue Service ("IRS") raises three objections to the Plan in the IRS Objection, two of which are not controversial, and the Debtor has amended the plan to address these points.

171.    First, in paragraph 1 of the IRS Objection, the IRS requests that the Debtor provide it with interest on account of its Allowed Claim as required under 11 U.S.C. 1129(a)(9)(C).  The Plan previously provided for payment of the full amount of the Allowed Priority Tax Claims (which would include any applicable interest on account of such Allowed Claim) on the Initial Distribution Date in order to fully satisfy these tax claims and avoid the incurrence of any unnecessary interest.  To clarify this issue and resolve this first objection, the Debtor has amended the Plan to provide for an additional treatment mechanism that provides that Allowed Claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code in the event the entirety of the IRS's Allowed Claims (inclusive of any interest pursuant to which such claims are entitled to) are not paid on the Initial Distribution Date, as provided in section II.C of the Plan.

172.    Second, in paragraph 3 of the IRS Objection, the IRS argues that its claims should not be "fixed" unless and until any required tax returns are filed.  The Debtor does not dispute this contention and believes that the proposed language that was provided to the IRS and reprinted below addresses this concern because it provides that the IRS's claims shall survive the bankruptcy as if the cases had not yet been filed, which is standard in chapter 11 confirmation orders.  Further, the Debtor believes that it has filed all applicable returns but, in an effort to resolve the IRS Objection, proposes the language below.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 101
Case 3:23-cv-00726-S Document 8-23 Filed 06/29/23 Page 1319 of 1726 PageID 12640
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 100 of
106

173.    In paragraph 2 of the IRS Objection, the IRS asserts that it has no record of the Debtor having filed its Form 720 with respect to its self-insured health plan for the June 30, 2014, June 30, 2016 and June 30, 2018 tax periods.  Because of this alleged non-compliance, the IRS proposes certain default provisions detailed in the chart below (the "Default Provisions").  The Debtor asserts that the Default Provisions are not warranted because that Debtor has filed all applicable tax returns.  Specifically, with respect to Form 720, on April 22, 2020, the Debtor responded to an IRS inquiry about the forms and provided an explanation about forms which were not required and provided the IRS with Form 720 for the 2015, 2016 and 2017 tax periods.  Further the Default Provisions are not warranted because the IRS has adequate collection and enforcement remedies available through applicable law and should not be granted additional remedies through the Plan.  Finally, the Default Provisions are vague and contain undefined terms which will result in confusion if enforcement is ever attempted.  Certain examples of these problems are discussed below.

174.    Default Provision (1) provides certain remedies to the IRS in the event of certain failures to pay taxes or timely file returns by the Debtor, the Reorganized Debtor or any successor in interest.  The Debtor asserts that the Default Provisions are unnecessary since the Debtor has provided all applicable returns.  Default Provisions (2) and (3) are not needed and are problematic because of their vagueness.  The Debtor would agree to Default Provision (1) provided that it is clarified to state that nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that

DOCS_SF:104855.7 36027/002

the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States.

175.     Default Provision (2), presumably intended to provide remedies in addition to those provided under Default Provision (1), would allow the IRS to declare the Debtor to be in **"default"** if the certain failures were not cured within fourteen (14) days and then the **"entire imposed liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, an/or any successor in interest."** The term **"entire imposed liability"** is not defined in the proposed Default Provision. The ability of the IRS to unilaterally declare the Debtor to be in default and the imposition of a fourteen (14) day deadline is inappropriate and the IRS should rely on applicable law without imposing additional requirements through the confirmation process. Further, if this provision is intended to cut off the Debtor's right to challenge any obligation that is asserted against it by the IRS, it goes beyond applicable law and would deprive the Debtor of valuable rights to legitimately challenge such asserted amounts, including applicable appeal rights. Further, to the extent that the Debtor may legitimately dispute certain tax obligations, acceleration of payment of other tax obligations is not appropriate and not in accordance with applicable law.

176.     Default Provision (3) requires full payment of the entire imposed liability, together with an unpaid current liabilities within fourteen (14) days of demand and also purports to extend the collection statute expiration date again attempting to augment remedies available to the IRS. Such remedies are not warranted. Again, the IRS has adequate remedies available to it

under applicable law and should not seek to augment them through the bankruptcy plan confirmation process.

177.   Aside from the fact that the pre-determination of the parties' applicable rights and defenses under applicable non-bankruptcy law does not belong in a chapter 11 plan or confirmation order, the IRS's language is problematic for another reason.  By grafting these requirements to a chapter 11 plan and or a court order, the IRS is creating additional remedies that it would otherwise not be entitled to under non-bankruptcy law because it could then use the Confirmation Order to hold the Debtor in contempt, and potentially foreclose any applicable defenses or other substantive rights in a later proceeding that contravene the IRS's Court-ordered default language.

178.   The Debtor has proposed (and the IRS has rejected) the standard "neutrality" language that protects the parties' respective rights and defenses and places them in the "the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated if the bankruptcy case had not been commenced" which is where they belong.

179.   The Debtor believes that the Court should not pre-adjudicate either the Debtor's or the IRS's applicable rights and remedies with respect to any unfiled tax returns or claims asserted by the IRS and these issues should be preserved for adjudication in the appropriate forums post-confirmation.  The Debtor believes that its neutrality language initially proposed is consistent with language approved by this Court and in other cases without pre-adjudicating the parties' substantive rights.  While the Debtor does not believe that any of the proposed Default Provisions are warranted because it has complied with applicable filing requirements, the Debtor

APP.105893

would agree to include Default Provision (1) as modified below. The Debtor believes that the language proposed to the IRS for insertion to the Confirmation Order[76] preserves each party's respective rights and defenses and adequately protects the IRS form enforcing any statutory claims or rights it may possess.

| | |
|---|---|
| **Proposed Resolution of Objection of United States of America**. | **Default Provision - IRS**. Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): |
| **Default Provision - IRS**. Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): | |
| (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: | (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: |
| (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; | (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; |
| (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire | (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may |

---

[76] The Debtor discussed its concerns with IRS counsel provided it with certain neutrality language to resolve the IRS objection. The IRS responded that it could not agree to such language and would stand on its objection and its requested default language

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 105
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1323 of 1726 PageID 12644
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 104 of 106

imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed; and

(3) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service;

(4) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States; and

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2) If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, **shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest**. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3) **If full payment is not made within fourteen (14) days of such demand**, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code. **The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan**.

(4) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 106
of 126
Case 3:23-cv-00726-S Document 8-23 Filed 06/29/23 Page 1324 of 1726 PageID 12645
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 105 of
106

| | after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. |
|---|---|

## **CONCLUSION**

For the reasons set forth herein and in the Memorandum, the Debtor respectfully requests that the Bankruptcy Court overrule the Objections for the reasons set forth herein and confirm the Plan as requested by the Debtor.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 107
Case 3:23-cv-00726-S   Document 8-23   Filed 06/29/23   Page 1325 of 1726   PageID 12646
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 106 of
106

Dated:  January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
_____
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 1 of 2

# **EXHIBIT A**

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 109
Case 3:23-cv-00726-S   Document 8-23   Filed 06/29/23   Page 1327 of 1726   PageID 12648
of 126
Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 2 of 2

# Plan Objections from Dondero-Related Entities: Organizational Charts



Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 14

# **EXHIBIT B**

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 111
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1329 of 1726 PageID 12650
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 2 of 14

## OBJECTION SUMMARY[1]

| Objecting Party | Objection | Response |
|---|---|---|
| U.S. Trustee | The release is overbroad and releases non-debtors in violation of Pacific Lumber | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors. No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable. Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The exculpation is overbroad and releases non-debtors in violation of Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| Internal Revenue Service | Plan does not state that the Debtor will pay IRS priority tax claims on the Effective Date. | The Plan provides that Allowed Priority Claims would be paid on the Initial Distribution Date. In response to this objection, the Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The plan does not provide for statutory interest on the IRS claims under Section 511 | Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The IRS asserts that the Debtor failed to file tax Form 720 returns related to its self-insured health plan for 2014, 2016, and 2017 and requests that the Plan be amended to include certain "Default Provisions" that, among other things, allow the IRS to declare defaults, demand that the "entire imposed liability" become due and payable, and the ability to collect unpaid liabilities upon 14 days' notice of demand for payment | The Debtor has provided all applicable tax forms and the proposed Default Provisions are unwarranted. The Debtor would agree, however, to modified Default Provisions.<br><br>The IRS' proposed Default Provisions graft the IRS' potential non-bankruptcy and arguably additional rights and remedies into the Plan, including the IRS' unilateral rights to declare defaults, impose successor liability, and to require payments of "entire imposed liabilities" upon 14 days' notice of demand. The Debtor does not think it is appropriate for the Plan or Confirmation Order to dictate these rights and they should be determined under applicable non bankruptcy law. |

---

[1] The following are summaries only. Parties should read the entirety of the Debtor's Reply.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 112
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1330 of 1726 PageID 12651
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 3 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County | Plan does not appropriately apply for treatment of postpetition and effective date interest on tax claims, Plan does not provide for continued security interest and Plan does not provide that failure to pay tax claims is a default under the plan | The Debtor is currently negotiating language with these taxing authorities to resolve the issues raised in their objection through insertion of language in the Confirmation Order in order to consensually resolve this objection. |
| Jack Yang and Brad Borud (joined by Deadman, Travers, Kauffman [D.I. 1674; 1679]) | Subordinated Claims are defined overly broad as not just claims subordinated under § 510 but also claims arising from Class A/B/C Limited Partnership interests in a way that impermissibly broadens § 510(b) | The Plan has been amended to clarify that it does not provide for categorical subordination of claims relating to partnership interests to address this objection |
| Patrick Daugherty | The Disputed Claims Reserve allows the Debtor to estimate claims for distribution, which provides for impermissible disparate treatment under § 1123(a)(4) | The Plan does not provide for disparate treatment of claims. The Plan provides for a mechanism for the Debtor or Mr. Daugherty (or any creditor) to file a motion to estimate any Disputed Claim for purposes of establishing the amount of the Disputed Claims Reserve pending the allowance or disallowance of his claim. Neither Daugherty or any other creditor is entitled to a reserve for the full amount of a disputed claim. This procedure does not constitute disparate treatment of claims under section 1123(a)(4) |
| Dugaboy Investment Trust and Get Good Investment Trust | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan is not complete as it doesn't list final documents governing the claimant trust/litigation trust/reorg debtor, retained causes of action, executory contracts | Dugaboy's reference to documents still under negotiation with the Committee was a vestige from a prior draft. Three Plan Supplements have been filed that contain those documents. An additional Plan Supplement is being filed concurrently herewith. |
| | Plan violates 1129(a)(7) because it doesn't provide the value that would be received in a chapter 7 liquidation because: (i) Reorg Debtor has no affirmative obligation to report to holders of beneficial interests in the Claimant Trust, (ii) Claimant Trustee is only liable for fraud, willful misconduct, or gross negligence and not breach of fiduciary duty; and (iii) a chapter 7 trustee would need to get court authority to sell assets and no such requirement exists for Claimant Trustee

[ | The Liquidation Analysis provides that creditors will receive distributions under the Plan that are not less than the value they would receive under a hypothetical distribution under chapter 7. This objection does not contest the conclusions set forth in the Liquidation Analysis.

The Plan, consistent with other plans including ones confirmed in this court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. Moreover, a chapter 7 trustee would enjoy qualified immunity for its actions. |

| Objecting Party | Objection | Response |
|---|---|---|
| | Exculpation provisions are overbroad as (i) they do not relate to a specific time period (just apply from Petition Date through implementation), especially when read in connection with the exculpation provision in the Claimant Trust Agreement, (ii) cover non-Debtors, and (iii) violates Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The CTA includes standard language limiting liability and is not an improper exculpation. |
| | Release provision (i) is overbroad and releases claims not related to the BK; (ii) waives future claims of the Claimant Trust | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and the LST only as successors to the Debtor, not any claims the CT or LST might subsequently have of their own.   No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The injunction provisions in Article IX.F are overbroad and arguably violates Pacific Lumber as an improper release and In re Zale and Thru, which prevents a non-debtor injunction if it effectively discharges a no debtor | The Injunction Provisions have been modified to address these concerns.  The Injunction Provision, as modified, merely implements the Plan's discharge, release, and Exculpation Provisions by enjoining the Enjoined Parties from commencing or maintaining any actions to interfere with the implementation or consummation of the Plan.  Implementation and consummation are words used in the Code and have meanings known by practitioners and the Court.  The injunction is only applicable to the Debtor and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust – none of whom are non-debtor third parties as the debtor has eliminated the Independent Directors from these provisions. |
| | The release provided to released parties does not meet the standards for a release as there is no meaningful contribution to the BK and is not necessary to protect non-debtor entities that are essentially the debtor | Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The consideration provided by the Released Parties will be presented.  The Released Parties are only being released by the Debtor and its successors. |

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 114
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1332 of 1726    PageID 12653
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 5 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | The "channeling injunction" and retention of jurisdiction is improper because it expands the BK court's jurisdiction to actions not arising under, related to, or arising in the BK.  This is especially so since there is no post-effective date Reorganized Debtor | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the Court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. |
| | The injunction prevents parties from enforcing the rights created by the plan post-effective date | Art. IX.F starts with "Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . . "  It does not prevent enforcement of rights created under the Plan |
| | The "channeling injunction" is not a proper channeling injunction under Section 524(j) and even if it were, 524(j) only applies to debtors that are eligible for a discharge under 1141 and HCMLP is not eligible for a discharge because it is a liquidation plan. | The Gatekeeper Provision has nothing to do with Section 524(j).  Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| James Dondero | The exculpation provision in IX.D is overbroad as it relates to non-debtors under Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | The "channeling injunction" in Article IX.F includes post-confirmation conduct and non-debtors and is effectively a third party release prohibited under Dropbox. | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the Court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed |

APPX. 05904

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 115
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1333 of 1726 PageID 12654
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 6 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | | and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. There is no "release" in the Gatekeeper Provision as it does not prevent claims from being brought – it merely requires that the Bankruptcy Court determine the claim is colorable before it can be brought. |
| | The "channeling injunction" limits jurisdiction to the Bankruptcy Court and ignores other courts with exclusive jurisdiction and specialized jurisdiction | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. |
| | The "channeling injunction" is impermissibly vague under FRBP 3016(c) | The Gatekeeper Provision is not vague and, to the extent FRBP 3016(c) is applicable, expressly complies with the rule in that the Gatekeeper Provision describes in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identifies the entities that would be subject to the injunction |
| | The Plan does not provide appropriate mechanisms for oversight of post-confirmation sales and would allow impermissible sales similar to that which occurred during the BK | This is the same objection filed by other Dondero Entities to prevent the post-confirmation monetization of assets. The Plan, consistent with other plans including ones confirmed in this Court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. |
| | The jurisdictional provisions are overbroad and would require all claims to be heard in the BK without regard to whether they arise in connection with implementation of the plan or otherwise | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. The Bankruptcy Court has jurisdiction to determine if a claim is colorable |
| | The elimination of vacant classes on the effective date would impermissibly limited later re-allocation of claims | The elimination of the only vacant class (Class 5 (Retained Employees)) is for voting tabulation purposes only. This provision permissibly provides for the treatment of any claims that may arise or become Allowed as a Class 5 Claim post-confirmation. |
| | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| NexPoint Real Estate Partners LLC, f/k/a HCRE Partners, LLC | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 116
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1334 of 1726   PageID 12655
of 126
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 7 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The "channeling injunction" improperly insulates non-debtors under s. 524(e). | The Gatekeeper Provisions do not implicate section 524(e).  There is no insulation of any non-debtor.  The Gatekeeper Provision simply requires the Bankruptcy Court to determine if a claim is colorable before it can be brought. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | Period of time covered by the release and exculpation provisions impermissibly extends post-effective date.  Cf. Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexPoint Advisors, Highland Capital Management Fund Advisors, and related funds<br><br>(joined by CLO Holdco)<br><br>(joined by NexPoint RE Entities [D.I. 1677] | Investment Advisers Act is "applicable law" that prohibits assumption/assignment of the Portfolio Management Agreements ("PMAs") under 365(c) | As this Court has ruled in Acis, and as SEC No Action Letters advise, the Investment Advisers Act does not prohibit assignment. The "actual test" applies and thus even if the PMAs were nonassignable, they would still be assumable. |
| | PMAs are "personal services contracts" and cannot be assigned under 365(c) | As this Court ruled in Acis, the PMAs are not nonassignable personal services contracts.  Further, the counterparties have consented, and under the "actual test" the PMAs would be assumable even if nonassignable. |

APP. 05996

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 117
Case 3:23-cv-00726-S   Document 8-23   Filed 11/29/23   Page 1335 of 1726   PageID 12656
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 8 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Fifth Circuit applies the hypothetical test under Section 365(c), not the actual test | Fifth Circuit has applied the actual test under §365(e) and lower courts within the Fifth Circuit have applied the actual test to §365(c). |
| | Even if "actual" test applies, the Reorg Debtor is not the Debtor because of slimmed down staff and use of subservicers | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | There is no consent to assumption under 365(c) | CLO issuers are the counterparties and they consent.  The objectors have no contract right to object to assumption. |
| | The objectors have standing because they have claims against the estate or will have large rejection claims under shared services agreements. | The Funds, Advisors and CLO Holdco are not creditors and will not be creditors.  They agreed to expungement of their claims or reduction to zero.  There will be no rejection damages because the contracts are freely terminable upon notice and are being terminated, not rejected.  Even if objectors were creditors, that would give them standing only as to whether assumption benefits the estate, not their particular interests. |
| | The objectors have standing because the plan violates 1129 because it provides for assumption of contracts in violation of law. | The objectors have no standing as creditors, they have no standing to object to assumption of contracts to which they are not parties and to which the counterparties have consented, and assumption of the PMAs does not violate any law. |
| | The objectors have standing because the plan seeks to limit their right to remove the manager | The Plan does not limit their removal rights. |
| | Debtor should take direction from the majority of the preference shareholders in the CLOs | The objectors have no contractual right to control the management of the CLOs. |
| | The injunction and release provisions are overbroad because they do not appropriately define their scope and prevent the movants from suing for future malfeasance | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of  the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable. Section 1123(b)(3) expressly permits a debtor to settle and release its own claims.  The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The injunction prevents the objectors and the CLOs from seeking relief against the | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan |

APPX. 105907

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 118
Case 3:23-cv-00726-S Document 8-23 Filed 126/29/23 Page 1336 of 1726 PageID 12657
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 9 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | debtor/reorg debtor from any present or future actionable wrongs under the servicing agreements and advisers act | and attempts to collect the claims and interests dealt with by the Plan. |
| | Injunction prevents set off or other damages under the servicing agreements and to seek legal redress | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | "Channeling Injunction" is defective with respect to post-confirmation actions and is overly broad | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. The Bankruptcy Court has jurisdiction to determine if a claim is colorable. |
| | Plan does not disclose who will be operating the reorganized debtor and claimant trust or their comp as required under s 1123(a)(7) or insider compensation under 1129(a)(5) | The Plan Supplement discloses the identity of the Claimant Trustee, Litigation Trustee and Oversight Committee members. The Debtor discloses in the Confirmation Brief the compensation of insiders pursuant 1129(a)(5) under the Plan who will serve post-confirmation in their Confirmation Brief |
| | The plan is not feasible because the treatment of the CLO management agreements is illegal and violates s. 365 | The Plan does not impact any party's rights under the CLO management agreements, and applicable law does not prohibit the Debtor's assumption of the CLO management agreements. |
| | The plan does not provide assurance of future performance with respect to the assumption of the CLO management agreement as required by 365(b) | The objectors lack standing to object. As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer. However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date. This is an adequate assurance issue, and the contract counterparties have consented. |
| | Release and injunction provisions are overbroad under Pacific Lumber because they release third parties | Neither the Release nor the Injunction Provisions release non-debtor third parties. |
| | Exculpation provisions are overbroad under Thru | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |

APPX. 05908

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 119
Case 3:23-cv-00726-S Document 8-23 Filed 126/29/23 Page 1337 of 1726 PageID 12658
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 10 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The plan divests movants from their set off rights | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The plan provides that contracts can be assumed until the Effective Date in violation of 365(d)(2) | The Plan has been amended to address this objection. |
| | Debtor is not entitled to a discharge under 1141 because it's a liquidating plan | Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| | The plan violates the absolute priority rule because equity gets to keep assets while senior creditors may not be paid in full | This assertion is false. Equity Interests will not receive any property on account of the their interests pursuant to the Plan unless and until the claims of creditors are full paid, inclusive of interests, as provided in the Plan. |
| CLO Holdco Ltd. | CLO Holdco has standing to object because of its interests in the CLOs | As set forth above, CLO Holdco has no standing to assert the rights of the contracting parties to the PMAs. It is also not a creditor, having reduced its claim to zero and having no rejection claim. Even if it was a creditor it would not have standing to object to assumption on the basis of rights held by contracting parties. |
| | Joined NPA/HCMFA objection | NPA/HCMFA objection responses are set forth above. |
| | Plan provides for impermissible "partial assumption" because it cherry picks provisions of the CLO management agreements that are going to be assumed by preventing removal of the CLO manager by the preference shares | For the reasons set forth above, CLO Holdco has no standing to assert objections to assumption held by the contracting parties, who consent to assumption. Further, the Plan does not deprive preference shareholders of removal rights. |
| | Injunction and exculpation prohibits creditors from interfering with implementation or consummation of the plan and would prevent the movants from removing the Debtor as the CLO manager | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The plan impermissibly modifies the movants' rights under the CLO management agreements without their consent | The Plan does not modify CLO Holdco's rights under the PMAs. |
| | Exculpation and indemnification provisions are third party releases in violation of applicable law under Pacific Lumber | The Plan does not contain an" indemnification provision." The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity |

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 120
Case 3:23-cv-00726-S Document 8-23 Filed 06/29/23 Page 1338 of 1726 PageID 12659
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 11 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | | of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., and NexBank | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | The Debtor amended Plan section III.J of the Plan to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | |
| | The exculpation and release provisions violate Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. The Release is only a release of claims owned by the Debtor and its estate and does not implicate Pacific Lumber which had nothing to do with debtor released which are permitted under section 1123(b)(3). |
| Senior Employees | The Plan violates § 1123(a)(4) because it treats the Senior Employees differently than similarly situated employees by requiring the Senior Employees to sign a Senior Employee Stipulation and reduce a portion of their claim to obtain a release. | The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided. The potential Debtor release of its own claims against employees or ex-employees under the Plan does not constitute "treatment" of Class 7 or Class 8 claims. |

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 121
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 of 126 Page 1339 of 1726 PageID 12660
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 12 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The Senior Employee Stipulation was not approved by the Senior Employees and contains material problems. | Whether or not the Senior Employees voluntary elect to sign the Senior Employee Stipulation does not constitute a valid basis to object to Plan confirmation. The voluntary decision to execute the Senior Employee Stipulation was at the option of the employee. Moreover, the Debtor has settled this objection with respect to Mr. Surgent and Mr. Waterhouse. |
| | The Debtor has improperly prevented the Senior Employees from making the Convenience Class Election because, as reflected in the chart prepared by the Debtor, the Senior Employees have liquidated claims which are not in dispute. | Under applicable bankruptcy law, the Plan and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.

Each Senior Employee filed a single proof of claim and the Senior Employees have not cited any authority supporting the proposition that a claimant may split claims listed in a single proof of claim; to the contrary, courts have stated that claim splitting is impermissible when covered by a single proof of claim. Further, the Plan and Disclosure Statement Order prohibit claim splitting for voting purposes. Finally, as explicitly set forth on the ballots approved by the Disclosure Statement Order, even if a Senior Employee could split his claims in order to elect Convenience Class treatment, the Convenience Class Election only impacts *treatment*, and explicitly does not impact voting. |
| | The Plan provides that a Class 8 Creditor can make the Convenience Class Election for a liquidated claim. Since a portion of each Senior Employee's claim is liquidated, the Senior Employees have a right to make the Convenience Class Election under the Plan.

The Debtor has contradicted the Plan in how in its conversations with the Senior Employees. Each Senior Employee received two ballots (one Class 7 and one Class 8) and this confusion justifies the Senior Employees review of the Plan.

The fact that the Plan splits employee claims into PTO claims and other claims is evidence that the Plan allows Claim splitting. The | As set forth directly above, each Senior Employee would have to split his claim in order to also retain the remainder of his Class 8 claim. This is impermissible under applicable case law and the Plan.

The Debtor's statements have been consistent with the Plan. In any event, the Plan governs. The Senior Employee's receipt of two ballots was an administrative error and cannot override the express terms of the Plan and Disclosure Statement Order.

As to the PTO Claims, those were separately classified *by the Plan*. The Senior Employees seek to split claims *within the same class*. It is splitting claims within the same class that is prohibited by applicable case law and the Plan and Disclosure Statement Order. |

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 122
Case 3:23-cv-00726-S   Document 8-23   Filed 06/29/23   Page 1340 of 1726   PageID 12661
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 13 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | exhibit is a representation that the Senior Employee claims have the right to a split claim because it discusses a Convenience Class claim. | |
| | The Plan identifies no basis for disparate and unfair treatment of the Senior Employees. | Debtors are not required to grant releases to anyone nor are their required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees. |
| | The Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the Claimant Trustee the unfettered power to "reclassify" any claim as a Subordinated Claim. | Section III.J of the Plan has been amended to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan allows the Debtor to make changes to the Plan without Court approval, including changes to the plan supplement documents. | To the contrary, Article XII of the Plan explicitly requires that modifications to the Plan be in compliance with section 1127. |

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 123
of 126
Case 3:23-cv-00726-S Document 8-23 Filed 11/29/23 Page 1341 of 1726 PageID 12662
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 14 of
14

Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 1 of 3

# **EXHIBIT C**

On the Effective Date, the Debtor will assume the agreements set forth on Appendix [_] hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[1] a cumulative amount of $525,000 (the "Cure Amount") as follows:

- $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

- $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and this Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; provided, however, that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

Effective as of the Effective Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the

---

[1] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 126
Case 3:23-cv-00726-S Document 8-23 Filed 06/29/23 Page 1344 of 1726 PageID 12665
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 3 of 3

"Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

Effective as of the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe, (xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.

Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs [__] hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

# EXHIBIT 37

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1346 of 1726   PageID 12667
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 23

Docket #2308  Date Filed: 05/14/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Elissa A. Wagner (CA Bar No. 213589) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket Nos. 2199, 2268, 2293, 2295** |
| | ) | |

<div align="center">

**DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR
ENTRY OF AN ORDER APPROVING SETTLEMENT WITH UBS SECURITIES
AND UBS AG LONDON BRANCH AND AUTHORIZING ACTIONS CONSISTENT
THEREWITH**

</div>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210514000000000006

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1347 of 1726   PageID 12668
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 2 of 23

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") (a) in response to (i) the *Limited Preliminary Objection to the Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2268] (the "Initial Dugaboy Objection"), (ii) the *Supplemental Opposition to Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2293] (the "Supplemental Dugaboy Objection," and together with the Initial Dugaboy Objection, the "Dugaboy Objection"), and (iii) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2295] (the "Dondero Objection," and together with the Dugaboy Objection, the "Objections") and (b) in support of its *Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199] (the "Motion").[2]  In further support of the Motion, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1.       As set forth in the Motion, the Settlement Agreement provides UBS with a Class 8 (General Unsecured Claim) of $65 million and a Class 9 (Subordinated Claim) of $60 million. The Settlement Agreement also provides that Multi-Strat will pay $18.5 million to UBS in satisfaction of UBS's claims against Multi-Strat.  This is an extraordinary achievement that is supported by the Debtor's major creditors.  It resolves over a decade of highly acrimonious litigation, including extensive litigation in this Court, and UBS's $1 billion plus claim against the Debtor as well as its claim against Multi-Strat.  The settlement paves the way for the Debtor to

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

APPX. 05919

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1348 of 1726 PageID 12669
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 23

begin making long-overdue distributions to creditors following the effective date of the Plan. It is opposed by no one except Mr. Dondero and the "family trust" – The Dugaboy Investment Trust ("Dugaboy") – that he controls (together, the "Dondero Objectors").[3]

2.      And, while the Debtor believed, and continues to believe, that it has defenses to UBS's claims, those defenses would be (i) subject to substantial factual disputes, (ii) require the cooperation of now-adverse parties whose credibility has already been questioned, and (iii) require expensive, time-consuming litigation that would likely be resolved only after a lengthy trial (and likely rounds of appeals) all while the Debtor (or its successor) assumes the risk that the defenses might fail.

3.      The Dondero Objectors do not (and cannot) dispute that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the principals and their counsel. The Debtor believes that the proposed settlement is fair and reasonable, results from the valid and proper exercise of its business judgment, and represents the successful resolution of an incredibly complicated and substantial claim.

4.      The facts underlying the Settlement Agreement are well known to this Court, but some bear repeating:

- In late 2008, CDO Fund and SOHC breached certain warehouse agreements;
- After years of litigation, in November 2019, UBS secured a judgment in the State Court against CDO Fund and SOHC on account of that breach of over $1 billion (inclusive of interest);
- As part of this litigation, UBS alleged that certain entities managed and/or controlled by the Debtor, including Multi-Strat, engaged in a series of orchestrated

---

[3] *See Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") ¶ 19. As this Court has previously found, and as set forth below, Mr. Dondero and Dugaboy have only the most tenuous economic interest in and connection to the Debtor's estate. *Id.* ¶¶ 17-18.

DOCS_NY:43138.5 36027/002

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1349 of 1726   PageID 12670
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 4 of 23

fraudulent conveyances with the goal of moving assets away from the Funds and outside the reach of UBS;

- UBS also alleged that the Debtor (then under Mr. Dondero's control) breached the implied covenant of good faith and fair dealing by interfering with CDO Fund and SOHC's payment of its obligations to UBS under the warehouse agreement;

- In December 2020, this Court entered an order estimating UBS's claim against the Debtor at $94,761,076 (the "Estimated Claim"), which included an estimation that UBS had a 90% chance of recovering $25,782,988 (plus interest) from Multi-Strat (resulting in a risk-adjusted claim against Multi-Strat of approximately $23.2 million) on account of UBS's fraudulent conveyance claim against it;

- After reaching an agreement in principle with UBS, the Debtor uncovered a secret scheme by the Debtor's former management (a) to transfer more than $300 million in face amount of securities and cash from the Funds to Sentinel – a Cayman-based reinsurance company owned and controlled by Mr. Dondero and Scott Ellington – and (b) to hide that transfer from the Independent Directors, UBS, and this Court; and

- But for that transfer, CDO Fund and SOHC could have used the value of such fraudulently transferred securities and cash to satisfy UBS's judgment.

Despite the facts set forth above, Mr. Dondero – directly and through Dugaboy – has the audacity to file the Objections and object to the UBS settlement.

5.      Dugaboy's objection also questions the Debtor's corporate authority and business judgment and accuses the Debtor (now under the control of the Independent Directors) of having breached its duties and obligations by settling with UBS.  As set forth below, there is absolutely no basis for this contention.  Dugaboy is a limited partner in Multi-Strat and knows (or should know) that Multi-Strat's governing documents provide the Debtor, as investment manager, and indirect owner of Multi-Strat's general partner with complete authority to manage Multi-Strat's property and to "*settle or compromise suits and administrative proceedings and other similar matters.*"

6.      Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy – and to disenfranchise this Court by questioning its authority should be rebuffed, and the objections

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1350 of 1726 PageID 12671
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 23

overruled. The Debtor asks this Court to (once again) see through the pretense of the Dondero-
controlled entities' objections to the USB settlement and approve it as a fair settlement and valid
exercise of the Debtor's business judgment.

### ADDITIONAL BACKGROUND ON MULTI-STRAT

7.      Multi-Strat is a pooled investment fund that is structured as a "mini master."[4]  A
"mini master" consists of an offshore feeder fund and onshore master fund.  Generally speaking,
foreign investors and tax-exempt entities invest in the foreign feeder for tax reasons, and the
foreign feeder fund in turn invests substantially all of its assets in the onshore master fund as a
limited partner together with the other direct limited partners in the master fund.  The master fund
is the dominant entity within the "mini master" structure (and the entity most commonly referenced
in the structure) as it holds and invests all the assets, including those of the feeder fund.  Here,
Multi-Strat's "master fund" is Highland Multi Strategy Credit Fund, L.P., a Delaware limited
partnership (the "Master Fund"),[5] and its offshore feeder fund is Highland Multi Strategy Credit
Fund, Ltd., a Cayman Islands exempted company (the "Feeder Fund").  The Master Fund, the
Feeder Fund, their direct and indirect subsidiaries, and their respective general partners are referred
to in the Settlement Agreement, collectively, as "Multi-Strat."[6]  All of Multi-Strat's investment
activity is conducted through the Master Fund and all of its investable assets are held by the Master
Fund (either directly or indirectly).  Investors in the Master Fund and in the Feeder Fund generally
have the same rights and liquidity.  *See* Feeder PPM at 5 ("Aside from the differences described

---

[4] Additional background on Multi-Strat is included in the *Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.*, dated November 2014 (the "Master PPM") and the *Confidential Private Offering Memorandum of Highland Multi Strategy Credit Fund, Ltd.*, dated November 2014 (the "Feeder PPM" and together with the Master PPM, the "PPMs").  Copies of the Master PPM and Feeder PPM are attached as Exhibits 1 and 2, respectively.

[5] Multi-Strat was originally called Highland Credit Opportunities CDO, L.P. but changed its name in 2014.

[6] Multi-Strat has a number of offshore and onshore wholly-owned direct and indirect subsidiaries.  An organizational chart showing Multi-Strat's corporate structure is attached hereto as Exhibit 3.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1351 of 1726   PageID 12672
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 6 of 23

in this Memorandum, an investment in the [Feeder] Fund will have substantially similar terms and risks to an investment in the [Master Fund], as described in the [Master PPM].")

8.      Multi-Strat is managed by its investment manager – the Debtor – and its general partner – Highland Multi Strategy Credit Fund GP, L.P. (the "MSCF GP").  The MSCF GP is 100% owned – indirectly – by the Debtor, and the sole officer of MSCF GP is James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.  The Debtor's rights, duties, and obligations as investment manager are set forth in the *Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P.*, dated November 1, 2013 (the "IMA"), the *Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P.*, dated November 1, 2014 (the "LPA"), the PPMs, and the *Amended and Restated Memorandum and Articles of Association of Highland Multi Strategy Credit Fund, Ltd.*, as adopted on 1 November 2014 (the "Articles" and together with the IMA, the LPA, and the PPMs, the "Governing Documents").[7]  MSCF GP's rights, duties, and obligations are set forth in the LPA, the Master PPM, and general Delaware partnership law.

9.      Multi-Strat's investors include both the limited partners in the Master Fund and the shareholders of the Feeder Fund (which itself is a limited partner of the Master Fund).  Nevertheless, for convenience of reference, the ultimate investors, whether direct or through the Feeder Fund, are commonly referred to as Multi-Strat's limited partners.  Multi-Strat's current limited partners are:

---

[7] Copies of the IMA, LPA, and Articles are attached hereto as Exhibits 4, 5, and 6, respectively.  These documents were created at Mr. Dondero's direction years before the Petition Date, severely undermining his challenge to the Debtor's authority and again calling into substantial question his credibility and motivations.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1352 of 1726 PageID 12673
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 23

| Limited Partner | Ownership %[8] |
|---|---|
| Debtor | 58.70% |
| CLO Holdco, Ltd. ("CLOH") | 4.06% |
| Dugaboy | 1.71% |
| Highland Capital Management Services, Inc. ("HCMS") | 35.10% |
| Mark Okada | 0.43% |

As this Court knows, CLOH, Dugaboy, and HCMS are all directly owned and/or controlled by Mr. Dondero. Mr. Okada, in turn, is Mr. Dondero's long-time business partner. As such, besides the Debtor, the *only* limited partners in Multi-Strat are (directly or indirectly) owned and/or controlled by Mr. Dondero. There are no third-party limited partners.

10. In addition to the current limited partners, there are a number of former "redeemed" limited partners of Multi-Strat, which are referred to as the "redeemers." Under the terms of the LPA and Articles, limited partners are allowed to redeem their limited partnership interests under certain circumstances. Once redeemed, a limited partnership interest is extinguished and the balance of the amount owed to the redeemer is "crystallized," *i.e.*, reduced to a fixed dollar amount (based on the value of Multi-Strat's assets at the time of redemption) and is treated similar to a debt obligation of the fund, *i.e.*, the redeemer no longer participates in the appreciation of the fund's assets and only has a claim for its set dollar amount. Currently, Multi-Strat owes its redeemers approximately $90 million on account of their unpaid redemptions.

11. Prior to 2021, the Debtor believed – because that is what it was told by certain of the Debtor's then-employees – that *all* the redeemers were third party investors unaffiliated with the Debtor. As the Debtor recently discovered, however, that is not true. In fact, the largest redeemer is Sentinel – the entity owned by Mr. Dondero and Mr. Ellington – which is purportedly

---

[8] Ownership is provided on a consolidated basis without regard to whether a party is invested in the Master Fund or the Feeder Fund. The Debtor reserves the right to challenge the purported Dondero and/or Okada controlled limited partnership interests.

DOCS_NY:43138.5 36027/002

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1353 of 1726 PageID 12674
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 23

owed approximately $33 million, or one-third of the total redeemed interests. The majority of Sentinel's interest in Multi-Strat was originally owned by CDO Fund but was fraudulently taken from CDO Fund and moved to Sentinel in August 2017. Sentinel purportedly redeemed its Multi-Strat interest in November 2019 as the State Court was entering its judgment against the Funds. Sentinel's redeemed interest is referred to as the "MSCF Interests" in the Settlement Agreement. On information and belief, the other redeemers are unaffiliated third party investors.

## REPLY

### A. Standing

12.     In the Dondero Objection, Mr. Dondero goes to great lengths to prove that he has standing to object to the UBS settlement asserting that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. Dondero Obj. ¶¶4-13. This Court has already made substantial findings of fact concerning Mr. Dondero and Dugaboy's interests in the estate, finding that "the remoteness of their interests is noteworthy." Confirmation Order ¶¶ 17-18. In light of Mr. Dondero's misleading statements, the Debtor must again address Mr. Dondero and Dugaboy's purported "standing."[9]

13.     **James Dondero.** On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[10] Over a year later, Mr.

---

[9] The following analysis should look familiar as it is nearly verbatim the analysis included in *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "HarbourVest Motion"). Mr. Dondero – directly and through his proxies – was also the only person to object to the Debtor's settlement with HarbourVest (as defined in the HarbourVest Motion). Dugaboy and Mr. Dondero's other family trust – The Get Good Trust – are currently appealing the settlement with HarbourVest. Two of Mr. Dondero's other entities – The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. – recently filed a complaint in the District Court for the Northern District of Texas, which seeks to have the District Court undertake a reconsideration or *de facto* appeal of the settlement with HarbourVest. *See Original Complaint*, Case No. 21-00842-B, Docket No. 1 (N.D. Tex. Apr. 12, 2001).

[10] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice. *See* Docket No. 1460.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1354 of 1726 PageID 12675
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 23

Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[11]

Mr. Dondero's claim as an "indirect equity security holder" is also a stretch. Mr. Dondero holds

no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc.

("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited

partnership interests in the Debtor through its ownership of Class A limited partnership interests.

The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class

B and Class C limited partnership interests. The Class A interests are also junior to all other claims

filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior

to any claims against Strand itself, including any indemnification claims asserted against Strand

by the Independent Directors or their agents. Consequently, before Mr. Dondero can recover on

his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B

and Class C creditors must be satisfied, and all claims against Strand must be satisfied. And, if all

of that occurred, Mr. Dondero would recover 0.25% of the net distributions from the estate.

14. **Dugaboy.** Dugaboy is a sham Dondero "trust" with only the most attenuated

standing. Dugaboy filed three proofs of claim (Claim Nos. 113; 131; 177). In two of these claims,

Dugaboy argues that (a) the Debtor is liable to Dugaboy for its postpetition mismanagement of

Multi-Strat, and (b) this Court should pierce the corporate veil and allow Dugaboy to sue the

Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a

Debtor-managed investment vehicle. These claims are frivolous, and the Debtor has objected to

them. [Docket No. 906]. In its third claim, Dugaboy asserts a claim against the Debtor arising

from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the

total limited partnership interests in the Debtor). Like Mr. Dondero, Dugaboy can recover on its

---

[11] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

DOCS_NY:43138.5 36027/002

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1355 of 1726   PageID 12676
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 10 of 23

equity interest only if the Debtor is solvent and all priority distributions to Class B and Class C creditors and all claims against Strand are satisfied.  Then, and only then, would Dugaboy recover 0.1866% of the net distributions from the estate.  Dugaboy also claims to own 1.71% of the limited partnership interests in Multi-Strat (as discussed above).

15.    Consequently, the Dondero Objectors' standing to object to the UBS settlement is extremely attenuated and their chances of recovery in this case are, at best, theoretical and speculative thereby calling into question the Dondero Objectors' motivation.  *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing).  Mr. Dondero and Dugaboy's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected. "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

## B.    The Objections Fail on the Merits

16.    As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1356 of 1726    PageID 12677
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 11 of 23

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views" and (ii) whether the settlement is the product of arm's length bargaining and not of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted); *see also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

### 1.    <u>The Dugaboy Objection Is Without Merit</u>

17.    In its Objection, Dugaboy presses various arguments and makes various factual assertions but neglects to disclose its affiliation with Mr. Dondero and its interest in Multi-Strat. Those neglected facts undermine the majority of the Dugaboy Objection.

### a.    **Dugaboy is a Limited Partner in Multi-Strat**

18.    Pursuant to a subscription agreement (the "<u>Subscription</u>"), Dugaboy subscribed for shares in the Feeder Fund by investing $180,000.  A copy of the Subscription is attached as Exhibit 7.  Because Dugaboy is a "revocable grantor trust," the Subscription required that it be signed by Dugaboy's beneficiary as if the beneficiary was the one subscribing to Multi Strat in his individual capacity.  Mr. Dondero is Dugaboy's beneficiary and therefore signed the Subscription on behalf of Dugaboy.  By signing the Subscription, Mr. Dondero represented that he had received a copy of the Governing Documents on behalf of Dugaboy.  Consequently, Dugaboy has no excuse not to know how Multi-Strat is governed.

19.    As Mr. Dondero knows and intended, Multi-Strat's Governing Documents vest in the Debtor (as investment manager) and MSCF GP (as general partner) the exclusive authority (and obligation) to manage and bind Multi-Strat, including the authority to settle claims against

DOCS_NY:43138.5 36027/002

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1357 of 1726   PageID 12678
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 12 of 23

Multi-Strat.  For example, in the section titled "Risk Factors and Potential Conflicts of Interest," the Master PPM states that "[s]ubstantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager.  Limited Partners have no right or power to take part in the management of the Fund."  Master PPM at 25; *see also* Feeder PPM at 6 ("[T]he [Feeder] Fund's management, as well as investment decisions at the [Master Fund] level, are effectively controlled by the Investment Manager or its affiliates.").

20.    Further, among other things:

- Section 2(a) of the IMA requires that the Feeder Fund invest all of its assets in the Master Fund to be managed by the Debtor as investment manager.[12] IMA, § 2(a)

- Section 2(c)(i) of the IMA grants the Debtor, as investment manager, full discretion and authority on behalf of both the Master Fund and the Feeder Fund to "exercise all rights, powers, privileges and other incidents of ownership or possession" with respect to Multi-Strat's investments and "other property and funds held or owned by the Master Fund." *Id.* § 2(c).

- Section 2(c)(i) of the IMA also expressly and explicitly grants the Debtor, as investment manager, the authority to "***institute and settle or compromise suits and administrative proceedings and other similar matters***." *Id.* (emphasis added).

- Under Section 4.1 of the LPA, the MSCF GP:

  o    has "complete and exclusive power and responsibility, to the fullest extent permitted" by Delaware law to manage and administer the affairs of the Partnership, and "to do all things that the General Partner considers necessary or desirable to carry out its duties" under the LPA "whether or not such action or authority is expressly provided for in [the LPA]."

  o    has full power and authority "to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1."

  o    may delegate "to any other Person, including the Investment Manager," any power and authority vested in the MSCF GP pursuant to the LPA.

---

[12] IMA, § 2(a) ("All of the investable assets of the [Feeder] Fund must be invested in, and the investment program of the [Feeder] Fund is to be conducted by the Investment Manager through the [Master] Fund.  The Investment Manager will exercise no discretion with respect to the investment of the assets of the [Feeder] Fund and the investment activities of the Investment Manager will be conducted at the [Master] Fund level as the investment manager to the [Master] Fund.").

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1358 of 1726   PageID 12679
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 13 of 23

The LPA also provides that Multi-Strat's limited partners, such as Dugaboy (and the Feeder Fund), have **no** right to manage, control, or operate Multi-Strat or to act on its behalf until expressly stated otherwise.  *See* LPA, § 4.3 ("The Limited Partners may not take any part in the management, control or operation of the Partnership's business, and have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.").

<div align="center">

**b.    UBS Has Direct Claims Against Multi-Strat**

</div>

21.    Dugaboy alleges that the Debtor used Multi-Strat to decrease the Debtor's liability to UBS.  This ignores (a) UBS's substantial, direct claims against Multi-Strat arising from an alleged fraudulent conveyance of assets to Multi-Strat – a fraudulent conveyance that was done to frustrate UBS's ability to recover on its claims against the Funds – and (b) the extensive arguments and judicial findings concerning UBS's direct claims against Multi-Strat in connection with the 3018 Motion.[13]

22.    The assets conveyed to Multi-Strat did not belong to the Debtor, and they were not conveyed to Multi-Strat by the Debtor.  These claims have not yet been litigated and would have been addressed in "Phase II" of the UBS litigation if the Debtor had not filed bankruptcy.  Consequently, UBS has a claim against the Debtor, under various theories, for $1 billion **and** a separate and distinct claim against Multi-Strat for approximately $26 million (plus interest).  Notably, Dugaboy admits that UBS has separate and distinct claims against Multi-Strat.  Dugaboy Obj. ¶12.

---

[13] Dugaboy attempts to paint this fraudulent transfer as somehow benefiting the Debtor.  "What the Debtor received for the transfer of its interest in Multi-Strat is unknown, however, and in assessing the value the Debtor received for its interest in Multi-Strat it is safe to assume that in some measure the Debtor received the benefit of the so-called fraudulently transferred assets."  Dugaboy Obj. ¶9.  This misrepresents the facts.  The Debtor did not transfer its interests in Multi-Strat (although it did sell a small amount of its interest to Sentinel prior to the 2017 fraudulent conveyance).

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1359 of 1726    PageID 12680
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 14 of 23

23.    Indeed, this Court previously estimated the value of UBS's claim against Multi-Strat at approximately $23 million, excluding interest.  As such, Multi-Strat would be required to either settle or litigate to conclusion UBS's claims against it – regardless of whether the Debtor settled UBS's claims against the Debtor.  Mr. Dondero knows this.  In fact, Mr. Dondero approached the Debtor and certain of its creditors in late 2020 with the hope of effectuating his "pot plan."  As part of his "pot plan," Mr. Dondero required that the "UBS settlement . . . be global and inclusive of all affiliated entities, including offshore entities and the Multi Strat Credit Fund" to avoid this exact result.

### c.    The Debtor Satisfied Its Fiduciary Duty

24.    Dugaboy alleges that the Debtor breached its fiduciary duties to Multi-Strat under the Investment Advisers Act of 1940 (the "Advisers Act") by, among other things, causing Multi-Strat to settle with UBS.  These allegations are false, but as importantly, they are a smokescreen.

25.    Multi-Strat's redeemers have approximately $90 million in redemption claims (including Sentinel's putative redemption claim), but they will not be affected by Multi-Strat's settlement with UBS.  Multi-Strat has approximately $120 million in assets.  The redeemers' claims therefore will be paid in full even if Multi-Strat pays UBS $18.5 million to satisfy UBS's claims.  In terms of Multi-Strat's remaining limited partners, as set forth above, there are functionally only two:  (a) the Debtor (59%) and (b) Mr. Dondero's controlled entities (41%).[14] The Settlement Agreement – as evidenced by the lack of objection by the Debtor's creditors – is in the best interests of Multi-Strat as a whole, Mr. Dondero's objections notwithstanding.  There is simply no point in continuing to engage in costly, time-consuming litigation with UBS that Multi-Strat might well lose.

---

[14] As evidenced by Mr. Dondero's objection to the UBS settlement, each of the investors in Multi-Strat had notice of the Settlement Agreement and the chance to object.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1360 of 1726    PageID 12681
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 15 of 23

26.    Because the Debtor – as investment manager – settled UBS's claims against Multi-Strat in the best interests of Multi-Strat, there can be no breach of fiduciary duty (particularly since the settlement value ($18.5 million) is materially less than the Court's estimated value of the claim ($23 million plus interest)).    Moreover, it is black-letter law that the Debtor's fiduciary duties under the Advisers Act run to Multi-Strat only, not to any individual investor in Multi-Strat such as Dugaboy.[15]    Further, even if an adviser has a conflict of interest, such conflict does not constitute a breach of the adviser's duty to its client if it is either eliminated *or* fully and fairly disclosed.[16]    Here, the required disclosures concerning the Debtor's potential conflicts of interests were made.[17]

27.    Finally, Dugaboy alleges that the Settlement Agreement puts the Debtor in direct conflict with Multi-Strat because (a) the Debtor is not releasing claims against Multi-Strat for the assets fraudulently transferred to Multi-Strat, (b) the Settlement Agreement obligates the Debtor to investigate and participate in the prosecution of claims against Multi-Strat, and (c) the Settlement Agreement is unclear if UBS is releasing all claims against Multi-Strat.    These can be quickly dispatched.

28.    *First*, the Debtor is not releasing claims against Multi-Strat arising from Multi-

---

[15] *See Goldstein v. SEC*, 451 F.3d 873, 879 (D.C. Cir. 2006) ("An investor in a private fund may benefit from the adviser's advice (or he may suffer from it) but he does not receive the advice directly.    He invests a portion of his assets in the fund.    The fund manager – the adviser – controls the disposition of the pool of capital in the fund.    The adviser does not tell the investor how to spend his money; the investor made that decision when he invested in the fund.    Having bought into the fund, the investor fades into the background; his role is completely passive.    If the person or entity controlling the fund is not an "investment adviser" to each individual investor, then a fortiori each investor cannot be a "client" of that person or entity.").

[16] *Commission Interpretation Regarding Standard of Conduct for Investment Advisers* (the "Release"), Release No. IA-5248; File No. S7-07-18, effective July 12, 2019 at 8 ("Under its duty of loyalty, an investment adviser must eliminate *or* make full and fair disclosure of all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which is not disinterested such that a client can provide informed consent to the conflict.") (emphasis added).

[17] Each of the PPMs includes pages of disclosures on potential conflicts of interests.    None of these disclosures were even acknowledged by Dugaboy in its objection.    *See generally* Master PPM "Risk Factors and Potential Conflicts of Interest" at 49-53; Feeder PPM "Risk Factors and Potential Conflicts of Interest" at 26.    The Feeder PPM cross references to and incorporates the disclosures contained in the Master PPM.    "The [Master PPM] contains further disclosures concerning potential conflicts of interests.    Such disclosures are incorporated herein by reference and should be read in their entirety prior to making a decision to invest in the [Feeder] Fund."    Feeder PPM at 26.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1361 of 1726 PageID 12682
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 16 of 23

Strat's receipt of fraudulently conveyed assets because the Debtor has no claim to the fraudulently conveyed assets (unlike UBS) and therefore has no claim against Multi-Strat as the recipient of such assets.[18] *Second*, Dugaboy is confused by the language of the Settlement Agreement. The Settlement Agreement provides that the Debtor will cooperate with respect to claims relating to the MSCF Interests and any injunctive relief necessary to ensure that additional money and assets are not transferred to Sentinel, among others. Settlement Agreement at § 1(c). Similarly, UBS has released all claims against Multi-Strat but has preserved its claims with respect to the MSCF Interests. *Id.* at § 3(a). As discussed above, the MSCF Interests are the interests in Multi-Strat that were fraudulently conveyed to Sentinel from CDO Fund in 2017. By preserving its claims with respect to the MSCF Interest, UBS has preserved its right to seek recovery of the MSCF Interests from Sentinel, not to sue Multi-Strat.

### d. This Court Has Jurisdiction to Approve All Aspects of the Settlement

29.     Dugaboy also objects to the settlement between UBS and Multi-Strat "on the ground that the Bankruptcy Court lacks jurisdiction to approve a settlement between non-debtors." Dugaboy Obj. ¶12.[19] As support for this objection, Dugaboy states that (a) linking UBS's separate settlements with Multi-Strat and the Debtor does not create "arising in, under, or related to" jurisdiction;[20] (b) the automatic stay does not apply to co-defendants, and (c) the Debtor has

---

[18] Dugaboy makes the nonsensical argument that the Debtor could settle its claims against Multi-Strat for "$18,000,000 [sic]" in lieu of Multi-Strat settling its claim against UBS. In Dugaboy's mind, this settlement would provide a cash inflow to the estate of $18 million and the failure to do this settlement somehow constitutes an impermissible plan modification under 11 U.S.C. § 1127. Dugaboy Obj. ¶ 11. For the reasons set forth above, this makes no sense. The Debtor does not have a claim against Multi-Strat on account of the fraudulently conveyed assets. The Debtor did not convey those assets to Multi-Strat nor were those assets fraudulently transferred out of an entity that the Debtor had a claim against.

[19] This position is ironic. Mr. Dondero has consistently argued to this Court that the Debtor has violated, among other statutes, 11 U.S.C. § 363 by *not* seeking this Court's authority before causing its managed funds and CLOs to sell assets. *See, e.g., James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Docket No. 1439].

[20] Because Multi-Strat's settlement with UBS could conceivably have an impact on the estate, at a minimum, "related to" jurisdiction exists. *See, e.g., Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 Fed. Appx. 741, 748 (5th Cir.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1362 of 1726 PageID 12683
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 17 of 23

admitted to this Court's lack of jurisdiction. Each of these arguments evinces a clear misunderstanding of the facts and the relief sought.

30.     The Debtor does not contend that this Court has jurisdiction over Multi-Strat's assets. Multi-Strat's assets are not "property of the estate" under 11 U.S.C. § 541 or for purposes of 11 U.S.C. § 363(b). *See, e.g., In re Guyana Dev. Corp.*, 68 B.R. 892, 905 (Bankr. S.D. Tex. 1994) ("As a general rule, property of the estate includes the debtor's stock in a subsidiary but not the assets of the subsidiary."). However, the Motion recognizes that 11 U.S.C. § 363(b) might still apply to the Debtor's exercise of its contractual rights under the IMA to manage and govern Multi-Strat (Motion ¶53), as those rights *do* constitute property of the estate. *See In re Thomas*, 2020 Bankr. LEXIS 1364 at *31 (Bankr. W.D. Tenn. 2020) (a debtor's membership interest in an LLC, including both its economic rights and governance rights, became property of the estate on the petition date, but the assets of the LLC remain separate and the debtor must manage them consistent with the terms of the operating agreement and applicable law); *In re Cardinal Indus.*, 105 B.R. 834, 849 (Bankr. S.D. Ohio 1989).

31.     This is consistent with the Debtor's position throughout this case that: (a) assets of non-debtor subsidiaries and funds are not "property of the estate;" (b) the Debtor's contractual right to manage and control the disposition of those assets is "property of the estate;" and (c) the Debtor generally does not need Court approval to exercise those rights because causing the managed funds to sell assets is in the "ordinary course of [the Debtor's] business" and exempt from approval under 11 U.S.C. § 363(c).[21] *See generally Debtor's Response to Mr. James*

---

2021) (finding that a proceeding "relates to" a case under Title 11 if "the outcome of [the non-bankruptcy] proceeding could conceivably have any effect on the estate being administered in bankruptcy.").

[21] Dugaboy cites to the "May 20, 2020 settlement between UBS, the Debtor and Multi-Strat" as an example of an agreement that was not brought to this Court for approval under 11 U.S.C. § 363. A true and correct copy of the May 20, 2020 settlement agreement (the "May Agreement") is attached hereto as Exhibit 8. As an initial matter, the Debtor was not party to that agreement; it was executed solely by UBS, Multi-Strat, and certain of Multi-Strat's wholly-

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 19 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1363 of 1726   PageID 12684
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 18 of 23

*Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Docket No. 1546].

32.      The difference here is that the Debtor is exercising its management and control rights to cause Multi-Strat to settle a material litigation claim against it.  That does not involve the sale of an asset or an investment and is arguably outside the ordinary course of the Debtor's business, necessitating this Court's approval under 11 U.S.C. § 363(b).  *See, e.g., In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013) (finding that a transaction is "ordinary course" if it does not "subject[] a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit" and is "of the sort commonly undertaken in the industry.").  The Debtor respectfully submits that the settlement between UBS and Multi-Strat as negotiated by the Debtor in an exercise of its management rights should be approved pursuant to 11 U.S.C. § 363(b) for the reasons set forth herein and in the Motion.

**2.       The Dondero Objection Is Without Merit**

33.      Mr. Dondero generally objects to the UBS settlement on two purported grounds: (a) the settlement impermissibly inflates UBS's claim, and (b) Multi-Strat's settlement of UBS's claims against Multi-Strat potentially violate the Bankruptcy Code and are contrary to investor interests.  Mr. Dondero's objections are without merit.

**a.       The Settlement Does Not Inflate UBS's Claims**

34.      Mr. Dondero argues that the Motion "lacks a sufficient foundation to demonstrate

---

owned subsidiaries.  Further, the May Agreement was entered into to allow Multi-Strat to sell certain assets that were the subject of UBS's claim against Multi-Strat.  Consequently, the May Agreement was not brought to this Court because it involved Multi-Strat executing an agreement with a non-debtor that would allow Multi-Strat to sell assets.  The May Agreement was thus executed in the ordinary course of business and did not require this Court's approval pursuant to 11 U.S.C. § 363(c).

Dugaboy cannot assert that it did not have notice of the May Agreement.  Dugaboy filed a proof of claim (Claim No. 177) alleging that the transactions effectuated through the May Agreement constituted a breach of the Debtor's duty to Dugaboy.  Dugaboy, therefore, cannot ***not*** have had notice of the May Agreement.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1364 of 1726   PageID 12685
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 19 of 23

that UBS is entitled to the inflated claim proposed under the settlement." Dondero Obj. ¶27. In other words, Mr. Dondero does *not* object to the proposed settlement with UBS that was announced at the hearing on the Debtor's Plan, which included a $50 million general unsecured claim and a $25 million subordinated claim being provided to UBS. Instead, Mr. Dondero objects, without irony, to the additional $15 million general unsecured claim and $35 million subordinated claim. Mr. Dondero clearly misunderstands the relevant facts and law.

35.    UBS has asserted claims against the Debtor alleging, among other things, that the Debtor caused the Funds *not* to pay the amounts they owed to UBS. Recently, the Debtor discovered that Dondero and the Dondero-controlled Debtor actually and intentionally caused the Funds to transfer over $300 million in face amount of the Funds' assets to an offshore entity owned and controlled by Mr. Dondero and Mr. Ellington. The Dondero and Dondero-controlled Debtor then covered up that transaction during this Bankruptcy Case. These facts are undeniable and damning; substantially undercut the Debtor's defense that it did not impede the Funds' ability to pay UBS's judgment; and caused the Debtor to agree to increase the consideration under the proposed settlement.

36.    Mr. Dondero also argues that the August 2017 transfer to Sentinel cannot relate to UBS's claim because that claim arose out of actions taken in 2008 and 2009. Mr. Dondero, however, misunderstands UBS's claim, which includes a broad reservation of rights "to assert any additional claims, defenses, remedies, and causes of action, including without limitation, claims for fraudulent inducement, breach of contract, tortious interference with contractual relations, fraudulent conveyances, or alter ego recovery." *See* Claim Nos. 190, 191, Annex ¶28. Just because the Sentinel fraud occurred *after* 2009 and potentially included assets not held by the Funds in 2009 does not mean that the Debtor escapes all potential liability for those transfers (especially

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1365 of 1726 PageID 12686
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of 23

when they were hidden from UBS, the Independent Directors, and this Court).

37.     Mr. Dondero next argues that the settlement is "vastly inflated from the Debtor's contention that the maximum amount should be $35,742,978.978 [sic] and exceeds even the Court's determination as to the amount to be allowed for voting purposes." Dondero Obj. ¶34. Mr. Dondero again ignores the facts. This Court estimated UBS's claim at approximately $95 million, which included approximately $23 million (exclusive of interest) from Multi-Strat. The proposed settlement provides for (a) an $18.5 million payment from Multi-Strat and (b) a $65 million general unsecured claim and a $60 million subordinated claim against the estate. As such, Mr. Dondero ignores the fact that Multi-Strat will pay substantially less under the settlement than was estimated by this Court. Mr. Dondero also assumes that the $65 million general unsecured claim and the $60 million subordinated claim will obtain the same rate of recovery under the Plan; they may not. As such, the Settlement Agreement is substantially in line with the Court's Estimated Claim (even after subtracting amounts allocable to Multi-Strat).

> **b.     The Settlement Does Not Contravene the Plan's Classification of Claims and Interests**

38.     Mr. Dondero states – without case law or support – that because the UBS settlement provides a "direct payment from Multi-Strat, one of its managed funds which the Debtor asserts it owns 59% and controls" it may violate the "fair and equitable" standard and the Plan's classification scheme. Dondero Obj. ¶38. Admittedly, the Debtor does not fully understand this argument. Nevertheless, Mr. Dondero plainly ignores UBS's substantial and direct claims against Multi-Strat. There is nothing improper about Multi-Strat – a non-debtor – paying cash to one of its creditors outside of the Plan, and there is no need to classify UBS's claim against Multi-Strat under the Debtor's Plan. *See Guyana.*, 168 B.R. at 905.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22     Entered 08/15/22 16:45:41     Page 22 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1366 of 1726   PageID 12687
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21     Entered 05/14/21 16:12:52     Page 21 of 23

### c.     "Investor Desires" Are Irrelevant

39.     Mr. Dondero next argues that the "Multi-Strat payment also may conflict with investor desires and the Debtor's management agreement with Multi-Strat."  Dondero Obj. ¶39. In light of the fraud discussed above, this argument is absurd.

40.     *First*, and as discussed above, the only limited partners in Multi-Strat are the Debtor and entities controlled by Mr. Dondero.  Moreover, the Debtor and MSCF GP have the sole and exclusive right to manage and control Multi-Strat, including to settle litigation.  The fact that the settlement may reduce the value of Mr. Dondero's indirect, minority interests in Multi-Strat does not give Mr. Dondero the authority to block Multi-Strat's settlement of claims against it.  *Second*, the Multi-Strat settlement with UBS is well in line with this Court's estimation of Multi-Strat's liability to UBS.  *Third*, Mr. Dondero has no direct interest in Multi-Strat, and, unless he is finally ready to admit that there is no distinction between him and CLOH, Dugaboy, and HCMS (which is clear notwithstanding a formal admission), he has no standing to object on behalf of Multi-Strat's investors.  *Fourth*, if Mr. Dondero is implying that the Debtor's creditors do not support the settlement, he should note that he is the **only** (purported) creditor objecting.  The foregoing applies equally to Mr. Dondero's claim that the releases under the Settlement Agreement with respect to Multi-Strat are vague.

### C.     Mr. Dondero and Dugaboy Ignore the "Paramount Interest of Creditors"

41.     Despite spending considerable time and expense objecting to the UBS settlement, neither Mr. Dondero nor Dugaboy even address the third factor analyzed by the Fifth Circuit when approving settlements – all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views." *Cajun Elec.*, 119 F.3d at 356.  This omission is telling.  Except for Mr. Dondero and Dugaboy – one of Mr. Dondero's proxies – no creditor or party in interest has objected to the settlement.  And Mr.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 23 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1367 of 1726   PageID 12688
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 22 of 23

Dondero and Dugaboy can barely be classified as creditors as they have no cognizable pecuniary interest in the estate.  Mr. Dondero's desire to re-assert control over the estate or to "burn the place down" should not, in any circumstance, outweigh the preferences of the Debtor and its legitimate creditors.  Those creditors have not objected to the settlement, and their preference for a reasonable and expeditious settlement of UBS's claims and the start of distributions under the Plan is clear.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:43138.5 36027/002

APPX. 05939

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 24 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1368 of 1726   PageID 12689
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 23 of 23

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated: May 14, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Elissa A. Wagner (CA Bar No. 213589)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        ewagner@pszjlaw.com
        gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:43138.5 36027/002



# EXHIBIT 1

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1370 of 1726   PageID 12691
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 2 of 76

Memorandum Number _____

# Confidential Private Placement Memorandum

*Series B, Series C and Series D Limited Partner Interests in*

## Highland Multi Strategy Credit Fund, L.P.

*General Partner*

Highland Multi Strategy Credit Fund GP, L.P.

*Investment Manager*

Highland Capital Management, L.P.

**November 2014**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1371 of 1726 PageID 12692
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 76

# TABLE OF CONTENTS

Page

NOTICE..................................................................................................................................... ii

DIRECTORY ............................................................................................................................iv

EXECUTIVE SUMMARY OF PRINCIPAL TERMS .................................................................1

INVESTMENT PROGRAM .......................................................................................................2

MANAGEMENT .......................................................................................................................4

SUMMARY OF TERMS ............................................................................................................8

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST.........................................25

BROKERAGE AND CUSTODY .............................................................................................54

TAX CONSIDERATIONS ........................................................................................................56

ERISA AND OTHER REGULATORY CONSIDERATIONS ...................................................67

PARTNERSHIP AGREEMENT - APPENDIX A

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 28 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1372 of 1726   PageID 12693
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 4 of 76

**NOTICE**

This Confidential Private Placement Memorandum (this "***Memorandum***") is being furnished on a confidential basis solely to selected qualified investors (or their respective authorized representatives) considering the purchase of limited partner interests (the "***Interests***") in Highland Multi Strategy Credit Fund, L.P. (the "***Fund***"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Highland Multi Strategy Credit Fund GP, L.P. (the "***General Partner***") (other than to professional advisors and employees of the prospective investor receiving this Memorandum from the General Partner or its authorized representative or such prospective investor).

Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner. Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other related matters relevant to the suitability of an investment in the Fund for such investor. In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Interests have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized. The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any of the states of the United States. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws. The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended. Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1373 of 1726   PageID 12694
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 5 of 76

substantial degree of risk.   See "*Risk Factors and Potential Conflicts of Interest*" beginning at page 25. No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom.   The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund.   Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not purport to be, and should not be construed as, a complete description of the limited partnership agreement of the Fund or the investment management agreement by and among the Fund's investment manager, the General Partner and the Fund.   Each prospective investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Fund's limited partnership agreement, the terms of the Fund's limited partnership agreement control.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology.   Due to various risks and uncertainties, including those described in "Risk Factors and Potential Conflicts of Interest," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

Pursuant to an exemption from the Commodity Futures Trading Commission, neither the General Partner nor the Investment Manager is registered with as a commodity pool operator and therefore, unlike a registered commodity pool operator, is not required to deliver a disclosure document or a certified annual report to participants in this pool.   Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association.   It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.

All references herein to "$" refer to U.S. dollars.

This Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

APPX. 105947

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1374 of 1726    PageID 12695
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 6 of 76

## DIRECTORY

| | |
|---|---|
| **General Partner** | **Highland Multi Strategy Credit Fund GP, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Investment Manager** | **Highland Capital Management, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Prime Broker** | **BNY Mellon Trust Company N.A.**<br>601 Travis Street, 16th FL (775-1700)<br>Houston, Texas 77002 |
| **Administrator** | **SEI Global Services, Inc.**<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| **Auditors** | **PricewaterhouseCoopers LLP**<br>2001 Ross Avenue, Suite 1800<br>Dallas, Texas 75201 |
| **Legal Counsel** | **Akin Gump Strauss Hauer & Feld LLP**<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201 |

*      *      *      *      *

*This Memorandum does not purport to be and should not be construed as a complete description of the Fund's limited partnership agreement, a copy of which is attached hereto as Appendix A.   Any potential investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax counselors.*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 31 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1375 of 1726   PageID 12696
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 7 of 76

## EXECUTIVE SUMMARY OF PRINCIPAL TERMS

| | |
|---|---|
| **The Fund** | Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Fund***"). |
| **General Partner** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "***General Partner***"). |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership (the "***Investment Manager***"). |
| **Investor Eligibility** | Investors must be both "accredited investors" and "qualified purchasers." |
| **Offshore Feeder Fund** | In order to facilitate investments by non-U.S. and other tax-exempt investors, the Investment Manager has sponsored the formation of Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***").   The Offshore Fund places all of its assets in and conducts all of its investment and trading activities through the Fund as a limited partner of the Fund. |
| **Investment Objective** | The Fund seeks attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management. |
| **Series of Interests** | The Fund has four series of Interests and is offering Series B Interests, Series C Interests and Series D Interests pursuant to this Memorandum. |
| **Minimum Investment** | The initial minimum investment is $1,000,000.00, although the General Partner has the right to accept lesser amounts. |
| **Management Fee** | Annual rate of 1.5% for Series B Interests, 1.0% for Series C Interests, and 2.0% for Series D Interests, calculated and payable quarterly in advance. |
| **Performance Allocation** | Highland Capital Management, L.P., as a special limited partner of the Fund, is entitled to receive an annual performance-based profit allocation at the end of each year equal to 20% of the Fund's net profits, subject to a "high water mark." |
| **Withdrawals** | Withdrawal rights vary by Series and are subject to timing restrictions, reserves for contingencies, partial hold-back pending completion of an annual audit and suspension restrictions as further described in "*Summary of Terms*." |
| **Variation of Terms** | The General Partner and/or the Investment Manager (as applicable) may agree with certain limited partners to a variation of the terms set forth in this Memorandum or establish additional classes or series of limited partner interests that have terms that differ from those described herein, including different management fees, performance allocations and withdrawal rights. |

1

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1376 of 1726 PageID 12697
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 76

# INVESTMENT PROGRAM

**Investment Objective**

The Fund's investment objective is to seek attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management. No assurance can be given, however that the Fund will achieve this objective.

**Investment Strategy**

*Investment Asset Classes*

The following is a description of the principal types of securities in which the Fund may invest and certain trading techniques the Fund may employ. The following description is merely a summary and the Investment Manager has discretion to cause the Fund to invest in other types of securities and to follow other investment criteria and guidelines. However, consistent with the investment strategy of the Fund, all new investments made by the Fund must, at the time of purchase, (i) trade over-the-counter or on an exchange, (ii) have a third-party quote or valuation available, and (iii) be considered a marketable investment in the reasonable opinion of the Investment Manager. An investment is a marketable investment if in the reasonable opinion of the Investment Manager it can be sold at the mark within 30 calendar days. Notwithstanding the foregoing, the Fund may invest up to 20% of its net asset value in non-marketable investments if and when the Fund's net asset value reaches $1 billion.

*Debt and Debt-Like Securities.* The Investment Manager intends for debt securities to be the Fund's primary focus, with a target allocation of 40-60% of net asset value of the Fund, although this may vary depending on market conditions. The Fund may invest (both long and short) in debt securities of any kind, including debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, inflation-indexed bonds, structured notes, loan assignments, loan participations, asset-backed securities, collateralized loan obligation ("*CLO*") securities (including, rated and unrated, debt, equity and preference share instruments relating to collateralized loan obligations ("*CLO Securities*")), debt securities convertible into equity securities, and securities issued or guaranteed by the U.S. Government or its agencies or instrumentalities, by foreign governments or international agencies or supranational entities or by domestic or private issuers.

The Fund may invest in debt securities of any credit quality, including below investment grade securities (also known as "high yield securities" or "junk securities"). Such securities are rated below investment grade by a nationally recognized statistical rating organization ("*NRSRO*") or are unrated but deemed by the Investment Manager to be of comparable quality. The Fund may invest without limitation in below investment grade or unrated securities, including in insolvent borrowers or borrowers in default.

*Equity and Equity-Like Securities.* The Fund may invest (both long and short) in common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to the value of common stock. Although the equity securities in which the Fund invests may have any capitalization, may be dominated in any currency, and may be located in emerging markets without limit, the Fund will primarily invest in equity securities of large capitalization companies that are located in developed markets. Additionally, the Fund may invest in equity or subordinated tranches of asset-backed securities, including CLOs, and may also invest in life settlement

APPX. 05940

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1377 of 1726 PageID 12698
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 76

policies and other instruments that have equity-like characteristics that meet the investment objective of the Fund.

*Investment Themes*

The Investment Manager's investment philosophy is based on the belief that thorough, fundamental research and a disciplined research methodology increase the likelihood of producing attractive long-term results. The Investment Manager uses this research in an attempt to anticipate long-term secular trends and identify those investments that have the highest relative value characteristics across four primary investment themes.

1) Convergence – Investments in market sectors in which the Investment Manager believes are mispriced and will converge to historic norms over time.

2) Deep Value – Investments in companies that the Investment Manager believes the market has undervalued. Through thorough research the Investment Manager believes the current market value does not correspond with the company's long-term fundamentals.

3) Event Driven – The Investment Manager will generally focus on equity and debt investments with catalysts that could include, but are not limited to, asset sales, covenant violations, liability management, amend/extend, refinancing, tenders and mergers/acquisitions.

4) Activism – Material holdings or controlling interests in companies, including the potential to obtain representation on the company's board, with the goal of affecting a change in the company in order to drive future profitability and value realization.

The Investment Manager may also manage interest rate, default, currency and other risks through a variety of trading methods and market tools, including security shorting and derivative hedging instruments, as it deems appropriate.

Although the Investment Manager expects to maintain a diversified portfolio of investments, it does not intend to limit itself to any one particular investment theme or asset class. Rather, the Investment Manager intends to follow a flexible approach in order to place itself in the best position to capitalize on opportunities in the financial markets.

*The investment objectives and methods summarized above represent the General Partner's and Investment Manager's current intentions. Depending on conditions and trends in the securities markets and the economy in general, the General Partner and the Investment Manager may pursue any objectives, employ any investment techniques or purchase any type of security that they consider appropriate and in the best interests of the Fund whether or not described in this section. The foregoing discussion includes and is based upon numerous assumptions and opinions of the General Partner and Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.* **There can be no assurance that the Fund's investment strategy will achieve profitable results.**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1378 of 1726   PageID 12699
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 10 of
76

# MANAGEMENT

**The General Partner and the Investment Manager**

Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "***General Partner***"), serves as the general partner of the Fund.    Highland Capital Management, L.P., a Delaware partnership (the "***Investment Manager***" or "***Highland***"), serves as the investment manager of the Fund and has responsibility for the Fund's investment program.    James D. Dondero ultimately controls the General Partner and the Investment Manager.

The General Partner has the full authority of a general partner under Delaware law.    The powers of the General Partner described in this Memorandum and the Partnership Agreement are not exhaustive and are not limited to the specific authorities described therein.    Thus, subject to applicable law, the General Partner may make certain decisions or take certain actions even where those decisions or actions are not expressly granted in the Partnership Agreement or described in this Memorandum.

**The Investment Management Agreement**

The Investment Manager serves pursuant to an investment management agreement with the Fund, the Offshore Fund and the General Partner (the "***Investment Management Agreement***").    Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Fund in pursuit of the investment objective and strategy described in this Memorandum.

The Investment Management Agreement provides that, in the absence of willful misconduct, fraud or gross negligence, each of the Investment Manager, its principals, shareholders, managers, employees and affiliates will be indemnified by the Fund and/or the Offshore Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.    For its services the Investment Manager is entitled to the Management Fee and reimbursement of any expenses incurred on behalf of the Fund or the Offshore Fund.

**Investment Personnel**

The key investment professionals of the Investment Manager who will be responsible for the Fund's investments are described below.

**James Dondero, CFA, Co-Founder, President**

James Dondero is Co-founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments).    Jim has over 30 years of experience in the credit markets.    Prior to founding Highland in 1993, Jim served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 and 1993.    His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, high-yield bonds, emerging market debt, derivatives, preferred stocks and common stocks.    From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express.    Prior to American Express, he completed the financial training program at JP Morgan.    Jim received a BS in Commerce (Accounting and Finance) from the University of Virginia.    Jim is a Certified Public Accountant, a Certified Managerial Accountant, and a Chartered Financial Analyst.    He currently serves as Chairman for CCS Medical and NexBank and serves on the

4

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 35 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1379 of 1726   PageID 12700
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 11 of
76

Board of Directors of American Banknote Corporation, Cornerstone Healthcare Group and Metro-Goldwyn-Mayer.

**Mark Okada, CFA, Co-Founder, Chief Investment Officer**

Mr. Okada is Chief Investment Officer of Highland Capital Management, L.P. and is responsible for overseeing Highland's investment activities for its various strategies.  Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience.  He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms.  Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles.  He has earned the right to use the Chartered Financial Analyst designation.  Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund Advisory board.

**Josh Terry, CFA, Head of Structured Products and Trading**

Mr. Terry is Head of Structured Products and Trading at Highland Capital Management, L.P.  He leads the trading desk, structured products and CLO fund management teams.  Since joining Highland in July 2005, Mr. Terry has served in various roles, including Senior Portfolio Analyst on the Distressed & Special Situations investment team, trading loans, bonds and equities on Highland's trading desk, and leading the sector rotation and fund management process for Highland's par credit funds.  Prior to joining Highland in July 2005, Mr. Terry worked as an Investment Banking Analyst at Stephens Inc., where he focused on M&A transactions and equity financings for public and private middle-market companies.  Mr. Terry serves as Chairman of the Finance Committee on the Board of Governors of Uplift Education, a network of charter schools in the Dallas-Fort Worth area.  He received a BBA in Finance and Economics, summa cum laude, from Baylor University.  Mr. Terry has earned the right to use the Chartered Financial Analyst designation.

**Trey Parker, Managing Director**

Mr. Parker is Managing Director and Head of Credit Research at Highland Capital Management, L.P.  Mr. Parker is responsible for managing the Credit Research Team/Platform.  Prior to his current role, Mr. Parker was a Portfolio Manager covering a number of the industrial verticals, as well as parts of Tech, Media and Telecom; he also worked as a Senior Portfolio Analyst on the Distressed & Special Situations investment team.  Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing.  Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries.  Prior to joining Hunt in 2004, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal.  While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions.  Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley.  Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute.  Mr. Parker serves on the Board of Directors of Euramax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

APP. 10543

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 36 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1380 of 1726   PageID 12701
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 12 of
76

**Advisory Committee**

The General Partner and/or the Investment Manager may appoint, or cause to be appointed, a committee (the "***Advisory Committee***") consisting of one or more individuals selected by the General Partner and/or the Investment Manager, none of whom is affiliated with the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in the Fund or an affiliate thereof). If established, the Advisory Committee will have the authority, at the request of the General Partner and/or the Investment Manager, to consult with the General Partner and/or the Investment Manager on any matters that may involve a conflict of interest between the General Partner and/or the Investment Manager (or their affiliates) on the one hand and the Limited Partners (or shareholders of the Offshore Fund) and the Fund on the other.   Any consent given by a majority of the Advisory Committee on behalf of the Fund in good faith after consultation with the General Partner and/or the Investment Manager is binding on the Fund and the Limited Partners or shareholders of the Offshore Fund (so long as such majority consists of persons independent of the General Partner and/or the Investment Manager and their affiliates).   The Fund will have the authority to agree to reimburse members of the Advisory Committee for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**Administrator**

SEI Investments is a leading global provider of investment processing, investment management and investment operations solutions for institutional and personal wealth management.   For more than 40 years, SEI has helped corporations, financial institutions, financial advisors and ultra-high-net-worth families create and manage wealth by providing comprehensive, innovative, investment and investment-business solutions.   SEI manages or administers $601.9 billion in funds and separately managed assets.   SEI is a public company and is listed on the NASDAQ exchange under the symbol SEIC.   SEI has been retained to perform certain administrative, accounting and investor services for the Fund and the Offshore Fund (in such capacity, the "***Administrator***").   In its capacity as Administrator, it will receive customary fees that will be paid out of the assets of the Fund.   The Administrator will also be reimbursed for all reasonable out-of-pocket expenses.

The Fund will enter into an administration agreement (the "***Administration Agreement***") with the Administrator.   The Administrator will be under no duty to take any action on behalf of the Fund except as specifically set forth in the Administration Agreement or as may be specifically agreed to by the Administrator and the Fund in a written amendment thereto.

The Administrator will act as liaison with the Fund's accountants and auditors and will provide account analyses, fiscal year summaries, and other audit-related schedules with respect to the Fund.   The Administrator will take all reasonable action in the performance of its duties under the Administration Agreement to assure that the necessary information is made available to such accountants and auditors for the expression of their opinion, as required by the Fund.

The Administrator will enter into and will maintain in effect with appropriate parties one or more agreements making reasonable provisions for emergency use of electronic data processing equipment to the extent appropriate equipment is available.   In the event of equipment failures, the Administrator will, at no additional expense to the Fund, take reasonable steps to minimize service interruptions.   The Administrator will have no liability with respect to the loss of data or service interruptions caused by equipment failure, provided such loss or interruption is not caused by the Administrator's own willful misfeasance, bad faith, gross negligence or reckless disregard of its duties or obligations under the Administration Agreement.

APP. 105942

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 37 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1381 of 1726   PageID 12702
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 13 of
76

Subject to the terms of the Administration Agreement, the Administrator will be liable to the Fund (or any person or entity claiming through the Fund) for damages only to the extent caused by the Administrator's own fraud or willful misconduct under the Administration Agreement ("**_Standard of Care_**").    The Administrator will not be liable for damages (including, without limitation, damages caused by delays, failure, errors, interruption or loss of data) occurring directly or indirectly by reason of circumstances beyond its reasonable control.    The Administrator will not be under any duty or obligation to inquire into and will not be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information which the Administrator reasonably believes to be genuine.    The Administrator will not be liable for any damages that are caused by actions or omissions taken by the Administrator in accordance with written instructions by authorized persons of the Fund or advice of counsel.    The Administrator will not be liable for any damages arising out of any action or omission to act by any prior service provider of the Fund or for any failure to discover any such error or omission.    Neither the Administrator nor its affiliates will be liable for any consequential, incidental, exemplary, punitive, special or indirect damages, whether or not the likelihood of such damages was known by the Administrator or its affiliates. Both the Fund and the Administrator will have a duty to mitigate damages for which the other party may become responsible.

Absent the Administrator's failure to meet its Standard of Care, the Fund agrees to indemnify, defend and hold harmless the Administrator and its affiliates and their respective directors, trustees, officers, agents and employees from certain claims, suits, actions, damages, losses, liabilities, obligations, costs and reasonable expenses (including attorneys' fees and court costs, travel costs and other reasonable out-of-pocket costs related to dispute resolution) arising directly or indirectly from any actions taken or omitted to be taken by the Administrator in connection with the provision of services to the Fund.

The Offshore Fund will also enter into an administration agreement with the Administrator, under which the terms will be substantially as above.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1382 of 1726   PageID 12703
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 14 of
76

# SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms of an investment in the Fund, and is subject, and qualified in its entirety by reference, to the limited partnership agreement of the Fund, as amended (the "**Partnership Agreement**") and the subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | The Fund is a limited partnership formed on December 1, 2005 under the laws of the State of Delaware with the name "Highland Credit Opportunities CDO, L.P." The General Partner filed an amendment to the Certificate of Limited Partnership of the Fund on August 26, 2014, changing the name of the Fund to "Highland Multi Strategy Credit Fund, L.P." |
| **Recent Amendments; Series of Interests** | The General Partner and the existing Limited Partners of the Fund adopted the Fourth Amended and Restated Limited Partnership Agreement of the Fund, effective November 1, 2014 (the "***Effective Date***"), whereby all existing limited partner interests were re-designated as "Series A Interests" and three new series of limited partner interests were created – "Series B Interests," "Series C Interests" and "Series D Interests" (the "***Amendments***"). |

As of the Effective Date, all existing Limited Partners will hold Series A Interests, the terms of which are set forth in a supplement to this Memorandum. The Fund is currently offering for subscription Series B Interests, Series C Interests and Series D Interests pursuant to this Memorandum.

The Fund may issue additional series of Interests over time (each, a "***Series***"). Not all Series of Interests will be available for subscription at the same time and the terms among the Series of Interests will vary. New Series of Interests may be established by the General Partner without notice to or approval of the Limited Partners.

Except with respect to management fees, performance-based profit allocations and withdrawal rights (each as discussed below), the rights and privileges attributable to Series A Interests, Series B Interests, Series C Interests and Series D Interests are identical.

References herein to "Interests" or "Limited Partners" shall include all Series of Interests and Limited Partners unless otherwise specified or context so requires.

APPX. 05956

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1383 of 1726 PageID 12704
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 15 of
76

| | |
|---|---|
| **General Partner** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership. The general partner of the General Partner is Highland Multi Strategy Credit GP, LLC, a Delaware limited liability company of which the Investment Manager is currently the sole member. |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership. |
| **Eligible Investors** | Limited partner interests ("*Interests*") may be purchased by investors who are "accredited investors" and "qualified purchasers," as defined in the Fund's Subscription Documents. Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The General Partner reserves the right to reject any investor for any reason or for no reason in its sole discretion. |
| | An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund. |
| **Subscriptions** | Subscriptions for Interests may be accepted as of the first Business Day of each calendar month and/or such other days as the General Partner may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date. The initial minimum investment is $1,000,000, although the General Partner may accept investments in a lesser amount. Capital contributions may be made in cash or, with the consent of the General Partner, in securities or partly in cash and partly in securities. |
| | "*Business Day*" means any day other than Saturdays, Sundays or any other day banks located in in New York, New York are required or authorized to be closed. |
| | A subscriber admitted to the Fund (a "*Limited Partner*") receives, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time. |
| | There is no minimum aggregate amount of subscriptions that is required for the initial acceptance of subscriptions, nor has the General Partner established any maximum aggregate amount of subscriptions that may be accepted. |
| | All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and |

APP.105957

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1384 of 1726    PageID 12705
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 16 of
76

Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in the Subscription Documents.

|                        |                        |
|------------------------|------------------------|
| **Offshore Feeder Fund** | In order to facilitate investments by non-U.S. and other tax-exempt investors, the Investment Manager has sponsored the formation of Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***").  The Offshore Fund places all of its assets in and conducts all of its investment and trading activities through the Fund as a limited partner of the Fund. |

Investors in the Offshore Fund will be issued participating non-voting shares of the Offshore Fund; provided that in the event that the Fund seeks the approval, vote or consent of the Offshore Fund with respect to any matter to which it would be entitled to vote as a limited partner of the Fund under the Partnership Agreement, the Offshore Fund:   (i) shall submit such matter for the consent of the holders of shares in the Offshore Fund and (ii) shall cause the Offshore Fund to vote its Interest proportionally for and against such matter in the same proportion that the shareholders in the Offshore Fund voted for and against such matter.

The Investment Manager may establish one or more additional feeder vehicles to invest in the Fund.

|                        |                        |
|------------------------|------------------------|
| **Capital Accounts** | The Fund will maintain a book capital account (a "***Capital Account***") for the General Partner and each Limited Partner (each, a "***Partner***" and collectively, the "***Partners***") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss.   The initial balance of each Partner's Capital Account will be equal to the amount of cash or net value of any property contributed to the Fund by such Partner. |

If a Partner invests in more than one Series of Interests, the Fund will maintain a separate Capital Account on behalf of such Partner with respect to each such Series and each Capital Account will be treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights applicable to each Series Capital Account.

If a Partner makes an additional capital contribution to an existing Capital Account, the Capital Account will be sub-divided into separate sub-accounts attributable to each separate capital contribution, with each capital sub-account treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights applicable to each capital sub-account. References herein to a Partner's "Capital Account" include any such separately maintained capital sub-accounts.

APPX. 105956

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 41 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1385 of 1726   PageID 12706
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 17 of
76

The Fund will issue to the Offshore Fund an Interest and maintain capital sub-accounts that correspond to each Sub-Series of Shares (as defined in the Partnership Agreement) and each capital sub-account is treated separately for determining Management Fees, the Performance Allocations and withdrawal rights.

**Alternative Investment Vehicles**
The General Partner will have the right, in connection with any investment, to direct the capital contributions of some or all of the subscribers to be made through one or more alternative investment vehicles (each an "***Alternative Investment Vehicle***"), and, in the case of an existing investment, transfer all or a portion of such investment to an Alternative Investment Vehicle, if, in the judgment of the General Partner, the use of such vehicle or vehicles would allow the Fund to overcome legal or regulatory constraints, invest in a more tax-efficient manner or would facilitate participation in certain types of investments. Any Alternative Investment Vehicle will be subject to terms and conditions substantially similar to those of the Fund (including Management Fees and the Performance Allocation defined below) and will be managed by the Investment Manager or an affiliate thereof.

**Affiliated Investors**
Interests in the Fund held by the Investment Manager or its affiliates (collectively, "***Affiliated Investors***") may not be assessed the management fees or the performance allocations that are applicable to other investors in the Fund, but share pro rata in other applicable expenses of the Fund (as more fully described in the Partnership Agreement).

**Borrowing and Leverage**
The Fund may buy securities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities in order to employ leverage when the Investment Manager deems such action appropriate.

**Management Fee**
For its services to the Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***"), calculated and payable quarterly in advance, equal to: (i) 1.5% (per annum) of each Capital Account attributable to a Series B Interest, (ii) 1.0% (per annum) of each Capital Account attributable to a Series C Interest and (iii) 2.0% (per annum) of each Capital Account attributable to a Series D Interest.

Management Fees will be appropriately adjusted for any partial quarter. The Investment Manager may reduce or eliminate the Management Fee with respect to any Limited Partner (or Capital Account) in its sole discretion.

**Other Fees and Expenses**
The Fund bears the reasonable, out-of-pocket expenses of the offering of the Interests contemplated hereunder and the recent Amendments, described above, including expenses associated with obtaining any requisite investor consent to such Amendments.   To the extent the General Partner deems appropriate, expenses related to the

Amendments may be capitalized and amortized by the Fund over a 36-month period from the Effective Date, even though such capitalization and amortization may be a divergence from U.S. generally accepted accounting principles ("*GAAP*").   Amortization of such expenses over a 36-month period may, in certain circumstances, result in a qualification of the Fund's annual audited financial statements.   In such instances, the General Partner may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating the Fund's net asset value.   There will be a divergence in the Fund's fiscal year-end net asset value and in the net asset value reported in the Fund's financial statements in any year where, pursuant to clause (ii), GAAP conforming changes are made only to the Fund's financial statements for financial reporting purposes.

If the Fund is terminated within 36 months of the Effective Date, any unamortized expenses will be recognized.

<u>Investment and Operational Expenses</u>.   The Fund bears all reasonable costs and expenses directly related to its investment program, including expenses related to research, due diligence, proxies, underwriting and private placements, brokerage commissions, interest on debt balances or borrowings, custody fees, travel fees and expenses related to the Fund's offering and any withholding or transfer taxes imposed on the Fund.   The Fund also bears all reasonable, out-of-pocket costs of the administration of the Fund, including (i) accounting, audit and legal expenses (including those incurred for the Fund, the General Partner or the Investment Manager to comply with applicable law, rule or regulation), (ii) costs of any litigation or investigation involving the Fund's activities, (iii) the costs, fees and expenses of any appraisers, accountants or other experts engaged by the General Partner or the Investment Manager as well as other expenses directly related to the Fund's investments and (iv) costs associated with reporting and providing information to existing and prospective Limited Partners. However, the General Partner or the Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

The Fund does not have its own separate employees or office.   Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager.   However, a portion of the commissions generated on the Fund's brokerage transactions may generate "soft dollar" credits that the General Partner and the Investment Manager are authorized to use to pay for research and research-related services and products used by the General Partner or the Investment Manager. In the event that the Investment Manager elects to use soft dollars, it intends to limit such use to services that fall

APP.103958

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1387 of 1726   PageID 12708
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 19 of
76

within the safe harbor afforded by Section 28(e) of the United States Securities Exchange Act of 1934, as amended.  See "*Brokerage and Custody*."

**Allocation of Net Profit and Loss**

Net profit or net loss of the Fund (including unrealized gains or losses and Fund expenses) is allocated among the Capital Accounts of the General Partner and the Limited Partners (collectively, the "***Partners***") as of the close of each calendar month, at such times as the Fund receives an additional capital contribution or effects a withdrawal or distribution, or at such other times as the General Partner may determine.

Profit and loss attributable and any Restricted New Issues (as described below) are determined and allocated among the Partners separately and are not reflected in the determinations and allocations of net profit or net loss attributable to the remainder of the Fund's net assets.

As of the close of each accounting period, the net profit or net loss (other than any profit or loss attributable to Restricted New Issues, which are allocated as per below) will be allocated *pro rata* among the Capital Accounts of the Partners in proportion to their percentage interests in the Fund as of the commencement of the period.  Each Partner's percentage interest in the Fund as of the commencement of any period is based on the value of the Partner's Capital Account at such time (excluding any amount attributable to such Partner's share of Restricted New Issues), in relation to the total value of the Fund's net assets at such time (excluding the aggregate amount of net assets attributable to Restricted New Issues).

If the General Partner determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Limited Partner may agree such Limited Partner should not participate (or should receive a reduced participation) in the net profit or net loss with respect to any investment, the General Partner may allocate net profit or net loss, if any, with respect to the investment to Limited Partners to the extent to which the above restrictions do not apply.

The Management Fee is calculated based on the Capital Account balance of each Limited Partner and is debited from each Limited Partner's Capital Account.  Allocations to each Partner of net profit or net loss of the Fund will be subject to periodic adjustment to give effect to the Performance Allocation, as described below.

**Restricted New Issues**

The Fund may from time to time purchase securities in public offerings made through member firms of the Financial Industry Regulatory Authority, Inc. ("***FINRA***").  FINRA member firms are not permitted to sell certain new issues ("***Restricted New Issues***") to accounts in which certain persons have a significant beneficial interest that are involved in the securities industry or to executive officers or directors

APPX. 05959

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1388 of 1726   PageID 12709
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 20 of
76

of companies that are current, recent, or prospective investment banking clients of the relevant underwriters ("***Restricted Persons***").   In order to enable the Fund to participate in Restricted New Issues, the Fund will require each Limited Partner to provide information to enable the Fund to determine whether the Limited Partner is a Restricted Person.   When the Fund invests in a Restricted New Issue, the profits and losses associated with the investment will specifically be allocated to those Partners who are permitted by the FINRA rules to have a beneficial interest therein.

The FINRA rules permit Restricted Persons that are involved in the securities industry to have in the aggregate up to a 10% participation in Restricted New Issues and Restricted Persons affiliated with a FINRA member's investment banking clients to have up to 25% participation in Restricted New Issues.  If the ownership of the Fund by Restricted Persons exceeds the maximum percentage, the General Partner will allocate such excess amount *pro rata* among the Capital Accounts of Partners who are not Restricted Persons or on such other basis that the General Partner reasonably determines ensures compliance with the FINRA Rules.

If a Restricted New Issue in which participation by Restricted Persons has been capped is not promptly sold, the investment may be reallocated among all Partners on a *pro rata* basis (including all Restricted Persons) after a secondary market develops at such secondary market price.

| | |
|---|---|
| **Performance Allocation** | The Investment Manager, in its capacity as a special limited partner in the Fund, is entitled to a performance allocation at the end of each calendar year (the "***Performance Allocation***"), which is calculated and charged separately with respect to each Capital Account of each Limited Partner, equal to 20% of the amount by which the Capital Account's "Performance Change Amount" (if positive) for the current calendar year exceeds the Capital Account's "Loss Carryforward Amount." |

A Capital Account's "***Performance Change Amount***" for any calendar year equals such Capital Account's *pro rata* allocation of net profit or net loss (including Management Fees, Restricted New Issues and/or other items of income or expense specially allocable to the Capital Account).

The "***Loss Carryforward Amount***" for any calendar year equals the aggregate Performance Change Amounts, if negative, allocated to a Capital Account during any preceding calendar year, minus any subsequent positive Performance Change Amounts on which no Performance Allocation was charged.  If a Limited Partner makes a withdrawal from its Capital Account at a time when there is a Loss Carryforward Amount, such Loss Carryforward Amount will be reduced in the same proportion that the withdrawal amount bears to the

14

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 45 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1389 of 1726   PageID 12710
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 21 of
76

Limited Partner's total Capital Account balance immediately prior to the withdrawal.

The Performance Allocation is calculated and charged to each Capital Account as of the last day of each calendar year. The Performance Allocation is also calculated and charged with respect to any Capital Account from which there is a permitted or required withdrawal as of any time other than the last day of a calendar year on the basis of net profits allocated to such Capital Account through the applicable date of withdrawal. In the case of a partial withdrawal, the Performance Allocation is calculated and charged only with respect to the portion of the Capital Account being withdrawn.

The Performance Allocation and Loss Carryforward Amount will be computed separately for each Capital Account (and each separately maintained capital sub-account reflecting additional contributions by a Limited Partner). Thus, if a Limited Partner has multiple Capital Accounts, the Performance Allocation and Loss Carryforward will be computed separately for each Capital Account, and the Capital Accounts will not be netted against one another for purposes of calculating the Performance Allocation. Accordingly, Limited Partners with multiple Capital Accounts may be charged a Performance Allocation in respect of one or more Capital Accounts for a year in which the aggregate net profits allocated to all of such Limited Partner's Capital Accounts do not exceed the aggregate Loss Carryforward Amount allocated to all of such Limited Partner's Capital Accounts.

The Performance Allocation with respect to any Limited Partner may be waived or altered by the Investment Manager in its sole discretion.

**Distributions**

Subject to the withdrawal privilege described below, all earnings of the Fund are ordinarily retained for investment. Other than distributions made pursuant to a withdrawal described below, Limited Partners should not expect the Fund to make any distributions.

**Withdrawals Generally**

Withdrawal rights vary by Series. For the purposes of establishing the withdrawal privileges below, withdrawal rights are determined separately with respect to each Capital Account (and each capital sub-account, if applicable) of a Limited Partner.

**Series Withdrawal Dates**

Subject to certain withdrawal restrictions described below, Limited Partners have the following withdrawal rights:

Series B Interests: Annual Liquidity. A Limited Partner is permitted to make complete or partial withdrawals of its Series B Interests upon written notice to the General Partner at least 180 days prior to the applicable Series B Withdrawal Date. The "*Series B Withdrawal Date*" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of

APPX. 05963

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1390 of 1726   PageID 12711
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 22 of
76

the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Withdrawal Date (i.e., if capital was contributed to the Fund on November 1, 2014, such capital would be eligible for withdrawal on October 31, 2015 and every year thereafter on October 31st, or the last Business Day of that month).

Series C Interests: Two Year Liquidity.    A Limited Partner is permitted to make complete or partial withdrawals of its Series C Interests upon written notice to the General Partner at least 180 days prior to the applicable Series C Withdrawal Date. The "*Series C Withdrawal Date*" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the two-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Withdrawal Date (i.e., if capital was contributed to the Fund on November 1, 2014, such capital would be eligible for withdrawal on October 31, 2016 and every two years thereafter on October 31st, or the last Business Day of that month).

Series D Interests: One Year Hard Lock-Up; Quarterly Liquidity.    A Limited Partner is permitted to make complete or partial withdrawals of its Series D Interest as of the last Business Day of each calendar quarter (and/or such other days as the General Partner may determine in its sole discretion) (each, a "*Series D Withdrawal Date*") following the one-year anniversary of the contribution of the capital to be withdrawn. Notice of any withdrawal of Series D Interests must be provided in writing to the General Partner at least 90 calendar days prior to the requested Series D Withdrawal Date.

The General Partner may, at any time and in its sole discretion, waive or modify the foregoing withdrawal and distribution restrictions with respect to any Limited Partner.

**Settlement of Withdrawal Proceeds**

With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Fund or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable date of withdrawal, and withdrawn amounts will be fixed as of the effective date of withdrawal, except as otherwise provided in the Partnership Agreement with respect to reserves for contingencies.

At least 90% of the estimated amount due with respect to the Fund's marketable investments is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Fund, within 30 Business Days after the date of withdrawal, provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund or the remaining Capital Accounts.    The General Partner is entitled to deduct from such

16

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1391 of 1726 PageID 12712
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 23 of
76

settlement an amount equal to the pro rata portion of any Performance Allocation (based on the portion of the withdrawal being settled) payable to the Investment Manager with respect to such withdrawn amount. Any balance will be held back and distributed, without interest thereon, promptly following completion of the audit of the Fund's financial statements for such fiscal year, or sooner in the General Partner's discretion.

In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the Limited Partner's interest in the Fund's marketable investments, no settlements occur with respect to any of such Limited Partner's interest in the Fund's non-marketable investments until the occurrence of liquidity events with respect to such non-marketable investments after the scheduled payment date for the withdrawal (without interest thereon). Notwithstanding the foregoing, the General Partner may, in its sole discretion, make settlements in such cases prior to the occurrence of a liquidity event if such settlement would, in the good faith opinion of the General Partner, not have a material adverse effect on the Fund. Generally, a liquidity event will be a sale of the relevant investment for cash, in which case the settlement will be funded in cash within 90 days after the liquidity event (without interest). If the liquidity event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Limited Partner's ratable share of the relevant investment or by distributing the net proceeds derived from a sale of such investment. The General Partner is entitled to withdraw from each such settlement an amount equal to the remaining portion of any Performance Allocation (pro rata based on the portion of such withdrawal being distributed) to be credited to the Investment Manager at the same time and in the same form (in cash or in kind) as the distribution to the withdrawing Limited Partner.

The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal.

**Withdrawal Conditions**     The General Partner may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the investor, the General Partner and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the withdrawal proceeds will be paid. The withdrawal proceeds will not

APPX. 105963

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 48 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1392 of 1726   PageID 12713
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 24 of
76

be paid to a third-party account if the investor and/or owner of the account fails to provide such information.

**Compulsory Withdrawals**   The General Partner reserves the right, in its sole discretion, to compel the withdrawal of any Limited Partner's Interest, in part or in its entirety, on not less than five days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Fund may cause the Fund, the Investment Manager or the General Partner to violate any applicable law).   Settlements are made in the same manner as voluntary withdrawals.

**Suspension of Valuations, Withdrawals and Withdrawal Payments**   The General Partner may suspend the issuance of Interests, the Partners' withdrawal privileges, the payment of withdrawal proceeds and the valuation of the Fund's net assets:

(i)   during any period when any stock exchange or over-the-counter market on which the Fund's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

(ii)   during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of investments by the Fund, or the determination of the value of the assets of the Fund, would not be reasonably practicable;

(iii)   during any breakdown in the means of communication normally employed in determining the price or value of the Fund's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Fund cannot reasonably be accurately ascertained within a reasonable time frame;

(iv)   during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange;

(v)   in other circumstances where the General Partner is unable to fairly value the Fund's assets due to extreme market conditions; or

(vi)   automatically upon liquidation of the Fund.

Upon the reasonable determination by the General Partner that conditions leading to suspension no longer apply, withdrawal rights for all Limited Partners shall be promptly reinstated, and any pending withdrawal requests (or new, timely withdrawal requests) shall be

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 49 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1393 of 1726   PageID 12714
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 25 of
76

honored as of the last Business Day of the calendar quarter in which withdrawals have recommenced, subject to the application of the withdrawal limitations described herein.

**Soft Wind Down**

It is anticipated that any suspension in the circumstances described above in "Suspension of Valuations, Withdrawals and Withdrawal Payments" (each, a "***Suspension***") would ordinarily be temporary (other than in connection with a decision to proceed with the liquidation of the Fund). However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the General Partner, in consultation with the Investment Manager, considers it appropriate to keep the Suspension in place indefinitely. In certain circumstances, even where a Suspension has not been declared, the General Partner may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued. During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the General Partner to cause the Fund to return the Fund's assets to Limited Partners in an orderly manner (without proceeding with a liquidation of the Fund) (an "***Orderly Realization***"). The General Partner may, in such circumstances, resolve to effect an Orderly Realization should it determine that doing so is in the best interests of the Fund as a whole. Such Orderly Realization shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the Limited Partners. The General Partner will notify Limited Partners of any decision to proceed with an Orderly Realization of the Fund. During an Orderly Realization, the Investment Manager may, in consultation with the General Partner, take such steps as are considered appropriate in the best interests of the Fund as a whole to effect the Orderly Realization. The General Partner, in consultation with the Investment Manager, shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "***Realization Period***"). Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under Delaware law or any other applicable bankruptcy or insolvency regime. The General Partner, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. Management Fees shall be payable and Performance Allocations shall

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1394 of 1726 PageID 12715
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 26 of
76

be made during an Orderly Realization on the same basis as described herein.

| | |
|---|---|
| **Transfers** | Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole discretion. The General Partner in its sole discretion may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement. Interests of any Affiliated Investors may be transferred to other affiliates thereof without restriction. |
| **Duty of Care; Indemnification** | The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Fund or the Limited Partners for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, fraud or gross negligence or as otherwise required by law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Fund's business or affairs to the fullest extent permitted by law. The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors. |
| **Valuations** | In general, the Fund's financial statements will be prepared in accordance with GAAP. The General Partner has delegated the valuation of the Fund's assets to the Investment Manager who values the Fund's assets as of the close of each accounting period in accordance with its valuation policies and procedures. Valuations may be suspended as set forth above in "Suspension of Valuations, Withdrawals and Withdrawal Payments." |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its sole discretion deems necessary or appropriate. In the sole discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were |

APPX. 05968

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 51 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1395 of 1726   PageID 12716
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 27 of
76

Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Partners during any such prior period.

**Fiscal Year**

The Fund has a fiscal year ending on December 31 of each calendar year.

**Reports to Partners**

The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each Partner to complete federal and state income tax or information returns, along with any other tax information required by law.   The Fund also furnishes monthly reports reviewing the Fund's performance for such calendar month.   The General Partner selects the Fund's independent accountants in its sole discretion.

**Advisory Committee**

The General Partner and/or the Investment Manager may appoint, or cause to be appointed, a committee (the "*Advisory Committee*") consisting of one or more individuals selected by the General Partner and/or the Investment Manager, none of whom is affiliated with the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in the Fund or an affiliate thereof). If established, the Advisory Committee will have the authority, at the request of the General Partner and/or the Investment Manager, to consult with the General Partner and/or the Investment Manager on any matters that may involve a conflict of interest between the General Partner and/or the Investment Manager (or their affiliates) on the one hand and the Limited Partners (or shareholders of the Offshore Fund) and the Fund on the other. Any consent given by a majority of the Advisory Committee on behalf of the Fund in good faith after consultation with the General Partner and/or the Investment Manager is binding on the Fund and the Limited Partners or shareholders of the Offshore Fund (so long as such majority consists of persons independent of the General Partner and/or the Investment Manager and their affiliates).   The Fund will have the authority to agree to reimburse members of the Advisory Committee for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

APP.10567

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1396 of 1726 PageID 12717
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 28 of
76

| | |
|---|---|
| **Dissolution and Liquidation** | In the event an Orderly Realization lasts longer than three years, Limited Partners with a combined percentage interest in the Fund of at least 75% may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Fund. The Limited Partners will not have any other right to bring an action in court to dissolve the Fund. |
| | Dissolution of the Fund may also occur upon the General Partner's election, in its sole discretion, to dissolve the Fund or upon the occurrence of any event which results in the General Partner (or a successor to its business) ceasing to be the general partner of the Fund. Upon the occurrence of any such event, the General Partner (or a liquidator elected by a majority in interest of the Limited Partners, if the General Partner is unable to perform this function) is charged with winding up the affairs of the Fund, liquidating its assets to the extent feasible and making liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with each Partner's Capital Account balance. |
| **Placement Agents** | The Investment Manager may engage third parties to solicit investors and act as placement agents for the Fund. Placement agents may charge a placement fee directly to investors solicited by any such placement agent, but such fees will not affect the subscription amount and will not be collected by or from the Fund. The placement agent may be reimbursed for its expenses and indemnified by the Fund. |
| | Furthermore, placement agents may be paid a portion of the Management Fee or Performance Allocation attributable to such investors solicited by them, thereby reducing the Management Fee or Performance Allocation received by the Investment Manager. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions. |
| | Each placement agent must comply with the legal requirements of the jurisdictions within which it offers and sells Interests. |
| **Tax Status** | The General Partner believes that the Fund should be treated as a partnership for U.S. federal income tax purposes and that it should not itself be subject to U.S. federal income taxation. Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions. Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period may differ from its financial or economic results. The |

APPX. 05960

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 53 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1397 of 1726    PageID 12718
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 29 of
76

deductibility of a Limited Partner's share of any Fund losses or deductions may be limited.   See "*Tax Considerations*."

**ERISA**

The General Partner intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***").   See "*ERISA and Other Regulatory Considerations*."

**Amendment of the Limited Partnership Agreement**

The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent.   However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; or (c) reduce any Limited Partner's right to share in net profits or assets of the Fund without the consent of each Limited Partner adversely affected thereby.   The above consent may be obtained by negative consent (affording the Limited Partners notice and opportunity to object).

Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund as of a date that is not less than 30 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment.

**Variation of Terms**

The General Partner, in its sole discretion, may enter into a side letter or similar agreement to or with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of the Partnership Agreement or the Subscription Documents (including those relating to Management Fees, the Performance Allocation, transparency, and withdrawals) with respect to such Limited Partner.   The General Partner generally grants waivers of the Management Fees, Performance Allocation and withdrawal restrictions to principals and employees of the Investment Manager and its affiliates, as well as their related family members and affiliates.

**Dispute Resolution**

Any controversy or claim ("***Dispute***") out of or relating to or in connection with the Partnership Agreement or otherwise involving the Fund, its Partners and/or any Indemnified Party (as defined in the Partnership Agreement) shall be submitted to mediation in accordance

APPX. 05969

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 54 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1398 of 1726   PageID 12719
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 30 of
76

with the Partnership Agreement and if such dispute has not been resolved within 90 days, will be resolved by binding arbitration in accordance with the Partnership Agreement.   Mediation and arbitration shall be held in Dallas, Texas and Delaware law shall apply to any dispute, except as otherwise provided in the Partnership Agreement.

APPX. 05972

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 55 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1399 of 1726   PageID 12720
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 31 of
76

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves certain risks.  Certain of these risks are summarized below.  The Fund may not be suitable for all investors and is intended for sophisticated investors who can accept the risks associated with its investments.  An investment in the Fund does not constitute a complete investment program.  Investors will not have recourse except with respect to the assets of the Fund.  Prospective investors should consider, among others, the risk factors and potential conflicts of interest described in this section.  All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

**Fund Risks**

*Investment Judgment; Market Risk*.  The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments.  There can be no assurance that the Investment Manager will be able to predict accurately these price movements.  With respect to the investment strategy utilized by the Fund, there is always some, and occasionally a significant, degree of market risk.

*Reliance on Key Persons.* The Fund will be substantially dependent on the services of James Dondero, Mark Okada and Joshua Terry (the "***Key Man Group***").  In the event of the death, disability, departure or insolvency of a member of the Key Man Group, or the complete transfer of a member's interest in the Investment Manager, the business of the Fund may be adversely affected.  Each member of the Key Man Group will devote such time and effort as he deems necessary for the management and administration of the Fund's business.  However, the members of the Key Man Group may engage in various other business activities in addition to managing the Fund, and consequently may not devote all time to Fund business.

*Investment Authority.*  Substantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager.  Limited Partners have no right or power to take part in the management of the Fund.  The Investment Manager also makes all of the trading and investment decisions of the Fund.   In the event of the withdrawal or bankruptcy of the General Partner, generally the Fund will be liquidated.

*Performance Allocation.*  The Performance Allocation made to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Withdrawal Restrictions.*  There are severe restrictions on withdrawals from the Fund (which may be settled in securities rather than cash) and on transfers of Interests.   The prior written consent of the General Partner is required for a transfer of the Interest of any Limited Partner and the General Partner, in its sole discretion, may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement. Because of the restrictions on withdrawals and transfers, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. There is no independent market for the purchase or sale of Interests and none is expected to develop. Limited Partners must represent that they are purchasing Interests for investment. A subscription for Interests should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

APPX. 105973

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 56 of
Case 3:23-cv-00726-S  Document 8-23  Filed 02/29/23  Page 1400 of 1726  PageID 12721
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 32 of
76

*No Distributions.*   Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income.   Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*In-Kind Distributions*.   The Partnership Agreement authorizes the General Partner to make distributions in kind of securities in lieu of or in addition to cash.   In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Diversification.*   Since the Fund's portfolio will not necessarily be widely diversified, the investment portfolio of the Fund may be subject to more rapid changes in value than would be the case if the Fund were required to maintain a wide diversification among companies, securities and types of securities.

*Valuations.*   From time to time, certain situations affecting the valuation of the Fund's investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Fund) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed.   The Fund is not required to make retroactive adjustments to prior subscription or withdrawal transactions or Management Fees or Performance Allocations based on subsequent valuation data.

*Non-Public Information.*   From time to time, the Investment Manager may come into possession of non-public information concerning specific companies.   Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies. The Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*Soft Dollars.*   The Investment Manager may enter into "soft dollar" arrangements with one or more broker-dealers whereby the Investment Manager will direct securities transactions to the broker-dealer in return for research products and services from the broker-dealer.   Although the Investment Manager will use the research and services in making investment decisions for the Fund, the Investment Manager may use such research or services for other accounts and the Fund will generally pay more than the lowest available commissions for execution of these transactions.   The Investment Manager may also enter into "soft dollar" arrangements to cover Fund expenses or costs and expenses of the Investment Manager to the extent such arrangements are permitted by law and described in this Memorandum.   See "*Brokerage and Custody*."

*Absence of Registration*.   The Fund has not and will not register under the Investment Company Act.   Accordingly, the provisions of the Investment Company Act which, among other things, require that a fund's board of directors, including a majority of disinterested directors, approve certain of the fund's activities and contractual relationships, prohibit certain trading and investment activities and prohibit the fund from engaging in certain transactions with its affiliates, will not be applicable.   Neither the General Partner nor the Investment Manager is registered as a CPO or a CTA with the NFA in reliance on an exemption from registration pursuant to CFTC Regulation 4.13(a)(3).   Accordingly, the provisions of the Commodity Exchange Act and the regulations promulgated thereunder applicable to registered persons will not be applicable to the General Partner or the Investment Manager.

APPX. 05974

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 57 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1401 of 1726   PageID 12722
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 33 of
76

*Recent Developments in the Financial Services Industry*.   Recent developments in the U.S. financial markets illustrate that the current environment is one of extraordinary and possibly unprecedented uncertainty for the financial services industry.   In July of 2010, the Dodd-Frank Financial Reform Act was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel.   The implications of the passage of the Dodd-Frank Financial Reform Act for the hedge fund industry as a whole still remain somewhat unclear.   The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Fund's business, operations and performance.

**Investment Strategy Risks**

Risks Associated With Investing in CLOs

*Risks of Investment Focus*.   The Fund's portfolio may consist of CLO Securities.   A cash flow CLO is generally analogous to a special purpose finance company.   The CLO owns a portfolio consisting of corporate loans and other investments typically from which it receives interest income, together with capital gains and losses.   The CLO is often financed with equity, which may be in the form of preference shares or income notes ("***CLO Equity***") and several levels of long-term debt ("***CLO Debt***").   CLO Debt is typically rated by the rating agencies based on the deal structure as well as outstanding principal amount of portfolio securities and, in most cases, is not contingent on the market value of the underlying portfolio.   CLO Equity is almost always unrated.

CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks.   The CLO Equity that the Fund may purchase may be unrated or non-investment grade.   In addition, as a holder of CLO Equity, the Fund may have limited remedies available upon the default of the CLO.

The value of the CLO Securities that the Fund may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("***CLO Collateral***"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates.   CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof.   If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation.   The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution.

CLO Collateral may consist of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality).   Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof.   The lower ratings of below

27

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 58 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1402 of 1726   PageID 12723
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 34 of
76

investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest.   Such investments may be speculative.

*Dependence Upon Other Unrelated Managers*.   The success of a CLO may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the Fund as an investor in such CLO.   Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Fund's investments in such CLOs will depend on the performance of unrelated managers.

*Investments in CLOs Managed by the Investment Manager or its Affiliates*.   The Fund may invest a significant portion of its capital in structured investments, including CLO tranches originated and managed by third parties and CLO tranches managed by the Investment Manager or its affiliates (the "**Affiliated CLOs**").   If the Fund invests in Affiliated CLOs, the Limited Partners will indirectly pay the fees (senior and subordinated) (but only if such investment is in the equity tranche of such Affiliated CLO), expenses and any carried interest at primary issuance.   The Investment Manager or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Affiliated CLOs.   If the Fund provides all of the equity for an Affiliated CLO, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis.   The Investment Manager will have conflicting division of loyalties and responsibilities regarding the Fund and an Affiliated CLO, and certain other conflicts of interest would be inherent in the situation.   There can be no assurance that the interests of the Fund would not be subordinated to those of an Affiliated CLO or to other interests of the Investment Manager.

*Multiple Levels of Fees*.   The Fund and the CLOs (including Affiliated CLOs) are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income.   This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments.   Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees.   The general partner or manager of a CLO (including a member of the Highland Group (defined below)) may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees).   Additionally, some of the CLOs may invest themselves in underlying hedge funds or CLOs.   In such case, additional management costs and other administrative expenses may be incurred.

*Limited Diversification*.   CLOs may invest in concentrated portfolios of assets.   The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities (the related CLO Equity in particular) to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs (the related CLO Equity in particular) to a greater degree of risk with respect to economic downturns relating to such industry.   The Fund may have a concentrated exposure to CLOs of a particular type of CLO.

*CLO Embedded Leverage Risk*.   The Fund's participation in CLOs involves varying amounts of leverage.   Leverage is embedded in all classes of a CLO other than the most senior tranche.   If the Fund retains either the most or one of the most subordinate tranches of the CLO's securities, it will hold the most leveraged investment in the CLO.   While leverage presents opportunities for increasing the Fund's total return, it has the effect of potentially increasing losses as well.   Accordingly, any event which

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1403 of 1726 PageID 12724
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 35 of
76

adversely affects the value of an investment in a CLO would be magnified to the extent such CLO is leveraged. The cumulative effect of the use of leverage by a CLO in a market that moves adversely to the CLO's investments could result in a substantial loss to the CLO which would be greater than if the CLO were not leveraged. The borrowing arrangements of CLOs will contain events of default that, under certain circumstances, could result in early amortization or in the acceleration of the maturities of these obligations. In the event of acceleration of the borrowing arrangements of a CLO, in whole or in part, it may be required to dispose of all or a significant portion of its investments. Such a forced disposal of securities could result in realization of value of such investments significantly below the anticipated market values for such securities. When the Fund invests in derivative transactions, it may also gain leverage through such derivative transactions, which will expose the Fund to a greater risk of loss.

*Interest Rate Mismatch.* CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate. As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("***Fixed Rate Assets***"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("***Floating Rate Assets***"). In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt or Equity. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO securities. In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

*Lower Credit Quality Securities.* There are no restrictions on the credit quality of the investments of the Fund. CLO Securities in which the Fund will invest may have no ratings or may be deemed by rating agencies to have substantial vulnerability to default in payment of interest and/or principal and have the lowest quality ratings. The Fund may purchase CLO Securities which have ratings that have been downgraded or placed on "credit watch" for future downgrading. Lower rated and unrated securities in which the Fund may invest have large uncertainties or major risk exposures to adverse conditions and are considered to be predominantly speculative and may become a defaulted asset for a variety of reasons. Generally, such securities offer a higher return potential than higher rated securities, but involve greater volatility of price and greater risk of loss of income and principal.

The market values of certain of these securities (such as subordinated securities) also tend to be more sensitive to changes in economic conditions than higher rated securities. The value of leveraged loans and other assets underlying a CLO may also be affected by changes in the market's perception of the entity issuing or guaranteeing them, or by changes in government regulations and tax policies. Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications. Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities. In addition, historically the trading volume in the loan market has been small relative to the high-yield debt securities market, and such illiquidity has been exacerbated during the current liquidity crisis.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1404 of 1726 PageID 12725
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 36 of
76

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities. There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the assets underlying CLO Securities.

In general, the ratings of nationally recognized rating organizations represent the opinions of such agencies as to the quality of securities that they rate. Such ratings may be used by the Investment Manager as an initial basis for the selection of portfolio securities. Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not evaluate the market value risk of the securities. Such ratings also do not reflect macroeconomic or systematic risk, including the risk of increased illiquidity in the credit markets. It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events.

*Defaulted Assets Underlying CLO Securities.* If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset. In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset. The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon. Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO security. Therefore, if any CLO security has defaulted assets which correspond to the exposure of the Fund's interest in the CLO security, the Fund may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities as a result of the current liquidity crisis. Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security. These additional risks may affect the returns on the investments in the Fund's portfolio.

*Subordination of CLO Debt and CLO Equity.* The Fund's portfolio may consist of CLO Equity and subordinate CLO Debt. Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches. CLO Equity generally is fully subordinated to any related CLO Debt. Thus, some of the investments of the Fund in a CLO may rank behind other creditors of the CLO and an investment by the Fund in the equity tranche of a CLO may rank behind all creditors of the CLO. To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches. In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO. Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt and/or the holders of the related CLO Equity, as applicable. Investments of the Fund may be the first to absorb any losses by the

APPX. 05976

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1405 of 1726 PageID 12726
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 37 of
76

CLO on its underlying portfolio. This may result in losses on the invested proceeds of the Fund and could result in the complete loss of invested proceeds.

*Mandatory Redemption of CLO Senior Tranches and CLO Debt.* Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt and the related CLO Equity will be used to redeem the related CLO senior tranches. This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt or such CLO Equity, which could adversely impact the returns to the holders of such CLO Debt or such CLO Equity.

*Optional Redemption of CLO Senior Tranches and CLO Debt.* An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO securities, including the Fund). As a result of any such rapid liquidation of a CLO, a holder of the related CLO securities (including the Fund) could lose all or a substantial portion of its investment in such CLO securities.

*Insolvency Risks.* Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "***Insolvent Company***"). The information in this paragraph and the following paragraph is applicable with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Fund) or from subsequent transferees of such payments (such as the Limited Partners).

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 62 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1406 of 1726   PageID 12727
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 38 of
76

However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets.  Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable.  Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States Federal and state laws. Insofar as the Fund's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

*"Widening" Risk*.  For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Fund invests may decline substantially.   In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale.  It may not be possible to predict, or to hedge against, such "spread widening" risk.

*There Is Limited Disclosure About the CLO Securities and the Underlying CLO Collateral in this Memorandum*. The Investment Manager will not be required to provide the investors in the Fund with financial or other information (which may include material non-public information) it receives related to the CLO Securities.   The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Fund to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor.   In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or terms of, or the identity of any obligor on, any CLO Securities.

*Impact of the Volcker Rule on the Liquidity of the Notes*.   Section 619 of the Dodd-Frank Act added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions.   The Volcker Rule also provides for certain supervised nonbank financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions.   The conformance period for the Volcker Rule has been extended to July 21, 2015, and to July 21, 2017 for CLOs.   Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities.   This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Fund's ability to liquidate these positions on a timely basis.

APPX. 05970

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 63 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1407 of 1726   PageID 12728
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 39 of
76

Investment Strategy and Investment Risks

  *General Economic and Market Conditions*.   The success of the Fund's activities will be affected by general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation of the Fund's investments), trade barriers, currency exchange controls, and national and international political circumstances (including wars, terrorist acts or security operations).   These factors may affect the level and volatility of securities prices and the liquidity of the Fund's investments.   Volatility or illiquidity could impair the Fund's profitability or result in losses.   The Fund may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets; the larger the positions, the greater the potential for loss.

  Unpredictable or unstable market conditions may result in reduced opportunities to find suitable investments to deploy capital or make it more difficult to exit and realize value (or avoid significant losses) from the Fund's existing investments.   It is important to understand that the Fund can incur material losses even if it reacts quickly to difficult market conditions and there can be no assurance that the Fund will not suffer material adverse effects from broad and rapid changes in market conditions.

  *Recent Developments in Global Credit Markets*.   Recently, declines in the market value of asset-backed securities, especially securities backed by subprime mortgages, have been concomitant with significant market events.   Increasing credit and valuation problems in the subprime mortgage market have generated extreme volatility and illiquidity in the markets for securities directly or indirectly exposed to subprime mortgage loans.   This volatility and illiquidity has extended to the global credit and equity markets generally, and, in particular, to the high-yield bond and loan markets, exacerbated by, among other things, growing uncertainty regarding the extent of the problems in the mortgage industry and the degree of exposure of financial institutions and others, decreased risk tolerance by investors and significantly tightened availability of credit.   The duration and ultimate effect of current market conditions cannot be predicted, nor is it known whether or the degree to which such conditions may worsen.   However, the continuation of current market conditions, uncertainty or further deterioration could result in further declines in the market values of potential Fund investments or declines in the market values of subsequently purchased Fund investments.   Such declines could lead to diminished investment opportunities for the Fund, prevent the Fund from successfully executing its investment strategies or require the Fund to dispose of investments at a loss while such adverse market conditions prevail.

  *Illiquidity*.   The investments made by the Fund may be or become very illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Manager's assessment of their value or the amount paid for such investments by the Fund.   Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by the Fund and other factors.   Furthermore, the nature of the Fund's investments, especially those in financially distressed companies, may require a long holding period prior to profitability.   The Partnership Agreement authorizes the General Partner to make distributions in kind (including interests in affiliated liquidating vehicles) of securities in lieu of or in addition to cash. In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

  *Short Sales*.   The Fund may enter into transactions, known as "short sales," in which it sells a security it does not own in anticipation of a decline in the market value of the security.   Short sales by the Fund that are not made "against the box" theoretically involve unlimited loss potential since the

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 64 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1408 of 1726 PageID 12729
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 40 of
76

market price of securities sold short may continuously increase. The Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions, the Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales.

*Derivatives*. Derivative instruments, or "derivatives," include futures, options, swaps, structured securities and other instruments and contracts that are derived from, or the value of which is related to, one or more underlying securities, financial benchmarks, currencies or indices. Derivatives allow an investor to hedge or speculate upon the price movements of a particular security, financial benchmark currency or index at a fraction of the cost of investing in the underlying asset. The value of a derivative depends largely upon price movements in the underlying asset. Therefore, many of the risks applicable to trading the underlying asset are also applicable to derivatives of such asset. However, there are a number of other risks associated with derivatives trading. For example, because many derivatives are "leveraged," and thus provide significantly more market exposure than the money paid or deposited when the transaction is entered into, a relatively small adverse market movement can not only result in the loss of the entire investment, but may also expose the Fund to the possibility of a loss exceeding the original amount invested. Derivatives may also expose investors to liquidity risk, as there may not be a liquid market within which to close or dispose of outstanding derivatives contracts, and to counterparty risk. The counterparty risk lies with each party with whom the Fund contracts for the purpose of making derivative investments (the "***Counterparty***"). In the event of the Counterparty's default, the Fund will only rank as an unsecured creditor and risks the loss of all or a portion of the amounts it is contractually entitled to receive.

*Life Settlement Investments*. The Fund may invest in life settlements or own companies that may invest in life settlements, which are the transfers of the beneficial interest in a life insurance policy by the underlying insured person to a third party. The Fund will generally purchase the beneficial interest in a life insurance policy for more than its cash surrender value but at a discount to its face value (i.e., the payment amount set forth in the life insurance policy that is payable on the death of the insured or upon maturity of the life insurance policy). After purchase the Fund will be responsible for premiums payable on the life insurance policy and will be entitled to receive the full face value from the insurance company upon maturation (i.e., upon the death of the insured). Accordingly, if the Fund is unable to make premium payments on a purchased life insurance policy due to liquidity issues or for any other reason, the policy will lapse, and the Fund will lose its ownership interest in the policy. In addition, the Fund's investments in life settlement policies involve certain additional risks, including inaccurate estimations of life expectancy of the insured individuals, liquidity risk, credit risk of the insurance company, risks of any policies purchased being unenforceable and risks of adverse regulatory and legal changes.

The actual rate of return on a life settlement policy cannot be calculated before the insured dies and the longer the insured lives, the lower the rate of return on the related life settlement policy will be. Current privacy laws may limit the information available to the Fund about insureds and may cause the Fund to inaccurately estimate the value of particular policies. The Fund's inability to predict with certainty the life expectancies of the pool of underlying insured persons tied to purchased life settlement policies may cause unanticipated delays in the collection of a substantial number of life settlement policies. Life settlements are also generally considered illiquid because there is a limited secondary market for such policies to be bought and sold. Accordingly, the Fund may be limited in its ability to sell policies in its portfolio in a timely fashion and/or at a favorable price. In addition, if a life insurance company declares bankruptcy or otherwise is insolvent, there may not be sufficient funds for it to pay

APPX. 05932

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1409 of 1726   PageID 12730
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 41 of
76

its liability, and while many states have an insurance guarantee fund to provide payments to beneficiaries of insurance companies that declare bankruptcy, the collection process can be prolonged and complicated, and collection may not be possible in all circumstances.

Life settlement policies may also be subject to contest by the issuing life insurance company.   If the insurance company successfully contests a policy, the policy will be rescinded and declared void. For example, insurers may refuse to pay benefits on certain life insurance policies on the basis that there was no "insurable interest" on the part of the purchaser of a life insurance policy at the time such policy was issued.   Recently the issue of a lack of insurable interest has been raised by insurers and beneficiaries of irrevocable life insurance trusts, in the context of so-called "stranger originated life insurance" policies.   It is possible that courts may void certain life settlement policies for these or other reasons.   The market for life settlement policies may also be subject to new government regulation that may impact the ability of the Fund to obtain life settlement policies.   Insurance companies may seek regulation or changes of law restricting or otherwise encumbering the transfer of life insurance policies in life settlement policy transactions. No assurance can be made that insurance companies will not be successful in limiting the supply of life insurance policies available for purchase in life settlement policy transactions.

Any or all of the risks described above could have a material adverse effect on the Fund's investment returns and, therefore, on its ability to make distributions to its shareholders.   In addition, it is unclear under a variety of federal income tax principles whether the income from life settlements or the Fund's ownership in a non-U.S. company that makes distributions resulting from such life settlement investments is qualifying income for purposes of the IRS 90% gross income test the Fund must satisfy each year to qualify as a regulated investment company ("*RIC*").   Further, the Fund's ownership in a non-U.S. company that invests in life settlements, it is unclear whether the U.S. will respect the non-U.S. company reliance on the applicable U.S. tax treaty for purposes of the avoidance of certain withholding tax or whether the non-U.S. company is deemed to be engaged in a U.S. trade or business within the U.S.  If any such was the case, the Fund could be materially adversely effected by such determination on the non-U.S. company with respect to the Fund's investments returns and its ability to make distributions to its shareholders.   The Fund intends to monitor its investments to ensure that the Fund remains qualified as a RIC.

*Foreign Securities*.   Investments in foreign securities involve certain factors not typically associated with investing in U.S. securities, such as risks relating to (i) currency exchange matters, including fluctuations in the rate of exchange between the U.S. dollar (the currency in which the books of the Fund are maintained) and the various foreign currencies in which the Fund's portfolio securities will be denominated and costs associated with conversion of investment principal and income from one currency into another; (ii) differences between the U.S. and foreign securities markets, including the absence of uniform accounting, auditing and financial reporting standards and practices and disclosure requirements, and less government supervision and regulation; (iii) political, social or economic instability; (iv) imposition of foreign income, withholding or other taxes; and (v) the extension of credit, especially in the case of sovereign debt.

*Commodities and Futures.*   The Fund may trade on a limited basis in commodities and futures. Such trading activity is regulated by the Commodity Futures Trading Commission (the "*CFTC*"). Pursuant to an exemption from registration under CFTC regulations, neither the General Partner nor the Investment Manager is required to register, and neither is registered, with the CFTC or the National Futures Association ("*NFA*") as a commodity pool operator (a "*CPO*") or as a commodity trading advisor ("*CTA*").   To comply with the exemption, the Investment Manager is subject to specific

APPX. 05793

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 66 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1410 of 1726   PageID 12731
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 42 of
76

limitations on the amount of commodities and futures that it can trade on behalf of the Fund.   Should the Fund's investments in commodities or futures instruments exceed the limits provided by the applicable exemption from registration, the Investment Manager will either have to register with the NFA or cease providing commodity interest trading advice to the Fund and liquidate the Fund's holdings of commodities and futures which could result in losses and additional costs to the Fund.

*Leverage.*   Subject to applicable margin and other limitations, the Fund may borrow funds in order to make additional investments and thereby increase both the possibility of gain and risk of loss.   Consequently, the effect of fluctuations in the market value of the Fund's portfolio would be amplified. Interest on borrowings will be a portfolio expense of the Fund and will affect the operating results of the Fund.   Also, the Fund could potentially create leverage via the use of instruments such as options and other derivative instruments.

*Options*.   Investing in options can provide a greater potential for profit or loss than an equivalent investment in the underlying asset.   The value of an option may decline because of a change in the value of the underlying asset relative to the strike price, the passage of time, changes in the market's perception as to the future price behavior of the underlying asset, or any combination thereof.   In the case of the purchase of an option, the risk of loss of an investor's entire investment (*i.e.*, the premium paid plus transaction charges) reflects the nature of an option as a wasting asset that may become worthless when the option expires.   Where an option is written or granted (*i.e.*, sold) uncovered, the seller may be liable to pay substantial additional margin, and the risk of loss is unlimited, as the seller will be obligated to deliver, or take delivery of, an asset at a predetermined price which may, upon exercise of the option, be significantly different from the market value.

*Currency Exposure*.   The Interests will be issued and generally withdrawal proceeds will be paid in U.S. Dollars.   A limited amount of the assets of the Fund may, however, be invested in securities and other investments which are denominated in currencies other than U.S. Dollars.   Accordingly, the value of such assets may be affected favorably or unfavorably by fluctuations in currency rates.   The Investment Manager may hedge the non-U.S. currency exposure of the Fund using Currency Hedging Instruments, as described in "Investment Program" above.   However, the assets of the Fund will necessarily be subject to foreign exchange risks.   In addition, prospective investors whose assets and liabilities are predominately in other currencies should take into account the potential risk of loss arising from fluctuations in value between the U.S. Dollar and other currencies.

To the extent unhedged, the value of the Fund's positions in non-U.S. investments will fluctuate with U.S. Dollar exchange rates as well as with the price changes of the investments in the various local markets and currencies.   In such cases, an increase in the value of the U.S. Dollar compared to the other currencies in which the Fund makes investments will reduce the effect of any increases and magnify the effect of any decreases in the prices of the Fund's financial instruments in their local markets and may result in a loss to the Fund.   Conversely, a decrease in the value of the U.S. Dollar will have the opposite effect on the Fund's non-U.S. Dollar investments.

*Concentration of the Fund's Portfolio.*   The Fund may be highly concentrated in CLO Securities.   The concentration of the Fund's portfolio in CLO Securities subjects the Fund to a greater degree of risk than if the Fund's portfolio was diversified with respect to several investment strategies. Also, the concentration of the Fund's portfolio in any one obligor would subject the Fund to a greater degree of risk with respect to defaults by such obligor.

APPX. 05784

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 67 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1411 of 1726 PageID 12732
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 43 of
76

*Volatility Risk*. The Fund's investment program may involve the purchase and sale of relatively volatile instruments such as derivatives, which are frequently valued based on implied volatilities of such derivatives compared to the historical volatility of underlying financial instruments. Fluctuations or prolonged changes in the volatility of such instruments, therefore, can adversely affect the value of investments held by the Fund. In addition, many non-U.S. financial markets are not as developed or as efficient as those in the U.S., and as a result, price volatility may be higher for the Fund's investments.

*Long-Biased Investment Program*. The Fund expects that its strategy will have a long bias. Therefore, any decline in the overall market may result in a decline in the value of the Fund's assets.

*Leverage*. Leverage may take a variety of forms, including but not limited to the following: long-term loans, convertible notes and repurchase arrangements. Leverage arrangements used by the Fund when financing is contingent on the market value of the financed assets may include those which may be subject to mark to market collateral or margin calls.

While leverage presents the opportunity for increasing the total return on investments, it has the effect of potentially increasing losses as well. Accordingly, any event that adversely affects the value of an investment could be magnified to the extent leverage is utilized. The cumulative effect of the use of leverage with respect to investments in a market that moves adversely to such investments could result in a substantial loss, which would be greater than if the investments were not leveraged.

In the futures markets, margin deposits are typically low relative to the value of the futures contracts purchased or sold. Such low margin deposits are indicative of the fact that any commodity futures contract trading is typically accompanied by a high degree of leverage. Low margin deposits mean that a relatively small price movement in a futures contract may result in immediate and substantial losses to the investor. For example, if at the time of purchase 10 percent of the price of a futures contract is deposited as margin, a 10 percent decrease in the price of the futures contract would, if the contract is then closed out, result in a total loss of the margin deposit before any deduction for the brokerage commission. Thus, like other leveraged investments, any purchase or sale of a commodity contract may result in losses in excess of the amount invested.

The use of short-term margin borrowings results in certain additional risks to the Fund. For example, should the securities pledged to brokers to secure the Fund's margin accounts decline in value, the Fund could be subject to a "margin call," pursuant to which the Fund must either deposit additional funds or securities with the broker, or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. In the event of a sudden drop in the value of the Fund's assets, the Fund might not be able to liquidate assets quickly enough to satisfy its margin requirements.

The Fund may borrow by entering into reverse repurchase agreements. Under a reverse repurchase agreement, the Fund sells securities and agrees to repurchase them at a mutually agreed date and price. Reverse repurchase agreements may involve the risk that the market value of the securities retained in lieu of sale by the Fund may decline below the price of the securities the Fund has sold but is obligated to repurchase. In the event the buyer of securities under a reverse repurchase agreement files for bankruptcy or becomes insolvent, such buyer or its trustee or receiver may receive an extension of time to determine whether to enforce the Fund's obligation to repurchase the securities and the Fund's use of the proceeds of the reverse repurchase agreement may effectively be restricted pending such decision. To the extent that, in the meantime, the value of the securities that the Fund has purchased has decreased, the Fund could experience a loss.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1412 of 1726 PageID 12733
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 44 of
76

The financing used by the Fund to leverage its portfolio include those extended by securities brokers and dealers in the marketplace in which the Fund will invest. While the Fund attempts to negotiate the terms of these financing arrangements with such brokers and dealers, its ability to do so is limited. The Fund is therefore subject to changes in the value that the broker-dealer ascribes to a given security or position, the amount of margin required to support such security or position, the borrowing rate to finance such security or position and/or such broker-dealer's willingness to continue to provide any such credit to the Fund. In addition, the Fund could be forced to liquidate its portfolio on short notice to meet its financing obligations. The forced liquidation of all or a portion of the Fund's portfolio at distressed prices could result in significant losses to the Fund.

*Market Liquidity and Leverage*. The Fund may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Fund's ability to adjust its positions. The size of the Fund's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in overall market leverage, deleveraging as a consequence of a decision by the prime brokers and custodians, or other counterparties with which the Fund enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Fund's portfolio.

*Risks Associated with Bankruptcies*. Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors. While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Fund. Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated. The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court. This process can involve substantial legal, professional and administrative costs to the company and the Fund; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately. In some cases, the company may not be able to reorganize and may be required to liquidate assets. Although the Fund intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value. Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Fund's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class. In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor. In those cases where the Fund, by virtue of such action, is found to exercise "domination and control" of a debtor, the Fund may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Fund.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 69 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1413 of 1726   PageID 12734
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 45 of
76

The Fund may invest in companies based outside the United States.  Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the classification, seniority and treatment of claims.   In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The General Partner, on behalf of the Fund, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation or enhancement of the Fund position as a creditor or equity holder.  A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents.  If the General Partner concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Fund, it will resign from that committee or group, and the Fund may not realize the benefits, if any, of participation on the committee or group.   In addition, and also as discussed above, if the Fund is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Fund may purchase creditor claims subsequent to the commencement of a bankruptcy case. Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

*Equitable Subordination*.   Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "***equitable subordination***").   The Fund does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Fund may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

*Fraud*.   Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower.  Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Fund to perfect or effectuate a lien on the collateral securing the loan.  The Fund will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness.   Under certain circumstances, payments to the Fund may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

*Interest Rate Risk*.   The value of the fixed rate securities in which the Fund may invest generally will have an inverse relationship with interest rates.   Accordingly, if interest rates rise the value of such securities may decline.   In addition, to the extent that the receivables or loans underlying specific

APPX. 05933

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1414 of 1726   PageID 12735
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 46 of
76

securities are prepayable without penalty or premium, the value of such securities may be negatively affected by increasing prepayments, which generally occur when interest rates decline.

*Reinvestment Risk*.   The Fund reinvests the cash flows received from a security.   The additional income from such reinvestment, sometimes called interest-on-interest, is reliant on the prevailing interest rate levels at the time of reinvestment.   There is a risk that the interest rate at which interim cash flows can be reinvested will fall.   Reinvestment risk is greater for longer holding periods and for securities with large, early cash flows such as high-coupon bonds.   Reinvestment risk also applies generally to the reinvestment of the proceeds the Fund receives upon the maturity or sale of a portfolio security.

The amount and timing of the addition of investments will affect the cash flows available to make payments on the Interests.   Reduced liquidity and lower volumes of trading in certain investments, in addition to restrictions on investment represented by the Fund's investment criteria, could result in periods of time during which the Fund has not been able to maximize its exposure to investments.   The longer the period before reinvestment of cash in investments, the greater the adverse impact may be on aggregate interest collected and distributed by the Fund, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the Interests were immediately reinvested.   In addition, the timing of the addition of investments, the scheduled interest payment dates of the investments and the amount of the net proceeds associated with the offering of the Interests invested in lower-yielding alternate short-term investments until applied to the addition of investments, may have a material impact on the amount of interest payments collected during any accrual period, which could affect payments on the Interests.

Further, obligors of investments may be more likely to exercise any rights they may have to prepay such obligations when interest rates or credit spreads are declining.   Any decrease in the yield on the investments will have the effect of reducing the amounts available to make payments on the Interests.

*Timing Risk*.   Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate.   There are three disadvantages to the call provision.   First, the cash flow pattern of a callable bond is not known with certainty.   Second, because the issuer will call the bonds when interest rates have dropped, the Fund is exposed to reinvestment rate risk, *i.e.*, the Fund will have to reinvest the proceeds received when the bond is called at lower interest rates.   Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

*Maturity Risk*.   In certain situations, the Fund may purchase a bond of a given maturity as an alternative to another bond of a different maturity.   Ordinarily, under these circumstances, the Fund will make an adjustment to account for the differential interest rate risks in the two bonds.   This adjustment, however, makes an assumption about how the interest rates at different maturities will move.   To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

*Inflation Risk*.   Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power.   For example, if the Fund purchases a five

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 71 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1415 of 1726 PageID 12736
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 47 of
76

(5) year bond in which it can realize a coupon rate of five percent (5%), but the rate of inflation is six percent (6%), then the purchasing power of the cash flow has declined. For all but adjustable bonds or floating rate bonds, the Fund is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

*Over-the-Counter-Trading*. Financial instruments that may be purchased or sold by the Fund may include instruments not traded on an exchange, including, but not limited to, swap transactions, and forward foreign currency transactions. Over-the-counter options, unlike exchange-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Fund can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Fund engages in these transactions, the Fund must rely on the creditworthiness of its counterparty. In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades. To reduce their credit risk exposure, the Fund may trade in the forward foreign currency market through money center banks and leading brokerage firms.

*Position Limits*. "Position limits" imposed by various regulators or regulations may also limit the Fund's ability to effect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Fund does not intend to exceed applicable position limits, it is possible that different accounts managed by the General Partner or its affiliates may be aggregated. If at any time positions managed by the General Partner were to exceed applicable position limits, the General Partner would be required to liquidate positions, which might include positions of the Fund, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Fund might have to forego or modify certain of its contemplated trades.

*Material, Nonpublic Information*. From time to time, certain personnel of the Investment Manager may come into possession of material, nonpublic information (including in connection with other investments or proposed investments not intended to benefit the Fund) that would limit the Investment Manager's ability to buy and sell investments. The Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to take certain actions because of such information. The Fund may experience losses if it is unable to sell an investment that it holds because certain personnel of the Investment Manager have obtained material, nonpublic information about such investment.

*Co-Investments with Third Parties*. The Fund may co-invest with third parties through joint ventures or other entities. Such investments may involve risks in connection with such third-party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 72 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1416 of 1726   PageID 12737
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 48 of
76

inconsistent with those of the Fund or be in a position to take (or block) action in a manner contrary to the Fund's investment objectives.   In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements.   Such compensation arrangements will reduce the returns to participants in the investments.

*Other Investment Vehicles.*   The Investment Manager may allocate a portion of the Fund's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers.   Since the Fund may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region.   Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist).   Even in the event that such information may be available to the Fund, the Fund's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

The managers of pooled investment vehicles with which the Fund may invest may be subject to asset-based fees and performance-based compensation.   Such fees or compensation may be higher than the fees or compensation of comparable investment vehicles.

Performance-based compensation is typically paid or allocated at the investment vehicle level on the basis of the performance of each individual investment vehicle, not on the basis of the overall performance of the Fund.   Consequently, performance-based compensation could be payable to a particular investment vehicle in respect of its performance during periods when the Fund as a whole incurs losses.   The existence of performance-based compensation also could cause the manager of such investment vehicle to trade in a more aggressive manner than it otherwise might.

*Futures Contracts*.   The value of futures depends upon the price of the financial instruments, such as commodities, underlying them.   The prices of futures are highly volatile, and price movements of futures contracts can be influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies.   In addition, investments in futures are also subject to the risk of the failure of any of the exchanges on which the Fund's positions trade or of its clearing houses or counterparties.

Futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits."   Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits.   Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit.   This could prevent the Fund from promptly liquidating unfavorable positions and subject the Fund to substantial losses or prevent it from entering into desired trades.   In extraordinary circumstances, a futures exchange or the Commodities Futures Trading Commission could suspend trading in a particular futures contract, or order liquidation or settlement of all open positions in such contract.

APPX. 05980

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 73 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1417 of 1726   PageID 12738
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 49 of
76

*Forward Trading*.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable.  The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration.  There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  Disruptions can occur in any market traded by the Fund due to unusual trading volume, political intervention or other factors.  The imposition of controls by governmental authorities might also limit such forward trading to less than that which the General Partner would otherwise recommend, to the possible detriment of the Fund.  Market illiquidity or disruption could result in major losses to the Fund.

*Hedging Transactions*.  The Fund may (but is not required to) utilize financial instruments both for investment purposes and for risk management purposes in order to (i) protect against possible changes in the market value of the Fund's investment portfolios resulting from fluctuations in the markets and changes in interest rates; (ii) protect the Fund's unrealized gains in the value of its investment portfolio; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in the Fund's portfolios; (v) hedge against a directional trade; (vi) hedge the interest rate, credit or currency exchange rate on any of the Fund's financial instruments; (vii) protect against any increase in the price of any financial instruments the Fund anticipates purchasing at a later date; or (viii) act for any other reason that the Investment Manager deems appropriate.  The Fund will not be required to hedge any particular risk in connection with a particular transaction or its portfolios generally.

The success of the Fund's hedging strategy will be subject to the Investment Manager's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the investments in the portfolio being hedged.  Since the characteristics of many securities change as markets change or time passes, the success of the Fund's hedging strategy will also be subject to the Investment Manager's ability to continually recalculate, readjust, and execute hedges in an efficient and timely manner.  While the Fund may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Fund than if it had not engaged in any such hedging transactions.  For a variety of reasons, the Investment Manager may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged.  Such imperfect correlation may prevent the Fund from achieving the intended hedge or expose the Fund to risk of loss.  The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Fund's portfolio holdings.  Moreover, it should be noted that the portfolio will always be exposed to certain risks that cannot be hedged.

*Use of Derivatives and Other Specialized Techniques*.  The Fund may engage in a variety of swaps and related derivative transactions including, but not limited to, total return swaps, interest rate swaps, credit derivative swaps, the use of forward contracts, put and call options, floors, collars or other similar arrangements and derivative transactions.  While some swaps will be required to be cleared and entered into through exchanges once the U.S. Commodity Futures Trading Commission (the "***CFTC***") makes its final clearing determination, swap contracts excluded from the clearing determination will not be traded on exchanges and will not be subject to margin and clearing requirements or the same type of

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 74 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1418 of 1726   PageID 12739
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 50 of
76

government regulation as exchange markets.  As a result, many of the protections afforded to participants on organized exchanges and in a regulated environment are not available in connection with these transactions.  The swap markets with respect to noncleared swaps are "principals' markets", in which performance with respect to a swap contract is the responsibility only of the counterparty to the contract, and not of any exchange or clearinghouse.  As a result, the Fund will be subject to the risk of the inability or refusal to perform with respect to non-cleared swap contracts on the part of the counterparties with whom the Fund will trade.

There are no limitations on daily price movements in swap transactions.  Speculative position limits are not currently applicable to swap transactions, although the Fund's swap counterparties may limit the size or duration of positions available to the Fund as a consequence of credit considerations. In addition, the CFTC has sought to impose federal speculative position limits on futures, swaps that reference those futures and contracts on non-U.S. boards of trade that settle against those contracts. While the CFTC adopted final position limits, the rulemaking was vacated due to the CFTC's failure to perform proper cost benefit analysis.  If the CFTC re-adopts rules or the above referenced discussion is overturned on appeal, the Fund may be limited in its ability to concentrate its positions in certain swaps. Furthermore, the Fund may also be subject to position limits pursuant to current or pending non-U.S. regulations.

Participants in the swap markets are not required to make continuous markets in the swap contracts in which they trade.  Participants could refuse to quote prices for swap contracts or quote prices with an unusually wide spread between the price at which they are prepared to buy and the price at which they are prepared to sell.  If an event of default or an additional termination event were to occur with respect to the Fund under an ISDA master agreement governing the Fund's swap transactions, the relevant swap counterparty and other swap counterparties may terminate all transactions with the Fund at significant losses to the Fund.

In addition to the foregoing, the investment techniques related to derivative instruments are highly specialized and may be considered speculative.  Such techniques often involve forecasts and complex judgments regarding relative price movements and other economic developments.  The success or failure of these investment techniques may turn on small changes in exogenous factors not within the control of any of the Investment Manager.  For all the foregoing reasons, the use of derivatives and related techniques can expose the Fund to significant risk of loss.

Moreover, trading in swaps and other derivative instruments offers scope for a high degree of synthetic leverage.  Accordingly, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Fund.  Thus, like other leveraged investments, a derivatives trade may result in losses in excess of the amount invested.  Any increase in the amount of leverage applied will increase the risk of loss due to the amount of additional leverage applied.  Also, swap agreements tend to shift the investment exposure from one type of investment to another.  Depending on how they are used, swap agreements may increase or decrease the overall volatility of the Fund.  The most significant factor in the performance of swap agreements is the change in the specific factors that determine the amounts of payments due to and from the Fund.  If a swap agreement calls for payments by the Fund, the Fund must be prepared to make such payments when due.  In addition, if a counterparty's creditworthiness declines, the value of swap agreements with such counterparty can be expected to decline, potentially resulting in losses to the Fund.

APPX. 05992

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 75 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1419 of 1726    PageID 12740
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 51 of
76

Finally, counterparties to the Fund may be subject to capital and other requirements as a "swap dealer" or "major swap participant" which may increase their costs of doing of business, a portion of which increase may be passed on to the Fund.   If a person is deemed to (i) enter into swaps as its ordinary course of business, (ii) be a market maker for any type of swaps, (iii) maintain a "substantial position" in any type of swap for speculative purposes, (iv) otherwise create counterparty risk that could have serious adverse consequences on the financial stability of the United States, or (v) be a financial entity that is highly leveraged relevant to its capital, the person may be deemed to be a swap dealer (in the case of (i) or (ii)) or a major swap participant (in the case of (iii), (iv) or (v)).   Persons deemed to be swap dealers or major swap participants are required to register with the CFTC as such and would be subject to a number of regulatory requirements, such as specific recordkeeping, back-office and reporting requirements, margin collection requirements for swaps that are not cleared, capital requirements, disclosure obligations, specific compliance obligations and special obligations to governmental entities. While it is unlikely that the Fund would be subject to these requirements, the requirements will likely apply to many of the Fund's counterparties which may increase the cost of trading swaps through increased fees to offset the counterparties' trading and compliance costs.

*Counterparty Insolvency.*   The Fund's assets may be held in one or more accounts maintained for the Fund by counterparties, including its prime brokers.   There is a risk that any of such counterparties could become insolvent.   In September 2008, Lehman Brothers Holdings Inc., a major investment bank based in the United States, filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.   While none of its U.S. broker-dealer subsidiaries was included in the Chapter 11 filing and all of its U.S. registered broker-dealer subsidiaries currently continue to operate, certain of Lehman Brothers subsidiaries, including Lehman Brothers International (Europe) ("*LBIE*") have been placed under the administration chartered to wind down their respective business.   To date, it is uncertain what percentage of the assets custodied with LBIE by its trading counterparties (including hedge funds) will ultimately be recovered and when.   The insolvency of the Fund's counterparties is likely to impair the operational capabilities or the assets of the Fund.   Although the Investment Manager regularly monitors the financial condition of the counterparties it uses, if one or more of the Fund's counterparties were to become insolvent or the subject of liquidation proceedings in the United States (either under the Securities Investor Protection Act or the United States Bankruptcy Code), there exists the risk that the recovery of the Fund's securities and other assets from such prime broker or broker-dealer will be delayed or be of a value less than the value of the securities or assets originally entrusted to such prime broker or broker-dealer.

In addition, the Fund may use counterparties located in various jurisdictions outside the United States like LBIE.   Such local counterparties are subject to various laws and regulations in various jurisdictions that are designed to protect their customers in the event of their insolvency.   However, the practical effect of these laws and their application to the Fund's assets are subject to substantial limitations and uncertainties. Because of the large number of entities and jurisdictions involved and the range of possible factual scenarios involving the insolvency of a counterparty, it is impossible to generalize about the effect of their insolvency on the Fund and its assets.   Investors should assume that the insolvency of any counterparty would result in a loss to the Fund and the Fund, which could be material.

*Counterparty Risk.*   Some of the markets in which the Fund may effect transactions are "over-the-counter" or "interdealer" markets.   The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange-based" markets.   This exposes the Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not *bona fide*) or because of a

APPX. 05993

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1420 of 1726    PageID 12741
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 52 of
76

credit or liquidity problem, thus causing the Fund to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Fund has concentrated its transactions with a single or small group of counterparties. The Fund is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty. Moreover, the Fund's internal credit function which evaluates the creditworthiness of its counterparties may prove insufficient. The lack of a complete and "foolproof" evaluation of the financial capabilities of the Fund's counterparties and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Fund.

*Exchange-Traded Funds.* The Fund may invest in exchange-traded funds ("*ETFs*"), which are shares of publicly-traded unit investment trusts, open-end funds, or depository receipts that seek to track the performance and dividend yield of specific indices or companies in related industries. These indices may be either broad-based, sector, or international. ETF shareholders are generally subject to the same risk as holders of the underlying securities they are designed to track. ETFs are also subject to certain additional risks, including, without limitation, the risk that their prices may not correlate perfectly with changes in the prices of the underlying securities they are designed to track, and the risk of trading in an ETF halting due to market conditions or other reasons, based on the policies of the exchange upon which the ETF trades. In addition, the Fund may bear, along with other shareholders of an ETF, its *pro rata* portion of the ETF's expenses, including management fees. Accordingly, in addition to bearing their proportionate share of the Fund's expenses (e.g., Management Fees and operating expenses), Partners may also indirectly bear similar expenses of an ETF, which may have a material adverse effect on the performance of the Fund.

*Non-U.S. Investments and Emerging Markets.* Investing in the securities of companies located outside the U.S. (including, western countries, "emerging market" countries and underdeveloped countries) involves certain considerations not usually associated with investing in securities of U.S. companies, including political and economic considerations, such as greater risks of expropriation and nationalization, confiscatory taxation, the potential difficulty of repatriating funds, general social, political and economic instability and adverse diplomatic developments; the possibility of imposition of withholding or other taxes on dividends, interest, capital gain or other income; the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; and certain government policies that may restrict the Fund's investment opportunities.

In addition, accounting and financial reporting standards that prevail in non-U.S. countries generally are not equivalent to U.S. standards and, consequently, less information is available to shareholders of companies located in such countries than is available to shareholders of companies located in the U.S. Moreover, an issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associate risks, are not expected to be highly correlated with each other and may behave in unpredictable ways. There is also less regulation, generally, of the securities markets in non-U.S. countries.

The Fund may be subject to additional risks which include possible adverse political and economic developments, possible seizure or nationalization of non-U.S. deposits and possible adoption of governmental restrictions which might adversely affect the payment of principal and interest to investors located outside the country of the issuer, whether from currency blockage or otherwise. Furthermore, some of the securities may be subject to brokerage, stamp or other taxes levied by

APPX. 05994
ПРР-105064

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 77 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1421 of 1726 PageID 12742
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 53 of
76

governments, which has the effect of increasing the cost of such investment and reducing the realized gain or increasing the realized loss on such securities at the time of sale. Furthermore, a non-U.S. issuer of debt or the non-U.S. governmental authorities that control the repayment of the debt may be unable or unwilling to repay principal or interest when due, and the Fund may have limited recourse in the event of a default. Some of these risks do not apply equally to issuers in larger, more developed countries. These risks are more pronounced in investments in issuers in countries with emerging markets or if the Fund invests significantly in a particular country.

Investment in emerging market securities and underdeveloped markets involves a greater degree of risk than an investment in securities of issuers based in developed countries. Among other things, emerging market securities investments may carry the risks of less publicly available information, more volatile markets, less strict securities market regulation, less favorable tax provisions and a greater likelihood of severe inflation, unstable currency, war and expropriation of personal property than investments in securities of issuers based in developed countries. In addition, the Fund's investment opportunities in certain emerging markets may be restricted by legal limits on foreign investment in local securities.

Emerging markets generally are not as efficient as those in developed countries. In some cases, a market for the security may not exist locally, and transactions will need to be made on a neighboring exchange. Volume and liquidity levels in emerging markets are lower than in developed countries. When seeking to sell emerging market securities, little or no market may exist for the securities. In addition, issuers based in emerging markets are not generally subject to uniform accounting and financial reporting standards, practices and requirements comparable to those applicable to issuers based in developed countries, thereby potentially increasing the risk of fraud or other deceptive practices. Furthermore, the quality and reliability of official data published by the government or securities exchanges in emerging markets may not accurately reflect the actual circumstances being reported.

The issuers of some non-U.S. securities, such as banks and other financial institutions, may be subject to less stringent regulations in emerging markets than would be the case for issuers in developed countries and therefore potentially carry greater risk. Custodial expenses for a portfolio of emerging markets securities generally are higher than for a portfolio of securities of issuers based in developed countries.

While the General Partner will take these factors into consideration in making investment decisions for the Fund, no assurance can be given that they will be able to fully avoid these risks.

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

**Tax Related Risks**

*Tax Uncertainty*. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 78 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1422 of 1726   PageID 12743
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 54 of
76

regulations have been interpreted inconsistently by the courts.   Additionally, some statutory provisions remain to be interpreted by administrative regulations.   Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund.   Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.

*Risk of Adverse Determination*.   There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Internal Revenue Service (the "*Service*"), or significantly modified by new legislation, changes in the Service's positions or court decisions.   The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum.   No representation or warranty of any kind is made by the General Partner with respect to the federal income tax consequences relating to an investment in the Fund.   The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts.   Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit*.   An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund.   If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment.   The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund.   The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Tax Considerations Taken into Account*.   The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax Liabilities Without Distributions*.   If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its distributive share of the Fund's profits, whether or not such profits have been distributed.   Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities.   In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund.   Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter.   In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter.   Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

*Delayed Schedules K-1*.   The Fund will provide Schedules K-1 as soon as practical after receipt of all of the necessary information.   However, the Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year.   The

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 79 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1423 of 1726 PageID 12744
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 55 of
76

General Partner will endeavor to provide Limited Partners with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but final Schedules K-1 may not be available until completion of the Fund's annual audit. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income*. The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("*UBTI*"). Thus, an investment in the Fund may not be desirable for certain tax-exempt investors. The Fund may participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes. Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI. Because of the Investment Manager's objective of maximizing the pre-tax returns of all the Limited Partners, the Investment Manager may be required to make certain decisions to maximize pre-tax returns that result in Tax-Exempt U.S. Investors (as defined below) recognizing more UBTI than might otherwise be the case. In some cases, the Investment Manager may forego actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes*. Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Internal Revenue Code of 1986, as amended (the "*Code*") may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

***The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund. Many of the relevant tax considerations will vary depending on a prospective Limited Partner's individual circumstances. The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations. Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA and Other Regulatory Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.***

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

**Potential Conflicts of Interest**

The scope of the activities of the Investment Manager, its affiliates, and the funds and clients managed or advised by the Investment Manager or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Fund in the future that cannot be foreseen

APPX. 05997

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 80 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1424 of 1726 PageID 12745
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 56 of
76

or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "*Highland Group*") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Manager is permitted to manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "*CDOs*") and other vehicles managed by members of the Highland Group ("*Highland Accounts*") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) Affiliated Investors may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Manager will devote to the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (vi) the need to re-size risk in the account's portfolio. The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may

APPX. 05996

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 81 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1425 of 1726   PageID 12746
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 57 of
76

allocate the trades among different accounts on a basis it considers fair and equitable over time.   One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis.

The General Partner and/or its affiliates may open "average price" accounts with brokers.   In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Fund, the Highland Accounts or affiliates of the General Partner are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types.   The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities.   The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest.   In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be pari passu, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships.   Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund.   In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund.   The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund.   In addition, in managing the Fund's portfolio, the Investment Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest.   Furthermore, in connection with actions taken in the ordinary course of business of the Investment Manager in accordance with its fiduciary duties to its other clients, the Investment Manager may take, or be required to take, actions which adversely affect the interests of the Fund.

In connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Manager to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Manager's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Manager will devote as much time to the Fund as the Investment Manager deems appropriate to perform its duties in accordance with the Investment Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Manager's other accounts.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 82 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1426 of 1726 PageID 12747
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 58 of
76

The directors, officers, personnel, employees and agents of the Investment Manager and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Fund or other entities that operate in the same or a related line of business as the Fund, for other clients managed by the Investment Manager or its affiliates, or for any obligor or issuer in respect of the CLOs, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Fund, such affiliated entities or any obligor or issuer in respect of any of the CLOs pursuant to their respective governing instruments, and the Fund shall have no right to any such fees. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund.

There is no limitation or restriction on the Investment Manager or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Manager and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Investment Manager's investment committee, the Investment Manager or its affiliates have to other clients.

The Investment Manager and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CLOs and Highland Accounts purchased by the Fund. Such transactions are on an arm's-length basis and shall be subject to fees that are no greater than arm's-length fees. There is no expectation for preferential access to transactions involving CLOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Manager and/or its affiliates and the Fund shall not have any right to any such fees.

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Fund any time that the Investment Manager believes such transaction to be fair to the Fund and such other client. By purchasing an Interest in the Fund, a Limited Partner is deemed to have consented to such client cross-transactions between the Fund and another client of the Investment Manager or one of its affiliates.

As further described below, the Investment Manager may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Manager and/or its affiliates, in each case in accordance with applicable law, which may include the Investment Manager obtaining the consent and approval of the Advisory Committee prior to engaging in any such principal transaction between the Fund and the Investment Manager or its affiliates. By subscribing for Interests, the Limited Partners are deemed to have consented to such procedures relating to principal transactions between the Fund and the Investment Manager or its affiliates.

The Investment Manager may direct the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Manager's own investments in such companies. Moreover, the Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 83 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1427 of 1726   PageID 12748
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 59 of
76

Fund and the other parties to such trade.   Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or such affiliates.   In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law.   The Investment Manager may obtain the Fund's written consent through the Advisory Committee if any such transaction requires the consent of the Fund under Section 206(3) of the Advisers Act.

There are generally no ethical screens or information barriers among the Investment Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions.   If the Investment Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or CLO, or have an interest in causing the Fund to acquire a particular CLO Security, the Investment Manager may be prevented from causing the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Manager. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Investment Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information.   Inadvertent trading on material non-public information could have adverse effects on the Investment Manager's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Manager's ability to perform its portfolio management services to the Fund.   In addition, while the Investment Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers.   In such event, the Investment Manager's ability to operate as an integrated platform could also be impaired, which would limit the Investment Manager's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") serves as counsel to the Fund, the Investment Manager, the General Partner and certain of their Affiliates (the "*Clients*") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time.   Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund.   In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests.   No independent counsel has been retained to represent the Limited Partners.   In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the principal's biographical data, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

APPX. 05999

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 84 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1428 of 1726   PageID 12749
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 60 of
76

# BROKERAGE AND CUSTODY

**Portfolio Transactions**

Substantially all of the Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at The Bank of New York Mellon ("*BNY Mellon*").

BNY Mellon and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services).   In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including the broker-dealer's research capabilities and the success of prior research recommendations, ability to efficiently execute difficult trades (such as those in illiquid markets or trades of substantial size), the broker's risk in positioning a block of securities, commitment of capital, access to new issues, nature and frequency of sales coverage, depth of services provided, including economic or political coverage, arbitrage and option operations, back office and processing capabilities, financial strength, stability and responsibility, efficiency, reputation, access to markets, confidentiality, commission rate, responsiveness to the Investment Manager and the value of research and brokerage and research products and services provided by such brokers.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager.   However, the Investment Manager does not believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Fund.

Broker-dealers may provide research that may include written or oral proprietary research. Broker-dealers may also provide research products that include software and related support services for use in research and trading, quotation boards, computer databases and quotation equipment, in each case to access research or which provide research directly.   Research services may include, among other things, research concerning market, economic and financial data, statistical information, data on pricing and availability of securities, financial publications, attendance at conferences and meetings, electronic market quotations, performance measurement services, analyses and/or due diligence concerning specific securities, companies or sectors, including due diligence on specific aspects of a company's operations or finances, analyses on issues raised in proxy statements and market, economic and financial studies and forecasts.   Research services may be in written or oral form or on-line and may be produced by broker-dealers or third parties such as attorneys, accountants or consultants.   Brokerage products and services may include certain order management system components and order routing.

The receipt of brokerage and research products from broker-dealers through client commission payments is commonly referred to as "soft dollars."   Broker-dealers may provide products and services paid for through soft dollars either directly or through credits deposited into an account that may be used for research developed by the broker-dealer, third-party research and brokerage services. Section 28(e) of the Exchange Act provides a safe harbor from liability for breach of fiduciary duties relating to the purchase of limited research or brokerage services using soft dollars so long as the products and services received constitute lawful and appropriate assistance and the amount indirectly paid for those products or services is reasonable.   If the Investment Manager uses research or

APPX. 108092

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 85 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1429 of 1726   PageID 12750
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 61 of
76

brokerage products or services, it intends to limit research and brokerage to those services included in the safe harbor under Section 28(e) of the Exchange Act.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients.   The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be supplemental to the Investment Manager's own research efforts.  While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products.  As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate.  In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes.   The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources.   The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients.

The Investment Manager will be responsible for the placement of the portfolio transactions of the Fund and the negotiation of any commissions or spreads paid on such transactions.  Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments.  Portfolio transactions through brokers involve a commission to the broker.  Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion.

## Custody

Custody of the Fund's assets is maintained by brokers and banks selected by the Investment Manager in its sole discretion.  The custodian or custodians may be changed at any time and from time to time by the Investment Manager without the consent of the Fund.  Currently, the custodian is BNY Mellon.  The Fund is eligible for insurance coverage against loss with respect to assets held in the custody of BNY Mellon in the event of the bankruptcy or liquidation of BNY Mellon to the same extent BNY Mellon's other customers.

APP.10893

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 86 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1430 of 1726 PageID 12751
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 62 of
76

# TAX CONSIDERATIONS

## Introduction

The following is a summary of certain aspects of the taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest that should be considered by a prospective Limited Partner. The Fund has not sought a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting Limited Partners or the Fund, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the Treasury regulations promulgated under the Code (the "*Treasury Regulations*"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect). Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund. This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code section 1221.

Further, this discussion assumes that all non-U.S. persons will invest in the Offshore Fund and will not invest in the Fund and, therefore, does not address the tax considerations relevant to an investment in the Fund by a non-U.S. person.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or non-U.S. tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors. This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("*AMT*") to the Limited Partners. There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

*The tax consequences of an investment in the Fund are particularly complex. Accordingly, prospective investors should not consider this discussion as a substitute for careful tax planning. Prospective investors should consult with their own tax advisors, attorneys or accountants on matters relating to an investment in the Fund with special references to such investor's particular situation.*

APPX. 08094

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1431 of 1726 PageID 12752
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 63 of
76

**Certain United States Taxation Matters**

Classification of the Fund

The General Partner believes that, under the provisions of the Code and the Treasury Regulations as currently in effect, the Fund should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). Depending on the number of Partners, the Fund may qualify for a safe harbor exemption for partnerships that are offered to investors in a private placement.

The remainder of this discussion assumes that the Fund will be treated, for U.S. federal income tax purposes, as a partnership and not as a publicly traded partnership treated as an association that is taxable as a corporation.

U.S. Federal Income Taxation of the Fund and Partners Generally

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner will be required to report separately on its income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's taxable income and gain regardless of whether it has received or will receive a distribution from the Fund. Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. An audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "***Tax Matters Partner***," will have the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 88 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1432 of 1726   PageID 12753
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 64 of
76

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs either positively or negatively from its U.S. federal income tax basis in its Interest.   There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation.  If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The Fund expects to act as a trader or investor, and not as a dealer, with respect to its securities transactions.  Generally, the gains and losses realized by a trader or investor on the sale of securities are capital gains and losses.  Thus, in general, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses.  These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction.   Property held for more than 12 months generally will be eligible for long-term capital gain or loss treatment.   Long term capital gains may be eligible for favorable tax rates in the hands of non-corporate U.S. Limited Partners. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals who are U.S. persons with "modified adjusted gross income" that exceeds certain thresholds (for example, $250,000 for married individuals filing jointly, $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of (i) their investment income, net of deductions properly allocable to such income, and (ii) the excess of their "modified adjusted gross income" above the applicable threshold.  The General Partner expects that most or all of the Fund's income will be treated as investment income for this purpose, and as a result Limited Partners receiving allocations of income from the Fund for these taxable years will be subject to this tax.   This tax will be in addition to any U.S. federal income tax imposed on such Limited Partners with respect to their allocable share of income of the Fund.   Trusts and estates also may be subject to this additional tax.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments.   Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund.   For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands.   Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains.   These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund.   Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year.   Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

The Fund may derive ordinary interest income and dividends on securities, and may be required to recognize income in respect of certain securities prior to receipt of any payment in respect of such securities.  For instance, the Fund may hold debt obligations with "original issue discount."  In such case, the Fund will be required to include a portion of such discount in its taxable income on a current

58

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 89 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1433 of 1726 PageID 12754
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 65 of
76

basis, and the Fund must allocate such income to the Limited Partners, even though receipt of such amounts by the Fund may occur in a subsequent tax year. The Fund also may acquire debt obligations with "market discount." Upon disposition of such an obligation, which might include the receipt of securities of the issuer in a recapitalization exchange, the Fund generally will be required to treat any gain realized (and required to be recognized) as ordinary interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund. Recapitalization exchanges involving securities held by the Fund also may result in the recognition of taxable gains prior to the receipt of cash or readily tradable property.

If the Fund is treated as a trader, it may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities as if the securities were sold for fair market value at the close of any taxable year of the Fund. The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market. The election would apply with respect to securities held in connection with the Fund's trade or business as a trader in securities. The election would not apply to any securities with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment. Once a Code section 475(f) election is made, it can be revoked only with the consent of the Service. In the event that the Fund makes such an election, the Fund's gains and losses from marking securities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses. The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the securities to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when a security is sold or when an interest payment is made on a security. These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment. Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative. In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments. In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260. The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners. However, there can be no assurance that the Service or a court would agree with the Fund's position. Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (*e.g.*, the "Subpart F" and "passive foreign investment company" provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1434 of 1726 PageID 12755
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 66 of
76

proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests. Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets. Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

<u>Taxation of Distributions and Withdrawals</u>

Cash non-liquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Partner's holding period (or holding periods) for its Interest. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Partner would recognize ordinary income.

APPX. 105098

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 91 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1435 of 1726   PageID 12756
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 67 of
76

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables).  However, a distribution of marketable securities will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c).   Although the General Partner cannot provide any assurances of whether the Fund is an "investment partnership" for these purposes, the General Partner anticipates that the Fund should qualify as an "investment partnership."   Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Fund consisted of cash, a distribution of marketable securities to such Limited Partner should not require the recognition of gain by such Limited Partner.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest.   Such a special allocation may result in the withdrawing Partner recognizing more or less taxable income, which may include short-term gain, in the Partner's last taxable year in the Fund, thereby reducing, or increasing, as applicable, the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal.   In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners.   Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

Limitations on Losses and Deductions

Limited Partners that are individuals or certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund.   For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Code section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund) would be deductible only as itemized deductions, subject to the limitations of Code sections 67 and 68.   In this regard, if all or a portion of the Performance Allocation to the General Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of such expense could be subject to such limitations.  Itemized deductions are non-deductible in computing such Limited Partner's alternative minimum taxable income and alternative minimum tax liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Code section 469.   Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity

APPX. 108997

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 92 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1436 of 1726 PageID 12757
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 68 of
76

losses from other activities are restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain and qualified dividend income is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it has sufficient investment income from all sources including the Fund. Any amount not deducted as a result of the application of the investment interest limitation may be carried forward to future years, subject to certain limitations. The Fund may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but may, by election of the Fund, be capitalized and amortized over a period of not less than 180 months. Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

Tax Consequences for Tax-Exempt U.S. Investors

A Limited Partner that is an organization exempt from tax under Code section 501(a) (a "*Tax-Exempt U.S. Investor*") will be subject to tax on its allocable share of the Fund's income that is considered to be "unrelated business taxable income" ("*UBTI*") as defined in Code section 512, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. The Fund may invest in entities that are treated as partnerships or other pass-through entities. UBTI generated by such entities would generally flow up to Tax-Exempt U.S. Investors, causing the realization of UBTI by such investors. Therefore, in light of the Fund's investment program, a Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph).

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("*UDFT*"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the

APPX. 105008

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 93 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1437 of 1726 PageID 12758
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 69 of
76

proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

The Fund expects to generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors. A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI will vary depending upon the degree of leverage utilized by the Fund and could be significant. In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

*We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.*

Investor Tax Filings and Record Retention.

The U.S. Treasury Department has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, these Treasury Regulations require investors in specified transactions (including partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties (in addition to penalties that generally may be applicable as a result of a failure to comply with the applicable Treasury Regulations) may be imposed for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope, and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain investors to the special tax filing and record retention rules. Additionally, under these Treasury Regulations, an investor's recognition of loss upon its disposition of its Interest could cause the investor to become subject to special tax filing and record retention rules. The General Partner intends to use its reasonable efforts to provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Fund.

Reporting under FATCA

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an agreement with the IRS (an "***FFI Agreement***"), and/or complies with an IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources since July 1, 2014, and will apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends after December 31, 2016.

APPX. 05009

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 94 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1438 of 1726   PageID 12759
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 70 of
76

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. Additional guidance is forthcoming.

It is possible that a lower-tier non-U.S. entity in which the Fund invests may be considered an FFI.  The Fund intends to assist lower-tier non-U.S. entities in complying with FATCA, but can give no assurance that it will be able to provide such assistance or that such an entity will be able to avoid the imposition of this withholding tax on it.

Further, the Fund may be required to act as a withholding agent for the Service under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation (including the prescribed forms) to the Fund or its agents showing its exemption from such withholding or compliance with FATCA.  The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations of income and gains made to investors.

The General Partner and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned.   In this regard, the General Partner and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner and the Fund in complying with their obligations under FATCA.  In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Fund, the General Partner, and the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

***Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests of the Fund.***

Separator

State and Local Taxes

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund.   State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit.   A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income.  Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents.  Each potential investor is urged to consult with its own tax advisor in this regard.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1439 of 1726   PageID 12760
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 71 of
76

*__Each prospective Limited Partner should consult its own tax advisor with respect to its state and local tax consequences and filing obligations as a result of an investment in the Fund.__*

Other Taxes

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes. Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund. It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

Tax Returns; Tax Audits

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner has the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. If the income tax returns of the Fund are audited by the Service, the tax treatment of the Fund's income and deductions is generally determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "Tax Matters Partner," has considerable authority to make decisions affecting the tax treatment and procedural rights of all Limited Partners. In addition, the Tax Matters Partner has the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority. All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction. However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties. Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains). The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1440 of 1726 PageID 12761
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 72 of
76

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund. In no event will the Fund, the General Partner, the Investment Manager, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding an Interest. The foregoing does not address tax considerations affecting investors that are not U.S. persons. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any foreign tax consequences of such an investment in its particular situation.*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 97 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1441 of 1726 PageID 12762
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 73 of
76

## ERISA AND OTHER REGULATORY CONSIDERATIONS

**ERISA Considerations**

General

Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their capital or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "***Benefit Plan Investors***" means any employee benefit plan subject to part 4 of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

In order to prevent the assets of the Fund from being considered Plan Assets under ERISA, it is the intention of the Fund to monitor the investments in the Fund and prohibit the acquisition, withdrawal or transfer of any Interests by any Limited Partner, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of Interests of any class owned by Benefit Plan Investors would be less than 25% of the aggregate value of the class of Interests (determined, as described above, by excluding certain Interests held by the General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of Interests by Benefit Plan Investors to less than 25%, the Fund may require the compulsory withdrawal of Interests of any class. Each Limited Partner that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires

APPX. 05018

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 98 of
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1442 of 1726   PageID 12763
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 74 of
76

Interests the maximum percentage of such general account or Plan Asset Entity that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Fund.  Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Interests, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the General Partner of that occurrence and shall, if and as directed by the General Partner, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Interests held in its general account or Plan Asset Entity by the end of the next following calendar month (or such earlier period directed by the General Partner).

If the Fund's assets were considered Plan Assets, then, under ERISA and the Code, the General Partner would be a fiduciary, and certain employees, partners and officers of the General Partner as well as certain affiliates would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties, the lending of money or other extensions of credit, the sale, exchange or leasing of property by the Fund or certain related parties or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions.  Additionally, individual investment in Interests by persons who are fiduciaries, and/or parties-in-interest and disqualified persons, to a Plan might be deemed to constitute prohibited transactions under such circumstances.

Representation by Plans

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities.  By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

Ineligible Purchasers

Interests may not be purchased with Plan Assets if the General Partner, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan.  A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Plans' Reporting Obligations

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting obligation for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 99 of
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1443 of 1726 PageID 12764
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 75 of
76

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

**Other Regulatory Matters**

<u>Securities Act of 1933</u>

Interests are not registered under the U.S. Securities Act of 1933, as amended, or any other securities law, including state securities or blue sky laws. Interests are offered without registration in reliance upon the exemption contained in Regulation D of this act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering. Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

<u>Investment Company Act of 1940</u>

The Fund is not registered under the U.S. Investment Company Act of 1940, as amended, in reliance upon relief from registration afforded to collective investment vehicles whose outstanding securities are not publicly offered and are beneficially owned exclusively by investors that are considered "qualified purchasers" within the meaning of the Investment Company Act. "Qualified purchasers" generally include individuals and certain family-owned companies owning total investments in excess of $5 million and entities owning total investments in excess of $25 million. Each investor will be required to complete the Fund's Subscription Documents to enable the Fund to determine its eligibility.

<u>Investment Adviser Registration</u>

The Investment Manager is registered as an investment adviser with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended (the "***Advisers Act***"). Each prospective investor will be required to make a representation to indicate that it is a "qualified client" as defined in the Advisers Act.

<u>Commodity Exchange Act</u>

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator or commodity trading adviser under the U.S. Commodity Exchange Act because the Fund is limiting participation to certain qualified investors, is restricting the Fund's commodity interest trading, and the Investment Manager only provides commodity trading advice to the Fund (or other pools for which it is an exempt commodity pool operator). Therefore, unlike a registered commodity pool operator, there is no requirement to deliver this Memorandum or other disclosure document or any certified annual report to the Fund's investors.

Anti-Money Laundering Regulations

All subscriptions for Interests will be subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the General Partner or its delegate may require verification of identity from all prospective investors. Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The General Partner reserves the right to request such information as is necessary to verify the identity of a prospective investor. The General Partner also reserves the right to request such identification evidence in respect of a transferee of Interests. In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the General Partner may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The General Partner also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the General Partner suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, the General Partner and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 1 of 49

# EXHIBIT 2

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 102
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1446 of 1726 PageID 12767
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 2 of 49

Memorandum Number _____

# Confidential Private Offering Memorandum

*Series B, Series C and Series D Shares of*

## Highland Multi Strategy Credit Fund, Ltd.

*A Cayman Islands Exempted Company*

*Investment Manager*

Highland Capital Management, L.P.

**November 2014**

***This Confidential Private Offering Memorandum must be read in conjunction with the Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.***

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 103
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1447 of 1726   PageID 12768
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 3 of 49

## TABLE OF CONTENTS

Page

NOTICE........................................................................................................................1

DIRECTORY ...............................................................................................................4

INTRODUCTION .........................................................................................................5

MANAGEMENT ..........................................................................................................6

SUMMARY OF TERMS ...............................................................................................9

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST.........................................22

SHARES OF THE FUND .............................................................................................27

TAX CONSIDERATIONS ............................................................................................31

ERISA CONSIDERATIONS .........................................................................................39

CAYMAN ISLANDS MUTUAL FUND LAW....................................................................42

ANTI-MONEY LAUNDERING COMPLIANCE.................................................................43

ANNEX A .................................................................................................................45

Attachment:   Confidential Private Placement Memorandum of Highland Multi Strategy Credit
Fund, L.P.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 104
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1448 of 1726 PageID 12769
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 49

## NOTICE

This Private Offering Memorandum (this "***Memorandum***") is confidential and intended solely for the use of the person to whom it has been delivered by Highland Multi Strategy Credit Fund, Ltd. (the "***Fund***") for the purpose of enabling the recipient to evaluate an investment in the Fund. The purpose of the Fund is to invest all of its assets in, and carry out its investment program through, Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Partnership***"). Accordingly, this Memorandum must be read in conjunction with the Partnership's Confidential Private Placement Memorandum, as amended and supplemented from time to time (the "***Partnership Memorandum***").

This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of the Fund (other than to professional advisors and employees of the investor receiving this Memorandum from the Fund or its authorized representative or such investor) and all recipients agree they will keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment and monitoring a subsequent investment in the Fund. Notwithstanding the foregoing, each investor (and each employee, representative or other agent of each investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment or tax structure. Acceptance of this Memorandum and the Partnership Memorandum by a recipient constitutes an agreement to be bound by the foregoing terms. No person is authorized to make any representations concerning the Fund which are inconsistent with those contained in this Memorandum.

Prospective investors are not to construe the contents of this Memorandum or the Partnership Memorandum as legal, tax, investment or other advice. Each prospective investor should consult its own advisors as to legal, financial, tax, ERISA and other related matters concerning an investment in the Fund.

In making an investment decision, investors must review both this Memorandum and the Partnership Memorandum and must rely on their own examination of the Fund and the Partnership and the terms of the offering, including the merits and risks involved. The shares in the Fund (the "***Shares***") have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

Neither this Memorandum nor the Shares described herein have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities, and this Memorandum shall not constitute an offer to sell or a solicitation of an offer to buy nor shall there be any sale of Shares in any jurisdiction in which such offer, solicitation or sale is not authorized or to any person to whom it is unlawful to make such offer, solicitation or sale.

In each member state of the European Economic Area (each a "***Relevant Member State***") that has implemented EU Directive 2011/61/EU on Alternative Investment Fund Managers (the "***AIFM Directive***"), the Fund may only be offered to investors in accordance with local measures implementing

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 105
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1449 of 1726 PageID 12770
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 49

the AIFM Directive. Investors in a Relevant Member State where the Fund is not being offered pursuant to private placement rules implementing the AIFM Directive may invest in the Fund, but only in circumstances where they do so at their own initiative.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Shares other than the information contained in the Memorandum and the Partnership Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund.

The Shares have not been, and will not, be registered under the United States Securities Act of 1933, as amended, or the securities laws of any of the states of the United States, and the Fund has not been and will not be registered under the United States Investment Company Act of 1940, as amended. Direct or indirect acquisition or ownership of Shares by "*U.S. Persons*" (as defined herein) without compliance with applicable U.S. securities laws or in contravention of the relevant provisions of the constituent documents of the Fund is prohibited.

The Fund is not a recognized collective investment scheme for the purposes of Section 264 of the Financial Services and Markets Act 2000 of the United Kingdom (the "*Act*"). The promotion of the Fund and the distribution of this Memorandum in the United Kingdom are accordingly restricted by law. This Memorandum is directed at persons to whom it may lawfully be issued or directed at under the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001, including persons who are authorized under the Act, certain persons having professional experience in matters relating to investments, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts and persons who qualify as certified sophisticated investors. The Shares are only available to such persons in the United Kingdom and this Memorandum must not be relied or acted upon by any other persons in the United Kingdom. In order to qualify as a certified sophisticated investor a person must (i) have a certificate in writing or other legible form signed by an authorized person to the effect that he or she is sufficiently knowledgeable to understand the risks associated with participating in unrecognized collective investment schemes and (ii) have signed, within the last 12 months, a statement in a prescribed form declaring, amongst other things, that he or she qualifies as a sophisticated investor in relation to such investments. This Memorandum is exempt from the general restriction in Section 21 of the Act on the communication of invitations or inducements to engage in investment activity on the grounds that it is being issued to and/or directed at only the types of persons referred to above. The content of this Memorandum has not been approved by an authorized person and such approval is, save where this Memorandum is directed at or issued to the types of persons referred to above, required by Section 21 of the Act.

The Shares described in this Memorandum are not the subject of a public offering in the Cayman Islands. No offer or invitation to subscribe for Shares may be made to the public in the Cayman Islands.

Any information forwarded to the Fund by any potential shareholder will be treated on a confidential basis except that such information may be passed on to a relevant third party by the Fund where so required by law or regulation and each shareholder upon subscribing for Shares shall be deemed to have consented to such release of such confidential information pursuant to the terms of the Confidential Relationships (Preservation) Law (as amended) of the Cayman Islands (or any amendment thereto).

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 106
Case 3:23-cv-00726-S Document 8-23 Filed 06/29/23 Page 1450 of 1726 PageID 12771
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 49

An investment in the Shares involves significant risks. Prospective investors should pay particular attention to the risk factors disclosed in this Memorandum and the Partnership Memorandum. Investment in the Fund is suitable only for sophisticated investors and requires the financial ability and willingness to accept the high risks inherent in an investment in the Fund. No assurance can be given that the Fund's investment objective will be achieved.

Each prospective investor is invited to meet with representatives of the Fund and to discuss with, ask questions of and receive answers from such representatives concerning the terms and conditions of this offering and to obtain any additional information, to the extent that such representatives possess such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

The Fund is a registered mutual fund for the purposes of the Mutual Funds Law (2013 Revision) of the Cayman Islands. The Fund is registered with the Cayman Islands Monetary Authority pursuant to Section 4(3) of that law and the prescribed details in respect of this Memorandum have been filed with the Cayman Islands Monetary Authority. Such registration does not imply that the Cayman Islands Monetary Authority has approved this Memorandum or the offering of Shares hereunder.

This Memorandum does not purport to be, and should not be construed as, a complete description of the memorandum of association and articles of association of the Fund (the "*Articles*") or the Partnership's limited partnership agreement, as amended and supplemented from time to time (the "*Partnership Agreement*"), copies of which will be provided to each prospective investor upon request. Each prospective investor in the Fund is encouraged to review the Articles and the Partnership Agreement carefully, in addition to consulting appropriate legal and tax counselors. To the extent of any inconsistency between this Memorandum, the Articles and the Partnership Agreement, the terms of the Articles and the Partnership Agreement control.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "*CFTC*"), neither the General Partner nor the Investment Manager (each as defined herein) is registered with the CFTC as a commodity pool operator ("*CPO*") or as a commodity trading advisor and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund since the date hereof. An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Except as otherwise noted, all monetary amounts set forth herein are expressed in United States ("*U.S.*") dollars.

## DIRECTORY

| | |
|---|---|
| **Registered Office** | **Highland Multi Strategy Credit Fund, Ltd.** |
| | c/o Maples Corporate Services Limited |
| | PO Box 309, Ugland House |
| | Grand Cayman, KY-1109 |
| | Cayman Islands |
| | |
| **Investment Manager** | **Highland Capital Management, L.P.** |
| | 300 Crescent Court |
| | Suite 700 |
| | Dallas, Texas 75201 |
| | |
| **Directors** | James D. Dondero |
| | Mark K. Okada |
| | |
| **Administrator** | **SEI Global Services, Inc.** |
| | One Freedom Valley Drive |
| | Oaks, Pennsylvania 19456 |
| | |
| **Auditors** | **PricewaterhouseCoopers LLP** |
| | P.O. Box 258 |
| | Strathvale House, George Town |
| | Grand Cayman KY1-1104 |
| | Cayman Islands |
| | |
| **Legal Counsel** | *In the United States* |
| | **Akin Gump Strauss Hauer & Feld LLP** |
| | 1700 Pacific Avenue, Suite 4100 |
| | Dallas, Texas 75201 |
| | |
| | *In the Cayman Islands* |
| | **Maples and Calder** |
| | PO Box 309 |
| | Ugland House |
| | Grand Cayman, KY-1104 |
| | Cayman Islands |

4

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 108
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 of 380 Page 1452 of 1726 PageID 12773
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 49

## INTRODUCTION

Highland Multi Strategy Credit Fund, Ltd. (the "***Fund***") is a Cayman Islands exempted company offering participating shares of the Fund ("***Shares***") for the purpose of enabling qualified non-U.S. investors and U.S. tax-exempt investors to participate in the investment program of Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Partnership***"), on a more tax efficient basis. The Partnership seeks attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management.

Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "***General Partner***"), serves as the general partner of the Partnership. Highland Capital Management, L.P., a Delaware partnership (the "***Investment Manager***"), serves as the investment manager of the Partnership and has responsibility for the Partnership's investment program. James D. Dondero ultimately controls the General Partner and the Investment Manager.

The Fund is a limited partner in the Partnership and invests all of its investible assets in, and conducts all of its operations through, the Partnership. Therefore, to be fully informed about an investment in the Fund, an investor must first understand the terms of an investment in the Partnership. Prospective investors are therefore urged to carefully review the current Confidential Private Placement Memorandum of the Partnership, as amended and supplemented from time to time (the "***Partnership Memorandum***"), the Limited Partnership Agreement of the Partnership, as amended and supplemented from time to time (the "***Partnership Agreement***") and the Investment Management Agreement by and among the Partnership, the General Partner, the Fund and the Investment Manager, as amended and supplemented from time to time (the "***Investment Management Agreement***"). A copy of the Partnership Memorandum is being provided to investors with this Memorandum. Copies of the Partnership Agreement and the Investment Management Agreement will be provided to investors upon request. The Partnership Memorandum, together with the Partnership Agreement and the Investment Management Agreement, describe the material terms of an investment in the Partnership. Aside from the differences described in this Memorandum, an investment in the Fund will have substantially similar terms and risks to an investment in the Partnership, as described in the Partnership Memorandum.

The Fund is seeking subscriptions from non-U.S. investors and U.S. tax-exempt investors that qualify as "accredited investors" and "qualified purchasers" (as defined in the Fund's subscription materials), generally in minimum amounts of at least $1,000,000. The Fund generally accepts subscriptions on the first business day of each calendar month.

Pursuant to recent amendments adopted by the Fund, as further explained in this Memorandum and the Partnership Memorandum, all outstanding Shares held as of the effective date of the amendments were, notwithstanding their designation prior to the amendments, re-designated as "Series A Shares." Additionally, under these amendments, the Fund created three additional series of Shares – "Series B Shares," "Series C Shares" and "Series D Shares." The Fund is offering Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum. The terms applicable to the Series A Shares are set forth in a Supplement to this Memorandum.

This Memorandum describes the principal terms that apply to an investment in the Fund in Series B, Series C and Series D Shares and certain other information that relates specifically to the offering of Shares. **This is not an offering of limited partner interests in the Partnership, although an investor should be fully informed about the Partnership in making an investment decision.**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 109
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1453 of 1726 PageID 12774
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 49

# MANAGEMENT

## Board of Directors

The Fund's board of directors (the "***Board of Directors***") consists of two (2) directors (collectively, the "***Directors***"). The members of the Board of Directors are James D. Dondero and Mark K. Okada. The biographies of the Directors are set forth in the Partnership Memorandum.

The Fund's Board of Directors does not currently consist of any directors that are not affiliated with the Investment Manager, and thus the Fund's management, as well as investment decisions at the Partnership level, are effectively controlled by the Investment Manager or its affiliates.

The Board of Directors has the full authority of a board under Cayman law. The powers of the Board of Directors described in this Memorandum and the Articles are not exhaustive and are not limited to the specific authorities described therein. Thus, subject to applicable law, the Board of Directors may take certain decisions or actions even where those decisions or actions are not expressly granted in the Articles or described in this Memorandum.

It is anticipated that the Board of Directors will meet, in person or by conference telephone, at least once a year to review the investment and administrative affairs of the Fund. The Directors will delegate investment of the Fund's assets to the Investment Manager, and the Directors are not responsible for the day to day conduct of the Fund's trading program. The Directors will also delegate certain day to day administrative and clerical affairs of the Fund to the Administrator or others.

The Directors each serve in a non-executive capacity. Any Director may hold any other office in connection with the Fund (other than the office of the Fund's independent auditors) in conjunction with his office of Director on such terms as to tenure of office and otherwise as the Directors may determine. Any Director may also act in a professional capacity (other than as the Fund's independent auditors) and he or its firm will be entitled to remuneration for such services as if he were not a Director. A Director may contract with the Fund provided that the Director declares his or its interest or gives notice of his or its interest as soon as practicable after the Director obtains such interest.

Each of the Directors has been duly registered, as applicable, under the Cayman Islands Directors Registration and Licensing Law, 2014.

A Director may vote at, or be counted in the quorum of, any meeting of the Board of Directors to consider any contract in which the Director is interested other than as a shareholder, provided that such Director declares such interest prior to the taking of the vote at such meeting.

Independent, third-party Directors, if any, will be entitled to remuneration for their services at such rate not exceeding the customary rate for the provision of services of a director as may be approved by the Fund. The Directors will be reimbursed for all out of pocket costs and expenses properly incurred by them, including in connection with attending meetings of the Directors or any committee of the Directors or any general meeting or any meeting held in connection with the business of the Fund. The Fund will indemnify the Directors for all liabilities, costs or expenses of

APPX. 05073

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 110
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1454 of 1726 PageID 12775
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 10 of
49

whatsoever kind incurred or suffered by them (other than those arising by reason of fraud, willful neglect or willful default on the part of a Director or servant or agent thereof).

**Administrator**

SEI Investments is a leading global provider of investment processing, investment management and investment operations solutions for institutional and personal wealth management. For more than 40 years, SEI has helped corporations, financial institutions, financial advisors and ultra-high-net-worth families create and manage wealth by providing comprehensive, innovative, investment and investment-business solutions. SEI manages or administers $601.9 billion in funds and separately managed assets. SEI is a public company and is listed on the NASDAQ exchange under the symbol SEIC. SEI has been retained to perform certain administrative, accounting and investor services for the Fund and the Partnership (in such capacity, the "***Administrator***"). In its capacity as Administrator, it will receive customary fees that will be paid out of the assets of the Fund. The Administrator will also be reimbursed for all reasonable out-of-pocket expenses.

The Fund will enter into an administration agreement (the "***Administration Agreement***") with the Administrator. The Administrator will be under no duty to take any action on behalf of the Fund except as specifically set forth in the Administration Agreement or as may be specifically agreed to by the Administrator and the Fund in a written amendment thereto.

The Administrator will act as liaison with the Fund's accountants and auditors and will provide account analyses, fiscal year summaries, and other audit-related schedules with respect to the Fund. The Administrator will take all reasonable action in the performance of its duties under the Administration Agreement to assure that the necessary information is made available to such accountants and auditors for the expression of their opinion, as required by the Fund.

The Administrator will enter into and will maintain in effect with appropriate parties one or more agreements making reasonable provisions for emergency use of electronic data processing equipment to the extent appropriate equipment is available. In the event of equipment failures, the Administrator will, at no additional expense to the Fund, take reasonable steps to minimize service interruptions. The Administrator will have no liability with respect to the loss of data or service interruptions caused by equipment failure, provided such loss or interruption is not caused by the Administrator's own willful misfeasance, bad faith, gross negligence or reckless disregard of its duties or obligations under the Administration Agreement.

Subject to the terms of the Administration Agreement, the Administrator will be liable to the Fund (or any person or entity claiming through the Fund) for damages only to the extent caused by the Administrator's own fraud or willful misconduct under the Administration Agreement ("***Standard of Care***"). The Administrator will not be liable for damages (including, without limitation, damages caused by delays, failure, errors, interruption or loss of data) occurring directly or indirectly by reason of circumstances beyond its reasonable control. The Administrator will not be under any duty or obligation to inquire into and will not be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information which the Administrator reasonably believes to be genuine. The Administrator will not be liable for any damages that are caused by actions or omissions taken by the Administrator in accordance with written instructions by authorized persons of the Fund or advice of counsel. The Administrator will not be liable for any damages arising out of any action or omission to act by any prior service provider of the Fund or for any failure to discover any such error or omission. Neither the

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 111
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1455 of 1726   PageID 12776
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 11 of
49

Administrator nor its affiliates will be liable for any consequential, incidental, exemplary, punitive, special or indirect damages, whether or not the likelihood of such damages was known by the Administrator or its affiliates.  Both the Fund and the Administrator will have a duty to mitigate damages for which the other party may become responsible.

Absent the Administrator's failure to meet its Standard of Care, the Fund agrees to indemnify, defend and hold harmless the Administrator and its affiliates and their respective directors, trustees, officers, agents and employees from certain claims, suits, actions, damages, losses, liabilities, obligations, costs and reasonable expenses (including attorneys' fees and court costs, travel costs and other reasonable out-of-pocket costs related to dispute resolution) arising directly or indirectly from any actions taken or omitted to be taken by the Administrator in connection with the provision of services to the Fund.

The Partnership will also enter into an administration agreement with the Administrator, under which the terms will be substantially as above.

APPX. 05023

## SUMMARY OF TERMS

*To understand this investment opportunity, a prospective investor should read both the Partnership Memorandum and the following summary. The information in the Partnership Memorandum is important to a prospective investor's investment decision because: (i) the purpose of the Fund is to invest in the Partnership and therefore the underlying investment opportunity is in the Partnership; (ii) an investment in the Fund will (aside from the differences described below) have substantially similar terms to those applicable to a direct investment in the Partnership; and (iii) many terms relevant to an investment in the Fund, including the information concerning compensation, expenses, distributions, risk factors and conflicts of interest, are set forth in the Partnership Memorandum and not in this Memorandum.*

*The following summary highlights certain differences from the terms that would apply were the investor to hold a limited partner interest in the Partnership directly, and does not purport to provide a summary of the investment terms or risks of an investment in the Partnership, which is provided in the Partnership Memorandum. The summary of differences does not purport to be, and should not be construed as, a complete description of the Fund's Articles. To the extent of any inconsistency between this Memorandum and the Articles, the terms of the Articles control. Moreover, this summary and the summary set forth in the Partnership Memorandum are subject to the detailed provisions of the Partnership Agreement and are qualified in their entirety by the terms of the Partnership Agreement.* **Capitalized terms used but not defined herein have the meanings ascribed to them in the Partnership Memorandum.**

| | |
|---|---|
| **The Fund** | Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company. |
| **The Partnership** | Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership. The Fund is a limited partner in the Partnership and invests all of its investible assets in, and conducts all of its investment activities through, the Partnership. As a limited partner of the Partnership, the Fund is subject to all of the terms and conditions of the Partnership applicable to limited partners of the Partnership. The Partnership will issue to the Fund an Interest in the Partnership and maintain capital sub-accounts that correspond to each Sub-Series of Shares (defined below). |
| **General Partner of the Partnership** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership. The general partner of the General Partner is Highland Multi Strategy Credit GP, LLC, a Delaware limited liability company of which the Investment Manager is currently the sole member. |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership. |
| **Recent Amendments; Series of Shares** | Effective November 1, 2014, the Board of Directors amended the terms of the Fund, whereby all outstanding Shares in the Fund were re-designated as "Series A Shares" and three new series of Shares were created – "Series B Shares," "Series C Shares" and "Series D Shares" (the "*Amendments*"). The General Partner and limited partners of the Partnership adopted similar amendments. |

9

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 113
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1457 of 1726 PageID 12778
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 13 of 49

As of the effective date of the Amendments (the "**Effective Date**"), all existing shareholders will hold Series A Shares, the terms of which are set forth in a supplement to this Memorandum. The Fund is currently offering for subscription Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum.

The Fund may issue additional series (each, a "**Series**") of Shares over time. Not all Series of Shares will be available for subscription at the same time and the terms among the Series of Shares will vary. New Series of Shares may be established by the Fund without notice to or approval of the shareholders.

Except with respect to management fees, performance-based profit allocations and redemption rights (each as discussed below), the rights and privileges attributable to Series A Shares, Series B Shares, Series C Shares and Series D Shares are identical.

References herein to "Shares" or "shareholders" shall include all Series of Shares and shareholders unless otherwise specified or context so requires.

**Eligible Investors**     Participating, redeemable, non-voting shares of the Fund (the "**Shares**") are being offered to investors that are not U.S. Persons and to selected U.S. investors that are tax-exempt persons who qualify both as "accredited investors" and as "qualified purchasers," as defined in the Fund's subscription application materials. The Fund reserves the right to reject any investor for any reason or for no reason in its discretion.

No Shares may be offered to the public in the Cayman Islands (which shall not include an exempted or ordinary non-resident company incorporated in the Cayman Islands). Shares of the Fund may be purchased only by eligible investors who are sophisticated individual or institutional investors. Each subscriber for Shares of the Fund must certify that the beneficial owner of such Shares will not be a "**U.S. Person**" as defined in Annex A attached to this Memorandum; provided, however, that subscriptions for Shares of the Fund may also be accepted from certain qualified U.S. tax-exempt organizations. The Fund reserves the right to reject subscriptions in its sole discretion.

Shares of the Fund will not be registered under the U.S. Securities Act of 1933, as amended, any state "blue sky" laws, or the securities laws of any other jurisdiction. Shares may be offered privately (i) outside the United States of America, its territories or possessions, or areas subject to its jurisdiction (the "**United States**"), or to or for the benefit of an investor that is not a U.S. Person, only in accordance with relevant laws of the jurisdiction where the offer is made, or (ii) within the United States or to a U.S. Person only in a transaction that does not require the registration of the Shares or the Fund under applicable U.S. federal or state securities laws.

APP.105029

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 114
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1458 of 1726 PageID 12779
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 14 of 49

More detailed information concerning the applicable suitability criteria is set forth in the Fund's subscription application materials (the "***Subscription Documents***").

The Fund or the Administrator reserves the right to request such information as is necessary to verify the identity and the source of funds of an applicant. To ensure compliance with statutory and other requirements relating to anti-money laundering, the Fund or the Administrator may require verification of identity and/or source of funds from any person submitting completed Subscription Documents. Pending the provision of evidence satisfactory to the Fund or the Administrator as to identity, the evidence of title in respect of Shares may be retained at the absolute discretion of the Fund or the Administrator. If within a reasonable period of time following a request for verification of identity, the Fund or the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event subscription monies will be returned without interest to the account from which such monies were originally debited. Subscription monies may be rejected by the Fund or the Administrator if the remitting bank or financial institution is unknown to the Fund or the Administrator.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum and the Partnership Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Subscriptions**

Subscriptions for Shares are accepted on the first Business Day of each calendar month and/or such other days as the Board of Directors may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date. Each investor will be required to invest a minimum of US$1,000,000 in the Fund, although the Fund may accept investments of a lesser amount in its discretion, subject to compliance with the applicable Cayman Islands Mutual Funds Law (2013 Revision) ("***Mutual Funds Law***"). Subscription payments may be made in cash or, with the consent of the Fund, in securities or partly in cash and partly in securities. The Fund reserves the right to reject subscriptions in its sole discretion.

"***Business Day***" means any day other than Saturdays, Sundays or any other day banks located in in New York, New York are required or authorized to be closed.

A subscriber admitted to the Fund (a "***shareholder***") receives, in exchange for the initial capital contribution and any subsequent capital

APP.105032

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 115
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1459 of 1726 PageID 12780
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 15 of 49

contribution, Shares representing a proportionate share of the net assets of the Fund at that time.

Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant subscription date. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date.

There is no minimum aggregate amount of subscriptions that is required for the initial acceptance of subscriptions, nor has the Fund established any maximum aggregate amount of subscriptions that may be accepted.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in the Subscription Documents.

**Share Sub-Series**

The Fund may issue Shares as a separate sub-series of the relevant Series on each subscription date (each, a "*Sub-Series*") at $1,000 per Share. The Fund may issue Shares as a separate Sub-Series for purposes of, among others, accounting for any profits and losses attributable to each individual shareholder and for the purpose of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received at different times. Each separate Sub-Series will be identified and referrable to each shareholder and by its date of issue. In general, each Sub-Series will participate in the Fund's profits and losses in the same manner as all other Sub-Series of Shares, except that the Performance Allocation to be charged to each Sub-Series of Shares will be calculated separately on the basis of the performance of the Sub-Series.

The Partnership maintains capital sub-accounts that correspond to each Sub-Series of Shares issued to shareholders of the Fund and each such capital sub-account is treated separately for purposes of determining Management Fees, Performance Allocations and redemption rights and restrictions (each as described in the Partnership Memorandum).

**Alternative Investment Vehicles**

The Directors will have the right, in connection with any investment, to direct the capital contributions of some or all of the subscribers to be made through one or more alternative investment vehicles (each an "*Alternative Investment Vehicle*"), and, in the case of an existing investment, transfer all or a portion of such investment to an Alternative Investment Vehicle, if, in the judgment of the Directors, the use of such vehicle or vehicles would allow the Fund to overcome legal or regulatory

APPX. 05723

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 116
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1460 of 1726   PageID 12781
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 16 of 49

constraints, invest in a more tax-efficient manner or would facilitate participation in certain types of investments. Any Alternative Investment Vehicle will be subject to terms and conditions substantially similar to those of the Fund and will be managed by the Investment Manager or an affiliate thereof.

**Affiliated Investors**

Shares held by the Investment Manager or its affiliates (collectively, "*Affiliated Investors*") may not be assessed the Management Fee or the Performance Allocations that are applicable to other investors in the Fund, but share pro rata in other applicable expenses of the Fund (as more fully described in the Partnership Agreement).

**Management Fee**

Although the Fund will not pay an asset-based fee directly to the Investment Manager, it will, as a limited partner in the Partnership, bear its pro rata share of the Management Fee paid by the Partnership to the Investment Manager in its capacity as investment manager of the Partnership. Accordingly, the Management Fee will be paid at the Partnership level by assessing such fee to the appropriate capital sub-account. The Management Fee is calculated and payable quarterly in advance at an annual rate of (i) 1.5% of the net asset value of each Series B Share, (ii) 1.0% of the net asset value of each Series C Share and (iii) 2.0% of the net asset value of each Series D Share. The Management Fee may be waived or reduced by the Investment Manager in its sole discretion.

**Other Fees and Expenses**

The Fund bears the reasonable, out-of-pocket expenses of the offering of the Shares contemplated hereunder and the recent Amendments, described above, including expenses associated with obtaining any requisite investor consent to such Amendments. To the extent the Directors deem appropriate, these expenses may be capitalized and amortized by the Fund over a 36-month period from the Effective Date, even though such capitalization and amortization may be a divergence from U.S. generally accepted accounting principles ("*GAAP*"). Amortization of such expenses over a 36-month period may, in certain circumstances, result in a qualification of the Fund's annual audited financial statements. In such instances, the Directors may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating the Fund's net asset value. There will be a divergence in the Fund's fiscal year-end net asset value and in the net asset value reported in the Fund's financial statements in any year where, pursuant to clause (ii), GAAP conforming changes are made only to the Fund's financial statements for financial reporting purposes.

If the Fund is terminated within 36 months of the Effective Date, any unamortized expenses will be recognized.

APP.105022

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 117
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1461 of 1726 PageID 12782
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 17 of
49

Investment and Operational Expenses. The Fund bears all reasonable costs and expenses directly related to its operations, including its pro rata share of all Partnership expenses, including the Management Fee paid by the Partnership to the Investment Manager. The Fund also bears all reasonable, out-of-pocket costs of the administration of the Fund, including accounting, audit and legal expenses, costs of any litigation or investigation involving the Fund's activities, and costs associated with reporting and providing information to existing and prospective investors. However, the General Partner or the Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

The Fund does not have its own separate employees or office. Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager.

**Restricted New Issues**

The Partnership may from time to time purchase securities in public offerings made through member firms of the Financial Industry Regulatory Authority, Inc. ("*FINRA*"). FINRA member firms are not permitted to sell certain new issues ("*Restricted New Issues*") to accounts in which certain persons have a significant beneficial interest that are involved in the securities industry or to executive officers or directors of companies that are current, recent or prospective investment banking client of the relevant underwriters ("*Restricted Persons*"). In order to enable the Partnership to participate in Restricted New Issues, the Fund will require each shareholder to provide information to enable the Fund to determine whether the shareholder is a Restricted Person. When the Partnership invests in a Restricted New Issue, the profits and losses associated with the investment will be specially allocated exclusively to those shareholders who are permitted by the FINRA rules to have a beneficial interest therein.

The FINRA rules permit Restricted Persons that are involved in the securities industry to have in the aggregate up to a 10% participation in Restricted New Issues and Restricted Persons affiliated with a particular investment banking client to have up to 25% participation in Restricted New Issues. If the ownership of the Partnership by Restricted Persons exceeds the maximum percentage, the Investment Manager will allocate such excess amount pro rata among the shareholders and the Partners of the Partnership who are not Restricted Persons or on such other basis that the Investment Manager reasonably determines ensures compliance with the FINRA rules.

If a Restricted New Issue in which participation by Restricted Persons has been capped is not promptly sold, the investment may be reallocated among all shareholders and the Partners of the Partnership on a pro rata

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 118
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1462 of 1726 PageID 12783
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 18 of 49

basis (including all Restricted Persons) after a secondary market develops at such secondary market price.

**Performance Allocation**

As further described in the Partnership Agreement, the Investment Manager, in its capacity as a special limited partner of the Partnership, is entitled to receive an annual performance-based profit allocation at the end of each year equal to 20% of the Partnership's net profits attributable to the Limited Partners of the Partnership, subject to a "high water mark" limitation.

The Performance Allocation is made at the Partnership level by deducting the Performance Allocation from the capital sub-account relating to each Sub-Series of Shares. The Performance Change (as defined in the Partnership Agreement) of each Sub-Series will not be netted against one another for purposes of determining the applicability of the "high water mark."

**Distributions**

Subject to the redemption privilege described below, all earnings of the Fund are ordinarily retained for investment. Other than distributions made pursuant to a redemption described below, shareholders should not expect the Fund to make any distributions.

**Redemptions Generally**

Redemptions from the Fund are subject to the withdrawal restrictions contained in the Partnership Agreement, whereby the Series A Interests in the Partnership correspond to the Series A Shares of the Fund, Series B Interests in the Partnership correspond to the Series B Shares of the Fund, the Series C Interests in the Partnership correspond to the Series C Shares of the Fund and the Series D Interests in the Partnership correspond to the Series D Shares of the Fund.

**Series Redemption Dates**

Subject to certain redemption restrictions described below, shareholders have the following redemption rights:

Series B Shares: Annual Liquidity. A shareholder is permitted to make complete or partial redemptions of its Series B Shares upon written notice to the Administrator at least 180 days prior to the applicable Series B Redemption Date. The "***Series B Redemption Date***" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of date of the issuance of the Shares being redeemed; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Redemption Date (i.e., if Shares were issued on November 1, 2014, such Shares would be eligible for redemption on October 31, 2015 and every one year thereafter on October 31st, or the last Business Day of that month).

Series C Shares: Two Year Liquidity. A shareholder is permitted to make complete or partial redemptions of its Series C Shares upon written notice to the Administrator at least 180 days prior to the applicable Series C Redemption Date. The "***Series C Redemption Date***" means: (i) the end

15

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 119
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1463 of 1726   PageID 12784
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 19 of
49

of the day on the last Business Day of the calendar month that immediately precedes the two-year anniversary of the date of issuance of the Shares being redeemed; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Redemption Date (or the last Business Day of that month) (i.e., if Shares were issued on November 1, 2014, such Shares would be eligible for redemption on October 31, 2016 and every two years thereafter on October 31st, or the last Business Day of that month).

<u>Series D Shares: One Year Hard Lock-Up; Quarterly Liquidity</u>.   A shareholder is permitted to make complete or partial redemptions of Series D Shares as of the last Business Day of each calendar quarter (each, a "***Series D Redemption Date***") following the one-year anniversary of the date of issuance of the Shares being redeemed. Notice of any redemption of Series D Shares must be provided in writing to the Administrator at least 90 calendar days prior to the requested Series D Redemption Date.

The Board of Directors may, at any time and in its sole discretion, waive or modify the foregoing redemption and distribution restrictions with respect to any shareholder.

**Settlement of Redemption Proceeds**

Redemption proceeds will be paid promptly following receipt by the Fund of the withdrawal proceeds from the Partnership in accordance with the Partnership Agreement.

**Redemption Conditions**

The Fund may refuse to accept a redemption request if it is not accompanied by such additional information as the Fund or the Administrator may reasonably require.   This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes.  In addition, where redemption proceeds are requested to be remitted to an account which is not in the name of the investor, each of the Fund and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the redemption proceeds will be paid.   The redemption proceeds will not be paid to a third-party account if the investor and/or owner of the account fails to provide such information.

**Compulsory Redemptions**

The Board of Directors reserves the right, in its sole discretion, to compel the redemption of any shareholder's Shares for any or no reason, in part or in their entirety, on not less than five days' prior written notice (or immediately if the Board of Directors determines in its sole discretion that such shareholder's continued participation in the Fund may cause the Fund, the Partnership, the General Partner or the Investment Manager to violate any applicable law).   Settlements are made in the same manner as voluntary redemptions.

APPX. 05023

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 120
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1464 of 1726 PageID 12785
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of 49

| | |
|---|---|
| **Suspension of Valuations, Redemption and Redemption Payments** | The Board of Directors may suspend the issuance of Shares, the shareholders' redemption privileges, the payment of redemption proceeds and the valuation of the Fund's net assets in the same circumstances as described in the Partnership Memorandum and set forth in the Partnership Agreement with respect to the suspension of valuations or of withdrawal privileges.

Upon the reasonable determination by the Board of Directors that conditions leading to suspension no longer apply, redemption rights for all shareholders shall be promptly reinstated, and any pending redemption requests (or new, timely withdrawal requests) shall be honored as of the last Business Day of the calendar quarter in which redemptions have recommenced, subject to the application of the redemption limitations described herein. |
| **Soft Wind Down** | It is anticipated that any suspension in the circumstances described above in "Suspension of Valuations, Redemptions and Redemption Payments" (each, a "***Suspension***") would ordinarily be temporary. However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the Board of Directors, in consultation with the Investment Manager, considers it appropriate to keep the Suspension in place indefinitely. In certain circumstances, even where a Suspension has not been declared, the Directors may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued. During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the Board of Directors that the Fund be managed with the objective of returning the Fund's assets to shareholders in an orderly manner (an "***Orderly Realisation***"). The Board of Directors may, in such circumstances, resolve to effect an Orderly Realisation should they determine that doing so is in the best interests of the shareholders. Such Orderly Realisation shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the shareholders. The Board of Directors shall promptly communicate to shareholders any resolution to proceed with an Orderly Realisation of the Fund. During an Orderly Realisation, the Investment Manager may, in consultation with the Board of Directors, take such steps as are considered appropriate in the best interests of the Fund's shareholders to effect the Orderly Realisation. The Board of Directors, in consultation with the Investment Manager shall establish what they consider to be a reasonable time by which the Orderly Realisation should be effected (the "***Realisation Period***"). Any resolution to undertake an Orderly Realisation and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under the |

APPX. 05026

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 121
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1465 of 1726 PageID 12786
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 21 of
49

Companies Law or any other applicable bankruptcy or insolvency regime. The Board of Directors, in consultation with the Investment Manager, may resolve to cease the Orderly Realisation within the Realisation Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. Management Fees shall be payable and Performance Allocations shall be made during an Orderly Realisation on the same basis as described herein.

**Transfers**

Shares may not be transferred without the prior written consent of the Board of Directors, which consent may be withheld in the sole discretion of the Board of Directors. Any transferee or assignee of any investor will be required to execute a subscription agreement in the same form as required to be completed and executed by a subscriber for Shares in the Fund.

**Duty of Care;
Indemnification**

The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Partnership and the Limited Partners (including the Fund) for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, fraud or gross negligence (as construed in accordance with the laws of the state of Delaware) or as otherwise required by law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Partnership (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Partnership's business or affairs to the fullest extent permitted by law. The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors.

Neither the Board of Directors of the Fund nor the Administrator shall be liable to the Fund or its shareholders for any loss or damage occasioned by any acts or omissions in the performance of its services on behalf of the Fund, except under certain limited circumstances. In addition, the Board of Directors and the Administrator and their respective affiliates will be indemnified by the Fund (but not by the shareholders individually) against any liabilities arising in connection with the performance of their activities on behalf of the Fund to the extent permitted by the Articles.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 122
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1466 of 1726 PageID 12787
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 22 of
49

| | |
|---|---|
| **Valuations** | The Fund's assets are valued based on the value of the Partnership's assets as set forth in the Partnership Memorandum. |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Shares of the shareholders for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the Board of Directors in its sole discretion deems necessary or appropriate. At the sole discretion of the Board of Directors, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Shares of those investors who are shareholders at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were shareholders at the time of the act or omission giving rise to the contingent liability for which the reserve was established. |
| | If the Board of Directors determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were shareholders during any such prior period. |
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Partners** | The Fund furnishes to its shareholders as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each shareholder to complete federal and state income tax or information returns, along with any other tax information required by law. The Fund also furnishes monthly reports reviewing the Fund's performance for such calendar month. The Board of Directors selects the Fund's independent accountants in its sole discretion. |
| **Dissolution and Liquidation** | In the event an Orderly Realization lasts longer than three years, shareholders holding Shares with a combined net asset value equal to at least 75% of the total net asset value of the Fund may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Fund. |
| | Wind down and liquidation of the Fund shall occur as set forth in the Articles. |
| **Placement Agents** | The Investment Manager may engage third parties to solicit investors and act as placement agents for the Fund. Placement agents may charge a placement fee directly to investors solicited by any such placement agent, but such fees will not affect the subscription amount and will not |

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 123
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1467 of 1726 PageID 12788
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 23 of 49

be collected by or from the Fund. The placement agent may be reimbursed for its expenses and indemnified by the Fund.

Furthermore, placement agents may be paid a portion of the Management Fee or Performance Allocation attributable to such investors solicited by them, thereby reducing the Management Fee or Performance Allocation received by the Investment Manager. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent must comply with the legal requirements of the jurisdictions within which it offers and sells Shares.

**Certain Tax Considerations**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has applied for and received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from July 10, 2012 (being the date of the undertaking), no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

The Investment Manager believes that the Fund will be treated as a non-U.S. corporation for U.S. federal income tax purposes. The Fund does not intend to be subject to U.S. federal income tax on its capital gains from securities trading. Dividends and certain interest received by the Fund may be subject to withholding at the source. See "*Tax Considerations*."

**ERISA**

The Fund intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"). See "*ERISA Considerations*."

APPX. 05039

| | |
|---|---|
| **Voting** | Shares in the Fund are participating non-voting shares; provided that in the event the Partnership seeks the approval, vote or consent of the Fund with respect to any matter to which it would be entitled to vote as a Limited Partner of the Partnership under the Partnership Agreement, the Fund will: (i) submit such matter for the consent of the shareholders and (ii) shall cause the Fund to vote its Limited Partner interest proportionally for and against such matter in the same proportion that the shareholders voted for and against such matter. |
| **Variation of Terms** | The Board of Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a shareholder to waive or modify the terms applicable to such shareholder's subscription for Shares (including those relating to Management Fees, the Performance Allocation, transparency and redemptions) without obtaining the consent of any other shareholder; provided that such waiver or modification does not amount to a variation of the rights attaching to the Shares of such other shareholders. The Fund generally grants waivers of the Management Fees and Performance Allocation to the Affiliated Investors. |

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 125
Case 3:23-cv-00726-S   Document 8-23   Filed 07/29/23   Page 1469 of 1726   PageID 12790
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 25 of
49

### RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund, and in turn, the Partnership, is speculative and involves certain risks. There can be no assurance that the Partnership's investment objective will be achieved, or that an investor will receive a return of its Capital.   Certain of these risks are summarized below.   The Fund may not be suitable for all investors, and is intended for sophisticated investors who can accept the risks associated with its investments.   Investors will not have recourse except with respect to the assets of the Fund.   Prospective investors should consider, among others, the risk factors described in this section.*

***This discussion must be read in conjunction with the risk factors and potential conflicts of interest of the Partnership set forth in the Partnership Memorandum.   The following is not meant to be an exhaustive listing of all potential risks associated with investing in the Fund. Investment-specific risks factors associated with the Partnership's investment strategy should be read in their entirety.***

*Illiquidity of Shares.*   Shares are not transferable without the approval of the Board of Directors, and there will be no secondary market for Shares.   Consequently, investors may not be able to dispose of their Shares prior to the liquidation of the Fund or as described in this Memorandum and the Partnership Memorandum, and may receive securities rather than cash in exchange for their Shares.

*Side Letters.*   The Board of Directors may from time to time, with the consent of the Partnership, enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more investors which provide such investor(s) with additional and/or different rights than such investor(s) have pursuant to this Memorandum or the Partnership Memorandum.   As a result of such Side Letters, certain investors may receive additional benefits (including, but not limited to, reduced fee/allocation obligations and/or expanded informational rights) which other investors will not receive.   The Fund is not required to notify any or all of the other investors of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund be required to offer such additional and/or different rights and/or terms to any or all of the other investors.   The Fund may enter into such Side Letters with any party as the Board of Directors may determine in its discretion at any time.   The other investors will have no recourse against the Fund, the Board of Directors and/or any of their affiliates in the event that certain investors receive additional and/or different rights and/or terms as a result of such Side Letters.

*Authority.*   Investors in the Fund have no right or power to take part in the management of the Fund.   The Board of Directors control the Fund and the General Partner controls the Partnership.   The Investment Manager is responsible for all investment decisions of the Partnership.

*Absence of Regulatory Oversight.*   The Fund is not registered under the Cayman Islands Mutual Funds Law (as amended).   Neither the Cayman Islands Monetary Authority nor any other governmental authority in the Cayman Islands has commented on or approved the terms or merits of this Memorandum.   There is no financial obligation or compensation scheme imposed on or by the government of the Cayman Islands in favor of or available to the investors in the Fund.

*Investment Judgment; Market Risk.*   The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments.   There can be no assurance that the Investment Manager will be able to predict accurately these price movements.   With respect to the investment strategy utilized by the Fund, there is always some, and occasionally a significant, degree of market risk.

APPX. 105043

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 126
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1470 of 1726 PageID 12791
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 26 of
49

*Performance Allocation.* The Performance Allocation made to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Redemption Restrictions.* There are severe restrictions on redemptions from the Fund (which may be settled in securities rather than cash) and on transfers of Shares. Because of the restrictions on redemptions, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. There is no independent market for the purchase or sale of Shares and none is expected to develop. Shareholders must represent that they are purchasing Shares for investment. A subscription for Shares should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

*No Distributions.* Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income. Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*In-Kind Distributions*. The Partnership Agreement authorizes the General Partner to make distributions in kind of securities in lieu of or in addition to cash. In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Diversification.* Since the Partnership's portfolio will not necessarily be widely diversified, the investment portfolio of the Partnership (and thus the Fund) may be subject to more rapid changes in value than would be the case if the Partnership were required to maintain a wide diversification among companies, securities and types of securities.

*Valuations.* From time to time, certain situations affecting the valuation of the Partnership's (and thus the Fund's) investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Partnership) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed. The Fund is not required to make retroactive adjustments to prior subscription or redemption transactions or Management Fees or Performance Allocations based on subsequent valuation data.

*Contagion*. The Fund has the power to issue Shares in different series. The Articles provide for the manner in which the liabilities are to be attributed across the various series (liabilities are to be attributed to the specific series in respect of which the liability was incurred). However, the Fund is a single legal entity and there is no limited recourse protection for any series. Accordingly, all of the assets of the Fund will be available to meet all of its liabilities regardless of the series to which such assets or liabilities are attributable. In practice, cross-series liability is only expected to arise where liabilities referable to one series are in excess of the assets referable to such series and it is unable to meet all liabilities attributed to it. In such a case, the assets of the Fund attributable to other series may be applied to cover such liability excess and the value of the contributing classes or series will be reduced as a result.

*Handling of mail*. Mail addressed to the Fund and received at its registered office will be forwarded unopened to the Investment Manager to be dealt with. None of the Fund, its Directors,

APPX. 05044

officers, advisors or service providers (including the organization which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the Investment Manager. In particular the Directors will only receive, open or deal directly with mail addressed to them personally (as opposed to mail which is addressed to just the Fund).

*Recent Developments in the Financial Services Industry*. Recent developments in the U.S. financial markets illustrate that the current environment is one of extraordinary and possibly unprecedented uncertainty for the financial services industry. In July of 2010, the Dodd-Frank Financial Reform Act was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. The implications of the passage of the Dodd-Frank Financial Reform Act for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Fund's business, operations and performance.

In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in the Fund are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares and to consult their own independent tax advisors.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Internal Revenue Service (the "***Service***") or other applicable taxing authority, or significantly modified by new legislation, changes in a taxing authority's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the U.S. federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the Investment Manager with respect to the U.S. federal income tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund.

*Tax Considerations Taken into Account*. The Fund will attempt to minimize the tax burden of the Fund over the long-term. However, the Investment Manager will not overlook short-term trading opportunities. Therefore, shareholders should not expect that the Fund will make tax-efficiency a

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 128
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1472 of 1726 PageID 12793
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 28 of 49

priority. However, the Investment Manager may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax-Exempt Entities*. Certain prospective investors that are tax-exempt for U.S. income tax purposes may be subject to U.S. federal and state laws, rules and regulations that regulate their participation in the Fund, or their engaging directly or indirectly through an investment in the Fund, in certain investment strategies the Partnership may utilize from time-to-time (*e.g.,* short-sales of securities and the use of leverage, the purchase and sale of options and limited diversification). While the Fund believes its investment program is generally appropriate for U.S. tax-exempt investors for which an investment in the Fund would otherwise be suitable, each type of tax-exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund. Investments in the Fund by entities subject to ERISA, and other tax-exempt entities, require special consideration. Trustees or administrators of such entities are urged to review carefully the matters discussed in this Memorandum.

*Non-U.S. Taxation*. With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries. An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Tax Changes*. Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Internal Revenue Code of 1986, as amended (the "*Code*"), may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or its shareholders. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

***The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund. Many of the relevant tax considerations will vary depending on a prospective shareholder's individual circumstances. The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations. Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.***

In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 129
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1473 of 1726 PageID 12794
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of
49

**Potential Conflicts of Interest**

*No Independent Directors.* The Fund's Board of Directors does not currently consist of any directors that are not affiliated with the Investment Manager, and thus the Fund's management, as well as the investment decisions at the Partnership level, are effectively controlled by the Investment Manager or its affiliates. However, the Fund may establish an Advisory Committee with respect to matters in which it seeks to resolve certain conflicts of interest that may arise. See "*Management—Advisory Committee*" in the Partnership Memorandum.

*No Separate Counsel.* Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") serves as counsel to the Fund, the Partnership, the Investment Manager, the General Partner and certain of their affiliates (the "*Clients*") in connection with the operation of the Fund and certain other Clients, the offering of Shares as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any shareholders nor does it purport to represent their interests. No independent counsel has been retained to represent the shareholders. In assisting in the preparation of the Partnership Memorandum and this Memorandum (as well as any supplements thereto), Akin Gump has relied on information provided by the Fund, the Partnership, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the biographical data of key investment personnel, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund. In connection with the Fund's offering of Shares and subsequent advice to the Fund, Maples and Calder will not be representing shareholders. No independent legal counsel has been retained to represent the shareholders. Maples and Calder's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund. There may exist other matters that could have a bearing on the Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Fund, there are times when the interests of shareholders may differ from those of the Fund. Maples and Calder does not represent the shareholders' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund.

*The Partnership Memorandum contains further disclosures concerning potential conflicts of interests. Such disclosures are incorporated herein by reference and should be read in their entirety prior to making a decision to invest in the Fund.*

*In view of the foregoing considerations, an investment in Shares is only suitable for investors who are capable of bearing the relevant risks and who understand the potential conflicts of interest.*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 130
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1474 of 1726 PageID 12795
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 30 of
49

## SHARES OF THE FUND

### The Fund's Share Capital

The Fund has an authorized share capital of U.S.$50,000 divided into 100 management shares ("*Management Shares*") of a par value of U.S.$1.00 each and 4,990,000 participating non-voting shares (the "*Shares*") of a par value of U.S.$0.01. The Directors may by resolution divide the Shares into separate series (each, a "*Series*") which may be subject to different rights, restrictions, preferences, privileges and payment obligations as between the different Series and further into separate sub-series (each, a "*Sub-Series*") within such Series (for example, a Sub-Series of Shares which will participate in Restricted New Issues and a Sub-Series of Shares which will not participate in such Restricted New Issues). The different Series and Sub-Series thereof shall be established and designated, and the variations in the relative rights and preferences as between the different Series and Sub-Series thereof shall be fixed and determined by the Board of Directors. Sub-Series of Shares are issued for the purposes, among others, of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately to reflect different returns achieved as a result of subscriptions received at different times.

The Fund previously issued Series A Shares and currently offers Series B Shares, Series C Shares and Series D Shares, all of which generally have identical rights and privileges except for purposes of calculating Management Fees and redemption rights. The Fund is offering Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum. Certain terms that specifically apply to Series A Shares are set forth in a Supplement to this Memorandum.

Each separate Sub-Series of Shares is identified by the investor to whom it was issued and its date of issue. Shares are issued to shareholders in Sub-Series at $1,000 per Share. Immediately following the close of any fiscal year in which a Performance Allocation is charged at the Partnership level with respect to a Sub-Series of Shares of a Series, each such Sub-Series of Shares may be compulsorily redeemed and the proceeds immediately applied to the subscription for an earlier Sub-Series of Shares of such Series; provided that such earlier Sub-Series of Shares has also been assessed as having a Performance Allocation payable at the Partnership level.

The Management Shares will carry all the voting rights but will have no right to participate in the assets of the Fund (other than to a return of the par value on a winding up). The Management Shares will be held by the Investment Manager or an affiliate, and will be voted in accordance with the instructions of the Investment Manager.

The Articles provide that, subject to the Companies Law (2013 Revision) of the Cayman Islands and the other provisions of the Articles, all or any of the class rights or other terms of offer, whether set out in this Memorandum, the Subscription Documents or otherwise (including any representations, warranties or other disclosure relating to the offer or holding of Shares) (collectively referred to as "*Share Rights*"), for the time being applicable to any class or Series of Shares in issue (unless otherwise provided by the terms of issue of those Shares) may (whether or not the Fund is being wound up) be varied without the consent of the holders of the issued Shares of that class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation shall be made only with the prior consent in writing of the holders of not less than two-thirds by net asset value of such Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any

APPX. 105048

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 131
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1475 of 1726 PageID 12796
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 31 of 49

such variation might not have a material adverse effect, to obtain consent from the holders of such Shares. Each subscriber for Shares will be required to agree that the terms of offer set out in the Subscription Documents and the rights attaching to the Shares can be varied in accordance with the provisions of the Articles.

The Articles further provide that, in relation to any class or Series consent required pursuant to the "Variation of Share Rights" Article, the Directors in their discretion may invoke the following procedure (the "*Negative Consent Procedure*"). The Directors shall provide written notice in respect of the proposed variation (the "*Proposal*") to the shareholders of the affected class or Series and shall specify a deadline (the "*Redemption Request Date*"), which shall be no earlier than 30 days after the date of giving such notice, by which date such shareholders may submit a written request for redemption of some or all of their Shares of the affected class and/or Series on the Redemption Date (the "*Specified Redemption Date*") specified by the Directors in such notice. The terms of the Proposal shall be such that its specified effective date (the "*Effective Date*") shall not be on or prior to the Specified Redemption Date. Such notice shall further provide that the holders of any Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "*Affected Shares*") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "*Negative Consent Shares*"). In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under the "Variation of Share Rights" Article with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favor of the Proposal on the Effective Date.

The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares, be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them, the redemption or purchase of any Shares or by the passing of any Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to the Shares or any modification of the fees payable to any service provider to the Fund.

In general, each Share will participate in the Fund's profits and losses attributable to the relevant class in the same manner, except that the Performance Allocation to be charged (at the Partnership level) to Shares of a Sub-Series held by each shareholder will be calculated separately on the basis of the performance of such Shares of a Sub-Series. The Performance Allocation is calculated and charged at the Partnership level through the use of separate capital sub-accounts within the Fund's capital account in the Partnership that correspond to the Shares of a Sub-Series of each shareholder in the Fund. Subject to the foregoing, each of the Shares will participate ratably with all other outstanding Shares in the Fund's assets and earnings and will have the redemption rights discussed above.

The Directors may impose such restrictions as they think necessary for the purpose of ensuring that no Shares in the Fund are held by (i) any person in breach of the laws or requirements of any country or governmental authority or (ii) any person or persons in circumstances which, in the opinion of the Directors, might result in the Fund incurring any liability of taxation or suffering any other pecuniary disadvantage which the Fund might not otherwise have incurred or suffered. A person who becomes aware that he or she is holding or owning Shares in breach of any restriction mentioned in the Articles shall promptly either deliver to the Fund a written request for redemption of his or her Shares or deliver to the Fund a written request to transfer the same to a person who would not thereby be a non-qualified person.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 132
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1476 of 1726 PageID 12797
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 32 of 49

## Management Shares

General meetings of the holders of Management Shares may be held to vote on various matters including to elect the Directors, to select the Fund's auditors and to attend to such other business as may properly be placed before the meeting. At any such general meeting, the favorable vote of a majority of the Management Shares present generally is sufficient for the approval of any action, unless such action is a matter requiring a special resolution, in which case two-thirds of the Management Shares shall be required, in each case as further detailed in the Articles.

## Registration of Management Shares and Shares and Share Certificates

Management Shares and Shares of the Fund are issued only in registered form. A current register of the names and addresses of the Fund's shareholders and their shareholdings is maintained at the office of the Administrator. No share certificates have been or will be issued.

## Other Rights and Liabilities

Under the terms of the Articles, the liability of the shareholders of the Fund is limited, and shareholders will not be liable for any debt, obligation or default of the Fund in excess of the amounts unpaid on their Shares.

The Fund and the Investment Manager may agree with certain investors to a fee structure, redemption rights or other terms that differ from the fee structure, redemption rights and other terms that are set forth in this Memorandum. Such different rights may, subject to applicable law, be effected by issuance of a separate Series of Shares or any other permissible means. Such rights may not be offered to all investors.

## Calculation of Fund Net Asset Value

The Directors have delegated to the Administrator the calculation of the net asset value of the Fund and the net asset value per Share of each Series and, if applicable, Sub-Series, subject to the overall supervision and direction of the Investment Manager and the Board of Directors. Net asset valuations of the Fund and each Series of Shares will be calculated as of the close of business on the last day of each fiscal period and any other date selected by the Board of Directors, in consultation with the Investment Manager, no less than quarterly, which shall, to avoid doubt, include each Redemption Date (each, a "*Valuation Date*").

The Fund's assets are valued based on the value of the Partnership's assets. The net asset value of the Fund is determined by taking the amount of all cash and credit balances plus the market value of all securities, commodities and other assets comprising the Fund's assets (including any interest and dividends receivable, but excluding any subscription amounts committed to the Fund from time to time to the extent such amounts are not held by or on behalf of the Fund), as calculated by the Administrator, minus all debit balances and other liabilities and obligations of the Fund. Net asset value in respect of any Series or Sub-Series of Shares is calculated by dividing the value of the account relating to that Series or Sub-Series of Shares by the number of Shares of that Series in issue. For the sole purpose of determining the number of Shares of a Series in issue, Shares of that Series which are to be redeemed on the relevant Valuation Date shall be deemed to be in issue until and including the close of business on the applicable Valuation Date. The principal amounts of the investments, cash balances and other assets of the Fund, the value of which is expressed in a currency other than that of the United States,

shall be valued after taking into account the market rate or rates of exchange in force on the Valuation Date in question.

APPX. 05049

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 134
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1478 of 1726 PageID 12799
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 34 of 49

## TAX CONSIDERATIONS

### General

The following is a general discussion of certain of the anticipated U.S. federal and Cayman Islands income tax considerations applicable to the Fund's activities and those relevant to non-U.S. persons (as defined below) and U.S. tax-exempt entities arising from the purchase, ownership and disposition of Shares. Prospective investors should consult their own tax advisors to determine the application and effect of tax laws with respect to their own particular circumstances. This discussion is based on laws and regulations currently in effect, which may change or be subject to differing interpretations (possibly on a retroactive basis). The Fund does not intend to seek a ruling from the Service, or any similar state or local authority, with respect to any of the tax issues affecting the Fund.

In view of the number of different jurisdictions where local laws may apply to shareholders, the discussion below does not address the local tax consequences to prospective investors of the purchase, ownership and disposition of Shares. Prospective investors are urged to consult their own tax advisors in determining the possible tax, exchange control or other consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries or in which they conduct business.

The summary assumes that no U.S. taxable investors will invest in the Fund and, therefore, does not address the U.S. tax consequences to such investors. Potential U.S. taxable investors should be aware that the Fund does not intend to provide information to any U.S. Person for purposes of such person qualifying to make an election to treat the Fund as a "qualifying electing fund" for U.S. federal income tax purposes. Accordingly, potential U.S. shareholders are urged to consult their tax advisors in this regard.

### United States Taxation Matters

The Fund will be treated as a corporation for U.S. federal income tax purposes. For U.S. federal income tax purposes, the Partnership is expected to be treated as a partnership. The Fund and the Partnership will make any necessary entity classification elections for U.S. tax purposes consistent with such respective treatment. Because the Fund is organized under the laws of the Cayman Islands, it will be considered a non-U.S. person for purposes of U.S. tax laws. As such, the U.S. federal income tax treatment of the Fund will vary depending on whether the Fund derives income or gains that are effectively connected with the conduct of a trade or business in the United States. The Fund intends to structure its operations (including those conducted through the Partnership) in order to minimize to the extent consistent with its investment strategy the possibility that the Fund will be treated as being engaged in a U.S. trade or business for U.S. federal income tax purposes, although there can be no certainty that the Fund will be successful minimizing such a possibility. It is also intended that the Fund's affairs will be conducted such that no income realized by the Fund will be effectively connected with the conduct of a U.S. trade or business or otherwise subject to regular U.S. federal income taxation on a net basis.

Pursuant to a safe harbor in the Code, trading in securities or commodities on an organized commodities exchange for the Fund's own account (including through the Partnership) is not considered a U.S. trade or business. It is not certain whether this safe harbor would apply to the trading of physical commodities. Although no assurances can be given that the Service will not successfully assert an

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 135
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1479 of 1726 PageID 12800
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 35 of 49

alternative position, the Fund intends to take the position that the Partnership's trading of physical commodities is within the prescribed safe harbor and does not constitute a trade or business and as such the Fund anticipates generally that its income will not be subject to U.S. corporate income tax, except as described below. However, the Fund will be subject to a 30% U.S. withholding tax on its allocable share of certain types of the Partnership's non-effectively connected income. As described below, the types of income (to the extent not constituting effectively connected income) on which a U.S. withholding tax will be imposed generally consist of dividends, interest and certain types of investment income, but not capital gains derived from the sale of stock or other capital assets (unless such capital gains are derived from the sale of stock of a "United States Real Property Holding Company" within the meaning of Section 897 of the Code and certain other interests in real property).

In general, a non-U.S. partner, such as the Fund, that is a partner of a partnership, such as the Partnership, is subject to U.S. federal income taxation on a net basis on its allocable share of the partnership's "effectively connected income." The Fund's allocable share of the Partnership's income will constitute "effectively connected income," and thus will be subject to U.S. federal income taxation, to the extent such income is derived by the Partnership from a trade or business carried on in the United States by the Partnership. Although there can be no assurances, the Partnership does not itself expect to engage directly in activities that would constitute a U.S. trade or business.

If the Fund were treated as being engaged in a U.S. trade or business as a result of activities conducted by the Partnership, then all or a portion of the Fund's allocable share of the Partnership's income would be treated as effectively connected income subject to U.S. federal income tax on a net basis at corporate tax rates. In such a case, the Fund would be required to file a U.S. federal income tax return to report its share of such income and pay U.S. federal income tax at regular U.S. rates on this income. In addition, the Partnership would be required (and would be legally liable) to withhold and pay over to the Service on behalf of the Fund an amount equal to 35% percent of the Fund's share of the Partnership's effectively connected income. Any amount so withheld would be creditable against the Fund's ultimate U.S. federal income tax liability, and the Fund would be entitled to a refund to the extent that the amount withheld exceeded the Fund's U.S. federal income tax liability for the taxable year. Furthermore, in such event, the Fund's allocable share of any effectively connected income of the Partnership would also be subject to a 30% U.S. branch profits tax, and possibly could be subject to state and/or local taxation in the United States. Such taxation of the Fund's activities could have a material adverse effect on the Fund's returns. Prospective investors are advised to consult their tax advisors regarding the risk of the Fund being treated as engaged in a trade or business in the United States.

Because the Fund is organized under the laws of the Cayman Islands, it is considered a non-U.S. person for purposes of the U.S. tax laws. As a result, dividends received by the Fund through the Partnership from U.S. sources will be subjected to U.S. withholding tax at a 30% rate. U.S. source interest income received by the Fund through the Partnership generally will be exempt from U.S. federal income and withholding tax under the exemption for "portfolio interest" or under another statutory exemption. Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto) or the underlying obligations are not in "registered form" for U.S. tax purposes. In addition, interest on U.S. bank deposits, certificates of deposit and certain obligations with maturities of 183 days or less (from original issuance) will not be subject to

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 136
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1480 of 1726 PageID 12801
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 36 of 49

withholding tax. Interest (including original issue discount) derived by the Fund or the Partnership from U.S. sources not qualifying as "portfolio interest" or not otherwise exempt under U.S. law will be subject to U.S. withholding tax at a rate of 30%. In addition, based on recent legislation, income from certain swaps directly or indirectly over certain stocks (e.g., U.S. stocks) are subject to U.S. withholding tax.

**Taxation of Non-U.S. shareholders**

For U.S. federal income tax purposes, a shareholder of the Fund who is a non-U.S. person will not be subject to U.S. federal income taxation on amounts paid by the Fund in respect of the Shares or gains recognized on the sale, exchange or redemption of Shares, provided that such income and gains are not considered to be effectively connected with the conduct of a trade or business by the shareholder in the United States. In limited circumstances, an individual shareholder who is present in the United States for 183 days or more during a taxable year may be subject to U.S. income tax at a flat rate of 30% on gains realized on a disposition of Shares in such year. Individual shareholders who at the time of their death are not citizens, former citizens or residents of the United States should not be subject, by reason of the ownership of Shares, to any U.S. federal gift or estate taxes.

For these purposes the term "***non-U.S. person***" means any person that is not a U.S. Person for U.S. federal income tax purposes. A "***U.S. Person***" means a citizen or resident of the United States, a partnership or corporation created or organized in the United States or under the laws of the United States or any state (other than a partnership that is not treated as a U.S. Person under any applicable Treasury Regulations), an estate whose income is includable in gross income for federal income tax purposes regardless of its source or a trust if a U.S. court is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in Treasury Regulations, certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, which elect to continue to be treated as U.S. Persons will also be U.S. Persons for these purposes.

Special rules may apply in the case of non-U.S. persons that (i) conduct a trade or business in the United States or that have an office or fixed place of business in the United States, (ii) have a tax home in the United States, (iii) are former citizens or long-term residents of the United States or (iv) are controlled foreign corporations, passive foreign investment companies, foreign insurance companies that hold Shares in connection with their U.S. business or corporations which accumulate earnings to avoid U.S. federal income tax. Such persons are urged to consult their U.S. tax advisors before investing in the Fund.

In the case of Shares held in the United States by a custodian or nominee for a non-U.S. person, U.S. "backup" withholding taxes may apply to distributions in respect of Shares held by such shareholder unless such shareholder properly certifies as to its non-U.S. status or otherwise establishes an exemption from "backup" withholding. Back-up withholding is not an additional tax. Rather, the U.S. federal income tax liability of non-U.S. persons subject to back-up withholding will be reduced by the amount of tax withheld. If back-up withholding results in an overpayment of U.S. federal income taxes, a refund may be obtained, provided the required documents are filed with the Service.

**Taxation of U.S. Tax-Exempt shareholders**

In general, U.S. tax-exempt shareholders should not be subject to the tax on "unrelated business taxable income" ("***UBTI***"), as defined in Code section 512, in respect of income and gains from the

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 137
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1481 of 1726 PageID 12802
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 37 of
49

Shares. In general, UBTI is the excess of gross income from any unrelated trade or business conducted by a U.S. tax-exempt entity over the deductions attributable to such trade or business, with certain modifications. These modifications provide that UBTI generally does not include interest, dividends or gains from the sale of securities not held as either inventory or primarily for sale to customers in the ordinary course of business, except to the extent that any such item of income is deemed to constitute "unrelated debt-financed income" ("*UDFI*") within the meaning of Code section 514 and the Treasury Regulations. Income that a U.S. tax-exempt shareholder derives from an investment in Shares should not give rise to UBTI under Code section 511, except to the extent that such entity's acquisition of Shares is financed with acquisition indebtedness within the meaning of Code section 514. In addition to UBTI that may arise when a tax-exempt investor uses leverage to finance the acquisition of Shares, the United States Congress from time to time has considered legislation that could result in a tax-exempt investor realizing UBTI in respect of an investment in a foreign investment company that leverages its investments.

The Fund is expected to constitute a "passive foreign investment company" (a "*PFIC*") for U.S. federal income tax purposes. Under the Treasury Regulations, a U.S. tax-exempt shareholder is not considered to be a shareholder in a PFIC, and thus will not be subject to the PFIC tax rules, except to the extent that a "dividend" from the PFIC would be taxable under subchapter F of the Code, for example, as UDFI. Hence, under the Treasury Regulations, a U.S. tax-exempt shareholder would be subject to tax under the PFIC regime in respect of an excess distribution from, or any gain realized on the sale of the shares of, a PFIC only under limited circumstances. Moreover, different rules may apply to certain types of tax-exempt entities, such as charitable remainder trusts. Accordingly, potential U.S. tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of an investment in the Fund.

**Prospective U.S. tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of the Shares.**

**Information Reporting Requirements and FATCA**

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("*IGA*") and related statutes, regulations, rules and other guidance thereunder, "*FATCA*") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("*FFI*"), unless such FFI enters into an agreement with the Service, and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources since July 1, 2014, and will apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends after December 31, 2016.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "*Cayman IGA*"), which came into force on April 14, 2014, and has issued the Tax Information Authority

APPX. 05053

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 138
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1482 of 1726 PageID 12803
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 38 of
49

(International Tax Compliance) (United States of America) Regulations 2014, as updated from time to time, and draft guidance notes thereunder. Additional guidance is forthcoming. In addition, the Cayman Islands have signed a similar inter-governmental agreement with the United Kingdom (the "**UK IGA**"). The UK IGA imposes similar requirements to the Cayman IGA, so that the Fund will be required to identify accounts held directly or indirectly by "Specified United Kingdom Persons" and report information on such Specified United Kingdom Persons to the Cayman Islands authorities, which will exchange such information annually with HM Revenue & Customs ("**HMRC**"), the United Kingdom tax authority. It is anticipated that further inter-governmental agreements ("**future IGAs**") similar to the Cayman IGA and the UK IGA may be entered into with other third countries by the Cayman Islands Government to introduce similar regimes for reporting to such third countries fiscal authorities ("**foreign fiscal authorities**").

The Fund is likely to be considered an FFI for FATCA purposes. In order to avoid U.S. withholding tax under FATCA on amounts paid to the Fund, the Fund is generally required to register with the Service and to comply with the Cayman IGA and any Cayman Islands legislation or guidance implementing the Cayman IGA. The Fund intends to register with the Service and, therefore, generally does not expect to become subject to U.S. withholding under FATCA. The Fund also expects that it will be required to identify and report on certain direct and indirect U.S. owners or investors in order to comply with the Cayman IGA in the future. An investor will be required to provide to the Fund information which identifies its direct and indirect ownership. Any such information provided to the Fund will ultimately be shared with the Cayman Islands government and transmitted to the Service and, potentially, certain other authorities and withholding agents, as applicable.

Further, it is possible that a lower-tier non-U.S. entity in which the Partnership invests also may be considered an FFI. The Fund intends to assist lower-tier non-U.S. entities in which the Partnership invests in complying with FATCA, but the Fund can give no assurance that it will be able to provide such assistance or that such an entity will be able to avoid the imposition of this withholding tax on it.

By investing (or continuing to invest) in the Fund (and indirectly investing in the Partnership), investors will be deemed to have acknowledged, and to have given their consent to, the following:

(i) the Fund (or its agent) may be required to disclose to the Cayman Islands authorities and withholding agents certain information (which could otherwise be deemed to be confidential) in relation to the investor or its direct or indirect owners, including the investor's name, address, tax identification number (if any), social security number (if any) and certain additional information or documentation relating to the investor's investment or identity, and the investor may be required to provide any such information or documentation;

(ii) the Cayman Islands authorities may be required to automatically exchange information with, among other authorities, the Service, and to provide additional information to such authorities should they have further inquiries, and the Fund (or its agent) may be required to disclose certain information (including information that could otherwise be deemed to be confidential) when registering with such authorities and in response to a request by any such authority for further information;

(iii) in the event an investor's failure to comply with any FATCA related reporting requirements gives rise to any withholding tax, the Fund reserves the right to ensure that any such withholding tax and any related cost, interest, penalties and other losses or

liabilities suffered by the Fund, the Partnership, the General Partner, the Investment Manager, the Administrator or any other investor, or any agent, delegate, employee, director, officer or affiliate of any of the foregoing persons, arising from such investor's failure to provide information to the Fund, is economically borne by such investor;

(iv)    in the event an investor does not provide the information and/or documentation necessary for the Fund's (or the Partnership's) satisfaction of its FATCA related reporting requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund (or the Partnership) or its investors being subject to withholding tax under the relevant FATCA regime, the Fund reserves the right to take any action and/or pursue all remedies at its disposal to mitigate the consequences of the investor's failure to comply with the requirements described above, including compulsory redemption of such investor; and

(v)    no investor affected by any such action or remedy shall have any claim against the Fund, the Partnership, the General Partner, the Investment Manager, the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

***Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests of the Fund.***

**Investor Tax Filings and Record Retention**

The United States Treasury Department has adopted regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, the regulations require investors in specified transactions (including certain shareholders in foreign corporations and partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be imposed (in addition to penalties that generally may be applicable as a result of a failure to comply with applicable Treasury regulations) for failure to comply with these tax filing and record retention rules.

The regulations are broad in scope and it is conceivable that the Fund or the Partnership may enter into transactions that will subject the Fund and certain investors in the Fund to the special tax filing and record retention rules. The Fund and the Investment Manager intend to use reasonable efforts to obtain and provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Fund or the Partnership.

**Transfer Reporting Requirements**

A U.S. Person (including in certain circumstances a U.S. tax-exempt entity) that transfers property (including cash) to the Fund in exchange for Shares will be required to file a Form 926 or a similar form with the Service. In the event a U.S. shareholder fails to file any required form, such holder could be subject to a penalty of up to 10% of the value of the property transferred, subject to a $100,000 limit so long as the failure was not due to intentional disregard.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 140
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1484 of 1726 PageID 12805
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 40 of 49

**Cayman Islands Taxation**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or its shareholders. The Cayman Islands are not party to any double taxation treaties.

The Fund has applied for and expects to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the Shares, debentures or other obligations of the Fund or (ii) by way of the withholding, in whole or in part, of a payment of dividend or other distribution of income or capital by the Fund to its shareholders or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

**European Union Savings Directive**

Dividends and other distributions of income made by the Administrator on behalf of the Fund, together with payment of the proceeds of sale and/or redemption of Shares ("***Payments***") are not subject to any reporting or withholding requirements that may arise as a result of the applicable legislation which implements the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "***EUSD***") as the Administrator is not located in the European Union (or a country that has implemented measures similar or equivalent to the EUSD).

If an investor in the Fund is based in the European Union or certain states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) and is making investments on behalf of other underlying investors who are individuals or certain unincorporated entities resident in the European Union or certain of the states which have similar equivalent measures to the EUSD, then the provisions of the EUSD or similar or equivalent measures may apply. In such circumstances such an investor may become a "paying agent" and may be required to obtain all relevant documentation relating to its underlying investors and make returns to the appropriate tax authorities or withhold tax at applicable rates from any redemption proceeds in accordance with the applicable legislation that implements the EUSD or similar or equivalent measures.

Such investors to whom the EUSD may be relevant should also be aware that on 24 March 2014, the Council of the European Union adopted a directive amending the EUSD to extend its scope to cover additional types of savings income and products that generate interest or equivalent income (including certain types of life insurance contracts) as well as a broader range of investment funds. In addition, a "look through" procedure will be established to limit the opportunities for circumventing the application of the EUSD by the use of certain intermediaries. Member States of the European Union have until 1 January 2016 to adopt domestic legislation to give effect to these changes, which must be applied from 1 January 2017. It is not yet clear as to whether those states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) will adopt such changes and if so by what date.

APPX. 105058

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 141
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1485 of 1726 PageID 12806
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 41 of
49

**Future Changes in Applicable Law**

The foregoing description of United States and Cayman Islands income tax consequences of an investment in, and the operations of, the Fund are based on laws and regulations that are subject to change through legislative, judicial or administrative action. Other legislation could be enacted that would subject the Fund to income taxes or subject shareholders to increased income taxes.

**Other Taxation**

A portion of the Fund's investments may be made in non-U.S. jurisdictions. With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries. An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

**Future Tax Legislation, Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Internal Revenue Service or judicial decisions may adversely affect the federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Internal Revenue Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on shareholders will vary with the particular circumstances of each shareholder and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

It is the responsibility of all persons interested in purchasing Shares to inform themselves as to any tax consequences from their investing in the Fund and the Fund's operations or management, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of Shares. Accordingly, each prospective shareholder should therefore seek their own separate tax advice in relation to their holding of Shares. In no event will the Fund, the Partnership, the Principals or the Investment Manager, or their affiliates, counsel or other professional advisers, be liable to any shareholder for any tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of the important tax rules and considerations affecting the shareholders, the Fund and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each shareholder, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Shares. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 142
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 of 330 Page 1486 of 1726 PageID 12807
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 42 of
49

## ERISA CONSIDERATIONS

## CIRCULAR 230 NOTICE

**The tax discussion contained in this Memorandum is not in the form of a covered opinion, within the meaning of Circular 230 issued by the United States Secretary of the Treasury. Thus, we are required to inform you that you cannot rely upon the summary contained in this Memorandum for the purpose of avoiding U.S. federal tax penalties. The following summary was written to support the promotion or marketing of the transactions or matters described in this Memorandum. Each prospective investor should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

### General

Fiduciaries and other persons who are proposing to invest in Shares on behalf of retirement plans, IRAs and other employee benefit plans ("*Plans*") covered by ERISA or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of shareholders to redeem all or any part of their capital or to transfer their Shares and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

### Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("*DOL*") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("*Plan Assets*"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than twenty-five percent (25%) of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "*significant participation test*"). For purposes of this determination, the value of any equity interest held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "*Benefit Plan Investors*" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs) and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "*Plan Asset Entity*").

In order to prevent the assets of the Partnership from being considered Plan Assets under ERISA, it is the intention of the Partnership to monitor the investments in the Fund and prohibit the acquisition, redemption or transfer of any Shares by any investor, including a Benefit Plan Investor, unless, after

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 143
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1487 of 1726   PageID 12808
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 43 of
49

giving effect to such an acquisition, redemption or transfer, the total proportion of each class of equity interests of the Partnership owned by Benefit Plan Investors would be less 25% of the aggregate value of such class (determined, as described above, by excluding certain Shares held by the Investment Manager, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in each class of equity interests of the Partnership by Benefit Plan Investors to less than 25%, the Partnership may require the compulsory redemption of Shares of any Series. Each shareholder that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Shares or equity interests of the Partnership the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "*Maximum Percentage*") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Partnership. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Shares or equity interests of the Partnership, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Investment Manager of that occurrence and shall, if and as directed by the Investment Manager, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Shares held in its general account or Plan Asset Entity.

If the Partnership's assets were considered Plan Assets, then, under ERISA and the Code, the Investment Manager would be a fiduciary, and certain employees, partners and officers of the Investment Manager, as well as certain affiliates, would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties or the lending of money or other extensions of credit, or the sale, exchange or leasing of property by the Partnership or certain related parties, or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions. Additionally, individual investment in equity interests of the Partnership by persons who are fiduciaries and/or parties-in-interest and disqualified persons to a Plan might be deemed to constitute prohibited transactions under such circumstances.

It is anticipated that investment in the Fund by Benefit Plan Investors may be "significant" for purposes of the DOL regulations. In such event, the underlying assets of the Fund would be deemed to constitute Plan Assets. As a general rule, if the assets of the Fund were regarded as Plan Assets of a Benefit Plan Investor, the Investment Manager would be deemed to be a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and the requirement that the Investment Manager follow the directions of the fiduciaries of each Benefit Plan Investor investing in the Fund, as set forth in each such investor's Subscription Documents, with respect to the investment by the Fund in the Partnership, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any Benefit Plan Investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and the requirement that the Investment Manager follow the directions of the fiduciary of each Benefit Plan Investor investing in the Fund, as set forth in each such investor's Subscription Documents, with respect to the investment by the Fund in the Partnership, the fiduciary of each such Benefit Plan Investor has retained the fiduciary authority and responsibility with respect to the Benefit

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 144
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1488 of 1726 PageID 12809
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 44 of
49

Plan Investor's initial and continuing investment in the Fund as though the Benefit Plan Investor is investing directly in the Partnership.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies, and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. In particular, exempt organizations should consider the applicability to them of the provisions relating to UBTI. By its purchase, each investor will be deemed to have represented that either (i) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (ii) it is not an entity whose assets include Plan Assets or (iii) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

**Ineligible Purchasers**

Shares may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (i) has investment discretion with respect to the investment of such Plan Assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

APPX. 05062

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 145
Case 3:23-cv-00726-S Document 8-23 Filed 07/29/23 Page 1489 of 1726 PageID 12810
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 45 of 49

### CAYMAN ISLANDS MUTUAL FUND LAW

The Fund is regulated as a mutual fund under the Mutual Funds Law (2013 Revision) of the Cayman Islands ("***Mutual Funds Law***"). The Cayman Islands Monetary Authority (the "***Authority***") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the Directors and may result in the Authority applying to the court to have the Fund wound up.

The Fund will not, however, be subject to supervision in respect of its investment activities or the constitution of the Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Fund, or any directors or agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2013 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2013 Revision) or Reporting of Savings Income information (European Union) Law (2007 Revision) and associated regulations, agreements, arrangements and memoranda of understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, director or agent, may be prohibited from disclosing that the request has been made.

## ANTI-MONEY LAUNDERING COMPLIANCE

**Cayman Islands**

In order to comply with legislation or regulations aimed at the prevention of money laundering the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity and source of funds. Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures (including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a shareholder (i.e. a subscriber or a transferee). Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required where an exemption applies under the Money Laundering Regulations (2013 Revision) of the Cayman Islands, as amended and revised from time to time or any other applicable law.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a shareholder if the Board of Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law, 2008 of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the Financial Reporting Authority, pursuant to the Terrorism Law (2011 Revision) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property. Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

**United States**

In response to increased regulatory concerns with respect to the identification of sources of funds used to make an investment in the Fund, the Investment Manager and/or its affiliates have implemented policies and procedures ("***AML Program***") designed to guard against and identify money laundering activities. Pursuant to the Fund's AML Program, the Investment Manager and/or its affiliates will request prospective investors and, in some instances, existing shareholders to provide additional documentation verifying, among other things, such person's identity and the source of funds used to

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 147
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1491 of 1726 PageID 12812
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 47 of 49

purchase its Shares of the Fund. The Investment Manager may decline to accept a subscription based upon this information, or if this information is not provided.

Pursuant to the Fund's AML Program, the Investment Manager and/or its affiliates will undertake enhanced due diligence procedures prior to accepting investors the Investment Manager believes present high risk factors with respect to money laundering activities. Examples, although not comprehensive, of persons posing high risk factors are persons resident in or organized under the laws of a "non-cooperative jurisdiction" or other jurisdictions designated by the Department of the Treasury as warranting special measures due to money laundering concerns, and any person whose capital contributions originate from or are routed through certain banking entities organized or chartered in a non-cooperative jurisdiction.

In addition, the Fund's AML Program prohibits the acceptance of subscriptions from or on behalf of:

      1.    persons on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Asset Control;

      2.    the Annex to Executive Order 13224;

      3.    such other lists as may be promulgated by law or regulation; and

      4.    foreign banks unregulated in the jurisdiction they are domiciled in or which have no physical presence.

Governmental regulators are continuing to consider appropriate measures to implement anti-money laundering laws as they apply to private investment funds such as the Fund. The Investment Manager and/or its affiliates will take such steps as it determines are necessary to comply with applicable law, regulations, orders, directives or special measures that may be required by governmental regulators. The specific policies and procedures that the Fund may be required to implement remain unclear, although such steps may include additional measures to confirm the identity of each investor, including the principal beneficial owners of the investor, if applicable, and/or reporting suspicious transactions to governmental regulators.

The requirements for the Investment Manager to guard against and identify money laundering activities in deciding whether to accept subscriptions are in addition to the discretion that the Investment Manager has in deciding whether to accept subscriptions.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 148
Case 3:23-cv-00726-S  Document 8-23  Filed 07/29/23  Page 1492 of 1726  PageID 12813
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21  Entered 05/14/21 16:12:52  Page 48 of
49

## ANNEX A

**Definition of "U.S. Person"**

For purposes of the applicable prohibitions against ownership and transfer of Shares of the Fund, the term "U.S. Person" means:

(1)  a resident or citizen of the United States;

(2)  a partnership or corporation organized under the laws of the United States;

(3)  any entity not organized under the laws of the United States:

    (a)  that has its principal office or place of business in the United States; or

    (b)  (i)  in which citizens or residents of or entities organized under the laws of or existing in the United States directly or indirectly hold in the aggregate 50% or more of the beneficial interests; and

        (ii)  that will own directly or indirectly, either alone or together with affiliated persons, an aggregate of more than 9.9% of the Fund's outstanding Shares; or

    (c)  (i)  that is organized principally for passive investment (such as an investment company, a commodity pool or other similar vehicle); and

        (ii)  (A)  in which the amount of units of participation held by United States Persons (other than "qualified eligible participants" as defined in Rule 4.7(a)(2) under the United States Commodity Exchange Act) represents in the aggregate 10% or more of the beneficial interest in the entity;

            (B)  that was formed for the purpose of facilitating investment by United States Persons in the Fund, or in any other commodity pool with respect to which the operator is exempt from certain requirements of Part 4 of the regulations promulgated by the United States Commodity Futures Trading Commission by virtue of its participants being non-United States Persons; or

            (C)  that was formed by United States Persons principally for the purpose of investing in securities not registered under the United States Securities Act of 1933, as amended, unless it is formed and owned by "accredited investors" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) who are not natural persons, estates or trusts;

(4)  an estate or trust:

    (a)  of which an executor, administrator or trustee is a United States Person, unless:

        (i)  an executor, administrator or trustee who is not a United States Person has sole or shared investment discretion with respect to the assets of the estate or trust; and

        (ii)  (A)  in the case of an estate, it is governed by non-U.S. law; or

45

(B)    in the case of a trust, no beneficiary (and no settlor if the trust is revocable) is a United States Person; or

(b)    the income of which is subject to United States income tax regardless of source;

(5)    any agency or branch of a foreign entity located in the United States;

(6)    any non-discretionary account or similar account (other than an estate or trust) held for the benefit or account of one or more United States Persons; and

(7)    any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States, unless it is held by a dealer or other professional fiduciary exclusively for the benefit or account of one or more non-United States Persons.

For purposes of the foregoing, the term "***United States***" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia.   Persons requiring details regarding other terms used in the foregoing definition (such as "qualified eligible participant" and "accredited investor") should contact the Administrator.

Case 19-34054-sgj11 Doc 2308-3 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 1 of 2

# **EXHIBIT 3**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 151
Case 3:23-cv-00726-S   Document 8-23   Filed 07/29/23   Page 1495 of 1726   PageID 12816
of 380

Case 19-34054-sgj11 Doc 2308-3 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 2 of 2

# HIGHLAND MULTI STRATEGY CREDIT FUND



Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 1 of 12

# **EXHIBIT 4**

# THIRD AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT

### by and among

## HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.

## HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.

### and

## HIGHLAND CAPITAL MANAGEMENT, L.P.

**November 1, 2013**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 154
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1498 of 1726 PageID 12819
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 12

THIS THIRD AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT (this "*Agreement*"), is dated effective as of November 1, 2014, by and among:

HIGHLAND MULTI STRATEGY CREDIT FUND, LTD., a Cayman Islands exempted company (the "*Offshore Fund*");

HIGHLAND MULTI STRATEGY CREDIT FUND, L.P., a Delaware limited partnership (the "*Domestic Fund*," and together with the Offshore Fund, the "*Clients*") acting through its general partner, Highland Multi Strategy Credit Fund GP, L.P. a Delaware limited partnership (the "*General Partner*"); and

HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership (the "*Investment Manager*").

## PRELIMINARY STATEMENTS

A.      The Domestic Fund previously retained the Investment Manager as its investment manager pursuant to an investment management agreement dated as of December 1, 2005, as amended and restated as of December 29, 2005 and as further amended and restated as of September 1, 2006 (the "*Original Agreement*").

B.      The Offshore Fund will invest all of its investable assets in the Domestic Fund. The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund and will serve merely as a steward thereof. The Investment Manager will conduct its investment activities at the Domestic Fund level as the investment manager to the Domestic Fund.

C.      The Domestic Fund desires to continue to retain the Investment Manager and the Offshore Fund desires to retain the Investment Manager to provide certain discretionary advisory services relating to the assets and liabilities of the Domestic Fund and the Investment Manager desires to accept such appointment, all subject to the terms and conditions hereinafter set forth.

## AGREEMENT

This Agreement amends and restates in its entirety the Original Agreement as set forth below. For good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      **Appointment.**

The Clients hereby appoint the Investment Manager as investment manager with respect to the assets and liabilities of the Domestic Fund and the Investment Manager hereby accepts such appointment and agrees to perform its obligations in accordance with the terms hereof and of the Fourth Amended and Restated Limited Partnership Agreement of the Domestic Fund, dated effective as of November 1, 2014, as amended from time to time (the "*Domestic Fund Partnership Agreement*"), and the investment objectives, policies,

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 155
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1499 of 1726 PageID 12820
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 12

guidelines and restrictions that from time to time are set forth in the Governing Documents of the Clients as applicable. "***Governing Documents***" mean, with respect to:

(a)     the Offshore Fund: the Memorandum and Articles of Association of the Offshore Fund, as amended from time to time, and the Confidential Private Offering Memorandum dated November 2014, as may be supplemented from time to time (the "***POM***");

(b)     the Domestic Fund: the Domestic Fund Partnership Agreement and the Private Placement Memorandum dated November 2014, as may be supplemented from time to time (the "***PPM***").

2.     **Authority and Duties of the Investment Manager.**

(a)     All of the investable assets of the Offshore Fund must be invested in, and the investment program of the Offshore Fund is to be conducted by the Investment Manager through, the Domestic Fund. The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund and the investment activities of the Investment Manager will be conducted at the Domestic Fund level as the investment manager to the Domestic Fund.

(b)     The Domestic Fund's investment program will be conducted by the Investment Manager in accordance with the PPM.

(c)     The Investment Manager serves as the investment manager to the Domestic Fund and in that capacity has full discretion and authority, without obtaining the prior approval of any officer or other agent of the Domestic Fund:

(i)     to continuously supervise the investment program of the Domestic Fund and the composition of its investment portfolio including, without limitation, determining from time to time what investments will be purchased, retained or sold, what contracts will be entered into by the Domestic Fund and what portion of its assets will be retained as cash, and to engage consultants and analysts in connection therewith; to cause the Domestic Fund to purchase or sell any asset, enter into any other investment-related transaction, including (directly or through subsidiaries or affiliates of the Domestic Fund) borrowing money, entering into swap transactions, lending securities, exercising control over a company, exercising voting or approval rights and selecting brokers and dealers for execution of portfolio transactions; and to undertake to do anything incidental to the foregoing to facilitate the performance of its obligations hereunder;

(ii)     to invest within or outside the United States of America in "Investments" (as defined in, and subject to the provisions of, the Domestic Fund Limited Partnership Agreement);

(iii)     to effect any and all transactions in Investments, including collateralized loan obligations, asset-backed securities, commodities, total return swaps,

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 156
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1500 of 1726 PageID 12821
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 12

credit default swaps, synthetic securities and other financial instruments and assets (and options and other contracts thereon), and everything connected therewith in the broadest sense, including, without limitation, the full discretion and authority to make short sales, to purchase or write options (including uncovered options) and to trade on margin;

(iv)    to, on behalf of the Clients, exercise all rights, powers, privileges and other incidents of ownership or possession with respect to the Investments and other property and funds held or owned by the Domestic Fund, including without limitation the right to possess, lend, transfer, mortgage, pledge or otherwise deal in, and to secure the payment of obligations of the Domestic Fund by mortgage upon, or hypothecation or pledge of, all or part of the property of the Domestic Fund, whether at the time owned or thereafter acquired, and to vote Investments, participate in arrangements with creditors, institute and settle or compromise suits and administrative proceedings and other similar matters;

(v)    to select brokers, dealers, banks and other intermediaries by or through whom such transactions will be executed or carried out and to open, maintain and close accounts with brokers, which power shall include the authority to issue all instructions and authorizations to brokers regarding securities and money therein and to cause the Domestic Fund to pay, or authorize the payment and reimbursement of, brokerage commissions;

(vi)    to open, maintain and close bank accounts and authorize the drawing of checks or other orders for the payment of monies;

(vii)    to borrow or raise monies or utilize any other forms of leverage and to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non- negotiable instruments and evidences of indebtedness and otherwise to utilize any lines of credit, credit balances or overdraft privileges available to the Domestic Fund;

(viii)    to value the Client's assets as of the close of each fiscal period and any other date selected by the respective Client;

(ix)    to direct any administrator of the Clients, banks, brokers or other custodians to effect deliveries of funds or assets, but only in the course of effecting portfolio transactions for the account of the Clients;

(x)    to remove or replace any administrator of the Clients and/or any accountant of the Clients at any time; and

(xi)    to make and execute all such documents and to take all such other actions as the Investment Manager considers necessary or appropriate to carry out its investment management duties hereunder.

4

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 157
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1501 of 1726   PageID 12822
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 6 of 12

(d)    In furtherance of the foregoing, the Board of Directors, on behalf of the Offshore Fund, and the General Partner, on behalf of the Domestic Fund, has delegated certain rights and responsibilities with respect to the operation of their respective partnerships and funds to the Investment Manager, as more fully set forth in the Governing Documents.

(e)    Each Client hereby designates the Investment Manager as the commodity pool operator (the "*CPO*") for such Client with complete authority and responsibility for compliance with the U.S. Commodity Exchange Act and the regulations promulgated thereunder, including to perform any and all duties required of a CPO (i) that is exempt from registration under the regulations of the U.S. Commodity Futures Trading Commission (the "*CFTC*") and (ii) that is in compliance with CFTC Rule 4.13(a)(3), including the filing of a notice of exemption under said Rule 4.13(a)(3) with the CFTC.

(f)    Additionally, each of the Clients hereby designates and appoints the Investment Manager as its agent and attorney-in-fact, with full power and authority and without the need for further approval of the Clients (except as may be required by law) to complete and execute all such documents and to take any and all actions that the Investment Manager, in its discretion, may deem advisable to carry out the foregoing with respect to the assets of the Clients; provided, however, that the Investment Manager is not intended to have actual or constructive custody of any assets of the Clients.  In connection with any of the foregoing, the Investment Manager is further authorized to transfer or tender for cash or exchange such assets. In all such purchases, sales or trades the Clients authorize the Investment Manager to act for the Clients, and at their risk, and in their name and on their behalf, in the same manner and with the same force and effect as the Clients might or could do with respect to such purchases, sales or trades without prior consultation with the Clients.  The Clients also appoint the Investment Manager as their agent and attorney-in-fact to vote, and to execute proxies, waivers, consents and other instruments with respect to, the assets of the Clients.

(g)    At the request of a Client, in any wind down of such Client, the Investment Manager will manage the realization of the Client's assets and the distribution thereof to investors.

(h)    In connection with the execution of transactions on behalf of the Domestic Fund, the Domestic Fund hereby acknowledges and agrees that in the course of selecting brokers, dealers, futures commission merchants, banks and financial intermediaries to effect transactions for the Domestic Fund's account, the Investment Manager may agree to such commissions, fees and other charges on behalf of the Domestic Fund's account as it may deem reasonable in the circumstances, taking into consideration all such factors as the Investment Manager deems relevant, including the following: the ability to effect prompt and reliable executions at favorable prices; the operational efficiency with which transactions are effected; the financial strength, integrity and stability of the broker; the quality, comprehensiveness and frequency of available research and other services considered to be of value; and

APP.105073

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 158
Case 3:23-cv-00726-S   Document 8-23   Filed 06/29/23   Page 1502 of 1726   PageID 12823
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 7 of 12

the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria.  It is understood that the costs of such services will not necessarily represent the lowest costs available and that the Investment Manager is under no obligation to combine or arrange orders so as to obtain reduced charges.

**3.    Fees and Expenses.**

(a)      For its services to the Domestic Fund, the Domestic Fund will pay the Investment Manager the Management Fee (as defined in the Domestic Fund Partnership Agreement), calculated and payable monthly in advance.  The Investment Manager may waive or reduce the management fees with respect to capital account and capital sub-accounts of the Domestic Fund in its discretion.

(b)      The Clients will pay, or will reimburse the Investment Manager, for all costs and expenses arising in connection with their operations, including without limitation, with respect to the Domestic Fund, all costs and expenses directly related to portfolio investments or prospective investments (whether or not consummated) of the Domestic Fund.

(c)      The Clients will not have their own separate employees or office, and they will not reimburse the Investment Manager for salaries, office rent and other general overhead costs of the Investment Manager. The Investment Manager will pay all of its own operating and overhead costs (except liability insurance) without reimbursement by the Clients.    The Investment Manager is entitled to reimbursement from the Clients for any expenses paid by it on behalf of the Clients; provided that, the Investment Manager in its sole discretion may absorb any or all of such expenses incurred on behalf of the Clients.  If the Investment Manager incurs any such expenses for the account of the Clients and any Customers (as defined below), the Investment Manager will allocate such expenses among the Clients and each such Customer in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the Investment Manager in its sole discretion considers fair and reasonable.

**4.    Other Activities and Investments.**

(a)      The Investment Manager is not required to devote its full time to the affairs of the Clients, but must devote such of its time to the business and affairs of the Clients as it may determine, in its discretion exercised in good faith, to be necessary to conduct the affairs of the Clients for the benefit of the Clients, the shareholders of the Offshore Fund and the partners of the Domestic Fund.  Subject to this limitation, the Investment Manager, its partners and principals and their affiliates are not precluded from engaging in or owning an interest in other business ventures or investment activities of any kind.  It is expressly understood that the Investment Manager and its affiliates may effect investment transactions for their own accounts and for the accounts of other customers (generally, "***Customers***"), and the Clients further understand and agree that nothing herein restricts the ability of the

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 159
Case 3:23-cv-00726-S  Document 8-23  Filed 03/29/23   Page 1503 of 1726  PageID 12824
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 8 of 12

Investment Manager and its affiliates to engage in any such transactions notwithstanding the fact that the Clients may enter into or engage in such transactions so long as such transactions are in the best interests of the Clients.

(b)    The Investment Manager will act in a manner that it considers fair, reasonable and equitable in allocating investment opportunities to the Clients.  It is understood that when the Investment Manager determines that it would be appropriate for the Clients and one or more of the Customers to participate in an investment opportunity, the Investment Manager will seek to execute orders for, or otherwise allocate such opportunities to, the Clients and such Customers on an equitable basis.  In such situations, the Investment Manager may place orders for the Clients and each Customer simultaneously, and if all such orders are not filled at the same price, the Investment Manager may cause the Clients and each Customer to pay or receive the average of the prices at which such orders were filled for the Clients and all other Customers.  If all such orders cannot be fully executed under prevailing market conditions, the Investment Manager may allocate among the Clients and the Customers the investments traded in a manner which the Investment Manager considers equitable, taking into account the size of the order placed for the Clients and each such Customer as well as any other factors which the Investment Manager deems relevant.

**5.**    **Account and Other Information.**

(a)    The Investment Manager must furnish such information concerning activities undertaken for the account of the Clients as the Clients may reasonably request.

(b)    The Clients agree to keep confidential and not to disclose to any person any information or matter relating to the Clients' investments (other than disclosure to the Clients' shareholders, partners, directors and employees, legal counsel, administrator, registrar and accountant in connection with the preparation and review of financial statements and with the filing of any tax returns or to any other person approved in writing by the Investment Manager (each such person being hereinafter referred to as an "***Authorized Representative***")); provided that the Clients and their Authorized Representatives may make such disclosure to the extent that (x) the information to be disclosed is publicly known at the time of proposed disclosure by the Clients or Authorized Representative, (y) the information otherwise is or becomes legally known to the Clients other than through disclosure by the Investment Manager or (z) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities, provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed.  Prior to making any disclosure required by law, the Clients will use their best efforts to notify the Investment Manager of such disclosure.  Prior to any disclosure to any Authorized Representative, the Clients must advise such Authorized Representative of the obligations set forth in this Section 5(b) and are responsible for any breach of these obligations made by an Authorized Representative.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 160
Case 3:23-cv-00726-S   Document 8-23   Filed 08/29/23   Page 1504 of 1726   PageID 12825
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 9 of 12

(c)     The Investment Manager retains, or arranges for the retention of, for a period of at least 5 years, copies of any documents generated or received by the Investment Manager in the ordinary course of business pertaining to the financial condition of the account of the Clients or to the compensation payable to the Investment Manager. At the request of the Clients, the Investment Manager will afford to the Clients' independent auditors reasonable access to such documents during customary business hours and will permit the Clients' auditors to make copies thereof or extracts therefrom at the expense of the Clients.

**6.     Custody.**

The assets of the Clients must be held in the custody of one or more custodians (or other independent institutions performing the functions of custodian, with respect to the assets which are held by such institutions) selected by the Investment Manager. The Investment Manager will notify the Clients promptly of the proposed selection of any custodians.

**7.     Scope of Liability.**

The Clients agree that the Investment Manager is not liable to the Clients or any of their partners or shareholders for any losses, damages, expenses or claims occasioned by any act or omission of the Investment Manager in connection with the performance of its services hereunder, other than as a result of the Investment Manager's willful misconduct, fraud or gross negligence, or as otherwise prescribed by applicable law. The Clients explicitly recognize that the investment advisory opinions, recommendations and actions of the Investment Manager will be based on advice and information deemed to be reliable but not guaranteed by or to the Investment Manager.

**8.     Indemnification.**

(a)     The Clients must indemnify and hold harmless the Investment Manager, each member, shareholder, partner, manager or director of, or any person who controls, the Investment Manager, each of the respective affiliates of the foregoing and each of the respective executors, heirs, assigns, successors or other legal representatives of the foregoing (each, an "***indemnitee***") from and against any expense, loss, liability or damage arising out of any claim asserted or threatened to be asserted against such indemnitee in connection with the Investment Manager's serving or having served as such pursuant to this Agreement; provided, however, that the indemnitee is not entitled to any such indemnification with respect to any expense, loss, liability or damage that was caused by the indemnitee's willful misconduct, fraud or gross negligence.

(b)     In the event that the Investment Manager or any other indemnitee entitled to indemnification pursuant to paragraph (a) above is or becomes a party to any action or proceeding in respect of which, or there otherwise exists a claim pursuant to which, it may be entitled to seek indemnification hereunder, the indemnitee must promptly notify the respective Client thereof. The respective Client is entitled to participate in any such suit or proceeding and, to the extent that it may wish, to

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 161
Case 3:23-cv-00726-S   Document 8-23   Filed 06/29/23   Page 1505 of 1726   PageID 12826
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 10 of
12

assume the defense thereof with counsel reasonably satisfactory to the indemnitee. After notice of an election by the Client so to assume the defense thereof, the Client will not be liable to the indemnitee hereunder for any legal or other expenses subsequently incurred by the indemnitee in connection with the defense thereof other than reasonable costs of investigation or reasonable legal expenses incurred as a result of (i) potential conflicts of interest between the indemnitee and the Client or (ii) the protection of proprietary or privacy interests of other clients of or parties in interest with the indemnitee. The Client must advance to the indemnitee the reasonable costs and expenses of investigating and/or defending such claim, subject to receiving a written undertaking from the indemnitee to repay such amounts if and to the extent of any subsequent determination by a court or other tribunal of competent jurisdiction that the indemnitee was not entitled to indemnification hereunder.

(c)    A Client is not liable hereunder for any settlement of any action or claim effected without its written consent thereto.

## 9.    Independent Contractor.

For all purposes of this Agreement, the Investment Manager is an independent contractor and not an employee or dependent agent of any Client. Nothing herein is to be construed as making any Client a partner or co-venturer with the Investment Manager or any of its affiliates or Customers. Except as provided in this Agreement, the Investment Manager has no authority to bind, obligate or represent the Clients.

## 10.    Term; Termination; Renewal.

(a)    This Agreement will remain in full force and effect for a period commencing on the date first above written and ending on December 31, 2014, and thereafter will renew automatically for successive one-year periods. This Agreement may be terminated by any party hereto, without penalty, upon 75 days' prior written notice to the other parties.

(b)    The termination of this Agreement does not extinguish the obligations of the Clients for the payment of fees and expenses in respect of services rendered by the Investment Manager prior to the effective date of such termination.

## 11.    Acknowledgement.

Each of the Clients certifies and acknowledges to the Investment Manager that it:

(i)    has fully disclosed to potential investors the fee provisions and other arrangements relating to the Client's account with the Investment Manager and is satisfied that the potential investors have received sufficient information from the Investment Manager to enable them to evaluate the terms of this Agreement; and

(ii)    fully understands the method of compensation provided herein and its associated risks, including the risk that the performance compensation arrangements with

APPX. 05079

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 162
Case 3:23-cv-00726-S   Document 8-23   Filed 05/29/23   Page 1506 of 1726   PageID 12827
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 11 of
12

affiliates of the Investment Manager may create an incentive for the Investment Manager to engage in transactions that are riskier or more speculative than would be the case in the absence of performance compensation and that such risk has been disclosed to potential investors.

12.     **Amendment; Modification; Waiver.**

Except as otherwise expressly provided herein, this Agreement may not be amended, nor may any provision of this Agreement be considered modified or waived, unless evidenced by a writing signed by the party to be charged with such amendment, waiver or modification.

13.     **Binding Effect; Assignment.**

This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors, but the rights and obligations hereunder are not, except as otherwise expressly provided herein, assignable, transferable or delegable without the written consent of the other parties hereto and any attempted assignment, transfer or delegation thereof without such consent is null and void, except that the Investment Manager may assign its rights and obligations hereunder to an entity that controls, is controlled by or is under common control with the Investment Manager; provided, however, that such entity assumes the obligations of the Investment Manager hereunder.

14.     **Governing Law.**

This Agreement is governed by and construed in accordance with the substantive laws of the State of Delaware which are applicable to contracts made and entirely to be performed therein, without regard to the place of performance hereunder.

[SIGNATURE PAGE FOLLOWS]

APPX. 05076

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 163
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1507 of 1726 PageID 12828
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 12 of 12

The parties have executed this Agreement as of the day and year first above written.

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

By: _____
Name: James Dondero
Title: Director

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: HIGHLAND MULTI STRATEGY CREDIT FUND GP, L.P
attorney-in-fact for the Limited Partners

By: HIGHLAND MULTI STRATEGY CREDIT GP, LLC
its general partner

By: HIGHLAND CAPITAL MANAGEMENT, L.P.
its sole member

By: STRAND ADVISORS, INC.
its general partner

By: _____
Name: James Dondero
Title: President

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: STRAND ADVISORS, INC.

By: _____
Name: James Dondero
Title: President

*Signature Page to Third Amended and Restated Investment Management Agreement*

Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 1 of 55

# **EXHIBIT 5**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 165
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1509 of 1726 PageID 12830
of 380

Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 2 of 55

# Highland Multi Strategy Credit Fund, L.P.

A Delaware Limited Partnership

**Fourth Amended and Restated**

**Limited Partnership Agreement**

November 1, 2014

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 166
Case 3:23-cv-00726-S Document 8-23 Filed 06/29/23 Page 1510 of 1726 PageID 12831
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 55

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ..........................................................................................1

Article II ORGANIZATION ...................................................................................10
2.1 Continuation of Limited Partnership ...........................................10
2.2 Name of Partnership ....................................................................11
2.3 Principal Office; Registered Office ..............................................11
2.4 Term of Partnership ......................................................................11
2.5 Object and Powers of Partnership ...............................................11
2.6 Liability of Partners .....................................................................12
2.7 Actions by Partnership .................................................................12
2.8 Reliance by Third Parties .............................................................12
2.9 UCC Status of Limited Partner Interests .....................................12
2.10 Series of Interests ........................................................................12

Article III CAPITAL ..............................................................................................13
3.1 Contributions to Capital ...............................................................13
3.2 Rights of Partners in Capital ........................................................14
3.3 Capital Accounts ..........................................................................14
3.4 Allocations of Net Profit and Net Loss ........................................15
3.5 Allocation of Management Fees, Withholding Taxes and Certain Other
    Expenditures ................................................................................15
3.6 Reserves; Adjustments for Certain Future Events ........................16
3.7 Performance Allocation ................................................................17
3.8 Limited Participation Investments and New Issues ......................17
3.9 Allocation to Avoid Capital Account Deficits ..............................18
3.10 Regulatory Allocations .................................................................18
3.11 Allocations for Income Tax Purposes ..........................................19
3.12 Individual Partner's Tax Treatment ..............................................21
3.13 Distributions .................................................................................21

Article IV MANAGEMENT ....................................................................................22
4.1 Duties and Powers of the General Partner ...................................22
4.2 Expenses ......................................................................................23
4.3 Rights of Limited Partners ...........................................................25
4.4 Other Activities of Partners ..........................................................25
4.5 Exculpation; Indemnification .......................................................26
4.6 Advisory Committee .....................................................................28
4.7 Alternative Investment Vehicles ..................................................29

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS .........................29
5.1 Admission of Limited Partners .....................................................29
5.2 Admission of Additional General Partners ...................................29
5.3 Transfer of Interests of Limited Partners ......................................30
5.4 Transfer of Interest of the General Partner ...................................30
5.5 Withdrawal of Interests of Partners ..............................................31

i

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 167
Case 3:23-cv-00726-S   Document 8-23   Filed 09/29/23   Page 1511 of 1726   PageID 12832
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 4 of 55

Article VI SOFT WIND DOWN, DISSOLUTION AND LIQUIDATION .................................. 35
    6.1      Soft Wind Down ..................................................................................................... 35
    6.2      Dissolution of Partnership ...................................................................................... 36
    6.3      Liquidation of Assets .............................................................................................. 36

Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS .......................... 37
    7.1      Accounting and Reports .......................................................................................... 37
    7.2      Valuation of Partnership Assets and Interests ........................................................ 38
    7.3      Determinations by the General Partner .................................................................... 38
    7.4      Books and Records .................................................................................................. 39
    7.5      Confidentiality ........................................................................................................ 39

Article VIII GENERAL PROVISIONS .................................................................................... 41
    8.1      Amendment of Partnership Agreement ................................................................... 41
    8.2      Special Power-of-Attorney ...................................................................................... 43
    8.3      Notices .................................................................................................................... 44
    8.4      Agreement Binding Upon Successors and Assigns; Delegation .......................... 44
    8.5      Governing Law ....................................................................................................... 44
    8.6      Not for Benefit of Creditors ................................................................................... 45
    8.7      Dispute Resolution ................................................................................................. 45
    8.8      Consents and Voting ............................................................................................... 47
    8.9      Merger and Consolidation ...................................................................................... 48
    8.10    Miscellaneous ......................................................................................................... 48
    8.11    BHCA Subject Persons .......................................................................................... 48
    8.12    RIC Limited Partners ............................................................................................. 49
    8.13    Bad Actor Limited Partners ................................................................................... 50
    8.14    Entire Agreement ................................................................................................... 50

APPx. 05073

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 168
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1512 of 1726   PageID 12833
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 5 of 55

THIS FOURTH AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Highland Multi Strategy Credit Fund, L.P., dated effective as of November 1, 2014, is by and among Highland Multi Strategy Credit Fund GP, L.P., as General Partner, and certain Persons who were admitted as Limited Partners in accordance with the Prior Agreement and those Persons who are hereafter admitted as additional Limited Partners in accordance with this Agreement.   Capitalized terms have the meanings set forth in Article I below.

## PRELIMINARY STATEMENTS

(A)    The General Partner and certain of the Limited Partners have heretofore formed a limited partnership pursuant to the Act (as defined herein) by filing a Certificate of Limited Partnership with the office of the Secretary of State of the State of Delaware on December 1, 2005, and previously entered into a Limited Partnership Agreement, dated effective as of December 1, 2005, as last amended and restated by the Third Amended and Restated Limited Partnership Agreement dated as of December 31, 2007 (the "*Prior Agreement*").

(B)    The General Partner filed an amendment to the Certificate of Limited Partnership of the Fund on August 26, 2014, changing the name of the Fund to "Highland Multi Strategy Credit Fund, L.P."

(C)    The parties hereto desire to continue the Partnership as a limited partnership under the Act and to make certain modifications to the Prior Agreement, as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the Prior Agreement is amended and restated in its entirety to read as follows:

## Article I
## DEFINITIONS

For purposes of this Agreement:

"*Act*" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as in effect on the date hereof and as amended from time to time, or any successor law.

"*Accounting Period*" means each period that starts on the day immediately following the last day of the preceding Accounting Period, and that ends on the earliest of the following dates:

(a)    the last day of a calendar month;

(b)    any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

APPX. 105076

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 169
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1513 of 1726 PageID 12834
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 55

(c) the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d) any other date which the General Partner selects.

"*Advisers Act*" means the U.S. Investment Advisers Act of 1940, as amended, and the rules promulgated thereunder.

"*Advisory Committee*" has the meaning set forth in Section 4.6.

"*Affiliate*" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person. For these purposes, "control" (including "controlled by" and "under common control") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Affiliated Investor*" means any Limited Partner that is an Affiliate of the General Partner or the Investment Manager, including their respective employees, members or partners and their respective immediate family members.

"*Agreement*" means this Fourth Amended and Restated Limited Partnership Agreement of the Partnership, as amended from time to time.

"*Alternative Investment Vehicle*" has the meaning set forth in Section 4.7.

"*Arbitration Rules*" has the meaning set forth in Section 8.7(b)(i).

"*Authorized Representative*" has the meaning set forth in Section 7.5(a).

"*Bad Actor Limited Partner*" means a Limited Partner that (i) would cause the disqualification of the Partnership from using Rule 506 under the Securities Act due to the operation of paragraph (d) thereof (or its successor) if such Limited Partner were to beneficially own 20% or more of the outstanding voting interest of all of the Partners (excluding any other Interests that are Non-Voting Interests) or (ii) the General Partner determines is likely to become subject to a conviction, order, judgment, finding or that would be likely to cause the disqualification described in clause (i).

"*BHCA*" means the U.S. Bank Holding Company Act of 1956, as amended.

"*BHCA Subject Person*" means any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"*Business Day*" means any day other than (a) Saturday and Sunday and (b) any other day on which banks located in New York, New York are required or authorized by law to be closed.

"*Calculation Period*" means, with respect to each Capital Account, the period commencing as of the date of the establishment of the Capital Account (in the case of the initial Calculation

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 170
Case 3:23-cv-00726-S   Document 8-23   Filed 08/29/23   Page 1514 of 1726   PageID 12835
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 7 of 55

Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Account, and ending as of the close of business on the first to occur of the following:

(a)    the last day of a calendar year;

(b)    the withdrawal of all or a portion of the Interest attributable to such Capital Account (but only with respect to such withdrawn amount);

(c)    the permitted Transfer of all or any portion of such Limited Partner's Interest; or

(d)    the final distribution to such Limited Partner following the dissolution of the Partnership.

"*Capital Account*" means, with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 3.3.

"*Carryforward Account*" means a memorandum account to be recorded in the books and records of the Partnership with respect to each Capital Account that has an initial balance of zero and that is adjusted as follows:

(a)    As of the first day after the close of each Calculation Period for such Capital Account, the balance of the Carryforward Account is (i) increased by the amount, if any, of such Negative Performance Change with respect to such Capital Account for such Calculation Period and (ii) reduced (but not below zero) by the amount, if any, of the Positive Performance Change with respect to such Capital Account for such Calculation Period.

(b)    As of the close of the Calculation Period, any positive balance of the Carryforward Account is further adjusted if such Capital Account has been reduced during such Calculation Period as a result of a distribution or withdrawal, by reducing such positive balance (but not below zero) by an amount determined by multiplying (i) such positive balance by (ii) a fraction, of which (A) the numerator is equal to the amount so distributed or withdrawn, and (B) the denominator is equal to the balance of such Capital Account immediately before giving effect to such distribution or withdrawal.

The Carryforward Account attributable to each Series A Capital Account shall be reset to zero on the Effective Date. For the avoidance of doubt, any gains or losses allocated by the Partnership to any Capital Account of a Limited Partner prior to the Effective Date will be inapplicable in the calculation of the Carryforward Account following the Effective Date.

"*Certificate*" means the Certificate of Limited Partnership of the Partnership referred to in Section 2.1(b).

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"*Dispute*" has the meaning set forth in Section 8.7.

"*Effective Date*" means the date set forth above as the effective date of this Agreement.

"*Election Notice*" has the meaning set forth in Section 8.11(c).

"*FAA*" has the meaning set forth in Section 8.7(b)(ii)

"*FATCA*" means Sections 1471 through 1474 of the Code, as amended, and any Regulations thereunder or official interpretations thereof, including any successor Regulations or interpretations, and any intergovernmental agreement implementing the foregoing.

"*FINRA*" means the Financial Industry Regulatory Authority, Inc.

"*Fiscal Year*" means each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner elects another fiscal year; provided that any such other fiscal year is permissible for U.S. federal income tax purposes.  In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "*Fiscal Year*" means the portion of the calendar year ending on the date on which the Partnership is terminated.

"*GAAP*" means generally accepted accounting principles in the United States, as amended.

"*General Partner*" means Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"*Indemnified Person*" has the meaning set forth in Section 4.5(a).

"*Interest*" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"*Investment Company Act*" means the U.S. Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

"*Investment Management Agreement*" means the investment management agreement between the Investment Manager, the General Partner, the Offshore Fund and the Partnership.

"*Investment Manager*" means Highland Capital Management, L.P., a Delaware limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"*Investments*" means investment in securities, assets and other financial or intangible investment instruments, contracts or products made as described in the Partnership's offering memorandum.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 172
Case 3:23-cv-00726-S  Document 8-23  Filed 03/29/23   Page 1516 of 1726   PageID 12837
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 9 of 55

"*Limited Partners*" means any Person who is a limited partner of the Partnership (which, except as otherwise indicated, will include a substituted Limited Partner) at the time of reference thereto, in such Person's capacity as a limited partner of the Partnership.   For all purposes of the Act, the Limited Partners of the Partnership will constitute a single class or group of limited partners.

"*Majority-in-Interest of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners.

"*Management Fee*" means, with respect to each Capital Account, an amount equal to one fourth of (i) 1.5% of each Series A Capital Account balance; (ii) 1.5% of each Series B Capital Account balance; (iii) 1.0% of each Series C Capital Account balance; and (iv) 2.0% of each Series D Capital Account balance, which amounts are calculated on the first Business Day of each calendar quarter. Management Fees shall be appropriately adjusted for contributions during any partial quarter.

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

"*Negative Basis Partner*" means any Partner who withdraws from the Partnership and who has a Negative Basis as of the Withdrawal Date, but such Partner shall cease to be a Negative Basis Partner at such time as it has received allocations pursuant to Section 3.11(d) equal to such Partner's Negative Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Net Assets*" means the total value, as determined by the General Partner or its delegate(s) in accordance with Section 7.2, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6,).   Except as otherwise expressly provided herein, Net Assets as of the first day of any Accounting Period are determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Accounting Period, but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Accounting Period, and after giving effect to Management Fee charges, and Net Assets as of the last day of any Accounting Period are determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

> (a)     any Performance Allocation as of the date on which such determination is made;

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 173
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1517 of 1726 PageID 12838
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 10 of 55

(b)    any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c)    withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdbacks or other amounts recorded pursuant to Section 3.6 and any increases or decreases in the value of any Restricted New Issues pursuant to Section 3.8(b) and other amounts specially allocated pursuant to Section 3.8 during the Accounting Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Accounting Period.

"*Net Loss*" means any amount by which the Net Assets as of the first day of an Accounting Period exceed the Net Assets as of the last day of the same Accounting Period.

"*Net Profit*" means any amount by which the Net Assets as of the last day of an Accounting Period exceed the Net Assets as of the first day of the same Accounting Period.

"*New Issue Rules*" has the meaning set forth in Section 3.8(b).

"*Nonrecourse Deductions*" has the meaning set forth in Regulations Section 1.704-2(b)(1) and (c).

"*Non-Voting Interest*" means an Interest, the holder of which is not entitled to vote, consent or withhold consent with respect to any Partnership matter (including but not limited to mergers, sales of substantially all assets or consolidations of the Partnership), except as otherwise expressly provided in this Agreement.

"*Offshore Fund*" means Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company and a Limited Partner of the Partnership.

"*Orderly Realization*" has the meaning set forth in Section 6.1.

"*Other Account*" means any assets or investments of the General Partner, or any assets managed by the General Partner or any Affiliate of the General Partner for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "*Partners*" means the General Partner and all of the Limited Partners.

"*Partnership*" means the limited partnership governed by this Agreement.

"*Partnership Minimum Gain*" has the meaning set forth in Regulations Section 1.704-2(b)(2) and (d).

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 174
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1518 of 1726   PageID 12839
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 11 of 55

"***Partnership Percentage***" means a percentage established for each Capital Account on the Partnership's books as of the first day of each Accounting Period.   The Partnership Percentage of a Capital Account for an Accounting Period is determined by dividing the amount of such Capital Account as of the beginning of the Accounting Period by the sum of the Capital Accounts of all of the Partners as of the beginning of the Accounting Period.   The numerator and denominator of the above shall be calculated after crediting all capital contributions to the Capital Account or Partnership, as appropriate, which are effective as of such date, net of all deductions, including Management Fees.   The sum of the Partnership Percentages of all Capital Accounts for each Accounting Period shall equal 100%.

"***Performance Allocation***" means, for each Capital Account of a Limited Partner, 20% of the amount by which (a) the Positive Performance Change for such Calculation Period for such Capital Account, if any, exceeds (b) any positive balance in the Carryforward Account for such Capital Account as of the most recent prior date as of which any adjustment has been made thereto.

"***Performance Change***" means, with respect to each Capital Account of a Limited Partner for each Calculation Period, the difference between:

(a)      the sum of (i) the balance of such Capital Account as of the close of the Calculation Period (after giving effect to Management Fees and all allocations to be made to such Capital Account as of such date, including such Capital Account's allocable share of any profits or losses pursuant to Section 3.8 and any credits or debits of any applicable carrying charge associated therewith other than any Performance Allocation to be debited against such Capital Account), plus (ii) any debits to such Capital Account during the Calculation Period to reflect any actual or deemed distributions or withdrawals with respect to such Capital Account, plus (iii) any debits to such Capital Account during the Calculation Period to reflect any items allocable to such Capital Account pursuant to Section 3.5(b) or (c); and

(b)      the balance of such Capital Account as of the commencement of the Calculation Period.

If the amount specified in clause (a) exceeds the amount specified in clause (b) such difference is a "***Positive Performance Change***," and if the amount specified in clause (b) exceeds the amount specified in clause (a), such difference is a "***Negative Performance Change***."

The Performance Change will be computed separately for each Capital Account (and thus each separately maintained capital sub-account created to reflect an additional contribution to a Capital Account).  Thus, if a Limited Partner has multiple Capital Accounts, the Performance Change will be calculated separately for each Capital Account and the resulting "Positive Performance Change" and "Negative Performance Change" shall be separately allocated to each such Capital Account and shall not be netted against each other.

"***Person***" means any individual, partnership, corporation, limited liability company, trust or other entity or any government (including a governmental agency or political subdivision thereof).

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 175
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1519 of 1726   PageID 12840
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 12 of
55

"*Positive Basis*" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest).

"*Positive Basis Partner*" means any Partner who withdraws from the Partnership and who has a Positive Basis as of the Withdrawal Date, but such Partner ceases to be a Positive Basis Partner at such time as it has received allocations pursuant to Section 3.11(c) equal to such Partner's Positive Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Prior Agreement*" has the meaning set forth in the Preliminary Statements to this Agreement.

"*Realization Period*" has the meaning set forth in Section 6.1.

"*Recent Amendments*" means the changes to the terms of an investment in the Partnership as contemplated in this Agreement and the constituent documents related thereto, including, but not limited to, the re-designation of all Interests held by Limited Partners on the Effective Date as Series A Interests.

"*Regulations*" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"*Regulatory Allocations*" has the meaning set forth in Section 3.10(d).

"*Restricted Capital Accounts*" has the meaning set forth in Section 3.8(b).

"*Restricted Issues*" has the meaning set forth in Section 3.8(b).

"*Revocation Notice*" has the meaning set forth in Section 8.11(c).

"*RIC Limited Partner*" means a Limited Partner that is registered as an investment company under the Investment Company Act.

"*Schedule of Partners*" means a schedule to be maintained by the General Partner containing the following information with respect to each Partner: (a) name; (b) address; (c) date of admission; (d) amount and date of all capital contributions and withdrawals; and (e) the amount and date of any permitted Transfers.

"*Series*" means a designated series of Interests established in accordance with this Agreement and having such terms as the General Partner determines.

"*Series A Capital Account*" means the Capital Account attributable to a Limited Partner's Series A Interest.

APP. 105091

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 176
Case 3:23-cv-00726-S Document 8-23 Filed 09/29/23 Page 1520 of 1726 PageID 12841
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 13 of
55

"*Series A Interests*" means a Series of Interests having the rights and obligations applicable to Series A Interests as set forth in this Agreement.

"*Series A Lock-Up*" has the meaning set forth in Section 5.5(c)(i).

"*Series A Withdrawal Date*" has the meaning set forth in Section 5.5(c)(i).

"*Series B Capital Account*" means the Capital Account attributable to a Limited Partner's Series B Interest.

"*Series B Interests*" means a Series of Interests having the rights and obligations applicable to Series B Interests as set forth in this Agreement.

"*Series B Withdrawal Date*" has the meaning set forth in Section 5.5(c)(ii).

"*Series C Capital Account*" means the Capital Account attributable to a Limited Partner's Series C Interest.

"*Series C Interests*" means a Series of Interests having the rights and obligations applicable to Series C Interests as set forth in this Agreement.

"*Series C Withdrawal Date*" has the meaning set forth in Section 5.5(c)(iii).

"*Series D Capital Account*" means the Capital Account attributable to a Limited Partner's Series D Interest.

"*Series D Interests*" means a Series of Interests having the rights and obligations applicable to Series D Interests as set forth in this Agreement.

"*Series D Withdrawal Date*" has the meaning set forth in Section 5.5(c)(iv).

"*Sub-Series of Shares*" refers to sub-series of the shares of the Offshore Fund, as created from time to time, for purposes of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received from shareholders at different times.

"*Suspension*" has the meaning set forth in Section 5.5(l).

"*Super-Majority-in-Interest of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 75% of the aggregate Partnership Percentages of all Limited Partners.

"*Transfer*" means any direct, indirect or synthetic sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

9

"*Withdrawal Date*" means, as applicable, the Series A Withdrawal Date, the Series B Withdrawal Date, the Series C Withdrawal Date, and the Series D Withdrawal Date or any other effective date of withdrawal pursuant to Section 5.5.

## Article II
## ORGANIZATION

**2.1    Continuation of Limited Partnership**

(a)    The General Partner and the Limited Partners hereby agree to continue the Partnership as a limited partnership under and pursuant to the Act and this Agreement.

(b)    The General Partner has executed and filed with the Secretary of State of the State of Delaware a Certificate, and shall execute, acknowledge and file with the Secretary any amendments thereto as may be required by the Act, and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership.  The General Partner shall cause any required amendment to the Certificate to be filed promptly following the event requiring such amendment.  All amendments may be signed by the General Partner (as required by the Act) and may be signed either personally or by an attorney-in-fact.

(c)    The parties hereto agree to operate the Partnership as a limited partnership pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Limited Partners and the General Partner are as provided in the Act, for limited partners and the general partner except as provided herein.

(d)    The parties hereto acknowledge and agree that the Partnership shall be classified as a "partnership" and not as an association taxable as a corporation for U.S. federal income tax purposes.  No election may be made by the Partners or the Partnership to treat the Partnership as other than a "partnership" for U.S. federal, state and/or local income tax purposes and, to the extent necessary, the Partners or Partnership shall make any election to treat the Partnership as a "partnership."   The Partners shall treat the Partnership consistently with its status as a "partnership" for U.S. federal income tax purposes and agree to undertake any further action which is necessary to treat the Partnership as such, and shall not undertake any action that is inconsistent with the Partnership's status as a "partnership" for U.S. federal, state and/or local income tax purposes.

(e)    The General Partner may change the domicile of the Partnership to another state, country or other jurisdiction where advisable due to legal, tax or other

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 178
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1522 of 1726 PageID 12843
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 15 of 55

considerations; <u>provided</u> that no such change of domicile would reasonably be expected to have a material adverse effect on the Limited Partners.

**2.2 Name of Partnership**

(a) The name of the Partnership is Highland Multi Strategy Credit Fund, L.P. or such other name as the General Partner may hereafter adopt, subject to causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware in accordance with the Act. The General Partner shall send a notice of any change of name to the Limited Partners. All business of the Partnership shall be conducted under such name or under such other name as the General Partner deems appropriate.

(b) The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's termination or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3 Principal Office; Registered Office**

(a) The Partnership's principal office shall be at such location as the General Partner may designate from time to time.

(b) The Partnership's registered office in the State of Delaware is at 1209 Orange Street, County of New Castle, Wilmington, Delaware 19801, and the registered agent of the Partnership in the State of Delaware is The Corporation Trust Company, unless a different registered office or agent is designated from time to time by the General Partner.

**2.4 Term of Partnership**

The term of the Partnership commenced on the date on which the Certificate was filed with the Secretary of State of the State of Delaware and continues until the Partnership is dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1). The legal existence of the Partnership as a separate legal entity continues until the cancellation of the Certificate.

**2.5 Object and Powers of Partnership**

(a) The object and business of the Partnership is (i) to purchase, sell (including short sales), invest and trade in Investments, (ii) to engage in financial transactions, including borrowing, financing, pledging, hedging and other derivative transactions relating thereto for the benefit of the Partnership, (iii) to engage in any lawful act or activity of which limited partnerships may be formed under the Act and (iv) to engage in any and all activities necessary or incidental to the foregoing.

APPX. 105094

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 179
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1523 of 1726 PageID 12844
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 16 of 55

(b)    The Partnership possesses and may exercise all such powers and privileges as the General Partner considers necessary, convenient or incidental to the conduct, promotion or attainment of the object of the Partnership.

**2.6    Liability of Partners**

In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act.

**2.7    Actions by Partnership**

The Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects.

**2.8    Reliance by Third Parties**

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

**2.9    UCC Status of Limited Partner Interests**

(a)    For purposes of the grant, pledge, attachment or perfection of a security interest in an Interest or otherwise, the Interests are deemed to be "securities" within the meaning of Section 8-102(a)(15) and as provided by Section 8-103(c) of the Uniform Commercial Code as in effect from time to time in the State of Delaware or analogous provisions in the Uniform Commercial Code in effect in any other jurisdiction.

(b)    Any Interest may be evidenced by a certificate of partnership interest issued by the Partnership in such form as the General Partner may approve. Every certificate representing an Interest shall bear a legend substantially in the following form:

"For the purposes of Section 8-103 of the Uniform Commercial Code of the United States of America in effect in any relevant jurisdiction, the certificates representing an interest in the Limited Partnership constitute "securities" within the meaning of Section 8-102 and Section 8-103 of the Uniform Commercial Code."

**2.10    Series of Interests**

(a)    The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different Series of Interests in the Partnership with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, Management Fees, Performance Allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 180
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1524 of 1726 PageID 12845
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 17 of 55

differences) as the General Partner may determine upon the issuance of such Series; provided that such Series would not reasonably be expected to have a material adverse effect on the existing Limited Partners. The terms and rights of such Series may be set forth in a supplement to the Partnership's offering memorandum or a "side letter" or other agreement, which the General Partner may incorporate by reference.

(b)     All Interests in the Partnership held by Limited Partners (including Affiliated Investors) as of the Effective Date are hereby designated as Series A Interests.

<div align="center">

**Article III**
**CAPITAL**

</div>

**3.1     Contributions to Capital**

(a)     The minimum required initial capital contribution of each Limited Partner is the amount determined by the General Partner. The General Partner may change the required minimum initial contribution amount at any time with respect to any, all or less than all Limited Partners.

(b)     The Partnership may accept additional contributions at such times as the General Partner may permit, but no Limited Partner shall be obligated to make any additional capital contribution to the Partnership, subject to the provisions of Section 3.5(b) and any contrary provision of the Act. The minimum required additional capital contribution of any existing Limited Partner to the Partnership shall be the amount the General Partner may determine. The General Partner may change the required minimum additional contribution amount at any time with respect to any, all or less than all Limited Partners.

(c)     The General Partner or an Affiliate has made a capital contribution to the Partnership as set forth in the Schedule of Partners. Except as required by the Act, the General Partner is not required to make any additional capital contributions to the Partnership. The General Partner may, however, make capital contributions to the Partnership in such amounts and at such times as it may determine. The General Partner or any of its Affiliates have the right at any time to make additional capital contributions as a Limited Partner or General Partner. If the General Partner or any of its Affiliates (including their associated Persons, such as officers, directors, partners, members or employees or any of their family members) makes a capital contribution as a Limited Partner, the General Partner or the Investment Manager shall have authority to waive the Management Fee and/or Performance Allocation with respect to such Limited Partner.

(d)     Except as otherwise permitted by the General Partner (i) initial or additional capital contributions by each Partner shall be paid in one installment with cash and/or Investments having an aggregate value as set forth in the Partnership's books and records, and (ii) initial contributions are due as of the date of admission of such Person as a Limited Partner of the Partnership. Whether Investments may be

<div align="center">13</div>

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 181
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1525 of 1726 PageID 12846
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 18 of 55

accepted as a contribution to the capital of the Partnership is determined by the General Partner.

**3.2    Rights of Partners in Capital**

(a)    No Partner shall be entitled to interest on its capital contributions to the Partnership.  For the avoidance of doubt, interest income, if any, earned on subscription amounts remitted to the Partnership prior to the date that an Interest is issued to a Partner shall be payable to the Partnership and not applied toward the purchase of an Interest.

(b)    No Partner shall have the right to the return of any capital contribution to the Partnership except (i) upon withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1.  The entitlement to any such return is limited to the value of the Capital Account(s) of the Partner.  The General Partner shall not be liable for the return of any such amounts.

**3.3    Capital Accounts**

(a)    The Partnership shall maintain a separate Capital Account for each Partner.   In the event a Limited Partner invests in more than one Series of Interests, the Partnership will maintain a separate Capital Account with respect to each Series of Interests held by such Limited Partner, with each such Capital Account being treated as if it were the Capital Account of a separate Partner for purposes of computing the Performance Allocation, the Management Fee and the withdrawal rights attributable to the Series.

(b)    The General Partner may, in its discretion, maintain a separate sub-account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting or to otherwise give effect to the provisions of this Agreement.  Each Capital Account shall reflect the aggregate sum of the balances in such Partner's Capital Account.

(c)    If a Partner makes an additional capital contribution to an existing Capital Account, the Capital Account will be sub-divided into separate capital sub-accounts attributable to each separate capital contribution, with each capital sub-account treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights and restrictions applicable to each capital sub-account.  References herein to a Partner's "Capital Account" include any such separately maintained capital sub-accounts.

(d)    The Partnership will issue to the Offshore Fund an Interest and maintain capital sub-accounts that correspond to each Sub-Series of Shares and each capital sub-account is treated separately for determining Management Fees, the Performance Allocations and withdrawal rights.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 182
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1526 of 1726 PageID 12847
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 19 of 55

(e)      Each Capital Account has an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to such Capital Account.

(f)      Each Capital Account shall be increased by such Capital Account's allocable share of the Net Profits allocated by the Partnership to such Capital Account pursuant to Section 3.4.

(g)      Each Capital Account shall be reduced by (i) the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.5 or 6.3, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(h), (ii) such Capital Account's allocable share of the Net Losses allocated by the Partnership to such Capital Account pursuant to Section 3.4, (iii) such Capital Account's *pro rata* portion of the expenses allocable (or specially allocable) by the Partnership pursuant to Section 3.5, (iv) such Capital Account's allocable share of the Performance Allocation allocable pursuant to Section 3.7, and (v) such Capital Account's *pro rata* portion of the expenses payable by the Partnership pursuant to Section 4.2(b).

(h)      The Capital Account of the Investment Manager, as a special Limited Partner of the Partnership, shall be increased by the amount of the Performance Allocation allocated to such Capital Account and the investment gains therein.

(i)      Each Capital Account shall also be adjusted to reflect all other allocations and other changes in the value of such Capital Account not otherwise described in this Section 3.3 in the manner specified in the remaining provisions of this Article III.

**3.4**      **Allocations of Net Profit and Net Loss**

Subject to Sections 3.5 through 3.10, as of the last day of each Accounting Period, any Net Profit or Net Loss of such Accounting Period shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages for such Accounting Period.

**3.5**      **Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures**

(a)      As of the first Business Day of each calendar quarter, each Capital Account's Management Fee for such calendar quarter shall be debited against such Capital Account and paid by the Partnership to the Investment Manager. Capital contributions accepted after the commencement of the calendar quarter shall be subject to a prorated Management Fee reflecting the time remaining during that quarter. The Investment Manager may reduce or eliminate the Management Fee with respect to any Partner (or Capital Account) in its sole discretion; provided that such reduction or elimination shall not increase the Management Fee payable by any other Partner (or Capital Account).

(b)      To the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 183
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1527 of 1726   PageID 12848
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 20 of 55

conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments on behalf of or with respect to any Partner or Partners (including backup withholding or withholding under FATCA), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required.   If the Partnership pays or incurs any withholding tax or other tax obligation (including under FATCA) with respect to the income allocable or distributable to one or more Partners, then the amount of such withholding tax or tax obligation shall be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement.   Such amount shall be debited against the Capital Account(s) of such Partner or Partners as of the close of the Accounting Period during which the Partnership so withholds, pays or incurs such obligation.   If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors shall make a contribution to the capital of the Partnership, within 10 days following request by the General Partner, the amount of such excess.   The General Partner is not obligated to apply for or obtain a reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such reduction or exemption, or be otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax.

(c)      Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be specially allocated only to the Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments.   Such allocations shall be debited from the relevant Capital Accounts of such Partners as of the close of the Accounting Period during which any such items were accrued by the Partnership.

**3.6     Reserves; Adjustments for Certain Future Events**

(a)      The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets and proportionately against the Capital Accounts for contingent liabilities or probable losses, such reserves to be in the amounts which the General Partner deems necessary or appropriate.   The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate.   The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be debited or credited, as the General Partner deems appropriate, to the Capital Accounts of current Partners that (i) are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or (ii) were Partners, or are transferees from Persons who were Partners, at the time of the act or omission giving rise to the contingent liability for which the reserve has been established by the General Partner.

APPX. 05099

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 184
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1528 of 1726   PageID 12849
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 21 of
55

(b)     If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately debited or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period.

**3.7     Performance Allocation**

(a)     The Performance Allocation shall be debited against each Capital Account of each Limited Partner as of the last day of each Calculation Period with respect to such Capital Account, and the amount so debited shall simultaneously be credited to the Capital Account of the Investment Manager, as a special Limited Partner of the Partnership.

(b)     The Investment Manager may waive or alter the Performance Allocation with respect to any Limited Partner.

**3.8     Limited Participation Investments and New Issues**

(a)     If the General Partner determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Partner may agree such Partner should not participate (or should receive a reduced participation) in the Net Profit or Net Loss with respect to any Investment, the General Partner may allocate Net Profit or Net Loss, if any, with respect to such Investment only to Partners to whom the restrictions on participating in that Investment do not apply.  In order to allocate Net Profit or Net Loss accordingly, the General Partner may establish and maintain a memorandum account in the accounting records of the Partnership on a Partner-by-Partner basis with respect to each such Investment. The Net Profit and Net Loss and expenses relating to such Investment will be separately calculated and allocated based on each participating Partner's balance in such memorandum account for such Investment divided by the sum of the balances of all memorandum accounts for all participating Partners.  In order to compensate a Limited Partner who is not participating in an Investment pursuant to this Section 3.8 for the use of such Partner's share of Partnership capital to purchase the Investment, the General Partner may credit the non-participating Partner's Capital Account (and correspondingly debit the Capital Account of the participating Partners with a carrying charge).  Any distributions from the memorandum account will be based on the participating Partner's respective percentage interest in such Investment.

(b)     Pursuant to certain rules of FINRA ("*New Issue Rules*"), members of FINRA are permitted to sell to the Partnership certain publicly-offered securities ("*Restricted Issues*") only if the Capital Accounts of Partners connected with the securities industry or executive officers or directors of investment banking clients of underwriters ("*Restricted Capital Accounts*") are not restricted from sharing a beneficial interest in such Restricted Issues in accordance with the provisions of the New Issue Rules.  Notwithstanding the provisions of Section 3.4, if the Partnership chooses to invest in Restricted Issues, the Partnership shall not allocate any items

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 185
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1529 of 1726   PageID 12850
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 22 of
55

of income, gain, loss, deduction and credit that relate to investments in Restricted Issues to Restricted Capital Accounts except to the extent permitted by the New Issue Rules, and shall instead allocate such items among the other Capital Accounts on a *pro rata* basis.  To the extent the New Issue Rules permit certain Persons with Restricted Capital Accounts to participate in profits and losses from Restricted Issues, the General Partner shall allocate such profits and losses from Restricted Issues among such Restricted Capital Accounts on a *pro rata* basis or on such other basis that the General Partner reasonably determines ensures compliance with the New Issue Rules.  To the extent consistent with the New Issue Rules, the General Partner shall determine when all Capital Accounts may participate in the Net Profit and Net Loss from any Restricted Issue.  The General Partner shall value any Restricted Issue at such time at the then-current price of the security in the secondary market.

**3.9    Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner.  Any credits in any subsequent Accounting Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.9 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.9 not previously recovered.

**3.10    Regulatory Allocations**

Notwithstanding anything to the contrary in this Agreement:

(a)    Qualified Income Offset.    In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; <u>provided</u> that an allocation pursuant to this Section 3.10(a) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.10(a) were not in this Agreement.  This Section 3.10(a) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and is to be interpreted consistently therewith.

(b)    Minimum Gain Chargeback.    Notwithstanding any other provision of this Section 3.10, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, the Partners shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an

APPX. 05793

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 186
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1530 of 1726   PageID 12851
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 23 of
55

amount equal to the portion of any such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Sections 1.704-2(f) and (g). This Section 3.10(b) is intended to comply with the minimum gain chargeback requirement in such Sections of the Regulations and shall be interpreted consistently therewith.

(c)    <u>Gross Income Allocation</u>.   In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner shall be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; <u>provided</u> that an allocation pursuant to this Section 3.10(c) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.10(a) and this Section 3.10(c) were not in this Agreement.

(d)    <u>Curative Allocations</u>.   The allocations set forth this Section 3.10 (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.10.   Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Partnership Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

(e)    <u>Nonrecourse Deductions</u>.   Any Nonrecourse Deductions for any Fiscal Year or other period shall be allocated to the Partners in accordance with their Partnership Percentages.

(f)    <u>Section 704(b) Compliance</u>.   The allocations provided in this Section 3.10 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

## 3.11    Allocations for Income Tax Purposes

(a)    <u>Income Tax Allocations</u>.   Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for U.S. federal

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 187
Case 3:23-cv-00726-S Document 8-23 Filed 07/29/23 Page 1531 of 1726 PageID 12852
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 24 of
55

income tax purposes in each Fiscal Year shall be allocated among the Partners in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership shall establish and maintain records which shall show the extent to which the Capital Account of each Partner comprises amounts that have not been reflected in the taxable income of such Partner as of the last day of each Fiscal Year. To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts. Foreign tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations. All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement shall be determined by the General Partner.

(b)  <u>Basis Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations; <u>provided</u> that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, shall be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)  <u>Positive Basis Allocations</u>.  If the Partnership recognized gains or items of gross income (including short-term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner may elect:   (i) to allocate such gains or items of gross income among such Positive Basis Partners, *pro rata* in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner that reflects equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; <u>provided</u>, <u>however</u>, that if, following such Fiscal Year, the Partnership recognizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the

20

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 188
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1532 of 1726   PageID 12853
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 25 of
55

liquidating share of any Positive Basis Partner, that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), then such Positive Basis Partner may be allocated an amount of such gains or items of gross income equal to the amount, if any, by which its or its Positive Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.11(c).

(d)     <u>Negative Basis Allocations</u>.  If the Partnership recognizes net losses or items of gross loss or deduction (including short-term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner may elect:   (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Partner, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner has been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner that reflects equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; <u>provided</u>, <u>however</u>, that if, following such Fiscal Year, the Partnership recognizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its or its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.11(d).

## 3.12    Individual Partner's Tax Treatment

Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership or which would result in inconsistent treatment, and each Partner further agrees to treat, on any U.S. federal, state, local and/or non-U.S. income tax return in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner consistent with the treatment of such item by the Partnership.

## 3.13    Distributions

(a)     The Partnership shall make distributions in respect of withdrawals in accordance with Section 5.5 and liquidation in accordance with Section 6.3.  In addition, the General Partner may make other distributions at the times and in the amounts the

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 189
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1533 of 1726   PageID 12854
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 26 of 55

General Partner determines.    Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner on any account of its Interest if such distribution would violate Section 17-607 of the Act or other applicable law.

### Article IV
### MANAGEMENT

**4.1    Duties and Powers of the General Partner**

(a)    Subject to the terms and conditions of this Agreement, the General Partner has complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for (i) all investment and investment management decisions to be undertaken on behalf of the Partnership and (ii) managing and administering the affairs of the Partnership, and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership, whether or not such action or authority is expressly provided for in this Agreement.    Without limiting the foregoing generality, the General Partner's powers include the power to borrow, obtain leverage or otherwise incur indebtedness with respect to the Partnership's capital.

(b)    Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner has full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1.

(c)    The General Partner may delegate to any other Person, including the Investment Manager, any power and authority vested in the General Partner pursuant to this Agreement.

(d)    The General Partner is the "tax matters partner" for purposes of Section 6231(a)(7) of the Code.    The General Partner has the exclusive authority in its determination to make any elections required or permitted to be made by the Partnership under any provisions of the Code or any other revenue laws.    The General Partner shall be entitled to be reimbursed by the Partnership for all costs and expenses incurred by it in connection with any administrative or judicial proceeding affecting tax matters of the Partnership and/or the Partners in their capacity as such and to be indemnified by the Partnership (solely out of Partnership assets) with respect to any

APPX. 05193

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 190
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1534 of 1726 PageID 12855
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 27 of 55

action brought against it in connection with any judgment in or settlement of any such proceeding.

(e) Every power vested in the General Partner pursuant to this Agreement and any decision or determination that it is permitted to make is to be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein, and the General Partner shall be entitled to consider in making such decisions or determinations only such interests and factors as it desires, including its own interests. No provision of this Agreement is to be construed to require the General Partner to violate the Act, the Advisers Act, or any other law, regulation or rule of any self-regulatory organization. Notwithstanding any other provision of this Agreement, whenever in this Agreement, the General Partner is permitted or required to make a decision in its "good faith" or under another expressed standard, the General Partner must act under such express standard and will not be subject to any other or different standards.

(f) Each Limited Partner shall deliver to the General Partner, upon a reasonable request, (i) an affidavit or certificate in form satisfactory to the General Partner that is sufficient to establish that the applicable Partner (and its partners, members, and/or beneficial owners, as the case may be) is not subject to withholding under the provisions of any U.S. federal, state, local, non-U.S. or other tax laws, or with respect to such Partner's tax status under such laws, and (ii) any information or documentation prescribed under FATCA or as may be necessary, as reasonably determined by the General Partner, for the Partnership to comply with its obligations under FATCA (including, but not limited to, information with respect to citizenship, residency, ownership or control of such Partner). Each Limited Partner shall reasonably cooperate with the General Partner in connection with any tax audit of the Partnership, or any existing or former Investment.

**4.2 Expenses**

(a) Except as otherwise provided herein, and in consideration of the Management Fee, the General Partner and the Investment Manager shall each pay all of its own operating and overhead costs, without reimbursement by the Partnership.

(b) The Partnership shall pay, or reimburse the General Partner and the Investment Manager for, all other reasonable costs, fees and expenses arising in connection with the Partnership's operations. Such expenses payable by the Partnership include the following:

(i) all costs, fees and expenses directly related to Investments or prospective Investments (whether or not consummated) of the Partnership, including research and due diligence costs related to an Investment; brokerage commissions and other execution and transaction costs, interest on, and commitment fees and expenses arising out of, debit balances or borrowings; exchange, clearing and settlement charges; fees and expenses of any third-party providers of "back office" and "middle office" services relating to

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 191
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1535 of 1726   PageID 12856
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 28 of
55

trade settlement; travel expenses; appraisal fees; investment banking fees and expenses; borrowing charges on Investments sold short; custody fees; and fees of consultants and finders relating to Investments or prospective Investments of the Partnership; the costs, fees and expenses of any appraisers, accountants or other experts engaged by the General Partner or the Investment Manager as well as other expenses directly related to the Partnership's Investments;

(ii)    any withholding, transfer or other taxes imposed on the Partnership;

(iii)   the reasonable, out-of-pocket fees, costs and expenses (including legal fees and expenses) incurred to comply with any applicable law, rule or regulation (including regulatory filings or other expenses of the Partnership and the pro rata portion of any regulatory and other expenses of the General Partner or the Investment Manager, which benefit or are attributable to the Partnership);

(iv)    the reasonable, out-of-pocket costs, fees and expenses for financial and tax accounting, bookkeeping and reporting services, and administrative services performed by any Person on behalf of the Partnership (e.g., the administrator of the Partnership), including the cost of any audit of the Partnership's financial statements and the preparation of its tax returns (including with respect to FATCA compliance);

(v)     Management Fees;

(vi)    the reasonable, out-of-pocket costs, fees and expenses of legal counsel and any other litigation or investigation involving Partnership activities;

(vii)   specific expenses incurred in obtaining, maintaining or performing systems, research and other information, including information service subscriptions, utilized with respect to the Partnership's Investments including without limitation for portfolio management, valuations and accounting purposes, including the costs of statistics and pricing services, service contracts for quotation equipment and related hardware, software, phone and internet charges;

(viii)  the reasonable, out-of-pocket costs, fees and expenses associated with the Recent Amendments, including legal and accounting fees, printing costs, reporting and providing information to existing and prospective Partners, obtaining requisite consent from Limited Partners, travel fees and expenses related to the Partnership's offering, filing fees (including any "blue sky" filing fees) and other out-of-pocket expenses and compliance with any applicable federal and state laws;

(ix)    the costs and expenses associated with meetings of Partners;

24

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 192
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1536 of 1726 PageID 12857
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of
55

(x)    the expenses of the Advisory Committee and the members thereof, including any indemnification expenses;

(xi)    the costs associated with maintaining "directors and officers" or similar liability insurance for the benefit of the Partnership, the General Partner, the Investment Manager, or any other Indemnified Person; and

(xii)    any costs or expenses of winding up and liquidating the Partnership and

(xiii)    all costs, fees and expenses associated with the ongoing offering of Limited Partner Interests.

(c)    Expenses with respect to Section 4.2(b)(viii) above will be amortized by the Partnership over a period of 36 months from the Effective Date; however, the General Partner may limit the amount of expenses amortized so that the Partnership's audited financial statements do not contain qualification.

(d)    Except as otherwise provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6, 3.8 and 5.5(i), expenses are generally borne *pro rata* by the Partners in accordance with their respective Partnership Percentages.

(e)    If the General Partner or the Investment Manager, as appropriate, incurs any Partnership expenses for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, shall allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)    The General Partner and the Investment Manager may, to the extent disclosed in the Partnership's offering memorandum or otherwise disclosed to the Limited Partners, use "soft dollars" generated by the Partnership. Use of "soft dollars" by the General Partner or the Investment Manager as disclosed herein shall not constitute a breach by either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

## 4.3    Rights of Limited Partners

The Limited Partners may not take any part in the management, control or operation of the Partnership's business, and have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.

## 4.4    Other Activities of Partners

(a)    The General Partner is not required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs

APP. 108106

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 193
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1537 of 1726 PageID 12858
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 30 of
55

of the Partnership as it may determine to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)    Each Partner acknowledges and agrees that the General Partner, its Affiliates and their respective partners, managers, directors, officers, shareholders, members or employees may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, Investments, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other issuers, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, whether or not any such activities may conflict with any interest of the parties with respect to the Partnership. Without in any way limiting the foregoing, each Partner hereby acknowledges that none of the General Partner, its Affiliates or their respective partners, managers, directors, officers, shareholders, members or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the Partnership, but may refer the same to any other party or keep such opportunities for their own benefit.

(c)    The General Partner and its Affiliates shall act in a manner that each considers fair, reasonable and equitable on an overall basis in allocating investment opportunities to the Partnership and any Other Account. The General Partner and its Affiliates shall allocate investment opportunities as set forth in their policies and procedures, as may be amended from time to time, and as communicated to Limited Partners through the Partnership's private offering memorandum for Interests or otherwise.

(d)    Each of the Partners hereby waives and covenants not to sue on the basis of any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners *inter se* which is or may be inconsistent with this Section 4.4.

**4.5    Exculpation; Indemnification**

(a)    The General Partner, the Investment Manager, any of their Affiliates, each direct or indirect member, manager, partner, director, officer, shareholder and employee of any of the foregoing and, with the approval of the General Partner, any agent of any of the foregoing (including their respective executors, heirs, assigns, successors or other legal representatives) (each an "***Indemnified Person***") shall not be liable to the Partnership or to any of the Limited Partners for any loss or damage occasioned by any acts or omissions in the performance of services under this Agreement or the Investment Management Agreement, or otherwise in connection with the Partnership, its Investments or operations, unless such loss or damage has occurred by reason of the willful misconduct, fraud or gross negligence of such Indemnified Person or as otherwise required by law; provided that nothing in this Agreement is to be construed as waiving any legal rights or remedies which the Partnership may have under state or federal securities laws.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 194
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1538 of 1726 PageID 12859
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 31 of 55

(b)     The Partnership (but not the Partners individually) shall indemnify each Indemnified Person to the fullest extent permitted by law against any cost, expense (including reasonable attorneys' fees), judgment or liability incurred by or imposed upon it in connection with any action, suit or proceeding (including any proceeding before any judicial, administrative or legislative body or agency) to which it may be made a party or otherwise be involved or with which it shall be threatened by reason of being or having been General Partner, having been the Investment Manager pursuant to the Investment Management Agreement or its having provided services to the Partnership; <u>provided</u> that the Indemnified Person is not so indemnified to the extent such cost, expense, judgment or liability has been finally determined (i) in a non-appealable decision on the merits in any such action, suit or proceeding, or (ii) on a plea of *nolo contendere*, to have been incurred or suffered by the Indemnified Person solely by reason of willful misconduct, fraud or gross negligence by the Indemnified Person.

(i)     The right to indemnification granted by this Section 4.5 shall be in addition to any rights to which the Indemnified Person may otherwise be entitled and shall inure to the benefit of the successors or assigns of such Indemnified Person. The Partnership shall pay the expenses incurred by the Indemnified Person in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by the Indemnified Person to repay such payment if there is an adjudication or determination that it is not entitled to indemnification as provided herein; provided that no such advance shall be made in connection with any action brought by a Majority-in-Interest of the Limited Partners.

(ii)     In any suit in the name of the Partnership to recover expenses advanced pursuant to the terms of an undertaking, the Partnership shall be entitled to recover such expenses upon a final adjudication that the Indemnified Person or other Person claiming a right to indemnification hereunder has not met the applicable standard of conduct set forth in Section 4.5(a). In any such suit brought to enforce a right to indemnification or to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnified Person or other Person claiming a right to indemnification shall not be entitled to be indemnified, or to an advancement of expenses, hereunder shall be on the Partnership (or any Limited Partner acting derivatively or otherwise on behalf of the Partnership or the Limited Partners) unless otherwise required by applicable law.

(iii)     Each Indemnified Person may not satisfy any right of indemnity or reimbursement granted in this Section 4.5 or to which it may be otherwise entitled except out of the assets of the Partnership, and no Partner shall be personally liable with respect to any such claim for indemnity or reimbursement. The General Partner may obtain appropriate insurance on behalf, and at the expense, of the Partnership to secure the Partnership's obligations hereunder.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 195
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 of 330 Page 1539 of 1726 PageID 12860
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 32 of
55

(iv)   Nothing in this Agreement is to be construed as to provide for the indemnification of an Indemnified Person for any liability (including liability under U.S. federal securities laws) to the extent that such indemnification would be in violation of applicable law but is to be construed so as to effectuate this Section 4.5 to the fullest extent permitted by law.

(v)   Each Indemnified Person shall be deemed a third-party beneficiary (to the extent not a direct party hereto) of this Agreement and, in particular, the provisions of this Section 4.5. The General Partner and/or the Investment Manager may enter into agreements on behalf of the Partnership with an Indemnified Person to provide an indemnity to the same extent provided in this Section 4.5.

**4.6   Advisory Committee**

(a)   The General Partner and/or the Investment Manager may appoint a committee (the "***Advisory Committee***") composed of one or more individuals selected from time to time by the General Partner. No member of the Advisory Committee may be an Affiliate of the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in an Affiliate of the Partnership).

(b)   If established, the Advisory Committee will meet with the General Partner and/or the Investment Manager from time to time as requested by and deemed appropriate by the General Partner and/or the Investment Manager to consult with and advise the General Partner and/or the Investment Manager on any matter deemed appropriate by the General Partner and/or the Investment Manager, including any circumstances involving conflicts of interest between the General Partner and/or the Investment Manager (and their Affiliates), on the one hand, and the Limited Partners and the Partnership, on the other.

(c)   The General Partner and/or the Investment Manager may in its discretion seek the approval of the Advisory Committee or establish any other reasonable mechanism in connection with (i) approvals that are or would be required under the Investment Advisers Act (including Section 206(3)) or (ii) any other matter deemed appropriate by the General Partner and/or the Investment Manager. Each Limited Partner agrees that, except as otherwise specifically provided herein and to the extent permitted by applicable law, the approval of a majority of the members of the Advisory Committee at such time is binding upon the Partnership and each Partner with respect to any approval sought under this Section 4.6(c).

(d)   As determined by the General Partner and/or the Investment Manager, meetings of the Advisory Committee may be held in person or by telephone. Approval of the Advisory Committee is deemed to have been given if given by a majority of those members present at a meeting or by a majority of all members of the Advisory Committee if given pursuant to a written consent without a meeting.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 196
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1540 of 1726 PageID 12861
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 33 of 55

(e)     The Partnership agrees to reimburse members of the Advisory Committee for their out-of-pocket expenses relating to their services as Advisory Committee members and to indemnify each Advisory Committee member to the maximum extent permitted by law

(f)     In the event an Advisory Committee is not appointed, the General Partner and/or the Investment Manager may obtain the approval of an unaffiliated third party, as is determined advisable by the General Partner and/or the Investment Manager, and any such approval by such third party shall, to the extent permitted under applicable law, serve as the approval of the Advisory Committee and shall be binding on the Partnership and the Limited Partners.

**4.7     Alternative Investment Vehicles**

The General Partner shall have the right in connection with any Investment to direct the capital contributions of some or all of the Partners to be made through one or more alternative investment vehicles ("***Alternative Investment Vehicles***") and to exchange a portion of the Interests of one or more Limited Partners for similar equity interests in one or more Alternative Investment Vehicles if, in the judgment of the General Partner, the use of such vehicle or vehicles would allow the Partnership to overcome legal or regulatory constraints or invest in a more tax efficient manner and/or would facilitate participation in certain types of Investments; underlined provided that the General Partner shall not employ the use of an Alternative Investment Vehicle in any manner that would reasonably be expected to have a material adverse effect on the participating Limited Partners. Any Alternative Investment Vehicle shall contain terms and conditions substantially similar to those of the Partnership and shall be managed by the General Partner or an Affiliate thereof, and such controlling Person is required to comply with the provisions of this Agreement applicable to Alternative Investment Vehicles. Expenses related to an Alternative Investment Vehicle on behalf of less than all of the Partners shall not be borne by the Partners that do not participate in such Alternative Investment Vehicle.

<div align="center">

**Article V**
**ADMISSIONS, TRANSFERS AND WITHDRAWALS**

</div>

**5.1     Admission of Limited Partners**

The General Partner may, at such times as the General Partner may determine, without advance notice to or consent from the Limited Partners, admit to the Partnership any Person who executes this Agreement or any other writing evidencing the intent of such Person to become a Limited Partner. Such admission shall be effective when the General Partner enters the name of such Person on the books and records of the Partnership as a Partner and does not require the consent or approval of any other Partner. The General Partner has the authority to reject subscriptions for Interests in whole or in part.

**5.2     Admission of Additional General Partners**

(a)     Except as provided in Section 5.2(b), the General Partner may admit one or more Persons as additional general partners to the Partnership. No additional general

<div align="center">

29

</div>

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 197
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1541 of 1726   PageID 12862
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 34 of
55

partner shall be added unless such additional general partner agrees to be bound by all of the terms of this Agreement.

(b)     Any Person to whom the General Partner has transferred its general partner interest in accordance with Section 5.4 shall be admitted to the Partnership as a substitute General Partner without the consent of the Limited Partners unless otherwise provided for in Section 5.4.

**5.3     Transfer of Interests of Limited Partners**

(a)     No Transfer of any Limited Partner's Interest, whether voluntary or involuntary, shall be valid or effective, and no transferee may become a substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be granted, withheld or conditioned for any reason by the General Partner.  Any attempted Transfer not made in accordance with this Section 5.3, to the fullest extent permitted by law, shall be void *ab initio*.

(b)     Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner may require the transferring Limited Partner to execute and acknowledge an instrument of Transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement.

(c)     In the event of a Transfer of a Partner's Interest or in the event of a distribution of assets of the Partnership to any Partner, the Partnership may, but shall not be required to, file an election under Section 754 of the Code and in accordance with the applicable Regulations, to cause the basis of the Partnership's assets to be adjusted for U.S. federal income tax purposes as provided by Section 734 or 743 of the Code.

(d)     In the event of a Transfer at any time other than the end of a Fiscal Year, items of income, gain, loss, deduction or credit recognized by the Partnership for U.S. federal income tax purposes shall be allocated between the transferring parties, as determined by the General Partner, using any permissible method under Code Section 706(d) and the Regulations thereunder.  To the extent the transferring parties have given the General Partner written notice prior to the consent by the General Partner pursuant to Section 5.3(a) of their agreement to apply a particular and reasonable method, then the General Partner may elect to use such method. The transferring parties agree to reimburse the General Partner and the Partnership for any incidental accounting fees and other expenses incurred by the General Partner and the Partnership in making allocations pursuant to this Section 5.3(d).

**5.4     Transfer of Interest of the General Partner**

The General Partner may Transfer its Interest as a General Partner in the Partnership; <u>provided</u> that if any such proposed Transfer would result in an "assignment" (as such term is

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 198
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1542 of 1726 PageID 12863
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 35 of 55

defined under the Advisers Act), the General Partner shall obtain the consent of Limited Partners constituting a Majority-in-Interest of Limited Partners that are not Affiliated Investors.

**5.5 Withdrawal of Interests of Partners**

(a) The Interest of a Limited Partner may not be withdrawn from the Partnership prior to its dissolution except as provided in this Section 5.5.

(b) Withdrawal rights are determined separately with respect to each Capital Account (and each capital sub-account, if applicable). Each capital contribution shall be accounted for using a separate capital sub-account, and, in the case of a Limited Partner for which more than one capital sub-account is maintained, the withdrawals from any such capital sub-accounts shall be processed on a "first-in, first-out" basis based upon the date on which each capital contribution was made, unless otherwise agreed between the General Partner and such Partner. Each capital sub-account relating to a contribution of capital from a Limited Partner will be treated as if it were the separate Capital Account of a separate Partner for the purposes of applying the withdrawal provisions of this Section 5.5.

(c) Subject to a Suspension and the other provisions of this Section 5.5:

(i) A Limited Partner may make a complete or partial withdrawal from its Series A Capital Account effective on the last Business Day of each calendar quarter occurring at least 36 calendar months after the contribution of the capital to be withdrawn (each, a "***Series A Withdrawal Date***") by providing written notice to the General Partner at least 90 days prior to the proposed Series A Withdrawal Date (such restriction, the "***Series A Lock-Up***"). For purposes of calculating the Series A Lock-Up, each Limited Partner holding Series A Interests on of the Effective Date is deemed to have made its initial contribution for Series A Interests as of the Effective Date. Additional contributions for Series A Interests after the Effective Date will also be subject to the Series A Lock-Up, which lock-up period shall commence on the date of each such additional contribution.

(ii) A Limited Partner may make a complete or partial withdrawal from its Series B Capital Account upon written notice to the General Partner at least 180 days prior to the applicable Series B Withdrawal Date. The "***Series B Withdrawal Date***" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Withdrawal Date (or the last Business Day of such month).

(iii) A Limited Partner may make a complete or partial withdrawal from its Series C Capital Account upon written notice to the General Partner at least 180 days prior to the applicable Series C Withdrawal Date. The "***Series C Withdrawal Date***" means: (i) the end of the day on the last Business Day of

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 199
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1543 of 1726 PageID 12864
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 36 of 55

the calendar month that immediately precedes the two-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Withdrawal Date (or the last Business Day of such month).

(iv)    A Limited Partner may make a complete or partial withdrawal from its Series D Capital Account effective on the last Business Day of each calendar quarter (each, a "**Series D Withdrawal Date**") occurring at least 12 calendar months after the contribution of the capital to be withdrawn by providing written notice to the General Partner at least 90 days prior to the proposed Series D Withdrawal Date.

(d)    Any notice of withdrawal shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner. For the avoidance of doubt, if a Limited Partner notifies the General Partner of its intent to withdraw and later chooses not to withdraw (with the General Partner's consent), any transaction costs incurred by the Partnership or the General Partner in connection therewith may be charged to such withdrawing Limited Partner. The General Partner may refuse to honor any Limited Partner's request for a full or partial withdrawal if such request is not accompanied by such additional information as the General Partner may reasonably require, including any information required to determine the "adjusted basis" for U.S. federal income tax purposes in the Limited Partner's Interest withdrawn.

(e)    With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Partnership or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable Withdrawal Date, and withdrawn amounts will be fixed as of the applicable Withdrawal Date, except as provided in Section 3.6. For the avoidance of doubt, none of the Partnership, the General Partner or the Investment Manager shall be liable to a Limited Partner for interest on the proceeds of any withdrawal.

(f)    At least 90% of the estimated amount due with respect to the Partnership's marketable investments is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Partnership, within 30 Business Days after the Withdrawal Date, provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership or the remaining Capital Accounts. The General Partner is entitled to deduct from such settlement payment an amount equal to the pro rata portion of any Performance Allocation (based on the portion of the withdrawal being settled) payable to the Investment Manager with respect to such withdrawn amount. Any balance will be held back and distributed, without interest thereon, promptly following completion of the audit of the Partnership's financial statements for such Fiscal Year, or sooner in the General Partner's discretion.

(g)    In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the Limited Partner's interest in the Partnership's marketable

APPX. 108017

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 200
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1544 of 1726 PageID 12865
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 37 of
55

investments, no settlements occur with respect to any of such Limited Partner's interest in the Partnership's non-marketable investments until the occurrence of liquidity events with respect to such non-marketable investments after the scheduled payment date for the withdrawal (without interest thereon). Notwithstanding the foregoing, the General Partner may, however, make settlements in such cases prior to the occurrence of a liquidity event if such settlement would, in the good faith opinion of the General Partner, not have a material adverse effect on the Partnership. Generally, a liquidity event will be a sale of the relevant investment for cash, in which case the settlement will be funded in cash within 90 days after the liquidity event (without interest). If the liquidity event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Limited Partner's ratable share of the relevant investment or by distributing the net proceeds derived from a sale of such investment. The General Partner is entitled to withdraw from each such settlement an amount equal to the remaining portion of any Performance Allocation (pro rata based on the portion of such withdrawal being distributed) to be credited to the Investment Manager at the same time and in the same form (in cash or in kind) as the distribution to the withdrawing Limited Partner.

(h)     The General Partner may effect withdrawal payments (i) in cash, (ii) in kind, by transfer of marketable or non-marketable Investments to the Limited Partner, the value of which, as determined in accordance with Section 7.2, would satisfy the Limited Partner's request for withdrawal, or (iii) in any combination of the foregoing.

(i)     The General Partner may deduct from any withdrawal proceeds due to any Limited Partner pursuant to this Section 5.5 an amount representing the Partnership's actual or estimated expenses, as determined by the General Partner, associated with processing the withdrawal. Any such withdrawal deduction shall be retained by the Partnership for the benefit of the remaining Limited Partners.

(j)     The right of any Partner to withdraw or receive distributions pursuant to the provisions of this Section 5.5 is subject to all Capital Account allocations and adjustments contemplated by this Agreement and to the provision by the General Partner for all Partnership liabilities and for reserves and holdbacks for contingencies provided in Section 3.6.

(k)     The General Partner may suspend or limit, in whole or in part, (i) the right of the Partners to withdraw or receive distributions from the Partnership and/or (ii) the valuation of the Partnership's Net Assets:

(i)     during any period when any exchange or over-the-counter market on which the Partnership's Investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

APPX. 05808

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 201
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1545 of 1726   PageID 12866
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 38 of
55

(ii)    during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of, or withdrawals or redemptions from, Investments by the Partnership, or the determination of the value of the assets of the Partnership, would not be reasonably practicable;

(iii)    during any breakdown in the means of communication normally employed in determining the price or value of the Partnership's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Partnership cannot reasonably be accurately ascertained within a reasonable time frame;

(iv)    during any period when the transfer of funds involved in the realization or acquisition of any Investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange;

(v)    in other circumstances where the General Partner is unable to fairly value the Partnership's assets due to extreme market conditions; or

(vi)    automatically upon liquidation of the Partnership.

(l)    In the event of any such suspension or limitation described above in Section 5.5(k) (a "*Suspension*"), the General Partner shall promptly notify each Limited Partner. Any Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted is not given any priority with respect to the withdrawal of such Interests or portions thereof after the cause for such Suspension ceases to exist.  The General Partner may, however, allow any such Partners to rescind their withdrawal requests to the extent of any portion thereof for which withdrawal proceeds have not yet been remitted.  Upon the reasonable determination by the General Partner that conditions leading to Suspension no longer apply, withdrawal rights for all Limited Partners shall be promptly reinstated, and any pending withdrawal requests (or new, timely withdrawal requests) shall be honored as of the last Business Day of the calendar quarter in which withdrawals have recommenced, subject to the application of the withdrawal limitations described herein.

(m)    The General Partner may, notwithstanding any Suspension, upon not less than five days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Partnership may cause the Partnership, the Investment Manager or the General Partner to violate any applicable law), require any Limited Partner's Interest to be withdrawn in part or in its entirety from the Partnership (including, but not limited to, for reasons relating to FATCA) and for the Limited Partner to cease to be a Limited Partner of the Partnership (in the case of a withdrawal of a Limited Partner's Interest in its entirety) pursuant to this Section 5.5(m).  Except as otherwise provided herein, settlements of withdrawals pursuant to this Section 5.5(m) are made in the same manner as voluntary withdrawals.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 202
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1546 of 1726 PageID 12867
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 39 of 55

(n)    Notwithstanding the foregoing, the General Partner may waive any restrictions on any Limited Partner's ability to withdraw.

### Article VI
### SOFT WIND DOWN, DISSOLUTION AND LIQUIDATION

**6.1**    **Soft Wind Down**

(a)    The General Partner may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued (whether or not the General Partner has implemented a Suspension). Having made such determination, the Investment Manager may recommend to the General Partner to cause the Partnership to return the Partnership's assets to Limited Partners in an orderly manner (without proceeding with a liquidation of the Partnership) (an "***Orderly Realization***"). The General Partner may, in such circumstances, resolve to effect an Orderly Realization should it determine that doing so is in the best interests of the Partnership as a whole. Such Orderly Realization shall not constitute a dissolution or winding up of the Partnership for any purposes, but rather only the continued management of the Partnership's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Partnership to the Limited Partners.

(b)    The General Partner will notify the Limited Partners of any decision to proceed with an Orderly Realization of the Partnership. During an Orderly Realization, the Investment Manager may, in consultation with the General Partner, take such steps as are considered appropriate in the best interests of the Partnership as a whole to effect the Orderly Realization. The General Partner, in consultation with the Investment Manager, shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "***Realization Period***"). Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Partnership and may be carried out without recourse to a formal process of liquidation under Delaware law or any other applicable bankruptcy or insolvency regime.

(c)    The General Partner, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued.

(d)    Management Fees, and all other fees and expenses, shall be payable and Performance Allocations shall be made during an Orderly Realization on the same basis as provided herein.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 203
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1547 of 1726   PageID 12868
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 40 of
55

6.2    **Dissolution of Partnership**

(a)    The Partnership shall be dissolved upon the first to occur of the following dates:

   (i)    any date on which the General Partner shall elect in writing to dissolve the Partnership; or

   (ii)    the occurrence of any other event causing (A) the General Partner (or a successor to its business) to cease to be the general partner of the Partnership or (B) the dissolution of the Partnership under the Act.

(b)    In the event an Orderly Realization lasts longer than three years, a Super-Majority-in-Interest of the Limited Partners may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Partnership.  The Limited Partners will not have any other right to bring an action in court to dissolve the Partnership.  The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.  Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.  Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

6.3    **Liquidation of Assets**

(a)    Upon dissolution of the Partnership, the General Partner shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority-in-Interest of Limited Partners shall liquidate the business and administrative affairs of the Partnership.   Net Profit and Net Loss during any Accounting Period, which includes the period of liquidation, shall be allocated pursuant to Article III.  The proceeds from liquidation shall be divided in the following manner, subject to the Act:

   (i)    the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

   (ii)    such debts as are owing to the Partners as Partners are next paid; and

   (iii)    the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 204
Case 3:23-cv-00726-S Document 8-23 Filed 10/29/23 Page 1548 of 1726 PageID 12869
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 41 of
55

Accounting Period ending on the date of the distributions under this Section 6.1(a)(iii).

(b) Notwithstanding this Section 6.3 and the priorities set forth in the Act, the General Partner or liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; provided, however, that if any in kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.2, and charged as so valued and distributed against amounts to be paid under Section 6.3(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit or Net Loss for the Accounting Period ending on the date of such distribution.

## Article VII
### ACCOUNTING AND VALUATION; BOOKS AND RECORDS

**7.1 Accounting and Reports**

(a) The Partnership may adopt for tax accounting purposes any accounting method that the General Partner shall decide is in the best interests of the Partnership and that is permissible for U.S. federal income tax purposes.

(b) As soon as practicable after the end of each Fiscal Year thereafter, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of each such period to be made by a firm of independent accountants selected by the General Partner. As soon as is practicable thereafter, but subject to Section 7.4, the General Partner shall furnish to each Limited Partner a copy of the set of financial statements prepared in accordance with GAAP, with such adjustments thereto as the General Partner determines appropriate, including the report of such independent accountants.

(c) As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

(d) As soon as practicable after the end of each calendar month, but subject to Section 7.5, the General Partner shall arrange for the preparation and delivery to each Limited Partner of an interim report containing such information concerning the affairs of the Partnership (which need not include any financial statements) as the General Partner considers appropriate.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 205
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1549 of 1726 PageID 12870
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 42 of
55

**7.2    Valuation of Partnership Assets and Interests**

(a)    The General Partner (or its delegate, including the Investment Manager or the administrator of the Partnership) shall value the assets of the Partnership as of the close of business on the last day of each Accounting Period.  Such valuations will generally be in accordance with GAAP, with such adjustments thereto as the General Partner reasonably determines appropriate.  In addition, the General Partner shall value the assets which are being distributed in kind as of the close of the Business Day immediately preceding the distribution date in accordance with Section 5.5(c) or Section 6.3(b).  In determining the value of the assets of the Partnership, no value shall be placed on the goodwill or name of the Partnership, or the office records, files, statistical data or any similar intangible assets of the Partnership not normally reflected in the Partnership's accounting records, but there shall be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

(b)    To the extent readily available, valuations will be based on independent market quotations obtained by the General Partner from recognized pricing services, market participants or other sources.  In the case of any Investment for which a quotation from an independent source is not available or is determined by the General Partner to be unreliable or inadequate, the General Partner (i) shall be authorized, to the extent permitted by applicable law, to value such positions at their fair value in such manner as the General Partner determines in good faith, or (ii) may (but shall not be required to) obtain an appraisal, at the expense of the Partnership, by an independent third party selected by the General Partner.   Except as otherwise determined by or at the direction of the General Partner, investment and trading transactions shall be accounted for on the trade date.

(c)    Accounts shall be maintained in U.S. dollars, and except as otherwise determined by or at the direction of the General Partner:  (i)  assets and liabilities denominated in currencies other than U.S. dollars shall be translated at the rates of exchange quoted by an independent pricing service as in effect as of the close of business on the relevant valuation dates (and exchange adjustments shall be recorded in the results of operations); and (ii) investment and trading transactions and income and expenses shall be translated at the rates of exchange in effect at the time of each transaction.

**7.3    Determinations by the General Partner**

(a)    All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 206
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1550 of 1726 PageID 12871
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 43 of
55

and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)    The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or sub-account as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

**7.4    Books and Records**

(a)    The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the Partnership. The General Partner shall afford to the Partnership's independent auditors reasonable access to such documents during customary business hours and shall permit the Partnership's auditors to make copies thereof or extracts therefrom at the expense of the Partnership.

(b)    The General Partner shall establish such standards as it deems appropriate regarding the access of Limited Partners to the books and records of the Partnership and shall not be obliged to permit access by a Limited Partner to the name or address of any other Limited Partner.

**7.5    Confidentiality**

(a)    Each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns) or disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to any Investment (other than disclosure to such Limited Partner's directors, employees, agents, advisors, or representatives responsible for matters relating to the Partnership or to any other Person approved in writing by the General Partner (each such Person being hereinafter referred to as an "***Authorized Representative***")); provided that (i) such Limited Partner and its Authorized Representatives may make such disclosure to the extent that (A) the information to be disclosed is publicly available at the time of proposed disclosure by such Limited Partner or Authorized Representative, (B) the information otherwise is or becomes legally available to such Limited Partner other than through disclosure by the Partnership or the General Partner, or (C) such disclosure is required by law or in

39

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 207
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1551 of 1726   PageID 12872
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 44 of
55

response to any governmental agency request or in connection with an examination by any regulatory authorities; <u>provided</u> that such governmental agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) such Limited Partner and its Authorized Representatives may make such disclosure to its beneficial owners to the extent required under the terms of its arrangements with such beneficial owners; and (iii) each Limited Partner will be permitted, after written notice to the General Partner, to correct any false or misleading information which becomes public concerning such Limited Partner's relationship to the Partnership or the General Partner.  Prior to making any disclosure required by law, each Limited Partner shall use its best efforts to notify the General Partner of such disclosure.  Prior to any disclosure to any Authorized Representative or beneficial owner, each Limited Partner shall advise such Authorized Representative or beneficial owner of the obligations set forth in this Section 7.5(a) and each such Authorized Representative or beneficial owner shall agree to be bound by such obligations.

(b)     The General Partner may keep confidential from the Limited Partners, for such period of time as the General Partner deems reasonable, any information, including the identity of the Partners or information regarding the Partners or Investments, which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

(c)     Subject to applicable legal and regulatory considerations, the General Partner shall use reasonable efforts to keep confidential any information relating to a Limited Partner obtained by the General Partner in connection with or arising out of the Partnership which the Limited Partner requests to be kept confidential.

(d)     Notwithstanding the provisions of this Section 7.5, Partners (and their employees, representatives and other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and its transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to such Person by, or on behalf of the Partnership.  For this purpose, "tax treatment" is the purported or claimed U.S. federal income tax treatment of a transaction and "tax structure" is limited to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction.  For this purpose, the names of the Partnership, the Partners, their affiliates, the names of their partners, members or equity holders and the representatives, agents and tax advisors of any of the foregoing are not items of tax structure.

(e)     The General Partner may disclose to prospective investors such information relating to the Partnership or the Investments as it believes in good faith will benefit the Partnership and facilitate investment in the Partnership by such prospective investors.

(f)      The Investment Manager and a Person acting as a service provider to the Partnership shall have the right to access all information belonging to the Partnership.

## Article VIII
## GENERAL PROVISIONS

**8.1    Amendment of Partnership Agreement**

(a)      Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, with the written consent of (i) the General Partner and (ii) the consent of a Majority-in-Interest of Limited Partners (which approval may be obtained by negative consent affording the Limited Partners at least 30 calendar days to object).

(b)      Any amendment that would:

(i)      increase the obligation of a Partner to make any contribution to the capital of the Partnership;

(ii)     reduce the Capital Account of a Partner other than in accordance with Article III;

(iii)    adversely alter any Partner's rights with respect to the allocation of Net Profit or Net Loss or with respect to distributions and withdrawals; or

(iv)     change the respective liabilities of the General Partner and the Limited Partners;

may only be made if the consent of each Partner adversely affected thereby is obtained (which consent may be obtained by negative consent affording the Partner at least 30 calendar days to object).

(c)      Notwithstanding paragraphs (a) and (b) of this Section 8.1, this Agreement may be amended by the General Partner without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Partnership as of a date determined by the General Partner that is not less than 30 calendar days after the General Partner has furnished written notice of such amendment to each affected Limited Partner and that is prior to the effective date of the amendment.   The admission and withdrawal of Limited Partners will not require notice or disclosure to, or the approval of, the other Limited Partners.

(d)      The General Partner may at any time without the consent of the other Partners:

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 209
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1553 of 1726 PageID 12874
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 46 of 55

(i)    add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

(ii)    cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

(iii)    change the name of the Partnership;

(iv)    make any changes required by a governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners, provided, however, that no such amendment may be made unless such change (A) is for the benefit of, or not adverse to, the interests of Limited Partners, (B) does not affect the right of the General Partner to manage and control the Partnership's business, (C) does not affect the allocation of profits and losses among the Partners and (D) does not affect the limited liability of the Limited Partners;

(v)    amend this Agreement to reflect a change in the identity of the General Partner which has been made in accordance with this Agreement;

(vi)    amend this Agreement (other than with respect to the matters set forth in Section 8.1(b)) to effect compliance with any applicable laws, regulations or administrative actions;

(vii)    subject to Section 8.1(b), amend this Agreement to reflect the creation, and terms, of any new Series of Interests;

(viii)    effect any other amendment which would not, in the good faith judgment of the General Partner, adversely affect any of the existing Limited Partners; and

(ix)    restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(e)    Following the adoption of any amendments to this Agreement pursuant to 8.1(d), the General Partner shall promptly deliver a copy of such amendments to this Agreement to the Limited Partners.

(f)    The General Partner may agree with a Limited Partner to waive or modify the application of any provision of this Agreement with respect to such Limited Partner without notifying or obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights as a Limited Partner pursuant to this Agreement would be materially and adversely changed by such waiver or modification). Any such waiver or modification may be evidenced by a "side letter" or other document which will govern with respect to the applicable Limited Partner and be incorporated as part of this Agreement.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 210
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1554 of 1726   PageID 12875
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 47 of
55

**8.2**    **Special Power-of-Attorney**

(a)    Each Limited Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns), with full power of substitution, the true and lawful representative and attorney-in-fact of, and in the name, place and stead of, such Limited Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish:

(i)    an amendment to this Agreement that complies with the provisions of this Agreement (including the provisions of Section 8.1);

(ii)    the Certificate and any amendment thereof required because this Agreement is amended, including an amendment to effectuate any change in the membership of the Partnership or in the capital contributions of the Partners;

(iii)    any financing statement or other filing or document required or permitted to perfect the security interests contemplated by any provision hereof; and

(iv)    all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the State of Delaware, or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership, exchange a portion of a Limited Partner's Interest for similar equity interests in an Alternative Investment Vehicle, or to effect the dissolution or termination of the Partnership.

(b)    Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without that Limited Partner's consent.  If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner contemplated by this Agreement, each Limited Partner agrees that, notwithstanding any objection which such Limited Partner may assert with respect to such action, the General Partner in its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action to be lawfully taken or omitted.  Each Partner is fully aware that each other Partner relies on the effectiveness of this special power-of-attorney with a view to the orderly administration of the affairs of the Partnership.  This power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the General Partner and as such:

(i)    is irrevocable and continues in full force and effect notwithstanding the subsequent death or incapacity of any party granting this power-of-attorney,

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 211
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1555 of 1726 PageID 12876
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 48 of
55

regardless of whether the Partnership or the General Partner has had notice thereof; and

(ii) survives the delivery of an assignment by a Limited Partner of the whole or any portion of such Limited Partner's Interest, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this power-of-attorney given by the assignor survives the delivery of such agreement for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

**8.3    Notices**

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner.  Notices will be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.

**8.4    Agreement Binding Upon Successors and Assigns; Delegation**

This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder are not assignable, transferable or delegable except as provided in Sections 4.1(c), 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections will be null and void *ab initio*.

**8.5    Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction.   The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in the courts located in Dallas County, Texas.  Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the register of Partners maintained by the General Partner.

APP. 1081279

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 212
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1556 of 1726 PageID 12877
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 49 of 55

**8.6    Not for Benefit of Creditors**

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership. Except for the rights of the Indemnified Persons hereunder, this Agreement is not intended for the benefit of non-Partner creditors and no rights are granted to non-Partner creditors under this Agreement.

**8.7    Dispute Resolution**

The following procedures shall be used to resolve any controversy or claim ("*Dispute*") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Indemnified Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    <u>Mediation</u>

(i)    Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(ii)    The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(iii)    The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(iv)    Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b)    <u>Arbitration</u>

(i)    If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 213
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1557 of 1726 PageID 12878
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 50 of 55

mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("***Arbitration Rules***"). In the event of a conflict, the provisions of this document will control.

(ii)     The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the U.S. Federal Arbitration Act ("***FAA***"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality, non-competition, non-solicitation or non-recruitment covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this Agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(iii)    The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(iv)    The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement.

(v)     No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes

it.  In any event, there shall be no more than (a) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (b) one non-party deposition of six hours; (c) twenty-five interrogatories; (d) twenty-five requests for admission; (e) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; and (f) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(vi)    All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement.  Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.  In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered.  The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(vii)    The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

## 8.8    Consents and Voting

(a)    Except as provided in Section 5.4, Limited Partners do not have any right to vote for the admission or removal of any General Partner and, except for the right to vote on certain amendments proposed by the General Partner and as otherwise expressly set out herein, have no other voting rights.   Upon the request of any Limited Partner, the General Partner may designate an Interest as a Non-Voting Interest, in which case the Limited Partner shall not have the right to vote on any matter including amendments.

(b)    Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and a copy thereof shall be filed and kept with the books of the Partnership.  For the avoidance of doubt, an amendment made pursuant to Section 8.1(c) or pursuant to negative consent under Section 8.1(a) or Section 8.1(b) shall not require any affirmative written response by any Limited Partner who is not electing to withdraw from the Partnership.

(c)    In the event the Partnership seeks the approval, vote or consent of the Offshore Fund with respect to any matter to which it would be entitled to vote as a Limited

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 215
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1559 of 1726 PageID 12880
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 52 of 55

Partner of the Partnership under this Agreement, the Offshore Fund will: (i) submit such matter for the consent of the shareholders and (ii) shall vote its Limited Partner interest proportionally for and against such matter in the same proportion that the shareholders voted for and against such matter.

**8.9     Merger and Consolidation**

(a)     The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an agreement of merger or consolidation which has been approved in the manner contemplated by Section 17-211(b) of the Act.

(b)     Notwithstanding anything to the contrary contained elsewhere in this Agreement, an agreement of merger or consolidation approved in accordance with Section 17-211(b) of the Act may, to the extent permitted by Section 17-211(g) of the Act, (i) effect any amendment to this Agreement, (ii) effect the adoption of a new limited partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the limited partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) shall be the limited partnership agreement of the surviving or resulting limited partnership.

**8.10     Miscellaneous**

(a)     The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.   Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)     This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c)     If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.   Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

**8.11     BHCA Subject Persons**

Notwithstanding any other provision of this Agreement to the contrary:

(a)     Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has a Partnership Percentage in

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 216
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1560 of 1726 PageID 12881
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 53 of 55

excess of 4.9% of the aggregate Partnership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold a Partnership Percentage of only 4.9% of the aggregate Partnership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 8.11 on all such Limited Partners), and such Partnership Percentage in excess of said 4.9% shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages; <u>provided</u> that this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of this Agreement up to the full amount of its Partnership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partner's Interest. The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; <u>provided</u>, <u>however</u>, that the foregoing voting restriction shall not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no Person acquires more than 2% of the Partnership's outstanding Interests; or (iv) in a single transaction to a third party who acquires at least a majority of the Partnership's outstanding Interests without regard to the Transfer of such Interests.

(b)     Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice, and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law. Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages.

(c)     A Limited Partner that is a BHCA Subject Person and that elects to be subject to Section 8.11(a) and (b) shall notify the General Partner thereof (an "***Election Notice***") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to Section 8.11(a) and (b) until 10 calendar days after such Limited Partner notifies the General Partner that it elects no longer to be subject to Section 8.11(a) and (b) (a "***Revocation Notice***"), which period may be reduced by the General Partner.

## 8.12   RIC Limited Partners

An Interest of a RIC Limited Partner does not entitle the RIC Limited Partner to vote or consent with respect to any Partnership matter unless the RIC Limited Partner's vote or consent with respect to its Interest would not be considered to be "voting securities" as defined under Section 2(a)(42) of the Investment Company Act. Except as provided in this Section 8.12, an Interest held by a RIC Limited Partner as a Non-Voting Interest is identical in all regards to all other Interests held by Limited Partners.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 217
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1561 of 1726 PageID 12882
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 54 of 55

### 8.13   Bad Actor Limited Partners

Under Rule 506(d) under the Securities Act, the Partnership may be banned from selling Interests under Rule 506 if a Limited Partner beneficially owning 20% or more of the Partnership's voting securities engages in a "bad act" set forth in Rule 506.   Accordingly, each Limited Partner agrees that the General Partner may deem the portion of any Bad Actor Limited Partner's Interests to be, or convert any Bad Actor Limited Partner's Interests into, Non-Voting Interests (except for the purposes of voting on any amendment to this Agreement that would materially and adversely change the Bad Actor Limited Partner's rights and preferences as a Limited Partner other than pursuant to an amendment under Section 8.1(c)) to the extent that the General Partner determines that such portion is in excess of 19.99% of the outstanding aggregate voting Interests of all Partners excluding any Interests that are Non-Voting Interests.

### 8.14   Entire Agreement

The parties acknowledge and agree that, this Agreement, together with any other agreement with a Limited Partner pursuant to Section 8.1(e), constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

[Signature Page Follows]

APPX. 10823

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 218
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1562 of 1726 PageID 12883

Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 55 of 55

The parties hereto have executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

HIGHLAND MULTI STRATEGY CREDIT FUND GP, L.P.

By:   HIGHLAND MUTI STRATEGY CREDIT GP, LLC
       its general partner

By:   HIGHLAND CAPITAL MANAGEMENT, L.P.
       its sole member

By:   STRAND ADVISORS, INC.
       its general partner

By: _____

Name: __James Dondero_____

Title: __President_____

**LIMITED PARTNERS:**

By:   HIGHLAND MULTI STRATEGY CREDIT FUND GP, L.P
       attorney-in-fact for the Limited Partners

By:   HIGHLAND MULTI STRATEGY CREDIT GP, LLC
       its general partner

By:   HIGHLAND CAPITAL MANAGEMENT, L.P.
       its sole member

By:   STRAND ADVISORS, INC.
       its general partner

By: _____

Name: __James Dondero_____

Title: __President_____

*Signature Page to the Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P.*

Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 43

# **EXHIBIT 6**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 220
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1564 of 1726   PageID 12885
of 330
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 2 of 43

THE COMPANIES LAW (2013 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES


AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF


HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.

(As Adopted by Special Resolution on 1 November 2014)



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 221
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1565 of 1726   PageID 12886
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 3 of 43

**THE COMPANIES LAW (2013 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**


**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

**(As Adopted by Special Resolution on 1 November 2014)**


1   The name of the Company is **Highland Multi Strategy Credit Fund, Ltd.**

2   The Registered Office of the Company shall be at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, or at such other place within the Cayman Islands as the Directors may decide.

3   The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the laws of the Cayman Islands.

4   The liability of each Member is limited to the amount unpaid on such Member's Shares.

5   The share capital of the Company is US$50,000 divided into 100 Management Shares of US$0.01 par value each and 49,999,000 Participating Shares of US$0.001 par value each.

6   The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7   Capitalised terms that are not defined in this Memorandum of Association bear the respective meanings given to them in the Articles of Association of the Company.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 08127

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 222
Case 3:23-cv-00726-S   Document 8-23   Filed 10/29/23   Page 1566 of 1726   PageID 12887
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 4 of 43

**THE COMPANIES LAW (2013 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**OF**

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

**(As Adopted by Special Resolution on 1 November 2014)**

**1    Interpretation**

1.1    In these Articles, Table A in the First Schedule to the Statute does not apply and unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| **"Administrator"** | means the person, firm or corporation appointed and from time to time acting as administrator of the Company. |
| **"Articles"** | means these articles of association of the Company. |
| **"Auditor"** | means the person (if any) for the time being performing the duties of auditor of the Company. |
| **"Business Day"** | means any day normally treated as a business day in such places and/or on such markets as the Directors may from time to time determine. |
| **"Cayman Islands"** | means the British Overseas Territory of the Cayman Islands. |
| **"Class"** | means a separate class of Participating Share (and includes any sub-class of any such class). |
| **"Company"** | means the above-named Company. |
| **"Directors"** | means the directors for the time being of the Company. |
| **"Dollars"** or **"US$"** | refers to the currency of the United States. |
| **"Electronic Record"** | has the same meaning as in the Electronic Transactions Law. |



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

| **"Electronic Transactions Law"** | means the Electronic Transactions Law (2003 Revision) of the Cayman Islands. |
|---|---|
| **"Eligible Investor"** | means a person eligible to hold Participating Shares, as determined from time to time by the Directors. |
| **"FATCA"** | means: |

|  | (i) | sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any associated legislation, regulations or guidance, or similar legislation, regulations or guidance enacted in any jurisdiction which seeks to implement similar tax reporting and/or withholding tax regimes; |
|---|---|---|
|  | (ii) | any intergovernmental agreement, treaty, regulation, guidance or any other agreement between the Cayman Islands (or any Cayman Islands government body) and the US, the UK or any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in paragraph (i); and |
|  | (iii) | any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding paragraphs. |

| **"Gross Negligence"** | shall have the meaning ascribed thereto under the laws of the State of Delaware, USA. |
|---|---|
| **"Investment Manager"** | means the person, firm or corporation appointed and for the time being acting as the investment manager of the Company. |
| **"Management Share"** | means a voting non participating Share in the capital of the Company of US$0.01 par value designated as a Management Share and having the rights provided for in these Articles. |
| **"Master Fund"** | means Highland Multi Strategy Credit Fund, L.P., or any other entity in which all, or substantially all, of the assets of the Company are invested. |
| **"Member"** | means each person whose name is, from time to time and for the time being, entered in the Register of Members as the holder of one or more Shares. |

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 08139

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 224
Case 3:23-cv-00726-S Document 8-23 Filed 10/29/23 Page 1568 of 1726 PageID 12889
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 43

| | |
|---|---|
| **"Memorandum"** | means the memorandum of association of the Company. |
| **"Net Asset Value"** | means the value of the assets less the liabilities of the Company, or of a Separate Account (as the context may require), calculated in accordance with these Articles. |
| **"Net Asset Value per Participating Share"** | means the amount determined in accordance with these Articles as being the Net Asset Value per Participating Share of a particular Class and/or Series. |
| **"New Issue"** | has the meaning ascribed thereto by Rule 2790 adopted by the National Association of Securities Dealers, Inc. |
| **"New Issue Investment"** | means any New Issue acquired by the Company. |
| **"New Issue Shares"** | means a class of Participating Shares issued and designated as "New Issue Shares" and which may be issued in any one or more Series having the rights and restrictions set out in these Articles |
| **"Offering Memorandum"** | means an offering memorandum relating to Participating Shares of any Class and/or Series as amended or supplemented from time to time subject to and in accordance with these Articles. |
| **"Ordinary Resolution"** | means a resolution passed by a simple majority of the votes of such Members as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting, and includes a unanimous written resolution. |
| **"Participating Share"** | means a participating redeemable Share in the capital of the Company of US$0.001 par value and having the rights provided for in these Articles. Participating Shares may be divided into Classes in the discretion of the Directors in accordance with the provisions of these Articles and each Class may be further divided into different Series of Participating Shares and the term "Participating Share" shall include all such Classes and Series of Participating Share. |
| **"Prohibited Person"** | means any person who is restricted from participating in a New Issue pursuant to the Free-Riding and Withholding Interpretation adopted by the Board of Governors of the National Association of Securities Dealers Inc. |
| **"Redemption Date"** | means, in relation to any Class and/or Series of Participating Shares, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time, upon which a Member is entitled to require the redemption of Participating Shares |

3

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 08132

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 225
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1569 of 1726 PageID 12890
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 43

of that Class and/or Series.

**"Redemption Fee"**  means such fee (if any) payable by a Member to the Company on a redemption of Participating Shares, as the same may be determined by the Directors and disclosed to the Member at the time of its subscription for such Participating Shares.

**"Redemption Notice"**  means a notice in a form approved by the Directors by which a holder of Participating Shares is entitled to require the Company to redeem its Participating Shares.

**"Redemption Price"**  means the price determined in accordance with these Articles at which redeemable Participating Shares of the relevant Class and/or Series may be redeemed.

**"Register of Members**  means the register of Members, which shall be maintained in accordance with the Statute and includes (except where otherwise stated) any branch or duplicate Register of Members.

**"Registered Office"**  means the registered office for the time being of the Company.

**"Sales Charge"**  means such sales charge (if any) determined by the Directors as being payable by a subscriber on a subscription for Participating Shares of any Class and/or Series.

**"Seal"**  means the common seal of the Company and includes every duplicate seal.

**"Separate Account"**  means a separate internal account of the Company which the Directors may establish and cause to be maintained in accordance with these Articles.

**"Series"**  means a separate series of Participating Share (and includes any sub-series of any such series).

**"Share"** and **"Shares"**  means a share or shares of any class or series in the Company, including a Management Share, a Participating Share or a New Issue Share, as well as any fraction of a Share.

**"Share Rights"**  means, with respect to the Participating Shares of any Class or Series in issue, the class rights for the time being applicable to such Participating Shares or other terms of offer for the time being applicable to such Participating Shares whether set out in the Offering Memorandum, any subscription agreement or otherwise (including any representations, warranties or other disclosure relating

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 226
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1570 of 1726 PageID 12891
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 43

to the offer or holding of such Participating Shares).

| | |
|---|---|
| **"Special Resolution"** | has the same meaning as in the Statute and includes a unanimous written resolution. |
| **"Statute"** | means the Companies Law (2013 Revision) of the Cayman Islands. |
| **"Subscriber"** | means the subscriber to the Memorandum. |
| **"Subscription Date"** | means, in relation to Participating Shares of any Class and/or Series, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time upon which a person may subscribe for Participating Shares of that Class and/or Series. |
| **"Subscription Price"** | means the price determined in accordance with these Articles at which Participating Shares of the relevant Class and/or Series may be subscribed. |
| **"Suspension"** | means a determination by the Directors to postpone or suspend (i) the calculation of the Net Asset Value of Participating Shares of any one or more Classes and/or Series (and the applicable Valuation Date) (a **"Calculation Suspension"**); (ii) the issue of Participating Shares of any one or more Classes and/or Series (and the applicable Subscription Date) (an **"Issue Suspension"**); (iii) the redemption by Members (in whole or in part) of Participating Shares of any one or more Classes and/or Series (and the applicable Redemption Date) (a **"Redemption Suspension"**); and/or (iv) the payment (in whole or in part) of any redemption proceeds (even if Valuation Dates and Redemption Dates are not postponed) (a **"Payment Suspension"**). |
| **"Transfer"** | means, in respect of any Share, any sale, assignment, exchange, transfer, pledge, encumbrance or other disposition of that Share, and **"Transferred"** shall be construed accordingly. |
| **"Treasury Share"** | means a Share held in the name of the Company as a treasury share in accordance with the Statute. |
| **"Valuation Date"** | means, in relation to each Class and/or Series of Participating Shares, the day or days determined from time to time by the Directors to be the day or days on which the Net Asset Value per Participating Share of that Class and/or Series is calculated. |
| **"Valuation Point"** | means, with respect to any Class and/or Series, the time or times on the Valuation Date of such Class and/or Series at which the Directors |

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 227
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1571 of 1726 PageID 12892
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 43

determine that the Net Asset Value per Participating Share of that Class and/or Series shall be calculated.

1.2    In these Articles:

(a)    the singular number includes the plural number and vice versa;

(b)    the masculine gender includes the feminine gender;

(c)    persons includes corporations;

(d)    "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)    "shall" shall be construed as imperative and "may" shall be construed as permissive;

(f)    references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

(g)    any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(h)    the term "and/or" is used herein to mean both "and" as well as "or."  The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others.  "Or" shall not be interpreted to be exclusive, and "and" shall not be interpreted to require the conjunctive — in each case, unless the context otherwise requires;

(i)    any reference to the powers of the Directors shall include, when the context admits, the service providers or any other person to whom the Directors may delegate their powers;

(j)    any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(k)    any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Law;

(l)    sections 8 and 19(3) of the Electronic Transactions Law shall not apply; and

(m)    headings are inserted for reference only and shall be ignored in construing these Articles.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

**APPX. 10833**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 228
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1572 of 1726   PageID 12893
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 10 of 43

## 2    Commencement of Business

2.1    The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

2.2    The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and operation of the Company, including the expenses of registration and the initial offering of Participating Shares.

## 3    Service Providers

3.1    The Directors may appoint any person, firm or corporation to act as a service provider to the Company (whether in general or in respect of any Class and/or Series of Shares) and may entrust to and confer upon any such service providers any of the functions, duties, powers and discretions exercisable by them as Directors, upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit. Without limiting the generality of the foregoing, such service providers may include managers, investment advisers, administrators, registrars, transfer agents, custodians and prime brokers.

3.2    Without prejudice to the generality of the preceding Article, the Directors may appoint any person, firm or corporation to act as the Investment Manager with respect to the assets of the Company (whether in general or in respect of any Class and/or Series of Shares).  The Directors may entrust to and confer upon the Investment Manager any of the functions, duties, powers and discretions exercisable by them as Directors upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit.

## 4    Rights attaching to Shares

4.1    The Management Shares shall have the following rights:

(a)    as to voting: the holder of a Management Share shall (in respect of such Management Share) have the right to receive notice of, attend at and vote as a Member at any general meeting of the Company; and

(b)    as to capital: a Management Share shall confer upon the holder the right in a winding up to repayment of capital as provided in these Articles but shall confer no other right to participate in the profits or assets of the Company; and

(c)    as to income: no dividends shall be payable on the Management Shares.

4.2    The Participating Shares shall have the following rights:



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APP. 108144

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 229
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1573 of 1726 PageID 12894
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 11 of 43

(a)      as to voting: the holder of a Participating Share shall not (in respect of such Participating Share) have the right to receive notice of, attend at or vote as a Member at any general meeting of the Company, but may vote at a separate Class meeting convened in accordance with these Articles; and

(b)      as to capital: a Participating Share shall confer upon the holder thereof the right in a winding up to participate in the surplus assets of the Company by reference to the Separate Account attributable to the relevant Class or Series of Participating Shares as provided in these Articles; and

(c)      as to income: the Participating Shares shall confer on the holders thereof the right to receive dividends as provided in these Articles.

4.3      Notwithstanding Articles 4.1(a) and 4.2(a), if the Company, in its capacity as a limited partner of the Master Fund, is called upon to approve, vote or consent to any matter to which it would be entitled to vote as a limited partner of the Master Fund and is required to seek the consent of the holders of Participating Shares in connection with any such approval, vote or consent pursuant to the constitutional documents of the Master Fund (a "**Master Fund Consent Transaction**"), each holder of a Participating Share shall have the right (in respect of such Participating Share), to the exclusion of the holders of the Management Shares (in respect of such Management Shares), to receive notice of, and vote on, the Master Fund Consent Transaction (the "**Special Voting Right**").  The voting rights attributable to each Participating Share shall be calculated by reference to the Net Asset Value per Participating Share (calculated as at the most recent Valuation Date) and not on the basis of one Participating Share, one vote.  For every Master Fund Consent Transaction, the Directors shall cause the Company to vote its limited partnership interest in the Master Fund proportionally for and against such matter in the same proportion that the Members holding Participating Shares voted for and against such matter pursuant to the Special Voting Right.

4.4      In relation to any Special Voting Right pursuant to Article 4.3, unless otherwise determined by the Directors in their sole discretion, the procedure in this Article 4.4 shall be invoked.  The Directors shall provide written notice of the proposed Master Fund Consent Transaction to the Members holding Participating Shares and shall specify a deadline (the "**Consent Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such Members may submit a written refusal to consent to the proposed Master Fund Consent Transaction.  The holders of Participating Shares in respect of which an express written refusal to consent has not been received by the Consent Date shall be deemed to have consented in writing to the proposed Master Fund Consent Transaction.

## 5    Share Capital

5.1      Subject to these Articles, the Directors may allot, issue, grant options or warrants over, or otherwise dispose of Shares in separate classes and/or series with different terms, preferences, privileges or special rights including, without limitation, with respect to investment strategy and/or policy, participation in assets, profits and losses of the Company, voting, fees charged (including

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 230
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1574 of 1726   PageID 12895
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 12 of
43

management, performance and incentive fees), redemption privileges, allocation of costs and expenses (including, without limitation, the costs and expenses incurred in any hedging activities and any profits and losses arising therefrom) as they think proper.  Subject to the Statute, these Articles and any applicable subscription agreement, any Share Rights (other than those set out in these Articles or set out in a Special Resolution) may be varied by either the Directors or by Ordinary Resolution.  Notwithstanding the foregoing, the Subscriber shall have the power to:

(a)      issue one Share to itself;

(b)      transfer that Share by an instrument of transfer to any person; and

(c)      update the Register of Members in respect of the issue and transfer of that Share.

5.2      On or before the allotment of any Participating Share the Directors shall resolve the Class and/or Series to which such Participating Share shall be classified and may, prior to the issue of any Participating Share, reclassify such Participating Share.  Each Class and/or Series shall be specifically identified.  Subject to the Statute and these Articles, the Directors may at any time re-name any Participating Share.

5.3      Notwithstanding the currency in which the par value of the Participating Shares is denominated, the Directors may specify any currency as the currency in which the Subscription Price, Redemption Price and Net Asset Value of Participating Shares of a Class and/or Series is calculated.

5.4      The Company shall not issue Shares to bearer.

5.5      Fractional Shares may be issued.

5.6      Shares shall only be issued as fully paid-up.

5.7      No right of pre-emption or first refusal shall attach to any Shares.

5.8      New Issue Shares shall not be issued to a Prohibited Person.

**6        Allotment and Issue of Participating Shares**

6.1      The Directors may from time to time allot and issue Participating Shares of any Class and/or Series.  The Directors may, in their discretion, refuse to allot and issue any Participating Shares, and shall not issue any Participating Shares to or for the account of an investor who is not an Eligible Investor.  If the Directors have declared a Calculation Suspension or Issue Suspension, no Participating Shares of that Class or Series (as appropriate) shall be issued until the relevant Suspension has ended.

6.2      The Directors shall determine the Subscription Price at the time of issue of the first issue of Participating Shares of any Class and/or Series.  Thereafter, the Directors may allot and issue

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 231
Case 3:23-cv-00726-S   Document 8-23   Filed 08/29/23   Page 1575 of 1726   PageID 12896
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 13 of
43

Participating Shares of the same Class and/or Series on any Subscription Date provided that such additional Participating Shares are issued at a Subscription Price equal to not less than the Net Asset Value per Participating Share of such Class and/or Series calculated on the relevant Subscription Date (or if the Subscription Date is not also a Valuation Date then on the immediately preceding Valuation Date).

6.3    The Directors may add to the Subscription Price per Participating Share (before making any rounding adjustment) an amount which they consider to be an appropriate allowance to reflect fiscal and purchase charges which would be incurred for the account of the Company in investing an amount equal to the Subscription Price.  The Directors may also add, in their discretion, a Sales Charge and/or an amount equal to any stamp duty and any other governmental taxes or charges payable by the Company with respect to the issue of such Participating Shares.

6.4    An applicant for Participating Shares shall pay for such Participating Shares in such currencies, in such manner, at such time, in such place and to such person acting on behalf of the Company as the Directors may from time to time determine.

6.5    Subject to the terms of any subscription agreement, an application for Participating Shares shall be irrevocable by an applicant for Participating Shares once it has been received by the Company.  Participating Shares shall be treated as having been issued with effect from the relevant Subscription Date notwithstanding that the subscriber for those Participating Shares may not be entered in the Register of Members until after the Subscription Date.

6.6    Participating Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case; likewise the Directors may from time to time prescribe an amount as the minimum subscription amount.

6.7    The Directors may resolve to accept non-cash assets in satisfaction (in whole or in part) of the Subscription Price.

6.8    The Directors may require an applicant for Participating Shares to pay to the Company for the benefit of any selling agent such selling commissions or such organisational charges as may have been disclosed to such applicant.  The Directors may differentiate between applicants as to the amount of such selling commissions or such organisational charges.

6.9    The Company may, in so far as the Statute permits, pay a commission to any person in consideration of that person subscribing or agreeing to subscribe whether absolutely or conditionally for any Participating Shares.  Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Participating Shares.  The Company may also on any issue of Participating Shares pay such brokerage as may be lawful.

7    **Separate Accounts**

7.1    The Directors shall have the power to establish and maintain, with respect to Participating Shares of any Class and/or Series, a Separate Account, to record (purely as an internal accounting

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APP.108139

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 232
Case 3:23-cv-00726-S   Document 8-23   Filed 01/30/23   Page 1576 of 1726   PageID 12897
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 14 of
43

matter) the allocation, on a differentiated basis, of the assets and liabilities of the Company to the holders of Participating Shares of any such Class and/or a Series in a manner consistent with the methodology set forth in the Offering Memorandum and the rights otherwise attaching to the Participating Shares.

7.2    The proceeds from the issue of Participating Shares of any Class and/or Series shall be applied in the books of the Company to the Separate Account established for Participating Shares of that Class and/or Series. The assets and liabilities and income and expenditure attributable to that Separate Account shall be applied to such Separate Account and, subject to the provisions of these Articles, to no other Separate Account. In the event that the assets of a Separate Account referable to any Class and/or Series are exhausted, any and all unsatisfied claims which any Members or former Members referable to that Class and/or Series have against the Company shall be extinguished. The Members or former Members referable to a Class and/or Series shall have no recourse against the assets of any other Separate Account established by the Company.

7.3    Where any asset is derived from another asset (whether cash or otherwise), such derivative asset shall be applied in the books of the Company to the same Separate Account as the asset from which it was derived, and on each revaluation of an asset the increase or diminution in value shall be applied to the same Separate Account and, subject to the provisions of these Articles, to no other Separate Account.

7.4    In the case of any asset or liability of the Company which the Directors do not consider is attributable to a particular Separate Account, the Directors shall have discretion to determine the basis upon which any such asset or liability shall be allocated between or among Separate Accounts.

7.5    The Directors may, in the books of the Company, allocate assets and liabilities to and from Separate Accounts if, as a result of a creditor proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne if applied under the foregoing Articles.

7.6    The Directors may from time to time transfer, allocate or exchange an asset or liability from one Separate Account to another Separate Account provided that at the time of such transfer, allocation or exchange the Directors form the opinion (in good faith) that the value in money or money's worth of each such asset or liability transferred, allocated or exchanged is not significantly less or more than the value in money or money's worth (referred to in these Articles as "proper value") received by the Separate Account from which such asset or liability is transferred, allocated or exchanged except only as is otherwise provided by these Articles.

**8    Determination of Net Asset Value**

8.1    The Net Asset Value and Net Asset Value per Participating Share of each Class and/or Series shall be determined by or on behalf of the Directors as at the relevant Valuation Point on each relevant Valuation Date.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 108140

8.2    In calculating the Net Asset Value and the Net Asset Value per Participating Share, the Directors shall apply such generally accepted accounting principles as they may determine.

8.3    The assets and liabilities of the Company shall be valued in accordance with such policies as the Directors may determine.  Absent bad faith or manifest error, any valuation made pursuant to these Articles shall be binding on all persons.

8.4    Unless otherwise determined by the Directors in any resolution creating a Class and/or Series of Participating Shares or as otherwise disclosed in any Offering Memorandum, the Net Asset Value per Participating Share of each Class (or Series) shall be determined by allocating *pro rata* the Net Asset Value, as at the relevant Valuation Point, of the Company and/or of the relevant Separate Account among each Class and/or Series, adjusting the amount so calculated to reflect any fees, costs, foreign exchange items or other assets or liabilities which are properly attributable to a specific Class and/or Series and then by dividing the resultant amount by the number of Participating Shares of such Class and/or Series then in issue.

8.5    The Directors may determine that the Net Asset Value of any Class and/or Series shall be definitively determined on the basis of estimates and that such determination shall not be modified to reflect final valuations.

8.6    Any expense or liability may be amortised over such period as the Directors may determine.

8.7    The Directors may establish such reserves as they deem reasonably necessary for Company expenses and any other contingent Company assets or liabilities, and may, upon the reversal or release of such reserves, apply any monies resulting therefrom in such manner as they may, in their absolute discretion, determine.

8.8    Net Asset Value per Participating Share shall be rounded to the nearest cent or such other amount as the Directors may determine and the benefit of any such roundings may be retained by the Company.

8.9    The Directors may cause the Company to issue new Participating Shares at par or to compulsorily redeem at par such number of Participating Shares as they consider necessary to address, in such manner as they consider equitable, any prior miscalculation of Net Asset Value or Net Asset Value per Participating Share.  The Company shall not be required to pay to the holder the redemption proceeds of any such compulsorily redeemed Participating Shares, which proceeds shall be retained by the Company.

**9      Suspensions**

9.1    The Directors may, from time to time, in the circumstances disclosed in the Offering Memorandum, declare a Suspension with respect to any one or more Classes and/or Series of Participating Shares.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APP. 108149

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 234
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1578 of 1726   PageID 12899
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 16 of
43

9.2    The Directors shall promptly notify all affected Members of any such Suspension and shall promptly notify such Members upon termination of such Suspension.

## 10    Transfer of Shares

10.1    Subject to Article 5.1, Shares may not be Transferred without the prior written approval of the Directors (which may be withheld for any or no reason) provided that the Directors may waive this requirement to the extent that they deem appropriate in connection with the listing of any Class or Series of Share on a stock exchange.

10.2    The Directors shall not register any Transfer of any Share to any person who is, in the opinion of the Directors, not an Eligible Investor.

10.3    Any proposed transferee shall provide to the Directors such information and documents as the Directors may request, including, without limitation, such documents or information as the Directors deem necessary or desirable:

   (a)    to enable the Directors to determine that the proposed transferee is an Eligible Investor; and

   (b)    to enable the Company to comply with all applicable laws, including anti-money laundering laws.

10.4    The instrument of Transfer of any Share shall be in writing and shall be executed by or on behalf of the transferor (and, if the Directors so require, signed by or on behalf of the transferee). The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

## 11    Transmission of Shares

11.1    If a Member dies, the survivor or survivors (where the Member was a joint holder) or his or her legal personal representatives (where the Member was a sole holder) shall be the only persons recognised by the Company as having any title to the Member's interest in the Company.  The death of any Member shall not operate to relieve, waive or reduce any liabilities attaching to the Member's Shares at the time of death and such liabilities shall continue to bind any survivor or survivors, or any personal representative, as the case may be.

11.2    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is an Eligible Investor may, upon delivery to the Directors of such evidence as may from time to time be required by them of:

   (a)    such person's entitlement to such Shares; and/or

   (b)    such person's status as an Eligible Investor,



13

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108452

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 235
Case 3:23-cv-00726-S   Document 8-23   Filed 08/29/23   Page 1579 of 1726   PageID 12900
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 17 of
43

elect, either to become the holder of such Share or to have such Share Transferred to another Eligible Investor nominated by such person.  If such person elects to become the holder of such Share, such person shall give notice in writing to the Directors to that effect, but the Directors shall, in either case, have the same right to decline registration of such person as a holder of such Share as they would have had in the case of a Transfer of the Share by that Member before his or her death or bankruptcy, or liquidation or dissolution, as the case may be.

11.3    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is not an Eligible Investor shall not be registered as the holder of such Share and shall promptly Transfer such Share to an Eligible Investor in accordance with these Articles.

11.4    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by Transfer), and who is an Eligible Investor, shall be entitled to the same dividends and other advantages to which such person would be entitled if such person were the registered holder of such Share. However, the person shall not, before becoming a Member in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him become the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

**12    Redemption of Shares**

12.1    Subject to any provisions relating to a specific Class and/or Series as set out in the Offering Memorandum or these Articles or in any resolution constituting a Class and/or Series or otherwise forming part of the special rights of such Participating Shares, a Member may require the redemption of all or any of such Member's Participating Shares by serving a Redemption Notice on the Company. Unless timely receipt is waived by the Directors in a particular case, a Redemption Notice shall be required to be received on or before a Redemption Date with respect to such Participating Shares (or such number of days prior to such Redemption Date as may be determined by the Directors).  Any Member redeeming Participating Shares shall submit to the Directors the share certificate (if any) issued in respect of those Participating Shares.  The Company shall redeem such Participating Shares at the Redemption Price, being an amount equal to the Net Asset Value per Participating Share of the relevant Class and/or Series prevailing on the relevant Redemption Date (or if the Redemption Date is not a Valuation Date then on the immediately preceding Valuation Date) subject to any deductions, holdbacks or adjustments provided for in these Articles and/or the Offering Memorandum.



SFC/690420-000001/33202513v4                                                                                                    14

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

12.2    The Directors may deduct any Redemption Fee from the Redemption Price.  The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

12.3    A Member may not withdraw a Redemption Notice once submitted to the Company unless (a) the Directors shall have declared a Calculation Suspension or Redemption Suspension or (b) the Directors determine (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part).  If a relevant Suspension has been declared by the Directors, the right of a Member to have its Participating Shares redeemed shall be suspended and during the period of Suspension the Member may withdraw its Redemption Notice.  Any withdrawal of the Redemption Notice shall be made in writing and shall only be effective if actually received by the Company before the termination of the period of the Redemption Suspension or Calculation Suspension, as applicable.  If the Redemption Notice is not withdrawn, any Participating Shares the redemption of which has been suspended shall be redeemed once the relevant Suspension has ended at the Redemption Price for Participating Shares of the relevant Class and/or Series calculated on the next Redemption Date following the end of the relevant Suspension.

12.4    The Directors may impose a gate the effect of which is to limit the redemptions of Participating Shares of any Class and/or Series or to limit the redemptions of Participating Shares held by any Member or Members as of any Redemption Date to such extent and in such manner as is disclosed in the Offering Memorandum.  If the Directors determine to limit redemptions, the Directors may determine the manner in which such gated redemption requests will be dealt with on any subsequent Redemption Date.

12.5    If the Company is required by the laws of any relevant jurisdiction to make a withholding from any redemption monies payable to the holder of Participating Shares the amount of such withholding shall be deducted from the redemption monies otherwise payable to such person.

12.6    No redemption of part of a Member's holding of Participating Shares of any one Class and/or Series may be made if, as a result thereof, such Member would hold fewer Participating Shares of such Class and/or Series than such minimum number or value of Participating Shares of such Class and/or Series as may from time to time be specified (either generally or in any particular case or cases) by the Directors.  If such partial redemption would reduce such Member's holding of Participating Shares to less than such minimum holding, the Directors may, in their discretion, elect to compulsorily redeem all of such Member's Participating Shares.

12.7    The Company may, in the absolute discretion of the Directors, refuse to make a redemption payment to a Member if the Directors suspect or are advised that the payment of any redemption proceeds to such Member may result in a breach or violation of any anti-money laundering law by any person in any relevant jurisdiction, or if such refusal is necessary to ensure the compliance by the Company, its Directors, the Administrator or any other service provider of the Company with any anti-money laundering law in any relevant jurisdiction.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 01844

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 237
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1581 of 1726   PageID 12902
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 19 of 43

12.8  Any amount payable to a Member for the redemption of Participating Shares shall be paid in such currency or currencies as the Directors may determine.  Subject to any Payment Suspension, the Company shall remit redemption proceeds (net of the costs of remittance) by cheque or wire transfer within such period or periods as the Directors shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period or periods as the Directors shall determine.  In the absence of directions as to payment the Company may remit redemption proceeds by cheque to the address of the Member appearing on the Register of Members or by wire transfer to such account as the Directors deem appropriate in the circumstances.  The Company shall not be liable for any loss resulting from this procedure.

12.9  On any redemption of Participating Shares the Directors shall have the power to satisfy (in whole or in part) the Redemption Price (and any other sums payable on redemption as provided in these Articles) owing on the redemption of such Participating Shares by dividing *in specie* the whole or any part of the assets of the Company (including, without limitation, shares, debentures, or securities of any other company whether or not held by the Company on the Redemption Date in question) and either (i) distributing such assets directly to the redeeming shareholder, and/or (ii) distributing or allocating such assets to a liquidating account or other similar mechanism to be managed and/or liquidated at the discretion of the Directors.

12.10  Participating Shares shall be treated as having been redeemed with effect from the relevant Redemption Date irrespective of whether or not a Member has been removed from the Register of Members or the Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Date, Members in their capacity as such will not be entitled to or be capable of exercising any rights arising under these Articles with respect to Participating Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Company) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Date but not yet paid (in each case with respect to the Participating Shares being redeemed). Such Members will be treated as creditors of the Company with respect to the Redemption Price and will rank accordingly in the priority of the Company's creditors.

12.11  Once a Participating Share is redeemed it shall be available for re issue and, until re issue, shall form part of the authorised and unissued share capital of the Company.

12.12  Upon the written request of a Member or prospective Member in a form acceptable to the Directors, the Company may, in the discretion of the Directors, accept a standing redemption request from such Member or prospective Member pursuant to which the Company shall agree (without assuming any liability for failing to do so) to use its commercially reasonable efforts to redeem such Member's Participating Shares to the extent necessary to ensure that such Member does not own over a specified percentage of the outstanding Participating Shares of the Company or any Class and/or Series thereof; such percentage to be the percentage identified by such Member or prospective Member in such written request as being the percentage which such Member's or prospective Member's ownership cannot exceed without material risk of such



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 108163

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 238
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1582 of 1726 PageID 12903
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of
43

Member or prospective Member being in violation of applicable law or regulation. Any such written request may be revoked by notice in writing to the Company from the affected Member.

12.13 No amendment to these Articles made after a Redemption Date shall affect a Member with respect to Participating Shares of that Member which have been redeemed, or are being treated as redeemed, on or prior to that Redemption Date.

12.14 Unless otherwise provided in the Offering Memorandum, unremitted redemption proceeds shall not bear interest against the Company and redeemed Participating Shares shall not participate in the profits and losses of the Company with effect from the relevant Redemption Date.

## 13 Compulsory Redemption

13.1 The Directors may cause the Company to redeem any or all of the Participating Shares held by any person at the appropriate Redemption Price in the circumstances disclosed in the Offering Memorandum. If the Directors determine compulsorily to redeem any Participating Shares under this Article they shall give the holder of the Participating Shares such notice of the redemption as they shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period as the Directors shall determine.

13.2 The Directors may cause a compulsory redemption during any period for which a Redemption Suspension has been declared.

13.3 Without prejudice to the generality of the foregoing, the Company may (without notice) compulsorily redeem the Participating Shares of any Member and, on behalf of such Member, apply the proceeds of redemption in paying for new Participating Shares to give effect to any exchange, conversion or roll-up policy disclosed to Members pursuant to which Participating Shares of one Class or Series (the "**Old Shares**") may, at the option of the Company, be exchanged for Participating Shares of another Class or Series (the "**New Shares**") by means of the redemption of the Old Shares and the immediate re-subscription of the redemption proceeds in paying up the New Shares.

## 14 FATCA

14.1 Notwithstanding any other Article, in order to comply with FATCA, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by FATCA, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108446

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 239
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1583 of 1726   PageID 12904
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 21 of
43

14.2    In order to comply with FATCA and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to FATCA or incur any costs or liabilities associated with FATCA, the Directors may cause the Company to undertake any of the following actions:

(a)    compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to FATCA; or (ii) where there has otherwise been non-compliance by the Company with FATCA whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b)    deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i)    comply with any requirement to apply  and collect withholding tax pursuant to FATCA;

(ii)    allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with FATCA;

(iii)    ensure that any FATCA related costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs or liabilities;

(c)    in order to give effect to the requirements imposed upon the Company by FATCA, including the actions contemplated by articles 14.2(a) and 14.2(b), the Directors may:

(i)    create separate classes and/or series of Shares ("**FATCA Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of FATCA Shares as the Directors determine; and/or

(ii)    may re-name any number of Shares (whether issued or unissued) as FATCA Shares, create a Separate Account with respect to such FATCA Shares and apply any FATCA related costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) to such Separate Account; and/or



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108153

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 240
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1584 of 1726   PageID 12905
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 22 of 43

      (iii)      allocate any FATCA costs, debts, expenses, obligations, liabilities or withholding tax among Separate Accounts on a basis determined solely by the Directors; and/or

      (iv)      adjust the Net Asset Value per Share of any relevant Shares (including any FATCA Share).

## 15   Designated Investments

15.1    The Directors may, in their discretion, classify certain of the Company's investments which are deemed by the Directors or the Investment Manager to be illiquid or the value of which is not readily or reliably ascertainable or which may have a relatively long-term investment horizon as **"Designated Investments"**.  Once so classified, Designated Investments may, in the discretion of the Directors, be represented by a separate Class and/or Series of Participating Shares which, unless otherwise determined by the Directors, shall be allotted only to those Members who are holders of Participating Shares at the time of such designation.  The gains and losses attributable to Designated Investments may, in the discretion of the Directors, be segregated and separately calculated and attributed amongst Members holding Shares of the relevant Class or Series in such manner as is consistent with the relevant provisions of the Offering Memorandum. Participating Shares of any such separate Class and/or Series may be issued by way of bonus or by way of conversion or exchange of all or part of a Member's holding of Participating Shares of another Class and/or Series.  Similarly, Shares of a Designated Investment Class and/or Series may be converted or exchanged back into Participating Shares of the original Class and/or Series upon the Directors making a determination that the relevant investment no longer qualifies as a Designated Investment.  The power to convert or exchange Participating Shares of one Class and/or Series into Participating Shares of another Class and/or Series may be effected by the Directors in any manner permitted by the Statute and the Articles, including the compulsory redemption of Participating Shares of one Class and/or Series and the application of the proceeds of redemption in subscribing for Participating Shares of the other Class and/or Series or by redesignating a portion of the Participating Shares of any existing Class and/or Series as thereafter belonging to a new Class and/or Series.  Shares of a Class or Series of Shares which represent Designated Investments shall not, unless the Directors otherwise determine, be redeemable at the option of the Members holding such Participating Shares.  Where investments are classified as Designated Investments and Participating Shares of a separate Class and/or Series are issued by way of bonus, the requirement of these Articles to ensure proper value is transferred to the Separate Account of the Participating Shares of the original Class and/or Series to which such investments were originally allocated shall not apply.

## 16   Purchase and Surrender of Shares

16.1    Subject to the provisions of the Statute and without prejudice to these Articles, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108456

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 241
Case 3:23-cv-00726-S   Document 8-23   Filed 05/29/23   Page 1585 of 1726   PageID 12906
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 23 of
43

16.2    The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

16.3    The Directors may accept the surrender for no consideration of any fully paid Share.

**17    Treasury Shares**

17.1    The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

17.2    The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

**18    Variation of Share Rights**

18.1    Subject to the Statute, these Articles and any applicable subscription agreement, all or any of the Share Rights applicable to any Class or Series of Participating Shares in issue (unless otherwise provided by the terms of issue of those Participating Shares) may (whether or not the Company is being wound up) be varied without the consent of the holders of the issued Participating Shares of that Class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation may be made with the prior consent in writing of the holders of not less than two-thirds by Net Asset Value of such Participating Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Participating Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of such Participating Shares. To any such meeting all the provisions of these Articles as to general meetings shall *mutatis mutandis* apply, but so that any holder of a Participating Share present in person or by proxy may demand a poll, and the quorum for any such meeting shall be Members holding not less than twenty per cent. by Net Asset Value of the issued Participating Shares of the relevant Class or Series. At any Class meeting, the voting rights attributable to each Participating Share shall be calculated by reference to the Net Asset Value per Participating Share (calculated as at the most recent Valuation Date) and not on the basis of one Participating Share, one vote.

18.2    For the purposes of a Class consent, the Directors may treat two or more or all the Classes or Series of Participating Shares as forming one Class or Series if the Directors consider that such Classes or Series would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes or Series.

18.3    Where the Shares of any Class or Series (the "**First Class**") rank, or will on issue rank, pari passu with the Shares of another Class or Series (the "**Second Class**") with respect to participation in the same pool of profits or assets of the Company on a winding up, the rights of the First Class shall be deemed to be varied by any variation of or creation of rights in the Second



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 108457

Class (including on initial issue) which gives the Second Class priority over the First Class on a winding up of the Company.

18.4    Subject to the foregoing Articles, the Share Rights applicable to any Class or Series of Shares in issue shall (unless otherwise expressly provided by the conditions of issue of such Shares) be deemed not to be varied by:

(a)    the creation, allotment or issue of further Shares ranking pari passu therewith and which may be issued with the benefit of the terms referred to below;

(b)    the purchase or redemption of any Shares;

(c)    the exercise of the powers to allocate assets and charge liabilities to the various Separate Accounts or any of them and to transfer the same to and from the various Separate Accounts or any of them, as provided for in these Articles;

(d)    any reduction or waiver of any fees (including early redemption, management or performance fees) chargeable or allocable to any Class or Series of Shares;

(e)    any reduction or waiver of any redemption notice, gate or lock-up period applicable to any Class or Series of Shares; or

(f)    any variation or waiver contemplated by or provided for in the Offering Memorandum applicable to the relevant Class and/or Series.

18.5    In relation to any Class or Series consent required pursuant to Article 18.1, the Directors in their discretion may invoke the following procedure (the "**Negative Consent Procedure**").   The Directors shall provide written notice of the proposed variation (the "**Proposal**") to the Members of the affected Class or Series and shall specify a deadline (the "**Redemption Request Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such Members may submit a written request for redemption of some or all of their Participating Shares of the affected Class and/or Series on the Redemption Date (the "**Specified Redemption Date**") specified by the Directors in such notice.   The terms of the Proposal shall be such that its specified effective date (the "**Effective Date**") shall not be on or prior to the Specified Redemption Date.   Such notice shall further provide that the holders of any Participating Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "**Affected Shares**") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "**Negative Consent Shares**").   In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under Article 18.1 with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favour of the Proposal on the Effective Date.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108550

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 243
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1587 of 1726   PageID 12908
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 25 of 43

## 19   Variation of Terms

The Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a Member to waive or modify the terms applicable to such Member's subscription for Participating Shares (including those relating to management and performance fees and redemption terms) without obtaining the consent of any other Member; provided that such waiver or modification does not amount to a variation of the rights attaching to the Participating Shares of such other Members.

## 20   Certificates for Shares

20.1   A Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates representing Shares, if any, shall be in such form as the Directors may determine.  Share certificates shall be signed by one or more Directors or another person authorised by the Directors. The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical process.  All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate.  All certificates surrendered to the Company for transfer shall be cancelled and, subject to these Articles, no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

20.2   The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

20.3   If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) on delivery up of the old certificate.

## 21   Register of Members

21.1   The Company shall maintain or cause to be maintained the Register of Members.

21.2   The Directors may determine that the Company shall maintain one or more branch registers of Members in accordance with the Statute. The Directors may also determine which register of Members shall constitute the principal register and which shall constitute the branch register or registers, and to vary such determination from time to time.

## 22   Closing Register of Members and Fixing Record Date

22.1   For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any dividend, or in order to make a determination of Members for any other proper purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed thirty days.

22

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 10859

22.2 In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any dividend or in order to make a determination of Members for any other proper purpose.

22.3 If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such dividend is passed, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## 23 Non Recognition of Trusts

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the registered holder.

23.1 if it is not paid all the provisions of these Articles shall apply as if that amount had become due and payable by virtue of a call.

23.2 The Directors may issue Shares with different terms as to the amount and times of payment of calls, or the interest to be paid.

23.3 The Directors may, if they think fit, receive an amount from any Member willing to advance all or any part of the monies uncalled and unpaid upon any Shares held by it, and may (until the amount would otherwise become payable) pay interest at such rate as may be agreed upon between the Directors and the Member paying such amount in advance.

23.4 No such amount paid in advance of calls shall entitle the Member paying such amount to any portion of a dividend declared in respect of any period prior to the date upon which such amount would, but for such payment, become payable.

## 24 Lien on Shares

24.1 The Company shall have a first and paramount lien on all Shares (whether fully paid-up or not) registered in the name of a Member (whether solely or jointly with others) for all debts, liabilities or engagements to or with the Company (whether presently payable or not) by such Member or such Member's estate, either alone or jointly with any other person, whether a Member or not, but the Directors may at any time declare any Share to be wholly or in part exempt from the provisions of this Article. The registration of a Transfer of any such Share shall operate as a waiver of the Company's lien thereon. The Company's lien on a Share shall also extend to any amount payable in respect of that Share.

23

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108502

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 245
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1589 of 1726 PageID 12910
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 27 of 43

24.2    The Company may sell, in such manner as the Directors think fit, any Shares on which the Company has a lien, if a sum in respect of which the lien exists is presently payable, and is not paid within fourteen clear days after notice has been given to the holder of the Shares, or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the Shares may be sold.

24.3    To give effect to any such sale the Directors may authorise any person to execute an instrument of Transfer of the Shares sold to, or in accordance with the directions of, the purchaser. The purchaser or such purchaser's nominee shall be registered as the holder of the Shares comprised in any such Transfer, and the purchaser shall not be bound to see to the application of the purchase money, nor shall the purchaser's title to the Shares be affected by any irregularity or invalidity in the sale or the exercise of the Company's power of sale under these Articles.

24.4    The net proceeds of such sale after payment of costs, shall be applied in payment of such part of the amount in respect of which the lien exists as is presently payable and any balance shall (subject to a like lien for sums not presently payable as existed upon the Shares before the sale) be paid to the person entitled to the Shares at the date of the sale.

## 25    Amendments of Memorandum and Articles and Alteration of Capital

25.1    The Company may, by Ordinary Resolution:

(a)    increase its share capital by such sum and with such rights, priorities and privileges annexed thereto, as the resolution shall prescribe;

(b)    consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c)    by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum; and

(d)    cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

25.2    All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of these Articles with reference to liens, Transfer, transmission and otherwise as the Shares in the original share capital.

25.3    Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution the Company may, by Special Resolution:

(a)    change its name;

(b)    alter or add to these Articles;



SFC/690420-000001/33202513v4

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 10853

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 246
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1590 of 1726   PageID 12911
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 28 of
43

(c)  alter or add to the Memorandum with respect to any objects, powers or other matters specified therein; and

(d)  reduce its share capital or any capital redemption reserve fund.

## 26    Registered Office

Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.  The Company may, in addition to its Registered Office, maintain such other offices or places of business as the Directors determine.

## 27    General Meetings

27.1  All general meetings other than annual general meetings shall be called extraordinary general meetings.  The Directors may call general meetings.

27.2  The Company may but shall not be obliged to hold a general meeting in each year as its annual general meeting, and shall specify the meeting as such in the notice calling it.  Any annual general meeting shall be held at such time and place as the Directors shall determine.

## 28    Notice of General Meetings

28.1  At least five Business Days' notice shall be given of any general meeting.  Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day on which the meeting is to be held and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a)  in the case of an annual general meeting, by all the Members entitled to attend and vote thereat; and

(b)  in the case of an extraordinary general meeting, by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than ninety five per cent. in par value of the Shares giving that right.

28.2  The accidental omission to give notice of a general meeting to, or the non receipt of notice of a meeting by, any person entitled to receive notice thereof shall not invalidate the proceedings of that meeting.

## 29    Proceedings at General Meetings

29.1  No business shall be transacted at any general meeting unless a quorum is present. A quorum shall be one or more Members (present in person, by proxy or authorised corporate

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108154

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 247
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1591 of 1726 PageID 12912
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of
43

representative, as the case may be) entitled to attend and vote and representing not less than twenty per cent. in par value of all of the Shares in issue and carrying the right to vote at the meeting.

29.2    A person may, with the consent of the Directors, participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other.  Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

29.3    A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations or other non-natural persons, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

29.4    If a quorum is not present within half an hour from the time appointed for the meeting or if during such a meeting a quorum ceases to be present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other day, time or such other place as the Directors may determine, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

29.5    The chairman, if any, of the board of Directors shall preside as chairman at every general meeting of the Company, or if there is no such chairman, or if the chairman shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

29.6    If no Director is willing to act as chairman, or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the Members present shall choose one of their number to be chairman of the meeting.

29.7    The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.  When a general meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting.  Otherwise it shall not be necessary to give any such notice.

29.8    A resolution put to the vote of a meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman or any Member present in person or by proxy (or in the case of a non-natural person, by its duly authorised representative or by proxy) demands a poll.

29.9    Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority,

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App. 10855

an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

29.10   The demand for a poll may be withdrawn.

29.11   Except on a poll demanded on the election of a chairman or on a question of adjournment, a poll shall be taken as the chairman directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.

29.12   A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time as the chairman of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

29.13   In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall not be entitled to a second or casting vote.

## 30   Votes of Members

30.1   Subject to any rights or restrictions attached to any Shares, on a show of hands every Member holding Shares carrying the right to vote on the matter in question who (being an individual) is present in person or by proxy or (if a corporation or other non-natural person) is present by its duly authorised representative or by proxy, shall have one vote and on a poll every such Member shall have one vote for every Share of which he is the holder.

30.2   In the case of joint holders of record, the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders. Seniority among joint holders shall be determined by the order in which the names of the holders stand in the Register of Members.

30.3   A Member of unsound mind, or in respect of whom an order has been made by any court or authority having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by the Member's committee, receiver, curator bonis, or other similar person appointed on such Member's behalf by that court or authority and any such committee, receiver, curator bonis or other similar person may vote by proxy.

30.4   No person shall be entitled to vote at any general meeting unless such person is registered as a Member on the record date for such meeting, nor until all calls or other monies then payable by such person in respect of such Shares have been paid.

30.5   No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is purported to be given or tendered and every vote not disallowed at the meeting shall be valid.  Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APP. 10856

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 249
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1593 of 1726 PageID 12914
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 31 of
43

30.6    On a poll or on a show of hands votes may be cast either personally or by proxy. A Member may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Member appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands.

30.7    A Member holding more than one Share need not cast the votes in respect of its Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain (any such abstentions to count neither for nor against the resolution) from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing it, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which such proxy is appointed either for or against a resolution and/or abstain from voting.

## 31    Proxies

31.1    The instrument appointing a proxy shall be in writing, be executed under the hand of the appointor or of such appointor's attorney duly authorised in writing or, if the appointor is a corporation or other non-natural person, under the hand of an officer or other person duly authorised for that purpose.  A proxy need not be a Member of the Company.

31.2    The Directors may, in the notice convening any meeting or adjourned meeting, or in an instrument of proxy sent out by the Company, specify the place and the time (being not later than the time for holding the meeting or adjourned meeting to which the proxy relates) at which the instrument appointing a proxy shall be deposited.  In the absence of any such direction from the Directors in the notice convening any meeting or adjourned meeting, the instrument appointing a proxy shall be deposited at the Registered Office not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

31.3    The chairman may in any event, at the chairman's discretion, declare that an instrument of proxy shall be deemed to have been duly deposited.  An instrument of proxy that is not deposited in the manner permitted and which has not been declared to have been duly deposited by the chairman, shall be invalid.

31.4    The instrument appointing a proxy may be in any usual or common form and may be incorporated within any subscription agreement or other document signed by or on behalf of the Member.  An instrument appointing a proxy may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked.  An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

31.5    Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the Transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or Transfer was received by the



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

28

APPX. 108153

Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

**32    Corporate Members**

Any corporation or other non-natural person which is a Member of the Company may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any Class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as the corporation could exercise if it were an individual Member.

**33    Shares Beneficially Owned by the Company**

Shares of the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

**34    Directors**

There shall be a board of Directors consisting of not less than one person (exclusive of alternate Directors) provided however that the Company may from time to time by Ordinary Resolution increase or reduce the limits in the number of Directors.  The first Directors of the Company shall be determined in writing by, or appointed by a resolution of, the Subscriber.

**35    Powers of Directors**

35.1    Subject to the provisions of the Statute, the Memorandum and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company.  No alteration of the Memorandum or these Articles and no such direction shall invalidate any prior act of the Directors which would have been valid if that alteration had not been made or that direction had not been given.  A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

35.2    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

35.3    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.  Notwithstanding the foregoing, the Directors shall not exercise the powers specified in this Article in breach of any limits or restrictions specified in the Offering Memorandum.



*Uploaded: 03-Nov-2014 14:05 EST*

*Filed: 05-Nov-2014 18:02 EST*

APPX. 108156

**36      Appointment and Removal of Directors**

36.1    The Company may, by Ordinary Resolution, appoint any person to be a Director and may, by Ordinary Resolution, remove any Director.

36.2    The Directors may appoint any person to be a Director, either to fill a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with these Articles as the maximum number of Directors.

**37      Vacation of Office of Director**

The office of a Director shall be vacated if:

(a)      the Director gives notice in writing to the Company that such Director resigns the office of Director;

(b)      the Director is absent (without being represented by proxy or an alternate Director appointed by such Director) from three consecutive meetings of the board of Directors without special leave of absence from the Directors, and they pass a resolution that such Director has by reason of such absence vacated office;

(c)      the Director dies, becomes bankrupt or makes any arrangement or composition with such Director's creditors generally;

(d)      the Director is or becomes of unsound mind;

(e)      the Director ceases to be a Director by virtue of, or is prohibited from being a Director by, an order made pursuant to any law or regulation binding on the Company; or

(f)      all the other Directors of the Company (being not less than two in number) resolve that such Director should be removed as a Director.

**38      Proceedings of Directors**

38.1    The quorum for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two if there are two or more Directors, and shall be one if there is only one Director.  A person who holds office as an alternate Director shall, if such person's appointor is not present, be counted in the quorum.  A Director who also acts as an alternate Director shall, if such Director's appointor is not present, count twice towards the quorum.

38.2    Subject to the provisions of these Articles, the Directors may regulate their proceedings as they think fit.  Questions arising at any meeting shall be decided by a majority of votes.  In the case of an equality of votes, the chairman shall not have a second or casting vote.  A Director who is also an alternate Director shall be entitled in the absence of such Director's appointor to a separate vote on behalf of such Director's appointor in addition to such Director's own vote.



*Uploaded: 03-Nov-2014 14:05 EST*

*Filed: 05-Nov-2014 18:02 EST*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 252
Case 3:23-cv-00726-S Document 8-23 Filed 10/29/23 Page 1596 of 1726 PageID 12917
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 34 of
43

38.3 A person may participate in a meeting of the Directors or any committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting. Unless otherwise determined by the Directors, the meeting shall be deemed to be held at the place where the chairman is located at the start of the meeting.

38.4 A resolution in writing (in one or more counterparts) signed by all the Directors or all the members of a committee of Directors (an alternate Director being entitled to sign such a resolution on behalf of such alternate Director's appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held.

38.5 A Director or alternate Director may, or other officer of the Company at the direction of a Director or alternate Director may call a meeting of the Directors by at least two days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held.

38.6 The continuing Directors may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

38.7 The Directors may elect a chairman of their board and determine the period for which the chairman is to hold office; but if no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

38.8 All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

38.9 A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by such Director. The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

## 39 Presumption of Assent

A Director who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless the Director's dissent shall be entered in the minutes of the meeting or unless the Director shall file such

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 08160

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 253
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1597 of 1726 PageID 12918
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 35 of
43

Director's written dissent from such action with the person acting as the chairman or secretary of the meeting before the close or adjournment thereof or shall forward such dissent by personal delivery, courier or registered post to such person immediately after the close or adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

## 40 Directors' Interests

40.1 A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with such Director's office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

40.2 A Director may act alone or by such Director's firm in a professional capacity for the Company and the Director or such Director's firm shall be entitled to remuneration for professional services as if such Director were not a Director or alternate Director.

40.3 A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by such Director or alternate Director as a director or officer of, or from such Director or alternate Director's interest in, such other company.

40.4 No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relationship thereby established. A Director (or such Director's alternate Director in such Director's absence) shall be at liberty to vote in respect of any contract or transaction in which such Director is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by such Director at or prior to such Director's consideration and any vote thereon.

40.5 A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which such Director has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## 41 Minutes

The Directors shall cause minutes to be made in books kept for the purpose of recording all appointments of officers made by the Directors, all proceedings at meetings of the Company or



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APP. 108469

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 254
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1598 of 1726 PageID 12919
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 36 of
43

the holders of any Class of Shares and of the Directors, and of committees of Directors including the names of the Directors or alternate Directors present at each meeting.

## 42 Delegation of Directors' Powers

42.1 The Directors may delegate any of their powers to any committee consisting of one or more Directors or such other persons as the Directors may designate. They may also delegate to any managing director or any Director holding any other executive office such of their powers as they consider desirable to be exercised by such managing director or any Director provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if such managing director ceases to be a Director. Any such appointment may be made subject to any conditions the Directors may impose, and either collaterally with or to the exclusion of their own powers, and may be revoked or altered. Subject to any such conditions, the proceedings of a committee of Directors shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

42.2 The Directors may establish any committees, local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees or local boards. Any such appointment may be made either collaterally with or to the exclusion of the Directors' powers, shall be subject to any conditions the Directors may impose, and may be revoked or altered. Subject to any such conditions, the proceedings of any such committee, local board or agency shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

42.3 The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised person to delegate all or any of the powers, authorities and discretions vested in such attorney or authorised person.

42.4 The Directors may appoint such officers as they consider necessary on such terms, at such remuneration (if any) and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors may think fit. Unless otherwise specified in the terms of such officer's appointment an officer may be removed by resolution of the Directors or Members.

## 43 Alternate Directors

43.1 Any Director (other than an alternate Director) may by written notice to the Company appoint any other Director, or any other person willing to act, to be an alternate Director and by written notice to the Company may remove from office an alternate Director so appointed by the Director.

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 108/2

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 255
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1599 of 1726 PageID 12920
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 37 of 43

43.2 An alternate Director shall be entitled to receive notice of all meetings of Directors and of meetings of committees of Directors of which such alternate Director's appointor is a member, to attend and vote at every such meeting at which the Director appointing such alternate Director is not personally present, and generally to perform all the functions of such alternate Director's appointor as a Director in such Director's absence.

43.3 An alternate Director shall cease to be an alternate Director if such alternate Director's appointor ceases to be a Director.

43.4 Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

43.5 Subject to the provisions of the Articles, an alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for such alternate Director's own acts and defaults and shall not be deemed to be the agent of the Director appointing such alternate Director.

## 44 No Minimum Shareholding for Directors

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director shall not be required to hold Shares.

## 45 Remuneration of Directors

45.1 The remuneration to be paid to the Directors, if any, shall be such remuneration as the Directors shall determine. The Directors shall also be entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors, or general meetings of the Company, or separate meetings of the holders of any Class of Shares or debentures of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors, or a combination partly of one such method and partly the other.

45.2 The Directors may by resolution approve additional remuneration to any Director for any services other than such Director's ordinary routine work as a Director. Any fees paid to a Director who is also counsel to the Company, or otherwise serves it in a professional capacity, shall be in addition to such Director's remuneration as a Director.

## 46 Seal

The Company may, if the Directors so determine, have a Seal, which shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors. Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person authorised by the Directors for the purpose.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APP. 10873

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 256
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1600 of 1726   PageID 12921
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 38 of
43

**47        Dividends, Distributions and Reserves**

47.1    Subject to the Statute, these Articles, and the special rights attaching to Participating Shares of any Class and/or Series, the Directors may, in their absolute discretion, declare dividends and distributions on Participating Shares of any Class and/or Series in issue and authorise payment of the dividends or distributions out of the relevant Separate Account in respect of such Participating Shares.  No dividend or distribution shall be paid except out of the realised or unrealised profits of the Company, or out of the share premium account attributable to Participating Shares of the Class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by law.

47.2    Except as otherwise provided by the rights attached to Participating Shares, or as otherwise determined by the Directors, all dividends and distributions in respect of Participating Shares of a particular Class and/or Series shall be declared and paid according to Net Asset Value of the Participating Shares of the Class and/or Series that a Member holds. If any Participating Share is issued on terms providing that it shall rank for dividend or distribution as from a particular date, that Participating Share shall rank for dividend or distribution accordingly.

47.3    The Directors may deduct and withhold from any dividend or distribution otherwise payable to any Member all sums of money (if any) then payable by it to the Company on account of calls or otherwise or any monies which the Company is obliged by law to pay to any taxing or other authority.

47.4    Under no circumstances may the assets (or the income derived from such assets) attributed to a Separate Account in respect of any Class and/or Series be used to pay a dividend in respect of a Separate Account that is attributed to any other Class and/or Series.

47.5    The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures or securities of any other company or in any one or more of such ways and, where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

47.6    Any dividend, distribution, interest or other monies payable in cash in respect of Participating Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct.  Every such cheque or warrant shall (unless the Directors in their sole discretion otherwise determine) be made payable to the order of the person to whom it is sent.  Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the Participating Share held by them as joint holders.

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APP.108674

47.7 Any dividend or distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date of declaration of such dividend or distribution may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the dividend or distribution shall remain as a debt due to the Member. Any dividend or distribution which remains unclaimed after a period of six years from the date of declaration of such dividend or distribution shall be forfeited and shall revert to the Company.

47.8 No dividend or distribution shall bear interest against the Company.

## 48 Capitalisation

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members of any Class and/or Series in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued Participating Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid. In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Participating Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned). The Directors may authorise any person to enter into an agreement with the Company, on behalf of all of the Members interested, providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

## 49 Books of Account

49.1 The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company. Such books of account must be retained for a minimum period of five years from the date on which they are prepared. Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

49.2 The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute, or authorised by the Directors or by the Company in general meeting.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108673

49.3    The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

**50      Audit**

50.1    The Directors may appoint an Auditor of the Company who shall hold office on such terms as the Directors determine.

50.2    Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

50.3    Any Auditors of the Company shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

**51      Notices**

51.1    Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to the Member or to the address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member).  Any notice, if posted from one country to another, is to be sent airmail.

51.2    Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier.  Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in the Cayman Islands) following the day on which the notice was posted.  Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted.  Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 108576

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 259
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1603 of 1726 PageID 12924
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 41 of 43

51.3    A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

51.4    Notice of every general meeting shall be given in the manner authorised by these Articles to every person shown as holding Shares carrying an entitlement to receive such notice in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of such person being a legal personal representative or a trustee in bankruptcy of a Member where the Member but for such Member's death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.

**52     Winding Up**

52.1    If the Company shall be wound up the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as such liquidator thinks fit. The liquidator shall in relation to the assets available for distribution among the Members make in the books of the Company such transfers thereof to and from Separate Accounts as may be necessary in order that the effective burden of such creditors' claims may be shared among the holders of Participating Shares of different Classes and/or Series in such proportions as the liquidator in such liquidator's absolute discretion may think equitable.

52.2    Subject to the special rights attaching to Participating Shares of any Class or Series, the balance shall then be applied in the following priority:

    (a)     first, to the holders of Management Shares, an amount equal to the par value of such Management Shares; and

    (b)     second, the balance shall be paid to the holders of Participating Shares in proportion to the Net Asset Value of Participating Shares held, subject to a deduction from those Participating Shares in respect of which there are monies due, of all monies due to the Company for unpaid calls, or otherwise.

52.3    If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution or resolutions passed by the holders of Participating Shares (whether as a whole or at separate Class meetings), divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of property of different kinds, and may for such purposes set such value as the liquidator deems fair upon any one or more class or classes of property, and may determine how such division shall be

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

APPX. 1081/73

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22  Entered 08/15/22 16:45:41   Page 260
Case 3:23-cv-00726-S  Document 8-23  Filed 07/29/23  Page 1604 of 1726  PageID 12925
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21  Entered 05/14/21 16:12:52  Page 42 of
43

carried out as between the Members or different classes of Members. The liquidator may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares or other property in respect of which there is a liability.

**53      Indemnity and Insurance**

53.1    Every Director and officer of the Company (which for the avoidance of doubt, shall not include any Auditor), together with every former Director and former officer of the Company (each an "**Indemnified Person**") shall be indemnified out of the assets of the Company against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud, wilful default or Gross Negligence. No Indemnified Person shall be liable to the Company for any loss or damage incurred by the Company as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud, wilful default or Gross Negligence of such Indemnified Person. No person shall be found to have committed actual fraud, wilful default or Gross Negligence under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

53.2    The Company shall advance to each Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defence of any action, suit, proceeding or investigation involving such Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to the Company if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article. If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Company (without interest) by the Indemnified Person.

53.3    The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

53.4    Pursuant to the foregoing provisions, the Company may enter into a service or other agreement with any Director (or any entity providing one or more persons to the Company to act as Directors) upon such terms and conditions (including as to indemnification and exculpation) as the Directors shall, in their absolute discretion, determine. Any such indemnification and exculpation provisions may be specified to a standard equal to or more favourable (but not less favourable) to the Company than any standard specified in these Articles.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX. 108968

**54**    **Disclosure**

If required to do so under the laws of any jurisdiction to which the Company, the Investment Manager, the Administrator or any other service provider is subject, or in compliance with the rules of any stock exchange upon which the Company's Shares are listed, or to ensure the compliance by any person with any anti-money laundering law in any relevant jurisdiction, any Director, Officer, the Investment Manager, the Administrator or Auditor of the Company shall be entitled to release or disclose any information in its possession regarding the affairs of the Company or a Member including, without limitation, any information contained in the Register of Members or subscription documentation of the Company relating to any Member.

**55**    **Financial Year**

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

**56**    **Transfer by way of Continuation**

The Company shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

**57**    **Mergers and Consolidations**

The Company shall, with the approval of a Special Resolution, have the power to merge or consolidate with one or more constituent companies (as defined in the Statute), upon such terms as the Directors may determine.



Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 37

# **EXHIBIT 7**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 263
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1607 of 1726 PageID 12928

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 2 of 37

# HIGHLAND CREDIT OPPORTUNITIES FUND, LTD.

### SUBSCRIBER INFORMATION FORM

**PART A** OF THIS SUBSCRIBER INFORMATION FORM IS DIVIDED INTO THREE SECTIONS. ALL SUBSCRIBERS ARE REQUIRED TO COMPLETE SECTION I. SUBSCRIBERS WHO ARE NATURAL PERSONS, INDIVIDUAL RETIREMENT ACCOUNTS (IRAs) OR GRANTOR TRUSTS MUST COMPLETE SECTION II. ALL OTHER SUBSCRIBERS MUST COMPLETE SECTION III.

ALL SUBSCRIBERS MUST COMPLETE THE SUBSCRIBER QUALIFICATION QUESTIONS IN **PART B**.

SUBSCRIBERS SUBSCRIBING AS A CUSTODIAN OR AN AGENT ON BEHALF OF A BENEFICIAL OWNER SHOULD COMPLETE THE QUESTIONS BELOW WITH REFERENCE TO THE BENEFICIAL OWNER OF THE SHARES.

*YOUR SUBSCRIPTION WILL NOT BE DEEMED COMPLETE UNTIL ALL OF THE REQUIRED DOCUMENTATION LISTED HEREIN AND ADDITIONALLY REQUESTED DOCUMENTATION IS RECEIVED BY THE ADMINISTRATOR.*

## PART A – SUBSCRIBER INFORMATION

## SECTION I. TO BE COMPLETED BY ALL SUBSCRIBERS

1. **Identity of Subscriber**

   Name(s): *THE DUGABOY INVESTMENT TRUST*       Country of domicile/ Citizenship: *USA*

   Please check *all* of the boxes that describe the beneficial owner(s) for whose account the Shares are being acquired.

   | | |
   |---|---|
   | ☐ Individual | ☐ Broker-dealer |
   | ☐ Joint (spouses) | ☐ Insurance company |
   | ☐ Joint (other) | ☐ Registered investment company |
   | ☒ Personal trust (taxable to grantor) | ☐ Tax-exempt endowment |
   | ☐ Personal trust (other) | ☐ Other tax-exempt organization |
   | ☐ Individual retirement account | ☐ Employee benefit plan (self-directed) |

Subscriber Information Form                1

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 264
Case 3:23-cv-00726-S    Document 8-23    Filed 08/29/23    Page 1608 of 1726    PageID 12929
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 3 of 37

☐ Charitable trust                       ☐ Employee benefit plan (trustee directed)

☐ Private tax-exempt foundation          ☐ Fund of Funds

☐ Other private fund                     ☐ Banking or thrift institution

☐ Family partnership or LLC              ☐ Sovereign wealth fund or foreign office
                                           institution

☐ Business entity (other)                ☐ Other

If "Other" or "Business entity (other)" was checked, please describe the entity or beneficial
owner:_____
_____

2.    **Contact Information**

      Primary Contact for Notices and Communications

      Name:              *JAMES DONDERO*

      Mailing Address:   *300 CRESCENT CT STE 700*

                         *DALLAS, TX 75201*

      Telephone:         *972-628-4100*

      Fax:               _____

      E-mail:            *JDONDERO@HCMLP.COM*

      Secondary Contact for Notices and Communications (optional)

      Name:              *MELISSA SCHROTH*

      Mailing Address:   *300 CRESCENT CT STE. 700*

                         *DALLAS, TX 75201*

      Telephone:         *972-628-4100*

      Fax:               _____

      E-mail:            *MSCHROTH@JHCMLP.COM*

Subscriber Information Form                        2

<u>Send copy of Financial Statements and Tax Information Returns to (optional)</u>

Name: *MELISSA SCHROTH*

Mailing Address: *300 CRESCENT CT STE 700*

*DALLAS, TX 75201*

Telephone: *972-628-4100*

Fax:

E-mail: *MSCHROTH@HCMLP.COM*

Please set forth below the names of persons authorized by the Subscriber to give and receive instructions between the Fund (or its Administrator) and the Subscriber together with their respective signatures. Such persons are the only persons so authorized until further written notice to the Administrator signed by one or more of such persons.

<u>Name</u>                                        <u>Signature</u>

*MELISSA SCHROTH*

*JAMES DONDERO*

3.  **Remitting Bank or Financial Institution**

Except as otherwise agreed by the Fund, all subscriptions are payable in full by wire transfer of readily available funds to the account of the Fund **at least two business days prior to the proposed date of subscription**. Please identify the bank or other financial institution (the "*Wiring Institution*") from which the Subscriber's funds will be wired. Note that any amounts paid to the Subscriber will be paid to the same account from which its subscription funds were originally remitted, which shall be in the name of the Subscriber, unless the Fund agrees otherwise.

A.   Name of Wiring Institution[1]:   *NEXBANK*

Address[2]:   *DALLAS TEXAS*

---

[1]  Important notice: please instruct your bank to ensure that the originating account and bank information is available in the wire. **Your transaction may be delayed or rejected if this information is not provided.**

[2]  If the Wiring Institution is not located in a jurisdiction that is member of the Financial Action Task Force on Money Laundering (the "*FATF*"), the Administrator may require additional information. For a current list of FATF members see: www.fatf-gafi.org.

Subscriber Information Form                    3

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 266
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1610 of 1726 PageID 12931

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 37

ABA, Chips or SWIFT Number: ▮▮▮▮▮▮▮▮▮▮▮▮

Account Name: _THE DUGIABOY INVESTMENT TRUST_

Account Number: ▮▮▮▮▮▮▮▮▮▮▮▮

For Benefit of: _[Subscriber Name] JAMES DONDERO_

Account Representative: _(TRUSTEE)_

Telephone: _____

B.     Is the Subscriber a customer of the Wiring Institution?

☑ Yes        ☐ No

**If you responded "No," please contact the Administrator for additional information that may be required.**

4.     **Electronic Delivery of Reports and Other Communications**

The Fund may make reports and other communications available in electronic form, such as e-mail or by posting on a web site (with notification of the posting by e-mail). Do you consent to receive deliveries of reports and other communications from the Fund (including annual and other updates of our consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies?

☑ Yes        ☐ No

5.     **Information Regarding Actual Ownership of the Shares**

Is the Subscriber subscribing for the Shares with the intent to sell, distribute or transfer the Shares to any other person or persons?

☐ Yes        ☑ No

Is the Subscriber subscribing for the Shares as agent, nominee, trustee, partner, or otherwise on behalf of, for the account of, or jointly with any other person or entity?

☐ Yes        ☑ No

Subscriber Information Form                    4

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 267
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1611 of 1726 PageID 12932

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 37

Will any other person or persons have a beneficial interest in the Shares acquired or a right to receive payments through contract or otherwise relating to the increase or decrease in value of the Shares (other than as a shareholder, partner or other beneficial owner of equity interests in the Subscriber)?

☐ Yes    ☑ No

Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Fund?

☐ Yes    ☑ No

Note: If any of the above questions were answered "Yes," please provide identifying information or contact the Administrator:

_____

6. **Government Entities**

(a)    Is the Subscriber a government entity or an officer, agent or employee thereof?

☐ Yes    ☑ No

Note: Government entities include all state and local governments, their agencies and instrumentalities, and any investment programs, defined benefit plans as defined in Section 414(j) of the Internal Revenue Code of 1986, as amended (the "*Code*"), state general funds, pools of assets or plans sponsored or established by state and local governments, including all public pension plans and any participant-directed plan or program of a government entity, such as "qualified tuition plans" authorized by section 529 of the Code and retirement plans authorized by section 403(b) or 457 of the Code.

If the answer is "Yes," please answer the following question. If the answer is "No," skip to question 7.

Is the Subscriber aware of any political contributions it or any of its employees has received from Highland Capital Management, L.P. (in its capacity as investment manager of the Fund, the "*Investment Manager*") or any of the Investment Manager's employees?

☐ Yes    ☐ No

If the answer is "Yes," please provide the date of the contribution:

_____

If the answer to either or both of the above questions is "Yes," please contact the Administrator.

Subscriber Information Form      5

7.    **Private Investment Fund Experience**

Has the Subscriber previously made an investment in a private investment fund such as a hedge fund, private equity or venture capital fund, commodity pool, real estate or energy partnership or fund of funds?

☑ Yes          ☐ No

8.    **Net Worth**

Is the Subscriber's net worth more than 10 times the amount of the subscription commitment?

☑ Yes          ☐ No

9.    **Ability to Bear Risk**

Does the Subscriber have the financial ability to bear the economic risk of this investment and have adequate means to provide for its current needs and contingencies?

☑ Yes          ☐ No

APPX. 108784

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 269
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23    Page 1613 of 1726   PageID 12934
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 8 of 37

## SECTION II. ADDITIONAL QUESTIONS FOR NATURAL PERSONS, INDIVIDUAL RETIREMENT ACCOUNTS OR GRANTOR TRUSTS

1. **Please indicate desired type of ownership interest**

   ☐ Individual
   ☐ Joint
   ☐ Individual Retirement Account
   ☑ Grantor Trust

2. **Place of Residence**

   (a)  Indicate the state where Subscriber has his or her principal residence:

   _TEXAS_

   Note: If you are married and live in a community property state, both you and your spouse must sign the signature page of the Subscription Agreement.  Community property states are Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin.  Property held by married persons resident in Alaska may also be subject to community property law if the married persons opted into the community property regime.

   (b)  Is the Subscriber or trust grantor a United States citizen or permanent resident of the United States?

   ☑ Yes    ☐ No

3. **Social Security Number:** ███████████

4. **Joint Subscriptions**

   If you are subscribing with another person, please answer the following questions:

   (a)  Please indicate type of ownership interest:

   ☐ Joint tenants (rights of survivorship)
   ☐ Tenants in common (no rights of survivorship)

   (b)  If you are purchasing Shares jointly with another person, please answer the following questions:

   (i)  Is the other person a United States citizen or permanent resident of the United States?

   ☐ Yes    ☐ No

   (ii)  If the answer to the above question is "Yes," please provide such other person's U.S. Social Security number: _____

APPX.10857

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 270
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1614 of 1726 PageID 12935
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 37

5.    **Individual Retirement Account Investors**

    (a)    If the Subscriber is subscribing as a trustee or custodian for an individual retirement account, is the Subscriber a qualified IRA custodian or trustee?

☐   Yes     ☐   No

    (b)    Name of qualified IRA trustee or custodian:

_____

6.    **Grantor Trust Investors**

    (a)    Please indicate whether the Subscriber, for federal income tax purposes, files now or has ever filed a tax or information return as a partnership, as a "grantor" trust or (if the Subscriber is a U.S. corporation) as an "S corporation" under Sections 1361-1379 of the Code.

☐   Yes     ☑   No

    (b)    If the answer is "Yes," will the investment in the Fund represent more than 75% of the assets of the Subscriber?

☐   Yes     ☑   No

APPX. 108788

| SECTION III. | ADDITIONAL QUESTIONS FOR ENTITIES AND NON-GRANTOR TRUSTS |
|---|---|

1. **Organizational Data**

     (a)    Legal form of entity: _____

     (b)    Jurisdiction of organization: _____

     (c)    Year of organization: _____

     (d)    Briefly identify the Subscriber's primary business: _____

              _____

              _____

     (e)    Identify the Subscriber's principal place of business:

              _____

              _____

     (f)    Total number of shareholders, partners or other holders of equity or beneficial interests or other securities (including any debt securities other than short term paper of the Subscriber) (If the number is more than 100, it is sufficient to respond "more than 100."):

              _____

     (g)    Is the Subscriber a wholly owned or majority-owned subsidiary of another entity?

                     ☐ Yes     ☐ No

        If yes, please provide name and address:

              _____

     (h)    Is the direct parent of the Subscriber a wholly owned or majority-owned subsidiary of another entity?

                     ☐ Yes     ☐ No

        If yes, please provide name and address:

              _____

APPX. 108179

(i)     Was the Subscriber organized for the specific purpose of acquiring the Shares?

☐ Yes ☐ No

(j)     Have shareholders, partners or other holders of equity or beneficial interests in the Subscriber been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Subscriber's investment in the Fund (*i.e.*, have investors in the Subscriber been permitted to determine whether their capital will form part of the specific capital invested by the Subscriber in the Fund)?

☐ Yes ☐ No

(k)     Is the Subscriber an entity engaged primarily in investing or trading securities?

☐ Yes ☐ No

If the answer is "Yes," please answer the following question. If the answer is "No," skip to question 2.

Does the current amount of the Subscriber's subscription to the Fund exceed 40% of the value of the Subscriber's total assets?

☐ Yes ☐ No

2. **Benefit Plan Accounts**

(a)     Is the Subscriber (1) an employee benefit plan subject to the fiduciary provisions of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), (2) a "plan" subject to Section 4975 of the Code, (3) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA, (a party described in (1), (2), or (3), a "*Plan*"), or (4) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "*Plan Asset Entity*")?

☐ Yes ☐ No

(b)     Is the Subscriber a Plan that is both voluntary and contributory?

☐ Yes ☐ No

Subscriber Information Form         10

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 273
Case 3:23-cv-00726-S    Document 8-23    Filed 08/29/23    Page 1617 of 1726    PageID 12938
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 12 of
37

(c)    Have beneficiaries of the Plan been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Plan's investment in the Fund (*i.e.*, have beneficiaries of the Plan been permitted to determine whether their capital will form part of the specific capital invested by the Plan in the Fund)?

☐ Yes    ☐ No

(d)    Is the Subscriber either (1) an insurance company general account the underlying assets of which include "plan assets" for purposes of ERISA or (2) a Plan Asset Entity?

☐ Yes    ☐ No

If the answer is "Yes", the maximum percentage of the Subscriber constituting "plan assets" will be:

_____

(Note that the Subscriber has an obligation under the Subscription Agreement to promptly notify the Fund if this percentage is exceeded in any calendar month).

3.    **Regulated Institutions**

(a)    Is the Subscriber a regulated institution that is subject to legal or regulatory restrictions or limitations on the nature of its investments (such as a bank or an insurance company)?

☐ Yes    ☐ No

(b)    If the answer is "Yes," has the Subscriber verified that the proposed subscription is in compliance with applicable laws and regulations?

☐ Yes    ☐ No

4.    **Tax Information**

(a)    Employer identification number:

_____

(b)    Indicate the annual date on which the Subscriber's taxable year ends for purposes of reporting federal income tax or filing information returns:

_____

APPX. 10389

(c)     Please indicate whether the Subscriber, for federal income tax purposes, files now or has ever filed a tax or information return, as a partnership, as a "grantor" trust or (if the Subscriber is a U.S. corporation) as an "S corporation" under Sections 1361-1379 of the Code.

☐     Yes     ☐     No

If the answer is "Yes," will the investment in the Fund represent more than 75% of the assets of the Subscriber?

☐     Yes     ☐     No

(d)     Is the Subscriber exempt from federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax-exempt organization described in Section 501(c)(3) of the Code)?

☐     Yes     ☐     No

5.     **Bank Investors**

(a)     Is the Subscriber an insured depository institution, as defined in the Federal Deposit Insurance Act or a company that controls directly or indirectly an insured depository institution?

☐     Yes     ☐     No

(b)     Is the Subscriber treated as a bank holding company for the purposes of Section 8 of the International Banking Act of 1978?

☐     Yes     ☐     No

(c)     Is the Subscriber a direct or indirect subsidiary of an entity described in (a) or (b) above?

☐     Yes     ☐     No

APPX. 108392

## PART B – SUBSCRIBER QUALIFICATION

SUBSCRIPTIONS WILL BE ACCEPTED ONLY FROM PERSONS WHO QUALIFY AS ELIGIBLE INVESTORS WITHIN THE MEANING OF APPLICABLE FEDERAL AND STATE SECURITIES REGULATIONS. UNLESS OTHERWISE INDICATED, RESPONSES SHOULD BE GIVEN BY REFERENCE TO THE SPECIFIC PERSON FOR WHOSE ACCOUNT THE SHARES ARE BEING ACQUIRED. THE SUBSCRIBER MAY BE REQUIRED TO PROVIDE SUCH FURTHER INFORMATION AND EXECUTE AND DELIVER SUCH DOCUMENTS AS THE FUND OR THE ADMINISTRATOR MAY REASONABLY REQUEST TO VERIFY THAT THE SUBSCRIBER QUALIFIES AS AN ELIGIBLE INVESTOR.

## SECTION I. ACCREDITED INVESTOR STATUS

Each Subscriber must indicate whether the intended beneficial owner of the Shares qualifies as an "accredited investor" pursuant to *at least one* of the following tests. (Please check *all* that apply, or, if none applies, consult the Administrator.)

### FOR NATURAL PERSONS:

☐ The Subscriber is a *natural person* whose individual net worth, or joint net worth with that person's spouse, at the time of purchase exceeds $1,000,000, *excluding* the value of the Subscriber's primary residence.[3]

☐ The Subscriber is a *natural person* with individual income (without including any income of the Subscriber's spouse) in excess of $200,000 or joint income with that person's spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.

☑ The Subscriber is an individual retirement account or a grantor trust and the owner of the individual retirement account or the grantor of the grantor trust is a *natural person* that meets the requirements described above.[4]

### FOR ENTITIES:

☐ The Subscriber is an *entity* with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Fund and is one of the following:

  ☐ a corporation;

  ☐ a partnership;

  ☐ a limited liability company;

---

[3]. An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

[4] Additional information may be required in connection with a grantor trust's investment.

Subscriber Information Form 13

APPX. 108193

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 276
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1620 of 1726 PageID 12941
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 15 of 37

☐ a business trust; or

☐ a tax-exempt organization described in Section 501(c)(3) of the Code.

☐ The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Fund and whose decision to invest in the Fund has been directed by a person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the investment.

☐ The Subscriber is an employee benefit plan within the meaning of Title I of ERISA, (including an individual retirement account), which satisfies at least one of the following conditions:

☐ it has total assets in excess of $5,000,000;

☐ the investment decision is being made by a plan fiduciary that is a bank, savings and loan association, insurance company or registered investment adviser; or

☐ it is a self-directed plan (i.e., a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

☐ The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions that has total assets in excess of $5,000,000.

☐ The Subscriber is licensed, or subject to supervision, by federal or state examining authorities such as a "bank," "savings and loan association," "insurance company," or "small business investment company" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

☐ The Subscriber is registered with the Securities and Exchange Commission as a broker or dealer or an investment company; or has elected to be treated or qualifies as a "business development company" (within the meaning of Section 2(a)(48) of the Investment Company Act of 1940, as amended (the "*Investment Company Act*"), or Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "*Investment Advisers Act*")).

☐ The Subscriber is an entity in which *all* of the equity owners are persons described above.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 277
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1621 of 1726 PageID 12942
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 16 of 37

## SECTION II. QUALIFIED CLIENT STATUS

Each subscriber must indicate whether the intended beneficial owner of the Shares qualifies as a "qualified client." IRAs and revocable grantor trusts should complete the questions for natural persons.

### FOR NATURAL PERSONS:

☑ The Subscriber (or the grantor, in the case of a grantor trust) is a natural person whose net worth (together, in the case of a natural person, with assets held jointly with that person's spouse), at the time of subscription exceeds $2,000,000, *excluding* the value of the Subscriber's primary residence.[5]

### FOR ENTITIES:

☐ The Subscriber is an entity that has a net worth at the time of subscription in excess of $2,000,000

If the entity is an entity engaged primarily in investing or trading in securities, state whether each of the shareholders, partners or other holders of equity or beneficial interests in the Subscriber (please answer both (A) and (B)):

(A) has a net worth of at least $2,000,000 *excluding* the value of the holder's primary residence:[6]

        ☐ Yes      ☐ No

(B) is either an entity which is not engaged primarily in investing or trading in securities or a natural person:

        ☐ Yes      ☐ No

---

[5]. An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

[6] See footnote immediately above.

Subscriber Information Form             15

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 278
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23    Page 1622 of 1726    PageID 12943
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 17 of 37

---

## SECTION III.    FUND INVESTMENTS IN FINRA-RESTRICTED ISSUES AND AFFILIATION WITH FINRA MEMBERS IN UNDERWRITTEN OFFERINGS

The Fund may, from time to time, consider direct or indirect investing in certain publicly offered equity securities, more commonly known as "new issue" securities ("*New Issues*"), through member firms of the Financial Industry Regulatory Authority, Inc. ("*FINRA*") in accordance with Rules 5130 and 5131 adopted by FINRA. Also, FINRA requires any member that is participating in a public offering of securities to report any affiliation between a 5% shareholder of the company whose securities are being offered with a FINRA member. In order for the Fund to be able to determine the extent to which a Subscriber is eligible to participate in New Issues and to comply with any filings required in any underwritten public offering that is conducted by any company in which the Fund invests, the Subscriber must complete the questionnaire below. *Even if the Subscriber does not wish to participate in the profits related to New Issues, the Subscriber must complete Items A and B, as the tests in each Item are conducted separately.*

A.    **Determination of Restricted Person Status under Rule 5130:**

Section 1 (Restricted Persons)

The Subscriber is:

☐    a FINRA member or other securities broker-dealer;

☐    an affiliate of a broker-dealer.[7]

☐    an officer, director, general partner, associated person or employee of any member of FINRA or any other securities broker-dealer, in either case other than a limited business broker-dealer. [8]

If the Subscriber checked any of the preceding boxes, please describe the name and CRD number of the applicable FINRA member along with a description of the relationship between such broker-dealer or affiliate and the Subscriber including, if applicable, the percentage of the Subscriber that is owned by a FINRA member: _____

_____

_____

---

[7]    As used herein, an "*affiliate*" means an entity which controls, is controlled by or is under common control with such broker-dealer. "Control" means (i) beneficial ownership of 10% or more of the outstanding common equity of an entity, including any right to receive such securities within 60 days; (ii) the right to 10% or more of the distributable profits or losses of an entity that is a partnership, including any right to receive an interest in such distributable profits or losses within 60 days; (iii) beneficial ownership of 10% or more of the outstanding subordinated debt of an entity, including any right to receive such subordinated debt within 60 days; (iv) beneficial ownership of 10% or more of the outstanding preferred equity of an entity, including any right to receive such preferred equity within 60 days; or (v) the power to direct or cause the direction of the management or policies of an entity.

[8]    As used herein, a "*limited business broker-dealer*" means any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities or direct participation programs.

Subscriber Information Form                16

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 279
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1623 of 1726 PageID 12944
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 18 of 37

☐ an agent of any member of the FINRA or any other securities broker-dealer that is engaged in the investment banking or securities business.

☐ a person who, directly or indirectly, owns or has contributed capital to any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer), and the Subscriber:

(a) is listed, or required to be listed, in Schedule A of the Form BD for such FINRA member or other securities broker-dealer, and is identified by an ownership code of at least 10%;

(b) is listed, or required to be listed, in Schedule B of the Form BD for such FINRA member or other securities broker-dealer, and such listing relates to a direct owner of such FINRA member or other securities broker-dealer that is identified by an ownership code of at least 10%;

(c) is listed, or required to be listed, in Schedule C of the Form BD of the FINRA member or other securities broker-dealer that meets any of the criteria noted in paragraphs (a) or (b) above;

(d) owns 10% or more of a public reporting company listed, or required to be listed, as a direct owner in Schedule A of a Form BD of any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer). For this purpose, a "public reporting company" does not include a reporting company that is listed on a national securities exchange; or

(e) owns 25% or more of a public reporting company listed, or required to be listed, as an indirect owner in Schedule B of a Form BD of any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer). For this purpose, a "public reporting company" does not include a reporting company that is listed on a national securities exchange.

If the Subscriber checked the immediately preceding box, please describe the name and CRD number of the FINRA member on whose form the relationship is disclosed: _____
_____
_____

☐ a person who may act as a finder with respect to any public offering of securities.

☐ a person, such as an attorney, accountant or financial consultant, whose professional activities may include acting in a fiduciary capacity to any managing underwriter of any public offering of securities.

☐ a person who has the authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor or other collective investment account (including any hedge fund, investment partnership, investment corporation or any other collective investment vehicle that

APPX. 10397

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 280 of 380
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1624 of 1726 PageID 12945

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 19 of 37

is engaged primarily in the purchase and/or sale of securities), other than a family investment account or investment club.

☐ a member of the immediate family of any person to whom any of the preceding paragraphs refer.[9]

If the Subscriber checked this box, please specify the identity and the nature of the relationship with the Restricted Person, the firm with which the Restricted Person is associated, and whether the Restricted Person either contributes directly or indirectly to the Subscriber's support or receives material support from the Subscriber.

_____

_____

☐ a domestic or foreign bank, bank branch, trust company, or other conduit for an undisclosed principal. The Fund may request additional information in order to determine the eligibility of the undisclosed principal.

☐ an employee benefit plan qualified under ERISA, that is sponsored by a FINRA member or other securities broker-dealer or an affiliate thereof.

☐ an entity (including a partnership, investment fund, limited liability company or other account) which either (i) knows that one or more of its beneficial owners is a Restricted Person described in any of the preceding categories, or (ii) has not affirmatively determined that there is no Restricted Person described in any of the preceding categories that has a beneficial interest in the entity.[10]

A Subscriber who has checked one of the boxes above may be able to participate in New Issues to the extent an exemption in Item C applies. See C below.

Section 2 (Unrestricted Persons)

☑ None of the Restricted Person Categories in Section 1 above apply and the Subscriber is eligible to fully participate in profits and losses from investments in New Issues.

---

[9] The term "*immediate family*" includes parents; mother-in-law or father-in-law; husband or wife; brother or sister; brother-in-law or sister-in-law; son-in-law or daughter-in-law; children; whether by birth or adoption; and any other person who is supported, directly or indirectly, to a material extent by such person. For this purpose, "*material support*" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

[10] The term "*beneficial interest*" means any economic interest such as the right to share in gains or losses. The receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account. However, for purposes of FINRA Rule 5130 and 5131, if such fee is subsequently invested into the account (as a deferred fee arrangement or otherwise), it would then be considered a beneficial interest in the account.

Subscriber Information Form                    18

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 281
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1625 of 1726 PageID 12946
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of 37

B. **Determination of Covered Person Status under Rule 5131:**

Section 1 (Persons Covered by Rule 5131)

The Subscriber is:

☐    an executive officer or director of a public company.[11]

☑    an executive officer or director of a covered non-public company.[12]

☐    a person materially supported by an executive officer or director of a public company or a covered non-public company.[13]

If any of the three preceding boxes are checked, please provide the name of the "public company" or "covered non-public company" in the space below.

*NexBank, MGM, Cornerstone, CCS Medical, Am. Banknote*

If the Subscriber is an entity in which any of the above persons have a direct or indirect beneficial interest, please specify the current beneficial interest of each such person (as a percentage) and each relevant "public company" or "covered non-public company" for which the relevant investor is an executive officer or director.

_____

_____

Note that Subscribers checking the boxes above may not be restricted in their participation in New Issues depending on such Subscriber's Interest in the Fund and the investment banking relationships of the companies they serve.

Section 2 (Persons Not Covered by Rule 5131)

☐    None of the Covered Person Categories in Section 1 above apply and the Subscriber is eligible to fully participate in profits and losses from investments in New Issues.

---

[11] As used herein, a "***public company***" is any company that has a class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), or any company that files periodic reports pursuant to Section 15(d) of the Exchange Act.

[12] As used herein, a "***covered non-public company***" means any non-public company satisfying any of the following three criteria:

    (a) income of at least $1 million in the previous fiscal year or in two of the three previous fiscal years *and* shareholders' equity of at least $15 million;

    (b) shareholders' equity of at least $30 million and an operating history of two years; or

    (c) total assets and total revenue of at least $75 million in the latest fiscal year *or* in two of the three most recent fiscal years.

[13] As used herein, "***material support***" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

Subscriber Information Form        19

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 282
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1626 of 1726 PageID 12947
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 21 of 37

C.   **Determination of Exempted Entity Status under Rules 5130 and 5131:**

A Subscriber who has checked one of the boxes set forth in Item A, Section 1 or Item B, Section 1 above may be eligible to participate in New Issues if the Subscriber meets certain criteria for exempted entities. In order for the Fund to be able to determine the extent to which an exemption applies, please check all appropriate boxes that describe the Subscriber.

Section 1 (Rules 5130 and 5131)

The Subscriber is an entity that:

☐   is an investment company registered under the Investment Company Act;

☐   is a common trust fund or similar fund, as described in Section 3(a)(12)(A)(iii) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), and the fund (i) has investments from 1,000 or more accounts and (ii) does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐   is an insurance company general, separate or investment account, and (i) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders and (ii) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons;

☐   is a publicly traded entity (other than a broker-dealer or an affiliate of a broker-dealer where such broker-dealer is authorized to engage in the public offering of New Issues either as a selling group or underwriter) that (i) is listed on a national securities exchange, or (ii) is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

☐   is an investment company organized under the laws of a foreign jurisdiction, (i) that is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and (ii) in which no person owning more than 5% of the shares of such investment company is a Restricted Person;

☐   is an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code, and such plan is not sponsored solely by a broker-dealer;

☐   is a state or municipal government benefit plan that is subject to state and/or municipal regulation;

☐   is a tax-exempt charitable organization under Section 501(c)(3) of the Code and has attached a copy of the IRS determination letter confirming the entity's qualification under Section 501(c)(3) of the Code, by virtue of which there are no "beneficial owners" as calculated based on the definition of "beneficial interest" under FINRA Rule 5130; or

APPX. 108198

☐    is a church plan under Section 414(e) of the Code.

☑    None of the preceding categories in this Item C apply to the Subscriber.

Section 2 (Rule 5130 only)

The Subscriber is:

☐    an entity that represents, based upon a representation from the beneficial account holders or a person authorized to represent the beneficial owners of the Subscriber (in either case, dated no earlier than 12 months prior to the date of the Subscription Agreement), that none of the beneficial owners of the Subscriber who participate in New Issues are persons who are not entitled to do so under FINRA Rule 5130, and the Subscriber is eligible to purchase New Issues in compliance with FINRA Rule 5130; or

☐    is an entity (including a private investment vehicle, such as a hedge fund or fund of hedge funds) (i) in which the beneficial interests of Restricted Persons do not exceed in the aggregate 10% of such entity or (ii) that limits participation in New Issue profits by Restricted Persons to not more than 10% of the profits from New Issues.

If the immediately preceding box is checked, please specify the current percentage of the net profits from New Issues allocable to beneficial owners of such entity who are Restricted Persons.

_____

APPX. 10399

# HIGHLAND CREDIT OPPORTUNITIES FUND, LTD.

### SUBSCRIPTION AGREEMENT

Highland Credit Opportunities Fund, Ltd.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Ladies and Gentlemen:

## 1.    Documents Received

(a)    The undersigned (the "*Subscriber*") hereby acknowledges having (i) received, read and understood the current Confidential Private Offering Memorandum, as supplemented and amended from time to time (the "*Private Offering Memorandum*"), of Highland Credit Opportunities Fund, Ltd., a Cayman Islands exempted company (the "*Fund*"), including but not limited to those sections dealing with risk factors, conflicts of interest, fees and tax consequences of an investment in the Fund, and the Memorandum and Articles of Association of the Fund, as amended to date (the "*Articles*"), (ii) received a copy of Form ADV Part 2A, the firm brochure, and Form ADV Part 2B, the brochure supplement, of Highland Capital Management, L.P. (in its capacity as the investment manager of the Fund, the "*Investment Manager*"), as amended to date (the "*Form ADV*"), prior to or simultaneously with delivery of this Subscription Agreement to the Fund and (iii) been given the opportunity to (A) ask questions of, and receive answers from the Investment Manager or one of its affiliates concerning the terms and conditions of the offering and other matters pertaining to an investment in the Fund and (B) obtain any additional information that the Investment Manager can acquire without unreasonable effort or expense that is necessary to evaluate the merits and risks of an investment in the Fund.

(b)    Appendix A hereto contains the definitions of certain capitalized terms used but not otherwise defined herein and should be read by the Subscriber prior to entering into this Subscription Agreement.

## 2.    Subscription Commitment

(a)    The Subscriber hereby irrevocably subscribes for shares of the Fund (the "*Shares*"), subject to Articles, as may be amended from time to time, and the Private Offering Memorandum, and agrees to contribute in cash (unless otherwise agreed by the Fund) to the capital of the Fund, the amount set forth on the Signature Page of this Subscription Agreement. Such amount shall be payable in full in readily available funds by wire transfer to the bank account of the Fund at least two business days prior to the proposed date of subscription.

(b)    The Subscriber understands that this subscription is not binding on the Fund until accepted by the Fund, and it may be rejected, in whole or in part, by the Fund in its absolute discretion. If and to the extent rejected, the Fund shall, to the extent permitted by law, return to the Subscriber, without interest or deduction, any payment tendered by the Subscriber, and the Fund and the Subscriber shall have no further obligation to each other hereunder. The Subscriber acknowledges and accepts that none of the Fund, the Investment Manager, the Fund's

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 285
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1629 of 1726 PageID 12950

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 24 of
37

administrator (the "*Administrator*," which term shall be construed to include any sub-administrator of the Fund unless the context otherwise requires) nor their respective agents, affiliates or representatives shall be responsible for any lost profit, revenue or damages of any kind due to a delayed acceptance or a rejected subscription.

**3.      Representations, Warranties and Covenants – All Subscribers**

To induce the Fund to accept this subscription, the Subscriber hereby makes the following representations, warranties and covenants to the Fund:

(a)     The information set forth in the subscriber information form attached hereto, which shall be considered an integral part of this Subscription Agreement (the "*Subscriber Information Form*"), is true, correct, accurate and complete, and will be relied upon by the Fund for the purpose of determining the eligibility of the Subscriber to purchase and own Shares.

(b)     The Subscriber hereby represents that the information set forth in the Subscriber Information Form is true, correct, accurate and complete as of the date hereof, and the Subscriber agrees to notify the Fund immediately if any representation or warranty contained in this Subscription Agreement, or any information provided pursuant to the Subscriber Information Form becomes untrue, misleading, or otherwise requires updating at any time. For so long as the Subscriber is a shareholder of the Fund, the Subscriber further agrees to provide any revised or updated information necessary to cause the Subscriber Information Form to remain true and correct as soon as practicable upon the Subscriber becoming aware that any such change or revision is necessary. The Subscriber agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Subscriber's status as an "accredited investor" or "qualified purchaser" or to otherwise determine the eligibility of the Subscriber to purchase Shares. The Subscriber agrees to provide any additional information and execute any additional documents as may reasonably be required in connection with any subscription, credit facility or other similar borrowing arrangement by the Fund or any lender named in the credit facility or similar lending arrangement.

(c)     The Subscriber consents to the disclosure of any such information, and any other information furnished to the Fund, to any governmental authority or self-regulatory organization or, to the extent required by law or deemed (subject to applicable law) by the Fund to be in the best interest of the Fund, to any other person.

(d)     Except as disclosed in the accompanying Subscriber Information Form, the Subscriber is acquiring the Shares for the Subscriber's own account; does not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of the Shares; and is not acquiring the Shares with a view to or for sale in connection with any distribution of the Shares.

(e)     The Subscriber or an advisor or consultant relied upon by the Subscriber in reaching a decision to subscribe has such knowledge and experience in financial, tax and business matters as to enable the Subscriber or such advisor or consultant to evaluate the merits and risks of an investment in the Fund (including the risks set forth in the Private Offering Memorandum) and to make an informed investment decision with respect thereto and has made its own investment decision, including decisions regarding suitability based on its own judgment

APPX. 108303

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 286
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1630 of 1726 PageID 12951

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 25 of 37

or upon the advice from such advisers as it deemed necessary and not upon the views or advice of the Fund, the Investment Manager, or their affiliates or representatives.

(f)     The Subscriber understands that the Shares have not been and will not be registered under the Securities Act of 1933, as amended (the "*Securities Act*"), or any state law and that the Fund is not registered under the Investment Company Act of 1940, as amended (the "*Investment Company Act*"). The Subscriber agrees to notify the Fund prior to any proposed sale, transfer, distribution or other disposition of the Shares or any beneficial interest therein, and will not sell, transfer, distribute or otherwise dispose of the Shares (including, without limitation, by pledge, option, swap or nominee or similar relationship, and further including, without limitation, the offering or listing of any Shares on or through any placement agent, intermediary, online service, site, agent or other similar person, service or entity) without the consent of the directors of the Fund (the "*Directors*") and the Investment Manager, which may be granted or withheld in their sole discretion, and unless the Shares are registered or such sale, transfer, distribution or other disposition is exempt from registration. The Subscriber understands that any such transfers without the consent of the Directors and the Investment Manager are null and void. The Subscriber also understands that the Fund has no intention to register the Fund or the Shares with the Securities and Exchange Commission or any state and is under no obligation to assist the Subscriber in obtaining or complying with any exemption from registration. The Fund may require that a proposed transferee meet appropriate financial and other suitability standards and that the transferor furnish a legal opinion satisfactory to the Fund and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws. An appropriate legend evidencing such restrictions may be placed on any certificates issued representing the Shares and appropriate stop-transfer instructions may be placed with respect to the Shares.

(g)     The Subscriber confirms that it has not been invited as a member of the public in the Cayman Islands to subscribe for Shares.

(h)     In formulating a decision to invest in the Fund, the Subscriber has not relied or acted on the basis of any representations or other information purported to be given on behalf of the Fund or the Investment Manager, except as set forth in the Private Offering Memorandum or the Articles or the Form ADV (it being understood that no person has been authorized by the Fund or the Investment Manager to furnish any such representations or other information).

(i)     The Subscriber recognizes that there is not now any secondary market for the Shares and that such a market is not expected to develop; accordingly, it may not be possible for the Subscriber readily to liquidate the Subscriber's investment in the Fund other than through a redemption of Shares as provided in the Articles and the Subscriber may be holding such Shares for an indefinite period of time.

(j)     The Subscriber understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Fund. The Subscriber's investment is consistent with the investment purposes and objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

Subscription Agreement         3

(k)    The Subscriber can afford a complete loss of its investment in the Fund and can afford to hold its investment in the Fund for an indefinite period of time.

(l)    If the Subscriber is a natural person, the Subscriber is qualified to become a shareholder of the Fund and has the legal capacity to execute, deliver and perform this Subscription Agreement.

(m)    If the Subscriber is a corporation, partnership, limited liability company, trust or other entity, it is authorized and qualified to become a shareholder of, and authorized to make its subscription payment to, the Fund and otherwise to comply with its obligations as a shareholder of the Fund; the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so; and this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms. In addition, such Subscriber will, upon request of the Fund or the Administrator, deliver any documents, including an opinion of counsel to the Subscriber, evidencing the existence of the Subscriber, the legality of an investment in the Fund and the authority of the person executing this Subscription Agreement on behalf of the Subscriber.

(n)    The purchase of the Shares hereunder and the compliance by such Subscriber with all of the provisions of this Subscription Agreement applicable to such Subscriber and the consummation by such Subscriber of the transactions herein and therein contemplated will not (a) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any statute, indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Subscriber is a party or by which such Subscriber is bound or to which any of the property or assets of such Subscriber is subject, nor (b) will such action result in any violation of (i), if such Subscriber is an entity, the provisions of the organizational documents of such Subscriber or (ii) any statute applicable to such Subscriber or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Subscriber or the property of such Subscriber.

(o)    The Subscriber has carefully reviewed and understands the various risks of an investment in the Fund, as well as the fees and conflicts of interest to which the Fund is subject, as set forth in the Private Offering Memorandum. The Subscriber hereby consents and agrees to the payment of the fees so described to the parties identified as the recipients thereof, and to such conflicts of interest.

(p)    The Subscriber believes that the compensation terms of the Fund represent an "arm's-length" arrangement and the Subscriber is satisfied that it has received adequate disclosure from the Fund and the Investment Manager to enable it to understand and evaluate the compensation and other terms of the Fund and the risks associated therewith.

(q)    The Subscriber represents and warrants that no holder of any beneficial interest in the Shares (each a "***Beneficial Interest Holder***") and, in the case of a Subscriber which is an entity, no Related Person is:

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 288
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1632 of 1726 PageID 12953
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 27 of 37

(1)     A person or entity whose name appears on the List of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Asset Control from time to time;

(2)     A Foreign Shell Bank; or

(3)     A person or entity resident in or whose subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction.

The Subscriber agrees promptly to notify the Fund or the person appointed to administer the Fund's anti-money laundering program, if applicable, of any change in information affecting this representation and covenant.

(r)     The Subscriber represents that (except as otherwise disclosed to the Fund in writing):

(1)     neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is a Senior Foreign Political Figure, any member of a Senior Foreign Political Figure's Immediate Family or any Close Associate of a Senior Foreign Political Figure;

(2)     neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is resident in, or organized or chartered under the laws of, a jurisdiction that has been designated by the Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;[14] and

(3)     its subscription funds do not originate from, nor will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a Non-Cooperative Jurisdiction.

(s)     The Subscriber acknowledges and agrees that any amounts paid to it will be paid to the same account from which its subscription funds were originally remitted, unless the Fund agrees otherwise.

(t)     If the Subscriber is purchasing the Shares as agent, representative or intermediary/nominee, or in any similar capacity for any other person, or is otherwise requested to do so by the Fund, it shall provide a copy of its anti-money laundering policies ("*AML Policies*") to the Fund. The Subscriber represents that (i) it is in compliance with its AML Policies, (ii) its AML Policies have been approved by counsel or internal compliance personnel who have been reasonably informed of the legal requirements and best practices for anti-money laundering policies and their implementation, and (iii) it has not received a deficiency letter, negative report or any similar determination regarding its AML Policies from independent

---

[14]   The Treasury Department's Financial Crimes Enforcement Network ("*FinCEN*") issues advisories regarding countries of primary money laundering concern. FinCEN's advisories are posted at http://www.fincen.gov/pub_main.html.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 289
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1633 of 1726 PageID 12954

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 28 of 37

accountants, internal auditors or some other person responsible for reviewing compliance with its AML Policies.

(u)  The Subscriber represents and warrants that as a result of its acquisition and holding of the Shares: (i) the assets of the Fund will not constitute the assets of any employee benefit plan subject to any federal, state, local or non-U.S. law, rule or regulations ("*Similar Law*") that is similar to (A) the U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), or (B) Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*"); (ii) the Investment Manager will not be considered to be a fiduciary of the Subscriber under any Similar Law; and (iii) no activity of the Fund contemplated in the Private Offering Memorandum or the Articles will violate any Similar Law.

(v)  The Subscriber will promptly provide any additional documentation the Fund or the Administrator may request in the future to the extent that the Fund or the Administrator determines necessary in order to comply with applicable anti-money laundering laws or policies or any other applicable law.

(w)  The Subscriber acknowledges that due to anti-money laundering requirements operating within their respective jurisdictions, the Fund, the Investment Manager and/or the Administrator (as the case may be) may require additional documentation before a subscription application or redemption request can be processed. Please be aware that your failure to provide or a delay in providing any such documentation may delay your acceptance to the Fund, cause your subscription to be rejected entirely or delay the satisfaction of your redemption request, as applicable. The Fund, the Investment Manager and the Administrator shall be held harmless and indemnified against any loss arising as a result of any such delay or rejection due to the Subscriber's failure to provide or delay in providing any such requested information.

(x)  The Subscriber acknowledges and agrees that Shares of the Fund will not be issued until such time as the Fund and/or the Administrator has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity. Where at the sole discretion of the Fund, Shares are issued prior to the Fund and/or Administrator having received all the information and documentation required to verify the Subscriber's identity, the Subscriber will be prohibited from redeeming any Shares so issued, and the Fund and the Administrator on its behalf reserves the right to refuse to make any redemption payment or distribution to the Subscriber, until such time as the Fund and/or the Administrator, as applicable, has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity.

(y)  The Subscriber acknowledges and agrees that each of the Fund, the Administrator and the Investment Manager may disclose to each other, to any affiliate, to any other service provider to the Fund or to any regulatory body in any applicable jurisdiction copies of the Subscriber's subscription documents and any information concerning the Subscriber in their respective possession, whether provided by the Subscriber to the Fund, the Administrator or the Investment Manager or otherwise, including details of the Subscriber's Shares, historical and pending transactions in the Shares and the value thereof, and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on any such person by law or otherwise.

Subscription Agreement                                        6

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 290
Case 3:23-cv-00726-S Document 8-23 Filed 06/29/23 Page 1634 of 1726 PageID 12955

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of 37

(z)     The Subscriber agrees to provide the Fund and/or the Administrator any additional tax information or documentation that the Fund or the Administrator believes will enable it, the Fund or any subsidiary of the foregoing to comply with or mitigate any of their respective tax reporting, tax withholding, and/or tax compliance obligations, including any such obligations under the U.S. Hiring Incentives to Restore Employment Act (P.L. 111-147), or which may arise as a result of a change in law or in the interpretation thereof.

(aa)     The Subscriber understands that Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") acts as U.S. counsel to the Fund, the Investment Manager and their affiliates. The Subscriber also understands that, in connection with this offering of Shares and ongoing advice to the Fund, the Investment Manager and their affiliates, Akin Gump will not be representing investors in the Fund, including the Subscriber, and no independent counsel has been retained to represent investors in the Fund. In addition, Akin Gump does not undertake to monitor the compliance of the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth in the Private Offering Memorandum, nor does Akin Gump monitor compliance with applicable laws. In preparing the Private Offering Memorandum, Akin Gump relied on information furnished to it by the Fund and/or the Investment Manager, and did not investigate or verify the accuracy or completeness of the information set forth therein concerning the Fund, the Investment Manager and their affiliates and personnel.

**4.     Representations, Warranties and Covenants – ERISA Subscribers**

If the Subscriber is, or is acting on behalf of, an employee benefit plan which is subject to ERISA or Section 4975 of the Code, to induce the Fund to accept this subscription, the Subscriber hereby makes the following additional representations, warranties and covenants to the Fund:

(a)     The person executing this Subscription Agreement on behalf of the Subscriber either is a "named fiduciary" (within the meaning of ERISA) of the Subscriber, or is acting on behalf of a named fiduciary of the Subscriber pursuant to a proper delegation of authority.

(b)     The person executing this Subscription Agreement on behalf of the Subscriber represents and warrants on behalf of such person or the Subscriber, as applicable, as follows:

(1)     The Subscriber is (w) an employee benefit plan subject to the fiduciary provisions of ERISA, (x) a "plan" subject to Section 4975 of the Code, (y) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA (a party described in (w), (x) or (y) a "*Plan*") or (z) any entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "*Plan Asset Entity*").

(2)     The execution and delivery of this Subscription Agreement and the consummation of the transactions contemplated hereunder, and in the Private Offering Memorandum and the Articles will not result in a breach or violation of any charter or organizational documents pursuant to which

the Subscriber was formed, or any statute, rule, regulation or order of any court or governmental agency or body having jurisdiction over the Subscriber or any of its assets, or in any material respect, any mortgage, indenture, contract, agreement or instrument to which the Subscriber is a party or otherwise subject.

(3)     The investment in the Fund is permitted by the documents of the Subscriber and such documents permit the Subscriber to invest in private investment funds that will engage in the investment program described in the Private Offering Memorandum.

(c)     The Subscriber is not in any way affiliated with (*i.e.*, does not own or control, is not owned or controlled by, nor is under common ownership or control with) any person or entity which will receive compensation, directly or indirectly, from the Fund, as specifically identified and described in the Private Offering Memorandum.

(d)     The Subscriber acknowledges and agrees that the decision to invest in the Fund and the review of the terms of the Fund must be made solely and independently by a fiduciary of the Subscriber who has no affiliation with the Investment Manager or any of its affiliates or employees, without relying on any recommendation of the Investment Manager or any of its affiliates or employees as a primary basis for its decision.

(e)     The appropriate fiduciaries of the Subscriber have considered the investment in light of the risks relating thereto and fiduciary responsibility provisions of ERISA applicable to the Subscriber and have determined that, in view of such considerations, the investment is appropriate for the Subscriber and is consistent with such fiduciaries' responsibilities under ERISA, and the appropriate fiduciaries: (i) are responsible for the Subscriber's decision to invest in the Fund, including the determination that such investment is consistent with the requirement imposed by Section 404 of ERISA that employee benefit plan investments be diversified so as to minimize the risk of large losses; (ii) are independent of the Investment Manager and any of its affiliates and employees and of any person or entity that will receive compensation, whether directly or indirectly, from the Fund, as specifically identified and described in the Private Offering Memorandum; (iii) are qualified and authorized to make such investment decision; and (iv) in making such decision, have not relied on the recommendation of the Investment Manager or any of its affiliates or employees.

(f)     The Subscriber through the appropriate fiduciaries has been given the opportunity to discuss the Subscriber's investment in the Fund, and the structure and operation of the Fund with the Investment Manager and has been given all information that the Subscriber or the appropriate fiduciaries have requested and which the Subscriber or the appropriate fiduciaries deemed relevant to the Subscriber's decision to participate in the Fund.

5.     **Representations, Warranties and Covenants – Insurance Company General Account and Plan Asset Entity Subscribers**

(a)     If the Subscriber is acquiring the Shares with the assets of the general account of an insurance company (a "*General Account*"), the Subscriber represents, warrants and covenants that, on each day the Subscriber owns the Shares, either (i) the assets of such General Account

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 292
Case 3:23-cv-00726-S   Document 8-23   Filed 02/29/23   Page 1636 of 1726   PageID 12957

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 31 of
37

are not considered to be plan assets within the meaning of Section 3(42) of ERISA, Department of Labor Regulations Section 2510.3-101 or Department of Labor regulations issued pursuant to Section 401(c)(1)(A) of ERISA, or (ii) the execution and delivery of this Subscription Agreement, and the acquisition and redemption of the Shares, is exempt from the prohibited transaction rules of Section 406(a) of ERISA and Section 4975(c)(1)(A) - (D) of the Code by virtue of Department of Labor Prohibited Transaction Class Exemption 95-60 or some other exemption of such rules.

(b)   By signing this Subscription Agreement, each Subscriber that is either a Plan Asset Entity or using the assets of a General Account hereby covenants that if, after its initial acquisition of the Shares, at any time during any calendar month the percentage of the assets of such General Account (as reasonably determined by the Subscriber) or Plan Asset Entity, as applicable, that constitute "plan assets" for purposes of Title I of ERISA or Section 4975 of the Code exceeds the maximum percentage limit specified by the Subscriber in Question 2(d) of Section III of the Subscriber Information Form, then such Subscriber shall promptly notify the Fund of such occurrence and the Fund may require the Subscriber to redeem or dispose of all or a portion of the Shares held in such General Account or by such Plan Asset Entity, as applicable, by the end of the next following calendar month or such other time as may be determined by the Investment Manager.

**6.      Indemnification**

(a)   The Subscriber understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that the subscription made hereby, if accepted by the Fund, will be accepted in reliance thereon. The Subscriber agrees to indemnify and hold harmless the Fund, the Directors, the Investment Manager and their affiliates, and the partners, members, managers, stockholders, other beneficial owners, officers, directors and employees of any of the foregoing (together, the "***Indemnified Persons***") from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which an Indemnified Person may incur by reason of, or in connection with, any representation or warranty made herein (or in the accompanying Subscriber Information Form) not having been true, correct and complete when made, any misrepresentation made by the Subscriber or any failure by the Subscriber to fulfill any of the covenants or agreements set forth herein, in the Subscriber Information Form or in any other document provided by the Subscriber to the Fund.

(b)   To the extent that any provisions of this Subscription Agreement, including, without limitation, Section 6 hereof, are not enforceable under applicable law by virtue of any person not being party to this Subscription Agreement (each such person, a "***Third Party***"), the Subscriber hereby agrees that the Fund may execute one or more deed polls and/or enter into one or more separate agreements with any such Third Party and take all further actions as may be necessary or desirable, in the sole opinion of the Fund, to give effect to such provisions.

(c)   The Subscriber expressly consents to the Investment Manager or the Administrator accepting and executing any instructions transmitted in written or facsimile form (or by other electronic means) in respect of an investment in the Fund to which this application relates (including, without limitation, withdrawal requests).  If instructions are given by the Subscriber in facsimile form (or by other electronic means), the Subscriber undertakes to send

APP. 103208

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 293
Case 3:23-cv-00726-S  Document 8-23   Filed 02/29/23   Page 1637 of 1726   PageID 12958
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 32 of
37

the original letter of instructions to the Fund and the Administrator and hereby agrees to hold harmless and indemnify each of the Indemnified Persons, the Administrator and any of its employees and agents against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means. Each Indemnified Person and each of the Administrator and any of its employees and agents may rely conclusively upon and shall incur no liability (i) for any loss arising from the non-receipt of any instructions relating to the Shares of the Subscriber delivered by facsimile or other electronic means or (ii) in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber.  Each Indemnified Person and each of the Administrator and any of its employees and agents shall be allowed such amount of time to act on and implement any instructions as may be reasonable having regard to their systems and operations and any other circumstances then prevailing and shall not be liable for any loss arising from any delay in acting on any instruction.

7.    **Miscellaneous**

(a)    The Subscriber agrees that neither this Subscription Agreement, nor any of the Subscriber's rights, interest or obligations hereunder, is transferable or assignable by the Subscriber, and further agrees that the transfer or assignment of any Shares acquired pursuant hereto shall be made only in accordance with the provisions hereof and all applicable laws.  Any assignment in violation of this Section 7(a) shall be null and void.

(b)    The Subscriber agrees that, except as permitted by applicable law, it may not cancel, terminate or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder, and that this Subscription Agreement shall survive the death or legal disability of the Subscriber and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(c)    All of the representations, warranties, covenants, agreements, indemnities and confirmations set out above and in the Subscriber Information Form shall survive the acceptance of the subscription made herein and the issuance of any Shares.

(d)    This Subscription Agreement together with the Subscriber Information Form constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.

(e)    The Subscriber hereby agrees that any representation made hereunder will be deemed to be reaffirmed by the Subscriber at any time it makes an additional capital contribution to the Fund and the act of making such additional contribution will be evidence of such reaffirmation.

(f)    Within 10 days after receipt of a written request therefor from the Fund, the Subscriber agrees to provide such information and to execute and deliver such documents as the Fund may deem reasonably necessary to comply with any and all laws, rules, regulations, orders and ordinances to which the Fund is or may be subject.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 294
Case 3:23-cv-00726-S  Document 8-23  Filed 03/29/23    Page 1638 of 1726  PageID 12959
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 33 of 37

(g)    The Subscriber agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its investment in the Fund) or disclose to any person, any information or matter relating to the Fund and its affairs and any information or matter related to any investment of the Fund (other than disclosure to the Subscriber's authorized representatives); provided that (i) the Subscriber may make such disclosure to the extent that (x) the information to be disclosed is publicly known at the time of proposed disclosure by the Subscriber, (y) the information otherwise is or becomes legally known to the Subscriber other than through disclosure by the Fund, or (z) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) the Subscriber may make such disclosure to its Beneficial Interest Holders to the extent required under the terms of its arrangements with such persons; and (iii) the Subscriber will be permitted, after written notice to the Fund, to correct any false or misleading information that becomes public concerning the Subscriber's relationship to the Fund.  Prior to making any disclosure required by law, the Subscriber shall use its best efforts to notify the Fund of such disclosure.  Prior to any disclosure to any authorized representative or Beneficial Interest Holder, the Subscriber shall advise such persons of the confidentiality obligations set forth herein and each such person shall agree to be bound by such obligations.  Notwithstanding the foregoing, the Subscriber may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided in connection with this Subscription Agreement to the Subscriber relating to such tax treatment or tax structure.  The Subscriber acknowledges and agrees that the Fund and the Investment Manager would be damaged irreparably and would not have an adequate remedy at law if this Section (g) is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, in addition to any other remedy to which it may be entitled at law or in equity, each party will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Section 7(g) and to enforce specifically this Section 7(g), without bond or other security being required.  The rights and remedies in this Section 7(g) are cumulative and in addition to any other rights and remedies otherwise available at law or in equity.  Nothing will be considered an election of remedies or a waiver of the right to pursue any other right or remedy to which party may be entitled.

(h)    The Subscriber acknowledges and understands that if any person who is resident in the Cayman Islands has a suspicion that a payment to the Fund (by way of subscription or otherwise) is the proceeds of criminal conduct, that person is required to report such suspicion to the relevant Cayman authorities pursuant to The Proceeds of Crime Law (as amended) of the Cayman Islands.

(i)    Except as otherwise indicated in PART A – SECTION I.4 of the Subscriber Information Form, the Subscriber has agreed to receive and accept reports and communications indefinitely from the Fund, the Administrator and the Investment Manager exclusively via e-mail to the e-mail address set forth in the Subscriber Information Form unless the Subscriber notifies the Investment Manager or the Administrator in writing that the Subscriber wishes to receive reports to either another e-mail address or alternatively, via regular mail in lieu of electronic mail.  *If instructions are given by the Subscriber via e-mail, the Subscriber agrees to indemnify each Indemnified Person and each of the Administrator and any of its employees and agents*

Subscription Agreement                                   11

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 295
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1639 of 1726 PageID 12960

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 34 of 37

*against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means. Each Indemnified Party and the Administrator may rely conclusively upon and shall incur no liability in respect of any loss arising from (i) the non-receipt of any instructions relating to the interests of the Subscriber delivered via e-mail or (ii) any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber.*

**8.    Standing Proxy**

The Subscriber hereby designates and appoints the Administrator with power of substitution, as the Subscriber's true and lawful proxy for the purpose of voting any Shares issued pursuant to this Subscription Agreement (or such portion thereof from time to time owned by the Subscriber) as said proxy may determine on any and all matters arising at any annual or special general meeting of the Fund or any class meeting upon which such Shares could be voted by the Subscriber (or the person in whose name the Shares hereby subscribed are registered at the Subscriber's direction) if present in person at the meeting. This proxy may be revoked by the Subscriber (or his registered nominee) either personally or by presentation of a subsequently executed form of proxy at any annual or special general meeting or any class meeting of the Fund or by written notice to the Administrator received at the Fund's registered office prior to any such meeting.

**9.    Notices**

Any notice required or permitted to be given to the Subscriber in relation to the Fund shall be sent to the address specified in Part A, Section I of the Subscriber Information Form or to such other address as the Subscriber designates by written notice received by the Fund. The Subscriber acknowledges and agrees that any consent that need be obtained from the Subscriber by the Fund may be obtained by the form of a negative consent following written notice. For purposes of clarity, the Fund may provide the Subscriber with reasonable advance notice of an issue requiring the Subscriber's consent, and if the Subscriber does not respond to such notice within a reasonable time as set forth in the notice, the Subscriber shall be deemed to have approved and consent to such issue.

**10.    Arbitration and Mediation**

The Subscriber acknowledges and agrees that the following procedures shall be used to resolve any controversy or claim ("***Dispute***") arising out of, relating to or in connection with this Subscription Agreement, the Articles or otherwise involving the Fund and/or any Indemnified Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    Mediation.

(i)    Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a

APPX. 103013

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 296
Case 3:23-cv-00726-S Document 8-23 Filed 02/29/23 Page 1640 of 1726 PageID 12961
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 35 of
37

mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(ii)     The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(iii)     The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(iv)     Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b)     <u>Arbitration.</u>

(i)     If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("***Arbitration Rules***"). In the event of a conflict, the provisions of this document will control.

(ii)     The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the U.S. Federal Arbitration Act ("***FAA***"), and resolved by the arbitrators, provided, however, that the Fund or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will another arbitration law or regulation preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(iii)     The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and

conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(iv)    The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Subscription Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(v)    No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(vi)    All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(vii)    The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

## 11.    Governing Law

Except for Section 10 of this Subscription Agreement which shall be governed by the laws of the State of Texas, this Subscription Agreement shall be governed by, and construed in accordance with, the laws of the Cayman Islands, without giving effect to any conflict of law principles that would result in the application of the laws of any other jurisdiction.

[Signature Page Follows]

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 298
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1642 of 1726   PageID 12963

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 37 of
37

## SIGNATURE PAGE

By signing below, the Subscriber (1) confirms that the information contained in the Subscriber Information Form is accurate and complete, (2) agrees to the terms of the Subscription Agreement, the Private Offering Memorandum and the Articles and (3) requests that the records of the Fund reflect the Subscriber's admission as a shareholder.

Executed as a Deed:

Dated: _____, 20__

**AMOUNT OF SUBSCRIPTION**

$ _180,000.00_

_THE DUGABOY INVESTMENT TRUST_

_____
Name of Other Subscriber
(*if a natural person and purchasing jointly*)

Name of Subscriber

_____
Signature of Other Subscriber
(*if natural person and purchasing jointly*)

Signature

_____
Witness

_MELISSA SCHROTH_
Witness

_EXECUTIVE ACCOUNTANT_
Name and title or representative
capacity, if applicable

If the Subscriber is an individual retirement account, Keogh Plan or other self-directed plan, the custodian or trustee of the Subscriber is also required to execute this Agreement below:

Dated: _____, 20___

_____
Name of custodian or trustee

_____
Signature
Title: _____

       The Subscriber's subscription is accepted, subject to the provisions of the Subscription Agreement, the Private Offering Memorandum and the Articles.

Highland Credit Opportunities Fund, Ltd.

By: _____
Name: _____

Dated: _____

Title: _____

Signature Page

Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 32

# **EXHIBIT 8**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 300
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1644 of 1726   PageID 12965
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 2 of 32

*Execution Version*

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of May 11, 2020 between and among UBS Securities LLC and UBS AG, London Branch (collectively, "UBS"), on the one hand, and Highland Multi Strategy Credit Fund, L.P. (f/k/a Highland Credit Opportunities Fund, L.P.) ("MSCF"), Highland Credit Opportunities CDO, Ltd. ("Credit Opps"), and Highland Credit Opportunities CDO Asset Holdings, L.P. ("Asset Holdings," and together with MSCF and Credit Opps, the "Funds"), on the other.  UBS and the Funds are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

A.    **WHEREAS,** MSCF and Credit Opps are parties to that certain Loan Agreement, made by and between MSCF, Credit Opps, and NexBank, SSB ("NexBank," and together with MSCF and Credit Opps, the "Loan Parties"), dated as of May 1, 2018 (as amended, the "Loan Agreement");

B.    **WHEREAS,** Asset Holdings, a wholly owned subsidiary of MSCF, holds life settlement policies with policy numbers ███████████████████████ ████████████████ (collectively, the "Life Settlement Policies");

C.    **WHEREAS,** on June 28, 2019, the Loan Parties entered into that certain Second Amendment to Loan Agreement pursuant to which it was agreed that the Life Settlement Policies with policy numbers ████████████████ (the "NexBank Life Settlement Policies") would be pledged to secure the obligations under the Loan Agreement;

D.    **WHEREAS,** on June 28, 2019, Asset Holdings executed that certain Collateral Assignment of Life Insurance in favor of NexBank pursuant to which Asset Holdings believes it assigned the NexBank Life Settlement Policies to NexBank to secure the obligations under the Loan Agreement ("Assignment");

E.    **WHEREAS,** the Funds have determined that it is in their best interests to sell the Life Settlement Policies;

F.    **WHEREAS,** UBS believes that it has a valid claim that the Life Settlement Policies were fraudulently conveyed to Asset Holdings in 2009 (the "Fraudulent Conveyance Claims");

G.    **WHEREAS,** the Fraudulent Conveyance Claims, among other claims, are the subject of a lawsuit brought by UBS in the Supreme Court of the State of New York, captioned *UBS Securities LLC and UBS AG, London Branch v. Highland Capital Management, L.P., Highland Special Opportunity Holding Company, Highland CDO Opportunity Master Fund, L.P., Highland Financial Partners, L.P., Highland Credit Strategies Master Fund, L.P., Highland Crusader Offshore Partners, L.P., Highland Credit Opportunities CDO, L.P., Strand Advisors, Inc.*, No. 650097/2009, against Highland Credit Opportunities CDO, L.P., the predecessor of MSCF, amongst other parties (the "State Court Action");

1

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 301
Case 3:23-cv-00726-S    Document 8-23    Filed 02/29/23    Page 1645 of 1726    PageID 12966
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 3 of 32

*Execution Version*

H.      **WHEREAS,** UBS, in the State Court Action, has asserted, among other things, that the Life Settlement Policies or their value must be turned over to UBS;

I.      **WHEREAS**, the Funds, among other defendants in the State Court Action, dispute UBS's claims to the Life Settlement Policies and the validity of the Fraudulent Conveyance Claims and UBS disputes the validity of the Assignment;

J.      **WHEREAS,** because of the Fraudulent Conveyance Claims and the Assignment, the Funds' ability to sell the Life Settlement Policies has been compromised;

K.      **WHEREAS**, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, and without either Party admitting liability, fault, or wrongdoing, or releasing or waiving any rights or defenses with respect to the Fraudulent Conveyance Claims, the Parties desire to enter into this Agreement to allow the Life Settlement Policies to be sold and the proceeds to be distributed.

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.      **Sale of Life Settlement Policies; Free and Clear.**

(a)      The Funds will use commercially reasonable efforts to cause the Life Settlement Policies to be sold at an auction (the "<u>Auction</u>") conducted by Maple Life Analytics, LLC ("<u>Maple</u>") for $37,135,000.00 in addition to amounts sufficient to reimburse the Funds for any Life Settlement Policy premiums paid in or after May 2020.

(b)      Subject to the terms of this Agreement, including Section 4 hereof, UBS agrees that, if all or some of the Life Settlement Policies are sold at the Auction, any such sale of the Life Settlement Policies will be free and clear of any and all claims (including the Fraudulent Conveyance Claims) against or interests in such Life Settlement Policies that have been, could have been, or could be asserted by UBS whether in the State Court Action or otherwise.  For the avoidance of doubt, UBS shall retain any and all such claims against (i) any Life Settlement Policies that are not sold in the Auction and/or (ii) against the Funds for the full value of such claims as they otherwise existed at the time of the completion of the Auction, including without limitation, for the value of any Life Settlement Policies sold at auction, and for any prejudgment interest, attorneys' fees, punitive damages, or other economic claims.  For the avoidance of doubt, the Parties' intent is that this Agreement shall neither diminish nor augment the recoverable value of any claims UBS has with respect to the Funds or the Life Settlement Policies.

2.      **Distribution of Proceeds.**

(a)      Subject to Section 2(b), the proceeds from the Auction will be distributed as soon as reasonably practicable as follows:

(i)      *First*, $371,350.00 to Maple as payment for their fees;

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 302
Case 3:23-cv-00726-S Document 8-23 Filed 05/29/23 Page 1646 of 1726 PageID 12967
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 32

*Execution Version*

(ii) *Second*, $100,000.00 to MSCF to be used to pay other expenses associated with the Auction;

(iii) *Third*, $15,840,000.000, representing the net proceeds from the sale of the NexBank Life Settlement Policies, to NexBank in satisfaction of its claimed security interest in the NexBank Life Settlement Policies and in repayment of a portion of the obligations owed by the Loan Parties to NexBank pursuant to the Loan Agreement;

(iv) *Fourth,* $1,750,000 to Highland Capital Management, L.P. ("HCMLP"), in satisfaction of certain amounts previously loaned to MSCF for the payment of Life Settlement Policy premiums and certain other operating expenses;

(v) *Fifth*, $8,969,000.00 to MSCF to be used to pay operating costs of the Funds (or to repay advances made to pay such costs), including, but not limited to, amounts due under the Loan Agreement and premiums due on any remaining life settlement policies, provided that none of the amounts in this Section 2(a)(v) shall be transferred to HCMLP as direct or indirect repayment of any amounts advanced by HCMLP to MSCF prior to the commencement of HCMLP's chapter 11 bankruptcy case; and

(vi) *Sixth*, $10,104,650.00 to the Escrow Account (as defined below) on the terms set forth in Section 3 hereof;

(b) In addition to the distributions set forth above:

(i) HCMLP will be entitled to receive any premium repayments or refunds made by any buyer of a Life Settlement Policy prior to any distributions being made pursuant to Section 2; and

(ii) Subject to Section 5 below, MSCF will retain any payments or proceeds received on the Life Settlement Policies that are not otherwise payable to the buyer of such Life Settlement Policy in the Auction.

(c) Notwithstanding anything in this Agreement to the contrary:

(i) if some, but not all, of the NexBank Life Settlement Policies are sold at the Auction, or if the NexBank Life Settlement Policies are sold for less than $15,840,000.00, the amount set forth in Section 2(a)(iii) will be reduced to reflect the net proceeds from the NexBank Life Settlement Policies actually sold and the amount set forth in Section 2(a)(i) will be adjusted to reflect the fee actually payable to Maple; and

(ii) if the proceeds from the Auction are less than $37,135,000.00 for any reason, other than as set forth in Section 2(c)(i), the amount set forth in Section 2(a)(i) will be adjusted to reflect the fee actually payable to Maple and any decrease in the gross proceeds shall be apportioned equally (i.e., by 50%) to each of the amounts set forth in Section 2(a)(vi) and Section 2(a)(iv). If the proceeds from the Auction are greater than $37,135,000.00, then the additional gross proceeds shall be apportioned equally (i.e., by 50%) to each of the amounts set forth in Section 2(a)(v) and Section 2(a)(vi).

3

*Execution Version*

3.  **Escrow Account.**  The proceeds from the Auction distributed pursuant to Section 2(a)(vi), will be deposited in an escrow account (the "Escrow Account") maintained at Citibank the terms and conditions set forth in the escrow agreement in the form attached hereto as **Exhibit A** (the "Escrow Agreement").  All costs associated with maintaining the Escrow Account will be paid by the Funds.  As set forth in the Escrow Agreement, the Escrow Account will be maintained for a period of two years from the date proceeds are initially deposited therein, unless such date is extended by mutual agreement of the Parties or pursuant to an order from a court of applicable jurisdiction, and no amounts will be released from the Escrow Account during such two year period unless subject to court order or the agreement of the Parties.  For the avoidance of doubt, it is expected that UBS will seek an extension of this two year period (upon a proper showing) if UBS's claims against HCMLP and/or the Funds have not been resolved.  Any amounts remaining in the Escrow Account at the expiration of the two year period, as may be extended and subject to contrary court order or agreement of the Parties, will be distributed to MSCF.

4.  **No Release; No Waiver**.  Except as set forth in Section 1(a) hereof, nothing contained herein is or will be construed as a waiver or release (i) by UBS of any claim, cause of action, or right of relief against any of the Funds or their predecessors, including the Fraudulent Conveyance Claims, whether in law, equity, or contract, including with respect to any proceeds from the sale of any of the Life Settlement Policies (the "Sale") held in the Escrow Account (the "Escrow Amount"), or (ii) by the Funds, their predecessors, or any other party of any defense whether in law, equity, or contract with respect to the Fraudulent Conveyance Claims or any other claims that UBS may assert.  All such rights are expressly reserved.  For the avoidance of doubt, notwithstanding the Sale of the Life Settlement Policies, (a) UBS's claims against the Life Settlement Policies are fully preserved against the proceeds of the Sale up to the Escrow Amount, and (b) all of UBS's claims, causes of action, and rights of relief, whether in law or equity, against the Funds and their predecessors, or any of them, and whether currently pending or not, are preserved as to (but not limited by) the total proceeds of the Sale as against any and all present and future assets held by, or interests in, the Funds (other than the Life Settlement Policies) and shall in no way be deemed altered, diminished, impaired, released, or waived in any respect by the Sale, this Agreement, or the execution of this Agreement.  For the further avoidance of doubt, the payment of proceeds from the Sale to HCMLP shall not be deemed in any way to impair, release, or waive any claims, causes of action, or rights of relief held by UBS against HCMLP or the Funds and their predecessors, nor shall any such payments in any way impair, release, waive, alter, or diminish UBS's ability to recover such amounts on account of its claims against HCMLP in HCMLP's chapter 11 case or otherwise.  For the further avoidance of doubt, any claims UBS currently has (if any) with respect to the Life Settlement Policies or otherwise against the Funds and their predecessors, including but not limited to, claims for the value of the Life Settlement Policies as of the date of the Auction, claims for prejudgment interest, claims for attorneys' fees and/or claims for punitive damages are intended to be preserved against the Funds, and shall not be diminished (or augmented) by the fact of the Sale of the Life Settlement Policies in the Auction.

5.  **No Additional Distributions**.

    (a)   Except for the distributions set forth in Section 2 above, none of the Funds will make any distributions or redemption payments to any of MSCF's limited partners, general

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 304
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1648 of 1726 PageID 12969
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 32

*Execution Version*

partners, shareholders, or other equity holders (collectively, the "Equity Parties") (regardless of whether an Equity Party has tendered its equity interest for redemption) for two years from the date of the closing of the Life Settlement Policy sales (the "Standstill Term") unless such payments are made with the mutual agreement of HCMLP and UBS or pursuant to an order from a court of applicable jurisdiction. It is agreed that the Funds shall provide UBS with no less than five (5) business days' advance written notice prior to seeking such an order. It is expressly recognized that, upon a proper showing (subject to proper objections by HCMLP), UBS may obtain a court-ordered extension of the Standstill Term. The Standstill Term may be extended by mutual agreement of the Parties or pursuant to an order from a court of applicable jurisdiction. Following the expiration of the Standstill Term, as may be extended, MSCF may make distributions or redemption payments to the Equity Parties, to the extent permissible and appropriate, in its sole discretion. For the avoidance of doubt, the expiration of the Standstill Term, in of itself, shall not have any impact on UBS's rights, if any, with respect to its claims against HCMLP and/or the Funds.

(b) During the Standstill Term (and any extension of that term pursuant to agreement or court order as set forth herein), the Funds agree to provide UBS with no less than five (5) business days' written notice of any proposed sale, transfer, or other disposition of any assets held by, or interest in, the Funds, including the proceeds from such transfer or disposition, and the proposed transferee with respect to such assets or interests.

6. **Representations and Warranties**. As of the date hereof, the Funds represent, warrant and covenant that the Funds' current assets and their most recent valuations are set forth in **Schedule 1** hereto in the following format:

| Asset | Value | Date of Valuation | Source of Valuation |
|-------|-------|-------------------|---------------------|
|       |       |                   |                     |
|       |       |                   |                     |
|       |       |                   |                     |
|       |       |                   |                     |
|       |       |                   |                     |
|       |       |                   |                     |

For the avoidance of doubt, nothing in this Section 6 or **Schedule 1** constitutes a representation or warranty as to the actual value of the Funds' assets or the price that can or may be obtained from a sale, if any, of such assets.

7. **Successors In Interest**. Each of the Parties agrees that this Agreement will be binding upon the Parties, and, as applicable, upon their predecessors, successors, subsidiaries,

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 305
Case 3:23-cv-00726-S Document 8-23 Filed 07/29/23 Page 1649 of 1726 PageID 12970
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 32

*Execution Version*

divisions, alter egos, affiliated and related entities, and their past or present officers, directors, partners, employees, attorneys, assigns, agents, representatives, and any or all of them.

8.    **No Admission of Liability**.    The Parties acknowledge that there is a bona fide dispute with respect to the Fraudulent Conveyance Claims.    Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Funds or any other person.    In particular, the execution of this Agreement will not constitute an admission of liability, fault, or wrongdoing on the part of the Funds or any other person

9.    **Confidentiality**.    The Parties agree that the information provided in **Schedule 1** shall be strictly confidential except as required by law or if necessary to disclose to enforce this Agreement (but in such case the Parties will take reasonable care to ensure confidentiality to the extent permitted by law).    The Parties to this Agreement stipulate and covenant not to repeat, speak, display or disclose any of the information set forth in **Schedule 1** to anyone other than their attorneys and advisors; *provided however*, that such information may be provided to the unsecured creditor committee appointed in the bankruptcy of HCMLP.

10.    **Notice**.    Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**UBS**

UBS Legal Department – Americas Litigation
Attn:  Patrick Shilling
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-3685
E-mail: patrick.shilling@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Jeffrey E. Bjork, Esq.
Telephone No.:  213-485-1234
Facsimile No.:  213-891-8763
E-mail:  jeff.bjork@lw.com

**MSCF, Asset Holdings, or Credit Opps**

Highland Multi Strategy Credit Fund, L.P.
c/o Highland Capital Management, L.P.

APP.108273

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 306
Case 3:23-cv-00726-S   Document 8-23   Filed 05/29/23   Page 1650 of 1726   PageID 12971
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 8 of 32

*Execution Version*

300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

11.    **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been
adequately represented by independent legal counsel of its own choice, throughout all of the
negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon
the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms
and conditions contained herein without any reservations; and (d) had the opportunity to have
this Agreement and all the terms and conditions contained herein explained by independent
counsel, who has answered any and all questions asked of such counsel, or which could have
been asked of such counsel, including, but not limited to, with regard to the meaning and effect
of any of the provisions of this Agreement.

12.    **Entire Agreement**.  This Agreement contains the entire agreement and
understanding concerning the subject matter of this Agreement, and supersedes and replaces all
prior negotiations and agreements, written or oral and executed or unexecuted, concerning such
subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or
attorney for any such Party, has made any promise, representation or warranty, express or
implied, written or oral, not otherwise contained in this Agreement to induce any Party to
execute this Agreement.  The Parties further acknowledge that they are not executing this
Agreement in reliance on any promise, representation or warranty not contained in this
Agreement.  This Agreement will not be waived or modified except by an agreement in writing
signed by each Party or duly authorized representative of each Party.

13.    **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this
Agreement are contractual and are the result of negotiations between the Parties and their chosen
counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.
In any construction to be made of this Agreement, the Agreement will not be construed against
any Party.

14.    **Severability**.  If any term or provision, or portion thereof, of this Agreement is
declared to be illegal or invalid, the validity of the remaining provisions or portions thereof will

APPX. 08244

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 307
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1651 of 1726   PageID 12972
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 9 of 32

*Execution Version*

not be affected thereby, and the illegal or invalid provision or portions thereof will be deemed not a part of the Agreement.

15. **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

16. **Governing Law; Venue**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan with respect to any disputes arising from or out of this Agreement.

*[Remainder of Page Intentionally Blank]*

APPX. 08223

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____

Name: Patrick Shilling

Its: Authorized Signatory


By: _____

Name: _____

Its: _____


**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**


By: _____

Name: _____

Its: _____


**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**


By: _____

Name: _____

Its: _____


**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**


By: _____

Name: _____

Its: _____

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____

Name: William W. Chandler

Its:    Authorized Signatory

By: _____

Name: _____

Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____

Name: _____

Its: _____

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 310
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1654 of 1726 PageID 12975
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 12 of 32

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____
Name: _____
Its: _____


By: _____
Name: _____
Its: _____


**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____
Name: _____
Its: Authorized Signatory

**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**

By: _____
Name: _____
Its: Authorized Signatory


**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____
Name: James P. Seery, Jr.
Its: Authorized Signatory

*[Signature Page to Settlement Agreement]*

*Execution Version*

**Schedule 1**

**Fund Assets**

APPX. 08247

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 312
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 of 330 Page 1656 of 1726 PageID 12977

Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 14 of 32

**Highland Multi Strategy Credit Fund**
As of 4.30.20 [1][2]



*Execution Version*

**Exhibit A**

**Form of Escrow Agreement**

APPX. 08329

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 314
Case 3:23-cv-00726-S Document 8-23 Filed 10/29/23 Page 1658 of 1726 PageID 12979
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 16 of 32

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of May ___, 2020, by and among (i) **UBS Securities LLC** ("UBS"), (ii) **Highland Multi Strategy Credit Fund, L.P.** ("MSCF") and **Highland Credit Opportunities CDO Asset Holdings, LP** ("Asset Holdings" and together with MSCF, sometimes referred to individually and collectively, the "Funds") and the Funds together with UBS, sometimes referred to individually as a "Party" and collectively as the "Parties"), and (iii) **CITIBANK, N.A.**, as escrow agent (the "Escrow Agent").

## RECITALS

WHEREAS, the Parties, along with UBS AG, London Branch and Highland Credit Opportunities CDO, Ltd., entered into a Settlement Agreement dated May 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Settlement Agreement") pursuant to which the Parties have agreed to place in escrow a portion of the proceeds from the sale of certain assets (the "Sale Proceeds").

WHEREAS, the Parties and the Escrow Agent desire to set forth their rights and obligations with respect to the Escrow Funds (as defined below) and the distribution and release thereof.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.   Appointment.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.   Escrow Funds.

(a)   Simultaneous with the execution and delivery of this Agreement, MSCF shall deposit or cause to be deposited with the Escrow Agent Sale Proceeds in the amount of $10,104,650.00 (or such other amount as may be agreed to by the Parties) (such amount, the "Escrow Amount") in immediately available funds.  The Escrow Agent hereby acknowledges receipt of the Escrow Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income (collectively, the "Escrow Earnings") earned with respect thereto (collectively, the "Escrow Funds") in separate and distinct account (the "Escrow Account"), subject to the terms and conditions of this Agreement.

(b)   For greater certainty, all escrow earnings shall be retained by the Escrow Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

3.   Investment of Escrow Funds.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 315
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1659 of 1726 PageID 12980
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 17 of 32

(a)      Unless otherwise instructed in writing by the Parties, the Escrow Agent shall hold the Escrow Funds in a "noninterest-bearing deposit account" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits.  The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b)      The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c)      The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4.      Disposition and Termination of the Escrow Funds.

(a)      Escrow Funds.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this Section 4(a) as follows:

(i)      Upon receipt of a Joint Release Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction.

(ii)      Upon receipt by the Escrow Agent of a copy of Final Determination from any Party, the Escrow Agent shall on the second (2nd) Business Day following receipt of such copy, disburse as directed, part or all, as the case may be, of the Escrow Funds (but only to the extent funds are available in the Escrow Account) to the applicable Party or Parties, in accordance with such Final Determination.  The Escrow Agent will act on such Final Determination without further inquiry.

(iii)      If the Escrow Funds have not been released in accordance with clause (i) or (ii) of this Section 4(a) on or before May [ ] , 2022, or such later date as agreed, and notified to the Escrow Agent, in writing by the Parties or established pursuant to an order from a court of applicable jurisdiction (the "Escrow End Date"), then, upon receipt of written instruction from the Funds (the "Final Instruction") executed by an authorized signer of each of the Funds, unless the Parties deliver to the Escrow Agent a Joint Release Instruction or a contrary order from a court of applicable jurisdiction prior to the disbursement expressly superseding such Final Instruction, the Escrow Agent shall on the second (2nd) Business Day following receipt of such Final Instruction, disburse all remaining Escrow Funds in accordance with such Final Instruction. The Funds agree not to send the Final Instruction prior to the Escrow End Date.

(iv)      All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or check as set forth in the Joint Release Instruction, Final Determination or Final Instruction, as applicable.

US-DOCS\115507286.12

(v)     Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2, and delivered to the Escrow Agent either (i) by confirmed facsimile only at the fax number set forth in Section 11 below or (ii) attached to an e-mail received on a Business Day from an e-mail address set forth in Section 11 below. In the event a Joint Release Instruction, Final Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in Exhibits A-1 and/or A-2 annexed hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of the applicable Party set forth on Exhibit A-1 or Exhibit A-2, actually received and acknowledged by the Escrow Agent.

(b)     Certain Definitions.

(i)     "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii)     "Final Determination" means a final non-appealable order of any court of competent jurisdiction, including without limitation, any judgment, order or decree, that finally adjudicates ownership of, or entitlement to, the Sale Proceeds, together with (A) a certificate of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing Party to effectuate such order.

(iii)     "Joint Release Instruction" means the joint written instruction, substantially in the form of Exhibit B attached hereto, executed by an authorized signer of each of UBS and the Funds directing the Escrow Agent to disburse all or a portion of the Escrow Funds, as applicable.

(iv)     "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.     Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no duties, including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between

3

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 317
Case 3:23-cv-00726-S  Document 8-23  Filed 05/29/23   Page 1661 of 1726  PageID 12982
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 19 of
32

the Parties, in connection herewith, if any, including without limitation the Settlement Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent.  The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction, Final Instruction or Final Determination furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the proper Party or Parties.  Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds.  In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction, Final Instruction or Final Determination.  The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's gross negligence or willful misconduct was the cause of any direct loss to either Party.   To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

6.    Resignation and Removal of Escrow Agent.  The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by the Parties acting jointly at any time by providing written notice to the Escrow Agent.  Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act (provided that the Escrow Agent will provide the Parties with reasonable notice of any such merger, conversion, consolidation or sale.)   The Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 318
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1662 of 1726 PageID 12983
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of 32

agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7.    Fees and Expenses.  All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto and shall be paid by the Funds.  The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

8.    Indemnity.  UBS, on the one hand, and the Funds, on the other hand, hereby agree to, severally and not jointly, indemnify, defend, and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Escrow Agent Losses") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from UBS or the Funds. Notwithstanding anything to the contrary herein, the Parties agree, solely as between the Parties, that any obligation for indemnification under this Section 8 (or for reasonable fees and expenses of the Escrow Agent described in Section 7) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by UBS and one-half by the Funds. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9.    Tax Matters.

(a)    MSCF shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned.  The Escrow Agent shall report any interest or income earned on the Escrow Funds to the IRS or other taxing authority on IRS Form 1099. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request.

5

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 319
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1663 of 1726   PageID 12984
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 21 of
32

(b)      The Escrow Agent shall be responsible only for income reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds.  The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)      The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates.  This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.  Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.    Covenant of Escrow Agent.  The Escrow Agent hereby agrees and covenants with the Parties that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11.    Notices.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the Party/ Parties to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five Business Days after the date such notice is deposited with the United States Postal Service.  If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to UBS, then to:

UBS Legal Department – Americas Litigation
Attn:  Patrick Shilling
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-3685
E-mail: patrick.shilling@ubs.com

US-DOCS\115507286.12

APP. 108237

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 320
Case 3:23-cv-00726-S Document 8-23 Filed 01/29/23 Page 1664 of 1726 PageID 12985
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 22 of 32

<u>with a copy (which shall not constitute notice) to:</u>

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Jeffrey E. Bjork, Esq.
Telephone No.: 213-485-1234
Facsimile No.: 213-891-8763
E-mail: jeff.bjork@lw.com


<u>or, if to MSCF or Asset Holdings, then to:</u>

Highland Multi Strategy Credit Fund, L.P.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

<u>with a copy (which shall not constitute notice) to:</u>

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

<u>or, if to the Escrow Agent, then to:</u>

Citibank, N.A.
Citi Private Bank
One Sansome Street, 24th Floor
San Francisco, CA 94144
Attn: Hamyd Mazrae
Telephone No.: 415-627-6044
Facsimile No.: 415-592-5584
E-mail: hamyd.mazrae@citi.com


Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this <u>Section 11</u>, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the

US-DOCS\115507286.12

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 321
Case 3:23-cv-00726-S Document 8-23 Filed 08/29/23 Page 1665 of 1726 PageID 12986
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 23 of 32

Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.  Termination.  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by the Parties after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13.  Miscellaneous.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party without the prior consent of the other parties.  This Agreement shall be governed by and construed under the laws of the State of New York. Each party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and submits to the exclusive jurisdiction of the federal and state courts in the Borough of Manhattan in the City of New York.  The parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the parties to this Agreement may be transmitted by facsimile or electronic transmission in portable document format (.pdf), and such facsimile or .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.  If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.  Except as expressly provided in Sections 7 and 8, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.  Compliance with Court Orders.  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 322
Case 3:23-cv-00726-S   Document 8-23   Filed 08/29/23   Page 1666 of 1726   PageID 12987
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 24 of
32

Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.    <u>Further Assurances</u>.  Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16.    <u>Assignment</u>.  No assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld).  Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.    <u>Force Majeure.</u>  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.    <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.  For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see financial statements, licenses, an identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    <u>Use of Citibank Name.</u>  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

*    *    *    *    *

US-DOCS\115507286.12

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**UBS SECURITIES LLC**

By: _____
Name: _____
Its: _____


By: _____
Name: _____
Its: _____


**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____
Name: _____
Its: _____


**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____
Name: _____
Its: _____

*Signature Page to Escrow Agreement*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 324
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1668 of 1726   PageID 12989
of 330
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 26 of 32

ESCROW AGENT:

**CITIBANK, N.A.**


By:   _____

Name:   _____

Its:   _____

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 325
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1669 of 1726 PageID 12990
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 27 of 32

## <u>Schedule 1</u>

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

### <u>Acceptance Fee</u>

To cover the acceptance of the Escrow Agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

      **Fee:**             **WAIVED**

### <u>Administration Fee</u>

The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on Escrow Amount being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

      **Fee:**             **WAIVED**

### <u>Tax Preparation Fee</u>

To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

      **Fee:**             **WAIVED**

### <u>Transaction Fees</u>

To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

      **Fee:**             **WAIVED**

### <u>Other Fees</u>

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement. Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 326
Case 3:23-cv-00726-S   Document 8-23   Filed 08/29/23   Page 1670 of 1726   PageID 12991
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 28 of 32

## EXHIBIT A-1

### Certificate as to UBS' Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of UBS and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of UBS.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

| Name / Title / Telephone | Specimen Signature |
| --- | --- |
| _____ Name | _____ Signature |
| _____ Title | |
| _____ Phone | _____ Mobile Phone *(Required for DocuSign Capabilities)* |
| _____ Name | _____ Signature |
| _____ Title | |
| _____ Phone | _____ Mobile Phone *(Required for DocuSign Capabilities)* |
| _____ Name | _____ Signature |
| _____ Title | |
| _____ Telephone | _____ Mobile Phone *(Required for DocuSign Capabilities)* |

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit to Escrow Agreement*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 327
Case 3:23-cv-00726-S Document 8-23 Filed 03/29/23 Page 1671 of 1726 PageID 12992
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of 32

EXHIBIT A-2

Certificate as to the Funds' Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Funds and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Funds. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s)..

Name / Title / Telephone                         Specimen Signature


_____                  _____
Name                                             Signature


_____
Title


_____                  _____
Phone                                            Mobile Phone (*Required for DocuSign
                                                 Capabilities*)


_____                  _____
Name                                             Signature


_____
Title


_____                  _____
Phone                                            Mobile Phone (*Required for DocuSign
                                                 Capabilities*)


_____                  _____
Name                                             Signature


_____
Title


_____                  _____
Telephone                                        Mobile Phone (*Required for DocuSign
                                                 Capabilities*)


NOTE: Actual signatures are required above. Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit to Escrow Agreement*

EXHIBIT B

Form of Joint Release Instruction

[●], 202[●]

Citibank, N.A.
c/o Citi Private Bank
One Sansome Street
San Francisco, CA 94104
Attn: Hamyd Mazrae
E-mail: hamyd.mazrae@citi.com

**Re:**     **Joint Release Instruction**

Dear Mr. Mazrae,

Reference is made to that certain Escrow Agreement by and among (i) **UBS Securities LLC** ("UBS"), (ii) **Highland Multi Strategy Credit Fund, L.P.** ("MSCF") and **Highland Credit Opportunities CDO Asset Holdings, LP** ("Asset Holdings" and together with MSCF, the "Funds") and (iii) **CITIBANK, N.A.** (the "Escrow Agent"), dated as of [●], 2020 (the "Escrow Agreement"). Unless otherwise indicated, all capitalized terms used and not otherwise defined herein have the respective meanings given to them in the Escrow Agreement.

This notice constitutes a Joint Release Instruction signed jointly by UBS and the Funds pursuant to Exhibit A-1 and Exhibit A-2 to the Escrow Agreement.

UBS and the Funds hereby jointly instruct the Escrow Agent, in accordance with Section 4(a)i of the Escrow Agreement to release $[●] from the Escrow Account to [*recipient*], via wire transfer of immediately available funds to the following wire instructions:

| | |
|---|---|
| Name of Bank: | [●] |
| ABA #: | [●] |
| Beneficiary Account #: | [●] |
| Beneficiary Account Name: | [●] |

The Parties acknowledge that prior to the remittance of funds from the Escrow Account, the Escrow Agent will need to speak to an authorized representative of each of UBS and the Funds to confirm payment details.

**[SIGNATURE PAGES FOLLOW]**

*Exhibit to Escrow Agreement*

Very truly yours,


**UBS SECURITIES LLC**


By: _____
Name: _____
Its: _____


By: _____
Name: _____
Its: _____


*Exhibit to Escrow Agreement*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 330
Case 3:23-cv-00726-S   Document 8-23   Filed 03/29/23   Page 1674 of 1726   PageID 12995
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 32 of 32

Very truly yours,

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By:    _____
Name:    _____
Its:    _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By:    _____
Name:    _____
Its:    _____

*Exhibit to Escrow Agreement*

# EXHIBIT 38

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1676 of 1726 PageID 12997
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 1 of 11

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) **Re: Docket Nos. 2537, 2626** |
| | ) |

## DEBTOR'S REPLY IN SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER
## (I) AUTHORIZING THE SALE AND/OR FORFEITURE OF CERTAIN LIMITED
## PARTNERSHIP INTERESTS AND OTHER RIGHTS AND
## (II) GRANTING RELATED RELIEF

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1677 of 1726   PageID 12998
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21   Entered 08/02/21 16:56:00   Page 2 of 11

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") (a) in response to the *Objection to the Motion for Entry of an Order (i) Authorizing the Sale and/or Forfeiture of Certain Limited Partnership Interests and Other Rights and (ii) Granting Related Relief* [Docket No. 2626] (the "Objection") filed by NexPoint Advisors, L.P. ("NexPoint") and (b) in support of the *Motion of the Debtor for Entry of an Order (I) Authorizing the Sale and/or Forfeiture of Certain Limited Partnership Interests and Other Rights and (II) Granting Related Relief* [Docket No. 2537] (the "Motion").[2]  In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Through the Motion, the Debtor seeks authority to sell, transfer, or assign the Interests and to sell, transfer, assign, or forfeit and waive certain rights under the Subsequent Funds Agreement to PetroCap pursuant to the terms of the Purchase Agreement.   The Purchase Agreement was the product of arms-length negotiations with PetroCap and represents the highest and best offer available to the Debtor based on the nature of the Interests and their illiquidity and lack of marketability.   The Committee supports the transactions set forth in the Purchase Agreement – notwithstanding the competing "offer" presented by The Dugaboy Investment Trust ("Dugaboy") – and no true creditor or party-in-interest has objected.

2.      Not surprisingly, the only objecting party is NexPoint, an entity owned and controlled by James Dondero.  NexPoint bases its Objection on its expectation that the Debtor would refuse to consider an offer of approximately $2.95 million that was tendered by Dugaboy moments before the Objection was filed.   Leaving aside the issues raised by the timing of

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

APPX. 10849

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1678 of 1726 PageID 12999
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 3 of 11

Dugaboy's offer,[3] the Debtor has reviewed Dugaboy's unsolicited offer and has determined that it is not in the Debtor's best interests to engage with Dugaboy (or any of Mr. Dondero's related entities) regarding a sale of the Interests and the rights under the Subsequent Funds Agreement for the reasons discussed below and in the *Motion of the Debtor for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2535] (the "Maple Sale Motion").[4] Further, as discussed in the Motion, the sale, transfer, or assignment of the Interests requires the consent of the PetroCap III GP and the SLP GP, as applicable, and both of those parties have informed the Debtor that they will ***not*** consent to the transfer of those Interests to a litigious party and would have serious reservations allowing any other party to be admitted as a limited partner in PetroCap III or SLP.

3.    NexPoint, anticipating the Debtor's response, has presumptively challenged the Debtor's business judgment and alleged that the Debtor has violated its duties to maximize estate recoveries. Objection ¶¶ 5-6. According to NexPoint, because Dugaboy's offer is nominally higher than PetroCap's, the Debtor must agree to sell the Property to Dugaboy (despite such sale being impossible under the terms of the relevant agreements). NexPoint is wrong.

4.    Preliminarily, and as discussed below, NexPoint lacks standing to object to the

---

[3] Dugaboy tendered its "offer" to Debtor's counsel at approximately 4:30 p.m. Central Time on Thursday, July 29, 2021. Before the Debtor had an opportunity to review the offer, NexPoint filed the Objection less than thirty minutes later. Obviously, these events were closely coordinated among Mr. Dondero and his related entities.

[4] As set forth in the Maple Sale Motion, the Debtor has determined it is not in the best interests of its estate to entertain any offers from Mr. Dondero or his related entities for a myriad of reasons, including (a) the unwillingness of other bidders to engage in an auction that includes Mr. Dondero for fear of reprisal and/or having the sale tied up in years of litigation, and (b) Mr. Dondero's (i) willful refusal to pay, or cause his related entities to pay, the amounts owed to the estate under a series of promissory and demand notes pursuant to which Mr. Dondero owes the estate in excess of $50 million; (ii) willingness to contort even the most unambiguous contractual provision in an effort to create litigation leverage in negotiations; (iii) continual efforts to "burn the Debtor" down through his and his related entities' serial and frivolous litigation since October 2020 in this Court, the United States District Court for the Northern District of Texas, the Fifth Circuit Court of Appeals, and the Texas state courts (a chart showing the litigation caused by Mr. Dondero is attached as Exhibit A); (iv) known propensity to re-trade and renege on deals; and (v) pattern of using litigation as a strategy to gain negotiating leverage and avoid paying his obligations when due.

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1679 of 1726 PageID 13000
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 4 of 11

Motion.  To the extent NexPoint asserts standing based upon its post-confirmation acquisition of certain disputed employee claims, such standing is tenuous at best and should be viewed through that lens.  Even assuming NexPoint has standing, its objection to the Motion is frivolous. NexPoint's overarching, although not articulated, argument that the Debtor may not take its prior interactions with Mr. Dondero and his related entities into account in determining whether to transact business with them is nonsensical and not supported by the case law.  Actions have consequences.  Mr. Dondero's repeated failure to abide by court orders and contractual obligations to the estate, unabashed willingness to assert frivolous positions and initiate baseless lawsuits,[5] and his documented history of litigiousness provide ample support for the Debtor's decision not to engage with Mr. Dondero or any of his related entities with respect to the transactions contemplated by the Purchase Agreement.

5.     As set forth in the Motion and as will be demonstrated in connection with the hearing on the Motion, the risks associated with transacting with Mr. Dondero or his related entities are not present in the transaction with PetroCap.  NexPoint's argument that both transactions are "apples to apples" ignores the impossibility of selling the Interests to Mr. Dondero, the closing

---

[5] In fact, in just the few weeks since the Debtor was last before this Court, Mr. Dondero has commenced two new actions against the Debtor that lack factual or legal support and that otherwise make no rational sense to pursue given Mr. Dondero's highly speculative and remote economic interest in the Debtor's estate.

*First*, on July 22, 2021, Mr. Dondero, again through his attorneys at Sbaiti & Co. ("Sbaiti"), filed an action in the Northern District of Texas using the Charitable Donor Advised Fund, L.P. (the "DAF Complaint").  *Original Complaint, The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Cause No. 3:21-cv-01710-N (N.D. Tex. July 22, 2021).  The DAF Complaint alleges that the DAF is a limited partner in the Highland Multi-Strategy Credit Fund ("Multi-Strat") and asserts claims against the Debtor for mismanagement of Multi-Strat during the pendency of this Bankruptcy Case.  The DAF Complaint is essentially verbatim the complaint filed in the Northern District of Texas by the Sbaiti firm on behalf of Mr. Dondero's family trust, the Dugaboy Investment Trust.  As this Court will remember, that complaint was duplicative of the proof of claim (Claim No. 177) filed by Dugaboy in this Court and was withdrawn within an hour after it was brought to this Court's attention.

*Second*, also on July 22, 2021, Sbaiti, again on behalf of the DAF, initiated an action in Texas state court for pre-suit discovery against the Redeemer Committee alleging, among other things, that the Redeemer Committee's transfer of its claim was in furtherance of a scheme concocted by James P. Seery, Jr., the Debtor's Court-approved chief executive officer and chief restructuring officer, to drain the estate of resources.  *Verified Petition to Take Deposition Before Suit and Seek Documents, In re James Dondero*, Cause No. DC-21-09534 (Tex. July 22, 2021).

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1680 of 1726 PageID 13001
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 5 of 11

risk, and the risk of potential post-sale litigation if the Debtor transacts with Mr. Dondero. One

need look no further than the years of litigation that caused the Debtor's chapter 11 filing and Mr.

Dondero's conduct during the case to reach the conclusion that *any* commercial transaction with

Mr. Dondero presents material risk. The Court should overrule the Objection and grant the Motion.

## THE COURT SHOULD AUTHORIZE THE CONSUMMATION OF THE PURCHASE AGREEMENT

### A. NexPoint Lacks Standing to Object to the Motion.

6.      NexPoint filed two proofs claim in this case (Claim Nos. 104 and 108) which were

later expunged [Docket No. 1233]. NexPoint, however, holds prepetition claims against the estate

after acquiring them from five former Debtor employees (acquisitions done solely to manufacture

standing to object to the Plan).[6]  The Debtor has objected to each of these claims and believes that

they are frivolous [Docket No. 2059]. A hearing on those objections is scheduled for November

14, 2021.

7.      Consequently, NexPoint's standing to object to the Purchase Agreement as a

prepetition creditor is extremely attenuated as its chances of recovery in this case are, at best,

theoretical and speculative. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding

that a party had standing only when it had a "pecuniary interest . . . directly affected by the

bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012),

*aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest

standing).[7]

---

[6] One of NexPoint's "claims," acquired from Michael Beispiel, is not a claim at all. Mr. Beispiel did not file a proof of claim nor was Mr. Beispiel's claim scheduled. Any alleged prepetition claim that Mr. Beispiel might have had is therefore barred. *See Order Establishing Bar Dates for Filing Claims and (ii) Approving the Form and Manner of Notice Thereof* [Docket No. 488] ("Any entity that is required to file a Proof of Claim Form but fails to [do] so properly by the applicable Bar Date, shall not be treated as a creditor with respect to such claim for purposes of voting upon, or receiving distributions under, any chapter 11 plan in this case.").

[7] NexPoint also cannot create standing by arguing Dugaboy would have standing. First, Dugaboy can assert its own rights and NexPoint cannot prosecute Dugaboy's claims, if any, for it. Second, Dugaboy would not have standing to

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1681 of 1726 PageID 13002
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 6 of 11

8. Finally, the Debtor believes there is a reason why Dugaboy submitted the offer but NexPoint objected to the Motion. As set forth above, NexPoint's standing is tenuous and is based solely on claims it acquired post-confirmation. Dugaboy's standing is worse. Dugaboy filed two prepetition claims (Claim Nos. 113 and 131).[8] Claim No. 113 is a "claim" arising from Dugaboy's equity interest and is subject to subordination. Claim No. 131 seeks to pierce the veil and hold the Debtor liable for a subsidiary's debts. The only other prepetition claim held by Dugaboy is its 0.1866% subordinated limited partnership interest in the Debtor. These shell games highlight Mr. Dondero's coordination of the efforts amongst his related entities.

**B.** **The Debtor's Good Faith Decision Not to Engage Mr. Dondero or His Related Entities in Connection with the Sale of the Property Was Justified and a Proper Exercise of the Debtor's Business Judgment.**

9. As discussed in the Motion, section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). As set forth in Rule 6004(f)(1), sales under 11 U.S.C. § 363(b) can be conducted by "private sale or by public auction." Although the Bankruptcy Code does not include a statutory standard for determining when the use of sale of property should be authorized, it is well established that a debtor may use or sell property or the estate outside the ordinary course of business if there is a good business reason for doing so and the proposed course of action is advantageous to the estate. *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Pisces Energy, LLC*, 2009 Bankr.

---

object to the transactions contemplated by the Purchase Agreement as a potential bidder. *See In re VCR I, LLC*, 2017 Bankr. LEXIS 3341, at *12 (Bankr. S.D. Miss. Sept. 29, 2017) ("This Court has previously held that a prospective purchaser does not have standing to object to a sale motion."); *see also Squire v. Scher (In re Squire)*, 282 Fed. App'x 413, 416 (6th Cir. 2008) ("Frustrated Bidders do not have standing to object to the sale of a property"); 3 COLLIER ON BANKRUPTCY ¶363.02[c] (same).

[8] Dugaboy also filed a proof of claim arising from the Debtor's alleged mismanagement of the Highland Multi-Strategy Credit Fund (Claim No. 177). Dugaboy has admitted that the conduct that forms the basis of this alleged claim occurred post-petition, not prepetition.

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1682 of 1726 PageID 13003
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 7 of 11

LEXIS 4709, at *18 (Bankr. S.D. Tex. Dec. 21, 2009).

10.     To challenge the Debtor's business judgment, NexPoint cites to case law for the unremarkable proposition that the goal of any sale is to maximize the proceeds to the estate. Objection ¶¶ 9-10 (citing *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764 (Bankr. D. Del. Aug. 15, 2007); *In re Walker County Hosp. Corp.*, 2021 U.S. App. LEXIS 20610 (5th Cir. July 12, 2021)).[9] The Debtor agrees and believes that the transactions in the Purchase Agreement did just that – maximized value. NexPoint cites no case – and the Debtor believes none exist – for the proposition that the Debtor must agree to include any party in a sale process and choose the nominally highest bid regardless of other circumstances that exist.

11.     Under section 363(b), a Debtor is tasked with finding the highest ***and best*** offer, not just accepting the offer that is nominally a higher dollar amount on paper. *See, e.g., Cadle Co. v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010)) (a trustee "must demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a lower bid in the presence of sound business reasons, such as substantial doubt that the higher bidder can raise the cash necessary to complete the deal"); *In re Tresha-Mob, LLC*, 2019 Bankr. LEXIS 13333, at *4-6 (Bankr. W.D. Tex. 2019) ("Voltaire adopts a one-track value-maximization argument that ignores the mountains of precedent in which trustees, debtors-in-possession, and courts have rejected the highest bid when it was not the 'best bid'");[10] COLLIER ¶ 363.02[4]

---

[9] Although *Walker County* has general language in dicta concerning 11 U.S.C. § 363(b), that case does not address the requirements of section 363(b) at all. Instead, *Walker County* deals with whether an appeal is statutorily moot by reason of 11 U.S.C. § 363(m).

[10] In *Treshe-Mob* the bankruptcy court rejected NexPoint's premise that the highest bid is always the best bid:

Here, the objection that Voltaire seeks to pursue is not "colorable." In its *Limited Objection*, Voltaire adopts a one-track value-maximization argument that ignores mountains of precedent in which trustees, debtors-in possession, and courts have rejected the highest bid when it was not the "best bid." *See In re Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015)* ("a debtor must demonstrate that the proposed purchase price is not only the highest offer, ***but the highest and best offer***") (emphasis added). While the bid that brings in the most cash often wins, it is "common knowledge" that the "highest bid is not always the best bid," especially if there are "conditions sufficient to overbalance the difference between

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1683 of 1726 PageID 13004
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 8 of 11

("Although a trustee normally would be expected to sell to the highest bidder in an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale.")

12.     *In re 160 Royal Palm*, a case from the District Court for the Southern District of Florida, which was affirmed by the 11th Circuit, presented a strikingly similar fact pattern to this case.  600 B.R. 119 (S.D. Fla. 2019) *aff'd* 785 Fed. App'x 829 (11th Cir. 2019).  In *160 Royal Palm*, the Debtor attempted to sell an asset at public auction.  That auction failed in substantial part because of the constant barrage of litigation brought by the property's former owner.  *Id.* at 124.  Ultimately, the Debtor entered into a private sale and sought bankruptcy court approval.  The former owner objected arguing it was "an abuse of discretion to eliminate other potential bidders from the sale," which included, of course, the former owner.  *Id.* at 127.  The bankruptcy court rejected that argument, and the district court affirmed, stating "private sales are not unheard of in bankruptcy proceedings" and, in part because the offer was conditioned on a private sale, the Debtor was entitled to pursue a "bird in hand" approach and sell the asset without competing bids.  *Id.* at 128.

13.     In so ruling, the District Court also rejected the unsolicited bid made by the former owner on the property despite that bid being higher.  The District Court found persuasive, among

---

the two."  *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925).  The Bankruptcy Code thus affords courts "broad flexibility in determining which of several bidders should be deemed the successful bidder at a *§ 363(b)* sale."  *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993).  As such, courts routinely reject the proposition that reviewing courts or fiduciaries are "duty-bound to mechanically accept a bid with the highest dollar amount."  *Lawsky v. Condor Capital Corp.,* 2015 U.S Dist. LEXIS 96347, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015) (internal quotation marks and citations omitted); *see also After Six, 154 B.R.* at 882 ("The Bankruptcy Code, like any law, must be read in its context as a tool of mankind, not a body of edicts to which mankind is a slave irrespective of its interests to the contrary.").

In determining whether the highest bid is the "best bid," the fiduciary and reviewing court must consider factors such as "the risks associated with each bid and the probabilities that the proposed terms will come to fruition" as well as "contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing."  *Lawsky,* 2015 U.S. Dist. LEXIS 96347, 2015 WL 4470332, at *9 (quoting and citing *Family Christian,* 533 B.R. at 622).

*Treshe-Mob*, 2019 Bankr. LEXIS 1333, at *4-6 (emphasis in original).

DOCS_NY:43788.4 36027/002

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1684 of 1726    PageID 13005
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 9 of 11

other things, the fact that the former owner had defaulted on a prior deal with the Debtor and his

documented history of litigiousness:

> While the KKPB offer ostensibly *could* provide the estate with an additional million
> dollars. . . the Court credits the Debtor's concerns about the uncertainty of that
> offer. Indeed, the Debtor sought a settlement and sale with KKPB once in the past,
> which fell through, because KKPB defaulted.

> Appellant vigorously argued at oral argument on April 5 that the Debtor should
> have accepted its higher bid. However, the Court notes that while a debtor has a
> duty to "maximize the return to a bankruptcy estate," which "often does require
> [the] recommendation of the highest monetary bid, *overemphasis of this usual
> outcome overlooks a fundamental truism, i.e., a 'highest' bid is not always the
> 'highest and best' bid.* The inclusion of 'best' in that conjunction is not mere
> surplusage." . . . .

> Appellant also alleges that Debtor only rejected KKPB's higher offer out of
> personal animus towards KKPB's owner, Mr. Straub. The Debtor provides a
> number of explanations for its rejection of the KKPB offer, including, among other
> things, Mr. Straub's litigiousness. . . .

>> Among other things, Mr. Glickstein testified that the potential for about a $1
>> million increase in the overall sale price was not worth the risk that KK-PB,
>> and its principal, Mr. Glenn Straub, would take action that would greatly
>> increase the costs to the estate. Mr. Glickstein pointed to specific experience
>> with Mr. Straub in this very case to support [his] view that the potential
>> increase in recovery was fair outweighed by the risk of additional litigation.
>> Mr. Glickstein stressed the strength of the purchaser identified in the sale
>> motion. . . .

<div align="center">***</div>

> On the record before this Court, the Debtor had real concerns about the viability of
> the KKPB offer for a variety of reasons — including the fear of additional litigation.
> Though Appellant may characterize this as "animus," the avoidance of litigation is
> a legitimate business objective. And, Appellant could not provide the Court with a
> single case where a court disallowed a sale because the debtor had concerns about
> future litigation.

> The Debtor's duty is to maximize value to the creditors, and that maximization
> includes considerations such as finality, stability, and expeditious resolution of the
> bankruptcy proceeding. The LR offer, although 2.5% lower than the KKPB offer,
> provided that finality and stability. When asked by the Court at oral argument,
> Appellant could provide no other reasons why the KKPB offer constituted the
> highest and best offer *other than* the purported one-million-dollar additional benefit
> to the estate. Thus, to force the Debtor to forego the LR offer and subject itself to

<div align="center">9</div>

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1685 of 1726 PageID 13006
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 10 of 11

> a public auction would require this Court to inappropriately use its own business
> judgment in place of the Debtor's, which this Court will not do.

*Id.* at 129-30 (emphasis in original).

14.     *160 Royal Palm* supports the Debtor's position in this case.  The Debtor has PetroCap who represents finality and stability and who is ready, willing, and able to close. PetroCap's Purchase Agreement also contemplates a private sale not subject to auction, and the Interests cannot be sold, transferred, or assigned without PetroCap III GP's or SLP GP's consent, as applicable.  Both PetroCap III GP and SLP GP have told the Debtor that they would be unwilling to have the Interests sold to a highly litigious party and that they would have serious reservations regarding having the Interests sold to any other party.  Consequently, not only is entertaining an offer from Mr. Dondero inadvisable per se, it is also impossible in this circumstance.  Despite this, NexPoint would have the Debtor renege on the commitment to PetroCap and agree to sell the Interests and the rights under the Subsequent Funds Agreement to Dugaboy by presumably (somehow) forcing PetroCap III GP and SLP GP to consent to Mr. Dondero becoming a limited partner.

15.     NexPoint also effectively insists that the Debtor ignore its prior dealings with Mr. Dondero and his related entities and disregard their failure to live up to their prior contractual obligations and documented history of litigation, including more than twenty pending litigation matters in this case alone.  And for what purpose?  So that the Debtor's estate can theoretically receive $268,488.60 more in sale proceeds?  The Debtor and the Committee have decided that any theoretical upside in engaging with Mr. Dondero or any of his related entities is not worth the risk. The evidence the Debtor will submit in connection with the hearing on the Motion will unequivocally demonstrate that the Debtor's position is justified.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:43788.4 36027/002

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1686 of 1726   PageID 13007
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 11 of 11

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated:  August 2, 2021.                      **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:43788.4 36027/002

# **EXHIBIT A**

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1688 of 1726 PageID 13009
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 2 of 14

# SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION*

## *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

**9/23/20** — *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* **[D.I. 1087]**

| Objectors: | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal has been briefed and the decision is pending. |
|---|---|---|---|---|

**11/18/20** — *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements* **[D.I. 1424]**

| Objectors: | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459]. | N/A |
|---|---|---|---|---|

**11/19/20** — *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course* **[D.I. 1439]**

| Movant: | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
|---|---|---|---|---|

**12/8/20** — *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* **[D.I. 1522]**

| Movants: | Advisors Funds | Movants argued that the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |
|---|---|---|---|---|

**\* The following is by way of summary only and does not include discovery disputes or similar matters. Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact. The Debtor reserves all rights that it may have whether in law or in equity.**

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1689 of 1726   PageID 13010
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21   Entered 08/02/21 16:56:00    Page 3 of 14

| 12/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith* **[D.I. 1625]** | | | |
|---|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal has been briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* **[D.I. 1752]** | | | |
| | **Movants**: | Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | *James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith* **[D.I. 1784]** | | | |
| | **Objector**: | Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1690 of 1726 PageID 13011
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 4 of 14

| | | | | |
|---|---|---|---|---|
| 1/22/20 | _Objections to Fifth Amended Plan of Reorganization_ **[D.I. 1472]** | | | |

**Objectors**:[1]

Dondero [D.I. 1661]

Advisors & Funds[2] [D.I. 1670]

HCRE [D.I. 1673]

NexBank Entities [D.I. 1676]

Trusts [D.I. 1667]

Senior Employees [D.I. 1669]

CLOH [D.I. 1675]

All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation.

All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted.

Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed.

| | | | | |
|---|---|---|---|---|
| 1/24/21 | _Application for Allowance of Administrative Expense Claim_ **[D.I. 1826]** | | | |

**Movants**: Advisors

The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy.

This matter is currently being litigated.

N/A

| | | | | |
|---|---|---|---|---|
| 2/3/21 | _NexBank's Application for Allowance of Administrative Expense Claim_ **[D.I. 1888]** | | | |

**Movant**: NexBank

NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services.

This matter is currently being litigated.

N/A

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., Highland Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1691 of 1726 PageID 13012
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 5 of 14

| 2/8/21 | *James Dondero Motion for Status Conference* **[D.I. 1914]** | | | |
|---|---|---|---|---|
| | **Movant:** | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N.A. |

| 2/28/21 | *Motions for Stay Pending Appeal* | | | | |
|---|---|---|---|---|---|
| | **Movants:** | | The only parties requesting a stay pending appeal were the Dondero Entities. They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| | Dondero [D.I. 1973] | Advisors [D.I. 1955] | | | |
| | Funds [D.I. 1967] | Trusts [D.I. 1971] | | | |

| 3/18/21 | *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* **[D.I. 2060]** | | | |
|---|---|---|---|---|
| | **Movants:** | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. The opening brief and the Debtor's response have been filed. |
| | | Advisors | | | |
| | | Trusts | | | |
| | | HCRE | | | |

| 4/15/21 | *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* **[D.I. 2199]** | | | |
|---|---|---|---|---|
| | **Movants:** | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "UBS") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008. The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293]. The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308]. UBS also filed a reply [D.I. 2310]. The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors appealed the settlement. |

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1692 of 1726   PageID 13013
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 6 of 14

| 4/23/21 | *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* **[D.I. 2247]** | | | |
|---|---|---|---|---|
| | **Movants**: | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders.  The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313].  The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |
| 4/23/21 | *Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* **[D.I. 2242]** | | | |
| | **Movants**: | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things.  The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | DAF and CLOH have appealed. [D.I. 2513] |
| 4/20/21 | *Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief* **[D.I. 2229]** | | | |
| | **Movants**: | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility.  The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness.  Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |

5

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1693 of 1726 PageID 13014
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 7 of 14

| 4/29/21 | *Motion to Compel Compliance with Bankruptcy Rule 2015.3* **[D.I. 2256]** | | | |
|---------|---------|---------|---------|---------|
| **Movants:** | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

### *Highland Capital Management, L.P. v. James D. Dondero*, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)

| 12/7/20 | *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* **[D.I. 2]** | | | |
|---------|---------|---------|---------|---------|
| **Movant:** | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1694 of 1726   PageID 13015
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 8 of 14

| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* [D.I. 48] | | |
|---|---|---|---|
| **Movant**: | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

**Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd., Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)**

| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* [D.I. 2] | | |
|---|---|---|---|
| **Movant**: | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor has reached an agreement in principle with the Funds and Advisors that settled this matter, and filed its 9019 motion. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

APPX. 108266

*Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*, **Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)**

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the injunction was moot.  The parties recently entered into a stipulation regarding discovery for the remaining breach of contract claim. This action was consolidated with the Advisors' admin claim since both matters arise from Shared Services Agreements. | N/A |

*Highland Capital Management, L.P. v. James Dondero*, **Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note.  Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery.  The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* [D.I. 21] | | | |
| | **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. Dondero filed a limited objection to the R&R. | N/A |

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1696 of 1726   PageID 13017
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 10 of
14

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.***, Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)

| 1/22/21 | ***Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate [D.I. 1]*** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note.  Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/13/21 | ***Defendants Motion to Withdraw the Reference [D.I. 20]*** | | | | |
| | **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a R&R on July 9 [D.I. 52]. HCMFA filed a limited objection to the R&R. | N/A |

***Highland Capital Management, L.P. v. NexPoint Advisors, L.P.***, Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)

| 1/22/21 | ***Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate [D.I. 1]*** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note.  NPA did not pay the note when and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/13/21 | ***Defendants Motion to Withdraw the Reference [D.I. 19]*** | | | | |
| | **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a R&R on July 9 [D.I. 42]. NPA filed a limited objection to the R&R.  The District Court adopted the R&R. [D. Ct. Dkt No. 10]. | N/A |

APPX. 108260

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1697 of 1726 PageID 13018
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 11 of
14

***Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | <u>Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate</u> [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("<u>HCMS</u>"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |

| 6/3/21 | <u>Defendants Motion to Withdraw the Reference</u> [D.I. 19] | | | |
|---|---|---|---|---|
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court issued its R&R on July 15, 2021 [D. I. 52]. HCMS filed a limited objection to the R&R. the District Court adopted the R&R. [D. Ct. Docket No. 5]. HCMS filed a Motion for Reconsideration of the District Court's Order adopting R&R [D. Ct. Docket No. 8]. |

***Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | <u>Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate</u> [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |

APPX. 08369

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1698 of 1726    PageID 13019
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 12 of
14

| 6/3/21 | _Defendants Motion to Withdraw the Reference_ **[D.I. 20]** | | |
|---|---|---|---|
| **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court issued its R&R on July 15, 2021 [D.I. 47]. HCRE filed a limited objection to the R&R [D. Ct. Docket No. 5]. |

### _Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd.,_ Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)

| 4/12/21 | _Original Complaint_ | | | |
|---|---|---|---|---|
| **Movants**: | DAF  CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22]. On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26]. Briefing is complete for both motions, and decisions are pending. | N/A |
| 4/19/21 | _Plaintiff's Motion for Leave to File First Amended Complaint in the District Court_ | | | |
| **Movants**: | DAF  CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1699 of 1726   PageID 13020
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 13 of
14

### *PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*, Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)

4/12/21      *Original Complaint*

| | | | | |
|---|---|---|---|---|
| **Movants**: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous.  The Debtor will take all appropriate actions. | The Complaint was recently filed and the Debtor has not yet been served. The Debtor will respond appropriately. | N/A |

### *The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)

6/23/21      *Original Complaint*

| | | | | |
|---|---|---|---|---|
| **Movants**: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

### *The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Case No. 21-cv-01710-N (N.D. Tex. July 22, 2021)

7/22/21      *Original Complaint*

| | | | | |
|---|---|---|---|---|
| **Movants**: | Dugaboy | DAF alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. DAF's allegations in the complaint are duplicative of allegations Dugaboy made in proofs of claim filed in the Bankruptcy Court and in its complaint filed in the Northern District of Texas. | The Complaint has not yet been served.   The Debtor will respond appropriately. | N/A |

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1700 of 1726 PageID 13021
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 14 of
14

*In re James Dondero, Petitioner,* **Cause No. DC-21-09534 (Tex. July 22, 2021)**

**7/22/21**     <u>***Original Complaint***</u>

| | | | |
|---|---|---|---|
| **Movants**: | Dondero | Dondero seeks pre-suit discovery from Farallon Capital, a purchaser of certain claims in this case, and the Crusader Fund. Dondero alleges that Farallon breached certain U.S. Trustee requirements when it purchased those claims. Dondero also alleges that Farallon purchased those claims because of its relationship to Mr. Seery and that Mr. Seery was leveraging his relationship with Farallon to ensure that he remains in control of the Debtor. | The pre-suit discovery has not yet been served. The Debtor will respond appropriately. N/A |

# EXHIBIT 39

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1702 of 1726   PageID 13023
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21   Entered 08/03/21 12:20:51   Page 1 of 11

Docket #2656  Date Filed: 08/03/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) **Re: Docket Nos. 2535, 2621, 2648** |
| | ) |

## DEBTOR'S AMENDED REPLY IN SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN PROPERTY AND (II) GRANTING RELATED RELIEF

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1703 of 1726   PageID 13024
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 2 of 11

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this amended reply (the "Reply")[2] (a) in response to the *Objection to the Debtor's Motion for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2621] (the "Objection") filed by NexPoint Advisors, L.P. ("NexPoint") and (b) in support of the *Motion of the Debtor for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2535] (the "Motion").[3]  In further support of the Motion, the Debtor respectfully states as follows:

### PRELIMINARY STATEMENT

1.     Through the Motion, the Debtor seeks authority to exercise its Management Rights to cause Maple Holdings, its wholly owned subsidiary, to sell the Property to the Purchaser pursuant to the terms of the Purchase Agreement.  After a thorough marketing process, the Debtor determined that the Purchaser's offer for the Property was the highest and otherwise best offer and that conducting a private sale was in the best interests of its estate.  The Committee supports the Debtor's exercise of the Management Rights to cause a sale of the Property to the Purchaser – notwithstanding the competing "offer" presented by NexPoint – and no true creditor or party-in-interest has objected.

2.     Not surprisingly, the only objecting party is NexPoint, an entity owned and controlled by James Dondero.  During the marketing process, the Debtor received an unsolicited offer to purchase the Property from NPRE, another entity owned and controlled by Mr. Dondero. For the reasons discussed in the Motion, the Debtor determined not to engage with NPRE with

---

[2] The Debtor is filing this amended Reply to clarify an issue initially raised in the *Debtor's Reply in Support of Its Motion for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2648] (the "Initial Reply").  For the convenience of the Court, a redline showing the changes to the Initial Reply is attached hereto as Exhibit B.

[3] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

APPX. 10837

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1704 of 1726   PageID 13025
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 3 of 11

respect to the offer.  The Debtor has also reviewed NexPoint's unsolicited contingent offer and has determined, for the same reasons, that it is not in the Debtor's best interests to engage with NexPoint regarding a sale of the Property.

3.      NexPoint challenges the Debtor's business judgment, claiming that the Debtor's decision not to engage with it (1) lacks a "sound business justification," (2) "blatantly shows an unjustified prejudice toward NPA supported by conclusory statements and incomplete facts," and (3) is an "abuse of discretion" and "arbitrary."  Objection ¶¶ 1, 4, 6, 7.  According to NexPoint, because its offer is nominally higher than the Purchaser's offer, the Debtor must agree to sell the Property to it.  NexPoint is wrong.

4.      Preliminarily, and as discussed below, NexPoint – as a potential purchaser – lacks standing to object to the Motion.  To the extent NexPoint asserts standing based upon its post-confirmation acquisition of certain disputed employee claims, such standing is tenuous at best and should be viewed through that lens.

5.      Even assuming NexPoint has standing, its objection to the Motion is frivolous. First, NexPoint's "offer" is contingent and subject to a ten-day "Inspection Period" at the conclusion of which NexPoint would, in its sole discretion, have the option to terminate its agreement to purchase the Property and receive $990,000 of its $1 million earnest money deposit back in full.  NPA PSA, pg. 2; § 5.  That is not an offer; it is a free option.  Second, NexPoint's overarching argument that the Debtor may not take its prior interactions with Mr. Dondero and his related entities into account in determining whether to transact business with them is nonsensical and not supported by the case law.  Actions have consequences.  Mr. Dondero's repeated failure to abide by Court orders and contractual obligations to the estate, unabashed willingness to assert

3

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1705 of 1726 PageID 13026
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 4 of 11

frivolous positions and initiate baseless lawsuits,[4] and his documented history of litigiousness[5] provide ample support for the Debtor's decision not to engage with Mr. Dondero or any of his related entities in the sale of the Property.

6.      As set forth in the Motion and as will be demonstrated in connection with the hearing on the Motion, the risks associated with selling the Property to Mr. Dondero or his related entities are not present in the transaction with the Purchaser. NexPoint's argument that both transactions are "apples to apples" ignores (a) the fact that NexPoint's offer is contingent on NexPoint's inspection of the Property and (b)(i) the closing risk, (ii) the risk of potential post-sale litigation if the Debtor transacts with Mr. Dondero, and (iii) the risk that if – for whatever reason – NexPoint does not close, the Purchaser will no longer be willing to complete the transaction, let alone on the terms negotiated. One need look no further than the years of litigation that caused the Debtor's chapter 11 filing and Mr. Dondero's conduct during the case to conclude that ***any*** commercial transaction with Mr. Dondero presents material risk. The Court should overrule the Objection and grant the Motion.

---

[4] In fact, in just the few weeks since the Debtor was last before this Court, Mr. Dondero has commenced two new actions against the Debtor that lack factual or legal support and that otherwise make no rational sense to pursue given Mr. Dondero's highly speculative and remote economic interest in the Debtor's estate.

***First***, on July 22, 2021, Mr. Dondero, again through his attorneys at Sbaiti & Co. ("Sbaiti"), filed an action in the Northern District of Texas using the Charitable Donor Advised Fund, L.P. (the "DAF Complaint"). *Original Complaint, The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Cause No. 3:21-cv-01710-N (N.D. Tex. July 22, 2021). The DAF Complaint alleges that the DAF is a limited partner in the Highland Multi-Strategy Credit Fund ("Multi-Strat") and asserts claims against the Debtor for mismanagement of Multi-Strat during the pendency of this Bankruptcy Case. The DAF Complaint is essentially verbatim the complaint filed in the Northern District of Texas by the Sbaiti firm on behalf of Mr. Dondero's family trust, the Dugaboy Investment Trust. As this Court will remember, that complaint was duplicative of the proof of claim (Claim No. 177) filed by Dugaboy in this Court and was withdrawn within an hour after it was brought to this Court's attention.

***Second***, also on July 22, 2021, Sbaiti, again on behalf of the DAF, initiated an action in Texas state court for pre-suit discovery against the Redeemer Committee alleging, among other things, that the Redeemer Committee's transfer of its claim was in furtherance of a scheme concocted by James P. Seery, Jr., the Debtor's Court-approved chief executive officer and chief restructuring officer, to drain the estate of resources. *Verified Petition to Take Deposition Before Suit and Seek Documents, In re James Dondero*, Cause No. DC-21-09534 (Tex. July 22, 2021).

[5] A chart showing the litigation caused, directly and indirectly, by Mr. Dondero since October 2020 is attached hereto as Exhibit A.

DOCS_NY:43784.7 36027/002

APPX. 10827

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1706 of 1726    PageID 13027
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 5 of 11

### THE COURT SHOULD AUTHORIZE THE DEBTOR TO EXERCISE ITS MANAGEMENT RIGHTS TO CAUSE MAPLES TO SELL THE PROPERTY TO THE PURCHASER

**A.**    **NexPoint Lacks Standing to Object to the Motion**

7.    NexPoint filed two proofs claim in this case (Claim Nos. 104 and 108) which were later expunged [Docket No. 1233].  NexPoint, however, holds prepetition claims against the estate after acquiring them from five former Debtor employees (acquisitions done solely to manufacture standing to object to the Plan).[6]  The Debtor has objected to each of these claims and believes that they are frivolous [Docket No. 2059].  A hearing on those objections is scheduled for November 15, 2021.

8.    Consequently, NexPoint's standing to object to the Purchase Agreement as a prepetition creditor is extremely attenuated as its chances of recovery in this case are, at best, theoretical and speculative.  *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing).

9.    Further, any claim made by NexPoint that it has standing to object to the sale of the Property as a potential bidder also fails.  *In re VCR I, LLC*, 2017 Bankr. LEXIS 3341, at *12 (Bankr. S.D. Miss. Sept. 29, 2017) ("This Court has previously held that a prospective purchaser does not have standing to object to a sale motion."); *see also Squire v. Scher (In re Squire)*, 282

---

[6] One of NexPoint's "claims," acquired from Michael Beispiel, is not a claim at all.  Mr. Beispiel did not file a proof of claim nor was Mr. Beispiel's claim scheduled.  Any alleged prepetition claim that Mr. Beispiel might have had is therefore barred.  *See Order Establishing Bar Dates for Filing Claims and (ii) Approving the Form and Manner of Notice Thereof* [Docket No. 488] ("Any entity that is required to file a Proof of Claim Form but fails to [do] so properly by the applicable Bar Date, shall not be treated as a creditor with respect to such claim for purposes of voting upon, or receiving distributions under, any chapter 11 plan in this case.").

DOCS_NY:43784.7 36027/002

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1707 of 1726 PageID 13028
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 6 of 11

Fed. Appx. 413, 416 (6th Cir. 2008) ("Frustrated Bidders do not have standing to object to the sale

of a property"); 3 COLLIER ON BANKRUPTCY ¶363.02[c] (same).

10.    Finally, Mr. Dondero initially offered to acquire the Property through NPRE,

another of his related entities. NexPoint only submitted its "offer" after the Motion was filed. The

Debtor believes that Mr. Dondero is causing NexPoint, rather than NPRE, to object because Mr.

Dondero recognizes that NPRE has no standing as a prepetition creditor[7] and that NexPoint's

standing arguments (although flimsy) are better. These shell games highlight Mr. Dondero's

coordination of the efforts amongst his related entities.

**B.    The Debtor's Good Faith Decision Not to Engage Mr. Dondero or His Related Entities in Connection with the Sale of the Property Was Justified and a Proper Exercise of the Debtor's Business Judgment**

11.    As discussed in the Motion, section 363(b) of the Bankruptcy Code provides, in

relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). As set forth in Rule

6004(f)(1), sales under 11 U.S.C. § 363(b) can be conducted by "private sale or by public auction."

Although the Bankruptcy Code does not include a statutory standard for determining when the use

or sale of property should be authorized, it is well-established that a debtor may use or sell property

of the estate outside the ordinary course of business if there is a good business reason for doing so

and the proposed course of action is advantageous to the estate. *See, e.g.*, *Black v. Shor (In re BNP*

*Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Pisces Energy, LLC*, 2009 Bankr.

LEXIS 4709, at *18 (Bankr. S.D. Tex. Dec. 21, 2009).

12.    To challenge the Debtor's business judgment, NexPoint cites to case law for the

---

[7] NPRE filed one proof of claim (Claim No. 146), which seeks to novate a limited liability corporation agreement because NPRE believes that there was a mutual mistake in the drafting of such agreement. The Debtor believes NPRE's claim is frivolous and has objected [Docket No. 1673].

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1708 of 1726 PageID 13029
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 7 of 11

unremarkable proposition that the goal of any sale is to maximize the proceeds to the estate.[8]
Objection ¶¶ 9-10 (citing *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764 (Bankr. D. Del.
Aug. 15, 2007); *In re Walker County Hosp. Corp.*, 2021 U.S. App. LEXIS 20610 (5th Cir. July
12, 2021)).[9] The Debtor agrees and believes that the process overseen by the Debtor for the sale
of the Property did just that: a sale of the Property to Purchaser has maximized value. NexPoint
cites no cases – and the Debtor believes none exist – for the proposition that the Debtor must agree
to include any party in a sale process and choose the nominally highest bid regardless of other
circumstances that exist.

13. Under 11 U.S.C. § 363(b), a Debtor is tasked with finding the highest ***and best***
offer, not just accepting the offer that is nominally a higher dollar amount on paper. *See, e.g.,*
*Cadle Co. v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010)) (a trustee "must demonstrate
that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a
lower bid in the presence of sound business reasons, such as substantial doubt that the higher bidder
can raise the cash necessary to complete the deal"); *In re Tresha-Mob, LLC,* 2019 Bankr. LEXIS
13333, at *4-6 (Bankr. W.D. Tex. 2019) ("Voltaire adopts a one-track value-maximization
argument that ignores the mountains of precedent in which trustees, debtors-in-possession, and
courts have rejected the highest bid when it was not the 'best bid'");[10] COLLIER ¶ 363.02[4]

---

[8] NexPoint also alleges, without factual support, that NexPoint's "participation in the sale process has resulted in
incremental estate recoveries." Objection ¶ 5. This is not true. Neither NPRE's nor NexPoint's "bids" were shown
to any other bidder. They were received after a deal had been reached with Purchaser and simply did not factor in to
the agreed upon purchase price.

[9] Although *Walker County* has general language in *dicta* concerning 11 U.S.C. § 363(b), that case does not address
the requirements of section 363(b) at all. Instead, *Walker County* deals with whether an appeal is statutorily moot by
reason of 11 U.S.C. § 363(m).

[10] In *Treshe-Mob* the bankruptcy court rejected NexPoint's premise that the highest bid is always the best bid:
   Here, the objection that Voltaire seeks to pursue is not "colorable." In its *Limited Objection*, Voltaire
   adopts a one-track value-maximization argument that ignores mountains of precedent in which trustees,
   debtors-in-possession, and courts have rejected the highest bid when it was not the 'best bid.' *See In re*
   *Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015)* ("a debtor must demonstrate that the
   proposed purchase price is not only the highest offer, ***but the highest and best offer***") (emphasis added).

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1709 of 1726 PageID 13030
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 8 of 11

("Although a trustee normally would be expected to sell to the highest bidder in an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale.").

14. *In re 160 Royal Palm*, a case from the District Court for the Southern District of Florida which was affirmed by the 11th Circuit, presented a strikingly similar fact pattern to this case. 600 B.R. 119 (S.D. Fla. 2019), *aff'd* 785 Fed. App'x 829 (11th Cir. 2019). In *160 Royal Palm*, the Debtor attempted to sell an asset at public auction. That auction failed in substantial part because of the constant barrage of litigation brought by the property's former owner. *Id.* at 124. Ultimately, the Debtor entered into a private sale and sought bankruptcy court approval. The former owner objected arguing it was "an abuse of discretion to eliminate other potential bidders from the sale," which included, of course, the former owner. *Id.* at 127. The bankruptcy court rejected that argument, and the district court affirmed, stating "private sales are not unheard of in bankruptcy proceedings" and, in part because the offer was conditioned on a private sale, the Debtor was entitled to pursue a "bird in hand" approach and sell the asset without competing bids. *Id.* at 128.

15. In so ruling, the District Court also rejected the unsolicited bid made by the former

---

While the bid that brings in the most cash often wins, it is "common knowledge" that the "highest bid is not always the best bid," especially if there are "conditions sufficient to overbalance the difference between the two." *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925). The Bankruptcy Code thus affords courts "broad flexibility in determining which of several bidders should be deemed the successful bidder at a *§ 363(b)* sale." *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993). As such, courts routinely reject the proposition that reviewing courts or fiduciaries are "duty-bound to mechanically accept a bid with the highest dollar amount." *Lawsky v. Condor Capital Corp.,* 2015 U.S Dist. LEXIS 96347, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015) (internal quotation marks and citations omitted); *see also After Six, 154 B.R.* at 882 ("The Bankruptcy Code, like any law, must be read in its context as a tool of mankind, not a body of edicts to which mankind is a slave irrespective of its interests to the contrary.").
In determining whether the highest bid is the "best bid," the fiduciary and reviewing court must consider factors such as "the risks associated with each bid and the probabilities that the proposed terms will come to fruition" as well as "contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *Lawsky,* 2015 U.S. LEXIS 96347, 2015 WL 4470332, at *9 (quoting and citing *Family Christian,* 533 B.R. at 622).
*Treshe-Mob*, 2019 Bankr. LEXIS 1333, at *4-6 (emphasis in original).

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1710 of 1726 PageID 13031
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 9 of 11

owner on the property despite that bid being higher. The District Court found persuasive, among other things, the fact that the former owner had defaulted on a prior deal with the Debtor and his documented history of litigiousness:

> While the KKPB offer ostensibly *could* provide the estate with an additional million dollars . . . the Court credits the Debtor's concerns about the uncertainty of that offer. Indeed, the Debtor sought a settlement and sale with KKPB once in the past, which fell through, because KKPB defaulted.
>
> Appellant vigorously argued at oral argument on April 5 that the Debtor should have accepted its higher bid. However, the Court notes that while a debtor has a duty to "maximize the return to a bankruptcy estate," which "often does require [the] recommendation of the highest monetary bid, *overemphasis of this usual outcome overlooks a fundamental truism, i.e., a 'highest' bid is not always the 'highest and best' bid*. The inclusion of 'best' in that conjunction is not mere surplusage." . . . .
>
> Appellant also alleges that Debtor only rejected KKPB's higher offer out of personal animus towards KKPB's owner, Mr. Straub. The Debtor provides a number of explanations for its rejection of the KKPB offer, including, among other things, Mr. Straub's litigiousness. . . .
>
>> Among other things, Mr. Glickstein testified that the potential for about a $1 million increase in the overall sale price was not worth the risk that KK-PB, and its principal, Mr. Glenn Straub, would take action that would greatly increase the costs to the estate. Mr. Glickstein pointed to specific experience with Mr. Straub in this very case to support [his] view that the potential increase in recovery was fair outweighed by the risk of additional litigation. Mr. Glickstein stressed the strength of the purchaser identified in the sale motion. . . .
>
> \*\*\*
>
> On the record before this Court, the Debtor had real concerns about the viability of the KKPB offer for a variety of reasons — including the fear of additional litigation. Though Appellant may characterize this as "animus," the avoidance of litigation is a legitimate business objective. And, Appellant could not provide the Court with a single case where a court disallowed a sale because the debtor had concerns about future litigation.
>
> The Debtor's duty is to maximize value to the creditors, and that maximization includes considerations such as finality, stability, and expeditious resolution of the bankruptcy proceeding. The LR offer, although 2.5% lower than the KKPB offer, provided that finality and stability. When asked by the Court at oral argument, Appellant could provide no other reasons why the KKPB offer constituted the

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23    Page 1711 of 1726    PageID 13032
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 10 of 11

> highest and best offer *other than* the purported one-million-dollar additional benefit
> to the estate.  Thus, to force the Debtor to forego the LR offer and subject itself to
> a public auction would require this Court to inappropriately use its own business
> judgment in place of the Debtor's, which this Court will not do.

*Id.*, at 129-30 (emphasis in original).

16.    *160 Royal Palm* supports the Debtor's position in this case.  On the one hand, the

Debtor has the Purchaser who represents finality and stability.  The Purchaser has conducted its

diligence and, as its inspection period has expired, has no due diligence out, negotiated a purchase

agreement that contemplated a private sale not subject to auction, and is ready, willing, and able

to close.  NexPoint would have the Debtor renege on the commitment to the Purchaser and enter

into a contingent agreement with NexPoint that could be terminated (without material

consequence) in NexPoint's sole discretion.  No reasonable person would terminate an agreement

with the Purchaser and enter into an "agreement" with NexPoint under these conditions.

17.    Moreover, even if the agreements were "apples to apples," NexPoint effectively

insists that the Debtor ignore its prior dealings with Mr. Dondero and his related entities and

disregard their failure to live up to their prior contractual obligations and documented history of

litigation, including more than twenty pending litigation matters in this case alone.  And for what

purpose?  So that the Debtor's estate can theoretically receive $350,000 more in sale proceeds?

The Debtor and the Committee have decided that any theoretical upside in agreeing to sell the

Property to Mr. Dondero or any of his related entities is not worth the risk.  The evidence the

Debtor will submit in connection with the hearing on the Motion will unequivocally demonstrate

that the Debtor's position is justified.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:43784.7 36027/002

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1712 of 1726    PageID 13033
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 11 of 11

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated:  August 3, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
               ikharasch@pszjlaw.com
               jmorris@pszjlaw.com
               gdemo@pszjlaw.com
               hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:43784.7 36027/002

APPX. 108786



Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 1 of 14

# **EXHIBIT A**

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1714 of 1726 PageID 13035
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 2 of 14

# SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION*

## *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

| 9/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] | | |
|---|---|---|---|
| | **Objectors**: Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal has been briefed and the decision is pending. |
| 11/18/20 | *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements* [D.I. 1424] | | |
| | **Objectors**: Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459]. | N/A |
| 11/19/20 | *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course* [D.I. 1439] | | |
| | **Movant**: Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
| 12/8/20 | *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1522] | | |
| | **Movants**: Advisors Funds | Movants argued that the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

**\* The following is by way of summary only and does not include discovery disputes or similar matters. Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact. The Debtor reserves all rights that it may have whether in law or in equity.**

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:23-cv-00726-S    Document 8-23    Filed 12/29/23    Page 1715 of 1726    PageID 13036
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 3 of 14

| 12/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith* [D.I. 1625] | | | | |
|---|---|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal has been briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |

| 1/14/21 | *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* [D.I. 1752] | | | | |
|---|---|---|---|---|---|
| | **Movants**: | Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |

| 1/20/21 | *James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith* [D.I. 1784] | | | | |
|---|---|---|---|---|---|
| | **Objector**: | Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 16 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1716 of 1726   PageID 13037
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21   Entered 08/03/21 12:20:51   Page 4 of 14

| 1/22/20 | **_Objections to Fifth Amended Plan of Reorganization_ [D.I. 1472]** | | | | |
|---|---|---|---|---|---|
| | **Objectors**:[1] | | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | | | |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | **_Application for Allowance of Administrative Expense Claim_ [D.I. 1826]** | | | | |
| | **Movants**: | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | **_NexBank's Application for Allowance of Administrative Expense Claim_ [D.I. 1888]** | | | | |
| | **Movant**: | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., Highland Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1717 of 1726 PageID 13038
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 5 of 14

| 2/8/21 | **James Dondero Motion for Status Conference [D.I. 1914]** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N.A. |
| 2/28/21 | **Motions for Stay Pending Appeal** | | | | |
| | **Movants**: | | The only parties requesting a stay pending appeal were the Dondero Entities. They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| | Dondero [D.I. 1973] | Advisors [D.I. 1955] | | | |
| | Funds [D.I. 1967] | Trusts [D.I. 1971] | | | |
| 3/18/21 | **James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455 [D.I. 2060]** | | | | |
| | **Movants**: | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. The opening brief and the Debtor's response have been filed. |
| | | Advisors | | | |
| | | Trusts | | | |
| | | HCRE | | | |
| 4/15/21 | **Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith [D.I. 2199]** | | | | |
| | **Movants**: | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "UBS") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008. The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293]. The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308]. UBS also filed a reply [D.I. 2310]. The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors appealed the settlement. |

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1718 of 1726 PageID 13039
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 6 of 14

| 4/23/21 | *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders [D.I. 2247]* | | | |
| --- | --- | --- | --- | --- |
| | **Movants**: | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders. The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |
| 4/23/21 | *Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction [D.I. 2242]* | | | |
| | **Movants**: | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | DAF and CLOH have appealed. [D.I. 2513] |
| 4/20/21 | *Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief [D.I. 2229]* | | | |
| | **Movants**: | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility. The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness. Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1719 of 1726 PageID 13040
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 7 of 14

| 4/29/21 | *Motion to Compel Compliance with Bankruptcy Rule 2015.3* **[D.I. 2256]** | | | |
|---|---|---|---|---|
| **Movants:** | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

### *Highland Capital Management, L.P. v. James D. Dondero*, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)

| 12/7/20 | *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* **[D.I. 2]** | | | |
|---|---|---|---|---|
| **Movant:** | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1720 of 1726   PageID 13041
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 8 of 14

| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* **[D.I. 48]** | | |
|---|---|---|---|
| | **Movant:** Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

**Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd.,** Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)

| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* **[D.I. 2]** | | |
|---|---|---|---|
| | **Movant:** Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor has reached an agreement in principle with the Funds and Advisors that settled this matter, and filed its 9019 motion. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1721 of 1726   PageID 13042
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 9 of 14

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.***, **Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)**

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* **[D.I. 2]** |
|---|---|

| **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the injunction was moot. The parties recently entered into a stipulation regarding discovery for the remaining breach of contract claim. This action was consolidated with the Advisors' admin claim since both matters arise from Shared Services Agreements. | N/A |
|---|---|---|---|---|

***Highland Capital Management, L.P. v. James Dondero***, **Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* **[D.I. 1]** |
|---|---|

| **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
|---|---|---|---|---|

| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* **[D.I. 21]** |
|---|---|

| **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. Dondero filed a limited objection to the R&R. | N/A |
|---|---|---|---|---|

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1722 of 1726 PageID 13043
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 10 of
14

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.***, Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)

| 1/22/21 | ***Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1]** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/13/21 | ***Defendants Motion to Withdraw the Reference* [D.I. 20]** | | | | |
| | **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a R&R on July 9 [D.I. 52]. HCMFA filed a limited objection to the R&R. | N/A |

***Highland Capital Management, L.P. v. NexPoint Advisors, L.P.***, Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)

| 1/22/21 | ***Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1]** | | | | |
|---|---|---|---|---|---|
| | **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note. NPA did not pay the note when and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/13/21 | ***Defendants Motion to Withdraw the Reference* [D.I. 19]** | | | | |
| | **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a R&R on July 9 [D.I. 42]. NPA filed a limited objection to the R&R. The District Court adopted the R&R. [D. Ct. Dkt No. 10]. | N/A |

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1723 of 1726 PageID 13044
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 11 of
14

*Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, **Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | <u>Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate</u> [D.I. 1] | | |
|---|---|---|---|
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("HCMS"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 6/3/21 | <u>Defendants Motion to Withdraw the Reference</u> [D.I. 19] | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court issued its R&R on July 15, 2021 [D. I. 52]. HCMS filed a limited objection to the R&R. the District Court adopted the R&R. [D. Ct. Docket No. 5]. HCMS filed a Motion for Reconsideration of the District Court's Order adopting R&R [D. Ct. Docket No. 8]. |

*Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, **Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | <u>Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate</u> [D.I. 1] | | |
|---|---|---|---|
| | **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |

APPX. 108297

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1724 of 1726   PageID 13045
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 12 of
14

| | | | |
|---|---|---|---|
| **6/3/21** | _Defendants Motion to Withdraw the Reference_ **[D.I. 20]** | | |
| **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021.   The Court issued its R&R on July 15, 2021 [D.I. 47]. HCRE filed a limited objection to the R&R [D. Ct. Docket No. 5]. |

**_Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd._, Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)**

| | | | | |
|---|---|---|---|---|
| **4/12/21** | _Original Complaint_ | | | |
| **Movants**: | DAF CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22].   On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26].   Briefing is complete for both motions, and decisions are pending. | N/A |
| **4/19/21** | _Plaintiff's Motion for Leave to File First Amended Complaint in the District Court_ | | | |
| **Movants:** | DAF CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

APPX. 105298

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:23-cv-00726-S Document 8-23 Filed 12/29/23 Page 1725 of 1726 PageID 13046
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 13 of
14

***PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*, Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)**

4/12/21     ***Original Complaint***

| | | | | |
|---|---|---|---|---|
| **Movants**: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous. The Debtor will take all appropriate actions. | The Complaint was recently filed and the Debtor has not yet been served. The Debtor will respond appropriately. | N/A |

***The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)**

6/23/21     ***Original Complaint***

| | | | | |
|---|---|---|---|---|
| **Movants**: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

***The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Case No. 21-cv-01710-N (N.D. Tex. July 22, 2021)**

7/22/21     ***Original Complaint***

| | | | | |
|---|---|---|---|---|
| **Movants**: | Dugaboy | DAF alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. DAF's allegations in the complaint are duplicative of allegations Dugaboy made in proofs of claim filed in the Bankruptcy Court and in its complaint filed in the Northern District of Texas. | The Complaint has not yet been served. The Debtor will respond appropriately. | N/A |

APPX. 08297

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22   Entered 08/15/22 16:45:41    Page 26 of
Case 3:23-cv-00726-S   Document 8-23   Filed 12/29/23   Page 1726 of 1726   PageID 13047
Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21   Entered 08/03/21 12:20:51   Page 14 of
14

*In re James Dondero, Petitioner,* **Cause No. DC-21-09534 (Tex. July 22, 2021)**

**7/22/21**      *<u>Original Complaint</u>*

|  |  |  |  |
|---|---|---|---|
| **Movants**: | Dondero | Dondero seeks pre-suit discovery from Farallon Capital, a purchaser of certain claims in this case, and the Crusader Fund.  Dondero alleges that Farallon breached certain U.S. Trustee requirements when it purchased those claims.   Dondero also alleges that Farallon purchased those claims because of its relationship to Mr. Seery and that Mr. Seery was leveraging his relationship with Farallon to ensure that he remains in control of the Debtor. | The pre-suit discovery has not yet been served.  The Debtor will respond appropriately. |

APPX. 08396